IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| DOUGLAS EDELMAN and DELPHINE LE DAIN, | 1:24-CR-00239 (CKK) |
| Defendants. | |

## GOVERNMENT'S MOTION TO REVOKE DEFENDANT DOUGLAS EDELMAN'S ORDER OF PRETRIAL RELEASE

Pursuant to 18 U.S.C. § 3148, the United States of America, by and through undersigned counsel, hereby respectfully moves the Court to revoke the current Order Setting Conditions of Release ("Order") authorizing the release of Defendant Douglas Edelman ("Edelman") to the Pretrial Services High Intensity Supervision Program. The evidence set forth below and in the declaration of Internal Revenue Service ("IRS") Special Agent Adam Soline ("Decl.," attached hereto as Attachment A) establishes clear and convincing evidence that Edelman has violated the Order setting his conditions of release by contacting his co-conspirators. Based on the factors set forth in 18 U.S.C. 3142(g), there are no conditions of release that will safeguard the community by precluding Edelman from fleeing, further damaging the integrity of these judicial proceedings. There are no conditions or combination of conditions that can prevent Edelman's continuing to flout his conditions of release.

Edelman has shown that even with highly generous conditions of release, he was unable to comply with the order of release. Facing significant prison time, Edelman initiated contact with two of the individuals he has financially supported and relied on for years to further his criminal aims. One of these individuals has a public cooperation agreement with the Government. Given the gravity of Edelman's violation, viewed in context of his crimes, and the danger presented to the integrity of the criminal justice system and Edelman's continued appearance if Edelman is allowed to remain on bond, the Government respectfully requests that the Court issue an Order of Detention.

## I.    Background

A grand jury in the District of Columbia indicted Douglas Edelman and Delphine Le Dain on May 16, 2024. Arrest warrants for both defendants were issued on the same day, but the case remained sealed. Edelman was charged with having perpetrated a yearslong scheme to defraud the United States by pretending that his French wife, Defendant Le Dain, was the founder and original 50% owner of Mina/Red Star, a lucrative defense contracting business that received more than $7 billion of contracts from the U.S. Department of Defense to provide jet fuel in the U.S.'s post-9/11 military efforts in Afghanistan and the Middle East. As part of his scheme, Edelman enlisted numerous co-conspirators to carry out his crimes—which included sending multiple attorneys to make false representations to various arms of the U.S. government. See Indictment, Dkt. 1.

> a. *After Being Arrested in Spain and Transported to the United States, Douglas Edelman was Released to Pretrial Services*

On July 3, 2024, Spanish authorities arrested Edelman in Ibiza, Spain, where he was visiting one of his multiple homes around Europe.  Edelman was presented to a Spanish court, which ordered him detained in Spanish prison until he was surrendered to the U.S. Marshals Service for transport to the United States.

Many defendants arrested abroad and transported to the United States are detained pending trial.  See, e.g., United States v. Jin Guanghua, 23-CR-91 (CKK) (defendant detained after extradition from Australia on charges including conspiracy, bank fraud, and money laundering related to defendant's efforts to procure tobacco products for North Korean entities); United States v. Milomir Desnica, 22-CR-257 (CJN) (defendant detained after extradition from Austria on charges of conspiracy to distribute controlled substance and money laundering); United States v. Sereika Savariau, 21-CR-706 (APM) (defendant detained after extradition from Jamaica on charges including wire fraud, conspiracy to commit wire fraud, and aggravated identity theft); United States v. Georgy Kavzharadze, 21-CR-257 (CKK) (Russian national detained after being extradited to the United States for selling stolen identities and financial information on the dark web).

Edelman has been charged with orchestrating one of the largest tax evasion schemes in United States history.  He has several grown children in the United States but has remained outside the country for several decades and has previously evaded service of a Congressional subpoena

requiring his appearance and testimony.[1]   Nevertheless, despite these factors, the Government negotiated proposed conditions of release to secure Edelman's continued appearance, even after Edelman signaled that he would refuse to post a bond.

On September 3, 2024, Magistrate Judge Moxila A. Upadhyaya entered an Order Setting Conditions of Release and releasing Edelman to Pretrial Services in the High Intensity Supervision Program.  The conditions in the Order, which Edelman acknowledged on the record, were:  (1) an unsecured bond of $12,900,000, (2) surrender of all passports; (3) residence at the stated address in Alexandria, VA, with home detention conditions and GPS monitoring; (4) permission to leave his apartment between 9 a.m. and 11 a.m. each day subject to a one-mile radius, and between 11 a.m. and 1 p.m. to be on the apartment premises; (5) permission for the defendant to otherwise leave his residence only for medical and legal appointments and court appearances, and a prohibition on the defendant leaving the D.C. area without prior approval by Pretrial Services and an order from the Court; and (6) prohibition on the defendant leaving the United States.  The Order also provided that "[e]xcept for his wife, Delphine Le Dain, [Edelman] shall have no direct contact (other than contact through legal counsel) with the co-conspirators named or identified in the Indictment."  Dkt. 16 at ¶ 7(g).  The government sent Edelman's counsel a letter identifying all co-conspirators named in the Indictment on September 26, 2024.

---

[1] See Mystery at Manas, December 2010 Report of the Majority Staff on the Subcommittee on National Security and Foreign Affairs, Committee on Oversight and Government Reform, House of Representatives, available at Mystery at Manas: Strategic Blind Spots in the Department of Defense's Fuel Contracts in Kyrgyzstan. Report of the Majority Staff, 3, 10-11, n.37.

   *b. Defendant Contacted Co-Conspirators in Direct Violation of His Conditions of Release*

On November 18, 2024, the Government received copies of WhatsApp messages Edelman sent to the individual identified in the Indictment as Co-Conspirator 3, "[Edelman's] longtime friend and business associate, a U.S. national, who worked for various of [Edelman's] business ventures, including his music television franchise in Eastern Europe."[2]  Dkt. 1 ¶ 8(c).  The messages, received from Co-Conspirator 3's counsel, are attached as Exhibit 1 to the Soline Declaration.

On November 20, 2024, the Government received screenshots of Signal messages Edelman sent to an individual identified as Co-Conspirator 4 in the Indictment, "[Edelman's] longtime friend and business associate, a dual U.S. and Irish national, who helped [Edelman] invest his profits from Mina/Red Star in a way that would hide [Edelman's] control of the money."  Dkt. 1, ¶ 8(d).  The screenshots, received from Co-Conspirator 4's counsel, are attached as Exhibit 2 to the Soline Declaration.

Both sets of messages were sent using applications (WhatsApp and Signal) that are end-to-end encrypted, meaning that no one other than the sender and recipient—not even the service provider—can access the content of the messages while they are being transmitted or stored.  Decl. ¶ 25.

---

[2] Co-Conspirator 3 has not yet been charged with any crimes, and there are currently no public proceedings regarding his status with the Government.  As such, even though his identity has been revealed to the Court and to Pretrial Services, the Government will refrain from using his name in this filing.

1.   <u>Edelman's WhatsApp message to Co-Conspirator 3</u>

The messages received by the Government show that on October 12, 2024, Edelman sent a WhatsApp message to Co-Conspirator 3: "Hi. Hope you're good!! I'm fine. Joe [believed to be Edelman's son] and I watching Detroit v. guardians !! We send a big abrazo!! Go Tigers".  Decl. Exh. 1.  The WhatsApp message did not relay any instructions or promise any benefits, but the previous message from Edelman (sent prior to Edelman's indictment) asked about Co-Conspirator 3's wife and kids, then referred to being "banned from being friends and talking even" and asserted "[h]ard to believe the power behind a govt and constitution that supposedly provided rights instead of fear and forgot about innocence until proven guilty .. And to take almost 4 years and destroying countless lives in the meantime.. Anyway, let me know if you ever want to rap." <u>Id.</u>  Not only did Edelman initiate communications with Co-Conspirator 3 in direct violation of his conditions of release, but the context of his message implies that he is willing to have further communications.

As set forth in the Soline Declaration, Co-Conspirator 3 was intimately involved in Edelman's alleged scheme: he ran various of Edelman's businesses for over a decade, and engaged in various efforts to make it appear that Le Dain was the actual owner. Decl. ¶¶ 5-8. Conspirator 3 was present on multiple occasions where Edelman admitted that he was in control and spent significant energy removing his name from his companies.  <u>Id.</u>  Edelman also advised Co-Conspirator 3 to put his salary in his wife's name, and explained that Le Dain had no idea about Edelman's true finances.  <u>Id.</u>, ¶ 7(a) ("She just has to abide.").

In addition, the Soline Declaration explains how Co-Conspirator 3 was financially reliant on Edelman.  Decl. ¶¶ 10-12.  Edelman had promised Co-Conspirator 3 equity in his Mexican land and infrastructure investments: this equity promise, potentially worth millions, was done verbally

by Edelman, with no written agreement.   In 2020, Co-Conspirator 3 told a family member that he had "too much tied up with [Edelman] to bail" because there had been so many equity promises. Decl. ¶ 12.

2.  Edelman's Numerous September-October 2024 Signal Messages to Co-Conspirator 4

The order setting the conditions of release was issued on September 3, 2024.   The information received by the Government shows that mere days later, starting on September 7, 2024 and continuing through at least late October, Edelman sent numerous messages to Co-Conspirator 4 using Signal, an end-to-end encrypted messaging application, which allows users to set their messages to delete immediately or after a period of time.   Decl. ¶ 25.

Co-Conspirator 4 is Robert Dooner, who has pleaded guilty to evading individual income taxes on profits he made from Ifone-Neda, a joint venture with Edelman and others providing internet services to U.S. military personnel and contractors at Kandahar Airfield in Afghanistan. See Statement of Offense, United States v. Robert Dooner, 23-CR-314 (CKK), Dkt. 12.  Edelman owned 40% of Neda, the Afghan component of the joint venture, see Indictment ¶ 15(h), and funded Neda with his profits from Mina/Red Star, Statement of Offense ¶ 2, United States v. Robert Dooner, 23-CR-314 (CKK), Dkt. 12 (referring to Edelman as "Individual-1" and Mina/Red Star as "Company-1").   Dooner has entered into a public cooperation agreement with the Government.   Plea Agreement, United States v. Robert Dooner, 23-CR-314 (CKK), Dkt. 12.

Given these public proceedings, and the materials Edelman has received in discovery, Edelman has long been on notice that Dooner will be a witness against him at trial.[3]

The messages begin on September 7, 2024 with Edelman telling Dooner about his living conditions as a defendant on bond. Decl. Exh. 2. Edelman told Dooner it was a "Good thing I can finally work from here on all the trust and biz [sic] matters." Id. Edelman continues:

> I know we can't talk abt [sic] the 'case' but we can talk about all and anything else! Seems I'll be here for 12-18 months to work through things and prepare defense and whatever else we may work on between now and any trial which seems more likely 18months [sic] away.

Edelman continued by explaining to Dooner the perks of being a defendant on bond:

> And yes I have freedom to leave flat etc within certain hours etc but otherwise am here. Nice highrise 22nd floor great views and light. Tv gets 300 channels, strong internet etc.. It's a big 2 bed and people can stay too etc . . . Must say last 2 months and [sic] adventure and I wrote a lot and read and have loads of stories from that experience !!

Id.

The messages were not just personal in nature. As explained in the Soline Declaration, Edelman had promised Dooner shares of a technology company named Palantir. Decl. ¶¶ 18-21. These shares were held on Dooner's behalf by the trust overseeing Edelman's assets, overseen by a trustee in Switzerland. The shares were most recently in a bank account at CBH Bahamas in the name of a nominee entity named Satellite Support Services Ltd. which is an entity within the trust structure. Id. On September 9, Dooner asked Edelman for help getting the valuable Palantir shares: "Im [sic] literally on fumes and pal[antir] is all I have. Not to mention my family [sic]

---

[3] Edelman's counsel acknowledged at the November 27th hearing that Dooner was a likely witness at Edelman's trial.

about to kill me for their shares." Decl. Exh. 2, p. 4. Edelman responded, "Seems we should not communicate at all," but then promised that he would check with two of his financial advisors. Id. at 5. Edelman told Dooner that he "[p]ushed this many times and brick wall everytime!!" Id. Dooner asked Edelman if they are not allowed to communicate, and Edelman admitted: "Not really they say!! Makes no sense to me as long as [sic] discuss other things (… or need George [Clarke] or someone on the calls (( just listening etc…" Id.

Dooner did not initially respond. Then, three days later on September 12, Edelman reached out to say "Hi. Trying to see what can be done re pal[antir]". Id. at 6. When Dooner said that "*any* help with pal would be awesome. I'm pretty much out of cash from end of Oct," Edelman replied, "Re pal understand." Id.

A week later, on September 19, Edelman reached out to Dooner and falsely stated, "We can communicate on practical things I think. What's new with AS ?" Id. at 7. As explained in the Soline Declaration, Edelman is asking Dooner the status of his investment in AS, a technology company in which he invested millions of dollars. Decl. ¶ 24. Edelman and Dooner then discussed the AS investment, with Edelman noting he hopes Jo – the trustee who nominally holds the investment – is "not involved as she hasn't a clue" and "adds nothing and silly she's even involved like that !! Crazy really." Decl. Exh. 2, p. 8.

On October 5, Edelman again told Dooner: "Hopefully palantir gets sorted. I see way up since even last month's! [sic] Hopefully some changes soon somehow as trust is just horrible overall !" Id. at 9. Edelman and Dooner continued discussing CBH. Id. at 10. On October 17, when Dooner complained about the trustee Joanne not responding to him while he was trying to

get his millions of dollars of shares out of CBH, Edelman said that "She needs to be replaced . . . Will keep you posted." Id. at 12.

On October 22, Edelman set his Signal messages to automatically disappear after one day. Id. This was the same day on which his co-conspirator wife was slated to travel to the United States to self-surrender but instead skipped her flight and fled to France. Status Report as to Defendant Delphine Le Dain, Dkt. 34. According to Dooner, Edelman kept sending him additional encrypted disappearing messages over Signal since October 22. Decl. ¶ 8. On or about November 11, 2024, Dooner received the Palantir shares. Decl. ¶ 23.

      c.   *After Learning of Edelman's Initial Violation, Pretrial Services Asked for Judicial Intervention*

On November 19, 2024, the Government provided Pretrial Services with Edelman's WhatsApp message to Co-Conspirator 3. Pretrial Services then filed a Pretrial Violation Report citing the violation of Edelman's conditions of release and asking for judicial intervention. Dkt. 39. The Court set a hearing on the violation for November 26, 2024. [4] The Government subsequently provided Pretrial Services and the Court with Edelman's Signal messages to Dooner.

At the November 27, 2024 hearing, Edelman conceded that he had violated his conditions of release by contacting two of his co-conspirators. See November 27, 2024 Minute Entry. The Government proffered additional facts showing the significance and gravity of the violation. After contemplating whether there were conditions sufficient to protect the integrity of the proceedings going forward, and concluding there were not, the Government moved for detention. The Court

---

[4] The Court initially set the hearing for 9 am on November 26, 2024, but at the request of Edelman's counsel, the hearing was rescheduled to 2 pm on November 27, 2024. See November 21, 2024 Minute Entry; November 22, 2024 Minute Entry.

requested that the Government file a written motion and supporting affidavit, with a chance for

Edelman to respond, and scheduled a hearing for December 11, 2024, at 9:00 a.m.  Id.

## II.    Legal Standard

"The Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq., permits the revocation of release

and an order of detention for a person who has been released under 18 U.S.C. § 3142 and has

violated a condition of that release."  United States v. Addison, 984 F. Supp. 1, 2 (D.D.C. 1997).

Section 3148 provides that a court:

> . . . shall order an order of revocation and detention if, after a hearing, the judicial officer—
>
> (1)     finds that there is—
>
> (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
> (B) clear and convincing evidence that the person has violated any other condition of release; and
>
> (2) finds that—
>
> (A) based on the factors set forth in [18 U.S.C. § 3142(g)], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
> (B) the person is unlikely to abide by any condition or combination of conditions of release.

The Government's motion here is based on Section 3148(b)(1)(B), which requires clear

and convincing evidence that Edelman violated a condition of release.  The parties agree that this

showing has been made.

The issue before the Court is the statute's second provision, 3148(b)(2).  Under Section

3148(b)(2)(A), the inquiry is whether, based on the factors set forth in 18 U.S.C. § 3142(g)—the

factors to be considered in setting conditions of release—there is any condition or combination of

conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community.  The factors to be considered under § 3142(g) are "(1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and serious of the danger to any person or the community that would be posed by the person's release"  <u>See, e.g.</u>, <u>United States v. Maucha</u>, No. 21-CR-322, 2023, WL 4131016, at *2  (D.D.C. June 22, 2023) (citing Section 3148 and considering the Section 3142 factors to ultimately revoke bond for a defendant who lied to Pretrial Services about his immigration status).

The safety of the community, as contemplated in section 3148, includes harm to the administration of justice and harm to the integrity of the courts—dangers that are entitled to the full protection of the Bail Reform Act.  <u>See</u> <u>United States v. Manafort</u>, No. 17-CR-201, Dkt. 328 (D.D.C. June 15, 2018).

Section 3148(b)(2)(B) provides for an alternative basis for revocation—where the defendant is unlikely to abide by the condition or combination of conditions imposed by the Court. Courts have found that violation of a release condition that prohibits the defendant from contacting witnesses is sufficient to support a conclusion that the defendant is unlikely to abide by the conditions of release.  <u>See, e.g.</u>, <u>United States v. Aron</u>, 904 F.2d 201 (5th Cir. 1990) (defendant's unapproved visit to witness constituted a willful and knowing violation sufficient to warrant 3148(b)(2)(B) finding).

### III.    Argument

#### a.  Clear and Convincing Evidence Establishes that Defendant Douglas Edelman Has Violated his Conditions of Release

The evidence set forth in Special Agent Soline's declaration—particularly paragraphs 3, 4, and 25-28—show that Edelman contacted Co-Conspirator 3 and Dooner in direct contravention of the Order that he not make direct contact with his co-conspirators.  Edelman's counsel agreed on the record that this element is satisfied.  November 27, 2024 Minute Entry. Therefore, the Court must enter an order of revocation and detention if either (1) there is no combination of conditions that will assure that Edelman will not flee and prevent him from posing a danger to the community based on the 3142(g) factors; or (2) Edelman is unlikely to abide by any condition or combination of conditions of release. Here, both are true.

#### b.  The 3142(g) Factors Counsel in Favor of Revocation

##### 1.  Nature and circumstances of the offense

Edelman is alleged to have orchestrated one of the largest ever tax evasion schemes. Specifically, Edelman evaded taxes on more than $350 million of income, causing an estimated tax loss to the U.S. Treasury of more than $129 million. He did so by taking elaborate steps to conceal his identity as the owner and founder of Mina/Red Star, including directing the creation of shell and nominee entities, backdating documents, lying to attorneys, lying to the United States, and directing numerous co-conspirators around the world to carry out his scheme.  At least two of these co-conspirators—Co-Conspirator 3 and Dooner—received promises from Edelman of significant financial benefits.  Decl. ¶¶ 10-12, 16, 18, 19, 23.  These circumstances raise a serious concern that Edelman has the knowledge and ability to use elaborate steps to apply his "skills" to

13

these judicial proceedings—either to obstruct justice or to flee and evade prosecution in these proceedings.  United States v. Otunyo, No. 18-251, 2020 WL 2065041, at *4 (D.D.C. Apr. 28, 2020) (circumstances where defendant had practice using false identification documents, creating shell companies, and recruiting others to assist in his fraudulent schemes weighed in favor of revoking bond).

The penalties set by Congress and the recommended sentences under the Sentencing Guidelines underscore the seriousness of Edelman's actions.  Edelman is charged with 30 felony offenses and faces statutory maximum criminal sentences of five years on Count One, five years on each of Counts Two and Three, five years each on Counts Four through Eighteen, and ten years each on Counts Nineteen through Thirty.  See 18 U.S.C. §§ 371, & 1001, 2; 26 U.S.C. § 7201; 31 U.S.C. §§ 5314 & 5322.  Under the Sentencing Guidelines, if convicted on all counts, Edelman would have a base offense level of 30.  With likely adjustments for having used sophisticated means, obstructed justice, and been a leader/organizer of criminal activity involving five or more participants, the Government estimates Edelman's adjusted offense level would be 38, corresponding to a sentencing exposure of 235-293 months.  The realistic possibility of Edelman's substantial term of imprisonment incentivizes—and, indeed, appears to have induced—desperate measures, such as witness tampering or flight, and weighs in favor of revoking bond. See Maucha, 2023 WL 4131016, at *4 (citing Otunyo, 2020 WL 2065041, at *4, and concluding that the substantial term of imprisonment defendant faced weighed in favor of revoking bond).

### 2.  Weight of the evidence

The second factor to be considered, the weight of the evidence, also weighs in favor of detention. The Government's case-in-chief at trial will include a litany of evidence from witnesses,

documents, and statements by Edelman himself proving that Edelman was the true co-founder and owner of Mina/Red Star from the business's formation, and that he received and controlled the resulting profits.

For example, the Government anticipates that Individual A[5] will testify that Edelman was his business partner and 50% owner of Mina/Red Star from the company's inception.  As shown in the Indictment, this testimony will be corroborated by, among other evidence, (1) original bank documents and/or emails identifying Edelman as a beneficial owner of Red Star Enterprises Limited, Dkt. 1 ¶¶ 24(a-b), 28; (2) documents describing Edelman as the beneficial owner of Bartol and Aspen Wind, the nominee entities used to create and fund Mina/Red Star, ¶ 18; and (3) documents edited by Edelman that described his having set up Aspen Wind and Bartol to "control his various worldwide trading activities and to provide the funds for investment in new ventures," ¶ 29.  Furthermore, evidence and witness testimony will demonstrate that Edelman largely held himself out as the co-founder and owner of Mina/Red Star in the early years of the business's operation but avoided paying U.S. taxes by simply not filing U.S. tax returns.  But over time simply failing to file was not enough to conceal his increasing untaxed income.  In 2008, in order to avoid being disclosed to U.S. law authorities as the beneficiary of a Swiss bank account, Edelman moved funds—including millions of dollars in profits from Mina/Red Star—to a new bank account in Singapore held by a foundation.  In 2010, when a Congressional Subcommittee began investigating Mina/Red Star's contracts with the Department of Defense and asking questions about the company's ownership, Edelman began taking steps to rewrite the story of Mina/Red Star's

---

[5] Individual A is identified in the Indictment as a Kyrgyz national with whom Edelman founded Mina/Red Star.

formation.  See id. ¶¶ 16-37.  The Government anticipates that Co-Conspirator 1 will testify that around that time, the standing order for all individuals involved in Edelman's business affairs was to make sure that Edelman was not listed on paper as an owner of any of his assets or business ventures.  As excerpted in the indictment, Edelman sent Co-Conspirator 1 an email in May 2010 stating that he "want[s] and need[s] [his] name OFF of everything."  Id. ¶ 56(d).  Two months later, Co-Conspirator 1 was instructed by Edelman to create backdated shareholding agreements and nominee agreements showing that his wife, Le Dain, was the 50% owner of Mina/Red Star. Id. ¶ 56(e).

Edelman would go on to spend the next decade telling his lawyers, banks, and the U.S. government that his wife was the founder and co-owner of Mina/Red Star, that all of the assets were hers, and that he owned nothing.  But while that was the public party line, the Government's case will also include evidence about what Edelman was saying to his friends in private.  This includes a 2012 email from Edelman to Co-Conspirator 3 advising Co-Conspirator 3—a U.S. citizen—to route his salary through his foreign wife and stating, "A man is wise to deal with his finances in his own way with talking to women.  Delphine really never had a clue abt [sic] what I earned or didn't and even sometimes what I did.  I always felt it better that way.  But then that [sic] just my way .. She just has to abide."  Decl. ¶ 7(a).  The Government's evidence also includes a 2018 recorded conversation where Edelman is discussing some of the investments "[he] funded . . . a hundred percent" and stated, "I spend my, all of my time trying to make sure my name isn't in anything."  Decl. ¶ 7(b).

The referenced testimonial, documentary, and recorded evidence is just a small sampling of the Government's case, but it demonstrates that the strength of the evidence weighs heavily in favor of detention.

        3.      <u>History and characteristics of the defendant</u>

Edelman's history and characteristics demonstrate that he poses a significant risk of flight and threatens to undermine the integrity of the proceedings.

First, on the issue of flight, Edelman is a 71-year-old man of substantial means who has not lived in the United States since at least the 1990s. He has no job and zero ties to the community; he has maintained residences, at least until recently, in Spain, Portugal, Austria, the United Kingdom, and Switzerland. He is not under the oversight of a third-party custodian. His three youngest children live abroad; his older children are scattered about the country and do not live in the area. His co-defendant wife is a fugitive believed to be living in France. He has substantial assets and international contacts abroad. As demonstrated by his recent messages with Dooner, he continues to have significant communications with many of these contacts.

Furthermore, Edelman has spent much of his life effectively avoiding detection by the U.S. government, namely the IRS, through lies and deceit. He has the means and skills necessary not only to flee the District of Columbia and the United States, but also to live comfortably and evade capture in foreign jurisdictions. These characteristics demonstrate a substantial risk of flight. <u>See United States v. Anderson</u>, 384 F.Supp.2d 32, 36 (D.D.C. 2005) (finding a defendant's history and characteristics in a tax evasion case weighed in favor of detention based on the defendant's "substantial assets abroad; his connections overseas; . . . his lack of ties to the District of Columbia; and his persistent deceitfulness . . . in his dealings with

the government).

Edelman's history has also proven that he poses a potential danger to the administration of justice.  He previously defied a subpoena from Congress.  He exploited a network of highly respected lawyers to convey false information to Congress, the IRS, and the Department of Justice.  He has backdated documents, induced false affidavits, and filed numerous false tax returns.  And now, he has knowingly violated a court order, using two different end-to-end encrypted messaging applications to contact potential witnesses and co-conspirators.  Edelman has gone to extreme lengths in the past to protect his assets, and his actions in the past and already while on release in this case should give the Court pause as to the lengths he may go to in the future to protect both his assets and his liberty.

    4.       <u>Nature and seriousness of the danger posed by release</u>

In <u>United States v. Manafort</u>, Judge Jackson recognized that "danger" under the Bail Reform Act does not just apply to the "typical varieties of harm . . . such as dangerous substances being peddled on the street, or the unlawful possession of firearms." 17-CR-201 (ABJ), Dkt. 328 at 17.  Both harm to the administration of justice and to the integrity of the courts are "entitled to the full protection of the Bail Reform Act."  <u>Id.</u>

Here, Edelman grew wealthy on the backs of the American taxpayers in the post-9/11 war effort, only to engage in a decades-long scheme to evade paying his own taxes. The public has great interest in the fair administration of justice in this case. And as the Court noted at the November 27, 2024 proceeding, Edelman's conduct—at the very least—tiptoes the line of witness tampering. Edelman has spent a lifetime flouting the rules to his financial advantage and has already in this case knowingly violated a court order. If past is prologue, the risk that he will

attempt to obstruct justice or flee is high, and this factor also weighs in favor of detention.

    *c. Edelman is unlikely to abide by any condition or combination of conditions of release*

An alternate basis for revocation of Edelman's pretrial release is that he is unlikely to abide by any condition or combination of conditions of release.  <u>See</u> 18 U.S.C. § 3148(b)(2)(B). Edelman's contacts with Co-Conspirator 3 and Dooner were knowing and willful, as the messages themselves reveal.  Edelman was made aware of the conditions of release by Pretrial Services and the Court at his initial appearance.  Nonetheless, he reached out to co-conspirators on multiple occasions since his initial appearance on September 3, 2024, each occasion constituting a violation of the pretrial release order.  The Government discovered this not because he had self-reported to Pretrial Services but because counsel for the co-conspirators provided the messages to the Government.  Decl. ¶¶ 3-4.

Moreover, the contacts with Robert Dooner—whose cooperation is public and known to Edelman—are particularly troubling.  As noted above, Dooner had and has significant financial ties to Edelman.  After his initial appearance, the defendant aided Dooner in obtaining possession of his and his family's Palantir shares, worth millions of dollars, which Dooner ultimately received on or about November 11, 2024.  The receipt of these shares meant the difference between poverty and wealth for Dooner, a fact surely not lost on neither him nor Edelman.  In other words, Edelman's contact with Dooner not only violated the Court's release Order but constituted conduct having the capability of influencing Dooner's testimony.  *Cf.* 18 U.S.C. § 1512(b)(1) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—(1) influence, delay, or prevent the testimony of any person in an official proceeding . . . shall be fined under this title

or imprisoned not more than 20 years, or both.").  Because Edelman took these actions while under supervision and under a Court Order expressly prohibiting such conduct, this Court cannot have confidence that any release conditions will prevent Edelman from engaging in future efforts to tamper with witnesses.

And there are not any conditions that can effectively prevent such obstructive efforts. Pretrial Services is unable to monitor Edelman's electronic device usage.  Although as a temporary measure, Edelman has apparently removed WhatsApp and Signal, the encrypted communication applications that he was using on his telephone, Edelman still has a telephone and other electronic devices that would permit him to communicate with his co-conspirators.  Thus, this condition relies solely on Edelman's word that he will not contact the co-conspirators.  Even taking away his devices is not a safeguard, because he may walk outside his residence and buy a new device, order one on the internet, or persuade one of his visitors to bring him one.

There are no conditions that can realistically preclude Edelman from violating his conditions again.  So we are left with Edelman's promise to abide by his conditions, and Edelman has repeatedly proven that his word is worthless.  Thus, a conclusion that he is unlikely to abide by any condition or combination of conditions under Section 3148(b)(2)(B) is warranted.

## IV.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court enter an Order of Detention, revoking Edelman's bond.

Respectfully submitted,

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General



By:    _____
Sarah C. Ranney
NY Bar No. 5050919
Trial Attorney
Department of Justice Tax Division
150 M Street, N.E., Room 1.104
Washington, DC 20002
Sarah.C.Ranney@usdoj.gov

Nanette L. Davis
D.C. Bar No. 442136
Senior Litigation Counsel
Department of Justice Tax Division
150 M Street, N.E., Room 1.107
Washington, D.C. 20002

Ezra Spiro
NY Bar No. 5291838
Department of Justice Tax Division
150 M Street, N.E., Room 1.108
Washington, DC 20002
Ezra.K.Spiro@usdoj.gov

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: _____

Joshua A. Gold
TX Bar No. 24103101
Assistant United States Attorney
U.S. Attorney's Office
601 D St NW
Washington, D.C. 20530
Office: 202-815-8965
Joshua.Gold@usdoj.gov