# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

    **v.**

**DOUGLAS EDELMAN**

**and**

**DELPHINE LE DAIN,**

    **Defendants.**

Case No. 24-cr-239 (CKK)

## DOUGLAS EDELMAN'S RESPONSE AND OBJECTION TO GOVERNMENT'S MOTION FOR RULE 15 DEPOSITION OF CO-CONSPIRATOR 1

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION**.................................................................................................. 1

**BACKGROUND** .................................................................................................. 2

**ANALYSIS** ......................................................................................................... 3

**I.**      **The Government cannot satisfy its burden under Rule 15(c)(3) to show that Co-Conspirator 1's deposition may be taken outside the United States without Mr. Edelman's being physically present.** ...................................................... 3

**II.**     **The admission of Co-Conspirator 1's deposition taken without Mr. Edelman's presence violates the Confrontation Clause** ............................................... 7

     **A.**    **The Confrontation Clause requires the defendant receive an in-person face-to-face opportunity to confront the witness.**......................................... 7

     **B.**    **Denying Mr. Edelman the right to face-to-face confrontation is not necessary to serve an "important public policy," as required by *Craig v. Maryland*.**..... 11

     **C.**    **The government has not shown that Co-Conspirator 1's Rule 15 deposition would satisfy the other "elements" of confrontation, specifically the enforceability of the oath.**................................................................. 19

**III.**    **A bench trial would mitigate the harm caused by the Constitutionally infirm admission of Co-Conspirator 1's pre-recorded, unconfronted Rule 15 deposition.**.. 21

     **A.**    **The government cannot to offer a reason sufficient to overcome the need for a bench trial in this case.** ................................................................ 24

     **B.**    **Mr. Edelman's Constitutional right to confront Co-Conspirator 1 conflicts with his Constitutional right to a jury trial.** ........................................ 25

     **C.**    **The complexity of this case additionally presents a substantial risk of an unfair trial if a jury is the finder of fact.**.......................................... 29

**REQUEST FOR RELIEF** ................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blunt v. United States*,
   959 A.2d 721 (D.C. 2008) ....................................................................................27

*Bronston v. United States*,
   409 U.S. 352 (1973)............................................................................................20

*Bruton v. United States*,
   391 U.S. 123 (1968)........................................................................27, 28, 29, 30

*California v. Green*,
   399 U.S. 149 (1970)..................................................................7, 12, 17, 19

*Coy v. Iowa*,
   487 U.S. 1012 (1988)........................................................................................1, 8

*Crane v. Kentucky*,
   476 U.S. 683 (1986)............................................................................................6

*Cromitie v. United States*,
   No. 09 CR 558-01 (CM), 2017 WL 1383982 (S.D.N.Y. Apr. 7, 2017) .................................29

*Davis v. Alaska*,
   415 U.S. 308 (1974)............................................................................................8

*Dunn v. United States*,
   307 F.2d 883 (5th Cir. 1962) ...............................................................................28

*Gannett Co., Inc. v. DePasquale*,
   443 U.S. 368 (1979)...........................................................................................25

*Griffin v. Harrington*,
   915 F. Supp. 2d 1091 (C.D. Cal. 2012). ..............................................................12

*Johnson v. Tennis*,
   549 F.3d 296 (3d Cir. 2008)................................................................................29

*Kentucky v. Stincer*,
   482 U.S. 730 (1987)............................................................................................8

*Kotteakos v. United States*,
   328 U.S. 750 (1946)............................................................................................5

*Krulewitch v. United States*,
    336 U.S. 440 (1949)..........................................................................................28

*Lee v. Illinois*,
    476 U.S. 530 (1986)..........................................................................................10

*Mancusi v. Stubbs*,
    408 U.S. 204 (1972)..........................................................................................17

*Maryland v. Craig*,
    497 U.S. 836 (1990).................................................................................. *passim*

*Mattox v. United States*,
    156 U.S. 237 (1895)............................................................................................7

*Pinson v. U.S. Dep't of Justice*,
    243 F.Supp.3d 74 (D.D.C. 2017) .....................................................................16

*Rogers v. McMackin*,
    884 F.2d 252 (6th Cir. 1989) ...........................................................................29

*Savage v. U.S. Dep't of Justice*,
    No. CV 21-1057 (CKK), 2022 WL 2982170 (D.D.C. July 28, 2022)...................14

*Simmons v. United States*,
    390 U.S. 377 (1968).....................................................................................25, 26

*Strickland v. Washington*,
    466 U.S. 668 (1984)..........................................................................................22

*United States v. Abu Ali*,
    528 F.3d 210 (4th Cir. 2008). ..........................................................12, 15, 16, 17

*United States v. Alahmedalabdaloklah*,
    94 F.4th 782 (9th Cir. 2024) ..............................................................................7

*United States v. Benfield*,
    593 F.2d 815 (8th Cir. 1979) .............................................................................8

*United States v. Bordeaux*,
    400 F.3d 548 (8th Cir. 2005) (en banc) .......................................................10, 12

*United States v. Braunstein*,
    474 F. Supp. 1 (D.N.J. 1978) ...................................................................29, 30, 31

*United States v. Burr*,
    25 F. Cas. 187 (C.C.D. Va. 1807) .......................................................................7

*United States v. Caramadre,*
    No. CR 11-186 S, 2012 WL 4762189 (D.R.I. Oct. 5, 2012) ..................................................22

*United States v. Carter,*
    907 F.3d 1199 (9th Cir. 2018) ........................................................................ *passim*

*United States v. Casher,*
    No. CR 19-65-BLG-SPW, 2020 WL 3270541 (D. Mont. June 17, 2020) ............................18

*United States v. Castro,*
    413 F.2d 891 (1st Cir. 1969)........................................................................26

*United States v. Cohn,*
    481 F. Supp. 3d 122 (E.D.N.Y. 2020) ............................................................23, 24, 25, 30

*United States v. Drogoul,*
    1 F.3d 1546 (11th Cir. 1993) ........................................................................7

*United States v. Dunnigan,*
    507 U.S. 87 (1993)........................................................................19

*United States v. Gear,*
    No. CR 17-00742 SOM-1, 2019 WL 150538 (D. Haw. Jan. 9, 2019) ..................................10

*United States v. Gigante,*
    166 F.3d 75 (2d Cir. 1999)........................................................................9, 12, 27

*United States v. Gonzalez-Lopez,*
    548 U.S. 140 (2006)........................................................................18

*United States v. Grayson,*
    438 U.S. 41 (1978)........................................................................21

*United States v. Kelley,*
    36 F.3d 1118 (D.C. Cir. 1994) ........................................................................3, 26, 27

*United States v. Lewis,*
    638 F. Supp. 573 (W.D. Mich. 1986) ........................................................................23, 24, 26

*United States v. Manfredonia,*
    414 F.2d 760 (2d Cir. 1969)........................................................................20

*United States v. Martin Linen Supply Co.,*
    430 U.S. 564 (1977)........................................................................24

*United States v. Medjuck,*
    156 F.3d 916 (9th Cir. 1998) ........................................................................16

*United States v. Pangelinan*,
  No. 19-10077-JWB, 2020 WL 5118550 (D. Kan. Aug. 31, 2020)........................................18

*United States v. Panteleakis*,
  422 F. Supp. 247 (D.R.I. 1976)....................................................................................29, 30

*United States v. Salamey*,
  No. 8:19-CR-298-VMC-SPF, 2022 WL 35992 (M.D. Fla. Jan. 4, 2022) .............................10

*United States v. Sanford, Ltd.*,
  860 F. Supp. 2d 1 (D.D.C. 2012) ...................................................................................3, 20

*United States v. Schipani*,
  44 F.R.D. 461 (E.D.N.Y. 1968) ...........................................................................................30

*United States v. Smith*,
  702 F. Supp. 3d 206 (S.D.N.Y. 2023)............................................................................ *passim*

*United States v. Trabelsi*,
  No. 06-cr-89 (RDM), 2023 U.S. Dist. LEXIS 114668 (D.D.C. June 5, 2023)............... *passim*

*United States v. Trabelsi*,
  No. 06-CR-89 (RDM), 2023 WL 4341429 (D.D.C. Apr. 5, 2023) .......................3, 13, 16, 19

*United States v. Trabelsi*,
  No. CR 06-89 (RWR), 2014 WL 12682266 (D.D.C. June 18, 2014)..............................14, 15

*United States v. Vo*,
  53 F.Supp.3d 77 (D.D.C. 2014) .............................................................................................2

*United States v. Xulam*,
  84 F.3d 441 (D.C. Cir. 1996) .................................................................................................5

*United States v. Yates*,
  438 F.3d 1307 (11th Cir. 2006) ...................................................................................... *passim*

*United States v. Zizzo*,
  120 F.3d 1338 (7th Cir. 1997) ..............................................................................................20

**Statutes**

18 U.S.C. § 1623(b) .....................................................................................................................20

18 U.S.C. § 3142 ...........................................................................................................................5

U.K. Perjury Act of 1911 § 1 ......................................................................................................20

U.S. Const. Amend. VI. ......................................................................................................... *passim*

**Other Authorities**

28 C.F.R. § 501.3 .................................................................................................................14, 15

Cong. Research Serv., *Obstruction of Justice: An Overview of Some of the
     Federal Statutes That Prohibit Interference with Judicial, Executive, or
     Legislative Activities* (Apr. 17, 2014) .......................................................................20

Daniel H. Pollitt, *The Right of Confrontation: Its History and Modern Dress*, 8 J.
     PUB. L. 381, 398 (1959) ..............................................................................................7

Extradition Treaty Between the United States of America and the United Kingdom of
     Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003 S. TREATY DOC. NO.
     108-23 .........................................................................................................................20

Fed. R. Crim. P. 15 ............................................................................................. *passim*

Fed. R. Crim. P. 23(a) .......................................................................22, 24, 25, 26

Jonne O. Hietanen, et al., *Eye Contact Reduces Lying* 66 CONSCIOUSNESS &
     COGNITION 65 (2018) ..................................................................................................10

Memorandum from Lanny A. Breuer, Assistant Attorney General, to Charles E.
     Samuels, Jr., Director, Bureau of Prisons, CRM000386 (Nov. 14, 2012)...............15

Susan A. Bandes & Neal Feigenson, *Virtual Trials: Necessity, Invention, and the
     Evolution of the Courtroom*, 68 BUFF L. REV. 1275 (2020) ......................................9

Vincent Denault & Miles L. Patterson, *Justice and Nonverbal Communication in a
     Post-Pandemic World: An Evidence-Based Commentary and Cautionary
     Statement for Lawyers and Judges*, 45 J. NONVERBAL BEHAV. 1 (2021) ..................9

# INTRODUCTION

*Look me in the eye and say that.*[1]

Co-Conspirator 1's role as the Edelman family advisor, accountant, and protector of the trusts of which Delphine LeDain Edelman was the beneficiary gave him first-hand knowledge of the events in the Indictment. Douglas Edelman agrees that Co-Conspirator 1 is a key witness in this case. Indeed, prior to his cooperation, there was an imaginable set of circumstances in which Mr. Edelman and Co-Conspirator 1 would have been tried together. There also is no dispute that Co-Conspirator 1 is unavailable; he is elderly, in poor health, and unable to travel to the United States. Thus, if the government wishes to have Co-Conspirator 1 testify against Mr. Edelman, it must take his deposition in the United Kingdom, under Federal Rule of Criminal Procedure 15.

Regardless of location, Mr. Edelman has the Sixth Amendment right to confront a witness against him. Confrontation means what it says: the explicit text of the Constitution gives Mr. Edelman the right to be in the same room, at the same time as Co-Conspirator 1 when he testifies. Mr. Edelman is entitled to this physical, face-to-face, in-person right of confrontation because the Constitution requires it and because a fair trial demands it. Reflecting the evergreen truism that it is harder to lie to someone's face than behind their back (or in this case 3,662 miles away, over Zoom), Rule 15 acknowledges this right and such a deposition would presumptively be taken in Mr. Edelman's presence.

However, although Mr. Edelman has evidenced his intent to stand trial and has no intent to flee, the government is unwilling to allow him to attend the London deposition of Co-Conspirator 1 and proposed that he participate via video. But a video "confrontation" is not a confrontation under the Sixth Amendment. And the government has shown no important policy in which

---

[1] *Coy v. Iowa*, 487 U.S. 1012, 1018 (1988).

depriving Mr. Edelman of his right to confront Co-Conspirator 1 is necessary. Admitting Co-Conspirator 1's testimony in these circumstances would violate Mr. Edelman's Sixth Amendment right of confrontation and his Due Process right to a fair trial. The parties are in a bind: Co-Conspirator 1 is a material witness, but eliciting (and then presenting) his testimony in this way violates Mr. Edelman's Constitutional rights.

There is, however, a way forward. To the extent the government agrees to a bench trial, the Court, as the fact finder, is in a position to watch this testimony live, observing the demeanor of both Mr. Edelman and Co-Conspirator 1 and then reflecting on that testimony when later hearing the rest of the case. Although this isn't perfect, such a process balances the Constitutional rights at issue in a fair manner. Furthermore, unlike a jury, who would be ill equipped to handle the pre-recorded testimony of such a key witness and for whom a limiting or curative instruction would have little effect, the Court is uniquely suited to weigh Co-Conspirator 1's unconfronted testimony in light of its circumstances and Co-Conspirator 1's role. Indeed, for that reason, along with the fact that this is a complex case, in which nearly two million documents have already been produced by the government, the Court could order a bench trial for Mr. Edelman, regardless of whether the government consents.

## **BACKGROUND**

Co-Conspirator 1 is perhaps the most important witness in this case. As protector of Delphine Le Dain Edelman's trust, Co-Conspirator 1 knows about and had considerable involvement in the trust's assets and organization. Furthermore, both prior to and during the existence of that trust, Co-Conspirator 1 maintained the Edelman family finances, liaised with banks, and generally served as an advisor to the family. Without Co-Conspirator 1's testimony, "there is a reasonable probability that . . . the result of [this trial will] have been different." *United States v. Vo*, 53 F.Supp.3d 77, 81 (D.D.C. 2014). Co-Conspirator 1's testimony is thus absolutely

"material." Given Co-Conspirator 1's medical condition, the only way for the government to obtain the material testimony and eventually use it at Mr. Edelman's trial would be to take it pursuant to a Rule 15 deposition.

## ANALYSIS

Because of the importance of Co-Conspirator 1's testimony, Mr. Edelman must be able to physically confront Co-Conspirator 1 by being present in the same room in London when Co-Conspirator 1 gives his testimony under oath. The right of confrontation is especially important because this is an complex case, involving intricate tax law, multiple defendants, and the laws of many jurisdictions.

**I.      The Government cannot satisfy its burden under Rule 15(c)(3) to show that Co-Conspirator 1's deposition may be taken outside the United States without Mr. Edelman's being physically present.**

"There is a distinct preference for having witnesses in criminal trials present for the jury to view, to assess, themselves confront. The concept of having depositions is an inferior technique for presenting these witnesses to a jury." *United States v. Sanford, Ltd.*, 860 F. Supp. 2d 1, 3 (D.D.C. 2012) (quoting *United States v. Ismaili*, 828 F.2d 153, 156 (3d Cir. 1987)). Unlike civil cases, depositions in criminal cases can only be taken with leave of the court. *United States v. Kelley*, 36 F.3d 1118, 1124 (D.C. Cir. 1994). Accordingly, in order to obtain a deposition of a witness in the United States, the Federal Rules of Criminal Procedure place a heavy burden on the party seeking the deposition, who must show that "'exceptional circumstances' necessitate a Rule 15 deposition." *United States v. Trabelsi*, No. 06-CR-89 (RDM), 2023 WL 4341429, at *2 (D.D.C. Apr. 5, 2023). The Rules also give the defendant a presumptive right of face-to-face confrontation, consistent with the Sixth Amendment. *See* Fed. R. Crim. P. 15(c)(1) ("Except as authorized by Rule 15(c)(3), the officer who has custody of the defendant must produce the defendant at the deposition and keep the defendant in the witness's presence during the examination . . . ."); *id.* R.

15(c)(2) ("Except as authorized by Rule 15(c)(3), a defendant who is not in custody has the right upon request to be present at the deposition, subject to any conditions imposed by the court."); *United States v. Yates*, 438 F.3d 1307, 1317 (11th Cir. 2006) (en banc) ("Rule 15, properly utilized, protects a defendant's confrontation rights by affording the defendant an opportunity to be present at the deposition.").

Where a party, here the government, wishes to take a deposition outside of the United States without the defendant's being physically present, Rule 15(c)(3) requires that party to make an additional showing that the defendant's right of face-to-face confrontation may be overcome. The Court must, by a preponderance of the evidence, make "case specific findings of all of the following":

(A) the witness's testimony could provide substantial proof of a material fact in a felony prosecution;

(B) there is a substantial likelihood that the witness's attendance at trial cannot be obtained;

(C) the witness's presence for a deposition in the United States cannot be obtained;

(D) the defendant cannot be present because:

    (i) the country where the witness is located will not permit the defendant to attend the deposition;

    (ii) for an in-custody defendant, secure transportation and continuing custody cannot be assured at the witness's location; or

    (iii) for an out-of-custody defendant, no reasonable conditions will assure an appearance at the deposition or at trial or sentencing; and

(E) the defendant can meaningfully participate in the deposition through reasonable means.

*See* Fed. R. Crim. P. 15(c)(3); Notes to 2012 Amendments ("The party requesting the deposition shoulders the burden of proof—by a preponderance of the evidence—on the elements that must be shown."). The government and Mr. Edelman do not dispute criteria (A), (B), (C), or (E). Instead, the parties dispute criterion (D)(iii) (reasonable conditions exist).

As its "proof" of a lack of reasonable conditions to assure Mr. Edelman's appearance at

trial, the government asserts that he has no cash bond securing his appearance, he has texted two close friends in violation of his conditions of release, he would have access to trains in the United Kingdom, the U.S. Marshal Service cannot monitor him or obtain the assistance of local law enforcement, he allegedly has the means to escape, and he allegedly has the motive to escape.[2] Motion at 7-8. The government does not propose any possible conditions. Instead, the government seems to tacitly argue that no set of conditions would *eliminate* the risk of his not appearing for trial. But that is not the test in Rule 15(c)(3)—the test is whether there are "no reasonable conditions that would assure" Mr. Edelman's appearance at trial. *Cf. United States v. Xulam*, 84 F.3d 441, 444 (D.C. Cir. 1996) (while a possibility of flight always exists with "every defendant released on conditions; it is also not the standard authorized by law for determining whether pretrial detention is appropriate. Section 3142 [of the Bail Reform Act] speaks of conditions that will 'reasonably' assure appearance, not guarantee it").

If the government is truly concerned about Mr. Edelman absconding, and if the Court were willing to change his conditions of release so that he could travel to London with his attorneys, Mr. Edelman would relinquish his passport, credit cards, cash, and phones. This would effectively tether him to his attorneys, who have an ethical and legal obligation to not aid in his flight. *See* D.C. R. Pro. Conduct 1.2, Cmt. 7 ("[A] lawyer may not knowingly assist a client in criminal or fraudulent conduct.").

Critically, Mr. Edelman has voluntarily complied with every step of this process. He did not, for example, fight extradition from Spain. Also, Mr. Edelman has been compliant with almost

---

[2] The government also attempts to attribute Mrs. Le Dain Edelman's current fugitive status to Mr. Edelman as evidence of Mr. Edelman's intent. *See* Motion at 8 n.2. That attribution is improper. The Constitution gives defendants "the right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others . . . ." *Kotteakos v. United States*, 328 U.S. 750, 775 (1946).

all of the conditions of his release. Specifically, he has strictly complied with all the conditions that are in place to prevent his fleeing: Mr. Edelman checks in weekly with his Pretrial Services Officer, he leaves his apartment only during the four-hour window allowed by this Court, and when he does so, he ventures no further than one mile from his apartment for the first two hours and stays within his apartment complex for the second two hours. Mr. Edelman wears his GPS monitor 24 hours a day and charges it daily so that it effectively monitors him. Mr. Edelman has also assiduously notified his Pretrial Services Officer about any legal visits that would allow him to be outside of his apartment or travel further than the one-mile range allowed by the Court.

While it is true that Mr. Edelman communicated with Co-Conspirator 3 and Co-Conspirator 4, as detailed in our recent filing, most of the people in the indictment are his friends and family. He messaged them because he was lonely. Although it was a truly stupid thing of him to do, and Mr. Edelman will not communicate with any witness going forward, there is no reasonable reading of Mr. Edelman's text messages that would suggest that he was trying to tamper with this case, and they certainly do not show that he plans to abscond if given the opportunity. By contrast, Mr. Edelman's full adherence with all the other conditions of release shows that he is not a risk of flight. The proposed conditions are reasonable and would assure that Mr. Edelman returns to the United States after Co-Conspirator 1's London deposition.

Moreover, preventing Mr. Edelman from attending Co-Conspirator 1's Rule 15 deposition puts Mr. Edelman in an impossible position: the government may prosecute him for alleged violations of the *extraterritorial* application of U.S. tax law, yet Mr. Edelman cannot *travel abroad* to exercise his right to participate in his defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment … or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, … the Constitution

6

guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *California v. Trombetta*, 467 U. S. 479, 485 (1984))).

## II.     The admission of Co-Conspirator 1's deposition taken without Mr. Edelman's presence violates the Confrontation Clause

The Sixth Amendment's Confrontation Clause guarantees the accused the right "to be confronted with the witnesses against him . . . ." U.S. Const., Amend. VI. The right of confrontation predates the Bill of Rights as the guarantee existed at English common law and was memorialized in many Revolution-era state constitutions. *See* Daniel H. Pollitt, *The Right of Confrontation: Its History and Modern Dress*, 8 J. Pub. L. 381, 398 (1959). In Aaron Burr's 1807 treason trial, Chief Justice Marshall ruled on the accused's right to be "confronted with the witness against him." *See United States v. Burr*, 25 F. Cas. 187, 193 (C.C.D. Va. 1807). In more modern times, the right has been articulated as comprising four "elements": (1) the defendant's right to be physically present with the witness when he testifies, (2) the witness's examination being taken under oath, (3) the availability of cross examination, and (4) the observation of the witness's demeanor by the trier of fact. *See Maryland v. Craig*, 497 U.S. 836, 846 (1990); *accord California v. Green*, 399 U.S. 149, 158 (1970); *Mattox v. United States*, 156 U.S. 237, 243 (1895).[3]

### A.     The Confrontation Clause requires the defendant receive an in-person face-to-face opportunity to confront the witness.

In contrast to the other three elements of the Clause, whose interpretation leaves "some

---

[3] The question of whether this Rule 15 deposition violates the Confrontation Clause is ripe for decision now, because the government has said that Co-Conspirator 1 will not be available for trial. Motion at 5-6. Given the Constitutional infirmity of taking of such a deposition, "there's no way the deposition could be admitted at trial," allowing this Court to "deny it outright," and avoid "engag[ing] in an act of futility by authorizing depositions that clearly will be inadmissible at trial." *See United States v. Drogoul*, 1 F.3d 1546, 1555 (11th Cir. 1993); *see also United States v. Alahmedalabdaloklah*, 94 F.4th 782, 817 (9th Cir. 2024) (holding defendant waived Confrontation Clause challenge to Rule 15 deposition where he "voluntarily and knowingly agreed" to deposition). A Confrontation Clause challenge is also timely given Mr. Edelman's request that this Court preside over the Rule 15 deposition of Co-Conspirator 1.

room for doubt," its guarantee of a physical face-to-face confrontation is clear. *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) ("We have never doubted, therefore, that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact."). Confrontation gives a defendant "a right to meet face to face all those who appear and give evidence at trial." *Id.* (quoting *Green*, 399 U.S. 149 (Harlan, J., concurring)). That face-to-face meeting includes the critical protection of "being allowed to confront the witness physically"— i.e., in person. *Davis v. Alaska*, 415 U.S. 308, 315 (1974).

The Sixth Amendment guarantee is "a functional one" that exists "for the purpose of promoting reliability in a criminal trial." *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987). A "face-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person." *Craig*, 497 U.S. at 846; *accord Coy*, 487 U.S. at 1019-20. It is widely believed that it is much harder "to tell a lie about a person 'to his face' than 'behind his back.'" *Coy*, 487 U.S. at 1019; *id.* at 1018 ("The phrase still persists, 'Look me in the eye and say that.'"); *see also United States v. Benfield*, 593 F.2d 815, 821 (8th Cir. 1979) ("Most believe that in some undefined but real way recollection, veracity, and communication are influenced by face-to-face challenge.").

Even in the age of widespread use of videoconferencing technology, courts continue to reaffirm that the "simple truth is that confrontation through a video monitor is not the same as physical face-to-face confrontation." *Yates*, 438 F.3d at 1315; *see United States v. Carter*, 907 F.3d 1199, 1207 (9th Cir. 2018) ("[The] important components of confrontation are lost when the witness is not testifying in court, regardless of the witness's age or ability to see the defendant on a screen from a distant location."). Even if videoconferencing technology is effective, and a defendant has an opportunity for cross examination, the "intangible elements of the ordeal of

testifying in a courtroom . . . are reduced or even eliminated by remote testimony." *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999). That is because there are "important practical differences between face-to-face confrontation and virtual confrontation." *Carter*, 907 F.3d at 1207. For example, the quality of the video and angle of the camera can impact both the testifying witness's experience as well as the perceptions of that testimony. *See id.* (noting that the witness had trouble seeing the defendant over video and the video display size and quality in the courtroom could also cause issues). Video conferencing eliminates any meaningful eye contact between participants as people tend to look at other video displays on their screen even if some virtual court guidelines instruct witnesses to look directly at the camera. *See* Susan A. Bandes & Neal Feigenson, *Virtual Trials: Necessity, Invention, and the Evolution of the Courtroom*, 68 BUFF L. REV. 1275, 1296 (2020). Despite the advancements of audio-visual technology, issues with connectivity may cause delays that cut into limited time scheduled for deposition testimony. *See, e.g.*, *Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *5 ("minor technological difficulties with the videoconferencing software" caused almost an hour delay of video deposition).

Use of videoconferencing technology distorts the experience of a testifying witness which in turn impacts the fact finder's ability to assess the witness's demeanor. *See* Bandes & Feigenson, *supra*, at 1296. Videoconferencing skews the field of vision for all parties as it displays only the witness's face and upper body which limits observation of body language and other visual cues of demeanor. *See* Vincent Denault & Miles L. Patterson, *Justice and Nonverbal Communication in a Post-Pandemic World: An Evidence-Based Commentary and Cautionary Statement for Lawyers and Judges*, 45 J. NONVERBAL BEHAV. 1, 4 (2021) ("[N]onverbal communication, which includes much more than just the speaker's face, provides participants feedback to coordinate and manage in-person exchanges on a moment-by-moment basis.").

The belief in face-to-face confrontation has both normative and empirical support. *See Lee v. Illinois*, 476 U.S. 530, 540 (1986) ("[T]he right to confront and cross-examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails."); *United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005) (en banc) ("[A] defendant watching a witness through a monitor will not have the same truth-inducing effect as an unmediated gaze across the courtroom."); Jonne O. Hietanen, et al., *Eye Contact Reduces Lying*, 66 CONSCIOUSNESS & COGNITION 65, 70 (2018) (study on the importance of direct eye contact and honesty where individuals incentivized to lie reduced their dishonest behavior due to the "perception of another individual's direct gaze"). Despite the ubiquity of Zoom, courts have continued to affirm that the "Sixth Amendment's guarantee of the right to confront one's accuser is most certainly compromised when the confrontation occurs through an electronic medium." *Yates*, 438 F.3d at 1315 (reversing conviction based on two-way video conference testimony on grounds that it violated defendant's right to "physical face-to-face confrontation"); *Bordeaux*, 400 F.3d at 554 (reversing conviction because the "virtual 'confrontations' offered by closed-circuit television systems fall short of the face-to-face standard because they do not provide the same truth-inducing effect"); *United States v. Gear*, No. CR 17-00742 SOM-1, 2019 WL 150538, at *1 (D. Haw. Jan. 9, 2019) ("[A]llowing [the witness] to testify via videoconferencing would violate [the defendant]'s right to physical, face-to-face confrontation under the Confrontation Clause of the Sixth Amendment."); *United States v. Salamey*, No. 8:19-CR-298-VMC-SPF, 2022 WL 35992, at *4 (M.D. Fla. Jan. 4, 2022) (denying Rule 15 deposition because the Court did "not believe that the convenience of the witness or the Government should trump [defendant]'s rights under the Sixth Amendment").

**B.      Denying Mr. Edelman the right to face-to-face confrontation is not necessary to serve an "important public policy," as required by *Craig v. Maryland*.**

In 1990, the Supreme Court issued *Craig v. Maryland*, 497 U.S. 836 (1990), which at once called face-to-face physical confrontation an "element" of the *Confrontation* Clause while simultaneously providing a new rule to allow courts to dispense with the element. *See id.* at 862 (Scalia, J., dissenting) ("The Court makes the impossible plausible by recharacterizing the Confrontation Clause, so that confrontation (redesignated 'face-to-face confrontation') becomes only one of many 'elements of confrontation.'").

*Craig* dealt with a Maryland evidentiary statute designed to protect child witnesses who were allegedly victims of abuse from the trauma of testifying against their alleged perpetrator. *Id.* at 852 (majority op.). To invoke the statute's procedure, the trial judge had to first make a specific finding of fact that the child's courtroom testimony, in front of their alleged abuser, would cause such serious emotional distress so as to prevent the child from effectively communicating. *Id.* at 840-41. Once invoked, the child, prosecutor, and defense attorney would go to a room, where the child would testify via *live* one-way, closed circuit television, while the defendant, judge, and jury remained in the courtroom. *Id.* The child could not see the defendant, and the child was subject to cross-examination. *Id.*

In a 5-4 ruling, the Court held that a defendant's confrontation right can be satisfied absent an actual confrontation (1) "only where denial of such confrontation is necessary to further an important public policy" and (2) "only where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850. The Court determined that protecting alleged child victims from "the trauma of testifying against the alleged perpetrator" was an important public policy interest. In order to overcome the defendant's Sixth Amendment right, first, the trial court "must hear evidence and determine" whether the confrontationless procedure was "necessary" to further that important

public policy. *Id.* at 852. With respect to assuring the reliability of the testimony, the Court held that "oath, cross-examination, and observation of the witness' demeanor" must be present. *Id.* at 851. It stressed that it is "[t]he combined effect of these elements of confrontation [which] serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id.* At 846. Of those three, the oath is of paramount importance as "availability for cross-examination does not cure a witness's failure to swear an oath." *Griffin v. Harrington*, 915 F. Supp. 2d 1091, 1104 (C.D. Cal. 2012), *modified*, No. CV 10-08753-VBF-SP, 2013 WL 3873958 (C.D. Cal. Jan. 18, 2013), *aff'd*, 727 F.3d 940 (9th Cir. 2013); *see also Green*, 299 U.S. at 158 (discussing importance of giving statements under oath which "impress[] him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury").

Neither the Supreme Court nor the D.C. Circuit has ruled on whether *Craig* applies to Confrontation Clause challenges to the admission and taking of Rule 15 depositions taken without a face-to-face confrontation, such as what the government's motion proposes. Other Circuits, however, have applied *Craig* to reverse convictions based on those types of video depositions. *See United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005) (en banc); *United States v. Yates*, 438 F.3d 1307, 1315 (11th Cir. 2006) (en banc); *United States v. Carter*, 907 F.3d 1199, 1208 (9th Cir. 2018). *But see United States v. Abu Ali*, 528 F.3d 210, 241 (4th Cir. 2008) (applying *Craig* and upholding terrorism conviction); *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (declining to apply *Craig* to two-way video system and applying less-stringent standard from Rule 15 depositions). This Court has applied *Craig* in circumstances similar to what the government proposes, albeit with a defendant subject to special administrative measures and facing terrorism charges, in *United States v. Trabelsi*, No. 06-cr-89 (RDM), 2023 U.S. Dist. LEXIS 114668 (D.D.C.

June 5, 2023).

In *Trabelsi*, the defendant was charged with conspiracy to kill a U.S. national and conspiracy and attempt to use weapons of mass destruction. *Id.* at *3. Nizar Trabelsi was foreign national who had traveled to Afghanistan to join Al-Qaeda and who had become close with Osama Bin Laden. The defendant traveled to Belgium to buy chemicals to build a bomb, and he scouted an Air Force base there to kill Americans. *Id.* He was convicted in Belgium for those acts and served a ten year sentence. *Id.* Once extradited to the United States, the defendant was set to be tried before a jury on the U.S. charges. *Id.*

During Trabelsi's trial, the government moved to introduce the Rule 15 testimony of his former romantic partner, Ms. Amal,[4] who lived in France and refused to travel to the United States. *Id.* at *4. The Court had previously allowed the government to proceed with the deposition in France without the defendant's presence. The testimony was taken via two-way video conferencing, with the defendant, one of his standby counsel, and government counsel in Courtroom 5 of the Prettyman Courthouse. *Id.* at *13. In Paris were Ms. Amal, defendant's other standby counsel, two representatives of the U.S. government, and several representatives of the French government. *Id.* At the request of the trial court judge, Magistrate Judge Upadhyaya presided over the deposition. *Id.* at *11.

In response to the government's motion to admit the Rule 15 deposition, the defendant argued that the video-recorded deposition of Ms. Amal was inadmissible under the Supreme Court's two-part *Craig* test for unconfronted testimony. The Court began its analysis by assuming the *Craig* test applied. Accordingly, the first issue was whether the denial of face-to-face

---

[4] The parties in *Trabelsi* agreed to refer to the witness as "Ms. Amal," and not use her surname on public filings to protect her safety and the safety of her family. *See Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *4 n.3.

confrontation was "necessary to further an important public policy." *Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *52. The important public policy must "be a case specific one and must be "more substantial than [the interest in] convicting someone of a criminal offense." *Id.* at *54 (quoting *Abu Ali*, 528 F.3d at 241) (alteration in original). The Court looked at cases in the Eleventh and Ninth Circuits which had rejected the admissibility of remote testimony at trial under *Craig*. *Yates*, 438 F.3d 1307 (trial court refused to transport defendant abroad to witnesses); *Carter*, 907 F.3d at 1208 (witness was unable to travel "due to her pregnancy—a temporary disability [but] [t]here were alternatives available to preserve Carter's right to physical face-to-face confrontation"). From those two cases, Judge Moss noted that "courts may not permit remote testimony if securing a face-to-face confrontation is possible—even if doing so is more logistically complicated than the alternative." *Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *54.

Judge Moss held that the admission of the video deposition of Ms. Amal satisfied the public policy prong of *Craig*. Trabelsi was subject to special administrative measures—extremely restrictive conditions of confinement reserved for inmates who the Attorney General has deemed so dangerous that the conditions are "reasonably necessary to protect persons against the risk of death or serious bodily injury." 28 C.F.R. § 501.3(a). While the details of Trabelsi's special administrative measures at the time are not public (likely due to security concerns),[5] the special administrative measures imposed on Kaboni Savage that were recently reviewed by this Court are instructive. *See Savage v. U.S. Dep't of Justice*, No. CV 21-1057 (CKK), 2022 WL 2982170, at

---

[5] In 2014, Trabelsi's special administrative measures included being "barred from communicating with the media, and those whom Trabelsi speaks with are prohibited from disseminating his communications to third parties." *United States v. Trabelsi*, No. CR 06-89 (RWR), 2014 WL 12682266, at *1 (D.D.C. June 18, 2014). Those conditions were "based, in part, on the evidence that Trabelsi was convicted for assaulting a prison guard, that he 'attempted to escape from prison and was considered a high security risk' by Belgium, and that he 'continues to show a commitment to al Qaeda's goals.'" *Id.*

*1 (D.D.C. July 28, 2022), *aff'd*, 91 F.4th 480 (D.C. Cir. 2024).

Special administrative measures are reserved for inmates whose "proclivity for terrorism" or "proclivity for violence" creates a "substantial risk" that their mere "communications or contacts could result in death or serious bodily injury to others,"[6] such as Trabelsi, who was accused of violent crimes, including conspiring to "kill U.S. citizens in Europe," a crime of which he had already been convicted and for which he had served a ten-year sentence in Belgium. *Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *1; *see also United States v. Trabelsi*, No. CR 06-89 (RWR), 2014 WL 12682266, at *1 (D.D.C. June 18, 2014) (Trabelsi attempted to escape Belgian prison and convicted of assaulting Belgian prison guard). The Chief of the Office of International Operations in the U.S. Marshals Service submitted a declaration attesting that the Marshals could not safely and securely arrange for Trabelsi's travel to Europe because they have no authority to hold a prisoner in custody abroad (let alone enforce Trabelsi's special administrative measures). *Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *57.

Accordingly, Judge Moss found that a "strong 'public interest' preclude[d] providing Trabelsi with a face-to-face confrontation with Ms. Amal in France." *Id.* at *58. That strong public interest was "national-security"—in light of the danger Trabelsi presented, "there were ample national-security reasons not to produce Trabelsi at a deposition in France." *Id.* at *59-60; *accord Abu Ali*, 528 F.3d at 241 ("Insistence on face-to-face confrontation may in some circumstances limit the ability of the United States to further its fundamental interest in preventing terrorist attacks."). Because Trabelsi was so dangerous, in order to further national security, it was "indeed

---

[6] *See* Memorandum from Lanny A. Breuer, Assistant Attorney General, to Charles E. Samuels, Jr., Director, Bureau of Prisons, "Extension of Special Administrative Measures Pursuant to 28 C.F.R. § 501.3 for Federal Bureau of Prisons Inmate [redacted]" at CRM000386 (Nov. 14, 2012), https://ccrjustice.org/sites/default/files/attach/2017/09/FOIA%20Docs%20%28CRM378-459%29.pdf.

necessary" to prevent him from leaving the Marshals' custody. *See Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *60. The Fourth Circuit came to the same conclusion in its application of *Craig* to the defendant in *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), who was convicted of being affiliated with Al Qaeda and attempted acts of terrorism.[7]

Judge Moss also noted in *Trabelsi* that the "global dimension" of terrorism informed its decision: It "would jeopardize the government's ability to prosecute [those accused of] terror[ism] using the domestic criminal justice system" if the court effectively "flatly prohibit[ed]" the deposition of a foreign witness from anywhere but the United States. *Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *60; *see Abu Ali*, 528 F.3d at 241 ("The prosecution of those bent on inflicting mass civilian casualties or assassinating high public officials is, however, just the kind of important public interest contemplated by the *Craig* decision.").

Unlike the defendants in *Trabelsi* and *Abu Ali*, Mr. Edelman has not been accused or convicted of terrorism. He has been accused of tax crimes. And unlike the defendants in *Trabelsi* and *Abu Ali*, Mr. Edelman is not affiliated with Al Qaeda or subject to special administrative measures, which are reserved for people deemed to present serious dangers to those around them. *See Pinson v. U.S. Dep't of Justice*, 243 F.Supp.3d 74, 78 (D.D.C. 2017). The government's motion does not point to any "important public policy" or otherwise engage with *Craig* or *Trabelsi* to justify not allowing Mr. Edelman to be present for Co-Conspirator 1's deposition. The motion mentions *Craig* in passing, as standing for the proposition that the "introduction of videotaped

---

[7] The government also cites to *United States v. Medjuck*, 156 F.3d 916, 920 (9th Cir. 1998), for the proposition that a confrontationless Rule 15 deposition of Co-Conspirator 1 is proper. *See* Motion at 12. The case is inapposite. *Medjuck*'s perplexing application of *Craig* makes no determination about whether such a deposition is necessary to further a public policy. The case rules on whether the government satisfied its burden of attempting to secure the defendant's presence. *Id.* at 920.

testimony of child victims in child abuse case did not violate the Sixth Amendment's Confrontation Clause," Motion at 12, but that is incorrect. Not only does *Craig* stand for a much narrower proposition of law (briefed above), but critically, the child witnesses in *Craig* gave testimony televised in real time from a nearby room to the defendant, judge, and jury. *See Craig*, 497 U.S. 841-42 ("The child witness is then examined and cross-examined in the separate room, while a video monitor records and displays the witness' testimony to those in the courtroom."); *see also id.* at 853-54 (noting different approaches among states: "videotaped testimony," "one-way closed circuit television testimony," and "the use of a two-way system").

Here, the government is asking the Court to allow it to present to the jury pre-recorded testimony of a key witness (maybe *the* key witness), obtained while the defendant is almost 4,000 miles away, sitting behind a computer. Those procedures are a far cry from what the government characterizes as "approved" by the Supreme Court in *Craig*, given those procedures were not addressed by the Supreme Court in *Craig*. In fact, in Supreme Court cases that do touch on the question of introducing prior testimony, the defendant was physically present, able to confront the witness face to face at the recorded proceeding. *See, e.g.*, *California v. Green*, 399 U.S. 149 (1970) (defendant present at preliminary hearing, transcript of which was introduced at trial). *Cf. Mancusi v. Stubbs*, 408 U.S. 204 (1972) (defendant present at in-court testimony of witness, transcript of which was introduced in subsequent criminal trial).

The government does not point to an important public policy because it cannot—the only policy in whose furtherance the government would have this Court hold is "necessary" to override Mr. Edelman's confrontation right is the "need . . . to make a case" or "to expeditiously resolve it." *Yates*, 438 F.3d at 1316. But "a generalized interest in law enforcement" is insufficient to overcome Mr. Edelman's right of confrontation. *Abu Ali*, 528 F.3d at 241. The Constitution

demands more: that the government's important public policy goal "be a case specific one." *Craig*, 497 U.S. at 850, 855. If the government's (unarticulated but apparent) goal of prosecuting Mr. Edelman's criminal case was held to be sufficient under *Craig*, then "every prosecutor wishing to present testimony from a witness overseas would argue that providing crucial prosecution evidence and resolving the case expeditiously are important public policies . . . ." *Yates*, 438 F.3d at 1316. That approach "eliminates the right" guaranteed by the Sixth Amendment. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145-46 (2006) (quoting *Craig*, 497 U.S. at 862 (Scalia, J., dissenting)).

But even if, counter-textually, prosecuting a crime were an "important public policy" under *Craig*, the government has not shown that it is "*necessary* to deny [Mr. Edelman] his right to a physical face-to-face confrontation." *Yates*, 438 F.3d at 1316 (emphasis in original). A showing of necessity must also be "case-specific," *Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *52; *Craig*, 497 U.S. at 855, and it presents a "high bar" for the government to satisfy. *See, e.g.*, *United States v. Casher*, No. CR 19-65-BLG-SPW, 2020 WL 3270541, at *2 (D. Mont. June 17, 2020). Courts determine whether confrontationless testimony is "necessary" by looking to the availability of alternatives. *See, e.g.*, *Carter*, 907 F.3d at 1208 (witness pregnancy insufficient because continuance could be granted); *Casher*, 2020 WL 3270541, at *4 (dangers of COVID-19 too high risk witness insufficient because witness could travel by car); *United States v. Pangelinan*, No. 19-10077-JWB, 2020 WL 5118550, at *4 (D. Kan. Aug. 31, 2020) (similar).

Here, alternatives exist; specifically if, against all the evidence, the government truly believes that Mr. Edelman will abscond if permitted to attend Co-Conspirator 1's deposition in London, Mr. Edelman would be willing to relinquish his passport, credit cards, cash, and phones.[8]

---

[8] This would require the Court to modify Mr. Edelman's conditions of release.

Under those circumstances, he would be completely reliant on and tethered to his attorneys, who have a legal and ethical obligation to not assist Mr. Edelman's absconding. It is not, therefore, Constitutionally permissible, let alone necessary, to deny Mr. Edelman the right to a face-to-face physical confrontation of Co-Conspirator 1.

### C.     The government has not shown that Co-Conspirator 1's Rule 15 deposition would satisfy the other "elements" of confrontation, specifically the enforceability of the oath.

Under *Craig*, unconfronted testimony can satisfy the Sixth Amendment "only where the reliability of the testimony is otherwise assured" by the presence of all of the "other elements of confrontation . . . ." *Craig*, 497 U.S. at 850-51. The government bears the proof on that issue. *See United States v. Trabelsi*, No. 06-CR-89 (RDM), 2023 WL 4341429, at *4 (D.D.C. Apr. 5, 2023). One of those other "elements" is the requirement that the witness testify under oath. *See Craig*, 497 U.S. at 857 ("The child witness must be competent to testify and must testify under oath . . . ."). The oath impresses on the witness "the seriousness of the matter and guard[s] against the lie by the possibility of a penalty for perjury." *California v. Green*, 399 U.S. 149, 158 (1970). Like the right of physical face-to-face confrontation, the "requirement of sworn testimony, backed by punishment for perjury, is as much a protection for the accused as it is a threat." *United States v. Dunnigan*, 507 U.S. 87, 97 (1993). In *Trabelsi*, the government reassured the defense and the court that Ms. Amal's oath would be effective and enforceable. *See* 2023 U.S. Dist. LEXIS 114668, at *62 n.8 ("[T]he government represents—without objection or dispute from the defense—that 'French law criminalizing perjury' will also apply."). Here, the government has offered no similar guarantees.

For Co-Conspirator 1, given his testimony will be taken abroad, he has represented that he cannot travel and is unwell, and that he is a U.K. citizen and resident, he is effectively outside the ability of any U.S. court to enforce a sanction for perjury or contempt of court "for testifying

falsely or evasively." *Sanford, Ltd.*, 860 F. Supp. 2d at 10 ("[T]he Court is well aware that 'foreign depositions are suspect and, consequently, not favored . . . .'"). While 18 U.S.C. § 1623(b) (a federal perjury statute) applies to conduct "without the United States," counsel for Mr. Edelman has struggled to find a single published or unpublished opinion addressing a prosecution for extraterritorial perjury.[9] Moreover, perjury is not a crime for which the United Kingdom will extradite its citizens to the United States. *See* Extradition Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC. NO. 108-23. And it is unclear whether the U.K. would prosecute a person for perjury made out of court in a foreign proceeding. *See* U.K. Perjury Act of 1911 § 1. Regardless, the government has offered no assurances, legal or practical, of any kind to ensure Mr. Edelman's right to have Co-Conspirator 1 testify under oath would be protected in a confrontationless Rule 15 deposition abroad. *Cf. Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *62 n.8 ("[T]he government represents . . . that 'French law criminalizing perjury' will also apply.").

Without the threat of enforceable sanctions for perjury, any oath taken by Co-Conspirator 1 is meaningless. *See United States v. Zizzo*, 120 F.3d 1338, 1348 (7th Cir. 1997) (upholding admission of testimony of witness who did not believe in oath because threat of perjury sanctions would promote truthfulness); *Bronston v. United States*, 409 U.S. 352, 357 (1973) (federal perjury statute was "enacted in an effort to keep the course of justice free from the pollution of perjury"); *United States v. Manfredonia*, 414 F.2d 760, 764 (2d Cir. 1969) ("[The] purpose of the perjury

---

[9] The "existence of extraterritorial jurisdiction is one thing; the exercise of such jurisdiction is another. Federal investigation and prosecution of any crime committed overseas generally presents a wide range of diplomatic, legal, and practical challenges." Cong. Research Serv., *Obstruction of Justice: An Overview of Some of the Federal Statutes That Prohibit Interference with Judicial, Executive, or Legislative Activities*, at 3 (Apr. 17, 2014) (RL34303). Given the government's explanation of the difficulty it would have pursuing Mr. Edelman and considering Co-Conspirator 1's age and poor health, he could be "long gone before action could be taken in the United Kingdom" to pursue a perjury charge. *See* Motion at 8.

statute . . . is to keep the process of justice free from the contamination of false testimony."). Absent the power to sanction, the oath becomes a "mere ritual without meaning." *United States v. Grayson*, 438 U.S. 41, 54 (1978). The government has not shown that Co-Conspirator 1's unconfronted testimony will bear the other indicia of reliability so as to satisfy the Sixth Amendment. *See Craig*, 497 U.S. at 850 ("[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial . . . only where the reliability of the testimony is otherwise assured."). Whether the oath is meaningful remains an open question conspicuously unaddressed in the government's motion.

**III.    A bench trial would mitigate the harm caused by the Constitutionally infirm admission of Co-Conspirator 1's pre-recorded, unconfronted Rule 15 deposition.**

The taking and admitting of Co-Conspirator 1's deposition taken abroad without Mr. Edelman's presence violates Mr. Edelman's right of confrontation. *See Craig*, 497 U.S. at 850; *cf. Trabelsi*, 2023 U.S. Dist. LEXIS 114668, at *50. However, Mr. Edelman appreciates the government's wish for Co-Conspirator 1's testimony and does not dispute that Co-Conspirator 1 is unavailable or that there is a substantial likelihood that his attendance at trial cannot be obtained within the meaning of Rule 15. Given the Supreme Court's instruction to interpret the Confrontation Clause in a manner that is "sensitive to its purpose and to the necessities of trial and the adversary process," *Craig*, 497 U.S. at 837, if the government can provide some assurances about the enforceability of the oath, Mr. Edelman would agree to Mr. Co-Conspirator 1's Rule 15 deposition under the following conditions:

1.    Mr. Edelman and one of his counsel would be located in a room in the Washington, D.C. region, along with one or more counsel for the government, observing the testimony of Co-Conspirator 1;

2.    Co-Conspirator 1 would be located in London, giving his testimony from Baker

  McKenzie's London office, and with him would be his own counsel, one or more of Mr. Edelman's counsel, counsel for the government (and whoever else the government would like to be present), a court reporter, and a court videographer;

3. The video and audio would be two-ways, allowing Mr. Edelman and Co-Conspirator 1 to see and hear one another, the videographer to capture both Mr. Edelman and Co-Conspirator 1's faces, and counsel to make objections;

4. Judge Kollar-Kotelly would preside over the entire deposition of Co-Conspirator 1 to observe his and Mr. Edelman's demeanors and reactions in real time, for the first time; and

5. Mr. Edelman be granted a bench trial, either by the government's consent or over the government's objection.

Having this Court as the ultimate, impartial trier of fact observe Co-Conspirator 1's reactions and demeanor in real time would mitigate the harm to Mr. Edelman's Sixth Amendment rights caused by having the testimony of the key witness be introduced via pre-recorded video, with Mr. Edelman sitting across the Atlantic Ocean. *See Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("[A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal . . . .").

  Federal Rule of Criminal Procedure 23(a) provides in order to obtain a bench trial, the defendant must waive his right to jury, the government must consent to a bench trial, and the Court must agree. *See* Fed. R. Crim. P. 23(a). Even in cases where there is "a massive risk of prejudice that conducting a bench trial is uniquely capable of resolving," the prosecution is not required to give its reasons for withholding consent. *United States v. Smith*, 702 F. Supp. 3d 206, 217 (S.D.N.Y. 2023). However, "the government's ability to withhold consent is not absolute." *United*

*States v. Caramadre*, No. CR 11-186 S, 2012 WL 4762189, at \*2 (D.R.I. Oct. 5, 2012).

In *Singer v. United States* the Supreme Court recognized that "there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial." 380 U.S. 24, 37 (1965). Indeed, in *United States v. Dockery*, the D.C. Circuit agreed: "the Government may veto the defendant's request for a bench trial, so long as that veto does not otherwise violate the defendant's constitutional rights." 955 F.2d 50, 55 (D.C. Cir. 1992). In consideration of the overt Confrontation Clause violation caused by the admission of Co-Conspirator 1's unconfronted testimony, along with the complexity of this case, which involves mixed questions of law and fact, the law of multiple jurisdiction, and potentially millions of documents, Mr. Edelman's case presents one of those circumstances contemplated by *Singer* and *Dockery*. *See United States v. Lewis*, 638 F. Supp. 573, 579 (W.D. Mich. 1986) (granting bench trial over government's objection where jury trial conflicted with defendant's First Amendment right).

Two recent cases that ordered a bench trial over the government's objection distilled the relevant factors for a Court to consider: (1) the government's motives in objecting to a non-jury trial; (2) whether the government's insistence on a jury trial "unfairly interferes with the defendant's exercise of a separate constitutional right"; (3) whether the government's demand for a jury trial "implicates the public's right to a speedy trial"; and (4) "whether case-specific factors, such as the nature of the evidence or the predominance of legal issues over factual issues, would render obtaining an impartial jury trial difficult or unworkable." *United States v. Cohn*, 481 F. Supp. 3d 122, 129 (E.D.N.Y. 2020); *Smith*, 702 F. Supp. at 206. Factors 1, 2, and 4 are most relevant to Mr. Edelman's case.

The government has neither denied or granted its consent to a bench trial yet, so there is no motive to explain (but Mr. Edelman invites the government's thoughts on this factor). In light of the importance of Co-Conspirator 1's testimony along with his unavailability, age, illness, and unwillingness to travel to the United States for trial, the Rule 15 deposition is necessary to obtain his testimony at trial. However, if unconfronted, there are no reasonable measures that could be taken to circumvent the "substantial and unavoidable risk of prejudice" that would be caused by introducing that testimony, aside from granting Mr. Edelman a bench trial. *See Smith*, 702 F. Supp. 3d at 210. Based on the factors laid out in *United States v. Cohn*, 481 F. Supp. 3d 122 (E.D.N.Y. 2020), *United States v. Smith*, 702 F. Supp. 3d 206 (S.D.N.Y. 2023), and the cases they draw from, Mr. Edelman should be granted a bench trial, regardless of whether the government gives its consent.

### A.    The government cannot to offer a reason sufficient to overcome the need for a bench trial in this case.

Mr. Edelman's right to confront Co-Conspirator 1 is a Constitutional right, explicitly stated in the Sixth Amendment. U.S. Const. Amend. VI. The government's "interest in a jury trial, by contrast, arises solely from Rule 23(a) and has no constitutional underpinnings." *Smith*, 702 F. Supp. 3d at 215; *see also United States v. Martin Linen Supply Co.*, 430 U.S. 564, 574 n.13 (1977) ("Any Government right to demand a jury verdict is limited to that afforded by Fed. Rule Crim. Proc. 23(a) . . . ."); *id.* ("[T]he prosecution has no constitutionally sanctioned interest in receiving a verdict from the jury . . . ."). In a conflict between a criminal defendant's Constitutional right and a rule of procedure, Mr. Edelman's Constitutional interest "plainly must prevail . . . ." *See Smith*, 702 F. Supp. 3d at 215; *accord Lewis*, 638 F. Supp. at 578 ("Consequently, Fed. R. Crim. P. 23(a) operates to burden unduly defendants' free exercise of religion."). Unlike other amendments, which deal with the right of the public, such as the First Amendment, the Sixth

Amendment right to confrontation, "is personal to the accused," because the Amendment's "overriding purpose [is] the protection of the accused from prosecutorial and judicial abuses." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 379-80 (1979).

The government is welcome to provide a reason why it is "not prepared to agree to a bench trial at this juncture." Motion at 12. Because Mr. Edelman's Constitutional right to confrontation would prevail over the government's Rule 23(a) interest, prosecutorial motive is not "dispositive," *Cohn*, 481 F. Supp. 3d at 129, and the Court may decide this issue without any input from the government.

**B.      Mr. Edelman's Constitutional right to confront Co-Conspirator 1 conflicts with his Constitutional right to a jury trial.**

To vindicate the entire Bill of Rights for criminal defendants, it is "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). In *Cohn*, the trial was set to take place during the height of the COVID-19 pandemic, and the defendant had serious underlying health issues. *See Cohn*, 481 F. Supp. 3d at 133. The court explained that in light of the defendant's right of confrontation and the fact finder's need to observe a witness' demeanor, "all testifying witnesses . . . [would] have to remove medical face masks while testifying." *Id.* But given the then-current "circumstances of the pandemic combined with this defendant's health profile," if the defendant were to testify (necessarily maskless) and in front of a jury, he would put himself at "unacceptable risk," which would "effectively rob the defendant of a meaningful opportunity, if he chose to do so, to testify on his own behalf." *Id.* The court found that the defendant's right to a jury trial was pitted "against his right to testify at that trial," which presented "a problem of constitutional dimension," and granted a bench trial over the government's objection. *Id.*

In *Smith*, Judge Rakoff ordered a bench trial over the government's objections. Jatiek Smith

invoked his right to represent himself, but had been ordered to remain shackled due to his history of disruptive and violent conduct in the courtroom. *Smith*, 702 F. Supp. 3d at 208. Given the unconstitutional bias of jurors against defendants who are shackled, Judge Rakoff explained that with a jury present, deciding his fate, the defendant in Smith would be forced to "remain seated and constrained to counsel's table," which would burden "his constitutional right to confront the witnesses against him." *Id.* at 214. Judge Rakoff held that the defendant's Constitutional rights of self-representation, to be free from shackles, and confrontation "plainly must prevail" over the government's interest in a jury trial, which interest "ar[ose] solely from Rule 23(a) and has no constitutional underpinnings." *Id.* at 215; *accord Lewis*, 638 F. Supp. at 581 (allowing defendants to "waive a jury trial without the government's consent" where defendants' sincerely held religious beliefs conflicted with submitting to a jury trial).

Here, Mr. Edelman's Constitutional right of confrontation would "have to be surrendered in order to" vindicate his Constitutional right to a jury trial, presenting an "intolerable" dilemma. *See Simmons*, 390 U.S. at 394. A jury viewing Co-Conspirator 1's unconfronted testimony, pre-recorded while Mr. Edelman was on another continent, would not understand that this approach to testimony is not the norm and may only be taken upon a showing "exceptional circumstances . . . ." *Kelley*, 36 F.3d at 1124. Unlike a judge, who presides over trials and makes credibility determinations all the time, a juror is a comparatively inexperienced fact finder. *See United States v. Castro*, 413 F.2d 891, 895 n.7 (1st Cir. 1969) ("A jury may have difficulty in disregarding extrajudicial statements implicating a defendant. We will not presume that a judge suffers from the same disability. Indeed, the presumption is to the contrary."). Accordingly, and regardless of the instruction given, a novice to the courtroom who is viewing Co-Conspirator 1's unconfronted testimony would think the Constitutionally infirm testimony was normal, as a matter of course. *Cf.*

26

*Kelley*, 36 F.3d at 1124 (Rule 15 depositions generally disfavored and granted only under "exceptional circumstances"). Moreover jurors, as untrained fact finders, would not be able to properly credit the effect of the "intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony." *Gigante*, 166 F.3d at 81; *see also Blunt v. United States*, 959 A.2d 721, 729 (D.C. 2008) (stressing the importance of allowing the defense "a full and fair opportunity to probe and expose [testimonial] infirmities through cross-examination" specifically because of its impact on the factfinder).

Even though it is widely accepted that "confrontation through a video monitor is not the same as physical face-to-face confrontation," *Yates*, 438 F.3d at 1315, given the importance of Co-Conspirator 1's testimony, even a curative instruction could not ameliorate the effects of the Constitutionally infirm testimony of Co-Conspirator 1. *See Bruton v. United States*, 391 U.S. 123, 135 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").

The Supreme Court dealt with an analogous situation in *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the defendant was tried with another person, Evans, who had confessed to a postal inspector that Evans had committed the armed robbery along with another person, whom he would not name. *Id.* at 124. The postal inspector testified at George Bruton and Evans' joint trial (Evans did not), where the court instructed the jury that "although Evans' confession was competent evidence against Evans it was inadmissible hearsay against [Bruton] and therefore had to be disregarded in determining [Bruton]'s guilt or innocence." *Id.* at 125. Nonetheless, the jury convicted Bruton, and the Eighth Circuit affirmed. *Id.*

The Supreme Court held that the Confrontation Clause prohibited the admission of Evans'

out-of-court testimonial statement that inculpated Bruton because Bruton had no opportunity to cross-examine Evans. The Supreme Court reversed the Eighth Circuit and held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton]'s guilt, admission of Evans' confession in this joint trial violated [Bruton]'s right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126. The Supreme Court explicitly overruled its prior precedent, which "assumed" that the "encroachment on the right to confrontation could be avoided by the instruction to the jury," because that assumption had been "effectively repudiated" as impossible to achieve in practice. *Id.* at 128.

Among other concerns, *Bruton* explained that given the "inevitably suspect" nature of a co-defendant's inculpatory testimony against a defendant, the "unreliability of such evidence is intolerably compounded when" a testimonial statement of the co-defendant is admitted. *Id.* at 136. "It was against such threats to a fair trial that the Confrontation Clause was directed." *Id.* Accordingly, and "[d]espite the concededly clear instructions to the jury . . . .[t]he effect is the same as if there had been no instruction at all." *Id.* at 137; *accord Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction."); *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962) (describing the common paradox of curative jury instructions: "one 'cannot unring a bell'; 'after the thrust of the saber it is difficult to say forget the wound'; and finally, 'if you throw a skunk into the jury box, you can't instruct the jury not to smell it'").

But here, the risk of an ineffective curative instruction can be avoided all together because Mr. Edelman "agree[s] to waive his right to a trial by jury." *Smith*, 702 F. Supp.3d at 216; *see also*

*Bruton*, 391 U.S. at 137 (curative procedure insufficient given "substantial threats to a defendant's constitutional rights [to confront the witnesses against him] . . . [a] hazard [the Supreme Court] cannot ignore"). These sorts of credibility determinations that require the factfinder to critically assess a key witness are best suited to judges, and Mr. Edelman has no doubt as to this Court's ability to make those assessments. *See, e.g.*, *Cromitie v. United States*, No. 09 CR 558-01 (CM), 2017 WL 1383982, at *7 (S.D.N.Y. Apr. 7, 2017) (judge would have recognized that "on the one and only point that mattered—predisposition—[the CI's] credibility ended up being immaterial"); *Johnson v. Tennis*, 549 F.3d 296, 300 (3d Cir. 2008) (collecting cases that decline to apply *Bruton* to bench trials because "the risks inherent in the jury system of which the *Bruton* Court was so concerned would seemingly not exist when a judge is sitting as a trier of fact"); *Rogers v. McMackin*, 884 F.2d 252, 257 (6th Cir. 1989) ("To apply *Bruton* to bench trials would be to [incorrectly] conclude that judges, like jurors, may well be incapable of separating evidence properly admitted against one defendant from evidence admitted against another.").

## C. The complexity of this case additionally presents a substantial risk of an unfair trial if a jury is the finder of fact.

There are at least four additional case-specific factors that militate against a jury trial: (a) the complexity of the issues, involving U.S. federal tax law and the tax, property, and marital law of various countries; (b) the government's attempt to attribute Delphine Le Dain Edelman's actions to her husband; (c) the vast number of documents; and (d) the need for a significant number of experts. *See United States v. Braunstein*, 474 F. Supp. 1, 13-14 (D.N.J. 1978) (granting bench trial over government's objection in case with multiple defendants and complex tax issues); *United States v. Panteleakis*, 422 F. Supp. 247, 250 (D.R.I. 1976) (granting bench trial over government objection where "unrealistic to expect a jury to hear all the evidence over a three month period, weigh approximately 1,000 exhibits and then categorize everything as it pertains to each particular

defendant to the exclusion of others against whom it is inadmissible without prejudice to all").

Charges of regulatory crimes such as tax, securities, and Medicaid or Medicare fraud, have been recognized as three types of law for which "the practical and human limitations of [a] jury . . . cannot be ignored," *Bruton*, 391 U.S. at 135, and a bench trial must be granted to avoid a constitutionally infirm proceeding. *See, e.g.*, *Braunstein*, 474 F. Supp. at 13 (tax and Medicaid); *United States v. Schipani*, 44 F.R.D. 461, 462 (E.D.N.Y. 1968) (tax); *Cohn*, 481 F.Supp.3d 122 (securities); *Panteleakis*, 422 F. Supp. at 250 (Medicare).

In *United States v. Braunstein*, there were five defendants, each charged with multiple crimes of tax evasion, Medicaid fraud, and making of false statements. The court laid out concerns about the substantive law and procedural aspects of the case to grant the defendants' request for a bench trial over the government's objection. *Braunstein*, 474 F. Supp. at 14. From a substantive perspective, because Medicaid was at issue, the laws of many jurisdictions (state and federal law) would be relevant, along with multiple jurisdictions' accounting rules. *Id.* at 13. Further, along with their own complexity, the tax charges added "another layer of complicated and different accounting rules" for Medicaid accounting. *Id.* at 13-14.

Considering the intricacy of the law, the *Braunstein* court had procedural concerns over how to instruct a jury on the separate jurisdictions' contract laws, which it remarked "would ordinarily be a subject for interpretation by the court alone absent some fact issue about the contract, in which case the instructions would be further complicated." *Id.* at 14; *accord Cohn*, 481 F.Supp.3d at 134 ("inherent complexity . . . make[s] a jury trial in this case more difficult"). Moreover, given the dispute was numbers-heavy, "[e]ach item of alleged expenditure said to have been improperly charged will need to be traced through books and records to establish their inclusion in the line items of the cost studies and the tax returns." *Braunstein*, 474 F. Supp. at 14.

The cure for these issues did not exist: "[e]ven with independent experts . . . the court is convinced that a jury of laymen could not be expected to master the intricacies and complications of fact and law sufficiently to provide a fair trial." *Id.*. For those reasons, as well as others, the *Braunstein* court granted a bench trial over the government's objection.

So too here. In a recent filing, filed under seal, Mr. Edelman laid out just a part of the complexity of his case. He will not re-state it. Suffice it to say that Mr. Edelman's case involves the thorny application of tax law, trust law, as well as the law of many different jurisdictions (some civil and some common law). As counsel for Mr. Edelman explained in two status hearings before this Court, Mr. Edelman anticipates filing multiple Rule 26.1 motions given the various jurisdictions upon which this case touches. *See* Nov. 1, 2024 Status Hrg. Tr. 19:1-4 (Bishop, S.) ("[T]here [are] so many jurisdictions involved that it doesn't make sense for us to file [a Rule 26.1 notice] until we actually know sort of what [the government's] case in chief is."); Sept. 13, 2024 Status Hrg. Tr. 13:23-25 (Bishop, S.) (similar). A bench trial would allow the parties to better address these complexities while also mitigating the harm to Mr. Edelman's Confrontation Clause rights.

## <u>REQUEST FOR RELIEF</u>

For the reasons explained herein, Mr. Edelman believes that Co-Conspirator 1's unconfronted testimony violates his Sixth Amendment right of confrontation. Nonetheless, if the government can provide some assurances about the enforceability of the oath, Mr. Edelman agrees to Co-Conspirator 1's Rule 15 deposition under the following conditions:

1.  Mr. Edelman and one of his counsel would be located in a room in the Washington, D.C. region, along with one or more counsel for the government, observing the testimony of Co-Conspirator 1;

2.  Co-Conspirator 1 would be located in London, giving his testimony from Baker

31

McKenzie's London office, and with him would be his own counsel, one or more of Mr. Edelman's counsel, counsel for the government (and whoever else the government would like to be present), a court reporter, and a court videographer;

3.     The video and audio would be two-ways, allowing Mr. Edelman and Co-Conspirator 1 to see and hear one another, the videographer to capture both Mr. Edelman and Co-Conspirator 1's faces, and counsel to make objections;

4.     Judge Kollar-Kotelly would preside over the entire deposition of Co-Conspirator 1 to observe his and Mr. Edelman's demeanors and reactions in real time, for the first time; and

5.     Mr. Edelman be granted a bench trial, either by the government's consent or over the government's objection.

Mr. Edelman asks the Court to grant an appropriate order, along with any other relief this Court deems appropriate.


Respectfully submitted,


/S/ George M. Clarke III                          /S/ Sonya C. Bishop
GEORGE M. CLARKE III                    SONYA C. BISHOP
D.D.C. Bar No. 480073                        D.D.C. Bar No. NY0568
George.clarke@bakermckenzie.com    Sonya.bishop@bakermckenzie.com
BAKER & McKENZIE LLP                 BAKER & McKENZIE LLP
815 Connecticut Ave., N.W.                452 Fifth Ave.
Washington, D.C. 20006                       New York, N.Y. 10018
(202) 835-6184                                      (332) 215-5812

*Counsel for Douglas Edelman.*

Dated: December 10, 2024