UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DOUGLAS EDELMAN,<br><br>Defendant. | Criminal Action No. 24-239-1 (CKK) |

**MEMORANDUM OPINION**
(June 20, 2025)

Defendant Douglas Edelman was charged with orchestrating one of the largest tax-evasion schemes in American history. While awaiting trial, Edelman violated his conditions of release. As a result, this Court ordered that he be detained. Recently, Edelman entered a guilty plea (but not a plea agreement) to some (but not all) of the charges against him.

Edelman then moved for temporary release pending sentencing. After a hearing, and having considered the parties' submissions, the relevant legal authority, and the entire record before it, the Court orally granted Edelman's motion. *See* Min. Order (June 18, 2025). This Memorandum Opinion explains the conclusions underlying that order.

**I. BACKGROUND**

**A. Edelman's Pretrial Release, Violation, and Detention**

This Court has discussed at length the circumstances giving rise to Edelman's pretrial detention. *See* Mem. Op., ECF No. 53 (*United States v. Edelman*, 2024 WL 5093496 (D.D.C. Dec. 12, 2024)). For present purposes, an abbreviated summary suffices.

In July 2024, Edelman—a U.S. citizen living abroad—was arrested in Ibiza, Spain. Mem. Op. at 3. Two months later, he appeared in this District for arraignment by Magistrate Judge Moxila A. Upadhyaya. *Id.* Edelman pleaded not guilty to all thirty counts of the Indictment, and

1

Magistrate Judge Upadhyaya ordered Edelman released pending trial on conditions of release he had negotiated with the Government. *Id.* Under that order, Edelman was released to the Pretrial Services Agency's High Intensity Supervision Program. *Id.* Among other things, Edelman was required to surrender his passport, submit to GPS monitoring, and restrict his movements to within one mile of his residence in Alexandria, Virginia. *Id.* He was also ordered to "have no direct contact (other than through legal counsel) with the co-conspirators named or identified in the Indictment." *Id.*

Just four days later, Edelman violated that no-contact order. *See* Mem. Op. at 14. In fact, "Edelman violated the condition that he not contact alleged co-conspirators at least 29 times in just the first 46 days of his pretrial release." *Id.* at 14–15. The Court found Edelman's messages with one co-conspirator (whom Edelman knew to be a cooperating witness) particularly troubling. Mem. Op. at 10. Those messages concerned assets held by Galactea Trust. *Id.* The Government contends that the trust is a sham designed by Edelman to shield his wealth from taxation by the United States. *See id.* Edelman insists that the trust is legitimate and that its assets belong to his wife and children. *See id.* at 11. That dispute was, and remains, a central question in this litigation.

Edelman's messages repeatedly suggested that he would attempt to influence the stewards of the trust to release millions of dollars to the cooperating witness. Mem. Op. at 10–14. And the Court found that Edelman contacted that witness in willful violation of his release order and with the intent to avoid detection. *Id.* at 16. Edelman's messages raised the concern that he would attempt to covertly influence potential witnesses against him if he remained on release. *Id.* at 15.

The Court concluded that Edelman had violated his conditions of release. *See* 18 U.S.C. § 3148(b)(1)(B). And the Court further concluded that Edelman was "unlikely to abide by any

condition or combination of conditions of release" moving forward. *See id.* § 3148(b)(2)(B). So the Court revoked Edelman's release and ordered him detained pending trial. *See id.* § 3148(b).

Edelman appealed that order. Notice of Appeal, ECF No. 55. But the D.C. Circuit affirmed. *United States v. Edelman*, 2025 WL 576596 (D.C. Cir. Feb. 21, 2025) (per curiam). And Edelman has now been detained for about six months.

### B. Subsequent Developments

After Edelman's detention in December 2024, this litigation continued apace. In January and February, the parties arranged for, and took, the remote deposition of a witness located in the United Kingdom. *See* Order, ECF No. 64. In March, Edelman's counsel raised concerns about his competency stemming from discussions with Edelman in the course of plea negotiations. *See* Min. Order (Mar. 14, 2025). After reviewing reports from three different doctors, the Court concluded in April that Edelman is competent to stand trial. *See* Min. Order (Apr. 4, 2025). At that time, the parties informed the Court that Edelman had rejected the Government's latest plea offer but that negotiations were ongoing. *See id.* By May, those negotiations had stalled. *See* Min. Order (May 16, 2025). So Edelman took a different tack.

On May 21, Edelman entered, and the Court accepted, a partial, "open plea." Without a plea agreement with the Government, Edelman pleaded guilty to Counts 1–10 of the Indictment—tax evasion for the years 2006–2012, false statements about the ownership of his businesses during that period, and conspiracy to conceal that ownership throughout the period of the indictment.

But Edelman did not change his plea as to Counts 11–30. Those counts concern the period between 2013 and 2020, after Edelman purported to transfer his assets to the trust discussed above. During that time, the assets continued generating income, but Edelman did not pay taxes on that income because—in his view—the income belonged to the trust and its beneficiaries. In effect, to

paraphrase the Government, Edelman's defense has shifted from "I never owned the assets" to "I owned the assets until 2012, but then I gifted them to my wife through the trust." *See* Gov't's Opp'n, ECF No. 82, at 9.  The merits of that defense remain an open question.

Because the parties have not reached a plea agreement, the Government may still attempt to resolve that question through a trial on Counts 11–30.  But the parties have agreed to first proceed to sentencing on Counts 1–10.  And at sentencing, the parties will dispute the validity of the trust in the context of ascertaining the total tax loss attributable to Edelman's offense conduct for Counts 1–10.  *See* Joint Notice of Authority, ECF No. 78.  The Government will argue the trust was a sham, that Edelman structured the trust as part of the same course of conduct underlying his guilty plea to Counts 1–10, and that the tax loss attributable to Edelman's offense conduct thus includes income earned on trust assets from 2013–2020.  Edelman, by contrast, will argue that the trust was legitimate and that, as a result, trust income forms no portion of the tax loss.

The Court's resolution of those competing arguments will likely obviate a trial.  As the parties have explained, the sentencing guidelines in this case are driven by the value of the tax loss.  *See* Joint Notice of Authority, ECF No. 78.  So if the Government prevails on its argument at sentencing, Edelman's base offense level on Counts 1–10 would be identical to the level resulting from a guilty verdict on all 30 counts at trial.  And the Government could pursue the same restitution it would have following a trial.  Trial on the remaining counts would thus be unlikely.  If instead the Government fails to prove the invalidity of the trust at sentencing, a subsequent trial under a more burdensome beyond-a-reasonable-doubt standard would also be unlikely.

Against this backdrop, Edelman moved for release pending sentencing.  *See* Def.'s Mot., ECF No. 81.  The Government opposed.  *See* Gov't's Opp'n, ECF No. 82.  Edelman replied.  *See* Def.'s Reply, ECF No. 83.  And the Court held a hearing on Edelman's motion.  Min. Order

4

(June 18, 2025). At the hearing, the Court heard argument from counsel for both parties and engaged in an extended colloquy with Edelman about his plans in the event of his release, his financial and living arrangements, and other matters.

## II. LEGAL STANDARD

By default, this Court "shall order" that a defendant like Edelman "awaiting imposition or execution of a sentence" be detained. 18 U.S.C. § 3143(a)(1). But the Court need not do so if it "finds by clear and convincing evidence" that the defendant "is not likely to flee or pose a danger to the safety of any other person or the community if released" on personal recognizance or on conditions. *Id.* In other words, the Court must "make the same flight risk and dangerousness assessment that the Bail Reform Act requires" for pretrial detention, "only, now, detention is presumed, and it is the defendant's burden to convince" the Court that he should be released. *United States v. Wiggins*, 613 F. Supp. 3d 348, 353–54 (D.D.C. 2020) (KBJ).[1]

## III. ANALYSIS

For the reasons that follow, although a close case, the Court concludes by clear and convincing evidence that, subject to restrictive conditions of release, including those in effect before Edelman's detention and additional conditions discussed at the June 17 hearing, Edelman is neither a flight risk nor a danger to the community.

### A. Flight Risk

Before Edelman violated this Court's order that he not contact co-conspirators, he was released subject to home detention and GPS monitoring. Release Order, ECF No. 16, at 2–3. He surrendered his passport. Pretrial Compliance Report, ECF No. 21, at 3. The Court was never

---

[1] Edelman suggests that, given the potential for trial on the remaining counts, the Court might treat his motion as one for reconsideration of the Court's earlier order under 18 U.S.C. § 3142(f) or look to 18 U.S.C. § 3142(i), which permits release where "necessary for preparation of the person's defense or for another reason." *See* Def.'s Mot. at 7. The Court does not reach those issues because Edelman prevails under 18 U.S.C. § 3143(a)(1).

alerted to any issues regarding Edelman's compliance with his location-monitoring conditions prior to his detention. And the Court never determined that Edelman was a flight risk while subject to those conditions. *See generally* Mem. Op., ECF No. 53.

As the Court sees the issue then, the question is whether Edelman's detention and guilty plea have changed the flight-risk calculus—either because the burden of persuasion has now shifted to Edelman, or because changed circumstances have increased the risk that he will flee.

The Government argues that Edelman "now has greater reason to flee" than he did while awaiting trial because he is certain to face punishment for his admitted criminal conduct. Gov't's Opp'n at 8. That may be so. But the Court agrees with Edelman that there is no reason to suspect that his *ability* to flee from justice has changed materially in the time since his detention. *See* Def.'s Reply at 6–7. Indeed, the Court's colloquy with Edelman at the June 17 hearing revealed that Edelman's access to the resources necessary to his facilitate his flight is limited and that Edelman's attorneys are essentially responsible for coordinating his personal finances.

Further, the Court has tailored Edelman's conditions of release to accommodate for any increase in Edelman's incentive to flee as a result of his guilty plea. Edelman will be subject to home incarceration, GPS monitoring under the supervision of Pretrial Services, and a prohibition on his entering, or even approaching, any airport, marina, embassy or consulate. In short, on release pending sentencing, Edelman will be subject to even more restrictive conditions than those the Government once agreed were sufficient to deter his flight pending trial.

The Court also notes that Edelman's guilty plea, however incomplete, suggests that he is ready to face the consequences for his crimes. The Government is no doubt correct that Edelman's "plea and sentencing strategy is an attempt to avoid" criminal liability for some of the Government's allegations and preserve the trust assets for his family from any restitution award.

Gov't's Opp'n at 9. The Court is not blind to the strategy at play. But this is a criminal prosecution. The defendant is entitled to strategize to limit his liability. And the tack Edelman has taken—"dealing with major issues at sentencing to conserve resources for everyone involved"—suggests an effort to shield trust assets from restitution through a streamlined, legitimate judicial process rather than by facilitating flight. *See* Def.'s Reply at 11–12.

Indeed, even if Edelman had the means to flee, the Court could (and would) proceed to award restitution in his absence. *See* Fed. R. Crim. P. 43(c); *United States v. Jordan*, 216 F.3d 1248, 1250 (11th Cir. 2000); *United States v. Robinson*, 390 F.3d 853, 887 (6th Cir. 2004); *United States v. Achbani*, 507 F.3d 598, 601 (7th Cir. 2007); *United States v. Rivera-Nazario*, 68 F.4th 653, 660 (1st Cir. 2023).

Accordingly, the Court concludes by clear and convincing evidence that Edelman is not likely to flee while released pending sentencing on home incarceration and GPS monitoring.

**B. Dangerousness**

There has never been any suggestion that Edelman, a septuagenarian charged with financial crimes, poses a danger to the physical safety of the community. Nor, given the nature of Edelman's offenses and his present station, is there any serious risk that he will reoffend while on release. Instead, the risk that concerned this Court at the time of Edelman's detention was the risk that he would disregard his conditions of release and contact his co-conspirators in an attempt to corruptly influence witnesses against him at trial. *See* Mem. Op., ECF No. 53, at 14.

But that risk no longer justifies Edelman's detention for two reasons.

First, the consequences of Edelman interfering with witnesses are less severe now that Edelman has entered an open plea. As explained, a trial on the remaining counts, though possible, is unlikely. And although witnesses will surely appear at the sentencing hearing scheduled for

7

November 17, 2025, the co-conspirator witnesses central to the Court's earlier concerns are unlikely to take on the prominent role they would have at trial.

Second, and much more importantly, the Court's trust in Edelman to comply with his conditions of release has grown significantly in the last six months. When the Court ordered Edelman detained, it stressed Edelman's "demonstrated untrustworthiness," "sense of contempt" for these proceedings, and evident disrespect for this Court's orders. Mem. Op. at 17–18. Those judgments about Edelman's demeanor and credibility, combined with the constraints on the Pretrial Services Agency's ability to monitor his electronic communications, led the Court to conclude "that nothing short of detention [could] ensure that Edelman will not contact his alleged co-conspirators." *Id.* at 19.

Since then, the Court's view has changed. Edelman has appeared before this Court repeatedly and without issue during the period of his detention. He entered a guilty plea as to Counts 1–10 without equivocation. And his briefing on his motion for release and demeanor in the hearing on that motion appeared to show genuine contrition for his earlier violations and a sincere commitment not to run afoul of his conditions of release again. The Court's impression of Edelman following the June 17 hearing is that his time in pretrial detention has deterred future misconduct and that his principal goal in seeking release pending sentencing is to spend time with his children and assist his attorneys in preparing for sentencing proceedings.

Further, the Court has crafted additional conditions of release to ensure that Edelman does not engage in any misconduct related to arranging financial windfalls for his co-conspirators in the future. On release pending sentencing, Edelman will not be allowed to own a smartphone, laptop, or other device with internet access. His family may not bring him any such devices. Edelman is further prohibited from discussing the liquidation of any trust assets, except through counsel. And

in the event any such assets are liquidated, Edelman will be required to report that liquidation to Pretrial Services. These conditions diminish the concerns that animated the Court's decision to detain Edelman following his initial violations.

It remains the case, as the Government notes, that Pretrial Services cannot effectively monitor Edelman's devices to ensure that he will not contact his alleged co-conspirators. But now, unlike in December, Edelman has convinced the Court that it can take him at his word. The Court has no doubt that Edelman understands the sanctions that will follow should he abuse this Court's trust again. And the Court is of the mind that Edelman's pretrial detention has deterred future noncompliance. In short, Edelman has made the necessary effort to re-earn the Court's trust.

Accordingly, the Court further concludes by clear and convincing evidence that Edelman is not likely to pose a danger to the community if released on restrictive conditions.

### IV. CONCLUSION

The Court found that Edelman is not likely to flee or pose a danger to the safety of any person or the community if released pending sentencing on the conditions imposed by the Court's original Release Order. *See* 18 U.S.C. § 3143(a)(1). Having made that finding, the Court was required to, and did, order that Edelman be released pending sentencing. *See id.* (the Court "shall order" such release).

**Dated:** June 20, 2025.

/s/ Colleen Kollar-Kotelly
COLLEEN KOLLAR-KOTELLY
United States District Judge