# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**V.**

**DOUGLAS EDELMAN.**

CASE NO. 24-CR-239 (CKK)

## <u>DOUGLAS EDELMAN'S PRE-HEARING BRIEF</u>

## <u>TABLE OF CONTENTS</u>

OVERVIEW ............................................................................................................. 1

ANALYSIS ............................................................................................................. 2

I.     The Court Need Not Decide Whether the Trusts Were Valid or Whether Mr. Edelman Had an Interest in Them in Order to Sentence Him Under the 2025 Guidelines but Those Determinations May Matter for the 2026 Amendments. ......... 2

     A.     The Parties Agree that the Tax Loss Is More than $65 Million but Less than $150 Million. ......................................................................... 2

     B.     The Tax Loss Determination and the Restitution Determination Are Two Different Inquiries and Mr. Edelman Is Uncollectable in Any Event. ............. 5

II.     The Internal Revenue Code Does Not Define a "Trust"; Federal Law Looks to Foreign Law ........................................................................................................ 6

III.     The Court Must Rely on Foreign Law at Both Steps of the Two-Step Process of Determining Whether the Trusts Are Trusts Under U.S. Law. ................................ 10

IV.     The BVI and English & Welsh Trust Law Expert Will Assist the Court in Understanding the Terms of the Foreign Trust Agreements ...................................... 16

V.     The Government's Key Witness Believed the Trusts Were Real, and the Government Is Not Calling the Current or Former Trustee as a Witness. ............... 18

     A.     As the Protector, CC1 Was Intimately Involved in Trust Operations and Finances. ............................................................................................. 19

     B.     Mr. O'Brien Was the Trustee, Responsible for the Oversight of the Trust, but the Government Will not Call Him to Testify. ........................................... 22

     C.     The Court May Infer that the Trustees' Testimony Would Have Been Damaging to the Government ............................................................................ 23

## <u>OVERVIEW</u>

If the Court decides to sentence Defendant Douglas Edelman under the 2025 Sentencing Guidelines, it does not need to determine whether Galactea Trust and related, nearly identical trusts (the "trusts"), are valid or whether Mr. Edelman has any interest in them. Those questions would matter only for purposes of the § 2T4.1 base-offense range and for estimating a restitution amount. Neither matters because (1) the parties agree that the tax loss falls within the 2025 Guidelines' M range, and (2) restitution and tax loss are different inquiries. Even if the two were the same, Mr. Edelman is not collectible. However, the recently proposed Guidelines amendments would change the tax loss range and other aspects of sentencing making them potentially relevant and militating in favor of continuing the sentencing hearing to November when they go into effect.

If the Court believes it must decide the validity and interest questions, then U.S. law requires the Court to apply foreign law. Despite its cornucopia of definitions, the Internal Revenue Code never defines a "trust." Congress left a void, filled by regulations and case law: While federal law determines how (and whether) to tax, local law determines whether there is anything to tax.

Courts separate the analysis into two steps. First, determine whether the documents interpreted under their constitutive law lay out the framework for the four elements of a trust. Second, determine whether that framework was respected. The second step incorporates both local law, which defines what was required to happen, and evidence of what actually happened.

John Machell, KC, will help the Court understand the local law, the laws the British Virgin Islands, England, and Wales. He will explain why, under those laws, the trusts would be valid and Mr. Edelman would not have had any interest in them. The government's key witness corroborates those conclusions factually, which the current and former trustees hypothetically could refute. But the government indicated it doesn't plan to call them. A negative inference should follow.

## ANALYSIS

**I.     The Court Need Not Decide Whether the Trusts Were Valid or Whether Mr. Edelman Had an Interest in Them in Order to Sentence Him Under the 2025 Guidelines but Those Determinations May Matter for the 2026 Amendments.**

There are only two possible reasons for determining the validity of and interest in the trusts: (1) to arrive at tax loss by determining whether Mr. Edelman's tax-related activities for 2013-2020 constituted "related conduct," under U.S.S.G. §§ 1B1.3(a) and 2T1.1, and (2) to arrive at a restitution figure. As to the first, the parties appear to agree on the tax loss range (more than $65 million but less than $150 million). While that agreement means that the precise tax loss does not matter under the 2025 Guidelines, proposed amendments that would go into effect later this year would make the number relevant to sentencing. As to the second, while the tax loss and restitution determinations are separate inquiries, even if the Court uses the same process to determine both figures, Mr. Edelman lacks any income or assets to pay restitution. Because the government cannot collect, any restitution determination against Mr. Edelman is academic.

**A.     The Parties Agree that the Tax Loss Is More than $65 Million but Less than $150 Million.**

**1.     Under the 2025 Guidelines, the Exact Amount of Tax Loss Does Not Matter.**

To sentence a person convicted of tax evasion, establishing the base offense level under step 2 of the advisory Guidelines requires this Court to first determine the tax loss. *See* U.S.S.G. §§ 2T1.1, 2T4.1. The parties agree that Mr. Edelman will be sentenced under § 2T1.1(a), which cross-references § 2T4.1 for coordinating the tax loss with the base offense level. The 2025 tax table at § 2T4.1 provides sixteen tax loss ranges, each of which corresponds to a base offense level. That table is replicated below:

| §2T4.1. | Tax Table | |
| --- | --- | --- |

| Tax Loss (Apply the Greatest) | | Offense Level |
| --- | --- | --- |
| (A) | $2,500 or less | 6 |
| (B) | More than $2,500 | 8 |
| (C) | More than $6,500 | 10 |
| (D) | More than $15,000 | 12 |
| (E) | More than $40,000 | 14 |
| (F) | More than $100,000 | 16 |
| (G) | More than $250,000 | 18 |
| (H) | More than $550,000 | 20 |
| (I) | More than $1,500,000 | 22 |
| (J) | More than $3,500,000 | 24 |
| (K) | More than $9,500,000 | 26 |
| (L) | More than $25,000,000 | 28 |
| (M) | More than $65,000,000 | 30 |
| (N) | More than $150,000,000 | 32 |
| (O) | More than $250,000,000 | 34 |
| (P) | More than $550,000,000 | 36 |

For a tax loss greater than $65 million but less than $150 million, this tax table indicates a base offense level of 30. *See* § 2T4.1(M). Mr. Edelman has no basis for alleging that the tax loss is less than $65,000,000, and, based on defense counsel's present understanding, the government will argue that the tax loss is approximately $128 million. Both figures are greater than $65 million but less than $150 million, putting them squarely in the 2025 M range of § 2T4.1, with a base offense of 30. The difference between $65,000,000 and $150,000,000 appears significant (and indeed is numerically significant), but because of the breadth of the 2025 tax table's M range, there is no present dispute that the base offense level under the 2025 Guidelines—the starting point for this Court's analysis—is 30.

> **2.    Under the Proposed Guidelines Amendments the Exact Amount of Tax Loss Could Matter.**

The proposed amendments to the 2025 Guidelines could make the exact amount of tax loss relevant because those amendments change the ranges. The amendments, released on December 12, 2025, propose adjusting the tax table for inflation, which could lower Mr. Edelman's base offense level. *See* U.S. Sentencing Comm'n, *Proposed Amendments to the Sentencing Guidelines*, at 52 (Dec. 12, 2025). The proposed tax table is replicated below:

| §2T4.1. | Tax Table | |
|---|---|---|
| [MULTIPLIER USED] | TAX LOSS (APPLY THE GREATEST) | OFFENSE LEVEL |
| [1.25] | (A) ~~$2,500~~$3,500 or less | 6 |
| [1.25] | (B) More than ~~$2,500~~$3,500 | 8 |
| [1.25] | (C) More than ~~$6,500~~$9,000 | 10 |
| [1.25] | (D) More than ~~$15,000~~$20,000 | 12 |
| [1.25] | (E) More than ~~$40,000~~$55,000 | 14 |
| [1.25] | (F) More than ~~$100,000~~$150,000 | 16 |
| [1.25] | (G) More than ~~$250,000~~$350,000 | 18 |
| [1.25] | (H) More than ~~$550,000~~$750,000 | 20 |
| [1.25] | (I) More than ~~$1,500,000~~$2,000,000 | 22 |
| [1.25] | (J) More than ~~$3,500,000~~$5,000,000 | 24 |
| [1.25] | (K) More than ~~$9,500,000~~$15,000,000 | 26 |
| [1.25] | (L) More than ~~$25,000,000~~$35,000,000 | 28 |
| [1.25] | (M) More than ~~$65,000,000~~$90,000,000 | 30 |
| [1.25] | (N) More than ~~$150,000,000~~$200,000,000 | 32 |
| [1.25] | (O) More than ~~$250,000,000~~$350,000,000 | 34 |
| [1.25] | (P) More than ~~$550,000,000~~$750,000,000 | 36. |

If the Court determines that Mr. Edelman's tax loss is less than $90 million, under the amendments, Mr. Edelman's base offense level would be 28, in the L range, pursuant to the amended tax table. The proposed amendments would also change the definition of "sophisticated means." *See Proposed Amendments to the Sentencing Guidelines*, at 155.

If Mr. Edelman is sentenced under the proposed amendments, the two-level sophisticated means enhancement may not apply. Currently, the Guidelines say that "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." § 2T1.1 (App. n. 5). Responding to comments that the current definition applies "based on commonplace technologies," the Commission has proposed revising the definition to include "using advanced or emerging technologies in ways not routinely employed by everyday users in a more specialized, elaborate, or unusual way than an ordinary user would." *Proposed Amendments to the Sentencing Guidelines*, at 164. There have been no allegations that Mr. Edelman has used (or is capable of using) "advanced or emerging technologies" to commit tax evasion or other crimes. Accordingly, under the revised definition, that two-level enhancement seems unlikely to apply.

The amendments are expected to go into effect on November 1, 2026. *See* 28 U.S.C. § 994(p) ("Such an amendment or modification . . . shall take effect on a date specified by the Commission, which shall be . . . no later than the first day of November of the calendar year in which the amendment or modification is submitted."). In light of those two major changes, it may be most efficient to wait to sentence Mr. Edelman until November. If his sentence were determined under the 2025 Guidelines, Mr. Edelman will likely move under 18 U.S.C. § 3582(c)(2) for this Court to reduce his Guideline range by as much as four levels—two for the tax loss and two for sophisticated means. The Court will likely require briefing for such a motion, which efforts could be consolidated more efficiently into the original sentencing proceeding.[1]

### B.    The Tax Loss Determination and the Restitution Determination Are Two Different Inquiries and Mr. Edelman Is Uncollectable in Any Event.

"'Loss' for the purposes of a criminal defendant's sentencing guidelines range and 'loss' for the purposes of restitution are distinct and different concepts." *United States v. Eckerd*, No. 22-cr-00237(1), 2026 U.S. Dist. LEXIS 10945, at *2 (S.D. Ohio Jan. 21, 2026). Whereas restitution "serves a compensatory function," and "focuses on the victim and the harm proximately caused by the defendant's conduct" loss under the Guidelines focuses "on the defendant, and seeks, however imperfectly, to measure the seriousness of his or her criminal conduct." *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 102 (2d Cir. 2014) (citations and internal quotations omitted). The two concepts "serve different purposes." *United States v. Gossi*, 608 F.3d 574, 582 (9th Cir. 2010). And even if the Court were to hold that the tax loss and the restitution determinations were one in the same, Mr. Edelman has no assets or income to pay restitution.[2]

---

[1] Defense counsel emailed the Department of Justice attorneys working on this matter to seek their views on this point. As of the time of filing, no substantive response has been received.

[2] The Government may argue that a determination by this Court that the trusts are invalid or that the trusts had Mr. Edelman as a beneficiary could impact this collection analysis. But as set out in

## II.     The Internal Revenue Code Does Not Define a "Trust"; Federal Law Looks to Foreign Law.

The Internal Revenue Code does not define what is and is not a "trust." While the Code recognizes a few types of "persons," 26 U.S.C. § 7701(a)(1), it defers to other authorities when it comes to defining each person's unique attributes. This includes trusts. Congress specifically declined to assign a federal label to this creature of local law. Relying on local law, Treasury Regulations provide direction.

### A.     The Treasury Regulations Define Trusts by Reference to the Law Under Which They Were Created.

Treas. Reg. §§ 301.7701-1 to -4 lay out the standards for classifying "organizations" for federal tax purposes. Organizations are a subset of "persons." Treas. Reg. § 301.7701-1(a) (1996). In 1996, those regulations underwent an overhaul to become what tax practitioners now call the "check-the-box regulations," which became effective in 1997. Prior to the implementation of the check-the-box regulations, we determined the classification of an "organization," which includes trusts, under multi-factor tests laid out in the regulations and in case law. *See* Treas. Reg. § 301.7701-1(b) (1996) ("Sections 301.7701-2 to 301.7701-4 set forth these tests, or standards, which are to be applied in determining whether an organization is (1) an association, (2) a partnership, or (3) a trust." (citations omitted)); *see, e.g.*, *Larson v. Comm'r*, 66 T.C. 159, 172 (1976) ("An organization will be taxed as a corporation if, taking all relevant characteristics into account, it more nearly resembles a corporation than some other entity.").

---

the Expert Report on BVI and English Law by John Machell, KC, under foreign law (the law that will govern collection) the trusts will be valid and Mr. Edelman will not be found to be a beneficiary. Ultimately, that foreign law will govern any attempts by the United States to seek collection of an order issued in this proceeding because the foreign jurisdictions will not allow the government to collect a judgment against Mr. Edelman from trusts in which he has no interest against a trustee who was not a party to this proceeding.

Those *pre*-check-the-box regulations specified that "the classes into which organizations are to be placed for purposes of taxation are determined under the Internal Revenue Code." Treas. Reg. § 301.7701-1(c) (1996). Setting aside the fact that the Code did not and has never defined what constitutes a "trust," the regulations made it clear that U.S. law, or "the Internal Revenue Code," determined the *classification* of an organization. *Id.* The regulations, however, had to grapple with the reality that an "organization" is created by and operates under "local law" not some amorphous U.S. federal "common" law. *See Morgan v. Comm'r*, 309 U.S. 78, 82 (1940) ("[S]tate law controls in determining the nature of the legal interest which the taxpayer had in the property."); *see also Cort v. Ash*, 422 U.S. 66, 84 (1975) ("Corporations are creatures of state law.").

Consistent with decades of case law, the IRS and Treasury decided that "[a]lthough it is the Internal Revenue Code rather than local law which establishes the tests or standards which will be applied in determining the *classification*" of an organization, "local law governs in determining whether *the legal relationships* which have been established in the formation of an organization are such that the standards are met." Treas. Reg. § 301.7701-1(c) (1996) (emphasis added); *see also Helvering v. Stuart*, 317 U.S. 154, 161-62 (1942) (property rights in a trust are determined by local, not federal, law); *Est. of Mittleman v. Comm'r*, 522 F.2d 132, 137 (D.C. Cir. 1975) (following *Morgan* and *Stuart*). Based on these decades of case law, Treasury specified that "it is local law which must be applied in determining such matters as the legal relationships of the members of the organization among themselves and with the public at large, and in the interests of the members of the organization and in its assets." Treas. Reg. § 301.7701-1(c) (1996).

The regulations defining trusts, found then where they are now at Treas. Reg. § 301.7701-4(a), incorporated, and still incorporate, that direction:

the term "trust" as used in the Internal Revenue Code refers to an arrangement created either by a will or by an inter vivos declaration whereby trustees take title to property for the purpose of protecting or conserving it for the beneficiaries under the *ordinary rules applied in chancery or probate courts*.

Treas. Reg. § 301.7701-4(a) (1996) (emphasis added); *see also* Treas. Reg. § 301.7701-4(a) (2026) (current check-the-box version which is identical to *pre*-check-the-box version).[3] Chancery and probate courts are state courts that adjudicate questions of property rights under state law and upon whose jurisdiction federal courts may not interfere. *See Markham v. Allen*, 326 U.S. 490, 494 (1946) ("[A] federal court [may] . . . not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court.").

### B.    The Check-the-Box Classification Regulations Continue to Embrace Local Law as Necessary for Classifying an Arrangement as a Trust.

As discussed above, the 1996 overhaul of the entity-classification regulations allowed taxpayers "to elect to treat certain domestic unincorporated business organizations as partnerships or as associations for federal tax purposes." Notice 95-14, 1995-1 C.B. 297, 297 (Apr. 3, 1995). This was done because, at the time, many states had revised their business organization laws so that "partnerships and other unincorporated organizations may possess characteristics that have traditionally been associated with corporations." *Id.* Those changes to state law created massive administrative burdens and serious foot faults for applying multi-factor tests to make basic classifications. *See id.* ("Taxpayers and the Service, however, continue to expend considerable resources in determining the proper classification of domestic unincorporated business organizations."). Thus, the "check-the-box regulations" were born.

---

[3] Treas. Reg. § 301.7701-4(a) in its current form is identical to the regulation as originally promulgated in 1967. *See* 32 Fed. Reg. 15241, 15376 (Nov. 3, 1967).

As relevant here, in promulgating those regulations, the IRS explained that the controlling framework used to decide whether a set of legal relationships creates a trust did not change: "The distinctions between trusts and business entities, although restated, are not changed by these [new] regulations." *See* Simplification of Entity Classification Rules, 61 Fed. Reg. 66584, 66585 (Dec. 18, 1996) (TD 8697) (codified at 26 C.F.R. pts. 1, 301, and 602). Instead, the check-the-box revisions focused on distinguishing unincorporated businesses' classifications among each other— i.e., whether an organization was a corporation, partnership, or a sole proprietorship. *See id.* at 66584 ("The regulations proposed to replace the existing regulations for classifying certain business organizations with an elective regime.").

Accordingly, the arrival of the check-the-box regulations did not modify how Treasury and the IRS define or understand when an "arrangement" or set of "legal relationships" constitutes a trust. *Compare* Treas. Reg. § 301.7701-4(a) (1996), *with* Treas. Reg. § 301.7701-4(a) (2026) (identical). Under both versions of Treas. Reg. § 301.7701-4(a),

> an arrangement will be treated as a trust under the Internal Revenue Code if it can be shown that the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business for profit.

Treas. Reg. § 301.7701-4(a) (1996); Treas. Reg. § 301.7701-4(a) (2026). And both versions of Treas. Reg. § 301.7701-4(a) provide that "the term 'trust' as used in the Internal Revenue Code refers to an arrangement . . . whereby trustees take title to property for the purpose of protecting or conserving it for the beneficiaries under the ordinary rules applied *in chancery or probate courts*." Treas. Reg. § 301.7701-4(a) (1996) (emphasis added); Treas. Reg. § 301.7701-4(a) (2026). The "language or necessary implication" of Treas. Reg. § 301.7701-4(a) "makes its application dependent on state law." *United States v. Pelzer*, 312 U.S. 399, 402-03 (1941). This is consistent with Supreme Court precedent holding that "[g]rantees under deeds, wills and trusts, alike, take

according to the rule of the state law." *Stuart*, 317 U.S. at 161 ("The power to transfer or distribute assets of a trust is essentially a matter of local law.").

### III.    The Court Must Rely on Foreign Law at Both Steps of the Two-Step Process of Determining Whether the Trusts Are Trusts Under U.S. Law.

Based on the foregoing, when courts are confronted with the question of whether an arrangement is respected as a trust for federal tax purposes, a two-step process follows. First, the court must determine whether the arrangement satisfies the requirements for the type of relationship that qualifies as a trust under U.S. law. If, interpreting the deed and constitutive documents under their controlling (here foreign) law, the arrangement qualifies as a trust, the court could stop. Or it could go on to determine whether the trust should be, for some other reason, disregarded for federal tax purposes. Because a trust is created by local law, in order to determine whether the arrangement is (1) a trust and (2) a valid one, courts must apply the relevant local law at both steps of the inquiry. *See generally Stuart*, 317 U.S. at 162 ("Whether that [taxable] event may or may not occur depends upon the interpretation placed upon the terms of the instrument by state law.").

Admittedly, there are some cases where courts bypass step one because, for example, the court never received the "trust agreements, declarations of trust, trust income tax returns, or other evidence that would substantiate their existence." *Saccato v. Comm'r*, T.C. Memo. 2023-96, 2023 Tax Ct. Memo LEXIS 97, at *13 (T.C. July 25, 2023). Similarly, where the petitioner peddled "trust packages," formed his own "business trust" for which he and his wife were the named grantors and only beneficiaries, and where there was no independent trustee, the Sixth Circuit put little focus on state law. *See Richardson v. Comm'r*, 509 F.3d 736, 742 (6th Cir. 2007). But even in instances where a court does not specifically state that it is engaging in two steps, in order to determine what substance attached to the form, the court inevitably must first determine that form.

*See Tracinda Corp. v. Comm'r*, 111 T.C. 315, 326 (1998) ("If substance follows form then this Court will respect the form chosen by the taxpayer.").

### A.    Courts Look at the Deed, Interpreted Under Local Law at Step One.

Courts interpret Treas. Reg. § 301.7701-4(a) as providing a four-element test to determine in the first instance whether an arrangement or relationship is a trust "for federal tax purposes": There must be "(1) a grantor, (2) a trustee that takes title to property for the purpose of protecting or conserving it, (3) property, and (4) designated beneficiaries." *Fairbank v. Comm'r*, T.C. Memo 2023-19, 2023 Tax Ct. Memo LEXIS 20, at *23 & n.22 (T.C. Feb. 23, 2023) ("It is widely accepted under the laws of all 50 states of this country, and in many other countries, that a trust consists of these four elements."); *see also Markosian v. Comm'r*, 73 T.C. 1235, 1241 (1980) (first analyzing trust agreement's terms).

To make the initial determinations about these four elements, courts, naturally, focus on the organizing documents. *Morrissey v. Comm'r*, 296 U.S. 344, 361 (1935) ("Its character was determined by the terms of the trust instrument."); *Elm St. Realty Tr. v. Comm'r*, 76 T.C. 803, 811 (1981) ("[W]eight should be given to the purpose for which the trust was organized, but that purpose is found in the agreement of the parties." (quoting *Helvering v. Coleman-Gilbert Assocs.*, 296 U.S. 369, 374 (1935))). In the case of a foreign trust, the organizing document will be constructed under and subject to foreign law. *See Stuart*, 317 U.S. at 161 ("That construction must be made in the light of rules of law for the interpretation of such documents."); *see also Voda v. Cordis Corp.*, 476 F.3d 887, 907 (Fed. Cir. 2007) (Newman, J., dissenting) (gathering cases where courts interpreted foreign documents pursuant to foreign law under Fed. R. Civ. Proc. 44.1).

The existence of a grantor, trustee, property, and designated beneficiaries are each determined under local law because federal tax law "creates no property rights but merely attaches

consequences, federally defined, to rights created under state law." *United States v. Bess*, 357 U.S. 51, 55 (1958). Accordingly, "in the application of a federal revenue act, state [or local] law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the [federal revenue] statute." *Aquilino v. United States*, 363 U.S. 509, 513 (1960) (quoting *Morgan*, 309 U.S. at 82); *see also Stuart*, 317 U.S. at 161 ("The power to transfer or distribute assets of a trust is essentially a matter of local law."); *accord Est. of Hartzell v. Comm'r*, T.C. Memo. 1994-576, 1994 Tax Ct. Memo LEXIS 584, at *13 (T.C. Nov. 23, 1994) ("We must determine, therefore, whether, under Ohio law, decedent retained the power to appoint the stock after it had been disbursed from trust principal.").

Congress has declined to define a *trust* in the "intricate and complicated Internal Revenue Code." *Summa Holdings Inc. v. Comm'r*, 848 F.3d 779, 790 (6th Cir. 2017). And the Code is the sort of "comprehensive and detailed" statutory scheme against which the Supreme Court has cautioned fashioning a new federal common law. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994). Congress's decision to refrain from defining a trust makes sense from a historical perspective given the federal tax law's deference to local law on characterization of property interests, especially when it comes to trusts. *See, e.g.*, *Blair v. Comm'r*, 300 U.S. 5, 9-10 (1937) ("By that law the character of the trust, the nature and extent of the interest of the beneficiary, and the power of the beneficiary to assign that interest in whole or in part, are to be determined. The decision of the state court upon these questions is final.").

Absent congressional authorization, the Supreme Court has cautioned that "common lawmaking" should take place only when "'necessary to protect uniquely federal interests.'" *Rodriguez v. FDIC*, 589 U.S. 132, 136 (2020) (quoting *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)). And no doubt, federal taxation is a uniquely federal interest. However,

without first analyzing whether the trusts are valid under the laws by which they are created, the court risks "moving too quickly past important threshold questions" necessary to getting to the substantive answer. *Rodriguez*, 589 U.S. at 138. Some courts combine steps one and two. *See, e.g.*, *Furman v. Comm'r*, 45 T.C. 360, 364-65 (1966) (analyzing trustee, trustee's powers, property in trust, interest in trust, beneficiaries, rights of beneficiaries), *aff'd*, 381 F.2d 22 (5th Cir. 1967). But even in those cases, *civil cases*, the court must determine whether the trust deed laid out each of the four requirements and whether those requirements were followed.

### B. At Step Two, the Court Considers Both Foreign Law and Facts.

At the second step, courts determine whether the people involved in the trust were conducting themselves pursuant to the terms of the trust agreement. Courts, and here the government, have cited *Markosian v. Commissioner*, 73 T.C. 1235 (1980), as the case that requires a court to "consider[] four factors relating to the trust to determine whether a trust had *economic substance*." *Close v. Comm'r*, T.C. Memo. 2014-25, 2014 Tax Ct. Memo LEXIS 25, at *35 (T.C. Feb. 10, 2014) (emphasis added); *Aldridge v. Comm'r*, T.C. Memo. 2024-24, 2024 Tax Ct. Memo LEXIS 25, at *28 (T.C. Feb. 21, 2024); *see also* Gov't Objection to Foreign Law Expert at 2 (ECF No. 114). But this appears to be a misstatement of law, at least *current* law.

In the modern era, "economic substance," refers to the rule of statutory interpretation, portions of which Congress codified at 26 U.S.C. § 7701(o). Section 7701(o)(1) requires courts to first determine whether "the economic substance doctrine is relevant" before actually applying the test. *See Patel v. Comm'r*, 165 T.C. ___, 2025 U.S. Tax Ct. LEXIS 2729, at *26 (T.C. Nov. 12, 2025). To make that determination, courts will look to the text of the controlling statute to discern whether Congress included language requiring further consideration of the economics or purpose of the transaction. *See, e.g.*, *id.* at *32 (economic substance doctrine relevant to deductibility as

13

"ordinary and necessary business expenses under section 162"). With no statutory definition of trust there can be no application of a doctrine of statutory interpretation to determine the true meaning of that term.

What *Markosian* and the later cases seem actually to be saying is that the substance of the trust must comport with its form. 73 T.C. at 1241 ("[T]his right does not bestow upon the taxpayer the right to structure a paper entity to avoid tax when that entity does not stand on the solid foundation of economic reality."). In similar words, the court "must determine that the substance of the transaction differs from its form" in order to void a trust.[4] *Tracinda Corp.*, 111 T.C. at 326.

As mentioned, step one of that inquiry requires a determination of the precise nature of "the form,"—i.e., what *are* Galactea and the other trusts, who was the grantor, what were the powers of the trustee, and what were the rights of beneficiaries and non-beneficiaries? *See Newman v. Comm'r*, 894 F.2d 560, 563 (2d Cir. 1990) ("While we exalt substance over form, we do not ignore the form."). This entails addressing each of the four elements of Treas. Reg. § 301.7701-4(a), using the documents interpreted under the relevant foreign law. *See Tracinda Corp.*, 111 T.C. at 327 ("[T]he original transaction documents . . . establish the form of the transactions."); *Furman*, 45 T.C. at 364 (first reviewing trust documents); *Fulk & Needham, Inc. v. United States*, 288 F. Supp. 39, 48 (M.D.N.C. 1968) ("The instrument (or words) creating the alleged trust is the focal point."), *aff'd*, 411 F2d 1403 (4th Cir. 1969).

The "substance-over-form" inquiry in step 2 analyzes whether the parties' form comported with the substance. For trusts, courts have looked to four factors to make this determination:

> (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether the trust has an independent trustee; (3) whether an economic interest passed to other trust

---

[4] John Machell, KC, also evaluates the trusts' "substance" under relevant foreign law and concludes they are neither "shams" nor "transitory."

beneficiaries; and (4) whether the taxpayer feels bound by the restrictions imposed by the trust agreement or the law of trusts.

*Aldridge*, 2024 Tax Ct. Memo LEXIS 25, at *28. At this point in the analysis, the court would be looking at whether Galactea and the other trusts were indeed *operated* as trusts. The trusts will be considered to have "substance" as trusts even if they were "poorly and improperly administered by the . . . trustees." *Fulk & Needham*, 288 F. Supp. at 48-49. While questions of substance are generally questions of fact, understanding those facts in light of foreign law moves part of this inquiry into the land of law as well. *See Paulson v. Comm'r*, T.C. Memo. 1991-508, 1991 Tax Ct. Memo LEXIS 557, at *16 (T.C. Oct. 7, 1991) (substance generally question of fact), *aff'd*, 992 F.2d 789 (8th Cir. 1993); Fed. R. Crim. Proc. 26.1 ("Issues of foreign law are questions of law."); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16, (1978) ("The general characterization of a transaction for tax purposes is a question of law subject to review.").

Substance over form comes from Judge Learned Hand's opinion in *Helvering v. Greogory*, 69 F.2d 809 (2d Cir. 1934). There, the court took a purposive approach to interpreting the Code, asking "if what was done here, was what was intended by section 112(i)(1)(B)." *Id.* at 810. Here, the doctrine is untethered from "its roots" because the Court is not tasked with interpreting a provision of the Internal Revenue Code. *See Summa Holdings*, 848 F.3d at 787 ("[S]ubstance-over-form . . . makes sense only when it holds true to its roots—when the taxpayer's formal characterization of a transaction fails to capture economic reality and would distort the meaning of the Code in the process."). It's being applied to determine whether the trusts and all the activities surrounding them rose to the level of "willful" under any of § 1B1.3(a)'s four alternative definitions of relevant conduct, as applied to the tax Guidelines.

That word willful reminds us of the purpose of this exercise. The Court is not merely trying to determine if the law taxes Mr. Edelman on his interest in the trust. It is tasked with deciding

whether he knowingly violated the law in order to include the purportedly related conduct. In that context "it is not contrary to common sense, let alone impossible, for a defendant to be ignorant of his duty based on [even] an irrational belief that he has no duty." *Cheek v. United States*, 498 U.S. 192, 203 (1991). Here, this heightened *mens rea* is "is in keeping with [the Supreme Court's] longstanding recognition of the principle that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity'"—i.e., in the defendant's favor. *Liparota v. United States*, 471 U.S. 419, 427 (1985) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). Lenity applies to the interpretation of the Sentencing Guidelines in the same manner as it applies to the interpretation of criminal statutes. *See, e.g.*, *United States v. Salvador-Gutierrez*, 128 F.4th 299, 320 (1st Cir. 2025) (applying rule of lenity due in part to ambiguity in § 1B1.3); *United States v. Blackburn*, 940 F.2d 107, 109 (4th Cir. 1991) (applying lenity to vacate sentence based on ambiguity of § 2K2.2(b)). Undergirding the rule is the belief that "legislatures and not courts should define criminal activity," *United States v. Bass*, 404 U.S. 336, 348 (1971), which is only amplified when courts are forced to wade into "judge-made criminal law" like the judicial doctrine of substance over form. *Rogers v. Tennessee*, 532 U.S. 451, 476 (2001) (Scalia, J., dissenting) ("Of course, the notion of a common-law crime is utterly anathema today.").

## IV.    The BVI and English & Welsh Trust Law Expert Will Assist the Court in Understanding the Terms of the Foreign Trust Agreements.

Given that the trusts are constituted under BVI and England and Wales law, which are foreign jurisdictions, the interpretation of the Galactea and the other trusts instruments' terms and limitations are "questions of law." Fed. R. Crim. Proc. 26.1 (issues of foreign law are issues of law); *De Fontbrune v. Wofsy*, 838 F.3d 992, 999 (9th Cir.) ("[A]pplicability, or interpretation of [a] foreign provision may not be characterized as a genuine issue as to any material fact." (internal quotations and citations omitted)), *amended on other grounds*, 2016 U.S. App. LEXIS 20416 (9th

Cir. Nov. 14, 2016).[5] As set out above, while it is true that the Court must consider certain facts at step two of the analysis, at both steps, the Court must consider the laws of the jurisdictions that create the trusts and how those laws apply to the facts. Because the relevant laws are not U.S. laws, reports and testimony from a foreign law expert will aid the court in properly applying the foreign law. *See Tschira v. Willingham*, 135 F.3d 1077, 1084 (6th Cir. 1998) (accepting foreign legal expert testimony and rejecting argument that "the ordinary meaning of 'auftrag'" applies "rather than the legal meaning").

To assist the Court in making those determinations of law, on or before March 2, 2026, the expert report of John Machell, KC will be filed with this Court. He will be available to testify at the March 23 hearing should the Court wish. Mr. Machell is a barrister and King's Counsel, who is an expert in the trust laws of England, Wales, and the British Virgin Islands.[6] Mr. Machell will conclude generally as follows:

1.   The laws controlling the trusts from December 23, 2012 to November 19, 2019, were the laws of the BVI;

2.   From December 23, 2012 to November 19, 2019, the trusts would be considered valid under the laws of the BVI;

3.   From December 23, 2012 to November 19, 2019, under the laws of the BVI, Mr. Edelman would not be considered to have an interest in the trusts;

4.   The laws controlling Galactea Trust from November 20, 2019 to December 31, 2020 were the laws of England & Wales, while BVI law continued to control the other trusts during that period;

---

[5] Questions of foreign law are questions of law. *See* Fed. R. Crim. Proc. 26.1; Fed. R. Civ. Proc. 44.1. The foreign law expert whose report will be filed on March 2, 2026 will opine on foreign law and its application, not "facts," as the government suggests. *See* Objection to Foreign Law Expert at 1 (ECF No. 114).

[6] Mr. Machell's complete curriculum vitae and proof of credentials will be filed along with the expert report.

5.  From November 20, 2019 to December 31, 2020, Galactea Trust would be considered valid under the laws of England & Wales, while the other trusts would be considered valid during that period under the laws of the BVI; and

6.  From November 20, 2019 to December 31, 2020, under the laws of England & Wales, Mr. Edelman would not be considered to have an interest in Galactea Trust, and under the laws of the BVI, Mr. Edelman would not be considered to have an interest in the other trusts.

Mr. Machell's report will also draw other conclusions of law consistent with those listed above.

## V.    The Government's Key Witness Believed the Trusts Were Real, and the Government Is Not Calling the Current or Former Trustee as a Witness.

CC1 is the government's lead witness against Mr. Edelman. CC1 was the protector of the trusts, a UK accountant, and one of the key people interacting with the trusts for the Edelman-Le Dain family. In those roles, CC1 worked closely with the trustee. The trustee was responsible for the trusts' administration, while others, including CC1, were responsible for accounting and additional operational roles. CC1 has testified that after its establishment, Galactea Trust, not Mr. Edelman, owned Mina and Red Star, the income-generating companies at the heart of this case.

Last year, CC1 testified in a four-day Rule 15 deposition in London. Each day of questioning lasted anywhere from five to seven hours and resulted in a transcript spanning four volumes and more than 500 pages. The government has relied heavily on CC1 in developing its case against Mr. Edelman. Indeed at Mr. Edelman's May 21, 2025 change of plea hearing, the government called CC1 "one of the witnesses" who "would be key to some of these determinations" about whether the Trusts are valid and whether Mr. Edelman has an interest in any of them. May 21, 2025 Change of Plea Hr'g Tr. at 74:8-9 (ECF No. 79). By contrast, the government has indicated it has no plan to call any of the former or current trustees.

### A. As the Protector, CC1 Was Intimately Involved in Trust Operations and Finances.

Over the course of four days, CC1 testified about (1) Galactea and the other trusts' establishment as trusts; (2) his role and duties as the protector; (3) Rosbelt International Limited, which CC1 explained was owned by Galactea and itself held the trust's 50% interest in Mina and Red Star; (4) that major payments were made from Rosbelt by the trustee; (5) that CC1 made routine payments, which he then reported to the trustee; and (6) in 2020, Rosbelt—not Mr. Edelman—sold the trust's 50% interest in Mina and Red Star, an interest it had to have owned in order to have sold.

From their inception in 2012 to December 31, 2020 (and beyond), CC1 was the trusts' protector. *See* CC1 R. 15 Depo. Tr. at 21:8-11 (Feb. 3, 2025) (the "CC1 Day 1 Tr.") (Ex. ____).[7] CC1 explained that as protector, he was responsible for "[o]verseeing what was being done by the Trustee; [liasing] and working with the Trustee and making sure that the . . . monies in and out of the Trust were being properly accounted for." *See* CC1 R. 15 Depo. Tr. at 51:23-52:1 (Feb. 6, 2025) (the "CC1 Day 4 Tr.") (Ex. ____). CC1 testified that Galactea's trustee was Leonard O'Brien, of Salamander Associates. *See* CC1 R. 15 Depo. Tr. at 131:24 (Feb. 5, 2025) (the "CC1 Day 3 Tr.") (Ex. ____).

CC1 and the trustee would on "sporadic occasions" meet with Ms. Le Dain "to discuss just generally what was happening with the Trust investments." *See* CC1 Day 3 Tr. at 122:12-15. He also met with Ms. Le Dain to discuss "the Trust structure and whether it was to be a Grantor . . .

---

[7] The government and defense intend to jointly file exhibits for the March 23 hearing and the written submissions on March 2. After those exhibits are jointly filed, Mr. Edelman can re-submit this brief with exhibit numbers, should the Court so request.

Trust," or some other sort of trust, presumably when Galactea was established. CC1 Day 4 Tr. at 59:23-24.

Prior to Galactea's establishment, starting in 2010, CC1 had been preparing "detailed accounting." *Id.* at 47:4-9. He relied on the Red Star and Mina accountant, to tell him "the distributions coming out of those companies to the shareholders." *Id.* at 44:17-21. In 2012, things changed; "there was the new Galactea Trust" and CC1's duties also changed. *Id.* at 47:14-15.

Under the trust structure, there "were two basic accounts operated through Galactea Trust[,] [m]ostly Rosbelt International, and secondly Bluestone International Investing Limited." *Id.* at 47:15-17. Rosbelt, which refers to both the company and its account, owned 50% of Mina and Red Star; the other 50% was owned by Individual A. CC1 Day 3 Tr. at 132:24-133:2 ("He was a 50% shareholder in the business."); CC1 Day 4 Tr. at  44:22-25 ("50/50 partnership"). And Rosbelt "was the Company receiving most of the income in this . . . [post-Galactea] period from, from the Mina Red Star distributions." CC1 Day 4 Tr. at 48:16-19.

 Rosbelt was paying expenses for the "investments" and making "purchases for all of the other entities." *Id.* at 48:19-21. CC1 testified that for "Rosbelt Limited . . . [the] signatories on that account were the Trustee." *Id.* at 50:7-9. And "the Trustee made the payments, the main payments[,] for investments from Rosbelt International Limited." *Id.* at 50:9-11. For other payments, "administration and overhead expenses," CC1 testified that "the majority of those were made through Bluestone International." *Id.* at 50:12-15.

Bluestone International, which also refers to both the company and its account, was set up under the trusts "as a treasury company," because the small, private banks the trusts were using at the time "were not really interest[ed] in doing volume minor payments." *Id.* at 51:1-4. CC1 explained that he used Bluestone to make "smaller payments," or "routine payments" that their

banks were unwilling to do. *Id.* at 51:3-8. These smaller, routine payments that were made for the trusts' investments were based on instructions from Mr. Edelman (the person who was involved in managing the investments). *Id.* at 51:11-13. But CC1 included those payments "in detailed reports month by month, year by year" for the trustee. *Id.* at 51:14-17. And, critically, the trustee made the major payments relating to the trusts' investments from Rosbelt. *See id.* at 50:7-11 ("[T]he Trustee made the payments, the main payments for investments from Rosbelt International.").

CC1 also testified "that the Trust sold the Mina Red Star business." *Id.* at 54:17-19. Specifically, "the Trust structure as it existed then," in 2020, had to "sell its 50% ownership of Red Star and Mina to [Individual A]." CC1 Day 3 Tr. at 137:14-17. CC1 reaffirmed this twice on cross-examination. First, when asked whether he "testified previously that the Trust sold the Mina Red Star business," CC1 answered, "[t]hat's correct." CC1 Day 4 Tr. at 54:17-19. He then agreed that in "order to sell something, you have to own it." *Id.* at 54:20-22. And when asked whether Rosbelt International being the seller was "consistent with [CC1's] understanding of what actually happened," he answered, "that is what I believe happened." *Id.* at 56:1-7. If there was any doubt, CC1 testified that the proceeds of the sale "were paid into Rosbelt International, Limited." *Id.* at 33:6-7 (direct examination).

In exchange for not criminally prosecuting him, CC1 signed an agreement requiring him to "cooperate fully with [the Tax Division], the Internal Revenue Service, Criminal Investigations ('IRS-CI'), and any other law enforcement agency." *See* Ex. ___ (CC1 Cooperation Agreement) at 1. The agreement also mandated he "cooperate with any efforts to secure his testimony," which include "appearing and truthfully testifying at any deposition taken pursuant to Federal Rule of Criminal Procedure 15." *Id.* at 2.

CC1 knew more than almost anyone else about the trusts and Mr. Edelman's relationship to them. As the government will no doubt highlight, during his Rule 15 deposition, CC1 gave damaging testimony about Mr. Edelman's conduct prior to Galactea's formation. But operating under the same non-prosecution agreement that compelled him to give that testimony, CC1 testified that Galactea was established in 2012; it was operated by a professional trustee; after it was established, the trustee made payments for the investments from Rosbelt and while CC1 made smaller, routine payments for recurring expenses which he reported to the trustee; Galactea, through Rosbelt, owned 50% of Mina and Red Star; and, in 2020, Rosbelt sold Galactea's 50% interest in Mina and Red Star.

### B.    Mr. O'Brien Was the Trustee, Responsible for the Oversight of the Trust, but the Government Will not Call Him to Testify.

There have been three trustees since the trusts were established, and the government has not indicated that it will call any of them. From 2012 to November 2019, the trustee was Salamander Associates Limited, a professional trust administration company organized under the laws of the British Virgin Islands, which was owned and operated by Leonard O'Brien. *See* Ex. ____ (2012 Galactea Deed) at 1. With a November 15, 2019 amendment, Salamander Associates Limited was replaced by Salamander Corporate Services SA, a Swiss company, also owned and operated by Mr. O'Brien. *See* Ex. ___ (2019 Galactea Amendment) at 3. For years after and outside of this case, Summit Trust (Cayman) Limited replaced Salamander Corporate Services SA, and continues to be the trustee. Ex. ___ (Summit Letter of Confirmation).

As the trustee, Mr. O'Brien held the purse strings of the trust. Salamander made "the main payments for investments from Rosbelt International." CC1 Day 4 Tr. at 50:7-11 (Ex. ____) (trustee was signatory on Rosbelt account). For the payments that the trustee did not make directly, CC1 would provide "detailed reports month by month, year by year." *Id.* at 51:16-17. Mr. O'Brien

"authorized the payments" for CC1's salary. *See* CC1 Day 1 Tr. 23:4-9 (Ex. ____). The trustee also authorized raises for CC1 but he would let Mr. Edelman know "more out of courtesy than anything" that his rate was increasing. *See id.* at 26:1-10. The trusts paid the salaries of other people who worked for it or its companies, including Bob Dooner, Tom Ehr, and Martin Shiel. *See id.* at 34:11-24, 37-38. The trustee made payments for investments, such as the Mexico fuel logistics business. *See* CC1 Day 4 Tr. at 33:22-23.

In October 2023, Summit became the trustee, and CC1 was removed as protector. Summit has stated that Mr. Edelman does not have "access to the Trusts' assets" and "no funds would be available to him at any time from the Trusts." Ex. ____ (Summit Letter of Confirmation). Summit has further refused to make payments or distributions from the trusts to Ms. Le Dain if they believe that the payments could somehow benefit Mr. Edelman. The trustee justified its refusal on the basis that Mr. Edelman is "not a beneficiary of the trust." *See* Ex. ____ at 1 (Letter from Summit re Rosbelt). For example, after Individual A bought Mina and Red Star from the trust, Rosbelt International sued him for his failure to make payments for the purchase. *See* Ex. ____ at 1 (Letter from Summit on Behalf of Rosbelt). Individual A then interpleaded Mr. Edelman as an "additional party," forcing Mr. Edelman to hire a Swiss attorney to defend him. *Id.* After prevailing in the case and obtaining an award from the tribunal, Mr. Edelman's Swiss counsel asked Rosbelt and the trust to pay her significant fees. Summit, acting on behalf of Rosbelt, flatly refused, telling Mr. Edelman's attorney that "your client is not a beneficiary of the trust and for this simple reason, any such commitment could not have been given away." *Id.*

### C. The Court May Infer that the Trustees' Testimony Would Have Been Damaging to the Government.

As trustee during the relevant period, Mr. O'Brien had extensive knowledge of the workings of the trusts. He also knew who was and was not a beneficiary of the trusts. But defense

counsel currently understands that the government does not plan to call Mr. O'Brien, anyone from his team, or anyone from Summit to testify about these topics, even though the government bears the burden of proof on the issue of the validity of, and Mr. Edelman's relationship to, the trusts. *See United States v. O'Doherty*, 643 F.3d 209, 218 (7th Cir. 2011) ("The Government must prove tax loss figures at sentencing by a preponderance of the evidence."); *United States v. Kaushansky*, No. 05-cr-129, 2007 U.S. Dist. LEXIS 41154, at *42 (W.D. Pa. June 6, 2007) ("The Government has not met its burden of establishing a tax loss attributable to . . . [the] corporation.").

If the government does not call any of the trustees, this Court should infer that those "missing witness[es] would have given testimony damaging" to the government. *United States v. Glenn*, 64 F.3d 706, 709 (D.C. Cir. 1995). While a party is not required to call to testify "everyone who could give relevant evidence," there are some people, "who potentially have so much to offer that one would expect them to take the stand." *United States v. Pitts*, 918 F.2d 197, 199 (D.C. Cir. 1990). If a party has "some special ability to produce" such a witness but does not do so, the factfinder may "draw an inference—namely, that the missing witness would have given testimony damaging to that party." *Id.*

The government "has it peculiarly within [its] power to produce witnesses whose testimony would elucidate the transaction," *Graves v. United States*, 150 U.S. 118, 121 (1893), where "because of the witness' relationship with the [government], [his] . . . testimony is, in pragmatic terms, only available" to the government, *United States v. Romo*, 914 F.2d 889, 893-94 (7th Cir. 1990) (alterations in original); *see also United States v. Young*, 463 F.2d 934, 942 (D.C. Cir. 1972) ("[A]vailability of a witness to the Government, as to any other party, must be judged practically as well as physically." (internal quotations omitted)). A witness who would be "hostile to or biased against" the defendant is "peculiarly available" to the government. *United States v. Hoenscheidt*,

7 F.3d 1528, 1531 (10th Cir. 1993). A witness's availability to one party or the other "is not to be decided on the basis of . . . his accessibility by writ of habeas corpus or by subpoena." *United States v. Johnson*, 467 F.2d 804, 809 (1st Cir. 1972).

The trustees' testimony is "a natural part of the Government's case." *United States v. Jackson*, 257 F.2d 41, 44 (3d Cir. 1958). Given their roles, Mr. O'Brien, other Salamander employees, and the Summit team's testimony "would elucidate" details about the trusts and Mr. Edelman's relationship to the trusts. *Graves*, 150 U.S. at 121. And the government could procure the trustees testimony in the same way it did for CC1, a British citizen and U.K. resident. *See* Ex. ____ (CC1 Cooperation Agreement); *cf. Johnson*, 467 F.2d at 809 (witness availability not determined by ability to subpoena). Indeed, counsel for Mr. Edelman understands that Summit has been in touch with the government about whether to make disbursements to Ms. Le Dain. The trustees are "not the kind of witness[es] that the defendant could be expected to call" because they will not speak to Mr. Edelman or his counsel. *Jackson*, 257 F.2d at 44. If the government does not call the witnesses essential to satisfying its burden of proof, the Court should infer that these key witnesses would have given testimony that damaged the government's position here.

\*    \*    \*

Respectfully submitted,

/S/ George M. Clarke, III           /S/ Sonya C. Bishop

GEORGE M. CLARKE, III              SONYA C. BISHOP

D.D.C. Bar No. 480073               D.D.C. Bar No. NY0568

George.clarke@bakermckenzie.com    Sonya.bishop@bakermckenzie.com

BAKER & McKENZIE LLP              BAKER & McKENZIE LLP

815 Connecticut Ave., N.W.          452 Fifth Ave.

Washington, D.C. 20006             New York, N.Y. 10018

(202) 835-6184                    (332) 215-5812

*Counsel for Defendant Douglas Edelman.*    Dated: February 16, 2026