**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 24-CR-239 (CKK)** |
| v. | : | |
| | : | |
| **DOUGLAS EDELMAN,** | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' MEMORANDUM ON SENTENCING ISSUES**

1

## Table of Contents

Procedural Background ................................................................................................................. 3

Factual Background ..................................................................................................................... 4

I.    Edelman founded Mina/Red Star ..................................................................................... 4

II.   Edelman concealed his foreign bank accounts from the U.S. government by moving his money to an account held by a nominee entity called the Sunage Foundation ........................ 5

III.  When a Congressional Subcommittee began asking questions about Mina/Red Star's ownership, Edelman came up with a new story .......................................................................... 6

IV.   From 2006 through 2012, Edelman controlled and spent millions of dollars in profits from Mina/Red Star ..................................................................................................................... 7

V.    In 2012 and 2013, Edelman restructured Mina/Red Star and created a new trust structure to further conceal his ownership ................................................................................................. 9

VI.   Despite the new structure of foreign trusts, Edelman continued to control Mina/Red Star's dividends after 2012 .......................................................................................................... 10

VII.  After creation of the trust, Edelman continued to control the assets as he had before . 12

VIII. In 2015 and 2016, Edelman lied to his tax attorneys and the IRS about the creation and ownership of Mina/Red Star ..................................................................................................... 17

IX.   In 2018, Edelman sent his attorneys to tell the DOJ that his wife created and owned Mina/Red Star ........................................................................................................................... 20

X.    Edelman filed false tax returns for the 2015 through 2019 tax years .............................. 20

XI.   Edelman sold his share of the business in 2020 and received $41 million .................... 20

Relevant Law .............................................................................................................................. 22

Argument ..................................................................................................................................... 22

I.    The 2013-2020 trust structure is disregarded as a sham ................................................. 22

    A.   Edelman's relationship to the assets did not materially change after the restructuring 24

    B.   There was no independent trustee .............................................................................. 25

    C.   No economic interest passed to the trust's named beneficiaries ................................ 26

    D.   Edelman was not bound by the restrictions imposed by the trust agreement or the law of trusts ............................................................................................................................... 27

    E.   The Galactea Trust and related entities are disregarded and the income attributed to Edelman, resulting in a $128.9 million tax loss ................................................................. 28

II.   Edelman knew the 2013-2020 income was his and intended to evade taxes on it .......... 29

    A.   Edelman continued to lie and obstruct after 2013 ..................................................... 30

    B.   Edelman did not have a good faith belief that the 2013 restructuring actually changed his status as an owner .......................................................................................................... 30

    C.   Edelman's own statements make clear he knew it was a sham ................................... 32

III.  Edelman was a leader/organizer of the long-running conspiracy ................................... 34

Defendant Douglas Edelman became rich off contracts with the U.S. government and perpetrated a twenty-year conspiracy to evade U.S. taxes on his income. His twenty-year international scheme ensnared numerous co-conspirators and unwitting accomplices, and included repeated lies to the U.S. government. He has pleaded guilty—without a plea agreement—to only part of the indictment charging him for his crimes. He has signaled that he will use foreign law and a sham trust to argue that the Court should not take into account the full breadth of his wrongdoing at sentencing, and that he will dispute the application of a sentencing enhancement for being a leader or organizer.

As discussed below, the government respectfully requests that the Court make factual findings as follows: (1) the structure of foreign trusts set up and used by Edelman from 2013 to 2020 to hold his income was a sham; (2) Edelman caused a tax loss of $128,995,238; and (3) Edelman was a leader or organizer of criminal activity involving that involved five or more participants. These findings take into account the scope of Edelman's wrongdoing and are supported by the evidence.

## PROCEDURAL BACKGROUND

Edelman was charged with a 30-count indictment on May 16, 2024. ECF 1. Count One charged him with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Counts Two and Three charged him with making false statements, in violation of 18 U.S.C. § 1001. Count Two involved false statements made to the Internal Revenue Service (IRS) in October 2016, and Count Three involved causing false statements to be made during a March 2018 presentation to the Department of Justice. Counts Four through Eighteen charged him with tax evasion, in violation of 26 U.S.C. § 7201, for the 2006 through 2020 tax years. Finally,

Counts 19 through 30 charged him with willful violation of the foreign bank account reporting regulations, in violation of 31 U.S.C. §§ 5314 and 5322(b).

From February 3 to 6, 2025, the parties conducted a Rule 15 deposition of Graham Collett. As Edelman's longtime accountant, Collett handled the logistics of Edelman's financial and business affairs from 2004 through 2020. Before testifying, Collett was sworn in by Magistrate Judge Moxhila Upadhyaya. Collett Deposition (Feb. 3, 2025) at 10.

In May 2025, Edelman pleaded guilty to Counts One through Ten of the indictment, which included the conspiracy to defraud the United States, making false statements to the IRS in 2016 and to the Department of Justice in 2018, and evading taxes for the 2006 through 2012 tax years.

The purpose of the upcoming March 23, 2026, hearing is to resolve factual disputes for sentencing for the convicted counts. The Government's understanding is that disputed facts include: the total relevant conduct tax loss and the applicability of the leader/organizer enhancement under U.S.S.G. § 3B1.1.

## FACTUAL BACKGROUND

### I.    Edelman founded Mina/Red Star

Douglas Edelman and Kyrgyz businessman Erkin Bek founded Red Star Enterprises and Mina Corp. (collectively, "Mina/Red Star"). Tr. of Plea Hearing (May 21, 2025) at 18-20. Starting in the early 2000s, Mina/Red Star won contracts to provide fuel for the U.S. military in support of the war in Afghanistan. *Id.* at 18-19.

From the founding of Mina/Red Star through 2008, Edelman routinely executed bank documents showing that he was the ultimate beneficial owner of his half of Mina/Red Star. *Id.* at 20. The companies became profitable by 2005, and Edelman began taking profit distributions. *Id*.

4

Initially, Edelman received his profit distributions through Swiss bank accounts for two companies he owned named Aspen Wind and Bartol. *Id.* From nearly the beginning, Edelman employed a British accountant named Graham Collett. Collett testified that Edelman informed him when and how dividends from Mina/Red Star were being made. Collett Deposition (Feb. 3, 2025) at 132-33. Edelman told him to put them into Aspen Wind or Bartol's Swiss bank accounts. Collett Deposition (Feb. 3, 2025) at 133. From 2006 through 2008, Edelman received $50,542,606 in dividends from Mina/Red Star into the Aspen Wind and Bartol Swiss bank accounts. Ex. 25-1.[1]

## II. Edelman concealed his foreign bank accounts from the U.S. government by moving his money to an account held by a nominee entity called the Sunage Foundation

In April 2008, Edelman created a Panamanian "foundation" named the Sunage Foundation. Tr. of Plea Hearing (May 21, 2025) at 21. Edelman made his wife Delphine Le Dain and his daughters with Le Dain the beneficiaries of the entity. *Id.* at 21.

In November 2008, Credit Suisse notified Collett that Edelman had to either close his accounts and transfer the balance or disclose to U.S. authorities that the accounts belonged to a U.S. person. *Id.* at 20-21. Edelman instructed Collett to close the accounts and moved the funds to an account he had opened at Bank Julius Baer, in Singapore in the name of the Sunage Foundation. *Id.* at 21. Following the closure of the Credit Suisse accounts, Edelman directed that his Mina/Red Star distributions be sent to the Sunage Foundation account at Julius Baer. *Id.* at 21; Collett Deposition (Feb. 3, 2025) at 133; 14-38. In 2009 and 2010, Edelman received an

---

[1] The exhibits to the Collett deposition were numbered based on their source. For example, Exhibits 1-1 and 1-2 came from the same custodian. Where this brief refers to the same exhibits, the same references are used. All new exhibits are numbered starting with 25-.

additional $53,950,000 in distributions, of which all but $5.2 million went to the new Sunage Foundation account.[2] Ex. 25-1.

Though his wife and children were nominally the beneficiaries, Edelman controlled the funds in the account and used them to fund his lifestyle and investments. Tr. of Plea Hearing (May 21, 2025) at 21. As discussed in more detail below, Edelman spent the tens of millions he received from Mina/Red Star to purchase properties and fund a number of large investments around the world. During his plea colloquy, Edelman admitted that he was the beneficial owner of the Sunage Foundation bank accounts. Tr. of Plea Hearing (May 21, 2025) at 21.

## III.    When a Congressional Subcommittee began asking questions about Mina/Red Star's ownership, Edelman came up with a new story

In 2010, a subcommittee of the U.S. House of Representatives began investigating allegations of corruption in connection with Mina/Red Star's contracts with the Department of Defense. Tr. of Plea Hearing (May 21, 2025) at 22. The subcommittee became interested in the identity of Mina/Red Star's owners. *Id*. At this point, Edelman had not filed U.S. tax returns to report the nearly $100 million he had already earned from Mina/Red Star, and disclosing his ownership would risk the U.S. government discovering that he had evaded tens of millions of dollars in taxes. Instead, Edelman caused attorneys to tell the Congressional subcommittee the false story that his wife Delphine Le Dain had co-founded Mina/Red Star with Bek and owned her 50% ownership stake through the Sunage Foundation. *Id*.

Collett explained that this was the point when Edelman began directing others to stick to the "party line," which was the newly created lie that the ownership and income had always been Le Dain's. Collett Deposition (Feb. 4, 2025) at 86; Collett Deposition (Feb. 5, 2025) at 44-46.

---

[2] The $5.2 million went to a Bartol account in February 2009. Ex. 25-1. It was the last payment of Mina/Red Star dividends to any Bartol or Aspen Wind account. *Id.*

Collett testified that this "party line" contradicted what he knew to be true, but that Edelman was adamant that his advisors and co-conspirators adopt the new story from 2010 onwards. *Id.*

As part of their efforts to support the "party line" lie during the Congressional investigation, Edelman and Collett caused the creation of false and backdated paperwork to corroborate Le Dain's purported ownership and to remove Edelman's name from the Sunage Foundation bank account at Julius Baer. Tr. of Plea Hearing (May 21, 2025) at 23. Collett testified at length about how he and Edelman worked together to create new backdated documents showing that Le Dain had been the owner of Mina/Red Star from the beginning, rather than the existing documentation which showed Edelman's ownership. Collett Deposition (Feb. 4, 2025) at 9-60; Collett Deposition (Feb. 5, 2025) at 45-46; 14-49; 14-50. This was done contemporaneously to the misrepresentations made to the U.S. Congress.

In late 2010 and again in 2011, Mina/Red Star bid on two contracts with the U.S. Department of Defense worth hundreds of millions of dollars each. Tr. of Plea Hearing (May 21, 2025) at 23. The Department of Defense asked Mina/Red Star who owned the company, and Edelman caused Mina/Red Star to respond that the company was owned by Bek and Le Dain. *Id.*

## IV.    From 2006 through 2012, Edelman controlled and spent millions of dollars in profits from Mina/Red Star

In 2011 and 2012, Edelman earned an additional $66,115,728 in income from Mina/Red Star, bringing the total earned between from 2006 and 2012 to $170.6 million.[3] Ex. 25-1. Edelman did not file any tax returns during this time, even though he did consult a tax attorney in 2010. Collett Deposition (Feb. 4, 2025) at 64-65; 82-88.

---

[3] Of this 2011 and 2012 income, $1,139,509 represented interest income from repayment of a loan between Edelman and Mina/Red Star.

From 2006 through 2012, Edelman directed the profit distributions from Mina/Red Star into the Aspen Wind, Bartol, and Sunage Foundation bank accounts and spent them as he saw fit. Edelman invested in a music television franchise in Eastern Europe, a land venture in Tulum, Mexico, a farm in Kenya, and a luxury townhome in London. Tr. of Plea Hearing (May 21, 2025) at 24. Edelman also spent over $44 million on a home in London in March 2010. Collett Deposition (Feb. 4, 2025) at 128. Edelman also used Mina/Red Star dividends paid to the Sunage Foundation bank accounts to purchase a ski chalet in Austria for around $1 million, and shares in a technology company for hundreds of thousands more. Collett Deposition (Feb. 4, 2025) at 129-37. In addition, he purchased a home in Ibiza, Spain, with funds from Mina/Red Star dividends sent to the Aspen Wind Corporation. Collett Deposition (Feb. 6, 2025) at 18-19. In October 2008, In another example, Edelman gave $580,000 to his son from his previous marriage.[4] Collett Deposition (Feb. 3, 2025) at 122-24.

Collett testified as to how, at Edelman's direction, he would transfer funds from various accounts to pay for these purchases and investments. Collett Deposition (Feb. 4, 2025) at 101-44. Though he was the person buying all of these assets, Edelman was careful not to own any of this property in his own name. Collett Deposition (Feb. 3, 2025) at 108. For example, in discussing the potential purchase of a London home in June 2008, Edelman wrote to Collett that they "simply need to decide who is best for ownership, for tax purposes // wife and kids maybe . . . I do have a foundation?" Ex. 14-31.

---

[4] Edelman told Collett to document this transfer as a loan but explained: "This is mainly for his tax purposes, as I am really just giving him the money." Collett Deposition (Feb. 3, 2025) at 123-24.

**V.     In 2012 and 2013, Edelman restructured Mina/Red Star and created a new trust structure to further conceal his ownership**

Edelman initially set up Mina/Red Star's corporate entities in Gibraltar. This proved "problematic" in 2010 and 2011 when he began to spread the new story about Le Dain's ownership, because his name was on the corporate documentation as the initial shareholder. Indeed, this is why Collett and Edelman worked together in 2010 to backdate and fabricate new documentation purporting to show that Le Dain had always been the owner.

In 2012 and 2013, Edelman and his associates came up with a better solution. The Mina/Red Star corporate entities were reorganized from the Gibraltar corporations set up by Edelman to a new company structure. Collett Deposition (Feb. 4, 2025) at 97-98. At the same time, a new foreign trust was created to be the named owner of the new Mina/Red Star entities: the Galactea Trust. Collett Deposition (Feb. 4, 2025) at 99.

In the new structure, the Galactea Trust owned Rosbelt International Limited (a British Virgin Islands company), and Rosbelt owned half of Global Resources Worldwide LP (a BVI partnership). Ex. 4-5 at 16. Through multiple other BVI entities, Global Resources Worldwide LP owned Mina Petroleum and Red Star Enterprises, which were now reincorporated in the United Arab Emirates and Hong Kong, respectively. *Id.*

Edelman was the driving force behind this reorganization, and he lied to the attorneys who planned the new structure and carried it out. Collett explained that when Edelman approached the law firm to create the Galactea Trust, Edelman falsely told them that Le Dain had always been the owner of Mina/Red Star. Collett Deposition (Feb. 5, 2025) at 44-45. In a January 2012 email from Edelman to Collett, he told Collett a series of lies to tell the lawyers, including that Le Dain had always owned Mina/Red Star, that Edelman's name had been previously used by mistake, that Edelman had never been paid dividends, and that he merely "worked on an

advisory basis." Ex. 24-1. A report prepared by the law firm in August 2012 confirms that they had been told that Le Dain owned Mina/Red Star through the Sunage Foundation. Ex. 4-5 at 55. This too was false on multiple counts, as Le Dain did not own Mina/Red Star, nor did the Sunage Foundation – the Gibraltar entities comprising Mina/Red Star up until the restructuring were owned by Edelman and Bek.[5]

## VI.   Despite the new structure of foreign trusts, Edelman continued to control Mina/Red Star's dividends after 2012

The new trust structure did not change anything with respect to Edelman's running the business, receiving distributions, and spending the funds.

To begin, Edelman continued to run Mina/Red Star along with Bek after 2013. For example, in January 2015, Edelman and Bek discussed firing Mina/Red Star's CEO and CFO, Graham O'Donoghue and Zachary Friedman. Ex. 25-2. A few months later, Bek and Edelman had a serious conversation about the business, its spending, its management, and its direction. Ex. 25-3. Edelman proposed to Bek: "I was wondering for us to consider and decide for someone between you and I to take ultimate power . . ." *Id.* In the same conversation, he wrote, "You and I need to speak with a single voice and give serious solid directions and instructions to people asap." *Id.*

In another example, in July 2016, Edelman and Bek discussed selling Mina/Red Star to another fuel company. Ex. 25-4. They went back and forth with each other on the value of their business and what price would be reasonable. *Id.* In June of 2018, one of Edelman's associates reported that the Department of Defense wanted a phone number for Le Dain, because she had

---

[5] Even Edelman and Collett's 2010 attempts to create backdated documents only stated that Le Dain had been the owner, not the Sunage Foundation. Ex. 14-50. They had discussed the idea of transferring ownership to the Sunage Foundation back in 2010, but Edelman rejected the idea because it would be "not good as it will show real timer [sic] dates." Ex. 14-49.

been listed as one of Mina/Red Star's founders. Ex. 25-5. Edelman provided the number but said

Le Dain was "so not involved" that he was not sure what she would say if someone at the

Defense Department called her. *Id.* It was Edelman, not Le Dain, who continued to run

Mina/Red Star after the 2012-2013 restructuring.

   Similarly, it was Edelman who continued to jointly decide with his co-owner Erkin Bek

when Mina/Red Star would pay out dividends. For example, in February 2016, Edelman emailed

Bek and said that he would like "Jerome" – an executive at Mina/Red Star – "to issue dividends.

2m each side. . . . you ok with this[?]" Ex. 25-6. Bek proposed a $10 million dividend each, and

Edelman agreed: "Let's do it for sure 100 pct or whatever we can spare." *Id.*

   Moreover, Edelman decided where Mina/Red Star should send the dividends. Collett

Deposition (Feb. 3, 2025) at 133; Collett Deposition (Feb. 4, 2025) at 20; Collett Deposition

(Feb. 5, 2025) at 135-36. In 2013, Mina/Red Star paid $17,789,654 in dividend distributions to

the Sunage Foundation account at Bank Julius Baer, even though at this point Mina/Red Star was

owned on paper by the Galactea Trust and Rosbelt International Ltd. Ex. 25-1. An additional $15

million was paid to the Sungage Foundation account in March 2014. *Id.* In his plea colloquy,

Edelman admitted that the dividends received in this account from 2009 through 2012

(approximately $113.7 million) were his income.

   Starting in February 2014, the dividends started to be sent to an account in the name of

Rosbelt International at Mirabaud Bank. Ex. 25-1. The Rosbelt account received $32,957,717 in

2014, on top of the $15 million sent to the Sunage Foundation account earlier that year. Collett

explained that when Bank Julius Baer was acquired by an American financial institution,

Edelman was told that the bank would likely change its policy regarding disclosure to U.S.

authorities. Collett Deposition (Feb. 3, 2025) at 144-45. Because of this, Edelman and Collett

were advised to move to Mirabaud Bank, and Edelman made the decision to switch. Collett Deposition (Feb. 3, 2025) at 145; Collett Deposition (Feb. 4, 2025) at 104-05. In 2015, the Mirabaud account received $16,260,693. Ex. 25-1.

The Mirabaud account received $6,606,898 in dividends in 2016 before Edelman directed that the funds be sent to a new account at Banque J. Safra Sarasin. *Id*. The choice to leave Mirabaud and join Safra was also Edelman's. Collett Deposition (Feb. 5, 2025) at 79-80. Ex. 11-5. From 2016 to 2019, $60,023,401 in dividends were paid to a Rosbelt account at Banque J. Safra Sarasin.[6] Ex. 25-1.

## VII.    After creation of the trust, Edelman continued to control the assets as he had before

After the distributions were received, Edelman still directed where they went and what they would be spent on. From 2013 onwards, Edelman spent tens of millions of dollars each year on various investments around the world. In his testimony, Collett spent significant time testifying about how Edelman continued to decide where to invest the hundreds of millions of dollars of Mina/Red Star distributions received by the trust structure, and how this did not change before or after the creation of the trusts. Collett Deposition (Feb. 4, 2025) at 101-144.

Exhibit 14-69 is a document that summarized investments made between 2011 and 2017. *Id.* at 102. It shows how much was invested from four different entities set up by Edelman: the Sunage Foundation, Satellite Support Services Ltd., Rosbelt International, and Bluestone International.[7]

---

[6] When Banque J. Safra Sarasin froze the accounts due to compliance issues in 2020, Edelman told Collett that "we need more accounts to replace Safra." Collett Deposition (Feb. 5, 2025) at 124-29.

[7] Bluestone International Ltd. was a company set up to operate various routine payments of the trust structure, including payments for Edelman's various advisors such as Collett, and was mainly used as a treasury company. Collett Deposition (Feb. 3, 2025) at 21; Collett Deposition (Feb. 6, 2025) at 47-51.

| Summary investments (for clean capital purposes) | | | | | |
| Company | Sunage | SSS | Rosbelt | Bluestone | TOTAL |
| Evanshire Finance Limited (see also sub analysis from Evanshire) | 2,656,599 | 3,117,763 | 10,196,908 | 849,071 | 16,820,340 |
| Waterlow Management Limited | | 33,976 | 3,064,280 | | 3,098,256 |
| Mountain Pass Limited | | 2,575 | 3,220,660 | | 3,223,235 |
| Murney Overseas Limited | 47,862,740 | 286,024 | 12,660,316 | | 60,809,080 |
| Lang International Holdings Limited | - | 3,922,401 | 27,555,150 | 12,896 | 31,490,448 |
| Taruki Management Limited | 5,975,676 | 4,849,141 | 5,387,372 | | 16,212,189 |
| Atlantic Screen Holdings Limited | | 1,751,339 | 1,883,995 | 2,132,714 | 5,768,048 |
| | 56,495,015 | 13,963,219 | 63,968,681 | 2,994,682 | 137,421,596 |

Ex. 14-69

Collett was intimately involved with payments made for each of these investments. He described what each investment was, and how Edelman was the ultimate decision-maker in every case. Collett Deposition (Feb. 4, 2025) at 102-143. First, Evanshire Finance was a Kenyan farming business that Edelman had invested considerable sums into prior to the restructuring. *Id.* at 102-03; Tr. of Plea Hearing (May 21, 2025) at 23-24. Collett explained that Edelman continued to invest in this project through 2017, and that Edelman had directed him to make the payments and authorized each payment. Collett Deposition (Feb. 4, 2025) at 103. Between 2013 and 2017, $16 million had been invested in the Kenyan farming venture. *Id.* at 105. Edelman continued to direct investments in the Kenyan farming project through 2020. *Id.* at 106.

Waterlow Management Limited was a company that held an investment in a satellite communications company called Isotropic. Collett Deposition (Feb. 4, 2025) at 106. It was Edelman's decision to invest in this company. *Id.* at 107. By 2017, Edelman had invested over $3 million into Isotropic, which was paid from the Rosbelt account. *Id.* at 107-08. More was invested into Isotropic after 2017. *Id.* at 109. That Edelman's investment was hidden in a trust entity was by his choice. In June 2015, he wrote to his business associate Robert Dooner (who

managed the Isotropic investment on Edelman's behalf) an email with "Isotropic" as the subject line: "Board seat is you for sure. I'm not really involved at all of course .. Shareholder will be an entity etc and end up in an easy kyc trust etc. Don't want any usa connection in this of course." Ex. 25-6. By 'kyc' Edelman was referring to financial institutions' "Know Your Customer" procedures by which they ask clients who the beneficial owners are, including whether they are U.S. citizens subject to various reporting requirements.

Mountain Pass Limited held Edelman's investments in a Chinese media business, which he made based on his personal relationship with a Chinese investor. Collett Deposition (Feb. 4, 2025) at 109-10. Collett explained that Edelman ultimately invested over $9 million in the Chinese media business. *Id.* at 109-110. Taruki Management Limited held Edelman's $16.2 million worth of investments made between 2014 and 2017 in films and other media productions – Collett explained that this line of investing began as early as 2008 and stemmed from Edelman's interest in film. *Id.* at 115.

Edelman purchased land in Mexico for over $60 million under a company named Murney Overseas Limited. Collett Deposition (Feb. 5, 2025) at 110-11. Edelman first told Collett about the investment in 2010 and continued investing funds well through 2016. Ex. 14-69 at 25-27. As with the other investments, Edelman instructed Collett to make these fund transfers. Collett Deposition (Feb. 4, 2025) at 112. Edelman also spent $5.7 million acquiring music and film royalty rights from 2010 through 2017, and the investments continued through 2020. *Id.* at 116-18.

The same document shows that that over $31 million was invested under the name Lang International Holdings Ltd. between 2013 and 2017. Ex. 14-69. Collett explained that this included investments in oil exploration projects in Canada and Africa, as well as a fuel logistics

14

project in Mexico. Collett Deposition (Feb. 4, 2025) at 112-113. Edelman made the decision to

invest in these project and continued to invest through 2020. *Id.* at 114. As an example, a

February 2016 email shows Edelman telling Collett that "we really do need in place 23 or 24

million" for the Mexican fuel logistics project. Ex. 25-7. In response, Collett told Edelman about

his recent discussions with Mina/Red Star employees about upcoming distributions and

questions which bank they should go to. *Id.* In response, Edelman instructed Collett to stop using

a company within the trust structure named Satellite Support Services, and said that "we need a

better entity and structure" because banks were asking too many questions. *Id.* By 2020, Collett

recalled that approximately $40 million had been invested in the Mexican fuel logistics project.

Collett Deposition (Feb. 4, 2025) at 114.

　　　　Some of the oil exploration projects in North America were in companies called

American Quantum and Canadian Quantum. On June 8, 2018, a recording was made of Edelman

discussing this investment with two business associates in London.[8] By this point, the

investments had no value and a former business associate was threatening to sue Edelman and

reveal him as the investor. On the recording, Edelman tells his business associates that he would

"just close all these companies . . . because suddenly I see my name on some legal document. I

spend my, all of my time trying to make sure my name isn't in anything, so any companies that

we have, anything whatsoever, any penny that we have in any company, lets close everything,

stop everything." Ex. 25-8. He added: "these are complete losses to this point and my name gets

---

[8] The recording is nearly four hours long. The Government exhibit is just the relevant 90-second
snippet for the Court's convenience, but the Government can also provide the entire recording as
well as an unofficial transcript of the conversation. Edelman joins the meeting after around two
and a half hours. Prior to his joining, Edelman's associates discussed setting up a new structure
in order to provide Le Dain with "a job on paper." This new structure involved a "network of
Spanish companies that hold land, you know, Doug's land investments in Spain . . . and of
course, Doug's nowhere in it, right?"

dragged into this and I funded it hundred percent, so I'm saying let's stop everything." *Id.* Finally, Edelman complained that "I don't have enough knowledge about what's going on and yet I've invested all the money." *Id.*

Additional examples of Edelman freely spending the dividends received abound. In April 2016 he instructed advisors to purchase a $480,000 home in Mexico for his ex-wife. Ex. 14-63. In the email, a business associate emailed Collett, Edelman, and another co-conspirator to say that "D just instructed me to go ahead and make payment . . .". *Id.* The business associate also discussed putting the house under an entity within the Murney Overseas Ltd. set of companies, which held the over $60 million invested in land near Tulum, Mexico. *Id.*

Edelman also decided to purchase two yachts for over one million euros in 2014 and 2015 and decided they should be owned by the Satellite Support Services entity (the same one he told Collett to stop using in February 2016). Collett Deposition (Feb. 4, 2025) at 139-40.

In short, from 2011 through 2020, Edelman decided to invest tens of millions of dollars worth of Mina/Red Star dividends. Collett testified that the investment ideas were driven by Edelman's various personal relationships and that when it came to the ultimate investment decision and instructions to fund the investments, "the directions had always come from Mr. Edelman." *Id.* at 119-20. He explained that this remained true from when Collett began his involvement in 2004 through 2020. *Id.* at 121. To oversee these investments, Edelman managed a team of other individuals. *Id.* at 121-22. Collett also explained that very few of these investments saw any return.

Throughout all of this, the trustee of the Galactea Trust and related trusts was absent. Collett recalled limited interactions with the trustee, and that there were some transactions where he made the trustee aware of the investments coming from the Rosbelt International account. *Id.*

at 123. Collett testified that from 2013 to 2020, he could not remember a single instance when Edelman wanted to make an investment and the trustee said 'no.' *Id.* at 123.

VIII.    **In 2015 and 2016, Edelman lied to his tax attorneys and the IRS about the creation and ownership of Mina/Red Star**

By 2015, Edelman had still not filed any U.S. income tax returns to report his income from Mina/Red Star or any other source. Tr. of Plea Hearing (May 21, 2025) at 24. In July 2015, Edelman sent a Dutch individual identified as Co-Conspirator 2 to the United States to meet with tax attorneys and tax preparers on his behalf. *Id.* At this time, Edelman was convinced to participate in an amnesty program for taxpayers who willfully failed to report foreign financial assets and pay taxes due, known as the Offshore Voluntary Disclosure Program ("OVDP"). *Id.* at 24-25.

Edelman's tax attorneys were not told the truth. Exhibit 4-5 is the client binder prepared by Edelman's advisors to give to his tax attorneys. It includes a summary of Edelman's position, as well as various corporation and trust documents. The client binder is notable for its misrepresentations and material omissions. First, Edelman and his co-conspirators relayed the misrepresentation that Le Dain owned Bartol Limited, Aspen Wind Corporation, and Mina/Red Star from the founding. 4-5 at 4. Of course, it was Edelman who owned Bartol and Aspen Wind, and who had founded Mina/Red Star. The information summary also stated that Le Dain's interest was transferred to the new Hong Kong-based structure under the Galactea Trust – this was also a lie, because she did not own Mina/Red Star. Another lie told to the tax attorneys was that Edelman owned Red Star on paper, but did so as the nominee for Le Dain. 4-5 at 21.

The tax attorneys were also provided with a sworn affidavit signed by Delphine Le Dain. 4-5 at 373. In it, she states under oath that she founded Mina/Red Star and that any shares held by Edelman or others were held on her behalf as her nominees. *Id.* In the affidavit, Le Dain

17

declared that all income from Mina/Red Star was hers in consideration for her 50 percent ownership in the companies. *Id.*

Based on the information he and his advisors provided to attorneys and tax preparers, Edelman was advised to only report "gifts" from Le Dain and "consulting fees" from Mina/Red Star. *Id.* at 25. With this false information, the tax lawyers determined that Edelman's income only consisted of payments made to his personal bank account, his credit cards, and to his family members from his prior marriage. Collett prepared summaries of this "income."[9] Ex. 4-5 at 309-344.

The "income" information provided did not include the Mina/Red Star dividends. It also did not include income that even the tax attorneys told the false story would have likely considered to be Edelman's. For example, the summary of payments to Edelman's children did not include the $580,000 he gave to his son in 2008. In addition, Edelman and his advisors did not tell the attorneys about dividends received from a company Edelman co-owned named Ifone-Neda. Ifone-Neda was a joint venture that sold internet services to military service members and contractors at Kandahar Air Base in Afghanistan. Tr. of Plea Hearing (May 21, 2025) at 28. From 2012 through 2020, Edelman received $1,559,939 in dividends from Ifone-Neda. *Id.*; Collett Deposition (Feb. 5, 2025) at 22; Ex. 25-9. Collet explained that in 2015, after the reorganization, he and Edelman had discussed how to get the dividends from Ifone-Neda into the trust structure through a company within the trust structure named Satellite Support Services Limited (SSSL). Collett Deposition (Feb. 5, 2025) at 25. Collett and another co-conspirator fabricated a consulting contract that would make it appear that Edelman's dividend payments from Ifone-

---

[9] Collett's testimony about the engagement of the tax attorneys can be found at Collett Deposition (Feb. 5, 2025) at 35-107.

Neda were instead consulting income to SSSL. *Id.* at 25-26. Though Ifone-Neda was outside the sham trust structure, Edelman's dividend income was still not reported to the tax attorneys.

The income reported to the tax attorneys also did not include funds received by Edelman for from the sale of a pub he had owned in Bishkek, Kyrgyzstan since before he founded Mina/Red Star. *Id.* at 12-19; 14-64. In September 2015, Edelman authorized a business associate to receive a $360,000 payment for his share of the pub. Ex. 14-64 at 14. When it came time for that business associate to transfer funds to Edelman's accounts, Collett described how he had fabricated a loan document in order to make it look like that associate had an outstanding loan agreement with the SSSL entity. Collett Deposition (Feb. 5, 2025) at 12-19; Ex. 14-64 at 16. Collett then emailed Mirabaud to state that this incoming payment was a loan repayment, and attached the fabricated loan agreement. Ex. 14-64 at 2. The tax attorneys were not told anything about the sale of the pub in 2015. Collett Deposition (Feb. 5, 2025) at 90, 101.

In March 2016, Edelman caused his attorneys to submit an OVDP letter to the IRS on his behalf, signed by him, swearing that he was a "consultant" for foreign entities in which he never had an ownership interest. Tr. of Plea Hearing (May 21, 2025) at 25. The signed letter also stated that Edelman had earned less than $1 million in unreported income each between from 2007 to 2014. *Id.*

In October 2016 Edelman caused his attorneys to make a full submission through the OVDP, including filing his 2007 through 2014 tax returns. *Id.* at 25-26. These returns were false in that they reported significantly less income than Edelman had received as the 50 percent owner of Mina/Red Star. *Id.* Instead of reporting the dividends, each return only reported the "income" derived from (some) of the transfers to Edelman's personal account and that of his

family from his prior marriage. Edelman has pleaded guilty to tax evasion for the 2007 through 2012 tax returns, admitting that they should have reported his dividend and other income.

IX.    **In 2018, Edelman sent his attorneys to tell the DOJ that his wife created and owned Mina/Red Star**

In 2018, after contact from the Department of Justice, Edelman caused his attorneys to make a presentation to a federal agent and prosecutors, claiming the false story that Le Dain had cofounded Mina/Red Star and that Edelman had received less than $1 million of income in each year from 2007 to 2014 as a consultant. *Id.* at 28. Edelman admitted that he knowingly caused these materially false statements to be made. *Id.* at 29.

X.    **Edelman filed false tax returns for the 2015 through 2019 tax years**

Edelman continued to file tax returns for the 2015 through 2019 tax years which also did not report the dividends received from Mina/Red Star. These returns only reported the money paid to his credit cards and transfers to his family members from his prior marriage. They also did not report his dividend income from Ifone-Neda.

XI.    **Edelman sold his share of the business in 2020 and received $41 million**

Starting in 2019, Mina Red/Star's co-owner Erkin Bek began to demand that Edelman end the charade. Collett explained that banks had started asking difficult questions, and Bek would not agree to any more dividend payments out of a concern that Mina/Red Star might withdraw their banking and trade finance relationships from Mina/Red Star. Collett Deposition (Feb. 5, 2025) at 123-24, 135-36. In December 2019, Bek wrote a letter accusing Edelman, Edelman's business associates, and the purported trustee of the Galactea Trust of "playing with fire on compliance business operational issues and not taking them seriously." Collett Deposition (Feb. 5, 2025) at 131-33. In the same letter, Bek wrote that Edelman needed to "formalize his position" in order to keep giving directions to Mina/Red Star's officers. *Id.* at 135.

In response, Edelman consulted with lawyers and put forth a number of different proposals for restructuring Mina/Red Star's ownership. *Id.* at 137. One of the proposals was to establish a new company named Praedium for Edelman to "acquire" the trust's 50 percent ownership in Mina/Red Star. *Id.* at 150. As part of this proposal Edelman began signing documents stating that he was the ultimate beneficial owner of this new company, and that he personally had an interest in Mina Group FZCO (an entity not yet created). Collett Deposition (Feb. 6, 2025) at 14-15. But at the same time, he still directed efforts to cover up evidence that he had initially founded Mina/Red Star: in 2020, one of Edelman's co-conspirators attempted to change the Gibraltar public registration database for the original Mina/Red Star entities, to reflect that Edelman was not the owner. Tr. of Plea Hearing (May 21, 2025) at 28-29; Collett Deposition (Feb. 5, 2025) at 141-44.

Ultimately, in July 2020 Edelman proposed that Bek buy the entirety of the company. Ex. 25-10. Edelman and Bek then negotiated the terms of the deal. For example, an August 2020 email shows the two partners discussing the proposal that ended up largely comprising the eventual deal. Ex. 25-11. In the email, Bek proposed to Edelman that he would pay $40.95 million paid in cash, plus earnout provisions for the years to come. *Id.* The ultimate deal involved substantially the same terms.

The sale was concluded on October 12, 2020. Edelman signed as the "seller guarantor," Bek signed as the "purchaser guarantor," and the seller and purchaser were Rosbelt International Limited and Bek's corporation, respectively. Ex. 25-12. One week later, Edelman emailed a business associate and mentioned that "we sold mina .. good deal for us." Ex. 25-13.

As part of the agreement, $40.95 million was paid in late 2020. Collett Deposition (Feb. 6, 2025) at 31-33; Ex. 25-1. Shortly after the receipt of the $41 million, Edelman directed that

approximately $10 million be sent to the Mexican fuel logistics investment. Collett Deposition

(Feb. 6, 2025) at 33. None of the sale income was reported on Edelman's 2020 tax return, which

instead reported a little over one percent of this income. Ex. 25-9.

### RELEVANT LAW

Relevant conduct for sentencing includes all acts and omissions that were part of the

same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. §

1B1.3. The commentary to Section 2T1.1 further explains that "all conduct violating the tax laws

should be considered as part of the same course of conduct or common scheme or plan unless the

evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 Note 2. Relevant

conduct need only be established by a preponderance of the evidence. *See United States v. Abu

Khatallah*, 314 F.Supp.3d 179, 185 (D.C. Cir. 2018) (citing *United States v. Bell*, 795 F.3d 88,

103 (D.C. Cir. 2015)).

A defendant's offense level is increased where the defendant was an organizer or leader

of a criminal activity that involved five or more participants or was otherwise extensive.

U.S.S.G. 3B1.1(a). A "participant" is a person who is criminally responsible for the commission

of the offense, but need not have been convicted. *Id.* Note 1. A fraud that used the unknowing

services of many outsiders could be considered extensive.

### ARGUMENT

**I.    The 2013-2020 trust structure is disregarded as a sham**

Edelman owned Mina/Red Star from its founding in the early 2000s through its sale in

2020. The 2013 restructuring did not change Edelman's status as the owner, but instead just

created a new series of nominee entities and sham trusts.

The Supreme Court has consistently held that the substance, not form, of a transaction is

what matters for tax purposes. *See Gregory v. Helvering*, 293 U.S. 465 (1935). In *Helvering v.*

*Clifford*, 309 U.S. 331 (1940), the Court held that abusive trust arrangements may be viewed as sham transactions, and the IRS may ignore the trust and its transactions for federal tax purposes. *See also Lucas v. Earl*, 281 U.S. 111 (1930) (assignment of income by taxpayer to his wife does not shift the incidence of taxation – the income remains taxable to the one who actually earned it).

A trust is disregarded for tax purposes if in substance it lacks any valid purpose but is simply a tax-avoidance device. *See Zmuda v. Comm'r*, 79 T.C. 714, 719-20 (1982). Courts consider four factors relating to the trust to determine whether the trust lacks economic substance for federal income tax purposes: (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether the trust has an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer feels bound by the restrictions imposed by the trust agreement or the law of trusts. *See Markosian v. Comm'r*, 73 T.C. 1235, 1243-44 (1980). If the trust lacks economic substance apart from tax consideration, the trust is a sham and is not recognized for federal tax purposes. *See Zmuda*, 79 T.C. at 720-22.

Whether a trust is a sham disregarded for tax purposes does not depend on the trust's validity. *See Richardson v. Comm'r*, 509 F.3d 736, 742 (6th Cir. 2007) ("That the trusts were valid under Ohio law, does not make them legitimate for federal income tax purposes. By adhering to state law in forming a trust, an individual does not necessarily give it economic substance as a matter of federal law. Just as the world can see through a Potemkin village, so the Tax Code sees through sham entities in assessing taxes, even though the trusts are otherwise 'valid under state laws'.") (citing *Comm'r v. Tower*, 327 U.S. 280, 291 (1946); *Zmuda v. Comm'r*, 79 T.C. 714, 720 (1980)).

A.  **Edelman's relationship to the assets did not materially change after the restructuring**

The first factor considers whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation. Courts consider whether the transfer of property into a trust materially altered any recognizable economic relationship between the taxpayer and the transferred property. *See Markosian*, 73 T.C. at 1243 ("Petitioners conducted their business and lived their private lives exactly the same as before the trust was created.")

Here, the relationship between Edelman and Mina/Red Star did not materially change following the restructuring. Edelman and Bek continued to run the company together. They decided when dividends would be paid out, when to fire Mina/Red Star's executives, and they coordinated about the direction and strategy of the company. When they considered selling the business in 2016, it was Edelman and Bek who decided on the price. In 2018, when the Department of Defense asked for Le Dain's phone number (after having been repeatedly told she was the owner), Edelman himself admitted to an associate that she was "so not involved." Finally, when it was time to sell the company in 2020, it was Edelman who negotiated with his partner, and who made the ultimate decision to sell his stake. In short, how Edelman ran Mina/Red Star did not change from the founding of the company to its sale.

Edelman's relationship to the dividends paid by Mina/Red Star also did not materially change. He continued to decide which entity they should be sent to, and he told advisors when they needed to seek new banking relationships – usually after a bank began asking too many questions. Just as Edelman determined in 2009 that the dividends should start going to Bank Julius Baer in Singapore instead of Credit Suisse in Switzerland, so too did Edelman decide in 2015 to leave Julius Baer for Mirabaud, and in 2018 to leave Mirabaud for Safra.

24

Before 2013, Edelman spent the dividends he received on a series of ill-fated investments in projects around the world. After the restructuring Edelman kept investing in exactly the same way. He directed that the dividends be invested into the same projects, as well as a series of new projects around the world based on his own relationships. Whereas before he did so through the Sunage Foundation and other entities, after 2013 Edelman used a different set of foreign entities. But nothing fundamentally changed about how he decided to spend the money.

Before 2013, Edelman invested millions into a music television franchise in Eastern Europe, a land venture in Tulum, Mexico, a Kenyan farming project, and other investments. He also invested in a technology company and bought a ski chalet in Austria. After the restructuring, Edelman directed the investment of an additional $11 million in the Kenyan farm project and another $12.6 million in the Tulum land project, all under the new trust structure. He also invested in a new technology company using an entity his co-conspirators created for that purpose. Before 2013, these investments were made in the name of a Panamanian foundation created at Edelman's direction, where Le Dain was the listed beneficiary. After, the investments were made in the name of a British Virgin Islands entity, created at Edelman's direction, with the same beneficiaries. The only difference is that whereas Edelman has admitted he used the Sunage Foundation as a sham nominee to hide his income, he denies that the newer entities were merely a continuation of the same. After 2013, Edelman continued to make every substantial investment decision, often for tens of millions of dollars apiece, in a series of foreign projects. As Collett explained, while the paper entities used to make these investments changed, Edelman's modus operandi did not.

### B. There was no independent trustee

A second factor looks to whether the trust had an actual independent trustee. Here, Collett worked closely with Edelman for sixteen years executing the details of each investment and

financial matter. He testified that it was Edelman, not the trustee, who made investment decisions about what to do with the funds and who managed the team of individuals who dealt with his investments. And though Collett said that they made the trustee aware of *some* transactions, he could not recall a single instance between 2013 and 2020 when Edelman wanted to make an investment and the trustee said 'no.' As such, there was no independent trustee who exercised any meaningful role in the operation of the trusts. *See Wegbreit v. Comm'r*, T.C. Memo. 2019-82 at *19 aff'd 21 F.4th 959 (7th Cir. 2021) ("Significantly, none of the trustees refused or even questioned petitioner Wegbreit's requests for funds or participated in the identification, evaluation, or selection of the trust assets and investments.")

### C.  No economic interest passed to the trust's named beneficiaries

No real economic interest passed to Le Dain or her children. Edelman continued to enjoy all of the economic benefit: he decided what to use the money for including his investments, yachts, and payments to his family from before his marriage to Le Dain. *See Wegbreit* at *19 ("Weigbreit also exclusively directed how [the trust] invested its assets.").  Collett only recalled a single occasion where anybody went to Le Dain for approval on a payment that Edelman had ordered. Collett Deposition (Feb. 5, 2025) at 121. Instead it was Edelman who made the decisions and who directed Collett to make payments totaling hundreds of millions of dollars.

In short, the economic interest remained Edelman's. He himself explained in an October 2012 email – sent while his advisors were in the midst of setting up the new foreign trust structure he ordered to be created – that Le Dain "never really had a clue [about] what I earned or didn't" and that his wife "just has to abide." Ex. 25-14.

### D. Edelman was not bound by the restrictions imposed by the trust agreement or the law of trusts

The final factor considers whether the taxpayer felt bound by any restrictions imposed by a trust. *See Markosian*, 73 T.C. at 1244 (finding that Markosian was not bound by any restriction where the trust imposed no substantial restriction on his use of the trust property, and where he had authority to deplete the corpus of the trust property). Edelman made decisions as if there was no trust. He switched entities and trusts at will, sometimes even telling his team that they needed to create a new entity for a particular investment.

The mere fact that so many different trusts were created for Edelman's various investments shows how un-seriously he took any trust restrictions. The client information provided to the tax attorneys detail the numerous trusts and corporate entities created to obscure each investment. Exhibit 4-5 at 8-18. These included not just the Galactea Trust (used to hold Mina/Red Star), but also entities such as Big Valley Trust (for the London townhome Edelman purchased), Iverna Trust (for Edelman's media investments), Atlas Trust (for Edelman's Kenyan farming investments), Dina Maropa Trust (for Edelman's Mexican land investments), Lightstar Trust (a trust established for Edelman's children from his first marriage), Ithaque Trust (purpose unclear), Bluestone Trust (used as a treasury account to receive dividends and fund investments), and Delfinity Trust (purpose unclear). On paper, each of these trusts oversaw numerous other corporations, partnerships, joint-ventures, and other entities.

Each entity was not treated as a separate trust or corporation – they were all controlled by Edelman to fund his same investments, and property was transferred at will between the entities. Collett explained that despite all the various trusts, there were two accounts used to fund Edelman's investments after 2013, Rosbelt International and Bluestone International. Collett Deposition (Feb. 6, 2025) at 47-51. And despite the "transfer" of Mina/Red Star to Galactea, in

2013 and 2014 Edelman directed that $32,789,654 in Mina/Red Star dividends be sent to the Sunage Foundation, just as they had for the previous years where he admitted that he beneficially owned Sunage and received dividends through it. Payments to Rosbelt International, a company under the Galactea Trust, only began later in 2014.

In reality, none of these entities were treated as anything other than methods for hiding Edelman's role as the ultimate beneficiary and decisionmaker. As such, Edelman was not bound by the law of trusts or any trust agreements. *See Aldridge v. Comm'r*, T.C. Memo. 2024-24, at *11 ("The trusts were operated in concert with one another, under the same administrative and management entity and with funds routinely transferred from one entity to another.")

### E.  The Galactea Trust and related entities are disregarded and the income attributed to Edelman, resulting in a $128.9 million tax loss

Given these factors, it is clear that the Galactea Trust and related trust entities lacked any semblance of economic substance and were mere alter egos of Edelman. Accordingly, they should be disregarded for Federal income tax purposes, and the income from Mina/Red Star attributed to him.

As such, the unreported income and tax loss are as follows:

| Year | Taxable income | Unreported income | Additional tax due and owing |
|------|----------------|-------------------|------------------------------|
| 2006 | $     6,492,606 | $     6,486,356 | $     2,256,850 |
| 2007 | $   16,100,000 | $   15,638,938 | $     5,448,858 |
| 2008 | $   27,950,000 | $   27,189,267 | $     9,482,773 |
| 2009 | $   40,700,000 | $   40,054,078 | $   13,987,971 |
| 2010 | $   13,250,000 | $   12,572,373 | $     4,368,514 |
| 2011 | $   15,649,588 | $   15,079,324 | $     5,250,997 |
| 2012 | $   50,604,890 | $   49,857,804 | $   17,418,317 |
| 2013 | $   17,964,655 | $   17,229,337 | $     7,461,346 |
| 2014 | $   48,015,218 | $   47,419,371 | $   20,563,064 |
| 2015 | $   16,488,229 | $   15,815,266 | $     6,825,130 |
| 2016 | $   22,606,898 | $   21,928,667 | $     9,478,248 |
| 2017 | $   17,207,399 | $   16,576,151 | $     7,151,248 |
| 2018 | $   14,853,889 | $   14,125,172 | $     5,717,201 |
| 2019 | $   14,178,432 | $   13,576,160 | $     5,490,789 |
| 2020 | $   41,167,192 | $   40,711,684 | $     8,093,932 |
| **Total** | **$ 363,228,996** | **$ 353,748,667** | **$ 128,995,238** |

Ex. 25-9

In total, Edelman earned $363,228,996 from 2006 through 2020. He filed tax returns that significantly underreported his income, resulting in him evading taxes on $353.7 million of the $363.2 million he earned, of which $183.3 million was earned but not reported to the IRS between 2013 and 2020. The IRS calculates that this resulted in a tax loss of $128,995,238.

## II.    Edelman knew the 2013-2020 income was his and intended to evade taxes on it

After having evaded taxes on over $170 million in income earned from 2006 through 2012, Edelman understood that the new trust structure was a sham and the income remained his. This is shown by the fact that, as he had before 2013, Edelman continued to lie, obscure, and obstruct through 2020. Moreover, his own private statements show he knew the trust structure was a sham and the assets and income actually his.

### A. Edelman continued to lie and obstruct after 2013

The existence of a sham trust structure did not change the object of his offense, and it did not change the means by which he committed the fraud. Edelman admitted that he evaded income on his 2006 through 2012 taxes by hiding his ownership of Mina/Red Star, including through a Panamanian foundation (the Sunage Foundation) where Le Dain and their kids were the named beneficiaries. So too from 2013 through 2020, Edelman willfully hid his ownership of Mina/Red Star, albeit through a different set of foreign entities with the exact same beneficiaries. Before 2013, Edelman lied to banks, attorneys, the US Congress, and the Department of Defense about the ownership of his business – all the while he ran Mina/Red Star and managed a series of investments with the dividends he earned. After 2013, his modus operandi did not change – he continued to run the company and invest the proceeds, and he continued to lie to banks, attorneys, and the government.

### B. Edelman did not have a good faith belief that the 2013 restructuring actually changed his status as an owner

Edelman did not actually believe that the restructuring had actually shifted the income to Le Dain. The simplest evidence for this is the fact that Edelman continued to lie to everyone around him about the founding of the company and the restructuring itself. If he had actually believed that the 2013 restructuring meant that the income was no longer his, there would be no reason to keep lying about it. Instead, he lied to the advisors who set up the Galactea Trust structure, telling them that Le Dain had owned Mina/Red Star and was the grantor of the trust. Edelman could not believe in good faith that the trust was not a sham for hiding his income when he lied repeatedly to the lawyers who set up the entities on his behalf.

He also lied to his tax attorneys, the IRS, and to the Department of Justice about his income and the founding of the company. The lies to his tax attorneys – whom he engaged in

2015 and 2016 to enter an IRS amnesty program – are worth further scrutiny. If he truly believed that he had only earned income through 2012, there would be no benefit to lying to his own attorneys about the founding of the company and his ownership through 2012. And there would be no reason to not report items that clearly fell within the categories that even these attorneys considered to be income, such as the $580,000 payment to his son or the money earned from selling his pub in Kyrgyzstan. Further, that he hid the Ifone-Neda dividends by fabricating consulting agreements making it appear this was income within the trust structure shows how he used these entities to hide his income. Instead, these lies show that Edelman knew the restructuring was bogus and that his intent was to evade taxes.

That Edelman made efforts to hide and minimize his own involvement also demonstrate his knowledge that the Galactea Trust structure was a sham. Within his circle of associates, Edelman was the only boss and ultimate decision maker. Yet externally, he and his co-conspirators took steps to hide his role and involvement. Banks were told that he was merely an advisor. For example, the due diligence information provided to Mirabaud said that Edelman was not involved in the management or decision-making of any of the trading entities, and that Le Dain merely consulted him on various strategic business matters. Ex. 4-5 at 366. Edelman and his associates knew this was simply not true, and their lying to banks in 2015 demonstrates they knew the trusts were a sham.

Edelman spent a lot of energy making sure his name was not on anything and minimizing his involvement. Indeed, he has pleaded guilty to two felony counts of making false statements to various arms of the U.S. government in 2016 and 2018, all in service of minimizing his role and avoiding further scrutiny. Again, if he had believed he was acting in good faith and that the income was not his, there would be no reason to do this. Instead, he continued to hide his actions

behind dozens of trusts and entities, and to continuously tell banks and lawyers that he was not involved. Even when Mina/Red Star was at risk of losing its banking and trade financing relationships, Edelman continued to try to hide his role. Had he thought it was not a problem for him to entirely control the trusts and funds the way he did, he would not have shied from letting others know.[10]

### C. Edelman's own statements make clear he knew it was a sham

Edelman's knowledge and intent are made clear from his own private conversations. For example, in October 2012, while the restructuring was taking place, Edelman wrote the following to a co-conspirator:

> "Don't go talking and going into all kinds of details with people [or] even [your wife] too much. A man is wise to deal with his finances in his own way with talking to women. Delphine never really had a clue abt what I earned or didn't and even sometimes what I did. I always felt it better that way. But then that just my way . . She just has to abide." Ex. 25-14

This email is just one example of Edelman's attitude towards the trust structure: it was a sham to be disregarded, he earned the income, it was his to spend, and Le Dain just had to "abide."[11]

In a later recorded conversation, Edelman told his co-conspirators that "I spend my, all of my time trying to make sure my name isn't in anything . . ." Ex. 25-8. Here in private, he speaks the truth: "I funded it hundred percent . . . I've invested all the money." *Id.* The incongruence between Edelman's private statements to co-conspirators and his lies to those who might make him pay taxes show his intent.

---

[10] Edelman might argue that his lying about the founding of the company was merely an attempt to evade his 2006-2012 taxes, or perhaps an attempt to evade any gift tax owed by him transferring the company to his wife. This story does not make sense given the facts. There is no evidence of Edelman gifting the company to his wife, and substantial evidence of him continuing to run the company while hiding his ownership and control through nominees.

[11] In the same email, Edelman also advised his co-conspirator and friend to take less salary in order to stay below a tax threshold and have the company pay the remaining salary to his friend's wife.

A November 2014 email between Edelman and a business associate shows that he reorganized the entities to avoid scrutiny by U.S. tax authorities. In the email, Edelman wrote to a co-conspirator about the attorney who had managed the 2012-2013 reorganization. Ex. 25-17. He said: "[the attorney is] quite clever re structures. . . . Ask him how much scrutiny us govt has over all things there etc? Ask him about 'grantor trust' and what he knows about those and how they relate to usa citizens etc . . Good to ask these things etc." *Id*.

That the trust was a sham was even a recurring joke among Edelman's co-conspirators. In August 2012, Edelman's friend Robert Dooner was visiting Kyrgyzstan and talked with Edelman about visiting the bar that Edelman owned there. Ex. 25-15. Edelman wrote:

> ". . . better not to bandy my name around. Refer to [Edelman's step-son] as the founder, owner operator etc etc. I think best to keep my name quiet. . . . Or as for the bantering of names maybe tell them you think new owner is called [the first name of Edelman's then-three-year-old daughter]."

The joke, of course, was that his three-year-old daughter – the "new owner" – was on paper a beneficiary of the trust that was being set up, while Edelman was the actual owner. He sold the bar in 2015 for at least $360,000 but did not report this income to his tax preparers, even though the bar was owned by him personally. Ex. 14-64 at 12.

Similarly, in January 2019, one co-conspirator was messaging Edelman about the Mexican investments and a threat by a former business associate to out Edelman's involvement. Ex. 25-16. Regarding the threat, Edelman's co-conspirator wrote: ". . . any legal action would go nowhere until we are all deposed and then we would all say the same thing – we take our orders from [Edelman's then-nine-year-old daughter]!" *Id.* at 2. While Edelman lied to his attorneys, banks, and the government, with his co-conspirators in private he made his understanding and intent clear.

III.    **Edelman was a leader/organizer of the long-running conspiracy**

Here, Edelman directed at least five others: Le Dain and the four co-conspirators listed in the Indictment. ECF 1. The evidence shows how Edelman was the leader and organizer of this fraud, as he told others what to do. Edelman's plea colloquy also makes this clear. In the plea hearing, the Government stated: "I would point the Court to Mr. Edelman's acknowledgment that he directed the actions of several co-conspirators; they were named in this statement of offense as Co-Conspirator 1, 2, 3, and 4, as well as Delphine Le Dain, who was also involved in actions at his direction." Tr. of Plea Hearing (May 21, 2025) at 33. When the Court asked: "Do you agree with that?" Edelman replied "Yes." *Id.*

Indeed, Edelman ordered Co-Conspirator 1 to close his Credit Suisse accounts and move the funds to the new Singaporean accounts at Julius Baer. *Id.* at 21. In July 2015, Edelman sent Co-Conspirator 2 to the United States to tell the tax attorneys the false story that Le Dain was the created and co-owner of Mina/Red Star. *Id.* at 24. Co-Conspirator 4 helped Edelman request dividends from Ifone-Neda, which were concealed from the IRS. *Id.* at 28. In 2020, another of Edelman's co-conspirators, on Edelman's direction, attempted to change the Gibraltar public registration database to falsely reflect that Edelman was not the owner of Mina/Red Star. *Id.* Le Dain was charged as a co-conspirator, and Edelman admitted that she signed a false letter to the IRS under penalty of perjury "at his direction." *Id.* at 25.

<u>**Conclusion**</u>

The government respectfully requests that the Court make factual findings that: (1) the structure of foreign trusts set up and used by Edelman from 2013 to 2020 to hold his income was a sham; (2) Edelman caused a tax loss of $128,995,238; and (3) Edelman was a leader or organizer of criminal activity involving that involved five or more participants. These findings are supported by the evidence and take into account the scope of Edelman's wrongdoing.

34

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:      <u>      /s/ Ezra Spiro               </u>
Ezra Spiro (NY Bar No. 5921838)
Trial Attorney
Department of Justice Criminal Division
950 Pennsylvania Ave NW
Washington, DC 20530
Ezra.K.Spiro@usdoj.gov
(202) 718-7308

Sarah Ranney (NY Bar No. 5050919)
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20579
Sarah.Ranney@usdoj.gov
(202) 252-7051