**CLIENT INFORMATION - FILE INDEX**

A. **SUMMARY INFORMATION** – referenced to request email received

B. **STRUCTURE**
- Proposed new structure based on BVI Trusts
- Detailed structure notes relating to Galactea Trust
- Sunage Foundation structure – showing proposed migration of investments and assets to new BVI structure

C. **CORPORATE INFORMATION**
- Historical summary of original structure (including full details of beneficial ownership issues that arose in the Gibraltar company in connection with the logistics business.

D. **GALACTEA TRUST**
- Copy of trust deed dated 23 December 2013
- Copy of tax advice report from Mishcon de Reya in connection with the new trust structure
- Copy of nominee trust agreement

E. **CURRENT TRUST STRUCTURE MANAGEMENT**
- Overall summary of structure, personnel and responsibilities
- Copy of recent agenda of Trustee/Protector/legal advisors – showing the various issues that are currently being dealt with both at the Trust level and the individual trading entities.
- Draft loan letter for use in transferring loan accounts and assets from the Sunage Structure to the new BVI Trusts

F. **U.S. BENEFICIARIES TRUST (LIGHTSTAR TRUST)**
- Copy of trust deed
- Summary note of advice received
- Copy of advice from Steptoe & Johnson LLP (via Mishcon de Reya)
- Copy of advice from Suzanne Reisman (via Mishcon de Reya)

G. **SUNAGE FOUNDATION**
- Trust deed dated 3 April 2008
- Regulations dated 10 June 2008
- Trust deed amendment 11 October 2011 (change of Trustees)
- Trust deed amendment 11 June 2012 (inclusion of Paloma – youngest daughter)

**Government Exhibit**

4-5

**HI. SUNAGE FOUNDATION – ADDITIONAL INFORMATION**

- Copy of information given to Bank Julius Baer on opening of account (purely for additional information purposes
- Financial statements for the first period to 31 March 2009 (for illustration purposes only)
- Copy of POA – Graham A Collett
- Copy of POA – Iryna Tsenzharyk
  *(note: these are the only two POAs in issue)*

**JK. ASPEN WIND CORPORATION**

- Certificate of Incorporation
- Memorandum and Articles of Association
- Certificate of Good standing
- Certificate of Incumbency
- Copies of Bearer shares
- POA – Graham A Collett
- POAs (2) – issued to client for the two years 2004 and 2005
- Tax Notice

**L. ASEPEN WIND CORPORATION – ADDITIONAL INOFRMATION**

- Financial statements for the year ended 31 December 2003
- Credit Suisse – Email dated 28 November 2008 regarding account closure
- Credit Suisse – Closing statements (sample only)

**M. BARTOL LIMITED**

- Summary note
- Certificate of incorporation
- Memorandum and Articles of Association
- Copies of draft financial statements for the four years ended 31 December 2004

**N. BENEFICIARY DISTRIBUTIONS AND TAX ADVICE**

- Overall summary of distributions – 2001 to 2012
- Tax advice – Mishcon de Reya
- Notes re: Spanish residency

**O. CLIENT INCOME SUMMARIES**

- Notes on basis of preparation
- Overall summary of distributions – 2001 to 2012
- Detailed schedule – HSBC account
- Detailed bank account reconciliations (and notes)
- Summary credit card payments on behalf of client

CAPLIN0024498
USPROD-02360699

**PQ. DLD INCOME SUMMARIES**

- Overall summary of distributions – 2001 to 2012
- Detailed transactions – year ended 31 December 2013
- Detailed transactions – year ended 31 December 2014

**R.  OTHER DISTRIBUTIONS (Full Analyses)**

- Rivkah Edelman
- China Edelman
- Gregory Edelman
- Josef Edelman
- Frederic Le Dain
- Rebecca Tassi
- Robert Edelman
- Ancillary information re: 2008 and 2009

**S. MIRABAUD MIDDLE EAST LIMITED**

- Bank's due diligence report on DLD
- Assets and income declaration

**T.  AFFIDAVIT**

- Affidavit by DLD in relation to ownership of Red Star Enterprises Limited

**UV. SATELLITE SUPPORT SERVICES LIMITED**

- Certificate of incorporation
- Memorandum and Articles of Association
- Nominee shareholder agreement
- Nominees director agreement
- POA – Graham A Collett

**WX. OTHER INFORMATION**

- Correspondence with BNP Paribas (Suisse)
- Correspondence with Weil Gotshal and Manges LLP

Confidential

Ex.004-5.0003

CAPLIN0024499
USPROD-02360700

**SUMMARY INFORMATION**

1.  The family wealth creation started in 2000/2001 when the logistics business was first operated through two companies - Bartol Limited (BVI) and Aspen Wind Corporation (Belize). The logistics business was later transferred to two Gibraltar based companies – Red Star Enterprises Limited and Mina Corp Limited - in 2005. These companies were both 50% owned by Delphine (DLD) via nominees until 2008 when Sunage Foundation (Panama) was set up.

    The beneficiaries of Sunage Foundation are DLD and three minor children. The client has had no interest in this trust at any time.

    In 2012, Galactea Trust was established with the same beneficiaries as Sunage Foundation. This is a BVI Grantor Trust, based on advice received from Mishcon de Reya. DLD's 50% ownership of the logistics business (Red Star and Mina Corp) was transferred from the two Gibraltar based companies to a new structure centred on Hong Kong, with a series of intermediate holding companies including a general partnership with the other 50% shareholder. *see org. chart.*

    Additional BVI trusts, being an exact replica of Galactea Trust have been set up to acquire various trading investments that have been established since 2008. These are fully detailed in the attached files

    A US grantor Trust, Lightstar Trust, has also been established for the US beneficiaries (children of the client by first marriage). This was also prepared by Mishcon de Reya based on tax advice received. No funds have yet been allocated to this account, nor any distributions made thereunder.

    Please refer to file index for relevant information on all of the above

    Details of all distributions from the above trusts are also included in the attached files. The summaries highlight the amounts paid to the client, DLD and the US beneficiaries (and the Trusts/entities from which the distributions were paid.

    There are no formal letters of wishes attached to any of the trusts referred to above.

2.  There are no companies or investments of this nature other than the trading investments directly (or indirectly) owned by the trusts referred to in 1 above.

3.  Organisational charts and relevant information is attached. It should be noted that the transfer of assets from Sunage Foundation to the new Trusts is already in progress.

4.  The client does not currently have any bank accounts in his own name, nor is he a signatory or direct beneficiary of any accounts.

Confidential

CAPLIN0024500
USPROD-02360701

DLD has personal accounts with HSBC (in UK), Mirabaud Middle East Limited and with CAM (Ibiza).

*[handwritten: no currency]*

None of the minor children have bank accounts (Check).
No information currently available in respect of the US beneficiaries of Lightstar.

5.   The following accounts are of relevance:

| | |
|---|---|
| Aspen Wind/Bartol Limited | BNP Paribas |
| | Credit Suisse |
| | |
| Red Star Gibraltar/Mina Corp*** | BNP Paribas |
| | Credit Suisse |
| | ABN Amro |
| | Maquarie |
| | ING |
| | Plus others..... |

*[handwritten: Mina Trading Company]*

*** These accounts all relate to the logistics trading businesses – originally based in Gibraltar, but latterly in Hong Kong

| | |
|---|---|
| Sunage Foundation | Bank Julius Baer (Singapore) *– Closed* |
| | CBH |
| | |
| Satellite Support Services | Bank Julius Baer *Singapore – Closed* |
| | Mirabaud Middle East Limited |
| | CBH |
| | |
| Galactea Trust | Mirabaud Middle East Limited |
| | |
| Rosbelt International Limited | Mirabaud Middle East Limited |

6.   There are no marriage/prenuptial agreements (client to confirm)

7.   The main property assets are:

- London house - (Cottesmore Gardens) – owned by Big Valley Trust - previously owned by Sunage Foundation and Beta Ventures Limited (Belize) when originally purchased in 2010. *[handwritten: BV]*

- Ibiza house – San Gertrudis – owned by DLD personally.

- London Flat – owned by Hersey Development Limited

- Motor yachts (2) – purchased recently by Satellite Support Services Limited – to be transferred to new entity.

- *[handwritten: Apartment in Nice - DLD inherited from mother.]*

CAPLIN0024501
USPROD-02360702

- Art collection – currently in London house – estimated value - £1M – partly purchased by Satellite Support Services Limited and partly by DLD through distributions.

- Two houses in US – one occupied by client's brother and the other by client' first wife. Both owned by LightAir Capital Limited.

*BVI Company.*

8.  Summaries of all relevant distributions and other transactions are attached, with detailed explanations where relevant.

9.  Copies of any relevant correspondence attached.

**From:** Dianne Mehany
**Sent:** Wednesday, July 22, 2015 5:28 PM
**To:** Scott Michel
**Subject:** HVK documents requested

Scott,

For our review next week, I would propose our time frame for review is from 2005 forward. Any type of document I request would include this period (including trusts/companies opened or closed at any time during any part of this ten year period).

With that in mind, I suggest we review the following documents:

1. Any trust documents in which the client, his wife, or his children are associated. This encompasses trust for which they are either the settlers, directors, protectors, or beneficiaries (whether discretionary, contingent, or otherwise). By trust documents, I would request the trust/foundation deed, supporting by-laws, revisions (including adding/deleting beneficiaries), and letters of wishes.
   a. List of distributions from the trusts/foundations.
2. The foundational documents for any company in which either the client, his wife, or his children are a 5% or greater shareholder, director, or an authorized person, as well as a description of the business (to determine whether subpart F applies for purposes of the income tax calculus).
3. An organizational chart showing the relationship between various companies and trusts.
4. A list of all accounts in which the client, his wife, or children have signatory or beneficial interest. At the very least, the high balance during the years at issue would be helpful. Eventually, we will request statements for these accounts, including a list of transfers and deposits.
   a. Opening (and closing, where applicable) documents are also helpful to this review.
   b. The names of all associated "authorized" persons, beneficiaries, signatories, etc., for these accounts.
5. A list of accounts to which any company or trust/foundation related to the client, his wife, or children are associated (i.e., at least 5% shareholder as well as director/owner).
   a. Opening (and closing, where applicable) documents are also helpful to this inquiry
   b. The names of all associated "authorized" persons, beneficiaries, signatories, etc., for these accounts.
6. The marriage agreement (i.e., prenuptial) between the client and his wife, including any revisions.
7. A list of real property and other substantial assets owned by the client or his wife, whether individually or through a structure.
8. A summary of all gifts made from the client to his wife, and to any children, siblings, nieces and nephews, and parents. Also a summary of all gifts made to any U.S. persons. For this request, I would go beyond the initial ten year period, as it impact current tax compliance. If the client gave any gift greater than $15k during his lifetime, we would request a summary (to the best of his memory, of course). Has his wife made any substantial gifts during her lifetime (i.e., more than $100k)? If so, we would request a summary of those gifts, including recipients (especially if those recipients are U.S. persons).
9. Any correspondence received by the bank or his wife regarding U.S. tax compliance, FATCA, or QI reporting.

I realize this list is quite voluminous, and may take some time to gather the documents. Whatever we can review next week would be very helpful to determine the various information reports due (as the attribution rules between families are quite complex), as well as the possible income/gift tax numbers.

Thanks,
D

2

Confidential
CAPLIN0024503
USPROD-02360704



All Trusts are identical with exception of Lightstar.

CAPLIN0024504
USPROD-02360705

Ex.004-5.0008



Trust: Discretionary, Revocable, Grantor Trust
Settlor: Delphine le Dain
Protector: Graham Collet
Beneficiaries:

GALACTEA TRUST
Trustees: Salamander Associates Limited

Mirabaud Dubai

Rosbelt International Limited
Director: Salamander Management Limited

Mirabaud Dubai

General Business Partner Limited
Midocean Chambers, 9 Columbus Centre, Pelican Drive, Road Town, Tortola, BVI
Registered Number: 1561266
Director: Graham Collet, ??

Yellowstone Resources Management Limited
BVI (1547402?)
Director: General Business Partner Limited

50% LP          50% LP

Global Resources Worldwide LP
BVI

First Overseas Properties Corporation
BVI (1547305)
Director: General Business Partner Limited

Intercontinental Capital Enterprises Limited
BVI (1547300)

*see detailed notes and updated structure attached.*

Mina Petroleum FZE
• Dubai free zone enterprise
• Operational company

Red Star Enterprises Ltd
Hong Kong
Directors:Stephen Myers Bucher, Christopher Slaboszewicz, James Richard Cecil

Mina Group investment in Mina petroleum -see detailed structure



*Media Structure 2012*

## Iverna Trust Structure

*Well all change.*

Subject to credit line agreement

**Iverna Trust** 75%
**Peter Gerwe** 12.5%
**New Co** 12.5%

Prospect Capital
Screen Media
R&D Media Kazakhstan

US National Secondary from Immigration

**Taruki Management**
Directors: SML     BVI

**StoryFirst Limited**
Directors: SML     BVI

**Russian Holding SPV, 100%**
**China New Media (BVI), 40%**
**HTV Media (Netherlands), 49%**
**SF Productions (BVI), 100%**
**MTV Adria (3 entities), 100%**
**Terraneo (Croatia), 100%**
**StoryFirst (UK), 100%**

Media Invest Holdings (BVI), 100%
PRT Holdings (Cyprus), 100%
MediaDom (Russia), 100%
People's Video (China), 49%
Economic interest, not shareholding
Based on Solex
Service company

StoryFirst Productions (BVI), 25%
Bressar Holdings (Cyprus), 68,77% - 100%
CCTV Internet communities, 100%
Hola TV (Spain), 25%

SF Productions (Russia), 100%
Startnet (Russia), 100%

Subject to OPIC approval

CAPLIN0024506
USPROD-02360707



**ATLAS TRUST**
Trustees: SAL

**ATLAS RESOURCES HOLDINGS LIMITED**
BVI

Trust: Discretionary, Revocable, Grantor Trust
Settlor: Delphine le Dain
Protector: Graham Collet
Beneficiaries:

**Amala Holdings Limited**
Directors: James Cecil, Graham Collet, David Saunders, Christian Benard

| New Trust | 70% |
| Christian Bernard | 30% |

**EVANSHIRE FINANCE LIMITED**
BVI Operating company for land
Directors: James Cecil, Graham Collet, David Saunders, Christian Bernard

| New Trust | 70% |
| Christian Bernard | 30% |

**Mara (EPZ) Limited**
Directors: James Cecil, David Saunders, Christian Benard, Bart Van Kruistrum

| Evanshire | 80% |
| Bart Van Kruistrum | 15% |
| James Farguharson | 5% |

**Mara Farming Limited**
Directors: James Cecil, David Saunders, Christian Benard, Bart Van Kruistrum

| Evanshire | 80% |
| Bart Van Kruistrum | 15% |
| James Farguharson | 5% |

**Mara Fresh BV**

| Evanshire | 80% |
| Bart Van Kruistrum | 15% |
| James Farguharson | 5% |

**Songorol Limited (avocado project)**

| Mara Farming | 50% |
| Woods | 50% |

**Ethiopia J V**
Directors: James Cecil, Christian Bernard + partners

| Mara Farming | 49% |
| Partner | 51% |

**Zimbabwe J V**
Directors: James Cecil, Christian Bernard + partners

| Mara Farming | 50% |
| Partner | 50% |

Confidential

Ex.004-5.0011

CAPLIN0024507
USPROD-02360708



Trust: Discretionary, Revocable,
Grantor Trust
Settlor: Delphine le Dain
Protector: Graham Collet
Beneficiaries:

Confidential



**LIGHTSTAR TRUST**
TRUSTEES: SAL

Trust: Discretionary, Revocable,
Settlor: Delphine le Dain
Protector: Graham Collet
Beneficiaries:
(Graham's first wife children)
• Rivkah Edelman
• China Edelman
• Josef Edelman
• Michel Tassi

**LIGHTSTAR LIMITED**
BVI

*No funding to date*

**LIGHTAIR CAPITAL**

*US properties . (2)*

Confidential

Ex.004-5.0013

CAPLIN0024509
USPROD-02360710

**Galactea Trust**    owns the whole of the issued share capital of :

**Rosbelt International Limited,**    a company incorporated in BVI. The ownership of Rosbelt has been changed to Galactea. The registered agent is Salamander

Rosbelt in turn is a 50% limited partner in Global Resources Worldwide LP (see further details below), which in turn is managed by:

**General Business Partners Limited.**    The company is the General Partner in Global Resources Worldwide LP and is effectively a fund manager on behalf of the LP and its Limited Partners.

The company is represented by Graham Collett and Francis Rojas as directors and shareholders.

By its nature (as a general partner and fund manager, the company is technically outside the "structure", but it has the power to act on behalf of the partnership and therefore needs to be fully accountable to the limited partners.

As indicated above, legal title of all LP assets is vested in the General Partner.

The company is the limited partner in:

**Global Resources Worldwide LP**, which is a limited partnership registered in BVI.

The LP structure is:         General Partner:    General Business Partners Limited

                            Limited Partners:   Rosbelt International Limited and Dewitt Art SA

The partnership has its principal place of business in BVI and the limited partners take no part in the day to day management of the company's business. The partnership has no legal personality in that its only asset is a 100% holding in Yellowstone Resources Limited. Strategic policy is decided by the General Partner, with prior consent of the Limited Partners. All major decisions (as defined in Schedule 5 to the agreement) must be agreed by the General and Limited Partners.

CAPLIN0024510
USPROD-02360711

The Limited Partners can replace the General Partner at any time, through choice or as a result of incapacity.   The control mechanism works in practice by means of close communication between the General Partner and the ultimate beneficiaries (or their representatives).

The limited partnership's sole asset is a 100% holding in:

**Yellowstone Resources Management Limited.** (Registered in BVI) The share capital (comprising one ordinary share) is owned by Global Resources Worldwide LP and its only director is Kapil Dutta.

Yellowstone in turns owns the following two intermediate holding companies – First Overseas Properties Corporation Limited and Intercontinental Capital Enterprises Limited.

**First Overseas Properties Corporation Limited.** (Registered in BVI. The company's registered agents are Midocean and the directors are Graham Collett and Francis Rojas. The issued share capital is 50,000 common shares, all issued to Yellowstone Resources Management Limited.

The company has a bank account with ING Belgium and also has an account in Dubai (details to follow).

The company in turn owns Mina Petroleum FZE and Mina Petroleum LLC (Oman)

**Intercontinental Capital Enterprises Limited.** The company has been formed on same basis as First Overseas Properties Corporation Limited and also has bank account with ING Belgium.

The company in turn owns Northlink Energy Limited, Petra Energy Limited and also Red Star Enterprises (Hong Kong).

## OTHER INFORMATION

Midocean is the registration agent for Maitland (Francis Rojas)



**JUNE2015**
**STRICTLY CONFIDENTIAL**

**Diagram of Structure**

document number: GN00692/0001-Geneva-14867/9

CAPLIN0024512
USPROD-02360713

NOTE: Investment structural changes from Sunage Foundation to new structure.

**HOLDINGS STRUCTURE**



**Sunage Foundation**

Red Star/Mina (Gib) (Logistics) — 50% now novated to ............ Gib. (now HK) — GALACTEA TRUST (see attached structure)

Evanshire Finance (Kenya *farm* properties) — See detailed structure attached — ATLAS ITHAQUE TRUST

Murney Overseas (Land and businesses in Mexico) — 100% BVI — DINA MAROPA TRUST

Little Ajax (Hotel in Austria) — 51% Held by FLD — Delphus Brother French

Mina Media (Holds 100% of MTV Adria d.o.o.) — 100% Cyprus — To be transferred to StoryFirst

CFS Equities Terraneo Festival — 100% BVI — To be transferred to StoryFirst — IVERNA TRUST

Solex Productions (NAME CHANGE TO "SF Productions) Movie production and investment — 100% BVI — To be transferred to StoryFirst

Satellite Support Svs Various trading and investments — 100% BVI — BLUESTONE TRUST

UK Property Cottesmore Gardens (owned direct) — BIG VALLEY TRUST

Confidential

Ex.004-5.0017

CAPLIN0024513
USPROD-02360714

(See continuation)

**HOLDINGS STRUCTURE (Continued...)**



Robstown

Lightair Capital    100%

(US residential)    BVI

Lang International Holdings
Canadian Quantum
H K Exploration (Joint Venture)

Borage Foundation *(no investments or activity)*

Delphine Le Dain

Hersey Development    100%
*(UK residential*    BVI
*property)*    ( IVERNA
GARDENS)

Ibiza Property -
*Ste Gertrudis (owned*
*direct)*

Spectral Fund

Listed/unlisted investments    Bahamas

Ajax Exploration    % tbc
*Ethiopia/Kenya Oil*    Cyprus
*licences*

Ark Trust    (Dormant)

BSI Generali

Insurance wrap
*Cash Holding*
*Investment holding*
*Investor in Spectral Fund*

LIGHT STAR (?)
DELFINITY TRUST

ITHAQUE
ATLAS TRUST

Transfer to
ATLAS TRUST
ITHAQUE

Confidential

Ex.004-5.0018

CAPLIN0024514
USPROD-02360715

**Red Star Enterprises Limited**

*(copies of appendices to follow)*

**Corporate information**

<u>Introduction</u>

*80% founded Unuestors*

The origins of the business now carried on in the name of Red Star Enterprises Limited can be traced back to an investment by Delphine Le Dain in 2000. An initial investment of 20% was made by Delphine le Dain in Manas International Services, a limited liability company established on 14 November 2000 in the Kyrgyz Republic. The main objective of the company was to pool intellectual and financial resources of the Founders with the aim of generating profits from various activities as set out within the founding agreement. The main activities of the new company included the supply and sale of aviation fuel. A copy of the translated Founders' agreement is attached in Appendix 1. *↳ ultimately folded into Bartol*

Shortly afterwards, in May 2001, Bartol Limited (incorporated in BVI) was set up as a vehicle to act as a supplier of fuel to Manas International Services (and others) and to develop the infrastructure for the supply and distribution of fuel.

Manas International Services needed supplies, but did not have the financial resources or expertise to develop the business themselves. Bartol Limited commenced trading in a very small way and was built up through establishing a permanent infrastructure, negotiating with suppliers and obtaining long term contracts for the supply of fuel.

From the beginning of 2002, Bartol Limited employed a number of outside experts in the fuel supply business (as consultants to the company) to develop contacts with customers, suppliers and technical services providers. The company also employed a financial accountant (from December 2001) to oversee financial control of all aspects of the business.

**Bartol Limited**

*Erkin did not contribute money*

<u>1.1.    Incorporation</u>

The company was incorporated on 23 May 2001.

<u>1.2.    Shareholders and corporate information</u>

On incorporation, two bearer shares of $1 each were issued - the beneficial owner of these shares was as follows:

---

**Strictly Private and Confidential**                                        Page 1
NOTE:        The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

CAPLIN0024515
USPROD-02360716

Delphine Le Dain                    2 shares

Full details of the corporate information relating to the company are set out in Appendix 2, together with copies of the relevant documents.


1.3.    Powers of Attorney

As outlined above, a number of external consultants were recruited and during the period from incorporation, many of these consultants were required to act under General Powers of Attorney (renewed each year by the director of the company).

Such Powers of Attorney were issued with the knowledge of the controlling shareholder. Douglas Edelman also had a General Power of Attorney to act for the shareholder in a general advisory capacity during 2004 and 2005 only.

Copies of the relevant documents (in respect of the years 2004 and 2005) are attached in Appendix 3.


The purpose of the Power of Attorney was to act for the beneficial owner (in her absence) possibly in connection with opening of bank accounts or certain statutory matters. No Powers of Attorney were issued after 2005.


1.4.    Trading and financial statements (to December 2004)


Bartol Limited commenced trading in 2002 and detailed trading and financial statements have been prepared for each financial period ended 31 December 2004. No dividends were paid to any shareholders during this period.

From 2005 onwards, the income of Bartol Limited has been restricted to the receipts of dividends from its 50% shareholding in Red Star Enterprises Limited.

1.5.    Additional shareholder


In 2002, as the business started to develop, Erkin Bekbolotov became a 50% shareholder (buy way of the acquisition of one of the two bearer shares in issue in Bartol Limited. From that date, he was fully responsible (as Managing Director) for the development and running of the business.


**Strictly Private and Confidential**                    Page 2
NOTE:        The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

CAPLIN0024516
USPROD-02360717

1.6    Restructuring

During the course of 2004, the shareholders of Bartol Limited (now being Delphine Le Dain and Erkin Bekbolotov) were advised to transfer the business to a Gibraltar based company, as a more desirable domicile.

Red Star Enterprises Limited was incorporated on 3 June 2004. (see detailed information in section 2 below).

On 31 December 2004, Bartol assigned the whole of its trading activities, together with all assets and liabilities of the company, to Red Star Enterprises Limited, incorporated in Gibraltar. The transfer was carried out on the basis that both Bartol Limited and Red Star Enterprises Limited had common shareholders and were under exactly the same ownership at the time of the transfer.

At the time of incorporation of Red Star Enterprises Limited, Douglas Edelman, under his Power of Attorney for Bartol Limited dated 5 May 2004, acted for the beneficial owner (Delphine Anne Le Dain) in setting up the company and as nominee for her 50% of the initial share issue in Red Star Enterprises Limited.

The shareholders of Red Star Enterprises Limited on incorporation and at 31 December 2004 were therefore as follows:

|  | Ordinary shares of £1 each |
|---|---|
| Douglas Philip Edelman (as nominee for Bartol Limited under Power of Attorney (on behalf of Delphine Le Dain) | 100 |
| Eurasian Capital Corporation S.A (on behalf of Erkin Bekbolotov) | 100 |

At the same time, Erkin Bekbolotov returned his bearer share in Bartol Limited to Delphine Le Dain who then once again owned 100% of Bartol Limited.

---

**Strictly Private and Confidential**                                            Page 3
NOTE:       The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

Confidential

CAPLIN0024517
USPROD-02360718

1.7.    Trading and financial statements (from January 2005 onwards)

Following the transfer of the business to Red Star Enterprises Limited on 1 January 2005, Bartol Limited ceased to trade. The company's income after 1 January 2005 consisted solely of dividends from Red Star Enterprises Limited in respect of its interests in 50% of the issued share capital of Red Star Enterprises Limited following the transfer of the business.

The financial statements of the company for the years ended 31 December 2005 onwards indicate that the company's main income was derived from dividends received from Red Star Enterprises Limited in respect of its 50% share in the profits of that company.

1.8.    Corporate changes in 2008

The first director and secretary of the company (Ledra Directors Limited and Ledra Secretaries Limited respectively) resigned from office on 15 September 2008.

The registered office of the company remained at

   C/o Aleman Cordero Galindo & Lee Trust (BVI) Limited
     P O Box 3175, Road Town, Tortola, British Virgin Islands

New directors were appointed  Edgardo E Diaz
           Fernando A Gill

Also, on 16 September 2008, the two bearer shares were cancelled (by resolution of the directors) and the issued share capital of the company was increased from $2 to $50,000 (see Appendix 2). A new share certificate was then issued to Joyner Overseas Inc. A Declaration of Trust was signed by the directors of Joyner Overseas Inc. to confirm that the shares were held in trust for Sunage Foundation. The settlor and main beneficiary of Sunage Foundation is Delphine Le Dain. This change does not therefore constitute a change of ownership.

Thereafter, dividends received from Red Star Enterprises Limited were paid either to Bartol Limited or, on instructions, were paid to Sunage Foundation (as the beneficial owner of Bartol Limited)

---

**Strictly Private and Confidential**        Page 4
NOTE:  The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

**Red Star Enterprises Limited**

2.1.    Incorporation

The company was incorporated on 3 June 2004 with the primary intention of acquiring the business carried on by Bartol Limited. (For the purposes of ease of transfer, the acquisition took place on 1 January 2005 – as referred to above).

2.2.    Corporate information

A copy of all statutory information filed at Companies House in Gibraltar is attached in Appendix 4.

The incorporation of the company was handled by BC Centrum in London and the first officers were as follows:

The first Director of the company was        Jesse Grant Hester

There were two Company Secretaries        David Pearlman
                                          Anthony Joseph Smith

The two initial shareholders as detailed in 1.6 above

Douglas Edelman (as nominee
    for Bartol Limited)                    100 shares

Euroasian Capital Corporation S.A.        100 shares

Douglas Edelman initially held the shares as a nominee (under his Power of Attorney) for Bartol Limited and Delphine Le Dain.

However, the allotment of the shares was not reported to Companies House in Gibraltar at the correct time and in fact, the shares to Euroasian Capital Corporation S.A were not issued until 3 June 2005 (which was due to an "oversight" on the part of the Secretary and which is confirmed by Affidavit – see Appendix 5 - of the Secretary of the company – A J Smith).

The Annual return for 2005, which was filed on 3 August 2005, confirmed the shareholders as shown above. The initial shares held by AJ Smith were shown as having been transferred to Douglas Edelman (as nominee for Bartol Limited) on 3 June 2004.

**Strictly Private and Confidential**                                    Page 5
NOTE:        The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

CAPLIN0024519
USPROD-02360720

On 10 November 2005, a further 1,800 ordinary shares were issued pro rata to the existing shareholders. Again, the allotments were not reported by the Company secretary at the correct time.

The Company Secretary, A J Smith died on 6 December 2005.

Following the death of the Company Secretary, Gibro Secretaries were subsequently appointed as Company Secretary and James Stuart Rodrigues was appointed Director on 1 August 2006 following the resignation of Jesse Grant Hester.

The 2006 Annual Return was submitted on 20 October 2006 still showing Douglas Edelman as shareholder.

Douglas Edelman continued to be shown as a nominee shareholder of the company from incorporation until 9 November 2006, when it was changed to Centrum Secretaries Limited, who then held the shares as a nominee for the beneficial owner, Delphine Le Dain. Centrum Secretaries Limited subsequently confirmed that they hold 50% of the shares in Red Star Enterprises Limited as nominees for the ultimate beneficial owner, Delphine Anne Le Dain with effect from 3 June 2004.

It is clear from the statutory records of the company that the Company Secretary failed to file the correct returns to Companies House in Gibraltar at the relevant times. Insufficient attention was paid to the detailed records to demonstrate the nominees (and the ultimate beneficiaries) of the issued share capital of Red Star Enterprises Limited). Both the beneficial owner and Mr Edelman were totally unaware of the errors and had relied totally on the company's officers to reflect the correct position and to maintain the company's statutory records in good order.

Furthermore, the financial records during the period from 3 June 2004 showed that 50% of all dividends paid by Red Star Enterprises Limited were correctly paid to Bartol Limited (as the beneficial owner) and this was never queried by the company's officers.

As far as the current nominee shareholder is concerned, the fact that all dividends were paid to Bartol as the beneficial owner of the shares at the relevant time (and that NO distributions were ever made to Douglas Edelman) is sufficient evidence to confirm his nominees status during the period during which he was erroneously shown as the shareholder.

2.4     Bank account with Credit Suisse

The opening of the account at Credit Suisse in the name of Red Star Enterprises Limited was the responsibility of the then Chief Financial Officer of the company, Anthony Guerne. The account opening was completed without any involvement from

---

**Strictly Private and Confidential**                                          Page 6
NOTE:          The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

CAPLIN0024520
USPROD-02360721

Douglas Edelman (and the Power of Attorney previously held by Mr Edelman had expired).

The application was clearly incorrect and there is no evidence that Douglas Edelman has signed any document which would suggest that he is the beneficial owner of the company. Furthermore, Douglas Edelman and the beneficial owner were totally unaware of the account opening documents until this matter arose.

The three small payments made to Douglas Edelman from the bank account represented consultancy fees for his time and advice in dealing with various matters relating to the company. No other payments have been made to Douglas Edelman since.

NOTE:        The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

Confidential

Ex.004-5.0025

CAPLIN0024521
USPROD-02360722

**Conclusions**

The above information clearly demonstrates that

3.1     The original business emanated from an investment made by Delphine le Dain back in the year 2000.

3.2     The initial growth of the business was conducted through a company (Bartol Limited) which was wholly owned by Delphine Le Dain

3.3     Further development of the business was achieved through the recruitment of Erkin Bekbolotov, who was rewarded with 50% of the business (i.e. shares in Bartol Limited) for his contribution.

3.4     The transfer of the business from Bartol Limited to Red Star Enterprises Limited did not represent any change of beneficial ownership. The fact that the company officers were incompetent in dealing with the correct entries in the company's statutory records (and in the Annual Returns to Companies House) does not ultimately affect the actual beneficial ownership of the business.

3.5     Without exception, all dividends were paid direct to the beneficial owners.

3.6     The account at Credit Suisse was managed by a senior employee using incorrect information and was made without the knowledge, consent or approval of the beneficial owner of the company or Douglas Edelman.

3.7     Douglas Edelman received no benefit from the business other than modest payments for consultancy services and for acting under a Power of Attorney for a limited period of time.

3.8     It will be absolutely clear to Gibro (who have been involved in the opening of other bank accounts in the name of Red Star Enterprises Limited) that Douglas Edelman is not the beneficial owner of any shares in the company. This can easily be proved from the account opening documents relating to other bank accounts if necessary.

3.9     In the light of the above evidence and conclusions, an Affidavit from Rodrigues stating that Douglas Edelman is not the beneficial owner of any shares in Red Star Enterprises Limited should be sufficient for the lawyers to present to the Bank

NOTE:     The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

Confidential                                    Ex.004-5.0026                          CAPLIN0024522
                                                                                  USPROD-02360723

**APPENDICES**

1. Copy of partnership agreement

2. Bartol Limited – Statutory documents

3. Bartol Limited – Powers of Attorney issued to Douglas Edelman

4. Red Star Enterprises Limited - Statutory information filed at Companies House

5. Red Star Enterprises Limited – Affidavit of Company Secretary.

*Copies of all relevant documents to follow.*

---

**Strictly Private and Confidential**                                    Page 9
NOTE:      The above information is given under privileged Attorney Client relationship and shall not be disclosed to any third party without express consent from the company or its beneficial owners.

Confidential

CAPLIN0024523
USPROD-02360724

Dated  23rd December  2012

DELPHINE ANNE LE DAIN

(Grantor)

and

SALAMANDER ASSOCIATES LIMITED

(Original Trustee)

and

GRAHAM AUBREY COLLETT

(Original Protector)

---

**THE GALACTEA TRUST**

---

15432165.3

1

Confidential

Ex.004-5.0028

CAPLIN0024524
USPROD-02360725

# TABLE OF CONTENTS

| No. | Heading | Page |
|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION | 4 |
| 2. | NAME | 6 |
| 3. | POWER TO RECEIVE ADDITIONAL PROPERTY | 7 |
| 4. | TRUST FOR SALE | 7 |
| 5. | POWER TO ADD DISCRETIONARY BENEFICIARIES | 7 |
| 6. | POWER OF EXCLUSION | 7 |
| 7. | GRANTOR'S POWER OF REVOCATION | 8 |
| 8. | DISCRETIONARY TRUST OF CAPITAL AND INCOME | 8 |
| 9. | INCOME TRUSTS IN DEFAULT OF APPOINTMENT | 9 |
| 10. | POWER TO APPLY CAPITAL FOR BENEFICIARIES | 9 |
| 11. | TRUSTS IN DEFAULT OF APPOINTMENT | 10 |
| 12. | ULTIMATE DEFAULT TRUSTS | 10 |
| 13. | ASSIGNMENT OF POWER OF APPOINTMENT | 10 |
| 14. | ADMINISTRATIVE POWERS | 10 |
| 15. | EXERCISE OF POWERS | 10 |
| 16. | GENERAL LIMITATION ON POWERS | 11 |
| 17. | REMOVAL AND APPOINTMENT OF TRUSTEES | 11 |
| 18. | APPOINTMENT OF PROTECTORS | 13 |
| 19. | EFFECT OF VACANCY IN PROTECTOR'S OFFICE | 14 |
| 20. | PROTECTOR'S INDEMNITY | 14 |
| 21. | PROPER LAW, FORUM AND PLACE OF ADMINISTRATION | 14 |
| 22. | EXCLUSION OF COMMUNITY PROPERTY RULES | 15 |
| 23. | EXCLUSION OF EXCLUDED PERSONS | 15 |
| 24. | VARIATION OF TERMS OF THIS TRUST | 15 |
| 25. | SEVERABILITY | 16 |
| 26. | COUNTERPARTS | 16 |
| 27. | POWER OF INVESTMENT | 16 |
| 28. | EXERCISE OF RIGHTS ATTACHING TO SHARES | 16 |
| 29. | POWER TO LEND | 17 |
| 30. | POWER TO BORROW | 17 |
| 31. | POWER TO GIVE GUARANTEES | 17 |
| 32. | POWER OF MANAGEMENT | 17 |
| 33. | POWERS IN RELATION TO LAND AND CHATTELS | 17 |
| 34. | POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY | 17 |
| 35. | POWER TO INSURE PROPERTY | 17 |

15432165.3

Confidential

Ex.004-5.0029

CAPLIN0024525
USPROD-02360726

| | | |
|---|---|---|
| 36. | POWERS IN RELATION TO LIFE INSURANCE POLICIES | 18 |
| 37. | POWER TO TRADE | 18 |
| 38. | POWER TO PROMOTE COMPANIES | 18 |
| 39. | POWERS IN RELATION TO COMPANIES | 18 |
| 40. | EXCLUSION OF APPORTIONMENT | 18 |
| 41. | POWER OF APPROPRIATION | 18 |
| 42. | DIVISION BETWEEN CAPITAL AND INCOME | 18 |
| 43. | PAYMENT OF EXPENSES | 19 |
| 44. | POWERS IN RELATION TO MINORS | 19 |
| 45. | POWER TO APPOINT AGENTS | 19 |
| 46. | POWER TO EMPLOY NOMINEES | 19 |
| 47. | POWERS TO DELEGATE | 19 |
| 48. | POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS | 19 |
| 49. | PAYMENTS TO CHARITIES | 20 |
| 50. | LEGAL PROCEEDINGS | 20 |
| 51. | COMPROMISE AND SETTLEMENT | 20 |
| 52. | ACCOUNTS AND AUDIT | 20 |
| 53. | PROTECTOR'S POWER TO MAKE REQUESTS | 20 |
| 54. | PAYMENT OF TAXES | 20 |
| 55. | PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS | 21 |
| 56. | TRUSTEE CHARGING | 21 |
| 57. | POWER TO RECEIVE REMUNERATION | 21 |
| 58. | INDEMNITY INSURANCE | 21 |
| 59. | POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST | 22 |
| 60. | DISCLOSURE OF DOCUMENTS | 22 |
| 61. | PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS | 22 |
| 62. | PROTECTION OF THE TRUSTEES GENERALLY | 22 |
| 63. | RELEASE OF POWERS | 23 |
| 64. | POWER TO VARY ADMINISTRATIVE PROVISIONS | 23 |

15432165.3

3

DEED OF SETTLEMENT

DATE: The ____ day of ____ 2012

## PARTIES

1)  **DELPHINE ANNE LE DAIN** of ▮▮▮▮▮▮▮ Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

2)  **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

3)  **GRAHAM AUBREY COLLETT** of ▮▮▮▮▮▮▮▮▮▮▮ Bromley, Kent, BR1 2TT (the **'Original Protector'**).

## RECITALS

A)  The Grantor wishes to make this Settlement and has transferred or delivered to the Original Trustee or otherwise placed under its control the property specified in the Schedule. Further money, investments or other property may be paid or transferred to the Trustees by way of addition.

B)  It is intended that this Trust shall be revocable during the lifetime of the Grantor.

C)  In establishing this Trust, it is the intention of the Grantor that this Trust (i) will qualify as a grantor trust, during the Grantor's lifetime, within the meaning of Subpart E of Subchapter J of the US Internal Revenue Code of 1986, as amended (the **"Code"**), (ii) will not confer a general power of appointment upon any US person within the meaning of sections 2041 and 2514 of the Code, and (iii) will not result in any person other than the Grantor being treated as the owner of any portion of this Trust within the meaning of Code section 676. Accordingly, and notwithstanding any provision contained in this Deed to the contrary, this Deed shall be construed and the trusts of this Trust administered in accordance with and to achieve these intents.

## PART I - OPERATIVE PROVISIONS

### 1.    DEFINITIONS AND CONSTRUCTION

1.1   In this Deed, where the context admits, the following definitions and rules of construction shall apply.

**'Beneficiary'** shall mean any person actually or prospectively entitled to any share or interest in the capital or income of the Trust Fund.

**'Charity'** shall mean any trust, foundation, company or other organisation whatever established only for purposes regarded as charitable under the proper law of the Trust or under the law of the jurisdiction in which the trust, foundation, company or other organisation was established.

**'children'**, **'grandchildren'** and **'issue'** of any person shall include his children, grandchildren and remoter issue, whether legitimate, legitimated, illegitimate or adopted.

15432165.3                                                4

Confidential

Ex.004-5.0031

CAPLIN0024527
USPROD-02360728

'**Company**' shall mean any body, incorporated or established in any part of the world, which has separate legal personality.

'**Consent Holder**' shall mean the person appointed as Consent Holder pursuant to sub-clause 7.2.

'**deed**' shall include any instrument in writing which is signed, witnessed and dated by or on behalf of each of the parties to the instrument and shall also include any instrument executed under seal by a Company.

'**Discretionary Beneficiaries**' shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:

(a)    the Grantor;

(b)    the children and remoter issue of the Grantor;

(c)    Charities; and

(d)    such other objects or persons as are added under clause 5 to the extent so added

provided that no person will be capable of being included or added as a Discretionary Beneficiary if such person is a US Person as herein defined or a resident of The British Virgin Islands as defined in section 2(1) of the Companies (Taxation and Concessions) Ordinance of The British Virgin Islands other than an individual who has been issued a certificate under Rule 6 of the Qualifying (Category 2) Individual Rules 2004 of The British Virgin Islands which remains valid at the date hereof or an individual whose income is subject to an election under Rule 11 of those Rules at the date hereof.

'**Excluded Person**' shall mean any person or class of persons or Charity by or in respect of whom or which a declaration under sub-clauses 6.1 or 6.4(b) has been made or treated as made but, in the case of a revocable exclusion, only during such time as the exclusion remains effective and unrevoked.

'**incapacity**' shall mean incapacity caused by physical or mental handicap or deterioration resulting in an individual whose incapacity is being judged being unable to manage his own affairs or to understand the nature or consequences of his actions, as confirmed by the written opinion of two medical practitioners qualified to assess such matters and '**incapacity**' shall also mean any legal incapacity deriving from age or insolvency and '**incapacitated**' shall have a corresponding meaning.

'**minor**' shall mean any individual who has not attained the age of 18.

'**person**' shall include any individual or Company.

'**proper law of this Trust**' shall mean the law governing this Trust as determined under clause 21.

'**Protector**' shall mean the person or entity designated as the Protector in accordance with clause 18.

'**Settlor**' shall mean the Grantor and any person who shall have donated (by way of gift or sale for less than full consideration) any sums of money, investments or other property to be held as part of the Trust Fund.

15432165.3                                                    5

Confidential

CAPLIN0024528
USPROD-02360729

'**Trustees**' shall include the Original Trustee and the trustees for the time being of this Trust.

'**Trust**' shall mean the trusts constituted by this Deed.

'**Trust Company**' shall mean any Company, wherever incorporated, which is authorised under its constitution or by applicable law to act as trustee of a trust or trusts and/or carry on the business of administering trusts.

'**Trust Fund**' shall mean:

    (a)    the property specified in Schedule;

    (b)    all money, securities, investments or other assets or property paid or transferred by any person (including, without limitation, by bequest under a will) to, or so as to be under the control of, and, in either case, accepted by the Trustees as additions;

    (c)    all accumulations (if any) of income added to the Trust Fund; and

    (d)    the money, investments and property from time to time representing the above.

'**Trust Period**' shall mean the period starting with the date of this Trust and ending on the earlier of:

    (a)    the last day of the period of 100 years starting from the date of this Deed, which period, and no other, shall be the applicable perpetuity period;

    (b)    such date as the Grantor shall revoke the Trust in accordance with this Deed; and

    (c)    such date as the Trustees shall at any time specify by deed in relation to the whole or any part of the Trust Fund (so that different days may be specified for different parts of the Trust Fund), not being a date earlier than the date of such deed or later than a date previously specified in relation to that part of the Trust Fund.

'**US Person**' shall mean a person described in section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended.

1.2    Words denoting the singular shall include the plural and vice versa.

1.3    Words denoting any gender shall include both genders.

1.4    References to any statutory provision shall include any statutory modification to or re-enactment of such provision.

1.5    The table of contents and clause headings are included for reference only and shall not affect the interpretation of this Deed.

2.    **NAME**

This Trust shall be known as The Galactea Trust or by such other name as the Trustees may, from time to time, determine.

15432165.3            6

Confidential

Ex.004-5.0033

CAPLIN0024529
USPROD-02360730

3.    **POWER TO RECEIVE ADDITIONAL PROPERTY**

The Trustees may, at any time during the Trust Period, accept additional money, securities, investments or other assets or property, of whatever nature and wherever situate, paid or transferred to them by the Grantor or any other person (including, without limitation, by bequest under a will). Such additional money, securities, investments or other assets or property shall, subject to any contrary direction, be held upon the trusts and with and subject to the powers and provisions of this Deed.

4.    **TRUST FOR SALE**

The Trustees shall hold the Trust Fund and any additions upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money. The Trustees may, in their discretion, invest such money in their names or under their control in any of the investments authorised by this Trust or by law, with power from time to time to vary or transpose any such investments for or into others so authorised.

5.    **POWER TO ADD DISCRETIONARY BENEFICIARIES**

5.1    The Trustees with the prior or simultaneous written consent of the Protector, may, at any time during the Trust Period, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine.

5.2    Any such addition shall be made by deed (revocable to the extent permitted by the proper law of this Trust or irrevocable):

> (a)    naming or describing the objects or persons or classes of objects or persons to be added; and

> (b)    specifying the date or event, not being earlier than the date of execution of the deed but before the end of the Trust Period, on the happening of which the addition shall take effect.

5.3    Any power of revocation reserved by a deed of addition shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has become indefeasibly entitled.

6.    **POWER OF EXCLUSION**

6.1    The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall (whether or not a Beneficiary) be an Excluded Person.

6.2    The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall:

> (a)    if included in the class of Discretionary Beneficiaries, cease to be so included; or

> (b)    if not included in the class of Discretionary Beneficiaries, not be eligible to be added as a Discretionary Beneficiary pursuant to sub-clause 5.1.

15432165.3

7

Confidential

CAPLIN0024530
USPROD-02360731

6.3    The powers conferred by sub-clauses 6.1 and 6.2 shall not be capable of being exercised

    (a)    so as to derogate from any interest to which any Beneficiary has or would, but for the provisions of this clause, have become indefeasibly entitled;

    (b)    in relation to the Grantor.

6.4    Any person (not being a minor) who may receive any benefit under this Trust may, by declaration in writing

    (a)    disclaim such benefit, either in whole or in part; or

    (b)    declare that he shall be an Excluded Person.

6.5    Any declaration made pursuant to sub-clauses 6.1, 6.2 or 6.4 shall be by deed (revocable during the Trust Period to the extent permitted by the proper law of this Trust or irrevocable), shall take effect in such circumstances or subject to such conditions and from such date (not being earlier than the date of such deed) specified in the deed.

## 7.    GRANTOR'S POWER OF REVOCATION

7.1    Power of revocation

    (a)    During her lifetime the Grantor shall have power by deed to revoke this Trust in whole or in part provided that any such revocation shall not invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Trust or made under any other power conferred by this Deed or by this Trust or by law.

    (b)    Any such deed shall take effect upon the date when the same is received by the Trustees or upon such later date as may be specified therein and whenever such a deed seeks to revoke this Trust in part only it shall specify the property being part of the Trust Fund to which such revocation shall apply.

7.2    Consent

The power conferred by sub-clause 7.1 on the Grantor shall be exercisable so as to take effect during the Grantor's lifetime with the prior written consent of the first person named by the Original Settlor or, failing which, by the Protector in the following list who is then living, not incapacitated and who is a related or subordinate party subservient to the Grantor within the meaning of Code Section 672(f)(2)(A)(i) (the **'Consent Holder'**) (unless no such person meets such requirements in which case the power shall be exercisable without such consent).

## 8.    DISCRETIONARY TRUST OF CAPITAL AND INCOME

8.1    The Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of such of the Discretionary Beneficiaries, at such ages or times, in such shares, upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint. Any such appointment may include such powers and provisions for the maintenance, education advancement or other benefit of the Discretionary Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit.

15432165.3

8

CAPLIN0024531
USPROD-02360732

8.2     No exercise of the power conferred by sub-clause 8.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Deed or made under any other power conferred by this Deed or by law.

8.3     Any trusts and powers created by an appointment under sub-clause 8.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them.

8.4     The exercise of the power of appointment conferred by sub-clause 8.1 shall:

(a)     comply with the provisions of sub-clause 15.1; and

(b)     be subject to the prior or simultaneous written consent of the Protector.

8.5     Notwithstanding clause 63, the Trustees may not release or restrict the power conferred by sub-clause 8.1 without the written consent of the Protector.

9.      **INCOME TRUSTS IN DEFAULT OF APPOINTMENT**

The provisions of this clause shall apply during the Trust Period until, subject to and in default of any appointment under sub-clause 8.1.

9.1     The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Discretionary Beneficiaries as shall for the time being be in existence, in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit.

9.2     Notwithstanding the provisions of sub-clause 8.1, the Trustees may at any time during the Trust Period in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and, subject to sub-clause 8.1, shall hold such accumulations as an accretion to capital.

9.3     The Trustees may apply the whole or any part of the income accumulated under sub-clause 8.1 as if it were income arising in the then current year.

10.     **POWER TO APPLY CAPITAL FOR BENEFICIARIES**

The provisions of this clause shall apply during the Trust Period notwithstanding the provisions of sub-clause 8.1 but subject to any appointment made under sub-clause 8.1 and to the Protector's written consent.

10.1    The Trustees may pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries, in such shares and in such manner generally as the Trustees shall in their discretion think fit.

10.2    The Trustees may apply the whole or any part of the capital of the Trust Fund by paying or transferring the same to the trustees of any other trust or settlement, whether or not the proper law of such other trust or settlement shall be the proper law of the Trust, for the benefit of any of the Beneficiaries.

10.3    The exercise of the power conferred by sub-clause 10.2 shall be subject to the following provisions:

15432165.3

9

Confidential

Ex.004-5.0036

CAPLIN0024532
USPROD-02360733

(a) upon the payment or transfer of any money or other property to the trustees of any such trust or settlement, the Trustees shall not be bound to see to the further application of such money or property;

(b) the Trustees may make such payment or transfer to the trustees of a discretionary trust, notwithstanding that the Beneficiary for whose benefit the power is exercised is only a discretionary object of such trust;

(c) the Trustees may make such payment or transfer notwithstanding that persons other than the Beneficiary for whose benefit the power is exercised are or may become entitled to, or to the income of, the money or other property paid or transferred;

(d) any exercise of the power shall comply with the provisions of sub-clause 15.1; and

(e) the power shall not be exercisable so as to permit any part of the income or capital of the Trust Fund to be paid or transferred to the trustees of any trust or settlement in which any Excluded Person is or may be interested.

## 11. TRUSTS IN DEFAULT OF APPOINTMENT

11.1 From and after the expiration of the Trust Period, and subject to any appointment made under sub-clause 8.1, the Trustees shall hold the capital and income of the Trust Fund upon trust absolutely for all or any one or more exclusively of the others of the Grantor and her children and remoter issue as shall then be living and, if more than one in equal shares *per stirpes*, so that no person shall take if any of his ascendants is alive and so capable of taking.

## 12. ULTIMATE DEFAULT TRUSTS

Upon expiration of the Trust Period, subject as above, if and so far as not wholly disposed of for any reason whatever by the above provisions, the capital and income of the Trust Fund shall be held upon trust for such Charities and, if more than one, in such shares as the Trustees shall determine absolutely.

## 13. ASSIGNMENT OF POWER OF APPOINTMENT

The Trustees may, with the prior or simultaneous written consent of the Protector, by deed, grant to any Beneficiary the power to appoint all or any part of the Trust Fund, whether capital or income or both, in such manner, outright or in further trust, as the Trustees shall in such deed provide.

## 14. ADMINISTRATIVE POWERS

The Trustees shall, in addition and without prejudice to all statutory powers, have the powers and immunities set out in Part 2 of this Deed. No power conferred on the Trustees shall be exercised so as to conflict with the beneficial provisions of this Deed.

## 15. EXERCISE OF POWERS

15.1 Every power conferred by the provisions of Part 1 of this Deed shall be subject to the application (if any) of the rule against perpetuities and any applicable laws governing the permitted period of accumulations and shall (except for clauses 17 and 18) be exercisable

15432165.3

10

Confidential

Ex.004-5.0037

CAPLIN0024533
USPROD-02360734

only during and so as to take effect during the Trust Period. No power of revocation shall be exercisable except during the Trust Period.

15.2   Any written consents required under the terms of this Deed may be given either specifically in relation to any particular matter or by a general written consent referring to one or more matters.

15.3   If there is more than one Protector in office, the Protectors shall act unanimously.

16.   **GENERAL LIMITATION ON POWERS**

16.1   No individual Trustee and no person to whom a Trustee has delegated his powers pursuant to the terms of this Trust or by law who is a Beneficiary and a US Person may participate as one of the Trustees or as a delegate of one of the Trustees in the exercise of any of the powers conferred by the following clauses and sub-clauses (the 'restricted powers'):

    (a)   clause 5 (Power to add Discretionary Beneficiaries);

    (b)   clause 6 (Power of exclusion);

    (c)   sub-clause 8.1 (Discretionary trust of capital and income);

    (d)   clause 9 (Income trusts in default of appointment);

    (e)   clause 10 (Power to apply capital for Beneficiaries);

    (f)   clause 24 (Variation of terms of this Trust); and

    (g)   clause 64 (Power to vary administrative provisions).

16.2   No Trust Company may participate as one of the Trustees in the exercise of any of the restricted powers if any individual director or alternate director (other than the Grantor) or any individual (other than the Grantor) to whom any one or more of the directors or alternate directors has delegated any or all of his powers as a director of such Trust Company is a Beneficiary who is a US Person (a 'restricted director' or a 'restricted delegatee' as the case may be) unless the Articles of Association, By-laws or any similar organisational documentation governing such Trust Company provide that any restricted director or restricted delegatee is not permitted to participate as a director or delegatee in the exercise of the restricted powers.

16.3   Neither the Protector nor the Grantor shall be eligible to serve as a Trustee of this Trust or to exercise the powers of the Trustees under any circumstances.

17.   **REMOVAL AND APPOINTMENT OF TRUSTEES**

17.1   A Trustee shall cease to be a Trustee on the happening of any of the following events:

    (a)   on resigning in accordance with sub-clause 17.2;

    (b)   on being removed in accordance with sub-clause 17.3;

    (c)   if an individual, on death, on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

164321653

11

Confidential

Ex.004-5.0038

CAPLIN0024534
USPROD-02360735

      (d)    if a corporation, on filing for bankruptcy, on becoming insolvent or on dissolution.

17.2    A Trustee may resign by giving three months notice in writing to the person for the time being having power to appoint new or additional Trustees under the provisions of sub-clause 17.4. Upon the expiration of such notice, or such shorter period as may be agreed in writing between the Trustee giving notice and the person for the time being having power to appoint new or additional Trustees, the Trustee who has given notice shall cease to be a Trustee. If the Trustee so resigning is the sole Trustee and a new Trustee shall not have been appointed before the expiration of the specified period of notice, the resigning Trustee shall have power to appoint a new Trustee in its place and its resignation shall become effective only upon such appointment being made.

17.3    The Protector shall have power (to be exercised in writing) to remove any or all of the Trustees with or without cause. Notice of such removal shall forthwith be given to the Trustee concerned and the removal shall become effective immediately, except where all the Trustees or the sole Trustee have or has been removed in which case the removal shall be effective only on the appointment of a new Trustee or Trustees.

17.4    The Protector or, if the Protector shall be incapacitated or otherwise unable or unwilling to act, or if there shall be no Protector, the Trustees, shall have the power to appoint new or additional such Trustees.

17.5    Any appointment of a new or additional Trustee under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office in which case the appointment shall become effective on such death, resignation or incapacity. Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Trustees under this clause.

17.6    An outgoing Trustee (which term shall include a Trustee removed under sub-clause 17.3) shall promptly and without delay execute and do all such transfers or other acts or things as may be necessary for the immediate vesting the Trust Fund in the new or continuing Trustees and any reasonable expenses associated therewith (agreed in advance by the Protector) shall be borne by the Trust Fund *provided always* that the outgoing Trustee shall in no event delay or resist transferring the Trust Fund.

17.7    In the event that a Trustee is removed without cause under sub-clause 17.3, the new or continuing Trustees shall be required to undertake in writing to indemnify and hold the outgoing Trustee its directors officers servants and agents harmless against any and all claims demands actions proceedings damages costs or expenses whatsoever for or arising out of any act or omission on the part of the outgoing Trustee or any of its directors officers servants or agents in relation to the Trust, *provided always* (i) that such indemnity shall not extend to any act or omission for which the outgoing Trustee would not have been entitled to be indemnified out of the assets of the Trust Fund had it remained trustee of the Trust, (ii) that the new or continuing Trustees shall not be liable under this indemnity in an amount exceeding the amount or value of the Trust Fund for the time being, (iii) that the Protector shall have given his consent to the terms of such indemnity (which shall be reasonable and in accordance with industry standards) which consent shall not be unreasonably withheld.

17.8    Any appointment under this clause shall be in writing signed by the person making the appointment and by the new or additional Trustee so appointed.

Confidential

CAPLIN0024535
USPROD-02360736

17.9    The provisions of this clause shall apply notwithstanding any provision in the legislation for the time being in effect under the proper law of this Trust for the time being relating to the appointment, removal, retirement or discharge of trustees.

17.10   A person may be appointed to be a trustee notwithstanding that such person is not resident in the jurisdiction the law of which is the proper law of this Trust for the time being and remaining out of such jurisdiction for more than 12 months shall not be a ground for the removal of a trustee.

17.11   There shall be no requirement that there be more than one Trustee.

18.     **APPOINTMENT OF PROTECTORS**

18.1    The first Protector shall be the Original Protector.

18.2    A Protector shall cease to be a Protector on the happening of any of the following events:

    (a)    on resigning in accordance with sub-clause 18.3;

    (b)    if an individual, on death; on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

    (c)    if a corporation, on filing for bankruptcy, becoming insolvent or on dissolution.

18.3    The Protector may at anytime resign its office by written instrument, notice of which shall be given to the Trustees. Such resignation shall be effective upon receipt of the notice or the expiration of one month from the date of the resignation, whichever shall be earlier.

18.4    Protectors subsequent to the first Protector shall be appointed as follows.

    (a)    The Original Protector may, by written instrument, appoint any other person or succession of persons to be protector or successive protectors of this Trust, either in addition to or to succeed it.

    (b)    A Protector whose successor is not prescribed in advance by the Original Protector pursuant to sub-clause (a), or all of whose prescribed successors under sub-clause (a) have died, become incapacitated or are otherwise incapable or unwilling to serve as protector, may, by written instrument, appoint any other person to be protector of this Trust either in addition to or to succeed it (but may not appoint a succession of protectors).

    (c)    Any appointment of a new or additional Protector under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office in which case the appointment shall become effective on such death, resignation or incapacity. Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Protectors under this clause.

18.5    Any appointment under this clause (other than the appointment of the Original Protector whose appointment and acceptance thereof is made by this Deed) shall be in writing signed by the person making the appointment and by the new or additional Protector so appointed.    Any such appointment shall only take effect when written notice of such appointment has been given to the Trustees.

18.6    If, notwithstanding the provisions of sub-clause 18.4 there shall at any time be no Protector of this Trust, the Trustees shall, by deed, irrevocably appoint any person, not being one of the Trustees, to be the Protector after consulting with such of the adult Discretionary Beneficiaries as they shall consider appropriate.

## 19.    EFFECT OF VACANCY IN PROTECTOR'S OFFICE

If there shall at any time be no Protector, this Trust (except for clause 18) shall, during such time as there shall be no Protector (but not further or otherwise), be read and construed as if all references to the requirement for the Protector's consent or agreement and to the exercise by the Protector of any power were omitted from this Trust.

## 20.    PROTECTOR'S INDEMNITY

20.1    The Protector shall exercise his powers in good faith.    He shall not, in the absence of actual fraud, dishonesty or wilful misconduct, be accountable to any Beneficiary or the Trustees for any act of omission or commission in relation to the powers given to him by this Trust.

20.2    The Protector shall be entitled to charge for the performance of his duties at such rate or in such manner as may be agreed from time to time between the Protector and the Trustees.

20.3    The Protector shall be entitled to reimbursement of all proper expenses incurred by him in relation to the exercise of his powers and performance of his duties under this Trust or the prosecution or defence of any legal proceedings arising in connection with the exercise and non-exercise of his powers or the performance or non-performance of his duties, provided that any claim for reimbursement shall be received by the Trustees within one year of the expenses being incurred.

## 21.    PROPER LAW, FORUM AND PLACE OF ADMINISTRATION

21.1    The proper law of this Trust shall be that of the British Virgin Islands.    Except as otherwise provided in this Trust, all rights under this Deed and its construction and effect shall be subject to the jurisdiction of the courts, and construed according to the laws, of the British Virgin Islands.

21.2    The courts of the British Virgin Islands shall be the forum for the administration of these trusts.

21.3    The provisions of this sub-clause shall apply notwithstanding the provisions of sub-clauses 21.1 and 21.2

(a)    The Trustees shall have power, subject to the application (if any) of the rule against perpetuities, to carry on the general administration of these trusts in any jurisdiction in the world.    This power shall be exercisable whether or not the law of such jurisdiction is for the time being the proper law of this Trust or the courts of such jurisdiction are for the time being the forum for the administration of these trusts, and whether or

15432165.3                                                14

Confidential

Ex.004-5.0041

CAPLIN0024537
USPROD-02360738

not the Trustees or any of them are for the time being resident or domiciled in, or otherwise connected with, such jurisdiction.

(b) The Trustees may at any time declare in writing that, from the date of such declaration, the proper law of this Trust shall be that of any specified jurisdiction. No exercise of this power shall be effective unless the law of the jurisdiction specified is one under which this Trust remains and all, or substantially all, of the trusts, powers and provisions contained in this Deed remain enforceable and capable of being exercised and so taking effect.

(c) Following any exercise of the power contained in sub-clause 21.3(b), the Trustees shall, by deed, make such consequential alterations or additions to this Deed as they consider necessary or desirable to ensure that, so far as may be possible, the trusts, powers and provisions of this Deed shall be as valid and effective as they were immediately prior to such change.

(d) The Trustees may, at any time, declare in writing that, from the date of such declaration, the forum for the administration of these trusts shall be the courts of any specified jurisdiction.

## 22. EXCLUSION OF COMMUNITY PROPERTY RULES

No benefit accruing to or devolving on any Beneficiary under this Deed shall form or constitute a portion of any communal or joint estate or marital property of such Beneficiary, but such benefit shall be and remain the sole, separate and exclusive property of such Beneficiary. Should such Beneficiary be married or marry in community of property, any benefit so accruing or devolving shall be expressly excluded from the community; such benefit shall also be free from the interference, control or marital power of any spouse of such Beneficiary. The provisions of this clause shall apply not only to benefits accruing to or devolving on any Beneficiary but also to the property of whatever nature for the time being representing the same and the income thereof.

## 23. EXCLUSION OF EXCLUDED PERSONS

23.1 No discretion or power conferred on the Trustees or any other person by this Deed or by law shall be exercised, and no provision of this Deed shall operate directly or indirectly, so as to cause or permit any part of the capital or income of the Trust Fund to become in any way payable to or applicable for the benefit of an Excluded Person.

23.2 The provisions of sub-clause 23.1 shall not preclude any Settlor from exercising any statutory right to claim reimbursement from the Trustees for any income tax or capital gains tax paid by him in respect of income arising to the Trustees or capital gains realised or deemed or treated as realised by them.

23.3 Subject to sub-clause 23.2 the prohibition in this clause shall apply notwithstanding anything else contained or implied in this Deed.

## 24. VARIATION OF TERMS OF THIS TRUST

The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part I of this Deed including the trusts, powers and discretions contained in Part I of this Deed provided always that:

Confidential

Ex.004-5.0042

CAPLIN0024538
USPROD-02360739

24.1    they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;

24.2    they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;

24.3    no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor.

24.4    no such variation, amendment, addition or deletion

    (a)    shall infringe the proper law of this Trust for the time being; or

    (b)    shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and

24.5    no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety.

25.    **SEVERABILITY**

If any provision of this Deed shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity and enforceability of the remaining provisions of this Deed which shall, so far as possible, be construed and take effect as if the invalid or unenforceable provisions had not been included in this Deed.

26.    **COUNTERPARTS**

This Deed may be signed in counterparts and each such counterpart shall constitute an agreed document and each such counterpart taken together, shall constitute one and the same instrument.

**PART 2 - ADMINISTRATIVE PROVISIONS**

27.    **POWER OF INVESTMENT**

27.1    The Trustees may apply any money to be invested in the purchase or acquisition (either alone or jointly with other persons) of such property, of whatever nature and wherever situate and whether of a wasting nature, involving liabilities or producing income or not, or in making such loans with or without security, as they think fit so that they shall have the same powers to apply money to be invested as if they were an absolute beneficial owner.

27.2    The Trustees may exchange property for other property on such terms as they think fit.

27.3    The Trustees shall not be required to diversify the investment of the Trust Fund.

28.    **EXERCISE OF RIGHTS ATTACHING TO SHARES**

Notwithstanding any other provision of this Deed, the power, authority and discretion granted to the Trustees under this Deed over the control or exercise of any rights (including, without limitation, voting rights) attaching to any securities, shares or other interests in any entity that form a part of the Trust Fund, or which are held (directly or

15432165.3                                        16

CAPLIN0024539
USPROD-02360740

indirectly) by a company or other entity whose shares form part of the Trust Fund and which is controlled by the Trustees, shall be exercisable by the Trustees, acting alone as provided in this Deed, without the approval or consent of any Beneficiary, Protector or any other person. No person other than the Trustees shall have any power, authority or discretion, directly or indirectly, over the control or exercise of any rights (including, without limitation, voting rights) which might be conferred by the holding of any such securities, shares or other interests unless specifically delegated such power, authority or discretion by the Trustees.

29.    **POWER TO LEND**

The Trustees may lend all or any part of the Trust Fund to any person or Beneficiary on such terms (whether or not including provision for the payment of interest) as the Trustees think fit.

30.    **POWER TO BORROW**

The Trustees may borrow on the security of all or any part of the Trust Fund or otherwise for any purpose.

31.    **POWER TO GIVE GUARANTEES**

The Trustees may guarantee the payment of money and the performance of obligations by any Beneficiary or by any company in which the Trust Fund is invested and may charge all or any part of the Trust Fund in support of such guarantee.

32.    **POWER OF MANAGEMENT**

The Trustees shall have all the powers of an absolute beneficial owner in relation to the management and administration of the Trust Fund.

33.    **POWERS IN RELATION TO LAND AND CHATTELS**

33.1    The Trustees shall have all the powers of an absolute beneficial owner in relation to the disposition, development and improvement of any land comprised in the Trust Fund.

33.2    The Trustees shall not be bound to maintain any building or other structure on land comprised in the Trust Fund or to preserve or repair any chattels comprised in the Trust Fund.

34.    **POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY**

The Trustees may, with the consent of the Protector, permit any Discretionary Beneficiary or any other person (if in the opinion of the Trustees it is in the interests of a Discretionary Beneficiary) to occupy or enjoy the use of all or any part of the Trust Fund on such terms as the Trustees think fit. The Trustees may acquire any property for this purpose.

35.    **POWER TO INSURE PROPERTY**

The Trustees may insure all or any part of the Trust Fund against any risk, for any amount and on such terms as they think fit but shall not be bound to do so.

Confidential
CAPLIN0024540
USPROD-02360741

36. **POWERS IN RELATION TO LIFE INSURANCE POLICIES**

The Trustees may apply all or any part of the Trust Fund in purchasing or maintaining any policy of insurance on the life of any person and shall have all the powers of an absolute beneficial owner in relation to any such policy.

37. **POWER TO TRADE**

37.1 The Trustees may trade either alone or in partnership and may exercise all or any of the powers conferred on them by this Trust in connection with such trade.

37.2 The Trustees shall be entitled to be indemnified out of the Trust Fund against all liability to which they may be subject in connection with such trade.

38. **POWER TO PROMOTE COMPANIES**

The Trustees may incorporate any company in any part of the world for any purpose in connection with this Trust.

39. **POWERS IN RELATION TO COMPANIES**

39.1 The Trustees may enter into any compromise or arrangement in relation to any company in which the Trust Fund is invested.

39.2 The Trustees may enter into any arrangements in relation to the winding up or liquidation of any company in which the Trust Fund is invested.

39.3 The Trustees shall not be bound to enquire into or be involved in the management of any company in which the Trust Fund is invested unless they have knowledge of circumstances which call for enquiry.

40. **EXCLUSION OF APPORTIONMENT**

No apportionment rules shall apply to the income of the Trust Fund or any part of it, so that all income received by the Trustees shall be treated as accruing at the date of receipt.

41. **POWER OF APPROPRIATION**

41.1 The Trustees may appropriate all or any part of the Trust Fund as they think fit in or towards satisfaction of the interest of any Beneficiary and may for such purpose place such value on any property as they think fit.

41.2 Where the Trustees have divided the Trust Fund into one or more sub-funds, the Trustees may transfer assets comprised in one such sub-fund to any other sub-fund in exchange for assets which have an equivalent open market value.

42. **DIVISION BETWEEN CAPITAL AND INCOME**

The Trustees may determine whether any sums received or disbursed are on account of capital or income, or partly on account of one and partly on account of the other, and in what proportions.

15432165.3                                      18

Ex.004-5.0045

CAPLIN0024541
USPROD-02360742

43.    **PAYMENT OF EXPENSES**

The Trustees shall have power to pay out of income or capital, as they may in their discretion determine, any expenses relating to the Trust Fund (or any assets comprised within it) or its administration.

44.    **POWERS IN RELATION TO MINORS**

44.1    The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the parent or guardian of any minor who is beneficially entitled to such assets or income, and the receipt of such parent or guardian, or of the minor, shall be a full discharge to the Trustees.

44.2    The parent or guardian of a minor shall in respect of any assets or income received in accordance with this clause have the powers conferred on the Trustees by Part 2 of this Deed.

45.    **POWER TO APPOINT AGENTS**

The Trustees may employ and pay at the expense of the Trust Fund any agent in any part of the world to transact any business in connection with this Trust without being responsible for the fraud, dishonesty or negligence of such agent, *provided* that such agent is employed in good faith, the Trustees reasonably ensure that the agent acts within the scope of its delegation, and the Trustees monitor and review from time to time the agent's overall performance.

46.    **POWER TO EMPLOY NOMINEES**

The Trustees may hold all or any part of the Trust Fund in the name of one or more of the Trustees, or of any other person or partnership, as nominee on such terms as the Trustees think fit.

47.    **POWERS TO DELEGATE**

47.1    The Trustees may engage any person or partnership as investment adviser to advise them on the investment of all or any part of the Trust Fund and they may, without being liable for any consequent loss, delegate to such investment adviser discretion to manage investments on such terms as the Trustees think fit.

47.2    The Trustees may, without being liable for any consequent loss, delegate to any person the operation of any bank, building society or other account.

47.3    Any trustee may by deed revocable or irrevocable, delegate to another trustee or any other person the exercise of all or any trusts and powers conferred on such trustee (other than the power of delegation conferred by this sub-clause) notwithstanding the fiduciary nature of such trusts and powers.

48.    **POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS**

48.1    The Trustees may indemnify any person in respect of any liability relating to this Trust and may charge all or any part of the Trust Fund in connection with such indemnity in such manner as they think fit.

1543216S.3                                                   19

Ex.004-5.0046
CAPLIN0024542
USPROD-02360743

48.2    The Trustees may enter into any agreement or give any commitment that they think fit relating to the transfer or sale of any business or company in which the Trust Fund is invested.

49.    **PAYMENTS TO CHARITIES**

The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the person who purports to be the treasurer or other appropriate officer of any Charity which is entitled to such assets or income, and the receipt of such person shall be a full discharge to the Trustees.

50.    **LEGAL PROCEEDINGS**

The Trustees may institute and defend proceedings at law and proceed to the final determination thereof or compromise the same as they shall in their discretion think fit.

51.    **COMPROMISE AND SETTLEMENT**

The Trustees may compromise and settle for such consideration and upon such terms and conditions as they shall in their discretion think fit all matters arising in relation to the trusts hereby created or the Trust Fund.

52.    **ACCOUNTS AND AUDIT**

The Trustees shall keep accurate accounts of their trusteeship and may, or shall if so requested by the Protector, have them audited annually by a firm of professionally qualified accountants selected by the Trustees.

53.    **PROTECTOR'S POWER TO MAKE REQUESTS**

In addition to the powers specifically conferred on the Protector by this Deed, the Protector shall have power to request information relating to this Trust from the Trustees (which information and accounts shall forthwith be supplied to the Protector) and to make other requests of or suggestions to the Trustees in regard to any matter relating to this Trust and the Trustees shall be bound to have regard to any such other request or suggestion but shall not be bound to act in accordance with the same.

54.    **PAYMENT OF TAXES**

In the event of any inheritance tax or probate, succession, estate duty or other duties, fees or taxes whatever becoming payable in any part of the world in respect of the Trust Fund or any part of it in any circumstances whatever, the Trustees may pay all such duties, fees or taxes (notwithstanding that they are not recoverable from the Trustees or the Beneficiaries) out of the capital or income of the Trust Fund at such time and in such manner as they think fit, *provided* that, during the lifetime of the Grantor, any United States income taxes or capital gains taxes payable in respect of the Trust Fund or any part of it shall be payable by the Grantor (subject to any statutory right of the Grantor to be reimbursed by the Trustees).  The power to pay duties, fees and taxes conferred by this clause shall extend to any related interest and penalties and to the provision of information to, or the filing of returns with, any relevant tax authorities.

Confidential

Ex.004-5.0047

CAPLIN0024543
USPROD-02360744

55.  **PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS**

Notwithstanding any provision to the contrary contained in this Deed, the Trustees shall comply with all requests received from any Beneficiary regarding information or documentation that they may require from the Trustees to fulfil their personal tax filing obligations and requirements. The provision of such information and documentation shall include, where requested:

55.1  the execution by the Trustees of such returns or statements as may be required for tax purposes;

55.2  the appointment, as contemplated by section 6048 of the Code, of a United States agent acceptable to the Trustees for the trusts declared or contained in this Deed; and

55.3  the production of the accounts pertaining to the Trust Fund within a reasonable time after the expiration of the Beneficiary's relevant tax reporting period.

56.  **TRUSTEE CHARGING**

56.1  A trustee which is a trust corporation or company authorised to undertake trust business shall be entitled to remuneration in accordance with such terms as may from time to time be agreed between the trustee and the Protector.

56.2  A trustee, whether acting as a person engaged in a profession or business or in a personal capacity, shall be entitled to all normal professional or other fees for business done, services rendered or time spent by such trustee personally or by such trustee's firm or company in the administration of these trusts, including acts which a trustee not engaged in any profession or business could have done personally.

56.3  A trustee shall be entitled to retain any commission which may be received personally or by such trustee's firm in respect of any transaction carried out on behalf of this Trust for which such trustee or trustee's firm is, in the normal course of business, allowed commission, notwithstanding that the receipt of such commission was procured by an exercise by such trustee or the Trustees of powers over the Trust Fund, but shall notify the Protector on receipt of any such commission.

57.  **POWER TO RECEIVE REMUNERATION**

A trustee may act and be remunerated as a director or other employee or as agent or adviser of any business or company in any way connected with the Trust Fund and shall not be liable to account for any remuneration, fees or profits received by the trustee in any such capacity, but shall notify the Protector on receipt of any such remuneration, fees or profit.

58.  **INDEMNITY INSURANCE**

58.1  The Trustees may pay out of the Trust Fund the cost of any premium in respect of insurance or indemnity to cover all personal liabilities which may be incurred by the Trustees in connection with this Trust. No trustee shall be accountable for any money paid to such trustee under the terms of any such insurance or indemnity unless the trustee shall otherwise have been fully indemnified in respect of the liability to which such payment relates.

15432165.3                                          21

CAPLIN0024544
USPROD-02360745

58.2    Any such insurance or indemnity shall not extend to any liabilities of a trustee arising from any act or omission in respect of which the trustee would not otherwise be entitled to be indemnified out of the Trust Fund.

59.    **POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST**

59.1    The Trustees may enter into any transaction concerning the Trust Fund:

(a)    notwithstanding that one or more of the Trustees or any one or more of the Protectors may be interested in the transaction other than as one of the Trustees or the Protectors; and

(b)    without any trustee or any protector who is so interested being liable to account for any reasonable incidental profit.

59.2    This power shall only apply provided that the transaction is at least as favourable to the Trustees as if it had been effected:

(a)    in the case of a purchase or sale of shares or other securities listed on any stock exchange, at the middle market price on the day on which such shares or other securities are purchased or sold; or

(b)    in the case of any other transaction, at a price and on terms such as would apply in the case of a transaction effected on fully commercial terms between unconnected persons.

60.    **DISCLOSURE OF DOCUMENTS**

The provisions of this clause shall apply without prejudice to any right of the Trustees under the proper law of this Trust to refuse to disclose any document.

60.1    The Trustees shall not, subject to sub-clause 60.2, be bound to disclose to any person any document relating to this Trust, its administration, the exercise of the Trustees' powers, the performance of their duties or the Grantor's wishes.

60.2    Notwithstanding sub-clause 60.1, in the event of a Beneficiary requesting disclosure, the Trustees shall disclose to that Beneficiary, this Deed, supplemental deeds, trustees' resolutions exercising dispositive powers and documents which relate to or form part of the accounts of this Trust.

61.    **PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS**

The Trustees may distribute the Trust Fund without having ascertained that there is no Beneficiary whose parents were not married to each other at the time of his birth (or who claims through a person whose parents were not so married) and the Trustees shall not be liable to any Beneficiary of whose existence they had no actual notice at the time of distribution.

62.    **PROTECTION OF THE TRUSTEES GENERALLY**

62.1    No trustee shall be liable for any loss to the Trust Fund however arising except as a result of the fraud, dishonesty or wilful misconduct of such trustee, or in the case of a

15432165.3                                                    22

Confidential

Ex.004-5.0049

CAPLIN0024545
USPROD-02360746

professional trustee entitled to charge for his services as trustee for the negligence of such trustee.

62.2    No trustee shall be bound to take any proceedings against a co-trustee or former trustee or the personal representatives of a co-trustee or former trustee for any breach or alleged breach of trust committed or suffered by such co-trustee or former trustee.

63.    **RELEASE OF POWERS**

63.1    Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.

63.2    The Protector and any other person on whom powers are conferred by this Deed may by deed (and so as to bind successive protectors of this Trust) release or restrict the future exercise of all or any of the powers conferred upon him by this Deed.

64.    **POWER TO VARY ADMINISTRATIVE PROVISIONS**

The Trustees may by deed amend or add to the administrative provisions contained in Part 2 of this Deed, provided that any amendment to clauses 45 (Power to appoint agents), 46 (Power to employ nominees), 47 (Power to delegate), 56 (Trustee charging), 57 (Power to receive remuneration) or 59 (Power to exercise powers notwithstanding personal interest) shall require the prior or simultaneous written consent of the Protector.

15432165.3                                          23

SCHEDULE

€100

Confidential

Ex.004-5.0051

CAPLIN0024547
USPROD-02360748

Signed sealed and delivered as a deed by )
**Delphine Anne Le Dain** )
) )
in the presence of )

**Witness**

Signature:

Name: MARTIN SHIE

Address:

SIMID OTD

Occupation: INVESTMENT CONSULTANS

The Common Seal of )
**Trustee** )
was hereunto affixed )

in the presence of

**Director**

Signature:

Name:

**Director / Secretary**

Signature:

Name:

15432165.3                    25

Ex.004-5.0052

CAPLIN0024548
USPROD-02360749

**Agreed and accepted by the Original Protector**

Signed sealed and delivered as a deed by          )

**GRAHAM AUBREY COLLETT**                         )

                                                  )

in the presence of

**Witness**

Signature:

Name:               MARTIN SHIEL

Address:            [redacted]

                    SND OFD

Occupation:         INVESTMENT CONSULTANT

15432165.3                        26

Confidential

Ex.004-5.0053

CAPLIN0024549
USPROD-02360750

Dated    21 August    2012

**STRICTLY PRIVATE AND CONFIDENTIAL**

**TAX REPORT FOR DELPHINE LE DAIN
RELATING TO THE SET UP OF A NEW TRUST**

Mishcon de Reya
Summit House
12 Red Lion Square
London WC1R 4QD
Tel: 020 7440 7000
Fax: 020 7404 5982
Ref: KM/4467/MB/38649.1
E-mail: kassim.meghjea@mishcon.com

This Tax Report is addressed specifically to Delphine Le Dain ("**Delphine**") and may not be relied upon by any other person. This Tax Report considers UK tax law and H.M. Revenue & Customs' (**HMRC**) published practice, US tax law and BVI tax law as at 21 August 2012, which may be subject to change, possibly with retrospective effect.

## 1.    BACKGROUND AND SUMMARY OF OUR CONCLUSIONS

We have been engaged by Delphine who is a UK tax resident but non-domiciled or deemed domiciled individual to review the current holding structure of a group of trading companies held through a Panama Foundation and to advise on whether that remains the optimal structure.

Based on what has been relayed to us and having conducted our review we are of the view that the current holding structure of a group of trading companies held through a Panama Foundation is no longer optimal as Panama is now being perceived as less reputable in the international tax arena. We recommend that Delphine should create a new offshore trust (the "**Trust**") for the benefit of herself and her minor children – neither her husband nor any other person who is a United States person for US tax purposes is to be a beneficiary of the Trust. The limited partnership interest currently held by the Panama Foundation should, once the trust is set up, be transferred to the Trust. What this means in practical terms is that the Panama Foundation should transfer the shares in it currently holds in the British Virgin Islands ("**BVI**") based Rosbelt International Limited (the "**Company**") to the Trust by way of a gift (i.e. for no consideration). We further recommend that the Trust should be revocable and be managed by experienced professional trustees who are based in Switzerland with a trusted independent protector who knows Delphine's family well and understands the nature of the business undertaken by the group companies.

## 2.    ASSUMPTIONS

For the purpose of our analysis and preparing this report we have assumed that:

2.1    Delphine is UK tax resident but non-UK domiciled, and that she claims – and will continue to claim – the remittance basis of taxation in her tax return;

2.2    Delphine is not UK deemed domiciled i.e. she has not been UK tax resident in seventeen of the previous twenty tax years (including the current year) and nor was she UK domiciled or deemed domiciled when she created the Panama Foundation;

2.3    Delphine's young children, who are also to be the beneficiaries of the trust, are also UK tax resident but non-domiciled in the UK; and

2.4    the income and gains in the structure arises and will continue to arise offshore and be kept offshore.

14382281.2

Confidential

CAPLIN0024551
USPROD-02360752

6.      **DELPHINE'S UK TAX POSITION AS A BENEFICIARY OF THE TRUST**

6.1     Income tax

Provided that the Trust income is paid to the Trust's non-UK bank account and kept offshore, it will not be subject to income tax in the UK. It is important that the Trust has separate bank accounts for capital and income, so that if there is ever any need to bring any funds onshore, it is capital that is brought onshore (which is not subject to tax in the UK) but income is still kept offshore. If Trust income is distributed to Delphine, it will not be taxed provided it is distributed to her offshore and kept offshore.

6.2     Capital gains Tax

In respect of any gain realised by the Trust – whether at Trust or company level, or whether relating to the pool of gains that has transferred across from the Panama Foundation – provided that any Trust distributions are made to Delphine offshore and kept offshore, there will be no CGT.

6.3     Inheritance tax

The situs of the Trust's interest in the partnership is the place where the partnership business is carried on. Assuming the business is carried on outside the UK, it is non-UK situs. On the basis that Delphine is non-UK domiciled and not UK deemed domiciled (as discussed above), and that the business is carried on outside the UK, the Trust fund should be excluded from inheritance tax on Delphine's death. In addition, 10-yearly charges and exit charges in respect of inheritance tax should not apply either.

7.      **US TAX IMPLICATIONS**

On the basis that neither Delphine nor any of her children are United States persons for US tax purposes, the Trust is a BVI based trust, and the Trust will be managed by professional trustees who are based in Switzerland, there should not be any US tax exposure for Delphine, any of her children, the Trust, or any of the professional trustees.

On the face of the Trust instrument, the right of the Grantor to revoke the Trust or a part thereof is unequivocal. Moreover, it is not subject to the approval or consent of any third person. It follows that, from a U.S. federal income tax perspective, it is likely that the Trust would be treated as a grantor trust and thus highly unlikely that the IRS would attribute income to any U.S. beneficiaries even if such beneficiaries are specifically named in the trust instrument or in subsequent protocols to the trust instrument. (See Example 1 under Treasury Regulation Section 1.672(f)-3(a)(4).)

The facts on the ground however need to correspond to the provisions of the Trust instrument. Thus, arrangements entered into by the grantor with the trustees, the protector or any other third person

14362281.2

CAPLIN0024552
USPROD-02360753

regarding her right to revoke the Trust must be consistent with the terms of the Trust. Further, note that Treasury Regulation Section 1.672(f)-3(a)(2) provides that the "grantor is treated as having a power to revest for a taxable year of the trust only if the grantor has such power for a total of 183 or more days during the taxable year of the trust" which is the case here. Therefore, the fact that the Trust can be revoked at any time by Delphine means that the Trust will be a "grantor trust" for US tax purposes in the unlikely event that there is US tax exposure, thus allowing Delphine to revoke the Trust and therefore eliminate the US tax exposure.

Although there is the possibility that the Trust might at some future time be used to create a U.S. trust or sub-trust, that remote possibility does not, in our view, change the fact that, at least for the time being, the trust will be viewed as grantor trust for U.S. income tax purposes as explained hereinabove. Therefore if such a trust or sub-trust were to be created by the Trust, it would need to be subject to the conditions described above – other words, the original grantor would need to retain the power to revoke the new trust or sub-trust.

It should be remembered that income from U.S. sources such as dividends and interest would be subject to U.S. withholding taxes. Tax treaty protection may or may not be available.

8.    **THE TAX CONSEQUENCES OF THE PROPOSED TRANSFER OF SHARES**

8.1    HMRC has indicated that foundations are to be treated as trusts for UK tax purposes.[1]  We have therefore assumed for the purposes of this Tax Report that HMRC will treat the Panama Foundation as a trust for UK tax purposes.

8.2    On the transfer by the Panama Foundation of its shares in the Company to the Trust, the Panama Foundation will realise a gain on the basis that the transaction will deemed to occur at market value as the beneficiaries are the same individuals.  Provided that all UK resident beneficiaries who have received distributions from the Panama Foundation are remittance basis users and have received their distributions offshore, as is the case here, there should be no CGT.

8.3    In addition, on the transfer of the shares in the Company to the Trust, any unmatched gains in the Foundation will be treated as transferring across to the Trust.[2]  However, these gains will not come into charge provided that all UK resident beneficiaries who receive distributions from the Trust are remittance basis users and received their distributions offshore, as is the case here.

8.4    There are no adverse tax consequences in the BVI on the transfer of the shares in the Company.

---

[1] The Joint Declaration by the Government of The Principality of Liechtenstein and Her Majesty's Revenue and Customs Concerning The Memorandum of Understanding Relating to Cooperation in Tax Matters
[2] Section 90 TCGA 1992

14332281.2

8.5    There are no adverse tax consequences in the US on the transfer of the shares in the Company.

## 9.    RECOMMENDATION OF TRUSTEES

As requested we have provided details of three possible trustees who we have worked with before and we believe all of them are suitable to be appointed as a trustee. We strongly recommend that both Delphine and the protector meets them to ensure that they are able to work with whichever individual they appoint – we are more than happy to facilitate a meeting. The details of the three possible trustees are:

9.1    Howard Rosen CBE, MA (Oxon.), TEP , Solicitor of the Senior Courts of England and Wales, of Howard Rosen Solicitors, P.O. Box 2258, Baarerstrasse 98, CH-6302 Zug, Switzerland.

9.2    Leonard O'Brien of Salamander Suisse, Rue du Rhone 56, 1204 Geneva, Switzerland; and

9.3    Tracey Casari, Group CEO of Wintust Limited, Bahnhofstrasse 28A 8001, Zürich, Switzerland.

## 10.    CONCLUSION

Having considered all the details provided to us our recommendation is that Delphine should create a new offshore trust in the form set out in the Annex for the benefit of herself and her minor children only and that limited partnership interest currently held by the Panama Foundation should, once the trust is set up, be transferred to the Trust. This is on the basis that we do not believe that the current holding structure of a group of trading companies held through a Panama Foundation is optimal as Panama for reasons set out above. The Trust should be revocable (it will be so if it is in the form set out in the Annex) and be managed by experienced professional trustees who are based in Switzerland with a trusted independent protector who knows Delphine's family well and understands the nature of the business undertaken by the group companies. We are of the view that if the recommendation is adopted the holding structure will be optimal again and the risk of an unwarranted review of the structure by the tax authorities will be greatly reduced.

We are happy to elaborate on any aspect of the above further if required.

**Kassim Meghjee**
**Partner**
**Mishcon de Reya**
21 August 2012

14382281.2

# AGREEMENT

## OF

## NOMINEE SECURITY HOLDING

*made and entered into between*

### SALAMANDER NOMINEES LIMITED

*and*

### SALAMANDER ASSOCIATES LIMITED AS TRUSTEES OF THE GALACTEA TRUST

Nominee Agreement

## 1.  RECORDAL

1.1   The undersigned, Salamander Associates Limited as Trustees of the Galactea Trust (hereinafter referred to as "the Client"), does hereby authorize SALAMANDER NOMINEES LIMITED (hereinafter referred to as "the Nominee"), to hold, as nominees on the Client's behalf, such funds, money deposits, script, share certificates, securities, documents of security and/or value, precious metals and coins as the Client may from time to time lodge with the Nominee, the Client remaining the beneficial owner thereof.

1.2   The Client acknowledges having read and understood these terms and conditions relating to such nominee holding by the Nominee.

## 2.  INTERPRETATION

Unless the context clearly otherwise indicates, the following words shall be attributed the meanings stated hereunder:

2.1   "the Nominee" -    SALAMANDER NOMINEES LIMITED, a company with limited liability and incorporated according to the company laws of the British Virgin Islands and having as its registered address:

> PO Box 4301
> Road Town
> Tortola
> British Virgin Islands

2.2   "the Client" -    The party whose name is stipulated in clause 1.1 supra of this agreement and whose address is:

> PO Box 4301
> Road Town
> Tortola
> British Virgin Islands

2.3   "Securities" -    Funds, money deposits, script, warrants, depositary receipts, stocks, commercial paper, share certificates, securities, documents of security, debt, title and/or value, precious metals and coins.

## 3.  ACKNOWLEDGEMENT OF RECEIPT

Upon receipt of the Securities from the Client, the Nominee shall issue to the Client a certificate, in the form annexed hereto marked "Annexure A", reflecting the nature of the Securities held by the Nominee as nominee for and on behalf of the Client. This form is to be read, mutatis mutandis, with this agreement.

## 4.  DECLARATION

The Client affirms being the lawful holder of right of the Securities.

J:\standard.dox\Nominee Agreement



CAPLIN0024556
USPROD-02360757

Nominee Agreement

## 5.   CONDITIONS

The Nominee holds the Securities as nominee for the Client, the Client being the beneficial owner thereof, on the following terms and conditions:

5.1   The Nominee is absolved from any liability or duty to place on investment, take up any rights, exercise any conversions or subscription of rights, take up or collect coupons, redeemable subscriptions or deal or negotiate with takeovers, offers or capital reorganizations, exercise voting rights or any other duties or responsibilities pertaining to the Securities, save unless specifically requested to do so in writing by the Client and likewise agreed by the Nominee in writing that such task shall be performed.

5.2   The Client shall, unless otherwise agreed with the Nominee in writing, take all the steps necessary to protect any rights they may have in connection with the Securities lodged with the Nominee as nominees. If no written instructions have been received by the Nominee from the Client in respect of such actions, the Nominee shall have the right to act in accordance with its own discretion and will be held blameless for any act or omission resulting in a loss, albeit direct, consequential or otherwise.

5.3   In the event that the Nominee agrees or resolves to exercise their discretion to perform customary administrative duties such as, inter alia, re-investment, the collection of coupons and redeemable securities, the obtaining of new coupons, the exchange of provisional certificates, et al, such acts shall be performed without the Nominee assuming any liability or responsibility therefore and the Nominee may likewise rely on publications and lists available to it likewise without assuming any liability therefore.

5.4   The Nominee may, at its discretion, lodge the Securities for safe keeping and ancillary services with any institution of its choice, the Client's right of recourse thereafter for any loss suffered by them as a result of any act or omission of the said institution lying solely against such institution.

## 6.   NOMINEE AND SAFE CUSTODY FEES

6.1   The Nominee shall charge to the Client its usual charges, as published from time to time, charged for providing nominee, safe custody and ancillary services together with such additional fees and charges emanating from any organization and institution that the Nominee may from time to time lodge the Securities with for safekeeping.

6.2   The Nominee reserves the right to modify its fees, as aforementioned, at any time and the Client shall be advised thereof, inter alia, by circular letter.

## 7.   RIGHT OF LIEN AND OFFSET

The Nominee has a right of lien over all the Securities held for and on behalf of the Client, whether in the Nominee's own custody or placed elsewhere and a right of offset in respect of claims which the Nominee may have against the Client from any funds held by the Nominee as nominees for and on behalf of the Client.

J:\standard.dox\Nominee Agreement



Confidential

Ex.004-5.0061

CAPLIN0024557
USPROD-02360758

Nominee Agreement

## 8.    TERMINATION

This agreement shall endure until cancelled by:

8.1  The Client giving the Nominee 60 days written notice of their intention to cancel this agreement and recover all the Securities of which the Client is the beneficial holder and which are being held by the Nominee;

8.2  The Nominee giving notice (for any period of time) to the Client of its intention to cancel this agreement and whereupon any amounts owing to the Nominee shall be immediately payable.

## 9.    AGREEMENT IN COUNTERPART

This Agreement may be executed by the Client and the Nominee in any number of counterparts and by the several parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

## 10.  DOMICILIUM AND NOTICES

10.1 Any notice given by any party to the other party of this agreement shall be deemed to be received by the addressee:-

(i)     on the date on which the notice was delivered to the addressee's domicilium citandi et executandi if delivered by hand; or

(ii)    on the fifth day after posting thereof if sent by pre-paid registered mail to the addressee at their domicilium citandi et executandi.

10.2 The parties hereto elect as their domicilium citandi et executandi for all purposes in terms of this agreement the addresses reflected for each party respectively in clause 2 of this agreement, and which domicilia may only be changed by giving notice as hereinbefore provided.

## 11.  ENTIRE AGREEMENT AND WAIVER

This Agreement represents the entire agreement between the parties and supersedes all previous and oral agreements between the parties pertaining to the subject matter herein contained and no variation shall be of any force or effect unless reduced to writing and agreed and signed by all the parties hereto. Any waiver or indulgence by any party to insist on strict compliance with any provision of this agreement shall in no way constitute a waiver of such provision.

Signed and sealed this 5 day of JULY 2013          Signed this 5 day of JULY 2013

_____                            _____
Director                                           Salamander Associates
Salamander Nominees Limited                        Limited as Trustees of the
                                                   Galactea Trust

f:\standard.dox\Nominee Agreement

Confidential                            Ex.004-5.0062                            CAPLIN0024558
USPROD-02360759

Nominee Agreement

Annexure A

## DECLARATION OF NOMINEE

### SECURITY HOLDING

made to

## SALAMANDER ASSOCIATES LIMITED AS TRUSTEES
## OF THE GALACTEA TRUST

("the Client")

We, SALAMANDER NOMINEES LIMITED, do hereby

ACKNOWLEDGE AND DECLARE

that we hold the Securities reflected in Annexure B which are to be redeemed by us or re-registered in our name or in the names of our nominees and held by us upon Trust for you or your nominee and we hereby undertake to sell, transfer or otherwise negotiate or deal with the said Securities in such manner as you may from time to time direct. We further undertake and agree to account to you or your nominated nominee for all income and capital receivables and accruals, including, without limiting the scope thereof, interest, dividends, bonus or additional shares, issued to us as a result of our holding the said Securities on your behalf, save for any salary, director's fees, nominee or custodian fees which are due to and retainable by us. We further agree and undertake to exercise any voting rights, privileges or obligations that attach to the said Securities in such manner as you or your nominated nominee may from time to time direct, such being in accordance with the Agreement to which this declaration is annexed thereto, the terms and conditions being applicable mutatis mutandis.

In witness whereof this Declaration is
signed, sealed and delivered by
SALAMANDER NOMINEES LIMITED

this 5 day of JULY 2013

Director: Salamander Nominees Limited

J:\standard.dox\Nominee Agreement

Ex.004-5.0063

CAPLIN0024559
USPROD-02360760

Nominee Agreement

Annexure B

Shares held in Rosbelt International Limited
50'000 SHARES OF USD 1.00 EACH
SHARE certificate no.2



Confidential

Ex.004-5.0064

CAPLIN0024560
USPROD-02360761

### *BVI BUSINESS COMPANY*

#### **Share Certificate**

**Certificate Number   \*\*\*2\*\*\*   Number of Shares   \*\*\*50'000\*\*\***

## ROSBELT INTERNATIONAL LIMITED

(Incorporated under the BVI Business Companies Act 2004 of the British Virgin Islands)

**The Company is authorised to issue 50,000 shares of one class with a par value of USD 1.00 each**

*THIS IS TO CERTIFY THAT* **SALAMANDER NOMINEES LIMITED** *is the registered holder of* **\*\*\*50'000\*\*\*** *shares of* **USD $1,00** *fully paid numbered* **\*\*1-50'000\*\*** *in the above named Company, subject to the Memorandum and Articles of Association of the said Company and to the terms and conditions endorsed hereon.*

*Given under the Common Seal of the Company*

*This    5th July 2013*



.....................................................
Salamander Management Limited
Director

**TRUST STRUCTURE AND MANAGEMENT**

**Overall Structure and responsibilities**

The current management of the trust structure requires regular review and updating in order to:

- Ensure proper control and full compliance with all legal, statutory and tax obligations
- Ensure full protection of Trust assets
- Achieve maximum returns (both capital and income) from all investments
- Plan and monitor investment strategy in short/medium and long term
- Maintain proper guidelines for management of all trust activities and investments

The current structure comprises:

| | | |
|---|---|---|
| Trustee | - | Len O'Brien (Salamander) |
| Protector | - | Graham Collett |
| CEO | - | Steve Buscher |
| Operational | - | James Cecil |
| Administration | - | Iryna Tsenzharyk |

SB, GAC and JC have developed a "management team" role, although this need to be more clearly defined with more accountability and interaction.

A summary of the responsibilities of each of the above are attached hereto. These are not exhaustive but are meant to reflect the current position. These roles need to be reviewed and updated to ensure efficient management of all aspects and to provide better coverage and distribution of responsibilities.

.....

**Trustee Meetings**

Until now, ad hoc meetings have been held between the Trustee and Protector based on detailed information provided by the GAC in his role as Financial Controller.

With effect from March, the Trustee and Protector will plan to meet once per month to review all trust matters, to include financial report, summary operational report/update on all major trust investments, future investment plans etc. These meeting will also involve Kassim Meghjee (Mishcon) as appropriate.

It is also planned for the Trustee and Protector to meet with the Beneficiary (and representative as appropriate) at least every three months to provide an overall update.

The extent to which the CEO should be involved with the Trustee meetings needs to be considered. The aim of the Trustee meetings is primarily for compliance purposes but the trustee may well be able to have input into specific or general matters and advice.

.....

**Management team**

The basis of these trustee/protector/beneficiary meetings (without undue replication) will be an enhanced monthly reporting system within the management team, which should be led by the CEO, with close involvement of GAC and JC (and IT where appropriate)

Based on the current individual responsibilities as scheduled below, the management team will have weekly general updates together with scheduled monthly meeting to review:

Financial report (including trading entity management accounts)
Operational report for each trading entity
Banking, FX and wealth management issues
Review of current investments
Prospective investments
Compliance issues

Confidential

Ex.004-5.0067

CAPLIN0024563
USPROD-02360764

**Steve Buscher (SB)**

SB's principal role is to act as CEO/CFO to the trust structure by maintaining close control over all existing investment activities (whether through direct involvement or investment in listed equities).

In each of the responsibilities listed below, a detailed "role description" should be prepared in order to provide clear lines of responsibility and to clarify SB's role to both local management and Trustees.

**Main responsibilities**

1. Overall responsibility for all treasury matters, including

   - FX planning and control
   - Liaison with banks and maintaining/developing banking relationships
   - Negotiation of group bank facilities, lines of credit etc. (this also includes working with operating entities and overseeing any trading facilities and borrowings)
   - Monitoring investment in existing bank investment funds and seeking new opportunities in wealth management (and potentially reduce direct involvement in operating investments).

2. Management of investment portfolio

   - Monitoring all listed investments within agreed investment parameters (through Spectral Fund).
   - Preparing annual "plan" based on agreed funding levels
   - Reporting to Trustees on a regular basis (performance, yields etc.)

3. Mina Group

   SB's role in Mina Group needs to be clearly defined based on business plan to be prepared (and endorsed by shareholders). At present, SB's role is not clearly defined, but current responsibilities include:

   Acting as CFO
   Preparing full group valuation
   Preparing detailed business plan to take account of staff/facilities reorganisation
   Finalising loan facility for Salalah
   Monitoring all other lines of credit
   Reporting to General Partners (and shareholders)

4. Overall CEO/CFO responsibility for the following Trust investments (including potential opportunities)

   - <u>Mexico (Tulum)</u> – liaising with Mexican partners and taking responsibility with them in terms of fundraising. Acting as quasi CFO and monitoring the performance of all our interests (both in terms of land holdings and trading entities. Preparation of overall business plan (short and long term) for agreement by all parties and monitoring performance on regular basis.

CAPLIN0024564
USPROD-02360765

- <u>Mexico (Kaban)</u> – responsibility for negotiations with potential Mexican partners, preparing business plans, shareholders' agreement and financing arrangements.

- <u>Lang International Holdings</u> – (currently holds CQM and HH Seismic JV) - monitor and develop Investments in oil and gas opportunities. Review the long term objectives for the company and devise overall business plan.

- <u>CQM</u> – responsibility for overall financial control in conjunction with company (Doug Brett) – including business plans, regular financial and operational reporting to the Trustees.

- <u>Joint Venture</u> – as for CQM, including finalisation of SHA, preparing business plan etc.

- <u>Mara Farming</u> – liaising with local management in terms of operational control and regular financial reporting. Reviewing all business objectives and seeking possible business partners in the long term. Assisting with loan facilities where necessary and providing support to local management.

- <u>Little Ajax</u> – maintaining full financial control and proper reporting to shareholders

- <u>StoryFirst</u> – acting as CFO to the group and working closely with CEO in terms of business plans and financial projections. Responsibility for establishing bank lines of credit where appropriate. Seeking opportunities to introduce new investors (to recover Trust investment) and define long term objectives for Trust investment.

- <u>Other miscellaneous investments</u> – maintain overall control, regular reviews, initiate investment opportunities and monitor performance.

Confidential

CAPLIN0024565
USPROD-02360766

**Graham Collett (GAC)**

GAC's principal role is to act as Financial Controller and Protector to the Trust. The role is largely financial, with involvement (with SB and JC) in business and financial planning and monitoring. GAC provides regular reports to the Trustee and maintains close liaison with the beneficiary and representatives.

**Main responsibilities**

- Overall financial control of all trust assets.

- Regular meetings with Trustee to provide updates and information for Trust compliance purposes.

- Maintaining detailed financial records of all trust transactions and providing regular information for Trustee and beneficiary representatives.

- Maintaining full records of all trust transactions, including full supporting (and authorised) documentation.

- Managing bank payments (in conjunction with IT)

- Preparing annual financial statements of Trust (and other trust companies) as appropriate and providing assistance with annual financial reporting to operational investments as required (e.g. Mara. Mina etc.).

- Preparation of annual projections (with monthly monitoring) of overall cash flow, income and investment activity, including beneficiary distributions.

- Maintenance and review of all statutory records of trust companies, ensuring compliance with all statutory regulations as appropriate.

- Providing KYC and other information as required by banks, other institutions and operating companies.

- Settling up new companies within trust structure, drafting shareholder agreements and loan agreements as required.

- Acting as General Partner (with Francis Rojas) in Mina Group. Providing advice and assistance to Mina management as required

CAPLIN0024566
USPROD-02360767

- Providing general advice and assistance to management of other operational investments – including reporting, business plans, legal agreements etc.

- Attending IC meetings for StoryFirst and meetings with management of other entities (in conjunction with SB and JC)

- Obtaining, reviewing and monitoring financial reporting of operational investments. This includes working closely with SB in providing detailed information as required.

- Liaising with and instructing Trust legal and tax representatives as required.

- Managing all loan arrangements with operating companies and individuals, ensuring full supporting documentation and compliance with repayment arrangements.

- Dealing with ad-hoc matters on behalf of the Trust beneficiaries and their representatives as required.

- Dealing with other ad hoc private matters for beneficiaries and representatives

CAPLIN0024567
USPROD-02360768

**James Cecil (JC)**

JC's role is not sufficiently defined at present.

The main responsibilities to date have been as follows:

- Assisting SB in various matters relating to operational companies and potential investments

- Liaising with Mara Group management and involvement with certain aspects of operations (e.g. monitoring sales, client base). JC has visited the farms and should develop his understanding of the business to provide detailed operational support to SB. This role can be replicated in other situations

- Exploring new investment opportunities through contacts.

JC's role need to be more carefully defined and expanded in order to support SB and GAC (as well as broadening his experience in detailed management). SB has not had the time to "mentor" JC in such a way as to effectively achieve this. GAC has already had discussions with JC and outlined various areas of additional involvement.

The immediate opportunities to achieve this are:

- Involvement in regular operational reporting (to assist both SB and GAC). This will provide more detailed experience of financial and operational planning and control.

- Monitoring all detailed outstanding issues and providing ad hoc support as required

- Planning meetings and ensuring that proper agendas and supporting documentation for meetings is distributed to participants

- Involvement with selected detailed tasks that GAC and IT may be responsible for in relation to the Trusts. This would not only provide useful experience but also cover for GAC and IT where necessary.

- To continue to seek investment and wealth management opportunities under clearly defined terms of reference from Trust and SB.

**Iryna Tsenzharyk (IT)**

IT is currently engaged directly my Mina Group but also has responsibilities for Trust and personal matters for the primary beneficiary.

The role with Mina Group is currently under review and may well alter substantially in the immediate future. This may involve more responsibility to Mina and the involvement in Trust matters will need to be reviewed in the light of any decisions regarding Mina Group.

**Main responsibilities**

- Detailed involvement with Trust and beneficiary banking transactions (as a signatory of relevant bank accounts). This role is carried out alongside GAC.

- Detailed involvement in a range of personal matters for primary beneficiary and representatives, including staff and house management, travel arrangements, personal credit cards etc.

- Management of London office and all domestic matters related thereto

- Operation of client account for business expenses and other transactions for primary beneficiary.

- Handling visa and other issues for "group" staff

**TRUST MEETING – 2 JUNE 2015**

**AGENDA AND REPORTS**

1. **Current structure**

   *( See section B )*

   1.1   Review chart  (See organigram updated by LO'B)
   1.2   Intermediate holding companies and jurisdictions follow up
   1.3   Other new Trusts (all now in place, but do we need any more?)

2. **LightStar (U S Trust)**

   2.1   Finalise trust structure and sign off Lightstar Trust (DLD signed off trust deed in April)
   2.2   Intermediate holding company (LightStar Limited - BVI has been set up)
   2.3   US tax advisors – communication and advice – KM to follow up and co-ordinate

3. **Organisational matters**

   3.1   Structure – follow up from GC's draft distributed at last meeting
   3.2   Trust Investment Strategy –follow up GC's draft
   3.3   FACTA issues – general and Mirabaud questionnaires
   3.4   Bank accounts – relationship with Mirabaud
   3.5   Bank accounts – new banking relationships (see Len's email 13.2.15)
   3.6   Consultancy agreements – KM to draft standard agreement
   3.7   Funding loan agreements – KM to draft "standard" agreement
   3.8   Transfer registered agent of all companies to Salamander – still to be done

4. **Galactea Trust**

   Sole asset is the Mina Group (see separate structure chart)  *( section B. )*

   The company's financial statements for 2014 are currently being audited – copy of management accounts for the year is attached.  Audit still in progress

   No distributions have been paid in 2013 or 2014.  However, shareholder loans (arising on transfer of assets from old Gibraltar companies) have been fully repaid.  Last repayment in April 2015.  No distributions expected in 2015.

CAPLIN0024570
USPROD-02360771

The level of trading in 2015 has dropped dramatically – company currently trading at a loss (see attached management accounts – May 2015)

| | |
|---|---|
| New Board of Directors: | Stephen Buscher |
| | Christopher Slaboszewicz |
| | Jerome Schurink |
| | |
| Current General Partners | Francis Rojas |
| | Graham Collett |

New management team is reviewing staffing and reductions already being made.  Full financial projections for 2015 currently being revised in detail to ensure future profitability (to be available by end May) – still not completed.  GC may go to Dubai to assist with management accounting and audit issues.

| | |
|---|---|
| Current trading activities: | Continuing contracts for DLAE (albeit at reduced volumes) |
| | |
| | Salalah terminal facility (Estimated cost $70M) – should be online by end 2015. |
| | |
| | New contracts being sought (Iraq fuel supply) |
| | |
| | Additional opportunities of Salalah being investigated |

5. **Big Valley Trust**

   5.1 **Sign off property transfer from Sunage** – KM drafting necessary docs to complete
   5.2 **All current costs of property are being paid from by SSS**
   5.3 **Review tax implications**
   5.4 **Future funding of costs and personal tax issues**

6. **Ithaque Trust (New)** – *Changed to Attaus . Trust*

   Trust will hold Mara Farming group companies under Evanshire Finance Limited - See revised organigram.

   The business purchased Tibu Farm in late 2013 and farms the land.  Main produce is green beans, sugar snaps and avocados etc.  The business has also acquired a majority stake in a flower distribution network

   6.1 **Copies of all corporate documents relating to the structure are held in Kenya and are being sent to London.** Still awaited – GC is chasing

CAPLIN0024571
USPROD-02360772

6.2    Shareholders' agreement drafted but not yet signed off.   Therefore all shares currently held by Evanshire.

6.3    Funding to date has exceeded original plan.   See attached summary and management accounts to 30 April 2015.  See further investment update (May-15) following March accounts.

## 7. Dina Maropa Trust

The trust owns Murney Overseas Limited, which in turn has funded the acquisition of substantial property in Tulum, Mexico.   Murney also has interests in a number of restaurants, bars and nightclub in Tulum.  The businesses are all operated in connection with Mexican partners.

7.1    All documentation relating to the property acquisitions currently being finalised. – the relevant documentation should be with us very shortly

7.2    Accounts available for all (currently) trading activities.

7.3    Plans being drawn up for hotel development.

## 8. Iverna Trust

Currently owns 100% of StoryFirst Limited and is investing in Solex, MTV, Hello TV, China New Media and SF Productions (see attached corporate structure).

8.1    Shareholder agreement still to be signed off (may be subject to changes). The agreement is now subject to major revisions which are currently being negotiated)

8.2    All shares still owned by StoryFirst – pending finalisation of SHA – thereafter 75:25 Trust and Peter Gerwe.

8.3    See attached summary of all investment to date.  Also draft business plan for 2015.

8.4    Funding loan agreement to be signed off – Awaiting final draft from KM

*Uhague*

9. Atlas Trust

The new trust will own Peppermill, which in turn currently owns Lang International Holdings Limited. The main assets of Lang are:

> Holdings in Canadian Quantum
> Residual assets from Ajax Exploration
> Interest in H K Exploration – a joint venture consultancy company

9.1   Canadian Quantum has not performed to expectations – shares currently quoted at less than 50% of original cost. No quarterly accounts have been published during 2014.

9.2   Exploration assets have been withdrawn from CQM (documentation awaited)

9.3   Awaiting detailed plans for future of company.

9.4   Joint venture agreement currently being finalised.

10. Delfinity Trust (New)

This trust will own two US residential properties which are in fact occupied by family members (Not beneficiaries). Both properties are currently estimated to be worth well in excess of cost. No rents received – purely held as investments.

10.1   **Tax advisory issues and management to be addressed.** KM to co-ordinate – see above.

11. Bluestone Trust (New)

This trust will acquire 100% of Satellite Support Services Limited (SSS). This has been used as a "service provider" and banker for most of the investment activities, distributions and loans to operation companies. It has bank accounts with Mirabaud and CBH Bahamas.

The company has a "track record" and is useful in the short/medium term, but should be replaced in the long term.

Accounts available for all years (up to 31 December 2014).

Confidential

CAPLIN0024573
USPROD-02360774

11.1    We need to carefully consider the future use of the company

11.2    Transfer of assets/ assignment of loans

11.3    Current POA arrangements

## 12. Other entities/assets

12.1    Hersey Development Limited – owns London Flat (Iverna Gardens) – BO is currently Delphine. Should this also be transferred to Big Valley Trust?  This might be a good vehicle to build if we decide to invest in more London property. To be followed up in conjunction with transfer of Cottesmore to Big Valley

12.2    Spectral Fund – hold a few investments – not being effectively used at present.

12.3    BSI Generali – Insurance wrap – cash/investment holding (investor in Spectral Fund)

12.4    Ibiza property – in Delphine's personal name (probably ok)

12.5    Little Ajax – hotel in Stuben – our 51% currently held by Frederic Le Dain (in trust). Accounts and documentation awaited. GC is chasing this

Ex.004-5.0078

CAPLIN0024574
USPROD-02360775

*[ON THE LETTERHEAD OF THE LENDER]*

The Directors
*[BORROWER]*
*[ADDRESS]*

*[DATE]*

Dear Sirs

**Loan Facility**

[    ] (the **Lender**) hereby offers [    ] (the **Borrower**) a loan facility of [up to] £[    ] (the **Facility**) on the terms and conditions set out in this letter (the **Letter**).

1.     **PURPOSE**

The Facility shall be used for the Borrower's general corporate purposes.

2.     **DRAWING**

2.1    Drawings may be made under the Facility from time to time (the aggregate amount of the Facility drawn down from time to time being the **Loan**), provided in each case that the Lender has received a written request for drawdown by no later than two Business Days before the date of drawdown or such lesser period of notice as the Lender may agree. Drawings must be made no later than *[DATE]*. Any part of the Facility not drawn down by close of business on *[DATE]* will be cancelled at such time.

2.2    Further drawings may be made under the Facility from time to time, provided in each case that[the conditions precedent specified in paragraph 4 below have been satisfied and that] the Lender has received a written request for drawdown by no later than two Business Days before the date of drawdown or such lesser period of notice as the Lender may agree. Drawings must be made no later than *[DATE]*. Any part of the Facility not drawn down by close of business on *[DATE]* will be cancelled at such time.

3.     **FEE**

On the first date on which a drawing is made under the Facility, the Borrower shall pay to the Lender an arrangement fee equal to [1%] of the amount of the Facility. The Lender shall be entitled to deduct that fee from any advance drawn down.

4.     **CONDITIONS PRECEDENT**

4.1    The Borrower may not draw down under the Facility unless and until:

4.1.1    the Lender has received:

24404941.1                                          1

CAPLIN0024575
USPROD-02360776

      (a)      this Letter duly countersigned on behalf of the Borrower; and

      (b)      if required, the Debenture referred to in paragraph 5 below duly executed on behalf of the Borrower; and

4.1.2    the Lender, acting reasonably and in good faith, considers that:

      (a)      it has the available funds to be able to make the requested advance without prejudice to its creditors; and

      (b)      it is not unable to pay its debts within the meaning given in section 123 of the Insolvency Act 1986.

5.      **SECURITY**

If the Lender so requires in writing at any time, all obligations of the Borrower under or in respect of the Loan shall be secured by a Debenture (in such form as the Lender may require) conferring fixed and floating charges over the assets and undertaking of the Borrower in favour of the Lender.

Confidential

Ex.004-5.0080

CAPLIN0024576
USPROD-02360777

6.    **INTEREST**

6.1    Interest shall accrue on Loan at the rate of [    ] per cent. per annum.  Interest shall accrue from day to day and be calculated for any period on the basis of the actual number of days elapsed and a 365 day year.

6.2    Interest shall be paid to the Lender in arrears on 31 March, 30 June, 30 September and 31 December in each year and also on the date of repayment of the Loan.

6.3    Any amount of interest accrued but not paid on the due date may, at the absolute discretion of the Lender, be capitalised and added to the amount of the Loan. Interest so capitalised shall itself accrue interest at the rate detailed in this paragraph 6.1.

7.    **REPAYMENT**

7.1    The Loan is repayable in full, together with all interest in accrued but not paid thereon and all other amounts owing hereunder, upon demand made by the Lender to the Borrower.

7.2    If the Lender has not made prior demand, the Loan together with all interest accrued but not paid thereon and all other amounts owing hereunder, shall be repayable on [*DATE*].

7.3    The Borrower may at any time prepay all or any part of the Loan if it (a) simultaneously pays all accrued interest on the amount prepaid and (b) gives not less than five Business Days' notice in writing to the Lender (the giving of which shall oblige the Borrower to make that prepayment accordingly).

8.    **PAYMENTS**

8.1    If any payment would otherwise be due on a day which is not a Business Day it shall instead be due on the next following Business Day.

8.2    All payments to be made by the Borrower hereunder shall be made in sterling (unless it is otherwise agreed in writing) in immediately available funds without any set-off or counterclaim and (save as required by law) without any deduction or withholding whatsoever, to such account as the Lender may specify from time to time.

8.3    If any deduction or withholding is required by law in respect of any payment due to the Lender under this Letter, the Borrower shall:

8.3.1    ensure or procure that the deduction or withholding is made and that it does not exceed the minimum legal requirement;

8.3.2    pay, procure the payment of, or otherwise account for, the full amount deducted or withheld to the relevant taxation or other authority in accordance with the applicable law;

Confidential

CAPLIN0024577
USPROD-02360778

8.3.3   promptly deliver or procure the delivery to the Lender receipts evidencing each of the deductions or withholdings which have been made, to the extent that such receipts are made available to the Borrower; and

8.3.4   pay to the Lender an additional amount to the extent necessary to ensure that, after the making of all deductions or withholdings, the Lender receives a net sum equal to the sum which it would have received had no deduction or withholding been required to be made.

9.   **DEFAULT INTEREST**

If any payment is not made in full on the due date the unpaid amount shall bear interest (after as well as before any judgement) at the rate which is two per cent. per annum above the rate referred to in paragraph 6.1.

10.   **REPRESENTATION AND WARRANTIES**

10.1   The Borrower hereby represents and warrants to the Lender that:

10.1.1   the Borrower is a limited liability company duly incorporated and validly existing under the laws of the country in which it is incorporated and has full power and authority to own its assets and to carry on business as it is now being conducted;

10.1.2   the Borrower has full power and authority to enter into this Agreement and the Debenture, to borrow the full amount of the Facility, and to perform all of the obligations expressed to be assumed by it hereunder and under the Debenture;

10.1.3   this Agreement and the Debenture constitute the legal valid and binding obligations of the Borrower enforceable against it in accordance with their respective terms which obligations rank and will at all times rank at least pari passu in all respects with all other present and future obligations (actual or contingent) of the Borrower (other than obligations which on an insolvency of the Borrower and without any agreement or other voluntary act would be preferred by law);

10.1.4   the execution and delivery by the Borrower of this Agreement and the Debenture, the borrowing by the Borrower of the full amount of the Facility and the performance by the Borrower of all the obligations expressed to be assumed by it hereunder and under the Debenture have been duly authorised by all necessary actions of the Borrower and:

(a)   do not and will not violate any provision of any law, decree, rule or regulation or of any order, judgment, injunction, decree, resolution, determination or award of any court or any judicial administrative or governmental authority or organisation having applicability to the Borrower or the Memorandum or Articles of Association of the Borrower; and

Confidential

Ex.004-5.0082

CAPLIN0024578
USPROD-02360779

(b) do not and will not violate any provision of any mortgage, agreement or other undertaking or instrument to which the Borrower is a party or which is binding upon it or its assets nor result in the creation or imposition of any security interest on any of its assets pursuant to the provisions of any such mortgage, agreement or other undertaking or instrument;

10.1.5 no judgment has been given in legal proceedings and no arbitral or administrative award has been given which has materially adversely affected the business, assets or financial condition of the Borrower or any of its Subsidiaries and save as disclosed by the Borrower to the Lender in writing prior to the date hereof no litigation or administrative or arbitration proceeding before or of any court, tribunal, arbitrator or other relevant authority is presently in process pending or to the knowledge of the Borrower threatened which might materially adversely affect the business, assets or financial condition of the Borrower or any of its Subsidiaries;

10.1.6 there is not in existence nor to the knowledge of the Borrower likely to occur any dispute with any governmental or other authority or any other dispute of any kind which in any such case affects the Borrower or any of its Subsidiaries and which might materially adversely affect their business, assets or financial condition; and

10.1.7 neither the Borrower nor any of its Subsidiaries is in default under any law, decree, rule or regulation nor under any order, judgment, injunction, decree, resolution, determination or award of any court or any judicial administrative or governmental authority or organisation having applicability to them nor under any mortgage, agreement or other undertaking or instrument which might materially adversely affect the business, assets or financial condition of the Borrower or any of its Subsidiaries.

10.2 The representations and warranties contained in paragraph 8.1 shall be deemed to be repeated on each drawing and each date on which any interest is paid while the Loan or any interest is outstanding as at and with reference to the facts subsisting as at each such date.] Delete if loan is on demand or if loan to be simple intra-group.

## 11. NON-WAIVER

The Lender may grant extra time to the Borrower or any other person for the payment of any monies due hereunder or may reach any other compromise with the Borrower or any other person without affecting the Borrower's liability hereunder.

## 12. NOTICES

12.1 Any demand or notice to be given under this Letter shall be in writing and sent by post or facsimile as follows:-

12.1.1 if to the Lender to its registered office stated above;

24404941.1                                     5

Confidential

Ex.004-5.0083

CAPLIN0024579
USPROD-02360780

12.1.2   if to the Borrower to its registered office stated above.

12.2   Any such notice or demand shall be deemed to have been served on the party to whom it is addressed on the first Business Day after despatch.

## 13.   BENEFIT OF LETTER

13.1   The terms of this Letter shall bind and enure for the benefit of the Borrower and the Lender and their respective successors.

13.2   Neither the Borrower nor the Lender may assign or transfer any part of its rights and/or obligations hereunder without the consent of the other.

## 14.   CERTAIN DEFINITIONS

14.1   In this Letter:

**Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for business in London;

**Group** means the Borrower and its Subsidiaries from time to time; and Group Company means any of them; and

**Subsidiary** means a subsidiary undertaking within the meaning of section 1162 of the Companies Act 2006; (and Subsidiaries shall be construed accordingly).

14.2   In this Letter:

14.2.1   save as otherwise expressly provided, references to this Letter or any other document include reference to this Letter or such other document as varied, supplemented and/or replaced as agreed between the parties hereto or as permitted hereby from time to time;

14.2.2   references to any enactment are references to such enactment as re-enacted, amended or extended;

14.2.3   references to the Lender and to the Borrower or to any other person shall, where relevant, be deemed to be references to or to include, as appropriate, the relevant person's successors or assigns; and

14.2.4   paragraph headings are for convenience only and shall not affect the construction of this Letter.

## 15.   THIRD PARTY RIGHTS

Save as expressly provided, a third party (being any person other than the Lender and the Borrower and their permitted successors and assigns) has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Letter.

24404941.1                                           6

16.    **COUNTERPARTS**

The Letter may be executed in counterparts each of which shall be an original and such counterparts taken together shall be deemed to constitute one and the same instrument.

17.    **LAW AND JURISDICTION**

17.1    This Letter and all non-contractual obligations arising out of this letter shall be governed by, and construed in accordance with, the laws of England.

17.2    The parties hereto submit to the exclusive jurisdiction of the courts of England.

If the terms of this Letter are acceptable to you, please indicate your agreement to them by signing and dating this Letter where indicated and returning the Letter to the Lender at the above address, retaining the copy of this Letter attached hereto for your own records.

Yours faithfully

.......................................

For and on behalf of
[*LENDER*]

Confidential

Ex.004-5.0085

CAPLIN0024581
USPROD-02360782

**Acceptance**

We confirm our acceptance of and agreement to the terms of this letter.

..........................................

For and on behalf of
[*BORROWER*]

Dated:  [    ]

Confidential
Ex.004-5.0086

CAPLIN0024582
USPROD-02360783

Dated ........................................................... **2015**

**DELPHINE ANNE LE DAIN**

(Grantor)

and

**SALAMANDER ASSOCIATES LIMITED**

(Original Trustee)

and

**GRAHAM AUBREY COLLETT**

(Original Protector)

---

**THE LIGHTSTAR TRUST**

---

21931899.1

Confidential

Ex.004-5.0087

CAPLIN0024583
USPROD-02360784

## TABLE OF CONTENTS

| No. | Heading | Page |
|-----|---------|------|
| 1. | DEFINITIONS AND CONSTRUCTION | 4 |
| 2. | NAME | 7 |
| 3. | POWER TO RECEIVE ADDITIONAL PROPERTY | 7 |
| 4. | TRUST FOR SALE | 7 |
| 5. | POWER TO ADD DISCRETIONARY BENEFICIARIES | 7 |
| 6. | POWER OF EXCLUSION | 8 |
| 7. | GRANTOR'S POWER OF APPOINTMENT | 8 |
| 8. | DISCRETIONARY TRUST OF CAPITAL AND INCOME | 9 |
| 9. | INCOME TRUSTS IN DEFAULT OF APPOINTMENT | 9 |
| 10. | POWER TO APPLY CAPITAL FOR BENEFICIARIES | 10 |
| 11. | TRUSTS IN DEFAULT OF APPOINTMENT | 10 |
| 12. | ULTIMATE DEFAULT TRUSTS | 10 |
| 13. | ASSIGNMENT OF POWER OF APPOINTMENT | 11 |
| 14. | ADMINISTRATIVE POWERS | 11 |
| 15. | EXERCISE OF POWERS | 11 |
| 16. | GENERAL LIMITATION ON POWERS | 11 |
| 17. | REMOVAL AND APPOINTMENT OF TRUSTEES | 12 |
| 18. | APPOINTMENT OF PROTECTORS | 13 |
| 19. | EFFECT OF VACANCY IN PROTECTOR'S OFFICE | 14 |
| 20. | PROTECTOR'S INDEMNITY | 15 |
| 21. | PROPER LAW, FORUM AND PLACE OF ADMINISTRATION | 15 |
| 22. | EXCLUSION OF COMMUNITY PROPERTY RULES | 16 |
| 23. | EXCLUSION OF EXCLUDED PERSONS | 16 |
| 24. | VARIATION OF TERMS OF THIS TRUST | 16 |
| 25. | SEVERABILITY | 17 |
| 26. | COUNTERPARTS | 17 |
| 27. | POWER OF INVESTMENT | 17 |
| 28. | EXERCISE OF RIGHTS ATTACHING TO SHARES | 17 |
| 29. | POWER TO LEND | 17 |
| 30. | POWER TO BORROW | 18 |
| 31. | POWER TO GIVE GUARANTEES | 18 |
| 32. | POWER OF MANAGEMENT | 18 |
| 33. | POWERS IN RELATION TO LAND AND CHATTELS | 18 |
| 34. | POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY | 18 |
| 35. | POWER TO INSURE PROPERTY | 18 |
| 36. | POWERS IN RELATION TO LIFE INSURANCE POLICIES | 18 |

Confidential

Ex.004-5.0088

CAPLIN0024584
USPROD-02360785

| | | |
|---|---|---|
| 37. | POWER TO TRADE | 18 |
| 38. | POWER TO PROMOTE COMPANIES | 18 |
| 39. | POWERS IN RELATION TO COMPANIES | 19 |
| 40. | EXCLUSION OF APPORTIONMENT | 19 |
| 41. | POWER OF APPROPRIATION | 19 |
| 42. | DIVISION BETWEEN CAPITAL AND INCOME | 19 |
| 43. | PAYMENT OF EXPENSES | 19 |
| 44. | POWERS IN RELATION TO MINORS | 19 |
| 45. | POWER TO APPOINT AGENTS | 19 |
| 46. | POWER TO EMPLOY NOMINEES | 20 |
| 47. | POWERS TO DELEGATE | 20 |
| 48. | POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS | 20 |
| 49. | PAYMENTS TO CHARITIES | 20 |
| 50. | LEGAL PROCEEDINGS | 20 |
| 51. | COMPROMISE AND SETTLEMENT | 20 |
| 52. | ACCOUNTS AND AUDIT | 21 |
| 53. | PROTECTOR'S POWER TO MAKE REQUESTS | 21 |
| 54. | PAYMENT OF TAXES | 21 |
| 55. | PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS | 21 |
| 56. | TRUSTEE CHARGING | 21 |
| 57. | POWER TO RECEIVE REMUNERATION | 22 |
| 58. | INDEMNITY INSURANCE | 22 |
| 59. | POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST | 22 |
| 60. | DISCLOSURE OF DOCUMENTS | 23 |
| 61. | PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS | 23 |
| 62. | PROTECTION OF THE TRUSTEES GENERALLY | 23 |
| 63. | RELEASE OF POWERS | 23 |
| 64. | POWER TO VARY ADMINISTRATIVE PROVISIONS | 23 |

Confidential
Ex.004-5.0089
CAPLIN0024585
USPROD-02360786

DEED OF SETTLEMENT

**DATE**: The          day of          2015

**PARTIES**

(1)    **DELPHINE ANNE LE DAIN** of ▉▉▉▉▉▉ Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

(2)    **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

(3)    **GRAHAM AUBREY COLLETT** of ▉▉▉▉▉▉▉▉ Bromley, Kent, BR1 2TT (the **'Original Protector'**).

**RECITALS**

(A)    The Grantor wishes to make this Settlement and has transferred or delivered to the Original Trustee or otherwise placed under its control the property specified in the Schedule. Further money, investments or other property may be paid or transferred to the Trustees by way of addition.

(B)    It is intended that this Trust shall be revocable during the lifetime of the Grantor.

(C)    In establishing this Trust it is the Grantor's intent that this Trust shall qualify as a foreign grantor trust under Code section 672(f)(2)(A)(i) of Subpart E of Subchapter J of the Code notwithstanding any provision of this Deed or the law governing the trusts created under this Deed during the Grantor's lifetime, any powers granted to the Trustees shall be subordinate to the power of appointment conferred upon the Grantor as set forth in Clause 7 of this Deed. Further, the Grantor intends that no provision of this Trust shall be construed to confer a general power of appointment upon any U.S. person under Code section 2041 or Code section 2514. Notwithstanding any other provision of this Deed to the contrary or any provision of the law governing the trusts created under this Deed, this Deed shall be construed and the trusts of this Trust administered in accordance with and to achieve these intents.

**PART 1 - OPERATIVE PROVISIONS**

**1.**    **DEFINITIONS AND CONSTRUCTION**

1.1    In this Deed, where the context admits, the following definitions and rules of construction shall apply.

    **'Beneficiary'** shall mean any person actually or prospectively entitled to any share or interest in the capital or income of the Trust Fund.

    **'Charity'** shall mean any trust, foundation, company or other organisation whatever established only for purposes regarded as charitable under the proper law of the Trust or under the law of the jurisdiction in which the trust, foundation, company or other organisation was established.

    **'children'**, **'grandchildren'** and **'issue'** of any person shall include his children, grandchildren and remoter issue, whether legitimate, legitimated, illegitimate or adopted.

Confidential

Ex.004-5.0090

CAPLIN0024586
USPROD-02360787

**'Code'** shall mean the U.S. Internal Revenue Code of 1986, as amended and as hereinafter amended from time to time.

**'Company'** shall mean any body, incorporated or established in any part of the world, which has separate legal personality.

**'Consent Holder'** shall mean the person appointed as Consent Holder pursuant to sub-clause 7.2 who is a Related or Subordinate Party who is subservient to the Grantor within the meaning of Code section 672(c) and sections 1.672(c)-1 and 1.672(f)-3(a)(1) of the Treasury Regulations.

**'deed'** shall include any instrument in writing which is signed, witnessed and dated by or on behalf of each of the parties to the instrument and shall also include any instrument executed under seal by a Company.

**'Discretionary Beneficiaries'** shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:

    (a)    Rivkah Edelman;

    (b)    China Edelman;

    (c)    Josef Edelman;

    (d)    Michel Tassi;

    (e)    the children and remoter issue of those set out in (a) to (d) immediately above;

    (f)    Charities; and

    (g)    such other objects or persons as are added under clause 5 to the extent so added.

**'Excluded Person'** shall mean any person or class of persons or Charity by or in respect of whom or which a declaration under sub-clauses 6.1 or 6.4(b) has been made or treated as made but, in the case of a revocable exclusion, only during such time as the exclusion remains effective and unrevoked.

**'incapacity'** shall mean incapacity caused by physical or mental handicap or deterioration resulting in an individual whose incapacity is being judged being unable to manage his own affairs or to understand the nature or consequences of his actions, as confirmed by the written opinion of two medical practitioners qualified to assess such matters and **'incapacity'** shall also mean any legal incapacity deriving from age or insolvency and **'incapacitated'** shall have a corresponding meaning.

**'minor'** shall mean any individual who has not attained the age of 18.

**'person'** shall include any individual or Company.

**'proper law of this Trust'** shall mean the law governing this Trust as determined under clause 21.

**'Protector'** shall mean the person or entity designated as the Protector in accordance with clause 18.

Confidential

CAPLIN0024587
USPROD-02360788

'**Related or Subordinate Party**' shall have the meaning given to that term in Code section 672(c), interpreted as if a beneficiary hereunder was a grantor of the trust created under this Deed with regard to which the status of related or subordinate party is relevant.

'**Settlor**' shall mean the Grantor and any person who shall have donated (by way of gift or sale for less than full consideration) any sums of money, investments or other property to be held as part of the Trust Fund.

'**Treasury Regulations**' shall mean the regulations promulgated by the U.S. Treasury interpreting the Code and codified under Title 26 of the U.S. Code of Federal Regulations.

'**Trustees**' shall include the Original Trustee and the trustees for the time being of this Trust.

'**Trust**' shall mean the trusts constituted by this Deed.

'**Trust Company**' shall mean any Company, wherever incorporated, which is authorised under its constitution or by applicable law to act as trustee of a trust or trusts and/or carry on the business of administering trusts.

'**Trust Fund**' shall mean:

    (a)    the property specified in Schedule;

    (b)    all money, securities, investments or other assets or property paid or transferred by any person (including, without limitation, by bequest under a will) to, or so as to be under the control of, and, in either case, accepted by the Trustees as additions;

    (c)    all accumulations (if any) of income added to the Trust Fund; and

    (d)    the money, investments and property from time to time representing the above.

'**Trust Period**' shall mean the period starting with the date of this Trust and ending on the earlier of:

    (a)    the last day of the period of 100 years starting from the date of this Deed, which period, and no other, shall be the applicable perpetuity period;

    (b)    such date as the Grantor shall revoke the Trust in accordance with this Deed; and

    (c)    such date as the Trustees shall at any time specify by deed in relation to the whole or any part of the Trust Fund (so that different days may be specified for different parts of the Trust Fund), not being a date earlier than the date of such deed or later than a date previously specified in relation to that part of the Trust Fund.

'**US Person**' shall mean an individual described in section 7701(a)(30) of the Code.

1.2    Words denoting the singular shall include the plural and vice versa.

1.3    Words denoting any gender shall include both genders.

21931899.1

6

Confidential

CAPLIN0024588
USPROD-02360789

1.4     References to any statutory provision shall include any statutory modification to or re-enactment of such provision.

1.5     The table of contents and clause headings are included for reference only and shall not affect the interpretation of this Deed.

## 2.     NAME

This Trust shall be known as The Lightstar Trust or by such other name as the Trustees may, from time to time, determine.

## 3.     POWER TO RECEIVE ADDITIONAL PROPERTY

The Trustees may, at any time during the Trust Period, accept additional money, securities, investments or other assets or property, of whatever nature and wherever situate, paid or transferred to them by the Grantor or any other person (including, without limitation, by bequest under a will).  Such additional money, securities, investments or other assets or property shall, subject to any contrary direction, be held upon the trusts and with and subject to the powers and provisions of this Deed.

## 4.     TRUST FOR SALE

The Trustees shall hold the Trust Fund and any additions upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money.  The Trustees may, in their discretion, invest such money in their names or under their control in any of the investments authorised by this Trust or by law, with power from time to time to vary or transpose any such investments for or into others so authorised

## 5.     POWER TO ADD DISCRETIONARY BENEFICIARIES

5.1     The Trustees with the prior or simultaneous written consent of the Protector, may, at any time during the Trust Period, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine.

5.2     Any such addition shall be made by deed (revocable to the extent permitted by the proper law of this Trust or irrevocable):

    (a)     naming or describing the objects or persons or classes of objects or persons to be added; and

    (b)     specifying the date or event, not being earlier than the date of execution of the deed but before the end of the Trust Period, on the happening of which the addition shall take effect.

5.3     Any power of revocation reserved by a deed of addition shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has become indefeasibly entitled.

Confidential
Ex.004-5.0093
CAPLIN0024589
USPROD-02360790

6.      **POWER OF EXCLUSION**

6.1     The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall (whether or not a Beneficiary) be an Excluded Person.

6.2     The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall:

      (a)     if included in the class of Discretionary Beneficiaries, cease to be so included; or

      (b)     if not included in the class of Discretionary Beneficiaries, not be eligible to be added as a Discretionary Beneficiary pursuant to sub-clause 5.1.

6.3     The powers conferred by sub-clauses 6.1 and 6.2 shall not be capable of being exercised

      (a)     so as to derogate from any interest to which any Beneficiary has or would, but for the provisions of this clause, have become indefeasibly entitled;

      (b)     in relation to the Grantor.

6.4     Any person (not being a minor) who may receive any benefit under this Trust may, by declaration in writing:

      (a)     disclaim such benefit, either in whole or in part; or

      (b)     declare that he shall be an Excluded Person.

6.5     Any declaration made pursuant to sub-clauses 6.1, 6.2 or 6.4 shall be by deed (revocable during the Trust Period to the extent permitted by the proper law of this Trust or irrevocable), shall take effect in such circumstances or subject to such conditions and from such date (not being earlier than the date of such deed) specified in the deed.

7.      **GRANTOR'S POWER OF APPOINTMENT**

7.1     Power of Appointment

      (a)     Subject to clause 7.2, the Grantor, while she is living and not incapacitated, shall have the power by deed, to appoint all or any part of the Trust Fund to herself.  During any period in which the Grantor is incapacitated, the Grantor's power to revest absolutely in the Grantor title to all or any part of the trust shall be vested in the Grantor's legal guardian or any other person or entity who has unrestricted authority to exercise this power on the Grantor's behalf, provided that this power may not be vested in a U.S. person who is a beneficiary hereunder or a Related or Subordinate Party with respect to any such U.S. person

      (b)     Any such deed shall take effect immediately upon the date when the same is received by the Trustees or upon such later date as may be specified therein and whenever such a deed seeks to appoint this Trust in part only it shall specify the property being part of the Trust Fund to which such appointment shall apply.

Confidential

CAPLIN0024590
USPROD-02360791

7.2     Consent

        During any period in which a Consent Holder has been appointed, the Grantor's exercise of the power conferred by sub-clause 7.1 shall be exercisable with the simultaneous or prior written consent of the Consent Holder.. For the avoidance of doubt, during any period in which no Consent Holder is serving, the Grantor may exercise the power conferred upon her by clause 7.1 acting alone, without the approval or consent of any other person.

8.      **DISCRETIONARY TRUST OF CAPITAL AND INCOME**

8.1     The Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of such of the Discretionary Beneficiaries, at such ages or times, in such shares, upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint. Any such appointment may include such powers and provisions for the maintenance, education advancement or other benefit of the Discretionary Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit.

8.2     No exercise of the power conferred by sub-clause 8.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Deed or made under any other power conferred by this Deed or by law.

8.3     Any trusts and powers created by an appointment under sub-clause 8.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them.

8.4     The exercise of the power of appointment conferred by sub-clause 8.1 shall:

        (a)     comply with the provisions of sub-clause 15.1; and

        (b)     be subject to the prior or simultaneous written consent of the Protector.

8.5     Notwithstanding clause 63, the Trustees may not release or restrict the power conferred by sub-clause 8.1 without the written consent of the Protector.

9.      **INCOME TRUSTS IN DEFAULT OF APPOINTMENT**

        The provisions of this clause shall apply during the Trust Period until, subject to and in default of any appointment under sub-clause 8.1.

9.1     The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Discretionary Beneficiaries as shall for the time being be in existence, in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit, provided that provided that during the Grantor's lifetime, the Trustees shall pay or apply so much or all of the income of the Trust Fund as the Grantor shall direct by instrument in writing delivered to the Trustees, unless the Trustees request and do not receive written directions within fifteen (15) days, beginning with the date of the request or receive directions which the Trustees consider to be conflicting

9.2     Notwithstanding the provisions of sub-clause 8.1, the Trustees may at any time during the Trust Period in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and, subject to sub-clause 8.1, shall hold such accumulations as an accretion to capital.

Confidential

CAPLIN0024591
USPROD-02360792

9.3     The Trustees may apply the whole or any part of the income accumulated under sub-clause 8.1 as if it were income arising in the then current year.

10.     **POWER TO APPLY CAPITAL FOR BENEFICIARIES**

The provisions of this clause shall apply during the Trust Period notwithstanding the provisions of sub-clause 8.1 but subject to any appointment made under sub-clause 8.1 and to the Protector's written consent.

10.1    The Trustees may pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries, in such shares and in such manner generally as the Trustees shall in their discretion think fit.

10.2    The Trustees may apply the whole or any part of the capital of the Trust Fund by paying or transferring the same to the trustees of any other trust or settlement, whether or not the proper law of such other trust or settlement shall be the proper law of the Trust, for the benefit of any of the Beneficiaries.

10.3    The exercise of the power conferred by sub-clause 10.2 shall be subject to the following provisions:

(a)     upon the payment or transfer of any money or other property to the trustees of any such trust or settlement, the Trustees shall not be bound to see to the further application of such money or property;

(b)     the Trustees may make such payment or transfer to the trustees of a discretionary trust, notwithstanding that the Beneficiary for whose benefit the power is exercised is only a discretionary object of such trust;

(c)     the Trustees may make such payment or transfer notwithstanding that persons other than the Beneficiary for whose benefit the power is exercised are or may become entitled to, or to the income of, the money or other property paid or transferred;

(d)     any exercise of the power shall comply with the provisions of sub-clause 15.1; and

(e)     the power shall not be exercisable so as to permit any part of the income or capital of the Trust Fund to be paid or transferred to the trustees of any trust or settlement in which any Excluded Person is or may be interested.

11.     **TRUSTS IN DEFAULT OF APPOINTMENT**

11.1    From and after the expiration of the Trust Period, and subject to any appointment made under sub-clause 8.1, the Trustees shall hold the capital and income of the Trust Fund upon trust absolutely for all or any one or more exclusively of the others of the Grantor and her children and remoter issue as shall then be living and, if more than one in equal shares *per stirpes*, so that no person shall take if any of his ascendants is alive and so capable of taking.

12.     **ULTIMATE DEFAULT TRUSTS**

Upon expiration of the Trust Period, subject as above, if and so far as not wholly disposed of for any reason whatever by the above provisions, the capital and income of the Trust

Confidential
Ex.004-5.0096
CAPLIN0024592
USPROD-02360793

Fund shall be held upon trust for such Charities and, if more than one, in such shares as the Trustees shall determine absolutely.

13.    **ASSIGNMENT OF POWER OF APPOINTMENT**

The Trustees may, with the prior or simultaneous written consent of the Protector, by deed, grant to any Beneficiary the power to appoint all or any part of the Trust Fund, whether capital or income or both, in such manner, outright or in further trust, as the Trustees shall in such deed provide, provided that the Trustees shall not grant a power of appointment to any Beneficiary who is a U.S. Person without taking the advice of a U.S. lawyer with at least 10 years' experience in U.S. international tax and trusts.

14.    **ADMINISTRATIVE POWERS**

The Trustees shall, in addition and without prejudice to all statutory powers, have the powers and immunities set out in Part 2 of this Deed. No power conferred on the Trustees shall be exercised so as to conflict with the beneficial provisions of this Deed.

15.    **EXERCISE OF POWERS**

15.1    Every power conferred by the provisions of Part 1 of this Deed shall be subject to the application (if any) of the rule against perpetuities and any applicable laws governing the permitted period of accumulations and shall (except for clauses 17 and 18) be exercisable only during and so as to take effect during the Trust Period. No power of revocation shall be exercisable except during the Trust Period.

15.2    Any written consents required under the terms of this Deed may be given either specifically in relation to any particular matter or by a general written consent referring to one or more matters.

15.3    If there is more than one Protector in office, the Protectors shall act unanimously.

16.    **GENERAL LIMITATION ON POWERS**

16.1    Notwithstanding any other provision of this Deed or applicable law, no individual U.S. Person shall have the power to exercise any power granted in a fiduciary capacity, or otherwise, to such individual hereunder if the holding of such power by such individual would, but for the provisions of this clause 16.1, subject such U.S. Person to tax in a personal capacity in any relevant jurisdiction. In particular, but without limitation, no individual Trustee who is a US citizen or a resident alien of the United States may participate in any decision concerning the distribution, use or application of income or capital (a) for his or her own benefit, unless the power is limited by an ascertainable standard relating to the health, education, maintenance or support of such U.S. Person or (b) for the benefit of any person in respect of whom such U.S. Person has a legal obligation of support. Except as set forth herein, no U.S. Person who is a Beneficiary (including for the avoidance of doubt a remainder beneficiary) of any trust created hereunder shall have any power to participate in any decision or exercise any power whatsoever in a fiduciary capacity or otherwise that would, but for the provision of this clause 16.1, cause such U.S. Person to be treated as an owner of trust property for US Federal income or transfer tax purposes or that would otherwise cause the trust property to be includible in the estate of the U.S. Person for US Federal transfer tax purposes, without the written opinion of a U.S. lawyer with at least 10 years' experience in U.S. international tax and trusts. In particular, but without limitation, no Beneficiary who is a U.S. Person may exercise of any of the powers conferred by the following clauses and sub-clauses (the 'restricted powers'):

Confidential

CAPLIN0024593
USPROD-02360794

(a)     clause 5 (Power to add Discretionary Beneficiaries);

(b)     clause 6 (Power of exclusion);

(c)     sub-clause 8.1 (Discretionary trust of capital and income);

(d)     clause 9 (Income trusts in default of appointment);

(e)     clause 10 (Power to apply capital for Beneficiaries);

(f)     clause 24 (Variation of terms of this Trust); and

(g)     clause 64 (Power to vary administrative provisions).

16.2    Neither the Protector nor the Grantor shall be eligible to serve as a Trustee of this Trust or to exercise the powers of the Trustees under any circumstances.

17.     **REMOVAL AND APPOINTMENT OF TRUSTEES**

17.1    A Trustee shall cease to be a Trustee on the happening of any of the following events:

(a)     on resigning in accordance with sub-clause 17.2;

(b)     on being removed in accordance with sub-clause 17.3;

(c)     if an individual, on death, on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

(d)     if a corporation, on filing for bankruptcy, on becoming insolvent or on dissolution.

17.2    A Trustee may resign by giving three months' notice in writing to the person for the time being having power to appoint new or additional Trustees under the provisions of sub-clause 17.4. Upon the expiration of such notice, or such shorter period as may be agreed in writing between the Trustee giving notice and the person for the time being having power to appoint new or additional Trustees, the Trustee who has given notice shall cease to be a Trustee. If the Trustee so resigning is the sole Trustee and a new Trustee shall not have been appointed before the expiration of the specified period of notice, the resigning Trustee shall have power to appoint a new Trustee in its place and its resignation shall become effective only upon such appointment being made.

17.3    The Protector shall have power (to be exercised in writing) to remove any or all of the Trustees with or without cause.  Notice of such removal shall forthwith be given to the Trustee concerned and the removal shall become effective immediately, except where all the Trustees or the sole Trustee have or has been removed in which case the removal shall be effective only on the appointment of a new Trustee or Trustees.

17.4    The Protector or, if the Protector shall be incapacitated or otherwise unable or unwilling to act, or if there shall be no Protector, the Trustees, shall have the power to appoint new or additional such Trustees.

17.5    Any appointment of a new or additional Trustee under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office in which case the appointment

Confidential

CAPLIN0024594
USPROD-02360795

shall become effective on such death, resignation or incapacity. Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Trustees under this clause.

17.6    An outgoing Trustee (which term shall include a Trustee removed under sub-clause 17.3) shall promptly and without delay execute and do all such transfers or other acts or things as may be necessary for the immediate vesting the Trust Fund in the new or continuing Trustees and any reasonable expenses associated therewith (agreed in advance by the Protector) shall be borne by the Trust Fund *provided always* that the outgoing Trustee shall in no event delay or resist transferring the Trust Fund.

17.7    In the event that a Trustee is removed without cause under sub-clause 17.3, the new or continuing Trustees shall be required to undertake in writing to indemnify and hold the outgoing Trustee its directors officers servants and agents harmless against any and all claims demands actions proceedings damages costs or expenses whatsoever for or arising out of any act or omission on the part of the outgoing Trustee or any of its directors officers servants or agents in relation to the Trust, *provided always* (i) that such indemnity shall not extend to any act or omission for which the outgoing Trustee would not have been entitled to be indemnified out of the assets of the Trust Fund had it remained trustee of the Trust, (ii) that the new or continuing Trustees shall not be liable under this indemnity in an amount exceeding the amount or value of the Trust Fund for the time being, (iii) that the Protector shall have given his consent to the terms of such indemnity (which shall be reasonable and in accordance with industry standards) which consent shall not be unreasonably withheld.

17.8    Any appointment under this clause shall be in writing signed by the person making the appointment and by the new or additional Trustee so appointed.

17.9    The provisions of this clause shall apply notwithstanding any provision in the legislation for the time being in effect under the proper law of this Trust for the time being relating to the appointment, removal, retirement or discharge of trustees.

17.10   A person may be appointed to be a trustee notwithstanding that such person is not resident in the jurisdiction the law of which is the proper law of this Trust for the time being and remaining out of such jurisdiction for more than 12 months shall not be a ground for the removal of a trustee.

17.11   There shall be no requirement that there be more than one Trustee.

17.12   Notwithstanding any other provision of this Clause 17, no Beneficiary who is a U.S. Person shall be appointed as Trustee and no Related or Subordinate Party of a Beneficiary who is a U.S. Person shall be appointed as Trustee.

## 18.     APPOINTMENT OF PROTECTORS

18.1    The first Protector shall be the Original Protector.

18.2    A Protector shall cease to be a Protector on the happening of any of the following events:

        (a)     on resigning in accordance with sub-clause 18.3;

        (b)     if an individual, on death; on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

Confidential

CAPLIN0024595
USPROD-02360796

(c)     if a corporation, on filing for bankruptcy, becoming insolvent or on dissolution.

18.3     The Protector may at any time resign its office by written instrument, notice of which shall be given to the Trustees. Such resignation shall be effective upon receipt of the notice or the expiration of one month from the date of the resignation, whichever shall be earlier.

18.4     Protectors subsequent to the first Protector shall be appointed as follows.

(a)     The Original Protector may, by written instrument, appoint any other person or succession of persons to be protector or successive protectors of this Trust, either in addition to or to succeed it.

(b)     A Protector whose successor is not prescribed in advance by the Original Protector pursuant to sub-clause (a), or all of whose prescribed successors under sub-clause (a) have died, become incapacitated or are otherwise incapable or unwilling to serve as protector, may, by written instrument, appoint any other person to be protector of this Trust either in addition to or to succeed it (but may not appoint a succession of protectors).

(c)     Any appointment of a new or additional Protector under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office in which case the appointment shall become effective on such death, resignation or incapacity. Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Protectors under this clause.

18.5     Any appointment under this clause (other than the appointment of the Original Protector whose appointment and acceptance thereof is made by this Deed) shall be in writing signed by the person making the appointment and by the new or additional Protector so appointed. Any such appointment shall only take effect when written notice of such appointment has been given to the Trustees.

18.6     If, notwithstanding the provisions of sub-clause 18.4 there shall at any time be no Protector of this Trust, the Trustees shall, by deed, irrevocably appoint any person, not being one of the Trustees, to be the Protector after consulting with such of the adult Discretionary Beneficiaries as they shall consider appropriate, provided that no Beneficiary who is a U.S. Person, and no U.S. Person who is a Related or Subordinate Party with respect to a Beneficiary who is a U.S. Person, shall be appointed as the Protector of any trust created under this Deed.

## 19.     EFFECT OF VACANCY IN PROTECTOR'S OFFICE

If there shall at any time be no Protector, this Trust (except for clause 18) shall, during such time as there shall be no Protector (but not further or otherwise), be read and construed as if all references to the requirement for the Protector's consent or agreement and to the exercise by the Protector of any power were omitted from this Trust.

Confidential

Ex.004-5.0100

CAPLIN0024596
USPROD-02360797

20.    **PROTECTOR'S INDEMNITY**

20.1    The Protector shall exercise his powers in good faith.  He shall not, in the absence of actual fraud, dishonesty or wilful misconduct, be accountable to any Beneficiary or the Trustees for any act of omission or commission in relation to the powers given to him by this Trust.

20.2    The Protector shall be entitled to charge for the performance of his duties at such rate or in such manner as may be agreed from time to time between the Protector and the Trustees.

20.3    The Protector shall be entitled to reimbursement of all proper expenses incurred by him in relation to the exercise of his powers and performance of his duties under this Trust or the prosecution or defence of any legal proceedings arising in connection with the exercise or non-exercise of his powers or the performance or non-performance of his duties, provided that any claim for reimbursement shall be received by the Trustees within one year of the expenses being incurred.

21.    **PROPER LAW, FORUM AND PLACE OF ADMINISTRATION**

21.1    The proper law of this Trust shall be that of the British Virgin Islands.  Except as otherwise provided in this Trust, all rights under this Deed and its construction and effect shall be subject to the jurisdiction of the courts, and construed according to the laws, of the British Virgin Islands.

21.2    The courts of the British Virgin Islands shall be the forum for the administration of these trusts.

21.3    The provisions of this sub-clause shall apply notwithstanding the provisions of sub-clauses 21.1 and 21.2

(a)    The Trustees shall have power, subject to the application (if any) of the rule against perpetuities, to carry on the general administration of these trusts in any jurisdiction in the world.  This power shall be exercisable whether or not the law of such jurisdiction is for the time being the proper law of this Trust or the courts of such jurisdiction are for the time being the forum for the administration of these trusts, and whether or not the Trustees or any of them are for the time being resident or domiciled in, or otherwise connected with, such jurisdiction.

(b)    The Trustees may at any time declare in writing that, from the date of such declaration, the proper law of this Trust shall be that of any specified jurisdiction.  No exercise of this power shall be effective unless the law of the jurisdiction specified is one under which this Trust remains and all, or substantially all, of the trusts, powers and provisions contained in this Deed remain enforceable and capable of being exercised and so taking effect.

(c)    Following any exercise of the power contained in sub-clause 21.3(b), the Trustees shall, by deed, make such consequential alterations or additions to this Deed as they consider necessary or desirable to ensure that, so far as may be possible, the trusts, powers and provisions of this Deed shall be as valid and effective as they were immediately prior to such change.

21931899.1                                    15

Confidential                          Ex.004-5.0101                          CAPLIN0024597
USPROD-02360798

(d)    The Trustees may, at any time, declare in writing that, from the date of such declaration, the forum for the administration of these trusts shall be the courts of any specified jurisdiction.

22.    **EXCLUSION OF COMMUNITY PROPERTY RULES**

No benefit accruing to or devolving on any Beneficiary under this Deed shall form or constitute a portion of any communal or joint estate or marital property of such Beneficiary, but such benefit shall be and remain the sole, separate and exclusive property of such Beneficiary. Should such Beneficiary be married or marry in community of property, any benefit so accruing or devolving shall be expressly excluded from the community; such benefit shall also be free from the interference, control or marital power of any spouse of such Beneficiary. The provisions of this clause shall apply not only to benefits accruing to or devolving on any Beneficiary but also to the property of whatever nature for the time being representing the same and the income thereof.

23.    **EXCLUSION OF EXCLUDED PERSONS**

23.1   No discretion or power conferred on the Trustees or any other person by this Deed or by law shall be exercised, and no provision of this Deed shall operate directly or indirectly, so as to cause or permit any part of the capital or income of the Trust Fund to become in any way payable to or applicable for the benefit of an Excluded Person.

23.2   The provisions of sub-clause 23.1 shall not preclude any Settlor from exercising any statutory right to claim reimbursement from the Trustees for any income tax or capital gains tax paid by him in respect of income arising to the Trustees or capital gains realised or deemed or treated as realised by them.

23.3   Subject to sub-clause 23.2 the prohibition in this clause shall apply notwithstanding anything else contained or implied in this Deed.

24.    **VARIATION OF TERMS OF THIS TRUST**

The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part 1 of this Deed including the trusts, powers and discretions contained in Part 1 of this Deed provided always that:

24.1   they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;

24.2   they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;

24.3   no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor.

24.4   no such variation, amendment, addition or deletion

(a)    shall infringe the proper law of this Trust for the time being; or

Confidential

Ex.004-5.0102

CAPLIN0024598
USPROD-02360799

(b)     shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and

24.5    no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety.

## 25.    SEVERABILITY

If any provision of this Deed shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity and enforceability of the remaining provisions of this Deed which shall, so far as possible, be construed and take effect as if the invalid or unenforceable provisions had not been included in this Deed.

## 26.    COUNTERPARTS

This Deed may be signed in counterparts and each such counterpart shall constitute an agreed document and each such counterpart taken together, shall constitute one and the same instrument.

## PART 2 - ADMINISTRATIVE PROVISIONS

## 27.    POWER OF INVESTMENT

27.1    The Trustees may apply any money to be invested in the purchase or acquisition (either alone or jointly with other persons) of such property, of whatever nature and wherever situate and whether of a wasting nature, involving liabilities or producing income or not, or in making such loans with or without security, as they think fit so that they shall have the same powers to apply money to be invested as if they were an absolute beneficial owner.

27.2    The Trustees may exchange property for other property on such terms as they think fit.

27.3    The Trustees shall not be required to diversify the investment of the Trust Fund.

## 28.    EXERCISE OF RIGHTS ATTACHING TO SHARES

Notwithstanding any other provision of this Deed, the power, authority and discretion granted to the Trustees under this Deed over the control or exercise of any rights (including, without limitation, voting rights) attaching to any securities, shares or other interests in any entity that form a part of the Trust Fund, or which are held (directly or indirectly) by a company or other entity whose shares form part of the Trust Fund and which is controlled by the Trustees, shall be exercisable by the Trustees, acting alone as provided in this Deed, without the approval or consent of any Beneficiary, Protector or any other person. No person other than the Trustees shall have any power, authority or discretion, directly or indirectly, over the control or exercise of any rights (including, without limitation, voting rights) which might be conferred by the holding of any such securities, shares or other interests unless specifically delegated such power, authority or discretion by the Trustees.

## 29.    POWER TO LEND

The Trustees may lend all or any part of the Trust Fund to any person or Beneficiary on such terms (whether or not including provision for the payment of interest) as the Trustees think fit.

Confidential

CAPLIN0024599
USPROD-02360800

30. **POWER TO BORROW**

The Trustees may borrow on the security of all or any part of the Trust Fund or otherwise for any purpose.

31. **POWER TO GIVE GUARANTEES**

The Trustees may guarantee the payment of money and the performance of obligations by any Beneficiary or by any company in which the Trust Fund is invested and may charge all or any part of the Trust Fund in support of such guarantee.

32. **POWER OF MANAGEMENT**

The Trustees shall have all the powers of an absolute beneficial owner in relation to the management and administration of the Trust Fund.

33. **POWERS IN RELATION TO LAND AND CHATTELS**

33.1 The Trustees shall have all the powers of an absolute beneficial owner in relation to the disposition, development and improvement of any land comprised in the Trust Fund.

33.2 The Trustees shall not be bound to maintain any building or other structure on land comprised in the Trust Fund or to preserve or repair any chattels comprised in the Trust Fund.

34. **POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY**

The Trustees may, with the consent of the Protector, permit any Discretionary Beneficiary or any other person (if in the opinion of the Trustees it is in the interests of a Discretionary Beneficiary) to occupy or enjoy the use of all or any part of the Trust Fund on such terms as the Trustees think fit. The Trustees may acquire any property for this purpose.

35. **POWER TO INSURE PROPERTY**

The Trustees may insure all or any part of the Trust Fund against any risk, for any amount and on such terms as they think fit but shall not be bound to do so.

36. **POWERS IN RELATION TO LIFE INSURANCE POLICIES**

The Trustees may apply all or any part of the Trust Fund in purchasing or maintaining any policy of insurance on the life of any person and shall have all the powers of an absolute beneficial owner in relation to any such policy.

37. **POWER TO TRADE**

37.1 The Trustees may trade either alone or in partnership and may exercise all or any of the powers conferred on them by this Trust in connection with such trade.

37.2 The Trustees shall be entitled to be indemnified out of the Trust Fund against all liability to which they may be subject in connection with such trade.

38. **POWER TO PROMOTE COMPANIES**

The Trustees may incorporate any company in any part of the world for any purpose in connection with this Trust.

Confidential
Ex.004-5.0104
CAPLIN0024600
USPROD-02360801

39. **POWERS IN RELATION TO COMPANIES**

39.1 The Trustees may enter into any compromise or arrangement in relation to any company in which the Trust Fund is invested.

39.2 The Trustees may enter into any arrangements in relation to the winding up or liquidation of any company in which the Trust Fund is invested.

39.3 The Trustees shall not be bound to enquire into or be involved in the management of any company in which the Trust Fund is invested unless they have knowledge of circumstances which call for enquiry.

40. **EXCLUSION OF APPORTIONMENT**

No apportionment rules shall apply to the income of the Trust Fund or any part of it, so that all income received by the Trustees shall be treated as accruing at the date of receipt.

41. **POWER OF APPROPRIATION**

41.1 The Trustees may appropriate all or any part of the Trust Fund as they think fit in or towards satisfaction of the interest of any Beneficiary and may for such purpose place such value on any property as they think fit.

41.2 Where the Trustees have divided the Trust Fund into one or more sub-funds, the Trustees may transfer assets comprised in one such sub-fund to any other sub-fund in exchange for assets which have an equivalent open market value.

42. **DIVISION BETWEEN CAPITAL AND INCOME**

The Trustees may determine whether any sums received or disbursed are on account of capital or income, or partly on account of one and partly on account of the other, and in what proportions.

43. **PAYMENT OF EXPENSES**

The Trustees shall have power to pay out of income or capital, as they may in their discretion determine, any expenses relating to the Trust Fund (or any assets comprised within it) or its administration.

44. **POWERS IN RELATION TO MINORS**

44.1 The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the parent or guardian of any minor who is beneficially entitled to such assets or income, and the receipt of such parent or guardian, or of the minor, shall be a full discharge to the Trustees.

44.2 The parent or guardian of a minor shall in respect of any assets or income received in accordance with this clause have the powers conferred on the Trustees by Part 2 of this Deed.

45. **POWER TO APPOINT AGENTS**

The Trustees may employ and pay at the expense of the Trust Fund any agent in any part of the world to transact any business in connection with this Trust without being responsible

Confidential
Ex.004-5.0105
CAPLIN0024601
USPROD-02360802

for the fraud, dishonesty or negligence of such agent, *provided* that such agent is employed in good faith, the Trustees reasonably ensure that the agent acts within the scope of its delegation, and the Trustees monitor and review from time to time the agent's overall performance.

## 46.    POWER TO EMPLOY NOMINEES

The Trustees may hold all or any part of the Trust Fund in the name of one or more of the Trustees, or of any other person or partnership, as nominee on such terms as the Trustees think fit.

## 47.    POWERS TO DELEGATE

47.1    The Trustees may engage any person or partnership as investment adviser to advise them on the investment of all or any part of the Trust Fund and they may, without being liable for any consequent loss, delegate to such investment adviser discretion to manage investments on such terms as the Trustees think fit.

47.2    The Trustees may, without being liable for any consequent loss, delegate to any person, other than a Beneficiary who is a U.S. Person, the operation of any bank, building society or other account.

47.3    Any trustee may, by deed revocable or irrevocable, delegate to another trustee or any other person the exercise of all or any trusts and powers conferred on such trustee (other than the power of delegation conferred by this sub-clause) notwithstanding the fiduciary nature of such trusts and powers.

## 48.    POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS

48.1    The Trustees may indemnify any person in respect of any liability relating to this Trust and may charge all or any part of the Trust Fund in connection with such indemnity in such manner as they think fit.

48.2    The Trustees may enter into any agreement or give any commitment that they think fit relating to the transfer or sale of any business or company in which the Trust Fund is invested.

## 49.    PAYMENTS TO CHARITIES

The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the person who purports to be the treasurer or other appropriate officer of any Charity which is entitled to such assets or income, and the receipt of such person shall be a full discharge to the Trustees.

## 50.    LEGAL PROCEEDINGS

The Trustees may institute and defend proceedings at law and proceed to the final determination thereof or compromise the same as they shall in their discretion think fit.

## 51.    COMPROMISE AND SETTLEMENT

The Trustees may compromise and settle for such consideration and upon such terms and conditions as they shall in their discretion think fit all matters arising in relation to the trusts hereby created or the Trust Fund.

Confidential

Ex.004-5.0106

CAPLIN0024602
USPROD-02360803

52.    **ACCOUNTS AND AUDIT**

The Trustees shall keep accurate accounts of their trusteeship and may, or shall if so requested by the Protector, have them audited annually by a firm of professionally qualified accountants selected by the Trustees.

53.    **PROTECTOR'S POWER TO MAKE REQUESTS**

In addition to the powers specifically conferred on the Protector by this Deed, the Protector shall have power to request information relating to this Trust from the Trustees (which information and accounts shall forthwith be supplied to the Protector) and to make other requests of or suggestions to the Trustees in regard to any matter relating to this Trust and the Trustees shall be bound to have regard to any such other request or suggestion but shall not be bound to act in accordance with the same.

54.    **PAYMENT OF TAXES**

In the event of any inheritance tax or probate, succession, estate duty or other duties, fees or taxes whatever becoming payable in any part of the world in respect of the Trust Fund or any part of it in any circumstances whatever, the Trustees may pay all such duties, fees or taxes (notwithstanding that they are not recoverable from the Trustees or the Beneficiaries) out of the capital or income of the Trust Fund at such time and in such manner as they think fit, *provided* that, during the lifetime of the Grantor, any United States income taxes or capital gains taxes payable in respect of the Trust Fund or any part of it shall be payable by the Grantor (subject to any statutory right of the Grantor to be reimbursed by the Trustees). The power to pay duties, fees and taxes conferred by this clause shall extend to any related interest and penalties and to the provision of information to, or the filing of returns with, any relevant tax authorities.

55.    **PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS**

Notwithstanding any provision to the contrary contained in this Deed, the Trustees shall comply with all requests received from any Beneficiary regarding information or documentation that they may require from the Trustees to fulfil their personal tax filing obligations and requirements. The provision of such information and documentation shall include, where requested:

55.1    the execution by the Trustees of such returns or statements as may be required for tax purposes;

55.2    the appointment, as contemplated by section 6048 of the Code, of a United States agent acceptable to the Trustees for the trusts declared or contained in this Deed; and

55.3    the production of the accounts pertaining to the Trust Fund within a reasonable time after the expiration of the Beneficiary's relevant tax reporting period.

56.    **TRUSTEE CHARGING**

56.1    A trustee which is a trust corporation or company authorised to undertake trust business shall be entitled to remuneration in accordance with such terms as may from time to time be agreed between the trustee and the Protector.

56.2    A trustee, whether acting as a person engaged in a profession or business or in a personal capacity, shall be entitled to all normal professional or other fees for business done,

Confidential

CAPLIN0024603
USPROD-02360804

services rendered or time spent by such trustee personally or by such trustee's firm or company in the administration of these trusts, including acts which a trustee not engaged in any profession or business could have done personally.

56.3    A trustee shall be entitled to retain any commission which may be received personally or by such trustee's firm in respect of any transaction carried out on behalf of this Trust for which such trustee or trustee's firm is, in the normal course of business, allowed commission, notwithstanding that the receipt of such commission was procured by an exercise by such trustee or the Trustees of powers over the Trust Fund, but shall notify the Protector on receipt of any such commission.

57.    **POWER TO RECEIVE REMUNERATION**

A trustee may act and be remunerated as a director or other employee or as agent or adviser of any business or company in any way connected with the Trust Fund and shall not be liable to account for any remuneration, fees or profits received by the trustee in any such capacity, but shall notify the Protector on receipt of any such remuneration, fees or profit.

58.    **INDEMNITY INSURANCE**

58.1    The Trustees may pay out of the Trust Fund the cost of any premium in respect of insurance or indemnity to cover all personal liabilities which may be incurred by the Trustees in connection with this Trust. No trustee shall be accountable for any money paid to such trustee under the terms of any such insurance or indemnity unless the trustee shall otherwise have been fully indemnified in respect of the liability to which such payment relates.

58.2    Any such insurance or indemnity shall not extend to any liabilities of a trustee arising from any act or omission in respect of which the trustee would not otherwise be entitled to be indemnified out of the Trust Fund.

59.    **POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST**

59.1    The Trustees may enter into any transaction concerning the Trust Fund:

(a)    notwithstanding that one or more of the Trustees or any one or more of the Protectors may be interested in the transaction other than as one of the Trustees or the Protectors; and

(b)    without any trustee or any protector who is so interested being liable to account for any reasonable incidental profit.

59.2    This power shall only apply provided that the transaction is at least as favourable to the Trustees as if it had been effected:

(a)    in the case of a purchase or sale of shares or other securities listed on any stock exchange, at the middle market price on the day on which such shares or other securities are purchased or sold; or

(b)    in the case of any other transaction, at a price and on terms such as would apply in the case of a transaction effected on fully commercial terms between unconnected persons.

21931899.1                                22

CAPLIN0024604
USPROD-02360805

60.     **DISCLOSURE OF DOCUMENTS**

The provisions of this clause shall apply without prejudice to any right of the Trustees under the proper law of this Trust to refuse to disclose any document.

60.1    The Trustees shall not, subject to sub-clause 60.2, be bound to disclose to any person any document relating to this Trust, its administration, the exercise of the Trustees' powers, the performance of their duties or the Grantor's wishes.

60.2    Notwithstanding sub-clause 60.1, in the event of a Beneficiary requesting disclosure, the Trustees shall disclose to that Beneficiary, this Deed, supplemental deeds, trustees' resolutions exercising dispositive powers and documents which relate to or form part of the accounts of this Trust.

61.     **PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS**

The Trustees may distribute the Trust Fund without having ascertained that there is no Beneficiary whose parents were not married to each other at the time of his birth (or who claims through a person whose parents were not so married) and the Trustees shall not be liable to any Beneficiary of whose existence they had no actual notice at the time of distribution.

62.     **PROTECTION OF THE TRUSTEES GENERALLY**

62.1    No trustee shall be liable for any loss to the Trust Fund however arising except as a result of the fraud, dishonesty or wilful misconduct of such trustee, or in the case of a professional trustee entitled to charge for his services as trustee for the negligence of such trustee.

62.2    No trustee shall be bound to take any proceedings against a co-trustee or former trustee or the personal representatives of a co-trustee or former trustee for any breach or alleged breach of trust committed or suffered by such co-trustee or former trustee.

63.     **RELEASE OF POWERS**

63.1    Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.

63.2    The Protector and any other person on whom powers are conferred by this Deed may by deed (and so as to bind successive protectors of this Trust) release or restrict the future exercise of all or any of the powers conferred upon him by this Deed.

64.     **POWER TO VARY ADMINISTRATIVE PROVISIONS**

The Trustees may by deed amend or add to the administrative provisions contained in Part 2 of this Deed, provided that any amendment to clauses 45 (Power to appoint agents), 46 (Power to employ nominees), 47 (Power to delegate), 56 (Trustee charging), 57 (Power to receive remuneration) or 59 (Power to exercise powers notwithstanding personal interest) shall require the prior or simultaneous written consent of the Protector.

Confidential
Ex.004-5.0109
CAPLIN0024605
USPROD-02360806

## SCHEDULE

€100

Confidential

Ex.004-5.0110

CAPLIN0024606
USPROD-02360807

Signed sealed and delivered as a deed by )

**Delphine Anne Le Dain** )

)                    ...................................

In the presence of

**Witness**

Signature:     ...................................................

Name:     ...................................................

Address:     ...................................................

...................................................

...................................................

Occupation:     ...................................................

The Common Seal of )

**Trustee** )

was hereunto affixed )...................................................

in the presence of

**Director**

Signature:     ...................................................

Name:     ...................................................

**Director / Secretary**

Signature:     ...................................................

Name:     ...................................................

21931899.1                                    25

CAPLIN0024607
USPROD-02360808

**Agreed and accepted by the Original Protector**

| Signed sealed and delivered as a deed by | ) |
| **GRAHAM AUBREY COLLETT** | ) |
|  | ) |

in the presence of

**Witness**

Signature: ........................................................

Name: ........................................................

Address: ........................................................

........................................................

........................................................

Occupation: ........................................................

Confidential

Ex.004-5.0112

CAPLIN0024608
USPROD-02360809

**Lightstar Trust**

**Key factors from trust deed and tax opinion**

- US taxpayers will NOT pay any tax on distributions received during DLD's lifetime

- Income and gains accumulated during DLD's lifetime will be treated as capital when distributed to beneficiaries during DLD's lifetime (i.e. not taxable).

- Any distirbutions made AFTER DLD's death **will** be taxable

- Trustees have power to distribute income to DLD as well as the beneficiaries

- Although no distributions will be taxable, the beneficiaries will have reporting obligations as follows:

CAPLIN0024609
USPROD-02360810



Avenue Louise 489
1050 Brussels
Tel:        32 (0)2 626 05 00
Fax:       32 (0)2 626 05 10
www.steptoe.com
E-Mail: eosterweil@steptoe.com

## MEMORANDUM

July 29, 2015

To:        **Kassim Meghjee**

Cc:        **Bob Rizzi**

From:      **Eric Osterweil**

Re:        **US Tax Advice on Foreign Grantor Trust**

*IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.*

Dear Kassim,

You have requested us to advise on certain US tax aspects of a draft trust deed identified as "Deed of Settlement of the XXX Trust" ("the Trust") to be formed under the laws of a non-US jurisdiction, in this case the British Virgin Islands. A copy of the Trust Deed that has served as the basis for our advice is attached hereto.

Specifically, you have asked whether the Trust may be characterized as a grantor trust under the US Income Tax Code of 1986 ("the Code"), as amended. Subject to the comments to be found below, it is likely that the Trust would, indeed, be viewed as a grantor trust for US income tax purposes. As a result, during the Grantor's lifetime, he or she rather than US beneficiaries, if any, under the Trust would be subject to US income tax on trust income.
The current US income tax rules relating to trusts created by foreign persons that have US persons as beneficiaries are complex. This memorandum focusses on the grantor trust provisions of the Code as applied to the Trust. It is not intended as a full recital of other potentially applicable Code provisions and Treasury Regulations.

This Memorandum does not comment on non-US tax issues that may be presented by the Trust document. It is assumed, moreover, that advice has been taken in regard to British Virgin Islands trust law and other non-US legislation that may be pertinent.

Confidential

CAPLIN0024610
USPROD-02360811



## A foreign grantor trust created by a non-US person under US income tax principles

On the assumption that the Grantor is a non-resident alien ("NRA") as defined below, a foreign trust will be treated as a grantor trust if it qualifies under one of two exceptions as provided in Code Section 672(f)(2). Under the first alternative, pursuant to Code Section 672(f)(2)(A)(i), if the trust is revocable by the grantor alone or with the consent of a "related or subordinate party" as defined in Code Section 672(c), the trust will be a grantor trust. A related or subordinate party is a "non-adverse party who is the grantor's parent, issue, sibling, employee and, in some cases, a subordinate employee of a corporation in which the grantor is an executive.

Additionally, pursuant to Code Section 672(f)(2)(A)(ii) a trust that benefits only the grantor and his/her spouse during the lifetime of the grantor will be deemed to be a grantor trust.[1] As the draft Trust instrument clearly provides that the Grantor may at any time during his or her lifetime revoke the Trust, it is not necessary to discuss the benefits-to-the grantor aspect of the law.

## Relevant features of the Trust instrument

Recital A in the Trust instrument provides that it is the intention of the Grantor that the Trust will qualify as a grantor trust during the Grantor's lifetime within the meaning of Subpart E of Subchapter J of the US Internal Revenue Code. Subpart E entitled Grantors and Others Treated as Substantial owners includes Code Sections 671 to 679. Certain of these sections contain language relevant to the draft Trust instrument as well as references to sections in other parts of the Code.

### (a) Preliminary Considerations

To qualify under the Grantor Trust rules, two principal factors need to be met. The Grantor needs to be a non-resident alien ("NRA") and the Trust must be a foreign trust.

1.      You have advised us that the Grantor is a person who is not a resident or citizen of the United States. Under the provisions of the Code such a person is treated for tax purposes as a NRA. We are further assuming (a) that the Grantor has not at any time in recent years been a resident of the United States, and (b) that the named Grantor will be the only person to settle funds into the Trust..

---

[1] In other words, where a trust instrument provides that 100 percent of the Trust's net income is subject to be retained or used for the benefit of the Grantor during his or her lifetime, the Trust will likely be treated as a grantor trust.

CAPLIN0024611
USPROD-02360812

Steptoe
STEPTOE & JOHNSON LLP
Page 3
July 29, 2015

2. Pursuant to Code Section 7701(a)(30(E), a trust is a foreign trust as long as US. Court does not exercise primary supervision over the administration of the trust and control over the trust does not reside in U.S. persons.

(a) Clause 21 provides that the proper law of the Trust shall be that of the British Virgin Islands and the courts of the British Virgin Islands shall have jurisdiction over the Trust.

(b)The term "Trustees" is defined in Clause 1 as the "Original Trustee and the trustees for the time being of this Trust". While not specifically identified in the draft Trust deed, we have been told that the Trustees are likely to be a Trust company located in the British Virgin Islands or possibly Switzerland. To avoid the risk that the Trust Company might be viewed as a resident of the United States, it would be best that it not have a U.S. presence and, indeed, that the majority of the directors of that corporation be NRAs.

### (b) Revocation of the Trust by the Grantor

Clause 7.1 specifically provides for the power of revocation during the Grantor's lifetime. Care must be exercised to ensure that the instrument of Trust does not contain limitations on the Grantor's right to revoke that might undermine compliance with Code Section 672(f). However, we have noted that draft Clause 7.2 requires consent by one of two persons who are not identified in the proposed text. Moreover, in the majority of the cases that we have seen, the Protector is not and, indeed, should not be a person related to or subservient to the Grantor. Without going into detail, it would appear sensible to review the language of this provision or possibly to remove this sub-clause entirely, to ensure full compliance with the provisions of Code Section 672(f)(2)(A)(i).

The Trust has a Protector with certain powers set forth in several clauses of the Trust, e.g., Clauses 5, 6, 7.2, 10, and 17.3. These provisions do not, in our view, undermine the right on the part of the Grantor to revoke the trust other than a possible difficulty of interpretation in respect of Clause 7.2 as indicated above.

### **Final points – Conclusion**

It should be remembered that even if the Trust qualifies as a grantor trust, any income derived from US sources by the Trust would be subject to US income taxation. For example, dividends and interest paid by US payors to the Trust will be subject to the appropriate US statutory withholding tax most likely at a rate of 30 percent. In the unlikely event that the Trust becomes engaged in a trade or business in the United States, the net income derived from that activity would be subject to US income tax.

We conclude that under current US tax rules, the draft Trust instrument is likely to be in compliance with grantor trust principles currently set forth in the Code and Regulations, subject to the caveat expressed with respect to Clause 7.2.

We look forward to discussing these matters with you.

Law Offices of Suzanne M. Reisman
35 Piccadilly 3rd Floor
London W1J 0DW England
+44-(0)20-7437-2007
suzanne@suzannereisman.com

11th January 2015

Kassim Meghjee
Mishcon de Reya                    BY EMAIL and BY POST
Summit House, 12 Red Lion Square,
London WC1R 4QD

Re: U.S. Tax Issues Relating to Lightstar Trust

Dear Kassim,

I am writing with regard to the U.S. tax issues that arise in connection with the trust
that Delphine Ann Le Dain is planning to settle with Salamander Associates Limited
as Trustee (the "Trust").

As set forth in more detail below, the Trust will qualify as a "foreign grantor trust" for
U.S. income tax purposes. This means that (1) the U.S. taxpayers who are
beneficiaries of the Trust will *not* be taxed on any distributions they receive from the
Trust during Mrs. Le Dain's lifetime; and (2) income and gains accumulated during
Mrs. Le Dain's lifetime will be treated as capital when distributed to U.S. taxpayers
who are beneficiaries of the Trust. Further, the assets held by the Trustees will have a
"fair market value" basis upon Mrs. Le Dain's death. This means that any
appreciation in the Trust's assets during Mrs. Le Dain's lifetime will be treated as
capital for U.S. income tax purposes upon her death. Although no tax will be payable
in respect of distributions received during her lifetime, or in respect of distributions of
capital after her death, U.S. beneficiaries will have reporting requirements as
discussed in Section VII below.

Any income arising after Mrs. Le Dain's death, and any realised gains that relate to
appreciation that accrues after her death will be subject to U.S. income tax if
distributions are made to U.S. beneficiaries.

I       Background.

My understanding of the facts is as follows.

- Mrs. Le Dain (the Grantor) is currently residing in Spain. She is not a U.S.
  citizen or a U.S. permanent resident (*i.e.*, a green card holder) and is not resident
  in the United States under U.S. domestic law. Further, Mrs. Le Dain is not a
  former U.S. taxpayer who is subject to a U.S. expatriation tax regime in effect
  under section 877A of the U.S. Internal Revenue Code of 1986 as amended (the
  Code) or previously in effect under Code section 877.

NY Office: 275 Madison Avenue, 6th Floor, New York, N.Y. 10016-1101, +1-(212)-880-1510
*Authorised and regulated by the Solicitors Regulation Authority (No. 417591)*

Confidential

CAPLIN0024613
USPROD-02360814

- Mrs. Le Dain intends to create a trust that will be funded with cash and marketable securities. The trust is not expected to invest in U.S. situs assets.

- During the Grantor's lifetime, the Grantor, her children and more remote descendants will be the primary beneficiaries of the Trust.

- The Grantor, has the power to appoint all or any part of the Trust to herself and to grant someone else the power to appoint the Trust assets during any period in which she is incapacitated.  (Cl. 7).

- The Grantor also has the direct the Trustees to pay the income upon her direction (Cl. 9.1).  The Trust assets will obtain a "step up" in basis upon the Grantors' death if the Grantor holds both the power to revest the Trust's assets in herself and the power to direct the payment of income to herself. See Section II B below

II        **Foreign Grantor Trust Status.**

When a Trust is settled by a non-U.S. person, it will qualify as a grantor trust if the Grantor[1] has the power to revest the trust assets in herself[2] without the consent of any other person *or* with the consent of a "related or subordinate party", which is a defined term, who is subservient to the Grantor.  A related or subordinate party who is subservient to the Grantor, an employee of a corporation she controls, her spouse, her siblings, and her descendants to the extent that they are not beneficiaries of the Trust.

A related or subordinate party will be deemed to be subservient unless a preponderance of the evidence indicates that this person is not subservient to the Grantor.  I note that a non adverse third party such as an advisor or the Protector are not be related or subordinate parties who are subservient to the Grantor.  Further the Grantor's descendants would not be subservient to her in this instance because they would have an interest in whether or not the Grantor exercised her power to revest the Trust's assets in herself.

As a general matter, U.S. income tax will be imposed on the Trust's assets as if the Grantor of the Trust owned the assets comprising the Trust Fund in her own name.  This is advantageous because the onerous income tax rules applicable to U. S. beneficiaries of foreign non-grantor trusts will not apply to the distributions made to the Grantor's U.S. citizen family member during her lifetime. These rules are discussed in Section IV below.

As a non-resident alien, the Grantor is only subject to U.S. income tax in connection with U.S. source income (i.e. rental income, dividends, interest and royalties) and gains realised in connection with the sale of U.S. real property.  The Grantor is not subject to tax on the sale of shares in U.S. companies.

---

[1] This advice presumes that the assets used to fund the Trust belong to Mrs. Le Dain and that she is not acting as an accommodation or nominee grantor for another family member who has gifted assets to her with the express intent that she will use those assets to fund the Lightstar Trust.

[2] In this case I have drafted the power to revest assets as a power of appointment rather than a power of revocation as it is more easily understood in the majority of jurisdictions outside of the United States and does not impair the Trust's ability to qualify as a foreign grantor trust. There are other trust provisions that will cause a trust to be characterised as foreign grantor trusts however they are not relevant to this matter.

2

Confidential

CAPLIN0024614
USPROD-02360815

I note however, that as set forth below, any U.S. taxpayers who are beneficiaries of the Trust may have reporting obligations during the Grantor's lifetime *regardless of* whether they receive distributions from the Trust. For example, even if a child of the Grantor does not receive a distribution from the Trust in a particular year, he may be required to report the fact that he is a beneficiary of the Trust on IRS Form 8938.

The Trust will continue to be a foreign grantor trust while the Grantor is incapacitated if her legal guardian, or another person that she designates, has unrestricted authority to exercise the power of appointment granted to the Grantor under Clause 7 of the Trust on her behalf.

III     **Tax Status of the Trust Upon the Grantor's Death.**

    A     **Funding the Trust with U.S. Situs Assets.**

My understanding is that the Trust is unlikely to hold U.S. situs assets however in the event that this is not the case, I am including a brief discussion of the relevant issues below. In the event that the Trustees decide to fund the Trust with U.S. situs assets, care must be taken in connection with the funding and administration of the Trust to protect the Trust's assets from U.S. estate tax.

The generous USD 5,430,000 U.S. estate tax exemption available to U.S. citizens and domiciliaries does not apply to individuals who are neither citizens nor domiciled in the United States. The Grantor, as a non-citizen non domiciliary(NCND) has an estate tax exemption of just Sixty Thousand Dollars (USD 60,000). Under current law, U.S. estate tax is imposed at marginal rates of up to forty percent (40%).

Typically whether assets are subject to death taxes is determined upon the death of the decedent. However an exception to that general rule applies to trusts created by NDNCs. The Grantor's estate will be liable for U.S. estate tax in respect of the Trust's assets if

       (a) the Trust is funded with any U.S. situs assets or;
       (b) the Trust holds U.S. situs assets upon the Grantor's death.

This means that if the Grantor were to contribute U.S. situs assets to the Trust (without first contributing them to a company) then under U.S. domestic law, that portion of the Trust that is attributable to these assets would be subject to U.S. estate tax upon her death. This rule would apply even if the Trustees sell the U.S. situs assets on the first day on which they are contributed to the Trust and never purchase U.S. situs assets in the future.

I note that cash should not be wired from an account located in the United States. If cash is wired to the Trust from a U.S. account, then the IRS could argue that U.S. situs cash was used to fund the Trust. It is however permissible for a U.S. financial institution to wire funds to the Trustee's client account to be held as nominee for the Grantor. Even if those funds are denominated in dollar, because the account is located outside of the United States, that cash could then be used to fund the Trust.

I appreciate that if the Trustees are unable to invest in U.S. situs assets, the Trust's investment policies are subject to what may be a significant restriction, depending on the future of the global investment markets.

3

Ex.004-5.0119

CAPLIN0024615
USPROD-02360816

- The Trustees may obtain exposure to the U.S. markets by investing in funds that are domiciled outside the United States that invest in U.S. situs assets. Funds domiciled outside of the United States are not U.S. situs assets for U.S. estate tax purposes provided that they are not organized under the laws of the United States (or any State thereof).

- However the Trustees should not invest in any investments that have "lock ups" or will be difficult to sell upon the Grantor's death because it is likely that they will be investing in non-U.S. funds that will be classified as "passive foreign investment companies" or PFICs for U.S. income tax purposes. If the Trust holds PFICs upon the Grantor's death and they are liquid and not subject to a lock up period, they can be sold immediately upon the Grantor's death. However if they are retained within the Trust and they appreciate, there could be adverse U.S. tax consequences to the Grantor's U.S. family members when they are sold.

- Alternatively, the Trustees may hold U.S. situs assets through a holding company and make an "entity election" to treat that holding company as a transparent entity upon the Grantor's death.

B    Income Tax Issues and Step Up in Basis.

Upon the Grantor's death, the Trust will be characterised as a foreign non-grantor trust. All of the income and gains that were accumulated during the Grantor's lifetime will be characterised as capital for U.S. income tax purposes, rather than as accumulated income and gains. Distributions of capital are not subject to U.S. income tax.

I have given the Grantor the power[3] to direct the Trustees to distribute income to her during the Grantor's lifetime. The Grantor also has the power[4] to appoint all of the Trust's assets to herself without the consent of an adverse party. As a result, upon the Grantor's death, the Trust's assets will be "stepped up" to the fair market value of such assets for U.S. income tax purposes. This is significant because when a U.S. taxpayer receives a distribution from a foreign trust, he is deemed to have received a pro rata portion of the income and gains recognised by the trust during that year.

In this case, the Trust's assets will receive a step up (or uplift) in basis as of the Grantor's death. That means that if shares or the proceeds of the sale of the shares are distributed to a U.S. taxpayer beneficiary, that beneficiary will not recognise any gain in connection with the distribution (other than any gain attributable to appreciation accruing after the Grantor's death).

Example:

- The original cost is $100.

- The fair market value and stepped up basis upon death is $1,100.

---

[3] *See* Cl. 9.1 of the Deed.
[4] *See* Cl. 7 of the Trust Deed.

4

Confidential

CAPLIN0024616
USPROD-02360817

- The shares are sold for $1,500 and this is the only component in distributable net income (discussed below) that year. All of the DNI (the $1,500) is distributed to a U.S. beneficiary.

- The U.S. beneficiary recognises gain of $400 (1,500-1,100).

If the Trustees transferred the shares to a U.S. beneficiary, instead of selling them, then the U.S. beneficiary would receive the shares with a cost basis of $1,100.

I note, that for U.S. income tax purposes, unless the Trust Deed indicates that certain beneficiaries are entitled to certain classes of income or assets, each distribution carries a pro rata portion of the income and gains realised by the Trustees each year.

Example: The Trustees realise $1,000 of net ordinary income and $1,000 of net capital gains. Distributions of $1,000 are made to 2 beneficiaries who are U.S. taxpayers.

For U.S. income tax purposes each beneficiaries is deemed to have received $250 or ordinary income and $250 or capital gains. The remaining $500 is deemed to have been accumulated in the Trust.

IV    Taxation of U.S. Taxpayers Who are Beneficiaries of Non Grantor Trusts

As stated above, the trust will become a foreign non-grantor trust upon the Grantor's death. The U.S. income taxation of U.S. beneficiaries of a non-grantor trust is based on the trust's "distributable net income" ("DNI"), which is broadly the trust's net income for the taxable year.

When a U.S. beneficiary receives a distribution from a discretionary trust, it is deemed to carry a pro rata portion of each item of income comprising DNI, which the beneficiary includes on his or her U.S. income tax return. Generally items of income or gain have the same character when they are received by a beneficiary as they do when they are earned by the Trustees. When the trustees of a trust that is a domestic non-grantor trust for U.S. income tax purposes accumulate income or gains, these accumulations are treated as capital when they are later distributed to the trust's beneficiaries.

When the trustees of a foreign non-grantor trust accumulate DNI, it is not characterised as capital in the hands of U.S. beneficiaries. Instead, it is characterised as "undistributed net income" or "UNI", which is taxed under the "throwback rules".

Broadly the throwback rules charge a U.S. beneficiary with U.S. income tax in respect of the UNI at the beneficiary's highest marginal ordinary income tax rate for the year in which the income and gains are deemed to have been accumulated. An interest charge is imposed on the additional tax due with respect to the UNI. Each item of UNI loses its character in the hands of a U.S. beneficiary. Capital gains, which are currently taxed at a preferential rate when distributed in the year in which they are earned by the Trustees, are instead taxed at the individual's highest marginal income tax rate for ordinary income for the year in which the assets are deemed to have been distributed.

5

Confidential

CAPLIN0024617
USPROD-02360818

There is no ceiling on the amount of the tax that can be applied to a distribution of UNI, provided that the combined tax and interest charge can not exceed the amount of the distribution. Accordingly there is a significant disincentive to making distributions in excess of current year income and gains to beneficiaries who are U.S. tax payers. I note that it is not possible for the Trustees to distribute capital to a beneficiary before the Trustees have distributed all of the DNI and UNI held in the trust. Distributions are first deemed to be composed or DNI, followed by UNI, followed by capital. This means that although capital is not taxable in the hands of a beneficiary, a distribution will not be treated as being composed of capital until all the Trustees are deemed to have distributed all of the DNI and UNI held by the Trust.

V    Appointment of Trustees and Protectors.

To avoid adverse U.S. tax consequences for the Grantor's U.S. family members, I have provided in new Clause 17.12 and have amended Clause 18.6 so that U.S. beneficiaries and related and subordinate parties with respect to U.S. beneficiaries are not permitted to be appointed as Trustees. The reason for this change is as follows. If U.S. taxpayers who are beneficiaries of the Trust have the unfettered power to hire and fire the Trustees, they are taxed as if they hold a general power of appointment over the Trust's assets. If a U.S. citizen holds a general power of appointment over a Trust's assets, he will be subject to U.S. income tax on the income and gains earned by the Trustees and the Trust's assets will be subject to U.S. estate tax upon his death.

VI    Loans to U.S. Taxpayers and the Use of Trust Assets.

It is common for international trustees to transfer trust assets to beneficiaries via loans. Anti abuse rules regarding loans from foreign trusts to U.S. taxpayers state that if a loan is not a "qualified obligation", then the loan will be disregarded and treated as a distribution from the trust. Under the applicable regulations, a qualified obligation must be for a term of not more than 5 years, it must be denominated in U.S. dollars and it must bear adequate interest. If the loan is "rolled over" the beneficiary will be deemed to have received a distribution when the roll over is arranged because the loan will fail the "5 year" limitation. In the event that the loan is not repaid, then the loan is treated as a distribution.

The legislative history to the statutory provision indicates that if the loan is "arms length" then it will be a qualified obligation. Legislation passed in March 2010 (as part of the HIRE Act) added provisions extending this deemed distribution rule to any trust property if fair market value is not paid for the use of the trust asset. The IRS is expected to issue guidance on this issue which may clarify whether loans of intangibles (e.g. securities, cash etc) which are made for fair market value but have a term of more than 5 years will be characterised as qualified obligations.

Under the HIRE Act rules if a U.S. taxpayer (whether or not a beneficiary of the Trust) uses Trust property without paying fair market value, he must report the use of the property as a distribution from the Trust. Pending further guidance, while the Trust is a grantor trust, there will be no tax due in connection with the use of Trust property however the use must be reported on Form 3520.

6

Confidential

CAPLIN0024618
USPROD-02360819

VII    Reporting Requirements.

### A. Form 3520

U.S. persons are also required to report gifts from foreign persons to the extent that such gifts exceed USD 100,000 in any one year. The $100,000 threshold is determined in the aggregate so that if a U.S. person receives 5 gifts of $21,000, he would have exceeded the reporting threshold. Gifts from non-U.S. partnerships and non-U.S. companies and non-U.S. partnerships in excess of $15,102 (indexed annually for inflation) must also be reported on IRS Form 3520.

In each year in which U.S. beneficiaries receive distributions from a foreign trust (regardless of the amount) they will be required to file IRS Form 3520. The Trustees will also have to appoint a "U.S. agent" who will have be willing to respond to any information requests the IRS may make with respect to the trust, e.g. a copy of the trust document and the trust's books and records.

The Internal Revenue Code includes anti-abuse provisions called the "intermediary rules" that allow the IRS to characterise distributions made from a trustee to a third party and then to a U.S. person as if they were received directly from the trust. So, for example, if the Trustees made a distribution to a beneficiary who is not a U.S. taxpayer, who then made a gift to a descendant of the Grantor who is a U.S. taxpayer 3 months later, this gift could be re-characterised as a gift from a foreign trust. I include this rule to caution that it is not possible to avoid the UNI rules by having a third party make a gift to the Grantor's U.S. family members after the her death if the Trust is no longer a grantor trust. This rule does not apply when gifts are made by a Grantor or grantor of a trust to a beneficiary.

The reason this rule does not apply when the Trustees make distributions to a Grantor who then makes gifts to a U.S. beneficiary, is that such gifts are not deemed to result in abuse of the U.S. income tax system.

This means that if the Trustees were to distribute $500,000 to the Grantor, and she transferred that $500,000 to a U.S. citizen family member the next day, the Grantor's gift to her family member would not be subject to the "intermediary" rule. This is because she is the grantor of the Trust. These gifts will however need to be reported on Form 3520 as gifts from foreign persons to the extent that the U.S. taxpayer has received gifts in excess of the relevant threshold in any year.

At such point as the Trust becomes a non-grantor trust, the U.S. beneficiaries will also need to report taxable distributions they receive from the Trust on their U.S. income tax returns.

### B. FBAR Reporting.

U.S. taxpayers who are beneficiaries of foreign trusts are not required to report the foreign bank and financial accounts held by a foreign trust unless (1) they receive more than 50% of the income earned by the Trustees each year or (2) they have a vested interest in more than 50% of the capital of the trust.

I note, however, that if a U.S. taxpayer has signatory authority over any bank or financial accounts held by the Trust (or any non-U.S. companies held outside of the Trust) he must report those accounts on his FBAR each year

7

Confidential

CAPLIN0024619
USPROD-02360820

## C. Form 8938

There is some difference of opinion with regard to Form 8938. Some practitioners take the view that a beneficiary (who is otherwise required to file Form 8938) has a reportable interest in a foreign grantor trust regardless of whether it is discretionary and they have received no distributions from the Trust. In the current environment, it is my view that prudence is the best course of action and on that basis, members of the discretionary class of beneficiaries who are aware of the existence of the Trust should report their interest in the Trust (if any) on Form 8938. Once a beneficiary has received a distribution from the Trust, he or she would, in my view, be deemed to have knowledge of the Trust and should report it on Form 8938 every year in which he or she is required to file that form.

In any year in which a beneficiary files a Form 3520 reporting a distribution from the trust, it is not necessary to include the Trust's assets on Form 8938. In lieu of full reporting, he need only indicate on page 2 of the Form 8938 that he has filed a Form 3520.

In any year in which a Trust is a foreign non-grantor trust, and subject to further IRS guidance, any U.S. taxpayers who are beneficiaries of the Trust will need to report the Trust on Form 8938 even if they do not have a right to income and do not receive any distributions from the Trust. In any year in which they receive distributions from the Trust, they may treat the Trust as an "excepted" asset on Form 8938 noting that they have filed a Form 3520 with respect to the Trust.

I hope you have found this to be helpful. Please do not hesitate to contact me if you have any questions.

Sincerely yours,

Suzanne M. Reisman

8

Confidential

CAPLIN0024620
USPROD-02360821



# REGULATIONS OF SUNAGE FOUNDATION
## First Amendment to the original regulations
### (As has been amended on June 11, 2012)

**SUNAGE FOUNDATION** is a Private Interest Foundation incorporated in accordance with the Law No. 25 of June 12, 1995 of the Republic of Panama, by Public Deed 7,309 of April 3, 2008 before the Notary Public Fifth of the Circuit of Panama, registered in the Microjacket FIP-28656, Document 1322049, Mercantile Section of the Public Registry of Panama (hereinafter "the Foundation").

The Foundation Council formed by Messrs. Isolda Moran Anria as President, Itzamara Madrid as Secretary and Carlos Bryden as Treasurer; has agreed to amend the regulation of the foundation and this First Amendment is issued to replace the original Regulation issued on June 10, 2008, as follow:

### ARTICLE 1:

During her lifetime, enjoyment of the foundation's net worth and the proceeds therefrom as stated in Annex A correspond only to:

#### DELPHINE ANNE LE DAIN

born on ▇▇▇▇ 1966, holder of the French Passport N°▇▇▇▇

### ARTICLE 2:

Following the demise of Mrs. **DELPHINE ANNE LE DAIN** enjoyment of the foundation's net worth and proceeds therefrom shall correspond in equal parts to her daughters:



1.  M▇▇▇▇▇▇▇▇▇ **EDELMAN**, born on ▇▇▇▇ 2002, holder of the French Passport ▇▇▇▇

2.  J▇▇▇▇▇▇ **EDELMAN**, born on ▇▇▇▇ 2006, holder of the French Passport ▇▇▇▇

3.  P▇▇▇▇▇▇▇▇ **EDELMAN**, born on ▇▇▇▇, 2009, holder of the French Passport ▇▇▇▇

Confidential

Ex.004-5.0125

CAPLIN0024621
USPROD-02360822

**ARTICLE 3:**

If any of the beneficiaries designated in Article 2 dies before or during enjoyment of the foundation's net worth, such enjoyment shall correspond to her descendants (which implies legitimate straight line descendants and legally adopted descendants in any degree), in equal parts, according to, lineage.

If there are no such descendants, they shall be accumulated to the net worth of the other beneficiary designated in Article 2 and in her absence to her respective descendants.

**ARTICLE 4:**

A beneficiary is entitled to the delivery of the foundation's enjoyment when reaching the age of 21.

When circumstances require it, the Council may grant, according to its own criteria, amounts for the livelihood and education of those beneficiaries who have not reached the age of 21.

**ARTICLE 5:**

If, following careful investigations, no beneficiary is found in accordance with articles 1-2, the foundation's existing net worth shall be devoted to such charitable institutions as the Foundation's Council shall determine. These institutions are not entitled to any information as to the source of the donations.

**ARTICLE 6:**

The Council may, with the consent of Mrs. **DELPHINE ANNE LE DAIN**, at any time amend the regulations.

Following the demise of Mrs. **DELPHINE ANNE LE DAIN**, amendment of the regulations is only possible with the approval of all the beneficiaries entitled to the full enjoyment of the foundation's net worth and the proceeds therefrom.

This document represents current text and valid regulations of SUNAG FOUNDATION, and has been approved by Mrs. DELPHINE ANNE LE DAIN as Primary Beneficiary and

CAPLIN0024622
USPROD-02360823

...issued by the Foundation Council, formed by the persons listed and who then sign the bottom as evidence of such approval. Each of the three (3) pages comprising this document is initialed by each member of the Foundation Council.

Panama, Republic of Panama on June 12, 2012.

Mrs. DELPHINE ANNE LE DAIN
Primary Beneficiary

Isolda Moran Anria
President

Itzamara Madrid
Secretary

Carlos Bryden
Treasurer

Yo, RICARDO A. LANDERO M., Notario Público Décimo del Circuito de Panamá, con Cedula No. 4-103-2337

CERTIFICO:

Que la(s) firma(s) anterior(es) ha(n) sido reconocida(s) como suya(s) por los firmantes, por consiguiente, dicha(s) firma(s) es (son) auténtica(s) 1 3 JUN 2012

Panamá.....................

Testigo                      Testigo

RICARDO A. LANDERO M.
Notario Público Décimo

Yo, LIC. RAÚL IVÁN CASTILLO SANJUR, Notario Público Tercero del Circuito de Panamá, con Cédula No. 4-157-725.

CERTIFICA

Que ha cotejado detenidas y minuciosamente esta copia fotostática con su original y la ha encontrado en un todo conforme

Panamá .................... 1 2 JUL 2013

Testigo                      Testigo

LIC. RAÚL IVÁN CASTILLO SANJUR
Notario Público Tercero

B. 1109
12 07 13
B/0.00
REPÚBLICA de PANAMA
TIMBRE NACIONAL
0765
1859

Confidential

Ex.004-5.0127

CAPLIN0024623
USPROD-02360824

APOSTILLE

Convention de la haye du 5 octobre 1961
1 Pais PANAMA
El presente documento público
2 ha sido firmado por _Raul E. Otolle_
3 quien actua en calidad _____
4 y esta revestido del sello/timbre de ___

CERTIFICADO



1 2 JUL 2013

5 EN Panamá _____ 6 el día _____
7 por DIRECCION ADMINISTRATIVA
8 Bajo el número _38,007_
9 Sello/timbre _____ 10 Firma _____

Esta Autorización no
implica responsabilidad
en cuanto al contenido
del documento

CAPLIN0024624
USPROD-02360825

Ex.004-5.0128





# REPÚBLICA DE PANAMA
## PROVINCIA DE PANAMÁ

## NOTARÍA NOVENA DEL CIRCUITO DE PANAMÁ

### Licdo. Roberto R. Rojas C.

NOTARIO PÚBLICO NOVENO

TELS.: 265-0121 / 265-0122          P.H. TORRE COSMOS, LOCAL 3, PLANTA BAJA          Apartado 0819-05874, El Dorado,
TELEFAX: 223-0874                  CALLE MANUEL MARÍA ICAZA, URB. CAMPO ALEGRE        Panamá, Rep. de Panamá
                                          (AREA BANCARIA)

COPIA

ESCRITURA No. **8,230** DE **5** DE **octubre** DE 20 **11**

POR LA CUAL:

se protocoliza el Acta de una Reunión celebrada el día 30 de septiembre de 2011, por el Consejo de Fundación de **SUNAGE FOUNDATION**, mediante la cual se eligen nuevos miembros del Consejo y se nombra a la firma forense **ICAZA, GONZALEZ-RUIZ & ALEMAN**, nuevo Agente Registrado.

Confidential

CAPLIN0024625
USPROD-02360826



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



NOTARIA PUBLICA NOVENA DEL CIRCUITO DE PANAMA

ESCRITURA PUBLICA NUMERO OCHO MIL DOSCIENTOS TREINTA ———— 8,230 ———

Por la cual se protocoliza el Acta de una Reunión celebrada el día 30 de septiembre de 2011, por el Consejo de Fundación de **SUNAGE FOUNDATION**, mediante la cual se eligen nuevos miembros del Consejo y se nombra a la firma forense **ICAZA, GONZALEZ-RUIZ & ALEMAN**, nuevo Agente Registrado.————————————————————————————
————————————————Panamá, 5 de octubre de 2011.——————————

En la Ciudad de Panamá, Capital de la República y Cabecera del Circuito Notarial del mismo nombre, a los cinco (5) días del més de octubre del año dos mil once (2011), ante mí, **ROBERTO RENE ROJAS CONTRERAS**, Notario Público Noveno del Circuito de Panamá, con cédula de identidad personal número cuatro-cien-mil ciento cuarenta y cuatro (4-100-1144), compareció personalmente el Licenciado **JOEL ROLANDO MEDINA**, varón, mayor de edad, casado, abogado, panameño, vecino de esta ciudad, con cédula de identidad personal número ocho-cuatrocientos setenta-ochocientos veintiséis (8-470-826), a quien conozco, en su calidad de Socio de la firma de Abogados **ICAZA, GONZALEZ-RUIZ & ALEMAN**, Agente Registrado en Panamá, según nombramiento y autorización en este mismo documento de **SUNAGE FOUNDATION**, debidamente inscrita en el Registro Público de Panamá, bajo Ficha FIP **veintiocho mil seiscientos cincuenta y seis (FIP 28656)**, Sección Mercantil (Micropelículas), me presentó para su protocolización en esta Escritura Pública, escrito en inglés con su correspondiente traducción al español, el Acta de una Reunión celebrada el día treinta (30) de septiembre del año dos mil once (2011), por el Consejo de Fundación de **SUNAGE FOUNDATION**, mediante la cual se eligen nuevos miembros del Consejo y se nombra a la firma forense **ICAZA, GONZALEZ-RUIZ & ALEMAN**, nuevo Agente Registrado.————————————————————————————————
————Queda hecha la protocolización solicitada y se expedirán las copias que soliciten los interesados.————————————————————————————————————————
————Leída como le fue esta Escritura al compareciente en presencia de los testigos

Confidential

Ex.004-5.0130

CAPLIN0024626
USPROD-02360827

Yamileth Vargas, con cédula de identidad personal número cuatro-setecientos cuatro ochocientos veintiséis (4-704-826), mayores de edad y vecinos de esta ciudad, a quienes conozco y son hábiles, la encontró conforme, le impartió su aprobación y firmamos todos para constancia por ante mí, que doy fe.---------------------------------------------------

Esta Escritura lleva el número ocho mil doscientos treinta ----------------8,230------------

(Fdo.)   JOEL R. MEDINA------Jaime Omar Espinosa Ríos------Marga Yamileth Vargas------ROBERTO RENE ROJAS CONTRERAS, Notario Público Noveno.----------------------------------

------------- ACTA DE UNA REUNIÓN DEL CONSEJO DE FUNDACIÓN------------

----------------------------------DE---------------------------------

-----------------SUNAGE FOUNDATION-----------------

---------Una reunión del Consejo de Fundación de **SUNAGE FOUNDATION,** ("la Fundación"), una fundación de interés privado, organizada conforme a la ley No. 25 de 12 de junio de 1995 de la República de Panamá, fue celebrada en Panamá, República de Panamá el día 30 de septiembre de 2011.----------------------------------

------Se encontraban presentes: -----------------------

----------------------EDGARDO E. DIAZ----------------

--------------------MARIA VALLARINO A.----------------

--------------------FERNANDO A. GIL-------------------

quienes son todos los miembros del consejo de fundación, y como tales, acordaron celebrar esta reunión renunciando al aviso previo. ----------------------

------El Sr. **EDGARDO E. DIAZ,** Presidente del Consejo de Fundación, actuó como Presidente de la reunión y la Sra. **MARIA VALLARINO A.,** Secretaria del Consejo de Fundación, actuó como Secretaria de la reunión. --------------------

------El Presidente de la reunión manifestó que los actuales miembros del Consejo de Fundación, habían presentado sus renuncias y que se hacía necesario elegir a sus sucesores. ----------------------------------

------A moción debidamente hecha y unánimemente aprobada, fue **RESUELTO,** aceptar las renuncias de los actuales miembros del Consejo de Fundación. -----------------



# REPUBLICA DE PANAMA
## PAPEL NOTARIAL



### NOTARIA PUBLICA NOVENA DEL CIRCUITO DE PANAMA

------**RESUELTO,** elegir a las siguientes personas como nuevos miembros:

------ISOLDA MORAN ANRIA ------ **PRESIDENTA**------

------ITZAMARA MADRID------ **SECRETARIA**------

------CARLOS BRYDEN------ **TESORERO**------

------El Presidente de la reunión continuó declarando que se hacía necesario elegir un nuevo Agente Registrado para la fundación en la República de Panamá. ------

------Acto seguido, por unanimidad, se decidió nombrar a la firma forense **ICAZA, GONZALEZ-RUIZ & ALEMAN,** domiciliada en Calle Aquilino de la Guardia No. 8 de la Ciudad de Panamá, como el nuevo Agente Registrado de esta fundación en la República de Panamá. ------

------Fue resuelto además, autorizar al nuevo Agente Registrado de la fundación, **ICAZA, GONZALEZ-RUIZ & ALEMAN,** para protocolizar y registrar el Acta de esta reunión en el Registro Público de Panamá. ------

------No habiendo otro asunto, la reunión fue clausurada. ------

(fdo.) Edgardo E. Díaz------(fdo.) (ilegible) ------

------**EDGARDO E. DIAZ**------ **MARIA VALLARINO A.** ------

------Presidente------ Secretaria------

Lo anterior es fiel traducción al español del documento escrito en inglés adjunto.------ Panamá, 5 de octubre de 2011.---(fdo.) Carmen B. de Mon----CARMEN B. DE MON---- Cédula No.8-67-712-Hay un sello que dice: CARMEN B. DE MON-----TRADUCTORA AUTORIZADA-RESOLUCION NO.172 del 6 de agosto de 1971.------

------Concuerda con su original esta primera copia que expido, sello y firmo en la Ciudad de Panamá, República de Panamá, a los cinco (5) días del mes de octubre del año dos mil once (2011).------

Esta escritura consta de un total de dos (2) páginas.------



Lcdo. ROBERTO R. ROJAS
Notario Público Noveno

Confidential

Ex.004-5.0132

CAPLIN0024628
USPROD-02360829

INGRESADO EN EL REGISTRO PÚBLICO DE PANAMÁ

Provincia: **Panamá**                              Fecha y Hora: 2011/Oct/06  13:15:19 3
Tomo: **2011**                                         Asiento: **183447**
Presentante: **GLORIA OLMEDO**                Cedula: **8-314-15**
Liquidación No.: **8711153930**              Total Derechos:      **50.00**
Ingresado Por: **MIDEMA**

**Jefe de Ingreso de Documentos
y Control de Calidad**



Inscrito en el Sistema Tecnológico de Información
del Registro Público de Panamá

Sección _Personas_    Ficha No _28656_    Sigla No _TP_
Documento Redi No. _2050526_
Orden Realizada _Acta_
Derecho de Registro B _110_
Derecho Calificación B _10_
Lugar y Fecha de Inscripción _10 de octubre del 2011_

_Registrador Jefe_

Confidential

CAPLIN0024629
USPROD-02360830

PUBLIC DEED NUMBER EIGHT THOUSAND TWO HUNDRED THIRTY-------8,230---------

Whereby the Minutes of a Meeting held on the 30th day of September 2011 by the Foundation Council of **SUNAGE FOUNDATION** electing the new members of the Council and appointing the law firm **ICAZA, GONZÁLEZ-RUIZ & ALEMÁN** as new Registered Agent are protocolized.

------------------------Panama, October 5th, 2011.------------

In the City of Panama, Capital of the Republic and Seat of the Notarial Circuit of the same name, on the fifth (5th) day of the month of October in the year two thousand eleven (2011), before me **ROBERTO RENE ROJAS CONTRERAS**, **Ninth Notary Public** of the Circuit of Panama, holder of personal identity certificate number four – one hundred – one thousand one hundred forty four (4-100-1144), personally appeared Attorney **JOEL ROLANDO MEDINA**, male, of age, married, lawyer, Panamanian, resident of this city, with personal identity certificate number eight – four hundred seventy – eight hundred twenty-six (8-470-826), whom I know, and in his capacity as Partner of the law firm **ICAZA, GONZALEZ-RUIZ & ALEMAN**, Registered Agent in Panama, in accordance to the appointment and authorization in this same document, of **SUNAGE FOUNDATION** duly registered at the Public Registry of Panama at Microjacket **FIP twenty eight thousand six hundred fifty six (FIP 28656)**, Mercantile Division (Microfilm) presented to me for its protocolization in this Public Deed, written in English with its corresponding translation into Spanish, the Minutes of a Meeting held on the thirtieth (30th) day of September of the year two thousand eleven (2011) by the Foundation Council of **SUNAGE FOUNDATION**, whereby new members of the Council are elected and the law firm **ICAZA, GONZÁLEZ-RUIZ & ALEMÁN** is appointed as new Registered Agent.--------------
----Said document is hereby protocolized as requested, and copies shall

Confidential

Ex.004-5.0134

CAPLIN0024630
USPROD-02360831

be issued to the interested parties, upon request.----------------------

----This document having been read to the appearors in the presence of

the instrumental witnesses, Jaime Omar Espinosa Ríos, holder of personal

identity certificate number four - two hundred seventy seven - nine

hundred fifty six (4-277-956) and Marga Yamileth Vargas, holder of

personal identity certificate number four - seven hundred four - eight

hundred twenty six (4-704-826), both of legal age, residents of this

city, whom I know and are qualified to serve, he found it correct,

approved it and as evidence all sign before me, which I attest.---------

This Deed bears the number eight thousand two hundred thirty---8,230---

(Sgd.) JOEL R. MEDINA----Jaime Omar Espinosa Ríos----Marga Yamileth

Vargas---ROBERTO RENE ROJAS CONTRERAS, Ninth Notary Public.------------

-----------------------------------------------------------------------

-----------------------------------------------------------------------

------------------**MINUTES OF A MEETING OF THE FOUNDATION COUNCIL**---------

------------------------------**OF**---------------------------------------

------------------------- **SUNAGE FOUNDATION**-------------------------

-----A meeting of the Foundation Council of **SUNAGE FOUNDATION** ("the

Foundation"), a private interest foundation organized pursuant to Law

N°25 of June 12th, 1995 of the Republic of Panama, was held in Panama,

Republic of Panama on the 30th day of September, 2011.------------------

---There were present:-------------------------------------------------

-----**EDGARDO E. DIAZ**-------------------------------------------------

-----**MARIA VALLARINO A.**----------------------------------------------

-----**FERNANDO A. GIL**-------------------------------------------------

who are all the members of the foundation council, and as such, agreed to

hold this meeting waiving prior notice.--------------------------------

-----Mr. **EDGARDO E. DIAZ**, Chairman of the Foundation Council, acted as

Chairman of the meeting and Mrs. **MARIA VALLARINO A.**, Secretary of the

Foundation Council, acted as Secretary of the meeting.------------------

----The Chairman stated that the current members of the Foundation Council, had tendered their resignation and it was necessary to elect their successors.-----------------------------------------------------------------
----Upon motion duly made and unanimously approved, it was, **RESOLVED**, to accept the resignations of the current members of the Foundation Council.
----**RESOLVED**, to elect the following persons as new members:------------------
----ISOLDA MORAN ANRIA------------------------------PRESIDENT-----------------
----ITZAMARA MADRID---------------------------------SECRETARY----------------
----CARLOS BRYDEN----------------------------------TREASURER----------------
----The Chairman continued to declare that it was necessary to elect a new Registered Agent for the foundation in the Republic of Panama.--------------
----Thereupon, by unanimity, it was decided to appoint the law firm **ICAZA, GONZALEZ-RUIZ & ALEMAN**, domiciled at Calle Aquilino de la Guardia No. 8 of the City of Panama, as the new Registered Agent of this foundation in the Republic of Panama.--------------------------------------------------------
----It was further resolved to authorize the new Registered Agent of the foundation, **ICAZA, GONZALEZ-RUIZ & ALEMAN** to protocolize and register the Minutes of this meeting at the Public Registry of Panama.--------------------
----There being no further business, the meeting adjourned.------------------
--(Sgd.) Edgardo E. Diaz----------------------(Sgd.) (illegible)----------
----**EDGARDO E. DIAZ**----------------------------**MARIA VALLARINO A.**----------
------President----------------------------------Secretary----------------

The foregoing is a true translation into Spanish of the attached document written in English.----------Panama, October 5th, 2011.------
(Sgd.) Carmen B. de Mon----CARMEN B. DE MON---Personal Identity Certificate No. 8-67-712--------There is a seal which reads: CARMEN B. DE MON------CERTIFIED PUBLIC TRANSLATOR - RESOLUTION NO. 172 of August 6th, 1971.-----------------------------------------------------------

Confidential

CAPLIN0024632
USPROD-02360833

----Certified as a true copy of its original which I issue, seal and sign in Panama City, Republic of Panama, on the fifth (5th) day of the month of October in the year two thousand eleven (2011).------------------------------------------------------------

This Deed has a total of two (2) pages.--------------------------------

(Sgd.) (illegible)

Attorney ROBERTO R. ROJAS C.

Ninth Notary Public

(SEAL: NINTH NOTARY OF THE CIRCUIT OF PANAMA)

---

**ENTERED AT THE PUBLIC REGISTRY OF PANAMA**

Province: **Panama**                     Date and Time: **2011/Oct/06 13:15:19:3**

Volume: **2011**                          Entry: **183447**

Presenter: **GLORIA OLMEDO** Personal identity certificate: **8-314-15**

Voucher No.: **8711153930**          Total Fees: **50.00**

Entered by: **MIDEMA**                (Sgd.) Esmeraldo Peñaloza

Chief of Entry of Documents and Quality Assurance

(SEAL) (REPUBLIC OF PANAMA - OFFICE OF PUBLIC REGISTRY)

---

**Registered in the Technological Information System of the Public Registry of Panama**

Division: Persons        Microjacket: 28656  Abbreviation No.: FIP

Redi Document No.: 2058526

Transaction performed: Minutes

Registration Fees B/: 40.00

Examination Fees B/: 10.00

Place and Date of Registration October 10th, 2011

(Sgd.) (illegible)

Chief Registrar

(SEAL OF THE PUBLIC REGISTRY OF PANAMA)

CAPLIN0024633
USPROD-02360834

## CERTIFICATE OF ACCURACY

The undersigned, **ELIZBETH Y. DEL CID** hereby certifies:

1. That she is a Certified Public Translator for the Republic of Panama of the Spanish and English languages, and is thoroughly conversant in both languages.

2. That the foregoing document is an English translation carefully made by her of Public Deed No. 8,230 of October 5th, 2011, whereby the Minutes of a Meeting held on the 30th day of September 2011 by the Foundation Council of **SUNAGE FOUNDATION** electing **the** new members of the Council and appointing the law firm **ICAZA, GONZÁLEZ-RUIZ & ALEMÁN** as new Registered Agent are protocolized.

3. That to the best of her knowledge and belief, said translation is a true and correct English version of such Public Deed No. 8,230 of October 5th, 2011.

Panama, October 14th, 2011

Elizabeth Y. Del Cid

I.D. No. 8-455-287

Elizabeth Y. Del Cid
Certified Public Translator
Resolution No. 495 of December 14th, 2004
of English-Spanish and vice-versa
Ministry of Education

Confidential

CAPLIN0024634
USPROD-02360835

## REGULATIONS
## OF SUNAGE FOUNDATION

Registered under Microjacket FIP-28656, Document 1322049, of the Public Registry of the Republic of Panama.

The Foundation Council, based on the Foundation Charter of SUNAGE FOUNDATION, hereby issues the following regulations for the foundation:

### ARTICLE 1:

During her lifetime, enjoyment of the foundation's net worth and the proceeds therefrom as stated in Annex A correspond only to:

### DELPHINE ANNE LE DAIN
born on █████, 1966, holder of the French Passport ████████

### ARTICLE 2:

Following the demise of Mrs. DELPHINE ANNE LE DAIN enjoyment of the foundation's net worth and proceeds therefrom shall correspond in equal parts to her daughters:



1. M██████████ EDELMAN, born on █████, 2002, holder of the French Passport ███████
2. J████████ EDELMAN, born on █████ 2006, holder of the French Passport █████



### ARTICLE 3:

If any of the beneficiaries designated in Article 2 dies before or during enjoyment of the foundation's net worth, such enjoyment shall correspond to her descendants (which implies legitimate straight line descendants and legally adopted descendants in any degree), in equal parts, according to lineage.

If there are no such descendants, they shall be accumulated to the net worth of the other beneficiary designated in Article 2 and in her absence to her respective descendants.

### ARTICLE 4:

A beneficiary is entitled to the delivery of the foundation's enjoyment when reaching the age of 21.

When circumstances require it, the Council may grant, according to its own criteria, amounts for the livelihood and education of those beneficiaries who have not reached the age of 21.

### ARTICLE 5:

If, following careful investigations, no beneficiary is found in accordance with articles 1-2, the foundation's existing net worth shall be devoted to such charitable institutions as the Foundation's Council shall determine. These institutions are not entitled to any information as to the source of the donations.

### ARTICLE 6:

The Council may, with the consent of Mrs. DELPHINE ANNE LE DAIN, at any time amend the regulations.

Following the demise of Mrs. DELPHINE ANNE LE DAIN, amendment of the regulations is only possible with the approval of all the beneficiaries entitled to the full enjoyment of the foundation's net worth and the proceeds therefrom.

Signed this 10th day of June, 2008.

### COUNCIL OF THE FOUNDATION

EDGARDO E. DIAZ                    MARIA VALLARINO A.

FERNANDO A. GIL









# REPUBLICA DE PANAMA
### PROVINCIA DE PANAMA

## NOTARIA QUINTA DEL CIRCUITO

## *Lic. Diomedes Edgardo Cerrud*
### NOTARIO

TELEFONOS: 223-2974
223-2979
TELEFAX: 223-2982

E-mail.: deca_gc@cwpanama.net

COPIA   Auténtica

ESCRITURA No. 7,309   de   3   de   Abril   de   2008

POR LA CUAL:   se protocoliza el Acta Fundacional de la Fundación denominada SUNAGE FOUNDATION, una fundación de interés privado.

MIGUEL MORENO
Cédula 8-634-1705
ALEMAN, CORDERO, GALINDO & LEE.

 **REPUBLICA DE PANAMA**
PAPEL NOTARIAL



**NOTARIA QUINTA DEL CIRCUITO DE PANAMA**

ESCRITURA PUBLICA NUMERO SIETE MIL TRESCIENTOS NUEVE--------------------------

-------------------------------------------(7,309)-----------------

POR LA CUAL se protocoliza el Acta Fundacional de la Fundación denominada **SUNAGE FOUNDATION**, una fundación de interés privado.--------------------------------

-----------------------------------Panamá, 3 de abril de 2008.----------------------

En la Ciudad de Panamá, Capital de la República y Cabecera del Circuito Notarial del mismo nombre, a los tres (3) días del mes de abril de dos mil ocho (2008), ante mí, Licenciado **DIOMEDES EDGARDO CERRUD**, Notario Público Quinto del Circuito de Panamá, portador de la cédula de identidad personal número ocho-ciento setenta y uno-trescientos uno (8-171-301), comparecieron personalmente los señores **ANDRES MAXIMINO SANCHEZ**, varón, mayor de edad, panameño, ejecutivo, casado, vecino de esta ciudad, con cédula de identidad personal número dos-ciento veintiséis-seiscientos cincuenta y seis (2-126-656), y **MYRNA DE NAVARRO**, mujer, mayor de edad, panameña, ejecutiva, viuda, vecina de esta ciudad, con cédula de identidad personal número ocho-noventa y seis-seiscientos sesenta y nueve (8-96-669), actuando en nombre y representación de **ALCOGAL CORPORATE SERVICES S.A.**, sociedad anónima constituida bajo las leyes de la República de Panamá mediante Escritura Pública número cuatro mil trescientos noventa y cinco (4,395) de veintisiete (27) de abril de dos mil (2000), de la Notaría Pública Quinta del Circuito de Panamá, inscrita a ficha tres siete ocho siete ocho siete (378787), documento uno cero dos cero cinco cuatro (102054) de la Sección Mercantil del Registro Público, personas a quienes doy fe que conozco y me entregaron para su protocolización, y al efecto protocolizo, Acta Fundacional de **SUNAGE FOUNDATION** debidamente firmada por los comparecientes, el cual se encuentra escrito en español con su correspondiente texto en idioma inglés.------------------------------------------------------------------------------------

-----Dicho documento consta de catorce (14) hojas escritas a máquina y su contenido se transcribe en la copia de esta escritura.-----------------------------------------------

-----Queda hecha la protocolización solicitada y se expedirán las copias que soliciten los interesados.-----------------------------------------------------------------------------

-----El suscrito Notario hace constar que la minuta de esta escritura pública ha sido confeccionada en base a minuta presentada por **ANIBAL GALINDO NAVARRO**, con cédula de identidad personal número ocho-doscientos cuarenta-ciento noventa (8-240-190), de la firma



Confidential

Ex.004-5.0142

CAPLIN0024638
USPROD-02360839



de abogados ALEMAN, CORDERO, GALINDO & LEE.----------------------------------

----El Notario advierte que una copia de esta escritura debe ser inscrita y leída como les fue a los

comparecientes en presencia de los testigos instrumentales los señores  **MAYLA CASTRELLON**

**DE BOCANEGRA**, con cédula de identidad personal número cinco-doce-mil cuatrocientos

sesenta y seis (5-12-1466) y **LUIS MORALES**, portador de la cédula de identidad personal número

cuatro-ciento cuarenta y cuatro- ochocientos veintidós (4-144-822), ambos mayores de edad,

panameños y vecinos de esta ciudad, a quienes conozco y son hábiles para ejercer el cargo, la

encontraron conforme, le impartieron su aprobación y firman todas para constancia por ante mí

el Notario que doy fe.----------------------------------------------------------------

-----Esta escritura lleva el número SIETE MIL TRESCIENTOS NUEVE--------------------------

-------------------------------------(7,309)-------------------------------

----(Firmado)  **ANDRES MAXIMINO SANCHEZ**-------**MYRNA DE NAVARRO**-------**MAYLA**

**CASTRELLON DE BOCANEGRA**----**LUIS MORALES**-------**DIOMEDES EDGARDO CERRUD,**

Notario Público Quinto del Circuito de Panamá.-------------------------------------

==========================================================================

------------------------------ACTA FUNDACIONAL-----------------------------

------------------------------------DE-------------------------------------

------------------------- SUNAGE FOUNDATION--------------------------------

-------------------------Una fundación de interés privado-------------------

----------------------Otorgada de acuerdo con la Ley de Fundaciones de Interés-----------

----------------------------Privado de la República de Panamá---------------

-----La suscrita ALCOGAL CORPORATE SERVICES S.A., debidamente representada por sus

Directores, ANDRES MAXIMINO SANCHEZ y MYRNA DE NAVARRO, y actuando como sociedad

fundadora de conformidad con la Ley 25 de 1995, por el presente documento constituyen una

Fundación de Interés Privado como persona jurídica bajo las leyes de la República de Panamá,

con las siguientes características:----------------------------------------------------

----PRIMERO: NOMBRE: La denominación de la fundación será: **SUNAGE FOUNDATION** (en

adelante "la fundación").---------------------------------------------------------

----SEGUNDO: PATRIMONIO INICIAL. El patrimonio inicial de la fundación es de US$10,000.00

(diez mil dólares, moneda de curso legal de los Estados Unidos de América). El patrimonio inicial

CAPLIN0024639
USPROD-02360840



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



NOTARIA QUINTA DEL CIRCUITO DE PANAMA

de la fundación puede ser incrementado en cualquier momento por el fundador, el Consejo de la Fundación o por cualquier otra tercera persona.

—TERCERO: EL CONSEJO DE LA FUNDACION.

—a. El Consejo de la Fundación es su órgano supremo.

—b. El consejo podrá estar formado por personas naturales y/o jurídicas.

—c. Los miembros del Consejo de la Fundación son nombrados inicialmente por el fundador. La elección de reemplazo de un miembro del Consejo por renuncia, incapacidad o muerte, sea titular o suplente requerirá la mayoría simple de los votos de los miembros restantes del Consejo. Si no existiera ningún miembro más del Consejo, o los miembros restantes estuvieran incapacitados, el derecho de designación de nuevos miembros del Consejo le corresponderá al agente residente de la Fundación. El ejercicio del cargo del Consejo de la Fundación no está limitado a un período fijo de tiempo.

—d. El fundador se reserva el derecho de remover a los miembros del Consejo de Fundación en cualquier momento, lo mismo que designar o adicionar nuevos miembros.

—e. El Consejo de la Fundación está encargado de la gestión, y de la representación, en forma ilimitada, de la Fundación ante terceras personas, especialmente ante las autoridades judiciales y administrativas del país y del extranjero.

—f. El Consejo de la Fundación podrá traspasar a uno o varios de sus miembros o a una tercera persona sus poderes para emitir el reglamento, lo mismo que la administración y representación de la Fundación para actos específicos, fijando, al hacerlo, el derecho a firmar y comprometer a la Fundación.

—g. Los miembros del Consejo están autorizados para ejercer poderes signatarios, y los Consejeros que firmen por la Fundación no tendrán que justificar ante terceros su derecho para ordenar y disponer; sin embargo, deberán atenerse siempre a un acuerdo válido del Consejo. Inicialmente el fundador, podrá determinar el modo y el derecho a firmar y comprometer a la Fundación. Posteriormente, el Consejo tendrá dichas facultades.

—h. Si el Consejo está compuesto por más de un miembro, se constituirá por sí mismo y podrá elegir un Presidente, un Vicepresidente, un Secretario y cualquier otro dignatario. Sus acuerdos serán válidos si todos los miembros han sido debidamente citados y la mayoría de ellos está presente. Los acuerdos del Consejo se tomarán con la mayoría simple de los miembros presentes.

CAPLIN0024640
USPROD-02360841



En caso de igualdad de votos, decide el del presidente.------------------------

---i.   Si el Consejo estuviera compuesto de dos miembros, sus acuerdos requerirán la unanimidad.-----------------------------------------------------

---j.   Si el Consejo estuviera compuesto de un sólo miembro, éste acuerda y decide por sí sólo.---

---k.   Los acuerdos del Consejo se incorporarán a un acta y ésta será firmada por todos los miembros presentes.

---l.   El Consejo se reunirá por invitación de su presidente, en la sede de la Fundación o en otro lugar designado por el Consejo.-------------------------------------

---m.   Los acuerdos del Consejo podrán tomarse también por medio de circular, pero en este caso requerirán la unanimidad.-------------------------------------

---n.   El Consejo de la Fundación no tendrá que rendir cuentas anuales de su gestión.   No obstante la rendición de cuentas y sus períodos podrán pactarse en el reglamento.-------------

---o. LOS MIEMBROS INICIALES DEL CONSEJO DE LA FUNDACIÓN Y SUS DIRECCIONES SON:------------------------------

---Presidente---EDGARDO E.  DIAZ, con domicilio en Calle 53 Este, Urbanización Marbella, Torre Swiss Bank, Piso 2, Panamá, República de Panamá.--------------------

---Secretaria---MARIA VALLARINO A., con domicilio en Calle 53 Este, Urbanización Marbella, Torre Swiss Bank, Piso 2, Panamá, República de Panamá.--------------------

---Tesorero---FERNANDO A. GIL, con domicilio en Calle 53 Este, Urbanización Marbella, Torre Swiss Bank, Piso 2, Panamá, República de Panamá.--------------------

----CUARTO: DOMICILIO.  El domicilio de la Fundación es Calle 53 Este, Urbanización Marbella, Torre Swiss Bank, Piso 2, Panamá, República de Panamá.  Mediante acuerdo del Consejo de la Fundación, el domicilio de la Fundación se podrá trasladar en cualquier momento a otro lugar en Panamá o del extranjero.   Todas las relaciones jurídicas derivadas por la constitución y existencia de la Fundación estarán sujetas al derecho vigente en su lugar de domicilio.  La Fundación tiene su foro jurídico competente ante los tribunales pertinentes del lugar de su domicilio.  En caso de traslado del domicilio a otro lugar, la Fundación continuará sometida a las disposiciones de la Ley de Fundaciones de Interés Privado de la República de Panamá, en la medida en que en el nuevo domicilio no existan disposiciones obligatorias contrarias que hagan necesaria una modificación.-----------------------

CAPLIN0024641
USPROD-02360842



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



NOTARIA QUINTA DEL CIRCUITO DE PANAMA



-----QUINTO: AGENTE RESIDENTE. El agente residente de la Fundación en la República de Panamá es la firma forense ALEMAN, CORDERO, GALINDO & LEE, con oficinas en Calle 53 Este, Urbanización Marbella, Torre Swiss Bank, Piso 2, Panamá, República de Panamá.-----

-----SEXTO: FINES. El fin de la fundación consiste en sufragar los gastos de educación, formación, equipamiento, ayuda, así como el mantenimiento en general u otros fines similares de uno o varios miembros de una o varias familias determinadas en el reglamento. En adición a los miembros de una o varias familias, la fundación podrá beneficiar a otras personas naturales o jurídicas o instituciones de cualquier naturaleza y tomar las previsiones necesarias para la ordenada sucesión de su patrimonio. Para lograr sus fines, la fundación está autorizada para preservar, administrar e invertir los bienes de la fundación, que podrán ser de cualquier clase, particularmente bienes inmuebles y participaciones en otras entidades, y para llevar a cabo todas las transacciones legales y de negocios que sean conducentes a la prosecución y realización de dichos fines.-----

---SEPTIMO: BENEFICIARIOS.-----

---a. El fundador, al momento de constituir la Fundación, o en su defecto, posteriormente, el Consejo de la Fundación podrán crear un documento privado denominado "reglamento" donde se designarán y se determinará todo lo referente a los beneficiarios. El Consejo destinará el patrimonio y el producto de la Fundación, total o parcialmente, a uno o a otro de los beneficiarios, o a varios de ellos de acuerdo a lo establecido en el reglamento.-----

---b. El reparto al o a los beneficiarios señalados, como también el momento y la cuantía de éste, quedará sujeto a lo establecido en el reglamento.-----

---c. Queda expresamente aclarado que los beneficiarios no son dueños, ni son acreedores de la Fundación, de modo que no podrán hacer valer ante ésta más derechos que aquellos previstos en el acta fundacional, el reglamento y/o los acuerdos del Consejo.-----

---OCTAVO: ENMIENDAS AL ACTA FUNDACIONAL. El Consejo de la Fundación, mediante acuerdo unánime, está autorizado para modificar estos estatutos.-----

---NOVENO: DURACION.-----

---a. La Fundación es de duración ilimitada y sólo podrá ser disuelta mediante un acuerdo unánime del Consejo y existiendo motivos importantes, como en el caso de haberse cumplido el objetivo de la Fundación, o imposibilidad de cumplir este objetivo o en los otros casos previstos

CAPLIN0024642
USPROD-02360843

en la Ley.----------------------------------------------------------

---DECIMO: DISOLUCIÓN Y LIQUIDACIÓN.----------------------------------------

---a. El Consejo decide la disolución de la Fundación, dentro de lo dispuesto por estos estatutos y el reglamento. El Consejo está autorizado a nombrar una o más liquidadores si lo considera necesario.----

---b. En caso de disolución de la Fundación, y después de haber pagado todas las deudas u obligaciones de la misma, la liquidación procederá de acuerdo a las provisiones sobre los beneficiarios establecidas en el reglamento. En caso de que no hubiese beneficiarios, el Consejo de la Fundación deberá resolver el destino final de los bienes de la Fundación. El acuerdo de disolución del Consejo, deberá ser debidamente inscrito en el Registro Público de la República de Panamá.----

---DECIMO PRIMERO: ORGANOS DE LA FUNDACION. Los órganos de la Fundación son:----

---a. El Consejo de la Fundación, y----------------------------------

---b. La entidad de fiscalización que fuera del caso.----------------------

---DECIMO SEGUNDO: AUDITORIA. El Consejo de la Fundación podrá designar en cualquier momento a una o varias personas como auditores de la Fundación.----

---DECIMO TERCERO: EL BENEFICIO.----------------------------------------

---a. No se extenderá certificados o documentos sobre el derecho a beneficio de la Fundación.----

---b. Los beneficios y todo reparto del patrimonio o del producto de la renta de la Fundación no podrán ser objeto de ningún tipo de medida precautoria, secuestro o embargo, a menos que sea por deudas de la Fundación.----

---c. El traspaso del derecho a recibir beneficios de la Fundación ya sean presentes o futuros es nulo. El derecho al beneficio de la Fundación tampoco podrá ser dado en garantía de ninguna clase, ya sean prendarias, hipotecarias o de cualquier otra índole. Cualquier beneficiario que intentara traspasar su beneficio, lo perderá.----

---DECIMO CUARTO: EL REGLAMENTO. El fundador, al momento de crear la Fundación, o posteriormente, el Consejo de Fundación, están facultados para emitir el reglamento de la Fundación según lo establecido en el Art. 7.----

---DECIMO QUINTO: NOTIFICACIONES: Las notificaciones dispuestas por la ley se harán en cualquier diario de amplia circulación en Panamá.----

Confidential

Ex.004-5.0147

CAPLIN0024643
USPROD-02360844



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



NOTARIA QUINTA DEL CIRCUITO DE PANAMA



---DECIMO SEXTO: CUENTA ANUAL. El Consejo de la Fundación decidirá a su propio criterio sobre la necesidad o no de la rendición de informes anuales.----------------

---DECIMO SEPTIMO: REPRESENTANTE LEGAL. El representante legal será el Presidente, por su falta, el Vice-Presidente o el Secretario y por falta de ellos, el Tesorero o la persona natural o jurídica que respectivamente haga sus funciones, aún si no tuviese dichos títulos. El representante legal podrá ser sustituido por el Consejo de la Fundación.--------------

----DECIMO OCTAVO: OBLIGACIONES ANTE TERCEROS. Al menos que el Consejo de Fundación esté compuesto por una persona jurídica, la firma conjunta de cualesquiera dos (2) de los miembros del Consejo de la Fundación con respecto a cualquier acto, transacción o negocio de la Fundación, obligará a la misma.--------

----DECIMO NOVENO: ARBITRAJE. Los conflictos de cualquier índole, resultante de la situación fundacional serán resueltos por un tribunal de arbitraje, compuesto por tres personas. Las decisiones de este tribunal son inapelables. Cada una de las partes litigantes elegirá un árbitro y entre estos dos, a un tercer árbitro. Los árbitros decidirán conjuntamente la jurisdicción o reglas de procedimiento bajo las cuales se van a regir para llevar a cabo su trabajo. En caso de que no se pongan de acuerdo en el plazo de treinta (30) días sobre la escogencia del tercer Arbitro, o acerca de las reglas de procedimiento bajo las cuales se van a regir se aplicarán las reglas de la INTERNATIONAL CHAMBER OF COMMERCE (I.C.C.) quien deberá nombrar el tercer árbitro a solicitud de una de las partes litigantes. El tribunal de arbitraje, una vez establecido, también tiene competencia para resolver otros conflictos de las mismas partes litigantes, resultantes de la situación fundacional, mientras esté pendiente el litigio original ante dicho tribunal. La decisión del tribunal de arbitraje es definitiva y obligatoria. El tribunal de arbitraje determinará las costas del proceso.--------

---VIGESIMO: INTERPRETACION DEL ACTA FUNDACIONAL Y EL REGLAMENTO. El acta fundacional y el reglamento tiene que ser interpretados según su concepto y objeto. En caso de duda la interpretación se sujeta a la manifiesta intención del fundador, considerando el desarrollo que haya tenido la Fundación hasta el momento de la duda. Por ser necesario de acuerdo a las leyes de la República de Panamá utilizar el idioma español, el acta fundacional podrá ser simultáneamente redactada en diferentes idiomas. En caso de duda rige el texto en el idioma que establezca el reglamento.------------

CAPLIN0024644
USPROD-02360845



---VIGÉSIMO PRIMERO: PROTECTOR - ASESOR PROFESIONAL - AUDITORES. El Consejo de la Fundación podrá nombrar personas naturales o jurídicas, que pudieran ser llamados protector, asesores profesionales, órgano de fiscalización, agentes, auditor u otros nombres similares y que podrá ejercer, cualesquiera de las siguientes atribuciones:---------------------------------------

---a. Velar por el cumplimiento de los fines de la Fundación y por los derechos intereses de los beneficiarios;-------------------------------------------------------------

---b. Exigir rendición de cuentas al Consejo de la Fundación;-------------------------------

---c. Modificar los fines u objetivos de la Fundación, cuando éstos resultasen de imposible o gravosa realización;--------------------------------------------------

---d. Designar nuevos miembros del Consejo de la Fundación por ausencia temporal, definitiva o extinción del período para el cual fueron designados;-----------------------------

---e. Nombrar nuevos miembros del Consejo de la Fundación, en reemplazo de los existentes en casos de ausencia temporal o accidental; y aumentar o reducir el número de los miembros del Consejo de la Fundación;----------------------------------------------

---f. Refrendar los actos adoptados por el Consejo de la Fundación indicados en el acta fundacional o su reglamento;---------------------------------------

---g. Supervisar el manejo de los bienes de la Fundación y velar por la aplicación de estos a los usos y finalidades enunciadas en el acta fundacional.----------------------

---h. Cualquier otra función que se considere conveniente.-----------------------

---VIGÉSIMO SEGUNDO: CAMBIO DE JURISDICCION. Cuando el Consejo de la Fundación o el Protector, si lo hubiere, lo consideren necesario, podrán a su entera y absoluta discreción transferir la Fundación a la jurisdicción de otro país.-----------------------

---VIGÉSIMO TERCERO: La Fundación podrá, si lo considera conveniente, adoptar su propio sello fundacional.-------------------------------------------------

---El presente documento es emitido por ALCOGAL CORPORATE SERVICES S.A. en la Ciudad de Panamá, República de Panamá, a los tres (3) días del mes de abril del año dos mil ocho (2008).-----------------------------------------------------

Por: ALCOGAL CORPORATE SERVICES S.A.-----------------------------------

(Firmado) Andrés M. Sánchez-----------------(Firmado) Myrna de Navarro----------

---ANDRES M. SANCHEZ--------------------------MYRNA DE NAVARRO----------

CAPLIN0024645
USPROD-02360846



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



NOTARIA QUINTA DEL CIRCUITO DE PANAMA

-------------------------Director----------------------------------Directora----------------

Por: ALEMAN, CORDERO, GALINDO & LEE----------------------------

------------(Firmado) Ilegible--------------------------------------

--ANIBAL GALINDO NAVARRO-----------------------------------------

= == == == == == == == == == == == == == == == == == == == == == == ==

------------------Foundation Charter of SUNAGE FOUNDATION--------------

--------------------a Private Interest Foundation----------------------

-------------Granted in conformity with the Law of Foundations of Private Interest-----------

---------------------of the Republic of Panama---------------------

--The undersigned, ALCOCAL CORPORATE SERVICES S.A., duly represented by its Directors ANDRES MAXIMINO SANCHEZ and MYRNA DE NAVARRO, acting as Founder according to law 25 of 1995, hereby constitutes a Foundation of Private Interest as a juridical person under the Laws of the Republic of Panama, as follows:------------------

----FIRST: NAME: The denomination of the Foundation is: **SUNAGE FOUNDATION** (hereinafter "the foundation").----------------------

--SECOND: THE INITIAL FOUNDATION CAPITAL. The initial foundation capital will be US$ 10,000.00 (Ten Thousand United States dollars). The foundation capital may at any time be increased by the founder, the Foundation Council, or any other third party.----------------

---THIRD: THE FOUNDATION COUNCIL (BOARD)------------------------

---a. The Foundation Council is the supreme body of the foundation.-----------------

--b. The Foundation Council may consist of natural and/or juridical persons.-----------------

---c. The Foundation Council is appointed initially by the founder. In the case of resignation, incapacity or demise of any member of the Foundation Council, be they title holders or alternates, a simple majority of the remaining members may elect a substitute. If there are no further members of the Foundation Council, or if the remaining members are incapable of acting, the resident agent shall be entitled to appoint new Foundation Council members. The tenure of office of the Foundation Council is unlimited.--------------------

---d. The founder shall reserve the right to remove the members of the Foundation Council, at any time, as well as to appoint or add new members.------------------

--e. The Foundation Council is responsible for the management and representation of the

CAPLIN0024646
USPROD-02360847

Ex.004-5.0150



foundation without restriction vis-a-vis third parties, and in relation to all national or foreign judicial or governmental authorities.-----------------------------------------------------------------

---f.  The Foundation Council is entitled to delegate its powers regarding issuance of the regulations, and to assign its responsibility for the administration and representation of the foundation for special affairs  to one or several members of the council or to a third party, including to arrange for the signatory powers.--------------------------------------------------------

---g.  The members of the Foundation Council are authorized to exercise signatory powers on behalf of the foundation, and are not obliged to respond to third parties as to their competence in giving instructions and making arrangements; however, they always have to act within the authority of a valid resolution of the Foundation Council. The right and the form of signature to bind the foundation vis-a-vis third parties may be established initially by the founder and then by the Foundation Council.----------------------------------------------------------------------

---h.  If the Foundation Council is comprised of more than one member, it shall constitute itself, elect its President, a Vice-President, a Secretary and any other officer.  The Foundation Council's resolutions are valid when all members have been duly summoned and when the majority of them are present.  The resolutions of the Foundation Council are passed with a simple majority of the members present.  In the case of parity of votes, the President has the deciding vote.------------

---i.  Should the Foundation Council be compromised by two members, their resolutions shall require unanimity.--------------------------------------------------------------------------------

---j.  Should the Foundation Council be comprised of only one member, such member alone shall pass resolutions and make decisions.---------------------------------------------------------------

---k.  Resolutions of the Foundation Council have to be written  and the minutes must be signed by all members present.-------------------------------------------------------------------------

---l.  The Foundation Council meets upon the invitation of the President at the domicile of the foundation, or at such other place as may be designated by the Foundation Council.------------------

---m.  Resolutions of the Foundation Council may also be taken by means of a circular letter, although in this case a unanimous vote will be required.-------------------------------------------

---n.  The Foundation Council is not required to present annual accounts of its administration. Nevertheless, such periodic accounts may be agreed upon in the regulations.----------------------

---o. THE INITIAL MEMBERS OF THE FOUNDATION COUNCIL AND THEIR ADDRESSES ARE:---



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



POSTALIA 440.767

NOTARIA QUINTA DEL CIRCUITO DE PANAMA

---President: EDGARDO E. DIAZ with business address at 53rd East Street Marbella, Swiss Bank Building, 2nd floor, Panama, Republic of Panama.---

---Secretary: MARIA VALLARINO A. with business address at 53rd East Street Marbella, Swiss Bank Building, 2nd floor, Panama, Republic of Panama.---

---Treasurer: FERNANDO A. GIL, with business address at 53rd East Street Marbella, Swiss Bank Building, 2nd floor, Panama, Republic of Panama.---

---FOURTH: DOMICILE: The domicile of the foundation is at East 53rd Street, Marbella, Swiss Bank Building, 2nd Floor, Panama, Republic of Panama. By a resolution of the Foundation Council the domicile of the foundation may at any time be transferred to another place in Panama or abroad. All legal relationships arising from the constitution and existence of the foundation are subject to the law in force at the domicile of the foundation. The competent court of jurisdiction for the foundation are the ones of its domicile. In the event of the foundation's domicile being transferred, the provisions of the law on foundations of private interest of the Republic of Panama shall remain applicable to the foundation insofar as compelling provisions at the foundations new domicile do not demand otherwise.---

---FIFTH: RESIDENT AGENT: The resident agent of the foundation in the Republic of Panama is the law firm of ALEMAN, CORDERO, GALINDO & LEE, with offices at East 53rd Street, Marbella, Swiss Bank Building, 2nd Floor, Panama, Republic of Panama.---

---SIXTH: PURPOSE OR OBJECT. The purpose of the foundation is to contribute to the cost of upbringing, education, aid as well as general maintenance or other similar aims of one or more members of one or several families as established in the regulations. In addition to the members of one or several families the foundation may benefit other natural or juridical persons including institutions of any kind and it may take the necessary provisions for the orderly disposition or succession of its patrimony. To achieve its objects the foundation is authorized to preserve, administer and invest in an appropriate manner the foundation's assets, being these assets of any kind, including real estate and participations in other entities and to conclude all business and legal transactions serving the pursuit and the realization of such objects.---

---SEVENTH: BENEFICIARIES.---

---a. The founder, at the time of creating the foundation, or in his absence, subsequently the Foundation Council, may create a private document, known as the regulations, whereby they can

Confidential

Ex.004-5.0152

CAPLIN0024648
USPROD-02360849



designate the beneficiaries or everything else that relates to them.  The Foundation Council shall distribute the patrimony and revenue of the foundation, in full or in part to one or several beneficiaries according to the provisions of the regulations.------------------------------

---b.  Distributions to one or several of the beneficiaries  designated, as well as the timing and extent of such distributions, are subject to the dispositions established in the regulations.-------------

---c.   it is expressly stipulated that beneficiaries are neither owners nor creditors of the foundation, and thus may not with validity bring any claim before the foundation other than those founded in the terms of the foundation charter, the regulations and/or the resolutions passed by the Foundation Council.-------------------------------------------

---EIGHTH: AMENDMENT OF THE CHARTER. The Foundation Council, by unanimous consent, is entitled to amend these statutes.------------------------------

---NINTH: DURATION.-----------------------

---a.  The period of duration of the foundation is not limited, and the foundation may only be dissolved by unanimous resolution of the Foundation Council and in the presence of compelling reasons, such as the accomplishment of the purposes of the foundation, the impossibility of the accomplishment of the foundations purposes or any other reason established in the law.--------------

---TENTH: DISSOLUTION AND LIQUIDATION -----------------------------

---a. Any resolution as to the liquidation of the foundation shall be taken by the Foundation Council subject to the terms of these statutes or of the regulations.  The Foundation Council is authorized to appoint one or more liquidators if it shall be necessary.-------------------------------

---b. In the event of dissolution of the foundation, and after the payment of any and all debts and obligations, liquidation shall proceed according to the provisions in favor of the beneficiaries established in the regulations. In case there are no beneficiaries, the Foundation Council shall resolve the final destination of the assets of the foundation.  The resolution of dissolution by the Foundation Council shall be registered at Panama's Public Registry.----------------------------

---ELEVENTH: BODIES OF THE FOUNDATION.---------------------------

---The bodies of the foundation are:  ----------------------------------------

---a. The Foundation Council (or board), and --------------------------------------

---b. The possible supervisory body.--------------------------------------------

---TWELFTH:  AUDITORS.   The Foundation Council may at any time appoint one or several

Confidential

Ex.004-5.0153

CAPLIN0024649
USPROD-02360850



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



**NOTARIA QUINTA DEL CIRCUITO DE PANAMA**

persons as auditors of the foundation.------------------------------------------------

---THIRTEENTH: THE BENEFIT.------------------------------------------------

---a. No certificate or legal document shall be issued with respect to the beneficial rights of the foundation.------------------------------------------------

---b. Benefits and all distributions from foundation assets or foundation revenues are excluded from any precautory measure, embargo or attachment, except for obligations directly incurred by the foundation.------------------------------------------------

---c. The assignment of an existing or reversionary beneficial right is null and void and may not, moreover, be given under any type of lien, charge, transfer or bill of sale. Any beneficiary who attempts to transfer his benefit shall forfeit the same.------------------------------------------------

---FOURTEENTH: REGULATIONS. The founder, at the time of creating the foundation, or subsequently the Foundation Council, is authorized to issue the regulations as stipulated in Article 7.------------------------------------------------

----FIFTEENTH: ANNOUNCEMENTS. Such announcements as are required by law shall be made in any daily Panamanian newspaper of ample circulation.------------------------------------------------

---SIXTEENTH: ANNUAL ACCOUNTS. The Foundation Council will decide at its own discretion about the need to have annual accounts.------------------------------------------------

---SEVENTEENTH: LEGAL REPRESENTATIVE. The legal representative will be the President, in his absence the Vice-President or the Secretary, and in their absence the Treasurer or the natural or juridical person which respectively occupies any of those positions, even if it does so without such titles. The legal representative may be substituted by the Foundation Council.------------------------------------------------

---EIGHTEENTH: RIGHT OF SIGNATURE TO BIND THE FOUNDATION. Unless the Foundation Council is composed of a juridical person, the joint signature of any two members of the Foundation Council in respect of any act, transaction or business of the foundation, shall be binding on the same.------------------------------------------------

---NINETEENTH: ARBITRATION. Any type of conflict which may arise under the foundation charter must be resolved by a court of arbitration comprised of up to three people. The awards of the arbitration court cannot be appealed. Each one of the litigating parties must choose an arbitrator, and between the two of them a third arbitrator shall be chosen. The arbitrators will jointly decide the jurisdiction or rules of procedure that will govern their office. If an agreement

Confidential

CAPLIN0024650
USPROD-02360851



can not be reached within thirty days as to the third arbitrator or the rules of procedure which will be used, the regulations of the INTERNATIONAL CHAMBER OF COMMERCE (I.C.C.) will apply and they in turn will assign the third arbitrator upon request of one of the litigating parties. Once the court of arbitration is established it can also resolve other conflicts between the litigating parties arising out of the foundation charter, as long as the original hearing is still in process before said court. The court of arbitration's decision is final. The court of arbitration will determine the expenses of the procedure.-------------------

---TWENTIETH: INTERPRETATION OF THE FOUNDATION CHARTER AND ITS REGULATIONS. The foundation charter and its regulations have to be interpreted according to their concept and objective. In case of doubt, the interpretation shall be subject to the manifest intention of the founder, considering the development of events up to the moment of doubt. As it is necessary by law to use the Spanish language in the Republic of Panama, the foundation charter might be simultaneously drafted in different languages. In case of doubt, the text indicated in the regulations shall prevail.-------------------

---TWENTY FIRST: PROTECTOR - PROFESSIONAL ADVISOR - AUDITORS. The Foundation Council may appoint natural or juridical persons, which can be called protector, professional advisors, supervisory body, auditors or any similar names, and which could have, any of the following powers:-------------------

---a. To ensure the compliance by the Foundation Council with the purposes of the foundation and to safeguard the rights and interests of the beneficiaries.-------------------

---b. To require the Foundation Council to render accounts.-------------------

---c. To modify the objects and purposes of the foundation when compliance is impossible or too burdensome.-------------------

---d. To appoint new members of the Foundation Council by reason of their temporary or permanent absence or expiration of the period for which they were appointed.-------------------

---e. To appoint new members of the Foundation Council in replacement of existing members in the event of temporary or accidental absence, and to add or reduce the number of members of the Foundation Council.-------------------

--f. To approve the acts done by the Foundation Council pursuant to the foundation charter or its regulations.-------------------

Confidential

Ex.004-5.0155

CAPLIN0024651
USPROD-02360852



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL



**NOTARIA QUINTA DEL CIRCUITO DE PANAMA**

---g. To supervise the management of the foundations assets and to control the application thereof to the objects or purposes established in the foundation charter.-----------------------

---h. Any other function that may be deemed convenient.-------------------------------------

---TWENTY SECOND: CHANGE OF GOVERNING LAW. When the Foundation Council or the protector, if there is any, at their sole and absolute discretion consider it necessary, they can transfer the foundation to the jurisdiction of another country.------------------------------------

---TWENTY THIRD: The foundation can, if it so deems convenient, have its own foundation seal.------------------------------------------------------------------------------------------

--The present document is issued by the Founders in the City of Panama, Republic of Panama, on the third (3ᵗʰ) day of the month of April of the year two thousand eight (2008).----------------

--For: ALCOGAL CORPORATE SERVICES S.A.-----------------------------------------------------

--(Sgd.) Andres M. Sanchez--------------------------(Sgd.) Myrna de Navarro------------------

ANDRES M. SANCHEZ--------------------------------MYRNA DE NAVARRO------------------------

---Director--------------------------------------------Director------------------------------

----For and on behalf of ALEMAN, CORDERO, GALINDO & LEE---------------------------------

----------(Signed) Illegible-----------------------------------------------------------------

-----ANIBAL GALINDO NAVARRO--------------------------------------------------------------

----Concuerda con su original esta copia que expido, sello y firmo en la Ciudad de Panamá, República de Panamá, a los tres (3) días del mes de abril de dos mil ocho (2008).----------------



Confidential

Ex.004-5.0156

CAPLIN0024652
USPROD-02360853



**Ingresado en el Registro Público de Panamá**

| | |
|---|---|
| Provincia: **Panamá** | Fecha y Hora: **2008/04/04  14:56:51:4** |
| Tomo: **2008** | Asiento: **61283** |
| Presentante: **MIGUEL MORENO** | Cedula: **8-530-1705** |
| Liquidación No.: **7008420951** | Total Derechos: **80.00** |
| Ingresado Por: **MASO2** | |

*Esmeralda Vázquez*

Inscrito en el Sistema Tecnológico de Información
del Registro Público de Panamá

Sección de Mercantil    Ficha No. 28656   Sigla No. FIP

Documento Real No. 1322049

Operación Realizada Fundación

Derechos de Registro B/. 50 -

Derecho de Certificado B/. 0 -

Panamá, 7 de Abril de 2008

*Daniel S. Fonseca*
Registrador Jefe

Yo, LIC. RAÚL IVÁN CASTILLO SANJUR, Notario
Público Tercero del Circuito de Panamá, con Cédula
No. 4-157-725.

CERTIFICA:

Que ha cotejado detenida y minuciosamente esta
copia fotostática con su original y la ha encontrado
en un todo conforme.

Panamá, ___ 1 2 JUL 2013

Testigos           Testigos

LIC. RAÚL IVÁN CASTILLO SANJUR
Notario Público Tercero

28676   12 02

1322049

=010.00=
REPÚBLICA de PANAMÁ * TIMBRE NACIONAL *
0766
1829

CAPLIN0024653
USPROD-02360854

APOSTILLE
Convention de la haye du 5 octobre 1961
1 Pais PANAMA
El presente documento público
2 ha sido firmado por
3 quien actua en calidad
4 y esta revestido del sello/timbre de

CERTIFICADO

5 EN Panamá                6 el día        1 2 JUL 2013
7 por DIRECCION ADMINISTRATIVA
8 Bajo el número          38.609
9 Sello/timbre    10 Firma



Esta Autorización no
implica responsabilidad
en cuanto al contenido
del documento

Confidential

CAPLIN0024654
USPROD-02360855

STRICTLY PRIVATE AND CONFIDENTIAL

**SUNAGE FOUNDATION**

**CORPORATE STRUCTURE AND ACTIVITIES**

Introduction

Sunage Foundation was established in June 2008 as a private interest foundation Mrs Delphine Edelman for the purpose of controlling various worldwide trading activities and to provide the funds for investment in new ventures, some in partnership with others non-connected parties.

A copy of the founding document and articles is attached in Appendix 1.

The company has a number of trading subsidiaries, details of which are set out in the corporate structure summary (Appendix 2)

At the present time, the two most important companies in the group are Bartol Limited ("Bartol") and Aspen Wind Corporation ("AWC"), both of which are wholly owned and controlled by the Foundation. Bartol is incorporated and registered in British Virgin Islands and AWC is incorporated and registered in Belize. There is an agreement between the Foundation and these two companies allowing the mutual transfer of funds through an inter company loan account.

The main source of income of the Foundation is currently derived from Bartol's interest in Red Star Enterprises Limited (see further information set out below).

Relationship with Julius Baer International Limited

The main purposes of the relationship with Julius Baer are as follows:

1.  To receive income (primarily by way of distributions/dividends) from interests in the various trading activities of the Foundation.

2.  To make payments (mainly investments) in existing and new ventures which the companies either own or in which they have a significant investment.

3.  To make payments (by way of distributions) to Mr and Mrs Edelman and their family.

All banking transactions of the Foundation are currently carried on through the accounts held with Julius Baer. Other companies within the group have banking arrangements with other institutions depending upon their location and requirements.

CAPLIN0024655
USPROD-02360856

STRICTLY PRIVATE AND CONFIDENTIAL

<u>Trading Activities</u>

<u>Bartol</u>

Until 1 January 2006, the main activity of Bartol was the sale and distribution of aviation jet fuel and other fuels (under contract arrangements with the US Defense Department) to Afghanistan and other countries in the region. With effect from 1 January 2006, the business and assets of Bartol Limited were transferred to Red Star Enterprises Limited ("Red Star"), a company also incorporated in Gibraltar.

Since 1 January 2006, Bartol's main income has been derived from distributions (dividends) made from the profits of Red Star. At present, regular dividend distributions are made from Red Star to Bartol based on the profits available for distribution after taking account of the cash flow requirements of Red Star. The financial statements of Red Star are fully audited and the company maintains lines of credit in excess of USD 175 million via BNP Paribas, Macquarie and Fortis Banks.

Since September 2007, Mina Corp Limited ("Mina Corp Gibraltar"), a company incorporated in Gibraltar has been trading in the same business as Red Star, although no distributions have yet been made from this company.

AWC also holds an investment share portfolio that is currently valued in excess of USD 3 million.

<u>Aspen Wind Corporation</u>

The main activity of AWC is to invest in other trading activities using the profits generated from the core business currently carried on by Red Star and Mina Corp Gibraltar.

These activities currently comprise:

1.  Afghan America Advertising, in which DE has a 50% interest.

2.  Neda Telecommunications – in which AWC has a 40% interest.

3.  Other smaller activities under the "Neda" name operating in Afghanistan in which AWC has varying levels of control.

4.  Various operations in Africa (which has involved investments of over USD 2 million in the past two years) including Afritise, a water company and the construction and ownership of Rumbek Rendezvous.

5.  YUGLO – a social internet site established in Madrid, which is 69% controlled by AWC. The investment made by AWC in the business will be repaid twofold from profits before any distributions are made to the shareholders.

CAPLIN0024656
USPROD-02360857

STRICTLY PRIVATE AND CONFIDENTIAL

Recent new ventures are as follows:

1.  Purchase of MTV (a television company), which holds a broadcasting licence in the Czech Republic and has exclusive licences to operate in the seven countries that were the former Yugoslavia. This has been acquired through Mina Media s.r.o. a locally incorporated company in which 100% is held by nominees on behalf of Mina Media Limited. The business is already being financed directly (and indirectly by making payments on behalf of the new venture) by AWC. This investment is expected to be recovered from future profits.

2.  Investment in Preacher Films LLC, incorporated in USA. The first film project of this company, (which was established in November 2007), was released in the October 2008 and revenue returns are expected to start in early 2009. The total budget for the film was USD 7.00 million, which has been financed by AWC. This investment is expected to be recovered from either an outright sale or licensing rights. Further film projects are expected to follow.

3.  Investment in Mina Media Africa (Cyprus) Limited, in which AWC controls 50% of the A class shares in issue. A recent further issue of shares was financed to provide additional resources for expansion of the company.

4.  Controlling investment in Clearsafe Limited, a UK based company whose principal activity will be the purchase of rail track for reprocessing and sale.

Further investments will be notified as they arise.

London Office

AW (thorough nominee shareholders owns 50% of Mina Corp Limited (Mina Corp UK), a company incorporated in England. This is a service company providing an administrative base and services to "group" companies. The costs of the office are largely funded by Red Star but also by AW in respect of services carried out on behalf of the respective companies.

Other information

The London office maintains copies of all relevant statutory documents relating to the Foundation and its various trading interests. The documents include registration information, shareholder agreements and other contractual documentation, copies of which can be provided as required.

CAPLIN0024657
USPROD-02360858

Registration number 1322049
(Republic of Panama)

DRAFT FOR CONSIDERATION

SUNAGE FOUNDATION

DIRECTOR'S REPORT AND FINANCIAL STATEMENTS

FOR THE YEAR ENDED 31 MARCH 2009

Confidential

Ex.004-5.0162

CAPLIN0024658
USPROD-02360859

## SUNAGE FOUNDATION

## COMPANY INFORMATION

| | |
|---|---|
| **Council members** | Edgardo E Diaz |
| | Fernando A Gil |
| | |
| **Secretary** | Maria Vallarino |
| | |
| **Registration number** | 1322049 (Republic of Panama) |
| | |
| **Registered Office** | East 53rd Street, Marbella |
| | Swiss Bank Building, 2nd Floor |
| | Panama, Republic of Panama |
| | |
| **Reporting Accountants** | |
| | |
| **Principal bankers** | Julius Baer International Limited |
| | 60 St James's Street |
| | London  SW1 |
| | Unitised Kingdom |
| | |
| | BNP Paribas |
| | Place De Hollande 2, |
| | Case Postale CH-1211 |
| | Geneva 11 |
| | Switzerland |

Ex.004-5.0163

CAPLIN0024659
USPROD-02360860

**SUNAGE FOUNDATION**

**FINANCIAL STATEMENTS**
*FOR THE YEAR ENDED 31 MARCH 2009*

**CONTENTS**

|  | Page |
|---|---|
| Report of the Director | 1 |
| Independent Accountants' report | 2 |
| Revenue account | 3 |
| Balance sheet | 4 |
| Notes to the financial statements | 5 - 6 |

Confidential

Ex.004-5.0164

CAPLIN0024660
USPROD-02360861

# SUNAGE FOUNDATION

## REPORT OF THE FOUNDATION COUNCIL
### *FOR THE YEAR ENDED 31 MARCH 2009*

The Foundation Council herewith submits its Annual Report, together with the financial statements for the year ended 31 March 2009

**Legal status**

The Foundation was established on 31 March 2008 as a Private Interest Foundation in conformity with the Law of Foundations of Private Interest Foundations of the Republic of Panama. The Foundation is established as an irrevocable trust.

**Principal activities**

The principal activity of the company is that of general trading and investment. The Foundation commenced activity on 1 April 2008 following the acquisition of the business interests of Aspen Wind Corporation and other related companies.

**Foundation Council**

The following members of the Foundation Council held office during the year under review:

> Edgardo E Diaz
> Fernando A Gil

No member of the Foundation Council has, (or has had) any interest in the issued capital of the Foundation.

**Results and distributions**

The results for the year are set out on page 3 to the financial statements. The Foundation Council has approved distributions to the beneficiaries from retained income during the year ended 31 March 2009 amounting to **US$ 6,733,607.**

**Reporting Accountants**

**Responsibilities of the Foundation Council**

The Foundation Council is required to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the company and of the income of the Foundation for that period. In preparing those financial statements, the Foundation Council is required to:

- select suitable accounting policies and then apply them consistently;
- make judgements and estimates that are reasonable and prudent;
- prepare the financial statements on the going concern basis unless it is inappropriate to
  presume that the Foundation will continue.

The Foundation Council is responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the Foundation. The Foundation Council is responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

On behalf of the Foundation Council

........................................................................
Maria Vallarino
Secretary to the Council

Dated:          2009

Confidential

Ex.004-5.0165

CAPLIN0024661
USPROD-02360862

# SUNAGE FOUNDATION

## INDEPENDENT ACCOUNTANTS' REPORT
### *TO THE MEMBERS OF SUNAGE FOUNDATION*

We have examined (without carrying out an audit) the financial statements of Sunage Foundation for the year ended 31 March 2009 on pages 3 to 6. These financial statements have been prepared in accordance with the accounting policies set out therein and the requirements of International Financial Reporting Standards.

This report is made solely to the Foundation's beneficiaries, as a body. Our examination has been undertaken so that we might state to the beneficiaries of the Foundation those matters we consider appropriate in our report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the beneficiaries of the Foundation as a body, for our examination, for this report, or for the opinions we have formed.

**Respective responsibilities of the Foundation Council and Reporting Accountants**

The Foundation Council's responsibilities for preparing the financial statements in accordance with applicable law and International Accounting Standards are set out on page 1.

Our responsibility is to examine the financial statements in accordance with relevant legal and regulatory requirements and International Accounting Standards.

We report to you our opinion as to whether the financial statements give a true and fair view. We also report to you whether in our opinion the information given in the Report of the Foundation Council is consistent with the financial statements

In addition, we also report to you if, in our opinion, the Foundation has not kept proper accounting records, if we have not received all the information and explanations we require for our examination or if information specified by law regarding transactions is not disclosed.

We read the Report of the Foundation Council and consider the implications for our report if we become aware of any apparent misstatements within it.

**Basis of opinion**

We examined, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. our examination also includes an assessment of the significant estimates and judgements made by the Foundation Council in the preparation of the financial statements, and of whether the accounting policies are appropriate to the Foundation's circumstances, consistently applied and adequately disclosed.

We planned and performed our examination so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

**Opinion**

In our opinion:
- the financial statements give a true and fair view, in accordance with International Financial Reporting Standards, of the state of the Foundation's affairs as at 31 March 2009 and of its income and distributions for the year then ended;
- the financial statements have been properly prepared in accordance with applicable law; and
- the information given in the Report of the Foundation Council is consistent with the financial statements.

Confidential

Ex.004-5.0166

CAPLIN0024662
USPROD-02360863

# SUNAGE FOUNDATION

**REVENUE ACCOUNT**
*FOR THE YEAR ENDED 31 MARCH 2009*

| | Notes | 2009 US $ |
|---|---|---|
| **Distributions received from investments** | | 27,950,000 |
| Other operating income | | 1,893,985 |
| **Gross revenue** | | 29,843,985 |
| Administrative expenses | | 494,076 |
| **Net operating income** | 2 | 29,349,909 |
| Interest receivable and similar income | | 340,930 |
| Provision against diminution in value of investments | | ( 1,246,095) |
| **Net income on ordinary activities before taxation** | | 28,444,744 |
| Tax on ordinary activities | 3 | - |
| **Net income for the year** | 11 | **28,444,744** |

There are no recognised gains and losses other than those passing through the revenue account

Confidential

Ex.004-5.0167

CAPLIN0024663
USPROD-02360864

# SUNAGE FOUNDATION

## BALANCE SHEET
### AS AT 31 MARCH 2009

|  | Notes | 2009 US $ | 2009 US $ |
|---|---|---|---|
| **Intangible Assets** |  |  |  |
| Investments | 4 |  | 25,853,664 |
|  |  |  |  |
| **Current assets** |  |  |  |
| Accounts receivable | 5 | 4,387,953 |  |
| Cash at bank and in hand |  | 33,274,641 |  |
|  |  | 37,662,594 |  |
|  |  |  |  |
| **Creditors: amounts falling due within one year** | 6 | 2,700,398 |  |
|  |  |  |  |
| **Net current assets** |  |  | 34,962,196 |
|  |  |  |  |
| **Total assets less current liabilities** |  |  | 60,815,860 |
|  |  |  |  |
|  |  |  |  |
| **Capital and reserves** |  |  |  |
| Called up share capital | 7 |  | 10,000 |
| Capital reserves | 8 |  | 39,094,723 |
| Undistributed income | 9 |  | 21,711,137 |
|  |  |  |  |
| **Total funds** |  |  | 60,815,860 |

These financial statements were approved by the Foundation Council on ................. 2009

...............................................
For and on behalf of the Foundation

Confidential

Ex.004-5.0168

CAPLIN0024664
USPROD-02360865

# SUNAGE FOUNDATION

## NOTES TO THE FINANCIAL STATEMENTS
### FOR THE YEAR ENDED 31 MARCH 2009

**1    Accounting policies**

**1.1    Accounting convention**
The financial statements have been prepared under the historical cost convention modified to include the revaluation of assets as required.

**1.2    Intangible assets**
Intangible assets are stated at the lower of cost or valuation, after providing for irrecoverable costs or permanent diminution in value

| **2    Net operating income** | **2009**<br>**US $** |
|---|---|
| Net operating income is stated after charging: | |
| Reporting accountant's remuneration | 9,000 |
| Provision for diminution in value of investments | 1,246,095 |

**3    Taxation**

The Foundation Council considers that no provision for taxation is required in respect of the net income for the year.

| **4    Intangible assets** | **2009**<br>**US $** |
|---|---|
| **Cost** | |
| Acquisitions at 1 April 2008 | 19,520,000 |
| Additions in year | 7,579,759 |
| Disposals | - |
| Provision for diminution in value | ( 1,246,095) |
| **As at 31 March 2009** | 25,853,664 |

The following significant investments were acquired on 1 April 2008:

| Company | Incorporated: | Holding |
|---|---|---|
| **Red Star Enterprises Limited** | Gibraltar | 50% |
| **Mina Corp Limited** | Gibraltar | 50% |
| **Clearsafe Limited** | UK | 79% |
| **Aspen Wind Corporation** | Belize | 100% |
| **Mina Media Limited** | Cyprus | 50% |
| **Mina Corp Africa** | British Virgin Islands | 51% |

The Foundation Council considers that the current market value of the investments of the Foundation at 31 March 2009 is in excess of USD 250 million

- 5 -

Confidential

Ex.004-5.0169

CAPLIN0024665<br>USPROD-02360866

# SUNAGE FOUNDATION

## NOTES TO THE FINANCIAL STATEMENTS (CONTINUED)
### FOR THE YEAR ENDED 31 MARCH 2009

| | | 2009 US $ |
|---|---|---|
| **5** | **Accounts receivable** | |
| | Prepayments and accrued income | 125,000 |
| | Loans to investment companies | 4,158,708 |
| | Other receivables | 104,245 |
| | | **4,387,953** |

| | | 2009 US $ |
|---|---|---|
| **6** | **Creditors: amounts falling due within one year** | |
| | Trade creditors | 2,632,878 |
| | Other creditors and accruals | 67,520 |
| | | **2,700,398** |

| | | 2009 US $ |
|---|---|---|
| **7** | **Foundation capital** | |
| | Authorised and fully paid | **10,000** |

| | | 2009 US $ |
|---|---|---|
| **8** | **Capital reserves** | |
| | Members' investment | **39,094,723** |

On 1 April 2008, the Foundation acquired net assets totalling US$ 39,094,723, following the acquisition of the business of Aspen Wind Corporation and other related companies

| | | 2009 US $ |
|---|---|---|
| **9** | **Statement of movement on undistributed income** | |
| | Balance at 1 April 2008 | – |
| | Net income for the year | 28,444,744 |
| | | 28,444,744 |
| | Less: Distributions to beneficiaries | 6,733,607 |
| | **Balance at 31 March 2009** | **21,711,137** |

Confidential

Ex.004-5.0170

CAPLIN0024666
USPROD-02360867

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned Mrs. **ISOLDA MORAN ANRIA**, acting as members of the Foundation Council of **SUNAGE FOUNDATION**, a foundation organized and existing under and by virtue of the laws of the Republic of Panama, having its registered office at Panama, Republic of Panama, have made, constituted, and appointed **Mr. GRAHAM AUBREY COLLETT**, British citizen, with passport number ███████ to be the attorney-in-fact, with full power and authority to act in the name and on behalf of the foundation in any and all countries of the world to do any and all of the following acts, namely:

**FIRST:** To purchase, sell, exchange, lease, take on lease and manage all kinds of real property.

**SECOND:** To manage the business of the foundation and in relation thereto to enter into all kinds of contracts. To demand, collect and receive any sums of money and other specie owing to the foundation; to issue receipts and execute acquaintances as may be required.

**THIRD:** To open bank accounts in any bank in the world and to draw against such accounts; to open security custodian or deposit accounts in any bank, trust foundation, brokerage firm or financial institution and to establish the rules for the operation of such bank, custodian or deposit accounts; and to designate the persons who may operate, sign and draw checks against said banking accounts and execute any other banking documents on behalf of the foundation.

**FOURTH:** To draw, endorse, deal in, discount, deliver for deposit or collection by any bank, trust foundation, firm or institution any checks, drafts, bills of exchange, promissory notes, warehouse receipts or other orders or instructions for the payment of money and to receive the proceeds thereof.

**FIFTH:** To accept any and all drafts, bills of exchange or other orders for the payment of money which may at any time be drawn against the foundation, with authority to make the same payable at any bank, trust foundation or other financial institution, and to cause the same to be paid by the drawee.

**SIXTH:** To borrow money, obtain overdrafts or advances in other forms of credit and to fix the rate of interest and other commissions on said borrowings, overdrafts or advances, and as security for the performance of such obligations, to pledge, transfer, endorse and deliver, whether originally or in addition or substitution, shares of stock, bonds, securities and other properties, with such provisions as to the sale or disposition of the security as they may deem

CAPLIN0024667
USPROD-02360868

proper, and also to execute and deliver any documents or statements required under any law or regulations relating to borrowings, overdrafts or advances.

**SEVENTH:** To purchase, exchange and otherwise acquire real or personal property and to dispose thereof by sale or in any other manner; to import and export all kinds of merchandise, goods and wares; to enter into all contracts necessary for the transportation thereof and to execute all acts necessary therefore, such as obtaining permits or licenses and customhouse declarations that the business may require.

**EIGHTH:** To represent the foundation at stockholders' meetings or other similar organization in which the foundation may hold shares of stock or other interest, to speak and vote on its behalf; to collect and receive dividends or other distribution of profits or any other funds belonging to the foundation.

**NINTH:** To represent the foundation before public organizations or authorities and the corresponding officials in any dealings, contracts, acts or claims, to establish, prosecute, exercise or defend, to answer or oppose all actions, lawsuits and other proceedings and to represent the foundation therein, and also to intervene on its behalf whenever deemed convenient to its interests with authority to abandon any lawsuit, proceedings or claim and any remedies interposed.

**TENTH:** To settle lawsuits or controversies occurring relative to the rights and obligations of the foundation; to extend and refuse jurisdiction or competency; and to compromise in arbitrators (at law) or friendly arbitrators.

**ELEVENTH:** To execute all documents, including negotiable documents, as may be required to carry on the business of the foundation under the pertinent laws and to pay any and all fees, expenses or taxes payable by such business.

**TWELFTH:** In general, to assume the legal representation of the foundation whenever deemed convenient, so that at no time shall the foundation be without representation in any business in which it may be interested in, whether referring to dispositive or merely administrative acts, anywhere in the world.

**THIRTEENTH:** To delegate this Power in whole or in part without prejudice to reserving for themselves the exercise of the powers herein conferred or to revoke any such delegations made.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed this 15th day of July, 2013.

Yo, LIC. RAÚL IVÁN CASTILLO SANJUR, Notario Público Tercero del Circuito de Panamá, con Cédula No. 4-157-725,
CERTIFICO:
Que dada la certeza de la identidad de la(s) persona(s) que firma(firmaron) el presente documento su(s) firma(s) es(son) auténtica(s).

Panamá, ____ 2 2 JUL 2013

_____
Testigos          Testigos

_____
ISOLDA MORAN ANRIA
President

_____
LIC. RAÚL IVÁN CASTILLO SANJUR
Notario Público Tercero

Confidential

Ex.004-5.0172

CAPLIN0024668
USPROD-02360869



APOSTILLE

Convention de la haye du 5 octobre 1961

País PANAMA

Le présent document public

ha sido firmado por *Raul F. Castillo*

quien actúa en calidad *notario*

está revestido del sello/timbre de *P*

CERTIFICADO

en Panamá _____ 6 el día

por DIRECCION ADMINISTRATIVA

Bajo el número _____ 426-91

Sello/timbre _____ 10 Firma

2 3 JUL 2013



Esta Autorización no
implica responsabilidad
en cuanto al contenido
del documento

Confidential

Ex.004-5.0173

CAPLIN0024669
USPROD-02360870

MINUTES OF THE FOUNDATION COUNCIL

OF

**SUNAGE FOUNDATION**

A meeting of the Foundation Council of **SUNAGE FOUNDATION**, a private interest foundation organized in accordance to Law No. 25 of 12th day of June, 1995 of the Republic of Panama, was held in Panama, Republic of Panama on the 15th day of July of 2013.

There were present all the member of the Foundation Council, to wit:

ISOLDA MORAN ANRIA

ITZAMARA MADRID

CARLOS BRYDEN

who are all of the members of the foundation, and as such, agreed to hold this meeting waiving prior notice.

Mrs. ISOLDA MORAN ANRIA, President of the foundation, acted as Chairman of the meeting, and Mrs. ITZAMARA MADRID, Secretary of the foundation, acted as Secretary of the meeting.

The President informed the meeting that the purpose of the same was to grant a General Power of Attorney in favor of Mr. **GRAHAM AUBREY COLLETT**, British citizen, with passport number ███████ to act individually in the name and on behalf of the foundation.

After discussion, and upon duly made and unanimously adopted, it was,

**RESOLVED**, to grant a General Power of Attorney in favor of Mr. **GRAHAM AUBREY COLLETT**, British citizen, with passport number ███████ to be exercised individually by said Attorney-in-Fact, with full power and authority to act in the name and on behalf of the foundation, with the broadest powers, to exercise it anywhere in the world, with special powers to transfer, dispose of, mortgage or execute any other act of strict ownership as well as to give authority adjusters and to receive, transact, submit to decisions, abandon and settle it by agreement or to enter into agreements implying disposition of chooses in action and any other power deemed convenient, exercising same as if it were the principal.

**FURTHER RESOLVED**, that any two of the members of the foundation council be and they are hereby authorized and directed to execute a Power of Attorney in favor of the above named person, in such terms as the said members may deem convenient.

**FURTHER RESOLVED**, that **ICAZA, GONZALEZ-RUIZ & ALEMAN**. Registered Agent of the company, be and it is hereby authorized and directed to appear before a Notary Public and execute the foregoing General Power of Attorney.

There being no further business to come before the meeting, it was adjourned.

_____
**ISOLDA MORAN ANRIA**

**President**

_____
**ITZAMARA MADRID**

**Secretary of the Meeting**

Yo, LIC. RAÚL IVÁN CASTILLO SANJUR, Notario
Público Tercero del Circuito de Panamá, con Cédula
No. 4-157-725.
CERTIFICO:
Que dada la certeza de la identidad de la(s)
persona(s) que traspusieron el presente
documento su(s) firma(s) es(son) auténtica(s)
(Art 1736 C.C. Art 835 C.J.)

Panamá _____ 2 2 JUL 2013

_____
Testigos                    Testigos

**LIC. RAÚL IVÁN CASTILLO SANJUR**
Notario Público Tercero

Ex.004-5.0175

CAPLIN0024671
USPROD-02360872

MINUTES OF THE FOUNDATION COUNCIL

OF

**SUNAGE FOUNDATION**

A meeting of the Foundation Council of **SUNAGE FOUNDATION**, a private interest foundation organized in accordance to Law No. 25 of 12th day of June, 1995 of the Republic of Panama, was held in Panama, Republic of Panama on the 15th day of July of 2013.

There were present all the member of the Foundation Council, to wit:

ISOLDA MORAN ANRIA

ITZAMARA MADRID

CARLOS BRYDEN

who are all of the members of the foundation, and as such, agreed to hold this meeting waiving prior notice.

Mrs. ISOLDA MORAN ANRIA, President of the foundation, acted as Chairman of the meeting, and Mrs. ITZAMARA MADRID, Secretary of the foundation, acted as Secretary of the meeting.

The President informed the meeting that the purpose of the same was to grant a General Power of Attorney in favor of Mrs. **IRYNA TSENZHARYK**, female, of age, British citizen, holder of passport ▓▓▓▓▓▓ to act individually in the name and on behalf of the foundation.

After discussion, and upon duly made and unanimously adopted, it was,

**RESOLVED**, to grant a General Power of Attorney in favor of Mr. Mrs. **IRYNA TSENZHARYK**, female, of age, British citizen, holder of passport ▓▓▓▓▓▓ to be exercised individually by said Attorney-in-Fact, with full power and authority to act in the name and on behalf of the foundation, with the broadest powers, to exercise it anywhere in the world, with special powers to transfer, dispose of, mortgage or execute any other act of strict ownership as well as to give authority adjusters and to receive, transact, submit to decisions, abandon and settle it by agreement or to enter into agreements implying disposition of chooses in action and any other power deemed convenient, exercising same as if it were the principal.

**FURTHER RESOLVED**, that any two of the members of the foundation council be and they are hereby authorized and directed to execute a Power of Attorney in favor of the above named person, in such terms as the said members may deem convenient.

Confidential

Ex.004-5.0176

CAPLIN0024672
USPROD-02360873

FURTHER RESOLVED, that ICAZA, GONZALEZ-RUIZ & ALEMAN, Registered Agent of the company, be and it is hereby authorized and directed to appear before a Notary Public and execute the foregoing General Power of Attorney.

There being no further business to come before the meeting, it was adjourned.

_ISOLDA MORAN ANRIA_

**President**

_ITZAMARA MADRID_

**Secretary**

Yo, LIC. RAÚL IVÁN CASTILLO SANJUR, Notario
Público Tercero del Circuito de Panamá, con Cédula
No 4-157-725.
    CERTIFICO:
Que dada la certeza de la identidad de la(s)
persona(s) que firma(firmaron) el presente
documento su(s) firma(s) es(son) auténtica(s)
(Art 1736 C.C. Art 835 C.J.)

Panamá, 2 2 JUL 2013

Testigos                Testigos

LIC. RAÚL IVÁN CASTILLO SANJUR
Notario Público Tercero

Confidential

Ex.004-5.0177

CAPLIN0024673
USPROD-02360874

**POWER OF ATTORNEY**

**KNOW ALL MEN BY THESE PRESENTS:**

That the undersigned Mrs. **ISOLDA MORAN ANRIA**, acting as members of the Foundation Council of **SUNAGE FOUNDATION**, a foundation organized and existing under and by virtue of the laws of the Republic of Panama, having its registered office at Panama, Republic of Panama, have made, constituted, and appointed Mrs. **IRYNA TSENZHARYK**, female, of age, British citizen, holder of passport ▮▮▮▮▮ to be the attorney-in-fact, with full power and authority to act in the name and on behalf of the foundation in any and all countries of the world to do any and all of the following acts, namely:

**FIRST:** To purchase, sell, exchange, lease, take on lease and manage all kinds of real property.

**SECOND:** To manage the business of the foundation and in relation thereto to enter into all kinds of contracts. To demand, collect and receive any sums of money and other specie owing to the foundation; to issue receipts and execute acquaintances as may be required.

**THIRD:** To open bank accounts in any bank in the world and to draw against such accounts; to open security custodian or deposit accounts in any bank, trust foundation, brokerage firm or financial institution and to establish the rules for the operation of such bank, custodian or deposit accounts; and to designate the persons who may operate, sign and draw checks against said banking accounts and execute any other banking documents on behalf of the foundation.

**FOURTH:** To draw, endorse, deal in, discount, deliver for deposit or collection by any bank, trust foundation, firm or institution any checks, drafts, bills of exchange, promissory notes, warehouse receipts or other orders or instructions for the payment of money and to receive the proceeds thereof.

**FIFTH:** To accept any and all drafts, bills of exchange or other orders for the payment of money which may at any time be drawn against the foundation, with authority to make the same payable at any bank, trust foundation or other financial institution, and to cause the same to be paid by the drawee.

**SIXTH:** To borrow money, obtain overdrafts or advances in other forms of credit and to fix the rate of interest and other commissions on said borrowings, overdrafts or advances, and as security for the performance of such obligations, to pledge, transfer, endorse and deliver, whether originally or in addition or substitution, shares of stock, bonds, securities and other properties, with such provisions as to the sale or disposition of the security as they may deem

proper, and also to execute and deliver any documents or statements required under any law or regulations relating to borrowings, overdrafts or advances.

**SEVENTH:** To purchase, exchange and otherwise acquire real or personal property and to dispose thereof by sale or in any other manner; to import and export all kinds of merchandise, goods and wares; to enter into all contracts necessary for the transportation thereof and to execute all acts necessary therefore, such as obtaining permits or licenses and customhouse declarations that the business may require.

**EIGHTH:** To represent the foundation at stockholders' meetings or other similar organization in which the foundation may hold shares of stock or other interest, to speak and vote on its behalf; to collect and receive dividends or other distribution of profits or any other funds belonging to the foundation.

**NINTH:** To represent the foundation before public organizations or authorities and the corresponding officials in any dealings, contracts, acts or claims, to establish, prosecute, exercise or defend, to answer or oppose all actions, lawsuits and other proceedings and to represent the foundation therein, and also to intervene on its behalf whenever deemed convenient to its interests with authority to abandon any lawsuit, proceedings or claim and any remedies interposed.

**TENTH:** To settle lawsuits or controversies occurring relative to the rights and obligations of the foundation; to extend and refuse jurisdiction or competency; and to compromise in arbitrators (at law) or friendly arbitrators.

**ELEVENTH:** To execute all documents, including negotiable documents, as may be required to carry on the business of the foundation under the pertinent laws and to pay any and all fees, expenses or taxes payable by such business.

**TWELFTH:** In general, to assume the legal representation of the foundation whenever deemed convenient, so that at no time shall the foundation be without representation in any business in which it may be interested in, whether referring to dispositive or merely administrative acts, anywhere in the world.

**THIRTEENTH:** To delegate this Power in whole or in part without prejudice to reserving for themselves the exercise of the power, and to revoke such powers and further delegations made.

**IN WITNESS WHEREOF,** the undersigned acknowledge this instrument to be executed this 15th day of July, 2013.

_____
**ISOLDA MORAN ANRIA**
**President**

Yo, RAUL IVAN CASTILLO SANJUR, Notario Público Tercero del Circuito de Panamá, don Cédula No. 4-157-725, **CERTIFICO** Que dada la certeza de la identidad de la(s) persona(s) que firma(firmaron) el presente documento conozco al instrumento(a) de este ciudad(es). (Art 1738 C.C. Art 836 C.J.)

Panamá, 2 2 JUL 2013

_____
Testigos                    Testigos

**LIC. RAUL IVAN CASTILLO SANJUR**
Notario Público Tercero

Confidential

Ex.004-5.0179

CAPLIN0024675
USPROD-02360876

REPUBLICA de PANAMA
★ TIMBRE NACIONAL ★
B/0010.00

APOSTILLE

Convention de la haye du 5 octobre 1961

1 Pais PANAMA
El presente documento público
2 ha sido firmado por _Raúl J. Cortés_
3 quien actua en calidad _Notario_
4 y esta revestido del sello/timbre de _J_

CERTIFICADO    2 3 JUL 2013    Esta Autorización no
                                implica responsabilidad
5 EN Panamá _____ 6 el día _____    en cuanto al contenido
7 por DIRECCION ADMINISTRATIVA         del documento
8 Bajo el número _40692_
9 Sello/timbre    10 Firma
        _2-_    _Magdalena de Soto_



Confidential

CAPLIN0024676
USPROD-02360877



**BELIZE CITY, BELIZE**

THE INTERNATIONAL BUSINESS COMPANIES ACT, 1990
(No. 9 of 1990)

# Certificate of Incorporation

*The undersigned, Registrar of International Business Companies, HEREBY*

*C E R T I F I E S, pursuant to Section 14(3) of The International Business Companies Act, that*

*all the requirements of said Act in respect of incorporation have been complied with.*

CERTIFIED TO BE A
TRUE COPY OF THE ORIGINAL

**ASPEN WIND CORPORATION** No. 15,971

DAVID PEARLMAN
CHARTERED ACCOUNTANT
788-790 FINCHLEY ROAD
LONDON NW11 7TJ

*is incorporated in Belize City, Belize as an International Business Company*
*this* ___15th___ *day of* ___March___ _____, *two thousand*

*G I V E N under my hand and Seal in Belize City, Belize.*

2/4/0?

**REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES**

Confidential

CAPLIN0024677
USPROD-02360878



**BELIZE**

## THE INTERNATIONAL BUSINESS COMPANIES ACT 1990

# MEMORANDUM OF ASSOCIATION
# AND
# ARTICLES OF ASSOCIATION
# OF

**ASPEN WIND CORPORATION**

**IBC NO. 13,971**

**INCORPORATED THE**

15th **DAY OF** March , 2000

**REGISTERED AGENT:**

CERTIFIED TO BE A
TRUE COPY OF THE ORIGINAL

**REGISTERED AGENT**

belize bank

60 Market Square
PO Box 364
Belize City
Belize
Central America

Telephone: 501 2 77132/3/4/5
Fax: 501 2 77016
Telex: 158 BZE BANK BZ

DAVID PEARLMAN
CHARTERED ACCOUNTANT
788-790 FINCHLEY ROAD
LONDON NW11 7TJ
2/10/03

Confidential

Ex.004-5.0182

CAPLIN0024678
USPROD-02360879

THE INTERNATIONAL BUSINESS
COMPANIES ACT 1990

INDEX

MEMORANDUM OF ASSOCIATION

CLAUSE

| | | |
|---|---|---|
| 1 | NAME | 1 |
| 2 | REGISTERED OFFICE | 1 |
| 3 | REGISTERED AGENT | 1 |
| 4 | GENERAL OBJECTS AND POWERS | 1 |
| 5 | EXCLUSIONS | 5 |
| 6 | SHARE CAPITAL | 5 |
| 7 | AMENDMENTS | 7 |

ARTICLES OF ASSOCIATION

ARTICLE

| | | |
|---|---|---|
| 1 | PRELIMINARY | 8 |
| 2 | OFFICES | 9 |
| 3 | REGISTERED SHARES | 9 |
| 4 | BEARER SHARES | 9 |
| 5 | SHARES - ISSUE, TRANSFER AND TRANSMISSION | 12 |
| 6 | MEETINGS OF MEMBERS | 13 |
| 7 | VOTING AND PROXIES | 16 |
| 8 | DIRECTORS | 17 |
| 9 | POWERS OF DIRECTORS | 18 |
| 10 | PROCEEDINGS OF DIRECTORS | 18 |
| 11 | OFFICERS | 20 |
| 12 | SEAL | 20 |
| 13 | DIVIDENDS | 21 |
| 14 | AUDIT | 22 |
| 15 | NOTICES | 22 |
| 16 | AMENDMENTS | 24 |

Confidential

CAPLIN0024679
USPROD-02360880

BELIZE

THE INTERNATIONAL BUSINESS COMPANIES ACT 1990

MEMORANDUM OF ASSOCIATION

OF

ASPEN WIND CORPORATION

1.    **NAME**

The name of the Company is  ASPEN WIND CORPORATION.

2.    **REGISTERED OFFICE**

The Registered Office of the Company is 60 Market Square, PO Box 364, Belize City or such other place within Belize as the Company may from time to time by a resolution of the members determine.

3.    **REGISTERED AGENT**

The Registered Agent of the Company is The Belize Bank Limited of 60 Market Square, PO Box 364, Belize City or such other person qualified under the International Business Companies Act 1990 (including any Statutory modification or re-enactment thereof for the time being in force) (the "Act") as the Company may from time to time by a resolution of the members determine.

4.    **GENERAL OBJECTS AND POWERS**

The objects of the Company are to engage in any act or activity that is not prohibited under any law for the time being in force in Belize including, but not limited to, the following:

4.1    to carry on the business of an investment company and for that purpose to acquire and hold either in the name of the Company or in that of any nominee shares, stocks, debentures, debenture stock, scrip, bonds, notes, obligations, investments and securities and warrants or options in respect of any shares, stocks, debentures, debenture stock, scrip, bonds, notes, obligations, investments or securities;

4.2    to acquire such shares, stocks, debentures, debenture stocks, scrip, bonds, notes, obligations, investments or securities or warrants or options therein by original subscription, contract, tender, purchase, exchange, underwriting, participation in syndicates or otherwise, and whether or not fully paid up, and to subscribe for the same subject to such terms and conditions (if any) as may be thought fit;

Confidential

CAPLIN0024680
USPROD-02360881

2

4.3    to exercise and enforce all rights and powers conferred by or incident to the ownership of any such shares, stock, obligations or other securities including without prejudice to the generality of the foregoing all such powers of veto or control as may be conferred by virtue of the holding by the Company of some special proportion of the issued or nominal amount thereof and to provide managerial and other executive supervisory and consultancy services for or in relation to any company in which the Company is interested upon such terms as may be thought fit;

4.4    to acquire and hold either in the name of the Company or in that of any nominee and whether as principal or broker or agent any currency in any form in any part of the world and any commodity and to enter into any contract of purchase, sale or option to purchase or sell in respect of any such currency or commodity;

4.5    to offer for public subscription any shares or stocks in the capital of or debentures or debenture stock or other securities of or otherwise to establish or promote or concur in establishing or promoting, any company, societe anonyme, association, undertaking or public or private body;

4.6    to carry on business as capitalists, financiers, concessionaires and merchants and to undertake and carry on and execute any other business which may seem to be capable of being conveniently carried on in connection with any of these objects or calculated directly or indirectly to enhance the value of or facilitate the realisation of, or render profitable, any of the Company's property or rights;

4.7    to carry on the business of a property investment and holding company and for that purpose to purchase, take on lease, or in exchange, or otherwise acquire, hold, undertake or direct the management of work, develop the resources of, and turn to account any estates, lands, buildings, tenements, and other real property and property of every description, whether of freehold, leasehold, or other tenure, and wheresoever situate, and any interests therein, rights and powers conferred by, or incident to, the ownership of any such property;

4.8    to sell, lease, let, mortgage, or otherwise dispose of, grant rights over or otherwise provide any such property of the Company without seeking rental or consideration for such disposal or provision, or otherwise upon such terms as the Company shall determine;

4.9    to acquire and assume for any estate or interest and to take options over, construct, develop or exploit any property, real or personal or movable or immovable and rights of any kind and the whole or any part of the undertaking assets and liabilities of any person and to act and carry on business as a holding company;

Confidential

CAPLIN0024681
USPROD-02360882

3

4.10    to acquire, trade and deal with, or hold stocks, shares, bonds, debentures, scrip, investments and securities of all kinds issued in any country in any part of the world;

4.11    to raise and borrow money by the issue of shares, stock, debentures, bonds, obligations, deposit notes and otherwise howsoever and to underwrite any such issue and without limiting the generality of the foregoing to secure or discharge any debt or obligation of or binding on the Company in any manner and in particular by the issue of debentures (perpetual or otherwise) and to secure the repayment of any money borrowed raised or owing by mortgage, charge, or lien upon the whole or any part of the Company's property or assets (whether present or future);

4.12    to deposit the monies of the Company with any company or person and to advance and lend money upon such terms as may be arranged and with or without security and to guarantee the performance of any contract or obligation and the payment of money of or by any person or company, and generally to give guarantees and indemnities including guarantees and indemnities in respect of the liabilities of persons whether or not associated with the Company and whether or not the Company receives any consideration therefor and to secure any such guarantee or indemnity by the grant of charges, mortgages or liens on the whole or any part of the Company's property or assets present or future;

4.13    to apply for, purchase or by other means acquire and protect, prolong and renew any patents, patent rights, brevets d'invention, licences, trade marks, protections and concessions or other rights which may appear likely to be advantageous or useful to the Company;

4.14    to acquire and undertake, on any terms and subject to any conditions, the whole or any part of the business, property and liabilities of any person or company carrying on any business which the Company is authorised to carry on, or possessed of property suitable for the purposes of the Company;

4.15    to amalgamate with or enter into partnership or any joint purpose or profit-sharing arrangement with or to co-operate in any way with, or assist or subsidise any company, firm or person carrying on, or proposing to carry on, any business within the objects of the Company;

4.16    to purchase with a view to closing or reselling in whole or in part any business or properties which may seem or be deemed likely to injure by competition or otherwise any business or branch of business which the Company is authorised to carry on, and to close, abandon and give up any works or businesses at any time acquired by the Company;

4.17    to act as directors or managers or to appoint directors or managers of any subsidiary company or of any other company in which this Company is or may be interested;

Confidential

CAPLIN0024682
USPROD-02360883

**4**

4.18    to make, draw, accept, endorse, discount, negotiate, execute and issue and to buy, sell and deal in promissory notes, bills of exchange, cheques, bills of lading, shipping documents, dock and warehouse warrants and other instruments negotiable or transferable or otherwise;

4.19    to lend money with or without security and to subsidise, assist and guarantee the payment of money by or the performance of any contract, engagement or obligation by any persons or companies;

4.20    to constitute any trusts with a view to the issue of preferred or deferred or any other special stocks or securities based on or representing any shares, stocks, or other assets specifically appropriated for the purposes of any such trusts, and to settle and regulate and, if thought fit, to undertake and execute any such trusts and to issue, dispose of or hold any such preferred, deferred or other special stocks or securities;

4.21    to pay all preliminary expenses of the Company and any company promoted by the Company or any company in which this Company is or may contemplate being interested including in such preliminary expenses all or any part of the costs and expenses of owners of any business or property acquired by the Company;

4.22    to enter into any arrangements with any Government or authority, imperial, supreme, municipal, local or otherwise, or company that seems conducive to the Company's objects or any of them and to obtain from any such Government, authority, or company any charters, contracts, decrees, rights, grants, loans, privileges or concessions which the Company may think it desirable to obtain and to carry out, exercise and comply with others;

4.23    to vest any real or personal property, rights or interest, acquired by or belonging to the Company in any person or company on behalf or for the benefit of the Company, with or without any declared trust in favour of the Company;

4.24    to undertake and perform sub-contracts and to act through or by means of agents, brokers, sub-contractors or others;

4.25    to remunerate any person or company rendering services to the Company, whether by cash payment or by the allotment to him or them of shares, stocks, debentures, bonds or other securities of the Company credited as paid up in full or in part or otherwise;

4.26    to procure the Company to be registered or recognised in any part of the world outside Belize;

4.27    to distribute among the members of the Company in kind any property of the Company (whether by way of dividend or otherwise) and in particular any shares, stocks, debentures, bonds or other securities belonging to or at the disposal of the Company;

CAPLIN0024683
USPROD-02360884

5

4.28    to do all or any of the above things in any part of the world, and either as principals, agents, trustees, contractors or otherwise and either alone or in conjunction with others, and either by or through agents, sub-contractors, trustees or otherwise;

4.29    to accept payment for any property or rights sold or otherwise disposed of or dealt with by the Company either in cash, by instalments or otherwise, or in fully or partly paid up shares of any company or corporation, with or without deferred or preferred rights in respect of dividend or repayment of capital or otherwise or in debentures or mortgage debentures or debenture stock, mortgages or other securities of any company or corporation, or partly in one mode and partly in another and to hold, dispose of or otherwise deal with any shares, stock or securities so acquired;

4.30    to have the power exercisable solely by resolution of the directors to vest the corpus or the income of any trust in itself and to do all such things as may be conducive to the attainment of such objects; and

4.31    to make such gifts of the Company's property as all members of the Company in general meeting shall decide including, without limiting the generality thereof, the power to vest all or any part of the Company's property, revocable or irrevocable, in the name of trustees for the benefit of such person or persons including the Company on such terms as all the members of the Company in general meeting shall decide.

The Company shall have all such powers as are permitted by law for the time being in force in Belize which are necessary or conducive to the conduct, promotion or attainment of the objects of the Company.

5.    **EXCLUSIONS**

The Company shall not carry on any business or engage in any activity contrary to Section 5 of the Act.

6.    **SHARE CAPITAL**

6.1    Shares in the Company shall be issued in the currency of The United States of America.

6.2    The authorised capital of the Company is fifty thousand dollars ($50,000) divided into fifty thousand (50,000) shares of one dollar ($1.00) par value.

6.3    The authorised share capital of the Company is made up of one class of share divided into fifty thousand (50,000) shares of one dollar ($1.00) par value with one (1) vote for each share.

6.4    The designations, powers, preferences, rights, qualifications, limitations and restrictions of each class and series of shares that the Company is authorised to issue, including, but not limited to, the allocation of different rights as to voting, dividends, redemption or distribution on liquidation, shall be fixed by resolution of the directors of the Company unless such designations, powers, preferences, rights, qualifications, limitations and restrictions are fixed by this Memorandum of Association or the Articles of Association of the Company.

Confidential
CAPLIN0024684
USPROD-02360885

6

6.5     Registered or Bearer Shares:

    6.5.1    the Company may issue all or part of its authorised shares either as registered shares or as shares issued to bearer and the directors of the Company shall be empowered to determine by resolution of the directors which of such authorised shares shall be issued as registered shares and which as shares issued to bearer unless such determination is fixed by this Memorandum of Association or the Articles of Association of the Company;

    6.5.2    shares issued as registered shares may be exchanged for shares issued to bearer; shares issued to bearer may be exchanged for registered shares;

    6.5.3    notice to the holders of shares issued to bearer shall be sent by prepaid registered post addressed to the addressee to which the original bearer share certificates were despatched and/or in the manner set out in the Articles of Association of the Company and compliance with the foregoing shall constitute proper service of any notice upon the bearer of such shares.

6.6     Registered shares in the Company may be transferred, subject to compliance with the requirements of the Act and of this Memorandum of Association and the Articles of Association of the Company.

Confidential

Ex.004-5.0189

CAPLIN0024685
USPROD-02360886

7

7.  **AMENDMENTS**

The Company may amend this Memorandum of Association by a resolution of its members.

For the purpose of incorporating an International Business Company under the laws of Belize the person whose name and address appears below as the Subscriber hereby subscribes its name to this Memorandum of Association in the presence of the undersigned witness:

SIGNATURE OF WITNESS                    SIGNATURE OF SUBSCRIBER

Name: ..... Katherine Haylock .............     Name: ..... Belize Incorporation Services Ltd.
Address: ..... P.O. Box 364 ...............     Address: ..... P.O. Box 3149 ................
............ 60 Market Square ...........     ............ Road Town, Tortola ..........
............ Belize City, Belize ..........     ............ British Virgin Islands ..........

Date: ...... March 15, 2000 ..............     Date: ...... March 15, 2000 ..............

Confidential                    Ex.004-5.0190                    CAPLIN0024686
USPROD-02360887

8

**BELIZE**

**THE INTERNATIONAL BUSINESS
COMPANIES ACT 1990**

**ARTICLES OF ASSOCIATION
OF**

**ASPEN WIND CORPORATION**

## 1.   PRELIMINARY

In these Articles, if not inconsistent with the subject or context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof:

| Words | Meanings |
|---|---|
| the Memorandum | the Memorandum of Association of the Company as originally framed or as from time to time amended; |
| the Act | the International Business Companies Act, 1990 including any statutory modification or re-enactment thereof for the time being in force; |
| the Seal | the Common Seal of the Company, any Overseas Seal or any Securities Seal authorised in accordance with Article 12; |
| Articles | these Articles of Association as originally framed or as from time to time amended. |

"Written" or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or represented or reproduced by any mode of representing or reproducing words in a visible form, including telex, telegram, cable or other form of writing produced by electronic communication.

Save as aforesaid, words or expressions contained in these Articles shall bear the same meanings as in the Act but excluding any statutory modification thereof not in force when these Articles become binding on the Company.

Words importing the singular number shall include the plural number and vice versa; words importing the masculine gender shall include the feminine and neuter genders respectively; words importing persons shall include bodies corporate and unincorporated associations of persons.

Confidential

Ex.004-5.0191

CAPLIN0024687
USPROD-02360888

9

A reference to money in these Articles is a reference to the currency of the United States of America unless otherwise stated.

## 2. OFFICES

The Company shall at all times have a registered office in Belize. The Company may have an office or offices at such other place or places within or outside Belize as the directors may from time to time by resolution of the directors appoint or the business of the Company may require.

## 3. REGISTERED SHARES

SECTION 1

The Company shall issue to every member holding registered shares in the Company a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him.

SECTION 2

Any member receiving a share certificate for registered shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of the wrongful or fraudulent use made by any person by virtue of the possession thereof. If a share certificate for registered shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of the directors.

SECTION 3

If several persons are registered as joint holders of any shares, any one of such persons may give an effectual receipt for any dividend payable in respect of such shares.

## 4. BEARER SHARES

SECTION 1

Subject to a request for the issue of bearer shares and to the payment of the appropriate consideration for the shares to be issued, the Company may, to the extent authorised by the Memorandum, issue bearer shares to, and at the expense of, such person as shall be specified in the request. The Company may also, upon receiving a request in writing accompanied by the share certificate for the shares in question, exchange registered shares for bearer shares or may exchange bearer shares for registered shares. Such request served on the Company by the holder of bearer shares shall specify the name and address of the person to be registered and unless the request is delivered in person by the bearer shall be authenticated as hereinafter provided. Such request served on the Company by the holder of bearer shares shall also be accompanied by any coupons or talons which at the date of such delivery have not become due for payment of dividends or any other distribution by the Company to the holders of such shares. Following such exchange the share certificate relating to the exchanged shares shall be delivered as directed by the member requesting the exchange.

CAPLIN0024688
USPROD-02360889

10

## SECTION 2

Bearer share certificates shall be under the Seal and shall state that the bearer is entitled to the shares therein specified, and may provide by coupons, talons, or otherwise for the payment of dividends or other monies on the shares included therein.

## SECTION 3

Subject to the provisions of the Act, the Memorandum and of these Articles the bearer of a bearer share certificate shall be deemed to be a member of the Company and shall be entitled to the same rights and privileges as he would have had if his name had been included in the share register of the Company as the holder of the shares.

## SECTION 4

Subject to any specific provisions in these Articles, in order to exercise his rights as a member of the Company, the bearer of a bearer share certificate shall produce the bearer share certificate as evidence of his membership of the Company. Without prejudice to the generality of the foregoing, the following rights may be exercised in the following manner:

(a)    for the purpose of exercising his voting rights at a meeting, the bearer of a bearer share certificate shall produce such certificate to the chairman of the meeting;

(b)    for the purpose of exercising his vote on a resolution in writing, the bearer of a bearer share certificate shall cause his signature to any such resolution to be authenticated as hereinafter provided;

(c)    for the purpose of requisitioning a meeting of members, the bearer of a bearer share certificate shall address his requisition to the directors and his signature thereon shall be duly authenticated as hereinafter provided; and

(d)    for the purpose of receiving dividends, the bearer of a bearer share certificate shall present at such places as may be designated by the directors any coupons or talons issued for such purpose, or shall present the bearer share certificate to any paying agent authorised to pay dividends.

## SECTION 5

The signature of a bearer of a bearer share certificate shall be deemed to be duly authenticated if the bearer of the bearer share certificate shall produce such certificate to a notary public or a bank manager or a director or officer of the Company (herein referred to as an "authorised person") and if the authorised person shall endorse the document bearing such signature with a statement:

CAPLIN0024689
USPROD-02360890

11

(a)     identifying the bearer share certificate produced to him by number and date and specifying the number of shares and the class of shares (if appropriate) comprised therein;

(b)     confirming that the signature of the bearer of the bearer share certificate was subscribed in his presence and that if the bearer is representing a body corporate he has so acknowledged and has produced satisfactory evidence thereof; and

(c)     specifying the capacity in which he is qualified as an authorised person and, if a notary public, affixing his seal thereto or, if a bank manager, attaching an identifying stamp of the bank of which he is a manager.

## SECTION 6

Notwithstanding any other provisions of these Articles, at any time, the bearer of a bearer share certificate may deliver the certificate for such shares into the custody of the Company at its registered office, whereupon the Company shall issue a receipt therefor under the Seal signed by a director or officer identifying by name and address the person delivering such certificate and specifying the date and number of the bearer share certificate so deposited and the number of shares comprised therein. Any such receipt may be used by the person named therein for the purpose of exercising the rights vested in the shares represented by the bearer share certificate so deposited including the right to appoint a proxy. Any bearer share certificate so deposited shall be returned to the person named in the receipt or his personal representative (if such person be dead) and thereupon the receipt issued therefor shall be of no further effect whatsoever and shall be returned to the Company for cancellation or, if it has been lost or mislaid, such indemnity as may be required by resolution of the directors shall be given to the Company.

## SECTION 7

The bearer of a bearer share certificate shall for all purposes be deemed to be the owner of the shares comprised in such certificate and in no circumstances shall the Company or the chairman of any meeting of members or the Company's registrars or any director or officer of the Company or any authorised person be obliged to enquire into the circumstances whereby a bearer share certificate came into the hands of the bearer thereof, or to question the validity or authenticity of any action taken by the bearer of a bearer share certificate whose signature has been authenticated as provided in Section 5 above.

## SECTION 8

If the bearer of a bearer share certificate shall be a company, then all the rights exercisable by virtue of such shareholding may be exercised by an individual duly authorised to represent the company but unless such individual shall acknowledge that he is representing a company and shall produce upon request satisfactory evidence that he is duly authorised to represent the company, the individual shall for all purposes hereof be regarded as the holder of the shares in any bearer share certificate held by him.

Confidential

Ex.004-5.0194

12

**SECTION 9**

The directors may provide for payment of dividends to the holders of bearer shares by coupons or talons and in such event the coupons or talons shall be in such form and payable at such time and in such place or places as the directors shall resolve. The Company shall be entitled to recognise the absolute right of the bearer of any coupon or talon issued as aforesaid to payment of the dividend to which it relates and delivery of the coupon or talon to the Company or its agents shall constitute in all respects a good and final discharge of the Company in respect of such dividend.

**SECTION 10**

If any bearer share certificate, coupon or talon be worn out or defaced, the directors may, upon the surrender thereof for cancellation, issue a new one in its stead, and if any bearer share certificate, coupon or talon be lost or destroyed, the directors may upon the loss or destruction being established to their satisfaction, and upon such indemnity being given to the Company as it shall by resolution of the directors determine, issue a new bearer share certificate in its stead, and in either case on payment of such sum as the Company may from time to time by resolution of the directors require. In case of loss or destruction the person to whom such new bearer share certificate, coupon or talon is issued shall also bear and pay to the Company all expenses incidental to the investigation by the Company of the evidence of such loss or destruction and to such indemnity.

## 5. SHARES - ISSUE, TRANSFER AND TRANSMISSION

**SECTION 1**

Subject to the provisions of the Act, the Memorandum, these Articles and any resolution of the members of the Company any unissued shares of the Company shall be at the disposal of the directors who may, without prejudice to any rights previously conferred on the holders of any existing shares or class or series of shares, offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions as the directors may determine.

**SECTION 2**

The Company shall issue certificates in respect of its shares, whether registered shares or bearer shares. No notice of a trust, whether expressed, implied or constructive, shall be entered in the share register of the Company.

**SECTION 3**

The directors may refuse to register any transfer of shares in favour of more than four persons jointly.

Confidential

CAPLIN0024691
USPROD-02360892

13

## SECTION 4

The registration of transfers of shares may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of the directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months.

## SECTION 5

The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognised by the Company as having any title to his shares but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the Act and in Section 6 below.

## SECTION 6

Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member shall be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

## SECTION 7

The directors may make such rules and regulations as are in accordance with the Act, the Memorandum and these Articles and as they may deem expedient concerning the issuance and transfer of certificates representing shares of the Company and may appoint transfer agents or registrars, or both, and may require all share certificates to bear the signature of either or both of the foregoing. Nothing herein shall be construed to prohibit the Company from acting as its own transfer agent at any of its offices.

## 6. MEETINGS OF MEMBERS

## SECTION 1

The Company may hold once in every calendar year an annual meeting at such time and place as may be designated in the notice of meeting.

## SECTION 2

All meetings of members other than annual meetings shall be called special meetings. The directors may call special meetings and, on the requisition of members pursuant to the provisions of the Act, shall forthwith proceed to call a special meeting for a date not later than eight weeks after receipt of the requisition.

Confidential

CAPLIN0024692
USPROD-02360893

14

## SECTION 3

Meetings of the members shall be held at such place either within or without Belize as may be fixed from time to time by the directors or if no such place has been fixed, such place as shall be stated in the notice of any such meeting.

## SECTION 4

Written notice of the time, place and, as far as practicable, purposes of each meeting of the members shall be given by any director or by the Secretary and shall be served in the manner required by Article 15 Section 1 to each member entitled to vote at such meeting.

## SECTION 5

Each meeting of the members shall be presided over by the Chairman of the board of directors (if any) or, in his absence, by such person as may be designated from time to time by the board of directors or, in the absence of such person or if there shall be no such designation, by a chairman to be chosen at the meeting. The Secretary shall act as secretary of each meeting of the members or, if he shall not be present, such person as may be designated by the board of directors shall act as such secretary or, in the absence of such person or if there shall be no such designation, a secretary shall be chosen at the meeting.

## SECTION 6

Without prejudice to Section 17 below, at all meetings of the members two persons entitled to vote upon the business to be transacted, each being a member or a proxy for a member or a duly authorised representative of a corporation, shall be necessary and sufficient to constitute a quorum for the transaction of business, except as otherwise provided by the Act, by the Memorandum or by these Articles.

## SECTION 7

No business shall be transacted at any meeting of the members unless a quorum is present. If such quorum is not present within half an hour from the time appointed for the meeting, or if during a meeting such a quorum ceases to be present, the meeting shall stand adjourned from time to time until a quorum shall attend or to such time and place as the directors may determine.

## SECTION 8

The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting), adjourn the meeting from time to time and from place to place, but no business shall be transacted at an adjourned meeting other than business which might properly have been transacted at the meeting had the adjournment not taken place. When a meeting is adjourned for fourteen days or more notice shall be given of the adjourned meeting in accordance with Section 4 above. Otherwise it shall not be necessary to give such notice.

15

## SECTION 9

A director shall, notwithstanding that he is not a member, be entitled to attend and speak at any meeting of the members and at any separate meeting of the holders of any class of shares in the Company.

## SECTION 10

A resolution put to the vote of the meeting of the members shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands a poll is duly demanded.  Subject to the provisions of the Act or the Memorandum, a poll may be demanded -

  (1)  by the chairman of the meeting; or

  (2)  by at least two members having the right to vote at the meeting; or

  (3)  by a member or members representing not less than 10 per cent. of the total voting rights of all the members having the right to vote at the meeting;

and a demand by a person as proxy for a member shall be the same as a demand by the member.

## SECTION 11

Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost, or not carried by a particular majority and an entry to that effect in the minutes of the meeting shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against the resolution.

## SECTION 12

The demand for a poll may, before the poll is taken, be withdrawn but only with the consent of the chairman and a demand so withdrawn shall not be taken to have invalidated the result of a show of hands declared before the demand was made.

## SECTION 13

A poll shall be taken as the chairman directs and he may appoint scrutineers (who need not be members) and fix a time and place for declaring the result of the poll.  The result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

## SECTION 14

In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall be entitled to a casting vote in addition to any other vote he may have.

Confidential

CAPLIN0024694
USPROD-02360895

16

## SECTION 15

A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken either forthwith or at such time and place as the chairman directs not being more than thirty days after the poll is demanded. The demand for a poll shall not prevent the continuance of a meeting for the transaction of any business other than the question on which the poll was demanded. If a poll is demanded before the declaration of the result of a show of hands and the demand is duly withdrawn, the meeting shall continue as if the demand had not been made.

## SECTION 16

No notice need be given of a poll not taken forthwith if the time and place at which it is to be taken are announced at the meeting at which it is demanded. In any other case at least seven days' notice shall be given specifying the time and place at which the poll is to be taken.

## SECTION 17

If the Company shall have only one member then, provided that such member represents, in person or by proxy, a majority of the shares of the Company issued and outstanding, that member shall have full power to represent and act on behalf of the members of the Company and the provisions herein contained for meetings of the members shall not apply. A member as aforesaid shall record in writing by signing a note or memorandum all matters requiring a resolution of members of the Company and such act shall be deemed a resolution that has been carried unanimously by the members of the Company having the right to vote upon the matter in question. Such a note or memorandum shall be in lieu of minutes of a meeting and shall constitute sufficient evidence of such resolution for all purposes.

## 7. VOTING AND PROXIES

## SECTION 1

At each meeting of the members, if there shall be a quorum, a majority of the votes cast at such meeting by the holders of shares entitled to vote thereon, and present in person or by proxy, shall decide all matters brought before such meeting, except as otherwise provided by the Act, by the Memorandum or by these Articles.

## SECTION 2

Subject to any rights or restrictions attached to any class of shares and to any provisions of the Act regarding joint ownership of shares, at any meeting of the Company each member present in person shall be entitled to one vote on any question to be decided on a show of hands and each member present in person or by proxy shall be entitled on a poll to one vote for each share held by him. A member shall be deemed to be present if he participates by telephone or other electronic means in the manner required by the Act in which event he shall be deemed to have raised or failed to raise his hand on a show of hands and to have voted either for, against or abstained on a poll as communicated by the participant by telephone or other electronic means, as appropriate, at the time of the vote in question. Any failure so to communicate by the participant shall be deemed to be a failure to raise his hand on a show of hands and an abstention on a poll on the vote in question.

CAPLIN0024695
USPROD-02360896

17

## SECTION 3

No objection shall be raised to the qualification of any vote except at the meeting at which the vote objected to is tendered. Any objection made in due time shall be referred to the chairman of the meeting whose decision shall be final and conclusive.

## SECTION 4

The instrument appointing a proxy shall be in writing under the hand of the appointer or of his attorney, or, if such appointer is a company, either under the hand of any duly appointed director or officer of such company or under its common seal. The instrument appointing a proxy shall be in any usual or common form or any other form which the directors shall from time to time approve or accept.   No person shall be appointed a proxy who is not a member.

## SECTION 5

The provisions of Section 4 above are in addition to and not in derogation of any other statutory or other provision enabling a company (wherever incorporated) which is a member of this Company to authorise a person to act as its representative at a meeting of the members of the Company.

## SECTION 6

An instrument either appointing a proxy or evidencing an authorisation made in the manner referred to in Section 4 above shall be left with the Secretary not less than 24 hours, or such shorter time as may be stated in the form of proxy circulated with the notice of the meeting, before the holding of the meeting or adjourned meeting, as the case may be, at which the person named in such instrument proposes to vote.

## 8. DIRECTORS

## SECTION 1

The first directors of the Company shall be elected by the subscribers to the Memorandum; and thereafter, new directors shall be elected by the members or by the existing directors for such term as the members or the directors, respectively, shall determine.

## SECTION 2

The minimum number of directors shall be one and the maximum number shall be ten.

## SECTION 3

Each director shall hold office for the term, if any, fixed by the resolution of the members or directors, as appropriate, or until his earlier death, resignation or removal.

Confidential

Ex.004-5.0200

CAPLIN0024696
USPROD-02360897

18

## SECTION 4

Any director may be removed from office, with or without cause, by a resolution of the members or a resolution of the directors.

## 9. POWERS OF DIRECTORS

### SECTION 1

The business and affairs of the Company shall be managed by a board of directors which shall consist of one or more persons who may be individuals or companies. The directors may pay all expenses incurred preliminary to and in connection with the formation, incorporation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or by these Articles required to be exercised by the members or any other person, subject to any delegation of such powers as may be authorised by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirement made by a resolution of members shall prevail if it be inconsistent with the Act, the Memorandum or these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

### SECTION 2

Any director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the board of directors or with respect to written consents of the directors.

### SECTION 3

The continuing directors may act notwithstanding any vacancy in their body.

### SECTION 4

All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments, and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of the directors.

## 10. PROCEEDINGS OF DIRECTORS

### SECTION 1

The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside Belize as the directors may determine to be necessary or desirable.

19

## SECTION 2

A director shall be given not less than 1 day's notice of meetings of directors, but a meeting of directors held without 1 day's notice having been given to all directors shall be valid if a majority of the directors entitled to vote at the meeting waive notice of the meeting; and for this purpose, the presence of a director at the meeting shall be deemed to constitute a waiver on his part.

## SECTION 3

Without prejudice to Section 4 below, a meeting of directors is properly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors, unless there are only two directors in which case the quorum shall be two.

## SECTION 4

If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors. Such a note or memorandum shall constitute a resolution of the directors and shall constitute sufficient evidence of such resolution for all purposes.

## SECTION 5

At every meeting of the board of directors the Chairman of the board of directors shall preside as chairman of the meeting. If there is no Chairman of the board of directors or if the Chairman of the board of directors is not present at the meeting the vice-chairman of the board of directors shall preside. If there is no vice-chairman of the board of directors or if the vice-chairman of the board of directors is not present at the meeting the directors present shall choose someone of their number to be chairman of the meeting.

## SECTION 6

The meetings and proceedings of any committee of directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

Confidential

Ex.004-5.0202

CAPLIN0024698
USPROD-02360899

20

## 11. OFFICERS

### SECTION 1

The Company may by resolution of the directors appoint officers of the Company at such times as shall be considered necessary or expedient. Such officers may consist of a Chairman of the board of directors, a vice-chairman of the board of directors, President and one or more vice-presidents, Secretary and Treasurer and such other officers as may from time to time be deemed desirable. Any number of offices may be held by the same person.

### SECTION 2

The emoluments of all the officers shall be fixed by resolution of the directors. Subject to the Act, the Memorandum and these Articles, the officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of the directors or resolution of the members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the board of directors to preside at meetings of directors and members, the vice-chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the vice-presidents to act in order of seniority but otherwise to perform such duties as may be delegated to them by the President, the Secretary to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

### SECTION 3

The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of the directors. Any vacancy occurring in any office of the Company may be filled by resolution of the directors.

## 12. SEAL

### SECTION 1

The directors shall provide for the safe custody of the Seal. The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorised from time to time by resolution of the directors. The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

Confidential

CAPLIN0024699
USPROD-02360900

21

## SECTION 2

The Company may have for use in any territory, district or place elsewhere than in Belize an official seal (the "Overseas Seal"), which seal shall be a facsimile of its common seal. A deed or other document to which the Overseas Seal is duly affixed shall bind the Company as if it had been sealed with the common seal of the Company.

## SECTION 3

The Company may have for use for sealing securities issued by the Company and for sealing documents creating or evidencing securities so issued an official seal (the "Securities Seal") which is a facsimile of the common seal of the Company with the addition on its face of the word "Securities". Each certificate to which the Securities Seal shall be affixed need not bear any signature.

## 13. DIVIDENDS

### SECTION 1

The Company may by a resolution of the directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorising the dividends, a fair and proper value for the assets to be so distributed.

### SECTION 2

The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company.

### SECTION 3

The directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

### SECTION 4

Notice of any dividend that may have been declared shall be given to each member in the manner mentioned in Article 15 Section 1 and all dividends unclaimed for three years after having been declared may be forfeited by resolution of the directors for the benefit of the Company.

### SECTION 5

No dividend shall bear interest as against the Company.

Confidential

CAPLIN0024700
USPROD-02360901

22

## 14. AUDIT

SECTION 1

The Company may by resolution of the members call for any accounts of the Company to be examined by auditors.

SECTION 2

The first auditors shall be appointed by resolution of the directors; subsequent auditors shall be appointed by a resolution of the members.

SECTION 3

The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

SECTION 4

The remuneration of the auditors of the Company:

(a)     in the case of auditors appointed by the directors, may be fixed by resolution of the directors;

(b)     subject to the foregoing, shall be fixed by resolution of the members or in such manner as the Company may by resolution of the members determine.

SECTION 5

Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

SECTION 6

The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss accounts and balance sheet are to be presented.

## 15. NOTICES

SECTION 1

Any notice, information or written statement to be given by the Company to members must be served, in the case of members holding registered shares, personally or sent by mail or by telegraph, cable, telex, facsimile transmission or similar communications equipment. If served other than in person, such notice shall be directed to each member at his address as it appears on the share register of the Company unless he shall have filed with the Secretary prior to such service a written request that notices intended for him

Confidential

Ex.004-5.0205

CAPLIN0024701
USPROD-02360902

23

be served at some other address, in which case it shall be directed to the address designated in such request. In the case of members holding shares issued to bearer, any such notice, information or written statement must be served in the manner required by the Memorandum and/or by publication in a newspaper in Belize, in such other newspapers (if any) as the directors consider to be appropriate and in a newspaper in the place where the Company has its principal office, if different.

## SECTION 2

Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

## SECTION 3

Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was mailed in such time as to admit to its being delivered in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage prepaid.

Confidential

CAPLIN0024702
USPROD-02360903

24

## 16. AMENDMENTS

These Articles may only be altered, repealed or replaced by resolution of the members of the Company.

For the purpose of incorporating an International Business Company under the laws of Belize the person whose name and address is set out below as the Subscriber hereby subscribes its name to these Articles of Association in the presence of the undersigned witness:

SIGNATURE OF WITNESS                    SIGNATURE OF SUBSCRIBER

Name: .....Katharine Haylock...........    Name: .....Belize Incorporation Services Ltd.

Address: .P.O. Box 364..................    Address: .P.O. Box 3149...................

............60 Market Square...........    ............Road Town, Tortola............

............Belize City, Belize........    ............British Virgin Islands........

Date: ........March 15, 2000............    Date: ........March 15, 2000............

Confidential

Ex.004-5.0207

CAPLIN0024703
USPROD-02360904



BELIZE CITY, BELIZE

### THE INTERNATIONAL BUSINESS COMPANIES ACT,

Chapter 270 of the Laws of Belize, Revised Edition 2000

# Certificate of Good Standing

*The undersigned, Registrar of International Business Companies, HEREBY*
*C E R T I F I E S, pursuant to Sections 136 (1) of The International Business Companies Act, that*

**ASPEN WIND CORPORATION**                                    No. 13,971

(A company incorporated under said Act) is of good standing
as of the date set out below

This certifies that the above-named company as of the date hereof:
(a) has not submitted to the Registrar articles of merger or consolidation that have not yet become
effective; (b) the company has not submitted to the Registrar articles of arrangement that have not yet
become active; (c) the company is not in the process of being wound up and dissolved;
(d) proceedings to strike the name of the company off the Register have not been instituted.

GIVEN under my hand and seal in Belize City, Belize

this 29th day of November, two thousand eleven

DEPUTY REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

Confidential

CAPLIN0024704
USPROD-02360905

**BELIZE**

**CERTIFICATE OF INCUMBENCY**

We, **ICAZA BELIZE TRUST CORPORATION LIMITED** as Registered Agent of **ASPEN WIND CORPORATION**, a company incorporated and operating under the International Business Company Act, Chapter 270, (hereinafter referred to as "the Company"), do hereby certify that:

(a)    The Company is duly organized, validly existing and in good standing under the laws of Belize.

(b)    The Company was constituted on the **15th day of March, 2000.**

(c)    The registered number of the Company is N° **13,971.**

(d)    The Director of the Company as of this date is:

    **CARLOS BRYDEN**

(e)    The authorised capital of the Company is fifty thousand dollars ($50,000) divided into fifty thousand (50,000) shares of one dollars ($1.00) par value.

    The authorised share capital of the Company is made up of one class of share divided into fifty thousand (50,000) shares of one dollar ($1.00) par value with one (1) vote for each share.

(f)    The Company is not in the process of being wound up and dissolved.

(g)    The Registered Agent and Office of the Company is **ICAZA BELIZE TRUST CORPORATION LIMITED** of 60 Market Square, P. O. Box 364, Belize City, Belize.

Dated the 29th day of November, 2011

_____
Lissa Lord
Authorized Representative
**ICAZA BELIZE TRUST CORPORATION LIMITED**

SHARE CERTIFICATE

# ASPEN WIND CORPORATION

**CERTIFICATE NUMBER 2**                    **NUMBER OF SHARES ◆1◆**

Incorporated under the International Business Companies Act of Belize

Authorised capital U.S. $ 50,000.00 divided into 50,000 shares of a par value of U.S. $ 1.00 each

THIS IS TO CERTIFY THAT **THE BEARER OF THIS CERTIFICATE** is entitled
to ONE (1) share in the above named Company, subject to the Memorandum
and Articles of the said Company.

Given under the Common Seal of the Company
this 15th day of April 2000.

_____                    _____
**LEDRA DIRECTORS LIMITED**                    **LEDRA SECRETARIAL SERVICES LIMITED**
**DIRECTOR**                                   **SECRETARY**

Confidential

CAPLIN0024706
USPROD-02360907

SHARE CERTIFICATE

# ASPEN WIND CORPORATION

**CERTIFICATE NUMBER 1**                    NUMBER OF SHARES ◆1◆

Incorporated under the International Business Companies Act of Belize

Authorised capital U.S. $ 50,000.00 divided into 50,000 shares of a par value of U.S. $ 1.00 each

THIS IS TO CERTIFY THAT **THE BEARER OF THIS CERTIFICATE** is entitled to ONE (1) share in the above named Company, subject to the Memorandum and Articles of the said Company.

Given under the Common Seal of the Company this 15th day of April 2000.

**LEDRA DIRECTORS LIMITED**
**DIRECTOR**

**LEDRA SECRETARIAL SERVICES LIMITED**
**SECRETARY**

Confidential

Ex.004-5.0211

CAPLIN0024707
USPROD-02360908

RESOLUTION OF THE DIRECTORS

OF

**ASPEN WIND CORPORATION**

The undersigned, being the Directors of **ASPEN WIND CORPORATION**, a company duly incorporated and existing under the laws of Belize (hereinafter called the "Company"),

**RESOLVED**

That the Directors of the Company are hereby authorized to issue a General Power of Attorney in favour of **Mr. GRAHAM COLLETT**.

IN WITNESS WHEREOF, we have executed this instrument on this 15th day of January, 2010.

Edgardo E. Diaz
Director

Fernando A. Gil
Director

CAPLIN0024708
USPROD-02360909

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, Edgardo E. Díaz and Fernando A. Gil, being the Directors of **ASPEN WIND CORPORATION**, a corporation organized and existing under the laws of Belize, HEREBY RESOLVE to make, constitute and appoint **MR. GRAHAM COLLETT,** the corporation's true and lawful attorney, and to act individually in its name and behalf in any and all countries and parts of the world in connection with its business, as occasion may require, and to do all or any act or thing which the corporation might itself do, including, but not limited to the following acts and things:

FIRST: To manage and govern property of every description, whether personal, real or movable, bonds, shares and/or securities which the corporation may now own or hereafter acquire.

SECOND:  To collect and receive from all kinds of organizations, individuals, entities, enterprises or mercantile and civil corporations, domestic and foreign, any sums of money for any reason owing to the corporation, whether originating from contracts and representing income, leases, credits, interests or dividends, issuing therefor the corresponding receipts and releases.

THIRD:  To give and take on lease all kinds of property, for the term and at such price and conditions as he may deem expedient; and to rescind all kinds of contracts whenever advisable.

FOURTH: To receive and render accounts of all kinds, to examine, approve or reject same and to receive and pay any balances resulting therefrom.

FIFTH:  To open, maintain, liquidate and/or close current and savings accounts in banks, corporations and banking institutions, domestic and foreign, make deposits of all kinds, accept, approve and reject statements of accounts; withdraw funds from said accounts, drawing and signing checks, authorizations and orders of payment of any kind; and in connection with such operations to sign all documents which may be necessary, without any limitation whatever and to authorize any other person or persons to sign the same.

SIXTH:  By any and all means to issue, accept, endorse, assign, transfer, pledge, negotiate, cancel, pay, collect, or undertake the collection of, guarantee and/or in any other manner dispose of and deliver bills of exchange, warrants, notes, checks and all kinds of credit documents and securities.

Confidential

Ex.004-5.0213

CAPLIN0024709
USPROD-02360910

-2-

SEVENTH: To request and arrange, on behalf of the corporation, with any bank or entity, the opening of commercial credits, letters of credit and of guarantees, to the persons or entities he may designate.

EIGHTH: To lend and borrow any sums of money, with or without mortgage security or pledge; fixing rate of interest, the term and other conditions he may deem proper to stipulate; and to constitute, accept, extend, assign, convey, encumber, amend, and/or satisfy mortgages.

NINTH: To arrange for the deposit of all property and securities in banks and institutions with power to withdraw all or any part of such deposits as he may deem appropriate, to take on lease safe deposit boxes in bank vaults, signing, extending and rescinding the corresponding contracts whenever he may deem proper; and to deposit and withdraw from such boxes whatever he may deem convenient, signing the proper vouchers therefor.

TENTH: To give and accept in payment of debts, all kinds of property for the price he may agree upon.

ELEVENTH: To handle all kinds of proceedings before public and private offices, Registry Offices of all kinds, and before individuals, officials and authorities of every nature, domestic and foreign, to file petitions and applications of every kind; transact business and proceedings of every nature, and to appeal through the proper channels against any kind of resolutions passed until a definite resolution has been obtained.

TWELFTH: To attend all meetings to which the corporation may be summoned, or which it may be entitled to attend, for any reason, both of private persons and of shareholders of mercantile or civil enterprises, both domestic and foreign; to take part in all kinds of discussions arising on any matter whatsoever; to adopt, approve or challenge resolutions, casting the votes of the corporation as he may deem advisable; and to sign the minutes of the meetings whenever so required by law or by the By-Laws.

THIRTEENTH: To buy, accept, exchange and otherwise or by any title to acquire and sell personal and real properties, and acquire and sell, contribute, assign, transfer, dispose of movables, effects, securities, bonds, shares of mercantile and civil enterprises and corporations, credit documents and securities, and rights and shares of all kinds, domestic and foreign, for cash or on installments, fixing the price and conditions as he may deem expendient to stipulate; to pay and receive the price of such operations; and to accept and execute receipts, releases and evidences of payment in connection therewith.

Confidential

CAPLIN0024710
USPROD-02360911

-3-

FOURTEENTH: To organize, amend, extend, liquidate and dissolve, mercantile and civil corporations of every kind, adding thereto or withdrawing therefrom the capital and properties, to establish the rules under which he should be governed; subscribe for shares, represent such shares and receive the proceeds thereof, and in due course appoint managers, liquidators and expert.

FIFTEENTH: To take actual, physical and symbolic possession of any kind of property belonging to the corporation, to apply for and grant reductions of amounts and extensions of time, entering into agreements for payment with creditors and debtors, and to compromise all kinds of credits, rights and actions.

SIXTEENTH: To exercise all rights originating in contracts entered or which may be entered into by the corporation, or on its behalf; draw up minutes for the purpose of recording facts, and to issue summons and notices of every kind, and consignments, with authority to withdraw said consignments and the amounts consigned on behalf of the corporation.

SEVENTEENTH: To apply for registrations and entries of every kind in the Stock Register of corporations and enterprises and in the Registry of Real Property and where most convenient.

EIGHTEENTH: To enter into all acts and contracts not specified herein whether the object thereof be the creation or extension of real and personal rights, including the conclusion of representation contracts with granting corporations or persons.

NINETEENTH: To be vested with all the authority entering into powers for lawsuits, among which he shall exercise the following on behalf of and in representation of the corporation:

(1) To represent, assist and defend the corporation in all lawsuits, civil and criminal cases and matters, oral hearings of all kinds and eviction proceedings, intestate proceedings, probate proceedings, formalities with respect to declarations of heirs in intestate proceedings, declaratories involving more and less than a certain sum, executions, with special power to file protests, to make lawful payments on account and complying therein with all pertinent requisites, insolvency proceedings, bankruptcies, retractions, interventions, injunctions, incidents, and in all judicial proceedings and actions, including those of voluntary jurisdiction, in which the corporation may now or hereinafter be interested, either as plaintiff, defendant, or otherwise; and likewise to represent, assist and defend it in all the stages of the proceedings mentioned and in administrative controversies, proceedings, through all stages, appeals and recourses.

Confidential

CAPLIN0024711
USPROD-02360912

-4-

(II) To initiate, continue and terminate summary proceedings in accordance with the Law of Real Estate or Mortgage Law or of its Regulations and legal provisions in force on the subject, with power to stipulate the obligation to indemnify damages; and to request adjudications of properties in payment of claims filed.

(III) To appear in each and every one of said lawsuits and matters, before Courts, Tribunals, Hearings, Courts of Equity, Ministries, competent offices and Authorities, either as plaintiff or defendant, file writings and complaints, claims, answers, replies, rejoinders, counter claims, conclusions, pleadings and applications of every description; to initiate, continue and terminate, matters of jurisdiction by restraining order or demurrer; to challenge judges and all other individuals, to initiate, continue and terminate all kind of actions and exceptions, requests notices, citations, summons, judicial and notarial citations, admonitions, evictions, assignations, adjournments, extensions, certifications, court orders, cancellations, imprisonments, releases from prison, embargoes of every kind, disembargoes, sale, legal seizure, auction of property and withdrawal of documents from court records; to submit and improve bids and proposals in judicial and extrajudicial sales, either for the grantor or for the purpose of transferring them to a third party; to request, execute and accept writings and deeds for the adjudication of personal and real property; to consign, deposit and withdraw sums of money; to present witnesses, interrogatories, files and documents as evidence; to offer, require and introduce all kinds of evidence; to impeach witnesses of the other party and represent the corporation in the taking of all evidence; to request and take possession of personal and real property and to attend and vote at all meetings and appearances, declaring, agreeing and resolving thereat whatever he may deem proper; as well as at trials and oral hearings; to request bankruptcy and insolvency proceedings, appoint receivers, Commissioners, Depositaries, Experts, Property appraisers and Administrators, hear decisions, judgments and sentences, consenting to anything favorable and appealing from anything unfavourable, request, announce, present, continue or not, nullity proceedings and notions to set aside, appeal, request, complain, appeal, modification, unconstitutionality, liability, of annulment, protection in the possession and ownership, revision, governmental, administrative controversial, and all other ordinary and extraordinary proceedings as may be necessary; to dismiss and withdraw from each and all of the recourses referred to, with authority to follow up the same through all stages until terminated and rejecting such as may be filed by the opposing party; to abide by, desist or withdraw whenever deemed proper from any proceedings, exceptions, lawsuits and complaints, without any exception whatever; to request execution of sentences enforcing the fulfillment thereof through pertinent legal channels; to request, promote and practice all the preliminary formalities and all judicial and extrajudicial proceedings may be necessary, with power to request, approve, reject and enforce the assessment of costs; and to bring suit, ratify, declare under oath, protest and compromise without limit whatever.

CAPLIN0024712
USPROD-02360913

-5-

TWENTIETH: To execute and sign all kinds of powers of attorney whenever he may deem it proper or necessary, either general, mercantile, for lawsuits or special, with all the powers he may freely grant, without limitation whatever, in any part of the world, as if the Board of Directors and the General Meeting of Stockholders of the corporation executed same.

TWENTY-FIRST: To represent the corporation in any licitation or bidding, whether private or public and take necessary action and sign all documents deemed convenient or necessary for the best interests of the corporation at the time of submitting the offers.

TWENTY-SECOND: To execute and issue, in the exercise of all powers granted, all public and private documents which may be necessary, with the clauses, terms, conditions, waivers, covenants and requisites as he may deem proper, without any limitation whatever, waiving domicile and stipulating the place for the performance of obligations.

TWENTY-THIRD: To delegate in part or in its entirety the authorities of the present power of attorney in favour of the person or persons he may designate and to revoke such delegations whenever he shall deem proper.

IN WITNESS WHEREOF, this Power of Attorney is executed this 15th day of January, 2010.

ASPEN WIND CORPORATION

Eduardo E. Diaz
Director

Fernando A. Gil
Director



# POWER OF ATTORNEY

BY

## ASPEN WIND CORPORATION

**BY THIS POWER OF ATTORNEY** given on the 6th day of May 2004.

BY

## ASPEN WIND CORPORATION

a Company incorporated and registered in Belize, under reg. No 13,971 having its registered office at the offices of 60 Market Square, PO Box 364, Belize City, Belize (hereinafter called "the Company") hereby appoints:

**MR. DOUGLAS PHILLIP EDELMAN**
**55 MANAS PROSPECT,**
**BISHKEK,**
**KYRGYZSTAN**

holder of a United States of America Passport № █████████

(hereinafter called "the Attorney") the true and lawful Attorney of the Company in all countries of the world for and in the name of and on behalf of the Company to do or execute all or any of the acts and things hereinafter mentioned that is to say:

1. To apply on behalf of the Company to legal and physical persons, government bodies and bodies of the local administration with applications, claims, petitions, complaints and to conclude with the above mentioned persons or bodies any agreements and transactions.

2. To open, maintain, close on behalf of the Company in any bank or bank institution any accounts and to perform any bank operations.

3. To sign on behalf of the Company commercial contracts and any documents, perform endorsements, cash in any promissory notes and other working documents.



Confidential

Ex.004-5.0218

CAPLIN0024714
USPROD-02360915



. To create, reorganize and liquidate branches and representative offices of the Company and to effect their management.

. To act as a founder of legal persons and also to act in the administrative bodies of legal persons.

. To participate in the investments, to enter any partnerships, companies, associations and other commercial and noncommercial unions.

. To acquire and alienate, officially register on behalf of the Company any property, movable, and also to issue legally valid receipts.

. To vote on shares belonging to the Company on the General Meeting of the shareholders, shareholders and establishers of commercial enterprises, in which the Company is registered shareholder or an establisher, on all the matters in agenda as it may think necessary.

. To participate in the arbitration, judicial, customs and other law-enforcement organs, including the right to sue, to change the subject of the suit, to peaceful settlement and appeal (statements, decisions) of judicial, customs and other law enforcement organs; to participate in arbitration organs for dispute settlement and to represent the interest of the Company in all state and public organs, entities and institutes.

0. The Company is not responsible for commitments, regardless of what nature, which its lawful Attorney makes in excess of the financial means available to the Company.

1. This Power of Attorney may not be delegated to any third party and the Company expressly declares that no sub-powers of Attorney can be granted on virtue of the Power of Attorney.

2. This Power of Attorney shall be governed by the laws of Cyprus. Any dispute among the parties, Company and or the parties relying on the present Power of Attorney shall be exclusively resolved by the competent Courts of Cyprus in which case Cyprus Laws shall be applicable.

3. This Power of Attorney is valid for one year from the date of its execution until the 5th day of May 2005.



Confidential

CAPLIN0024715
USPROD-02360916



AND it is hereby declared that:

The Company hereby ratifies and confirms and agrees to ratify and confirm whatsoever the Attorney shall do by virtue of this Power of Attorney.

IN WITNESS whereof this Power of Attorney has been executed this 6th day of May 2004.

(Signed)...............................
**LEDRA DIRECTORS LIMITED**
**DIRECTOR**

(Signed)...............................
**LEDRA SECRETARIAL SERVICES LIMITED**
**SECRETARY**

Signed this day in my presence by IOANNA SAVVIDOU on behalf of LEDRA DIRECTORS LIMITED as Director and KYRIAKI DEMETRIOU-KAMPERI on behalf of LEDRA SECRETARIAL SERVICES LIMITED as Secretary of ASPEN WIND CORPORATION who are personally known to me and sealed this day in my presence. In testimony where of I have hereto set my hand and official seal this 6th day of May 2004.

(Sign).....................
Certifying Officer

**Athena Nicolaidou**
**Certifying Officer**



Confidential

Ex.004-5.0220

CAPLIN0024716
USPROD-02360917



This is to certify that the signature appearing above/overleaf is the signature of *Andreas Nicolaides*, a Certifying Officer of Nicosia, appointed by the Council of Ministers of the Republic of Cyprus under the Certifying Officers Law Cap 35 to certify signature and seals, and that the seal opposite the said signature is that of the Certifying Officer of Nicosia.

Nicosia - Cyprus
Date 7/5/04
District Officer
Nicosia

MARO KOULLI

# APOSTILLE
## (Convention de La Haye du 5 octobre 1961)

1. Country CYPRUS.
   This public document

2. has been signed by ........... MARO KOULLI

3. acting in the capacity of District Officer

4. bears the seal/stamp of the District Officer.

            Certified

5. at Nicosia.                 6. the ........

        M. IASONOS

7. by ........

8. No. ........... 38584/04

9. Seal/stamp ........       10. Signature:

Permanent Secretary
Ministry of Justice and Public Order

Confidential

CAPLIN0024717
USPROD-02360918



# POWER OF ATTORNEY

BY

## ASPEN WIND CORPORATION

**BY THIS POWER OF ATTORNEY** given on the 6th day of May 2005.

BY

## ASPEN WIND CORPORATION

a Company incorporated and registered in Belize, under reg. No 13,971 having its registered office at the offices of 60 Market Square, PO Box 364, Belize City, Belize (hereinafter called "the Company") hereby appoints:

**MR. DOUGLAS PHILLIP EDELMAN**
**55 MANAS PROSPECT,**
**BISHKEK,**
**KYRGYZSTAN**

holder of a United States of America Passport № ▮▮▮▮▮▮

(hereinafter called "the Attorney") the true and lawful Attorney of the Company in all countries of the world for and in the name of and on behalf of the Company to do or execute all or any of the acts and things hereinafter mentioned that is to say:

1. To apply on behalf of the Company to legal and physical persons, government bodies and bodies of the local administration with applications, claims, petitions, complaints and to conclude with the above mentioned persons or bodies any agreements and transactions.

2. To open, maintain, close on behalf of the Company in any bank or bank institution any accounts and to perform any bank operations.

3. To sign on behalf of the Company commercial contracts and any documents, perform endorsements, cash in any promissory notes and other working documents.

CAPLIN0024718
USPROD-02360919



4. To create, reorganize and liquidate branches and representative offices of the Company and to effect their management.

5. To act as a founder of legal persons and also to act in the administrative bodies of legal persons.

6. To participate in the investments, to enter any partnerships, companies, associations and other commercial and noncommercial unions.

7. To acquire and alienate, officially register on behalf of the Company any property, movable, and also to issue legally valid receipts.

8. To vote on shares belonging to the Company on the General Meeting of the shareholders, shareholders and establishers of commercial enterprises, in which the Company is registered shareholder or an establisher, on all the matters in agenda as it may think necessary.

9. To participate in the arbitration, judicial, customs and other law-enforcement organs, including the right to sue, to change the subject of the suit, to peaceful settlement and appeal (statements, decisions) of judicial, customs and other law enforcement organs; to participate in arbitration organs for dispute settlement and to represent the interest of the Company in all state and public organs, entities and institutes.

10. The Company is not responsible for commitments, regardless of what nature, which its lawful Attorney makes in excess of the financial means available to the Company.

11. This Power of Attorney may not be delegated to any third party and the Company expressly declares that no sub-powers of Attorney can be granted on virtue of this Power of Attorney.

12. This Power of Attorney shall be governed by the laws of Cyprus. Any dispute among the parties, Company and or the parties relying on the present Power of Attorney shall be exclusively resolved by the competent Courts of Cyprus in which case Cyprus Laws shall be applicable.

13. This Power of Attorney is valid for one year from the date of its execution until the **5th day of May 2006.**

CAPLIN0024719
USPROD-02360920



AND it is hereby declared that:

The Company hereby ratifies and confirms and agrees to ratify and confirm whatsoever the Attorney shall do by virtue of this Power of Attorney.

IN WITNESS whereof this Power of Attorney has been executed this **6th day of May 2005.**

(Signed).........................
**LEDRA DIRECTORS LIMITED**
**DIRECTOR**

(Signed).........................
**LEDRA SECRETARIAL SERVICES LIMITED**
**SECRETARY**

Signed this day in my presence by ANDRI CHARILAOU on behalf of LEDRA DIRECTORS LIMITED as Director and MICHALIS KORELLIS on behalf of LEDRA SECRETARIAL SERVICES LIMITED as Secretary of **ASPEN WIND CORPORATION** who are personally known to me and sealed this day in my presence. In testimony where of I have hereto set my hand and official seal this **6th day of May 2005.**

(Sign):.........................
Certifying Officer



**Athena Nicolaidou**
Certifying Officer

Confidential

Ex.004-5.0224

CAPLIN0024720
USPROD-02360921

This is to certify that the signature appearing hereinunder is the signature of MRS. ATHENA NICOLAIDOU a Certifying Officer of Nicosia, appointed by the Council of Ministers of the Republic of Cyprus under the Certifying officers Law Cap 39 to certify signature and seals, and that the seal opposite the said signature is that of the Certifying Officer of Nicosia.

Nicosia - Cyprus
Date 3/6/03

Certing officer
Nicosia

30.6.2003

This is to certify that the signature appearing above/overleaf is the signature of MRS. ATHENA NICOLAIDOU a Certifying Officer at Nicosia, appointed by the Council of Ministers of the Republic of Cyprus under the Certifying Officers Law Cap 39 to certify signature and seals, and that the seal opposite the said signature is that of the Certifying Officer at Nicosia.

_signature_

District Officer

30.6.2003

## APOSTILLE
### (Convention de La Haye du 5 octobre 1961)

1. Country CYPRUS.
   This public document

2. has been signed by _____ MARIA VOSKOU

3. acting in the capacity of District Officer

4. bears the seal/stamp of the District Officer.

Certified

5. at Nicosia.                    6. the ___ 03/06/05

7. by ___ St. Constantinou

8. No. ___ 6127910r

9. Seal/stamp:                    10. Signature:

30.6.2003    30.6.2003

_signature_

Permanent Secretary
Ministry of Justice and Public Order

Confidential

Ex.004-5.0226

CAPLIN0024722
USPROD-02360923



**New York State Department of**
## Taxation and Finance
OPTS-Corporation Tax Liability Resolution
W A Harriman State Campus
Albany NY 12227-0001

**DATE:** 10/12/10

### NOTICE AND DEMAND for Payment of Tax Due

**ASSESSMENT ID:** L-033570717-8

**TOTAL AMOUNT DUE:** $373.48

**PAYMENT DUE DATE:** 11/02/10

ASPEN WIND CORPORATION
788 790 FINCHLEY RD
LONDON,
G BRITAIN/NO IRELAND

**TPS ID:** TF1757589AA

**TAX TYPE:** Corporation

**TAX ARTICLE/SECTION:** 9A/209.1

**DTF CONTROL NUMBER:** CE001319771

**TAXPAYER'S COMPLETE LEGAL NAME**
ASPEN WIND CORPORATION

**EXPLANATION AND INSTRUCTIONS**
You have failed to comply with the original notice issued to you on 04/23/10 requesting you to file Tax Returns/Reports due for the Tax Type indicated above. Please refer to the DELINQUENT RETURN/REPORT SECTION for the tax period(s) affected and the returns/reports due.

Since the returns/reports were not filed, additional penalty and interest have been added to the ESTIMATED amount due. Please refer to the COMPUTATION SUMMARY SECTION for a computation of the current ESTIMATED balance due.

A RETURN/REPORT MUST BE FILED AS SOON AS POSSIBLE EVEN IF THERE IS NO TAX DUE FOR THE TAX PERIOD.

If you HAVE NOT FILED the Returns/Reports, YOU MUST:

Complete the returns/reports in full and compute the ACTUAL amount of tax due for each period PLUS penalty and interest due (refer to your Return/Report Instructions to help determine penalty and interest rates).

Make full payment of the ACTUAL tax due (as computed on each return/report) PLUS penalty and interest due.

Send your completed Report(s) and Payment to:
NYS Department of Taxation and Finance
Tax Processing Unit
PO Box 1909
Albany, NY 12201-1909

This ESTIMATED liability will be canceled if you file the returns/reports due and pay the ACTUAL tax due PLUS appropriate penalty and interest by 11/02/10.

If you do not file the returns/reports and make payment of the ACTUAL amount due by 11/02/10:

We will take legal action to compel payment of the ESTIMATED tax due PLUS additional penalty and

(CONTINUED ON BACK)

**DTF-966F (1/02)**     TSF0000017 2740845

**Keep this notice for your records.**

Confidential

Ex.004-5.0227

CAPLIN0024723
USPROD-02360924

**EXPLANATION AND INSTRUCTIONS** (continued)

interest.

Additional penalty(s) will accrue and there may be an audit of your books and records. Additional penalty(s) may include penalty for failure to pay tax required to be shown on a return, imposed by section 1085(a)(3) of the Tax Law.

A lien will exist upon your real and personal property. Even if this ESTIMATED liability is paid, such a lien will remain until the report(s) are filed and the ACTUAL tax plus penalty and interest due is paid.

If you HAVE ALREADY FILED or believe you are NOT REQUIRED TO FILE the returns/reports due, complete the Disagreement With Findings Section on the enclosed Payment Document and return the Payment Document in the envelope provided.

You may pay the ESTIMATED amount due by completing the Payment Application Section on the enclosed Payment Document. HOWEVER, payment of this amount DOES NOT constitute filing the returns/reports due. As such, the Department of Taxation and Finance has an unlimited period of time in which to further assess taxes which may be due.

If you have questions regarding this notice, please call (518) 485-0384. For in-state callers without free long distance, call 1 866 697-2499. Please refer to the Assessment ID shown on this notice when calling.

**Hotline for the Hearing and Speech Impaired**
If you have a hearing or speech impairment and have access to a telecommunications device for the deaf (TTY), you can get answers to your questions regarding this notice by calling (518) 485-5082. If you do not own a TTY, check with independent living centers or community action programs to find out where machines are available for public use.

**DELINQUENT RETURN/REPORT SECTION**

TAX PERIOD ENDED DATE: 11/30/08
REPORT TYPE DUE: CT-3          ORIGINAL FILING DUE DATE: 02/17/09

**COMPUTATION SUMMARY SECTION**

| Tax Period Ended | Estimated Tax Assessed | (+) Interest Amount Assessed | (+) Penalty Amount Assessed | (-) Assessment Payments/ Credits | (=) Current Estimated Balance Due |
|---|---|---|---|---|---|
| 11-30-08 | 250.00 | 33.45 | 100.00 | 9.97 | 373.48 |
| TOTALS | 250.00 | 33.45 | 100.00 | 9.97 | 373.48 |

NOTE: To view the current balance of this or any other outstanding liabilities, access our web site at www.nystax.gov and select the Online Tax Center option.

DTF-966FC (1/02)                                    **Keep this notice for your records.**

Confidential

Ex.004-5.0228

CAPLIN0024724
USPROD-02360925

**New York State Department of**
# Taxation and Finance

**Payment Document**

If name or address shown is incorrect or
has changed, enter correct information
and return this **entire** payment document.

L-033570717-8
ASPEN WIND CORPORATION
788 790 FINCHLEY RD
LONDON,
G BRITAIN/NO IRELAND

**INSTRUCTIONS**
Complete, sign, and return this entire page if you have already filed or if you believe you are not required
to file a return.
- If you pay this liability, include your delinquent return with your payment of the actual amount due
  or you may be subject to an audit of your books and records.
- Return this entire page in the envelope provided with our address showing in the window; or
- Fax this completed form along with any supporting documentation to (518) 435-8606.
- Telephone assistance is available from 8:30 A.M. to 4:30 P.M. (eastern time), Monday through Friday at
  (518) 485-0384. For in-state callers without free long distance, call 1 866 697-2499.

**Disagreement with findings section - Check the appropriate box(es), enter any required information and sign below.**

|  | Date filed | Tax period ended | Amount Paid | Taxpayer ID | Confirmation No. |
|---|---|---|---|---|---|
| ☐ (016) My return was filed: | | | | | |

Attach a copy of the front and back of your canceled check or money order (not the money order
receipt). If you filed or paid electronically, provide confirmation or transaction number.

☐ (072) The corporation was legally dissolved on: _____ (A return must be filed through the date of dissolution.)

☐ (004) Other - Explain (use back if necessary): _____

**SIGN HERE** ▶

| Responsible person | Date | Telephone number | Email address |
|---|---|---|---|

| Third – party designee | Do you want to allow another person to discuss this notice with the Tax Department?* Yes ☐ *(complete the following)*   No ☐ |
|---|---|
| | Designee's name *(please print)*   Designee's phone number   Personal Identification Number (PIN) |

* By marking an *X* in the *Yes* box, you authorize the Tax Department to discuss this matter, which may include confidential tax information, with your designee.
This permission ends when the Tax Department completes its informal review. This informal review does not extend your time to file a formal protest with the
Department's Bureau of Conciliation and Mediation Services or the Division of Tax Appeals. If you want your designee to receive correspondence from us or
represent you before the Tax Department, you'll have to file a Power of Attorney (Form POA-1).
Γ    168.1-B (9/08)

**PAYMENT APPLICATION SECTION - Check the box and enter in the space provided the payment amount enclosed.**
See above for instructions on returning this form.

- ☐ Payment for Assessment ID: L-033570717-8

**NOTE: PAYMENT OF THIS ESTIMATED LIABILITY WITHOUT FILING THE DELINQUENT RETURN/REPORT WILL
RESULT IN THE ACCRUAL OF ADDITIONAL PENALTY AND/OR A POSSIBLE AUDIT OF YOUR BOOKS
AND RECORDS.**

Make your check or money order * payable to the *Commissioner of Taxation
and Finance*. Include your Assessment ID number on your payment.
* If you prefer to pay by credit card or electronic funds withdrawal, please visit our
Web site at *www.nystax.gov* and click on *Online Tax Center*, or call 1 800 835-3554.

| Enter amount enclosed ▶ | $ |
|---|---|

Make sure this address
shows through envelope window.
▼

| For office use only |
|---|
| Form track number |
| Amount received |
| Payment effect/rec'd dates |

NYS ASSESSMENT RECEIVABLES
PO BOX 4127
BINGHAMTON NY 13902-4127

DTF-968.1-B (9/08)          TSF0000018 2740845

L0335707178      000000037348

Confidential

Ex.004-5.0229

CAPLIN0024725
USPROD-02360926

# ASPEN WIND CORPORATION

## FINANCIAL STATEMENTS

## FOR THE YEAR ENDED

## 31 DECEMBER 2003

Confidential

CAPLIN0024726
USPROD-02360927

**ASPEN WIND CORPORATION**
**BALANCE SHEET AS AT 31 DECEMBER 2003**

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | US $ | US $ | US $ | US $ |
| **CURRENT ASSETS** | | | | |
| Stocks | | 229,069 | | 123,770 |
| | | | | |
| Accounts receivable | | | | |
| Trade contracts | 129,884 | | 81,419 | |
| Other | - | 129,884 | 7,002 | 88,421 |
| | | | | |
| Inter-group accounts | | | | |
| Minacorp | 262,889 | | 214,557 | |
| Bartol Limited | 945,249 | | 617,991 | |
| Red Star Enterprises | 115,216 | | 152,814 | |
| Ramon Insurance Brokers | 27,837 | 1,351,191 | 840 | 986,202 |
| | | | | |
| Prepaid expenses | | 21,717 | | 8,297 |
| | | | | |
| Cash at bank | | | | |
| Credit Suisse | 7,269 | 7,269 | 29,708 | 29,708 |
| | | | | |
| Total current assets | | 1,739,130 | | 1,236,398 |
| **CURRENT LIABILITIES** | | | | |
| | | | | |
| Accounts payable | | 265,119 | | 266,989 |
| | | | | |
| Accrued expenses | | 9,651 | | 26,249 |
| | | | | |
| Director's current account | | - | | - |
| | | | | |
| Total current liabilities | | 274,770 | | 293,238 |
| | | | | |
| **NET ASSETS** | | 1,464,360 | | 943,160 |
| | | | | |
| **Financed by:** | | | | |
| **EQUITY** | | 100,000 | | 100,000 |
| | | | | |
| **RETAINED EARNINGS** | | | | |
| Balance brought forward | 843,160 | | 381,947 | |
| Net revenue for the period | 521,200 | 1,364,360 | 461,213 | 843,160 |
| | | 1,464,360 | | 943,160 |

Confidential

Ex.004-5.0231

CAPLIN0024727
USPROD-02360928

**ASPEN WIND CORPORATION**

**TRADING AND PROFIT AND LOSS ACCOUNT**
**FOR THE YEAR ENDED 31 DECEMBER 2003**

| | 2003 | | 2002 | |
|---|---:|---:|---:|---:|
| | US $ | US $ | US $ | US $ |
| **Revenue** | | | | |
| Sales | | 14,269,369 | | 11,603,961 |
| **Less: Direct costs** | | | | |
| Cost of sales | | 13,129,554 | | 10,673,464 |
| **Gross margin** | | 1,139,815 | | 930,497 |
| **Indirect costs** | | | | |
| Commissions | | 26,829 | | 17,269 |
| **Trading profit before administration costs** | | 1,112,986 | | 913,228 |
| **Administration expenses** | | | | |
| Employee costs | 470,357 | | 346,486 | |
| Office costs | 71,714 | | 62,006 | |
| Consultancy | 4,999 | | 3,545 | |
| Professional fees | 13,158 | | 12,966 | |
| Accountancy fees | 9,755 | | 8,744 | |
| Interest paid | 245 | | - | |
| Bank charges | 21,558 | 591,786 | 18,268 | 452,015 |
| **Net profit for the period** | | 521,200 | | 461,213 |

Confidential

CAPLIN0024728
USPROD-02360929

very Urgent                                                                                    Page 1 of 2

## G A. Collett

| | |
|---|---|
| **From:** | Bianchi Svetlana (SGAT 423) [svetlana.bianchi@credit-suisse.com] |
| **Sent:** | 28 November 2008 11:26 |
| **To:** | GACollettCA@aol.com |
| **Subject:** | very Urgent |

Dear Graham,

I received an email from my college from Risk Department concerning clients who has the US passport.

As a several initiatives have been launched by the USA to combat perceived tax evasion by US taxpayers via Non-US entities.

To achieve this goal the US authorities wish to involve foreign banks in order to receive more information. One of the consequences might be a change in the withholding tax and reporting rules.

In order to avoid risks for the bank and the clients action needs to be taken. Therefore the bank CS propose to clients:

- o Terminate their relationship with CS and withdraw their assets out of CS (e.g. by transferring the assets to another bank) or
- o Convert to a client relationship with CS Private Advisors (CSPA), including the signature of a W9 Form (= disclosure of account information to the IRS)
- o Exception: US-Person on Form A provides copy of form 5471 (sent to US authority)

All form are attached.

I'm very sorry.....
It's very urgent so can give an answer as soon as possible.

Kind regards,


Best regards/ С уважением,

Svetlana Bianchi
**CREDIT SUISSE**
Corporate & Institutional Clients
Commodity & Structured Trade Finance
17, Rue de Lausanne
CH-1211 Genève
Tel.: +41 22 393 41 01
Fax: +41 22 393 20 43
svetlana.bianchi@credit-suisse.com
www.credit-suisse.com

>This message may contain confidential, proprietary or legally privileged information and is intended only for the use of the addressee named above. No confidentiality or privilege is waived or lost by any mistransmission. If you are not the intended recipient of this message you are hereby notified that you must not use, disseminate, copy it in any form or take any action in reliance on it. If you have received this message in error please delete it and any copies of it and notify the sender immediately. CREDIT SUISSE GROUP and its subsidiaries reserve the right to intercept

CAPLIN0024729
USPROD-02360930

# CREDIT SUISSE

**CREDIT SUISSE**
CH-Genève 70 (0251)
Your adviser: Svetlana Bianchi, Tel. 022 393 41 01
Business Center, Tel.: +41 22 393 39 31
Clearing No.: 4835  / BIC: CRESCHZZ12A

400

**Outstanding irrevocable L/C's  462397-52-10**
Account holder:     Aspen Wind Corporation
                    Ret
Currency:           US dollars
IBAN:               ████████████5201 0

CS Private & Corporate Clients
ULAZ 22
Intern

November 29th, 2008

## Statement of account without posting per 30.11.2008

Sheet 1/1

| Date | Text | Debit | Credit | Value | Balance |
|------|------|-------|--------|-------|---------|
| 01.11.08 | Balance carried forward | | | | 0.00 |
| | **Total turnover / Book balance as of 30.11.2008** | **0.00** | **0.00** | | **0.00** |

Yours sincerely

CREDIT SUISSE

**Conditions for investments in a non-Swiss currency:** The obligations of the bank shall be discharged exclusively at the place of business of the branch managing the accounts and solely through the establishment of a credit entry in the country of the currency concerned at a bank named by the client or, in the absence of such instructions, at the bank's own branch or a correspondent bank. The laws in force at the location of the branch managing the accounts shall be binding. The transaction is subject to any measures taken by the country of the currency in question. The location of the branch managing the accounts shall be the sole place of jurisdiction.

Form without signature

Pursuant to Art. 7 para. 2 of our bank's General Conditions, account statements are deemed to have been accepted if no complaints are received within one month.

Confidential

CAPLIN0024730
USPROD-02360931



CREDIT SUISSE

Current account Trade Finance ███ 7-52-8
Aspen Wind Corporation
Ret

## Statement of account closing per 10.12.2008

Sheet 2/2

| Date | Text | Debit | Credit | Value | Balance |
|------|------|------:|-------:|------:|--------:|
| 06.11.08 | Payment order electronic banking Graham A Collett 14 Rosewood Court | 1'862.65 | | 06.11.08 | 31'966.57 |
| 14.11.08 | Payment order electronic banking AMERICAN EXPRESS SERVICES EUROPE LTD | 19'106.01 | | 14.11.08 | 12'859.56 |
| 18.11.08 | Payment BARTOL LIMITED RET | | 16'000.00 | 17.11.08 | 28'859.56 |
| 17.11.08 | Payment order electronic banking MALWRIGHT LIMITED LONDON | 28'178.86 | | 18.11.08 | 680.70 |
| 25.11.08 | Payment BARTOL LIMITED RET | | 5'000.00 | 25.11.08 | |
| 25.11.08 | Payment BARTOL LIMITED RET | | 30'000.00 | 25.11.08 | 35'680.70 |
| 25.11.08 | Payment order electronic banking INCENTIVE DESTINATIONS PVT LIMITED | 3'130.41 | | 26.11.08 | 32'550.29 |
| 02.12.08 | Payment order electronic banking Graham A Collett 14 Rosewood Court | 1'652.68 | | 02.12.08 | |
| 02.12.08 | Payment order electronic banking Shiel & Lindsay London | 3'512.34 | | 02.12.08 | |
| 02.12.08 | Payment order electronic banking Shiel & Lindsay London | 3'512.34 | | 02.12.08 | |
| 02.12.08 | Payment order electronic banking Mrs Delphine LE DAIN London | 8'012.34 | | 02.12.08 | |
| 02.12.08 | Payment order electronic banking SCOTT DAVIDSON CHARTERED SURVEYORS | 14'699.84 | | 02.12.08 | 1'160.75 |
| 08.12.08 | Balance settlement of expenses | 37.58 | | 10.12.08 | |
| 08.12.08 | Balance of closing entries as shown separately | | 4.64 | 10.12.08 | 1'127.81 |
| | **Total turnover / Book balance as of 08.12.2008** | **174'843.35** | **141'004.64** | | **1'127.81** |

Yours sincerely

CREDIT SUISSE

**Conditions for investments in a non-Swiss currency:** The obligations of the bank shall be discharged exclusively at the place of business of the branch managing the accounts and solely through the establishment of a credit entry in the country of the currency concerned at a bank named by the client or, in the absence of such instructions, at the bank's own branch or a correspondent bank. The laws in force at the location of the branch managing the accounts shall be binding. The transaction is subject to any measure taken by the country of the currency in question. The location of the branch managing the accounts shall be the sole place of jurisdiction.

Form without signature

Pursuant to Art. 7 para. 2 of our bank's General Conditions, account statements are deemed to have been accepted if no complaints are received within one month.

BE06

Confidential

Ex.004-5.0235


CREDIT SUISSE

CREDIT SUISSE
CH-Genève 70 (0251)
Your adviser: Svetlana Bianchi, Tel. 022 393 41 01
Business Center, Tel.: +41 22 393 39 31
Clearing No.: 4835  / BIC: CRESCHZZ12A

**Current account Trade Finance  462397-52-8**
Currency:          Pounds sterling
IBAN:                                        5200 8

Aspen Wind Corporation
Ret
PCC  ULDR 2

December 9th, 2008

## Statement of account closing per 10.12.2008

RET
Sheet 1/2

| Date | Text | Debit | Credit | Value | Balance |
|---|---|---|---|---|---|
| 01.10.08 | Balance carried forward | | | | 34'966.52 |
| 30.09.08 | Payment order electronic banking<br>Shiel & Lindsay London | 3'511.49 | | 01.10.08 | |
| 30.09.08 | Payment order electronic banking<br>Mrs Delphine LE DAIN London | 9'011.49 | | 01.10.08 | 22'443.54 |
| 09.10.08 | Payment order electronic banking<br>Graham A Collett 14 Rosewood Court | 1'292.50 | | 09.10.08 | |
| 09.10.08 | Payment BARTOL LIMITED RET | | 20'000.00 | 09.10.08 | 41'151.04 |
| 10.10.08 | Payment order electronic banking<br>AMERICAN EXPRESS SERVICES EUROPE LTD | 35'443.12 | | 10.10.08 | 5'707.92 |
| 17.10.08 | Payment order electronic banking<br>SRK EXPLORATION SERVICES LIMITED 16 | 6'281.61 | | 17.10.08 | |
| 17.10.08 | Payment BARTOL LIMITED RET | | 10'000.00 | 17.10.08 | 9'426.31 |
| 21.10.08 | Payment order electronic banking<br>Mrs Delphine LE DAIN London | 8'011.51 | | 21.10.08 | 1'414.80 |
| 24.10.08 | Payment order electronic banking<br>AMERICAN EXPRESS SERVICES EUROPE LTD | 390.35 | | 24.10.08 | 1'024.45 |
| 27.10.08 | Payment BARTOL LIMITED RET | | 20'000.00 | 27.10.08 | 21'024.45 |
| 27.10.08 | Payment order electronic banking<br>SRK CONSULTING (RUSSIA) LIMTED 21 GO | 4'660.34 | | 28.10.08 | |
| 28.10.08 | Payment order electronic banking<br>Mina Corp Uk Ltd 20 Conduit Street | 10'011.51 | | 28.10.08 | 6'352.60 |
| 04.11.08 | Payment order electronic banking<br>Shiel & Lindsay London | 3'512.19 | | 04.11.08 | |
| 04.11.08 | Payment order electronic banking<br>Mrs Delphine LE DAIN London | 9'012.19 | | 04.11.08 | |
| 04.11.08 | Payment BARTOL LIMITED RET | | 40'000.00 | 04.11.08 | 33'828.22 |

Continued on next page

Ex.004-5.0236

CAPLIN0024732
USPROD-02360933



400

**CREDIT SUISSE**
CH-Genève 70 (0251)
Your adviser: Svetlana Bianchi, Tel. 022 393 41 01
Business Center, Tel.: +41 22 393 39 31
Clearing No.: 4835   / BIC: CRESCHZZ12A

**Outstanding irrevocable L/C's  462397-52-10**
Account holder:   Aspen Wind Corporation
                  Ret
Currency:         US dollars
IBAN:             ████████████5201 0

CS Private & Corporate Clients
ULAZ 22
Intern

December 10th, 2008

## Statement of account closing w/o posting per 09.12.2008

Sheet 1/1

| Date | Text | Debit | Credit | Value | Balance |
|------|------|-------|--------|-------|---------|
| 01.12.08 | Balance carried forward | | | | 0.00 |
| | **Total turnover / Book balance as of 09.12.2008** | **0.00** | **0.00** | | **0.00** |

Yours sincerely

CREDIT SUISSE

**Conditions for investments in a non-Swiss currency:** The obligations of the bank shall be discharged exclusively at the place of business of the branch managing the accounts and solely through the establishment of a credit entry in the country of the currency concerned at a bank named by the client or, in the absence of such instructions, at the bank's own branch or a correspondent bank. The laws in force at the location of the branch managing the accounts shall be binding. The transaction is subject to any measures taken by the country of the currency in question. The location of the branch managing the accounts shall be the sole place of **jurisdiction.**

Form without signature

Pursuant to Art. 7 para. 2 of our bank's General Conditions, account statements are deemed to have been accepted if no complaints are received within one month.

BEC05

Ex.004-5.0237

CAPLIN0024733
USPROD-02360934

**Bartol Limited**

Bartol Limited was originally incorporated on 23 May 2001 with two bearer shares in issue. These were subsequently replaced on 16 September 2008 by 50,000 shares in the name of Joyner Overseas (as nominees for Sunage) by which time, Bartol has no trading activity.

DE had POAs to act for Bartol Limited in 2004 and 2006

We have draft accounts for Bartol Limited since its incorporation up to 2005, when its trading activity ceased.

**The business of Red Star was originally carried on in the name of Bartol Limited until it was transferred into Red Star Enterprises Limited (Gibraltar) with effect from 1 January 2005.**

CAPLIN0024734
USPROD-02360935



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

CERTIFICATE OF INCORPORATION          (SECTIONS 14 AND 15)

No. 445933

The  Registrar of Companies  of the British Virgin Islands HEREBY CERTIFIES

pursuant to the International Business Companies Act, Cap. 291 that all

the requirements of the Act in respect of incorporation having been satisfied,

**BARTOL LIMITED**

is incorporated in the British Virgin Islands as an International Business

Company this 23rd day of May, 2001.

Given under my hand and seal at
Road Town, in the Territory of the
British Virgin Islands

REGISTRAR OF COMPANIES

CRTI0015

I.B.C. Nc    445933



**BRITISH VIRGIN ISLANDS**

**INTERNATIONAL BUSINESS COMPANIES ACT**
(Cap.291)

**MEMORANDUM AND ARTICLES**
**OF ASSOCIATION**

**OF**

**BARTOL LIMITED**

Incorporated the 23rd day of    May    ,2001

**INTERLINK CONSULT S.A.**
P.O. Box 6-1014
El Dorado
Panama, Republic of Panama



Confidential

CAPLIN0024736
USPROD-02360937

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

MEMORANDUM OF ASSOCIATION

OF

BARTOL LIMITED

1.　　The name of the company is:　**BARTOL LIMITED**

2.　　The registered office of the Company shall be located at the offices of **ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED, P.O. Box 3175, Road Town, Tortola, British Virgin Islands,** or at such other place within the British Virgin Islands as the directors may from time to time determine.

3.　　The registered agent of the Company shall be **ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED, P.O. Box 3175, Road Town, Tortola, British Virgin Islands** or such other person or company being a person or company entitled to act as a registered agent as the directors may from time to time determine.

4.　　The objects for which the Company is established are:

(1)　　To buy, sell, underwrite, invest in, exchange or otherwise acquire, and to hold, manage, develop, deal with and turn to account any bonds, debentures, shares (whether fully paid or not), stocks, options, commodities, futures, forward contracts, notes, or securities of governments, states, municipalities, public authorities or public or private limited or unlimited companies in any part of the world, precious metals, gems, works of art and other articles of value, and whether on a cash or margin basis and including short sales, and to lend money against the security of any of the aforementioned property.

(2)　　To buy, own, hold, subdivide, lease, sell, rent, prepare building sites, construct, reconstruct, alter, improve, decorate, furnish, operate, maintain, reclaim or otherwise deal with and/or develop land and buildings and otherwise deal in real estate in all its branches, to make advances upon the security of land or other property or any interest therein, and whether erected or in course of erection and whether on first mortgage or charge or subject to a prior mortgage or charge or charges, and develop land and buildings as may seem expedient but without prejudice to the generality of the foregoing.

(3)　　To borrow or raise money by the issue of debentures, debenture stock (perpetual or terminable), bonds, mortgages, or any other securities founded or based upon all or any of the assets or property of the Company or without any such security and upon such terms as to priority or otherwise as the Company shall think fit.

(4)　　To engage, in any other business or businesses whatsoever, or in any act or activity, which are not prohibited under any law for the time being in force in the British Virgin Islands.

CAPLIN0024737
USPROD-02360938

2

(5)    To do all such other things as are incidental to or the Company may think conducive to the attainment of all or any of the above objects.

And it is hereby declared that the intention is that each of the objects specified in each paragraph of this clause shall, except where otherwise expressed in such paragraph, be an independent main object and be in nowise limited or restricted by reference to or inference from the terms of any other paragraph or the name of the Company.

5.    The Company has no power to:

(1)    carry on business with persons resident in the British Virgin Islands;

(2)    own an interest in real property situated in the British Virgin Islands, other than a lease of property for use as an office from which to communicate with members or where books and records of the company are prepared or maintained;

(3)    carry on banking or trust business unless it is licensed under the Banks and Trust Companies Act, 1990;

(4)    carry on business as an insurance or a reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorizing it to carry on that business;

(5)    carry on business of company management unless it is licensed under the Company Management Act, 1990; or

(6)    carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

6.    The Company shall have perpetual existence.

7.    The shares in the Company shall be issued in the currency of the United States of America.

8.    The authorized capital of the Company is US$50,000.00 divided into 50,000 shares with a par value of US$1.00 each.  The directors shall by resolution determine, at their discretion, and from time to time, how many shares thereof are to be issued as registered shares and how many shares thereof are to be issued as bearer shares.  Registered shares may be exchanged for shares issued to the bearer, and shares issued to bearer may be exchanged for registered shares.

9.    The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

10.    The directors shall by resolution have the power to issue any class or series of shares that the Company is authorized to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions.

11.    Where shares are issued to bearer, the bearer, identified for this purpose by the number of share certificate, shall be requested to give to the Company the name and address of an agent or attorney for service of any notice, information or written statement required to be given to members, and service upon such agent or attorney shall constitute service upon the bearer of such shares.  In the absence of such name and address being given [illegible]

CAPLIN0024738
USPROD-02360939

3

purpose of service for the Company to publish the notice, information or written statement in a newspaper circulated in the British Virgin Islands and in a newspaper in the place where the Company has its principal office.

12.  The Company shall by resolution of the directors have the power to amend or modify any of the conditions contained in this Memorandum of Association and to increase or reduce the authorized capital of the Company in any way which may be permitted by law.



Confidential

CAPLIN0024739
USPROD-02360940

4

We, **ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED**, of P.O. Box 3175, Road Town, Tortola, British Virgin Islands, being a licenced trust company, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association.

FOR:    ALEMAN, CORDERO, GALINDO & LEE
        TRUST (BVI) LIMITED

Andrés M. Sánchez
Authorized Signatory

DATED this  23rd day of        May     , 2001

WITNESS to the above signature:

Marcos A. Muñoz
c/o P.O. Box 3175
Road Town, Tortola
British Virgin Islands



Confidential

Ex.004-5.0244

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

ARTICLES OF ASSOCIATION

OF

BARTOL LIMITED

1.      References in these Regulations to the Act shall mean The International Business Companies Act
(CAP. 291). The following Regulations shall constitute the Regulations of the Company. In these
Articles words and expressions defined in the Act shall have the same meaning and, unless
otherwise required by the context, the singular shall include the plural and vice-versa, the masculine
shall include the feminine and neuter and references of persons shall include corporations and all
legal entities capable of having a legal existence.

SHARES

2.      The authorized capital of the Company is US$50,000.00 divided into 50,000 shares with a par value
of US$1.00 each. The directors shall by resolution determine, at their discretion, and from time to
time, how many shares thereof are to be issued as registered shares and how many shares thereof
are to be issued as bearer shares.

3.      Every person whose name is entered as a member in the share register being the holder of
registered shares, and every person who subscribes for shares issued to bearer, shall, without
payment, be entitled to a certificate signed by two directors or two officers or by one director and
one officer of the Company or under the common seal of the Company with or without the signature
of any director or officer of the Company specifying the share or shares held and the par value
thereof, provided that in respect of a registered share, or shares, held jointly by several persons the
Company shall not be bound to issue more than one certificate, and delivery of a certificate for a
share to one of several joint holders shall be sufficient delivery to all.

4.      In the case of bearer shares, each certificate for shares issued to bearer shall carry an identifying
number, and the Company shall maintain a register of the name and address of an agent or attorney
which may be given to the Company by the bearer, identified for this purpose by such identifying
number, for service of any notice, information or written statement required to be given to members.

5.      If a certificate is worn out or lost it may be renewed on production of the worn-out certificate, or on
satisfactory proof of its loss together with such indemnity as the directors may reasonably require.
Any member receiving a share certificate shall indemnify and hold the Company and its officers
harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use
or representation made by any person by virtue of the possession of such certificate.

CAPLIN0024741
USPROD-02360942

2

## SHARE CAPITAL AND VARIATION OF RIGHTS

6. Subject to the provisions of these Articles, the unissued shares of the Company (whether forming part of the original or any increased capital) shall be at the disposal of the directors who may offer, allot. grant options over or otherwise dispose of them to such persons at such times and for such consideration, being not less than the par value of the shares being disposed of, and upon such terms and conditions as the directors may determine,

7. Without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares. any share in the Company may be issued with such preferred, deferred or other special rights or such restrictions, whether in regard to dividend. voting. return of capital or otherwise as the directors may from time to time determine.

8. Subject to the provisions of the Act in this regard, shares may be issued on the terms that they are redeemable, or, at the option of the Company, are liable to be redeemed on such terms and in such manner as the directors before or at the time of the issue of the share may determine.

9. The directors may redeem any such share at a premium.

10. If at any time the share capital is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class and of the holders of not less than three-fourths of the issued shares of any other class of shares which may be affected by such variation.

11. The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

12. Except as required by law, no person shall be recognized by the Company as holding any share upon any trust, and the Company shall not be bound by or be compelled in any way to recognize (even when having notice thereof) any equitable, contingent, future or partial interest in any share or any interest in any fractional part of a share or (except only as by these Regulations or by law otherwise provided) any other rights in respect of any share except an absolute right to the entirety thereof by the registered holder.

### LIEN

13. The Company shall have a first and paramount lien on every share issued for a promissory note or for any other binding obligation to contribute money or property or any combination thereof to the Company, and the Company shall also have a first and paramount lien on every share standing registered in the name of a member, whether singly or jointly with any other person or persons, for all the debts and liabilities of such member or his estate to the Company. whether the same shall have been incurred before or after notice to the Company of any interest of any person other than

Confidential

CAPLIN0024742
USPROD-02360943

3

such member, and whether the time for the payment or discharge of the same shall have actually arrived or not, and notwithstanding that the same are joint debts or liabilities of such member or his estate and any other person, whether a member of the Company or not. The Company's lien on a share shall extend to all dividends payable thereon. The directors may at any time either generally, or in any particular case, waive any lien that has arisen or declare any share to be wholly or in part exempt from the provisions of this Regulation.

14.   In the absence of express provisions regarding sale in the promissory note or other binding obligation to contribute money or property, the Company may sell, in such manner as the directors may by resolution of directors determine, any share on which the Company has a lien, but no sale shall be made unless some sum in respect of which the lien exists is presently payable nor until the expiration of twenty one days after a notice in writing, stating and demanding payment of the sum presently payable and giving notice of the intention to sell in default of such payment, has been served on the holder for the time being of the share.

15.   The net proceeds of the sale by the Company of any shares on which it has a lien shall be applied in or towards payment of discharge of the promissory note or other binding obligation to contribute money or property or any combination thereof in respect of which the lien exists so far as the same is presently payable and any residue shall (subject to a like lien for debts or liabilities not presently payable as existed upon the share prior to the sale) be paid to the holder of the share immediately before such sale.  For giving effect to any such sale the directors may authorize some person to transfer the share sold to the purchaser thereof.  The purchaser shall be registered as the holder of the share and he shall not be bound to see to the application of the purchase money, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the sale.

## FORFEITURE OF SHARES

16.   If a member fails to pay for any share or shares issued for a promissory note or other written binding obligation for payment of a debt on the day appointed for payment thereof, the directors may, at any time thereafter during such time as any part of the payment remains unpaid, serve a notice on him requiring payment of so much of the payment as is unpaid, together with any interest which may have accrued.

17.   The notice shall name a further day (not earlier than the expiration of fourteen days from the date of service of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the shares in respect of which payment is not made will be liable to be forfeited.

18.   If the requirements of any such notice as aforesaid are not complied with any share in respect of which the notice has been given may at any time thereafter before the payment required by the notice has been made, be forfeited and cancelled by a resolution of the directors to that effect.

19.   A person whose shares have been forfeited shall cease to be a member in respect of the forfeited shares. The Company is under no obligation to refund any moneys to such person in respect of the

Confidential

CAPLIN0024743
USPROD-02360944

4

forfeited shares and that person shall be discharged from any further obligations to the Company with respect to the forfeited shares.

## MORTGAGES AND CHARGES OF SHARES

20. Any member who mortgages or charges one or more registered shares of the Company shall immediately notify the registered office in writing as to which registered shares have been mortgaged or charged and the name and address of the mortgagee or chargee. Upon receipt of such notification, the directors shall immediately enter in the share register

    (a)    a statement that the shares are mortgaged or charged;

    (b)    the name of the mortgagee or chargee; and

    (c)    the date on which the statement and name are entered in the share register.

## TRANSFER OF SHARES

21. Registered shares in the Company may be transferred by a written instrument signed by the transferor and containing the name and address of the transferee or in such other manner or form and subject to such evidence as the directors shall consider appropiate. Shares issued to bearer shall be transferred by delivery of the certificate evidencing same.

22. The holder of registered shares may request that such shares be exchanged for shares issued to bearer and the directors shall cancel the certificate evidencing registered shares and the entry in the share register and instead issue a certificate evidencing shares issued to bearer with and subject to such evidence of intent as the directors may consider appropiate.

23. The holder of a certificate evidencing shares issued to bearer may request that such shares be exchanged for registered shares and the directors shall cancel the certificate evidencing shares issued to bearer and instead issue a certificate evidencing registered shares and enter the name and address of the holder thereof in the share register with and subject to such evidence of intent as the directors may consider appropiate.

24. Upon receipt of notification of any change of name and address of any agent or attorney given to the Company for the purpose of service of any notice, information or written statement required to be given to members, identified by reference to the number of the certificate to bearer, the directors shall forthwith amend the register maintained for this purpose.

## TRANSMISSION OF SHARES

25. The personal representatives, guardians or trustees as the case may be of a deceased, incompetent or bankrupt sole holder of a registered share shall be the only persons recognized by the Company as having any title to the share. In the case of a share registered in the name of two or more holders, the survivor or survivors, and the personal representative, guardian or trustee as

Confidential

CAPLIN0024744
USPROD-02360945

5

the case may be of the deceased, incompetent or bankrupt, shall be the only persons recognized by the company as having any title to the share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the following two Regulations.

26.    Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member for all purposes shall be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

27.    Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as a transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

### ACQUISITION OF OWN SHARES

28.    Subject to the provisions of the Act in this regard, the directors may, on behalf of the Company, purchase, redeem or otherwise acquire any of the Company's own shares for such consideration as they consider fit, and either cancel or hold such shares as Treasury shares. The directors may dispose of any shares held as Treasury shares on such terms and conditions as they may from time to time determine. Shares may be purchased or otherwise acquired in exchange for newly issued shares in the Company.

### ALTERATION IN CAPITAL

29.    Subject to the terms of any resolution passed by the directors for the purpose of increasing the authorized capital of the Company, such increased capital may be divided into shares of such respective amounts, and with such right or privileges (if any) as the directors think expedient.

30.    Any capital raised by the creation of new shares shall be considered as part of the original capital, and shall be subject to the same provisions as if it had been part of the original capital.

31.    The directors may by resolution -

    (a)    consolidate and divide all or any of its share capital into shares of larger amount than its existing shares;

    (b)    cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of its authorized share capital by the amount of the shares so cancelled;

    (c)    sub-divide its shares or any of them into shares of smaller amount than is fixed by the Memorandum of Association and so that subject to the provisions of Regulation 10 the resolution whereby any share is sub-divided may determine that as between the holders of the shares resulting from such sub-division one or more of the shares may have such preferred or other special rights over or may have such qualified or deferred rights or be subject to any such restrictions as compared with the other or others as the Company has

Confidential

CAPLIN0024745
USPROD-02360946

6

power to attach to unissued or new shares;

(d)    subject to any confirmation or consent required by law, reduce its authorized and issued share capital or any capital redemption reserve fund or any share premium account in any manner.

32.    Where any difficulty arises in regard to any consolidation and division under this Regulation the directors may settle the same as they think expedient.

## MEETINGS OF MEMBERS

33.    The directors may convene meetings of the members of the Company at such times and in such manner and places as the directors consider necessary or desirable, and they shall convene such a meeting upon the written request of members holding more than 50 per cent of the votes of the outstanding voting shares in the Company.

34.    Seven days' notice at the least specifying the place, the day and the hour of the meeting and the general nature of the business to be conducted shall be given in manner hereinafter mentioned to such persons whose names on the date the notice is given appear as members in the share register of the Company and to the agent or attorney of record of the holders of bearer shares.

35.    A meeting of the members shall be deemed to have been validly held, notwithstanding that it is held in contravention of the requirement to give notice in Regulation 34, if notice of the meeting is waived by an absolute majority in number of the members or holders of bearer shares having a right to attend and vote at the meeting.

36.    The inadvertent failure of the directors to give notice of a meeting to a member or to the agent or attorney as the case may be, or the fact that a member or such agent or attorney has not received the notice, does not invalidate the meeting.

## PROCEEDINGS AT MEETINGS OF MEMBERS

37.    No business shall be transacted at any meeting unless a quorum of members is present at the time when the meeting proceeds to business. A quorum shall consist of the holder or holders present in person or by proxy of not less than one-half of the shares of each class or series of shares entitled to vote as a class or series thereon and the same proportion of the votes of the remaining shares entitled to vote thereon.

38.    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting shall be dissolved.

39.    At every meeting the members present shall choose some one of their number to be the Chairman. If the members are unable to choose a Chairman for any reason, then the person representing the greatest number of voting shares present at the meeting shall preside as Chairman failing which the oldest individual person shall take the chair.

40.    The Chairman may, with the consent of the meeting, adjourn any meeting from time to time, and

Confidential

CAPLIN0024746
USPROD-02360947

7

from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

41.  At any meeting a resolution put to the vote of the meeting shall be decided on a show of hands by simple majority unless a poll is (before or on the declaration of the result of the show of hands) demanded:

(a)  by the chairman; or

(b)  by any member or members present in person or by proxy and representing not less than one-tenth of the total voting rights of all the members having the right to vote at the meeting.

42.  Unless a poll be so demanded, a declaration by the Chairman that a resolution has, on a show of hands, been carried, and an entry to that effect in the book containing the minutes of the proceedings of the Company, shall be sufficient evidence of the fact, without proof of the number or proportion of the votes recorded in favour of or against such resolution.

43.  If a poll is duly demanded it shall be taken in such manner as the Chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll may be withdrawn.

44.  In the case of an equality of votes, whether on a show of hands, or on a poll, the Chairman of the meeting at which the show of hands takes place, or at which the poll is demanded, shall be entitled to a second or casting vote.

## VOTES OF MEMBERS

45.  At any meeting of members whether on a show of hands or on a poll every holder of a voting share present in person or by proxy shall have one vote for every voting share of which he is the holder.

46.  A resolution which has been notified to all members for the time being entitled to vote and which has been approved by a majority of the votes of those members in the form of one or more documents in writing or by telex, telegram, cable or other written electronic communication shall forthwith, without the need for any notice, become effectual as a resolution of the members.

47.  If a committee be appointed for any member who is of unsound mind he may vote by his committee.

48.  If two or more persons are jointly entitled to a registered share or shares and if more than one of such persons shall vote in person or by proxy at any meeting of members or in accordance with the terms of Regulation 45, the vote of that person whose name appears first among such voting joint holders in the share register shall alone be counted.

49.  Votes may be given either personally or by proxy.

50.  The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

Confidential

CAPLIN0024747
USPROD-02360948

8

51. An instrument appointing a proxy shall be in such form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

52. The instrument appointing a proxy shall be in writing under the hand of the appointer unless the appointer is a corporation or other form of legal entity other than one or more individuals holding as joint owners in which case the instrument appointing a proxy shall be in writing under the hand of an individual duly authorized by such corporation or legal entity to execute the same. The Chairman of any meeting at which a vote is cast by proxy so authorized may call for a notarially certified copy of such authority which shall be produced within 7 days of being so requested or the vote or votes cast by such proxy shall be disregarded. In the case of a proxy being given by the holder of a share issued to bearer, it shall be sufficient for the appointer to identify himself by writing, the identifying number of the certificate evidencing the shares issued to bearer.

## VOTING TRUSTS

53. One or more members may by agreement in writing deposit bearer shares with, or transfer registered shares to, any person authorized to act as trustee for the purpose of vesting in such person, who may be designated voting trustee, the right to vote thereon and the following provisions shall apply:

    (a) the period of time for which the trust may vote shall not exceed 10 years;

    (b) subject to paragraph (a), the agreement may contain any other provisions not inconsistent with the purpose of the agreement;

    (c) a copy of the agreement shall be filed at the registered office and shall be open to the inspection of members

        (i) in the case of any beneficiary of the trust under the agreement, daily during business hours, and

        (ii) in the case of members, subject to the provisions of these Articles;

    (d) where certificates for registered shares have been issued for shares that are to be transferred to a trustee pursuant to this section, new certificates shall be issued to the voting trustee to represent the shares so transferred and the certificates formerly representing the shares that have been transferred shall be surrendered and cancelled;

    (e) where a certificate is issued to a voting trustee, an endorsement shall be made on the certificate that the shares represented thereby in the case of registered shares and the certificates in case of bearer shares are held by the person named therein pursuant to an agreement;

    (f) there shall be noted in the share register against the record of the shares held by the trustee the fact that such an agreement exists;

Confidential

CAPLIN0024748
USPROD-02360949

9

(g)   the voting trustee may vote the shares so issued or transferred during the period specified in the agreement;

(h)   shares registered in the name of the voting trustee may be voted either in person or by proxy and, in voting the shares, the voting trustee shall not incur any liability as member or trustee, except in-so-far as he may be liable for his own conduct or acts;

(i)   where two or more persons are designated as voting trustees and the right and method of voting any shares registered in their names at any meeting of members or on any resolution of members are not fixed by the agreement appointing the trustees, the right to vote shall be determined by a majority of the trustees, or if they are equally divided as to the right the shares in any particular case, the votes of the shares in such case shall be divided equally among the trustees;

(j)   at any time within two years prior to the time of expiration of any voting trust agreement as originally fixed or as last extended as provided in this subsection, one or more beneficiaries of the trust under the voting trust agreement may, by written agreement and with the written consent of the voting trustee, extend the duration of the voting trust agreement for an additional period not exceeding 10 years from the expiration date of the trust as originally fixed or as last extended; and

(k)   the voting trustee shall, prior to the time of expiration of a voting trust agreement, as originally fixed or as previously extended, as the case may be, file at the registered office of the Company a copy of the extension agreement and of his consent thereto, and thereupon the duration of the voting trust agreement shall be extended for the period fixed in the extension agreement, but no extension agreement shall affect the rights or obligations of persons not parties thereto.

54.   Two or more members may by agreement in writing provide that in exercising any voting rights the shares held by them shall be voted

(a)   as provided by the agreement;

(b)   as the parties may agree; or

(c)   as determined in accordance with such procedure as they may agree upon.

55.   No agreement made pursuant to Regulation 54 shall be effective for a period of more than ten years from the date it is made, but at any time within the two years immediately preceeding the date of the expiration of the agreement the parties may extend its duration for an additional period, not exceeding 10 years at any one time, as they may desire.

56.   The validity of any voting trust or other voting agreement is not affected during a period of ten years from the date when it was created or last extended by reason only of the fact that under its terms it will or may last beyond a period of 10 years.

Confidential

CAPLIN0024749
USPROD-02360950

10

57. These Regulations shall be deemed not to invalidate any voting or other agreement among members or any irrevocable proxy that is not otherwise illegal.

### CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

58 Any corporation or other form of corporate legal entity which is a member of the Company may by resolution of its directors or other governing body authorize such person as it thinks fit to act as its representative at any meeting of the members or of any class of members of the Company and the person so authorized shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual member of the Company.

### DIRECTORS

59. Subject to any subsequent amendment to change the number of directors, the number of the directors shall be not less than one nor more than seven.

60. The first director or directors shall be elected by the subscriber(s) to the Memorandum. Thereafter, the directors shall be elected by a resolution of members or of directors for such term as they may determine.

61. Each director holds office until his successor takes office or until his earlier death, resignation or removal.

62. A vacancy in the board of directors may be filled by a resolution of members or of a majority of the remaining directors.

63. The subscribers to the Memorandum and Articles of Association shall not have the power to act as directors.

64. A director shall not require share qualification, but nevertheless shall be entitled to attend and speak at any meeting of the members and at any separate meeting of the holders of any class of shares in the Company.

65 A director by writing under his hand deposited at the Registered Office of the Company may from time to time appoint another director or any other person to be his alternate. Every such alternate shall be entitled to be given notice of meetings of the directors and to attend and vote as a director at any such meeting at which the director appointing him is not personally present and generally at such meeting to have and exercise all the powers, rights, duties and authorities of the director appointing him. Every such alternate shall be deemed to be an agent of the Company and shall not be deemed to be an agent of the director appointing him. If undue delay or difficulty would be occasioned by giving notice to a director of a resolution of which his approval is sought in accordance with Regulation 94 his alternate (if any) shall be entitled to signify approval of the same on behalf of that director. The remuneration of an alternate shall be payable out of the remuneration payable to the director appointing him, and shall consist of such portion of the last-mentioned remuneration as shall be agreed between such alternate and the director appointing him. A director

CAPLIN0024750
USPROD-02360951

11

by writing under his hand deposited at the Registered Office of the Company may at any time revoke the appointment of an alternate appointed by him. If a director shall die or cease to hold the office of director, the appointment of his alternate shall thereupon cease and terminate.

66.    The directors may, by resolution, fix the emoluments of directors in respect of services rendered or to be rendered in any capacity to the Company. The directors may also be paid such travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the directors, or any committee of the directors or meetings of the members, or in connection with the business of the Company as shall be approved by resolution of the directors.

67.    Any director who, by request, goes or resides abroad for any purposes of the Company who performs services which in the opinion of the Board go beyond the ordinary duties of a director, may be paid such extra remuneration (whether by way of salary, commission, participation in profits or otherwise) as shall be approved by resolution of the directors.

68.    The Company may pay to a director who at the request of the Company holds any office (including a directorship) in, or renders services to any company in which the Company may be interested, such remuneration (whether by way of salary, commission, participation in profits or otherwise) in respect of such office or services as shall be approved by resolution of the directors.

69.    The office of director shall be vacated if the director:

(a)    is removed from office by a resolution of members or by a resolution of directors, or

(b)    becomes bankrupt or makes any arrangement or composition with his creditors generally, or

(c)    becomes of unsound mind, or of such infirm health as to be incapable of managing his affairs, or

(d)    resigns his office by notice in writing to the Company.

70.    (a)    A director may hold any other office or position of profit under the Company (except that of auditor) in conjunction with his office of director, and may act in a professional capacity to the Company on such terms as to remuneration and otherwise as the directors shall arrange.

(b)    A director may be or become a director or other officer of, or otherwise interested in any company promoted by the Company, or in which the Company may be interested, as a member or otherwise, and no such director shall be accountable for any remuneration or other benefits received by him as director or officer or from his interest in such other company. The directors may also exercise the voting powers conferred by the shares in any other company held or owned by the Company in such manner in all respects as they think fit, including the exercise thereof in favour of any resolutions appointing them, or any of their number, directors or officers of such other company, or voting or providing for the payment or remuneration to the directors or officers of such voting rights in manner

Confidential

CAPLIN0024751
USPROD-02360952

12

aforesaid, notwithstanding that he may be, or be about to become, a director or officer of such other company, and as such in any other manner is, or may be, interested in the exercise of such voting rights in manner aforesaid.

(c)  No director shall be disqualified by his office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any director shall be in any way interested be voided, nor shall any director so contracting or being so interested be liable to account to the Company for any profit realized by any such contract or arrangement, by reason of such director holding that office or of the fiduciary relationship thereby established. The nature of a director's interest must be declared by him at the meeting of the directors at which the question of entering into the contract or arrangement is first taken into consideration, and if the director was not at the date of that meeting interested in a contract or arrangement, or shall become interested in a contract or arrangement after it is made, he shall forthwith after becoming so interested advise the Company in writing of the fact and nature of this interest. A general notice to the directors by a director that he is a member of a specified firm or company, and is to be regarded as interested in any contract or transaction which may, after the date of notice, be made with such firm or company shall (if such director shall give the same at a meeting of the directors, or shall take reasonable steps to secure that the same is brought up and read at the next meeting of directors after it is given) be a sufficient declaration of interest in relation to such contract or transaction with such firm or company. A director may be counted as one of a quorum upon a motion in respect of any contract or arrangement which he shall make with the company, or in which he is so interested as aforesaid, and may vote upon such motion.

## REGISTER OF DIRECTORS

71.  The Company may by resolution of directors exercise its option to keep a register of directors containing

(a)  the names and addresses of the person or persons who are directors of the Company;

(b)  the date on which each person whose name is entered in the register was appointed as a director of the Company; and

(c)  the date on which each person named as a director ceased to be a director of the Company.

72.  The register of directors may be in such form as the directors approve, but if it is magnetic, electronic or other date storage form, the Company must be able to produce legible evidence of its contents.

73.  A copy of the register of directors, commencing from the date of the registration of the Company, shall be kept at the registered office.

CAPLIN0024752
USPROD-02360953

13

74.    The register of directors is prima facie evidence of any matters directed or authorized by the Act to be contained therein.

## OFFICERS

75.    The directors of the Company may, by a resolution of directors, appoint officers of the Company at such times as shall be considered necessary or expedient. No officer or agent shall have any power or authority with respect to matters requiring a resolution of directors. All officers shall have the power to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the officer by the Company. Such officers may consist of a President, one or more Vice-Presidents, a Secretary and a Treasurer and such other officers as may from time to time be deemed desirable. The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed by the directors thereafter, but in the absence of any specific allocation of duties it shall be the responsibility of the President to manage the day to day affairs of the Company, the Vice-Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretary to maintain the registers, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

76.    Any person may hold more than one office and no officer need be a director or member of the Company. The Officers shall remain in office until removed from office by the directors whether or not a successor is appointed.

77.    Any officer who is a body corporate may appoint any person its duly authorized representative for the purpose of representing it and of transacting any of the business of the officers.

## POWERS OF DIRECTORS

78.    The business of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company, and may exercise all such powers of the Company as are not by the Act or by these Regulations required to be exercised by the members subject to any delegation of such powers as may be authorized by these Regulations and to such requirements as may be prescribed by resolution of the members; but no requirement made by resolution of the members shall prevail if it be inconsistent with these Regulations nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

79.    The Board may entrust to and confer upon any director or officer any of the powers exercisable by it upon such terms and conditions and with such restrictions as it thinks fit, and either collaterally with, or to the exclusion of, its own powers, and may from time to time revoke, withdraw, alter or vary all or any of such powers. The directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall

Confidential

CAPLIN0024753
USPROD-02360954

14

in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the directors.

80.   The directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Regulations) and for such period and subject to such conditions as they may think fit, and any such powers of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the directors may think fit and may also authorize any such attorney to delegate all or any of the powers, authorities and discretions vested in him.

81.   Any director who is a body corporate may appoint any person its duly authorized representative for the purpose of representing it at Board Meetings and of transacting any of the business of the directors.

82.   All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the directors shall from time to time by resolution determine.

83.   The directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

84.   The continuing directors may act notwithstanding any vacancy in their body, save that if the number of directors shall have been fixed at two or more persons and by reason of vacancies having occurred in the Board there shall be only one continuing director he shall be authorized to act alone only for the purpose of appointing another director.

### PROCEEDINGS OF DIRECTORS

85.   The meetings of the Board of Directors and any committee thereof shall be held at such place or places as the directors shall decide.

86.   The directors may elect a Chairman of their meetings and determine the period for which he is to hold office; but if no such Chairman is elected, or if at any meeting the Chairman is not present at the time appointed for holding the same, the directors present may choose one of their number to be Chairman of the meeting.

87.   The directors may meet together for the dispatch of business, adjourn and otherwise regulate their meetings as they think fit. Questions arising at any meeting shall be decided by a majority of votes; in case of any equality of votes the Chairman shall have a second or casting vote. A director may at any time summon a meeting of the directors. If the Company shall have only one director the

CAPLIN0024754
USPROD-02360955

15

provisions hereinafter contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of the directors. Such note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

88. A director shall be given not less than three days notice of a meeting of the directors.

89. Notwithstanding Regulation 88 above, a meeting of directors held in contravention of that regulation shall be valid if a majority of the directors entitled to vote at the meeting have waived the notice of the meeting.

90. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

91. A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one-half of the total number of directors.

92. If within half an hour from the time appointed for the meeting a quorum is not present the meeting shall be dissolved.

93. Any one or more members of the Board of Directors or any committee thereof may participate in a meeting of such Board or committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting.

94. A resolution approved by a majority of the directors for the time being entitled to receive notice of a meeting of the directors or of a committee of the directors and taking the form of one or more documents in writing or by telex, telegram, cable or other written electronic communication shall be as valid and effectual as if it had been passed at a meeting of the directors or such committee duly convened and held, without the need for any notice.

### REGISTER OF MORTGAGES AND CHARGES

95. The Company may by resolution of directors exercise its option to maintain at the registered office a register of mortgages, charges and other encumbrances in which there shall be entered particulars regarding each mortgage, charge and other encumbrances as follows:

    (a) the sum secured;

    (b) the assets secured;

    (c) the name and address of the mortgagee, chargee or other encumbrancee;

    (d) the date of creation of the mortgage, charge or other encumbrance; and

CAPLIN0024755
USPROD-02360956

16

(e)   the date on which the particulars specified in paragraphs (a) to (d) in respect of the mortgage, charge or other encumbrance are entered in the register.

## OPTIONAL PUBLIC FILING OR REGISTERS

96.   The Company may, by resolution of directors, exercise its option to submit for registration by the Registrar any of the following Registers

(a)   Share Register;

(b)   Register of Directors (if the Company has exercised its option pursuant to Regulation 71 to create the same); or

(c)   Register of Mortgages and Charges (if the Company has exercised its option pursuant to Regulation 95 to create the same).

97.   If the Company has exercised its option pursuant to Regulation 96 to submit for registration to the Registrar the Register of Mortgages and Charges it may also, by resolution of directors, exercise a further option to submit to the Registrar for registration

(a)   any document or copy of a document creating a mortgage, charge or any other encumbrance over some or all of the assets of the Company;

(b)   any document or copy of a document amending any document referred to in Regulation 97 (a); and

(c)   any document releasing or discharging a mortgage charge or any encumbrance over any or all of the assets of the Company.

## INDEMNITY

98.   Subject to the provisions of the Act and of any other statute for the time being in force every director or other officer of the Company shall be entitled to be indemnified out of the assets of the Company against all losses or liabilities which he may sustain or incur in or about the execution of the duties of his office or otherwise in relation thereto, and no director or other officer shall be liable for any loss, damage or misfortune which may happen to, or be incurred by the Company in the execution of the duties of his office, or in relation thereto.

## SEAL

99.   The directors shall provide for the safe custody of the common seal of the Company. The common seal when affixed to any instrument, except as provided in Regulation 3, shall be witnessed by a director or any other person so authorized from time to time by the directors. The directors may

17

provide for a facsimile of the common seal and approve the signature of any director or authorized person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## DIVIDENDS AND RESERVES

100.   The directors may by resolution declare a dividend but no dividend shall be declared and paid except out of surplus and unless the directors determine that immediately after the payment of the dividend

    a)   the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

    b)   the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital.

101.   Dividends may be declared and paid in money, shares or other property.

102.   In computing the surplus for the purpose of resolving to declare and pay a dividend, the directors may include in their computation the net unrealized appreciation of the assets of the Company.

103.   The directors may from time to time pay the members such interim dividends as appear to the directors to be justified by the surplus of the Company.

104.   Subject to the rights of holders of shares entitled to special rights as to dividends, all dividends shall be declared and paid according to the par value of the shares in issue, excluding those shares which are held by the Company as Treasury shares at the date of declaration of the dividend.

105.   The directors may, before recommending any dividend, set aside out of the profits of the Company such sums as they think proper as a reserve or reserves which shall, at the discretion of the directors, be applicable for meeting contingencies, or for any other purpose to which the profits of the Company may be properly applied, and pending such application may, at the like discretion, either be employed in the business of the Company or be invested in such investments as the directors may from time to time think fit.

106.   If several persons are registered as joint holders of any share, any of them may give effectual receipt for any dividend or other monies payable on or in respect of the share.

107.   In the case of shares issued to bearer, the directors may provide for the payment of dividend by reference to counterfoils or warrants issued with the certificate for such shares, and the production of such dividend counterfoil or warrant shall evidence entitlement to receipt of such dividend in the same way and to the same extent as production of the certificate itself. At the time of presentation

CAPLIN0024757
USPROD-02360958

18

of the counterfoil or warrant, the directors may issue such further counterfoils or warrants as may be required to permit receipt by the holder thereof of subsequent dividends.

108.   Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for three years after having been declared may be forfeited by the directors for the benefit of the Company.

109.   No dividend shall bear interest against the Company.

## BOOKS AND RECORDS

110.   The Company shall keep such accounts and records as the directors consider necessary or desirable in order to reflect the financial position of the Company.

111.   The Company shall keep minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members, and copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members.

112.   The books, records and minutes required by Regulations 110 and 111 shall be kept at the registered office of the Company or at such other place as the directors determine, and shall be opened to the inspection of the directors at all times.

113.   The directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the books, records and minutes of the Company or any of them shall be opened to the inspection of members not being directors, and no member (not being a director) shall have any right of inspecting any book, record, minute or document of the Company except as conferred by Law or authorized by resolution of the directors.

## AUDIT

114.   The directors may by resolution call for the accounts of the Company to be examined by an auditor or auditors to be appointed by them at such remuneration as may from time to time be agreed.

115.   The auditor may be a member of the Company but no director or officer shall be eligible during his continuance in office.

116.   Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the officers of the Company such information and explanations as he thinks necessary for the performance of his duties.

117.   The report of the auditor shall be annexed to the accounts upon which he reports, and the auditor shall be entitled to receive notice of, and to attend, any meeting at which the Company's audited profit and loss account and balance sheet is to be presented.

Confidential

Ex.004-5.0262

CAPLIN0024758
USPROD-02360959

19

## NOTICES

118.    Any notice, information or written statement required to be given to members shall be served

a)    in the case of members holding registered shares, by mail (airmail service if available) addressed to each member at the address shown in the share register; and

b)    in the case of members holding shares issued to bearer

(i)    by mail (airmail service if available) addressed to the agent or attorney whose name and address has been given for service of notice by the bearer of the share (identified for this purpose by the number of the share certificate), or

(ii)    in the absence of an address for service being given, or if the notice, information or written statement cannot be served for any other reason, by publishing the notice, information or written statement in a newspaper circulated in the British Virgin Islands and in a newspaper in the place where the Company has its principal office.

119.    All notices directed to be given to the members shall, with respect to any registered share to which persons are jointly entitled, be given to whichever of such persons is named first in the share register, and notice so given shall be sufficient notice to all the holders of such share.

120.    Any notice, if served by post, shall be deemed to have been served within ten days of posting, and in proving such service it shall be sufficient to prove that the letter containing the notice was properly addressed and put into the post office.

## PENSION AND SUPERANNUATION FUNDS

121.    The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. A director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension, allowance or emolument.

Confidential

CAPLIN0024759
USPROD-02360960

20

## WINDING UP

122. If the Company shall be wound up, the Liquidator may, in accordance with a resolution of members, divide amongst the members in specie or in kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the members or different classes of members. The Liquidator may vest the whole or any part of such assets in trustees upon such trusts for the benefit of the contributories as the Liquidator shall think fit, but so that no member shall be compelled to accept any shares or other securities whereon there is any liability.

## ARBITRATION

123. Whenever any difference arises between the Company on the one hand and any of the members, their executors, administrators or assigns on the other hand touching the true intent and construction or the incidence or consequences of these presents or of the Act touching anything done or executed omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these presents or to any Act affecting the Company or to any of the affairs of the Company such difference shall unless the parties agree to refer the same to a single arbitrator be referred to two arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

124. If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for ten days after the other party has given him notice to appoint the same such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

## CONTINUATION

125. The Company may by a resolution of members or by a resolution of directors continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided for by the laws of that other jurisdiction.

## AMENDMENT TO ARTICLES

126. The Company may alter or modify the conditions contained in these Regulations as originally drafted or as amended from time to time by a resolution of directors.

Confidential

CAPLIN0024760
USPROD-02360961

21

We, **ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED**, of  P.O. Box 3175, Road Town, Tortola, British Virgin Islands, being a licenced trust company, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association.

FOR:    ALEMAN, CORDERO, GALINDO & LEE
TRUST (BVI) LIMITED

Andrés M. Sánchez
Authorized Signatory

DATED this 23rd   day of        May    , 2001 .

WITNESS to the above signature:

Marcos A. Muñoz
c/o P.O. Box 3175
Road Town, Tortola
British Virgin Islands

Confidential

Ex.004-5.0265

CAPLIN0024761
USPROD-02360962

## <u>MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS OF</u>
## <u>BARTOL LIMITED (the "Company")</u>

A special meeting of the Board of Directors of the above mentioned Company has been held on the 15th day of September 2008 at 10.00 am.

| | | |
|---|---|---|
| PRESENT: | **VASILIKI ANDREOU ON BEHALF**<br>**OF LEDRA DIRECTORS LIMITED** | **- DIRECTOR** |
| | **MARIA IOANNIDES on behalf of**<br>**LEDRA SECRETARIAL SERVICES LIMITED** | **- SECRETARY** |

Vasiliki Andreou on behalf of Ledra Directors Limited acted as Chairwoman and Maria Ioannides on behalf of Ledra Secretarial Services Limited, as the Secretary, recorded the minutes thereof. All directors being present and having agreed to waive notice, the Chairwoman declared the meeting duly convened and constituted

The Chairwoman then informed that she deemed it proper for the business of the Company that:

1. Mr. Edgardo E. Diaz and Mr. Fernando A. Gil, having presented to the board the letter of acceptance of appointment to the post of director, should be appointed to the said post as from the closing of the meeting and Ledra Directors Limited having presented the letter of resignation from the post of the director of the Company should resign as from the closing of the meeting.

2. Ledra Secretarial Services Limited having presented the letter of resignation from the post of the Secretary of the Company should resign as from the closing of the meeting.

Whereupon, on motion duly made and supported, the following resolution was adopted:

**RESOLVED:**

1. **THAT** Mr. Edgardo E. Diaz and Mr. Fernando A. Gil are appointed as directors of the Company as from the closing of the meeting and that the resignation of Ledra Directors Limited by accepted effective as from the closing of the meeting.

Confidential

Ex.004-5.0266

CAPLIN0024762<br>USPROD-02360963

2.   THAT the resignation of Ledra Secretarial Services Limited is hereby accepted as from the closing of the meeting.

There being no further business, the Chairman declared the meeting closed.

(Sgn.) : .........................
**LEDRA DIRECTORS LIMITED**
**DIRECTOR**

(Sgn.) : .........................
**LEDRA SECRETARIAL SERVICES LIMITED**
**SECRETARY**

Confidential

Ex.004-5.0267

CAPLIN0024763
USPROD-02360964

RESOLUTION OF THE DIRECTORS

OF

**BARTOL LIMITED**

The undersigned, being the Directors of **BARTOL LIMITED**, a BVI Business Company existing and operating under the laws of the British Virgin Islands (the "Company"), DO HEREBY ADOPT the following resolutions:

RESOLVED, to annul the following share certificates:

| Certificate No. | Holder | Number of Shares |
|---|---|---|
| 1 | Bearer | 1 |
| 2 | Bearer | 1 |

FURTHER RESOLVED, to authorize the President and the Secretary of the Company to issue, under the seal of the Company, the following share certificate:

| Certificate No. | Holder | Number of Shares |
|---|---|---|
| 3 | JOYNER OVERSEAS INC. | 50,000 |

Adopted and signed this 16th day of September, 2008.

_____
Edgardo E. Díaz
Director

_____
Fernando A. Gil
Director

Confidential

CAPLIN0024764
USPROD-02360965

| NAME OF SHAREHOLDER | CERTIFICATE N° | DATE OF ISSUE | N° OF SHARES |
|---|---|---|---|
| JOYNER OVERSEAS INC. | 3 | September 16th, 2008 | 50,000 |



BVI BUSINESS COMPANY
SHARE CERTIFICATE

Certificate Number ▮▮▮▮▮          Number of Shares ▮▮▮▮▮

# BARTOL LIMITED

INCORPORATED UNDER THE LAWS OF THE BRITISH VIRGIN ISLANDS

AUTHORIZED CAPITAL US$50,000.00 divided into 50,000 shares with a par value of US$1.00 each.

THIS IS TO CERTIFY THAT **JOYNER OVERSEAS INC.** is the owner of **FIFTY THOUSAND (50,000)** shares in the above named Company, subject to the Memorandum and Articles of Association of the said Company.

Given under the Common Seal of the Company
this 16th day of September, 2008.

President                                        Secretary

Confidential

Ex.004-5.0269

CAPLIN0024765
USPROD-02360966

## SHARE TRANSFER

I/WE: _____ of _____
(The Transferor)

Acknowledge receipt of the sum of _____ and other valuable consideration

PAID TO ME/US BY: _____ of _____
(The Transferee)

and DO HEREBY TRANSFER to the said TRANSFEREE the shares represented by this certificate and standing in the
books of the company, to hold unto the said TRANSFEREE, HIS/THEIR executors, administrators and assigns, subject to
the several conditions on which I/WE held the same at the time of execution hereof.

And I/WE said TRANSFEREE do hereby agree to take the said shares subject to the same conditions.

TRANSFEROR: _Maria J. Guevara_    _charles cardona_    WITNESS _____
Signed by the TRANSFEROR this _____ day of _____ , _____ .

TRANSFEREE: _____ WITNESS _____
Signed by the TRANSFEREE this _____ day of _____ , _____ .

Confidential

CAPLIN0024766
USPROD-02360967

# BARTOL LIMITED

### DRAFT FINANCIAL STATEMENTS

### FOR THE PERIOD ENDED

### 31 DECEMBER 2001

Confidential

CAPLIN0024767
USPROD-02360968

**BARTOL LIMITED**

**BALANCE SHEET AS AT 31 DECEMBER 2001**

|  |  | US $ |
|---|---:|---:|
| **CURRENT ASSETS** |  |  |
| Accounts receivable |  |  |
| Aspen Wind |  | 10,000 |
| Moscow Office |  | - |
| Blue Spray |  | 20,009 |
|  |  |  |
| Cash at bank |  |  |
| Credit Suisse |  | 11,861 |
|  |  |  |
| Total current assets |  | 41,870 |
|  |  |  |
| **CURRENT LIABILITIES** |  |  |
| Accounts payable |  | - |
| Accrued expenses |  | 250 |
| Director's current account |  | 5,000 |
|  |  |  |
| Total current liabilities |  | 5,250 |
|  |  |  |
| **NET ASSETS** |  | 36,620 |
|  |  |  |
| **Financed by:** |  |  |
| **EQUITY** |  | 10,000 |
| **RETAINED EARNINGS** |  |  |
| Balance brought forward |  | - |
| Net revenue for the period | 26,620 | 26,620 |
|  |  | 36,620 |

Confidential

CAPLIN0024768
USPROD-02360969

**BARTOL LIMITED**

**TRADING AND PROFIT AND LOSS ACCOUNT**
**FOR THE PERIOD 23 MAY TO 31 DECEMBER 2001**

|  |  | US $ |
|---|---|---|
| **Revenue** | | |
| Sales | | 100,000 |
| **Less: Direct costs** | | |
| Cost of sales | | 50,000 |
| **Gross margin** | | 50,000 |
| **Administration expenses** | | |
| Moscow Office expenses | 18,009 | |
| Employee costs | 1,509 | |
| Professional fees | 3,556 | |
| Accountancy fees | 250 | |
| Bank charges | 56 | 23,380 |
| **Net profit for the period** | | 26,620 |

Confidential

Ex.004-5.0273

CAPLIN0024769
USPROD-02360970

# BARTOL LIMITED

**DRAFT FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED**

**31 DECEMBER 2002**

Confidential

CAPLIN0024770
USPROD-02360971

**BARTOL LIMITED**

**TRADING AND PROFIT AND LOSS ACCOUNT**
**FOR THE YEAR ENDED 31 DECEMBER 2002**

|  | 2002 | | 2001 | |
|---|---:|---:|---:|---:|
|  | US $ | US $ | US $ | US $ |
| **Revenue** | | | | |
| Sales | | 4,494,619 | | 100,000 |
| **Less:  Direct costs** | | | | |
| Cost of sales | | 4,187,389 | | 50,000 |
| **Gross margin** | | 307,230 | | 50,000 |
| **Administration expenses** | | | | |
| Moscow Office | 29,564 | | 18,009 | |
| Rent | 11,922 | | ~ | |
| Employee costs | 192,410 | | 1,509 | |
| Adminsitration fees | 39,041 | | ~ | |
| Consultancy | 15,431 | | ~ | |
| Professional fees | 4,916 | | 3,556 | |
| Accountancy fees | 750 | | 250 | |
| Bank charges | 700 | 294,734 | 56 | 23,380 |
| **Net profit for the period** | | 12,496 | | 26,620 |

Confidential

Ex.004-5.0275

CAPLIN0024771
USPROD-02360972

**BARTOL LIMITED**

**BALANCE SHEET AS AT 31 DECEMBER 2002**

| | 2002 | | 2001 | |
|---|---:|---:|---:|---:|
| | US $ | US $ | US $ | US $ |
| **CURRENT ASSETS** | | | | |
| Stocks | | 320,000 | | - |
| Accounts receivable | | | | |
| Aspen Wind | | | | 10,000 |
| Moscow Office | | - | | - |
| Blue Spray | | - | | 20,009 |
| Inter-group accounts | | | | |
| Synergy | 15,000 | | - | |
| Ramon Insurance Brokers | 11,793 | 26,793 | - | - |
| Cash at bank | | | | |
| Credit Suisse | | 19,141 | | 11,861 |
| Total current assets | | 365,934 | | 41,870 |
| **CURRENT LIABILITIES** | | | | |
| Accounts payable | | - | | - |
| Accrued expenses | | 1,000 | | 250 |
| Director's current account | - | 55,382 | | 5,000 |
| Inter-group accounts | | | | |
| Aspen Wind | 247,200 | | | |
| Red Start Enterprises | 134,000 | 381,200 | | |
| Total current liabilities | | 326,818 | | 5,250 |
| **NET ASSETS** | | 39,116 | | 36,620 |
| **Financed by:** | | | | |
| **EQUITY** | | - | | 10,000 |
| **RETAINED EARNINGS** | | | | |
| Balance brought forward | 26,620 | | - | |
| Net revenue for the period | 12,496 | 39,116 | 26,620 | 26,620 |
| | | 39,116 | | 36,620 |

Confidential

CAPLIN0024772
USPROD-02360973

# BARTOL LIMITED

**DRAFT FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED**

**31 DECEMBER 2003**

**BARTOL LIMITED**

**TRADING AND PROFIT AND LOSS ACCOUNT**
**FOR THE YEAR ENDED 31 DECEMBER 2003**

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | US $ | US $ | US $ | US $ |
| **Revenue** | | | | |
| Sales | | 45,694,607 | | 4,494,619 |
| **Less: Direct costs** | | | | |
| Cost of sales | | 40,641,765 | | 4,187,389 |
| **Gross margin** | | 5,052,842 | | 307,230 |
| **Indirect costs** | | | | |
| Commission - BNP | 159,244 | | - | |
| Commission - Channoil | 12,935 | | - | |
| Commission - RSE (re: DESC) | 210,084 | 382,263 | - | - |
| **Trading profit before administration costs** | | 4,670,579 | | 307,230 |
| **Administration expenses** | | | | |
| Rent | - | | 11,922 | |
| Office expenses - Canada | 59,356 | | - | |
| Office expenses - London | 100,636 | | - | |
| Office expenses - Moscow | 17,012 | | 29,564 | |
| Employee costs | 330,579 | | 192,410 | |
| Adminsitration fees | 54,045 | | 39,041 | |
| Consultancy | 23,503 | | 15,431 | |
| Professional fees | - | | 4,916 | |
| Accountancy fees | 8,523 | | 750 | |
| Loan interest | 33,094 | | - | |
| LOC charges | 19,260 | | - | |
| Interest paid | 58,782 | | - | |
| Bank charges | 16,667 | 721,457 | 700 | 294,734 |
| **Net profit for the period** | | 3,949,122 | | 12,496 |

Confidential

Ex.004-5.0278

CAPLIN0024774
USPROD-02360975

**BARTOL LIMITED**
**BALANCE SHEET AS AT 31 DECEMBER 2003**

|  | 2003 | | 2002 | |
|---|---|---|---|---|
|  | US $ | US $ | US $ | US $ |
| **INTANGIBLE ASSETS** | | | | |
| Short term investments | | 750,000 | | - |
| **CURRENT ASSETS** | | | | |
| Stocks | | 2,526,603 | | 320,000 |
| Accounts receivable | | | | |
| Trade contracts | 2,128,498 | | - | |
| Moscow Office | - | | - | |
| Iraq Today | 116,298 | 2,244,796 | - | - |
| Inter-group accounts | | | | |
| Minacorp | 20,000 | | - | |
| Aspen Wind | 150,800 | | - | |
| Red Star Enterprises | 293,089 | | - | |
| Synergy | 15,000 | | 15,000 | |
| Ramon Insurance Brokers | 11,793 | 490,682 | 11,793 | 26,793 |
| Prepaid expenses | | 62,946 | | |
| Cash at bank | | | | |
| Credit Suisse | 15,470 | | 19,141 | |
| BNP Paribas | 346,089 | | - | |
| Credit Suisse | 3,038 | 364,597 | - | 19,141 |
| Total current assets | | 6,439,624 | | 365,934 |
| **CURRENT LIABILITIES** | | | | |
| BNP Parisbas | | 2,143,075 | | - |
| Accounts payable | | 501,535 | | - |
| Accrued expenses | | 15,500 | | 1,000 |
| Director's current account | - | 218,724 | - | 55,382 |
| Inter-group accounts | | | | |
| Aspen Wind | - | | 237,200 | |
| Red Start Enterprises | - | - | 134,000 | 371,200 |
| Total current liabilities | | 2,441,386 | | 316,818 |
| **NET ASSETS** | | 3,998,238 | | 49,116 |
| **Financed by:** | | | | |
| **EQUITY** | | 10,000 | | 10,000 |
| **RETAINED EARNINGS** | | | | |
| Balance brought forward | 39,116 | | 26,620 | |
| Net revenue for the period | 3,949,122 | 3,988,238 | 12,496 | 39,116 |
| | | 3,998,238 | | 49,116 |

Confidential

Ex.004-5.0279

CAPLIN0024775
USPROD-02360976

**BARTOL LIMITED**

**PROFIT AND LOSS ACCOUNT**
*FOR THE YEAR ENDED 31 DECEMBER 2004*

| | Notes | 2004 US $ | 2003 US $ |
|---|---|---|---|
| **Turnover** | | 86,104,240 | 45,694,607 |
| Cost of sales | | 80,513,211 | 40,641,765 |
| **Gross Profit** | | 5,591,029 | 5,052,842 |
| Administrative expenses | | 2,555,238 | 1,103,720 |
| **Operating profit** | 2 | 3,035,791 | 3,949,122 |
| Other interest receivable and similar income | | - | - |
| **Profit on ordinary activities before taxation** | | 3,035,791 | 3,949,122 |
| Tax on ordinary activities | 3 | - | - |
| **Profit on ordinary activities after taxation** | | 3,035,791 | 3,949,122 |
| Distributions to equity shareholders | | 1,760,000 | - |
| **Retained profit for the year** | 9 | 1,275,791 | 3,949,122 |

There are no recognised gains and losses other than those passing through the profit and loss account.

Confidential

Ex.004-5.0280

# BARTOL LIMITED

## BALANCE SHEET
### AS AT 31 DECEMBER 2004

| | Notes | 2004 US $ | 2003 US $ |
|---|---|---|---|
| **Current assets** | | | |
| Inventories | 4 | 2,081,099 | 2,526,603 |
| Debtors | 5 | 5,109,051 | 3,017,148 |
| Cash at bank and in hand | 6 | 2,650,392 | 1,114,597 |
| | | 9,840,542 | 6,658,348 |
| **Creditors: amounts falling due within one year** | 7 | 4,576,511 | 2,670,108 |
| **Total assets less current liabilities** | | 5,264,031 | 3,988,240 |
| | | | |
| **Capital and reserves** | | | |
| Called up share capital | 8 | 2 | 2 |
| Profit and loss account | 9 | 5,264,029 | 3,988,238 |
| **Shareholders' funds - equity interests** | 10 | 5,264,031 | 3,988,240 |

These financial statements were approved by the directors on 8 July 2005

.......................................
**For and on behalf of Ledra Directors Limited**
**Director**

Confidential

Ex.004-5.0281

CAPLIN0024777
USPROD-02360978

# BARTOL LIMITED

## NOTES TO THE FINANCIAL STATEMENTS
### FOR THE YEAR ENDED 31 DECEMBER 2004

**1    Accounting policies**

**1.1    Accounting convention**
The financial statements have been prepared under the historical cost convention modified to include the revaluation of assets as required.

**1.2    Turnover**
Turnover represents amounts receivable for goods and services net of taxes and trade discounts.

| 2    Operating profit | 2004 US $ | 2003 US $ |
|---|---|---|
| Operating profit is stated after charging: | | |
| Reporting accountants' remuneration | 7,500 | 4,000 |
| Bank and loan interest paid | 118,988 | 91,876 |

**3    Taxation**
No provision has been made for tax arising on the results for the year

**4    Inventories**
Inventories comprise stock of diesel fuel and have been valued by the directors at the lower of cost and net realisable value

| 5    Debtors | 2004 US $ | 2003 US $ |
|---|---|---|
| Trade debtors | 4,829,903 | 2,128,498 |
| Amounts due from associated and related companies | 279,148 | 606,980 |
| Prepaid expenses | - | 62,946 |
| Other debtors | - | 218,724 |
| | 5,109,051 | 3,017,148 |

**6    Cash at bank and in hand**
Bank balances at 31 December 2004 include US$2,643,079 (2003 – US$1,096,088) held by Red Star Enterprises Limited on behalf of the company under the terms of an agreement dated 3 January 2002 (see note 10).

| 7    Creditors: amounts falling due within one year | 2004 US $ | 2003 US $ |
|---|---|---|
| Bank loan | 1,336,223 | 2,143,075 |
| Trade creditors | 1,739,727 | 501,535 |
| Accruals and other creditors | 1,500,561 | 25,498 |
| | 4,576,511 | 2,670,108 |

Confidential

Ex.004-5.0282

CAPLIN0024778
USPROD-02360979

# BARTOL LIMITED

## NOTES TO THE FINANCIAL STATEMENTS (CONTINUED)
### FOR THE YEAR ENDED 31 DECEMBER 2004

| 8 | Share capital | 2004 US $ | 2003 US $ |
|---|---|---|---|
| | Allotted, called up and fully paid 2 Bearer shares of US $1 each | 2 | 2 |

| 9 | Statement of movement on reserves | Profit and loss account US $ |
|---|---|---|
| | Balance at 1 January 2004 | 3,988,238 |
| | Retained profit for the year | 1,275,791 |
| | Balance at 31 December 2004 | 5,264,029 |

| 10 | Reconciliation of movements in shareholders' funds | 2004 US $ | 2003 US $ |
|---|---|---|---|
| | Retained profit for the financial year | 1,275,791 | 3,949,122 |
| | Opening shareholders' funds | 3,998,238 | 49,116 |
| | Closing shareholders' funds | 5,274,029 | 3,998,238 |

**11   Related party transactions**

Under the terms of an agreement dated 3 January 2002, Red Star Enterprises Limited provides consultation, managerial and advisory services to the company in respect of trading transactions. During the year ended 31 December 2004, the gross revenue generated from transactions under the agreement amounted to **US$85,586,241** (2003 - US$45,129,349). Red Star Enterprises Limited and Bartol Limited are associated companies under common control

**12   Subsequent events**

The agreement dated 3 January 2003 between the company and Red Star Enterprises Limited (in relation to the supply of services referred to in note 10 above) was terminated on 1 January 2005. The scale of activity within the company during 2005 will therefore be significantly reduced.

**13   Going concern**

The financial statements have been prepared on a going concern basis. The directors anticipate that further sources of income will be generated from other related activities in the short to medium term.

Confidential

Ex.004-5.0283

CAPLIN0024779
USPROD-02360980

## BARTOL LIMITED

### DETAILED PROFIT AND LOSS ACCOUNT
### FOR THE YEAR ENDED 31 DECEMBER 2004

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | US $ | US $ | US $ | US $ |
| **Revenue** | | | | |
| Sales | | 86,104,240 | | 45,694,607 |
| **Less: Direct costs** | | | | |
| Cost of sales | | 80,513,211 | | 40,641,765 |
| **Gross margin** | | 5,591,029 | | 5,052,842 |
| **Indirect costs** | | | | |
| Commission - BNP | 96,231 | | 159,244 | |
| Commission - Channoil | 3,489 | | 12,935 | |
| Commission - RSE (re: DESC) | 158,925 | 258,645 | 210,084 | 382,263 |
| **Trading profit before administration costs** | | 5,332,384 | | 4,670,579 |
| **Administration expenses** | | | | |
| Office expenses - Canada | 45,072 | | 59,356 | |
| Office expenses - London | 616,472 | | 100,636 | |
| Office expenses - Moscow | 1,166,967 | | 17,012 | |
| Employee costs | 273,778 | | 330,579 | |
| Travel costs | 5,925 | | ~ | |
| Administration fees | ~ | | 54,045 | |
| Consultancy | ~ | | 23,503 | |
| Accountancy and audit fees | 13,573 | | 8,523 | |
| Other costs | 9,923 | | ~ | |
| Loan interest | 81,386 | | 33,094 | |
| Letter of credit charges | 45,099 | | 19,260 | |
| Interest paid | 37,602 | | 58,782 | |
| Bank charges | 796 | 2,296,593 | 16,667 | 721,457 |
| **Net profit for the year** | | 3,035,791 | | 3,949,122 |

Confidential

Ex.004-5.0284

CAPLIN0024780
USPROD-02360981

**Mr & Mrs D Edelman**

**Income from business entities**
**Thirteen years to December 2012**

| | DE (UK Remitted) | DLD (UK remitted) | DLD (Not remitted) | Property purchases | Total remittances to UK |
|---|---|---|---|---|---|
| | (a) | (b) | | | (a) + (b) |
| 2000 | - | | | | |
| 2001 | 125,152.88 | - | | | 125,152.88 |
| 2002 | 344,773.35 | | | | 344,773.35 |
| 2003 | 538,061.33 | | | | 538,061.33 |
| 2004 | 372,174.32 | | | | 372,174.32 |
| 2005 | 397,717.95 | | | | 397,717.95 |
| 2006 | 480,903.07 | | | | 480,903.07 |
| 2007 | 415,156.60 | 36,500.00 | - | 5,361,121.55 | 451,656.60 |
| 2008 | 481,739.00 | 568,750.34 | 456,259.71 | | 1,050,489.34 |
| 2009 | 493,643.40 | 532,297.29 | 113,453.28 | | 1,025,940.69 |
| 2010 | 280,799.34 | 1,490,406.40 | 1,110,964.52 | | 1,771,205.74 |
| 2011 | 150,796.56 | 602,455.38 | 401,013.95 | | 753,251.94 |
| 2012 | 77,798.66 | 502,233.73 | 253,952.10 | | 580,032.39 |
| | | | | | |
| | 4,158,716.47 | 3,732,643.14 | 2,335,643.56 | | 7,891,359.61 |
| Check | 4,158,716.47 | 3,732,643.14 | | | |

The property in Ibiza was purchased by DLD in 2007
The UK property (Cottesmore) was purchased in 2010 by Beta Ventures Limited
  (and transferred to Sunage Foundation in March 2013
A small London property was purchased in 2012 by Hersey Development Limited,
  the shares of which are owned direct by DLD

Confidential

CAPLIN0024781
USPROD-02360982

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

Dated ............................................................................ 2013

**DRAFT**

**SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE**

**TAX REPORT FOR DOUGLAS AND DELPHINE ANNE
LE DAIN EDELMAN**

Mishcon de Reya
Summit House
12 Red Lion Square
London WC1R 4QD
Tel: 020 7440 7000
Fax: 020 7404 5982
Ref:
E-mail:

18308333.8

CAPLIN0024782
USPROD-02360983

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

1.    **TAX REPORT**

This Tax Report is addressed specifically to Mr Douglas Edelman ("Mr Edelman") and Mrs Delphine Anne Le Dain Edelman ("Mrs Edelman") and may not be relied upon by any other person.  Our advice relates solely to UK tax law and H.M. Revenue & Customs' (HMRC) published practice as at [6] September 2013, which may be subject to change, possibly with retrospective effect.

We also advise that Mr and Mrs Edelman seek tax and legal advice in the US and France and we liaise with their advisors in these jurisdictions.

Considerations other than those specifically dealt with in the requested Tax Report, such as indirect taxes, non-tax legal considerations and accounting treatment are excluded from this engagement and from future similar engagements unless specifically agreed otherwise.

2.    **ASSUMPTIONS**

2.1    We have assumed the following in relation to Mr and Mrs Edelman:

2.1.1    they are both UK resident and non-UK domiciled for tax purposes.

2.1.2    they have not been approached by HMRC or are currently subject to an enquiry by them.

2.1.3    the schedules and information provided to us are correct and the years referred to in the schedules are referenced according to UK tax years (6 April – 5 April).

18308333.8                                        1

CAPLIN0024783
USPROD-02360984

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

3.    **SCOPE**

3.1    We have been asked to provide Mr and Mrs Edelman with UK tax advice and recommendations in relation to their potential undisclosed UK tax liabilities.

3.2    Our understanding is that:

3.2.1    Mr and Mrs Edelman have spent time in the UK since 2000 and believe they are currently resident in the UK. In the last 13 years both Mr and Mrs Edelman have brought in money to the UK for personal expenditure.

3.2.2    Mr Edelman is a consultant to various offshore structures. The structures pay him a consultancy fee, and settle credit cards that he uses in the UK. He also uses funds from Touchdown Limited, a company operating from Switzerland.

3.2.3    Mrs Edelman receives money from the structures which she uses for personal expenditure in the UK.

3.2.4    Both Mr and Mrs Edelman anticipate that the money that has been brought into the UK is taxable and have asked us to provide them with an estimate of the tax due and advice on how to regularise their UK tax situation.

Confidential

Ex.004-5.0288

CAPLIN0024784
USPROD-02360985

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

3.3    The scope of this Report does not extend to UK inheritance tax planning, or an analysis of the UK taxation of the structures in relation to Mr and Mrs Edelman, including any management and control issues there may be in relation to the various entities within the structures.  We recommend Mr and Mrs Edelman seek separate advice on these points, which we would be happy to provide.  We also recommend that Mr Edelman's adult children receive tax advice in whichever jurisdiction they are resident.

3.4    Our work has been limited by reference to information and facts made available to us by Mr and Mrs Edelman.  In the circumstances we may not be aware of all facts or information.  We accept no responsibility for matters not covered in our advice or omitted from our advice due to facts or matters not known to us.

4.    **RECOMMENDATIONS AND CONCLUSION**

From the information we have available to us, both Mr and Mrs Edelman have both made taxable remittances of income and possibly capital gains to the UK since they became UK resident.

We recommend that we first establish the length of Mr and Mrs Edelman's UK residency and the nature and amounts of money that has been brought into the UK.  This will determine the amount of UK tax payable.   The calculations in this Report assume that Mr and Mrs Edelman have been resident in the UK since 2000.  They may have become UK resident at a later date in which case the tax, interest and penalties due will be significantly reduced.

We recommend Mr and Mrs Edelman regularise their UK tax situation by making a disclosure to HMRC using the Lichtenstein Disclosure Facility.  There are several advantages in using the Lichtenstein Disclosure Facility.  If Mr and Mrs Edelman meet certain criteria the penalties under the LDF will be significantly limited.  Mr and Mrs Edelman will also be immune from prosecution and being publicly named by HMRC.

18308333.8                                         3

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

We understand that Mr Edelman is also seeking US tax advice – it is likely that he will be able to set off any UK tax paid against his US tax exposure. We recommend that going forward we liaise with his US tax advisors.

5.    **DETAILED ANALYSIS**

5.1   **TAX POSITION**

*Residency and domicile*

5.1.1   Mr and Mrs Edelman's tax position depends on whether they are treated as resident in the UK. The test of whether a person is resident changed in April 2013 when a new Statutory Residence Test was introduced. Before April 2013 the test was based on previous case law. Under both tests Mr and Mrs Edelman will be treated as resident if they have been spending at least 91 days in the UK each year. Please forward us a schedule of the amount of days Mr and Mrs Edelman have spent in the UK since 2000 so we can determine how long they have been UK resident. A day generally counts if they were in the UK at midnight. This Report is based on the assumption that both Mr and Mrs Edelman been resident in the UK since 2000. It may well be the case that they became resident at a later date, in which case the amount of tax payable will be significantly lower.

5.1.2   "Domicile" means the country of origin or the country where a person has settled permanently or indefinitely. We have assumed that Mr Edeleman has a US domicile and that Mrs Edelman has a French domicile. A domicile of choice in the UK will only be acquired if it can be shown that either Mr or Mrs Edelman have formed the intention of settling here permanently, in the sense of intending to continue to live here indefinitely. The standard of proof is high and it is difficult for someone with a foreign domicile of origin to acquire a domicile of choice in the UK.

5.1.3   If HMRC wanted to argue that Mr or Mrs Edelman had acquired a UK domicile of choice they would need to look at the pattern of their life. They

18308333.8                                    4

Ex.004-5.0290

CAPLIN0024786
USPROD-02360987

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

would investigate their social, business, family and economic ties to the UK and show that they now regard the UK as their permanent home where they always want to live, and that such ties no longer exist in France or the US or are much reduced. As a sensible safeguard, we can prepare a statement of domicile for both Mr and Mrs Edelman. This would be a comprehensive summary of their circumstances indicating that they do not regard the UK as their permanent home.

5.1.4   There is a special rule for Inheritance tax purposes only, that a person automatically treated as domiciled in the UK if they have been resident in the UK in at least seventeen of the twenty tax years ending with the year in which they make a gift or die. If either Mr or Mrs Edelman are treated as domiciled for inheritance tax purposes their worldwide personally held assets (not the assets contained in trusts or companies) will be subject to inheritance tax on their death. The current rate of inheritance tax is 40% above the first £325,000 nil rate band. Inheritance tax planning is outside the scope of this note but we recommend that both Mr and Mrs Edelman take advice in good time before either of them become domiciled in the UK for inheritance tax purposes.

*The remittance basis of taxation*

5.1.5   As both Mr and Mrs Edelman are classed as UK resident and non-UK domiciled they are entitled to claim the remittance basis of taxation. The remittance basis of taxation means that they will only taxed on foreign income and gains when they bring (or remit) them to the UK. If they do not claim the remittance basis of taxation they will be taxed on their worldwide foreign income and gains, regardless of whether they bring them to the UK.

5.1.6   The remittance basis of taxation is free of charge for the first seven years of residency. In 2008 the UK Government introduced a charge of £30,000 a year for people who have been resident in the UK for seven out of the previous nine UK tax years and who wish to claim the remittance basis. The

18308333.8                                    5

charge increases to £50,000 a year for people who have been resident for twelve out of the previous fourteen UK tax years.

5.1.7   Assuming Mr and Mrs Edelman have been resident since 2000, they should have each paid £30,000 per year since 2008. For the current and previous tax year the £50,000 yearly charge will apply to both Mr and Mrs Edelman.

*Rate of tax*

5.1.8   The rate of tax depends on the nature of the money that has been brought to the UK. The money will either be treated as income, capital gain, or "clean capital".

5.1.9   The rate of income tax between the 2000 and 2010 tax years was 40%. It increased to 50% for the next three tax years, and dropped to 45% for the current tax year.

5.1.10  The rate of capital gains tax followed the income tax rates until 2009. Between 2009 and 2011 the rate of capital gains tax was 18%. The current rate is 28%.

5.1.11  "clean capital" may be brought to the UK free of tax. Clean capital is capital free of income or gain, or contains income or gains that were made before a person became UK tax resident. For example, if Mr Edelman brought money into the UK in 2001 that he made in 1999, this would be free of UK tax.

*Mr Edelman*

5.1.12  It is likely that the nature of the money that Mr Edelman brought to the UK is income. His consultancy fees would almost certainly be classed as income, as would the settlement of his UK credit card bills (presumably this would be treated as part of his consultancy fee). We assume that the Touchdown Limited has paid Mr Edelman dividends, which are classed as income.

18308333.8                                         6

CAPLIN0024788
USPROD-02360989

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

5.1.13    Since 2001 Mr Edelman has remitted £4,158,716 to the UK.    Using the applicable income tax rates, the tax due would be £1,883,219.    This calculation includes the remittance basis charge where appropriate.

*Mrs Edelman*

5.1.14    It is not clear whether the money Mrs Edelman has brought to the UK should be classed as income or capital gain.

5.1.15    We understand that Mrs Edelman has been receiving distributions from the Sunage Foundation to fund herself in the UK.    It is likely that the UK tax authorities will treat the foundation as a trust for UK tax purposes.    Although the foundation itself will not pay capital gains tax, there are anti-avoidance rules which were introduced in 2008 that can tax Mrs Edelman on the gains made by the Foundation.

5.1.16    Distributions Mrs Edelman has received from the foundation could be classed as capital distributions, in which case she would be liable to capital gains tax and not income tax.    As above, capital gains tax is charged at a lower rate to income tax.    However, if the Foundation did not distribute all of its gains to Mrs Edelman (as is likely) a higher rate of tax may be applicable.

5.1.17    Alternatively, Mrs Edelman may have received dividends from offshore companies.    Dividends are classed as income, and therefore income tax would be payable on the amounts remitted.

5.1.18    We have calculated the tax on the money that Mrs Edelman brought into the UK as if it were classed as income.    Since 2008 she has remitted £3,732,643 to the UK.    Using the applicable income tax rates, the tax payable on this amount is £1,922,564.    This includes the remittance basis charge where appropriate.

5.1.19    As above, we need to classify the nature of the payments received by both Mrs and Mrs Edelman from the various entities.    For example, if Mrs Edelman received distributions from the Foundation we would need to

Confidential

CAPLIN0024789
USPROD-02360990

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

analyse the Foundation governing documents and any deeds distributing money.  We would also need to analyse what capital gains, if any, the foundation has made.   We would also need to identify if any clean capital was brought into the UK.

*Interest and penalties*

5.1.20   Interest is payable on the tax due.  The HMRC rate of late payment interest since September 2009 is 3%.   Before September 2009 the rate varied between 2.5% - 8.5%.

5.1.21   Penalties will also be payable for late tax, although these may be significantly reduced if Mr and Mrs Edelman approach HMRC voluntarily in the manner we recommend.

5.1.22   HMRC have recently increased the penalties to up to 200% of the tax due for the 2011 tax year.  The 200% rate will apply if there has been a failure to notify HMRC of a foreign source of income that may be taxable.  The penalty is also linked to how readily the foreign territory shares information with the UK.  The harder it is for HMRC to get information the higher the penalties can be.  As the main holding entity is in based in Panama, the highest rate of 200% may apply.

5.1.23   In previous years, the penalty could be up to 100% of the tax due when a tax return has not been submitted for more than 12 months and where the omission is classed by HMRC as sufficiently serious.

5.1.24   As above, these penalties will not apply to the Edelman's if they disclose voluntarily to HMRC or use the LDF.

## 5.2   REGULARISING THE EDELMAN'S TAX POSITION

We recommend that Mr and Mrs Edelman make a disclosure to HMRC.  If the Edelman's are investigated before they make a disclosure they potentially face criminal charges and a lengthy and costly investigation into their affairs.  They will

18308333.8                                                   8

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

need to pay substantive legal fees, the tax due, together with high penalties and interest payments. HMRC also releases a list of deliberate tax defrauders, on which they could be included.

We recommend the most appropriate way of approaching HMRC is by using the Lichtenstein Disclosure Facility ("LDF"), which we describe below.

An alternative to the LDF is to approach HMRC directly with completed tax returns for the last 13 years and negotiate a settlement with them. If the Edelman's approach HMRC and make a voluntary, full and frank disclosure it is unlikely that they will be prosecuted and named by HMRC, however the penalties will not be limited in the same way as under the LDF.

*Lichtenstein Disclosure Facility ("LDF")*

The LDF is a taxpayer assistance and compliance programme under which the Edelman's can become UK tax compliant. If certain conditions are satisfied the LDF offers the following benefits:

5.2.1    Mr and Mrs Edelman will be immune to prosecution for tax-related offences, provided that the disclosure made under the LDF is "full, accurate and unprompted".

5.2.2    There is a fixed penalty of 10% in respect of liabilities to income tax and CGT for the tax years 1999-2000 to 2008-2009. The penalties imposed on the Edelman's after these tax years will be up to 40%.

5.2.3    They will only have to provide information for each successive tax year commencing on 6 April 1999 (i.e. they will only have to disclose their omissions for the past 14 years rather than 40 years). Depending on when they became UK resident this could be an advantage for them.

5.2.4    Mr and Mrs Edelman will be immune to "naming and shaming" by HMRC.

5.2.5    The LDF will allow the Edelman's to claim the remittance basis of taxation, provided they have paid the remittance basis charge.

Confidential
Ex.004-5.0295
CAPLIN0024791
USPROD-02360992

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

To be eligible to use the LDF they will need a Liechtenstein bank account. They can create this account now. There are many banks offering this service at the moment. They will each need to fund the account with at least CHF3 million (the equivalent to approximately £2 million).

The Edelman's can either choose to apply a composite rate of tax or the actual rate of tax. The composite rate of tax is a set 40% rate of tax that applies to all undisclosed past liabilities. The rate will be applied to all income, profits, gains and other sums chargeable. The advantage of the composite rate is that it offers a fast way of calculating the liability. However, as they will be claiming the remittance basis of taxation, and the distributions to Mrs Edelman may have been of a capital nature you may wish to apply the actual rate of tax to lower the final tax bill. We will be able to advise further on this point when the accounting exercise has been finalised.

Please let us know how Mr and Mrs Edelman would like to proceed.

**Mishcon de Reya**
**[6] September 2013**

18308333.8

10

Confidential

Ex.004-5.0296

CAPLIN0024792
USPROD-02360993

DISCUSSION DRAFT – 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

**Douglas Philip Edelman**

| Year | Amount remitted | Rate of tax | Tax payable |
|------|-----------------|-------------|-------------|
| 2001 | £125,152 | 40% | £50,060 |
| 2002 | £344,773 | 40% | £137,909 |
| 2003 | £538,061 | 40% | £215,224 |
| 2004 | £372,174 | 40% | £148,869 |
| 2005 | £397,717 | 40% | £159,086 |
| 2006 | £480,903 | 40% | £192,361 |
| 2007 | £415,156 | 40% | £164,862 |
| 2008 | £481,739 | 40% | £192,695 £30,000 RBC |
| 2009 | £493,643 | 40% | £197,457 £30,000 RBC |
| 2010 | £280,799 | 50% | £140,399 £30,000 RBC |
| 2011 | £150,796 | 50% | £75,398 £30,000 RBC |
| 2012 | £77,798 | 50% | £38,899 £50,000 |
| | | | **£1,883,219** |

Confidential

Ex.004-5.0297

CAPLIN0024793
USPROD-02360994

DISCUSSION DRAFT -- 6 September 2013
SUBJECT TO LEGAL PROFESSIONAL PRIVILEGE

### Delphine Anne le Dain Edelman

| Year | Amount remitted | Rate of tax | Tax payable |
|---|---|---|---|
| 2007 | £36,500 | 40% | £14,600 |
| 2008 | £568,750 | 40% | £227,500<br>£30,000 |
| 2009 | £532,297 | 40% | £212,918<br>£30,000 |
| 2010 | £1,490,406 | 50% | £745,203<br>£30,000 |
| 2011 | £602,455 | 50% | £301,227<br>£30,000 |
| 2012 | £502,233 | 50% | £251,116<br>£50,000 |
|  |  |  | **£1,922,564** |

Confidential
Ex.004-5.0298
CAPLIN0024794
USPROD-02360995

Potential United States tax reporting requirements and exposure in connection with the Foundation.

**Facts and Assumptions**

In performing this analysis, we made the following assumptions:

- Client is not a U.S. citizen and not a U.S. resident.

- Client is the grantor of the Foundation and is the sole beneficiary of Foundation during her life.

- Client is the sole contributor of property to the Foundation.

- From the US perspective, Foundation is treated like a Trust.

**Short Answer**

Because the Foundation is treated as a grantor trust, of which the Client, who is neither a U.S. citizen nor a U.S. resident, is considered the grantor, Client does not have any U.S. reporting requirements in connection with the Foundation or the assets held by the Foundation.

**Analysis and Application**

The Internal Revenue Code of 1986 (the "Code") contains a set of provisions, known as the grantor trust rules, which provide that in certain cases, the income of a trust will be taxed to the grantor, regardless of who in fact receives the income. Essentially, grantor trusts are not treated as separate taxpayers from their grantors. However, Section 672(f) of the Code provides that in general trusts with non-U.S. grantors will not be treated as grantor trusts for U.S. income tax purposes.

There are three main types of trusts with non-U.S. grantors that are still treated as grantor trusts for U.S. income tax purposes.[1]

The first type of trust is one that is revocable by the grantor without the consent of a related or subordinate party.[2] While Article 6 provides that the Council requires Client's consent to amend the Foundation, the Client does not have the unilateral power to revoke the Foundation and accordingly this exception does not appear to be applicable.

The second exception is a trust which, during the lifetime of the grantor, principal and/or income from the trust can only be paid to the grantor or her spouse.[3] That appears to be the case here. Article 1 of the Foundation provides that "During her lifetime, enjoyment of the foundation's net worth and the proceeds therefrom as stated in Annex A correspond only to: _____." As mentioned above, our assumption is that this beneficiary is the Client. Accordingly, from the US perspective, the Foundation would be considered a grantor trust with Client treated as the grantor or owner of the Foundation.

---

[1] I.R.C. §672(f); Treas. Reg. §1.672(f)-3.

[2] I.R.C. §672(f)(2)(A)(i); Treas. Reg. §1.672(f)-3(a)(1).

[3] I.R.C. §672(f)(2)(A)(ii); Treas. Reg. §1.672(f)-3(b)(1).

CAPLIN0024795
USPROD-02360996

The third exception relates to a so-called compensatory trust and is not relevant.[4]

### Conclusion

Because the Foundation is treated as a grantor trust and is not treated as a separate taxpayer from the Client from the U.S. perspective, the Client, as the grantor, is deemed to own the underlying Foundation assets.

---

[4] I.R.C. §672(f)(2)(B);  Treas. Reg. §1.672(f)-3(c).

Confidential                                                Ex.004-5.0300                                CAPLIN0024796
USPROD-02360997

1. **Background:**

   a. Clients are UK residents – see section 5 below.
   b. Clients are contemplating moving to Spain (Ibiza).
   c. Client has owned a property in Ibiza since 2008, this property been valued at approximately €4M.
   d. They intend to stay in Spain approximately 1 year, and then move back to the UK.
   e. Clients own a house in London (no – owned by Trust) which will be vacated and may also be rented while living in Spain.

2. **Presumptions:**

   a. Clients have not been tax resident in Spain in the past.
   b. Clients do not intend to carry out any labour or economic activity in Spain.

3. **Introduction: general ideas to be considered**

   According to Spanish Tax Law, tax residence is based on any of the following:

   - Presence in Spain for more than 183 days in the tax year; or
   - Having the centre of your economic interests in Spain.

   In addition, an individual is presumed to be tax resident in Spain if his/her wife or husband, and dependent children, are tax resident in Spain (not applicable to this case at the moment).

   Please note that the Spanish tax year runs from January 1 through December 31 and, unlike the UK tax year, cannot be split.

   Therefore, as a general rule, an individual will be likely considered tax resident in Spain, starting on January 1st, if he moves to Spain before July 3rd of any year. In addition, irrespective of the date of relocation to Spain, an individual can be considered tax resident in Spain if his income or wealth is significantly located in Spain, more so than in any other country (need to look at this – income no, personal wealth, possibly yes).

   Either rule can render a person tax resident in Spain.

   The Spanish Tax Authorities will likely be accepting the tax residence of clients once they move to Spain. In our opinion, any discussions on their tax residence status may come from the UK Tax Authorities. As you already know, in case of conflict the "tie-break" rules of Article 4 in the Spain – UK Tax Treaty would apply:

   - permanent home
   - personal and economic relations are closer (centre of vital interests)
   - habitual abode
   - nationality
   - mutual agreement

   Tax residents in Spain are liable, under the Spanish Personal Income Tax (PIT), on their worldwide income for the relevant tax year. Tax rates are progressive as shown in the following table (Euros):

CAPLIN0024797
USPROD-02360998

| Up to | Tax quota | Up to | Tax rate |
|---|---|---|---|
| 0.00 | 0.00 | 17 707.20 | 24.75% |
| 17 707.20 | 4 382.53 | 15 300.00 | 30.00% |
| 33 007.20 | 8 972.53 | 20 400.00 | 40.00% |
| 53 407.20 | 17 132.53 | 66 593.00 | 47.00% |
| 120 000.20 | 48 431.24 | 55 000.00 | 49.00% |
| 175 000.20 | 76 381.24 | 125 000.00 | 51.00% |
| 300 000.20 | 82 881.24 | Onwards | 52.00% |

Variations do take place depending on the region where the individual is based (though this is not the case for Ibiza).

Short term capital gains (<1 year) are also subject to the general progressive tax rates.

Long term capital gains (>1 year) and investment income (i.e. dividends, interest, etc.), are currently subject to the following rates:
- 0 € – 6,000 €: 21%
- 6,000 € – 24,000 €: 24%
- Over 24,000 €: 27%

Tax residents in Spain are also liable to Wealth Tax on the net value of their worldwide assets, provided said net value exceeds a given threshold (Euro 700,000). Progressive rates for Wealth Tax generally range from 0.2% to 2.5%. Some regions, such as Madrid, have currently suppressed Wealth Tax, but it remains in force in most regions, including Ibiza (Baleares), once the aforementioned threshold is exceeded.

Non-residents in Spain are liable on their Spanish source income only at a flat 24.75% rate, as well as under the Wealth Tax on their Spanish bases assets.

Owning a property in Spain which is not used as a permanent home nor rented, is taxable both under the resident and the non-resident income and wealth tax. Therefore, the house owned by clients in Ibiza should have given rise to a taxable "imputed" income under the non-resident tax law in past years. Likewise, and depending on the value of the property in Ibiza and other assets in Spain, clients could have also been liable to Spanish non-resident Wealth Tax in the past years.

The Spanish Tax Law includes a special regime for individuals who have not been resident in Spain for the past 10 years and relocate to Spain for labour reasons. This special regime allows a person to become tax resident in Spain but be taxed as non-resident (i.e. flat 24,75% rate on Spanish source income only), for a period of up to 6 fiscal years. The applicability of this regime to clients would require a careful analysis since it is addressed to employees and relocation to Spain must be based on labour reasons, this is, either starting a new labour contract in Spain or being on secondment to Spain. (Considered N/A in this instance).

Recently, new disclosure obligations have been introduced on foreign assets held by Spanish tax residents (Form 720). This means that, if clients were considered as tax resident in Spain for year 2014, they would have to file a Form 720 in April 2015 disclosing foreign assets including bank accounts, shares, bonds, investment funds, interest in companies and real estate, in excess of Euro 50,000. Although no additional tax is payable on this obligation, failure to disclose is subject to heavy penalties and other tax consequences. This would NOT apply to Trust assets.

CAPLIN0024798
USPROD-02360999

Finally, please note that the Government is currently working on a tax reform for year 2015. Said reform may result in lower tax rates and other changes so that our conclusions should be reviewed once tax measures are effectively passed.

4.  Answers to our questions

Q1.  What information will need to be disclosed to the Spanish tax authorities when clients formally take up residence in Spain? In particular, what information will need to be provided in respect of past tax history?

There are no formalities to take Spanish tax residence. However, as indicated by you, it can be recommendable that clients obtain Spanish tax IDs (namely "Número de Identificación de Extranjero" or "NIE"), if not already done so, as well as to communicate a domicile in Spain (Ibiza) to the Tax Authorities through Form 030, in addition to any civil registration that they choose to complete while living in Ibiza.

There is no need to disclose past tax history.

Q2.  We need to confirm that based on Spanish residency, clients will pay tax primarily on income received in Spain (as in the UK). We also need to clarify the position regarding any tax on the property currently owned in Spain (which is the house as referred to above).

As tax residents in Spain, clients will be liable on their <u>worldwide income</u> obtained from January 1 through December 31 in the relevant tax year. Therefore, UK income will also be taxable in Spain. Clients will be entitled to a foreign tax credit in Spain on the lesser of (i) UK taxes or (ii) Spanish taxes due on UK income. (Unlikely to be any UK income)

Under the Personal Income Tax:
- A property that is your permanent home does not bear taxes
- A vacant property other than your permanent home is taxed as "imputed income". Taxable imputed income is calculated as 1,1% of so called cadastral value. If the property does not have cadastral value, income is calculated as 1,1% of 50% of acquisition value. This would apply to the London property (if not rented) while clients are tax residents in Spain. (NO – because owned by Trust)
- Net income from rented property is taxable under the general progressive rates. Expenses such as insurance, municipal taxes and other are deductible from the income. This may also apply to the London property if rented. (N/A – as above)

In addition, the London property would also be taken into account for Wealth Tax purposes (together with any other worldwide asset that clients may own). (N/A - as above)

Q3.  Clients would obviously require Spanish tax IDs and we require advice on any issues (other than taxes) regarding residency for both of them (and also for the three children).

We can offer advice on obtaining tax IDs although we do not typically carry out registration procedures. We can also offer advice on a variety of legal areas. We do not typically offer advice on immigration, although this does not seem to be an issue in the case at hand.

Q4.  The intention is to move to the UK at some stage later (possibly after 18 months, depending upon the information that will be needed in the UK as a "fresh start").

We can offer advice on tax residence issues and obtaining Spanish tax residence certificate.

Confidential

CAPLIN0024799
USPROD-02361000

Q5. In the meantime, it is intended that the London house would be effectively vacated and that Trust would rent part or all or part the house when they eventually move to the UK. Another possibility is that the London house may be just be kept for them without it being rented.

See comments above on taxation of property under the Spanish Personal Income Tax.

Q6. If above plan put into action, what would be required in terms of tax history if and when clients take up UK residency? How far would we have to go back?

There is no exit tax in Spain and there would be no need to provide information of tax history to Spanish Tax Authorities when moving back to UK. (This comment assumes previous UK tax residency). The Spanish statute of limitation is 4 years. We may address any further concerns you may have on effective relocation of tax residence from and to Spain.

See other issue below in respect of entering/coming back to the UK

5. **Other Issues**

When a person has income or gain that has to be declared and paid in the UK, that individual has to apply (i) for a National Insurance Number first, and then (ii) to complete a self-assessment return and to obtain a Unique Tax Reference Number. To obtain a National Insurance Number, there is a short interview process with Jobcentre Plus where that office primarily checks immigration related document (her EU passport and his visa to remain in the UK). Once the National Insurance Number is obtained they would then have to complete the HMRC form SA 1 with all the necessary details – see attached. This is not specifically related to a person entering the country. The questions on page 2 need to be looked at carefully in our context as we have to enter a date and there is a declaration that need to be completed – the form is not specific to entry into the UK or a return back to the UK – it is a generic form which applies in multiple instances and that causes concern in our context. The short answer is that the position remains the same as is currently – we are unlikely to get a "fresh start".

If the house is "mothballed" with the costs borne by the trust in the time when they are not resident in the UK, there should be no tax to pay in respect of that period as there is no tax payer in the UK. The usual process however is to let HMRC know that the relevant individuals are leaving the UK by completing the HMRC Form P85 for each of them and letting HMRC know of his and her departure. As neither is on HMRC's radar at the moment we need to be very judicious about any contact with HMRC without full consideration. If they are to pay rent when they return to the UK, they would certainly tidy up the position going forward and dealing with tax related issues for those period would become a lot easier.

As set out in 4 above, we are unlikely to get a "fresh start" and therefore the move to Spain should not have an impact on what we need to do for historic issues. The detailed work carried out to date will remain very helpful for that as and when a decision is made to approach HMRC. Our view remains that it should be done as soon as possible.

Confidential

CAPLIN0024800
USPROD-02361001

|  | CYPRUS | Source | Netherlands | Source | Luxembourg | |
|---|---|---|---|---|---|---|
| Financial Reporting | 1. All companies must file annual accounts. 2. All non-small companies must file audited accounts (i.e. assets over €3.4m, turnover over €7.0m.) |  | 1. All companies must file annual accounts. 2. Audited accounts required if assets exceed €4.4m, turnover exceeds €8m 3. If a company controls a participation, then consolidated accounts required. |  | 1. All companies must file annual accounts 2. Audited accounts required if assets exceed €17.5m, turnover exceeds €35m 3. If a company controls a participation then consolidated accounts required | |
| Saffery verified | 1. All companies must submit financial statements and an annual return to the Registrar of Companies each year. 2. All companies must be audited unless they qualify as "small" by satisfying two of the three following tests: total assets not more than €3.4m, Turnover not in excess of €7m, not more than 50 employees | Doc 1  Doc 2 | 1. All companies must file annual accounts with the office of the commercial register. 2. Small legal entities are exempt. Small legal entities are those satisfying two of the three following criteria for two consecutive years: a. Total assets less than €4.4m b. Turnover of less than €8.8m c. Fewer than 50 employees 3. If a company is considered to be at the head of a group or sub-group i.e. is a company which exercises dominant policymaking control over at least one other company, it must prepare consolidated accounts, unless one of the statutory exceptions is available. | Doc 6  Doc d  Doc 7 | 1. All companies must file annual accounts. 2. Not confirmed. It appears that both Medium and Large Companies require an audit, and that only Small-sized companies are exempt. To be Small a company must not exceed two of the three following thresholds: Turnover <€8m, Total Assets <€4m, Employees <50 3. Consolidated accounts are required where one company has control over another undertaking, determined broadly by the holding of a majority of the voting rights, or the ability to appoint or dismiss board members. There are also a number of exemptions. | Doc 10  Doc 11  Doc 12 |
| Disclosure on public record | Directors, shareholders, capital, charges and full AR |  | Direct shareholder (unless more than one) and names of manager(s) - other privacy structures can be used to avoid the name of the shareholder. |  | 1. Direct shareholder and names of manager(s) although a privacy structure can be used to avoid the name of the shareholder. 2. Name of UBO should (on a confidential basis) be disclosed to the Notary and the Luxembourg bank | |
| Saffery verified | Director & Shareholder information but not beneficial ownership of shares. | Doc 3 | Name but not address of directors and authorised signatories. | Doc 5 | 1. Names of Directors available on public register. Shareholders disclosed for a SARL but not for a BA. 2. Beneficial Owners not filed on public record. | Doc 13  Doc 13 |
| Regulatory control | Recommended that company demonstrates control from Cyprus. Majority should be resident |  | No regulatory supervision. |  | No regulatory supervision | |
| Saffery verified | Although not a requirement, it is common practice for the majority of the directors to be Cypriot residents. | Doc 1 | Unconfirmed | | Unconfirmed | |
| Taxation | 1. Corporation tax at 12.5% 2. Dividend income exempt from tax 3. No tax on securities trading 4. No capital gains tax |  | 1. On the basis of the Dutch participation exemption, dividend income and capital gains should be exempt from corporate income tax (no holding period restriction) 2. However, a BVI holding co. could become subject to 25% non-resident tax. This can be avoided with EU company above the Dutch trading company. |  | On the basis of the Luxembourg participation, dividend income and capital gains should be exempt from corporate income tax (subject to 12 month holding period) | |
| Saffery verified | 1. Corporation tax at 12.5% if Resident 2. Dividend income exempt with two exceptions:  a. Where paying company's activities >50% investment income generation; b. Where paying company's domestic tax rate is substantially less than 12.5% | Doc 3  Doc 3 | 1. The participation exemption applies to dividends and capital gains derived from shareholdings of at least 5%, provided: (1) the subsidiary is not held as a mere portfolio investment; or (2) the subsidiary is subject to a reasonable effective tax rate based on Dutch tax principles; or (3) less than 90% of the assets of the subsidiary consist of "passive" assets based on the fair market value of the assets. 2. No CFC legislation, but an obligation to annually reassess shareholdings of 25% plus in low-taxed companies whose assets consist of at least 90% "passive" assets. | Doc 4  Doc 4 | Dividends and capital gains from a qualifying shareholding may be exempt from Luxembourg corporate income tax and municipal business tax, notably, if the recipient holds or commits to hold direct'y or indirectly the participation for an uninterrupted period of at least 12 months and the participation does not fall below 10% or below an acquisition price of €1.2m (€6m for capital gains) throughout that period. | Doc 14 |

Confidential

CAPLIN0024801
USPROD-02361002

| | | | |
|---|---|---|---|
| | 3. Profits arising from the trading or disposal of securities are not subject to income tax    Doc 3<br><br>4. No capital gains tax unless selling shares in a company that owns immovable property, where there is flat rate capital gains tax of 29% | | |
| WHT | 1. No withholding tax on dividend payments<br>2. WHT on dividend receipts from Non-EU - 5% (or 10% if investment less than €100k) | 1. 15% WHT on dividend payments with options to mitigate.<br>2. BVI Holding co could become subject to 25% non-resident tax. This can be avoided with EU Company above the Dutch trading company<br>3. If 25% rate applies (see above) then dividend rate reduced to 2.5% | 1. 15% on dividend payments - with options to mitigate.<br>2. Interest payments not subject to WHT |
| Saffery verified | 1. No withholding tax on dividend paid to non resident    Doc 3<br><br>2. See separate WHT Table | 1. Domestic WHT rate 15% on dividends paid to non-residents    Doc 4<br>2. & 3. Not confirmed. Does this comment relate to a BVI Co managed & controled in the Netherlands? | 1. Domestic WHT on dividends 15%. A system mirroring EU parent-subsidiary directive exists in qualifying circumstances    Doc 14<br>2. No WHT on interest    Doc 14 |
| Distributions and restrictions | No WHT and payments can be made up to full distributable reserves | No restrictions | No restrictions |
| Saffery verified | Not verified | New Distribution Test introduced for BV companies in 2012    Doc 8 | Dependent of form of legal entity in question |
| Other considerations | | | |

Confidential

CAPLIN0024802<br>USPROD-02361003

| Intermediary HoldCo ▶ ▶ / Subsid Trade Co ▼ ▼ | Domestic WHT | Cyprus | N'lands | Lux | UK |
|---|---|---|---|---|---|
| Domestic WHT - Divs | | Nil | 15% | 15% | Nil |
| Russia | 15% Note 6 | 10%/5% Note 1 | 15%/5% Note 2 | 15%/10% Note 3 | 10% |
| N'lands | 15% | no treaty | | 2.50% Note 4 | 10%/15%/0% Note 5 |
| Canada | 25% | 15% | 15%/5% Note 7 | 15%/5% Note 7 | 15%/5% Note 7 |
| Mexico | 10% Note 8 | no treaty | 15%/10% Note 9 | 15%/8% Note 10 | 0%/15% Note 11 |
| BVI | Nil | no treaty | no treaty | no treaty | no treaty |
| Kenya | 10% | no treaty | no treaty | no treaty | 15% |
| UK | Nil | Nil treaty | Nil treaty | Nil treaty | |
| Spain | 21% | no treaty | 15%/10%/5% Note 12 | 15%/10% Note 13 | 15%/10% Note 14 |
| Hungary | Nil Note 15 | 5% disregarded | 5% disregarded | 5% disregarded | 0% disregarded |

**Footnotes**

Note 1 — The lower WHT rate applies if the value of the holding is at least €100,000

Note 2 — The rate applies if the recipient company holds directly at least 25% of the capital in the Russian company and the value of the capital investment is at least ECU 75,000 or its equivalent in the national currencies of the contracting states.

Note 3 — The 10% rate applies if the Luxembourg individual or corporate recipient owns directly at least 30% of the capital in the Russian company and the value of the holding is at least EUR 75,000.

Note 4 — The 2.5% rate applies if the recipient is a company the capital of which is, wholly or partly, divided into shares or corporate rights assimilated to shares by the taxation law of the other State, which company controls directly at least 25% of the capital of the company paying the dividends

Note 5 — The 10% is the default rate under the treaty, The 15% rate applies to dividends received from an investment company mainly investing in real estate

The 0% rate applies if the UK company receiving the dividends owns at least 10% of the voting power of the company distributing the dividends, or when the dividends are received by a pension fund, or a cultural, scientific or educational organization

Note 6 — A new disclosure rule was introduced with effect from 03/12/13 whereby an increased WHT rate of 30% can apply in certain cases where the ultimate foreign beneficiaries of dividend income are not disclosed

Note 7 — The 5% rate applies if the recipient company owns at least 10% of the capital or the voting power of the paying company, as the case may be. Special conditions may apply.

Note 8
Under the new Income Tax Law, dividends distributed by resident companies to non-residents from profits generated as of 2014 are subject to a 10% withholding tax

Note 9
The general rate under the treaty is 15%. However, by virtue of a most-favoured nation clause (Protocol, para. 6), the rate is reduced to 10%

Note 10
The rate is reduced to 8% of the gross amount of the dividends if the beneficial owner is a company (other than a partnership) which holds directly at least 10 per cent of the capital of the company paying the dividends

Note 11
Dividends will be tax exempt in the source state under certain conditions. The 15% rate applies if the dividends or distributions are paid out of income derived from immovable property by an investment vehicle under certain conditions.

Note 12
The 10% rate applies if the Netherlands company is not exempt from corporate tax on the dividends received, and owns at least 50% of the capital in the Spanish company or at least 25% while another Netherlands company also owns at least 25%; the 5% rate applies if the Netherlands company, in addition to the above-mentioned holding requirement, qualifies in the Netherlands for the participation exemption on the dividends.

Note 13
The 10% rate applies if the beneficial owner is a company (other than a partnership) which holds directly at least 25% of the capital of the company paying the dividends, if the beneficial owner is a company which has held the capital for a period of at least one year prior to the distribution of the dividends;

Note 14
The rate is 10% of the gross amount of the dividends if the beneficial owner is a company which controls directly or indirectly at least 10% of the voting power in the company paying the dividends.

Note 15
No tax is withheld on dividends, even where a treaty allows such tax

Confidential

Ex.004-5.0308

CAPLIN0024804
USPROD-02361005

**DOUGLAS PHILIP EDELMAN**

**Notes to income summaries**

<u>Basis of preparation</u>

The attached income summaries have been prepared primarily from the HSBC personal bank account operated by Mr Edelman.

Statements for the last ten years have been obtained and all receipts into the account have been scheduled.

All receipts have, as far as possible, been matched and verified with the bank transactions recorded in the accounts of the various trading entities during the period.

In addition, certain credit card payments have been made by the companies for whom Mr Edelman has acted. These have been identified from the payments made by the relevant companies and verified with the credit card statements available

<u>Matters arising</u>

1.  The reconciliation exercise has not been fully completed in respect of the years 2005 and 2006 due to the lack of available bank statements and other information relating to the trading entities.

2.  There are a number of payments, made by the trading entities, which have not been received into the HSBC account. These have been separately identified and treated as income, pending further investigation.

3.  From 2007 onwards, payments were largely made from GBP accounts operated by the trading entities (rather than USD payments), which has made the task of reconciliation considerably easier.

<u>Credit card payments</u>

4.  Not all credit card payments made by the entities on behalf of Mr Edelman have yet been identified and verified.

5.  In addition, these credit card payments will include expenses incurred on behalf of the trading entities and these should technically be eliminated. This can only be completed from a detailed analysis of all credit card statements over the last ten years.

<u>Touchdown Limited</u>

6.  A complete analysis of the bank transactions in respect of the account with BSI Lugano has been prepared and payments made to Touchdown have been verified with payments made by the trading entities. Payments have been made from the Touchdown account is respect of a credit card account in the name of Mr Edelman. The credit card payments have been

CAPLIN0024805
USPROD-02361006

identified (for the purposes of identifying any business expenses) but have been adjusted out of the total income received into the account

Exchange rates

7.   Income received in GBP has been converted at estimated exchange rates – these will need to be verified and adjusted as required.

CAPLIN0024806
USPROD-02361007

Douglas Edelman

Summary of earned income (USD)

Thirteen years to 31 December 2013

| | Consultancy fees | | | | Contras | | Other payments received | | Other | TOTAL | Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Paid into HSBC A/c | Paid from Aspen* | Paid from Bartol* | Paid to Touchdown | Contra HSBC | Contra Touchdown** | Credit cards (Summary) | Mastercard Touchdown** | | | |
| 2000 | (No info) | - | - | | | ( 25,262.00) | | 25,262.00 | - | - | |
| 2001 | 85,455.86 | 24,039.23 | 10,000.00 | | | ( 26,207.89) | 5,657.79 | 26,207.89 | | 125,152.88 | |
| 2002 | 234,382.84 | 36,110.41 | 22,022.05 | 25,000.00 | | ( 58,551.45) | 27,258.05 | 58,551.45 | | 344,773.35 | |
| 2003 | 389,258.33 | 30,545.58 | 62,350.53 | 49,940.00 | ( 19,113.79) | ( 93,629.61) | 25,080.68 | 93,629.61 | | 538,061.33 | |
| 2004 | 266,787.59 | 4,023.97 | 25,000.00 | 57,500.00 | | ( 57,933.39) | 18,862.76 | 57,933.39 | | 372,174.32 | |
| 2005 | 277,717.95 | | | 120,000.00 | | ( 75,941.46) | - | 75,941.46 | | 397,717.95 | |
| 2006 | 276,335.40 | | | 75,000.00 | | ( 42,716.66) | 129,567.67 | 42,716.66 | | 480,903.07 | |
| 2007 | 174,075.00 | - | - | 70,000.00 | | ( 59,493.68) | 171,081.60 | 59,493.68 | | 415,156.60 | |
| 2008 | 233,465.10 | - | - | | | ( 69,420.30) | 248,273.90 | 69,420.30 | | 481,739.00 | |
| 2009 | 266,475.00 | - | - | - | | ( 18,073.54) | 227,168.40 | 18,073.54 | | 493,643.40 | |
| 2010 | 224,400.00 | | | | | | 56,399.34 | | | 280,799.34 | |
| 2011 | 126,500.00 | | | | | | 24,296.56 | | | 150,796.56 | |
| 2012 | 49,600.00 | | | | | | 28,198.66 | | | 77,798.66 | |
| | 2,604,453.08 | 94,719.19 | 119,372.58 | 397,440.00 | ( 19,113.79) | ( 527,229.98) | 961,845.42 | 527,229.98 | - | 4,158,716.47 | |

4,158,716.47

\* These amounts paid out of Aspen Wind and Bartol have not been paid into the HSBC account - see detailed annual reconciliations

Confidential

Ex.004-5.0311

CAPLIN0024807
USPROD-02361008

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2001**

| | | HSBC (GBP) | Other* (USD) | Source not verified | Payments from | | Exch rate |
|---|---|---|---|---|---|---|---|
| | | | | | AW | Bartol | |
| | | **GBP** | **USD** | **GBP** | **USD** | **USD** | |
| 03-May-01 | Note 2 | 13,335.27 | | | 20,002.90 | | 1.500000 |
| 29-Jun-01 | Note 2 | 7,346.94 | | | 11,020.41 | | 1.500000 |
| 25-Jul-01 | | 2,494.00 | | 2,494.00 | | | |
| 30-Aug-01 | Note 3 | | 7,508.70 | | 7,508.70 | | |
| 12-Sep-01 | | 9,994.00 | | 9,994.00 | | | |
| 09-Oct-01 | | | | | | | |
| 16-Oct-01 | | 1,494.00 | | | 2,205.48 | | 1.476225 |
| 17-Oct-01 | | | 5,509.28 | | 5,509.28 | | |
| 24-Oct-01 | | 3,994.00 | | | 5,815.10 | | 1.455959 |
| 16-Nov-01 | | 3,994.00 | | | 5,848.25 | | 1.464259 |
| 27-Nov-01 | | | 10,000.00 | | | 10,000.00 | |
| 29-Nov-01 | | 5,575.69 | | 5,575.69 | | | |
| | | | 5,021.25 | | 5,021.25 | | |
| 04-Dec-01 Paid in at HSBC | | 650.00 | | | | | |
| 19-Dec-01 | | 9,994.00 | | 9,994.00 | | | |
| 28-Dec-01 | | | 6,000.00 | | 6,000.00 | | |
| | | **37,539.69** | **34,039.23** | **28,057.69** | **68,931.37** | **10,000.00** | |

Notes:
1. Unable to obtain HSBC bank statements prior to July 2001 - therefore unable to verify receipts January to June 2001
2. Income taken from Aspen Wind transfers - total $31,000 at exchange rate of $1.50 to £1
3. Payments totalling        $    34,039.23  have been made from Aspen/Bartol, but not traced to the HSBC account
4. Receipts into HSBC totalling £    28,057.69  have not been matched to the source of the funds
5. One other small payment into the HSBC account has been ignored (not thought to be income)

Confidential

Ex.004-5.0312

CAPLIN0024808
USPROD-02361009

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2002**

| Date | | HSBC (GBP) | | Other (USD) | Source not verified (GBP) | Payments from AW (USD) | Bartol (USD) | Exch rate |
|---|---|---|---|---|---|---|---|---|
| | | **GBP** | | **USD** | **GBP** | **USD** | **USD** | |
| 31-Jan-02 | | | | 10,000.00 | | 10,000.00 | | |
| 04-Feb-02 | | 1,074.73 | | | 1,074.73 | | | |
| 05-Feb-02 | | | | | | 10,000.00 | | 1.442600 |
| 19-Feb-02 | | 6,931.93 | | | | | | |
| 01-Mar-02 | | 9,994.00 | | | 9,994.00 | | | |
| 13-Mar-02 | | | | 5,000.00 | | 5,000.00 | | |
| 19-Apr-02 | | 2,044.00 | | | 2,044.00 | | | |
| 30-Apr-02 | Per post | | 152.00 | | | | | |
| | Paid in at HSBC | | 176.00 | | | | | |
| 07-May-02 | | 3,994.00 | | | | | 5,930.80 | 1.484927 |
| 10-May-02 | | 2,194.00 | | | 2,194.00 | | | |
| 22-May-02 | Trf 36763839 | 6,683.46 | | | | | 10,000.00 | 1.496231 |
| 28-May-02 | | 6,076.00 | | | 6,076.00 | | | |
| 03-Jun-02 | | | | 3,500.00 | | | 3,500.00 | |
| 18-Jun-02 | | 13,494.00 | | | 13,494.00 | | | |
| 19-Jul-02 | | 6,364.00 | | | 6,364.00 | | | |
| 26-Jun-02 | | | | 5,500.00 | | | 5,500.00 | |
| 29-Jul-02 | | | | 6,022.06 | | 6,022.06 | | |
| 12-Aug-02 | | | | 10,000.00 | | | 10,000.00 | |
| 14-Aug-02 | | 14,994.00 | | | | | 23,243.16 | 1.550164 |
| 22-Aug-02 | | 6,520.00 | | | 6,520.00 | | | |
| 23-Aug-02 | | | | 6,022.00 | | 6,022.13 | | |
| 11-Sep-02 | | | | 3,022.05 | | | 3,022.05 | |
| 24-Sep-02 | | | | | | 5,022.05 | | |
| 25-Sep-02 | | 6,444.00 | | | 6,444.00 | | | |
| 10-Oct-02 | | 5,994.00 | | | 5,994.00 | | | |
| 16-Oct-02 | Paid in at HSBC | | 80.00 | | | | | |
| 22-Oct-02 | Transfer | 37,922.61 | | | | 50,022.06 | | 1.319056 |
| 25-Oct-02 | | 2,994.00 | | | | 4,022.06 | | 1.343373 |
| 05-Nov-02 | | | | 2,022.12 | | 2,022.12 | | |
| 29-Nov-02 | | | | 4,022.12 | | 4,022.12 | | |
| 02-Dec-02 | Trf 36763839 | 11,486.51 | | | | 17,522.12 | | 1.525452 |
| 11-Dec-02 | | | | 3,022.11 | | 3,022.11 | | |
| 27-Dec-02 | | 8,994.00 | | | | | 14,657.39 | 1.629685 |

Confidential

Ex.004-5.0313

CAPLIN0024809
USPROD-02361010

154,199.24    58,132.46          60,198.73          122,698.83    75,853.40

Notes:    1. Payments totalling        $      58,132.46    have been made from Aspen/Bartol, but not traced to the HSBC account
          2. Receipts into HSBC totalling £        60,198.73    have not been matched to the source of the funds
          3. One other small payment into the HSBC account has been ignored (not thought to be income)
          4. The exchange rates in respect of two transfers made in October 2002 look suspect – the actual rate ion the day was 1.5463

Confidential

CAPLIN0024810
USPROD-02361011

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2003**

| | HSBC (GBP) | Other (USD) | Source not verified | Verified AW | Bartol | Exch rate |
|---|---|---|---|---|---|---|
| | GBP | USD | GBP | USD | USD | |
| 03-Jan-03 | | 10,022.79 | | 10,022.79 | | |
| 24-Jan-03 Trf 36763839 | | 11,661.88 | | 19,000.00 | | |
| 29-Jan-03 | | 10,022.79 | | 10,022.79 | | 1.6292399 |
| 04-Feb-03 | 10,904.00 | | 10,904.00 | | | |
| 17-Feb-03 Paid in at HSBC | 100.00 | | | | | |
| 11-Mar-03 | 9,994.00 | | 9,994.00 | | | |
| 17-Mar-03 | | 10,000.00 | | | 10,000.00 | |
| 19-Mar-03 | | 8,071.17 | | | 8,071.17 | |
| 19-Mar-03 | 4,994.00 | | | 6,023.03 | | 1.2060533 |
| 02-Apr-03 | | 4,500.00 | | | 4,500.00 | |
| 08-Apr-03 | | 4,500.00 | | | 4,500.00 | |
| 22-Apr-03 | 9,994.00 | | | | 15,936.59 | 1.5946158 |
| 25-Apr-03 Advised | 355.00 | | | | | |
| 29-Apr-03 | | 6,000.00 | | 6,000.00 | | |
| 02-May-03 | 16,994.00 | | | 27,450.37 | | 1.6152978 |
| 22-May-03 | 9,994.00 | | 9,994.00 | | | |
| 27-May-03 | | 16,579.36 | | | 16,579.36 | |
| 02-Jun-03 | | 4,500.00 | | 4,500.00 | | |
| 13-Jun-03 Paid in at HSBC | 82.26 | | | | | |
| 18-Jun-03 | 9,994.00 | | 9,994.00 | | | |
| 08-Jul-03 Paid in at HSBC | 8,462.76 | | | | | |
| 30-Jul-03 | 14,994.00 | | 14,994.00 | | | |
| 13-Aug-03 | 14,994.00 | | 14,994.00 | | | |
| 18-Aug-03 Paid in at HSBC | 341.25 | | | | | |
| 28-Aug-03 Trf from Touchdown | 6,000.00 | | | | | |
| 4-Sep-03 Trf from Touchdown | | 5,000.00 | | | 5,000.00 | |
| 08-Sep-03 | 6,000.00 | | | | | |
| 15-Sep-03 | 19,994.00 | | 19,994.00 | | | |
| 26-Sep-03 Paid in at HSBC | 2,000.00 | | | | | |
| 08-Oct-03 | 5,994.00 | | 5,994.00 | | | |
| 10-Oct-03 Paid in at HSBC | 2,000.00 | | | | | |
| 13-Oct-03 | 13,994.00 | | 13,994.00 | | | |

Confidential

Ex.004-5.0315

CAPLIN0024811
USPROD-02361012

| Date | Description | | | | | | |
|------|-------------|---|---|---|---|---|---|
| 21-Oct-03 | Paid in at HSBC | 250.00 | | | | | |
| 31-Oct-03 | | | 3,994.00 | | | | 6,000.00 |
| 06-Nov-03 | | | | 1,700.00 | | | 1,700.00 |
| 12-Nov-03 | Trf 36763839 | | 14,744.91 | | 14,744.91 | | |
| 17-Nov-03 | | | 19,994.00 | | 19,994.00 | | |
| 03-Dec-03 | | | | 6,000.00 | | | 6,000.00 |
| 03-Dec-03 | | | 9,194.00 | | 9,194.00 | | |
| 03-Dec-03 | | | 9,994.00 | | 9,994.00 | | |
| 09-Dec-03 | | | 4,394.00 | | 4,394.00 | | |
| 29-Dec-03 | | | 9,994.00 | | 9,994.00 | | |
| 30-Dec-03 | | | | 6,000.00 | | | 6,000.00 |
| | | | 238,808.79 | 92,896.11 | 179,170.91 | 83,018.98 | 84,287.12 |

Notes:
1. Payments totalling $ 92,896.11 have been made from Aspen/Bartol, but not traced to the HSBC account
2. Receipts into HSBC totalling £ 179,170.91 have not been matched to the source of the funds, although most are thought to have been sent from the BNP accounts (as opposed to Aspen Wind
3. Two amounts of £6,000 each were transferred form the Touchdown account and should therefore be contra'd for income purposes
4. The exchange rates in respect of the transfer on 19 March 2003 look suspect – the actual rate ion the day was 1.5648
5. There were a number of other amounts paid into to HSBC account (not internet transfers) – these have not been identified

Confidential

CAPLIN0024812
USPROD-02361013

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2004**

| | HSBC (GBP) | Other (USD) | Source not verified | Verified | | Exch rate |
| | | | | AW | Bartol | |
| | GBP | USD | GBP | USD | USD | |
|---|---|---|---|---|---|---|
| 09-Jan-04 | 6,994.00 | | 6,994.00 | | | |
| 12-Feb-04 | 4,000.00 | | | 8,000.00 | | |
| 23-Feb-04  Trf 930000519751000 | 1,000.00 | | 1,000.00 | | | |
| 25-Feb-04 | 2,500.00 | | 2,500.00 | | | |
| 27-Feb-04 | 6,000.00 | | 6,000.00 | | | |
| 09-Mar-04 | | 6,500.00 | | | 6,500.00 | |
| 10-Mar-04 | 5,000.00 | | 5,000.00 | | | |
| 17-Mar-04 | 11,800.00 | | 11,800.00 | | | |
| 02-Apr-04 | | 6,500.00 | | | 6,500.00 | |
| 13-Apr-04 | 2,500.00 | | 2,500.00 | | | |
| 14-Apr-04 | 8,493.58 | | 8,493.58 | | | |
| 20-Apr-04 | 2,000.00 | | 2,000.00 | | | |
| 30-Apr-04 | | 6,000.00 | | | 6,000.00 | |
| 30-Apr-04 | 5,993.58 | | 5,993.98 | | | |
| 10-May-04 | 500.00 | | 500.00 | | | |
| 19-May-04 | 9,500.00 | | 9,500.00 | | | |
| 24-May-04 | 5,493.45 | | 5,493.45 | | | |
| 01-Jun-04 | | 6,000.00 | | | 6,000.00 | |
| 02-Jun-04 | 7,993.48 | | | 17,073.97 | | 2.1359871 |
| 21-Jun-04 | | 4,023.97 | | 4,023.97 | | |
| 22-Jun-04 | 7,993.48 | | 7,993.48 | | | |
| 01-Jul-04 | 9,994.44 | | 9,994.44 | | | |
| 12-Jul-04 | 17,933.44 | | 17,933.44 | | | |
| 31-Aug-04 | 10,000.00 | | 10,000.00 | | | |
| 17-Sep-04 | 10,000.00 | | 10,000.00 | | | |
| 29-Sep-04 | 7,000.00 | | 7,000.00 | | | |
| 18-Oct-04 | 4,500.00 | | 4,500.00 | | | |
| 10-Nov-04 | 3,500.00 | | 3,500.00 | | | |
| 03-Dec-04 | 7,000.00 | | 7,000.00 | | | |
| 09-Dec-04 | 4,000.00 | | 4,000.00 | | | |
| 15-Dec-04  Paid in at HSBC | 3,460.00 | | | | | |

Confidential

CAPLIN0024813
USPROD-02361014

| 161,689.45 | 29,023.97 | | 149,696.37 | | 29,097.94 | 25,000.00 |

Notes:
1. Payments totalling          $     29,023.97   have been made from Aspen/Bartol, but not traced to the HSBC account
2. Receipts into HSBC totalling £     149,696.37   have not been matched to the source of the funds, although most are thought to have been sent from the Credit Suisse GBP account (Aspen Wind or Bartol)
3. The exchange rates in respect of the transfer on 2 June 2004 look suspect - the actual rate ion the day was 1.8381
4. There was one amount paid into to HSBC account (not internet transfer) - this has not been identified

Confidential

Ex.004-5.0318

CAPLIN0024814
USPROD-02361015

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2005**

| | HSBC (GBP) | Other (USD) | Source not verified | Verified AW (USD) | Bartol (USD) | Exch rate |
|---|---|---|---|---|---|---|
| | GBP | USD | GBP | USD | USD | |
| 18-Jan-05 | 6,500.00 | | 6,500.00 | | | |
| 25-Jan-05 | 7,627.91 | | 7,627.91 | | | |
| 26-Jan-05 | 4,500.00 | | 4,500.00 | | | |
| 02-Feb-05 | 5,994.00 | | 5,994.00 | | | |
| 22-Feb-05 | 8,994.00 | | 8,994.00 | | | |
| 18-Mar-05 | 4,994.00 | | 4,994.00 | | | |
| 04-Apr-05 | 6,794.00 | | 6,794.00 | | | |
| 06-Apr-05 | 9,500.00 | | 9,500.00 | | | |
| 28-Apr-05 | | 6,024.52 | | 6,024.52 | | |
| 29-Apr-05 | 6,994.00 | | 6,994.00 | | | |
| 24-May-05 | 8,994.00 | | 8,994.00 | | | |
| 26-May-05 | | 5,024.52 | | 5,024.52 | | |
| 24-Jun-05 | 6,994.00 | | 6,994.00 | | | |
| 26-May-05 | | 5,523.72 | | 5,523.72 | | |
| 15-Jul-05 | 6,994.00 | | 6,994.00 | | | |
| 01-Sep-05 | 4,994.00 | 5,523.72 | 4,994.00 | 5,523.72 | | |
| 05-Sep-05 | 7,494.00 | | 7,494.00 | | | |
| 15-Sep-05 | 7,994.00 | | 7,994.00 | | | |
| 22-Sep-05 | 9,494.00 | | 9,494.00 | | | |
| 30-Sep-05 | 9,494.00 | 5,512.00 | 9,494.00 | 5,512.00 | | |
| 11-Oct-05 | 5,994.00 | | 5,994.00 | | | |
| 26-Oct-05 | 8,994.00 | | 8,994.00 | | | |
| 31-Oct-10 | | 5,812.00 | | 5,812.00 | | |
| 16-Nov-05 | 8,994.00 | | 8,994.00 | | | |
| 29-Nov-05 | 5,994.00 | | 5,994.00 | | | |
| 07-Dec-05 | 4,994.00 | | 4,994.00 | | | |
| 14-Dec-05 Paid in at HSBC | 180.00 | | | | | |
| 23-Dec-05 Paid in at HSBC | 3,033.60 | | | | | |
| 28-Dec-05 | 8,994.00 | | 8,994.00 | | | |
| | 168,313.91 | 33,420.48 | 168,313.91 | 33,420.48 | | |

Notes:  1. Payments totalling $ 33,420.48 have been made from Aspen/Bartol, but not traced to the HSBC account
        2. Receipts into HSBC totalling £ 168,313.91 have not been matched to the source of the funds, although most are thought to have been

Confidential

Ex.004-5.0319

CAPLIN0024815
USPROD-02361016

sent from the Credit Suisse GBP account (Aspen Wind or Bartol)

3. There was two amounts paid into to HSBC account (not internet transfers) - these have not been identified

Confidential

CAPLIN0024816
USPROD-02361017

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2006**

| | | HSBC (GBP) | Other (USD) | Source not verified | Verified | | Exch rate |
| | | | | | AW | Bartol | |
| | | GBP | USD | GBP | USD | USD | |
|---|---|---|---|---|---|---|---|
| 03-Jan-06 | | 8,994.00 | | 8,994.00 | | | |
| 23-Jan-06 | | 9,500.00 | | 9,500.00 | | | |
| 02-Feb-06 | Paid in at HSBC | 3,000.00 | | | | | |
| 06-Mar-06 | Paid in at HSBC | 3,000.00 | | | | | |
| 09-Mar-06 | | 9,500.00 | | 9,500.00 | | | |
| 27-Mar-06 | | 8,000.00 | | 8,000.00 | | | |
| 27-Mar-06 | | 8,994.00 | | 8,994.00 | | | |
| 26-Apr-06 | | 8,994.00 | | 8,994.00 | | | |
| 28-Apr-06 | | 9,000.00 | | 9,000.00 | | | |
| 10-May-06 | | 9,000.00 | | 9,000.00 | | | |
| 10-May-06 | Paid in at HSBC | 416.00 | | | | | |
| 19-May-06 | | 8,994.00 | | 8,994.00 | | | |
| 22-May-06 | | 9,000.00 | | 9,000.00 | | | |
| 07-Jun-06 | Paid in at HSBC | 3,000.00 | | | | | |
| 21-Jun-06 | | | 1,300.83 | | 1,300.83 | | |
| 29-Jun-06 | | 20,000.00 | | 20,000.00 | | | |
| 27-Jul-06 | | 9,500.00 | | 9,500.00 | | | |
| 29-Aug-06 | | 10,000.00 | | 10,000.00 | | | |
| 28-Sep-06 | | 10,000.00 | | 10,000.00 | | | |
| 19-Oct-06 | Paid in at HSBC | 839.40 | | | | | |
| 30-Oct-06 | | 10,000.00 | | 10,000.00 * | | | |
| 29-Nov-06 | | 9,000.00 | | 9,000.00 * | | | |
| 22-Dec-06 | | 9,000.00 | | 9,000.00 * | | | |
| | | 167,476.00 | 1,300.83 | 167,476.00 | | | |

Notes:   1. Payments totalling          $     1,300.83   have been made from Aspen/Bartol, but not traced to the HSBC account
2. Receipts into HSBC totalling £    167,476.00   have not been matched to the source of the funds, although most are thought to have been
sent from the Credit Suisse GBP account (Aspen Wind or Bartol).  The last three receipts in the year (marked*) have actually been verified
with Credit Suisse GBP account (see also 2007 and 2008)
3. There were various amounts paid into to HSBC account (not internet transfers) - these have not been identified

Confidential

Ex.004-5.0321

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2007**

| | | HSBC (GBP) | Other (USD) | Source verified | Verified | | Exch rate |
|---|---|---|---|---|---|---|---|
| | | | | | AW | Bartol | |
| | | GBP | USD | GBP | USD | USD | |
| 19-Jan-07 | Paid in at HSBC | 2,000.00 | | | | | |
| 29-Jan-07 | | 9,000.00 | | 9,000.00 * | | | |
| 27-Feb-07 | | 9,000.00 | | 9,000.00 * | | | |
| 28-Mar-07 | | 9,000.00 | | 9,000.00 * | | | |
| 27-Apr-07 | | 9,000.00 | | 9,000.00 * | | | |
| 30-May-07 | | 9,000.00 | | 9,000.00 * | | | |
| 28-Jun-07 | | 9,000.00 | | 9,000.00 * | | | |
| 05-Jul-07 | Advised | 653.30 | | | | | |
| 17-Aug-07 | | 9,000.00 | | 9,000.00 * | | | |
| 18-Sep-07 | | 8,500.00 | | 8,500.00 * | | | |
| 09-Oct-07 | | 7,000.00 | | 7,000.00 * | | | |
| 02-Nov-07 | | 9,000.00 | | 9,000.00 ** | | | |
| 03-Dec-07 | | 9,000.00 | | 9,000.00 * | | | |
| 20-Dec-07 | | 9,000.00 | | 9,000.00 * | | | |
| | | 105,500.00 | - | 105,500.00 | - | - | |

Notes:
1. Payments totalling $ - have been made from Aspen/Bartol, but not traced to the HSBC account
2. Receipts into HSBC totalling £ 105,500.00 have been matched to the Credit Suisse statements for Bartol * and Aspen Wind **
   GBP accounts - all fully accounted for
3. There were various amounts paid in to HSBC account (not internet transfers) - these have not been identified

**Douglas Edelman**

CAPLIN0024818
USPROD-02361019

**Receipts into HSBC accounts**
**Year ended 31 December 2008**

| | | HSBC (GBP) | Other (USD) | Source verified | | Verified AW | Bartol | Exch rate |
|---|---|---|---|---|---|---|---|---|
| | | GBP | USD | GBP | | USD | USD | |
| 01-Feb-08 | | 9,000.00 | | 9,000.00 | * | | | |
| 02-Apr-08 | | 5,000.00 | | 5,000.00 | * | | | |
| 07-May-08 | | 9,000.00 | | 9,000.00 | * | | | |
| 30-May-08 | | 5,000.00 | | 5,000.00 | * | | | |
| 31-Jul-08 | | 5,000.00 | | 5,000.00 | * | | | |
| 08-Aug-08 Paid in at HSBC | 2,000.00 | | | | | | | |
| 26-Aug-08 | | 6,500.00 | | 6,500.00 | ** | | | |
| 05-Sep-08 | | 39,994.00 | | 39,994.00 | * | | | |
| 08-Sep-08 | | 9,000.00 | | 9,000.00 | * | | | |
| 22-Sep-08 | | 9,000.00 | | 9,000.00 | * | | | |
| 30-Sep-08 | | 9,000.00 | | 9,000.00 | * | | | |
| 21-Oct-08 | | 8,000.00 | | 8,000.00 | * | | | |
| 04-Nov-08 | | 9,000.00 | | 9,000.00 | * | | | |
| 10-Dec-08 | | 9,000.00 | | 9,000.00 | *** | | | |
| 23-Dec-08 | | 9,000.00 | | 9,000.00 | *** | | | |
| | | 141,494.00 | - | 141,494.00 | | - | - | |

Notes:
1. Payments totalling $ - have been made from Aspen/Bartol, but not traced to the HSBC account
2. Receipts into HSBC totalling £ 141,494.00 have been matched and fully accounted for as follows:
   Credit Suisse GBP account - Bartol*
   Credit Suisse GBP accounts - Aspen Wind Corporation **
   Julius Baer GBP account - Sunage Foundation ***
4. There was one amount paid into to HSBC account (not internet transfer) - this has been not been identified

Confidential

CAPLIN0024819
USPROD-02361020

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2009**

| | HSBC (GBP) | Other (USD) | Source verified | Verified AW | Bartol | Exch rate |
|---|---|---|---|---|---|---|
| | GBP | USD | GBP | USD | USD | |
| 29-Jan-09 | 9,000.00 | | 9,000.00 | | | |
| 17-Feb-09 | 9,000.00 | | 9,000.00 | | | |
| 27-Feb-09 | 9,000.00 | | 9,000.00 | | | |
| 03-Mar-09 | 9,000.00 | | 9,000.00 | | | |
| 31-Mar-09 | 9,000.00 | | 9,000.00 | | | |
| 05-May-09 | 9,000.00 | | 9,000.00 | | | |
| 01-Jun-09 | 8,500.00 | | 8,500.00 | | | |
| 19-Jun-09 | | 290.00 | | | | |
| 03-Aug-09 | 9,000.00 | | 9,000.00 | | | |
| 28-Aug-09 | 9,000.00 | | 9,000.00 | | | |
| 23-Sep-09 | 9,000.00 | | 9,000.00 | | | |
| 02-Oct-09 | 9,000.00 | | 9,000.00 | | | |
| 14-Oct-09 Trf 400106 62339374 | | 6,000.00 | | | | |
| 29-Oct-09 | 9,000.00 | | 9,000.00 | | | |
| 13-Nov-09 | 9,000.00 | | 9,000.00 | | | |
| 20-Nov-09 | 9,000.00 | | 9,000.00 | | | |
| 25-Nov-09 | 9,000.00 | | 9,000.00 | | | |
| 02-Dec-09 | 9,000.00 | | 9,000.00 | | | |
| 30-Dec-09 | 9,000.00 | | 9,000.00 | | | |
| 30-Dec-09 | 9,000.00 | | 9,000.00 | | | |
| | 161,500.00 | - | 161,500.00 | - | - | |

Notes:
1. All amounts received from Sunage Foundation
2. There was two amounts paid into to HSBC account (not internet transfers) - these have not been identified

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2010**

|  | GBP |  | USD | |
|---|---|---|---|---|
|  | **HSBC account** |  | AW | Bartol |
| 03-Feb-10 | 9,000.00 | | | |
| 05-Feb-10 | 9,000.00 | | | |
| 02-Mar-10 | 9,000.00 | | | |
| 19-Mar-10 | 9,000.00 | | | |
| 01-Apr-10 | 9,000.00 | | | |
| 05-May-10 | 9,000.00 | | | |
| 01-Jun-10 | 9,000.00 | | | |
| 30-Jun-10 | 9,000.00 | | | |
| 27-Jul-10 | 9,000.00 | | | |
| 01-Sep-10 | 9,000.00 | | | |
| 21-Sep-10 | 9,000.00 | | | |
| 01-Oct-10 | 9,000.00 | | | |
| 02-Nov-10 | 5,000.00 | | | |
| 19-Nov-10 | 5,000.00 | | | |
| 02-Dec-10 | 9,000.00 | | | |
| 24-Dec-10 | 9,000.00 | | | |
|  | **136,000.00** | | | |

Notes:    1. All amounts received from Sunage Foundation

Ex.004-5.0325

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2011**

GBP
HSBC account

| USD | |
|-----|-----|
| AW | Bartol |

Confidential

Ex.004-5.0326

CAPLIN0024822
USPROD-02361023

**Douglas Edelman**
**Receipts into HSBC accounts**
**Year ended 31 December 2012**

|  | GBP HSBC account |
|---|---|
| 16-Feb-12 | 5,000.00 |
| 05-Mar-12 | 9,000.00 |
| 11-May-12 | 9,000.00 |
| 07-Jun-12 | 9,000.00 |
|  | **32,000.00** |

| USD | |
|---|---|
| AW | Bartol |

**D Edelman – Summary of income – HSBC account**

**Year ended 31 December 2001**

|  |  | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|---|
| Paid into HSBC Account |  | 37,539.69 |  | 54,432.55 | 1.45 |
| Paid into HSBC account – statements unavailable |  |  | 31,023.31 | 31,023.31 |  |
| Paid into other accounts (not yet identified) |  |  | 26,530.53 | 26,530.53 |  |
|  |  |  |  | 111,986.39 |  |
| Received from | Aspen Wind |  | 68,931.37 | 68,931.37 |  |
|  | Bartol Limited |  | 10,000.00 | 10,000.00 |  |
|  | Other sources | 28,057.69 |  | 40,683.65 | 1.45 |
|  |  |  |  | 119,615.02 |  |
|  | Overall difference (Exchange rate variances) |  |  | - 7,628.63 |  |

**D Edelman – Summary of income – HSBC account**

Confidential

Ex.004-5.0328

CAPLIN0024824
USPROD-02361025

**Year ended 31 December 2002**

|  |  | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|---|
| Paid into HSBC Account |  | 154,199.24 |  | 234,382.84 | 1.52 |
| Paid into HSBC account - statements unavailable |  |  | - | - |  |
| Paid into other accounts (not yet identified) |  |  | 58,132.46 | 58,132.46 |  |
|  |  |  |  | 292,515.30 |  |
|  |  |  |  |  |  |
| Received from | Aspen Wind |  | 122,698.83 | 122,698.83 |  |
|  | Bartol Limited |  | 75,853.40 | 75,853.40 |  |
|  |  |  |  | - |  |
|  | Other sources | 60,198.73 |  | 91,502.07 | 1.52 |
|  |  |  |  | 290,054.30 |  |

Overall difference
(Exchange rate variances)                                    2,461.01  (see October transactions)

**D Edelman – Summary of income – HSBC account**

**Year ended 31 December 2003**

Confidential

CAPLIN0024825
USPROD-02361026

|  |  | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|---|
| Paid into HSBC Account |  | 238,808.79 |  | 389,258.33 | 1.63 |
| Paid into HSBC account - statements unavailable |  |  | - | - |  |
| Paid into other accounts (not yet identified) |  |  | 92,896.11 | 92,896.11 |  |
|  |  |  |  | 482,154.44 |  |
|  |  |  |  |  |  |
| Received from | Aspen Wind |  | 83,018.98 | 83,018.98 |  |
|  |  |  |  | - |  |
|  | Bartol Limited |  | 84,287.12 | 84,287.12 |  |
|  | Other sources | 179,170.91 |  | 292,048.58 | 1.63 |
|  |  |  |  | 459,354.68 |  |
|  | Overall difference (Exchange rate variances) |  |  | 22,799.75 |  |

**D Edelman - Summary of income - HSBC account**

**Year ended 31 December 2004**

|  | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|

Confidential

Ex.004-5.0330

CAPLIN0024826
USPROD-02361027

| | | | | | |
|---|---|---|---|---|---|
| Paid into HSBC Account | | 161,689.45 | | 266,787.59 | 1.65 |
| Paid into HSBC account - statements unavailable | | | - | - | |
| Paid into other accounts (not yet identified) | | | 29,023.97 | 29,023.97 | |
| | | | | 295,811.56 | |
| | | | | | |
| Received from | Aspen Wind | | 29,097.94 | 29,097.94 | |
| | Bartol Limited | | 25,000.00 | 25,000.00 | |
| | Other sources | 149,696.37 | | 246,999.01 | 1.65 |
| | | | | 301,096.95 | |
| | | Overall difference (Exchange rate variances) | | -   5,285.39 | |

**D Edelman - Summary of income - HSBC account**

**Year ended 31 December 2005**

| | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|
| Paid into HSBC Account | 168,313.91 | | 277,717.95 | 1.65 |

Confidential

Ex.004-5.0331

CAPLIN0024827
USPROD-02361028

Paid into HSBC account - statements unavailable     -      -

Paid into other accounts (not yet identified)     -      -

                                                   277,717.95

| Received from | Aspen Wind | | - | - | |
| | Bartol Limited | | - | - | |
| | Other sources | 168,313.91 | | 277,717.95 | 1.65 |
| | | | | 277,717.95 | |

Overall difference
(Exchange rate variances)           -

**D Edelman - Summary of income - HSBC account**

**Year ended 31 December 2006**

| | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|
| Paid into HSBC Account | 167,476.00 | | 276,335.40 | 1.65 |
| Paid into HSBC account - statements unavailable | | - | - | |

Confidential

CAPLIN0024828
USPROD-02361029

| | | | | | |
|---|---|---|---|---|---|
| Paid into other accounts (not yet identified) | | | - | - | |
| | | | | 276,335.40 | |
| | | | | | |
| Received from | Aspen Wind | | - | - | |
| | Bartol Limited | | - | - | |
| | Other sources | 167,476.00 | | 276,335.40 | 1.65 |
| | | | | 276,335.40 | |
| | Overall difference (Exchange rate variances) | | | - | |

**D Edelman - Summary of income - HSBC account**

**Year ended 31 December 2007**

| | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|
| Paid into HSBC Account | 105,500.00 | | 174,075.00 | 1.65 |
| Paid into HSBC account - statements unavailable | | - | - | |
| Paid into other accounts (not yet identified) | | - | - | |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  | 174,075.00 |  |
| Received from | Aspen Wind | 9,000.00 | - | 14,850.00 | 1.65 |
|  | Bartol Limited | 96,500.00 | - | 159,225.00 | 1.65 |
|  | Other sources | - |  | - | 1.65 |
|  |  |  |  | 174,075.00 |  |
|  | Overall difference (Exchange rate variances) |  |  | - |  |

**D Edelman - Summary of income - HSBC account**

**Year ended 31 December 2008**

|  | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|
| Paid into HSBC Account | 141,494.00 |  | 233,465.10 | 1.65 |
| Paid into HSBC account - statements unavailable |  | - | - |  |
| Paid into other accounts (not yet identified) |  | - | - |  |
|  |  |  | 233,465.10 |  |

Confidential

Ex.004-5.0334

CAPLIN0024830
USPROD-02361031

| Received from | Aspen Wind | 6,500.00 | - | 10,725.00 | 1.65 |
|---|---|---|---|---|---|
| | Bartol Limited | 116,994.00 | - | 193,040.10 | 1.65 |
| | Sunage Foundation | 18,000.00 | | 29,700.00 | 1.65 |
| | | | | 233,465.10 | |

Overall difference
(Exchange rate variances)                                    -

**D Edelman - Summary of income - HSBC account**

**Year ended 31 December 2009**

| | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|
| Paid into HSBC Account | 161,500.00 | | 266,475.00 | 1.65 |
| Paid into HSBC account - statements unavailable | | - | - | |
| Paid into other accounts (not yet identified) | | - | - | |
| | | | 266,475.00 | |

Confidential

Ex.004-5.0335

CAPLIN0024831
USPROD-02361032

| Received from | | GBP | | USD equivalent | Exch rate |
|---|---|---|---|---|---|
| | Aspen Wind | | - | - | |
| | Bartol Limited | | - | - | |
| | Sunage Foundation | 161,500.00 | | 266,475.00 | 1.65 |
| | | | | 266,475.00 | |
| | Overall difference (Exchange rate variances) | | | - | |

**D Edelman - Summary of income - HSBC account**

**Year ended 31 December 2010**

| | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|
| Paid into HSBC Account | 136,000.00 | | 224,400.00 | 1.65 |
| Paid into HSBC account - statements unavailable | | - | - | |
| Paid into other accounts (not yet identified) | | - | - | |
| | | | 224,400.00 | |
| Received from     Aspen Wind | | - | - | |
| Bartol Limited | | - | - | |

Confidential

CAPLIN0024832
USPROD-02361033

| | | | | |
|---|---|---|---|---|
| Sunage Foundation | 136,000.00 | | 224,400.00 | 1.65 |
| | | | 224,400.00 | |
| Overall difference (Exchange rate variances) | | | - | |

**Year ended 31 December 2011**

| | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|
| Paid into HSBC Account | - | | - | 1.65 |
| Paid into HSBC account - statements unavailable | | - | - | |
| Paid into other accounts (not yet identified) | | - | - | |
| | | | - | |

| | | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|---|
| Received from | Aspen Wind | | - | - | |
| | Bartol Limited | | - | - | |
| | Sunage Foundation | - | | - | 1.65 |
| | | | | - | |

Overall difference
(Exchange rate variances)                                    -

CAPLIN0024833
USPROD-02361034

**Year ended 31 December 2012**

|  |  | GBP | USD | USD equivalent | Exch rate |
|---|---|---|---|---|---|
| Paid into HSBC Account |  | 32,000.00 |  | 49,600.00 | 1.55 |
| Paid into HSBC account - statements unavailable |  |  | - | - |  |
| Paid into other accounts (not yet identified) |  |  | - | - |  |
|  |  |  |  | 49,600.00 |  |
|  |  |  |  |  |  |
| Received from | Aspen Wind |  | - | - |  |
|  | Bartol Limited |  | - | - |  |
|  | Sunage Foundation | 32,000.00 |  | 49,600.00 | 1.55 |
|  |  |  |  | 49,600.00 |  |
| | Overall difference (Exchange rate variances) | | | - | |

Confidential

CAPLIN0024834
USPROD-02361035

**DE Income**
**Credit card payments**

|  |  | C Suisse Eurocard | | | Amex Gold | Amex Platinum |
|---|---|---|---|---|---|---|
|  |  | USD | GBP |  |  |  |

**Year ended 31 December 2001**

**Credit Suisse Eurocard**

(None before December 2001)

| December | SPLIT? | 5,657.79 | | | 5,809.97 | |
|---|---|---|---|---|---|---|
|  |  | 5,657.79 | - | | | |
| Exchange rate |  |  | - | USD equivalent | | |
| **Total received in year** |  | **5,657.79** | | | | |

**Year ended 31 December 2002**

|  | USD | GBP |  |  |
|---|---|---|---|---|
| **Credit Suisse Eurocard** | | | | |
| January | 2,581.63 | | 5,808.97 | 2,869.30 |
| February | 1,814.96 | | 6,414.16 | 335.09 |
| March | 4,608.41 | | 5,947.66 | |
| April | 1,690.23 | | 5,293.69 | 510.93 |
| May | 7,726.69 | | | 3,648.36 |
| June | 711.80 | | | 9,519.49 |
| July | 214.38 | | 6,705.97 | 3,570.09 |
| August | - | | | |
| September | 833.52 | | | |
| October | 1,620.70 | | | 2,057.75 |
| November | 4,908.06 | | 5,241.47 | 6,994.90 |
| December | 547.67 | | 5,494.49 | 5,742.81 |
|  | 27,258.05 | - | | |
| Exchange rate | | - | USD equivalent | |
| **Total received in year** | **27,258.05** | | | |

**Year ended 31 December 2003**

|  | USD | GBP |  |  |
|---|---|---|---|---|
| **Credit Suisse Eurocard** |  |  |  |  |
| January | 228.49 |  | 5,488.25 | 2,872.59 |
| February | 54.37 |  | 5,563.09 | 5,101.84 |
| March |  |  | 4,629.39 | 779.22 |
| April | 2,315.50 |  | 4,179.40 | 210.10 |
| May | 1,766.80 |  | 3,726.96 | 2,711.37 |
| June | 204.01 |  | 4,519.98 | 2,075.38 |
| July | 9,489.17 |  | 4,323.41 | 11,015.78 |
| August | 2,350.14 |  | 3,374.50 | 4,854.36 |
| September | 135.84 |  | 3,434.63 | 4,882.96 |
| October | 7,897.78 |  | 3,269.65 | 2,687.94 |
| November | 122.32 |  | 3,328.53 | 4,558.88 |
| December | 516.26 |  | 3,290.64 | 2,148.36 |
|  | 25,080.68 | - |  |  |
| Exchange rate |  | - USD equivalent |  |  |
| **Total received in year** | **25,080.68** |  |  |  |

**Year ended 31 December 2004**

| **Credit Suisse Eurocard** | USD |  | GBP |  |
|---|---|---|---|---|
| January | 1,245.68 |  | 3,371.04 | 2,774.21 |
| February | 2,572.92 |  | 1,822.03 | 6,941.86 |
| March | 12,665.11 |  | 1,849.64 | 1,841.55 |
| April | 2,379.05 |  |  | 5,011.10 |
| May |  |  |  |  |
| June |  |  |  |  |
| July |  |  | 12.24 | 1,978.43 |
| August |  |  |  | 2,749.35 |
| September |  |  | 788.59 | 1,459.20 |
| October |  |  | 597.66 | 4,588.92 |
| November |  |  | 504.64 | 3,385.71 |
| December |  |  | 410.83 | 4,297.02 |
|  | 18,862.76 | - |  |  |
| Exchange rate |  | - USD equivalent |  |  |
| **Total received in year** | **18,862.76** |  |  |  |

**Year ended 31 December 2005**

|  | USD | GBP |
|---|---|---|

Ex.004-5.0340

CAPLIN0024836
USPROD-02361037

**Credit Suisse Eurocard**

| Month | | |
|---|---|---|
| January | 316.16 | 8,367.92 |
| February | 219.45 | 6,353.68 |
| March | 121.65 | 1,811.75 |
| April | | 1,051.38 |
| May | 1,505.64 | 4,913.90 |
| June | 1,534.69 | 2,382.57 |
| July | 725.13 | 5,069.10 |
| August | 655.08 | 4,449.29 |
| September | 836.78 | 9,975.96 |
| October | 544.41 | 3,763.32 |
| November | 781.77 | 5,265.84 |
| December | 438.45 | 5,517.03 |

Exchange rate _____ USD equivalent

**Total received in year** _____

**Year ended 31 December 2006**

| | USD | GBP |
|---|---|---|

**Credit Suisse Eurocard**

| Month | USD | GBP | |
|---|---|---|---|
| January | 1.04 | 5,671.98 | |
| February | | 3,767.13 | |
| March | | 11,205.02 | |
| April | 262.24 | 4,941.74 | |
| May | 222.30 | 6,905.30 | |
| June | | 21,339.45 | |
| July | | 4,103.42 | |
| August | 5,574.72 | 5,574.72 | * |
| September | 18,958.38 | 18,958.38 | * |
| October | 18,853.90 | 18,853.90 | * |
| November | 4,015.90 | 4,015.90 | * |
| December | 19,042.06 | 19,042.06 | * |
| | | 66,444.96 | |

Exchange rate 1.95 | 129,567.67 USD equivalent

**Total received in year** 129,567.67

**Year ended 31 December 2007**

| | USD | GBP |
|---|---|---|

**Amex**

Confidential

Ex.004-5.0341

CAPLIN0024837
USPROD-02361038

| | | | |
|---|---:|---:|---:|
| January | | 12,873.02 | |
| February | | | 8,057.99 |
| March | | | 12,913.50 |
| April | | 10,274.23 | 10,508.73 |
| May | | 8,547.19 | 8,596.15 |
| June | | 5,738.61 | 5,731.60 |
| July | | | 9,910.57 |
| August | | 17,083.05 | 7,165.53 |
| September | | 15,998.24 | 16,683.43 |
| October | | 15,890.51 | 15,883.37 |
| November | | | 9,803.99 |
| December | | (see Jan-08) | 10,347.71 |
| | - | 86,404.85 | 115,602.57 |
| Exchange rate | 1.98 | 171,081.60 | USD equivalent |
| Total received in year | 171,081.60 | | |

**Year ended 31 December 2008**

| | USD | GBP | |
|---|---:|---:|---:|
| **Swiss card** | | | |
| January | 1,603.68 | 10,355.03 | 8,387.99 |
| February | 1,656.30 | 8,126.71 | 10,912.27 |
| March | 3,916.98 | 10,920.16 | 8,451.98 |
| April | 1,306.56 | 8,415.24 | 11,566.49 |
| May | 647.43 | 11,575.13 | |
| June | | 12,224.33 | |
| July | | 6,062.18 | |
| August | | 12,643.64 | |
| September | | 2,915.24 | |
| October | | 6,757.98 | 35,858.61 |
| November | | 35,443.12 | 12,761.95 |
| December | | 390.35 | 12,839.48 |
| January | | 19,106.01 | |
| | 9,130.95 | 144,935.12 | 100,778.77 |
| Exchange rate | 1.65 | 239,142.95 | USD equivalent |
| Total received in year | 248,273.90 | | |

**Year ended 31 December 2009**

| | USD | GBP | |
|---|---:|---:|---:|
| **Amex** | | | |
| January | | 12,778.61 | |
| February | | 12,856.64 | |

Confidential

Ex.004-5.0342

CAPLIN0024838
USPROD-02361039

| | | |
|---|---:|---:|
| March | | 4,181.22 |
| April | | 65,142.58 |
| May | | 11,384.28 |
| June | | |
| July | | 17,574.15 |
| August | | 6,868.81 |
| September | | 2,825.06 |
| October | | 4,072.82 |
| November | | - |
| December | | 2,543.24 |
| | - | 140,227.41 |
| Exchange rate | 1.62 | 227,168.40 USD equivalent |
| **Total received in year** | **227,168.40** | |

**Year ended 31 December 2010**

| | USD | GBP |
|---|---|---|
| **Amex** | | |
| January | | 5,119.29 |
| February | | |
| March | | 4,402.29 |
| April | | 1,828.13 |
| May | | |
| June | | 7,966.85 |
| July | | 3,540.30 |
| August | | 9,627.84 |
| September | | 369.33 |
| October | | 618.64 |
| November | | |
| December | | 2,833.00 |
| | | 81.00 |
| | - | 36,386.67 |
| Exchange rate | 1.55 | 56,399.34 USD equivalent |
| **Total received in year** | **56,399.34** | |

**Year ended 31 December 2011**

| | USD | GBP |
|---|---|---|
| **Amex** | | |
| January | | |

CAPLIN0024839
USPROD-02361040

February
March
April
May
June
July
August
September
October
November
December

| | | |
|---|---|---|
| Exchange rate | 1.62 | USD equivalent |
| **Total received in year** | ~ | |

**Year ended 31 December 2012**

| | USD | GBP |
|---|---|---|
| **Amex** | | |
| January | | 1,728.12 |
| February | | 2,008.02 |
| March | | 8,976.94 |
| April | | 1,742.24 |
| May | | 388.03 |
| June | | 34.19 |
| July | | |
| August | | 647.85 |
| September | | ~ |
| October | | 1,881.19 |
| November | | ~ |
| December | | ~ |
| | ~ | 17,406.58 |
| Exchange rate | 1.62 | 28,198.66 |
| **Total received in year** | 28,198.66 | |

Confidential

Ex.004-5.0344

CAPLIN0024840
USPROD-02361041

**Delphine Edelman**

**Summary of earned income (USD)**

**Thirteen years to 31 December 2013**

| | Income utilised outside UK | | | | UK income | | | | | TOTAL | UK only | Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Purchase IBIZA | Drawings IBIZA | Other costs IBIZA | Travel/Holiday (Outside UK) | Drawings HSBC | UK Property rental | Other UK costs | Credit cards | Other | | | |
| 2000 | | | | | | | | | | - | - | |
| 2001 | | | | | | | | | | - | - | |
| 2002 | | | | | | | | | | - | - | |
| 2003 | | | | | | | | | | - | - | |
| 2004 | | | | | | | | | | - | - | |
| 2005 | | | | | | | | | | - | - | |
| 2006 | | | | | | | | | | - | - | |
| 2007 | | | | | 36,500.00 | | | | | 36,500.00 | 36,500.00 | |
| 2008 | 5,361,121.55 | 402,095.10 | 28,245.42 | 25,919.20 | 164,377.74 | 148,984.87 | 37,273.37 | 218,114.35 | - | 6,386,131.60 | 568,750.34 | |
| 2009 | | 66,000.00 | | 47,453.28 | 112,320.00 | 219,851.61 | 43,680.00 | 156,445.68 | - | 645,750.57 | 532,297.29 | |
| 2010 | | 529,200.00 | 159,063.11 | 422,701.41 | 200,295.00 | 261,020.54 | 308,962.66 | 720,128.20 | - | 2,601,370.92 | 1,490,406.40 | |
| 2011 | | 334,875.40 | | 66,138.55 | 153,914.49 | 174,746.69 | 10,740.11 | 263,054.09 | | 1,003,469.33 | 602,455.38 | |
| 2012 | | 244,946.07 | 9,006.03 | | 128,480.94 | | | 373,752.79 | | 756,185.83 | 502,233.73 | |
| | 5,361,121.55 | 1,577,116.57 | 196,314.56 | 562,212.44 | 795,888.17 | 804,603.71 | 400,656.14 | 1,731,495.11 | - | 11,429,408.25 | 3,732,643.14 | |

11,429,408.25

Confidential

CAPLIN0024841
USPROD-02361042

5:13 PM
30/07/15
Accrual Basis

**SUNAGE FOUNDATION**
**General Ledger**
As of 31 December 2014

Sunage Foundation
Private costs
Year ened 31 December 2014

| Type | Date | Num | Memo | Split | Amount | Balance |
|------|------|-----|------|-------|--------|---------|
| **Cottesmore Gardens - costs** | | | | | | 0.00 |
| | | | | | | |
| **Palladian London Limited** | | | | | | 0.00 |
| Cheque | 02/27/2014 | 481 | Palladian - January costs | Julius Baer -GBP | 8,113.23 | 8,113.23 |
| Cheque | 03/19/2014 | 489 | Palladian | Julius Baer -GBP | 8,847.84 | 16,961.07 |
| Cheque | 05/07/2014 | 92 | Palladian - Maintenance costs | CBH -GBP | 69,081.49 | 86,042.56 |
| Cheque | 08/05/2014 | 108 | Invoice 100165 | CBH -GBP | 27,011.39 | 113,053.95 |
| Total Palladian London Limited | | | | | 113,053.95 | 113,053.95 |
| | | | | | | |
| **Drawings** | | | | | | 0.00 |
| **Cash card control** | | | | | | 0.00 |
| Cheque | 02/03/2014 | 130 | Transfer to card 79726 | CBH - USD | 5,000.00 | 5,000.00 |
| Cheque | 02/11/2014 | 131 | Trasnfer card 79725 | CBH - USD | 36,100.00 | 41,100.00 |
| Cheque | 04/01/2014 | 135 | Trf account 79726 | CBH - USD | 10,000.00 | 51,100.00 |
| Cheque | 05/21/2014 | 149 | IFO A/c 548027 | CBH - USD | 20,920.99 | 72,020.99 |
| Cheque | 05/21/2014 | 150 | IFO A/c 548025 | CBH - USD | 34,888.32 | 106,889.31 |
| Cheque | 05/22/2014 | 151 | IFO account 548025 | CBH - USD | 50,000.00 | 156,889.31 |
| Cheque | 06/05/2014 | 156 | Transfer GVA a/c 79726 | CBH - USD | 9,000.00 | 165,889.31 |
| Total Cash card control | | | | | 165,889.31 | 165,889.31 |
| | | | | | | |
| **Credit card - Amex** | | | | | | 0.00 |
| Cheque | 01/23/2014 | 224 | Amex card payment | Julius Baer - EUR | 28,306.95 | 28,306.95 |
| Cheque | 02/20/2014 | 230 | Amex card payment | Julius Baer - EUR | 65,897.53 | 94,204.48 |
| Cheque | 03/19/2014 | 236 | Amex card payment | Julius Baer - EUR | 11,024.83 | 105,229.31 |
| Cheque | 04/21/2014 | 247 | Amex card payment | Julius Baer - EUR | 50,453.03 | 155,682.34 |
| Cheque | 05/21/2014 | 249 | Amex card payment | Julius Baer - EUR | 27,884.97 | 183,567.31 |
| Cheque | 08/20/2014 | 250 | Amex card payment | Julius Baer - EUR | 19,996.30 | 203,563.61 |
| Total Credit card - Amex | | | | | 203,563.61 | 203,563.61 |
| | | | | | | |
| **DE - HSBC transfers** | | | | | | 0.00 |
| Cheque | 02/10/2014 | 470 | Drawings | Julius Baer -GBP | 14,903.10 | 14,903.10 |
| Total DE - HSBC transfers | | | | | 14,903.10 | 14,903.10 |
| | | | | | | |
| **DE - Other drawings** | | | | | | 0.00 |
| Total DE - Other drawings | | | | | | 0.00 |
| | | | | | | |
| **DLD - HSBC transfers** | | | | | | 0.00 |
| Cheque | 02/11/2014 | 472 | Drawings | Julius Baer -GBP | 7,451.55 | 7,451.55 |
| Cheque | 02/19/2014 | 476 | Drawings | Julius Baer -GBP | 7,451.55 | 14,903.10 |
| Cheque | 02/25/2014 | 478 | Drawings | Julius Baer -GBP | 7,451.55 | 22,354.65 |
| Cheque | 02/27/2014 | 484 | Drawings | Julius Baer -GBP | 7,451.55 | 29,806.20 |
| Total DLD - HSBC transfers | | | | | 29,806.20 | 29,806.20 |
| | | | | | | |
| **DLD - Ibiza account** | | | | | | 0.00 |
| Cheque | 02/11/2014 | 228 | Funds transfer | Julius Baer - EUR | 6,142.50 | 6,142.50 |
| Cheque | 02/19/2014 | 229 | Funds transfer | Julius Baer - EUR | 6,142.50 | 12,285.00 |
| Cheque | 02/25/2014 | 231 | Funds transfer | Julius Baer - EUR | 6,142.50 | 18,427.50 |
| Cheque | 02/27/2014 | 235 | Funds transfer | Julius Baer - EUR | 6,142.50 | 24,570.00 |
| Cheque | 03/25/2014 | 238 | Funds transfer | Julius Baer - EUR | 6,223.50 | 30,793.50 |
| Cheque | 03/31/2014 | 241 | Funds transfer | Julius Baer - EUR | 6,223.50 | 37,017.00 |
| Cheque | 04/15/2014 | 246 | Funds transfer | Julius Baer - EUR | 6,214.50 | 43,231.50 |
| Cheque | 04/25/2014 | 248 | Funds transfer | Julius Baer - EUR | 6,214.50 | 49,446.00 |

Page 1 of 2

Confidential

Ex.004-5.0346

CAPLIN0024842
USPROD-02361043

5:13 PM
30/07/15
Accrual Basis

## SUNAGE FOUNDATION
## General Ledger
### As of 31 December 2014

| Type | Date | Num | Memo | Split | Amount | Balance |
|------|------|-----|------|-------|--------|---------|
| Cheque | 05/05/2014 | 31 | Funds transfer | CBH - EUR | 6,178.50 | 55,624.50 |
| Cheque | 05/20/2014 | 35 | Funds transfer | CBH - EUR | 6,178.50 | 61,803.00 |
| Cheque | 05/27/2014 | 36 | Funds transfer | CBH - EUR | 6,178.50 | 67,981.50 |
| Cheque | 06/04/2014 | 41 | Funds transfer | CBH - EUR | 6,518.40 | 74,499.90 |
| Cheque | 07/16/2014 | 43 | Funds transfer | CBH - EUR | 6,499.20 | 80,999.10 |
| Cheque | 08/08/2014 | 45 | Funds transfer | CBH - EUR | 6,499.20 | 87,498.30 |
| Cheque | 09/25/2014 | 48 | Funds transfer | CBH - EUR | 5,680.35 | 93,178.65 |
| Cheque | 10/09/2014 | 49 | Funds transfer | CBH - EUR | 5,700.15 | 98,878.80 |
| Cheque | 10/22/2014 | 51 | Funds transfer | CBH - EUR | 5,700.15 | 104,578.95 |
| Cheque | 11/14/2014 | 53 | Funds transfer | CBH - EUR | 5,633.55 | 110,212.50 |
| Cheque | 11/27/2014 | 55 | Funds transfer | CBH - EUR | 5,633.55 | 115,846.05 |
| **Total DLD - Ibiza account** | | | | | **115,846.05** | **115,846.05** |
| | | | | | | |
| **Expenses - Chateau St Anne** | | | | | | **0.00** |
| Cheque | 08/02/2014 | 39 | Chateau St Anne - expenses | CBH - EUR | 2,820.14 | 2,820.14 |
| Cheque | 11/14/2014 | 54 | Chateau St Anne - expenses | CBH - EUR | 2,303.75 | 5,123.89 |
| **Total Expenses - Chateau St Anne** | | | | | **5,123.89** | **5,123.89** |
| | | | | | | |
| **Holiday costs** | | | | | | **0.00** |
| Cheque | 01/06/2014 | 223 | Hotel Mondschein | Julius Baer - EUR | 631.01 | 631.01 |
| Cheque | 02/18/2014 | 91 | Link Express | CBH - GBP | 46,563.25 | 47,194.26 |
| Cheque | 03/24/2014 | 237 | Hotel Mondeschein | Julius Baer - EUR | 1,465.98 | 48,660.24 |
| Cheque | 10/20/2014 | 50 | Hotel Goldener Berg - Deposit | CBH - EUR | 13,300.35 | 61,960.59 |
| **Total Holiday costs** | | | | | **61,960.59** | **61,960.59** |
| | | | | | | |
| **Netjets - flight costs** | | | | | | **0.00** |
| Cheque | 05/06/2014 | 34 | Netjets - April costs | CBH - EUR | 19,899.70 | 19,899.70 |
| Cheque | 06/03/2014 | 40 | Netjets- May costs | CBH - EUR | 33,438.18 | 53,337.88 |
| **Total Netjets - flight costs** | | | | | **53,337.88** | **53,337.88** |
| | | | | | | |
| **Other drawings** | | | | | | **0.00** |
| Cheque | 04/04/2014 | 501 | Sylvie Kieran | Julius Baer -GBP | 13,476.51 | 13,476.51 |
| **Total Other drawings** | | | | | **13,476.51** | **13,476.51** |
| | | | | | | |
| **School fees** | | | | | | **0.00** |
| Cheque | 01/09/2014 | 455 | Harrodian School - Spring Term | Julius Baer -GBP | 8,404.05 | 8,404.05 |
| Cheque | 01/09/2014 | 456 | Thomas's London Day School - Spring term | Julius Baer -GBP | 17,444.91 | 25,848.96 |
| Cheque | 04/22/2014 | 136 | Thomas Day Schools | CBH - USD | 19,207.74 | 45,056.70 |
| Cheque | 04/22/2014 | 138 | Harrodian School | CBH - USD | 8,756.84 | 53,813.54 |
| Cheque | 07/11/2014 | 110 | Harrodian School (incl. bank fee) | CBH -GBP | 8,501.54 | 62,315.08 |
| **Total School fees** | | | | | **62,315.08** | **62,315.08** |

Confidential

Ex.004-5.0347

CAPLIN0024843
USPROD-02361044

5:30 PM
30/07/15
Accrual Basis

# SATELLITE SUPPORT SERVICES LIMITED
## General Ledger
### As of 31 December 2014

**Satellite Support Servcies Limited**
**Private costs**
**Year ended 31 December 2014**

| Type | Date | Num | Memo | Split | Amount | Balance |
|------|------|-----|------|-------|--------|---------|
| **Drawings** | | | | | | 0.00 |
| **Credit card payments** | | | | | | 0.00 |
| Cheque | 06/24/2014 | | Amex card payment | CBH - USD | 10,125.00 | 10,125.00 |
| Cheque | 07/02/2014 | | Catella Bank EWM card transfer | Mirabaud - EUR | 20,685.00 | 30,810.00 |
| Cheque | 10/31/2014 | | Deposit payment to EWM card | Mirabaud - CHF | 10,459.00 | 41,269.00 |
| Cheque | 10/31/2014 | | Cornercard | CBH - EUR | 15,254.10 | 56,523.10 |
| Cheque | 11/17/2014 | | American Express | CBH - EUR | 23,624.43 | 80,147.53 |
| Total Credit card payments | | | | | 80,147.53 | 80,147.53 |
| | | | | | | |
| **Drawings** | | | | | | 0.00 |
| **Credit card transfer** | | | | | | 0.00 |
| Cheque | 07/02/2014 | | Catella Bank - EWM Card transfer | Mirabaud - CHF | 16,986.00 | 16,986.00 |
| Cheque | 09/02/2014 | | Card costs (DLD) | CBH - CHF | 104.80 | 17,090.80 |
| Cheque | 09/11/2014 | | Amex | CBH - EUR | 5,049.20 | 22,140.00 |
| Cheque | 10/28/2014 | | EWM credit card | Mirabaud - EUR | 12,800.00 | 34,940.00 |
| Cheque | 12/01/2014 | | Amex International | CBH - USD | 56,977.80 | 91,917.80 |
| Cheque | 12/04/2014 | | Corner Banque SA | CBH - EUR | 5,694.80 | 97,612.60 |
| Cheque | 12/04/2014 | | Corner Banque SA | CBH - CHF | 37,192.04 | 134,804.64 |
| Total Credit card transfer | | | | | 134,804.64 | 134,804.64 |
| | | | | | | |
| **Other drawings** | | | | | | 0.00 |
| Cheque | 12/10/2014 | | Candela Manzano-Monis | CBH - EUR | 7,583.83 | 7,583.83 |
| Total Other drawings | | | | | 7,583.83 | 7,583.83 |
| | | | | | | |
| **School fees** | | | | | | 0.00 |
| Cheque | 08/22/2014 | | Morna College | Mirabaud - EUR | 23,365.44 | 23,365.44 |
| Total School fees | | | | | 23,365.44 | 23,365.44 |
| | | | | | | |
| **Netjets** | | | | | | 0.00 |
| Cheque | 01/28/2014 | | Netjets - January | Julius Baer - EUR | 56,772.64 | 56,772.64 |
| Cheque | 02/11/2014 | | Netjets - January | Julius Baer - EUR | 18,099.75 | 74,872.39 |
| Cheque | 02/27/2014 | | Netjets - February | Julius Baer - EUR | 20,579.67 | 95,452.06 |
| Cheque | 03/24/2014 | | Netjets - March | Julius Baer - EUR | 13,726.73 | 109,178.79 |
| Cheque | 06/16/2014 | | Netjets June charges | CBH - EUR | 18,170.04 | 127,348.83 |
| Cheque | 07/08/2014 | | Netjets - June account | CBH - EUR | 7,594.67 | 134,943.50 |
| Cheque | 08/07/2014 | | Netjets - July account | CBH - EUR | 44,707.73 | 179,651.23 |
| Cheque | 09/10/2014 | | Netjets | CBH - EUR | 7,116.03 | 186,767.26 |
| Cheque | 10/14/2014 | | Netjesis - costs September | CBH - EUR | 27,589.40 | 214,356.66 |
| Cheque | 11/14/2014 | | Netjets | CBH - EUR | 21,733.24 | 236,089.90 |
| Cheque | 12/22/2014 | | Netjets - November charges | CBH - EUR | 31,896.88 | 267,986.78 |
| Total Netjets | | | | | 267,986.78 | 267,986.78 |
| | | | | | | |
| **Priority Travel** | | | | | | 0.00 |
| Cheque | 05/23/2014 | | Priority Travel | CBH - GBP | 173,658.00 | 173,658.00 |
| Total Priority Travel | | | | | 173,658.00 | 173,658.00 |

Confidential

Ex.004-5.0348

CAPLIN0024844
USPROD-02361045

4:59 PM
30/07/16
Accrual Basis

# SUNAGE FOUNDATION
## General Ledger
### As of 31 December 2013

**Sunage Foundation**
**Private costs**
**Year ended 31 December 2013**

| Type | Date | Num | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|
| **Cottesmore Gardens - costs** | | | | | | 0.00 |
| **JJ Construction** | | | | | | 0.00 |
| Cheque | 01/10/2013 | 301 | JJ Construction - Dec-12 | Julius Baer -GBP | 10,019.37 | 10,019.37 |
| Cheque | 03/04/2013 | 322 | January works | Julius Baer -GBP | 20,125.53 | 30,144.90 |
| Cheque | 09/20/2013 | 395 | Summer works | Julius Baer -GBP | 13,847.25 | 43,992.15 |
| Total JJ Construction | | | | | 43,992.15 | 43,992.15 |
| | | | | | | |
| **Palladian London Limited** | | | | | | 0.00 |
| Cheque | 01/10/2013 | 299 | Palladian Dec-12 costs | Julius Baer -GBP | 13,640.25 | 13,640.25 |
| Cheque | 02/20/2013 | 314 | Palladian - January costs | Julius Baer -GBP | 14,935.88 | 28,576.13 |
| Cheque | 03/19/2013 | 326 | February costs | Julius Baer -GBP | 10,126.13 | 38,702.26 |
| Cheque | 04/17/2013 | 343 | March costs | Julius Baer -GBP | 13,074.11 | 51,776.37 |
| Cheque | 05/17/2013 | 353 | April costs | Julius Baer -GBP | 20,854.61 | 72,630.98 |
| Cheque | 08/07/2013 | 363 | May costs | Julius Baer -GBP | 10,096.40 | 82,727.38 |
| Cheque | 07/26/2013 | 383 | June costs | Julius Baer -GBP | 8,188.16 | 90,915.54 |
| Cheque | 08/05/2013 | 389 | July costs | Julius Baer -GBP | 15,180.08 | 106,095.62 |
| Cheque | 09/13/2013 | 405 | August costs | Julius Baer -GBP | 13,423.46 | 119,519.08 |
| Cheque | 10/25/2013 | 423 | New boiler and lift controls | Julius Baer -GBP | 81,158.83 | 200,677.91 |
| Cheque | 10/31/2013 | 425 | VAT on new controls | Julius Baer -GBP | 16,231.77 | 216,909.68 |
| Cheque | 11/11/2013 | 430 | November costs | Julius Baer -GBP | 9,434.05 | 226,343.73 |
| Cheque | 12/12/2013 | 443 | Palladian - November costs | Julius Baer -GBP | 9,051.52 | 235,395.25 |
| Cheque | 12/23/2013 | 447 | November/December costs | Julius Baer -GBP | 8,064.69 | 243,459.94 |
| Total Palladian London Limited | | | | | 243,459.94 | 243,459.94 |
| | | | | | | |
| **Drawings** | | | | | | 0.00 |
| **Cash card control** | | | | | | 0.00 |
| Cheque | 12/27/2013 | 129 | IFO AC 79728 | CBH - USD | 10,200.00 | 10,200.00 |
| Total Cash card control | | | | | 10,200.00 | 10,200.00 |
| | | | | | | |
| **Credit card - Amex** | | | | | | 0.00 |
| Cheque | 01/23/2013 | 142 | DLD amex card payment | Julius Baer - EUR | 55,911.66 | 55,911.66 |
| Cheque | 02/25/2013 | 146 | DLD card payment | Julius Baer - EUR | 65,056.10 | 120,967.76 |
| Cheque | 03/27/2013 | 152 | DLD Amex card payment | Julius Baer - EUR | 20,943.74 | 141,911.50 |
| Cheque | 04/22/2013 | 156 | DLD - Amex card payment | Julius Baer - EUR | 28,603.20 | 170,514.70 |
| Cheque | 05/23/2013 | 163 | DLD credit card payment | Julius Baer - EUR | 19,994.65 | 190,509.35 |
| Cheque | 07/17/2013 | 173 | DLD - Amex card payment | Julius Baer - EUR | 22,717.19 | 213,226.54 |
| Cheque | 07/18/2013 | 174 | DLD Amex card payment | Julius Baer - EUR | 32,395.85 | 245,622.39 |
| Cheque | 08/29/2013 | 188 | DLD Amex card payment | Julius Baer - EUR | 5,715.43 | 251,337.82 |
| Cheque | 09/25/2013 | 197 | DLD Amex card payment | Julius Baer - EUR | 7,857.58 | 259,195.40 |
| Cheque | 10/21/2013 | 201 | DLD AMex card payment | Julius Baer - EUR | 17,500.38 | 276,695.78 |
| Cheque | 11/22/2013 | 209 | DLD Amex card payment | Julius Baer - EUR | 18,954.30 | 295,650.08 |
| Cheque | 12/24/2013 | 221 | Amex card payment | Julius Baer - EUR | 55,572.00 | 351,222.08 |
| Total Credit card - Amex | | | | | 351,222.08 | 351,222.08 |
| | | | | | | |
| **Credit card - UOB** | | | | | | 0.00 |
| Cheque | 06/11/2013 | 394 | UOB card payment | Julius Baer - USD | 7,299.45 | 7,299.45 |
| Cheque | 07/29/2013 | 412 | UOB card payment | Julius Baer - USD | 15,406.06 | 22,705.51 |
| Total Credit card - UOB | | | | | 22,705.51 | 22,705.51 |
| | | | | | | |
| **DLD - HSBC transfers** | | | | | | 0.00 |
| Cheque | 03/28/2013 | 352 | Funds transfer | Julius Baer -GBP | 13,561.00 | 13,561.00 |
| Cheque | 05/20/2013 | 355 | Funds transfer | Julius Baer -GBP | 9,174.00 | 22,735.00 |
| Cheque | 05/23/2013 | 357 | Funds transfer | Julius Baer -GBP | 12,232.00 | 34,987.00 |
| Cheque | 06/03/2013 | 360 | Funds transfer | Julius Baer -GBP | 12,376.00 | 47,363.00 |

Page 1 of 3

Confidential

Ex.004-5.0349

CAPLIN0024845
USPROD-02361046

4:59 PM
30/07/15
Accrual Basis

**SUNAGE FOUNDATION**
**General Ledger**
As of 31 December 2013

| Type | Date | Num | Memo | Split | Amount | Balance |
|------|------|-----|------|-------|--------|---------|
| Cheque | 06/07/2013 | 368 | Funds transfer | Julius Baer -GBP | 6,188.00 | 53,551.00 |
| Cheque | 06/17/2013 | 369 | Funds transfer | Julius Baer -GBP | 13,923.00 | 67,474.00 |
| Cheque | 09/13/2013 | 405 | Funds transfer | Julius Baer -GBP | 7,137.00 | 74,611.00 |
| **Total DLD - HSBC transfers** | | | | | **74,611.00** | **74,611.00** |
| | | | | | | |
| **DLD - Ibiza account** | | | | | | 0.00 |
| Cheque | 01/04/2013 | 136 | Funds transfer | Julius Baer - EUR | 33,250.00 | 33,250.00 |
| Cheque | 02/08/2013 | 145 | Funds transfer | Julius Baer - EUR | 33,375.00 | 66,625.00 |
| Cheque | 03/21/2013 | 150 | Funds transfer | Julius Baer - EUR | 32,400.00 | 99,025.00 |
| Cheque | 03/28/2013 | 151 | Funds transfer | Julius Baer - EUR | 19,440.00 | 118,465.00 |
| Cheque | 05/20/2013 | 161 | Funds transfer | Julius Baer - EUR | 7,786.00 | 126,253.00 |
| Cheque | 05/23/2013 | 162 | Funds transfer | Julius Baer - EUR | 11,682.00 | 137,935.00 |
| Cheque | 06/03/2013 | 164 | Funds transfer | Julius Baer - EUR | 11,862.00 | 149,797.00 |
| Cheque | 06/07/2013 | 166 | Funds transfer | Julius Baer - EUR | 11,862.00 | 161,659.00 |
| Cheque | 06/17/2013 | 167 | Funds transfer | Julius Baer - EUR | 10,544.00 | 172,203.00 |
| Cheque | 06/25/2013 | 168 | Funds transfer | Julius Baer - EUR | 11,882.00 | 184,085.00 |
| Cheque | 06/28/2013 | 169 | Funds transfer | Julius Baer - EUR | 11,862.00 | 195,927.00 |
| Cheque | 07/18/2013 | 175 | Funds transfer | Julius Baer - EUR | 5,886.00 | 201,813.00 |
| Cheque | 07/23/2013 | 177 | Funds transfer | Julius Baer - EUR | 5,886.00 | 207,699.00 |
| Cheque | 07/30/2013 | 180 | Funds transfer | Julius Baer - EUR | 5,232.00 | 212,931.00 |
| Cheque | 08/14/2013 | 182 | Funds transfer | Julius Baer - EUR | 5,989.50 | 218,920.50 |
| Cheque | 08/19/2013 | 183 | Funds transfer | Julius Baer - EUR | 5,989.50 | 224,910.00 |
| Cheque | 08/20/2013 | 184 | Funds transfer | Julius Baer - EUR | 6,322.25 | 231,232.25 |
| Cheque | 08/23/2013 | 187 | Funds transfer | Julius Baer - EUR | 6,388.80 | 237,621.05 |
| Cheque | 09/04/2013 | 191 | Funds transfer | Julius Baer - EUR | 6,012.00 | 243,633.05 |
| Cheque | 09/04/2013 | 192 | Funds transfer | Julius Baer - EUR | 6,346.00 | 249,979.05 |
| Cheque | 09/06/2013 | 193 | Funds transfer | Julius Baer - EUR | 6,012.00 | 255,991.05 |
| Cheque | 10/25/2013 | 202 | Funds transfer | Julius Baer - EUR | 6,547.20 | 262,538.25 |
| Cheque | 10/31/2013 | 203 | Funds transfer | Julius Baer - EUR | 6,547.20 | 269,085.45 |
| Cheque | 11/26/2013 | 210 | Funds transfer | Julius Baer - EUR | 6,070.50 | 275,155.95 |
| Cheque | 11/27/2013 | 211 | Funds transfer | Julius Baer - EUR | 6,070.50 | 281,226.45 |
| Cheque | 12/12/2013 | 215 | Funds transfer | Julius Baer - EUR | 6,165.00 | 287,391.45 |
| Cheque | 12/19/2013 | 217 | Funds transfer | Julius Baer - EUR | 6,165.00 | 293,556.45 |
| **Total DLD - Ibiza account** | | | | | **293,556.45** | **293,556.45** |
| | | | | | | |
| **Expenses - Chateau St Anne** | | | | | | 0.00 |
| Cheque | 04/03/2013 | 154 | Chateau St Anne - Servcie charges | Julius Baer - EUR | 1,572.72 | 1,572.72 |
| Cheque | 10/04/2013 | 200 | Chateau St Anne - service charges | Julius Baer - EUR | 4,201.32 | 5,774.04 |
| **Total Expenses - Chateau St Anne** | | | | | **5,774.04** | **5,774.04** |
| | | | | | | |
| **Holiday costs** | | | | | | 0.00 |
| Cheque | 01/03/2013 | 135 | Hotel Goldener | Julius Baer - EUR | 40,126.91 | 40,126.91 |
| Cheque | 01/21/2013 | 141 | David Paul Williams - Expenses | Julius Baer - EUR | 9,310.00 | 49,436.91 |
| Cheque | 03/12/2013 | 346 | Torres - Xpuha Villa rental | Julius Baer - USD | 82,500.00 | 131,936.91 |
| Cheque | 03/14/2013 | 348 | Torres - additional villa deposit | Julius Baer - USD | 1,000.00 | 132,936.91 |
| Cheque | 03/26/2013 | 359 | Torres - additional payment | Julius Baer - USD | 2,000.00 | 134,936.91 |
| Cheque | 08/14/2013 | 181 | Hotel Goldener - Deposit | Julius Baer - EUR | 23,958.00 | 158,894.91 |
| Cheque | 11/12/2013 | 208 | Sensha Holdings - Holiday deposit - Feb-- | Julius Baer - EUR | 15,920.90 | 174,815.81 |
| **Total Holiday costs** | | | | | **174,815.81** | **174,815.81** |
| | | | | | | |
| **Ibiza - House costs** | | | | | | 0.00 |
| Cheque | 01/04/2013 | 137 | AU Stusio - Design costs | Julius Baer - EUR | 18,171.32 | 18,171.32 |
| Cheque | 01/14/2013 | 140 | Becker Interiors | Julius Baer - EUR | 1,600.30 | 19,771.62 |
| **Total Ibiza - House costs** | | | | | **19,771.62** | **19,771.62** |
| | | | | | | |
| **Other drawings** | | | | | | 0.00 |
| Cheque | 07/23/2013 | 176 | SARL Aera - Apartment design fee | Julius Baer - EUR | 3,924.00 | 3,924.00 |
| Cheque | 11/12/2013 | 207 | Spiekermeier - Photograph deposit | Julius Baer - EUR | 2,698.00 | 6,622.00 |

**Page 2 of 3**

Confidential

Ex.004-5.0350

4:59 PM
30/07/15
Accrual Basis

# SUNAGE FOUNDATION
## General Ledger
### As of 31 December 2013

| Type | Date | Num | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|
| Cheque | 11/18/2013 | 434 | Sylvie Kieren - deposit | Julius Baer - GBP | 13,202.00 | 19,824.00 |
| Cheque | 12/23/2013 | 218 | Petra Sinz | Julius Baer - EUR | 3,425.00 | 23,249.00 |
| **Total Other drawings** | | | | | 23,249.00 | 23,249.00 |
| | | | | | | |
| **School fees** | | | | | | 0.00 |
| Cheque | 01/10/2013 | 302 | St Thomas's - January term | Julius Baer - GBP | 18,587.02 | 18,587.02 |
| Cheque | 04/17/2013 | 341 | St Thomas's - April | Julius Baer - GBP | 17,448.53 | 36,035.55 |
| Cheque | 04/17/2013 | 342 | Harrodian School - deposit | Julius Baer - GBP | 3,062.00 | 39,097.55 |
| Cheque | 08/01/2013 | 386 | Harrodian School - September term | Julius Baer - GBP | 7,906.55 | 47,004.10 |
| Cheque | 08/01/2013 | 387 | Thomas's Day Schools - September term | Julius Baer - GBP | 12,968.31 | 59,972.41 |
| **Total School fees** | | | | | 59,972.41 | 59,972.41 |
| | | | | | | |
| **Mishcon de Reya** | | | | | | 0.00 |
| Cheque | 03/04/2013 | 321 | Tax advice fees | Julius Baer - GBP | 45,270.00 | 45,270.00 |
| Cheque | 04/16/2013 | 339 | Legal fees - ref: F Rojas | Julius Baer - GBP | 11,268.16 | 56,538.16 |
| Cheque | 05/09/2013 | 351 | Balance of tax advice | Julius Baer - GBP | 3,764.60 | 60,302.76 |
| Cheque | 06/07/2013 | 364 | International tax advice | Julius Baer - GBP | 13,122.09 | 73,424.85 |
| Cheque | 10/03/2013 | 438 | Fees on account - US Trust advice | Julius Baer - USD | 10,000.00 | 83,424.85 |
| Cheque | 10/03/2013 | 416 | Legal fees re: tax advice | Julius Baer - GBP | 40,225.00 | 123,649.85 |
| **Total Mishcon de Reya** | | | | | 123,649.85 | 123,649.85 |
| | | | | | | |
| **Travel and entertaining** | | | | | | 0.00 |
| **Priority Travel** | | | | | | 0.00 |
| Cheque | 02/20/2013 | 315 | Travel costs | Julius Baer - GBP | 24,930.54 | 24,930.54 |
| Cheque | 03/28/2013 | 330 | Priority Travel | Julius Baer - GBP | 10,469.89 | 35,400.43 |
| Cheque | 04/16/2013 | 340 | Priority Travel | Julius Baer - GBP | 47,094.02 | 82,494.45 |
| Cheque | 08/07/2013 | 392 | Priority Travel | Julius Baer - GBP | 2,275.40 | 84,769.85 |
| Cheque | 09/24/2013 | 409 | Priority Travel | Julius Baer - GBP | 2,829.66 | 87,599.51 |
| **Total Priority Travel** | | | | | 87,599.51 | 87,599.51 |

Confidential

Ex.004-5.0351

CAPLIN0024847
USPROD-02361048

5:21 PM
30/07/15
Accrual Basis

# SATELLITE SUPPORT SERVICES LIMITED
## General Ledger
### As of 31 December 2013

**Satellite Support Services Limited**
**Private costs**
**Year ended 31 December 2013**

| Type | Date | Num | Memo | Split | Amount | Balance |
|------|------|-----|------|-------|--------|---------|
| **Netjets** | | | | | | **0.00** |
| Cheque | 01/24/2013 | | Dec-12 costs | Julius Baer - EUR | 6,193.16 | 6,193.16 |
| Cheque | 02/01/2013 | | Sate-Excel-131212 lease purchase | Julius Baer - USD | 125,000.00 | 131,193.16 |
| Cheque | 03/04/2013 | | Final statement on 400XP contract | Julius Baer - EUR | 7,446.26 | 138,639.42 |
| Cheque | 03/28/2013 | | February costs | Julius Baer - EUR | 50,307.88 | 188,947.30 |
| Cheque | 04/16/2013 | | April costs | Julius Baer - EUR | 7,394.00 | 196,341.30 |
| Cheque | 05/17/2013 | | April/May costs | Julius Baer - EUR | 28,009.17 | 224,350.47 |
| Cheque | 07/04/2013 | | May costs | Julius Baer - EUR | 21,248.77 | 245,599.24 |
| Cheque | 08/20/2013 | | July costs | Julius Baer - EUR | 24,164.41 | 269,763.65 |
| Cheque | 08/23/2013 | | June flight costs | Julius Baer - EUR | 22,480.04 | 292,243.69 |
| Cheque | 09/13/2013 | | September costs | Julius Baer - EUR | 7,343.62 | 299,587.31 |
| Cheque | 11/11/2013 | | June flight costs | Julius Baer - EUR | 21,838.31 | 321,425.62 |
| Cheque | 11/22/2013 | | November costs | Julius Baer - EUR | 7,691.18 | 329,116.80 |
| **Total Netjets** | | | | | 329,116.80 | 329,116.80 |
| | | | | | | |
| **Priority Travel** | | | | | | **0.00** |
| Cheque | 01/18/2013 | | Priority Travel | Julius Baer - GBP | 42,460.62 | 42,460.62 |
| **Total Priority Travel** | | | | | 42,460.62 | 42,460.62 |

Page 1 of 1

Ex.004-5.0352

CAPLIN0024848
USPROD-02361049

**Sunage Foundation**

**Rivkah Edelman**

Year ended 31 December 2008  (see separate analysis)                                    43,000.00

Year ended 31 December 2009                                                              44,850.00

Period 1 January 2010 to 30 April 2015

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 01/29/2010 | 16 | Funds transfer | Julius Baer - USD | 4,000.00 | 4,000.00 |
| Cheque | 03/02/2010 | 27 | Funds transfer | Julius Baer - USD | 4,000.00 | 8,000.00 |
| Cheque | 03/08/2010 | | Funds transfer | Julius Baer - USD | 6,000.00 | 14,000.00 |
| Cheque | 04/01/2010 | | Funds transfer | Julius Baer - USD | 4,000.00 | 18,000.00 |
| Cheque | 05/05/2010 | 43 | Funds transfer | Julius Baer - USD | 4,000.00 | 22,000.00 |
| Cheque | 05/31/2010 | 48 | Funds transfer | Julius Baer - USD | 4,000.00 | 26,000.00 |
| Cheque | 06/30/2010 | 53 | Funds transfer | Julius Baer - USD | 4,000.00 | 30,000.00 |
| Cheque | 07/27/2010 | 62 | Funds transfer | Julius Baer - USD | 4,000.00 | 34,000.00 |
| Cheque | 09/01/2010 | 71 | Funds transfer | Julius Baer - USD | 4,000.00 | 38,000.00 |
| Cheque | 10/01/2010 | 81 | Funds transfer | Julius Baer - USD | 4,000.00 | 42,000.00 |
| Cheque | 11/02/2010 | 87 | Funds transfer | Julius Baer - USD | 4,000.00 | 46,000.00 |
| Cheque | 12/02/2010 | 93 | Funds transfer | Julius Baer - USD | 4,000.00 | 50,000.00 |
| Cheque | 12/24/2010 | 98 | Funds transfer | Julius Baer - USD | 4,000.00 | 54,000.00 |
| Cheque | 02/02/2011 | 104 | Funds transfer | Julius Baer - USD | 4,000.00 | 58,000.00 |
| Cheque | 03/01/2011 | 108 | Funds transfer | Julius Baer - USD | 4,000.00 | 62,000.00 |
| Cheque | 03/08/2011 | 112 | Funds transfer | Julius Baer - USD | 6,000.00 | 68,000.00 |
| Cheque | 03/30/2011 | 119 | Funds transfer | Julius Baer - USD | 6,000.00 | 74,000.00 |
| Cheque | 03/30/2011 | 122 | Funds transfer | Julius Baer - USD | 9,000.00 | 83,000.00 |
| Cheque | 04/14/2011 | 124 | Funds transfer | Julius Baer - USD | 8,000.00 | 91,000.00 |
| Cheque | 04/15/2011 | 125 | Funds transfer | Julius Baer - USD | 9,000.00 | 100,000.00 |
| Cheque | 04/21/2011 | 126 | Funds transfer | Julius Baer - USD | 9,000.00 | 109,000.00 |
| Cheque | 05/04/2011 | 130 | Funds transfer | Julius Baer - USD | 4,000.00 | 113,000.00 |
| Cheque | 06/01/2011 | 134 | Funds transfer | Julius Baer - USD | 4,000.00 | 117,000.00 |
| Cheque | 07/04/2011 | 143 | Funds transfer | Julius Baer - USD | 4,000.00 | 121,000.00 |
| Cheque | 08/05/2011 | 157 | Funds transfer | Julius Baer - USD | 4,000.00 | 125,000.00 |
| Cheque | 08/24/2011 | 165 | Funds transfer | Julius Baer - USD | 9,000.00 | 134,000.00 |
| Cheque | 09/16/2011 | 171 | Funds transfer | Julius Baer - USD | 9,000.00 | 143,000.00 |
| Cheque | 10/03/2011 | 175 | Funds transfer | Julius Baer - USD | 9,000.00 | 152,000.00 |
| Cheque | 10/20/2011 | 186 | Funds transfer | Julius Baer - USD | 8,500.00 | 160,500.00 |
| Cheque | 11/03/2011 | 189 | Funds transfer | Julius Baer - USD | 4,000.00 | 164,500.00 |
| Cheque | 12/01/2011 | 199 | Funds transfer | Julius Baer - USD | 4,000.00 | 168,500.00 |
| Cheque | 12/30/2011 | 209 | Funds transfer | Julius Baer - USD | 4,000.00 | 172,500.00 |
| Cheque | 02/10/2012 | 215 | Funds transfer | Julius Baer - USD | 4,000.00 | 176,500.00 |
| Cheque | 03/05/2012 | 223 | Funds transfer | Julius Baer - USD | 4,000.00 | 180,500.00 |
| Cheque | 04/03/2012 | 227 | Funds transfer | Julius Baer - USD | 4,000.00 | 184,500.00 |
| Cheque | 04/17/2012 | 235 | Funds transfer | Julius Baer - USD | 9,000.00 | 193,500.00 |
| Cheque | 04/18/2012 | 237 | Funds transfer | Julius Baer - USD | 8,500.00 | 202,000.00 |
| Cheque | 05/11/2012 | 239 | Funds transfer | Julius Baer - USD | 4,000.00 | 206,000.00 |
| Cheque | 05/22/2012 | 245 | Funds transfer | Julius Baer - USD | 9,000.00 | 215,000.00 |
| Cheque | 05/29/2012 | 247 | Funds transfer | Julius Baer - USD | 9,000.00 | 224,000.00 |

Ex.004-5.0353

CAPLIN0024849
USPROD-02361050

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 05/29/2012 | 249 | Funds transfer | Julius Baer - USD | 9,000.00 | 233,000.00 |
| Cheque | 05/29/2012 | 250 | Funds transfer | Julius Baer - USD | 8,000.00 | 241,000.00 |
| Cheque | 06/07/2012 | 252 | Funds transfer | Julius Baer - USD | 4,000.00 | 245,000.00 |
| Cheque | 06/08/2012 | 255 | Funds transfer | Julius Baer - USD | 9,000.00 | 254,000.00 |
| Cheque | 06/11/2012 | 256 | Funds transfer | Julius Baer - USD | 9,000.00 | 263,000.00 |
| Cheque | 06/12/2012 | 257 | Funds transfer | Julius Baer - USD | 7,000.00 | 270,000.00 |
| Cheque | 06/13/2012 | 258 | Funds transfer | Julius Baer - USD | 5,000.00 | 275,000.00 |
| Cheque | 06/26/2012 | 265 | Funds transfer | Julius Baer - USD | 4,000.00 | 279,000.00 |
| Cheque | 08/01/2012 | 274 | Funds transfer | Julius Baer - USD | 4,000.00 | 283,000.00 |
| Cheque | 09/06/2012 | 281 | Funds transfer | Julius Baer - USD | 4,000.00 | 287,000.00 |
| Cheque | 10/02/2012 | 292 | Funds transfer | Julius Baer - USD | 4,000.00 | 291,000.00 |
| Cheque | 10/31/2012 | 301 | Funds transfer | Julius Baer - USD | 4,000.00 | 295,000.00 |
| Cheque | 11/30/2012 | 306 | Funds transfer | Julius Baer - USD | 4,000.00 | 299,000.00 |
| Cheque | 01/04/2013 | 318 | Funds transfer | Julius Baer - USD | 4,000.00 | 303,000.00 |
| Cheque | 02/06/2013 | 330 | Funds transfer | Julius Baer - USD | 4,000.00 | 307,000.00 |
| Cheque | 02/27/2013 | 342 | Funds transfer | Julius Baer - USD | 4,000.00 | 311,000.00 |
| Cheque | 03/28/2013 | 362 | Funds transfer | Julius Baer - USD | 4,000.00 | 315,000.00 |
| Cheque | 05/02/2013 | 380 | Funds transfer | Julius Baer - USD | 4,000.00 | 319,000.00 |
| Cheque | 06/03/2013 | 389 | Funds transfer | Julius Baer - USD | 4,000.00 | 323,000.00 |
| Cheque | 06/28/2013 | 403 | Funds transfer | Julius Baer - USD | 4,000.00 | 327,000.00 |
| Cheque | 07/30/2013 | 414 | Funds transfer | Julius Baer - USD | 4,000.00 | 331,000.00 |
| Cheque | 08/23/2013 | 425 | Funds transfer | Julius Baer - USD | 4,000.00 | 335,000.00 |
| Cheque | 09/30/2013 | 431 | Funds transfer | Julius Baer - USD | 4,000.00 | 339,000.00 |
| Cheque | 09/30/2013 | 434 | Funds transfer | Julius Baer - USD | 4,000.00 | 343,000.00 |
| Cheque | 10/31/2013 | 442 | Funds transfer | Julius Baer - USD | 4,000.00 | 347,000.00 |
| Cheque | 11/29/2013 | 461 | Funds transfer | Julius Baer - USD | 4,000.00 | 351,000.00 |
| Cheque | 12/23/2013 | 472 | Funds transfer | Julius Baer - USD | 4,000.00 | 355,000.00 |
| Cheque | 01/07/2014 | 482 | Funds transfer | Julius Baer - USD | 4,000.00 | 359,000.00 |
| Cheque | 02/04/2014 | 484 | Funds transfer | Julius Baer - USD | 4,000.00 | 363,000.00 |
| Cheque | 02/27/2014 | 496 | Funds transfer | Julius Baer - USD | 4,000.00 | 367,000.00 |
| Cheque | 03/31/2014 | 504 | Funds transfer | Julius Baer - USD | 4,000.00 | 371,000.00 |
| Cheque | 05/05/2014 | 141 | Funds transfer | CBH - USD | 4,000.00 | 375,000.00 |
| Cheque | 05/28/2014 | 154 | Funds transfer | CBH - USD | 4,000.00 | 379,000.00 |
| Cheque | 06/26/2014 | 159 | Funds transfer | CBH - USD | 4,000.00 | 383,000.00 |
| Cheque | 07/24/2014 | 167 | Funds transfer | CBH - USD | 4,000.00 | 387,000.00 |
| Cheque | 08/21/2014 | 171 | Funds transfer | CBH - USD | 4,000.00 | 391,000.00 |
| Cheque | 09/25/2014 | 179 | Funds transfer | CBH - USD | 4,000.00 | 395,000.00 |
| Cheque | 10/22/2014 | 186 | Funds transfer | CBH - USD | 4,000.00 | 399,000.00 |
| Cheque | 11/28/2014 | 191 | Funds transfer | CBH - USD | 4,000.00 | 403,000.00 |
| Cheque | 12/22/2014 | 198 | Funds transfer | CBH - USD | 4,000.00 | 407,000.00 |
| Cheque | 01/28/2015 | 200 | Monthly funds trans | CBH - USD | 4,000.00 | 411,000.00 |
| Cheque | 02/26/2015 | 206 | Monthly funds trans | CBH - USD | 4,000.00 | 415,000.00 |
| Cheque | 03/26/2015 | 210 | Monthly funds tranfc | CBH - USD | 4,000.00 | 419,000.00 |
| Cheque | 04/27/2015 | 216 | Monthly funds trans | CBH - USD | 4,000.00 | 423,000.00 |
| **Total Rivkah Edelman** | | | | | **423,000.00** | **423,000.00** |

Confidential

CAPLIN0024850
USPROD-02361051

**Sunage Foundation**

**China Edelman**

| Year ended 31 December 2008  (see separate analysis) | | | | | | | 36,500.00 |
|---|---|---|---|---|---|---|---|

| Year ended 31 December 2009 | | | | | | | 44,850.00 |
|---|---|---|---|---|---|---|---|

**Period 1 January 2010 to 30 April 2015**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cheque | 01/29/2010 | 15 | Funds transfer | Julius Baer – USD | 3,500.00 | 3,500.00 |
| Cheque | 03/02/2010 | 25 | Funds transfer | Julius Baer – USD | 3,500.00 | 7,000.00 |
| Cheque | 04/01/2010 | | Funds transfer | Julius Baer – USD | 3,500.00 | 10,500.00 |
| Cheque | 05/05/2010 | 42 | Funds transfer | Julius Baer – USD | 3,500.00 | 14,000.00 |
| Cheque | 05/31/2010 | 47 | Funds transfer | Julius Baer – USD | 3,500.00 | 17,500.00 |
| Cheque | 06/30/2010 | 54 | Funds transfer | Julius Baer – USD | 3,500.00 | 21,000.00 |
| Cheque | 07/27/2010 | 63 | Funds transfer | Julius Baer – USD | 3,500.00 | 24,500.00 |
| Cheque | 09/01/2010 | 70 | Funds transfer | Julius Baer – USD | 3,500.00 | 28,000.00 |
| Cheque | 10/01/2010 | 80 | Funds transfer | Julius Baer – USD | 3,500.00 | 31,500.00 |
| Cheque | 11/02/2010 | 86 | Funds transfer | Julius Baer – USD | 3,500.00 | 35,000.00 |
| Cheque | 12/02/2010 | 92 | Funds transfer | Julius Baer – USD | 3,500.00 | 38,500.00 |
| Cheque | 12/24/2010 | 97 | Funds transfer | Julius Baer – USD | 3,500.00 | 42,000.00 |
| Cheque | 02/02/2011 | 106 | Funds transfer | Julius Baer – USD | 3,500.00 | 45,500.00 |
| Cheque | 03/01/2011 | 109 | Funds transfer | Julius Baer – USD | 3,500.00 | 49,000.00 |
| Cheque | 03/30/2011 | 121 | Funds transfer | Julius Baer – USD | 3,500.00 | 52,500.00 |
| Cheque | 05/04/2011 | 127 | Funds transfer | Julius Baer – USD | 3,500.00 | 56,000.00 |
| Cheque | 06/01/2011 | 135 | Funds transfer | Julius Baer – USD | 3,500.00 | 59,500.00 |
| Cheque | 07/04/2011 | 144 | Funds transfer | Julius Baer – USD | 3,500.00 | 63,000.00 |
| Cheque | 08/05/2011 | 155 | Funds transfer | Julius Baer – USD | 3,500.00 | 66,500.00 |
| Cheque | 08/24/2011 | 166 | Funds transfer | Julius Baer – USD | 3,500.00 | 70,000.00 |
| Cheque | 10/03/2011 | 178 | Funds transfer | Julius Baer – USD | 3,500.00 | 73,500.00 |
| Cheque | 11/03/2011 | 191 | Funds transfer | Julius Baer – USD | 3,500.00 | 77,000.00 |
| Cheque | 12/01/2011 | 198 | Funds transfer | Julius Baer – USD | 3,500.00 | 80,500.00 |
| Cheque | 12/30/2011 | 211 | Funds transfer | Julius Baer – USD | 3,500.00 | 84,000.00 |
| Cheque | 02/10/2012 | 214 | Funds transfer | Julius Baer – USD | 3,500.00 | 87,500.00 |
| Cheque | 03/05/2012 | 222 | Funds transfer | Julius Baer – USD | 3,500.00 | 91,000.00 |
| Cheque | 04/03/2012 | 230 | Funds transfer | Julius Baer – USD | 3,500.00 | 94,500.00 |
| Cheque | 05/11/2012 | 241 | Funds transfer | Julius Baer – USD | 3,500.00 | 98,000.00 |
| Cheque | 06/07/2012 | 253 | Funds transfer | Julius Baer – USD | 3,500.00 | 101,500.00 |
| Cheque | 06/26/2012 | 263 | Funds transfer | Julius Baer – USD | 3,500.00 | 105,000.00 |
| Cheque | 08/01/2012 | 275 | Funds transfer | Julius Baer – USD | 3,500.00 | 108,500.00 |
| Cheque | 09/06/2012 | 280 | Funds transfer | Julius Baer – USD | 3,500.00 | 112,000.00 |
| Cheque | 10/02/2012 | 295 | Funds transfer | Julius Baer – USD | 3,500.00 | 115,500.00 |
| Cheque | 10/31/2012 | 303 | Funds transfer | Julius Baer – USD | 3,500.00 | 119,000.00 |
| Cheque | 11/30/2012 | 308 | Funds transfer | Julius Baer – USD | 3,500.00 | 122,500.00 |
| Cheque | 12/10/2012 | 103 | Funds transfer | CBH – USD | 8,000.00 | 130,500.00 |
| Cheque | 12/11/2012 | 309 | Funds transfer | Julius Baer – USD | 8,000.00 | 138,500.00 |
| Cheque | 12/11/2012 | 104 | Funds transfer | CBH – USD | 8,000.00 | 146,500.00 |
| Cheque | 01/04/2013 | 317 | Funds transfer | Julius Baer – USD | 3,500.00 | 150,000.00 |
| Cheque | 02/06/2013 | 331 | Funds transfer | Julius Baer – USD | 3,500.00 | 153,500.00 |

CAPLIN0024851
USPROD-02361052

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 02/27/2013 | 343 | Funds transfer | Julius Baer - USD | 3,500.00 | 157,000.00 |
| Cheque | 03/28/2013 | 365 | Funds transfer | Julius Baer - USD | 3,500.00 | 160,500.00 |
| Cheque | 05/02/2013 | 377 | Funds transfer | Julius Baer - USD | 3,500.00 | 164,000.00 |
| Cheque | 06/03/2013 | 388 | Funds transfer | Julius Baer - USD | 3,500.00 | 167,500.00 |
| Cheque | 06/28/2013 | 405 | Funds transfer | Julius Baer - USD | 3,500.00 | 171,000.00 |
| Cheque | 07/04/2013 | 408 | Funds transfer | Julius Baer - USD | 4,500.00 | 175,500.00 |
| Cheque | 07/30/2013 | 416 | Funds transfer | Julius Baer - USD | 3,500.00 | 179,000.00 |
| Cheque | 08/23/2013 | 426 | Funds transfer | Julius Baer - USD | 3,500.00 | 182,500.00 |
| Cheque | 09/30/2013 | 433 | Funds transfer | Julius Baer - USD | 3,500.00 | 186,000.00 |
| Cheque | 10/04/2013 | 438 | Funds transfer | Julius Baer - USD | 3,500.00 | 189,500.00 |
| Cheque | 10/31/2013 | 440 | Funds transfer | Julius Baer - USD | 3,500.00 | 193,000.00 |
| Cheque | 11/29/2013 | 458 | Funds transfer | Julius Baer - USD | 3,500.00 | 196,500.00 |
| Cheque | 12/18/2013 | 469 | Funds transfer | Julius Baer - USD | 4,000.00 | 200,500.00 |
| Cheque | 12/23/2013 | 474 | Funds transfer | Julius Baer - USD | 4,000.00 | 204,500.00 |
| Cheque | 12/23/2013 | 475 | Funds transfer | Julius Baer - USD | 3,500.00 | 208,000.00 |
| Cheque | 01/07/2014 | 480 | Funds transfer | Julius Baer - USD | 3,500.00 | 211,500.00 |
| Cheque | 02/04/2014 | 485 | Funds transfer | Julius Baer - USD | 3,500.00 | 215,000.00 |
| Cheque | 02/27/2014 | 495 | Funds transfer | Julius Baer - USD | 3,500.00 | 218,500.00 |
| Cheque | 03/31/2014 | 505 | Funds transfer | Julius Baer - USD | 3,500.00 | 222,000.00 |
| Cheque | 05/05/2014 | 143 | Funds transfer | CBH - USD | 3,500.00 | 225,500.00 |
| Cheque | 05/28/2014 | 153 | Funds transfer | CBH - USD | 3,500.00 | 229,000.00 |
| Cheque | 06/26/2014 | 162 | Funds transfer | CBH - USD | 3,500.00 | 232,500.00 |
| Cheque | 07/24/2014 | 168 | Funds transfer | CBH - USD | 3,500.00 | 236,000.00 |
| Cheque | 08/21/2014 | 173 | Funds transfer | CBH - USD | 3,500.00 | 239,500.00 |
| Cheque | 09/25/2014 | 176 | Funds transfer | CBH - USD | 3,500.00 | 243,000.00 |
| Cheque | 10/22/2014 | 187 | Funds transfer | CBH - USD | 3,500.00 | 246,500.00 |
| Cheque | 11/28/2014 | 190 | Funds transfer | CBH - USD | 3,500.00 | 250,000.00 |
| Cheque | 12/22/2014 | 197 | Funds transfer | CBH - USD | 3,500.00 | 253,500.00 |
| Cheque | 01/28/2015 | 201 | Monthly funds transfer | CBH - USD | 3,500.00 | 257,000.00 |
| Cheque | 02/26/2015 | 209 | Monthly funds transfer | CBH - USD | 3,500.00 | 260,500.00 |
| Cheque | 03/26/2015 | 212 | Monthly funds transfer | CBH - USD | 3,500.00 | 264,000.00 |
| Cheque | 04/27/2015 | 217 | Monthly funds transfer | CBH - USD | 3,500.00 | 267,500.00 |
| **Total China Edelman** | | | | | **267,500.00** | **267,500.00** |

China is DE's daughter

**Sunage Foundation**

**Frederic Le Dain**

| | | | | | | |
|---|---|---|---|---|---|---|
| Year ended 31 December 2008 (see separate analysis) | | | | | | 0.00 |
| Year ended 31 December 2009 | | | | | | 0.00 |
| Period 1 January 2010 to 30 April 2015 | | | | | | |
| Cheque | 12/15/2011 | 17 | | CBH - EUR | | 0.00 |
| Cheque | 12/15/2011 | 18 | Funds transfer | CBH - EUR | 6,316.80 | 6,316.80 |
| Cheque | 12/11/2012 | 28 | Funds transfer | CBH - EUR | 3,933.00 | 10,249.80 |
| Cheque | 04/17/2013 | 155 | Funds transfer | Julius Baer - EUR | 6,515.00 | 16,764.80 |
| Cheque | 07/23/2013 | 178 | Funds transfer | Julius Baer - EUR | 6,540.00 | 23,304.80 |
| Cheque | 08/20/2013 | 186 | Funds transfer | Julius Baer - EUR | 6,388.80 | 29,693.60 |
| Cheque | 09/13/2013 | 194 | Funbds transfer | Julius Baer - EUR | 6,412.80 | 36,106.40 |
| Cheque | 10/31/2013 | 204 | Funds transfer | Julius Baer - EUR | 6,547.20 | 42,653.60 |
| Cheque | 11/29/2013 | 213 | Funds transfer | Julius Baer - EUR | 6,475.20 | 49,128.80 |
| Cheque | 12/23/2013 | 220 | Funds tansfer | Julius Baer - EUR | 6,576.00 | 55,704.80 |
| Cheque | 02/04/2014 | 226 | Frederic Le Dain - January | Julius Baer - EUR | 6,552.00 | 62,256.80 |
| Cheque | 02/27/2014 | 233 | F Le Dain | Julius Baer - EUR | 6,552.00 | 68,808.80 |
| Cheque | 03/31/2014 | 242 | F Le Dain -March | Julius Baer - EUR | 6,638.40 | 75,447.20 |
| Cheque | 05/06/2014 | 32 | Funds transfer | CBH - EUR | 6,590.40 | 82,037.60 |
| Cheque | 05/28/2014 | 38 | Funds transfer | CBH - EUR | 6,590.40 | 88,628.00 |
| Cheque | 07/24/2014 | 44 | Funds transfer | CBH - EUR | 6,499.20 | 95,127.20 |
| Cheque | 08/21/2014 | 46 | Funds transfer | CBH - EUR | 6,499.20 | 101,626.40 |
| Cheque | 09/25/2014 | 47 | Funds transfer | CBH - EUR | 6,059.04 | 107,685.44 |
| Cheque | 10/22/2014 | 52 | Funds transfer | CBH - EUR | 6,080.16 | 113,765.60 |
| Cheque | 11/27/2014 | 56 | Funds transfer | CBH - EUR | 6,009.12 | 119,774.72 |
| Cheque | 12/22/2014 | 57 | Funds transfer | CBH - EUR | 6,009.12 | 125,783.84 |
| Cheque | 01/28/2015 | 60 | Funds transfer | CBH - EUR | 5,456.64 | 131,240.48 |
| Cheque | 02/26/2015 | 204 | Monthly funds transfer (4,800 | CBH - USD | 5,622.58 | 136,863.06 |
| Cheque | 04/23/2015 | 67 | Funds transfer | CBH - EUR | 5,184.00 | 142,047.06 |
| **Total Frederic Le Dain** | | | | | **142,047.06** | **142,047.06** |

Frederic is DLD's brother

Confidential

Ex.004-5.0357

CAPLIN0024853
USPROD-02361054

Sunage Foundation

Gregory Edelman

Year ended 31 December 2008  (see separate analysis)          **16,000.00**

Year ended 31 December 2009          21,000.00

Period 1 January 2010 to 30 April 2015

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 01/29/2010 | 14 | Funds transfer | Julius Baer - USD | 2,000.00 | 2,000.00 |
| Cheque | 03/02/2010 | 26 | Funds transfer | Julius Baer - USD | 2,000.00 | 4,000.00 |
| Cheque | 04/01/2010 | 300311 | Funds transfer | Julius Baer - USD | 2,000.00 | 6,000.00 |
| Cheque | 05/05/2010 | 44 | Funds transfer | Julius Baer - USD | 3,000.00 | 9,000.00 |
| Cheque | 05/31/2010 | 49 | Funds transfer | Julius Baer - USD | 3,000.00 | 12,000.00 |
| Cheque | 06/30/2010 | 55 | Funds transfer | Julius Baer - USD | 3,000.00 | 15,000.00 |
| Cheque | 07/27/2010 | 61 | Funds transfer | Julius Baer - USD | 5,000.00 | 20,000.00 |
| Cheque | 09/01/2010 | 69 | Funds transfer | Julius Baer - USD | 5,000.00 | 25,000.00 |
| Cheque | 10/01/2010 | 82 | Funds transfer | Julius Baer - USD | 5,000.00 | 30,000.00 |
| Cheque | 11/02/2010 | 88 | Funds transfer | Julius Baer - USD | 5,000.00 | 35,000.00 |
| Cheque | 12/02/2010 | 94 | Fund transfer | Julius Baer - USD | 3,000.00 | 38,000.00 |
| Cheque | 12/24/2010 | 99 | Funds transfer | Julius Baer - USD | 3,000.00 | 41,000.00 |
| Cheque | 02/02/2011 | 105 | Funds transfer | Julius Baer - USD | 3,000.00 | 44,000.00 |
| Cheque | 03/01/2011 | 110 | Funds transfer | Julius Baer - USD | 3,000.00 | 47,000.00 |
| Cheque | 03/30/2011 | 120 | Funds transfer | Julius Baer - USD | 3,000.00 | 50,000.00 |
| Cheque | 05/04/2011 | 129 | Funds transfer | Julius Baer - USD | 3,000.00 | 53,000.00 |
| Cheque | 06/01/2011 | 137 | Funds transfer | Julius Baer - USD | 3,000.00 | 56,000.00 |
| Cheque | 07/04/2011 | 142 | Funds transfer | Julius Baer - USD | 3,000.00 | 59,000.00 |
| Cheque | 08/05/2011 | 154 | Funds transfer | Julius Baer - USD | 3,000.00 | 62,000.00 |
| Cheque | 08/24/2011 | 162 | Funds transfer | Julius Baer - USD | 3,000.00 | 65,000.00 |
| Cheque | 10/03/2011 | 177 | Funds transfer | Julius Baer - USD | 3,000.00 | 68,000.00 |
| Cheque | 11/03/2011 | 190 | Funds transfer | Julius Baer - USD | 3,000.00 | 71,000.00 |
| Cheque | 12/01/2011 | 200 | Funds transfer | Julius Baer - USD | 3,000.00 | 74,000.00 |
| Cheque | 12/30/2011 | 210 | Funds transfer | Julius Baer - USD | 3,000.00 | 77,000.00 |
| Cheque | 02/10/2012 | 213 | Funds transfer | Julius Baer - USD | 3,000.00 | 80,000.00 |
| Cheque | 03/05/2012 | 221 | Funds transfer | Julius Baer - USD | 3,000.00 | 83,000.00 |
| Cheque | 04/03/2012 | 229 | Funds transfer | Julius Baer - USD | 3,000.00 | 86,000.00 |
| Cheque | 05/11/2012 | 240 | Funds transfer | Julius Baer - USD | 3,000.00 | 89,000.00 |
| Cheque | 06/07/2012 | 254 | Funds transfer | Julius Baer - USD | 3,000.00 | 92,000.00 |
| Cheque | 06/26/2012 | 264 | Funds transfer | Julius Baer - USD | 3,000.00 | 95,000.00 |
| Cheque | 08/01/2012 | 273 | Funds transfer | Julius Baer - USD | 3,000.00 | 98,000.00 |
| Cheque | 09/06/2012 | 283 | Funds transfer | Julius Baer - USD | 3,000.00 | 101,000.00 |
| Cheque | 10/02/2012 | 294 | Funds transfer | Julius Baer - USD | 3,000.00 | 104,000.00 |
| Cheque | 10/31/2012 | 302 | Funds transfer | Julius Baer - USD | 3,000.00 | 107,000.00 |
| Cheque | 11/30/2012 | 305 | Funds transfer | Julius Baer - USD | 3,000.00 | 110,000.00 |
| Cheque | 01/04/2013 | 316 | Funds trasnfer | Julius Baer - USD | 3,000.00 | 113,000.00 |
| Cheque | 02/08/2013 | 328 | Funds transfer | Julius Baer - USD | 3,000.00 | 116,000.00 |
| Cheque | 03/04/2013 | 344 | Funds transfer | Julius Baer - USD | 4,500.00 | 120,500.00 |
| Cheque | 03/12/2013 | 347 | Funds transfer | Julius Baer - USD | 4,000.00 | 124,500.00 |
| Cheque | 03/19/2013 | 352 | Funds transfer | Julius Baer - USD | 3,500.00 | 128,000.00 |
| Cheque | 03/21/2013 | 354 | Funds transfer | Julius Baer - USD | 4,000.00 | 132,000.00 |
| Cheque | 03/26/2013 | 356 | Funds transfer | Julius Baer - USD | 4,000.00 | 136,000.00 |

CAPLIN0024854
USPROD-02361055

| | | | | | | |
|---|---|---|---|---|---:|---:|
| Cheque | 03/28/2013 | 366 | Funds transfer | Julius Baer - USD | 3,000.00 | 139,000.00 |
| Cheque | 04/03/2013 | 368 | Funds transfer | Julius Baer - USD | 4,000.00 | 143,000.00 |
| Cheque | 04/08/2013 | 372 | Funds transfer | Julius Baer - USD | 4,000.00 | 147,000.00 |
| Cheque | 04/25/2013 | 375 | Funds transfer | Julius Baer - USD | 4,000.00 | 151,000.00 |
| Cheque | 05/02/2013 | 378 | Funds transfer | Julius Baer - USD | 3,000.00 | 154,000.00 |
| Cheque | 05/09/2013 | 384 | Funds transfer | Julius Baer - USD | 4,500.00 | 158,500.00 |
| Cheque | 05/20/2013 | 386 | Funds transfer | Julius Baer - USD | 4,500.00 | 163,000.00 |
| Cheque | 05/20/2013 | 387 | Funds transfer | Julius Baer - USD | 4,750.00 | 167,750.00 |
| Cheque | 06/03/2013 | 391 | Funds transfer | Julius Baer - USD | 3,000.00 | 170,750.00 |
| Cheque | 06/07/2013 | 393 | Funds transfer | Julius Baer - USD | 4,750.00 | 175,500.00 |
| Cheque | 06/17/2013 | 398 | Funds transfer | Julius Baer - USD | 4,750.00 | 180,250.00 |
| Cheque | 06/28/2013 | 404 | Funds transfer | Julius Baer - USD | 3,000.00 | 183,250.00 |
| Cheque | 07/30/2013 | 415 | Funds transfer | Julius Baer - USD | 3,000.00 | 186,250.00 |
| Cheque | 08/07/2013 | 417 | Funds transfer | Julius Baer - USD | 3,500.00 | 189,750.00 |
| Cheque | 08/14/2013 | 421 | Funds transfer | Julius Baer - USD | 3,500.00 | 193,250.00 |
| Cheque | 08/23/2013 | 424 | Funds transfer | Julius Baer - USD | 3,000.00 | 196,250.00 |
| Cheque | 09/30/2013 | 432 | Funds transfer | Julius Baer - USD | 3,000.00 | 199,250.00 |
| Cheque | 10/31/2013 | 441 | Funds transfer | Julius Baer - USD | 3,000.00 | 202,250.00 |
| Cheque | 11/29/2013 | 460 | Funds transfer | Julius Baer - USD | 3,000.00 | 205,250.00 |
| Cheque | 12/23/2013 | 473 | Funds transfer | Julius Baer - USD | 3,000.00 | 208,250.00 |
| Cheque | 01/07/2014 | 481 | Funds transfer | Julius Baer - USD | 3,000.00 | 211,250.00 |
| Cheque | 02/04/2014 | 487 | Funds transfer | Julius Baer - USD | 3,000.00 | 214,250.00 |
| Cheque | 02/27/2014 | 491 | Funds transfer | Julius Baer - USD | 3,000.00 | 217,250.00 |
| Cheque | 03/31/2014 | 506 | Funds transfer | Julius Baer - USD | 3,000.00 | 220,250.00 |
| Cheque | 05/05/2014 | 144 | Funds transfer | CBH - USD | 3,000.00 | 223,250.00 |
| Cheque | 06/20/2014 | 158 | Funds transfer | CBH - USD | 3,000.00 | 226,250.00 |
| Cheque | 06/26/2014 | 161 | Funds transfer | CBH - USD | 3,000.00 | 229,250.00 |
| Cheque | 07/24/2014 | 169 | Funds transfer | CBH - USD | 3,000.00 | 232,250.00 |
| Cheque | 08/21/2014 | 172 | Funds transfer | CBH - USD | 3,000.00 | 235,250.00 |
| Cheque | 09/25/2014 | 177 | Funds transfer | CBH - USD | 3,000.00 | 238,250.00 |
| Cheque | 10/22/2014 | 185 | Funds transfer | CBH - USD | 3,000.00 | 241,250.00 |
| Cheque | 11/28/2014 | 189 | Funds transfer | CBH - USD | 3,000.00 | 244,250.00 |
| Cheque | 12/22/2014 | 196 | Funds transfer | CBH - USD | 3,000.00 | 247,250.00 |
| Cheque | 01/28/2015 | 202 | Monthly funds transfer | CBH - USD | 3,000.00 | 250,250.00 |
| Cheque | 02/26/2015 | 208 | Monthly funds transfer | CBH - USD | 3,000.00 | 253,250.00 |
| Cheque | 03/26/2015 | 211 | Monthly funds transfer | CBH - USD | 3,000.00 | 256,250.00 |
| Cheque | 04/27/2015 | 218 | Monthly funds transfer | CBH - USD | 3,000.00 | 259,250.00 |
| Total Gregory Edelman | | | | | 259,250.00 | 259,250.00 |

Gregory is DE's brother

Confidential

Ex.004-5.0359

CAPLIN0024855
USPROD-02361056

**Sunage Foundation**

**Josef Edelman**

**Year ended 31 December 2008  (see separate analysis)**      0.00

**Year ended 31 December 2009**      9,400.00

**Period 1 January 2010 to 30 April 2015**

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 05/14/2012 | 244 | Funds transfer | Julius Baer - USD | 3,000.00 | 3,000.00 |
| Cheque | 02/06/2013 | 327 | Funds transfer | Julius Baer - USD | 9,000.00 | 12,000.00 |
| Cheque | 02/06/2013 | 329 | Funds transfer | Julius Baer - USD | 5,000.00 | 17,000.00 |
| Cheque | 08/07/2013 | 418 | Funds transfer | Julius Baer - USD | 2,500.00 | 19,500.00 |
| Cheque | 12/23/2013 | 476 | Funds transfer | Julius Baer - USD | 2,500.00 | 22,000.00 |
| Cheque | 05/19/2014 | 148 | Funds transfer | CBH - USD | 3,500.00 | 25,500.00 |
| Cheque | 10/17/2014 | 183 | Funds trasnfer | CBH - USD | 3,000.00 | 28,500.00 |
| Cheque | 04/24/2015 | 215 | Funds transfer | CBH - USD | 2,000.00 | 30,500.00 |
| Total Josef Edelman | | | | | 30,500.00 | 30,500.00 |

Josef is DE's  son

Confidential

Ex.004-5.0360

CAPLIN0024856
USPROD-02361057

**Sunage Foundation**

**Rebecca Tassi (see note below)**

| | | | | | | |
|---|---|---|---|---|---|---|
| Year ended 31 December 2008   (see separate analysis) | | | | | | 17,000.00 |
| Year ended 31 December 2009 | | | | | | 4,500.00 |

**Period 1 January 2010 to 30 April 2015**

**Leoncio Carrion**

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 07/05/2012 | 267 | Funds transfer | Julius Baer - USD | 5,000.00 | 5,000.00 |
| Cheque | 08/03/2012 | 276 | Funds transfer | Julius Baer - USD | 5,000.00 | 10,000.00 |
| Cheque | 09/06/2012 | 282 | Funds transfer | Julius Baer - USD | 5,000.00 | 15,000.00 |
| Cheque | 10/02/2012 | 293 | Funds transfer | Julius Baer - USD | 5,000.00 | 20,000.00 |
| Cheque | 12/21/2012 | 314 | Funds transfer | Julius Baer - USD | 4,000.00 | 24,000.00 |
| Cheque | 01/24/2013 | 324 | Funds transfer | Julius Baer - USD | 4,000.00 | 28,000.00 |
| Cheque | 02/27/2013 | 341 | Funds transfer | Julius Baer - USD | 2,000.00 | 30,000.00 |
| Cheque | 03/19/2013 | 353 | Funds transfer | Julius Baer - USD | 3,500.00 | 33,500.00 |
| Cheque | 03/21/2013 | 355 | Funds transfer | Julius Baer - USD | 3,500.00 | 37,000.00 |
| Cheque | 03/28/2013 | 361 | Funds transfer | Julius Baer - USD | 3,500.00 | 40,500.00 |
| Cheque | 04/03/2013 | 367 | Funds transfer | Julius Baer - USD | 3,500.00 | 44,000.00 |
| Cheque | 04/08/2013 | 370 | Funds transfer | Julius Baer - USD | 3,500.00 | 47,500.00 |
| Total Leoncio Carrion | | | | | 47,500.00 | 47,500.00 |

**Luis Leggarrea**

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 05/25/2012 | 56 | Funds advance | CBH -GBP | 9,334.62 | 9,334.62 |
| Cheque | 05/28/2012 | 66 | Funds transfer | CBH - USD | 8,200.00 | 17,534.62 |
| Cheque | 10/28/2012 | 96 | Funds transfer | CBH - USD | 9,000.00 | 26,534.62 |
| Cheque | 11/23/2012 | 86 | Funds transfer | CBH -GBP | 9,204.24 | 35,738.86 |
| Total Luis Leggarrea | | | | | 35,738.86 | 35,738.86 |

**Rebecca Tassi**

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 06/30/2010 | 56 | Funds transfer | Julius Baer - USD | 6,000.00 | 6,000.00 |
| Cheque | 06/15/2011 | 139 | Funds transfer | Julius Baer - USD | 6,000.00 | 12,000.00 |
| Cheque | 09/22/2011 | 172 | Funds transfer | Julius Baer - USD | 9,000.00 | 21,000.00 |
| Cheque | 10/03/2011 | 176 | Rebecca Tassi | Julius Baer - USD | 9,000.00 | 30,000.00 |
| Cheque | 10/20/2011 | 187 | Funds transfer | Julius Baer - USD | 9,000.00 | 39,000.00 |
| Cheque | 11/09/2011 | 195 | Funds transfer | Julius Baer - USD | 9,000.00 | 48,000.00 |
| Cheque | 02/10/2012 | 216 | Funds transfer | Julius Baer - USD | 5,000.00 | 53,000.00 |
| Cheque | 04/03/2012 | 228 | Funds transfer | Julius Baer - USD | 9,000.00 | 62,000.00 |
| Cheque | 04/04/2012 | 231 | Funds transfer | Julius Baer - USD | 8,000.00 | 70,000.00 |
| Cheque | 04/05/2012 | 232 | Funds transfer | Julius Baer - USD | 7,000.00 | 77,000.00 |
| Cheque | 04/17/2012 | 234 | Funds transfer | Julius Baer - USD | 7,000.00 | 84,000.00 |
| Cheque | 01/10/2013 | 319 | Contribution to house rep: | Julius Baer - USD | 13,619.00 | 97,619.00 |
| Cheque | 02/06/2013 | 332 | Contibution to property ex | Julius Baer - USD | 4,230.00 | 101,849.00 |

CAPLIN0024857
USPROD-02361058

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 03/28/2013 | 364 | Funds transfer | Julius Baer - USD | 2,000.00 | 103,849.00 |
| Cheque | 05/02/2013 | 379 | Funds transfer | Julius Baer - USD | 2,000.00 | 105,849.00 |
| Cheque | 05/09/2013 | 383 | Property expenses | Julius Baer - USD | 2,333.00 | 108,182.00 |
| Cheque | 06/03/2013 | 390 | Funds transfer | Julius Baer - USD | 2,000.00 | 110,182.00 |
| Cheque | 05/17/2013 | 397 | Property expenses | Julius Baer - USD | 1,700.00 | 111,882.00 |
| Cheque | 06/28/2013 | 406 | Funds transfer | Julius Baer - USD | 2,000.00 | 113,882.00 |
| Cheque | 07/02/2013 | 407 | Funds transfer | Julius Baer - USD | 2,000.00 | 115,882.00 |
| Cheque | 07/30/2013 | 413 | Funds transfer | Julius Baer - USD | 4,000.00 | 119,882.00 |
| Cheque | 08/23/2013 | 423 | Funds transfer | Julius Baer - USD | 4,000.00 | 123,882.00 |
| Cheque | 10/31/2013 | 439 | Funds transfer | Julius Baer - USD | 4,000.00 | 127,882.00 |
| Cheque | 11/29/2013 | 459 | Funds transfer | Julius Baer - USD | 4,000.00 | 131,882.00 |
| Cheque | 12/23/2013 | 470 | Funds transfer | Julius Baer - USD | 4,000.00 | 135,882.00 |
| Cheque | 02/04/2014 | 486 | Funds transfer | Julius Baer - USD | 4,000.00 | 139,882.00 |
| Cheque | 02/27/2014 | 493 | Funds transfer | Julius Baer - USD | 4,000.00 | 143,882.00 |
| Cheque | 03/31/2014 | 507 | Funds transfer | Julius Baer - USD | 4,000.00 | 147,882.00 |
| Cheque | 05/05/2014 | 142 | Funds transfer | CBH - USD | 4,000.00 | 151,882.00 |
| Cheque | 05/28/2014 | 152 | Funds transfer | CBH - USD | 4,000.00 | 155,882.00 |
| Cheque | 06/26/2014 | 160 | Funds transfer | CBH - USD | 4,000.00 | 159,882.00 |
| Cheque | 07/24/2014 | 170 | Funds transfer | CBH - USD | 4,000.00 | 163,882.00 |
| Cheque | 08/21/2014 | 174 | Funds transfer | CBH - USD | 4,000.00 | 167,882.00 |
| Cheque | 09/25/2014 | 178 | Funds transfer | CBH - USD | 4,000.00 | 171,882.00 |
| Cheque | 10/22/2014 | 184 | Funds transfer | CBH - USD | 4,000.00 | 175,882.00 |
| Cheque | 11/28/2014 | 188 | Funds transfer | CBH - USD | 4,000.00 | 179,882.00 |
| Cheque | 12/22/2014 | 195 | Funds transfer | CBH - USD | 4,000.00 | 183,882.00 |
| Cheque | 01/28/2015 | 203 | Monthly funds trasnfer | CBH - USD | 4,000.00 | 187,882.00 |
| Cheque | 02/26/2015 | 207 | Monthly funds transfer | CBH - USD | 4,000.00 | 191,882.00 |
| Cheque | 03/26/2015 | 213 | Monthly funds transfer | CBH - USD | 4,000.00 | 195,882.00 |
| Cheque | 04/27/2015 | 219 | Monthly funds transfer | CBH - USD | 4,000.00 | 199,882.00 |
| Total Rebecca Tassi | | | | | 199,882.00 | 199,882.00 |

All of the above payments relate to Rebecca Tassi - either paid to her, her husband or accounts controlled by her

**Sunage Foundation**

**Robert Edelman**

| | | | | | | |
|---|---|---|---|---|---|---|
| Cheque | 05/14/2012 | 243 | Funds transfer | Julius Baer - USD | 8,500.00 | 8,500.00 |
| Total Robert Edelman | | | | | 8,500.00 | 8,500.00 |

This relates to one payment to DE's brother shortly before Roberts death.

CAPLIN0024859
USPROD-02361060

**Sunage Foundation**

**Family payments**
**Year ended 31 December 2009**

|  |  | Rivkah | China | Gregory | Josef | Rebecca |
|---|---|---|---|---|---|---|
| 2.2.09 | Julius Baer | 5,850.00 | 4,000.00 | 2,000.00 | 600.00 | 500.00 |
| 28.2.09 | Julius Baer | 3,500.00 | 3,000.00 | 2,000.00 | 600.00 | 500.00 |
| 31.3.09 | Julius Baer | 3,500.00 | 3,000.00 | 2,000.00 | 600.00 | 500.00 |
| 30.4.09 | Julius Baer | 3,500.00 | 3,000.00 | 2,000.00 | 600.00 | 500.00 |
| 7.7.09 | BNP | 3,500.00 | 3,500.00 | 2,000.00 | 2,000.00 | 500.00 |
| 30.7.09 | BNP | 4,000.00 | 3,500.00 | 2,000.00 | 2,500.00 | 500.00 |
| 2.10.09 | Julius Baer | 4,000.00 | 3,500.00 | 2,000.00 | 2,500.00 | 500.00 |
| 3.11.09 |  | 4,000.00 | 3,500.00 | 2,000.00 | - |  |
| 23.10.09 |  | 4,000.00 |  |  |  |  |
| 2.12.09 |  | 4,000.00 | 3,500.00 | 2,000.00 |  |  |
| 28.12.09 |  | 5,000.00 | 4,500.00 | 3,000.00 |  | 1,000.00 |
|  |  | 44,850.00 | 35,000.00 | 21,000.00 | 9,400.00 | 4,500.00 |

|  |  |  |
|---|---|---|
| **Total** | 114,750.00 |  |

Delphine - €200,000 paid from JB on 31.1.09 (to Ibiza account)

Confidential

Ex.004-5.0364

CAPLIN0024860
USPROD-02361061

**Bartol Limited/Aspen Wind Corporation**                                    **Schedule 11**

**Family payments**
**Year ended 31 December 2008**

(all USD)

| | Rickvah Edelman | China Edelman | Joe Edelman | Gregory Edelman | Rebecca Tassi | Mikhail Tassi |
|---|---|---|---|---|---|---|
| January | | | 5,000.00 | | | |
| | 3,500.00 | 3,000.00 | 2,500.00 | 1,000.00 | 500.00 | |
| February | 4,500.00 | 4,000.00 | 3,500.00 | 2,000.00 | 500.00 | |
| March | 3,500.00 | 3,000.00 | 2,500.00 | 1,000.00 | 500.00 | |
| April | 3,500.00 | 2,000.00 | 2,500.00 | 1,000.00 | 500.00 | |
| May | 3,500.00 | 3,000.00 | 2,500.00 | 1,000.00 | 500.00 | |
| June | 3,500.00 | 3,000.00 | 2,500.00 | 1,000.00 | 500.00 | |
| July | 3,500.00 | 3,000.00 | 2,500.00 | 1,000.00 | 500.00 | 20,000.00 |
| August | 3,500.00 | 3,000.00 | 600.00 | 1,000.00 | 500.00 | |
| | | | | | 5,000.00 | |
| September | 3,500.00 | 3,000.00 | 600.00 | 1,000.00 | 500.00 | 9,000.00 |
| October | 3,500.00 | 3,500.00 | 1,000.00 | 2,000.00 | 500.00 | |
| | | | 1,000.00 | | 2,000.00 | |
| November | 3,500.00 | 3,000.00 | 600.00 | 2,000.00 | 2,500.00 | |
| December*** | 3,500.00 | 3,000.00 | 600.00 | 2,000.00 | 2,500.00 | |
| | 43,000.00 | 36,500.00 | 27,900.00 | 16,000.00 | 17,000.00 | 29,000.00 |

169,400.00

*** - paid end November before closure of CS accounts)

Confidential

Ex.004-5.0365

CAPLIN0024861
USPROD-02361062

( Mirabaud )

## Enhanced Due Diligence Profile

| | |
|---|---|
| **Name of client** | Delphine Le Dain Edelman (**DLD**) |
| **Relationship Manager** | Viorel Campeanu/Andrew Schildbach (**VC/AS**) |
| **Account name** | |
| **Nationality of Client** | French |
| **Domicile of Client** | |
| **Booking centre** | |
| **Expected AUM** | |
| **Expected revenues** | |
| **Related Clients** | |

DLD has been a client of VC/AS since 2008. DLD and her young children, M███ J██ and P███ are the beneficiaries of a private trust which has interests in commodity trading and media companies run by professional managers out of Dubai. Total wealth of the client is difficult to judge given the nature of the business (various parts are difficult to value), however, we conservatively estimate DLD's net worth at USD400mn, with perhaps USD100mn in liquid assets; however a lot of the wealth is tied up in non-liquid assets, e.g. not easily marketable land and proprietary technology. Annual income estimated at USD20-40mn, although this may vary with cashflow/investment requirements of the underlying companies and securities investments.

DLD's husband, Douglas Edelman, is a US citizen (retired). His wife consults him on various strategic business matters (technical matters, business contacts, etc), but neither is involved in the management (or decision making) of any trading entities and Douglas is not a beneficiary of any of DLD's assets. The trading businesses are exclusively conducted outside the US.

DLD's family have multiple luxury residences – we are aware of two in London, one in France and another one in Ibiza.

DLD and her husband are part resident in London.

The wealth of DLD stems from a variety of businesses in the developing world including those related to various civil support/contractor functions for the US government (civilian functions only):

- Telecommunications, especially the provision of satellite mobile telephony and internet in countries and areas with poor infrastructure and sparse mobile coverage; the company installs and maintains wi-fi type units with satellite connectivity in central Asia, esp. Tajikistan, Kyrgyzstan and Uzbekistan.

- MTV-licensed business and programming in South-Eastern Europe. A number of companies hold broadcasting licences in the Czech Republic and the countries of the former Yugoslavia. There are additional interests in film production.

1

Ex.004-5.0366

CAPLIN0024862
USPROD-02361063

- Advertising and communications. A number of companies providing telecommunications and billboard and other advertising investments in Africa.

- Energy – the company provides and maintains oil storage facilities. DLD has contracts to deliver oil to the US army.

- Construction – there is a unit that builds telecom and energy facilities (e.g. transmitters/fuel depots; occasional construction is undertaken for the US army (e.g. accommodation, etc).

- Real Estate – DLD has used her inheritance to invest in properties in the UK, Spain and France, now estimated at USD40-50mn.

- Equity holdings: over the years DLD has accumulated substantial investment portfolios.

Part of the source of funds is contracts with the US government entities, whereby our client provides non-military services (jet fuel, diesel, facility maintenance) to the US entities outside the US territory.

The nature of contracts is subject to the confidentiality agreement with the US government and therefore not subject to disclosure. However, we have been provided with an estimate of existing annual contract values of approximately USD688mn for jet and diesel fuel.

The client recognised the need to show additional evidence of the source of funds; not being able to provide further detail with respect to the above, the client has provided us with solid additional information/KYC on other businesses not subject to confidentiality agreements.

Further, we have been provided with strong additional KYC evidencing other substantial cash-generating underlying businesses controlled by DLD:

- Detailed description of the holding structure of the business and the nature of activities of the entities within the structure including major trading activities in fuel distribution/delivery and media and telecom investments. Further information has been provided with respect to other structures within the holding, including MTV interests, venture capital investments, and film production investments.
- The disclosure of the facts above has been backed up by the provision of contracts/business receipts for the underlying business (jet fuel receipts, telecom-related payments, venture capital presentations, and MTV/digital services/film contracts).

VC/AS operated a number of accounts for DLD:
1) Sunage Foundation – used to accumulate profits from the business (average AUM USD40mn) with a loan of GBP22mn to support an FX strategy; *Details to follow;*
2) The trust account operated by EFG Trust Company Limited – with a purpose to provide for DLD's children.
3) Satellite Support Services Limited – a trade account for one of DLD's companies. This account housed a guarantee to a third party to support the client's trading business.
4) DLD's personal spending account.

In April 2010 DLD acquired a London property worth GBP27mln and financed it through a loan.

2

CAPLIN0024863
USPROD-02361064

**Origin of Wealth**

Delphine's father began transferring his real estate assets to Delphine in the late 1990s. Having got an MBA and other analytical education/training, she was ready and invested the money wisely into luxury real estate in Western Europe, quickly trading up the property ladder.

She also invested in a couple of successful private equity projects which have now been united under one corporate umbrella managed professionally out of the Dubai International Trade Zone, to which DLD moved the HQ. For example in Kyrgyzstan the client co-invested in a project that takes advantage of a US satellite in the region, which provides telephone and broadband internet to private and business users in the region by installing a briefcase size unit in the office.

This is also how she met and married (in 2000) her husband. They now have three children. Although DLD is still a principal investor in the business, because of her commitments to the children the management of the business activities has been delegated to professionals.

Total number of employees is currently around 1000 people, located around offices in Dubai and continental and Eastern Europe as well as Central Asia. DLD keeps a low profile – at the moment all of her businesses are registered separately evidencing their emergence from a number of separate real estate/private equity undertakings.

Our analysis of the current level of the client's wealth based on the information provided by the client (business invoices and contracts) shows that the returns generated on DLD's core commodity trading and financing business are 8-11% per quarter, or close to 40% annualised (these returns disregard the less profitable parts of the client's business – e.g. film/media finance and private equity/telecoms).

Discounting the current estimated wealth (USD500mn) of the client by these (leveraged) returns over 20 years gives the initial capital base of just USD 600,000 – well within the reasonable reach of an educated entrepreneur.

Our relationship over the years with the client confirms the continuous reinvestment nature of the client's business – this client does not keep excess cash or accumulate financial resources as almost all wealth that is generated is ploughed back into the businesses and real estate. This is evidenced by the history of our accounts (over USD50mn in business dividends/profits came in 2010, almost all of this has been reinvested). We have also met the top management of the business and can confirm the highly professional/corporate nature of the business.

Further, we have documented knowledge that major international trade banks (BNP Paribas, Société Générale, and Macquarie) have been providing loans and leverage to facilitate this client's business.

Therefore we can conclude that the leveraged capital base required to start and begin to grow this trading business over 15-20 years is well within the reach of an educated entrepreneur. Additional attention must be paid to the fact that DLD does not run her business – it is a portfolio of trading and investment entities (approximately 1,000+ employees) run by professional managers.

**Summary of key media facts:**

- The company of the client is a vendor of jet fuel to US Airforce/NATO forces.
- These and various other contracts with the US government entities were first won beginning 2003.

3

CAPLIN0024864
USPROD-02361065

- Non-jet fuel business in region includes WIFI services, advertising, mineral water, IT services, recruitment, rehabilitation and construction of civil, social and infrastructure projects in the region.
- There were allegations that the jet fuel businesses were paying kickbacks to the regime in Kyrgyzstan. These allegations were investigated by a subcommittee of the US Congress which found no substantiation for such allegations. It was announced by the US Ambassador to Kyrgyzstan Tatiana Groeller that the investigation was complete and it did not find any evidence to back up the allegations.
- The US Embassy in Kyrgyzstan stated that the fuel supply contract 'was awarded ... in accordance with both US and Kyrgyz law'.
- The client's companies are fully approved defence contractors for the US military supply organisation, the Defence Logistics Agency.
- US Defence Department stating that these jet fuel contracts are 'crucial for the US effort in Afghanistan'.
- Pentagon has praised the client's companies for providing 'reliable fuel deliveries'.
- The new interim government of Kyrgyzstan stating that it would honour the lease on its territory of the US base to which the jet fuel deliveries are being made by the client. The Kyrgyz President stated clear intention to extend the use of the base for the US and NATO troops.

However:

- Moscow is trying to lean on Kyrgyzstan to throw out American contractors so that jet fuel can be supplied by a joint venture between the new Kyrgyz government and the Russian Gazpromneft. There is also Russian animosity towards US military presence in the former Soviet Union's backyard. The Kyrgyz President said that the private jet fuel supplies should be replaced by the Russian-Kyrgyz joint venture (meeting with the Russian President).
- Pentagon, ignoring Kyrgyz hostility towards private contractors, has opened bidding on a new jet fuel contract and the company of our client has been once again invited to participate. Current contracts are in place until 2014, with further renewals/extensions likely into 2015 and possibly beyond.

Key facts:

The company of our client is a fully approved contractor for the US Government/NATO with a long, verified and reputable business history.
Allegations against our client have not been substantiated.
The source of the allegations was the new Kyrgyz government which, together with the Russians (who supported the new regime in coming to power), was trying to muscle in on the business of supplying jet fuel to the Americans in the region. It is telling that the new government wants the Americans to stay; however, it also wants, together with the Russians, to be the only supplier of jet fuel in the region. In the meantime, the client's companies are actively seeking new business opportunities and diversification in current areas of operation which will require significant further investment.

4

INDIVIDUALS                                                                 (JULY 2008)

## ASSETS AND INCOME SUBJECT TO UNITED STATES WITHHOLDING TAX
DECLARATION OF NON-U.S. STATUS[1]

CLIENT NUMBER ....................................................    PORTFOLIO NUMBER(S) ....................................................

NAME OF PORTFOLIO HOLDER[2]  DELPHINE  LE  NAIN

CITIZENSHIP(S)  FRENCH

PERMANENT RESIDENCE ADDRESS[3]  ▯▯▯▯▯▯▯▯▯▯▯▯   17314  IBIZA

In relation to the requirements imposed by the United States Withholding Tax Regulations and by the Qualified Inter-
mediary Agreement the Bank has concluded with the U.S. Internal Revenue Service ("IRS"), the undersigned portfolio
holder hereby gives the Bank the following information relating to the ownership of assets held in the portfolio(s)
related to the above-mentioned client number.
This form should enable the Bank
1.  to ascertain whether an portfolio holder is or is not a "U.S. Person" and
2.  to determine whether the portfolio holder intends to claim the benefits of an Income Tax
    Treaty, if any, between the U.S. and the portfolio holder's country of tax residence.

## I.  DECLARATIONS

A.  "Non-U.S. Person" Declaration
    (Please check all the applicable boxes below)

    1.  Are you a United States citizen (sole or multiple citizenship)?                    ☑ No    ☐ Yes

    If the answer to Question 1 is "No", please answer the following questions:

    2.  Are you a U.S. resident for U.S. Income Tax Purposes?                              ☑ No    ☐ Yes
        (Are you a lawful permanent resident ("green card" holder) not eligible for treaty protection or do you otherwise qualify as an income tax resident of the U.S.
        under the "substantial presence test"?)

    3.  Are you subject to U.S. income tax on a basis other than that applicable
        to non-residents for any other reason?                                            ☑ No    ☐ Yes
        (As an example, are you a dual tax resident? Have you elected to be treated as a resident of the U.S. for any purposes, including an election to "file jointly" with
        a U.S. citizen spouse? Have you expatriated or given up your «green card» during the last ten years and are you subject to special "sourcing rules"?)

    If you have answered "Yes" to any of the above questions, disregard this Form and submit a duly completed and
    signed IRS Form W-9.

B.  "No Effectively Connected Income" Declaration
    The undersigned portfolio holder hereby declares that the income to which this Form relates is not effectively connected with the conduct of a trade or business in the U.S.

C.  "Beneficial Owner" Declaration
    The undersigned portfolio holder declares that, according to U.S. tax principles, he is the beneficial owner of all assets and income to which this Form relates.

## II.  DISCOVERY OF STATUS AS A "U.S. PERSON" / AGREEMENT TO SELL U.S. SECURITIES
UNDER DEDUCTION OF BACKUP WITHHOLDING TAX

–   If the declarations made above become invalid after the filing of this Form with the Bank due to: (i) a change in the portfolio holder's
    status from "non-U.S. Person" to "U.S. Person": (ii) a late discovery of the fact that, notwithstanding this Form, the
    portfolio holder's status has been misrepresented, and

–   If, on or after January 1, 2001, the portfolio holder fails to submit a valid IRS Form W-9 to the Bank,

the portfolio holder hereby irrevocably agrees that the Bank has the right, without prior notice, to sell all U.S. invest-
ments held (or considered to be held) in the above-mentioned portfolio(s) and to deduct and pay to the IRS a Backup
Withholding Tax of 28% (or the then applicable rate) on the income and the gross sale proceeds of such investments, as
provided for under the Qualified Intermediary Agreement concluded between the Bank and the IRS[4], and the portfolio
holder agrees that the Bank may not invest in U.S. investments on the portfolio holder's behalf.

[1] The present Form will be kept in the records of the Bank
[2] Joint portfolio holders have to complete and sign separate forms
[3] Do not use a P.O. Box, or a "in care of" address
[4] Remittance of Backup Withholding Tax to the IRS will be done without disclosure of the identity of the portfolio holder
    to the U.S. Withholding Agent or the IRS, as expressly foreseen by the Qualified Intermediary Agreement.

E - 05 2010                                                                                   24a

Confidential                                              Ex.004-5.0370                      CAPLIN0024866
USPROD-02361067

The undersigned portfolio holder hereby expressly releases the Bank from any liability in respect of the sale of his U.S. investments and in respect of the Bank ceasing further U.S. investments pursuant to the application of this provision and undertakes to indemnify the Bank for any liability incurred under the U.S. tax rules or under the Qualified Intermediary Agreement in connection with the Bank's late discovery of the client's status as a U.S. Person.

## III. ASSETS AND INCOME SUBJECT TO UNITED STATES WITHHOLDING TAX

### Application of income tax treaty relief

The undersigned portfolio holder declares that he wishes to claim the benefits of the applicable income Tax Treaty:

 No

☐ Yes   By checking this box, the undersigned confirms that he meets all the provisions that are necessary to claim a reduced rate of withholding on all assets and all income to which this Declaration relates under the applicable income Tax Treaty between the United States and the country of his permanent residence.

## IV. CHANGE IN CIRCUMSTANCES

During the contractual relationship with the Bank, the undersigned portfolio holder undertakes to inform the Bank, **at his own initiative and within 30 days,** of any change in circumstances which, under applicable U.S. Tax regulations, modifies his residence, citizenship or treaty eligibility, including a change in status that would alter a response under Part I of this Declaration.

**The undersigned certifies that: (i), if necessary, he has taken appropriate tax advice in the U.S. and in his country of residence or country of treaty eligibility on the issues covered herein, in particular in order to be able to confirm that he meets the conditions allowing him to claim Treaty benefits, (ii), to best of his knowledge and belief, the information contained herein is true, correct and complete and (iii) no contrary information has, directly or indirectly, been provided to the Bank or to any of its officers, employees or agents.**

Date   *7 November 2013*          Signature(s)

**APOSTILLE**

(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

**UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND**

1.  Country:  United Kingdom of Great Britain and Northern Ireland
    Pays:  Royaume-Uni de Grande-Bretagne et d'Irlande du Nord
    This public document / Le présent acte public

2.  Has been signed by       **Pawel K Salinger**
    a été signé par

3.  Acting in the capacity of  **Notary Public**
    agissant en qualité de

4.  Bears the seal/stamp of   **The Said Notary Public**
    est revêtu du sceau/timbre de

                                            Certified/Attesté

5.  at London/à Londres                    6.  the/le  **05 March 2012**

7.  by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
    par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8.  Number/sous No   **J163747**

9.  Stamp:                                  10.  Signature:  S Rapp
    timbre:



                        For the Secretary of State / Pour le Secrétaire d'Etat

**If this document is to be used in a country which is not party to the Hague Convention of 5th October
1961, it should be presented to the consular section of the mission representing that country.**

An apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is
genuine. It does not mean that the content of the document is correct or that the Foreign &
Commonwealth Office approves of the content.

Ex.004-5.0372

CAPLIN0024868
USPROD-02361069

**AFFIDAVIT**

I, DELPHINE ANNE LE DAIN of ▇▇▇▇▇▇▇ London W8 6TP, United Kingdom MAKE OATH AND SAY:

1.  I am a citizen of France, and I am resident, but not domiciled in the United Kingdom.

2.  I have direct knowledge of the matters to which I hereafter swear, except where otherwise indicated. Where I have obtained facts from other sources, I believe those facts to be true.

3.  Prior to 3 June 2004, I set up a business together with a third party (unrelated) partner. The business was operated as an equal partnership with each partner being the owner of 50% of the assets and profits of the business.

4.  On 3 June 2004, I (together with the third party partner) gave instructions for a new company to be incorporated in Gibraltar named Red Star Enterprises Limited ('RSEL'), with Jesse Grant Hester of Cyprus as initial sole director, and David Pearlman and Anthony Joseph Smith as initial co-secretaries. The aforesaid business was transferred to RSEL and shares were issued to me and the third party partner in equal proportions so as to reflect the same ownership as before. From inception, I have had my shares held on my behalf by nominees (first my husband, and thereafter by a nominee company)

5.  I have been the beneficial owner of 50% of the shares in RSEL from 3 June 2004 (until I transferred my interest in April 2008 to a Private Interest Foundation incorporated under the laws of Panama. I am the founder and principal beneficiary of the Foundation. The third party owner remains the beneficial owner of the residual 50% of the shares in RSEL.

6.  I contributed my own capital and assets to the company in consideration for my 50% ownership in RSEL.

7.  All income and gains earned with respect to my 50% ownership in RSEL over time was owned by me as the ultimate beneficial owner.

8.  At all times since 3 June 2004, my shares in RSEL have been held for, and on my behalf, by nominees.

SWORN by DELPHINE ANNE LE DAIN   )

at Kensington, London,   )

this 29th day of February 2012   )

Before me,

Notary Public

PAWEL K. SALINGER
NOTARY PUBLIC
15 KENSINGTON HIGH STREET
LONDON W8 5NP
ENGLAND

Confidential

Ex.004-5.0373

CAPLIN0024869
USPROD-02361070

TERRITORY OF THE BRITISH VIRGIN ISLANDS
BVI BUSINESS COMPANIES ACT, 2004

CERTIFICATE OF CHANGE OF NAME
(Section 21)

The REGISTRAR OF CORPORATE AFFAIRS of the British Virgin Islands HEREBY CERTIFIES that, pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of a change of name having been complied with

Satelite Support Services LTD

BVI COMPANY NUMBER 1485524

which was incorporated in the British Virgin Islands under the BVI Business Companies Act, 2004, on the 5th day of June, 2008 has changed its name to

SATELLITE SUPPORT SERVICES LTD

this 26th day of June, 2008.



CERTIFIED A TRUE COPY
Icaza, Gonzalez-Ruiz & Aleman (BVI) Trust
Limited, as Registered Agent of
SATELLITE SUPPORT SERVICES LTD

Date   July 7, 2014

Signature

*for* REGISTRAR OF CORPORATE AFFAIRS
26th day of June, 2008

Confidential

CAPLIN0024870
USPROD-02361071

Yo, RICARDO A. LANDERO M., Notario Público Décimo
del Circuito de Panamá, con Cedula No. 4-103-2337

CERTIFICO:

Que la(s) firma(s) anterior(es) ha(n) sido reconocida(s)
como suya(s) por los firmantes, por consiguiente,
dicha(s) firma(s) es (son) auténtica(s).

Panamá........................................ 1 1 JUL 2014

Testigo                              Testigo

RICARDO A. LANDERO M.
Notario Público Décimo

APOSTILLE

Convention de la haye du 5 de octubre 1961

1 Pais PANAMÁ.
El presente documento público )
2 ha sido firmado por ..................................
3 quien actúa en calidad ............................
4 y está revestido del sello/timbre de ..........

CERTIFICADO                    1 4 JUL 2014

5 EN Panamá ........................ 5 de ..................
" por DIRECCION ADMINIST........YA
8 Bajo el número ......... 40,737

Esta Autorización no
no implica responsabilidad
asi como el contenido

CAPLIN0024871
USPROD-02361072



REPÚBLICA DE PANAMÁ
NOTARÍA DECIMA DEL CIRCUITO

Yo, RICARDO A. LANDERO M., Notario Público Décimo
del Circuito de Panamá, con Cédula no. 4-103-2337
CERTIFICO:
Que la(s) firma(s) autoriza(da) fué(ron) reconocida(s)
como suya(s) por la(s) firmante(s), por consiguiente, dicha(s)
firma(s) es (son) auténtica(s).

Panamá, _____ 11 JUL 2014

Nº _____    Testigo

CERTIFIED **A TRUE COPY**
Icaza, González-Ruiz & Alemán (BVI) Trust
Limited, as Registered Agent of
SATELLITE SUPPORT SERVICES LTD

Date: July 7, 2014
Signature: _____

British Virgin Islands
BVI Business Companies Act, 2004

Memorandum of Association
and
Articles of Association
of

**SATELLITE SUPPORT SERVICES LTD**

A COMPANY LIMITED BY SHARES

Incorporated the 5th day of June, 2008

**ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED**
P.O. Box 3175
Road Town, Tortola
British Virgin Islands

REPÚBLICA DE PANAMÁ
* TIMBRE NACIONAL *
14 07 14
B./0.00
PA.1109
121
1860
4508

CAPLIN0024872
USPROD-02361073

Convencion de la Haya de 5 ... ... *
1 Pais PANAMÁ.
El presente documento públ...
2 ha sido firmado por... *Alejandro O. Carles*
3 quien actua en calidad.... *Director*
4 y esta revestido del sello/timbre ... *$.*

CERTIFICADO     1 4 JUL 2014     Esta Autorización no
                                  no implica responsabilidad
                                  en cuanto el contenido
5 En Panamá ............... 5 le...           del documento
7 por DIRECCION ADMINIST........
8 Bajo el número... *40735*
9 Sello/timbre  10 Firma  *Miguel De Leto*

CAPLIN0024873
USPROD-02361074

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE BVI BUSINESS COMPANIES ACT 2004

MEMORANDUM OF ASSOCIATION

OF

SATELLITE SUPPORT SERVICES LTD

A COMPANY LIMITED BY SHARES

## 1.   DEFINITIONS AND INTERPRETATION

1.1.   In this Memorandum of Association and the attached Articles of Association, if not inconsistent with the subject or context:

"Act" means the BVI Business Companies Act (No. 16 of 2004) and any modification, extension, re-enactment or renewal thereof and any amendments thereto and any regulations made thereunder;

"Articles" means the attached Articles of Association of the Company;

"Chairman of the Board" has the meaning specified in Regulation 12;

"Distribution" in relation to a distribution by the Company means:

(i)      the direct or indirect transfer of an asset, other than Shares, to or for the benefit of the Shareholder in relation to Shares held by a Shareholder; or

(ii)     the incurring of a debt to or for the benefit of a Shareholder,

in relation to Shares held by a Shareholder, and whether by means of a purchase of an asset, the redemption or other acquisition of Shares, a distribution of indebtedness or otherwise, and includes a dividend;

"Eligible Person" means individuals, corporations, trusts, the estates of deceased individuals, partnerships and unincorporated associations of persons;

"Memorandum" means this Memorandum of Association of the Company;

"Resolution of Directors" means either:

(a)      a resolution approved at a duly convened and constituted meeting of directors of the Company or of a committee of directors of the Company by the affirmative vote of a majority of the directors present at the meeting who voted except that where a director is given more than one vote, he shall be counted by the number of votes he casts for the purpose of establishing a majority; or

(b)      a resolution consented to in writing by all directors or by all members of a committee of directors of the Company, as the case may be;

CAPLIN0024874
USPROD-02361075

- 2 -

"**Resolution of Shareholders**" means either:

(a)   a resolution approved at a duly convened and constituted meeting of the Shareholders of the Company by the affirmative vote of a majority of the votes of the Shares entitled to vote thereon which were present at the meeting and were voted; or

(b)   a resolution consented to in writing by a majority of the votes of Shares entitled to vote thereon;

"**Seal**" means any seal which has been duly adopted as the common seal of the Company;

"**Securities**" means Shares and debt obligations of every kind of the Company, and including without limitation options, warrants and rights to acquire shares or debt obligations;

"**Share**" means a share issued or to be issued by the Company;

"**Shareholder**" means an Eligible Person whose name is entered in the register of members of the Company as the holder of one or more Shares or fractional Shares;

"**Treasury Share**" means a Share that was previously issued but was repurchased, redeemed or otherwise acquired by the Company and not cancelled; and

"**written**" or any term of like import includes information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange, electronic mail, telegram, telex or telecopy, and "in writing" shall be construed accordingly.

1.2.   In the Memorandum and the Articles, unless the context otherwise requires a reference to:

(a)   a "**Regulation**" is a reference to a regulation of the Articles;

(b)   a "**Clause**" is a reference to a clause of the Memorandum;

(c)   voting by Shareholders is a reference to the casting of the votes attached to the Shares held by the Shareholder voting;

(d)   the Act, the Memorandum or the Articles is a reference to the Act or those documents as amended; and

(e)   the singular includes the plural and vice versa.

1.3.   Any words or expressions defined in the Act unless the context otherwise requires bear the same meaning in the Memorandum and Articles unless otherwise defined herein.

1.4.   Headings are inserted for convenience only and shall be disregarded in interpreting the Memorandum and Articles.

2.   **NAME**

The name of the Company is **SATELLITE SUPPORT SERVICES LTD**

Confidential

CAPLIN0024875
USPROD-02361076

- 3 -

3.    **STATUS**

The Company is a company limited by shares.

4.    **REGISTERED OFFICE AND REGISTERED AGENT**

4.1.    The first registered office of the Company is at the offices of Aleman, Cordero, Galindo & Lee Trust (BVI) Limited, P.O. Box 3175, Road Town, Tortola, British Virgin Islands, the office of the first registered agent.

4.2.    The first registered agent of the Company is Aleman, Cordero, Galindo & Lee Trust (BVI) Limited of P.O. Box 3175, Road Town, Tortola, British Virgin Islands.

5.    **CAPACITY AND POWERS**

5.1.    Subject to the Act and any other British Virgin Islands legislation, the Company has, irrespective of corporate benefit:

(a)    full capacity to carry on or undertake any business or activity, including trading of any commodities or goods, do any act or enter into any transaction; and

(b)    for the purposes of paragraph (a), full rights, powers and privileges.

5.2    For the purposes of section 9(4) of the Act, there are no limitations on the business that the Company may carry on.

6.    **NUMBER AND CLASSES OF SHARES**

6.1.    The Company is authorised to issue 50,000 shares of US$1.00 par value each of a single class.

6.2.    The Company may issue fractional shares. A fractional Share shall have the corresponding fractional rights, obligations and liabilities of a whole share of the same class or series of shares.

7.    **DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES**

7.1    Each Share in the Company confers upon the Shareholder:

(a)    the right to one vote at a meeting of the Shareholders of the Company or on any Resolution of Shareholders;

(b)    the right to an equal share in any dividend paid by the Company; and

(c)    the right to an equal share in the distribution of the surplus assets of the Company on its liquidation.

7.2    The directors may at their discretion by Resolution of Directors redeem, purchase or otherwise acquire all or any of the Shares in the Company subject to Regulation 3 of the Articles.

Ex.004-5.0380

CAPLIN0024876
USPROD-02361077

- 4 -

**8.    VARIATION OF RIGHTS**

The rights attached to Shares as specified in Clause 7 may only, whether or not the Company is being wound up, be varied with the consent in writing of or by a resolution passed at a meeting by the holders of more than 50 per cent of the issued Shares of that class.

**9.    RIGHTS NOT VARIED BY THE ISSUE OF SHARES PARI PASSU**

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the Shares of that class, be deemed to be varied by the creation or issue of further Shares ranking *pari passu* therewith.

**10.    REGISTERED SHARES**

10.1    The Company shall issue registered shares only.

10.2    The Company is not authorised to issue bearer shares, convert registered shares to bearer shares or exchange registered shares for bearer shares.

**11.    TRANSFER OF SHARES**

11.1    The Company shall, on receipt of an instrument of transfer complying with Sub-Regulation 6.1 of the Articles, enter the name of the transferee of a Share in the register of members unless the directors resolve to refuse or delay the registration of the transfer for reasons that shall be specified in a Resolution of Directors.

11.2    The directors may not resolve to refuse or delay the registration of a transfer of a Share unless the transferor thereof has failed to pay an amount due in respect of the Share.

**12.    AMENDMENT OF MEMORANDUM AND ARTICLES**

Subject to Clause 8, the Company may amend its Memorandum or Articles by a Resolution of Shareholders or by a Resolution of Directors, save that no amendment may be made by a Resolution of Directors:

(a)    to restrict the rights or powers of the Shareholders to amend the Memorandum or Articles;

(b)    to change the percentage of Shareholders required to pass a Resolution of Shareholders to amend the Memorandum or Articles;

(c)    in circumstances where the Memorandum or Articles cannot be amended by the Shareholders; or

(d)    to Clauses 7, 8 or 9 or this Clause 12.

Confidential

Ex.004-5.0381

CAPLIN0024877
USPROD-02361078

- 5 -

We, Aleman, Cordero, Galindo & Lee Trust (BVI) Limited of P.O. Box 3175, Road Town, Tortola, British Virgin Islands for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands hereby sign this Memorandum of Association.

Dated this 5th day of June, 2008.

Incorporator

Andrés M. Sánchez
Authorised Signatory
ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED



Confidential

CAPLIN0024878
USPROD-02361079

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE BVI BUSINESS COMPANIES ACT 2004

**ARTICLES OF ASSOCIATION**

**OF**

**SATELLITE SUPPORT SERVICES LTD**

A COMPANY LIMITED BY SHARES

**1. REGISTERED SHARES**

1.1. Every Shareholder is entitled to a certificate signed by a director or officer of the Company or under the Seal specifying the number of Shares held by him and the signature of the director and the Seal may be facsimiles.

1.2. Any Shareholder receiving a certificate shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a certificate for Shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a Resolution of Directors.

1.3. If several Eligible Persons are registered as joint holders of any Shares, any one of such Eligible Persons may give an effectual receipt for any Distribution.

**2. SHARES**

2.1. Shares and other Securities may be issued at such times, to such Eligible Persons, for such consideration and on such terms as the directors may by Resolution of Directors determine.

2.2. Section 46 of the Act (*Pre-emptive rights*) does not apply to the Company.

2.3. A Share may be issued for consideration in any form, including money, a promissory note or other written obligation to contribute money or property, real property, personal property (including goodwill and know-how), services rendered or a contract for future services.

2.4. No Shares may be issued for a consideration other than money, unless a Resolution of Directors has been passed stating:

    (a) the amount to be credited for the issue of the Shares;

    (b) their determination of the reasonable present cash value of the non-money consideration for the issue; and

Confidential

CAPLIN0024879
USPROD-02361080

-2-

    (c)    that, in their opinion, the present cash value of the non-money consideration for the issue is not less than the amount to be credited for the issue of the Shares.

2.5.    The Company shall keep a register (the "register of members") containing:

    (a)    the names and addresses of the Eligible Persons who hold Shares;

    (b)    the number of each class and series of Shares held by each Shareholder;

    (c)    the date on which the name of each Shareholder was entered in the register of members; and

    (d)    the date on which any Eligible Person ceased to be a Shareholder.

2.6.    The register of members may be in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents. Until the directors otherwise determine, the magnetic, electronic or other data storage form shall be the original register of members.

2.7.    A Share is deemed to be issued when the name of the Shareholder is entered in the register of members.

**3.**    **REDEMPTION OF SHARES AND TREASURY SHARES**

3.1.    The Company may purchase, redeem or otherwise acquire and hold its own Shares save that the Company may not purchase, redeem or otherwise acquire its own Shares without the consent of Shareholders whose Shares are to be purchased, redeemed or otherwise acquired unless the Company is permitted by the Act or any other provision in the Memorandum or Articles to purchase, redeem or otherwise acquire the Shares without their consent.

3.2.    The Company may only offer to acquire Shares if at the relevant time the directors determine by Resolution of Directors that immediately after the acquisition the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

3.3.    Sections 60 (*Process for acquisition of own shares*), 61 (*Offer to one or more shareholders*) and 62 (*Shares redeemed otherwise than at the option of company*) of the Act shall not apply to the Company.

3.4.    Shares that the Company purchases, redeems or otherwise acquires pursuant to this Regulation may be cancelled or held as Treasury Shares except to the extent that such Shares are in excess of 50 percent of the issued Shares in which case they shall be cancelled but they shall be available for reissue.

3.5.    All rights and obligations attaching to a Treasury Share are suspended and shall not be exercised by the Company while it holds the Share as a Treasury Share.

3.6.    Treasury Shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with the Memorandum and Articles) as the Company may by Resolution of Directors determine.

Confidential

CAPLIN0024880
USPROD-02361081

-3-

3.7. Where Shares are held by another body corporate of which the Company holds, directly or indirectly, shares having more than 50 per cent of the votes in the election of directors of the other body corporate, all rights and obligations attaching to the Shares held by the other body corporate are suspended and shall not be exercised by the other body corporate.

**4.    MORTGAGES AND CHARGES OF SHARES**

4.1.    Shareholders may mortgage or charge their Shares.

4.2.    There shall be entered in the register of members at the written request of the Shareholder:

    (a)    a statement that the Shares held by him are mortgaged or charged;

    (b)    the name of the mortgagee or chargee; and

    (c)    the date on which the particulars specified in subparagraphs (a) and (b) are entered in the register of members.

4.3.    Where particulars of a mortgage or charge are entered in the register of members, such particulars may be cancelled:

    (a)    with the written consent of the named mortgagee or chargee or anyone authorised to act on his behalf; or

    (b)    upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

4.4.    Whilst particulars of a mortgage or charge of a Share are entered in the register of members pursuant to this Regulation:

    (a)    no transfer of any Share the subject of those particulars shall be effected;

    (b)    the Company may not purchase, redeem or otherwise acquire any such Share; and

    (c)    no replacement certificate shall be issued in respect of such Shares,

without the written consent of the named mortgagee or chargee.

**5.    FORFEITURE**

5.1.    Shares that are not fully paid on issue are subject to the forfeiture provisions set forth in this Regulation and for this purpose Shares issued for a promissory note or a contract for future services are deemed to be not fully paid.

5.2.    A written notice of call specifying the date for payment to be made shall be served on the Shareholder who defaults in making payment in respect of the Shares.

5.3.    The written notice of call referred to in Sub-Regulation 5.2 shall name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of

Confidential

Ex.004-5.0385

CAPLIN0024881
USPROD-02361082

-4-

non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

5.4.  Where a written notice of call has been issued pursuant to Sub-Regulation 5.3 and the requirements of the notice have not been complied with, the directors may, at any time before tender of payment, forfeit and cancel the Shares to which the notice relates.

5.5.  The Company is under no obligation to refund any moneys to the Shareholder whose Shares have been cancelled pursuant to Sub-Regulation 5.4 and that Shareholder shall be discharged from any further obligation to the Company.

6.  **TRANSFER OF SHARES**

6.1.  Shares may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, which shall be sent to the Company at the office of its registered agent for registration. The instrument of transfer shall also be signed by the transferee if registration as a holder of the share imposes a liability to the Company on the transferee.

6.2.  The transfer of a Share is effective when the name of the transferee is entered on the register of members.

6.3.  If the directors of the Company are satisfied that an instrument of transfer relating to Shares has been signed but that the instrument has been lost or destroyed, they may resolve by Resolution of Directors:

(a)  to accept such evidence of the transfer of Shares as they consider appropriate; and

(b)  that the transferee's name should be entered in the register of members notwithstanding the absence of the instrument of transfer.

6.4.  Subject to the Memorandum, the personal representative of a deceased Shareholder may transfer a Share even though the personal representative is not a Shareholder at the time of the transfer.

6.5.  If the Company shall have only one Shareholder who is an individual and that Shareholder shall also be the sole director of the Company, that sole Shareholder/director may, by instrument in writing, nominate a person who is not disqualified from being a director of the Company under the Act as a reserve director of the Company to act in place of the sole director in the event of his death, PROVIDED THAT such person shall have consented in writing to be nominated as a reserve director.

7.  **MEETINGS AND CONSENTS OF SHAREHOLDERS**

7.1.  Any director of the Company may convene meetings of the Shareholders at such times and in such manner and places within or outside the British Virgin Islands as the director considers necessary or desirable.

7.2.  Upon the written request of Shareholders entitled to exercise 30 per cent or more of the voting rights in respect of the matter for which the meeting is requested the directors shall convene a meeting of Shareholders.

Confidential

Ex.004-5.0386

CAPLIN0024882
USPROD-02361083

-5-

7.3.  The director convening a meeting shall give not less than 7 days' notice of a meeting of Shareholders to:

(a)  those Shareholders whose names on the date the notice is given appear as Shareholders in the register of members of the Company and are entitled to vote at the meeting; and

(b)  the other directors.

7.4.  The director convening a meeting of Shareholders may fix as the record date for determining those Shareholders that are entitled to vote at the meeting the date notice is given of the meeting, or such other date as may be specified in the notice, being a date not earlier than the date of the notice.

7.5.  A meeting of Shareholders held in contravention of the requirement to give notice is valid if Shareholders holding at least 90 per cent of the total voting rights on all the matters to be considered at the meeting have waived notice of the meeting and, for this purpose, the presence of a Shareholder at the meeting shall constitute waiver in relation to all the Shares which that Shareholder holds.

7.6.  The inadvertent failure of a director who convenes a meeting to give notice of a meeting to a Shareholder or another director, or the fact that a Shareholder or another director has not received notice, does not invalidate the meeting.

7.7.  A Shareholder may be represented at a meeting of Shareholders by a proxy who may speak and vote on behalf of the Shareholder.

7.8.  The instrument appointing a proxy shall be produced at the place designated for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote. The notice of the meeting may specify an alternative or additional place or time at which the proxy shall be presented.

7.9.  The instrument appointing a proxy shall be in substantially the following form or such other form as the chairman of the meeting shall accept as properly evidencing the wishes of the Shareholder appointing the proxy.

| [ Name of Company ] |
|---|
| I/We being a Shareholder of the above Company HEREBY APPOINT ................ ............................ of ..................................... or failing him ............................... of .................................... to be my/our proxy to vote for me/us at the meeting of Shareholders to be held on the ...... day of ..........................., 20...... and at any adjournment thereof. |
| (Any restrictions on voting to be inserted here.) |
| Signed this ...... day of ..........................., 20...... |
| .................................................. Shareholder |

CAPLIN0024883
USPROD-02361084

-6-

7.10.   The following applies where Shares are jointly owned:

(a)     if two or more persons hold Shares jointly each of them may be present in person or by proxy at a meeting of Shareholders and may speak as a Shareholder;

(b)     if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners; and

(c)     if two or more of the joint owners are present in person or by proxy they must vote as one.

7.11.   A Shareholder shall be deemed to be present at a meeting of Shareholders if he participates by telephone or other electronic means and all Shareholders participating in the meeting are able to hear each other.

7.12.   A meeting of Shareholders is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 per cent of the votes of the Shares or class or series of Shares entitled to vote on Resolutions of Shareholders to be considered at the meeting. A quorum may comprise a single Shareholder or proxy and then such person may pass a Resolution of Shareholders and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy instrument shall constitute a valid Resolution of Shareholders.

7.13.   If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved; in any other case it shall stand adjourned to the next business day in the jurisdiction in which the meeting was to have been held at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the Shares or each class or series of Shares entitled to vote on the matters to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

7.14.   At every meeting of Shareholders the Chairman of the Board shall preside as chairman of the meeting. If there is no Chairman of the Board or if the Chairman of the Board is not present at the meeting, the Shareholders present shall choose one of their number to be the chairman. If the Shareholders are unable to choose a chairman for any reason, then the person representing the greatest number of voting Shares present in person or by proxy at the meeting shall preside as chairman failing which the oldest individual Shareholder or representative of a Shareholder present shall take the chair.

7.15.   The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

7.16.   At any meeting of the Shareholders the chairman is responsible for deciding in such manner as he considers appropriate whether any resolution proposed has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes of the meeting. If the chairman has any doubt as to the outcome of the vote on a proposed resolution, he shall cause a poll to be taken of all votes cast upon such resolution. If the chairman fails to take a poll then any Shareholder present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be

Confidential

Ex.004-5.0388

CAPLIN0024884
USPROD-02361085

-7-

taken and the chairman shall cause a poll to be taken. If a poll is taken at any meeting, the result shall be announced to the meeting and recorded in the minutes of the meeting.

7.17. Subject to the specific provisions contained in this Regulation for the appointment of representatives of Eligible Persons other than individuals the right of any individual to speak for or represent a Shareholder shall be determined by the law of the jurisdiction where, and by the documents by which, the Eligible Person is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any Shareholder or the Company.

7.18. Any Eligible Person other than an individual which is a Shareholder may by resolution of its directors or other governing body authorise such individual as it thinks fit to act as its representative at any meeting of Shareholders or of any class of Shareholders, and the individual so authorised shall be entitled to exercise the same rights on behalf of the Eligible Person which he represents as that Eligible Person could exercise if it were an individual.

7.19. The chairman of any meeting at which a vote is cast by proxy or on behalf of any Eligible Person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such Eligible Person shall be disregarded.

7.20. Directors of the Company may attend and speak at any meeting of Shareholders and at any separate meeting of the holders of any class or series of Shares.

7.21. An action that may be taken by the Shareholders at a meeting may also be taken by a Resolution of Shareholders consented to in writing without the need for any notice, but if any Resolution of Shareholders is adopted otherwise than by the unanimous written consent of all Shareholders, a copy of such resolution shall forthwith be sent to all Shareholders not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more Shareholders. If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the earliest date upon which Eligible Persons holding a sufficient number of votes of Shares to constitute a Resolution of Shareholders have consented to the resolution by signed counterparts.

## 8. DIRECTORS

8.1. The first directors of the Company shall be appointed by the first registered agent within six months of the incorporation of the Company; and thereafter, the directors shall be elected by the Shareholders or by the directors for such term as the Shareholders or directors determine.

8.2. No person shall be appointed as a director of the Company or nominated as a reserve director, unless he has consented in writing to act as a director or to be nominated as a reserve director.

8.3. The minimum number of directors shall be one and the maximum number shall be 12. If the Company shall have three directors, one director is authorized to bind the Company.

8.4. Each director holds office for the term, if any, fixed by the Resolution of Shareholders or Resolution of Directors appointing him, or until his earlier death, resignation or removal. If no

Confidential

CAPLIN0024885
USPROD-02361086

-8-

term is fixed on the appointment of a director, the director serves indefinitely until his earlier death, resignation or removal.

8.5.    A director may be removed from office,

(a)    with or without cause, by a Resolution of Shareholders passed at a meeting of Shareholders called for the purposes of removing the director or for purposes including the removal of the director; or

(b)    with cause, by a Resolution of Directors passed at a meeting of directors called for the purpose of removing the director or for purposes including the removal of the director.

8.6.    A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company at the office of its registered agent or from such later date as may be specified in the notice.  A director shall resign forthwith as a director if he is, or becomes, disqualified from acting as a director under the Act.

8.7.    The directors may at any time appoint any person to be a director either to fill a vacancy or as an addition to the existing directors.  Where the directors appoint a person as director to fill a vacancy, the term shall not exceed the term that remained when the person who has ceased to be a director ceased to hold office.

8.8.    A vacancy in relation to directors occurs if a director dies or otherwise ceases to hold office prior to the expiration of his term of office.

8.9.    The Company shall keep a register of directors containing

(a)    the names and addresses of the persons who are directors of the Company or who have been nominated as reserve directors of the Company;

(b)    the date on which each person whose name is entered in the register was appointed as a director of the Company or nominated as a reserve director;

(c)    the date on which each person named as a director ceased to be a director of the Company;

(ca)    the date on which the nomination of any person nominated as a reserve director ceased to have effect; and

(d)    such other information as may be prescribed by the Act.

8.10.    The register of directors may be kept in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.  Until a Resolution of Directors determining otherwise is passed, the magnetic, electronic or other data storage shall be the original register of directors.

8.11.    The directors may, by a Resolution of Directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

8.12.    A director is not required to hold a Share as a qualification to office.

Confidential

Ex.004-5.0390

CAPLIN0024886
USPROD-02361087

-9-

**9.     POWERS OF DIRECTORS**

9.1.    The business and affairs of the Company shall be managed by, or under the direction or supervision of, the directors of the Company. The directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company. The directors may pay all expenses incurred preliminary to and in connection with the incorporation of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or the Articles required to be exercised by the Shareholders.

9.2.    Each director shall exercise his powers for a proper purpose and shall not act or agree to the Company acting in a manner that contravenes the Memorandum, the Articles or the Act. Each director, in exercising his powers or performing his duties, shall act honestly and in good faith in what the director believes to be the best interests of the Company.

9.3.    If the Company is the wholly owned subsidiary of a holding company, a director of the Company may, when exercising powers or performing duties as a director, act in a manner which he believes is in the best interests of the holding company even though it may not be in the best interests of the Company.

9.4.    Any director which is a body corporate may appoint any individual as its duly authorised representative for the purpose of representing it at meetings of the directors, with respect to the signing of consents or otherwise.

9.5.    The continuing directors may act notwithstanding any vacancy in their body.

9.6.    The directors may by Resolution of Directors exercise all the powers of the Company to incur indebtedness, liabilities or obligation and to secure indebtedness, liabilities or obligations whether of the Company or of any third party.

9.7.    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by Resolution of Directors.

9.8.    For the purposes of Section 175 (*Disposition of assets*) of the Act, the directors may by Resolution of Directors determine that any sale, transfer, lease, exchange or other disposition is in the usual or regular course of the business carried on by the Company and such determination is, in the absence of fraud, conclusive.

**10.    PROCEEDINGS OF DIRECTORS**

10.1.   Any one director of the Company may call a meeting of the directors by sending a written notice to each other director.

10.2.   The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

10.3.   A director is deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

Confidential

Ex.004-5.0391

CAPLIN0024887
USPROD-02361088

-10-

10.4.  A director shall be given not less than 3 days' notice of meetings of directors, but a meeting of directors held without 3 days' notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend waive notice of the meeting, and for this purpose the presence of a director at a meeting shall constitute waiver by that director.  The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

10.5.  A director may by a written instrument appoint an alternate who need not be a director and the alternate shall be entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director until the appointment lapses or is terminated.

10.6.  A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one-half of the total number of directors, unless there are only 2 directors in which case the quorum is 2.

10.7.  If the Company has only one director the provisions herein contained for meetings of directors do not apply and such sole director has full power to represent and act for the Company in all matters as are not by the Act, the Memorandum or the Articles required to be exercised by the Shareholders.  In lieu of minutes of a meeting the sole director shall record in writing and sign a note or memorandum of all matters requiring a Resolution of Directors.  Such a note or memorandum constitutes sufficient evidence of such resolution for all purposes.

10.8.  At meetings of directors at which the Chairman of the Board is present, he shall preside as chairman of the meeting.  If there is no Chairman of the Board or if the Chairman of the Board is not present, the directors present shall choose one of their number to be chairman of the meeting.

10.9.  An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a Resolution of Directors or a resolution of a committee of directors consented to in writing by all directors or by all members of the committee, as the case may be, without the need for any notice.  The consent may be in the form of counterparts each counterpart being signed by one or more directors.  If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the date upon which the last director has consented to the resolution by signed counterparts.

**11.    COMMITTEES**

11.1.  The directors may, by Resolution of Directors, designate one or more committees, each consisting of one or more directors, and delegate one or more of their powers, including the power to affix the Seal, to the committee.

11.2.  The directors have no power to delegate to a committee of directors any of the following powers:

    (a)    to amend the Memorandum or the Articles;

    (b)    to designate committees of directors;

    (c)    to delegate powers to a committee of directors;

    (d)    to appoint or remove directors;

Confidential

Ex.004-5.0392

CAPLIN0024888
USPROD-02361089

-11-

    (e)   to appoint or remove an agent;

    (f)   to approve a plan of merger, consolidation or arrangement;

    (g)   to make a declaration of solvency for the purposes of section 198(1) (a) of the Act or to approve a liquidation plan; or

    (h)   to make a determination under section 57(1) of the Act that the Company will, immediately after the proposed distribution, satisfy the solvency test set out at Regulation 18.1.

11.3.   Sub-Regulation 11.2(b) and (c) do not prevent a committee of directors, where authorised by the Resolution of Directors appointing such committee or by a subsequent Resolution of Directors, from appointing a sub-committee and delegating powers exercisable by the committee to the sub-committee.

11.4.   The meetings and proceedings of each committee of directors consisting of 2 or more directors shall be governed *mutatis mutandis* by the provisions of the Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the Resolution of Directors establishing the committee.

11.5.   Where the directors delegate their powers to a committee of directors they remain responsible for the exercise of that power by the committee, unless they believed on reasonable grounds at all times before the exercise of the power that the committee would exercise the power in conformity with the duties imposed on directors of the Company under the Act.

12.    OFFICERS AND AGENTS

12.1.   The Company may by Resolution of Directors appoint officers of the Company at such times as may be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a president and one or more vice-presidents, secretaries and treasurers and such other officers as may from time to time be considered necessary or expedient. Any number of offices may be held by the same person.

12.2.   The officers shall perform such duties as are prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by Resolution of Directors. In the absence of any specific prescription of duties it shall be the responsibility of the Chairman of the Board to preside at meetings of directors and Shareholders, the president to manage the day to day affairs of the Company, the vice-presidents to act in order of seniority in the absence of the president but otherwise to perform such duties as may be delegated to them by the president, the secretaries to maintain the register of members, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the treasurer to be responsible for the financial affairs of the Company.

12.3.   The emoluments of all officers shall be fixed by Resolution of Directors.

12.4.   The officers of the Company shall hold office until their successors are duly appointed, but any officer elected or appointed by the directors may be removed at any time, with or without cause,

-12-

by Resolution of Directors.  Any vacancy occurring in any office of the Company may be filled by Resolution of Directors.

12.5.    The directors may, by a Resolution of Directors, appoint any person, including a person who is a director, to be an agent of the Company.  An agent of the Company shall have such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in the Articles or in the Resolution of Directors appointing the agent, except that no agent has any power or authority with respect to the following:

(a)    to amend the Memorandum or these Articles;

(b)    to change the registered office or the registered agent of the Company;

(c)    to designate committees of directors;

(d)    to delegate powers to a committee of directors;

(e)    to appoint or remove directors;

(f)    to appoint or remove an agent;

(g)    to fix emoluments of directors;

(h)    to approve a plan of merger, consolidation or arrangement;

(i)    to make a declaration of solvency for the purposes of Section 198(1) (a) of the Act or to approve a liquidation plan;

(j)    to make a determination under Section 57(1) of the Act that the company will, immediately after a proposed distribution, satisfy the solvency test set out at Regulation 18.1; or

(k)    to authorise the Company to continue as a company incorporated under the laws of a jurisdiction outside the Virgin Islands, pursuant to Regulation 22.

12.6.    The Resolution of Directors appointing an agent may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.  The directors may remove an agent appointed by the Company and may revoke or vary a power conferred on him.

## 13.    CONFLICT OF INTERESTS

13.1.    A director of the Company shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose the interest to all other directors of the Company.

13.2.    For the purposes of Sub-Regulation 13.1, a disclosure to all other directors to the effect that a director is a member, director or officer of another named entity or has a fiduciary relationship with respect to the entity or a named individual and is to be regarded as interested in any transaction which may, after the date of the entry or disclosure, be entered into with that entity or individual, is a sufficient disclosure of interest in relation to that transaction.

Confidential

Ex.004-5.0394

CAPLIN0024890
USPROD-02361091

-13-

13.3. A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

    (a)    vote on a matter relating to the transaction;

    (b)    attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum; and

    (c)    sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction,

and, subject to compliance with the Act shall not, by reason of his office be accountable to the Company for any benefit which he derives from such transaction and no such transaction shall be liable to be avoided on the grounds of any such interest or benefit.

## 14.    INDEMNIFICATION

14.1.  Subject to the limitations hereinafter provided the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

    (a)    is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

    (b)    is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, whether a corporate or a partnership, joint venture, trust or other enterprise.

14.2.  The indemnity in Sub-Regulation 14.1 only applies if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe their conduct was unlawful. For the purposes of this Sub-Regulation, a director acts in the best interests of the Company if he acts in the best interests of:

    (a)    the Company's holding company; or

    (b)    a Shareholder or Shareholders of the Company;

in either case, in the circumstances specified in Section 120(2), (3) or (4) of the Act, as the case may be.

14.3.  The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of the Articles, unless a question of law is involved.

14.4.  The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a *nolle prosequi* does not, by itself, create a presumption that the person did not act

Confidential

Ex.004-5.0395

CAPLIN0024891
USPROD-02361092

-14-

honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

14.5. The Company may purchase and maintain insurance in relation to any person who is or was a director, officer or liquidator of the Company, or who at the request of the Company is or was serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability as provided in the Articles.

## 15. RECORDS

15.1. The Company shall keep the following documents at the office of its registered agent:

    (a) the Memorandum and the Articles;

    (b) the register of members, or a copy of the register of members;

    (c) the register of directors, or a copy of the register of directors; and

    (d) copies of all notices and other documents filed by the Company with the Registrar of Corporate Affairs in the previous 20 years.

15.2. If the Company maintains only a copy of the register of members or a copy of the register of directors at the office of its registered agent, it shall:

    (a) within 15 days of any change in the register, notify the registered agent in writing of the change; and

    (b) provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

15.3. The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine:

    (a) minutes of meetings and Resolutions of Shareholders and classes of Shareholders;

    (b) minutes of meetings and Resolutions of Directors and committees of directors; and

    (c) an impression of the Seal, if any.

15.4. Where any original records referred to in this Regulation are maintained other than at the office of the registered agent of the Company, and the place at which the original records is changed, the Company shall provide the registered agent with the physical address of the new location of the records of the Company within 14 days of the change of location.

15.5. The records kept by the Company under this Regulation shall be in written form or either wholly or partly as electronic records complying with the requirements of the Electronic Transactions Act (No. 5 of 2001).

-15-

**16.    REGISTERS OF CHARGES**

The Company shall maintain at the office of its registered agent a register of charges in which there shall be entered the following particulars regarding each mortgage, charge and other encumbrance created by the Company:

(a)    the date of creation of the charge;

(b)    a short description of the liability secured by the charge;

(c)    a short description of the property charged;

(d)    the name and address of the trustee for the security or, if there is no such trustee, the name and address of the chargee;

(e)    unless the charge is a security to bearer, the name and address of the holder of the charge; and

(f)    details of any prohibition or restriction contained in the instrument creating the charge on the power of the Company to create any future charge ranking in priority to or equally with the charge.

**17.    SEAL**

The Company may have more than one Seal and references herein to the Seal shall be references to every Seal which shall have been duly adopted by Resolution of Directors. The directors shall provide for the safe custody of the Seal and for an Imprint thereof to be kept at the registered office. Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of any one director or other person so authorised from time to time by Resolution of Directors. Such authorisation may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings. The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been attested to as hereinbefore described.

**18.    DISTRIBUTIONS BY WAY OF DIVIDEND**

18.1.    The directors of the Company may, by Resolution of Directors, authorise a distribution by way of dividend at a time and of an amount they think fit if they are satisfied, on reasonable grounds, that, immediately after the distribution, the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

18.2.    Dividends may be paid in money, shares, or other property.

18.3.    Notice of any dividend that may have been declared shall be given to each Shareholder as specified in Sub-Regulation 20.1 and all dividends unclaimed for 3 years after having been declared may be forfeited by Resolution of Directors for the benefit of the Company.

18.4.    No dividend shall bear interest as against the Company and no dividend shall be paid on Treasury Shares.

Confidential

Ex.004-5.0397

CAPLIN0024893
USPROD-02361094

-16-

### 19.    ACCOUNTS AND AUDIT

19.1.    The Company shall keep records that are sufficient to show and explain the Company's transactions and that will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

19.2.    The Company may by Resolution of Shareholders call for the directors to prepare periodically and make available a profit and loss account and a balance sheet. The profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit and loss of the Company for a financial period and a true and fair view of the assets and liabilities of the Company as at the end of a financial period.

19.3.    The Company may by Resolution of Shareholders call for the accounts to be examined by auditors.

19.4.    The first auditors shall be appointed by Resolution of Directors; subsequent auditors shall be appointed by a Resolution of Shareholders.

19.5.    The auditors may be Shareholders, but no director or other officer shall be eligible to be an auditor of the Company during their continuance in office.

19.6.    The remuneration of the auditors of the Company:

(a)    in the case of auditors appointed by the directors, may be fixed by Resolution of Directors; and

(b)    subject to the foregoing, shall be fixed by Resolution of Shareholders or in such manner as the Company may by Resolution of Shareholders determine.

19.7.    The auditors shall examine each profit and loss account and balance sheet required to be laid before a meeting of the Shareholders or otherwise given to Shareholders and shall state in a written report whether or not:

(a)    in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the assets and liabilities of the Company at the end of that period; and

(b)    all the information and explanations required by the auditors have been obtained.

19.8.    The report of the auditors shall be annexed to the accounts and shall be read at the meeting of Shareholders at which the accounts are laid before the Company or shall be otherwise given to the Shareholders.

19.9.    Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

19.10.   The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of Shareholders at which the Company's profit and loss account and balance sheet are to be presented.

Confidential

Ex.004-5.0398

CAPLIN0024894
USPROD-02361095

-17-

**20.    NOTICES**

20.1.    Any notice, information or written statement to be given by the Company to Shareholders may be given by personal service or by mail addressed to each Shareholder at the address shown in the register of members.

20.2.    Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

20.3.    Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was delivered to the registered office or the registered agent of the Company or that it was mailed in such time as to admit to its being delivered to the registered office or the registered agent of the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

**21.    VOLUNTARY WINDING UP AND DISSOLUTION**

The Company may by a Resolution of Shareholders or by a Resolution of Directors appoint a voluntary liquidator.

**22.    CONTINUATION**

The Company may by Resolution of Shareholders or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

Confidential

Ex.004-5.0399

CAPLIN0024895
USPROD-02361096

-18-

We, Aleman, Cordero, Galindo & Lee Trust (BVI) Limited of P.O. Box 3175, Road Town, Tortola, British Virgin Islands for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands hereby sign these Articles of Association.

Dated this 5th day of June, 2008.

Incorporator

Andrés M. Sánchez
Authorised Signatory
ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED



### NOMINEE SHAREHOLDER AGREEMENT

| Company name and number ("the Company") | SATELLITE SUPPORT SERVICES LTD BC No. 1485524 |
| --- | --- |
| The Owner: (name and address) | THE SUNAGE FOUNDATION P.O. Box 0823-02435 Panama, Republic of Panama. |
| The Shares: | Fifty Thousand (50,000) Shares represented in the share certificate no. 2 |
| The Nominee: | SOUTH BAY CORPORATION, Calle Aquilino de la Guardia No.8, Panama, Republic of Panama. |

1.  The nominee acknowledges and declares that it holds the Shares in the Company registered in its name as nominee of the Beneficial Owner.

2.  The Nominee irrevocably undertakes and agrees:

    (a) not to transfer, deal with or dispose of the Shares or any part of them save as the Owner may from time to time direct.

    (b) to assign to the Owner the right to receive any dividends that may be declared on the Shares together with all the profits or other monies which may be paid or payable to it from time to time upon or in respect of the Shares;

    (c) to exercise its voting power as holder of the Shares in such manner and for such purposes as the Beneficial Owner may from time to time direct or determine; and

    (d) To provide a signed transfer form in the name or names of any transferee or transferees at any time in accordance with the written instructions of the Beneficial Owner.

3.  This Declaration shall be subject to and construed in accordance with the laws of the British Virgin Islands and shall be subject to the non-exclusive jurisdiction of the courts of British Virgin Islands.

This Nominee Agreement is executed as a deed on December 12, 2011.

By **SOUTH BAY CORPORATION**

Accepted by:

Mr Graham Collett

Yo, NO RAUL IVAN CASTILLO SANJUR, Notario Público Tercero del Circuito de Panamá, con Cédula No 4-167-725.
CERTIFICO:
Que dada la certeza de la identidad de la(s) persona(s) que firmaron(ron) el presente documento esta firma(s) es(son) auténtica(s) (Art 1730 C.C. Art 899 C.J.)
Panamá,

1 7 JUL 2013

LIC RAUL IVAN CASTILLO SANJUR
Notario Público Tercero

CERTIFIED A TRUE COPY
Icaza, González-Ruiz & Alemán **(BVI) Trust** Limited, as Registered Agent of
SATELLITE SUPPORT SERVICES LTD

Date: July 10, 2013

Signature:



111
1899
0657
11 07 13

**REPUBLICA de PANAMA**
★ TIMBRE NACIONAL ★
≋010.00
R.a. 1109

**APOSTILLE**

Convention de la haye du 5 octobre 1961
1 Pais PANAMA
El presente documento público,
2 ha sido firmado por _____
3 quien actua en calidad _____
4 y esta revestido del sello/timbre de ____

**CERTIFICADO**

5 EN Panamá _____ 6 el día 11 JUL 2013
7 por DIRECCION ADMINISTRATIVA
8 Bajo el número _____ 32 952
9 Sello/timbre    10 Firma _____



Esta Autorización no
mplica responsabilida
en cuanto al contenido
del documento

Ex.004-5.0402

CAPLIN0024898
USPROD-02361099

## NOMINEE DIRECTOR AGREEMENT

This agreement is made and entered into on **12 December 2011**, by and between **The Sunage Foundation**, of **P.O. Box 0823-02435 Panama, Republic of Panama** hereinafter referred to as the "**PRINCIPAL**", and **Mr. Carlos Bryden** hereinafter referred to as the "**NOMINEE**".

**WHEREAS**, the NOMINEE is Director of **SATELLITE SUPPORT SERVICES LTD** a company duly incorporated and existing under the laws of **British Virgin Islands**, hereinafter referred to as the "**COMPANY**";

**WHEREAS**, the PRINCIPAL owns all or substantially all of the issued and outstandings shares of the COMPANY, and is interested in the business, activities and management of the COMPANY;

**WHEREAS**, the NOMINEE is a Director of the COMPANY in the name only and has no other powers or responsibilities and, further, does not have any financial or management interest in the affairs of the COMPANY;

**WHEREAS**, the NOMINEE will act on behalf of the THE COMPANY on instructions from the PRINCIPAL;

**WHEREAS**, the THE NOMINEE wish to be protected and saved harmless and against any liability which he may incur by reason of his acting hereunder.

**NOW, THEREFORE**, it is hereby agreed and understood:

1.  The PRINCIPAL shall indemnify the NOMINEE, his heirs, executors and assignees from all losses, expenses, damages, costs and attorney's fees that may at any time incur by reason of any actions, liabilities, proceedings, claims or suits brought against them provided that: (a) such actions, proceedings, claims or suits are related to or arise from his acting for the COMPANY on instructions received from the PRINCIPAL or the person(s) indicated herein; and (b) NOMINEE gives prompt notice to PRINCIPAL of the initiation or commencement of any such actions, proceddings, claims or suits. PRINCIPAL shall have the right to participate in such actions, suit claims or proceedings.

2.  NOMINEE shall be entitled to take instructions from PRINCIPAL or from such other person(s) indicated herein or otherwise approved in writing by PRINCIPAL, whether such instructions are transmitted by telex, fax, letter or email. NOMINEE shall be deemed to act in good faith (which good faith shall be presumed) should he have no reason to believe that instructions originate from someone other than the party sending or purporting to send such instructions.

Confidential

Ex.004-5.0403



3. The NOMINEE will respect the confidentiality of the COMPANY and its beneficiaries except with regard to **British Virgin Islands** Authorities legally authorised to make proper enquiries. The NOMINEE maintains the right to refuse to sign or produce documents that, in his opinion, may be misleading or unlawful, and further, is legally obliged to report evidence that may point to unlawful activity by the COMPANY.

4. PRINCIPAL undertakes to advise NOMINEE of the transfer of any interest or shares in the COMPANY, it being understood nevertheless that PRINCIPAL shall continue to be bound by the terms of this agreement notwithstanding such transfer until a formal release has been executed.

5. This agreement and the indemnity hereby created shall continue in force so long as any actions, proceedings, claims or suits in respect to the enforceability of this agreement or said indemnity are not barred by any applicable statute of limitations.

6. This agreement shall be binding upon and shall inure to the benefit of the parties, their legal representatives, successors and assignees.

7. This agreement shall be unlimited as to its duration. Nonetheless, it may be terminated unilaterally, by either party hereto, upon delivery of a one (1) day written notice of unilateral termination to the other party hereto by telex, fax, letter or email, sent to the address of record.

8. Nothing herein shall be deemed or construed to create a partnership, trust or joint venture between the parties hereto and each party is an independent contractor.

**IN WITNESS WHEREOF**, the parties hereto have caused this agreement to be duly executed and signed on the day and year first above stated.

PRINCIPAL

NOMINEE

The Sunage Foundation
Mr Graham Collett
Authorised Representative

Name: Carlos Bryden

Yo, LIC. RAÚL IVÁN CASTILLO SANJUR, Notario
Público Tercero del Circuito de Panamá, con Cédula
No. 4-157-705.
CERTIFICO:
Que dada la certeza de la identidad de la(s)
persona(s) que firma(firmaron) el presente
documento su(s) firma(s) es(son) auténtica(s)
(Art.1736 C.C. Art 835 C.J.)

Panamá _____ 10 JUL 2013

LIC. _____ LLO SANJUR
Notario Público Tercero

CERTIFIED A TRUE COPY
Icaza, González-Ruiz & Alemán (BVI) Trust
Limited, as Registered Agent of

SATELLITE SUPPORT SERVICES LTD

Date: July 10, 2013
Signature:

CAPLIN0024900
USPROD-02361101

## APOSTILLE

Convention de la haye du 5 octobre 1961
1 Pais PANAMA
El presente documento público
2 ha sido firmado por _Raul F. Catello_
3 quien actua en calidad _notario_
4 y esta revestido del sello/timbre de _____

### CERTIFICADO

5 EN Panamá _____ 6 el día      1 1 JUL 2013
7 por DIRECCION ADMINISTRATIVA
8 Bajo el número _39954_
9 Sello/timbre ___ 10 Firma _____



esta Autorización no
implica responsabilidad
en cuanto al contenido
del documento

RESOLUTION OF THE DIRECTORS

OF

**SATELLITE SUPPORT SERVICES LTD**

The undersigned, being the Directors of **SATELLITE SUPPORT SERVICES LTD**, a company duly incorporated and existing under the laws of the British Virgin Islands (hereinafter called the "Company"),

**<u>RESOLVED</u>**

That the Directors of the Company are hereby authorized to issue a Limited Power of Attorney in favour of **Mr. GRAHAM COLLETT**.

IN WITNESS WHEREOF, this instrument has been executed on this 15th day of January, 2010.

Edgardo E. Diaz
Director

Fernando A. Gil
Director

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, Edgardo E. Díaz and Fernando A. Gil, being the Directors of **SATELLITE SUPPORT SERVICES LTD**, a corporation organized and existing under the laws of the British Virgin Islands, HEREBY RESOLVE to make, constitute and appoint **MR. GRAHAM COLLETT**, the corporation's true and lawful attorney, and to act individually in its name and behalf in any and all countries and parts of the world in connection with its business, as occasion may require, to do the following acts and things:

FIRST: To manage and govern property of every description, whether personal, real or movable, bonds, shares and/or securities which the corporation may now own or hereafter acquire.

SECOND: To open, maintain, liquidate and/or close current and savings accounts in banks, corporations and banking institutions, domestic and foreign, make deposits of all kinds, accept, approve and reject statements of accounts; withdraw funds from said accounts, drawing and signing checks, authorizations and orders of payment of any kind; and in connection with such operations to sign all documents which may be necessary, without any limitation whatever and to authorize any other person or persons to sign the same.

THIRD: To handle all kinds of proceedings before public and private offices, Registry Offices of all kinds, and before individuals, officials and authorities of every nature, domestic and foreign, to file petitions and applications of every kind; transact business and proceedings of every nature, and to appeal through the proper channels against any kind of resolutions passed until a definite resolution has been obtained.

FOURTH: To attend all meetings to which the corporation may be summoned, or which it may be entitled to attend, for any reason, both of private persons and of shareholders of mercantile or civil enterprises, both domestic and foreign; to take part in all kinds of discussions arising on any matter whatsoever; to adopt, approve or challenge resolutions, casting the votes of the corporation as he may deem advisable; and to sign the minutes of the meetings whenever so required by law or by the By-Laws.

FIFTH: To execute and issue, in the exercise of all powers granted, all public and private documents which may be necessary, with the clauses, terms, conditions, waivers, covenants and requisites as he may deem proper, without any limitation whatever, waiving domicile and stipulating the place for the performance of obligations.

SIXTH: To delegate in part or in its entirety the authorities of the present power of attorney in favour of the person or persons he may designate and to revoke such delegations whenever he shall deem proper.

IN WITNESS WHEREOF, this Power of Attorney is executed this 15th day of January, 2010.

**SATELLITE SUPPORT SERVICES LTD**

Edgardo E. Díaz
Director

Fernando A. Gil
Director

CAPLIN0024904
USPROD-02361105

POLEDNA | BOSS | KURER

**By registered mail**
BNP PARIBAS (SUISSE) SA
Place de Hollande 2
P.O. Box
CH-1211 Geneva 11

Zurich, 15 April 2014
505886 | 04 | 0000004

ATTORNEYS AT LAW

Walter H. Boss
   Attorney at law, LL.M
Thomas G. Albert
   Attorney at law, LL.M

**Mina Corp Limited / Account at BNP Paribas / Ref: 83954-0**

Dear Mr. Rogy,
Dear Ms. Bino,

Reference is made to your letter with reference to the "US DOJ program – Documentation for U.S. Related Accounts" (the "**Letter**") of February 13, 2014, sent to our client Mina Corp Limited (the "**Client**"). I beg you to find the respective power of attorney herewith enclosed.

As stated in your Letter, the program for Swiss banks, as announced in a joint statement of August 29, 2013, by the Swiss Federal Department of Finance and the U.S. Department of Justice ("**DoJ**"), provides that a process shall be set forth by which Swiss banks may voluntarily seek to clarify and, if required, resolve their status before the DoJ regarding tax matters involving accounts related to the U.S. held by current and former bank clients during the period beginning August 1, 2008 (the "**Program**"). Your bank is currently not subject to a criminal tax investigation by the DoJ, as confirmed in your Letter, and, thus, is eligible for the Program.

We have reasons to believe, however, that this Letter was sent to our Client erroneously, as follows:

As you know, our Client, Mina Corp Limited, was during the relevant period a company domiciled in Gibraltar (cf. a copy of the memorandum and articles of association as enclosed hereto) owned *ab initio* by non-US persons, that is, (i) Mr. Erkin Bek, who is a citizen of St Kitts (cf. passport copy enclosed hereto) currently residing in Switzerland (cf. a copy of the utility bill as enclosed hereto) and whose interest was held since June 11, 2012, by the trustees of a private trust called The Rivoli Trust, and (ii) Sunage Foundation, a Panama foundation,

Poledna Boss Kurer AG

P | B | K ZÜRICH
Bellerivestrasse 241
Postfach 665
CH-8034 Zürich
+41 44 220 12 12 T
+41 44 220 12 13 F

P | B | K LUGANO
Via Serafino Balestra 17
CH-6900 Lugano
+41 91 911 80 80 T

info@pbklaw.ch
www.pbklaw.ch

MwSt.-Nr. CHE-114.182.661
MwSt.-Nr. 669898
Eingetragen im kantonalen Anwaltsregister

Confidential

CAPLIN0024905
USPROD-02361106

P | B | K

the founder of which was Ms. Delphine Le Dain, a French citizen and EU resident, for the benefit of the founder and her issue (a copy of the regulations of Sunage Foundation and Mrs. Le Dain's passport copy are enclosed hereto). Our Client, Mina Corp Limited, ceased its activities on December 31, 2012, and is currently being liquidated.

Hence, our Client does obviously not meet the requirements of the Program.

May I, therefore, kindly ask you to confirm that you have removed our Client from the list of U.S. related account holders and that it is not subject to the provisions of the Program. You are hereby also kindly requested to provide us with an explanation, why our Client's bank account has been listed as a U.S. related account in the sense of the Program.

Finally, I kindly ask you based on art. 400 of the Swiss Code of Obligations (CO) and art. 8 of the Federal Act on Data Protection (FADP) to provide us with copies of the account opening documents regarding all accounts and deposits held by our Client, incl. any other agreement or form which has been subsequently concluded by your bank with our Client (this includes amongst others the account opening form, the Form A, the authorized signatories list, the power of attorney forms and any other form which has been concluded on occasion of the account opening).

I am looking forward to hearing from you at your very earliest convenience, the latest, however, until April 25, 2014. In case of any further query, please do not hesitate to contact me.

Kind regards,

Walter H. Boss

Encls.

2 | 2

Confidential

Ex.004-5.0410

CAPLIN0024906
USPROD-02361107

## POLEDNA  BOSS  KURER

## POWER OF ATTORNEY

**Walter H. Boss**

**Thomas G. Albert**

ATTORNEYS AT LAW

Walter H. Boss
Attorney at law, LL.M

Thomas G. Albert
Attorney at law, LL.M.

and all attorneys who at the time of the performance of the relevant legal act are registered under Art. 6 or 28 of the Federal Act concerning the Professional Activities of Attorneys of Law under the business address of

## Poledna Boss Kurer AG

with the bar registry of a Swiss Canton or with a cantonal supervisory authority are

**in the matter of**    Mina Corp Limited

**concerning**    Account at BNP Paribas

hereby authorised, each individually, to perform all legal acts within the scope of authority of a person appointed under a general power of attorney (attorney-in-fact), including the right to appoint substitutes.

This power of attorney includes, in particular, the authority to: represent the client in matters not before a court, in matters before all courts, administrative bodies and arbitration tribunals, enter into agreements regarding jurisdiction and arbitration agreements, assert legal rights and to waive them, conclude settlements, admit the allegations of a complaint or to withdraw a complaint, enforce judgments and settlements, receive and deliver securities, payments and other property which is the subject of a dispute, institute and prosecute debt enforcement actions, including the filing of petitions for bankruptcy, represent the client in inheritance matters and in matters requiring notarization and the recording of real estate transactions, represent the client in criminal matters, in particular to institute and to withdraw charges and requests for the institution of charges.

Subject to contrary provisions of procedural law, this power of attorney shall not expire upon the death, the official declaration of disappearance, the loss of capacity to act or the bankruptcy of the client.

The client confirms that the client has assigned to Poledna Boss Kurer AG all of the client's claims for indemnification of litigation costs or similar costs.

The exclusive venue over disputes arising from this mandate relationship shall be Zurich. The laws of Switzerland shall apply.

Place and date:

Name, address / legal residence

Mina Corp Limited

Poledna Boss Kurer AG

P | B | K  ZÜRICH
Bellerivestrasse 241
Postfach 665
CH-8034 Zürich
+41 44 220 12 12 T
+41 44 220 12 13 F

P | B | K  LUGANO
Vie Serafino Balestra 17
Postfach 6322
CH-6901 Lugano
+41 91 911 80 80 T

info@pbklaw.ch
www.pbklaw.ch

MwSt-Nr. CHE-114.162.661
MwSt-Nr. 693086

Eingetragen im kantonalen Anwaltsregister

Confidential

Ex.004-5.0411

CAPLIN0024907
USPROD-02361108

POLEDNA | BOSS | KURER

**By registered mail**
BNP PARIBAS (SUISSE) SA
Place de Hollande 2
P.O. Box
CH-1211 Geneva 11

Zurich, 15 April 2014
505886 | 04 | 0000005

ATTORNEYS AT LAW

Walter H. Boss
Attorney at law, LL.M.
Thomas G. Albert
Attorney at law, LL.M.

**Red Star Enterprises Limited/Account at BNP Paribas/Ref: 83955-6**

Dear Mr. Rogy,
Dear Ms. Bino,

Reference is made to your letter with reference to the "US DOJ program – Documentation for U.S. Related Accounts" (the "**Letter**") of February 13, 2014, sent to our client Red Star Enterprises Limited (the "**Client**"). I beg you to find the respective power of attorney herewith enclosed.

As stated in your Letter, the program for Swiss banks, as announced in a joint statement of August 29, 2013, by the Swiss Federal Department of Finance and the U.S. Department of Justice ("**DoJ**"), provides that a process shall be set forth by which Swiss banks may voluntarily seek to clarify and, if required, resolve their status before the DoJ regarding tax matters involving accounts related to the U.S. held by current and former bank clients during the period beginning August 1, 2008 (the "**Program**"). Your bank is currently not subject to a criminal tax investigation by the DoJ, as confirmed in your Letter, and, thus, is eligible for the Program.

We have reasons to believe, however, that this Letter was sent to our Client erroneously, as follows:

As you know, our Client, Red Star Enterprises Limited, was during the relevant period a company domiciled in Gibraltar (cf. a copy of the memorandum and articles of association as enclosed hereto) owned *ab initio* by non-US persons, that is, (i) Mr. Erkin Bek, who is a citizen of St Kitts (cf. passport copy enclosed hereto) currently residing in Switzerland (cf. a copy of the utility bill as enclosed hereto) and whose interest was held since June 11, 2012, by the trustees of a private trust called The Rivoli Trust, and (ii) Sunage Foundation, a Panama

Poledna Boss Kurer AG

P I B I K  ZÜRICH
Bellerivestrasse 241
Postfach 865
CH-8034 Zürich
+41 44 220 12 12 T
+41 44 220 12 13 F

P I B I K  LUGANO
Via Serafino Balestra 17
CH-6900 Lugano
+41 91 911 90 50 T

info@pbklaw.ch
www.pbklaw.ch

MwSt.-Nr. CHE–114.160.861
MwSt.-Nr. 593068

Eingetragen im Kantonalen Anwaltsregister

Confidential

CAPLIN0024908
USPROD-02361109

P | B | K

foundation, the founder of which was Ms. Delphine Le Dain, a French citizen and EU resident, for the benefit of the founder and her issue (a copy of the regulations of Sunage Foundation and Mrs. Le Dain's passport copy are enclosed hereto). Our Client, Red Star Enterprises Limited, ceased its activities on December 31, 2012, and is currently being liquidated.

Hence, our Client does obviously not meet the requirements of the Program.

May I, therefore, kindly ask you to confirm that you have removed our Client from the list of U.S. related account holders and that it is not subject to the provisions of the Program. You are hereby also kindly requested to provide us with an explanation, why our Client's bank account has been listed as a U.S. related account in the sense of the Program.

Finally, I kindly ask you based on art. 400 of the Swiss Code of Obligations (CO) and art. 8 of the Federal Act on Data Protection (FADP) to provide us with copies of the account opening documents regarding all accounts and deposits held by our Client, incl. any other agreement or form which has been subsequently concluded by your bank with our Client (this includes amongst others the account opening form, the Form A, the authorized signatories list, the power of attorney forms and any other form which has been concluded on occasion of the account opening).

I am looking forward to hearing from you at your very earliest convenience, the latest, however, until April 25, 2014. In case of any further query, please do not hesitate to contact me.

Kind regards,

Walter H. Boss

Encls.

2 | 2

POLEDNA   BOSS   KURER

## POWER OF ATTORNEY

ATTORNEYS AT LAW

Walter H. Boss
    Attorney at law, LL.M.
Thomas G. Albert
    Attorney at law, LL.M

**Walter H. Boss**

**Thomas G. Albert**

and all attorneys who at the time of the performance of the relevant legal act are registered under Art. 6 or 28 of the Federal Act concerning the Professional Activities of Attorneys of Law under the business address of

## Poledna Boss Kurer AG

with the bar registry of a Swiss Canton or with a cantonal supervisory authority are

**in the matter of**    Red Star Enterprises Limited

**concerning**          Account at BNP Paribas

hereby authorised, each individually, to perform all legal acts within the scope of authority of a person appointed under a general power of attorney (attorney-in-fact), including the right to appoint substitutes.

This power of attorney includes, in particular, the authority to: represent the client in matters not before a court, in matters before all courts, administrative bodies and arbitration tribunals, enter into agreements regarding jurisdiction and arbitration agreements, assert legal rights and to waive them, conclude settlements, admit the allegations of a complaint or to withdraw a complaint, enforce judgments and settlements, receive and deliver securities, payments and other property which is the subject of a dispute, institute and prosecute debt enforcement actions, including the filing of petitions for bankruptcy, represent the client in inheritance matters and in matters requiring notarization and the recording of real estate transactions, represent the client in criminal matters, in particular to institute and to withdraw charges and requests for the institution of charges.

Subject to contrary provisions of procedural law, this power of attorney shall not expire upon the death, the official declaration of disappearance, the loss of capacity to act or the bankruptcy of the client.

The client confirms that the client has assigned to Poledna Boss Kurer AG all of the client's claims for indemnification of litigation costs or similar costs.

The exclusive venue over disputes arising from this mandate relationship shall be Zurich. The laws of Switzerland shall apply.

Place and date:

Name, address / legal residence

Red Star Enterprises Limited

Poledna Boss Kurer AG

P | B | K ZÜRICH
Bellerivestrasse 241
Postfach 865
CH-8034 Zürich
+41 44 220 12 12 T
+41 44 220 12 13 F

P | B | K LUGANO
Via Serafino Balestra 17
Postfach 6322
CH-6901 Lugano
+41 91 911 80 80 T

info@pbklaw.ch
www.pbklaw.ch

MwSt-Nr. CHE-114.162.681
MwSt-Nr. 693086

Eingetragen im handelsregister Amtsschreiberei

CAPLIN0024910
USPROD-02361111

1300 Eye Street NW, Suite 900
Washington, DC 20005-3314
+1 202 682 7000 tel
+1 202 857 0940 fax

**Weil, Gotshal & Manges LLP**

**William Burck**
+1 202 682 7157
bill.burck@weil.com

September 24, 2010

Stuart Rodriguez
4 Giro's Passage
Gibro House
Gibraltar

Re: Subpoenas from the U.S. House of Representatives

Dear Mr. Rodriguez:

We represent Mina Corporation Ltd. and Red Star Enterprises Ltd. (collectively, "the companies") in connection with an investigation being conducted by the Subcommittee on National Security and Foreign Affairs of the Committee on Oversight and Government Reform of the U.S. House of Representatives (the "Committee"). We understand that HLB Gibro Group ("Gibro") is in receipt of subpoenas addressed to the companies by the Committee this past July. We are writing to update you on the current status of the Committee's investigation and the subpoenas in your possession. As an initial matter, you should be aware that the companies are fully cooperating with the Committee's investigation and have produced hundreds of thousands of pages of documents to the Committee, in addition to making senior personnel from the companies available for interviews.

As background, the companies are Gibraltar based corporations that hold contracts with the United States government to supply jet fuel to the United States Armed Forces in Kyrgyzstan and Afghanistan. These jet fuel supplies are critical to the U.S. war effort in Afghanistan. The companies have been supplying jet fuel to U.S. forces in 2003. Since that time, the companies have received repeated praise from the U.S. government for the reliable and cost-effective manner in which they have supplied jet fuel in support of the war effort. Indeed, the U.S. government has renewed its supply contracts with the companies on numerous occasions, a further indication of the companies' status as a reliable contracting partner with the U.S. government.

The instant investigation is being conducted by a committee of the U.S. House of Representatives. The House of Representatives is one of two houses of the U.S. Congress, the legislative branch of the U.S. government. The investigation does not implicate either the executive or judicial branches of the U.S. government. It is not a criminal investigation, but rather a domestic legislative investigation designed to explore issues deemed relevant to possible future legislation by the U.S. Congress.

The Committee initiated its investigation into the U.S. Department of Defense's ("DOD") activities at the Manas Transit Center in Kyrgyzstan in April. The Manas Transit Center is a key U.S. logistical and

Stuart Rodriguez
Subpoenas from the U.S. House of Representatives
September 24, 2010
Page 2

**Weil, Gotshal & Manges LLP**

military hub for prosecuting the war effort in Afghanistan. Part of this investigation involved the companies' fuel supply contracts with DOD in Kyrgyzstan and Afghanistan. Specifically, the Committee sought information concerning a purported relationship between the companies and the previous two presidents of Kyrgyzstan, Kurmanbek Bakiyev and Askar Akayev, and their respective families. Shortly after the toppling of the Bakiyev regime in April, allegations appeared in certain press outlets that the companies had an improper relationship with certain members of the Bakiyev family. These allegations claimed, without any support or evidence, that the companies had worked with DOD to make improper payments to the Bakiyevs as an inducement to keep the Manas Transit Center open. These allegations prompted the congressional investigation. The allegations included claims that relatives of President Bakiyev were part-owners of the companies, and that illicit payments were made to the first families of Kyrgyzstan over the last seven years through the companies' contracts to supply jet fuel to the U.S. Air Force based at the Manas Transit Center.

Based on our conversations with several officers and employees at the companies, as well as our review of documents and correspondence from the companies, we believe these allegations are baseless and malicious. At the company's request and on their behalf, we contacted the Committee and categorically denied these allegations. The Committee requested several categories of information from the companies, and the companies agreed to provide the Committee with a substantial amount of the requested information. The companies, however, were not prepared to divulge certain information concerning beneficial ownership without a guarantee from the Committee that the ownership information would be kept confidential. The companies have long-believed that keeping such information confidential is critical because they operate in volatile and dangerous areas of the world and that divulging ownership information would pose an intolerably high risk to the personal safety of the owners and other company personnel. The Committee assured us that the information would be treated in a "sensitive" manner, but declined to guarantee confidentiality.

In the course of discussions with Committee staff on how to resolve the Committee's request for ownership information, the Chairman of the Oversight and Government Reform Committee authorized subpoenas seeking the same information in an attempt to compel the companies to divulge beneficial ownership information. The authorization of the subpoenas to compel information from foreign companies located overseas lacked support under U.S. or international law. Based on our research and consultation with local counsel in Gibraltar, we believe that the subpoenas mailed to the companies' Gibraltar address are of no legal effect in either the United States, Gibraltar, or any other jurisdiction.

Despite the Committee's attempt to compel the companies, the companies still desired to cooperate with the investigation and to clear away any uncertainty created by the false allegations made in Kyrgyzstan. Thus, on behalf of the companies, we pursued alternative means of cooperation with the Committee outside of the subpoena process. After brief negotiations, we concluded an agreement with the Committee that permitted voluntary cooperation by the companies without the need of the subpoenas. The Committee agreed not to attempt to enforce the subpoenas, so long as the terms of the agreement were satisfied by the companies. Thus, although the subpoenas will not formally lapse until January 2011, they are, for all intents and purposes, nullities pursuant to our agreement with the Committee. As such, Gibro and the companies have no further obligation to produce documents or otherwise respond to the subpoenas.

CAPLIN0024912
USPROD-02361113

Stuart Rodriguez                                                    **Weil, Gotshal & Manges LLP**
Subpoenas from the U.S. House of Representatives
September 24, 2010
Page 3

The agreement with the Committee provided for two interviews with personnel from the companies, namely, Charles Squires and Erkin Bekbolotov. The interviews took place over two days in August at the U.S. Embassy in London. They were conducted by five members of the Committee staff. In addition to the interviews with Mr. Squires and Mr. Bekbolotov, we disclosed beneficial ownership information to the Committee, having received an assurance that the Committee would treat the information with the utmost sensitivity due to the harm that could befall individuals affiliated with the companies if the information were made public. Finally, the companies have produced almost 200,000 pages of corporate documents and correspondence to the Committee to further the Committee's understanding of the companies and their operations.

As the foregoing should make clear, the companies have been cooperating fully with the Committee's investigation throughout this process. To facilitate this cooperation, the companies have elected to deal directly with the Committee and not to respond to the investigation through press statements or other public media. Moreover, the companies look forward to publicly dispelling the false allegations made about them in Kyrgyzstan after the Committee has concluded its investigation. Although the investigation's origin in a smear campaign orchestrated by self-serving actors in Kyrgyzstan is deeply unfortunate, the companies believe that the investigation has provided a valuable opportunity to rebut slanderous allegations and present its case to the Committee in the course of the interviews in London.

The Committee has given us every indication that they are satisfied with the companies' cooperation. Since the interviews of Mr. Squires and Mr. Bekbolotov in August, the Committee has not made any additional requests for information or made any attempt to restart the subpoena process. Although we obviously are not a position to speak for the Committee, we are confident that it will agree with our view of the facts and evidence that there is no support for the scurrilous allegations of misconduct made against the companies. Indeed, we believe that the Committee will agree that the allegations derived from interests antagonistic to the companies for political and financial reasons. The Committee has not informed us when its investigation will be complete, but we see early November as a likely date.

We trust this letter has provided you with an overview of the status of the investigation and the subpoenas. You were not contacted earlier about the subpoenas in large part because the agreement with the Committee resolving the subpoenas was reached very soon after the subpoenas were issued, and thus no further response to or acknowledgement of the subpoenas was required by Gibro or companies. Going forward, we will keep you informed of all significant developments as the investigation concludes. Please do not hesitate to contact us if you have any questions regarding the foregoing.

Sincerely,

*William A. Burck*

William A. Burck