# Transcript of Graham Collett

# Deposition



## UNITED STATES OF AMERICA
## v.
## DOUGLAS EDELMAN
## and
## DELPHINE LE DAIN
## (also known as DELPHINE LE DAIN EDELMAN)

### Volume I

### Monday, February 3rd, 2025

**TransAtlantic International Legal Solutions**
**1-646-480-0520**
**calendar@tavds.com**
**www.tavds.com**

Graham Collett                                         February 03, 2025

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA      |CRIMINAL NUMBER:
                              |1:24-CR-00239-CKK
                              |
                              |VIOLATIONS
Vs.                           |
                              |Count: 1:18:U.S.C.§371
                              |(Conspiracy to defraud
DOUGLAS EDELMAN               | the United States)
                              |
and                           |Counts 2-3:18 U.S.C.§1001
                              |(False Statements)
                              |
DELPHINE LE DAIN              |Counts 4-18:26 U.S.C §7201
(also known as DELPHINE       |
 LE DAIN EDELMAN)             |Counts 19-30:31 U.S.C.§§
                              |5314&5322(b);31 C.F.R
                              |1010.350,1010.306(c)-
                              |(d)and 1010.840(b);18
                              |U.S.C.§2
                              |(Wilful violation of
                              |foreign Bank account
                              |reporting)
_____|

          HYBRID DEPOSITION OF GRAHAM COLLETT

                    VOL. I.

            MONDAY 3RD FEBRUARY 2025




Taken at:

BAKER & McKENZIE
280 Bishopsgate
London EC2M 4AG

Court Reporter:  David Erdos
Certified Deposition Reporter
CDR-1865
```

```
 1              A P P E A R A N C E S:

 2
     On behalf of the Plaintiff:
 3
 4   U.S. DEPARTMENT OF JUSTICE, TAX DIVISION

 5   CRIMINAL ENFORCEMENT SECTION

 6   By: Sarah Ranney

 7       sarah.c.ranney@usdoj.gov

 8       (202) 514-2000

 9       Ezra Spiro

10       Ezra.K.Spiro@usdoj.gov

11       (202) 718-7308

12

13   PRESENT IN WASHINGTON DC:

14       Josh Gold

15       Josh.Gold@usdoj.gov

16       Nanette Davis

17       Nanette.Davis@usdoj.gov

18

19   DEPARTMENT OF THE TREASURY,

20   INTERNAL REVENUE SERVICE, CRIMINAL INVESTIGATION

21   By: Rebekah Gamez

22       Rebekah.Bott@ci.irs.gov

23       Adam Soline

24       Adam.Soline@ci.irs.gov

25       630.493.5224
```

```
 1              A P P E A R A N C E S (CONTINUED)

 2   On behalf of the Defendants:

 3   BAKER & McKENZIE LLP

 4   815 Connecticut Avenue,
     NW, Washington DC, 20006
 5   By: George Clarke

 6       George.clarke@bakermckenzie.com

 7       (202)835 6184

 8       Sonya Bishop

 9       452 Fifth Avenue, New York, NY 10018

10       Sonya.Bishop@bakermckenzie.com

11       212.626.4591

12

13   PRESENT WITH DEFENDANT IN WASHINGTON DC:

14       Allison Rocker

15       Allison.rocker@bakermckenzie.com

16       303.906.9558

17

18   PRESENT WITH WITNESS IN LONDON:

19       Dr. Sharon Persaud

20       BOUTIQUE LAW

21       Ground Floor West, 9 Grays Inn Square

22       London WC1R 5JD

23       sharon@boutique.law.com

24       William Dunlop

25       William@boutique.law.com
```

Graham Collett                                                February 03, 2025
4

```
 1              A P P E A R A N C E S (CONTINUED)

 2                         REMOTE:

 3

 4       Danielle J. Sochaczevski

 5       WILLIAMS & CONNOLLY LLP

 6       680 Maine Avenue, SW, Washington DC, 20024

 7       dsochaczevski@wc.com

 8

 9

10

11   Also Present:   Lauren Barbor, Videographer

12                   Shannon Korpela, IRS (Remote)
                     David Ross, CE0, TAVDS
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Graham Collett                                          February 03, 2025

5

```
 1                    I N D E X

 2   WITNESS                EXAMINATION BY              PAGE

 3

 4   GRAHAM COLLETT      MS. RANNEY                     11

 5   EXHIBIT    DESCRIPTION                            PAGE

 6

 7   GC-1               DOJ Tax Division Graham Collett   16
                        Violations Agreement Document
 8                      [4 pages]

 9   Gov. Exb 6-2       Graham Collett Email and          47
                        Attachments 12/20/2012
10                      [USPROD-03355271] + 30 pages

11   Gov. Exb 6-1       Graham Collett Email and          54
                        Attachments 12/20/2012
12                      [USPROD-03355258/03355268-0355270]

13   Gov. Exb 13-3      Red Star Enterprises Ltd          61
                        Reconciliation Document
14                      [USPROD-04708934-04708938]

15   Gov. Exb 14-79     Instance Type and Transmission    67
                        Document [USPROD-02175442]
16
     Gov. Exb 14-2      Banque De Luxembourg Documents    70
17                      [USPROD-02034297-02034351]

18
     Gov. Exb 6-3       Graham Collett Email and          73
19                      Attachments 12/20/2012
                        [USPROD-03355281] + 21 pages
20
     Gov. Exb 14-8      Bartol Ltd Accounts Documents     79
21                      [USPROD-02187243-02187263]

22
     Gov. Exb 14-75     Aspen Wind Bank Account           84
23                      Documentation
                        [USPROD-04708939-04709008]
24

25
```

Graham Collett                                    February 03, 2025

6

1                    E X H I B I T S (CONTINUED)

2

3
     Gov. Exb 14-74    Aspen Wind Corporation Letter        87
4                      and Documents
                       [USPROD-02185476-02185498]
5
     Gov. Exb 14-77    Aspen Wind Corporation Financial     88
6                      Statements for the Year Ended
                       31 December 2003
7                      [USPROD-02185960-02185971]

8    Gov. Exb 14-9     Red Star International Accounts       91
                       Payable Documents
9                      [USPROD-02049556/02049582-02049584/
                       02049788-02049790]
10
     Gov. Exb 14-15    Red Star Enterprises Limited          95
11                     Audit Queries and Requirements
                       Period Ended 30 September 2005
12                     [USPROD-02049522-02049524]

13   Gov. Exb 14-10    Red Star Enterprises Limited          97
                       Notes to the Financial Statements
14                     (continued) for the nine months
                        ended 30 September 2005
15                     [USPROD-02049402/-2049398/02049432/
                        02049446/02049452]
16
     Gov. Exb 14-26    Red Star Enterprises Limited         100
17                     Distributions to shareholders
                       Year Ended 31 December 2006
18                     [USPROD-02073776]

19   Gov. Exb 14-31    House Email 16/06/2008               107
                       [USPROD-02254900]
20
     Gov. Exb 14-29    Re: Bank Account Information          111
21                     Email chain 26/05/2008
                       [USPROD-02109686/02109696-
22                      02109700]

23
     Gov. Exb 14-30    Fax Message Documents                117
24                     [USPROD-02253541-02253559]

25

Graham Collett                                           February 03, 2025

7

E X H I B I T S (CONTINUED)

Gov. Exb 14-32      Collett/Guerreiro/Bertschy          118
                    Email chain
                    [USPROD-02112958-02112960]

Gov. Exb 14-33      Crane & Partners Correspondance     119
                    Thursday 11 September 2008
                    [USPROD-02254770-02254778]

Gov. Exb 14-34      Graham Collett Email chain          122
                    05 October 2008
                    [USPROD-04683805-04683812]

Gov. Exb 13-2       Svetlana Bianchi Email chain        126
                    28 November 2008
                    [USPROD-02027660]

Gov. Exb 14-35      Fax Messages 5 December 2008        128
                    [USPROD-02254232/02254256-02254264]

Gov. Exb 14-37      Sunage Foundation Documents         130
                    [USPROD-02061086-02061096]

Gov. Exb 14-38      Graham Collett Email 22/12/2008     131
                    [USPROD-022553769]

Gov. Exb 14-39      Re: Bartol and Aspen Wind           134
                    Corporation Email 22/12/2008
                    [USPROD-02254240]

Gov. Exb 14-40      Re: FW Payments Email               134
                    05/01/2009 [USPROD-02091472]

Gov. Exb 14-41      Re: Payments Email chain            136
                    20/01/2009
                    [USPROD-02254806-02254808]

Gov. Exb 14-42      Re: Payments Email 03/02/2009       138
                    [USPROD-02253783]

Graham Collett                                          February 03, 2025

8

```
 1
 2                    E X H I B I T S (CONTINUED)
 3
 4
 5   Gov. Exb 14-43        FW: mina media etc Email chain    139
                           19/03/2009
 6                         [USPROD-02189472/02189470/
                           02189468]
 7   Gov. Exb 14-57        Credit Suisse Edelman             141
                           Documents
 8                         [USPROD-02313234-02313239]
 9   Gov. Exb 14-60        JB and Mirabaud Notes of          144
                           meeting with Andrew Schildbach
10                         - 10.6.13
                           [USPROD-02101787-02101790]
11
     Gov. Exb 6-5          Graham Collett Email and          146
12                         Attachments 2/23/2010
                           [USPROD-03339738-03339741]
13
     Gov. Exb 6-6          DE Email and Attachment           148
14                         [USPROD-03339742-03339745]
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    PROCEEDINGS:
 2        CLERK OF COURT:  Court is now in Session. Good
 3   morning, Your Honor.  This is Criminal Case:  24-239.
 4   Defendant Number 1. The United States of America versus
 5   Douglas Edelman.
 6             The Defendant is present in the Courtroom.
 7   This matter is set for Deposition.  Parties please
 8   introduce yourselves for the Record, starting with the
 9   Government.
10        MS. RANNEY:  Good morning, Your honor. Sarah Ranney
11   --
12        Mr. GOLD:  Josh Gold in DC along with Nanette Davis
13   from the Tax Division.  Ezra Spiro and Sarah Ranney are
14   joining us in London on behalf of the Government.  Also
15   from the Tax Division.
16        JUDGE UPADHYAYA:  Okay.  Good morning.
17        MS. ROCKER:  Good morning, Your Honor.  Allison
18   Rocker joining Mr. Douglas Edelman, who is present in
19   counselling. I'm also joined by George Clarke and Sonya
20   Bishop with Baker McKenzie in London.
21        JUDGE UPADHYAYA:  Okay.  Good morning, Counsel.
22   Good morning, Mr. Edelman.  And good morning to our
23   friends in the UK.
24             And I see that the Witness is also here and
25   present.  Is that correct?  I see the witness on Zoom.
```

```
 1    All right.  Hearing, hearing no.  But can I just have
 2    the Witness wave to me, please, to make sure you can
 3    hear me, sir.  That's very good.  Thank you.
 4              I trust that everyone has read my protocol
 5    order that I issued on Friday, which was largely
 6    adopting the Parties requested protocol.  There were a
 7    few edits that I made.  I will not be on the bench, as
 8    you all know, for the Deposition, but I will be
 9    available throughout the week for any disputes, or any
10    objections upon which I need to rule.
11              I also will not be opening Court every day
12    this week other than today, because today I'm going to
13    be swearing in the Witness.
14              Are there any preliminary matters before I
15    swear the Witness in?
16        MS. ROCKER:  Nothing for Mr. Edelman.
17        JUDGE UPADHYAYA:  All right.  And I just want to
18    confirm, Mr. Edelman, you can see the Witness?  Correct?
19    From where you're sitting.  Okay.  All right.  And so I
20    will ask the witness to please raise his right hand.
21              Sir, do you swear under penalty of perjury,
22    under the laws of the United States that the testimony
23    will be giving in this deposition is true and accurate,
24    so help you God?
25        THE WITNESS:  I do.
```

```
 1        JUDGE UPADHYAYA:  Okay.  Thank you.  All right.
 2   Well.  I will let you all resume, and if there are any
 3   issues that you need me for, just call my chambers.  And
 4   I think you all have my chambers phone number.  Is that
 5   right?  Okay.  All right.  I'll, let me give you my
 6   chambers phone number is 202.354.3230. So, you'll
 7   contact me, not Judge Collacatelli's chambers.  Even
 8   though Judge Collacatelli's Chambers was very gracious
 9   to help us get this all set up.  You'll call me if you
10   have any issues.  Okay.  All right.  Thank you.  All
11   right.
12                        EXAMINATION
13   BY MS. RANNEY:
14        Q.    It sounds like everyone is ready.  Will you
15   please state your name and spell it for the Record?
16        A.    It's Graham --
17              (Brief umuted colloquoy from Court.)
18   BY MS. RANNEY:
19        Q.    Will you please state your name and spell it
20   for the Record?
21        A.    It's Graham Aubrey Collett.  That's
22   G-R-A-H-A-M.  A-U-B-R-E-Y.  C-O-L-L-E-T-T.
23        Q.    And Mr. Collett, where do you live?
24        A.    I live in London.
25        Q.    Before we get started, I'd like to ask about
```

1    any physical issues that you might have impacting your

2    ability to see, or hear.  Do you have any such issues?

3         A.    I have very limited hearing.  I have 25%

4    hearing in my left ear, and none in my right ear.

5         Q.    Mr. Collett, are you able to read my lips

6    when I'm facing you and speaking to you?

7         A.    Yes, I can hear you quite clearly.

8         Q.    And are you generally able to hear what's

9    going on in the room today?

10         A.    Pretty well, yes.

11         Q.    If at any point you are not able to hear

12    where someone is speaking to you.  And you're not able

13    to read their lips, please let us know, will you?

14         A.    Certainly.

15         Q.    Mr. Collett, do the hearing issues you just

16    mention impact your ability to answer questions

17    truthfully?

18         A.    No, I don't think it does.

19         Q.    Do your hearing issues impact your ability to

20    recall events or remember things?

21         A.    Not that I'm aware of.

22         Q.    Mr. Collett, what do you currently do for

23    work?

24         A.    I am now at this precise moment retired.

25         Q.    Before you retired, what line of work were

1    you in?

2         A.    I was a Chartered Accountant for most of my

3    working life.

4         Q.    When did you become a Chartered Accountant?

5         A.    I qualified in 1972 as a member and later a

6    fellow of the Institute of Chartered Accountants in

7    England and Wales.

8         Q.    And did you work as a Chartered Accountant

9    over the course of your career?

10        A.    Yes.

11        Q.    And if you had to just generally characterize

12   for us, what type of Accounting did you do in your

13   career?

14        A.    I was mainly involved with audit work,

15   general Accounting.  Those were my main tasks, main

16   specialties that I focused on during my whole career.

17        Q.    And if we could go over just some of the very

18   high points of your resume; could you give us perhaps

19   the last several jobs you had before you retired?

20        A.    Following my qualification, I spent a number

21   of years with a large London firm.

22        MR. CLARKE:  Well, they're having a tough time

23   there. They're having a tough time hearing.

24        MR. SPIRO:  Can we increase his sound levels?

25   They're having a hard time hearing.

Graham Collett                                          February 03, 2025
14

1      VIDEOGRAPHER:  So, we're currently using the table

2   audio, just so we don't get feedback.  Give me one

3   moment, Counsel.

4      MR. SPIRO:  They're getting headphones for

5   Mr. Edelman.

6      MR. CLARKE:  As long as it's not this end.  If it's

7   that end, we can?

8      COURT REPORTER:  It's very clear in the headphones.

9      VIDEOGRAPHER:  Hi, Counsel, can you hear me now?

10  Is that any better?

11     MS. RANNEY:  Mr. Collett, can you say one more

12  thing to test the audio in the courtroom?

13     THE WITNESS:  Yes, indeed.  Is that clearer?  Can

14  you hear me more clearly now.

15     VIDEOGRAPHER:  Please, there's an issue with my

16  laptop.  It seems as soon as I plug that in.  It seems

17  to -- I'm sorry, Counsel, my main laptop seems quite

18  literally to have just died.

19     MR. CLARKE:  These things happen. It's technical.

20     MS. RANNEY:  No, no fainting.

21     VIDEOGRAPHER:  Okay, Counsel.  I'm incredibly sorry

22  for the interruption.

23     MS. RANNEY:  No worries.

24     VIDEOGRAPHER:  Mr. Collett, are you able to say

25  something?

Graham Collett                                          February 03, 2025

15

```
 1        THE WITNESS:  Yes. Can you hear me more clearly
 2   now?
 3        MR. CLARKE:  Yes.
 4        THE WITNESS:  Okay.
 5        MS. RANNEY:  Great.
 6        COURT REPORTER:  Yes.
 7   BY MS. RANNEY:
 8        Q.    All right.  We'll jump back in.
 9             Mr. Collett, you were just telling us about
10   your career as an Accountant.  Would you tell us what
11   you did perhaps for the last 20 years before you
12   retired?
13        A.    For the last 20 years, I was a Partner in
14   Crane & Partners from 2003, involved primarily in a
15   range of small and medium sized clients in terms of
16   accounting and auditing and business planning to a
17   certain extent.
18             And then from 2004, after meeting
19   Mr. Edelman, I carried on with Crane & Partners until I
20   retired from the Partnership in 2012, and then spent
21   10,12 years working with the Trust structures for
22   Mr. Edelman until my retirement in 2023, which occurred
23   following a major medical cardiovascular problems that I
24   experienced.
25        Q.    Mr. Collett, I'd like to break apart a few
```

1   things that you just said there.  But first, you

2   mentioned Mr. Edelman.  Is that Douglas Edelman, you're

3   referring to?

4        A.    That's correct.

5        Q.    And do you see Mr. Edelman as a virtual, or

6   in-person attendee to these proceedings?

7        A.    Yes, I do.

8        Q.    And can you tell us what color shirt he's

9   wearing today?

10       A.    It's a white shirt.

11       Q.    Mr. Collett, you mentioned that you worked

12  with small to medium sized clients over the course of

13  your career.  Were these businesses individuals, or

14  both?

15       A.    Both.

16       MS. RANNEY:  Mr. Collett, before we talk about your

17  career, or your work much further, I'd like to look

18  together at GC-1, if we could.

19  (Exhibit GC-1 was entered into evidence.)

20  BY MS. RANNEY:

21       Q.    Mr. Collett, you have the Exhibits before you

22  in hard copy and on the screen.  Are you able to see

23  clearly on the screen and/or in hard copy when I show

24  you the Exhibits?

25       A.    Yes, I am.

Graham Collett                                        February 03, 2025

1      Q.    If at any point you have problems seeing an

2  Exhibit on the screen and/or in hard copy, please let us

3  know.  Mr. Collett, do you recognize GC-1?

4      A.    Yes, I do.

5      Q.    Can you tell us what it is?

6      A.    It is an Agreement between myself and the

7  Department of Justice in terms of the violations that

8  have been committed by myself.  And this is an Agreement

9  of non-prosecution in the event of providing a full and

10  accurate and truthful Testimony.

11      Q.    Mr. Collett, could we turn to the last page

12  of this Exhibit, please.  Is that your signature on the

13  last page of this document?

14      A.    Yes, it is.

15      Q.    And can you, you described the Agreement for

16  us a moment ago, but can you tell us what you understand

17  to be your obligation under this Agreement?

18      A.    To provide a full record; truthful, accurate

19  record of all my dealings in connection with Mr. Edelman

20  and also to provide full cooperation with the Department

21  of Justice in every aspect of this case, that I'm able

22  to.

23      Q.    Mr. Collett, you mentioned meeting

24  Mr. Edelman a while ago and working for him for some

25  time.  Can you tell us what year you met Mr. Edelman?

Graham Collett                                    February 03, 2025

18

1        A.      It was 2004.

2        Q.      And what were you doing in 2004 when you met

3   Mr. Edelman:  What were you doing for work?

4        A.      I was a Partner in Crane & Partners at that

5   time which was a, at that time a five partner firm in

6   South London.

7        Q.      And how did you meet Mr. Edelman?

8        A.      I met Mr. Edelman, I was introduced to him by

9   a client of mine, Charles Tryon, who at that particular

10  time was working with Mr. Edelman.

11       Q.      And in 2004, when you met him what generally

12  speaking, what type of work were you doing at Crane &

13  Partners?

14       A.      General accounting work and audit work.

15       Q.      And what did Mr. Edelman tell you about

16  himself when you met him?

17       A.      He told me that he was involved in fuel

18  logistics in Central Asia.  He told me that he was

19  working on various contracts for Government Departments.

20  U.S. Government Departments, and that he was, he was the

21  main lead in, in dealing with those contracts.

22       Q.      Did he tell you where he was from; that is

23  what, which country he was a citizen of?

24       A.      Yes.  He told me, was he was from the U.S.

25       Q.      And did he tell you what type of services he

1  might need from you?

2        A.    The first services that he said he needed was

3  some help in preparing accounts for two of the Companies

4  that he was operating at the time.

5        Q.    And what two Companies were those?

6        A.    Aspen Wind Corporation and Bartol Ltd.

7        Q.    And could you sketch out for us the general

8  period of time that you continue to do the work you just

9  mentioned for Aspen Wind and Bartol?

10       A.    It was primarily a one-off exercise for the

11  years 2000 to 2004, based on the records that were

12  available at the time.

13       Q.    And did Mr. Edelman ever ask you to do any

14  additional projects?

15       A.    As time went on, yes, he did.  As I say, it

16  was ad hoc work for quite a period of time from 2004 to

17  2008.  And then became more regular from that time

18  onward.  And in the meantime, from 2005 until 2012, I

19  was auditing the accounts of Red Star Enterprises Ltd

20  and Mina Corp Ltd when the businesses were based in

21  Geneva and latterly in Dubai.

22       Q.    You mentioned some sort of ad hoc tasks

23  during that early period of time.  Can you just give us

24  a general sense of what those ad hoc tasks were?

25       A.    They were, in the period from 2005 to 2008,

Graham Collett                                    February 03, 2025

1  it was a fairly limited amount of work.  For example,

2  providing a certificate for a property rental Company,

3  looking at one or two potential purchases of property,

4  and generally not a great deal of work during that

5  particular time.

6         Q.    Let's focus on this, this period of time for

7  a moment.  How were you getting paid for the projects

8  you did for Mr. Edelman during that early period?

9         A.    During that early period up until very late

10  on in 2007, any work carried out, including the audit

11  work for the Red Star and Mina business, was billed

12  through Crane & Partners.

13         Q.    And did your role, or your tasks for

14  Mr. Edelman start to increase after for the date you

15  just mentioned?  I think you said 2008.

16         A.    Yes.  In late 2007.  November, to be precise.

17  I recall Mr. Edelman asked me to be a signatory to one

18  or two bank accounts in conjunction with Iryna

19  Tzsenzharyk, who was a, who was working in the business

20  alongside Mr. Edelman at that time.

21         Q.    And approximately how long did that role

22  continue?

23         A.    That role continued for early 2008 onwards in

24  terms of various bank accounts for various Companies

25  over the period, until 2020.

Graham Collett                                        February 03, 2025

1    Q.    Mr. Collett, after 2008, how were you paid

2  for the Projects that you did for Mr. Edelman?

3    A.    In terms of the main Projects involved, I

4  billed from my own practice as Graham Collett and

5  Company.

6          And then from 2013 onwards, in terms of the

7  operation of payments through Widmore Business

8  Solutions, a Company of which I was the sole shareholder

9  in connection with the, with the business of Bluestone

10 International Ltd, which operated the, all the routine

11 payments of the Trust structure at that time.

12   Q.    Mr. Collett, in the early period you just

13 described, who gave you instructions for your day to day

14 tasks that you are completing for Mr. Edelman?

15   A.    The day to day tasks and general instructions

16 came from Mr. Edelman.

17   Q.    And who did you consider to be your boss on

18 the Projects that you get in that early period, for

19 Mr. Edelman?

20   A.    In respect of anything to do with the

21 businesses which Mr. Edelman was running, then I

22 considered Mr. Edelman to be the boss.

23   Q.    And what about the second period you

24 mentioned, from I think it was approximately 2008 to

25 2012?  Who gave you instructions on your day to day

1  tasks?

2      A.    Again, Mr. Edelman was the person who, who

3  directed me and from whom I took directions.

4      Q.    And who did you consider to be your boss on

5  those projects?

6      A.    Mr. Edelman.

7      Q.    In that second period, you mentioned that you

8  were paid through your own Company that you had formed,

9  whose idea was it to start that set-up in approximately

10 2008?

11     A.    That was primarily myself making that

12 decision to, to bill the relevant entities on which I

13 was receiving instructions from Mr. Edelman.

14     Q.    And why were you billing separately from your

15 work at Crane & Partners?

16     A.    I was billing my work separately, because I

17 was the one who was actually providing those tasks,

18 rather than Crane & Partners' staff and resources.

19     Q.    Whose idea was it for you to take on those

20 additional tasks around 2008?

21     A.    In terms of the, in terms of my involvement

22 it was my, it was my choice to actually bill through my

23 own accounting practice at that time.

24     Q.    And what about in 2012?  I believe you

25 mentioned that you retired from Crane & Partners then.

1  Can you describe for us how your role changed in 2012?

2       A.    My role changed in 2012 when the Galactea

3  Trust structure and other identical Trusts were set up,

4  at which time I became a Protector of those Trusts.  And

5  I billed, I set up Widmore Business Solutions and I

6  billed the Trust for all the services that I carried out

7  from that time. The bills are going to the Trust, the

8  Trustee who authorized the payments and who, with whom I

9  was working.

10      Q.    So, I'd like to talk about that second period

11 of time then, if I could: the 2008 to 2012 and the

12 change you just mentioned.

13            In that period of time, who gave you

14 instructions for the day to day tasks that you completed

15 for Mr. Edelman?

16      A.    In that period from 2008 to 2012?  That was

17 Mr. Edelman.

18      Q.    And who did you consider to be your boss on

19 the projects that you completed for Mr. Edelman?

20      A.    Mr. Edelman.

21      Q.    And were you paid a salary during that period

22 of time through the work you billed through your own

23 Company?  Or were you paid an hourly rate?

24      A.    I billed on an hourly rate, on a monthly

25 basis.

Graham Collett                                          February 03, 2025
                                                                      24

1        Q.    And who set your hourly rate?

2        A.    I set that primarily myself.

3        Q.    If you wanted a raise in your hourly rate,

4   who did you go to?

5        A.    I would mention it to Mr. Edelman and he

6   would approve that on the basis of approving the monthly

7   bills that I sent.  I raised and sent to him for

8   approval.

9        Q.    In the earlier period that we mentioned, 2004

10  to approximately 2008, did you ever take your day to day

11  instructions from Delphine Le Dain?

12       A.    No.  I never took any instructions from

13  Delphine Le Dain during that period.

14       Q.    What about the second period of time we just

15  discussed?  Approximately 2008 to 2012.  Did you take

16  day to day instructions from Delphine Le Dain?

17       A.    No, I didn't.

18       Q.    So, I'd like to now talk about 2012 and the

19  change you mentioned at that point.  Can you tell us

20  when was the official last date you were at Crane &

21  Partners?

22       A.    I believe it was the 31st of January 2013 was

23  the final date that I actually -- was the date on which

24  I finally left Crane & Partners.

25       Q.    And do I understand correctly that after you

Graham Collett                                                February 03, 2025

1    left Crane & Partners then you continued working through

2    Widmore up until 2023 when you had the health event you

3    mentioned?

4          A.    That's correct.

5          Q.    And during that period of time, 2012 to 2023,

6    who did you consider to be ultimately giving you your

7    day to day instructions on what to do?

8          A.    That was Mr. Edelman.

9          Q.    And who did you consider your boss in that

10   period of time?  2012 to 2023?

11         A.    That was, again was Mr. Edelman.

12         Q.    And how were you paid in that period, 2012 to

13   2023?

14         A.    I was paid on the basis of same, same

15   processes before, based on hourly billing rates and

16   hours spent, which I submitted to the Trustee of

17   Galactea Trust for approval.  I.e. Salamander

18   Associates.

19         Q.    And who set your hourly rate in that period

20   of time, 2012 to 2023?

21         A.    I set the hourly rate which was reviewed

22   perhaps once a year or so, which I, which I, I informed

23   the Trustee of the, of the actual increases.

24         Q.    And when you wanted a raise in your hourly

25   rate, who did you go to?

1     A.    I primarily went to the Trustee, but also

2 mentioned it to Mr. Edelman that I was increasing the

3 amount by usually a very modest amount.

4     Q.    And why were you telling Mr. Edelman, or

5 keeping him in the loop about wanting an increase in

6 your rate?  What was his role at that point?

7     A.    At that particular time, I was still

8 reporting largely to Mr. Edelman and it was more out of

9 courtesy than anything to let him know that I was, I was

10 increasing the rate.

11     Q.    In addition to the hourly rate for your time

12 in the periods that you were billing hourly; did you

13 have any other types of confidence action or bonuses?

14     A.    Yes, I did.  And in common with other people

15 working within the Organization, Mr. Edelman would vote

16 discretionary bonuses, of which I received several

17 during the period from 2013 up to 2019, I believe.

18     Q.    And to the extent of your knowledge, who set

19 the amount of any bonuses that you were paid?

20     A.    That was Mr. Edelman.

21     Q.    Were these regular bonuses, or were they

22 discretionary bonuses?

23     A.    They were discretionary bonuses.

24     Q.    And whose discretion often decided whether or

25 not you would get a bonus?

Graham Collett                                          February 03, 2025

27

 1        A.     I believed it was Mr. Edelman on the basis

 2   that he communicated those bonuses to me and to others.

 3        Q.     And as you sit here now, do you recall any

 4   specific amounts of bonuses that you got at any

 5   particular point in time?

 6        A.     Yes, there were certainly, there was, that

 7   they ranged between 50, 50,000.  The last bonus covering

 8   a period of two years was for 250,000.

 9        Q.     Do you remember approximately when you got

10   the 250,000 bonus?

11        A.     I believe it was round about 2019.

12        Q.     Mr. Collett, you mentioned working for some

13   sort of Organization. I'd like to follow up on that, if

14   we could.

15             In the first period that we talked about

16   approximately 2000, four to 2008, who were, who, if

17   anyone, were you in contact with other than Mr. Edelman

18   for the Projects you did for him?

19        A.     My primary contact at that stage in

20   connection with general matters relating to the two

21   Companies of which we prepared the accounts for, in the

22   first instance, i.e. Aspen Wind corporation and Bartol

23   Limited, I was liaising with Iryna Tsenzharyk, who was

24   an Administrative Assistant working directly with

25   Mr. Edelman.

1          Then in connection with Red Star Enterprises

2   Limited and Mina Corp, with the Gibraltar based

3   Companies, I was I was liaising with Anthony Guerne who

4   was the CEO of those two Companies from 2015 for

5   approximately three years.

6        Q.    Was it 2015 or an earlier date?  Apologies

7   I'm not sure, are we talking about the earlier period of

8   time?

9        A.    No. from 20 -- from 2005 onwards, in

10  connection with the audit of Red Star and Mina Corp, I

11  was working with Mr. Guerne, who was the CEO of those

12  two Companies at the time.  And I was also liaising with

13  Nikolai Ushakov who was the Financial Controller of

14  those two Companies.

15       Q.    You mentioned Irina Tsenzharyk.  Did you know

16  where Ms. Tsenzharyk was based in this early period of

17  time?  We're talking about 2004 to 2008?

18       A.    She was based in London.

19       Q.    And what about Nikolai Ushakov?  Do you know

20  where he was based in that period of time?

21       A.    He spent some of his time in London but also

22  spent time in Geneva in the Geneva office of Red Star

23  and Mina Corp.

24       Q.    And what about Mr. Guerne?  Do you know where

25  he was based in this early period of time?  2004 to

Graham Collett                                          February 03, 2025
29

1  2008?

2       A.    2004, 2008?  He, he was based almost entirely

3  in Geneva.

4       Q.    And what about Mr. Edelman?  Do you know

5  where he was based during that period of time where he

6  was living?

7       A.    He was based largely in London.

8       Q.    And can you tell us what your communications

9  with him were in that period of time?  Were you seeing

10 him in person or communicating via phone, or email?

11      A.    It was a mixture of all levels of

12 communication. We would meet in London spasmodically.

13 Otherwise, it was by email, or by phone.

14      Q.    Were you able to observe, or be part of

15 communications giving you an impression of who Iryna

16 Tsenzharyk's boss was; who she reported to?

17      A.    I believe that she reported to Douglas

18 Edelman.

19      Q.    And what about Nikolai Ushakov?  Were you

20 able to observe who he reported to, who his boss was?

21      A.    I think he, for my, for my knowledge of what

22 he was actually doing during that period, he was

23 liaising with Mr. Guerne and also with, with, with

24 Mr. Edelman.

25      Q.    And what about Mr. Guerne?  Were you able to

1  observe who he was taking instructions from?

2      A.    It's a little bit difficult to answer that

3  question precisely on the basis that I was not working

4  closely with with Mr. Guerne.  But on the basis of the

5  transactions and the business that was being carried

6  out, I believe that Mr. Guerne was liaising primarily

7  with Mr. Edelman during that period of time.

8      Q.    And in the second period of time that you

9  mentioned; approximately 2008 to 2012, were those same

10 individuals a part of the Projects that you were working

11 on?

12     A.    Yes.  With the exception of Mr. Guerne who

13 was succeeded by -- he, he left the Organization and a

14 new CEO was appointed.

15     Q.    Do you know where Ms. Tsenzharyk worked?

16     A.    Ms. Tsenzharyk worked in the London office

17 for that period as well.

18     Q.    Was the London office to your knowledge, up

19 and running in the earlier period?

20     A.    Yes.  The London office to my knowledge, was

21 certainly running from 20 -- early part of 2004 when it

22 moved addresses.  It changed the office, but still,

23 main-still maintained in London for that period.

24     Q.    And what about the second period?  Was there

25 a London office, approximately 2008 to 2012?

1    A.    Yes, the London office moved to Conduit

2  Street in, I believe, about 2008 to 2009.

3    Q.    And was there anyone working in the London

4  office besides Ms. Tsenzharyk?

5    A.    Yes.  Charles Tryon was working in the London

6  office as well, and one or two others were working in

7  the London office on various other Projects, mainly

8  related to Media.

9    Q.    The others in the London office; were you

10  able to observe who they took their instructions from?

11    A.    In terms of Iryna Tsenzharyk, she was taking

12  her instructions from Douglas Edelman.  As far as others

13  primarily on the Media side, any Media Projects were

14  also being directed by Mr. Edelman and Charles Tryon was

15  working on various Projects in conjunction with

16  Mr. Edelman.

17    Q.    I'd like to talk about the last period that

18  you mentioned, between 2012 to 2023.  Was there a

19  Conduit Street office during this period of time?

20    A.    There was up until I believe, the middle of

21  2000, 2021, when the Conduit office was closed.

22    Q.    Do you know if Ms. Tsenzharyk worked in the

23  Conduit Street office between 2012 till the office was

24  closed?

25    A.    Yes, she did.

Graham Collett                                    February 03, 2025

1      Q.    And did you ever work out of that office?

2      A.    Not on a permanent basis.  If I had anything

3   specifically that I needed to to liaise with

4   Ms. Tzenzharyk, or if there were meetings on various

5   other projects that were going on that I needed to be in

6   attendance, then I would work out of the Conduit office.

7   But that wasn't a permanent arrangement.

8      Q.    Mr. Collett, you mentioned a moment ago that

9   you took on a new role after you left Crane & Partners.

10  Can you give us just a very brief description of your

11  role between 2012 and 2023?  In terms of the day to day

12  tasks that you were doing?

13     A.    In terms of the day to day tasks, I was

14  maintaining accounting records for the main entities

15  that had been set up at that time.

16         I was working on various Projects;

17  investments that were being made in conjunction with

18  with other individuals who were responsible for those

19  Projects; making, making payments from the various

20  business accounts in conjunction with Iryna Tsenzharyk,

21  and liaising generally with the businesses that were

22  operating at the time.

23         In addition to that, I was also liaising with

24  the main personnel who were running the Red Star Mina

25  business in Dubai.

1    Q.    Mr. Collett, during this period of time, 2012

2    to 2023, did you ever take your instruction as to the

3    day to day tasks you were to complete from Delphine Le

4    Dain?

5    A.    No.  I was not taking any day to day

6    instructions from Delphine Le Dain.

7    Q.    You mentioned a moment ago that there was an

8    Organization during this period of time.  Can you

9    describe for us the different people involved in this

10   Organization who you worked with on a continuing basis?

11   A.    There were several people involved in the

12   Organization and running of various Projects and

13   investments that had been made during that period.

14          In terms of specifics, for example Robert

15   Dooner was involved in quite a few of the Projects

16   related to satellite technology and telecommunications

17   in Afghanistan.

18          Working from the London office, Martin Shiel,

19   and latterly, one or two others were working on Media

20   Projects.

21          Tom Ehr was working on various Projects,

22   including the Mexican Land and Media, Media Projects,

23   including the, the licenses in, in central Europe for

24   MTV.  Those were some of the main people involved.

25   Q.    So, I'd like to talk about Mr. Dooner first.

Graham Collett                                      February 03, 2025
                                                              34

```
 1    Do you know where Mr. Dooner was from?
 2         A.    I believe he was from the U.S.
 3         Q.    And when do you recall meeting Mr. Dooner for
 4    the first time?
 5         A.    I can't remember exactly when it was, but to
 6    the best of my knowledge, it was, I liaised with him on
 7    various things that he was doing from about 2009.
 8         Q.    And do you have any personal knowledge about
 9    how Mr. Dooner came to be involved in this Project?
10    What was his connection to the Project he was doing?
11         A.    I can't really remember.
12         Q.    Do you know if he was Delphine Le Dain's
13    friend?
14         A.    I'm not really sure about that at all.
15         Q.    Do you know if he was Douglas Edelman's
16    friend?
17         A.    That was certainly the impression that I got.
18         Q.    And did you have any chance to observe who
19    Mr. Dooner was taking his day to day instructions from?
20         A.    I believe based on the projects that he was
21    involved in and the extent to which he liased directly
22    with Mr. Edelman, that he was taking his instructions
23    from Mr. Edelman.
24         MR. CLARKE:  Witness is speculating.
25         MS. RANNEY:  Is that an objection?
```

Graham Collett                                      February 03, 2025
                                                              35

1        MR. CLARKE:  It's an objection.

2   BY MS. RANNEY:

3        Q.    Mr. Collett, were you involved in meetings

4   with Mr. Dooner and Mr. Edelman over the period of time

5   that you worked with both of them?

6        A.    Yes, when necessary.

7        Q.    And were you on email communications with

8   Mr. Edelman and Mr. Dooner?

9        A.    Yes, I was.

10       Q.    And from the meetings that you were in and

11  the email communication lines that you had with both of

12  them, were you able to observe who was giving Mr. Dooner

13  the instructions for the tasks he was to complete on a

14  day to day basis?

15       A.    On the basis of that level of communication,

16  I believe that Mr. Dooner was taking his instructions

17  from Mr. Edelman.

18       Q.    And you mentioned a person named Martin

19  Shiel.  Can you tell us approximately when Martin Shiel

20  became involved in any of these ventures?

21       A.    I think that was largely the period from

22  2005.  Maybe early 2006 onwards.

23       Q.    And how did he relate to all of this?  Was he

24  a business associate, or friend?  Do you know how he

25  played into the picture?

Graham Collett                                    February 03, 2025

36

1        A.    I'm not quite sure of the background.  What I
2   do know is that Martin Shiel was involved in Media:
3   Films, that sort of business.  But I'm not quite sure
4   how he sort of came into contact with Mr. Edelman.
5        Q.    Do you know who brought him into the Project
6   in the first instance?
7        A.    To the best of my knowledge, it was
8   Mr. Edelman.
9        Q.    Were you in in-person meetings with Martin
10  Shiel over the course of your work with him?
11       A.    Yes, I was.
12       Q.    And were you on email communications with
13  Mr. Shiel over the course of your work with him?
14       A.    Yes.
15       Q.    And from your involvement in those
16  communications, were you able to tell who Mr. Shiel took
17  his instructions from or who he considered to be his
18  boss?
19       A.    I believed his boss to be Mr. Edelman on the
20  basis of the Projects that he was working on in terms of
21  film production and other Media interests.
22       Q.    And you mentioned someone named Tom Ehr.  Do
23  you know where Mr. Ehr was from?
24       A.    Mr. Ehr is a U.S. citizen.
25       Q.    And can you tell us approximately when

1  Mr. Ehr came onto the scene?

2       A.    In terms of my knowledge at the time that

3  would have been round about 2008.

4       Q.    And were you in in-person meetings with

5  Mr. Ehr over the course of your involvement in these

6  Projects?

7       A.    Yes.

8       Q.    And were you on email communications with him

9  over the course of your involvement?

10      A.    Yes, I was.

11      Q.    And were you able to tell who Mr. Ehr was

12  taking his day to day instructions from?

13      A.    In terms of the Projects that I knew that

14  Mr. Ehr was working on, he was taking his instructions

15  from Mr. Edelman.

16      Q.    And were you involved in any financial

17  transactions related to any of the three people we just

18  talked about being paid for their work?

19      A.    I'm not quite understanding the question.

20      Q.    Do you know how Mr. Dooner was paid, if at

21  all, for his work on the Satellite Project?

22      A.    Mr. Dooner was originally, in the earlier

23  years, he was paid through the two original Companies,

24  Aspen Wind and Bartol, and latterly I believe that he

25  was paid through the Afghan companies for

1    telecommunications.

2        Q.    And what about Mr. Shiel, do you have any

3    personal knowledge about how he was paid?

4        A.    Mr. Shiel was paid through, again, through

5    the same companies, the original companies in London and

6    then latterly through the Trust Company on a monthly

7    salary basis.

8        Q.    And what about Mr. Ehr?  Do you have any

9    personal knowledge about how he was paid?

10       A.    On a similar basis.

11       Q.    You mentioned a few moments ago when we were

12   talking about your bonus, that there may have been

13   bonuses for others.  Do you have any personal knowledge

14   about whether the individuals we just talked about were

15   paid any bonuses related to their work?

16       A.    I was certainly aware that Mr. Ehr was, was

17   was paid bonuses.  And also Mr. Sheil in the early

18   years, but not to any great extent.

19       Q.    To the extent of your knowledge, who

20   determined whether those individuals got bonuses?

21       A.    To my knowledge, it was Mr. Edelman who

22   decided on any bonuses to be paid.

23       Q.    Before we dig more deeply into your work in

24   these periods of time, I'd like to ask about more about

25   the office here in London.  To the extent of your

1  knowledge, did Mr. Edelman work in the London office on

2  a day to day basis?

3      A.    In the early period, he spent quite a lot of

4  time in the first London office in Park Place.

5  Thereafter, as far as Conduit Street is concerned, he

6  would be in that office, not on a full-time basis, but

7  he would be there for relevant meetings and discussions.

8      Q.    And what about in the later period, the 2012

9  to 2023 period, we discussed, did Mr. Edelman work in

10  the Conduit Street office in that period?

11      A.    Again, on the same sort of basis for, for

12  meetings and so on.  But he did not work on a day to day

13  work regular basis in the office.

14      Q.    In the early period of time that we just

15  talked about in the 2004 to 2008 period, do you recall

16  seeing Delphine Le Dain in the London office?

17      A.    No, I didn't.

18      Q.    And what about in 2008 to 2012?  Was she in

19  the London office?

20      A.    No.

21      Q.    And what about 2012 to 2023?  Was she in the

22  London office?

23      A.    No, not at all.

24      Q.    And in that period, 2012 to 2023, did you

25  ever take your day to day instructions for tasks to

Graham Collett                                    February 03, 2025

40

1  complete from Delphine Le Dain?

2       A.    No, I didn't.

3       Q.    In the earlier period, 2004 to 2008, when you

4  were still at Crane & Partners, how were you keeping

5  records related to your work on Mr. Edelman's Projects;

6  how did you keep the documents that you used for your

7  Projects?

8       A.    In terms of the limited amount of work I did,

9  other than the initial accounting work, then I would

10  maintain written records and I would maintain files of

11  information that were relevant to the work that I was

12  carrying out.

13       Q.    And for the period 2008 to 2012, for your

14  Crane & Partners work, did you continue to keep records

15  in the same way?

16       A.    In terms of the, the audit of the accounts of

17  Red Star Enterprises Ltd and Mina Corp, then there were

18  audit files of information.  In terms of payments that I

19  was making from the various bank accounts, I would

20  maintain detailed records of those payments including

21  the supporting documentation for those payments together

22  with any other information relevant to anything else

23  that I was doing during that time.

24       Q.    And in keeping those records, were you also

25  keeping documents from Third Parties, like invoices or

1  bank statements, or supporting documentation from other

2  sources?

3       A.    Yes, where relevant, that is the case.

4       Q.    And how would you use those types of records

5  in the work that you were doing on an ongoing basis?

6       A.    In terms of the documentation, I would use

7  that for any in relation to the specific tasks.  In

8  terms of other documentation, I would maintain it as a

9  record of support for payments that were made.

10      Q.    And did you keep those records in the regular

11  course of your job in that earlier period of time up

12  until 2012?

13      A.    Up until 2012?  Yes.

14      Q.    And did you ever have occasion to rely on

15  them to prepare financial summaries, or other sort of

16  documents that you would need to prepare for your

17  Projects?

18      A.    Yes.  In terms of for example, any accounting

19  records would be based on the, the bank statements and

20  supporting documentation for payments where relevant.

21      Q.    Now, I'd like to talk to you about the period

22  between 2012 and 2023.  Did you continue to keep records

23  after you left Crane & Partners related to your work on

24  these Projects for Mr. Edelman?

25      A.    Yes, I did.

Graham Collett                                              February 03, 2025

42

1    Q.    And can you tell us physically, how did you
2  keep these records?  Where were they?
3    A.    In the initial period I kept those in my home
4  address, and then latterly, I went to the small office
5  close to where I was living, and maintained those
6  records in that office.
7    Q.    And can you tell us where this small rented
8  office was?
9    A.    It was in a serviced office building
10 initially in Chislehurst and then later in Bromley.
11   Q.    And approximately when did you have this
12 rented office?
13   A.    The first one in Chislehurst was
14 approximately 2014.  2015.  And then latterly up until
15 the beginning of 2004 -- sorry, 2024 that I vacated the
16 office that I had in Bromley.
17   Q.    And just to confirm, when you vacated an
18 office, or moved office, would you take your records
19 with you?
20   A.    Yes, indeed.
21   Q.    And in terms of how you kept these records,
22 did you have any sort of system for keeping track of the
23 records?
24   A.    For example in terms of the, the payments
25 made from the various entities, there were files of

1  payment advices with supporting documentation.  There

2  would be files containing the monthly accounts based on

3  the various transaction patterns.  There would also be

4  files in relation to the main Projects.  For example,

5  the, the, the, the, the, that the business in, in Kenya,

6  or the MTV business, or all the various Projects then I

7  would maintain files for each of those.

8       Q.    When your rented office closed, where did you

9  take the files to?

10      A.    I took those to my home address in

11  Robertsbridge.

12      Q.    And Mr. Collett, we will discuss this more

13  later, but in November 2020, do you recall that records

14  were seized from your house?

15      A.    Yes, indeed.

16      Q.    And at that point in November 2020, can you

17  describe for us what the state was of your records where

18  were they physically kept?

19      A.    They were kept partly in the house and partly

20  in the garage.  Because, because of the volume of them.

21  More of the archived records were kept in the garage.

22      Q.    And did you have the records just in loose

23  stacks or did you have some sort of organizational

24  system?

25      A.    They were in a fairly organized state of

1  boxes relating to the various Projects and lever arch

2  files stored in the boxes relevant to those particular

3  Projects.

4      Q.    Mr. Collett, do you recall being asked in

5  preparation for your testimony to review sets of records

6  that were retrieved from your files in November 2020?

7      A.    Yes, I do.

8      Q.    And when you reviewed those files, did you

9  recognize them to be records that you had been keeping

10  related to your work as we just described in the three

11  different periods?

12     A.    Yes, I do.

13     Q.    And did you recognize those records to be

14  made at, or near the time of the occurrence of the

15  matters set forth in those records?

16     A.    To the best of my ability and recognition,

17  yes.

18     Q.    And did you recognize them to be made from

19  information transmitted by a person with knowledge of

20  those matters?

21     A.    Again, to the best of my knowledge, yes.

22     Q.    And did you recognize these records to relate

23  to business activities that had caused you to make these

24  records in your regular practice?

25     A.    That is correct.

Graham Collett                                          February 03, 2025
                                                                      45

```
 1       Q.    And did you recognize these records to be if
 2   not originals, potentially duplicates of the actual
 3   originals in your files?
 4       A.    That again, is correct.  To the best of my
 5   knowledge.
 6       Q.    And Mr. Collett, did you make and sign, or
 7   did you sign a certificate written about these records
 8   and the aspect of them that we just discussed in advance
 9   of your testimony today?
10       A.    Yes.
11       MS. RANNEY:  Is everyone okay if we keep going, or
12   is now a good time for a five minute break?  All right.
13       MR. CLARKE:  I would say ask the Witness.
14       MS. RANNEY:  Mr. Collett, would you like a five
15   minute break, or keep going.
16       THE WITNESS:  I'm alright at the moment.
17   BY MS. RANNEY:
18       Q.    Okay.  Mr. Collett, you mentioned two
19   businesses near the beginning of your testimony:  Aspen
20   Wind and Bartol Limited.  Can you recall Mr. Edelman
21   telling you about what these businesses did?
22       A.    He told me that they had, that the two
23   businesses had actually started on various transactions
24   relating to the purchase and sale of fuel.  There was
25   fuel logistics Projects based in, in Asia.
```

1       Q.     And did Mr. Edelman tell you who owned these

2    two businesses?

3       A.     I can't remember him specifically saying "I

4    own these businesses." But he always referred to them as

5    "my businesses." And the fact, that he was actually

6    using those bank accounts and those were the initial

7    records that he gave me to actually start preparing the

8    accounts.

9       Q.     So, can you just describe for those of us who

10   aren't accountants what was this Project that you were

11   engaged to do, initially?

12      A.     The initial Project was, it was, was simply

13   to, from the bank statements to prepare summaries of the

14   various income and expenditure through those two

15   companies.  And to prepare basic accounts showing income

16   and expenditure assets and liabilities from those, from

17   the, from the transactions that have been made through

18   the companies and their various bank accounts.

19      Q.     And who gave you the information you needed

20   to prepare these summaries?

21      A.     Iryna Tsenzharyk had been keeping the various

22   bank statements, which she passed over to me.  So that

23   back in my Crane and Partner's office, with the help of

24   other assistants, we actually produced the summaries of

25   all the transactions from the beginning of those

Graham Collett                                February 03, 2025

1  companies around about the year 2000, up to, up to date.

2      Q.    After you prepared any of these summaries,

3  did you show your work to Mr. Edelman?

4      A.    Yes, I did.  In the first instance to

5  understand a little bit more about the types of

6  transactions that were being conducted through those two

7  bank accounts; whether they were for fuel payment

8  receipts and so on, and to get a better, slightly better

9  understanding of the business, so that I could prepare a

10  detailed and accurate analysis of all the income and

11  expenditure.

12      Q.    When you had any questions about transactions

13  you came across, who did you go to?

14      A.    I primarily went to Douglas Edelman.

15  Anything of a very routine nature, Iryna Tsenzharyk

16  would be able to provide information as well.

17      Q.    I'd like to look at what's been marked as

18  Exhibit 6-2, if we could please.

19  (Exhibit Gov. Exb 6-2 was entered into evidence.)

20  Mr. Collett?

21      MR. CLARKE:  We're still working.

22      MS. RANNEY:  Still working.  Okay.

23      MR. CLARKE:  Got it.  One second.  Go for it.

24  BY MS. RANNEY:

25      Q.    Mr. Collett, this appears to be an email

Graham Collett                                          February 03, 2025

1    dated 12/20/2012.  Do you see that at the top?

2         A.    Yes, I do.

3         Q.    And can you identify for us who is this from

4    email address?

5         A.    This is me transferring from my Crane &

6    Partners email address to my own Practice address.  The

7    information that I had prepared in 2004 at Crane &

8    Partners.  And on my departure from Crane & Partners, I

9    transferred all the relevant documentation over to my

10   own practice for future reference.

11        Q.    And the files that you just mentioned having

12   transferred before you emailed them to yourself, had you

13   been keeping them in your records at Crane & Partners?

14        A.    That's correct.

15        Q.    Now, I'd like to look at the attachments to

16   this document, if we could.  Can we turn to the second

17   page, please.  And you'll note these exhibits have a

18   page number in the bottom center of each page.  That's

19   what we sent last week.

20        MR. CLARKE:  Yeah. Okay.

21   BY MS. RANNEY:

22        Q.    Okay.  So, Mr. Collett, do you have an

23   Exhibit page number in the bottom center of your page?

24        A.    Yes, I do.

25        Q.    Okay.  So, looking at page 2 of Exhibit 6-2,

1  do you see where it says 'Bartol Limited Trial Balance',
2  at the top left?
3       A.    Correct, yes.
4       Q.    Is this an example of one of the summaries
5  that you just mentioned having prepared?
6       A.    That is correct.
7       Q.    And can you tell us what time period is this
8  document for?
9       A.    This particular trial balance is for the year
10  ended 31st of December 2002.
11      Q.    Now, I'd like to look down under the
12  'Revenue' category, if we could.  For those of us who
13  aren't Accountants, what is Revenue?
14      A.    Income.
15      Q.    And can you tell us the first line under
16  Revenue?  It says 'Interlink.' Do you know what
17  Interlink is?
18      A.    I understood it was to be a Trading Company.
19      Q.    Do you know who's Trading Company it was, or
20  who was operating it in this period of time?
21      A.    I really can't recall.
22      Q.    Do you see where it says 'Letters of Credit?'
23  Do you see that?
24      A.    Yes, I do.
25      Q.    Do you know, can you explain for that, for

1  those of us who are not accountants, or business people,
2  what a Letter of Credit is?
3      A.    A Letter of Credit is where based on a
4  particular transaction, money is raised in order to pay
5  for goods ahead of receiving the money back from the,
6  from the client.
7      Q.    And if I could draw your attention down to
8  where it says 'Inter Group accounts.' Do you see that?
9      A.    Yes.
10     Q.    And then it lists Aspen Wind.  Do you see
11 that there?
12     A.    Yes.
13     Q.    And why is Aspen Wind listed under Inter
14 Group accounts on this summary?
15     A.    Basically because these amounts represent
16 amounts that were transferred between the two companies
17 over the course of the year.
18     Q.    And what about Red Star Enterprises; do you
19 know what that entity is?
20     A.    The Red Star Company, at that moment in time
21 was being operated in Canada, and that was revenue that
22 was received into Bartol from the Canadian Red Star
23 business.
24     Q.    And what about the amount from Aspen Wind?
25 What is being shown on that line?  Is that revenue in,

1   or money out?

2        A.    They were transfers in and out of the various

3   companies as opposed to revenue.

4        Q.    And at this point in time, the entity you

5   just mentioned, Red Star Enterprises.  Do you know who's

6   entity that was?

7        A.    That I believe was a joint venture. 50% owned

8   by Mr. Edelman and 50% by Erkin Beck.

9        Q.    Down at the bottom where it says 'Directors

10  Account.' Do you see that?

11       A.    Yes.

12       Q.    What is it a Director's Account?

13       A.    These were amounts that were transferred to,

14  or from Mr. Edelman as the Director of the Company at

15  that time.

16       Q.    And drawing your attention to the next page,

17  page 3, where it says 'Administration Costs.' Do you see

18  that?

19       A.    Yes.

20       Q.    And do you see the entry a few lines down

21  where it says 'Consultancy'?  And then there are two

22  names listed.  Do you see those entries?

23       A.    Yes, I do.

24       Q.    And can you tell us in terms of accounting,

25  what is being noted here under Consultancy?

Graham Collett                                              February 03, 2025

52

1         A.     Payments made to various individuals during
2    the year.
3         Q.     And can you for those of us who are not
4    accountants, can you tell us what it means that payments
5    to individuals are being listed in a business's
6    administration costs?
7         A.     They have carried out business, carried out
8    work for the particular entity and have been paid for
9    that work that they have carried out.
10        Q.     Mr. Collett, do you know who Rebecca Tassi
11   is?
12        A.     Rebecca Tassi is, I, I believe, was Douglas
13   Edelman's wife in the, in the 1990s.
14        Q.     And what about Rivkah Edelman?  Do you know
15   who Rivkah Edelman is?
16        A.     That is Douglas Edelman's daughter.  His
17   eldest daughter.  To my knowledge.
18        Q.     Do you know how old Rivkah Edelman was in
19   2002?
20        A.     Not exactly, but probably in the region of
21   about 20.
22        Q.     Mr. Collett, do you remember Mr. Edelman
23   telling you why his ex-wife and daughter were listed as
24   having provided services to Bartol Limited in 2002?
25        A.     I can't remember exactly what he said, but I

1   understood that his daughter had been doing some sort of

2   work when she was in London and she was being paid for

3   it.  I don't know any, I can't remember any details.

4   And obviously was not involved at the time.

5       Q.    Mr. Collett, if we could look, please at page

6   5.  Well, looking first at page 4, where it says 'Bartol

7   Ltd. Draft Financial statements.' Do you see that?

8       A.    That's correct, yes.

9       Q.    For those of us who aren't accountants, can

10  you tell us what a financial statement is?

11      A.    The financial statement represents the income

12  and expenditure and the assets and liabilities of the

13  Company, together with the details of its Net resources,

14  its Share Capital and retained earnings.

15      Q.    And can you tell us just looking at the year

16  2002, what was the revenue for Bartol Ltd?  I'm sorry,

17  looking at the next page, page 5.

18      A.    Yes.

19      Q.    What was Bartol Limited, what was the revenue

20  of that Company in 2002?

21      A.    The revenue based on its Gross sales was

22  $4,494,000.

23      Q.    And you just mentioned Dollars and I see a

24  U.S. dollar sign here on this page.  Can you tell us

25  what currency was used for these financial statements?

1          A.      That was U.S. Dollars.

2          Q.      Why did you use U.S. Dollars to make these

3    financial statements?

4          A.      Basically because the bank accounts were

5    operated in U.S. Dollars and the trading was carried out

6    in Dollars.

7          Q.      Do you know was Bartol Ltd. a U.S. Company?

8          A.      Well, Bartol Ltd. was not a U.S. Company.

9          Q.      Were any of the bank accounts that we just

10   looked at regarding Inter Group transactions, do you

11   recall any of those bank accounts being in the United

12   States?

13         A.      The bank accounts at this time were with

14   Credit Suisse and BNP Paribas, operated out of Geneva.

15         Q.      And for those of us who may not have studied

16   up on our geography, where is Geneva?  Which country is

17   it in?

18         A.      Switzerland.

19         Q.      Could we look at 6-1, please?

20   (Exhibit Gov. Exb 6-1 was entered into evidence.)

21   Mr. Collett, this is another email from December 2012.

22   Is this another example of you emailing Crane and

23   Partner's files to yourself?

24         A.      That is correct.

25         Q.      And are you able to tell from the list of

1    attachments, or the documents after this email,

2    generally speaking, what's attached here?

3        A.    What is attached here is a summary of the

4    notes and questions arising from the preparation of the

5    draft accounts for Bartol Ltd for the year ended 31st

6    December 2004.

7        Q.    And generally speaking, who were these notes

8    and questions prepared for, or presented to?

9        A.    They were basically notes that I used to

10   discuss with Mr. Edelman after having prepared these

11   accounts and to make him aware of the various issues and

12   assumptions that have been made within the various

13   within the draft accounts.

14       Q.    And if I could draw your attention to page 2,

15   please.  Do you see where it says 'Bartol Ltd Accounts

16   Notes and Queries' at the top on the left?

17       A.    Correct.

18       Q.    I'd like to look at paragraph 2.  Do you see

19   where it says:

20            "A further adjustment has provisionally been

21   made in respect of $18,000."

22            Do you see that?

23       A.    Yes.

24       Q.    Why would you have included that information?

25       A.    Because this relates to income that was, was

Graham Collett                                      February 03, 2025

56

1   not received until after the 31st of December 2004.  But

2   actually related to the, the year 2004.  And that

3   payment, as I noted at the time, was as per 'DE' meaning

4   Douglas Edelman, had advised me that that was income

5   that was due to be received in the following year.

6        Q.    And then directing your attention to

7   paragraph 4, where it says:

8             "Payments have been made to the following."

9             Do you see that?

10       A.    Yes.

11       Q.    And then there's a list of companies.  Do you

12   see that?

13       A.    That's right.

14       Q.    Looking at the first one; Sherway.  Do you

15   know whose Company sure way was?

16       A.    I believe that Sherway in actual fact, was a

17   Company that was controlled by Erkin Bek.

18       Q.    And who did you know Erkin Bek to be in this

19   period of time?

20       A.    He was the 50% partner in the, the Red Star

21   business that was being operated in Canada during this

22   period of time.

23       Q.    And what about Synergy?  Do you know whose

24   Company Synergy was?

25       A.    Synergy, I believe, was a Company that was

1    registered to Douglas Edelman in those very early years.

2    But I know very, very little about anything related to

3    that Company.

4         Q.    What about Ramon Insurance Brokers.  Do you

5    know whose Company that was?

6         A.    I can't remember anything about that at all.

7         Q.    Iraq Today.  Do you know anything about that

8    Company?

9         A.    That was a Project that I believe Mr. Edelman

10   had an interest in and it was made, I believe in

11   connection with payments made to reporters for Iraq

12   Today.

13        Q.    What about Kabul Neda?  Do you know whose

14   Company that was?

15        A.    I'm not aware of a Company called Kabul Neda.

16   But there were several Projects being conducted under

17   the name of Neda in, in Afghanistan.  But other than

18   that, I don't know any more about what the particular

19   payments in this particular period were for.

20        Q.    Do you know whose company Neda was, or who

21   owned it?

22        A.    There was several companies using the name or

23   including the name of Neda, some of which to my

24   knowledge, have Mr. Edelman was involved in, together

25   with, with other, other Partners.

1        Q.    Do you know the names of some of those other

2   partners in the Neda businesses?

3        A.    One of them was certainly Homayoon Froogh.

4        Q.    Do you know where Mr. Froogh was from?

5        A.    I don't know.  I can't tell you his exact

6   country, no.

7        Q.    What about the entity listed here:  Cyprus.

8   Or entity, or whatever it is?  Do you know what that

9   entry represents?

10       A.    I can't really recall what it was, or if I

11  was, if I was speculating at all.

12       MR. CLARKE:  You shouldn't be speculating.

13       A.    I would say that it was possibly payments to

14  the Cyprus formation, Corporate Service Providers.

15  BY MS. RANNEY:

16       Q.    Mr. Collett, where did you get the

17  information to prepare these accounts, notes and

18  queries?

19       A.    Basically, from the information contained on

20  the bank statements as to what the, what the payments

21  were for.

22       Q.    And if you listed something here as payments

23  have been made to the following and then carried

24  forward; if you listed it here on this list, does that

25  mean that you had some level of knowledge about these

Graham Collett                                    February 03, 2025

1    payments having been made?

2         A.    These payments, I would have identified from

3    the bank statements that were available to me.

4         Q.    And did you have conversations with

5    Mr. Edelman about what these transactions were, or what

6    the entities were that the monies were going to?

7         A.    I would have done at the time when I

8    discussed the accounts with Mr. Edelman back in early

9    2005, after I had prepared these accounts. Precisely

10   what happened to the, to the -- precisely what we

11   discussed and what was agreed, I'm not sure.  It's just

12   too long ago to remember the precise details of the

13   conversation.

14        Q.    Mr. Collett, do you recall anything about the

15   last entry on this list?  Touchdown.  Do you know what

16   that is?

17        A.    Yes.  This relates to a numbered Swiss

18   Account.  It didn't have a name on it at all.  It was

19   just simply a numbered Swiss Account.  Payments were

20   made to this Account.  At a later stage, to this, I

21   carried out more work on that particular Bank Account of

22   the information that was available to me, made available

23   to me.

24        Q.    Do you recall anything, Mr. Edelman told you

25   about Touchdown in this period of time?

Graham Collett                                        February 03, 2025

60

1        A.    He said it was a, a, it was a Numbered

2   Account. But from my recollection he was fairly vague

3   about who actually owned it.

4        Q.    Mr. Collett, could we look at paragraph 5,

5   please.  Do you see where it says the 'Directors

6   Account, i.e. payments to DE?'

7        A.    Yes.

8        Q.    Can you tell us again what that means and who

9   DE is?

10       A.    These were payments that were made from the

11  bank accounts of Bartol directly to Mr. Edelman.

12       Q.    And what is the amount on those Directors

13  Account payments for this year that you totaled up?

14       A.    $416,807.

15       Q.    And then the last sentence of paragraph 5?

16  Can you read that for us, please?  Beginning

17  'Transactions:'

18       A.    "Transactions during the year included a loan

19  repayment to Delphine of $120,015.

20       Q.    And do you know who Delphine is?

21       A.    That is referring to Delphine Edelman.

22  Delphine Le Dain.

23       Q.    In this period of time, did you refer to her

24  as Delphine Edelman, or Delphine Le Dain?

25       A.    At this particular time I would refer to her

1    as Delphine Edelman.

2        Q.    And where it says 'loan repayment to

3    Delphine', why did you characterize that transaction as

4    loan repayment? Where did you get the information to

5    make that characterization?

6        A.    A little difficult to remember precisely, but

7    I'm pretty sure it would have been from the information

8    on the bank statement showing the repayment and what it

9    was for.

10        Q.    And after you prepared this document, did you

11    tell Mr. Edelman about it and show it to him?

12        A.    Within these notes, yes.

13        Q.    And do you recall, Mr. Edelman telling you.

14    "No, No, you must change anything in here?" Do you

15    recall him telling you that anything in here was wrong?

16        A.    I cannot remember that at all.  No.

17        Q.    If Mr. Edelman, based on your working

18    relationship at the time, if Mr. Edelman had told you

19    that you had incorrectly characterized something what

20    would you have done?

21        A.    Subject to verification, I would have changed

22    it.

23        Q.    I'd like to look at 13.3, please,

24    Mr. Collett.

25    (Exhibit Gov. Exb 13-3 was entered into evidence.)

Graham Collett                                          February 03, 2025

1   Do you see where it says 'Red Star Enterprises Ltd

2   Reconciliation' and then 2002 to 2003.  Do you see that?

3        A.    Yes, I do.

4        Q.    In 2002 to 2003, where was Red Star

5   Enterprises Ltd operating?  Where was the Company's

6   office?

7        A.    It was operating out of Canada using a firm

8   of accountants that were based in, in Canada.

9        Q.    And was Red star Enterprises ltd, one of the

10  entities that was engaged in transfers in and out of the

11  Red Star -- I'm sorry, in the Bartol and Aspen wind

12  Accounts during these years?

13       A.    Yes.  It was the only Red Star business that

14  was operating during that period of time.  To the best

15  of my knowledge.

16       Q.    And so does --

17       MR. CLARKE:  Does the Witness need some water?

18  Maybe he's out of water?

19       MS. RANNEY:  We'll get you some water quickly

20  before we go on.

21       MR. CLARKE:  Are we okay to keep going.  Or, I'm

22  not trying to interrupt.

23       MS. RANNEY:  Mr. Collett, are you okay to keep

24  going?

25       THE WITNESS:  Yes, yes, yes.

1        MS. RANNEY:  Should we aim for a break in about

2    half an hour.  If anyone needs a break before then,

3    please.

4        MS. PERSAUD:  I was just going to suggest, perhaps

5    a bit sooner?

6        MR. CLARKE:  Okay.  You want to go now.

7        MS. PERSAUD:  Yeah.

8        MS. RANNEY:  Should we do a short break now?

9        MR. CLARKE:  Yes.

10       MS. RANNEY:  Okay, let's do that.

11       VIDEOGRAPHER:  This is the end of Media I, going

12   off the Record At 15:06 as indicated on the video

13   screen.

14              (Break taken.)

15       VIDEOGRAPHER:  This is beginning of Media II.

16   Going back on the record at 15:27, as indicated on the

17   video screen.  Thank you, Counsel.

18   BY MS. RANNEY:

19       Q.    Mr. Collett, before we turn back to 13-3,

20   I'd just like to clarify a couple of points about our

21   set-up today. Earlier, you identified Mr. Edelman as

22   wearing a white shirt.  Can you clarify, is he in the

23   room with us here in London, or do you see him on the

24   screen?

25       A.    I see him on the screen.

1      Q.    And Mr. Collett, are you able to see him

2   clearly from where you're sitting?

3      A.    Yes.

4      Q.    If at any time you're not able to see him

5   will you please let us know?  Certainly returning now to

6   13-3, if we could.  Mr. Colett, did you rely on records

7   from Red Star Enterprises during these years:  2002 and

8   and 2003 to prepare financial summaries, or other

9   Projects that you did for Mr. Edelman?

10      A.    Not these particular summaries, no.  I don't

11   recall that at all.

12      Q.    Do you recall relying on records from Red

13   Star Enterprises Limited generally for your Projects?

14      A.    Red Star, Canada.  No, I can't remember

15   relying on them for any particular project or exercise

16   that comes to mind.

17      Q.    Mr. Collett, if I could ask you some

18   questions about some of the information that's listed on

19   13-3.  Do you recognize the name Aspen Wind in the

20   description of some of these transactions?

21      A.    Yes.

22      Q.    Whose entity was Aspen wind in 2002, 2003?

23      A.    The Aspen Wind Belize Company to my knowledge

24   was Douglas, Mr. Edelman's Company.

25      Q.    And what about on the top line here, where it

1    says Bek under Transaction:  Who was Bek in 2002, 2003.

2         A.    That was Erkin Bekbolotov, as he was known at

3    that time.

4         Q.    And drawing your attention down a little bit

5    further, do you see where about halfway down the page

6    there are references to 'payment by' and then it says

7    'Credit Suisse.' Do you see where it says that?

8              "Payment by Red Star Credit Suisse?"

9         A.    Payment by -- on the first page.

10        Q.    Yes.  About halfway down, under the

11   transaction?

12        A.    Ah. Sorry.  Yes.  Payment by Red Star credit

13   Suisse to Red star BNP.

14        Q.    Do you know whether Red Star had Credit

15   Suisse Bank accounts during this period of time in 2002,

16   2003?

17        A.    Red Star Canada in 2002, 2003.  I really

18   can't recall.  I was not involved in any of the detailed

19   preparation at that stage.

20        Q.    What about BNP, were you aware of Red Star

21   having a BNP bank account during this period of time?

22        A.    Again, I can't say that with any certainty.

23        Q.    Can I draw your attention, please to the

24   transaction that's listed March 14th.  About halfway

25   down the page?

```
 1        A.    Yes.

 2        Q.    Can you read for us what it says there?

 3        A.    "The very first payment was a receipt into

 4   this account, was a payment by Banque Luxembourg.  In

 5   brackets -- Delphine to Red Star.  Loan $115,000."

 6        Q.    And if I could have you turn the page, please

 7   to page 3 of 13-3?

 8        A.    Yes.

 9        Q.    Under the July 2003 heading, on the left?

10        A.    Yes.

11        Q.    I'm sorry.  Scratch that.  The June 2003

12   heading.

13        A.    Yes.

14        Q.    The 16.6 entry.  Can you tell us what is

15   being shown in the 16.6 entry?

16        A.    It is showing a payment of $400,000 by Red

17   Star Canada to Lovett Trade.  It says:

18              "Douglas profit share."

19        Q.    Do you know anything about what Lovett trade

20   is, or whose business that was?

21        A.    I don't recall.

22        Q.    And what about a few lines down?  Another

23   entry noted as 16.6?

24        A.    Yes.

25        Q.    Can you tell us what this entry appears to
```

Graham Collett                                    February 03, 2025

67

 1   note?

 2        A.    This is a payment of $900,000.  Red star.

 3   Coming.  No, this is a payment coming in.  From Red

 4   Star.  Sorry, to Red Star from Bartol for $900,000.

 5        Q.    Could we look at 14-79, please?

 6   (Exhibit Gov. Exb 14-79 was entered into evidence.)

 7   Mr. Collett, do you recognize this document?  14-79.

 8        A.    Yes.  I saw this at some stage, but I can't

 9   remember quite when.

10        Q.    Do you recognize the handwriting on this

11   document?

12        A.    I believe, based on other handwriting I've

13   seen that it belongs to Mr. Edelman.

14        Q.    And do you see at the very top of the page,

15   it looks like there's a header and it says 13 Mar 3.  Do

16   you see that?

17        A.    Yes, I do.

18        Q.    And then there's some information here that

19   includes information about Banque de Luxembourg.  Do you

20   see that?

21        A.    Yes.

22        Q.    For those of us who aren't Accountants, are

23   you able to decipher what is being shown here in these

24   series of numbers and letters?

25        A.    The sender of the money of 115,000 was Banque

1   of Luxembourg.  The receiver of the money was BNP

2   Paribas.  And the recipient according to this was Red

3   Star Enterprises Ltd.

4       Q.    Do you see any name listed as the Sender, or

5   information that you understand to be related to the

6   Sender?

7       A.    Yes, it says Delphine Le Dain.

8       Q.    And are you able to see a date on this

9   transaction, or read any information about the date from

10  this document?

11      A.    The date of, the date of the transaction

12  appears to be the 13th of March 2003.

13      Q.    And do you see the top handwritten notation?

14  It appears to say:

15            "A-t-t-n: Anthony Guerne."

16            Do you see that?

17      A.    Yes.

18      Q.    What was Anthony Guerne's role in March of

19  2003?

20      A.    I'm not quite sure what the relationship

21  would have been at that particular time.  I knew that in

22  2004 he was still at BNP.  In relation to what his

23  precise role was at that stage, I can't, I can't be

24  honest -- I can't be certain.

25      Q.    But do I understand correctly that you think

Graham Collett                                          February 03, 2025

69

1   around this time he was working at the Bank at BNP?

2        A.     I believe so.

3        Q.     And a moment ago you said you thought this

4   handwriting might belong to Mr. Edelman.  Do you see any

5   signature or name on here that leads you to believe the

6   handwritten information is from Mr. Edelman?

7        A.     Where he signed off 'Douglas.'.

8        Q.     I believe you mentioned Mr. Guerne earlier

9   having a role at one of the Companies.  Do you remember

10  approximately when he started in his role at the

11  Companies?

12       A.     I'm not quite sure when he became CEO of Red

13  Star Gibraltar.  I can't quite place when he, when that

14  was, but that was the role that he had after leaving the

15  Bank.

16       Q.     Do you know whose idea it was for Anthony

17  Guerne to become CEO of one of the Gibraltar Companies?

18       A.     I believe based on the relationship built up

19  with the BNP accounts that it was Douglas Edelman.

20       Q.     What is the basis for that belief?  Can you

21  explain what you mean by the 'relationship with BNP?'

22       A.     Anthony Guerne had been the Relationship

23  Manager, as I understand it, before the accounts of

24  Aspen Wind and Bartol. And I do recall at an early

25  meeting when I, when I was first engaged, that Anthony

Graham Collett                                          February 03, 2025

70

```
 1   Guerne was in the London office.
 2       Q.    If we look at 14.2 please.
 3   (Exhibit Gov. Exb 14-2 was entered into evidence.)
 4   Mr. Collett?
 5       MR. CLARKE:  Sorry, sorry, sorry.
 6   BY MS. RANNEY:
 7       Q.    Looking at the collection of documents here
 8   in 14-2, do you recognize them to be from your files?
 9       A.    Yes.  I received these as -- I receive these
10   as copies.  Yes.
11       Q.    And Mr. Collett, was it your ordinary
12   business practice to receive copies of documents like
13   these?  And then keep them in your files?
14       A.    Copies of documents of this nature, if
15   relevant to a particular matter?  Yes.  Would be kept.
16       Q.    Documents relating to the specific
17   transactions between accounts, or entities?
18       A.    Yes, that's correct.
19       Q.    Documents relating to bank statements, or
20   printouts of bank statements?
21       A.    Yes.
22       Q.    What about documents related to the
23   incorporation of entities, or the business being
24   conducted by entities?
25       A.    In the general rule, yes.
```

1      Q.    Looking at the very top page here, do you see

2   where it says Banque de Luxembourg?  At the top, the

3   right hand corner?

4      A.    Yes.

5      Q.    Do you recognize?

6      MR. CLARKE:  I'm not sure I'm on the right

7   document.  I'm sorry.

8      MS. RANNEY:  14-2.

9      MR. CLARKE:  I'm on 14-2.  It doesn't look like the

10  right thing.

11     MS. RANNEY:  There was a corrected version of 14-2

12  sent over.

13     MR. CLARKE:  Okay. 2.

14     MS. RANNEY:  So, it should begin on page 5.  If you

15  didn't have a corrected version.

16     MR. CLARKE:  Yep.  I got, I got.  I'm sorry.

17  Sorry.

18  BY MS. RANNEY:

19     Q.    Perfect.  No worries.  Can you tell us what

20  this document appears to be, or what you know it to be?

21     A.    I know it to be a copy of the bank transfer

22  from Bank of Luxembourg to Red Star Enterprises in

23  Canada in the amount of 115,000 USD.

24     Q.    And are you able to tell the date of the

25  transaction you just described?

Graham Collett                                      February 03, 2025

1    A.    The date of the transaction, according to the

2  top, it looks to be the 12th of March 2003.

3    Q.    And then drawing your attention to the second

4  transaction listed there, where it says, and I'm going

5  to butcher this.  Sorry, everyone:  'Virement?'

6  Virement. Do you see where it says that?

7    A.    Sorry, I'm.

8    Q.    Mr. Collett, can I direct your attention to

9  the second transaction listed here?  Which just so

10 happens to have a large black dot to the left of it?

11   A.    Oh, yes.

12   Q.    Can you tell us the date listed on that

13 transaction?

14   A.    The date was the 13th of March, and that

15 would have been a payment.

16   Q.    And do you see where there's, looks like a

17 square with some handwriting underneath the information

18 for this transaction.  Do you see that?

19   A.    Yes.

20   Q.    Do you recognize that handwriting?

21   A.    That's my handwriting.

22   Q.    And can you tell us why you were making a

23 handwritten notation with arrows to this transaction?

24   A.    Because this was passed on to me as evidence

25 that Delphine had made the payment back in 2003 into the

Graham Collett                                          February 03, 2025

73

1    Canadian Company.

2          Q.    And who passed on this information to you?

3          A.    It was Mr. Edelman who in conjunction with

4    his wife, had found this transaction in her bank

5    records.

6          Q.    Do you know that because he told it to you?

7          A.    That's correct.

8          Q.    And do you remember, are you able to place in

9    time a proximately when you received this record, this

10   Bank of Luxembourg record that we're looking at now?

11         A.    I believe it's at a much, much later stage.

12   I can't remember the exact date, but it was probably

13   around -- my best estimate of it is around about 2018 or

14   2019.

15         Q.    Mr. Collett, I'd like to look back, if we

16   could, at 6-3.  Back because we're all turning back in

17   the binders.

18   (Exhibit Gov. Exb 6-3 was entered into evidence.)

19         MR. CLARKE:  I got it. I got it.  I got it here.

20   Not yet.

21   BY MS. RANNEY:

22         Q.    Mr. Collett, this appears to be another email

23   from December 2012.  Is this another instance of you

24   emailing Crane and Partners files to yourself?

25         A.    This is correct.

74

1      Q.     And if you could take a moment to look at the

2  list of attachments, or the documents after this email;

3  can you summarize for us what is attached to this email?

4      A.     These documents relate to the preparation of

5  accounts for Bartol Ltd based on the detailed bank

6  statement records.  Accounts were prepared initially for

7  the nine months to 30th of September 2004.  And been in

8  a more formal format for the year, ended 31st of

9  December 2004.

10     Q.     And Mr. Collett are these like the documents

11  we looked at a moment ago, records that you had kept in

12  your Crane & Partners files until you forwarded them to

13  yourself?

14     A.     Correct.

15     Q.     And are these, like the other records that we

16  looked at before, ones that you had shared with

17  Mr. Edelman after you prepared them?

18     A.     Exactly.

19     Q.     And when you were making these documents, if

20  you had questions, who did you go to?

21     A.     If I had questions about these accounts that

22  ultimately I would have gone to Mr. Edelman to clarify.

23     Q.     Could we look, please, at page 2?  Do you see

24  where it says up in the top left, 'Bartol Ltd summarized

25  cash book.' Do you see that?

1        A.      That's correct.

2        Q.      And are you able to tell from this document,

3    which bank account, or accounts is being summarized

4    here?

5        A.      That one is for, it indicates that it is the

6    Credit Suisse current account.

7        Q.      And if I could beg everyone's indulgence

8    please, to look at page 3.  A transaction about half way

9    down, on the 11th of June 2004, in teeny, tiny print.

10   Mr. Collett, do you see that transaction there on

11   June 11th 2004.  The top one.

12       A.      It is a payment to Delphine Le Dain in the

13   sum of $120,015.99 entitled 'Loan Repayment.'

14       Q.      And based on the process that we just

15   described, for you to have prepared this, where would

16   you have gotten the information to characterize this

17   transaction as loan repay?

18       A.      It is without looking at the actual bank

19   statements.  I can't be absolutely certain.  But in most

20   instances that would have been recorded on the bank

21   statement as being a loan repayment.  I can't be

22   absolutely 100% certain on that without access to the

23   bank statement.

24       Q.      If you had a question about any of the

25   transactions that you were looking at in preparing this

```
1   summary; who did you go to to ask for the information to

2   answer those questions?

3        A.   If it was a fairly basic query, then Iryna

4   Tsenzharyk might know.  Failing that, I would have to

5   ask Mr. Edelman.

6        Q.   We could go to page 5, please. Mr.  Collett,

7   do you see where it says 'Bartol Limited Summary of

8   Payments to Personnel' in the top left hand corner?

9        A.   Yes.

10       Q.   And then I'd like to talk to you about some

11  of the individuals listed in this summary do you see

12  three lines down where it says Rebeca Tassi?

13       A.   Yes.

14       Q.   In this period of time when you were

15  preparing this transaction summary, who did you

16  understand Rebeca Tassi To be?

17       A.   At this moment in time, I knew her to be

18  Douglas Edelman's previous wife.

19       Q.   And what about Judd Fischer?  Who was Judd

20  Fischer?  If you know?

21       A.   He was an Accountant who was looking after

22  these accounting records in this period for the two

23  companies, up until early 2004.

24       Q.   Do you know where Mr. Fischer was from?

25       A.   I believe -- I was told that he was a U.S.
```

1    citizen.

2        Q.    And what about Chuck Squires?  Who was Chuck

3    Squires in this period of time?

4        A.    Chuck Squires was basically in charge of the

5    relationship with the U.S. Department of Defense in

6    terms of the contracts.  He was ex-U.S. Military and he,

7    he, he was, he was one of the main contacts, I believe

8    with the, with the Defense Department, for the, for the

9    for the contracts.

10       Q.    Were you able to observe who Mr. Fischer

11   reported to on a day to day basis?

12       A.    I wasn't.  I never met Judd Fischer at all.

13       Q.    Were you able to observe who Mr. Squires

14   reported to on a day to day basis?

15       A.    Based on his time in the London office and

16   later on in the, when the business went to Dubai, he

17   certainly reported to Mr. Edelman in London.

18       Q.    And what about Konstantin Tron; what was his

19   role in this period?  If you know?

20       A.    Mr. Tron was based in the, in Moscow and I

21   don't know his exact role, but I believe it was, it was

22   to do with the procurement of fuel for sale under

23   contracts.

24       Q.    Do you recall Mr. Edelman ever telling you

25   where the fuel came from for these businesses?

Graham Collett                                          February 03, 2025

```
1          A.      Not in any great detail.

2          Q.      Do you know who supervised Mr. Tron in his

3   day to day activities?

4          A.      I believe that he and his, his partner sort

5   of liaised directly with Mr. Edelman at this particular

6   time.

7          Q.      What about Petrov Oleg?

8          A.      He was Konstantin's partner in Moscow.

9          Q.      Then, do I understand correctly -- who did

10  you think Mr. Oleg reported to on a day to day basis?

11  In this period of time?

12         A.      I can't be any more certain than, than as far

13  as Konstantin Tron was concerned.

14         Q.      What about Gregory Edelman?  Who was he in

15  this period of time, in 2004?

16         A.      That is Mr. Edelman's brother.

17         Q.      And did you understand him to have any role

18  in the business?

19         A.      Not to my knowledge.

20         Q.      What about China Edelman?  Do you know who

21  that is?

22         A.      That is Mr. Edelman's daughter.

23         Q.      Do you know approximately how old she was in

24  2004?

25         A.      Probably about 20.
```

Graham Collett                                              February 03, 2025

79

1       Q.      What about Joe Edelman?  Do you know who that

2   is?

3       A.      That is Mr. Edelman's son.

4       Q.      Do you know approximately how old he was in

5   2004?

6       A.      A bit younger at that particular time.

7       Q.      Do you know where China and Joe lived in

8   2004?  Which country?

9       A.      I'm not, I'm not certain as to when they,

10  where they were living at that particular time.

11      Q.      Do you recall, Mr. Edelman saying anything to

12  you about why family members were listed as having

13  received payments as personnel of Bartol Limited?

14      A.      I can't remember any specific discussions on

15  each of those individuals.  No, I can't remember any.

16      Q.      Can we look at 14-8, please?

17  (Exhibit Gov. Exb 14-8 was entered into evidence.)

18  Mr. Collett, do you recognize this?

19      A.      Yes.  This is a copy of the accounts of

20  Bartol for the year ended 31st December, 2003 prepared

21  from the accounting records and other information.  Was

22  available to me.

23              And together also with a letter dated 27th of

24  October 2004 approving the accounts and certifying that

25  all the records have been made available and confirming

1   that the issue share capital of the Company comprised

2   10,000 bearer shares of £1 each.

3        Q.    Mr. Collett, what is the currency

4   denomination next to the one and that last sentence you

5   read?

6        A.    It's $1 each.

7        Q.    Mr. Collett, can you tell whose signature is

8   on this document?  Are you familiar with that

9   handwriting?

10       A.    I believe that it is Mr. Edelman's signature.

11       Q.    And before these financial statements were

12   finalized, did you review them with Mr. Edelman?

13       A.    I would have reviewed them before sending

14   them to him in the final version.

15       Q.    Did you give him the opportunity to make any

16   corrections or updates after his review?

17       A.    I can't remember whether there were any other

18   than -- but if there had been any changes, that he had

19   instructed, then I would have made them based on the

20   available evidence.

21       Q.    Can we look at the documents following this

22   letter, please?  Starting on page 3.  Do you see where

23   it says 'Bartol Limited Directors Report and Financial

24   Statements', in the center page?

25       A.    That's right. Yes.

1      Q.      Is that what you were just referring to as

2   the statements that you prepared for Bartol?

3      A.      That's correct.

4      Q.      And if we could look, please at page 5.

5   Where it says 'Company Information.' Page 5 of 14-8.

6      A.      Yes.

7      Q.      Can you tell us who is listed as the

8   Directors of Bartol Limited?

9      A.      Two Directors were Mr. Edelman and Ledra

10  Directors Limited.  Who were the Corporate Service

11  Providers.

12     Q.      Do you know where Ledra was based out of?

13     A.      Ledra, I believe from memory were based in

14  Cyprus.

15     Q.      Could we go to page 15, please?

16     A.      Page 15.

17     Q.      At the center numbering please.

18     A.      Yes.

19     Q.      Do you recognize the handwritten signature at

20  the bottom of this page?

21     A.      I believe it's Mr. Edelman's signature.

22     Q.      And for those of us who are not accountants,

23  can you explain to us in simple terms what's being

24  reflected on this page?

25     A.      This is the balance sheet of Bartol Limited

1    as of the 31st of December 2003.  And reflects the

2    assets, less the liabilities showing Net assets of

3    3,998,238.  Which is represented by the Capital and

4    Reserves of 10,000 and the accumulated profit as shown

5    in the profit and loss account of 3,988,000.

6         Q.    Mr. Collett, drawing your attention down to

7    the bottom bold entry where it says 'Shareholders funds

8    equity interests.' Do you see that?

9         A.    Yes.

10        Q.    Can you tell us what that means to those of

11   us who are not accountants; what does that entry

12   represent?

13        A.    That actually represents the total amount

14   that the shareholders have invested and have, have

15   invested in the Company, together with the accumulated

16   profits to date, which is represented by the various

17   assets and liabilities as shown in the top part of the

18   balance sheet.

19        Q.    Could we turn, please to page 19?  Do you see

20   at the bottom where it says 'Related Party

21   Transactions.' Do you see that?

22        A.    Yes.

23        Q.    And do you see that there is some description

24   there about Red Star Enterprises Ltd and that paragraph?

25   Do you see that?

Graham Collett                                          February 03, 2025

83

```
1        A.    Yes.
2        Q.    And do you see where the last sentence says
3   that:
4              "Red Star Enterprises Ltd and Bartol Ltd are
5   associated companies under common control."
6              Do you see where it says that?
7        A.    Yes.
8        Q.    What does it mean for companies to be under
9   common control?
10       A.    Well, under the same ownershop -- ownership.
11       Q.    And when you prepared this, who's ownership
12  did you understand Bartol and Red Star Enterprises to be
13  under?
14       A.    In terms of Red Star Enterprises, Canada I
15  believe that they were, they were under the control of
16  Mr. -- 50/50 Mr. Edelman and Mr. Bek.  And because
17  Mr. Edelman is shown, and was the shareholder of Bartol,
18  that made them under common control.  Not equal control,
19  but common control.
20       Q.    Could we go to page 21, please.  Mr. Collett,
21  do you see at the top where it says 'Detailed Profit and
22  Loss Account?  I'm sorry.  Yes.  Detail Profit and Loss
23  Account?
24       A.    That's correct.
25       Q.    And do you see at the top under 'Revenue'
```

1  where it lists sales in 2003?

2      A.    Yes.

3      Q.    And can you tell us how much is listed there

4  in sales in 2003 for this Company.

5      A.    It's $45,694,807.

6      Q.    Can you tell us the currency denomination

7  that that amount is in?

8      A.    That's U.S. Dollars.

9      Q.    And does that mean that this company had $45

10  Million of profits this year?

11      A.    No, that was the Gross revenue for which you

12  have to deduct the cost of sales and all of the

13  administrative expenses.

14      Q.    And after doing that?

15      A.    In order. In order to --

16      Q.    This business have a profit?

17      A.    It did.  It had a profit of $3,949,122.

18  After all direct costs of sale and administrative

19  expenses.

20      Q.    Mr. Collett, I'd like to now look at some of

21  the summaries that you prepared related to the other

22  entity you mentioned, Aspen Wind.  Could we look at

23  14-75 please.

24  (Exhibit Gov. Exb 14-75 was entered into evidence.)

25  Mr. Collett I'd like to look, if we could at the first

1    three pages of this document.  And then I'll ask you a

2    few questions about it.  Can you look at the first three

3    pages for me, please.  Are you able to tell what this

4    document is?

5         A.    This is primarily the analysis of the bank

6    accounts held by Aspen Wind for the period from

7    incorporation of the Company in 2000 up until 2004.

8         Q.    And Mr. Collett, could we look at page 3

9    please.  Do you see the handwritten notations on page

10   three, or starting on page 3?

11        A.    This is -- I want to make sure I've got the

12   right page.  It says 2.

13        MS. PERSAUD:  It's the page up on the screen,

14   that's right?

15        A.    Ah, yes.  Sorry.  Yes.  The handwriting on

16   that page is mine based on, in the same manner as for

17   Bartol, when we had first prepared the summaries at the

18   same time for the two companies.  This would have been

19   my notes that I would have made on initially discussing

20   the figures and the nature of the transactions with

21   Mr. Edelman.

22   BY MS. RANNEY:

23        Q.    And besides your discussions with

24   Mr. Edelman, what else did you use to prepare these

25   summaries?  Where did you get that information?

1    A.    Primarily from the bank statements which

2    would notate the nature of the, of the, of the payments

3    and receipts, as indicated against the amounts and the

4    dates.

5    Q.    Can we look on page 3?  On the left, where

6    there's a line and then it says 'DE.'

7    A.    Yes.

8    Q.    You see that?

9    A.    Yes.  Third line from the bottom.

10    Q.    It looks like there's one, third line from

11    the bottom.  Do you also see the one about a third of

12    the way down the page?

13    A.    Yes, that was on the 2nd of November 2000.

14    Q.    And can you tell us what the notation DE

15    represents?

16    A.    That presents payments made directly to

17    Mr. Edelman.

18    Q.    Can we look, please, at page 59?  Which will

19    come up on the screen in front of you if it's easier to

20    look there?

21    A.    Yes.

22    Q.    Can you tell us what this page is?

23    A.    This is a similar information for the fourth

24    quarter of the year, 2000.  Payments from the Credit

25    Suisse Account.

1        Q.    Is this a summary of the individual

2   transactions that we just looked at?

3        A.    From the bank statements, yes.

4        Q.    And do you see where it says under Quarter 4,

5   2000.  It says 'Receipts.' Do you see that?

6        A.    Quarter 4.  Yep.

7        Q.    And then for the next Quarters, it also lists

8   receipts?

9        A.    Of Quarter, Quarter 1, 2001.

10        Q.    Can you tell us, for those of us who are not

11   accountants, what do receipts mean?  What does it mean

12   for something to be characterized as a receipt?

13        A.    That would be money paid into the bank

14   accounts.

15        Q.    And so, if someone had put money into Aspen

16   Wind in any of the periods reflected here, how would it

17   be characterized on this sheet?

18        A.    It would be shown as a receipt and with a

19   corresponding entry from the available, from the bank

20   statement.

21        Q.    Can we go to 14-74, please?

22   (Exhibit Gov. Exb 14-74 was entered into evidence.)

23   Do you see this letter dated 10th of May 2004?

24        A.    Yes, I do.

25        Q.    Mr Collett, in the course of working for

1  Mr. Edelman, did you come to have files in your

2  possession related to Aspen Wind in the years 2002,

3  2004?

4      A.    I'm not quite sure when I actually had these,

5  whether they were in 2004, or whether they were at a

6  later period.

7      Q.    Do you see under the line 'Sincerely' where

8  it says 'Douglas Edelman, Beneficial Owner.'.

9          Do you see that?

10     A.    Yes.

11     Q.    Does that match with your understanding in

12 this period in 2004 of Mr. Edelman's relationship to

13 Aspen Wind?

14     A.    That is correct, to the best of my knowledge.

15     Q.    And can we look at 14-77?

16     MS. PERSAUD:  14-Sorry.

17     MS. RANNEY:  77.

18 (Exhibit Gov. Exb 14-77 was entered into evidence.)

19     MS. BISHOP:  Can you give us a minute to get there?

20 BY MS. RANNEY:

21     Q.    Sure.  Mr. Collett, Do you recognize this

22 document.  This is 14-77.

23     A.    This is the accounts of Aspen Wind for the

24 year ended 31st December 2003.

25     Q.    And is this another example of a financial

1   summary that you prepared for Mr. Edelman?

2        A.    That's right, yes.

3        Q.    And like the others we discussed, after you

4   prepared it, did you show it to Mr. Edelman?

5        A.    Yes.  I can't quite remember the timing of

6   showing him, but all of these accounts I would have

7   discussed with him.

8        Q.    Was it your practice to show clients drafts

9   of the financial summaries before you finalize them?

10       A.    Yes.

11       Q.    And give them the opportunity to make any

12  corrections?

13       A.    That's correct, Yes.

14       Q.    Can we look at page 5, please.  Mr. Collett,

15  can you tell us what a balance sheet is?

16       A.    The balance sheet summarizes all the assets

17  of the Company in terms of its accounts receivable.  Any

18  other receivables, cash back, less any liabilities for

19  trade accounts, accrued expenses.  The balance then

20  showing in terms of the equity and the Net retained

21  earnings of the Company.

22       Q.    Do you see near the bottom where there's an

23  entry that says 'Financed by' and then it has Equity in

24  big letters?

25       A.    That's right.

1      Q.      What does it mean to have equity in a
2  Company?
3      A.      That's the Share Capital.
4      Q.      And can you tell us what's listed here for
5  the Share Capital in Aspen Wind in these years?
6      A.      The Share Capital is, as I was told at the
7  time was $100,000.
8      Q.      And based on your work around this period of
9  time and your conversations with Mr. Edelman, who did
10  you understand to hold that equity, that Share Capital?
11      A.      I believe that he held that as the Beneficial
12  Owner.
13      Q.      Now, Mr. Collett, we just looked at a series
14  of documents related to Aspen Wind and Bartol.  And I'd
15  like to ask you a few questions about what you knew
16  about these businesses during that period of time.
17          Did Mr. Edelman ever tell you in your work
18  together, preparing these summaries that there was
19  another seed investor in Aspen, Wind or Bartol besides
20  him, or Mr. Bek?
21      A.      At this stage at this time, when I was
22  preparing this information, no, he didn't.
23      Q.      Did Mr. Edelman ever tell you that his wife
24  had invested in Bartol, or Aspen Wind?
25      A.      At this stage in 2000, in the period up to

Graham Collett                                          February 03, 2025

1    2004, I do not recall that at all.

2         Q.    What about in Red Star Enterprises; do you

3    recall him ever saying that his wife was an investor in

4    that business?

5         A.    If you are referring to Red Star Canada, no,

6    I don't recall any such reference to his wife being

7    owner.

8         Q.    I'd like to look at a few documents related

9    to some of the companies other than Aspen Wind and

10   Bartol.  Could we look at 14-9, please?

11   (Exhibit Gov. Exb 14-9 was entered into evidence.)

12         MR. CLARKE:  I'm just pointing out it's 4:30.  So.

13         MS. RANNEY:  Would you rather break now for 30

14   minutes?

15         MR. CLARKE:  Its upto you. I just --

16         MS. RANNEY:  Mr. Collett, would you rather break

17   now for 30 minutes, or go about another 15 minutes and

18   then break?

19         THE WITNESS:  I don't mind.

20         MS. RANNEY:  Why don't we do another 15 minutes and

21   then break?  Is everyone okay with that?

22         MR. CLARKE:  That's fine with me.

23   BY MS. RANNEY:

24         Q.    Mr. Collett, can you tell us what 14-9 is?

25         A.    14-9 is a summary of the accounting

1   information of Red Star Gibraltar for the year -- sorry,

2   the nine months to 30th of September 2005.

3        Q.    Did you prepare this document?

4        A.    In terms of the actual accounting

5   information, that was prepared by Nikolai Ushakov, who

6   is now the Financial Accountant for Red Star Gibraltar.

7   And he maintained all the accounting records of the

8   Company from 2005 onwards.

9        Q.    And do you know where he was physically when

10  he was maintaining the records?

11       A.    At this particular time he was, I believe he

12  was based in, in Geneva, but he also spent time in

13  London as well.

14       Q.    And are you able to tell from looking at

15  these documents how he was keeping the records?

16       A.    He was using an accounting system called

17  QuickBooks.

18       Q.    How do you know that?

19       A.    I knew because I knew those were the records

20  he was keeping.  And these schedules are consistent with

21  QuickBooks format.

22       Q.    And did you rely on records that Mr. Ushakov

23  kept related to Red Star Gibraltar during this period of

24  time?

25       A.    In terms of the annual financial statements

1  that were audited, then, yes I, I relied on these,

2  subject to the normal audit tests that we would carry

3  out.

4       Q.     Could we look at page 5, please.  Do you see

5  at the top where it says 'General Ledger?'

6       A.     Yes.

7       Q.     And can you just tell us generally speaking,

8  what a General Ledger is?

9       A.     This is the summary of all the accounting

10 entries for the year, analyzed by the assets the

11 liabilities.  And all the elements of the Profit and

12 Loss Account.

13      Q.     And do you see down at the bottom where it

14 says 'Equity. The bottom left on page 5?

15      A.     Yes.

16      Q.     And what does it mean on a General Ledger to

17 have a listing for Equity?

18      A.     Under Equity is shown Share Capital and any

19 accumulated profits and any loans, directors.

20 Participants.

21      Q.     Do you see the entry right under Equity where

22 it says 'DE?'

23      A.     Yes.

24      Q.     Do you see that?  In this period of time in

25 2005, who did you understand to be DE? Or, what did you

1    understand DE to refer to?

2         A.    I understood the DE to refer to Mr. Edelman.

3         Q.    And do you see the transaction that's listed

4    here under DE?

5         A.    Yes.

6         Q.    And then the following one on page 7, if you

7    turn the page?

8         A.    Yes.

9         Q.    Are you able to tell us in plain words what's

10   happening in those two transactions from your read of

11   the General Ledger?

12        A.    Basically, there was a transfer of a $700,000

13   from Aspen Wind to Red Star Gibraltar.  The second entry

14   relates to assets acquired by Aspen Wind and to be

15   honest, I don't, I can't recall what that was related to

16   at all.

17        Q.    But do you see on the right side of the page

18   where there's an entry that says 'Balance.' Can you tell

19   us what that number is and the balance?

20        A.    The balance of 207,000 represents the amount

21   at the date of these accounts, the 30th September 2005

22   was due back to Mr. Edelman.

23        Q.    And then can you see the next entry on the

24   left where it says EB?  Do you see that?

25        A.    That's right.

1      Q.    And do you know what EB refers to in this
2  context?
3      A.    That refers to Erkin Bek.
4      Q.    And then are you able to summarize for us
5  what you understand to be happening in the transactions
6  listed under that?
7      A.    These are -- I can't recall exactly what the
8  transactions relate to, but they are specific
9  transactions which have been allocated to Erkin Bek and
10  the balance due back to him.  The Net balance due back
11  to him was 208,000.
12      Q.    You okay? Could we look, please, at 14-15?
13  (Exhibit Gov. Exb 14-15 was entered into evidence.)
14  Do you see where it says at the top of this page 'Red
15  Star Enterprises Limited Audit Queries and
16  Requirements?'
17      A.    That's right.
18      Q.    Do you see that?
19      A.    That's right.
20      Q.    Did you prepare this document?
21      A.    Yes, I did.
22      Q.    Can you tell us why you prepared this?
23      A.    We had been asked to prepare a set of
24  accounts for the nine month period, which was the first
25  initial period of Red Star Enterprises, Gibraltar, and I

Graham Collett                                    February 03, 2025

 1  | scheduled all of the various points arising from those

 2  | accounts that needed to be discussed, and also

 3  | indicating the balance on which the, the accounts had

 4  | been prepared.

 5  |     Q.     And can you tell us, looking at the page 3,

 6  | please, can you tell us who's handwriting is on page 3?

 7  | If you recognize it, at the bottom there?

 8  |     A.     That is my writing.

 9  |     Q.     Can you tell us what's indicated here by your

10  | writing on this document?

11  |     A.     The responses to my queries are lined on the

12  | on the left hand side of the page, being the

13  | explanations and confirmations that I received from

14  | Anthony Guerne when I discussed these accounts with him.

15  |     Q.     Drawing your attention to paragraph 6 at the

16  | bottom of the first page.

17  |     A.     Yes.

18  |     Q.     Can you read us the first sentence, please?

19  |     A.     "The Account show that Douglas and Erkin have

20  | invested equity of $208,000 each in the company.  I

21  | asked if there was any further documentation to support

22  | these figures, bearing in mind that the company was

23  | originally set up with share capital of £100, all of

24  | which was held by Douglas Edelman."

25  |     Q.     I'd like to draw your attention to that last

1   phrase that you just read, bearing in mind that the

2   company was originally set up with Share Capital, all of

3   which was held by Douglas Edelman.  Where did you get

4   the information to put that sentence into this audit

5   queries and requirements?

6        A.   At that particular time, I can't remember

7   precisely where it came from.  But that was the basis on

8   which the Company had been set up originally.  Before

9   the share capital was increased -- issued.

10       Q.   Does that sentence reflect your understanding

11  at the time of who had set up Red Star Enterprises?

12       A.   At that particular time that was what I that

13  that is what I believed and understood and ultimately

14  matched to the records of the company.

15       Q.   Can we look at 14-10, please.

16  (Exhibit Gov. Exb 14-10 was entered into evidence.)

17  Mr. Collett, is this another document you prepared for

18  Red Star Enterprises for the year for the three Quarters

19  ending 30th September 2005?

20       A.   Yes.

21       Q.   And looking at page 3, if we could?

22       A.   Yes.

23       Q.   Do you see this email from GACollett?

24       A.   That's right.

25       Q.   And there's an email address finance@rsel.net

1    Do you know who was responding to finance@rsel.net in

2    this period of time?

3         A.    That would be, that was Anthony Guerne, to

4    whom I was writing.

5         Q.    And then the email address that's on the copy

6    line.  Do you recognize that?

7         A.    Copy line?  That's Douglas@minacorp.com.

8         Q.    And whose email address did you understand

9    that to be?

10        A.    That is Mr. Edelman's address that he was

11   using.

12        Q.    Can we look at page 5, please.  Do you see at

13   the top where it says 'Notes to the Financial Statements

14   Continued?'

15        A.    That's correct, yes.

16        Q.    And do you see under the 'Related Party

17   Transactions Period', there's something, there's a

18   transaction described there.  Do you see that?

19        A.    Yes.

20        Q.    Can you tell us, or summarize for us what's

21   being described in that first paragraph?

22        A.    In the first paragraph, under an Agreement,

23   the Company irrevocably acquired the whole of the

24   trading activity of Bartol Limited, a company under

25   common control.  And the assets were all transferred

Graham Collett                                          February 03, 2025

99

 1  similarly.  So, what has happened here was that the, the
 2  the fuel logistics business, which had previously been
 3  carried out by Bartol Ltd was transferred to Red Star
 4  Enterprises Ltd, based in Gibraltar.
 5      Q.    So, at the time of the transfer based on all
 6  of your review of documents and work with Mr. Edelman,
 7  who did you understand to own Bartol Ltd, going into the
 8  transfer?
 9      A.    My understanding that was that it was Douglas
10  Edelman.
11      Q.    And at the time of the transfer, based on all
12  of your review of documents and work with Mr. Edelman,
13  who did you understand to own Red Star Enterprises Ltd?
14      A.    At the time, based on these accounts, that it
15  was Douglas Edelman.
16      MS. RANNEY:  Why don't we break there quickly.  Or
17  I guess this is not quickly.  30 minutes.  So, why don't
18  we say, why don't we pick a time to reconvene.  I can't
19  do math right now.
20      MR. CLARKE:  5:20  5:40?
21      Q.    Sorry, looking at D.C. time.  So, 5:20? And
22  that's 12:20 on the DC side to reconvene.  All right.
23      A.    This is the end of the Media II, going off
24  the Record at 4.49 as indicated on video screen.
25          (Break taken.)

1          VIDEOGRAPHER:  This is beginning of Media III,

2     Vol. I., going back on the record at 17:32 as indicated

3     on the video screen.  Thank you, Counsel.

4     BY MS. RANNEY:

5          Q.    Mr. Collett, I'd like to start by looking at

6     14-26, if we could, please.

7     (Exhibit Gov. Exb 14-26 was entered into evidence.)

8     Do you see where it says Red Star Enterprises Limited at

9     the top, Distributions to shareholders?  Do you see

10    that?

11         A.    Yes, I do.

12         Q.    Do you know who prepared this document?

13         A.    Yes, I prepared this document.

14         Q.    Why did you prepare this?

15         A.    This was a part of the exercise in preparing

16    and auditing the accounts of Red Star Enterprises Ltd

17    for the year ended 31st of December 2006.  And the, the

18    aim of the schedule was to show that at this stage the

19    shareholders being 50, now 50% -- 50% to Erkin Bek and

20    50% still to Douglas Edelman. That both of the

21    shareholders had received exactly the same amount in

22    terms of distributions from the Company during the,

23    during that year.

24         Q.    You mentioned that the aim of this document

25    was to, was to?

Graham Collett                                              February 03, 2025

101

```
 1        A.    Yes.
 2        Q.    -- agree something.  Who told you that that
 3   was the aim of this document?
 4        A.    It was, it was part of our, it was part of
 5   the audit procedure in terms of working out and agreeing
 6   exactly the amount of distributions that had been made
 7   to the two shareholders at that time.
 8        Q.    And who had asked you to do that audit in the
 9   first place?
10        A.    We've been instructed on an annual basis,
11   which was, which was a rolling engagement to prepare the
12   accounts for Red Star and Mina Corp for, for each Year
13   End.
14        Q.    And who ultimately had initiated that part of
15   the engagement?
16        A.    The original engagement back in 2005.  From
17   memory that came from, from Douglas Edelman.
18        Q.    I'd like to return to the distributions to
19   shareholders document in front of us.  Do you see where
20   at the top it says 'Transfers to Bartol.' Do you see
21   that?
22        A.    That's right.
23        Q.    Why would transfers to Bartol be listed on a
24   schedule of distributions to shareholders?
25        A.    Because these were the amounts that were
```

```
 1    actually paid to Bartol and Aspen Wind during the year.
 2        Q.    And how does that relate to a shareholder of
 3    Red Star Enterprises -- transfers to Bartol and Aspen
 4    Wind?
 5        A.    Those were the bank transfers that were made
 6    in terms of the allocation of profits.
 7        Q.    And whose profits were being allocated in the
 8    transfers to Bartol and Aspen Wind?
 9        A.    The profits of Red Star Enterprises Limited,
10    Gibraltar
11        Q.    To whose benefit were the transfers to Bartol
12    and Aspen Wind; which shareholder?
13        A.    For the, for the shareholder of Aspen Wind
14    and Bartol at that time.
15        Q.    And who was that?
16        A.    Being, being Douglas Edelman.
17        Q.    And what about on the second bottom half of
18    the page where it says 'Transfers to Sherway.' Do you
19    see where it says that?
20        A.    Yes.
21        Q.    Why are transfers to Sherway being collected
22    on a schedule of distributions to shareholders?
23        A.    Because these were the amounts that were paid
24    to Erkin Bek's Company.
25        Q.    Did you know how these transfers had been
```

1    initiated?  Do you know who transfers, who initiated

2    them?

3        A.    I didn't have any direct responsibility for

4    the accounting records at that time.  And to the best of

5    my recollection the distributions would have been made

6    by mutual agreement between the two shareholders.

7        Q.    And can you just tell us, based on this

8    schedule, how, how much in distributions each

9    shareholder had gotten in the year 2006?

10       A.    6,540,000 each, making a total distribution

11   of 13,080,000.

12       Q.    Do you know which currency this schedule was

13   prepared in?

14       A.    It's all in U.S. Dollars.

15       Q.    From the shareholder side, that's reflected

16   in the top half of this document under transfers to

17   Bartol.  Do you know who had directed and where these

18   individual transfers were supposed to go?

19       A.    I can't be precise.  Not knowing and not, not

20   being involved in the detailed accounting and day to day

21   business at the time.  But my understanding would be the

22   shareholders of the various companies would say where

23   they wanted their share, where they wanted their

24   distribution to be made.

25       Q.    Do you know where Bartol had an Account in

1  the year 2006; where Bartol had Bank Accounts?

2      A.    It had Bank Accounts with Credit Suisse and

3  with, with BNP Paribas.

4      Q.    And what about Aspen Wind?  Do you know where

5  Aspen wind had bank accounts?

6      A.    Remember the same.

7      Q.    The two?

8      A.    The same. Credit Suisse and BNP Paribas.

9      Q.    So, I'd like to talk about the period of work

10  that you mentioned earlier.  When you started doing

11  additional Projects, and you were added as an Account

12  Signatory, can you tell us again the approximate period

13  of time that you began doing additional Projects?

14      A.    It varies.  It's, it's difficult to define

15  the period when I started doing additional Projects.

16  But in terms of the Signatories roles that started in

17  late 2007.

18      Q.    And which Bank Accounts were you added to as

19  Signatory?

20      A.    At that stage I'm just trying to -- it would

21  have been, I believe, Aspen Wind and Bartol accounts.

22      Q.    And can you tell us just generally speaking,

23  what types of duties you had as an Account Signatory?

24  What were you doing day to day?

25      A.    From day to day, as necessary I was making

Graham Collett                                           February 03, 2025

1    payments from those accounts in conjunction with Iryna

2    Tsenzharyk, who also had signing powers at that time.

3    We worked on payments jointly, making payments for

4    various investments for other domestic payments.  A

5    whole range of payments that were made every month.

6         Q.    You mentioned investments.  Whose investments

7    were you making payments on?

8         A.    On the Companies' investments on the

9    instructions of Mr. Edelman.

10         Q.    And can you give us a general sense of what

11    types of investments we are talking about in 2008?

12         A.    2007, as well.  2007.  2008.  There were

13    payments being made out on the, on the films.  There was

14    the investment in MTV, which happened round about that

15    time.  Those sorts, those sorts of investments that were

16    being made.

17         Q.    You mentioned films.  What do you recall

18    learning about film investments during this period of

19    time?

20         A.    I knew that one major production was, was

21    being made and being finalized roughly around this time.

22    And I knew that other Projects were, were being planned.

23         Q.    Do you know who had decided to invest in a

24    film project?

25         A.    I believe that the ultimate, the ultimate

```
 1   decision came from Mr. Edelman.
 2        Q.    You mentioned a movie.  Do you know the name
 3   of the movie?
 4        A.    It was called, 'Billy:  The Early Years.' It
 5   was based on the early life of Billy Graham.
 6        Q.    Do you happen to know approximately how much
 7   money went into that movie?
 8        A.    Overall, it was approximately $6 million.
 9        Q.    Do you know if the movie ever made any money?
10        A.    It did not make any significant, significant
11   return on it, as far as I'm aware.
12        Q.    And you mentioned an MTV franchise.  What did
13   you know about that during this period of time?
14        A.    I knew that the MTV project came with Thomas
15   Ehr, who had been working with MTV and the decision to
16   invest in MTV came from the relationship between Douglas
17   Edelman and Tom Ehr.  And I believe that Mr. Edelman
18   made the decision to invest in the MTV Project.
19        Q.    Do you know if the MTV project ever made any
20   money?
21        A.    No, it didn't.
22        Q.    And who did you observe to make the decision
23   to invest $6 Million into the movie about Billy Graham?
24        A.    I believe it was Mr. Edelman who authorized
25   all the various payments to be made.
```

Graham Collett                                    February 03, 2025
107

1      Q.    So, I believe you mentioned earlier that
2  around this period of time, your day to day instructions
3  came from Mr. Edelman.  How were you communicating with
4  him around the 2007, 2008 period?
5      A.    Mainly through emails.  For example, on the
6  monthly payments we would meet occasionally, but not
7  that often during this particular period.
8      Q.    I'd like to look at 14-31, please.
9  (Exhibit Gov. Exb 14-31 was entered into evidence.)
10 Mr. Collett, I'd like to look at a few examples of your
11 work during this period of time.  Do you see this email
12 dated 2008?  June 16th, 2008.  Do you see that?
13     A.    That's right.  Yes, I do.
14     Q.    And I believe you identified this email
15 address for us previously as Mr. Edelman's email
16 address:  the Douglas@minacorp.  Is that right?
17     A.    That's correct.
18     Q.    And what about the To email address?  Is that
19 you gacollettca?
20     A.    @aol.com?  Yes.
21     Q.    And do you see where it says on the second
22 line here:
23            "Looks like I will buy the house in London."
24            Do you see that?
25     A.    Yes.

Graham Collett                                    February 03, 2025

108

1        Q.    Do you remember whether Mr. Edelman bought a

2   house in London at this period of time in June 2008?

3        A.    At that period in time, no, I don't think it

4   was bought to my knowledge at that time.

5        Q.    I'd like to draw your attention to a few

6   lines down where it says:

7              "simply need to decide who is best for

8   ownership, for tax purposes."

9              Do you see that?

10       A.    Yes.

11       Q.    At this period of time, in 2008, did

12  Mr. Edelman have any property in his own name, to your

13  knowledge?

14       A.    In 2008, not to my knowledge.

15       Q.    Do you see where it continues on:

16             "Wife and kids maybe.  I do have a

17  Foundation.  Question mark."

18             Do you see that?

19       A.    Yes.

20       Q.    Do you know what Foundation this is referring

21  to?

22       A.    I can't be absolutely certain, but I

23  subsequently found out soon after this that the Sunage

24  Foundation had been set up.  I'm not aware of any other

25  Foundations at that particular time.

1       Q.     Do you see the next line where it says:

2              "You will see another USD 5 million."

3              Do you see that line?

4       A.     Yes.

5       Q.     Do you know what it means:  "Will arrive to

6   Bartol" what that might refer to.

7       A.     That would refer to a dividend of 5 thou-of

8   5 million coming into Bartol from the Red Star business.

9       Q.     And then on the next line, do you see where

10  it says:

11             "I will probably spend over the next three

12  months, at least 2 million on the movie."

13             Do you see that?

14      A.     Yes.

15      Q.     Which movie do you understand that to refer

16  to?

17      A.     In 2008, from memory that would have been the

18  Billy Graham movie.

19      Q.     And what about where it continues on:

20             "1 Million, or 1.5 on MTV."

21             Do you know what that refers to?

22      A.     That, I believe, refers to the acquisition of

23  the franchises relating to the MTV networks in Eastern

24  Europe.

25      Q.     Do you see the next line where it says:

1              "After the 5 Million, I should have close to
2     19 Million USD."
3              Do you see where it says that?
4        A.    Yes.
5        Q.    Do you know what that's referring to?  The
6     19 Million.
7        A.    I think from memory relates to the, to the
8     funds available in Bartol, or Aspen Wind at that
9     particular moment in time.
10       Q.    And do you see the second line from the
11    bottom where it says:
12             "I have other amounts I can lay my hands on
13    pretty easily."
14             Do you see where it says that?
15       A.    Yes.
16       Q.    What do you think that refers to, based on
17    your knowledge of Mr. Edelman and his finances at the
18    time?
19       A.    It's a bit difficult to be absolutely clear
20    on what I understood at the time for that to mean.  It
21    could, although I have no real certainty what he was
22    thinking about at that time, except for possibly funds
23    within the Neda companies.  I don't, I can't remember
24    precisely.
25       Q.    At this period of time, did you know

Graham Collett                                      February 03, 2025

111

```
 1    Mr. Edelman, to have various business interests and
 2    investments?
 3         A.    At this time in 2008, I didn't really know
 4    too much about what else was going on in, in any detail.
 5         Q.    That good to look at 14-29, please.
 6    (Exhibit Gov. Exb 14-29 was entered into evidence.)
 7    This is an email from around the same period of time in
 8    2008, from May 26th.  Do you see your email address in
 9    the To line?  Do you see that?
10         A.    Yes, I do.
11         Q.    And the email address you identified as
12    Mr. Edelman's in the front line.  Do you see that?
13         A.    That's correct.
14         Q.    And drawing your attention down the page to
15    the initial email in this chain which appears to be from
16    you to Mr. Edelman, do you see where it says:
17              "I attach an amended version of the corporate
18    notes?"
19              Do you see that?  You can also look, it's on
20    the screen, as well for reference?
21         THE WITNESS:  Oh.
22         MS. RANNEY:  Yeah.  14-29.  Yeah.
23         THE WITNESS:  14-29.
24    BY MS. RANNEY:
25         Q.    Yes, I'm sorry. It's my American accent.  Do
```

 1  you see where it says "I attach an amended version of

 2  the corporate notes?"

 3      A.    Yes, indeed.

 4      Q.    And then do you see at the end of that

 5  paragraph where it says:

 6          "the list of documents I have prepared for

 7  sending to Credit Suisse."

 8          Do you see that?

 9      A.    Yes, I do.

10      Q.    Can you tell us what's going on in this

11  email?  Why you're sending information over to

12  Mr. Edelman?

13      A.    What happened here was that Credit Suisse

14  were asking for updated information for their Compliance

15  Department in connection with the ownership and running

16  and use of the accounts for Aspen Wind and Bartol.  I

17  produced the summary of the information that they'd

18  requested and a summary of corporate notes of the

19  situation as I understood it at the time for sending to

20  Credit Suisse.  And I sent it to Mr. Edelman for his

21  information, comment and approval.

22      Q.    So, if we could look, please at page 2, where

23  the attachment to this email.  Sorry.  They. Page 2.

24      A.    Yes.

25      Q.    Do you see where there is an email from

1    Mr. Edelman to himself and to you on May 24th, 2008?

2         A.    Yes.

3         Q.    Do you recognize this as the summary that you

4    prepared for Credit Suisse, as we just discussed a

5    minute ago?

6         A.    That's correct.

7         Q.    And you mentioned that you sent this summary

8    over to Mr. Edelman.  When you sent it for his review,

9    did you incorporate any changes that he requested you

10   make to your initial draft?

11        A.    I did say on the previous email that I had

12   incorporated -- was on the subsequent -- trying to work

13   out which -- there had been some small amendments to the

14   one that we're looking at now dated the 24th.  And he

15   asked me to see changes, or ideas for some small

16   changes.

17        Q.    And was, was it your practice in this period

18   of time to make changes, or when Mr. Edelman had changes

19   to documents you made for him?

20        A.    Yes, I would make those changes.

21        Q.    I'd like to look at the text of the email

22   that begins on page 2.

23        A.    Yes.

24        Q.    Under 'Introduction,' can you read us the

25   first sentence under 'Introduction?'

1      A.      It says:

2              "The two companies Bartol Ltd and Aspen Wind

3      Corporation are both owned and controlled by Douglas

4      Edelman (DE), through nominees, shareholders.  Bartol is

5      incorporated in Gibraltar and Aspen Wind Corporation and

6      is incorporated in Belize."

7      Q.      And then drawing your attention down the page

8      to the line right above 'Trading Activities,'?

9      A.      Yes.

10     Q.      Can you read us that line that begins 'DE

11     is?'

12     A.      "Until 1st of January 2006, the main activity

13     of Bartol was the sale and distribution of aviation jet

14     fuel."

15     Q.      My apologies.  Can you read us the line

16     that's above Trading Activity, that begins 'DE is?'

17     A.      "DE is the ultimate owner of both Bartol and

18     Aspen Wind."

19     Q.      And do you recall whether this summary was

20     ultimately submitted to Credit Suisse?

21     A.      This, I believe was the version that was

22     submitted to Credit Suisse.

23     Q.      Could we look, please, at paragraph, at

24     number 3 on this page, under 'Relationship with Credit

25     Suisse?'?

Graham Collett                                    February 03, 2025

115

```
1        A.    Yes.

2        Q.    Do you see where it says at the top:

3              "The main purposes of the relationship with

4    Credit Suisse are as follows."

5              Do you see that?

6        A.    Yes.

7        Q.    And then can you read us what number 3 says?

8        A.    Number 3 says:

9              "To make payments by way of distributions to

10   DE and his family."

11       Q.    And does that match with your understanding

12   of the purpose of the Credit Suisse Account and the

13   transactions that you were involved in during this

14   period of time?

15       A.    That does match the description.

16       Q.    And can we look at 14 -- well, hold on.  Can

17   we look at page 4, please?  Do you see near the top of

18   the page where there's a list under 'these activities

19   currently compromise.' Do you see that?  I'm sorry,

20   comprise?

21       A.    Comprised, yes.

22       Q.    Do you see where it says 'Afghan America

23   Advertising.' Do you see that?

24       A.    Yes.

25       Q.    Who did you understand to have a 50%
```

Graham Collett                                        February 03, 2025
                                                            116

1    ownership interest in Afghan America Advertising?

2        A.    That was Douglas Edelman.

3        Q.    And Neda Telecommunications.  The next

4    Company listed.  Who did you own -- understand to own

5    Neda Telecommunications?

6        A.    I understood Douglas Edelman to own.

7        Q.    And what about in the next paragraph where it

8    says 'Recent New Ventures.' And then there's number 1

9    and it says:

10              "Purchase of MTV."

11              Do you see that?

12       A.    Yes.

13       Q.    Is that what you were referring to earlier,

14   when you were talking about the MTV investment?

15       A.    That's correct.

16       Q.    And the next paragraph, 'Investment in

17   Preacher Films LLC.' Do you see that?

18       A.    Yes.

19       Q.    Is that what you were talking about when you

20   were referring to the movie about Billy graham?

21       A.    That's correct.

22       Q.    And what about number 3: the investment in

23   Mina Media Africa Cyprus Limited?  Do you know who owned

24   that?

25       A.    Aspen Wind controlled 50% of the shares in

1    that Company.

2         Q.    And I'd like to look at 14-30, if we could,

3    please?

4    (Exhibit Gov. Exb 14-30 was entered into evidence.)

5    Do you see where it says Fax Message at the top, and

6    then it bears the date 26th May 2018.  See that?

7         A.    That's correct, yes.

8         Q.    Did you draft this fax?

9         A.    Yes, I did.

10        Q.    What is this fax conveying?

11        A.    This is conveying the, of the outline summary

12   that we're just looking at together with the various

13   additional documents and information that the bank had

14   requested as set out on page 15.  It was basically

15   additional information, documentation supporting various

16   payments which, which the bank had highlighted.

17        Q.    I'd like to look, if we could at the To on

18   this fax message.  Can you tell us who this fax is to?

19        A.    It's to Elizaveta Billaud who was the one of

20   the Relationship Managers at Crédit Suisse, Switzerland.

21        Q.    And if we could look at page 9, please?  Page

22   9 of this fax.  If you could just look at the summary

23   that was sent over to Credit Suisse and tell us who did

24   you tell the bank owned Aspen Wind and Bartol?

25        A.    At this moment in time, based on the first

1  paragraph of that, the first two paragraphs that

2  Mr. Edelman owned Bartol and Aspen Wind.

3       Q.    I'd like to look at 14-32, please.

4  (Exhibit Gov. Exb 14-32 was entered into evidence.)

5  Mr. Collett, this appears to be an email exchange from

6  2008.  Can we turn please to the back page, page 3 of

7  this email exchange?  Do you see where there's an email

8  dated June 19th, 2008 from Graham

9  Collett@Craneandpartners.com.  Do you see that?

10      A.    Yes.

11      Q.    And can you tell us who the recipient of that

12 email is, if you recognize the name, or the address?

13      A.    Yes, it was to Omero, who was the CEO of Red

14 Star at that time.

15      Q.    And to draw your attention down to the bottom

16 paragraph of this email which begins 'as far as

17 ownership is concerned.' Do you see where it says that?

18      A.    Yes.

19      Q.    Can you read us the rest of that sentence

20 after 'as far as ownership is concerned?'

21      A.    The rest of that paragraph.

22      Q.    Yes, please.

23      A.    "As far as ownership is concerned since the

24 changes in 2005, the beneficial ownership of the shares

25 has remained unchanged, even though the nominees may

1  have changed, e.g. the transfer of shares on Red Star

2  Enterprises on the 9th of September 2006 from Douglas

3  Edelman to Centrum Secretaries which was not a transfer,

4  was not a change in the ultimate beneficial ownership of

5  the shares."

6       Q.    Did you write that paragraph based on your

7  understanding of the facts at the time, based on your

8  work with Mr. Edelman and your review of the relevant

9  documents?

10      A.    That's correct.

11      Q.    I'd like to look at 14-33, if we could,

12  please.

13 (Exhibit Gov. Exb 14-33 was entered into evidence.)

14      MR. CLARKE:  Which one, sorry?

15 BY MS. RANNEY:

16      Q.    14.33.  Mr. Collett, do you see this

17 correspondence that appears to be dated 11th

18 September 2008?

19      A.    Yes.

20      Q.    And do you recognize this signature on this

21 correspondence?

22      A.    Yes.  That's my signature on Crane and

23 Partners.

24      Q.    Do you recognize this letter?

25      A.    Yes, I do.

Graham Collett                                February 03, 2025

1      Q.     What is that?

2      A.     It's a reference to a, an estate agent

3   regarding the proposed rental of a property.  And they

4   needed confirmation of Mr. and Mrs. Edelman's income.

5      Q.     Who asked you to draft this letter to confirm

6   income for a rental?

7      A.     Douglas Edelman asked me to prepare a letter

8   stating a reasonable sum of money that would qualify and

9   satisfy the potential Agent, the Agent for the potential

10  letting of the property that they were looking at.

11     Q.     I'd like to draw your attention to page 3 of

12  the Exhibit.  I'd like to draw your attention to the

13  paragraph in the middle of the letter.  First of all, is

14  this one of the letters that you prepared related to the

15  rentals; page 3?

16     A.     Yes.

17     Q.     Drawing your attention about halfway down, do

18  you see the paragraph beginning:  'We can also confirm?'

19     THE WITNESS:  Sorry, am I on the right this is on

20  page nine.

21     MS. RANNEY:  Page 3.

22     MS. PERSAUD:  Page 3.

23     A.     Sorry, yes.  Client's income in the last

24  three years is an excess of 420,000 per annum.

25  Therefore, more than sufficient to finance the rental

1   obligations arising from the proposed tenancy.

2   BY MS. RANNEY:

3        Q.    And who, if you can tell from the rest of

4   this letter, who is our client referring to in this

5   paragraph?  Who does this letter relate to?

6        A.    This, this letter here relates to Delphine

7   Edelman. And the other one related to Douglas Edelman.

8        Q.    I'd like to look at page 9.  Is this the

9   other letter you just referred to?

10       A.    That's correct.

11       Q.    Related to Mr. Edelman?

12       A.    Yes.

13       Q.    And do you see about halfway down where it

14   says:

15            "Our clients income from these businesses?"

16       A.    "In the last three years has been in excess

17   of $10 million" Yes.

18       Q.    And did you write this based on your

19   understanding at the time of Mr. Edelman's financial

20   circumstances?

21       A.    That's correct.

22       Q.    And do you recall whether he reviewed this

23   before you submitted it to the rental agency?

24       A.    I can't quite remember one way or the other.

25       Q.    Directing your attention to the paragraph

1    right above that, where it says:

2            "This firm has acted for Mr. Edelman since

3    2003 in connection with his personal and business

4    affairs."

5            Do you see that?

6        A.    Yeah.

7        Q.    And can you read us the next sentence,

8    please?

9        A.    "Our clients' income is derived mainly from

10   dividends received from worldwide trading companies,

11   which have been established over 20 years and which

12   Mr. Edelman has a substantial and/or controlling

13   interest."

14       Q.    When you wrote this letter in 2008, was that

15   your understanding of Mr. Edelman and his income

16   situation, as you just characterized it in that letter?

17       A.    That's correct.  Based on the income that he

18   was receiving from the current companies.

19       Q.    I'd like to look at 14-34, if we could,

20   please.

21   (Exhibit Gov. Exb 14-34 was entered into evidence.)

22   To continue on looking at transactions in this period of

23   time, do you see this email dated October 2008?

24       A.    That's correct.

25       Q.    And is this from the email address you

```
1    identified as Mr. Edelman's to your email address?

2         A.    That's correct.

3         Q.    And do you see here where there's a long

4    series of text in all caps?  Do you see that?

5         A.    Yes.

6         Q.    Do you know who drafted that text in all

7    caps?

8         A.    I believe that that was Mr. Edelman.  It was

9    his usual style if commenting, or editing a, an email to

10   use capitals to highlight his comments and suggestions.

11        Q.    Do you see the first line below 'Dear

12   Graham', where it says:

13             "See below.  I wish to send 580K USD to my

14   son Mikhail."

15             Do you see that?

16        A.    Yes.

17        Q.    Do you know who Mikhail is?

18        A.    Mr. Edelman's son, I believe.

19        Q.    And do you see the next line where it says:

20             "On paper we will structure it as a loan to

21   his Company."

22             Do you see where it says that?

23        A.    Yes.

24        Q.    And then do you see two lines down where it

25   says:
```

Graham Collett                                    February 03, 2025

124

1             "This is mainly for his tax purposes, as I am
2    really just giving him the money."
3             Do you see that?
4        A.    Yes.
5        Q.    Did you ultimately make any transaction of
6    money to Mikhail, Mr. Edelman's son?
7        A.    I did.  Based on this instruction.
8        Q.    How much money did you transfer?
9        A.    I believe it was the full amount of the
10   580,000.
11       Q.    And did you draw up papers for a loan related
12   to this transfer?
13       A.    Yes.  I drafted a Loan Agreement.
14       Q.    Was it your idea to draft a Loan Agreement
15   for the transfer to Mikhail?
16       A.    Mr. Edelman asked me to draft that loan
17   agreement.
18       Q.    For those of us who aren't accountants, is it
19   appropriate to classify something as a loan, if it's
20   really a gift; are those two things considered the same
21   thing in accounting principles?
22       A.    In accounting principles, no, they're not
23   the same thing.
24       Q.    Why did you draw up loan papers for a
25   transfer that wasn't really a loan?

Graham Collett                                          February 03, 2025

1      A.    Because Mr. Edelman asked me to do so.

2      Q.    Did you push back and tell him that you can't

3   characterize something as a loan, if it's really a gift?

4      A.    No, I didn't.

5      Q.    Can I draw your attention to halfway down the

6   page, please, where it says 'should come.' Do you see

7   that?

8      A.    Should come from Bartol, I guess.

9      Q.    What does that mean in this context?  If you

10  know?

11     A.    The money should be paid from the Bartol

12  Account.

13     Q.    And just practically speaking, how did you

14  interpret those instructions to make your transaction?

15     A.    I interpreted those instructions to make the

16  payment to Zeebird from the Credit Suisse Account.

17     Q.    I'd like to look at page 3, if we could.  Do

18  you see this email dated October 6th, 2008?

19     A.    I do.

20     Q.    From you to SvetlanaBianchi@CreditSuisse.com.

21  Do you see that?

22     A.    That's correct.

23     Q.    Who do you know Svetlana Bianchi at Credit

24  Suisse to be?

25     A.    She was one of the Account Managers that we

Graham Collett                                        February 03, 2025
                                                                    126

1    dealt with at the Bank.

2         Q.    Do you see in the body of this email where it

3    says:

4              "Mr. Edelman wishes to make a loan to his

5    son, Mikhail."

6              Do you see that?

7         A.    That's right.

8         Q.    And do you see in the next line where it

9    says:

10             "The loan will be subject to a formal

11   agreement."

12             Do you see that?

13        A.    That's correct.

14        Q.    And is that the Agreement you drafted for

15   this transaction?

16        A.    That's right.

17        MS. RANNEY:  I'd like to look at 13-2, if we could,

18   please.

19   (Exhibit Gov. Exb 13-2 was entered into evidence.)

20        THE WITNESS:  13?

21        MS. PERSAUD:  13-2.

22        THE WITNESS:  13-2.

23        MS. PERSAUD:  Yeah, that's.

24   BY MS. RANNEY:

25        Q.    This is an email dated November 2008.  Do you

1    see that, at the top?

2         A.    Yes.

3         Q.    This is from an individual you just

4    identified.  Can you tell us her name.

5         A.    This is Svetlana.  Svetlana Bianchi.

6         Q.    And who is this email to?

7         A.    It's addressed to me.

8         Q.    And if you could, can you summarize what Ms.

9    Bianchi communicated to you in 2008?

10        A.    She was communicating to me that several

11   initiatives have been launched in the USA to combat

12   perceived tax evasion by U.S. taxpayers living abroad.

13   She set out three options in connection with the

14   accounts for Bartol and Aspen Wind, to terminate the

15   relationship and withdraw the assets, convert to a

16   client relationship with Credit Suisse private advisors,

17   or to provide a Form A sent to the U.S. authorities.

18        Q.    Based on what you just said, do I understand

19   correctly that of these three options, the only one that

20   would avoid disclosure to U.S. Authorities was Bank

21   Account closure?

22        A.    Was to close the accounts.

23        Q.    And did you tell Mr. Edelman about this

24   email?

25        A.    I did.  It was discussed.

Graham Collett                                    February 03, 2025

128

1        Q.    Do you know which option he chose?

2        A.    He decided that the best thing to do would be

3   to close the accounts.

4        Q.    Did he tell you why?

5        A.    He said that he did not want any disclosure

6   at all and therefore the best option was to close the

7   accounts.

8        Q.    I'd like to look at 14-35, if we could,

9   please.

10  (Exhibit Gov. Exb 14-35 was entered into evidence.)

11  Do you see this appears to be a fax message dated 5th

12  September 2008.  Do you see that?

13       A.    That's correct.

14       Q.    Did you prepare this fax message?

15       A.    Yes, I did.

16       Q.    Is that your signature on the front of the

17  fax?

18       A.    It is.

19       Q.    And can you tell us what is this fax message

20  conveying?

21       A.    "Please see the attached."

22             It was submitting the detailed instructions

23  and authorization for the closure of all accounts and to

24  transfer any funds to Julius Baer International.

25       Q.    I'd like to look, if we could, at page 2 of

Graham Collett                                          February 03, 2025

1   the Exhibit.

2        A.    Yes.  This was the Authority Letter to Credit

3   Suisse, in respect of Bartol and Aspen Wind to close the

4   accounts and to transfer the balances to Sunage

5   Foundation at Credit Suisse -- at Julius Baer.

6        Q.    Just to be abundantly clear, who had decided

7   that the money should be transferred to this Account

8   Sunage Foundation at Julius Baer?

9        A.    This was Mr. Edelman's instruction.

10       Q.    And where it says:

11             "for and on behalf of Bartol Limited and

12   Aspen Wind Corporation."

13             Do you recognize the signature under that

14   signature block?

15       A.    Yes, I believe this is Mr. Edelman's

16   signature.

17       Q.    And to look at page 4, please?

18       A.    Yes.

19       Q.    Is this another letter regarding instructions

20   to move the money from the Credit Suisse, Bartol Limited

21   accounts and Aspen Wind accounts to the Sunage

22   Foundation Accounts at Julius Baer?

23       A.    That's right.

24       Q.    And whose signature is on this document?

25       A.    I believe that one to be Mr. Edelman's.

Graham Collett                                            February 03, 2025
                                                                      130

1        Q.    Can we look at 14-37, please.

2    (Exhibit Gov. Exb 14-37 was entered into evidence.)

3    After Mr. Edelman directed the transfer of the funds

4    into the Sunage Account, did you continue to be involved

5    in transfers in and out of the Sunage bank Account, or

6    in and out of accounts at Mr. Edelman's direction?

7        A.    Yes.   I became a signatory to the Sunage

8    accounts with Julius Baer in and around the same time,

9    when Iryna Tsenzharyk and I were both appointed as

10   signatories to make regular payments out of these

11   accounts.

12       Q.    Do you recall why Julius Baer, Singapore was

13   chosen as the location for the bank Account?  Did you

14   have any personal knowledge about that?

15       A.    I don't have any personal knowledge why

16   Singapore was chosen.

17       Q.    Looking at 14.37, the document in front of

18   you?

19       A.    Yes.

20       Q.    Do you recall, or do you know who drafted

21   this?

22       A.    These were a template that was set up to make

23   payments from the Sunage Foundation, which I drafted and

24   which was used sort of consistently throughout the

25   period.

Graham Collett                                                    February 03, 2025

1    Q.    Before the transfer to Sunage, who gave you

2    instructions when and where to transfer money?

3    A.    Primarily, Mr Edelman.

4    Q.    And after the transfer to Sunage, who gave

5    you instructions on when and where to transfer money?

6    A.    Primarily Douglas Edelman.

7    Q.    I'd like to look at 14-38, please.

8    (Exhibit Gov. Exb 14-38 was entered into evidence.)

9    Do you see at the top where the date on this email

10   appears to be December 22nd, 2008.  Do you see that?

11   A.    That's right.

12   Q.    From Mr. Edelman's email address to yours.

13   Do you see that?

14   A.    Yes.

15   Q.    And can you read me the top sentence that's

16   in all caps there.

17   A.    Says:

18       "We need as well to notify everyone who sends

19   money currently to Aspen or Bartol to now send to

20   Sunage."

21   Q.    And just to confirm who were these

22   instructions coming from?

23   A.    These instructions were coming to me from

24   Douglas Edelman.

25   Q.    And then on the next line, where it says:

1          "I will inform Geneve as well as I am

2   planning a USD 15 MM dividend disbursement."

3          Do you see where it says that?

4      A.    Yes.

5      Q.    Do you know what 'I will inform Geneve'

6   refers to?

7      A.    I believe that that was informing the Geneva

8   office of Red Star to send the 15 Million dividend

9   disbursement to Julius Baer.  Sunage Account.

10     Q.    Around this period of time in 2007, 2008, had

11  you been involved in or aware of other instances when

12  distributions or dividends came out of Mina, or Red

13  Star?

14     A.    Sorry, can you just repeat that question for

15  me?

16     Q.    Around this period of time in 2007 and 2008,

17  had you been aware of other times that distributions

18  came out of Mina, or Red Star?

19     A.    They, they did come out of Mina, of Red Star

20  during those years.

21     Q.    And were you sometimes involved in

22  communications about when a distribution should be made

23  or how much?

24     A.    I was usually informed by Mr. Edelman as to

25  when and how the dividends were being made from Red Star

1  and Mina Corp.

2       Q.     And in those transactions that you just

3  mentioned, when you were informed, were you able to

4  discern who had decided where the distribution should

5  go; which bank Account they should go into?

6       A.     I was normally instructed to put them into

7  Bartol, or Aspen Wind.

8       Q.     Who gave you those instructions to put them

9  into Bartol, or Aspen Wind?

10      A.     That would have been Mr. Edelman.

11      Q.     And then after the closure of the Credit

12 Suisse accounts, where did the dividends or

13 distributions go?

14      A.     They went to Sunage Foundation Account with

15 Julius Baer.

16      Q.     And who instructed you to put the dividends

17 into the Sunage Account?

18      A.     That was Mr. Edelman, Based on the on the

19 standard instruction that all money should go to.

20 Sunage Foundation.

21      Q.     Around this period of time, did Mr. Edelman

22 tell you that he wanted to give his business interests,

23 or any of his assets to his wife?

24      A.     I don't recall a discussion of that nature.

25      Q.     Did he ask you to draw a paperwork to

Graham Collett                                          February 03, 2025
                                                                    134

 1  transfer any ownership of his interests to his wife's?

 2      A.    Not that I can recall.

 3      Q.    Can we look at 14-39, please.

 4  (Exhibit Gov. Exb 14-39 was entered into evidence.)

 5  Do you see this email exchange in December of 2008?

 6      A.    Yes.

 7      Q.    Do you see in the initial email, towards the

 8  bottom, which appears to be from you to Ms. Bianchi.  Do

 9  you see that?

10      A.    Yes, I do.

11      Q.    Do you see where it says:

12            "Do you have banking arrangements in

13  Singapore and if so, would it be possible to use such

14  arrangements without any disclosure being required?"

15            Do you see that?

16      A.    Yes, I do.

17      Q.    Whose concern was it that there not be any

18  disclosure?  Was that your concern?

19      A.    It was Mr. Edelman's concern.  And he asked

20  me to ask Credit Suisse whether they had arrangements

21  in, in Singapore.

22      Q.    Could we look at 14-40, please.

23  (Exhibit Gov. Exb 14-40 was entered into evidence.)

24  Do you see this email exchange from January 2009?

25      A.    Yes.

Graham Collett                                          February 03, 2025
                                                                    135

```
 1        Q.    Do you see in the bottom email from you?
 2        A.    Yes.
 3        Q.    Where you say:
 4              "I still have had not any direct confirmation
 5    about payments."
 6              Do you see that?
 7        A.    Yes.
 8        Q.    And then do you see in the top email, where
 9    you mentioned a delay in payments.  Do you see that?
10        A.    Yes.
11        Q.    Why were you reporting to Mr. Edelman about
12    payments in early 2009?
13        A.    He'd asked me to make payments and there was
14    a delay in making those payments.  And he spoke to me
15    and said, "why haven't these payments been made?  What's
16    the problem?"
17        Q.    Could we look at 14-41 -- I apologize.  Can
18    we look at the paragraph that begins 'I have spoken to
19    CS.'  Do you see that?
20        A.    Yes.
21              "I've spoken to Credit Suisse.  They suggest
22    we make direct contact with Credit Suisse in Singapore
23    to see if they can provide Internet banking without any
24    threat of disclosure.  Credit Suisse in Geneva didn't
25    seem to know."
```

Graham Collett                                    February 03, 2025

136

1       Q.      And again, why were you taking follow up
2   actions related to threat of disclosure or
3   non-disclosure around this period of time?
4       A.      This follows the previous email when I had
5   spoken to Credit Suisse.  I asked them about Singapore
6   at Mr. Edelman's request and this was me reporting back
7   on what was said.
8       Q.      I'd like to look at 14-41 please.
9   (Exhibit Gov. Exb 14-41 was entered into evidence.)
10  I'd like to draw your attention first to the bottom
11  email on this first page, which appears to be
12  January 19th, 2009.  Do you see that?
13      A.      That's right.
14      Q.      That's from the address you identified as
15  yours to Mr. Edelman's email address.
16      A.      That's correct.
17      Q.      And there's some handwriting on this.  Can
18  you identify the handwriting for us?
19      A.      That's my handwriting.
20      Q.      And why is there handwriting on this?  What
21  does that indicate?
22      A.      Well, the numbers are basically reference
23  numbers for when I've made the payments.
24      Q.      Do I understand correctly that the
25  handwriting indicates you've checked off a task, or that

Graham Collett                                    February 03, 2025

137

```
1   you're memorializing it in some way?
2       A.    Yes, I can't really quite remember why the
3   numbering on those.
4       Q.    And just looking at the list of payments in
5   this email, do you see the names of Mr. Edelman's
6   children that we talked about earlier:  Rivkah, China
7   and Joe?  Do you see that?
8       A.    That's correct.
9       Q.    What do these entries here reflect?
10      A.    Those interests, they reflect the amounts
11  of -- that he wanted to pay, either every month going
12  forward, or adding an additional amount for a month
13  only.
14      Q.    And which bank Account are these payments to
15  be made from?
16      A.    These payments, I believe were made from the
17  Sunage Account with Julius Baer on the basis that the
18  Credit Suisse accounts have been closed.
19      Q.    I'd like to draw your attention to the top
20  email.  Where it says:
21            "Also I think we can use BNP."
22            Do you see that?
23      A.    Yes.
24      Q.    And can you read for us the line continuing
25  from where I just read, 'I think we can use BNP?'
```

1      A.      "BNP in brackets where I have Aspen and

2   Bartol accounts.  BNP assure me there will never release

3   information, etc. and certainly without asking and not

4   before giving us a chance to close the accounts."

5      Q.      Do you understand what, what that means?

6              "They would never release information without

7   giving us a chance to close the accounts?"

8      A.      I believe that that relates to the fact that

9   Mr. Edelman had, had knowledge of that from his

10  relationship with BNP.

11     Q.      I'd like to go to 14-42 if we could, please.

12  (Exhibit Gov. Exb 14-42 was entered into evidence.)

13  This appears to be a February 2009 email.  Do you see

14  that?

15     A.      Yes.

16     Q.      From Mr. Edelman's email address to your

17  email address.  Do you see that.

18     A.      Yes.

19     Q.      Can you read us the bottom line of that email

20  beginning 'also all?'

21     A.      "Also all incoming into Sunage.  Also all

22  income coming into Sunage."

23     Q.      And then in the brackets?

24     A.      "Just sent another 10 million last week into

25  Sunage."

Graham Collett                                    February 03, 2025

139

```
1          Q.    Do you know what that means?

2          A.    I think that refers to another dividend

3    distribution coming in from Red Star Enterprises.

4          Q.    Can we look at 14-43, please

5    (Exhibit Gov. Exb 14-43 was entered into evidence.)

6    Do you see at the top where this appears to be an email

7    exchange from March 2009?  Do you see that?

8          A.    Yes, I do.

9          Q.    And do you see the top email where it says:

10               "See from Steven a few weeks back."

11               Do you see that?

12         A.    Yes.

13         Q.    Do you know who Steven is in this context?

14         A.    It's Steve MacSerraigh.

15         Q.    And who is Steven MacSerraigh in this period

16   of time?  What was his role?

17         A.    He was an associate of Mr. Edelman's.  And

18   involved in a company called Mina Media.

19         Q.    I'd like to direct you, if I could to the

20   first email exchange in this email, beginning on page 2

21   from, from Douglas@minacorp, beginning.  'Hi, Steven.'

22   Do you see that?

23         A.    Yes, I do.

24         Q.    Do you see almost to the bottom where it

25   says:
```

1           "Also we need to make some changes as Cyprus

2    companies and Cypriot bank accounts cannot be tied to me

3    personally anymore."

4           Do you see that?

5    A.    Yes.

6    Q.    Do you know what that means?

7    A.    I believe that this was because Mr. Edelman

8    was shown as a shareholder alongside Steven MacSerraigh

9    in Mina Media.

10   Q.    And then a few lines down do you see where it

11   says:

12          "I think this depends on the shareholding

13   agreement, whether the shares are held up as options and

14   then -- "

15          I'm sorry.

16          "help as options and then released upon

17   repayment of the loans made to Mina Media by one of my

18   other companies."

19          And then in the paren, can you read what it

20   says, in the paren?

21   A.    My other companies --

22          "Probably my Foundation, Sunage."

23   Q.    Can you read the next one, after the paren

24   beginning, 'I was?'

25   A.    "I was thinking we switch Mina Media and use

1    the Singapore banks to handle the financial side of

2    things."

3        Q.    Based on your communications with Mr. Edelman

4    around this time, do you know what that refers to?

5        A.    Do you mean the last sentence?

6        Q.    Correct.  The switch to Singapore banks.  Do

7    you know why he would be asking about switch to

8    Singapore banks based on your communication?

9        A.    Because based on, based on the previous

10   emails we've looked at Singapore -- was the best option

11   to, in terms of disclosure and privacy of accounts.

12       Q.    And when you say disclosure, disclosure to

13   who?  To the extent of your knowledge?

14       A.    To the U.S. authorities.

15       MS. RANNEY:  Like to look at 14-57.

16       MR. CLARKE:  57?

17       MS. RANNEY:  14-57?

18       MR. CLARKE:  Yes.

19       MS. RANNEY:  14-57. Just making sure everybody is

20   awake.  Change of binders.

21       MR. CLARKE:  It works.

22   (Exhibit Gov. Exb 14-57 was entered into evidence.)

23   BY MS. RANNEY:

24       Q.    Do you see this letter dated 2011?

25       A.    Yes.

1      Q.    Have you ever seen this before?

2      A.    I can't specifically remember when I got it,

3  but I know that it was in my files.

4      Q.    And if you can tell from this first page who

5  is the letter from?

6      A.    It's from Credit Suisse addressed to

7  Mr. Edelman personally.

8      Q.    And are you able to summarize for us what

9  this letter is conveying to Mr. Edelman?

10      A.    It, it is basically requesting information of

11  the accounts of various U.S. persons addressed to him

12  personally.

13      Q.    If I could ask everyone to look at the top of

14  page 2, please.  Mr. Collett, do you see where it says

15  in the box at the top of the page, on page 2:

16          "This letter provides notice to you."

17          Do you see that?

18      A.    So on page 2.

19      Q.    It's on the screen as well, if that's easier.

20      A.    Sorry.  I've turned over one too many pages.

21  Yes, I see that.  Yes.

22      Q.    Do you see where it says:

23          "The Credit Suisse Account of which you had

24  have or had the Beneficial Ownership."

25          Do you see that?

1      A.      Yes.

2      Q.      In the period between 2002 and 2010, did

3  Mr. Edelman have Beneficial Ownership of accounts at

4  Credit Suisse to the extent of your knowledge?

5      A.      Yes, he did.

6      Q.      Which accounts were those, that you know of?

7      A.      The ones that I know of are the Bartol, the

8  Aspen Wind and the Sunage accounts.

9      Q.      Do you recall Mr. Edelman's response to

10  getting this letter in 2011?

11      A.      I can't remember the response or the action

12  that was taken on it.  I can't immediately remember.

13      Q.      Do you recall his general attitude towards

14  the notion that his identity as the Beneficial Owner of

15  an Account would be turned over to U.S. authorities?

16  What was his general view on that?

17      A.      When you say general view.  Sorry.  When you

18  say his general view I'm not quite sure what you're

19  actually asking me in terms of --

20      Q.      Had Mr. Edelman ever told you that he was

21  okay with his information being turned over to U.S.

22  authorities, related to ownership of bank accounts in

23  Switzerland?

24      A.      No, he did not tell me that.

25      Q.      Did he ever tell you to take steps to avoid

1  his identity being disclosed to us authorities?

2       A.    In terms of the actions that were taken; for

3  example, the closure of the Credit Suisse accounts then

4  yes, that was the intention.

5       Q.    Did you know that intention from

6  conversations with him about what, what to do on the

7  accounts?

8       A.    I can't remember specific conversations, but

9  the fact that that is, for example, the option that he

10 directed, that should be taken; to close the Credit

11 Suisse accounts because of the risk of disclosure.

12      Q.    Can we look at 14-60, please.

13 (Exhibit Gov. Exb 14-60 was entered into evidence.)

14 Do you recognize this?

15      A.    Yes.  This was a note that I prepared in

16 June 2013, following a conversation, telephone

17 conversation that I had no meeting I had with Andrew

18 Schildbach, who was the Relationship Manager of Julius

19 Baer.

20      Q.    And can you tell us what the general gist of

21 the meeting was?  What was the topic?

22      A.    Andrew Schildbach told me that Julius Baer

23 had been acquired as part of Merrill Lynch.  Going

24 forward.  And this has changed the whole philosophy of

25 Julius Baer as a private bank.  Because of that Andrew

Graham Collett                                        February 03, 2025

145

1   thought that the full impact of the changes could have

2   consequences in terms of disclosure in Singapore.  He

3   also told me that he will be leaving Julius Baer Bank

4   and moving to Mirabaud Bank, based in Dubai.  And

5   basically, he was advising.  But it would probably be

6   best to to leave Julius Baer.  Sorry, I'm getting -- and

7   move over to Mirabaud Bank, where he was joining.

8        Q.    Did you pass that information along to Mr

9   Edelman?

10       A.    Yes, I did.

11       Q.    Ultimately was there a decision made to

12  change Banks as Mr. Schildbach had advised?

13       A.    Yes, the decision was made.

14       Q.    Was it your decision to change Banks?

15       A.    No.  Mr. Edelman had a direct line of

16  communication with Andrew Schildbach.

17       Q.    And so --

18       A.    Probably more so than I did.

19       Q.    And so who ultimately made the decision to

20  move all of the money to a new Bank?

21       A.    I believe it was Mr. Edelman who made that

22  decision.

23       MS. RANNEY:  If we could look, please at 6-5,

24  please, and then I think pretty shortly there's a good

25  breaking place for the day, if that's okay with

1    everyone.

2        MR. CLARKE:  Early's good.  Sorry what are we

3    supposed to be looking at?

4        MS. RANNEY:  6-5.

5        MR. CLARKE:  Sorry I'm on 14-65.

6    (Exhibit Gov. Exb 6-5 was entered into evidence.)

7    BY MS. RANNEY:

8        Q.    Mr. Collett, this is an email from 2010

9    between an email address that you've identified as

10   yours, and then an email address you identified as

11   Mr. Edelman's.  Do you see that?

12       A.    Correct.  Yes.

13       Q.    And do you see the first line of this email

14   where you say:

15             "I attach the first draft of a business

16   summary."

17             Do you see that?

18       A.    Yes, I do.

19       Q.    And do you see where the subject line is

20   DynCorp?

21       A.    That's right.  Yes.

22       Q.    What is DynCorp?  If you recall?

23       A.    It was a potential investment in a -- I can't

24   quite remember what the Company was doing, but I think

25   it was something to do with technology.

Graham Collett                                        February 03, 2025

147

1        Q.    And why were you sending Mr. Edelman

2   information in regards to DynCorp, if you recall?

3        A.    Mr. Edelman had requested this meeting to

4   prepare a summary in as much that any potential

5   investors were required to submit their own business.

6   CV for consideration to to participate in, in, in a

7   shareholding for this Company.

8        Q.    And who in this period of time was

9   potentially considering investing in DynCorp?  Whose

10  decision was it whether or not to make that investment?

11       A.    I believe it would have been Mr. Edelman's

12  intent, and certainly his instruction to me to prepare a

13  summary of the business activities of Sunage Foundation

14  for submission to DynCorp, for their consideration.

15       Q.    I'd like to look at the attachment to this,

16  if we could please, which is on page 2.  Did you draft

17  this document?

18       A.    Yes, I did.

19       Q.    Was this document based on your understanding

20  of Mr. Edelman's financial circumstances and holdings at

21  the time?

22       A.    That's correct.

23       Q.    And can you read us the first line under

24  'Introduction', please?

25       A.    Says:

1              "Mr. Douglas edelman has founded and built up

2     a substantial network of businesses during the past 25

3     years, the current focus of which is the supply and

4     distribution of oil based commodities, etc."

5         Q.    And then can we look at 6-6, please.

6     (Exhibit Gov. Exb 6-6 was entered into evidence.)

7     This is an email from February 2010 from an email

8     address you identified as Mr. Edelman to your email

9     address.  Can you tell us the subject line on this

10    email?

11        A.    Said that the subject is Sunage.  Sunage

12    stock.

13        Q.    And then do you see in the body of the email

14    where it says:

15              "Graham, see some ideas attached."

16              Do you see that?

17        A.    Yes.

18        Q.    So, what did you understand, or what do you

19    understand from your review that this email is relaying?

20        A.    This was relaying -- basically just

21    recommends ideas that he didn't like this, my draft at

22    all.  He did not want his name mentioned in it at all,

23    which had already been changed at his request.  And he

24    really did not like the way in which I had put this

25    document together.

Graham Collett                                          February 03, 2025
                                                                    149

1    Q.    If you look at the attachment to this email

2    beginning on page 2 and then continuing, are you able to

3    tell where Mr. Edelman made edits, or comments in this

4    document?

5    A.    On this version, his edits and comments are

6    in capitals.

7    Q.    You mentioned earlier that you had seen him

8    doing that before.

9    A.    Yes.

10   Q.    Was that something that you understood him to

11   do frequently from your dealings with him?

12   A.    Yes.  It was his way of highlighting

13   amendments or comments or queries.

14   Q.    If we could do a quick side by side

15   comparison of 6.6, page 2 and 6.5, page 2.  Do you see

16   on the left your initial draft where it says:

17        "Mr. Edelman has founded and built up?"

18   A.    Yes.

19   Q.    And then on the right, do you see where that

20   next draft says:

21        "The Company has founded and built up."

22        Do you see that?

23   A.    That's right.

24   Q.    Who put in that change to the extent of your

25   knowledge?

1      A.    I made that and I -- certainly, Mr. Edelman

2    wanted that change to 'the Company.' I'm not quite sure

3    how it got in capitals there, but that was what he said.

4    "No, no.  I will take my name out of this.  I don't I

5    don't need my name in this."

6      Q.    And I'd like to look at page 3, if we could,

7    of 6-6. Take our side by side down, please?

8      A.    Yes.

9      Q.    Do you see the underlined section near the

10   top of the page where it, where it begins.  'Other

11   Activities?'

12     A.    That's right, yes.

13     Q.    And can you read us the all caps text?

14     A.    This is Mr. Edelman saying:

15          "Don't like this at all.  Aspen existed long

16   before Red Star.  Aspen created Red Star and Mina Corp

17   Finance in its entirety.  And gave 50% of the stock to

18   the initial management as Sweat Equity."

19     Q.    Do you know what he's referring there,

20   referring to there in the last part of that sentence

21   'gave 50% of the stock?'

22     A.    Sweat equity.  I think he's, I think he's

23   referring to the 50% of Red Star to be given to Mr. Bek.

24     Q.    Had you ever heard him say that before; that

25   he had given 50% of the stock to Mr. Bek as Sweat

1  Equity?

2       A.    I can't remember him saying that in those

3  exact terms, but that was the understanding, that 50%

4  had been given to Erkin Bek.

5       Q.    Do you recall Mr. Edelman telling you his

6  general view of Mr. Bek?

7       A.    His general view?

8       Q.    His general view of him in relation to Red

9  Star and Mina.  Did he see him as an equal partner on

10  equal footing with him?

11      A.    We never discussed Mr. Bek in those sort of

12  terms, but overall, yes, I think he did regard him as a

13  50/50 partner in terms of his contribution to the

14  overall business.

15      Q.    Mr. Collett, I'd like to look at a few more

16  entities mentioned in this document.

17            Do you see further down the page where it

18  says, number 4: Pan-African Advertising?

19      A.    Yes.

20      Q.    Do you know what that is?

21      A.    Yes.  That was an Advertising Company.

22  Billboards in various African countries.

23      Q.    And whose Company was that?  Who owned it?

24      A.    That was a, that was jointly owned, I believe

25  from memmory between Douglas Edelman and Homayoon

1   Froogh.  I can't remember without reference the actual

2   percentages.

3        Q.    Down the page on paragraph 9, where it says

4   Satellite Support services Limited?

5        A.    Yes.

6        Q.    Who had caused the creation of Satellite

7   Support Services Limited?

8        A.    I'm not quite sure who set up the Company,

9   but it was meant to hold investments in satellite

10  technology.  Initially, the company called O3B.

11       Q.    And who had made the decision to invest in

12  Satellite companies?

13       A.    I believe and understand that it was

14  Mr. Edelman in connection with Mr. Dooner, who --

15  Mr. Dooner being the one who had the knowledge and

16  expertise in this, this area of investment.

17       Q.    And number 11, if we could please, on the

18  following page.  Page 4.  Do you see where it says Solex

19  Productions?

20       A.    Yes.

21       Q.    What is Solex Productions?

22       A.    That was the main Company involved in the,

23  the Billy The Movie Project.  The film production.

24       Q.    Do you know if an investment was ultimately

25  made into Dyncorp?

1        A.    Not to my knowledge.

2        MS. RANNEY:  I think this is a good place to stop.

3   And we're right after our scheduled time, so I propose

4   that we stop and go off the Record and then reconvene

5   tomorrow morning.

6        MR. CLARKE:  Sounds good.

7        MS. RANNEY:  Morning DC time, afternoon your time.

8   Does that work?

9        MR. CLARKE:  Perfect.

10       VIDEOGRAPHER:  This is the end of Media III,  Vol.

11   I, going off the record, 19:07 as indicated on the video

12   screen.

13

14

15

16

17

18

19

20

21

22

23

24

25

Graham Collett                                    February 03, 2025
                                                             154

```
 1                    E R R A T A

 2              Deposition of Graham Collett

 3    (Please show all corrections on this page, not in the

 4    transcript.)

 5    Page/Line No.      Description      Reason for change

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21

22

23    Signed:   _____

24    Name:    _____

25    Date:    _____
```

Graham Collett                                    February 03, 2025
                                                              155

```
1              CERTIFICATE OF COURT REPORTER

2

3    I, DAVID ERDOS, a Certified Real-Time Court Reporter,

4    hereby certify that Graham Collett was duly sworn, that

5    I took the notes of the foregoing deposition and that

6    the transcript thereof is a true and accurate record

7    transcribed to the best of my skill and ability.  I

8    further certify that I am neither counsel for, related

9    to, nor employed by any of the parties to the action in

10   which the deposition was taken, and that I am not a

11   relative or employee of any attorney or counsel employed

12   by the parties hereto, nor financially or otherwise

13   interested in the outcome of the action.

14   Before completion of the deposition, review of the

15   transcript was requested.  Any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18

19

20

21
     Signed: _____
22
     DAVID ERDOS
23

24   Dated: 02/10/2025

25
```

