# Transcript of Graham Collett

# Deposition

Trans
Atlantic
International Legal Solutions

## UNITED STATES OF AMERICA
## v.
## DOUGLAS EDELMAN
## and
## DELPHINE LE DAIN
## (also known as DELPHINE LE DAIN EDELMAN)

## Volume II

## Tuesday, February 4th, 2025

TransAtlantic International Legal Solutions
1-646-480-0520
calendar@tavds.com
www.tavds.com

TransAtlantic Reference 101670

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NUMBER: 1:24-CR-00239-CKK |
| | VIOLATIONS |
| Vs. | |
| | Count: 1:18:U.S.C.§371 (Conspiracy to defraud the United States) |
| DOUGLAS EDELMAN | |
| and | Counts 2-3:18 U.S.C.§1001 (False Statements) |
| DELPHINE LE DAIN (also known as DELPHINE LE DAIN EDELMAN) | Counts 4-18:26 U.S.C §7201 |
| | Counts 19-30:31 U.S.C.§§ 5314&5322(b);31 C.F.R 1010.350,1010.306(c)-(d)and 1010.840(b);18 U.S.C.§2 (Wilful violation of foreign Bank account reporting) |

HYBRID DEPOSITION OF GRAHAM COLLETT

VOL. II.

TUESDAY 4TH FEBRUARY 2025

Taken at:

BAKER & McKENZIE
280 Bishopsgate
London EC2M 4AG

Court Reporter: David Erdos
Certified Deposition Reporter
CDR-1865

A P P E A R A N C E S:

On behalf of the Plaintiff:

U.S. DEPARTMENT OF JUSTICE, TAX DIVISION

CRIMINAL ENFORCEMENT SECTION

By: Sarah Ranney

sarah.c.ranney@usdoj.gov

(202) 514-2000

Ezra Spiro

Ezra.K.Spiro@usdoj.gov

(202) 718-7308

PRESENT IN WASHINGTON DC:

Josh Gold

Josh.Gold@usdoj.gov

Nanette Davis

Nanette.Davis@usdoj.gov

DEPARTMENT OF THE TREASURY,

INTERNAL REVENUE SERVICE, CRIMINAL INVESTIGATION

By: Rebekah Gamez

Rebekah.Bott@ci.irs.gov

Adam Soline

Adam.Soline@ci.irs.gov

630.493.5224

A P P E A R A N C E S (CONTINUED)

On behalf of the Defendants:

BAKER & McKENZIE LLP

815 Connecticut Avenue,
NW, Washington DC, 20006
By: George Clarke

George.clarke@bakermckenzie.com

(202)835 6184

Sonya Bishop

452 Fifth Avenue, New York, NY 10018

Sonya.Bishop@bakermckenzie.com

212.626.4591

PRESENT WITH DEFENDANT IN WASHINGTON DC:

Allison Rocker

Allison.rocker@bakermckenzie.com

303.906.9558

PRESENT WITH WITNESS IN LONDON:

Dr. Sharon Persaud

BOUTIQUE LAW

Ground Floor West, 9 Grays Inn Square

London WC1R 5JD

sharon@boutique.law.com

William Dunlop

William@boutique.law.com

A P P E A R A N C E S (CONTINUED)

REMOTE:

Danielle J. Sochaczevski
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW, Washington DC, 20024
dsochaczevski@wc.com

Also Present: Lauren Barbor, Videographer
Shannon Korpela, IRS (Remote)
David Ross, CEO, TAVDS

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| GRAHAM COLLETT | MS. RANNEY | 9 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Gov. Exb 6-7 | Douglas E email chain 5/10/2010 [USPROD-03341307] | 10 |
| Gov. Exb 6-10 | GACollett Email 5/13/2010 [USPROD-03341355] | 14 |
| Gov. Exb 6-11 | douglas e Email chain 5/17/2010 [USPROD-03341400/03341401/03341397] | 16 |
| Gov. Exb 11-1 | Raoul Duke email 6/1/2010 [USPROD-03153428] | 21 |
| Gov. Exb 6-12 | Jenssen Ellul Email chain 6/3/2010 [USPROD-03341488-03341490] | 23 |
| Gov. Exb 6-13 | GACollett email 6/3/2010 [USPROD-03341491] | 25 |
| Gov. Exb 14-47 | Corporate Structure Email 21/06/2010 [USPROD-02081865-02081867] | 27 |
| Gov. Exb 6-14 | David Pearlman email 6/23/2010 [USPROD-03341659] | 30 |
| Gov. Exb 14-22 | Mina Corp Fact Sheet [USPROD-02074114] | 32 |

E X H I B I T S (CONTINUED)

| | | |
|---|---|---|
| Gov. Exb 14-23 | Mina Corp Fact Sheet and Documents [USPROD-02074114-02074184] | 33 |
| Gov. Exb 14-49 | No Subject Douglas Edelman Email chain 15/07/2010 [USPROD-02081861-02081863] | 34 |
| Gov. Exb 6-15 | Graham Collett Email 7/17/2010 [USPROD-03341900] | 43 |
| Gov. Exb 6-16 | Douglas Edelman Email 7/17/2010 [USPROD-03341905] | 45 |
| Gov. Exb 6-17 | GACollett Email 7/18/2010 [USPROD-03341912] | 48 |
| Gov. Exb 6-18 | GACollett Email 7/18/2010 [USPROD-03341914] | 50 |
| Gov. Exb 14-50 | Delphine Edelman Email [USPROD-02081873-02081875] | 51 |
| Gov. Exb 15-7 | RE:2 Gibraltar Companies Documents [USPROD-01960275-01960293] | 53 |
| Gov. Exb 14-84 | Re: Various Email chain [USPROD-02188020-02188023] | 61 |
| Gov. Exb 14-52 | Mina Media Limited Email and Documents [USPROD-02190156-02190160] | 66 |
| Gov. Exb 14-53 | Aspen Wind Corporation File Documents [USPROD-02185268-02185296] | 68 |
| Gov. Exb 14-54 | Re: POAs and other items Email chain [USPRPOD-02157013-02157019] | 73 |

E X H I B I T S (CONTINUED)

| Exhibit | Description | Page |
|---|---|---|
| Gov. Exb 11-2 | gacollett Email and Attachments 9/27/2010 [USPROD-03154383 (1-6)] | 78 |
| Gov. Exb 14-86 | Marnin Michaels Email chain 04/12/2010 [USPROD-02323419-02323423] | 82 |
| Gov. Exb 14-81 | Marnin Michaels Invoice Enclosure [USPROD-02154316] | 87 |
| Gov. Exb 14-58 | Defense Logistics Agency Letter Nov 2011 [USPROD-02299744] | 90 |
| Gov. Exb 6-22 | GACollett Email and Attachments 11/27/2011 [USPROD-03352318-03352321] | 92 |
| Gov. Exb 24-1 | Douglas de@ledain.ch Email [1 page] | 95 |
| Gov. Exb 14-69 | Summary Investments (for clean capital purposes) Documents [USPROD-02263056-02263102] | 101 |
| Gov. Exb 22-2 | 7.23 Template for passing on payment instructions received by clients by phone Documents [USPRPOD-01999901-01999903] | 124 |
| Gov. Exb 14-85 | Sunage Foundation Fax Message and Documents 30 March 2010 [USPROD-02302182-02302206] | 126 |
| Gov. Exb 6-21 | GACollett Email 4/22/2011 [USPROD-03346505/6] | 128 |
| Gov. Exb 18-2 | Proposed Little Ajax Structure Documents [USPROD-00306351-00306356] | 131 |

E X H I B I T S (CONTINUED)

| Exhibit | Description | Page |
|---|---|---|
| Gov. Exb 22-5 | Sunage Foundation Transfer Request Documents [USPROD-02000785-02000789] | 134 |
| Gov. Exb 8-2 | Robert Dooner Email and Attachments 10/11/2013 [USPROD-02912346-02912348] | 135 |
| Gov. Exb 8-3 | Preferred Stock Transfer Agreement [USPROD-02893433-02893462] | 137 |
| Gov. Exb 14-83 | Finance@sssl.ae Email chain 21 July 2014 [USPROD-02163225-02163244] | 138 |
| Gov. Exb 8-1 | Finance@sssl.ae Email Chain 7/17/2014 [USPROD-02910763-02910765] | 139 |
| Gov. Exb 14-82 | Princess Juliet Bill of Sale [USPROD-02162318-02162339] | 142 |

VIDEOGRAPHER: Good afternoon. Today's date is the 4th of February 2025. This is the beginning of Media I., Vol. II. in the Video Deposition of Graham Collett. Going back for the Record at 13:40, as indicated on the video screen. Thank you, Counsel.

EXAMINATION

BY MS. RANNEY:

Q. Good afternoon, Mr. Collett. Before we jump back in today, can you tell me, are you able to see Mr. Edelman among the participants in this Deposition?

A. I can see, yes.

Q. And is he in-person with you, or do you see him virtually?

A. I see him virtually.

Q. If at any point you are not able to see him clearly, will you let us know?

A. Certainly.

Q. Mr. Collett, I'd like to to start with 6-6. If we could put that back up from yesterday please. At this point the date of this email in February 2010, Mr. Collett?

A. Yes.

Q. Before we proceed to look at the Exhibit Mr. Collett, I'll remind you that you're still under oath from yesterday's proceedings. Do you understand?

A. Fully understood.
Q. Looking at Exhibit 6-6 and the date on this email in February 2010?
A. That's correct.
Q. At this point in February 2010, who did you understand to own Mina and Red Star, the jet fuel businesses?
A. At this particular moment in time I understood the Mina and Red Star businesses to be owned 50/50 by Mr. Edelman and Mr. Bek.
Q. And who at this point in early 2010, based on your work with Mr. Edelman, your conversations with him and the documents you'd seen; who did you understand to have created and founded Mina and Red Star?
A. At that particular point in time I understood that the entities had been, and the business had been created by Mr. Edelman.
Q. Now, I'd like to look at 6-7, if we could, please.
(Exhibit Gov. Exb 6-7 was entered into evidence.)
Do you see at the top where the date on this email is, May 2010? Do you see that?
A. Yes.
Q. This is an email from the address you identified as Mr. Edelman's address to your email

address. Do you see that?

A. That's correct.

Q. I'd like to look first at the email down at the bottom of the chain, which appears to be from you to Mr. Edelman?

A. Yes.

Q. Can you tell us why you sent this email if you recall?

A. To the best of my recollection, there were two Secretaries, two Company Secretaries. Two -- I can't quite remember which Company it was at this moment in time, but I do remember that Iryna Tsenzharyk was receiving mail, or some sort of communication from people outside of business she didn't know, inquiring about the Mina business to her personal address. The reason being that as Company Secretary, her home address was listed, on the register at Companies House.

As I say, I cannot remember the exact conversations around this particular point, but I did suggest that was not necessary to have two Company Secretaries, and that Iryna Tzsenzharyk should, should resign so that her address, her personal private address was not shown on the register at Companies House.

Q. Did you have any awareness of why Ms. Tsenzharyk was being contacted or what, what this all

 related to?

A. I cannot remember the precise details, but I -- from, from from what I can recall, I think it was somebody trying to obtain information about one of the Companies.

Q. And I'd like to look at the top email if we could. Mr. Edelman's response?

A. Yes.

Q. Do you see where it says:

"Graham basically, I want and need my name off of everything."

Do you see where it says that?

A. Yes.

Q. Did you have conversations with Mr. Edelman around this point about what he means by 'I want and need my name off of everything?'

A. At this point in time that were general conversations. Again, it is difficult to remember the precise nature of those conversations, but it was clear that someone was looking at the companies. I don't know who it was. And Mr. Edelman made it very clear at that point that he did not want his name to be connected with any of the Companies, and it was clear from this email that somebody had written to him from Centrum about this, and I'm not quite sure, I cannot remember the

precise details.

Q. You mentioned Centrum. Can you tell us what is Centrum. And what is their role at this time in 2010?

A. BC Centrum was the Service Provider for the Red Star companies.

Q. And what does a Service Provider do for a Company like Mina or Red Star?

A. They maintain the Corporate Records and make any Corporate Returns any Corporate Updates, and they act as Nominees for the Shareholders if appropriate, and make sure that the Company's registers are properly maintained at the, at the relevant company register in the country where the companies are based.

Q. You just mentioned that acting as a Nominee. What does it mean for a Corporate Service Provider like you just described to act as a Nominee?

A. They can act as a Nominee on behalf of the Ultimate Beneficial Owners of a Company.

Q. And can you give us a sense of what does a Nominee in this scenario, a Corporate Provider; what does it mean for them to be a Nominee? What would they do?

A. They would be holding the shares, or some shares in a Company as a Nominee for the Ultimate

Beneficial Owner.

Q. And just so that we're clear: for a Corporate Service Provider to act as a Nominee, does that mean that they actually become the Ultimate Beneficial Owner of the shares they're holding?

A. They are, they are shown as the Shareholder on behalf of the Ultimate Beneficial Owner by means of a Nominee Agreement between the Service Provider and the Ultimate Beneficial Owner.

Q. I'd like to look at 6-10, if we could please.

(Exhibit Gov. Exb 6-10 was entered into evidence.)

Mr. Collett, do you see the date on this email May 13th, 2010 at the top?

A. That's correct.

Q. And this email is from an email address that I believe you identified previously as yours, but can you tell us who the recipient on this email appears to be? If you know?

A. The recipient is David Pearlman, who was a Director of Centrum, Centrum Services, the Service Provider.

Q. I'd like to look at the text of this email in the very top line. You say:

"in advance of our meeting this afternoon."

Do you see that?

A. Yes.

Q. And it looks like you're proposing to outline the purpose of the meeting. Do you see that?

A. That's correct.

Q. Can you tell us why you are requesting a meeting with David Pearlman at this point in time?

A. Yes. Mr. -- I had had conversations with Mr. Edelman about the matter that we were just discussing, and he asked me to arrange a meeting with David Pearlman at Centrum to identify who the actual shareholders were, and to research the historical records in terms of the, the way in which the, the ownership of Red Star Gibraltar and Mina Corp Gibraltar had been structured, and what was actually on the register at this precise moment in time.

Q. Did he tell you why he wanted to know that?

A. I can't remember the, his specific comments in that respect, except to say that it needed to be to be absolutely clear as to who was being shown as the Ultimate Beneficial Owners of the two companies.

Q. Directing your attention to the paragraph that begins, 'I need to know', do you see that?

A. Yes.

Q. Do you see where it says:

"I need to know which companies you are still

acting for in respect of our mutual client."

Do you see that?

A. Yes.

Q. Do you know who 'our mutual client' refers to?

A. It's referring to Douglas Edelman.

Q. I'd like to go to 6-11 if we could, please.

(Exhibit Gov. Exb 6-11 was entered into evidence.)

Mr. Collett, do you see the date on this email? May 17th, 2010?

A. That's correct, yes, I see that.

Q. And this is from the email address you identified as Mr. Edelman to your email address. I'm sorry, with a copy to you, but it looks like there's a recipient we haven't discussed yet. Do you recognize that email address?

A. Shakhidi@gmail.com.

Q. Do you know who that recipient was? Can you tell from the email?

A. That was Firdavs Shakhidi.

Q. And what was Firdavs Shakhidi's role at this point, in May 2010?

A. He had been involved for quite some time, I believe in direct discussions, initially with, with Mr. Edelman on various companies being set up, and he

also, being involved in banking, was organizing bank accounts for use by various companies within the general sphere of ownership.

Q. Based on your observations and your involvement in communications with Mr. Shakhidi, who did you understand to be giving him his day to day instructions on the tasks that you just mentioned?

A. I had understood him to receive his instructions from Mr. Edelman.

Q. And you mentioned that he worked on businesses and investments. Whose businesses and investments did Mr. Shakhidi work on?

A. When you say 'work on investments' he was mainly setting up bank accounts and also acting, as I believe, the link with another firm of Corporate Service Providers and Aleman Cordero.

Q. And for the bank accounts you mentioned who directed funds to be put into the bank accounts that Mr., Mr. Shakhidi had opened?

A. Initially, and I believe the source was from, the instructions were from Mr. Edelman.

Q. I'd like to turn back to the Exhibit, if we could, please. 6-11. I'd like to look at the bottom email if we could, which begins on the bottom of the page. Do you see where it's from, Mr. Shakhidi to

Mr. Edelman?

A. Yes.

Q. After the greeting it says:

"I have spoken to Gibro Services."

Do you see that?

A. Yes.

Q. Do you know who Gibro Services is?

A. They were the service -- the Corporate Service Providers for the two Gibraltar companies; Red Star Enterprises and Mina Corp.

Q. And then continuing on, it says:

"Who will be happy to deal directly with the beneficial owners."

Do you see where it says that? Following on the same sentence?

A. Yes.

Q. And then on the next page, do you see where it says:

"Attached is the letter, which I drafted."

Do you see where it says that?

A. Yes.

Q. And then if you look at the attachment on the following page, page 3.

A. Yes.

Q. Who is the recipient on this letter as it

 appears here?

A. This is addressed to Mr. James Rodriguez, who I recall was the, the Nominee Shareholder. And he was the, not the nominee, he was, he was certainly the Director acting for Red Star and Mina and was employed by Gibro.

Q. And if you look at the text of this letter in the first paragraph, do you see where it says:

"We,a undersigned being the beneficial owners of the above two companies."

Do you see where it says that?

A. Yes.

Q. And then under the signature, under 'yours truly', there are two sets of initials. Do you see those two sets of initials?

A. Yes.

Q. Who do you understand those two sets of initials to refer to?

A. As far as DE is concerned, I understood at this stage that that referred to Douglas Edelman. But of course, it could refer to Delphine Edelman.

Q. Up until this point in the documents that you had drafted, who did you use as a reference when you said DE? Who are you referring to?

A. I would refer to Douglas Edelman.

Q. And looking here at the email chain a few lines up. I'm sorry, going back to the first page. Do you see in the middle of the page the response from Douglas Edelman to Mr. Shakhidi?

A. I do, yes.

Q. Do you see where it says:

"Be very careful here. As for BO may well not be EB at all."

Do you see this?

A. Yes.

Q. At this point in May 2010, had you ever heard discussions before about Delphine Edelman being the second beneficial owner alongside Erkin Bek of the two companies?

A. At this time following the set up of Sunage Foundation, the distributions from the two Gibraltar companies from the logistics business were starting to be paid into Sunage Foundation.

Q. Mr. Collet, who had made the choice to direct those distributions into Sunage Foundation? Whose decision was that?

A. I believe at the time that those the decision as to where the distributions went to, was managed by Douglas Edelman.

Q. And a few minutes ago when I asked you about

February 2010 and who the two beneficial owners were of Mina and Red Star, do you recall the two people you named?

A. I named Douglas Edelman and Erkin Bek.

Q. And so when you look at a letter attached to a May 2010 email, what would make you say that a list of the beneficial owners for Mina, or Red Star might include Delphine Edelman?

A. I say purely because the actual initials: DE.

Q. At this point in May 2010, who did you understand to be the two beneficial owners of Mina and Red Star?

A. At this point in time, I still believe that they were, they were Douglas Edelman and Erkin Bek.

Q. You mentioned that you sometimes that DE could stand for Delphine Edelman. Is that how you refer to Douglas Edelman's wife in this period of time?

A. At this period in time I find that a bit difficult to, to answer precisely. In terms of the reference to Delphine Edelman, when she changed her name on the Trust Deed of Sunage Foundation, then she was always referred to as DLD - Delphine Le Dain.

Q. Back to look at 11-1 if we could, please.

(Exhibit Gov. Exb 11-1 was entered into evidence.)

Mr. Collett, do you see this email -- or I'll give you a second here?

A. Yes.

Q. You see this email dated June 1st, 2010. June 21st, 2010. And there's an email address at the top we haven't seen before. Do you know whose email address this is?

A. That is an email address that Mr. Edelman used.

Q. And do you recognize that name next to the email address?

A. Raoul Duke.

Q. Do you know who that is?

A. I'm not sure.

Q. Do you remember corresponding with Mr. Edelman at this email address globalspec1@yahoo.com?

A. Yes, I do.

Q. And looking at the text of this email from Mr. Edelman to you, do you see where it says:

"Can you travel to Gibraltar if need be with Firdavs?"

Do you see that?

A. Yes.

Q. From other communications with Mr. Edelman at this period of time, do you recall why he would have

been asking you to travel to Gibraltar?

A. There had been a number of conversations around this time concerning the corporate records of Red Star and Mina Corp, and what was shown on the records as the beneficial owners. Mr. Edelman asked me if I would go to Gibraltar with Firdavs Shakhidi in order to deal with any issues arising from what was being shown on the registers.

Q. What does that mean? 'deal with any issues'; to your recollection?

A. To understand the extent to which Mr. Edelman's name was shown on the records in Gibraltar as the Beneficial Owner.

Q. Do you see at the bottom the last line of the email says:

"Please delete."

Do you see that?

A. Yes, I do.

Q. Do you recall, Mr. Edelman ever requesting that you delete emails before this?

A. I can't recall any, any, any specific instances.

Q. I'd like to look at 6-12 if we could.

(Exhibit Gov. Exb 6-12 was entered into evidence.)

Do you see this email from the same period of time?

June 2010?

A. That's correct.

Q. And there's an email address we haven't seen yet. Can you tell us if you know who the sender on this email is?

A. The sender of the email is, is -- record. Jenssen Ellul. E-L-L-U-L. J-E-E-L-L-U-L-E. And he was I was, he was employed by Gibro, the Corporate Service Director, or Providers.

Q. And it appears that this email is to you with a copy to Mr. Shakhidi. Do you see that?

A. That's correct.

Q. And do you see at the top where it says, sorry, the top text of the email says.

"It was a pleasure speaking to you earlier today."

Do you see that?

A. Yes.

Q. And then down near the bottom, it says:

"I understand that you wish to come to Gibraltar to meet us."

Do you see that?

A. Yes.

Q. Whose idea was it for you to go to Gibraltar to see Mr. Ellul?

A. The suggestion came from Douglas Edelman that Firdavs Shakhidi and I should go to Gibraltar.

Q. I'd like to look at 6-13, please.

(Exhibit Gov. Exb 6-13 was entered into evidence.)

This is an email the same day, from the email address that you identified as yours to Mr. Shakhidi, or -- I'm sorry, can you identify the recipient email on this email?

A. Yes.

Q. Whose email is that?

A. That is from, sorry to Firdavs Shakhidi.

Q. And do you see where it says at the top text of the email:

"You will no doubt have seen the email from Jenssen Ellul."

Do you see that?

A. Yes.

Q. And then it continues on to say:

"They are going to want a lot of information."

Do you see that?

A. Correct.

Q. Do you recall who was asking for a lot of information in this context?

A. Jenssen Ellul on behalf of the Corporate

Service Providers, were asking for a lot of information about the Beneficial Owners at that particular moment in time.

Q. And then do you see the next paragraph where it says:

"I've spoken to Douglas and we have agreed not to do anything at the present time until I hear back from Douglas."

Do you see that?

A. That's correct.

Q. And then do you see where the sentence, the next sentence continues on to say:

"I am sure that he will not want us to be giving Gibro the information that they are requesting."

Do you see that?

A. Yes, I do.

Q. Can you tell us what that means in the context of what was going on?

A. Gibro, from Jensen Ellul had asked for a lot of information for their, their records, and I spoke to Mr. Edelman about this, and it was on his direction, he said "Well, let's leave that for now. We don't need to be giving all that information to Gibro."

Q. I'd like to look at 14-47, if we could, please

(Exhibit Gov. Exb 14-47 was entered into evidence.)
Do you see at the top where this email bears the date? June 21st, 2010. Do you see that?

A. Yes, I do.

Q. And it's an email from your email address, as you've identified, to the email address you've identified as Mr. Edelman's. Do you see that?

A. That's correct.

Q. Do you see where the top line says:

"I attach an outline plan of our discussions earlier today."

Do you see that?

A. Yes.

Q. And then I'd like to turn to the attachment to this document, if we could, which is on page 3. Mr. Collett, if I could ask your indulgence reading this very, very small text. Can I draw your attention to this schematic that's all the way on the left of this page. Do you see there where there's a bottom box that says 'Mina Corp Ltd, Gibraltar.' Do you see that?

A. Yes.

Q. And then do you see where there's a line above it to a box that says 'New BVI Company.' Do you see that?

A. That's right.

Q. And do you see next to it where it says:

"Shares to be held by nominees on behalf of Foundation."

Do you see that?

A. Yes.

Q. And in this context, do you know what Foundation refers to?

A. That refers to a, a new entity to be set up.

Q. And then do you see next where it says:

"Will purchase Mina Corp Ltd at price to be agreed."

Do you see that?

A. Yes.

Q. And then do you see where there's a line up to a box that says 'New Foundation?'

A. Yes.

Q. And then next to it, can you read us the text of what's next to that top box?

A. It says:

"Martin Shiel as beneficial owner."

Then I put a query against that:

"Can he not be the settlor in the same way as Delphine is for Sunage? Other beneficiaries can then be added as and when desired."

Q. And at the very top above where it says

'Structure,' do you see where it says 'Corporate Structure Outline Plan' at the very top? Do you see that?

A. That's right.

Q. At this period of time in June 2010, had Mr. Edelman told you that he wanted to give his business interest in Mina to Martin Shiel?

A. This arose from discussions at this time with Mr. Edelman and with David Pearlman and also with another advisor, John Roberts, with -- who was a Partner in a large London legal firm, in order to look at different ways in which to hold these assets. Conversations were fairly wide ranging, and again it is difficult to remember the exact details of all the, all the conversations and meetings. Either, I don't know who came up, I can't remember who came up with the idea of Martin Shiel actually being a Beneficial Owner, but he would have had to have been on, on the basis that he was holding them, holding shares for the interests for somebody else.

Q. And can you remind us up until this point, what had Martin Shiel's role been to the extent of your observation?

A. He was involved on, on Media projects, mainly on the film production.

Q. And in these discussions that you mentioned about potential plans, what was the goal of these potential plans, or scenarios? Why were they being discussed?

A. These plans were being discussed in order to make sure that any, any structures that were in place from that point onwards did not involve any ownership of Douglas Edelman.

Q. Now, was it your idea that structures going forward should not have Douglas Edelman in them?

A. No, that was not my idea.

Q. Whose idea was it that restructuring be done so that Douglas Edelman's name wasn't shown as an owner?

A. Ultimately, I believe that that came from Douglas Edelman.

Q. I'd like to look at 6-14, if we could, please.

(Exhibit Gov. Exb 6-14 was entered into evidence.)

Do you see this email dated June 23rd, 2010?

A. Yes.

Q. From the email address you identified as Mr. Pearlman to an email address that you've identified as yours. Do you see that?

A. That's correct.

Q. And can you tell us the subject line on this

email?

A. This email follows a meeting that we had a couple of days before which David Pearlman agreed that he would send us a copy of all of the relevant documents that were held at the Companies House in Gibraltar relating to the shareholders, beneficial owners and directors of the two Gibraltar based companies.

Q. Do you see at the end of the email text where it refers to yesterday's meeting at Douglas Edelman's home. Do you see that?

A. That's right. That was the meeting I was referring to.

Q. Do you recall anything else about this meeting? Why Mr. Edelman was instructing, or what Mr. Edelman said about this situation?

A. There were a number of issues discussed at that meeting, one being the actual records of Centrum, which was showing from their point of view that the shares in Red Star Gibraltar in particular were held 50% by Douglas Edelman and 50% by a Company called Eurasian, which was on behalf of an Erkin Bek Company.

Q. Were you able to observe, or hear from Mr. Edelman, in his words, what his reaction was to papers showing him as the Beneficial Owner?

A. He said it was all wrong.

Q. Did you yourself review, or obtain a copy of the papers we just talked about that showed Mr. Edelman as the Beneficial Owner?

A. Yes.

Q. I'd like to look at 14-22, if we could, please

(Exhibit Gov. Exb 14-22 was entered into evidence.)

Mr. Collett, are you able to tell what this document is? 14-22.

A. This is a Fact Sheet from the files of Centrum sharing the corporate information relating to Mina Corp.

Q. And just looking at 14-22 for a moment, if we could; there's a big square on top of it that has some handwriting. Do you recognize that handwriting?

A. Yes, I do.

Q. Whose is it?

A. That was my writing.

Q. Can you tell us what it says?

A. It says 'original documents.'

Q. And why did you put that notation on this document?

A. Because these were the original documents which were held in the Iryna Tsenzharyk's file that had, that she had been maintaining at this time, and up until

this time in respect of the, the corporate records that she received from Centrum.

Q. I'm looking at 14-23 if we could
(Exhibit Gov. Exb 14-23 was entered into evidence.)
It bears the same heading as the previous. Is this another set of corporate documents like the one we just reviewed?

A. Yes. It looks to be, yes. The first page appears to be the same as the previous except that on the reverse.

Q. If we could look at page 2, please of 14-23.

A. Yes.

Q. Is this an example of what you are talking about earlier? A Nominee Agreement by a Corporate Service provider?

A. That's correct.

Q. And it looks like turning back to the first page of this Exhibit there's a similar square bearing, some handwriting?

A. Yes.

Q. Is that your handwriting?

A. That is my handwriting.

Q. And can you tell us why you wrote on this set of documents?

A. Because as I understood it, these were the

original documents sent to Iryna Tsenzharyk from Centrum Services.

Q. And looking at page 4 of this Exhibit, if we could please. Do you see at the top where it says 'Declaration?'

A. Yes.

Q. And then there's language about holding shares in the capital of Mina Corp. Do you see that?

A. Correct.

Q. And who is the declarant? If you can tell?

A. Who is the?

Q. The Declarant on this Declaration. Who is making this Declaration?

A. This is James Stuart Rodriguez.

Q. And can you tell us who does this Declaration name as the Beneficiary in this arrangement?

A. Douglas Edelman is shown as the Beneficiary.

Q. Mr. Collet, is this an example of what you are referring to earlier, the corporate records bearing Mr. Edelman's name?

A. That's correct.

Q. I'd like to look at 14-49, if we could, please

(Exhibit Gov. Exb 14-49 was entered into evidence.)

Mr. Collett, before we look at the text of 14-49, I want

to return to something you said a moment ago.

MS. PERSAUD: Sorry.

BY MS. RANNEY:

Q. You mentioned that Mr. Edelman had made an assertion that it was all a mistake. Do you recall saying that a minute ago?

A. Yes, I do.

Q. Can you tell us in the context of what was going on at this point in 2010? What did that mean it's a mistake? Do you know what he meant by that, based on your other conversations with him?

A. I believe he was referring to the way in which Centrum had set up the two companies, Red Star Enterprises and Mina Corps in Gibraltar.

Q. And what was the mistake in how they were set up. If he told you?

A. That as far as the, as far as Red Star Enterprise is concerned he, Douglas Edelman was shown as the Beneficial Owner direct of 50% of the shares in the Company. The other 50% being held by Eurasian, a Company controlled by Erkin Bek.

Q. Before this point in 2010, had you ever heard Mr. Edelman talk about some mistake in how shareholding had been recorded?

A. Not up until this time. I, I'm not aware of

any many conversations of that nature.

Q. Now, I'd like to look at 14-49. Do you see this email dated July 16th, 2010?

A. Yes. I see that.

Q. And do you see where it appears to be from an email address you identified as Mr. Edelman's to an email address you identified as yours?

A. That's correct.

Q. And do you see in the very top line, right under your email address where there's a line in all caps that says:

"See questions below."

Do you see that?

A. Yes, I do.

Q. You told us earlier that Mr. Edelman tended to write in all caps. Do you understand this to be an example of him writing in all caps?

A. Writing it in all caps with comments or questions or whatever in relation to the main body of the of the email that had been sent to him. Yes, that's correct.

Q. And so, if you look at the body of the email that continues down the page, are you able to tell by the use of all caps where there's a response by Mr. Edelman in line to the text of the original email?

A. If yes, if we look at option one, there was a question in this instance will the transfer be on the public record in GIP, being, meaning -- I believe Gibraltar. Will dates appear anywhere. Also, will there be old share certificates signed off.

Q. Now, Mr. Collett?

A. Or, at least can there be an old declaration perhaps somewhere?

Q. So, I'd like to look at the text of your email, before we discuss his response. Can you see in the text of the email where there are several places where you say 'option.' Do you see that?

A. That's correct.

Q. Can you tell us, based on your communications with Mr. Edelman around this time, why were you sending an email to him with options?

A. These options arose from various discussions with Mr. Edelman and with David Pearlman of Centrum and also with John Roberts in terms of making adjustments to the changes to the, the nominees and other details relating to the ownership of the two companies, Red Star and Mina.

Q. I'd like to direct your attention to the top of the email. Do you see where it says, in the first paragraph, you say:

"There's a reference to tidying up, or tidy up as necessary."

Do you see where it says that?

A. Yes.

Q. And do you see a few lines down, where it says:

"If you want to transfer BO to the Foundation."

Do you see that?

A. Yes.

Q. Do you know what BO stands for?

A. Beneficial Owner.

Q. Do you know what Foundation that might be referring to?

A. I believe at this point in time it was, it was to transfer to the Sunage Foundation.

Q. And then, do you see where there's an Option 1 and a dash a little further down?

A. Yes.

Q. And do you see where it says:

"We transfer shareholding in Mina to Centrum."

Do you see that?

A. Yes.

Q. And do you see towards the end of that

paragraph, before the all caps starts, where it says:

"No disclosure of Ultimate Beneficial Owner appears on the Company's House register in Gibraltar."

Do you see that?

A. Yes.

Q. Do you know why you would have put a note about disclosure of beneficial owner related to Option 1?

A. That was simply, that was to advise that, that Douglas Edelman's name would not appear on the register in Gibraltar as the Beneficial Owner. Would simply show the nominees.

Q. And then can we go again to the response in all caps. Do you see where it says:

"In this instance, will this transfer be on the public record in Gib?"

Do you see where it says that?

A. Yes.

Q. Do you know what 'Gib' refers to?

A. Gibraltar.

Q. And then it follows:

"Will dates appear anywhere in Gib?"

Do you see where it says that?

A. Yes.

Q. And then you see it continues:

"Also, will there be old shares certificates signed off before to the Foundations?"

Do you see that?

A. Yes.

Q. Do you know why he's asking about old shares certificates?

A. I believe, based on our discussions at the time, was that, would there be any record, on the public record, on the public records of any old share certificate showing his name as being the beneficiary of part of the shares of the companies.

Q. Did he tell you why that mattered to him in this period of time?

A. It's difficult to, to, to recall precise conversations or instructions, except that he did not want his name to appear on any of these documents as being the beneficial owner of the companies.

Q. I'd like to look at the next paragraph down where it says 'Option 2 and a dash.' Do you see that?

A. Yes.

Q. And can you just tell us in your own words, what's the option being presented there?

A. It had been suggested that a Swiss lawyer should be perhaps used in place of Centrum in both Red Star and Mina Corp.

Q. And can you tell us what is the all caps response to that option?

A. "This will also constitute new and current --" not quite sure what is a typo there, but I'm not quite sure what it -- I believe it means dates everywhere. Yes. Because the question.

Q. And then do you see where it says 'Option 3 and a dash?'

A. Yes.

Q. And do you see where it says:

"We transfer the BO to the Foundation, or new foundations in both cases?"

Do you see where it says that?

A. Yes.

Q. And can you read us what the all caps response is?

A. "I think not good as it will show real time dates, right?"

Q. And Mr. Collett, there's some handwriting on this page. Can you identify the handwriting? Do you recognize it?

A. That is my writing.

Q. Can you tell us why you wrote on this page, or what the handwriting denotes?

A. They were really notes to myself in terms of

answers to the questions raised on options 2 and 3.

"Yes, that would be correct."

And in terms of option 1: Need to clarify the exact dates. Only the existing declarations are available."

Q. I'd like to look at page 3 of this Exhibit, if we could please. Do you see the paragraph beginning:

"As far as the use of a woman's maiden name is concerned, this is perfectly legitimate and legal."

Do you see that?

A. Yes.

Q. Can you tell us, based on your conversations and communications with Mr. Edelman around this period of time, why you were reporting to him about the use of a woman's maiden name?

A. He was asking the question in relation to his wife, Delphine, whether it would be possible for her to use her maiden name in respect of ownership of, of any assets going forward.

Q. Did he tell you --

A. Or any other connections?

Q. My apologies, Mr. Collett, I spoke over you to want to finish your answer.

A. Yeah. Or in connection with any, any, any assets, or any other sort of communications.

Q. Did he tell you why he was interested in Ms. Le Dain, or Mrs. Edelman using her maiden name instead of her married name at this period of time?

A. From my, from my recollection, it was more a case of not having the name of Edelman associated with Delphine.

Q. And can you tell us, can you read us the all caps response to this note about use of a woman's maiden name?

A. It says:

"Can we make these changes at once? What does Firdavs need to do? Let's do it literally within a day or so, day or two."

Q. I'd like to look at 6-15 if we could, please?

MS. BISHOP: Can you say that again?

BY MS. RANNEY:

Q. 6-15. Six dash 15. 6-15.

(Exhibit Gov. Exb 6-15 was entered into evidence.)

Do you see this email dated July 17th, 2010?

A. Yes.

Q. This is from an email address you've identified as Mr. Edelman's to an email address you've identified as yours. Do you see that?

A. That's correct.

Q. And can you read us what Mr. Edelman is

saying to you in the text of this email?

A. He said:

"Hi, Douglas here. Let's chat where we can. Pretty urgent. There are things we must (in capitals) achieve before 2:00 p.m. Monday. Best D."

Q. Did he tell you at any point what was urgent or what had to be accomplished in this period of time?

A. He was referring to various matters, I believe in terms of Delphine's name being changed, and also various other matters relating to the ownership of the Mina Corp and Red Star shareholder records at this particular moment in time.

Q. Did he tell you anything about why this was an urgent issue for him, the ownership of these two companies?

A. At this precise moment, I was not aware of the urgency of it, but obviously I later found out exactly why this information was required and these actions were required to be taken as soon as possible.

Q. Did he tell you eventually why they had been taken urgently?

A. I can't remember any specific conversations confirming that at that particular time.

Q. Do you remember where you found out what the urgency was, or what had happened around this period of

time?

A. I found out later, as and when the, the results of the, the Congressional Inquiry came out, published showing Delphine Le Dain as 50% owner of Mina Red Star businesses, which have been declared by representatives acting for the Company, or for Red Star and Mina to the Inquiry.

Q. You mentioned a Congressional Investigation and you just used the word 'inquiry.' Do you know which country this investigation was happening in?

A. This was happening, happening in the United States.

Q. I'd like to look at 6-16, if we could, please (Exhibit Gov. Exb 6-16 was entered into evidence.) I'd like to look: Do you see this email from July 17th 2010?

A. Yes.

Q. And do you see where this is an email address you've identified as Mr. Edelman's with an email address you've identified as yours. Do you see that?

A. That's correct.

Q. And I'd like to look at the the bottom email first. Do you see where it says.

"Have just read your text? I'm sure we can sort out pretty quickly."

Do you see that?

A. Yes.

Q. And then the next paragraph begins:

"We basically need to talk about my last email as to which route we take."

Do you see that?

A. Yes.

Q. And then can you read us the end of that sentence?

A. "Either showing Sunage as the direct shareholder on the register in Gibraltar, or through Centrum as nominees."

Q. And then can you read us a few lines down the sentence beginning 'my main initial concern.' Can you read that for us, please?

A. "My main initial concern is the date we want to show on the transfers, particularly if you want to backdate them."

Q. Why would you have indicated concern about the date on transfers?

A. Because at this particular point in time with the, with this issue, the stratagem, I would say that Delphine had been the owner of the shares in two companies from the date of which the companies were set up and that this was the big mistake that was made at

the initial, initial set up of the companies.

Q. Was that true based on what you had observed and what you'd seen in the records? Did you think that was true, that it was a mistake?

A. It was difficult to -- it was certainly different. It was, it was -- the corporate records clearly showed something different to what Mr. Edelman was saying.

Q. I'd like to look at Mr. Edelman's response at the top of this email, please.

A. Yes.

Q. Do you see where it says:

"Share transfer date easy as they are blank."

Do you see where it says that?

A. Yes.

Q. And then can you read us the next sentence, please?

A. "We may even -- we may even just show Delphine Le Dain as a shareholder. In brackets. It's just an idea. All I know is we need old dates on share transfers documents and POA's. We can talk earlier tomorrow your time."

Q. Mr. Collett, we looked a few minutes ago at documents that you labeled as originals, showing Mr. Edelman, as Shareholder. Had you made him aware

that those documents existed? Had you shown them to him?

A. Yes, I had. That came up in, in the various conversations as to what was actually shown on the various registers.

Q. And did he say anything to you about how to reconcile the fact that there would be documents showing something contradicting what he's talking about here: old dates?

A. I can't remember the exact words, but the inference was clearly 'well, when we collect all these records we don't need to keep the originals. It's no, no point in keeping the original documents.'

Q. I'd like to look at 6-17, please.

(Exhibit Gov. Exb 6-17 was entered into evidence.)

Mr. Collett, this is an email from July 18th, 2010. Do you see that?

A. Yes.

Q. And do you see where you say at the top:

"Further to your texts, my email of 16th July and your responses, I think we really need to confirm clarify the following."

Do you see that ?

A. Yes.

Q. Do you see in number 1, where it says:

"The official change of name for Delphine."

Do you see that?

A. Yes.

Q. Can you tell us what that refers to?

A. That refers to Delphine Edelman, his wife, and the change of the name to Delphine Le Dain.

Q. And then do you see in the paren beginning, 'if this causes a major problem'; Do you see that a few lines later?

A. Yes.

Q. Can you read the rest of that sentence?

A. "If this causes a major problem then perhaps we can use one of the two new Foundations in Delphine's maiden name. In any event, I presume that it will not take too long."

Q. I'd like to look down at option -- or, I'm sorry, number 3. Do you see where it says:

"The transfer of the shares in Mina and Red Star?"

And then there's a question. Can you read us that question, and it's on the screen in front?

A. "Do you want these directly into the name of Sunage/Aspen, or Delphine?"

Q. And then can you continue reading the next line, please?

A. "If so, David can do this so that the new BO, new beneficial owner appears on the registers of the Companies House in Gibraltar. However, as I understand it from David, these transfers cannot be backdated."

Q. Can you explain to us what's going on in paragraph 3? What are you relaying to Mr. Edelman?

A. The fact that it is not possible to actually re-date, or backdate the documents that already exist.

Q. And you've told us a moment ago that this was an email to Mr. Edelman. In presenting these choices to Mr. Edelman, who did you understand to be making the decision about exactly what was going to happen here; the next steps to take?

A. I set out the, the various matters in this email to enable Mr. Edelman to make whatever decisions he felt would be the best.

Q. I'd like to look at 6-18, please.

(Exhibit Gov. Exb 6-18 was entered into evidence.)

Do you see this email from July 18th, 2010?

A. Yes.

Q. Do you see that it's from an email address you've identified as yours to an email address that you've identified as Mr. Shakhidi. Do you see that?

A. That's correct.

Q. And do you see it says:

"Dear Firdavs, following, following various conversations that I have had with Douglass today, we need to take some very swift action regarding certain matters."

Do you see that?

A. Correct.

Q. Can you paraphrase for us what the instructions were that you were relaying and this email?

A. I was asking him that -- to arrange for the change of Delphine's name from David -- from, from Delphine Edelman to Delphine Anne Le Dain on the Foundation documents of Sunage Foundation.

Q. And was this your idea to give Firdavs these instructions?

A. These with these instructions I was passing on based on Mr. Edelman's decisions.

Q. I'd like to look at 14-50, if we could, please.

(Exhibit Gov. Exb 14-50 was entered into evidence.)

Do you see this email from July 19th, 2010?

A. Yes, I do.

Q. And do you see where there's a subject line: Delphine Edelman. Do you see that?

A. Correct.

Q. And this is from an email address you've

identified as yours, to an email address that you identified as David Pearlman's. Do you see that, at the top?

A. That's right.

Q. And looking at this email at the top, it says:

"I am writing to confirm the instructions from my clients as follows."

Do you see that?

A. Yes.

Q. And can you summarize for us what the instructions are being given in this email?

A. The first instruction is to transfer the 1000 shares held in Mina Corp by James Stuart Rodriguez to transfer those to Centrum Secretaries Limited. And I attached a copy of the signed transfer to that effect.

"Please arrange this be registered theat Companies House immediately."

Q. And then I'd like to look at paragraph 2. Number 2.

A. "Require an updated declaration of trust for the new nominee shareholder. The shares are held with effect from 9th of May 2003, in favor of Delphine Anne Le Dain."

Q. Was it your idea to give that instruction to

Mr. Pearlman?

A. It was not my idea to actually give that instruction. it was based on the various discussions that were held with David Pearlman and with John Roberts and with Mr. Edelman, which resulted in Centrum under David Pearlman's hand issuing declarations that the shares of Red Star Enterprises had been held for the benefit of Delphine Edelman, with effect from the date of incorporation of the Company. And similarly that the shares in Mina Corp Gibraltar were held as nominees with effect from the 9th of May 2003, when that Company was was, was, was, was incorporated, again, in the name of Delphine.

Q. And these meetings that you just mentioned; had Mr. Edelman said anything about who had actually founded or created Mina or Red Star?

A. I can't remember any specific discussions on that particular point. The main thrust of the conversations was that there had been mistakes and that these, the shares in these in both of those companies should have been recorded in the name of Delphine rather than himself.

Q. I'd like to look at 15-7, if we could, please.

(Exhibit Gov. Exb 15-7 was entered into evidence.)

Mr. Collett, I'd like to look at the first page of 15 seven, if we could, please. Do you see this email exchange dated July 19th, 2010?

A. Yes.

Q. And do you see the email about halfway down the page from the email address you identified as Mr. Pearlman's to Stuart Rodriguez with a copy to you. Do you see that?

A. That's correct, yes.

Q. And do you say, do you see where it says:

"Dear Stuart, Mina Corp Limited, Red Star Enterprises Limited, I attach copies."

Do you see where it says that?

A. Yes.

Q. Can you tell us based on the text of this email, or your recollection, what's being attached to this email conveyed to Stuart Rodriguez?

A. It is attaching copies of the, of updated nominee papers for the two companies. Having accepted instructions from myself, who is advising both the companies who have explained that the whole of the beneficial interest is understood to have been that of Delphine Anne Le Dain, who is in fact the wife of Douglas Edelman.

Q. I'd like to look at Page 7 of this Exhibit,

if we could please?

MR. CLARKE: Which page?

BY MS. RANNEY:

Q. Page 7. Do you see at the top where it says declaration by the nominee?

A. Yes.

Q. Is this one of the, or is this part of the updated papers that were created around this period of time in 2010?

A. That is correct.

Q. And can you tell us which Company this relates to?

A. This relates to Red Star Enterprises Limited, Gibraltar.

Q. And where it says 'Beneficiary,' can you read us what it says next to 'Beneficiary' at the top?

A. "As from the 4th of June 2004 Delphine Anne Le Dain."

Q. Do you see down at the bottom where there's a date and signature line?

A. Yes.

Q. And do you see the typed name that's listed under the signature line?

A. Yes.

Q. Who is that? Can you tell us what it says?

A. Based on other documents that I've seen from the historical records, that is the signature of James Stuart Rodriguez, who was the Nominee.

Q. Were you present when this document was signed?

A. No.

Q. Do you have any personal knowledge about whether it was signed by Mr. Rodriguez personally?

A. I certainly was not around when -- I was not present when he signed it. The fact that these came through David Pearlman, who had arranged them with Gibraltar.

Q. So, to the extent of your knowledge, who had taken care of getting a signature on this document, if you know?

A. I can't be absolutely certain.

Q. I'd like to look at page 10, if we could, please. Is this another example of the papers within the updated records that we've been discussing?

A. Yes, it is. This relates to Red Star Enterprises Ltd, whereas the documents we have just been looking at referred to Mina Corp.

Q. And I'd like to look, if we could next to Beneficiary. Can you read us what it says next to Beneficiary?

A. "As from the 4th of June 2004 Delphine Anne Le Dain."

Q. And then can you tell us down at the bottom, what is the date on this Declaration?

A. 19th of July 2010.

Q. Is there a term in accounting for a document that's labeled 'As Of' but has a much later date that it was signed?

A. The term 'backdating.'

Q. Is this an example of what you and Mr. Edelman were referring to in your email communications; backdating documents?

A. That's correct.

Q. I'd like to look at page 14, if we could, please. Just looking if we could, at the signature on this document. Is that, do you recognize that name as the same name on the previous declaration, we looked at: James Stuart Rodriguez?

A. Yes, as far as I can distern-discern, yes, that is right.

Q. And were you personally involved in this document being signed? Were you there when it was signed?

A. No.

Q. In fact, were you present when any of the

documents included and these attachments were signed?
A. No.
Q. Could we please do a quick comparison side by side between 14-23. Page 4. And 15-7. Page 14.
A. 14-3.
Q. Yep. And it might be easier to look at the screen?
A. Right? Yes. Okay.
Q. Where we pulled them up. Mr. Collett, we talked a moment ago about the original records that you had in your files showing Mr. Edelman as the Beneficial Owner. Looking at the right image on the screen in front of you, can you tell us the main difference between these two documents in terms of who is listed as an owner?
A. The right hand shows Delphine Anne Le Dain. The left shows Douglas Philip Edelman.
Q. And what is the date on the left hand Declaration?
A. 1st of August 2006.
Q. And what is the date on the right hand Declaration showing Ms. Le Dain's name?
A. 19th of July 2010.
Q. Could we look, please at -- can you tell us before we go away from this screen which entity these

documents relate to?

A. They both relate to Mina Corp Limited Gibraltar.

Q. Could we please look at a comparison between 14-23. Page 20 with 15-7. Page 7. Mr. Collett, you told us a moment ago that you had the original statutory documents in your file related to Red Star Enterprises, the Gibraltar Company. Can you tell us who's listed on the left hand side document as the Beneficial Owner of Red Star Enterprises Gibraltar?

A. It's shown as Douglas Phillip Edelman.

Q. And can we change the left side image just to be page 22, please.

Do you see where there's a declaration on the left hand side related to Centrum Secretaries. Do you see that?

A. Yes.

Q. And who is shown as the Beneficiary on this Declaration, in the documents you identified?

A. This is shown as Mill Park Limited.

Q. And then who's the individual shown there as the beneficiary?

A. Douglas Edelman.

Q. And do you know what Mill Park Ltd is?

A. I believe that it was the name that, of the

Company that was incorporated as a, as a, what we term a 'Shelf Company' and had it's name changed to Red Star Enterprises Ltd. That is, that is how I understood it to be.

Q. And can you tell us the date on this left hand side document?

A. It says the 9th in November 2006.

Q. And then on the right hand side?

A. 19th of July 2010.

Q. And on the Declaration dated July 2010, which entity does that relate to?

A. That relates to Red Star Enterprises Ltd.

Q. And who is the, is shown as the Beneficiary theory on that Declaration, from 2010?

A. That's from the 4th of June 2004. Delphine Anne Le Dain. We've been going for about an hour and a half. I think this is a good time for a break? Mr. Collett, would you like a cup of tea? Should we do a quick break.

MR. CLARKE: That's good.

COURT REPORTER: Could we have a slightly longer break, because I need to do something technically.

MS. RANNEY: Absolutely. 15. Okay, so that puts us back at 11:00 a.m. I'm sorry. 10:30 Eastern. Cannot add. 10:30 Eastern. And that is 3:30 UK.

VIDEOGRAPHER: This is the end of Media I., Vol. II, going off the Record at 15:15 as indicated on the video screen.

(Break taken.)

VIDEOGRAPHER: This is the beginning of Media II. Vol. II, going back on the Record at 15:39 as indicated on the video screen. Thank you.

BY MS. RANNEY:

Q. Mr. Collett, I'd like to look at 14-84, if we could please.

(Exhibit Gov. Exb 14-84 was entered into evidence.)

Do you see at the top where this appears to be an email dated August 1st, 2010?

A. Yes.

Q. Do you see that the sender on this email appears to be an email address you've identified as one of Mr. Edelman's to an email address you've identified as yours. Do you see that?

A. Yes, I do.

Q. I'd like to look down to the original email on the chain, if I could, please?

A. Yes.

Q. Do you see where it says:

"Good morning, Douglas"

And then it continues:

"There are various matters that I need to update you on and get your approval."

Do you see where it says that?

A. Yes.

Q. At this point in August 2010, who were you taking your day to day instructions from?

A. In all matters like this, generally I was taking my orders from and instructions from Mr. Edelman.

Q. And who were you reporting to when you completed tasks or had updates?

A. Primarily, Mr. Edelman.

Q. I'd like to look at a couple of things on this email, but first, I see that there's some handwriting on this email. Do you recognize that handwriting?

A. Yes, that's my writing.

Q. And can you tell us why you wrote on this document, or what the handwriting might denote?

A. I would have printed a copy of this email and used it as a, as a record to make notes to myself when, when these tasks have been dealt with.

Q. I'd like to look first at paragraph 1 where it says 'House lift.'

A. Yes.

Q. Do you see that?

A. Yes, I do.

Q. And you said:

"I have had correspondence from Concierge."

Do you see that?

A. Yes.

Q. Do you recall what 'Concierge' was, and how it related to a house lift.

A. Concierge was a Company that dealt with Property Management. And Concierge had been recruited to look after various aspects of the house: maintenance and so on. Because, because at this particular moment in time, the house was not being fully occupied at all.

Q. Do you know which house this refers to?

A. This refers to Cottesville Gardens and was 12 to 14 Cottesmore Gardens.

Q. And what is a 'house lift?'

A. It had an elevator in the, in the house.

Q. I'd like to look at paragraph 5, if we could, please. Can you read us the top line of paragraph 5?

A. "Delphine has asked, has requested an additional set of keys cut for the house. We need to provide certain documentation to Banham -- "

That's the Company that provides the keys and the security to confirm ownership.

"Also Banham require authorization, which I

can do quite easily is this okay with you."

Q. Is this the type of issue that you would typically put to Mr. Edelman; having keys cut for a house for Delphine?

A. Yes, I was, I was, I would update him on, on any matters relating to the house, and particularly where a Third Party has got to be contacted, as in this case.

Q. And I'd like to look at paragraph 6, if we could. Do you see where it says:

"I have received a draft engagement letter from Marnin's secretary."

Do you see that?

A. Yes.

Q. Do you know who Marnin is?

A. This was Marnin Michaels, who Mr. Edelman had been talking to in connection with tax matters, I believe.

Q. What does Marnin Michaels do? Do you know?

A. I believe he's a tax lawyer.

Q. Do you know where Marnin Michaels was located at this point in time?

A. I think he was in, I think he was located in in the U.S. I'm not sure whether he was in London, or not.

Q. And before this point in August 2010, had you ever had any conversations with Mr. Edelman about taxes?

A. Not specifically. He, he never mentioned much about it. And bearing in mind that my, my expertise in tax was very limited only to sort of UK domestic tax and and not an area that I, I, I sort of wanted to get involved with in any great detail, because I didn't have the knowledge or the expertise.

Q. Did Mr. Edelman tell you why he was potentially engaging Marnin Michaels?

A. I can't remember any specific discussions in detail, except that he would have told me that he was engaging Marnin Michaels on tax matters. I can't really be that much more specific.

Q. I'd like to look at paragraph 7, if we could. Please?

A. Yes, this was my monthly invoice for fees, which I would submit every month to Mr. Edelman for approval at this particular time.

Q. Do you see where it says:

"My hours for July have been much higher than normal."

Do you see that?

A. That's right.

Q. And do you recall whether Mr. Edelman paid

you any more for the work you'd done for him in July 2010?

A. Yes. He asked me to add 10,000 to the fees as the top of the email.

Q. I'd like to look at 14-52 if we could, please.

(Exhibit Gov. Exb 14-52 was entered into evidence.)

Do you see this email bearing the date August 3rd, 2010. ?

A. 3rd of August 2010. Yes.

Q. And this is from an email address you've identified as yours to an email address you've identified as Mr. Edelman's. Do you see that?

A. That's correct.

Q. And can you tell us at the very top line of this email what the subject line is?

A. A company called Mina Media Ltd.

Q. And can you remind us whose Company Mina Media Ltd was?

A. This was, I understand set up as a joint venture between Mr. Edelman and an associate by the name of Steven MacSerraigh.

Q. And do you see in the text of the email where it says:

"I have found the records for Mina Media Ltd

and I have prepared a summary of the information that we have."

Do you see that?

A. That's correct.

Q. Was it your idea to prepare a summary of information on Media, on Mina Media?

A. As a matter of routine, I was building up knowledge of various companies at this time and I knew that the records were, were held in London, I believe at the time. And I can't remember the precise context in which it came up at this time.

Q. I'd like to look at the attachment, if we could, on page 3. Can you tell us what, what note number 1 is relaying?

A. The original -- Know Your Client information provided to Vassiliades -- who were the Corporate Service Providers -- showed DE: Douglas Edelman as the Beneficial Owner, together with Steven MacSerraigh.

Q. Do you know how Mina Media was funded from the Douglas Edelman side?

A. The bulk of the funding which included the MTV franchises in Eastern Europe; I believe the funds came in about 2008, 2009 period and came from Aspen Wind and Bartol, in the main.

Q. Could we look at 14-53, please?

(Exhibit Gov. Exb 14-53 was entered into evidence.)
Mr. Collett, can you are you able to tell us what we're looking at on the first page of 14-53?

A. On the very first page, it is the spine of one of my lever arch files that I maintained in respect of matters relating to Aspen Wind Corporation.

Q. So, if we could, with my apologies go back to 14-52 quickly. Do you see at the bottom of the email we just looked at, where you say:

"I am preparing summaries in the same format for all companies."

Do you see that? On 14-52.

A. Yes.

Q. And then the line continues:

"So that we can deal with all outstanding or contentious issues."

Do you see that?

A. That's right, yes.

Q. And do you see the line above it where it says:

"Perhaps we can discuss and I can go ahead and deal with the O/S matters."

Do you see that?

A. Yes.

Q. Do you know what O/S refers to?

A. Outstanding.

Q. So, do you recall what these outstanding, or contentious issues were that you were flagging at the beginning of August 2010. For all companies?

A. This really resulted from the followed immediately from the issues arising on Red star and Mina Corp Gibraltar companies and the backdating of the Agreements.

And at that particular point it was felt that I should look at all of the records of all of the companies to see exactly what the, what the company records were saying and stating as the ownerships and other, other issues.

Q. Why would you go look at what the other companies were stating as the ownership issues in early August 2010?

A. Following all, as I say from the events of June and July, in respect of Red Star and Mina, and because the records -- I had not had any direct involvement in maintaining any of those records at all, that I should look at these records and see exactly what was being shown in the corporate files that were being held by Iryna Tsenzharyk in London at the time.

Q. Can we look back at the, the summary again on page 3, please?

A. Yes.

Q. Do you see in paragraph 7, where it says:

"Declaration signed by Delphine Le Dain Edelman confirming her beneficial ownership of Sunage Foundation."

Do you see that?

A. Yes.

Q. And then do you see where it says:

"In turn being Beneficial Owner of Josh -- Joseph Schmo Investments Ltd."

Do you see that?

A. Yes.

Q. Do you know who came up with the name Joseph Schmo Investments for a Company?

A. I don't know, to be honest.

Q. Do you know whose Company that was?

A. At that particular time, I can't remember the exact shareholders of that Company, at the time, but I know that it was funded by by either Bartol, or Aspen Wind.

Q. And who had directed that it be funded by Bartol, or Aspen Wind?

A. At that particular time not being that much involved in payments and so on. I, I can only, I can only speculate on that really, at this particular moment

in time. But, I can only think that it would have been Douglas Edelman at that time.

Q. From your experience, being an Account Signatory on the Aspen Wind and Bartol Bank Accounts, who in your experience gave directions for transfer of funds out of the Bank Accounts to fund things?

A. At the time that I had, I had detailed experience of who was making the payments, it would have been Mr. Edelman.

Q. And now could we return to 14-53, please. Mr. Collett, a moment ago you identified this, I believe, as the spine of a binder. Can you tell us how you know that this is a spine of a binder?

A. It's, it's, it's a block with a, with a, with a ring at the bottom of it. And that is, that's the type of label I would put on the top of the files.

Q. Do you, do I understand correctly that you recognize this as a binder that you had made for one of your files?

A. That's right.

Q. Did you keep other binders like these in your files?

A. Yes. Majority of the, of the papers relating to, to any matters were kept in folders of this nature.

Q. And can you tell us, if you can tell from the

label, what this binder relates to?

A. This relates to matters for As-for the Company, Aspen Wind Corporation. It would include things like statutory documents, any specific Agreements, or copies of accounts; any general matters relating to the Company.

Q. I'd like to start -- sorry.

A. -- that would come into my possession, either for record, or for use.

Q. I'd like to look at the first page behind this spine of a binder. Is this another entity summary like the one we looked at a moment ago?

A. That's right. That's correct.

Q. And which entity does this relate to?

A. This relates to Aspen Wind Corporation.

Q. Did you make this summary?

A. Yes, I did.

Q. And if you look down at the very bottom of the page, can you tell us the date on here that this was updated?

A. It was updated on the 8th of November 2010.

Q. And as of November 2010, based on your experience and the records that you had reviewed, who did you understand to have created the Aspen Wind Corporation?

A. I understood from my experience and every -- all the history from when I first became involved, this company had been set up by Douglas Edelman.

Q. I'd like to look at 14-54, if we could, please?

(Exhibit Gov. Exb 14-54 was entered into evidence.)

Do you see this email bearing the date September 2nd, 2010?

A. Yes.

Q. And do you see the email is from an address you identified as Mr. Edelman's to an email address you identified as Mr. Shakhidi's. Do you see that?

A. That's correct.

Q. And do you see the copies on this email include you and then another email address? Do you see that?

A. You were referring to global1?

Q. I'm sorry, on the, on the CC line. Do you see the email address after your?

A. Sorry. Yes. That's Robert Dooner.

Q. And do you recall corresponding with Mr. Dooner at this email address?

A. To the best of my knowledge, yes. At that particular time. Yes.

Q. I'd like to turn to the first email in this

chain, if we could please. Which begins on page 5, at the very bottom.

Do you see where there's an email from globalspec1@yahoo to Mr. Shakhidi, with a copy to you and Mr. Dooner. Do you see that?

A. Yes.

Q. And do you see where it says on page 7:

"Dear Firdavs, we will need an SAP some POAs as follows."

Do you see where it says that?

A. Yes.

Q. What is a POA?

A. Power Of Attorney.

Q. And then can you read the following line, please?

A. It says:

"We will need, and as soon as possible, some POAs for Delphine Le Dain, not Edelman from Sunage and for Mina and Red Star Gibraltar. In brackets. From Centrum maybe. Full powers of attorney with authority to sign and negotiate and open bank accounts. And issued to Dooner, Graham and Ira."

Meaning Robert Dooner, myself and Iryna Tsenzharyk.

Q. What does a POA for a bank account do? What

is their job?

A. The Power Of Attorney would be to actually open bank accounts on behalf of the Company with full powers to agree the terms of that bank account and to operate that Bank Account.

Q. Did Mr. Edelman tell you in any separate communications, why he needed ASAP Powers Of Attorney drawn up for these individuals?

A. At this point in time I can't, I can't remember any specific reason for this.

Q. I'd like to look at the email response from Mr. Shakhidi, if we could, on page 5.

A. It says:

"On Sunage, there was already issued POA to you, Graham and Iryna, dated 15th of June 2009. I suggest we revoke the existing Power Of Attorney and issue a new one to Le Dain, Graham, Iryna and Bob. Questioning Ok?"

Q. Okay. Do you know why in September 2010, Mr. Shakhidi would be suggesting to Mr. Edelman that there was a POA to Edelman that should be revoked?

A. I can't think of a specific reason other than he did not want to have a power of attorney going forward on such account.

Q. Did he tell you why not?

A. I can't remember that specifically, bearing in mind that it's simply him responding, Firdavs responding to Firdavs.

Q. And then can we look at Mr. Edelman's response at the top of this page? Do you see where Mr. Edelman responds to Mr. Shakhidi, copying you and Mr. Dooner?

A. That's right.

Q. And can you read us the first few lines?

A. He's saying:

"Okay, leave the ones that exist already, unless they mention Delphine Le Dain Edelman. If they do, go ahead and make new ones. Ditto for Aspen and other maybe. Or is that not needed, because Sunage owns Aspen. Also Bartol."

Q. I'd like to look at the response to Mr. Edelman's email, if we could, on page 3.

A. This was from Firdavs to Raoul Duke, Mr. Edelman, myself and Bob Dooner saying:

"We can leave them. There is no POA to Delphine, and her name is not mentioned anywhere. POAs are signed by Counsel. Do you actually want a new POA in her name? I would advise not. Bartol exists and no -- not bearer, but normal registered shares to the Foundation."

Q. Can you look, please, at Mr. Edelman's response to that on the next portion up on the page?

A. Further up to that.

Q. Do you see where he says?

A. "Okay makes sense to leave them as they are. Delphine not does not need one, I guess. Is it all now in Le Dain, right. And no, no Edelman anywhere. Same for Bartol too, I presume."

Q. I'd like to look at two lines or two emails up, the email from Mr. Edelman beginning on the bottom of the first page. Where he asks:

"How is the insurance wrap?"

Do you see that?

A. Yes.

Q. What is an 'insurance wrap?'

A. It's a fairly complicated form of entity to hold assets. It was something that Firdavs Shakhidi had come up with and recommended to Mr. Edelman. It involves Banks. I am not that familiar with the mechanisms of how these insurance wraps work. The idea was to invest money in a particular insurance wrap for future use.

Q. Can you look up please, at the response from Mr. Shakhidi to this email? Do you see where it says:

"Once you fund the account in Singapore it

will take a week to set up."

Do you see that?

A. Yes.

Q. Do you recall whether the insurance wrap was funded?

A. Yes, it was funded.

Q. Who gave the instructions for the insurance wrap to be funded?

A. Mr. Edelman.

Q. And how much was it initially funded with? If you know, or if you can tell from this email?

A. It's, it says on the top there that Firdavs confirmed that it was funded with:

"1 Million USD, then 500,000 was taken out. You can top it back up. So around 750-800,000 USD."

Which I arranged to be sent on Mr. Edelman's instructions to top up the, the insurance wrap account.

Q. I'd like to look at 11-2, please.

(Exhibit Gov. Exb 11-2 was entered into evidence.)

Mr. Collett, before we turn to the next Exhibit, do you recall which account the insurance wrap was funded from? Which bank account?

A. At this precise moment, I can't, I can't remember which, which, which account. It was funded from -- all I can say with any certainty is that the

main bank account being used at this time was Sunage Foundation.

Q. And in the transactions that you were involved in, who gave the instructions for transfers in or out of the Sunage Foundation accounts, at this point in Fall 2010?

A. That would have been Mr. Edelman.

Q. And now can we look at 11-2, please. Do you recall which Bank held the Sunage Foundation account at this point in time in 2010?

A. That was Julius Baer.

Q. Do you recall which branch of Julius Baer?

A. It was operated out of the London office of Julius Baer. The actual account, I believe, was in Singapore. I believe. I'm not 100% certain on that.

Q. Mr. Collett, could we look at 11-2, please? The November 27th, 2010 email. This is from an email address you identified as yours to global spec1@yahoo.com, which you identified as Mr. Edelman. Do you see that?

A. That's correct.

Q. And do you see in the text of the email where it says:

"Dear Douglas, please see updated valuation."

Do you see where it says that?

A. Yes.
Q. Can you tell us what valuation are you referring to in this email?
A. At some time in the past, Mr. Edelman had asked me to prepare a summary valuation for the Red Star Mina business, i.e. the fuel logistics business.
I can't remember exactly when the first draft was prepared but this was a later draft which Mr. Edelman had asked me to prepare, and said that he was possibly thinking about selling the business based on the accounting information, the historical results of the business; its assets its liabilities; its risks and using fairly standard and fairly basic accounting principles for the valuation of a business. I.
Put forward, I put together this Report which summarizes all the profits, the distributions the adjusting factors, the risk factors, a weighted average valuation for goodwill.
These figures are obviously subjective but form the basis of any, can can form the basis of any discussion between the buyer and the seller.
Q. And if we could look at the attachment to your email, please. Is this a copy of the value option that you prepare prepared at this point in September 2010?

A. I believe that it is.

Q. And can you tell us how, how much you had valued the business of Red Star Enterprises at this point in 2010?

A. Yes. On the basis of the above calculations of goodwill and the net assets and subject to the application of various risk factors attached to any business, I assess the overall value of the business in the region of $339 Million.

Q. And is that the figure that's listed at the bottom of page 3 to this Exhibit?

A. That's correct.

Q. And did you submit that figure to Mr. Edelman?

A. Yes, I did. As outlined in the email.

Q. Do you recall his reaction to the assessment that you made of the company's value?

A. I can't remember the detailed discussions. We would have discussed it in some level of detail.

Q. Did he tell you who he was contemplating selling to?

A. I can't recall that he actually mentioned any specific person, or entity at that time.

Q. Do you recall him saying anything about wanting to give any part of the business to someone?

A. No, I can't think of. Not to gift it to anybody, no.

Q. Do you know, do you have any personal knowledge about whether there was a sale, or a gift at this period of time, in November 2010?

A. Of the Red Star Mina business.

Q. Correct?

A. No, I have no evidence or knowledge of that happening.

MS. RANNEY: I'd like to look at 14-86, if we could, please.

(Exhibit Gov. Exb 14-86 was entered into evidence.)

This appears to be an email dated December 4th, 2010. Do you see that?

A. Yes.

Q. And do you recognize the sender on this email?

Q. The person whose email address is on the front line?

A. This is from Marnin Michaels at Baker McKenzie.

Q. And who is it to?

A. And it's to myself.

Q. I'd like to look at the original email if we could, please. It looks like it begins just about an

inch and a half down from you to Marnin Michaels. Do you see that?

A. That's correct.

Q. And do you see where it says.

"We are now almost at the point of being able to file returns for Douglas."

Do you see that?

A. That's right.

Q. And then do you see in the next line where it says:

"I attach a summary of the income figures for your information."

Do you see that?

A. Yes.

Q. Can you tell us why at this point in December 2010, you are sending summaries of income figures to Marnin Michaels?

A. Mr. Edelman had been having discussions with Marnin Michaels, and he, he asked me to provide information to Marnin Michaels in terms of his income over a period of time and to, to enable Marnin Michaels to assess the overall, his, Douglas Edelman's overall tax position and the action that needed to be taken.

Q. Mr. Collett, I'd like to look with you at we could -- if we could, at the top of page 3.

A. Yes.
Q. It might be helpful to back up and look at the format of this email. Do you see some points laid out in numbers?
A. Yes.
Q. And then do you see some points laid out with bullet points?
A. Yes.
Q. And looking at the very top of this email chain, where it says, from Marnin Michaels:
"Dear Graham, please see below comments from our London office."
Do you see that?
A. Yes.
Q. Does that give you the basis to make any conclusions, or do you recall how the conversation went in this email chain? What's being represented here?
A. It is a detailed and complex email. My recollection of this is that I provided the main numerical paragraphs and Marnin Michaels came back with the bullet point comments. As he mentioned above in his response to me, from points raised by his London office.
Q. Now, I'd like to look at page 3 at the top. Do you see the parenon the second line where it says:
"We are assuming that his wife is the source

of wealth?"

Do you see that?

A. Yes, I see that.

Q. Is it true that Douglas Edelman's wife was the source of his wealth? In December 2010?

A. In reality, no, it was not correct.

Q. Do you know why that impression would have been given to Marnin Michaels? Was that your idea?

A. It was based on Mr. Edelman's instructions. The fact, as he saw it, that the businesses had all been owned with effect from the date of the creation of the companies. And that at this point, the Congressional Inquiry had had, it had concluded, based on information given by Mr. Edelman's representatives at that, that Congressional Hearing that Delphine Le Dain had owned those businesses from the start of the Gibraltar companies.

Q. Had you been involved in giving Marnin Michaels information suggesting that Mr. Edelman's wife was the source of his wealth?

A. In terms of the information that I provided and the figures that I provided then, yes, I did. Based on Mr. Edelman's instructions.

Q. Why did you do that, if you knew, or if you didn't believe it to be true? As you just said a minute

ago?

A. At that time following the Congressional and the Declarations that had been made, in my view, it was a, it was a change of ownership, in 2008. But it was not correct. And Mr. Edelman was insistent that all of the income was his wife's. And I went along with that.

Q. Did you push back on Mr. Edelman and say, "This isn't right? I don't want to pass this information along?"

A. We would have had discussions about this, but at the end of the day, I went along with it and it became the accepted, and what we termed as 'the party line' in terms of going forward.

Q. I'd like to continue reading on in the paren that we were just looking at, after "we are assuming that his wife is the source of wealth." Do you see where it says:

"And where this is the case, the anti-avoidance rules may not be directly relevant to DE."

Do you see that?

A. Yes, I do.

Q. And then do you see where it continues:

"However, to the extent that he gave his wife assets to transfer into the structure, or himself

transferred any rights to the structure, he will be a transferor for the purposes of the relevant UK anti-avoidance rules."

Do you see that?

A. Yes. At the top of the page, yes.

Q. And do you see where it continues:

"And any income that arises as a result of that transfer could be regarded as his."

Do you see where it says that?

A. Yes.

Q. Did you brief Mr. Edelman on your communications with Mr. Michaels?

A. Yes, I did.

Q. Do you know if Mr. Edelman ended up filing any U.S. tax returns around this period of time based on Mr. Marnin Michael's advice?

A. No, he didn't.

Q. I'd like to look at 14-81, please.

(Exhibit Gov. Exb 14-81 was entered into evidence.)

Mr. Collett, this appears to be a letter dated April 5th, 2011. Do you see the date on it?

A. Yes.

Q. And do you see at the top where it says Baker and McKenzie?

A. Yes.

Q. Can you tell us, did you keep bills from Marnin Michaels in your files in this particular instance?

A. Yes, I did.

Q. And can we look at the text of this letter, please? Where it says:

"Dear Mr. Edelman,"

Do you see that?

A. Yes.

Q. Do you see where it says L:

"Enclosed please find our invoice statement for professional services rendered."

And then can you read the rest of that sentence, please? After 'services rendered?'

A. "In relation to U.S. expatriation and U.S. tax advice in the amount of Swiss Francs: 4,452.50 for your attention."

Q. Mr. Collett, to the extent of your knowledge, are you aware of Mr. Edelman's expatriation from the United States?

A. Not to my knowledge, no.

Q. And at this point in April 2011, were you aware whether, whether Mr. Edelman had filed U.S. Tax Returns in any of the previous years?

A. In any of the years when he'd been in the UK

I was not aware of any returns that had been made.

Q. And as someone who was a signatory on bank accounts, had you ever observed any payments going out to the U.S. Treasury that you identified for payment of taxes?

A. Not in my experience at all.

Q. Mr. Collett, do you know what expatriation is?

A. It's, it's primarily leaving, leaving the U.S. and being domiciled elsewhere in the world. And I believe revoking U.S. citizenship.

Q. Had Mr. Edelman ever spoken to you about expatriation from the United States?

A. He had talked about taking residency in Malta, I believe.

Q. Did he tell you why he would choose Malta as a place to take residency?

A. Not in any great detail. I just tried to remember who he, he did consult someone about it. I can't quite remember the details.

Q. To the extent of your knowledge, did Mr. Edelman, or anyone in his family have a house in Malta?

A. Mr. Edelman was renting a property in Malta for a short space of time.

Q. Do you remember approximately when?
A. Difficult to recall the exact dates.
Q. I'd like to look at 14-58 if we could, please?
(Exhibit Gov. Exb 14-58 was entered into evidence.)
Can you break it. Okay. 14-58.
A. Yes, I have it. Oh. 14.
Q. Mr. Collett, do you see this document that says 'Defense Logistics Agency' at the top?
A. Yes, I do.
Q. Do you recognize this document?
A. I believe I received a copy of this when working alongside the CEO of the Red Star Mina business in Dubai in connection with Defense Logistics contracts in early in 2011.
Q. And who was the CEO at that point in 2011?
A. I can't quite remember who it was. I believe it was Omero. I'm not sure who it was at that particular time.
Q. Mr. Collett, drawing your attention to this document. You mentioned a moment ago that you had a copy of it in your files. Can you tell us who this letter is from?
A. It's from the Defense Logistics Agency requesting for the purposes of evaluating a

solicitation, details of beneficial ownership and other information regarding the bidders for the contracts.

Q. Do you know which entity the DLA was asking about here? Did you have any personal knowledge about that at the time?

A. I believe it was, it was Red Star Enterprises.

Q. Do you recall who gave you a copy of this letter?

A. I can't quite remember who gave me a copy of the letter, but I did have subsequent correspondence, either directly, or via Mr. Edelman in terms of information to be provided in a, in, in answer to the information that was being requested by the DLA.

Q. Can we look -- so you mentioned that you had become involved in drafting the response. Who asked you to get involved in drafting the response?

A. Mr. Edelman asked me to get involved and to work with the team in Dubai.

Q. And you mentioned a moment ago that this letter is ultimately asking about the ownership of the business?

A. That is correct.

Q. In the draft response that you made for Mr. Edelman, do you recall who you said owned the

business?

A. Yes, I said that it was owned by the Sunage Foundation, of which Delphine Le Dain was the main beneficiary, along with her children.

Q. Was it your idea to give that response to the DLA?

A. No, it wasn't my idea. It was based on the Declarations that have been made and the, the, the physical documentation to support the Sunage ownership.

Q. I'd like to look at 6-22, please.

(Exhibit Gov. Exb 6-22 was entered into evidence.)

Do you see this email from November 27th, 2011?

A. Yes.

Q. And do you see that it's from the email that you identified as your email address to globalspec1, which you identified as Mr. Edelman's email address. Do you see that?

A. That is correct, yes.

Q. And do you see in the text of the email where you say:

"I've spent some time going through the DLA requirements and attach some note -- notes, which I hope will be of help."

Do you see that?

A. Yes.

A. I do I'd like to look at the attached document if we could, please. I'm sorry. Page 2.

Mr. Collett, is this the draft that you prepared at Mr. Edelman's request related to the response to the DLA?

A. I believe that it is.

Q. And you can take a moment if you need to, but is Mr. Edelman's name mentioned anywhere in this response?

A. Mr. Edelman's name is not mentioned.

Q. Based on your communications with Mr. Edelman around this period of time, what do you think would have happened if you had put his name in this response to the DLA about who owned Red Star?

A. He would have immediately struck it out.

Q. Mr. Collett, I'd like to talk to you about what was going on in, in these years, 2011 and 2012. We've looked at a couple of documents now, but in 2011, can you tell us what your general day to day duties were?

A. My general day to day duties as far as the the Edelman businesses, for want of a better expression, is concerned, I was with Iryna Tsenzharyk making payments maintaining accounting records and dealing with various issues, such as what we've been discussing just

now. In conjunction with my continuing client portfolio at Crane and Partners.

Q. And had your day to day duties changed much substantively after the events of July 2010?

A. The, the amount of work was increasing in terms of time, but at the same time, I was nowhere near full-time working on these matters, because of my other commitments within Crane & Partners.

Q. Did you ever become full-time working on the Edelman businesses, as you just called them?

A. Effectively, in January 2013 when I retired from the Partnership, I was then, and spent most of my working time on the Edelman businesses.

Q. Whose idea had it been to increase the amount of time, or tasks that you were doing over the course of those two years: 2011 and 2012?

A. I don't think it was a conscious, or planned happening. It, it was based on whatever issues were, were arising during the period and in conjunction with the, the increased accounting involvement. It started to grow. Not by, by evolving more than anything.

Q. Who made the decision to get you involved in those Projects?

A. It was basically through instruction from Mr. Edelman as time went on, to be involved in these

sorts of activities and the, because the initial direction came from him. It sort of, it it sort of grew in that way.

Q. I'd like to look at 24-1, if we could, please?

(Exhibit Gov. Exb 24-1 was entered into evidence.)

Mr. Edelman -- I'm sorry, Mr. Collett. My apologies. Do you see at the top where this appears to be dated January 31st, 2012? Do you see that?

A. Yes.

Q. And can you tell us what this document is? Can you identify it for us?

A. It's a copy of an email from Douglas Edelman to myself dated 31st of January 2012.

Q. And do you know where this email came from?

A. This came from my email records.

Q. Did you retrieve this email to provide to the government?

A. Yes, I did.

Q. You mentioned a moment ago that the, the sender address is Mr. Edelman's.

A. That's correct.

Q. Are you referring to the de@ledain.ch?

A. That's correct.

Q. Do you remember approximately when

Mr. Edelman began using that email address?

A. I believe it was round about this time. I think it was about 2011 that the Le Dain email address was first used. It was around about this sort of time.

Q. I'd like to direct your attention to the text of this email, if we could, please. Do you see where Mr. Edelman says:

"The Company was seeded and has always been owned by Delphine Le Dain."

Do you see that?

A. Yes.

Q. And then it looks like there are some parens and DLD. Do you see that?

A. Yes.

Q. On the top line of this email.

A. Yes, that's right.

Q. Mr. Collett, based on your work that you did in the early years of your engagement with Mr. Edelman, and the documents that you reviewed, and your communications with him in the early years of your engagement, do you know that line to be true or false?

A. That was false.

Q. Mr. Collett, do you know why Mr. Edelman was emailing you about this in January 2012?

A. I can't quite remember the, the reason why it

came up at this particular time. At the moment.

Q. I'd like to look a little further down in the email, closer to the right side of the page where it says.

"DE never is not the BO."

Do you see where it says that?

A. "DE never is -- never been paid dividends, did not operate the account at all and worked on the advisory."

Yes, I see that.

Q. And Mr. Collett, can you see the top of that paragraph where it says:

"something I just jotted down quickly more to put the lawyer into the picture."

Do you see that?

A. Yes.

Q. And then do you see a couple of lines down where it says:

"To get done ASAP is what we will write and present to Francis."

Do you see that?

A. Yes.

Q. Do you know who Francis is?

A. That is Francis Rohar.

Q. And what does Francis Rohar do for work?

A. He's a lawyer and he was General Counsel to the Mina Red Star business at this particular time and going forward.

Q. And so does this note about Francis, or presenting to Francis; does that refresh your recollection at all about why Mr. Edelman was sending an email about this to you in January 2012?

A. I'm, I'm still just a bit vague as to what the actual events were at this particular time. Other than that, the introduction of the new regime for the the Red Star Mina business, which came, which was introduced in 2012.

Q. What do you mean by 'new regime?' Can you tell us briefly what you mean?

A. It was, the business was transferred out of the Red Star Gibraltar companies into a new structure which Francis Rohar was working on. And the companies within and the business was then based in Singapore.

Q. And Mr. Collett, with respect to the other entities that we've talked about, other than Mina and Red Star; you mentioned previously when we were talking about the change in your role over time that there had been a Trust created at some point. Can you tell us around when was that Trust created, that you mentioned?

A. The Trust, to give it it's name, the Sunage

Foundation was established in April 2008. It was set up with Delphine as the Settlor and the principle beneficiary, along with her four children. This was set up in and based in Panama using Corporate Service Providers Aleman Cordero. Who were based in Panama.

Q. And Mr. Collett, when we were discussing your change in roles over time, you mentioned a Galactea Trust. Can you tell us when the Galactea Trust was formed?

A. That was formed in early 2012, and going into 2013 with additional identical Trusts.

Q. And what was your role in the creation of the Galactea Trust, if any?

A. I had no direct involvement in the founding, in the creation of those particular Trusts, no direct role.

Q. Do you know who was involved in the creation of the Trust?

A. This was primarily from discussions that have been held between Mr. and, I believe, Mrs. Edelman with a law firm in London.

Q. Which law firm was that? If, you know?

A. Mishcon de Reya.

Q. Do you recall Mr. Edelman telling you around this period of time in 2012 that he wanted to gift his

assets to his wife?

A. I do not remember a conversation of that specific nature.

Q. When you say you don't remember a conversation of that specific nature, are you saying that you don't think it happened, or you don't recall whether it happened?

A. I don't think, it didn't specifically happen in that way.

Q. In fact, looking at 24-1 again, if we could. Can you tell us, does the top line of that email from Mr. Edelman say I wish to gift my assets to my wife?

A. No.

Q. What does it say?

A. It says the Company was seeded and has always been owned by Delphine Le Dain. DLD.

MS. RANNEY: Shall we do a break? Yeah. I think, I think this is probably a good time for a break. We discussed doing a half hour break, so we'll come back at 12:30 D.C. time, which is 5:30 UK time.

VIDEOGRAPHER: This is the end of Media II. Vol II, going off the Record at 16:58 as indicated on the Video screen.

(Break taken.)

VIDEOGRAPHER: This is the beginning of Media III,

Vol. II. Going back on the Record at 17:51 as indicated on the screen.

MS. RANNEY: Mr. Collett, I'd like to talk to you about some of the work you did on what I believe you referred to earlier as the Edelman Projects. Could we look, please, at -- the Court's indulgence. If I may. It's for 14-69, rather. Okay. 14-69. Thank you for everyone's patience.

(Exhibit Gov. Exb 14-69 was entered into evidence.)

MR. CLARKE: Sorry, I'm not there yet.

BY MS. RANNEY:

Q. Mr. Collett, do you see this document that says at the top 'Summary investments for clean capital. Purposes.' Do you see that?

A. That's correct, yes.

Q. You see that -- can you look at this document and tell me if you know who created it?

A. I created this document.

Q. And can you tell us what this document is?

A. It is a summary of all payments made in the period before the date.

Q. Could we look at --

A. It's 2017 and --

Q. Can we look at the bottom of page 1, please?

A. Yes.

Q. Pardon me, Mr. Collett. Do you see it on the left where it says year?

A. That's right.

Q. There's a list of years?

A. Yes.

Q. Can you tell us which years this summary relates to?

A. This summary relates to the years 2010 to 30th of September 2017.

Q. And Mr. Collett I'd like to go through some of the entries in here, and ask what you know about them. Do you see at the top where under 'Company' it says 'Evanshire Finance Ltd.' Do you see that?

A. Yes.

Q. Do you know what Evanshire Finance Ltd is?

A. Evanshire Finance Ltd is the Company which owned the assets related to the Kenyan farm business.

Q. Could we look at page 3, please?

Mr. Collett, is this a summary of transactions related to the Evanshire Finance ltd?

A. That is correct.

Q. And you mentioned that Evanshire related to a farm?

A. That's right, yes.

Q. Was this a business, or an investment? What

can you tell us about this?

A. It was an investment in land and a business operated through various subsidiaries of Evanshire Finance ltd.

Q. And do you know who made the decision to invest in a farm in Africa?

A. It was Mr. Edelman's decision to make that investment.

Q. And were you involved in the transactions that are listed here on page 3,4 and 5 related to Evanshire?

A. In terms of making the payments that were necessary for the purchase of the land, the funding of the business and operational expenses, I was, I was making those payments from the various accounts shown on the schedule.

Q. And when you made those payments, who had directed you when to make a payment and how much to pay?

A. These were directed by Mr. Edelman, based on the original land contracts, and funding required on a regular basis, which I provided him with details, and he authorized the payments.

Q. Mr. Collett, I see here that in the column where it begins at the top, 'Julius Baer USD.' Do you see that?

A. Yes.
Q. In the middle?
A. That's right.
Q. And then going down that column it looks like it says 'CBH' on some entries and then 'Mirabaud' on some entries. And then later it says 'Safra.' Do you see that?
A. That's right.
Q. Who chose which bank account to make these payments out of?
A. These payments were made from principally the accounts available at the time to those various companies that are listed. For example, in, in terms of the, of the main entities, the four entities: Satellite Support Services. Sunage Foundation. Rosbelt International and Bluestone. And the the initial payments in the earlier periods were made from Julius Baer before the Julius Baer accounts were transferred over to Mirabaud.
Q. And can you remind us who had directed that transfer to be made from Julius Baer to Mirabaud?
A. As we discussed earlier, that related to the to the Relationship Manager transferring from Julius Baer to Mirabaud.
Q. But who had made the ultimate call that the

funds were to be transferred?

A. That was Douglas Edelman.

Q. And can you tell us, based on this summary, how much was invested in farming in Africa in years 2010 to 2017?

A. Based on the summary, the total invested in that period as shown on page 1, was 16,820,000.

Q. Mr. Collett, do you know if this African farming venture returned any profit?

A. No, it didn't.

Q. I'd like to look at the next Company listed on the front page?

A. Yes.

Q. Actually, before we move to that; do you know whether funds continue to be invested in the Kenyan farming venture after the year 2017?

A. Yes, they did.

Q. Do you know up until what date funds were continuing to be invested in the Kenyan farming business?

A. Up to I believe, the end of 2020.

Q. And when you, or when those transfers were made to invest in Kenyan farming business, were you involved in those transfers?

A. Up until the up until November 2020, yes, I

 was involved in those payments.

Q. And for that period of time between 2017 and 2020, who gave you instructions when and how much to transfer money?

A. That was Douglas Edelman.

Q. And in that period of time, do you know if the farming business turned any profit?

A. No, it didn't.

Q. Looking at the next Company listed on the first page of this Exhibit. Do you see where it says 'Waterlow Management Ltd?'?

A. That's correct.

Q. Can you tell us what Waterlow Management Ltd is?

A. So, that was a domestic Company which invested in shares in a company called Isotropic.

Q. I'd like to look if we could please at page 7. I apologize. One moment. Page 19.

A. Page 9?

Q. Page 19. You mentioned a moment ago a Company called Isotropic?

A. Yes.

Q. Do you know what Isotropic did?

A. Yes, it was a Project involved in satellites and communication lines.

Q. And whose idea was it, if you know to invest in satellites and communications through Isotropic?

A. Again, this investment was approved by Douglas Edelman, based on his association with the Founder of the, of the technology and the developer, the main developer of the technology.

Q. Do you know what his name was?

A. I can't quite, I, I can't quite remember his name at the moment.

Q. Looking at page 19. Are these transactions related to the investments out of Waterlow Management?

A. That's right.

Q. Were you involved in these transactions?

A. These transactions were mainly made through Rosbelt International owned by Galactea Trust and those payments would have been made direct by the Trustee who had the authoritization powers to make payments from the Rosbelt accounts. I would, I would communicate the instructions to pay those amounts, on Mr. Edelman's instructions.

Q. So, just so that we're completely clear; who gave the original instructions setting in motion these transfers to fund the Isotropic investment through Waterlow?

A. That was Mr. Edelman.

Q. And can you tell from this page 19 what the total investment into Waterlow was?

A. 3,098,000.

Q. And do you know whether investments into Waterlow continued after 2017?

A. Yes. Additional investments were made -- in the -- yes, additional amounts were made. I can't quite recall the amount, but I believe it was probably another 4 or 5 Million.

Q. Through when do you think investments continue to be made in Waterlow to your recollection?

A. I think until about 2018, 2019.

Q. Do you know if the investment into Waterlow turned a profit?

A. To the best of my knowledge, it had not achieved a profit at the time that I ceased to have any involvement in it. It was an ongoing research project. So, whether it has been ultimately successful I'm not sure.

Q. You said 'as of the time you ceased your involvement you didn't think it had turned a profit.' When was, when was it that you ceased your involvement related to investments in Waterlow?

A. Well, in terms of the Trust matters generally and in terms of any decision making that was

November 2020.

Q. Going back to the first page, if we could, to look at the next entity listed on your summary, do you see where it says 'Mountain Pass Ltd?'

A. That's right.

Q. Can you tell us what Mountain Pass Ltd is?

A. That was a subsidiary Company of a part of the Trusts which invested in, in China in a company called Beijing Cable.

Q. And if we could go to page 21, please and stretching on to page 23. Looking at these pages are these transactions representing funds being deposited into the Mountain Pass trading investment?

A. At this stage, yes, that's correct.

Q. And whose decision was it to invest in a Chinese Media Company?

A. Again, this was Mr. Edelman based on his association with a Chinese national investor.

Q. Do you know the name of that Chinese national?

A. I can't remember his name.

Q. Looking at page 23, can you tell us in the years 2010 to 2017 how much had been put into this Chinese Media Company?

A. $3,223,000.

Q. And Mr. Collett, did funds continue to be transferred to Mountain Pass Trading between 2017 and the end of your involvement in November 2020?

A. Yes. There was further investments totaling approximately $6 Million.

Q. And who gave the instructions for those further investments to be made?

A. Mr. Edelman.

Q. Do you know if this investment ever turned any profit.

A. In terms of profit, I don't know. In terms of repayment of part of the investment, I know that certain repayments were made in the region of 3 Million with more expected after 2020.

Q. Going back to the first page, please to 'Murney Overseas'-- I'm sorry, to the, to the entity list. Do you see where it says 'Murney Overseas Limited', the next entity in the list?

A. Yes.

Q. Do you know what Murney Overseas Ltd is?

A. This was the main Holding Company of the investments in land in Mexico.

Q. Can you tell us when you first learned of the notion that an investment should be made in Mexican land? If you remember?

A. The first notion was, I believe back in 2011, 2012.

Q. And whose decision was it to invest in Mexican land?

A. The instructions came again from Mr. edelman.

Q. And I'd like to look, if we could at page, well, sticking with page 1 for the moment, can you tell us the total invested in Murney Overseas Ltd between 2010 and 2017?

A. Well, $60,809,000.

Q. Do you know if the investment in Murney Overseas Ltd ever turned any profit?

A. In terms of profit up until the end of 2020, there have been no return of profits on that investment.

Q. To the extent of your knowledge, did the investments continue after 2017 through the end of your involvement into Murney?

A. To my knowledge there would have been a small amount of investing in terms of security, legal and other routine costs after 2017. But to my knowledge, there were no more significant investments in land itself.

Q. Mr. Collett, if we could look at page 25, please. Continuing on through page 26 and 27. Are these individual transactions representing investments into

the Murney Overseas Mexican land venture?
A. That's correct.
Q. And were you involved in these transactions?
A. Yes, I was.
Q. And who instructed you to make these transactions and how much to make?
A. The instructions came ultimately from Mr. Edelman.
Q. Is that the case with the transactions between, or the transactions after 2017 that we mentioned?
A. That's correct.
Q. I'd like to turn back to the first page, please, if we could. Drawing your attention to the next Company on this list, says 'Lang International Holdings.' Do you see that?
A. Yes.
Q. Can you tell us what Lang International Holdings is?
A. This was a Holding Company for various interests in oil exploration.
Q. And do you know where the exploration was occurring for the investments in Lang International? Where were the actual physical Projects to be done, if you know?

A. They were investments in places like Canada and in Africa.

Q. And can you tell from this summary how much was invested in Lang International Holdings between 2010 and 2017?

A. It was a total of 31, 31 Million U.S. Dollars.

Q. And if we could turn to page 7?

A. Could I just add something? Could I just add something to that?

Q. Yes, please.

A. This includes the investment in the fuel logistics pipeline project in Mexico which, which amounted to approximately $24 million of the total at that time.

Q. Could we look at page 7, please and continuing on to page 8 and 9.

A. Yes.

Q. Are these individual transactions to fund the fuel exploration investments you just mentioned?

A. Yes. And the fuel logistics in Mexico.

Q. And did the fuel logistics in Mexico have a particular name. Or entity associated with it?

A. Yes, it represented a 50% interest in a Sirius Energy Limited.

Q. And who had made the decision to invest in a fuel exploration project in Mexico?
A. That was Mr. Edelman.
Q. And can you tell us, did the investments into the fuel exploration projects, or the Sirius Project continue between 2017 and the time that you ceased your involvement in November 2020?
A. Yes, that is correct.
Q. And in that period of time, who gave instructions for when and how much to transfer for those investments.
A. That was ultimately agreed and authorized by Mr. Edelman.
Q. And as of the end of your involvement in November 2020, do you know the total investment that was made into the fuel exploration, or Sirius Projects?
A. I believe it was approximately $40 Million.
Q. And do you know whether any profits had been returned on that project as of the time you ceased your involvement in November 2020?
A. I'm not sure how the Project has developed since that time. And I'm not aware of any profit being generated from trading operations.
Q. As of November 2020. Had there been any profits generated from the Project to the extent of your

knowledge?

A. No.

Q. And looking back at the first page again and the next entry here? Do you see. Where it says 'Taruki Management Limited?'

A. That's right.

Q. What is Taruki Management Limited? Sorry, it's on the first page in this summary?

A. Taruki Management was basically the, the Media businesses that started off with the, with the films as early as 2008, 2009 and carried on into the creation of a Media structure involving investment in films and productions and and other, other entities within Media.

Q. And who had made the decision to make investment into Media and Film?

A. That was Mr. Edelman.

Q. And did he tell you why he wanted to invest in Media or Film?

A. I think that was an area that he had a lot of interest in.

Q. What makes you think that?

A. I think the fact that he, he wanted to make movies, that was a particular interest of his.

Q. And can you tell from the summary on page 1,

how much was invested in Taruki Management Limited between 2010 and 2017?

A. A total of $16,212,000.

Q. And to the extent of your knowledge, did the investments continue between the period 2017 and the end of your involvement in November 2020?

A. Yes, they did, albeit at a lower level of investment.

Q. And for the transactions to fund Taruki, who had given the instructions for when to invest and how much to invest?

A. I had, I had made the various payments based on the approval of Mr. Edelman, in terms of the overall budgets and free amounts of investment.

Q. Do you know if the investment in these Media Projects ever turned any profit?

A. Very little, to my knowledge.

Q. I'd like to look at the first page again at the next entity. Do you see where it says 'Atlantic Screen Holdings Ltd'. Do you see that?

A. Yes.

Q. Do you know what that is?

A. That was a minority investment. Excuse me. That was a minority investment in a group called 'Atlantic Screen', which was involved in the purchase

and income from music and film royalties.

Q. And who had made the decision to invest in Atlantic Screen Holdings?

A. That, again, was Mr. Edelman.

Q. And can you tell us, based on this summary here on the first page, how much had been invested into Atlantic Screen Holdings between 2010 and 2017?

A. It was a total of $5,768,000.

Q. And then if we could turn to page 41, please? And continuing on through page 47.

A. Yes.

Q. Are these transactions to fund Atlantic Screen Holdings between the years 2010 to 2017?

A. Yes. And that included payments to develop a film fund for further investment.

Q. Who had directed you to make payment into a film fund for further investment?

A. That was Mr. Edelman.

Q. Were you involved in the transactions listed here to fund Atlantic Screen Holdings?

A. I was making the payments based on the agreed amounts with Mr. Edelman.

Q. And to the extent of your knowledge, did these payments continue beyond 2017?

A. They did but at a much slower rate.

Q. To the extent of your knowledge, do they continue through the end of your involvement in November 2020?

A. In terms of investment and amounts, very little to my knowledge.

Q. Do you know if Atlantic Screen Holdings ever turned a profit?

A. In terms of payment of dividends on the shareholding that were held, no. But the, there was repayment of part of the investment, which was originally put in as loans. And I believe that the loans have been recovered. And the last I heard on this was that there was a buyback proposal to recover the remaining amount of the original investment.

Q. Do you know approximately how much had been recovered of the original investment last you knew?

A. In terms of the shares in, in Atlantic Screen, I think that most of that money was probably recovered. The amount of money spent on the development of the film fund; I don't think any money was ever recovered on it.

Q. Do you know who negotiated that buyback agreement you just mentioned?

A. That was a question that was being negotiated by the Company in conjunction with an adviser for the

Trust after 2020.

Q. Mr. Collett, I'd like to go back to the first page of this document, if we could, to the notes. About halfway down the page.

A. Yes.

Q. Do you see where it says:

"The above summary represents the major investments made since 2010."

Do you see where it says that?

A. Yes.

Q. What does that note mean, that it's the major investments?

A. It was the primary investments. Major Projects with direct involvement in the establishment of those. The decisions in buying the assets. So on.

Q. Were there other smaller investments, or Projects made during these years? To the extent of your knowledge?

A. A few minor ones. And also some direct investments in large Corporations, by means of an investment portfolio.

Q. And who had made the decision about those smaller investments?

A. Again, the directions had always come from Mr. Edelman.

Q. Generally speaking, were those smaller investment less profitable?

A. Not that I can recall.

Q. Mr. Collett, you've told us about a lot of investments of millions of dollars and not many profits coming out of them. Was there an investment strategy in these years 2010 to 2020, that you could discern?

A. No, there wasn't a particular strategy in terms of investment in different types of assets to provide a balanced portfolio of risk.

Q. If you had to characterize the general theme, or purpose for how, or why investments were made, what would you say?

A. The investments were, were made primarily on the basis of Mr. Edelman's contacts with various people within various spheres of activity. He would develop those relationships and would make decisions based on those discussions with those individuals as to when and how to invest.

Q. Did you ever try to get Mr. Edelman to put together some sort of formal strategy for investing?

A. Yes. I produced various papers for consideration in terms of, of, of an investment strategy, more latterly when the Trust structure was set up, which I prepared in conjunction with the Trustee,

that also included a management structure based on the key individuals that were involved at the time, and running the, the various individual operations in the various investments that we've just discussed.

Q. What was Mr. Edelman's response to your proposal to put in place a formal strategy or management structure?

A. I would say that he, he acknowledged it, but did not 100% support it at all.

Q. Did he tell you why not?

A. Not specifically, but his Modus Operandi throughout the period did not really change.

Mr. Edelman was the one making the decisions based on his various contacts and in conjunction with three or four of the key personnel involved in the overall structure, the overall Organization.

Q. You just mentioned 'throughout the period', which period are you referring to when you say 'throughout the period?'

A. Certainly from my involvement in 2004 until 2020.

Q. And who were these key individuals that you just mentioned working with Mr. Edelman on these investments?

A. Robert Dooner, Stephen Buscher, Thomas Ehr,

to a certain extent, James Cecil.

Q. Mr. Collett, to the extent of your observation in and based on your communications with these individuals and Mr. Edelman were you able to observe who they took their instruct actions from with respect to these investment?

A. Based on my observations and the way in which decisions were made, it was Mr. Edelman who was directing all of those investments that those individuals took part in.

Q. Did you ever try to propose any investment ideas to Mr. Edelman?

A. Not at that, not at that specific level. But going back in, in time, as part of the sort of investment strategy, it was discussed that we should perhaps try to put together a property portfolio of investments in the UK, or wherever and to build up, say, a portfolio in the region of 30, $30 Million, perhaps in London property. Many properties were looked at in conjunction with Mr. Edelman and he was looking for properties. Iryna Tsenzharyk And I were looking at properties to build up a firm basis, which would provide income to fund all the family costs. But that never materialized.

Q. Mr. Collett, a moment ago you mentioned that

there were some transactions where the Trustee had been involved. Do you recall that?

A. In terms of making the payments, yes.

Q. Were there transactions ones where you needed to consult the Trustee before the transactions were made?

A. The Trustee would be kept aware of the various investments that were being made and he would authorize the main payments out of the Rosbelt account, which is where the money from the fuel logistics in terms of distributions came into.

Q. Mr. Collett, do you ever remember a time when Mr. Edelman wanted to make an investment, or a transfer of money and the Trustee said "No?"

A. I cannot remember any such situation.

Q. And just to clarify; when you say you cannot remember any such situation, does that mean you don't know whether it happened, or you don't recall it ever happening?

A. I don't recall it ever happening.

Q. Mr. Collett, I'd like to talk about some of the transfers and purchases outside the investments that we just discussed.

Do you recall in 2009 an investment into Palantir stock?

A. That's correct, yes.

Q. And do you remember whose idea it was to invest in Palantir stock?

A. I believe that it was Mr. Edelman in conjunction with Mr. Dooner.

Q. And were you involved in the transfer of funds to purchase the Palantir stock?

A. Yes.

Q. Do you recall which account you used to purchase the Palantir stock?

A. From memory, I believe it was Satellite Support Services.

Q. And how had Satellite Support Services been funded when that initial transfer was made?

A. That Company was funded in 2009. If that was the, that was the time in 2009, that would have come from Sunage Foundation. Based on its income from the Red Star business.

Q. Could we look at 22-2 please

(Exhibit Gov. Exb 22-2 was entered into evidence.)

Mr. Collett, I'd like to draw your attention to the second page of this Exhibit, if I could. Mr. Collett, we looked at something similar to this earlier. Is this an example of a transfer request out of the Sunage Foundation Bank Account?

A. Yes, it is.

Q. And can you recognize the signature towards the bottom of the page on behalf of Sunage Foundation?

A. That's right. That was my signature on the payment instruction to Sunage.

Q. And can you tell us who the payee on this transaction is?

A. That was Palantir Technologies Inc.

Q. And the date on this transaction listed at the top here?

A. Was the 23rd of December 2009.

Q. And who had asked you to submit this payment request to the Bank?

A. Mr. Edelman had asked me to make that payment.

Q. Mr. Collett, we looked at documents earlier, or an email earlier where Mr. Edelman mentioned purchase of a house in London. Do you remember that?

A. Yes.

Q. Was a house in London ever purchased, to the extent of your knowledge?

A. The one that was originally spoken about in terms of the 11 Million, that was not purchased.

Q. Was there a house in London purchased later?

A. Yes, there was.

Q. Can we look at 14-85, please.

(Exhibit Gov. Exb 14-85 was entered into evidence.)

Do you see this fax message that says Sunage Foundation at the top?

A. That's correct.

Q. Do you know who drafted this?

A. I'm not sure who would have drafted this.

Q. Do you recall being involved in the transfer of funds in March 2010 for the purchase of a home in London in Cottesmore Gardens?

A. Yes.

Q. And who had asked you to be involved in that transaction?

A. Douglas Edelman, initially.

Q. And can you tell from this fax, or do you recall the address of the residence that was purchased?

A. 12 to 14 Cottesmore Gardens.

Q. And if you know, was the house purchased in the name of a person? Was it purchased by a person?

A. No, it wasn't.

Q. Who purchased the house, on paper?

A. It was purchased in, in the name of a Company based in Belize called Beta Ventures Ltd.

Q. Who directed that the purchase be done in the name of Beta Ventures?

A. There was a discussion as to how the property should be owned. I can't remember the exact discussions, other than to say that Firdavs Shakhidi actually set up the Company, and I believe that Mr. Edelman authorized that that Company to be used.

Q. Can we turn to the last page of this Exhibit, please, to page 25? Is this another example of the funds transfer requests out of the Sunage Foundation bank account that we've looked at previously?

A. This was a straight transfer from the Sunage Foundation account with Julius Baer to Satellite Support Services in the amount of $3,500,000.

Q. And this, is this the form you were using around this time in March 2010?

A. That is correct.

Q. Looking at this now, do you think you drafted this Funds Transfer Request?

A. Yes, I would probably have drafted these transfers.

Q. And who was giving you directions in this period of time about when to draft up transfer requests like this?

A. In terms of the detailed steps of the, of the purchase, then Mr. Edelman would have been instructing me to make the various payments in order to get the

funds in place for the purchase of the property.
Q. And looking at page 23, if we could. Is this another example of a Funds Transfer Request out of the Sunage Foundation Bank Account?
A. That's right.
Q. And is this the template that you were using in the period of time, March 2010?
A. That's correct.
Q. Can you tell us the amount on this Funds Transfer Request?
A. This was $44,400,000.
Q. And who had directed you to prepare that Fund Transfer, Funds Transfer request?
A. Ultimately, this was approved by Mr. Edelman in order to purchase the property.
Q. Is that the property you mentioned a moment ago, the Cottesmore Gardens property?
A. That's correct.
Q. I'd like to look at 6-21, if we could, please
(Exhibit Gov. Exb 6-21 was entered into evidence.)
Mr. Collett, do you see at the top of this email where it says April 22nd, 2011? Do you see that?
A. Yes.
Q. And this appears to be from an email address you've identified as yours to someone we haven't talked

about yet. Can you identify that email address please?

A. That is Stephen Buscher.

Q. And can you read what it says next to the subject line at the top of this email?

A. 'Little Ajax structure.'

Q. What is Little Ajax, if you know?

A. Little Ajax is a Company set up in Austria, with the aim of buying a property in Austria.

Q. Whose idea was it to buy a property in Austria?

A. I believe that this was probably a decision of Mr. and Mrs. Eidelman to, to buy a specific property in Austria.

Q. Do you know which specific property that was?

A. It was a small hotel called House Hannes Schneider.

Q. And to the extent of your knowledge, was the intention to operate it as a hotel?

A. Certainly. Initially, I believe that that was the intention.

Q. In practice, do you know what happened to this structure, to this property?

A. It was still in place in November 2010, and I don't know what happened to it after that date. I don't know whether, what has happened to the property at all.

Q. Are you referring to November 2020?
A. 2020.
Q. When your involvement ended?
A. Yes.
Q. Do you know if the ski chalet was used by Mr. Edelman, or his family?
A. Yes, it was.
Q. Do you know what they used it for?
A. They would normally spend the festive season, around Christmas, New Year and perhaps also in February, during the skiing season.
Q. Do you recall the purchase price of this ski chalet?
A. I can't quite remember the amount. I think it was about 2 Million, or so. €2 Million.
Q. I'd like to look at the text of this email if we could, please. Do you see at the top where it says:
"I have now had an opportunity to go through the proposed Shareholders Agreement for Little Ajax."
Do you see that?
A. Yes.
Q. And then do you see next to the 1, where you say:
"I would not think that we will want to have his name included in the document."

Do you see that?

A. That's correct.

Q. And at the end of that paragraph, do you see where it says:

"All references to DE will need to be removed."

A. Yes.

Q. Why would all references to DE need to be removed from a Little Ajax document?

A. Because Mr. Edelman had already made it very clear sometime before that he did not want his name shown on anything, and that was a standing instruction that I conveyed to Stephen Buscher.

Q. And just to be abundantly clear, who who does DE refer to here?

A. Mr. Edelman.

Q. I'd like to look at 18-2, if we could, please (Exhibit Gov. Exb 18-2 was entered into evidence.) Do you see where this says, at the top 'Proposed Little Ajax Structure?'

A. Yes.

Q. Do you know who drafted this document?

A. I'm not sure precisely who drafted it. And I believe it was Mr. Buscher who was involved in the detailed planning of the purchase. And I don't know who

drafted this.

Q. And what was Mr. Buscher's role relative to Mr. Edelman?

A. Mr. Buscher had been involved in various Projects over years with Mr. Edelman, and he was wanting to have a, an equity stake to be involved in the purchase of this as a Partner.

Q. Just looking at the top left hand corner of this document where it says 'shareholders?'

A. Yes.

Q. And then it says:

"51%. Frederic Le Dain."

Do you know who that is?

A. That is Delphine's brother.

Q. What was his role in the proposed purchase of this house in Austria?

A. His role was simply, as I understood it, to be the shareholder of 51% of the property.

Q. Was the intention that he was going, that they were buying it for him; that he was going to actually own 51% of it, or that his name would be on paper as the shareholder?

A. I believe that ultimately the intention was that he would hold the shares effectively as a nominee.

Q. And do you see where it says:

"49% Stephen Buscher."

A. Yes.

Q. Do you see that? Did you understand that Steven Bushcer was actually holding the interest, or that he was a nominee?

A. The intention was that he would actually own 49%. I'd say that on the basis that part of the purchase price for the chalet was financed by a bank loan which Steven Bushcer was personally responsible for discharging.

Q. Do you see under the 'Purchase' section, the second line where it says:

"Stephen Buscher shall owe to Frederic Le Dain, or Douglas Edelman depending on the terms of the loan."

Do you see where it says that?

A. Yes.

Q. What did you understand that to be?

A. That -- it reads that 75% of the initial purchase price would be paid by Frederic Le Dain. And 25% funded by Stephen Buscher. And that the, the balance, the imbalance between those amounts being funded and the actual shareholdings would be owed to, as it says here, Douglas Edelman, or Frederic Le Dain. From the proceeds, of the proceeds under the terms of

the note below.

Q. Could we look at 22-5, please.

(Exhibit Gov. Exb 22-5 was entered into evidence.)

Mr. Collett, is this, underneath all the stamps and handwriting, another example of a Transfer Request out of the Sunage Foundation bank account?

A. That's right.

Q. And down at the bottom, do you recognize those who signed as the Authorized Signatory on this Request?

A. I signed it.

Q. And can you tell us the amount in this Transfer Request?

A. This was €919,500.

Q. And do you see where it says 'Details,' what's listed next to details?

A. Hotel purchase proceeds plus vat.

Q. And do you see the date at the top? 3rd June 2011?

A. Yes.

Q. Mr. Collett, does this match with your recollection, or appear to you to be the Transfer Request for the purchase of the Little Ajax ski chalet?

A. That's correct.

Q. And who directed you to put in this Transfer

Request for the purchase?

A. The request ultimately came from Mr. Edelman to make transaction.

Q. Mr. Collett, we looked earlier at some documents related to the purchase of some Palantir shares. And I'd like to talk to you about it. Some later purchases, if you recall. Could we look at 8-2, please.

(Exhibit Gov. Exb 8-2 was entered into evidence.)

Mr. Collett, do you see the date at the top of this email? It appears to be 2013.

A. Correct.

Q. And do you see where the sender is dooner@sssl.ae. Do you see that?

A. Yes.

Q. And whose email address did you know that to be?

A. That was Robert Dooner. Bob Dooner's address.

Q. And what about the first email on the To line? Whose email address is that?

A. Martin Shiel.

Q. And I believe you've identified the next email address as Mr. Edelman's, and then the following as your own. Do you see that?

A. Yes, correct.

Q. Can you read for us the subject line of this email?

A. This is the Palantir shareholding breakdown.

Q. Can you tell from the email why there's a breakdown of Palantir shares being communicated at this point of time?

A. Basically, two payments had been made for Palantir shares; one and -- as set out on the second page. And the summary shows the owners of those, a breakdown of the owners of those shares. The first payment in the D round which was made in December 2009 was that was for $500,000. 625,000 shares. And the allocation was between a Spectral Fund, which was an entity which was used for the purchase of various investments of this sort of nature. I.e. investments in outside Companies and Organizations.

And at the same time Martin Shiel and Bob Dooner were to take a share of those, took a share of those shares, in their own names, on the understanding that they paid for them.

Q. Who had fronted the money for the purchase of these Palantir shares?

A. I believe in 2009 that payment would have come from Sunage Foundation. To the best of my knowledge.

Q. And who had directed that that payment be made in 2009?

A. Mr Edelman whould have authorized that payment.

Q. And what about in 2013? Who had directed that payment?

A. That has also been directed by Mr. Edelman. In terms of the purchase of the shares. But he decided that the Trust really didn't want to have any additional involvement. And therefore the shares were allocated to Martin Shiel. Also to BD, is Bob Dooner. And the other initials listed were relatives of Bob Dooner. To the best of my knowledge.

Q. You mentioned the 'Spectral Fund.' To the extent of your knowledge, who directed transfers in or out of the Spectral Fund?

A. Ultimately, they were small investments, all of which to my knowledge, were approved by Douglas Edelman at some point over the -- at some point during the acquisition of all these investments.

Q. Could we look at 8-3, please.
(Exhibit Gov. Exb 8-3 was entered into evidence.)
Do you see where it says 'Preferred Stock Transfer Agreement' mat the top?

A. Yes.

Q. And can you tell us from this top paragraph who this Transfer Agreement is between?

A. It is between a Company called Conduit Investments Ltd and Palantir Technologies with a sale from purchase of the deferred the stock in Palantir.

Q. Did you draft this Agreement?

A. No. I believe that this was a standard Agreement that came from Palantir. To the best of my knowledge, that's where it came from.

Q. Mr. Collett, I'd like to talk to you about some of the other Transfer Orders that you made at Mr. Edelman's request. Do you recall being involved in the purchase of a yacht called Divinity?

A. Yes.

Q. Can we look at 14-83, please.

(Exhibit Gov. Exb 14-83 was entered into evidence.)

Do you see this email dated July 2014?

A. July 21st, 2014. Yes.

Q. And the From, the sender; do you recognize that email address?

A. That was my email address that I started to use back in 2014.

Q. Why had you started to use that email address back in 2014?

A. Because a, a group email address had been set

up as sssl.ae which Mr. Dooner had set up and was to be used by Mr. Edelman, myself, Bob Dooner and one or two others within the Organization.

Q. Could we look, please at 8-1?

(Exhibit Gov. Exb 8-1 was entered into evidence.)

Mr. Collett, This is a July 2014 email, and it appears that the sender is the email address you just identified as yours to an email address that you have previously identified as Mr. Dooner's. Do you see that?

A. That's correct.

Q. And do you see where it says in the body of this top email:

"Hi Bob, can we possibly Skype/speak as soon as possible. After speaking to D yesterday I think that we should buy the yacht in the name of SSS."

Do you see that?

A. Yes.

Q. Who is D in that top line?

A. That is Mr. Edelman.

Q. And why, after speaking to him, did you think that a yacht should be purchased in the name of SSS?

A. I asked Mr. Edelman which Company do you want to put this in, was discussed and he said, "Well, let's put it in the name of SSS, which is Satellite Support Services.

Q. And if we could look back now at 14-83, please and could we go, please, to page 14. Mr. Collett. Is this another Transaction Request to a Bank?
A. Yes, that's correct.
Q. Can you tell us which bank this Transaction Request is directed to?
A. This is directed to Mirabaud Bank.
Q. And do you recognize the signature on the Authorized Representative line?
A. That's my signature.
Q. Did you draft this Transfer Request?
A. Yes, I did.
Q. At whose direction did you draft this Transfer Request?
A. Ultimately, in terms, in terms of authorization from Mr. Edelman, in order to buy the yacht.
Q. Can you tell us the amount listed on this Transfer Request?
A. €711,000.
Q. And can you tell us the details on this Transfer Request?
A. The balance for the purchase of a merchant vessel Divinity.

Q. Were you ever involved in the purchase of another yacht?

A. Yes.

Q. Do you recall that yacht's name?

A. Princess Juliet.

Q. Do you know where that name came from?

A. It was the name that was on the yacht at the time of purchase.

Q. Do you know who chose that yacht?

A. I'm sorry?

Q. Do you know who picked the yacht?

A. I'm not sure.

Q. Were you involved in the transfer of money to purchase the yacht Juliet, or Princess Juliet?

A. Yes, in the same way as the purchase for Divinity.

Q. And who directed you to transfer money for the purchase of the yacht?

A. Mr. Edelman.

MS. PERSAUD: Sarah, I wonder when you finish this topic, if that's a good place to stop. I think Mr. Collett's coming to the end.

BY MS. RANNEY:

Q. Do you recall approximately when the Princess Juliet purchase was made?

A. It was made some little while after the purchase of divinity.

Q. Could we look at 14-82, please.

(Exhibit Gov. Exb 14-82 was entered into evidence.)

You see at the top where it's -- Oh, I'll give you a second. Sorry. Did you see at the top where it says 'Bill of Sale?'

A. That's correct.

Q. And then in section one, it says name of ship. You see that?

A. Yes.

Q. Can you tell us the name of the ship?

A. Princess Juliet.

Q. And if you could turn, please, to page 5 of this Exhibit?

A. Yes.

Q. About a third of the way down on the page, where there's a box that says 'Date of Agreement.' Do you see that?

A. Yes. 9th March 2015.

Q. And two boxes down, where it says 'Name of Buyer.' Do you see that?

A. Yes.

Q. Can you tell us the Buyer's name that's listed there?

A. That was Satellite Support Services. The same entity that was used for the purchase of Divinity.

Q. Could we look at page 7, please?

A. Yes.

Q. You see in the box about a third of the way down where it says 'Sales Price?'

A. Yes.

Q. Can you tell us the sales price listed there?

A. This was €325,000.

MS. RANNEY: I think this is a good place to stop for today.

VIDEOGRAPHER: This is the end of Media III, Vo. II, going off the Record at 19:19 as indicated on the video screen.

E R R A T A

Deposition of Graham Collett

(Please show all corrections on this page, not in the transcript.)

Page/Line No. Description Reason for change

Signed: ______________________________

Name: ________________________________

Date: ________________________________

CERTIFICATE OF COURT REPORTER

I, DAVID ERDOS, a Certified Real-Time Court Reporter, hereby certify that Graham Collett was duly sworn, that I took the notes of the foregoing deposition and that the transcript thereof is a true and accurate record transcribed to the best of my skill and ability. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Before completion of the deposition, review of the transcript was requested. Any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Signed: ______________________________

DAVID ERDOS

Dated: 02/12/2025