# Transcript of Graham Collett

# Deposition



## UNITED STATES OF AMERICA
v.
## DOUGLAS EDELMAN
and
## DELPHINE LE DAIN
(also known as DELPHINE LE DAIN EDELMAN)

### Volume III

### Wednesday, February 5th, 2025

**TransAtlantic International Legal Solutions**
**1-646-480-0520**
calendar@tavds.com
www.tavds.com

TransAtlantic Reference 101670

Graham Collett                                      February 04, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NUMBER: 1:24-CR-00239-CKK |
| | |
| | VIOLATIONS |
| Vs. | |
| | Count: 1:18:U.S.C.§371 (Conspiracy to defraud the United States) |
| DOUGLAS EDELMAN | |
| and | Counts 2-3:18 U.S.C.§1001 (False Statements) |
| DELPHINE LE DAIN (also known as DELPHINE LE DAIN EDELMAN) | Counts 4-18:26 U.S.C §7201 |
| | Counts 19-30:31 U.S.C.§§ 5314&5322(b);31 C.F.R 1010.350,1010.306(c)- (d)and 1010.840(b);18 U.S.C.§2 (Wilful violation of foreign Bank account reporting) |

HYBRID DEPOSITION OF GRAHAM COLLETT

VOL. III.

WEDNESDAY 4TH FEBRUARY 2025

Taken at:

BAKER & McKENZIE
280 Bishopsgate
London EC2M 4AG

Court Reporter:  David Erdos
Certified Deposition Reporter
CDR-1865

Graham Collett                                                    February 04, 2025
2

```
 1              A P P E A R A N C E S:

 2
    On behalf of the Plaintiff:
 3
 4  U.S. DEPARTMENT OF JUSTICE, TAX DIVISION

 5  CRIMINAL ENFORCEMENT SECTION

 6  By: Sarah Ranney

 7      sarah.c.ranney@usdoj.gov

 8      (202) 514-2000

 9      Ezra Spiro

10      Ezra.K.Spiro@usdoj.gov

11      (202) 718-7308

12

13  PRESENT IN WASHINGTON DC:

14      Josh Gold

15      Josh.Gold@usdoj.gov

16      Nanette Davis

17      Nanette.Davis@usdoj.gov

18

19  DEPARTMENT OF THE TREASURY,

20  INTERNAL REVENUE SERVICE, CRIMINAL INVESTIGATION

21  By: Rebekah Gamez

22      Rebekah.Bott@ci.irs.gov

23      Adam Soline

24      Adam.Soline@ci.irs.gov

25      630.493.5224
```

Graham Collett                                    February 04, 2025

3

```
1              A P P E A R A N C E S  (CONTINUED)

2    On behalf of the Defendants:

3    BAKER & McKENZIE LLP

4    815 Connecticut Avenue,
     NW, Washington DC, 20006
5    By: George Clarke

6        George.clarke@bakermckenzie.com

7        (202)835 6184

8        Sonya Bishop

9        452 Fifth Avenue, New York, NY 10018

10       Sonya.Bishop@bakermckenzie.com

11       212.626.4591

12

13   PRESENT WITH DEFENDANT IN WASHINGTON DC:

14       Allison Rocker

15       Allison.rocker@bakermckenzie.com

16       303.906.9558

17

18   PRESENT WITH WITNESS IN LONDON:

19       Anand Doobay

20       BOUTIQUE LAW

21       Ground Floor West, 9 Grays Inn Square

22       London WC1R 5JD

23       anand@boutique.law.com

24       William Dunlop

25       William@boutique.law.com
```

```
 1              A P P E A R A N C E S  (CONTINUED)

 2                        REMOTE:

 3

 4       Danielle J. Sochaczevski

 5       WILLIAMS & CONNOLLY LLP

 6       680 Maine Avenue, SW, Washington DC, 20024

 7       dsochaczevski@wc.com

 8

 9

10

11   Also Present:  Lauren Barbor, Videographer

12                  Shannon Korpela, IRS (Remote)
                    David Ross, CEO, TAVDS
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Graham Collett                                    February 04, 2025
5

```
 1                    I N D E X

 2   WITNESS              EXAMINATION BY              PAGE

 3

 4   GRAHAM COLLETT      MS. RANNEY                     9

 5   EXHIBIT    DESCRIPTION                           PAGE

 6

 7   Gov. Exb 14-64     Graham Collett Email and       12
                        Attachments
 8                      [USPREOD-02237533-02237549]

 9   Gov. Exb 9-2       Afghanistan Investment Support 19
                        Agency Document [USPROD-03496460]
10

     Gov. Exb 12-2      Finance@sssl.ae Email chain    21
11                      5/7/2015 [USPROD-03183165]

12
     Gov. Exb 14-67     Graham Collett Email chain 13  24
13                      June 2017 [USPROD-02237602]

14
     Gov. Exb 14-68     Awaiting comments from Remco   27
15                      Email chain 19 June 2017
                        [USPROD-02237587-02237600]
16
     Gov. Exb 14-70     Graham Collett Email chain and 31
17                      Attachments 09 April 2018
                        [USPROD-02146644-02146669]
18
     Gov. Exb 4-5       Client Information File Index  37
19                      Documentation
                        [USPROD-02360698-02361114]
20
     Gov. Exb 14-1      Bartol Limited Accounts &      61
21                      Corporate Lever Arch File
                        Documents [USPROD-02047220-02047231]
22
     Gov. Exb 11-4      Graham Collett Email chain     64
23                      11/3/2015 [USPROD-03176785]

24

25
```

Graham Collett                                                    February 04, 2025

6

1                          E X H I B I T S  (CONTINUED)

2

3      Gov. Exb 4-8           Remco Polderman Email and          67
                              Attachments
4                             [USPROD-02349159-02349183]

5      Gov. Exb 11-5          Graham Collett Email chain         76
                              11/6/2015 [USPROD-03176799/800]
6

7      Gov. Exb 1-1           Scott D. Michel Preclearance       80
                              Request Letter November 18, 2015
8                             [USPROD-03207755/56]

9      Gov. Exb 10-1          De@ledain.ch Email chain and       83
                              Documentation/Logistics
10                            [USPROD-03242191-034242208]

11     Gov. Exb 5-1           Mr &Mrs Edelman Income from        86
                              business entities Thirteen years
12                            to December 2012 Document
                              [USPROD-02336534]

13     Gov. Exb 4-11          Rivero, Luis Email chain and       87
                              Attachments 4/13/2016
14                            [USPROD-02356347-02356385]

15     Gov. Exb 5-2           Rivero, Luis Email chain and       91
                              Attachments 2/24/2016
16                            [USPROD-02337337-02337357]

17     Gov. Exb 5-4           Graham Collett Email chain and     99
                              Attachments 6/7/2016
18                            [USPROD-02338324-0237159]

19     Gov. Exb 5-5           Graham Collett Email chain and    101
                              Attachments 28/03/2017
20                            [USPROD-02331260-02331263]
                              + 6 pages
21

22     Gov. Exb 4-14          Graham Collett Email chain and    102
                              Attachments 4/10/2018
23                            [USPROD-02362464-02362478]
                              + 11 pages

24

25

Graham Collett                                      February 04, 2025

7

```
 1                    E X H I B I T S  (CONTINUED)

 2

 3

     Gov. Exb 5-6      Graham Collett Email chain and      106
 4                     Attachments 08/04/2019
                       [USPROD-023333420-02333423]
 5                      + 10 pages

 6   Gov. Exb 5-7      Graham Collett Email and            107
                       Attachments 21/09/2020
 7                     [USPROD-02334539-02334545]
                       + 6 pages]
 8

     Gov. Exb 14-65    Deed of Gift Document               109
 9                     [USPROD-02144242/43]

10

     Gov. Exb 4-12     Diane Mehany Email Decemeber        112
11                     2017 [USPROD-02368639/02368641]

12

     Gov. Exb 12-7     cdc@sssl.ae Email and Attachment    118
13                     [USPROD-03188151/2]

14   Gov. Exb 17-9     Delphine Le Dain Email              120
                       Mon, 01 Jun 2020 [USPROD-01861280]
15

     Gov. Exb 17-10    Banking and loan arrangements       123
16                     Email chain Mon, 06 Jul 2020
                       [USPROD-01872800-01872803]
17

     Gov. Exb 3-4      Erkin Bek Email 6 December 2019     131
18                     [USPROD-02618440/441]

19

     Gov. Exb 17-1     Red Star Enterprises Limited &      137
20                     Mina Corp Limited Email chain
                       and Attachments Wed, 12 Feb 2020
21                     [USPROD-01828695-01828699]

22   Gov. Exb 17-3     Fw: ascan 2 rsel/april 3, not      140
                       sent to gibro yet at all Email
23                     and Attachments Min, 15 June 2020
                       [USPROD-01867628-01867630]
24

25
```

Graham Collett                                          February 04, 2025

8

```
 1                    E X H I B I T S (CONTINUED)

 2

 3   Gov. Exb 17-4       FW: Automatic Reply: Res Star      141
                         Enterprises Limited and Mina Corp
 4                       Limited Email chain and Attachments
                         Tue, 16 Jun 2020
 5                       [USPROD-01868177-01869180]

 6   Gov. Exb 17-5       Thomas Ehr Email chain             143
                         Tue, 16 Jun 2020
 7                       [USPROD-01868181-01868183]

 8   Gov. Exb 17-6       Red Star Enterprises Limited       145
                         and Mina Corp Limited Email
 9                       and Documentation
                         Thu, 02 Jul 2020
10                       [USPROD-01872080-01872082]

11   Gov. Exb 17-7       re: Indemnity Letter Email         147
                         Thu, 02 Jul 2020
12                       [USPROD-01872129]

13   Gov. Exb 3-5        Gilles Thieffry Email chain        148
                         29 March 2020
14                       [USPROD-02619830-02619921]

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          VIDEOGRAPHER:  This is the beginning of Media I. of
 2   Vol. III in the Video Deposition of Graham Collett.
 3               Today's date is the 5th of February 2025.
 4   Going back on the Record at 13:10, as indicated on the
 5   video screen.  Thank you, Counsel.
 6                          EXAMINATION
 7   BY MS. RANNEY:
 8          Q.    Good afternoon Mr. Collett.  I'd like to
 9   remind you that you are still under oath.  Do you
10   understand that?
11          A.    Yes, I still fully understand that.
12          Q.    And, Mr. Collett, are you able to see
13   Mr. Edelman among the in-person, or virtual participants
14   in the deposition today?
15          A.    As a virtual participant.  Yes.
16          Q.    Can you tell us what color shirt Mr. Edelman
17   is wearing today?
18          A.    Wearing a white shirt.
19          Q.    And, Mr. Collett, if at any point you're not
20   able to see Mr. Edelman clearly, will you please let us
21   know?
22          A.    I will do.
23          Q.    Mr. Collett, we talked yesterday about
24   payments that you were involved in to various businesses
25   and investments.  Do you recall being involved in any
```

1    loans made to individual people over the years that you

2    were involved in the Edelman businesses?

3         A.    Yes, there was the one that immediately comes

4    to mind is to Mikhail Tassi, who I understand is

5    Mr. Edelman's son.  It was a loan in connection with a

6    purchase of a business that Mr. Tassi was wanting to,

7    wanted to do.

8         Q.    And in the document that we looked at

9    yesterday about that transaction, do you recall how

10   Mr. Edelman characterized that transfer?  Did he

11   characterize it as a loan?

12        A.    He asked me to arrange that it be treated as

13   a loan although he also said that he did not expect

14   Mr. Tassi to repay that loan.

15        Q.    In the time that you worked with Mr. Edelman,

16   were you involved in any other instances where he

17   transferred money to family members, or friends, or

18   asked you to transfer money to family members, or

19   friends?

20        A.    The next one that comes to mind is a loan to

21   Tom Ehr.  Which was for the purchase of a property in

22   Ibiza.

23        Q.    Do you recall a proximately when that was in

24   time?

25        A.    I believe that was around 2018, 2017.  2018

Graham Collett                                    February 04, 2025

```
 1    from memory.
 2         Q.    Do you remember the approximate amount of
 3    that transaction?
 4         A.    It was approximately €450,000.
 5         Q.    And in the, the amount you just mentioned
 6    being transferred related to Tom Ehr, do you recall who
 7    directed you to make that transfer?
 8         A.    Mr. Edelman approved that transfer, asked me
 9    to make that transfer.
10         Q.    Mr. Collett, do you remember ever being
11    involved in a transfer of money to an individual named
12    Tony Hayes?
13         A.    Yes.  Tony Hayes and his wife.
14         Q.    And who asked you to transfer money to Tony
15    Hayes?
16         A.    Mr. Edelman.
17         Q.    Do you recall approximately how much it was?
18         A.    In various tranches, I can't recall the exact
19    amount.  I think it was around about $200,000.
20         Q.    Do you recall whether Tony Hayes ever repaid
21    any of those amounts?
22         A.    I'm not aware that he ever repaid any amounts
23    at all.
24         Q.    What about the amount that was transferred,
25    related to Tom Ehr?  Are you aware of any payments?
```

Graham Collett                                            February 04, 2025

12

```
 1        A.     No.

 2        Q.     Back?

 3        A.     No.

 4        Q.     Do you know why a loan or a transfer was made

 5   to Tony Hayes?  Did Mr. Edelman tell you why?

 6        A.     Mr. Edelman said that Mr. Hayes was

 7   endeavoring to sell a property and that he needed liquid

 8   cash in the meantime, because he didn't have any

 9   immediate resources for day to day living.  And

10   Mr. Edelman told me that the money should be repaid when

11   the property was sold.

12        Q.     Did Mr. Edelman tell you how he knew

13   Mr. Hayes or his wife?

14        A.     Not in any great detail.  But I understood

15   from Mr. Edelman that he had known Mr. Hayes for quite a

16   long time.

17        Q.     I'd like to look at 14-64, if we could,

18   please.

19   (Exhibit Gov.Exb 14-64 was entered into evidence.)

20   Mr. Collett, if we could please turn to page 16 of this

21   Exhibit, the page numbers being at the bottom center of

22   each page.?

23        A.     14-64.

24        Q.     1464.  Page 16.  Almost to the end.

25   Mr. Collett, do you see this email from May 2016 from an
```

1  email address you've identified as yours?  Do you see

2  that?

3       A.    That's correct, yes.

4       Q.    And can you tell us who the recipient of this

5  email is on page 16?

6       A.    This is Nikolai Ushakov.

7       Q.    And in May 2016, what was Nikolai Ushakov's

8  role?

9       A.    He was Financial Controller of the Red Star

10 Mina business in Dubai.

11      Q.    Do you see where next to the attachments

12 line, it says:

13           "And you draft a loan agreement doc."

14           Do you see that?

15      A.    Yes.

16      Q.    And do you see in the text of the email on

17 the top line where you say:

18           "as discussed, I attach a Draft Loan

19 Agreement."

20           Do you see that?

21      A.    Yes.

22      Q.    Do you recall why you were sending a Draft

23 Loan Agreement to Nikolai Ushakov in 2016?

24      A.    This was in connection with a transaction

25 relating to Mr. Edelman.  It was related, I believe, to

1   the sale of a business that Mr. Edleman had an interest

2   in; a Bar business and Mr. Edelman wanted to get that

3   money sent to one of the Trust Companies rather than

4   directly to himself.

5           I believe that Nikolai Ushakov was appointed

6   as a under a Power Of Attorney to act in order for the

7   funds to be transferred to Mr. Ushahov's account.

8           The aim of the Loan Agreement, which was

9   falsely put together was to enable the funds to be

10  received into one of the Trust Accounts.

11      Q.    Mr. Collett, do you recall the name of this

12  business venture that you're discussing?

13      A.    Sorry, I can't remember.  It's the, the

14  Metropol, or something like that.  I can't remember the

15  exact name.

16      Q.    Do you remember where the Bar was?

17      A.    It was somewhere in Central Asia.

18      Q.    And just to be clear, after the money went to

19  Mr. Ushakov, do you have personal knowledge about where

20  it was supposed to go after that?

21      A.    Based on the Loan Agreement that was signed

22  off, it actually came into, I believe, Satellite Support

23  Services.  I'm not quite sure which, which Company it

24  was.  It came into one of the Trust Companies.

25      Q.    You said a moment ago that the Loan Agreement

1    was falsely created.  Did you create the Loan Agreement?

2          A.    I created that Loan Agreement.

3          Q.    Who directed you to create that Loan

4    Agreement?

5          A.    I discussed it with first of all, with, with

6    Remco Polderman, and then based on that I agreed with

7    Mr. Edelman that that is the way it works; that we were

8    going to go to get that money into the Trust Companies.

9          Q.    Just to be very clear:  Was it your idea to

10   use a false Loan Agreement?

11         A.    To use a false Loan Agreement, it emerged

12   from discussions, and I agreed that it would be a way to

13   get that money in to the Company and to provide the, the

14   the Agreement to the bank in support of that, of that

15   Loan Transfer.

16         Q.    If we could look, please at page 8 of this

17   Exhibit?  You see at the top where it says:

18         "This Agreement is made this 29th day of

19   September 2014."

20         Do you see that?

21         A.    That's right.

22         Q.    And do you see where under between it says:

23         "Satellite Support Services Limited" next to

24   number 1.  Do you see that?

25         A.    That's correct, yes.

1        Q.     And then number 2, it says:

2               "Mr. Nikolai Ushakov."

3               Do you see that?

4        A.     Correct.

5        Q.     Looking at this document, do you recognize

6    this as the Loan Agreement that you just said you had

7    created, the false Loan Agreement?

8        A.     That's correct.

9        Q.     And do you recall, or are you able to tell

10   from this false Loan Agreement what the amount of this

11   transaction was?

12       A.     The amount of the transaction, which was

13   totally, totalling 360,000 U.S. Dollars

14       Q.     And if we could look, please, at page 6.  Do

15   you see at the top where this says 'Satellite Support

16   Services Limited', and then:

17               "Loaned to Nikolai Ushakov."

18               Do you see that?

19       A.     That's correct.  Yes.

20       Q.     Did you make this document?

21       A.     I put this together in support of the Loan

22   Agreement to show interest being accumulated in order to

23   arrive at the, the final amount that was due to be

24   received from Mr. Ushakov.

25       Q.     And I'd like to look, please, if we could, at

1  page 2.  Do you see this email from May 2016?  From an

2  email address you've identified as yours?

3       A.    Yes.

4       Q.    Can you tell us who the recipient is on this

5  email?

6       A.    This is to Mirabaud Bank, enclosing the Loan

7  Agreement in support of the, the payment that was being

8  received into Satellite Support Services.

9       Q.    And did you attach the false Loan Agreement

10 to this email to the bank?

11      A.    Yes, I did.

12      Q.    And do you see on the top line where it says:

13            "One of our long serving consultants is about

14 to repay an outstanding loan."

15            Do you see that?

16      A.    Yes.

17      Q.    And then do you see on the second line where

18 it says:

19            "For compliance purposes, I attach a copy of

20 the original Loan Agreement."

21            Do you see that?

22      A.    Yes, I do.

23      Q.    Are you referring there to the false Loan

24 Agreement?

25      A.    Yes.

Graham Collett                                            February 04, 2025

18

 1        Q.    And do you see a few lines down where it
 2   says:
 3              "I trust that this information will be
 4   sufficient for compliance purposes."
 5              Do you see that?
 6        A.    Yes.
 7        Q.    And it follows:
 8              "The funds should be transferred in the next
 9   few days."
10              Do you see that?
11        A.    That's correct.
12        Q.    Do you know whether the funds were
13   transferred?
14        A.    I believe that they were transferred very
15   shortly after this.
16        Q.    Can we look at page 12, please.  Do you see
17   at the top of this document where it says 'From Douglas
18   Philip Edelman.' Do you see that.
19        A.    Yes.
20        Q.    And do you see in the text of this document
21   where it says:
22              "Hereby I, Douglas Philip Edelman"
23              And then some information:
24              "Kindly request you to make a payment of USD
25   360,000."

Graham Collett                                    February 04, 2025

1              Do you see that?

2        A.    Yes.

3        Q.    And do you see at the bottom where there's a

4   signature on this document?

5        A.    Yes.

6        Q.    Do you recognize that signature?

7        A.    I recognize that signature as being that of

8   Mr. Edelman.

9        Q.    Mr. Collett, did you draft this document?

10       A.    No.

11       Q.    Mr. Collett, do you understand this document

12  to relate to the transaction we were just talking about

13  the sale of Metro Bar?

14       A.    I do, yes.

15       Q.    Did you have this document in your files

16  along with the other correspondence and documents

17  related to this transaction?

18       A.    I had these documents in my file.

19       Q.    Mr. Collett, I'd like to talk to you about

20  another business.  Could we look at 9-2, please?

21  (Exhibit Gov.Exb 9-2 was entered into evidence.)

22  Mr. Collett, can you tell us if you can discern from

23  this document what the Company name is on this business

24  document?

25       A.    Neda Telecommunications was a Company that

1  had been set up  -- I can't remember exactly when it was

2  set up, but it was set up in order to start a

3  telecommunications business in Afghanistan.

4       Q.    Could I direct your attention down near the

5  bottom left of the page, where it says 'Date of Issue.'

6  Do you see that?

7       A.    Yes.

8       Q.    Can you tell us the date under Date of Issue?

9       A.    That I understand was 19th of October 2011.

10      Q.    Do you happen to know, or can you tell which

11 country this document might relate to, or originate

12 from?

13      A.    Which country?

14      Q.    Which country?

15      A.    I believe it emanates from Afghanistan.

16      Q.    And looking at the two pictures on this

17 document, do you recognize either of the individuals

18 appearing on the face of this document?

19      A.    I certainly recognize Mr. Douglas Edelman as

20 Vice-President of the Company, as shown here.  The other

21 name I know as being Homayoon Froogh.

22      Q.    And just to be very clear, is Mr. Edelman's

23 picture on the left, or the right on this document?

24      A.    It's on the left.

25      Q.    Do you recall being involved in transfers of

Graham Collett                                          February 04, 2025

```
 1   money related to Neda communications?
 2        A.    I can't recall any specific transfers of
 3   money without reference to all the detailed records.
 4        Q.    Could we look at 12-2, please?
 5   (Exhibit Gov.Exb 12-2 was entered into evidence.)
 6   Do you see this May 7th, 2015 email:  12-2?
 7   Mr. Collett, I believe you testified earlier that
 8   finance@sssl.ae was your email address?
 9        A.    That's right.
10        Q.    Do you see that at the top of this email?
11        A.    That's right.
12        Q.    Who is the recipient on this email?
13        A.    Worldnet44, that is Mr. Edelman.
14        Q.    Is that another email address you use to
15   correspond with Mr. Edelman?
16        A.    That's correct.
17        Q.    Do you remember approximately when he started
18   using Worldnet44?
19        A.    I can't remember exactly when.  There were a
20   number of email addresses.  And in this instance here,
21   the original message was the one that was received from
22   Mr. Edelman using that address.
23        Q.    Mr. Collett, did Mr. Edelman ever tell you
24   any rhyme, or reason for why he would use a particular
25   email address, or when he would use a particular email
```

1   address?

2       A.    Not, not particularly.  As I can recall.

3       Q.    I'd like to look, if we could, at the very

4   bottom email, please.

5       A.    Yes.

6       Q.    In this email from Mr. Edelman to you, do you

7   see where it says 'Subject.  Dividends?'

8       A.    Dividends.  Yes.

9       Q.    And then can you read what Mr. Edelman says

10  in the text of that email with the subject line

11  dividends?

12      A.    "Can you please advise in the last couple of

13  years all dividends you've received from Neda and also

14  from iFone Neda?"

15      Q.    Mr. Collett, do you know what iFone Neda is?

16      A.    That is an allied business to Neda

17  Telecommunications.  And this one was specifically set

18  up to provide Internet services for the U.S. troops in

19  Afghanistan.

20      Q.    Do you know if iFone Neda was profitable?

21      A.    Yes, it was.

22      Q.    Do you recall approximately when it became

23  profitable?

24      A.    I can't remember exactly when, but it was

25  profitable pretty well throughout the period in which it

Graham Collett                                          February 04, 2025

23

1  operated.

2      Q.    If you recall, can you tell us who were the

3  owners of iFone Neda?

4      A.    There were two main shareholders.  One U.S.

5  person and also Mr. Edelman.

6      Q.    Do you remember the name of the U.S. person?

7      A.    I can't remember his, his name without

8  reference to the files.

9      Q.    Mr. Collett, can you recall approximately how

10  much money this business selling internet to U.S. troops

11  made over the course of its existence, or that you were

12  aware of?

13      A.    In terms of the total profits that it made,

14  that's a rough estimate without reference to any

15  detailed accounts, I would say that it probably made in

16  the region in excess of $10 Million.

17      Q.    I'd like to look at the middle email on this

18  page if we could, please.  From your email address to

19  Mr. Edelman's.  Do you see where it says:

20          "Please see attached schedule for iFone

21  Neda?"

22      A.    Yes.

23      Q.    And then can you tell us what it says there

24  about the total for 2013 and 2014 dividends?

25      A.    It shows the figure of 593,750 being

24

1  attributable for the years 2013, 2014.  In respect of

2  Mr. Edelman share.

3       Q.    And then can you read us the first few lines

4  of Mr. Edelman's response to that email please?  In the

5  next email up?

6       A.    He says:

7             "Thanks.  You say our share.  Does this mean

8  Neda's share of which we have 40% and Bob has half of

9  our share?"

10      Q.    Do you know who Bob refers to?

11      A.    Mr. Dooner.

12      Q.    Do you know what his role in this business

13 was?

14      A.    I do know it was actually operating and

15 rallying the, the, the, the native telecommunications

16 and iFone businesses in Afghanistan, and spent quite a

17 bit of time out there on a regular basis.

18      Q.    You just mentioned that Mr. Dooner was

19 spending time in Afghanistan.  Do you happen to know

20 where the troops were that this business was selling

21 internet to?

22      A.    This was at the, the, the U.S. base in

23 Afghanistan.

24      Q.    I'd like to look at 14-67, please.

25 (Exhibit Gov.Exb 14-67 was entered into evidence.)

Graham Collett                                          February 04, 2025

25

 1   Do you see this June 2017 email?

 2       A.     From Mr. Dooner yes.

 3       Q.     I'd like to look at the bottom email chain,

 4   if we could, please.  The first email here.  Do you see

 5   where it says:

 6              "Good morning, Bob.  Did you manage to follow

 7   up on the proposed route to repatriate the iFone funds."

 8   Do.

 9              You see that?

10       A.     Yes.

11       Q.     Can you tell us what that means?

12       A.     There had been discussions with Mr. Dooner

13   and Mr. Edelman in terms of getting the dividends for

14   iFone Neda back into the Trust structure specifically

15   into Satellite Support Services Limited.

16       Q.     Just to clarify, when you say the dividends,

17   are you talking about the profits from the business

18   selling Internet to U.S. troops?

19       A.     That's right.

20       Q.     And if we could look at the top please, at

21   Mr. Dooner's response?

22       A.     "You were going to create a contract between

23   SSS and iFone Neda.  I need to supply you with the

24   billable activities, which should be as follows."

25       Q.     And then do you see further down where it

1    says:

2              "The total amount should be 1.3M."

3              Do you see that?

4        A.    1.3 Million.  Yes.

5        Q.    And then there's a list of numbers.  And some

6    words.  Do you see that?

7        A.    Yes.

8        Q.    Can you interpret those numbers for us,

9    please?

10       A.    Right.  Of the 1.3 Million dividend, 39,000

11   was to be paid to a small shareholder, an individual

12   whose first name was Artem.  I can't remember his second

13   name.  Leaving a total, Net Total of $1,261,000.  Of

14   which Mr. Dooner's share was 315,250, leaving a balance

15   of 945,750 due to Mr. Edelman.

16       Q.    Can you read us the next two lines in this

17   email beginning?  'Share?'

18       A.    "DE's share of this would normally be 315,250

19   as well but since he, Mr. Edelman was using this as an

20   opportunity to claw back some from Homayoon Froogh FH--

21   sorry HF-- his Net comes to 945,750.

22       Q.    Going back to the top of this email and

23   looking at the first phrase about creating a contract;

24   can you tell us why a contract would be created between

25   SSS and iFone?

1    A.    Again, the, the, the purpose of this was to

2  enable the funds to be transferred back to Satellite

3  Support Services, and to provide information to provide

4  explanation of this to the bank for their compliance

5  purposes.

6    Q.    Well, why could, why couldn't they just be

7  transferred back to Mr. Edelman, if it was his share?

8    A.    Because Mr. Edelman instructed that he wanted

9  those funds to go back into Satellite Support Services,

10 as opposed to any personal bank account of his.

11   Q.    I'd like to look at 14-68, please.

12 (Exhibit Gov.Exb 14-68 was entered into evidence.)

13 Do you see this email from June 2017, on page 2?

14   A.    On page 2.  Yes.

15   Q.    And do you see where it's from an email

16 address you've identified as yours to an email address I

17 don't believe we discussed yet.  Do you see that?

18   A.    Yes.

19   Q.    Can you tell us who that recipient is?

20   A.    I'm sorry?

21   Q.    Can you tell us who the recipient on this

22 email is?

23   A.    This is Remco Polderman.

24   Q.    Who was Remco Polderman?

25   A.    Remco Polderman was a Partner in Prudence Tax

1   Advisory and had been engaged by Mr. Edelman and

2   Mrs. Edelman on various tax matters from approximately

3   2014.

4        Q.    I'd like to look at the top line of this

5   email where you say:

6              "You may remember I mentioned to you that we

7   are trying to get a substantial distribution out of

8   iFone."

9              Do you see that?

10       A.    Yes.

11       Q.    And is that referring to the Company we were

12   just talking about?

13       A.    That's --

14       Q.    -- the one selling Internet to U.S. troops?

15       A.    That is correct.

16       Q.    And can you read us the remainder of that

17   paragraph starting with 'we do not?'

18       A.    Sorry, which paragraph?

19       Q.    The paragraph, the first paragraph at the top

20   of the email?

21       A.    "We do not really want to treat it as a

22   dividend.  This money is sitting in a bank account in

23   USA."

24       Q.    And then can you continue reading the first

25   sentence of the next paragraph please?

Graham Collett                                          February 04, 2025

```
1        A.     "You may recall that I suggested that we

2   tried to get this money out via a Consultancy

3   Agreement.".

4        Q.     Is this -- my apologies Mr. Collett.  Is this

5   the Agreement you just mentioned a moment ago about

6   creating to get the money out of iFone Neda?

7        A.     That's correct.

8        Q.     In this email, where you said "we do not

9   really want to treat it as a dividend, "who are you

10  referring to? Who is 'we?'

11       A.     I'm referring to Mr. Edelman.

12       Q.     I'd like to look, if we could, at page 4 of

13  this Exhibit, please.  Do you see at the top where it

14  says 'Satellite Support Services Ltd?'?

15       A.     Yes.

16       Q.     And then do you see the first text on this

17  document appears to be addressed to iFone Neda Inc.  Do

18  you see that?

19       A.     Correct.

20       Q.     And it continues:

21              "Dear sirs, this is to confirm our

22  Agreement."

23              Do you see that?

24       A.     Yes.

25       Q.     Do you recognize this document?
```

1        A.    Yes, I do.

2        Q.    What is this?

3        A.    This is the basic Consultancy Agreement to be

4   used for Bank compliance purposes to transfer the monies

5   from iFone Neda's account into Satellite Support

6   Services.

7        Q.    I'd like to draw your attention to 1.2, if I

8   could, please.  Do you see where it says this Agreement

9   will commence on 1 April 2015?  Do you see that?

10       A.    That's correct.

11       Q.    But looking back at page 2 of this Exhibit,

12   can you tell us the date on the email where you are

13   transmitting this Agreement?

14       A.    That was the 19th of June, 2017.

15       Q.    Now, I believe you told us earlier that there

16   was a term for Agreements that were created on a

17   particular date, but listing earlier dates for 'as of'.

18   What is that term again?

19       A.    That's a Backdated Agreement.

20       Q.    Did you create this Agreement?

21       A.    Yes, I did.

22       Q.    Do you know if Mr. Edelman saw this

23   Agreement?

24       A.    I'm not sure whether he saw the final version

25   of this Agreement, but it was discussed with him and

Graham Collett                                          February 04, 2025

```
 1   with Remco Polderman.  And Mr. Dooner was also fully
 2   aware.
 3        Q.   I'd; like to look at 14-70, if we could,
 4   please?
 5   (Exhibit Gov.Exb 14-70 was entered into evidence.)
 6        A.   14-70.
 7        Q.   1470.  Do you see this email dated
 8   April 2018?
 9        A.   Yes.
10        Q.   From an email address that you've identified
11   as yours, it looks like it's to Mr. Downer.  Do you see
12   that?
13        A.   Correct.
14        Q.   Can I draw your attention to the bottom email
15   on this chain, please?
16        A.   Yes.
17        Q.   Do you see where it says:
18             "Hi, Bob can we please try to organize a
19   distribution of the accumulated profits from the bank
20   balances that are currently held."
21             Do you see that?
22        A.   Correct.  Yes.
23        Q.   And do you recall, or are you able to tell
24   from this email chain, which Company this distribution
25   of accumulated profits relates to?
```

Graham Collett                                    February 04, 2025

 1        A.    I believe it relates to iFone Neda.

 2        Q.    And can you see what Mr. Dooner's response is

 3   in the next email up.  Do you see where it says.

 4              "Yes, they have agreed to 1.6 total?"

 5              Do you see that?

 6        A.    Correct.

 7        Q.    And then can you read us the next text?

 8   Beginning '800?'

 9        A.    Yes.

10              "They have agreed to 1.6.  800 to each side.

11   600 in total for DE. Mr. Edelman and HF: Homayoon

12   Froogh."

13        Q.    And can you tell us what these numbers

14   correspond to to the best of your recollection, or from

15   this context?  What is 1.6 and 800?

16        A.    Those are the amounts that they have agreed

17   to distribute from the profits of iFone Neda.

18        Q.    And do you know if 800 means $800?

19        A.    It means $800,000.

20        Q.    And what about 600?  Does that mean $600?

21        A.    I believe so, yes.

22        Q.    $600?

23        A.    $600,000.

24        Q.    I'd like to look at the top email.  Your

25   response to Mr. Dooner.  Do you see where you said:

1              "Thanks for the update.  We actually sent it

2    to Mirabaud on the basis of a Consultancy Agreement."

3              Do you see that?

4        A.    Yes.

5        Q.    And can you read us what that Paren says

6    beginning 'simply?'

7        A.    Sorry?

8        Q.    Can you read us the rest of this sentence?

9        A.    "We actually sent this to Mirabaud on the

10   basis of a Consultancy Agreement.  An invoice simply for

11   bank compliance purposes.  You remember, you may

12   remember that we got advice from Remco on this.  For our

13   purposes I have drafted an invoice, a copy of which is

14   attached together with a copy of the side, of the

15   Agreement for your information.  The full wiring details

16   are on the invoice."

17       Q.    I'd like to look at page 3 of this Exhibit,

18   if we could please.  Do you see where it says 'Satellite

19   Support Services' at the top?

20       A.    Yes.

21       Q.    And then it says 'Invoice.' Do you see that?

22       A.    Yes.

23       Q.    Can you tell us the amount listed on that

24   invoice?

25       A.    $800,000.

Graham Collett                                           February 04, 2025
                                                                      34

 1        Q.    And then the next one, page 5.  Do you see
 2   where it says 'Invoice' on this document?
 3        A.    Yes.
 4        Q.    Can you tell us the amount listed on that
 5   invoice?
 6        A.    That was 945, 000
 7        Q.    Did you create these invoices?
 8        A.    Yes, I did.
 9        Q.    What were these amounts listed on these
10   invoices; what were they really?
11        A.    In reality they were distributions from the
12   profits of iFone Neda. In respect of Mr. Edelman's
13   shares in the Company.
14        Q.    And drawing your attention back to page 1 of
15   this Exhibit, where you say 'we actually sent it to
16   Mirabaud.' Who is Mirabaud?
17        A.    That's Mirabaud Bank.  Where Satellite
18   Services, Satellite Support Services had a bank account
19   to which the monies were to be transferred.
20        Q.    Why did you send these invoices to Mirabaud?
21        A.    In support of their, in support of the
22   receipt of the payments for their Compliance purposes.
23        Q.    At this point in time, in April 2018, do you
24   know where the Mirabaud Bank account was located?
25        A.    The were based in Dubai.

Graham Collett                                    February 04, 2025

35

1      Q.    Mr. Collett, we talked yesterday about your

2  knowledge of Mr. Edelman engaging, Marnin Michaels and

3  the approximate time period, 2010 or 2011.  Were you

4  ever involved in any later engagement by Mr. Edelman of

5  attorneys related to his tax issues?

6      A.    Yes.

7      Q.    Were you ever involved in the engagement of

8  any U.S. United States lawyers related to Mr. Edelman's

9  tax issues?

10     A.    Yes.

11     Q.    Do you recall the law firm that you were

12 first engaged with, or involved with, related to

13 Mr. Edelman's U.S. taxes?

14     A.    That was Caplin and Drysdale.

15     Q.    Do you remember approximately when you heard

16 about the engagement of Caplin and Drysdale?

17     A.    I believe it was early 2015.

18     Q.    And what if anything, did Mr. Edelman tell

19 you about his reasons for getting involved with Caplin

20 and Drysdale?

21     A.    He told me that he had had discussions with

22 Mr. Polderman, who I knew about at a slightly earlier

23 stage, and that Mr. Polderman knew Caplin and Drysdale

24 well, and recommended that Mr. Edelman engaged Caplin

25 and Drysdale to start dealing with his, his, his, his,

1    Mr. Edelman's U.S. tax matters.

2        Q.    At that point in early 2015, do you know

3    whether Mr. Edelman had filed U.S. Tax Returns in any of

4    the recent years?

5        A.    I was aware at that stage that he had not

6    filed any Tax Returns for a number of years.

7        Q.    Had he told you, why not?

8        A.    He never discussed it in that level of

9    detail.

10        Q.    Do you have any personal knowledge about

11    whether Mr. Edelman did eventually file U.S. Tax

12    Returns?

13        A.    Eventually, in 2016 after taking advice, he

14    entered into an overseas Voluntary Disclosure program

15    arrangement in the U.S.

16        Q.    Do you know whose program arrangement that

17    was with in the United States?  Who it was with it was?

18        A.    It was with the Internal Revenue service.

19        Q.    And were you involved in the preparation of

20    any of those Tax Returns, or materials for the program?

21        A.    I was responsible for providing information

22    on to Caplin and Drysdale based on, based on financial

23    transactions, and Mr. Edelman's income over a

24    significant period of time, together with other

25    information based on discussions with Caplin and

1   Drysdale.

2        Q.    Mr. Collett, I'd like to look at Exhibit 4-5,

3   if we could, please.

4   (Exhibit Gov.Exb 4-5 was entered into evidence.)

5   Do you see at the top where this says 'Client

6   Information File Index.' Do you see that?

7        A.    That's correct.

8        Q.    And then do you see where there are lettered

9   paragraphs and bullet points following?  Do you see

10  that?

11       A.    That's correct.

12       Q.    Can you tell us, do you know what this

13  document is?

14       A.    This was an index I prepared of a file of

15  information that I provided to Caplin and Drysdale.

16       Q.    Did you compile these documents together?

17       A.    Together.

18       Q.    Did you compile this group of documents?

19       A.    Yes, I did.

20       Q.    And we've discussed your, your record

21  keeping.  Did you use files in your records to make this

22  compilation?

23       A.    Yes, I did.

24       Q.    I'd like to look first, if we could at T. in

25  this index which is on page 3.

 1          A.    Yes.

 2          Q.    Do you see where it says T.  Affidavit.  Do

 3   you see that?

 4          A.    Yes.

 5          Q.    And there's a bullet that says:

 6                "Affidavit by DLD in relation to ownership of

 7   Red Star Enterprises Limited."

 8                Do you see that?

 9          A.    Yes.

10          Q.    Can you tell us who DLD is in that bullet

11   point?

12          A.    This is Delphine Le Dain.

13          Q.    Could we look at page 373 of this Exhibit,

14   please.  Mr. Collett, do you see at the top where this

15   says 'Affidavit?'

16          A.    Yes.

17          Q.    And do you see where it says:

18                "I, Delphine Le Dain"

19                At the top in the first line?

20          A.    Yes.

21          Q.    Mr. Collett, is this what the line T. on the

22   index was just referring to as the Affidavit of Delphine

23   Le Dain?

24          A.    That is correct.

25          Q.    Did you draft this Affidavit?

```
 1        A.    No, I didn't.

 2        Q.    Do you know who did?

 3        A.    I'm not sure who drafted it.

 4        Q.    Directing your attention down near the bottom

 5   of the page, can you tell us the date shown on this

 6   Affidavit?

 7        A.    This was the 29th of February, 2012.

 8        Q.    Do you recognize the signature next to that

 9   date?

10        A.    To the best of my knowledge, that is Delphine

11   Anne Le Dain's signature.

12        MS. RANNEY:  Bless you.

13        COURT REPORTER:  Thank you.

14   BY MS. RANNEY:

15        Q.    Mr. Collett, directing your attention back up

16   to paragraph 3 in the Affidavit of Delphine Anne Le

17   Dain, do you see where it says:

18              "Prior to 3rd June 2004, I set up a business

19   together with a Third Party."

20              Do you see that?

21        A.    Yes.

22        Q.    Is it true that Delphine set up Red Star or

23   Mina prior to June 2004?  To the extent of your

24   knowledge.

25        A.    To the extent of my knowledge, that is not
```

Graham Collett                                        February 04, 2025

```
 1   correct.
 2        Q.    And looking at paragraph 4; do you see where
 3   it says:
 4              "On 3rd June 2004, I, together with the Third
 5   Party Partner, gave instructions for a new Company to be
 6   incorporated in Gibraltar named Red Star Enterprises
 7   Ltd."
 8              Do you see that?
 9        A.    Yes.
10        Q.    To the extent of your knowledge, was it true
11   that Delphine Le Dain gave instructions in 2004 for the
12   Gibraltar entity Red Star Enterprises, to be
13   incorporated?
14        A.    To the extent of my knowledge and based on
15   the events that followed, and based on the
16   documentation, I believe it was Mr. Edelman who set up
17   those two companies.
18        Q.    Looking at paragraph 5, do you see where it
19   says:
20              "I have been the Beneficial Owner of 50% of
21   the shares in RSEL from 3rd June 2004."
22              Do you see that?
23        A.    Yes, I do.
24        Q.    Based on your understanding, and the events
25   that you are involved in, and the records you saw, who
```

1  was the Beneficial Owner of 50% of the shares in Red

2  Star in June 2004?

3       A.    Based on the records and the extent of my

4  knowledge, the Beneficial Owner of 50% of Red Star

5  Enterprises at that point in time was Douglas Edelman.

6       Q.    I'd like to look at paragraph 6, if we could,

7  please. Do you see where it says, in the Affidavit of

8  Delphine Le Dain:

9            "I contributed my own capital and assets to

10  the Company in consideration for my 50% ownership in

11  RSEL."

12            Do you see where it says that?

13       A.    Yes.

14       Q.    Mr. Collett, based on the records you saw,

15  and your communications with Mr. Edelman, who did you

16  understand to have contributed the capital and assets to

17  the Company that ultimately became Red Star Enterprises

18  Limited?

19       A.    I believe that that capital and assets based

20  on the information available at the time and

21  subsequently was provided by Mr. Edelman.

22       Q.    Do you see paragraph 7, where it says:

23            "All income and gains earned with respect to

24  my 50% ownership in RSEL over time was owned by me as

25  the ultimate Beneficial Owner."

Graham Collett                                    February 04, 2025
                                                                 42

```
1              Do you see where it says that?
2      A.     Yes.
3      Q.     Mr. Collett, what's an Ultimate Beneficial
4  Owner?
5      A.     The Ultimate Beneficial Owner is the person
6  ultimately entitled to any profits of a business.
7      Q.     Mr. Collett, do you know if Ms. Le Dain spoke
8  English?
9      A.     Yes.
10     Q.     Do you know if she could read english?
11     A.     Yes.  How do you know she could read English?
12     A.     From, from meeting her and and knowing her.
13 Knowing her, the extent to which I did, I was quite sure
14 that she could read English.
15     Q.     Did you have discussions with her in English?
16     A.     Yes.
17     Q.     Were you present when this Affidavit was
18 signed, or have any personal knowledge about how it was
19 signed?
20     A.     No, I was not present when it was signed.
21     Q.     Why did you provide it to Caplin and
22 Drysdale?
23     A.     It was provided to me after it was prepared
24 and signed, and I kept the records and I provided it to
25 Caplin and Drysdale, because I thought it was relevant
```

Graham Collett                                          February 04, 2025

1   information.

2       Q.    I'd like to look, if we could at page 4 of

3   this Exhibit, please?

4       A.    Sorry.  Page 4?

5       Q.    Page 4.

6       A.    Sorry I'm --

7       Q.    All the way back at the beginning.  Page 4 at

8   the bottom of the page?

9       A.    Yes.

10      Q.    Do you see at the top where it says 'Summary

11  Information.' On page 4?

12      A.    Yes.

13      Q.    Did you draft this document?

14      A.    I believe I did.

15      Q.    Do you see at the top where it says:

16          "The family wealth creation started in

17  2000/2001."

18          Do you see that?

19      A.    Yes.

20      Q.    And do you see in the paragraph where it

21  says:

22          "The logistics business was later transferred

23  to two Gibraltar based companies, Red Star Enterprises

24  Ltd and Mina Corp in 2005."

25          Do you see that?

1          A.    Yes.

2          Q.    Do you see where it says:

3          "These companies were both 50% owned by

4    Delphine via nominees until 2008."

5          Do you see that?

6          A.    Yes.

7          Q.    You told us just a minute ago who you had

8    understood to be the owner of Mina Corp and Red Star

9    Enterprises in 2004.

10         A.    Yes.

11         Q.    Can you remind us who that was?

12         A.    That was Douglas Edelman.

13         Q.    And who did you understand the owner of

14   Bartol Ltd and Aspen Wind to be in the years 2001, 2002,

15   2003, 2004?

16         A.    Based on the available records, I believe

17   those to be Douglas Edelman.

18         Q.    Mr. Collett, yesterday when we were looking

19   at a document from 2012 where Mr. Edelman was talking to

20   you about Delphine having made a seed investment, you

21   mentioned 'a party line.' Can you explain to us what you

22   meant by 'the party line?'

23         A.    Over a period of time, culminating in 2010

24   and 2012, Mr. Edelman made it very clear that a lot --

25   mistakes have been made; Delphine Le Dain had been the

Graham Collett                                    February 04, 2025
                                                              45

 1 | owner of the Red Star and Mina Corp Companies from the
 2 | dates of their incorporation in 2003 and 2004.
 3 |        Subsequent to that, in 2012, when Mr. Edelman
 4 | and Mrs. Edelman approached Mishcon de Reya, as we
 5 | discussed, he made it very clear that it had always been
 6 | Delphine.  It was never his, and the ownership and the
 7 | seed investment, it was always Delphine.
 8 |     Q.    Mr. Collett, did that party line match with
 9 | the documents that you had seen, or the experience that
10 | you had had in your early years of working on these
11 | businesses and with, with Mr. Edelman?
12 |     A.    No, it didn't.
13 |     Q.    Do you recall hearing this party line in
14 | 2004?
15 |     A.    Not in 2004?  No.
16 |     Q.    What about 2005?
17 |     A.    Not that I can recall.
18 |     Q.    2006?
19 |     A.    No.
20 |     Q.    2007?
21 |     A.    No.
22 |     Q.    2008?
23 |     A.    No, I can't specifically remember during any
24 | of that period.
25 |     Q.    What about, you mentioned 2010.  Do you

1  recall hearing this party line in 2010?

2        A.    From 2009 and moving into 2010 the Sunage

3  Foundation was created, which reflected Delphine Le Dain

4  as the Settlor of that Foundation.  Moving into 2010,

5  with the Congressional Inquiry and the documents that

6  were backdated to 2004 for the two Red Star companies

7  and based on the instructions that were given to

8  Mr. Edelman's attorneys in their communication with the

9  with the Inquiry, it was, they confirmed that Delphine

10 Edelman was the 50% owner of the business.

11       Q.    When you say they confirmed in the Inquiry,

12 do you mean they pass that information along to

13 Congress?

14       A.    I believe that they did.

15       Q.    Mr. Collett, I'd like to look at page 19, if

16 we could, please.  Do you see where it says 'Red Star

17 Enterprises Limited Corporate Information' at the top?

18       A.    Yes.

19       Q.    Did you draft this?

20       A.    Yes, I did.

21       Q.    Do you see where it says under

22 'Introduction':

23              "The origins of the business now carried on

24 in the name of Red Star Enterprises Limited can be

25 traced back to an investment by Delphine Le Dain in

1   2000."

2           Do you see that?

3      A.   That's correct.

4      Q.   And can we go, please, to page 26?  Do you

5   see where it says 'Conclusions' at the top of this page?

6      A.   Yes.

7      Q.   26.  Do you see paragraph 3.2 where it says:

8           "The initial growth of the business was

9   conducted through a Company Bartol Limited which was

10  wholly owned by Delphine Le Dain."

11          Do you see that?

12     A.   Yes.

13     Q.   Who did you understand to own Bartol Wind

14  around the year 2000, 2001?

15     A.   I'd understood it to be Douglas Edelman.

16     Q.   So, is this true, to the extent of your

17  knowledge?

18     A.   That is not true.

19     Q.   And just to harken back a few minutes, can

20  you tell us again who this packet of materials was being

21  provided to?

22     A.   This was being provided to Caplin and

23  Drysdale for their information.

24     MS. RANNEY:  Can we look at 3.4, please.

25     A.   3.4.

Graham Collett                                    February 04, 2025

```
 1        Q.    Do you see where it says -- I'm sorry, 3.4 on
 2   this same page?
 3        MR. CLARKE:  Binder change.
 4   BY MS. RANNEY:
 5        Q.    Do you see where it says:
 6              "The transfer of the business from Bartol
 7   Limited to Red Star Enterprises Limited did not
 8   represent any change of beneficial ownership."
 9              Do you see that?
10        A.    Yes.
11        Q.    And then it continues:
12              "The fact that the company officers were
13   incompetent in dealing with the correct entries."
14              Do you see that?
15        A.    Yes.
16        Q.    Can you tell us what is meant by this
17   "Company Officers were incompetent." What does that
18   refer to?
19        A.    That relates to mistakes that Mr. Edelman
20   made it very clear had been made.  I was conveying in
21   there Mr. Edelman's remarks and his assertion that he
22   should never have been shown as a shareholder of Red
23   Star Enterprises, Gibraltar.
24        Q.    And looking down at 3.7.  Do you see where it
25   says:
```

1          "Douglas Edelman received no benefit from the

2    business other than modest payments for consultancy

3    services?"

4          Do you see where it says that?

5    A.    Yes.

6    Q.    Was it your idea to tell the U.S. tax lawyers

7    that 'Mr. Edelman had received no benefit from any of

8    these businesses other than modest consultancy

9    payments?' Did you come up with that?

10   A.    This is what I, what I was conveying, which

11   was Mr. Edelman's assertions at all times that all he

12   ever received out of the business was modest payments.

13   Q.    I'd like to look at page 9, please, if we

14   could.  Mr. Collett, can you tell us what we're looking

15   at, please?  On page 9?

16   A.    This is an Organization chart relating to the

17   Red Star Mina business.

18   Q.    Did you make this chart?  Sorry I apologize,

19   Mr. Collett, I didn't mean to cut you off.  Continue,

20   please.

21   A.    And reflects the Corporate structure of Red

22   Star Enterprises in respect of 50% of the business that

23   by this stage was owned by Galactea Trust.

24   Q.    Did you make this graphic?

25   A.    No.

Graham Collett                                          February 04, 2025
                                                                      50

1          Q.     Do you know who did?

2          A.     This was made in Dubai principally I recall,

3    by Francis Rohar.

4          Q.     Do you see at the top left hand side where

5    there's a box?

6          A.     Yes.

7          Q.     And in that box, it says 'Settlor.' Can you

8    tell us the name listed next to that box?

9          A.     The Settlor is Delphine Le Dain.

10         Q.     And then who is listed as 'Protector?'

11         A.     Myself.

12         Q.     And can we look at page 10, please.  Can you

13   tell us what we're looking at on page 10?

14         A.     This is a summary of the Trust structure

15   which was the, which was a Trust set up on exactly the

16   same basis principles of the Galactea Trust and held all

17   of the various Media interests that have been invested

18   in over the years.

19         Q.     I'd like to draw your attention, please, to a

20   box, a few boxes down where it says 'Taruki Management.'

21   Do you see that?

22         A.     Yes.

23         Q.     Is that the same entity we were discussing

24   yesterday related to all the transactions that you had

25   been involved in?

Graham Collett                                          February 04, 2025

1      A.     That's correct.

2      Q.     Can you remind us again who had directed you

3 to make all of those transactions related to Taruki?

4      A.     In terms of the investments that were being

5 made by Turaki, those those instructions, directions

6 came from Mr. Edelman.

7      Q.     What about 'StoryFirst?' What's StoryFirst?

8      A.     That was another intermediate Holding Company

9 to hold the various investments shown underneath it.

10      Q.     And just looking across the line at these

11 investments listed under 'StoryFirst.' Can you tell us

12 who had decided to invest money in each of these

13 ventures?

14      A.     In terms of China New Media, HTV Media,

15 StoryFirst SF Productions, MTV, Terraneo, StoryFirst UK,

16 all of those investments were directed by Mr. Edelman.

17      Q.     And what about Russian Holding SPV, all the

18 way on the left.  What is that entity?

19      A.     That was a slightly different arrangement in

20 conjunction with Mr. Peter Gerwe who's listed as a

21 percentage shareholder.

22      Q.     And who was Mr. Gerwe?

23      A.     Mr. Gerwe was a -- he'd built up interests in

24 Hello TV, part of the Hello magazine, the Hello brand,

25 and he was operating in various Media businesses, who

1 | Mr. Edelman knew and brought in to -- at one point to
2 | oversee all of the Media investments.
3 |     Q.    And were you able to observe who Mr. Gerwe
4 | took his day to day instructions from, in relation to
5 | his work on those entities or investments?
6 |     A.    He liaised very closely with Mr. Edelman in
7 | terms of building the Media structure from 2013, 2014
8 | onwards.
9 |     Q.    Mr. Collett, I'd like to draw your attention
10 | to some, three letters that are in a couple of places in
11 | different boxes on this page.  Do you see where it says
12 | 'BVI' in a couple of these boxes?
13 |     A.    That's right.
14 |     Q.    What does 'BVI' stand for?
15 |     A.    British Virgin Islands indicating the
16 | Company, indicating the jurisdiction in which the
17 | company had been set up.
18 |     Q.    I'd like to look at 11, if we could, please.
19 | Can you tell us what we're looking at on page 11?
20 |     A.    This is the Atlas Trust, which held the
21 | interests in the Kenyan farming business under which
22 | trade is under the name of Mara farming.
23 |     Q.    Can you tell us again who had made the
24 | decision to invest in Kenyan farming?
25 |     A.    Mr. Edelman.

Graham Collett                                                February 04, 2025

53

1          Q.    Can you tell me in the top right hand side

2    box who's listed as the settlor on this trust?

3          A.    Delphine Le Dain.

4          Q.    And who's the Protector?

5          A.    And myself as Protector.

6          Q.    I'd like to look at page 12.  What are we

7    looking at on page 12?

8          A.    This is Dina Maropa Trust which through an

9    intermediate Holding company, Moropa Limited, held 100%

10   of Murney Overseas which in turn invested in the Mexican

11   property in Tulum.

12         Q.    Can you remind us whose idea it had been to

13   invest in Mexican property in Tulum?

14         A.    That was Mr. Edelman.

15         Q.    And who's listed as the Settlor on this

16   trust?

17         A.    Delphine Le Dain.

18         Q.    And the Protector?

19         A.    And myself as Protector.

20         Q.    I'd like to look at page 13, if we could,

21   please.  What are we looking at on this page?

22         A.    Another of the Trusts in the structure.

23   Light Star Trust.  Which in turn owned 100% of Light.

24   Star Ltd and in turn owned 100% of Light Air Capital.

25         Q.    What was the purpose of, of these entities?

Graham Collett                                      February 04, 2025
                                                                54

1        A.     These entities through that Trust purchased

2    two properties in the United States through Light Air

3    Capital Limited.

4        Q.     Were you involved in the transfer of funds

5    for the purchase of those properties in the United

6    States?

7        A.     Yes, I was.

8        Q.     Who directed you to make those transfers of

9    money?

10       A.     Mr. Edelman.

11       Q.     Do you know what those transfers of money

12   were for?

13       A.     The purchase of two properties.

14       Q.     Do you know where those properties were?

15       A.     One was in Miami, and the other was in

16   Stockton.

17       Q.     Did Mr. Edelman tell you what he was going to

18   do with those properties or who was going to live there?

19       A.     Rebecca Tassi, his former wife owned, lived

20   in the Miami property.  And his brother, Douglas

21   Edelman's brother lived in the Stockton property.

22       Q.     Do you recall approximately how much was

23   transferred for the, for the purchase of each property?

24       A.     Miami I believe, was approximately $1.2

25   Million.  Stockton was slightly less, I believe, about

Graham Collett                                          February 04, 2025

55

 1   $900,000.

 2       Q.    Could we look, please, at the top right hand

 3   side box on this page?

 4       A.    Yes.

 5       Q.    Whose listed as the Settlor of this Trust?

 6       A.    Delphine Le Dain.

 7       Q.    And the Protector?

 8       A.    Myself.

 9       Q.    And can you tell us what it says under

10   'Beneficiaries?'

11       A.    Yes.  Well, there is a mistake there because

12   it refers to Graham's first wife, children.  That is

13   totally incorrect.  These schedules here were prepared

14   by the Trustee, Len O'Brien at Salamander and this

15   information itself is, is not correct.

16       Q.    Whose children are listed there in that list?

17       A.    That is, that is Douglas Edelman's children.

18       MS. RANNEY:  Say it's about time for a break.

19   Mr. Collett, would you like to take a quick break?

20   Drink some water?

21       THE WITNESS:  Yes, that would be helpful.  Thank

22   you.

23       MS. RANNEY:  Should we do ten minutes.  Back at ten

24   til?  Is that sufficient time for everyone? Okay.  Back

25   at ten to.

1        A.      This is the end of Media I., Vol. III, going

2    off the Record at 14:38 as indicated on the video

3    screen.

4              (Break taken.)

5        VIDEOGRAPHER:  This is the beginning of Media II.,

6    Vol. III., going back on record at 14:58 as indicated on

7    the screen.  Thank you, Counsel.

8    BY MS. RANNEY:

9        Q.      Mr. Collett, before we move on.  Looking at

10   page 13 that we have in front of us related to the Light

11   Star Trust, can you tell us who had chosen to make

12   transfers, or to send money for the purchase of

13   properties for Mr. Edelman's ex-wife and brother?

14       A.      Those instructions had come to me from

15   Mr. Edelman.

16       Q.      I'd like to look at one or two more things in

17   this client binder.  If we could please could we look at

18   54. Page 54?

19       Q.      Do you see where this has a date at the top

20   that says '21st August 2012.' Do you see that?

21       A.      Yes.

22       Q.      And it says about halfway down the page:

23              "Tax Report for Delphine Le Dain relating to

24   the set up of a new Trust."

25              Do you see that?

```
 1          A.    Yes.

 2          Q.    And then further down the page says Mishcon

 3   de Reya.  Do you see that?

 4          A.    Yes.

 5          Q.    Who had given you this report?  How did it

 6   get to be in your files?  Do you know?

 7          A.    I was given a copy of this, this Report at

 8   some stage at the time that the, the Trust structures

 9   were being set up.

10          Q.    And you mentioned a moment ago that around

11   this time, Mr. Edelman had started using what you termed

12   'the party line.' Do you recall him using 'the party

13   line' around the time of this Report:  August 2012?

14          A.    Yes, I do.  Earlier in the year and leading

15   up to the creation of the Trust, he, he made it very

16   clear that it was Delphine.  It had always been

17   Delphine, and that was his clear instruction to

18   everybody involved, that it was always his wife's

19   businesses.

20          MS. RANNEY:  I'd like to look at 286, if we could,

21   please.  Do we need to break for a moment for technical

22   issues?  Okay. Just let me know.

23

24   BY MS. RANNEY:

25          Q.    286.  Do you see at the top?  Where this says
```

Graham Collett                                    February 04, 2025

58

 1   'Discussion Draft' and then it has '6th

 2   September 2013.'.

 3              Do you see that?

 4        A.    Yes.

 5        Q.    It says about halfway down the page, 'Tax

 6   Report for Douglas and Delphine Anne Le Dain Edelman.'.

 7              Do you see that?

 8        A.    Yes.

 9        Q.    And then further down the page, it says

10   Mishcon de Reya.

11        A.    Yes, I see that.

12        Q.    Do you recall how this document came to be in

13   your files?

14        A.    I was given a copy of it at some stage.  I

15   can't quite remember when.

16        Q.    And the date at the top of this page.

17   September 2013.  Was Mr. Edelman using the party line

18   around that period of time?

19        A.    Yes.

20        Q.    And can we look, please, at 366.  Do you see

21   where it says 'Enhanced Due Diligence Profile' at the

22   top?

23        A.    Yes.

24        Q.    Can you tell us what this is?

25        A.    This is information that was given to

1   Mirabaud in connection with their due diligence

2   procedures.

3        Q.    And can we look please, at the first, or at

4   the top where it says 'Name of Client.' Can you tell us

5   who's identified as the client at the very top of this

6   page?

7        A.    Delphine Le Dain.

8        Q.    I'd like to look, if we could, please, at

9   368.  Do you see at the top where it says 'Origin of

10  Wealth.' Do you see that?

11       A.    Yes.

12       Q.    Do you see where it says:

13            "Delphine's father began transferring his

14  Real Estate assets to Delphine in the late 1990s."

15            Do you see that?

16       A.    Yes.

17       Q.    Where it continues:

18            "Having got an MBA and other analytical

19  education training, she was ready and invested the money

20  wisely into luxury real estate in Western Europe quickly

21  trading up the property ladder."

22            Do you see where it says that?

23       A.    Yes, I see that.

24       Q.    Do you recall what Mr. Edelman had told you

25  about Delphine's background?

1      A.    He told me a little bit, but not in this

2  detail.

3      Q.    Had he ever told you that Delphine was from

4  money?  That she was an Heiress?

5      A.    Not in any particular detail.

6      Q.    Do you know what 'she invested money wisely

7  in luxury real estate' would refer to?

8      A.    I don't know for the simple reason that I did

9  not draft this particular document.

10     Q.    Do you know who did?

11     A.    I believe that Remco Polderman drafted this

12  agreement.

13     Q.    And we discussed Mr. Polderman's role, but

14  can you tell us based on your observations and the

15  communications you are part of, who did Remco Polderman

16  take instructions from on a day to day basis?

17     A.    Ultimately, from Douglas Edelman.

18     Q.    I'd like to look the second paragraph here

19  where it says:

20           "She also invested in a couple of successful

21  Private Equity Projects which have now been united under

22  one Corporate umbrella managed professional Italy out of

23  the Dubai International Trade Zone."

24           Do you see that?

25     A.    Yes.

1      Q.    In the transactions that you'd been involved

2  in, who was the person who had directed investments in

3  Private Equity Projects?  To the extent of your

4  involvement, was it Delphine, or was it Mr. Edelman?

5      A.    I'm not quite sure what is meant by 'Private

6  Equity Projects, as I say, I did not draft this.  I'm

7  not quite sure what is being referred to there.

8      Q.    Does that match with your understanding of

9  who the investor in the family had been?

10      A.    It was not my understanding, no.

11      Q.    I'd like to look at Exhibit 14-1, if we

12  could, please?

13  (Exhibit Gov. Exb 14-1 was entered into evidence.)

14  Mr. Collett, you testified previously that you had kept

15  binders in your files.  Do you remember that?

16      A.    I kept these files.  Yes.

17      Q.    Can you tell us what 14-1 is?  What the first

18  page of this document is that we're looking at?

19      A.    This is the spine of a lever arch file, as we

20  call them, for records relating to Bartol Ltd.

21  Basically, Accounts and any Corporate matters relating

22  to Bartol Ltd.

23      Q.    Can we look at page 4 of this Exhibit,

24  please.  Do you see at the top where it says 'Bartol

25  Ltd, Aspen Wind Corporation?'?

```
 1        A.    Yes.
 2        Q.    And can you tell us, or can you read for us
 3   the first sentence under the 'Introduction' paragraph?
 4        A.    Yes.
 5              "The two companies, Bartol and Aspen Wind
 6   Corporation are both owned and controlled by Douglas
 7   Edelman through nominee shareholders."
 8        Q.    And then about halfway down the page, the
 9   first line above 'Trading Activities', can you read that
10   to us, please?  Beginning 'DE is?'
11        A.    "DE is the ultimate owner of both Bartol and
12   Aspen Wind corporation."
13        Q.    Just looking down at the bottom of this page.
14   Do you see in the center where it says 'Updated' and
15   then there's a date?
16        A.    Yes.
17        Q.    Can you tell us what that date is?
18        A.    That date is the 20th of August 2015.
19        Q.    Mr. Collett, why would this document read
20   updated 20th of August 2015, if you know?
21        A.    I believe that this was the original
22   information that I sent to Credit Suisse.  And because I
23   had to print it off again, it updated the date and I
24   don't think it updated the content from the best of my
25   knowledge.
```

1    Q.    Could we do a comparison, please, between

2  this page that we're on, in 14-1. Page 4.  With 4-5:

3  page 26.  And the comparison is on the screen, Mr.

4  collet, if it's easier to look.

5         The document we were just looking at is on

6  the left hand side.

7    A.    Yes.

8    Q.    You just identified for us the place where it

9  says DE is the ultimate owner of both our toll -- Bartol

10  and AWC.  Do you see that?

11   A.    Yes.  Yes.

12   Q.    And on the right side of the screen is a page

13  we looked at a few minutes ago from the materials that

14  you provided to Caplin and Drysdale, the U.S. tax

15  attorneys in 2015.  Do you see that?

16   A.    Yes.

17   Q.    On the right side.  And do you see on 3.2 on

18  the right side where it says:

19         "The initial growth of the business was

20  conducted through a company, Bartol Limited which was

21  wholly owned by Delphine Le Dain."

22         Do you see that?

23   A.    That's correct.  That was the party line.

24   Q.    And Mr. Collett, was it your idea to tell the

25  party line to Caplin and Drysdale?

1          A.     No, it was not my idea to.  I was, I was, I

2     was told many times, certainly from 2012 onwards, that

3     it was always Delphine.  "Remember, it's always

4     Delphine.  I don't own anything."

5          Q.     Who was it telling you that?

6          A.     Mr. Edelman.

7          Q.     I'd like to look at 11-4, if we could,

8     please.

9     (Exhibit Gov. Exb 11-4 was entered into evidence.)

10    Do you see this email from November 2015?

11         A.     Yes.

12         Q.     And do you see where it's between an email

13    address you've identified as yours and the

14    globalspec1@yahoo.com email address you identified as

15    Mr. Edelman's.  Do you see that?

16         A.     That's right.

17         Q.     And I'd like to look at the bottom email on

18    this chain from you to Mr. Edelman, where you say:

19               "Got a lot of docs from Nikolai, which look

20    very helpful.  We are getting them translated, but

21    already I can see that they refer to DLD as a

22    shareholder.  20%."

23               Do you see where it says that?

24         A.     Yes.

25         Q.     Can you tell us what you're talking about

Graham Collett                                    February 04, 2025

65

1   here?

2       A.    These, this followed conversations which I

3   believe Douglas Edelman had with Nikolai Ushakov in

4   trying to get copies of the original documents relating

5   to the Manas Company.  Nikolai Ushakov managed to get

6   copies of those documents, but they needed to be

7   translated and that was what was being arranged.  I was

8   conveying that to Mr. Edelman.

9       Q.    Did Mr. Edelman tell you why people would be

10  looking for documents from Manas in this period of time?

11      A.    To try to establish Delphine's, Edelman's

12  shareholding in the original Company and the extent to

13  which he was involved.  In other words, trying to build

14  up a picture that would support the notion that she had

15  created the business.

16      Q.    Do you see in the middle email here

17  Mr. Edelman's response, where it says:

18            "Thanks.  There were also some and another

19  company where she was, I think even 70%.  Great.  Keep

20  digging.  Delphine also requested readouts for her

21  accounts from 2003 to 2004."

22            Do you see that?

23      A.    Yes.

24      Q.    Did you have any conversations with Delphine

25  Lydon around this time?

Graham Collett                                                    February 04, 2025

66

```
1          A.     Not --
2          Q.     About trying to find these old records?
3          A.     Not directly, as I can recall.
4          Q.     Who were you communicating with directly
5     about this issue?
6          A.     Primarily, Mr. Edelman.
7          Q.     And can we look at your response on the top
8     here, please.  Can you read us what your response is in
9     the top email?
10         A.     "I think Delphine may have to go back to
11    about 1998 to 2001.  As far as I can recall, no monies
12    went into Red Star during that period.  Red Star was not
13    formed until 2004 anyway.  I will check with the
14    detailed records but I don't recall identifying any
15    payments from Delphine after 2002."
16         Q.     Mr Collett, when do you recall first
17    learning, or being told that there was some relationship
18    between Manas and the Red Star or Mina entities?  When
19    do you think you heard that?
20         A.     I'm finding that difficult to, to answer.  I
21    really can't remember when I would have heard about that
22    part of the, of the picture.
23         Q.     Do you think it was before the party line or,
24    do you think it was after you heard the party line?
25         A.     I can't say for any certainty exactly.  I
```

Graham Collett                                              February 04, 2025
                                                                         67

```
 1   would only be speculating, to be honest.
 2        Q.    I'd like to look at 4-8 if we could, please?
 3   (Exhibit Gov. Exb 4-8 was entered into evidence.)
 4        A.    Sorry, 4?
 5        Q.    8. 4.8. Do you see this email exchange from
 6   November 2015?
 7        A.    Yes.
 8        Q.    And the sender on the top email is a person
 9   we've discussed previously, Mr. Pearlman. Can you tell
10   us who the recipients are on the top email?
11        A.    The recipients are Diane Mehany and Scott
12   Michel.
13        Q.    And who are they?
14        A.    They are both Partners in Caplin and
15   Drysdale.
16        Q.    And looking at the bottom email in this
17   chain, do you see where it's from you to Mr. Polderman?
18   Do you see that on the bottom email?
19        A.    And the bottom email, this is an email to
20   Remco.
21        Q.    And do you see where it says:
22             "Please see attached copies of the English
23   translations of the Manas documents."
24             Do you see that?
25        A.    Yes.
```

1        Q.    Do you understand those to relate to the

2    documents that Nikolai had been sent to find?

3        A.    That's correct.

4        Q.    And do you see at the top of this email where

5    it says:

6              "As mentioned before, the translations of the

7    originals that we have only in photocopy."

8              Do you see that?

9        A.    (READS TO SELF:)As mentioned before the

10   translations --

11             Yes, that's the comment from Remco Polderman

12   to Caplin Drysdale.

13       Q.    Mr. Collett, did you read the translations of

14   the documents carefully before you forwarded them to

15   Mr. Polderman.

16       A.    I think from memory, I basically forwarded

17   them to, to him.  I can't remember the extent to which I

18   really went through them in huge detail.

19       Q.    And who, who had told you that the Manas

20   documents would support the notion that Delphine had

21   been an investor in Manas?  Who had told you that?

22       A.    Ultimately, Douglas Edelman would have told

23   me that, on the basis that they would show that Delphine

24   Le Dain had always, had always had the initial interest.

25       Q.    Can we look at the attachments to this,

Graham Collett                                        February 04, 2025

1  please, starting on page 2.  Mr. Collett, do you

2  recognize these to be the, the english translations of

3  the Manas documents that we were just discussing?

4       A.    To the best of my recollection, yes.

5       Q.    I'd like to look at page 20.  Do you see

6  where it says 'Charter of Manas International Services.'

7  Do you see that?

8       A.    Yes.

9       Q.    And then on page 3, do you see at the top

10 where it says 'General Provisions?'

11      A.    Yes.

12      Q.    And then there's a lot of text here.  But a

13 few lines down, it says:

14            "The Company is established by"

15            Do you see that?

16      A.    Yes.

17      Q.    And then a few lines down from that.  Do you

18 see where it says:

19            "Le Dain Delphine Anna."

20            Do you see that?

21      A.    Yes, I see that.

22      Q.    Can we go to page 11, please.  Do you see at

23 the top where it says 'Constitutive Agreement.' Do you

24 see that?

25      A.    Yes.

Graham Collett                                          February 04, 2025

70

 1        Q.     "On the establishment and operation of Manas
 2   International Services."
 3             Do you see that?
 4        A.     Yes.
 5        Q.     And on the next page, page 12, do you see
 6   Section 3, where it says 'Charter Capital?'.
 7        A.     Yes.
 8        Q.     And it says:
 9             "The Company's charter capital is made up of
10   contributions made by its founders and constitutes
11   10,000 USD."
12             Do you see where it says that?
13        A.     Yes.
14        Q.     And then at the bottom of paragraph 8, can
15   you read us the last line beginning with 'Le Dain
16   Delphine Anna?'
17        A.     Yes.
18             "Le Dain. Delphine Anna U.S. Dollars, which
19   accounts for 20% of the charter capital."
20        Q.     And can we look at page 20, please.  Do you
21   see at the top where it says 'Minutes Number 14?'
22        A.     Yes.
23        Q.     "Of the extraordinary meeting of the
24   shareholders -- in Paren -- founders."
25             Do you see that?

1     A.     Yes.

2     Q.     And then at the bottom, under 'Agenda' in

3   bold, do you see where it says:

4          "On exclusion of founder Le Dain, Delphine

5   Anna."

6          Do you see that?

7     A.     I see that.

8     Q.     And on the next page, page 21.

9     A.     Yes.

10    Q.     Do you see the paragraph, at the very bottom

11  where it says:

12         "The share of Le Dain Delphine Anna, in the

13  charter capital of Manas International Service, LLC,

14  constitutes USD $2000."

15         Do you see that?

16    A.     Yes.

17    Q.     And can you continue reading in that

18  paragraph for us, after 'USD 2000?'

19    A.     Yes.

20         "Le Dain Delphine Anna failed to fulfill the

21  specified obligation and to pay for her share within one

22  year following the state registration of Manas

23  International Services, thus causing damage to the

24  company's interests."

25    Q.     I'd like to look at page 22, please, if we

Graham Collett                                        February 04, 2025

72

1    could.  The next page.  Do you see partially down the

2    page where it says 'Representative of Le Dain Delphine,

3    Anna-Natalia Sidorovna Galliamova.' Do you see that?

4         A.    Yes.

5         Q.    Do you see where it says:

6              "As you may know, there is another Company

7    Manas Jet Service LLC, where one of the founders is

8    husband of Le Dain Delphine Anna-Douglas Edelman."

9              Do you see that?

10        A.    Yes.

11        Q.    Can you continue reading in that paragraph,

12   please?

13        A.    It says that:

14             "This family has been continuously engaged in

15   the business carried out by Manas International LLC.

16   Manas Jet Service LLC used to have and still has

17   indebtedness to Douglas Edelman."

18        Q.    And then can you read the next sentence,

19   please?

20        A.    "The contribution of Le Dain Delphine Anna to

21   the Charter Capital should have been paid from these

22   funds and Le Dain Delphine Anna was certain that the

23   contributions to the Charter Capital was paid from the

24   indebtedness of Manas Jet Services LLC."

25        Q.    Can we look at page 23, please.  Could you

1  read for us the text beginning at the top of page 23?

2  Sorry, the, the text beginning at the top of page 23?

3      A.    "I would like to point out that 2,000 USD do

4  not constitute a considerable or a significant amount

5  for Le Dain Delphine Anna.  The entire issue is in the

6  formal procedure.  Le Dain Delphine Anna was sure that

7  the money for, for her was contributed by Manas Jet

8  Service LLC."

9      Q.    And could, could I direct you to the next

10 highlighted -- or I'm sorry, the next bolded entry which

11 says 'Alexander Ivanovich Nastaev.' Do you see that?

12     A.    Yes.

13     Q.    And do you see the second line down where it

14 says:

15          "There is Bartol Limited Company, which keeps

16 fuel reserve of 2000 tons."

17          Do you see that?

18     A.    Yes.

19     Q.    "Approximately for USD, $500,000."

20          Do you see that?

21     A.    Yes.

22     Q.    And then do you see, third line from the

23 bottom where it says:

24          "Bartol Limited Company supplies fuel to

25 Manas International Service, just as any other vendor on

1  the same conditions, and such relations have no

2  connection to the relations of founder Le Dain Delphine

3  Anna with Manas International Service, LLC."

4          Do you see that?

5      A.    Yes.

6      Q.    Can you remind us again in this period of

7  time, in the early 2000, whose company was Bartol?

8      A.    Bartol, as I understood it and as reported,

9  was owned by Douglas Edelman.

10     Q.    I'd like to look at 11-4, please.

11  Before we do that, could we look at 6-6?

12  And Mr. Collett, we looked at this Exhibit before, but

13  I'd like to turn back to it just one more time.  You

14  testified previously about this business summary in

15  early 2010 that you prepared for.  Mr. Edelman.  Do you

16  remember that?

17     A.    In connection with the DynCorp proposal of

18  investment?  Yes.

19     Q.    Can you turn to page 3, please, of the

20  attached document to this email?

21     A.    Yes.

22     Q.    And near the top and the paragraph that's

23  underlined, can you tell us again from the text who you

24  understood to be writing here in this summary, this

25  paragraph?

1        A.    This I understood to be Mr. Edelman's

2   writing, in common with his normal style of responding

3   on these sorts of emails.

4        Q.    Can you read the all caps text to us, please?

5        A.    He said:

6              "Don't like this at all.  Aspen existed long

7   before Red Star.  Aspen created Red Star and Minacorp

8   financed it and its entirety and gave 50% of the stock

9   to the initial management as Sweat Equity."

10       Q.    Is Manas International Services mentioned in

11  Mr. Edelman's description there of how Red Star and Mina

12  were formed?

13       A.    Not at all.

14       Q.    Can you tell us again the date on this

15  summary and Mr. Edelman's statement to you in this

16  document?

17       A.    Sorry?

18       Q.    What's the date on the email on the first

19  page of this Exhibit?

20       A.    This was 23rd of February 2010.

21       Q.    Was that before or after you recall learning

22  of the Congressional Investigation in the United States?

23       A.    It would have been very, very close to the

24  date, but I don't believe that I knew of the

25  Congressional at that precise moment.

Graham Collett                                        February 04, 2025

```
1        Q.    Could we go to 11-5, please.
2   (Exhibit Gov. Exb 11-5 was entered into evidence.)
3   Do you see this email dated November 2015?
4        A.    Yes, I do.
5        Q.    And do you see where it appears to be an
6   email address you've identified as yours to the global
7   spec email address you've identified as Mr. Edelman.  Do
8   you see that?
9        A.    That's correct.
10       Q.    And further down the chain it looks like
11  there's an individual named Len O'Brien.  Can you tell
12  us who he was in this period of time?
13       A.    He was the Trustee for the Trust structures.
14       Q.    And what about the other email on the CC
15  line?  Who is that?
16       A.    That was the one from, from Andrew Schildbach
17  to myself, to Len O'Brien with a copy to globalspec1,
18  Which is which I would identify as Mr. Edelman, and
19  Iryna Tsenzharyk.
20       Q.    I'd like to draw your attention to the bottom
21  email here from Andrew Schildbach to the individuals we
22  just mentioned.
23       A.    Yes.
24       Q.    Do you see where it says on the second line:
25             "As you may recall earlier this year I sent
```

Graham Collett                                    February 04, 2025

77

```
1   numerous emails noting that the account has not
2   fulfilled the fund investment objective."
3            Do you see that?
4       A.   Yes.
5       Q.   And then looking at the response right above
6   it from you to Mr. Edelman.  Do you see that?
7       A.   Yes.
8       Q.   The middle email about half way down this
9   paragraph.  Do you see where it says:
10           "I know we have some big cash calls coming
11  up."
12      A.   Yes.
13      Q.   "I have been watching the RS position quite
14  closely."
15           Do you see that?
16      A.   Yes.
17      Q.   What does RS refer to in that context?
18      A.   Red Star. Red Star Enterprises.
19      Q.   And then on the second line up from the
20  bottom of this email, do you see where it says:
21           "possible shareholder distributions going
22  forward."
23           Do you see that?
24      A.   Yes.
25      Q.   Which entity were you referring to
```

Graham Collett                                        February 04, 2025

1   shareholder distributions out of?

2       A.    That would have been Red Star Enterprises.

3       Q.    And who were you reporting about shareholder

4   distributions out of Red Star to in this email?

5       A.    I was reporting them to Mr. Edelman.

6       Q.    And do you see at the bottom where it says,

7   the last line of this email is:

8             "Meanwhile, we have 30M in total reserves for

9   right now."

10            Do you see that?

11      A.    That's correct.

12      Q.    Were you also reporting that to Mr. Edelman

13  in this email?

14      A.    Yes.

15      Q.    And then looking at Mr. Edelman's response.

16      A.    Yes.  This is 6th of November.

17      Q.    Do you see where it says in the first line:

18            "Biggest call is Mexican biz 10M."

19            Can you tell us what that means?

20      A.    At this stage that refers to the, the Mexican

21  business -- this would have been the, the fuel logistics

22  business, Sirius, which was underway by this stage and

23  was going to acquire funding of approximately $10

24  Million.

25      Q.    And what about the second line up from the

1    bottom of this particular email, where it says:

2            "Otherwise we may do 10 in China and a couple

3    on property."

4        A.    Yes.

5        Q.    You know what that means?

6        A.    The investment of 10 million in China in the

7    acquisition of the Beijing Cable and China New Media

8    businesses.  'A couple in property', I'm not quite sure

9    what that refers to.

10       Q.    And then in the very top email -- sorry,

11   sticking with this middle email, do you see where

12   Mr. Edelman says:

13           "Also suggest you and Remco open today, or

14   next week ASAP the new accounts and we just leave

15   Mirabaud."

16           Do you see that?

17       A.    Yes.

18       Q.    Did you ultimately leave Mirabaud and move

19   funds to a different Bank?

20       A.    Yes.

21       Q.    Whose decision was that ultimately, to close

22   the Mirabaud account and move the funds to a different

23   Bank?  Who made that call?

24       A.    The call ultimately came from Mr. Edelman

25   after Remco Polderman had negotiated arrangements with

1   Safra Bank.

2       Q.    And as for the Mexican investment you just

3   talked about, who made the call, whether or not to send

4   that $10 Million into the Mexican investment?

5       A.    Again, Mr. Edelman authorized all the various

6   payments that were made into the Sirius Mexican project.

7       Q.    And what about the China project that's

8   mentioned here?

9       A.    Again, that was authorized by Mr. Edelman.

10      Q.    Like to look at 1-1, please.

11  (Exhibit Gov. Exb 1-1 was entered into evidence.)

12  Mr. Collett, do you see at the top of 1-1, the

13  letterhead that reads Caplin and Drysdale.  Do you see

14  that?

15      A.    Yes.

16      Q.    And do you see the date at the top of this

17  letter says November 18th, 2015?

18      A.    Yes.  Correct.

19      Q.    Can you tell me the recipient listed on this

20  document?

21      A.    It was it was addressed as a fax to the

22  Internal Revenue Service.

23      Q.    Can you tell which country?

24      A.    In the United States.

25      Q.    Do you see under 'Dear Sir or Madam', where

1   there's some text in this document?

2       A.    Do I see?

3       Q.    Do you see under 'Dear Sir or Madam,' where

4   there's some text in this document and it says:

5            "Please run a preclearance check on the

6   following taxpayer who intends to enter the IRS Offshore

7   Voluntary Disclosure program."

8            Do you see that?

9       A.    Yes.

10      Q.    Is that the program that you testified about

11  earlier?

12      A.    That was the program, yes.  I understood.

13      Q.    Can you tell us the taxpayer listed on this

14  document?

15      A.    Douglas Edelman.

16      Q.    And can you tell us -- it's in very small

17  text, but looking down on footnote 2.

18      A.    Sorry, on?

19      Q.    In footnote 2. The bottom of the page.  Do

20  you see where it says:

21           "Taxpayer's name may have been reflected

22  erroneously some years ago as having an interest in one

23  or more accounts owned by a non U.S. account holder at a

24  non-U.S. bank."

25           Do you see where it says that?

1        A.    Yes.

2        Q.    Do you see where it continues:

3              "This preclearance request names the only

4    non-U.S. bank in which taxpayer had a reportable

5    interest in a foreign account during the OVDP period."

6              Do you see that?

7        A.    Yes.

8        Q.    And can you tell us above, above the line in

9    this email there's a notation for 'Financial

10   Institution.' Do you see that?  Do you see where there's

11   a notation next to 'Financial Institution.'

12       A.    Oh, sorry.  Yes.  Yes.

13       Q.    Can you tell us which listed next to

14   'Financial Institution?'

15       A.    HSBC Bank London UK.

16       Q.    And can we look down at footnote 3, please?

17       A.    Yes.

18       Q.    Do you see where it says:

19             "Per FAQ 23, there is no entity through which

20   the undisclosed OVDP assets were held by the taxpayer."

21   Do you see that?

22       A.    Yes.

23       Q.    And can, can you read to us the rest of the

24   text in that footnote, even though it's very small?

25       A.    Yes.

1           "The taxpayer served as a paid adviser to a

2    foreign trust in brackets and certain of its affiliated

3    entities because -- brackets -- the grantor and owner of

4    which what is his non-U.S. spouse and he received

5    occasional gifts from her paid through the trust for

6    convenience, these matters will be fully reported in the

7    taxpayer's OVDP submission."

8           Q.    I'd like to turn to the next page of this

9    Exhibit please, if we could.  Do you see the signatory

10   on this letter is Scott Michael.  Is Scott Michael one

11   of the Caplin Drysdale attorneys you had provided the

12   client binder to?

13          A.    Yes.

14          Q.    Can we go to 10-1, please?

15   (Exhibit Gov. Exb 10-1 was entered into evidence.)

16   Before we look at this Exhibit, Mr. Collett, do you

17   recall any conversations with Mr. Edelman around this

18   period of time in 2015 about his submission?  Did he

19   tell you how he felt about it?

20          A.    At this time in November 2015, when work was

21   progressing in terms of the preparation of Returns and

22   so on, I got the general impression that Mr. Edelman was

23   not totally satisfied with what was happening.  And as

24   it got nearer the time that the detailed information was

25   being submitted, I do recall that Remco Polderman and I

1  had discussions in terms of trying to persuade

2  Mr. Edelman that he needed to, he needed to proceed with

3  the OVDP arrangement in order to try to rectify his lack

4  of, of filing Returns.  At the end of the day, he did

5  need quite a lot of persuading to give the final go

6  ahead.

7       Q.    I'd like to look at 10-1, if we could,

8  please.  This is an email from December 2015 between an

9  email address, de@ledain.ch who you identified as

10  Mr. Edelman's.

11      A.    Yes.

12      Q.    And an email address you identified as Mr.

13  Buscher's, I believe.  Do you see that?

14      A.    Correct.

15      Q.    With a copy to your email address.  And then

16  can you identify for us the next Yahoo address after

17  yours?

18      A.    Thomas Ehr and James Cecil.

19      Q.    And at this period in 2015, what were Tom Ehr

20  and James Cecil's roles?

21      A.    Tom Ehr was involved in a number of Projects

22  including the Mexican Logistics Project, and James Cecil

23  was also involved in one or two of the Projects.  For

24  example, in connection with Mara Farming and in looking

25  for general business opportunities.

Graham Collett                                    February 04, 2025
85

1       Q.    Mr. Collett, I'd like to look at page 3 of
2   this Exhibit, please.  The very bottom email on page 3,
3   which appears to be from Mr. Buscher to several
4   individuals.  Do you recognize those names?  On the to
5   and copy lines?
6       A.    Yes, to Jaime De La Rosa, with a copy to
7   Alberto Garza.  Jaime was one of the Accounting Team,
8   Finance Team in Sirius and Alberto Garza Santos, I
9   believe, he was one of the Mexican Partners in the 50%
10  ownership of the Sirius business, as was Thomas, as he
11  was known, as TMS.
12      Q.    Do you know how Mr. Edelman knew these
13  individuals, or whether he did?
14      A.    I believe that Mr. Edelman knew of these, of
15  these two individuals.  Quite how he originally came to
16  know them, I don't, I, I don't really know.
17      Q.    I'd like to look at page 2 of this Exhibit,
18  if we could, please.  The email that's about halfway
19  down the page, from Mr. Edelman at 620-6:36 a.m.  Do you
20  see where he says:
21          "Do we even want a USA citizen on a bank
22  account?  Why invite all the extra regulators and
23  scrutiny?  Did anyone think about this?"
24          Do you see that?
25      A.    Yes.

Graham Collett                                          February 04, 2025

86

1        Q.    Do you know what that means?

2        A.    Not only did don't want his name on anything,

3    but he did not, at this particular point say that he

4    felt that having any other U.S. citizens involved as

5    directors, or involvements in any of these entities was

6    not a good idea.

7        Q.    Mr. Collett, you mentioned earlier that there

8    were eventually some tax returned, Tax Returns prepared

9    and that you had been involved.  I'd like to talk about

10   your involvement in the preparation of those Tax

11   Returns.  Can we look at 5-1, please.

12   (Exhibit Gov. Exb 5-1 was entered into evidence.)

13   Mr. Collett, did you prepare this document?

14       A.    Yes, I did.

15       Q.    Can you tell us what it is?

16       A.    It is a summary of income directly out of any

17   of the Companies within the structure personally, to

18   Mr. Edelman, or to Delphine Le Dain.

19       Q.    And when you say 'directly to' what do you

20   mean?

21       A.    Paid into their personal bank accounts, or

22   paid out to children, or other family members.  And

23   payments for private expenses, such as credit cards and

24   so on.

25       Q.    I'd like to look at 4-11.  If we could,

Graham Collett                                    February 04, 2025

1    please.

2    (Exhibit Gov. Exb 4-11 was entered into evidence.)

3    Mr. Collett, the summary that we just looked at; do you

4    recall providing summaries like that one to Caplin and

5    Drysdale?

6         A.    Yes, I would have done that.

7         Q.    And looking at 14-11, if we could, I'm sorry.

8    4-11, if we could.  Do you see this email dated

9    August 20th?  I'm sorry, April 2016.

10        A.    Yes.

11        Q.    Can you tell us who the sender on this email

12   is?

13        A.    Myself.

14        Q.    Sorry, looking at the very top email, the

15   very top email is from Rivero, Luis Rivero, to myself

16   with copies to Diane Mehany.  Scott Michels.  Juan

17   Ferrucho, Alvarez, Mark Levine, Alvarez.  To Remco

18   Polderman and sorry, I can't remember his first name.

19   M. Vankranenburg. Another Partner in HVK Stevens.

20        Q.    Who is Luis Rivero? Or, Luis Rivero, the

21   first, the sender on this email?

22        A.    They are employed by Alvarez Marsal, who were

23   the Company that were actually preparing the Returns,

24   the Tax Returns.

25        Q.    Whose Tax Returns were they preparing?

1        A.    Douglas Edelman's.

2        Q.    And Juan Ferrucho, do you recall his role?

3        A.    I can't tell you their exact roles, whether

4    they were -- I can't remember their, their level of

5    authority within Alvarez, their status within Alvarez.

6        Q.    I'd like to look at the original email from

7    you, which is at the bottom of the chain, please.  Or

8    bottom of the screen.

9        A.    Yes.

10        Q.    Do you see where it says:

11              "I've reviewed all of the final figures based

12    on the working papers that you sent me, and I only have

13    a few comments."

14              Do you see that?

15        A.    Yes.

16        Q.    Mr. Collett, can you give us a brief summary

17    of exactly how this process went of getting information

18    to the attorneys, or Tax Preparers, through to getting

19    Tax Returns prepared?

20        A.    Yes.  On, on the initial Returns that were

21    submitted, I had summarized all of the various

22    transactions and summarized the basis on which I had

23    prepared them, and sent them to Caplin and Drysdale.

24    And then obviously, on to Alvarez to actually prepare

25    the detailed Returns.

1          On an annual basis, that happened going

2    forward from 2015.  On an annual basis.  And I prepared

3    the Tax Returns information in terms of income, so on,

4    exactly the same principles that had been adopted at the

5    outset.

6          Q.    When you say 'principles that had been

7    adopted at the outset,' what do you mean?

8          A.    I mean, I believe I set out somewhere, that

9    the basis on which I prepared them -- in other words any

10   income to Mr. Edelman's personal bank account.  Any

11   payments to his families members.

12          Also payments made in respect of credit cards

13   used by him.

14          Any other payments that were made out of the

15   Trust Companies that were payments out of the Trust

16   Companies that related directly to him.

17          Also, details of any of the payments made on

18   the private jet which had been discussed with Caplin and

19   Drysdale.  And for example, if it was decided that the

20   whole of the, the jet payments costs should be reported

21   on the Tax Returns.

22          Those were the basic principles on which I, I

23   prepared the figures every year for preparation of the

24   Returns.

25          Q.    And when in time was this in relation to the

Graham Collett                                          February 04, 2025

90

1  client binder that you had given to Caplin Drysdale?

2  Was it before, or after you gave them the client binder

3  that you prepared these Returns?

4        A.    This was after.

5        Q.    Like to look if we could please -- Mr.

6  Collett, did you tell Caplin Drysdale about the sale of

7  Mr. Edelman's interest in Metro Bar?

8        A.    No, I didn't.

9        Q.    Did you tell Caplin Drysdale about the

10  dividend distributions that had come out of Ifone Neda?

11        A.    No.

12        Q.    What about the purchase, the purchase of the

13  Divinity Yacht?  Did you tell them about that?  That

14  Mr. Edelman had directed it?

15        A.    No.

16        Q.    What about the purchase of the Princess

17  Juliet yacht?  Did you tell them that Mr. Edelman had

18  directed it?

19        A.    No.

20        Q.    Did you tell them that he was directing the

21  movement of tens of millions of Dollars into a Mexican

22  fuel investment?

23        A.    Not directly, no.

24        Q.    Did you tell them that he was the person who

25  had directed money into an eastern European MTV

1  franchise?

2      A.    No.

3      Q.    Did you tell them about the $580,000 that he

4  had sent to his son Mikhail Tassi?

5      A.    No.

6      Q.    Do you recall the year that the money had

7  gone to Mr. Tassi?

8      A.    I believe it was 2015, or thereabouts.  Don't

9  remember.

10     MS. RANNEY:  I think now is a good time for a

11 break.  Can we do our longer break?  30 minutes? .

12     VIDEOGRAPHER:  This is the end of Media II, Vol.

13 III, going off the Record 16:07, as indicated on the

14 video screen.

15           (Break taken.)

16     VIDEOGRAPHER:  This is the beginning of Media III.,

17 Vol. III, going back on the Record at 16:46, as

18 indicated on the video screen.

19 BY MS. RANNEY:

20     Q.    Mr. Collett, I'd like to return to your work

21 on the OVDP and follow on Tax Returns, if we could

22 please.  Could we look at Exhibit 5-2?

23 (Exhibit Gov. Exb 5-2 was entered into evidence.)

24 Do you see this email from February 2016?

25     A.    February 2016.  Yes.

1      Q.     And this, if you look down the email chain to
2  the bottom of this first page, there's an email from you
3  to Mr. Polderman.  Do you see that?
4      A.     Yes.
5      Q.     Do you see where it says:
6             "Many thanks for forwarding the summaries to
7  me yesterday."
8             Do you see that?
9      A.     Yes.
10     Q.     And then, can you see in the emails above
11 that where information appears.  In the top email.  From
12 Mr. Rivero to Mr. Ferrucho. Do you see that?
13     A.     Yes.
14     Q.     So, there's an FYI?
15     A.     Yes.  Has Draft, Draft Returns. Yes.
16     Q.     And it appears that there are attachments to
17 that email.  Do you see that?
18     A.     Yes.
19     Q.     I'd like to look at some of the attachments
20 to these in the email.  Could we look at page 5, please.
21 Do you see where it says 'DE Tax Return Information
22 Summary 2007.' Do you see that?
23     A.     Yes.
24     Q.     Do you know who prepared this summary?
25     A.     I prepared this summary.

1      Q.    And after you prepared it, did you review it
2  with Mr. Edelman?
3      A.    All of these, for the earlier years, I
4  prepared in one -- at one time.  And went through the
5  basis on which these have been prepared with Mr. Edelman
6  at the time, before they were submitted to to the IRS.
7      Q.    So, looking at this one, page 5, can you tell
8  us which year this appears to relate to?
9      A.    This relates to 2007.
10      Q.    And turning to Page 9.  Is this another
11  summary of tax return information that you prepared for
12  Mr. Edelman?
13      A.    This is for the year 2008.  That's right.
14      Q.    And is it also the case that you reviewed
15  this one with Mr. Edelman after you prepared it?
16      A.    These would have already been prepared at
17  roughly the same time and discussed with Mr. Edelman at
18  the same time.
19      Q.    And if we could look pleas at Page 12.  Is
20  this another tax return information summary that you
21  prepared?
22      A.    This is for the year 2009.
23      Q.    And was this part of the group that you
24  reviewed with Mr. Edelman after you prepared it?
25      A.    That's right.

Graham Collett                                        February 04, 2025

94

 1        Q.    Can we look at Page 14, please?

 2        A.    This is the return for 2010 summary.

 3        Q.    Is this part of the group that you reviewed

 4   with Mr Edelman?

 5        A.    Yes.

 6        Q.    And page 16; is this another summary that you

 7   prepared?

 8        A.    That's right.

 9        Q.    And which year does this relate to?

10        A.    This relates to the year 2011.

11        Q.    And is this part of the group that you

12   reviewed with Mr. Edelman?

13        A.    Yes.

14        Q.    And page 18.  Is this another yearly tax

15   return information summary that you prepared?

16        A.    That's correct.

17        Q.    Which year is this for?

18        A.    This is for the year 2012.

19        Q.    And is this part of the group that you

20   reviewed with Mr. Edelman?

21        A.    Yes.

22        Q.    I'd like to look at a few entries on this

23   2012 page, if we could, please.  Do you see about half

24   the way down the page, where it says 'Trust Payments?'

25        A.    Yes.

Graham Collett                                                February 04, 2025

95

1     Q.    And then there are some sets of initials?

2     A.    That's correct.

3     Q.    Do you know who those initials relate to, or

4  what those initials relate to?

5     A.    These relate to various payments made to, for

6  example Rivkah Edelman, Gregory Edelman and Rebecca

7  Tassi.

8     Q.    Can you remind us who those three individuals

9  are?

10    A.    They are -- Rivkah is Mr. Edelman's daughter,

11 Gregory Edelman is Mr. Edelman's brother.  And Rivkah,

12 sorry, Rebecca Tassi is Mr. Edelman's former wife.

13    Q.    And what about the next entry, where it says

14 'Netjets Costs.' Do you see that?

15    A.    Yes.

16    Q.    Can you tell us how much in Netjets costs is

17 reflected that year?

18    A.    That is the total cost of the hiring and

19 operating of a lease of a, of a, of a private jet.

20    Q.    Do you recall when a private jet had started

21 to be leased?  When in time that happened?

22    A.    Sometime earlier that -- I can't quite

23 remember the exact date.

24    Q.    And who had decided to lease a private jet?

25 Whose decision was that?

Graham Collett                                          February 04, 2025

1        A.    I believe that that was Mr. Edelman's
2    decision.
3        Q.    Did he ever take you to ride on a private jet
4    with him?
5        A.    Once.
6        Q.    Do you remember where you went?
7        A.    We went from London, Biggin Hill to Geneva
8    for a meeting in the Geneva office.
9        Q.    Do you know if Mr. Edelman took other
10   business associates on the private jet?
11       A.    From my recollection of the invoices that I
12   would have seen every month, I believe that there were
13   other instances where he would take business colleagues
14   on various journeys on the, on the, on the jet.
15       Q.    Continuing on to page 20, if we could,
16   please.  Is this another tax return information summary
17   that you prepared?
18       A.    That's correct.
19       Q.    And which year is this for?
20       A.    This is for the year 2013.
21       Q.    And is this also in the group that you
22   reviewed with Mr. Edelman?
23       A.    Yes.
24       Q.    And what about the next page?  Is this
25   another tax return information summary?  Page 21.  For

1    2014?

2         A.    Yes, that is correct.

3         Q.    And is this in the group that you reviewed

4    with Mr. Edelman?

5         A.    Yes.

6         Q.    Do you remember anything about Mr. Edelman's

7    response when you presented him with these summaries?

8         A.    I can't remember anything specific other than

9    "why do we need to include the, the personal payments to

10   the various individuals?" He said: "Why should I be

11   paying tax on that?" I explained to him the situation

12   that they were payments being made on his behalf to

13   family members.

14        Q.    And who had directed that those payments be

15   made in the first place to Mr. Edelman's family members

16   and ex-wife?

17        A.    Mr. Edelman.

18        Q.    Do you remember whether Mr. Edelman discussed

19   his view on whether those payments were gifts to his

20   family members, or not?

21        A.    I can't remember exactly what he would have

22   said other than that they were their gifts.

23        Q.    Do you remember any anything related to his

24   general reaction to including information about the HSBC

25   Account on these Summaries?

1    A.    I can't remember anything specific that he

2  said.  What I, what I explained to him was that these

3  were the payments that I had identified from his HSBC

4  bank statements and tried to confirm those with the

5  amounts that had been paid out from the various

6  Companies.

7    Q.    Could you go back to 4-11, please.

8  Mr. Collett, we talked about this email a moment ago,

9  this April 2016 email, but I'd like to look at the

10  bottom of the first page, please, if we could, where

11  there's a numeral 1.  Do you see that at the bottom of

12  the first page?

13    A.    Yes.

14    Q.    Do you see where it says:

15          "The income of 70K that went into the T... n

16  Account."

17          Do you see that?

18    A.    That's right.

19    Q.    Do you know what that refers to?

20    A.    That refers to the Touchdown Account.

21    Q.    Can you remind us what the Touchdown account

22  is?

23    A.    It was a numbered Swiss Account without a, a

24  personal name attached to it, and which was funded by, I

25  recall, Aspen Wind and Bartol, and was used for various

Graham Collett                                                    February 04, 2025

1   payments and receipts and payment of expenses.

2        Q.    And do you recall whether Mr. Edelman was

3   pleased, or displeased that you had told the Tax

4   Preparers and Caplin Drysdale about the Touchdown

5   account?

6        A.    I recall that he wasn't very pleased.  He

7   said "Why, why do you need to include this?  Why do you

8   need to tell them about the Touchdown account?  It's

9   nothing to do with anybody."

10       Q.    Mr.  Collett, we looked at that group of

11  summaries a moment ago, and you said that you had

12  prepared them in a group and reviewed them with

13  Mr. Edelman.  Do you recall preparing information for

14  later year Tax Returns as well?

15       A.    Yes, I did.

16       Q.    Can we look at 5-4, please.

17  (Exhibit Gov. Exb 5-4 was entered into evidence.)

18  Do you see this email from 2016 June 2016?

19       A.    Yes.

20       Q.    From an email address you identified as yours

21  to Mr. Rivero at Alvarez and Marsal.  Do you see that?

22       A.    Yes, that's correct.

23       Q.    And do you see in the text of the email where

24  it says:

25             "Dear Luis, further to email, I now attach

1    the relevant working papers to enable you to commence

2    preparation of the 2015 tax return for the client."

3            Do you see that?

4        A.    That's correct, yes.

5        Q.    And who's the client you're referring to?

6        A.    Douglas Edelman.

7        Q.    And had you prepared the summary that you

8    were forwarding?

9        A.    Yes.

10        Q.    If we could turn to page 4 of the Exhibit?

11        A.    Yes.

12        Q.    Is this the summary that you prepared for

13    2015?

14        A.    That is correct.

15        Q.    And did you use the same or different

16    principles to put together the summary information for

17    this Tax Year?

18        A.    I used the same principles that I'd used for

19    the previous years.

20        Q.    And did you review this summary with

21    Mr. Edelman after you prepared it?

22        A.    As and when it came to him signing off the

23    account, I believe that from 2015 onwards, I reviewed

24    them on an annual basis with him when the final drafts

25    were ready for sign off.  And the various detailed

1   return forms had to be signed by Mr. Edelman.

2        Q.    For the 2015 tax year, did you include any

3   information about the distributions Mr. Edelman had

4   taken from iFone Neda, the Company making profits on

5   selling Internet to U.S. troops in Afghanistan?

6        A.    No, I didn't.

7        Q.    Did you include any information related to

8   the sale of Metro Pub, Metro Bar?

9        A.    No.

10       Q.    And the amounts received for that sale?

11       A.    No.

12       Q.    You look at 5-5, please.

13  (Exhibit Gov. Exb 5-5 was entered into evidence.)

14  Do you see this email from March 2017?

15       A.    Yes.

16       Q.    Is this from -- the top email from you to

17  Luis Rivero?

18       A.    That is correct.

19       Q.    Do you see that?  And do you see next to the

20  attachments line, where it says 'Overall Income Summary

21  2016.' Do you see that?  'Overall Income Summary?'

22       A.    Yes.

23       Q.    And turning to the attachment to this

24  document, page 5.  Do you see at the top where it says

25  'Douglas Edelman Tax Return Information Summary?

Graham Collett                                    February 04, 2025

1        A.      26, for the year ended 31st December 2016.

2        Q.      Is this the summary that you prepared for

3    2016?

4        A.      Yes.

5        Q.      Was it using the same principles that you

6    just discussed for the previous year Returns?

7        A.      That's correct.

8        Q.      Did you review this with Mr. Edelman?

9        A.      Yes.  When it came to the time of him signing

10   off the final Return forms on which these figures were

11   based, yes, I would have discussed that with him when he

12   signed the accounts.

13       Q.      Did you include any of the profits from

14   iFhone Neda, the Company selling Internet to U.S. troops

15   in Afghanistan in this summary?

16       A.      No, I didn't.

17       Q.      I'd like to look at for 4-14, if I could

18   please?

19   (Exhibit Gov. Exb 4-14 was entered into evidence.)

20       A.      I'm sorry.  4?

21       Q.      4-14.  Do you see this email dated April

22   2018 ?

23       A.      Yes.

24       Q.      From you to looks like another Alvarez and

25   Marsal email address.  Do you see that?

1        A.    Yes.   Erik Christianson is Alvarez.

2        Q.    And do you see down on the Attachments line

3   where it says:

4             "Copy of Edelman 2017 Information request

5   completed Draft."

6             Do you see that?

7        A.    Yes.

8        Q.    Do you recall submitting information to the

9   Tax Preparers to be used for the preparation of

10  Mr. Edelman's 2017 Return?

11       A.    That's correct.

12       Q.    I'd like to look at the attachment to this

13  email, if we could please?  Could we turn to page 16,

14  please.  Is this the summary information you prepared

15  for Mr. Edelman for the Tax Year 2017?

16       A.    This is correct.

17       Q.    And did you review this information with

18  Mr. Edelman?

19       A.    Again, when the Tax Returns were ready for

20  submission.

21       Q.    I'd like to draw your attention to very small

22  print but on line 6, where it says 'Dividend Income.'

23  And then if you look across it says:

24             "No dividend income for 2017."

25             Do you see that?

1      A.    That's correct.

2      MS. RANNEY:   Could we put back up 14-70, please?

3  An Exhibit we looked about just a minute ago, side by

4  side with this page.

5  BY MS. RANNEY:

6      Q.    Mr. Collett, do you remember a few moments

7  ago when we looked at the email forwarding invoices

8  related to Ifone Neda?  Do you remember that?

9      A.    Yes.

10     Q.    And do you remember what you told us about

11 what those amounts on the invoices actually were?  What

12 were those amounts on the invoices?

13     A.    In terms of what, what they represented?

14     Q.    What they represented?  What were they?

15     A.    They represented dividends back to

16 Mr. Edelman.

17     Q.    And can you tell us the date on the top email

18 14-70.  On the first page.

19     A.    Yes, that's, that's April 2018.

20     Q.    And if we could go back on the left hand side

21 on 4-14, can you tell us the date that you forwarded the

22 Summary to Alvarez and Marsal for 2017?

23     A.    That was the, that was October 2018.

24     Q.    If you could look at the email on the second

25 page of this Exhibit; what's the date on that email?

Graham Collett                                    February 04, 2025
                                                            105

 1  Halfway down the page.

 2      A.    Down the page -- the email to Erik

 3  Christiansen was dated the 10th of April 2018.

 4      Q.    Yep.  And then looking again at the top email

 5  on page 1:  You see where it says 4-10-2018?

 6      A.    Yes.

 7      Q.    In the United states, do you know what

 8  4/10/18; what date that would be in the United States?

 9      A.    That would be the 10th of April.

10      Q.    Mr. Collett, was it your idea not to tell the

11  Tax Preparers about the distributions from iFone Neda in

12  relation to Mr. Edelman's U.S. Tax Returns?

13      A.    No, it was not my idea.

14      Q.    Whose idea was it?

15      A.    I'm, I really can't be certain as to whose

16  idea that was.  I reviewed these figures with

17  Mr. Edelman. The amounts that actually going into one of

18  the Trust Companies.  I can't remember the exact

19  discussions concerning that, that, that decision.  But

20  I, I pointed this out at the time that the Returns were

21  being submitted.  And the amounts were not included.

22      Q.    Well, would Mr. Edelman receiving millions of

23  dollars in distributions be consistent with 'the party

24  line', as you've described it?

25      A.    Yes.  Inasmuch that he did not receive any of

 1 | that money, personally.

 2 |       Q.    But who did you understand to have the

 3 | ownership interest in iFone Neda?

 4 |       A.    It was Douglas Edelman.

 5 |       Q.    And who had decided that the money for his

 6 | ownership share should not come directly to him?  Was

 7 | that your idea, or his idea?

 8 |       A.    It was his idea, in that he did not want the

 9 | money coming in to his account, or any accounts that he

10 | had.

11 |       Q.    I'd like to look at 5-6, please.

12 | (Exhibit Gov. Exb 5-6 was entered into evidence.)

13 | Do you see this email dated 2019 from you to several

14 | Alvarez and Marsal email addresses?

15 |       A.    Yes.

16 |       Q.    And do you see where the attachments, it says

17 | 'Schedules-2018.' Do you see that?

18 |       A.    Yes.

19 |       Q.    And in the body of the email, do you see

20 | where it says:

21 |             "I attach here with a summary of the client's

22 | income for the year ended 31st December 2018."

23 |             Do you see that?

24 |       A.    That's correct.

25 |       Q.    And if we look at the attachment starting on

1    page 5, if we could. Is this the summary for 2018?

2         A.    That is correct.

3         Q.    Who prepared this?

4         A.    I prepared it.

5         Q.    Did you review it with Mr. Edelman?

6         A.    Again, at the time his Return was ready for

7    submission and signature, I went through the return with

8    him.

9         Q.    Are any distributions from iFone Neda

10   reported in this summary?

11        A.    No, there aren't.

12        Q.    Can we look at 5-7, please?

13   (Exhibit Gov. Exb 5-7 was entered into evidence.)

14   Is this an email from September 2020?

15        A.    Correct.

16        Q.    And do you see where it's from your email

17   address that you've previously identified as yours to

18   several folks at Alvarez Marsal, among others?

19        A.    Yes.

20        Q.    You see that?  And do you see in the top of

21   the email text, where you say:

22             "As promised, I attach the final summary of

23   income for Douglas Edelman in respect to the Year End at

24   31st December 2019."

25             Do you see that?

1       A.      Correct.

2       Q.      Can we look at the attachment to this email,

3  please?  Beginning page 8.  Is this the summary that you

4  prepared for 2019?

5       A.      Yes, that is correct.

6       Q.      And did you review this with Mr. Edelman?

7       A.      Yes. This was a draft, subject to audit.  I

8  would have discussed either this one, or the final

9  version with Mr. Edelman at the time he was signing off

10 on the accounts.

11      Q.      Did this summary include any distributions

12 from iFone Neda?

13      A.      No, it didn't.

14      Q.      Mr. Collett, in the income summaries that we

15 just looked at, did you include any distributions from

16 Mina, or Red Star on the income summaries?

17      A.      No.

18      Q.      Do you know if distributions were made out of

19 Mina, or Red Star in the years between 2007 and 2019?

20      A.      Yes.

21      Q.      Do you have any personal knowledge about who

22 had requested distribution to be made or requested the

23 amount to be distributed?

24      A.      The amounts to be distributed were usually

25 discussed between Mr. Edelman and Mr. Bek and then the

1  distribution would be made according, according to

2  whatever they had agreed, and forwarded to the relevant

3  Companies receiving those dividends: Mr. Bek into his

4  Companies, and in as far as the 50% for the, for -- on

5  the Edelman side would be decided by Mr. Edelman in

6  terms of whichever entity was, was in place at the time.

7      Q.    And Mr. Collett, do you have any personal

8  knowledge about what size of distributions we're talking

9  about here?  We're talking about hundreds of thousands

10 of Dollars?

11     A.    In terms of the distributions over the period

12 that we looked at before, the total amount of dividends,

13 I believe was in the region of 300 Million.

14     Q.    And is that 300 Million, to your recollection

15 just to the Edelman side, as you described it?

16     A.    Yes, that's correct.

17     Q.    I'd like to look at 14-65, if we could,

18 please.

19 (Exhibit Gov. Exb 14-65 was entered into evidence.)

20 Mr. Collett, do you see at the top of this document

21 where it says 'Deed Of Gift?'

22     A.    Yes.

23     Q.    And it looks like the first line says:

24        "This Deed Of Gift is made or entered into on

25 this 17th day of June 2016."

Graham Collett                                    February 04, 2025

1            Do you see that?

2      A.    Yes, Correct.

3      Q.    And who is listed as the Donor on this Deed

4   Of Gift?

5      A.    Delphine Edelman.

6      Q.    And the Donee?  Who's listed?

7      A.    Douglas Edelman.

8      Q.    Can you tell us what this is?  Do you know

9   what this is?

10     A.    This was a Deed Of Gift from Delphine

11  Edelman, Delphine Le Dain as she was then known, to her

12  husband in the amount of 4 Million USD.

13     Q.    And does it say on this Deed Of Gift, what

14  the gift is supposed to be for?

15     A.    It doesn't say specifically what it's for.

16     Q.    Drawing your attention to the second bolded

17  paragraph where it says:

18           "Whereas the Donor wishes to personally

19  assist Donee, her husband and his efforts to resolve

20  certain U.S. tax issues."

21           Do you see that?

22     A.    Yes.

23     Q.    And then it looks like, down at the bottom of

24  this Deed, on the 'By:' line there's a signature.  Do

25  you recognize that signature?

Graham Collett                                              February 04, 2025

1      A.     I recognize that signature as being that of

2  Delphine Le Dain to the best of my ability, to to, to

3  confirm it.

4      Q.     In June 2016, who was giving you your day to

5  day instructions about when and where to transfer money?

6      A.     Primarily, Douglas Edelman.

7      Q.     Before June 2016, is there any period of time

8  where Delphine Le Dain, or Delphine Edelman had given

9  you your day to day instructions about when and where to

10  transfer money?

11      A.     On a regular basis, no.  There was no, there

12  was no period of time when that happened.

13      Q.     In fact based on your experience in the

14  investments and transactions we've just discussed, if

15  Douglas Edelman wanted to put $4 Million somewhere, what

16  would he do to make that happen?

17      A.     He would give me instructions to do so.

18      MS. RANNEY:  Could we look at 14-2, please?

19  Everyone's indulgence, please.  Let's go to -- yes. We

20  can come back to that in a moment.  Could we do 14-12?

21  Everyone's indulgence.  I apologize.  4-12.  Tomorrow,

22  I'll wear my glasses, I promise.

23      MR. CLARKE:  I'm missing 4-12.  I don't have 4-12

24  in my binder.

25      MS. RANNEY:  I don't either. That's not good.  I

```
 1   don't think, Mr. Collett does either.  All right.  Never

 2   mind.  Can we use the screen?  So, is everyone able to

 3   do that 4-12?

 4        VIDEOGRAPHER:  I can bring it closer.

 5        MS. RANNEY:  Can you see?

 6        MR. CLARKE:  Like, I mean I can see that, if he's

 7   got that.  Just leave it, that's fine.

 8   (Exhibit Gov. Exb 4-12 was entered into evidence.)

 9   BY MS. RANNEY:

10        Q.    Mr. Collett, are you able to see on the

11   screen this email dated December 2017?

12        A.    Yes.

13        Q.    And do you see that? It's from an email

14   address you've identified as Diane Mehany?

15        A.    Yes.

16        Q.    @caplindrysdale to an email address you've

17   identified as yours.

18        A.    That's right.

19        Q.    And if we could scroll down to the bottom of

20   the email chain, please.  I'm sorry, on the middle of

21   the page; do you see the email from you to Diane Mehany

22   where you say:

23            "Hi Diane.  One other point came to mind

24   after I responded to Scott's email yesterday."

25            Do you see that?
```

1     A.    Yes.

2     Q.    Do you see where it continues:

3           "When you come to London on January 5th, will

4     you be able to bring with you the file that I gave you

5     when you were in London in 2015 or 2016?"

6           Do you see that?

7     A.    Yes.

8     Q.    Can you tell us what this email refers to?

9     Why were you emailing with Diane Mehany about the files

10    that you had given her?

11    A.    This was the file that I gave them back in

12    July 2015, when we started the process that we've

13    identified from the index that we discussed earlier.

14          I, the meeting had been arranged for

15    December 17 in London, and because I hadn't kept an

16    absolute copy separately of that file, I suggested that

17    she bring the original file with her, so that we'd have

18    ease of reference of all the documents that were in

19    there, if we needed to.  All in one place at one time.

20    Q.    Do you remember why you needed to look back

21    at those documents?

22    A.    Only inasmuch as, as any matters coming up in

23    in, in the meeting regarding the information would be

24    all in one place, rather than in various separate files,

25    which I wouldn't have with me in London at that

1  particular time because they would have been back in my
2  office.
3      Q.    And can you tell us what was the substance of
4  this meeting that you're referring to?  Do you recall?
5      A.    I don't recall the exact agenda for that
6  meeting.
7      Q.    Do you recall being involved in providing
8  additional information to Ms. Mehany in 2018?
9      A.    Other than the, the preparation of the
10 routine annual returns, Tax Returns in 2017, I'm not
11 sure, but certainly in 2018.  Although, I can't remember
12 any specific additional information that I provided at
13 that time.
14     Q.    Mr. Collett, do you remember, generally
15 speaking, the types of tasks you are doing for Mr.
16 Edelman in 2018?
17     A.    When you say the types of activities, I was
18 preparing the, the -- in 2018, I would have been
19 preparing the 2017 annual return.  Otherwise in 2018.
20 I,can't remember any specific Tax Returns, or additional
21 information precisely at that time.
22     Q.    Mr. Collett I'd like to look at 14-2, if we
23 could, please Mr. Collett, we looked at this Exhibit
24 previously, and you identified the first page for us.
25 But I'd like to have you look, if we could, at page 29.

```
 1   Do you see at the top where it says 'Deed Of Gift?'
 2        A.    Yes.
 3        MR. CLARKE:  Sorry, I'm lost.  Where are we?
 4        MS. RANNEY:  Page 29, in 14-2.
 5        MR. CLARKE:  14-2. is 29, right?
 6        MS. RANNEY:  Is that the replacement 14-2 that we
 7   sent over?
 8        MR. CLARKE:  This is your binder.
 9        MS. RANNEY:  Our binder?
10        MR. CLARKE:  I'll just, I'll look there.  That's
11   fine.  That's fine.  I'll look, I'll look up there.
12   BY MS. RANNEY:
13        Q.    Okay.  Is this another deed of gift, like the
14   one we looked at a moment ago?
15        A.    That's correct.
16        Q.    And can you tell us the date on this Deed Of
17   Gift?
18        A.    This was dated the 15th of April 2020.
19        Q.    And who is this a gift from?
20        A.    It is from Delphine Le Dain. To her husband.
21        Q.    I'm sorry.  Who is it to?
22        A.    It is to her husband, Douglas Edelman.
23        Q.    And can you tell us what the amount of this
24   gift is?
25        A.    It is 20.  20,000 U.S. Dollars.
```

1        Q.    And next to the 'By:' line.  Do you see a

2   signature?

3        A.    Yes.

4        Q.    Do you recognize it?

5        A.    It is.  Yes, it's Delphine's, although it's

6   very small.

7        Q.    And under the 'Witness' line, do you

8   recognize the name of the person who witnessed this?

9        A.    Yes, I witnessed it.

10       Q.    And do you recognize your signature there?

11       A.    Yes.

12       Q.    Do you recall being present when this Deed Of

13  Gift was signed?

14       A.    No, it was emailed to me, and then I signed

15  it off from there.

16       Q.    Do you know whether this Deed Of Gift, or the

17  other Deed Of Gift we looked at were forwarded to Caplin

18  Drysdale at any point?

19       A.    I believe yes, they were.  I'm sure that the

20  the original 4 Million.  Sorry, 2 Million was actually

21  sent to Caplin and Drysdale.

22       Q.    I'd like to look at the date in this Deed Of

23  Gift again, April 2020, if we could.

24             In April 2020, who were you taking your day

25  to day instructions from on when and where to transfer

1    money?

2         A.    Day to day instructions from Mr. Edelman.

3         Q.    And Mr. Collett, you mentioned a moment ago

4    that you recognize Delphine Le Dain's signature, but you

5    seemed somewhat hesitant about it?

6         A.    Yes.

7         Q.    Can you tell us, had you ever been in Ms.  Le

8    Dain's presence when she signed documents in the years

9    that you worked for Mr. Edelman?

10        A.    Not usually.  No, I wasn't, I wasn't --

11   there may have been one or two occasions, perhaps, but

12   not on a regular basis.

13        Q.    Do you recall whether her, her signature was

14   ever needed for documents related to the Trust after

15   2012?

16        A.    In terms of Trust documents, the set up of

17   the Trust structures and so on; those types of

18   documents -- sorry, your basic question is?

19        Q.    Do you recall being present with her when any

20   documents relating to the Trust were signed?

21        A.    Not always, no.

22        Q.    Do you recall taking documents to her to sign

23   on any occasion?

24        A.    There were one or two occasions, yes, when I

25   was present.  When she signed off on various documents

1  but that was not as a general rule.

2      Q.    Mr. Collett, in all of the instances that

3  we've discussed, where Mr. Edelman gave you directions

4  about when and where to transfer money, was there any

5  time that you first went to Ms. Le Dain to ask if those

6  transfers would be okay to make?

7      A.    No.  Other than one occasion when I think

8  it's about 2018, when Mr. Edelman had voted me the

9  bonus, and I had passed that through to Len O' Brien at

10  Salamander and I had suggested that he should ask

11  Delphine Le Dain for an approval of that amount.

12      Q.    Do you recall why you had asked for approval

13  on that particular amount?

14      A.    Because it was being paid down out of the

15  accounts that that he was operating, that I suggested

16  that, I suggested that that should happen.

17      Q.    Can we look at 12-7, please.

18  (Exhibit Gov. Exb 12-7 was entered into evidence.)

19  Mr. Collett, do you recognize the email address at the

20  top of 12-7?

21      A.    Yes.

22      Q.    Whose email address is cdc@sssl.ae?

23      A.    That was Douglas Edelman.

24      Q.    And do you see where the subject line on this

25  email is:  'GC Bonus'?

Graham Collett                                    February 04, 2025

119

```
 1        A.     Yes.
 2        Q.     And do you see that this email bears a date
 3   of 2/1/2019.  Do you see that?
 4        A.     That's right.
 5        Q.     Turning to the next page of the document,
 6   page 2.  Do you see the attached letter?
 7        A.     Yes.
 8        Q.     Bearing the date 31st January 2019.  Do you
 9   see that?
10        A.     Yes.
11        Q.     Did you draft this letter?
12        A.     I think I drafted it with out a, an amount in
13   it.
14        Q.     And does this letter relate to the bonus that
15   you were just describing?
16        A.     That's correct.
17        Q.     And who had decided that you were to get a
18   $250,000 bonus?
19        A.     That came from Mr. Edelman.
20        Q.     Do you see at the bottom of the letter here
21   where it says:
22               "Thank you very much"
23               And then there's a name.  Do you see that?
24        A.     That's right.
25        Q.     Whose name is that?
```

Graham Collett                                         February 04, 2025

1        A.     That's Delphine Le Dain.

2        Q.     And Mr. Collett, just to confirm, were you

3   ultimately paid that 250,000 bonus?

4        A.     Yes.

5        Q.     Mr. Collett, while we're on the subject of

6   your interactions with Ms. Le Dain, could we look at

7   17-9, please?

8   (Exhibit Gov. Exb 17-9 was entered into evidence.)

9   Do you see this email dated June 1st, 2020?  Or this

10  email exchange from May June 2020?

11       A.     That's correct.

12       Q.     Do you see the bottom email?

13       A.     Yes.

14       Q.     Who's the sender on that bottom email?

15       A.     That is Delphine sending the email to myself.

16       Q.     Do you see in the text of the email where it

17  says:

18              "Dear Graham, also, I understand that most of

19  the cash flow we live on comes from Dubai, the Mina

20  contracts."

21              Do you see that?

22       A.     Yes.

23       Q.     At this point in May 2020, how long have you

24  been working for the Edelman businesses?  How many

25  years?

1    A.    2020?  16 years.

2    Q.    And do I understand correctly, based on your

3    testimony a minute ago, that in all of that time, you

4    only recall once going to Ms. Le Dain for approval on a

5    payment that Mr. Edelman had requested?

6    A.    That's the only one I can, I can, I can

7    recall.

8    Q.    Do you see the next line on that email where

9    it says:

10            "Now that is gone from Galactea where is the

11   cash flow going to come from?"

12            Do you see that?

13   A.    Yes.

14   Q.    And can you read the next sentence for us

15   started with 'everything?'

16   A.    "Everything else seems to be tied up in

17   volatile and risky assets in Mexico and Kenya that cost

18   money rather than bringing in money."

19   Q.    Mr. Collet, who had made the decision to

20   invest in Projects in Mexico and Kenya?

21   A.    Mr. Edelman.

22   Q.    Would you agree with the assessment that at

23   this point in 2020, those investments had cost money

24   rather than bringing money?

25   A.    Yes.

1    Q.    And looking at the next line do you see where
2  it says:
3          "Just worried when I think of the long term.
4  Also, how or where is Doug going to borrow 65 million
5  USD?"
6          Do you see that?
7    A.    Yes.
8    Q.    Before this period of time in May 2020, do
9  you recall ever having communications like this with Ms.
10  Le Dain about where the investments in the Trust were
11  being made?
12    A.    Not in any great detail, other than very
13  sporadic occasions when I would meet with her, or the
14  Trustee would meet with her and myself to discuss just
15  generally what was happening with the Trust investments.
16    Q.    And just to be clear, why would you have
17  periodic meetings with Ms. Le Dain about generally what
18  was going on in the Trust investments?
19    A.    She may ask occasionally, but in the main it
20  was when Len O' Brien was in London and the two of us
21  would meet with her.
22    Q.    In that period of time between 2012 and 2020,
23  who was the Beneficiary of the Trust?
24    A.    Between 2012 and 2020, the beneficiaries of
25  the Galactea Trust and the other related identical

1  Trusts, Settlor was Delphine Le Dain. And the

2  beneficiaries were Delphine Le Dain and her children.

3      Q.    And is that why you were meeting with her; to

4  tell her at a high level what was going on because her

5  name was on the paperwork for the Trust?

6      A.    That's correct.

7      Q.    Do you know why in this period of time in

8  May 2020, Ms. Le Dain was asking more specific questions

9  about the money coming in or out of the Trust?

10     A.    At this particular point in time the other

11 shareholder in the Mina Red Star business, Erkin Bek

12 raised a number of issues regarding who was his Partner

13 in the business.

14          There were many discussions involving various

15 people, concerning the ownership which arose primarily

16 from an email from Erkin Bek stating that he now

17 regarded Douglas Edelman as his Partner throughout the

18 period of existence of the fuel logistics business.

19     Q.    Mr. Collett, I'd like to return to what you

20 just mentioned, but first if we could look at 17-10,

21 please.

22 (Exhibit Gov. Exb 17-10 was entered into evidence.)

23 Do you see this email from July 2020?

24     A.    Yes.

25     Q.    And could we turn, please, to the initial

1   email in the chain which starts on page 3?

2        A.    Yes.

3        Q.    Do you see where you're saying, 'Good

4   morning, Delphine?'?

5        A.    Yes.

6        Q.    And a few lines down, you say:

7             "Following on from our messages on Friday and

8   as promised I set out below an explanation of the

9   current banking situation, the difficulties that we

10  currently have and the means by which we are trying to

11  overcome the problems."

12            Do you see that?

13       A.    Yes.

14       Q.    And then can you describe for us what's set

15  forth in the rest of this email?

16       A.    I was advising there, saying that the Safra

17  Accounts had been, been frozen earlier in the year 2020,

18  and they decided to carry out a detailed investigation

19  on all the various payments that had been made, and at

20  the same time there were no distributions coming out of

21  Red Star.  And Erkin Bek had made it very difficult

22  to -- and he would not agree to any monies coming out

23  the Mina Red Star business.

24            Remco Polderman had contact with Havilland

25  Bank and was trying to organize facilities and bank

Graham Collett                                          February 04, 2025

125

1    accounts with Havilland during this period.  I would say

2    it indicated that there were accounts with ING for two

3    Companies within the trust structure Comporta and Manas.

4            There was also the mention of loan accounts

5    to be set up to generate cash flow in that period

6    because of the lack of cash to pay liabilities and fund

7    the routine expenses of the Trust structure.

8        Q.    Before Erkin Bek turned off the tap of

9    distributions from Mina and Red Star, had Ms. Le Dain

10   can ever requested information like this before?

11       A.    No.

12       Q.    And if we could look at Ms. Le Dain's

13   response to your email on page 2.  Do you see where she

14   says:

15            "What are the amounts we are talking about

16   for the loans?  If I understand well, those two

17   Companies Comportahat and Lanius are borrowing from me,

18   my personal account at Mirabaud."

19            Do you see that?

20       A.    Yes.

21       Q.    Prior to you informing Ms. Le Dain about

22   this, do you know if she had been part of any

23   conversations about personal loans involving her and how

24   that could solve a cash flow crisis?

25       A.    I'm not quite sure how this, how this all

1  evolved, but because there was little access to cash

2  flow because of the Safra situation there were still

3  accounts with the CBH Account.  And amounts were being

4  transferred from CBH, accounts within the Trust

5  structure to Delphine's account, her personal account,

6  in order to make routine payments from her account.

7      Q.    And who had directed those transfers?

8      A.    Those had been ultimately directed by

9  Mr. Edelman on the basis that, that was the only way

10  that any money could flow through to pay regular

11  expenses.

12      Q.    You just mentioned CBH Bank.  Do you know

13  where CBH bank was?

14      A.    Yes, that was, that was based in well, it was

15  based in London and in Switzerland, I believe, from,

16  from, from my memory.

17      Q.    Looking at the email that we were just

18  reading in line 2, it says:

19          "those two companies, Comporta and Lanius."

20          Do you see that?

21      A.    Yes.

22      Q.    To the extent of your knowledge, who had made

23  the decision to put money into the Company, Comporta?

24      A.    Comporta was like, was a Company that had

25  been set up by Remco Polderman in connection with the

1    purchase and development of properties in Spain and

2    Portugal and Mr. Edelman had authorized the payments to

3    go out of the Trust accounts into Comporta, for those

4    Spanish investments.

5         Q.    And what about Lanius? Who had made the

6    decision to put money into Lanius?

7         A.    On a similar basis, money was transferred

8    into Lanius, another Company set up by Remco Polderman,

9    which was in connection with the, the Sirius Project.

10        Q.    Could we look at Ms. Le Dain's response,

11   please?  One email up in the chain?

12        A.    Yes.

13        Q.    Do you see where it says:

14              "We are talking about 1M facility."

15              Do you see that?

16        A.    Yes.

17        Q.    Do you know what that refers to?

18        A.    If you're referring to what amounts are we

19   talking about for the loans.

20        Q.    And do you see where it says:

21              "Yes, the companies will be borrowing from

22   your personal account, but your personal account is

23   being funded from part of the amounts that came in from

24   China."

25              Do you see that?

1        A.      That's correct.

2        Q.      Do you know what that refers to?

3        A.      We referred earlier to Chinese investments in

4    Beijing Cable in China New Media in the amount of

5    approximately $10 million.  Part of the, that investment

6    was being repaid, and those moneys were going into

7    Delphine's account because they, because there wasn't,

8    because Safra was not accepting any money at that time.

9        Q.      Whose idea had it been to invest in the

10   Chinese Project?

11       A.      Mr. Edelman.

12       Q.      And do you know who had negotiated the return

13   of money from the Chinese investment?

14       A.      Principally, Mr. Edelman in conjunction with

15   Tom Ehr.

16       Q.      Mr. Collett, you mentioned a moment ago that

17   Safra was not accepting any payments, but they had

18   frozen accounts.

19       A.      Yes.

20       Q.      Do you know why? What was their issue?

21       A.      Their issue was one of Compliance and the,

22   they were not happy with the, with, with the way in

23   which the, the, the business was being conducted.

24       Q.      Do you know what they weren't happy about?

25       A.      I can't quite remember the specifics of, of

1    their, their issues, but they, they froze the accounts

2    in order to carry out a detailed analysis and

3    examination of the various payments that were being made

4    through the accounts.

5        Q.    Do you remember any conversations with

6    Mr. Edelman about Safra's unhappiness during this period

7    of time and then freezing the accounts?

8        A.    He was made well aware of the issues faced

9    not just for me, but also for Remco Polderman, whom he

10   asked to try to arrange other facilities.

11       Q.    What was his response?  Could you gauge what

12   his response was to the Safra freezing the accounts?

13       A.    I can't remember the exact discussions except

14   to say 'we need more accounts to replace Safra.'

15       Q.    I'd like to look at the first page of this

16   Exhibit, if we could, please.  Do you see the top email

17   from Ms. Le Dain to you, where it says:

18            "Meanwhile which assets left in the trust is

19   producing cash for short term, short term and near

20   future?  I just do not understand.  We keep investing in

21   long term, shaky, very uncertain deals when in the short

22   term we cannot even pay the bills."

23            Do you see that?

24       A.    Yes.

25       Q.    Would you agree with the notion that in the

1  years of your involvement with Mr. Edelman's businesses,
2  that investments had been made 'in long term shaky, very
3  uncertain deals?'
4       A.    That is certainly a fair assessment.
5       Q.    Just to be clear to the extent of your
6  observation, had Ms. Le Dain been involved in the
7  decision making on making those investments 'into long
8  term shaky, very uncertain deals?'
9       A.    From my personal involvement with and
10 interaction with Delphine over the period, she was not
11 involved in those decisions, based as I say on my
12 personal experience.  The extent to which she discussed
13 those with Mr. Edelman, I can't comment.
14      Q.    To your observation, who had made the
15 decision to invest all of that money 'into long term
16 shaky, very uncertain deals?'
17      A.    That to the best of my knowledge,
18 recollection, is Mr. Edelman.
19      MS. RANNEY:  Mr.  Collett, we could keep going, or
20 we could do a short break.  Are you okay to keep going,
21 or would you prefer to take a five minute break?
22      THE WITNESS:  Yes, could we? If we could have a
23 five minute. that would be.
24      MS. RANNEY:  Why don't we do five minutes?  We'll
25 be back at -- or ten.  Ten would be better.  Yeah.

Graham Collett                                                    February 04, 2025

1  Let's do ten minutes back at 6:10 here.  6:10 here.

2  1:10 there in DC.

3       VIDEOGRAPHER:  This is the end of Media III.  Vol.

4  III, going off the Record at 18:02 as indicated on the

5  video screen.

6            (Break taken.)

7       VIDEOGRAPHER:  This is the beginning of Media IV,

8  Vol. III.  Going back on the Record at 18:16 as

9  indicated on video screen.

10 BY MS. RANNEY:

11      Q.   Mr. Collett, a moment ago when we were

12 looking at correspondence from May and June 2020, you

13 mentioned had an email from Mr. Bek.  Do you remember

14 that?

15      A.   Yes, I do.

16      Q.   Can you look for me, please at 3-4?

17 (Exhibit Gov. Exb 3-4 was entered into evidence.)

18 Do you see this email dated 6 December 2019?

19      A.   Yes, indeed.

20      Q.   Do you see the sender on that email, at the

21 top?

22      A.   Yes.  Erkin Bek.

23      Q.   And who is this email to?

24      A.   It is addressed to Len O' Brien, the Trustee.

25 Douglas Edelman, myself and Remco Polderman.

1    Q.    I'd like to direct your attention to the top

2  paragraph there.  Could you read us the top paragraph in

3  this email quote?

4    A.    "After reading -- receiving various

5  conflicting messages in regard to your side of

6  ownership, mixed with various multiple

7  misrepresentations made from your side by Remco, Graham,

8  Leonard and Douglas, I conclude that you are playing

9  with fire on compliance business operational issues and

10  not taking them seriously."

11    Q.    I'd like to direct your attention down the

12  email chain to the paragraph further down the page where

13  it says:

14            "My partner and ultimate beneficial owner is

15  Douglas Edelman."

16            Do you see that?

17    A.    Yes.

18    Q.    And can you read the following sentences,

19  please?

20    A.    "It is not Delphine.  It is not Leonard, or

21  his sham trust companies.  Not Graham, not Remco, nor

22  anyone else.  There's one and only partner and UBO -

23  Douglas Edelman."

24    Q.    And can you remind us what was Erkin Bek's

25  role related to Mina and Red Star?  Who was he to those

Graham Collett                                    February 04, 2025

133

1    companies?

2        A.    He was a 50% shareholder in the business.

3        Q.    And to the extent of your knowledge, when had

4    his involvement in Mina and Red star begun?

5        A.    In my, in my experience and in terms of the

6    information available, he was involved from 2000 when

7    the business was operated out of Red Star Canada.

8        Q.    And this email is dated the end of 2019.

9        A.    Yes.

10       Q.    Do you understand, can you give a sense of

11   whether there was a change in his role, over time?

12       A.    I don't think there was much of a change of

13   his role.  I didn't have any sort of day to day

14   interaction with Mr. Bek.  I would see him when I was

15   preparing the audited accounts, and latterly on other

16   periods, occasions when I was in Dubai.  But my general

17   impression over that period was that he was involved on

18   the operational side in a managerial capacity, an

19   oversight, as he had other businesses himself and was

20   generally taking very close interest in what was

21   happening; how the business was developing, what new

22   initiatives were being proposed, and proved and

23   implemented throughout that period.

24       Q.    And to the extent of your knowledge, had he

25   had a 50% ownership in Mina and Red Star consistently

Graham Collett                                        February 04, 2025
                                                                    134

 1    through that whole period of time?

 2          A.      Through the various structures of, of, of

 3    the, of the business, then, yes.

 4          Q.      I'd like to draw your attention to the bottom

 5    paragraph on this first page.  Do you see where it says:

 6                  "Some years back in 2010, I was under the

 7    impression that Delphine must have been the UBO."

 8                  Do you see that?

 9          A.      Yes.

10          Q.      And it continues on:

11                  "And thus even my partner, as I believed

12    representations made by Douglas."

13                  Do you see that?

14          A.      Yes.

15          Q.      Do you see the next paragraph on page 2?  Do

16    you see where it says:

17                  "Going forward, I will treat Douglas as the

18    UBO and the Partner."

19                  Do you see that?

20          A.      Yes.

21          Q.      And do you see further down in the paragraph

22    where it says:

23                  "You will appreciate that dealing with the

24    U.S. Government and the U.S. Congress will require that

25    we make the true representations."

1          Do you see that?

2     A.     Yes.

3     Q.     And can you read aloud the last sentence of

4 that paragraph beginning 'I, or anyone else?'

5     A.     "I, or anyone else cannot lie to Congress or

6 to the DOJ if inquired, and I won't as misrepresenting,

7 would constitute perjury, obstruction of justice, or

8 another dire implication."

9     Q.     I'd like to draw your attention further down

10 the email chain where it says, the paragraph beginning:

11          "Douglas needs to formalize his position."

12          Do you see that?

13     A.     Yes.

14     Q.     Do you see where it says:

15          "Douglas needs to formalize his position

16 regarding his own status if he wants to keep giving

17 directions to the company's officers such as Jim Robar,

18 Nikolai, Ivan, Erik and Seddik."

19          Do you see that?

20     A.     Yes.

21     Q.     That list of individuals; did you know them

22 to be officers of Mina and Red Star?

23     A.     Yes, indeed.

24     Q.     And had you observed Mr. Edelman giving

25 directions to those individuals over the years of your

1    involvement?

2         A.    Yes.  Particularly in terms of agreeing,

3    discussing the levels of distributions, and also in

4    terms of asking for information on the trading

5    activities.

6         Q.    Mr. Collett, do you have any knowledge about

7    what had prompted this email from Mr. Bek?

8         A.    I believe that this was prompted a little

9    earlier than the actual email date in terms of the

10   Compliance requirement of the various Banks, and

11   Mr. Bek's deep concern that if any of the Banks decided

12   to withdraw facilities, then that would have an almost

13   fatal impact on the business.

14             I'm referring, particularly within those

15   banking relationships, to the trade finance arrangements

16   that were in place in order to finance the large amounts

17   of fuel purchases.  And if the trade finance facilities

18   were to be terminated, itself, would have been, it would

19   have made it very, very difficult for the Company.

20        Q.    Do you know at this period of time in 2019,

21   who Mina and Red star's clients were?  Do you know who

22   they were providing fuel to?

23        A.    They were fighting fuel to the, to the U.S.

24   DLA under the terms of of the ongoing contracts.

25        Q.    Mr. Collett, can you walk us through in your

1  own words what Mr. Edelman's response was to this email

2  by Mr. Bek and whether he gave any instructions to you

3  about what to do next?

4      A.    It was a fairly long and confusing time

5  following this email.  I know that Mr. Edelman consulted

6  with various lawyers including Caplin and Drysdale

7  including Erik Bruce, involving Remco Polderman.  And

8  also other U.S. lawyers, and there was a long series of

9  meetings and proposals put forward over the following

10  six months.

11      Q.    Can you tell us what ultimately happened to

12  the issues?  What ultimately happened based on the

13  issues raised by Mr. Beck?

14      A.    The decision was taken that the, the only way

15  out was for the Trust structure as it existed then to

16  sell its 50% ownership of Red Star and Mina to Mr. Bek.

17      Q.    Do you recall approximately when that

18  happened?

19      A.    That decision was taken, I believe, round

20  about the July, August of 2010.

21      Q.    I'd like to look at a few documents related

22  to events that you just described.  Can we look at 17-1,

23  please?

24  (Exhibit Gov. Exb 17-1 was entered into evidence.)

25  Mr. Collett, do you see this email from February 2020,

1   just a few months after the email we just reviewed?

2        A.    Yes.

3        Q.    And who's the sender on this email?

4        A.    The top of the email center is Seddik

5   Bourezak from Mina Corp.

6        Q.    And this is to an email address that you've

7   identified as yours.  Do you see that?

8        A.    Correct?

9        Q.    And do you see next to the attachments line

10  where it lists documents called 'Strike off Indemnity.'.

11        Do you see that?

12        A.    Yes.

13        Q.    Can you tell us why there's an email exchange

14  with Mr. Bourezak in this period of time related to

15  Strike off Indemnities?

16        A.    This relates to the Company, the Registrar

17  and main Companies in Gibraltar which had been inactive

18  since 2013.  When the businesses were transferred out of

19  Gibraltar Companies into the new structure.  That was

20  based in Singapore from, I believe, from, from memory,

21  from the 1st of January 2013.

22        Q.    And what is a Strike off Indemnity?

23        A.    Strike of Indemnity relates to where a

24  Company is to be struck off the Register.  There should

25  be an indemnity in respect of any liabilities that still

1  exist for a Company.

2       Q.    Could we look at the email at the bottom of

3  the chain, please?  Do you see where there's an email

4  from someone named Janine Finlayson.  Do you see that?

5       A.    Janine Finlayson.  Yes.

6       Q.    And can you tell where Janine Finlayson

7  works?

8       A.    She was, she was employed by both the

9  Corporate Service Providers for the two Companies.

10       Q.    And do you see in the email where it says:

11       "Please find attached Strike off Indemnities

12  for both Companies."

13       Do you see that?

14       A.    Yes.

15       Q.    And if we could turn to the attachment to

16  this email, please, on page 3.  When the Gibro Group

17  sent Draft Strike off Indemnities for Mina and Red Star,

18  who did they list as the beneficial owners for both

19  Companies?

20       A.    That is to Douglas Edelman and Erkin Bek.

21       Q.    Could we look at the top email, please?  And

22  this email chain?

23       A.    Yes.

24       Q.    Do you see at the top where it says:

25       "We had a meeting last week with DE."

1          Do you see that?

2     A.    Yes.

3     Q.    Do you recall Mr. Edelman's reaction to the

4 fact that Strike off Indemnity letters from Gibro had

5 his name on them?

6     A.    I can't recall his immediate reaction to it

7 other than to say, "Well it's, it's wrong."

8     Q.    And could we look at 17-3, please?

9 (Exhibit Gov. Exb 17-3 was entered into evidence.)

10 Do you see this email from 15th of June 2020?

11    A.    June 15th, 2020.  Yes.

12    Q.    And I believe you've identified that sender

13 email address as Mr. Edelman.  But can you tell us who

14 is te@888kinect.com?

15    A.    That's Thomas Ehr.

16    Q.    And can we look at the a page 3 of this

17 document, please, if we could.  Do you see at the top

18 where it says 'Indemnity?'?

19    A.    Yes.

20    Q.    And can you tell us which Company this

21 relates to?

22    A.    This relates to Red Star Enterprises Ltd,

23 Gibraltar.

24    Q.    And can you tell us who is signing this

25 document as the UBO of Red Star Enterprises?  Is it Mr.

Graham Collett                                    February 04, 2025
                                                              141

1   Edelman?

2       A.    I recognize this as Delphine Le Dain's

3   signature.

4       Q.    And do you recognize the name of the Witness

5   who's listed here?

6       A.    Rene Sijmonsbergen. He was a, he was involved

7   in one of the properties being developed in Spain.

8       Q.    Who was he involved with?  Was he Delphine

9   Anne Le Dain's business associate, or was he

10  Mr. Edelman's business associate?

11      A.    I think Rene was known to both Mr. and

12  Mrs. Edelman.

13      Q.    Like to look at 17-4, please.

14  (Exhibit Gov. Exb 17-4 was entered into evidence.)

15  This is another email from June 2020.  It appears to be

16  from an email address that you've identified as yours to

17  one that you just identified as Mr. Ehr's.  Do you see

18  that?

19      A.    That's correct.

20      Q.    Do you see at the top where it says:

21            "These are the ones that should really be

22  signed with both or DLD right now and send through to

23  Seddik either directly or indirectly."

24            Do you see that?

25      A.    Yes.

Graham Collett                                          February 04, 2025
                                                                    142

1        Q.    And then do you see where it says:

2              "We agreed back in March that EB might not

3    want to sign anything with DLD's name on it."

4              Do you see that?

5        A.    Yes.

6        Q.    Why would EB not want to sign anything with

7    DLD's name on it?  What does that refer to?

8        A.    Basically, Mr. Edelman would not want to sign

9    any document regarding any indemnity for these two

10   Companies with his name on it.

11       Q.    I'd like to look at page 3, if I could and

12   page 4.  Do you see these two sheets listing 'Indemnity'

13   at the top of the page?

14       A.    Yes.

15       Q.    And who is listed as the UBO on these two

16   Indemnity pages?

17       A.    Delphine Le Dain and Erkin Bek.

18       Q.    Do you have any personal knowledge as to why

19   the beneficial owners had been changed in these

20   Indemnity letters from the previous ones we looked at

21   listing Mr. Edelman?  Why did that happen?

22       A.    Because as far as the shareholders at that

23   particular time, they was, they were shown ultimately as

24   Douglas Edelman and Erkin Bek on the records of the two

25   Companies in Gibraltar.  That did not tie up with the

Graham Collett                                    February 04, 2025

 1 | records of the existing Companies, the new successor
 2 | companies.  And it was highly unlikely that Delphine, or
 3 | Erkin Bek, would want Delphine signing those accounts,
 4 | knowing that that situation in terms of the beneficial
 5 | owners was not correct.
 6 |     Q.    Like to look at 17-5, please.
 7 | (Exhibit Gov. Exb 17-5 was entered into evidence.)
 8 | Do you see this email dated 16 June 20th, 20?
 9 |     A.    Yes.
10 |     Q.    Do you see the email from Tom Ehr to you at
11 | the top where he says:
12 |           "I think if we just sign and send through,
13 | they would of course say, well, where did we get this?"
14 |           Do you see that?
15 |     A.    Yes.
16 |     Q.    "And we just say, 'Gibro' and they say, Well,
17 | on what basis did they issue this one, as before they
18 | issued a different one."
19 |           Do you see that?
20 |     A.    Yes.
21 |     Q.    Do you recall someone asking Gibro to change
22 | the Indemnity letters in 2020, to put Delphine's name on
23 | it?
24 |     A.    I was aware that, I believe it was Tom Ehr
25 | and Francis Rohar were engaging with Gibro on this

1  particular matter.  I wasn't involved in those

2  conversations at all.  But I believe that that was what

3  they were trying to do, on the basis that the registers

4  of the two Companies were still showing Douglas Edelman

5  as a shareholder.

6      Q.    You mentioned Mr. Rohar; in this period of

7  time in 2020, do you know whether, or do you know who

8  Mr. Rohar worked for?  What was his job?

9      A.    He was General Counsel for the Red Star Mina

10  Group until roughly this time, when, when he left the

11  Organization.  Erkin Bek apprently fired him.

12      Q.    And after Erkin Bek fired Mr. Rohar, do you

13  know who Mr. Rohar went to work for?

14      A.    I'm not quite sure who -- I think he was

15  working on his own account.  And I'm not quite sure

16  what, what he was doing after that.

17      Q.    Was he involved in the Projects you were

18  doing for Mr. Edelman after he was fired by Erkin Bek?

19      A.    When you say the 'project', just, do you mean

20  generally?

21      Q.    Projects like this one, like asking Gibro to

22  change the Register?

23      A.    Yes, he was.  He was, he was involved in

24  this.

25      Q.    Could we look at 17-6, please?

1    (Exhibit Gov. Exb 17-6 was entered into evidence.)

2    It's very small print but do you see at the top, where

3    it says -- this is an email chain from 2nd July 2020?

4    Do you see that?

5         A.    Yes.

6         Q.    Between the email address you just identified

7    as Mr. Ehr's to someone named Michael Mahtani at Gibro

8    Group.  Do you see that?

9         A.    Yes.

10        Q.    With a copy to you and to several others with

11   Gibro.com email addresses.  Do you see that?

12        A.    Yes.

13        Q.    And further down on the email exchange do you

14   see the email from Mr. Ehr, about half way down,

15   starting about half way down the page.

16        A.    Yes.

17        Q.    And then a large image included in the body

18   of the email.  Do you see that?

19        A.    That's right a.

20        Q.    Are you able to tell what the image is here?

21   In this email?

22        A.    I believe it is a screenshot from the

23   Registry showing Mr. Edelman and Erkin Bek as the

24   Ultimate Beneficial Owners.

25        Q.    Do you remember whether you reported to

1    Mr. Edelman that he was still shown as a Beneficial

2    Owner on the Registry in 2020?

3         A.    I'm not sure that I was the first person to,

4    to, to mention this to him.

5         Q.    Do you recall being in conversation where

6    Mr. Edelman said that he knew about this Registry, or

7    had been informed about it?

8         A.    I can't remember any specific discussions

9    with him on this at this particular time.  I say that on

10   the basis that Tom Ehr got involved in dealing directly

11   with Gibro at this particular time.

12        Q.    Mr. Collett, just to be very clear, which

13   share, which Registry are we referring to, or are you

14   referring to?

15        A.    I believe that this is the Registry, the

16   official Registry in Gibraltar showing the Beneficial

17   Owners of the two Companies.

18        Q.    And was it your understanding that this

19   Registry was publicly available?

20        A.    Yes, I believe it is.

21        Q.    Mr. Collett, was it your idea to ask that the

22   Share Registry in Gibraltar be changed?

23        A.    That was not my idea, and I didn't have any

24   conversations.  I can't recall any conversations that I

25   had directly with Gibro at that particular time.

1        Q.    Could we look at 17-7, please?

2   (Exhibit Gov. Exb 17-7 was entered into evidence.)

3   Do you see this email exchange from 2nd July 2020?  Do

4   you see that?

5        A.    Yes.

6        Q.    Do you see the bottom email here, where it's

7   from the email address you just identified as Thomas

8   Ehr's.  Do you see that?

9        A.    Yes.

10       Q.    Can you tell us this subject, next to the

11  word 'subject?'

12       A.    Indemnity Letter.

13       Q.    And then can you read us the text of the

14  email?

15       A.    It says:

16            "D is stressing about it.  Did you not say

17  that Seddik had contacted you about it?

18       Q.    Do you know who is D in this context?

19       A.    That is Mr. Edelman.

20       Q.    If we could look at your response to that

21  email, please?

22       A.    "You may recall that I mentioned I had spoken

23  to Seddik about this and that the drafts were wrong and

24  should include both signatures.  He agreed and said that

25  he would redraft.  Seddik has now sent me the attached

Graham Collett                                        February 04, 2025

1   which do not include the two signatures, but instead

2   referred to DLD as being 50%.  "

3           I said that:

4           "Erkin Bek presumably does not want to sign

5   on the same page."

6       Q.   Mr. Collett, I'd like to look if we could,

7   please at 3-5.

8   (Exhibit Gov. Exb 3-5 was entered into evidence.)

9   Mr.  Collett,  I'd like to talk about a few more events

10  that happened in this late 2019 and 2020 time period.

11  I'd like to look at this email dated 29th March 2020.

12  Do you see that?

13      A.   Yes.

14      Q.   It's from someone named G. -- can you.

15  Pronounce the name for me please?

16      A.   Gilles Thieffry.

17      Q.   Who did you understand, who is Mr. Thieffry,

18  in this period of time?

19      A.   He was an attorney working for Mr. Bek.

20      Q.   And could we look, please, at the first email

21  in this chain at the bottom of the second page.  If you

22  could look, please.  Do you see where it says it's from

23  Remco Holderman to Mr. Thieffry, with a copy to you.  Do

24  you see that?

25      A.   Yes.

1    Q.    And then there's someone else copied there.

2  Can you tell us who that is?

3    A.    Christopher, Christopher Slaboszewicz.

4    Q.    And who is he?

5    A.    He at that time I believe, was still a

6  Director of Red Star, Mina.

7    Q.    Do you remember when he, do you recall

8  approximately when Mr. Slaboszewicz came onto the scene?

9    A.    Quite some considerable time before.  He, I

10  believe that he'd known Mr. Edelman for a long time, and

11  had been involved with bank finance and I can't quite

12  remember when he became a Director of Red Star Mina.

13  But he was, he was active in banking relationships for

14  the Companies at this time.

15    Q.    Mr. Collett, do you recall why you and

16  Mr. Edelman were engaged in a back and forth with

17  Mr. Thieffry in this period of time?

18    A.    At this point in time, in March 2020, it

19  followed the email that Mr. Bek had sent out in the

20  December, that we looked at earlier.  Discussions were

21  ongoing in terms of the ownership.  Remco Polderman at I

22  believe, Mr. Edelman's request, instructions had taken

23  the lead at this point in dealing with these issues and

24  trying to resolve the way forward.

25    Q.    Were you able to observe who Mr. Polderman

Graham Collett                                                    February 04, 2025
                                                                          150

```
 1   was taking his orders from, when he was taking the lead
 2   on this project, I believe?
 3        A.    He was taking his instructions from
 4   Mr. Edelman.
 5        Q.    And at this period of time in March 2020, do
 6   you know, or do you recall what the current thinking was
 7   about what the proper course would be?
 8        A.    The suggestion that was being discussed at
 9   this particular time was for a new Company to be set up,
10   and that company Would have would be owned by
11   Mr. Edelman and would be used to acquire the Trust's 50%
12   ownership in Red Star and Mina Corp.
13        Q.    Do you remember the name of that proposed new
14   company to be set up?
15        A.    That was called Praedium.
16        MS. RANNEY:  We're right under the wire.  I propose
17   that we stop for the day and then should be able to
18   continue as scheduled tomorrow.  To be on our time
19   schedule.  Is that Okay?
20        MR. CLARKE:  Sounds good to me.
21        MS. RANNEY:  Rather than pivot and take another
22   hour of everyone's time.  We'll do that.  Is that okay
23   with you Mr. Collett?
24        A.    Yes, that's fine.  Yes.
25        MS. RANNEY:  All right.
```

Graham Collett                                        February 04, 2025

1        VIDEOGRAPHER:  This is the end of Media IV, Vol.

2   III, going off the Record at 18:55 as indicated on the

3   video screen.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Graham Collett

February 04, 2025

152

```
1                    E R R A T A

2              Deposition of Graham Collett

3    (Please show all corrections on this page, not in the

4    transcript.)

5    Page/Line No.      Description      Reason for change

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21

22

23   Signed:  _____

24   Name:    _____

25   Date:    _____
```

Graham Collett                                          February 04, 2025
                                                                     153

```
 1              CERTIFICATE OF COURT REPORTER

 2

 3   I, DAVID ERDOS, a Certified Real-Time Court Reporter,

 4   hereby certify that Graham Collett was duly sworn, that

 5   I took the notes of the foregoing deposition and that

 6   the transcript thereof is a true and accurate record

 7   transcribed to the best of my skill and ability.  I

 8   further certify that I am neither counsel for, related

 9   to, nor employed by any of the parties to the action in

10   which the deposition was taken, and that I am not a

11   relative or employee of any attorney or counsel employed

12   by the parties hereto, nor financially or otherwise

13   interested in the outcome of the action.

14   Before completion of the deposition, review of the

15   transcript was requested.  Any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18

19

20

21

22   Signed: _____

23   DAVID ERDOS

24   Dated: 02/13/2025

25
```