# Transcript of Graham Collett

# Deposition



## UNITED STATES OF AMERICA
### v.
## DOUGLAS EDELMAN
### and
## DELPHINE LE DAIN
## (also known as DELPHINE LE DAIN EDELMAN)

**Volume IV**

**Thursday, February 6th, 2025**

**TransAtlantic International Legal Solutions**
**1-646-480-0520**
**calendar@tavds.com**
**www.tavds.com**

Graham Collett                                      February 06, 2025

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA      |CRIMINAL NUMBER:
                              |1:24-CR-00239-CKK
                              |
                              |VIOLATIONS
Vs.                           |
                              |Count: 1:18:U.S.C.§371
                              |(Conspiracy to defraud
DOUGLAS EDELMAN               | the United States)
                              |
and                           |Counts 2-3:18 U.S.C.§1001
                              |(False Statements)
DELPHINE LE DAIN              |
(also known as DELPHINE       |Counts 4-18:26 U.S.C §7201
 LE DAIN EDELMAN)             |
                              |Counts 19-30:31 U.S.C.§§
                              |5314&5322(b);31 C.F.R
                              |1010.350,1010.306(c)-
                              |(d)and 1010.840(b);18
                              |U.S.C.§2
                              |(Wilful violation of
                              |foreign Bank account
                              |reporting)
_____|

          HYBRID DEPOSITION OF GRAHAM COLLETT

                      VOL. IV.

              THURSDAY 6TH FEBRUARY 2025




Taken at:

BAKER & McKENZIE
280 Bishopsgate
London EC2M 4AG

Court Reporter:  David Erdos
Certified Deposition Reporter
CDR-1865
```

```
 1              A P P E A R A N C E S :

 2
    On behalf of the Plaintiff:
 3

 4  U.S. DEPARTMENT OF JUSTICE, TAX DIVISION

 5  CRIMINAL ENFORCEMENT SECTION

 6  By: Sarah Ranney

 7      sarah.c.ranney@usdoj.gov

 8      (202) 514-2000

 9      Ezra Spiro

10      Ezra.K.Spiro@usdoj.gov

11      (202) 718-7308

12

13  PRESENT IN WASHINGTON DC:

14      Josh Gold

15      Josh.Gold@usdoj.gov

16      Nanette Davis

17      Nanette.Davis@usdoj.gov

18

19  DEPARTMENT OF THE TREASURY,

20  INTERNAL REVENUE SERVICE, CRIMINAL INVESTIGATION

21  By: Rebekah Gamez

22      Rebekah.Bott@ci.irs.gov

23      Adam Soline

24      Adam.Soline@ci.irs.gov

25      630.493.5224
```

Graham Collett                                          February 06, 2025
3

```
1              A P P E A R A N C E S  (CONTINUED)

2    On behalf of the Defendants:

3    BAKER & McKENZIE LLP

4    815 Connecticut Avenue,
     NW, Washington DC, 20006
5    By: George Clarke

6        George.clarke@bakermckenzie.com

7        (202)835 6184

8        Sonya Bishop

9        452 Fifth Avenue, New York, NY 10018

10       Sonya.Bishop@bakermckenzie.com

11       212.626.4591

12

13   PRESENT WITH DEFENDANT IN WASHINGTON DC:

14       Allison Rocker

15       Allison.rocker@bakermckenzie.com

16       303.906.9558

17

18   PRESENT WITH WITNESS IN LONDON:

19       Dr. Sharon Persaud

20       BOUTIQUE LAW

21       Ground Floor West, 9 Grays Inn Square

22       London WC1R 5JD

23       sharon@boutique.law.com

24       William Dunlop

25       William@boutique.law.com
```

```
 1              A P P E A R A N C E S (CONTINUED)
 2                       REMOTE:
 3
 4       Danielle J. Sochaczevski
 5       WILLIAMS & CONNOLLY LLP
 6       680 Maine Avenue, SW, Washington DC, 20024
 7       dsochaczevski@wc.com
 8
 9
10
11   Also Present:  Lauren Barbor, Videographer
12                  Shannon Korpela, IRS (Remote)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Graham Collett                                      February 06, 2025

5

```
 1                    I N D E X

 2   WITNESS                 EXAMINATION BY              PAGE

 3

 4   GRAHAM COLLETT          MS. RANNEY                     6
                             MR. CLARKE                    42
 5                           MS. RANNEY                    63

 6   EXHIBIT    DESCRIPTION                              PAGE

 7
```

```
 8   Gov. Exb 3-6      Douglas Edelman Letter            13
                       to Erkin Bek, April 13, 2020
 9                     [USPROD-03361186]

10   Gov. Exb 3-7      Douglas Edelman Letter            15
                       to Erkin Bek, April 13, 2020
11                     [USPROD-03361187]

12   Gov. Exb 17-2     DE Email and Attachment           19
                       Sun,14 Jun
13                     [USPROD-01867555-01867557]

14
     Gov. Exb 17-8     DE Email chain Fri, 10 Apr 2020
15                     [US PROD-01844707/01841650-01841652]

16
     Gov. Exb 14-72    Remco Polderman Email chain       23
17                     29 April 2020
                       [USPROD-02309471-02309473]
18
     Gov. Exb 16-1     Employment Agreement              25
19                     [USPROD-018657666-018657674]

20
     Gov. Exb 3-9      Purchaser and Seller Guaranty     31
21                     Document [USPROD-03361627-03361639]

22
     Gov. Exb 24-2     DLD Trust Summary of Cash flows   34
23                     from September 2020 to December 2021

24
     Def. Exb 8        Red Star Summary of Trading       52
25                     results and Distributions
                       All years to 2016 [USPROD-01499072]
```

1      VIDEOGRAPHER:  This is beginning of Media I., Vol.

2  IV in the Video Deposition of Graham Collett.  Today's

3  date is the 6th of February 2025.  Going back on the

4  Record at 13:27, as indicated on the video screen.

5  Thank you, Counsel.

6                        EXAMINATION

7  BY MS. RANNEY:

8      Q.    Good afternoon, Mr. Collett.  I'd like to

9  remind you that you are under Oath.  Do you understand

10 that?

11     A.    Fully understood.

12     Q.    Mr. Collett, are you able to see Mr. Edelman

13 in the participants in this proceeding today?

14     A.    Yes, I can see him.

15     Q.    And can you identify the color of shirt that

16 Mr. Edelman is wearing?

17     A.    White shirt.

18     Q.    Mr. Collett, if at any point in today's

19 proceedings you're unable to see Mr. Edelman, will you

20 please let us know?

21     A.    Certainly.

22     Q.    Mr. Collett, I'd like to return, if we could,

23 to the period of time in 2020 that we discussed

24 yesterday.  Could we look at 3-5, please?

25           Mr. Collett, yesterday we talked about the

7

```
 1   individuals on this email, and I'd like to look at the
 2   first email in this chain beginning on page 2, near the
 3   bottom.  You see that?
 4        A.    Yes.
 5        Q.    Do you see where it appears to be from
 6   Mr. Polderman to Mr. Thieffry and a copy to the
 7   individuals we discussed yesterday.  Do you see that?
 8        A.    That's correct, yes.
 9        Q.    And do you see on the next page, page 3,
10   where Mr. Polderman says in the first paragraph:
11             "We wanted to get back to you sooner
12   regarding your follow up questions to my last email
13   regarding the new structure for MR."
14             Do you see that?
15        A.    Yes, I see that, yes.
16        Q.    Can you tell us what MR. is?
17        A.    I believe that would be Mina Red Star.
18        Q.    And do you recall, or can you tell from the
19   text of this email why Mr. Polderman was sending an
20   email to Mr. Theiffry about follow up questions and a
21   new structure for MR.?
22        A.    In summary, this was Mr. Polderman was
23   taking the lead in terms of communications with
24   Mr. Thieffry in respect of the, the planned change of
25   the Beneficial Owner of the Mina Star, Mina Red Star
```

1    group, based on a new structure where the ultimate
2    beneficiary, beneficiaries were to be shown at the top
3    of the organization as individuals.
4         Q.    And can you remind us who the individuals
5    were to be shown on the top of this proposed new
6    structure?
7         A.    The two beneficiaries that Mr. Bek required
8    and insisted upon as the beneficial owners of 50% each
9    were himself and Mr. Edelman.
10        Q.    Do you see in this top paragraph where it
11   continues on about half way through the paragraph:
12              "I apologize for the delay, but we needed
13   time to review and establish all the documentation
14   available to us on the MR structure for close to the
15   past 20 years."
16              Do you see that?
17        A.    Yes.
18        Q.    Do you see where it continues:
19              "Our attached memo is based on our knowledge
20   of the history of the MR structure and all the
21   documentation regarding that available to us."
22        A.    That's correct.  I see that.
23        Q.    Could we look, please at page 6 of this
24   Exhibit.  Do you see where it says 'Red Star Enterprises
25   Ltd and Mina Corp Ltd Corporate Information' at the top?

1     A.    Yes.

2     Q.    Do you know who drafted this document?

3     A.    This was an updated copy of the document that

4     I originally prepared back in 2012.

5     Q.    I'd like to look at the top sentence under

6     'Introduction.' Do you see where it says:

7           "The origins of the business now carried on

8     in the name of Red Star Enterprises Ltd and Mina Corp

9     Ltd until January 2013, can be traced back to an

10    investment by Delphine Le Dain in 2000."

11          Do you see that?

12    A.    Yes.

13    Q.    And do you see in the second paragraph the

14    second sentence says:

15          "Bartol Ltd (see below) commenced trading in

16    a very small way using a seed investment of

17    approximately $300,000 from DLD."

18          Do you see that?

19    A.    Yes, $30,000.

20    Q.    And do you see further down the page the

21    sentence beginning 'On incorporatation?' Can you read us

22    the rest of that sentence 'on incorporation?'

23    A.    "The beneficial owner of Bartol Ltd was

24    Delphine Anne Le Dain."

25    Q.    Mr. Collett, to the extent of your knowledge,

1   having worked for Mr. Edelman at this point for nearly

2   20 years, did you understand that to be true, or was

3   that the party line?

4        A.    That, based on my experience, was the party

5   line.

6        Q.    So, was that true or false that Bartol was

7   originally Delphine's Company?

8        A.    To the best of my knowledge and understanding

9   that was false.

10       Q.    Mr. Collett, was it your idea to pass along

11  false information to Mr. Thieffry?

12       A.    It was not my idea to pass along false

13  information as such.  This was what I was told was the

14  actual position, and in this, this document being

15  updated from what I was told in 2012; this was what I

16  understood from Mr. Edelman was the real position and

17  that itself was the party line.

18       Q.    You said you were told in 2012.  Who told you

19  that in 2012?

20       A.    That was Mr. Edelman.

21       Q.    I'd like to look at back at the text of the

22  email, if we could please, on page 4.  Do you see where

23  it says:

24             "The proposed structure makes DE a full UBO

25  from all angles."

1          Do you see that?

2     A.    Yes.

3     Q.    Can you read the rest of that paragraph,

4  please?

5     A.    From all angles.

6          "and he will become the full legal

7  representative from our side of the ownership structure

8  of MR. Please note that DE and DLD together as a married

9  couple, own 100% of their stake anyway."

10    Q.    Mr. Collett, you testified previously about

11 the information that had been given to Caplin and

12 Drysdale, the US attorneys.  Were Caplin and Drysdale

13 told that Mr. Edelman and Ms. Le Dain together as a

14 married couple owned 100% of anything?

15    A.    Not by me.  Not by me. This is from

16 Mr. Polderman.

17    Q.    Do you see where it says:

18          "the proposed structure makes DE a full UBO?"

19          Can you tell us what that refers to?

20    A.    I understand from the way in which it is

21 written, my interpretation is that Mr. Edelman would

22 become the full beneficial owner of 50% of the shares in

23 the Mina Red Star group.

24    Q.    Do you see at the -- drawing your attention

25 to page 5, If I could please.  Do you see at the top

1    where it says:

2              "In addition DE is ready to stand as a

3    responsible partner alongside EB."

4              Do you see that?

5         A.   Yes.

6         Q.   Do you know what that means?

7         A.   To interpret Mr. Polderman's language, I

8    would understand that to mean that Mr. Edelman would

9    step in as a full partner both in terms of shareholding

10   and direction of the Mina Red Star Group alongside Erkin

11   Bek as an equal partner.

12        Q.   Could we look back at 3-4, please.  We talked

13   about this Exhibit yesterday, Mr. Collett, and I'd like

14   to draw your attention to the sender on this email one

15   more time.  Who is the sender on this email?

16        A.   This one, this was Remco Polderman on the

17   26th of March.

18        Q.   And what's the year on the email you're

19   looking at right now?

20        A.   2020. 15:43.

21        Q.   So do I understand correctly that

22   Mr. Polderman?

23        MR. CLARKE:  Which document?

24   BY MS. RANNEY:

25        Q.   So, I think Mr. Collett, are you looking at

Graham Collett                                    February 06, 2025

                                                              13

```
 1   3-5?  The email from March 2020?
 2        A.    Sorry.
 3        Q.    And then can we turn to 3-4, the Exhibit
 4   previous to it we're currently on 3-4.  Can you turn to
 5   3-4?
 6        A.    The page -- ?
 7        Q.    No.  Exhibit 3-4.
 8        A.    Sorry.
 9        Q.    Mr. Collett, you just told us that the email
10   from Remco Polderman where he mentioned Mr. Edelman
11   stepping up to be the UBO was March of 2020.  Can you
12   tell us what the date on 3-4 is?  What is that email?
13        A.    This is the 6th of December 2019.
14        Q.    And who is it from?
15        A.    It is from Mr. Bek.
16        Q.    And can you read us the paragraph two thirds
17   of the way down where it begins 'my partner?'
18        A.    Yes.
19              "My partner and ultimate beneficial owner is
20   Douglas Edelman.  It is not Delphine Edelman.  It is not
21   Leonard, or his sham trust companies.  Not Graham, not
22   Remco, nor anyone else.  There is one and only partner
23   UBO.  Douglas Edelman."
24        Q.    Can we look at 3-6, please.
25   (Exhibit Government Exhibit 3-6 was entered into
```

1   evidence.)

2   Do you see this letter dated April 13th, 2020,

3   Mr. Collett?

4        A.    Yes, I do.

5        Q.    Do you know what this is?

6        A.    This is a letter of confirmation from

7   Mr. Edelman to Mr. Bek certifying his ownership of the

8   Company Praedium Limited.

9        Q.    And can you, do you recognize the signature

10  on this document?

11       A.    I believe that is Mr. Edelman's signature.

12       Q.    And drawing your attention to the text of

13  this letter, can you tell us who is this letter

14  addressed to?

15       A.    This is addressed to Mr. Erkin Bek.

16       Q.    And there's a company name at the top right

17  under the date.  You recognize that company name?

18       A.    That is TNF Investments Limited. I believe

19  that is Mr. Bek's Company.

20       Q.    So, I believe you paraphrased for us a moment

21  ago what's going on in this certification, but I'd like

22  to draw your attention to some of the the particular

23  language.  Do you see the first sentence where it says:

24            "This letter shall serve as my certification

25  of the following facts regarding my 100% interest as the

1  ultimate beneficial owner of Praedium?"

2      A.    Yes.

3      Q.    You see that?

4      A.    Yes.

5      Q.    And then it continues:

6            "Praedium is a holding company for the 50%

7  interest that I personally have in Mina Group FZCO."

8            Do you see that?

9      A.    Yes.

10     Q.    And then can we look at 3-7, please.

11 (Exhibit Government Exhibit 3-7 was entered into

12 evidence.)

13 Do you see this letter dated April 13th, 2020?

14     A.    Yes.

15     Q.    And who is it addressed to?

16     A.    It's addressed to Mr. Bek.

17     Q.    And do you recognize the signature on this

18 letter?

19     A.    I believe this signature to be Mr.Edelman.

20     Q.    And can you read us the first sentence of

21 this letter, please?

22     A.    "This letter should serve as my certification

23 that the following will immediately occur. 1: the

24 authorization of any necessary third parties, including

25 Galactea Trust to transfer all of the business of the

Graham Collett                                    February 06, 2025

1   Companies to Mina Group FZCO, including without

2   limitation, the novation of all contracts with the DLAE

3   from the Companies to Mina Group FZCO, or any of its

4   affiliates.  And secondly, the appointment of myself and

5   Mr. Beck as directors of Mina Group FZCO once Praedium

6   Limited owns 50% thereof."

7        Q.    Mr. Collett, did you draft this letter, or

8   the other one that we just looked at?

9        A.    No, I did not have any part in drafting these

10  letters.

11       Q.    Did you have any understanding of how exactly

12  it was supposed to work that Mr. Edelman could certify

13  about the transfer of, of businesses, or entities

14  relating to Praedium?

15       A.    As I mentioned before, that there, there was

16  a lot of meetings and discussions with the various

17  lawyers that I referred to earlier.  And as a result of

18  of that, these letters were drafted by the lawyers and

19  this was the route that was planned to be taken in order

20  to satisfy Mr. Erkin Bek's demands that Mr. Edelman

21  should become in his own name the 50% shareholder in the

22  two Companies.

23       Q.    You mentioned a moment ago that there were a

24  lot of lawyers involved in this period of time.  Were

25  the lawyers from Caplin and Drysdale involved in this

 1   period of time?

 2        A.    Yes, they were.

 3        Q.    And to your recollection was it the same

 4   lawyers from Caplin and Drysdale that you had provided

 5   the client binder to?

 6        A.    Correct.  Yes.

 7        Q.    And was it the same lawyers from Caplin

 8   Drysdale that you had submitted the yearly income

 9   summaries to, or copied on?

10        A.    That is correct.

11        Q.    And if you could tell us, please; did the

12   client binder tell the true story, or did it tell the

13   party line?

14        A.    Binder told the party line.

15        Q.    And did those income summaries include any

16   mention of IFone Neda distributions for the years that

17   you had prepared them?

18        A.    No.

19        Q.    And did those income summaries that you

20   submitted to the Caplin Drysdale attorneys include any

21   mention of Mina Red Star distributions?

22        A.    Mina Red Star distributions out of the two

23   Companies?  No, it didn't.

24        Q.    Mr. Collett, I'd like to look if we could,

25   please, at the last line of this email where it says:

Graham Collett                                    February 06, 2025

1          "Executed this 13th day of April 2020 in

2     Ibiza, Spain."

3          Do you see that?

4     A.    Yes.

5     Q.    Do you have any personal knowledge about why

6     this letter would be executed in Ibiza, Spain?

7     A.    The only, the only explanation I can

8     attribute to that, is that Mr. Edelman was actually in

9     Ibiza at the time.

10    Q.    Do you know why he would be in Ibiza?  Do you

11    know if he had any connection to Ibiza?

12    A.    The, the house in Ibiza, which had been

13    acquired in 2008, was used quite extensively by the

14    family.  And Mr. Edelman was spending quite a lot of

15    time there at this particular, at this particular

16    juncture.

17    Q.    Do you recall being involved in the purchase

18    of a house in Ibiza, Spain?

19    A.    Yes.

20    Q.    Can you tell us what was your involvement?

21    A.    Simply to, on Mr. Edelman's instructions, to

22    remit the funds for the purchase of the property.

23    Q.    Do you recall where the funds came from at

24    Mr. Edelman's instruction?

25    A.    My recollection is that the funds actually

1    came from Aspen Wind Corporation.

2        Q.    And at that period of time, do you recall

3    where the funds and the Aspen Wind Bank account had come

4    from; how that bank account was funded?

5        A.    It was funded from the distributions made

6    from Mina Red Star business in that period.

7        Q.    Could we look at 17-2, please?

8    (Exhibit 2020 [USPROD-01867555-01867557] was entered

9    into evidence.)

10       A.    17-2?

11       Q.    17-2.  Mr.  Collett,  do you see this email

12   dating 14 June 20th, 2020?

13       A.    Yes.

14       Q.    And can you tell us who it's from?

15       A.    It's from Mr. Edelman to Tom Ehr, myself,

16   Remco Polderman.

17       Q.    And can you tell us what the attachment to

18   this 2020 email is listed on the Attachments line. What

19   the title to the document is?

20       A.    It is a copy of an undated, unsigned

21   Affidavit.  No name on it.

22       Q.    And just looking at the top of page 2, if we

23   could please.  Do you see where it says:

24            "Sworn_February 2012."

25            Do you see that?

1      A.     Yes.

2      Q.     Turning back to the text of this email; do

3  you see where it says in all caps:

4             "FYI Graha is this all properly in the file?"

5             Do you see that?

6      A.     Yes.

7      Q.     Do you know what Mr. Edelman is asking you

8  about there?

9      A.     I think he is asking me if this Affidavit was

10 actually signed off and I made clear to RSEL at the

11 time.

12     Q.     Do you know why Mr. Edelman would have been

13 emailing you about a 2012 Affidavit in June of 2020?

14     A.     I can't remember the specifics of this at

15 that particular time.

16     Q.     Looking back at the Affidavit, quickly before

17 we move on, starting on page 2.  Did you draft this

18 Affidavit?

19     A.     No, I didn't.

20     Q.     Do you know who did?

21     A.     I'm looking at it now.  No, I don't know who

22 drafted it.

23     Q.     To the extent of your knowledge, do you think

24 you've ever seen a signed version of this affidavit?

25     A.     I cannot recall ever seeing, seeing a signed

 1  copy of an affidavit which purports to be from Centrum

 2  secretaries.  In paragraph, point 2 it says on the 3rd

 3  of June, my firm Centrum Secretaries Incorporated the

 4  Company.  I presume, therefore that this was an

 5  affidavit meant to be signed by David Pearlman.

 6      Q.    I'd like to look at 17-8, if we could,

 7  please.

 8  (Exhibit Government Exhibit 17-8 was entered into

 9  evidence.)

10  Mr.  Collett, do you see this email exchange from

11  April 2020?

12      A.    Yes.

13      Q.    And before we look at the top email exchange,

14  could we look at the very bottom, please where there's a

15  a header, right at the very bottom of the page?

16      A.    Yes.

17      Q.    Can you tell us who the sender is on that

18  bottom email?

19      A.    That is Delphine Le Dain.

20      Q.    And then who is she sending an email to?

21      A.    To Mr. Edelman.

22      Q.    And what's the subject line, if you could

23  read it for us, please?

24      A.    "March 2003 transfer to BNP Paribas."

25      Q.    And then can you tell us in the next email up

1   if you're able to discern from, from the email

2   addresses, or the context, do you see where it appears

3   that DE@ledain.ch forwards the below correspondence to

4   Remco Polderman and yourself?  Do you see that?

5        A.    Yes.

6        Q.    And do you see where the text of the email

7   says, Mr. Edelman says:

8             "Clearly shows Red Star as beneficiary of the

9   transfer."

10            Do you see that?

11       A.    Yes.

12       Q.    Can you tell us the date on that email?

13       A.    That is the 10th of April 2020.

14       Q.    And could we look at the attachments to this,

15  please, starting on page 2.  Do you recognize this?

16       A.    Yes.  This is another copy of correspondance

17  we've looked at before.

18       Q.    And do you see at the top on the right hand

19  side where it says Banque de Luxembourg?

20       A.    Yes.

21       Q.    And then on the left, it says Delphine Le

22  Dain, at the top.

23       A.    That's correct.

24       Q.    And you mentioned a moment ago that we had

25  looked at this previously but could we look, please, at

Graham Collett                                          February 06, 2025

1    page three?

2         A.    Yes.

3         Q.    And the second transaction listed here, dated

4    March 13, 2003.  Do you see that?

5         A.    That's correct.

6         Q.    Can you tell us the amount on that

7    transaction?

8         A.    That's 115,000 USD.

9         Q.    And can you tell us the beneficiary listed on

10   that transaction?

11        A.    Red Star Enterprises Ltd.

12        Q.    I'd like to look at 14-72, if we could,

13   please.

14   (Exhibit Government Exhibit 14-72 was entered into

15   evidence.)

16   Do you see this April 2020 email exchange?  Do you see

17   where at the top it says 29th April 2020?

18        A.    Yes.

19        Q.    And I'd like to look, if we could at the

20   bottom email on this first page.  Can you identify the

21   sender on that email?  Who is that person on the front

22   line?

23        A.    Noeleene Goes-Farrell.

24        Q.    And who was that?

25        A.    She was an executive of Banque Havilland.

1    Q.    And if you look at the other recipients on

2    this email it includes Ms. Tsenzharyk, another Banque

3    Havilland email, yourself and Remco Holderman.  Do you

4    see that?

5    A.    That's correct.

6    Q.    Do you know why you and the others would be

7    emailing with someone from Banque Havilland in

8    April 2020?

9    A.    This was based on the fact that Remco

10   Polderman was trying to open a bank facilities with

11   Banque Havilland.

12   Q.    Could we look on page 3 of this Exhibit,

13   please, where the email from Noeleene Goes-Farrell

14   continues.  Do you see at the top where it says:

15        "Supporting documentation for the EUR 450K

16   salary from the Sixth Senses Venture.  Copy of contract

17   will suffice."

18        Do you see that?

19   A.    Yes.

20   Q.    What is Sixth Sense venture?

21   A.    Sixth Senses Ventures was a Company that was

22   incorporated by Remco Holderman.  He was the, I believe

23   he was the 100% shareholder of that Company.  It was set

24   up in order to employ Delphine during the time as a

25   consultant to the building projects that were being set

1   up in Spain and Portugal.

2        Q.    Do you know why it was set up to employ her

3   as a consultant?

4        A.    I understand that this was part of the, the

5   process whereby Delphine Le Dain registered for tax in

6   Spain.

7        Q.    I'd like to look quickly at 16-1, if we

8   could, please.

9   (Exhibit Government Exhibit 16-1 was entered into

10  evidence.)

11  Do you see on the top right corner of this document

12  where it says Employment Agreement.  Do you see that?

13       A.    Yes.

14       Q.    And do you see where it continues down to,

15  say:

16            "In Barcelona on August 4th, 2015, between

17  Mr. Remco Marijn Polderman."

18       A.    Yes.

19       Q.    And do you see where it says:

20            "Acting for and on behalf of Sixth Sense

21  Ventures."

22            Do you see that?

23       A.    Yes.

24       Q.    And then the next paragraph begins.

25            "Mrs. Delphine Anne Le Dain."

Graham Collett                                          February 06, 2025

1       A.      Correct.

2       Q.      Turning to the second page, do you see at the

3   top where it says:

4               "The employee will render services to the

5   Company as a Business development manager."

6               Do you see that?

7       A.      Yes.

8       Q.      And do you see under the paragraph entitled

9   Second Remuneration.  Where it says:

10              "The employee will receive as remuneration

11  for the obligations set out in this contract an annual

12  gross amount of €450."

13      A.      €450,000, yes.

14      Q.      Can you tell us what that means?  What does

15  this paragraph say?  If you had to sum it up?

16      A.      Under this, under this employment

17  arrangement, the company Sixth Sense Ventures would pay

18  Delphine Le Dain $450,000.  Sorry, €450,000 as an annual

19  salary?

20      Q.      And looking at page 3 of this document, do

21  you see at the top right where it says:

22              "Unless the company and the employee agree

23  otherwise in writing, the working hours will be 30 hours

24  a week."

25              Do you see that?

Graham Collett                                    February 06, 2025
27

1      A.    Yes.

2      Q.    To the extent of your knowledge, was the

3  Sixth Sense Ventures Employment Agreement provided to

4  Banque Havilland?

5      A.    I presume, I can only presume if it was

6  provided, it was provided by Mr.  Mr. Polderman. I can't

7  be honest, I can't be absolutely clear as to whether

8  this was provided, or not.

9      Q.    Did you draft the Employment Agreement we

10  just looked at?

11      A.    No, I had nothing to do with this agreement

12  at all.

13      Q.    To the extent of your knowledge and

14  observation, did Delphine Le Dain work 30 hours a week

15  as a business consultant after 2015?

16      A.    To the best of my knowledge and experience, I

17  was obviously not in Spain at the time, but I don't

18  believe that Delphine Le Dain actually spent that amount

19  of time in Spain, and not to the extent of spending 30

20  hours a week as a business consultant.

21      Q.    Going back if we could, to 14-72.  On page 3

22  continuing on down the email, do you see next to

23  paragraph 3 where it says:

24          "We need to understand how DLD made her first

25  million?  I understand that the initial seed investment

```
 1   was of USD 200K."
 2            Do you see that?
 3        A.    Could you remind me which, which tab you're
 4   Looking at?
 5        MS. RANNEY:  I'm sorry, Mr. Collett.  We're in
 6   14-72.
 7        THE WITNESS:  1472.  Yes.  Sorry. I have it.
 8   BY MS. RANNEY:
 9        Q.    Mr. Collett, could we look at page 3, please?
10        A.    Yes.
11        Q.    And next, 2.3.  Do you see where it begins
12   'we need?'
13        A.    To understand.
14        Q.    Can you read us the rest of that sentence?
15        A.    Yes.
16              "We need to understand how DLD made her first
17   million."
18        Q.    And can you continue on reading for us,
19   please?
20        A.    "I understand that the initial seed
21   investment was of 200,000 USD from her professional
22   career to this point into the Manas LLC in 2003.  Can I
23   please have more details of this."
24        Q.    Mr. Collett, do you know whether the money,
25   any money was ultimately transferred into accounts at
```

1   Banque Havilland?

2          A.    To my knowledge, no, because the, the

3   facility discussions were not, not continued, or

4   finalized.

5          MS. RANNEY:  Mr.  Collett, if we could return,

6   please to an Exhibit we looked at together earlier in

7   your testimony.  Can we look at 6-1, please and could we

8   please put 14-72, page 3 up on the left hand side of the

9   screen and look at 6-1 page 3.  My apologies.  Can we

10  start with 6-2,  Page 2.

11  BY MS. RANNEY:

12         Q.    Mr. Collett, we just talked about in the

13  Banque Havilland email, the transaction of $115,000 and

14  the date of 2003.

15         A.    Yes.

16         Q.    Can you look, please on the right hand side,

17  where we've put up 6-2. The Bartol Limited year ended

18  2004 Account Notes and Queries.  Do you see that?

19         A.    Yes.

20         Q.    On the right hand side?

21         A.    Yes.

22         Q.    Can you tell us again who drafted this

23  document?

24         A.    I drafted this at the time that I prepared

25  the accounts.

1    Q.    And who had given you the information when to

2    put this together, when you drafted it?

3    A.    In terms -- I was stating the basis on which

4    I had prepared the accounts.  And where there is

5    reference to information, I received information from

6    Iryna. A further adjustment was, was made for $518,000

7    to be received as per DE.  Mr.  Edelman.  I prepared

8    that information from what was available from the

9    information, what I was told.

10    Q.    And can you remind us approximately when in

11    time you had prepared this document, the account notes

12    and queries?

13    A.    In respect of the year ended 31st of

14    December 2004.  That would have been in 2005.  During

15    that year.

16    Q.    And after you prepared this document and the

17    other Bartol Limited records that you prepared, did you

18    review them with Mr. Edelman?

19    A.    I believe that I did, yes.

20    Q.    Could we look at page 3 of these account

21    notes and queries for Bartol Limited for 2004?  Can you

22    read to us that top full sentence at the top of the

23    page, please?

24    A.    "Transactions during the year included a loan

25    repayment to Delphine of $120,015."

Graham Collett                                                February 06, 2025

1    Q.    Just to look back, if we could, at 14-72, at

2    that paragraph 3. Take a minute if you need to, but does

3    that paragraph 3 say anywhere that the $115,000 had been

4    repaid to Ms. Le Dain very shortly after it was put into

5    the Company?  Does it say that anywhere?

6    A.    No, it doesn't.

7    Q.    Mr Collett, you mentioned in your previous

8    testimony that ultimately there was a buyout of

9    interests in Mina and Red Star in 2020.  Do you recall

10   that?

11   A.    Yes.

12   Q.    And just to be abundantly clear, who was the

13   buying party in that transaction?

14   A.    That was Mr. Bek's Company, TNF.

15   Q.    Do you recall approximately when that buyout

16   agreement was consummated, or when it technically

17   happened?

18   A.    I believe it was during October 2020.

19   Q.    Do you know what the purchase price was?

20   A.    Purchase price overall was approximately $76

21   Million.

22   Q.    Could we look at 3-9, please?

23   (Exhibit Government Exhibit 3-9 was entered into

24   evidence.)

25   Do you see at the top of this document where it says

1  Purchaser and Seller, Seller Mutual Guaranty.  Do you

2  see that?

3        A.    Correct.  Yes.

4        Q.    And do you see where it says on this front

5  page dated October 12th, 2020?  Do you see that?

6        A.    Yes.

7        Q.    And then do you see where it says:

8              "By Douglas Philip Edelman, Seller,

9  Guarantor."

10             Do you see that?

11       A.    Yes.

12       Q.    And it continues:

13             "And Erkin Azatovich Bek Puchaser Guarantor"

14             Do you see that?

15       A.    Yes.

16       Q.    And could we turn, could we turn to page 11,

17  please?  I'm sorry.  Page 12.  I'm sorry.  Page 10.  Do

18  you see at the bottom of this page where it says 'Seller

19  Guarantor.' Do you see that?

20       A.    Yes.

21       Q.    And then do you recognize the signature under

22  Seller Guarantor on this Sales Agreement?

23       A.    I believe this to be Mr. Edelman.

24       Q.    And, Mr. Collett, do you have any personal

25  knowledge about whether any payments were made pursuant

1  to this Purchase Agreement?

2       A.    Pursuant to this, to this agreement, yes.

3  There were two payments made totaling $41 Million.

4       Q.    And which accounts were those payments made

5  into?  If you recall?

6       A.    They were paid into Rosbelt International,

7  Limited.

8       Q.    And after the money hit the accounts, can you

9  tell us what happened to it?  Do you have any personal

10  knowledge about that?

11       A.    Yes.  Shortly afterwards the various payments

12  were made out of the account and over the period from

13  October 2020 to the end of 2021, approximately 13

14  months, most of that, of the 41 million, was dispersed.

15       Q.    Can you tell us where it was dispersed to?

16       A.    The money went in various payments.  Shortly

17  after receipt, an amount of 10 million was made as a

18  further investment into the Sirius business.  The, the

19  fuel logistics business in Mexico.

20       Q.    Who directed that that investment be made?

21       A.    I believe Mr. Edelman directed that payment

22  to be made.  And it was made by the, by Leonard O' Brien

23  from Salamander.

24       Q.    Just to be clear, is this the same Mexico

25  investment that you testified yesterday was a very risky

1  investment that had not returned any profits?

2       A.    That is correct.

3       Q.    And beside the transfer to the Mexican

4  investment on Mr. Edelman's instructions, do you

5  remember any other transfers of money out of that $40

6  Million pot?

7       A.    In that 13 month period there were payments

8  made to Delphine Le Dain of approximately $6 million.

9  There were payment of legal fees of approximately

10 13 million-pound -- $13 Million.  There were other

11 payments in respect of investments, ongoing costs I

12 think of about 3 or 4 million.  And various other

13 administration and consultant fees paid during that

14 year.

15      Q.    Could we look at 24-2, please?

16 (Exhibit Gov. Exb 24-2 was entered into evidence.)

17      A.    Yes.  This is, this is my summary.

18      Q.    Mr. Collett, you just said that this was your

19 summary.  Can you tell us when you prepared this

20 summary?

21      A.    I prepared this summary early in 2022, I

22 believe.

23      Q.    And what did you use to prepare this summary?

24      A.    I used the QuickBooks records that I've

25 maintained and and compiled from the bank statements and

1    other information as I had done in the previous years.

2         Q.    Mr. Collett, did you keep this summary in

3    your files after you prepared it?

4         A.    Yes, I did.

5         Q.    And did you retrieve it from your files in

6    order to provide it to the Government?

7         A.    Yes, I did.

8         Q.    And is this a fair and accurate copy of the

9    Summary that you prepared?

10        A.    Yes, I believe it is.

11        Q.    And in your work for Mr. Edelman over the

12   years, had you prepared other summaries like this,

13   relying on the same types of records you use to prepare

14   this one?

15        A.    That's correct.

16        Q.    Can you read us the first text on the page

17   below?  Summary of Cash flows where it begins 'the

18   following Summary indicates?'

19        A.    "Indicates the disbursement of the sales

20   proceeds from the sale of Galactea Trust's 50% interest

21   in Mina Group during the period September 2020 to

22   December 2021."

23        Q.    I'd like to look about halfway down the page

24   where there's a notation:  'Investment Costs.' Do you

25   see that?

1          A.    Yes.

2          Q.    Do you see where there's an entry:

3                "GLOBAL Private Equity Fund for Sirius."

4                Do you see that?

5          A.    Yes.

6          Q.    And can you tell us what that entry is

7    showing you?

8          A.    That was a payment into an entity called

9    Global Private Equity Fund and which was used to make

10   the payment out to Mexico and to Sirius from that

11   Account.

12         Q.    And who gave you instructions for that

13   payment to be made?

14         A.    I didn't make that payment.  It was made

15   directly by the Trustee on the basis that I had no, no

16   involvement in actually making payments after that date.

17         Q.    Do you know who had given instructions to the

18   Trustee to make that payment?

19         A.    I can only assume, and it is, that it was

20   Mr. Edelman.

21         Q.    Whose investment had Sirius been, based on

22   your years of involvement in money transfers to Sirius?

23   Who had initiated all the previous investments?

24         A.    Mr.  Edelman.

25         Q.    And looking at the next entry here, 'MTV

1    Adria.' Do you see that?

2         A.    Yes.

3         Q.    Can you remind us what that is?

4         A.    That, MTV Adria was the MTV franchise

5    business in Eastern Europe.

6         Q.    And whose investment had that been?

7         A.    That had been made by Mr. Edelman.

8         Q.    And what about the next one?  'The Oakwood

9    Trust.'  What is that?

10        A.    That was another of the, the Trusts.  I can't

11   quite remember which assets were included in the, in the

12   Oakwood Trust.  I'd have to be.

13        Q.    And do you see on the next line where there's

14   an entry for Sirius?

15        A.    Yes.

16        Q.    And can you tell us the amount on that

17   transaction, please?

18        A.    That is 1,277,000 USD.

19        Q.    And then the next entry, Evanshire Mara

20   Farming.  Can you remind us what that is?

21        A.    That was, that was further funding for the

22   farming business in Kenya.

23        Q.    And whose investment had that been?

24        A.    That would be Mr. Edelman investment.

25        Q.    And how much is that transaction?

1        A.      That's 342,000 USD.

2        Q.      And then the last entry there, 'Halcon Del

3   Mar Yachts.'  Do you see that?

4        A.      That's right.

5        Q.      Do you know what that is?

6        A.      That's payments to Halcon Del Mar, which at

7   that point in time owned the two yachts that we've

8   referred to, Divinity and Princess Juliet.  That relates

9   to the costs and repairs to the yachts.

10       Q.      And looking at the next entry here, where it

11  says Big Valley Trust Cottesmore house.  What is that?

12       A.      That is largely payments of interest on a

13  loan that had been taken out on the Cottesmore house.

14       Q.      Do you remember approximately when a loan had

15  been taken out on the Cottesmore house?

16       A.      I believe it was about a year or so before

17  the sale of the business.  I think he was around about

18  2018, 2019.

19       Q.      Do you remember what was done with the funds

20  obtained by using the Cottesmore house as leverage?

21       A.      The money was largely used for investment.

22  I, I recall to the best of my ability, was used for

23  further investment into Sirius.

24       Q.      Do you remember whose idea it was to use the

25  Cottesmore house as leverage to put more money into

Graham Collett                                        February 06, 2025
                                                                    39

```
 1   Sirius?  Whose idea was that?
 2        A.    I believe it was Mr. Edelman's.
 3        Q.    Mr. Collett, you mentioned in describing some
 4   of your work on the investments that your activity had
 5   ceased, or changed around November 2020.  Do you recall
 6   that testimony?
 7        A.    Yes.
 8        Q.    Can you tell us what happened in
 9   November 2020 leading to a change in your role?
10        A.    Yes.  If you're referring to me personally, I
11   was visited by HM Revenue Customs.  And I was
12   interviewed.  All the records were, and my devices were
13   seized.  As a result of which I then took no further
14   part in, in detailed transactions.  Or in any
15   communications with Mr. Edelman.
16        Q.    Mr. Collett, where were you living at this
17   point in November 2020?
18        A.    I was living in our house in Mill Rise in
19   Robertsbridge in Sussex, in the UK.
20        Q.    You mentioned that records were seized.  Can
21   you describe for us at that point what types of records
22   you had with you at your house?
23        A.    I had all the paper records in files of many
24   of the Exhibits that we've been looking at, together
25   with any other information relating to the various
```

1  Companies, entities and matters that I dealt with.

2       Q.    Mr. Collett, you mentioned that these Agents

3  asked you some questions.  Do you recall answering the

4  questions that they asked of you?

5       A.    Yes, I did.

6       Q.    Mr. Collett, you've testified now about a lot

7  of the work that you did for Mr. Edelman over the course

8  of nearly 20 years.  When the law enforcement agents

9  asked you who your client was did you say it was Douglas

10  Edelman?

11       A.    I said it was Delphine, using the party line.

12       Q.    Was that true?

13       A.    No, it wasn't.

14       Q.    And when the law enforcement agents asked you

15  in November 2020 about the origin of the wealth and the

16  Trust, who did you name as the initial investor?

17       A.    Delphine Le Dain, as per the company line.

18       Q.    Was that true?

19       A.    No, it was not true.

20       Q.    When the law enforcement agents asked you in

21  November 2020 about Mr. Edelman being shown as an

22  initial shareholder in Red Star, do you recall what you

23  said?

24       A.    As an initial shareholder in Red Star; I

25  can't remember.  I can't recall my exact response to

1    that.

2         Q.    Would you have agreed in that interview if

3    you were giving the party line that Mr. Edelman had been

4    an initial shareholder?

5         A.    The answer to that is no.

6         Q.    Mr. Collett, when the law enforcement agents

7    asked you whether Mr. Edelman had benefited from the

8    wealth in the Trust, do you recall what you said to

9    them?

10        A.    To the best of my recollection, I said that

11   he had been remunerated for working for the Trust.

12        Q.    Mr. Collett, was that the whole story, or was

13   that the party line?

14        A.    That was the party line.

15        Q.    Mr. Collett where are we presently; which

16   country are we in?

17        A.    The United Kingdom.

18        Q.    But which country do you understand these

19   proceedings to relate to?

20        A.    The United States.

21        Q.    Mr. Collett, if your health allowed, would

22   you be willing to come to the United States to testify

23   in a criminal proceeding?

24        A.    If my health allowed, yes.

25        Q.    Mr. Collett, to the best of your assessment,

```
 1   or your understanding, does your health currently allow

 2   you to travel to the United States?

 3        A.    No, it doesn't.

 4        MS. RANNEY:  No further questions at this time.

 5        MR. CLARKE:  How much time you think we need on

 6   this stuff?  I need ten max.  Yeah.  Let's, let's do

 7   this -- let's take.  We need to organize and flip sides.

 8   Twenty minutes.  Is that okay?  Let's, let's do.  Let's

 9   do that.  Yeah, that's perfect.  Let's come back at 3.

10   Okay.

11        VIDEOGRAPHER:  This is the end of Media I, going

12   off the Record at 2:38 as indicated on the video screen.

13             (Break taken.)

14        VIDEOGRAPHER:  This is the beginning of Media II,

15   Vol. IV,  going back on the record at 15:03, as

16   indicated on the video screen.  Thank you.

17                   CROSS EXAMINATION

18   BY MR. CLARKE:

19        Q.    Mr. Collett, good afternoon.  I'm George

20   Clarke with Baker McKenzie, and my colleague Sonya

21   Bishop, also with Baker McKenzie.  We represent

22   Mr. Edelman.

23             If at any time you have a difficult time

24   hearing me.

25        THE WITNESS:  Yes.
```

1        MR. CLARKE:  Let me know and I'll try to speak up a

2   little bit.  Hopefully, that's okay.

3        THE WITNESS:  Yeah, that's fine.

4   BY MR. CLARKE:

5        Q.    I'd like to start really with your work

6   accounting for the income earned and the expenses

7   incurred by these businesses, if I can.

8        A.    Yes.

9        Q.    You're an experienced accountant, right, sir?

10       A.    Yes.

11       Q.    And when we see a financial statement or a

12   financial Summary that you prepared, you tried to get

13   those things right to the best of your ability, correct?

14       A.    That's correct.

15       Q.    Now, Ms. Ranney walked you through times when

16   you included personal expenses, or excluded certain

17   income items per instruction.  You remember that?

18       A.    Yes.

19       Q.    She also walked you through certain

20   situations in which you hid things from Caplin and

21   Drysdale and other lawyers.  You remember that?

22       A.    In terms of conveying an agreed line about

23   the party line, that's correct.

24       Q.    Precisely.  So, if we set those specific

25   instances aside, generally we can rely on your work.

1    Correct?

2         A.    I would think so.

3         Q.    Okay.  So, for an example:  Business expenses

4    that you included in the financial statements that you

5    prepared were generally ordinary and necessary to the

6    best of your knowledge.  Is that correct?

7         A.    Yes.

8         Q.    And underlying income numbers, like revenue

9    and income from Mina and Red Star, we can rely on that,

10   right?

11        A.    In terms of the distributions coming in and

12   where they, where they came from, then I would record

13   those accordingly.

14        Q.    And in fact you testified, I think, that you

15   you relied on another accountant at Mina and Red Star

16   for some of that distribution information, right?

17        A.    Yes.  In my work in the, the Red Star Mina

18   accounts that were prepared by Nikolai Ushakov, yes, I

19   worked with him in terms of the, of those accounts and

20   the the distributions coming out of those companies to

21   the shareholders.

22        Q.    Very good.  And in fact that was a 50/50

23   partnership, right?  That Mr. Ushakov was dealing with

24   correct?

25        A.    That's right, yes.

Graham Collett                                          February 06, 2025

45

1        Q.    So, there's actually some natural tension to

2    make sure that those numbers are correct?

3        A.    Yes.

4        Q.    Okay.  So, I'm not going to walk you through

5    all the documents that Mr. Ranney put you through, but I

6    do want to look at 14-69, if we can do that?

7    Just tell me when you're -- that's good. Do we have

8    that?  Okay.  So, this document is an example of

9    something that you tried to get right.  Correct?

10       A.    Yes.

11       Q.    Okay.  Now, you testified that many of these

12   payments, these investments you actually made yourself,

13   right?

14       A.    A lot of the payments, yes.  Under direction.

15       Q.    And that, those payments, just so I

16   understand, the money for those payments by and large,

17   came from Mina and Red Star.  Originally.  Right?

18       A.    That's correct, yes.

19       Q.    If I use the term 'cash cow.' Do you

20   understand what I mean?

21       A.    Yes.

22       Q.    So, Mina and Red Star was the cash cow,

23   right?

24       A.    It was referred to by various people as a

25   cash cow.  Yes.

Graham Collett                                                February 06, 2025

1        Q.     And so, these investments were funded by Mina
2    and Red Star money?
3        A.     Ultimately, yes.
4        Q.     Now, Ms. Ranney walked you through all of
5    these top investments that were largely failed
6    investments, correct?
7        A.     That's correct.
8        Q.     As to the money that went into those
9    investments, my client never received any of that money
10   personally.  Right?
11       MS. RANNEY:  Objection. Witness can answer.
12       A.     All the money went into the various entities
13   that existed along the history from 2004 onwards.
14   BY MR. CLARKE:
15       Q.     And as you testified, most of that money was
16   actually lost in these investments, correct?
17       A.     Yes.
18       Q.     So, my client never received that money?
19       A.     Not directly, no.
20       Q.     And his wife never received that money
21   directly?
22       A.     No.
23       Q.     And his children will never receive that
24   money?
25       A.     No.

Graham Collett                                    February 06, 2025

47

1       Q.    When you made these payments for these

2  investments, you did it in the form of loans between the

3  entities.   Correct?

4       A.    What I did was, I maintained accounting

5  records for the various entities over the period of

6  time.  So, over the time that I was doing the detailed

7  accounting, which was really from 2010, when I started

8  keeping full records, there were four entities, there

9  were four entities from that time onwards.

10            One, the first one was Sunage Foundation in

11  2008.  Which was founded in 2008.

12            Satellite Support Services, which followed

13  shortly thereafter.

14            Then in 2012, there was the new Galactea

15  Trust.  And were two basic accounts operated through

16  Galactea Trust.  Mostly Rosbelt International, and

17  secondly was Bluestone International Investing Limited.

18            So, when you refer to loans, what I did was

19  within those accounting records I showed all of the

20  payments relating and analyzed them out in terms of the

21  payments made in respect of specific investments.  As we

22  looked at, in terms of administration, overhead

23  expenses; in terms of payments to the beneficiaries.

24            So, what I did is, is I completely analyzed

25  within the QuickBooks information all of the payments

1    and allocated them to the various projects, or cost that
2    they related.
3         Q.    Okay.  So, I was confused a little bit just
4    because it says if you look at note four on that first
5    page, it says:
6              "The loans to the various company investments
7    comprise:"
8              You see, it talks about all that?
9         A.    Yes.
10        Q.    And that's why I thought that they were
11   loans, like the various entities that you're talking
12   about.  Between them were loans.  How did you consider
13   them?
14        A.    In terms of the -- all of these relate to the
15   Trust structure.  And it was basically Galactea Trust,
16   Rosbelt International which was the Company receiving
17   most of the income in this, in this period from, from
18   the Mina Red Star distributions, it was going into
19   Rosbelt.  Rosbelt, in turn was paying expenses:
20   investments, purchases for all of the other entities
21   that we've discussed.
22              So, I was allocating all of those costs as a
23   cost head overall to that particular investment, and
24   that particular Company.  For example, anything to do
25   with Mara farming, for example, was under the heading of

1   Evsanshire.  That was how I accounted for all of the

2   money's coming in and going out.

3        Q.    Okay.  So, when.

4        VIDEOGRAPHER:  Sorry, can I just move the cable

5   from under the binder?  Sorry, Mr. Collett, very

6   quickly.  Thank you.  Sorry about that.

7   BY MR. CLARKE:

8        Q.    So, when you did this, when you made these

9   cross payments, these payments across entities, you

10  didn't have a distribution, or a dividend declared and

11  another contribution down to the other entity.  You

12  didn't do anything like that?

13       A.    No.

14       Q.    Okay.  To the extent that you could have done

15  the movement of the money between different pockets in a

16  tax efficient way; would you have done that?

17       MS. RANNEY:  Objection.  Witness can answer.

18       A.    I didn't do that for the simple reason that I

19  didn't, I didn't know how any tax money was then going

20  to be accounted for.  So, what I did was I kept it as

21  simple and as transparent as I possibly could.

22  BY MR. CLARKE:

23       Q.    Understood.  Understood.  Thank you for that.

24  I am confused about the control over the bank accounts

25  post 2013.  So, I want to be real clear.  I'm not

Graham Collett                                          February 06, 2025
                                                                      50

```
 1   talking about pre-2013.  I'm talking about post
 2   Galactea.
 3        MS. RANNEY:  Objection.  Counsel is testifying.
 4   BY MR. CLARKE:
 5        Q.    Who had control over those accounts post
 6   Galactea?
 7        A.    In terms of Rosbelt Limited, Rosbelt
 8   International Limited; signatories on that account were
 9   the Trustee.  And the Trustee made the payments, the
10   main payments for investments from Rosbelt
11   International.
12             As far as other payments for example, the the
13   administration and overhead expenses and, and so on, the
14   majority of those were made through Bluestone
15   International.
16        Q.    And who had control --
17        A.    The main --
18        Q.    Sorry.  Sorry, sir.
19        A.    The, the signatures on that account were
20   basically myself and Iryna Tsenzharyk.
21        Q.    So, for the Bluestone accounts post 2013, did
22   you keep the Trustee informed?  Did you have or you
23   delegated authority from the Trustee?  How did that
24   work?
25        A.    In terms of the, the operation of Bluestone,
```

1   just to explain; the banks that were being used at that

2   particular time were private banks, and were not really

3   interested in doing volume minor payments.  Bluestone

4   was set up effectively as a Treasury Company.  And that

5   meant that we could make smaller payments through that

6   that were routine payments through that, through that

7   Company more easily, using CBH Bank, for example.  That

8   was the reasoning behind it.

9           All of the payments that were made for the

10  investments, if they were small amounts; again, they

11  were always authorized, either based on standing

12  instructions from Mr. Edelman, or specific instructions

13  from Mr. Edelman.

14      Q.    And, and on those payments, did you summarize

15  those for the Trustee?

16      A.    Yes.  They were all included in detailed

17  reports month by month, year by year.

18      Q.    Okay.  That's helpful.  Thank you.  You were

19  the Protector of the Trust, correct?

20      A.    Yes.

21      Q.    Explain to me what you believe that meant;

22  your role was as a Protector?

23      A.    Overseeing what was being done by the

24  Trustee; raising and working with the Trustee and making

25  sure that the, the monies in and out of the Trust were

Graham Collett                                    February 06, 2025

52

1   being properly accounted for.  Yes.  That that was

2   basically the role.

3        Q.    Okay.  Thank you.  So, we talked about 14-69.

4   And you'll notice, though, that 14-69, at the bottom of

5   it, it starts at 2010.  As you may know, this case

6   involves years a little bit before ?

7        A.    That's right.

8        Q.    Yeah, it involves years a little bit before

9   2010.  So, if you could go to our Exhibit 8. If you

10  could bring that up?  Okay.  And actually, we need to

11  give you one, too.

12  (Exhibit Defence Exhibit 8 was entered into evidence.)

13  Do you recognize that document?

14       A.    Yes.  This is.

15       Q.    Can you explain to us what that document is?

16       A.    This was a Summary that I prepared of the

17  trading results, distributions from Red Star into the

18  various entities along the history line, showing the net

19  trading profits, the distributions and the equity as

20  shown in the, the annual accounts.

21       Q.    Is this one of the documents that you tried

22  to get right that we can rely on?

23       A.    That, that this is, yes, this is based on the

24  actual accounts of the of the Red Star Mina businesses.

25       Q.    Okay.  Do you think we need to cover the one

1   - So, I'd like to talk to you next about Government's

2   Exhibit 11-2.  Do you remember speaking with Ms.  Ranney

3   about this document?

4        A.    Yes.

5        Q.    Okay.  This was a valuation, correct?

6        A.    Yes.

7        Q.    Now valuations, when it comes to an income

8   method, depend on the forecast for the income. Right?

9        A.    Full cost for the income, yes.  And the

10  historical results as well.

11       Q.    But for instance, if the forecast were to say

12  that the next year was going to be zero income, that

13  would grossly affect the valuation.  Correct, sir?

14       A.    Yes.

15       Q.    So, this valuation assumes that the business

16  is a going concern and it will continue to earn money,

17  right?

18       A.    Correct.

19       Q.    You understand that this business, and this

20  is Mina Red Star involved government contracts.

21  Correct?

22       A.    Yes.

23       Q.    So, if those government contracts stopped,

24  this valuation would be wrong?

25       A.    That's correct.

Graham Collett                                        February 06, 2025

                                                                    54

1       Q.    Have you ever seen my client overvalue his
2   own assets?
3       A.    If I can refer to a specific example.
4       Q.    Please.
5       A.    In terms of the, the Mexican land purchases
6   that were made, totaling approximately $60 million.
7   Mr. Edelman often referred to that portfolio of land
8   having a, having a value considerably in excess three or
9   four times that amount of, of money.  That's the sort of
10  example I would refer to.
11      Q.    Thank you.  If you have a theoretical
12  valuation, on one hand, and an actual sale transaction
13  on the other, which one defines the value of an asset?
14      A.    The actual transaction, inasmuch that any
15  forecast relies on a willing seller and a willing buyer.
16      Q.    So, while we're on the point of the sale of a
17  business, you testified previously that the Trust sold
18  the Mina Red Star business.  Correct?
19      A.    That's correct.
20      Q.    In order to sell something, you have to own
21  it, right?
22      A.    Yes.
23      Q.    So, if I could draw your attention to Exhibit
24  3-6.  We'll start there.  You remember Ms. Ranney just
25  spoke with you about this document less than an hour

```
1   ago?
2       A.    Yes.
3       Q.    Did the transactions that this document
4   reflects happen?
5       A.    As far as I can recall, the investment into
6   Mina Group FZCO, which was a new Company that was set
7   up, I'm not sure that that actually happened.
8       Q.    And if you can go to 3.7.  Again, same
9   question.  Does the transaction that this document
10  reflects upon, did that transaction happen, to the best
11  of your knowledge?
12      A.    To the best of my knowledge, no, it didn't
13  happen.  Inasmuch that the, these documents, I believe
14  were, were superseded by the eventual sale of the 50%
15  interest.
16      Q.    Okay.  Let's, while we're on it, let's talk
17  about that.  Get it over with.  If you go to 3.9.  Based
18  on just looking at that page, who is the Seller of the
19  business?  Who's it say is the Seller?
20      A.    This refers to the Seller Guarantor.
21      Q.    If you keep reading down.
22      A.    Being Douglas Edelman.
23      Q.    It does.  And then it refers to the Purchaser
24  Guarantor being who, sir?
25      A.    Erkin Bek.
```

1    Q.    And who does it refer to as the Seller on the

2    next line?

3    A.    Rosbelt International.

4    Q.    Is that consistent with your understanding of

5    what actually happened?

6    A.    That is my, yes.  That is, that is what I

7    believe happened.

8    Q.    Okay.  You can put that away, sir.

9          So, I want to talk to you next about control

10   versus ownership.  Ms. Ranney asked you several,

11   several questions, many questions about based on your

12   experience, who worked for whom.  You remember those

13   questions, right?

14   A.    Yes.

15   Q.    Would you agree that someone other than an

16   owner of a business can give instructions, or directions

17   in that business?

18   A.    That is correct.  If, if, if it is, if it is,

19   it is quite clear that the person has the mandate to do

20   it in general terms.

21   Q.    So, like a Manager doesn't have to be an

22   Owner of the business, correct, sir?

23   A.    That's correct.

24   Q.    CEOs even don't have to be owners of the

25   business right, sir?

Graham Collett                                          February 06, 2025
                                                                      57

```
 1          A.      That's correct.
 2          Q.      Directors don't have to be Owners of the
 3   business.  Right, sir?
 4          A.      That is also correct.
 5          Q.      In fact, you were a Director on some of these
 6   entities, right, sir?
 7          A.      Yes.
 8          Q.      Did you own those businesses?  Signatories on
 9   bank accounts:  They don't have to be owners, right,
10   sir?
11          A.      No.
12          Q.      In fact, you were a signatory on many
13   account. They want you to move your mic up.  I'm sorry
14   sir.
15          COURT REPORTER:  As far as you can, Mr. Collett.
16   Thank you, Counsel.
17   BY MR. CLARKE:
18          Q.      So, Signatories on Bank Accounts, you said
19   don't have to be owners.  You were, in fact, a Signatory
20   on a bunch of Bank Accounts.  Right?
21          A.      Yes.
22          Q.      Did you own those businesses?
23          A.      No.  None of them.
24          Q.      Okay.  I want to talk next about Ms. Le Dain.
25   I heard your testimony to be that you didn't talk to her
```

Graham Collett                                    February 06, 2025

1    very much until about 2020.  Is that right?

2         A.    That's pretty correct, yes.

3         Q.    Okay.  If we can go to 17-9, if you can find

4    that, sir.  You remember Ms. Ranney asking you about

5    this email?

6         A.    Yes, indeed.

7         Q.    Now, she asked you why Ms. Le Dain was asking

8    more specific questions about the money and the Trust.

9    You remember that question?

10        A.    Yes.

11        Q.    My question is:  Isn't she just scared about

12   the family income going away?  Isn't that what this

13   reflects?

14        MS. RANNEY:  Objection.  Calls for Speculation.

15   Witness can answer.

16        A.    Yes.  It reflects her concern with the, with

17   the situation that arisen, had arisen in connection with

18   the potential sale of the business and/or transfer.  And

19   she was worried about the, the ongoing cash flow.

20   BY MR. CLARKE:

21        Q.    Now, I understand that you're very

22   experienced, but why would Ms. Le Dain be asking you

23   instead of her own husband, these questions?

24        MS. RANNEY:  Objection.  Calls for Speculation.

25   Witness can answer.

1    A.    That's slightly difficult to answer in, in,

2    inasmuch as I can't comment on the -- I don't know what

3    the relationship was between Mr. and Mrs. Edelman at

4    that particular time as to why she was asking me direct,

5    rather than her husband.

6    BY MR. CLARKE:

7    Q.    Based on your observation, sir, based on your

8    observations, did my client include Ms. Le Dain in

9    business decisions?

10   A.    Again, I find that difficult to answer

11   inasmuch that I was not privy to their, their, their

12   conversations and their level of interaction.

13   Q.    Ms.  Ranney asked you if you ever saw Ms. Le

14   Dain sign any documents.  You remember that question?

15   A.    Yes.

16   Q.    You said you never saw her sign anything

17   personally.

18   A.    Not relating to the investments, so on.

19   Q.    That means, doesn't it, that you never

20   briefed her, or walked her through a document that she

21   was about to sign?  Correct, sir?

22   A.    There was one occasion when the, the, that I

23   can recall, regarding the, the Trust structure and

24   whether it was to be a Grantor or Trust; those documents

25   were walked through with Delphine Le Dain before she

Graham Collett                                    February 06, 2025

1    signed them.  There may have been one or two other small

2    occasions, but I can't recall any.

3         Q.    As a general matter, that's the one you --

4         A.    As a general matter, yeah.

5         Q.    You remember.

6         A.    Yeah.

7         Q.    And so for an investment type decision, you

8    don't remember ever walking her through the results of

9    something she needed to sign?

10        A.    No.  The instructions always came from

11   Mr. Edelman.

12        Q.    Do you have any reason to believe that the

13   document she signed, she signed with full knowledge?

14   Any reason to believe that, sir?

15        A.    When you say signed with full knowledge of

16   the nature of the --?

17        Q.    The consequences.

18        A.    Consequences.  Again, I find that, I find

19   that difficult to, to answer specifically. She was not

20   an unintelligent person, by any stretch of the

21   imagination.  And it's, it's, it's difficult to, to say

22   with any certainty whether she understood.  From the

23   little I know of her, I would of, I would suspect that

24   she would want to understand anything before she signed

25   it.

1    Q.    Okay.  Thank you, sir.  My client is a bully,

2    isn't he, sir?

3    A.    Quite honestly?

4    Q.    Yes?

5    A.    Yes.

6    Q.    He bullied you?  Do you have any reason to

7    believe that he didn't bully her?

8    A.    I really don't know.  I, it's difficult for

9    me to assess the exact relationship between the two of

10   them.

11   Q.    Fair enough, sir.  I want to talk to you now

12   about the many times that Ms. Ranney asked you about

13   whether my client told you he gifted the income

14   producing assets to his wife.  You remember all those

15   times, right?

16   A.    Yes.

17   Q.    In order for my client to have admitted to

18   you that he gifted that business, he would have to admit

19   to you that he owned it prior to the gift.  Correct?

20   A.    Yes.  That would have to have been clear

21   evidence of that.

22   Q.    You can't give something you don't own,

23   right?

24   A.    That's correct.

25   Q.    Sir, I want to just clarify timeline quickly

Graham Collett                                              February 06, 2025

```
 1   here.  You were not involved in these businesses in
 2   2000.  Correct?
 3        A.    No.
 4        Q.    You were not involved in 2001?
 5        A.    No.
 6        Q.    Or 2002?
 7        A.    No.
 8        Q.    Or 2003? 2004 was the first time you were
 9   involved in these business.  Right, sir?
10        A.    Yes.  Only in terms of the basic accounting
11   instruction.
12        Q.    So, even your involvement in 2004, you're
13   characterizing is limited.  But that was the earliest.
14   Correct, sir?
15        A.    That's correct.
16        Q.    So, if we needed somebody that had personal
17   knowledge of things that happened in 2000, 2001, and
18   2002 and 2003, that person is not you.  Right, sir?
19        A.    That is correct.
20        MR. CLARKE:  I don't have any other thing.  Do you
21   guys want to take a break now, or go?
22        MS. RANNEY:  Sure.
23        MR. CLARKE:  I'm done.
24        MS. RANNEY:  Okay.  Yeah.  Let's do 15 minutes,
25   because at the very least, I'm going to need to move
```

```
 1    back over there.
 2         MR. CLARKE:  Sure.  Although you can, I guess, you
 3    could stay here.  Okay.  Let's do 15 minutes.
 4         MR. CLARKE:  Okay.  We're on a break for fifteen
 5    minutes.
 6         VIDEOGRAPHER:  This is the end of Media II. Vol.
 7    IV. Going off the Record at 15:36 as indicated on the
 8    video screen.
 9              (Break taken.)
10         VIDEOGRAPHER:  This is the beginning of Media III.
11    Vol. IV. Going back on the Record at 15:57, as indicated
12    on the video screen.  Thank you, Counsel.
13                     REDIRECT EXAMINATION
14    BY MS. RANNEY:
15         Q.   Mr. Collett, Mr. Clarke asked you a question
16    on cross examination about ordinary and necessary
17    business expenses.  Do you remember that?
18         A.   Ordinary.
19         Q.   Ordinary and necessary.  Do you remember that
20    phrase?
21         A.   Yes.
22         Q.   Are you familiar with what the phrase
23    ordinary and necessary means in the context of United
24    States Income Tax Law?
25         A.   I can't say that I am.
```

Graham Collett                                    February 06, 2025
                                                                64

1      Q.    In fact, have you had any training in United
2  States Income Tax Law, or principles?
3      A.    No.
4      Q.    Mr. Collett, do you have experience working
5  with business organizations and entities in your career?
6      A.    Yes.  In terms of within the UK.
7      Q.    Mr. Collett, can the manager of a business
8  also be an owner?
9      A.    Yes.
10     Q.    Can a Chief Executive Officer of a business
11 also be an owner?
12     A.    Yes.
13     Q.    If someone receives dividends from a
14 business, does that suggest that they have an ownership
15 interest?
16     A.    If they receive dividends, distributions from
17 a business that implies that they are owners.
18     Q.    Mr. Collett, in the early years of the work
19 that you did that we discussed related to Mr. Edelman,
20 can you remind us who initially had come to you for the
21 initial engagement? Who was your client, initially?
22     A.    It was Mr. Edelman.
23     Q.    And who had directed the Projects that you
24 were to do in those early years?
25     A.    Mr. Edelman.

Graham Collett                                          February 06, 2025

1      Q.    And when you completed the Projects, who did

2   you take them to for review?

3      A.    Mr. Edelman.

4      Q.    I'd like to look at another example, if we

5   could, of one of these Projects from the early years.

6   Could we put up 6-1, please?

7      MR. CLARKE:  I guess, I'll Object.  Outside the

8   Scope of Cross.

9   BY MS. RANNEY:

10     Q.    Mr. Collett, do you remember when Mr. Clarke

11  asked you on cross examination about your level of

12  knowledge related to 2000 to 2004?  Do you remember

13  that?

14     A.    Yes.

15     Q.    Can you tell us when you prepared the Project

16  that Mr. Edelman had asked you for; what information did

17  you use to put those Projects together?  Where did you

18  get that information?

19     A.    In terms of the defining Projects as the

20  accounts that I prepared, that information came from the

21  bank statements.  And where necessary, explanations of

22  the payments which I obtained from Mr. Edelman.  And

23  also in terms of other queries, again, information from

24  Mr. Edelman.

25     Q.    And do you recall in your communications with

```
 1   Mr. Edelman, did he give you an impression about who
 2   owned Aspen Wind and Bartol in those early years?
 3       MR. CLARKE:  Asked and Answered.  Outside the Scope
 4   of Cross. You can answer.
 5       A.    He gave a clear indication that he was the
 6   boss.  He was owning those businesses.  At that, that
 7   was my impression and my understanding at the time.
 8   BY MS. RANNEY:
 9       Q.    Could we look at 14-9, please?  No. 14-49.
10   14-49. Right here.
11       MR. CLARKE:  49?
12       MS. PERSAUD:  14?
13       MS. RANNEY:  Nope, that's not the right number.
14   It's on your sheet.  Nope.  So.  14?  Ha. 14-29. Sorry
15   about that.
16       MS. PERSAUD:  That's 30.
17   BY MS. RANNEY:
18       Q.    14-29.  And could we look at page 2, please.
19   (Exhibit Government Exhibit 14-29 was entered into
20   evidence.)
21   Mr.  Collett, do you see this email from Mr. Edelman to
22   you dated May 2008?
23       A.    Yes.
24       Q.    Can you read us the first sentence under
25   introduction, please?
```

Graham Collett                                           February 06, 2025

1          MR. CLARKE:  Outside the Scope of Cross.  You can

2     answer.

3          A.     "The two Companies, Bartol, and Aspen Wind

4     Corporation are both owned and controlled by Douglas

5     Edelman (DE) through nominee shareholder."

6     BY MS. RANNEY:

7          Q.     And then --

8          A.     "Bartol is incorporated in Gibraltar and AWC.

9     Aspen Wind Corporation is incorporated in Belize."

10         Q.     And then can you read us the first sentence

11    of the next paragraph, please?

12         MR. CLARKE:  Same objection. You can answer.

13         A.     "Both Companies were set up by Mr. Edelman to

14    control his various worldwide wide trading activities

15    and to provide the funds for investment in new ventures.

16    Some in partnership with others non-connected parties."

17         MS. RANNEY:  No further questions.

18         VIDEOGRAPHER:  This is the end of Media III. Vol.

19    IV in the Video Deposition of Graham Collett, going off

20    the Record at 16:05.  This concludes today's Deposition.

21

22

23

24

25

Graham Collett                                    February 06, 2025
                                                              68

```
 1                    E R R A T A

 2              Deposition of Graham Collett

 3    (Please show all corrections on this page, not in the

 4    transcript.)

 5    Page/Line No.       Description        Reason for change

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21

22

23    Signed:  _____

24    Name:    _____

25    Date:    _____
```

Graham Collett                                    February 06, 2025
                                                                 69

```
1               CERTIFICATE OF COURT REPORTER

2

3    I, DAVID ERDOS, a Certified Real-Time Court Reporter,

4    hereby certify that Graham Collett was duly sworn, that

5    I took the notes of the foregoing deposition and that

6    the transcript thereof is a true and accurate record

7    transcribed to the best of my skill and ability.  I

8    further certify that I am neither counsel for, related

9    to, nor employed by any of the parties to the action in

10   which the deposition was taken, and that I am not a

11   relative or employee of any attorney or counsel employed

12   by the parties hereto, nor financially or otherwise

13   interested in the outcome of the action.

14   Before completion of the deposition, review of the

15   transcript was requested.  Any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18

19

20

21
                 
     Signed: _____
22

23   DAVID ERDOS

24   Dated: 02/14/2025

25
```