# Expert Report of John Machell KC

**<u>UNITED STATES OF AMERICA v DOUGLAS EDELMAN AND DELPHINE LE DAIN</u>**

**<u>EXPERT REPORT ON BVI AND ENGLISH LAW</u>**
**<u>JOHN MACHELL KC</u>**

**<u>Introduction</u>**

1.  There are attached to this report two paginated Appendices of the copy documents to which I refer below. References to the Appendices are in the form: **[Appendix[ ]/tab/page]**.

2.  I graduated from the University of Southampton in 1992 with a first class law degree. I was called to the Bar of England and Wales in 1993, and appointed to the rank of Queen's Counsel (now King's Counsel) in 2012. I am entitled to practise as a barrister in England and Wales and as a legal practitioner in the Territory of the Virgin Islands (**"BVI"**). I have included in the Appendix copies of my degree certificate **[Appendix2/1/1]**, call certificate **[Appendix2/2/2]**, my letters patent (which concern my status as a KC) **[Appendix2/3/3]**, my current English practising certificate **[Appendix2/4/4]** and BVI certificate **[Appendix2/5/5]**.

3.  I have been in self-employed, independent practice since 1994 from a Chambers now called Serle Court in Lincoln's Inn, London, United Kingdom. A copy of my Curriculum Vitae is **[Appendix2/6/6]**. I have provided expert reports on English law on several occasions. I appear regularly in the Courts of England, the Eastern Caribbean Supreme Court (including Court of Appeal) and (on an ad hoc admission basis) the Grand Court of the Cayman Islands. I have also been admitted in Bermuda on an ad hoc basis. My practice involves cases across the spectrum of trust, corporate and commercial matters. Details of some of the cases I have been in involved in are set out in my CV. The *PJSC National Bank Trust v Mints* case – which involved proceedings in Cayman and England – raised issues concerning the sham/illusory trust principles, and setting aside transactions alleged to have defrauded creditors. Many of the trust cases I have been involved in are confidential and have been resolved without court proceedings. I am currently instructed in relation to a US$1.5 billion BVI trust on a matter raising various issues as to the validity of the appointment and removal of trustees; and a Cayman matter concerning to the validity of the constitution of the various trusts.

4.  I am instructed to prepare this report by Kobre & Kim (UK) LLP, who act for Delphine Le Dain (**"Ms Le Dain"**). I understand that this report will be filed with the United States District Court for

the District of Columbia for the benefit of the US court which I understand will have regard to it at the upcoming hearing concerning Douglas Edelman (**"Mr Edelman"**). I understand that the purpose of the hearing is to sentence Mr Edelman, and that I might be called to give evidence at that hearing.

5.   My instructions are set out in a letter dated 6 February 2026 (**"Instructions"**) **[Appendix1/A00/1]** and its attachments (which start at **[Appendix1/A01/10]**). I am asked to assume that the facts set out in my Instructions and in the indictment are true (which starts at **[Appendix1/A01/10]**). I have no independent knowledge of any the facts. The questions I am asked to address are set out in paragraph 31 of my Instructions **[Appendix1/A00/5]**.

6.   I believe that the opinions I have expressed in this report are independent, objective, honest and unbiased and are based solely on my expertise and analysis of the applicable law. I am aware that my role is that of an independent expert to assist the Court, and not to act an advocate for any party.

**<u>BVI legal system and sources of law</u>**

7.   The BVI is a British Overseas Territory which has its own system of laws and court system. The superior court of record for the BVI is the Eastern Caribbean Supreme Court, which comprises the High Court (a court of first instance, and which includes a Commercial Court) and the Court of Appeal. Appeals from the Court of Appeal are to the Judicial Committee of the Privy Council in London, which is the highest court of appeal for the BVI.

8.   The BVI legal system is a common law legal system. Like England and other common law jurisdictions, the sources of law are statutory acts and other statutory instruments/orders and decided cases. A system of precedent operates such that decisions of the Privy Council in appeals from the BVI are binding on the BVI courts in subsequent cases. The ratios of Court of Appeal decisions are binding on the High Court, and High Court decisions, whilst not formally binding in later High Court cases, are usually followed. In the absence of binding BVI decisions, relevant decisions of the English courts and of other countries of the British Commonwealth and decisions of the Privy Council on appeals from other countries are treated as persuasive (to the extent consistent with local statute and practice). It should also be noted that the principles of English common law were imported into BVI law by virtue of the Common Law (Declaration of Application) Act, Cap 13 and the Eastern Caribbean Supreme Court (Virgin Islands) Act (Cap 80) section 21 provides: "*In all matters in which there was formerly or is any conflict or variance between the rules of equity and the rules of common law with reference to the same matter the rules of equity shall prevail.*"

2

**Sources of BVI trust law**

9.  Like in England, BVI trust law is to be found in a combination of statutory provision and common law/equitable principles. The principal statute is the Trustee Act 1961 (as amended). The Hague Trusts Convention on the Law Applicable to Trusts and on their Recognition (1985) (**"Hague Convention"**) applies in the BVI by virtue of Recognition of Trusts Act 1987 (Overseas Territories) Order 1989.

10. The leading textbook on English trust law is (in my opinion) Lewin on Trusts (20th ed) (including the first supplement). Most of the principles I address below are uncontroversial and so I have made numerous references below to sections of Lewin, rather than cited a large number of decided cases. Where I do so (and subject to a point I address in paragraph 42 below), my opinion is that the parts of the book to which I refer accurately reflect both English and BVI law. Where I refer to non-BVI cases, my view is that they would be treated as persuasive by a BVI court and reflect BVI law (unless I say to the contrary).

**The Trusts**

11. This report is concerned with 10 trusts (**"the Trusts"**). The governing documents which I have been provided with start at **[Appendix1/B01/187]**. Each of the Trusts was constituted by a Deed entered into by Ms Le Dain as grantor, Salamander Associates Limited as trustee (**"the Trustee"**) and Graham Collett as original protector. Under BVI and English law, the Deeds are the constitutional documents which define the legal powers and obligations of the trustee and protector, and the primary documents to which Courts look when interpreting trusts. Each Trust has been subject to at least one amendment made pursuant to a power of amendment in clause 24. Clause 24 gives the Trustee a power of amendment, which it can exercise if it obtains the consent of the protector and (for the purpose of deleting the power of revocation in clause 7) Ms Le Dain as the grantor. I assume (as appears to be the case) that counsel's opinion was obtained for each of the amendment deeds as required by the powers of amendment.

12. I note that the trustee is now Summit Trust International in respect of each of the Trust. References below to "the Trustee", include references as appropriate to Summit Trust International. I also note that Ms Le Dain is described as the "*Grantor*", which is a term that I understand is more often used in relation to US trusts. The usual term in English/BVI Trusts is "settlor", but nothing turns on the difference in terminology.

3

13. The initial property of each Trust is stated in the Schedule to the Deeds to be €100, which I assume was transferred to the Trustee in its capacity of each trustee of each trust. I am instructed that further assets have been transferred to the Trustee to be held on the terms of each Trust, but I have no information in respect of those assets save for that set out in my Instructions and cannot comment on the validity of the dispositions of those assets to the Trustee. I note that the Deeds provide for the Trustee to have power to accept additional property as trust property transferred either by Ms Le Dain as the grantor or by "*any other person*". As noted in paragraph 24 below, assets can be settled on trust (i.e. transferred to the trustee) by a person who is not a party to the trust Deed (a so-called "economic settlor"). The reference to "*any other person*" reflects this and I note that the Deeds contain a definition of "*Settlor*" that includes such a person.   If property was transferred by Mr Edleman to the Trustee in its capacity as trustee of any of the Trusts, then Mr Edelman will, so far as that property is concerned, therefore, have become a "*Settlor*" as defined in each of the Deeds.

14. Each of the Deeds provides at clause 21.1 for the proper law to be that of the BVI. That constitutes an express choice of law for the purposes for Article 6 of the Hague Convention **[Appendix2/7/25]**. The proper law of the Galactea trust was changed from BVI to English law by the Deed of 15 November 2019 **[Appendix2/B40/707]**.

15. The Trusts are discretionary trusts, and the terms of the Deeds are in a common form regularly encountered (in my experience) in practice. The purpose of a trust is to vest legal title to assets in a trustee to be held and applied for the benefit of beneficiaries. In the case of a discretionary trust (like those in the present case), the trustee holds the trust property on trust with powers to apply the income and capital for the benefit of one of more of the discretionary beneficiaries identified by the terms of the trust. The members of the discretionary class may be individuals or corporate entities, including corporate entities acting in their capacity as trustee of another trust. In the present case, the beneficiaries are principally Ms Le Dain, her children and remoter issue and Charities, and the trustee has powers to add or exclude beneficiaries. See paragraph 21 below.

16. I assume that Mr Edelman is a "*US Person*" for the purposes of section 7701(a)(30) of the US Internal Revenue Code of 1986 and so is excluded from benefiting from the Trusts by the definition of Discretionary Beneficiary. Whether or not excluded, Mr Edelman is not, on the basis of the documents I have seen, a beneficiary.

**Question 1: What are the requirements for a valid trust settlement?**

17. For the creation of the legal relationship of trustee and beneficiary, certain essential conditions must be satisfied (the so-called "three certainties"): there must be an intention to create a trust and there

must be certainty of both subject-matter (i.e. the property that is the trust property or assets) and objects (i.e. the persons who are the beneficiaries of the trust). See Lewin at 5-001 to 5-004, 5-045 to 5-047 **[Appendix2/9/60, 72]**.

18. In the case of the Trusts, the requisite intention to create trusts appears from the terms of the Deeds and the transfer of assets to the trustee by Ms Le Dain as grantor or by Mr Edelman (or other third party). Further, no difficulty arises in relation to certainty of subject-matter or object.

19. If the Deeds were validly executed (which on their face they appear to have been) and property was transferred to the Trustee to be held on the terms of each Trust, then (subject to the points I consider below) my view is that valid trusts were created.

**Question 2: Who owns assets held in a discretionary trust? What is the nature of the interest in the assets held by the Trustee and the beneficiaries? Does anyone else have an ownership interest in the assets?**

20. The legal title to the assets of a trust is held by the trustee.

21. The nature of the beneficiaries' interests depends on the nature of the trust. In the present case, the Trusts are discretionary trusts. A named beneficiary of a discretionary trust – sometimes referred to as a discretionary object – does not have any proprietary interest in the trust assets. In general, no person has a vested interest in the assets of a discretionary trust (until a relevant dispositive power is exercised) because vesting is contingent upon the selection of an object from a nominated class. But a discretionary beneficiary has a right to be considered as a potential recipient of benefit by the trustee and a right to have his/her interest protected by a court of equity: see *Gartside v IRC* [1968] AC 553 at 605-606 and 617 **[Appendix2/10/83]** and Lewin at 1-061 to 1-062 **[Appendix2/9/49]**. A trustee of a discretionary trust of the kind in issue in the present case is (during the life of the trust) under a duty to consider whether to make distributions of income or capital to one or more of the beneficiaries and in what shares; but is not obliged to do so.

22. No one else has an ownership interest, including Mr Edelman, who is not a trustee or beneficiary of any of the trusts; and, on the assumption that he is a US Person, he excluded from benefit. Consequently, he has no interest in the trust assets, whether at law or in equity.

**Question 3: Under what circumstances can a trust be deemed to be void or voidable? In particular, under what circumstances will a purported trust be treated as a "sham"? Please include an explanation of any element of knowledge or intent required by law for a finding that a trust is a sham, including who is required to have such knowledge or intent and at what times.**

23. A trust created by an instrument to which the settlor and trustee are party may be void or voidable, or otherwise ineffective, in various ways:

   (1) the settlor's dispositive intention may be vitiated by reason, for example, of duress, undue influence or lack of mental capacity, with the consequence that the trust and/or the dispositions of assets to the trustee may be set aside by the court;

   (2) the trust may be a "sham" in the sense explained below, in which case it will be of no legal effect and, if assets have been transferred to a trustee, the trustee will hold the assets on resulting trust for the person who transferred them;

   (3) the settlor may have a power of revocation (or some other kind of dispositive power such as a non-fiduciary power of appointment) that enables him/her to revest the assets in themselves without requiring the consent of the trustee, and in that case the trust may be brought to an end by an exercise of that power voluntarily by the settlor or on his/her behalf by a person appointed by a court to exercise the power (such as a receiver appointment by a judgment creditor);

   (4) the terms of trust may not, on their proper construction, be effective to divest the settlor of his/her beneficial interest in the property transferred to the trustee (so-called "illusory trusts"), with the consequence that the assets are held on resulting trust for the person who transferred them;

   (5) the transaction may be capable of being set aside by the court pursuant to a statutory power, such as powers to set aside antecedent transactions found in applicable insolvency legislation, or a general statutory power to set aside transactions defrauding creditors.

24. It is not, I think, necessary for me to say anything about the first of these possibilities save to note that the relevant dispositive intention here may extend to a person who was the economic settlor of

6

the (or particular) assets even if he/she was not the formal settlor.[1] There is nothing in what I have seen to suggest that the intention of either Ms Le Dain (as the formal settlor) or Mr Edelman (if he was the economic settlor of any of the assets) was vitiated in any way.

*Sham*

25. A trust is a "sham" if the parties to the declaration of trust did not intend to create a trust on the terms set out in the trust instrument but instead wished to give a false impression to third parties and ultimately the court; that is, they wished to pretend to the outside world that a trust had been created when in fact it had not. See Lewin at 5-020 to 5-030 **[Appendix2/9/62]**. Where a trust is a sham and property has been transferred to the "trustee", then the property is held beneficially for the "settlor" (whether formal or economic) on resulting trust (Lewin at 5-028 **[Appendix2/9/67]**), although the shamming "settlor" is probably not entitled to assert his/her interest in the property (Lewin at 5-029 **[Appendix2/9/67]**). This enables a creditor of the "settlor" to enforce a judgment against assets on the footing that they belong beneficially to the settlor despite the fact that under the terms of the trust the "settlor" was not a beneficiary.

26. For there to be a sham, the parties must have a subjective intent to give a false impression (Lewin at 5-021 **[Appendix2/9/63]**) and all parties (including the trustee and any protector) must share the shamming intent. As they are volunteers, it is enough that the trustee is prepared to go along with the trusts being ignored. See Lewin at 5-023 **[Appendix2/9/65]**).[2]

27. If a trust was a sham at the outset, but new trustees are appointed who do not share the shamming intent then the trust may become effective at that point: Lewin at 5-026 **[Appendix2/9/66]**.

28. These principles have not, as far as I know, been the subject of detailed consideration in any BVI decision, but there are BVI decisions in which the principles are referred to by reference to one of the leading English decisions (*Snook v London & West Riding Investments Ltd* [1967] 2 QB 786 **[Appendix2/11/155]**): see, for example, *Alfa Telecom Turkey Ltd Appellant v Teliasonera Finland Oyj* [VG 2009 CA 6] at [17] **[Appendix2/12/178]**, *Great Panorama International Ltd v Qin Hui* [2020] [2020] ECSCJ No 278 (13 August 2020) at [55] **[Appendix2/13/213]** and *Access Bank Plc*

---

[1] A person may settle assets on a trust (i.e. transfer assets to a trustee to be held on the terms of the trust) without being party to the trust instrument. A person in that position is usually referred to as the "economic settlor" to distinguish them from the person who is the named settlor in the trust instrument (the "formal" or "nominal settlor").

[2] I should note for completeness that there is English authority that it is enough that the trustee is recklessly indifferent as to the settlor's true intentions: *Pugachev* at [150(iv)] and [435]–[437] **[Appendix2/20/416]**; but as Lewin notes in footnote 107 **[Appendix2/9/65]** that analysis is problematic. I do not consider this issue is material in the present case given what I say in paragraph 29.

*v Orjiako* [2025] ECSC J1001-2 Mithani J at [38] to [43] **[Appendix2/14/255]**. I have no doubt that the general principles summarised above reflect BVI law.

29. I do not consider that the facts as set out in my Instructions and the indictment would support a finding of a shamming intent. Indeed, even if it could be said that Mr Edelman and/or Ms Le Dain had a reason for pretending to create trusts (as to which I cannot usefully comment), there is no basis, as far as I can see from the material I have considered, for finding a shamming intent on the part of the original trustee or protector, or Summit Trust International as successor trustee. A settlor may create a trust with the desire to retain control of the assets and may regard the assets as still being theirs, but unless the other parties to the trust instrument (e.g. the trustee and protector) have a shamming intent the trust will be valid and the trustee and protector must administer the trust according to its terms.

### *Powers of revocation etc*

30. If a settlor has a power of revocation or a general (i.e. non-fiduciary) power to appoint the trust property to himself or herself, then that power is treated as (at least) tantamount to beneficial ownership of the trust assets and the power is treated as property against which a creditor of the settlor can enforce including by way of the appointment of a receiver: *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank & Trust Co (Cayman) Ltd* [2012] 1 WLR 1721 **[Appendix2/15/339]** (a decision of the Privy Council on an appeal from the Cayman Islands).

31. In present case, each of the Deeds contained powers of revocation but those powers have been removed by amendment by the trustee pursuant to clause 24 of each Deed: see the Deeds of Amendment at **[Appendix1 pages 213, 266, 321, 375, 429, 481, 533, 578, 630 and 676]**. I have seen nothing that would suggest that the Trusts were not validly amended to remove the powers of revocation (assuming the deeds of amendments were validly executed, as they appear to have been).

32. I also note:

    (1) first, that the powers of revocation were in any event potentially subject to third party consent: see clause 7.2 of each Deed. If a person was appointed as Consent Holder under clause 7.2, then the power of revocation could not be regarded as being tantamount to beneficial ownership of the trust property, although I have not seen any evidence that anyone was appointed as Consent Holder;

(2) secondly, the power of revocation was exercisable by Ms Le Dain not Mr Edelman and so the powers were not something against which a creditor of Mr Edelman could have enforced.

*Illusory trusts*

33. In the case of a trust that is not a sham and where the relevant property is transferred to (or otherwise held by) the intended trustee, there are some circumstances in which, as a result of an objective reading of the terms of the trust instrument in the light of the admissible factual matrix, an effective trust is not created because the settlor failed to divest him/herself of the beneficial interest in the property; in other words, on a proper construction of the trust instrument, the property remains held beneficially for the settlor.

34. This topic is one of some controversy and the principles are not settled. See Lewin at 5-031 to 5-035J **[Appendix2/9/68]**; Underhill & Hayton: Law of Trusts and Trustees (20th ed) at 8.1 to 8.7 **[Appendix2/16/355]**; and Snell's Principles of Equity (24th ed) at para.22-071 **[Appendix2/17/359]**.

35. The principal decisions are as follows:

(1) *Re AQ Revocable Trust* (2010) 13 ITELR 260 **[Appendix2/18/361]** (a Bermuda decision);

(2) *Clayton v Clayton (No 1)* [2016] NZSC 29, [2016] 1 NZLR 551 **[Appendix2/19/376]** (a New Zealand decision);

(3) *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch) **[Appendix2/20/416]** (an English High Court decision);

(4) *Webb v Webb* [2020] UKPC 22 **[Appendix2/21/508]** (a privy Council decision, on appeal from the Cook Islands); and

(5) *Law Society v Dua* [2020] EWHC 3528 (Ch) **[Appendix2/22/552]** (an English High Court decision).

36. It is not, I think, necessary for me to set out a detailed analysis on this issue because I do not consider that the principle (if it is one) can have the effect of invalidating the Trusts in the present case.[3] This is not a case where a settlor has appointed himself/herself as trustee. The Deeds provide for the appointment of a separate person as trustee and provide for the Trustee to have dispositive powers that it can exercise in favour of identified beneficiaries and the exercise of which is subject to its fiduciary obligations. The Grantor's power to get the assets back was (at the time the Trusts were constituted) limited to a power of revocation, which is a power that is commonly encountered in practice.

37. So, in the present case, an "illusory trust" argument would have to be mounted on the footing that the mere fact of the inclusion of a power of revocation prevents a valid trust from being constituted notwithstanding that the trust property has been vested in a trustee who is (pursuant to the trust instrument) subject to rights and obligations in that capacity. There are no decided cases (as far as I am aware) that go that far, and I do not consider that the Privy Council (on an appeal from BVI) would hold the Trusts to be invalid on this basis. The better analysis is, in my opinion, that valid trusts were created and that those trusts continued unless and until the power of revocation was exercised (either voluntarily by Ms Le Dain as grantor or at the instance of a creditor of Ms Le Dain) at which point the assets would have revested beneficially in Ms Le Dain (or in Mr Edelman to the extent that they were transferred to the Trustee by him).

38. In any event, my view is that the existence of the power of revocation in the Deeds as originally drafted would not prevent the Trusts from being valid at the present time.

39. First, the BVI Trustee Act was amended in 2021 to make provision for a new section 86 that provides (as relevant) as follows **[Appendix2/8/41]**:

"*86. (1) The reservation by the settlor to himself or herself or the grant to any other person or to any office holder or body, including (but not limited to) a protector or protective committee, in a trust instrument evidencing and recording a trust governed by the laws of the Virgin Islands of any limited beneficial interest in the trust property, whether of income or capital, or any or all of the powers specified in subsection (2) or both such an interest and any or all of such powers, shall not —*

*(a) invalidate the trust;*
*(b) prevent the trust taking effect according to its terms; or*

---

[3] I should note for completeness that I do not personally regard the illusory trust part of the *Pugachev* decision to have been correctly decided on its facts.

*(c) cause any of the trust property to be part of the estate of the settlor for the purposes of succession on death, whether testate or intestate.*

*(2) The powers referred to in subsection (1) are—*

*(a) in the case of a reservation to the settlor or other donor of trust property, power to revoke the trusts in whole or in part;*

*...*

*(4) Subject to any contrary provision herein, this section applies to any trusts governed by the laws of the Virgin Islands, whether created before, on or after the date on which this section comes into force, and to acts and omissions occurring while the trust was governed by the laws of the Virgin Islands.*

*...”*

40. This kind of provision is commonly referred to as a reserved powers provision the purpose of which is, by statue, to prevent an otherwise valid trust from being ineffective as a result of the extent of the powers reserved to a settlor. See, for example, section 14 of the Cayman Trusts Act **[Appendix2/23/597]**.

41. S.86(4) provides expressly that the section applies to any trusts created before the section came into force (which the trusts in the present case did). Whilst I would acknowledge an argument to the effect that, if the trust was ineffective when first constituted, it cannot be saved by a later statutory provision of this kind, I do not consider that that argument would be accepted by a BVI court or, ultimately, the Privy Council, at least in a case like the present where assets have been transferred to a trustee. Whatever may have been the status of the terms of the Trusts at the outset, the Trustee must have held the trust assets as a trustee, even if, as a matter of construction, it held those for the beneficially for the person or persons who settled them i.e. a trust of some kind must have existed. If, as I assume to be the case, the Trustee continued to hold the assets at the time that the replacement section 86 came into force in 2021, then it seems to me that the purpose and effect of s.86(4) was to validate the Trusts at that point. So, on that footing, in my opinion, even if the Trusts were (contrary to the view I have expressed above) ineffective on the date they were originally purportedly constituted, they are now properly constituted Trusts.

42. Secondly, the Deeds were all amended to delete the powers of revocation and those amendments was made by Deeds to which the Trustee, Ms Le Dain and protector were all parties. In my opinion, if the views I have expressed above are incorrect and the Trusts were ineffective on the date they were originally purportedly constituted, the effect of the deeds of amendment was to validly constitute the Trusts at that point. The editors of Lewin appear to be sceptical about the validity of an argument to this effect (Lewin at 5-035J **[Appendix2/37/855]**), but there is some authority to

11

support it: *Clayton* at [124] fourth sentence **[Appendix2/19/409]**; and, in a case where the trustee and settlor are separate persons and are both party to an amendment to remove the power of revocation, it seems to me that the effect of the deed making the amendment is to constitute the trust at that point even if it was not previously effective: see Lewin fn 195 **[Appendix2/37/863]**. So, in my opinion, even if the Trusts were (contrary to the view I have expressed above) ineffective on the date they were originally purportedly constituted, they are now properly constituted Trusts.

***Statutory powers***

43. The BVI Insolvency Act includes bankruptcy provisions pursuant which a court can set aside prior transactions where, for example, they preferred particular creditors or were at an under value, but those provisions are subject to time limits which only look back a maximum of five years. So, I assume they are irrelevant in the present case.

44. BVI law also contains general provisions giving a court power to undo prior transactions where they are entered into fraudulently to defeat creditors: see the Fraudulent Conveyances Act 1571 **[Appendix2/32/735]** and section 81 of Conveyancing and Law of Property Act **[Appendix2/33/740]**. There is a question a whether the 1571 Act is still in force in BVI (it was repealed in England on 1 January 1926), but that question may well be academic because section 81 of the Conveyancing and Law of Property Act 1961 are to similar effect:[4] see *Lai Wing Lun v Marine Bright Limited* BVIHC (COM) 2022/0025 13 August 2022 at [38] **[Appendix2/34/741]** referring to *Great Panorama International Ltd v Qin Hui* [2020] ECSCJ No 278 (13 August 2020) at [57] **[Appendix2/13/213]**.

45. Section 81(1) **[Appendix2/33/740]** provides: "*Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced.*"

46. So, a person prejudiced by a conveyance of property (which includes a transfer of assets to be held by a trustee on a discretionary trust) can apply to set aside the transfer if the transfer was made with an intent to defraud creditors. The word "intent" denotes a state of mind. A person's intention is a question of fact. Actual intent may be proved by direct evidence or may be inferred from surrounding circumstances. Intent may also be imputed on the basis that a person must be presumed

---

[4] That said, it should be noted that the 1571 Act renders a conveyance void and the 1961 Act only renders a transfer voidable and so it is possible that in particular circumstances the difference between the two statutory provisions may be material.

to intend the natural consequences of his own act: see *Emirates NBD Bank PJSC v Almakhawi* [2023] EWHC 1113 (Comm) at [123] to [136] **[Appendix2/35/762]**.

47. Section 81(3) **[Appendix2/33/740]** provides: "*This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith or upon good consideration and in good faith to any person not having at the time of conveyance, notice of the intent to defraud creditors.*" Settlement of assets on trust is (usually) voluntary (i.e. not for valuable or good consideration) and so section 81(3) will not (usually) apply. In the present case, the settlement of assets on the trust was, I assume, voluntary and so section 81(3) would not apply in the event that an application to set aside was made under section 81(1).

48. In England, the relevant statutory provisions are contained in the Insolvency Act 1986 which contains specific avoidance provisions consequent upon a person's bankruptcy, but also a specific provision that is a modern version of section 172 of the Law of Property Act 1925 (the English equivalent to s.81), namely, section 423 **[Appendix2/36/844]**.

**Question 4: How would the BVI and, where relevant, the English court determine a dispute regarding the validity of a trust established in their jurisdiction?**

49. A person challenging the validity of a trust in a BVI court would commence a claim in the BVI Commercial Court pursuant to its Civil Procedure Rules seeking declaratory relief. Subject to the exercise by the court of its powers to summarily determine a claim, the matter would proceed to a trial before a judge. Following a judgment on trial, the unsuccessful party has a right to appeal to the Court of Appeal and (potentially) to the Privy Council.

50. A person challenging the validity of a trust in an English court would commence a claim in the Business and Property Court (Chancery Division) of the High Court pursuant to its Civil Procedure Rules seeking declaratory relief. Subject to the exercise by the court of its powers to summarily determine a claim, the matter would proceed to a trial before a judge. Following a judgment on trial, the unsuccessful party who wishes to the Court of Appeal must obtain permission to do so from either the first instance court or the Court of Appeal. There is the possibility of a further appeal to the UK Supreme Court.

51. I note that the question is framed in terms of trusts established in BVI and England. In fact, the jurisdictional rules of both jurisdictions permit proceedings about trusts governed by foreign law in certain circumstances.

**Question 5: Please explain the source and effect of "firewall" legislation regarding trusts. In particular, please explain whether the US Court has jurisdiction to make findings in relation to trusts which are governed by BVI and/or English law, and whether the trustee of such trusts or third parties would be bound by any such findings which are made by the US Court.**

52. There is, of course, a conceptual distinction between questions of proper (or applicable) law and jurisdiction: proper law is concerned with the system of law governing the determination of a claim or issue and jurisdiction is concerned with the power of a particular court to determine a claim or issue. The question whether a US court has jurisdiction to make findings about a BVI trust is a matter for its own substantive or procedural rules.

53. The BVI firewall legislation is concerned with the identification of the proper law that governs the determination of particular issues and the enforceability or recognition of foreign judgments. The proper law provisions are not themselves concerned with questions of jurisdiction: see, in relation to the Cayman Islands firewall, *Geneva Trust Company (GTC) SA v IDF* 2021 1 CILR 186, [2020] CIGC J1221-2 **[Appendix2/26/606]**.

54. The BVI firewall provisions are contained in section 83A of the Trustee Act **[Appendix2/31/728]**. English law does not include firewall provisions.

55. Sections 83A(7) to (9) make provision for the law to govern issues relating to the validity of dispositions of property onto trust.

56. Section 83A(12) provides for "*all questions arising in regard to the validity, construction, effect or administration, whether the administration is conducted in the Territory or elsewhere, of a trust … to be determined by the proper law of the trust or, where there are different proper laws for different aspects of the trust, the proper law applicable to the area in which the question falls.*" See also section 83A(6). In the present case, the proper law of the Trusts is BVI law (other than the Galactea Trust): see paragraph 14 above.

57. Sections 83A(13) to (18) contain provisions that prevent trusts or dispositions of property to be held on trust being invalid by reason of certain matters such as the law of any foreign jurisdiction prohibiting or not recognising the concept of a trust or foreign law providing for forced heirship or other personal rights.

58. Section 83A(19) provides: "*To the extent that it is inconsistent with subsections (13) to (18), a foreign judgment shall not be recognised or enforced or give rise to any estoppel, and both its*

*recognition and its enforcement shall be regarded as contrary to the public policy of the Territory …".*

59. A difficult question arises, in my view, as to whether, although sections 83A(6) to (12) are not referred to in section 83A(19), the BVI court would nevertheless refuse on public policy grounds to recognise or enforce an otherwise enforceable foreign judgment that determined an issue by reference to a system of law contrary to that identified by section 83A(6) to (12). There is some Cayman authority that supports a contention that general public policy would prevent enforcement or recognition: *HSBC International Trustee Limited v Tan Poh Lee* [2019] CIGC J1107-3 **[Appendix2/27/645]** and Lewin at 12-209 **[Appendix2/9/51]**. But this issue would be of academic interest only in the present case if a US court would in any event apply BVI law as the applicable law on the basis of the express choice in the Deeds.

60. It should also be noted that, aside from the effect of express firewall provisions and more general public policy, BVI and English law adopts quite a narrow approach to the enforcement or recognition of foreign judgments. Where a person is not a party to proceedings, the general rule is that they are not bound by the result or any findings may in the proceedings. Where they are a party, broadly speaking, a judgment obtained against a defendant will not be enforceable or recognised unless the defendant was either present in the foreign jurisdiction when the proceedings were instituted (in the case of a legal person, this requires a fixed place of business in that jurisdiction) or voluntarily submitted to the foreign jurisdiction: Dicey, Morris & Collins on the Conflict of Laws (16th ed) at 14R-058 to 14-073 **[Appendix2/28/654]**.  Also, a BVI court has no jurisdiction to entertain an action for the enforcement, either directly or indirectly, of a penal, revenue (i.e. tax) or other public law of a foreign state (although that rule does not apply to a claim for the reimbursement of sums of which a tax authority was defrauded): *Skatteforvaltningen v Solo Capital Partners LLP* [2024] UKSC 40 **[Appendix2/29/663]**.

**Question 6: In what circumstances can a trustee legitimately have regard, when making decisions about the administration of trust assets, to the views or expertise of a person who is not the settlor or beneficiary of the trust (including professional and non-professional advisers)?**

61. A trustee has a general duty to act in the best interests of the trust for the benefit of the beneficiaries as a whole, acting impartially, or fairly, as between beneficiaries with different interests: Lewin at 46-072 **[Appendix2/9/75]**. In deciding whether and how to exercise a power (including a dispositive power) in the interests of the beneficiaries, it is for the trustee to decide what process to follow and what information to take into account: Lewin at 29-041 to 29-053A **[Appendix2/9/52]**. A practice has developed of settlors preparing letters of wishes in which they

15

seek to set out how they would like a trustee to exercise its dispositive powers and/or guidance more generally, but letters of wishes have no formal status and (subject to the terms of the trust instrument) are not binding. Whilst letters of wishes are usually prepared for formal settlors, they can be prepared by economic settlors i.e. the person who provided assets of a trust even if not party to the trust instrument. This was recognised by the Privy Council (on appeal from Bermuda) in *Grand View Private Trust Co Ltd v Wong* [2022] UKPC 47 at [63] **[Appendix2/30/687]**. Nor is there any requirement for wishes to be expressed in any particular form.

62. Subject to the terms of the trust instrument, a trustee would act in breach of trust if it slavishly did whatever a particular person asked it to do because it would be abrogating its responsibility as trustee and failing to exercise independent judgment, but there is nothing inherently wrong in a trustee soliciting views from whoever it thinks can properly provide information or opinion relevant to a decision (including professional or non-professional advisers).

**Question 7: Are each of the Trusts valid trusts under applicable laws? Could the Trusts (or any of them) be properly regarded as 'sham trusts' under BVI law? With regard to the assets held in the Trusts, what ownership interest (if any) is held by Summit, Ms Le Dain, the other beneficiaries, and DE respectively?**

63. I have addressed the legal aspects of these questions above.

John Machell KC
Serle Court
London

15 February 2026