# Appendix 1
# Part 1

# KOBRE & KIM

TOWER 42
25 OLD BROAD STREET
LONDON, EC2N 1HQ
WWW.KOBREKIM.COM
TEL +44 (0) 20 3301 5700

6 February 2026

**BY EMAIL**

John Machell KC
Serle Court Chambers
6 New Square
Lincoln's Inn
London WC2A 3QS

*Privileged & Confidential*

Dear John

**Le Dain Family Trusts – Expert Opinion**
**Our client: Mrs Delphine Le Dain**

1. Thank you for agreeing to act as an expert witness in this matter.

2. As explained further below:

    2.1. Our client Delphine Le Dain ("**DLD**"), and her husband Douglas Edelman ("**DE**"), have been charged with tax offences in the United States. In short, the US DOJ alleges that between 2006 and 2020, DE (a US citizen) failed to pay US taxes due on income generated by businesses which he beneficially owned, and that DLD (a French citizen with no personal US tax obligations herself) conspired with and assisted DE to evade tax by holding herself out as the beneficial owner of certain assets which were in fact owned and controlled by DE.

    2.2. Between 2012 and 2015, much of the family's wealth was settled into BVI trusts (albeit one of these is now an English law governed trust) of which DLD was legal settlor and DLD and her three daughters were beneficiaries. DE has never been a beneficiary. The assets settled onto trust were derived from the profits of DE's business activities. The trustee of those trusts is presently Summit Trust International ("**Summit**").

**AMERICAS** (NEW YORK, DELAWARE, MIAMI, SAN FRANCISCO, SÃO PAULO, WASHINGTON DC)
**APAC** (HONG KONG, SEOUL, SHANGHAI), **CARIBBEAN** (BVI, CAYMAN ISLANDS), **EMEA** (CYPRUS, DUBAI, LONDON, TEL AVIV)

KOBRE & KIM REFERRED TO HEREIN IS A REFERENCE TO KOBRE & KIM (UK) LLP, A LIMITED LIABILITY PARTNERSHIP,
REGISTERED IN ENGLAND AND WALES WITH REGISTERED NUMBER OC 347946. IT IS AUTHORISED AND REGULATED BY THE
SOLICITORS REGULATION AUTHORITY, NO. 537858. THE TERM PARTNER IS USED TO REFER TO A MEMBER OF KOBRE & KIM (UK) LLP.
A LIST OF THE PARTNERS IS AVAILABLE FOR INSPECTION AT THE ABOVE REGISTERED ADDRESS.

001

6 February 2026
Page 2

2.3. DLD has not appeared in the US proceedings. DE pleaded guilty to a subset of the charges and is due to be sentenced by the US Court at a hearing scheduled for 23 March 2026. In short, he admitted that he was the beneficial owner of certain assets which were held in DLD's name before they were settled into trust, but denies that he had any interest subject to US taxes in those assets after they were placed in trust. His position is that the trust settlements were valid and that from the point of settlement, the trustee owned the assets in question. Conversely, we understand that the DOJ's case is that DE should be treated as having retained a taxable interest in the trust assets post-settlement. No allegations have been made against the trustee.

2.4. At the upcoming sentencing hearing the US court will determine the tax loss suffered by the US as a result of DE's tax evasion. In order to make that determination, it may wish to consider the validity of the relevant trust arrangements and the nature of any interest DE has had in the trust assets since settlement.

3. You are asked to:

3.1. Produce a written opinion addressing the questions set out below in order to assist the US Court. The questions relate to: (a) BVI and English trusts law regarding the validity of trusts; and (b) the practice of trusts administration. Your opinion is required to be filed by 2 March 2026 at the latest, but preferably well in advance of that deadline.

3.2. Respond to any questions raised by the US Court (or the parties) in relation to your opinion.

3.3. If requested by the US Court, be available to give oral evidence at the sentencing hearing (as an expert witness). This is listed for **23 March 2026**. At present we do not anticipate that you will be required to give evidence, but we cannot rule it out.

4. The remainder of these instructions are structured at follows:

4.1. **Section A** sets out the relevant factual background and introduces the documents which are enclosed with these instructions.

4.2. **Section B** sets out the questions we would like you to address in your opinion.

4.3. **Section C** sets out the format which we would like your opinion to take.

4.4. The documents which we are enclosing and which you are asked to consider are at **Annex 1**.

A. **FACTUAL BACKGROUND**

5. The relevant facts are set out in the enclosed documents, listed in Annex 1, and can be summarised as follows.[1]

---

[1] This summary is provided for convenience only. Counsel should rely only on the facts alleged or set out in the enclosed documents for the purposes of the Opinion.

002

6 February 2026
Page 3

6. DLD was born in 1966 in France. Her childhood was spent in France. She is a French national and holds a French passport and a Spanish residency permit. She is not a US person and has no personal US tax obligations. She currently lives in France.

7. DE is a US citizen. He was born in 1952.

8. DLD met DE in 1998. They married in France in 2000.

9. DLD and DE have three children together: Margot Charlotte Lucia Edelman Le Dain, Juliet Romy Rose Le Dain Edelman and Paloma Clementine Lita Le Dain Edelman, born in 2002, 2006 and 2009 respectively. All three of their children were born in the UK. The family never lived in the US.

10. DLD and DE remain married, but are separated.

11. In the early 2000s, following the September 11 terrorist attacks, DE co-founded an international fuel logistics business ("**Mina/Red Star**"), which supplied jet fuel to the US military in the Middle East. DE ran the businesses in conjunction with Erkin Bekbolotov, a Kyrgyz national. The business was highly profitable and was the source of the majority of the family's subsequent wealth. The indictment at **[A01]** provides further information regarding the background to Mina/Red Star. At a change of plea hearing in May 2025, DE made a series of admissions relating to the facts alleged in the indictment. Those admissions are recorded at pages 17 – 30 of the transcript of the change of plea hearing, at **[A02]**.

The Trusts

12. At issue are ten irrevocable discretionary trusts, established under the laws of the BVI between 2012 and 2015 (one of which has been the subject of a change of proper law such that the governing law is now the law of England & Wales) (the "**Trusts**"). The governing documents of the Trusts with which we have been provided are at **[B01-B51]**.

13. The legal settlor of each of the trusts was DLD. The beneficiaries of all of the Trusts are DLD and her three daughters except that:

13.1.    the beneficiaries of the Lightstar Trust are DE's children from his first marriage; and

13.2.    the trustee of the Bluestone Trust was added as beneficiary of the Atlas Trust.

14. The assets of the Trusts all derived from DE's legitimate business activities, being primarily his profits from Mina/Red Star. The Trusts subsequently acquired a number of investment assets and tangible assets (including real estate) across several jurisdictions. Those assets are unrelated to the fuel logistics business.

15. The trustee of the Trusts was initially Salamander Associates Limited, and then a related Swiss entity, Salamander Corporate Services SA. In 2023, Salamander Corporate Services SA was replaced by Summit as trustee of all the Trusts.

16. The Trusts have made distributions to the beneficiaries from time to time.

003

6 February 2026
Page 4

*Galactea Trust*

17. In December 2012, a trust deed was executed to establish a discretionary trust under BVI law known as Galactea Trust. The trust was established over nominal funds and DLD was named as the settlor and was included in the class of beneficiaries alongside her three daughters with DE. This was set up with the assistance of DE and DLD's then lawyers, Mishcon de Reya LLP. In November 2019, a deed was executed that changed the governing law of the Galactea Trust to the law of England and Wales.

18. On 1 June 2013, DLD transferred the two promissory notes in her name to the trustees of Galactea Trust and the trustees then transferred these notes down the underlying holding structure.

*Other Trusts*

19. Between 2013 and 2015, nine other discretionary trusts were established under BVI law, on similar terms to the Galactea Trust.

20. DLD was named as the "grantor" of each trust and was included in the class of beneficiaries of each (except for the Lightstar Trust, of which the named beneficiaries are DE's children from his first marriage who are based in the US).

21. These trusts (in most cases) came to hold investment assets and real estate which were unconnected with the fuel logistics businesses.

22. Financial statements for these trusts are not available, but it is understood that none of them generated any material amount of income.

*Management of the Trusts*

23. As noted above, the trusts were settled with assets which represented the proceeds of DE's business interests. DLD had no direct involvement in those businesses.

24. The trustees (Salamander and then Summit) also had regard at various times to advice given as to the management of trust assets by DE and people associated with him. This was particularly the case in relation to assets which DE had been involved in creating or managing. However, DE himself never had any formal status in the trusts, either as a settlor, beneficiary or consultant.

The DOJ Proceedings

25. In May 2024, DE was indicted in the US on charges relating (primarily) to unpaid tax on profits from the Business in excess of US $350m. DLD was named as a co-conspirator in the indictment. The indictment is at **[A01]**. The relevant allegations can be summarised as follows:

    25.1.  Between 2005-2010, DE unlawfully failed to file any tax returns or pay US taxes that were due on several millions of dollars of income.

6 February 2026
Page 5

25.2.  In the course of a Congressional investigation in 2010, DE falsely claimed that DLD owned his stake in Mina/Red Star. It is alleged that DLD made false statements and signed false documents to support this claim.

25.3.  Between 2015-2020, DE filed false tax returns which claimed he received significantly less income than he had in fact received from Mina/Red Star during this period.

25.4.  DE sold his share in Mina/Red Star to a third party for over $40m in 2020. His tax return for that year failed to disclose the sale.

26.  In May 2025, DE pleaded guilty to tax evasion for the years 2006-2012, as well as conspiracy to defraud the US Government and making materially false statements to the IRS and DOJ in 2016 and 2018 respectively. He did not plead guilty to tax evasion for the period 2013-2020.

27.  DLD has not made an appearance in the DOJ proceedings.


The Sentencing Hearing

28.  Following DE's guilty plea, a sentencing hearing is due to take place on 23 March 2026.

29.  We understand that DE's sentence will in part be determined by the court's determination of the quantum of the tax loss suffered by the US Government. At the sentencing hearing, the court will hear submissions from the parties on the tax loss and may wish to consider whether the assets of the Trusts are DE's property for restitution purposes.

30.  During a prior hearing of DE's bail application (made following his guilty plea), the court indicated that to calculate the tax loss it would need to make a determination as to the validity of the Trusts [A03]. It also indicated that, if it determined that the assets used to settle the trusts should have been paid to the US Government, then the trust assets might be used by way of restitution [A03].


B.  **QUESTIONS TO ADDRESS IN YOUR OPINION**

31.  Please consider the facts described above and the enclosures at Annex 1 and produce an expert opinion which addresses the following questions. In each case, please answer by reference to both BVI and English law as applicable (or, if they are the same, please state this).  For the purposes of your Opinion, please assume the allegations in the indictment as to the source of the trust assets [A01] are true.


General questions

31.1.  What are the requirements for a valid trust settlement?

31.2.  Who owns assets held in a discretionary trust? What is the nature of the interest in the assets held by the Trustee and the beneficiaries? Does anyone else have an ownership interest in the assets?

005

6 February 2026
Page 6

31.3. Under what circumstances can a trust be deemed to be void or voidable? In particular, under what circumstances will a purported trust be treated as a "sham"? Please include an explanation of any element of knowledge or intent required by law for a finding that a trust is a sham, including who is required to have such knowledge or intent and at what times.

31.4. How would the BVI and, where relevant, the English Court determine a dispute regarding the validity of a trust established in their jurisdiction?

31.5. Please explain the source and effect of "firewall" legislation regarding trusts. In particular, please explain whether the US Court has jurisdiction to make findings in relation to trusts which are governed by BVI and/or English law, and whether the trustee of such trusts or third parties would be bound by any such findings which are made by the US Court.

31.6. In what circumstances can a trustee legitimately have regard, when making decisions about the administration of trust assets, to the views or expertise of a person who is not the settlor or beneficiary of the trust (including professional and non-professional advisers)?

The Trusts

31.7. Are each of the Trusts valid trusts under applicable laws? Could the Trusts (or any of them) be properly regarded as 'sham trusts' under BVI and/or English law (as applicable)?

31.8. With regard to the assets held in the Trusts, what ownership interest (if any) is held by Summit, DLD, the other beneficiaries, and DE respectively?

32. If, having read this letter, you feel that you may not after all have the appropriate experience or expertise to deal with these matters, please let us know immediately.

## C.  **FORMAT OF YOUR REPORT**

33. In providing your expert opinion, your primary function is to assist the Court in understanding the relevant principles and their application. Your opinion should be independent, objective, and unbiased, based solely on your expertise and analysis of the applicable law.

34. You should provide your honest professional opinion regardless of whether it supports or undermines the position of the instructing party. Your role is that of an independent expert assisting the Court, not an advocate for any party to this litigation.

35. Please ensure that:

35.1. You acknowledge any limitations in the available authorities or uncertainties in the foreign law.

006

6 February 2026
Page 7

 35.2. You identify any aspects where reasonable experts might differ in their analysis.

36. While we have retained you and will compensate you for your work, your duty of candour and objectivity to the Court takes precedence. If you become aware of any material that undermines your opinion or supports an alternative view, please bring this to our attention and address it in your report.

37. In your report, please:

 37.1. Summarise your career and qualifications including your admissions to practice, your professional experience and any previous work as an expert.

 37.2. Set out the documents you have had regard to in reaching your opinion.

 37.3. Answer the questions set out above in as much detail as you consider appropriate, as well as any qualifications or limitations to your answers.

38. Please do not hesitate to contact us if you have any questions. We look forward to working with you.

Yours faithfully

**KOBRE & KIM (UK) LLP**

*Enc.*

007

6 February 2026
Page 8

## **Annex 1: List of Documents Enclosed**

| Ref | Date | Document Name | |
|---|---|---|---|
| A 01 | | Edelman and Le Dain Indictment | |
| A 02 | 21/05/2025 | Transcript for Change of Plea Hearing | |
| A 03 | 17/06/2025 | Transcript of Mtn Hearing | |
| B 01 | 23/12/2012 | Galactea Trust | Trust Deed |
| B 02 | 15/12/2017 | Galactea Trust | Deed of Amendment |
| B 03 | 22/04/2022 | Galactea Trust | Revocable Deed of Amendment Regarding the Beneficial Class |
| B 04 | 04/04/2023 | Galactea Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 05 | 07/07/2014 | Big Valley Trust | Trust Deed |
| B 06 | 15/12/2017 | Big Valley Trust | Deed of Amendment |
| B 07 | 12/04/2022 | Big Valley Trust | Deed of Amendment regarding Beneficial Class |
| B 08 | 04/04/2023 | Big Valley Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 09 | 07/07/2014 | Dina Maropa Trust | Trust Deed |
| B 10 | 15/12/2017 | Dina Maropa Trust | Deed of Amendment |
| B 11 | 12/04/2022 | Dina Maropa Trust | Deed of Amendment regarding Beneficial Class |
| B 12 | 04/04/2023 | Dina Maropa Trust | Settlor Contracting Party Compliance Declaration |
| B 13 | 07/07/2014 | Iverna Trust | Trust Deed |
| B 14 | 15/12/2017 | Iverna Trust | Deed of Amendment |
| B 15 | 12/04/2022 | Iverna Trust | Deed of Amendment regarding Beneficial Class |
| B 16 | 04/04/2023 | Iverna Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 17 | 16/07/2015 | Atlas Trust | Trust Deed |
| B 18 | 15/12/2017 | Atlas Trust | Deed of Amendment |
| B 19 | 12/04/2022 | Atlas Trust | Deed of Amendment regarding Beneficial Class |
| B 20 | 04/04/2023 | Atlas Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 21 | 06/05/2014 | Bluestone Trust | Trust Deed |
| B 22 | 15/12/2017 | Bluestone Trust | Deed of Amendment |
| B 23 | 12/04/2022 | Bluestone Trust | Deed of Amendment regarding Beneficial Class |
| B 24 | 04/04/2023 | Bluestone Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 25 | 06/05/2015 | Delfinity Trust | Trust Deed |
| B 26 | 15/12/2017 | Delfinity Trust | Deed of Amendment |
| B 27 | 04/04/2023 | Delfinity Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 28 | 06/05/2015 | Ithaque Trust | Trust Deed |
| B 29 | 15/12/2017 | Ithaque Trust | Deed of Amendment |
| B 30 | 12/04/2022 | Ithaque Trust | Deed of Amendment regarding Beneficial Class |
| B 31 | 04/04/2023 | Ithaque Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 32 | 06/05/2015 | Lightstar Trust | Trust Deed |
| B 33 | 15/12/2017 | Lightstar Trust | Deed of Amendment |
| B 34 | 04/04/2023 | Lightstar Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 35 | 18/11/2015 | Oakwood Trust | Trust Deed |
| B 36 | 15/12/2017 | Oakwood Trust | Deed of Amendment |
| B 37 | 12/04/2022 | Oakwood Trust | Deed of Amendment regarding Beneficial Class |
| B 38 | 04/04/2023 | Oakwood Trust | Settlor/Contracting Party Compliance Declaration (Summit) |
| B 39 | 13/11/2019 | Galactea Trust | Deed of Appointment of New Trustee |
| B 40 | 15/11/2019 | Galactea Trust | Deed of change of Governing Law |
| B 41 | 13/04/2021 | Galactea Trust | DLD Letter of wishes |

008

6 February 2026
Page 9

| Ref | Date | Document Name | |
|------|------------|------------------|-----------------------------------------------------|
| B 42 | 11/01/2019 | Big Valley Trust | Deed of appointment of new trustee |
| B 43 | 03/05/2020 | Dina Maropa Trust | DORA of Trustee and Appointment of 2nd protector |
| B 44 | 03/05/2020 | Iverna Trust | DORA of Trustee and Appointment of 2nd protector |
| B 45 | 25/01/2019 | Atlas Trust | Addition of Beneficiary Appointment and Distribution |
| B 46 | 03/05/2020 | Atlas Trust | DORA of Trustee and Appointment of 2nd protector |
| B 47 | 03/05/2020 | Bluestone Trust | DORA of Trustee and Appointment of 2nd protector |
| B 48 | 03/05/2020 | Delfinity Trust | DORA of Trustee and Appointment of 2nd protector |
| B 49 | 03/05/2020 | Ithaque Trust | DORA of Trustee and Appointment of 2nd protector |
| B 50 | 03/05/2020 | Lightstar Trust | DORA of Trustee and Appointment of 2nd protector |
| B 51 | 03/05/2020 | Oakwood Trust | DORA of Trustee and Appointment of 2nd protector |
| B 52 | 11/03/2020 | Galactea Trust | Deed of appointment of Second Protector |
| B 53 | 27/07/2021 | Galactea Trust | Deed of appointment of Successor Protector |
| B 54 | 03/10/2023 | Galactea Trust | DoRA appointing Summit as trustee |
| B 55 | 27/03/2024 | Galactea Trust | Deed of Indemnity between Summit and Salamander |
| B 56 | 03/10/2023 | Big Valley Trust | DoRA appointing Summit as trustee |
| B 57 | 03/10/2023 | Dina Maropa Trust | DoRA appointing Summit as trustee |
| B 58 | 03/10/2023 | Iverna Trust | DoRA appointing Summit as trustee |
| B 59 | 03/10/2023 | Atlas Trust | DoRA appointing Summit as trustee |
| B 60 | 03/10/2023 | Bluestone Trust | DoRA appointing Summit as trustee |
| B 61 | 03/10/2023 | Delfinity Trust | DoRA appointing Summit as trustee |
| B 62 | 03/10/2023 | Ithaque Trust | DoRA appointing Summit as trustee |
| B 63 | 03/10/2023 | Oakwood Trust | DoRA appointing Summit as trustee |
| B 64 | 28/07/2021 | All Trusts | Letter to Alexandra Issa from Trustee re. Successor Protector role |

009

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. |
| v. | VIOLATIONS; |
| DOUGLAS EDELMAN | Count 1: 18 U.S.C. § 371 (Conspiracy to Defraud the United States) |
| and | |
| DELPHINE LE DAIN (also known as DELPHINE LE DAIN EDELMAN), | Counts 2-3: 18 U.S.C. § 1001 (False Statements) |
| | Counts 4-18: 26 U.S. C. § 7201; 18 U.S.C. § 2 (Tax Evasion) |
| Defendants. | |
| | Counts 19-30: 31 U.S.C. §§ 5314 & 5322(b); 31 C.F.R. §§ 1010.350, 1010.306(c)-(d), and 1010.840(b); 18 U.S.C. § 2 (Willful Violation of Foreign Bank Account Reporting) |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates and at the approximate times stated below:

## INTRODUCTION

### Overview

1.    Defendant DOUGLAS EDELMAN is a U.S. citizen who made more than $350 million as a defense contractor during the United States' post-9/11 military efforts in Afghanistan and the Middle East.  DOUGLAS EDELMAN is married to defendant DELPHINE LE DAIN, a French citizen.  DOUGLAS EDELMAN and DELPHINE LE DAIN have lived in recent years in the United Kingdom and Spain, but currently live in Switzerland.

1

010

2.      Between 2003 and 2020, DOUGLAS EDELMAN was the 50% owner of Mina Corp. and Red Star Enterprises (collectively, "Mina/Red Star"), a defense contracting business that received more than $7 billion from contracts with the U.S. Department of Defense to provide jet fuel to U.S. troops in Afghanistan and the Middle East. DOUGLAS EDELMAN founded Mina/Red Star with Individual A, a Kyrgyz businessman.

3.      Mina/Red Star became profitable in 2005. DOUGLAS EDELMAN directed his profits from Mina/Red Star into bank accounts in countries other than the United States, such as Switzerland, the Bahamas, Singapore, and the United Arab Emirates. DOUGLAS EDELMAN held the bank accounts in the name of non-U.S. companies incorporated in countries such as Panama, Belize, and the British Virgin Islands. DOUGLAS EDELMAN closed bank accounts and moved funds to avoid disclosure to U.S. authorities. DOUGLAS EDELMAN controlled the money in the bank accounts and used it to fund other business ventures around the world, including a business selling internet services to military troops and contractors at Kandahar Air Base in Afghanistan, a Mexican fuel infrastructure project, and a music television franchise in Eastern Europe. DOUGLAS EDELMAN also used the money to buy a ski chalet in Austria, a house in Spain, a townhouse in London, and multiple yachts.

4.      Between 2005 and 2010, DOUGLAS EDELMAN had an obligation to file U.S. tax returns and pay taxes on the tens of millions of dollars of income he made from Mina/Red Star, but he filed no tax returns and paid zero U.S. taxes.

5.      In 2010, during a Congressional investigation, U.S. authorities began asking questions about Mina/Red Star's ownership. Rather than disclose his ownership, and potentially admit that he owed taxes on the millions of dollars he was making from Mina/Red Star, DOUGLAS EDELMAN created the false story that his French wife, DELPHINE LE DAIN, had

2

011

founded Mina/Red Star with Individual A and had always been the owner of DOUGLAS EDELMAN's 50% stake. Around this time, DOUGLAS EDELMAN and his co-conspirators caused the creation of false documents to paper over this story, and DOUGLAS EDELMAN removed his name from the bank accounts receiving Mina/Red Star distributions.

6.      After telling the false story of Mina/Red Star's creation to the U.S. Congress, DOUGLAS EDELMAN caused the false story to be repeated to several other arms of the U.S. government. In 2015, DOUGLAS EDELMAN submitted false filings to the Internal Revenue Service ("IRS") in an application to the Offshore Voluntary Disclosure Program ("OVDP") for years 2007 to 2014, telling the false story that DELPHINE LE DAIN was Mina/Red Star's founder and owner. DOUGLAS EDELMAN filed false tax returns for years 2015 to 2020 telling the same false story and claiming significantly less income than DOUGLAS EDELMAN made in those years as the 50% owner of Mina/Red Star. DOUGLAS EDELMAN also caused the false story to be repeated to the Defense Logistics Agency ("DLA"), and the U.S. Department of Justice—as well as to banks around the world.

7.      Despite knowing the truth, DELPHINE LE DAIN made false statements and signed false documents to confirm DOUGLAS EDELMAN's false story about the creation and ownership of Mina/Red Star.

8.      Several other co-conspirators also knew the truth of Mina/Red Star's creation and ownership but nevertheless helped DOUGLAS EDELMAN spread the false story of DELPHINE LE DAIN's purported ownership and conceal DOUGLAS EDELMAN's identity as the 50% owner of Mina/Red Star and receipt of hundreds of millions of dollars in profits from the business, including:

3

012

    a.   Co-Conspirator 1, DOUGLAS EDELMAN's longtime accountant, a British national;

    b.   Co-Conspirator 2, DOUGLAS EDELMAN's financial advisor, a Dutch national;

    c.   Co-Conspirator 3, DOUGLAS EDELMAN's longtime friend and business associate, a U.S. national, who worked for various of DOUGLAS EDELMAN's business ventures, including his music television franchise in Eastern Europe; and

    d.   Co-Conspirator 4, DOUGLAS EDELMAN's longtime friend and business associate, a dual U.S. and Irish national, who helped DOUGLAS EDELMAN invest his profits from Mina/Red Star in a way that would hide DOUGLAS EDELMAN's control of the money.

9.    In 2020, Individual A bought out DOUGLAS EDELMAN's 50% share in Mina/Red Star. DOUGLAS EDELMAN signed a seller's guaranty as part of the sale. Individual A paid more than $40 million for DOUGLAS EDELMAN's share in Mina/Red Star. DOUGLAS EDELMAN filed a tax return for 2020 that reported approximately $400,000 in consulting income but made no mention of the $40 million sale.

10.    DOUGLAS EDELMAN, with the assistance of his co-defendant DELPHINE LE DAIN and their co-conspirators, evaded U.S. taxes on more than $350 million DOUGLAS EDELMAN made from Mina/Red Star and related businesses. In the course of the scheme, DOUGLAS EDELMAN, DELPHINE LE DAIN, and their co-conspirators perpetrated several crimes:

    a.   Conspiring to defraud the United States, in violation of 18 U.S.C. § 371;

4

013

    b. Making and causing false statements to the Executive Branch of the U.S.

Government, specifically:

       i. the IRS and

      ii. the Department of Justice,

in violation of 18 U.S.C. § 1001;

    c. Tax evasion for years 2006 to 2020, in violation of 26 U.S.C. § 7201, as

well as aiding and abetting tax evasion, in violation of 18 U.S.C. § 2;

    d. Willfully violating foreign bank account reporting laws, in violation of 31

U.S.C. §§ 5314 & 5322(b) and 31 C.F.R. 1010.350, 1010.306(c)-(d), and

1010.840(b).

## DOUGLAS EDELMAN's Tax and Foreign Bank Account Reporting Obligations

11. The IRS was an agency within the U.S. Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

12. DOUGLAS EDELMAN began living outside the United States in the mid-1990's. As a U.S. citizen, when he received income above a certain threshold for any year, DOUGLAS EDELMAN had an obligation to report his worldwide income to the IRS and pay any resulting income taxes.

13. United States citizens who had an interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during the prior year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts ("FBAR"). An FBAR reported, among other things, the names of the financial institutions at which the account were held, the account numbers, and the maximum value of the accounts during the calendar year.

014

14.    From at least the mid-1980s to 2015, DOUGLAS EDELMAN did not file individual U.S. income tax returns or pay U.S. income taxes.  Nor did he disclose any foreign bank accounts.  From 2015 forward, DOUGLAS EDELMAN filed false and fraudulent U.S. income tax returns that claimed his only income was as a consultant and significantly underreported his income and taxes due and owing.  He also filed false FBARs claiming he had only one foreign bank account from 2007 to 2012.

**Other Relevant Individuals and Entities**

15.    Other relevant individuals and entities include:

a.    Attorney 1, a Washington D.C.-based attorney, who represented Mina/Red Star in the 2010 Congressional investigation into Mina/Red Star's contracts with the U.S. Department of Defense;

b.    Attorneys 2 and 3, Washington D.C.-based attorneys, who represented DOUGLAS EDELMAN in the 2010 Congressional investigation into Mina/Red Star's contracts with the U.S. Department of Defense;

c.    Attorneys 4 and 5, Washington D.C.-based attorneys, who represented DOUGLAS EDELMAN starting in 2015 related to his filings to the IRS's OVDP and other tax filings.

d.    Aspen Wind Corporation ("Aspen Wind"), a Belizean company DOUGLAS EDELMAN used starting in 2000 as part of his trading businesses;

e.    Bartol Limited ("Bartol"), a British Virgin Islands company DOUGLAS EDELMAN used starting in 2001 as part of his trading businesses;

6

015

f.    Sunage Foundation, a Panamanian entity DOUGLAS EDELMAN caused

to be created in 2008, and for which DELPHINE LE DAIN and her

children with DOUGLAS EDELMAN were listed as beneficiaries;

g.    Satellite Support Services Ltd. ("SSSL"), a British Virgin Islands entity

DOUGLAS EDELMAN, Co-Conspirator 1, and Co-Conspirator 4 created

and caused to be created in 2008, and thereafter used as a "treasury entity"

to pay personal expenses on behalf of DOUGLAS EDELMAN and

DELPHINE LE DAIN;

h.    Ifone-Neda, a joint venture formed in Afghanistan and registered in the

United Arab Emirates, between Ifone, Inc. (a U.S. company) and Neda

Telecommunications (an Afghan company 40% owned by DOUGLAS

EDELMAN) that sold internet services to military service members and

contractors at Kandahar Air Base in Afghanistan;

i.    Rosbelt International Ltd. ("Rosbelt"), an entity incorporated in British

Virgin Islands in 2005, and, starting in 2011, used by DOUGLAS

EDELMAN as a holding company for DOUGLAS EDELMAN's other

businesses, including Mina/Red Star.

**DOUGLAS EDELMAN's Entities Aspen Wind and Bartol**

16.    In the late 1990s and early 2000s, DOUGLAS EDELMAN worked as a

commodities trader near Manas Air Base in Kyrgyzstan.  He operated several companies,

including Aspen Wind and Bartol.

17.    In 2000 and 2001, DOUGLAS EDELMAN opened bank accounts for Aspen

Wind and Bartol at Credit Suisse in Switzerland.  In March 2003 and May 2005, DOUGLAS

EDELMAN opened bank accounts for Aspen Wind and Bartol at BNP Paribas (Suisse) in

7

016

Switzerland.  DOUGLAS EDELMAN used the Aspen Wind and Bartol bank accounts to receive profits from his businesses, pay associates, send money to his family in the United States, finance other business operations and investments, and pay expenses for himself, DELPHINE LE DAIN, and their families.

18.     DOUGLAS EDELMAN held himself out to third parties as the beneficial owner of Aspen Wind and Bartol.  For example, in 2005, DOUGLAS EDELMAN submitted corporate documents to Bartol's corporate registration service in Cyprus on behalf of the company as the beneficial owner:

19.     In 2004, DOUGLAS EDELMAN hired Co-Conspirator 1 to do bookkeeping and prepare financial statements for Aspen Wind and Bartol.  Co-Conspirator 1's role later expanded to include assisting DOUGLAS EDELMAN with his many other bank accounts, entities, and financial transactions, including for Mina/Red Star.

017

### Formation and Financing of Mina/Red Star

20.     After the attacks on September 11, 2001, the United States increased its military engagement in Afghanistan and the Middle East. Manas Air Base in Kyrgyzstan was a strategic location for staging crucial supplies—such as jet fuel—for U.S. troops in the region.

21.     At that point, DOUGLAS EDELMAN had been living in Bishkek, Kyrgyzstan for several years. He had dealings with Russian fuel providers and worked with several local businesspeople, including Individual A, a Kyrgyz national. Using these connections, DOUGLAS EDELMAN and Individual A formed a business to bid on a contract with the combat support agency of the U.S. Department of Defense, the Defense Energy Support Center ("DESC"), later known as the DLA, to provide fuel for U.S. troops. DOUGLAS EDELMAN and Individual A won the contract in the name of Red Star Enterprises Limited, a Canadian company owned by Individual A.

22.     Starting as early as 2003, DOUGLAS EDELMAN used hundreds of thousands of dollars from Aspen Wind and Bartol, along with trade financing eventually secured by DOUGLAS EDELMAN and Individual A, to finance much of Red Star's startup costs and early operations. Red Star grew quickly and continued to win contracts to service U.S. fuel needs in the region, including at Bagram Air Base in Afghanistan.

23.     In 2003, DOUGLAS EDELMAN created Mina Corp Limited—a sister company to Red Star—in Gibraltar. DOUGLAS EDELMAN incorporated a new Red Star entity in Gibraltar in 2004.

24.     Around this same time, DOUGLAS EDELMAN and Individual A opened bank accounts for the business, presented themselves to the banks as the owners of the business, and signed bank forms indicating that they were the beneficial owners. For example:

018

a. A Form A, Establishment of Beneficial Owner's Identity, at Credit Suisse lists DOUGLAS EDELMAN and Individual A as the beneficial owners of Red Star Enterprises Limited:

b. An account form at BNP Paribas (Suisse) bears DOUGLAS EDELMAN's signature as an authorized account signatory for Red Star Enterprises Limited Gibraltar:

019

25.    Beginning as early as 2003, DOUGLAS EDELMAN and Individual A also negotiated trade financing agreements with banks so that Mina/Red Star could fund operations between payments from the Department of Defense.  DOUGLAS EDELMAN and Individual A held themselves out to trade financiers as the beneficial owners of Mina/Red Star.

**DOUGLAS EDELMAN's Receipt of Mina/Red Star Profits into
Bank Accounts He Controlled**

26.    Mina/Red Star became profitable in 2005.  Rather than drawing a salary, DOUGLAS EDELMAN and Individual A each took owner profit distributions from Mina/Red Star.  Between 2005 and 2008 alone, each owner received more than $50 million in owner profit distributions.

27.    DOUGLAS EDELMAN initially used Aspen Wind and Bartol bank accounts at Swiss banks, primarily Credit Suisse, to receive his owner distributions.

28.    In May 2008, Credit Suisse questioned the source of the funds in the Aspen Wind and Bartol accounts.  DOUGLAS EDELMAN and Co-Conspirator 1 prepared materials for Credit Suisse explaining Aspen Wind and Bartol's relationship to DOUGLAS EDELMAN—

020

namely, that the companies were owned and controlled by DOUGLAS EDELMAN, and used to

control and provide funds for DOUGLAS EDELMAN's "worldwide trading activities":



29.    Even though the accounts were held in the names of entities, DOUGLAS

EDELMAN controlled the money in the Aspen Wind and Bartol accounts at Credit Suisse.  For

example, in October 2008, DOUGLAS EDELMAN directed Co-Conspirator 1 to send a gift of

approximately $580,000 to a relative from the Bartol account at Credit Suisse.

**DOUGLAS EDELMAN's Use of the Sunage Foundation**

30.    In April 2008, DOUGLAS EDELMAN caused the creation of the Sunage

Foundation in Panama and named DELPHINE LE DAIN and their daughters as beneficiaries.

31.    Although DELPHINE LE DAIN was named as a beneficiary of the foundation,

DOUGLAS EDELMAN referred to Sunage as "my foundation" and considered using it as a

12

021

nominee in transactions such as the purchase of a home and to hold his shares in a music television franchise in Eastern Europe.

32.     In September 2008, DOUGLAS EDELMAN opened a Sunage Foundation bank account at Bank Julius Baer (Singapore). DOUGLAS EDELMAN was an authorized signatory on the account:

33.     In November 2008, Credit Suisse notified Co-Conspirator 1 that due to U.S. law enforcement activity regarding the use of Swiss bank accounts for tax evasion, DOUGLAS EDELMAN had a choice: (1) close his Credit Suisse account and move the money, or (2) disclose the accounts to U.S. authorities.

34.     In December 2008 and January 2009, DOUGLAS EDELMAN closed his Credit Suisse accounts and moved the funds to his recently opened Sunage Foundation account at Bank Julius Baer (Singapore).

35.     After December 2008 and continuing for the next several years, DOUGLAS EDELMAN caused his Mina/Red Star owner distributions to be deposited into the Sunage Foundation account at Bank Julius Baer (Singapore).

13

022

### DOUGLAS EDELMAN and DELPHINE LE DAIN's Illegal Scheme to Conceal DOUGLAS EDELMAN's Mina/Red Star Profits from U.S. Authorities

36.     In the years 2000 to 2008, as described above, DOUGLAS EDELMAN used nominee entities to hold his business interests and kept his money in bank accounts outside the United States to conceal his income from U.S. authorities—namely, the IRS.

37.     But after late 2008, DOUGLAS EDELMAN began to add an additional layer to his concealment:  by recruiting his wife DELPHINE LE DAIN to be the nominee owner for his businesses.  In 2010, the House of Representatives Committee on Oversight and Government Reform Subcommittee on National Security and Foreign Affairs (the "Subcommittee") began investigating allegations of bribery and corruption related to U.S. Department of Defense contracts with Mina/Red Star.  The Subcommittee asked the identity of Mina/Red Star's owners. At this point, DOUGLAS EDELMAN had not filed U.S. tax returns to report the millions of dollars he had earned from Mina/Red Star and had not paid U.S. taxes on his income.  Rather than disclose his ownership, DOUGLAS EDELMAN caused his attorneys to tell the Subcommittee the false story that DELPHINE LE DAIN—not DOUGLAS EDELMAN— created Mina/Red Star with Individual A and owned 50% of Mina/Red Star, and that DELPHINE LE DAIN held her interests through the Sunage Foundation.  Around the same time as he caused this false representation to the Subcommittee, DOUGLAS EDELMAN caused the creation of false and backdated paperwork to corroborate DELPHINE LE DAIN's purported ownership and removed his name from the Sunage Foundation bank account at Bank Julius Baer.

38.     Around this time, during the solicitation and award process related to a contract with the U.S. Department of Defense worth hundreds of millions of dollars, the DLA asked Mina/Red Star the identity of the company's owners.  DOUGLAS EDELMAN caused Mina/Red Star to certify—falsely—that the business was owned by Individual A and DELPHINE LE

023

DAIN. In later contract negotiations, the DLA asked for the identity of Mina/Red Star's owners, and the company continued to certify—again, falsely—as it had to the Subcommittee: that Individual A and DELPHINE LE DAIN were the owners.

39.    In July 2015, Co-Conspirator 2 traveled to the United States to meet with attorneys and tax return preparers on DOUGLAS EDELMAN's behalf. At that point, DOUGLAS EDELMAN still had not filed any U.S. tax returns to report the income he made from Mina/Red Star or any other source. Rather than tell them the truth about DOUGLAS EDELMAN's ownership of Mina/Red Star, Co-Conspirator 2 told the tax return preparers, falsely, that the 50% share in the company—and all the resulting profits—belonged to DELPHINE LE DAIN. Over the next few months, Co-Conspirator 1 and Co-Conspirator 2 provided false documents to Attorneys 4 and 5, including an affidavit from DELPHINE LE DAIN declaring that she had founded Mina/Red Star with Individual A and that all of the profits from Mina/Red Star belonged to her. The materials also included the false statement that Aspen Wind and Bartol—the trading companies DOUGLAS EDELMAN used to create and fund Mina/Red Star—were DELPHINE LE DAIN's companies:

> **Conclusions**
>
> The above information clearly demonstrates that
>
> 3.1    The original business emanated from an investment made by Delphine le Dain back in the year 2000.
>
> 3.2    The initial growth of the business was conducted through a company (Bartol Limited) which was wholly owned by Delphine Le Dain

40.    The materials falsely asserted that DOUGLAS EDELMAN had an interest in only one foreign bank account, at British Bank 1.

15

024

41.    Based on the false information provided by Co-Conspirator 1 and Co-Conspirator 2, Attorneys 4 and 5 concluded that DOUGLAS EDELMAN was not the owner of Mina/Red Star, and his only reportable income would only be gifts from his wealthy spouse and consulting fees. Based on these conclusions, Attorneys 4 and 5 helped DOUGLAS EDELMAN put together an application to the IRS OVDP for years 2007 to 2014.

42.    In March 2016, Attorneys 4 and 5 submitted a Form 14457 Offshore Voluntary Disclosure Letter to the IRS on behalf of DOUGLAS EDELMAN. DELPHINE LE DAIN co-signed the letter under penalty of perjury. The letter falsely stated that, among other things:

    a.    In years 2007 to 2014, DOUGLAS EDELMAN was a consultant for foreign entities in which he never had an ownership interest; and

    b.    In tax years 2007 to 2014, DOUGLAS EDELMAN had received between $100,000 to $1,000,000 in unreported income in each year.

43.    In October 2016, Attorneys 4 and 5 made a full submission to the OVDP on DOUGLAS EDELMAN's behalf, including Forms 1040, U.S. Individual Income Tax Returns ("Forms 1040"), for DOUGLAS EDELMAN for years 2007 to 2014, and the false March 2016 letter DOUGLAS EDELMAN co-signed with DELPHINE LE DAIN. The Forms 1040 were false in that they, among other things, reported significantly less income than the amount DOUGLAS EDELMAN had received as the 50% owner of Mina/Red Star. Specifically, DOUGLAS EDELMAN falsely reported the following total amounts per year he received as "gifts" and "consulting payments":

16

025

| Year | Income Reported |
|------|-----------------|
| 2007 | $  473,447 |
| 2008 | $  777,468 |
| 2009 | $  661,400 |
| 2010 | $  693,536 |
| 2011 | $  584,715 |
| 2012 | $  764,144 |
| 2013 | $  752,443 |
| 2014 | $  611,287 |

The tax returns did not report, and DOUGLAS EDELMAN did not pay taxes on, the tens of millions of dollars in each year that DOUGLAS EDELMAN made from his 50% ownership of Mina/Red Star.

44.     After applying to the OVDP, DOUGLAS EDELMAN caused the filing of false tax returns for years 2015 to 2019, which—just like the OVDP submission—reported that he was merely a consultant earning less than $1 million each year. To pay the taxes associated with the OVDP and other tax filings, DELPHINE LE DAIN executed false documents purporting to "gift" DOUGLAS EDELMAN the money—when, in fact, DOUGLAS EDELMAN controlled the money and did not need a gift to make his tax payments.

45.     In 2018, after contact from the Department of Justice, DOUGLAS EDELMAN caused Attorneys 2, 4, and 5 to make a presentation to an IRS agent and prosecutors from the Department of Justice claiming that DOUGLAS EDELMAN was merely a consultant and had received less than $1 million of income in each of the years 2007 to 2014. DOUGLAS EDELMAN caused his attorneys to repeat the false story that DELPHINE LE DAIN and Individual A had partnered to create Mina/Red Star.

17

026

46.    During the same years he was causing these misrepresentations to be made to the U.S. government, DOUGLAS EDELMAN received millions of dollars in owner profit distributions from Mina/Red Star.  DOUGLAS EDELMAN controlled the money but kept his name off bank accounts and ownership documents.

47.    DOUGLAS EDELMAN and his co-conspirators caused the creation of entities and trusts created in Panama, Malta, the British Virgin Islands, and other countries, to hold the various businesses DOUGLAS EDELMAN owned—including Mina/Red Star, and other business ventures he funded with Mina/Red Star profits.  For example:

    a.    To conceal DOUGLAS EDELMAN's profits from Ifone-Neda, Co-Conspirator 1 and Co-Conspirator 2 caused the creation of a fake "consultancy agreement" between Ifone-Neda and SSSL, which was created in 2017 but backdated to 2015, and fake invoices for consulting fees.  Co-Conspirator 4 forwarded fake invoices and requested wires from Ifone-Neda to DOUGLAS EDELMAN in one of his non-U.S. bank accounts;

    b.    To conceal DOUGLAS EDELMAN's identity as an investor in a Mexican fuel infrastructure project, Co-Conspirator 1, Co-Conspirator 2, and others layered ownership of the venture in holding companies created in Mexico, the Netherlands, Malta, and British Virgin Islands.  Co-Conspirator 2 told the other significant party in the project that the investor was DELPHINE LE DAIN, and that the funds for the project came from other investments owned by DELPHINE LE DAIN.

18

48.    During the years he concealed his ownership of Mina/Red Star, DOUGLAS EDELMAN functioned, along with Individual A, as the head of Mina/Red Star.  DOUGLAS EDELMAN and Individual A made high-level strategic decisions for the business, including deciding whether or not to sell the business, and hiring and firing Mina/Red Star executives.  But DOUGLAS EDELMAN's use of a complex web of offshore entities to conceal his ownership put increasing pressure on Mina/Red Star's business and its ability to continue relationships with banks and lenders.

49.    In early 2020, Individual A urged DOUGLAS EDELMAN to come out as Mina/Red Star's 50% beneficial owner.  DOUGLAS EDELMAN refused.  Relations between the two men broke down, and in October 2020, Individual A bought out DOUGLAS EDELMAN's 50% interest in Mina/Red Star.  As part of the agreement, DOUGLAS EDELMAN personally signed as a "Seller Guarantor":



50.    Around this same time, DOUGLAS EDELMAN, DELPHINE LE DAIN, and their co-conspirators attempted to alter records and conceal information that might link DOUGLAS EDELMAN to Mina/Red Star.

51.    In October and November 2020, Individual A paid more than $40 million to buy out DOUGLAS EDELMAN's 50% share of Mina/Red Star, which DOUGLAS EDELMAN

19

028

caused to be wired to Rosbelt bank accounts. In December 2021, DOUGLAS EDELMAN caused the filing of a U.S. tax return for 2020 claiming that his only income was earned as a consultant and omitting mention of the $40 million payment from Individual A.

52.     As a result of this scheme, between 2003 and 2020, DOUGLAS EDELMAN evaded taxes on more than $350 million of income he made from Mina/Red Star and other businesses funded with Mina/Red Star profits.

## COUNT ONE
### (Conspiracy to Defraud the United States—18 U.S.C. § 371)

53.     Paragraphs 1 through 52 are incorporated here by reference.

### The Conspiracy

54.     From in or about April 2008 through in or about December 2021, in the District of Columbia and elsewhere, defendants DOUGLAS EDELMAN and DELPHINE LE DAIN did unlawfully, voluntarily, intentionally, and knowingly combine, conspire, confederate, and agree with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, and Co-Conspirator 4, as well as other co-conspirators known and unknown to the Grand Jury, to defraud the United States of America by impeding, impairing, defeating, and obstructing the lawful government functions of the United States and an agency thereof, to wit, the Internal Revenue Service, in the ascertainment, evaluation, assessment, and collection of income taxes.

### Manner and Means of the Conspiracy

55.     DOUGLAS EDELMAN, DELPHINE LE DAIN, and their co-conspirators sought to accomplish the object of the conspiracy through the following manner and means, among others:

      a.   Using nominees, including DELPHINE LE DAIN, other family members and business associates, entities, and trusts, to hold and conceal assets and

029

foreign bank accounts and receive income ultimately owned and controlled by DOUGLAS EDELMAN;

b. Layering entities and trusts into complex holding structures to conceal the ownership of assets and foreign bank accounts ultimately owned and controlled by DOUGLAS EDELMAN;

c. Causing DOUGLAS EDELMAN's income and funds to be deposited into bank accounts opened and held in the names of nominee entities in banks known to shield the identity of account holders from disclosure to U.S. authorities;

d. Closing accounts and moving funds to avoid DOUGLAS EDELMAN's name being disclosed to U.S. authorities in connection with a foreign bank account;

e. Submitting false Know Your Customer ("KYC") information to foreign banks to conceal the owner of the businesses holding the accounts, and the source of the funds in the accounts;

f. Making and causing to be made false statements to the U.S. government about the creation and ownership of Mina/Red Star and the identity of the persons receiving profits from the business, specifically:

   i. Making and causing others to make false statements to a U.S. Congressional subcommittee during a 2010 investigation into the Department of Defense's contracts with Mina/Red Star;

   ii. Making and causing others to make false statements to the Department of Defense during solicitations for contracts, contract

21

030

negotiations, and servicing of contracts to provide jet fuel to U.S. troops;

    iii. Making and causing others to make false statements to the IRS during the submission of an application to the IRS OVDP in 2016, including false individual income tax returns for tax years 2007 to 2014; and

    iv. Making and causing others to make false statements to an IRS agent and prosecutors from the Department of Justice during a 2018 presentation;

g. Causing the preparation and filing of false tax returns and FBARs, specifically:

    i. False and fraudulent U.S. individual income tax returns for DOUGLAS EDELMAN for tax years 2015 to 2020; and

    ii. False FBARs with the U.S. Department of Treasury and IRS for 2007-2012;

h. Providing false information to attorneys, advisors, and tax preparers about DOUGLAS EDELMAN and DELPHINE LE DAIN, and their respective financial history, income, assets, foreign bank accounts, and relationship to Mina/Red Star; and

i. Causing the creation of false, backdated, or otherwise misleading documents and records regarding DOUGLAS EDELMAN and DELPHINE LE DAIN's entities, financial transactions, and source of wealth.

031

### Overt Acts

56.    In furtherance of the conspiracy, and to effect the illegal object thereof, defendants DOUGLAS EDELMAN and DELPHINE LE DAIN, and their co-conspirators, committed and caused to be committed the following overt acts in the District of Columbia and elsewhere:

     a.   On December 8, 2008, to avoid DOUGLAS EDELMAN's connection to Credit Suisse accounts being disclosed to U.S. authorities, DOUGLAS EDELMAN and Co-Conspirator 1 directed Credit Suisse to close the Aspen Wind and Bartol accounts and move the funds to the Sunage Foundation account at Bank Julius Baer (Singapore), where DOUGLAS EDELMAN was a signatory;

     b.   Between December 29, 2009, and April 10, 2010, DOUGLAS EDELMAN instructed Co-Conspirator 1 to purchase a £27 million (approximately $43 million) townhome in London's Kensington neighborhood in the name of Beta Ventures, a nominee entity;



032

c.  In April or May 2010, after the Congressional Subcommittee investigating Mina/Red Star's contracts with the Department of Defense asked about Mina/Red Star's ownership, DOUGLAS EDELMAN instructed Mina/Red Star's attorney, Attorney 1, to tell the Subcommittee that Mina/Red Star would stop servicing contracts to provide fuel to U.S. troops rather than disclose the identity of the company's owners;

d.  On May 10, 2010, DOUGLAS EDELMAN emailed Co-Conspirator 1 and instructed him to remove DOUGLAS EDELMAN's name from Mina/Red Star corporate documents:

| From: | Douglas E <douglas@minacorp.com> |
| To: | ██████████████████████████ |
| Sent: | 5/10/2010 12:50:19 PM |
| Subject: | Re: Mina Corp Ltd., Our Ref: 8433 |

██████

basically i want and need my name OFF of everything...

e.  In July 2010, at DOUGLAS EDELMAN's instruction, Co-Conspirator 1 requested the creation of backdated shareholding agreements and nominee agreements to falsely show DELPHINE LE DAIN as the 50% owner of Mina/Red Star;

f.  On July 18, 2010, DOUGLAS EDELMAN told Attorneys 2 and 3— retained to represent him in the Congressional investigation—the false story that DELPHINE LE DAIN had created and financed Mina/Red Star and was the 50% owner of Mina/Red Star, along with Individual A, from

033

the formation of the companies. DOUGLAS EDELMAN falsely told Attorneys 2 and 3, among other things, that:

   i. "Then 9/11. . . . As time went by the US Govt opened an open tender [at Manas] for new fuel suppliers. As my wife (prior to being my wife) had been a shareholder in an aviation fuel company (she was the primary investor) and it had a few employees it made sense to bid on this new US Govt contract . . . . A partnership was established between [Individual A] and [DELPHINE LE DAIN], a French citizen.";

   ii. "By the way, all initial seed capital needed was invested by [DELPHINE LE DAIN].";

g. On July 18, 2010, DOUGLAS EDELMAN provided additional false and fraudulent written assertions to Attorneys 2 and 3, including that DELPHINE LE DAIN funded and owned Mina/Red Star from the start, and DOUGLAS EDELMAN never received money from Mina/Red Star;

h. On July 19, 2010, DOUGLAS EDELMAN caused Attorneys 2 and 3 to proffer falsely to Subcommittee staff that DOUGLAS EDELMAN was not an owner of Mina/Red Star and had never received profits or distributions from the companies, and that DELPHINE LE DAIN was the 50% owner of Mina/Red Star;

i. On July 23, 2010, DOUGLAS EDELMAN caused Attorney 1 to write a letter to the Subcommittee falsely asserting that the owners of Mina/Red Star were "citizens of foreign countries;"

25

034

j.  In August 2010, at an in-person meeting, DELPHINE LE DAIN falsely stated to Attorney 3 that she was the 50% owner of Mina/Red Star;

k.  On November 4 and 5, 2010, DOUGLAS EDELMAN caused a Mina/Red Star representative to certify to the DLA, falsely, that Individual A and DELPHINE LE DAIN owned the companies;

l.  On November 16, 2010, DOUGLAS EDELMAN caused a request to be sent to Bank Julius Baer (Singapore) to (1) remove his name as a signatory on the Sunage Foundation account, and (2) add Co-Conspirator 4, who used his Irish passport, rather than his U.S. passport, in the identification documents presented to the bank;

m.  In April 2011, acting on DOUGLAS EDELMAN's instructions, Co-Conspirator 1 caused the formation of a nominee entity called "Little Ajax," which was used to purchase a ski chalet in Austria. At DOUGLAS EDELMAN's direction, Co-Conspirator 1 transferred approximately $955,000 from the Sunage Foundation account as a down payment. DOUGLAS EDELMAN used one of DELPHINE LE DAIN's French relatives as a nominee for his portion of the chalet;



26

035

n.  On November 28, 2011, in response to a request from the DLA seeking information about the ownership of Mina/Red Star during solicitation for a contract worth more than $630 million, DOUGLAS EDELMAN and Co-Conspirator 1 caused a Mina/Red Star official to falsely represent that other than Individual A, DELPHINE LE DAIN, and DELPHINE LE DAIN's children, no other person benefitted directly or indirectly from Mina/Red Star;

o.  On February 29, 2012, DELPHINE LE DAIN signed a sworn affidavit in which she falsely stated that she had set up Mina/Red Star with a partner and was the 50% beneficial owner from the start;

p.  In September 2013, DOUGLAS EDELMAN caused Co-Conspirator 1 to transfer funds from the Sunage Foundation bank account at Bank Julius Baer (Singapore) to purchase approximately $500,000 of shares in a then-privately held U.S. technology company;

q.  On April 15, 2014, DOUGLAS EDELMAN caused a Swiss attorney to ask BNP Paribas (Suisse) to remove Mina/Red Star accounts from information being disclosed to the Department of Justice, by falsely representing to BNP Paribas (Suisse) that Mina/Red Star was owned by Individual A and the Sunage Foundation, the founder of which was DELPHINE LE DAIN;

r.  In May and June 2014, DOUGLAS EDELMAN caused the Sunage Foundation and SSSL accounts at Bank Julius Baer (Singapore) to be

27

036

closed, and the money to be transferred to newly established accounts at Mirabaud (Middle East) held in the names of SSSL and Rosbelt;

s.  In July 2014, DOUGLAS EDELMAN caused Co-Conspirator 4 to negotiate terms and caused Co-Conspirator 1 to transfer €790,000 (approximately $1,074,000) from an SSSL account at Mirabaud (Middle East), which had been funded primarily with Mina/Red Star distributions from the Sunage Foundation accounts, for the purchase a 63-ton, 70-foot pleasure yacht called "Divinity." DOUGLAS EDELMAN used SSSL as a nominee for the purchase of the yacht;



t.  In March 2015, DOUGLAS EDELMAN caused Co-Conspirator 4 to negotiate terms and Co-Conspirator 1 to transfer €325,000 (approximately $347,587) from an SSSL account at Mirabaud (Middle East), which had

28

037

been funded primarily with Mina/Red Star distributions from the Sunage Foundation accounts, to purchase a yacht called "Princess Juliet." DOUGLAS EDELMAN used SSSL as a nominee for the purchase of the yacht;



u.   On July 16, 2015, DOUGLAS EDELMAN caused Co-Conspirator 2 to meet with Attorney 4 and several tax return preparers about DOUGLAS EDELMAN's U.S. tax obligations and falsely tell them that the 50% share in Mina/Red Star, and all the resulting profits, belonged to DELPHINE LE DAIN;

v.   On July 31, 2015, DOUGLAS EDELMAN caused Co-Conspirator 1 and Co-Conspirator 2 to meet with Attorneys 4 and 5 to provide false documents and information supporting the false story that DELPHINE LE DAIN—not DOUGLAS EDELMAN—was the 50% owner of Mina/Red Star from the beginning;

29

038

w.  In October 2015, Co-Conspirator 2 called Attorney 4 at his office in Washington, D.C. to relay the false story that DELPHINE LE DAIN's purported seed investment in the jet fuel business that became Mina/Red Star was made before September 11, 2001;

x.  In November 2015, DOUGLAS EDELMAN caused Attorney 4 to submit, from his office in Washington, D.C., a false OVDP Preclearance Request to the IRS, which falsely asserted that DOUGLAS EDELMAN had interests in only one foreign bank account, and was merely an advisor to entities owned by his non-U.S. spouse (DELPHINE LE DAIN);

y.  In March 15, 2016, DOUGLAS EDELMAN caused Attorney 4 to submit, from Attorney 4's office in Washington, D.C., a false application letter to the IRS OVDP—signed by DELPHINE LE DAIN and DOUGLAS EDELMAN under penalty of perjury—and falsely asserting that DOUGLAS EDELMAN received less than $1 million in income in each of the years 2007 to 2014, and had only one non-U.S. bank account in any of those years;

z.  On March 18, 2016, representatives of DOUGLAS EDELMAN opened accounts for several of DOUGLAS EDELMAN's entities, including Rosbelt, at Bank J. Safra Sarasin, a Swiss bank.  Co-Conspirator 1 and others provided "Know Your Customer" information to the bank falsely asserting that the source of the wealth in the accounts was from DELPHINE LE DAIN's "seed investment" in Central Asia;

039

aa. On April 13, 2016, Co-Conspirator 1 sent an email to Attorneys 4 and 5, and to DOUGLAS EDELMAN's tax preparers, including an attachment summarizing the amount of money DOUGLAS EDELMAN sent to his U.S. family members in 2008, which was false in that it did not include the $580,000 DOUGLAS EDELMAN had sent to a family member in October 2008 from the Bartol account at Credit Suisse;

bb. In June 2016, DELPHINE LE DAIN signed, and Co-Conspirator 3 signed as a witness, a deed of gift for $4 million, falsely purporting to be a gift from DELPHINE LE DAIN to DOUGLAS EDELMAN for the payment of DOUGLAS EDELMAN's U.S. tax liabilities;

cc. In September 2016, DELPHINE LE DAIN signed a declaration falsely stating that she was the sole owner of one of the entities involved in the Mexican fuel infrastructure project;

dd. On October 3, 2016, DOUGLAS EDELMAN caused the filing of false FBARs to the Department of Treasury, falsely reporting that DOUGLAS EDELMAN had financial interest in and signatory authority over only one foreign bank account in years 2007 to 2012;

ee. On October 4, 2016, DOUGLAS EDELMAN caused Attorney 4 to submit to the IRS, from his office in Washington, D.C., a false OVDP submission, which included false Forms 1040 for years 2007 to 2014, significantly underreporting DOUGLAS EDELMAN's taxable income in each of those years and falsely reporting that DOUGLAS EDELMAN had

31

040

no interest in the companies or entities purportedly owned by his non-U.S. spouse (DELPHINE LE DAIN);

ff. On October 20, 2016, DOUGLAS EDELMAN caused the filing of a false Form 1040 for tax year 2015, which was false in that it reported only $791,712 of income DOUGLAS EDELMAN earned, purportedly as a consultant, and reported that DOUGLAS EDELMAN had no interest in or signatory authority over a foreign financial account with a balance over $10,000;

gg. On February 1, 2017, responding to a question from Bank J. Safra Sarasin about who owned the money in accounts at the bank, Co-Conspirator 2 falsely represented that DELPHINE LE DAIN was the sole beneficial owner of Rosbelt and the related entities, and that DOUGLAS EDELMAN had no legal entitlement to the funds in the accounts;

hh. In June 2017, DELPHINE LE DAIN signed a "deed of gift" falsely purporting to gift $200,000 from DELPHINE LE DAIN to DOUGLAS EDELMAN for the payment of DOUGLAS EDELMAN's U.S. tax liabilities;

ii. On July 13, 2017, Co-Conspirator 4 sent a fake bill purporting to be for consulting fees to Ifone-Neda's bookkeeper, requested that a dividend be issued from Ifone-Neda, and directed that $945,000 representing DOUGLAS EDELMAN's share of the dividend be wired to an SSSL account at Mirabaud (Middle East);

32

041

jj. On July 20, 2017, DOUGLAS EDELMAN caused the filing of a false Form 1040 for tax year 2016, which was false in that it reported only $797,558 of income DOUGLAS EDELMAN earned, purportedly as a consultant, and reported that DOUGLAS EDELMAN had no interest in or signatory authority over a foreign financial account with a balance over $10,000;

kk. In January 2018, DOUGLAS EDELMAN caused Co-Conspirator 1 and Co-Conspirator 2 to falsely tell Attorneys 2, 4, and 5 that DOUGLAS EDELMAN had no interests in foreign bank accounts or foreign entities;

ll. On March 19, 2018, DOUGLAS EDELMAN caused Attorneys 2, 4, and 5 to make a presentation at a Department of Justice office in Washington, D.C., to federal prosecutors and a law enforcement agent from the IRS, on DOUGLAS EDELMAN's behalf, which was false in that it claimed that:

    i. DOUGLAS EDELMAN was merely a consultant for foreign entities in which he never had an ownership interest;

    ii. in tax years 2007 to 2014, DOUGLAS EDELMAN received between $100,000 to $1,000,000 of unreported income in each year; and

    iii. in tax years 2007 to 2012, DOUGLAS EDELMAN was the beneficial owner of only one foreign financial account, at British Bank 1;

mm. On April 10, 2018, Co-Conspirator 1 sent a tax organizer to Attorneys 4 and 5, as well as DOUGLAS EDELMAN's tax preparers,

042

falsely reporting that in 2017, DOUGLAS EDELMAN had no interests in foreign businesses and received no distributions from Mina/Red Star or any other company;

nn. On June 13, 2018, DOUGLAS EDELMAN caused the filing of a false Form 1040 for tax year 2017, which was false in that it reported only $745,783 of DOUGLAS EDELMAN's income, which he reported earning, purportedly as a consultant, and reported that DOUGLAS EDELMAN had no interest in or signatory authority over a foreign financial account with a balance over $10,000;

oo. In June 2019, DELPHINE LE DAIN signed a "deed of gift" falsely purporting to gift $75,000 from DELPHINE LE DAIN to DOUGLAS EDELMAN for the payment of DOUGLAS EDELMAN's U.S. tax liabilities;

pp. On June 24, 2019, Co-Conspirator 2 submitted false information to an investment partner in DOUGLAS EDELMAN's Mexican fuel infrastructure project, asserting that DELPHINE LE DAIN was the owner of the entities making the investment and that the funds came from DELPHINE LE DAIN's other investments;

qq. On October 8, 2019, DOUGLAS EDELMAN caused the filing of a false Form 1040 for tax year 2018, which was false in that it reported only $851,987 of income DOUGLAS EDELMAN earned, purportedly as a consultant, and reported that DOUGLAS EDELMAN had no interest in or

043

signatory authority over a foreign financial account with a balance over $10,000;

rr. In March 2020, DELPHINE LE DAIN signed a "deed of gift" falsely purporting to gift $60,000 from DELPHINE LE DAIN to DOUGLAS EDELMAN for the payment of DOUGLAS EDELMAN's U.S. tax liabilities and professional fees;

ss. In May 2020, DELPHINE LE DAIN contacted a close associate of Individual A and asked her to persuade Individual A not to disclose the truth about the ownership of Mina/Red Star;

tt. In June 2020, Co-Conspirator 3 contacted a Gibraltar corporate services business to ask that the public registration information for Mina Corp. and Red Star Enterprises be changed to reflect, falsely, that the 50% owner of the companies was DELPHINE LE DAIN, not DOUGLAS EDELMAN;

uu. On October 14, 2020, DOUGLAS EDELMAN caused the filing of a false Form 1040 for tax year 2019, which was false in that it reported only $726,136 of income DOUGLAS EDELMAN earned, purportedly as a consultant, and reported that DOUGLAS EDELMAN had no interest in or signatory authority over a foreign financial account with a balance over $10,000;

vv. In November 2020, when search warrants were executed in the United Kingdom at DOUGLAS EDELMAN and DELPHINE LE DAIN's residence, as well as Co-Conspirator 1's residence, Co-Conspirator 1 falsely told law enforcement agents that he worked for DELPHINE LE

044

DAIN, and that she had put up the initial investment for Mina/Red Star and grown wealthy from her investment;

ww.    On December 28, 2021, DOUGLAS EDELMAN caused the filing of a false Form 1040 for tax year 2020, which was false in that it reported only $455,508 of income DOUGLAS EDELMAN earned, purportedly as a consultant, but made no mention of the $40 million DOUGLAS EDELMAN received from Individual A for his 50% share in Mina/Red Star; and reported that DOUGLAS EDELMAN had no interest in or signatory authority over a foreign financial account with a balance over $10,000.

(In violation of Title 18, United States Code, Section 371)

## COUNT TWO
**(False Statements to the Executive Branch, Internal Revenue Service—18 U.S.C. § 1001)**

57.    Paragraphs 1 through 52, and 56 are incorporated here by reference.

58.    On or about October 4, 2016, defendant DOUGLAS EDELMAN willfully made and knowingly made and caused to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States by falsely stating, in a submission to the Internal Revenue Service with respect to its Offshore Voluntary Disclosure Program, that (a) in tax years 2007 to 2014, he had no reportable interest in companies owned by his non-U.S. spouse, (b) made less than $1 million in each year, and (c) had a reportable interest in only one foreign bank account in any of those years.

(In violation of Title 18, United States Code, Sections 1001, 2)

36

045

## COUNT THREE
**(False Statements to the Executive Branch, Department of Justice—18 U.S.C. § 1001)**

59.     Paragraphs 1 through 52, and 56 are incorporated here by reference.

60.     On or about March 19, 2018, defendant DOUGLAS EDELMAN willfully made and knowingly made and caused to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States by falsely causing his attorneys to state, in a presentation to federal prosecutors from the Department of Justice and an agent from the Internal Revenue Service – Criminal Investigation, that (a) DELPHINE LE DAIN—not DOUGLAS EDELMAN—formed a partnership with Individual A to create the business that became Mina/Red Star; (b) DOUGLAS EDELMAN was merely a consultant for Mina/Red Star; (c) DOUGLAS EDELMAN's only income each year was occasional payments and fees, as well as gifts from DELPHINE LE DAIN, totalling less than $1 million in each year.

(In violation of Title 18, United States Code, Sections 1001, 2)

## COUNT FOUR
**(Tax Evasion 2006—26 U.S.C. § 7201)**

61.     Paragraphs 1 through 52, and 56 are incorporated here by reference.

62.     During the calendar year 2006 DOUGLAS EDELMAN received taxable income on which there was income tax due and owing to the United States.  Knowing the foregoing facts and failing to make an income tax return on or before June 15, 2007, as required by law, to any proper office of the IRS, and failing to pay the income tax to the IRS, defendants DOUGLAS EDELMAN and DELPHINE LE DAIN, from on or about January 2006 through in or about at least May 2020, in the District of Columbia and elsewhere, willfully attempted to evade and

37

**046**

defeat income taxes due and owing by DOUGLAS EDELMAN to the United States by committing and causing to be committed the following affirmative acts, among others:

a. Making and causing false statements to be made to U.S. authorities about the ownership of Mina/Red Star;

b. Using nominees, including DELPHINE LE DAIN, to conceal DOUGLAS EDELMAN's income and assets;

c. Creating and signing false documents about DELPHINE LE DAIN's relationship to Mina/Red Star, and DOUGLAS EDELMAN's income and assets;

d. Causing DOUGLAS EDELMAN's income and funds to be deposited into bank accounts opened and held in the name of various nominee entities in banks known to shield the identity of account holders from disclosure;

e. Closing accounts and moving funds to avoid DOUGLAS EDELMAN's name being disclosed to U.S. authorities as having a connection to a foreign bank account;

f. Providing false information to banks, attorneys, and tax return preparers about DOUGLAS EDELMAN and DELPHINE LE DAIN's income, assets, and financial accounts, and DELPHINE LE DAIN's purported founding and ownership of Mina/Red Star;

g. Attempting to influence others to prevent them from disclosing DOUGLAS EDELMAN's ownership of Mina/Red Star to U.S. authorities.

(In violation of Title 26, United States Code, Sections 7201;
Title 18, United States Code, Section 2)

38

047

## COUNTS FIVE - EIGHTEEN
### (Tax Evasion 2007 to 2020—26 U.S.C. § 7201)

63.    Paragraphs 1 through 52, and 56 are incorporated here by reference.

64.    Beginning on January 1, 2007, through on or about December 28, 2021, and on the dates listed below related to each tax year, in the District of Columbia and elsewhere, defendants DOUGLAS EDELMAN and DELPHINE LE DAIN willfully attempted to evade and defeat income taxes due and owing by DOUGLAS EDELMAN to the United States of America, for each of the calendar years listed below, by committing and causing to be committed affirmative acts of evasion for each year listed below, including:

    a.   Making and causing false statements to be made to U.S. authorities about the ownership of Mina/Red Star;

    b.   Using nominees, including DELPHINE LE DAIN, to conceal DOUGLAS EDELMAN's income and assets;

    c.   Creating and signing false documents about DELPHINE LE DAIN's relationship to Mina/Red Star, and DOUGLAS EDELMAN's income and assets;

    d.   Causing DOUGLAS EDELMAN's income and funds to be deposited into bank accounts opened and held in the name of various nominee entities in banks known to shield the identity of account holders from disclosure;

    e.   Closing accounts and moving funds to avoid DOUGLAS EDELMAN's name being disclosed to U.S. authorities as having a connection to a foreign bank account;

    f.   Providing false information to banks, attorneys, and tax return preparers about DOUGLAS EDELMAN and DELPHINE LE DAIN's income,

39

048

assets, and financial accounts, and DELPHINE LE DAIN's purported
founding and ownership of Mina/Red Star;

g.   Attempting to influence others to prevent them from disclosing
DOUGLAS EDELMAN's ownership of Mina/Red Star to U.S.
authorities;

h.   Preparing and filing false documents with the IRS relating to DOUGLAS
EDELMAN's attempted participation in the IRS's Offshore Voluntary
Disclosure Program; and

i.   Preparing and causing to be prepared, and signing and causing to be
signed, and filing and causing to be filed with the IRS a false and
fraudulent Form 1040, U.S. Individual Income Tax Return ("Form 1040"),
for each tax year:

| COUNT | TAX YEAR | RETURN | APPROX. FILING DATE |
|---|---|---|---|
| 5 | 2007 | Form 1040 | 10/4/2016 |
| 6 | 2008 | Form 1040 | 10/4/2016 |
| 7 | 2009 | Form 1040 | 10/4/2016 |
| 8 | 2010 | Form 1040 | 10/4/2016 |
| 9 | 2011 | Form 1040 | 10/4/2016 |
| 10 | 2012 | Form 1040 | 10/4/2016 |
| 11 | 2013 | Form 1040 | 10/4/2016 |
| 12 | 2014 | Form 1040 | 10/4/2016 |
| 13 | 2015 | Form 1040 | 10/20/2016 |
| 14 | 2016 | Form 1040 | 07/20/2017 |
| 15 | 2017 | Form 1040 | 06/13/2018 |
| 16 | 2018 | Form 1040 | 10/08/2019 |
| 17 | 2019 | Form 1040 | 10/14/2020 |
| 18 | 2020 | Form 1040 | 12/28/2021 |

(In violation of Title 26, United States Code, Sections 7201;
Title 18, United States Code, Section 2)

049

## COUNTS NINETEEN - TWENTY-FOUR
### (Willfully Filing False FBARs for 2007-2012—31 U.S.C. §§ 5314 and 5322(b); C.F.R. 31 C.F.R. §§ 1010.350, 1010.306(c)-(d), and 1010.840(b))

65.     Paragraphs 1 through 52, and 56 are incorporated here by reference.

66.     On or about the dates set forth below, in the District of Columbia and elsewhere, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit, conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and tax evasion, in violation of 26 U.S.C. § 7201, defendant DOUGLAS EDELMAN did unlawfully, willfully, and knowingly file and cause to be filed with the U.S. Department of Treasury, false and fraudulent Reports of Foreign Bank and Financial Accounts, which were false and fraudulent in that they reported that he had only one financial interest in, and signatory and other authority over a bank, securities, and financial account at United Kingdom Bank 1, when in fact DOUGLAS EDELMAN knew that he had other financial interests in, and signatory and other authority over bank, securities, and financial accounts, each of which had an aggregate value of more than $10,000 at any time during the years listed below, that were not disclosed:

41

**050**

| COUNT | YEAR | APPROX. FBAR FILING DATE | ACCOUNT(S) NOT DISCLOSED (ACCOUNT ENDING) |
|---|---|---|---|
| 19 | 2007 | 10/3/2016 | Credit Suisse: #97-52, #76-32, #94-52<br>BNP Paribas (Suisse): #3822, #3815, #3954, #3955 |
| 20 | 2008 | 10/3/2016 | Credit Suisse: #97-52, #76-32, #94-52;<br>BNP Paribas (Suisse): #3822, #3815, #3954, #3955 |
| 21 | 2009 | 10/3/2016 | BNP Paribas (Suisse): #3822, #3815, #3954, #3955<br>Bank Julius Baer (Singapore): #0927 |
| 22 | 2010 | 10/3/2016 | BNP Paribas (Suisse): #3822, #3815, #3954, #3955;<br>Bank Julius Baer (Singapore): #0927, #0400 |
| 23 | 2011 | 10/3/2016 | BNP Paribas (Suisse): #3954, #3955;<br>Bank Julius Baer (Singapore): #0927, #0400 |
| 24 | 2012 | 10/3/2016 | BNP Paribas (Suisse): #3954, #3955;<br>Bank Julius Baer (Singapore): #0927, #0400 |

(In violation of Title 31, United States Code, Sections 5314 and 5322(b);
Code of Federal Regulations 1010.350, 1010.306(c)-(d), and 1010.840(b);
Title 18, United States Code, Section 2)

## COUNTS TWENTY-FIVE - THIRTY
### (Willful Failure to file FBARs for 2015-2020—31 U.S.C. §§ 5314 and 5322(b); C.F.R. 31 C.F.R. §§ 1010.350, 1010.306(c)-(d), and 1010.840(b))

67.    Paragraphs 1 through 52, and 56 are incorporated here by reference.

68.    On or about the dates set forth below, in the District of Columbia and elsewhere, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit, conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and tax evasion, in violation of 26 U.S.C. § 7201, defendant DOUGLAS EDELMAN did unlawfully, willfully, and knowingly violate his obligation to file with the U.S. Department of Treasury Reports of Foreign Bank and Financial Accounts disclosing that he had a financial interest in, and signature and other authority over, a bank, securities, and financial account in a foreign country, which had an aggregate value in excess of $10,000 during the years listed below:

051

| COUNT | YEAR | APPROX. FBAR DUE DATE | ACCOUNT(S) FOR WHICH NO FBAR WAS FILED (ACCOUNT ENDING) |
|---|---|---|---|
| 25 | 2015 | 06/30/2016 | CBH (Bahamas): #8025, #8027<br>Mirabaud (ME): #0869, #0972 |
| 26 | 2016 | 04/15/2017 | CBH (Bahamas): #8025, #8027<br>Mirabaud (ME): #0869, #0972<br>Bank J. Safra Sarasin: #4560, #4577 |
| 27 | 2017 | 04/15/2018 | CBH (Bahamas): #8025, #8027<br>Mirabaud (ME): #0869, #0972<br>Bank J. Safra Sarasin: #4560, #4577 |
| 28 | 2018 | 04/15/2019 | CBH (Bahamas): #8025, #8027<br>Mirabaud (ME): #0869, #0972<br>Bank J. Safra Sarasin: #4560, #4577 |
| 29 | 2019 | 04/15/2020 | CBH (Bahamas): #8025, #8027<br>Mirabaud (ME): #0869, #0972<br>Bank J. Safra Sarasin: #4560, #4577 |
| 30 | 2020 | 04/15/2021 | Mirabaud (ME): #0869, #0972<br>Bank J. Safra Sarasin: #4560, #4577 |

(In violation of Title 31, United States Code, Sections 5314 and 5322(b);
Code of Federal Regulations 1010.350, 1010.306(c)-(d), and 1010.840(b); Title 18,
United States Code, Section 2)

A TRUE BILL

_____
Grand Jury Foreperson

By   _____
MATTHEW M. GRAVES
UNITED STATES ATTORNEY IN AND FOR
THE DISTRICT OF COLUMBIA

_____
STUART GOLDBERG
ACTING DEPUTY ASSISTANT ATTORNEY GENERAL, TAX DIVISION
U.S. DEPARTMENT OF JUSTICE

43

052

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,           )  Criminal Action
              Plaintiff,            )  No. 24-239
vs.                                 )
                                    )  May 21, 2025
DOUGLAS EDELMAN,                    )  2:35 p.m.
              Defendant.            )  Washington, D.C.
* * * * * * * * * * * * * * * *

**TRANSCRIPT OF PLEA COLLOQUY**
**BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR THE UNITED STATES:
              SARAH CAITLYN WHITE RANNEY
              EZRA SPIRO
              Assistant United States Attorneys
              DEPARTMENT OF JUSTICE, Tax Division
              601 D Street NW, Room 7814
              Washington, DC 20579
              (202) 514-5616
              sarah.c.ranney@usdoj.gov
              ezra.k.spiro@usdoj.gov

FOR THE DEFENDANT:
              GEORGE M. CLARKE, III
              SONYA C. BISHOP (New York Office)
              Baker & Mckenzie LLP
              815 Connecticut Avenue NW
              Washington, DC 20006-4078
              (202) 835-6184
              george.clarke@bakermckenzie.com
              sonya.bishop@bakermckenzie.com

Court Reporter: Elizabeth Davila, RPR, FCRR
              Official Court Reporter

*This transcript is <u>work product</u>.  This transcript shall be considered null and void if the transcript is edited, printed, disassembled, screenshot, and/or distributed in any manner by any party without authorization of the signatory.*

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

053

2

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Criminal Case 24-239-1, the United States versus Douglas Edelman.

Counsel, would you please identify yourselves for the record, starting with the government.

MS. RANNEY:  Good afternoon, Your Honor. Sarah Ranney and Ezra Spiro for the United States.

THE COURT:  All right.  Good afternoon.

MR. CLARKE:  Good afternoon, Your Honor. George Clarke and Sonya Bishop for Mr. Edelman, and Mr. Edelman is here.

THE COURT:  All right.  Good afternoon.

Good afternoon, Mr. Edelman.

THE DEFENDANT:  Good afternoon.

THE COURT:  All right.  I think I have it worked out, in terms of how we're going to do this.  So I am going to go through -- there is no agreement.  There are certain questions that I would be asking, in terms of accepting the plea.  We have the statement of offense; I have the unredacted version, which will be filed under seal.  I have the elements.

I am going to discuss what I call "the plan," which is related to how the base offense loss or considerations will be involved in that eventually.  I will set those out just to make sure we are all in agreement

054

3

about how that is going to be proceeding.  And then I have the guidelines discussion as well.

So if it's not as I stated, then make sure we get -- you bring it up.

Let me have Mr. Edelman sworn in.  You can just stand.

(The defendant, DOUGLAS EDELMAN, was sworn.)

THE COURT:  Okay.  Mr. Edelman, you can take your mask -- go ahead and sit down.

You can take your mask off because you are going to be answering questions, and it's just more comfortable.

THE DEFENDANT:  Okay.

THE COURT:  And we'll get a record.

I am going to leave you seated next to your lawyer so you can, at any time, consult with him if you wish, instead of doing it at the podium.

The microphone -- with the green light on, we can hear you.  If you push the button below that, it mutes it so you can have a discussion that we can't hear anything about.

THE DEFENDANT:  Okay.

THE COURT:  So as I have indicated, I have the unredacted version, which will not be what I will be discussing in open court, but it does set out identifying certain companies, individuals, et cetera.  So that is just going to be for the record, to make sure that we are all in

055

4

agreement just who these people or what companies we're talking about.

So I take it, Mr. Edelman, that, in signing this, you agree that who they have identified are the correct people; is that correct? -- or companies?

MR. CLARKE:  Your Honor, it isn't signed, the document.

THE COURT:  Okay.

MR. CLARKE:  But it is something that he is familiar with, we have walked through with him.  He understands.  To the extent that you want to ask him questions about it, he will --

THE COURT:  We do need to have him sign it.

MR. CLARKE:  Okay.

THE COURT:  Okay?  I mean, there is no rush on it; but I prefer that it be signed.

MR. CLARKE:  That's fine, Your Honor.

THE COURT:  So he's actually agreed that who we have put in here or companies we have identified are the correct ones, since they're going to be with pseudonyms, in terms of what's going to be put actually on the record.

It doesn't have to be done this instant, but I would appreciate it.

He should have the statement of offense available to him because we will be going over that, and any other

056

5

documents that may be useful.

As I said, there is no agreement, so we are not looking at an agreement itself.

All right.  Let me read this over.

So in order to accept, Mr. Edelman, your guilty plea, I need to make a finding that you are entering it knowingly and that you are doing it voluntarily.

So my questions are going to be to set out what you have been charged with in the indictment, which counts you have decided you are going to be pleading guilty to, and which counts you are not going to be pleading guilty to.

My questions -- I have a few background questions to ask you.

THE DEFENDANT:  Okay.

THE COURT:  I will then go over your constitutional rights that you are giving up by pleading guilty.  We'll go over the statement of offense which, evidently, the -- both the government and defense have agreed to.

I need to find that you have admitted to conduct that meets the elements of what you are pleading guilty to, those particular counts.

The government can weigh in on that as well.

I will then discuss, basically, the consequences of pleading guilty, which include -- there is, obviously,

6

the statutory penalties -- to have you aware of that.  But the bigger thing is the advisory sentencing guidelines, which -- one of the key features is going to be the loss amount; and that's what I am calling "the plan" in terms of how that's going to proceed.  I will go through that and make sure that we all agree that that's what the considerations are going to be.

I will then also go over the rest of the guidelines, in terms of what the government is saying, what you would be saying -- in other words, what the different options are so that you are aware of all of that, as well as just discussing -- for the presentence report that would be prepared.  Ultimately, there are a couple of other consequences that need to be brought up with you and, then, the voluntariness of your plea.  Okay?

So if you need clarification of anything that I am asking you -- most of it is going to be whether you understand it, so it will be:  "Do you understand and agree to it?"

I may ask it or explain it differently than what you understood or understood with your lawyer, so you can talk to him or you can ask more questions.  Don't just give me the answer you think I want to hear.  I want to make sure that you actually understand it.

THE DEFENDANT:  Okay.

058

7

THE COURT:  And in terms of at least what you are pleading guilty to, I want to make sure this is what you want to do.  You can't come back in two months and say: Well, Judge, I changed my mind.

So I want to make sure this is actually what you have decided.  All right?

THE DEFENDANT:  Okay.  Thanks, Your Honor.

THE COURT:  So I have had you sworn in.

Do you understand that you are now under oath and if you don't answer my questions truthfully you could be prosecuted for perjury or for making a false statement?

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  The charges in the indictment or -- I am going to go through all of them.

Count 1, conspiracy to defraud the United States -- I will indicate, in this first discussion, and then I am going to drop what the statutory provisions are -- the first one is in violation of 18 U.S.C. Section 371; Count 2 is making materially false statements to the IRS in 2016, in violation of 18 U.S.C. 1001; Count 3, making materially false statements to the Department of Justice in 2018, in violation, again, of 18 U.S.C. Section 1001; Counts 4 through 10 are tax evasion for tax years 2006 to 2012, in violation of 26 U.S.C. Section 7201; Counts 11

059

8

through 18, again, tax evasion for tax years 2013 to 2020, again, in violation of 26 U.S.C. Section 7201; and Counts 19 to 30 are willful violation of foreign bank account reporting, in violation of 31 U.S.C. Sections 5314, 5322(b); 31 C.F.R. Sections 1010.350 and 1010.306(c) through (d); and 1010.840(b).

You are pleading guilty to Count 1, a conspiracy to defraud the United States; Count 2, making materially false statements to the IRS in 2016; Count 3, making materially false statements to the Department of Justice in 2018; and Counts 4 through 10, the tax evasion for tax years 2006 to 2012.

You will not be pleading guilty to Counts 11 through 30.

Is that accurate?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.

At present, you are detained.  And I understand that your counsel will be filing a motion to have that reconsidered, but at this point you are detained.

The terms of allocutions or recommendations at the time of sentencing, both parties are free to recommend whatever they think is appropriate.

Let me ask just a couple of background questions.

How old are you?

060

9

THE DEFENDANT:  73.

THE COURT:  I'm sorry 70-?

THE DEFENDANT:  73.

THE COURT:  73.

What's your date of birth?

THE DEFENDANT:  ███████████.

THE COURT:  Okay.  And what is the highest level of education that you have?

THE DEFENDANT:  Two years of college.

THE COURT:  What did you study?

THE DEFENDANT:  In those days, all the basic requirements you had to to continue studying and, then, with an idea towards international trade and relations.

THE COURT:  Okay.  Where were you born?

THE DEFENDANT:  Stockton, California.

THE COURT:  All right.  In the last 48 hours have you taken any kind of medication?

THE DEFENDANT:  Baby aspirin, that's it.

THE COURT:  Okay.  I ask that question to make sure your mind is clear and that --

THE DEFENDANT:  I understand.

THE COURT:  -- there is no issue with it.  So aspirin isn't going to affect that.

Have you ever received any treatment for any type of mental illness or emotional disturbance?

10

THE DEFENDANT:  No.  Except for a few weeks ago I was -- we had an interview, and I talked; but other than that, never.

THE COURT:  Okay.  Now, I am assuming that you have a copy of the indictment which sets out all of the charges?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And have you had an opportunity to fully discuss those charges with your counsel?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  And are you completely satisfied with the services of your attorneys in this case?

THE DEFENDANT:  Yes.

THE COURT:  And have you had enough time to talk with your attorney, discuss the case, and whether or not you have chosen, as I said, to plead guilty to certain counts and not plead guilty to the other counts?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  In terms of your basic constitutional rights, you have a right to plead not guilty, have a jury trial in this case.  We do have, actually, a trial date at this point tentatively set, which includes a series of -- like a trial template, dates when you would file motions, and various other things.

So as to the counts that you are pleading guilty

062

11

to -- which is 1, 2, 3, and 4 through 10 -- are you willing to give up your trial date as to those?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And are you willing to not have resolved if, potentially, there would have been motions filed as related to those -- which could be discovery motions, could be other kind of motions, to suppress, or something else?

THE DEFENDANT:  Okay.  Yes, Your Honor.  Fine.

THE COURT:  Okay.  I don't know that there would have been, but there was certainly an opportunity to do so.

THE DEFENDANT:  Right.  Okay.

THE COURT:  All right.  In terms of a very basic way:  For the jury trial, citizens from the District of Columbia would be summoned to the courtroom.  You, through counsel, the government, the Court would be asking them questions to find out if they know anything about the case, any of the participants in the case, and to explore if they had any views or biases that would affect the unfairness -- or the fairness of the jury for both sides.  We would select 12 out of those who would be -- determine your guilt or innocence, and it would be based on the evidence that would be presented in the courtroom and the jury instructions that the Court would give, which they would apply to the evidence; and they would decide whether or not the

12

government had proved the case beyond a reasonable doubt.

Do you understand your right to a jury trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand if you went forward to trial you would have a right to be represented by a lawyer at the trial; if you couldn't afford one, one could be appointed?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that at a trial you would have the right, through your attorney, to confront and cross-examine any witnesses against you?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you would have the right to present your own witnesses and have the right to subpoena them; in other words, to require them to come and testify in your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that if there was a trial -- and we're talking about the counts that you are considering pleading to -- you would have the right to testify, present evidence on your own behalf if you wanted to? But you wouldn't have to testify or present any evidence if you didn't want to, and that's because you can't be forced to incriminate yourself to present evidence of your own guilt. And in terms of the jury, they would be

13

told that they could not hold it against you, nor infer any guilt based on your asserting your constitutional right.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand that unless and until I accept your guilty plea as to the counts at issue, you are presumed by the law to be innocent because it's the government's burden to prove your guilt beyond a reasonable doubt; and until it does that, you cannot be convicted at trial?

THE DEFENDANT:  I understand, yes.

THE COURT:  Okay.  And do you understand if you went forward to trial and were convicted, you would have a right to appeal your conviction to the Court of Appeals, a higher court, and have a lawyer, again, help you prepare your appeal?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  And so you can appeal your conviction if you -- in general terms, if your guilty plea was somehow unlawful, involuntary, some other fundamental defect in the proceedings that was not given to you; and you also have a statutory right to appeal under certain circumstances if, for instance, you thought the sentence was contrary to the law or illegal?

The notice would need to be filed, generally,

14

within 14 days of judgment.

Do you understand you do have a right to appeal?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And if you are unable to pay the cost of an appeal, you can request that you file it without cost to you.

Do you understand?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  Now, do you understand if you plead guilty as to those counts that are at issue, and I accept your guilty plea, you are giving up the rights I have explained to you as those counts because there isn't going to be a trial?

THE DEFENDANT:  I understand, yes.

THE COURT:  And do you want to plead guilty in this case, give up your rights to a trial as to those counts, and all of the other rights that I have explained you would have if your case went to trial?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  At this point, we can go over the statement of offense.  I don't know whether the government wants to go through it, since it would be what the evidence would be.

As I understand it, both sides have agreed to this statement; am I accurate?  Yes?

066

15

You have stipulated; is that correct, or not?

If you haven't, let me know.

MS. RANNEY:  The government has not signed the statement of offense.  We have worked on it together with the defense and agreed that, if he uses this statement of offense, it's a fulsome enough admission that we would agree to his acceptance of responsibility --

THE COURT:  Okay.

MS. RANNEY:  -- for the purposes of getting a two-point reduction under the guidelines.  So in that sense -- in the spirit of your question, the answer is yes.

THE COURT:  Okay.  I can go ahead and read it.  But as I understand it -- I just want to make sure that, as I understand it, the government has agreed that this is enough on those particular counts -- that there is evidence that you would agree that you have that relates to the elements of the counts that he is pleading guilty to.

MS. RANNEY:  That's correct, Your Honor.

We agree that this statement of offense meets the elements of the counts.  Yes.

THE COURT:  All right.  And the defense has -- I will inquire, but agrees that this -- to these particular facts Mr. Edelman will; and that these also meet the elements of the offense, just on the ones that he is pleading guilty to.

16

Am I correct about that?

MR. CLARKE:  Yes, Your Honor.  He agrees that this is correct.  Again, it's sort of odd because we don't actually have a "plea agreement."

THE COURT:  Right.

MR. CLARKE:  So it's not like there is a signed copy of this.  But he agrees -- he's been through these.  He agrees that these are factually correct and support the basis.

THE COURT:  All right.  I can go ahead and read it.  It sound like the government is uncomfortable with this.

MS. RANNEY:  I would be happy to read it, Your Honor.  Whose ever voice you would like to hear more.

THE COURT:  Okay.  So what I will do is -- after each paragraph if you would stop, and I will ask Mr. Edelman if he agrees.

You indicate you agree.  If you don't agree, you indicate you don't agree.  Or if it's evidence that you are not aware of at the time -- not something you have learned later -- you can indicate that you don't dispute it if you don't have information to refute what they are saying.  I don't know whether that is in there or not, but those are the options.

MS. RANNEY:  Certainly, Your Honor.  So I am going

17

to read the redacted version into the record.

THE COURT:  Right.  Yes.  We will do the redacted version that doesn't identify anybody.

MS. RANNEY:  All right.

THE COURT:  And you can just start with paragraph 1, "At all relevant times..."

MS. RANNEY:  Okay.  At all relevant times, Edelman, the defendant, was a United States citizen who lived outside the United States.  From at least the mid-1980s to 2015, Edelman did not file individual U.S. income tax returns or pay U.S. income taxes despite his knowledge that U.S. citizens living abroad had an obligation to report worldwide income to the Internal Revenue Service, IRS, and pay any resulting income taxes.

THE COURT:  Would you agree with that, Mr. Edelman?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

MS. RANNEY:  In the early 2000s, Edelman was living in Bishkek, Kyrgyzstan.  Following the attacks on September 11, 2001, the United States increased its military engagement in Afghanistan and the Middle East, making Manas Air Base, in Kyrgyzstan, a strategic location for supplying U.S. troops in the region.  As a result, the U.S. military greatly increased its purchase of jet fuel.

18

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.  I was partially in -- in Kyrgyzstan in those days.  I was there, and I was also in England.

THE COURT:  Okay.

THE DEFENDANT:  I was not there all the time.

THE COURT:  So that's why I said -- I mean, if it's something that you know and agree with, fine.  If it's something --

THE DEFENDANT:  Yeah.

THE COURT:  -- you would not have known at the time but you are not disputing, you can also indicate that.

THE DEFENDANT:  Okay.

THE COURT:  All right.  Let's move to 3.

MS. RANNEY:  Drawing on connections Edelman had in the region, Edelman and a Kyrgyz national, Individual A, formed a business to bid on a contract with the combat support agency of the U.S Department of Defense, the Defense Energy Support Center, "DESC," later known as the Defense Logistics Agency, "DLA," to provide fuel for U.S. troops.

Edelman and Individual A won the contract in the name of Red Star Enterprises Limited, a Canadian company owned by Individual A.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.

070

19

THE COURT:  Okay.  And you need to slow down a little bit for the court reporter.

MS. RANNEY:  Starting as early as 2003, Edelman used hundreds of thousands of dollars from entities he owned -- Aspen Wind Corporation and Bartol Limited -- along with trade financing secured by Edelman and Individual A to finance much of Red Star's start-up costs and early operations.  Red Star grew quickly and continued to win contracts to service U.S. fuel needs in the region, including at Bagram Air Base in Afghanistan.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.  These are were -- this -- this -- the money that they referred to were loans into the Canadian company that were, then, paid back; but yes, I agree otherwise.  Yes.

THE COURT:  You may want to talk to your lawyer about adding additional information, but it's fine if you want to.

THE DEFENDANT:  Okay.  So it's fine.  All clear.  Thank you.

THE COURT:  Okay.  Go ahead.

MS. RANNEY:  In 2003, Edelman created Mina Corp Limited, a sister company to Red Star, in Gibraltar.  Edelman also incorporated a new Red Star entity in Gibraltar in 2004.  These entities collectively, known as Mina/Red

071

20

Star, were owned in a 50/50 partnership between Edelman and Individual A.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.

MS. RANNEY:  From the founding of Mina/Red Star through 2008, Edelman routinely executed bank documents showing that he was the ultimate beneficial owner, or "UBO," of his half of Mina/Red Star; and when Mina/Red Star became profitable, in 2005, Edelman took profit distributions from Mina/Red Star.  During this period, Edelman used Aspen Wind and Bartol bank accounts at Swiss banks, primarily Credit Suisse, to receive with his distributions.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.

THE COURT:  Edelman used his profits from Mina/Red Star to, among other things, send money to his U.S. family members, invest in other businesses, and purchase property around Europe, including a home in Ibiza, Spain.

THE DEFENDANT:  One second.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Okay.  Yes.  Yes, Your Honor.

MS. RANNEY:  In November 2008, Credit Suisse notified Edelman's accountant, Co-Conspirator 1, that due to U.S. law enforcement activity regarding the use of Swiss banks for tax evasion, Edelman had to either:  One, close

21

his Credit Suisse account and transfer the account balance; or two, disclose to U.S. authorities that the accounts belonged to a U.S. person.  These accounts were not in Edelman's name, but he was the ultimate beneficial owner of the accounts.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  With the assistance of Co-Conspirator 1, Edelman closed his Credit Suisse accounts in December 2008 and January 2009 and moved the funds to an account he recently opened at Bank Julius Baer, Singapore, for the Sunage Foundation, known as "Sunage," a Panamanian entity Edelman created in April 2008 with his French wife, Delphine Le Dain, and his daughters named as the entity's beneficiaries.

Following the closure of the Credit Suisse accounts, Edelman directed his Mina/Red Star distributions to the Sunage account at Julius Baer.  Although his wife and children were nominally the beneficiaries of Sunage, Edelman controlled the funds in the Sunage account and used them to fund his lifestyle and investments.

That account was not in Edelman's name, but he was the ultimate beneficial owner of the accounts.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Sure.

073

22

Okay.  Yes.  Yes, Your Honor.  Thank you.

MS. RANNEY:  In 2010 --

THE DEFENDANT:  Go ahead.

MS. RANNEY:  In 2010, the House of Representatives Committee on Oversight and Government Reform, Subcommittee on National Security and Foreign Affairs, known as the "Subcommittee," began investigating allegations of corruption in connection with Mina/Red Star's contracts with the Department of Defense.  As part of this inquiry, the Subcommittee became interested in the identity of Mina/Red Star's owners.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  At this point, Edelman had not filed U.S. tax returns to report the millions of dollars he had earned from Mina/Red Star and had not paid U.S. taxes on his income.  Rather than disclose his ownership, Edelman caused attorneys to tell the Subcommittee in Washington, D.C., a false story that:  One, his wife, Le Dain, founded Mina/Red Star with Individual A; two, she owned 50 percent of Mina/Red Star; and three, she held her interests through Sunage.

As a French citizen, Le Dain had no U.S. tax obligations for her income earned outside the United States.

THE COURT:  Would you agree with that?

074

23

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  In 2010, at the same time as he caused this false representation to the Subcommittee, Edelman, with the assistance of Co-Conspirator 1, caused the creation of false and backdated paperwork to corroborate Le Dain's purported ownership and remove his name from the Sunage Foundation bank account at Bank Julius Baer.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  In late 2010 and, again, in 2011, during the solicitation of two contracts with the U.S Department of Defense worth hundreds of millions of dollars each, the DLA also asked Mina/Red Star the identity of the company's owners.

Edelman caused Mina/Red Star to falsely certify that the business was owned by Le Dain and Individual A.

THE COURT:  Would you agree with that?

THE DEFENDANT:  One second, Your Honor.

THE COURT:  Certainly.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.

MS. RANNEY:  From the period of the congressional investigation through late 2012, Edelman continued to direct his profit distributions from Mina/Red Star into Sunage and spend them as he saw fit, including investing in a music

24

television franchise in Eastern Europe, a land venture in Tulum, Mexico, and a farm in Kenya, and purchasing a luxury town home in London.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  In July 2015, Edelman sent Co-Conspirator 2, a Dutch national, to the United States to meet with tax attorneys and tax preparers on Edelman's behalf.  At that point, Edelman still had not filed any U.S. tax returns to report his income from Mina/Red Star or any other source.  Thereafter, Co-Conspirator 1 and Co-Conspirator 2 told the attorneys and tax preparers the same false story:  That Le Dain was the creator and 50 percent owner of Mina/Red Star and that the assets, put in a trust, had been hers.

Over the next few months, Edelman's advisors, including Co-Conspirator 1 and Co-Conspirator 2, provided a series of false and misleading documents to support the false story that Mina/Red Star was and always had been owned by Le Dain.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  At this time, Edelman was convinced to participate in an amnesty program for taxpayers who willfully failed to report foreign financial assets and pay

25

taxes due, known as the Offshore Volunteer Disclosure Program, or "OVDP."  Based on the information provided by Edelman and his advisors to the attorneys and tax preparers, Edelman was advised to report only "gifts" from Le Dain and "consulting fees" from Mina/Red Star.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.

MS. RANNEY:  In March 2016, Edelman caused his attorneys to submit an OVDP letter to the IRS on his behalf, signed by Edelman and Le Dain, at his direction, under penalty of perjury, falsely stating, among other things:

In years 2007 to 2014, Douglas Edelman was a consultant for foreign entities in which he never had an ownership interest; and in tax years 2007 to 2014, Douglas Edelman had received between 100,000 and 1 million U.S. dollars in unreported income in each year.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  In October 2016, Edelman caused his attorneys to make a full submission to the OVDP on Edelman's behalf, including Forms 1040 U.S. Individual Income Tax Returns, or "Forms 1040," for Douglas Edelman for years 2007 to 2014, and the false March 2016 letter Douglas Edelman cosigned with Le Dain.  The forms 1040 were false in that they, among other things:  Reported significantly less

26

income than the amount Edelman had received as the 50 percent owner of Mina/Red Star. Specifically, Edelman falsely reported the following total amounts per year he received as gifts and consulting payments:

In year 2007, income reported in U.S. dollars is 473,447; for the year 2008, 777,468; for the year 2009, 661,400; for the year 2010, 693,536; for the year 2011, 584,715; for 2012, 764,144.

The tax returns did not report, and Douglas Edelman did not pay taxes on the tens of millions of dollars each year that Douglas Edelman made from his 50 percent ownership of Mina/Red Star.

THE COURT: Would you agree with that?

THE DEFENDANT: Yes, Your Honor.

MS. RANNEY: Edelman's OVDP submission did not include a 2006 tax return; meaning, Edelman did not report or pay any taxes on -- in U.S. dollars -- 6,486,356 in profit distributions from Mina/Red Star he earned during that year.

THE COURT: Would you agree with that?

THE DEFENDANT: Yes, Your Honor.

MS. RANNEY: The tax returns filed for Edelman for years 2013 to 2020 reported income from gifts and consulting payments each year in the following amounts, all in U.S. dollars:

078

27

For year 2013, income reported of 752,443;

For 2014, 611,287;

For 2015, 296,475;

For 2016, 298,734;

For 2017, 277,411;

For 2018, 298,306;

For 2019, 247,345;

And for 2020, 455,508.

The tax returns did not report, and Douglas Edelman did not pay taxes on, any income from Mina/Red Star or any other business.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MR. CLARKE:  Your Honor, just to make it clear, those numbers are, obviously, in there based on one of the requests that you made about what income he did report on those years.

THE COURT:  Right.

MR. CLARKE:  He is not pleading guilty to those years, but that's in the factual --

THE COURT:  We're including all of this so that we can move to the --

MR. CLARKE:  Correct.

THE COURT:  -- part about the sentencing.

MR. CLARKE:  Exactly.

079

28

THE COURT: Go ahead. And it covers the conspiracy.

MS. RANNEY: The tax returns from 2006 to 2012 also concealed Edelman's ownership interest in Ifone-Neda, a joint venture that sold internet services to military service members and contractors at Kandahar Air Base in Afghanistan, as well as Edelman's share of the profits from the business. At Edelman's direction, Co-Conspirator 1 and Co-Conspirator 4 requested dividends from Ifone-Neda to be issued in proportion to Edelman's ownership share.

THE COURT: Would you agree with that?

THE DEFENDANT: Yes, Your Honor.

MS. RANNEY: In 2018, after contact from the Department of Justice, Edelman caused his attorneys to make a presentation to a federal agent and prosecutors, claiming the false story that his wife had cofounded Mina/Red Star and that Edelman had received less than $1 million of income in each year from 2007 to 2014 as a consultant.

THE COURT: Would you agree with that?

THE DEFENDANT: Yes, Your Honor.

MS. RANNEY: In 2020, one of Edelman's co-conspirators, on Edelman's direction, attempted to change the Gibraltar public registration database to falsely reflect that Edelman was not the owner of Mina/Red Star during the period of time those entities were incorporated

080

29

in that jurisdiction.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.  Yes, Your Honor.

MS. RANNEY:  From 2006 to 2012, Edelman earned tens of millions of dollars each year in dividends from Mina/Red Star.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  Edelman knowingly and willfully engaged in a scheme with others to conceal his true income from the IRS and impede and obstruct the IRS's ascertainment, evaluation, assessment, and collection of income taxes.  Edelman knowingly caused materially false statements and representations to be made to the Subcommittee, the IRS, and the Department of Justice.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  Edelman willfully evaded taxes by: One, making false statements to U.S. authorities; two, using nominees to conceal income and assets; three, creating false documents; four, closing accounts and moving funds to avoid his name being disclosed to U.S. authorities; five, providing false information to banks, attorneys, and tax return preparers regarding his income, assets, financial accounts, and the historical ownership of Mina/Red Star; and

30

six, filing false tax returns for the years 2007 through 2012.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Since this is, basically, the government's evidence in terms of -- and you would have to agree that what he has agreed to as facts meets those elements in order for him to be found guilty of the ones that are at issue, can you -- obviously, paragraphs 25 and 26, in summary form, set out what the elements are.

But what I would ask is:  Going through the elements for the three categories, the tax evasion, the materially false statements and the conspiracy, if you would go through the elements, in very summary form, either indicate the paragraphs that show it or just, in summary form, the evidence that is there.

MS. RANNEY:  Certainly, Your Honor.

Before I begin, I would just like to flag something we flagged for defense before we got started.

We would like to just add an additional element to the 371 elements that were emailed over to the Court the other day.

THE COURT:  Okay.

MS. RANNEY:  We were looking at some D.C. case law and want to make sure that we have an accurate recounting of the elements, and I can read that in.

082

31

THE COURT:  So you have three.  And what's the fourth?

MS. RANNEY:  So we have -- our additional element is:  By deceitful or dishonest means.

THE COURT:  Deceitful, or what?

MS. RANNEY:  Dishonest means.  So the first element is:  Defendant entered into an agreement; the second is --

THE COURT:  -- knowing and voluntary participation.

MS. RANNEY:  Right.

So I think the "entering into an agreement" and "obstructing the lawful function of the government" are sometimes combined and sometimes not.  But we wanted to highlight that the addition of "by deceitful or dishonest means" comes before the finding of one overt act in a couple of D.C. Circuit cases -- I'm sorry, district cases.

THE COURT:  Okay.

All right.  Mr. Edelman, do you agree with that, after consulting with your counsel?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.

MS. RANNEY:  And to be clear --

THE COURT:  So if you'd set it out, from the government's perspective, in terms of -- and I am talking

083

about, really, various summary forms, or you can do the paragraphs. I mean, I think, they start around paragraph 11, that we begin to get into some of the -- you know, hiding of the assets, and not reporting certain things.

But if you would set out from your perspective, the government's perspective, since the Court needs to find that the government actually has evidence to meet these elements in order to accept the plea as to the counts and, also, that he would have to agree that his conduct -- to the conduct that would meet the elements of these offenses for me to accept the plea.

MS. RANNEY: Yes, Your Honor.

THE COURT: I am asking the government, since I need to have them indicate that the government has this evidence that meets those.

MS. RANNEY: Yes, Your Honor.

Specifically, as to the first element that the defendant --

THE COURT: Which count are we talking about?

MS. RANNEY: Starting with Count 1, Your Honor.

THE COURT: Okay. The conspiracy, under 371. Okay.

MS. RANNEY: As to the first element, that there was an agreement by two or more persons and that the

084

33

defendant entered into the agreement, I would point the Court to Mr. Edelman's acknowledgment that he directed the actions of several co-conspirators; they were named in this statement of offense as Co-Conspirator 1, 2, 3, and 4, as well as Delphine Le Dain, who was also involved in actions at his direction.

THE COURT:  All right.  Do you agree with that?

THE DEFENDANT:  Yes.

MS. RANNEY:  And to the notion that the agreement was to obstruct a lawful function of the government or an agency of the government, I would point to the statement by Mr. Edelman and the government's evidence that would show that Mr. Edelman took steps to conceal his income from the Internal Revenue Service by a number of means, including putting bank accounts in the name of nominee entities; moving funds when the ownership of the accounts was going to be disclosed to the United States in Swiss bank accounts; and placing -- or purporting to place assets into the name of a nominee, his wife, Delphine Le Dain; and causing false statements to be made about the ownership of Mina/Red Star to third parties who would have passed that information along to the IRS, or directly to the IRS itself.

THE COURT:  Okay.  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  For the third element, that this was

085

34

done by deceitful or dishonest means, Mr. Edelman has acknowledged, and the government would have been prepared to prove at trial, that:  In multiple circumstances, Mr. Edelman directed the creation of false or backdated documents, including false tax returns that were eventually submitted to the Internal Revenue Service, and false documents to corroborate a false story told to a subcommittee of the U.S. Congress.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  To the last element, that at least one overt act was taken in furtherance of the conspiracy, Mr. Edelman has acknowledged, and the government would have been prepared to prove at trial, that:  In 2020, Mr. Edelman directed the actions of Co-Conspirator 4 to make changes to a public registration database in Gibraltar, which reflected Mr. Edelman as the owner of Mina/Red Star entities in Gibraltar.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes.

THE COURT:  And presumably, the knowing and voluntary participation.

MS. RANNEY:  Your Honor, Mr. Edelman has acknowledged, and the government would have been prepared to show at trial -- prove at trial -- that:  Mr. Edelman, in

086

35

fact, employed multiple attorneys and tax preparers and provided them false information, showing that he not only knew what his duty was, but intentionally shirked it in order to conceal his income from the IRS.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  So that takes care of Count 1.

MS. RANNEY:  As to Count 2, Your Honor, which is 1001, false statements made to the IRS in March 2016, the elements are:  First, that defendant made or caused to be made through others a false, fictitious, or fraudulent statement or representation; second, that the statement was material; third, that the statement was made within the jurisdiction of a department or agency of the United States; and fourth, that the making or causing of the statement or representation was willful.

THE COURT:  What's the definition of "willful" in this context?

MS. RANNEY:  Your Honor, I understand it to be the same as willfulness in other contexts, which is:  An intentional violation of a known legal duty.

THE COURT:  In other words, he knows that he was doing something unlawful?

MS. RANNEY:  That is correct, Your Honor.

087

36

THE COURT:  Okay.

MS. RANNEY:  He knows that he is violating a legal duty --

THE COURT:  Right.  Okay.

MS. RANNEY:  -- to be truthful.

THE COURT:  All right.  And then if you would go through -- again, as you did with the first one, first count, let's move to this one.

MS. RANNEY:  Pardon me.

THE COURT:  No problem.

MS. RANNEY:  As to the first element, that defendant made or caused to be made through others a false statement, Mr. Edelman has acknowledged, and the government would have been prepared to prove at trial, that: Mr. Edelman sent co-conspirators to the United States to provide false information to tax preparers and attorneys amounting to the false story that Mina/Red Star was and always has been owned by Le Dain, and that caused the submission of a false Offshore Voluntary Disclosure Program filing to the IRS in March 2016.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  My apologies.  I said "March 2016." It is, in fact, October 2016.

THE COURT:  Okay.

088

37

MS. RANNEY:  We may need to ask that Mr. Edelman agree to that because I believe --

THE COURT:  Do you agree with the date, which is -- it's October 2016, not March 2016, what she said; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Do you want to take a moment to actually drink enough --

MS. RANNEY:  I may see if someone has a cough drop really quick, Your Honor.

(Whereupon, the proceeding pauses.)

MR. CLARKE:  There may be a question about that March versus October date.  It might be that -- there is, like, a preclear document that goes in.  That may be the March 2016; and then, the final returns came in October 16th [sic].  So I am not sure if we need to clarify that or not.

MS. RANNEY:  Should we take a minute to clarify?

MR. CLARKE:  Yeah.

MS. RANNEY:  Okay.  Your Honor, if we could take a minute to make sure we're on the same page about this.

THE COURT:  Okay.  I will let you talk.

(Whereupon, counsel confer.)

MS. RANNEY:  My apologies, Your Honor.

THE COURT:  No.  That's okay.

You want to take enough of the water to actually

38

lubricate your throat.

MS. RANNEY:  Thank you.

If I can't make it through, I may ask Mr. Spiro to sub in.

THE COURT:  So how do we want to deal with the March versus October?

MS. RANNEY:  Your Honor, we've agreed with the defense that:  For the purposes of the 1001, the October 2016 submission was the false statement made to the IRS.

THE COURT:  You need to -- I realize you are having trouble speaking, but we're having trouble hearing you -- for the court reporter.

MS. RANNEY:  We have agreed with defense, Your Honor, that, for purposes of the 1001, the October 2016 submission was the false statement to the IRS.

THE COURT:  All right.

Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Let's proceed.

MS. RANNEY:  The second element is that such statement or representation was material.

Mr. Edelman acknowledged, and the government would have been prepared to prove, that:  The false statement related to Mr. Edelman's income in each year for the OVDP submission, which related to the IRS's ability to compute

39

his tax due and owing for each year.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  Third, that such statement was made within the jurisdiction of a department or agency of the United States, Mr. Edelman has acknowledged that the statement was made to the IRS, and the government would have been prepared to prove that.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  Fourth, that the making or causing of the statement or representation was willful, Mr. Edelman has acknowledged, and the government would have been prepared to prove, that:  Mr. Edelman knew that he was the owner of Mina/Red Star and had income in those years but intentionally caused misrepresentations to be made to the attorneys and tax preparers who were preparing the statement to the IRS.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  As to the second false statement count, which has the same elements but relates to a representation made to the Department of Justice in 2018:  First, that the defendant caused or made through others a false statement.  Mr. Edelman provided false information to

091

40

attorneys who then made a presentation to the Department of Justice which claimed falsely that Delphine Le Dain had been the creator and founder of Mina/Red Star.

THE COURT: Mr. Edelman acknowledged, and the government would have been prepared to prove that it was Mr. Edelman who was the creator and founder of Mina/Red Star, and that he deliberately caused his attorneys to tell the Department of Justice the false story about his wife.

THE COURT: Would you agree with that?

THE DEFENDANT: Yes, Your Honor.

MS. RANNEY: As to the second element, that the statement or representation was material, the statement or representation went directly to the question of ownership of Mina/Red Star, and the recipient of tens of millions of dollars of income which was, at that juncture, under investigation by multiple federal agencies, including the Internal Revenue Service.

THE COURT: Would you agree?

MS. RANNEY: Mr. Edelman has acknowledged --

THE COURT: Oh, sorry.

MS. RANNEY: -- that the government --

THE COURT: Go ahead. I'm sorry.

MS. RANNEY: I'm sorry.

THE COURT: I thought you were done. Go ahead.

MS. RANNEY: And the government would have been

092

41

prepared to prove that the statement or representations went directly to a matter that was under investigation.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  To the third element, that the statement was made within the jurisdiction of a department or agency of the United States, Mr. Edelman acknowledged that the statement was made to a law enforcement agent and to prosecutors from the Department of Justice; and the government would have been prepared to prove at trial that the statement was made to law enforcement agents from the Internal Revenue Service and from SIGAR, the Special Inspector General for Afghan Reconstruction.

THE COURT:  All right.  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  The fourth element, that the making or causing of the statement or representation was willful, Mr. Edelman has acknowledged that he was the creator of Mina/Red Star and that he intentionally provided false information so that his attorneys would represent that it was his wife, not him, who was the creator of Mina/Red Star.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  As to the next counts, Your Honor, tax evasion, in violation of 26 U.S.C. 7201, there are three

093

42

elements.  The first is that there is a substantial tax due and owing; second, that defendant made an affirmative attempt to evade or defeat that tax; and third, that the attempt was willful.

For the seven counts of tax evasion, Mr. Edelman has acknowledged and the government would have been prepared to prove at trial, that:  For 2006, Mr. Edelman did not file a tax return and did not report or pay any taxes on more than $6 million in profit distributions from Mina/Red Star that he earned during that year.

As to the first element, he has acknowledged that he did not pay taxes on that amount, so there would be a tax due and owing; and the government would have been prepared to prove that amount at trial.

THE COURT:  Would you agree to that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  As to the second element, that the defendant made an affirmative act to evade, 2006 was among the years Mr. Edelman acknowledged that he made false statements about who was the owner of Mina/Red Star, including statements to the IRS, to Congress, and to the Department of Justice to conceal the fact that he was the owner of Mina/Red Star in 2006.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

43

MS. RANNEY: And third, that this was willful, Mr. Edelman has acknowledged, and the government would have been prepared to prove, that he was the creator and owner of Mina/Red Star from the beginning and in the year 2006, and that he intentionally caused misrepresentations to be made to conceal the fact that he was the owner.

THE COURT: Would you agree with that?

THE DEFENDANT: Yes, Your Honor.

MS. RANNEY: For each of the years 2007 to 2012, each of which is its own count of tax evasion, which we understand Mr. Edelman to be pleading guilty to, there was a tax return filed for each of those years reporting a specific amount of income which Mr. Edelman has agreed to, was reported based on false information that he provided through co-conspirators to attorneys and tax preparers who put together the tax returns for each of those years.

He agreed that in each of those years he did not report or pay taxes on tens of millions of dollars each year that he had made from his 50 percent ownership in Mina/Red Star.

If this case had proceeded to trial, the government would have been able to show, and Mr. Edelman has acknowledged, that there was tax due and owing on those unreported tens of millions of dollars each year from Mr. Edelman's 50 percent ownership, satisfying the first

095

44

element for each of those counts.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  As to the second element, an affirmative act of evasion, the false tax return that Mr. Edelman acknowledged was filed for each of those years constitutes an affirmative act of evasion for each of those years.  There are additional acts of evasion Mr. Edelman acknowledged, and the government would have been prepared to prove at trial, including using nominee entities and bank accounts, making false statements to various arms of the U.S. government, and creating false documents, among others.

THE COURT:  Would you agree with that?

THE DEFENDANT:  Yes, Your Honor.

MS. RANNEY:  Third, as to the element of willfulness for all of the counts, Mr. Edelman acknowledged, and the government would have been prepared to prove at trial, that Mr. Edelman knew he was the owner and creator of Mina/Red Star from the beginning and in these early years, and that he intentionally sent co-conspirators and attorneys and tax preparers to make false representations to various arms of the U.S. government to conceal his ownership, which would satisfy the element for each of those tax evasion counts.

THE COURT:  Would you agree with that?

096

45

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  I think that covers it.

So I will find that the government has evidence that meets the elements of each of the counts that he is pleading guilty to beyond a reasonable doubt, and Mr. Edelman has agreed to conduct that meets those elements as to the counts that he is pleading guilty to.

All right.  So you can go ahead and sit down, let me move on.

So the next thing I am going to move to is consequences, which has to do with sentencing issues.

Let me start with statutory penalties.

Congress has set out for crimes maximum penalties that the Court can impose.  If you impose a penalty above the statutory maximum, that's an unlawful sentence.

Count 1, which is their conspiracy to defraud, the maximum period of imprisonment is five years, the maximum fine is $250,000, the maximum period of supervised release is three years, and there is a special assessment of $100.

The supervised release would be added if the Court sentenced you to jail time.  I can sentence you to be supervised in the community with certain conditions.  You should be aware that:  If you violate those conditions and/or commit a new crime, the Court can revoke the supervised release and impose a new sentence.  It's a

097

46

combination of statute and the advisory sentencing guidelines. And the important part is: You would not get credit for periods of time that you had already spent in jail with your sentences.

For instance, the period that you are locked up during this period will, obviously, be credited against any -- if I gave you a jail sentence, would be reduced by the time that you have been locked up. That would not be happening with -- if I revoked your supervised release. In other words, whatever time you'd served would not be used to reduce the time you would serve on a sentence under supervised release.

Counts 2 and 3, which is making material false statements, maximum time in jail is five years; maximum fine is 250,000; again, the maximum supervised release is three years; again, $100 special assessment.

Then Counts 4 through 10, the tax evasion, again, the maximum imprisonment would be five years; maximum fine would be 100,000; maximum supervised release is the three years; and another special assessment of $100.

MS. RANNEY: Your Honor.

THE COURT: Yes.

MS. RANNEY: I apologize. If we could just point out that the max fine for tax evasion is under a different statute, it's $250,000, or twice --

098

47

THE COURT:  Two times the pecuniary --

MS. RANNEY:  Yes, Your Honor.

THE COURT:  Okay.

MS. RANNEY:  My apologies for interrupting.

THE COURT:  -- two times the pecuniary gain or loss.

All right.  So have you discussed those statutory penalties, or are you aware of what's involved with that?

THE DEFENDANT:  Okay.

THE COURT:  You have to say something orally or I can't -- nods don't show up on the record.

THE DEFENDANT:  Yes.  I understand.  I'm -- yes.

THE COURT:  All right.  So the next thing that I want to talk to you about is -- in terms of sentencing, there is a statute, 3553(a), which sets out very broad factors that the Court has to consider at the time of sentencing.  There are things like the seriousness of your offense, any rehabilitation needs that you may have, considerations of parity with other defendants who might have been sentenced in the same kind of things, a just and reasonable sentence, deterrence to you, deterrence to others, those kinds of very broad concepts.

The probation department will prepare a presentence report which will set out, again, the offense level, will give personal information of your background,

099

48

will discuss any criminal history, your financial condition, education, job history, any physical condition, substance abuse, mental health issues -- those kinds of things -- so that the Court will have a full picture to consider if there is any particular mitigation, or not, or rehabilitation needs that you may have.

Importantly, they will prepare and provide what would be considered the official advisory sentencing guidelines.

Now, the guidelines were developed by a sentencing commission, which Congress has established, with the goal of having judges sentence more uniformly for the same types of offenses; obviously, each offense is different, but for the same types. It's all a matter of numbers, frankly. The higher the number, the higher the sentence; the lower the number, the lesser the sentence.

You will receive a copy of the presentence report. You and the government can review it before I get it. You can object to, either, inaccuracies in the report or if you challenge how they have done the calculations. They may change the report based on the objections, or they may not. If they don't change them and there are still exigent objections at the time that I receive it, I will then resolve those objections before we go forward to sentencing.

THE DEFENDANT: Okay.

49

THE COURT:  In terms of the sentencing guidelines, which are somewhat complicated in your case -- and the biggest issue is, really, the loss or the base offense, which considers how much is at issue, which at this point has not been determined -- I will put it that way.

As I understand it -- I will call it "the plan."

As I understand it, this is the way we're going to be proceeding:  I have set out the counts that you have entered a plea to -- are entering a plea.  I will be proceeding, as I understand it, to sentencing on the 1 to 10.

The parties agree that, at sentencing, all ten counts would be grouped and treated functionally as one count; and that's a particular guideline.  If there is a dispute about that, I will set out which one it is.

The parties further agree that certain guidelines, specifically, Section 2T1.1, which is applicable to tax evasion, would govern that grouping.  Guideline 2T1.1 provides that:  The base offense level is determined by the tax loss, which is defined as the total amount of loss that was the object of the offense.

Now, in calculating that loss -- this is a quote:  All conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan.  That relates to Note 2 to those guidelines.

In other words, the Court considers all relevant

101

50

conduct, and the specific guidelines set that out.

So I will be resolving any sentencing disputes.

At this point, the parties dispute whether Mr. Edelman's conduct in tax years 2013 and 2020 is relevant conduct -- those are the counts that you are not entering a plea of guilty to -- for determining your base offense level for Counts 1 through 10 under this guideline of 2T1.1.

During the sentencing phase, I will be determining by a preponderance of the evidence several issues:  Whether the income derived from Mina/Red Star in 2013 through 2020 was Mr. Edelman's income; what law -- foreign, U.S., or both -- governs that determination; whether assets were contributed to the trust, and when; whether such contribution was a completed gift by Mr. Edelman to his wife and/or the trust; if there was a contribution, the value of the contributed assets.

Those determinations will result, as I understand it, in a calculation of the tax loss, which will, in turn, dictate the base offense level under the guidelines.  And this is Section 2T4.1, which is the tax table.

So does everybody agree with that so far, as I understand the approach that is being taken?

If you disagree, let me know.

Otherwise, I will assume, roughly, that's the first part of proceeding along.  There is obviously more to

51

this.  But I want to make sure that, up to this point, we all agree what's at issue and what decisions I need to make.

THE DEFENDANT:  Yes.

THE COURT:  Okay.

MS. RANNEY:  Yes, Your Honor.

THE COURT:  Okay.  So the Court, then, will apply relevant enhancements, and there may be a dispute of that, in terms of -- and impose a sentence.

So that sets out sort of the plan, as I understand it, for the base offense, which includes the loss.

Now, in terms of the guidelines themselves, which the base offense sets out the loss, so that we would start with that.  And then, there are other points that would need to be considered.

So I am going to go over, as I understand it, people's positions.  And just tell me again, as I asked you, whether this is correct.

At the last hearing, we reviewed on the record your decision to decline the government's most recent plea offer.  And under that offer -- I am going over it because it sets out, basically, what their position is.

Under that offer, you would have pled guilty to one count of a conspiracy; one count of willful tax evasion encompassing the full tax, that loss the government alleges is at issue in the indictment; and one count of making false

103

52

statements.

You would also have stipulated to a range of tax loss corresponding to a base offense level of either 28 or 30 under the sentencing guidelines; and you would have agreed to make restitution in the total amount of the tax loss, according to the government, which the government would argue is $128 million.

You would also have agreed to certain sentencing enhancements:  Sophisticated means, adding two points; obstruction of justice, two points; leadership role, which would be four points.  You start out with the base offense, and then you can add these things to it.  And you would have agreed that you are entitled to a deduction of two points for acceptance of responsibility rather than the three-point deduction the government had offered before the Rule 15 deposition.

They generally control the third point to the extent of how much extra work has gone -- in terms of the timing of the plea versus preparing for trial.  And so in terms of the plea, they would have argued that they were moving into preparing for trial with a deposition and, therefore, you would only get the two points.

Under the government's proposed agreement, your total adjusted offense level would have been, either, 34, a base offense level of 28, the 2 points for sophisticated

53

means, 2 for obstruction, 4 for leadership, minus 2 points for acceptance of responsibility; or 36, a base offense level of 30, again, plus these additional points.  And it would depend to some degree, as I understand it, on the base offense and what would be included in the loss.

The Criminal History Category is I.  You have no convictions, so there are no points.  So it would have been an adjusted level 34, which is 151 to 188 months; or for 36, 188 to 235 months.

The statutory maximum term of imprisonment would be 180 months, that is 15 years.

You would have been required to pay restitution in the total amount of what the government viewed as the relevant tax loss which, as I indicated, was 128 million.

So am I accurately setting out what the government's position was?

MS. RANNEY:  Yes, Your Honor.

THE COURT:  Which covers, to some degree, what they would be requesting in this particular case.

Is that your understanding of what they had expected or what their argument would be?

You are not agreeing to it, I just want you to -- if this is what they had set out and what you were looking at.

THE DEFENDANT:  Yes, Your Honor.  Yes.

THE COURT:  Okay.  So in terms of -- if you

54

proceed to trial on all counts in the indictment, then the government would argue for a tax loss corresponding to a base offense level of 30, the same restitution amount, and sentencing enhancements that we just went over. And you would not be entitled to a two-point deduction for acceptance of responsibility.

So if you were convicted on all counts at trial, they would have argued the offense level is 38 -- again, this is the 30, plus the various 2 points, but there would have been 4 points for a leadership role; a Criminal History Category of I, which would have given you an offense level of 38, 235 to 293 months.

Again, it's five years, so it can't be more than -- these guidelines are above the statutory maximum, so you would have to do it below the statutory maximum.

You also could have been required to pay a fine.

The fines are 250,000 or the pecuniary loss or gain, up to 500,000, on 2 counts of making a false statement; up to 1.5 on the 15 counts of tax evasion, or 3 million for 6 counts of filing for the false statements. So it would have come to a potential total maximum fine of 8.25 million.

They would still have also sought restitution in the 128 million.

Sir, do you understand that?

55

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Let's now move to today's hearing.

Looking at what you have -- are pleading guilty to, because you are not intending to plead guilty under an agreement with the government -- obviously, neither I nor anyone else can give you any guarantees about what arguments the government, frankly, will present at sentencing -- what sentence the government will recommend or what I will ultimately impose.

But I want to make sure that you understand your maximum likely exposure if you plead guilty, okay, as I understand it.

Based on the government's arguments, as I currently understand them, they will argue that the total tax loss associated with the crimes to which you intend to plead guilty is 128 million, which corresponds to a base offense level of 30.  Again, we're expecting the government to argue with the same enhancements that they would have done if you had gone to trial, which is the sophisticated means, obstruction of justice, and the leadership role.

I don't know what their position would be on the acceptance of responsibility.  At one point they would have agreed to a two-point reduction.  The third point is sort of up in the air and will probably be something that will be

56

argued, in terms of whether it's appropriate or not.  But you are likely to receive the two-point deduction for acceptance of responsibility based on the plea today, unless some other information comes forward.

Based on all those facts and circumstances, your maximum total exposure under the guilty plea is a total adjusted offense level of 38, starting with the 30, adding, basically, 8 points.  If that is no deduction for acceptance of responsibility, it's -- with a Criminal History Category I -- 235 to 293 months.  If you get the 2 points, it's 188 to 235 months.

Because each of the ten counts to which you are pleading guilty is punishable for a term up to 5 years, the statutory maximum sentence would be 600 months, which would far exceed the guideline range.  So you are not going to have a problem with the statutory maximums.

There is also a possibility of imposing a fine.

Each of the seven tax fraud counts for which you are proposing to plead guilty carry maximums of $100,000.  Each of the other three felony counts carries 250,000.  There is that two times the pecuniary gain or loss, which is the other way of calculating.

My understanding of your proposed plea is, you would be subject to a fine up to $1,450,000, which would be in addition to any award of restitution.  I am expecting

108

57

that the government would probably ask for restitution in the total amount of what they view is the relevant tax law.

Is that something that you understand and have talked to your lawyer about so far?

I am trying to give you all of the permutations that could come up since we don't have an agreement.

THE DEFENDANT:  Yes, I understand.  It's clear.

THE COURT:  All right.

Government, I think I have tried to cover any possible permutations of what would happen, since we don't have an agreement as to what the different possibilities are.

Am I wrong about any of those?

MR. SPIRO:  Your Honor, it's just -- because the maximum fine for the tax evasion count is 250,000 or twice the pecuniary gain or loss, for the ten counts the defendant is proposing to plea to today, the maximum fine would be two and a half million dollars, or twice the pecuniary gain or loss.

THE COURT:  Okay.  So instead of 1 million 450; is that what you are saying?

MR. SPIRO:  Yes, Your Honor.

THE COURT:  Would you agree with that, or not?

Or is that -- presumably, that's an argument that they would make.  But...

109

58

MR. CLARKE:  You understand --

THE DEFENDANT:  Yeah.  Yeah, I understand.

THE COURT:  Okay.  Now, let me talk about likely exposure if I accept certain arguments, Mr. Edelman, that your lawyer is going to be making.  And this scenario -- I am trying to give you the maximum, in terms of what -- depending on what arguments are made and what decisions I make -- that's sort of the maximum, what I have been talking about, that you could be facing.

Let me discuss what is likely to be at the bottom half, in terms of the lower.

This represents the lower end of the sentencing range that you are likely to face.

I understand that your lawyers plan to argue that the total tax loss associated with the offenses to which you are pleading guilty is less than 128 million that the government is seeking.

I don't know exactly what arguments your lawyer is going to make.  The statement of offense that the parties have proposed states that you failed to pay taxes on -- and this is a quote:  Tens of millions of dollars each year in tax years 2007 through 2012.

So I will hear whatever argument is going to be made about that.  But for purposes of our discussion, I will assume, without deciding, that the tax loss associated with

110

59

your proposed plea is at least 25 million.

Am I correct, as I understand the arguments?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So if it's a tax loss of 25 million, that would correspond to a base offense level of 28.

Let's assume that the government argues for these enhancements and the Court goes along with it; so it would be the 2 points for sophisticated means, 2 points for obstruction of justice, 4 points for a leadership role.

Let's assume I decide you are entitled to the full 3-point reduction for acceptance of responsibility.  Each of those adjustments -- the adjusted level would be 33; that's the base offense of 28, plus the various points, minus the acceptance of responsibility; in Criminal History Category I, it would be 135 to 168 months.

And assuming, for the sake of this discussion, that I decide that none of the government's proposed enhancements apply, then the total adjusted offense level would be 25, in Criminal History Category I, then the guideline would be 57 to 71 months.  That is, I understand, the best-case scenario for you.

THE DEFENDANT:  I understand.

THE COURT:  Because each of the ten counts that you are proposing with this is punishable by imprisonment

111

60

for a term of up to five years; the statutory penalty is higher, so it would far exceed the guideline range.  So we don't have to worry about --

THE DEFENDANT:  Right.

THE COURT:  -- having a problem with it exceeding that.

You would also be subject to the fine, which the government has indicated is the 2 million-plus, which could be in addition to any award of restitution.

Finally, I am also -- I may also order you to pay restitution in the total amount of the relevant tax law, whatever I decide that amount is.

So is that your understanding and discussion you had with your counsel --

THE DEFENDANT:  Yes.

THE COURT:  -- these various options?

THE DEFENDANT:  Yes.  I understand.

THE COURT:  And these are the discussions you have had?

These, obviously, are various options I have put out there.

THE DEFENDANT:  Yes.

THE COURT:  Okay.  At the sentencing we would start to come through with the figures.

So in summary, if I accept your plea, the total

61

adjusted offense level would be a minimum of 25, which is 57 to 71; it's likely to be 33, which would be 135 to 168; at most 38, which would be 235 to 293.  And none of this would be above the statutory maximum.

If I imposed a fine, then the government would argue it's a two point plus -- 2 million plus, which could be added in addition to any restitution.

At this point, the government would be arguing for a restitution as the relevant amount is 128 million.

Is that your understanding, sort of in summary form, of what all of the options are?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Now, at this point I can't guarantee you exactly how this is all going to work.  I can tell you what appears to be at the top end, based on the arguments as I understand them; what's at the bottom end, based on the arguments as I understand them.

We will be having -- and the big thing will be the relevant conduct in terms of, frankly, the base offense to start with; and then moving on to any enhancements or not, and the acceptance of responsibility as categories of doing this.

We would need to have a hearing as part of the sentencing.

But is that your understanding?

113

62

I realize it's fairly complicated. I have gone through all of these possibilities to make sure you have some understanding of what the options are that the Court will be making. It may turn out to be different. But at this point, based on what I have been told by the government and your counsel, these appear to be the options at the top end and at the bottom end.

THE DEFENDANT: Yeah. You have made it very clear, and I understand.

THE COURT: Okay. All right.

There are two other things in terms -- that I want to mention about the advisory sentencing guidelines that have not been discussed by either of the parties, but I want to bring them up.

Under the rubric of the sentencing guidelines, there can be departures, and these are very narrow exceptions to the usual calculations that are made. Nobody has discussed them particularly, so I don't know whether any of them apply -- where the Court could depart up or down from whatever the guideline range is.

Also, there could be what we call a "variance." The guidelines are advisory, they are not mandatory. So the Court could vary the sentence, obviously, not above the statutory maximum.

In order to do a variance, according to the Court

114

63

of Appeals, I need to do the calculation under the guidelines, consider whether there are any departures that would apply. Then, if I am going to do a variance, I have to give very specific -- and it would definitely emphasize "specific" -- reasons why I am not doing it within -- the sentence within the guidelines or a departure, but doing something different. So it's rare, frankly, that courts vary. But it does occur.

Sir, do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, there are some other, I'll say, "consequences" that I want to make sure that you understand. And that is in terms of -- if you are given a period of jail time, you actually serve the jail time. There is no parole or some other way of reducing it.

Now, the Bureau of Prisons has their own system. They have what we call "good time credits," which are: If you don't have any violations, they reduce the sentence roughly 54 days a year during this period. I don't know whether they would do that, but I just want to make sure that you understand that.

There is also one other ramification or consequence to your pleading guilty. These are felony offenses. If I accept your plea and find you guilty, that may deprive you of valuable civil rights; and this is the

64

right to vote, the right to hold public office, the right to serve on a jury, the right to possess any kind of firearm or ammunition. That's a federal statute, in terms of the firearm and ammunition. States may have their own licensing requirements, and sometimes they need to be considered together. But in general, you would not be able to have a firearm or ammunition.

Now, in terms of the rest of rights, it depends on where you live. Some don't deprive you at all, some do it for a time period, and some you never get the rights back. It depends very much on where you live.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. And the last set of questions relate to the voluntariness of your plea as to the counts you are pleading guilty to.

Has anyone, including any of the attorneys, the prosecutor, or anybody else that you have come in contact with since your arrest, promised or suggested to you that by pleading guilty that you are guaranteed a specific sentence?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone forced, threatened, or coerced you in any way into entering this plea of guilty?

THE DEFENDANT: No.

THE COURT: Has anyone made any promises to you as

65

to what sentence I will impose if I accept your guilty plea to these counts?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Do you understand that at this time I don't know what sentence I will impose since I haven't heard from probation or the lawyers, or made some of the decisions that I need to make?  Do you --

THE DEFENDANT:  I understand.

THE COURT:  All right.  Are you entering this plea of guilty to these counts voluntarily of your own free will?

THE DEFENDANT:  Yes.

THE COURT:  And are you entering your plea of guilty to these counts at issue because you are guilty of those counts?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Anything you don't understand?  Anything you want to ask me or your lawyer?

THE DEFENDANT:  No.  I'm pretty -- it's pretty clear.  Thank you.

THE COURT:  All right.

Douglas Edelman, how do you plead to Count 1, conspiracy to defraud the United States, guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  Count 2, making materially false

117

statements to the IRS in 2016, guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  Count 3, making materially false statements to the Department of Justice in 2018, guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  Counts 4 through 10, as to each of those, which is a tax evasion that cover tax years 2006 to 2012 -- to each of those counts, do you plead guilty or not guilty?

THE DEFENDANT:  Guilty, Your Honor.

THE COURT:  All right.

I am satisfied that Mr. Edelman is fully competent, capable of making a decision today.

We have discussed this issue, in terms of:  He did have an examination and I found that he was competent; provided some insight but it does not in any way, I think, affect the Court's determination that he is competent.

I am assuming counsel does not, in any way, feel that there is an issue or you would have brought it up.

Am I correct?

MR. CLARKE:  That is correct, Your Honor.

THE COURT:  Okay.  He understands the nature and consequences of what he is doing, acting voluntarily of his own free will; and there is an adequate factual basis for

67

his plea as to the specific counts at issue.

Therefore, I accept the plea and find Douglas Edelman guilty of Count 1, conspiracy to defraud the United States; Count 2, making materially false statements to the IRS in 2016; guilty as to Count 3, making materially false statements to the Department of Justice in 2018; and guilty as to each count from 4 to 10 as to tax evasion for the tax years 2006 to 2012.

All right.  At this point, we need to set other dates.  So how do we wish to proceed at this point?

I will go ahead and order a presentence report.

I don't believe we have set another date because we have got the rest -- I believe what the idea was that -- the other counts that he is not pleading guilty to will be held in abeyance, we'll put it that way, until we proceed with the sentencing.

Is that the plan?

MR. CLARKE:  I think that's the plan, Your Honor.

THE COURT:  Government?

MS. RANNEY:  Yes, Your Honor.

THE COURT:  All right.  So we'll hold in abeyance the dates that we have at the present time; and we can deal with those at a later point, depending on how all this works.

What I would be doing is getting the presentence

68

report date, and then we can set -- I tentatively would set a hearing date so that I can work it in with my trials.

So what's the presentence date?

THE COURTROOM DEPUTY:  August 19th.

MR. CLARKE:  I thought it was 120 days for PSRs now.

THE COURT:  Is it 120, Dorothy?

MR. CLARKE:  It's only 90.

THE COURTROOM DEPUTY:  That's 90 days.

THE COURT:  No.  Do 120.  This is going to be complicated enough, and I believe that they're backed up.

THE COURTROOM DEPUTY:  September 19.

THE COURT:  I'm sorry?  September?

THE COURTROOM DEPUTY:  September 19.

THE COURT:  Okay.

MS. RANNEY:  Your Honor, if I may.

We agree to holding the dates for the pretrial scheduling order in abeyance.

But we discussed before setting a second trial date for the remaining counts so that the government and the witnesses, who would potentially be called at the second trial, can at least hold the time on their calendar.  I believe we had thrown out early 2026, and there were some questions about Your Honor's availability in that period of time.

120

69

THE COURT:  I think that's correct.

I will put out language in terms of how we're going to be viewing the dates that we have -- that's we've already set.  I need to go back and look at them and see how we're going to set them out.  But the presentence report will be September 19th.

Let me set a hearing date for the sentencing and, then, we can do dates for memos and various other things.  I think we need to have the hearing so that we can actually figure out -- I would have them do the presentence report so we at least get everything up to date.

The base offense, which would have the tax loss -- they may have some issues coming up with that until I have the hearing.  But I still think we should -- instead of waiting for that, and then doing 120 days -- which doesn't make sense.  We'll proceed -- I will indicate that the offense -- and they can do a combination of things -- like I have, or not -- once we have the hearing, which would establish, presumably, the loss, which would inform the base offense.  The rest of it can be done fairly simply.  But they can get the rest of it done.  So that's why I'd go ahead and order the presentence report.

Let me look at the hearing date after that.

But, obviously, we're not going to trial on October 20th, I will put it that way, on the rest of the

121

70

counts.

Let me check with my law clerk about that.

(Whereupon, the Court and staff confer.)

THE COURT:  My law clerk is reminding me that January, at this point, is fully booked.  Although, I have to say my trial calendar is moving around.  I have gotten -- been assigned a couple of codefendant cases that will either take -- will take time to whittle down, or not.

I want to put a date for the hearing at least. And then I will take a look at the rest of the calendar and tentatively come up with a date, so we at least hold something just in case we wind up going to trial on the last counts.  Okay?  But at this point I can't tell you what it is.  I need to take a better look at where all of my other trials are.  But it's not going to be any earlier than in 2026; that's obvious.

Okay.  So let me get a date for the hearing.

Can I get some sense from you -- witnesses or, you know, what is this going to consist of, generally, so I can figure out on my calendar how much to block out, how much time I need?

I will try and pick something between trials.

MS. RANNEY:  Yes, Your Honor.  So since we already have a block held in your calendar in October at the moment, we were thinking --

71

THE COURT:  Do you want to do it then?

We can do it in October, if you want, what we have blocked out as the trial date.  That's October 20th, though.

MR. CLARKE:  I guess -- my question would just be: Is that enough time?

If we get the PSR on the 19th of September and then we -- presumably, you are going to want briefs on our relative positions on the related conduct and tax loss, and that; and then you are going to want to absorb that.

I am just thinking, practically, is that enough time?

THE COURT:  Okay.  I haven't had to do this before, in terms of --

MS. RANNEY:  I think we had a five-week block held.  Maybe we can do further in -- yeah, farther in --

THE COURT:  So you are doing it during the -- you are talking about when I've -- your trial was October 20th to, roughly, November 21st; so you want to do it during that period?

MR. CLARKE:  Towards the end -- maybe at the end of that would make --

THE COURT:  Okay.  So the end of October or the end of November?

MR. CLARKE:  At the end of that trial period would seem to make a little bit more sense for everybody.

123

72

MS. RANNEY:  Second week of November.

THE COURT:  Okay.  That's fine with me.

We can set -- what I would ask -- I won't set them today.  But what I would ask is that you give some consideration and discuss when you want to file -- when you will know enough to tell me what you want to file, and set dates for the relevant conduct.

In other words, I want you to think about when you want to do that before the hearing.  Okay?

I won't ask for dates now.  But once I put out my order, I would expect that -- I will ask for you to confer and figure out -- part of it is to figure out what arguments you want to make.  I know generally what they are but, also, what evidence, et cetera, is going to be put out.

But let's look at -- how about if we did it the last weekend -- October, or we can go into November.

What do you want to do?

MR. CLARKE:  I think if we take it into November it would be better, if that's fine.  I just -- these things always take more time than anybody thinks it might take.

THE COURT:  Okay.  How about if we did it the week of November 17th, picking a day there?

The week after that gets into Thanksgiving, so --

MR. CLARKE:  That sounds perfect to me.

THE COURT:  Let me just look at something.

124

73

Why don't we set it on Monday, November 17th, and I will put all day -- I will block it off all day, so I don't have to put something else in there.

Then, once you let me know if there are witnesses, or however we're going to do it -- if I need more time, I will block it in.  I will leave the trial date open for about another week or two before I start filling in.  Okay?

Does that work?

MR. CLARKE:  Sounds good.

THE COURT:  Okay.  The hearing itself will be November 17th, all day.  And then what we need is whatever memos are going to need to be filed, legal things, plus some idea of what you are going to be presenting as evidence so that I have -- I know, factually, how much time to really block out, and whether there are any legal decisions the Court has to make before the hearing, if there is something we need to resolve before we start.  Off the top of my head, I can't think of anything, but just in case.

Does that work?

So the presentence report is September 19th.  The hearing on what I will call "the relevant conduct," which gets to the loss, basically; and once we get that, the rest will fall into place fairly easily.  November 17th, all day.

We'll talk to the presentence report writer about the fact that when I put out -- request the presentence

125

74

report, that we're having a hearing about the loss; so that they'll be aware that there may be some finding that will make a difference for them in terms of their decision.  But they can do everything else, and get it ready.

Anything else, then, we need to address?

Government?

MS. RANNEY:  I don't think so.  But I will flag for you that one of the witnesses, in the government's mind, that would be key to some of these determinations -- his deposition has already been taken and is available by video and also on transcript.  So that might make it a little bit easier, you know, for the Court to view it ahead of time --

THE COURT:  Sure.

MS. RANNEY:  -- or request certain portions or rely on a transcript where, otherwise, we might be talking about the testimony.

THE COURT:  Anything that can be done to make the hearing shorter, sure.  That's not a problem.

MS. RANNEY:  So I think we might be able to do things outside of court a little more easily given those circumstances.

THE COURT:  Okay.  So my suggestion will be -- I will give you a couple of weeks, after today, to come back and tell me generally what your briefing schedule is; if there is material that can be provided earlier for the

75

hearing, in advance of the hearing; what material it is and when it is going to be provided; maybe do some sort of a joint status report; for the two of you to come up with some dates, and what -- if there are depositions, or whatever, that in advance we would need -- and that's fine -- in order to prepare for the hearing.

MR. CLARKE:  Sounds good.

THE COURT:  All right.  Anything else?

I don't think so.

MS. RANNEY:  Court's indulgence, Your Honor.

THE COURT:  Maybe there is.

MR. CLARKE:  We have one other thing on our side, Your Honor.

THE COURT:  Okay.

MR. CLARKE:  And that's just timing for this motion for release.  We are planning on filing it Friday, this Friday.  I will wait until the government finishes speaking.

My understanding is that the government needed a week -- or asked for a week for that, to respond to the motion to release.  So if we file it on Friday, they respond the next Friday.  And so the question is:  How much time Your Honor would need to look at that?

June 4th, we had previously a status report that, I think, I asked us to move; but we could do that June 4th.

76

THE COURT:  Okay.  So hold on.

You are going to file on the 23rd?

MR. CLARKE:  That's -- yes.

THE COURT:  Okay.  You are filing on May 30th?

MR. CLARKE:  Yes.

THE COURT:  Okay.  And then if you want to respond --

MR. CLARKE:  We'll respond, like, on that Monday or over the weekend.  We will flip a response super fast.

THE COURT:  All right.  So, say, June 2nd.

I am trying to remember whether we set a date to come back.

MR. CLARKE:  Well, we had a status report date of June 4th.  And somebody wanted --

THE COURT:  Okay.

MR. CLARKE:  -- and I had asked to move that because somebody wanted me, and now they don't want me on that date.  June 4th would still work for me, but if there's a different date --

THE COURT:  Well, that may cut it short.

MR. CLARKE:  I understand.  So --

THE COURT:  My suggestion is that I take a look at it once you file it, and then I can either set a hearing or not.

MR. CLARKE:  Sounds great.

128

77

THE COURT:  Okay?

MR. CLARKE:  Sounds good.

THE COURT:  Okay.  Anything else?

MS. RANNEY:  One last thing, Your Honor.

We would just like to ask to -- move to exclude the time on the remaining counts.  I believe they had already been excluded up through the first day of trial. We'd just ask to exclude them, on the same basis, through November 17th.

THE COURT:  In other words, to the November 17th date you are, basically, talking about?

MS. RANNEY:  Correct.  On the remaining counts in the indictment.

THE COURT:  Okay.

So on the remaining counts -- Mr. Edelman, do you remember your speedy trial rights?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So are you willing not to count from today's date, which is May 21st, until we come back for this hearing on the sentencing November 17th, in order to prepare -- to move to the -- resolve some issues for the sentencing?

THE DEFENDANT:  That's fine, yes.

THE COURT:  All right.  Then I'll find it's in the interest of justice and the community to continue

78

Mr. Edelman's speedy trial rights between May 21st and November 17th.

All right.  I think that's it.

All right.  The parties are excused.  Everybody take care.  Be well.

MR. CLARKE:  Thank you.

THE COURT:  I will take a look and see if there is anything else that needs to be addressed that we have not, in terms of the minute entry relating to the proceedings.

The parties are excused.

(Whereupon, the proceeding concludes, 4:33 p.m.)

* * * * *

**CERTIFICATE**

I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 22nd day of May, 2025.

/s/ Elizabeth Davila, RPR, FCRR
Official Court Reporter

1

**$**

**$1,450,000** [1] - 56:24
**$100** [3] - 45:19, 46:16, 46:20
**$100,000** [1] - 56:19
**$128** [1] - 52:7
**$250,000** [2] - 45:18, 46:25

**/**

**/s** [1] - 78:21

**1**

**1** [21] - 7:16, 8:7, 11:1, 17:6, 20:23, 21:9, 23:4, 24:11, 24:17, 25:15, 28:8, 28:17, 32:21, 33:4, 35:8, 45:16, 49:10, 50:7, 57:20, 65:21, 67:3
**1.5** [1] - 54:19
**10** [8] - 7:24, 8:11, 11:1, 46:17, 49:10, 50:7, 66:7, 67:7
**100,000** [2] - 25:15, 46:19
**1001** [5] - 7:21, 7:24, 35:10, 38:8, 38:14
**1010.306(c** [1] - 8:5
**1010.350** [1] - 8:5
**1010.840(b)** [1] - 8:6
**1040** [3] - 25:21, 25:22, 25:24
**11** [4] - 7:25, 8:13, 17:21, 32:3
**12** [1] - 11:21
**120** [4] - 68:5, 68:7, 68:10, 69:15
**128** [5] - 53:14, 54:24, 55:17, 58:16, 61:9
**135** [2] - 59:16, 61:2
**14** [1] - 14:1
**15** [3] - 52:15, 53:11, 54:19
**151** [1] - 53:8
**168** [2] - 59:16, 61:2
**16th** [1] - 37:15
**17th** [8] - 72:22, 73:1, 73:11, 73:23, 77:9, 77:10, 77:20, 78:2
**18** [4] - 7:19, 7:21, 7:23, 8:1
**180** [1] - 53:11
**188** [3] - 53:8, 53:9, 56:11
**19** [3] - 8:2, 68:12, 68:14

**19th** [4] - 68:4, 69:6, 71:6, 73:20

**2**

**2** [22] - 7:20, 8:8, 11:1, 24:7, 24:12, 24:17, 33:4, 35:9, 46:13, 49:24, 52:25, 53:1, 54:9, 54:18, 56:10, 59:9, 60:8, 61:6, 65:25, 67:4
**20006-4078** [1] - 1:17
**2000s** [1] - 17:19
**2001** [1] - 17:21
**2003** [2] - 19:3, 19:22
**2004** [1] - 19:25
**2005** [1] - 20:9
**2006** [11] - 7:24, 8:12, 26:16, 28:3, 29:4, 42:7, 42:18, 42:23, 43:4, 66:8, 67:8
**2007** [8] - 25:12, 25:14, 25:22, 26:5, 28:18, 30:1, 43:9, 58:22
**2008** [5] - 20:6, 20:22, 21:10, 21:13, 26:6
**2009** [2] - 21:10, 26:6
**2010** [5] - 22:2, 22:4, 23:2, 23:10, 26:7
**2011** [2] - 23:10, 26:7
**2012** [11] - 7:25, 8:12, 23:23, 26:8, 28:3, 29:4, 30:1, 43:9, 58:22, 66:9, 67:8
**2013** [5] - 8:1, 26:23, 27:1, 50:4, 50:10
**2014** [5] - 25:12, 25:14, 25:23, 27:2, 28:18
**2015** [3] - 17:10, 24:6, 27:3
**2016** [17] - 7:21, 8:9, 25:8, 25:19, 25:23, 27:4, 35:10, 36:20, 36:23, 36:24, 37:4, 37:15, 38:9, 38:14, 66:1, 67:5
**2017** [1] - 27:5
**2018** [7] - 7:23, 8:11, 27:6, 28:13, 39:23, 66:4, 67:6
**2019** [1] - 27:7
**202** [2] - 1:13, 1:18
**2020** [7] - 8:1, 26:23, 27:8, 28:21, 34:14, 50:4, 50:10
**2025** [2] - 1:4, 78:20
**2026** [2] - 68:23, 70:16

**20579** [1] - 1:12
**20th** [3] - 69:25, 71:3, 71:17
**21** [1] - 1:4
**21st** [3] - 71:18, 77:19, 78:1
**22nd** [1] - 78:20
**235** [5] - 53:9, 54:12, 56:10, 56:11, 61:3
**23rd** [1] - 76:2
**24-239** [1] - 1:3
**24-239-1** [1] - 2:2
**247,345** [1] - 27:7
**25** [5] - 30:8, 59:1, 59:5, 59:20, 61:1
**250,000** [4] - 46:15, 54:17, 56:20, 57:15
**26** [4] - 7:25, 8:2, 30:9, 41:25
**277,411** [1] - 27:5
**28** [4] - 52:3, 52:25, 59:6, 59:14
**293** [3] - 54:12, 56:10, 61:3
**296,475** [1] - 27:3
**298,306** [1] - 27:6
**298,734** [1] - 27:4
**2:35** [1] - 1:4
**2nd** [1] - 76:10
**2T1.1** [3] - 49:16, 49:17, 50:7
**2T4.1** [1] - 50:20

**3**

**3** [9] - 7:21, 8:9, 11:1, 18:14, 33:4, 46:13, 54:19, 66:3, 67:5
**3-point** [1] - 59:12
**30** [8] - 8:3, 8:14, 52:4, 53:3, 54:3, 54:9, 55:18, 56:7
**30th** [1] - 76:4
**31** [2] - 8:4, 8:5
**33** [2] - 59:13, 61:2
**34** [2] - 52:24, 53:8
**3553(a** [1] - 47:15
**36** [2] - 53:2, 53:8
**371** [3] - 7:20, 30:20, 32:22
**38** [4] - 54:8, 54:12, 56:7, 61:3

**4**

**4** [12] - 7:24, 8:11, 11:1, 28:9, 33:4, 34:15, 46:17, 53:1, 54:10, 59:10, 66:7, 67:7

**450** [1] - 57:20
**455,508** [1] - 27:8
**473,447** [1] - 26:6
**48** [1] - 9:16
**4:33** [1] - 78:11
**4th** [4] - 75:24, 75:25, 76:14, 76:18

**5**

**5** [1] - 56:13
**50** [6] - 22:20, 24:13, 26:1, 26:11, 43:19, 43:25
**50/50** [1] - 20:1
**500,000** [1] - 54:18
**514-5616** [1] - 1:13
**5314** [1] - 8:4
**5322(b** [1] - 8:4
**54** [1] - 63:19
**57** [2] - 59:21, 61:1
**584,715** [1] - 26:8

**6**

**6** [2] - 42:9, 54:20
**6,486,356** [1] - 26:17
**600** [1] - 56:14
**601** [1] - 1:12
**611,287** [1] - 27:2
**661,400** [1] - 26:7
**693,536** [1] - 26:7

**7**

**70** [1] - 9:2
**71** [2] - 59:21, 61:2
**7201** [3] - 7:25, 8:2, 41:25
**73** [3] - 9:1, 9:3, 9:4
**752,443** [1] - 27:1
**764,144** [1] - 26:8
**777,468** [1] - 26:6
**7814** [1] - 1:12

**8**

**8** [1] - 56:8
**8.25** [1] - 54:21
**815** [1] - 1:17
**835-6184** [1] - 1:18

**9**

**90** [2] - 68:8, 68:9

**A**

**abeyance** [3] - 67:15, 67:21, 68:18

**ability** [2] - 38:25, 78:16
**able** [3] - 43:22, 64:6, 74:19
**abroad** [1] - 17:12
**absorb** [1] - 71:9
**abuse** [1] - 48:3
**accept** [10] - 5:5, 13:6, 14:10, 32:9, 32:12, 58:4, 60:25, 63:24, 65:1, 67:2
**acceptance** [10] - 15:7, 52:14, 53:2, 54:6, 55:23, 56:3, 56:8, 59:12, 59:15, 61:21
**accepting** [1] - 2:18
**according** [2] - 52:6, 62:25
**account** [8] - 8:3, 21:1, 21:11, 21:18, 21:20, 21:22, 23:7
**accountant** [1] - 20:23
**accounts** [13] - 20:11, 21:2, 21:3, 21:5, 21:9, 21:17, 21:23, 29:21, 29:25, 33:15, 33:16, 33:17, 44:11
**accurate** [4] - 8:15, 14:25, 30:24, 78:14
**accurately** [1] - 53:15
**acknowledged** [19] - 34:2, 34:13, 34:24, 36:13, 38:22, 39:6, 39:13, 40:4, 40:19, 41:7, 41:18, 42:6, 42:11, 42:19, 43:2, 43:23, 44:6, 44:9, 44:16
**acknowledgment** [1] - 33:2
**act** [5] - 31:16, 34:12, 42:18, 44:5, 44:7
**acting** [1] - 66:24
**Action** [1] - 1:2
**actions** [3] - 33:3, 33:5, 34:15
**activity** [1] - 20:24
**acts** [1] - 44:8
**add** [2] - 30:19, 52:12
**added** [2] - 45:20, 61:7
**adding** [3] - 19:17, 52:9, 56:7
**addition** [4] - 31:15, 56:25, 60:9, 61:7
**additional** [5] - 19:17, 30:19, 31:3, 44:8, 53:3
**address** [1] - 74:5

131

2

**addressed** [1] - 78:8
**adequate** [1] - 66:25
**adjusted** [6] - 52:24, 53:8, 56:7, 59:13, 59:19, 61:1
**adjustments** [1] - 59:13
**admission** [1] - 15:6
**admitted** [1] - 5:20
**advance** [2] - 75:1, 75:5
**advised** [1] - 25:4
**advisors** [2] - 24:16, 25:3
**advisory** [5] - 6:2, 46:1, 48:8, 62:12, 62:22
**Affairs** [1] - 22:6
**affect** [3] - 9:23, 11:19, 66:18
**afford** [1] - 12:6
**Afghan** [1] - 41:13
**Afghanistan** [3] - 17:22, 19:10, 28:7
**afternoon** [6] - 2:6, 2:8, 2:9, 2:12, 2:13, 2:14
**agencies** [1] - 40:16
**agency** [5] - 18:18, 33:11, 35:15, 39:5, 41:7
**Agency** [1] - 18:20
**agent** [2] - 28:15, 41:8
**agents** [1] - 41:11
**ago** [1] - 10:1
**agree** [69] - 4:4, 6:6, 6:18, 15:6, 15:16, 15:19, 16:18, 16:19, 17:15, 18:1, 18:8, 18:24, 19:11, 19:15, 20:3, 20:13, 20:20, 21:6, 21:24, 22:12, 22:25, 23:8, 23:17, 24:4, 24:21, 25:6, 25:17, 26:13, 26:20, 27:12, 28:11, 28:19, 29:2, 29:7, 29:16, 30:2, 30:6, 31:19, 32:10, 33:7, 33:23, 34:9, 34:19, 35:5, 36:21, 37:2, 37:3, 38:17, 39:2, 39:9, 39:19, 40:9, 40:18, 41:3, 41:14, 41:22, 42:15, 42:24, 43:7, 44:2, 44:13, 44:25, 49:11, 49:15, 50:21, 51:2, 57:23, 68:17
**agreed** [15] - 4:18, 5:19, 14:24, 15:5,

15:14, 30:6, 38:7, 38:13, 43:13, 43:17, 45:6, 52:5, 52:8, 52:13, 55:24
**agreeing** [1] - 53:22
**agreement** [15] - 2:17, 2:25, 4:1, 5:2, 5:3, 16:4, 31:7, 31:12, 32:25, 33:1, 33:9, 52:23, 55:6, 57:6, 57:11
**agrees** [5] - 15:22, 16:2, 16:7, 16:8, 16:17
**ahead** [12] - 3:9, 15:12, 16:10, 19:21, 22:3, 28:1, 40:22, 40:24, 45:8, 67:11, 69:22, 74:12
**aided** [1] - 1:25
**Air** [3] - 17:23, 19:10, 28:6
**air** [1] - 55:25
**allegations** [1] - 22:7
**alleges** [1] - 51:24
**allocutions** [1] - 8:21
**AMERICA** [1] - 1:2
**ammunition** [3] - 64:3, 64:4, 64:7
**amnesty** [1] - 24:24
**amount** [13] - 6:4, 26:1, 42:12, 42:14, 43:13, 49:19, 52:5, 53:13, 54:3, 57:2, 60:11, 60:12, 61:9
**amounting** [1] - 36:17
**amounts** [2] - 26:3, 26:24
**answer** [3] - 6:23, 7:10, 15:11
**answering** [1] - 3:11
**apologies** [3] - 36:23, 37:23, 47:4
**apologize** [1] - 46:23
**appeal** [6] - 13:14, 13:16, 13:18, 13:22, 14:2, 14:5
**Appeals** [2] - 13:14, 63:1
**appear** [1] - 62:6
**APPEARANCES** [1] - 1:8
**applicable** [1] - 49:16
**apply** [5] - 11:24, 51:6, 59:19, 62:19, 63:3
**appointed** [1] - 12:7
**appreciate** [1] - 4:23
**approach** [1] - 50:22
**appropriate** [2] - 8:23, 56:1

**April** [1] - 21:13
**argue** [6] - 52:7, 54:2, 55:15, 55:19, 58:14, 61:6
**argued** [3] - 52:20, 54:8, 56:1
**argues** [1] - 59:7
**arguing** [1] - 61:8
**argument** [3] - 53:21, 57:24, 58:23
**arguments** [9] - 55:7, 55:14, 58:4, 58:7, 58:18, 59:2, 61:16, 61:17, 72:12
**arms** [2] - 44:11, 44:22
**arrest** [1] - 64:19
**ascertainment** [1] - 29:12
**Aspen** [2] - 19:5, 20:10
**aspirin** [2] - 9:18, 9:23
**asserting** [1] - 13:2
**assessment** [4] - 29:12, 45:19, 46:16, 46:20
**assets** [8] - 24:14, 24:25, 29:20, 29:24, 32:4, 33:18, 50:12, 50:16
**assigned** [1] - 70:7
**assistance** [2] - 21:8, 23:4
**Assistant** [1] - 1:11
**associated** [3] - 55:16, 58:15, 58:25
**assume** [4] - 50:24, 58:25, 59:7, 59:11
**assuming** [3] - 10:4, 59:17, 66:19
**attacks** [1] - 17:20
**attempt** [2] - 42:3, 42:4
**attempted** [1] - 28:22
**attorney** [2] - 10:15, 12:10
**Attorneys** [1] - 1:11
**attorneys** [18] - 10:12, 22:18, 24:8, 24:12, 25:3, 25:9, 25:20, 28:14, 29:23, 35:1, 36:16, 39:17, 40:1, 40:7, 41:20, 43:15, 44:20, 64:17
**August** [1] - 68:4
**authorities** [3] - 21:2, 29:19, 29:22
**authorization** [2] - 1:23, 78:18
**availability** [1] - 68:24
**available** [2] - 4:24,

74:10
**Avenue** [1] - 1:17
**avoid** [1] - 29:21
**award** [2] - 56:25, 60:9
**aware** [6] - 6:1, 6:11, 16:20, 45:23, 47:8, 74:2

## B

**baby** [1] - 9:18
**backdated** [2] - 23:5, 34:4
**backed** [1] - 68:11
**background** [3] - 5:12, 8:24, 47:25
**Baer** [3] - 21:11, 21:18, 23:7
**Bagram** [1] - 19:10
**Baker** [1] - 1:16
**balance** [1] - 21:1
**bank** [7] - 8:3, 20:6, 20:11, 23:7, 33:15, 33:17, 44:10
**Bank** [2] - 21:11, 23:7
**banks** [3] - 20:11, 20:25, 29:23
**Bartol** [2] - 19:5, 20:11
**base** [19] - 2:23, 49:3, 49:18, 50:6, 50:19, 51:10, 51:12, 52:3, 52:11, 52:25, 53:2, 53:4, 54:3, 55:17, 59:5, 59:14, 61:19, 69:12, 69:19
**Base** [3] - 17:23, 19:10, 28:6
**based** [12] - 11:22, 13:2, 25:2, 27:15, 43:14, 48:21, 55:14, 56:3, 56:5, 61:15, 61:17, 62:5
**basic** [3] - 9:11, 10:19, 11:13
**basis** [3] - 16:9, 66:25, 77:8
**became** [2] - 20:8, 22:10
**BEFORE** [1] - 1:7
**began** [1] - 22:7
**begin** [2] - 30:17, 32:3
**beginning** [2] - 43:4, 44:19
**behalf** [4] - 12:21, 24:9, 25:9, 25:21
**belonged** [1] - 21:3
**below** [3] - 3:18, 54:15, 78:18
**beneficial** [3] - 20:7, 21:4, 21:23

**beneficiaries** [2] - 21:15, 21:19
**best** [2] - 59:22, 78:15
**best-case** [1] - 59:22
**better** [2] - 70:14, 72:19
**between** [4] - 20:1, 25:15, 70:22, 78:1
**beyond** [3] - 12:1, 13:8, 45:5
**biases** [1] - 11:19
**bid** [1] - 18:17
**big** [1] - 61:18
**bigger** [1] - 6:2
**biggest** [1] - 49:3
**birth** [1] - 9:5
**Bishkek** [1] - 17:20
**Bishop** [1] - 2:10
**BISHOP** [1] - 1:16
**bit** [3] - 19:2, 71:25, 74:11
**block** [6] - 70:20, 70:24, 71:14, 73:2, 73:6, 73:15
**blocked** [1] - 71:3
**booked** [1] - 70:5
**born** [1] - 9:14
**bottom** [3] - 58:10, 61:16, 62:7
**briefing** [1] - 74:24
**briefs** [1] - 71:7
**bring** [2] - 3:4, 62:14
**broad** [2] - 47:15, 47:22
**brought** [2] - 6:14, 66:20
**burden** [1] - 13:8
**Bureau** [1] - 63:16
**business** [4] - 18:17, 23:16, 27:11, 28:8
**businesses** [1] - 20:17
**but..** [1] - 57:25
**button** [1] - 3:18

## C

**C.F.R** [1] - 8:5
**CAITLYN** [1] - 1:10
**calculating** [2] - 49:21, 56:22
**calculation** [2] - 50:18, 63:1
**calculations** [2] - 48:20, 62:17
**calendar** [5] - 68:22, 70:6, 70:10, 70:20, 70:24
**California** [1] - 9:15
**Canadian** [2] - 18:22,

3

19:14
**cannot** [1] - 13:9
**capable** [1] - 66:14
**care** [2] - 35:7, 78:5
**carries** [1] - 56:20
**carry** [1] - 56:19
**Case** [1] - 2:2
**case** [15] - 10:12, 10:15, 10:21, 11:17, 11:18, 12:1, 14:16, 14:18, 30:23, 43:21, 49:2, 53:19, 59:22, 70:12, 73:18
**cases** [3] - 31:17, 70:7
**categories** [2] - 30:11, 61:21
**Category** [5] - 53:6, 54:11, 56:10, 59:16, 59:20
**caused** [15] - 22:17, 23:3, 23:4, 23:15, 25:8, 25:19, 28:14, 29:13, 35:11, 36:12, 36:18, 39:16, 39:24, 40:7, 43:5
**causing** [4] - 33:19, 35:16, 39:11, 41:17
**Center** [1] - 18:19
**certain** [10] - 2:17, 3:24, 10:16, 13:22, 32:4, 45:22, 49:15, 52:8, 58:4, 74:14
**certainly** [4] - 11:11, 16:25, 23:19, 30:16
**CERTIFICATE** [1] - 78:13
**certificate** [1] - 78:17
**certify** [2] - 23:15, 78:14
**cetera** [2] - 3:24, 72:14
**challenge** [1] - 48:20
**change** [3] - 28:22, 48:21, 48:22
**changed** [1] - 7:4
**changes** [1] - 34:15
**charged** [1] - 5:9
**charges** [3] - 7:14, 10:6, 10:9
**check** [1] - 70:2
**children** [1] - 21:19
**chosen** [1] - 10:16
**Circuit** [1] - 31:17
**circumstances** [4] - 13:23, 34:3, 56:5, 74:21
**citizen** [2] - 17:8, 22:23
**citizens** [2] - 11:14, 17:12
**civil** [1] - 63:25

**claimed** [1] - 40:2
**claiming** [1] - 28:15
**clarification** [1] - 6:16
**clarify** [2] - 37:16, 37:17
**Clarke** [1] - 2:10
**CLARKE** [37] - 1:15, 2:9, 4:6, 4:9, 4:14, 4:17, 16:2, 16:6, 27:14, 27:19, 27:23, 27:25, 37:12, 37:18, 58:1, 66:22, 67:18, 68:5, 68:8, 71:4, 71:20, 71:24, 72:18, 72:24, 73:9, 75:7, 75:12, 75:15, 76:3, 76:5, 76:8, 76:13, 76:16, 76:21, 76:25, 77:2, 78:6
**clear** [7] - 9:20, 19:19, 27:14, 31:23, 57:7, 62:9, 65:19
**clerk** [2] - 70:2, 70:4
**close** [1] - 20:25
**closed** [1] - 21:9
**closing** [1] - 29:21
**closure** [1] - 21:16
**co** [5] - 28:22, 33:3, 36:15, 43:15, 44:20
**Co** [12] - 20:23, 21:9, 23:4, 24:7, 24:11, 24:12, 24:17, 28:8, 28:9, 33:4, 34:15
**Co-Conspirator** [12] - 20:23, 21:9, 23:4, 24:7, 24:11, 24:12, 24:17, 28:8, 28:9, 33:4, 34:15
**co-conspirators** [5] - 28:22, 33:3, 36:15, 43:15, 44:20
**codefendant** [1] - 70:7
**coerced** [1] - 64:23
**cofounded** [1] - 28:16
**collection** [1] - 29:12
**collectively** [1] - 19:25
**COLLEEN** [1] - 1:7
**college** [1] - 9:9
**COLLOQUY** [1] - 1:6
**Columbia** [1] - 11:15
**COLUMBIA** [1] - 1:1
**combat** [1] - 18:17
**combination** [2] - 46:1, 69:17
**combined** [1] - 31:14
**comfortable** [1] - 3:11
**coming** [1] - 69:13
**commission** [1] - 48:11
**commit** [1] - 45:24

**Committee** [1] - 22:5
**common** [1] - 49:23
**community** [2] - 45:22, 77:25
**companies** [4] - 3:24, 4:1, 4:5, 4:19
**company** [3] - 18:22, 19:14, 19:23
**company's** [1] - 23:14
**competent** [3] - 66:14, 66:16, 66:18
**complete** [1] - 78:15
**completed** [1] - 50:14
**completely** [1] - 10:11
**complicated** [3] - 49:2, 62:1, 68:11
**compute** [1] - 38:25
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**conceal** [7] - 29:10, 29:20, 33:13, 35:4, 42:22, 43:6, 44:22
**concealed** [1] - 28:4
**concepts** [1] - 47:22
**concludes** [1] - 78:11
**condition** [2] - 48:1, 48:2
**conditions** [2] - 45:22, 45:23
**conduct** [13] - 5:20, 32:10, 32:11, 45:6, 49:22, 49:23, 50:1, 50:4, 50:5, 61:19, 71:8, 72:7, 73:21
**confer** [3] - 37:22, 70:3, 72:11
**confront** [1] - 12:10
**Congress** [4] - 34:8, 42:21, 45:13, 48:11
**congressional** [1] - 23:22
**Connecticut** [1] - 1:17
**connection** [1] - 22:8
**connections** [1] - 18:15
**consequence** [1] - 63:23
**consequences** [5] - 5:24, 6:14, 45:11, 63:12, 66:24
**consider** [3] - 47:16, 48:4, 63:2
**consideration** [1] - 72:5
**considerations** [3] - 2:24, 6:7, 47:19
**considered** [6] - 1:22, 48:8, 49:22, 51:14, 64:5, 78:17

**considering** [1] - 12:20
**considers** [2] - 49:4, 49:25
**consist** [1] - 70:19
**conspiracy** [10] - 7:16, 8:7, 28:2, 30:12, 32:22, 34:12, 45:16, 51:23, 65:22, 67:3
**Conspirator** [12] - 20:23, 21:9, 23:4, 24:7, 24:11, 24:12, 24:17, 28:8, 28:9, 33:4, 34:15
**conspirators** [5] - 28:22, 33:3, 36:15, 43:15, 44:20
**constitutes** [2] - 44:7, 78:14
**constitutional** [3] - 5:16, 10:20, 13:2
**consult** [1] - 3:15
**consultant** [2] - 25:13, 28:18
**consulting** [4] - 25:5, 26:4, 26:23, 31:20
**contact** [2] - 28:13, 64:18
**context** [1] - 35:19
**contexts** [1] - 35:21
**continue** [2] - 9:12, 77:25
**continued** [2] - 19:8, 23:23
**contract** [2] - 18:17, 18:21
**contractors** [1] - 28:6
**contracts** [3] - 19:9, 22:8, 23:11
**contrary** [1] - 13:24
**contributed** [2] - 50:13, 50:16
**contribution** [2] - 50:14, 50:15
**control** [1] - 52:17
**controlled** [1] - 21:20
**convicted** [3] - 13:9, 13:13, 54:7
**conviction** [2] - 13:14, 13:19
**convictions** [1] - 53:7
**convinced** [1] - 24:23
**copy** [3] - 10:5, 16:7, 48:17
**Corp** [1] - 19:22
**Corporation** [1] - 19:5
**correct** [17] - 4:4, 4:5, 4:20, 15:1, 15:18, 16:1, 16:3, 16:8, 27:23, 35:25, 37:5,

51:17, 59:2, 66:21, 66:22, 69:1, 77:12
**correspond** [1] - 59:5
**corresponding** [2] - 52:3, 54:2
**corresponds** [1] - 55:17
**corroborate** [2] - 23:5, 34:7
**corruption** [1] - 22:8
**cosigned** [1] - 25:24
**cost** [2] - 14:4, 14:5
**costs** [1] - 19:7
**cough** [1] - 37:9
**counsel** [9] - 2:4, 8:19, 10:9, 11:16, 31:20, 37:22, 60:14, 62:6, 66:19
**Count** [16] - 7:16, 7:20, 7:21, 8:7, 8:8, 8:9, 32:21, 35:8, 35:9, 45:16, 65:21, 65:25, 66:3, 67:3, 67:4, 67:5
**count** [11] - 32:20, 36:8, 39:22, 43:10, 49:13, 51:23, 51:25, 57:15, 67:7, 77:18
**counts** [49] - 5:9, 5:11, 5:22, 10:16, 10:17, 10:25, 12:19, 13:6, 14:10, 14:12, 14:17, 15:15, 15:17, 15:20, 32:9, 41:24, 42:5, 44:1, 44:16, 44:24, 45:4, 45:7, 49:8, 49:12, 50:5, 54:1, 54:7, 54:18, 54:19, 54:20, 56:12, 56:18, 56:20, 57:16, 59:24, 64:16, 65:2, 65:10, 65:13, 65:14, 66:9, 67:1, 67:14, 68:20, 70:1, 70:13, 77:6, 77:12, 77:15
**Counts** [9] - 7:24, 7:25, 8:2, 8:11, 8:13, 46:13, 46:17, 50:7, 66:7
**couple** [5] - 6:13, 8:24, 31:16, 70:7, 74:23
**course** [1] - 49:23
**court** [5] - 3:23, 13:15, 19:2, 38:12, 74:20
**COURT** [219] - 1:1, 1:7, 2:8, 2:12, 2:15, 3:8, 3:13, 3:21, 4:8, 4:13, 4:15, 4:18, 5:15, 7:1, 7:8, 7:14,

4

8:17, 9:2, 9:4, 9:7, 9:10, 9:14, 9:16, 9:19, 9:22, 10:4, 10:8, 10:11, 10:14, 10:19, 11:4, 11:10, 11:13, 12:4, 12:9, 12:13, 12:18, 13:5, 13:12, 13:18, 14:4, 14:9, 14:15, 14:20, 15:8, 15:12, 15:21, 16:5, 16:10, 16:15, 17:2, 17:5, 17:15, 17:18, 18:1, 18:5, 18:7, 18:11, 18:14, 18:24, 19:1, 19:11, 19:16, 19:21, 20:3, 20:13, 20:15, 20:20, 21:6, 21:24, 22:12, 22:25, 23:8, 23:17, 23:19, 23:21, 24:4, 24:21, 25:6, 25:17, 26:13, 26:20, 27:12, 27:18, 27:21, 27:24, 28:1, 28:11, 28:19, 29:2, 29:7, 29:16, 30:2, 30:4, 30:22, 31:1, 31:5, 31:9, 31:18, 31:22, 31:24, 32:14, 32:20, 32:22, 33:7, 33:23, 34:9, 34:19, 34:21, 35:5, 35:7, 35:18, 35:23, 36:1, 36:4, 36:6, 36:10, 36:21, 36:25, 37:3, 37:7, 37:21, 37:24, 38:5, 38:10, 38:16, 38:19, 39:2, 39:9, 39:19, 40:9, 40:18, 40:20, 40:22, 40:24, 41:3, 41:14, 41:22, 42:15, 42:24, 43:7, 44:2, 44:13, 44:25, 45:2, 46:22, 47:1, 47:3, 47:5, 47:10, 47:13, 49:1, 51:4, 51:6, 53:18, 53:25, 55:2, 57:8, 57:20, 57:23, 58:3, 59:4, 59:24, 60:5, 60:16, 60:18, 60:23, 61:13, 62:10, 63:11, 64:14, 64:22, 64:25, 65:4, 65:9, 65:12, 65:16, 65:20, 65:25, 66:3, 66:7, 66:12, 66:23, 67:19, 67:21, 68:7, 68:10, 68:13, 68:15, 69:1, 70:4, 71:1, 71:12, 71:16, 71:22, 72:2, 72:21, 72:25, 73:10, 74:13,

74:17, 74:22, 75:8, 75:11, 75:14, 76:1, 76:4, 76:6, 76:10, 76:15, 76:20, 76:22, 77:1, 77:3, 77:10, 77:14, 77:18, 77:24, 78:7
**Court** [24] - 1:20, 1:21, 11:16, 11:24, 13:14, 30:20, 32:7, 33:2, 45:14, 45:20, 45:24, 47:16, 48:4, 49:25, 51:6, 59:8, 62:3, 62:19, 62:23, 62:25, 70:3, 73:16, 74:12, 78:21
**Court's** [2] - 66:18, 75:10
**courtroom** [2] - 11:15, 11:23
**COURTROOM** [5] - 2:2, 68:4, 68:9, 68:12, 68:14
**courts** [1] - 63:7
**cover** [2] - 57:9, 66:8
**covers** [3] - 28:1, 45:2, 53:18
**created** [2] - 19:22, 21:13
**creating** [2] - 29:20, 44:12
**creation** [2] - 23:5, 34:4
**creator** [7] - 24:13, 40:3, 40:6, 41:18, 41:21, 43:3, 44:18
**credit** [1] - 46:3
**Credit** [5] - 20:11, 20:22, 21:1, 21:9, 21:16
**credited** [1] - 46:6
**credits** [1] - 63:17
**crime** [1] - 45:24
**crimes** [2] - 45:13, 55:16
**Criminal** [7] - 1:2, 2:2, 53:6, 54:10, 56:9, 59:15, 59:20
**criminal** [1] - 48:1
**cross** [1] - 12:11
**cross-examine** [1] - 12:11
**cut** [1] - 76:20

## D

**D.C** [4] - 1:5, 22:18, 30:23, 31:17
**Dain** [13] - 21:14, 22:19, 22:23, 23:16,

24:13, 24:20, 25:4, 25:10, 25:24, 33:5, 33:19, 36:18, 40:2
**Dain's** [1] - 23:6
**database** [2] - 28:23, 34:16
**date** [24] - 9:5, 10:22, 11:2, 37:3, 37:13, 67:12, 68:1, 68:2, 68:3, 68:20, 69:7, 69:11, 69:23, 70:9, 70:11, 70:17, 71:3, 73:6, 76:11, 76:13, 76:18, 76:19, 77:11, 77:19
**Dated** [1] - 78:20
**dates** [9] - 10:23, 67:10, 67:22, 68:17, 69:3, 69:8, 72:7, 72:10, 75:4
**daughters** [1] - 21:14
**Davila** [2] - 1:20, 78:21
**DAVILA** [1] - 78:14
**days** [7] - 9:11, 14:1, 18:3, 63:19, 68:5, 68:9, 69:15
**DC** [2] - 1:12, 1:17
**deal** [2] - 38:5, 67:22
**deceitful** [4] - 31:4, 31:5, 31:15, 34:1
**December** [1] - 21:10
**decide** [4] - 11:25, 59:11, 59:18, 60:12
**decided** [2] - 5:10, 7:6
**deciding** [1] - 58:25
**decision** [3] - 51:19, 66:14, 74:3
**decisions** [4] - 51:2, 58:7, 65:6, 73:15
**decline** [1] - 51:19
**deduction** [5] - 52:13, 52:15, 54:5, 56:2, 56:8
**defeat** [1] - 42:3
**defect** [1] - 13:21
**defendant** [11] - 3:7, 17:8, 31:7, 32:19, 33:1, 35:11, 36:12, 39:24, 42:2, 42:18, 57:16
**Defendant** [1] - 1:5
**DEFENDANT** [122] - 1:15, 2:14, 3:12, 3:20, 5:14, 6:25, 7:7, 7:13, 8:16, 9:1, 9:3, 9:6, 9:9, 9:11, 9:15, 9:18, 9:21, 10:1, 10:7, 10:10, 10:13, 10:18, 11:3, 11:9, 11:12, 12:3, 12:8,

12:12, 12:17, 13:4, 13:11, 13:17, 14:3, 14:8, 14:14, 14:19, 17:17, 18:2, 18:6, 18:10, 18:13, 18:25, 19:12, 19:19, 20:4, 20:14, 20:19, 20:21, 21:7, 21:25, 22:3, 22:13, 23:1, 23:9, 23:18, 23:20, 24:5, 24:22, 25:7, 25:18, 26:14, 26:21, 27:13, 28:12, 28:20, 29:3, 29:8, 29:17, 30:3, 31:21, 33:8, 33:24, 34:10, 34:20, 35:6, 36:22, 37:6, 38:18, 39:3, 39:10, 39:20, 40:10, 41:4, 41:15, 41:23, 42:16, 42:25, 43:8, 44:3, 44:14, 45:1, 47:9, 47:12, 48:25, 51:3, 53:24, 55:1, 57:7, 58:2, 59:3, 59:23, 60:4, 60:15, 60:17, 60:22, 61:12, 62:8, 63:10, 64:13, 64:21, 64:24, 65:3, 65:8, 65:11, 65:15, 65:18, 65:24, 66:2, 66:6, 66:11, 77:17, 77:23
**defendants** [1] - 47:19
**Defense** [5] - 18:18, 18:19, 22:9, 23:12
**defense** [7] - 5:18, 12:16, 15:5, 15:21, 30:18, 38:8, 38:13
**defined** [1] - 49:19
**definitely** [1] - 63:4
**definition** [1] - 35:18
**defraud** [5] - 7:16, 8:8, 45:16, 65:22, 67:3
**degree** [2] - 53:4, 53:18
**deliberately** [1] - 40:7
**Delphine** [4] - 21:14, 33:5, 33:19, 40:2
**depart** [1] - 62:19
**department** [4] - 35:15, 39:5, 41:6, 47:23
**Department** [14] - 7:22, 8:10, 18:18, 22:9, 23:12, 28:14, 29:15, 39:23, 40:1, 40:7, 41:9, 42:22, 66:4, 67:6
**DEPARTMENT** [1] - 1:11

**departure** [1] - 63:6
**departures** [2] - 62:16, 63:2
**deposition** [3] - 52:16, 52:21, 74:10
**depositions** [1] - 75:4
**deprive** [2] - 63:25, 64:9
**DEPUTY** [5] - 2:2, 68:4, 68:9, 68:12, 68:14
**derived** [1] - 50:10
**DESC** [1] - 18:19
**despite** [1] - 17:11
**detained** [2] - 8:18, 8:20
**determination** [2] - 50:12, 66:18
**determinations** [2] - 50:17, 74:9
**determine** [1] - 11:21
**determined** [2] - 49:5, 49:18
**determining** [2] - 50:6, 50:8
**deterrence** [2] - 47:21
**developed** [1] - 48:10
**dictate** [1] - 50:19
**difference** [1] - 74:3
**different** [7] - 6:10, 46:24, 48:13, 57:11, 62:4, 63:7, 76:19
**differently** [1] - 6:20
**direct** [1] - 23:23
**directed** [4] - 21:17, 33:2, 34:4, 34:15
**direction** [4] - 25:10, 28:8, 28:22, 33:6
**directly** [3] - 33:22, 40:13, 41:2
**disagree** [1] - 50:23
**disassembled** [2] - 1:23, 78:17
**disclose** [2] - 21:2, 22:17
**disclosed** [2] - 29:22, 33:17
**Disclosure** [2] - 25:1, 36:19
**discovery** [1] - 11:6
**discuss** [7] - 2:22, 5:24, 10:9, 10:15, 48:1, 58:10, 72:5
**discussed** [5] - 47:7, 62:13, 62:18, 66:15, 68:19
**discussing** [2] - 3:23, 6:12
**discussion** [6] - 3:2, 3:19, 7:17, 58:24,

134

59:17, 60:13
**discussions** [1] - 60:18
**dishonest** [4] - 31:4, 31:6, 31:15, 34:1
**dispute** [4] - 16:21, 49:14, 50:3, 51:7
**disputes** [1] - 50:2
**disputing** [1] - 18:12
**distributed** [1] - 1:23
**distributions** [6] - 20:9, 20:12, 21:17, 23:24, 26:18, 42:9
**DISTRICT** [3] - 1:1, 1:1, 1:7
**district** [1] - 31:17
**District** [1] - 11:14
**disturbance** [1] - 9:25
**dividends** [2] - 28:9, 29:5
**Division** [1] - 1:11
**DLA** [2] - 18:20, 23:13
**document** [2] - 4:7, 37:14
**documents** [7] - 5:1, 20:6, 24:18, 29:21, 34:5, 34:7, 44:12
**dollars** [14] - 19:4, 22:15, 23:12, 25:16, 26:5, 26:10, 26:17, 26:25, 29:5, 40:15, 43:18, 43:24, 57:18, 58:21
**done** [8] - 4:22, 34:1, 40:24, 48:20, 55:20, 69:20, 69:21, 74:17
**Dorothy** [1] - 68:7
**doubt** [3] - 12:1, 13:9, 45:5
**DOUGLAS** [2] - 1:4, 3:7
**Douglas** [10] - 2:3, 25:12, 25:14, 25:22, 25:23, 26:9, 26:11, 27:9, 65:21, 67:2
**down** [5] - 3:9, 19:1, 45:8, 62:19, 70:8
**drawing** [1] - 18:15
**drink** [1] - 37:8
**drop** [2] - 7:18, 37:9
**due** [6] - 20:23, 25:1, 39:1, 42:1, 42:13, 43:23
**during** [10] - 20:10, 23:11, 26:18, 28:25, 42:10, 46:6, 50:8, 63:19, 71:16, 71:18
**Dutch** [1] - 24:7
**duty** [3] - 35:3, 35:22, 36:3

# E

**early** [5] - 17:19, 19:3, 19:7, 44:19, 68:23
**earned** [5] - 22:16, 22:24, 26:18, 29:4, 42:10
**easier** [1] - 74:12
**easily** [2] - 73:23, 74:20
**East** [1] - 17:22
**Eastern** [1] - 24:1
**EDELMAN** [2] - 1:4, 3:7
**Edelman** [103] - 2:3, 2:10, 2:11, 2:13, 3:5, 3:8, 4:3, 5:5, 15:23, 16:16, 17:8, 17:10, 17:16, 17:19, 18:15, 18:16, 18:21, 19:3, 19:6, 19:22, 19:24, 20:1, 20:6, 20:9, 20:10, 20:15, 20:25, 21:9, 21:13, 21:17, 21:19, 22:14, 22:17, 23:4, 23:15, 23:23, 24:6, 24:9, 24:23, 25:3, 25:4, 25:8, 25:10, 25:12, 25:15, 25:19, 25:22, 25:23, 26:1, 26:2, 26:10, 26:11, 26:16, 26:22, 27:10, 28:14, 28:17, 28:24, 29:4, 29:9, 29:13, 29:18, 31:19, 33:12, 33:13, 34:1, 34:4, 34:13, 34:14, 34:17, 34:23, 34:25, 36:13, 36:15, 37:1, 38:22, 39:6, 39:12, 39:14, 39:25, 40:4, 40:5, 40:19, 41:7, 41:18, 42:5, 42:7, 42:19, 43:2, 43:11, 43:13, 43:22, 44:6, 44:8, 44:16, 44:18, 45:6, 50:14, 58:4, 65:21, 66:13, 67:3, 77:15
**Edelman's** [19] - 20:23, 21:4, 21:22, 24:8, 24:16, 25:20, 26:15, 28:4, 28:7, 28:8, 28:10, 28:21, 28:22, 33:2, 38:24, 43:25, 50:4, 50:11, 78:1
**edited** [1] - 1:22
**education** [2] - 9:8, 48:2

**either** [8] - 20:25, 30:13, 48:19, 52:3, 52:24, 62:13, 70:8, 76:23
**element** [18] - 30:19, 31:3, 31:7, 32:18, 32:24, 33:25, 34:11, 36:11, 38:20, 40:11, 41:5, 41:16, 42:11, 42:17, 44:1, 44:4, 44:15, 44:23
**elements** [18] - 2:21, 5:21, 15:17, 15:20, 15:24, 30:7, 30:9, 30:11, 30:13, 30:20, 30:25, 32:9, 32:11, 35:11, 39:22, 42:1, 45:4, 45:6
**Elizabeth** [2] - 1:20, 78:21
**ELIZABETH** [1] - 78:14
**emailed** [1] - 30:20
**emotional** [1] - 9:25
**emphasize** [1] - 63:4
**employed** [1] - 35:1
**encompassing** [1] - 51:24
**end** [10] - 58:12, 61:15, 61:16, 62:7, 71:20, 71:22, 71:23, 71:24
**Energy** [1] - 18:19
**enforcement** [3] - 20:24, 41:8, 41:11
**engaged** [1] - 29:10
**engagement** [1] - 17:22
**England** [1] - 18:4
**enhancements** [7] - 51:7, 52:9, 54:4, 55:19, 59:8, 59:19, 61:20
**entered** [3] - 31:7, 33:1, 49:9
**entering** [7] - 5:6, 31:12, 49:9, 50:5, 64:23, 65:9, 65:12
**Enterprises** [1] - 18:22
**entities** [7] - 19:4, 19:25, 25:13, 28:25, 33:15, 34:17, 44:10
**entitled** [3] - 52:13, 54:5, 59:11
**entity** [2] - 19:24, 21:13
**entity's** [1] - 21:14
**entry** [1] - 78:9
**establish** [1] - 69:19

**established** [1] - 48:11
**et** [2] - 3:24, 72:14
**Europe** [2] - 20:18, 24:1
**evade** [2] - 42:3, 42:18
**evaded** [1] - 29:18
**evaluation** [1] - 29:12
**evasion** [20] - 7:24, 8:1, 8:11, 20:25, 30:11, 41:25, 42:5, 43:10, 44:5, 44:7, 44:8, 44:23, 46:17, 46:24, 49:17, 51:23, 54:19, 57:15, 66:8, 67:7
**eventually** [2] - 2:24, 34:5
**evidence** [17] - 11:22, 11:25, 12:21, 12:23, 12:24, 14:23, 15:15, 16:19, 30:5, 30:15, 32:8, 32:16, 33:12, 45:3, 50:9, 72:14, 73:13
**evidently** [1] - 5:18
**exactly** [3] - 27:25, 58:18, 61:14
**examination** [1] - 66:16
**examine** [1] - 12:11
**exceed** [2] - 56:15, 60:2
**exceeding** [1] - 60:5
**except** [1] - 10:1
**exceptions** [1] - 62:17
**exclude** [2] - 77:5, 77:8
**excluded** [1] - 77:7
**excused** [2] - 78:4, 78:10
**executed** [1] - 20:6
**exigent** [1] - 48:22
**expect** [1] - 72:11
**expected** [1] - 53:21
**expecting** [2] - 55:18, 56:25
**explain** [1] - 6:20
**explained** [2] - 14:12, 14:17
**explore** [1] - 11:18
**exposure** [3] - 55:12, 56:6, 58:4
**extent** [2] - 4:11, 52:18
**extra** [1] - 52:18
**EZRA** [1] - 1:10
**Ezra** [1] - 2:7
**ezra.k.spiro@usdoj. gov** [1] - 1:14

# F

**face** [1] - 58:13
**facing** [1] - 58:9
**fact** [5] - 35:1, 36:24, 42:22, 43:6, 73:25
**factors** [1] - 47:16
**facts** [3] - 15:23, 30:6, 56:5
**factual** [2] - 27:20, 66:25
**factually** [2] - 16:8, 73:14
**failed** [2] - 24:25, 58:20
**fairly** [3] - 62:1, 69:20, 73:23
**fairness** [1] - 11:20
**fall** [1] - 73:23
**false** [54] - 7:11, 7:20, 7:22, 8:9, 8:10, 22:19, 23:3, 23:5, 24:13, 24:18, 24:19, 25:23, 25:24, 28:16, 29:13, 29:19, 29:20, 29:23, 30:1, 30:12, 33:19, 34:4, 34:5, 34:6, 34:7, 35:2, 35:10, 35:12, 36:12, 36:16, 36:17, 36:19, 38:9, 38:15, 38:23, 39:21, 39:25, 40:8, 41:19, 42:19, 43:14, 44:5, 44:11, 44:12, 44:21, 46:13, 51:25, 54:18, 54:20, 65:25, 66:3, 67:4, 67:6
**falsely** [5] - 23:15, 25:11, 26:3, 28:23, 40:2
**familiar** [1] - 4:10
**family** [1] - 20:16
**far** [4] - 50:21, 56:15, 57:4, 60:2
**farm** [1] - 24:2
**fast** [1] - 76:9
**FCRR** [3] - 1:20, 78:14, 78:21
**features** [1] - 6:3
**federal** [3] - 28:15, 40:16, 64:3
**fees** [1] - 25:5
**felony** [2] - 56:20, 63:23
**few** [3] - 5:12, 10:1, 24:16
**fictitious** [1] - 35:12
**figure** [4] - 69:10, 70:20, 72:12
**figures** [1] - 60:24

6

**file** [9] - 10:24, 14:5, 17:10, 42:7, 72:5, 72:6, 75:21, 76:2, 76:23
**filed** [9] - 2:20, 11:6, 13:25, 22:14, 24:9, 26:22, 43:12, 44:6, 73:12
**filing** [6] - 8:19, 30:1, 36:20, 54:20, 75:16, 76:4
**filling** [1] - 73:7
**final** [1] - 37:15
**finally** [1] - 60:10
**finance** [1] - 19:7
**financial** [3] - 24:25, 29:24, 48:1
**financing** [1] - 19:6
**fine** [21] - 4:17, 11:9, 18:8, 19:17, 19:19, 45:18, 46:14, 46:18, 46:24, 54:16, 54:21, 56:17, 56:24, 57:15, 57:17, 60:7, 61:5, 72:2, 72:19, 75:5, 77:23
**fines** [1] - 54:17
**finishes** [1] - 75:17
**firearm** [3] - 64:2, 64:4, 64:7
**first** [15] - 7:17, 7:19, 31:6, 32:18, 32:24, 35:11, 36:7, 36:11, 39:24, 42:1, 42:11, 43:25, 50:25, 77:7
**fit** [1] - 23:25
**five** [7] - 29:22, 45:17, 46:14, 46:18, 54:13, 60:1, 71:14
**five-week** [1] - 71:14
**flag** [2] - 30:17, 74:7
**flagged** [1] - 30:18
**flip** [1] - 76:9
**following** [4] - 17:20, 21:16, 26:3, 26:24
**FOR** [3] - 1:1, 1:9, 1:15
**forced** [2] - 12:24, 64:22
**foregoing** [1] - 78:14
**Foreign** [1] - 22:6
**foreign** [4] - 8:3, 24:25, 25:13, 50:11
**form** [4] - 30:9, 30:13, 30:15, 61:11
**formed** [1] - 18:17
**Forms** [2] - 25:21, 25:22
**forms** [2] - 25:24, 32:1
**forward** [4] - 12:4,

13:13, 48:24, 56:4
**Foundation** [2] - 21:12, 23:7
**founded** [1] - 22:19
**founder** [2] - 40:3, 40:6
**founding** [1] - 20:5
**four** [2] - 29:21, 52:11
**fourth** [4] - 31:2, 35:16, 39:11, 41:16
**franchise** [1] - 24:1
**frankly** [4] - 48:14, 55:8, 61:19, 63:7
**fraud** [1] - 56:18
**fraudulent** [1] - 35:12
**free** [3] - 8:22, 65:10, 66:25
**French** [2] - 21:13, 22:23
**Friday** [4] - 75:16, 75:17, 75:21, 75:22
**fuel** [3] - 17:25, 18:20, 19:9
**full** [5] - 25:20, 48:4, 51:24, 59:11, 78:15
**fully** [3] - 10:9, 66:13, 70:5
**fulsome** [1] - 15:6
**function** [2] - 31:13, 33:10
**functionally** [1] - 49:12
**fund** [1] - 21:21
**fundamental** [1] - 13:20
**funds** [4] - 21:10, 21:20, 29:21, 33:16
**furtherance** [1] - 34:12

## G

**gain** [5] - 47:5, 54:18, 56:21, 57:16, 57:18
**general** [2] - 13:19, 64:6
**General** [1] - 41:13
**generally** [5] - 13:25, 52:17, 70:19, 72:13, 74:24
**George** [1] - 2:10
**GEORGE** [1] - 1:15
**george.clarke@ bakermckenzie. com** [1] - 1:18
**Gibraltar** [5] - 19:23, 19:24, 28:23, 34:16, 34:18
**gift** [1] - 50:14
**gifts** [3] - 25:4, 26:4,

26:23
**given** [4] - 13:21, 54:11, 63:13, 74:20
**goal** [1] - 48:11
**govern** [1] - 49:17
**Government** [1] - 22:5
**government** [60] - 2:5, 5:18, 5:23, 6:9, 11:16, 12:1, 14:22, 15:3, 15:14, 16:11, 31:13, 32:8, 32:14, 32:15, 33:10, 33:11, 34:2, 34:13, 34:24, 36:13, 38:22, 39:7, 39:13, 40:4, 40:21, 40:25, 41:10, 42:6, 42:13, 43:2, 43:22, 44:9, 44:12, 44:17, 44:22, 45:3, 48:18, 51:24, 52:6, 52:15, 53:13, 54:2, 55:6, 55:8, 55:9, 55:18, 57:1, 57:9, 58:17, 59:7, 60:8, 61:5, 61:8, 62:5, 67:19, 68:20, 74:6, 75:17, 75:19
**government's** [11] - 13:8, 30:5, 31:25, 32:7, 33:12, 51:19, 52:23, 53:16, 55:14, 59:18, 74:8
**governs** [1] - 50:12
**great** [1] - 76:25
**greatly** [1] - 17:25
**green** [1] - 3:17
**grew** [1] - 19:8
**grouped** [1] - 49:12
**grouping** [1] - 49:17
**guarantee** [1] - 61:14
**guaranteed** [1] - 64:20
**guarantees** [1] - 55:7
**guess** [1] - 71:4
**guideline** [7] - 49:13, 49:17, 50:7, 56:15, 59:21, 60:2, 62:20
**guidelines** [20] - 3:2, 6:2, 6:9, 15:10, 46:2, 48:9, 48:10, 49:1, 49:15, 49:24, 50:1, 50:19, 51:11, 52:4, 54:14, 62:12, 62:15, 62:22, 63:2, 63:6
**guilt** [4] - 11:21, 12:25, 13:2, 13:8
**guilty** [60] - 5:5, 5:10, 5:11, 5:17, 5:21, 5:25, 7:2, 8:7, 8:13, 10:16, 10:17, 10:20, 10:25, 13:6, 13:19,

14:10, 14:11, 14:15, 15:17, 15:25, 27:19, 30:7, 43:11, 45:5, 45:7, 50:6, 51:22, 55:4, 55:5, 55:12, 55:17, 56:6, 56:13, 56:19, 58:16, 63:23, 63:24, 64:16, 64:20, 64:23, 65:1, 65:10, 65:13, 65:22, 65:23, 65:24, 66:1, 66:2, 66:4, 66:5, 66:6, 66:9, 66:10, 66:11, 67:3, 67:5, 67:7, 67:14

## H

**half** [3] - 20:8, 57:18, 58:11
**happy** [1] - 16:13
**head** [1] - 73:17
**health** [1] - 48:3
**hear** [5] - 3:18, 3:19, 6:23, 16:14, 58:23
**heard** [1] - 65:5
**hearing** [23] - 38:11, 51:18, 55:3, 61:23, 68:2, 69:7, 69:9, 69:14, 69:18, 69:23, 70:9, 70:17, 72:9, 73:10, 73:16, 73:21, 74:1, 74:18, 75:1, 75:6, 76:23, 77:20
**held** [4] - 22:21, 67:15, 70:24, 71:15
**help** [1] - 13:15
**hereby** [1] - 78:14
**hiding** [1] - 32:4
**higher** [4] - 13:15, 48:15, 60:2
**highest** [1] - 9:7
**highlight** [1] - 31:15
**historical** [1] - 29:25
**History** [5] - 53:6, 54:10, 56:9, 59:15, 59:20
**history** [2] - 48:1, 48:2
**hold** [6] - 13:1, 64:1, 67:21, 68:22, 70:11, 76:1
**holding** [1] - 68:17
**home** [2] - 20:18, 24:3
**Honor** [102] - 2:6, 2:9, 4:6, 4:17, 7:7, 7:13, 8:16, 10:7, 10:10, 10:18, 11:3, 11:9, 12:3, 12:8, 12:17, 13:4, 14:3, 14:8, 14:19, 15:18, 16:2,

16:14, 16:25, 20:21, 21:7, 22:1, 22:13, 23:1, 23:9, 23:18, 23:20, 24:5, 24:22, 25:18, 26:14, 26:21, 27:13, 27:14, 28:12, 28:20, 29:3, 29:8, 29:17, 30:3, 30:16, 31:21, 32:13, 32:17, 32:21, 33:24, 34:10, 34:23, 35:6, 35:9, 35:20, 35:25, 36:22, 37:10, 37:19, 37:23, 38:7, 38:14, 38:18, 39:3, 39:10, 39:20, 40:10, 41:4, 41:15, 41:23, 41:24, 42:16, 42:25, 43:8, 44:3, 44:14, 45:1, 46:21, 47:2, 51:5, 53:17, 53:24, 55:1, 57:14, 57:22, 61:12, 63:10, 64:13, 64:21, 65:3, 65:15, 66:11, 66:22, 67:18, 67:20, 68:16, 70:23, 75:10, 75:13, 75:23, 77:4, 77:17
**Honor's** [1] - 68:24
**HONORABLE** [1] - 1:7
**hours** [1] - 9:16
**House** [1] - 22:4
**hundreds** [2] - 19:4, 23:12

## I

**Ibiza** [1] - 20:18
**idea** [3] - 9:13, 67:13, 73:13
**identified** [2] - 4:4, 4:19
**identify** [2] - 2:4, 17:3
**identifying** [1] - 3:23
**identity** [2] - 22:10, 23:13
**Ifone** [2] - 28:4, 28:9
**Ifone-Neda** [2] - 28:4, 28:9
**III** [1] - 1:15
**illegal** [1] - 13:24
**illness** [1] - 9:25
**impede** [1] - 29:11
**important** [1] - 46:2
**importantly** [1] - 48:7
**impose** [7] - 45:14, 45:25, 51:8, 55:10, 65:1, 65:5
**imposed** [1] - 61:5
**imposing** [1] - 56:17
**imprisonment** [4] -

136

7

45:17, 46:18, 53:10, 59:25
**inaccuracies** [1] - 48:19
**include** [2] - 5:25, 26:16
**included** [1] - 53:5
**includes** [2] - 10:22, 51:10
**including** [12] - 19:10, 20:18, 23:25, 24:17, 25:21, 27:21, 33:14, 34:5, 40:16, 42:21, 44:10, 64:17
**income** [27] - 17:11, 17:13, 17:14, 22:17, 22:24, 24:10, 25:16, 26:1, 26:5, 26:23, 27:1, 27:10, 27:16, 28:17, 29:10, 29:13, 29:20, 29:24, 33:13, 35:4, 38:24, 39:15, 40:15, 43:13, 50:10, 50:11
**Income** [1] - 25:21
**incorporated** [2] - 19:24, 28:25
**increased** [2] - 17:21, 17:25
**incriminate** [1] - 12:24
**indicate** [8] - 7:17, 16:18, 16:19, 16:21, 18:12, 30:14, 32:15, 69:16
**indicated** [3] - 3:21, 53:14, 60:8
**indictment** [6] - 5:9, 7:15, 10:5, 51:25, 54:1, 77:13
**Individual** [8] - 18:16, 18:21, 18:23, 19:6, 20:2, 22:20, 23:16, 25:21
**individual** [1] - 17:10
**individuals** [1] - 3:24
**indulgence** [1] - 75:10
**infer** [1] - 13:1
**inform** [1] - 69:19
**information** [12] - 16:22, 19:17, 25:2, 29:23, 33:21, 35:2, 36:16, 39:25, 41:20, 43:14, 47:25, 56:4
**innocence** [1] - 11:22
**innocent** [1] - 13:7
**inquire** [1] - 15:22
**inquiry** [1] - 22:9
**insight** [1] - 66:17
**Inspector** [1] - 41:13
**instance** [2] - 13:23,

46:5
**instant** [1] - 4:22
**instead** [3] - 3:16, 57:20, 69:14
**instructions** [1] - 11:23
**intend** [1] - 55:16
**intending** [1] - 55:5
**intentional** [1] - 35:22
**intentionally** [5] - 35:3, 39:16, 41:19, 43:5, 44:20
**interest** [3] - 25:14, 28:4, 77:25
**interested** [1] - 22:10
**interests** [1] - 22:21
**Internal** [5] - 17:13, 33:14, 34:6, 40:17, 41:12
**international** [1] - 9:13
**internet** [1] - 28:5
**interrupting** [1] - 47:4
**interview** [1] - 10:2
**invest** [1] - 20:17
**investigating** [1] - 22:7
**investigation** [3] - 23:23, 40:16, 41:2
**investing** [1] - 23:25
**investments** [1] - 21:21
**involuntary** [1] - 13:20
**involved** [3] - 2:24, 33:5, 47:8
**IRS** [18] - 7:21, 8:9, 17:14, 25:9, 29:11, 29:15, 33:22, 35:4, 35:10, 36:20, 38:9, 38:15, 39:7, 39:18, 42:21, 66:1, 67:5
**IRS's** [2] - 29:11, 38:25
**issue** [12] - 9:22, 13:6, 14:10, 30:8, 49:3, 49:4, 51:2, 51:25, 65:13, 66:15, 66:20, 67:1
**issued** [1] - 28:10
**issues** [5] - 45:11, 48:3, 50:9, 69:13, 77:21
**itself** [3] - 5:3, 33:22, 73:10

### J

**jail** [6] - 45:21, 46:4, 46:7, 46:14, 63:13, 63:14

January [2] - 21:10, 70:5
**jet** [1] - 17:25
**job** [1] - 48:2
**joint** [2] - 28:5, 75:3
**JUDGE** [1] - 1:7
**Judge** [1] - 7:4
**judges** [1] - 48:12
**judgment** [1] - 14:1
**Julius** [3] - 21:11, 21:18, 23:7
**July** [1] - 24:6
**juncture** [1] - 40:15
**June** [5] - 75:24, 75:25, 76:10, 76:14, 76:18
**jurisdiction** [4] - 29:1, 35:15, 39:5, 41:6
**jury** [7] - 10:21, 11:14, 11:20, 11:23, 12:2, 12:25, 64:2
**justice** [4] - 52:10, 55:21, 59:10, 77:25
**Justice** [11] - 7:23, 8:10, 28:14, 29:15, 39:23, 40:2, 40:8, 41:9, 42:22, 66:4, 67:6
**JUSTICE** [1] - 1:11

### K

**Kandahar** [1] - 28:6
**Kenya** [1] - 24:2
**key** [2] - 6:3, 74:9
**kind** [4] - 9:17, 11:7, 47:20, 64:2
**kinds** [2] - 47:22, 48:3
**knowing** [2] - 31:9, 34:21
**knowingly** [3] - 5:7, 29:9, 29:13
**knowledge** [1] - 17:12
**known** [7] - 18:11, 18:19, 19:25, 21:12, 22:6, 25:1, 35:22
**knows** [2] - 35:23, 36:2
**KOLLAR** [1] - 1:7
**KOLLAR-KOTELLY** [1] - 1:7
**KOTELLY** [1] - 1:7
**Kyrgyz** [1] - 18:16
**Kyrgyzstan** [3] - 17:20, 17:23, 18:3

### L

**land** [1] - 24:1
**language** [1] - 69:2

last [7] - 9:16, 34:11, 51:18, 64:14, 70:12, 72:16, 77:4
**late** [2] - 23:10, 23:23
**law** [11] - 13:7, 13:24, 20:24, 30:23, 41:8, 41:11, 50:11, 57:2, 60:11, 70:2, 70:4
**lawful** [2] - 31:13, 33:10
**laws** [1] - 49:22
**lawyer** [9] - 3:14, 6:21, 12:6, 13:15, 19:16, 57:4, 58:5, 58:18, 65:17
**lawyers** [2] - 58:14, 65:6
**Le** [14] - 21:14, 22:19, 22:23, 23:5, 23:16, 24:13, 24:20, 25:4, 25:10, 25:24, 33:5, 33:19, 36:18, 40:2
**leadership** [5] - 52:10, 53:1, 54:10, 55:21, 59:10
**learned** [1] - 16:20
**least** [8] - 7:1, 17:9, 34:11, 59:1, 68:22, 69:11, 70:9, 70:11
**leave** [2] - 3:14, 73:6
**legal** [4] - 35:22, 36:2, 73:12, 73:15
**less** [3] - 25:25, 28:17, 58:16
**lesser** [1] - 48:16
**letter** [2] - 25:9, 25:23
**level** [19] - 9:7, 47:25, 49:18, 50:6, 50:19, 52:3, 52:24, 52:25, 53:3, 53:8, 54:3, 54:8, 54:11, 55:18, 56:7, 59:5, 59:13, 59:19, 61:1
**licensing** [1] - 64:4
**lifestyle** [1] - 21:21
**light** [1] - 3:17
**likely** [6] - 55:12, 56:2, 58:3, 58:10, 58:13, 61:2
**Limited** [3] - 18:22, 19:5, 19:23
**live** [2] - 64:9, 64:11
**lived** [1] - 17:9
**living** [2] - 17:12, 17:20
**LLP** [1] - 1:16
**loans** [1] - 19:13
**location** [1] - 17:23
**locked** [2] - 46:5, 46:8
**Logistics** [1] - 18:20

London [1] - 24:3
**look** [9] - 69:4, 69:23, 70:10, 70:14, 72:15, 72:25, 75:23, 76:22, 78:7
**looking** [4] - 5:3, 30:23, 53:23, 55:4
**loss** [29] - 2:23, 6:3, 47:6, 49:3, 49:19, 49:21, 50:18, 51:10, 51:12, 51:24, 52:3, 52:6, 53:5, 53:14, 54:2, 54:17, 55:16, 56:21, 57:16, 57:19, 58:15, 58:25, 59:4, 69:12, 69:19, 71:8, 73:22, 74:1
**lower** [3] - 48:15, 58:11, 58:12
**lubricate** [1] - 38:1
**luxury** [1] - 24:2

### M

**machine** [1] - 1:24
**Manas** [1] - 17:22
**mandatory** [1] - 62:22
**manner** [2] - 1:23, 78:18
**March** [9] - 25:8, 25:23, 35:10, 36:20, 36:23, 37:4, 37:13, 37:15, 38:6
**mask** [2] - 3:9, 3:10
**material** [6] - 35:14, 38:21, 40:12, 46:13, 74:25, 75:1
**materially** [10] - 7:20, 7:22, 8:8, 8:10, 29:13, 30:12, 65:25, 66:3, 67:4, 67:5
**matter** [2] - 41:2, 48:14
**max** [1] - 46:24
**maximum** [24] - 45:13, 45:15, 45:17, 45:18, 46:14, 46:15, 46:18, 46:19, 53:10, 54:14, 54:15, 54:21, 55:12, 56:6, 56:14, 57:15, 57:17, 58:6, 58:8, 61:4, 62:24
**maximums** [2] - 56:16, 56:19
**Mckenzie** [1] - 1:16
**mean** [3] - 4:15, 18:7, 32:2
**meaning** [1] - 26:16
**means** [9] - 31:4, 31:6, 31:16, 33:14, 34:1,

137

8

52:9, 53:1, 55:21,
59:9
**medication** [1] - 9:17
**meet** [4] - 15:23, 24:8,
32:8, 32:11
**meets** [6] - 5:21,
15:19, 30:6, 32:16,
45:4, 45:6
**members** [2] - 20:17,
28:6
**memos** [2] - 69:8,
73:12
**mental** [2] - 9:25, 48:3
**mention** [1] - 62:12
**Mexico** [1] - 24:2
**microphone** [1] - 3:17
**mid-1980s** [1] - 17:10
**Middle** [1] - 17:22
**might** [6] - 37:13,
47:19, 72:20, 74:11,
74:15, 74:19
**military** [3] - 17:21,
17:24, 28:5
**million** [17] - 25:15,
28:17, 42:9, 52:7,
53:14, 54:20, 54:22,
54:24, 55:17, 57:18,
57:20, 58:16, 59:1,
59:5, 60:8, 61:6,
61:9
**million-plus** [1] - 60:8
**millions** [8] - 22:15,
23:12, 26:10, 29:5,
40:14, 43:18, 43:24,
58:21
**Mina** [1] - 19:22
**Mina/Red** [43] - 19:25,
20:5, 20:8, 20:10,
20:15, 21:17, 22:8,
22:10, 22:16, 22:19,
22:21, 23:13, 23:15,
23:24, 24:10, 24:14,
24:19, 25:5, 26:2,
26:12, 26:18, 27:10,
28:16, 28:24, 29:6,
29:25, 33:20, 34:17,
36:17, 39:15, 40:3,
40:6, 40:14, 41:19,
41:21, 42:9, 42:20,
42:23, 43:4, 43:19,
44:19, 50:10
**mind** [3] - 7:4, 9:20,
74:8
**minimum** [1] - 61:1
**minus** [2] - 53:1,
59:14
**minute** [3] - 37:17,
37:20, 78:9
**misleading** [1] - 24:18
**misrepresentations**

[2] - 39:16, 43:5
**mitigation** [1] - 48:5
**moment** [2] - 37:7,
70:24
**Monday** [2] - 73:1,
76:8
**money** [2] - 19:13,
20:16
**months** [11] - 7:3,
24:16, 53:8, 53:9,
53:11, 54:12, 56:10,
56:11, 56:14, 59:16,
59:21
**most** [3] - 6:17, 51:19,
61:3
**motion** [3] - 8:19,
75:16, 75:21
**motions** [4] - 10:24,
11:5, 11:7
**move** [10] - 18:14,
27:22, 36:8, 45:9,
45:10, 55:2, 75:25,
76:16, 77:5, 77:21
**moved** [1] - 21:10
**moving** [5] - 29:21,
33:16, 52:21, 61:20,
70:6
**MR** [38] - 2:9, 4:6, 4:9,
4:14, 4:17, 16:2,
16:6, 27:14, 27:19,
27:23, 27:25, 37:12,
37:18, 57:14, 57:22,
58:1, 66:22, 67:18,
68:5, 68:8, 71:4,
71:20, 71:24, 72:18,
72:24, 73:9, 75:7,
75:12, 75:15, 76:3,
76:5, 76:8, 76:13,
76:16, 76:21, 76:25,
77:2, 78:6
**MS** [97] - 2:6, 15:3,
15:9, 15:18, 16:13,
16:25, 17:4, 17:7,
17:19, 18:15, 19:3,
19:22, 20:5, 20:22,
21:8, 22:2, 22:4,
22:14, 23:2, 23:10,
23:22, 24:6, 24:23,
25:8, 25:19, 26:15,
26:22, 28:3, 28:13,
28:21, 29:4, 29:9,
29:18, 30:16, 30:23,
31:3, 31:6, 31:11,
31:23, 32:13, 32:17,
32:21, 32:24, 33:9,
33:25, 34:11, 34:23,
35:9, 35:20, 35:25,
36:2, 36:5, 36:9,
36:11, 36:23, 37:1,
37:9, 37:17, 37:19,

37:23, 38:2, 38:7,
38:13, 38:20, 39:4,
39:11, 39:21, 40:11,
40:19, 40:21, 40:23,
40:25, 41:5, 41:16,
41:24, 42:17, 43:1,
43:9, 44:4, 44:15,
46:21, 46:23, 47:2,
47:4, 51:5, 53:17,
67:20, 68:16, 70:23,
71:14, 72:1, 74:7,
74:14, 74:19, 75:10,
77:4, 77:12
**multiple** [3] - 34:3,
35:1, 40:16
**music** [1] - 23:25
**mutes** [1] - 3:18

## N

**name** [7] - 18:22, 21:4,
21:22, 23:6, 29:22,
33:15, 33:18
**named** [2] - 21:14,
33:3
**narrow** [1] - 62:16
**National** [1] - 22:6
**national** [2] - 18:16,
24:7
**nature** [1] - 66:23
**Neda** [2] - 28:4, 28:9
**need** [29] - 4:13, 5:6,
5:20, 6:14, 6:16,
13:25, 19:1, 32:15,
37:1, 37:16, 38:10,
51:2, 51:13, 61:23,
63:1, 64:5, 65:7,
67:9, 69:4, 69:9,
70:14, 70:21, 73:5,
73:11, 73:12, 73:17,
74:5, 75:5, 75:23
**needed** [1] - 75:19
**needs** [5] - 19:9, 32:7,
47:18, 48:6, 78:8
**never** [3] - 10:3, 25:13,
64:10
**New** [1] - 1:16
**new** [3] - 19:24, 45:24,
45:25
**next** [6] - 3:14, 24:16,
41:24, 45:10, 47:13,
75:22
**nobody** [1] - 62:17
**nominally** [1] - 21:19
**nominee** [3] - 33:15,
33:19, 44:10
**nominees** [1] - 29:20
**none** [2] - 59:18, 61:3
**Note** [1] - 49:24
**notes** [1] - 78:15

**notice** [1] - 13:25
**notified** [1] - 20:23
**notion** [1] - 33:9
**November** [14] -
20:22, 71:18, 71:23,
72:1, 72:16, 72:18,
72:22, 73:1, 73:11,
73:23, 77:9, 77:10,
77:20, 78:2
**null** [2] - 1:22, 78:17
**number** [3] - 33:14,
48:15, 48:16
**numbers** [2] - 27:15,
48:14
**NW** [2] - 1:12, 1:17

## O

**oath** [1] - 7:9
**object** [2] - 48:19,
49:20
**objections** [3] - 48:21,
48:23, 48:24
**obligation** [1] - 17:12
**obligations** [1] - 22:24
**obstruct** [2] - 29:11,
33:10
**obstructing** [1] -
31:13
**obstruction** [4] -
52:10, 53:1, 55:21,
59:10
**obvious** [1] - 70:16
**obviously** [10] - 5:25,
27:15, 30:8, 46:6,
48:13, 50:25, 55:6,
60:20, 62:23, 69:24
**occur** [1] - 63:8
**October** [15] - 25:19,
36:24, 37:4, 37:13,
37:15, 38:6, 38:8,
38:14, 69:25, 70:24,
71:2, 71:3, 71:17,
71:22, 72:16
**odd** [1] - 16:3
**OF** [4] - 1:1, 1:2, 1:6,
1:11
**offense** [40] - 2:19,
2:23, 4:24, 5:17,
14:21, 15:4, 15:6,
15:19, 15:24, 33:4,
47:18, 47:24, 48:13,
49:3, 49:18, 49:20,
50:6, 50:19, 51:10,
51:12, 52:3, 52:11,
52:24, 52:25, 53:2,
53:5, 54:3, 54:8,
54:11, 55:18, 56:7,
58:19, 59:5, 59:14,
59:19, 61:1, 61:19,

69:12, 69:17, 69:20
**offenses** [4] - 32:11,
48:13, 58:15, 63:24
**offer** [3] - 51:20, 51:22
**offered** [1] - 52:15
**Office** [1] - 1:16
**office** [1] - 64:1
**official** [2] - 48:8,
78:21
**Official** [1] - 1:21
**Offshore** [2] - 25:1,
36:19
**old** [1] - 8:25
**once** [5] - 69:18,
72:10, 73:4, 73:22,
76:23
**one** [25] - 6:3, 7:19,
12:6, 20:19, 20:25,
22:19, 23:18, 27:15,
28:21, 29:19, 31:16,
34:12, 36:7, 36:8,
49:12, 49:14, 51:23,
51:25, 55:23, 63:22,
74:8, 75:12, 77:4
**ones** [3] - 4:20, 15:24,
30:7
**open** [2] - 3:23, 73:6
**opened** [1] - 21:11
**operations** [1] - 19:8
**opportunity** [2] - 10:8,
11:11
**options** [7] - 6:11,
16:24, 60:16, 60:20,
61:11, 62:3, 62:6
**orally** [1] - 47:10
**order** [12] - 5:5, 30:7,
32:9, 35:4, 60:10,
62:25, 67:11, 68:18,
69:22, 72:11, 75:5,
77:20
**otherwise** [3] - 19:15,
50:24, 74:15
**outside** [3] - 17:9,
22:24, 74:20
**OVDP** [5] - 25:2, 25:9,
25:20, 26:15, 38:24
**Oversight** [1] - 22:5
**overt** [2] - 31:16,
34:12
**owing** [4] - 39:1, 42:2,
42:13, 43:23
**own** [8] - 12:14, 12:21,
12:25, 43:10, 63:16,
64:4, 65:10, 66:25
**owned** [7] - 18:23,
19:5, 20:1, 22:20,
23:16, 24:19, 36:18
**owner** [13] - 20:7,
21:4, 21:23, 24:14,
26:2, 28:24, 34:17,

138

9

39:14, 42:20, 42:23, 43:3, 43:6, 44:18
**owners** [2] - 22:11, 23:14
**ownership** [13] - 22:17, 23:6, 25:14, 26:12, 28:4, 28:10, 29:25, 33:16, 33:20, 40:13, 43:19, 43:25, 44:22

**P**

**p.m** [2] - 1:4, 78:11
**page** [1] - 37:20
**paid** [2] - 19:14, 22:16
**Panamanian** [1] - 21:12
**paperwork** [1] - 23:5
**paragraph** [3] - 16:16, 17:5, 32:3
**paragraphs** [3] - 30:8, 30:14, 32:2
**pardon** [1] - 36:9
**parity** [1] - 47:19
**parole** [1] - 63:14
**part** [7] - 22:9, 27:24, 46:2, 49:23, 50:25, 61:23, 72:12
**partially** [1] - 18:2
**participants** [1] - 11:18
**participate** [1] - 24:24
**participation** [2] - 31:10, 34:22
**particular** [6] - 5:22, 15:15, 15:22, 48:5, 49:13, 53:19
**particularly** [1] - 62:18
**parties** [9] - 8:22, 33:21, 49:11, 49:15, 50:3, 58:19, 62:13, 78:4, 78:10
**partnership** [1] - 20:1
**party** [2] - 1:23, 78:18
**passed** [1] - 33:21
**pauses** [1] - 37:11
**pay** [14] - 14:4, 17:11, 17:14, 24:25, 26:10, 26:17, 27:10, 42:8, 42:12, 43:18, 53:12, 54:16, 58:20, 60:10
**payments** [2] - 26:4, 26:24
**pecuniary** [6] - 47:1, 47:5, 54:17, 56:21, 57:16, 57:18
**penalties** [4] - 6:1, 45:12, 45:13, 47:8
**penalty** [3] - 25:11,

45:14, 60:1
**people** [2] - 4:1, 4:5
**people's** [1] - 51:16
**per** [1] - 26:3
**percent** [6] - 22:20, 24:14, 26:2, 26:11, 43:19, 43:25
**perfect** [1] - 72:24
**period** [13] - 20:10, 23:22, 28:25, 45:17, 45:18, 46:5, 46:6, 63:13, 63:19, 64:10, 68:24, 71:19, 71:24
**periods** [1] - 46:3
**perjury** [2] - 7:11, 25:11
**permutations** [2] - 57:5, 57:10
**person** [1] - 21:3
**personal** [1] - 47:25
**persons** [1] - 32:25
**perspective** [3] - 31:25, 32:6, 32:7
**phase** [1] - 50:8
**photocopied** [1] - 78:17
**physical** [1] - 48:2
**pick** [1] - 70:22
**picking** [1] - 72:22
**picture** [1] - 48:4
**place** [2] - 33:18, 73:23
**placing** [1] - 33:18
**Plaintiff** [1] - 1:3
**plan** [8] - 2:22, 6:4, 49:6, 49:23, 51:9, 58:14, 67:17, 67:18
**planning** [1] - 75:16
**plea** [29] - 2:19, 5:6, 6:15, 13:6, 13:19, 14:11, 16:4, 32:9, 32:12, 49:9, 50:6, 51:19, 52:19, 52:20, 56:3, 56:6, 56:23, 57:17, 59:1, 60:25, 63:24, 64:15, 64:23, 65:1, 65:9, 65:12, 67:1, 67:2
**PLEA** [1] - 1:6
**plead** [11] - 10:16, 10:17, 10:20, 14:9, 14:15, 55:5, 55:12, 55:17, 56:19, 65:21, 66:9
**pleading** [23] - 5:10, 5:11, 5:16, 5:21, 5:25, 7:2, 8:7, 8:13, 10:25, 12:20, 15:17, 15:25, 27:19, 43:11, 45:5, 45:7, 55:4,

56:13, 58:16, 63:23, 64:16, 64:20, 67:14
**pled** [1] - 51:22
**plus** [7] - 53:3, 54:9, 59:14, 60:8, 61:6, 73:12
**podium** [1] - 3:16
**point** [28] - 8:20, 10:22, 14:20, 15:10, 22:14, 24:9, 33:1, 33:11, 46:23, 49:4, 50:3, 51:1, 52:14, 52:17, 54:5, 55:23, 55:24, 56:2, 61:6, 61:8, 61:13, 62:5, 67:9, 67:10, 67:23, 70:5, 70:13
**points** [18] - 51:13, 52:9, 52:10, 52:11, 52:13, 52:22, 52:25, 53:1, 53:3, 53:7, 54:9, 54:10, 56:8, 56:10, 59:9, 59:10, 59:14
**portions** [1] - 74:14
**position** [3] - 51:21, 53:16, 55:22
**positions** [2] - 51:16, 71:8
**possess** [1] - 64:2
**possibilities** [2] - 57:11, 62:2
**possibility** [1] - 56:17
**possible** [1] - 57:10
**potential** [1] - 54:21
**potentially** [2] - 11:5, 68:21
**practically** [1] - 71:10
**preclear** [1] - 37:14
**prefer** [1] - 4:16
**prepare** [5] - 13:15, 47:23, 48:7, 75:6, 77:21
**prepared** [16] - 6:13, 34:2, 34:14, 34:24, 36:14, 38:23, 39:8, 39:13, 40:5, 41:1, 41:10, 42:6, 42:13, 43:3, 44:9, 44:17
**preparers** [9] - 24:8, 24:12, 25:3, 29:24, 35:1, 36:16, 39:17, 43:15, 44:21
**preparing** [3] - 39:17, 52:19, 52:21
**preponderance** [1] - 50:9
**present** [7] - 8:18, 12:14, 12:21, 12:22, 12:24, 55:8, 67:22

**presentation** [2] - 28:15, 40:1
**presented** [1] - 11:23
**presentence** [12] - 6:12, 47:24, 48:17, 67:11, 67:25, 68:3, 69:5, 69:10, 69:22, 73:20, 73:24, 73:25
**presenting** [1] - 73:13
**presumably** [4] - 34:21, 57:24, 69:19, 71:7
**presumed** [1] - 13:7
**pretrial** [1] - 68:17
**pretty** [2] - 65:18
**previously** [1] - 75:24
**primarily** [1] - 20:11
**printed** [1] - 1:22
**Prisons** [1] - 63:16
**probation** [2] - 47:23, 65:6
**problem** [4] - 36:10, 56:16, 60:5, 74:18
**proceed** [6] - 6:5, 38:19, 54:1, 67:10, 67:16, 69:16
**proceeded** [1] - 43:21
**proceeding** [6] - 3:1, 37:11, 49:8, 49:10, 50:25, 78:11
**proceedings** [3] - 13:21, 78:9, 78:15
**Proceedings** [1] - 1:24
**produced** [1] - 1:25
**product** [1] - 1:22
**profit** [4] - 20:9, 23:24, 26:18, 42:9
**profitable** [1] - 20:9
**profits** [2] - 20:15, 28:7
**program** [1] - 24:24
**Program** [2] - 25:2, 36:19
**promised** [1] - 64:19
**promises** [1] - 64:25
**property** [1] - 20:17
**proportion** [1] - 28:10
**proposed** [5] - 52:23, 56:23, 58:20, 59:1, 59:18
**proposing** [3] - 56:19, 57:17, 59:25
**prosecuted** [1] - 7:11
**prosecutor** [1] - 64:18
**prosecutors** [2] - 28:15, 41:9
**prove** [16] - 13:8, 34:3, 34:14, 34:25, 36:14, 38:23, 39:8, 39:14,

40:5, 41:1, 41:10, 42:7, 42:14, 43:3, 44:10, 44:17
**proved** [1] - 12:1
**provide** [3] - 18:20, 36:16, 48:7
**provided** [9] - 24:17, 25:2, 35:2, 39:25, 41:19, 43:14, 66:17, 74:25, 75:2
**provides** [1] - 49:18
**providing** [1] - 29:23
**provisions** [1] - 7:18
**pseudonyms** [1] - 4:20
**PSR** [1] - 71:6
**PSRs** [1] - 68:5
**public** [3] - 28:23, 34:16, 64:1
**punishable** [2] - 56:13, 59:25
**purchase** [2] - 17:25, 20:17
**purchasing** [1] - 24:2
**purported** [1] - 23:6
**purporting** [1] - 33:18
**purposes** [4] - 15:9, 38:8, 38:14, 58:24
**push** [1] - 3:18
**put** [15] - 4:19, 4:21, 24:14, 43:16, 49:5, 60:20, 67:15, 69:2, 69:25, 70:9, 72:10, 72:14, 73:2, 73:3, 73:25
**putting** [1] - 33:15

**Q**

**questions** [12] - 2:18, 3:11, 4:12, 5:8, 5:12, 6:22, 7:10, 8:24, 11:17, 64:15, 68:24
**quick** [1] - 37:10
**quickly** [1] - 19:8
**quote** [2] - 49:21, 58:21

**R**

**ramification** [1] - 63:22
**range** [5] - 52:2, 56:15, 58:13, 60:2, 62:20
**RANNEY** [98] - 1:10, 2:6, 15:3, 15:9, 15:18, 16:13, 16:25, 17:4, 17:7, 17:19, 18:15, 19:3, 19:22,

139

20:5, 20:22, 21:8, 22:2, 22:4, 22:14, 23:2, 23:10, 23:22, 24:6, 24:23, 25:8, 25:19, 26:15, 26:22, 28:3, 28:13, 28:21, 29:4, 29:9, 29:18, 30:16, 30:23, 31:3, 31:6, 31:11, 31:23, 32:13, 32:17, 32:21, 32:24, 33:9, 33:25, 34:11, 34:23, 35:9, 35:20, 35:25, 36:2, 36:5, 36:9, 36:11, 36:23, 37:1, 37:9, 37:17, 37:19, 37:23, 38:2, 38:7, 38:13, 38:20, 39:4, 39:11, 39:21, 40:11, 40:19, 40:21, 40:23, 40:25, 41:5, 41:16, 41:24, 42:17, 43:1, 43:9, 44:4, 44:15, 46:21, 46:23, 47:2, 47:4, 51:5, 53:17, 67:20, 68:16, 70:23, 71:14, 72:1, 74:7, 74:14, 74:19, 75:10, 77:4, 77:12
**Ranney** [1] - 2:7
**rare** [1] - 63:7
**rather** [2] - 22:17, 52:14
**read** [6] - 5:4, 15:12, 16:10, 16:13, 17:1, 30:25
**ready** [1] - 74:4
**realize** [2] - 38:10, 62:1
**really** [4] - 32:1, 37:10, 49:3, 73:14
**reasonable** [4] - 12:1, 13:8, 45:5, 47:21
**reasons** [1] - 63:5
**receive** [4] - 20:12, 48:17, 48:23, 56:2
**received** [5] - 9:24, 25:15, 26:1, 26:4, 28:17
**recent** [1] - 51:19
**recently** [1] - 21:11
**recipient** [1] - 40:14
**recommend** [2] - 8:22, 55:9
**recommendations** [1] - 8:21
**reconsidered** [1] - 8:20
**Reconstruction** [1] - 41:13

**record** [7] - 2:5, 3:13, 3:25, 4:21, 17:1, 47:11, 51:18
**recounting** [1] - 30:24
**Red** [5] - 18:22, 19:7, 19:8, 19:23, 19:24
**redacted** [2] - 17:1, 17:2
**reduce** [2] - 46:11, 63:18
**reduced** [1] - 46:7
**reducing** [1] - 63:15
**reduction** [3] - 15:10, 55:24, 59:12
**referred** [1] - 19:13
**reflect** [1] - 28:24
**reflected** [1] - 34:16
**Reform** [1] - 22:5
**refute** [1] - 16:22
**regarding** [2] - 20:24, 29:24
**region** [3] - 17:24, 18:16, 19:9
**registration** [2] - 28:23, 34:16
**rehabilitation** [2] - 47:18, 48:5
**relate** [1] - 64:15
**related** [5] - 2:23, 11:6, 38:24, 38:25, 71:8
**relates** [3] - 15:16, 39:22, 49:24
**relating** [1] - 78:9
**relations** [1] - 9:13
**relative** [1] - 71:8
**release** [9] - 45:18, 45:20, 45:25, 46:9, 46:12, 46:15, 46:19, 75:16, 75:21
**relevant** [12] - 17:6, 17:7, 49:25, 50:4, 51:7, 53:14, 57:2, 60:11, 61:9, 61:19, 72:7, 73:21
**rely** [1] - 74:15
**remaining** [4] - 68:20, 77:6, 77:12, 77:15
**remember** [2] - 76:11, 77:16
**reminding** [1] - 70:4
**remove** [1] - 23:6
**report** [27] - 6:12, 17:13, 22:15, 24:10, 24:25, 25:4, 26:9, 26:16, 27:9, 27:16, 42:8, 43:18, 47:24, 48:17, 48:19, 48:21, 67:11, 68:1, 69:5, 69:10, 69:22, 73:20,

73:24, 74:1, 75:3, 75:24, 76:13
**reported** [7] - 1:24, 25:25, 26:3, 26:5, 26:23, 27:1, 43:14
**reporter** [2] - 19:2, 38:12
**Reporter** [3] - 1:20, 1:21, 78:21
**reporting** [3] - 8:4, 32:4, 43:12
**represent** [1] - 41:20
**representation** [9] - 23:3, 35:13, 35:17, 38:21, 39:12, 39:23, 40:12, 40:13, 41:17
**representations** [3] - 29:14, 41:1, 44:21
**Representatives** [1] - 22:4
**represented** [1] - 12:5
**represents** [1] - 58:12
**request** [3] - 14:5, 73:25, 74:14
**requested** [1] - 28:9
**requesting** [1] - 53:19
**requests** [1] - 27:16
**require** [1] - 12:15
**required** [2] - 53:12, 54:16
**requirements** [2] - 9:12, 64:5
**resolve** [3] - 48:24, 73:17, 77:21
**resolved** [1] - 11:5
**resolving** [1] - 50:2
**respond** [4] - 75:20, 75:21, 76:7, 76:8
**response** [1] - 76:9
**responsibility** [10] - 15:7, 52:14, 53:2, 54:6, 55:23, 56:3, 56:9, 59:12, 59:15, 61:21
**rest** [8] - 6:8, 64:8, 67:13, 69:20, 69:21, 69:25, 70:10, 73:22
**restitution** [10] - 52:5, 53:12, 54:3, 54:23, 56:25, 57:1, 60:9, 60:11, 61:7, 61:9
**result** [2] - 17:24, 50:17
**resulting** [1] - 17:14
**return** [5] - 26:16, 29:24, 42:8, 43:12, 44:5
**Returns** [1] - 25:22
**returns** [11] - 17:11, 22:15, 24:10, 26:9,

26:22, 27:9, 28:3, 30:1, 34:5, 37:15, 43:16
**Revenue** [5] - 17:13, 33:14, 34:6, 40:17, 41:12
**review** [1] - 48:18
**reviewed** [1] - 51:18
**revoke** [1] - 45:24
**revoked** [1] - 46:9
**rights** [10] - 5:16, 10:20, 14:11, 14:16, 14:17, 63:25, 64:8, 64:10, 77:16, 78:1
**role** [4] - 52:10, 54:10, 55:21, 59:10
**Room** [1] - 1:12
**roughly** [3] - 50:24, 63:19, 71:18
**routinely** [1] - 20:6
**RPR** [3] - 1:20, 78:14, 78:21
**rubric** [1] - 62:15
**Rule** [1] - 52:15
**rush** [1] - 4:15

**S**

**sake** [1] - 59:17
**SARAH** [1] - 1:10
**Sarah** [1] - 2:7
**sarah.c.ranney@ usdoj.gov** [1] - 1:13
**satisfied** [2] - 10:12, 66:13
**satisfy** [1] - 44:23
**satisfying** [1] - 43:25
**saw** [1] - 23:25
**scenario** [2] - 58:5, 59:22
**schedule** [1] - 74:24
**scheduling** [1] - 68:18
**scheme** [2] - 29:10, 49:23
**screenshot** [1] - 1:23
**seal** [1] - 2:20
**seated** [1] - 3:14
**second** [13] - 20:19, 23:18, 31:7, 35:13, 38:20, 39:21, 40:11, 42:2, 42:17, 44:4, 68:19, 68:21, 72:1
**Section** [6] - 7:20, 7:23, 7:25, 8:2, 49:16, 50:20
**Sections** [2] - 8:4, 8:5
**secured** [1] - 19:6
**Security** [1] - 22:6
**see** [3] - 37:9, 69:4, 78:7

**seeking** [1] - 58:17
**seem** [1] - 71:25
**select** [1] - 11:20
**send** [1] - 20:16
**SENIOR** [1] - 1:7
**sense** [4] - 15:11, 69:16, 70:18, 71:25
**sent** [3] - 24:6, 36:15, 44:20
**sentence** [19] - 13:23, 45:15, 45:21, 45:25, 46:7, 46:11, 47:21, 48:12, 48:15, 48:16, 51:8, 55:9, 56:14, 62:23, 63:6, 63:18, 64:20, 65:1, 65:5
**sentenced** [2] - 45:21, 47:20
**sentences** [1] - 46:4
**sentencing** [28] - 6:2, 8:22, 27:24, 45:11, 46:1, 47:14, 47:17, 48:8, 48:10, 48:24, 49:1, 49:10, 49:11, 50:2, 50:8, 52:4, 52:8, 54:4, 55:8, 58:12, 60:23, 61:24, 62:12, 62:15, 67:16, 69:7, 77:20, 77:22
**September** [7] - 17:21, 68:12, 68:13, 68:14, 69:6, 71:6, 73:20
**series** [2] - 10:23, 24:18
**seriousness** [1] - 47:17
**serve** [3] - 46:11, 63:14, 64:2
**served** [1] - 46:10
**service** [2] - 19:9, 28:6
**Service** [5] - 17:13, 33:14, 34:6, 40:17, 41:12
**services** [2] - 10:12, 28:5
**set** [27] - 2:25, 3:23, 5:8, 10:22, 30:9, 31:24, 32:6, 45:13, 47:24, 49:8, 49:14, 50:1, 53:23, 64:14, 67:9, 67:12, 68:1, 69:4, 69:5, 69:7, 72:3, 72:6, 73:1, 76:11, 76:23
**sets** [5] - 10:5, 47:15, 51:9, 51:12, 51:21
**setting** [2] - 53:15, 68:19
**seven** [2] - 42:5, 56:18
**several** [2] - 33:3, 50:9

11

**shall** [2] - 1:22, 78:17
**share** [2] - 28:7, 28:10
**shirked** [1] - 35:3
**short** [1] - 76:20
**shorter** [1] - 74:18
**shorthand** [1] - 1:24
**show** [5] - 30:14, 33:12, 34:25, 43:22, 47:11
**showing** [2] - 20:7, 35:2
**sic]** [1] - 37:16
**side** [1] - 75:12
**sides** [2] - 11:20, 14:24
**SIGAR** [1] - 41:12
**sign** [1] - 4:13
**signatory** [2] - 1:23, 78:18
**signed** [5] - 4:6, 4:16, 15:3, 16:6, 25:10
**significantly** [1] - 25:25
**signing** [1] - 4:3
**simply** [1] - 69:20
**Singapore** [1] - 21:11
**sister** [1] - 19:23
**sit** [2] - 3:9, 45:8
**six** [1] - 30:1
**slow** [1] - 19:1
**sold** [1] - 28:5
**solicitation** [1] - 23:11
**someone** [1] - 37:9
**sometimes** [3] - 31:14, 64:5
**somewhat** [1] - 49:2
**SONYA** [1] - 1:16
**Sonya** [1] - 2:10
**sonya.bishop@ bakermckenzie. com** [1] - 1:19
**sophisticated** [4] - 52:9, 52:25, 55:20, 59:9
**sorry** [6] - 9:2, 31:17, 40:20, 40:22, 40:23, 68:13
**sort** [6] - 16:3, 51:9, 55:24, 58:8, 61:10, 75:2
**sought** [1] - 54:23
**sound** [1] - 16:11
**sounds** [5] - 72:24, 73:9, 75:7, 76:25, 77:2
**source** [1] - 24:11
**Spain** [1] - 20:18
**speaking** [2] - 38:11, 75:18

**Special** [1] - 41:12
**special** [3] - 45:19, 46:16, 46:20
**specific** [6] - 43:13, 50:1, 63:4, 63:5, 64:20, 67:1
**specifically** [3] - 26:2, 32:18, 49:16
**speedy** [2] - 77:16, 78:1
**spend** [1] - 23:25
**spent** [1] - 46:3
**spirit** [1] - 15:11
**SPIRO** [3] - 1:10, 57:14, 57:22
**Spiro** [2] - 2:7, 38:3
**staff** [1] - 70:3
**stand** [1] - 3:6
**Star** [45] - 18:22, 19:8, 19:23, 19:24, 20:1, 20:5, 20:8, 20:10, 20:16, 21:17, 22:16, 22:20, 22:21, 23:13, 23:15, 23:24, 24:10, 24:14, 24:19, 25:5, 26:2, 26:12, 26:18, 27:10, 28:16, 28:24, 29:6, 29:25, 33:20, 34:17, 36:17, 39:15, 40:3, 40:6, 40:14, 41:19, 41:21, 42:9, 42:20, 42:23, 43:4, 43:20, 44:19, 50:10
**Star's** [3] - 19:7, 22:8, 22:11
**start** [10] - 17:5, 19:7, 32:2, 45:12, 51:12, 52:11, 60:24, 61:20, 73:7, 73:17
**start-up** [1] - 19:7
**started** [1] - 30:18
**starting** [4] - 2:5, 19:3, 32:21, 56:7
**statement** [35] - 2:19, 4:24, 5:17, 7:11, 14:21, 14:25, 15:4, 15:5, 15:19, 33:4, 33:11, 35:13, 35:14, 35:16, 36:13, 38:9, 38:15, 38:21, 38:23, 39:4, 39:7, 39:12, 39:17, 39:21, 39:25, 40:12, 41:1, 41:6, 41:8, 41:11, 41:17, 54:19, 58:19
**statements** [19] - 7:20, 7:22, 8:9, 8:10, 29:14, 29:19, 30:12, 33:20, 35:10, 42:20, 42:21, 44:11, 46:14,

52:1, 54:20, 66:1, 66:4, 67:4, 67:6
**states** [2] - 58:20, 64:4
**STATES** [4] - 1:1, 1:2, 1:7, 1:9
**States** [17] - 1:11, 2:3, 2:7, 7:17, 8:8, 17:8, 17:9, 17:21, 22:24, 24:7, 33:17, 35:15, 36:15, 39:6, 41:7, 65:22, 67:4
**stating** [1] - 25:11
**status** [3] - 75:3, 75:24, 76:13
**statute** [4] - 46:1, 46:25, 47:15, 64:3
**statutory** [14] - 6:1, 7:18, 13:22, 45:12, 45:15, 47:7, 53:10, 54:14, 54:15, 56:14, 56:16, 60:1, 61:4, 62:24
**stenographic** [1] - 78:15
**steps** [1] - 33:13
**still** [5] - 24:9, 48:22, 54:23, 69:14, 76:18
**stipulated** [2] - 15:1, 52:2
**Stockton** [1] - 9:15
**stop** [1] - 16:16
**story** [7] - 22:19, 24:13, 24:19, 28:16, 34:7, 36:17, 40:8
**strategic** [1] - 17:23
**Street** [1] - 1:12
**study** [1] - 9:10
**studying** [1] - 9:12
**sub** [1] - 38:4
**subcommittee** [1] - 34:8
**Subcommittee** [6] - 22:5, 22:7, 22:10, 22:18, 23:3, 29:15
**subject** [2] - 56:24, 60:7
**submission** [6] - 25:20, 26:15, 36:19, 38:9, 38:15, 38:25
**submit** [1] - 25:9
**submitted** [1] - 34:6
**subpoena** [1] - 12:15
**substance** [1] - 48:2
**substantial** [1] - 42:1
**suggested** [1] - 64:19
**suggestion** [2] - 74:22, 76:22
**Suisse** [5] - 20:12, 20:22, 21:1, 21:9, 21:16

**summary** [6] - 30:9, 30:13, 30:14, 32:1, 60:25, 61:10
**summoned** [1] - 11:15
**Sunage** [8] - 21:12, 21:18, 21:19, 21:20, 22:22, 23:7, 23:24
**super** [1] - 76:9
**supervised** [8] - 45:18, 45:20, 45:22, 45:25, 46:9, 46:12, 46:15, 46:19
**supplying** [1] - 17:23
**support** [3] - 16:8, 18:18, 24:18
**Support** [1] - 18:19
**suppress** [1] - 11:7
**Swiss** [3] - 20:11, 20:24, 33:17
**sworn** [3] - 3:5, 3:7, 7:8
**system** [1] - 63:16

**T**

**table** [1] - 50:20
**tax** [73] - 7:24, 8:1, 8:11, 17:11, 20:25, 22:15, 22:23, 24:8, 24:10, 24:12, 25:3, 25:14, 26:9, 26:16, 26:22, 27:9, 28:3, 29:23, 30:1, 30:11, 34:5, 35:1, 36:16, 39:1, 39:17, 41:25, 42:1, 42:3, 42:5, 42:8, 42:12, 43:10, 43:12, 43:15, 43:16, 43:23, 44:5, 44:21, 44:23, 46:17, 46:24, 49:16, 49:19, 49:22, 50:4, 50:18, 50:20, 51:23, 51:24, 52:2, 52:5, 53:14, 54:2, 54:19, 55:16, 56:18, 57:2, 57:15, 58:15, 58:22, 58:25, 59:4, 60:11, 66:8, 67:7, 67:8, 69:12, 71:8
**Tax** [2] - 1:11, 25:21
**taxes** [13] - 17:11, 17:14, 22:16, 25:1, 26:10, 26:17, 27:10, 29:13, 29:18, 42:8, 42:12, 43:18, 58:20
**taxpayers** [1] - 24:24
**television** [1] - 24:1
**template** [1] - 10:23
**ten** [4] - 49:11, 56:12, 57:16, 59:24

**tens** [6] - 26:10, 29:5, 40:14, 43:18, 43:24, 58:21
**tentatively** [3] - 10:22, 68:1, 70:11
**term** [3] - 53:10, 56:13, 60:1
**terms** [33] - 2:16, 2:18, 4:21, 6:4, 6:9, 7:1, 8:21, 10:19, 11:13, 12:25, 13:19, 30:5, 31:25, 47:14, 49:1, 51:8, 51:11, 52:18, 52:20, 53:25, 56:1, 58:6, 58:11, 61:19, 62:11, 63:13, 64:3, 64:8, 66:15, 69:2, 71:13, 74:3, 78:9
**testify** [3] - 12:16, 12:21, 12:22
**testimony** [1] - 74:16
**Thanksgiving** [1] - 72:23
**THE** [347] - 1:1, 1:7, 1:9, 1:15, 2:2, 2:8, 2:12, 2:14, 2:15, 3:8, 3:12, 3:13, 3:20, 3:21, 4:8, 4:13, 4:15, 4:18, 5:14, 5:15, 6:25, 7:1, 7:7, 7:8, 7:13, 7:14, 8:16, 8:17, 9:1, 9:2, 9:3, 9:4, 9:6, 9:7, 9:9, 9:10, 9:11, 9:14, 9:15, 9:16, 9:18, 9:19, 9:21, 9:22, 10:1, 10:4, 10:7, 10:8, 10:10, 10:11, 10:13, 10:14, 10:18, 10:19, 11:3, 11:4, 11:9, 11:10, 11:12, 11:13, 12:3, 12:4, 12:8, 12:9, 12:12, 12:13, 12:17, 12:18, 13:4, 13:5, 13:11, 13:12, 13:17, 13:18, 14:3, 14:4, 14:8, 14:9, 14:14, 14:15, 14:19, 14:20, 15:8, 15:12, 15:21, 16:5, 16:10, 16:15, 17:2, 17:5, 17:15, 17:17, 17:18, 18:1, 18:2, 18:5, 18:6, 18:7, 18:10, 18:11, 18:13, 18:14, 18:24, 18:25, 19:1, 19:11, 19:12, 19:16, 19:19, 19:21, 20:3, 20:4, 20:13, 20:14, 20:15, 20:19,

141

20:20, 20:21, 21:6, 21:7, 21:24, 21:25, 22:3, 22:12, 22:13, 22:25, 23:1, 23:8, 23:9, 23:17, 23:18, 23:19, 23:20, 23:21, 24:4, 24:5, 24:21, 24:22, 25:6, 25:7, 25:17, 25:18, 26:13, 26:14, 26:20, 26:21, 27:12, 27:13, 27:18, 27:21, 27:24, 28:1, 28:11, 28:12, 28:19, 28:20, 29:2, 29:3, 29:7, 29:8, 29:16, 29:17, 30:2, 30:3, 30:4, 30:22, 31:1, 31:5, 31:9, 31:18, 31:21, 31:22, 31:24, 32:14, 32:20, 32:22, 33:7, 33:8, 33:23, 33:24, 34:9, 34:10, 34:19, 34:20, 34:21, 35:5, 35:6, 35:7, 35:18, 35:23, 36:1, 36:4, 36:6, 36:10, 36:21, 36:22, 36:25, 37:3, 37:6, 37:7, 37:21, 37:24, 38:5, 38:10, 38:16, 38:18, 38:19, 39:2, 39:3, 39:9, 39:10, 39:19, 39:20, 40:9, 40:10, 40:18, 40:20, 40:22, 40:24, 41:3, 41:4, 41:14, 41:15, 41:22, 41:23, 42:15, 42:16, 42:24, 42:25, 43:7, 43:8, 44:2, 44:3, 44:13, 44:14, 44:25, 45:1, 45:2, 46:22, 47:1, 47:3, 47:5, 47:9, 47:10, 47:12, 47:13, 48:25, 49:1, 51:3, 51:4, 51:6, 53:18, 53:24, 53:25, 55:1, 55:2, 57:7, 57:8, 57:20, 57:23, 58:2, 58:3, 59:3, 59:4, 59:23, 59:24, 60:4, 60:5, 60:15, 60:16, 60:17, 60:18, 60:22, 60:23, 61:12, 61:13, 62:8, 62:10, 63:10, 63:11, 64:13, 64:14, 64:21, 64:22, 64:24, 64:25, 65:3, 65:4, 65:8, 65:9, 65:11, 65:12, 65:15, 65:16, 65:18, 65:20, 65:24, 65:25, 66:2,

66:3, 66:6, 66:7, 66:11, 66:12, 66:23, 67:19, 67:21, 68:4, 68:7, 68:9, 68:10, 68:12, 68:13, 68:14, 68:15, 69:1, 70:4, 71:1, 71:12, 71:16, 71:22, 72:2, 72:21, 72:25, 73:10, 74:13, 74:17, 74:22, 75:8, 75:11, 75:14, 76:1, 76:4, 76:6, 76:10, 76:15, 76:20, 76:22, 77:1, 77:3, 77:10, 77:14, 77:17, 77:18, 77:23, 77:24, 78:7
**themselves** [1] - 51:11
**thereafter** [1] - 24:11
**therefore** [2] - 52:22, 67:2
**thinking** [2] - 70:25, 71:10
**thinks** [1] - 72:20
**third** [10] - 33:21, 33:25, 35:14, 39:4, 41:5, 42:3, 43:1, 44:15, 52:17, 55:24
**thousands** [1] - 19:4
**threatened** [1] - 64:22
**three** [10] - 22:21, 29:20, 30:11, 31:1, 41:25, 45:19, 46:15, 46:19, 52:14, 56:20
**three-point** [1] - 52:14
**throat** [1] - 38:1
**thrown** [1] - 68:23
**times..** [1] - 17:6
**timing** [2] - 52:19, 75:15
**today** [5] - 56:3, 57:17, 66:14, 72:4, 74:23
**today's** [2] - 55:2, 77:19
**together** [3] - 15:4, 43:16, 64:6
**took** [2] - 20:9, 33:13
**top** [3] - 61:15, 62:6, 73:17
**total** [14] - 26:3, 49:19, 52:5, 52:24, 53:13, 54:21, 55:15, 56:6, 57:2, 58:15, 59:19, 60:11, 60:25
**towards** [2] - 9:13, 71:20
**town** [1] - 24:3
**trade** [2] - 9:13, 19:6
**transcript** [9] - 1:22, 1:22, 1:25, 74:11, 74:15, 78:15, 78:15,

78:17
**TRANSCRIPT** [1] - 1:6
**transcription** [1] - 1:25
**transfer** [1] - 21:1
**treated** [1] - 49:12
**treatment** [1] - 9:24
**trial** [43] - 10:21, 10:22, 10:23, 11:2, 11:14, 12:2, 12:5, 12:6, 12:9, 12:19, 13:10, 13:13, 14:13, 14:16, 14:18, 34:3, 34:14, 34:25, 36:14, 41:10, 42:7, 42:14, 43:21, 44:10, 44:18, 52:19, 52:21, 54:1, 54:7, 55:20, 68:19, 68:22, 69:24, 70:6, 70:12, 71:3, 71:17, 71:24, 73:6, 77:7, 77:16, 78:1
**trials** [3] - 68:2, 70:15, 70:22
**tried** [1] - 57:9
**troops** [2] - 17:24, 18:20
**trouble** [2] - 38:11
**true** [3] - 29:10, 78:14, 78:15
**trust** [3] - 24:15, 50:13, 50:15
**truthful** [1] - 36:5
**truthfully** [1] - 7:10
**try** [1] - 70:22
**trying** [3] - 57:5, 58:6, 76:11
**Tulum** [1] - 24:2
**turn** [2] - 50:18, 62:4
**twice** [3] - 46:25, 57:15, 57:18
**two** [23] - 7:3, 9:9, 15:10, 21:2, 22:20, 23:11, 29:19, 32:25, 47:1, 47:5, 52:9, 52:10, 52:13, 52:22, 54:5, 55:24, 56:2, 56:21, 57:17, 61:6, 62:11, 73:7, 75:3
**two-point** [4] - 15:10, 54:5, 55:24, 56:2
**type** [1] - 9:24
**types** [2] - 48:12, 48:14

**U**

**U.S** [28] - 17:10, 17:11, 17:12, 17:24, 18:18, 18:20, 19:9, 20:16,

20:24, 21:2, 21:3, 22:15, 22:16, 22:23, 23:11, 24:9, 25:15, 25:21, 26:5, 26:17, 26:24, 29:19, 29:22, 34:8, 44:12, 44:22, 50:11
**U.S.C** [7] - 7:19, 7:21, 7:23, 7:25, 8:2, 8:4, 41:25
**UBO** [1] - 20:7
**ultimate** [3] - 20:7, 21:4, 21:23
**ultimately** [2] - 6:13, 55:10
**unable** [1] - 14:4
**uncomfortable** [1] - 16:11
**under** [20] - 2:20, 7:9, 13:22, 15:10, 25:10, 32:22, 40:15, 41:2, 46:11, 46:24, 50:7, 50:19, 51:20, 51:22, 52:4, 52:23, 55:5, 56:6, 62:15, 63:1
**understood** [2] - 6:21
**unfairness** [1] - 11:19
**uniformly** [1] - 48:12
**UNITED** [4] - 1:1, 1:2, 1:7, 1:9
**United** [17] - 1:11, 2:3, 2:7, 7:17, 8:8, 17:8, 17:9, 17:21, 22:24, 24:7, 33:17, 35:15, 36:15, 39:6, 41:7, 65:22, 67:4
**unlawful** [3] - 13:20, 35:24, 45:15
**unless** [2] - 13:5, 56:3
**unredacted** [2] - 2:20, 3:22
**unreported** [2] - 25:16, 43:24
**up** [28] - 3:4, 5:16, 6:14, 11:2, 14:11, 14:16, 19:7, 46:5, 46:8, 47:11, 51:1, 54:18, 54:19, 55:25, 56:13, 56:24, 57:6, 60:1, 62:14, 62:19, 66:20, 68:11, 69:11, 69:13, 70:11, 70:12, 75:3, 77:7
**useful** [1] - 5:1
**uses** [1] - 15:5
**usual** [1] - 62:17

**V**

**valuable** [1] - 63:25

**value** [1] - 50:15
**variance** [3] - 62:21, 62:25, 63:3
**various** [9] - 10:24, 32:1, 44:11, 44:21, 54:9, 59:14, 60:16, 60:20, 69:8
**vary** [2] - 62:23, 63:8
**venture** [2] - 24:1, 28:5
**version** [4] - 2:20, 3:22, 17:1, 17:3
**versus** [4] - 2:3, 37:13, 38:6, 52:19
**video** [1] - 74:10
**view** [2] - 57:2, 74:12
**viewed** [1] - 53:13
**viewing** [1] - 69:3
**views** [1] - 11:19
**violate** [1] - 45:23
**violating** [2] - 36:2, 49:22
**violation** [9] - 7:19, 7:21, 7:23, 7:25, 8:2, 8:3, 8:4, 35:22, 41:25
**violations** [1] - 63:18
**voice** [1] - 16:14
**void** [2] - 1:22, 78:17
**voluntarily** [3] - 5:7, 65:10, 66:24
**voluntariness** [2] - 6:15, 64:15
**Voluntary** [1] - 36:19
**voluntary** [2] - 31:9, 34:22
**Volunteer** [1] - 25:1
**vote** [1] - 64:1
**vs** [1] - 1:3

**W**

**wait** [1] - 75:17
**waiting** [1] - 69:15
**walked** [1] - 4:10
**wants** [1] - 14:22
**Washington** [4] - 1:5, 1:12, 1:17, 22:18
**water** [1] - 37:25
**week** [7] - 71:14, 72:1, 72:21, 72:23, 73:7, 75:20
**weekend** [2] - 72:16, 76:9
**weeks** [2] - 10:1, 74:23
**weigh** [1] - 5:23
**WHITE** [1] - 1:10
**whittle** [1] - 70:8
**wife** [8] - 21:13, 21:18,

22:19, 28:16, 33:19, 40:8, 41:21, 50:14

**willful** [8] - 8:3, 35:17, 35:18, 39:12, 41:17, 42:4, 43:1, 51:23

**willfully** [3] - 24:25, 29:9, 29:18

**willfulness** [2] - 35:21, 44:16

**willing** [3] - 11:1, 11:4, 77:18

**win** [1] - 19:8

**wind** [1] - 70:12

**Wind** [2] - 19:5, 20:10

**wish** [2] - 3:15, 67:10

**witnesses** [6] - 12:11, 12:14, 68:21, 70:18, 73:4, 74:8

**won** [1] - 18:21

**words** [7] - 6:10, 12:15, 35:23, 46:10, 49:25, 72:8, 77:10

**works** [1] - 67:24

**worldwide** [1] - 17:13

**worry** [1] - 60:3

**worth** [1] - 23:12

**writer** [1] - 73:24

## Y

**year** [21] - 25:16, 26:3, 26:5, 26:6, 26:7, 26:11, 26:19, 26:24, 27:1, 28:18, 29:5, 38:24, 39:1, 42:10, 43:4, 43:18, 43:24, 58:21, 63:19

**years** [34] - 7:24, 8:1, 8:11, 9:9, 25:12, 25:14, 25:22, 26:23, 27:17, 27:20, 30:1, 39:15, 42:19, 43:9, 43:12, 43:16, 43:17, 44:6, 44:8, 44:19, 45:17, 45:19, 46:14, 46:16, 46:18, 46:20, 50:4, 53:11, 54:13, 56:13, 58:22, 60:1, 66:8, 67:8

**York** [1] - 1:16

**yourself** [1] - 12:24

**yourselves** [1] - 2:4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                CR No. 1:24-cr-00239-CKK-MAU-1

v.                                      Washington, D.C.
                                        Tuesday, June 17, 2025
DOUGLAS EDELMAN,                        3:00 p.m.

              Defendant.
- - - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the United States:   Ezra Spiro, Esq.
                         Joshua A. Gold, Esq.
                         DOJ-TAX
                         150 M Street, NE
                         Washington, DC 20002
                         (202) 514-5614

For the Defendant:       George M. Clarke, III, Esq.
                         Sonya C. Bishop, Esq.
                         BAKER & MCKENZIE LLP
                         815 Connecticut Avenue, NW
                         Washington, DC 20006
                         (202) 835-6184

Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111

Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.

144

2

**P R O C E E D I N G S**

THE DEPUTY CLERK:  Criminal Case 24-239-1, the United States v. Douglas Edelman.

Counsel, would you please identify yourself for the record, starting with the Government.

MR. SPIRO:  Good afternoon, Your Honor.  Ezra Spiro and Josh Gold on behalf of the United States.

THE COURT:  All right.  Good afternoon.

MR. CLARKE:  Good afternoon, Your Honor.  George Clarke and Sonya Bishop on behalf of Mr. Edelman, and Mr. Edelman's here.

THE COURT:  All right.  Good afternoon.

And good afternoon, Mr. Edelman.

THE DEFENDANT:  Good afternoon, Your Honor.

THE COURT:  All right.  I brought you in for -- to discuss Mr. Edelman's motion for temporary release pending sentencing, and I had a few things I wanted to clear up and then you can make a quick argument.  So what I'd like to do is to swear Mr. Edelman in.

And you could stay where you are.  You don't -- I mean, you need to stand and be sworn in, but I won't put you in the --

THE DEFENDANT:  Okay.

THE COURT:  -- witness box.

THE DEPUTY CLERK:  Raise your right hand, please.

145

Do you solemnly swear that you will well and truly answer all questions propounded to you by this Court, so help you God?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Go ahead and sit down.  And you can take the mask off, because we can't hear you --

THE DEFENDANT:  Okay.

THE COURT:  -- with it on.  I'd take it off altogether.  It's too uncomfortable --

THE DEFENDANT:  Okay.  Thank you.

THE COURT:  -- hanging off your ear.

All right.  So I had a couple of questions in terms of, sort of, practical questions, I'll say.  Whether I decided to give you either home detention or home incarceration, one is more restrictive, obviously, than the other which would limit you the opportunity to go out.  You'd still have some opportunity.  But the question that I have is -- none of the papers indicate -- where are you planning on living?

THE DEFENDANT:  We have a place here.  It's where I was living before, an apartment in Alexandria.

THE COURT:  So is it an apartment?  A house?  What is it?

MR. CLARKE:  Your Honor, it's the same apartment that he previously was in.  We -- because he was overseas

4

for 30 years, we rented that apartment for him and the rent's -- it was a one-year lease and it's partly under my name, too, so I wasn't going to break the lease. And so we're continuing to pay rent on that. So it's still there.

THE COURT: Okay. So it's basically rented by counsel? Because my question is where he was going to be and who was paying the rent.

MR. CLARKE: That's it, Your Honor.

THE COURT: Okay. So it's rented by counsel. So he's not going to have an issue in terms of paying the rent? It's being paid for?

MR. CLARKE: That's correct, Your Honor.

THE COURT: Okay. And this would be in the same apartment that he had been when he was originally released; is that correct?

MR. CLARKE: It is, Your Honor.

THE COURT: Okay. What are you going -- as I understand, reading materials, you have no assets and no income. So you have to eat, various other expenses. Where is that money coming from?

THE DEFENDANT: Well, there's some funds that my wife provided to counsel before I came here for the apartment, enough money for food, and local bills which are not much. So --

MR. CLARKE: If you want precision on that, Your

5

Honor, his wife gave us 100 -- rough- -- it was in euros, but roughly 100,000 U.S. to pay for rent. The rent's, I think, 5,200 a month, and then for, you know, food items and things like that, and that's what we've been using to pay it.

THE COURT: So basically, Mr. Edelman's wife gave it to counsel and counsel, then, is providing the funding to the defendant --

MR. CLARKE: That's correct.

THE COURT: -- or the defendant has the money?

MR. CLARKE: The defendant does not have the money. The defendant, when this was all happening, didn't have a bank account. So it was a problem for us to get it to him and we were concerned about whether the landlord would actually rent him a place, and so we had to deal with it the way we dealt with it.

THE COURT: Okay. So what I'm getting at is his access to funds. So --

MR. CLARKE: Yep.

THE COURT: -- does he have a bank account that he pays things out that you have put the money in? He has to ask you for the money? What's the system?

MR. CLARKE: He has to ask me for the money. I give him cash from this money that was received. He has a Revolut card. And the Revolut card, it's, like, a -- I

148

6

don't know; what did it used to be called -- like, a Vanilla Mastercard where you pay on it and then it's, like, a debit card that you can charge off of it.  It isn't a credit card. It isn't connected, really, to any other bank account, but I can transfer him money to that.

THE COURT:  Okay.  All right.  The other question that I had related to his interest in terms of having contact with his children which I understand, at the jail, he can't make these international calls.  Are his children in Europe or are they here?

THE DEFENDANT:  They're in Europe.  They just finished school for the summer.  So they're more able to travel now, but they're in Europe.  They go to school in Europe.

THE COURT:  Okay.  So are they planning on -- you want your -- one of the reasons you would like to be out is to be able to have contact with them, leaving aside phone calls.  Are they planning on coming to the United States? Are they planning on staying in Europe?  What?

THE DEFENDANT:  Well, they'll be in Europe, but they'll also come here once I'm out and then we'll make arrangements about when they can come and -- to visit.

THE COURT:  And where would they stay?  I mean, do you have other relatives?

THE DEFENDANT:  They can stay in the apartment.

149

7

THE COURT:  Okay.  So you would plan on having your children stay with you?

THE DEFENDANT:  Yes.

THE COURT:  And what ages are they?

THE DEFENDANT:  Sixteen, eighteen, and twenty-two.

THE COURT:  Okay.  I understand you're --

THE DEFENDANT:  And they may come at different times.

THE COURT:  And I understand you're a grandfather.

THE DEFENDANT:  Yes.  I have seven grandchildren.

THE COURT:  So --

THE DEFENDANT:  They'll also come.

THE COURT:  -- are they -- I'm just trying to figure out who's --

MR. CLARKE:  Your Honor, there's two --

THE COURT:  Mr. Edelman has to answer these. Okay?

MR. CLARKE:  I just -- I'm going to clarify and he can respond.  There are two sets of children.  That's why --

THE COURT:  Okay.

MR. CLARKE:  -- there's seven -- that's why the grandchildren.  There's an older set of children from his first wife.  He can explain that, but just trying to help you out here, Your Honor.

THE COURT:  Okay.  So the children that he's

8

interested that he's talked about in his papers, which children are we talking about that would come and potentially stay with him?  Is that --

THE DEFENDANT:  The ones in --

THE COURT:  -- from the second family?

THE DEFENDANT:  The younger ones in Europe.  The second --

THE COURT:  I'm sorry?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  We'll call it the second family --

THE DEFENDANT:  Okay.

THE COURT:  -- not that it diminishes them in any way.

THE DEFENDANT:  Right.

THE COURT:  Just to make a distinction.

THE DEFENDANT:  Okay.

THE COURT:  So I understood that there's a grandchild you haven't seen.  I assume it's from the second family.  Is that correct or --

THE DEFENDANT:  Yes, they live in Chicago now and they'll have a chance to, of course, visit.

THE COURT:  So is that -- that family, is that -- they -- the parent, is it a daughter or a son?

THE DEFENDANT:  In Chicago, I have a son and I

151

9

have a daughter who's the one that had the recent grandchild. She's got two.

THE COURT: Okay.

THE DEFENDANT: And I have another one in Austin who's got three and --

THE COURT: So part of what I'm trying to figure out is in terms of who is going to be with you in this apartment. Is it one bedroom? More than that? What is it?

THE DEFENDANT: Two bedrooms and a fold-out couch in the living room, and there would never be more than, you know, a couple of kids at a time, or if my daughter came with her husband and the kids, there's room for them to stay there, as well.

THE COURT: So have you made any plans or is this your hope?

THE DEFENDANT: This is my -- well, it's my dream. That's my hope, yes.

MR. CLARKE: Well, and just to be clear on that, Your Honor, prior to him being taken into custody, the children in Europe were planning on coming. So there was a plan for them to come already and they weren't able to come because they -- obviously, he was taken into custody.

THE DEFENDANT: They were coming for Christmas.

THE COURT: Okay.

MR. CLARKE: I guess, just while I'm at it, Your

10

Honor, one other thing.  One of the --

THE COURT:  I'm -- okay.

MR. CLARKE:  One of the --

THE COURT:  I'm going to give you a chance to argue.  I'm trying to get --

MR. CLARKE:  It wasn't argument.  Sorry, Your Honor.  I'll --

THE COURT:  I'm trying to get answers from --

MR. CLARKE:  Sure.

THE COURT:  -- Mr. Edelman.  All right?  I'll give you more than an opportunity to get up and make your argument and the Government can as well, but I'd like to talk to Mr. Edelman about some of this.

Okay.  So gone through the children, how you support yourself.  So in terms of your either -- you would either be -- if released, either in some sort of home detention or home incarceration.  One, obviously, more strict than the other.  What do you plan on doing all day?

THE DEFENDANT:  Well, working with my lawyers on the financial side of things and helping to do everything I can towards the sentencing part of the next step here, and I'm also reading and writing and communicating with my family and trying to walk and stay healthy.  Yeah.

THE COURT:  All right.  We had made a request of Pretrial.  If you could come up for a second and identify

153

11

yourself, as well. And you can also take the mask down. It's just very hard to get a record with it.

THE PROBATION OFFICER: Good afternoon, Your Honor. Britney Dahlkoetter on behalf of Pretrial Service Agency.

THE COURT: Okay. So if he's living in Virginia, he would be -- I'm keeping jurisdiction. So monitoring would be ultimately at this end, from D.C. But would he be monitored as well in Virginia? And what I'm getting at is, do they do device monitoring? Which I know the D.C. group does not.

THE PROBATION OFFICER: You -- are you talking about his phone, Your Honor?

THE COURT: Well, phone or any other devices. It's not just phones.

THE PROBATION OFFICER: Right. So we do not do computer and telephone monitoring. So we -- the only way we would -- and I spoke to the defense about it. The only way we would see his phone, if he was -- if he brought it in, but the GPS monitoring, that would be under us because he is within 50 -- a 50-mile radius. So we would keep the case.

THE COURT: Okay. But I'm not just talking about the phone; in terms of any other laptops or any other devices that could be at issue. I realize that, generally speaking, Pretrial in D.C. does not do the monitoring. If

154

12

he was -- is he -- if he were monitored by Virginia, since he's going to live in Alexandria, would they do monitoring?

THE PROBATION OFFICER:  No, they wouldn't take the case, Your Honor.  Because he is so close in our jurisdiction, it would be our supervision.

THE COURT:  Okay.  But do they do monitoring?

THE PROBATION OFFICER:  They do do the monitoring.

THE COURT:  What kind of monitoring?

THE PROBATION OFFICER:  I have to verify that with Ms. Robinson.

THE COURT:  Do you know if they do monitoring of the phone or not?

THE PROBATION OFFICER:  I believe they do computer and phone monitoring, but I can verify with my supervisor right now.

THE COURT:  Okay.  Did you take a particular position on if he was released at this point?

THE PROBATION OFFICER:  I spoke to the previous pretrial officer who was supervising him before he was detained and I also spoke to my supervisor and then, at this time, we are deferring to you to make that assessment, but we did look over the conditions and -- that he previously had, and if he was released those conditions can remain the same.  We wouldn't ask for anything else.

THE COURT:  So that would be home detention?

13

THE PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  If I ordered some sort of -- and what could he be released to do under that program?

THE PROBATION OFFICER:  So under home detention, you're essentially only released for work, religious services, medical appointments, school, and then approved PSA activities --

THE COURT:  Okay.  So --

THE PROBATION OFFICER:  -- meaning, like, going grocery shopping and getting a haircut, such as that.

THE COURT:  Okay.  Sort of, daily-living issues.

THE PROBATION OFFICER:  Yes.

THE COURT:  Okay.  He's not going to be working.  So that's not going to be an issue.

If he -- if they had -- if I ordered home incarceration -- which is done occasionally, not often -- but what would the restrictions be from your perspective?

THE PROBATION OFFICER:  It would be 24-hour lockdown.  You would only be able to leave to see your attorney, court, and Pretrial.

THE COURT:  Okay.  And if he has detention, what would be the contact he'd have with Pretrial?

THE PROBATION OFFICER:  He would report weekly in person or as Your Honor directs him to, but it's usually weekly in person.

156

14

THE COURT:  Okay.  Thank you.

THE PROBATION OFFICER:  Thank you.

THE COURT:  You can go ahead and sit down.  I don't have any other questions with that.

So obviously, Mr. Edelman, part of it is in terms of whether you're in a different position than you were earlier in terms of your reaching out to anybody else who would be involved with the case, which you had been prohibited to do and did.  You're in a different posture at this point in terms about the sentencing, but also the other half of the case that's left that will either go to trial or not, and also, there is the hearing on the restitution which is, basically, the hearing on whether this is an actual trust or not and whether the money would be used for restitution or it's money in a trust that would not be used for restitution.  So we're in a different position.  Your counsel has filed indicating that you have a different attitude.  I imagine the jail setting has -- not something that's been very pleasant for you.  Is it something that -- from your perspective, would you agree to either the home detention or incarceration in terms of actually being in the community but following what you're supposed to do?

THE DEFENDANT:  Absolutely.  I mean, as far as what -- like, what I was doing before, being detained in the apartment?  Yes.

15

THE COURT:  What's changed from before when you were out and you had an opportunity to, basically, take advantage of the different, you know -- different things that you were allowed to do and now?  What's changed for you that I should rely on and assume that I can trust you?

THE DEFENDANT:  Okay.  Well, you can count on me. The -- prior, I followed the rules perfectly.  I did screw up and I did come -- make the contact on the phone which I shouldn't have, and I take full responsibility for that and I know how wrong that was and I would never do that in a million years.  I didn't -- and, you know, being able to work with my counsel going forward on the case and having a clear head and being able to communicate with my kids, who I haven't spoken to, you know, in six months, for example, and being detained was fine.  I was in the apartment 22 hours a day.  I only went out for a walk and shopping.  And, you know, the difference is, obviously, night and day between that and, you know, life at the moment.

THE COURT:  Okay.  All right.  I don't have any other questions.

So Mr. Clarke, I'm letting you do -- I've read all the materials.  So you can give me your -- what you view is the strongest points and then I'll hear from the Government.

MR. CLARKE:  So first, Your Honor, I'm sorry for interrupting you.  I was just trying to --

16

THE COURT:  You could move the microphone up that way.

MR. CLARKE:  Yeah, as far as the -- does it go up?

THE COURT:  No.

MR. CLARKE:  Okay.  I'll just --

THE COURT:  There you go.

MR. CLARKE:  There we go.  Okay.

Sorry for interrupting you there.  I was just trying to make sure that the record was clear because of the two families.  And there is actually -- one of the -- the first wife's children is on the no-contact list.  So I just wanted to make -- that person, obviously, won't be staying in the apartment with him.  It would only be people that he's authorized to have contact with and we understand that and I think we would work with the Government to make sure that that was okay.

The second thing, just to put a point on it in case you had a question, when he says one of the things he wants to do is work on the finances, he owes us a lot of money.  And so one of the things -- and we have not been paid since last year.  And so one of the things that he will be working on is trying to work with his wife to figure out how to liquidate some assets and get us paid.  So that's another thing on that.

That's the only two clarifying points I had that I

17

wanted to make.

As far as the motion itself --

THE COURT:  Can I ask you a question?

MR. CLARKE:  Sure.

THE COURT:  In terms of if you're working with the wife about, you know, liquidating assets, is that assets in the trust?

MR. CLARKE:  It could be; it could not be. There -- actually, there's a house that the wife owns, too. So --

THE COURT:  So that's -- is that the house, you know --

MR. CLARKE:  In Spain.

THE COURT:  -- in Europe or here?

MR. CLARKE:  It's a house in Spain.

THE COURT:  I'm sorry?

MR. CLARKE:  It's a house in Spain --

THE COURT:  Okay.

MR. CLARKE:  -- the wife has.  So --

But as far as the motion itself, he is a changed man.  He has taken responsibility for his actions.  He has understood the seriousness of the Court's rules and, you know, we look at him and say this is somebody who is, you know, categorically different from where he was before.  And so we feel like, at the end of the day, this is somebody

18

that will follow the Court's rules.  He understands very clearly what will happen if he doesn't.  He also understands very clearly this is his last chance.  That's the first thing.

The second thing -- and we made a big deal about this in the filings -- but helping us with sentencing, 73-year-old guy who's got all these contacts outside the United States, for us to get letters of support; for us to get people -- we don't know all those people, Your Honor. It will be very difficult for us to pull together a really good sentencing package for you to sentence the person, not the crime, and having him out, even if he's in the apartment, will just make that way easier.

And then I think the reality is the likelihood of -- again, he's not going to tamper with anyone.  He's not going to contact anyone.  The likelihood of that being an issue, because of the way the case is currently postured, is low.  Sure.  Is there a possibility that somebody the Government would try to call to testify is somebody that he could contact?  Yes, but we have to look at this, like, reasonably.  Is there -- is it likely that he would have an effect on such a person?  Is it likely that such a person would actually be somebody that would testify?  We're going to have a much more limited evidentiary record here.  If Your Honor finds that the later years are included, the

161

19

Government isn't going to retry it. I know they won't say that right now because they don't have authorization to say it, but we all know they're not going to. And if you find on a preponderance that those years are out, is the Government really going to bring a case where they have to prove beyond a reasonable doubt that he failed to properly report his income in those years? Probably not. So I think that's where we look at it and say this is definitely a changed circumstance and definitely something, I think, you can rely on comfortably that he's not going to have a problem.

Finally, I will just say he is not a flight risk. He hasn't been a flight risk from the beginning. He, you know -- the -- ultimately, the magistrate gave him no cash bond. He was exactly where they tried to find him in Spain at his wife's house. He didn't fight extradition; right? He -- there's no indication that -- he's 73 years old. He only has a U.S. passport. Where's he going to go? Okay. So I think from a flight risk perspective, you can be comfortable on that one. And then the question's really just this witness tampering piece which, again, I think I've addressed, unless you have other questions for me.

THE COURT: Okay. No, I think one of the questions is that I thought that the money in the trust was somewhat secure in not being used in any way or distributed.

20

Am I wrong --

MR. CLARKE:  He has a --

THE COURT:  -- about that?

MR. CLARKE:  -- Sixth Amendment right to counsel, Your Honor.  That would be --

THE COURT:  I'm sorry?

MR. CLARKE:  He has a Sixth Amendment right to counsel.  That would be the issue that I'm talking about.

THE COURT:  Okay.  And I'm -- all I'm saying is in terms -- just looking at the trust money, what I'm trying to get at is my understanding is that the trustee -- at least the one that's in there now -- was not giving money out; therefore, the money was there, depending on what the Court ultimately says.  The money is his to give to his family or the money is not and it's the government's and it goes to restitution.  So I was just interested to know that there is possibilities of the money in the trust being distributed during this period of time.

MR. CLARKE:  The wife has to agree; right -- well, the trustee ultimately has to agree, but in order for the trustee to agree, the wife would have to make -- his wife would have to make some request of the trustee.  Right now, the trustee hasn't been distributing anything.  Okay?

THE COURT:  Well, that's what I understood.  I mean --

163

21

MR. CLARKE:  Zero.

THE COURT:  -- the question I have, though, is, isn't the issue that I'm deciding in November is whether it's actually a trust that the wife has?

MR. CLARKE:  It is.

THE COURT:  Well, isn't that the dispute?

MR. CLARKE:  Well, it is a dispute, Your Honor.  I guess the question is -- I don't represent the trustee.  So I can't stand here and say that the trustee will or will not do something.  The trustees also owe U.S.  They're not in the United States.

THE COURT:  Right.

MR. CLARKE:  So I can't even make a representation as to what the trust -- all I can tell you is I have not received any distributions from the trust.  I -- in the conversations I've had with the people who know about it, the only thing that might have been distributed is small amounts to pay school fees.  Okay?  So I think your factual predicate as to what's actually happening with the trust is correct, but I don't represent the trust.

THE COURT:  Okay.

MR. CLARKE:  I'm just trying to get paid.

THE COURT:  All right.  So let me hear from the Government.  You can start with the trust as to whether there's anything going on with the trust.  I had understood

164

22

that the trustee was not giving any money out at the present time.  You need to speak in the microphone.

MR. SPIRO:  Yes, Your Honor.  Well, first of all, we would frame the issue that you have to decide as whether -- you're asked to be -- to decide whether it was Mr. Edelman's income, the money that went --

THE COURT:  Right.

MR. SPIRO:  -- into the trust.  And we, frankly, don't know what the trustee is doing or going to do. They're an overseas trustee.  I believe the trust is in the Cayman Islands, if I'm not mistaken, and we have no idea whether they're going to distribute funds or not.  I guess what we do know is Mr. Edelman claims, at the same time, that he has no assets, no control over the trust, that he made hundreds of millions of dollars that he admitted to but doesn't even have a bank account and, at the same time, says he wants to be released to work with his wife, who's a fugitive in this case, in order to liquidate assets which he, again, says he has no control over.  So in terms of what's going on with the trust, we don't know, but from --

THE COURT:  I'm just trying to get a sense of where we were with the trust.  We don't need to get into what's going to happen in November.  I just was interested in, you know -- in terms of where money was coming and where it was going.

23

MR. SPIRO:  Your Honor, we -- so the Government's position is that Mr. Edelman should stay detained.  The standard here is that he should remain detained unless the defendant meets the burden of showing by clear and convincing evidence that he is not a risk of flight or danger to the community, and the defendant hasn't met that burden here.  You asked what's changed since your December ruling where you found that he would be unable to abide by any conditions set by the Court and, frankly, nothing has changed that would alter the Court's reasoning or conclusions there that he's unable to abide.  So --

THE COURT:  Well, let me interrupt for a second.  But isn't -- I mean, part of the issue was, prior to his plea, is that all of these people would potentially be witnesses and we had no way of monitoring what contacts he would have made and, certainly, in terms of his approach, shall we say, to his conditions which, I think, some months in jail have changed.  He now has pled.  So at least there is not going to be a trial on what the, you know -- the counts that he has pled to.  Now, I realize there's still counts that are left.  There's still the issue of the sentencing.  But the danger that there was prior to the plea in terms of standing trial for all of it was certainly greater than it would be now in terms of, you know, his -- I'm not expecting him to contact anybody, but I'm just

24

saying that the risk is a lesser risk in terms of what's changed in terms of that aspect of it.

MR. SPIRO:  Your Honor, our view is that the defendant still stands to benefit from contacting witnesses. So like you mentioned, there does still remain 20 open counts that he's charged in the indictment which, at this point, there are no plans to -- Government is not authorized to dismiss them and is prepared to go to trial on those counts, but even just looking at the contested sentencing hearing, the defendant stands to benefit by interfering with witnesses before that sentencing hearing.  A key issue in the sentencing hearing is going to be whether he effectively had control of the funds and control of the assets and control of what was going on with this alleged trust from 2013 and onward, and a lot of the witnesses who are overseas and who the defendant was contacting prior to his detention here in the U.S. could potentially be witnesses in that sentencing hearing, either live witnesses or witnesses who produce affidavits either for the Government or the defense, and so he does still benefit from reaching out to these people for a pretty significant issue at -- with regards to his sentencing.

I'd also add, Your Honor, that the fact that he's pled guilty does not mean he's less of a risk of flight.  In the Government's view, that makes him more of a risk of

25

flight.  He --

THE COURT:  Well, he wasn't, you know -- they -- the original release conditions and the decision that was made at the time was that he was he not a risk of flight or, obviously, he would not have been released into the community.  So are you indicating you think there's a heightened risk at this point that there wasn't before?  I mean, in -- before he actually pled or he was facing the, you know -- the trial and all of the complete indictment.

MR. SPIRO:  So Your Honor, I think, before -- I would say that there was a risk of flight for -- and before the magistrate court decided that there were very strict and stringent conditions which could mitigate that risk of flight.  That's why he was on home incarceration.  He wasn't allowed --

THE COURT:  No, he was on -- I believe he was on home detention -- or home incarceration --

Pretrial?  I thought it was detention.

THE PROBATION OFFICER:  Home detention, Your Honor.

THE COURT:  Okay.  Which is different.

MR. SPIRO:  Yes, Your Honor.  He was effectively not allowed to leave that apartment except for two hours in the morning with the exception of visiting the court or visiting his attorneys, are my understanding of the

168

26

conditions, and he wasn't allowed near airports, and when he left he was only allowed within a mile of his apartment, and there was no secured bond or any bond and that's because the defendant represented that he had no assets under his control. And so I'd argue, Your Honor, that the court did consider him to be a risk of flight at the time that it set those conditions. It set relatively restrictive conditions for a defendant who's awaiting trial and then, almost immediately, the defendant violated those conditions. So --

THE COURT: But they weren't flight conditions that he violated. He violated, certainly, the no-contact --

MR. SPIRO: Yes, Your Honor.

THE COURT: -- which is not a minor violation, I agree with you, but it's a different violation than his making preparations or something to disappear.

MR. SPIRO: Yes, Your Honor. And I think our point is that that shows he doesn't have respect for the conditions of the Court. He was caught violating one condition before, and our fear is that he's going to violate these other conditions the Court may be anticipating which are aimed at keeping him from fleeing. And we do think there's a heightened risk of flight here where he's pled guilty. He's facing a significant sentence. He has ties overseas. He's been overseas for the last 30 years. He has assets -- significant assets overseas. He's talked about

27

coordinating with his wife, who's a co-defendant and a fugitive in the same case.  And so we do think that the plea does not mitigate the risk of flight that existed before but does actually heighten it.

And I'd add, Your Honor, the defendant talks about how, you know, because he was incarcerated, he's changed and reformed and done something different, but it's worth bearing in mind that the defendant was incarcerated -- the defendant was arrested in Spain in early July of last year and incarcerated in Spain from July through September when he was brought to the United States.  He was released on conditions in September and then almost immediately violated.  So in terms of the defendant saying that this time in prison has showed him the importance of not violating, the Government and, we'd argue, the Court, too, should take that with a grain of salt because clearly a multiple-months-long period of incarceration previously didn't do anything to deter him from violating a court's conditions almost right away.  And so the fact that he has been detained over the last two months does not, in the Government's view, mean that he's any less likely to violate now when he did so quickly beforehand.

THE COURT:  Okay.  Thank you.

MR. SPIRO:  Thank you.

THE COURT:  Anything you want to respond to?

28

MR. CLARKE:  I just want to point out something, sort of, obvious at the beginning.  My colleagues here in four months or five months will be arguing for a detention sentence precisely because it is specific deterrence as to him to not do it again and that it's general deterrence.  So the idea that somehow he's been incarcerated for six months and it didn't have an effect is, sort of, inconsistent with what the Department of Justice always argues as far as whether somebody should be detained or not.  The detention has had the effect.  Okay?  He has respect for this Court that he didn't have before, he has respect for these proceedings that he didn't have before, he has respect for the conditions and not violating them that he didn't have before, and that's obvious from his plea; it's obvious from his demeanor and his changed demeanor here; and, again, I think it's obvious from our common experience that detention does change people.  So I think that's the first thing I'd like to say.

As to the existence of the remaining counts, those remaining counts are -- there's a legitimate debate about whether or not that trust is his or not, and we're going to get into all that later, but to expect him to somehow agree -- he pled guilty to the counts that he felt like he could plead guilty to and, without talking about our advice of counsel, we felt that we could be comfortable with this.

171

29

There's legitimate arguments as to why he didn't plead guilty to those later counts and the Court's going to have to deal with those, and the likelihood of there being a witness that he can materially manipulate -- again, he's not going to and I think that's what you should rely on, not this secondary argument; he's not going to -- but the likelihood is reduced.  We're not going to have a full-blown trial.  We're not going to have all these people here.  We're going to have a much smaller evidentiary hearing about a much more narrow set of facts.

And, Your Honor, unless I -- you have questions for me, that's what I have.

THE COURT:  Okay.  The other question that I have -- I have nothing else to ask.

MR. CLARKE:  Okay.

THE COURT:  Is there any possibility -- if I could get Pretrial to come up -- is there any possibility of persuading Virginia to take on at least the monitoring portion in terms of if he had -- and we can have a discussion about what he might wish to have in the house.

THE PROBATION OFFICER:  Your Honor, I would have to call Virginia and ask them.  They -- if -- they would take on, essentially, the whole case in supervising, and I can go back and ask my supervisor and have them ask Virginia.  I just know the Eastern District this far up

30

north usually don't take our cases because they are overwhelmed as well, but I can certainly make that phone call.

THE COURT:  Maybe I'll -- I'm going to take a break and look over this, but it would be helpful to know. I mean, it would be useful to know whether at least any devices that he would have -- and I'll ask in a moment what he wants or what he's expecting to have -- there was some monitoring of them so we would at least know, you know, what contacts would be out or there's more of a deterrent if you're going to be able to look at what he's using.

THE PROBATION OFFICER:  Yes, Your Honor.  I'll call them.

THE COURT:  All right.  What devices does he want?

Mr. Edelman?

THE DEFENDANT:  I think it's up to the Court.  I mean, it would be nice to be able to speak to people and speak to my family and speak to my children.

THE COURT:  So you're talking about a phone?

THE DEFENDANT:  I guess, yeah.  I have a local telephone that's provided by counsel, a local number.

THE COURT:  And what is he --

What are you doing in terms of the work on the case?  How are you doing that, Mr. Clarke?

MR. CLARKE:  I mean, it would be nice from our

31

perspective for him to have some ability to message or email us, but I'm fine giving up that if we want him to just have voice only. I mean, we could get him a flip phone, if that's -- if that makes everybody comfortable. We could take the laptop away from him. We could take the -- is it an iPhone or a -- no, it's a --

MS. BISHOP: It's an Android.

MR. CLARKE: -- an Android phone, we could take that away from him and just have him have a flip phone. That would be okay. As you can appreciate, it will make it a little bit more inefficient for us, but we're willing -- that's fine, if that's what the Court's comfortable with. I think our operating assumption was that he could have the Galaxy phone that he has now, but if that's something that you're uncomfortable with, again, we'll -- we can go to T-Mobile or wherever and get him a flip phone today.

THE COURT: Okay. I'm just exploring different things.

All right. If you can make the call, let me take a break and go over answers I have. How about if we come back at 4:00 and then just let me know if you need more time.

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: Okay. So we're on a break.

THE DEPUTY CLERK: Court stands in a brief recess.

32

(Brief recess taken.)

THE COURT:  All right.  So I've gone through the papers, reviewed what you've brought to my attention today, and so this is how we're going to go forward.  I am going to release Mr. Edelman.  I'm going to do it tomorrow, not tonight.  I want to have the order put out as well as the -- it's going to be home detention -- no -- home incarceration, not home detention.  So it's more restrictive.  I would order that it be a flip phone and not other kinds of things at least to start with so we see how this all works.  And we'll get the material to the jail tomorrow.  And you need to make some arrangement to have him picked up or whatever so he has a way of getting over to the -- to his apartment.

I don't know whether Probation -- I mean, Pretrial wants to have him stop by Pretrial or you want tomorrow or another day, and also, I was going to ask you to go over with him briefly, sort of, the key portions of -- since it's been some months since he had the special conditions, the airport and all the other things that need to be done.

THE PROBATION OFFICER:  Yes, Your Honor.  And just to update you, I did contact Virginia and my supervisor; are not going to be supervising this case.  So it will remain with us.

THE COURT:  Okay.

THE PROBATION OFFICER:  And then just to go over

175

33

the quick conditions -- and if Your Honor would like to add or take away, just let me know -- you're going to stay out of D.C. except for court or PSA business.

THE COURT:  Well, stay out of -- okay.  Go ahead.

THE PROBATION OFFICER:  Okay.  You're going to participate in home incarceration.  So you are essentially on 24-hour lockdown.  You cannot leave your house -- your apartment.  You have to get permission to see your attorney, to come see us -- we'll give you reporting instructions -- and then, of course, to come to court.  And then avoid all contact, directly or indirectly, with any co-conspirators.

THE COURT:  Or anyone else connected to the case.

THE PROBATION OFFICER:  Yes.

And then we've already verified your address.  We already have your passport.  Not to obtain -- or other -- not to obtain a passport, other international travel document; don't possess any firearms; submit to location monitoring as directed by the Pretrial Services officer or supervising officer and comply with all of the program requirements; don't use or unlawfully possess a narcotic drug or other controlled substance.

He was drug testing, Your Honor.  Did you want him to remain on drug -- weekly drug testing?

THE COURT:  I didn't think he -- was the original condition weekly drug testing?

34

THE PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  I don't think he needs that.  I didn't --

THE PROBATION OFFICER:  Okay.

THE COURT:  -- see any indication that suggests there's a problem.

THE PROBATION OFFICER:  And every --

THE COURT:  If he has not had a drug -- did he have a drug test to start with and -- at somewhere along the way, there should be one done sometime after he gets out --

THE PROBATION OFFICER:  I can just do a --

THE COURT:  -- an unannounced one just to see -- you have a protocol, if I'm not mistaken, that you can do drug testing, and then if it turns out to be negative, they don't do it as often; if it's positive, then you do it more often.  So if you could follow that protocol that you've --

THE PROBATION OFFICER:  Yes.

THE COURT:  -- set up --

THE PROBATION OFFICER:  Yes.

THE COURT:  -- and add that.

THE PROBATION OFFICER:  I'll add that.

Report as soon as possible to the Pretrial Services officer every contact with law enforcement personnel, including arrests, questioning, or traffic stops; and then since you're being released tomorrow, you will

177

35

report to 633 Indiana Avenue, Ninth Floor.

THE COURT:  Is that where he's -- so tomorrow, when he gets out, he would go in terms of having the monitoring; right?

THE PROBATION OFFICER:  Yes.

So you would get your GPS monitor hooked up at that location down the street.  Immediately following, you come back to district court to my office so we can do your program orientation and reacquaint you with your Pretrial Services officer.

THE DEFENDANT:  Okay.

THE PROBATION OFFICER:  And then one of the conditions that we had was defendant may leave his residence from 9:00 a.m. to 11:00 a.m. each day, may not go further than one mile from his residence.  During this period of home detention, apart from that, the defendant may only leave his -- excuse me.  It sounds like he was allowed to go walk around his residence.

THE COURT:  Okay.  I -- let's leave it as the incarceration.  He needs to talk to you all about when you -- what he wants to do.

THE PROBATION OFFICER:  And then the other condition: defendant shall not leave the United States. Defendant is permitted to have family members come to his home with prior notification to PSA.  Stay away: defendant

36

is expressly prohibited from entering or being within 1,000 feet from any airport, marina, embassy, or consulate. And then live at -- and I won't say your address on the record, but it's the address on file.

THE COURT: Okay. The other thing is, if family visits and people come to family, can we put some restrictions that they don't bring certain things to give to him? Can we put things in --

THE PROBATION OFFICER: Yes. What would you like to add?

THE COURT: My recollection in terms of -- is that they not bring communication devices, I guess, is the best way of putting it, to -- when they come and visit and stay -- either visit and/or stay with him.

And I also think -- I don't know whether your family would agree, but I would hope that your family would agree not to contact anybody on the outside. You're under a no-contact, but they should be as well which you should have some discussion about.

THE DEFENDANT: Okay.

THE PROBATION OFFICER: And then would you like to add the condition about the flip phone? Do not --

THE COURT: Yeah, if you just put that in. We'll start with this and we'll see how this all works and what routine you set up.

179

37

THE PROBATION OFFICER:  Anything else, Your Honor?

THE COURT:  I'm sorry?

THE PROBATION OFFICER:  Anything else?

THE COURT:  I don't think so.

Government, anything you want added?

MR. SPIRO:  Your Honor, we were -- Your Honor, the Government's particularly concerned about the defendant's statement that he was going to work with his fugitive wife to liquidate assets.  And so to the extent he is working to liquidate assets, we propose, maybe, a condition that he reports any assets which he has worked to liquidate or any assets which he's aware were liquidated.

THE COURT:  Okay.  Is this going to be, Mr. Clarke, that you're going to be the one doing it or is he doing it?  I had understood that you were working with his wife, not --

MR. CLARKE:  I am involved in --

THE COURT:  -- the defendant.

MR. CLARKE:  I am involved in the process.  The trustee won't speak to me directly.  Okay?  Because, one, there's a relationship breakdown; and, two, she has no --

THE COURT:  So who does the trustee speak to?

MR. CLARKE:  The trustee speaks to the wife.  Okay?

THE COURT:  Okay.

180

38

MR. CLARKE:  That's who has control.  So I speak to the wife's lawyer, who's at Kobre & Kim, and then sometimes to the wife with the wife's lawyer there.  That's the communication change.  So what I suspect is going to happen is there's going to be a four-person call -- me, him, or, maybe, Ms. Bishop and him, and the Kobre & Kim lawyer and the wife -- talking about what they're going to do and how they're going to work on this.  I suspect that's what's going to happen, but counsel's going to be involved in that from a -- he's going to have conversations with his wife, obviously, about personal issues, of course, but when it comes to things like that, we're going to be involved in it, either me or Ms. Bishop.

THE COURT:  Okay.  So how about a provision -- if -- can you come up with some provision that indicates if they're discussing, in any way, you know, the assets and the trust presumably, if that's what you want to focus it on, that counsel has to be involved with those discussions and then you can have that they can be reported, but they cannot be discussions between the wife and the defendant without counsel being involved.  How about that?  Does that work?

MR. SPIRO:  Yes, Your Honor.  Maybe we'd add -- well, you said not between the wife and the defendant and we'd add, maybe, the defendant and anyone else besides counsel; meaning, he can't speak with co-conspirators --

181

39

THE COURT:  Oh, okay.  All right.  Well --

MR. CLARKE:  He already can't do that.

THE COURT:  Well, he has that, but certainly in terms of anything relating to, you know, the finances.  So we'll come up with some language or --

Probation, do you have some language that you can propose for this so he knows what it is?  I mean, basically, any financial discussions involving the wife and the trust -- we're putting it in the trust -- that the -- there cannot be conversations just between the wife and Mr. Edelman.  They have to involve -- counsel has to be present for the conversations.  How about that?

THE LAW CLERK:  I was going to say we could model it, Judge, on the condition that already exists for the contact with co-conspirators.  I believe it's no contact except through counsel --

THE COURT:  Okay.  We can do that.  That works.

Okay.  So you understand, then, if there's any discussions, your counsel has to be involved in terms of these -- any of these negotiations relating to fees or whatever else that's involved.

Anything else from the Government?

MR. SPIRO:  No.  Thank you, Your Honor.

THE COURT:  Mr. Clarke, anything from you?

MR. CLARKE:  The only question I have, just for

40

clarity -- which I think we'll just work with Pretrial -- is for him to go grocery shopping or something like that, he'll call --

THE COURT:  Yeah, they --

MR. CLARKE:  -- Pretrial and then --

THE COURT:  -- they'll coordinate --

MR. CLARKE:  -- let him do that.  Right.

THE COURT:  -- these things.

MR. CLARKE:  Great.

THE COURT:  In other words, they'll -- it will be more restrictive.  They'll coordinate in terms of doing it. As opposed to saying, "You can go and do this," sort of, generally, he'll have to have more individual contact --

MR. CLARKE:  Understood.

THE COURT:  -- at least to start with.

MR. CLARKE:  Thank you, Your Honor.

THE COURT:  All right.  So we'll do the -- do we need to change -- do we need to do a new order of release or how do we -- with those conditions or how does -- how do we want to do this?

THE PROBATION OFFICER.  Yes, Your Honor.  I can type it up and send it to you --

THE COURT:  Okay.  All right.

THE PROBATION OFFICER:  -- with the conditions. My computer's stalling right now.  So --

41

THE COURT:  I'm sorry?

THE PROBATION OFFICER:  -- I can -- my computer is frozen.  So I can type it up when I get back to my office --

THE COURT:  Okay.  And then --

THE PROBATION OFFICER:  -- and we can just put "acknowledged on the record."

THE COURT:  Okay.  And then you'll add this particular condition in terms of the rest.

The next hearing for him will be November 17th. 9:00 a.m. is when we're coming back for the hearing and the sentencing, et cetera, unless somebody asks for a hearing in between.  There shouldn't be any need for it.

We need -- Dorothy, you need to give him his warnings.

So I'll write up a memorandum opinion as to why he's, you know -- based on the motion you have filed, why I'm releasing him.  He will have the conditions that are the same, plus these new ones that we've added which I'll sign off on.

Does he have to -- he has to sign off, too, doesn't he?

THE PROBATION OFFICER:  I put them on the record, Your Honor.  So yeah, I can just put "acknowledged on the record."  He doesn't --

THE COURT:  Okay.

184

42

THE PROBATION OFFICER:  -- need to sign it.

THE COURT:  All right.  So do you acknowledge those conditions?  You're still under oath.

THE DEFENDANT:  Yes, I do, Your Honor.

THE COURT:  Okay.

THE DEFENDANT:  Thank you.

THE COURT:  All right.  And then when you get released tomorrow, hopefully somebody will make arrangements to take you over to Pretrial so that the monitoring thing can be put on, et cetera.

All right.  Any other questions logistically?

(Brief pause.)

All right.  We'll get it off in the -- first thing in the morning so that they process him during the day and he gets released during the daylight hours.

All right.  I'm counting on you, Mr. Edelman.

THE DEFENDANT:  You can trust me, Your Honor.

THE COURT:  So I don't want to see you back here in trouble.

THE DEFENDANT:  Okay.  Thank you very much.

THE COURT:  All right.  The parties are excused.

MR. SPIRO:  Thank you.

MR. CLARKE:  Thank you.

(Proceedings concluded at 4:24 p.m.)

                    * * * * * * * * * * * *

185

43

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 25th day of June 2025.

/s/Timothy R. Miller, RPR, CRR, NJ-CCR
Official Court Reporter
United States Courthouse
Room 6722
333 Constitution Avenue, NW
Washington, DC 20001

186

Dated 23·12 _____ 2012

## DELPHINE ANNE LE DAIN

(Grantor)

and

## SALAMANDER ASSOCIATES LIMITED

(Original Trustee)

and

## GRAHAM AUBREY COLLETT

(Original Protector)

---

## THE GALACTEA TRUST

---

15432165.3

187

## TABLE OF CONTENTS

| No. | Heading | Page |
|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION | 4 |
| 2. | NAME | 6 |
| 3. | POWER TO RECEIVE ADDITIONAL PROPERTY | 7 |
| 4. | TRUST FOR SALE | 7 |
| 5. | POWER TO ADD DISCRETIONARY BENEFICIARIES | 7 |
| 6. | POWER OF EXCLUSION | 7 |
| 7. | GRANTOR'S POWER OF REVOCATION | 8 |
| 8. | DISCRETIONARY TRUST OF CAPITAL AND INCOME | 8 |
| 9. | INCOME TRUSTS IN DEFAULT OF APPOINTMENT | 9 |
| 10. | POWER TO APPLY CAPITAL FOR BENEFICIARIES | 9 |
| 11. | TRUSTS IN DEFAULT OF APPOINTMENT | 10 |
| 12. | ULTIMATE DEFAULT TRUSTS | 10 |
| 13. | ASSIGNMENT OF POWER OF APPOINTMENT | 10 |
| 14. | ADMINISTRATIVE POWERS | 10 |
| 15. | EXERCISE OF POWERS | 10 |
| 16. | GENERAL LIMITATION ON POWERS | 11 |
| 17. | REMOVAL AND APPOINTMENT OF TRUSTEES | 11 |
| 18. | APPOINTMENT OF PROTECTORS | 13 |
| 19. | EFFECT OF VACANCY IN PROTECTOR'S OFFICE | 14 |
| 20. | PROTECTOR'S INDEMNITY | 14 |
| 21. | PROPER LAW, FORUM AND PLACE OF ADMINISTRATION | 14 |
| 22. | EXCLUSION OF COMMUNITY PROPERTY RULES | 15 |
| 23. | EXCLUSION OF EXCLUDED PERSONS | 15 |
| 24. | VARIATION OF TERMS OF THIS TRUST | 15 |
| 25. | SEVERABILITY | 16 |
| 26. | COUNTERPARTS | 16 |
| 27. | POWER OF INVESTMENT | 16 |
| 28. | EXERCISE OF RIGHTS ATTACHING TO SHARES | 16 |
| 29. | POWER TO LEND | 17 |
| 30. | POWER TO BORROW | 17 |
| 31. | POWER TO GIVE GUARANTEES | 17 |
| 32. | POWER OF MANAGEMENT | 17 |
| 33. | POWERS IN RELATION TO LAND AND CHATTELS | 17 |
| 34. | POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY | 17 |
| 35. | POWER TO INSURE PROPERTY | 17 |

15432165.3

2

188

| 36. | POWERS IN RELATION TO LIFE INSURANCE POLICIES | 18 |
|---|---|---|
| 37. | POWER TO TRADE | 18 |
| 38. | POWER TO PROMOTE COMPANIES | 18 |
| 39. | POWERS IN RELATION TO COMPANIES | 18 |
| 40. | EXCLUSION OF APPORTIONMENT | 18 |
| 41. | POWER OF APPROPRIATION | 18 |
| 42. | DIVISION BETWEEN CAPITAL AND INCOME | 18 |
| 43. | PAYMENT OF EXPENSES | 19 |
| 44. | POWERS IN RELATION TO MINORS | 19 |
| 45. | POWER TO APPOINT AGENTS | 19 |
| 46. | POWER TO EMPLOY NOMINEES | 19 |
| 47. | POWERS TO DELEGATE | 19 |
| 48. | POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS | 19 |
| 49. | PAYMENTS TO CHARITIES | 20 |
| 50. | LEGAL PROCEEDINGS | 20 |
| 51. | COMPROMISE AND SETTLEMENT | 20 |
| 52. | ACCOUNTS AND AUDIT | 20 |
| 53. | PROTECTOR'S POWER TO MAKE REQUESTS | 20 |
| 54. | PAYMENT OF TAXES | 20 |
| 55. | PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS | 21 |
| 56. | TRUSTEE CHARGING | 21 |
| 57. | POWER TO RECEIVE REMUNERATION | 21 |
| 58. | INDEMNITY INSURANCE | 21 |
| 59. | POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST | 22 |
| 60. | DISCLOSURE OF DOCUMENTS | 22 |
| 61. | PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS | 22 |
| 62. | PROTECTION OF THE TRUSTEES GENERALLY | 22 |
| 63. | RELEASE OF POWERS | 23 |
| 64. | POWER TO VARY ADMINISTRATIVE PROVISIONS | 23 |

189

DEED OF SETTLEMENT

**DATE**: The *23* day of *December* 2012

**PARTIES**

(1)     **DELPHINE ANNE LE DAIN** of Buzon 110 Serreta, Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

(2)     **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

(3)     **GRAHAM AUBREY COLLETT** of 14 Rosewood Court, Orchard Road, Bromley, Kent, BR1 2TT (the **'Original Protector'**).

**RECITALS**

(A)     The Grantor wishes to make this Settlement and has transferred or delivered to the Original Trustee or otherwise placed under its control the property specified in the Schedule.  Further money, investments or other property may be paid or transferred to the Trustees by way of addition.

(B)     It is intended that this Trust shall be revocable during the lifetime of the Grantor.

(C)     In establishing this Trust, it is the intention of the Grantor that this Trust (i) will qualify as a grantor trust, during the Grantor's lifetime, within the meaning of Subpart E of Subchapter J of the US Internal Revenue Code of 1986, as amended (the **"Code"**), (ii) will not confer a general power of appointment upon any US person within the meaning of sections 2041 and 2514 of the Code, and (iii) will not result in any person other than the Grantor being treated as the owner of any portion of this Trust within the meaning of Code section 676. Accordingly, and notwithstanding any provision contained in this Deed to the contrary, this Deed shall be construed and the trusts of this Trust administered in accordance with and to achieve these intents.

**PART I - OPERATIVE PROVISIONS**

1.      **DEFINITIONS AND CONSTRUCTION**

1.1     In this Deed, where the context admits, the following definitions and rules of construction shall apply.

**'Beneficiary'** shall mean any person actually or prospectively entitled to any share or interest in the capital or income of the Trust Fund.

**'Charity'** shall mean any trust, foundation, company or other organisation whatever established only for purposes regarded as charitable under the proper law of the Trust or under the law of the jurisdiction in which the trust, foundation, company or other organisation was established.

**'children'**, **'grandchildren'** and **'issue'** of any person shall include his children, grandchildren and remoter issue, whether legitimate, legitimated, illegitimate or adopted.

**190**

'**Company**' shall mean any body, incorporated or established in any part of the world, which has separate legal personality.

'**Consent Holder**' shall mean the person appointed as Consent Holder pursuant to sub-clause 7.2.

'**deed**' shall include any instrument in writing which is signed, witnessed and dated by or on behalf of each of the parties to the instrument and shall also include any instrument executed under seal by a Company.

'**Discretionary Beneficiaries**' shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:

    (a)    the Grantor;

    (b)    the children and remoter issue of the Grantor;

    (c)    Charities; and

    (d)    such other objects or persons as are added under clause 5 to the extent so added

*provided* that no person will be capable of being included or added as a Discretionary Beneficiary if such person is a US Person as herein defined or a resident of The British Virgin Islands as defined in section 2(1) of the Companies (Taxation and Concessions) Ordinance of The British Virgin Islands other than an individual who has been issued a certificate under Rule 6 of the Qualifying (Category 2) Individual Rules 2004 of The British Virgin Islands which remains valid at the date hereof or an individual whose income is subject to an election under Rule 11 of those Rules at the date hereof.

'**Excluded Person**' shall mean any person or class of persons or Charity by or in respect of whom or which a declaration under sub-clauses 6.1 or 6.4(b) has been made or treated as made but, in the case of a revocable exclusion, only during such time as the exclusion remains effective and unrevoked.

'**incapacity**' shall mean incapacity caused by physical or mental handicap or deterioration resulting in an individual whose incapacity is being judged being unable to manage his own affairs or to understand the nature or consequences of his actions, as confirmed by the written opinion of two medical practitioners qualified to assess such matters and '**incapacity**' shall also mean any legal incapacity deriving from age or insolvency and '**incapacitated**' shall have a corresponding meaning.

'**minor**' shall mean any individual who has not attained the age of 18.

'**person**' shall include any individual or Company.

'**proper law of this Trust**' shall mean the law governing this Trust as determined under clause 21.

'**Protector**' shall mean the person or entity designated as the Protector in accordance with clause 18.

'**Settlor**' shall mean the Grantor and any person who shall have donated (by way of gift or sale for less than full consideration) any sums of money, investments or other property to be held as part of the Trust Fund.

15432165.3                            5

**191**

'Trustees' shall include the Original Trustee and the trustees for the time being of this Trust.

'Trust' shall mean the trusts constituted by this Deed.

'Trust Company' shall mean any Company, wherever incorporated, which is authorised under its constitution or by applicable law to act as trustee of a trust or trusts and/or carry on the business of administering trusts.

'Trust Fund' shall mean:

(a)    the property specified in Schedule;

(b)    all money, securities, investments or other assets or property paid or transferred by any person (including, without limitation, by bequest under a will) to, or so as to be under the control of, and, in either case, accepted by the Trustees as additions;

(c)    all accumulations (if any) of income added to the Trust Fund; and

(d)    the money, investments and property from time to time representing the above.

'Trust Period' shall mean the period starting with the date of this Trust and ending on the earlier of:

(a)    the last day of the period of 100 years starting from the date of this Deed, which period, and no other, shall be the applicable perpetuity period;

(b)    such date as the Grantor shall revoke the Trust in accordance with this Deed; and

(c)    such date as the Trustees shall at any time specify by deed in relation to the whole or any part of the Trust Fund (so that different days may be specified for different parts of the Trust Fund), not being a date earlier than the date of such deed or later than a date previously specified in relation to that part of the Trust Fund.

'US Person' shall mean a person described in section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended.

1.2    Words denoting the singular shall include the plural and vice versa.

1.3    Words denoting any gender shall include both genders.

1.4    References to any statutory provision shall include any statutory modification to or re-enactment of such provision.

1.5    The table of contents and clause headings are included for reference only and shall not affect the interpretation of this Deed.

2.    **NAME**

This Trust shall be known as The Galactea Trust or by such other name as the Trustees may, from time to time, determine.

15432165.3                                   6

192

3.    **POWER TO RECEIVE ADDITIONAL PROPERTY**

The Trustees may, at any time during the Trust Period, accept additional money, securities, investments or other assets or property, of whatever nature and wherever situate, paid or transferred to them by the Grantor or any other person (including, without limitation, by bequest under a will). Such additional money, securities, investments or other assets or property shall, subject to any contrary direction, be held upon the trusts and with and subject to the powers and provisions of this Deed.

4.    **TRUST FOR SALE**

The Trustees shall hold the Trust Fund and any additions upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money. The Trustees may, in their discretion, invest such money in their names or under their control in any of the investments authorised by this Trust or by law, with power from time to time to vary or transpose any such investments for or into others so authorised.

5.    **POWER TO ADD DISCRETIONARY BENEFICIARIES**

5.1    The Trustees with the prior or simultaneous written consent of the Protector, may, at any time during the Trust Period, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine.

5.2    Any such addition shall be made by deed (revocable to the extent permitted by the proper law of this Trust or irrevocable):

(a)    naming or describing the objects or persons or classes of objects or persons to be added; and

(b)    specifying the date or event, not being earlier than the date of execution of the deed but before the end of the Trust Period, on the happening of which the addition shall take effect.

5.3    Any power of revocation reserved by a deed of addition shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has become indefeasibly entitled.

6.    **POWER OF EXCLUSION**

6.1    The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall (whether or not a Beneficiary) be an Excluded Person.

6.2    The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall:

(a)    if included in the class of Discretionary Beneficiaries, cease to be so included; or

(b)    if not included in the class of Discretionary Beneficiaries, not be eligible to be added as a Discretionary Beneficiary pursuant to sub-clause 5.1.

15432165.3                                                7

193

6.3    The powers conferred by sub-clauses 6.1 and 6.2 shall not be capable of being exercised

    (a)    so as to derogate from any interest to which any Beneficiary has or would, but for the provisions of this clause, have become indefeasibly entitled;

    (b)    in relation to the Grantor.

6.4    Any person (not being a minor) who may receive any benefit under this Trust may, by declaration in writing:

    (a)    disclaim such benefit, either in whole or in part; or

    (b)    declare that he shall be an Excluded Person.

6.5    Any declaration made pursuant to sub-clauses 6.1, 6.2 or 6.4 shall be by deed (revocable during the Trust Period to the extent permitted by the proper law of this Trust or irrevocable), shall take effect in such circumstances or subject to such conditions and from such date (not being earlier than the date of such deed) specified in the deed.

## 7.    GRANTOR'S POWER OF REVOCATION

7.1    Power of revocation

    (a)    During her lifetime the Grantor shall have power by deed to revoke this Trust in whole or in part provided that any such revocation shall not invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Trust or made under any other power conferred by this Deed or by this Trust or by law.

    (b)    Any such deed shall take effect upon the date when the same is received by the Trustees or upon such later date as may be specified therein and whenever such a deed seeks to revoke this Trust in part only it shall specify the property being part of the Trust Fund to which such revocation shall apply.

7.2    Consent

The power conferred by sub-clause 7.1 on the Grantor shall be exercisable so as to take effect during the Grantor's lifetime with the prior written consent of the first person named by the Original Settlor or, failing which, by the Protector in the following list who is then living, not incapacitated and who is a related or subordinate party subservient to the Grantor within the meaning of Code Section 672(f)(2)(A)(i) (the 'Consent Holder') (unless no such person meets such requirements in which case the power shall be exercisable without such consent).

## 8.    DISCRETIONARY TRUST OF CAPITAL AND INCOME

8.1    The Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of such of the Discretionary Beneficiaries, at such ages or times, in such shares, upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint. Any such appointment may include such powers and provisions for the maintenance, education advancement or other benefit of the Discretionary Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit.

8.2 No exercise of the power conferred by sub-clause 8.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Deed or made under any other power conferred by this Deed or by law.

8.3 Any trusts and powers created by an appointment under sub-clause 8.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them.

8.4 The exercise of the power of appointment conferred by sub-clause 8.1 shall:

(a) comply with the provisions of sub-clause 15.1; and

(b) be subject to the prior or simultaneous written consent of the Protector.

8.5 Notwithstanding clause 63, the Trustees may not release or restrict the power conferred by sub-clause 8.1 without the written consent of the Protector.

## 9. INCOME TRUSTS IN DEFAULT OF APPOINTMENT

The provisions of this clause shall apply during the Trust Period until, subject to and in default of any appointment under sub-clause 8.1.

9.1 The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Discretionary Beneficiaries as shall for the time being be in existence, in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit.

9.2 Notwithstanding the provisions of sub-clause 8.1, the Trustees may at any time during the Trust Period in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and, subject to sub-clause 8.1, shall hold such accumulations as an accretion to capital.

9.3 The Trustees may apply the whole or any part of the income accumulated under sub-clause 8.1 as if it were income arising in the then current year.

## 10. POWER TO APPLY CAPITAL FOR BENEFICIARIES

The provisions of this clause shall apply during the Trust Period notwithstanding the provisions of sub-clause 8.1 but subject to any appointment made under sub-clause 8.1 and to the Protector's written consent.

10.1 The Trustees may pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries, in such shares and in such manner generally as the Trustees shall in their discretion think fit.

10.2 The Trustees may apply the whole or any part of the capital of the Trust Fund by paying or transferring the same to the trustees of any other trust or settlement, whether or not the proper law of such other trust or settlement shall be the proper law of the Trust, for the benefit of any of the Beneficiaries.

10.3 The exercise of the power conferred by sub-clause 10.2 shall be subject to the following provisions:

195

(a) upon the payment or transfer of any money or other property to the trustees of any such trust or settlement, the Trustees shall not be bound to see to the further application of such money or property;

(b) the Trustees may make such payment or transfer to the trustees of a discretionary trust, notwithstanding that the Beneficiary for whose benefit the power is exercised is only a discretionary object of such trust;

(c) the Trustees may make such payment or transfer notwithstanding that persons other than the Beneficiary for whose benefit the power is exercised are or may become entitled to, or to the income of, the money or other property paid or transferred;

(d) any exercise of the power shall comply with the provisions of sub-clause 15.1; and

(e) the power shall not be exercisable so as to permit any part of the income or capital of the Trust Fund to be paid or transferred to the trustees of any trust or settlement in which any Excluded Person is or may be interested.

## 11. TRUSTS IN DEFAULT OF APPOINTMENT

11.1 From and after the expiration of the Trust Period, and subject to any appointment made under sub-clause 8.1, the Trustees shall hold the capital and income of the Trust Fund upon trust absolutely for all or any one or more exclusively of the others of the Grantor and her children and remoter issue as shall then be living and, if more than one in equal shares *per stirpes*, so that no person shall take if any of his ascendants is alive and so capable of taking.

## 12. ULTIMATE DEFAULT TRUSTS

Upon expiration of the Trust Period, subject as above, if and so far as not wholly disposed of for any reason whatever by the above provisions, the capital and income of the Trust Fund shall be held upon trust for such Charities and, if more than one, in such shares as the Trustees shall determine absolutely.

## 13. ASSIGNMENT OF POWER OF APPOINTMENT

The Trustees may, with the prior or simultaneous written consent of the Protector, by deed, grant to any Beneficiary the power to appoint all or any part of the Trust Fund, whether capital or income or both, in such manner, outright or in further trust, as the Trustees shall in such deed provide.

## 14. ADMINISTRATIVE POWERS

The Trustees shall, in addition and without prejudice to all statutory powers, have the powers and immunities set out in Part 2 of this Deed. No power conferred on the Trustees shall be exercised so as to conflict with the beneficial provisions of this Deed.

## 15. EXERCISE OF POWERS

15.1 Every power conferred by the provisions of Part 1 of this Deed shall be subject to the application (if any) of the rule against perpetuities and any applicable laws governing the permitted period of accumulations and shall (except for clauses 17 and 18) be exercisable

15432165.3                                           10

196

only during and so as to take effect during the Trust Period. No power of revocation shall be exercisable except during the Trust Period.

15.2    Any written consents required under the terms of this Deed may be given either specifically in relation to any particular matter or by a general written consent referring to one or more matters.

15.3    If there is more than one Protector in office, the Protectors shall act unanimously.

16.    **GENERAL LIMITATION ON POWERS**

16.1    No individual Trustee and no person to whom a Trustee has delegated his powers pursuant to the terms of this Trust or by law who is a Beneficiary and a US Person may participate as one of the Trustees or as a delegate of one of the Trustees in the exercise of any of the powers conferred by the following clauses and sub-clauses (the 'restricted powers'):

(a)    clause 5 (Power to add Discretionary Beneficiaries);

(b)    clause 6 (Power of exclusion);

(c)    sub-clause 8.1 (Discretionary trust of capital and income);

(d)    clause 9 (Income trusts in default of appointment);

(e)    clause 10 (Power to apply capital for Beneficiaries);

(f)    clause 24 (Variation of terms of this Trust); and

(g)    clause 64 (Power to vary administrative provisions).

16.2    No Trust Company may participate as one of the Trustees in the exercise of any of the restricted powers if any individual director or alternate director (other than the Grantor) or any individual (other than the Grantor) to whom any one or more of the directors or alternate directors has delegated any or all of his powers as a director of such Trust Company is a Beneficiary who is a US Person (a 'restricted director' or a 'restricted delegatee' as the case may be) unless the Articles of Association, By-laws or any similar organisational documentation governing such Trust Company provide that any restricted director or restricted delegatee is not permitted to participate as a director or delegatee in the exercise of the restricted powers.

16.3    Neither the Protector nor the Grantor shall be eligible to serve as a Trustee of this Trust or to exercise the powers of the Trustees under any circumstances.

17.    **REMOVAL AND APPOINTMENT OF TRUSTEES**

17.1    A Trustee shall cease to be a Trustee on the happening of any of the following events:

(a)    on resigning in accordance with sub-clause 17.2;

(b)    on being removed in accordance with sub-clause 17.3;

(c)    if an individual, on death, on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

197

(d)    if a corporation, on filing for bankruptcy, on becoming insolvent or on dissolution.

17.2    A Trustee may resign by giving three months notice in writing to the person for the time being having power to appoint new or additional Trustees under the provisions of sub-clause 17.4. Upon the expiration of such notice, or such shorter period as may be agreed in writing between the Trustee giving notice and the person for the time being having power to appoint new or additional Trustees, the Trustee who has given notice shall cease to be a Trustee. If the Trustee so resigning is the sole Trustee and a new Trustee shall not have been appointed before the expiration of the specified period of notice, the resigning Trustee shall have power to appoint a new Trustee in its place and its resignation shall become effective only upon such appointment being made.

17.3    The Protector shall have power (to be exercised in writing) to remove any or all of the Trustees with or without cause. Notice of such removal shall forthwith be given to the Trustee concerned and the removal shall become effective immediately, except where all the Trustees or the sole Trustee have or has been removed in which case the removal shall be effective only on the appointment of a new Trustee or Trustees.

17.4    The Protector or, if the Protector shall be incapacitated or otherwise unable or unwilling to act, or if there shall be no Protector, the Trustees, shall have the power to appoint new or additional such Trustees.

17.5    Any appointment of a new or additional Trustee under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office in which case the appointment shall become effective on such death, resignation or incapacity. Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Trustees under this clause.

17.6    An outgoing Trustee (which term shall include a Trustee removed under sub-clause 17.3) shall promptly and without delay execute and do all such transfers or other acts or things as may be necessary for the immediate vesting the Trust Fund in the new or continuing Trustees and any reasonable expenses associated therewith (agreed in advance by the Protector) shall be borne by the Trust Fund *provided always* that the outgoing Trustee shall in no event delay or resist transferring the Trust Fund.

17.7    In the event that a Trustee is removed without cause under sub-clause 17.3, the new or continuing Trustees shall be required to undertake in writing to indemnify and hold the outgoing Trustee its directors officers servants and agents harmless against any and all claims demands actions proceedings damages costs or expenses whatsoever for or arising out of any act or omission on the part of the outgoing Trustee or any of its directors officers servants or agents in relation to the Trust, *provided always* (i) that such indemnity shall not extend to any act or omission for which the outgoing Trustee would not have been entitled to be indemnified out of the assets of the Trust Fund had it remained trustee of the Trust, (ii) that the new or continuing Trustees shall not be liable under this indemnity in an amount exceeding the amount or value of the Trust Fund for the time being, (iii) that the Protector shall have given his consent to the terms of such indemnity (which shall be reasonable and in accordance with industry standards) which consent shall not be unreasonably withheld.

17.8    Any appointment under this clause shall be in writing signed by the person making the appointment and by the new or additional Trustee so appointed.

17.9    The provisions of this clause shall apply notwithstanding any provision in the legislation for the time being in effect under the proper law of this Trust for the time being relating to the appointment, removal, retirement or discharge of trustees.

17.10    A person may be appointed to be a trustee notwithstanding that such person is not resident in the jurisdiction the law of which is the proper law of this Trust for the time being and remaining out of such jurisdiction for more than 12 months shall not be a ground for the removal of a trustee.

17.11    There shall be no requirement that there be more than one Trustee.

18.    **APPOINTMENT OF PROTECTORS**

18.1    The first Protector shall be the Original Protector.

18.2    A Protector shall cease to be a Protector on the happening of any of the following events:

(a)    on resigning in accordance with sub-clause 18.3;

(b)    if an individual, on death; on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

(c)    if a corporation, on filing for bankruptcy, becoming insolvent or on dissolution.

18.3    The Protector may at anytime resign its office by written instrument, notice of which shall be given to the Trustees.  Such resignation shall be effective upon receipt of the notice or the expiration of one month from the date of the resignation, whichever shall be earlier.

18.4    Protectors subsequent to the first Protector shall be appointed as follows.

(a)    The Original Protector may, by written instrument, appoint any other person or succession of persons to be protector or successive protectors of this Trust, either in addition to or to succeed it.

(b)    A Protector whose successor is not prescribed in advance by the Original Protector pursuant to sub-clause (a), or all of whose prescribed successors under sub-clause (a) have died, become incapacitated or are otherwise incapable or unwilling to serve as protector, may, by written instrument, appoint any other person to be protector of this Trust either in addition to or to succeed it (but may not appoint a succession of protectors).

(c)    Any appointment of a new or additional Protector under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office in which case the appointment shall become effective on such death, resignation or incapacity.  Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Protectors under this clause.

154321653    13

18.5 Any appointment under this clause (other than the appointment of the Original Protector whose appointment and acceptance thereof is made by this Deed) shall be in writing signed by the person making the appointment and by the new or additional Protector so appointed. Any such appointment shall only take effect when written notice of such appointment has been given to the Trustees.

18.6 If, notwithstanding the provisions of sub-clause 18.4 there shall at any time be no Protector of this Trust, the Trustees shall, by deed, irrevocably appoint any person, not being one of the Trustees, to be the Protector after consulting with such of the adult Discretionary Beneficiaries as they shall consider appropriate.

## 19. EFFECT OF VACANCY IN PROTECTOR'S OFFICE

If there shall at any time be no Protector, this Trust (except for clause 18) shall, during such time as there shall be no Protector (but not further or otherwise), be read and construed as if all references to the requirement for the Protector's consent or agreement and to the exercise by the Protector of any power were omitted from this Trust.

## 20. PROTECTOR'S INDEMNITY

20.1 The Protector shall exercise his powers in good faith. He shall not, in the absence of actual fraud, dishonesty or wilful misconduct, be accountable to any Beneficiary or the Trustees for any act of omission or commission in relation to the powers given to him by this Trust.

20.2 The Protector shall be entitled to charge for the performance of his duties at such rate or in such manner as may be agreed from time to time between the Protector and the Trustees.

20.3 The Protector shall be entitled to reimbursement of all proper expenses incurred by him in relation to the exercise of his powers and performance of his duties under this Trust or the prosecution or defence of any legal proceedings arising in connection with the exercise or non-exercise of his powers or the performance or non-performance of his duties, provided that any claim for reimbursement shall be received by the Trustees within one year of the expenses being incurred.

## 21. PROPER LAW, FORUM AND PLACE OF ADMINISTRATION

21.1 The proper law of this Trust shall be that of the British Virgin Islands. Except as otherwise provided in this Trust, all rights under this Deed and its construction and effect shall be subject to the jurisdiction of the courts, and construed according to the laws, of the British Virgin Islands.

21.2 The courts of the British Virgin Islands shall be the forum for the administration of these trusts.

21.3 The provisions of this sub-clause shall apply notwithstanding the provisions of sub-clauses 21.1 and 21.2

(a) The Trustees shall have power, subject to the application (if any) of the rule against perpetuities, to carry on the general administration of these trusts in any jurisdiction in the world. This power shall be exercisable whether or not the law of such jurisdiction is for the time being the proper law of this Trust or the courts of such jurisdiction are for the time being the forum for the administration of these trusts, and whether or

15432165.3                                    14

<span style="color:red">200</span>

not the Trustees or any of them are for the time being resident or domiciled in, or otherwise connected with, such jurisdiction.

(b) The Trustees may at any time declare in writing that, from the date of such declaration, the proper law of this Trust shall be that of any specified jurisdiction. No exercise of this power shall be effective unless the law of the jurisdiction specified is one under which this Trust remains and all, or substantially all, of the trusts, powers and provisions contained in this Deed remain enforceable and capable of being exercised and so taking effect.

(c) Following any exercise of the power contained in sub-clause 21.3(b), the Trustees shall, by deed, make such consequential alterations or additions to this Deed as they consider necessary or desirable to ensure that, so far as may be possible, the trusts, powers and provisions of this Deed shall be as valid and effective as they were immediately prior to such change.

(d) The Trustees may, at any time, declare in writing that, from the date of such declaration, the forum for the administration of these trusts shall be the courts of any specified jurisdiction.

## 22. EXCLUSION OF COMMUNITY PROPERTY RULES

No benefit accruing to or devolving on any Beneficiary under this Deed shall form or constitute a portion of any communal or joint estate or marital property of such Beneficiary, but such benefit shall be and remain the sole, separate and exclusive property of such Beneficiary. Should such Beneficiary be married or marry in community of property, any benefit so accruing or devolving shall be expressly excluded from the community; such benefit shall also be free from the interference, control or marital power of any spouse of such Beneficiary. The provisions of this clause shall apply not only to benefits accruing to or devolving on any Beneficiary but also to the property of whatever nature for the time being representing the same and the income thereof.

## 23. EXCLUSION OF EXCLUDED PERSONS

23.1 No discretion or power conferred on the Trustees or any other person by this Deed or by law shall be exercised, and no provision of this Deed shall operate directly or indirectly, so as to cause or permit any part of the capital or income of the Trust Fund to become in any way payable to or applicable for the benefit of an Excluded Person.

23.2 The provisions of sub-clause 23.1 shall not preclude any Settlor from exercising any statutory right to claim reimbursement from the Trustees for any income tax or capital gains tax paid by him in respect of income arising to the Trustees or capital gains realised or deemed or treated as realised by them.

23.3 Subject to sub-clause 23.2 the prohibition in this clause shall apply notwithstanding anything else contained or implied in this Deed.

## 24. VARIATION OF TERMS OF THIS TRUST

The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part 1 of this Deed including the trusts, powers and discretions contained in Part 1 of this Deed provided always that:

24.1    they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;

24.2    they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;

24.3    no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor.

24.4    no such variation, amendment, addition or deletion

(a)    shall infringe the proper law of this Trust for the time being; or

(b)    shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and

24.5    no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety.

## 25.    SEVERABILITY

If any provision of this Deed shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity and enforceability of the remaining provisions of this Deed which shall, so far as possible, be construed and take effect as if the invalid or unenforceable provisions had not been included in this Deed.

## 26.    COUNTERPARTS

This Deed may be signed in counterparts and each such counterpart shall constitute an agreed document and each such counterpart taken together, shall constitute one and the same instrument.

## PART 2 - ADMINISTRATIVE PROVISIONS

## 27.    POWER OF INVESTMENT

27.1    The Trustees may apply any money to be invested in the purchase or acquisition (either alone or jointly with other persons) of such property, of whatever nature and wherever situate and whether of a wasting nature, involving liabilities or producing income or not, or in making such loans with or without security, as they think fit so that they shall have the same powers to apply money to be invested as if they were an absolute beneficial owner.

27.2    The Trustees may exchange property for other property on such terms as they think fit.

27.3    The Trustees shall not be required to diversify the investment of the Trust Fund.

## 28.    EXERCISE OF RIGHTS ATTACHING TO SHARES

Notwithstanding any other provision of this Deed, the power, authority and discretion granted to the Trustees under this Deed over the control or exercise of any rights (including, without limitation, voting rights) attaching to any securities, shares or other interests in any entity that form a part of the Trust Fund, or which are held (directly or

15432165.3                                      16

202

indirectly) by a company or other entity whose shares form part of the Trust Fund and which is controlled by the Trustees, shall be exercisable by the Trustees, acting alone as provided in this Deed, without the approval or consent of any Beneficiary, Protector or any other person. No person other than the Trustees shall have any power, authority or discretion, directly or indirectly, over the control or exercise of any rights (including, without limitation, voting rights) which might be conferred by the holding of any such securities, shares or other interests unless specifically delegated such power, authority or discretion by the Trustees.

29.    **POWER TO LEND**

The Trustees may lend all or any part of the Trust Fund to any person or Beneficiary on such terms (whether or not including provision for the payment of interest) as the Trustees think fit.

30.    **POWER TO BORROW**

The Trustees may borrow on the security of all or any part of the Trust Fund or otherwise for any purpose.

31.    **POWER TO GIVE GUARANTEES**

The Trustees may guarantee the payment of money and the performance of obligations by any Beneficiary or by any company in which the Trust Fund is invested and may charge all or any part of the Trust Fund in support of such guarantee.

32.    **POWER OF MANAGEMENT**

The Trustees shall have all the powers of an absolute beneficial owner in relation to the management and administration of the Trust Fund.

33.    **POWERS IN RELATION TO LAND AND CHATTELS**

33.1    The Trustees shall have all the powers of an absolute beneficial owner in relation to the disposition, development and improvement of any land comprised in the Trust Fund.

33.2    The Trustees shall not be bound to maintain any building or other structure on land comprised in the Trust Fund or to preserve or repair any chattels comprised in the Trust Fund.

34.    **POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY**

The Trustees may, with the consent of the Protector, permit any Discretionary Beneficiary or any other person (if in the opinion of the Trustees it is in the interests of a Discretionary Beneficiary) to occupy or enjoy the use of all or any part of the Trust Fund on such terms as the Trustees think fit. The Trustees may acquire any property for this purpose.

35.    **POWER TO INSURE PROPERTY**

The Trustees may insure all or any part of the Trust Fund against any risk, for any amount and on such terms as they think fit but shall not be bound to do so.

15432165.3                                        17

203

## 36.    POWERS IN RELATION TO LIFE INSURANCE POLICIES

The Trustees may apply all or any part of the Trust Fund in purchasing or maintaining any policy of insurance on the life of any person and shall have all the powers of an absolute beneficial owner in relation to any such policy.

## 37.    POWER TO TRADE

37.1    The Trustees may trade either alone or in partnership and may exercise all or any of the powers conferred on them by this Trust in connection with such trade.

37.2    The Trustees shall be entitled to be indemnified out of the Trust Fund against all liability to which they may be subject in connection with such trade.

## 38.    POWER TO PROMOTE COMPANIES

The Trustees may incorporate any company in any part of the world for any purpose in connection with this Trust.

## 39.    POWERS IN RELATION TO COMPANIES

39.1    The Trustees may enter into any compromise or arrangement in relation to any company in which the Trust Fund is invested.

39.2    The Trustees may enter into any arrangements in relation to the winding up or liquidation of any company in which the Trust Fund is invested.

39.3    The Trustees shall not be bound to enquire into or be involved in the management of any company in which the Trust Fund is invested unless they have knowledge of circumstances which call for enquiry.

## 40.    EXCLUSION OF APPORTIONMENT

No apportionment rules shall apply to the income of the Trust Fund or any part of it, so that all income received by the Trustees shall be treated as accruing at the date of receipt.

## 41.    POWER OF APPROPRIATION

41.1    The Trustees may appropriate all or any part of the Trust Fund as they think fit in or towards satisfaction of the interest of any Beneficiary and may for such purpose place such value on any property as they think fit.

41.2    Where the Trustees have divided the Trust Fund into one or more sub-funds, the Trustees may transfer assets comprised in one such sub-fund to any other sub-fund in exchange for assets which have an equivalent open market value.

## 42.    DIVISION BETWEEN CAPITAL AND INCOME

The Trustees may determine whether any sums received or disbursed are on account of capital or income, or partly on account of one and partly on account of the other, and in what proportions.

15432165.3                    18

204

## 43.  PAYMENT OF EXPENSES

The Trustees shall have power to pay out of income or capital, as they may in their discretion determine, any expenses relating to the Trust Fund (or any assets comprised within it) or its administration.

## 44.  POWERS IN RELATION TO MINORS

44.1  The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the parent or guardian of any minor who is beneficially entitled to such assets or income, and the receipt of such parent or guardian, or of the minor, shall be a full discharge to the Trustees.

44.2  The parent or guardian of a minor shall in respect of any assets or income received in accordance with this clause have the powers conferred on the Trustees by Part 2 of this Deed.

## 45.  POWER TO APPOINT AGENTS

The Trustees may employ and pay at the expense of the Trust Fund any agent in any part of the world to transact any business in connection with this Trust without being responsible for the fraud, dishonesty or negligence of such agent, provided that such agent is employed in good faith, the Trustees reasonably ensure that the agent acts within the scope of its delegation, and the Trustees monitor and review from time to time the agent's overall performance.

## 46.  POWER TO EMPLOY NOMINEES

The Trustees may hold all or any part of the Trust Fund in the name of one or more of the Trustees, or of any other person or partnership, as nominee on such terms as the Trustees think fit.

## 47.  POWERS TO DELEGATE

47.1  The Trustees may engage any person or partnership as investment adviser to advise them on the investment of all or any part of the Trust Fund and they may, without being liable for any consequent loss, delegate to such investment adviser discretion to manage investments on such terms as the Trustees think fit.

47.2  The Trustees may, without being liable for any consequent loss, delegate to any person the operation of any bank, building society or other account.

47.3  Any trustee may, by deed revocable or irrevocable, delegate to another trustee or any other person the exercise of all or any trusts and powers conferred on such trustee (other than the power of delegation conferred by this sub-clause) notwithstanding the fiduciary nature of such trusts and powers.

## 48.  POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS

48.1  The Trustees may indemnify any person in respect of any liability relating to this Trust and may charge all or any part of the Trust Fund in connection with such indemnity in such manner as they think fit.

**205**

48.2 The Trustees may enter into any agreement or give any commitment that they think fit relating to the transfer or sale of any business or company in which the Trust Fund is invested.

## 49. PAYMENTS TO CHARITIES

The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the person who purports to be the treasurer or other appropriate officer of any Charity which is entitled to such assets or income, and the receipt of such person shall be a full discharge to the Trustees.

## 50. LEGAL PROCEEDINGS

The Trustees may institute and defend proceedings at law and proceed to the final determination thereof or compromise the same as they shall in their discretion think fit.

## 51. COMPROMISE AND SETTLEMENT

The Trustees may compromise and settle for such consideration and upon such terms and conditions as they shall in their discretion think fit all matters arising in relation to the trusts hereby created or the Trust Fund.

## 52. ACCOUNTS AND AUDIT

The Trustees shall keep accurate accounts of their trusteeship and may, or shall if so requested by the Protector, have them audited annually by a firm of professionally qualified accountants selected by the Trustees.

## 53. PROTECTOR'S POWER TO MAKE REQUESTS

In addition to the powers specifically conferred on the Protector by this Deed, the Protector shall have power to request information relating to this Trust from the Trustees (which information and accounts shall forthwith be supplied to the Protector) and to make other requests of or suggestions to the Trustees in regard to any matter relating to this Trust and the Trustees shall be bound to have regard to any such other request or suggestion but shall not be bound to act in accordance with the same.

## 54. PAYMENT OF TAXES

In the event of any inheritance tax or probate, succession, estate duty or other duties, fees or taxes whatever becoming payable in any part of the world in respect of the Trust Fund or any part of it in any circumstances whatever, the Trustees may pay all such duties, fees or taxes (notwithstanding that they are not recoverable from the Trustees or the Beneficiaries) out of the capital or income of the Trust Fund at such time and in such manner as they think fit, *provided* that, during the lifetime of the Grantor, any United States income taxes or capital gains taxes payable in respect of the Trust Fund or any part of it shall be payable by the Grantor (subject to any statutory right of the Grantor to be reimbursed by the Trustees). The power to pay duties, fees and taxes conferred by this clause shall extend to any related interest and penalties and to the provision of information to, or the filing of returns with, any relevant tax authorities.

15432165.3

20

## 55.  PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS

Notwithstanding any provision to the contrary contained in this Deed, the Trustees shall comply with all requests received from any Beneficiary regarding information or documentation that they may require from the Trustees to fulfil their personal tax filing obligations and requirements.  The provision of such information and documentation shall include, where requested:

55.1    the execution by the Trustees of such returns or statements as may be required for tax purposes;

55.2    the appointment, as contemplated by section 6048 of the Code, of a United States agent acceptable to the Trustees for the trusts declared or contained in this Deed; and

55.3    the production of the accounts pertaining to the Trust Fund within a reasonable time after the expiration of the Beneficiary's relevant tax reporting period.

## 56.  TRUSTEE CHARGING

56.1    A trustee which is a trust corporation or company authorised to undertake trust business shall be entitled to remuneration in accordance with such terms as may from time to time be agreed between the trustee and the Protector.

56.2    A trustee, whether acting as a person engaged in a profession or business or in a personal capacity, shall be entitled to all normal professional or other fees for business done, services rendered or time spent by such trustee personally or by such trustee's firm or company in the administration of these trusts, including acts which a trustee not engaged in any profession or business could have done personally.

56.3    A trustee shall be entitled to retain any commission which may be received personally or by such trustee's firm in respect of any transaction carried out on behalf of this Trust for which such trustee or trustee's firm is, in the normal course of business, allowed commission, notwithstanding that the receipt of such commission was procured by an exercise by such trustee or the Trustees of powers over the Trust Fund, but shall notify the Protector on receipt of any such commission.

## 57.  POWER TO RECEIVE REMUNERATION

A trustee may act and be remunerated as a director or other employee or as agent or adviser of any business or company in any way connected with the Trust Fund and shall not be liable to account for any remuneration, fees or profits received by the trustee in any such capacity, but shall notify the Protector on receipt of any such remuneration, fees or profit.

## 58.  INDEMNITY INSURANCE

58.1    The Trustees may pay out of the Trust Fund the cost of any premium in respect of insurance or indemnity to cover all personal liabilities which may be incurred by the Trustees in connection with this Trust.  No trustee shall be accountable for any money paid to such trustee under the terms of any such insurance or indemnity unless the trustee shall otherwise have been fully indemnified in respect of the liability to which such payment relates.

15432165.3

207

58.2    Any such insurance or indemnity shall not extend to any liabilities of a trustee arising from any act or omission in respect of which the trustee would not otherwise be entitled to be indemnified out of the Trust Fund.

## 59.    POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST

59.1    The Trustees  may enter into any transaction concerning the Trust Fund:

(a)    notwithstanding that one or more of the Trustees or any one or more of the Protectors may be interested in the transaction other than as one of the Trustees or the Protectors; and

(b)    without any trustee or any protector who is so interested being liable to account for any reasonable incidental profit.

59.2    This power shall only apply provided that the transaction is at least as favourable to the Trustees as if it had been effected:

(a)    in the case of a purchase or sale of shares or other securities listed on any stock exchange, at the middle market price on the day on which such shares or other securities are purchased or sold; or

(b)    in the case of any other transaction, at a price and on terms such as would apply in the case of a transaction effected on fully commercial terms between unconnected persons.

## 60.    DISCLOSURE OF DOCUMENTS

The provisions of this clause shall apply without prejudice to any right of the Trustees under the proper law of this Trust to refuse to disclose any document.

60.1    The Trustees shall not, subject to sub-clause 60.2, be bound to disclose to any person any document relating to this Trust, its administration, the exercise of the Trustees' powers, the performance of their duties or the Grantor's wishes.

60.2    Notwithstanding sub-clause 60.1, in the event of a Beneficiary requesting disclosure, the Trustees shall disclose to that Beneficiary, this Deed, supplemental deeds, trustees' resolutions exercising dispositive powers and documents which relate to or form part of the accounts of this Trust.

## 61.    PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS

The Trustees may distribute the Trust Fund without having ascertained that there is no Beneficiary whose parents were not married to each other at the time of his birth (or who claims through a person whose parents were not so married) and the Trustees shall not be liable to any Beneficiary of whose existence they had no actual notice at the time of distribution.

## 62.    PROTECTION OF THE TRUSTEES GENERALLY

62.1    No trustee shall be liable for any loss to the Trust Fund however arising except as a result of the fraud, dishonesty or wilful misconduct of such trustee, or in the case of a

208

professional trustee entitled to charge for his services as trustee for the negligence of such trustee.

62.2    No trustee shall be bound to take any proceedings against a co-trustee or former trustee or the personal representatives of a co-trustee or former trustee for any breach or alleged breach of trust committed or suffered by such co-trustee or former trustee.

## 63.    RELEASE OF POWERS

63.1    Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.

63.2    The Protector and any other person on whom powers are conferred by this Deed may by deed (and so as to bind successive protectors of this Trust) release or restrict the future exercise of all or any of the powers conferred upon him by this Deed.

## 64.    POWER TO VARY ADMINISTRATIVE PROVISIONS

The Trustees may by deed amend or add to the administrative provisions contained in Part 2 of this Deed, provided that any amendment to clauses 45 (Power to appoint agents),  46 (Power to employ nominees), 47 (Power to delegate), 56 (Trustee charging), 57 (Power to receive remuneration) or 59 (Power to exercise powers notwithstanding personal interest) shall require the prior or simultaneous written consent of the Protector.

15432165.3                                          23

209

# SCHEDULE

€100



15432165.3

24

Signed sealed and delivered as a deed by    )

**Delphine Anne Le Dain**    )

    )

in the presence of

**Witness**

Signature: .........................................................

Name: MARTIN SHIEL

Address: 3 FERNSHAW MANSIONS

FERNSHAW ROAD

SW10 0TD

Occupation: INVESTMENT CONSULTANT

The Common Seal of    )

**Trustee**    )

was hereunto affixed    )

    )

in the presence of

**Director**

Signature: .........................................................

Name: LEONARD T TREVEN

**Director / Secretary**

Signature: .........................................................

Name: GENEVIEVE MAUROUX

15432165.3                                    25

211

**Agreed and accepted by the Original Protector**

Signed sealed and delivered as a deed by        )

**GRAHAM AUBREY COLLETT**        ` )

        )

*G A Collett .*

...................................

in the presence of

**Witness**

Signature:        *M. Shiel*

Name:        MARTIN SHIEL

Address:        3 FERNSHAW MANZIONS

        FERNSHAW ROAD

        SW10 0TD

Occupation:        INVESTMENT CONSULTANT.

15432165.3        26

212

Dated _15th December_ 2017

DELPHINE ANNE LE DAIN

(Grantor)

and

SALAMANDER ASSOCIATES LIMITED

(Original Trustee)

and

GRAHAM AUBREY COLLETT

(Original Protector)

---

# DEED OF AMENDMENT TO

# THE GALACTEA TRUST

---

41844544.1

213

DEED OF AMENDMENT

**DATE:** The ᴧ𝖲 day of December 2017

**PARTIES**

(1) **DELPHINE ANNE LE DAIN** of Buzon 110 Serreta, Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

(2) **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

(3) **GRAHAM AUBREY COLLETT** of 14 Rosewood Court, Orchard Road, Bromley, Kent, BR1 2TT (the **'Original Protector'**),

together, the **"Parties"**.

**RECITALS**

(A) This Deed is supplemental to the settlement (the **"Settlement"**) specified in the Schedule to this Deed.

(B) The Original Trustee is the present Trustee of the Settlement.

(C) Under clause 24 (*Variation of terms of this Trust*) of the Settlement, the Trustees have power, exercisable by deed and subject to the prior or simultaneous consent of the Protector, to vary, amend, add to or delete, any or all the provisions of Part 1 of the Settlement including the trusts, powers and discretions contained in Part 1 of the Settlement, provided always that:

    (1) they are satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;

    (2) they have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust (which is the British Virgin Islands under clause 21 (*Proper law, forum and place of administration*) of the Settlement) for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers (the **"Counsel Opinion"**);

    (3) no such variation, amendment or addition shall be made to the provisions of clause 7 of the Settlement (*Grantor's power of revocation*) without the consent of the Grantor (the **"Grantor Consent"**); and

    (4) no such variation, amendment, addition or deletion shall:

        a. infringe the proper law of the Galactea Trust for the time being; or

<span style="color:red">**214**</span>

b.  permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in the Settlement,

(the "**Power**").

(D)  The Trustees wish to exercise the Power in the manner set out in this Deed.

**OPERATIVE PROVISIONS**

1.  **DEFINITIONS AND CONSTRUCTION**

In this Deed, where the context admits, the definitions and rules of construction contained in the Settlement shall apply.

2.  **VARIATION OF THE SETTLEMENT**

2.1  In exercise of the Power and all other powers (if any), and:

2.1.1  being satisfied that such variation is for the benefit of the Beneficiaries;

2.1.2  having obtained the Counsel Opinion; and

2.1.3  having obtained the Grantor Consent,

the Trustees hereby, with effect from the date of this Deed, vary the Settlement by deleting clause 7 (*Grantor's power of revocation*) of the Settlement in its entirety.

2.2  In accordance with clause 16 (*General limitation on powers*) of the Settlement, no Trust Company may participate as one of the Trustees in the exercise of any of the Power if any individual director or alternate director (other than the Grantor) or any individual (other than the Grantor) to whom any one or more of the directors or alternate directors has delegated any or all of his powers as a director of such Trust Company is a Beneficiary who is a US Person (a 'restricted director' or a 'restricted delegatee' as the case may be) unless the Articles of Association, By-laws or any similar organisational documentation governing such Trust Company provide that any restricted director or restricted delegatee is not permitted to participate as a director or delegatee in the exercise of the restricted powers.

## SCHEDULE

The Deed of Settlement for the Galactea Trust dated 23 December 2012 between the Parties.

216

4

Signed sealed and delivered as a deed by )

**Delphine Anne Le Dain**                    )

                                             )

in the presence of

**Witness**

Signature:

Name: *Iryna Tsenzharyk*

Address: *20 Conduit Street*
*London W1S 2XW*

Occupation: *Finance Manager*

The Common Seal of                          )

**SALAMANDER ASSOCIATES**   )

**LIMITED**                                  )

was hereunto affixed                         )

in the presence of

**Director**

Signature:

Name:

**Director / Secretary**

Signature:

Name:

<span style="color:red">217</span>

41844544.1                    5

**Agreed, consented and accepted by the Original Protector**

Signed sealed and delivered as a deed by )

**GRAHAM AUBREY COLLETT**                    )

                                             )

in the presence of

**Witness**

Signature:

Name:

Address:

Occupation:

218



CRS
CharlesRussell
Speechlys

DATED    *12ᵀᴴ APRIL*    2022

## SALAMANDER CORPORATE SERVICES SA (1)

and

## GRAHAM AUBREY COLLETT (2)

---

## REVOCABLE DEED OF AMENDMENT REGARDING THE BENEFICIAL CLASS

## (THE GALACTEA TRUST)

---



219

**THIS DEED OF AMENDMENT** is made on the *12ᵀᴴ* day of *APRIL* 2022

**BETWEEN**

(1) **SALAMANDER CORPORATE SERVICES SA** whose registered office is at Rue Jean-Gabriel Eynard 8, 1205 Geneva, Switzerland **AS TRUSTEE OF THE GALACTEA TRUST** (the "**Trustee**"); and

(2) **GRAHAM AUBREY COLLETT** of 53 Mill Rise, Robertsbridge, East Sussex TN32 5EG (the "**Protector**").

**WHEREAS**

(A) This deed is supplemental to:

    (i) a trust deed dated 23 December 2012 and made between (1) Delphine Anne Le Dain as settlor (the "**Settlor**"), (2) Salamander Associates Limited as original trustee and (3) the Protector as the original protector, establishing the Galactea Trust (the "**Trust**"); and

    (ii) all other relevant deeds and documents made supplemental to the Trust.

(B) The Trustee is the present and sole trustee of the Trust.

(C) By clause 24 of the Trust, the Trustee has the following power:

*"The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part 1 of this Deed including the trusts, powers and discretions contained in Part 1 of this Deed provided always that:*

    *24.1 they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;*

    *24.2 they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;*

    *24.3 no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor;*

    *24.4 no such variation, amendment, addition or deletion*

        *(a) shall infringe the proper law of this Trust for the time being; or*

        *(b) shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and*

    *24.5 no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety."*

(the "**Power of Amendment**").

2


220

(D)    By clause 63 of the Trust, the Trustee has the following power:

"*Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.*"

(the "**Power to Release**").

(E)    The Trustee is desirous of exercising the Power of Amendment and Power to Release revocably to amend the class of Discretionary Beneficiaries in the event that the Settlor dies whilst resident in Switzerland for Swiss estate tax purposes in the manner set out below. It is intended that clause 2.3 takes effect upon the date of the Settlor's death whereas the remaining provisions do not take effect unless and until the Settlor dies in said circumstances.

(F)    The Trustee has satisfied itself that all the conditions set out in sub-clauses 24.1 to 24.5 of the Trust have been satisfied.

(G)    The Protector wishes to consent to the exercise of the Power of Amendment and is a party to this deed for that purpose.

(H)    The Trust Period as defined in sub-clause 1.1 of the Trust has not yet expired.

**NOW THIS DEED WITNESSES** as follows:

1      **DEFINITIONS AND INTERPRETATIONS**

In this deed, where the context allows, the definitions and rules of construction contained in the Trust shall apply.

2      **AMENDMENT**

2.1    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Trust shall be read and construed such that the definition of "Discretionary Beneficiaries" in sub-clause 1.1 of the Trust were replaced in its entirety by the following words:

""**Discretionary Beneficiaries**" shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:

(a)    the Grantor;
(b)    the children and remoter issue of the Grantor;
(c)    Charities; and
(d)    the trustees of any other trust of which any one or more of the Beneficiaries of this Trust are interested;

but not any other persons or classes of persons."

3


221

2.2    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Trust shall be read and construed such that the definition of "Charity" in sub-clause 1.1 of the Trust were replaced in its entirety by the following words:

> ""**Charity**" shall mean any trust, foundation, company or other organisation that:
>
> (a)    for Valais (Switzerland) tax purposes is eligible for a zero rate of donation, estate or inheritance tax as such tax is defined under Swiss law when receiving a transfer from an ordinary tax resident of Valais; and
>
> (b)    is incorporated in Valais;
>
> and the words "**Charities**" and "**Charitable**" shall be construed accordingly always provided that any reference to a Charity that is a trust shall, where the context requires, mean the trustees (acting in that capacity) of such trust"

2.3    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death, the Trust shall be read and construed such that sub-clause 5.1 of the Trust (Power to Add Discretionary Beneficiaries) were replaced in its entirety by the following words:

> "5.1    The Trustees with the prior or simultaneous written consent of the Protector may, at any time during the Trust Period but only after the Grantor's death and provided always that she did not die whilst resident in Switzerland for Swiss estate tax purposes, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine. For the avoidance of doubt if the Grantor does die whilst resident in Switzerland for Swiss estate tax purposes the Trustees may not add to the class of Discretionary Beneficiaries."

2.4    In exercise of the Power to Release and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Power of Amendment under clause 24 is released by the Trustee only insofar as it applies to the definition of Discretionary Beneficiaries.

2.5    This deed shall be revocable in whole or in part by the Trustee by deed at any time during the Trust Period. Notwithstanding any other provision of this deed, this deed shall nonetheless become irrevocable upon the death of the Settlor if on the date of her death she is resident in Switzerland for Swiss estate tax purposes.

2.6    For the avoidance of doubt, the provisions of this deed prevail over any other provisions of the Trust to the contrary.

2.7    For the avoidance of doubt, the provisions of this deed are not intended to cause, and will not cause, a resettlement of the Trust.

4


222

3    **PROTECTOR CONSENT**

As required by clause 24 of the Trust, the Protector Trustee hereby consents to the exercise of the Power of Amendment in accordance with clause 2 hereof.

4    **CONFIRMATION**

Save as provided above the terms of the Trust shall continue in full force and effect.

5    **GOVERNING LAW**

This deed shall be governed by and construed in accordance with the laws of England and Wales and the parties hereto irrevocably submit to the non-exclusive jurisdiction of the courts of England and Wales.

6    **COUNTERPARTS**

This deed may be executed in counterparts, all of which taken together, shall constitute one and the same deed and any party may enter into this deed by executing a counterpart.

**IN WITNESS** of which the parties to this deed have executed this deed on the day and year first above written

Signed as a Deed and Delivered by )
**SALAMANDER CORPORATE SERVICES** )
**SA** as trustee of the Galactea Trust acting )
by a director )
) ................................
) Director
)

in the presence of:

Witness signature:

Witness name:    DMITRY ZVONAREV

Witness address:    CHEMIN DE LA TULETTE 4, 1223 COLOGNY

Witness occupation:    SENIOR MANAGER

5

SIGNED as a DEED and DELIVERED          )    .......~~ACollett....................
by GRAHAM AUBREY COLLETT as             )
Protector of the Galactea Trust

in the presence of:

Witness signature: ASEllis

Witness name: Anthony Stephen Ellis

Witness address: 5 Wakeley Road , Rainham, Kent ME8 8HD

Witness occupation: Retired

6

224

# Summit Trust International SA ("STI")

**Summit Trust (Cayman) Limited**
**Summit Trust Company Ltd**

# Settlor/Contracting Party Compliance Declaration
### (Version: May 2021)

**Settlors, Founders and Owners of managed companies** should complete sections A, B, C, D and, if relevant, E.

*Protectors & Beneficiaries* should complete separate form

Please sign and date all sections as requested.

General information including data protection information is included in section F – please sign to acknowledge.

**Nexus: insert name of Trust/Foundation/Companies covered by this declaration:**

Trust

Galactea Trust

Companies

Rosbelt International Ltd

**(hereinafter referred to below as "the Fiduciary Structure")**

THIS PAGE IS INTENTIONALLY LEFT BLANK

## SECTION A:
## DECLARATION OF BENEFICIAL OWNERSHIP

*1.  For Trusts and Foundations*

I, *(insert name)*    **Delphine Anne le Dain**

being the settlor/donator/asset contributor of the Fiduciary Structure hereby declare that the "**Beneficial Owner**" (as defined below) of the assets of the Fiduciary Structure is/are the persons listed below who are the named or identified beneficiaries or objects of discretionary powers contained in the relevant documentation of the Fiduciary Structure:

**EITHER** *( please check one of the following:)*

*For Revocable Trusts:*    ☐ I am the 'beneficial owner' as the Trust is revocable by me;

**OR**

*For Irrevocable Trusts:*    ☒ The 'beneficial owners' are as described in (a) or (b) below:

### a) For Discretionary Trusts

☒ There are no persons with fixed interests in the trust fund, but the persons who may be entitled to benefit are those described in the Trust Deed as 'Beneficiaries'.

### b) For Non-Discretionary Trusts

☐ **Life Interest Trusts:** The beneficial owners are the persons named or described as life tenants and beneficiaries in the Trust Deed.

**AND**

I confirm that the following person(s) is the Protector/Guardian/Appointor under the Fiduciary Structure having the powers specified by the instrument creating the Fiduciary Structure:

| Names: | Full Residential addresses/domicile |
|---|---|
| **HERVÉ BENZAKEIN** | **c/o HBS SA,** |
| | **Rue de la Rôtisserie 1,** |
| | **1204 Genève Switzerland** |

2. **For Stand Alone Managed Companies only**

I, *(insert name)*

_____

hereby declare that the "Beneficial Owner" of the **Fiduciary Structure** (being a company or corporate body) and therefore the person or persons entitled to the assets of the Fiduciary Structure upon a liquidation thereof is/are the persons listed below:

Names:                                           Full Residential addresses/domicile

*(attach an additional sheet, if necessary)*

## INTERPRETATION

"Beneficial Owner" as used in this form signifies only 'beneficial owner' for regulatory purposes in Switzerland in accordance with the laws in force in Switzerland relating to the prevention of money laundering (blanchiment d'argent) and has no wider legal significance. In particular, in the case of discretionary trusts, or trusts containing powers of appointment in favour of objects of discretion, the fact that an object of a discretionary trust power or power is described in this Form as a "beneficial owner" does not mean that that person has any greater legal right or entitlement to trust property or that the trustees' discretionary powers of appointment have been exercised fettered or restricted in any way whatsoever.

## Undertakings

1) I undertake to inform STI of any changes in the above which are brought about through my own powers to do so where this is possible.

2) The information furnished above is true and complete and given to the best of my knowledge and belief.

Signature: _____        Date: 04/04/2023

Summit Trust International SA: Compliance Declaration May 2021 version

228

## SECTION B:
## INTERNATIONAL TAX COMPLIANCE DECLARATION (FATCA & AEOI)

1.  I, *(insert name)*    **Delphine Anne le Dain**

    hereby declare that my tax status is:

    *Please check the box that applies:*

    **Non-US Person**

    ☒ I am <u>not</u> an American citizen, I do <u>not</u> possess or am entitled to a United States "green card" and I have no visa or other permission entitling me to reside in the United States of America and I am <u>not</u> otherwise a resident of the United States of America.

    *(if you ticked this box, please continue to Part 2 of this section)*

    **US Person**

    ☐ I am an American citizen.

    ☐ I was born in the United States and have not renounced US citizenship or my right to claim it.

    ☐ I am <u>not</u> an American citizen but I possess or am entitled to a United States "green card".

    ☐ I am <u>not</u> an American citizen and I do <u>not</u> possess or am entitled to a United States "green card" but I am resident in the United States

    **AND** my address in the United States is:

    _____

    _____

    _____

    **My US taxpayer identification number or reference number is:**

    _____

2.   **_For completion by all who are non-US Persons_**

**Declaration of Tax Status**

My residential address is set out below and confirmed by the attached address verification document.

Address:

**Chemin de St Christophe 1, 1936 Verbier, Switzerland.**

**Country of Tax Residence:**        Switzerland.

**My taxpayer identification number or reference number is:**

**AVS 756.4431.4088.57 - (TIN)**

**If you are not able to provide a TIN, please state one of the 3 reasons below:**

☒   A - The country where I am liable to pay tax does not issue TINs to its residents

☐   B - I am otherwise unable to obtain a TIN or equivalent number – please explain

**SWITZERLAND TIN EQUIVALENT ABOVE**

☐   C - No TIN is required by the authorities of my country of tax residence

Undertakings

1)   I undertake to inform STI of any changes in the above which are brought about through my own powers as soon as possible.

2)   The information furnished above is true and complete and given to the best of my knowledge and belief.

3)   I understand that this information will be used by STI, or other relevant companies within the Summit Group, in order for them to comply with their obligations and duties to report under the FATCA regime and the Automatic Exchange of Information required under the Common Reporting Standard.

Signature: _____          Date: 04/04/2023

Summit Trust International SA: Compliance Declaration May 2021 version

**230**

## SECTION C:
## SOURCE OF FUNDS DECLARATION

1   The funds which I am intending to transfer to you for holding in the Fiduciary Structure, as discussed with you recently, are solely the result of:

*(Please tick as appropriate & provide information as indicated. If more space is needed please attach a separate sheet. If several categories apply, please tick all that apply and give a brief description under each one.)*

☒   **Professional Earnings** - provide brief details of profession / business activities

> Bartol Limited was incorporated in BVI on May 2001 with a seed investment of approximately $300,000 from DLD. The $300,000 was funded from Delphine's private savings accumulated as a journalist. The beneficial owner of Bartol Limited was Delphine Anne Le Dain (DLD). It was set up as a vehicle to act as a fuel supplier. Bartol continued to trade until December 2004, when the logistics business was transferred to Red Star Enterprises Limited,

> Dividend from Rosbelt International Ltd - 50% interest in Global Resources Worldwide LP  owner of  Red Star Enterprises Limited (Attached Schedule of Dividend distributions from Red Star Enterprises Ltd 2003 - 2017 - Prepared by Graham Collett Trust CFO) Via Bartol / Aspen Wind / Sunage Foundation and Galactea Trust

☐   **Inheritance** - provide brief details of how family wealth was originally generated including names of family members and name and details of family business as relevant

☒   **Sale of Business** - provide brief details of business activity, name of business and total sale proceeds

231

**Rosbelt International Limited,**

- 50% Holding in Global Resources Worldwide LP  (Attached Signed Purchase Agreement - Dated 12 October 2020) Total sales consideration $40,950,000

**Oil Distribution and Trading Company**

☐ **Other** (If sale of other assets such as Property or Investments, please provide brief details. If a Gift, please indicate donor & how their wealth was originally generated)

and are beneficially owned by me and are capable of free transfer by me and do not derive from any illegal activity.

1. I do not have any creditors whose claims I cannot satisfy from my free assets and have never been an adjudged bankrupt.

2. I have not been the subject of any audits or special tax investigations by any tax authority other than routine inquiries.

3. I have never been convicted of a serious criminal offence (i.e. offences other than those related to motoring).

4. I undertake to notify you without delay of any change to the warranties, undertakings & representations made above.

232

Signature: _____    Date: _04/04/ 2023_

Summit Trust International SA: Compliance Declaration May 2021 version

## SECTION D:

## TELEPHONE, FAX & ELECTRONIC COMMUNICATIONS INDEMNITY

### In relation to the Fiduciary Structure

I hereby confirm that I may wish to communicate with you by means of telephone, facsimile, electronic mail ("e-mail") from time to time and I am therefore authorizing you to accept such means of communication. I would require you to exercise reasonable care in determining whether a purported communication from me is genuine and complete and free from corruption or interference and if you are in doubt I require you to take such steps as you see fit in order to verify the same before acting upon it. Provided that you have acted with reasonable care and have not acted with gross negligence I hereby agree to indemnify you from and against all losses, claims, actions, proceedings, demands, costs and expenses incurred or sustained by you whatsoever in connection with such communications.

Signature: _____     Date: 04/04/223 _____

Summit Trust International SA: Compliance Declaration May 2021 version

234

## SECTION E:

## THIRD PARTY DISCLOSURE AUTHORITY

### In relation to the Fiduciary Structure

1   I wish to be able to communicate with you through

**HERVÉ BENZAKEIN , DERMOT SHORTT**                           ("the Agent")

with whom I have enjoyed a long standing relationship.  I hereby authorize you to release such information about the Fiduciary Structure to the Agent as he/she may request from time to time

2   In addition, I authorize you to rely upon and act in accordance with any requests made by me or purportedly given or made by me from time to time in connection with the Fiduciary Structure which may be transmitted by telephone, facsimile or e-mail to you by the Agent on my behalf. You will have no further duty to inquire as to the authority or identity of the person passing on any such request provided he/she has identified himself/herself by name and supplied the name of the Fiduciary Structure. You shall be entitled to treat any such request passed to you by the Agent as if made by me and as fully authorized and binding on me and my estate or heirs.  Should you require written confirmation of any request made under this authority, I undertake to provide this to you as soon as practicable thereafter.

3   In consideration for your acting in accordance with the terms of this letter, I, my personal representatives, heirs and assigns undertake to indemnify you and keep you indemnified against all losses, claims, actions, proceedings, damages, costs and expenses (including legal costs) incurred or sustained by you of whatever nature and howsoever arising out of your acting upon any requests made by, or purportedly made by, the Agent.

4   The terms of this letter shall remain in force until such time as you receive notice in writing of termination from me save that any such termination will not release me, my personal representatives, heirs and assigns from any liability under this authority and indemnity in respect of any act performed by you in accordance with the terms of this letter prior to receipt of notice of termination.

Signature: _____          Date: _04/04/2023_

235

## SECTION F: DATA PRIVACY STATEMENT

STI, like other financial services businesses, is subject to Swiss laws on the protection of personal data. Where STI deals with persons resident in European Union Member States, the General Data Protection Regulation is also relevant. This document provides a summary of the rights that you have as a data subject by STI as a data controller and the policies STI has adopted to control the processing of personal data in accordance with the law.

### Reasons for Collecting Data

STI only collects personal data in order to administer trusts, companies, foundations, partnerships and other fiduciary structures ("fiduciary relationships") that it administers for its client families. Personal data is not sold for marketing purposes to third parties.

### Personal Data

The personal data that we collect includes name; date of birth; address; taxpayer or social security numbers; identity documents such as passport, driving licence, and national identity cards; proofs of address; bank account details so that payments can be made; information about your personal financial and domestic situation so that trustee discretions can be properly made, which may include information about your dependants; and other information that we may consider necessary in connection with our fiduciary duties and legal obligations.

Personal data is usually provided to us by you upon request but may be obtained by us from third parties and other sources such as databases and internet searches as well as from professional advisers such as lawyers, accountants, banks and financial advisers.

### Data Transfer

STI may transfer such data to third parties such as law firms, accountancy firms, banks, asset managers, securities custodians, and investment advisers in order to comply with laws such as those directed against money laundering or to obtain legal or tax advice required in connection with the administration of a fiduciary relationship. Personal data may be viewed by our auditors and can be produced to regulators and law enforcement bodies if requests are made. Personal data may also be reported to tax authorities under various international tax reporting obligations such as FATCA (where the United States is concerned) or the Automatic Exchange of Information provisions (for most countries outside of the United States). Personal data may also be exchanged as part of due diligence exercises in connection with the acquisition, merger or sale of trust businesses including STI and its subsidiaries. Personal data may also be transferred by STI to its subsidiaries or affiliated companies.

### Storage of Personal Data

STI maintains electronic records of personal data on its servers in Geneva and on a back-up server in a secure location in Switzerland. Personal data is also maintained on paper files in its offices in Geneva. Paper files are kept in locked cabinets overnight and the office is protected by an alarm system when not staffed overnight or at weekends. Staff are bound by personal undertakings to maintain client confidentiality, which includes protection of personal data, and office policies require that files containing personal data are filed away at night and not left on desktops. Where personal data is transferred outside of Switzerland, it will either be transferred to a jurisdiction that has equivalent legislative protection for personal data (e.g. the UK or a country within the European Economic Area) or we will in other cases, take steps to secure equivalent protection for personal data by means of contractual undertakings.

Personal data will be retained by us for as long as you are the subject of or might be concerned with a fiduciary relationship with us and for such periods as may be prescribed by law from time to time afterwards such as under the anti-money laundering legislation.

Once personal data is no longer required, STI will anonymise or erase it.

## Personal Data Information Rights

STI will adequately inform you when personal data is collected from you or from a third party. The use of sensitive data is subject to your express consent.

When personal data is communicated outside Switzerland, STI will inform you of the name of the third State or international body to which the data is to be communicated.

You may also request that we provide you with information about the personal data that we may hold about you and copies of that information. We will provide copies of information or documents we hold about you upon written request under the 'Contact' section below. If the information we hold about you is inaccurate you may require us to correct it by written request. You may also request that we cease to process information about you but in such cases this may impede our ability to provide financial benefits to you under a fiduciary relationship.

You may request that we erase all of your personal data under the "right to be forgotten" if (i) it is no longer necessary for us to hold that personal data with respect to the original purpose for which it was obtained; or (ii) where your consent was the basis of our receiving your personal data, you wish to withdraw that consent; or (iii) you have objections to our processing your personal data and there is no overriding legitimate interest that would entitle us to continue doing so; or (iv) your personal data has been processed unlawfully; or (v) your personal data has to be erased in order to comply with a particular legal or regulatory obligation. Erasure of personal data will prevent us from providing any financial benefit to you as without such information it would not be lawful for us to administer a fiduciary relationship from which you could benefit.

In Switzerland, the government body responsible for supervising data processing is the Federal Data Protection and Information Commissioner (FDPIC) whose address is: Office of the Federal Data Protection and Information Commissioner FDPIC, Feldeggweg 1, CH-3003 Berne, Switzerland, Telephone: +41 58 462 43 95; Fax: +41 58 465 99 96. Information about data protection in Switzerland is available from the FDPIC website: www.edoeb.admin.ch

## Contact

If you have any questions about our data protection policy please contact your usual Trust Officer or director contact or write to The Managing Director, Summit Trust International SA, 6 Place des Eaux-Vives, CH-1207 Geneva, Switzerland; tel + 41 22 707 8399; fax + 41 22 707 8395.

\* \* \* \* \*

**Acknowledged**

Signature: _____    Date: 04/04/2023

Summit Trust International SA: Compliance Declaration May 2021 version

237

Dated ___7th July___ 2014

## DELPHINE ANNE LE DAIN

(Grantor)

and

## SALAMANDER ASSOCIATES LIMITED

(Original Trustee)

and

## GRAHAM AUBREY COLLETT

(Original Protector)

---

# THE BIG VALLEY TRUST

---

1

15432165.4

**238**

## TABLE OF CONTENTS

| No. | Heading | Page |
|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION | 4 |
| 2. | NAME | 7 |
| 3. | POWER TO RECEIVE ADDITIONAL PROPERTY | 7 |
| 4. | TRUST FOR SALE | 7 |
| 5. | POWER TO ADD DISCRETIONARY BENEFICIARIES | 7 |
| 6. | POWER OF EXCLUSION | 8 |
| 7. | GRANTOR'S POWER OF REVOCATION | 9 |
| 8. | DISCRETIONARY TRUST OF CAPITAL AND INCOME | 9 |
| 9. | INCOME TRUSTS IN DEFAULT OF APPOINTMENT | 10 |
| 10. | POWER TO APPLY CAPITAL FOR BENEFICIARIES | 10 |
| 11. | TRUSTS IN DEFAULT OF APPOINTMENT | 11 |
| 12. | ULTIMATE DEFAULT TRUSTS | 11 |
| 13. | ASSIGNMENT OF POWER OF APPOINTMENT | 11 |
| 14. | ADMINISTRATIVE POWERS | 11 |
| 15. | EXERCISE OF POWERS | 11 |
| 16. | GENERAL LIMITATION ON POWERS | 12 |
| 17. | REMOVAL AND APPOINTMENT OF TRUSTEES | 12 |
| 18. | APPOINTMENT OF PROTECTORS | 14 |
| 19. | EFFECT OF VACANCY IN PROTECTOR'S OFFICE | 15 |
| 20. | PROTECTOR'S INDEMNITY | 15 |
| 21. | PROPER LAW, FORUM AND PLACE OF ADMINISTRATION | 16 |
| 22. | EXCLUSION OF COMMUNITY PROPERTY RULES | 17 |
| 23. | EXCLUSION OF EXCLUDED PERSONS | 17 |
| 24. | VARIATION OF TERMS OF THIS TRUST | 17 |
| 25. | SEVERABILITY | 18 |
| 26. | COUNTERPARTS | 18 |
| 27. | POWER OF INVESTMENT | 18 |
| 28. | EXERCISE OF RIGHTS ATTACHING TO SHARES | 18 |
| 29. | POWER TO LEND | 19 |
| 30. | POWER TO BORROW | 19 |
| 31. | POWER TO GIVE GUARANTEES | 19 |
| 32. | POWER OF MANAGEMENT | 19 |

239

| | | |
|---|---|---|
| 33. | POWERS IN RELATION TO LAND AND CHATTELS | 19 |
| 34. | POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY | 19 |
| 35. | POWER TO INSURE PROPERTY | 20 |
| 36. | POWERS IN RELATION TO LIFE INSURANCE POLICIES | 20 |
| 37. | POWER TO TRADE | 20 |
| 38. | POWER TO PROMOTE COMPANIES | 20 |
| 39. | POWERS IN RELATION TO COMPANIES | 20 |
| 40. | EXCLUSION OF APPORTIONMENT | 20 |
| 41. | POWER OF APPROPRIATION | 20 |
| 42. | DIVISION BETWEEN CAPITAL AND INCOME | 21 |
| 43. | PAYMENT OF EXPENSES | 21 |
| 44. | POWERS IN RELATION TO MINORS | 21 |
| 45. | POWER TO APPOINT AGENTS | 21 |
| 46. | POWER TO EMPLOY NOMINEES | 21 |
| 47. | POWERS TO DELEGATE | 21 |
| 48. | POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS | 22 |
| 49. | PAYMENTS TO CHARITIES | 22 |
| 50. | LEGAL PROCEEDINGS | 22 |
| 51. | COMPROMISE AND SETTLEMENT | 22 |
| 52. | ACCOUNTS AND AUDIT | 22 |
| 53. | PROTECTOR'S POWER TO MAKE REQUESTS | 22 |
| 54. | PAYMENT OF TAXES | 23 |
| 55. | PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS | 23 |
| 56. | TRUSTEE CHARGING | 23 |
| 57. | POWER TO RECEIVE REMUNERATION | 24 |
| 58. | INDEMNITY INSURANCE | 24 |
| 59. | POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST | 24 |
| 60. | DISCLOSURE OF DOCUMENTS | 25 |
| 61. | PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS | 25 |
| 62. | PROTECTION OF THE TRUSTEES GENERALLY | 25 |
| 63. | RELEASE OF POWERS | 25 |
| 64. | POWER TO VARY ADMINISTRATIVE PROVISIONS | 25 |



240

15432165.4                                    3

DEED OF SETTLEMENT

**DATE**: The            day of            2014

**PARTIES**

(1)    **DELPHINE ANNE LE DAIN** of Buzon 110 Serreta, Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

(2)    **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

(3)    **GRAHAM AUBREY COLLETT** of 14 Rosewood Court, Orchard Road, Bromley, Kent, BR1 2TT (the **'Original Protector'**).

**RECITALS**

(A)    The Grantor wishes to make this Settlement and has transferred or delivered to the Original Trustee or otherwise placed under its control the property specified in the Schedule. Further money, investments or other property may be paid or transferred to the Trustees by way of addition.

(B)    It is intended that this Trust shall be revocable during the lifetime of the Grantor.

(C)    In establishing this Trust, it is the intention of the Grantor that this Trust (i) will qualify as a grantor trust, during the Grantor's lifetime, within the meaning of Subpart E of Subchapter J of the US Internal Revenue Code of 1986, as amended (the **"Code"**), (ii) will not confer a general power of appointment upon any US person within the meaning of sections 2041 and 2514 of the Code, and (iii) will not result in any person other than the Grantor being treated as the owner of any portion of this Trust within the meaning of Code section 676. Accordingly, and notwithstanding any provision contained in this Deed to the contrary, this Deed shall be construed and the trusts of this Trust administered in accordance with and to achieve these intents.

**PART 1 - OPERATIVE PROVISIONS**

1.    **DEFINITIONS AND CONSTRUCTION**

1.1    In this Deed, where the context admits, the following definitions and rules of construction shall apply.

'**Beneficiary**' shall mean any person actually or prospectively entitled to any share or interest in the capital or income of the Trust Fund.

'**Charity**' shall mean any trust, foundation, company or other organisation whatever established only for purposes regarded as charitable under the proper law of the

15432165.4                                    4

<span style="color:red">241</span>

Trust or under the law of the jurisdiction in which the trust, foundation, company or other organisation was established.

**'children'**, **'grandchildren'** and **'issue'** of any person shall include his children, grandchildren and remoter issue, whether legitimate, legitimated, illegitimate or adopted.

**'Company'** shall mean any body, incorporated or established in any part of the world, which has separate legal personality.

**'Consent Holder'** shall mean the person appointed as Consent Holder pursuant to sub-clause 7.2.

**'deed'** shall include any instrument in writing which is signed, witnessed and dated by or on behalf of each of the parties to the instrument and shall also include any instrument executed under seal by a Company.

**'Discretionary Beneficiaries'** shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:

    (a)     the Grantor;

    (b)     the children and remoter issue of the Grantor;

    (c)     Charities; and

    (d)     such other objects or persons as are added under clause 5 to the extent so added

*provided* that no person will be capable of being included or added as a Discretionary Beneficiary if such person is a US Person as herein defined or a resident of The British Virgin Islands as defined in section 2(1) of the Companies (Taxation and Concessions) Ordinance of The British Virgin Islands other than an individual who has been issued a certificate under Rule 6 of the Qualifying (Category 2) Individual Rules 2004 of The British Virgin Islands which remains valid at the date hereof or an individual whose income is subject to an election under Rule 11 of those Rules at the date hereof.

**'Excluded Person'** shall mean any person or class of persons or Charity by or in respect of whom or which a declaration under sub-clauses 6.1 or 6.4(b) has been made or treated as made but, in the case of a revocable exclusion, only during such time as the exclusion remains effective and unrevoked.

**'incapacity'** shall mean incapacity caused by physical or mental handicap or deterioration resulting in an individual whose incapacity is being judged being unable to manage his own affairs or to understand the nature or consequences of his actions, as confirmed by the written opinion of two medical practitioners qualified to assess such matters and **'incapacity'** shall also mean any legal incapacity deriving from age or insolvency and **'incapacitated'** shall have a corresponding meaning.

<span style="color:red; font-size:2em;">242</span>

'**minor**' shall mean any individual who has not attained the age of 18.

'**person**' shall include any individual or Company.

'**proper law of this Trust**' shall mean the law governing this Trust as determined under clause 21.

'**Protector**' shall mean the person or entity designated as the Protector in accordance with clause 18.

'**Settlor**' shall mean the Grantor and any person who shall have donated (by way of gift or sale for less than full consideration) any sums of money, investments or other property to be held as part of the Trust Fund.

'**Trustees**' shall include the Original Trustee and the trustees for the time being of this Trust.

'**Trust**' shall mean the trusts constituted by this Deed.

'**Trust Company**' shall mean any Company, wherever incorporated, which is authorised under its constitution or by applicable law to act as trustee of a trust or trusts and/or carry on the business of administering trusts.

'**Trust Fund**' shall mean:

(a)     the property specified in Schedule;

(b)     all money, securities, investments or other assets or property paid or transferred by any person (including, without limitation, by bequest under a will) to, or so as to be under the control of, and, in either case, accepted by the Trustees as additions;

(c)     all accumulations (if any) of income added to the Trust Fund; and

(d)     the money, investments and property from time to time representing the above.

'**Trust Period**' shall mean the period starting with the date of this Trust and ending on the earlier of:

(a)     the last day of the period of 100 years starting from the date of this Deed, which period, and no other, shall be the applicable perpetuity period;

(b)     such date as the Grantor shall revoke the Trust in accordance with this Deed; and

(c)     such date as the Trustees shall at any time specify by deed in relation to the whole or any part of the Trust Fund (so that different days may be specified for different parts of the Trust Fund), not

being a date earlier than the date of such deed or later than a date previously specified in relation to that part of the Trust Fund.

'**US Person**' shall mean a person described in section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended.

1.2    Words denoting the singular shall include the plural and vice versa.

1.3    Words denoting any gender shall include both genders.

1.4    References to any statutory provision shall include any statutory modification to or re-enactment of such provision.

1.5    The table of contents and clause headings are included for reference only and shall not affect the interpretation of this Deed.

2.    **NAME**

This Trust shall be known as The Big Valley Trust or by such other name as the Trustees may, from time to time, determine.

3.    **POWER TO RECEIVE ADDITIONAL PROPERTY**

The Trustees may, at any time during the Trust Period, accept additional money, securities, investments or other assets or property, of whatever nature and wherever situate, paid or transferred to them by the Grantor or any other person (including, without limitation, by bequest under a will). Such additional money, securities, investments or other assets or property shall, subject to any contrary direction, be held upon the trusts and with and subject to the powers and provisions of this Deed.

4.    **TRUST FOR SALE**

The Trustees shall hold the Trust Fund and any additions upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money. The Trustees may, in their discretion, invest such money in their names or under their control in any of the investments authorised by this Trust or by law, with power from time to time to vary or transpose any such investments for or into others so authorised.

5.    **POWER TO ADD DISCRETIONARY BENEFICIARIES**

5.1    The Trustees with the prior or simultaneous written consent of the Protector, may, at any time during the Trust Period, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine.

5.2    Any such addition shall be made by deed (revocable to the extent permitted by the proper law of this Trust or irrevocable):

**244**

(a)   naming or describing the objects or persons or classes of objects or persons to be added; and

(b)   specifying the date or event, not being earlier than the date of execution of the deed but before the end of the Trust Period, on the happening of which the addition shall take effect.

5.3   Any power of revocation reserved by a deed of addition shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has become indefeasibly entitled.

## 6.   POWER OF EXCLUSION

6.1   The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall (whether or not a Beneficiary) be an Excluded Person.

6.2   The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall:

(a)   if included in the class of Discretionary Beneficiaries, cease to be so included; or

(b)   if not included in the class of Discretionary Beneficiaries, not be eligible to be added as a Discretionary Beneficiary pursuant to sub-clause 5.1.

6.3   The powers conferred by sub-clauses 6.1 and 6.2 shall not be capable of being exercised

(a)   so as to derogate from any interest to which any Beneficiary has or would, but for the provisions of this clause, have become indefeasibly entitled;

(b)   in relation to the Grantor.

6.4   Any person (not being a minor) who may receive any benefit under this Trust may, by declaration in writing:

(a)   disclaim such benefit, either in whole or in part; or

(b)   declare that he shall be an Excluded Person.

6.5   Any declaration made pursuant to sub-clauses 6.1, 6.2 or 6.4 shall be by deed (revocable during the Trust Period to the extent permitted by the proper law of this Trust or irrevocable), shall take effect in such circumstances or subject to such conditions and from such date (not being earlier than the date of such deed) specified in the deed.

245

7.    **GRANTOR'S POWER OF REVOCATION**

7.1    Power of revocation

(a)    During her lifetime the Grantor shall have power by deed to revoke this Trust in whole or in part provided that any such revocation shall not invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Trust or made under any other power conferred by this Deed or by this Trust or by law.

(b)    Any such deed shall take effect upon the date when the same is received by the Trustees or upon such later date as may be specified therein and whenever such a deed seeks to revoke this Trust in part only it shall specify the property being part of the Trust Fund to which such revocation shall apply.

7.2    Consent

The power conferred by sub-clause 7.1 on the Grantor shall be exercisable so as to take effect during the Grantor's lifetime with the prior written consent of the first person named by the Original Settlor or, failing which, by the Protector in the following list who is then living, not incapacitated and who is a related or subordinate party subservient to the Grantor within the meaning of Code Section 672(f)(2)(A)(i) (the '**Consent Holder**') (unless no such person meets such requirements in which case the power shall be exercisable without such consent).

8.    **DISCRETIONARY TRUST OF CAPITAL AND INCOME**

8.1    The Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of such of the Discretionary Beneficiaries, at such ages or times, in such shares, upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint. Any such appointment may include such powers and provisions for the maintenance, education advancement or other benefit of the Discretionary Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit.

8.2    No exercise of the power conferred by sub-clause 8.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Deed or made under any other power conferred by this Deed or by law.

8.3    Any trusts and powers created by an appointment under sub-clause 8.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them.

8.4    The exercise of the power of appointment conferred by sub-clause 8.1 shall:

<span style="color:red;">246</span>

(a)    comply with the provisions of sub-clause 15.1; and

(b)    be subject to the prior or simultaneous written consent of the Protector.

8.5    Notwithstanding clause 63, the Trustees may not release or restrict the power conferred by sub-clause 8.1 without the written consent of the Protector.

9.    **INCOME TRUSTS IN DEFAULT OF APPOINTMENT**

The provisions of this clause shall apply during the Trust Period until, subject to and in default of any appointment under sub-clause 8.1.

9.1    The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Discretionary Beneficiaries as shall for the time being be in existence, in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit.

9.2    Notwithstanding the provisions of sub-clause 8.1, the Trustees may at any time during the Trust Period in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and, subject to sub-clause 8.1, shall hold such accumulations as an accretion to capital.

9.3    The Trustees may apply the whole or any part of the income accumulated under sub-clause 8.1 as if it were income arising in the then current year.

10.    **POWER TO APPLY CAPITAL FOR BENEFICIARIES**

The provisions of this clause shall apply during the Trust Period notwithstanding the provisions of sub-clause 8.1 but subject to any appointment made under sub-clause 8.1 and to the Protector's written consent.

10.1    The Trustees may pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries, in such shares and in such manner generally as the Trustees shall in their discretion think fit.

10.2    The Trustees may apply the whole or any part of the capital of the Trust Fund by paying or transferring the same to the trustees of any other trust or settlement, whether or not the proper law of such other trust or settlement shall be the proper law of the Trust, for the benefit of any of the Beneficiaries.

10.3    The exercise of the power conferred by sub-clause 10.2 shall be subject to the following provisions:

(a)    upon the payment or transfer of any money or other property to the trustees of any such trust or settlement, the Trustees shall not be bound to see to the further application of such money or property;

(b)    the Trustees may make such payment or transfer to the trustees of a discretionary trust, notwithstanding that the Beneficiary for whose

**247**

benefit the power is exercised is only a discretionary object of such trust;

(c) the Trustees may make such payment or transfer notwithstanding that persons other than the Beneficiary for whose benefit the power is exercised are or may become entitled to, or to the income of, the money or other property paid or transferred;

(d) any exercise of the power shall comply with the provisions of sub-clause 15.1; and

(e) the power shall not be exercisable so as to permit any part of the income or capital of the Trust Fund to be paid or transferred to the trustees of any trust or settlement in which any Excluded Person is or may be interested.

## 11. TRUSTS IN DEFAULT OF APPOINTMENT

11.1 From and after the expiration of the Trust Period, and subject to any appointment made under sub-clause 8.1, the Trustees shall hold the capital and income of the Trust Fund upon trust absolutely for all or any one or more exclusively of the others of the Grantor and her children and remoter issue as shall then be living and, if more than one in equal shares *per stirpes*, so that no person shall take if any of his ascendants is alive and so capable of taking.

## 12. ULTIMATE DEFAULT TRUSTS

Upon expiration of the Trust Period, subject as above, if and so far as not wholly disposed of for any reason whatever by the above provisions, the capital and income of the Trust Fund shall be held upon trust for such Charities and, if more than one, in such shares as the Trustees shall determine absolutely.

## 13. ASSIGNMENT OF POWER OF APPOINTMENT

The Trustees may, with the prior or simultaneous written consent of the Protector, by deed, grant to any Beneficiary the power to appoint all or any part of the Trust Fund, whether capital or income or both, in such manner, outright or in further trust, as the Trustees shall in such deed provide.

## 14. ADMINISTRATIVE POWERS

The Trustees shall, in addition and without prejudice to all statutory powers, have the powers and immunities set out in Part 2 of this Deed. No power conferred on the Trustees shall be exercised so as to conflict with the beneficial provisions of this Deed.

## 15. EXERCISE OF POWERS

15.1 Every power conferred by the provisions of Part 1 of this Deed shall be subject to the application (if any) of the rule against perpetuities and any applicable laws governing

248

the permitted period of accumulations and shall (except for clauses 17 and 18) be exercisable only during and so as to take effect during the Trust Period. No power of revocation shall be exercisable except during the Trust Period.

15.2 Any written consents required under the terms of this Deed may be given either specifically in relation to any particular matter or by a general written consent referring to one or more matters.

15.3 If there is more than one Protector in office, the Protectors shall act unanimously.

16. **GENERAL LIMITATION ON POWERS**

16.1 No individual Trustee and no person to whom a Trustee has delegated his powers pursuant to the terms of this Trust or by law who is a Beneficiary and a US Person may participate as one of the Trustees or as a delegate of one of the Trustees in the exercise of any of the powers conferred by the following clauses and sub-clauses (the 'restricted powers'):

(a)     clause 5 (Power to add Discretionary Beneficiaries);

(b)     clause 6 (Power of exclusion);

(c)     sub-clause 8.1 (Discretionary trust of capital and income);

(d)     clause 9 (Income trusts in default of appointment);

(e)     clause 10 (Power to apply capital for Beneficiaries);

(f)     clause 24 (Variation of terms of this Trust); and

(g)     clause 64 (Power to vary administrative provisions).

16.2 No Trust Company may participate as one of the Trustees in the exercise of any of the restricted powers if any individual director or alternate director (other than the Grantor) or any individual (other than the Grantor) to whom any one or more of the directors or alternate directors has delegated any or all of his powers as a director of such Trust Company is a Beneficiary who is a US Person (a 'restricted director' or a 'restricted delegatee' as the case may be) unless the Articles of Association, By-laws or any similar organisational documentation governing such Trust Company provide that any restricted director or restricted delegatee is not permitted to participate as a director or delegatee in the exercise of the restricted powers.

16.3 Neither the Protector nor the Grantor shall be eligible to serve as a Trustee of this Trust or to exercise the powers of the Trustees under any circumstances.

17. **REMOVAL AND APPOINTMENT OF TRUSTEES**

17.1 A Trustee shall cease to be a Trustee on the happening of any of the following events:

**249**

(a)    on resigning in accordance with sub-clause 17.2;

(b)    on being removed in accordance with sub-clause 17.3;

(c)    if an individual, on death, on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

(d)    if a corporation, on filing for bankruptcy, on becoming insolvent or on dissolution.

17.2    A Trustee may resign by giving three months' notice in writing to the person for the time being having power to appoint new or additional Trustees under the provisions of sub-clause 17.4. Upon the expiration of such notice, or such shorter period as may be agreed in writing between the Trustee giving notice and the person for the time being having power to appoint new or additional Trustees, the Trustee who has given notice shall cease to be a Trustee. If the Trustee so resigning is the sole Trustee and a new Trustee shall not have been appointed before the expiration of the specified period of notice, the resigning Trustee shall have power to appoint a new Trustee in its place and its resignation shall become effective only upon such appointment being made.

17.3    The Protector shall have power (to be exercised in writing) to remove any or all of the Trustees with or without cause. Notice of such removal shall forthwith be given to the Trustee concerned and the removal shall become effective immediately, except where all the Trustees or the sole Trustee have or has been removed in which case the removal shall be effective only on the appointment of a new Trustee or Trustees.

17.4    The Protector or, if the Protector shall be incapacitated or otherwise unable or unwilling to act, or if there shall be no Protector, the Trustees, shall have the power to appoint new or additional such Trustees.

17.5    Any appointment of a new or additional Trustee under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office in which case the appointment shall become effective on such death, resignation or incapacity. Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Trustees under this clause.

17.6    An outgoing Trustee (which term shall include a Trustee removed under sub-clause 17.3) shall promptly and without delay execute and do all such transfers or other acts or things as may be necessary for the immediate vesting the Trust Fund in the new or continuing Trustees and any reasonable expenses associated therewith (agreed in advance by the Protector) shall be borne by the Trust Fund *provided always* that the outgoing Trustee shall in no event delay or resist transferring the Trust Fund.

15432165.4                                    13

17.7    In the event that a Trustee is removed without cause under sub-clause 17.3, the new or continuing Trustees shall be required to undertake in writing to indemnify and hold the outgoing Trustee its directors officers servants and agents harmless against any and all claims demands actions proceedings damages costs or expenses whatsoever for or arising out of any act or omission on the part of the outgoing Trustee or any of its directors officers servants or agents in relation to the Trust, *provided always* (i) that such indemnity shall not extend to any act or omission for which the outgoing Trustee would not have been entitled to be indemnified out of the assets of the Trust Fund had it remained trustee of the Trust, (ii) that the new or continuing Trustees shall not be liable under this indemnity in an amount exceeding the amount or value of the Trust Fund for the time being, (iii) that the Protector shall have given his consent to the terms of such indemnity (which shall be reasonable and in accordance with industry standards) which consent shall not be unreasonably withheld.

17.8    Any appointment under this clause shall be in writing signed by the person making the appointment and by the new or additional Trustee so appointed.

17.9    The provisions of this clause shall apply notwithstanding any provision in the legislation for the time being in effect under the proper law of this Trust for the time being relating to the appointment, removal, retirement or discharge of trustees.

17.10    A person may be appointed to be a trustee notwithstanding that such person is not resident in the jurisdiction the law of which is the proper law of this Trust for the time being and remaining out of such jurisdiction for more than 12 months shall not be a ground for the removal of a trustee.

17.11    There shall be no requirement that there be more than one Trustee.

18.    **APPOINTMENT OF PROTECTORS**

18.1    The first Protector shall be the Original Protector.

18.2    A Protector shall cease to be a Protector on the happening of any of the following events:

(a)    on resigning in accordance with sub-clause 18.3;

(b)    if an individual, on death; on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

(c)    if a corporation, on filing for bankruptcy, becoming insolvent or on dissolution.

18.3    The Protector may at any time resign its office by written instrument, notice of which shall be given to the Trustees. Such resignation shall be effective upon receipt of the notice or the expiration of one month from the date of the resignation, whichever shall be earlier.

**251**

18.4     Protectors subsequent to the first Protector shall be appointed as follows.

      (a)     The Original Protector may, by written instrument, appoint any other person or succession of persons to be protector or successive protectors of this Trust, either in addition to or to succeed it.

      (b)     A Protector whose successor is not prescribed in advance by the Original Protector pursuant to sub-clause (a), or all of whose prescribed successors under sub-clause (a) have died, become incapacitated or are otherwise incapable or unwilling to serve as protector, may, by written instrument, appoint any other person to be protector of this Trust either in addition to or to succeed it (but may not appoint a succession of protectors).

      (c)     Any appointment of a new or additional Protector under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office in which case the appointment shall become effective on such death, resignation or incapacity.  Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Protectors under this clause.

18.5     Any appointment under this clause (other than the appointment of the Original Protector whose appointment and acceptance thereof is made by this Deed) shall be in writing signed by the person making the appointment and by the new or additional Protector so appointed.  Any such appointment shall only take effect when written notice of such appointment has been given to the Trustees.

18.6     If, notwithstanding the provisions of sub-clause 18.4 there shall at any time be no Protector of this Trust, the Trustees shall, by deed, irrevocably appoint any person, not being one of the Trustees, to be the Protector after consulting with such of the adult Discretionary Beneficiaries as they shall consider appropriate.

19.     **EFFECT OF VACANCY IN PROTECTOR'S OFFICE**

If there shall at any time be no Protector, this Trust (except for clause 18) shall, during such time as there shall be no Protector (but not further or otherwise), be read and construed as if all references to the requirement for the Protector's consent or agreement and to the exercise by the Protector of any power were omitted from this Trust.

20.     **PROTECTOR'S INDEMNITY**

20.1     The Protector shall exercise his powers in good faith.  He shall not, in the absence of actual fraud, dishonesty or wilful misconduct, be accountable to any Beneficiary or

**252**

the Trustees for any act of omission or commission in relation to the powers given to him by this Trust.

20.2    The Protector shall be entitled to charge for the performance of his duties at such rate or in such manner as may be agreed from time to time between the Protector and the Trustees.

20.3    The Protector shall be entitled to reimbursement of all proper expenses incurred by him in relation to the exercise of his powers and performance of his duties under this Trust or the prosecution or defence of any legal proceedings arising in connection with the exercise or non-exercise of his powers or the performance or non-performance of his duties, provided that any claim for reimbursement shall be received by the Trustees within one year of the expenses being incurred.

## 21.    PROPER LAW, FORUM AND PLACE OF ADMINISTRATION

21.1    The proper law of this Trust shall be that of the British Virgin Islands.  Except as otherwise provided in this Trust, all rights under this Deed and its construction and effect shall be subject to the jurisdiction of the courts, and construed according to the laws, of the British Virgin Islands.

21.2    The courts of the British Virgin Islands shall be the forum for the administration of these trusts.

21.3    The provisions of this sub-clause shall apply notwithstanding the provisions of sub-clauses 21.1 and 21.2

(a)    The Trustees shall have power, subject to the application (if any) of the rule against perpetuities, to carry on the general administration of these trusts in any jurisdiction in the world.  This power shall be exercisable whether or not the law of such jurisdiction is for the time being the proper law of this Trust or the courts of such jurisdiction are for the time being the forum for the administration of these trusts, and whether or not the Trustees or any of them are for the time being resident or domiciled in, or otherwise connected with, such jurisdiction.

(b)    The Trustees may at any time declare in writing that, from the date of such declaration, the proper law of this Trust shall be that of any specified jurisdiction.  No exercise of this power shall be effective unless the law of the jurisdiction specified is one under which this Trust remains and all, or substantially all, of the trusts, powers and provisions contained in this Deed remain enforceable and capable of being exercised and so taking effect.

(c)    Following any exercise of the power contained in sub-clause 21.3(b), the Trustees shall, by deed, make such consequential alterations or additions to this Deed as they consider necessary or desirable to ensure that, so far as may be possible, the trusts, powers and

253

provisions of this Deed shall be as valid and effective as they were immediately prior to such change.

(d)    The Trustees may, at any time, declare in writing that, from the date of such declaration, the forum for the administration of these trusts shall be the courts of any specified jurisdiction.

## 22.    EXCLUSION OF COMMUNITY PROPERTY RULES

No benefit accruing to or devolving on any Beneficiary under this Deed shall form or constitute a portion of any communal or joint estate or marital property of such Beneficiary, but such benefit shall be and remain the sole, separate and exclusive property of such Beneficiary.   Should such Beneficiary be married or marry in community of property, any benefit so accruing or devolving shall be expressly excluded from the community; such benefit shall also be free from the interference, control or marital power of any spouse of such Beneficiary.   The provisions of this clause shall apply not only to benefits accruing to or devolving on any Beneficiary but also to the property of whatever nature for the time being representing the same and the income thereof.

## 23.    EXCLUSION OF EXCLUDED PERSONS

23.1    No discretion or power conferred on the Trustees or any other person by this Deed or by law shall be exercised, and no provision of this Deed shall operate directly or indirectly, so as to cause or permit any part of the capital or income of the Trust Fund to become in any way payable to or applicable for the benefit of an Excluded Person.

23.2    The provisions of sub-clause 23.1 shall not preclude any Settlor from exercising any statutory right to claim reimbursement from the Trustees for any income tax or capital gains tax paid by him in respect of income arising to the Trustees or capital gains realised or deemed or treated as realised by them.

23.3    Subject to sub-clause 23.2 the prohibition in this clause shall apply notwithstanding anything else contained or implied in this Deed.

## 24.    VARIATION OF TERMS OF THIS TRUST

The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part 1 of this Deed including the trusts, powers and discretions contained in Part 1 of this Deed provided always that:

24.1    they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;

24.2    they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being

254

confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;

24.3    no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor.

24.4    no such variation, amendment, addition or deletion

    (a)    shall infringe the proper law of this Trust for the time being; or

    (b)    shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and

24.5    no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety.

## 25.    SEVERABILITY

If any provision of this Deed shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity and enforceability of the remaining provisions of this Deed which shall, so far as possible, be construed and take effect as if the invalid or unenforceable provisions had not been included in this Deed.

## 26.    COUNTERPARTS

This Deed may be signed in counterparts and each such counterpart shall constitute an agreed document and each such counterpart taken together, shall constitute one and the same instrument.

## PART 2 - ADMINISTRATIVE PROVISIONS

## 27.    POWER OF INVESTMENT

27.1    The Trustees may apply any money to be invested in the purchase or acquisition (either alone or jointly with other persons) of such property, of whatever nature and wherever situate and whether of a wasting nature, involving liabilities or producing income or not, or in making such loans with or without security, as they think fit so that they shall have the same powers to apply money to be invested as if they were an absolute beneficial owner.

27.2    The Trustees may exchange property for other property on such terms as they think fit.

27.3    The Trustees shall not be required to diversify the investment of the Trust Fund.

## 28.    EXERCISE OF RIGHTS ATTACHING TO SHARES

Notwithstanding any other provision of this Deed, the power, authority and discretion granted to the Trustees under this Deed over the control or exercise of

**255**

any rights (including, without limitation, voting rights) attaching to any securities, shares or other interests in any entity that form a part of the Trust Fund, or which are held (directly or indirectly) by a company or other entity whose shares form part of the Trust Fund and which is controlled by the Trustees, shall be exercisable by the Trustees, acting alone as provided in this Deed, without the approval or consent of any Beneficiary, Protector or any other person. No person other than the Trustees shall have any power, authority or discretion, directly or indirectly, over the control or exercise of any rights (including, without limitation, voting rights) which might be conferred by the holding of any such securities, shares or other interests unless specifically delegated such power, authority or discretion by the Trustees.

29.    **POWER TO LEND**

The Trustees may lend all or any part of the Trust Fund to any person or Beneficiary on such terms (whether or not including provision for the payment of interest) as the Trustees think fit.

30.    **POWER TO BORROW**

The Trustees may borrow on the security of all or any part of the Trust Fund or otherwise for any purpose.

31.    **POWER TO GIVE GUARANTEES**

The Trustees may guarantee the payment of money and the performance of obligations by any Beneficiary or by any company in which the Trust Fund is invested and may charge all or any part of the Trust Fund in support of such guarantee.

32.    **POWER OF MANAGEMENT**

The Trustees shall have all the powers of an absolute beneficial owner in relation to the management and administration of the Trust Fund.

33.    **POWERS IN RELATION TO LAND AND CHATTELS**

33.1    The Trustees shall have all the powers of an absolute beneficial owner in relation to the disposition, development and improvement of any land comprised in the Trust Fund.

33.2    The Trustees shall not be bound to maintain any building or other structure on land comprised in the Trust Fund or to preserve or repair any chattels comprised in the Trust Fund.

34.    **POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY**

The Trustees may, with the consent of the Protector, permit any Discretionary Beneficiary or any other person (if in the opinion of the Trustees it is in the interests of a Discretionary Beneficiary) to occupy or enjoy the use of all or any part of the Trust Fund on such terms as the Trustees think fit. The Trustees may acquire any property for this purpose.

**256**

15432165.4                                    19

35. **POWER TO INSURE PROPERTY**

The Trustees may insure all or any part of the Trust Fund against any risk, for any amount and on such terms as they think fit but shall not be bound to do so.

36. **POWERS IN RELATION TO LIFE INSURANCE POLICIES**

The Trustees may apply all or any part of the Trust Fund in purchasing or maintaining any policy of insurance on the life of any person and shall have all the powers of an absolute beneficial owner in relation to any such policy.

37. **POWER TO TRADE**

37.1    The Trustees may trade either alone or in partnership and may exercise all or any of the powers conferred on them by this Trust in connection with such trade.

37.2    The Trustees shall be entitled to be indemnified out of the Trust Fund against all liability to which they may be subject in connection with such trade.

38. **POWER TO PROMOTE COMPANIES**

The Trustees may incorporate any company in any part of the world for any purpose in connection with this Trust.

39. **POWERS IN RELATION TO COMPANIES**

39.1    The Trustees may enter into any compromise or arrangement in relation to any company in which the Trust Fund is invested.

39.2    The Trustees may enter into any arrangements in relation to the winding up or liquidation of any company in which the Trust Fund is invested.

39.3    The Trustees shall not be bound to enquire into or be involved in the management of any company in which the Trust Fund is invested unless they have knowledge of circumstances which call for enquiry.

40. **EXCLUSION OF APPORTIONMENT**

No apportionment rules shall apply to the income of the Trust Fund or any part of it, so that all income received by the Trustees shall be treated as accruing at the date of receipt.

41. **POWER OF APPROPRIATION**

41.1    The Trustees may appropriate all or any part of the Trust Fund as they think fit in or towards satisfaction of the interest of any Beneficiary and may for such purpose place such value on any property as they think fit.

**257**

41.2    Where the Trustees have divided the Trust Fund into one or more sub-funds, the Trustees may transfer assets comprised in one such sub-fund to any other sub-fund in exchange for assets which have an equivalent open market value.

42.    **DIVISION BETWEEN CAPITAL AND INCOME**

The Trustees may determine whether any sums received or disbursed are on account of capital or income, or partly on account of one and partly on account of the other, and in what proportions.

43.    **PAYMENT OF EXPENSES**

The Trustees shall have power to pay out of income or capital, as they may in their discretion determine, any expenses relating to the Trust Fund (or any assets comprised within it) or its administration.

44.    **POWERS IN RELATION TO MINORS**

44.1    The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the parent or guardian of any minor who is beneficially entitled to such assets or income, and the receipt of such parent or guardian, or of the minor, shall be a full discharge to the Trustees.

44.2    The parent or guardian of a minor shall in respect of any assets or income received in accordance with this clause have the powers conferred on the Trustees by Part 2 of this Deed.

45.    **POWER TO APPOINT AGENTS**

The Trustees may employ and pay at the expense of the Trust Fund any agent in any part of the world to transact any business in connection with this Trust without being responsible for the fraud, dishonesty or negligence of such agent, *provided* that such agent is employed in good faith, the Trustees reasonably ensure that the agent acts within the scope of its delegation, and the Trustees monitor and review from time to time the agent's overall performance.

46.    **POWER TO EMPLOY NOMINEES**

The Trustees may hold all or any part of the Trust Fund in the name of one or more of the Trustees, or of any other person or partnership, as nominee on such terms as the Trustees think fit.

47.    **POWERS TO DELEGATE**

47.1    The Trustees may engage any person or partnership as investment adviser to advise them on the investment of all or any part of the Trust Fund and they may, without being liable for any consequent loss, delegate to such investment adviser discretion to manage investments on such terms as the Trustees think fit.

**258**

47.2    The Trustees may, without being liable for any consequent loss, delegate to any person the operation of any bank, building society or other account.

47.3    Any trustee may, by deed revocable or irrevocable, delegate to another trustee or any other person the exercise of all or any trusts and powers conferred on such trustee (other than the power of delegation conferred by this sub-clause) notwithstanding the fiduciary nature of such trusts and powers.

48.    **POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS**

48.1    The Trustees may indemnify any person in respect of any liability relating to this Trust and may charge all or any part of the Trust Fund in connection with such indemnity in such manner as they think fit.

48.2    The Trustees may enter into any agreement or give any commitment that they think fit relating to the transfer or sale of any business or company in which the Trust Fund is invested.

49.    **PAYMENTS TO CHARITIES**

The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the person who purports to be the treasurer or other appropriate officer of any Charity which is entitled to such assets or income, and the receipt of such person shall be a full discharge to the Trustees.

50.    **LEGAL PROCEEDINGS**

The Trustees may institute and defend proceedings at law and proceed to the final determination thereof or compromise the same as they shall in their discretion think fit.

51.    **COMPROMISE AND SETTLEMENT**

The Trustees may compromise and settle for such consideration and upon such terms and conditions as they shall in their discretion think fit all matters arising in relation to the trusts hereby created or the Trust Fund.

52.    **ACCOUNTS AND AUDIT**

The Trustees shall keep accurate accounts of their trusteeship and may, or shall if so requested by the Protector, have them audited annually by a firm of professionally qualified accountants selected by the Trustees.

53.    **PROTECTOR'S POWER TO MAKE REQUESTS**

In addition to the powers specifically conferred on the Protector by this Deed, the Protector shall have power to request information relating to this Trust from the Trustees (which information and accounts shall forthwith be supplied to the Protector) and to make other requests of or suggestions to the Trustees in regard to any matter relating to this Trust and the Trustees shall be bound to have regard to

**259**

any such other request or suggestion but shall not be bound to act in accordance with the same.

54.  **PAYMENT OF TAXES**

In the event of any inheritance tax or probate, succession, estate duty or other duties, fees or taxes whatever becoming payable in any part of the world in respect of the Trust Fund or any part of it in any circumstances whatever, the Trustees may pay all such duties, fees or taxes (notwithstanding that they are not recoverable from the Trustees or the Beneficiaries) out of the capital or income of the Trust Fund at such time and in such manner as they think fit, *provided* that, during the lifetime of the Grantor, any United States income taxes or capital gains taxes payable in respect of the Trust Fund or any part of it shall be payable by the Grantor (subject to any statutory right of the Grantor to be reimbursed by the Trustees).  The power to pay duties, fees and taxes conferred by this clause shall extend to any related interest and penalties and to the provision of information to, or the filing of returns with, any relevant tax authorities.

55.  **PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS**

Notwithstanding any provision to the contrary contained in this Deed, the Trustees shall comply with all requests received from any Beneficiary regarding information or documentation that they may require from the Trustees to fulfil their personal tax filing obligations and requirements.  The provision of such information and documentation shall include, where requested:

55.1  the execution by the Trustees of such returns or statements as may be required for tax purposes;

55.2  the appointment, as contemplated by section 6048 of the Code, of a United States agent acceptable to the Trustees for the trusts declared or contained in this Deed; and

55.3  the production of the accounts pertaining to the Trust Fund within a reasonable time after the expiration of the Beneficiary's relevant tax reporting period.

56.  **TRUSTEE CHARGING**

56.1  A trustee which is a trust corporation or company authorised to undertake trust business shall be entitled to remuneration in accordance with such terms as may from time to time be agreed between the trustee and the Protector.

56.2  A trustee, whether acting as a person engaged in a profession or business or in a personal capacity, shall be entitled to all normal professional or other fees for business done, services rendered or time spent by such trustee personally or by such trustee's firm or company in the administration of these trusts, including acts which a trustee not engaged in any profession or business could have done personally.

260

60.    **DISCLOSURE OF DOCUMENTS**

The provisions of this clause shall apply without prejudice to any right of the Trustees under the proper law of this Trust to refuse to disclose any document.

60.1    The Trustees shall not, subject to sub-clause 60.2, be bound to disclose to any person any document relating to this Trust, its administration, the exercise of the Trustees' powers, the performance of their duties or the Grantor's wishes.

60.2    Notwithstanding sub-clause 60.1, in the event of a Beneficiary requesting disclosure, the Trustees shall disclose to that Beneficiary, this Deed, supplemental deeds, trustees' resolutions exercising dispositive powers and documents which relate to or form part of the accounts of this Trust.

61.    **PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS**

The Trustees may distribute the Trust Fund without having ascertained that there is no Beneficiary whose parents were not married to each other at the time of his birth (or who claims through a person whose parents were not so married) and the Trustees shall not be liable to any Beneficiary of whose existence they had no actual notice at the time of distribution.

62.    **PROTECTION OF THE TRUSTEES GENERALLY**

62.1    No trustee shall be liable for any loss to the Trust Fund however arising except as a result of the fraud, dishonesty or wilful misconduct of such trustee, or in the case of a professional trustee entitled to charge for his services as trustee for the negligence of such trustee.

62.2    No trustee shall be bound to take any proceedings against a co-trustee or former trustee or the personal representatives of a co-trustee or former trustee for any breach or alleged breach of trust committed or suffered by such co-trustee or former trustee.

63.    **RELEASE OF POWERS**

63.1    Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.

63.2    The Protector and any other person on whom powers are conferred by this Deed may by deed (and so as to bind successive protectors of this Trust) release or restrict the future exercise of all or any of the powers conferred upon him by this Deed.

64.    **POWER TO VARY ADMINISTRATIVE PROVISIONS**

The Trustees may by deed amend or add to the administrative provisions contained in Part 2 of this Deed, provided that any amendment to clauses 45 (Power to appoint agents), 46 (Power to employ nominees), 47 (Power to delegate), 56 (Trustee charging), 57 (Power to receive remuneration) or 59 (Power to exercise powers

15432165.4                                                  25

**261**

notwithstanding personal interest) shall require the prior or simultaneous written consent of the Protector.

15432165.4                                              26

## SCHEDULE

€100

263

Signed sealed and delivered as a deed by )

**Delphine Anne Le Dain**                              )

                                                                   )

in the presence of                                          )

**Witness**

Signature:

Name:                GRAHAM A. COLLETT

Address:             1 BROMLEY LANE

                            CHISLEHURST

                            KENT   BR6 7LH

Occupation:        CHARTERED   ACCOUNTANT


The Common Seal of                          )

**Trustee**                                            )

was hereunto affixed                         )..................................

in the presence of

**Director**

Signature:

Name:                Leonard O'Brien

**Director / Secretary**   witness  Therer Heitzauer

Signature:

Name:

264

**Agreed and accepted by the Original Protector**

Signed sealed and delivered as a deed by )

**GRAHAM AUBREY COLLETT**                 )

                                          )

in the presence of

**Witness**

Signature: *GBarbey*

Name: JEANINE BARBEY

Address: 94 RUE DE LA SERVETTE.

1202 GENEVA SWITZERLAND

Occupation: CLIENT EXECUTIVE

15432165.4                29

265

Dated ___15th December___ 2017


**DELPHINE ANNE LE DAIN**

(Grantor)

and

**SALAMANDER ASSOCIATES LIMITED**

(Original Trustee)

and

**GRAHAM AUBREY COLLETT**

(Original Protector)

---

**DEED OF AMENDMENT TO**

**THE BIG VALLEY TRUST**

---

42363474.1

266

DEED OF AMENDMENT

**DATE:** The    *15*    day of    *December*    2017

**PARTIES**

(1)     **DELPHINE ANNE LE DAIN** of Buzon 110 Serreta, Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

(2)     **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

(3)     **GRAHAM AUBREY COLLETT** of 14 Rosewood Court, Orchard Road, Bromley, Kent, BR1 2TT (the **'Original Protector'**),

together, the **"Parties"**.

**RECITALS**

(A)     This Deed is supplemental to the settlement (the **"Settlement"**) specified in the Schedule to this Deed.

(B)     The Original Trustee is the present Trustee of the Settlement.

(C)     Under clause 24 (*Variation of terms of this Trust*) of the Settlement, the Trustees have power, exercisable by deed and subject to the prior or simultaneous written consent of the Protector, to vary, amend, add to or delete, any or all the provisions of Part 1 of the Settlement including the trusts, powers and discretions contained in Part 1 of the Settlement, provided always that:

> (1)     they are satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;

> (2)     they have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust (which is the British Virgin Islands under clause 21 (*Proper law, forum and place of administration*) of the Settlement) for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers (the **"Counsel Opinion"**);

> (3)     no such variation, amendment or addition shall be made to the provisions of clause 7 of the Settlement (*Grantor's power of revocation*) without the consent of the Grantor (the **"Grantor Consent"**); and

> (4)     no such variation, amendment, addition or deletion shall:

>> a.    infringe the proper law of the Big Valley Trust for the time being; or

42363474.1                                            2

<span style="color:red">267</span>

b. permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in the Settlement,

(the "**Power**").

(D)     The Trustees wish to exercise the Power in the manner set out in this Deed.

## OPERATIVE PROVISIONS

1.     **DEFINITIONS AND CONSTRUCTION**

In this Deed, where the context admits, the definitions and rules of construction contained in the Settlement shall apply.

2.     **VARIATION OF THE SETTLEMENT**

2.1     In exercise of the Power and all other powers (if any), and:

2.1.1     being satisfied that such variation is for the benefit of the Beneficiaries;

2.1.2     having obtained the Counsel Opinion; and

2.1.3     having obtained the Grantor Consent,

the Trustees hereby, with effect from the date of this Deed, vary the Settlement by deleting clause 7 (*Grantor's power of revocation*) of the Settlement in its entirety.

2.2     In accordance with clause 16 (*General limitation on powers*) of the Settlement, no Trust Company may participate as one of the Trustees in the exercise of any of the Power if any individual director or alternate director (other than the Grantor) or any individual (other than the Grantor) to whom any one or more of the directors or alternate directors has delegated any or all of his powers as a director of such Trust Company is a Beneficiary who is a US Person (a 'restricted director' or a 'restricted delegatee' as the case may be) unless the Articles of Association, By-laws or any similar organisational documentation governing such Trust Company provide that any restricted director or restricted delegatee is not permitted to participate as a director or delegatee in the exercise of the restricted powers.

## SCHEDULE

The Deed of Settlement for the Big Valley Trust dated 7 July 2014 between the Parties.

269

Signed sealed and delivered as a deed by )

**Delphine Anne Le Dain** )

)

in the presence of

**Witness**

Signature: ......................................

Name: _Iryna Tsenzharyk_

Address: _20 Conduit Street_

_London  W1S 2XW_

Occupation: _Finance Manager_

The Common Seal of )

**SALAMANDER ASSOCIATES** )

**LIMITED**  )

was hereunto affixed )

in the presence of

**Director**

Signature: ......................................

Name: _LEONARD JULIEN_

**Director / Secretary**

Signature: ......................................

Name: ......................................

**270**

42363474.1 5

**Agreed, consented and accepted by the Original Protector**

Signed sealed and delivered as a deed by )

**GRAHAM AUBREY COLLETT**                     )

                                              )

in the presence of

**Witness**

Signature:

Name:         *Iryna Ssengharyk*

Address:      *20 Conduit Street*

              *London*

              *W1S 2XW*

Occupation:   *Finance Manager*

271

42363474.1                              6



CharlesRussell
Speechlys

DATED **April, 12th** 2022

## SALAMANDER ASSOCIATED LIMITED (1)

and

## SALAMANDER CORPORATE SERVICES SA (2)

and

## GRAHAM AUBREY COLLETT (3)

---

## DEED OF AMENDMENT REGARDING THE BENEFICIAL CLASS

## (THE BIG VALLEY TRUST)

---

272

**THIS DEED OF AMENDMENT** is made on the    12    day of    April    2022

**BETWEEN**

(1)    **SALAMANDER ASSOCIATES LIMITED** whose registered office is at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands; and

(2)    **SALAMANDER CORPORATE SERVICES SA** whose registered office is at Rue Jean-Gabriel Eynard 8, 1205 Geneva, Switzerland (together the "**Trustee**"); and

(3)    **GRAHAM AUBREY COLLETT** of 53 Mill Rise, Robertsbridge, East Sussex TN32 5EG (the "**Protector**").

**WHEREAS**

(A)    This deed is supplemental to:

     (i)    a trust deed dated 7 July 2014 and made between (1) Delphine Anne Le Dain as settlor (the "**Settlor**"), (2) Salamander Associates Limited as original trustee and (3) the Protector as the original protector, establishing the Big Valley Trust (the "**Trust**"); and

     (ii)    all other relevant deeds and documents made supplemental to the Trust.

(B)    The Trustee is the present and sole trustee of the Trust.

(C)    By clause 24 of the Trust, the Trustee has the following power:

*"The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part 1 of this Deed including the trusts, powers and discretions contained in Part 1 of this Deed provided always that:*

   24.1    *they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;*

   24.2    *they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;*

   24.3    *no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor;*

   24.4    *no such variation, amendment, addition or deletion*

     (a)    *shall infringe the proper law of this Trust for the time being; or*

     (b)    *shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and*

   24.5    *no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety."*

2

273

(the "**Power of Amendment**").

(D)    By clause 63 of the Trust, the Trustee has the following power:

"*Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.*"

(the "**Power to Release**").

(E)    The Trustee is desirous of exercising the Power of Amendment and Power to Release revocably to amend the class of Discretionary Beneficiaries in the event that the Settlor dies whilst resident in Switzerland for Swiss estate tax purposes in the manner set out below. It is intended that clause 2.3 takes effect upon the date of the Settlor's death whereas the remaining provisions do not take effect unless and until the Settlor dies in said circumstances.

(F)    The Trustee has satisfied itself that all the conditions set out in sub-clauses 24.1 to 24.5 of the Trust have been satisfied.

(G)    The Protector wishes to consent to the exercise of the Power of Amendment and is a party to this deed for that purpose.

(H)    The Trust Period as defined in sub-clause 1.1 of the Trust has not yet expired.

**NOW THIS DEED WITNESSES** as follows:

1    **DEFINITIONS AND INTERPRETATIONS**

In this deed, where the context allows, the definitions and rules of construction contained in the Trust shall apply.

2    **AMENDMENT**

2.1    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Trust shall be read and construed such that the definition of "Discretionary Beneficiaries" in sub-clause 1.1 of the Trust were replaced in its entirety by the following words:

""**Discretionary Beneficiaries**" shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:

(a)    the Grantor;
(b)    the children and remoter issue of the Grantor;
(c)    Charities; and
(d)    the trustees of any other trust of which any one or more of the Beneficiaries of this Trust are interested (but not any other persons or classes of persons)."

3

**274**

2.2    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Trust shall be read and construed such that the definition of "Charity" in sub-clause 1.1 of the Trust were replaced in its entirety by the following words:

> ""**Charity**" shall mean any trust, foundation, company or other organisation that:
>
> (a)    is established only for purposes regarded as exclusively charitable under the laws of The British Virgin Islands and, if the proper law of this Trust has been changed, under the proper law of this trust;
>
> (b)    for Valais (Switzerland) tax purposes is eligible for a zero rate of donation, estate or inheritance tax as such tax is defined under Swiss law when receiving a transfer from an ordinary tax resident of Valais; and
>
> (c)    is incorporated in Valais;
>
> and the words "**Charities**" and "**Charitable**" shall be construed accordingly always provided that any reference to a Charity that is a trust shall, where the context requires, mean the trustees (acting in that capacity) of such trust"

2.3    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death, the Trust shall be read and construed such that sub-clause 5.1 of the Trust (Power to Add Discretionary Beneficiaries) were replaced in its entirety by the following words:

> "5.1    The Trustees with the prior or simultaneous written consent of the Protector may, at any time during the Trust Period but only after the Grantor's death and provided always that she did not die whilst resident in Switzerland for Swiss estate tax purposes, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine. For the avoidance of doubt if the Grantor does die whilst resident in Switzerland for Swiss estate tax purposes the Trustees may not add to the class of Discretionary Beneficiaries."

2.4    In exercise of the Power to Release and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Power of Amendment under clause 24 is released by the Trustee only insofar as it applies to the definition of Discretionary Beneficiaries.

2.5    This deed shall be revocable in whole or in part by the Trustee by deed at any time during the Trust Period. Notwithstanding any other provision of this deed, this deed shall nonetheless become irrevocable upon the death of the Settlor if on the date of her death she is resident in Switzerland for Swiss estate tax purposes.

2.6    For the avoidance of doubt, the provisions of this deed prevail over any other provisions of the Trust to the contrary.

4

275

2.7 For the avoidance of doubt, the provisions of this deed are not intended to cause, and will not cause, a resettlement of the Trust.

3 **PROTECTOR CONSENT**

As required by clause 24 of the Trust, the Protector Trustee hereby consents to the exercise of the Power of Amendment in accordance with clause 2 hereof.

4 **CONFIRMATION**

Save as provided above the terms of the Trust shall continue in full force and effect.

5 **GOVERNING LAW**

This deed shall be governed by and construed in accordance with the laws of The British Virgin Islands and the parties hereto irrevocably submit to the non-exclusive jurisdiction of the courts of The British Virgin Islands.

6 **COUNTERPARTS**

This deed may be executed in counterparts, all of which taken together, shall constitute one and the same deed and any party may enter into this deed by executing a counterpart.

**IN WITNESS** of which the parties to this deed have executed this deed on the day and year first above written

Signed as a Deed and Delivered by )
**SALAMANDER CORPORATE SERVICES** )
**SA** as trustee of the Big Valley Trust acting )
by a director )
)

.................................................
Director

in the presence of:

Witness signature:

Witness name:  DMITRY ZVONAREV

Witness address:  CHEMIN DE LA TULETTE 4, 1223 COLOGNY, CH

Witness occupation:  SENIOR MANAGER

5

276

Signed as a Deed and Delivered by )
**SALAMANDER ASSOCIATES LIMITED** as )
trustee of the Big Valley Trust acting by a )
director )
)
)

.................................................... 
Director

in the presence of:

Witness signature:

Witness name: DMITRY ZVONAREV

Witness address: CHEMIN DE LA TULETTE 9, 1223 COLOGNY, CH

Witness occupation: SENIOR MANAGER

6

277

**SIGNED** as a **DEED** and **DELIVERED**          )          ...........JA Collett..................
by **GRAHAM AUBREY COLLETT** as          )
Protector of the Big Valley Trust


in the presence of:

Witness signature: ~A Ellis~

Witness name: Anthony Stephen Ellis

Witness address: 5 Wakeley Road, Rainham, Kent, ME8 8HD

Witness occupation: Retired

7

**278**

# Summit Trust International SA ("STI")

**Summit Trust (Cayman) Limited**
**Summit Trust Company Ltd**

# Settlor/Contracting Party Compliance Declaration
(Version: May 2021)

**Settlors, Founders and Owners of managed companies** should complete sections A, B, C, D and, if relevant, E.

*Protectors & Beneficiaries* *should complete separate form*

Please sign and date all sections as requested.

General information including data protection information is included in section F – please sign to acknowledge.

**Nexus: insert name of Trust/Foundation/Companies covered by this declaration:**

Trust - BIG VALLEY TRUST

Companies

Hursey Development Ltd

Global Private Equity Fund Ltd

**(hereinafter referred to below as "the Fiduciary Structure")**

279

THIS PAGE IS INTENTIONALLY LEFT BLANK

## SECTION A:
## DECLARATION OF BENEFICIAL OWNERSHIP

1.  **For Trusts and Foundations**

I, *(insert name)*        **Delphine Anne le Dain**

being the settlor/donator/asset contributor of the Fiduciary Structure hereby declare that the **"Beneficial Owner"** (as defined below) of the assets of the Fiduciary Structure is/are the persons listed below who are the named or identified beneficiaries or objects of discretionary powers contained in the relevant documentation of the Fiduciary Structure:

**EITHER** *( please check one of the following:)*

**For Revocable Trusts:**        ☐ I am the 'beneficial owner' as the Trust is revocable by me;

**OR**

**For Irrevocable Trusts:**      ☒ The 'beneficial owners' are as described in (a) or (b) below:

### a) For Discretionary Trusts

☒ There are no persons with fixed interests in the trust fund, but the persons who may be entitled to benefit are those described in the Trust Deed as 'Beneficiaries'.

### b) For Non-Discretionary Trusts

☐ **Life Interest Trusts:** The beneficial owners are the persons named or described as life tenants and beneficiaries in the Trust Deed.

**AND**

I confirm that the following person(s) is the Protector/Guardian/Appointor under the Fiduciary Structure having the powers specified by the instrument creating the Fiduciary Structure:

| Names: | Full Residential addresses/domicile |
|---|---|
| **HERVÉ BENZAKEIN** | **c/o HBS SA,** |
| | **Rue de la Rôtisserie 1,** |
| | **1204 Genève Switzerland** |

281

2. **For Stand Alone Managed Companies only**

I, *(insert name)* _____

hereby declare that the "Beneficial Owner" of the **Fiduciary Structure** (being a company or corporate body) and therefore the person or persons entitled to the assets of the Fiduciary Structure upon a liquidation thereof is/are the persons listed below:

<u>Names:</u>

<u>Full Residential addresses/domicile</u>

*(attach an additional sheet, if necessary)*

## INTERPRETATION

"Beneficial Owner" as used in this form signifies only 'beneficial owner' for regulatory purposes in Switzerland in accordance with the laws in force in Switzerland relating to the prevention of money laundering (blanchiment d'argent) and has no wider legal significance. In particular, in the case of discretionary trusts, or trusts containing powers of appointment in favour of objects of discretion, the fact that an object of a discretionary trust power or power is described in this Form as a "beneficial owner" does not mean that that person has any greater legal right or entitlement to trust property or that the trustees' discretionary powers of appointment have been exercised fettered or restricted in any way whatsoever.

<u>Undertakings</u>

1)    I undertake to inform STI of any changes in the above which are brought about through my own powers to do so where this is possible.

2)    The information furnished above is true and complete and given to the best of my knowledge and belief.

Signature: _____          Date: ___04/14/2023___

Summit Trust International SA: Compliance Declaration May 2021 version

**282**

## SECTION B:
## INTERNATIONAL TAX COMPLIANCE DECLARATION (FATCA & AEOI)

1.  I, *(insert name)*    **Delphine Anne le Dain**

    hereby declare that my tax status is:

    *Please check the box that applies:*

    **Non-US Person**

    ☒ I am <u>not</u> an American citizen, I do <u>not</u> possess or am entitled to a United States "green card" and I have no visa or other permission entitling me to reside in the United States of America and I am <u>not</u> otherwise a resident of the United States of America.

    *(if you ticked this box, please continue to Part 2 of this section)*

    **US Person**

    ☐ I am an American citizen.

    ☐ I was born in the United States and have not renounced US citizenship or my right to claim it.

    ☐ I am <u>not</u> an American citizen but I possess or am entitled to a United States "green card".

    ☐ I am <u>not</u> an American citizen and I do <u>not</u> possess or am entitled to a United States "green card" but I am resident in the United States

    **AND** my address in the United States is:

    _____

    _____

    _____

    _____

    **My US taxpayer identification number or reference number is:**

    _____

283

2.    **_For completion by all who are non-US Persons_**

**Declaration of Tax Status**

My residential address is set out below and confirmed by the attached address verification document.

Address:

**Chemin de St Christophe 1, 1936 Verbier, Switzerland.**

**Country of Tax Residence:**    Switzerland.

**My taxpayer identification number or reference number is:**

AVS 756.4431.4088.57 - (TIN)

**If you are not able to provide a TIN, please state one of the 3 reasons below:**

☒    A - The country where I am liable to pay tax does not issue TINs to its residents

☐    B - I am otherwise unable to obtain a TIN or equivalent number – please explain

**SWITZERLAND TIN EQUIVALENT ABOVE**

☐    C - No TIN is required by the authorities of my country of tax residence

Undertakings

1)    I undertake to inform STI of any changes in the above which are brought about through my own powers as soon as possible.

2)    The information furnished above is true and complete and given to the best of my knowledge and belief.

3)    I understand that this information will be used by STI, or other relevant companies within the Summit Group, in order for them to comply with their obligations and duties to report under the FATCA regime and the Automatic Exchange of Information required under the Common Reporting Standard.

Signature: _____    Date: 04/04/2023

**284**

## SECTION C:
## SOURCE OF FUNDS DECLARATION

1    The funds which I am intending to transfer to you for holding in the Fiduciary Structure, as discussed with you recently, are solely the result of:

*(Please tick as appropriate & provide information as indicated. If more space is needed please attach a separate sheet. If several categories apply, please tick all that apply and give a brief description under each one.)*

☒ **Professional Earnings** - provide brief details of profession / business activities

Bartol Limited was incorporated in BVI on May 2001 with a seed investment of approximately $300,000 from DLD. The $300,000 was funded from Delphine's private savings accumulated as a journalist. The beneficial owner of Bartol Limited was Delphine Anne Le Dain (DLD). It was set up as a vehicle to act as a fuel supplier. Bartol continued to trade until December 2004, when the logistics business was transferred to Red Star Enterprises Limited,

Dividend from Rosbelt International Ltd - 50% interest in Global Resources Worldwide LP owner of Red Star Enterprises Limited (Attached Schedule of Dividend distributions from Red Star Enterprises Ltd 2003 - 2017 - Prepared by Graham Collett Trust CFO) Via Bartol / Aspen Wind / Sunage Foundation and Galactea Trust

☐ **Inheritance** - provide brief details of how family wealth was originally generated including names of family members and name and details of family business as relevant

☒ **Sale of Business** - provide brief details of business activity, name of business and total sale proceeds

285

**Rosbelt International Limited,**

- 50% Holding in Global Resources Worldwide LP  (Attached Signed Purchase Agreement - Dated 12 October 2020) Total sales consideration $40,950,000

**Oil Distribution and Trading Company**

☐ **Other** (If sale of other assets such as Property or Investments, please provide brief details. If a Gift, please indicate donor & how their wealth was originally generated)

and are beneficially owned by me and are capable of free transfer by me and do not derive from any illegal activity.

1.  I do not have any creditors whose claims I cannot satisfy from my free assets and have never been an adjudged bankrupt.

2.  I have not been the subject of any audits or special tax investigations by any tax authority other than routine inquiries.

3.  I have never been convicted of a serious criminal offence (i.e. offences other than those related to motoring).

4.  I undertake to notify you without delay of any change to the warranties, undertakings & representations made above.

286

287

Signature:     Date: 04/04/2023

## SECTION D:

## TELEPHONE, FAX & ELECTRONIC COMMUNICATIONS INDEMNITY

### In relation to the Fiduciary Structure

I hereby confirm that I may wish to communicate with you by means of telephone, facsimile, electronic mail ("e-mail") from time to time and I am therefore authorizing you to accept such means of communication. I would require you to exercise reasonable care in determining whether a purported communication from me is genuine and complete and free from corruption or interference and if you are in doubt I require you to take such steps as you see fit in order to verify the same before acting upon it. Provided that you have acted with reasonable care and have not acted with gross negligence I hereby agree to indemnify you from and against all losses, claims, actions, proceedings, demands, costs and expenses incurred or sustained by you whatsoever in connection with such communications.

Signature: _____   Date: 04/04/2023

288

## SECTION E:

## THIRD PARTY DISCLOSURE AUTHORITY

### In relation to the Fiduciary Structure

1    I wish to be able to communicate with you through

**HERVÉ BENZAKEIN , DERMOT SHORTT**                    ("the Agent")

with whom I have enjoyed a long standing relationship.  I hereby authorize you to release such information about the Fiduciary Structure to the Agent as he/she may request from time to time

2    In addition, I authorize you to rely upon and act in accordance with any requests made by me or purportedly given or made by me from time to time in connection with the Fiduciary Structure which may be transmitted by telephone, facsimile or e-mail to you by the Agent on my behalf. You will have no further duty to inquire as to the authority or identity of the person passing on any such request provided he/she has identified himself/herself by name and supplied the name of the Fiduciary Structure. You shall be entitled to treat any such request passed to you by the Agent as if made by me and as fully authorized and binding on me and my estate or heirs.  Should you require written confirmation of any request made under this authority, I undertake to provide this to you as soon as practicable thereafter.

3    In consideration for your acting in accordance with the terms of this letter, I, my personal representatives, heirs and assigns undertake to indemnify you and keep you indemnified against all losses, claims, actions, proceedings, damages, costs and expenses (including legal costs) incurred or sustained by you of whatever nature and howsoever arising out of your acting upon any requests made by, or purportedly made by, the Agent.

4    The terms of this letter shall remain in force until such time as you receive notice in writing of termination from me save that any such termination will not release me, my personal representatives, heirs and assigns from any liability under this authority and indemnity in respect of any act performed by you in accordance with the terms of this letter prior to receipt of notice of termination.

Signature: _____        Date: _04/04/2023_

289

## SECTION F: DATA PRIVACY STATEMENT

STI, like other financial services businesses, is subject to Swiss laws on the protection of personal data. Where STI deals with persons resident in European Union Member States, the General Data Protection Regulation is also relevant. This document provides a summary of the rights that you have as a data subject by STI as a data controller and the policies STI has adopted to control the processing of personal data in accordance with the law.

### Reasons for Collecting Data

STI only collects personal data in order to administer trusts, companies, foundations, partnerships and other fiduciary structures ("fiduciary relationships") that it administers for its client families. Personal data is not sold for marketing purposes to third parties.

### Personal Data

The personal data that we collect includes name; date of birth; address; taxpayer or social security numbers; identity documents such as passport, driving licence, and national identity cards; proofs of address; bank account details so that payments can be made; information about your personal financial and domestic situation so that trustee discretions can be properly made, which may include information about your dependants; and other information that we may consider necessary in connection with our fiduciary duties and legal obligations.

Personal data is usually provided to us by you upon request but may be obtained by us from third parties and other sources such as databases and internet searches as well as from professional advisers such as lawyers, accountants, banks and financial advisers.

### Data Transfer

STI may transfer such data to third parties such as law firms, accountancy firms, banks, asset managers, securities custodians, and investment advisers in order to comply with laws such as those directed against money laundering or to obtain legal or tax advice required in connection with the administration of a fiduciary relationship. Personal data may be viewed by our auditors and can be produced to regulators and law enforcement bodies if requests are made. Personal data may also be reported to tax authorities under various international tax reporting obligations such as FATCA (where the United States is concerned) or the Automatic Exchange of Information provisions (for most countries outside of the United States). Personal data may also be exchanged as part of due diligence exercises in connection with the acquisition, merger or sale of trust businesses including STI and its subsidiaries. Personal data may also be transferred by STI to its subsidiaries or affiliated companies.

### Storage of Personal Data

STI maintains electronic records of personal data on its servers in Geneva and on a back-up server in a secure location in Switzerland. Personal data is also maintained on paper files in its offices in Geneva. Paper files are kept in locked cabinets overnight and the office is protected by an alarm system when not staffed overnight or at weekends. Staff are bound by personal undertakings to maintain client confidentiality, which includes protection of personal data, and office policies require that files containing personal data are filed away at night and not left on desktops. Where personal data is transferred outside of Switzerland, it will either be transferred to a jurisdiction that has equivalent legislative protection for personal data (e.g. the UK or a country within the European Economic Area) or we will in other cases, take steps to secure equivalent protection for personal data by means of contractual undertakings.

Personal data will be retained by us for as long as you are the subject of or might be concerned with a fiduciary relationship with us and for such periods as may be prescribed by law from time to time afterwards such as under the anti-money laundering legislation.

Once personal data is no longer required, STI will anonymise or erase it.

## Personal Data Information Rights

STI will adequately inform you when personal data is collected from you or from a third party. The use of sensitive data is subject to your express consent.

When personal data is communicated outside Switzerland, STI will inform you of the name of the third State or international body to which the data is to be communicated.

You may also request that we provide you with information about the personal data that we may hold about you and copies of that information. We will provide copies of information or documents we hold about you upon written request under the 'Contact' section below. If the information we hold about you is inaccurate you may require us to correct it by written request. You may also request that we cease to process information about you but in such cases this may impede our ability to provide financial benefits to you under a fiduciary relationship.

You may request that we erase all of your personal data under the "right to be forgotten" if (i) it is no longer necessary for us to hold that personal data with respect to the original purpose for which it was obtained; or (ii) where your consent was the basis of our receiving your personal data, you wish to withdraw that consent; or (iii) you have objections to our processing your personal data and there is no overriding legitimate interest that would entitle us to continue doing so; or (iv) your personal data has been processed unlawfully; or (v) your personal data has to be erased in order to comply with a particular legal or regulatory obligation. Erasure of personal data will prevent us from providing any financial benefit to you as without such information it would not be lawful for us to administer a fiduciary relationship from which you could benefit.

In Switzerland, the government body responsible for supervising data processing is the Federal Data Protection and Information Commissioner (FDPIC) whose address is: Office of the Federal Data Protection and Information Commissioner FDPIC, Feldeggweg 1, CH-3003 Berne, Switzerland, Telephone: +41 58 462 43 95; Fax: +41 58 465 99 96. Information about data protection in Switzerland is available from the FDPIC website: www.edoeb.admin.ch

## Contact

If you have any questions about our data protection policy please contact your usual Trust Officer or director contact or write to The Managing Director, Summit Trust International SA, 6 Place des Eaux-Vives, CH-1207 Geneva, Switzerland; tel + 41 22 707 8399; fax + 41 22 707 8395.

\* \* \* \* \*

## Acknowledged

Signature: _____  Date: 04/04/2023

291

**Dated** _7th July_ _2014_

## DELPHINE ANNE LE DAIN

(Grantor)

and

## SALAMANDER ASSOCIATES LIMITED

(Original Trustee)

and

## GRAHAM AUBREY COLLETT

(Original Protector)

---

## DINA MAROPA TRUST

---

292

15432165.4

1

## TABLE OF CONTENTS

| No. | Heading | Page |
|-----|---------|------|
| 1. | DEFINITIONS AND CONSTRUCTION | 4 |
| 2. | NAME | 7 |
| 3. | POWER TO RECEIVE ADDITIONAL PROPERTY | 7 |
| 4. | TRUST FOR SALE | 7 |
| 5. | POWER TO ADD DISCRETIONARY BENEFICIARIES | 7 |
| 6. | POWER OF EXCLUSION | 8 |
| 7. | GRANTOR'S POWER OF REVOCATION | 9 |
| 8. | DISCRETIONARY TRUST OF CAPITAL AND INCOME | 9 |
| 9. | INCOME TRUSTS IN DEFAULT OF APPOINTMENT | 10 |
| 10. | POWER TO APPLY CAPITAL FOR BENEFICIARIES | 10 |
| 11. | TRUSTS IN DEFAULT OF APPOINTMENT | 11 |
| 12. | ULTIMATE DEFAULT TRUSTS | 11 |
| 13. | ASSIGNMENT OF POWER OF APPOINTMENT | 11 |
| 14. | ADMINISTRATIVE POWERS | 11 |
| 15. | EXERCISE OF POWERS | 11 |
| 16. | GENERAL LIMITATION ON POWERS | 12 |
| 17. | REMOVAL AND APPOINTMENT OF TRUSTEES | 12 |
| 18. | APPOINTMENT OF PROTECTORS | 14 |
| 19. | EFFECT OF VACANCY IN PROTECTOR'S OFFICE | 15 |
| 20. | PROTECTOR'S INDEMNITY | 15 |
| 21. | PROPER LAW, FORUM AND PLACE OF ADMINISTRATION | 16 |
| 22. | EXCLUSION OF COMMUNITY PROPERTY RULES | 17 |
| 23. | EXCLUSION OF EXCLUDED PERSONS | 17 |
| 24. | VARIATION OF TERMS OF THIS TRUST | 17 |
| 25. | SEVERABILITY | 18 |
| 26. | COUNTERPARTS | 18 |
| 27. | POWER OF INVESTMENT | 18 |
| 28. | EXERCISE OF RIGHTS ATTACHING TO SHARES | 18 |
| 29. | POWER TO LEND | 19 |
| 30. | POWER TO BORROW | 19 |
| 31. | POWER TO GIVE GUARANTEES | 19 |
| 32. | POWER OF MANAGEMENT | 19 |

293

15432165.4

33.    POWERS IN RELATION TO LAND AND CHATTELS                          19
34.    POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY                      19
35.    POWER TO INSURE PROPERTY                                         20
36.    POWERS IN RELATION TO LIFE INSURANCE POLICIES                    20
37.    POWER TO TRADE                                                   20
38.    POWER TO PROMOTE COMPANIES                                       20
39.    POWERS IN RELATION TO COMPANIES                                  20
40.    EXCLUSION OF APPORTIONMENT                                       20
41.    POWER OF APPROPRIATION                                           20
42.    DIVISION BETWEEN CAPITAL AND INCOME                              21
43.    PAYMENT OF EXPENSES                                              21
44.    POWERS IN RELATION TO MINORS                                     21
45.    POWER TO APPOINT AGENTS                                          21
46.    POWER TO EMPLOY NOMINEES                                         21
47.    POWERS TO DELEGATE                                               21
48.    POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS                  22
49.    PAYMENTS TO CHARITIES                                            22
50.    LEGAL PROCEEDINGS                                                22
51.    COMPROMISE AND SETTLEMENT                                        22
52.    ACCOUNTS AND AUDIT                                               22
53.    PROTECTOR'S POWER TO MAKE REQUESTS                               22
54.    PAYMENT OF TAXES                                                 23
55.    PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS          23
56.    TRUSTEE CHARGING                                                 23
57.    POWER TO RECEIVE REMUNERATION                                    24
58.    INDEMNITY INSURANCE                                              24
59.    POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST       24
60.    DISCLOSURE OF DOCUMENTS                                          25
61.    PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS           25
62.    PROTECTION OF THE TRUSTEES GENERALLY                             25
63.    RELEASE OF POWERS                                                25
64.    POWER TO VARY ADMINISTRATIVE PROVISIONS                          25

294

DEED OF SETTLEMENT

**DATE**: The _7th_ day of _July_ 2014

## PARTIES

(1)    **DELPHINE ANNE LE DAIN** of Buzon 110 Serreta, Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

(2)    **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

(3)    **GRAHAM AUBREY COLLETT** of 14 Rosewood Court, Orchard Road, Bromley, Kent, BR1 2TT (the **'Original Protector'**).

## RECITALS

(A)    The Grantor wishes to make this Settlement and has transferred or delivered to the Original Trustee or otherwise placed under its control the property specified in the Schedule. Further money, investments or other property may be paid or transferred to the Trustees by way of addition.

(B)    It is intended that this Trust shall be revocable during the lifetime of the Grantor.

(C)    In establishing this Trust, it is the intention of the Grantor that this Trust (i) will qualify as a grantor trust, during the Grantor's lifetime, within the meaning of Subpart E of Subchapter J of the US Internal Revenue Code of 1986, as amended (the **"Code"**), (ii) will not confer a general power of appointment upon any US person within the meaning of sections 2041 and 2514 of the Code, and (iii) will not result in any person other than the Grantor being treated as the owner of any portion of this Trust within the meaning of Code section 676. Accordingly, and notwithstanding any provision contained in this Deed to the contrary, this Deed shall be construed and the trusts of this Trust administered in accordance with and to achieve these intents.

## PART 1 - OPERATIVE PROVISIONS

### 1.    DEFINITIONS AND CONSTRUCTION

1.1    In this Deed, where the context admits, the following definitions and rules of construction shall apply.

**'Beneficiary'** shall mean any person actually or prospectively entitled to any share or interest in the capital or income of the Trust Fund.

**'Charity'** shall mean any trust, foundation, company or other organisation whatever established only for purposes regarded as charitable under the proper law of the

Trust or under the law of the jurisdiction in which the trust, foundation, company or other organisation was established.

'**children**', '**grandchildren**' and '**issue**' of any person shall include his children, grandchildren and remoter issue, whether legitimate, legitimated, illegitimate or adopted.

'**Company**' shall mean any body, incorporated or established in any part of the world, which has separate legal personality.

'**Consent Holder**' shall mean the person appointed as Consent Holder pursuant to sub-clause 7.2.

'**deed**' shall include any instrument in writing which is signed, witnessed and dated by or on behalf of each of the parties to the instrument and shall also include any instrument executed under seal by a Company.

'**Discretionary Beneficiaries**' shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:

(a)     the Grantor;

(b)     the children and remoter issue of the Grantor;

(c)     Charities; and

(d)     such other objects or persons as are added under clause 5 to the extent so added

*provided* that no person will be capable of being included or added as a Discretionary Beneficiary if such person is a US Person as herein defined or a resident of The British Virgin Islands as defined in section 2(1) of the Companies (Taxation and Concessions) Ordinance of The British Virgin Islands other than an individual who has been issued a certificate under Rule 6 of the Qualifying (Category 2) Individual Rules 2004 of The British Virgin Islands which remains valid at the date hereof or an individual whose income is subject to an election under Rule 11 of those Rules at the date hereof.

'**Excluded Person**' shall mean any person or class of persons or Charity by or in respect of whom or which a declaration under sub-clauses 6.1 or 6.4(b) has been made or treated as made but, in the case of a revocable exclusion, only during such time as the exclusion remains effective and unrevoked.

'**incapacity**' shall mean incapacity caused by physical or mental handicap or deterioration resulting in an individual whose incapacity is being judged being unable to manage his own affairs or to understand the nature or consequences of his actions, as confirmed by the written opinion of two medical practitioners qualified to assess such matters and '**incapacity**' shall also mean any legal incapacity deriving from age or insolvency and '**incapacitated**' shall have a corresponding meaning.



'**minor**' shall mean any individual who has not attained the age of 18.

'**person**' shall include any individual or Company.

'**proper law of this Trust**' shall mean the law governing this Trust as determined under clause 21.

'**Protector**' shall mean the person or entity designated as the Protector in accordance with clause 18.

'**Settlor**' shall mean the Grantor and any person who shall have donated (by way of gift or sale for less than full consideration) any sums of money, investments or other property to be held as part of the Trust Fund.

'**Trustees**' shall include the Original Trustee and the trustees for the time being of this Trust.

'**Trust**' shall mean the trusts constituted by this Deed.

'**Trust Company**' shall mean any Company, wherever incorporated, which is authorised under its constitution or by applicable law to act as trustee of a trust or trusts and/or carry on the business of administering trusts.

'**Trust Fund**' shall mean:

    (a)    the property specified in Schedule;

    (b)    all money, securities, investments or other assets or property paid or transferred by any person (including, without limitation, by bequest under a will) to, or so as to be under the control of, and, in either case, accepted by the Trustees as additions;

    (c)    all accumulations (if any) of income added to the Trust Fund; and

    (d)    the money, investments and property from time to time representing the above.

'**Trust Period**' shall mean the period starting with the date of this Trust and ending on the earlier of:

    (a)    the last day of the period of 100 years starting from the date of this Deed, which period, and no other, shall be the applicable perpetuity period;

    (b)    such date as the Grantor shall revoke the Trust in accordance with this Deed; and

    (c)    such date as the Trustees shall at any time specify by deed in relation to the whole or any part of the Trust Fund (so that different days may be specified for different parts of the Trust Fund), not

**297**

being a date earlier than the date of such deed or later than a date previously specified in relation to that part of the Trust Fund.

**'US Person'** shall mean a person described in section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended.

1.2   Words denoting the singular shall include the plural and vice versa.

1.3   Words denoting any gender shall include both genders.

1.4   References to any statutory provision shall include any statutory modification to or re-enactment of such provision.

1.5   The table of contents and clause headings are included for reference only and shall not affect the interpretation of this Deed.

2.   **NAME**

This Trust shall be known as The Dina Maropa Trust or by such other name as the Trustees may, from time to time, determine.

3.   **POWER TO RECEIVE ADDITIONAL PROPERTY**

The Trustees may, at any time during the Trust Period, accept additional money, securities, investments or other assets or property, of whatever nature and wherever situate, paid or transferred to them by the Grantor or any other person (including, without limitation, by bequest under a will). Such additional money, securities, investments or other assets or property shall, subject to any contrary direction, be held upon the trusts and with and subject to the powers and provisions of this Deed.

4.   **TRUST FOR SALE**

The Trustees shall hold the Trust Fund and any additions upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money. The Trustees may, in their discretion, invest such money in their names or under their control in any of the investments authorised by this Trust or by law, with power from time to time to vary or transpose any such investments for or into others so authorised.

5.   **POWER TO ADD DISCRETIONARY BENEFICIARIES**

5.1   The Trustees with the prior or simultaneous written consent of the Protector, may, at any time during the Trust Period, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine.

5.2   Any such addition shall be made by deed (revocable to the extent permitted by the proper law of this Trust or irrevocable):

**298**

(a)     naming or describing the objects or persons or classes of objects or persons to be added; and

(b)     specifying the date or event, not being earlier than the date of execution of the deed but before the end of the Trust Period, on the happening of which the addition shall take effect.

5.3     Any power of revocation reserved by a deed of addition shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has become indefeasibly entitled.

6.     **POWER OF EXCLUSION**

6.1     The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall (whether or not a Beneficiary) be an Excluded Person.

6.2     The Trustees may with the prior or simultaneous written consent of the Protector declare that any person, class of persons or Charity shall:

(a)     if included in the class of Discretionary Beneficiaries, cease to be so included; or

(b)     if not included in the class of Discretionary Beneficiaries, not be eligible to be added as a Discretionary Beneficiary pursuant to sub-clause 5.1.

6.3     The powers conferred by sub-clauses 6.1 and 6.2 shall not be capable of being exercised

(a)     so as to derogate from any interest to which any Beneficiary has or would, but for the provisions of this clause, have become indefeasibly entitled;

(b)     in relation to the Grantor.

6.4     Any person (not being a minor) who may receive any benefit under this Trust may, by declaration in writing:

(a)     disclaim such benefit, either in whole or in part; or

(b)     declare that he shall be an Excluded Person.

6.5     Any declaration made pursuant to sub-clauses 6.1, 6.2 or 6.4 shall be by deed (revocable during the Trust Period to the extent permitted by the proper law of this Trust or irrevocable), shall take effect in such circumstances or subject to such conditions and from such date (not being earlier than the date of such deed) specified in the deed.

<span style="color:red">299</span>

15432165.4                                          8

7. **GRANTOR'S POWER OF REVOCATION**

7.1 Power of revocation

    (a) During her lifetime the Grantor shall have power by deed to revoke this Trust in whole or in part provided that any such revocation shall not invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Trust or made under any other power conferred by this Deed or by this Trust or by law.

    (b) Any such deed shall take effect upon the date when the same is received by the Trustees or upon such later date as may be specified therein and whenever such a deed seeks to revoke this Trust in part only it shall specify the property being part of the Trust Fund to which such revocation shall apply.

7.2 Consent

The power conferred by sub-clause 7.1 on the Grantor shall be exercisable so as to take effect during the Grantor's lifetime with the prior written consent of the first person named by the Original Settlor or, failing which, by the Protector in the following list who is then living, not incapacitated and who is a related or subordinate party subservient to the Grantor within the meaning of Code Section 672(f)(2)(A)(i) (the '**Consent Holder**') (unless no such person meets such requirements in which case the power shall be exercisable without such consent).

8. **DISCRETIONARY TRUST OF CAPITAL AND INCOME**

8.1 The Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of such of the Discretionary Beneficiaries, at such ages or times, in such shares, upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint. Any such appointment may include such powers and provisions for the maintenance, education advancement or other benefit of the Discretionary Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit.

8.2 No exercise of the power conferred by sub-clause 8.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Deed or made under any other power conferred by this Deed or by law.

8.3 Any trusts and powers created by an appointment under sub-clause 8.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them.

8.4 The exercise of the power of appointment conferred by sub-clause 8.1 shall:



300

(a)      comply with the provisions of sub-clause 15.1; and

(b)      be subject to the prior or simultaneous written consent of the Protector.

8.5      Notwithstanding clause 63, the Trustees may not release or restrict the power conferred by sub-clause 8.1 without the written consent of the Protector.

9.      **INCOME TRUSTS IN DEFAULT OF APPOINTMENT**

The provisions of this clause shall apply during the Trust Period until, subject to and in default of any appointment under sub-clause 8.1.

9.1      The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Discretionary Beneficiaries as shall for the time being be in existence, in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit.

9.2      Notwithstanding the provisions of sub-clause 8.1, the Trustees may at any time during the Trust Period in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and, subject to sub-clause 8.1, shall hold such accumulations as an accretion to capital.

9.3      The Trustees may apply the whole or any part of the income accumulated under sub-clause 8.1 as if it were income arising in the then current year.

10.      **POWER TO APPLY CAPITAL FOR BENEFICIARIES**

The provisions of this clause shall apply during the Trust Period notwithstanding the provisions of sub-clause 8.1 but subject to any appointment made under sub-clause 8.1 and to the Protector's written consent.

10.1      The Trustees may pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries, in such shares and in such manner generally as the Trustees shall in their discretion think fit.

10.2      The Trustees may apply the whole or any part of the capital of the Trust Fund by paying or transferring the same to the trustees of any other trust or settlement, whether or not the proper law of such other trust or settlement shall be the proper law of the Trust, for the benefit of any of the Beneficiaries.

10.3      The exercise of the power conferred by sub-clause 10.2 shall be subject to the following provisions:

(a)      upon the payment or transfer of any money or other property to the trustees of any such trust or settlement, the Trustees shall not be bound to see to the further application of such money or property;

(b)      the Trustees may make such payment or transfer to the trustees of a discretionary trust, notwithstanding that the Beneficiary for whose

**301**

benefit the power is exercised is only a discretionary object of such trust;

(c) the Trustees may make such payment or transfer notwithstanding that persons other than the Beneficiary for whose benefit the power is exercised are or may become entitled to, or to the income of, the money or other property paid or transferred;

(d) any exercise of the power shall comply with the provisions of sub-clause 15.1; and

(e) the power shall not be exercisable so as to permit any part of the income or capital of the Trust Fund to be paid or transferred to the trustees of any trust or settlement in which any Excluded Person is or may be interested.

## 11. TRUSTS IN DEFAULT OF APPOINTMENT

11.1 From and after the expiration of the Trust Period, and subject to any appointment made under sub-clause 8.1, the Trustees shall hold the capital and income of the Trust Fund upon trust absolutely for all or any one or more exclusively of the others of the Grantor and her children and remoter issue as shall then be living and, if more than one in equal shares *per stirpes*, so that no person shall take if any of his ascendants is alive and so capable of taking.

## 12. ULTIMATE DEFAULT TRUSTS

Upon expiration of the Trust Period, subject as above, if and so far as not wholly disposed of for any reason whatever by the above provisions, the capital and income of the Trust Fund shall be held upon trust for such Charities and, if more than one, in such shares as the Trustees shall determine absolutely.

## 13. ASSIGNMENT OF POWER OF APPOINTMENT

The Trustees may, with the prior or simultaneous written consent of the Protector, by deed, grant to any Beneficiary the power to appoint all or any part of the Trust Fund, whether capital or income or both, in such manner, outright or in further trust, as the Trustees shall in such deed provide.

## 14. ADMINISTRATIVE POWERS

The Trustees shall, in addition and without prejudice to all statutory powers, have the powers and immunities set out in Part 2 of this Deed. No power conferred on the Trustees shall be exercised so as to conflict with the beneficial provisions of this Deed.

## 15. EXERCISE OF POWERS

15.1 Every power conferred by the provisions of Part 1 of this Deed shall be subject to the application (if any) of the rule against perpetuities and any applicable laws governing

15432165.4                                11

**302**

the permitted period of accumulations and shall (except for clauses 17 and 18) be exercisable only during and so as to take effect during the Trust Period. No power of revocation shall be exercisable except during the Trust Period.

15.2  Any written consents required under the terms of this Deed may be given either specifically in relation to any particular matter or by a general written consent referring to one or more matters.

15.3  If there is more than one Protector in office, the Protectors shall act unanimously.

16.  **GENERAL LIMITATION ON POWERS**

16.1  No individual Trustee and no person to whom a Trustee has delegated his powers pursuant to the terms of this Trust or by law who is a Beneficiary and a US Person may participate as one of the Trustees or as a delegate of one of the Trustees in the exercise of any of the powers conferred by the following clauses and sub-clauses (the 'restricted powers'):

>   (a)    clause 5 (Power to add Discretionary Beneficiaries);
>
>   (b)    clause 6 (Power of exclusion);
>
>   (c)    sub-clause 8.1 (Discretionary trust of capital and income);
>
>   (d)    clause 9 (Income trusts in default of appointment);
>
>   (e)    clause 10 (Power to apply capital for Beneficiaries);
>
>   (f)    clause 24 (Variation of terms of this Trust); and
>
>   (g)    clause 64 (Power to vary administrative provisions).

16.2  No Trust Company may participate as one of the Trustees in the exercise of any of the restricted powers if any individual director or alternate director (other than the Grantor) or any individual (other than the Grantor) to whom any one or more of the directors or alternate directors has delegated any or all of his powers as a director of such Trust Company is a Beneficiary who is a US Person (a 'restricted director' or a 'restricted delegatee' as the case may be) unless the Articles of Association, By-laws or any similar organisational documentation governing such Trust Company provide that any restricted director or restricted delegatee is not permitted to participate as a director or delegatee in the exercise of the restricted powers.

16.3  Neither the Protector nor the Grantor shall be eligible to serve as a Trustee of this Trust or to exercise the powers of the Trustees under any circumstances.

17.  **REMOVAL AND APPOINTMENT OF TRUSTEES**

17.1  A Trustee shall cease to be a Trustee on the happening of any of the following events:


303

(a)     on resigning in accordance with sub-clause 17.2;

(b)     on being removed in accordance with sub-clause 17.3;

(c)     if an individual, on death, on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

(d)     if a corporation, on filing for bankruptcy, on becoming insolvent or on dissolution.

17.2    A Trustee may resign by giving three months' notice in writing to the person for the time being having power to appoint new or additional Trustees under the provisions of sub-clause 17.4.  Upon the expiration of such notice, or such shorter period as may be agreed in writing between the Trustee giving notice and the person for the time being having power to appoint new or additional Trustees, the Trustee who has given notice shall cease to be a Trustee.  If the Trustee so resigning is the sole Trustee and a new Trustee shall not have been appointed before the expiration of the specified period of notice, the resigning Trustee shall have power to appoint a new Trustee in its place and its resignation shall become effective only upon such appointment being made.

17.3    The Protector shall have power (to be exercised in writing) to remove any or all of the Trustees with or without cause.  Notice of such removal shall forthwith be given to the Trustee concerned and the removal shall become effective immediately, except where all the Trustees or the sole Trustee have or has been removed in which case the removal shall be effective only on the appointment of a new Trustee or Trustees.

17.4    The Protector or, if the Protector shall be incapacitated or otherwise unable or unwilling to act, or if there shall be no Protector, the Trustees, shall have the power to appoint new or additional such Trustees.

17.5    Any appointment of a new or additional Trustee under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office in which case the appointment shall become effective on such death, resignation or incapacity. Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Trustees then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Trustees under this clause.

17.6    An outgoing Trustee (which term shall include a Trustee removed under sub-clause 17.3) shall promptly and without delay execute and do all such transfers or other acts or things as may be necessary for the immediate vesting the Trust Fund in the new or continuing Trustees and any reasonable expenses associated therewith (agreed in advance by the Protector) shall be borne by the Trust Fund *provided always* that the outgoing Trustee shall in no event delay or resist transferring the Trust Fund.



304

17.7    In the event that a Trustee is removed without cause under sub-clause 17.3, the new or continuing Trustees shall be required to undertake in writing to indemnify and hold the outgoing Trustee its directors officers servants and agents harmless against any and all claims demands actions proceedings damages costs or expenses whatsoever for or arising out of any act or omission on the part of the outgoing Trustee or any of its directors officers servants or agents in relation to the Trust, *provided always* (i) that such indemnity shall not extend to any act or omission for which the outgoing Trustee would not have been entitled to be indemnified out of the assets of the Trust Fund had it remained trustee of the Trust, (ii) that the new or continuing Trustees shall not be liable under this indemnity in an amount exceeding the amount or value of the Trust Fund for the time being, (iii) that the Protector shall have given his consent to the terms of such indemnity (which shall be reasonable and in accordance with industry standards) which consent shall not be unreasonably withheld.

17.8    Any appointment under this clause shall be in writing signed by the person making the appointment and by the new or additional Trustee so appointed.

17.9    The provisions of this clause shall apply notwithstanding any provision in the legislation for the time being in effect under the proper law of this Trust for the time being relating to the appointment, removal, retirement or discharge of trustees.

17.10   A person may be appointed to be a trustee notwithstanding that such person is not resident in the jurisdiction the law of which is the proper law of this Trust for the time being and remaining out of such jurisdiction for more than 12 months shall not be a ground for the removal of a trustee.

17.11   There shall be no requirement that there be more than one Trustee.

## 18.    APPOINTMENT OF PROTECTORS

18.1    The first Protector shall be the Original Protector.

18.2    A Protector shall cease to be a Protector on the happening of any of the following events:

     (a)    on resigning in accordance with sub-clause 18.3;

     (b)    if an individual, on death; on becoming incapacitated, on filing for bankruptcy or on becoming insolvent; or

     (c)    if a corporation, on filing for bankruptcy, becoming insolvent or on dissolution.

18.3    The Protector may at any time resign its office by written instrument, notice of which shall be given to the Trustees. Such resignation shall be effective upon receipt of the notice or the expiration of one month from the date of the resignation, whichever shall be earlier.

**305**

18.4    Protectors subsequent to the first Protector shall be appointed as follows.

(a)    The Original Protector may, by written instrument, appoint any other person or succession of persons to be protector or successive protectors of this Trust, either in addition to or to succeed it.

(b)    A Protector whose successor is not prescribed in advance by the Original Protector pursuant to sub-clause (a), or all of whose prescribed successors under sub-clause (a) have died, become incapacitated or are otherwise incapable or unwilling to serve as protector, may, by written instrument, appoint any other person to be protector of this Trust either in addition to or to succeed it (but may not appoint a succession of protectors).

(c)    Any appointment of a new or additional Protector under the provisions of this clause shall take effect immediately unless it is expressly stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office in which case the appointment shall become effective on such death, resignation or incapacity.  Any appointment that is stated to take effect on the death, resignation or incapacity of one or more of the Protectors then in office may be revoked at any time before it takes effect by the person who then has the power of appointing Protectors under this clause.

18.5    Any appointment under this clause (other than the appointment of the Original Protector whose appointment and acceptance thereof is made by this Deed) shall be in writing signed by the person making the appointment and by the new or additional Protector so appointed.  Any such appointment shall only take effect when written notice of such appointment has been given to the Trustees.

18.6    If, notwithstanding the provisions of sub-clause 18.4 there shall at any time be no Protector of this Trust, the Trustees shall, by deed, irrevocably appoint any person, not being one of the Trustees, to be the Protector after consulting with such of the adult Discretionary Beneficiaries as they shall consider appropriate.

19.    **EFFECT OF VACANCY IN PROTECTOR'S OFFICE**

If there shall at any time be no Protector, this Trust (except for clause 18) shall, during such time as there shall be no Protector (but not further or otherwise), be read and construed as if all references to the requirement for the Protector's consent or agreement and to the exercise by the Protector of any power were omitted from this Trust.

20.    **PROTECTOR'S INDEMNITY**

20.1    The Protector shall exercise his powers in good faith.  He shall not, in the absence of actual fraud, dishonesty or wilful misconduct, be accountable to any Beneficiary or

306

the Trustees for any act of omission or commission in relation to the powers given to him by this Trust.

20.2    The Protector shall be entitled to charge for the performance of his duties at such rate or in such manner as may be agreed from time to time between the Protector and the Trustees.

20.3    The Protector shall be entitled to reimbursement of all proper expenses incurred by him in relation to the exercise of his powers and performance of his duties under this Trust or the prosecution or defence of any legal proceedings arising in connection with the exercise or non-exercise of his powers or the performance or non-performance of his duties, provided that any claim for reimbursement shall be received by the Trustees within one year of the expenses being incurred.

## 21.    PROPER LAW, FORUM AND PLACE OF ADMINISTRATION

21.1    The proper law of this Trust shall be that of the British Virgin Islands.  Except as otherwise provided in this Trust, all rights under this Deed and its construction and effect shall be subject to the jurisdiction of the courts, and construed according to the laws, of the British Virgin Islands.

21.2    The courts of the British Virgin Islands shall be the forum for the administration of these trusts.

21.3    The provisions of this sub-clause shall apply notwithstanding the provisions of sub-clauses 21.1 and 21.2

(a)    The Trustees shall have power, subject to the application (if any) of the rule against perpetuities, to carry on the general administration of these trusts in any jurisdiction in the world.  This power shall be exercisable whether or not the law of such jurisdiction is for the time being the proper law of this Trust or the courts of such jurisdiction are for the time being the forum for the administration of these trusts, and whether or not the Trustees or any of them are for the time being resident or domiciled in, or otherwise connected with, such jurisdiction.

(b)    The Trustees may at any time declare in writing that, from the date of such declaration, the proper law of this Trust shall be that of any specified jurisdiction.  No exercise of this power shall be effective unless the law of the jurisdiction specified is one under which this Trust remains and all, or substantially all, of the trusts, powers and provisions contained in this Deed remain enforceable and capable of being exercised and so taking effect.

(c)    Following any exercise of the power contained in sub-clause 21.3(b), the Trustees shall, by deed, make such consequential alterations or additions to this Deed as they consider necessary or desirable to ensure that, so far as may be possible, the trusts, powers and

**307**

provisions of this Deed shall be as valid and effective as they were immediately prior to such change.

(d) The Trustees may, at any time, declare in writing that, from the date of such declaration, the forum for the administration of these trusts shall be the courts of any specified jurisdiction.

## 22. EXCLUSION OF COMMUNITY PROPERTY RULES

No benefit accruing to or devolving on any Beneficiary under this Deed shall form or constitute a portion of any communal or joint estate or marital property of such Beneficiary, but such benefit shall be and remain the sole, separate and exclusive property of such Beneficiary. Should such Beneficiary be married or marry in community of property, any benefit so accruing or devolving shall be expressly excluded from the community; such benefit shall also be free from the interference, control or marital power of any spouse of such Beneficiary. The provisions of this clause shall apply not only to benefits accruing to or devolving on any Beneficiary but also to the property of whatever nature for the time being representing the same and the income thereof.

## 23. EXCLUSION OF EXCLUDED PERSONS

23.1 No discretion or power conferred on the Trustees or any other person by this Deed or by law shall be exercised, and no provision of this Deed shall operate directly or indirectly, so as to cause or permit any part of the capital or income of the Trust Fund to become in any way payable to or applicable for the benefit of an Excluded Person.

23.2 The provisions of sub-clause 23.1 shall not preclude any Settlor from exercising any statutory right to claim reimbursement from the Trustees for any income tax or capital gains tax paid by him in respect of income arising to the Trustees or capital gains realised or deemed or treated as realised by them.

23.3 Subject to sub-clause 23.2 the prohibition in this clause shall apply notwithstanding anything else contained or implied in this Deed.

## 24. VARIATION OF TERMS OF THIS TRUST

The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part 1 of this Deed including the trusts, powers and discretions contained in Part 1 of this Deed provided always that:

24.1 they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;

24.2 they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being

**308**

confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;

24.3  no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor.

24.4  no such variation, amendment, addition or deletion

(a)  shall infringe the proper law of this Trust for the time being; or

(b)  shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and

24.5  no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety.

## 25.  SEVERABILITY

If any provision of this Deed shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity and enforceability of the remaining provisions of this Deed which shall, so far as possible, be construed and take effect as if the invalid or unenforceable provisions had not been included in this Deed.

## 26.  COUNTERPARTS

This Deed may be signed in counterparts and each such counterpart shall constitute an agreed document and each such counterpart taken together, shall constitute one and the same instrument.

## PART 2 - ADMINISTRATIVE PROVISIONS

## 27.  POWER OF INVESTMENT

27.1  The Trustees may apply any money to be invested in the purchase or acquisition (either alone or jointly with other persons) of such property, of whatever nature and wherever situate and whether of a wasting nature, involving liabilities or producing income or not, or in making such loans with or without security, as they think fit so that they shall have the same powers to apply money to be invested as if they were an absolute beneficial owner.

27.2  The Trustees may exchange property for other property on such terms as they think fit.

27.3  The Trustees shall not be required to diversify the investment of the Trust Fund.

## 28.  EXERCISE OF RIGHTS ATTACHING TO SHARES

Notwithstanding any other provision of this Deed, the power, authority and discretion granted to the Trustees under this Deed over the control or exercise of


309

any rights (including, without limitation, voting rights) attaching to any securities, shares or other interests in any entity that form a part of the Trust Fund, or which are held (directly or indirectly) by a company or other entity whose shares form part of the Trust Fund and which is controlled by the Trustees, shall be exercisable by the Trustees, acting alone as provided in this Deed, without the approval or consent of any Beneficiary, Protector or any other person.  No person other than the Trustees shall have any power, authority or discretion, directly or indirectly, over the control or exercise of any rights (including, without limitation, voting rights) which might be conferred by the holding of any such securities, shares or other interests unless specifically delegated such power, authority or discretion by the Trustees.

29.    **POWER TO LEND**

The Trustees may lend all or any part of the Trust Fund to any person or Beneficiary on such terms (whether or not including provision for the payment of interest) as the Trustees think fit.

30.    **POWER TO BORROW**

The Trustees may borrow on the security of all or any part of the Trust Fund or otherwise for any purpose.

31.    **POWER TO GIVE GUARANTEES**

The Trustees may guarantee the payment of money and the performance of obligations by any Beneficiary or by any company in which the Trust Fund is invested and may charge all or any part of the Trust Fund in support of such guarantee.

32.    **POWER OF MANAGEMENT**

The Trustees shall have all the powers of an absolute beneficial owner in relation to the management and administration of the Trust Fund.

33.    **POWERS IN RELATION TO LAND AND CHATTELS**

33.1    The Trustees shall have all the powers of an absolute beneficial owner in relation to the disposition, development and improvement of any land comprised in the Trust Fund.

33.2    The Trustees shall not be bound to maintain any building or other structure on land comprised in the Trust Fund or to preserve or repair any chattels comprised in the Trust Fund.

34.    **POWER TO PERMIT ENJOYMENT OF TRUST PROPERTY**

The Trustees may, with the consent of the Protector, permit any Discretionary Beneficiary or any other person (if in the opinion of the Trustees it is in the interests of a Discretionary Beneficiary) to occupy or enjoy the use of all or any part of the Trust Fund on such terms as the Trustees think fit.  The Trustees may acquire any property for this purpose.

**310**

35. **POWER TO INSURE PROPERTY**

The Trustees may insure all or any part of the Trust Fund against any risk, for any amount and on such terms as they think fit but shall not be bound to do so.

36. **POWERS IN RELATION TO LIFE INSURANCE POLICIES**

The Trustees may apply all or any part of the Trust Fund in purchasing or maintaining any policy of insurance on the life of any person and shall have all the powers of an absolute beneficial owner in relation to any such policy.

37. **POWER TO TRADE**

37.1    The Trustees may trade either alone or in partnership and may exercise all or any of the powers conferred on them by this Trust in connection with such trade.

37.2    The Trustees shall be entitled to be indemnified out of the Trust Fund against all liability to which they may be subject in connection with such trade.

38. **POWER TO PROMOTE COMPANIES**

The Trustees may incorporate any company in any part of the world for any purpose in connection with this Trust.

39. **POWERS IN RELATION TO COMPANIES**

39.1    The Trustees may enter into any compromise or arrangement in relation to any company in which the Trust Fund is invested.

39.2    The Trustees may enter into any arrangements in relation to the winding up or liquidation of any company in which the Trust Fund is invested.

39.3    The Trustees shall not be bound to enquire into or be involved in the management of any company in which the Trust Fund is invested unless they have knowledge of circumstances which call for enquiry.

40. **EXCLUSION OF APPORTIONMENT**

No apportionment rules shall apply to the income of the Trust Fund or any part of it, so that all income received by the Trustees shall be treated as accruing at the date of receipt.

41. **POWER OF APPROPRIATION**

41.1    The Trustees may appropriate all or any part of the Trust Fund as they think fit in or towards satisfaction of the interest of any Beneficiary and may for such purpose place such value on any property as they think fit.

15432165.4                                        20

**311**

41.2    Where the Trustees have divided the Trust Fund into one or more sub-funds, the Trustees may transfer assets comprised in one such sub-fund to any other sub-fund in exchange for assets which have an equivalent open market value.

42.    **DIVISION BETWEEN CAPITAL AND INCOME**

The Trustees may determine whether any sums received or disbursed are on account of capital or income, or partly on account of one and partly on account of the other, and in what proportions.

43.    **PAYMENT OF EXPENSES**

The Trustees shall have power to pay out of income or capital, as they may in their discretion determine, any expenses relating to the Trust Fund (or any assets comprised within it) or its administration.

44.    **POWERS IN RELATION TO MINORS**

44.1    The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the parent or guardian of any minor who is beneficially entitled to such assets or income, and the receipt of such parent or guardian, or of the minor, shall be a full discharge to the Trustees.

44.2    The parent or guardian of a minor shall in respect of any assets or income received in accordance with this clause have the powers conferred on the Trustees by Part 2 of this Deed.

45.    **POWER TO APPOINT AGENTS**

The Trustees may employ and pay at the expense of the Trust Fund any agent in any part of the world to transact any business in connection with this Trust without being responsible for the fraud, dishonesty or negligence of such agent, *provided* that such agent is employed in good faith, the Trustees reasonably ensure that the agent acts within the scope of its delegation, and the Trustees monitor and review from time to time the agent's overall performance.

46.    **POWER TO EMPLOY NOMINEES**

The Trustees may hold all or any part of the Trust Fund in the name of one or more of the Trustees, or of any other person or partnership, as nominee on such terms as the Trustees think fit.

47.    **POWERS TO DELEGATE**

47.1    The Trustees may engage any person or partnership as investment adviser to advise them on the investment of all or any part of the Trust Fund and they may, without being liable for any consequent loss, delegate to such investment adviser discretion to manage investments on such terms as the Trustees think fit.

312

47.2    The Trustees may, without being liable for any consequent loss, delegate to any person the operation of any bank, building society or other account.

47.3    Any trustee may, by deed revocable or irrevocable, delegate to another trustee or any other person the exercise of all or any trusts and powers conferred on such trustee (other than the power of delegation conferred by this sub-clause) notwithstanding the fiduciary nature of such trusts and powers.

## 48.    POWER TO GIVE INDEMNITIES AND OTHER COMMITMENTS

48.1    The Trustees may indemnify any person in respect of any liability relating to this Trust and may charge all or any part of the Trust Fund in connection with such indemnity in such manner as they think fit.

48.2    The Trustees may enter into any agreement or give any commitment that they think fit relating to the transfer or sale of any business or company in which the Trust Fund is invested.

## 49.    PAYMENTS TO CHARITIES

The Trustees may pay or transfer any assets comprised in, or any income of, the Trust Fund to the person who purports to be the treasurer or other appropriate officer of any Charity which is entitled to such assets or income, and the receipt of such person shall be a full discharge to the Trustees.

## 50.    LEGAL PROCEEDINGS

The Trustees may institute and defend proceedings at law and proceed to the final determination thereof or compromise the same as they shall in their discretion think fit.

## 51.    COMPROMISE AND SETTLEMENT

The Trustees may compromise and settle for such consideration and upon such terms and conditions as they shall in their discretion think fit all matters arising in relation to the trusts hereby created or the Trust Fund.

## 52.    ACCOUNTS AND AUDIT

The Trustees shall keep accurate accounts of their trusteeship and may, or shall if so requested by the Protector, have them audited annually by a firm of professionally qualified accountants selected by the Trustees.

## 53.    PROTECTOR'S POWER TO MAKE REQUESTS

In addition to the powers specifically conferred on the Protector by this Deed, the Protector shall have power to request information relating to this Trust from the Trustees (which information and accounts shall forthwith be supplied to the Protector) and to make other requests of or suggestions to the Trustees in regard to any matter relating to this Trust and the Trustees shall be bound to have regard to

**313**

any such other request or suggestion but shall not be bound to act in accordance with the same.

## 54.    PAYMENT OF TAXES

In the event of any inheritance tax or probate, succession, estate duty or other duties, fees or taxes whatever becoming payable in any part of the world in respect of the Trust Fund or any part of it in any circumstances whatever, the Trustees may pay all such duties, fees or taxes (notwithstanding that they are not recoverable from the Trustees or the Beneficiaries) out of the capital or income of the Trust Fund at such time and in such manner as they think fit, *provided* that, during the lifetime of the Grantor, any United States income taxes or capital gains taxes payable in respect of the Trust Fund or any part of it shall be payable by the Grantor (subject to any statutory right of the Grantor to be reimbursed by the Trustees).  The power to pay duties, fees and taxes conferred by this clause shall extend to any related interest and penalties and to the provision of information to, or the filing of returns with, any relevant tax authorities.

## 55.    PROVISION OF INFORMATION FOR BENEFICIARIES' TAX RETURNS

Notwithstanding any provision to the contrary contained in this Deed, the Trustees shall comply with all requests received from any Beneficiary regarding information or documentation that they may require from the Trustees to fulfil their personal tax filing obligations and requirements.   The provision of such information and documentation shall include, where requested:

55.1    the execution by the Trustees of such returns or statements as may be required for tax purposes;

55.2    the appointment, as contemplated by section 6048 of the Code, of a United States agent acceptable to the Trustees for the trusts declared or contained in this Deed; and

55.3    the production of the accounts pertaining to the Trust Fund within a reasonable time after the expiration of the Beneficiary's relevant tax reporting period.

## 56.    TRUSTEE CHARGING

56.1    A trustee which is a trust corporation or company authorised to undertake trust business shall be entitled to remuneration in accordance with such terms as may from time to time be agreed between the trustee and the Protector.

56.2    A trustee, whether acting as a person engaged in a profession or business or in a personal capacity, shall be entitled to all normal professional or other fees for business done, services rendered or time spent by such trustee personally or by such trustee's firm or company in the administration of these trusts, including acts which a trustee not engaged in any profession or business could have done personally.

**314**

56.3    A trustee shall be entitled to retain any commission which may be received personally or by such trustee's firm in respect of any transaction carried out on behalf of this Trust for which such trustee or trustee's firm is, in the normal course of business, allowed commission, notwithstanding that the receipt of such commission was procured by an exercise by such trustee or the Trustees of powers over the Trust Fund, but shall notify the Protector on receipt of any such commission.

57.    **POWER TO RECEIVE REMUNERATION**

A trustee may act and be remunerated as a director or other employee or as agent or adviser of any business or company in any way connected with the Trust Fund and shall not be liable to account for any remuneration, fees or profits received by the trustee in any such capacity, but shall notify the Protector on receipt of any such remuneration, fees or profit.

58.    **INDEMNITY INSURANCE**

58.1    The Trustees may pay out of the Trust Fund the cost of any premium in respect of insurance or indemnity to cover all personal liabilities which may be incurred by the Trustees in connection with this Trust.  No trustee shall be accountable for any money paid to such trustee under the terms of any such insurance or indemnity unless the trustee shall otherwise have been fully indemnified in respect of the liability to which such payment relates.

58.2    Any such insurance or indemnity shall not extend to any liabilities of a trustee arising from any act or omission in respect of which the trustee would not otherwise be entitled to be indemnified out of the Trust Fund.

59.    **POWER TO EXERCISE POWERS NOTWITHSTANDING PERSONAL INTEREST**

59.1    The Trustees  may enter into any transaction concerning the Trust Fund:

(a)    notwithstanding that one or more of the Trustees or any one or more of the Protectors may be interested in the transaction other than as one of the Trustees or the Protectors; and

(b)    without any trustee or any protector who is so interested being liable to account for any reasonable incidental profit.

59.2    This power shall only apply provided that the transaction is at least as favourable to the Trustees as if it had been effected:

(a)    in the case of a purchase or sale of shares or other securities listed on any stock exchange, at the middle market price on the day on which such shares or other securities are purchased or sold; or

(b)    in the case of any other transaction, at a price and on terms such as would apply in the case of a transaction effected on fully commercial terms between unconnected persons.

**315**

15432165.4                                24

## 60.    DISCLOSURE OF DOCUMENTS

The provisions of this clause shall apply without prejudice to any right of the Trustees under the proper law of this Trust to refuse to disclose any document.

60.1    The Trustees shall not, subject to sub-clause 60.2, be bound to disclose to any person any document relating to this Trust, its administration, the exercise of the Trustees' powers, the performance of their duties or the Grantor's wishes.

60.2    Notwithstanding sub-clause 60.1, in the event of a Beneficiary requesting disclosure, the Trustees shall disclose to that Beneficiary, this Deed, supplemental deeds, trustees' resolutions exercising dispositive powers and documents which relate to or form part of the accounts of this Trust.

## 61.    PROTECTION OF THE TRUSTEES IN RESPECT OF DISTRIBUTIONS

The Trustees may distribute the Trust Fund without having ascertained that there is no Beneficiary whose parents were not married to each other at the time of his birth (or who claims through a person whose parents were not so married) and the Trustees shall not be liable to any Beneficiary of whose existence they had no actual notice at the time of distribution.

## 62.    PROTECTION OF THE TRUSTEES GENERALLY

62.1    No trustee shall be liable for any loss to the Trust Fund however arising except as a result of the fraud, dishonesty or wilful misconduct of such trustee, or in the case of a professional trustee entitled to charge for his services as trustee for the negligence of such trustee.

62.2    No trustee shall be bound to take any proceedings against a co-trustee or former trustee or the personal representatives of a co-trustee or former trustee for any breach or alleged breach of trust committed or suffered by such co-trustee or former trustee.

## 63.    RELEASE OF POWERS

63.1    Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.

63.2    The Protector and any other person on whom powers are conferred by this Deed may by deed (and so as to bind successive protectors of this Trust) release or restrict the future exercise of all or any of the powers conferred upon him by this Deed.

## 64.    POWER TO VARY ADMINISTRATIVE PROVISIONS

The Trustees may by deed amend or add to the administrative provisions contained in Part 2 of this Deed, provided that any amendment to clauses 45 (Power to appoint agents), 46 (Power to employ nominees), 47 (Power to delegate), 56 (Trustee charging), 57 (Power to receive remuneration) or 59 (Power to exercise powers

316

notwithstanding personal interest) shall require the prior or simultaneous written consent of the Protector.

317

## SCHEDULE

€100

318

Signed sealed and delivered as a deed by )

**Delphine Anne Le Dain**    )

    )

in the presence of

**Witness**

Signature:    ...................................

Name:    GRAHAM A. COLLETT

Address:    1 BROMLEY LANE

    CHISLEHURST, KENT

    BR6 7LH

Occupation:    CHARTERED ACCOUNTANT

The Common Seal of    )

**Trustee**    )

was hereunto affixed    )...................................

in the presence of

**Director**

Signature:    ...................................

Name:    LEONARD O'BRIEN

**Director / Secretary**    witness  Thérèse Hertzauer

Signature:    ...................................

Name:    ...................................

**319**

15432165.4    28

**Agreed and accepted by the Original Protector**

Signed sealed and delivered as a deed by )

**GRAHAM AUBREY COLLETT**                )

                                                   )

in the presence of

**Witness**

Signature:        _Barbey_

Name:             JEANINE BARBEY

Address:          94 RUE DE LA

                        SERVETTE , 1202

                        GENEVA SWITZERLAND

Occupation:       CLIENT EXECUTIVE.

15432165.4                              29

Dated _15th December_ 2017

**DELPHINE ANNE LE DAIN**

(Grantor)

and

**SALAMANDER ASSOCIATES LIMITED**

(Original Trustee)

and

**GRAHAM AUBREY COLLETT**

(Original Protector)

---

## DEED OF AMENDMENT TO

## THE DINA MAROPA TRUST

---

**321**

42365405.1                                    1

## DEED OF AMENDMENT

**DATE:** The  15  day of  December  2017

## PARTIES

(1)     **DELPHINE ANNE LE DAIN** of Buzon 110 Serreta, Sta Gertrudis, Ibiza 07814, Spain (the **'Grantor'**);

(2)     **SALAMANDER ASSOCIATES LIMITED**, a company organised under the laws of The British Virgin Islands with registered office situated at Trinity Chambers, PO Box 4301, Road Town, Tortola, The British Virgin Islands (the **'Original Trustee'**); and

(3)     **GRAHAM AUBREY COLLETT** of 14 Rosewood Court, Orchard Road, Bromley, Kent, BR1 2TT (the **'Original Protector'**),

together, the **'Parties'**.

## RECITALS

(A)     This Deed is supplemental to the settlement (the **'Settlement'**) specified in the Schedule to this Deed.

(B)     The Original Trustee is the present Trustee of the Settlement.

(C)     Under clause 24 (*Variation of terms of this Trust*) of the Settlement, the Trustees have power, exercisable by deed and subject to the prior or simultaneous written consent of the Protector, to vary, amend, add to or delete, any or all the provisions of Part 1 of the Settlement including the trusts, powers and discretions contained in Part 1 of the Settlement, provided always that:

> (1)     they are satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;
>
> (2)     they have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust (which is the British Virgin Islands under clause 21 (*Proper law, forum and place of administration*) of the Settlement) for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers (the **'Counsel Opinion'**);
>
> (3)     no such variation, amendment or addition shall be made to the provisions of clause 7 (*Grantor's power of revocation*) of the Settlement without the consent of the Grantor (the **'Grantor Consent'**); and
>
> (4)     no such variation, amendment, addition or deletion shall:
>
> > a.     infringe the proper law of the Dina Maropa Trust for the time being; or

<span style="color:red">**322**</span>

42365405.1                                          2

b.  permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in the Settlement,

(the **'Power'**).

(D)  The Trustees wish to exercise the Power in the manner set out in this Deed.

## OPERATIVE PROVISIONS

1.  **DEFINITIONS AND CONSTRUCTION**

In this Deed, where the context admits, the definitions and rules of construction contained in the Settlement shall apply.

2.  **VARIATION OF THE SETTLEMENT**

2.1  In exercise of the Power and all other powers (if any), and:

2.1.1  being satisfied that such variation is for the benefit of the Beneficiaries;

2.1.2  having obtained the Counsel Opinion; and

2.1.3  having obtained the Grantor Consent,

the Trustees hereby, with effect from the date of this Deed, vary the Settlement by deleting clause 7 (*Grantor's power of revocation*) of the Settlement in its entirety.

2.2  In accordance with clause 16 (*General limitation on powers*) of the Settlement, no Trust Company may participate as one of the Trustees in the exercise of any of the Power if any individual director or alternate director (other than the Grantor) or any individual (other than the Grantor) to whom any one or more of the directors or alternate directors has delegated any or all of his powers as a director of such Trust Company is a Beneficiary who is a US Person (a 'restricted director' or a 'restricted delegatee' as the case may be) unless the Articles of Association, By-laws or any similar organisational documentation governing such Trust Company provide that any restricted director or restricted delegatee is not permitted to participate as a director or delegatee in the exercise of the restricted powers.

**323**

## SCHEDULE

The Deed of Settlement for the Dina Maropa Trust dated 7 July 2014 between the Parties.

**324**

Signed sealed and delivered as a deed by )

**Delphine Anne Le Dain** )

)

in the presence of

**Witness**

Signature:

Name: *Iryna Tsenharyk*

Address: *20 Conduit Street*

*London W1S 2XW*

Occupation: *Finance Manager*

The Common Seal of )

**SALAMANDER ASSOCIATES** )

**LIMITED** )

was hereunto affixed )

in the presence of

**Director**

Signature:

Name: *L. DOWEN*

**Director / Secretary**

Signature:

Name:

**325**

42365405.1                                            5

**Agreed, consented and accepted by the Original Protector**

Signed sealed and delivered as a deed by )

**GRAHAM AUBREY COLLETT** )

)

in the presence of

**Witness**

Signature:

Name:

Address:

Occupation:

326



CRS
CharlesRussell
Speechlys

DATED    *12ᵀᴴ APRIL*    2022


SALAMANDER CORPORATE SERVICES SA (1)

and

GRAHAM AUBREY COLLETT (2)

---

DEED OF AMENDMENT REGARDING THE BENEFICIAL

CLASS

(THE DINA MAROPA TRUST)

---



327

**THIS DEED OF AMENDMENT** is made on the  *12ᵀᴴ* day of  *APRIL* 2022

BETWEEN

(1)    **SALAMANDER CORPORATE SERVICES SA** whose registered office is at Rue Jean-Gabriel Eynard 8, 1205 Geneva, Switzerland (the "**Trustee**"); and

(2)    **GRAHAM AUBREY COLLETT** of 53 Mill Rise, Robertsbridge, East Sussex TN32 5EG (the "**Protector**").

WHEREAS

(A)    This deed is supplemental to:

    (i)    a trust deed dated 7 July 2014 and made between (1) Delphine Anne Le Dain as settlor (the "**Settlor**"), (2) Salamander Associates Limited as original trustee and (3) the Protector as the original protector, establishing the Dina Maropa Trust (the "**Trust**"); and

    (ii)    all other relevant deeds and documents made supplemental to the Trust.

(B)    The Trustee is the present and sole trustee of the Trust.

(C)    By clause 24 of the Trust, the Trustee has the following power:

*"The Trustees may at any time during the Trust Period by deed with the prior or simultaneous written consent of the Protector vary, amend, add to or delete any or all the provisions of Part 1 of this Deed including the trusts, powers and discretions contained in Part 1 of this Deed provided always that:*

    *24.1    they shall be satisfied that any such variation, amendment, addition or deletion is for the benefit of all or any one or more of the Beneficiaries;*

    *24.2    they shall have obtained a prior written opinion from a lawyer qualified for at least five years in the jurisdiction of the proper law of this Trust for the time being confirming that any such variation, amendment, addition or deletion is within the scope of the Trustees' powers;*

    *24.3    no such variation, amendment or addition shall be made to the provisions of clause 7 (Grantor's power of revocation) without the consent of the Grantor;*

    *24.4    no such variation, amendment, addition or deletion*

        *(a)    shall infringe the proper law of this Trust for the time being; or*

        *(b)    shall permit any Excluded Person to benefit in any way under or by virtue of the trusts or powers contained in this Deed; and*

    *24.5    no such variation, amendment or addition shall be made to the provisions of this clause but it shall be permissible to delete this clause in its entirety."*

(the "**Power of Amendment**").

(D)    By clause 63 of the Trust, the Trustee has the following power:

2



328

> "*Unless otherwise provided by this Deed, the Trustees may by deed (and so as to bind successive trustees of this Trust) release or restrict the future exercise of all or any of the powers conferred on them by this Deed.*"

(the "**Power to Release**").

(E)    The Trustee is desirous of exercising the Power of Amendment and Power to Release revocably to amend the class of Discretionary Beneficiaries in the event that the Settlor dies whilst resident in Switzerland for Swiss estate tax purposes in the manner set out below. It is intended that clause 2.3 takes effect upon the date of the Settlor's death whereas the remaining provisions do not take effect unless and until the Settlor dies in said circumstances.

(F)    The Trustee has satisfied itself that all the conditions set out in sub-clauses 24.1 to 24.5 of the Trust have been satisfied.

(G)    The Protector wishes to consent to the exercise of the Power of Amendment and is a party to this deed for that purpose.

(H)    The Trust Period as defined in sub-clause 1.1 of the Trust has not yet expired.

**NOW THIS DEED WITNESSES** as follows:

1    **DEFINITIONS AND INTERPRETATIONS**

In this deed, where the context allows, the definitions and rules of construction contained in the Trust shall apply.

2    **AMENDMENT**

2.1    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Trust shall be read and construed such that the definition of "Discretionary Beneficiaries" in sub-clause 1.1 of the Trust were replaced in its entirety by the following words:

> ""**Discretionary Beneficiaries**" shall mean (subject to the provisions relating to exclusion from benefit in clause 6) the following, whether living at the date of this Deed or born later:
>
> (a)    the Grantor;
> (b)    the children and remoter issue of the Grantor;
> (c)    Charities; and
> (d)    the trustees of any other trust of which any one or more of the Beneficiaries of this Trust are interested;
>
> but not any other persons or classes of persons."

2.2    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Trust shall be read and construed such that the

3


329

definition of "Charity" in sub-clause 1.1 of the Trust were replaced in its entirety by the following words:

> ""**Charity**" shall mean any trust, foundation, company or other organisation that:
>
> (a)    for Valais (Switzerland) tax purposes is eligible for a zero rate of donation, estate or inheritance tax as such tax is defined under Swiss law when receiving a transfer from an ordinary tax resident of Valais; and
>
> (b)    is incorporated in Valais;
>
> and the words "**Charities**" and "**Charitable**" shall be construed accordingly always provided that any reference to a Charity that is a trust shall, where the context requires, mean the trustees (acting in that capacity) of such trust"

2.3    In exercise of the Power of Amendment and all other enabling powers, if any, upon the Settlor's death, the Trust shall be read and construed such that sub-clause 5.1 of the Trust (Power to Add Discretionary Beneficiaries) were replaced in its entirety by the following words:

> "5.1    The Trustees with the prior or simultaneous written consent of the Protector may, at any time during the Trust Period but only after the Grantor's death and provided always that she did not die whilst resident in Switzerland for Swiss estate tax purposes, add to the Discretionary Beneficiaries such objects or persons or Charities or classes of objects or persons as the Trustees shall, subject to the application (if any) of the rule against perpetuities, determine. For the avoidance of doubt if the Grantor does die whilst resident in Switzerland for Swiss estate tax purposes the Trustees may not add to the class of Discretionary Beneficiaries."

2.4    In exercise of the Power to Release and all other enabling powers, if any, upon the Settlor's death whilst resident in Switzerland for Swiss estate tax purposes and only in these circumstances, the Power of Amendment under clause 24 is released by the Trustee only insofar as it applies to the definition of Discretionary Beneficiaries.

2.5    This deed shall be revocable in whole or in part by the Trustee by deed at any time during the Trust Period. Notwithstanding any other provision of this deed, this deed shall nonetheless become irrevocable upon the death of the Settlor if on the date of her death she is resident in Switzerland for Swiss estate tax purposes.

2.6    For the avoidance of doubt, the provisions of this deed prevail over any other provisions of the Trust to the contrary.

2.7    For the avoidance of doubt, the provisions of this deed are not intended to cause, and will not cause, a resettlement of the Trust.

4


330

3    **PROTECTOR CONSENT**

As required by clause 24 of the Trust, the Protector Trustee hereby consents to the exercise of the Power of Amendment in accordance with clause 2 hereof.

4    **CONFIRMATION**

Save as provided above the terms of the Trust shall continue in full force and effect.

5    **GOVERNING LAW**

This deed shall be governed by and construed in accordance with the laws of The British Virgin Islands and the parties hereto irrevocably submit to the non-exclusive jurisdiction of the courts of The British Virgin Islands.

6    **COUNTERPARTS**

This deed may be executed in counterparts, all of which taken together, shall constitute one and the same deed and any party may enter into this deed by executing a counterpart.

**IN WITNESS** of which the parties to this deed have executed this deed on the day and year first above written

Signed as a Deed and Delivered by )
**SALAMANDER CORPORATE SERVICES** )
**SA** as trustee of the Dina Maropa Trust )
acting by a director )
)

................................
Director

in the presence of:

Witness signature:

Witness name:      DMITRY ZVONAREV

Witness address:   CHEMIN DE LA TULETTE 4 1223 COLOGNY

Witness occupation:   SENIOR MANAGER

331

**SIGNED** as a **DEED** and **DELIVERED**          )   ....~~LA Collett~~ -
by **GRAHAM AUBREY COLLETT** as                     )
Protector of the Dina Maropa Trust

in the presence of:

Witness signature:  ASEll

Witness name:  Anthony Stephen Ellis

Witness address:  5 Wakeley Road, Rainham Kent ME8 8HD

Witness occupation:  Retired

6

**332**

# Summit Trust International SA ("STI")

## Summit Trust (Cayman) Limited
## Summit Trust Company Ltd

# Settlor/Contracting Party Compliance Declaration
### (Version: May 2021)

**Settlors, Founders and Owners of managed companies** should complete sections A, B, C, D and, if relevant, E.

***Protectors & Beneficiaries*** *should complete separate form*

Please sign and date all sections as requested.

General information including data protection information is included in section F – please sign to acknowledge.

**Nexus: insert name of Trust/Foundation/Companies covered by this declaration:**

| | |
|---|---|
| Trust | |
| Dina Maropa Trust | |
| Companies | |
| Maropla Ltd | |
| Murney Overseas Ltd | |
| Inmobiliaria Calibra SA DE CV | |
| Promotora Sol Y Arena SA DE CV | |

333

Armextur SA DE CV

Desarrollo CoCo Y Mar SA DE CV

**(hereinafter referred to below as "the Fiduciary Structure")**

THIS PAGE IS INTENTIONALLY LEFT BLANK

## SECTION A:
## DECLARATION OF BENEFICIAL OWNERSHIP

**1.  *For Trusts and Foundations***

I, *(insert name)*     **Delphine Anne le Dain**

being the settlor/donator/asset contributor of the Fiduciary Structure hereby declare that the **"Beneficial Owner"** (as defined below) of the assets of the Fiduciary Structure is/are the persons listed below who are the named or identified beneficiaries or objects of discretionary powers contained in the relevant documentation of the Fiduciary Structure:

**EITHER** *(please check one of the following:)*

**For Revocable Trusts:**    ☐ I am the 'beneficial owner' as the Trust is revocable by me;

**OR**

**For Irrevocable Trusts:**    ☒ The 'beneficial owners' are as described in (a) or (b) below:

### a) For Discretionary Trusts

☒ There are no persons with fixed interests in the trust fund, but the persons who may be entitled to benefit are those described in the Trust Deed as 'Beneficiaries'.

### b) For Non-Discretionary Trusts

☐ **Life Interest Trusts:** The beneficial owners are the persons named or described as life tenants and beneficiaries in the Trust Deed.

**AND**

I confirm that the following person(s) is the Protector/Guardian/Appointor under the Fiduciary Structure having the powers specified by the instrument creating the Fiduciary Structure:

| Names: | Full Residential addresses/domicile |
|---|---|
| **HERVÉ BENZAKEIN** | **c/o HBS SA,** |
| | **Rue de la Rôtisserie 1,** |
| | **1204 Genève Switzerland** |

Summit Trust International SA: Compliance Declaration May 2021 version

**336**

2.  **For Stand Alone Managed Companies only**

I, *(insert name)* _____

hereby declare that the "Beneficial Owner" of the **Fiduciary Structure** (being a company or corporate body) and therefore the person or persons entitled to the assets of the Fiduciary Structure upon a liquidation thereof is/are the persons listed below:

| Names: | Full Residential addresses/domicile |
|---|---|
| | |

*(attach an additional sheet, if necessary)*

### INTERPRETATION

"Beneficial Owner" as used in this form signifies only 'beneficial owner' for regulatory purposes in Switzerland in accordance with the laws in force in Switzerland relating to the prevention of money laundering (blanchiment d'argent) and has no wider legal significance. In particular, in the case of discretionary trusts, or trusts containing powers of appointment in favour of objects of discretion, the fact that an object of a discretionary trust power or power is described in this Form as a "beneficial owner" does not mean that that person has any greater legal right or entitlement to trust property or that the trustees' discretionary powers of appointment have been exercised fettered or restricted in any way whatsoever.

### Undertakings

1)    I undertake to inform STI of any changes in the above which are brought about through my own powers to do so where this is possible.

2)    The information furnished above is true and complete and given to the best of my knowledge and belief.

Signature: _____     Date: 04/04/223

Summit Trust International SA: Compliance Declaration May 2021 version

**337**

## SECTION B:
## INTERNATIONAL TAX COMPLIANCE DECLARATION (FATCA & AEOI)

1.  I, *(insert name)*     **Delphine Anne le Dain**

hereby declare that my tax status is:

*Please check the box that applies:*

**Non-US Person**

☒ I am <u>not</u> an American citizen, I do <u>not</u> possess or am entitled to a United States "green card" and I have no visa or other permission entitling me to reside in the United States of America and I am <u>not</u> otherwise a resident of the United States of America.

*(if you ticked this box, please continue to Part 2 of this section)*

**US Person**

☐ I am an American citizen.

☐ I was born in the United States and have not renounced US citizenship or my right to claim it.

☐ I am <u>not</u> an American citizen but I possess or am entitled to a United States "green card".

☐ I am <u>not</u> an American citizen and I do <u>not</u> possess or am entitled to a United States "green card" but I am resident in the United States

**AND** my address in the United States is:

_____

_____

_____

_____

**My US taxpayer identification number or reference number is:**

_____

2.   *For completion by all who are non-US Persons*

**Declaration of Tax Status**

My residential address is set out below and confirmed by the attached address verification document.

Address:

**Chemin de St Christophe 1, 1936 Verbier, Switzerland.**

**Country of Tax Residence:**     Switzerland.

**My taxpayer identification number or reference number is:**

**AVS 756.4431.4088.57 - (TIN)**

**If you are not able to provide a TIN, please state one of the 3 reasons below:**

☒   A - The country where I am liable to pay tax does not issue TINs to its residents

☐   B - I am otherwise unable to obtain a TIN or equivalent number – please explain

**SWITZERLAND TIN EQUIVALENT ABOVE**

☐   C - No TIN is required by the authorities of my country of tax residence

Undertakings

1)   I undertake to inform STI of any changes in the above which are brought about through my own powers as soon as possible.

2)   The information furnished above is true and complete and given to the best of my knowledge and belief.

3)   I understand that this information will be used by STI, or other relevant companies within the Summit Group, in order for them to comply with their obligations and duties to report under the FATCA regime and the Automatic Exchange of Information required under the Common Reporting Standard.

Signature: _____     Date: 04/04/2023

Summit Trust International SA: Compliance Declaration May 2021 version

**339**

## SECTION C:
## SOURCE OF FUNDS DECLARATION

**340**

1  The funds which I am intending to transfer to you for holding in the Fiduciary Structure, as discussed with you recently, are solely the result of:

*(Please tick as appropriate & provide information as indicated. If more space is needed please attach a separate sheet. If several categories apply, please tick all that apply and give a brief description under each one.)*

☒ **Professional Earnings** - provide brief details of profession / business activities
Bartol Limited was incorporated in BVI on May 2001 with a seed investment of approximately $300,000 from DLD. The $300,000 was funded from Delphine's private savings accumulated as a journalist. The beneficial owner of Bartol Limited was Delphine Anne Le Dain (DLD). It was set up as a vehicle to act as a fuel supplier. Bartol continued to trade until December 2004, when the logistics business was transferred to Red Star Enterprises Limited,

Dividend from Rosbelt International Ltd - 50% interest in Global Resources Worldwide LP  owner of  Red Star Enterprises Limited (Attached Schedule of Dividend distributions from Red Star Enterprises Ltd 2003 - 2017 - Prepared by Graham Collett Trust CFO) Via Bartol / Aspen Wind / Sunage Foundation and Galactea Trust

☐ **Inheritance** - provide brief details of how family wealth was originally generated including names of family members and name and details of family business as relevant

☒ **Sale of Business** - provide brief details of business activity, name of business and total sale proceeds