# Appendix 2
# Part 1



# University of Southampton

This is to certify that

on 30 June 1992

JOHN WILLIAM MACHELL

was awarded the degree of

BACHELOR OF LAWS

with First Class Honours

Vice-Chancellor

Secretary and Registrar

001

This certificate is invalid
without embossed hart above

# The Honourable Society of the Inner Temple



I hereby certify that

## JOHN WILLIAM MACHELL

was admitted as a member of the Honourable Society of the Inner Temple on the Twenty Seventh day of February One Thousand Nine Hundred and Ninety Two and was Called to the Bar by the said Society on the Fourteenth day of October One Thousand Nine Hundred and Ninety Three.

In testimony whereof I have set my hand this Fourteenth day of October in the year of Our Lord One Thousand Nine Hundred and Ninety Three.

Patrick Sheehan

Sub-Treasurer          Treasurer

002



**E**LIZABETH THE SECOND by the Grace of God of the United Kingdom of Great Britain and Northern Ireland and of Our other Realms and Territories Queen Head of the Commonwealth Defender of the Faith To all to whom these Presents shall come Greeting Know Ye that We of Our especial grace have constituted ordained and appointed Our trusty and well beloved

**John William Machell** Esquire

**one of Our Counsel learned in the Law** And We have also given and granted unto him as one of Our Counsel aforesaid place precedence and preaudience next after Andrew Michael Hunter Esquire in Our Courts And we also will and grant to the said John William Machell full power and sufficient authority to perform do and fulfil all and every the things which any other of Our Counsel learned in the Law as one of Our said Counsel may do and fulfil We Will that this Our grant shall not lessen any Office by Us or by Our Ancestors heretofore given or granted In Witness whereof we have caused these Our Letters to be made Patent Witness Ourself at Westminster the thirtieth day of March in the sixty-first year of Our Reign

**BY THE QUEEN HERSELF**

**CHAKRABARTI**





I certify that this is a true copy
of the original

003

David Drake, Barrister
31 May 2020

 

# Practising Certificate

The General Council of the Bar of England and Wales
hereby declares that

## Mr John William Machell KC

a self-employed barrister

is authorised to undertake the following reserved legal
activities, subject to compliance with the relevant provisions of the BSB
Handbook which includes the Code of Conduct for barristers:

The exercise of rights of audience before every court in relation to all
proceedings

Probate Activities
Administration Of Oaths
Immigration Work
Registration as a public access practitioner
Reserved Instrument Activities

This certificate is valid from 01 April 2025 until 30 April 2026

**Malcolm Cree CBE**
Chief Executive
Bar Council

**Mark Neale**
Director General
Bar Standards Board

www.barcouncil.org.uk          www.barstandardsboard.org.uk
289-293 High Holborn, London WC1V 7HZ, DX: 240 LDE
Tel: 020 7242 0082   Fax: 020 7831 9217

004




PC No. 0382/2026

Receipt No. SO-1076725

# THE EASTERN CARIBBEAN SUPREME COURT
## Territory of the Virgin Islands

# PRACTISING CERTIFICATE

Pursuant to the **Legal Profession Act, 2015 (as amended)**, it is hereby certified that:

## JOHN MACHELL K.C.

whose name is registered on the Roll of Legal Practitioners is entitled to practise as a legal practitioner during the year 2026 and the month of January next ensuing.

Dated this **30**th day of **January 2026**



Vareen Vanterpool-Nibbs
**REGISTRAR**

This certificate shall not be valid without the embossed seal of the Registrar and is valid only for the period specified.

Third Floor, Sakal Place, Road Town

P.O. Box 418, Road Town, Tortola, British Virgin Islands, VG 1110

Tel: (284) 468-5001 / (284) 468-3701 (ext.) 5001 ~ email: supremecourt@gov.vg

005



**serle court**

clerks@serlecourt.co.uk
+44 (0)20 7242 6105

# John Machell KC

Year of Silk: 2012 Year of Call: 1993

*"A strong commercial chancery silk with an excellent reputation for his partnership work. He carries out both advisory work and litigation, and is regarded as a hard-working and technically astute practitioner." "Works tremendously hard and has a good brain."*

Chambers & Partners

jmachell@serlecourt.co.uk
clerks@serlecourt.co.uk



## Practice Overview

John has a broad commercial chancery practice, and particular experience of large-scale litigation involving trusts, fiduciary duties, and fraud and trusts, particularly with an international dimension.

John is regarded as one of the leading partnership and LLP silks and has experience of a wide range of both contentious and non-contentious matters across the whole range of business sectors. A large part of his work involves issues arising from the use of partnerships and LLPs in hedge fund and private equity structures; in international commercial group structures; and as part of wealth planning strategies.

A substantial part of John's practice relates to trusts, mostly offshore, and he has appeared in the Grand Court in Cayman on a number of occasions in the last few years.

John acts as an arbitrator and as an expert pursuant to expert determination agreements. As a member of the Football Premier League Panel, John sat as the chair of an inquiry into Hull City's ticketing policy. John has conducted internal inquiries on professional conduct and other matters for firms of solicitors.

## Areas of Expertise

### Private Client Trusts and Probate

A substantial part of John's practice relates to trusts, particularly with an international dimension.  John's experience extends across the range of trust issues and he has particular experience of trust issues arising as part of wider commercial and fraud disputes.

Cases of note:

Re C Trust (2024-25): Acting for the BVI trustee of a Cayman trust in relation to proceedings in Cayman and BVI concerning issues arising from Regulation 18C of the Russian sanctions regulations (instructed by Harneys).

In the Matter of the G Trust (2024): Acting for beneficiaries in relation to a Beddoe application concerning Hong Kong proceedings (instructed by Collas Crill).

*ITG v Fort Trustees Ltd* [2022] UKPC 36: Appearing for the successful Appellants before the Privy Council in landmark case concerning insolvent trusts and the ranking of the claims of successive trustees (instructed by Babbe Legal).

*MaplesFS Limited v B&B Protector Services Limited* (14 July 2022) Doyle J: Appearing for the trustee on forum non conveniens challenge (instructed by Maples)

*MaplesFS Limited v B&B Protector Services Limited* (10 March 2022): Appearing for the trustee on an application by the defendants for an adjournment to make a sanction licence application (instructed by Maples).

*St. John's Trust Co. (PVT) Ltd v Medlands (PTC) Ltd* [2022] CA (Bda) 18 Civ and [2021] CA (Bda) 20 Civ: Appearing for the protector successfully opposing an appeal in the Bermuda Court of Appeal relating to the various orders made at first instance including the apppointment of a new trustee (instructed by Kennedys).

*Medlands (PTC) Ltd v A-G and Brockman* [2021] SC (Bda) 41 Com: Appearing for the protector at a hearing to deal with the terms of appointment of a new trustee (instructed by Kennedys).

*In the Matter of a Settlement made by deed dated 27 December 2017* (27 July 2021): Appearing for the trustee before

Kawaley J in Cayman on a *Beddoe* application concerning English High Court proceedings (Instructions by Maples).

*PJSC National Bank Trust v Mints* (2021): Acting for MaplesFS Limited in relation to  a jurisdiction application concerning the proper forum to determine issues as to the construction of Cayman trust deed (instructed by Bird & Bird).

*M v N* (2021/22): Advising beneficiary of a Bahamian trust in relation to distribution proposals (instructed by Archerfield).

*Re Starke deceased* (2021): Acting for residuary beneficiary of Will in relation to issues concenring the administration of the estate (instructed by Birlketts).

*C v D* (2020): Advising trustee of a substantial Cayman trust in relation to trust issues arising from English Commercial Court proceedings (instructed by Maples).

*Re Y Trust* (2021): Advising beneficiary of a series of €1b+ trusts in relation to various issues (instructed by Mishcon).

*Schwartz v VGV (UK) Limited* (2020): Acting for beneficiary before Trower J on an aplication for a proprietary injunction against the trustee (instructed by McDermott Will & Emery).

*A v B* (2019): Acting for trustees before Morgan J and Mann J in November 2019 to obtain an injunction against a person purportedly appointed as the protector of a trust to restrain him from removing the trustee (instructed by Burges Salmon).

*Re B* (2019): Acting for the guardian ad litem appointed to represent a class of beneficiaries in relation to a restructuring of a $1b Cayman trust. Hearings before the Chief Justice in July and September 2019 (instructed by Harneys).

*Danilina v Chernukhin* (2018/19): Advising on trusts issues arising in Commercial Court action (instructed by Clifford Chance).

*Re L Trust* (2018): Advising on breach of trust claim and removal application against trustees (instructed by Mishcon de Reya).

*Re C Trust* (2018): Advising on claim for distribution from a discretionary trust (instructed by Clifford Chance).

*Re B Trust* (2018): Advising trustee of a substantial Cayman family trust in relation to various issues including the liability of the trust to indemnify an ex-protector and the ownership of various chattels (instructed by Maples & Calder).

*Re Y Trust* (2018): Advising and appearing before Kawaley J for the trustee in Cayman proceedings relating to the validity of a decision by the settlor to change the beneficiary of the trust (instructed by Harneys).

*Re Z Trust* (2017): Advising on issues arising in relation to the termination of a trust (instructed by Harneys).

*Re M Trust* (2017): Advising the beneficiary of a Jersey trust in relation to various issues (instructed by Collas Crill).

*Re V Trusts* (2017): Advising and appearing for the trustees of Cayman trusts in relation to various issues arising from criminal forfeiture proceedings in the US and in relation to an application to replace the trustee (instructed by Harneys).

*Re Y Trust* (2017): Advising and appearing for the trustee in Cayman proceedings relating to the validity of a decision by the settlor to change the beneficiary of the trust (instructed by Harneys).

*Re C Trust* (2016): Appearing for the trustee in a Beddoe application in the Cayman court as to whether the trustees should defend English High Court proceedings (instructed by Clifford Chance and Collas Crill).

*Liongate v various defendants* (2016): Acting for Defendants to a constructuive trust claim in Cayman proceedings relating to a hedge fund structure (instructed by Turners).

*Re X Trust* (2015): Acting for the trustee of a substantial family trust in relation to Cayman proceedings concerning the status and removal of the protector (instructed by Mourant).

*Salem v Salem* (2015/16): Acting for the Defendants in major commercial partnership/trust litigation (instructed by Quinn Emanuel).

*Hardwick v Hardwick* (2013): Substantial farming proprietary estoppel claim (instructed by Quality Solicitors Burroughs Day).

*North Shore Ventures Ltd v Anstead Holdings Inc* [2012] WTLR 1241: Important Court of Appeal decision on orders for the production of trust documents against de facto settlors / discretionary beneficiaries (instructed by Cooke, Young & Keidan).

*AB Jnr v MB* (2012): Acting for the claimants in a substantial claim for breach of trust culminating in a 10 week trial in the Cayman Islands in 2012 (instructed by Farrer & Co and Conyers, Dill & Pearman).

*Stow v Stow and HMRC* (2009): Dispute concerning the beneficial ownership of assets settled on the terms of offshore trusts (instructed by Fladgate).

*Re Rendell-Reynolds deceased* (2008) Sir Andrew Morritt: constructive and secret trust claim to assets held by deceased (instructed by Mills & Reeve).

*Nissim v Wettreich* (2008): international trusts and fraud claim (instructed by Fladgate).

*Re Northcott* (2008 and 2010) (instructed by Blake Lapthorn): Application by trustees for directions where an issue of parentage had arisen in respect of one of the putative beneficiaries.

*Tait v Wedgwood* [2003] WTLR 121 Rimer J: Winding up bare trust where beneficiary under mental disability.

---

## Commercial Litigation

John deals with a wide range of commercial and contractual cases, and has particular experience of large-scale litigation, particularly with an international dimension.

Cases of note include:

Ni v Green Eite (October 2025): Appearing for the Respondent before the BVI Court of Appeal on an appeal by Madam Ni in relation to the appointment of receivers to assist enforcing a judgment debt in the underlying proceedings (instructed by Harneys).

Letterone Treasury Services SA v Eisler Capital Multi Strayegy Fund Ltd (March 2025): Appearing before the Cayman Grand Court for the defendant fund in a claim by an investor for lost profit on a redemption caused by the Russian sanctions regime (instructed by Maples).

Commission Recovery Limited v Marks & Clerk LLP  [2024] EWCA Civ 9: Acting for Appellants before the Court of Appeal on an appeal concerning the appropriateness of using the representative action procedure  in a claim for

009

breach of fiduciary (instructed by Clifford Chance).

Nam Tai Property Inc v Westridge Investment Company Limited: Acting for the successful respondent before the Eastern Caribbean Court of Appeal in relation to a substantial judgment to repay a share subscription payment following the subscription having been declared void (instructed by Harneys).

*Fang v Green Elite* [2025] UKPC 47: Appearing for the successful Respondent in an appeal by the Privy Council concerning the scope of the *Duomatic* principle and in particular the role of intention and certainty (instructed by Harneys).

*Fang v Green Elite* (20 October 2022): Appearing for successful in Respondent in an appeal concerning the disclosure of documents to funders (instructed by Harneys).

*IsZo Capital LP v Nam Tai Property Inc* (7 April 2022): Appearing before Jack J in BVI for successful ancillary claimant in obtaining judgment. Issues included conspiracy, dishonest assistance and change of position defence (instructed by Harneys).

*Durant International Corp v Maluf* (2021) Appearing for the Appellant before the Eastern Caribbean Court of Appeal in a BVI appeal concerning service in Brazil and issues relating to the Hague Service Convention (instructed by Kobre & Kim).

*Green Elite Limited (in liquidation) v Fang* (2021): Appearing for the Claimant at a trial before Jack J in the BVI concerning alleged breaches of fiduciary by the directors of Green Elite (instructed by Harneys).

*Durant International Corp v Maluf* (2021): Appearing for the Defendant before Jack J in the BVI on an application in relation to service, jurisdiction and the discharge of a freezing injunction (instructed by Kobre & Kim).

*WWRT v Tyshchenko* [2021] EWHC 939 (Ch): Application for stay of proceedings pending Ukranian bankruptcy proceedings and discharge of freezing injunction (instructed by Clarion).

*Circumference v Martin* (2021): Acting for Claimants in claim for rescission of an SPA for fraudulent misrepresentation (instructed by Dentons).

*Durant International Corp v Maluf* (2021): Appearing for the Defendant before Wallbank J in the BVI on an application concerning the use of information disclosed pursuant to a freezing order in a foreign jurisdiction (instructed by Kobre & Kim).

*Green Elite Limited (in liquidation) v Fang* (2020): Appearing for the Appellant before the Eastern Caribbean Court of Appeal in a BVI appeal concerning the discharge of a freezing injunction (instructed by Harneys).

*M v N* (2020): Advising in relation to BVI proceedings concerning alleged breach of fiduciary duty and conspriracy (instructed by Mourant).

*Deripaska v Chernukhin* [2019] EWHC 173 (Comm) Acting for defendants in substantial commercial court action (instructed by Clifford Chance). John was instructed specifically to deal with a number of urgent and difficult disclosure and privilege issues.

*S v A* (2018): Acting for the claimants in a substantial arbitration arising in relation to shareholder agreements (instructed by Clifford Chance)

*Principal Investors Global LLC v various defendants* (2017): Acting for Rothschild in relation to a breach of warranty claim brought for £50m+ arising from the sale of shares in Liongate Limited (instructed by Clifford Chance).

*Liongate SPC v various defendants* (2017): Acting for various defendants in respect of Cayman proceedings in which proprietary and personal claims are made in respect of alleged breaches of fiduciary duty arising from investment decisions (instructed by Turners).

*Salem v Salem* (2016): Acting for the Defendants in major commercial partnership/trust litigation (instructed by Quinn Emanuel).

*BTA Bank v Ablyazov* (2013/14): Acting for a Norwich Pharmacal respondent at a number of hearings, including in respect of an important decision relating to the recovery of costs by Norwich Pharmacal respondents [2015] 1 WLR 1547 (instructed by Boodle Hatfield).

*Grupo Mexico v Pearse Trust International Limited* (2014/15): Acting for a Norwich Pharmacal defendant in relation to disclosure of documents in connection with Mexican proceedings (instructed by Cooke Young & Keidan).

*Re L* (2013): Acting for a shareholder in a hedge fund structure in relation to the alleged wrongful disposal of corporate assets (instructed by Clifford Chance).

$1b claim relating to a Russian joint venture (2013).

*Icer Brands Europe Limited v Beyond Productions LLC* (2013): Acting for the defendant in a claim for damages for alleged breach of a licensing agreement (instructed by Dentons).

*Mains v Harrison* (2012): Proceedings to set-aside compromise agreement for fraud (instructed by Fladgate LLP).

*Conarco Partnership v Grillo* (2012) Mann J: Freezing injunction application (instructed by Peters & Peters).

*Woodrow Inc v Karchava* (2012) Warren J: Freezing injunction application (instructed by Boodle Hatfield LLP).

*Wah v Grant Thornton* [2012] EWHC 3198 (Ch) Hildyard J: Enforceability of ADR provisions in member firm agreement (instructed by Locke Lord).

*McKellar v Kingston Smith* (2012) HHJ Waksman: Third party costs application (instructed by Kingston Smith).

*Cherney v Neuman* (2011) Henderson J: Commercial, joint venture and fiduciary duty dispute involving individuals from the former Soviet Union (instructed by SNR Denton).

*Intercontinental Bank v Akingbola* [2011] EWHC 605 (Comm): Alleged breach of fiduciary duty by director of Nigerian bank (instructed by Peters & Peters).

*North Shore Ventures Ltd v Anstead Holdings Inc* [2011] Times 22 April, Floyd J: Whether hearings had taken place in public or private (instructed by Cooke, Young & Keidan).

*North Shore Ventures Ltd v Anstead Holdings Inc* [2012] Ch. 31 Court of Appeal and [2010] 2 Lloyd's Rep 265 Newey J: Setting aside guarantee for non-disclosure (instructed by Cooke, Young & Keidan).

*North Shore Ventures Ltd v Anstead Holdings Inc* [2010] EWCA Civ 1634 Court of Appeal: Stay of execution and conditions for permission to appeal (instructed by Cooke, Young & Keidan).

*Bexbes LLP v Beer* [2009] EWCA Civ 628: Calculation of performance sharing payment under an agency agreement (instructed by Bird & Bird).

*Hitchcox v Handlesman* (2006): Joint venture dispute arising out of the development of St Pancras station (instructed by Denton Wilde Sapte).

*Enron (Thrace) v Clapp and Others* [2005] EWCA Civ 1511 Court of Appeal; [2005] EWHC 401 (Comm) Aikens J; [2004] EWHC 1612 (Comm) Langley J: Liability of subsidiary for fraud of parent; guarantee of liability under a joint venture agreement (instructed by DLA).

*BAS Capital Funding v Medfinco Ltd* [2004] LLR 652 Lawrence Collins J: Non-exclusive jurisdiction clause; extra territorial injunction (instructed by Peters & Peters).

---

## Partnership and LLP

John is regarded as one of the leading partnership and LLP silks and has experience of a wide range of both contentious and non-contentious matters across the whole range of business sectors from professional services and financial services to farming, doctors and dentists.

A large part of his work involves issues arising from the use of partnerships and LLPs in hedge fund, private equity and other financial services structures; in international commercial group structures; and as part of wealth planning strategies.

John has extensive experience of advising and drafting documentation in relation to professional service firms; including issues relating to restrictive covenants; team moves; retirements; expulsions; dissolutions; liability to third parties; indemnity insurance; international structuring; domestic and international mergers; LLP conversions; and regulatory matters.

Most of the matters John is involved in are highly confidential, but cases of note include:

Boston Consulting Group UK LLP v HMRC (November 2025): Appearing for the Appellant before the Tax Upper Tribunal on a case concerning various LLP tax issues (instructed by Freshfields).

Mariampillai v Sooben [2025] EWHC 394 (Ch): Appeal as to the meaning and effect of a partnership agreement between solicitors.

*Grupo Mexico v Infund LLP* [2019] EWCA Civ 1673 and [2018] EWHC 1306 (Ch) Carr J: Rectification of LLP register pursuant to s.1096 of the Companies Act 2006 (instructed by Cooke Youg & Keidan LLP).

*Flanagan v Liontrust Investment Partners LLP* [2017] EWCA Civ 985 Court of Appeal and [2015] EWHC 2171 (Ch) Henderson J: Unfair prejudice claim under Companies Act 2006; and applicability of the doctrine repudiatory breach to LLPs (instructed by Macfarlanes LLP).

*Campbell v Campbell* [2018] EWCA Civ 80, [2017] EWHC 2747 (Ch), [2017] EWHC 182 (Ch), [2016] EWHC 2237 (Ch) and [2016] EWHC 1828 (Ch): Dispute as to the extent of a jewellery partnership.

*Hosking v Marathon Asset Management Ltd* [2016] EWHC 2148 (Ch) Newey J: Whether the profit share of a partner/member of an LLP is liable to be forfeited under the fiduciary remuneration forfeiture rule (instrcuted by Orrick).

*King v Hg Capital LLP* (2016): Dispute as to the discretionary reallocation of carried interest (instructed by Mishcon de Reya).

*Salem v Salem* (2016): Acting for the Defendants in major commercial partnership/trust litigation (instructed by Quinn Emanuel).

*Bottrill v Harling* [2015] EWCA Civ 564 Court of Appeal: Terms of oral partnership agreement and right to repayment of capital (instructed by Brachers).

*Bates van Winkelhof v Clyde & Co LLP* [2014] 1 WLR 2047 Supreme Court: Acting for intervener in appeal concerning whistleblowing and worker status of LLP members (instructed by CM Murray LLP).

*Archer v Nubuke Investments LLP* [2014] EWHC 3425 (Ch): Acting for the successful Defendants in a claim by a former member of a financial services LLP (instructed by Dentons).

*Wah v Grant Thornton* [2013] 1 All ER (Comm) 1226; [2012] EWHC 3198 (Ch) Hildyard J: Enforceability of ADR provisions in member firm agreement (instructed by Locke Lord).

*Tiffin v Lester Aldridge* (pro bono) [2012] 1 WLR 1887 Court of Appeal: Employment status of fixed share members of LLPs and meaning of section 4(4) of the Limited Liability Partnerships Act 2000.

*Re Y* (2011): Arbitration arising from the collapse of a national law firm (instructed by SNR Denton).

*Price v Farnsworth* (2011): Claim arising from misappropriation of partnership assets (instructed by Maxwell Winward).

*O'Leary v Standen* (2010) Briggs J: Dissolution of partnership; and appropriate costs order where Part 36 offer made before order for dissolution (instructed by Allen & Overy).

---

## Civil Fraud

John has been involved in a number of substantial fraud cases, including:

*Circumference v Martin* (2021): Acting for Claimants in claim for rescission of an SPA for fraudulent misrepresentation (instructed by Dentons).

*Durant International Corp v Maluf* (2021): Appearing for the Defendant before Wallbank J in the BVI on an application concerning the use of information disclosed pursuant to a freezing order in a foreign jurisdiction (instructed by Kobre & Kim).

*WWRT v Tyshchenko* [2021] EWHC 939 (Ch): Application for stay of proceedings pending Ukranian bankruptcy proceedings and discharge of freezing injunction (instructed by Clarion).

*Green Elite Limited (in liquidation) v Fang* (2020): Acting for the Appellant in a BVI appeal concerning the discharge of a freezing injunction (instructed by Harneys).

*S v A* (2018): Acting for the claimants in a substantial arbitration arising in relation to shareholder agreements. The dispute concerned wide ranging allegations of fraud and dishonesty in several jurisdictions (instructed by Clifford Chance).

*Mains v Harrison* (2012): Proceedings to set-aside compromise agreement for fraud (instructed by Fladgate LLP).

*Conarco Partnership v Grillo* (2012) Mann J: Freezing injunction application (instructed by Peters & Peters).

*Cherney v Neuman* (2011) Henderson J: Commercial, joint venture and fiduciary duty dispute involving individuals from the former Soviet Union (instructed by SNR Denton).

*Intercontinental Bank v Akingbola* [2011] EWHC 605 (Comm): Alleged breach of fiduciary duty by director of Nigerian bank (instructed by Peters & Peters).

*Enron (Thrace) v Clapp and Others* [2005] EWCA Civ 1511 Court of Appeal; [2005] EWHC 401 (Comm) Aikens J; [2004] EWHC 1612 (Comm) Langley J: Liability of subsidiary for fraud of parent; guarantee of liability under a joint

013

venture agreement (instructed by DLA).

*BAS Capital Funding v Medfinco Ltd* [2004] LLR 652 Lawrence Collins J: Non-exclusive jurisdiction clause; extra territorial injunction (instructed by Peters & Peters).

*Mattos Junior v MacDaniels Ltd* 22 November 2002 Peter Smith J: security for costs against claimant outside jurisdiction and fortification of cross-undertaking in damages (instructed by Peters & Peters).

## Insolvency

John has acted in a wide range of insolvency cases and often advises on insolvency issues arising in cases in other practice areas.

**Cases of note:**

Jin Yao Holdings Ltd v Forever Winner International Ltd (December 2025): Acting for the respondent to a BVI just and equitable winding up petition) (instructed by Carey Olsen).

Crown Treasure Limited (July 2024): Appearing for the liquidators in a BVI hearing concerning sanction for the pursuit of proceeding the People's Republic of China (instructed by Ogier).

Town and Country Properties (GB) Ltd v Patel  [2023] EWHC 1168 (Ch): Appearing for the successful respondent in an appeal against the dismismal of a winding up petition (instructed by Thursfields).

Hunt v Ubhi [2023] EWCA Civ 417: Appearing for the successful Appellant in a case concerning a cross undertaking in damages given by an officeholder (instructed by Thursfields).

*Kenworth Industrial Limited v Xin Gang Power Investments Limited* (31 October 2022): Appearing in the Eastern Caribbean Supreme Court before Jack J on an application for a stay of a liquidation application pending arbitration (instructed by Ogier).

*Citicorp International Limited v Unigroup Holdings Ltd* (27 July 2022): Appearing in the Eastern Caribbean Supreme Court before Wallbak J on an application for the continuation of the apppointment of provisional joint liquidators (instructed by Harneys)

*WWRT v Tyshchenko* [2021] EWHC 939 (Ch): Application for stay of proceedings pending Ukranian bankruptcy proceedings (instructed by Clarion).

*Sisu Capital v Tucker and Others* [2005] EWHC 2321 (Ch); [2005] EWHC 2170 (Ch) Warren J: Unfair prejudice challenge to company CVAs in the TXU administration (instructed by Fladgate).

*Secretary of State v Collins* [2000] BCC 998 Court of Appeal: Application by disqualified director for leave to act as a manager.

*Harper v O'Reilly* [1997] BPIR 656 Michael Hart KC: Proprietary effect of a matrimonial property adjustment order in circumstances in which the husband or wife is subsequently made bankrupt.

*Razzaq v Pala* [1997] 1 WLR 1336 Lightman J: Validity of a re-entry effected by a landlord when the tenant was bankrupt; meaning of "secured creditor" in the Insolvency Act 1986.

014

## Company

John advises on the full range of company law issues, particularly section 994 claims, derivative claims, reflective loss issues, claims against directors and issues arising in relation to share sales and shareholder resolutions.

Jin Yao Holdings Ltd v Forever Winner International Ltd (December 2025): Acting for the respondent to a BVI just and equitable winding up petition) (instructed by Carey Olsen).

Crown Treasure Limited (July 2024): Appearing for the liquidators in a BVI hearing concerning sanction for the pursuit of proceeding the People's Republic of China (instructed by Ogier).

*Fang v Green Elite* (4 October 2022): Appearing for the Respondent in an appeal concerning the scope of the *Duomatic* principle and in particular the role of intention and certainty (instructed by Harneys).

*Green Elite Limited (in liquidation) v Fang* (2021): Appearing for the Claimant at a trial before Jack J in the BVI concerning alleged breaches of fiduciary duty (improper purpose/misappropriation of company assets) by the directors of Green Elite (instructed by Harneys).

Re X Ltd: Advising board of X Ltd in relation to whether amendment of articles to add drag provisions would constitute an improper purpose and/or constitute an abuse by shareholders of their voting powers.

During 2013 and 2014 John has advised on issues relating to drag along provisions in connection with two high value takeovers; and the validity of class resolutions in the light of alleged defects in the directors' circular.

*Wilcox v Snell & Wilcox* (2007): Company law and restitution case involving issues relating to the authority of the directors (instructed by Blake Lapthorn).

*DTC v Sergeant* [1996] 1 WLR 797 Michael Crystal KC: Scope of an accountant's lien over clients' papers and the meaning of "accounting records" in s.221 of the Companies Act 1985.

---

## Arbitration

---

## Chancery

---

## International and Offshore

---

## Recommendations

Chancery: Traditional (Chambers & Partners HNW 2020-2023)

Company and Partnership (Who's Who Legal, 2023)

Private Client (Who's Who Legal, 2020)

Partnership, Chancery: Commercial, Chancery: Traditional, Offshore, Commercial Dispute Resolution (Chambers & Partners, 2019)

Dispute Resolution: Commercial, Dispute Resolution: Commercial Chancery (Chambers Global, 2019)

Chancery: Commercial, Chancery: Traditional, Commerical Dispute Resolution, Partnership Star Individual (Chambers UK, 2018)

Partnership, Offshore, Private Client: Trusts and Probate (The Legal 500, 2017)

Chancery: Traditional (Chambers & Partners High Net Worth, 2017 & 2019)

Dispute Resolution: Commercial, Dispute Resolution: Commercial Chancery (Chambers Global 2017)

Private Client, Corporate (Who's Who Legal UK Bar)

Partnership (Best Lawyers)

---

## Quotes

*"John is technically excellent and able to step back and see the bigger picture."* (Chambers & Partners, 2026)

*"John is excellent on his feet."* (Chambers & Partners, 2026)

*"John is without peer among silks when it comes to advising on LLP and partnership law."* (Chambers & Partners, 2026)

*"John is brilliant and highly commercial. He picks things up in an instant and doesn't sit on the fence."* (Chambers & Partners, 2026)

*"John is very technical, always willing and someone who writes persuasive skeleton arguments. You feel like you have an advantage going into the courtroom with him."* (Chambers & Partners, 2026)

*"He is an absolute pleasure to work with. He is extremely capable and also well liked by clients. A go-to KC for trust disputes."* (Chambers & Partners, 2026)

*"John has a way of presenting to the court which the judges really respond to well across chancery and commercial matters."* (Chambers & Partners, 2026)

*"John can advise on the full spectrum on offshore trusts work. He is just so user-friendly, incredibly responsive, and clients like him. He is straightforward and efficient."* (Chambers & Partners, 2026)

*"John is down to earth, super responsive and commercially minded. He has great judgement and balances the risks*

016

and benefits of a matter in a concise manner." (Chambers & Partners, 2026)

"John has a way of presenting to the court which judges really respond to. He rolls his sleeves up and gets stuck in to documents and drafting." (Chambers & Partners, 2026)

"He is without peer among silks advising on LLP and partnership law." (Chambers & Partners, 2026)

"A very able advocate with an excellent style, he is very intelligent and presents things in a way clients like." (Chambers & Partners, 2026)

"John is hard-working, and has both razor-sharp intelligence and an incisive eye for detail. He is an excellent all-rounder." (Chambers & Partners, 2026)

"John is my go-to chancery silk in London, for trusts disputes in Cayman. He is absolutely on top of his game and one of the best in trust litigation with significant Cayman experience." (Chambers & Partners, 2026)

"John is a good advocate, unflappable and very focused." (Chambers & Partners, 2026)

"An excellent advocate and strong on commercial Chancery work, fraud and offshore." (Chambers & Partners, 2026)

"John Machell is the leading silk in this area, who focuses on the most complex, high-value work." (Chambers & Partners, 2026)

"John Machell is an authority on LLP law, who gives concise and really considered advice. Very pragmatic in his approach, he always thinks about the end goal." (Chambers & Partners, 2026)

"John Machell is in a different league to everyone else. His depth of knowledge across the field is so much deeper." (Chambers & Partners, 2026)

"John Machell is lovely, very intelligent and a real street fighter. They call him 'Mr LLP'." (Chambers & Partners, 2026)

"John Machell is a top-notch barrister who is both sensible and commercial. He has a very thorough understanding of the law and is extremely strong in terms of his analysis." (Chambers & Partners, 2026)

"John is smooth, reassuring and all over the detail. You know you are in the safest pair of hands when working with him and clients absolutely love him." (Chambers & Partners, 2025)

"An undisputed leader in the field of partnerships and LLPs, who is very user-friendly." (Chambers & Partners, 2025)

"John Machell KC is knowledgeable, calm, highly commercial and absolutely to be trusted. You always feel that he's got your back, and that's what you need in a barrister." (Chambers & Partners, 2025)

"John Machell KC is always quick to respond. He cuts through the issues and looks beyond the finer legal points for the best commercial outcome." (Chambers & Partners, 2025)

"John is technically excellent and a real pleasure to deal with." (Chambers & Partners, 2025)

"John is a quality lawyer, good on his feet, and with a much-appreciated client-facing demeanour." (Chambers & Partners, 2025)

"John is an absolute pleasure to work with. He's thorough, considered and extremely well regarded by clients." (Chambers & Partners, 2025)

"John's advice is clear, commercial and concise. His calm demeanour puts clients at ease and he is generally a

*pleasure to work with."* (Chambers & Partners, 2025)

*"Extremely responsive and commercially minded, he has great judgement and balances the risks and benefits of a matter in a concise manner."* (Chambers & Partners, 2025)

*"John has a phenomenal brain. His deep understanding of partnership law, structures, culture and strategy really set him apart. But he also has an incredible commercial focus which helps you turn a partnership dispute into a partnership resolution."* (Legal 500, 2025)

*"John is a class act and a star of the trust litigation bar. He is intelligent, gets to the point, provides quality advice, and is very effective as an advocate."* (Legal 500, 2025)

*"John hits all the marks - he is an intellectual powerhouse, a persuasive advocate, and his advice is always commercial."* (Legal 500, 2025)

*"John is a quality lawyer, good on his feet, with a much appreciated client-facing demeanour."* (Chambers & Partners High Net Worth, 2024)

*"John is an absolute pleasure to work with. He's thorough, considered and extremely well regarded by clients."* (Chambers & Partners High Net Worth, 2024)

*"John's advice is clear, commercial and concise. His calm demeanour puts clients at ease and he is generally a pleasure to work with."* (Chambers & Partners High Net Worth, 2024)

*"John Machell KC is a respected silk with a broad chancery practice, who often appears in trusts and estates cases as well as more commercial matters. He is also frequently sought after for offshore matters, particularly those concerning trusts."* (Chambers & Partners, 2024)

*"A subject matter expert in a number of areas and an excellent advocate, he's very client friendly and someone who can package technical advice in a commercial, pragmatic way."* (Chambers & Partners, 2024)

*"He's very down to earth, hardworking and concise in his analysis."* (Chambers & Partners, 2024)

*"John is practical, rigorous, clever and commercial."* (Chambers & Partners UK Bar, 2023)

*"He has an encyclopaedic knowledge of the law.*" (Chambers & Partners UK Bar, 2023)

*"A very able advocate: he's got an excellent style, he's very intelligent and he presents things in a way that clients like. Very balanced and sensible, he is extremely easy to work with and very responsive - with him you always know what is going on in the case."* (Chambers & Partners UK Bar, 2023)

*"John is fantastic and the breadth of his practice is very impressive. Very good for private wealth disputes and group litigation, his legal analysis is always on the money."* (Chambers & Partners UK Bar, 2023)

*"He is good with difficult clients. He has an authoritative and calm demeanour about him."* (Chambers & Partners UK Bar, 2023)

*"John is a first-class operator. Very user-friendly, and totally on top of his brief. He provides good advice, excellent advocacy and is a pleasure to work with."* (Chambers & Partners HNW, 2023)

*"He is so easy to work with and his written work is exceptional and he is the most efficient barrister we work with in terms of fees. His advocacy and written work is top of the game. He is very down to earth and user-friendly and really great to work with."* (Chambers & Partners HNW, 2023)

*"John is outstanding. He is excellent with the bench, instructing solicitors and clients alike."* (Chambers & Partners HNW, 2023)

*"Known particularly for partnership and offshore work."* (Chambers & Partners HNW, 2021)

*"If I need a silk, he's my first call."* (Chambers & Partners HNW, 2021)

*"He is very diligent and pragmatic, very easy to work with and I always get a quick response. He is a realist as well, which is incredibly helpful."* (Chambers & Partners HNW, 2021)

*"He is a go-to silk for Cayman matters. He's excellent to work with, very thorough, approachable and flexible,"* (Chambers & Partners HNW, 2020)

*"In court, he makes his point very eloquently and can explain difficult issues in a clear way."* (Chambers & Partners HNW, 2020)

*"He's measured in his approach, and gives clear, balanced, well-reasoned advice. He's hard-working and personable."* (Chambers & Partners HNW, 2020)

*"Has a strong command of the brief and is excellent if there are complex issues at play." "Extremely able, intellectually impressive and good both in court and on the papers."* (Chambers & Partners, 2020)

*"John Machell is one of the leading lights in the partnership arena. We generally turn to him because he's one of the leaders in his field." "He's very cerebral, a good advocate and good in terms of strategic thinking and advising clients."* (Chambers & Partners, 2020)

*"He doesn't opine from on high and is fantastically clear with clients. He works very hard with the solicitor teams and has a collaborative approach."* (Chambers & Partners, 2020)

*"He gives clear, strategic advice."* (Chambers & Partners, 2020)

*"An excellent all-rounder, he's a hard-working barrister with supreme intelligence and an incisive eye for detail." "John combines excellent written work with persuasive advocacy skills."* (Chambers & Partners, 2020)

*"A very modern-type Silk with a very sharp mind."* (The Legal 500 2020)

*"Super user-friendly, commercial, practical and really knows his stuff."* (The Legal 500, 2020)

"*He's one of the best silks you could work with, a total team player – he doesn't opine from on high, and is fantastically clear with clients. He works very hard with the solicitor teams, and has a collaborative approach*," (Chambers High Net Worth 2019)

a "*sound strategist with excellent client communication skills*", say sources who consider him a "*very good tactician with excellent advocacy skills.*" (Who's Who Legal, 2019)

"*Completely on top of deadlines, he always delivers when he says he will. He is a very nice guy to deal with, a very bright man and a very strong advocate. Quite measured in his approach, he's not somebody who goes in for fireworks and theatricals. What he says is always very balanced and extremely well reasoned.*" "*He's a very technical lawyer, so you know you'll always get the right answer.*" (Chambers Global 2019)

"*A go-to silk for contentious trust matters. He is very approachable and cuts straight to the point, addressing issues directly and succinctly.*" "*A brilliant advocate and a great performer in court who explains difficult concepts with ease.*" (Chambers Global 2019)

019

"*He is extremely good on his feet and good with clients.*" "*A true expert in his field, he's a pleasure to work with, technically excellent and highly responsive. He's a persuasive advocate with plenty of trial experience.*" (Chambers & Partners, 2019)

"*Works tremendously hard and has a good brain.*" "*A very experienced advocate at all levels, he has a very wide and deep legal understanding.*" (Chambers & Partners, 2019)

"*Brilliant at private clients matters, especially when there is a partnership element.*" "*A brilliant advocate. He is a great performer in court and can explain difficult concepts with relative ease.*" (Chambers & Partners, 2019)

"*As good on his feet as he is in his writing, he has the rare ability to make highly complex concepts and arguments appear simple.*" "*What he says is always balanced, extremely well reasoned and presented.*" (Chambers & Partners, 2019)

"*A hard-working team player, as good on his feet as he is in writing, who has the rare ability to make highly complex concepts and arguments appear simple.*" (Chambers & Partners, 2019)

"*The leading partnership silk; he is clever, quick, hardworking.*" (The Legal 500, 2019)

"*User friendly and down to earth, he handles difficult clients very well.*" (The Legal 500, 2019)

"*Works tremendously hard and has a good brain.*" "*A very experienced advocate at all levels, he has a very wide and deep legal understanding.*" (Chambers & Partners, 2018)

"*His legal expertise is exemplary and his brain works very logically. He can process and understand very complex matters and explain them to the client well.*" "*A fabulous, thoughful and considerate advocate, who is very commercially aware and takes his roles and duties very seriously. He ensures he achieve equitable results and is a pleasure to work with.*" (Chambers & Partners, 2018)

"*He's Mr LLP: any difficult LLP point and you pick up the phone to John.*" (Chambers & Partners, 2018)

"*He tells it as it is and will give you a very authoritative and great on his feet.*" (Chambers & Partners, 2017)

"*He cuts to the chase, gives robust and practical advice, and is impressive on his feet.*" "*Very clever, creative and decisive.*" (Chambers & Partners, 2017)

"*The only specialist partnership silk, and far and away the best KC handling this type of work.*" "*The counsel of choice in this areal, particulary in respect of LLP issues. He is authroitative, excellent in conference and user-friendly.*" (Chambers & Partners, 2017)

"*His legal expertise is exemplary and his brain works very logically. He can process and understand very complex matters and explain it to the client,*" enthuses one lawyer, who continues: "*You know he is a very safe pair of hands.*" He is also noted for his offshore expertise; another legal source enthuses: "*He is a fabulous, thoughtful and considerate advocate. He is very commercially aware and takes his roles and duties very seriously.*" (Chambers & Partners High Net Worth 2017)

"*His advice and guidance are top-notch.*" (The Legal 500 2017: Partnership)

"*He is popular with clients as he can unravel complex arguments and to get right to the heart of the problem.*" (The Legal 500 2017: Offshore)

"*His advice is top-notch.*" (The Legal 500 2017: Private client trusts and probate)

"*He is a superb lawyer and clients value the fact that he is measured yet intensely commercial. He immediately holds*

*the confidence of the client and he is very engaging - I consider him the best in the field." "His knowledge of LLP and partnership law is encyclopaedic and he is a very impressive advocate.*" (Chambers & Partners 2014)

"*He is a go-to practitioner for a wide variety of commercial and chancery disputes, but has an especially prominent reputation on breach of fiduciary duty cases, and litigation involving complex joint venture elements or allegations of fraud.  "He is a skilled advocate who is great with the clients. He is able to understand their problems and the emotions that run through them."*" (Chambers & Partners 2014)

## Client Testimonials

"*Serle Court is a market leader and a go-to set for contentious trust and offshore work. Over the years, we have worked with a number of different silks and juniors on both litigation and arbitration matters, often with a cross jurisdiction aspect. This has included Alan Boyle KC, Dominic Dowley KC, John Machell KC, Richard Wilson KC, Dakis Hagen KC, Sophie Holcombe, and Oliver Jones. The quality of their work has been consistently excellent, and their commercial nous and practical advice certainly sets them out from the pack. Head Clerk, Steve Whitaker, runs a tight ship and is always a pleasure to deal with.*"

Jeremy Kosky and Maxine Mossman (Clifford Chance LLP)

## Publications

[Forfeiture of Fiduciaries' Remuneration](), Trusts and Estates Law, With [Jennifer Haywood](), March Edition 2018

A third way?  A review of cases relevant to trustees' liability to forfeit remuneration for breach of fiduciary duty T.E.L. & T.J. 2018, 194(Mar), 11-13

The Law of Limited Liability Partnerships 4th edition 2016 (Bloomsbury Professional)

Consultant Editor, Halsbury's Laws Partnership (5th edition)

Limited partnerships: limited partners fight back? (2014) B.J.I.B. & F.L. 29(3), 152-153

Discretionary decision making in a commercial context (2013) B.J.I.B. & F.I. 28(4), 195-198

In the matter of the AB Trust (2013) T. & T. 19(5), 486-490

Equitable compensation: a free-standing remedy for breach of fiduciary duty (2013) T. & T. 19(8), 811-815

LLP Legislation Handbook 2010 (Bloomsbury Professional)

Fishing for your talent, Legal Week 2009, 11(1), 33-34

Forging a union based on mutual obligations, Law Society Gazette 2008, 105(13), 17

Covering all bases, New Law Journal 2008, 158(7324), 804-805

Vicarious Liability for equitable wrongs: partners beware! New Law Journal 2003, 153(7071), 405, 409

**Education & Qualifications**

LLB (First Class) University of Southampton

**Memberships**

Association of Partnership Practitioners

Commercial Bar Association

Chancery Bar Association

022



Connecter  Protéger  Coopérer  Depuis 1893
Connecting  Protecting  Cooperating  Since 1893
Conectando  Protegiendo  Cooperando  Desde el 1893

## 30. CONVENTION ON THE LAW APPLICABLE TO TRUSTS AND ON THEIR RECOGNITION[1]

*(Concluded 1 July 1985)*

The States signatory to the present Convention,

Considering that the trust, as developed in courts of equity in common law jurisdictions and adopted with some modifications in other jurisdictions, is a unique legal institution,

Desiring to establish common provisions on the law applicable to trusts and to deal with the most important issues concerning the recognition of trusts,

Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions –

CHAPTER I – SCOPE

### Article 1

This Convention specifies the law applicable to trusts and governs their recognition.

### Article 2

For the purposes of this Convention, the term "trust" refers to the legal relationships created – *inter vivos* or on death – by a person, the settlor, when assets have been placed under the control of a trustee for the benefit of a beneficiary or for a specified purpose.

A trust has the following characteristics –

a)  the assets constitute a separate fund and are not a part of the trustee's own estate;

b)  title to the trust assets stands in the name of the trustee or in the name of another person on behalf of the trustee;

c)  the trustee has the power and the duty, in respect of which he is accountable, to manage, employ or dispose of the assets in accordance with the terms of the trust and the special duties imposed upon him by law.

The reservation by the settlor of certain rights and powers, and the fact that the trustee may himself have rights as a beneficiary, are not necessarily inconsistent with the existence of a trust.

### Article 3

The Convention applies only to trusts created voluntarily and evidenced in writing.

### Article 4

The Convention does not apply to preliminary issues relating to the validity of wills or of other acts by virtue of which assets are transferred to the trustee.

---

[1] This Convention, including related materials, is accessible on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions". For the full history of the Convention, see Hague Conference on Private International Law, *Proceedings of the Fifteenth Session (1984)*, Tome II, *Trusts – applicable law and recognition* (ISBN 90 12 04930 X, 423 pp.).

024

Article 5

The Convention does not apply to the extent that the law specified by Chapter II does not provide for trusts or the category of trusts involved.

CHAPTER II – APPLICABLE LAW

Article 6

A trust shall be governed by the law chosen by the settlor. The choice must be express or be implied in the terms of the instrument creating or the writing evidencing the trust, interpreted, if necessary, in the light of the circumstances of the case.
Where the law chosen under the previous paragraph does not provide for trusts or the category of trust involved, the choice shall not be effective and the law specified in Article 7 shall apply.

Article 7

Where no applicable law has been chosen, a trust shall be governed by the law with which it is most closely connected.
In ascertaining the law with which a trust is most closely connected reference shall be made in particular to –
a)    the place of administration of the trust designated by the settlor;
b)    the situs of the assets of the trust;
c)    the place of residence or business of the trustee;
d)    the objects of the trust and the places where they are to be fulfilled.

Article 8

The law specified by Article 6 or 7 shall govern the validity of the trust, its construction, its effects, and the administration of the trust.
In particular that law shall govern –
a)    the appointment, resignation and removal of trustees, the capacity to act as a trustee, and the devolution of the office of trustee;
b)    the rights and duties of trustees among themselves;
c)    the right of trustees to delegate in whole or in part the discharge of their duties or the exercise of their powers;
d)    the power of trustees to administer or to dispose of trust assets, to create security interests in the trust assets, or to acquire new assets;
e)    the powers of investment of trustees;
f)    restrictions upon the duration of the trust, and upon the power to accumulate the income of the trust;
g)    the relationships between the trustees and the beneficiaries including the personal liability of the trustees to the beneficiaries;
h)    the variation or termination of the trust;
i)    the distribution of the trust assets;
j)    the duty of trustees to account for their administration.

Article 9

In applying this Chapter a severable aspect of the trust, particularly matters of administration, may be governed by a different law.

Article 10

The law applicable to the validity of the trust shall determine whether that law or the law governing a severable aspect of the trust may be replaced by another law.

025

CHAPTER III — RECOGNITION

Article 11

A trust created in accordance with the law specified by the preceding Chapter shall be recognised as a trust.

Such recognition shall imply, as a minimum, that the trust property constitutes a separate fund, that the trustee may sue and be sued in his capacity as trustee, and that he may appear or act in this capacity before a notary or any person acting in an official capacity.

In so far as the law applicable to the trust requires or provides, such recognition shall imply, in particular —

a)    that personal creditors of the trustee shall have no recourse against the trust assets;
b)    that the trust assets shall not form part of the trustee's estate upon his insolvency or bankruptcy;
c)    that the trust assets shall not form part of the matrimonial property of the trustee or his spouse nor part of the trustee's estate upon his death;
d)    that the trust assets may be recovered when the trustee, in breach of trust, has mingled trust assets with his own property or has alienated trust assets. However, the rights and obligations of any third party holder of the assets shall remain subject to the law determined by the choice of law rules of the forum.

Article 12

Where the trustee desires to register assets, movable or immovable, or documents of title to them, he shall be entitled, in so far as this is not prohibited by or inconsistent with the law of the State where registration is sought, to do so in his capacity as trustee or in such other way that the existence of the trust is disclosed.

Article 13

No State shall be bound to recognise a trust the significant elements of which, except for the choice of the applicable law, the place of administration and the habitual residence of the trustee, are more closely connected with States which do not have the institution of the trust or the category of trust involved.

Article 14

The Convention shall not prevent the application of rules of law more favourable to the recognition of trusts.

CHAPTER IV — GENERAL CLAUSES

Article 15

The Convention does not prevent the application of provisions of the law designated by the conflicts rules of the forum, in so far as those provisions cannot be derogated from by voluntary act, relating in particular to the following matters —

a)    the protection of minors and incapable parties;
b)    the personal and proprietary effects of marriage;
c)    succession rights, testate and intestate, especially the indefeasible shares of spouses and relatives;
d)    the transfer of title to property and security interests in property;
e)    the protection of creditors in matters of insolvency;
f)    the protection, in other respects, of third parties acting in good faith.

If recognition of a trust is prevented by application of the preceding paragraph, the court shall try to give effect to the objects of the trust by other means.

Article 16

026

The Convention does not prevent the application of those provisions of the law of the forum which must be applied even to international situations, irrespective of rules of conflict of laws.

If another State has a sufficiently close connection with a case then, in exceptional circumstances, effect may also be given to rules of that State which have the same character as mentioned in the preceding paragraph.

Any Contracting State may, by way of reservation, declare that it will not apply the second paragraph of this Article.

## Article 17

In the Convention the word "law" means the rules of law in force in a State other than its rules of conflict of laws.

## Article 18

The provisions of the Convention may be disregarded when their application would be manifestly incompatible with public policy (*ordre public*).

## Article 19

Nothing in the Convention shall prejudice the powers of States in fiscal matters.

## Article 20

Any Contracting State may, at any time, declare that the provisions of the Convention will be extended to trusts declared by judicial decisions.

This declaration shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands and will come into effect on the day when this notification is received.

Article 31 is applicable to the withdrawal of this declaration in the same way as it applies to a denunciation of the Convention.

## Article 21

Any Contracting State may reserve the right to apply the provisions of Chapter III only to trusts the validity of which is governed by the law of a Contracting State.

## Article 22

The Convention applies to trusts regardless of the date on which they were created.

However, a Contracting State may reserve the right not to apply the Convention to trusts created before the date on which, in relation to that State, the Convention enters into force.

## Article 23

For the purpose of identifying the law applicable under the Convention, where a State comprises several territorial units each of which has its own rules of law in respect of trusts, any reference to the law of that State is to be construed as referring to the law in force in the territorial unit in question.

## Article 24

A State within which different territorial units have their own rules of law in respect of trusts is not bound to apply the Convention to conflicts solely between the laws of such units.

027

Article 25

The Convention shall not affect any other international instrument containing provisions on matters governed by this Convention to which a Contracting State is, or becomes, a Party.

CHAPTER V — FINAL CLAUSES

Article 26

Any State may, at the time of signature, ratification, acceptance, approval or accession, or at the time of making a declaration in terms of Article 29, make the reservations provided for in Articles 16, 21 and 22. No other reservation shall be permitted.
Any Contracting State may at any time withdraw a reservation which it has made; the reservation shall cease to have effect on the first day of the third calendar month after notification of the withdrawal.

Article 27

The Convention shall be open for signature by the States which were Members of the Hague Conference on Private International Law at the time of its Fifteenth Session.
It shall be ratified, accepted or approved and the instruments of ratification, acceptance or approval shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

Article 28

Any other State may accede to the Convention after it has entered into force in accordance with Article 30, paragraph 1.
The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.
The accession shall have effect only as regards the relations between the acceding State and those Contracting States which have not raised an objection to its accession in the twelve months after the receipt of the notification referred to in Article 32. Such an objection may also be raised by Member States at the time when they ratify, accept or approve the Convention after an accession. Any such objection shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

Article 29

If a State has two or more territorial units in which different systems of law are applicable, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all of its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.
Any such declaration shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands and shall state expressly the territorial units to which the Convention applies.
If a State makes no declaration under this Article, the Convention is to extend to all territorial units of that State.

Article 30

The Convention shall enter into force on the first day of the third calendar month after the deposit of the third instrument of ratification, acceptance or approval referred to in Article 27.
Thereafter the Convention shall enter into force –
a)    for each State ratifying, accepting or approving it subsequently, on the first day of the third calendar month after the deposit of its instrument of ratification, acceptance or approval;
b)    for each acceding State, on the first day of the third calendar month after the expiry of the period referred to in Article 28;
c)    for a territorial unit to which the Convention has been extended in conformity with Article 29, on the first day of the third calendar month after the notification referred to in that Article.

028

Article 31

Any Contracting State may denounce this Convention by a formal notification in writing addressed to the Ministry of Foreign Affairs of the Kingdom of the Netherlands, depositary of the Convention.
The denunciation takes effect on the first day of the month following the expiration of six months after the notification is received by the depositary or on such later date as is specified in the notification.


Article 32

The Ministry of Foreign Affairs of the Kingdom of the Netherlands shall notify the States Members of the Conference, and the States which have acceded in accordance with Article 28, of the following –
*a)*     the signatures and ratifications, acceptances or approvals referred to in Article 27;
*b)*     the date on which the Convention enters into force in accordance with Article 30;
*c)*     the accessions and the objections raised to accessions referred to in Article 28;
*d)*     the extensions referred to in Article 29;
*e)*     the declarations referred to in Article 20;
*f)*     the reservation or withdrawals referred to in Article 26;
*g)*     the denunciations referred to in Article 31.


In witness whereof the undersigned, being duly authorised thereto, have signed this Convention.

Done at The Hague, on the first day of July, 1985, in English and French, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Kingdom of the Netherlands, and of which a certified copy shall be sent, through diplomatic channels, to each of the States Members of the Hague Conference on Private International Law at the date of its Fifteenth Session.

029

**No. 12 of 2021**

<div align="center">

**VIRGIN ISLANDS**

**TRUSTEE (AMENDMENT) ACT, 2021**

**ARRANGEMENT OF SECTIONS**

</div>

*Section*

1…  Short title and commencement.
2…  Section 2 amended.
3…  Amendment of Heading.
4…  Section 2A repealed.
5…  Section 40 amended.
6…  New section 58B inserted.
7…  New section 59A inserted.
8…  Section 83A amended.
9…  Section 86 repealed and substituted.
10..  Section 91 amended.
11..  New section 92A inserted.
12..  Section 95 amended.
13..  Section 104 amended.

030

**No. 12 of 2021**  **Trustee (Amendment) Act, 2021**  **Virgin Islands**

**I Assent**
**(Sgd.) John J. Rankin, CMG**
**Governor.**
**7th May, 2021**

**VIRGIN ISLANDS**

**No. 12 of 2021**

An Act to amend the Trustee Act (Cap. 303) and for other matters connected therewith.

[Gazetted 13th May, 2021]

ENACTED by the Legislature of the Virgin Islands as follows:

Short title and commencement.

**1.** (1)   This Act may be cited as the Trustee (Amendment) Act, 2021.

(2)   Subject to subsection (3), this Act shall come into force on such date as the Governor may, by Proclamation published in the *Gazette*, appoint.

(3)   Section 11 shall be deemed to have come into force on the 30th day of March, 2015.

Section 2 amended.

**2.**   Section 2 of the Trustee Act (hereinafter referred to as "the principal Act") is amended in subsection (4) by inserting after the word "reservation", the words "or grant".

Amendment of Heading.

**3.**   The principal Act is amended by deleting immediately after the words "PART II", the heading "TRUST RECORDS".

Section 2A repealed.

**4.**   The principal Act is amended by repealing section 2A.

2

031

**5.** Section 40 of the principal Act is amended by adding after subsection (2), the following new subsection –

      Section 40 amended.

      "(3) For the avoidance of doubt, the reference in subsection (1) to "co-trustees" includes a single co-trustee and shall be interpreted to have always included such single co-trustee.".

**6.** The principal Act is amended by inserting after section 58A, the following new section –

      New section 58B inserted.

"Powers of Court to vary trusts.

      **58B.** (1) This section applies to the following trusts governed by Virgin Islands law –

(a) a trust created on or after the date on which this section came into force where the trust instrument expressly so provides; and

(b) a trust, whenever created, that was previously governed by the law of a jurisdiction other than that of the Virgin Islands, and either –

(i) the instrument effecting the change of the governing law to the Virgin Islands, or

(ii) an instrument taking effect at the same time as the instrument effecting the change of the governing law and executed by the person who has the power to change the governing law ("the power holder"),

expressly so provides.

      (2) The instrument referred to in subsection (1) (b) (i) and (ii) may amend the terms of the trust to –

(a) include any exclusion of, or restriction on, any of the Court's powers under this section, or

(b) confer power on any person to exclude or restrict any of the Court's powers under this section,

3

and the amendment may be made either pursuant to a power conferred by the trust or, whether or not there is any such power, by the power holder.

(3)    Where this section applies to any trusts, the Court may upon application, if it thinks fit and the condition specified in subsection (4) is satisfied, by order –

> (a)    vary, add to, revoke or replace all or any of the trusts;

> (b)    enlarge, restrict or remove all or any of the powers of the trustee of managing or administering any of the property subject to the trusts or all or any other powers of the trustee; or

> (c)    vary, add to, remove, or replace any or all of the other provisions of the trusts.

(4)    The condition referred to in subsection (3) is that the making of the order is determined by the Court to be expedient in the circumstances then existing, whether or not the terms of the order may adversely affect any person or purpose.

(5)    In making a determination under subsection (4), the Court shall have regard to the factors outlined in the following paragraphs in so far as the Court considers them material to the particular case and to be within the Court's knowledge –

> (a)    any wishes or likely expectations of the settlor;

> (b)    changes in circumstances after the creation of the trust, including (but not limited to) family, fiscal, financial, and commercial circumstances; and

> (c)    in relation to the proposed extinguishment or curtailment of, or placing of conditions on, any interest –

>> (i)    the remoteness of that interest; and

4

033

(ii)    the protective needs of individual beneficiaries.

(6)    An application to the Court for an order under this section may be made by –

(a)    the trustee;

(b)    any person, office holder or body, including (but not limited to) a protector or protective committee, authorised to apply by the trust instrument; or

(c)    any person beneficially interested under the trust, including any object of a discretionary trust or power of any nature.

(7)    The Court's powers under this section are subject to any exclusions or restrictions imposed by –

(a)    the trust instrument referring, explicitly or implicitly, to this section; or

(b)    the exercise of any power in that behalf conferred by the trust instrument on the trustee or on any other person or on any office holder or body, including (but not limited to) a protector or protective committee.

(8)    No order shall be made under this section which affects an interest that, apart from this section, has vested absolutely and indefeasibly in possession, and the reference to 'interest' shall be construed to exclude an interest in income which at the time of the order has not yet arisen.

(9)    Nothing in subsections (1) to (8) shall apply to trusts affecting property settled by any other law of the Virgin Islands.

(10)    Nothing in this section shall be taken to limit the powers conferred by section 58 or 59, or by section 6 of the Eastern Caribbean Supreme Court (Virgin Islands) Act.

Cap. 80

(11)    A reference in this section to a trust instrument relates to any document, including an instrument

034

referred to in subsection (1) (b) (i) and (ii), that evidences and records the current terms of the trust in question.".

New section 59A inserted.

**7.** The principal Act is amended by inserting after section 59, the following new section –

"Power of Court to set aside flawed exercise of fiduciary power.

**59A.** (1)    If the Court, in relation to the exercise of a fiduciary power, is satisfied on an application by a person specified in subsection (5) that the conditions set out in subsection (2) are met, the Court may—

(a)    set aside the exercise of the power, either in whole or in part, and either unconditionally or on such terms and subject to such conditions as the Court may think fit; and

(b)    make such order consequent upon the setting aside of the exercise of the power as it thinks fit.

(2)    The conditions referred to in subsection (1) are that—

(a)    in the exercise of the power, the person who holds the power did not take into account one or more considerations (whether of fact, law, or a combination of fact and law) that were relevant to the exercise of the power, or took into account one or more such considerations that were irrelevant to the exercise of the power; and

(b)    but for his failure to take into account one or more such relevant considerations or his having taken into account one or more such irrelevant considerations, the person who holds the power—

(i)    would not have exercised the power;

(ii)    would have exercised the power, but on a different occasion to that on which it was exercised; or

6

035

> > (iii)    would have exercised the power, but in a different manner to that in which it was exercised.

(3)    If and to the extent that the exercise of a power is set aside under this section, to that extent the exercise of the power shall be treated as never having occurred.

(4)    The conditions set out in subsection (2) may be satisfied without it being alleged or proved that in the exercise of the power, the person who holds the power, or any adviser to such person, acted in breach of trust or in breach of duty.

(5)    An application to the Court under this section may be made —

> (a)    by the person who holds the power;

> (b)    where the power is conferred in respect of a trust or trust property, by any trustee of that trust, or by any person beneficially interested under that trust, or (in the case of a purpose trust) by any person appointed by or under the trust for the purposes of sections 84 (2) (d) or 84A (3) (d);

> (c)    where the power is conferred in respect of a charitable trust or otherwise for a charitable purpose, by the Attorney-General; or

> (d)    with the leave of the Court, by any other person.

(6)    For the purposes of subsection (5) a person beneficially interested under a trust shall include a person who is a discretionary object of that trust or of a power conferred under the terms of that trust.

(7)    No order may be made under subsection (1) which would prejudice a *bona fide* purchaser for value of any trust property without notice of the matters which allow the Court to set aside the exercise of a power over the trust property or in relation to it.

(8)    The jurisdiction conferred upon the Court by this section may be exercised by the Court in respect of fiduciary

7

036

powers, whether conferred or exercised before, on or after the date on which this section came into force.

(9)    In this section—

(a)    "fiduciary power" means any power that, when exercised, must be exercised for the benefit of or taking into account the interests of at least one person other than the person who holds the power;

(b)    "power" includes a discretion as to how an obligation is performed; and

(c)    "person who holds the power" includes any person on whom a power has been conferred, whether or not that power is exercisable by that person alone, and any person to whom the exercise of a power has been delegated.

(10)    Nothing in this section shall be taken to limit or otherwise affect the Court's jurisdiction under the doctrine of mistake.".

Section 83A amended.

**8.**    Section 83A of the principal Act is amended–

(a)    in subsection (1) by –

(i)    inserting the following definitions in their appropriate alphabetical order –

"beneficiary" includes an object of a discretionary trust or power of any nature;

"office-holder" means any trustee, protector, enforcer or any other person who has any powers under a trust, whether or not such powers are fiduciary or whose exercise is otherwise subject to any duties;

"persons internal to the trust relationship" means any office-holder, settlor or beneficiary;

(ii)    deleting the definition of "personal relationship" and substituting the following definition –

8

037

"personal relationship" includes every form of relationship by blood, adoption, marriage or cohabitation, whether or not the relationship is recognised by law and, in particular, a personal relationship between two persons exists if –

(a)    one is the child or remoter descendant of the other, whether any such child or descendant is –

    (i)    natural or adopted;

    (ii)    legitimate, legitimated or illegitimate;

    (iii)    a stepchild; or

    (iv)    born by means of artificial fertilisation or surrogacy.

(b)    one is married to the other or in any other relationship recognised under the laws of the Virgin Islands;

(c)    one cohabits with the other, enters into an arrangement with the other or otherwise so conducts himself or herself in relation to the other as to give rise in any jurisdiction to any rights, obligations or responsibilities analogous to those of a parent and child and husband and wife or of any other relationship recognised under the laws of the Virgin Islands;

(d)    personal relationships exist between each of them and a third person; or

(e)    any of the relationships referred to in paragraphs (a) to (d) has ended for any reason.";

(b)    by repealing subsection (12) and substituting the following new subsection –

9

038

"(12)    Subject to subsections (6) to (11) and the First Schedule, all questions arising in regard to a trust, whether the administration is conducted in the Virgin Islands or elsewhere, including all questions regarding the validity, construction, effect or administration of the trust and, in particular, but without limitation –

(a)    questions relating to any of the following matters, being matters specified in Article 8 of the Hague Trusts Convention –

(i)    the appointment, resignation and removal of the office-holders, the capacity to act of the persons internal to the trust relationship and the devolution of the office of the office-holders under the trust,

(ii)    the rights and duties of the persons internal to the trust relationship among themselves,

(iii)    the right of office-holders to delegate in whole or in part the discharge of their duties or the exercise of their powers,

(iv)    the powers of the office-holders to administer or to dispose of trust assets, to create security interests in the trust assets, or to acquire new assets,

(v)    the powers of investment of the office-holders,

(vi)    restrictions upon the duration of the trust, and upon the power to accumulate the income of the trust,

10

(vii)    the relationships between the office-holders and the beneficiaries, including the personal liability of any of the office-holders to the beneficiaries or to other office-holders or otherwise in relation to the trust,

(viii)    the variation or termination of the trust,

(ix)    the distribution of trust assets, and

(x)    the duty of the office-holders to account for their administration or otherwise in relation to their duties under the terms of the trust, and

(b)    to the extent that they do not fall under paragraph (a), questions as to –

(i)    the fiduciary or non-fiduciary powers, obligations or duties of the office-holders or to the liabilities or rights of the office-holders,

(ii)    the existence and extent of powers conferred or retained, including powers to vary or revoke the trust and powers of appointment, and questions as to the validity of any exercise of any such power,

are to be determined by the proper law of the trust or, where there are different proper laws for different aspects of the trust, the proper law applicable to the area in which the question falls; and

11

040

(c)     to the extent that Virgin Islands law applies to the trust, or to the issue in question, no other rule of the law of any other jurisdiction shall be applicable to such questions.";

(c)     in subsection (13) –

(i)     by deleting the opening paragraph and substituting the following:

"Subject to any express provision to the contrary in the trust or disposition, no Virgin Islands trust, and no disposition of property to be held upon the trusts of such a trust, is void, voidable, liable to be set aside or defective in any fashion, nor is the capacity of any persons internal to the trust relationship in relation to the trust or disposition to be questioned, nor is any person internal to the trust relationship or any other person to be subjected to any liability or deprived of any right, claim or interest by reason that –"; and

(ii)     in paragraph (b) (i), by inserting immediately after the word "settlor", the words "or any beneficiary";

(d)     in subsection (16), by inserting immediately after the word "settlor", the words "or any beneficiary" and

(e)     in subsection (19), by deleting the comma at the end of the subsection and adding the words "and, for the avoidance of doubt, a judgment of a foreign court varying a Virgin Islands trust without the consent of the adult *sui juris* beneficiaries shall be considered inconsistent within the meaning of this subsection.".

| | | |
|---|---|---|
| Section 86 repealed and substituted. | **9.** | Section 86 of the principal Act is repealed and substituted by the following new section – |

| | | |
|---|---|---|
| "Reservation or grant of power to settlor or others. | **86.** (1) | The reservation by the settlor to himself or herself or the grant to any other person or to any office holder or body, including (but not limited to) a protector or protective committee, in a trust instrument evidencing and recording a trust governed by the laws of the Virgin Islands of any limited beneficial interest in |

12

041

the trust property, whether of income or capital, or any or all of the powers specified in subsection (2) or both such an interest and any or all of such powers, shall not —

    (a)    invalidate the trust;

    (b)    prevent the trust taking effect according to its terms; or

    (c)    cause any of the trust property to be part of the estate of the settlor for the purposes of succession on death, whether testate or intestate.

(2)    The powers referred to in subsection (1) are—

    (a)    in the case of a reservation to the settlor or other donor of trust property, power to revoke the trusts in whole or in part;

    (b)    power to vary or amend the terms of a trust instrument or any of the trusts, purposes or powers arising thereunder in whole or in part;

    (c)    a general, intermediate or special power to advance, appoint, pay, apply, distribute or transfer trust property (whether income or capital or both) or to give directions for the making of any such advancement, appointment, payment, application, distribution or transfer;

    (d)    power to act as, or give binding directions as to the appointment or removal of, a director or an officer of any company wholly or partly owned by the trust or to direct the trustee as to the manner of exercising voting rights attaching to any of the shares held in such company;

    (e)    power to give binding directions in connection with the purchase, retention, holding, sale of or other commercial or

042

investment dealings with trust property or any investment or reinvestment thereof or the exercise of any powers or rights arising from such trust property;

(f) power to appoint, add, remove or replace any trustee, protector, enforcer or any other office holder or any advisor, including any investment advisor or any investment manager;

(g) power to add, remove or exclude any beneficiary, class of beneficiaries or purpose;

(h) power to change the proper law of the trust;

(i) power to change the terms of the trust which specify which courts have exclusive or non-exclusive jurisdiction in any proceedings involving rights or obligations under the trust; and

(j) power to restrict the exercise of any powers, discretions or functions of a trustee by requiring that they shall only be exercisable with the consent, or at the direction, of any person specified in the trust instrument.

(3) No person, other than a person in whom trust property or an interest in trust property is vested, shall be or become a trustee by reason only of the reservation or grant of any of the powers set out in subsection (2).

(4) Subject to any contrary provision herein, this section applies to any trusts governed by the laws of the Virgin Islands, whether created before, on or after the date on which this section comes into force, and to acts and omissions occurring while the trust was governed by the laws of the Virgin Islands.

(5) In this section, "settlor" includes—

14

043

(a)    a testator who grants powers under a testamentary trust by the terms of his or her last will and testament; and

(b)    a person who by a declaration of trust declares that assets held by him or her beneficially shall be held by him or her on the terms of the trust so declared.".

**10.**    Section 91 of the principal Act is amended –

Section 91 amended.

(a)    in subsection (1) (c), by deleting the words "pursuant to the powers and discretions specified in the instrument creating the trust" and substituting the words "pursuant to the terms of the trust"; and

(b)    by adding after subsection (2), the following new subsection –

"(3)    A reference in this section to a "trust" shall be construed to include a trust the proper law of which is that of a jurisdiction other than the Virgin Islands.".

**11.**    The principal Act is amended by inserting immediately after section 92, the following new section –

New section 92A inserted.

"Duty to maintain records and underlying documentation.

**92A** (1)    In this section –

"Applicable Trust" means a trust governed by the law of any jurisdiction other than –

(a)    an implied, constructive or bare trust; or

(b)    the duties incidental to the office of a personal representative; and

"Relevant Trustee" means –

(a)    a company incorporated in the Virgin Islands;

(b)    a foreign company registered under Part XI of the BVI Business Companies Act, 2004;

15

044

(c)     an individual resident in the Virgin Islands; or

(d)     any other person who is a trustee of a trust administered (in whole or in part) in or from within the Virgin Islands.

(2)     Every Relevant Trustee (each a "Trustee") of an Applicable Trust (each a "Trust") shall maintain records and underlying documentation of the Trust whether within or outside the Virgin Islands and retain those records and underlying documentation for a period of at least five years from the date on which either –

(a)     they first came into the possession or under the control of the Trustee; or

(b)     they were prepared by the Trustee.

(3)     The records and underlying documentation of the Trust shall be in such form as is appropriate to the Trust and trust property.

(4)     A Trustee who fails to comply with this section commits an offence and is liable on summary conviction to a fine not exceeding ten thousand dollars.".

Section 95 amended.

**12.**     Section 95 of the principal Act is amended by adding after subsection (5), the following new subsection –

"(6)     Subsection (1) shall not apply if the third party has acted dishonestly in entering into the transaction.".

Section 104 amended.

**13.**     Section 104 of the principal Act is amended by –

(a)     renumbering the existing section as subsection (1);

(b)     deleting the words "This Part" in subsection (1) as renumbered and substituting the words "Subject to subsection (2), this Part"; and

(c)     adding after subsection (1) as renumbered, the following new subsection –

16

045

"(2)    The trustees of any trust created before the date on which this Part came into force may by deed provide that this Part shall apply to that trust.".

Passed by the House of Assembly this 22nd day of April, 2021.

(Sgd.) Julian Willock,
Speaker.

(Sgd.) Phyllis Evans,
Clerk of the House of Assembly.

17

046

*TRUSTS, WILLS AND PROBATE LIBRARY*

# LEWIN ON TRUSTS

## *TWENTIETH EDITION*

*But they thinke it against al right and iustice, that men shuld be bound to those laws, which other be in numbre mo then be able to be readde, or els blinder and darker, then that any man can well understand them.*

Sir Thomas More
Bencher of Lincoln's Inn
*Utopia*, book II

BY

### LYNTON TUCKER, M.A., B.C.L.
*Barrister of Lincoln's Inn*

### NICHOLAS LE POIDEVIN, Q.C., M.A., LL.B.
*Bencher of Lincoln's Inn*

### JAMES BRIGHTWELL M.A., LL.M.
*Barrister of Lincoln's Inn*

EDITOR

### THOMAS FLETCHER, M.A., LL.M.
*Barrister of The Inner Temple*

ASSISTANT EDITOR

### AIDAN BRIGGS, B.A.
*Barrister of The Inner Temple*

SPECIAL CONTRIBUTOR

### SIMON ADAMYK, M.A., LL.M.
*Barrister of Lincoln's Inn*



**SWEET & MAXWELL**          **THOMSON REUTERS**

047

This is a PDF of the original 20th Ed. main work

property in good faith. Thirdly, the trust property is a *fund*, in the sense that the trustees have power to sell its constituent parts free of the beneficiaries' proprietary rights, and reinvest the proceeds in other assets, which thereupon automatically become subject to those rights. The unique feature of this "real subrogation" in the case of a trust is that, if the trustees *wrongfully* transpose trust assets into other assets, the beneficiaries' proprietary interests attach to the new assets, and bind them, not only in the hands of the trustees, their creditors and successors, but also in the hands of third parties generally other than *bona fide* purchasers for value without notice.

## 2.  CLASSIFICATION OF TRUSTS

### Bare or simple trusts and special trusts

A distinction has traditionally been drawn between "bare" trusts, or "simple" or "naked" trusts, and "special" trusts. According to that distinction, a bare trustee holds property in trust for a single beneficiary absolutely and indefeasibly, and is a mere passive repository for the beneficial owner, having no duties other than a duty to transfer the property to the beneficial owner or as he directs. By contrast a trustee holding property on special trusts has active duties to perform, for example in executing the trusts of a will or settlement, with administrative (and perhaps also dispositive) powers accompanying his active duties. It is still possible to distinguish between an absolute trust for a single beneficiary, which might still be called a bare or simple trust, and other types of trust. On closer examination, however, a distinction cannot satisfactorily be drawn between bare and special trusts on the basis that a person holding property on trust for another absolutely and indefeasibly is always a mere passive repository for the beneficial owner while a trustee holding property on special trusts has active duties to perform. The description of a bare trustee as a mere passive repository for the beneficial owner with no active duties to perform other than a duty of transfer requires at least some qualification in its application to cases where a beneficiary has an absolute and indefeasible interest. We consider later in this Chapter aspects of the law concerning bare or absolute trusts and bare trustees, and the distinction between such trusts and special trusts.[99]

**1-028**

### Fixed and discretionary trusts and powers

Special trusts may be subdivided into fixed[100] trusts, where the objects are identified, and discretionary trusts, where their choice is left to the trustee. A trust for A for life with remainder to his children, or to B, is a fixed trust. A trust to divide the income among such of A's children and in such shares as the trustees think fit is a discretionary trust.[101] To be distinguished is a power, where the trustees are authorised, but not directed, to distribute.[102] What at first sight appears a power may impose a duty to distribute, requiring the trustees to choose the recipients. The

**1-029**

---

[99]  See § 1-036 onwards.
[100]  Or "ministerial" or "instrumental".
[101]  See, for instance, *Att.-Gen. v Scott* (1749) 1 Ves. Sen. 413 (trust to select preacher); *Gartside v I.R.C.* [1968] A.C. 553, HL.
[102]  See *McPhail v Doulton (Baden No.1)* [1971] A.C. 424, HL. On the release of a possibility of benefiting under such a power, see *Re Gulbenkian's Settlements (No.2)* [1970] Ch. 408 and § 28-148.

048

This is a PDF of the original 20th Ed. Trian work

(4) *Variation of Trusts Act 1958.* The court may approve a variation of trust on behalf of persons with unascertained interests, if satisfied that the variation is beneficial to them, other than any person whose interest would have been ascertained had the date or event upon which the ascertainment of his interest depended occurred at the time of the application to the court.[212] By contrast the court has no jurisdiction to approve a variation of trust on behalf of a person with a future contingent interest unless he lacks capacity.[213]

*Endurance of the distinction between contingent and unascertained interests*

The difference between the treatment of persons who have a future contingent interest and an unascertained interest to a large extent turns on the language used to describe the gift, rather than a difference of substance between the future contingent interest and the unascertained interest. We consider that the stark distinction between the treatment under the authorities as they now stand of a future contingent interest and an ascertained interest is open to reconsideration and perhaps restatement by the Supreme Court (though not any lower English court) or the Privy Council; and that the approach adopted by the Privy Council in *Schmidt v Rosewood Trust Ltd* to the question whether the distinction between a discretionary trust and a mere fiduciary power justified a totally different treatment of the rights of objects of them, might be influential to a re-consideration of the question whether the distinction between a future contingent interest and an unascertained interest justifies the totally different treatment in trust law of the persons who stand to take under them. **1-060**

**Discretionary interests**[214]

The term 'discretionary interest' is convenient to describe the interests of the object of a discretionary trust. An object of a discretionary trust has no proprietary interest in the trust assets or capital[215] and no right to a definable part of the trust income.[216] In general, a discretionary trust has no one in whom the beneficial interest in the trust property can be said to be vested because vesting is contingent upon the selection of an object from a nominated class.[217] However, an object of a discretionary trust: **1-061**

> "… has a right to be considered as a potential recipient of benefit by the trustees and a right to have his interest protected by a court of equity. Certainly that is so, and when it is said that he has a right to have the trustees exercise their discretion "fairly" or "reasonably" or "properly" that indicates clearly enough that some objective consideration (not stated explicitly in declaring the discretionary trust, but latent in it) must be applied by the trustees and that the right is more than a mere spes."[218]

---

[212] See §§ 43-051 and 43-052.
[213] *Knocker v Youle* [1986] 1 W.L.R. 934.
[214] For further discussion of discretionary trusts, see §§ 28-024 onwards.
[215] *Gartside v I.R.C.* [1968] A.C. 553, HL at 617; *Re Tantular* [2014] JRC 128; 2014 (2) JLR 25 at [30]; *Granada Group Ltd v The Law Debenture Trust Corp. Plc* [2016] EWCA Civ 1289; [2017] Bus. L.R. 870 at [30]; *Biema Holdings Ltd v SG Hambros Bank (Channel Islands) Ltd* [2017] JRC 122 at [61].
[216] *Sainsbury v I.R.C.* [1970] Ch. 712 at 723H.
[217] *Murphy v Murphy* [1999] 1 W.L.R. 282, 290.
[218] *Gartside v I.R.C.* [1968] A.C. 553 at 605–606, HL *per* Lord Reid, at 617H–618B, *per* Lord

049

This is a PDF of the original 20th Ed. main work

A discretionary interest includes a right to be considered for the exercise of the trustees' discretion;[219] a right to compel the due administration of the trust;[220] a *prima facie* right to obtain information and accounts from the trustees;[221] and a right to bring a claim for breach of trust, including a right to compel a third-party recipient of trust assets to restore them to the trustees.[222] It has been suggested that an object of a discretionary trust may have a legitimate expectation of being consulted before a regular payment is stopped, or at least given the opportunity to persuade the trustees to continue the payments.[223] The question whether a discretionary interest counts as an interest under a trust for the purposes of a freezing injunction is considered elsewhere.[224]

**1-062**   A discretionary interest can be surrendered[225] or assigned for value.[226] In certain circumstances all the objects of a closed class of discretionary beneficiaries may act together to bring the trust to an end.[227] However, the objects of a discretionary trust have no interest in possession in the trust fund, and that is the case whether the trust is exhaustive[228] or non-exhaustive.[229]

### Employee benefit trusts

**1-063**   An employee benefit trust (EBT) is a species of discretionary trust established for the benefit of a company's employees, and will often include as objects the relatives and dependants of the employees. EBTs are often established to save tax by taking advantage of section 86 of the Inheritance Tax Act 1984 (trusts for the benefit of employees) or section 1166 of the Companies Act 2006 (employee share schemes). It should be noted that an attempt to use EBTs to avoid national insurance contributions or income tax is likely to be caught by the disguised remuneration provisions of Part 7A of the Income Tax (Earnings and Pensions) Act 2003. Generally, the trustee of the EBT is entirely separate from the company, which usually acts as the settlor, and from the senior management. It was a breach of trust for the trustees of an EBT established for the benefit of employees to transfer shares in the company to a second EBT established for the benefit of the company's senior management, and the director who instigated the transfer was liable for assisting in the breach of trust.[230] The trustees owe fiduciary duties in the same way as other

---

Wilberforce; *Re Munro's Settlement Trusts* [1963] 1 W.L.R. 145 at 149A; *I.R.C. v Eversden* [2002] EWHC 1360 (Ch); [2002] W.T.L.R. 1013 at [13]–[14] (affd [2003] EWCA Civ 668; [2003] W.T.L.R. 893); *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWCA Civ 139; [2016] 1 W.L.R. 160 at [13].

[219] *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 209A–C. See § 29-007.

[220] *Whaley v Whaley* [2011] EWCA Civ 617; [2012] 1 F.L.R. 735 at [112].

[221] *Schmidt v Rosewood Trust Ltd* [2003] 2 A.C. 709 at [51], [66]–[67], PC. See §§ 21-020, 21-078 onwards.

[222] See § 41-073.

[223] *Scott v National Trust for Places of Historic Interest or Natural Beauty* [1998] 2 All E.R. 705 at 718C–H *per* Robert Walker J.; cited with approval in *Maciejewski v Telstra Super Pty Ltd* (1998) 44 NSWLR 601 at 605; doubted in *Re Y Trust* [2011] JRC 135; 14 I.T.E.L.R. 687.

[224] See § 21-118.

[225] *Re Gulbenkian's Settlement Trusts (No.2)* [1970] Ch. 408.

[226] See §§ 26-010 and 26-011.

[227] See §§ 22-022.

[228] *Sainsbury v I.R.C.* [1970] Ch. 712; *Re Weir's Settlement Trusts* [1971] Ch. 145.

[229] *Gartside v I.R.C.* [1968] A.C. 553, HL.

[230] *Roadchef (Employee Benefit Trustees) Ltd v Hill* [2014] EWHC 109 (Ch).

050

This is a PDF of the original 20th Ed. main work

provisions, both positive and negative.[607] In others, only inconsistency with the negative provisions attracts the prohibition.[608]

12-209    The difference is significant. In the latter jurisdictions, a judgment is not expressly precluded from enforcement or recognition if the ground on which it was given falls outside the negative provisions, though within the positive; hence a foreign judgment which, say, held a trust to be a sham would not be precluded from enforcement or recognition, even if the foreign court had applied a test of shamming different from that of the local law. The same is true of a foreign judgment enforcing heirship rights where they do not affect a trust.[609] The local court may, however, take the view that enforcement or recognition, though not expressly prohibited by the negative provisions, is precluded by the local public policy embodied in the positive provisions.[610] Quite apart from public policy, it does not follow that even in the latter jurisdictions enforcement or recognition will be automatic, since a claimant will still have to satisfy the conditions laid down locally for the purpose; and in jurisdictions following the English rules, which are restrictive,[611] a claimant will find it difficult to do so. The Jersey courts have adopted a much wider test of comity for the enforcement of foreign judgments[612] but as Jersey is one of the jurisdictions with the more extended prohibition in its firewall, the wider test will still not permit enforcement there.[613]

*Decisions other than judgments*

12-210    Most firewall legislation refers without more to a foreign judgment[614] or to a foreign judgment or order of a court.[615] Some extend the prohibition on enforcement or recognition to a decision of any other foreign tribunal, whether in an arbitration or otherwise.[616]

---

[607]  As in the legislation in Gibraltar, Guernsey, Isle of Man and Jersey. See § 12-180 for the distinction between the positive and the negative provisions.

[608]  As in the legislation in The Bahamas, Bermuda, BVI, Cayman Islands and the DIFC.

[609]  *Walton v De la Haye*, unreported, August 14, 2015, EC CA at [54] onwards.

[610]  See *HSBC International Trustee Ltd v Tan Poh Lee*, unreported, November 7, 2019, at [17]–[19], [29], Cayman GC, holding that enforcement of any foreign judgment directing a distribution from the trust, ordering its termination or changing its trustee, though given on grounds falling outside the negative provisions of the Cayman firewall (foreign provisions as to non-recognition of trusts and heirship rights), was nonetheless precluded by the local public policy to be found in the positive provisions.

[611]  See §§ 11-115 to 11-118. The English rules are partly legislative but legislation in similar terms applies in much of the Commonwealth.

[612]  *Lane v Lane* 1985–86 J.L.R. 48; *Compass Trustees Ltd v McBarnett* (2002) 5 I.T.E.L.R. 44, Jers RC; *Mrs FM v ASL Trustee Co. Ltd* [2006] JRC 020A; *C.I. Law Trustees Ltd v Minwalla* [2005] JRC 099; 9 I.T.E.L.R. 601.

[613]  For the consequences of submission to the foreign jurisdiction, see § 12-214.

[614]  THE BAHAMAS: Trusts (Choice of Governing Law) Act 1989, s.10; BERMUDA: Trusts (Special Provisions) Act 1989, s.11(2); BVI: Trustee Act 1961, s.83A(19); CAYMAN ISLANDS: Trusts Law (2020 Revision), s.93; DIFC: Trust Law, DIFC No.4 of 2018, art.16

[615]  GUERNSEY: Trusts (Guernsey) Law 2007, s.14(4); ISLE OF MAN: Trusts Act 1995, s.5(2).

[616]  BVI: Trustee Act 1961, s.83A(1) (definition of "judgment"); GIBRALTAR: Trusts (Private International Law) Act 2015, s.4(2)(b), (5); JERSEY: Trusts (Jersey) Law 1984 (revised edn, 2019), art.9(4)(b).

051

This is a PDF of the original 20th Ed. main work

if the trustees merely remain supine.[132] The trustees may in consequence lose the benefit of a statutory protection.[133]

*Consequences of failure to act responsibly and in good faith*

29-040    If trustees give no genuine consideration of their own to the exercise of a power, acting merely on the promptings of others, then there is no real decision at all and the purported exercise of the power is void.[134] It is not obvious that the same is true of other failings falling under this head, such as acting irrationally or, if different, unreasonably, which we consider render the exercise voidable rather than void.[135] Adopting the opposite rule would introduce a difficult distinction between such cases and cases in which the trustees have failed to take relevant matters into account, when it is clear that the exercise is voidable and not void.[136]

### Duty of trustees (2)—to take only relevant matters into account

*General*

29-041    The trustees are under a duty to take relevant matters into account and ignore irrelevant matters.[137] The duty requires them to inform themselves, before taking a decision, of matters material to it, including where necessary advice from appropriate experts such as lawyers, accountants, actuaries, surveyors or scientists.[138] The obligation may be onerous, given the general rule that they cannot delegate their discretions,[139] but they must assess the expert advice themselves as best they can.[140]

29-042    It has been said in some recent authority that trustees are bound to take into account *all* relevant matters.[141] Taken literally the proposition cannot be correct.[142] Most decisions, whether taken by trustees or by any other person, could be better

---

[132]  *Re Greenwood* (1911) 105 L.T. 509; *Partridge v Equity Trustees Executors and Agency Co. Ltd* [1947] HCA 42; 75 C.L.R. 149.

[133]  See cases cited in previous footnote. Trustee Act 1925, s.15(e) formerly protected a trustee acting in good faith who gave time for payment of a debt and now (as amended by Trustee Act 2000, s.40 and Sch.2, Pt II, para.20) protects one who discharges the statutory duty of care (Trustee Act 2000, s.1(1)). In both its earlier and its present form it protects only a trustee who deliberately exercises the power.

[134]  See § 29-038.

[135]  In *Re Piedmont Trust* [2015] JRC 196; 19 I.T.E.L.R. 210, however, the Jersey court held both appointments of trustees and of protectors "invalid", apparently meaning void, because they were irrational, being appointments which no reasonable appointor could have made, see at [48]–[49], [51], [151], [153]–[154]. The court explicitly distinguished between grounds for holding the appointments invalid and grounds for removing the appointees (see at [155]) but did not discuss why they should be void rather than voidable. See further §§ 15-073 to 15-076 as to appointments of new trustees.

[136]  See §§ 30-041, 30-047; and also §§ 29-060, 29-061.

[137]  *Edge v Pensions Ombudsman* [2000] Ch. 602 at 627, CA.

[138]  *Stannard v Fisons Pensions Trust* [1992] I.R.L.R. 27, CA; *Scott v National Trust for Places of Historic Interest or Natural Beauty* [1998] 2 All E.R. 705 at 717, cited and approved in *Pitt v Holt* [2013] UKSC 26; [2013] 2 A.C. 108 at [10].

[139]  See §§ 28-110 onwards.

[140]  *Scott v National Trust*, above.

[141]  *Mettoy Pension Trustees Ltd v Evans* [1990] 1 W.L.R. 1587 at 1626; *Edge v Pensions Ombudsman* [2000] Ch. 602 at 627–628, citing *Harris v Lord Shuttleworth* [1994] I.C.R. 991, CA ("take into account all relevant but no irrelevant factors"), though *Harris* was a decision as to reaching a judgment on the existence of a fact; *Abacus Trust Co. (Isle of Man) v Barr* [2003] EWHC 114 (Ch);

052

This is a PDF of the original 20th Ed. main work

informed.[143] To hold the trustees to be in breach of duty for failing to consider every matter which they might sensibly regard as relevant would at best be burdensome on the trustees and, in cost and delay, on the beneficiaries; at worst it would paralyse decision-making.[144] The range of circumstances which require to be taken into account will depend upon the context. The point arises acutely when the trustees have to consider the rival claims of discretionary beneficiaries. The beneficiaries' needs and wishes are relevant matters[145] but a decision to make a distribution to a beneficiary on the ground of need is not a breach of trust even if the trustees have not ascertained the needs or wishes of all the beneficiaries.[146] No general obligation exists to consult them,[147] though in the case of powers of appointment there is some discussion in the decisions of the range of enquiry called for on the part of trustees; the point is considered elsewhere.[148] Time and quantum may play a part, in the sense that a decision to release a modest part of the trust fund to meet an urgent need of one of several beneficiaries may not require the same degree of enquiry and examination as would be required if there was no urgency or the proposed distribution affected a large part of the trust fund.[149] The duty to take relevant matters into consideration is in our view best regarded as an element in the duty to act responsibly, so that the trustees must have a rational basis for a decision but will be in breach of duty only if a given matter is so significant that a failure to take it into account would be irrational.[150]

**29-043**   If the trustees have actually exercised the power, the question whether they improperly took an irrelevant matter into account is likely to be equivalent to asking whether they committed a fraud on the power.[151] That will not be so, however, where the complaint is that they wrongly omitted to take a relevant matter into account when exercising the power or that they wrongly took account of an irrelevant matter when making only a provisional decision to exercise the power, for which they are seeking the approval of the court;[152] nor will it be so where they have refrained from exercising a power, whether by reason of taking account of an irrelevant matter or failing to take account of a relevant matter. Hence the duty is of broader scope than that embodied in the doctrine of fraud on a power.

**29-044**   Although the duty to take into account only relevant matters is frequently mentioned

---

[2003] Ch. 409 at [16]; *Sieff v Fox* [2005] EWHC 1312 (Ch); [2005] 1 W.L.R. 3811 at [109].

[142] That formulation was avoided in *Pitt v Holt* [2013] UKSC 26; [2013] 2 A.C. 108, where it was noted (at [64]) that the older cases tended to focus not on what should be taken into account but on what should not be taken into account.

[143] *Scott v National Trust*, above, at 718 ("based on less than complete information").

[144] *Scott v National Trust*, above, at 718, warning of undue stringency.

[145] See §§ 29-051 onwards.

[146] Compare *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 210. See, however, *McNulty v McNulty* [2011] NZHC 1173; 14 I.T.E.L.R. 361 at [118]–[128] and § 29-052.

[147] See § 28-116.

[148] See §§ 33-033.

[149] *Pitt v Holt* [2011] EWCA Civ 197; [2012] Ch. 132 at [117] (on appeal at [2013] UKSC 26; [2013] 2 A.C. 108).

[150] This paragraph was approved in *Tao Soh Ngun v HSBC International Trustee Ltd* [2019] HKCFI 1268 at [196]–[197], [200]. The last sentence was quoted in *Khan v Gany Holdings (PTC) SA*, unreported, March 14, 2016, at [93], EC CA (affd *sub nom. Gany Holdings (PTC) SA v Khan* [2018] UKPC 21; 21 I.T.E.L.R. 310).

[151] For fraud on the power, see §§ 30-066 onwards.

[152] As in *Jones v Firkin-Flood* [2008] EWHC 2417 (Ch) at [280].

053

This is a PDF of the original 20th Ed. main work

in the decisions, authority on what matters are relevant is more scanty.[153] A matter is relevant if it can properly be taken into account. The trust instrument may direct the trustees to take a specified matter into account.[154] Otherwise the relevance of any matter may be capable of being judged only in the light of the particular question or questions which the trustees have to ask themselves. In the case, for example, of a power to apply capital for the benefit of a given beneficiary the questions will be whether the proposed application will indeed be for the benefit of the beneficiary and, if so, whether they should make it notwithstanding the prejudice to those interested in capital in default of exercise of the power; hence the beneficiary's circumstances, his means and the means of those interested in default of exercise of the power, and his closeness to the settlor are all material. There are authorities on powers of various kinds canvassing the matters material to the exercise of the particular power.[155] Public policy may place constraints on the matters which the trustees may take into account.[156] It will commonly be obvious whether a given matter is relevant or irrelevant. But some matters will be relevant to most questions and can usefully be mentioned here.

*Settlor's wishes*

**29-045**   In a conventional family trust the funds comprised in the settlement are the settlor's bounty.[157] Except to the extent that he has reserved powers to himself or conferred them on third parties, the trustees are the means that he has chosen to benefit the beneficiaries out of property of his own. He could have done so by gifts made directly to them but instead has interposed a trust, so as to make continuing provision for them after his death or to give them the security of a proprietary interest, rather than a precarious dependency on him, or to take advantage of opportunities for tax planning or for a variety of other reasons. So far as the trustees are given dispositive powers, they are to make choices which the settlor could have made himself.

**29-046**   Trustees therefore rightly give great weight to the settlor's wishes, either expressed from time to time during his lifetime or recorded, usually in documentary form, before his death.[158] Letters or memoranda of wishes from the settlor are now commonplace; on occasion a precatory clause is inserted in the trust instrument, for example asking the trustees to consider someone as the primary beneficiary.[159] The significance of the settlor's wishes has grown with the growth of wide discretion-

---

[153] *Pitt v Holt* [2011] EWCA Civ 197; [2012] Ch. 132 at [114] (and on appeal at [2013] UKSC 26; [2013] 2 A.C. 108 at [64]); and compare the argument in *Independent Trustee Services Ltd v Hope* [2009] EWHC 2810 (Ch); [2010] I.C.R. 553 at [108(1)].

[154] *Re Fletcher Challenge Energy Employee Educational Fund* [2004] W.T.L.R. 199 at [43], NZ HC; *Sinclair v Moss* [2006] VSC 130.

[155] *e.g.* a list of considerations for pension trustees considering whether to increase benefits and, if so, which benefits is given in *Edge v Pensions Ombudsman* [2000] Ch. 602 at 626–627, CA. A list of considerations for trustees considering whether to exercise a power of addition of beneficiaries is given in *Tam Mei Kam v HSBC International Trustee Ltd* [2008] HKCFI 496; 11 I.T.E.L.R. 246 at [247] (on appeal [2010] HKCA 197; [2011] HKCFA 34); see § 33-061.

[156] *Independent Trustee Services Ltd v Hope*, above, at [118]–[120].

[157] The text in this and the next paragraph were approved in *Harrison v Harrison* [2015] NZHC 2935 at [53].

[158] The text in this and the next paragraph (now revised) were approved in *Re Shiu Pak Nin* [2014] 1 C.I.L.R. 173 at [188], [225], Cayman GC.

[159] As in *Foreman v Kingstone* [2005] W.T.L.R. 823, NZ HC. In *A1 v R1* [2015] W.T.L.R. 684, Guerns RC a memorandum of wishes was scheduled to the trust instrument.

054

[84]

ary trusts and powers in preference to trusts comprising wholly or mainly fixed interests. Without some guidance from the settlor, trustees would often have difficulty in identifying who ought to benefit. "The settlor's wishes", the Supreme Court has held, "are always a material consideration in the exercise of fiduciary discretions".[160] It was previously well established that the trustees are entitled to take serious account of the settlor's wishes[161] and it is the better view that they are bound to do so;[162] the notion that the trustees may be entitled to take it into account but not bound to do so is in our view wrong, for it is either a relevant consideration which in view of its importance ought to be taken into account or an irrelevant one which should not.[163] Where trustees of a discretionary trust could not agree on the manner in which the fund should be distributed, the court took the view that the majority had departed too far from the settlor's wishes, first directing a reconsideration by the trustees and then exercising the powers itself.[164] The trustees may properly be led by the settlor's wishes to take a decision which they would not otherwise have taken.[165] Repeated compliance on the part of a trustee with a settlor's wishes is not indicative of an abdication of duty; it is equally consistent with a properly-administered trust where the trustees have in good faith considered each request of the settlor, concluded that it is reasonable and decided that it is proper to accede to such requests in the interests of one or more of the beneficiaries of the trust.[166] The propriety of deference to the settlor's wishes is also reflected in the decisions on applications by beneficiaries for disclosure of letters or memoranda of wishes. Although such applications have met with varying degrees of success, no criticism is made in them of trustees who pay close attention to the settlor's

---

[160] *Pitt v Holt* [2013] UKSC 26; [2013] 2 A.C. 108 at [66].

[161] *Re Manisty's Settlement* [1974] Ch. 17 at 26; *Hartigan Nominees Pty Ltd v Rydge* (1992) 29 N.S.W.L.R. 405 at 427–431, NSW CA; *Re Rabaiotti's Settlements* [2000] W.T.L.R. 953 at 967–968, Jers RC; *Breadner v Granville-Grossman* [2001] Ch. 523 at [22], [66]; *Abacus Trust Co. (Isle of Man) v Barr* [2003] EWHC 114 (Ch); [2003] Ch. 409; *Re Esteem Settlement* [2003] JRC 092; [2004] W.T.L.R. 1 at [166]–[167], [215], Jers RC; *Kain v Hutton* [2005] W.T.L.R. 1024 at [301], NZ HC; on appeal [2007] NZCA 199; [2007] 3 N.Z.L.R. 349 at [272] and [2008] NZSC 61; 11 I.T.E.L.R. 130); *Charman v Charman* [2005] EWCA Civ 1606; [2006] 1 W.L.R. 1053 at [12].

[162] *Kain v Hutton*, above, at [301]. On a settlor's letter of wishes, see too *Hartigan Nominees v Rydge*, above, at 419 ("an essential component of, or companion to, the trust deed itself"); *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26; [2003] 2 A.C. 709 at [19], [33], [68(4)] ("exceptionally strong claims to be considered"). Compare, however, *Re Rabaiotti's Settlement*, above, at 968 ("an informal document which the trustees are free to ignore") and *Re Esteem Settlement*, above, at [215] ("no legal obligation"). On the significance of the settlor's wishes in the execution of a discretionary trust by the court, see *McPhail v Doulton* [1971] A.C. 424, HL, at 457 (execution "in the manner best calculated to give effect to the settlor's or testator's intentions") and § 33-035.

[163] Compare Underhill and Hayton, *Law of Trusts and Trustees* (19th edn), §§ 56.53 to 56.59, which draws a distinction between "legally significant" letters of wishes, which have to be considered by the trustees, and "morally binding" letters of wishes, which do not. As to the latter, it is no doubt open to the settlor to write a letter of wishes to the trustees on terms that it is to be of no legal significance at all but in that case it appears to us that the letter is an irrelevant consideration which should be disregarded. The trust instrument could no doubt provide that the trustees should be entitled to take a letter of wishes into account but not bound to do so.

[164] *AB v CD* [2019] EWHC 2323 (Ch) and [2019] EWHC 2324 (Ch), where there seems (see first judgment at [10]) to have been a proposal on the part of some of the trustees to buy off certain beneficiaries.

[165] *Kain v Hutton* [2007] NZCA 199; [2007] 3 N.Z.L.R. 349 at [272] (on appeal [2008] NZSC 61; [2008] 3 N.Z.L.R. 589); *Tao Soh Ngun v HSBC International Trustee Ltd* [2019] HKCFI 1268 at [140(3)].

[166] *Re Esteem Settlement*, above, at [167], approved in *Kan v Poon* [2014] HKCFA 65; 17 I.T.E.L.R. 841 at [35]; *Tao Soh Ngun v HSBC International Trustee Ltd*, above, at [140(4)].

055

wishes.[167] In a different context, the court has treated it as a sufficient reason for overturning an appointment made by trustees that they believed that they were thereby giving effect to the settlor's wishes when in fact, through a misunderstanding, they were not.[168]

**29-047**   No particular formality is required to convey or record the settlor's wishes, though a written letter or memorandum is convenient for obvious reasons. His wishes are a material consideration for trustees even when the wishes are not formally recorded.[169] Moreover, trustees are entitled to have regard to the settlor's wishes expressed from time to time and are not confined to those expressed contemporaneously with the creation of the trust.[170]

**29-048**   When the trust is a charitable trust, it seems that the trustees should likewise give weight to the settlor's wishes. Authorities make it clear that the court itself, when giving directions to charity trustees, will treat the settlor's wishes as important.[171] From that principle, and from the rule applicable to private trusts, it must follow that the trustees themselves should do so.

**29-049**   Trustees, however, must form their own view when exercising their dispositive powers and must not unthinkingly act as ciphers for the settlor, whether alive or dead; to do so is a breach of trust[172] and leaves their decision open to challenge.[173] The settlor's wishes are ordinarily not binding[174] except to the extent that the trust instrument makes them so, and in a letter or memorandum of wishes they are commonly expressed not to be binding. Indeed, it would not be a ground for challenging the exercise of a discretion that the trustees had thereby departed from the settlor's wishes.[175] Curious circumstances might arise, however, in which a letter or memorandum of wishes had to be treated as comprising part of the terms of the

---

[167]   See §§ 21-066 onwards on disclosure of the settlor's letter of wishes.

[168]   *Abacus Trust Co. (Isle of Man) v Barr* [2003] Ch. 409, approved in *Pitt v Holt* [2013] UKSC 26; [2013] 2 A.C. 108).

[169]   *Re A Trust, Investec Co. Trustees Ltd v Kidd* [2012] JRC 066 at [62]–[63]; *Slutsker v Haron Investments Ltd* [2012] EWHC 2539 (Ch) at [37] (on appeal [2013] EWCA Civ 430; 16 I.T.E.L.R. 257).

[170]   *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26, [2003] 2 A.C. 709, at [20], [33]; *Re Esteem Settlement* [2003] JRC 092; [2004] W.T.L.R. 11, at [166], [215]; *Chambers v S R Hamilton Corporate Trustee Ltd* [2017] NZCA 131; [2017] N.Z.A.R. 882 at [36]–[38] (implied); *Re R Trust* [2019] SC (Bda) 36 Civ; 22 I.T.E.L.R. 123 (implied).

[171]   *Att.-Gen. v Dedham School* (1857) 23 Beav. 350 at 355 ("What this Court looks at, in all charities, is the original intention of the founder, and … this Court carries into effect the wishes and intentions of the founder of the charity"); *Re J.W. Laing Trust* [1984] Ch. 143 at 154 ("The court should always be slow to thwart a donor's wishes"); *A v B Management Ltd* [2011] JRC 070; 14 I.T.E.L.R. 233, Jers RC. See too *Re Hampton Fuel Allotment Charity* [1989] Ch. 484, CA, where the court held that the settlor could be a "person interested" for the purpose of what is now Charities Act 2011, s.115(1) and hence eligible to apply to the court for directions concerning the charity.

[172]   *I.R.C. v Schroder* [1983] S.T.C. 480 at 505; *Re Rabaiotti's Settlements*, above, at 189. Compare *Turner v Turner* [1984] Ch. 100; see § 29-038.

[173]   *Pitt v Holt*, above, at [66]–[67], criticising "unquestioning obedience to the settlor's wishes"; *Re R Trust* [2019] SC (Bda) 36 Civ; 22 I.T.E.L.R. 123 at [36].

[174]   *Bank of Nova Scotia Trust Co. (Bahamas) Ltd v Barletta* (1996) 1 B.O.C.M. 5, Bah SC (decided 1984); *Hartigan Nominees Pty Ltd v Rydge*, above; *Re Rabaiotti's Settlements*, above, at 189; *Hui Chi Ming v Koon Wing Yee* [2010] HKCFI 371; [2010] 4 H.K.C. 86 at [56]–[57]; *Re A and B Trusts* [2012] JRC 169A, [2013] W.T.L.R. 1117 ("without any obligation to follow them"); *Re R Trust*, above, at [36]; *Tao Soh Ngun v HSBC International Trustee Ltd* [2019] HKCFI 1268 at [64].

[175]   *Kain v Hutton* [2005] W.T.L.R. 1024 at [301], NZ HC (on appeal at [2007] NZCA 199; [2007] 3 N.Z.L.R. 349 and [2008] NZSC 61; 11 I.T.E.L.R. 130). It was said in *Re R Trust*, above, at [37] that

056

trust itself and so as binding. Moreover, a provision is unobjectionable in a trust instrument which directs the trustees to give effect, so far as possible, to any expression of wishes in the settlor's will.[176]

The trustees' administrative powers stand on a somewhat different footing. In practice the only administrative power likely to give rise to any difficulty in this context is the power of investment. In general terms, a power of investment is to be exercised with a single eye to the benefit of the beneficiaries, the trustees owing a duty of care and other duties concerning suitability and diversification.[177] The trustees could not give effect to a request from the settlor that the trust property should be invested in a way intended to benefit a non-beneficiary. Nor could they give effect to any wishes which conflicted with the rights of particular beneficiaries, such as an investment in high-interest securities for the benefit of a life tenant and to the prejudice of remaindermen, unless the trust instrument permitted them not to hold an even hand between the beneficiaries.[178] On the other hand, there are circumstances in which the settlor's wishes are consistent with the performance of the trustees' duties concerning investment, especially in trusts holding land or chattels with a historic family connection with the beneficiaries, or shares in a family company. Even in this context, however, what is feasible and sensible as an investment matter is capable of objective assessment, and the settlor's wishes cannot by any means be decisive.[179] Hence trustees cannot justify a refusal to sell a property on the ground that the settlor wished it to be retained as an ancestral home when to do is of no benefit to the beneficiaries.[180] A settlor who wishes to impose restrictions on the disposition of historic family assets, or shares in family company, is well advised to do so in the trust instrument and not to rely on a letter of wishes seeking to limit or control the exercise of investment powers in wide terms.

**29-050**

### *Beneficiaries' wishes and needs*

It is obvious that trustees may and should take into account the wishes of beneficiaries and their needs.[181] That is the reason why consultation with beneficiaries is encouraged and in some cases required, though the wishes so expressed are not binding on the trustees.[182] The provision of accommodation, the cost of children's upbringing and education and the settlement or disposal of proceedings for financial provision on divorce are all common matters for trustees to take into account when exercising their dispositive powers. Beneficiaries' wishes of a less commonplace kind are also to be taken into account and may be decisive. Hence it is proper for

**29-051**

---

even in an application for approval of a decision of trustees under *Public Trustee v Cooper* it was not necessary for trustees to explain why they were departing from the settlor's wishes. For such applications, and the trustees' duty to disclose their reasons, see §§ 39-072, 39-076 to 39-083.

[176] *Power v Ekstein* [2000] NSWSC 905.

[177] See §§ 35-055 onwards.

[178] For the duty to hold an even hand, see §§ 23-113 onwards.

[179] *Bank of Nova Scotia Trust Co. (Bahamas) Ltd v Barletta*, above.

[180] *Seng v Tuang* [2012] SGCA 41; 15 I.T.E.L.R. 286.

[181] *Fraser v Murdoch* (1881) 6 App. Cas. 855 at 864, 867, 878; *Re Boston's Will Trusts* [1956] Ch. 395 at 406 (means); *Marley v Mutual Security Merchant Bank and Trust Co. Ltd* [1991] 3 All E.R. 198 at 210, PC; *Re Esteem Settlement* [2003] JRC 092; [2004] W.T.L.R. 1 at [165]; *Pitt v Holt* [2011] EWCA Civ 197; [2012] Ch. 132 at [114] ("so far as made known to the trustees") (on appeal at [2013] UKSC 26; [2013] 2 A.C. 108); *Whaley v Whaley* [2011] EWCA Civ 617; 14 I.T.E.L.R. 1 at [112] (citing this passage).

[182] See § 28-116.

057

This is a PDF of the original 20th Ed. main work

trustees to exercise a power of appointment, at the request of a beneficiary, so as to make a charitable donation which the beneficiary feels under a moral obligation to secure.[183]

**29-052**  As with taking account of the settlor's wishes,[184] the trustees are not bound by the beneficiaries' wishes and must form their own view. They need not follow the wishes of a beneficiary though she has an "overwhelmingly preponderant interest" in the trust property[185] and even all the beneficiaries collectively cannot direct the trustees in the exercise of their powers.[186]

**29-053**  A beneficiary, moreover, has no general right to a hearing from the trustees,[187] not even when the exercise of the power depends on a judgment as to a state of facts.[188] The rules of natural justice do not apply.[189] It seems, however, that there may be occasions when the trustees would be acting unreasonably if they failed to give a beneficiary an opportunity to persuade them against a particular course.[190] In that limited sense the concept of legitimate expectation, well known in public law, may have some part to play in the law of trusts.[191] So the sudden discontinuance of a modest income payment to an elderly and impoverished beneficiary which had previously been made over a long period is liable to be challenged as unreasonable.[192] Similarly, it seems that the trustees ought to take into account any previous indications that they have given to the beneficiaries as to the manner in which they might exercise their powers in the future;[193] precisely for that reason, however, it is generally preferable for trustees to avoid giving such indications, even though expressed not to be binding.[194] If a beneficiary may gain expectations from a course of conduct, as where discretionary distributions of income or capital have been made for several years, trustees will be well advised to inform the beneficiary

---

[183]  *Re Clore's Settlement Trusts* [1966] 1 W.L.R. 955; but see *X v A* [2005] EWHC 2706 (Ch); [2006] 1 W.L.R. 741.

[184]  For which see § 29-049.

[185]  *Re Steed's Will Trusts* [1960] Ch. 407 at 417–418, CA. Compare *Williams v Holland* [1965] 1 W.L.R. 739 (executor).

[186]  See § 22-024.

[187]  *Pelensky v Alberta Stock Exchange* (1992) 96 D.L.R. (4th) 252; *R. v Charity Commissioners, ex p. Baldwin* [2001] W.T.L.R. 137; *Crociani v Crociani* [2017] JRC 146 at [460], citing this paragraph with an incorrect reference (reversed in part on other points *sub nom. BNP Paribas Jersey Trust Corp. Ltd v Crociani* [2018] JCA 136A).

[188]  *R. v Charity Commissioners, ex p. Baldwin*, above.

[189]  *Karger v Paul* [1984] V.R. 161 at 166, Vic SC, followed in *R. v Charity Commissioners, ex p. Baldwin*, above, at 48; *Stuart v Armourguard Security Ltd* [1996] 1 N.Z.L.R. 484, NZ HC; *McNulty v McNulty* [2011] NZHC 1173; 4 I.T.E.L.R. 361 at [97], [105]; *Re Y Trust* [2011] JRC 135; 14 I.T.E.L.R. 687 at [55] onwards, quoting this paragraph.

[190]  *Scott v National Trust for Places of Historic Interest or Natural Beauty* [1998] 2 All E.R. 705 at 718.

[191]  *Scott v National Trust for Places of Historic Interest or Natural Beauty*, above, at 718. At most, however, such an expectation may give rise to a claim to an opportunity to influence the trustees, not to a claim that they are bound to reach a particular decision: *Tao Soh Ngun v HSBC International Trustee Ltd* [2019] HKCFI 1268 at [174]–[177].

[192]  *Scott v National Trust for Places of Historic Interest or Natural Beauty*, above, at 718.

[193]  *Cameron v M & W Mack (Esop) Trustee Ltd* [2002] W.T.L.R. 647. The trustees, however, cannot bind themselves as to the future exercise of their discretions: see §§ 29-095 onwards. Hence even clear indications that they will decide in a particular way are not binding on them: *Re Y Trust*, above.

[194]  *Re B Trust, RBS Coutts (Cayman) Ltd v W* (2010) 14 I.T.E.L.R. 557, Cayman GC, at [41]–[42]. But in applications under the Variation of Trusts Act 1958, it is common for trustees to state how they would be likely to exercise their discretion in the absence of the arrangement for which approval is sought, so as to assist the court in assessing its benefits: see § 53-060.

058

This is a PDF of the original 20th Ed. main work

that he cannot expect such distributions to be made automatically in the future. We consider that indications from a trustee may be of greater importance as a relevant consideration on the exercise of powers if a beneficiary has relied on them to his detriment, for instance where the beneficiary gives property away or makes a charitable donation after an indication that provision would be made for him by trustees. It has been said to be at least arguable that trustees may need on the particular facts of a given case to make enquiries as to the respective positions of the class of beneficiaries.[195]

### *Trustees' personal preferences*

When trustees consider exercising a discretionary power it is an occasion for form- **29-054** ing a judgment but not for indulging their personal preferences. Where the power is a power of appointment, they may properly take into account their views of the prudence of any proposed appointee and generally of his suitability for the appointment: if they are, say, deciding the destination of an estate they are free to give effect to their assessment of the respective characters of the possible recipients. But personal spite or resentment or disapproval as to style of life are irrelevant considerations which must be ignored, so that where one of two trustees refused to exercise a power of advancement in favour of her daughter because the daughter had married without her consent the court interfered.[196] Disapproval of inherited wealth is not a proper ground for the exercise or non-exercise of a power to apply trust funds,[197] though it is of course proper to have regard to the effect of a proposed exercise on those who would be prejudiced by it.[198] In the exercise of powers of investment, the trustees' own views about moral and political issues must be set aside[199] and similar considerations apply in the exercise of dispositive powers. We consider that charity trustees would likewise be unable to defend a refusal to accept a donation from a source of which they personally disapproved unless acceptance would in some way prejudice the charity, for example by deterring other donors.[200]

### *Tax considerations*

The fiscal consequences, if any, of exercising a power in a given way are amongst **29-055** the matters which the trustees should take into account.[201] The relevant fiscal consequences are the fiscal consequences for the beneficiaries, not others such as the settlor, though if (say) a beneficiary is to be excluded as part of the exercise the

---

[195] *McNulty v McNulty* [2011] NZHC 1173; 14 I.T.E.L.R. 361 at [118]–[128].

[196] *Klug v Klug* [1918] 2 Ch. 67.

[197] *X v A* [2006] 1 W.L.R. 741 at [47].

[198] *X v A*, above, at [47].

[199] *Harries v Church Commissioners for England* [1992] 1 W.L.R. 1241 at 1247E–F (charity trustees "must not use property held by them for investment purposes as a means for making moral statements"). We consider the point more fully at §§ 35-061 onwards.

[200] Compare *Harries v Church Commissioners for England*, above (investments which might deter potential donors).

[201] *Green v Cobham* [2000] W.T.L.R. 1101; *Abacus Trust Co. (Isle of Man) Ltd v National Society for the Prevention of Cruelty to Children* [2001] S.T.C. 1344 at [15]–[18]; *Sieff v Fox* [2005] EWHC 1312 (Ch); [2005] 1 W.L.R. 3811 at [86]; *Pitt v Holt* [2013] UKSC 26; [2013] 2 A.C. 108 at [65]. The first three of those authorities, applying the so-called principle of *Re Hastings-Bass*, now have to be read in the light of the last; but the relevance of tax considerations was expressly affirmed in it.

059

This is a PDF of the original 20th Ed. main work

| | |
|---|---|
| Mistake in rectification after *Pitt v Holt* .......... | 5-081 |
| Need for an issue between the parties .......... | 5-084 |
| Mistakes by trustees in relation to the exercise of their powers ................................ | 5-085 |
| *Locus standi* to apply for rescission and rectification on the ground of mistake ...................... | 5-086 |
| Bars to rescission and rectification on the ground of mistake ................................ | 5-089 |
| Rescission or rectification on the ground of mistake—practical considerations ..................... | 5-090 |
| Rectification of wills ......................... | 5-093 |
| Rescission or rectification on the ground of mistake—settlements executed by way of bargain .......... | 5-094 |
| Rescission on the grounds of fraud, duress, misrepresentation or undue influence ............ | 5-095 |
| Undue influence .......................... | 5-096 |
| Rebutting the presumption of undue influence .... | 5-097 |
| Cancellation of documents ..................... | 5-098 |

## 1.   VALIDITY OF AND CHALLENGES TO EXPRESS TRUSTS

**Overview**

For the creation of the legal relationship of trustee and beneficiary to take place,[1] certain essential conditions must be satisfied. For a trust to be valid and enforced by the court under its equitable jurisdiction, there must first be an intention to create a trust, together with certainty of both subject-matter and objects. Every non-charitable trust must be for the benefit of identifiable individuals, or a purpose which such individuals can apply to the court to enforce. Even in those cases where an express trust is on its face valid, equity has developed various doctrines which permit the court to declare that an express trust is invalid, or liable to be rectified. The court may declare that there is no trust at all, for it is a sham. In such a case, of course, there will never have been a genuine intention to create the relationship of trustee and beneficiary in the first place. Equity will also intervene to rectify or to set a trust aside in order to grant relief from the settlor's mistake. It will also set a trust aside where it would be unconscionable to enforce it in the circumstances in which it was procured.

**5-001**

## 2.   THE REQUISITE INTENTION TO CREATE A TRUST

**General principle**

Wherever a person having a power of disposition over property[2] manifests any intention that it be held upon trust for another,[3] the court, where any necessary

**5-002**

---

1   See §§ 1-001 onwards.
2   As to who is a competent settlor, see §§ 2-002 to 2-013, and as to what property may be subjected to a trust, see §§ 2-034 to 2-041.
3   As to who may be a beneficiary, see §§ 2-025 to 2-034.

060

This is a PDF of the original 20th Ed. main work

formal requirements[4] (such as that of writing) have been complied with, will execute that intention, however informal the language in which it happens to be expressed, so long as the three particulars mentioned in the next paragraph can be gathered from the language used.

### The "three certainties"

5-003  Lord Langdale M.R. declared[5] three essentials for the creation of a trust:

> "As a general rule it has been laid down, that when property is given absolutely to any person, and the same person is by the giver who has power to command, recommended, or entreated or wished, to dispose of that property, in favour of another, the recommendation, entreaty or wish shall be held to create a trust:
>
> *First*, if the words are so used, that upon the whole, they ought to be construed as imperative,
>
> *Secondly*, if the subject of the recommendation or wish be certain; and,
>
> *Thirdly*, if the object or persons intended to have the benefit of the recommendation or wish be also certain."

The "three certainties" which must be found in a declaration of trust are therefore certainty of *words*,[6] certainty of *subject-matter*[7] and certainty of *objects*.[8] Although they are conceptually distinct, it has been said that in practice they can seldom be separated.[9]

### Certainty of words

5-004  The words of a declaration of trust must show an intention on the part of the settlor that a trust should be created. In most cases, there is no difficulty in discovering such an intention because the settlor directs that the trust property is to be held "in trust" or "upon trust". In some cases, however, it is doubtful whether the words indicate the necessary intention and the doubtful cases are discussed in the next pages. But as they mostly arise on the construction of wills, the following discussion is brief, and references are given to the leading works on that subject.[10]

### Inferred or "precatory" trusts

5-005  Testators often and settlors *inter vivos* occasionally[11] use words precatory[12] or recommendatory or expressing a belief when they mean to declare a trust. In the

---

4    See §§ 3-008 onwards.
5    In *Knight v Knight* (1840) 3 Beav. 148 at 172.
6    See §§ 5-004 to 5-019.
7    See §§ 3-005, 3-006.
8    See §§ 5-045 to 5-051.
9    *High Commissioner for Pakistan in the United Kingdom v Prince Muffakham Jah* [2019] EWHC 2551 (Ch) at [245].
10   See generally *Jarman on Wills* (8th edn), Vol.2, Chap.XXV; *Theobald on Wills* (18th edn), Chaps 13 and 26; *Williams on Wills* (10th edn), Vol.1, Chaps 50, 53 and 82.
11   *Liddard v Liddard* (1860) 28 Beav. 266; *Hill v Hill* [1897] 1 Q.B. 483.
12   The term, "precatory trust" has been described as a misleading nickname, for if precatory words are held to establish a trust, then there is an imperative trust: *Re Williams* [1897] 2 Ch. 12 at 27, CA.

061

the case of a completely constituted trust, even though the subject matter of the trust is a contractual right, and therefore does not apply to such cases as are discussed above.[83] They are cases of perfected trusts of contractual rights.

*Trusts of bank accounts*

5-018 Instances can be found of informal declarations of trust of bank accounts, for instance where a mail order company paid customers' deposits into a "Customers' Trust Deposit Account"[84] and where a depositor in a bank frequently told the woman he was living with, "the money is as much yours as mine".[85]

*Position where no trust*

5-019 Even where there is no trust, if A contracts with B to confer a benefit on C, B can obtain specific performance, compelling A to confer the benefit on C.[86] But B is not entitled, merely because he provided the consideration, to intercept the benefit for himself, unless A agrees: A can insist on performing the contract according to its terms.[87]

### 3.   TRUSTS HELD TO BE SHAMS

## General principle

5-020 In certain circumstances, the courts have found that a settlor has not created a trust at all, on the ground that what on its face is a declaration of trust was a sham.[88] In those decisions, a declaration of trust is ineffective as a sham,[89] or pretence,[90] if the parties to the declaration intended not to create a trust, but instead to give a false impression to third parties and ultimately the court.[91] Properly understood thus,

---

[83] *Fletcher v Fletcher* (1844) 4 Hare 67; *Royal Exchange Assurance v Hope* [1928] Ch. 179. See too *Re Patrick* [1891] 1 Ch. 82, where the benefit of an existing contract was settled.

[84] *Re Kayford Ltd* [1975] 1 W.L.R. 279; and see *Re Nanwa Gold Mines Ltd* [1955] 1 W.L.R. 1080 ("application moneys [on subscription for shares] will be refunded and meanwhile will be retained in a separate account").

[85] *Paul v Constance* [1977] 1 W.L.R. 527, CA. Payment into a separate bank account is a useful indication of an intention to create a trust, but is by no means essential: *Re Kayford*, above, at 282; *Lehman Brothers International Europe (in admin) v CRC Credit Fund Ltd* [2012] UKSC 6; [2012] 3 All E.R. 1 at [194].

[86] *Beswick v Beswick* [1968] A.C. 58, HL.

[87] *Re Stapleton-Bretherton* [1941] Ch. 482; *Re Schebsman* [1944] Ch. 83, approved in *Beswick v Beswick*, above.

[88] *Midland Bank v Wyatt* [1997] 1 B.C.L.C. 242 (deed "not to be acted on but put in the safe for a rainy day"); *Ashe (Trustee in Bankruptcy of Mumford) v Mumford* [2001] B.P.I.R. 1, CA (affirming a decision that a purported trust was ineffectual as the naming of beneficiaries was "nothing more than window-dressing"); *R. v Allen* [1999] S.T.C. 846, CA (affd [2001] UKHL 45; [2002] 1 A.C. 509 (no appeal on sham); jury found Gibraltar and Jersey settlements were shams); *Minwalla v Minwalla* [2004] EWHC 2823 (Fam); [2005] 1 F.L.R. 771. See too *Rahman v Chase Bank (C.I.) Trust Co. Ltd* 1991 J.L.R. 103, Jers RC; Hitch v Stone [2001] EWCA Civ 63; [2001] S.T.C. 214; and the other authorities considered in the following two paragraphs where the requisite intention to create a trust was found not to exist. See Conaglen (2008) 68 C.L.J. 176.

[89] For the precise effect, see § 5-028.

[90] The word preferred in some of the authorities, including *A.G. Securities v Vaughan* [1990] 1 A.C. 417 at 462H, HL, *per* Lord Templeman (clause in a lease dressed up as a licence).

[91] *CR v MZ* [2013] EWHC 295 (Fam); [2014] W.T.L.R. 233 at [83]. Further, on the necessary intent,

062

This is a PDF of the original 20th Ed. main work

there is no such thing as a 'sham trust', but merely a document purporting to create a trust which does not in fact exist. The question whether a trust is a sham is a different question from the question whether the control of the settlor over the trust fund and its income under the terms of the trust is so extensive that the trust is invalid on the basis that the purported settlor has never parted with the beneficial interest in the trust property;[92] and it does not follow from a decision that a trust is not a sham that such an outcome should not follow where the facts justify it.[93]

*The shamming intent*

In addition to the intention not to give effect to the trusts, the authorities require an intent to give a false impression.[94] The parties will in the nature of things usually have some side intent or there would be no point in their entering into a document they mean to disregard. It is difficult to establish the necessary intent, "[b]ecause a finding of sham carries with it a finding of dishonesty, because innocent third parties may often rely on the genuineness of the provision or agreement, and because the court places great weight on the existence and provisions of a formal signed document".[95] There is a requirement of very clear evidence given the seriousness of the allegation, and a presumption that parties intend to be bound by documents they enter into, but the question of sham is determined on the balance of probabilities.[96] Subsequent actions of the parties in disregarding the trusts declared are admissible in evidence to establish that they intended at the time when the trusts were declared never to carry them out,[97] though not on any question of interpreta-

**5-021**

---

and in particular on whether it must be shared by the trustees, see the following two paragraphs.

[92] Such circumstances are best not described as involving the creation of an "illusory trust", see § 5-035.

[93] *Clayton v Clayton (No.1)* [2016] NZSC 29; 19 I.T.E.L.R. 406 at [118]–[130] and [133]. See §§ 5-031 to 5-035.

[94] *Hitch v Stone* [2001] EWCA Civ 63; [2001] S.T.C. 214 at [66]; *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [45], [58] (affd on other issues [2002] EWCA Civ 1541; [2002] 1 B.C.L.C. 55); *Carman v Yates* [2004] EWHC 3448 (Ch); [2005] B.P.I.R. 476 at [219]; *Equuscorp Pty Ltd v Glengallan Investments Pty Ltd* [2004] HCA 55; 218 C.L.R. 471 at [46]: "[sham] refers to steps which take the form of a legally effective transaction but which the parties intend should not have the apparent, or any, legal consequences"; *Hill v Spread Trustee Co. Ltd* [2005] EWHC 336 (Ch); [2005] B.P.I.R. 842 at 907 (affd on other issues [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404); *Raftland Pty Ltd v Commissioner of Taxation* [2008] HCA 21; 238 C.L.R. 516. The position in Canada is different. There is no requirement of tortious deceit and it is enough that the parties to a transaction present it as being different from what they know it to be: *Antle v R* [2010] FCA 280; 13 I.T.E.L.R. 591 at [15]–[22]. For a summary of the requirements for a trust to be held a sham, see *Bhura v Bhura* [2014] EWHC 727 (Fam); [2015] 1 F.L.R. 153 at [9]; *Raja v van Hoogstraten*, unreported, February 26, 2018, Ch D, at [39].

[95] *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [45], [59] (tenancy agreement and sale of land held not to be shams) (affd on other issues [2002] EWCA Civ 1541; [2002] 1 B.C.L.C. 55). And see *Carman v Yates*, above, at [219]; and *Hill v Spread Trustee Co. Ltd*, above, a case of a settlement, relying on this passage. Because of the need to prove intent, a plea of sham is unlikely to be capable of determination on written evidence alone: see *Ghassemian v Tigris Industries Inc* [2016] EWCA Civ 269 for a case where a finding of sham was overturned on appeal, but where the claimants were not entitled to a retrial, and their claim was dismissed, because they had agreed to a trial on written evidence at first instance.

[96] *Bhura v Bhura*, above, at [9]. The court may examine external evidence such as the parties' explanations and their subsequent conduct.

[97] *A.G. Securities v Vaughan* [1990] 1 A.C. 417 at 475–476, HL, *per* Lord Jauncey; *Minwalla v Minwalla* [2004] EWHC 2823 (Fam); [2005] 1 F.L.R. 771, where the judgment relies largely on subsequent acts, and see *Rahman v Chase Bank (C.I.) Trust Co. Ltd* 1991 J.L.R. 103, Jers RC. The court should not declare a trust to be valid, relying on the presumption of validity described in

[163]

tion of the trusts.[98] Evidence of effective control by a person other than the trustee is not sufficient to prove a sham, but is admissible to establish that a trust is a sham if it indicates that it was not intended at the outset that the trust take effect according to its terms.[99] If, however, such an intention is not established, then in subsequently disregarding the trusts declared the trustees are simply in breach of trust.[100] In considering subsequent actions of the trustees in complying with the settlor's wishes about the administration of the trusts, it is necessary to see whether the trustees were acting in disregard of the trusts declared, which would point towards a shamming intent, or whether they were instead exercising their own discretions under the trusts, albeit in ways influenced by the settlor, which would not point to such an intent.[101]

### *Relevance of motive as distinct from intention*

**5-022** For a transaction to be genuine, it is sufficient that the parties intended it to be given effect in the form in which it is recorded, and the courts will not inquire into their motives for so intending. As Knox J. stated in *Chase Manhattan Equities Ltd v Goodman*,[102] "impropriety of motive alone will not provide grounds for treating a transaction as a sham"; and Megarry J. in *Miles v Bull*[103] stated that "a transaction is no sham merely because it is carried out with a particular purpose or object. If what is done is genuinely done, it does not remain undone merely because there was an ulterior purpose in doing it."[104]

---

*National Westminster Bank v Jones Plc v Jones* [2001] 1 B.C.L.C. 98 at [59] where there is insufficient evidence about the trust assets and the history of the administration of the trust: *Re The Brazilian Trust* [2018] JRC 081A at [54], [62].

[98] *Chase Manhattan Equities Ltd v Goodman* [1991] B.C.L.C. 897 at 923. On the question of the relationship between the doctrine of sham and the construction of trust instruments, see §§ 5–031 to 5–035.

[99] *Official Assignee v Wilson* [2007] NZCA 122; [2008] 3 N.Z.L.R. 45 at [71]; *Rosebud Corporate Trustee Ltd v Bublitz* [2014] NZHC 2018 at [92]. But a trust is not a sham merely because a third party controls the trustee—what is in New Zealand called the alter ego trust, see § 5-042.

[100] Parties to a contract could agree to depart from its terms but continue to allow its "shadow to mask their new arrangement" as part of a pretence: *Marac Finance Ltd v Virtue* [1981] 1 N.Z.L.R. 586 at 588, NZ CA, followed in *Raftland Pty Ltd v Commissioner of Taxation* [2008] HCA 21; 238 C.L.R. 516 at [149], but it is hard to see how the settlor and trustees could alter the trusts by such a mere informal agreement between themselves. In *Ben Nevis Forestry v Commissioner of Inland Revenue* [2008] NZSC 15; [2009] 2 N.Z.L.R. 89 at [33], it was suggested that "a document which originally records the true common intention of the parties may become a sham if the parties later agree to change their arrangement but leave the original document standing and continue to represent it as an accurate reflection of their arrangement". See too *Keach v Keach* [2011] FamCA 192 at 172.9–172.11; *Lewis v Condon* [2013] NSWCA 204; 85 N.S.W.L.R. 99 at [80]–[82]; *De Santis v Aravanis* [2014] FCA 1243; 227 F.C.R. 404 at [55]–[65].

[101] Further, on the effect of a settlor having practical control, see §§ 5-031 to 5-040.

[102] [1991] B.C.L.C. 897 at 921i.

[103] [1969] 1 Q.B. 258 at 264.

[104] Nor is it undone merely because the document does not accurately record what they intended to achieve: *Pankhania v Chandegra* [2012] EWCA Civ 1438; [2013] W.T.L.R. 101 (party made a tenant in common for convenience, in order to obtain a mortgage, although allegedly intended to be only a legal owner). The defendant argued that the trust was a sham. The CA held, at [22], that the declaration of trust was entered into as a convenient way for the parties to obtain a mortgage and could not be a sham as it did not involve giving a false impression of the parties' legal ownership of the property to the mortgagee or the court, and the lender was not concerned with beneficial ownership. See too *ND v SD* [2017] EWHC 1507 (Fam); [2018] 1 F.L.R. 1489 at [240]–[242].

064

This is a PDF of the original 20th Ed. main work

*The trustees or other parties to a declaration*

The general rule is that, for a transaction to be a sham, all the parties to it must share the necessary intent.[105] Thus, if the trustees are parties to the declaration of trust, then they normally must, for it to be held a sham, be implicated in the intention that the trusts are not to be given effect. The general principle applies to a declaration of trust to which the trustees or others, such as a protector, are parties, though as they are volunteers it is enough that they are prepared to go along with the trusts (created primarily by the settlor) being ignored,[106] or are recklessly indifferent as to the settlor's true intentions.[107] If the original trustees do not share the settlor's shamming intent then the settlor will have placed assets under the control of trustees who will administer them in accordance with the trust instrument, and the settlor's private intention that the instrument should be a sham will have no effect.[108] Further, as a matter of evidence, unless the settlor has reason to believe that the trustees will go along with ignoring the trusts, and will be willing to treat the settlor as still the owner of the trust property, the settlor can hardly expect that this will happen, and so can hardly be found to have intended that it should.[109]

**5-023**

If the trustee, protector, settlor or other party to the alleged sham is a corporate entity then its intentions are those attributable to the natural person or persons who manage and control its relevant conduct,[110] which is most likely to be the decision to enter into the trust deed. If the settlor has a nominee on the board of the corporate trustee, or the directors follow his instructions without question, then the intentions of the settlor may be attributable to the corporate trustee.[111]

**5-024**

---

[105] *Snook v London and West Ridings Investments Ltd* [1967] 2 Q.B. 786 at 802D–F, CA; *R v Quillan* [2015] EWCA Crim 538; [2015] 1 W.L.R. 4673 at [89].

[106] *Midland Bank v Wyatt* [1997] 1 B.C.L.C. 242; *Shalson v Russo* [2003] EWHC 1637 (Ch); [2005] Ch. 281 at [190]; and see two *Jersey decisions, Re Esteem Settlement* [2003] JCR 092; [2004] W.T.L.R. 1 at [41]–[54]; *MacKinnon v Regent Trust Co. Ltd* [2004] JRC 211; 2004 J.L.R. 477 (affd [2005] JCA 066; [2005] W.T.L.R. 1367).

[107] *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426; 20 I.T.E.L.R. 905 at [150(iv)] and [435]–[437]. The court found that the trustee genuinely administered the trust but had no intention independent to that of the settlor, who intended to retain ownership of the trust assets, see at [434]. See Brightwell and Richardson (2018) 24 *Trusts & Trustees* 398 at 403–404 as to the problematic nature of this analysis.

[108] The view was expressed in a previous edition of this work (see 17th edn at § 4–23) that a shamming intention of a settlor need not necessarily be shared by his trustees, even if parties to the declaration, for a trust to be sham (relying in part upon *Midland Bank v Wyatt*, above, at 245 and in part upon the fact that a trust is complete without any element of acceptance by the trustees, as to which see § 13-019). This possibility has not found favour with the courts: see *Shalson v Russo*, above, at [190]; *Re Esteem Settlement*, above, at [41]–[54]; but see too *Hitch v Stone* [2001] EWCA Civ 63; [2001] S.T.C. 214 at [69] and [85]. It has been said that a common intention is required, but that reckless indifference on the part of the trustee will be taken to amount to the necessary intention: *A v A* [2007] EWHC 99 (Fam); [2009] W.T.L.R. 1 at [52]. In *Re Reynolds* [2008] NZCA 122; 10 I.T.E.L.R. 1064 at [38], reference was made to recklessness or ignorance on the part of the trustee as being tantamount to intention, but ignorance would not be tantamount to intention unless it involved a wilful shutting of eyes.

[109] We suggest that the requirement that the trustees must share the intent follows not only, or perhaps not so much, from any separate legal principle, as from the need to establish the settlor's shamming intent.

[110] *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*, above, at [154] and [426]–[435].

[111] *Rosebud Trust Corporate Trustee v Bublitz* [2014] NZHC 2018 at [97].

065

This is a PDF of the original 20th Ed. main work

*Original trustees*

**5-025**    For a trust to be a sham, the original trustees must share the settlor's shamming intent at the time of the constitution of the trust. If they receive assets intending to hold them subject to the terms of the trust instrument, any later arrangement with the settlor or one or more discretionary beneficiary to treat the trust as a sham will constitute a breach of trust and will not convert the valid trust into a sham.[112] However, if the original trustees receive additional assets from the settlor which they have agreed to hold for the settlor's benefit (or on different trusts to those declared in the trust instrument), there may be a sham in relation to those assets alone.[113]

*Appointment of new trustees*

**5-026**    If the original trustees retire and new trustees are appointed there will be two questions. First, whether the original trustees had been parties to a sham and, secondly, whether the new trustees are also parties to the sham. If the original trustees were not parties to a sham and held the assets subject to the terms of the trust instrument, then the appointment of new shamming trustees will not convert the trust into a sham any more than will the adoption by the original trustees of a shamming intent.[114] However, if the original trustees were parties to a sham then the appointment of new trustees who do not share the shamming intent may convert the sham into a valid trust.[115] If both the original and new trustees share the same shamming intent then the sham continues.

**5-027**    In one case,[116] the judge required the necessary shamming intent, not in the original trustees, but rather in Guernsey trustees who were appointed three days after the settlement was executed. This was perhaps on the basis that the original trustees were not intended to take steps in relation to the administration of the trust, and executed a deed of appointment and retirement in favour of the Guernsey trustees at the same time as the trust instrument. Of course, if the shamming settlor is going to be the sole trustee then no one else's intention is relevant.[117] Likewise, where trusts were declared by trustees under a power conferred on them by an existing settlement, their intention alone was relevant.[118]

---

[112] *A v A*, above, at [41]–[43]; *Fordyce v Ryan* [2016] QSC 307; [2017] 2 Qd.R. 240 at [39]–[40]. In *Shalson v Russo*, above, at [190], it was said that "unless that intention (*i.e.* the intention to treat the assets as belonging to the settlor) is from the outset shared by the trustee (or later becomes shared), I fail to see how the settlement can be regarded as a sham". The words in brackets ("or later becomes shared") were questioned in *Hill v Spread Trustee Co. Ltd* [2005] EWHC 336 (Ch); [2005] B.P.I.R. 842 at 910 (affd on other issues [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404), and must be treated as having been said *per incuriam*.
[113] *Re Reynolds* [2008] NZCA 122; 10 I.T.E.L.R. 1064 at [57].
[114] *A v A*, above, at [42]. At [44], Munby J. canvassed the possibility that a genuine trust could be converted into a sham with the consent of all the beneficiaries. Without such consent, there would be a breach of trust as against the beneficiaries, not a revocation of the trust. See § 5–021.
[115] *A v A*, above, at [45]–[47].
[116] *Hill v Spread Trustee Co. Ltd*, above.
[117] *Painter v Hutchison* [2007] EWHC 758 (Ch); [2008] B.P.I.R. 170 at [111]–[115].
[118] *Shalson v Russo*, above.

066

This is a PDF of the original 20th Ed. main work

*The effect of finding a sham*

The effect of a trust being held to be ineffective as a sham is that third parties can treat the trust property as still belonging to the settlor or the settlor's estate.[119] Third parties who wish to do so might include the settlor's creditors, such as revenue authorities or a trustee in bankruptcy, an estranged spouse or civil partner, or legatees, next of kin, creditors or others who might be interested in the estate of a settlor who has died. As the court will necessarily have made a finding of intentional deceit, it is justified in taking the exceptional step of determining the legal effect of the purported trust instrument on the basis of the parties' subjective intentions, including by reference to extrinsic material, as opposed to the objective meaning of the document.[120] Where the facts justify such a conclusion, therefore, it would seem that the subjective intention to which the court may give effect is that the legal effect of the document is a gift to others or a trust for others, rather than (as will usually be the case) that of the property remaining vested in the settlor, or that the terms of the trust are different from those contained in the document.[121] It may be that the trust instrument contains certain sham provisions and others which are valid despite the shamming intent. It has been held that a provision in a lease may be invalid as a sham in circumstances where the lease itself remains valid,[122] and assumed that the doctrine of sham may apply to certain provisions of legal documents more generally without invalidating the whole,[123] but the application of this point in the context of trusts remains uncertain.[124]

**5-028**

*Reliance on the sham by the settlor*

The High Court (which is to say the highest court) of Australia once allowed a settlor to assert his own shamming intent to defeat the effect of his formal declaration of trust as against a revenue authority,[125] but according to the recent English cases, and on principle, the parties to a declaration of trust cannot rely on their own shamming intent as against innocent third parties. If the declaration of trust is a sham or pretence, then "as against an innocent third party it cannot lie in the mouths

**5-029**

---

[119] See *Clayton v Clayton* [2015] NZCA 30; [2015] 3 N.Z.L.R. 293 at [63] (reversed in part on other grounds: [2016] NZSC 29; 19 I.T.E.L.R. 406).

[120] *Raftland Pty Ltd v Commissioner of Taxation* [2008] HCA 21; 238 C.L.R. 516 at [140]–[142]; *Coshott v Prentice* [2014] FCAFC 88; 311 A.L.R. 428 at [64].

[121] *Re IC Real Estate Pty Ltd* [2014] NSWSC 479 at [32].

[122] *A.G. Securities v Vaughan* [1990] 1 A.C. 417, HL, where a clause giving the landlord the right to introduce new occupiers, inserted solely in order to give the impression that the tenants did not have the benefit of any statutory protection, was held to be a sham.

[123] *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [45], [59] (affd on other issues [2001] EWCA Civ 1541; [2002] 1 B.C.L.C. 55).

[124] In Australia the possibility that "where the acts and documents reflect a transaction divisible into separate parts … a transaction is a sham as to only part of the transaction" was mentioned in the context of trusts in *Raftland Pty Ltd v Commissioner of Taxation* [2008] HCA 21; 238 C.L.R. 516 at [148]. It is difficult to see why, if the trusts purportedly declared of the entirety of the beneficial ownership of the settled property are a sham, other terms such as administrative provisions should be upheld unless, perhaps on special facts, the settlor and trustees intend such provisions to be valid notwithstanding their shamming intent.

[125] *Commissioner of Stamp Duties (Queensland) v Jolliffe* [1920] HCA 45; 28 C.L.R. 178, but note the powerful dissent of Isaacs J., at 182–184. That dissent was treated as now representing Australian (as well as English) law in *Byrnes v Kendle* [2011] HCA 26; 14 I.T.E.L.R. 299 at [13]–[18], [60]–[66] and [116], where the statement of the law in this paragraph was approved.

067

of the pretenders to say to the disadvantage of that innocent third party that the transaction was a sham, pretence and thus of no effect".[126] A settlor who has executed a declaration of trust is subject to the usual rule that prevents a party to a legal document from relying on mere mental reservations to resist its enforcement.[127] It seems that this general rule may apply to prevent a claim by a settlor to set aside a trust on the ground that he intended it to be a sham. Although dishonesty is required for a finding of sham, there need not be any illegality involved (at any rate at the point at which the sham declaration is executed).[128] If third parties have relied on the provisions of the trust instrument to their detriment, the settlor may be estopped from asserting that the trust is a sham and from seeking to recover the trust property.[129] It is, of course, an abuse of process to assert in litigation that a sham document is genuine.[130]

*Reliance by those who are not parties to the sham*

5-030    If there ever were any subsequently appointed trustees who were not implicated in the sham, and did not know of it when appointed, they would do well to consider applying to court as soon as they discover it. They would not be giving evidence of their own wrongful intent, but that of their predecessors.[131] A different example would be where the true arrangement (behind the apparent trust created for tax reasons) is that the trust fund should be held, not on the trusts expressed in the trust deed, but on trusts for a particular person (not the settlor) absolutely on the basis of a constructive trust or of a valid oral declaration of trust. In our view it is clear that, in such circumstances, the 'real' beneficiary can enforce the 'true' trusts in his favour. It may even be that he can do so without the need to assert the existence of a sham (and so without alleging dishonesty), if the 'true' trusts are constituted before the execution of the sham document and so take priority over it.

**Settlors retaining powers, interests and control**

5-031    So long as the trusts are intended to take effect according to their terms, the retention of large powers or weighty influence by a settlor does not itself make the trusts void as a sham, though it might make the settlement into a testamentary document which is invalid unless executed in accordance with the Wills Act 1837.[132] It has generally been considered that a trust is either a sham in the sense explained in §§ 5-020 and 5-021 above, or, subject to compliance with the Wills Act 1837 if testamentary, is valid and enforceable. There is no third state of affairs between a

---

[126] *Carman v Yates* [2004] EWHC 3448 (Ch); [2005] B.P.I.R. 476 at [219]. See too *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98, at [60]; *Hill v Spread Trustee Co. Ltd*, above, referring to Hayton [2004] J.L.R. 8.

[127] *Shalson v Russo* [2003] EWHC 1637 (Ch); [2005] Ch. 281 at [190].

[128] See *Painter v Hutchison* [2007] EWHC 758 (Ch); [2008] B.P.I.R. 170 (applying *Tribe v Tribe* [1996] Ch. 107).

[129] *Re Esteem Settlement* 2003 J.L.R. 188, Jers RC, at [53(3)]; *Carman v Yates* [2005] B.P.I.R. 476 at [219].

[130] *Sartipy v Tigris Industries Inc.* [2019] EWCA Civ 225; [2019] 1 W.L.R. 5892 at [45].

[131] The circumstances in which the trustees were appointed may themselves arouse suspicion, *e.g.* the appointment may have been an attempt to defeat the creditors of the settlor, who remained the beneficial owner of the assets under the prior sham.

[132] See §§ 1-014 to 1-016 and 5-036 to 5-040.

068

valid trust on the one hand and a sham on the other.[133] If the settlor retains power to direct investments, that does not make the trust a sham. Indeed, his directing investments through the machinery of the trust recognises them as real.[134] Even if the settlor retains practical control of the whole administration of the trust through informal, personal influence over the trustees, that does not enable his creditors to "pierce the veil of the trust".[135]

The retention by the settlor of large powers may mean that economically the settlor is in a similar position to an absolute owner. That similarity may be important in the context of insolvency or divorce, or in tax or other contexts, and may enable third parties to gain access to the trust assets in a way which would not be possible if he did not have those powers. But so long as the trust is not a sham, it does not mean that the trust is not a trust, nor that it takes effect in some different way from what its terms provide. For example, if the settlor reserves a general power of appointment[136] during his lifetime exercisable by deed, with default trusts for himself for life with remainder on trusts for his spouse and children, and he never exercises the power during his lifetime and dies solvent and having survived his spouse, then on his death the trust property will be held in trust for the settlor's children, and not as part of his estate devolving in accordance with his will or intestacy. That is so because the trust is a valid trust which takes effect according to its terms, as was intended by the settlor and trustees when the trust was constituted. If the settlor had become insolvent, then his creditors would have been able to gain access to the capital of the trust fund, not because he was the absolute owner, but because he retained the general power.[137] And, if his spouse had divorced the settlor, then the spouse might have obtained access to the trust property in matrimonial proceedings because he had the general power.[138] But none of that means that the terms of the trust are any different from what they purport to be, nor that the settlor is the absolute owner.

**5-032**

Similar considerations apply if the settlor, instead of reserving a general power of appointment, confers on the trustees a special power of appointment[139] exercisable during his lifetime with his consent in favour of a class of beneficiaries including himself. So long as the trust is not a sham, it will take effect according to its terms, and so if the power is not exercised, the trust fund will pass to the settlor's children on his death. The consent requirement means that the settlor will be able to block

**5-033**

---

[133] *Re Esteem Settlement* [2003] JCR 092; [2004] W.T.L.R. 1.

[134] Settlor control may often occur with the view of benefiting the beneficiaries and thus be quite consistent with the existence of an intention on behalf of the settlor that the trust be operative: *Re Reynolds* [2008] NZCA 122; 10 I.T.E.L.R. 1064 at [127].

[135] *Re Esteem Settlement*, above, at [105]–[107], [122]–[124]; *Antle v R* [2009] TCC 465; 12 I.T.E.L.R. 314 at [73]–[74] (agreeing with submissions relying on the statement in the text, affd without comment on these submissions [2010] FCA 280; 13 I.T.E.L.R. 591). Evidence of poor administration of a trust is insufficient to establish a sham, although it may show a breach of trust: *Re Reynolds* [2008] NZCA 122; 10 I.T.E.L.R. 1064 at [92], [125]. In *Hill v Spread Trustee Co. Ltd*, above, the settlor's intention to retain "influence, perhaps even a decisive influence, on the administrative decisions" did not render the trust a sham.

[136] On general powers of appointment, see §§ 33-002 onwards.

[137] Compare *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co. (Cayman) Ltd* [2011] UKPC 17; [2012] 1 W.L.R. 1721.

[138] See §§ 51-045 onwards.

[139] On special powers of appointment, see §§ 33-017 onwards.

069

This is a PDF of the original 20th Ed. main work

any exercise of the power of which he does not approve, but it does not mean that the settlor is the absolute owner of the trust property. And if the settlor, in addition, retains a power to remove and appoint trustees, that does not mean that he is the absolute beneficial owner of the trust property, because of the existence of the power. That is because the powers of removal and appointment are fiduciary powers,[140] but even if they are beneficial powers,[141] the trustees' power of appointment is a fiduciary power[142] which, if no sham is involved, takes effect according to its terms and prevents the settlor from being the absolute beneficial owner unless and until the power is exercised in his favour. The trust may be vulnerable to being set side under the insolvency legislation,[143] but if there are no grounds for setting aside the trust under that legislation, then the trust will take effect in accordance with its terms, and so the creditors will take the settlor's life interest, but not the capital, because that is the true effect of the trust.

**5-034**   There are, however, two ways in which trusts under which the settlor retains powers, interest and control have been attacked otherwise than as shams, relying on these features of the trust, rather than any shamming intent, as forming the basis for attack. The first is that, upon the true construction of a trust instrument which appears to create a conventional lifetime trust, the settlor has failed to part with the beneficial interest and so remains the absolute beneficial owner of the trust property. The second is that, what appears to be a lifetime trust, is a testamentary disposition and so is invalid unless executed in accordance with the formal requirements of the Wills Act 1837.

*Failure to part with the beneficial interest*

**5-035**   There is nothing unusual in contentions to the effect that all the trusts and powers contained in a settlement are void for uncertainty, perpetuity or some other reasons so that the settlor has failed to part with the beneficial interest in the trust property, which is held upon a resulting trust for him.[144] However, in a 2017 English case, the court, without suggesting that the trusts or powers were void for reasons of the above kind, and independently of contentions to the effect that the settlement with which the court was concerned was a sham or liable to be set aside under the insolvency legislation, held that the reservation by the settlor of powers as protector, including the power to remove and appoint trustees, which was classified as a beneficial power,[145] meant, on the true construction of the settlement, that the settlor never divested himself of the beneficial ownership of the trust property.[146] We consider this decision to be doubtful,[147] earlier authority having indicated that even

---

[140]   See §§ 14-066, 14-067 and 15-047 onwards.
[141]   See §§ 15-051 and 15-052 (and see too § 5-035).
[142]   See §§ 28-018, 28-020.
[143]   See §§ 27-002 onwards.
[144]   See §§ 9-002 onwards.
[145]   See § 15-052.
[146]   *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch); 20 I.T.E.L.R. 905 at [267]–[278].
[147]   The reasoning of the judge depended heavily on his categorisation of the powers of the settlor/protector all being personal powers. Even if the power to appoint or remove new trustees could properly be so viewed, this would only give the settlor effective beneficial ownership if he could direct a new trustee to act contrary to the interests of the beneficiaries, something that would be inconsistent with the finding that the trustee's powers were fiduciary. See Brightwell and Richardson

070

This is a PDF of the original 20th Ed. main work

the retention of a personal power to revoke a trust or to appoint the entire trust property to the settlor does not prevent there being a valid trust in the meantime, taking effect in accordance with its terms.[148] We do not consider that the reservation to the settlor even of very considerable rights and powers would make the trusts illusory during the settlor's lifetime unless the settlor was the absolute equitable owner of the trust property during his life.[149] It would make a difference if the terms of the settlement declared that the trust property was held in trust as to capital and income for the settlor absolutely and indefeasibly and then purported to set out trusts in favour of other beneficiaries, because those trusts would be repugnant to the absolute interest retained by the settlor. But the fact that the settlor reserves powers rather than an absolute beneficial interest means that the trusts can and will take effect in default of exercise of the retained powers. It is clear that, if a settlor does, as a matter of construction, fail to divest himself of the beneficial ownership of the trust property, it does not mean without more that there is a sham. The principle is one of construction and does not entail any dishonesty of the kind which is requisite for a finding of sham.[150] It is best not to use the phrase "illusory trust" to describe the result of a determination the result of that the settlor has failed to part with the beneficial interest in the trust property; if there is no valid trust other than an absolute trust for the settlor, that is all that needs to be said.[151]

*Settlement taking effect as a testamentary disposition*

As is explained elsewhere,[152] if the person executing an instrument, in whatever form, intends that it should not take effect until after his death, and that it is dependent on his death for its effect, then it is testamentary and so invalid unless executed in accordance with the requirements of the Wills Act 1837. A document, appearing to be settlement, which reserves very extensive interests and powers for the settlor during his lifetime, coupled with a power of revocation,[153] can turn a settlement into a will, because it is dependent on the settlor's death for its effect. There

**5-036**

---

(2018) 24 *Trusts & Trustees* 398 at 400–401. The terms of the trusts in question were also unexceptional and of a kind frequently encountered in practice and it would appear that the findings of dishonesty which also justified a finding of sham may have affected the analysis of the construction of the trusts. The reasoning of the judge does, however, gain some support from Underhill and Hayton, *Law of Trusts and Trustees* (19th edn), § 17.7. And the decision was followed (in relation to a differently worded trust instrument) in *Webb v Webb* [2017] CKCA 4 at [52]–[65] (appeal to PC heard in January 2020, judgment outstanding).

[148] See § 1-016; and see *Clayton v Clayton (No.1)* [2019] NZSC 29; 19 I.T.E.L.R. 406 at [125], citing *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co. (Cayman) Ltd* [2011] UKPC 17; [2012] 1 W.L.R. 1721.

[149] As in *Re MacInnes* [1935] 1 D.L.R. 401, Can SC. *Clayton v Clayton (No.1)* [2016] NZSC 29; 19 I.T.E.L.R. 406 at [118]–[130] and [133] inconclusively considers whether a settlement is void in circumstances where the settlor was the original sole trustee and retained general powers over distribution of capital and income. *Clayton v Clayton* was considered in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*, above, at [159]–[169].

[150] *Clayton v Clayton (No.1)*, above, at [123]; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*, above, at [167]–[168].

[151] *Clayton v Clayton (No.1)*, above, at [123]. Note that in the United States, the term "illusory trust" is used to describe a sham, see *Scott and Ascher on Trusts* (5th edn), Vol.2, § 8.2.2.

[152] See §§ 1-013 and 1-014.

[153] As to powers of revocation, see §§ 33-089 onwards.

071

This is a PDF of the original 20th Ed. main work

that statutory anti-avoidance provisions will be relevant if a settlor has created a trust in order put his assets beyond the reach of creditors, and that recourse should be made to such provisions,[181] and not to concepts such as piercing the veil.

*The proper law governing the question whether a trust is a sham*

**5-044**  Finally, if the substantive law governing sham arrangements were to diverge between jurisdictions, then the issue of the law which governs the question whether a trust is a sham would arise. If it became clear, for example, that the requirements for a sham finding were tighter in Jersey law than in English law, then such considerations would need to be addressed. It is our view that the putative governing law of the trust in each case ought, by analogy with the position in contract,[182] to decide the question whether or not the apparent arrangements are a sham, rather than (as could be argued) the *lex situs* of the trust property concerned.[183] It may also constitute an exorbitant assumption of jurisdiction of an English court to declare a foreign trust a sham, at least in matrimonial proceedings.[184]

## 4.  CERTAINTY OF OBJECTS OF THE TRUST

### Certainty of objects

**5-045**  The declaration of trust must make it sufficiently clear who are the beneficiaries or what is the object to which the trust property is to be applied. The declaration of an object trust will fail if the description of the object to which the trust property is to be applied is too vague to enable the court to enforce it,[185] though such a trust will also commonly fail on the ground that there is no person in whose favour the court can enforce it.[186]

*Fixed trusts*

**5-046**  Where the trust is intended for the benefit of particular persons, the declaration will fail if the words used do not enable the trustees to draw up a complete list of all

---

[181]  As to which, see §§ 27-002 onwards.

[182]  See Art.8(1) of the Rome Convention on the Law Applicable to Contractual Obligations, which provides that "the existence and validity of a contract, or of any term of a contract, shall be determined by the law which would govern it under this Convention if the contract or term were valid".

[183]  See §§ 12-066 onwards, 12-143. In *Minwalla v Minwalla* [2004] EWHC 2823 (Fam); [2005] 1 F.L.R. 771, the question whether a Jersey law trust was a sham was determined by reference to English law without any consideration being given to whether English law was the applicable law. The Jersey RC was critical, rightly in our view, of the English court in *Minwalla v Minwalla*, for applying English law to the sham issue: *C.I. Law Trustees Ltd v Minwalla* [2005] JRC 099; 9 I.T.E.L.R. 601 at [17].

[184]  See §§ 11-088 and 51-024.

[185]  *Blair v Duncan* [1902] A.C. 37, HL Sc. ("charitable or public purposes"); *Grimand v Grimand* [1905] A.C. 124, HL Sc. ("charitable or religious institutions and societies"); *Chichester Diocesan Fund and Board of Finance v Simpson* [1944] A.C. 341, HL ("charitable or benevolent object or objects"); *Crawford v Phillips* [2018] NZCA 208; 22 I.T.E.L.R. 1 at [19], [40]–[42]. Charitable trusts do not fail for uncertainty but in these cases the trustees could have applied the whole fund (if the trusts had been valid) to non-charitable objects. For general treatment of the law of charities, see *Tudor on Charities* (10th edn); Picarda, *Law and Practice Relating to Charities* (4th edn).

[186]  See §§ 5-052 onwards.

072

those intended to take an interest under the trust.[187] Only conceptual uncertainty as to the intended list will invalidate the trust: mere practical difficulty in applying the definition, for example in tracing particular absent beneficiaries, will not do so.[188]

*Discretionary trusts and powers*

Where there is a power[189] or a trust[190] to distribute amongst members of a class of beneficiaries to be selected it is enough that it can be said with certainty whether any particular person is a member of the class. In such a case, the test is satisfied if some persons will be able to prove that they are members of the class, even though the most it will be possible to say about others is that they have not proved that they are members of the class, though they may be. The selectors need not be able to enumerate the whole class in either case.[191] Where, however, there is no trust or power to select, but a trust for an individual, or a class who are to share the gift, it must be possible to identify the individual or all the members of the class.[192] Where a discretionary trust is so unhappily drafted that it is impossible to advance a construction of the trust instrument which provides a coherent statement of the beneficial interests, the whole trust will be held invalid.[193]

**5-047**

---

187 *Whishaw v Stephens* [1970] A.C. 508, HL (the Gulbenkian case) at 523–524, *per* Lord Upjohn: that a list that is *probably* a complete list can be drawn up would appear to be enough: *Re Saxone Shoe Co. Ltd* [1962] 1 W.L.R. 943 at 955, *per* Cross J. Following *McPhail v Doulton* [1971] A.C. 424, HL (*Baden No.1*), the best view would seem to be that the requirement of a complete list in the case of a fixed trust survives the relaxation of the certainty test for discretionary trusts (as to which see § 5-047); so held in *OT Computers Ltd v First National Tricity Finance Ltd* [2003] EWHC 1010 (Ch); [2007] W.T.L.R. 165 at [21]; *Pascoe v Boensch* [2008] FCAFC 147; 250 A.L.R. 24 at [22]. For a review of the relevant English authorities in the context of a fixed trust (and a decision to depart slightly from them), see *West v Weston* [1998] NSWSC 419; 44 N.S.W.L.R. 625 at 659–662.
188 *McPhail v Doulton*, above, at 457, *per* Lord Wilberforce; *Re Baden's Trusts (No.2)* [1973] Ch. 9; Emery (1982) 98 L.Q.R. 551; Matthews [1984] Conv. 22; Martin [1984] Conv. 304; Hayton [1984] Conv. 307. For earlier cases, when the certainty test for both fixed and discretionary trusts was thought to be that which now survives only in respect of fixed trusts, see *Merdith v Heneage* (1827) 1 Sim. 542; see at 558, 559, 565 (gift before 1926 of mixed realty and personalty to the "heirs" of A: uncertain whether his heir or next of kin was intended); but see *Harland v Trigg* (1782) 1 Bro.C.C. 142; *Wright v Atkyns* (1810) 17 Ves. Jr. 255; (1814) 19 Ves. Jr. 299; *Green v Marsden* (1853) 1 Drew. 646; *Lambe v Eames* (1871) L.R. 10 Eq. 267; 6 Ch. App. 597; *Re Hamilton* [1895] 2 Ch. 370; *Re Hill* [1923] 1 Ch. 259 ("family"), but see *Cruwys v Colman* (1804) 9 Ves. Jr. 319; *Grant v Lynam* (1828) 4 Russ. 292; *Wright v Atkyns* (1810) 17 Ves. Jr. 255; (1814) 19 Ves. Jr. 299; *White v Briggs* (1847–48) 2 Ph. 583; *Pigg v Clarke* (1876) 3 Ch.D. 672; *Whishaw v Stephens* [1970] A.C. 508 at 424, HL, *per* Lord Upjohn ("my old friends"); compare *Re Gibbard's Will Trusts* [1967] 1 W.L.R. 42; *Public Trustee v Butler* [2012] EWHC 858 (Ch); [2012] W.T.L.R. 1043 ("the deserving materially hardship cases"); *Re Lehman Brothers International (Europe) (in administration)* [2012] EWHC 2997 (Ch); [2014] 2 B.C.L.C. 295 ("any Lehman Brothers entity").
189 *Whishaw v Stephens* [1970] A.C. 508, HL (the Gulbenkian case).
190 *McPhail v Doulton*, above, overruling *I.R.C. v Broadway Cottages Trust* [1955] Ch. 21. For the distinction between trusts and powers, and the categorisations possible within each description, see *Burrough v Philcox* (1840) 5 My & Cr 72; *Re Weekes' Settlement* [1897] 1 Ch. 289; *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202; *Mettoy Pension Trustees Ltd v Evans* [1990] 1 W.L.R. 1587; Emery (1982) 98 L.Q.R. 551; Martin [1991] Conv. 364; Gardner (1991) 107 L.Q.R. 214; and see §§ 33-027 onwards.
191 *Re Baden's Trusts (No.2)* [1973] Ch. 9.
192 *Whishaw v Stephens*, above, *per* Lord Upjohn at 523–524, see § 5-046.
193 *Re the Double Happiness Trust* [2002] JRC 235A; [2003] W.T.L.R. 367.

073

# Section 2. - Interest of Trustees in Exercise of Dispositive Powers

**Lewin on Trusts 20th Ed.**

**Mainwork updated to include amendments from First Supplement**

**Volume 2**

**Part 7 - Proceedings and Remedies**

**Chapter 46 - Conflicts of Interest**

**Section 2. - Interest of Trustees in Exercise of Dispositive Powers**

## Introduction

46-069  The previous section of this Chapter was concerned mainly with the application of the self-dealing rule to purchases of trust property and other transactions of an administrative character. This section is concerned with the question whether and to what extent the self-dealing rule [284] applies so as to disable trustees from exercising fiduciary dispositive powers vested in them in favour of any of themselves. [285]

## Beneficial and limited powers

46-070  The self-dealing rule can have no application to beneficial powers [286] or even to limited [287] powers since the donees of such powers have no fiduciary duties in relation to their exercise, and hence the question of conflict of duty and interest does not arise. Nor is there any question of the donees of beneficial or limited powers profiting from their fiduciary position. Limited powers are subject to the doctrine of fraud on the power and the donees of limited powers have a duty to the beneficiaries interested in default of their exercise not to exercise such powers otherwise than for an authorised object of the power. [288] But if the donee of a non-fiduciary power is, as a matter of construction of the power, an object of it, then the power is a beneficial power [289] and there is nothing in the doctrine of fraud on the power which precludes an exercise of the power in favour of the donee. Thus, it is well settled that where, on the true construction of a personal special power of appointment, the donee of the power is also an object of it, the power may be exercised in his favour. [290]

## The problem with trustees' powers

46-071  Fiduciary relationships are often spoken of as involving a duty by one person to act for the benefit of another or others. [291] The problem in applying to trustees the general principle against fiduciaries profiting from their position is that there is no necessary severance between the trusteeship and beneficial interests. Trustees can be, and indeed frequently are, beneficiaries [292] and as such are entitled to benefit from the enjoyment of the trust property.

© 2026 Thomson Reuters.

074

Case 1:24-cr-00239-CKK-MAU    Document 119-6    Filed 03/02/26    Page 76 of 292

Section 2. - Interest of Trustees in Exercise of Dispositive..., UKBC-LEWINTR...

## Trustees benefiting under fiduciary administrative powers

46-072    The problem is relatively slight so far as administrative powers are concerned, because the general duty of the trustees is to act in the best interests of the trust for the benefit of the beneficiaries as a whole, acting impartially, or fairly, as between beneficiaries with different interests, including themselves if they are beneficiaries.[293] Even in the context of administrative powers, the trustees may be faced with decisions which affect different beneficiaries in different ways, for example investment decisions which affect the yield of a trust fund, or the prospects of long term capital growth. A trustee who is the life tenant, or who has a reversionary interest in capital, has a fiduciary obligation to participate in the decision, whether or not the decision affects his own personal interest as a beneficiary differently from other beneficiaries. It could not be seriously suggested that trustee investment powers are not fiduciary powers if the trustees include beneficiaries, or that a trustee is unable to exercise an investment power where he is also a beneficiary and has an obligation to reach an investment decision which affects his own interest differently from that of other beneficiaries. Otherwise a trustee could not be a beneficiary, but that is not English law.

## Can trustees benefit under their own fiduciary dispositive powers?

46-073    When one turns from the administrative powers of trustees to their dispositive powers, however, the problem is more acute. That is because a trustee is entitled to be partial in the exercise of such powers, and to prefer some beneficiaries over others.[294] But that entitlement is subject to a duty to consider the exercise of such powers from to time, and to exercise them in good faith, taking into account relevant considerations but not taking into account irrelevant, irrational or improper factors.[295] In spite of this, a decision of the Court of Appeal[296] establishes that, notwithstanding certain previous *dicta* to the contrary considered in the next paragraph, it is possible to authorise a trustee who is also a beneficiary to exercise a power under which the trustee himself can benefit over other beneficiaries, whether the trustee is interested in an exercise of the power or interested in default of exercise of the power, and even though it is a fully fiduciary power vested in the trustees as such. Moreover, the fact that the trustee is also an object of the power under which he is able to benefit does not throw on him the burden of showing that he has exercised it rationally and properly. It is for those who challenge its exercise to show that it was not properly exercised.[297] Nor can the fact that a power is exercised in favour of a trustee who is able to benefit under the power in itself amount to a breach of duty.[298] Unless authorised to do so, however, trustees are barred from exercising fiduciary dispositive powers in their own favour, and any purported exercise of the power in favour of a trustee is either void, or voidable as of right on the application of a beneficiary prejudiced by it.[299] We turn shortly to consider what will amount to the necessary authority, but first we consider some earlier cases.

46-074    Jenkins J. said that a power given to a trustee was either a beneficial power or a fiduciary one, and that if it was fiduciary the trustee could not exercise it in his own favour.[300] His view gains some support from United States authority,[301] but cannot stand with the decision of the Court of Appeal.[302] In England it was said before that decision that commonsense dictates that no man should be asked to exercise a discretion as to the application of a fund amongst a class of which he is a member, for he cannot be expected fairly to weigh his own merits against the merits of others.[303] These words need to be placed in context. They were spoken in answer to criticism of an earlier ruling of the same judge[304] in which he declined, in giving directions as to the distribution of surplus of a trust fund, to allow selected beneficiaries of the pension scheme who were authorised to prepare a scheme of distribution to benefit under the distribution. What the court will do in the exercise of its jurisdiction over the execution of a trust is not the same thing as what can be done out of court. For example, the court will not normally appoint a beneficiary as a trustee when asked to exercise its jurisdiction over the appointment of new trustees, but that does not mean that a beneficiary cannot be appointed a trustee out of court.[305]

46-075

© 2026 Thomson Reuters.

In the context of pension schemes, it has been recognised that it is possible for a trustee who is also a beneficiary to have the duties described in the previous paragraph in relation to the exercise of a power vested in the trustees as such and at the same time to benefit under the exercise of the power.[306] In the context of private trusts too, it has been recognised that a trustee might be capable of benefiting under a power vested in the trustees while at the same time being subject to duties which do not apply in the case of personal powers.[307] The authorities taken as a whole, then, recognise that trustees can be authorised to exercise in their own favour even dispositive powers that are vested in them by virtue of their office as trustees. The possible powers of trustees are not confined to personal powers which may be exercised in favour of the donee if an authorised object and fiduciary powers from which a trustee is necessarily excluded. It is also possible to have a power vested in trustees by virtue of their office which is subject to the general duties applicable to fiduciary powers while at the same time a trustee is eligible to benefit from an exercise of the power, or from its non-exercise.

# Construction of the power and the role of the self-dealing rule

**46-076** The fact that a power is capable of being exercised in favour of a person upon whom it is conferred is very important in determining whether a power is a mere personal power or a fiduciary power subject to the general duties applicable to fiduciary powers, but it is not necessarily determinative of the issue.[308] Where a power of appointment or other dispositive power is given to trustees by virtue of their office, it is a fiduciary power.[309] That determines the question whether the power is fiduciary, but does not determine the question whether a trustee can benefit under it. It might be thought that the question whether a trustee is eligible to benefit under a fiduciary dispositive power is purely one of construction of the relevant power, as in the case of a personal power, so that if as a matter of construction the trustee is an object of the power it may be exercised in his favour, otherwise not. On that basis the self-dealing rule would have no role to play.[310] If as a matter of construction a trustee was an object of the power, it could be exercised in his favour because he was an object. The self-dealing rule would not apply because its application would be inconsistent with the power which had been conferred on the trustees. If, however, as a matter of construction, the trustee was not an object of the power, the question would not arise, since the trustee would be ineligible to benefit in any event. Though this has been the approach adopted for ordinary, non-fiduciary powers of appointment, it is not the approach which has been taken for dispositive powers conferred on trustees by virtue of their office.

**46-077** Sometimes general statements of the self-dealing rule refer only to trustees entering into "engagements" in which there is a conflict of interest and duty,[311] and that terminology is perhaps not apt in the context of the exercise of dispositive powers. But other statements of the rule express it more broadly and cannot be read as being confined to the exercise of administrative powers and the like.[312] The modern English authorities indicate that the rule does apply to the exercise of fiduciary dispositive powers.[313] The rule may therefore operate to limit the exercise of a fiduciary dispositive power, just as it operates to limit the exercise of a fiduciary administrative power. For example, if a power is conferred on trustees to distribute a fund to such persons as they think fit, the generality of the power may be limited by the rule to prevent the trustees from distributing to themselves.[314] We consider that similar considerations would apply to a power for trustees to add beneficiaries expressed in general terms. The generality of such fiduciary dispositive powers is limited by the rule in just the same way as, for example, an administrative fiduciary power of appointment of new trustees expressed in general terms is limited by the rule to prevent the appointor from appointing himself.[315] And that is so even though as a matter of pure construction of the relevant power there is nothing which shows that it is not to be exercised in favour of the trustee or other fiduciary. The rule applies not only where a trustee has a personal interest in the exercise of a dispositive power but also where his duties in relation to the exercise of the power conflict with his duties in a different fiduciary capacity, for example where an appointment is made to a bankrupt beneficiary by trustees one of whom is also a creditor of the beneficiary in his capacity as executor of a deceased person's estate.[316]

**46-078** But, though the self-dealing rule may limit the exercise of a fiduciary dispositive power, the rule may be excluded so as to enable a trustee to benefit from its exercise or non exercise. As we have seen, judicial observations at first instance which suggest that the rule applies in a more severe way to the exercise of dispositive powers than to other powers cannot stand with the authority of the Court of Appeal.[317] The rule is riddled with exceptions.[318] Of these exceptions two are of particular significance in

© 2026 Thomson Reuters.

Case 1:24-cr-00239-CKK-MAU    Document 119-6    Filed 03/02/26    Page 78 of 292

Section 2. - Interest of Trustees in Exercise of Dispositive..., UKBC-LEWINTR...

the context of fiduciary dispositive powers. One is that the rule does not apply where the trustee has not placed himself in the position of conflict but has been placed in that position by the settlor and the terms of trust. [319] The other is that the rule may be excluded by the terms of the trust. [320] We now turn to consider how these exceptions apply in the context of fiduciary dispositive powers so as to authorise trustees to benefit under them.

## Exclusion of the rule where the trustee does not place himself in a position of conflict

46-079    The self-dealing rule has been described in the context of dispositive powers as one under which a trustee cannot act if he finds himself in a position where he owes conflicting duties, or where his duty conflicts with his interest. [321] But that is not the conventional description of the rule. Rather the rule is one under which a trustee is not allowed to place himself in a position where there is a conflict between his duty and interest, or his duty in different capacities. The rule therefore does not apply where the trustee has not placed himself in a position of conflict and interest but has been placed in that position by the settlor or the terms of the trust. [322]

46-080    This exception to the rule applies to the exercise of a dispositive power. [323] Thus, where the terms of the trust conferred dispositive powers exercisable in favour of a class of objects, and also required that the trustees should include members of that class, the conflict of interest and duty was inevitable, but it was the product of the trusts, not the result of the beneficiary-trustees placing themselves in a position of conflict of interest. And so the self-dealing rule was excluded, as too was the rule about profits from the trust. [324]

46-081    Another case where we consider that the self-dealing rule would be excluded is where a fiduciary power is conferred on the trustee exercisable in favour of beneficiaries other than the trustee, but the trustee is interested in default of exercise of the power. There is an inevitable conflict between the trustee's interest in not exercising the power and his duty in considering its exercise. But that conflict is brought about by the settlor who has both selected the trustee and created trusts and powers under which a conflict is unavoidable. And so the rule should be excluded. [325] Similar considerations apply to a case where an original trustee is the sole object of a power or discretion conferred by the terms of the trust or even, in our view, one of the objects of a discretionary trust or power operative or conferred on the trustees.

46-082    We do not consider that, apart from exceptional circumstances, the exclusion applies to successor trustees, [326] but original trustees, at least, are not required to avoid a conflict caused by the settlor or the terms of the trust by retirement or appointment of additional trustees. [327] An example of a case where the exclusion of the rule may extend to a successor trustee by reason of exceptional circumstances is this. A settlor constitutes a family discretionary trust in favour of his two children and their descendants. The settlor contemplates that the two original trustees will be his two children who are also intended by him to be the two principal beneficiaries of the discretionary trust. The trust needs to be constituted by a particular time for tax or other reasons, but one of his children is abroad on that time. And so, as a temporary measure, the two original trustees are the child remaining in England and the settlor's solicitor. On the other child's return from abroad, the solicitor retires and the settlor (in whom the statutory power of appointment of new trustees is vested) appoints the other child as a trustee in the solicitor's place. Since it would be bizarre, in such circumstances, for the self-dealing rule to operate against one trustee because he was a successor trustee, though not against the other (because he was an original trustee), the rule should be impliedly excluded in relation to both.

46-083

© 2026 Thomson Reuters.

The exception to the rule does not, however, apply to an employer company which appoints itself as original trustee of its pension scheme, and a latent conflict becomes an actual conflict when the company becomes insolvent. [328] Nor does the exception apply to cases of involuntary actual conflicts of fiduciary duties where the creation of the conflict cannot be attributed to the settlor or the terms of the trust. Thus, where in a pension scheme the employer company was given a fiduciary power on the winding-up of the scheme to augment benefits out of any surplus of the trust fund but was itself entitled to the surplus to the extent that the power was not exercised, the liquidator of the company was held to be precluded from exercising the power, because as trustee of the power he owed a duty to the beneficiaries to give a fair consideration to exercising it and as liquidator a duty to the company's creditors and contributories to secure the largest return for them; the court was then bound to interpose. [329]

## Express and implied exclusion of the rule by the terms of the trust

46-084    Although the self-dealing rule may be expressly excluded by the terms of the trust, as may the rule concerning profits from the trust, doubts have been raised whether this is permissible in the context of fiduciary dispositive powers. [330] But once it is appreciated that it is possible to enable a trustee to benefit from a fiduciary power, [331] then those doubts evaporate. It is clear that the self-dealing rule can be excluded by the terms of the trust. [332] It is common for a family trust to contain a clause that the trustees may exercise a particular power such as a power of appointment, or any dispositive powers conferred by the terms of the trust or by law, even though any one or more of the trustees has as a beneficiary a direct or indirect personal interest in the mode or result of any such exercise. We consider that such a clause takes effect according to its terms so as to exclude the self-dealing rule expressly and enable trustees to exercise the powers concerned in favour of one or more of themselves.

46-085    A provision conferring power on the trustees to enter into any transaction concerning the trust fund notwithstanding that any of the trustees is interested in the transaction other than as one of the trustees has, in the context of the terms of the settlement as a whole and admissible evidence as to the background of the settlement, been broadly construed so as to encompass an addition of a trustee to the class of beneficiaries under a power of addition and a subsequent appointment to that trustee under a power of appointment in favour of the beneficiaries. [333]

46-086    Further, it has been held in the context of fiduciary dispositive powers that the self-dealing rule (together with the rule concerning profits from the trust) can be excluded, not only by the express terms of the trust, but also by the implied terms where that is necessary in order to give efficacy to the terms of the trust. [334] An example of a case where we consider that the self-dealing rule would be excluded impliedly is where the terms of the trust appoint A and B as trustees, and also confer a power on the trustees, meaning the original trustees or other the trustees for the time being, to appoint among a class consisting of A, C and D. If the self-dealing rule were applied, then the power would become a power for the original trustees to appoint to C and D, but that is not what the settlor provided for. Again the rule may be excluded where a testator appoints his spouse trustee or one of the trustees and gives the spouse a life interest and the trustees a power to advance capital to the spouse. [335] But it is less clear that the self-dealing rule would be excluded if the original trustees were not beneficiaries and a beneficiary was appointed a trustee later on. [336]

46-087    Of course the powers concerned remain fiduciary powers and so trustees must give proper consideration to an exercise of them in favour of other beneficiaries, and cannot simply have regard to their own interests, as is permissible where a donee of a personal power is also an object of it.

© 2026 Thomson Reuters.

078

## No rescue for bad timing

**46-088**  If neither of the exceptions considered in §§ 46-079 to 46-087 is available, the self-dealing rule might needlessly be engaged as a result of bad timing, but the court will not rescue the trustee from the application of the self-dealing rule for that reason. [337]  If it is contemplated that a beneficiary will both benefit under a power of appointment conferred on the trustees and be appointed as one of the trustees, the appointment under the power of appointment will not be impugned if the existing trustees make the appointment in favour of the beneficiary and subsequently the beneficiary is appointed as a trustee. But if the appointment in favour of the beneficiary is made after the beneficiary's appointment as a trustee then it will be caught by the self-dealing rule. The difference between the two cases is one of substance, and the court cannot approach the matter as though the relevant deeds had been executed in a different order from the order in which they were actually executed or formed a single composite deed when they did not. In the first case the beneficiary has no fiduciary functions in relation to the exercise of the power of appointment even if it is contemplated that the beneficiary will become a trustee subsequently. In the second case the beneficiary, having already become a trustee, even though for a short time, does have fiduciary functions in relation to the exercise of the power of appointment and cannot say that those functions were not performed since that would, if correct, itself taint the exercise of the power of appointment.

## Trustees who are members of pension schemes

**46-089**  Much of the controversy surrounding the application of the self-dealing rule to the exercise of dispositive powers has involved member trustees of pension schemes. This controversy has now been resolved by section 39 of the Pensions Act 1995, which came into force on January 1, 1996, [338]  in regard to pension schemes regulated by that Act. This provides:

> "No rule of law that a trustee may not exercise the powers vested in him so as to give rise to a conflict between his personal interest and his duties to the beneficiaries shall apply to a trustee of a trust scheme, who is also a member of the scheme, exercising the powers vested in him in any manner, merely because their exercise in that manner benefits, or may benefit, him as a member of the scheme."

This enactment does not prejudice the application of the established non-statutory exceptions to the self-dealing rule in cases where the statutory provision does not apply, or before it came into force. [339]

## Application to the court

**46-090**  In a case where the self-dealing rule does or may apply to the exercise of a dispositive power, the court has jurisdiction to give the trustees directions enabling its exercise, even though the trustees who seek the directions will benefit in consequence. It will do so in a proper case, particularly where different interests are separately represented, and the alternatives of appointment of new wholly independent trustees or full surrender of discretion to the court are likely to involve greater delay and expense. [340]  But we consider that the court would not have such a jurisdiction if, as a matter of construction, a trustee was not an object of the power, for if that were so the exercise of the jurisdiction would involve an extension of a dispositive power, not the mere removal of a disability. Accordingly, it is necessary to construe the relevant power to determine whether as a matter of construction a person who is for the time being a trustee is not an object of the power, or whether a person who is for the time being a trustee is merely disabled by the self-dealing rule from benefiting under the power.

© 2026 Thomson Reuters.

Case 1:24-cr-00239-CKK-MAU    Document 119-6    Filed 03/02/26    Page 81 of 292

Section 2. - Interest of Trustees in Exercise of Dispositive..., UKBC-LEWINTR...

**Footnotes**

284    See § 46-008.

285    See *Mowbray (1996) 10 Tru.L.I. 49* and *[1998] P.C.B. 239 at 243–250*.

286    See § 28-016.

287    See § 28-017.

288    *Mettoy Pension Trustees Ltd v Evans [1990] 1 W.L.R. 1587* at 1613G–1614A. On fraud on the power, see § 30-066 onwards.

289    See § 30-005.

290    *Taylor v Allhusen [1905] 1 Ch. 529*; *Re Penrose [1933] Ch. 793*.

291    See generally Thomas on Powers (2nd edn), §§ 1-57 onwards and the discussion of the duty of loyalty in *Bristol and West Building Society v Mothew [1998] Ch. 1* at 18–19, CA; approved *Arklow Investments Ltd v Maclean [2000] 1 W.L.R. 594, PC*; *Royal Bank of Scotland Plc v Chandra [2011] EWCA Civ 192; [2011] Bus. L.R. D149* at [24].

292    This is less common in the offshore jurisdictions than in England. There it is the norm to have corporate (or professional) trustees, though some of the functions which in England might be vested in trustees are often vested instead in protectors or the like, sometimes being or including beneficiaries. Accordingly, the issues which in England generally arise in relation to trustees often arise in the offshore jurisdictions in connection not with trustees but with protectors or the like. As to these, see §§ 28-044 to 28-046.

293    See § 35-075.

294    *Edge v Pensions Ombudsman [1998] Ch. 512 at 523B–C, affd [2000] Ch. 602* at 622–630, CA. *Barnsley v Noble [2016] EWCA Civ 799; [2017] Ch. 191* at [26]–[31]. See too *Cooper v Pinney [2023] NZCA 62* at [110], citing this paragraph; and see § 33-004.

295    See previous footnote.

296    *Edge v Pensions Ombudsman [2000] Ch. 602 at 622D–E, CA, approving [1998] Ch. 512* at 539.

297    *Edge v Pensions Ombudsman [2000] Ch. 602* at 630–633, CA.

298    *Mandie v Memart Nominees Pty Ltd [2016] VSCA 4* at [78].

299    See § 46-077.

300    *Re Edward's Will Trusts [1947] 2 All E.R. 521* at 524. In *Webb v Webb [2017] CKCA 4* at [61] (appeal to PC heard in January 2020, judgment outstanding) the court decided, without reference to the cases cited in this and the previous paragraph, that a clause authorising the exercise by a trustee who was also the settlor of dispositive powers conferred on the trustee in favour of the trustees together with other provisions in an unconventionally drawn trust instrument, invalidated the trust.

301    Scott and Ascher on Trusts (5th edn), Vol.3, § 18.2.5.

302    *Edge v Pensions Ombudsman [2000] Ch. 602, CA*.

303    *British Coal Corporation v British Coal Staff Superannuation Scheme Trustees Ltd [1994] I.C.R. 537* at 551G, *per* Vinelott J.

304    *Re William Makin & Son Ltd [1993] O.P.L.R. 171* at 179.

305    See § 15-090, compare § 15-057.

306    *Edge v Pensions Ombudsman [2000] Ch. 602* at 622D–E (approving *[1998] Ch. 512* at 539) and 630–633, CA.

307    *Re Beatty [1990] 1 W.L.R. 1503* at 1506; and see *Blair v Vallely [2000] W.T.L.R. 615* at 639, NZ SC.

308    See §§ 28-036 onwards.

309    See § 28-020. But it does not necessarily follow from the fact that a power of amendment is conferred on persons who include some who have certain fiduciary functions in relation to the trust that the power of amendment is conferred on them by virtue of the office, see *Re Z Trust [1997] C.I.L.R. 248* and § 28-048.

310    See the analysis in Thomas on Powers (2nd edn), §§ 12-11 onwards, especially §§ 12-42 to 12-43.

311    *Aberdeen Railway v Blaikie Bros (1854) 1 Macq. 461* at 471, *per* Lord Cranworth L.C.; *Regal (Hastings) Ltd v Gulliver (1942) [1967] 2 A.C. 134n* at 137, HL, *per* Viscount Sankey. See too *Wright v Morgan [1926] A.C. 788* at 797, PC, where Lord Dunedin referred to a "transaction" where there is a conflict of duty and interest.

© 2026 Thomson Reuters.

312    *Bray v Ford [1896] A.C. 44* at 51–52, HL, *per* Lord Herschell (quoted in § 45-001); *Re Thompson's Settlement [1986] Ch. 99* at 115, *per* Vinelott J.

313    *Re Beatty [1990] 1 W.L.R. 1503* at 1506B; *Re William Makin & Son Ltd [1993] O.P.L.R. 171* at 176–177; *Re Drexel Burnham Lambert U.K. Pension Plan [1995] 1 W.L.R. 32*; *Public Trustee v Cooper [2001] W.T.L.R. 901* at 933B; *Breakspear v Ackland [2008] EWHC 220 (Ch); [2009] Ch. 32* at [114]; *Rafferty v Philp [2011] EWHC 709 (Ch)* at [34]–[35], [69] (statement in text approved). In *Edge v Pensions Ombudsman [1998] Ch. 512, affd [2000] Ch. 602, CA*, the conflict rule was excluded, not on the ground that the rule was inapplicable to fiduciary powers, but rather on the ground that the case fell within exceptions to the rule. See too *Dever v Knobloch [2009] NZHC 2013* at [37]–[54] as to the position in New Zealand and *Crociani v Crociani [2017] JRC 146* at [543] onwards (reversed in part on other points *sub nom. BNP Paribas Jersey Trust Corp. Ltd v Crociani [2018] JCA 136A*) as to the position in Jersey.

314    See *Re Beatty*, above.

315    *Re Skeat's Settlement (1889) 42 Ch.D. 522*. See §§ 14-047 onwards; and consider *Re French Protestant Hospital [1951] Ch. 567*.

316    *Smith v Michelmores Trust Corp. Ltd [2021] EWHC 1425 (Ch)* at [60]–[61].

317    See §§ 46-073 and 46-074.

318    *Re Drexel Burnham Lambert U.K. Pension Plan*, above, at 40E, *per* Lindsay J.

319    See §§ 46-041 and 46-042.

320    See § 46-040.

321    *Re William Makin & Son Ltd [1993] O.P.L.R. 171* at 176, *per* Vinelott J. Compare the description of the rule by the same judge in *Re Thompson's Settlement [1986] Ch. 99* at 115F, where reference was made to the principle that a man must not put himself in a position of conflict. See too *Bristol and West Building Society v Mothew [1998] Ch. 1* at 19G–H, CA, where Millett L.J. was concerned with the context of an actual conflict of fiduciary duties.

322    See § 46-041.

323    *Edge v Pensions Ombudsman [1998] Ch. 512 at 539–541 (affd [2000] Ch. 602, CA)*; and see *Re Z Trust [1997] C.I.L.R. 248* at 291–292.

324    *Edge v Pensions Ombudsman*, above.

325    *Breakspear v Ackland [2008] EWHC 220 (Ch); [2009] Ch. 32* at [122]. Contrast *Re William Makin & Son Ltd [1993] O.P.L.R. 171* at 177, where Vinelott J. considered that the original trustee could not have decided to refrain from exercising the relevant power with the consequence that his interest in default of exercise would be preserved. That followed from his statement of the conflict rule referred to at the beginning of the present paragraph, but would not follow if the rule takes effect subject to the exception considered in this paragraph.

326    Compare *Re Drexel Burnham Lambert U.K. Pension Plan [1995] 1 W.L.R. 32* at 40H–41A, where Lindsay J. referred to the exception but did not apply it in a case involving successor trustees placed in a position of conflict by the terms of the trust. Nor was the exception applied to a successor trustee in *Breakspear v Ackland*, above, see at [122].

327    *Sargeant v National Westminster Bank Plc (1990) 68 P. & C.R. 518* at 523.

328    *Buckley v Hudson Forge Ltd [1999] Pens. L.R. 151* at 167.

329    *Mettoy Pension Trustees Ltd v Evans [1990] 1 W.L.R. 1587* at 1616–1617; compare *Thrells Ltd v Lomas [1993] 1 W.L.R. 456* at 459. And see § 46-042.

330    *Re William Makin & Son Ltd [1993] O.P.L.R. 171* at 176; *Re Drexel Burnham Lambert U.K. Pension Plan [1995] 1 W.L.R. 32* at 43.

331    See § 46-073.

332    *Breakspear v Ackland [2008] EWHC 220 (Ch); [2009] Ch. 32* at [114] and [117]–[125]; *McNulty v McNulty [2011] NZHC 1173; 14 I.T.E.L.R. 361* at [40]–[73].

333    *Breakspear v Ackland*, above, at [114] and [117]–[125].

334    *Edge v Pensions Ombudsman [1998] Ch. 512 at 540B–D, affd [2000] Ch. 602, CA*. Contrast *Re Z Trust [1997] C.I.L.R. 248* at 289–290.

335    See *Karger v Paul [1984] V.R. 161, Vic. SC*; *Re Saunders and Malom (1987) 32 D.L.R. (4th) 503, BC CA*. In neither of these cases was it suggested that the self-dealing rule might apply, though the power was not treated as a personal power.

336    As in *Re Drexel Burnham Lambert U.K. Pension Plan [1995] 1 W.L.R. 32*.

337    *Breakspear v Ackland [2008] EWHC 220 (Ch); [2009] Ch. 32* at [115], [127]–[128], *per* Briggs J.

338    Pensions Act 1995 (Commencement No.2) Order 1995 (SI 1995/3104).

339    *Edge v Pensions Ombudsman [1998] Ch. 512 at 541H, affd [2000] Ch. 602, CA*.

340    *Re Drexel Burnham Lambert U.K. Pension Plan [1995] 1 W.L.R. 32* referring to what is now para.1(2)(b) and (c) of Practice Direction 64A—Estates, Trusts and Charities. Contrast *Re William Makin & Son Ltd [1993] O.P.L.R. 171* at

© 2026 Thomson Reuters.

179; and *Re Z Trust [1997] C.I.L.R. 248* at 293–294. For a Jersey case where the court exercised an express power of amendment to authorise trustees' remuneration on a surrender of discretion by the trustees where there was a clear conflict of interest, see *HSBC Trustees Ltd v Rearden [2005] JRC 130*.

**End of Document**    **© 2026 SWEET & MAXWELL**

A.C.                    AND PRIVY COUNCIL                    553

A  assessment cannot be said to be erroneous, still less wholly erroneous. The recent case of *Andrews* v. *Freeborough*,[52] where the Court of Appeal refused to interfere with an award of £500 for the loss of expectation of life for a girl of eight, accords with this view. So I think that the Court of Appeal had no right to disturb the judge's finding.

B  Furthermore, I myself think that in assessing £1,000 by way of damages the majority of the Court of Appeal fixed a sum which was too high and which could not, as of today, properly be described as moderate.

For these reasons I would allow this appeal.

C                                        *Appeal allowed.*

Solicitors: *Herbert Smith & Co. for James Chapman & Co.,  Manchester; Rowley Ashworth & Co.*

J. A. G.

D              [52] [1967] 1 Q.B. 1.

*H. L. (E.)  
1967*

Naylor  
*v.*  
Yorkshire  
Electricity  
Board

Lord Upjohn

---

[HOUSE OF LORDS]

E  GARTSIDE AND ANOTHER    -    -    -    -    APPELLANTS  
                              AND  
INLAND REVENUE COMMISSIONERS    -    RESPONDENTS

*Revenue—Estate duty—"Interest in possession"—Settlement—Discretionary trust of income—Accumulation of surplus income to capital—On death of named member of discretionary class trust of capital and income to his children—Advancement to children 16 months before death—Whether discretionary objects had "interest in possession" before advancement—Whether an "interest limited to cease" on named member's death—Whether determined before advancement—Liability to estate duty—Whether interest in possession of measurable amount—Finance Act, 1894 (57 & 58 Vict. c. 30), ss. 1, 2 (1) (b), 7 (7)—Finance Act, 1940 (3 & 4 Geo. 6, c. 29), s. 43 (as amended).*

By section 43 (1) of the Finance Act, 1940 (as amended):

" Subject to the provisions of this section, where an interest limited to cease on a death has been disposed of or

*C. A.  
1967  
Jan. 27,  
30, 31;  
Feb. 1, 2;  
Mar. 2*

Lord  
Denning  
M.R.,  
Harman  
and  
Salmon L.JJ.

*H. L. (E.)* *  
1967  
Oct. 3, 4, 5,  
9, 10, 11, 12,  
16, 17;  
Dec. 13*

*Present*: LORD REID, LORD MORRIS OF BORTH-Y-GEST, LORD HODSON, LORD GUEST and LORD WILBERFORCE.

083

554                          HOUSE OF LORDS                    **[1968]**

**C. A.**

1967

———

Gartside
*v.*
Inland
Revenue
Commrs.

——

has determined, whether by surrender, assurance, divesting, A
forfeiture or in any other manner (except by the expiration
of a fixed period at the expiration of which the interest was
limited to cease), whether wholly or partly, and whether
for value or not, after becoming an interest in possession,
and the disposition or determination (or any of them if there
are more than one) is not excepted by subsection (2) of this
section, then—(*a*) if, had there been no disposition or deter- B
mination, as aforesaid of that interest and no disposition of
any interest expectant upon or subject to that interest, the
property in which that interest subsisted would have passed
on the death under section 1 of the Finance Act, 1894, that
property shall be deemed by virtue of this section to be
included as to the whole thereof in the property passing on
the death; or (*b*) if, had there been no disposition or deter-
mination as aforesaid of that interest and no disposition of
any interest expectant upon or subject to that interest, the C
property in which the interest subsisted would have been
deemed by virtue of paragraph (*b*) of subsection (1) of sec-
tion 2 of the said Act to be included to a particular extent
in the property passing on the death, the property in which
the interest subsisted shall be deemed by virtue of this
section to be included to that extent in the property passing
on the death."

By his will, made in 1934, the testator gave a fourth share of D
the residue of his estate to trustees to hold on trust as follows:
(1) to apply the income of the fund at their discretion for the
maintenance or benefit of all or any of his son, his son's wife
or children (if any), and to accumulate surplus income as an
addition to capital with power at any time to resort to the
accumulations and to apply them as current income, and (2) after
the son's death, to hold the capital, income, and accumulations E
upon trust for such of the son's children as being male attained
21 or being female attained that age or married, and if more
than one equally. He gave power to the trustees to advance at
any time to a grandchild of his sums of up to one-half of the
presumptive or vested share of that grandchild in the fund.

The testator died on January 8, 1941; in 1942 the son married
and, in 1945, twin sons were born; there were no other children. F
On January 2, 1962, the trustees exercised their power of advance-
ment in favour of the testator's grandsons. They declared that
they held investments and the income thereof on trust for each
grandson should he attain 21 years; the investments formed part
of the original capital of the testator's son's share, and represented
less than one-quarter of it. The testator's son died in May, 1963, G
and the Crown claimed estate duty on the two funds advanced
in 1962. The trustees contested this claim on the grounds that (1)
before the power of advancement was exercised in 1962 neither the
discretionary objects nor the accumulation beneficiaries had an
" interest in possession " or, indeed, any " interest " at all in the
trust fund, within the meaning of section 43 of the Finance Act,
1940 ; and (2) even if there was an interest in possession, it

084

C. A.

1967

Gartside
*v.*
Inland
Revenue
Commrs.

was not of a measurable amount as required by section 2 (1) (*b*) and section 7 (7) of the Finance Act, 1894:—

*Held*, that the only right of an object of a discretionary trust, of income is to require the trustees to consider from time to time whether or not to apply the whole or some part of the income for his benefit, and this right is not an interest in the whole fund or any part of it within the meaning of section 43 of the Finance Act, 1940.

An " interest in possession " must mean that the person's interest enables him to claim whatever may be the subject of the interest. A right to require trustees to consider whether they will pay him something does not enable him to claim anything.

*Per* Lord Wilberforce: As regards the accumulations, there was no " interest in possession " because the whole income was being validly accumulated for the benefit of persons with contingent interests and accordingly section 43 did not attach (post, p. 622B–C).

*Scott and Coutts & Co.* v. *Inland Revenue Commissioners* [1937] A.C. 174; 53 T.L.R. 130; [1936] 3 All E.R. 752, H.L.(E.); *Burrell* and *Kinnaird* v. *Attorney-General* [1937] A.C. 286; [1936] 3 All E.R. 758, H.L.(E.); *Attorney-General* v. *Heywood* (1887) 19 Q.B.D. 326, D.C. and *Attorney-General* v. *Farrell* [1931] 1 K.B. 81; 46 T.L.R. 587, C.A. distinguished.

*Attorney-General* v. *Power* [1906] 2 I.R. 272 approved.

Decision of the Court of Appeal, post, p. 564D; [1967] 3 W.L.R. 671; [1967] 2 All E.R. 173, C.A. reversed.

APPEAL from the Court of Appeal (Lord Denning M.R., Harman and Salmon L.JJ.).

This was an appeal from an order dated March 2, 1967, of the Court of Appeal, reversing an order dated May 27, 1966, of the Chancery Division of the High Court of Justice (Ungoed-Thomas J.) on an application by originating summons, taken out under section 3 of the Administration of Justice (Miscellaneous Provisions) Act, 1933, by the appellants, Edmund Travis Gartside and Donald Warburton, as trustees of the will of Thomas Edmund Gartside, the testator, for the determination of a question of liability to estate duty on the death of the testator's son, John Travis Gartside.

The testator, Thomas Edmund Gartside, by his will dated February 8, 1934, gave to trustees a residuary trust fund to divide into four equal parts. One part (the trust fund with which this appeal was concerned) was left on a discretionary trust for the benefit, support and maintenance of all or any of the testator's son, John Travis Gartside, his son's wife or children (if any). The trustees were given an absolute discretion to apply any or all of the income of the fund as they thought fit and the income

C. A.

1967

Gartside
*v.*
Inland
Revenue
Commrs.

not distributed was to be added to the capital of the fund. They also had power to make advancements to any child of the son out of the trust fund, provided that such advancement did not exceed one-half of the then presumptive share of that child. After the testator's son's death the trustees were to hold the capital and income on trust for the son's children who being male attained the age of 21 years or being female attained that age or married previously.

On January 8, 1941, the testator died. On August 5, 1942, the testator's son married and on January 5, 1945, twin sons were born.

For 20 years the trustees accumulated the income and distributed none of it. In May, 1961, they applied £786 of the income for the benefit of the testator's son and in June, 1961, they applied £50 for the benefit of his wife.

On January 2, 1962, when the twin sons were aged 17, the trustees exercised their power of advancement. By two deeds poll, identical in terms, one for the benefit of each twin, the trustees declared that they held investments and the income thereof (which represented part of the original capital of the trust fund) on trust for the beneficiary absolutely should he attain the age of 21 years. From January 2, 1962, and until his death the trustees paid to the testator's son the whole income of the trust fund, excepting the property comprised in the deeds poll, but including investments representing accumulations.

The testator's son died on May 8, 1963. At the date of his death the value of the fund comprised in each of the deeds was about £23,500. The property admittedly passing on the testator's son's death was about £216,000.

The Inland Revenue Commissioners claimed estate duty on the two funds of £23,500. The total duty involved amounted to about £32,000.

On September 9, 1965, the plaintiff trustees took out a summons under section 3 of the Administration of Justice (Miscellaneous Provisions) Act, 1933, to determine whether on the death of the testator's son, estate duty did or did not become payable on the property then representing the investments specified in the deeds poll.

Ungoed-Thomas J.[1] held that although the discretionary objects and the accumulation beneficiaries had an interest in the property from which the income was derived, this was not an

---

[1] [1967] Ch. 543; [1966] 3 W.L.R. 759; [1966] 3 All E.R. 89.

086

C. A.
1967

Gartside
*v.*
Inland
Revenue
Commrs.

A    " interest in possession " within the meaning of section 43 (1) of the Finance Act, 1940, because it did not confer any right of present enjoyment of that income and that, accordingly, estate duty was not payable on the property advanced. The Crown appealed.

The facts and the relevant extracts from the will are more B    fully stated in the judgment of Harman L.J.

*H. E. Francis Q.C.* and *J. P. Warner* for the Crown. The expression " interest " in estate duty legislation is not used in the technical conveyancing sense of English law, but in a popular sense.

C    It is settled by authorities binding on this court that an object of a discretionary trust has an " interest " within the meaning of that term in the estate duty legislation: see *Attorney-General* v. *Heywood* [2] and *Attorney-General* v. *Farrell.* [3]

A single object of a discretionary trust has an interest in possession but he has no exclusive interest in the whole or any D    ascertainable part of the income. How then does the interest (or aggregate interests) of the whole group differ where (as here) the trustees can decide to accumulate the whole income? The difference is that the group as a whole comprise all the persons interested under the discretionary trust; in so far as the trustees, in the execution of that trust, determine to distribute the income, it must be E    distributed amongst one or more of the persons constituting the discretionary class. The trust must be executed, if at all, in their favour. The group as a whole are the only persons beneficially interested under the discretionary trust. But a single object among the group is only one of several persons beneficially interested. He is not the only person interested in the income as a whole, and he F    cannot be said to be solely interested in any part of the income. The quantum of his interest is not measurable.

The judge applied the wrong test for determining whether the interest in question was in possession or in expectancy. The test is not whether the interest confers an immediate right to payment of income, but whether the interest is a present interest or a future G    interest. The judge confused two separate things, i.e., the interest of the discretionary objects in the trust fund under the discretionary trust, and their right to payment of income. The interest is not the right to receive income: it may, of course, confer that right on one or more of the group as regards the whole or part of the income.

[2] (1887) 19 Q.B.D. 326.        [3] [1931] 1 K.B. 81.

**C.A.**

**1967**

Gartside
*v.*
Inland
Revenue
Commrs.

But that is not the "interest" with which we are concerned. The **A** "interest" is not that of the discretionary object in each piece of income as it reaches the trustees' hands, but in the whole income of the fund during the relevant trust period. The interest is the prospect of having income of the fund paid to or applied for their benefit under the discretionary trust. That is an interest in the corpus of the fund, not in each piece of income. If the judge is **B** right, the interest in the trust fund of objects of a discretionary trust can never be an interest in possession and from that point of view there is no difference between the interest arising under an immediate discretionary trust, and the interest to arise under a future discretionary trust. Yet the position of the discretionary object is materially different in the two cases. Surely, as a matter **C** of legal terminology, or classification, it is apt to describe the interest of the one group as being in possession, and the interest of the other as being in expectancy.

It is wrong to equate "interest in possession" with an entitlement to financial benefit. For purposes of estate duty, a person may have an interest in possession although he has no immediate **D** right to a financial benefit: see *Wrightson* v. *Inland Revenue Commissioners* [4] and *In re Kilpatrick's Policies Trusts.* [5]

Although there is no authority directly in point, there are judicial dicta to the effect that the collective interest (or aggregate interests) of a group of persons interested under an "immediate discretionary trust" is an interest in possession: *In re Holmden's* **E** *Settlement Trusts.* [6]

This case is plainly within the mischief which section 43 of the Act of 1940 was meant to counteract. If the interest under the discretionary trust had not been determined by the advances, there is no doubt that estate duty would have been payable in respect of the property advanced under sections 1 and 2 (1) (*b*). Section 43 **F** being directed against deliberate acts of avoidance, it is limited to cases where the interest disposed of or determined has become an interest in possession so that but for the disposition or determination the property would have passed under section 1 or would have been deemed to pass under section 2 (1) (*b*). There are several cases in which it has been held that where a discretionary trust is **G** limited to cease on the death of a person, followed either by a new discretionary trust for a different class or by an absolute trust of

[4] [1958] A.C. 210; [1957] 3 W.L.R. 427; [1957] 2 All E.R. 745, H.L.

[5] [1966] Ch. 730; [1966] 2 W.L.R. 1346; [1966] 2 All E.R. 149, C.A.

[6] [1965] 1 W.L.R. 420; [1965] 1 All E.R. 744.

088

C. A

1967

Gartside
v.
Inland
Revenue
Commrs.

A  income or capital for one or more persons,. there is a passing under sections 1 or 2 (1) (*b*). These cases support the view that the interest under a discretionary trust is an interest in possession, and not an interest in expectancy. If the interest were in expectancy, there would have been no passing under section 1 or a deemed passing under section 2 (1) (*b*), and the claim for duty (if

B  any) would be under section 2 (1) (*d*) in respect of the interest accruing or arising on death of the deceased: see Hanson on Death Duties, 10th ed. (1956), (p. 187); *Scott* v. *Inland Revenue Commissioners* [7]; *Burrell and Kinnaird* v. *Attorney-General* [8]; and *In re Doughty's Settlement.* [9] In *In re Kirkwood,* [10] section 5 (3) would have been a complete answer.

C      The case of *Attorney-General* v. *Power* [11] is not binding on this court, and is distinguishable on its facts, because (i) The question was whether Hubert's vested but defeasible estate in fee simple in the land was in possession, not whether he had an interest in possession under the trusts declared by the proviso. (ii) The provision for maintenance under the proviso was ancillary to

D  his interest in capital. Maintenance could be given only to a person prospectively entitled to capital. Here the discretionary trust cannot be regarded as ancillary to any interest in capital. It is a trust quite independent of any interest in capital; the objects included the deceased and his wife who had no interest in capital.

      In the alternative, the discretionary objects, together with the

E  persons interested in the accumulations of surplus income, had interests in possession extending to the whole income of the fund. The persons interested in accumulations were: (*a*) the discretionary class, and (*b*) the persons interested in capital, i.e., the twin sons. Those interested in capital had two separate interests: (i) in capital, i.e., interest in expectancy; (ii) in income being accumu-

F  lated, under the distinct trust for accumulation.

      This latter interest was an interest in possession; it was an interest in current income. The judge held that the interest of the accumulation beneficiaries in the income being accumulated arose by virtue of their interest in capital, and could not be regarded as an interest separate from their interest in capital. In our submis-

G  sion this is wrong. The interest in capital by itself would not have given the capital beneficiaries any right in respect of the income

[7] [1937] A.C. 174.
[8] [1937] A.C. 286; [1936] 3 All E.R. 758, H.L.(E.).
[9] [1964] Ch. 89; [1963] 2 W.L.R. 1452; [1963] 2 All E.R. 228.
[10] [1966] A.C. 520; [1966] 2 W.L.R. 136; [1966] 1 All E.R. 76, H.L.(E.).
[11] [1906] 2 I.R. 272.

C. A.

1967

Gartside
*v.*
Inland
Revenue
Commrs.

accruing during the life of deceased. The interests in capital  **A**
did not carry the unapplied income during life of the deceased.
What gave them an interest in that income was the trust for
accumulation; but for that trust, there would have been an in-
testacy as regards income which the trustees decided not to apply
for benefit of discretionary objects: see *In re Hodson's Settle-*
*ment* [12]; *Westminster Bank Ltd.* v. *Attorney-General* [13]; and *Coutts*   **B**
*& Co.* v. *Inland Revenue Commissioners.* [14]

*G. A. Rink Q.C.* and *P. W. E. Taylor* for the plaintiff trustees.
In the Acts relating to estate duty the term " interest in posses-
sion " bears the meaning which has always been attached to it
and which, so far as concerns land in England, is set out in
Fearne's Contingent Remainders, 10th ed. (1844), pp. 1 and 2,   **C**
i.e., a right of present enjoyment. Neither in the Finance Acts
themselves nor in the cases when properly understood is there any
ground for giving the term a novel and wholly different meaning,
such as the meaning for which the Crown contends: see *Scott* v.
*Inland Revenue Commissioners* [15]; *Burrell and Kinnaird* v.
*Attorney-General* [16]; *Coutts* v. *Inland Revenue Commissioners* [17];   **D**
*In re Kirkwood* [18]; and *Westminster Bank* v. *Inland Revenue*
*Commissioners.* [19]

It is accepted in this court that the objects of a discretionary
trust have an interest within the meaning of the Finance Act, 1894;
and that *Attorney-General* v. *Farrell* [20]; *In re Hodson's Settle-*
*ment* [21] and *Westminster Bank* v. *Attorney-General* [22] were cor-   **E**
rectly decided, although these points are being kept open for
argument in the House of Lords should that be necessary.

We are not concerned with the position of the objects of a
discretionary trust where the whole income must be distributed
among them and they therefore could, while all sui juris, decide
how the income from time to time should be dealt with. Where,   **F**
as in the present case, the trustees have a discretion as to the
quantum, if any, of the total income to be applied for all or any
members of the discretionary group, there is no material distinc-
tion between the interest of a discretionary object and the interest
of the group.

**G**

[12] [1939] Ch. 343; [1939] 1 All
E.R. 196, C.A.
[13] [1939] Ch. 610; [1939] 2 All
E.R. 72, C.A.
[14] [1953] A.C. 267; [1953] 2
W.L.R. 364; [1953] 1 All E.R. 418,
H.L.
[15] [1937] A.C. 174.

[16] [1937] A.C. 286.
[17] [1953] A.C. 267, 283, 284.
[18] [1966] A.C. 520.
[19] [1958] A.C. 210, 236.
[20] [1931] 1 K.B. 81.
[21] [1939] Ch. 343.
[22] [1939] Ch. 610.

090

C. A.

1967

Gartside
·v.
Inland
Revenue
Commrs.

A    In such a case the discretionary objects, whether taken as a group or individually, never have an interest in possession in respect of the trust fund itself, since they never have a right of present enjoyment of the fund or its income or even a certain right of future enjoyment: *In re Coleman*[23]; *Attorney-General* v. *Farrell*[24]; *Attorney-General* v. *Power*[25]; *Burrell and Kinnaird* v. 

B    *Attorney-General*[26]; and *In re Munro's Settlement Trusts.*[27]

If they ever have present enjoyment of any trust property at all, it is because a new beneficial interest in that property has been given to them by means of an exercise of the discretion conferred on the trustees by the terms of the settlement and not because an existing interest of theirs has come to fruition: see *Westminster* 

C    *Bank* v. *Inland Revenue Commissioners*[28] and *Ralli Brothers Ltd.* v. *Inland Revenue Commissioners.*[29]

An alternative way of putting this point is that the relevant characteristic of a life interest in possession is that its owner has a present right to receive such income (if any) as may from time to time be produced by the trust assets. The discretionary object's 

D    "interest" in a trust fund is that he has a chance that the trustees may exercise their discretion and pay income to him. His interest in the fund never becomes an interest in possession because he never has a right of present enjoyment of it, i.e., he never has the right to receive the whole or even part of its current income. He only has the chance that the trustees will, on one or more future 

E    occasions, exercise their discretion in his favour.

When a discretionary trust is determined, the determination does not affect the rights of the discretionary objects in respect of the sums which have already been paid or applied for their benefit. It does, however, determine their *chance* of a future exercise of the discretion in their favour, but this chance is at no time an interest 

F    in possession.

The accumulation beneficiaries, whether as a group or individually, have no right of present enjoyment. Their interests are clearly future interests and so "interests in expectancy" and not interests in possession: *In re Strangways*[30]; *In re Hodson's Settlement*[31]; *Westminster Bank* v. *Attorney-General*[32]; and *Coutts* v. 

G    *Inland Revenue Commissioners.*[33]

[23] (1889) 39 Ch.D. 443, C.A.
[24] [1931] 1 K.B. 81.
[25] [1906] 2 I.R. 272.
[26] [1937] A.C. 286.
[27] [1963] 1 W.L.R. 145, 148, 149; [1963] 1 All E.R. 209.
[28] [1958] A.C. 210, 230, 236, 237.
[29] [1966] A.C. 483, 511; [1966] 2 W.L.R. 19; [1966] 1 All E.R. 65, H.L.(E.).
[30] (1887) 34 Ch.D. 423, 431.
[31] [1939] Ch. 343, 368.
[32] [1939] Ch. 610, 616.
[33] [1953] A.C. 267, 273, 283, 284.

562                              HOUSE OF LORDS                       **[1968]**

C. A.

1967

Gartside
v.
Inland
Revenue
Commrs.

If the aggregate interests of the discretionary objects and the accumulation beneficiaries were interests in possession, interests in possession in the whole of the advanced funds would have been determined by the advancements and estate duty would be payable on the whole of these funds. But if the interests of only one of the groups was an interest in possession, it extended only to an indeterminate part of the income of the trust fund and so its cesser would not have attracted duty: *In re Kirkwood*[34] and *Attorney-General* v. *Power*.[35]

On the footing that the interest of only one of the two groups was an interest in expectancy, the two groups together could not be treated as a single group having an interest in possession. If the income of a fund is during a specified period held as to half in trust for group A and as to the other half in trust for X for life then for group B, group A and group B have not between them an interest in possession during the life of X. Maugham L.J. in *Attorney-General* v. *Burrell*[36] said that the discretionary objects in that case, together with a number of ascertained persons, could be treated as a single composite person for the purposes of section 2 (1) (*b*) of the Finance Act, 1894. Though this dictum was quoted by Pennycuick J. in *In re Holmden's Settlement Trusts*,[37] it is both wrong and inconsistent with the ratio decidendi of the House of Lords in *Burrell and Kinnaird* v. *Attorney-General*.[38] Moreover, the dictum could not apply to the circumstances of the present case, since, unlike the additional persons referred to in the dictum, the accumulation beneficiaries in the present case are unascertainable and ex hypothesi have an interest in expectancy and not an interest in possession.

The Revenue's arguments apparently lead to the following startling consequences: (1) estate duty would be payable on a fund held in trust for a beneficiary at 21, with the usual powers of maintenance and accumulation, if he died before attaining that age; (2) on the death of any and every object of a discretionary trust, estate duty would be payable on the entirety of the fund notwithstanding the dicta to the contrary in *In re Kirkwood*[39]; (3) if estate duty became payable on a trust fund whose income was immediately after a death held wholly or partly on discretionary trusts, every object, however remote, of these trusts would be accountable for the whole duty as a person having a beneficial

---

[34] [1966] A.C. 520, 545, 547.
[35] [1901] 2 I.R. 272, 278, 279.
[36] (1935) 153 L.T. 393, 402, C.A.
[37] [1965] 1 W.L.R. 420, 429.
[38] [1937] A.C. 286.
[39] [1966] A.C. 520, 545, 547.

**A.C.**              AND PRIVY COUNCIL                    563

C.A.

1967

Gartside
*v.*
Inland
Revenue
Commrs.
——

interest in possession, Finance Act, 1894, s. 8 (4), though he would have the right of reimbursement given by section 9 (5).

*P. W. E. Taylor* following. A further indication that discretionary trusts were not intended to be within section 43 of the Act of 1940 is to be found in the effect which subsection (2) of the section would have if they were. Where there is an ordinary life interest not held on a discretionary trust, subsection (2) normally frees an advancement to a reversioner from duty once the life beneficiary has survived five years. To obtain the exemption given by the subsection, the death must occur more than five years after the entire exclusion of the person or persons who had the life interest and of any benefit to him or them. It follows that, if the advances to the twin sons had been made shortly after their birth, and section 43 applied to the discretionary trust, duty would, so it seems, have still been payable, although the advances would have been made about 18 years before the relevant death: the persons who would have had the life interest before the making of the advances would have been the deceased, his wife and twin sons, and the sons would not have been excluded from the advanced property. Until they attained full age, the advances were under the deeds poll to be held in trust for them contingently on their attaining that age: this must amount to non-exclusion of them.

A benefit to a former life beneficiary by an associated operation is to be treated as non-exclusion for the purposes of subsection (2): see section 43 (2) and (3) of the Finance Act, 1950. These provisions would bring further inequitable consequences. Many advances must have been made in the past, some long ago, from trust funds where the previously subsisting trust was a discretionary trust for a life. The discretionary class may have contained not only the advanced beneficiaries but also all their close relatives. The advanced funds may have been shares in private family companies which have remained unrealised and will be likely to be traceable indefinitely. In circumstances such as those, if discretionary trusts were within section 43, freedom from duty would only be obtained for an advance where not only the advancee but the entire class of relatives had been excluded from any benefit by any associated operation. Thus the five-year period would be started afresh by any benefit to any of them from any associated operation. This would include any disposition affecting the advanced property, whether originally contemplated or not: see the definition of " associated operations " in section 59, para. (*a*), of the Finance Act, 1940. For instance, if the advancee

093

C. A.

1967

Gartside
v.
Inland
Revenue
Commrs.

A

died and left his property to one of the relatives by will, a five-year period would start anew and attract duty on the death within that five years of the person for whose life the discretionary trust was limited, although the advance had been made many years before.

B

Parliament and those concerned in drawing the legislation would have provided some code different from the original sub-section (2) and the associated operations enactment if they had consciously intended discretionary trusts to fall within section 43 of the Act of 1940. No doubt discretionary trusts were overlooked, but that is no reason for giving a strained or unusual meaning to the language of the section in order to bring all such trusts within it. The onus is on the Crown to show that the subject is clearly within the words of an enactment imposing taxation.

C

*H. E. Francis Q.C.* replied.

*Cur. adv. vult.*

D

March 2, 1967.  The following judgments were read.

LORD DENNING M.R.  On January 8, 1941, Thomas Edmund Gartside died. I will call him the grandfather. He left a will by which a fourth share of his residuary trust fund was to be applied by trustees for the benefit of his son John (who was then unmarried) and his family (when he did marry). I will call it the trust fund. This trust fund was to be held by the trustees on these trusts: (a) During the lifetime of the son John, the trustees were to pay the income of the trust fund, or such part of it as they thought fit, on a *discretionary trust* for the benefit of the son, his wife and children. I will call them the " discretionary objects." If the trustees did not distribute the whole of the income, they were to *accumulate* the surplus income, and add it to the capital of the fund. This addition I will call the " accumulation fund." (b) After the death of the son, the trustees were to hold both the capital and income of the trust fund, and also the accumulation fund, upon trust for the grandsons who attained 21. I will call them the " accumulation beneficiaries." (c) The trustees were given power at any time to make *advances* out of the trust fund to any of the grandchildren. These advances should be of sums up to one-half of the share of that grandchild in the fund.

On the death of the grandfather on January 8, 1941, the trustees took possession of the trust fund. On August 5, 1942, the

E

F

G

094

**A.C.**                    AND PRIVY COUNCIL                    565

C. A.

1967

Gartside
v.
Inland
Revenue
Commrs

LORD
DENNING
M.R.

son married. On January 5, 1945, the son and his wife had twin sons (the two grandsons), but no other children.

For 20 years after the grandfather died, the trustees *accumulated* all the income of the fund. They did not distribute any of it to the discretionary objects at all. None to the son or his wife or the grandchildren. Then in 1961 they paid £786 10s. to the son and £50 to his wife. Save for those two payments, they accumulated all the income of the trust fund and added it to the capital.

In 1962 the figures were as follows: the original trust fund stood at £93,700, earning a gross income of £6,400 a year. The income which had accumulated over the years came to £55,185.

On January 2, 1962, the trustees decided to exercise the power of *advancement*. The twin grandsons were then nearly 17 years of age. The trustees advanced each of them £23,500. These advances were made out of the original trust fund. The trustees did it by two deeds poll, one in favour of each grandson. By each deed poll the trustees declared that they held investments valued at £23,500 and the income thereof upon trust for that grandson if he should attain the age of 21 years.

On May 8, 1963, the son died, leaving his wife and the grandsons surviving him. Thereafter the trustees held the original trust fund (save for the advances) and the accumulation fund on trust for the two grandsons. On the son's death there was clearly a passing of those funds such as to attract estate duty. But the question is whether estate duty is payable on the advances made in January, 1962, to the grandsons.

On January 5, 1966, the twin grandsons became 21 and indefeasibly entitled to the £23,500 each.

Seeing that the advances were made in favour of the grandsons before the son's death, there was clearly no passing of them at his death so as to be caught by the Finance Act, 1894. But the question is whether these advances are caught by section 43 (as amended) of the Finance Act, 1940. That section was passed so as to catch dispositions made within five years of the death. These advances were made only 16 months before the death. They are, therefore, within the time, if they are within the words. The material words for present purposes are:

"When an interest limited to cease on a death has been determined in any manner after becoming an interest in possession, then if, had there been no determination, the property in which the interest subsisted would have passed

C.A.

1967

———

Gartside
v.
Inland
Revenue
Commrs.

———

Lord
Denning
M.R.

———

on the death under section 1 of the Finance Act, 1894, that
property shall be deemed by virtue of this section to be
included as to the whole thereof in the property passing on
the death."

In order to be caught by the words, there are four requisites:
1. The objects of the discretionary trust (i.e., the son, his wife
and children) must have had an "interest limited to cease" on
the son's death. 2. That interest must have become an "interest
in possession" before the advances were made to the grandsons.
3. That interest must have been determined by the deeds poll
to the extent of the amounts advanced, namely, £47,000. 4. If the
interest had not been so determined, the advanced sums (of
£47,000) would have passed or be deemed to pass on the son's
death under section 1 or section 2 (1) (*b*) of the Act of 1894.

If requisites 1 and 2 are satisfied, it is admitted that requisites
3 and 4 are satisfied. I turn, therefore, to requisites 1 and 2.

1. Did the discretionary objects have an "interest limited to
cease" on the son's death?

This point is settled by authority. For 80 years now the
courts have held that each one of the objects of a discretionary
trust has an "interest" in the trust fund, even where there is
power in the trustees to withhold it and accumulate the surplus
for others: see *Attorney-General* v. *Heywood*,[1] followed in
*Attorney-General* v. *Farrell*.[2] These cases have stood so long and
so many transactions effected and, I may add, so many statutes
passed on the faith of them that we must abide by them. What
is the reasoning underlying those cases? I think it is simply
this: Every person who is an object of a discretionary trust has
a *right* in respect of the trust fund, even when there is power to
withhold it and accumulate the surplus. He has a right to be
considered by the trustees as eligible for a payment to be made
to him. This right is analogous to the right of a competitor for
a prize. Like a girl who goes in for a beauty competition. Her
entry must be taken into consideration. She has no right to any
of the prizes but she has a right to be considered as eligible for
one of them: and she will be entitled to damages if she is shut
out from consideration: see *Chaplin* v. *Hicks*.[3] By virtue of this
right, she has an interest in the prize fund. Her interest can be
assessed in money. It is the damages which will be awarded
to her if she is wrongly excluded. So with the objects of a

[1] (1887) 19 Q.B.D. 326, D.C.          [3] [1911] 2 K.B. 786; 27 T.L.R.
[2] [1931] 1 K.B. 81; 46 T.L.R.    458, C.A.
587, C.A.

096

**A.C.**                    AND PRIVY COUNCIL                    567

C.A.

1967

Gartside
*v.*
Inland
Revenue
Commrs.

LORD
DENNING
M.R.

A    discretionary trust. They have a right to be considered as eligible for payment. If a wife and children were destitute and the trustees unreasonably rejected their request for payment, I have no doubt a court of equity would intervene to compel it. The court would, if necessary, remove the trustees and appoint others who would pay them: see *In re Wrightson*,[4] by Warrington J.[5] This right is

B    more than a mere hope or expectation: see *In re Munro's Settlement*,[6] by Wilberforce J. It is an interest in the trust fund, though not to any defined part of it. But the group of discretionary objects, regarded as one unit, have an interest in the property as a whole: because all together they are the only persons who have any right to the beneficial enjoyment of the income.

C        Once it is accepted that the group had an " interest " in the trust fund, it was plainly an interest limited to cease on the son's death.

        2. Did that " interest " become an " interest in possession " before the advances were made?

        The expression " interest in possession " is not defined in the

D    statutes, but the expression " interest in expectancy " is. It is a reasonable inference that an " interest in possession " is the opposite of an " interest in expectancy." Section 22 (1) (*j*) says that

        " the expression ' interest in expectancy ' includes an estate
        in remainder or reversion and every other future interest
        whether vested or contingent, but does not include reversions

E        expectant upon the determination of leases."

        The question, therefore, is: What is the nature of the interest of the objects of a discretionary trust? Is it an " interest in possession " or an " interest in expectancy "? It must be one or other. Faced with this choice, I have no doubt what the answer is. It is not a future interest. It is an interest in possession. Take the com-

F    mon case where the trustees distribute the whole of the income to one of the objects of the discretionary trust. Just as in *Attorney-General* v. *Heywood*,[7] the trustees paid to Edmund Peel during his life the whole income of the funds of the settlement; and in *Burrell* v. *Attorney-General*[8] the trustees applied nearly the whole of the income (£115,000) in paying the allowance to Harry. Surely

G    when the whole income is paid to one of the discretionary objects, his interest is an " interest in possession." There is nothing future about it at all. It is actually in hand. And he has the beneficial

    ⁴ [1908] 1 Ch. 789, 798.                    ⁷ (1887) 19 Q.B.D. 326.
    ⁵ Ibid. 798.                                ⁸ [1937] A.C. 286; [1936] **3** All
    ⁶ [1963]  1  W.L.R.  145,  149;    E.R. 758, H.L.
[1963] 1 All E.R. 209.

097

568                          HOUSE OF LORDS                    **[1968]**

C.A.

1967

Gartside
*v.*
Inland
Revenue
Commrs.
___
Lord
Denning
M.R.
___

enjoyment of it. Next, take the case where very little is paid to **A** one of the discretionary objects, as here, when only £786 was paid to the son and £50 to the wife. No valid distinction can be drawn between the case where the whole is paid out and only very little. The interest of everyone who receives something is an interest in possession. Next, take the case where some objects of the discretionary trust receive something and others receive nothing. **B** It seems a little difficult to say that those who get nothing have an interest in possession. But be that as it may, it is plain that the group of all the discretionary objects, considered as one unit, have an interest in possession: because some of them at least have beneficial enjoyment of it. Lastly, take the case where the trustees distribute none of the fund to the discretionary objects but **C** accumulate it all for the accumulation beneficiaries. This is the most difficult case of all. But one thing is clear. If anyone was in possession at all, it was the group of discretionary objects taken as a composite unit. They were the only people who could during the relevant period " obtain any benefit from the property or have any beneficial enjoyment of it." [9] That is, I think, sufficient to **D** consider them as having an " interest in possession."

In support of these views I rely on the two leading cases in the House of Lords: *Scott's* case [9] and *Burrell's* case. [10] In each of those cases there was a discretionary trust with power to accumu- late (or to reduce capital charges). In each it was held that, on one discretionary trust coming to an end and being replaced by a **E** different trust, there was

> " a change of hands in the beneficial title or possession of the property as a whole occurring on the death . . . which consti- tuted a passing of the property on that death within the mean- ing of section 1 of the Finance Act 1894 ":

so said Lord Russell of Killowen. [11] It was assumed in those cases **F** by all concerned that the interest of the discretionary objects had, before the death, become an " interest in possession ": for if it had not done so, section 5 (3) would have been a complete answer to the claim. Three years later in 1940 section 43 of the Finance Act, 1940, was passed including the words " after becoming an interest in possession." Those words are an echo of section 5 (3). **G** Parliament must have been using them in the same sense in both Acts. Seeing that under the first Act a discretionary trust with power to accumulate was accepted as an " interest in posses- sion," so also it should be accepted in the later Act.

[9] [1937] A.C. 174; 53 T.L.R. 130;      [10] [1937] A.C. 286.
[1936] 3 All E.R. 752, H.L.            [11] [1937] A.C. 174, 182.

098

C.A.

1967

Gartside
v.
Inland
Revenue
Commrs.

LORD
DENNING
M.R.

A    *Attorney-General* v. *Power* [12] is distinguishable. The son there took a vested legal estate as tenant in common in fee, with a limitation on his dying under 21. The trustees had power to pay maintenance to him whilst under 21. The interest of the son there (to receive maintenance at the discretion of the trustees) was ancillary to his interest as tenant in fee. The court, therefore,

B    looked to his primary interest as tenant in fee: and as that had never become an interest in possession before his death, it followed that under section 5 (3) the property did not pass on his death.

Reliance was placed on the definition in Fearne's Contingent Remainders, 10th ed. (1844), p. 2: " An estate is vested in posses-

C    sion when there exists a right of present enjoyment." That definition is good for legal estates, but I do not think it apposite for equitable interests. At any rate, not for the " interest " in a discretionary trust. Fearne would probably not have regarded it as an interest at all. But we must do so. Being an " interest," we have to inquire when it is " in possession." I think it is in possession

D    when the only people who are entitled to receive the income are the discretionary objects, considered as a composite unit. The only alternative is to say that no one is in possession of the income. Which is absurd. Someone must be in possession. And it is the group as a whole. In my opinion, so long as the whole income was distributable to the discretionary objects, it was an " interest

E    in possession," even though it was not in fact distributed to them. It was an interest in possession of the property as a whole.

3. Measurement.

There is an established rule that, in a discretionary trust, the property does not pass on the dropping of one of the

F    lives. The reason is said to be because the interest is not capable of being measured. I am not altogether satisfied with this reason. In the common law we measure chances. So also I should have thought we could measure the value of the interest of one of the discretionary objects. Nevertheless the rule is well established. And we were invited to say that, by parallel reason-

G    ing, when the trustees have a discretion to give all or none of the income to the discretionary objects, their interest cannot be measured. I am not prepared to extend the special rule (about the dropping of one life) to cover this case. I return to *Scott's* case [13] and *Burrell's* case.[14] The House of Lords held that when

[12] [1906] 2 I.R. 272.          [14] [1937] A.C. 286.
[13] [1937] A.C. 174.

099

570                          HOUSE OF LORDS                        **[1968]**

C.A.

1967

Gartside
*v.*
Inland
Revenue
Commrs.

——

Lord
Denning
M.R.

——

the discretionary trust came to an end, there was a passing that  **A**
could be measured. So here.

4. The accumulation beneficiaries.

That is enough to decide the case. But I ought to mention a
further point that was put to us. It was suggested that the whole
income could be considered as an interest in possession of a com-
posite unit, namely, a group combined of both the discretionary  **B**
objects and the accumulation beneficiaries together. I do not think
this can be done. The accumulation beneficiaries did not have an
interest in possession. Their interest in the accumulation fund was
future and contingent. It would only come into being if the
trustees did not pay out the whole income to the discretionary
objects but accumulated the surplus: and in any case it would not  **C**
come into being until the son died. It was an interest in ex-
pectancy only. It cannot be regarded, even in combination with
others, as an interest in possession.

5. Conclusion.

I think that the provisions of section 43 are satisfied. The in-
terest of the discretionary objects, after becoming an interest in  **D**
possession, was determined by the advances; and is to be treated
as a passing on the death. I would allow the appeal.

Harman L.J. Thomas Edmund Gartside died in the year 1941,
having by his will, made in 1934, bequeathed his residue to trustees  **E**
on trust for sale and to divide the proceeds into four shares. He
disposed of one-quarter share upon trusts stated as follows:

> "Upon trust during the lifetime of my son John Travis
> Gartside to pay or apply the whole or such part as
> my trustees shall in their absolute and uncontrolled dis-
> cretion think fit of the income of such fourth share for
> or towards the maintenance support or otherwise for the  **F**
> benefit of my said son John Travis Gartside or during his
> life for his wife or children (if any) or any one or more ex-
> clusively of the other or others of them in such manner in all
> respects as my trustees shall in their absolute and uncon-
> trolled discretion without being liable to account think fit
> and shall accumulate the surplus (if any) of the said income
> by investing the same and the resulting income thereof in  **G**
> manner hereinafter mentioned To the intent that the accumu-
> lations shall be added to the fourth share and follow the
> destination thereof with power nevertheless for my trustees
> at any time to resort to the accumulations of any preceding
> year and apply the same for the maintenance support and
> benefit of my said son John Travis Gartside or (during his
> life) any wife or children of his or any one or more of them

100

A.C.                    AND PRIVY COUNCIL                    571

C. A.
1967
Gartside
v.
Inland
Revenue
Commrs.

HARMAN L.J.

A      (*b*) Upon trust after the decease of my said son John Travis Gartside both as to the capital and income of the fourth share for all or any the children or child of my said son who being sons or a son attain the age of 21 years or being daughters or a daughter attain that age or previously marry and if more than one in equal shares absolutely,"

B      with remainder over which did not take effect. He then added:

" and I declare that my trustees shall have power at any time or times to raise by sale or mortgage upon such terms as they may think proper out of the share of and in my residuary trust fund hereby given to any grandchild of mine any sum or sums not exceeding one-half of the then presumptive or vested share of such grandchild and to pay or apply the same as my trustees shall think fit for the advancement or benefit of such grandchild. . . ."

C      At the date of this will the testator had four children, one of whom was the John Gartside already mentioned. This son married and had twin children born on January 5, 1945. John Gartside died on May 8, 1963, leaving his widow and twin sons surviving. The discretionary trust was during the lifetime of the son John only exercised in the year 1961 and then to the tune of some £850, partly in favour of John and partly in that of his wife. The whole of the rest of the income of the one-quarter share was accumulated until January, 1962, when the trust for accumulation ran out, as from which time the income of John's share was paid to him until his death in 1963.

E      In 1962 the value of the one-quarter share was over £90,000, apart from accumulations which were worth some £55,000, and the trustees then decided to exercise the power of advancement contained in the testator's will and did so in favour of the twin sons by two deeds poll in like form. The value of the sum advanced in each case was some £23,500 and represented the total advancement that could be made excluding accumulations under the power in the testator's will.

John Gartside died in 1963 and thereupon the discretionary trust of income during his lifetime came to an end, as did the residuary trust of income which arose when the accumulation period ended. There is no doubt that, excepting the two advanced funds, the whole property, including the accumulations, passed on John Gartside's death and duty was paid accordingly at the rate of 60 per cent. This was an actual passing, the whole fund changing hands and passing to the twin sons of John equally upon attaining 21, as they did in January, 1966; but the Crown claims in addition duty on the two advanced funds.

572                           HOUSE OF LORDS                    [1968]

C.A.

1967

———

Gartside
v.
Inland
Revenue
Commrs.

———

HARMAN L.J.

———

Under each of these deeds poll the advanced sum was directed    A
to be held upon trust for one of the two advanced beneficiaries if
he should attain the age of 21 years. There were further pro-
visions purporting to defer the payment over of parts of the sum
until the beneficiaries should attain 25 years and 30 years of age,
but these provisions were, I think, invalid and each advanced
grandchild can now call for the transfer of the whole fund to him    B
absolutely, they having attained 21 years of age in January, 1966.

The result of the two advances was to put an end, so far as the
advanced funds were concerned, to the discretionary trust of
income during the life of John Gartside and to all the remainders
under the will of the testator.

The Crown now claims duty on the two advanced funds.    C
These, of course, did not pass on John Gartside's death
and the Crown must rely on the fiction set up by section 43 of the
Finance Act, 1940, which has already in effect been read by my
Lord and which I need not repeat.

It is agreed that each advanced fund constituted an interest
limited to cease on the death of John Gartside which was disposed    D
of or determined by the advances and that but for these advances
the advanced funds, too, would have passed under section 1 like the
rest of the share. All the conditions laid down in section 43 are
satisfied if, and only if, the interest which was disposed of, namely,
the advanced fund in each case, had before the disposition, that is
to say the advance, "become an interest in possession." The    E
whole argument in this long case has turned around these words.
It seems to me that the words were put in in order to avoid it
being said that the Crown could claim on future contingent in-
terests, a claim which the Crown has never made, a matter alluded
to in *Attorney-General* v. *Power*,[15] mentioned by my Lord in the
judgment of Palles C.B.[16]    F

It is argued that to regard the interests, so to call them, of a
discretionary class or any member of it, unless indeed the whole
class can together claim the whole income, as an interest in
possession is an extraordinary view. Furthermore, the same is
even more true of the interest of those beneficially entitled to the
accumulations of the unapplied portion of the income. The interests    G
of these taken by themselves are clearly in expectancy and not in
possession. I agree then that none of the rights taken by themselves
do amount to an interest in possession and that, even if they do,
each is not an interest capable of quantification and, therefore, on

———

[15] [1906] 2 I.R. 272, 281.          [16] Ibid.

A.C.                 AND PRIVY COUNCIL                573

C.A.
1967
Gartside
v.
Inland
Revenue
Commrs.
HARMAN L.J.

A   well-known principles no duty is payable. In my opinion, however, if the whole bundle of rights attaching during his lifetime to the interest of John Gartside's one-quarter share be combined together, that is to say both the discretionary rights and the right to accumulations, they do amount to an interest in possession because they embrace the whole of the property. Somebody must have an interest

B   in possession, for the trustee's interest may be disregarded for this purpose and it is the passing of beneficial interests with which the Act is concerned. The admitted passing of the unadvanced portion of John's share on his death rests on this basis, that the whole property and all the interests in it passed on that event. Exactly the same thing happened to the advanced funds on the making

C   of the advancements, the whole bundle of rights in the advanced funds changed hands, all the trusts attaching to them before the advancements came to an end, together with all the interests in them existing before the advancements were made, and this change of hands caused a new interest in possession to arise, and this must, in my view, have arisen from the interest in possession

D   existing immediately before the deeds were executed; cf. the argument of Lord Russell in *Burrell and Kinnaird v. Attorney-General*.[17] I am, therefore, of opinion that there was what may properly be described as an interest in possession in the advanced funds taken as a whole before the date of the advancements.

    This is enough to settle the issue in favour of the Crown. A

E   great many cases were cited to us but none of them is directly in point, and in my judgment the question depends purely on the true construction of the Act and its result is in my opinion to make the Crown's claim for duty good on the two advanced funds. I would allow the appeal accordingly.

F   SALMON L.J. The word "interest" as used in the Finance Acts has a wider meaning than its strict conveyancing meaning. It is now well settled that those eligible to benefit under a discretionary trust, commonly called the "discretionary objects," have an interest in the property from which the income, the subject-matter of the discretionary trust, is derived. This is so notwithstanding

G   that there is a power of accumulation of surplus income and the trustees may never pay to or apply for the benefit of any of the discretionary objects one penny of the income: *Attorney-General v. Farrell*.[17a] In the present case the trustees accumulated virtually the whole of the income. This appeal turns upon whether or

---

[17] [1937] A.C. 286, 293, H.L.          [17a] [1931] 1 K.B. 81.

574                        HOUSE OF LORDS                        **[1968]**

**C.A.**

**1967**

Gartside
*v.*
Inland
Revenue
Commrs.

Salmon L.J.

not the interest of the objects of the discretionary trust set up under   A
the grandfather's will was " an interest in possession " within the
meaning of section 43 (as amended) of the Finance Act, 1940. If
it was such an interest, it was certainly limited to cease on the
death of the testator's son and it was clearly determined to the
extent of the advancement of £47,000 made by the trustees out
of the original trust fund to the twin grandsons of the testator 18   B
months before the son's death. Accordingly, by virtue of section
43 (supra), the £47,000 would be deemed to have passed on the
son's death. But for the advancement, the £47,000, like the rest
of the trust fund, would have passed or be deemed to have passed
on the son's death under section 1 or section 2 (1) (*b*) of the
Finance Act, 1894. Indeed, on the son's death, duty was admit-   C
tedly due and has been paid on the whole fund less £47,000. The
issue now is whether it is payable on the £47,000.

In order to decide whether or not the interest of the discre-
tionary objects was an interest in possession it is necessary to
consider the nature of that interest. It certainly gave the discre-
tionary objects no right to be paid any part of the income or to   D
have any part of it applied for their benefit. It made them
eligible to receive or to have applied for their benefit so much of
the income (if any) as the trustees might in their discretion decide.
Snell's Principles of Equity, 25th ed. (1965), p. 129, in my view
correctly states the position thus:

> " A discretionary trust is one which gives the beneficiary no   E
> right to any part of the income of the trust property, but vests
> in the trustees a discretionary power to pay him, or apply for
> his benefit, such part of the income as they think fit.... The
> beneficiary thus has no more than a hope that the discretion
> will be exercised in his favour."

In *Attorney-General* v. *Farrell* [18] Greer L.J. said of a discretionary   F
object:

> " He had no legal right to force the trustees to give him any-
> thing; at the same time he has in a colloquial sense an interest
> in the estate, because it was an estate out of which something
> might be allotted to him in the discretion of the trustees."

And Greer L.J. concluded that that was an interest within the   G
meaning of the Finance Acts. In the same case Romer L.J. said [19]
that it was rightly decided in *Attorney-General* v. *Heywood* [20] that

> " the prospect of an object of a discretionary trust sharing in
> the income, the subject-matter of the discretionary trust, is an

[18] [1931] 1 K.B. 81, 101.          [20] 19 Q.B.D. 326.
[19] Ibid. 103.

**104**

A    interest of that person in the property from which the income is derived."

The only right which any discretionary object possesses in addition to his chance or prospect is the right that the trustees shall honestly and fairly consider whether any, and if so what, part of the income shall be allotted to him. In a sense it may be difficult to
B    appreciate how discretionary objects, who have only such a limited right and only such an uncertain chance or prospect of receiving anything, can be said to have any legally recognisable interest in the trust property. Once, however, it is conceded, as an authority it must be, that they have such an interest, it is even more difficult to see how that interest can properly be described as an interest
C    in expectancy. They are in possession of the right and of the chance or prospect to which I have referred. The value of the right and of the chance or prospect no doubt depends upon how the trustees exercise their discretion. But the discretionary objects at all times enjoy the right and the chance or prospect, whatever its value may turn out to be. A person who has a vested interest
D    to receive money out of a trust fund on the happening of an event has only a right in expectancy until the event occurs. On the happening of the event, his right becomes a right in possession. The nature of his interest in the fund is determined by the nature of his rights. When, however, a discretionary object is paid some of the income, it is not in my view accurate, having regard to the
E    nature of his right, to say that his right is then vested in possession. He has not even then and never has had any right to be paid any part of the income which he receives. On the other hand, he has at all times enjoyed and been in possession of the right and chance or prospect which I have described. It may be tempting to say that a chance or prospect is something enjoyed in expectancy and
F    that, when it comes off, it is enjoyed in possession. But this in my view is a fallacy, for when it comes off it ceases to be a chance or prospect and is not as such enjoyed at all. By its very nature as long as it exists it is enjoyed in possession. After the race, the owner of the winning horse, on being asked: " Have you a chance of winning? " would reply: " It is not a matter of my having a chance: I
G    have now won. I always had a chance," or if he were pedantic: " I was always in possession of and enjoyed a chance." On the other hand, his right to be paid by the bookmaker (were it a legally recognised right) would be a right in expectancy up to the moment his horse passed the winning post, and a right in possession thereafter. The discretionary object never has a right to be paid: he

C.A.
1967

Gartside
v.
Inland
Revenue
Commrs.

Salmon L.J.

576                                HOUSE OF LORDS                                **[1968]**

C. A.

1967

Gartside
v.
Inland
Revenue
Commrs.

Salmon L.J.

has only a chance or prospect and the very limited right, to which **A** I have referred, of being considered for an allotment of income.

It has long been accepted that the value of a single discretionary object's interest cannot be measured, and that, accordingly, no estate duty is payable on his death. This rule may be difficult to understand. As the Master of the Rolls points out, in the common law courts, it is by no means unusual for the value of a chance to **B** be assessed: see, for example, *Chaplin* v. *Hicks*.[21] If a fund, the subject-matter of a discretionary trust, yields an income of £1,000 a year and there are, say, 10 discretionary objects, and the trustees have throughout the years distributed the whole income equally amongst them, there could be no difficulty in assessing the value of the interest of any discretionary object who died. Similarly, there **C** would be no difficulty in assessing the value of such an interest if throughout the years the trustees had never paid the deceased or applied for his benefit any part of the income. Between these two extremes there are, of course, many cases in which the task of measuring the interest would be difficult but no more difficult than the task of assessing the imponderables which has to be per- **D** formed every day in the common law courts. The rule, however, that, on the dropping of the life of one of the discretionary objects, no estate duty is payable because his interest is deemed to be immeasurable is so well established that it is now impossible to question it. The respondents argue that just as no estate duty is payable on the death of one discretionary object because his **E** interest is immeasurable, so no estate duty is payable when the whole discretionary trust ceases on a death, because the interest of the body of discretionary objects is just as immeasurable as that of any one of them. Even if the interest of the body of discre- tionary objects is immeasurable, there can be no doubt that on the discretionary trust ceasing, a benefit accrued to the grandsons **F** under the other trust, which then took effect. If the property did not pass under section 1, it would pass under section 2 (1) (*b*) of the Act of 1894. Moreover, I agree with the Master of the Rolls that the rule relating to the dropping of a single life should not necessarily be extended to the combined interests of the discre- tionary objects as a composite body. Indeed, it is clear that when **G** all their interests cease on a death, the property does pass and estate duty is exigible: *Scott's* case [22]; *Burrell's* case.[23] In the latter case virtually the whole of the income was distributed

[21] [1911] 2 K.B. 786.          [23] [1937] A.C. 286.
[22] [1937] A.C. 174.

106

A.C.                    AND PRIVY COUNCIL                    577

C. A.

1967

Gartside
v.
Inland
Revenue
Commrs.

Salmon L.J.

A    amongst the discretionary objects, no point was taken under section 5 (3) of the Act of 1894 and, accordingly, the question as to whether the interests were interests in possession was not considered. That question arises for the first time in the present case. It is to be observed that in this case, although the respondents contended that none of the discretionary objects had any interest

B    in possession, they conceded that the whole estate except the £47,000 passed on the son's death, and attracted estate duty which has been paid. The judge and the respondents in this court relied strongly upon *Attorney-General* v. *Power*.[24] I agree with the Master of the Rolls that that decision is distinguishable from the present case. Indeed, properly understood, in my view it throws

C    no light on the problem which confronts us, although there is a passage in the judgment which, taken out of context, appears to do so. It is true that at first sight the position of a discretionary object, for whose benefit the trustees have power to apply the income from the trust property, may seem to resemble the position of the infant for whose maintenance or benefit the trustees have

D    power to apply the income from the trust property. But the two positions in law are fundamentally different. In the former case we know from the authorities, to which I have referred, that the existence of the power confers an interest in the estate upon the discretionary object, whereas in the latter case the existence of the power by itself confers no separate interest upon the infant. His

E    only interest is his interest in fee.

        The settlement in *Attorney-General* v. *Power*[25] was in an unusual form. It vested the estate in fee upon the children of the marriage equally. When the eldest child was born, he took the whole estate in fee subject to the birth of any other child or children. On the birth of the second child, half the estate was

F    divested from the first child and went to the second, and so on. Should any child die under 21, his share became divested and divided equally amongst the others. There was also a proviso that during the minority of each child the trustees should hold the rents and profits of his share, which they had power to apply for his maintenance or benefit, and accumulate the surplus, but not for

G    the infant. The surplus rents and profits was not the infant's property in any event, but was " captured by the trusts of the settlement " and, together with the infant's share of the capital, would go to the other children should the infant die under the age of 21. One of the children, Hubert Power, died an infant. The question

[24] [1906] 2 I.R. 272.              [25] Ibid.
      A.C. 1968.                                    23

C. A.

1967

Gartside
v.
Inland
Revenue
Commrs.

SALMON L.J.

was: had he an interest in possession in his share so that estate **A** duty became payable on his death? The court's decision was against the Crown on the ground that the income was not the infant's income and that the provision as to maintenance gave the infant no separate interest in the estate. His only interest was his interest in fee to which the power to maintain was ancillary. Palles C.B. held that the conveyancing form of the settlement deed **B** made no difference in law to the reality of the situation. It was just as if the settlement had provided that the children should take subject to attaining the age of 21 " with such a provision for maintenance (as the actual settlement conferred) or without it, in which event a substantially similar provision would have been applied by the Conveyancing Act." In such a case the Attorney-General con- **C** ceded (rightly, according to Palles C.B.) that no estate duty would have been payable whether or not any of the income had been applied for the infant's maintenance or benefit. The infant's only interest in the estate would have been his interest in fee, which was an interest in expectancy only. The whole case proceeded on the basis that a power in the trustees to apply income **D** for the infant's maintenance or benefit, even if exercised, gave the infant no separate interest in the estate. *Attorney-General* v. *Heywood* [26] was not cited—presumably because it never occurred to anyone that the position of the infant was truly analogous to that of a discretionary object. In my view the court never considered what would have been only an academic question, namely, had the **E** power to maintain given the infant a separate interest in the estate —would such an interest have been an interest in possession or in expectancy?

If, which cannot now be doubted, the chances of prospects of a discretionary object and his limited right give him an interest in the trust fund, then in my judgment, for the reasons I have already **F** stated, the interest must be an interest in possession and not in expectancy. *Attorney-General* v. *Power* [27] does not touch this point.

If, contrary to my view, the group of discretionary objects had no interest in possession but only an interest in expectancy, I, for my part, would feel unable to accept the Crown's contention that **G** their interest can be combined with that of the accumulation beneficiaries so as to form a composite unit which would have an interest in possession. At the time of the advancement, the interests of the accumulation beneficiaries were indisputably interests in

[26] 19 Q.B.D. 326.                    [27] [1906] 2 I.R. 272.

**A.C.**        AND PRIVY COUNCIL        579

C. A.
1967
————
Gartside
v.
Inland
Revenue
Commrs.
————
SALMON L.J.

A  expectancy. To combine one group of interests in expectancy with another group of interests in expectancy and thereby form a composite group of interests in possession involves an intellectual gymnastic feat which, no doubt, owing to a common lawyer's inexperience of the exercise, I cannot even follow, let alone perform. In my attempt to do so, I have found no help in *In re Hodson's*
B  *Settlement*[28] or *Westminster Bank* v. *Attorney-General*,[29] which, so far as aggregation is concerned, seem to me to establish no more than that for the purposes of calculating the rate of estate duty payable, the values of different classes of interest may be aggregated.

   I do not think that it is necessary or even permissible to
C  assume that there must always be some person or body of persons in possession of a beneficial interest in the trust property. If such an assumption has to be made, no doubt the neatest solution (when no interest in possession is otherwise discernible) is to call into existence a body in which are amalgamated all the beneficial interests in the trust property, because ex hypothesi it would con-
D  tain the interest in possession which is assumed to exist. I cannot, however, accept such an assumption. If, at the date of the advancement, the interest of the discretionary objects was truly an interest in expectancy, then in my view there could have been no beneficial interest in possession anywhere. The whole beneficial interest would have been in expectancy and the Crown would
E  have failed.

   Since, however, I consider that the discretionary objects had an interest in possession at the date of the advancement, I would allow the appeal.

*Appeal allowed with costs.*
*Leave to appeal.*

F

   Solicitors: *Solicitor of Inland Revenue; Gregory, Rowcliffe & Co. for John Taylor & Co., Blackburn.*

   The trustees of the testator's will appealed to the House of
G  Lords.

[Reported by MRS. ROSALIE LONG, Barrister-at-Law.]

———————

[28] [1939] Ch. 343; 55 T.L.R. 357;       [29] [1939] Ch. 610; [1939] 2 All
[1939] 1 All E.R. 196, C.A.                E.R. 72, C.A.

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

*G. A. Rink Q.C.* and *P. W. E. Taylor* for the appellants. The main issue is this: was there under the discretionary provision and the accumulation provision a beneficial interest in possession in the trust fund before the power of advancement was exercised? This involves two questions: (a) was there within section 43 of the Finance Act, 1940, a beneficial interest at all under either of the provisions? (b) If so, was it in either case an interest in possession within that section? During the relevant period nobody had a *right* to receive any income at all.

An " interest in possession " means a present right of present enjoyment of the relevant property—in this case the trust fund. Contrast this with a future interest (called in the Finance Act, 1894, " an interest in expectancy.") Though the owner of such an interest may be able to enjoy and profit from it (e.g. by selling or mortgaging it) while it remains such an interest, it is not on that account an interest in possession, since it gives him no present right to receive or enjoy any capital or income of the trust fund itself.

Here the trust fund was held in trust during the life of the deceased to apply the whole or such part of the income as the trustees in their absolute and uncontrolled discretion should think fit for the benefit of the deceased and his wife and children or any of them and to accumulate the remainder of the income. There was merely a *power* to distribute and the trustees were not obliged to distribute anything. There is a crucial difference between the present case and that of a *trust* to distribute the whole income.

The question raised in these proceedings is whether estate duty became payable on the advanced funds. They did not actually pass or change hands on the death and the issue is whether they were caught by section 43. They cannot have been so caught unless an interest in possession within the section arose under the discretionary provision or the accumulation trust or both combined.

. It is conceded that the persons who will get the capital of the accumulations have an interest in it, but it is not an interest in possession. It is submitted: (1) Nobody had an interest within section 43 under the discretionary provision; (2) if that is held to be wrong, then any interest under this provision was not an interest in possession; (3) if, contrary to these contentions, there was an interest in possession under the discretionary provision, but only an interest in expectancy under the accumulation provision, duty cannot have become payable as a result of the determination of the discretionary provision, since (a) that provision did not extend to the whole or any measurable part of the income of the advanced

A

B

C

D

E

F

G

A.C.                    AND PRIVY COUNCIL                    581

A    funds and (b) an interest in possession cannot be combined with an
interest in expectancy so as to produce an interest in possession
extending to the whole fund.

[LORD REID. The majority of the Court of Appeal were in
your favour on this last point (point 3 (b)) and you can leave it
to the respondents to deal with it if they wish to do so.]

B    (1) The first question is whether the discretionary objects had an
interest within section 43. There is a presumption that the same
words have the same meaning throughout the same enactment but
this presumption must yield to the requirements of the context.
The word "interest" has not the same meaning in all parts of the
Finance Act, 1894, or even throughout section 2, but it is clear
C    that in section 43 of the Finance Act, 1940, it has the same meaning
as in section 2 (1) (b) of the Act of 1894.

Though the Act of 1894 applies to property of every kind, real
and personal, legal and equitable, everywhere, it often uses the
language of conveyancing in England and extends this to other
property by reference or by the use of vague and flexible terms,
D    which derive some colour from being placed in such a context.

For instance, there are in the Act of 1894 three references to
the Settled Land Act, 1882 (sections 9 (7), 22 (1) (i) and 22 (2) (a));
it is therefore clear that the Act of 1882 was well in the minds of
the persons who drafted the 1894 Act, and persons concerned with
the latter were expected to know the former.

E    Some light on the meaning of "interest" in the Act of 1894 is
provided by the Bankruptcy Act, 1883, which was cast in the
widest possible terms to catch everything that belonged to the
bankrupt. In section 168 (1) of this Act (and also in section 167
of the Bankruptcy Act, 1914) the "property" which passes to a
trustee in bankruptcy is defined as including "every description . . .
F    of interest . . . present or future, vested or contingent, arising out
of or incidental to the property"; but nevertheless it does not
cover such an "interest" or spes as an object of a discretionary
trust may have in the trust fund or its income. If it were
otherwise, then on the bankruptcy of an object of a discretionary
trust he would cease to be a person for whose benefit the trustees
G    of the fund could apply the income, and his trustee in bankruptcy
would become such a person in his place. But this is not so.

Though "interest" in these Finance Acts is not used in any
narrow or technical sense, it has a legal flavour and is not used
in a purely popular sense. For example, if land was limited to
A for life and then to his heir at law in fee simple, an almost

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

582                     HOUSE OF LORDS                  **[1968]**

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

unlimited number of persons during A's life might have an interest **A** in the popular sense, since any of them might become his heir at law if all nearer potential claimants predeceased A. Possibly for this reason, the law does not recognise a potential heir at law as having any interest whatsoever in the legal sense or give him any rights during A's life. The term " interest " in the Act cannot include a relative's chance of ultimately becoming entitled to the **B** property under a settlement of this type. It is not an " interest " in law.

Even the fact that a person has an interest which the court will protect does not necessarily give him an " interest " within section 2 (1) (*b*); see *Coutts & Co.* v. *Inland Revenue Commissioners.*[1] An interest for this purpose must be (a) an interest in **C** property; (b) one which can be measured under section 7 of the Act of 1894 and (c) one which is enforceable, so that an interest under a discretionary trust is not enough: see *In re J. Bibby & Sons Ltd. Trust Deed,*[2] which is helpful by analogy. From the *Coutts* case[3] it appears that the mere fact that money has to be spent in a way which will ultimately benefit A does not **D** necessarily give him an interest in that money or in the trust fund.

As to the rights of an object of a discretionary trust, he has no right to complain provided the trustees do their duty properly, and his right in this respect does not amount to an " interest ". It is unlikely that Parliament would treat as an interest something **E** which is purely personal and unassignable in law and include it in the Act of 1894 for the purposes of estate duty.

A classification of the powers vested in trustees is shown in *In re Leek.*[4] The present case falls in the third category mentioned by Buckley J. The objects of a discretion or power of appointment have no interest in its subject matter until the discretion or power **F** of appointment is exercised in their favour, and after that they have only such interest as comes into existence as a result of the exercise: *In re Brooks' Settlement Trusts,*[5] which shows how the hope or chance of getting something under the appointment has been regarded and described in legal language. The appointees **G** under an appointment in their favour take no interest in its subject

[1] [1953] A.C. 267; [1953] 2 W.L.R. 364; [1953] 1 All E.R. 418, H.L.(E.).
[2] [1952] 2 T.L.R. 297; [1952] 2 All E.R. 483.
[3] [1953] A.C. 267.
[4] [1967] Ch. 1061, 1073–4; [1967] 3 W.L.R. 576; [1967] 2 All E.R., 1160.
[5] [1939] Ch. 993, 996–7; 55 T.L.R. 914; [1939] 2 All E.R. 920.

112

A.C.                    AND PRIVY COUNCIL                    583

A    matter till the appointment takes effect: *Williams* v. *Muir* [6]; see        H. L. (E.)
also *In re Coleman* [7]; *In re Strangways* [7a] and *In re Ashby.* [8]              1967

So far as *Attorney-General* v. *Heywood* [9] and *Attorney-General*              Gartside
v. *Farrell* [10] decided that the object of a discretionary trust had an            v.
interest in the trust fund, they are inconsistent with these decisions            Inland
and ought to be overruled.                                                        Revenue
                                                                                  Commrs.
B    No practical inconvenience to either taxpayers or the Revenue
would result from overruling them. No statute has been passed
on the basis of *Farrell's* case [10] and if it was overruled no duty on
that basis would be repayable to the Crown: see section 31 of the
Finance Act, 1951. In any event, *Farrell's* case [10] was decided
only on a narrow point—namely that under paragraph (c) of section
C    38 (2) duty becomes payable on the death of a settlor who is an
object of a discretionary trust under the settlement, even if the
discretion was never exercised in his favour. Where the discretion
was so exercised, duty normally becomes payable under paragraph
(a) of that section. Duty also becomes payable under paragraph
(c) where the settlor has retained a right to definite payments under
D    the settlement, even if he had not in fact received any such
payment. Even if *Heywood's* case [10a] and *Farrell's* case [10b] were
rightly decided, they are distinguishable from the present case
because they were solely concerned with the meaning of " interest "
in section 38 (2) (c) of the Customs and Inland Revenue Act, 1881,
and, even though that section was incorporated in section 2 (1) (c)
E    of the Act of 1894, " interest " there did not have the same
meaning as in section 2 (1) (b). *Heywood's* case [10c] is also distin-
guishable on an additional ground: the primary trust there was
to pay money for the benefit of the settlor and his family jointly
and the relevant discretion was merely a discretion to exclude him.
Under section 2 (1) (b) duty is not payable unless the relevant
F    interest could be measured under section 7 (7). Accordingly,
section 43 of the Act of 1940 would not have imposed duty on the
termination, shortly before the death of a discretionary object, of
his chance of being benefited in exercise of the discretion.

A discretion to distribute income must be exercised in a
reasonable time. Here, if the trustees failed to exercise their
G    discretion within a reasonable time, they would have to accumu-
late and it would not be paid out to the beneficiaries who

[6] [1943] A.C. 468, 484–5, H.L.        [9] (1887) 19 Q.B.D. 326, D.C.
(Sc.).                                  [10] [1931] 1 K.B. 81; 46 T.L.R.
    [7] (1888) 39 Ch.D. 443, C.A.       587, C.A.
    [7a] (1886) 34 Ch.D. 423, 431; 3    [10a] 19 Q.B.D. 326.
T.L.R. 94, C.A.                         [10b] [1931] 1 K.B. 81.
    [8] [1892] 1 Q.B. 872.              [10c] 19 Q.B.D. 326.

H. L. (E.)
1967

Gartside
v.
Inland
Revenue
Commrs.

happened to be in existence: see *In re Allen-Meyrick's Will* **A**
*Trusts.*[11] The position would be different if the primary trust were
(as in *Heywood's* case [12]) to apply the whole income unless the
trustees saw fit in their discretion to apply less.

Without defining the meaning of " interest " in section 2 (1) (*b*),
one may say that it is a right to get something and not a mere
chance of getting something at somebody else's will or on the **B**
decision of somebody else. An interest in property is an enforce-
able right to receive in cash or kind something out of the property
or assets which represent it.

(2) As to the question whether discretionary objects had an
interest in possession, if, contrary to the appellant's submissions,
the discretionary objects had an " interest " in the trust fund within **C**
section 2 (1) (*b*), it was for the following reasons not an interest in
possession:

(a) Though the term "interest" is a word in general use,
"interest in possession" is a term of art. In the Act of 1894 it
is contrasted with "interest in expectancy" (which is defined in
conveyancing language in section 22 (1) (*j*) ), and the two terms are **D**
mutually exclusive, though they do not necessarily cover the whole
field.

(b) When the Act of 1894 was passed "interest in possession"
was a term of art well understood as giving its owner present
enjoyment of the property in which it subsisted: see Fearne on
Contingent Remainders, 10th ed. (1844), Vol. 1, pp. 1–2; Preston on **E**
Estates (1820), p. 89; Challis on Real Property, 2nd ed. (1892),
p. 64 (the leading textbook when the Act of 1894 was passed),
and Jarman on Wills, 6th ed. (1910), pp. 1352–1353, a passage new
in this edition and repeated verbatim in the latest edition. A spes,
even if it is an interest, cannot be an interest in possession; that
would be a contradiction in terms. **F**

(c) There was no ground for using the term "interest in
possession" in a novel sense in the Act of 1894.

(d) The discretionary objects never had an interest in posses-
sion in the trust fund because they never had a right of present
enjoyment of it. **G**

(e) If the trustees exercise their discretion by paying a sum to
a discretionary object, he obtains a right of present enjoyment of
that sum but the quality of his interest (if any) in the remainder
of the trust fund remains unchanged.

[11] [1966] 1 W.L.R. 499; [1966] 1    [12] 19 Q.B.D. 326.
All E.R. 740.

A    (f) The determination of a discretionary provision only determines the possibility of the discretionary objects benefiting under a future exercise of the discretion, but the possibility is at no time an interest in possession.

Words must be used in their legal sense unless a contrary intention appears: *Commissioners for the Special Purposes of the Income Tax* v. *Pemsel*.[13]    When there is a technical conveyancing

B    term used to describe an interest, nothing entitles one to adopt any other construction.    In *Attorney-General* v. *Power*,[14] Palles C.B. rightly said that estate duty would not be payable on the death of an infant who had been entitled to property contingently on attaining 21 and had in the meantime had the benefit of the

C    usual power of maintenance.    The same considerations apply to the discretionary provision in the present case:  see also *In re Jones' Will Trusts*[15] and *Attorney-General* v. *Coole*.[16]

It would be contrary to the scheme of the Act of 1894 as to accountability if a person who was not entitled to receive, and might in practice never receive, any property under the trust

D    should nevertheless be accountable for the duty; but that would be the effect of section 8 (4) if the respondents were right in their submission that the objects of a discretionary trust for the time being in operation had interests in possession.

(3) As to the " extent " of any interest in possession, if the discretionary objects had an interest in possession, it was an

E    interest in an indefinite part of the income of the trust fund, since it was impossible to know in advance what part of the income (if any) they would recover.    An interest in such a part cannot be measured as required by section 7 (7) of the Act of 1894 and so cannot " extend " to the whole or part of the fund so as to attract duty under section 2 (1) (*b*) or section 43.

F    As to the relevant estate duty cases, among the cases relating to estate duty where there have been trusts for accumulation or discretionary trusts, the facts (though not the question of law) in *Adamson* v. *Attorney-General*[17] were on all fours with the present case.    In each case practically nothing was applied under the discretionary powers, which the House of Lords ignored in *Adam-

G    son*.[17]    *Scott* v. *Inland Revenue Commissioners*[18] is distinguishable

H. L. (E.)

1967

_____

Gartside
*v.*
Inland
Revenue
Commrs.

_____

---

[13] [1891] A.C. 531, 577 et seq., H.L.(E.).
[14] [1906] 2 I.R. 272.
[15] [1947] Ch. 48; [1946] 2 All E.R. 281.
[16] [1921] 3 K.B. 607; 37 T.L.R. 255.

[17] [1933] A.C. 257, 258, 259, 261, 277; 49 T.L.R. 169, H.L.(E.).
[18] [1937] A.C. 174, 180–181, 183; 53 T.L.R. 130; [1936] 3 All E.R. 752, H.L.(E.).

586                         HOUSE OF LORDS                     [1968]

H. L. (E.)
1967

Gartside
v.
Inland
Revenue
Commrs.

and little can be deduced from it. *Burrell* v. *Attorney-General* [19] A
is also distinguishable from the present case on the " interest " and
" interest in possession " points because the House of Lords treated
it as a case where the group was entitled to the whole income.
In using the phrase " beneficially interested " in relation to the
discretionary objects, Lord Russell of Killowen was merely using
a convenient term and not intending to imply that they had an    B
interest within section 2 (1) (*b*). In *Ralli Brothers Ltd.* v.
*Inland Revenue Commissioners* [20] the essential point was that
where a single person has a beneficial interest in the whole or
a substantial part of the income both before and after the death
there is no passing even though the beneficial interest arose under
two separate instruments. *Public Trustee* v. *Inland Revenue*    C
*Commissioners* [21] (*In re Kirkwood*) was a similar case, save that
the trusts of the income were discretionary trusts. That
case did not deal with the question whether there was an interest
in possession and, in any event, did not deal with the type of
trust in the present case. It was dealing with the case where the
whole income had to be distributed. If the whole income had to    D
be distributed and all the objects were sui juris, they might
have an interest in possession, because they could demand the
whole income. A person who only has a hope has no right of
present enjoyment.

    *P. W. E. Taylor* following. The expression " interest in posses-
sion " in section 43, lacking precision, should be so construed as    E
to exclude discretionary trusts because: (1) a doubt or ambiguity
in a taxing Act should be resolved against the Crown by limiting
the extent of the tax: see *Adamson* v. *Attorney-General*.[22-24]   (2)
Surprising and inequitable results would follow if discretionary
trusts were included.

    In construing any statute the object is to find the intention of    F
Parliament from the words used and any other admissible material.
These results, in particular, show that Parliament could not con-
sciously have intended discretionary trusts to fall within section 43.

    Section 43 (2) contains an exemption from or limitation of the
charge in section 43 and creates the well-known five-year period.
If discretionary trusts or powers confer interests in possession,    G
section 43 (2) would seldom enable a fund to escape duty after

---

[19] [1937] A.C. 286, 287, 301–302;   [21] [1966] A.C. 520, 522, 540–1,
[1936] 3 All E.R. 758, H.L.(E.).    544–545; [1966] 2 W.L.R. 136;
[20] [1966] A.C. 483; [1966] 2   [1966] 1 All E.R. 76, H.L.(E.).
W.L.R. 19; [1966] 1 All E.R. 65,    [22-24] [1933] A.C. 257, 275.
H.L.(E.).

H. L. (E.):
1967·
Gartside
v..
Inland
Revenue
Commrs.

the determination of a discretionary trust or power (however long before the death the determination occurred) since the objects of most such trusts or powers include the reversioners or other persons in whose favour the power of advancement or any similar power can be exercised.

The Crown base their case on a simultaneous determination of the interests of all discretionary objects or of all discretionary objects and accumulations beneficiaries, reading section 43 in the plural throughout, as referring to several interests at once or else treating the beneficiaries concerned as having a group interest. In either alternative the words " the person who immediately before the disposition or determination had the interest " in section 43 (2) must be read as referring to the persons who " had the interests or group interest." In the present case these would be the deceased, his wife and twin sons.

On the respondents' construction, if the advances to the twins had been made shortly after their birth, eighteen years before their father's death, duty would have been payable under section 43. Until they attained full age the advances were under the deeds poll to be held in trust for them contingently on their doing so and this would amount to non-exclusion. In the final result they would be enjoying the released income when they were among the persons who should be excluded to start the five-year period running.

This example of the astonishing results which would follow if discretionary trusts were within section 43 is affected by the complication that the persons for whose benefit capital is taken out are both discretionary objects and reversioners, but similar surprising results would occur without that factor.

One cannot avoid absurdity by construing the reference in section 43 (2) to the person who had the interest as excluding any person becoming entitled by virtue of or upon the disposition or determination. That would produce the absurdity that a trust for X for life could be determined and replaced by a discretionary trust for X and other persons for a long period and then X, being one of the persons becoming entitled, would not need to be excluded from any benefit and could have the whole income without preventing the five-year period from running.

Section 43 (2) of the Act of 1940 was expanded in section 43 (2) and (3) of the Finance Act, 1950: see also the definition of " associated operations " in section 59 of the Act of 1940. Many advances must have been made in the past, some long ago, from

117

588                              HOUSE OF LORDS                              **[1968]**

H. L. (E.)
1967
Gartside
v.
Inland
Revenue
Commrs.

trust funds where the prior trust was a discretionary trust for life. **A** Some of these would have been for wide discretionary classes containing not only the advanced beneficiaries but also all their close relatives. The advanced funds may be shares in family companies which will remain unrealised and traceable indefinitely. If discretionary trusts were within section 43, then in such circumstances freedom from duty would only be obtained for an advance if, not **B** only the advancee, but the entire class of relatives had been excluded from any benefit from any associated operation. The five-year period would be started afresh by any benefit to any of the relatives from an associated operation. This would include any disposition affecting the advanced property, whether originally contemplated or not. Thus if the advancee died and left his **C** property to one of the relatives by will, a five-year period would start anew and attract duty on the death within that five years of the person for whose life the discretionary trust was limited, although the advance had been made years before.

These harsh results suggest that the legislature could not have intended the construction which would lead to them. **D**

Alternatively, this particular determination, being in favour of some of the discretionary objects, is outside section 43. In *Ralli's* case [25] the House of Lords held that section 43 only applied where there was a determination or disposal in favour of some other party. The statements were mainly based on the use in subsection (2) of the words "the person becoming entitled **E** by virtue of the determination" and "the person who had an interest", which presuppose that in a section 43 case there must be a person who becomes entitled and was not therefore entitled before. If section 43 (1) refers only to a determination or disposition to some person other than the owner of the life interest it follows that: (a) If discretionary objects have separate interests **F** simultaneously determined, each son's previous interest in his own advance, being determined in favour of himself, falls outside section 43. The determinations falling within section 43 are therefore the determinations of the interests of the beneficiaries other than the son advanced. These interests have no measurable **G** extent. (b) If the discretionary objects are to be regarded as having a group interest belonging to them collectively, the determination of this group interest does not cause a person to become entitled who was not entitled before. The son becoming entitled was

[25] [1966] A.C. 483, 509–10, 514.

A   within, and not outside, the class of those entitled before. Hence again the determination is not within section 43.

As to section 7 (7) of the Act of 1894, the meaning of the expressions " if the interest extended to the whole income " and " if the interest extended to less than the whole income " has never been canvassed in detail. In *Attorney-General* v. *Barclays* B   *Bank Ltd.*[26] income to which the interest extended, so referred to, appears to have been taken as meaning " income which the annuitant could lawfully require." See also *Skinner* v. *Attorney-General*[27]; *Attorney-General of Ceylon* v. *Chettiar*[28]; the *Kirkwood* case.[29] In *In re Baron Vestey's Settlement*[30] a firm distinction was drawn between the chance of participating in income C   of the trust property and the interest which a favoured discretionary object had in the sum of money which was in the hands of the trustees and in regard to which they had exercised their discretion. The beneficiary's interest in that arose when the discretion was exercised in his favour in respect of that sum.

*H. E. Francis Q.C.* and *J. P. Warner* for the respondents. It D   is submitted: (1) The interests with which the House of Lords is concerned are the interests in the trust fund, not in any particular piece of income: see the language of section 43. A particular piece of income in the hands of trustees does not become the subject of an interest of the beneficiaries until it is paid over to them. That is not the interest with which the House of Lords is concerned. E   (2) The House of Lords is not concerned with the accumulations fund built up before the deeds poll. It is only concerned with interests in the original trust fund created by the will of the testator and limited to endure till the death of his son. The nature of those interests did not change. There were alterations in the objects, at first only the son and later his children, but the nature F   of the interests remained the same.

(3) The expressions " group interest " or " class interest " are only a convenient rubric for the totality of the several individual interests of the members of the group of discretionary objects. It is not submitted that there is a single interest in the group.

(4) The nature of the interests of the discretionary beneficiaries G   must depend on the legal effect of the relevant provisions of the

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

[26] (1942) 59 T.L.R. 52; [1943] 1 All E.R. 181; [1943] K.B. 721; 59 T.L.R. 358; [1943] 2 All E.R. 123, C.A.; [1944] A.C. 372; 60 T.L.R. 531; [1944] 2 All E.R. 208, H.L.(E.).
[27] [1940] A.C. 350 358; 55 T.L.R. 1025; [1939] 3 All E.R. 787, H.L.(E.)
[28] [1957] A.C. 513, 538; [1957] 3 W.L.R. 293 (P.C.).
[29] [1966] A.C. 520, 541, 545, 547, 549.
[30] [1951] Ch. 209; [1950] 2 All E.R. 891, C.A.

H. L. (E.)
1967

Gartside
.v.
Inland
Revenue
Commrs.

testator's will and the legal rights under it and not on the way     **A**
in which the trustees administer the trusts or on the financial
benefits conferred by them: see *In re Parkes' Settlement*[31] cited
in *Kirkwood's* case.[32] It is irrelevant that in fact only two sums
were paid out to the objects. The position in law would have been
the same if the whole had been distributed in the lifetime of the
deceased among the discretionary objects.                            **B**

As to the question whether a discretionary object has an
"interest" the word is used in section 43 of the Act of 1940
in a special or popular sense and is not confined to a proprietary
interest as commonly understood by property lawyers. An
annuitant has been held to have an interest for estate duty
purposes in an unadministered estate, although the entire legal     **C**
and equitable interest was in the executors: see *In re White*[32a];
*Attorney-General* v. *Skinner*[33]; and *Commissioner of Stamp
Duties (Queensland)* v. *Livingston*.[34] An "interest" here means
some beneficial right with regard to the property.

Interest in section 2 (1) (*b*) of the Act of 1894 means some
beneficial right with regard to the property, one which can result   **D**
in a payment of money or money's worth to the beneficiary in the
present or the future. In these cases it is essential to identify
the real interest and not to confuse it with some right incidental to
it. "Interest" does not mean financial benefit. The right to finan-
cial benefit is not necessarily the true interest, for example, in the
case of insurance policies. A beneficiary may have an interest in    **E**
possession, although the right to financial benefit is future and
conditional. "Interest" cannot be equated with such an interest
as confers an immediate and unconditional right to financial
benefit. It would be wrong to put an artificial meaning on the
word merely because of the wording of section 7 (3) of the Act of
1894: see *Coutts & Co.* v. *Inland Revenue Commissioners*[35] and   **F**
*Westminster Bank Ltd.* v. *Inland Revenue Commissioners*.[36] The
receipt of money from trustees by a discretionary object is merely
the fruition of his interest, not the interest itself.

Each of the discretionary objects was beneficially interested in
the trust fund. In the income of the fund which accrued in the       **G**

---

[31] [1956] 1 W.L.R. 397, 402;
[1956] 1 All E.R. 833, C.A.
[32] [1966] A.C. 520, 541–2.
[32a] [1939] Ch. 131, 139–41; 57
T.L.R. 836; [1938] 2 All E.R. 629,
C.A.
[33] [1940] A.C. 350, 353, 357 et seq.

[34] [1965] A.C. 694, 707 et seq.,
712, 714, 716; [1964] 3 W.L.R. 963;
[1964] 3 All E.R. 692, P.C.
[35] [1953] A.C. 267, 279–80, 283–4.
[36] [1958] A.C. 210, 212, 214, 217,
223, 225–6, 227–8, 229–30; [1957] 3
W.L.R. 427; [1957] 2 All E.R. 745,
H.L.(E.).

120

A    lifetime of the deceased someone must have had an interest. If it was not the discretionary objects, it must have been those entitled to the accumulations. The beneficial interest does not belong to the trustee, for it would be contrary to equitable doctrine to say that the whole legal and equitable ownership was in them. In the present case there have been beneficiaries at all material times.

H. L. (E.)
1967

Gartside
v.
Inland
Revenue
Commrs.

B    Suppose a fund was held in trust for persons to be appointed within 21 years and in the meantime the income was accumulated. The beneficial interest would then remain in the settlor until appointment. If created by will, it would remain in the residuary legatee or next-of-kin. The entire beneficial interest would not

C    have been disposed of and there would be a resulting trust. *In re Chance's Settlement Trusts* [37] can only be explained on the basis that the possible objects of the trust were persons who would be beneficially interested in the trust fund when they came into existence. It is sufficient if there are beneficial interests in expectancy. A contingent interest is an interest recognised by law as

D    a beneficial interest. Though the objects of a power have no beneficial interest, the objects of a discretionary trust have such an interest in the trust fund. In *Costabadie* v. *Costabadie* [38] a discretionary object was referred to as having an equitable interest in the residue.

   It is submitted that: (1) the objects of a primary discretionary

E    trust (as here) under which the whole or part of the income is applicable for their benefit have beneficial interests in the trust property. (2) The totality of interests of the discretionary objects extend to the whole income notwithstanding that income not applied under the primary trust is directed to be accumulated. This is so because they are the only persons for whom the income could be

F    applied.

   *Scott* v. *Inland Revenue Commissioners* [39] was a case where the primary trust was as in the present case; then there was a provision for accumulation and a lot of income was accumulated. The existence of the discretionary trust was the only thing causing a passing. If it had been cut out and there had only been

G    the provision for accumulation; *Adamson* v. *Attorney-General* [40] would have applied. The 7th Earl was the only reversioner and had an estate tail and could have disentailed to make himself

---

[37] [1918] W.N. 34; 62 Sol.J. 349.
[38] (1847) 6 Hare 410.

[39] [1935] Ch. 246, 259–60, 262–3, 265–266; 51 T.L.R. 83, C.A.; [1937] A.C. 174, 176, 179–82.
[40] [1933] A.C. 257.

592                         HOUSE OF LORDS                    [1968]

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

the absolute owner. The manner of the exercise of the discretion   A
cannot affect the nature of the interests. If it be found that the
whole income could be distributed, then the group or person
concerned has a beneficial interest extending to the whole: see also
*In re Burney's Settlement Trusts* [41] and *In re Monro's Settlement
Trusts.* [42]

The interest of a discretionary object may be described in   B
various ways: (*a*) The title to receive the whole or part of the
income at the discretion of the trustees: see *Chance's* case [43] and
*Burrell's* case. [44]   In *Kirkwood's* case [45] the power to accumulate
was not decisive. (*b*) The prospect or chance of sharing in the
income of the trust fund by receiving some income from the
trustees: see *Farrell's* case [46] and what Salmon L.J. said in   C
the Court of Appeal in the present case. [47]   (*c*) The right to be
considered by the trustees as eligible for a payment to be made:
see what Lord Denning M.R. said in the present case. [48]

It is better to combine all three ways of putting it and to say
that an interest is the right to require the trustees, as regards the
whole income of the trust funds, as it comes into their hands, to   D
consider whether any and what part of it should be distributed
among the discretionary objects. That is a continuing obligation.
The counterpart is to require the trustees at convenient intervals
to apply their minds to this question in regard to the whole of
the income, and by reason of this the discretionary object has the
chance of receiving the whole or a part of it. If the discretion is   E
exercised in his favour, the discretionary object has a title to
receive and keep the sum appointed. The mere exercise of the
discretion does not give a right to payment because it may be
revoked. If there is an interest, it is not to be equated with the
right to payment. In the case of an ordinary life beneficiary
the right to payment is not the only right included in the interest;   F
there is also the right to sell and the right to mortgage the life
interest. A life tenant of a house or landed estate continues to
have a life interest, even though he receives no income, because
all the income has been applied by the trustees in repairs. Equally
a person may have an interest, although he cannot alienate it,
for example, in the case of the old restraint on anticipation or of   G
non-alienable interests in Parliamentary estates. The latter were

[41] [1961] 1 W.L.R. 545, 549;
[1961] 1 All E.R. 856.
[42] [1963] 1 W.L.R. 145, 147–9;
[1963] 1 All E.R. 205.
[43] [1918] W.N. 34.
[44] [1937] A.C. 286.

[45] [1966] A.C. 520, 522, 540–1,
547–8.
[46] [1931] 1 K.B. 81, 103–4.
[47] Ante, p. 575; [1967] 3 W.L.R.
671; [1967] 2 All E.R. 173.
[48] Ante, p. 566F.

A    the subject of section 5 (5) of the Finance Act, 1894. A protected life beneficiary equally cannot assign his interest.

There is a distinction between (a) a discretionary trust and (b) a fiduciary power of advancement or maintenance. An "interest ceasing on the death of the deceased" in section 2 (1) (b) refers to an interest capable of continuing from its creation to the death and which is determined by the death, but it does not cover an interest which may arise intermittently according to circumstances. The distinction between (a) and (b) is that in the case of the discretionary trust there is a continuing interest, because the trustees have continuously to exercise their discretion, whereas in the case of a fiduciary power of advancement the interest arises intermittently, because the trustees need only consider whether to exercise their discretion when they are asked to do so. This distinction is shown by *In re Roper*[49] and *Klug* v. *Klug*.[50]

*Heywood's* case[51] and *Farrell's* case[52] were referred to in order to show that no distinction was drawn between different types of discretionary trust, that is, depending on whether or not there was accumulation. Both were concerned with the Customs and Inland Revenue Act, 1881. The reference to powers of revocation in section 38 (2) (c) is not otiose, because a power of revocation is a special power with a trust in default and does not fall within the discretionary trust category. There is no reason for giving "interest" a different meaning in the Act of 1881 and the Act of 1894.

It is impossible to distinguish between these two authorities, and they were both rightly decided. If *Farrell's* case[52] were overruled, it might lead to a change in the form of marriage settlements; property could on marriage be settled with a long-term discretionary trust for the spouses and the issue of the marriage, and the entire income could then be paid under the trust for life to the settlor without attracting duty on his death. It would destroy the whole scheme of the Estate Duty Acts to hold that there was no interest in cases of discretionary trusts with powers of accumulation.

Section 7 (7) of the Act of 1894 merely provides a formula for valuing the extent of the benefit and goes no further, and it is not right to use it to limit the construction of "interest" in section 2 (1) (b) where "interest" in the light of the scheme of the

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

[49] (1879) 11 Ch.D. 272.
[50] [1918] 2 Ch. 67.
[51] 19 Q.B.D. 326.
[52] [1931] 1 K.B. 81.

H. L. (E.)
1967

Gartside
v.
Inland
Revenue
Commrs.

Act should have such a meaning as to catch an interest like that   **A**
in the present case.

*Vestey's* case [53] turned merely on the conveyancing language of
the Trustee Act, 1925, like *In re Beckett's Settlement.*[54] These two
cases are not in point because the " interests " with which the
House of Lords is here concerned are not confined to conveyancing
interests. The estate duty enactments do not use the word in the   **B**
conveyancing sense only.

*Bibby's* case [55] was not a decision directly on section 2 (1) (*b*).
Further, it was wrongly decided in so far as it was held that the
widow had no beneficial interest, though the decision could have
been justified on the ground that the interests had no value.

As to the meaning of the words " in possession ", for estate   **C**
duty purposes interests are either in possession or in expectancy,
and these two categories are exhaustive: see sections 5 (3), 7 (6)
and 21 (3) of the Act of 1894. If the appellants were right, the
interest of an object of a present discretionary trust would be in
the same category as that of an object of a future discretionary
trust; but there must be some distinction as a matter of legal   **D**
terminology. The interest of an ordinary non-discretionary life
tenant is future in the sense that it is dependent on whether or not
the trustees actually receive income.

If the word " interest " has a popular sense, the expression " in
possession " should be similarly interpreted. An interest in posses-
sion connotes a right in current income not subject to a prior   **E**
interest. One must consider the matter in relation to a period and
not to a particular time. There are also different kinds of interest.
In the case of an estate in land an interest in possession requires
present enjoyment, but where the interest does not confer the
right to payment, the concept of possession must be adjusted
accordingly. If the interest confers a present right with respect to   **F**
current income of the fund, it is in possession. The interest here is
more than a mere chance.

Section 43 of the Act of 1940 is just an appendix to the Act
of 1894 and one would expect it to use the same terminology in
the same sense.

On the question of measurability as a matter of construction   **G**
of the testator's will, there is a primary trust extending to the
whole of the income of the trust fund for the discretionary objects
with a trust over in respect of the trust income not applied under

---

[53] [1951] Ch. 209.            [55] [1952] 2 T.L.R. 297.
[54] [1940] Ch. 279; 56 T.L.R. 342.

**124**

A    the previous trusts. The primary trust must be performed first before the trust for accumulation arises.

Under section 2 (1) (*b*) of the Act of 1894 one must consider whether there is property in which the deceased had an interest limited to cease on his death. Here one must ask whether the discretionary objects had an interest in the trust property. They

B    had such an interest in the trust fund as a whole because they had an interest in the income. Where there is a trust in the due performance of which the whole income of a fund may be paid out to a person or group of persons and to no one else, that person or those persons have an interest extending to the whole of the income. *Power's* case [55a] dealt with wholly different ques-

C    tions from the present case and is distinguishable because it was not a case of a discretionary trust; the trustees had only a power of maintenance and advancement, which they were under no obligation to exercise.

If it be held that because of the trust for accumulation, the interest of the discretionary objects does not extend to the whole

D    of the income, then it is submitted that the combined interest of the accumulation beneficiaries and the discretionary objects does so extend: *In re Hudson's Settlement* [56] and *Westminster Bank Ltd. v. Attorney-General*.[57]

It is submitted: (1) The right in respect of the accumulations during the lifetime of the deceased constituted an interest in the

E    trust fund because it was a beneficial right in regard to the income of the trust fund. It is beneficial because a fund is produced to the benefit of which the beneficiary may become entitled. (2) It was an interest in possession because it was enjoyed during the life of the deceased, being a beneficial right over current income. (3) The interest cannot be regarded in this case as being merely

F    incidental to capital interests. The interests of the accumulations beneficiaries are not merely incidental to the capital interests because the accumulations fund could have gone to the husband and wife who were not interested in the capital at all.

The right to have the interest accumulated, instead of going as on an intestacy, arises only by virtue of the trust for

G    accumulation.

Where the Act of 1940 refers to an interest it refers to an " interest limited to cease on the death of the deceased ". Here the determination took place after the interests had been interests

H. L. (E.)

1967

———

Gartside
*v.*
Inland
Revenue
Commrs.

———

[55a] [1906] 2 I.R. 272, 277–9, 281.    [57] [1939] Ch. 610, 625 et seq.;
[56] [1939] Ch. 343, 355 et seq.; 55    [1939] 2 All E.R. 72, C.A.
T.L.R. 357; [1939] 1 All E.R. 196.

H. L. (E.)
1967

Gartside
v.
Inland
Revenue
Commrs.
———

in possession. If there had been no such determination the **A** property would have passed under section 1 or section 2 (1) (*b*) of the Act of 1894.

*J. P. Warner* following. It is not necessary for the purposes of this case to define the word " interest " in section 2 (1) (*b*) of the Act of 1894 and section 43 of the Act of 1940. To define it exhaustively would be difficult because it embraces rights arising **B** under foreign systems of law as well as rights arising under English or Scots law. It is enough that the word does embrace the interest of an object of an English discretionary trust. One must not confuse the two meanings of " interest " as used by lawyers. In its narrow sense it means an estate or something in the nature of an estate in the property. In its wider sense it means the right to **C** have the property dealt with in a particular way for the benefit of the person having the right. See *Livingston's* case,[58] where *Skinner's* case [59] was explained as resting on the fact that, in section 2 (1) (*b*), the word interest is used in a sense wide enough to include interests where it was used in the second sense.

The object of a discretionary trust has an interest in the trust **D** fund in the second sense: *Beckett's* case.[60] See also *Costabadie's* case [61]; *Chance's* case [62]; *Heywood's* case [63]; *Scott's* case [64] and *Burrell's* case.[65] Accordingly the object of a discretionary trust has an interest in the trust fund within the meaning of section 2 (1) (*b*).

The respective positions of an object of a discretionary trust **E** and an object of a power of appointment are different: Contrast *In re Greaves* [66] and *Burrell's* case.[67]

The next question is whether, in this case, the interests of the discretionary objects, between them, extend to the whole income of the fund (as the Crown contends) or extend only to an un-measurable part of it (as the taxpayer contends). The answer is **F** that they extend to the whole because the discretionary trust is the primary trust and it extends to the whole of the income, the objects have an interest in the whole income: *Scott's* case [68] and *Burrell's* case.[69]

One cannot escape from that conclusion by saying that *Scott's* case [70] and *Burrell's* case [71] turned on the way in which the trustees **G**

[58] [1965] A.C. 694, 712.
[59] [1940] A.C. 350.
[60] [1940] Ch. 279, 285.
[61] 6 Hare 410.
[62] [1918] W.N. 34.
[63] 19 Q.B.D. 326.
[64] [1937] A.C. 174.

[65] [1937] A.C. 286.
[66] [1954] Ch. 434, 446.
[67] [1937] A.C. 286.
[68] [1937] A.C. 174.
[69] [1937] A.C. 286.
[70] [1937] A.C. 174.
[71] [1937] A.C. 286.

126

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

A had in fact applied the income in those cases. This would involve adopting the suggestion made in the Court of Appeal in the present case by Lord Denning M.R.[72] and Salmon L.J.[73-74] as to what should happen on the dropping out of one of the lives in a discretionary trust, satisfactory though it would be from the point of view of the Crown.

B Nor can one escape from *Burrell's* case [75] and *Scott's* case,[76] by holding that they were pure section 1 cases, because that would be inconsistent with the *Arnholz* case [77] (*Public Trustee* v. *Inland Revenue Commissioners*) in the light of which every pre-1960 decision must now be re-examined and, if necessary, re-explained. That is what has been done with regard to *Christie* v. *Lord*
C *Advocate* [78]: see the *Coutts* case [79] and the *Ralli* case.[80]

Nothing was said in *Scott's* case [81] or *Burrell's* case [82-83] which is not equally applicable in the present case.

The principle applicable is that all the interests in possession at the time of the death came to an end and new interests came into being.

D G. A. Rink Q.C. in reply. It is not accepted that *Scott* [84] and *Burrell* [85] would have been decided any differently on the *Arnholz* [86] basis . In the former case there was in effect a discretionary trust and a trust for accumulation. If the whole income had been accumulated the position would have been the same as in *Westminster Bank Ltd.* v. *Attorney-General* [87] and
E there would have been a section 1 passing.

In *Burrell's* case [88] the primary trust was for the trustees in their absolute discretion to pay a yearly allowance to Harry. The amount paid under the discretionary trust was virtually the whole income but it might have been a much smaller amount. The taxpayer might therefore have argued that because part of the income could have been retained and accumulated in Harry's life there
F was no complete change of hands on his death and so no passing under section 1. But this argument was not submitted and, if it had been, it ought to have failed on the principle subsequently established by the *Westminster Bank* case.[89] What was in fact

G
[72] Ante, p. 569G.
[73-74] Ante, p. 576D-G.
[75] [1937] A.C. 286.
[76] [1937] A.C. 174.
[77] [1960] A.C. 398; [1960] 2 W.L.R. 203; [1960] 1 All E.R. 1, H.L.(E.).
[78] [1936] A.C. 569, 570, 574-5; [1936] 1 All E.R. 443, H.L.(Sc.).
[79] [1964] A.C. 1393, 1418-9.
[80] [1965] A.C. 483, 512-3.
[81] [1937] A.C. 174.
[82-83] [1937] A.C. 286.
[84] [1937] A.C. 174.
[85] [1937] A.C. 286.
[86] [1960] A.C. 398.
[87] [1939] Ch. 610.
[88] [1937] A.C. 280.
[89] [1939] Ch. 610.

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

argued in *Burrell's* case [90] was (a) that the whole estate remained in the heir-at-law and next-of-kin of the testator, save in so far as the trustees distributed the income and (b) that there was no passing under section 1 because the group of discretionary objects immediately after the death included persons who had been such objects immediately before the death. The House of Lords rejected the first argument on the ground that the heir-at-law and next-of-kin had such microscopic interests that they could be ignored, and the second on the ground that the group of persons interested immediately after the death under a trust then coming into operation must be treated as a different group from those who had been interested immediately before the death under a different trust.

The respondents in the present case rely on the dictum of Lord Upjohn in *Kirkwood's* case,[91] but it does not help them even if the trust for accumulation contained in the testator's will in that case had been in operation immediately before the relevant death, the accumulation beneficiaries immediately before the death would not have been the same as the beneficiaries immediately afterwards and so the existence of the accumulation trust would not have prevented a passing.

Where there is a trust, and not merely a power, to distribute the whole income among discretionary objects and the trustees fail to exercise their discretion, the court will divide the income equally between the objects (*In re Hughes* [92]). So the " interest " of the objects under such a trust is akin to a defeasible interest.

In *Skinner's* case [93] the House of Lords held in effect that for the purposes of duty under section 2 (1) (*b*) on the death of an annuitant under the will of a testator whose estate is still in course of administration, the " extent " of the annuitant's interest must be determined on the same basis as if the annuity arose under a fully constituted trust. In *Livingston's* case [94] Lord Radcliffe took a different view on this point, but his judgment casts no light on the effect of section 2 (1) (*b*) in relation to the interests under a trust where there is no question of a continuing administration by personal representatives.

As to *Costabadie's* case [95] the basis of the judgment was that the daughter was entitled to a substantial payment, though the amount was left in the discretion of the wife.

A

B

C

D

E

F

G

[90] [1937] A.C. 286.        [93] [1940] A.C. 350.
[91] [1966] A.C. 520.        [94] [1965] A.C. 694.
[92] [1921] Ch. 208.         [95] 6 Hare 410, 413.

**A.C.**                    AND PRIVY COUNCIL                    599

A    *Chance's* case[96] is poorly reported and nothing useful can be got out of the words employed.

As to the duty of the trustees in the case of a discretionary trust, it is accepted that the statement in *In re Gestetner Settlement*[97] is correct.

*In re Greaves*[97a] was a case of a discretionary power rather B    than a discretionary trust. It is an ordinary case where there is a power of maintenance.

The argument that a particular decision would provide an easy way of evading tax is of no weight. The question is what is the fair meaning of the Act: *Potts' Executors* v. *Inland Revenue Commissioners.*[98]

C    As to the reading of two Acts when one incorporates the other, see the *Kirkness* case.[99]

The interest here is an interest in expectancy because it gives its owner no right to enjoy any part of the trust fund or the income and he may never get any such right. If there is no such right, there cannot be an interest in possession. The mere right D    to be considered for a possible payment does not confer an interest in possession.

*Wilson* v. *Turner*[100] was a case where the words were exactly the same as in the present case.

In the present case the law relating to fiduciary powers applies and it should not be held that discretionary objects as a group E    have an interest extending to the whole fund.

Their Lordships took time for consideration.

Dec. 13, 1967. LORD REID. My Lords, Thomas Gartside, the testator, died in January 1941. He left four children and this F    case is concerned with the share of his estate which he bequeathed for the benefit of his son John and his family. With regard to that share he provided that it should be held by his trustees:

> " Upon trust during the lifetime of my son John Travis Gartside to pay or apply the whole or such part as my trustees shall in their absolute and uncontrolled discretion think fit G    of the income of such fourth share for or towards the maintenance support or otherwise for the benefit of my said son John Travis Gartside or during his life for his wife or

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

---

[96] [1918] W.N. 34.
[97] [1953] Ch. 672, 688; [1953] 2 W.L.R. 1033; [1953] 1 All E.R. 1150.
[97a] [1954] Ch. 434.
[98] [1951] A.C. 443, 455–6; [1951] 1 T.L.R. 152; [1951] All E.R. 76.
[99] [1955] A.C. 696, 713.
[100] (1853) 22 Ch.D. 521, 523, 525, 527, C.A.

H. L. (E.)

1967

———

Gartside
*v.*
Inland
Revenue
Commrs.

———

LORD REID

———

children (if any) or any one or more exclusively of the other or others of them in such manner in all respects as my trustees shall in their absolute and uncontrolled discretion without being liable to account think fit and shall accumulate the surplus (if any) of the said income by investing the same and the resulting income thereof in manner hereinafter mentioned. To the intent that the accumulations shall be added to the fourth share and follow the destination thereof with power nevertheless for my trustees at any time to resort to the accumulations of any preceding year and apply the same for the maintenance support and benefit of my said son John Travis Gartside or (during his life) any wife or children of his or any one or more of them."

When the testator died John was unmarried. The next year he married and he had two sons, twins, born on January 5, 1945. His wife and two sons survived during the period relevant to this case. John died on May 8, 1963, and the present case raised the question whether estate duty is payable on his death in respect of sums which the testator's trustees had advanced to his twin sons prior to his death. From the testator's death until 1960 his trustees accumulated the whole income of John's share by virtue of the provision which I have already quoted. In 1961 they paid out of income sums of £786 for the benefit of John and of £50 for the benefit of his wife and accumulated the balance. By January 1, 1962, the total accumulated income amounted to about £55,000. On January 2, 1962, when the twin sons were nearly seventeen years of age the trustees, by virtue of a power to advance, executed two deeds poll whereby they declared that certain investments should be held in trust for each of the twin sons if he attained the age of twenty-one years. These two advances together amounted to nearly half the trust funds, apart from the accumulations, and they were worth about £47,000 at the date of John's death.

It is admitted that estate duty was payable on John's death on the whole of these trust funds, including the accumulations, with the exception of the £47,000 which had been advanced to his twin sons. The respondents claim that estate duty is also payable on this sum under the provisions of section 43 (1) of the Finance Act, 1940. That subsection provides:

" Subject to the provisions of this section, where an interest limited to cease on a death has been disposed of or has determined, whether by surrender, assurance, divesting, forfeiture or in any other manner (except by the expiration of a fixed period at the expiration of which the interest was limited to cease), whether wholly or partly, and whether for

A    value or not, after becoming an interest in possession, and the disposition or determination (or any of them if there are more than one) is not excepted by subsection (2) of this section, then—(*a*) if, had there been no disposition or determination as aforesaid of that interest and no disposition of any interest expectant upon or subject to that interest, the property in which the interest subsisted would have passed on the death under section one of the Finance Act, 1894, that

B    property shall be deemed by virtue of this section to be included as to the whole thereof in the property passing on the death; or (*b*) if, had there been no disposition or determination as aforesaid of that interest and no disposition of any interest expectant upon or subject to that interest, the property in which the interest subsisted would have been deemed by virtue of paragraph (*b*) of subsection (1) of section

C    2 of the said Act to be included to a particular extent in the property passing on the death, the property in which the interest subsisted shall be deemed by virtue of this section to be included to that extent in the property passing on the death."

The case for the respondents is that by making these advances

D    the trustees determined an interest or interests limited to cease on the death of John, and that such interest or interests had before that date become interests in possession. Until the trustees advanced these funds they were bound under the testator's will to decide, from time to time as income accrued, whether and to what extent that income should be applied for the benefit of John,

E    his wife and his two sons or any of them. After the advances had been made they were no longer entitled to deal with the income from the advanced funds in that way. If the advances had not been made the trustees would still have been bound from time to time to decide whether to exercise that discretion until the death of John when other trust provisions would have

F    come into operation.

The argument for the respondents was that the duty of the trustees to exercise that discretion from time to time gave to each of John, his wife and his two sons an interest in the fund, that that interest extended to the whole fund because the trustees could at any time have given the whole of the income from it to any

G    one of them, and that these interests were interests in possession. They say that it is immaterial whether or not the trustees ever at any time in fact gave to any of these beneficiaries any sum or other benefit: they each had interests in possession of the whole fund even if none of them ever received anything from it. If that were right then the section would apply. But the appellants

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

Lord Reid

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

LORD REID

argued that *a person's right to require trustees of a discretionary* *trust to consider from time to time whether or not to apply the* *whole or some part of the income of the trust funds for his benefit* *is not an interest, and, in any event, is not an interest in possession,* *in the whole fund or in any part of it within the meaning of this* *section.*

So the first and main question in this appeal is what is the meaning of the word " interest " in this section. The 1940 Act provides that it has to be construed as one with the Finance Act, 1894, and the two most closely allied provisions of the latter Act are section 2 (1) (*b*) and section 7 (7). It seems clear that the word " interest " must have the same meaning in these three provisions. The word " interest," as an ordinary word of the English language, is capable of having many meanings, and it is equally clear that in these provisions its meaning cannot be limited by any technicality of English law. Not only do these provisions also apply to Scotland, but they may have to be applied where duty is claimed in respect of interest under deeds which have to be construed under the laws of other countries.

But that does not mean that everything which the man in the street might call an interest is covered by the word " interest " in these sections. A man might say that a son and heir has an interest in his father's property to which he might reasonably expect to succeed. But one can discard that meaning: the son not only has no right in or over his father's property but he has no right to prevent his father from dissipating it. The respondents admit that, to be an interest under these provisions, it must give to the holder of it some right.

Then take the next step. A person, who has a contingent right to some benefit from a trust fund in some future event, has a present right to prevent the trustees from dissipating the fund. But that right is not an interest in possession separate from and in addition to his contingent interest. That is made clear by the decision in *Coutts & Co.* v. *Inland Revenue Commissioners.*[1] There beneficiaries had a right to require trustees to make payments of the premiums necessary to keep up a life insurance policy. When the person insured died that right, of course, ceased because no more premiums were payable. This House rejected the contention that this right to control the actions of the trustees

---

[1] [1953] A.C. 267; [1953] 2 W.L.R. 364; [1953] 1 All E.R. 418, H.L.(E.).

A.C.                    AND PRIVY COUNCIL                    603

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

LORD REID

A   was an interest, the cesser of which on the death gave rise to a claim for estate duty. Lord Porter said [2]:

"I cannot think that in any ordinary sense the interest is the right to have the premiums paid."

But the respondents' argument is that there is a distinction between such a right and a right to require trustees to consider whether
B   to exercise a discretion in favour of the particular beneficiary.

Before I go further I must examine section 2 (1) (*b*) and section 7 (7) of the Act of 1894, which are as follows:

"2. (1) Property passing on the death of the deceased shall be deemed to include the property following, that is to say: . . .
(*b*) Property in which the deceased or any other person had an interest ceasing on the death of the deceased, to the extent
C   to which a benefit accrues or arises by the cesser of such interest; but exclusive of property the interest in which of the deceased or other person was only an interest as holder of an office, or recipient of the benefits of a charity, or as a corporation sole; . . ."
"7. (7) The value of the benefit accruing or arising from the
D   cesser of an interest ceasing on the death of the deceased shall —(*a*) if the interest extended to the whole income of the property, be the principal value of that property; and (*b*) if the interest extended to less than the whole income of the property, be the principal value of an addition to the property equal to the income to which the interest extended."

E   The first thing that strikes one is that these provisions must have been intended to be coterminous. Section 2 (1) (*b*) (read in conjunction with section 1) only makes the cesser of an interest the cause of liability for estate duty "to the extent to which a benefit accrues or arises" by the cesser. And section 7 (7) directs how the "benefit accruing or arising from the cesser" shall be
F   valued. On any ordinary principle or method of construction I would infer that section 2 (1) (*b*) is only intended to apply to those "interests" the cesser of which causes "a benefit to accrue or arise" and therefore creates a liability to pay estate duty. Why should section 2 (1) (*b*) have set out to deal with any other kind of right? There is nowhere any definition of the word
G   "interest": one must infer its meaning from the context. The subsection plainly applies to every kind of right the cesser of which does cause a benefit to accrue or arise, but I find nothing to indicate that it can have been intended to apply or must be held to apply to any right or any kind of right the cesser of which

[2] [1953] A.C. 267, 279.

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

——
LORD REID
——

does not have that result. To find what is meant by a benefit     **A**
accruing or arising one must turn to section 7 (1), for again there
is no definition of this phrase. It appears to me to be obvious
that section 7 (7) was intended to provide a method for valuing
every benefit accruing or arising from any cesser of an interest
within the meaning of section 2 (1) (*b*), and it is implicit in section
7 (7) that every right which is an " interest " within the scope of     **B**
these provisions must " extend " either to the whole or to a part
of the income of the property in which the right gave to its
owner the " interest." The scheme appears to me to be perfectly
clear. If the deceased or any other person had a right which
" extended " (whatever that may mean) to the whole or to any part
of the income of any property and that right ceased on the death     **C**
of the deceased, then estate duty is to be due to an amount to
be determined by section 7 (7). If the right of the deceased or
other person did not " extend " to any part of the income, then
it was not an interest within the meaning of these provisions.
It appears to have been assumed in some cases that a right can
be an " interest " within the meaning of section 2 (1) (*b*), although     **D**
its cesser does not cause any benefit to accrue or arise, or that it
is sufficient that the cesser causes some benefit to accrue or arise
although the interest does not " extend " to any part of the income
of any property. I can find nothing either in the words or in the
apparent purpose of these provisions to justify such an extension
of the meaning of the word " interest " in section 2 (1) (*b*). It may     **E**
well be that the word " interest " in other provisions of the Act of
1894 has a different or wider meaning, but I must return to that.

Next comes the question of what is meant by an interest
" extending " to the whole or a part of the income of certain
property. Normally that must mean that the owner of the interest
is entitled to receive that income. In that case, apart from the     **F**
method of valuation of the interest, those provisions are in line
with the general scheme of the Act. On the cesser of that interest,
someone else will become entitled to receive the income accruing
from and after the cesser. So the right to receive the income will
change hands, and that is what happens when the property itself     **G**
passes under section 1.

The respondents seek to attach a much wider meaning to the
word " extend." They argue that each one of the objects of a
discretionary trust, who may be numerous, has an interest extend-
ing to the whole income of the trust fund because the trustees
could if they chose give the whole income to any one of the objects.

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.
___
LORD REID

A If there are a dozen objects of the trust, then there would be twelve different interests each extending to the same income. But they do not take that argument to its logical conclusion, for if they are right I see no escape from the conclusion that when any one of the twelve dies his interest ceases and there is therefore a cesser of an interest which extended to the whole income.

B That would at once bring section 2 (1) (b) and section 7 (7) into operation, and estate duty would have to be paid on the whole trust fund. And the same would happen on the death of another, and of a third, and of a fourth object before the end of the discretionary trust. So in the course of a few years estate duty would have to be paid on the whole trust fund as many times

C as there were deaths of objects of the discretionary trust, even if those objects who had died had never in fact received anything, the trustees having throughout exercised their discretion in favour of other objects of the trust who had survived. That would be a monstrous result which could never have been intended. In fact the respondents have never tried to claim estate duty when one

D of several objects of a discretionary trust dies, but that is not relevant in determining what is the true meaning of the word "extend." If giving an extended meaning to a word in an Act, and particularly in a taxing Act, leads to a wholly unreasonable result, that is a very strong indication that the word was not intended to have that extended meaning. And the strength of

E that indication cannot be diminished by the fact that the Revenue authorities have chosen to refrain from collecting tax which, if their view of the law is right, they are entitled to exact.

There are in some of the cases indications of a view that, while each of the objects of a discretionary trust has an interest in the trust fund, this interest does not extend to the whole or

F any part of the interest accruing from the fund. But, on the other hand, all the objects together have a single class or group interest which does extend to the whole interest of the fund. Counsel for the respondents in the clear and well reasoned argument expressly declined to adopt that view and I think he was well advised in taking that course. Where a number of persons are

G members of a company or other incorporation which has a separate legal personality, the incorporation can, of course, have a single right different from the rights of any of its members. But otherwise two or more persons cannot have a single right unless they hold it jointly or in common. But clearly objects of a discretionary trust do not have that: they each have individual rights:

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

Lord Reid

they are in competition with each other and what the trustees give to one is his alone.

I think that this idea of a group or class right must have arisen in this way. Where the trustees are bound to distribute the whole income among the discretionary beneficiaries and have no power to retain any part of it or use any part of it for any other purposes, you cannot tell what any one of the beneficiaries will receive until the trustees have exercised their discretion. But you can say with absolute certainty that the individual rights of the beneficiaries when added up or taken together will extend to the whole income. You can have an equation $x + y + z = 100$ although you do not yet know the value of x or y or z. And that may lead to important results where the trust is of that character. But that is not this case.

There was also an intermediate argument that, although an object of a discretionary trust has an interest in the whole of the trust fund, he does not have any interest in either the whole or any part of the income accruing from the fund. That argument is too subtle for me to understand it. No object of a discretionary trust has, as such, any legal right to or in the capital. His sole interest, if it be an " interest " within the scope of these provisions, is with regard to the income: he can require the trustees to exercise, in bona fide, their discretion as to how it shall be distributed, and he can take and enjoy whatever part of the income the trustees choose to give to him. I cannot see any ground for holding that he can have any " interest " in the capital if he has no interest in the income. As I have already explained, his right to prevent misappropriation of the capital is not a separate interest.

There is one other matter which I think throws light on these provisions. It may be that in 1894 discretionary trusts were not so common that the draftsman of the legislation must have had them in mind. But provisions authorising trustees to apply the whole or a part of the trust income for the maintenance of an infant who had a contingent but not a vested right to capital were extremely common. In such a case the infant (or his guardian) had a present right to make a claim for payment for maintenance and a right to require the trustees to exercise in bona fide their discretion whether or to what extent they would apply trust income for that purpose. If, as the respondents contend, the right of an object of a discretionary trust to have the trustees consider his case is an " interest " within the meaning of these provisions, what about the similar right of an infant with regard

H. L. (E.)

1967
___

Gartside
v.
Inland
Revenue
Commrs.
___

LORD REID
___

A     to maintenance? The respondents do not contend that such an infant has any " interest " and the draftsman and Parliament cannot possibly have intended that these provisions should apply on the death of such an infant before majority. But the only distinction which counsel for the respondents was able to suggest was that trustees are bound to consider the position of

B     discretionary objects without waiting for the objects to make a claim, whereas trustees are not bound to consider whether any sum should be applied towards the maintenance of an infant until a claim is made. That is a very narrow distinction and cannot in my view justify a conclusion that objects of a discretionary trust have " interests " in the trust fund but an infant with a claim

C     for maintenance has not.

      In my judgment, an examination of the relevant provisions of this legislation leads to the clear conclusion that objects of a discretionary trust do not have interests extending to the whole or any part of the income of the trust fund and it must follow that they do not have interests in the fund within the meaning

D     of section 2 (1) (*b*). And when one comes to section 43 of the 1940 Act, a fortiori they do not have interests in possession. It does not seem to me to be a reasonable method of construction to say first that you must disregard technicalities when considering what " interest " means and then, with regard to the rest of the phrase " in possession ", introduce the technicality that

E     any interest which is not " in expectancy " must be an interest " in possession." To have an interest in possession does not merely mean that you possess the interest. You also possess an interest in expectancy, for you may be able to assign it and you can rely on it to prevent the trustees from dissipating the trust fund. " In possession " must mean that your interest enables you to claim

F     now whatever may be the subject of the interest. For instance, if it is the current income from a certain fund your claim may yield nothing if there is no income, but your claim is a valid claim, and if there is any income you are entitled to get it. But a right to require trustees to consider whether they will pay you something does not enable you to claim anything. If the trustees do

G     decide to pay you something, you do not get it by reason of having the right to have your case considered: you get it only because the trustees have decided to give it to you. Even if I had thought the objects of discretionary trusts have interests, I would not find any good reason for holding that they have interests in possession.

      So it is now necessary to consider whether I am in any way

608                          HOUSE OF LORDS                          [1968]

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

LORD REID

precluded by authority from giving effect to these views. The    A
respondents relied principally on four cases in this House and I
have not found in any of the other cases cited in argument any
very illuminating discussion of the meaning of the word " interest "
in section 2 (1) (b) or of the phrase " interest in possession " in
the Act of 1940.

In *Scott* v. *Inland Revenue Commissioners*,[3] before the relevant    B
death the

> " persons beneficially interested in the income of the property
> . . . were . . . the various persons who were objects of the
> discretionary trust and the persons who might ultimately
> benefit by the accumulations and discharge of incumbrances "
> (*per* Lord Russell [4]).                                        C

After the death the seventh Earl Cadogan became entitled to
receive the whole income. If the seventh Earl had not been one
of the objects of the discretionary trust it would seem that the
property which yielded the income passed on the death. Enjoy-
ment of the income changed hands on the death. It was held    D
that the fact that he had been one of those objects made no dif-
ference. I do not think it useful to examine Lord Russell's
phraseology because no question was raised under section 2 (1) (b).
But, if one does look at it, he said in the passage which I have
quoted that the objects of the discretionary trust " were bene-
ficially interested in the income of the property." He did not    E
invent the idea of a group right: he must have meant that each
object was beneficially interested in the income. But I think that
he would have been extremely surprised if he had been told that it
necessarily followed that each object had an interest extending to
the whole income so that on the death of any one of the objects    F
there was a cesser of an interest extending to the whole income
within the meaning of sections 2 (1) (b) and 7 (7). Confusion will
generally result if one tries to apply language adequate for the
point under discussion to a problem which was not in the mind of
the speaker—however eminent may have been the person who used
the language. I do not regard this case as a compelling authority    G
on the present question.

In *Burrell* v. *Attorney-General* [5] there was a discretionary trust
and a provision that any surplus income not used for that purpose

³ [1937]  A.C.  174,  181;  53          ⁴ [1937] A.C. 174, 181.
T.L.R.  130; [1936] 3 All E.R. 752,      ⁵ [1937]  A.C.  286; [1936]  3 All
H.L.(E.).                                E.R. 758, H.L.(E.).

138

**A.C.**            AND PRIVY COUNCIL            609

H. L. (E.)
1967
———
Gartside
v.
Inland
Revenue
Commrs.
———
Lord Reid

A   was to be carried forward and could be used for the reduction of capital charges. But Lord Russell said [6]:

> " In my opinion the state of affairs which prevailed at Harry's death is sufficient to show that the beneficial interest of the heir at law and next of kin in the property was microscopic ... their interest is so minute and so remote that it may for our
B   present purpose be ignored."

So the case was decided on the footing that the trustees were to devote the whole income to making payments to one or more of the discretionary objects. That seems to me to be what Lord Russell meant when he said with regard to the objects of the
C   discretionary trust [7]:

> " It is true that no one of them could claim to be beneficially interested in any defined share of or to any defined extent in the property: but the six together constituted the only people who could, while Harry was alive, obtain any benefit from the property or have any beneficial enjoyment of the property."

D   He then said that those who became interested after the death of Harry were a new group becoming interested under a new trust and fulfilling a new qualification as a condition of membership. So he held that the title to the beneficial interest in the property as a whole changed hands on the death notwithstanding that some of
E   the members of the two groups were the same persons. That this case is no direct authority on the construction of section 2 (1) (b) is shown by the fact that the Court of Appeal had relied on that section but their order was varied in this House so as to strike that out.

F   Counsel for the respondents put his case so high as to argue that these cases show that, whenever there is a primary discretionary trust followed by a direction to deal with any surplus not paid to the discretionary objects by accumulation or otherwise, the court must disregard any such direction and treat the case as if the trustees had been directed to divide the whole income among the
G   discretionary objects. I can find no basis and no rational justification for any such artificial rule. The present case must be decided in accordance with the fact that neither individually nor collectively were the objects of this discretionary trust entitled in any year to receive any part of the trust income: that is shown by the fact that

---

[6] [1937] A.C. 286, 299.            [7] [1937] A.C. 300.
A.C. 1968.                                        24

610                            HOUSE OF LORDS                    **[1968]**

H. L. (E.)
1967
———
Gartside
v.
Inland
Revenue
Commrs.
———
LORD REID
———

in only one out of twenty years did any of them receive any part **A** of the income.

Then it was argued that, although the construction and effect of section 2 (1) (*b*) was not considered in this House in either of these cases, the effect of the decision in *Public Trustee* v. *Inland Revenue Commissioners* [8] was to make them in some way authorities on the proper construction of that section. I do not think that this decision **B** had any such effect. What the case did was to decide

> " that sections 1 and 2 are not mutually exclusive and that the excepting words in section 2 (1) (*b*) are operative in regard to property which falls within that subsection even though that property may fall also within the wide words of section 1 " (*per* Lord Simonds [9]).                                                         **C**

We are not bound by the decision nor do I think that we are bound by the reasoning to hold that in every case of settled property where there is a passing of the property there must also be the cesser of an interest within the meaning of section 2 (1) (*b*). It could only be on that footing that earlier cases where it was decided that there was a passing under section 1 must now be regarded as **D** authorities on the scope and meaning of section 2 (1) (*b*). But the *Public Trustee* case [10] is relevant here in another way. If I take the view that for a long time there has been considerable misunderstanding with regard to section 2 (1) (*b*), I need not hesitate to say so because this House in that case removed a much more funda- **E** mental and long standing misunderstanding than any with which we have to deal in the present case. I can repeat the words of Lord Radcliffe [11] :

> " I can only say that at the end of the day I am relieved to find that we are not constrained by any authority to impose upon ourselves a construction of taxing provisions which seems to **F** me as much contrary to the plain meaning of the Act as it would be frivolously capricious in its result."

Here I would only omit the word " frivolously."

Next I must deal with *Ralli Brothers Ltd.* v. *Inland Revenue Commissioners* [12] and *Public Trustee* v *Inland Revenue Commis- sioners (In re Kirkwood).* [13] In the *Ralli* case [14] both section 2 (1) **G**

[8] [1960] A.C. 398; [1960] 2 W.L.R. 203; [1960] 1 All E.R. 1, H.L.(E.).
[9] [1960] A.C. 398, 416.
[10] [1960] A.C. 398.
[11] Ibid. 417.

[12] [1966] A.C. 483; [1966] 2 W.L.R. 19; [1966] 1 All E.R. 65, H.L.(E.).
[13] [1966] A.C. 520; [1966] 2 W.L.R. 136; [1966] 1 All E.R. 76, H.L.(E.).
[14] [1966] A.C. 483.

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

Lord Reid

A  (*b*) and section 43 were considered but I do not think that any of the observations regarding these provisions throws any light on the questions now before the House. The matters for decision with regard to these provisions do not arise in this case. The *Kirkwood* case,[15] however, does require fuller examination. There was a settlement under which the income went to a discretionary class

B  until the death of the testator's daughter: she was a member of that class. On her death her son, John, became entitled to the fund. In 1961 John assigned to the trustees the income until 1968. His mother was still alive so he could only effectively assign any income which might accrue after his mother's death and before 1968. The trustees were to apply this income for the same discretionary trust

C  as that which then existed but, of course, the objects could not be the same because the mother would have dropped out before this new trust could take effect. The mother died a few days after John had made this assignment. So what happened on her death was that the discretionary trust under the original settlement then came to an end and the new discretionary trust set up by John took

D  effect. It was held that the property passed under section 1 because on the death there was a passing of the right to the income to a new trust set up by a new settlor for the benefit of a new class of discretionary objects. There was little said about section 2 (1) (*b*). My noble and learned friend, Lord Guest, merely said [16]:

E  " It thus follows that the beneficial interest ceased on the mother's death for the benefit of a class different from that group which had the beneficial interest before the death, in which case there would be a passing under section 2 (1) (*b*)."

Lord Morton of Henryton said [17] that if the share did not pass under section 1,

F  " Class A had an interest in the Kirkwood share which ceased on the death of Mrs. Pattisson, and on her death a benefit accrued to Class B to the extent of the whole of the share. The property passing on the death of Mrs. Pattisson must, therefore, be ' deemed to include ' the Kirkwood share and the case falls within section 2 (1) (*b*) of the same Act."

G  Lord Upjohn dealt with the matter at somewhat greater length, but he was under a misapprehension as to the discretionary trust; he thought there was a power to accumulate any surplus income but that power in the original settlement had come to an end before

---

[15] [1966] A.C. 520.
[16] Ibid. 544–545.
[17] Ibid.

612                          HOUSE OF LORDS                      **[1968]**

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

Lord Reid

the relevant period. He accepted the view of the Inland Revenue    A
that there is no claim for duty when one member falls out of a
class of discretionary objects. I cannot read the speeches in that
case as showing that this House came to any clear decision as
to the meaning of the word " interest " in section 2 (1) (*b*).

But then the respondents founded on two decisions on the
meaning of the word " interest " in a different provision which    B
was obviously passed to deal with a different problem. The
Customs and Inland Revenue Act, 1881, required certain property
to be brought in although it had ceased to belong to the deceased
at the date of his death. This included the case where a
settlor in making a settlement had reserved an interest in the
settled property. In *Attorney-General* v. *Heywood* [18] the settlor    C
had provided that the trustees had a discretion to apply the
trust income for the benefit of himself his wife and children or
any one or more of them. It was, I think, rightly decided that
he had reserved an interest within the meaning of that provision.
It is always proper to construe an ambiguous word or phrase
in light of the mischief which the provision is obviously designed    D
to prevent, and in light of the reasonableness of the conse-
quences which follow from giving it a particular construction.
Here, if " interest " were given a narrow or technical meaning
it would be very easy to defeat the obvious purpose of the
provision by setting up a discretionary trust and choosing trustees    E
who might be expected to exercise their discretion in favour of
the settlor. And, on the other hand, no unreasonable consequences
would follow if the word were given a wider meaning so as to
include possible benefit that would come to the settlor in a certain
event—in the event of the trustees deciding that he should have
the whole or part of the income.                                  F

If so vague a word as " interest " is used in different Acts
dealing with different problems, there is only, in my view, a
slender presumption that it has the same meaning in both;
where they are dealing with the same problem the presumption
is very much stronger. There is here the special feature that the    G
Act of 1894, by section 2 (1) (*c*), picks up and slightly amends that
provision in the Act of 1881. But I see no reason why there
should be any strong inference from that fact that, when the
Act of 1894 goes on to deal with quite a different problem,

---

[18] (1887) 19 Q.B.D. 326, D.C.

H. L. (E.)

1967

_____

Gartside
v.
Inland
Revenue
Commrs.
___

Lord Reid
___

A   the word "interest" must be given the same meaning as it had in the Act of 1881. In the absence of good reason to the contrary one would attach the same meaning. But the reasons which I have stated for giving a different meaning to the word in section 2 (1) (b) and section 7 (7) appear to me greatly to outweigh any presumption which there might otherwise be for

B   adopting the same meaning. The respondents also founded on Attorney-General v. Farrell,[19] but that case does not appear to me to throw any additional light on the present question.

I would allow this appeal.

C   Lord Morris of Borth-y-Gest. My Lords, I have had the advantage of reading the opinion of my noble and learned friend, Lord Reid. I agree with it, and would allow the appeal.

Lord Hodson. My Lords, I have had the advantage of reading the opinion of my noble and learned friend, Lord Wilberforce.

D   I agree with it, and would allow the appeal.

Lord Guest. My Lords, I have had the opportunity of reading the speech of my noble and learned friend, Lord Reid. I agree with it and would allow the appeal.

E   Lord Wilberforce. My Lords, the testator, Thomas Edward Gartside, by his will dated February 8th, 1934, gave one-quarter of his residuary estate to his trustees upon trusts during the life of his son John Travis Gartside to pay or apply the whole or such part as his trustees should in their absolute and uncontrolled discretion think fit for or towards the mainten-

F   ance, support or benefit of his said son or the son's wife or children and to accumulate any surplus income. The trustees had power to resort to the accumulations at any time during the son's life and to use them for the maintenance etc., of the same class of persons. After the death of John Travis Gartside the share was to be held for such of his children as should attain 21 or, if

G   daughters, marry. There was a power of advancement in favour of any grandchild up to one-half of his or her presumptive or vested share.

The testator died on January 8, 1941, so that the period of permissible accumulation came to an end on January 7, 1962,

[19] [1931] 1 K.B. 81; 46 T.L.R. 587, C.A.

143

614                    HOUSE OF LORDS                  **[1968]**

H. L. (E.)
1967
———
Gartside
*v.*
Inland
Revenue
Commrs.
———
LORD
WILBERFORCE
———

A    On January 2, 1962, just before the termination of that period, the trustees made advances to the twin sons of John Travis Gartside, then aged 17, out of the capital of the one-fourth share, of a value of about £23,500 each. On May 8, 1963, John Travis Gartside died.

The Crown claims estate duty on his death on the advanced
B    funds under section 43 of the Finance Act, 1940. The conditions laid down by that section for a charge of estate duty are stated in the words

> " where an interest limited to cease on a death has been disposed of or has determined . . . after becoming an interest in possession; . . ."

C    It is relevant to add that paragraphs (a) and (b) of subsection (1) proceed to deal separately with the cases where (a) if the interest had not been determined the property in which the interest subsisted would have passed on the death under section 1 of the Finance Act, 1894, and (b) if, on the same hypothesis, that property would have been deemed by virtue of section 2 (1) (b)
D    of the Finance Act, 1894, to be included to a particular extent in the property passing on the death, imposing a total or partial charge as the case may be.

The decision in this appeal turns upon the meaning of the words " interest " and " interest in possession." In the courts below it was generally accepted, following certain authorities, that the beneficiaries had " interests "; the debate was, in the main,
E    concentrated on the question whether they had " interests in possession." But the prior question is whether they had " interests " at all and to that I now turn.

At the relevant date, that is just before the death of John Travis Gartside, the potential beneficiaries under the discretionary
F    trusts (for convenience called " the discretionary beneficiaries ") were four, namely, John Travis Gartside himself, his wife and his two sons. Under the trusts of income which applied during his life, no one of these beneficiaries had any right to receive any income. The trustees had an absolute discretion to distribute or
G    to withhold distribution of the income of any year, and, as regards any income they decided to distribute, to give all or none of it to any one beneficiary. Any undistributed income had, during the permissible period, to be accumulated, i.e., added to capital. The accumulations so made could subsequently be distributed in the same way as current income—no beneficiary having

144

A  any right to any such distribution—and subject to this power were
held by the trustees upon trusts under which the two grandchildren
had contingent interests only.

I have said that no one of the discretionary beneficiaries had
at the relevant time any right to receive any income, but this is
not the whole of the matter. It is also necessary to appreciate

B  that the discretionary beneficiaries taken together had no right
to receive any or, a fortiori, all of the income. Two of them were
infants but even if they had been of age they could not, with their
parents, have called upon the trustees to pay them the income
of any year; the reason being that the trustees had power to
accumulate so much as they did not distribute, which might be

C  the whole, for the possible benefit of persons unborn. To describe
them as " the only people who could during the relevant period
obtain any benefit from the property or have any beneficial enjoy-
ment of it " may be misleading, unless one bears in mind that,
singly or collectively, they had no right in any year to receive a

D  penny.

I can now consider the language of section 43 of the Finance
Act, 1940. Subsection (1) starts by referring to an " interest "
limited to cease on a death but neither this section nor any section
of definition, whether in the Finance Act, 1940, or in the Finance
Act, 1894, gives any guidance as to the meaning of this word.

E  Some limit is placed upon the scope of the enquiry by the later
words " after becoming an interest in possession ": these suggest,
if not compel, the conclusion that the " interests " with which
the subsection is dealing are such as are capable of being des-
cribed as " interests in possession." Whatever exactly that means,

F  it is safe, I think, to say that " interests in possession " are, in
this legislation, contrasted with " interests in expectancy ": so
that one may say this of the " interests " with which the subsection
is concerned, that one would expect these to fit within this
classification. I return later to this point.

This is not all the guidance one may get as to the meaning

G  of " interest." Section 43 of the Finance Act, 1940, is to be con-
strued together with the Finance Act, 1894. Both its structure
and its language are related to those of the earlier Act. The
parent provision in the Finance Act, 1894, is evidently section
2 (1) (b) which deals with interests ceasing on the death and there
cannot be any doubt that " interest limited to cease on a death "

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

Lord
Wilberforce

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.
—
Lord
Wilberforce
—

in section 43 must refer to the same kind of interest: in section **A**
2 (1) (*b*) the interest has ceased; in section 43 it was limited to
cease but has not done so because some event or action has
prevented this result.

What, then, can one say of "interest" as used in section
2 (1) (*b*)? Two indications are given. The first is in the subsection
itself which says that the property is deemed to pass "to the **B**
extent to which a benefit accrues or arises" by the cesser of the
interest. We are concerned here with a taxing Act, and if one
thing is necessary about taxes it is that the amount of them should
be ascertained with precision. The subsection must, then, con-
template that some definite portion of the property should be
ascertainable when an interest ceases. The second indication is **C**
given by section 7 (7) which deals precisely with this point: it
reads:

> "7. (7) The value of the benefit accruing or arising from the
> cesser of an interest ceasing on the death of the deceased
> shall—(*a*) if the interest extended to the whole income of
> the property, be the principal value of that property; and **D**
> (*b*) if the interest extended to less than the whole income of the
> property, be the principal value of an addition to the property
> equal to the income to which the interest extended."

This shows that for the cesser of an interest to give rise to a charge
for duty, it must be possible to say of the interest that it extended
to the whole income, or to a definite part of the income. This **E**
notion of definite extension is, in my opinion, vital to the under-
standing and working of section 2 (1) (*b*) and consequently of
section 43 of the Act of 1940.

It must follow that the discretionary beneficiaries under the
settlement had no "interest" within the meaning of the section: **F**
no single member of this class had any right to any income:
even if one considers them collectively they had no right to any
income because the trustees could accumulate the whole of it.
This makes it unnecessary and, indeed, otiose to consider whether
the discretionary beneficiaries had "interests in possession," but
the use of these words in the subsection do provide a cross check **G**
as to the meaning of "interest." As is well illustrated by the
judgments in the courts below, it is exceedingly difficult to fit the
rights of the discretionary beneficiaries either into the category
of "interests in possession" or into its statutory counterpart
"interests in expectancy": to say that, as it is not one, it must

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

LORD
WILBERFORCE

A    be the other is not a very satisfactory solution (the categories though mutually exclusive need not be exhaustive) especially if this technique can be used—as it has been used by the courts below—either way. Rather, the difficulty of giving either answer endorses the conclusion that this is not an " interest," within the meaning of this section at all.

B    So much as regards the discretionary beneficiaries. Before I deal with the position of the accumulation beneficiaries I must deal with some arguments presented to us. The Crown sought to establish that a wide meaning should be attributed to the word " interest," wide enough to include the interest of a beneficiary under a discretionary trust, by three main arguments. First, it was said that the expression " interest " itself is one of complete generality: in the context of the estate duty legislation it should be given a popular rather than a conveyancing meaning. Secondly, when one analyses a beneficiary's rights under a discretionary trust, the conclusion must be that he has an interest even in a technical legal sense of the word. Thirdly, the point was said to be settled by authority, in particular by two decisions, *Attorney-General* v. *Heywood* [20] and *Attorney-General* v. *Farrell.* [21] These arguments were substantially accepted by the Court of Appeal but I do not find them persuasive.

E    (1) It can be accepted that " interest " is capable of a very wide and general meaning. But the wide spectrum that it covers makes it all the more necessary, if precise conclusions are to be founded upon its use, to place it in a setting: Viscount Radcliffe, delivering the Board's judgment in *Commissioner of Stamp Duties (Queensland)* v. *Livingston* [22] shows how this word has to do duty in several quite different legal contexts to express rights of very different characters and that to transfer a meaning from one context to another may breed confusion.

    No doubt in a certain sense a beneficiary under a discretionary trust has an " interest ": the nature of it may, sufficiently for the purpose, be spelt out by saying that he has a right to be considered as a potential recipient of benefit by the trustees and a right to have his interest protected by a court of equity. Certainly that is so, and when it is said that he has a right to have

---

[20] 19 Q.B.D. 326.                    [22] [1965] A.C. 694, 719; [1964] 3
[21] [1931] 1 K.B. 81.                W.L.R. 963; [1964] 3 All E.R. 692, P.C.

HOUSE OF LORDS                    **[1968]**

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

Lord
Wilberforce

the trustees exercise their discretion "fairly" or "reasonably"   **A**
or "properly" that indicates clearly enough that some objective
consideration (not stated explicitly in declaring the discretionary
trust, but latent in it) must be applied by the trustees and that the
right is more than a mere spes. But that does not mean that he
has an interest which is capable of being taxed by reference to its   **B**
extent in the trust fund's income: it may be a right, with some
degree of concreteness or solidity, one which attracts the protec-
tion of a court of equity, yet it may still lack the necessary quality
of definable extent which must exist before it can be taxed. This
may be illustrated by reference to the decision in *Skinner v.
Attorney-General*[23] on which the Crown relied. Whatever may   **C**
be the correct explanation of that case, the existence of the element
of extent was clearly apparent. In the present case its absence is
equally noticeable, so that merely to show that "interest" in
section 2 (1) (*b*) has a "popular" meaning—as Sir Wilfrid Greene
M.R. described it in the Court of Appeal: *In re White*[24]—fails   **D**
to meet the critical difficulty in the Revenue's way.

The Master of the Rolls and Salmon L.J. in the Court of
Appeal were persuaded by an argument which was suggested to
meet this difficulty. The beneficiary's right, it was claimed, is
analogous to that of a competitor in a beauty competition; she has
a right to be considered for the prize: if she is excluded, she can   **E**
be awarded damages which a jury can assess. The analogy was
inevitably left at some distance because it could hardly be suggested
that a charge for estate duty could be assessed by any similar
procedure: and it is clear enough that it fails at the critical point,
namely, of establishing that a person with a chance of success has   **F**
an interest in more than the broadest popular sense, *in the fund.*

(2) Returning to the nature of the beneficiary's right, the Crown
is met with the difficulty that as a matter of long-established
acceptance, and also of authoritative decision (*Attorney-General
of Ceylon v. Chettiar,*[25] *per* Viscount Simonds L.C.), no charge for
duty arises when one of a discretionary class dies. Lord Denning   **G**
M.R. regarded this as a special rule whose rationale was unsatis-
factory and which should not be extended and Salmon L.J. said

[23] [1940] A.C. 350; 55 T.L.R.    [24] [1939] Ch. 131, 141; 57 T.L.R.
1025; [1939] 3 All E.R. 787, H.L.    836; [1938] 2 All E.R. 629, C.A.
(E.).    [25] [1957] A.C. 513; [1957] 3
W.L.R. 293, P.C.

**A.C.**          AND PRIVY COUNCIL                    619

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

LORD
WILBERFORCE

A that it was difficult to understand. I do not so regard it: it seems to me an inevitable and necessary and, I am tempted to add, reasonable, consequence of the method of taxation laid down by section 2 (1) (*b*) and section 7 (7) of the Finance Act, 1894. This was in fact the ground on which it was put by Viscount Simonds L.C. when he said [26] (quoting and adopting the words of the judge in

B the court below):

> " I find it impossible to conceive of a basis of valuation which, in relation to such an ' interest,' would conform to the scheme prescribed by section 17 (6) " (corresponding to section 7 (7) of the Finance Act, 1894).

C But if, as seems indisputable, the exemption from duty which arises in such cases as these arises directly from the legislative scheme, it becomes a task of great difficulty for the Crown to suggest a definition of interest which, omitting the exempted case, will cover the present situation. No formulation suggested in argument was

D in fact able to achieve this.

(3) I now come to the decisions in *Attorney-General* v. *Heywood* [27] and *Attorney-General* v. *Farrell*.[28] *Attorney-General* v. *Heywood* [29] was decided in 1887 upon section 38 (2) (*c*) of the Customs and Inland Revenue Act, 1881, when what was levied was a stamp duty on property included in an account. The 1881

E Act defined various categories of property to be included in an account, viz., property included in a gift made within three months of the death, property held on joint tenancy, and (under paragraph (*c*)) settled property in which a limited interest was reserved to the settlor or over which the settlor reserved a power of revocation. *Attorney-General* v. *Heywood* [29] was concerned with a voluntary

F settlement under which the trustees had a discretion to apply income, during the settlor's life, for a class including the settlor, and it was held by a Divisional Court that section 38 (2) (*c*) applied. The judgment of Wills J. contains the following passage [30]:

> " The word ' interest ' is capable of different meanings, according to the context in which it is used or the subject-matter to which it is applied. If the contention for the defendants is right nobody has any interest in the property settled, and yet the whole fund was to be held for the benefit of three classes of persons—the husband, the wife, and the children; and the

[26] [1957] A.C. 513, 539.    [29] 19 Q.B.D. 326.
[27] 19 Q.B.D. 326.           [30] Ibid. 331.
[28] [1931] 1 K.B. 81.

149

620                              HOUSE OF LORDS                          **[1968]**

H. L. (E.)

1967

———

Gartside
*v.*
Inland
Revenue
Commrs.

———

LORD
WILBERFORCE

———

sum of the benefits conferred on all these three classes taken   **A**
together, being the sum of three nothings amounts to nothing,
whereas, on the other hand, it must necessarily comprehend
the whole interest in the fund. This is simply a reductio ad
absurdum. The application of the word ' interest ' is not con-
fined to a vested or a necessarily contingent interest. The Act
was meant to cast a wider net than such a construction would
imply."                                                          **B**

When this decision was followed in *Attorney-General* v. *Farrell,*[31]
section 38 (2) (*c*) of the Act of 1881 (as amended in 1889) had been
incorporated by the unhappy technique of reference into section
2 (1) (*c*) of the Finance Act, 1894—" as if therein enacted." This
case, too, was concerned with a settlement which contained a
discretionary trust of income for the settlor and other persons. The   **C**
Court of Appeal, not without hesitation, held that duty was pay-
able and that *Attorney-General* v. *Heywood*[32] ought to be followed.
Lord Hanworth M.R. expressed himself as unwilling to dissent
from a case which had stood for so long and been acted upon:
Greer L.J. considered that but for *Attorney-General* v. *Heywood*[32]   **D**
the case would have presented great difficulty. Romer L.J. both
applied and approved the previous decision.

The appellants invited your Lordships to overrule these cases.
The Crown supported them and urged that they should be treated
as governing the meaning of " interest " in the present case. I see
no need to take either course. Perhaps *Attorney-General* v.   **E**
*Farrell*[33] could have been decided the other way on the ground
that once section 38 (2) (*c*) had been embodied in the Finance
Act, 1894, s. 2 (1), the word " interest " in the earlier section
should be given a meaning similar to that which it bears in
paragraphs (*b*) and (*d*), each of which involved the conception of   **F**
extent. But this was not done and one can appreciate why not.
For section 38 (2) (*c*) is concerned, broadly, with the case of persons
who settle their property, yet wish to benefit from it so long as
they live. To tax them in such a case is perfectly understandable,
however large or small the reserved benefit may be and whether
it is defined in extent or undefined. No definition is necessary,   **G**
because the measure of the charge is the whole value of the
property. So naturally no reference is made to " extent "—the mere
fact of reservation is enough. I think, therefore, that the decisions

---

[31] [1931] 1 K.B. 81.                    [33] [1931] 1 K.B. 81.
[32] 19 Q.B.D. 326.

**150**

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

Lord
WILBERFORCE

A  in principle are acceptable. But—this is the other limb—acceptance of them does not carry the present case. In section 2 (1) (*b*) of the Finance Act, 1894 (and the same is true of section 2 (1) (*d*) ), a duty is imposed the quantum of which is related to the extent of the interest and I see no difficulty in saying that the element of extent is relevant under the two sections but not under the third: the B  distinction is both made in the language and is necessary if the tax is to work.

Before leaving the subject of discretionary trusts I must consider one further point. When one object of a discretionary class dies, there is no charge for duty: the same must follow (under C  section 43 of the Finance Act, 1940), if the interest of one object is disposed of or determined (if that can be done). But there is also the case of a " closed class," that is, a class of discretionary objects, no one of whom is entitled to any income, but who between them can claim to be entitled, in each year, to the whole. It may well D  be possible to apply section 2 (1) (*b*) of the Finance Act, 1894, or section 43 of the Finance Act, 1940 (as the case may be), to such a situation, as some of their Lordships who decided the recent appeal *In re Kirkwood* [34] suggest. I do not find it necessary to pursue this particular argument since we are not concerned with a closed class.

E      I now consider the position as regards the surplus income in each year, that is, the amount of income not distributed among the discretionary class. There is no difficulty here; in the first place (one may call this the primary trust) this income had to be added to capital and held upon trusts under which the testator's grand- F  children had contingent interests. In the second place (one may call this the secondary trust) the trustees had power to resort to any accumulations and to apply them as income, that is, to distribute them between the discretionary beneficiaries. The interests of the accumulation beneficiaries under the primary trust was, in the terminology of the Finance Act, 1894, an interest in G  expectancy (as contrasted with an interest in possession): the discretionary beneficiaries under the secondary trust had, for the reasons already given, no " interest " at all. So it is impossible to say that when, by the advances, the trust for accumulation of the surplus income was, pro tanto, determined, there was any deter-

[34] [1966] A.C. 520.

H. L. (E.)

1967

Gartside
v.
Inland
Revenue
Commrs.

Lord
Wilberforce

mination within the section. In the Court of Appeal, Harman L.J.,    **A**
while accepting that the rights of the accumulation beneficiaries,
taken by themselves, were in expectancy and that those of the
discretionary beneficiaries, taken by themselves, were not such that
duty would be chargeable, came to the conclusion that taking all
the rights together, an interest in possession could be found.
" Somebody," he said,[35] " must have an interest in possession."    **B**
I would, respectfully, agree with his judgment but for the latter
point: for, at any rate for the purposes of estate duty, cases may
exist where, at the relevant time, no " interest in possession " can
be found: one such is where the whole income is being validly
accumulated for the benefit of persons with contingent interests.    **C**
That, in fact, is this case and the fact that it is so prevents the
section from attaching.

Finally, I must now say something of certain authorities. First,
there are two cases in this House the authority of which was
invoked by the Crown: these are *Scott* v. *Inland Revenue Commis-*
*sioners*[36] and *Burrell* v. *Attorney-General.*[37] In each of these    **D**
cases income was held on trust for a class of discretionary bene-
ficiaries who, singly and collectively, had no right to receive any
income in any year. In *Scott's* case[38] the surplus income, during
the relevant life (of the sixth Earl Cadogan) was to be accumulated
and applied in the discharge of debts or incumbrances affecting the    **E**
estates and subject thereto as capital money. The capital of the
estate was held upon trust for a person (the seventh Earl Cadogan)
who had an interest in expectancy. It was held that on the death
of the sixth Earl the property as a whole passed under section 1
of the Finance Act, 1894.

In *Burrell's* case,[39] the trusts were more elaborate and cannot    **F**
accurately be described except by repeating in full the analysis
of Lord Russell of Killowen. However, but for one complicating
factor, the case would be a simple one, as it was then regarded
by this House and has since been regarded, namely, as a case where
before the relevant death the income was held for a discretionary    **G**
class (" A ") and after the death for a distinct but overlapping
discretionary class (" B ") in neither case either any individual,
nor the class collectively, having a right to any, or the whole

[35] Ante, p. 573B; [1967] 3 W.L.R.    [37] [1937] A.C. 286.
671; [1967] 2 All E.R. 173.    [38] [1937] A.C. 174.
[36] [1937] A.C. 174.    [39] [1937] A.C. 286.

A.C.                    AND PRIVY COUNCIL                            623

H. L. (E.)
1967
Gartside
v.
Inland
Revenue
Commrs.

LORD
WILBERFORCE

A    income. The decision was that in such a case there was a passing
of the property under section 1. The complicating factor was that
if and only if the whole income was not distributed to class A,
or to class B, or applied by the trustees in paying off certain portions
actually charged and other portions which might be charged, or
in paying off capital charges, there might, at a date in the future
B    (i.e., when all possible allowancers were dead or the entail barred)
be an ultimate trust for the heir-at-law or next-of-kin of the testator.
This consideration was relied on by the taxpayer to support an
argument that there was no passing, because the whole estate, legal
and equitable, remained in the heir-at-law and next-of-kin except
C    to the extent that the trustees decided to distribute. It is not sur-
prising that this argument did not succeed. Lord Russell of
Killowen disposes of it [40] by showing how remote in time and also
in reality (" so minute and so remote ") the interest was and called
it " microscopic." I cannot regard the position of the heir-at-law
or next-of-kin as other than a special factor which neither had any
D    bearing on the decision of *Burrell's* case [41] nor any relevance by
analogy to the present. This matter apart, the nature of the two
decisions is clear. They were both decisions on a passing within
section 1 of the Finance Act, 1894, on the footing that the property
as a whole changed hands, and, if so, neither the decisions, nor any
E    phrases in which the unavoidable word " interest " was used can
be used as authority that the discretionary class in either case,
or any member of it, or aggregate of any other persons had an
" interest " within section 2 (1) (*b*). Counsel for the Crown sought
to adapt them for this purpose. The argument was that they were
decided at a time when (following Lord Macnaghten's opinion in
F    *Cowley* v. *Inland Revenue Commissioners* [42]) sections 1 and 2 of
the Finance Act, 1894, were thought to be mutually exclusive, so
that a case could only come within one of the subsections of section
2 if it did not fall within section 1. This House having now in the
*Arnholz* case (*Public Trustee* v. *Inland Revenue Commissioners* [43])
G    departed from this view of the matter and having held that section 2
is definitive of section 1 by " exclusion " and " inclusion," *Scott's* [44]
and *Burrell's* [45] cases must, it was said, now be regarded as decisions

[40] [1937] A.C. 299.          [43] [1960] A.C. 398.
[41] [1939] A.C. 286.          [44] [1937] A.C. 174.
[42] [1899] A.C. 198; 15 T.L.R.   [45] [1937] A.C. 286.
270, H.L.(E.).

153

624                          HOUSE OF LORDS                    **[1968]**

H. L. (E.)

1967

Gartside
*v.*
Inland
Revenue
Commrs.

LORD
WILBERFORCE

under section 2 (1) (*b*) and so as decisions that an " interest " or
" interests " existed. I find this argument totally unacceptable.
I know of no principle by which an expressed ratio decidendi can
be converted into another ratio decidendi merely because (if such
is the case) the first is founded upon a principle which has been
superseded by a new principle which would support the second.
One cannot have authority by translation. The impossibility, in-
deed, of such a process is shown by the fact that in *Burrell's* case [45]
not only did Lord Russell of Killowen expressly decide that the case
fell not within section 2 (1) (*b*) but within section 1, but this House
rescinded the order of the Court of Appeal which was based on
the former section and restored that of Finlay J. which was based
on the latter. It may be permissible, or even necessary, if a case
similar to *Burrell's* case [45] arises for decision, to consider whether,
after the *Arnholz* case [46] the new decision should be put on the
same or on another ground: what one cannot do is to force on
those who gave the decision of the House of 1937 reasoning which
they did not accept.

The remaining authority is that of *Attorney-General* v. *Power*.[47]
I need say no more of this case than that I agree with the analysis
of it by Ungoed-Thomas J. and with his observations [48] that it
shows that the Crown's contention in the present case would involve
the consequence that duty could be claimed on the death under
twenty-one of an infant contingently entitled, if there was a
discretionary power of maintenance, a conclusion for which the
Crown did not contend.

I would allow the appeal and restore the judgment of
Ungoed-Thomas J.

*Appeal allowed.*

Solicitors: *Gregory Rowcliffe & Co. for John Taylor & Co.,
Blackburn*; *Solicitor of Inland Revenue.*

F. C.

[45] [1937] A.C. 286.
[46] [1960] A.C. 398.
[47] [1906] I.R. 272.

[48] [1967] Ch. 543, 572; [1966] 3
W.L.R. 759; [1966] 3 All E.R. 89.

C. A.

1966

Kingsley
v.
Sterling
Industrial
Securities
Ltd.

For the reasons which I have endeavoured to express I would allow this appeal both as to the plaintiff's claim for the return of the car and as to the defendants' counterclaim.

*Appeal allowed with costs.*
*Leave to appeal refused. Stay of execution for one month granted pending application to the House of Lords for leave to appeal.*

Solicitors: *Victor Mishcon & Co.; Malcolm Fraser & Co.*

E. M. W.

A

B

C

D

[COURT OF APPEAL]

C. A.

1966
Oct. 7, 10
1967
Jan. 17

LORD
DENNING
M.R.,
DIPLOCK and
RUSSELL JJ.

# SNOOK v. LONDON AND WEST RIDING INVESTMENTS LTD.

*Hire-Purchase—" Actual payment "—Hire-purchase to original hirer —Refinancing agreement relating to motor car—Loan required by borrower on security of car hired—Purported sale to agents and resale to new finance company—Car let on hire-purchase to borrower—Whether " actual payment "—Whether " sham " transaction—Whether contravention of statutory order—Hire-Purchase and Credit Sale Agreements (Control) Order, 1960 (S.I. 1960 No. 762), art. 1 (1), Sch. 2, Pt. 1, paras. 2, 3.[1]*

*Hire-Purchase — Hire-purchase agreement — Illegality — Refinancing agreement relating to car hired—Loan required on security of car—Purported sale to agents and resale to new finance company—Car let on hire-purchase to borrower—Whether " sham " transaction—Whether figures fictitious—Whether contravention of statutory order—Whether agent's knowledge to be imputed to finance company—Hire-Purchase and Credit Sale Agreements (Control) Order, 1960, art. 1 (1), Sch. 2, Pt. 1, paras. 2, 3.[1]*

E

F

G

[1] Hire-Purchase and Credit Sale Agreements (Control) Order, 1960, art. 1 (1): " A person shall not dispose of any goods to which this Order applies in pursuance of a hire-purchase or credit sale agreement . . . unless the requirements specified in Part I of Sch. 2 hereto are or have been complied with in relation to that agreement. . . ."
Sch. 2, Pt. I: " . . . 2. The agreement contains in respect of each description of goods a statement of the cash price of the goods . . . comprised in the agreement . . . 3. Before the agreement

A

*Estoppel—Conduct, by—Contract—Refinancing agreement relating to
car hired—Purported sale to agents and resale to new finance
company—Car let on hire-purchase—Whether hirer estopped
from denying finance company's title to car.*

*Sale of Goods—Property, whether passing—" Sale "—Hirer of motor
car seeking finance—Purported sale to agents and resale to new
finance company—New hire-purchase agreement with hirer—
Whether genuine sale.*

B

C. A.
1967

Snook
v.
London and
West Riding
Investments
Ltd.

In September, 1963, the plaintiff got a new car from a dealer.
The cash price was £935 19s. 8d., of which £735 19s. 8d. was paid
in cash. The balance of £200 was financed by a hire-purchase
agreement with a finance company, T.I., who let the car to the
plaintiff on hire-purchase terms, the sum of £216 being payable
by 12 monthly instalments of £17 18s. 4d.

C

In January, 1964, after three instalments had been paid,
the plaintiff, who wanted to raise some money on the car, got
in touch with another finance company, A.F. A.F. ascertained
from T.I. that the "settlement figure" was £160 if paid within
seven days and told the plaintiff that they would pay out T.I.
and allow him a further £100. In order to carry out this re-
financing operation A.F. put before the plaintiff a number of docu-

D

ments which he signed. The documents were a letter addressed to
T.I. by which the plaintiff stated, inter alia, that he had sold his
rights in the car to A.F.; and a hire-purchase form of agreement
with the defendant finance company. A.F. filled in the details
as a hire-purchase transaction for the car. On an attached
delivery receipt the plaintiff acknowledged that he understood that
the car was the property of the defendants of which he had

E

accepted delivery. The cash price was stated to be £800 and the
initial payment to be £500. Those figures were fictitious. The
balance payable was put at £355, payable by the plaintiff over
two years by monthly instalments of £14 15s. After obtaining the
plaintiff's signature, A.F., invoiced the car to the defendants, filling
in the same fictitious figures and warranting that the car was their
absolute property. A.F. sent all the documents to the defendants,
who had had many dealings with them. The defendants then paid

F

£300 to A.F. A.F. paid £160 to T.I., which was accepted by the
latter in full discharge of their interest in the car. A.F. paid £125
to the plaintiff and kept £15 themselves.

The plaintiff paid two instalments of £14 15s. to the defen-
dants, but then fell out of work and failed to pay two months'
instalments. On June 6, 1964, A.F., as agents for the defendants,

G

was entered into actual payment
was made in respect of each descrip-
tion of goods comprised in the
agreement of not less than an
amount equal to the percentage
specified in col. 2 of Part I of Sch.
1 hereto in relation to that descrip-
tion of goods of the aggregate of—
(a) the cash price of the goods . . .
and (b) any amount payable by

instalments under the agreement for
the installation or maintenance
of the goods. . . . In computing for
the purposes of this paragraph the
total amount to be paid before any
agreement is entered into, account
may be taken of any allowance for
any goods taken in part exchange
for goods comprised in that agree-
ment. . . ."

788                        QUEEN'S BENCH DIVISION                        [1967]

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

seized the car. A.F., having refused the plaintiff's offer to pay
off the arrears, sold the car, the value of which was found at the
trial to be £775, for £575. A.F. paid the defendants £280 and kept
the balance of £295 for themselves.

The plaintiff claimed £474 10s. against the defendants as
damages for conversion or money had and received to his use.
The county court judge held that the refinancing operation
effected by A.F. was a sham but that there was no evidence that
the defendants were aware of any of the irregularities in the
conduct of the deal. Judgment was given for the plaintiff for
£449 10s.

On appeal by the defendants:—

*Held,* allowing the appeal (Lord Denning M.R. dissenting),
that as the title to the car had been validly transferred to the
defendants, who were not parties to the alleged "sham" refinanc-
ing operation, and as the hire-purchase agreement with the
defendants was not invalid by reason of the Hire-Purchase and
Credit Sale Agreements (Control) Order, 1960 (S.I. 1960 No.
762), the plaintiff's claim failed.

*Yorkshire Railway Wagon Co.* v. *Maclure* (1882) 21 Ch.D.
309; *Stoneleigh Finance Ltd.* v. *Phillips* [1965] 2 Q.B. 537; [1965]
2 W.L.R. 508; [1965] 1 All E.R. 513, C.A.; and *Kingsley* v.
*Sterling Industrial Securities Ltd.* ante, p. 747; [1966] 2 W.L.R.
1265; [1966] 1 All E.R. 37; [1966] 2 All E.R. 414, C.A. applied.

*Per* Lord Denning M.R. A.F. did not become the owners of
the car and as they had nothing to transfer to the defendants, the
latter did not become the owners (post, p. 797E–F). The hire-
purchase transaction with the defendants was illegal and could
not form the basis of a claim as there was no cash price and no
"actual payment" of the deposit (post, p. 798C, E–F). The
documents in the refinancing operation were a sham to cover up
a loan made on the security of the car by A.F. as agents for the
defendants, who were responsible for the manner in which their
agents conducted themselves (post, p. 799C–D, F). The defendants
could not justify a conversion by reliance on illegal and sham
documents (post, p. 801A).

*Per* Diplock and Russell L.JJ. The plaintiff is estopped by
his conduct from denying the defendant's title to the car (post,
pp. 802A, 804A). The transaction between the plaintiff, A.F.
and the defendants could not be said to be a "sham" to mask a
loan because the defendants were not parties to the alleged "sham"
(post, pp. 802C–F, 804C–D). The transaction was outside
the mischief of unregulated credit facilities at which the Hire
Purchase and Credit Sale Agreements (Control) Order, 1960 (S.I.
1960 No. 762), was aimed and in the light of the well-known
practice with respect to initial payments under hire-purchase
agreements by which the finance company itself did not receive
this payment in cash from the hirer but debited it to the dealer
in the price and credited it to the hirer in the agreement, there
had been no breach of the requirements regarding "actual
payment" in paragraph 3 of Part I of Schedule 2 to that order
(post, pp. 802F—803A, 804F—805B, 806B, 807C–D).

A

B

C

D

E

F

G

157

APPEAL from Judge Ould at Sheffield County Court.

By his particulars of claim, the plaintiff, Alan Snook, claimed against the defendants, London and West Riding Investments Ltd., inter alia, that in January, 1964, he was the hirer under a hire-purchase agreement with Totley Investments Ltd. (" Totley ") of a 1963 M.G.B. motor car and wishing to raise a loan of £300 thereon, he negotiated such a loan with Auto Finance Services (Hallamshire) Ltd. (" Auto Finance "); that the defendants were industrial bankers and the loan of £300 was obtained from them on the security of the car; that for the purpose of securing the loan the plaintiff, Auto Finance and the defendants executed various documents which purported to effect or evidence a purchase from the plaintiff by Auto Finance of the plaintiff's rights in the car, the settlement of the outstanding balance of the hire-purchase agreement with Totley, the invoicing of the car to the defendants by Auto Finance and the hiring back of the car to the plaintiff by a hire-purchase agreement dated January 27, 1964; that these documents were a sham and misrepresented the transaction which had taken place in which, inter alia, all the assertions in the invoice of the car to the defendants were untrue, the alleged cash price and the initial payment being entirely bogus and the car not being Auto Finance's absolute property; that the transaction was not a hire-purchase agreement but a loan of £300 on the security of the plaintiff's car and within the Bills of Sale Act, but the purported hire-purchase agreement was not registered as a bill of sale; that on June 6, 1964, when the plaintiff owed the defendants about £325 10s., they, by their servants or agents, wrongfully seized and converted the car which they wrongfully sold for about £800. The plaintiff claimed £474 10s. as damages for conversion, alternatively as money had and received by the defendants to the plaintiff's use.

In their defence, the defendants alleged that the plaintiff's contract of hire-purchase with Totley was terminated on or about January 24, 1964, by the payment of £160 by Auto Finance to Totley and that thereafter Auto Finance became the owners of the car; that by agreements on or about January 27, 1964, Auto Finance sold the car to the defendants and the plaintiff and the defendants entered into a contract of hire-purchase in respect thereof; that in breach of that contract of hire-purchase the plaintiff paid only one monthly instalment and that in June, 1964, the defendants repossessed and sold the car; and that in the premises

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

158

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

the defendants never lent the plaintiff £300 or any sum and never wrongfully converted the car.

On May 26, 1966, at Sheffield County Court, Judge Ould gave judgment for the plaintiff for £449 10s.

The defendants appealed. The grounds of appeal were, inter alia, that the judge was wrong in holding that there had been no transfer of ownership of the car from Totley to Auto Finance; that the ownership of the car was transferred from Totley to the plaintiff; that Auto Finance did not transfer ownership in the car to the defendants and that the defendants did not acquire title thereto; that there was a breach of the relevant hire-purchase regulations in relation to the contract of hire-purchase between the plaintiff and the defendants and that that contract was illegal and void; that the said contract was a sham and that the transaction was a loan of money upon the security of the car which was unenforceable as an unregistered bill of sale; that the defendants were guilty of converting the car.

The facts are fully stated in the judgments.

*P. M. Beard* for the defendants. There are three main issues. First, what happened to the title to the car? The judge found that it never passed to the defendants. It was on the footing that they did not get title that the judge found them guilty of conversion. The defendants say the title passed to them. Secondly, the judge held that the contract between the parties in January, 1964, was not a contract of hire-purchase, but a loan which was void as it was not registered under the Bills of Sale Act. So far as the defendants' interest was concerned, if it was not a contract of hire-purchase, it was nothing. Thirdly, assuming that it was a contract of hire-purchase, was there any breach of the relevant hire-purchase regulations?

On title, it was no one's case that the title remained with Totley. On the documents the title to the car passed from Totley to Auto Finance and from Auto Finance to the defendants. If the plaintiff allowed Auto Finance to fill in the documents in which they said they had got title and he knew that they were going to send to the defendants those documents, in which there was a statement that Auto Finance were the owners, then under section 21 (1) of the Sale of Goods Act, 1893, the plaintiff is precluded from denying Auto Finance's authority to sell. This plaintiff was not new to hire-purchase matters and he said in his evidence in chief that he knew that he had to enter into a new hire-purchase agreement. He was willing to take the defendants' money; they paid £300, of which

159

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

A he got £125. In the general rearrangement of his affairs which he was seeking to effect, title went to the defendants. After the end of January, 1964, the plaintiff kept the car and paid two or three instalments, having signed the documents. The judge said three times that the defendants were "innocent parties," *i.e.*, that they were entering into a contract of hire-purchase or nothing. All that
B the defendants got was the information given in the documents. The only contracts to which they gave their consent were a contract of purchase of the car from Auto Finance and a contract of hire-purchase of that car with the plaintiff. On the facts of this case, the plaintiff, by his conduct, from the moment he went to see Auto Finance until the car was seized, was approbating the arrangements
C made.

If the plaintiff receives a copy of a hire-purchase agreement and attempts to say " this is not my contract, because I made a contract of loan or something other than what this document evidences," he should have said so in February, 1964: see *Campbell Discount Co. Ltd.* v. *Gall* [2]; *Hodge Industrial Securities Ltd.* v. *Cooper* [3];
D and *Astley Industrial Trust Ltd.* v. *Rollinson* [4] where this court said that the plaintiff had approbated the contract. Even if these cases are only examples of estoppel, they are prayed in aid: see also *Eastern Distributors Ltd.* v. *Goldring (Murphy, Third Party)* [5] and *Stoneleigh Finance* v. *Phillips.* [6] Where people sign documents together and jointly submit them to a finance company, that is
E conduct which must preclude the hirer from denying that title passes: see the *Eastern Distributors'* case. [7] When a man puts his signature to a document, the usual inference is that he is bound by it. The defendants as innocent parties assumed that everything was correct; it was a hire-purchase contract or nothing so far as they were concerned.

F The judge's finding that this was a loan and the hire-purchase document was a sham was totally unsupported by the evidence. If may be that one can say that Auto Finance were doing what otherwise the defendants would have had to do themselves; but they never had power to bind their principal and it would beg the question to impute knowledge to the defendants that the plaintiff
G intended this to be a loan when it is clear on the evidence that they never had such knowledge. If that were to be so, a finance company

[2] [1961] 1 Q.B. 431; [1961] 2 W.L.R. 514; [1961] 2 All E.R. 104, C.A.
[3] (1961) Unreported; Bar Library Transcript No. 426 of 1961.
[4] (1963) Unreported; Bar Library Transcript No. 33 of 1963.
[5] [1957] 2 Q.B. 600; [1957] 3 W.L.R. 237; [1957] 2 All E.R. 525, C.A.
[6] [1965] 2 Q.B. 537; [1965] 2 W.L.R. 508; [1965] 1 All E.R. 513, C.A.
[7] [1957] 2 Q.B. 600.

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

in the defendants' situation would never know where they stood and whether, when they appended their signature to a document, it could be upset on this kind of protest. That is the vital distinction from *Polsky* v. *S. & A. Services Ltd.*,[8] where Polsky did know. The judge erred in the reliance which he put on that case. *North Central Wagon Finance Co. Ltd.* v. *Brailsford*[9] is clearly a case on the *Polsky*[10] side of the line, where the finance company knew the intentions of the hirer and Cairns J. states[11] the relevant propositions.

Assuming in the defendants' favour that they acquired title to the car, then there are two possibilities. The contract of hire-purchase was either illegal and void because there was a breach of the Hire-Purchase and Credit Sale Agreements (Control) Order, 1960, or it was valid. If the contract was legal, then the defendants as owners repossessed the car when the plaintiff did not pay his instalments. If the contract was void and illegal, the plaintiff is in no better position. The first effect of illegality is to destroy the hirer's possessory title. The contract of hire-purchase was dependent on the contract of sale from Auto Finance to the defendants. There was an initial payment of £500. The initial contract of sale was not governed by the hire-purchase regulations (S.I. 1960 No. 762). Even if the hire-purchase agreement was invalid, the contract of sale was valid and legal. The contract of sale can exist quite independently of the contract of hire-purchase. The defendants acquired title under the contract of sale regardless of whether the contract of hire-purchase was subsequently avoided. So they acquired title and the defendants cannot succeed in conversion.

[DIPLOCK L.J. Would not the hirer be the bailee of the goods, subject to being under a licence terminable at the will of the owner?]

Yes. Motive is irrelevant here. Terms are only implied into a contract if it is necessary in order to give it effectiveness.

As to whether the transaction was a loan and whether the hire-purchase agreement was invalid because there was a breach of the requirement for " actual payment," see *Kingsley* v. *Sterling Industrial Securities Ltd.*,[12] on which the defendants rely. Here the £500 was a credit. The plaintiff was credited with that sum because he had given value. The initial payment is the credit. This case is covered by *Kingsley's* case.[12] The mischief at which

A

B

C

D

E

F

G

[8] [1951] W.N. 136 and 256; [1951] 1 All E.R. 185 and 1062, C.A.
[9] [1962] 1 W.L.R. 1288; [1962] 1 All E.R. 502.
[10] [1951] 1 All E.R. 185 and 1062.
[11] [1962] 1 W.L.R. 1288, 1292.
[12] Ante, p. 747; [1966] 2 W.L.R. 1265; [1966] 1 All E.R. 37; [1966] 2 All E.R. 414, C.A.

161

A    the hire-purchase regulations (S.I. 1960 No. 762) was aimed was that there should not be an undue inflation of credit.

Two authorities, *Bowmakers Ltd.* v. *Barnet Instruments Ltd.*[13] and *Singh* v. *Ali,*[14] a Privy Council case referred to by Winn L.J. in *Kingsley's* case,[15] show the position where a sale is not tainted by illegality. The first effect of the failure of the hire-purchase

B    agreement is that the plaintiff's title vanishes and the defendant has an unanswerable claim. Once a contract of sale was made, the defendants had title.

*S. S. Gill* for the plaintiff. Nothing happened in this case which remotely resembled *Kingsley* v. *Sterling Industrial Securities,*[16] see the observation of Sellers L.J.[17] and the facts there.[18] The plaintiff

C    here never sold his rights to Auto Finance. No price was ever fixed. No credit could be given to the plaintiff for any figure at all, for no credit was ever arranged. No deposit or anything resembling a deposit was paid. The figure of £500 was not a genuine figure. In any event, no payment was made. The dealer is the agent of the finance company: see *per* Lord Denning M.R. in

D    *Financings Ltd.* v. *Stimson.*[19]

If the hire-purchase agreement was void for illegality because there was no " actual payment " of the deposit, contrary to the Hire-Purchase and Credit Sale Agreements (Control) Order, 1960, the transfer of title was also void. The plaintiff was in possession of the car throughout.

E    The question of estoppel arose in *Stoneleigh Finance Ltd.* v. *Phillips* [20] and turns on the question of agency, see the argument in that case.[21] The question of agency is a question of fact. It is being suggested that the plaintiff is estopped from denying the accuracy of the documents to which he put his pen. But estoppel does not affect the question of illegality. In *North Central Wagon*

F    *Finance Co. Ltd.* v. *Brailsford* [22] the three parties concerned did not include the hire-purchase company but the broker was acting on their behalf and it was held that the real transaction between the parties was a loan on the security of the lorry. The brokers are the agents of the finance company even to entering into a sham. In the *Stoneleigh* case,[23] the brokers were strictly instructed not

G

C. A.

1967

Snook
*v.*
London and
West Riding
Investments
Ltd.

---

[13] [1945] K.B. 65; 61 T.L.R. 62; [1944] 2 All E.R. 579, C.A.
[14] [1960] A.C. 167; [1960] 2 W.L.R. 180; [1960] 1 All E.R. 269, P.C.
[15] Ante, p. 747.
[16] Ante, p. 747.
[17] Ibid. 768.
[18] Ibid.

[19] [1962] 1 W.L.R. 1184, 1188; [1962] 3 All E.R. 386, C.A.
[20] [1965] 2 Q.B. 537; [1965] 2 W.L.R. 508; [1965] 1 All E.R. 513, C.A.
[21] [1965] 2 Q.B. 537, 545.
[22] [1962] 1 W.L.R. 1288.
[23] [1965] 2 Q.B. 537.

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

to carry out re-financing undertakings. As to when the dealer is regarded as agent of the finance company, see the judgment of Russell L.J. in that case.[24]

*Cur. adv. vult.*

January 17, 1967. The following judgments were read.

LORD DENNING M.R. In September, 1963, Mr. Snook, the plaintiff, got from a dealer a brand new M.G. car. The cash price was £935 19s. 8d. He paid most of it cash down, £735 19s. 8d., leaving only £200 outstanding. He arranged to pay off this £200 on hire-purchase terms. The dealer introduced him to a finance company called Totley Investments Ltd. (which I will call Totley). On September 16, 1963, Totley lent him the car on these hire-purchase terms:

| | | | | |
|---|---|---|---|---|
| Balance outstanding | ... | ... | ... | £200 |
| Finance charge | ... | ... | ... | 15 |
| Option fee | ... | ... | ... | 1 |
| | | | | £216 |

payable by 12 monthly instalments of £17 18s. 4d., the first payable on October 16, 1963.

Mr. Snook duly paid to Totley the first three instalments due in October, November and December, 1963, coming to £53 15s., leaving £161 5s. outstanding. But then he wanted to raise some money on the car. He saw an advertisement by another finance company called Auto Finance (Hallamshire) Ltd. (" Auto Finance ") which said:

> " Auto Finance puts common sense into credit. We can help you. Refinance: We pay off your existing hire-purchase debt and refinance this over a further period of 12 to 36 months, thus reducing monthly payments."

Mr. Snook went to Auto Finance. He saw a Mr. Hukins, who in his presence telephoned Totley and asked for the " settlement figure." Totley said that they would accept £160 in settlement if paid within seven days. Mr. Hukins then told Mr. Snook that they would pay out Totley and allow him a further £100.

In order to carry out this refinancing operation, Auto Finance put before Mr. Snook a number of documents for signature. Mr. Snook signed them believing that they would produce the

[24] [1965] 2 Q.B. 537, 573, 580.

**2 Q.B.**        QUEEN'S BENCH DIVISION        795

desired result. They turned out to be a sham. The judge so found. They dressed up the "refinancing operation" to look like a new hire-purchase transaction: whereas it was really a loan on the security of goods. The *first document* was a letter addressed to Totley. It said:

> "I have sold my rights in the above vehicle to Auto Finance Ltd., subject only to your lien which they will discharge. Will you please inform Auto Finance how much you require to settle my obligations to you and to pass title absolutely to them in the vehicle."

On the bottom half there was a reply ready for Totley to sign. It was addressed to Auto Finance and said: "We are prepared to sell title in the above vehicle to you absolutely for the sum of £ . . ., this amount to be received within 7/14/21 days of this date." Mr. Snook signed the top half, and left the paper with Auto Finance. But it does not appear that they ever forwarded it to Totley. They seem to have kept it in their office. The bottom half was never signed by Totley. The blank figure was never filled in. Most important of all, the statement in the top half, "I have sold my rights . . . to Auto Finance," was not true. The judge found it was not true. Mr. Snook had not sold his rights to them. They were worth £700 or £800 and they did not pay him a penny for them. He was in sole possession of the vehicle and had never parted with it to anyone.

It is equally important to note that Totley never sold their interest to Auto Finance. Nevertheless, thenceforward, in spite of having no title, Auto Finance treated themselves as if they were owners of the car. They acted as if they were dealers disposing of it on hire-purchase terms to Mr. Snook. They put before Mr. Snook a *second document*, which was a hire-purchase form. It was not with Auto Finance but with another finance company called London and West Riding Investments Ltd., the defendants. It appears to be a company for whom Auto Finance act as agents. They stock its forms and get them filled in. On this form Auto Finance filled it in as a hire-purchase transaction for the M.G. car. They invented the figures. The cash price was filled in as £800 when it was not the price. The initial payment was put as £500 when nothing had been paid. The finance charge was put at £54. Option fee £1. The balance payable was put at £355, payable by Mr. Snook over two years by monthly instalments of £14 15s. On the same form there was also a printed delivery receipt. Mr. Snook signed it, as he did the others. By it he

*Margin references:*
C. A.
1967
Snook
*v.*
London and West Riding Investments Ltd.

Lord Denning M.R.

C. A.

1967

Snook
*v.*
London and
West Riding
Investments
Ltd.

Lord
Denning
M.R.

A   acknowledged that he had accepted delivery of the car and he understood it was the property of the West Riding company.

When Auto Finance had got Mr. Snook to sign these documents, they themselves signed another form by which they invoiced the car to the defendants. They filled in the same fictitious figures, the cash price £800, initial payment of £500, balance £300. In this B form they warranted that the car was their absolute property. That was not true. It was not their property. They had not bought it, nor paid a penny for it.

Auto Finance then sent all these documents to the defendants. That company knew that Auto Finance dealt in these refinancing transactions. They had had many previous deals with Auto C Finance. But there was no evidence that they knew of any of the irregularities in the conduct of the deal. On receiving the documents, the defendants paid £300 to Auto Finance. Auto Finance paid £160 to Totley, who accepted it in full discharge and acknowledged that they had no further interest in the vehicle. Auto D Finance paid £125 to Mr. Snook and kept £15 for themselves for their services.

Mr. Snook paid the defendants the instalments of £14 15s. due on February 27 and March 27, 1964, but then he was out of work and fell into arrear for the two months of April and May, 1964. On June 6, 1964, whilst Mr. Snook had parked the car for a little while, some men seized the car and took it off. They were E men from Auto Finance acting as agents for the defendants. When Mr. Snook discovered that they had taken it, he went to Auto Finance and offered to pay off the arrears. He took the money down to them, but they refused to accept it. They resold the car, The judge found that at that time it was worth £775, but they sold F it for £575. They paid off the defendants £280 (which satisfied them) and kept the balance of £295 for themselves. It was, they said, their " profit " in the transaction.

Mr. Snook now sues the defendants for damages for conversion of the car. The defendants in their defence claim that it is their car. They say that, after the " settlement figure " was paid, G Auto Finance became the owners; that Auto Finance sold it to them; that they let it on hire-purchase to Mr. Snook; that he failed to pay the instalments, whereupon " the defendants repossessed the car and sold the same."

In considering this case there are two cardinal facts to be remembered: first, that Mr. Snook was at all times in possession

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

Lord
Denning
M.R.

A  of the car and entitled to it as against all the world save he who could prove a better title; second, that the defendants, by their agents, Auto Finance, took possession of the car and sold it and took the proceeds. Those two facts are sufficient to give Mr. Snook a prima facie case for damages for conversion. It is for the defendants to show that they were entitled to retake it, as they did.

B  The judge decided in favour of Mr. Snook on three grounds, which I will take in the same order as he did.

*First, the defendants did not prove a title to the car*

The defendants claim that they bought the car from Auto Finance: but they have failed to prove any title in Auto Finance.

C  Immediately prior to the refinancing operation, there were two persons entitled to an interest in the car: *Totley*, who were the owners, and had let it out to Mr. Snook on hire-purchase; and *Mr. Snook*, who had the right to acquire the title by paying the "settlement figure" of £161: see the recent case of *Wickham Holdings* v. *Brook House*,[1] of November 8, 1966. Seeing that the

D  car was worth some £900, Mr. Snook's contractual right (or "equity," as it is sometimes called) was worth about £740.

In the course of the refinancing operation, Auto Finance paid to Totley the "settlement figure" of £161: but that did not give Auto Finance the title to the car. The only person who had the right to pay that "settlement figure" was Mr. Snook. Auto

E  Finance must be presumed to have paid it on behalf of Mr. Snook, with the result that Mr. Snook became the owner of the car: see the recent case of *Bennett* v. *Griffin Finance*.[2] Auto Finance never bought the car from Mr. Snook, nor his interest in it. They never paid him a penny for his contractual right. They did not

F  become the owners of the car. The title was in Mr. Snook.

Seeing that Auto Finance were not owners, they had nothing to transfer to the defendants. So the defendants did not become the owners. It was suggested in the course of the argument before us that they acquired a title by estoppel similar to that which the finance company acquired in *Eastern Distributors Ltd.* v. *Gold-*

G  *ring (Murphy, Third Party)*[3] and *Stoneleigh Finance* v. *Phillips*.[4] I do not think this point is open to the defendants. Estoppel was

---

[1] [1967] 1 W.L.R. 295; [1967] 1 All E.R. 117, C.A.
[2] Ante, p. 46; [1967] 2 W.L.R. 561; [1967] 1 All E.R. 515, C.A.
[3] [1957] 2 Q.B. 600; [1957] 3 W.L.R. 237; [1957] 2 All E.R. 525, C.A.
[4] [1965] 2 Q.B. 537; [1965] 2 W.L.R. 508; [1965] 1 All E.R. 513, C.A.

798                    QUEEN'S BENCH DIVISION                    [1967]

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

Lord
Denning
M.R.

not pleaded, nor was it raised in the county court, nor found by    A
the judge. It is not even mentioned in the notice of appeal. Even
if it were open, no evidence was given by the defendants to support
an estoppel. They do not say that they relied on any representation
by Mr. Snook or on his conduct or on his signing the documents.
They relied on a sale by Totley to Auto Finance and on a sale
by Auto Finance to them. Their director said: " We acquired    B
title from Auto Finance and paid them for it." They repeated
this in their defence. I would not allow them now to change their
ground.

*Second, the defendants were seeking to enforce an illegal
    transaction*                                                   C

The judge held that the hire-purchase documents were in
breach of the statutory regulations and could not be relied upon
by the defendants. I think he was quite right. The regulations
require that there should be " a statement of the cash price of the
goods." There was here no cash price. The figure of £800 was
fictitious. So there could be no statement of the cash price. The    D
regulations also require that there should be " actual payment "
of the deposit. There was no deposit here, and no payment of it,
actual or otherwise. The figure of £500 was fictitious. The defen-
dants relied on the recent case of *Kingsley v. Sterling Industrial
Securities Ltd.*[5] But that is clearly distinguishable. The headnote
accurately states the effect of the decision. It is that the "actual    E
payment " need not be made in currency, but it must be a *real
and genuine payment*. It was held that a credit in account of
£600 was real and genuine, and ranked as " actual payment."
But in this case, as the judge found,

> " no deposit was paid and no allowance by way of credit or
> any other thing which by the remotest stretch of imagination    F
> could be called a deposit was allowed for. The sum of £500
> supposed to have been paid as a deposit was purely fictitious."

That finding is decisive. This hire-purchase transaction was illegal
and cannot form the basis of any claim by the defendants: see
*Snell* v. *Unity Finance Co. Ltd.*[6] and the recent unreported case of
*Viking Hire-Purchase Co. Ltd.* v. *Jordan.*[7]                    G

Test it in this way: If the defendants had not taken possession
of the car of their own motion, but had recourse to the courts to

---

[5] Ante, p. 747; [1966] 2 W.L.R.
1265; [1966] 1 All E.R. 37; [1966] 2
All E.R. 414, C.A.

[6] [1964] 2 Q.B. 203; [1963] 3
W.L.R. 559; [1963] 3 All E.R. 50,
C.A.
[7] (1966) Bar Library Transcript
No. 272 of 1966.

A    recover it, it is plain that the courts would not have assisted them. They had never been in possession and would have perforce to rely on the illegal transaction. Lord Mansfield said long ago that "No court will lend its aid to a man who founds his cause of action upon an illegal or immoral act": see *Holman* v. *Johnson*,[8] applied in *Palaniapper Chettiar* v. *Arunasalam Chettiar*.[9]

B    In view of this illegality, the defendants could not have recovered this car by action in the courts. It follows that they cannot justify taking it without action. They cannot better their position by taking the law into their own hands.

*Third, the defendants were seeking to enforce documents which*
C    *were a sham*

The judge held that this refinancing operation was a loan: and that the documents were a sham to cover up the loan. He said that "The whole thing is obviously a sham and to my mind falls clearly on the side of the line represented by the *Polsky* v. *S. & A. Services Ltd.*[10] line of cases." The transaction, though taking the
D    form of a sale and reletting, was "nothing more than a loan of money on the security of the goods," and therefore illegal under the Bills of Sale Acts. I think there was ample evidence on which he could so find. The essence of the matter was that Auto Finance got the defendants to advance £300 on the security of the goods, which was applied on behalf of Mr. Snook as to £160 in paying off
E    Totley, as to £125 in making an additional loan to Mr. Snook, and as to £15 in commission to Auto Finance. The documents were filled with fictitious figures and statements—all of which are badges of sham: see *Polsky's* case.[11]

There is this difference, however, from *Polsky's* case.[11] The defendants did not themselves negotiate the transaction. They
F    were, as the judge said, innocent of any irregularity by which the deal was carried through. Nevertheless, he thought that they could not take advantage of it. I agree with him, and for this simple reason: the real transaction, as he found, was a loan on the security of goods. I ask: who was it made this loan? The answer is plain. The defendants made it. No one else lent any money at
G    all. How did the defendants make it? The answer again is plain. By means of Auto Finance, who were their agents for this purpose. There were no other means by which the loan was made. Once

C. A.

1967

Snook
*v.*
London and
West Riding
Investments
Ltd.

Lord
Denning
M.R.

---

[8] (1775) 1 Cowp. 341, 343.
[9] [1962] A.C. 294; [1962] 2 W.L.R. 548; [1962] 1 All E.R. 494, P.C.

[10] [1951] W.N. 136 and 256; [1951] 1 All E.R. 185 and 1062, C.A.
[11] [1951] 1 All E.R. 185, 189, 1062.

QUEEN'S BENCH DIVISION **[1967]**

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

LORD
DENNING
M.R.

it is seen that Auto Finance were the agents of the defendants to **A** make the loan, it follows inexorably that the defendants are responsible for the manner in which their agents conducted themselves therein, including the preparation of fictitious documents: see *Lloyd* v. *Grace Smith & Co.*[12]

It was argued that the defendants are not to be affected by this sham transaction unless they were themselves parties to it. **B** I cannot agree with this. Although the defendants were not parties to the sham, their agents were: and that is the end of it. Every principal is answerable for the conduct of his agent in the course of his agency. The case of *Stoneleigh Finance* v. *Phillips*[13] is distinguishable because there was no agency.

On each of those three points the judge held that the defendants **C** were not entitled to seize the car. As he said, any one of them is sufficient. I agree with him on all three. His judgment convinces me. The defendants are liable in damages for conversion.

*Damages*

The judge held that the value of the car at the date of conver- **D** sion was £775. But he did not award the plaintiff that sum. He deducted the sum which the defendants would have received if the refinancing operation had been completed, that is, £325 10s. In other words, he allowed them credit for their loan and finance charges. So he only gave judgment for £449 10s. I think this was right. A finance company are entitled to recoup themselves **E** the amount owing to them, but not to take additional profit for themselves: see *Wickham Holdings* v. *Brook House*[14] and this applies not only when they sue for conversion, but also when they retake the car and sell it.

*Conclusion* **F**

Viewing the matter broadly, it comes to this: Mr. Snook paid about £800 towards the purchase of this new car. It was more than three-fourths of the price. Yet after he had only had it nine months, a finance company took it from him. All because he was £30 in arrears. He offered to pay off those arrears. But they would not accept it. They insisted that the car belonged absolutely **G** to them: and that his valuable equity was forfeited. They sold the car at a high price, recouped themselves the money they had lent, and took a large profit of £300. Seeing that he was in possession,

[12] [1912] A.C. 716; 28 T.L.R. 547, H.L.
[13] [1965] 2 Q.B. 537.
[14] [1967] 1 W.L.R. 295.

169

C. A.

1967

Snook
*v.*
London and
West Riding
Investments
Ltd.

A  this conduct was a plain conversion unless they could show a good title in themselves to warrant it. All they have done is to produce documents full of fictitious entries, which the judge has found to be illegal and a sham. I do not see how the defendants can justify a conversion by reliance on illegal and sham documents. I would dismiss this appeal.

B  DIPLOCK L.J. (read by RUSSELL L.J.). It is not a presumption of law that a hire-purchase finance company cannot be innocent. It is not even a prima facie presumption of fact. It was thus open to the county court judge to find as he did that the defendants were innocent in that they were unaware of any irregularity in the

C  way that the deal was carried through. This finding is, in my view, crucial to the present appeal.

My sympathy, like that of the Master of the Rolls, is for the plaintiff. My judgment, like that of Russell L.J., must be for the defendants. What happened to the plaintiff was, until the Hire-Purchase Act, 1965, liable to happen to any hire-purchaser who

D  defaulted on instalments due in respect of goods upon which he had made a large initial payment. He says that it ought not to happen to him for three reasons: (1) the defendants never acquired title to the car; (2) he, the plaintiff, and Auto Finance, at any rate, intended the transaction to be a sham in order to mask a loan of £300 on the security of the car; (3) the hire purchase agreement

E  was void under the Hire Purchase and Credit Sale Agreements (Control) Order, 1960 (S.I. 1960 No. 762).

The plaintiff's object was to raise £100 if he could by making use of his rights in respect of a car worth about £800 which he had on hire-purchase from Totley under an agreement under which instalments amounting in all to £161 5s. remained to be

F  paid. To do this without running foul of either the Bills of Sale Act, 1878, or the Hire Purchase and Credit Sale Agreements (Control) Order, 1960, it was necessary to transfer the title to the car to another hire-purchase finance company and for the plaintiff to enter into a fresh hire-purchase agreement with that company and to make to that company actual payment of 25 per cent. of

G  the cash price of the car. He was advised by Auto Finance to do this. He took that advice and he did.

As regards transfer of the title, I do not think that it matters whether, upon the true analysis of the transaction with Totley, the title to the car passed from Totley to Auto Finance on their own behalf or as trustees for the plaintiff or passed to the plaintiff himself. In so far as the beneficial or legal title was in him, he

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

Diplock L.J.

clearly authorised Auto Finance to transfer it on his behalf to the defendants. That Auto Finance purported to act as principals in the sale of the car to the defendants, whereas they may have been acting as agents for the plaintiff as undisclosed principal, does not in my view matter. In any event I agree with Russell L.J. that the plaintiff is estopped by his conduct from denying the defendants' title to the car. As the defendants were unaware that he intended a sham, it would be a travesty of justice if he were not, and in view of the terms in which his claim is pleaded, I do not think that the defendants are debarred from relying, if it be necessary, on this estoppel, although it is not expressly pleaded as such in the defence. All the facts necessary to establish it were proved.

As regards the contention of the plaintiff that the transactions between himself, Auto Finance and the defendants were a " sham," it is, I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the " sham " which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. But one thing, I think, is clear in legal principle, morality and the authorities (see *Yorkshire Railway Wagon Co.* v. *Maclure* [15] and *Stoneleigh Finance Ltd.* v. *Phillips*),[16] that for acts or documents to be a " sham," with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a " shammer " affect the rights of a party whom he deceived. There is an express finding in this case that the defendants were not parties to the alleged " sham." So this contention fails.

As regards the contention that the hire-purchase agreement was void under the Hire Purchase and Credit Sale Agreements (Control) Order, 1960, because there was no " actual payment " of the sum of £500 credited to the plaintiff as the " initial payment " in the hire-purchase agreement, this depends upon the meaning of the words "actual payment" in the order. I agree with Russell L.J. that the words of the order, which is penal legislation, must be construed in the light of the mischief against which the order is directed and also in the light of the well-known

A

B

C

D

E

F

G

15 (1882) 21 Ch.D. 309, C.A.          16 [1965] 2 Q.B. 537.

**2 Q.B.**          QUEEN'S BENCH DIVISION          803

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

DIPLOCK L.J.

A   practice with respect to initial payments under hire-purchase agreements by which the hire-purchase finance company itself never receives this payment in cash from the hirer but debits it to the dealer in the purchase price and credits it to the hirer in the hire-purchase agreement. Russell L.J. in his judgment deals with this point in detail. I agree with his analysis and his conclusion.
B   I will not try to gild his refined gold.

For these reasons, and for those he will give upon all three contentions of the plaintiff, I would allow this appeal.

RUSSELL L.J. The plaintiff's case for denying the right of the defendants to retake the car under the hire-purchase agreement
C   is threefold. First: he says that the defendants are not shown to have acquired the title to the car. Second: he says that the whole transaction was but a dressed-up arrangement for a loan on the security of the car, and avoided by the Bills of Sale Act. Third: he says that the hire-purchase agreement was illegal and therefore void or unenforceable because no "actual payment"
D   was made of the £500 stated in the agreement to have been paid by way of deposit, or of any other sum, as required by the Hire Purchase and Credit Sale Agreements (Control) Order, 1960 (S.I. 1960 No. 762). I will consider these contentions in that order.

First, as to the defendants' title to or ownership of the car. The county court judge analysed the sequence of events, concluded
E   that the title never reached Auto Finance, and for that reason concluded that it never reached the defendants. But the plaintiff, who was told by Auto Finance that the matter would involve paying off the existing owners (the plaintiff's existing hire-purchase company, Totley), and obtaining hire-purchase finance elsewhere, executed documents for presentation to the defendants which in
F   terms recognised the defendants to be the owners of the car. Indeed, the plaintiff intended the title to the car to pass to the defendants, just as the defendants intended to acquire it; for only thus could the defendants hire it to the plaintiff. The plaintiff further confirmed to the defendants by letter of February 17 that the details of the agreement were correct. How can it be
G   now open to the plaintiff to assert that he became the owner of the car when Totley was paid off, that he has remained such ever since, and that the defendants never became such? One has only to look at the matter from the defendant's point of view—the defendants being, as the judge held, innocent and ignorant of any irregularities—to see that it would be quite wrong to allow the plaintiff to take this title point. He is estopped by his own conduct

804                          QUEEN'S BENCH DIVISION                  [1967]

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

RUSSELL L.J.

A

from denying the defendants' title to the car, and this title by estoppel is a true title: see *Eastern Distributors* v. *Goldring* [17] and *Stoneleigh Finance Ltd.* v. *Phillips.*[18]

The plaintiff's second contention is that the substance of the transaction was the borrowing of money by the plaintiff on the security of the car, and that the defendants cannot rely upon the hire-purchase agreement because of the provisions of the Bills of Sale Act. But this is not a case in which the defendants were party to anything but the apparent acquisition of a car for £800 less £500, net £300, and the simultaneous hiring out of the car under a hire-purchase agreement which credited the hirer with a deposit of £500 towards ultimate purchase. The defendants never intended to take part in any transaction by way of a loan of money on the security of the car. To enable the court to hold that a transaction was intended to mask a loan, it must find that both parties to the transaction so intended: see *Yorkshire Railway Wagon Co.* v. *Maclure* [19] and *Stoneleigh Finance Ltd.* v. *Phillips.*[20] The latter case is also authority for the proposition that even if it be correct that the substance of the whole arrangement as between the plaintiff and Auto Finance was to dress up a loan on security, that intention on the part of Auto Finance cannot be imputed to the defendants. I must, therefore, reject the plaintiff's contention under this head also.

Thirdly and lastly, the plaintiff says that the hire-purchase agreement upon which the defendants rely is illegal under S.I. 1960 No. 762, and therefore unenforceable, because (he says) no "actual payment" was made of the required percentage of the cash price, though by the agreement he was credited with a deposit of £500 towards ultimate purchase.

The purpose of S.I. 1960 No. 762 is undoubted. It is to restrict credit in the field (inter alia) of hire-purchase: in particular, the requirement of a minimum deposit of a percentage of the cash price of the goods is designed to prevent the acquisition of goods on hire-purchase without immediate and substantial reduction of the acquirer's assets. It is to be noticed that Part II of Schedule 2 to the statutory instrument is aimed at avoiding the effect of payment when it does *not* have the effect of such reduction. On the other hand, a fair allowance for goods taken in part-exchange —an operation which *does* reduce the acquirer's assets—is allowed in the calculation of the amount actually paid. It is quite clear

B

C

D

E

F

G

[17] [1957] 2 Q.B. 600, 611.
[18] [1965] 2 Q.B. 537, 571, 578.
[19] 21 Ch.D. 309.
[20] [1965] 2 Q.B. 537.

173

C. A.

1967

Snook
*v.*
London and
West Riding
Investments
Ltd.

Russell L.J.

that that in the present case—for the cash price figure of £800 is not challenged as appropriate to the car—the plaintiff surrendered and the defendants acquired £500 worth of car in exchange for the same amount credited as paid towards ultimate purchase. The transaction, therefore, was one right outside the mischief of unregulated credit facilities at which the statutory instrument was aimed. But the question remains whether the language of the statutory instrument is such that its net is cast wider than the mischief and embraces also the present case.

In considering the application of the statutory instrument in this regard, I notice first that, as was remarked in *Kingsley* v. *Sterling Industrial Securities*,[21] in the ordinary hire-purchase case, the finance company never in the strictest sense receives payment of the initial payment. This the dealer receives from the customer and retains, and the sale by dealer to finance company is carried through by a simple payment of the difference between the cash price and the deposit. It has never been thought necessary for the finance company to pay the cash price to the dealer in exchange for a payment by the dealer (on behalf of the customer-hirer) of the deposit as an initial payment by the hirer to be credited to him. Nor has it been thought necessary to record the equivalent as cross-entries in books. The whole process is short-circuited and the same result achieved.

Suppose a car-owner wishes to raise finance (say, £300) on his car which is worth £800. (Here I am not concerned with any question of invalidity on other grounds.) The transaction might take this form: the owner approaches a finance company and agrees to sell to the company for £800 on terms that it will hire back the car under a hire-purchase agreement, crediting the owner with an initial payment of £500 and providing for payment of (say) £350 by " x " equal monthly instalments. If this is carried through by a cheque from finance company to owner for £800 in exchange for a cheque the other way for £500, it could not be doubted that the owner had made an actual payment of £500. (Nor could it be said that the £500 had been " acquired " from the finance company under the statutory instrument, Sch. 2, Part II— see the judgment of Winn L.J. in the *Kingsley* case.[22]) I would see no reason for denying the fact of " actual payment " in the context of the statutory instrument if, in the example given, instead of cheques being solemnly handed across the table (or indeed

[21] Ante, p. 747.                    [22] Ante, p. 777.

806                    QUEEN'S BENCH DIVISION                    [1967]

C. A.

1967

Snook
v.
London and
West Riding
Investments
Ltd.

Russell L.J.

currency notes handed one way and part handed back), the trans-   A
action was carried through by a cheque for £300 combined with
appropriate entries in the finance company's books such as would
have attended an exchange of cheques. I would take exactly the
same view if, as a matter of practical convenience, all that was
done in order to carry out the transaction was a cheque for £300
from the finance company accompanied by a hire-purchase agree-   B
ment in usual form stating the £800 cash price and £500 initial
payment received. The finance company would be paying £800
for the car in part by a cheque for £300 and in part by crediting
the owner at his request with a balance of £500 against the ulti-
mate purchase price under the hire-purchase agreement. I cannot
think that this would not be actual payment within the statutory   C
instrument when a mutual exchange of cheques, or a handing
and return of £500 in notes, would be such. Indeed, the whole
transaction could in my judgment have been stated even more
briefly with the same outcome. Q. "On what terms will you take
over my car and hire it back to me under a hire-purchase agree-
ment?" A. "Cash price £800: deposit £500: balance £300 plus   D
finance charge £50 by 'x' equal monthly instalments. Option
payment £1. Total hire-purchase price £851." This conversation,
followed by a hire-purchase agreement signed by both declaring
the finance company to be the owner of the car and containing
those terms and accompanied by a cheque to the owner for £300,
would, I consider, be unexceptionable. Both parties would intend   E
the title to pass and it would pass without any physical delivery;
and in my view the owner would actually pay the £500 within
that phrase as used in the statutory instrument. I do not think
that the statutory instrument should be construed in such a way
as to require parties to such a transaction to take a long way round
when there is a perfectly sensible short cut to the same commercial   F
terminus.

　　If in such a case "actual payment" can be achieved in this
manner, what of the case now under consideration? The
plaintiff must, I think, be taken to have known that if the defen-
dants were to hire the car to him on hire-purchase terms, the
title to the car must go to the defendants as purchasers: as pre-   G
viously stated, he must have intended this to happen. The £800
was a proper cash price value. The plaintiff, through Auto
Finance, puts forward a proposition by which the defendants will
buy the car for £800, but by which, instead of paying the cash
price to the defendants or to Auto Finance on his behalf and

175

C. A.

1967

Snook
*v.*
London and
West Riding
Investments
Ltd.

RUSSELL L.J.

A     taking £500 back as deposit or initial payment under the hire-purchase agreement, which is an integral part of the transaction, the procedure is short-circuited by a direct credit given in the hire-purchase agreement. If the defendants had paid the full £800 to Auto Finance, the latter would have held £500 of it for the plaintiff with an obligation to repay it on the plaintiff's behalf as

B     initial deposit. If Auto Finance had exchanged their cheque for £500 with the defendants' cheque for £800, and accounted to the plaintiff, the receipt side of such account would have stood at £800, and the disbursement side, in addition to £160 paid to Totley, would have included an item "£500 initial deposit paid to defendants on your behalf." Clearly there would have been

C     actual payment of the initial deposit. I would not construe the statutory instrument so as to destroy a transaction because a purely formal step is not taken. The case of *Kingsley* [23] was, of course, different. But I would borrow from the judgment of Sellers L.J. [24] the phrase "The fact that those motions were not actually gone through can make no difference to the transaction":

D     and I echo another phrase [25] by saying that here £500 was a real loss to the plaintiff because the car was worth £800: he had the money in the value of the car and the transaction was in no sense one where a man acquired a car when he had nothing with which to acquire it and was unable to find the deposit: and finally I agree with the statement [26] that it is not the manner of payment which

E     the statutory instrument affects but its reality.

For those reasons I would allow the appeal.

It is right to record that it was said in evidence for Auto Finance that before the car was sold after repossession for £575, Auto Finance offered it to the plaintiff for £280, the sum which Auto Finance were called upon to pay to the defendants under

F     a recourse agreement: though the judge made no finding on this. If this offer were made and had the plaintiff been able or willing to accept it, his total outlay in acquiring the car from first to last would have been about £974—the retail price when he " bought " it new in September, 1963, having been £940.

I do not agree with the suggestion that Auto Finance was

G     agent of the defendants so as to validate the first two of the plaintiff's contentions. The county court judge made no such finding, and I do not think it any more justified than it would have been in the *Stoneleigh Finance* case. [27] Particular reliance is placed

[23] Ante, p. 747.
[24] Ibid. 768, 769.
[25] Ibid. 769.
[26] Ibid. 772.
[27] [1965] 2 Q.B. 537.

808                                QUEEN'S BENCH DIVISION                                [1967]

C. A.

1967

Snook
*v.*
London and
West Riding
Investments
Ltd.

Russell L.J.

on the profit made on the sale of the car and permitted by the          A
defendants to be kept by Auto Finance. As to profit, this was
at the relevant time a feature of any hire-purchase agreement
(above certain limits of value) where there was a high percentage
of initial payment and the hirer defaulted, so that the finance
company was entitled to repossess and sell for the true value of
the car and keep the proceeds: if the plaintiff had defaulted on          B
the Totley agreement, Totley could have repossessed and sold and
made a large profit. As to the repossession being by Auto Finance
on behalf of the defendants, and the profit being taken by Auto
Finance and not by the defendants, this was presumably provided
for in the recourse agreement. If anything, the profit retention
by Auto Finance without accounting to the defendants points          C
away from agency.

I add that the only point for argument in *Viking Hire-Purchase
Co.* v. *Jordan,*[28] referred to by the Master of the Rolls, was whether
the agreement was a hire-purchase agreement within the statutory
instrument of 1960. If, as was held, it was in character such an
agreement, it was conceded that it offended under the statutory          D
instrument because no cash price was stated therein.

*Appeal allowed with costs. Leave
to appeal to the House of Lords.*

Solicitors: *Bell, Brodrick & Gray for Glass, Bagshawe, Miller          E
& Co., Sheffield; Neal, Scorah, Siddons & Co., Sheffield.*

A. H. B.

[28] (1966) Bar Library Transcript No. 272 of 1966.

                                                                         F

1967
Feb. 27, 28;
March 1, 2
3, 21

Megaw J.

FOWLEY MARINE (EMSWORTH) LTD. *v.* GAFFORD

[1964 F. No. 390]

*Dock—Harbour—Mooring rights—Tidal creek—Laying of perma-          G
    nent mooring—Whether ordinary incident of navigation—Whether
    common law right.*
*Possession—Land—Tidal creek—Trespass—Whether exclusive actual
    possession—Acts of concurrent possession by others—Presumption
    of ownership by Crown.*

[Reported by Miss Stella Solomon, Barrister-at-Law.]

**TERRITORY OF THE VIRGIN ISLANDS**

**IN THE COURT OF APPEAL**

**HCVAP 2008/012**

**BETWEEN:**

**ALFA TELECOM TURKEY LIMITED.**

Appellant

**and**

**TELIASONERA FINLAND OYJ**

Respondent

**Before:**
The Hon. Mde. Ola Mae Edwards                    Justice of Appeal
The Hon. Mde. Janice George-Creque              Justice of Appeal
The Hon. Mr. Michael Gordon, QC                 Justice of Appeal [Ag.]

**Appearances:**
Mr. Stephen Smith QC, Mr. Robert Levy and Mr. Oliver Clifton for the Appellant
Mr. Bankim Thanki QC, Mr. Michael Fay and Mr. Ben Valentin for the Respondent

---

2009:    January 14;
September 28.

---

*Civil Appeal – Civil Procedure – Interim injunction – standing to seek injunctive relief - whether there is a serious issue to be tried – party already enjoined - whether there was imminent risk of harm – whether there was acquiescence or waiver so as to bar injunctive relief – whether there was delay so as to defeat claim for injunctive relief*

*Economic tort – tort of knowing interference – tort of inducing a breach of contract / whether cause of action sufficiently identified*

*Tort of conspiracy – whether sufficiently particularised*

*Fortification - quantum*

The appellant ("Alfa"), a Russian-based conglomerate which controls a diversified range of businesses (including telecommunications companies), is the registered shareholder of 49% of the issued shares in Cukurova Telecoms Holdings Ltd. ("CTH").  CTH is part of a group of companies which may together be called "Cukurova".  Cukurova holds some 33%

1

178

of the shares in Turkcell Holdings AS which is part of a group of companies that operate the largest mobile telecommunications business in Turkey. The respondent ("Telia") held some 47% of the shares in Turkcell Holdings.

Cukurova and Telia executed the Turkcell Holdings Shareholders Agreement ("THSA") in October 1999, which, among other things, restricted the free transfer of Telia's or Cukurova's shares in Turkcell Holdings to a third party. The THSA provided that if such a transfer of shares were contemplated, a transfer notice was required to be sent to the other existing shareholders who could exercise the "right of first refusal" or the "come along right". A transfer notice was not however required if the shares were being transferred to an "affiliate".

A Telia buy out of the Turkcell Shares ("the Shares") was discussed when Cukurova ran into financial difficulties in 2004. When Cukurova resolved to pursue other options, Telia commenced arbitration proceedings in Geneva and obtained interim measures against Cukurova which prevented Cukurova from disposing of the Shares. In November 2005, Telia withdrew the interim measures.

Cukurova then entered into an agreement with Alfa by which Alfa granted a secured dollar term loan facility in favour of Cukurova ("the Facility Agreement"). This included the grant of equitable mortgages to Alfa over the shares held in Cukurova. A number of share transfers ("the Alfa Transactions") were effected primarily between subsidiaries of Cukurova by virtue of which each subsidiary became bound by the THSA. No transfer notices were presented to Telia in respect of the Alfa Transactions.

Alfa alleged defaults under the Facility Agreement and appropriated the shares in Cukurova. Alfa commenced claims 72 and 73 in the BVI seeking repayment of the balance of the loan facility and perfection of its security as holder of the charged shares. Cukurova however obtained injunctive relief against Alfa in claim 72 ("the Cukurova injunction") which restrained Alfa from registering itself as owner of the charged shares and from taking any steps to enforce the share charges granted to Alfa pursuant to the Alfa Transactions.

Telia commenced the instant proceedings against Alfa claiming that by instituting claims 72 and 73 Alfa was threatening to induce or procure Cukurova to breach the THSA or that Alfa had previously induced a breach of contract by entering into the Alfa Transactions. Telia also sought injunctive relief to restrain Alfa from taking any steps to effect or complete a transfer of ownership of Cukurova to Alfa. In light of Telia's application for injunctive relief, Alfa proffered a number of undertakings which provided, among other things, that it would give notice to Telia of any application to discharge the Cukurova Injunction. Telia considered them inadequate. The injunctive relief sought by Telia was granted; against which decision Alfa appeals.

2

179

**Held:** allowing the appeal, setting aside the grant of the injunction in the court below and awarding costs in the appeal to the appellant to be assessed unless agreed within 21 days:

1. Injunctive relief should only be granted in cases of real urgency, that is, where there is an imminent risk of harm. In the circumstances of the case, it was necessary for the learned judge to explain why the undertakings offered by Alfa did not afford adequate protection. As it stands, it has not been made clear as to why lack of imminent risk of harm was not a bar to Telia's claim for urgent relief. Whilst it is not necessary for a trial judge to consider every point raised in a party's argument, nonetheless it is necessary to give reasons in respect of those matters which are vital to arriving at a final decision. This enables an appellate court to appreciate why a particular decision was arrived at. It is reasonable to conclude, given the lack of reasoning thereon, that no proper consideration of this aspect was undertaken.

    **English v Emery Reimbold & Strick Ltd.** [2002] 1 WLR 2409 applied.

2. The question as to whether there is imminent risk of harm must be assessed in the circumstances as they exist at the time of seeking such interim relief. It must be established that were it not granted at the time then consequential irreparable harm would result which cannot be adequately compensated in damages. The fact that there was no guarantee that the Cukurova injunction would not be discharged does not amount to imminent risk of harm to Telia.

3. Alfa became an equitable mortgagee of the charged shares on the closing of the Alfa Transactions in 2005, and would have been entitled as from then to be entered on the register of CTH and CFI. Telia ought to have brought proceedings prior to the closing of the Alfa Transactions in 2005, in effect enjoining Cukurova and thus preventing Alfa from acquiring or being granted such rights. Telia, not having done so, or having taken proceedings against Cukurova enjoining them and later surrendering the injunction which allowed the Alfa Transactions to close cannot now seek to undo the Alfa Transactions by raising the issue as to whether Alfa is an equitable mortgagee or now, as Alfa contends, an equitable owner. This was a factor which ought to have been taken into account in deciding whether, Telia, at this stage, was entitled to injunctive relief. The failure to appreciate Telia's legal standing vis à vis Alfa's status as an equitable mortgagee, amounted to an error of principle which inevitably lead to arriving at a wrong conclusion.

4. The tort of inducing a breach of contract is a tort of secondary liability in that the breach of contract (primary liability) must first be established. [OBG which applied Lumley] In the tort of interference or prevention a defendant's liability stands alone; there is no accessory liability. In prevention cases, independent unlawful means must be pleaded and shown to exist. Intention is relevant to both torts. In an inducement case, there must be an intention to procure a breach of contract whereas in interference case, there must be intention to cause loss. Actual

3

**180**

knowledge is required to establish the torts.  Constructive notice is not sufficient. [Swiss Bank]

**OBG Ltd. v Allan** [2007] 2 WLR 920, **Meretz Investments NV v ACP** [2008] CH 244 and **Swiss Bank Corporation v Lloyds Bank Ltd.** [1979] 1 Ch 548 applied.

5.   There was a failure by the learned judge to give reasons for concluding that the action of Alfa amounted to "a threatened breach of Cukurova's obligations under the THSA."  This amounted to an error in principle.

**English v Emery Reimbold & Strick Ltd.** [2002] 1 WLR 2409 applied.

6.   Issues of knowledge and intention are matters requiring factual determination which cannot be made at this early stage of the proceedings.  It was necessary that the learned judge correctly identify the cause of action supported by the averments as pleaded and to say whether as a matter of law such cause of action had been made out giving rise to a serious issue to be tried.  It is fundamental to establishing the cause of action that the primary party's breach of contract be set out in the party's case, with some cogent evidence of this sufficient to warrant the grant of injunctive relief.

7.   It is a long established maxim that delay defeats equity.  Delay in seeking interim relief is all the more critical as the grant of such relief is predicated on a state of urgency.  In addressing the question of delay the learned judge referenced 2005, which can only be reasonably taken as the time she considered as being the relevant time.  Having regard to Telia's pleadings in the court below and the findings of the learned judge, Alfa's seizure of control of CTH in 2007, is not relevant to this determination.

8.   The learned judge's finding that Telia could have only brought proceedings against Alfa in Turkey in 2005, is not relevant to the question of delay.  The point is not *where* but **when** Telia pursued its remedies against Alfa for breach of its rights.

9.   In all the circumstances, Telia has failed to explain its two year delay in seeking relief for breach of the rights complained of as early as 2005.  The learned judge accordingly fell into error in holding that the delay was not of such a nature as to weigh against Telia.

10.  Having regard to the total lack of particularisation in respect of Telia's claim that Alfa's conduct or threatened conduct amounted to the tort of conspiracy, this ground is dismissed as being unworthy of further consideration for the purpose of continuing the injunction.

11.  Obiter:  The ordering of fortification and the level thereof, in respect of a cross-undertaking to pay damages on the grant of an interim injunction is discretionary. If fortification is ordered then the yardstick as to quantum would invariably be the amount of loss the party enjoined is likely to suffer in the event it turns out that the

4

181

injunction was wrongly granted. This in turn would call for a preliminary assessment of the value of the stake based on the material before the judge and not on some extraneous consideration relative to the country in which the matter is being litigated. A judgment once delivered is not subject to being reopened by the judge save in exceptional circumstances.

## JUDGMENT

[1]    **GEORGE-CREQUE, J.A.:**   This appeal by Alfa Telecom Turkey Limited ("Alfa") is against the judgment and order of the trial judge made on 9th May 2008, granting the respondent, Teliasonera Finland OYJ ("Telia") being the claimant in the court below, an interim injunction. The injunction restrains Alfa from seeking to register themselves as holder of a 51% shareholding in a Virgin Islands ("BVI") company, Cukurova Telecoms Holdings Limited ("CTH"). CTH is or was part of a group of Turkish companies which may together be called "Cukurova". Cukurova holds a very valuable stake in the Turkish mobile telecommunications industry. Telia has contended in the proceedings below that Alfa is threatening to induce and or procure CTH to breach a shareholder's agreement entered into in 1999, between Telia and Cukurova. A short history of the matter and relationship between the parties is necessary in order to gain an appreciation of the current proceedings being just one set in a number of related proceedings and applications amongst the various parties.

### The Background

[2]    (a)    The Cukurova group of companies is a very substantial Turkish group of companies with interests in the banking, media and telecoms industry. Telia forms part of a Scandinavian group of companies and is part owned by the Swedish and Finnish Governments and also has extensive telecoms interests. Alfa is part of a Russian group of companies with substantial diversified interests ranging from banking and oil exploration to telecoms.

5

182

(b)     Within the Cukurova Group is a company called Turkcell Holdings AS ("Turkcell Holdings").  Turkcell Holdings in turn owned a majority interest in Turkcell Iletisim Hizmetleri AS ("Turkcell") which is the largest mobile telecoms company in Turkey.

(c)     In October 1999, Telia and Cukurova executed an Agreement called the Turkcell Holdings Shareholders Agreement ("THSA") in respect of their shareholding in Turkcell Holdings.  On the creation of Turkcell Holding, Telia held 47.09% of its shares and the remainder were held in large part by Cukurova.[1]

(d)     The THSA governed the relationship between Telia and Cukurova and contained provisions in essence restricting the free transfer of Telia's or Cukurova's shares in Turkcell Holdings to a third party.  In brief, if a shareholder wished to transfer its Turkcell Holdings shares to a third party, that shareholder was required to send a transfer notice to the other existing shareholder offering the shares firstly to the other existing shareholder (the so called 'right of first refusal') or afforded that other shareholder the opportunity to sell its own shares along with the existing shareholder's ("the come along right").  The THSA also contained a provision entitling a shareholder to transfer its shares to an affiliate without sending a transfer notice to the other existing shareholder.  But if such an affiliate whilst holding the Turkcell Holdings shares ceased being an affiliate then the affiliate was required to re transfer those shares back to the transferor or an affiliate of the Transferor before the affiliate ceased being an affiliate.  These provisions are contained in clause 3.02 of the THSA.  Indeed, these are the provisions which are at the heart of the dispute and which Telia alleges that Alfa has either threatened to induce or procured Cukurova to breach or has breached.  The THSA is governed

---

[1] Cukurova Holding held 32.9 %, an entity called YKB ( not affiliated to Cukurova or Telia) held 20% and smaller amounts were held by other entities, some being within the Cukurova Group.

6

183

by and to be construed in accordance with the laws of the Republic of Turkey.

(e)    In late 2004, Cukurova ran into financial difficulties. Cukurova approached Telia in early 2005, with a view to Telia buying out Cukurova's Turkcell Holding shares ("the Shares") for cash. Telia was receptive and discussions regarding the sale were undertaken. However, in May 2005, Cukurova announced that it intended to start working on possible alternatives to the Telia buy out. This decision by Cukurova became the subject of an ICC arbitration in Geneva ("The Geneva Arbitration"). The Geneva Arbitration proceedings are only relevant in the context of this appeal to the extent that Telia, in those proceedings obtained interim measures against Cukurova on 24th October 2005, which in effect prevented Cukurova from disposing of the Shares.

(f)    Eventually Telia withdrew the interim measures obtained against Cukurova. This became effective as of 22nd November 2005, by order of the arbitration tribunal.

(g)    Cukurova and Alfa thereupon entered into a series of transactions completed on 25th November 2005, ("the Alfa Transactions") in which the Shares moved to CTH[2] in this way:

    (i)    An entity, Yapi Kredi Bankasi ("YKB" not affiliated to Cukurova or Telia) transferred its "Shares"[3] to a company called Intercon.[4]

    (ii)    Cukurova Holding transferred its Shares to Intercon which had become a wholly owned subsidiary of CTH.

---

[2] It is common ground that CTH prior to the Alfa Transactions was an Affiliate of Cukurova group of companies as that term is defined in the THSA.

[3] "Shares" in this sense means shares in Turkcell Holdings.

[4] Intercon was a subsidiary of a company called Buselten Finance a company in the Cukurova group.

7

Intercon, (now holding 52% plus) of the Shares became bound by the terms of the THSA.

(iii)     CTI was incorporated and became a wholly owned subsidiary of CTH.

(iv)     Intercon in turn transferred the Shares so acquired to CTI. CTI thus became bound by the THSA.

(v)     CTI in turn transferred the Shares (52% plus) so acquired to CTH. On receipt of the Shares, CTH became bound by the THSA.

(vi)     Alfa, in consideration of a payment of $1.593 billion by it to Cukurova, acquired shares convertible into a 49% stake in CTH ( and thereby an indirect 5.93% interest in Turkcell Holdings and an indirect 13.22% interest in Turkcell.

(vii)     Alfa also loaned to Cukurova Finance International Limited[5] ("CFI"- a BVI company, holding a 51% interest in CTH) $1.352 billion. This sum was secured to Alfa on both CFI's 51% interest in CTH and on Cukurova Holdings' entire shareholding in CFI ("the charged shares"). The charged shares were the subject of two sets of share charges. One set being English Share charges which provided for the novel remedy of 'appropriation'[6] and the other set being BVI share charges. It is now settled that the share charges made Alfa an equitable mortgagee of the charged shares[7].

---

[5] A wholly owned subsidiary of Cukurova Holdings
[6] Pursuant to the Financial Collateral Arrangements (No.2) Regulations 2003 of the European Directive
[7] See: the judgment of the Privy Council Appeal No 60 of 2008. ---- CFI, CH v Alfa Telecom Turkey

8

185

(viii)   The diagrams marked "A" and "B" attached to Telia's skeleton arguments provide a ready and easy illustration of the corporate groups and their interrelationships "before" and "after" the Alfa Transactions. The diagrams numbered 1 to 7 attached to Alfa's reply skeleton arguments shows the more intricate movement of the Shares up to the point of Alfa's subscription for the 49% stake in CTH.

(h)   The potential net effect of the Alfa Transactions is that were the Alfa securities to be realized, Alfa would indirectly, through ownership of CFI and CTH, own the Shares. It is useful to note however, that after the Alfa Transactions it cannot be said that Alfa owned as of right any controlling interest with its 49% stake in CTH since CFI still held 51% (though now subject to the share charges in favour of Alfa) and thus the controlling interest in CTH. The power to exercise control by virtue of its status as equitable mortgagee of the charged shares is quite another matter and it is this state of affairs which is at the very heart of the matter in terms of whether the Transfer Notice provisions of the THSA were triggered.

(i)   No Transfer Notice was given to Telia in respect of the Alfa Transactions as based on the corporate structure presented after the Alfa Transactions, Cukurova considered that CTH remained Cukurova's affiliate because CFI (owned by Cukurova Holding) retained the majority 51% ownership of CTH. Further, CTI from whom CTH acquired the Shares, remained a subsidiary of CTH.

(j)   The issue as to whether Telia was entitled to a Transfer Notice is also the subject of an arbitration commenced in Vienna, Austria by Telia against Cukurova Holding ("(the Vienna Arbitration") on 16th August 2005. One of Telia's contentions is that the transfer of the Shares violated the THSA.

9

186

(k)     Alfa accepts that it was aware of the THSA at the time of the Alfa Transactions.  In fact Alfa's position is that it and Cukurova intended to effect the Alfa Transactions in a manner that would not engage the provisions of the THSA[8].

(l)     At the time that Telia withdrew the interim measures it had obtained against Cukurova in the Geneva Arbitration, it was aware of the likelihood of the Alfa Transactions proceeding. As stated earlier, the Alfa Transactions were completed within a matter of a few days following the formal release of the interim measures by the Geneva Arbitration Tribunal.

(m)     Whilst the Vienna and Geneva arbitration proceedings were ongoing as between Telia and Cukurova, apart from correspondence passing between Telia and Alfa from as early as June 2005, (Alfa complaining of breach or threatened breach of the THSA) no proceedings were commenced or became joined as between them.

(n)     It appears that the tone and colour of all understandings changed when Alfa wrote to Cukurova alleging that Cukurova was in default under the Facility Agreement comprised in the Alfa Transactions and demanding repayment of the loans made by Alfa.

(o)     The upshot is that on 16th April 2007, Alfa, commenced 2 sets of proceedings ("the Cukurova Proceedings") against Cukurova:

(i)     Claim 72 alleged events of default under the Facility Agreement comprised in the Alfa Transaction and demanded repayment of the balance of the loan under the Facility;

(ii)     Claim 73 sought to have Alfa registered by way of perfection of its security as holder of the charged shares.

---

[8] See: Hardiman's Affidavit 1 and 2 - paras. 38-43 and 21 – 30 respectively.

(p)    Cukurova obtained injunctive relief against Alfa in claim 72 on 11th May 2007, which in effect restrained Alfa from registering itself as owner of the charged shares and also from taking any steps to enforce the share charges granted to Alfa pursuant to the Alfa Transactions.  This injunction is still in place ("the Cukurova Injunction").

(q)    These events including Alfa's stated 'appropriation' of the charged shares, spurred Telia into action[9]. On 17th May 2007, Telia commenced the instant proceedings against Alfa in which Telia alleges as its primary case that Alfa in bringing the claims 72 and 73 is threatening to induce or procure CTH to breach the THSA and alternatively, that Alfa had previously induced a breach of the THSA by entering into the Alfa Transactions.  Telia, on the same date, also applied for injunctive relief to restrain Alfa, in effect and inter alia, from pursuing or taking any steps in its claims 72 and 73 of 2007 unless or until CTH transferred the Shares to Cukurova Holding AS, and from taking any further steps to effect or complete a transfer of ownership of CTH to Alfa.

(r)    Telia's application for interim injunctive relief came on for hearing on 12th March 2008. On 9th May 2008, the learned judge, after hearing considerable argument and reviewing much evidence on affidavit for both sides, in a written judgment, granted to Telia injunctive relief.  I set out the relevant portions of the order for the purposes of this appeal:

"The Injunction"
1.    "[Alfa] be restrained …. from ….:

(a)    Registering ….. the transfer of any shares of Cukurova Telecom of which it is not already the legal and registered owner, to any person or entity;

(b)    Taking any further or other steps to effect or complete a transfer of any shares of Cukurova Telecom of which it is not already the legal and registered owner, to any person or entity.

---

[9] See: Telia's skeleton arguments para. 28

11

Fortification

2. [Telia] will pay into court as fortification for its cross undertaking in damages the sum of US$29,000,000 within 21 days.... Pending trial of this action or such further order.........

On 30th May 2008, the learned Judge further ordered as follows:

"The relevant provision in the order of 9th May 2008, is varied to permit [Telia] to provide the fortification ordered either by way of payment into court or by way of bank guarantee from a reputable commercial bank ... in the Territory. Such guarantee shall be in the form used in the English courts with consequential amendments to reflect that it is given by a bank in the Territory..."

(s) Alfa, being dissatisfied with the decision of the learned judge has appealed this decision.

**The grounds of appeal**

[3] Alfa contends that this court should set aside the decision of the learned trial judge because she exercised her discretion wrongly in that she: (a) committed an error of principle; (b) took into account matters she ought not to have taken into account; (c) failed to take into account matters which she ought to have taken into account; and (d) reached a conclusion which was plainly wrong.

Despite the lengthy submissions and voluminous documents comprising of affidavits, pleadings, correspondence between the parties and the like, the issues raised in some respects, are not overly complex.

**The Law**

[4] The law as to the ability of the appellate court to set aside a decision of the trial judge on the exercise of a discretion may be taken as well settled in establishing that an appellate court cannot interfere with the exercise of the judge's discretion simply because were they themselves sitting at first instance they would have reached a different conclusion. A decision based on the exercise of discretion

12

may only be set aside applying the principles as set out in the well known decisions of **Hadmor Productions v Hamilton**[10] and **The Abidin Daver**[11] which are cited with approval and adopted in many decisions of this court. I do not consider that any further exposition of the principles is necessary here.

### Alfa already enjoined

[5]     Counsel for Alfa contends that it is wrong in principle to restrain a person from doing that which the person has already been restrained from doing. He termed it 'highly unusual' to have in place what he called a 'duplicating injunction'. He further argued that the learned judge failed to give sufficient consideration to the offer of undertakings to Telia which included a requirement to give notice to Telia if Alfa intended to apply for a discharge of the Cukurova Injunction. The learned judge in paragraph 56 of her judgment erroneously concluded that the Court of Appeal had, on 22nd April 2007, discharged the Cukurova Injunction.[12] Her decision however, as counsel for Telia points out, did not rest on this basis. She was of the view that Telia could not be forced to rely on an injunction to which it was not a party and, was accordingly entitled, in essence, to seek an injunction to protect its own rights irrespective of the state of affairs in the Cukurova Proceedings. She also found that Telia did not act unreasonably in refusing Alfa's undertakings.

### Imminent risk of harm

[6]     Counsel for Alfa further contended that the fact that an injunction against Alfa in almost similar terms was already in place then there was no imminent risk of harm to Telia as the court must assume that its order will be obeyed. Mr. Hardiman, in his first affidavit[13] on behalf of Telia stated as its reason for seeking urgent interim relief that Telia was *"concerned to ensure that its rights are fully protected in the event that the court lifts the interim injunctive relief...... granted to Cukurova.... ."*

---

[10] [1983] AC 191
[11] [1984] AC 398
[12] The injunction was not in issue before the Court of Appeal which dealt with the question of whether there had been an "appropriation" of the charged shares.
[13] Volume 2, Tab 1, para. 47 of the Record

13

190

Based on this statement, counsel argues that Telia was therefore fully aware that, so long as the Cukurova Injunction remained in place, Telia was also protected thereby. Counsel relied on the principle set out in **Snells Equity**[14] which states:

> "This class of action, known as the quia timet, has long been established, but the Claimant must establish a strong case; "No one can obtain a quia timet order by merely saying "Timeo". He must prove that there is an imminent danger of very substantial damage, or further damage, eg by showing that the threatened act "is attended with extreme probability of irreparable injury to the property of the Claimants, including also danger to their existence."

[7]     Mr. Hardman's first affidavit on behalf of Alfa sets out the undertakings given by Alfa to Telia in light of Telia's application for injunctive relief.[15]   These included inter alia that:

(i)     Alfa would not apply for the injunction in claim 72 to be set aside prior to a hearing of Telia's application for injunctive relief;

(ii)    Alfa would give notice to Telia of any application by Cukurova to discontinue the injunction in claim 72.

These were being offered notwithstanding Alfa's view that Telia was not entitled to injunctive relief.  Telia has not said why these undertakings would not afford adequate protection.  The learned judge having found that Telia did not act unreasonably in refusing Alfa's undertakings did not say why she so found or why the lack of imminent risk of harm was not a good answer to Telia's claim for relief. She did say in effect however, that the court of appeal having discharged the Cukurova injunction that issue fell away although there was the possibility of a further appeal. [16]  This was obviously based on an erroneous understanding.  In my view, given the nature of the relief sought which should only be granted in cases of real urgency, the imminent risk of harm being an integral consideration in assessing whether such relief should be granted on an urgent basis it was necessary to explain why the undertakings did not afford adequate protection in

---

[14] 31st Ed. (2005) para. 16-13
[15] Volume 2, Tab 2, paras. 62-63 of the Record.  See: also   Hardman 2nd Affidavit, Vol.2, Tab 7, paras.18-20
[16] See: judgment: Volume 1, Tab 8, para. 56

14

191

making a finding that Telia had not acted unreasonably in refusing them. As it stands, it has not been made clear as to why lack of imminent risk of harm was not a bar to Telia's claim for urgent relief. Whilst it is not necessary for a trial judge to consider every point raised in a party's argument, nonetheless it is necessary to give reasons in respect of those matters which are vital to arriving at a final decision. This enables an appellate court to appreciate why a particular decision was arrived at. More will be said on the duty to give reasons later. It is reasonable to conclude, given the lack of reasoning thereon, that no proper consideration of this aspect was undertaken.

[8]   Telia's response to this contention is that the judge having found that Telia should not be forced to rely on the Cukurova injunction was therefore of the view that there was imminent risk of harm to Telia - in essence there was no guarantee that the Cukurova Injunction would not be discharged and this finding was well within the judge's discretion to so find. But does the fact of no such guarantee equate, without more, to imminent risk of harm to Telia? I think not. As to whether risk of harm is imminent, this must be assessed in the circumstances as they exist at the time of seeking such interim relief. It must be established that were it not granted at the time then consequential irreparable harm would result which cannot be adequately compensated in damages.

**Telia's standing to seek injunctive relief:**

[9]   Alfa contends that the learned judge erred in failing to address their principal argument namely:

(i)   that Telia had no arguable claim to restrain registration because Alfa had, prior to the issuance of proceedings by Telia become the equitable owner of the charged shares (as the judge herself recognized in her judgment in the Cukurova Proceedings[17] and the Court of Appeal in its judgment[18]); and

---

[17] Alfa Telecom v Cukurova Holding A.S. et al Claim Nos. 72 and 119 of 2007 (delivered 16 November 2007)
[18] Alfa Telecom Turkey Ltd. v Cukurova Finance International Ltd. et al HCVAP 2007/027 (delivered 22 April 2008)

15

(ii)    that Telia had no arguable proprietary claim to the charged shares.

[10]    Alfa says that it acquired the equitable ownership of the charged shares as a security interest in November 2005, subject only to Cukurova's equity of redemption. This was common ground in the Cukurova Proceedings. Counsel for Alfa further argues that upon the exercise of Alfa's contractual right of appropriation under the share charges, on 27th April 2007, Alfa became the indefeasible equitable owner of the Shares - in essence, that the act of appropriation[19] destroyed Cukurova's equity of redemption. Accordingly, Alfa says, Telia was too late when it brought its proceedings as Alfa had already become the owner of the charged shares with Cukurova being its bare trustee in respect of the shares and that Telia could not seek to undo what had already occurred firstly, as equitable mortgagee under the share charges, and thereafter as absolute beneficial owner upon 'appropriation' on 27th April 2007. Alfa says that if indeed there was a time for Telia to bring such proceedings it was in 2005, prior to the closing of the Alfa Transactions. On this basis Alfa says that Telia has no right to prevent it acquiring legal title (whether as equitable mortgagee or as beneficial owner) from the party who holds the legal title on a bare trust for it. Accordingly Telia was not entitled to an injunction but if entitled to any remedy at all, on the assumption that Alfa had committed an economic tort,(which Alfa disputes) then Telia's remedy lie in damages only.

[11]    Interestingly, whilst Telia accepts that it was common ground in the Cukurova Proceedings that Alfa was an equitable mortgagee of the charged shares, Telia disputes this and says that this raises a serious triable issue in the proceedings below.[20]  The reasons they give may be summarized as follows:

---

[19] The issue as to what constitutes an 'appropriation' was the subject of appeal to the Privy Council which concluded that Alfa was an equitable mortgagee of the legal interest in the shares and that commercial practicalities require that there should be an overt act evincing the intention to exercise a power of appropriation, communicated to the collateral-provider. In this case ATT's (Alfa) letter of 27 April 2007 was an effective exercise of ATT's power of appropriation (subject always to the dispute about an event of default (proceeding before the court below - which is not part of the preliminary issues).
[20] See also: Telia's Counter-Notice para. 4(2)

193

(a)     That the establishment of an equitable right relies on equity's aid and the maxim that equity looks on that as done which ought to be done;

(b)     If Alfa knowingly acquired its equitable mortgage by engineering a breach of the THSA then equity should not treat Alfa's equitable mortgage as a matter which ought in equity to be done;

(c)     There is a serious issue as to whether Alfa has clean hands so as to invoke the aid of equity;

(d)     Any views expressed by the experts in the Cukurova Proceedings are irrelevant as Telia's contention of tortious breach of the THSA by Alfa or Cukurova are not being considered in those proceedings.[21]

[12]    Given that Cukurova does not assert that its dealings with Alfa and the entering into of the Alfa Transactions were in breach of Telia's rights under the THSA, or that the share charges are tainted with invalidity it is difficult, in my view, for Telia to make the case that Alfa's rights acquired under the Alfa Transactions by which Alfa became an equitable mortgagee of the charged shares is not to be given effect because Cukurova in giving those rights to Alfa was acting in breach of the THSA. Surprisingly, Telia has not sought in this jurisdiction to sue or join Cukurova, its contracting party who it says is being induced or being made to breach the THSA.  I agree with counsel for Alfa, that if this is the case which Telia seeks to make then Telia ought to have brought proceedings prior to the closing of the Alfa Transactions in 2005, in effect enjoining Cukurova and thus preventing Alfa from acquiring or being granted such rights.  Telia, not having done so, or having taken proceedings[22] against Cukurova enjoining them and later surrendering the injunction which allowed the Alfa Transactions to close cannot now seek to undo the Alfa Transactions by raising the issue as to whether Alfa is

---

[21] There is no assertion by Alfa or Cukurova that either is in breach of the THSA.
[22] Referring to the Geneva Arbitration

17

194

an equitable mortgagee or now, as Alfa contends, an equitable owner. In my view, this was a factor which ought to have been taken into account in deciding whether, Telia, at this stage, was entitled to injunctive relief.

[13]    I also agree with counsel for Alfa that to the extent that Alfa must rely on equity for the establishment of its rights as an equitable mortgagee this would be as against Cukurova only and not Telia since Telia does not have any proprietary right (which it accepts) to the charged shares but relies only on its contractual rights under the THSA. Alfa's position however is that as an equitable mortgagee it has the right, in essence at its sole option, to convert or merge its equitable holding into a legal holding of the charged shares subject only to Cukurova's right of redemption which Alfa says has been destroyed by Alfa's 'appropriation' of the charged shares.

[14]    Consequently, it would be difficult to rationalize the basis on which Telia can claim to be entitled to injunctive relief restraining Alfa from registering itself as owner of the charged shares. The fact is that Alfa became an equitable mortgagee of the charged shares on the closing of the Alfa Transactions in 2005, and would have been entitled as from then to be entered on the register of CTH and CFI. Alfa could have perfected its equitable proprietary interest by calling for the legal estate thereby converting the equitable mortgage into a legal mortgage subject only to Cukurova's equity of redemption. In my view the failure to appreciate Telia's legal standing vis à vis Alfa's status as an equitable mortgagee, amounted to an error of principle which inevitably lead to arriving at a wrong conclusion. Having so stated for the avoidance of doubt, I express no view as to whether Alfa was entitled to exercise its power of appropriation. That issue is very much joined in the proceedings below. This no doubt suffices to dispose of this appeal.

[15]    Telia further contends however, that its undisputed contractual rights under the THSA in respect of which it says Alfa had knowledge at the time of entering into the Alfa Transactions, gives it standing to seek injunctive relief to protect those rights. Telia relies on the case of **Swiss Bank Corporation v Lloyds Bank Ltd.**[23]

_____

[23] [1979] 1 Ch. 548

18

195

in which Browne-Wilkinson J in reference to the tort of knowing interference with contractual rights had this to say at page 575C-E of his judgment:

> "… 2. A person proposing to deal with property in such a way as to cause a breach of contract affecting that property will be restrained by injunction from so doing if when he acquired that property he had actual knowledge of that contract. 3. A plaintiff is entitled to such an injunction even if he has no proprietary interest in the property: his right to have his contract performed is a sufficient interest. 4. There is no case in which such an injunction has been granted against a defendant who acquired the property with only constructive notice, as opposed to actual notice of the contract. In my judgment constructive notice is not sufficient, since actual knowledge of the contract is a requisite element of the tort."

[16]    In support of this Telia places reliance on the learned judge's findings [para. 48] that "..*on the pleadings and on the evidence Telia has made out a strong case that Alfa was aware of the THSA prior to beginning of negotiations with the Cukurova Group...*". However, does evidence of being aware of the THSA equate to actual knowledge? More will be said about this in dealing with the question as to whether Telia has been able to show a good arguable case thereby satisfying the first limb of the American Cyanamid test for the grant of an injunction.

[17]    Telia also contends that the learned judge ought to have found that certain intermediate share transfers (all part of the Alfa Transactions) were 'sham' transactions and should be disregarded for the purpose of considering whether Alfa threatens to induce or has induced breach of the THSA.[24] Telia says that they carried no commercial value and that no rational purpose for them has even been suggested other than an attempt to deny Telia's rights under the THSA. **In Stone v Hitch**[25] it was stated by Lady Justice Arden, that the test for ascertaining whether acts or documents are a 'sham' is that laid down in the **Snook v London & West Riding Investments Ltd** [26] in which Lord Diplock stated at page 802 as follows:

---

[24] See: Telia's Counter-Notice para.4(7)
[25] [2001]EWCA Civ 63
[26] [1967] 2 QB 786

> "For acts or documents to be a "sham", … all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating."

Alfa points to the fact that numerous lawyers and law firms were involved for the different parties involved in the transactions and they are legitimate transactions and in any event does not meet the test of a "sham" as laid down in **Snook.** Adopting that test it becomes readily apparent that Telia (a non party to the Alfa Transactions) apart from assertions and relying on unsustained inferences, would be hard put to establish such a claim in the absence of the contracting parties (Cukurova/ Alfa) making such an allegation. There is no evidence suggesting that any of the intermediate share transfers were fictitious. The fact that Telia finds no commercial purpose to those intermediate transactions does not bring those transactions within the definition of a "sham" applying the Snook test.

### The economic torts

[18]    Much argument has been advanced on the question as to the type of economic tort Alfa is said to have committed: in essence, whether Telia's claim against Alfa is substantively one of inducement or one of interference or prevention. Telia's primary claim is based on future threatened breaches of the THSA[27]. It is common ground that Telia has certain contractual rights under the THSA. The issue however is not the existence of those rights, but rather, whether those rights have been breached or are about to be breached. Telia asserts that the execution of the Alfa Transactions amounted to a breach of the THSA (by Cukurova) induced by Alfa, and says further that Alfa, by bringing proceedings against Cukurova, in claims 72 and 73, threatens to induce and or procure Cukurova to breach the THSA or, as in essence put by Telia in its skeleton arguments,[28] Alfa having induced the breach of the THSA in 2005, threatened by its actions in 2007, to aggravate the damage flowing to Telia from the breach. Alfa's case is that there has been no breach of the THSA.

---

[27] See para.93 of Telia's skeleton arguments.
[28] See paras. 64, 83, 94, 108, Telia's skeleton arguments.

20

197

[19]    The tort of inducing a breach a contract is different from the tort of interference with business by unlawful means although they are both recognised as economic torts. These torts were carefully analyzed in the cases of **OBG Ltd. v Allan**[29] **and Meretz Investments NV v ACP**[30]. The ingredients required for establishing a case in each are different. First of all, the tort of inducing breach of contract is a tort of secondary liability. Therefore a breach of contract is an essential element. "***One cannot be liable for inducing a breach unless there has been a breach. No secondary liability without primary liability***"[31] In the tort of interference or prevention cases no question of accessory liability arises. A defendant's liability stands alone. The distinguishing features of the two torts were succinctly explained by Lord Nicholls of Birkenhead in **OBG.** At paragraph 178 he stated:

> "There is a crucial difference between cases where the defendant induces a contracting party not to perform his contractual obligations and cases where the defendant prevents a contracting party from carrying out his contractual obligations. In inducement cases the very act of joining with the contracting party and inducing him to break his contract is sufficient to found liability as an accessory. In prevention cases the defendant does not join with the contracting party in a wrong (breach of contract) committed by the latter. There is no question of accessory liability. In prevention cases the defendant acts independently of the contracting party. The defendant's liability is a 'stand – alone' liability. Consistently with this, tortious liability does not arise in prevention cases unless …. the preventative means used were independently unlawful."

[20]    The question of intention is relevant to both torts. In an inducement case there must be an intention to procure a breach of contract whereas in an unlawful means case, there must be an intention to cause loss. As Lord Hoffman said in **OBG** at paragraph 52 of his judgment:

> "The ends which must have been intended are different. **South Wales Miners Federation v Glamorgan Coal Co. Ltd** [1905] AC 239 shows that one may intend to procure a breach of contract without intending to cause loss. Likewise, one may intend to cause loss without intending to procure a breach of contract. But the concept of intention is in both cases the same"

---

[29] [2007] 2 WLR 920, para. 178
[30] [2008] Ch 244
[31] Per Lord Hoffman in OBG Limited v Allan  para. 44

21

198

To establish intent, a certain degree or quality of knowledge is required.  The alleged tortfeasor must know that he is inducing a breach of contract. Actual knowledge is required.  Constructive notice is not sufficient.[32]  Lord Hoffman in the **OBG** case, at para. 39 of his opinion, stated:[33]

> "To be liable for inducing breach of contract you must know that you are inducing a breach of contract. It is not enough that you know that you are procuring an act which, as a matter of law or construction of the contract, is a breach.  You must actually realise that it will have this effect.  Nor does it matter that you ought reasonably to have done so."

At para. 43 he went on further to say:

> ".. if the  breach of contract is neither an end in itself nor a means to an end, but merely a foreseeable consequence, then in my opinion it cannot for this purpose be said to have been intended"

[21]    Alfa, boldly says that the Alfa Transactions were structured in such a way so as not to infringe the Turkcell Holdings' Articles of Association which they understood to be in similar terms as the THSA.  Having stated in paragraph 48 of her judgment that Telia had made out a strong case showing that Alfa was aware of the THSA prior to beginning negotiations with Cukurova, and aware of the Geneva Arbitration proceedings brought by Telia against Cukurova to enforce its contract, it is easy to appreciate the judge's conclusion thus: **"It appears that Alfa was alive to the possibility that it could not acquire those shares without circumventing the THSA."**  As Alfa rightly contends, circumventing a contract in a way which does not involve or avoids its breach does not ground a cause of action – at least not in inducement.

[22]    As it relates to actual knowledge (the burden of proof of which is on Telia), Alfa says in essence that Telia has failed to produce any evidence to show that:

---

[32] See: Swiss Bank Corporation v Lloyd's Bank Ltd. [1979] 1 Ch 548
[33] See also Mainstream Properties v Young [2007] 2 WLR 920 per Lord Hoffman at para. 70 where the principle is similarly stated.

199

(i) Alfa had the requisite knowledge and intention to bring about a breach of the THSA in the **OBG/Mainstream Properties**[34] sense; or

(ii) that Alfa had breached a contractual obligation which it had assumed in relation to the Shares in the **Strathcona** sense. The **Strathcona** principle is, in essence, this: Where party C (third party) accepts property from one of the original contracting parties being A and B, subject to an obligation to perform certain contractual obligations to A or B those obligations being fully disclosed to C, then C may not renege on the performance of those obligations.

[23] Further, Alfa says that to the contrary, it adduced evidence showing that it had no such intention and pointed to the evidence regarding the assurances and the warranty obtained from Cukurova (Telia's THSA contracting party) to the effect that the Alfa Transactions did not involve any breaches of contract or the Articles of Turkcell Holdings.

[24] It is not disputed that the lawyer, Mr. Derman, who had previously acted for Telia in the negotiation and consummation of the THSA, acted for Cukurova in the negotiation and consummation of the Alfa Transactions. It appears to be common ground that he did not act for Alfa. The judge however found, contrary to the evidence produced, that Alfa had sought out Mr. Derman's services and had relied on advice from him in respect of the Alfa Transactions, and went on to conclude that this casts doubts on Alfa's bona fides.[35] This was a misunderstanding of the facts leading to the unwarranted drawing of an adverse inference as to the bona fides of Alfa's stated lack of knowledge and intention to induce or procure the breach of the THSA.

---

[34] [2007] 2 WLR 920
[35] Para. 49- Judgment –core bundle tab 8

23

200

[25]    Telia in its Counter-Notice says that the judge ought to have found as an additional ground for concluding there was a serious issue to be tried as to whether Alfa intends or intended procuring a breach of the THSA, the lack of any explanation whatsoever on the part of Alfa as to the necessity for the complexity of the structure for achieving the holding of the Shares by CTH. However, it would appear that this was taken into account where in para 48, she referred to the intricate network of companies brought about *"some for merely a nanosecond"* for the purpose" of the Alfa Transactions and concluded that Alfa was alive to the possibility of their being unable to acquire the Shares without circumventing the THSA.

[26]    Alfa contends that the allegations of wrongdoing levelled by Telia against Alfa are principally allegations that Alfa is attempting or threatening to prevent Cukurova from performing its obligations under the THSA by the institution of the Cukurova Proceedings and accordingly is not an inducement case at all on the basis that inducement presupposes some element of consensual behaviour in achieving a desired result.  Alfa accepts that the negotiation and consummation of the Alfa Transactions were consensual.  It denies however any unlawfulness in respect of those actions.  The actions in respect of the Cukurova Proceedings, Alfa says, is anything but consensual as the parties (Cukurova and Alfa) are locked in a bitter and hard fought battle.  Cukurova enjoined Alfa from getting itself registered as legal owner of the charged shares.  Accordingly, there could be no question of Cukurova being induced by Alfa in 2007, to do anything.  On this basis, Alfa says that on Telia's pleaded case in respect of Alfa's actions in 2007, the wrong alleged can only be in substance a prevention case for which independent unlawful means must be pleaded and shown to exist.  No such unlawful means has been pleaded or alleged by Telia.  I agree that the bringing of the Cukurova Proceedings cannot be considered as unlawful means for the purpose of grounding such a cause of action.

24

201

**The establishment of an inducement case.**

[27] As is clear from the **OBG** case and long established in **Lumley v Gye**[36], a breach of contract is critical to establishing the tort of inducement or procurement. This would require some consideration of the act of alleged breach itself.

[28] The learned judge in paragraph 45 of her judgment, whilst referring to Clause 3.02(b) and 3.02(c) of the THSA and noting Telia's pre-emption and come–along rights and the exception or reservation on those rights as it related to "Affiliates" of the contracting parties, concluded in essence that if Alfa succeeds on its rectification claim (claim 73) and having no intention of allowing CTH to return the charged shares to the 'original Cukurova transferor', that this amounted to '*a threatened breach*' of CTH's obligations under the THSA. She failed however to set out her reasons for so finding. Key to this finding would be a consideration of the term "**affiliate**" defined by the THSA and whether there was evidence tending to show that CTH was an affiliate, or that the transferor to CTH was an affiliate or had ceased being an affiliate.

[29] Moreover, it is not clear whether the learned judge was satisfied that there was 'a breach' of the THSA or 'a threatened breach'. At paragraph 43 the judge expressly found as follows:

> "… having regard to the evidence I am of the view that Telia has established a good arguable case that the acts done by Alfa in the BVI threaten to procure a breach of the THSA by Cukurova and that BVI law governs this tort…. the principal acts which would result in breach are taking place in the BVI."

A reference to the acts taking place in BVI could only be, in the context of the case, a reference to the Cukurova Proceedings.

[30] At paragraph 44 the learned judge went on to say as follows.

> "Thus, Telia must then go on to show that it has a good arguable case that the acts of which it complains amount to the tort of inducing breach of contract"

---

[36] [1853] 2E&B 216

25

202

As I stated earlier, the learned judge went on to find at paragraph 45 of her judgment a threatened breach of the THSA in the course of her treatment of the tort of inducement. At paragraph 48 she spoke of Alfa being alive to the possibility of their inability to acquire the Shares without circumventing the THSA and then at paragraph 50, she stated as follows:

> "In my view, Telia has made out a good case that this tort (inducing breach of contract) the actions leading to breach of contract are not required to be unlawful in themselves...."

Finally, on this issue the learned judge summed up at para. 51 as follows:

> "On the question whether Telia has a good arguable case I find for the reasons advanced that Telia has crossed that initial hurdle."

[31]    If it is that Telia was found to have made out a case of 'threatened breach' then, to my mind what is missing in the learned judge's treatment of this issue is a consideration of the acts which are said to amount to breach or threatened breach of the THSA on the part of Cukurova and the manner in which Alfa is said to have induced or threatens to procure such breach by Cukurova. As Telia has rightly pointed out, a judge is not required to give reasons in respect of every issue raised by a party in the proceedings and has quite helpfully distilled the following principles from the judgment of Lord Phillips MR in **English v Emery Reimbold & Strick Ltd,**[37] which also finds support in this court:

> "(i) There is no duty on a judge, in giving his reasons, to deal with every argument presented by counsel in support of his case. It is sufficient if what is said shows the parties and, if need be the appellate court the basis on which he acted.
>
> (ii) "... The judgment must enable the appellate court to understand why the judge reached his decision.
>
> "This does not mean that every factor which weighed with the judge in his appraisal of the vidence has to be identified and explained. **But the issues the resolution of which was vital to the judge's conclusion should be identified and the manner in which he resolved them explained.**"[38] (my emphasis)

---

[37] [2002] 1WLR 2409
[38] Per Lord Phillips para. 19

203

[32]    The establishment of the underlying cause of action in this case the tort of inducing breach of contract is in my view at the heart of the matter.  As Telia has rightly stated in reliance upon **Siskina**[39], an interlocutory injunction is not a cause of action.  It cannot stand on its own.  It is dependant upon there being a pre-existing cause of action against the Defendant.  As has already been established the tort of inducing breach of contract is one of secondary liability.  Accordingly, for the purpose of deciding whether a good arguable case had been made out in respect of the tort of inducing breach of contract or in this case a threatened breach of contract, for the purpose of satisfying the **American Cyanamid** test, the learned judge, in my view, was required to say what were the acts of Cukurova which could or would result in breach of the THSA and to identify those provisions of the THSA and explain (whether on an application of Turkish law or BVI law), how those acts are said to be in breach or threatens to breach the THSA and go further to explain the actions by which Alfa is said to have induced Cukurova to breach or threatens to procure a breach of those provisions.  A cause of action is not made out by merely being stated.  The acts averred must be capable of giving rise to the cause of action as stated.  In essence, it was necessary to explain the basis for concluding that the action of Alfa amounted to, as she termed it [para. 45] *"a threatened breach of Cukurova's obligations under the THSA".*  There was a failure to provide this analysis which in my view amounts to an error in principle.

[33]    Alfa accordingly contends that Telia has failed to make out an arguable case in respect of either the tort of inducing breach of contract or the tort of interference or prevention of performance and that the trial judge was in essence wrong in concluding, that the first limb of the test laid down in **American Cyanamid** had been satisfied by Telia.    Alfa says that this is because the trial judge misunderstood the effects of the rulings in the **OBG** and **Meretz** cases and applied the wrong test;[40] that had she asked herself whether Telia's principal claims concerning Alfa's actions in 2007, were in substance an inducement case or an interference case she would have reached the conclusion that it was the latter and

---

[39] Siskina (Cargo Owners) v Distros SA [1979] AC 210 ( para 32 of Telia's skeleton arguments).
[40] See judgment para. 50

27

204

that the claim was accordingly bound to fail because unlawful means were not pleaded and could not be proved.

[34]   In respect of the tort of inducement I agree with the learned judge that issues of knowledge and intention are matters requiring factual determination which cannot be made at this early stage of the proceedings.[41]  All the evidence is not yet in and engaging in a mini trial is an undesirable course.  I refrain from making any such finding the issue being one for trial.  Nevertheless, bearing in mind that this tort is one of secondary liability, in my view, it was necessary that the judge correctly identify the cause of action supported by the averments as pleaded and to say whether as a matter of law such cause of action had been made out giving rise to a serious issue to be tried.  I agree with counsel for Alfa that where a claimant alleges that the tort of inducing a breach of contract has been committed, it behoves the claimant to identify the contractual provision(s) it is alleged have been breached by the contracting party (here Cukurova) and to explain the way in which that contracting party's actions may be said to amount to a breach of those provisions;  and to identify the manner in which it is alleged that 'the inducer' [Alfa] induced the contracting party to breach those provisions.  It cannot be left to be presumed generally, that a contract has been breached based upon the end result.  It must be shown that the actions leading to that result were acts involving or which would involve a breach.  In this regard the words of Lord Hoffman in **OBG** warrant repetition: *"**One cannot be liable for inducing a breach unless there has been a breach**".*  Accordingly, it is fundamental to establishing the cause of action that the primary party's breach of contract be set out in the party's case, with some cogent evidence of this sufficient to warrant the grant of interim injunctive relief.

[35]   Telia says that the judge could have taken into account as being relevant to the grant of injunctive relief the fact that the Vienna Arbitration had concluded that Cukurova had breached the THSA in 2005.  This is raised in Telia's Counter-Notice.  The judge expressly refused to take account of the findings of the Vienna

---

[41] See judgment para. 49

Arbitration.[42]  Whilst this may be a relevant factor to consider in deciding whether or not to grant interim injunctive relief, this does not obviate the need for making out a case on the tort of inducement as between the parties to this substantive action applying the **American Cyanamid** principles.  Breach by the primary party is but one element.  Knowledge and intention on the part of the accessory or secondary party must also be shown.

[36]    On the basis that Telia has made out an arguable case in respect of Alfa inducing Cukurova to breach (assuming there was a breach for present purposes and having due regard to the fact that Telia's primary case relates to Alfa's actions in 2007, as establishing a case of procuring or threatening to procure breach of the THSA), such action on the part of Alfa as may amount to inducement, on the pleadings and evidence adduced, in my view, are Alfa's actions in 2005, in the negotiation and consummation of the Alfa Transactions. Do those actions occurring in 2005, afford good ground for injunctive relief in 2007?

[37]    Telia says in paragraph 83 of its skeleton arguments that Alfa induced certain breaches of the THSA by Cukurova in 2005, and that Alfa's conduct in 2007, threatens to cause or aggravate damage to Telia resulting from those past breaches.  In my view, whether the breach may be said to have been aggravated by the commencement of the Cukurova Proceedings in 2007, the acts which may be said to give rise to the alleged breach would have none the less occurred in 2005.  The cause of action does not lie in the aggravation of the breach but in the breach itself.  This brings me to the question of delay in seeking urgent injunctive relief in April 2007, for an alleged breach in 2005, and whether there was acquiescence or waiver by Telia of its right to seek such relief.

### Acquiescence / waiver

[38]     The parties agree that acquiescence may be a bar to relief and that the test for acquiescence is whether it would be unconscionable on the part of an owner of a

---

[42] See judgment paras. 62 - 63

206

right to press or seek to enforce that right.[43] It is common ground that Telia had obtained protection of its rights asserted against Cukurova by virtue of the 'interim measures' granted in its favour in the Geneva Arbitration. It is also common ground that interim measures in effect blocked the consummation of the Alfa Transactions. Alfa contends that Telia, being aware that without an injection of funds Cukurova was facing bankruptcy, voluntarily agreed to surrender the interim measures in the knowledge that the Alfa Transactions would proceed thus providing the funds needed by Cukurova to stay afloat. The Alfa Transactions were accordingly consummated resulting in the sizeable funding of Cukurova by Alfa and the taking of appropriate security by Alfa which would ultimately give to Alfa, an interest in the Shares. In so doing Alfa says, Telia acquiesced in the consummation of the Alfa Transactions or in any event waived its right to seek protection of its alleged rights and accordingly cannot be allowed to assert those rights. Alfa also points to Telia's letter of 27.09.05 to Cukurova and Alfa which it says clearly demonstrates Telia's understanding of the nature of the Alfa Transactions. Alfa further contends that Telia, whilst stating that the interim measures were released, has failed to explain why they were released in the face of Alfa's stated assertion to Telia that this conduct amounted to a waiver of such rights.

[39] The judge at paragraph 53 stated:

> "It is well established that waiver cannot apply unless one has full knowledge of what is being waived."

With regard to Telia's conduct in 2005, the judge had this to say at paragraph 55:

> "... in any event says Alfa, the grant of an injunction is discretionary and Telia had an injunction against Cukurova in October, 2005 in the Geneva arbitration and that it did not persist with that remedy thus allowing Cukurova to conclude the valuable Alfa/Cukurova transactions of which it was aware. In my opinion this is a too facile interpretation of the reasons why Telia did not pursue that injunction. The reasons for not doing so can be gleaned from the Geneva partial award and in those circumstances I do not accept that Telia acted unreasonably in

---

[43] Snell's Equity 21st Ed. Para.16-16

207

> not maintaining the injunction and in any event it cannot be taken to have known of the full implications of the Alfa/ Cukurova transactions to raise any question of waiver against it."

[40] Alfa contends that the judge applied too stringent a test as to knowledge such as to amount to waiver. I do not consider for one moment that counsel is seeking to suggest that knowledge is not a salient factor in determining waiver. One certainly cannot be said to have waived that of which one has no knowledge. Telia, on the other hand, contends that the judge properly exercised her discretion for the reasons given in her judgment. Having examined those documents which were before the judge, I am satisfied that this is a conclusion reasonably open to her to find. This accordingly, would not afford a basis for interference by this court.

### Delay

[41] The maxim of equity that 'delay defeats equities' is well known and is sometimes stated in the expression – 'a person who sleeps on his rights losses them'. Delay in seeking interim relief is that much more critical. This is because the grant of interim relief is predicated on a state of urgency. **Snell** at 16-25 states it thus:

> "...a lesser degree of acquiescence or laches suffices to debar a claimant from interlocutory relief than from obtaining a perpetual injunction, the refusal of an interlocutory injunction is only a temporary rebuff, whereas the refusal of a perpetual injunction... 'amounts to a decision that a right which has once existed is absolutely and forever lost'. Moreover, interim relief is granted only in matters of urgency, so that a claimant who delays thereby demonstrates the absence of any urgency requiring prompt relief. Even a month's delay between the assertion of a right and the commencement of proceedings may debar the claimant if in the meantime the Defendant has contracted to let the subject property matter to third parties."

[42] Alfa asserts that Telia's delay in seeking interim relief against it is extensive – since 2005, when Telia was aware of Alfa's agreement to finance Cukurova to the tune of $3.3 billion, and that Telia had written to Alfa, in June 2005,[44] asserting its rights of first refusal in respect of the Shares in reliance on the THSA and requesting that Alfa refrain from any action in breach of the THSA, which Telia

---

[44] This correspondence appears at Volume 3, Tab 1, pp. 234 – 238 of the Record

208

asserted would cause substantial harm to it. In correspondence passing between Telia, and Alfa, Telia on 16th November 2005, warned that it intended to pursue all it remedies for breach of its rights[45]. Telia however, took no steps as against Alfa until commencing these proceedings in May 2007.

[43]    The judge at paragraph 57 of her judgment stated thus:

> "I do not accept that Telia ought to have brought proceedings against Alfa in 2005. In any event, Telia could only have done so in Turkey and not the BVI at that time. Telia in fact instituted the Vienna arbitration against Cukurova in May 2005, for breach of the THSA. Alfa was aware of that and of the Geneva arbitration. It cannot be said that Telia slept on its rights such as to disarm Alfa. In the complicated circumstances of this case I do not accept that there was delay of such a nature that should weigh against Telia....."

[44]    Alfa complains that this was a plainly wrong exercise of discretion in that the learned judge:

(i)     took into account the irrelevant consideration of Alfa being aware of the Vienna and the Geneva arbitrations which in any event were confidential and to which Alfa was not a party;

(ii)    concluded that Telia could only have brought proceedings in Turkey at the time and not BVI, thereby overlooking the fact that Alfa is a BVI company and thus was liable to suit in BVI as of right;

(iii)   failed to say why the bringing of proceedings in Turkey would not have sufficed;

(iv)    failed to explain why she did not accept that Telia ought to have brought proceedings against Telia in 2005, having regard to Telia's correspondence of 16.11. 05 complaining that a breach of its rights had occurred and that Sonera would pursue available remedies;

---

45 This correspondence appears at Volume 3, Tab 1, pp. 264 – 265 of the Record

      (v)    applied the wrong test on delay having said *"It cannot be said that Telia slept on its rights such as to disarm Alfa." [para. 57]*, The question being whether Telia had delayed and if so whether such delay amounted to a bar to interim relief.

[45]    Telia, in defending the judge's exercise of discretion on this aspect referred to the test to be applied as being whether there has been a substantial lapse of time coupled with the existence of circumstances which make it inequitable to enforce the claim[46]. Telia asserts that:

      (i)    the action which gives rise to Telia's primary case was the seizing of control of CTH in April 2007, and its application was issued one month later in May 2007;

      (ii)    even if the judge was incorrect in holding that in 2005, Telia could only have brought proceedings against Alfa in Turkey such a finding made no difference to her overall conclusion that Telia had not delayed in such a way that it could be said it had sat on its rights. Telia goes on to say that 'the finding is probably correct in that any action in 2005, would have had as its primary focus the conduct of Cukurova Holding which was a Turkish company; and

      (iii)    there is no suggestion in the judgment that the judge took into account Alfa's awareness of the Vienna and Geneva arbitrations as a material factor (or a factor at all) in concluding on delay.

[46]    In my view, Telia's arguments fail to meet the challenges mounted by Alfa on this point. To rely on Alfa 's seizing of control of CTH Telecom in April 2007, adds nothing to the point as the judge's reasoning failed to address any action occurring in 2007, as the basis for her conclusion on delay. Rather, she referenced 2005, which can only be reasonably taken as the time she considered as being the relevant time. In that regard Telia's correspondence in 2005, threatening pursuit

---

[46] See: Snell's Equity (21st Ed) para. 5-19

of its remedies for breach was in my view highly relevant.  I agree with Alfa that the point is not <u>where</u> Telia pursued its remedies against Alfa but rather the fact as to whether Telia did or did not pursue remedies against Alfa <u>wherever,</u> having complained of breach of the very rights complained of now, as early as 2005.  For the reasons as clearly advanced by Alfa, and summarised at paragraph 44 above this amounted, in my view, to a wrongful exercise of the judge's discretion. The delay has simply not been satisfactorily explained by Telia.  The learned judge fell into error in addressing this issue.

### The conspiracy claim – Telia's Counter-Notice

[47]   In this judgment I have made reference to Telia's Counter-Notice where relevant in respect of matters which it felt ought to have been relied on or taken into account by the learned judge in arriving at her decision.  Telia further urges as an additional point, that in the event the court concludes that there is no serious issue to be tried in respect of its claim founded on the tort of inducing breach of contract, then it ought to consider continuing the injunction based on Telia's claim as set out in its Re-Re-amended Statement of Claim that Alfa's conduct/ threatened conduct amounts to the tort of conspiracy.[47]  Alfa in answer points, in my view quite rightly, to the total lack of particularisation in respect of this newly pleaded claim to the point that nothing further requires being said by way of dismissing this ground as being unworthy of further consideration for the purpose of continuing the injunction.

[48]   For the reasons advanced I would allow this appeal and set aside the order made by the judge.  Having arrived at this conclusion it is not necessary to consider the question of the level of fortification save to make these comments:

     (i)     The ordering of fortification and the level thereof, in respect of a cross-undertaking to pay damages on the grant of an interim injunction is discretionary.  If fortification is ordered then the yardstick as to quantum would invariably be the amount of loss

---

[47] See: paras. 23-25 of Re-Re-Amended Statement of Claim; Counter-Notice para. 7: See Volume 1, Tab 13 of the Record

211

the party enjoined is likely to suffer in the event it turns out that the injunction was wrongly granted. This in turn would call for a preliminary assessment of the value of the stake based on the material before the judge and not on some extraneous consideration relative to the country in which the matter is being litigated.

(ii)     A judgment once delivered is not subject to being reopened by the judge save in exceptional circumstances.

### Conclusion

[49]     The appeal is allowed and the order of the trial judge is set aside. The respondent shall bear the costs of this appeal to be assessed unless agreed within 21 days. Finally, I am grateful to counsel on both sides for their well presented submissions which made this task easier.

<div align="right">

**Janice George-Creque**
Justice of Appeal

</div>

I concur.

<div align="right">

**Ola Mae Edwards**
Justice of Appeal

</div>

I concur.

<div align="right">

**Michael Gordon, QC**
Justice of Appeal [Ag.]

</div>

212

EASTERN CARIBBEAN SUPREME COURT
BRITISH VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE
(COMMERCIAL DIVISION)

CLAIM NO. BVIHC (COM) 2019/0180

BETWEEN:

GREAT PANORAMA INTERNATIONAL LTD

Claimant

and

[1]    QIN HUI

Defendant

[2]    DAYSPRING INVESTMENTS LTD
[3]    KING FAME TRADING LTD

Respondents

Appearances:
Mr. Robert-Jan Temmink QC, with him Mr. Richard Baird and Mr. Christopher
Bromilow of Forbes Hare for the claimant
Mr. Michael J. Fay QC of Agon Litigation for Qin Hui and Dayspring Investments
Ltd
Mr. Nicholas Burkill and Mr. Nicholas Brookes of Ogier for King Fame Trading Ltd

_____

2020: June 25, 26
August 13

_____

JUDGMENT

[1]    **JACK, J [Ag.]**:    On 19th December 2019 I granted the claimant ("Great
Panorama") a freezing order against the defendant ("Mr. Qin") and the two
respondents to Great Panorama's application, Dayspring Investments Ltd
("Dayspring") and King Fame Trading Ltd ("King Fame"), both BVI companies.
Before me are applications by Great Panorama for an extension of the freezing
order and cross-applications by the other parties for discharge.  Great Panorama

1

213

also wishes to amend its claim form and statement of claim to add Dayspring and King Fame as defendants, to add further causes of action and to substitute Goldteam Group Ltd ("Goldteam") for itself as claimant following an assignment of the claim on 13th January 2020.

**Delay**

[2]     I deal first with the issue of delay.  As I pointed out in **VTB Bank (Public Joint Stock Co) v Miccros Group Ltd and another**:[1]

> "There seems to be developing a culture in this Territory of parties obtaining interim relief and then doing nothing to obtain final substantive relief.  That is not the purpose of granting interim remedies.  If parties do nothing once they have obtained interim relief, they can expect the Court to discharge the interim relief on that ground alone."

[3]     In the current case, Mr. Qin filed his acknowledgment of service on 24th January 2020.  He equivocated as to whether he would seek to challenge the jurisdiction of the Court or the validity of service but in the event has done neither.  Nor has he served a defence.   Mr. Temmink QC, who appeared for Great Panorama, sketched what appeared to be inadequate reasons for the failure to exercise diligence, but in the event the other parties did not take any point on delay, so I did not investigate the validity of the reasons which Mr. Temmink QC advanced for the delay.  It is of course also fair to say that the coronavirus pandemic has interfered with the ordinary conduct of litigation, particularly in cross-border matters such as the instant case.

[4]     Accordingly, I will not in this case discharge the injunction on the basis of delay. Instead I will consider the applications and cross-applications on their merits.

**Two procedural matters**

[5]     When this matter originally came before me, the only named defendant was Mr. Qin.  The two companies were named solely as respondents to the application for

---

[1] BVIHC (COM) 2018/0067 (delivered 23rd January 2020) at para [9].

2

214

an injunction. This was a reasonably common procedure in this Territory. Since the granting of the injunction in December last year, however, the Court of Appeal has handed down its decision in **Broad Idea (No 2)**, which disapproves making such orders without naming the respondents as defendants in a claim form.[2]

[6]     This is in my judgment a mere procedural defect, which, against the background of the practice which I have outlined, was an excusable mistake. It can be easily rectified (as Great Panorama are seeking to do) by adding the two companies as defendants with a pleaded case against them: CPR 26.9. I shall grant such permission.

[7]     Likewise, Great Panorama have assigned their judgment debt in Hong Kong to Goldteam Group Ltd ("Goldteam"). Goldteam now seek to be substituted as claimant. Subject to any issues about Great Panorama's liabilities for costs and under the cross-undertaking for damages given (on which I will hear the parties), the substitution appears uncontroversial.

**The facts in outline**

[8]     On 26th August 2019 Great Panorama obtained a default judgment in the Court of First Instance in Hong Kong for HK\$165,300,000 plus interest. It is this judgment which Great Panorama (and now Goldteam) seek to enforce in this jurisdiction.

[9]     There are many disputed matters. The following, however, is uncontroversial. Mr. Qin is a citizen of the People's Republic of China. He uses the alias "Li Muk Lam". He was (and says, although this is disputed, that he still is) a wealthy man. A major asset was a majority, latterly 70.02 per cent, shareholding in SMI Holdings Group Ltd ("SMI"), a company listed on the Hong Kong Stock Exchange.

[10]   Mr. Qin was and is the sole shareholder in Dayspring. Dayspring's only asset is an apartment on the Tanglin Road in Singapore ("St Regis"). St Regis was bought in 2010 for the equivalent of just under US\$10½ million.

---

[2] Broad Idea International Ltd v Convoy Collateral Ltd BVIHCMAP 2019/0026 (determined 29th May 2020, unreported) at paras [23], [24] and [56]

3

215

[11]    In 2010 Mr. Qin married Ms. Liu Duo, who is generally known as "Emma".  Without disrespect this is how I shall refer to her.  There are two children of the union, now aged six and nine.  Mr. Qin was the sole shareholder of King Fame.  In turn the only asset of King Fame is a large Georgian style mansion in Applegreen Drive, Old Westbury, New York ("Applegreen Drive"), which was purchased in 2011 for US$15,880,000.  By a purported deed made Thursday 30th August 2018 Mr. Qin, as legal and beneficial owner of the single share in King Fame, transferred by way of gift the share to Ms. Liu Xuemin ("Ms. Liu"), Emma's mother and therefore Mr. Qin's mother-in-law.  The transfer was registered the same day in the register of shareholders.  The deed was governed by Hong Kong law.

[12]    On Monday 3rd September 2018, trading in SMI was suspended following a public announcement "that certain subsidiaries of the Company may have been unable to repay their debts when due."[3]  In his third affidavit sworn on 16th April 2020, Mr. Qin said:

> "[T]rading was voluntarily suspended and will resume shortly.  The only hold up is the SMI Holdings needs to finalise updated financial statements for its 2018 and 2019 annual reports but as soon as this is done then trading will resume."

[13]    In fact, on 7th May 2020, three weeks later, SMI was placed in insolvent liquidation by the High Court of Hong Kong.  Mr. Qin's shares in SMI are probably worthless.  Mr. Qin has given guarantees of SMI's indebtedness in the sum of HK$333 million (about US$43 million),[4] which are debts quite separate to those the subject of the current proceedings.

**The Hong Kong set aside application**

[14]    Very shortly before argument was heard before me on the current applications, Mr. Qin issued an application in Hong Kong to set aside the default judgment.  Mr. Qin

---

[3] Bundle 4/60/89.
[4] Fan Man Seung, Vanessa, 3rd Affidavit, para [12], Bundle 2/28/202.

4

216

relied on two matters.  Firstly, he had not been properly served.  Secondly, as to the merits he says:[5]

> "The claim [against him] is entirely misconceived and appears to be based on fraudulent documentation.  The claim is said to arise out of an agreement, which I was not party to, entered into in November 2015 where Nation Field [a company owned by Mr. Yap, a former chairman of SMI] agreed to purchase 200,000,000 shares in SMI Holdings from Wise Vanguard [an Emperor Group company] for HK$200 million...  A freestanding guarantee and undertaking dated 16 November 2015 purportedly evidences my agreement to guarantee Nation Field's obligation to pay the remaining HK$180 million...  However, I did not agree to give the purported guarantee, which is said to give rise to the alleged debt in this claim, and the document appears to contain a forgery of my signature."

[15]    As to the first of these two grounds for setting aside, given that Hong Kong has a common law system, Mr. Qin may face difficulties in relation to delay.  He must have been aware of the judgment before the coronavirus caused the courts in Hong Kong to close.  In any event, service appears to have been effected in accordance with the terms of the agreement.  In relation to the second, substantive, ground, his signature on the guarantee was witnessed by a solicitor of the High Court of Hong Kong, Ms. Hom Mun Yee Caroline.  She has made a statutory declaration dated 21st April 2020[6] that Mr. Qin executed the guarantee in her presence after she had translated and explained the document to him in Cantonese.  She was admittedly the head of legal at the Emperor Group, but the solemn declaration of a solicitor is entitled to great weight.

[16]    Further the defence of forgery now sought to be run by Mr. Qin bears a striking resemblance to the defence he ran in proceedings brought against an SMI company back in 2010.  To these I now turn.

---

[5] Qin Hui, 3rd Affidavit, 16th April 2020, Bundle 2/26/181 at para [40(c)].
[6] Bundle 3E/49/4.

5

**The 2010 Hong Kong judgment**

[17]    These earlier proceedings concerned a loan made to SMI.  Mr. Temmink QC sought to rely on a judgment of Fok J, sitting in the Hong Kong Court of First Instance.[7] The facts recited by the judge were these:

> "6. The plaintiff claims that, by a loan agreement in writing dated 23 April 2008…, it agreed to provide a term loan of HK$60 million to SMI.
>
> 7. Clause 3.1(d) of the Loan Agreement provided that the plaintiff:
>> '… shall not be obliged to make the Advance to [SMI] unless it shall have received the Share Charge duly executed under seal by the [defendant] together with all documents required pursuant thereto.'
>
> 8. As required by this condition precedent, the defendant executed a share charge dated 23 April 2008… in favour of the plaintiff creating, on its face, a first fixed charge over 261,473,945 shares of SMI beneficially owned by the defendant… as security for the loan.
>
> 9. The plaintiff executed the Loan Agreement and Share Charge in reliance on board minutes of the defendant dated 22 April 2008 apparently signed by Mr. Qin Hong and Mr. Qin Hui, its directors.  Those board minutes recorded a resolution unanimously passed by the directors approving the entry into and execution of the Share Charge and certain deeds in favour of the plaintiff and authorising a Mr. Kung Yiu Fai ('Kung') to execute and do all things necessary to give effect to them.
> …
> 25. On 26 January 2010 an affirmation was filed on behalf of the defendant by Mr. Tse Yuen Ming, a partner of the defendant's solicitors on the basis of instructions received by him from Mr. Qin Hui, a director of the defendant.  In that affirmation, the gist of the forgery defence was put forward for the first time.  This evidence was confirmed by Mr. Qin Hui in his own affirmation, subsequently filed on 10 February 2010.
>
> 26. The evidence was to the effect that Mr. Qin Hui and the defendant disputed the authenticity of the Share Charge and other security documents allegedly executed by the defendant in favour of the plaintiff. Mr. Qin Hui disclaimed any knowledge that the defendant's Board of Directors ever resolved to authorise Kung to execute any charge against the Shares in favour of the plaintiff.  Moreover, the existence of the Loan Agreement and the purported security documents including the Share

---

[7] Re 261,473,945 Ordinary Shares of SMI Publishing Group Limited under the Name of Strategic Media International Limited; Billion Wealth Group Ltd v Strategic Media International Ltd HCMP2586/2009 (determined 3rd May 2010).

218

Charge was not known to Mr. Qin Hui until these proceedings. Mr. Qin Hui denied that the board meeting on 22 April 2008 apparently authorising Kung to execute the Share Charge ever took place and disputed the authenticity of his signature on the minutes of that meeting as well as that of Mr. Qin Hong, his brother and codirector of the defendant.

27. The crux of the defence is therefore that the board resolution of 22 April 2008 is a forgery and therefore that Kung was not in fact authorised to execute the Share Charge."

The judge then considered the fact there had been a public announcement of these matters and a transfer of shares by SMI's broker which would hardly have taken place without Mr. Qin's knowledge. He concluded that he was:

"persuaded... that the alleged forgery defence flies in the face of the contemporaneous acts of those in control of the defendant, in particular the matters referred to above. I therefore accept [counsel's] submission that the alleged forgery defence is not capable of belief and does not give rise to a triable defence."

[18]    Mr. Fay QC objected to the admissibility of this judgment. He relied on section 90 and 102 of the **Evidence Act 2006**.[8] Section 90 provides:

"(1) Subject to subsection (2) and sections 91 and 92, evidence of the decision in legal or administrative proceedings is not admissible to prove the existence of a fact that was in issue in the legal or administrative proceedings.

(2) Where evidence of a decision referred to in subsection (1) is relevant, otherwise than as mentioned in that subsection, it shall not be used for the purpose mentioned in that subsection."

[19]    Section 91 then gives exceptions in respect of grants of probate and letters of administration and in respect of criminal convictions. Section 92 exclude the operation of sections 90 and 91 in respect of (a) laws relating to the admissibility of

---

[8] No 15 of 2006, Laws of the Virgin Islands.

7

criminal convictions, (b) judgments *in rem* and (c) "the law relating to *res judicata* or issue estoppel."

[20]    Section 102 (which applies to both criminal and civil cases) provides:

> "(1) Evidence that relates to the credibility of a witness is not admissible to prove that the evidence of the witness should or should not be accepted.
>
> (2) Where such evidence is relevant otherwise than as mentioned in subsection (1), that subsection does not prevent the use of the evidence to prove that the evidence of the witness should or should not be accepted."

[21]    Section 103 only applies to criminal proceedings.  Section 104 applies to both civil and crime:

> "(1) The credibility rule does not prevent the admission or use of evidence that relates to the credibility of a witness and has been adduced in cross-examination of the witness.
>
> (2) Evidence referred to in subsection (1) is not admissible if it
> >        (a) is relevant only to the credibility of the witness; and
> >        (b) does not have substantial probative value as to the credibility of the witness.
>
> (3) In determining whether the evidence referred to in subsection (1) has substantial probative value, the court shall, among other things, consider
> >        (a) whether the evidence tends to prove that the witness knowingly or recklessly made a false representation at a time when the witness was under an obligation to tell the truth; and
> >        (b) the period that has elapsed since the acts or event to which the evidence relates were done or occurred."

[22]    It can be seen that section 90 gives statutory effect to the rule in **Hollington v F Hewthorn & Co Ltd**,[9] whilst section 102 gives statutory effect to the common law rule that a cross-examiner is bound by the witness's answers to matters only going to the witness's credit.

---

[9] [1943] KB 587.

8

[23]    There are three points which potentially answer Mr. Fay QC's objection:

(a) On the current applications, the claimant is not seeking to rely on the determination of Fok J "to *prove* the existence of a fact". It relies on the judgment solely to show a good arguable case that Mr. Qin is dishonest. *Proof* is something which is required at trial or an application for summary judgment.

(b) In any event, even if Fok J's conclusion is inadmissible, the underlying facts recited in his judgment are admissible hearsay on an interlocutory application. They are sufficient to show Mr. Qin's dishonesty.

(c) Section 102 is not engaged. The 2010 Hong Kong proceedings are relied on as similar fact evidence. They are strikingly similar to the facts now relied on in Hong Kong to set aside the judgment. They go to Mr. Qin's honesty, not his credibility.

It was not argued that Mr. Qin was the privy of SMI for the purposes of *res judicata* in respect of the 2010 judgment.

[24]    As to (a), I dealt with a similar section 90 objection to admissibility in **Re Sports Properties International Ltd; Danis v Dickson**:[10]

> "[36] …Mr. McCarroll SC [for Mr. Danis] sought to rely on adverse comments made by Nugee J in the English Chancery Division about Mr. Dickson in a case called **Sir Owen Glenn KNZM ONZM and another v Eric John Watson (personally and as the trustee of the Richmond Trust) and others**.[11] Mr. Dickson was not a party to that action, but he had been the sole director of a company called Kea Investments Ltd, which was a party…
>
> [37] Mr. Morgan QC [for Mr. Dickson] objected to the admissibility of this judgment under section 90 of the **Evidence Act 2006**. In the course of the hearing I gave an oral judgment in which I held that it was admissible on an interlocutory hearing and at trial might be cited as going to Mr. Dickson's credit. Nonetheless, I also indicated that the weight which

---

[10] BVIHC (COM) 2019/0179 (determined 25th May 2020, following oral argument on 13th May 2020, when I gave the *ex tempore* judgment referred to).
[11] [2018] EWHC 2016 (Ch) at para [443]ff.

9

**221**

might be attached to it in determining the application for security for costs might be very little. In my judgment, the observations of Nugee J go only to credit. There is no basis for saying that the facts of **Glenn** are admissible as similar fact evidence. On an interlocutory application, it will only be in an unusual case, that a judge has to assess credibility. That is a matter for live evidence at trial. Accordingly I disregard **Glenn** in deciding the current application."

[25]    I do not have access to the transcript of my oral judgment, but from recollection the reasoning was similar to (although not as lengthy as) that in **VTB Bank v Miccros** where I held:

"[84] This leaves the question whether VTB can rely on the Butcher and Robertson judgments in order at the current interlocutory stage to show a good arguable case that Eastbridge [which was not a party to the action which was the subject of those two judgments] is also a vehicle controlled by Mr. Skurikhin. The classical approach in **Hollington v F Hewthorn & Co Ltd**, as confirmed in **Rogers v Hoyle**[12] and by the Privy Council in **Calyon v Michailaidis**[13], is that, in the absence of an estoppel *per rem judicatam*, the findings of a judge in one case are not admissible in another case. As Christopher Clarke LJ held in **Rogers**:

'39. …The trial judge must decide the case for himself on the evidence that he receives, and in the light of the submissions on that evidence made to him. To admit evidence of the findings of fact of another person, however distinguished, and however thorough and competent his examination of the issues may have been, risks the decision being made, at least in part, on the opinion of someone who is neither the relevant decision maker nor an expert in any relevant discipline, of which decision making is not one. The opinion of someone who is not the trial judge is, therefore, as a matter of law, irrelevant and not one to which he ought to have regard.'

[85] However, there appears to be an exception to this rule in the case of interlocutory applications. In **Sabbagh v Khoury**[14] there had been earlier litigation on related matters (the Masri litigation), but not between the same parties, so *res judicata* did not apply. Carr J (as she then was) held:

---

[12] [2014] EWCA Civ 257, [2015] QB 265.
[13] [2009] UKPC 34, 2007-09 Gib LR 321.
[14] [2014] EWHC 3233 (Comm), applied by me in two cases: Advalorem Value Asset Fund Ltd v Redford at para [16] (Supreme Court of Gibraltar, decision of 4th September 2015, unreported) and Re Wardour Trading Ltd; Cohen v Nekrich 2016 Gib LR 46 at para [40].

10

222

'[202] Sana's reliance on the Masri litigation has generated much heated debate. There is first an issue as to admissibility. The defendants contend that, as a matter of principle, judicial findings in previous litigation are not admissible and that is the case even if, unlike in this case, they related to the same subject matter...

[203] Sana, on the other hand, contends that the rule in **Hollington v Hewthorn** does not prevent the use of findings in other litigation at an interlocutory stage. This is because the rationale of the rule in **Hollington v Hewthorn** is to exclude findings that are no more than the opinion of another person, based on unknown facts, so as to preserve the fairness of the trial. There is no risk to fairness of a trial if such material is introduced on the question of whether or not there is a serious issue to be tried. Such material can assist in identifying the evidence which can reasonably be expected to be available at trial, to which a court is entitled to have regard at the interlocutory stage. Reliance is placed on **Joint Stock Co Aeroflot – Russian Airlines v Berezovsky**[15]. There, when considering the question of whether or not there was a serious issue to be tried for the purpose of service out of the jurisdiction, Aikens LJ held that the claimant could rely on the findings of the Swiss criminal court...

[204] The defendants counter with reliance on the earlier Privy Council decision in **Calyon v Michailaidis**... [a]nd **Ferrexpo v Gilson Investments**[16]...

[206] I am inclined to agree with Sana that the findings of another court may be relied on at an interlocutory stage for the limited purpose of demonstrating whether there is a serious issue to be tried, for example in considering what material at trial there might be. The Court of Appeal in **Joint Stock Co Aeroflot – Russian Airlines v Berezovsky**... clearly thought it appropriate to do so, and would have been well aware of the relevant principle in **Hollington v Hewthorn**. To deploy the findings of another court in this way does not endanger a fair trial for any of the parties. The situation in **Calyon v Michailaidis**... is distinguishable: there the findings of the Greek court were being relied on as conclusive, alternatively probative, evidence of a central plank of the Claimants' case, without more.

[207] Thus, to the extent that the Masri litigation is being used simply to inform the question of whether there is a properly

---

[15] [2013] EWCA Civ 784, [2013] 2 Lloyd's Rep 242.
[16] [2012] EWHC 721 (Comm), [2012] 1 Lloyd's Rep 588 at para [51].

11

arguable claim in prospect, that is, in my judgment a legitimate exercise in principle. To the extent that Sana seeks to use any findings in the Masri litigation as admissible evidence to prove a fact in issue or a fact relevant to the issue in these proceedings, I agree with the Defendants that she cannot do so (see para [28] of the judgment in **Calyon v Michailaidis**...).'

[86] In my judgment it is proper to take the Robertson judgment into account in considering whether there is a good arguable case that Eastbridge is, like Berenger, a vehicle under the effective control of Mr. Skurikhin."

[26] Now it is true that in **VTB Bank v Miccros** I was not referred to section 90 of the Evidence Act. However, in my oral judgment in **Sports Properties International** I concluded that section 90 was intended solely to give statutory effect to the rule in **Hollington v Hewthorn**, so that **Sabbagh v Khoury** could still be applied.

[27] Even if I am wrong in this and Fok J's conclusion is inadmissible, as regards point (b), the underlying facts recited in the judgment are in my judgment admissible hearsay: CPR 30.3(2). They are not a result of the judge's own view of the evidence. In other words, they are not a result of the judge hearing the evidence of two opposing witnesses and deciding which he prefers: they are the evidence themselves. If I had to reach my own conclusion based on the facts set out there and wholly ignore Fok J's conclusions, I would reach the same conclusion as Fok J. The case of forgery put forward by Mr. Qin in those proceedings did not in my judgment raise a triable issue.

[28] As to point (c), the evidence from the 2010 proceedings is relied on to show the dishonesty of Mr. Qin. Sections 102 and 104 are expressly limited to evidence impugning a witness's credibility, in other words the honesty of the witness's *testimony*. They do not apply to evidence as to the honesty of the *man*. I am in my judgment entitled to rely on this evidence adduced in this 2010 case in deciding whether the claimant has shown a good arguable case that Mr. Qin is a dishonest man. Given the striking similarity of Mr. Qin's defence to the 2010

12

224

225

proceedings to his defence to the current Hong Kong proceedings, the evidence is admissible in my judgment to show that.

13

225

**Chabra relief**

[29]   I turn then to the claim to a **Chabra** injunction.  The Court of Appeal in **Broad Idea (No 2)** at para 55 accepted counsel's submission as to the elements of such a claim:

> "(a) The court is to be seized of substantive proceedings against the primary defendant;
> (b) The court, being seized of the substantive proceedings, has granted or is in the process of granting a freezing order against the primary defendant;
> (c) The court must be persuaded that the evidence shows good reason to suppose that a third party is acting as an agent or nominee of the primary defendant or has assets which would be amenable to some process of execution to satisfy an eventual judgment.  Observation of the existence of a separate corporate personality continues;
> (d) There must be evidence before the court that the assets of the third party are at risk of dissipation;
> (e) The court is able to join the third party to the substantive proceedings to perfect its jurisdiction as against the third party as a non cause of action defendant ("NCAD").   The joinder allows the court to undertake the ultimate resolution of both the substantive merits and the merits of the allegations of the third party being a mere nominee or agent of the primary defendant; and
> (f) Having joined the third party the court may determine the issue of the ownership of the third party's assets before determining the substantive merits, but being seized of the substantive merits the court is bound to allow a final determination of the substantive issue."

[30]   The Court proceeded to approve the *dictum* of Sir Bernard Rix in **Lakatamia Shipping Co 30 Ltd v Nobu**[17] that:

> "…if a claimant wishes to freeze company assets of a non-defendant, he must either be prepared to make a sufficient case that the company concerned is just a money-box of the defendant and holds assets to which the defendant is beneficially entitled, and/or it has to make that company a defendant itself under the **Chabra** jurisdiction."

---

[17] [2014] EWCA Civ 636, [2015] 1 WLR 291.

14

226

[31]    In the current case, there is no evidence that Dayspring is and King Fame was a nominee or agent for Mr. Qin.  However, there was a dispute as to whether either is or was a "money-box".  Mr. Burkill and Mr. Fay QC submitted that this referred to a situation where a company had a bank account which the principal debtor used as his own.  Mr. Temmink QC submitted that this was wider than this and also covered situations where the debtor used the company for holding assets.  I shall return to consider this later.

[32]    Apart from the nominee/agent/moneybox type of case, our Court of Appeal approved the grant of **Chabra** relief against a company which "has assets which would be amenable to some process of execution to satisfy an eventual judgment."  In the case before it, the Court of Appeal did not need to expand on what was meant by this.  The shares in Broad Idea International Ltd were held 50.1 per cent by Mr. Cho (the putative judgment debtor) and 49.9 per cent by Mr. Choi (who was not a party).  Thus, the only available means of execution in respect of Mr. Cho's putative debt was by a charging order over Mr. Cho's 50.1 per cent shareholding or by appointment an equitable receiver over those shares.  Because the property of a company is not the property of the shareholders, neither remedy would necessarily give any power to sell the underlying assets of the company.

[33]    The Court of Appeal did not need to consider the case of a 100 per cent shareholder.  In such a case, the Court can appoint an equitable receiver over the judgment debtor's shares.  The equitable receiver in turn can change the directors of the company and realise the value of the underlying assets of the company, either by winding up the company voluntarily, or by declaring a dividend, or (if the relevant company law permits it) making a capital distribution.  I appointed an equitable receiver for that purpose in **Industrial Bank Financial Leasing Co Ltd v Xing Libin**.[18]  A similar result can be achieved by obtaining a final charging order over the shares, although it is slower.

---

[18] Claim No BVIHC (COM) 0032 of 2018 (determined 28th January 2020).

15

227

[34]    Does this form of procedure constitute "some process of execution" for the purpose of granting **Chabra** relief?  The law was analysed by Chadwick P in the Cayman Court of Appeal in **Algosaibi v Saad Investments Co Ltd**.[19]   He considered nine propositions advanced by Henderson J at an earlier stage in that litigation (omitting most citations):

> "(i) The **Chabra** jurisdiction is part of the law of the Cayman Islands;
> (ii) The jurisdiction is most often exercised where there is a good arguable case that a cause-of-action defendant is the beneficial owner of assets in the possession of a non-cause-of-action defendant, but it is not confined to that situation;
> (iii) The jurisdiction is available against a non-cause-of-action defendant where a freezing order is ancillary and incidental to the effective enforcement of a prospective judgment because that defendant's assets may become available to satisfy the judgment;
> (iv) This may be so where the non-cause of action defendant has become mixed up in an attempt by the cause-of-action defendant to make himself judgment proof and the assets or their proceeds are not readily identifiable in his hands;
> (v) The important question is whether there is good reason to suppose that the cause-of-action defendant exercises substantive control over the assets in question of the non-cause-of-action defendant;
> (vi) The law in this area is evolving significantly and it is undesirable to deprive it of the necessary flexibility to address complex corporate relationships whose purpose (in whole or in part) may be to put assets beyond the reach of legitimate creditors;
> (vii) The limitation proposed in [**C Inc PLC v L and another**][20] (that there must be a causal link between the cause of action and the subsequent right to claim against the non-cause-of-action defendant) has not found support in later decisions and does not represent the current state of the law;
> (viii) On an application of this sort, one question of importance is the degree to which those challenging the injunction have complied with their disclosure obligations under it;
> (ix) Uncertainty about the true ownership of assets or whether they might be available to satisfy a future judgment may count against an applicant where it could have, but did not, shed light upon the question of ownership by making appropriate and credible disclosure."

---

[19] 2011 (1) CILR 178, Civil Appeal No 1 of 2010.
[20] [2001] 2 Lloyd's Rep 459.

16

[35]    Chadwick P disapproved proposition (iv), but agreed with the other propositions formulated by Henderson J.  In so doing, as can be seen, he disapproved part of the judgment of Aikens J (as he then was) in **C Inc PLC** case, but he did approve these propositions advanced by Aikens J in that case:

> "(1) The purpose of a freezing order is to ensure that the orders of the Court are effectively enforced.
>
> (2) A freezing order will usually be granted against a defendant against whom there is a claim for substantive relief.  The order will cover assets of which he is the beneficial owner.  But the Court has the power to grant freezing orders against third parties...
> …
> (5) If there is a claim for substantive relief by A against B... or A has obtained a judgment against B (in the English Court), then the English Court can grant a freezing order against the assets of C.  But, generally, it must be arguable that those assets, even if in C's name, are, in fact, beneficially owned by B.
>
> (6) The crucial question is whether the Court can go one stage further. Does it have the power to grant a freezing order against the assets of C when: (i) A has a substantive right against B (e.g. in the form of a judgment); (ii) the assets of C are not, even arguably, beneficially owned by B.  The answer, to my mind, depends on how one interprets the phrases 'ancillary' and 'incidental to and dependent upon' used by Lords Browne-Wilkinson and Mustill in the **Channel Tunnel** case.[21]  In the **Cardile** case[22] the High Court of Australia has, effectively, given those phrases a broad interpretation.  But, critically, the High Court of Australia held that the right of A to a freezing order against C is dependent upon A having a right against B and that right itself giving rise to a right that B can exercise against C and its assets.  Therefore the freezing order sought by A against C is 'incidental to' A's substantive right against B and it is also 'dependent upon' that right."

[36]    Chadwick P also approved the following passage of the judgment of Warren J in **Basra v Poole**,[23] dealing with claims under insolvency legislation which might be the subject of **Chabra** relief:

---

[21] Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd [1993] AC 334.
[22] Cardile v Led Builders Pty Ltd [1999] HCA 18, 198 CLR 380.
[23] [2007] EWHC 3528 (Ch) at para [9].

17

229

"The basis for this relief was that the directors might well be liable to the company at the suit of the yet to be appointed liquidator.  It was just and equitable to freeze their assets to prevent their dissipation before such a liquidator had been able to act.  Even so, the applicant would need to show a good arguable case for one of the following: (a) assets being held by the third party belonging to the defendant; (b) a disposition of assets by the defendant to the third party liable to be set aside under section 423 of the **Insolvency Act 1986** [24] [the equivalent of section 81 of our **Insolvency Act 2003**][25], which concerns transactions defrauding creditors; or (c) an impending insolvency in the course of which the trustee in bankruptcy or liquidator would be able to recover for the benefit of creditors, for instance, where the transfer is at an undervalue or constitutes a preference."

[37]    Chadwick P summarised the principles at para [33]:

"The fact that the potential judgment debtor (the CAD) has substantial control over assets which are held by a party against whom no cause of action is alleged (the NCAD) — say, because the NCAD can be expected to act in accordance with the wishes or directions of the CAD (whether or not it could be compelled to do so) — is likely to be of critical importance in relation to the question whether there is a real risk that the assets will be dissipated or otherwise put beyond the reach of the claimant.  But, as it seems to me, the existence of substantial control is not, of itself, enough to meet the first of the two requirements just mentioned.  It is not enough that the CAD could, if it chose, cause the assets held by the NCAD to be used to satisfy the judgment.  It is necessary that the court be satisfied that there is good reason to suppose either (i) that the CAD can be compelled (through some process of enforcement) to cause the assets held by the NCAD to be used for that purpose; or (ii) that there is some other process of enforcement by which the claimant can obtain recourse to the assets held by the NCAD."

[38]    In my judgment, in a case like Dayspring, the ability of the Court to appoint an equitable receiver over Mr. Qin's 100 per cent shareholding is sufficient to support the grant of a **Chabra** injunction.    Applying Aikens J's test, "A [Great Panorama/Goldteam] having a right against B [Mr. Qin] and that right itself giving

_____

[24] 1986 c 45.
[25] No 5 of 2003, Laws of the Virgin Islands.

18

230

rise to a right that B [Mr. Qin] can exercise against C [Dayspring] and its assets" means **Chabra** relief is available.

[39]    Similarly, if it can be shown that the transfer of King Fame to Ms. Liu was void or is liable to be set aside under insolvency legislation, that too would be sufficient to support a **Chabra** injunction against King Fame: see the passage in **Basra v Poole** set out above.

[40]    In each case, of course, the other elements needed to grant a **Chabra** relief, such as the risk of dissipation, need to be considered, but in principle **Chabra** relief is available.

### Moneybox

[41]    Strictly speaking, there is no need for me to decide the "moneybox" issue, but it was fully argued before me and may be relevant if any appeal is brought.    The starting point here is to note that there is a major difference between on the one hand assets caught by **Mareva** injunctions or freezing orders and on the other hand assets against which execution can be made.    The former are wider than the latter.    Since **Chabra** orders are a species of **Mareva**, the **Mareva** test applies in my judgment to **Chabra** defendants.

[42]    A defendant subject to a freezing order is invariably required to disclose his assets.    Now theoretically it would be possible to limit a freezing order solely to assets which are available for execution in due course.    Experience has, however, shown that defendants subject to freezing orders are not always entirely candid in revealing their assets.    It has therefore been necessary to expand the classes of asset subject to freezing orders in order to prevent dishonest defendants escaping their obligations too easily.    The current form of freezing order in the (English) **Commercial Court Guide**[26] provides that the order:

> "applies to all the Respondent's assets whether or not they are in its, her or his own name, whether they are solely or jointly owned and whether the

---

[26] 10th Ed, 2017 at Appendix 11, p 122.

19

231

> Respondent is interested in them legally, beneficially or otherwise.  For the purpose of this order the Respondent's assets include any asset which it, she or he has the power, directly or indirectly, to dispose of or deal with as if it were its, her or his own.  The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its, her or his direct or indirect instructions."

[43]    It can readily be seen that these classes of assets are not necessarily all available for execution.  However, if a defendant could, for example, aver that, although he had the legal title to an asset, he held the asset on trust for another, that would afford a straightforward route to evasion.  The Courts are very familiar with defendants whose personal ownership of assets might be described as "now you see it, now you don't": see, for example, my discussion in **Miccros** at paras [63] and [64].  The English approach is pre-emptively to freeze assets in the debtor's power and control and then litigate about their availability for execution later.

[44]    This is in my judgment the correct approach when considering what constitutes a "moneybox".  At the pre-judgment stage, the question is whether an asset put in the company against which **Chabra** relief is sought falls within the broad category of assets which are subject to a freezing order in the standard English commercial form containing the provision I have cited.  I therefore reject the submission that it is confined solely to bank accounts (although such cases are indeed covered).  Any company into which a putative debtor puts assets is, at the pre-judgment stage, potentially the subject of being named as a **Chabra** defendant.  It is only at the post-judgment stage that the question arises as to whether the judgment creditor has direct enforcement powers against the assets (because they are beneficially owned by the judgment debtor) or must go down the indirect execution route of appointing an equitable receiver or seeking a charging order over the shares (because the assets are beneficially owned by the company) or has no remedy at all (because, for example, the shares or the underlying assets are held on a valid discretionary trust).

20

[45]    In the current case, Mr. Qin remained the sole director of King Fame after the purported transfer of the share to Ms. Liu.  As such he retained control of Applegreen Drive.  I shall consider, what, if any, remedy should be granted against King Fame below, but the fact that he remained a director was in my judgment sufficient on its own to mean that Applegreen Drive fell within the English standard form definition of assets subject to a freezing order.  That was sufficient to make King Fame a "moneybox" for the purpose of **Chabra** relief.

[46]    In practice, a trading company will not be a "moneybox" in any meaningful sense. It will be able to trade its assets under the usual carve-out in a freezing order for transactions in the ordinary course of business.  A "moneybox" will usually be a company merely holding assets, as King Fame does here.

**Risk of dissipation**

[47]    I turn then to the risk of dissipation.  Pereira CJ in **Broad Idea (No 2)** said:

> [59] This brings me to consider whether the learned judge properly concluded, based on the evidence, that Broad Idea's assets were at risk of dissipation.  It is well settled that an applicant for a freezing order must provide solid evidence of a real (as opposed to fanciful) risk of dissipation. Evidence which merely shows a possibility of a risk of dissipation or is speculative is insufficient."

She then cited **The Niedersachsen**[27] and **Mitsuji Konoshita and another v JTrust Asia Pte Ltd**,[28] before approving this passage from the judgment of Gloster LJ in **Holyoake v Candy**:[29]

> "There was some debate as to what was the correct test to establish that there was a risk of dissipation such as to make it just and convenient to grant a conventional freezing injunction.  However, the threshold in relation to conventional freezing orders is well established.  There must be a real risk, judged objectively, that a future judgment would not be met because of unjustifiable dissipation of assets.  But it is not every risk of a

---

[27] Ninemia Maritime Corporation v Trave Schiffahrtsgesellschaft mbH und Co KG. ("The Niedersachsen") [1983] 1 WLR 1412 (CA only); [1984] 1 All ER 398, (Mustill J) at p 400, (CA) at p 415.
[28] BVIHCMAP2018/0047 and BVIHCMAP2018/0020 (delivered 18th December 2018, unreported).
[29] [2017] EWCA Civ 92, [2018] Ch 297 at para [34].

21

**233**

234

> judgment being unsatisfied which can justify freezing order relief.  Solid evidence will be required to support a conclusion that relief is justified, although precisely what that entails in any given case will necessarily vary according to the individual circumstances."

[48]    In the current case, the risk of dissipation is shown by solid evidence.  The transfer of King Fame to Ms. Liu just days before Mr. Qin's financial affairs started unravelling with the suspension of SMI on the Hong Kong stock exchange is in my judgment such evidence.

[49]    The explanation given for the transfer is that Mr. Qin's marriage to Emma had been in difficulties.  Emma wanted financial security by having the beneficial ownership of the family home in America, Applegreen Drive, transferred to her. She and her mother took tax advice from Mr. Jason Wang.  He is a certified public accountant practising in New York.  He advised that, because Ms. Liu was not a US citizen, it would be advantageous for a transfer to be to her rather to her daughter.  The discussions had started in late 2017.  His evidence[30] is:

> "Based on my discussions with Ms. Liu and [Emma], it is my understanding that the purpose of the transfer of King Fame was to protect Applegreen Drive for [Emma] and her children in the event that Mr. Qin and [Emma] dissolved their marriage and Mr. Qin elected to establish more permanent residency in Singapore or Hong Kong."

[50]    Mr. Wang is not giving independent evidence that the Qins' marriage was in difficulties; he is merely reporting what he was told.  Mr. Qin, Ms. Liu and Emma all have an interest in saying the transfer was part of the resolution of some matrimonial difficulties, so their evidence is potentially self-serving.  The evidence of the execution of the deed of trust on 30th August 2018 is that all three, as well as the two children, met in Greece on what appears to have been a family holiday.

---

[30] Bundle 2/23/148.

22

[51]    In fact, however, whether there had been matrimonial difficulties or not is in my judgment irrelevant.  Spouses take each other "for richer, for poorer".  Obligations to creditors take priority over inter-spousal claims.  The timing of the transfer is solid evidence in my judgment of Mr. Qin actively dissipating his assets.  Coupled with the good arguable case that he is a dishonest man, in my judgment there is a real risk that assets will disappear.

[52]    That conclusion is sufficient to grant **Chabra** relief against Dayspring (subject to consideration of the complaints in relation to the grant of relief *ex parte*).  The case against King Fame is more complicated because of the transfer to Ms. Liu.  To this I now turn.

**The case against King Fame**

[53]    There are a number of ways in which the case against King Fame can be put.  I have already mentioned the argument that the company was Mr. Qin's "moneybox" for holding Applegreen Drive, so that under the pre-judgment test for assets subject to a freezing order it is caught.  However, in order in due course to enforce against Applegreen Drive, the claimant would need to show one of four things.  The first possibility is that Applegreen Drive was held on trust for Mr. Qin; the second that Ms. Liu held the share in King Fame on trust for Mr. Qin; the third that the initial transfer of US$15,880,000 is liable to set aside under insolvency legislation; and the fourth that the transfer of the share to Ms. Liu is liable to be set aside under insolvency legislation.  I shall examine each of these possibilities in turn.

[54]    As to the first, there is no evidence of any type of express trust in favour of Mr. Qin.  There might be some form of resulting trust arising from Mr. Qin paying the purchase price for Applegreen Drive.  The conveyance of the property to King Fame is not in evidence, nor is there any evidence as to the New York law of resulting trusts.  In the absence of evidence on these points, the first possibility does not in my judgment reach the threshold of being a good arguable case ("one which is more than barely capable of serious argument, but not necessarily one

23

235

which the judge considers would have a better than 50 per cent chance of success").

[55]     As to the second, the existence of any trust of the share in favour of Mr. Qin is belied by the terms of the deed of gift.  It is only if the deed of gift is a sham that any question of a trust could arise.   It is often difficult to establish that a legal document is a sham: **Snook v London and West Riding Investments Ltd**.[31]  Here, however, there is some evidence to support such a case.  Firstly, if this was an attempt at dissipation, then it may be possible to infer that the deed of gift was not the true expression of the parties' intentions.  Secondly, the signatures of Mr. Qin and Ms. Liu on the deed of trust were both witnessed by Emma, rather than some independent person.  This raises the question how seriously the parties took the making of the deed.  Thirdly, there may be an issue with the formal validity of the deed.  The photograph of the deed signed by the three, which was sent by Emma on social media to the solicitor who drafted the deed at Squire Paton Boggs, does not show any seals having been affixed, which implies that the wafer seals were affixed later.  This may, as a matter of Hong Kong law, render the deed invalid.  (Issues of late sealing are usually "cured" by the doctrine of estoppel, but this may not be possible in the case of a deed of gift.)  Fourthly, Mr. Qin has continued to visit New York.   There is no evidence of current matrimonial difficulties, so he presumably stays at Applegreen Drive, which in any event is the family home.

[56]     These considerations in my judgment reach the good arguable case threshold.

[57]     The third and fourth possibilities involve a consideration of the relevant insolvency legislation.  Insofar as the law of this Territory applies, there are provisions of two Acts which are potentially applicable: the **Fraudulent Conveyances Act 1571**[32] and section 81 of this Territory's **Conveyancing and Law of Property Act**

---

[31] [1967] 2 QB 786.
[32] 13 Eliz I c. 5.

24

**1961**.[33]   There is a question as to whether the 1571 Act is still in force in this Territory.  In **Miccros** I said:

> "[48] [Section 81 of the 1961 Act] covers much the same ground as the earlier statute.  The 1961 provision is taken word-for-word from section 172 of the **Law of Property Act 1925** (UK)[34] (a section which has in turn since been replaced by section 423 of the **Insolvency Act 1986** (UK)[35]).  The 1925 Act expressly repealed the 1571 Act: see the Seventh Schedule to the 1925 Act.  The 1961 Act does not.  In my judgment that is significant.  In the modern era it is very rare that the doctrine of implied repeal can apply, because no professional parliamentary draftsman or woman would leave such an important question at large.   This is particularly the case with a Statute of such importance as the 1571 Act.  If the legislator had meant to repeal the 1571 Act, it would have said so.  It did not, so the Act in my judgment is still in force."

[58]   That conclusion I drew without adversarial argument.   Mr. Burkill sought to persuade me that I was wrong.  He relied on **Commissioner of Taxation v Oswal (No 6)**,[36] a decision of the Federal Court of Australia for the proposition that a later Act would impliedly repeal the 1571 Act.  Gilmour J was dealing with the Western Australian **Property Law Act 1969**.[37]  He said: "Section 89 replaced, in Western Australia, the statute 13 Eliz 1 c 5."  It is true that the 1969 Act (like the 1961 Act) does not expressly repeal the 1571 Act, but there are still a number of difficulties with Mr. Burkill's submission.   Firstly, section 89 of the Western Australian legislation was part of a bigger Part IX which might be said to set out a code for setting aside transactions in fraud of creditors.  The argument for implied repeal was thus stronger than with the single section of the 1961 Act.  Secondly, the implied repeal point does not appear to have been argued.  Rather the judge treated the point as part of his *tour d'horizon* of Australian state legislation replacing the 1571 Act.  Thirdly, the reception of English statutes into Australia is not straightforward.  I would want more information on the history of the reception

---

[33] Cap 220, Revised Laws of the Virgin Islands.
[34] 15 & 16 Geo V c 20.
[35] 1986 c 45.
[36] [2016] FCA 762 at para [37].
[37] 1969 c 32, Laws of Western Australia.

25

237

of Imperial legislation (and its repeal) and on statutory interpretation in Western Australia to reach a view on whether the only explanation for Gilmour J's view is the theory of implied repeal.

[59] The issue is not free from doubt and it may be further research would find good arguments for finding the 1571 Act is repealed in this jurisdiction. At present, however, I adhere to the view I expressed in **Miccros** that the 1571 Act is still in force.

[60] Mr. Temmink QC did not take me to any case-law on the 1571 Act. In particular, I am not sure about the territorial effect of the Act. My recollection is that, so long as the Court had personal jurisdiction over the defendant against whom relief was sought, the Act was potentially applicable, no matter where the impugned transaction took place. However, I may be wrong. There are textbooks on the 1571 Act,[38] but I was not taken to any of them.

[61] As to the substance of the case, Mr. Temmink QC submitted that the initial advance of the purchase price to King Fame was an attempt to hide assets. There are difficulties with this submission. Mr. Qin (or one of his companies: there is no evidence where precisely the money came from) transferred the $15,880,000 to King Fame and in return received an increase in the value of the share in King Fame resulting from the acquisition of Applegreen Drive, which precisely matched the financial contribution. No monies were dissipated. However, Mr. Temmink QC has just convinced me that he meets the **Niedersachsen** "good arguable case" test on the basis that Mr. Qin was in financial difficulties in 2011 (see the 2010 Hong Kong case discussed above). Moving monies into a BVI company for the purchase of a property in the United States, whilst facing financial ruin in Hong Kong, may be sufficiently "devised and contrived of malice, fraud, covin, collusion

---

[38] E.g. Orlando F Bump, Fraudulent Conveyances: A Treatise on Conveyances intended by Debtors to Defraud Creditors (1872, reprinted 2000 by Beard Books) and Fredrick Scott Wait, A Treatise on Fraudulent Conveyances and Creditors' Bills (1884, reprinted 2000 by Beard Books). Pre-1926 editions of Dicey on the Conflict of Laws (1st Ed, 1896) may also have relevant materials.

238

or guile to the end, purpose and intent to delay, hinder or defraud creditors" as to be set aside under the 1571 Act.

[62]   Mr. Burkill raised an issue as to limitation.  However, he did not develop this point, nor cite any authority.  I do not therefore refuse relief on the basis that any claim is statute-barred.

[63]   An attack on the gift of the share in King Fame to Ms. Liu appears to be more straightforward.   The gift was made only days before SMI's shares were suspended, when Mr. Qin must have known of the company's financial difficulties. The deed of gift itself is governed by Hong Kong law.  No evidence has been adduced of Hong Kong insolvency law, but as a common law country I assume it will have some successor to the 1571 Act, so that the deed of gift is potentially liable to be set aside.  Moreover, even if the deed of gift is governed by Hong Kong law, the transfer of the share is governed by BVI law, so the 1571 and 1961 Acts potentially bite.  If the view I have expressed of the territorial breadth of the 1571 Act is correct, then the deed may stand to be set aside as matter of BVI law as well, if proceedings are served on Ms. Liu.

[64]   At present, however, no amended pleading has been settled making such a claim, nor has any application to add Ms. Liu as a defendant been made.  Unless and until an amended case is presented, I shall not examine this basis for a claim further.

[65]   I turn then to the risk of dissipation in relation to King Fame.  This risk is in my judgment even higher than with Dayspring.  The second and fourth possibilities for attacking the transfer to Ms. Liu result in the transfer of the share in King Fame being reversed.   That, however, would not affect any transfer made in the meantime of King Fame's assets, in particular Applegreen Drive.  Ms. Liu and Mr. Qin would have every incentive to convey Applegreen Drive away from King Fame, whilst they still had control of King Fame's assets.  Even a gift of Applegreen Drive to another company controlled by Ms. Liu might not, as a matter

27

239

of law, be capable of reversal following the setting aside of the deed of gift or the transfer of the King Fame share.  No legal mechanism is apparent to me as to how a setting aside of the King Fame share transfer would result in any transfer of Applegreen Drive also being set aside.

[66]    Thus, in relation to King Fame I will grant **Chabra** relief, but again subject to consideration of the respondents' objections to the way the claimant obtained relief *ex parte*.

[67]    For completeness, I should mention that Great Panorama criticised Mr. Qin's disclosure and sought to rely on this as further evidence of the risk of dissipation. Mr. Qin denies any non-disclosure and I have not considered it necessary to reach any conclusion of this point, which in any event was not pressed in oral argument.

**Setting aside the *ex parte* injunction**

[68]    I heard Great Panorama's application for a freezing order against Mr. Qin with consequential **Chabra** relief against the two companies on 19th December 2019. This application was made *ex parte*.  Mr. Robert Nader represented Great Panorama.  The respondents to the application say that the presentation of the application and, what are said to have been, breaches of Great Panorama's duties of full and frank disclosure are such that I should discharge the injunction granted then and refuse to reimpose an injunction.

[69]    I should say at once that I have little personal recollection of the application.  Many applications for freezing orders come before this Court.  However, I have been shown a transcript of what occurred.[39]  It is unclear what documents were before me, since the hearing began with a discussion of what had happened to the bundle.  Nonetheless I had clearly read (possibly from the e-litigation portal) at least the application, the skeleton, the pleadings and the affidavit evidence. Whether I would have read the certificate of urgency is doubtful.  Once the matter

---

[39] Bundle 4/62/324.

is listed before the judge the certificate of urgency is spent, so there would have been no reason to do so.

[70]    A party's duty making an *ex parte* application is well-established.    The *locus classicus* is the judgment of Ralph Gibson LJ in **Brink's Mat Ltd v Elcombe**:[40]

> "(1) The duty of the applicant is to make 'a full and fair disclosure of all the material facts.'
>
> (2) The material facts are those which it is material for the judge to know in dealing with the application as made: materiality is to be decided by the court and not by the assessment of the applicant or his legal advisers.
>
> (3) The applicant must make proper inquiries before making the application. The duty of disclosure therefore applies not only to material facts known to the applicant but also to any additional facts which he would have known if he had made such inquiries.
>
> (4) The extent of the inquiries which will be held to be proper, and therefore necessary, must depend on all the circumstances of the case including (a) the nature of the case which the applicant is making when he makes the application; and (b) the order for which application is made and the probable effect of the order on the defendant: see, for example, the examination by Scott J[41] of the possible effect of an **Anton Piller** order; and (c) the degree of legitimate urgency and the time available for the making of inquiries.
>
> (5) If material non-disclosure is established the court will be 'astute to ensure that a plaintiff who obtains [an ex parte injunction] without full disclosure... is deprived of any advantage he may have derived by that breach of duty.'
>
> (6) Whether the fact not disclosed is of sufficient materiality to justify or require immediate discharge of the order without examination of the merits depends on the importance of the fact to the issues which were to be decided by the judge on the application.    The answer to the question whether the non-disclosure was innocent, in the sense that the fact was not known to the applicant or that its relevance was not perceived, is an important consideration but not decisive by reason of the duty on the applicant to make all proper inquiries and to give careful consideration to the case being presented.

---

[40] [1988] 1 WLR 1350 at p 1356, citations omitted.
[41] Columbia Picture Industries Inc. v Robinson [1987] Ch 38.

29

241

(7) Finally, it 'is not for every omission that the injunction will be automatically discharged. A *locus poenitentiae* may sometimes be afforded.' The court has a discretion, notwithstanding proof of material non-disclosure which justifies or requires the immediate discharge of the ex parte order, nevertheless to continue the order, or to make a new order on terms

> 'when the whole of the facts, including that of the original non-disclosure, are before [the court, it] may well grant... a second injunction if the original non-disclosure was innocent and if an injunction could properly be granted even had the facts been disclosed.'"

[71]    This was approved by our Court of Appeal in **Enzo Addari v Edy Gay Addari**[42] and most recently in **Paraskevaides and another v Citco Trust Corp and others**,[43] where Carrington JA said:

> "[31] ...The onus is on an applicant for *ex parte* relief to comply with the obligation to make full and frank disclosure as *ex parte* applications are, generally speaking, inconsistent with the adversarial nature of court proceedings under our system of law which usually permits a respondent to be heard before an order is made against them. The key elements are that the duty is not only to disclose what the party or their legal advisers considers to be material but what one reasonably should expect a court to consider to be material in the exercise of its discretion whether to grant the order being sought. This requires not only objective consideration of the matters that the party puts before the court, but also an active duty to make proper inquiries so as to determine whether there is other material that may available for him to place before the court on the application. This is because even an innocent non-disclosure on account of a party not being aware of the fact or not realizing its materiality may be a factor against him whereas a deliberate non-disclosure will always be a factor against him.

> [32] A distinction may perhaps be made here between material that is known and material that ought to have been known by an applicant. The extent of the obligation differs between the two categories of material. With respect to the former, the duty appears understandably to be more absolute. Whereas for the latter, the duty is to make proper inquiries as to the existence of further material facts. The extent of this obligation to make such inquiries is dependent on all the circumstances including the

---

[42] Civil Appeal No 2 of 2005 (determined 27th June 2005).
[43] BVIHCMAP 2018/0046 (determined 30th March 2020). The citation given for Addari in Paraskevaides is to a later appeal in the same case, but the judgment detailed in the previous footnote is the one intended.

242

nature of the case being advanced, the order being sought, the effects of such an order, if granted, on both the applicant and potential respondent and the interplay between the degree of urgency of the application and the time available for making such inquiries.

[33] Once it has been established that there has been non-disclosure of a material fact, and the duty is in relation to facts, the Court must ensure that the party who failed to disclose is stripped of any advantage that he gained from that breach of his duty. This may not always result in the discharge of the *ex parte* order but, even if it does, the Court may nevertheless grant a fresh order if the non-disclosure was innocent only and the balance of convenience in light of all the material facts of which the court is aware demands that a new injunction should be granted. However, the consequences of non-disclosure are not necessarily as severe if the court finds that the non-disclosure relates to a fact that is of lesser importance to the issues to be determined in order to grant the relief being sought."

[72]   An unusual feature of the current case is that the primary basis on which I have now found solid evidence of a risk of dissipation, the transfer of the share in King Fame to Ms. Liu, was one which was not relied on at the *ex parte* hearing. The primary basis relied on at the *ex parte* hearing, namely that Applegreen Drive and St Regis were on the market at suspiciously low prices, had much less weight attached to it at the *inter partes* hearing. The reason for this change in approach is straightforward. Great Panorama did not know of the transfer of the King Fame share until it saw the respondents' evidence. That was stronger evidence of the risk of dissipation than the evidence available of the marketing of Applegreen Drive and St Regis. The respondents say that I was deliberately misled at the *ex parte* hearing. Great Panorama was wrong about Applegreen Drive and St Regis having been on the market. This, they say, is a serious breach of Great Panorama's duties. I turn first to the facts.

[73]   On the application for the *ex parte* injunction, the following documents mention the marketing of Applegreen Drive and St Regis. First, the certificate of urgency (which I may not have read) said: "Those properties appear recently to have been

31

243

listed for sale at far below their market value."[44]    Second, the notice of application[45] said:

> "Investigations have uncovered evidence that Mr. Qin is in the process of liquidating his assets.  King Fame listed its New York property for sale in April 2019 for an asking price almost half the amount for which it purchased the property in 2011.  Another New York property, owned by a Bahamian company of which it is highly likely that Mr. Qin is the beneficial owner, remains on the market.  It appears that the Singapore property may be on the market as well at a heavy discount."

The Bahamian company played little rôle at the *ex parte* hearing or on the *inter partes* hearing, so I shall not consider it further.

[74]    Third, Mr. Kitchell Osman Bin in his first affidavit[46] says:

> "25. ...I obtained reports on Mr. Qin's overseas assets from an investigative firm, K2 Intelligence.  Copies of these are [in the exhibit].  Relevantly they disclosed the following:"

and he then gives details of Dayspring, King Fame and the Bahamian company together with their assets.

> "26. The fact that all three of these properties appear to have been listed for sale this year — and in two cases apparently far below market value — provides good reasons to be concerned that Mr. Qin may be in the process of dissipating his assets.  As noted above, he has given no indication that this might be for the purpose of paying his judgment debt.  Rather, it is more likely that he is seeking to support his lifestyle where he has absconded in Chana, following the collapse of his business empire."

[75]    I was not taken at the *ex parte* hearing to the K2 reports themselves, although these were exhibited to Mr. Kitchell's affidavit.  The first is dated 25th October 2019.[47]  This identifies Applegreen Drive as owned by King Fame, which in turn

---

[44] Bundle 4/54/1.
[45] Bundle 4/58/21.
[46] Bundle 4/59/39-40.
[47] Bundle 4/60/148, subsequent quotes are at 152 and 157.

244

was reported as owned by Mr. Qin.  It continued: "According to a local property website, the property was recently offered for sale at USD 7.557 million before being taken off the market."  Later in the report K2 said: "The property was listed for sale in April 2019 with an asking price of USD 8,348,400."  A footnote identifies a webpage at Realtor.com.  The different asking prices are unexplained.

[76]    K2's second report is dated 26th November 2019.[48]  It reports that Singapore Land Authority records show Dayspring as the owner of St Regis.  It continues:

> "An apartment in the same building... has been up for sale for SGD 5,380,000 (USD 3.9 million) since the beginning of November 2019, according to a Singaporean real-estate listings website. [A footnote refers to the website.]  While we cannot confirm that this property for sale is [St Regis], it is possible, particularly given Qin Hui's recent financial difficulties and the fact that the two US properties have also recently been offered for sale."

[77]    The skeleton for the *ex parte* hearing begins by saying that there was "strong evidence" of beneficial ownership of Dayspring and King Fame whilst there was "also evidence" of Applegreen Drive and St Regel being marketed.  Later it says:[49]

> "The New York property owned by King Fame was listed for sale at far below its market value in April 2019, and it appears that the Singapore property owned by Dayspring may also be on the market right now at a greatly reduced price than what the company paid for it.  There is strong evidence that Mr. Qin is the beneficial owner of those companies..."

[78]    The transcript of the hearing on 19th December 2019[50] records this:

> "Mr. Nader [for Great Panorama] at page 9 of the transcript: [F]or full and frank disclosure purposes I should say that if you've seen the evidence, it's really a belief that we articulate, we don't have a tremendous amount of backing up.
> …

---

[48] Bundle 4/60/167, with quotation at 174.
[49] Bundle 4/61/314 at 315, para 4, and at 319, para 18.
[50] Bundle 4/62/324, subsequent quotes at 332, 334 and 335-336.

> Mr. Nader at page 11: The last question is whether the Court is prepared to grant a freezing injunction in aid of this enforcement process.
> The Court: And you say there is an obvious risk of dissipation because he is actually trying to sell these properties.
>
> …
>
> Mr. Nader at page 12: There is the fact that he appears to be hiding and then as you said, there is the fact that K2 Intelligence have identified certainly that the asset of King Fame Trading Ltd, that's the American house, has been on the market recently for about half, I think, what was paid for it. They have also identified in respect of the Singapore property that it may be for sale. They can see that a flat, an apartment, you probably could say, in that building is for sale. They can't say with certainty that it is that and the risk is that what will happen is a fire sale, the money — I should say actually again for full and frank purposes there is a mortgage over the Singapore property in favour of UBS. But whatever monies result from those sale[s] go to Mr. Qin. He is in China and we have little prospect of accessing those in the circumstances."

[79]    Now there is in the papers for the *inter partes* hearing a print out of the Realtor.com webpage for Applegreen Drive downloaded on 24th February 2020.[51] This is the webpage identified by K2 in their first report. Under "property history" it says: "This property was sold once in the last 10 years. Mar 7, 2011 Sold for $15,880,000. Dec 1, 2010 Listed for $20,000,000. History data displayed is obtained from public records and/or MLS feeds from the local jurisdiction. Contact REALTOR® directly in order to obtain latest information." Under "property details", it says: "Status: off market."

[80]    This screenshot does not show what K2 says they found in October 2019. K2 did not take any screenshot of the webpage, so we do not know what they would have seen when they downloaded the webpage. However, it is clear that they did not just invent the figure of $8,348,400. This is because Mr. Qin in his second affidavit[52] says:

> "The first report notes that [Applegreen Drive] was listed for sale in April 2019 with an asking price of USD 8,348,400, but that it had subsequently been withdrawn from the market without any sale having taken place.

---

[51] Bundle 3A/36/421.
[52] Bundle 2/17/89 at para 35.

34

<span style="color:red">246</span>

> However, that was an error and the house was never on the market. The link to Realtor.com which is referenced in the K2 report simply shows the house and says it has an 'estimated value of $8,348,400'. This appears to have been based on an estimate taken from the value of houses in the area. There is nothing at all to suggest that the house was on the market. Indeed, the website just seems to be one that gives information about houses and their values in different locations."

[81]    Mr. Qin does not seem to have taken a screenshot either. What he is saying is also inconsistent with the only screenshot we do have, because there is no estimated value of Applegreen Drive given on that screenshot. Nor does the figure of $8,348,400 appear on the extant screenshot at all.

[82]    The Court is normally reluctant to resolve this type of dispute on affidavit evidence without cross-examination. However, here it is said that the Court was deliberately misled. If that allegation is established, then it has a very material impact on the Court's decision whether to discharge the *ex parte* injunction and whether to reimpose an injunction following the discharge: see the passages from **Paraskevaides** above. I therefore consider that I have to do the best I can on the evidence adduced by the parties.

[83]    K2 have no reason to want to invent the fact that Applegreen Drive had been on the market. The figure of $8,348,400 is, as I have said, not an invented one. It is what Mr. Qin says was on the website. However, Mr. Qin's case that the $8,348,400 was the estimated value of Applegreen Drive is in my judgment improbable. It would mean a nearly 50 per cent drop in the property's value since its purchase in 2011. There is nothing on the available screenshot of the webpage to suggest that there was any such drop in real estate prices in the area. Further, Ms. Liu says about $8.5 million has been spent on improving the property: see her first affidavit.[53] Such an investment would normally enhance the value of a property. I am mindful of the fact that there is an inconsistency in K2's evidence as to whether the offer price was $7,557,000 or $8,348,400, and that either price is

---

[53] Bundle 2/13/21 at para 6.

an oddly precise figure. However, it is common ground that the latter figure was indeed on the website. I have to decide on balance of probabilities whether $8,348,400 was an offer price or an estimate of value. Mr. Qin has an obvious interest in establishing that Great Panorama misled me. Balancing all these considerations, I prefer the evidence of K2 to that of Mr. Qin and find that the property was indeed offered at a fire sale price in April 2019.

[84]    In these circumstances, on balance of probabilities I refuse to find that Great Panorama deliberately misled me at the *ex parte* hearing by wrongly asserting that Applegreen Drive had been placed on the market in April 2019 at $8,348,400. By Great Panorama, I include K2, Mr. Kitchell and their legal representatives.

[85]    The respondents criticise Great Panorama and its legal representatives for not checking what was on the Realtor.com website themselves and taking a screenshot. This last criticism might of course equally be levied at Mr. Qin, who by the time he was doing his research was aware of the forensic importance of what was on the webpage. In the light of my finding of fact that the property was marketed, any want of care in failing to check the website is not causative of any misleading of the Court.

[86]    The respondents criticise the evidence of Mr. Kitchell that Mr. Qin had "effectively gone into hiding in mainland China". Mr. Qin has produced immigration stamps showing that he was in fact moving internationally, including to Hong Kong and the United States. I accept that Mr. Kitchell's averment as to Mr. Qin's hiding was in fact incorrect. However, Mr. Kitchell gives a detailed explanation in his third affidavit of the reasons for his belief.[54] Without his being cross-examined, I have no basis on which I can doubt that Mr. Kitchell did indeed have that belief. The facts he states would justify such a belief. There were no further steps which Great Panorama could have sensibly taken to check Mr. Qin's whereabouts. I find that there was no deliberate or negligent misstatement to the Court on the *ex parte* hearing.

---

[54] Bundle 2/15/35 at paras 7 and 8.

[87]  Lastly, the respondents criticise the presentation made by Mr. Nader to me.  In particular, they rely on a failure speedily to correct an error under which I laboured.  At page 11 of the transcript, it will be recalled I said: "And you say there is an obvious risk of dissipation because he is actually trying to sell these properties."  This overstated the evidence.  Mr. Nader did correct me (see the passage I have cited from page 12 of the transcript), but Mr. Burkill and Mr. Fay QC submitted that the correction was too late.

[88]  This in my judgment is requiring too much of an advocate.  As I said in **Renova Industries Ltd and others v Emmerson International Corp and other**:[55]

> "The Vekselberg Parties make a general complaint that the style of advocacy on the *ex parte* applications was unnecessarily aggressive and that this was incompatible with a fair presentation of the absent parties' case.  With hindsight it would have been much better if [leading counsel] had split the advocacy with his first junior, so that [the latter] could have presented the points which the Vekselberg Parties and ABC would have wished to make, had they been present.  However, if there was a fair and even-handed presentation of the substantive points which should have been drawn to the Court's attention on the *ex parte* applications, the fact that the case for the applicants for the freezing orders was presented aggressively would not in my judgment be a free-standing ground for setting aside the *ex parte* orders.  The Court is not well-placed to make, effectively artistic, judgments on whether an advocate is 'aggressive' rather than merely 'firm' or 'doughty' or 'persistent'.  Every judge will have his or her own view on the style of advocates.  By contrast, it can assess whether there has been a fair presentation of the absent side's case reasonably easily."

[89]  In my judgment the correction which Mr. Nader made of my misapprehension was sufficient to meet the duties laid upon him on an *ex parte* application.

[90]  The respondents also criticise Great Panorama for its reliance on the K2 reports.  These were reports from a private investigator.  The duty of care assumed in the reports was only to Dechert LLP, Great Panorama's lawyers.  There was no

---

[55] BVIHC (COM) 2013/0160 (determined 19th June 2019) at para [131].

declaration of truthfulness given to the Court. It was not, they submit, a balanced report. In my judgment these matters go merely to weight. There is no adequate evidence that any further or different investigations would have revealed matters which would have been exculpatory. If the transfer of the King Fame share had been discovered, that would have been damning rather than exculpatory.

[91] The only exception is in relation to St Regis, where it might have been possible to have a dummy purchaser arrange a viewing to confirm whether the apartment on sale was indeed St Regis. However, there is no evidence how easy arranging a viewing would have been. Estate agents selling über-prime properties are usually very wary of time-wasters and very protective of the privacy of their clients. In the event, appropriately little weight was put on the potential marketing of St Regis by Mr. Nader at the *ex parte* hearing. He expressly flagged up the evidential weakness of his case in relation to St Regis.

[92] Lastly, the respondents say that the application for the freezing order and **Chabra** relief should have been made *inter partes*. This is because the assets of Dayspring and King Fame were real property, which cannot be disposed of quickly. I do not accept that it was inappropriate to deal with the matter *ex parte*. There are steps, such as the creation of charges or the exchange of contracts (coupled with the grant by the vendor of a non-rescindable power of attorney to the purchaser), which a debtor can take very quickly to make enforcement against assets difficult. In any event, it was for me hearing the application to decide whether to adjourn it to be heard *inter partes*. No blame attaches to Great Panorama.

[93] Looking at matters overall, in my judgment, Great Panorama was not in breach of its duties of full and frank disclosure on the *ex parte* application before me. Accordingly I decline to discharge the order I made on that occasion.

[94] I should add that even if I am wrong in some of my conclusions and should discharge the injunction originally granted, this would have been an appropriate

38

250

case for reimposing the injunction. If I am wrong in finding that Applegreen Drive had been marketed in April 2019, the error would have been that of K2. No doubt K2 should have double-checked the website, but their failure to do so would have been negligent rather than deliberate. Maybe Great Panorama's lawyers should have checked the website, although this smacks of hindsight, but again this would have fallen in the category of that which they ought to have done, rather than any deliberate breach of their duties. It would in my judgment be disproportionate to refuse to reinstate the injunction in the circumstances of this case. If no relief is granted against King Fame, there is a very real prospect of Goldteam being unable to execute a judgment against Applegreen Drive, a property which is likely to be worth greatly in excess of the $15.88 million for which it was purchased. Any breach of Great Panorama's duties of full and frank disclosure would have been at the lower end of the scale. In the exercise of my discretion I would have reimposed the injunction.

### Conclusion

[95]   Accordingly, I refuse to discharge the injunction. When I had this draft circulated, I indicated that I would hear the parties on costs and on what further directions I should give. I need hardly say that when giving directions this Court would not have countenanced the sloth displayed by the claimant in the prosecution of this action to date. In the event, I considered written submissions.

### Postscript

[96]   I had a copy of this judgment distributed in draft to the parties as long ago as 13th July with a request for corrections and an agreed order by 17th July. Corrections were provided by then, but counsel could not agree the form of order. They requested a short oral hearing, but counsel's availability was such that none could be arranged before the end of term. I accordingly gave directions for written submissions, the last of which I received on 10th August.

[97]   After circulating my draft judgment, on 17th July 2020 Ogier on behalf of King Fame filed a witness statement from Mr. Nicholas Brookes. Ogier invited me to

39

251

reopen part of my judgment on the basis of this new evidence. I indicated that I would refuse to read the witness statement without a formal application being made on behalf of King Fame.

[98] The law on judges changing their orders is now clear. It is open to a judge to change the outcome of a case at any time before the judge's order is sealed: **Re L (Children) (Preliminary Finding: Power to Reverse)**,[56] substantially widening the **Barrell** jurisdiction.[57] The judge also has the power to admit further evidence. For obvious reasons, this is an exceptional jurisdiction. The purpose of distributing a judgment so that parties can correct any errors. It is not to permit the parties to reargue their cases or fill in evidential *lacunae*: **Outlook Asset Management LP and others v Capstone Corporate Ltd and others**.[58]

[99] The day that evidence was filed, at my direction my assistant sent an email saying that I did not consider it appropriate for me to read the witness statement "without an application being made on which the other parties can comment." I pointed out that the "circulation of a draft judgment is not intended as an opportunity for parties to adduce further evidence." If an application had been made it would have given Great Panorama and Goldteam an opportunity to make submissions on the proposed new evidence and, if so advised, answer it with further evidence. King Fame made no application, so that in my judgment is the end of the matter. I decline to read the proposed new evidence without a formal application.

[100] I should add that from what little I have been able to glean from Mr. Burkill's comments, it appears that the proposed fresh evidence comprises a further screenshot of the realtor.com webpage for Applegreen Drive, but dating from after the distribution of the draft judgment. It apparently shows an estimated value of Applegreen Drive. However, insofar as the true value of Applegreen Drive is relevant, the Court would usually expect expert valuation evidence rather than the notoriously unreliable figures which real estate websites can generate. Moreover

---

[56] [2013] UKSC 8, [2013] 1 WLR 634.
[57] See Re Barrell Enterprises [1973] 1 WLR 19.
[58] BVIHCMAP 2018/0016 (determined 11th February 2019) at para [36]ff.

the evidence would appear to have only a limited relevance to the question of whose evidence I prefer on whether $8,348,400 was an offer price or an estimate of value. As a matter of discretion, even if I had not directed King Fame to issue an application, I would have refused to entertain the new evidence. There must be some finality to interlocutory applications.

[101] I turn then to costs. Mr. Burkill and Mr. Fay QC submit that until Dayspring and King Fame were added as defendants (rather than respondents) the Court had no jurisdiction to grant **Chabra** relief. I disagree. The Court always had jurisdiction to grant **Chabra** relief; Great Panorama's failure to add them as defendants was a venial sin, easily remedied once **Broad Idea (No 2)** showed their divergence from the path of righteousness. In any event, negligible costs were caused by their being named as respondents rather than defendants. This point is wholly unrelated to the underlying merits of the application for **Chabra** relief.

[102] Looking at the different heads of costs, there are firstly the costs of substituting Goldteam for Great Panorama. Such costs must usually be borne by the party making the substitution. In this case, however, the defendants raised an issue as to whether as a matter of Hong Kong law a judgment debt could be assigned. This necessitated Great Panorama obtaining an expert report on Hong Kong law. In my judgment, this was unreasonable behaviour on the part of the defendants. This territory is one of the few jurisdictions which do not allow the legal assignment of debts. Even if (which I doubt) the defendants thought there might be some genuine argument about the validity in Hong Kong law of the assignment from Great Panorama to Goldteam, all the firms involved in this case have Hong Kong offices which would have provided easy access to Hong Kong lawyers who could have given a quick and easy answer. The sole effect of insisting that Great Panorama obtain an expert report was to rack up costs. The defendants' costs of the substitution application will be insignificant compared to the costs of the substantive applications. Therefore, I shall order that there be no order for costs on the substitution application, save that the defendants do pay the claimant's costs of and in the obtaining of expert evidence of Hong Kong law.

41

253

[103]  A claimant is entitled to amend its pleadings once before the date of the first case management conference (which has not yet occurred).  The defendants complain that Great Panorama and Goldteam are now on their fourth draft amended pleading.  That is not an unreasonable complaint but, unless and until a claimant actually serves its amended pleading, the drafts are as if written on water.  The defendants particularly complain that Ms. Liu has been added as a defendant, before any application has been made to serve her outside the jurisdiction.  I fail to see how this can prevent the claimant making the amendment.  Likewise the defendants complain that, when arguing the case for the continuation of the injunction, Great Panorama was relying on an earlier version of the proposed amended pleadings.  They succeeded on the earlier version and have not abandoned any of the averments made in those proposed pleadings.  Again, I do not see why it is objectionable for them now to try and widen their case, for example by adding Ms. Liu as a party based on a fresh cause of action.  The claimant must, however, bear its costs of the amendments.

[104]  As to the costs of the *ex parte* application for the **Chabra** injunction, the parties are agreed that these should be costs in the case and I would in any event have made that order.  As to the costs of the applications for continuation and for discharge, in my judgment Great Panorama has been successful.  In particular, the serious allegation that the Court was misled on the *ex parte* application has failed.  In my judgment, the three defendants should pay those costs.

<div align="right">

**Adrian Jack**
Commercial Court Judge [Ag.]


**By the Court**


**Registrar**

</div>

42

254

EASTERN CARIBBEAN SUPREME COURT
TERRITORY OF THE VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION

CLAIM NO. BVIHC (COM) 2023/0282

BETWEEN:

ACCESS BANK PLC
(as successor in title and assignee of Diamond Bank plc)

Claimant/Applicant

and

[1]    DR AMBROSIE BRYANT CHUKWUELOKA ORJIAKO ("Dr Orjiako")
[2]    SHEBAH PETROLEUM DEVELOPMENT COMPANY LIMITED (BVI)
       ("Shebah BVI")
[3]    ABBEYCOURT ENERGY SERVICES (BVI) LIMITED ("Abbeycourt")
[4]    NEVILLE INVESTMENT MANAGEMENT LIMITED ("Neville")
[5]    PLUMAGE MANAGEMENT LIMITED ("Plumage")
[6]    PURSLEY RESOURCES LTD (Pursley")
[7]    SINCLAIR COMMERCIAL LTD ("Sinclair")
[8]    SALVIC ENERGY LTD (Salvic Energy")
[9]    SALVIC PETROLEUM RESOURCES LTD (Salvic Petroleum BVI")
[10]   MRS IGRA CHIOMA HENRIETTA ORJIAKO ("Mrs Orjiako")

Defendants/Respondents

[11]   AFRICAN EXPORT-IMPORT BANK ("African Export-Import")
[12]   ASSET MANAGEMENT CORPORATION OF NIGERIA ("AMCON")
       (as successor in title and assignee of Skye Bank plc)

Nominal Defendants

1

255

**Appearances**:

Mr Steven Thompson KC, instructed by Carey Olsen, and with him Mr Richard Brown and Mr Sean Kinney, both of Carey Olsen, for the Claimant

Mr Robert Weekes KC, instructed by HFW, and with him, Mr Scott Cruickshank, of HFW, for the First to Tenth Defendants

---------------------------------------------------

2025:   July 28; 29
October 1.

---------------------------------------------------

**JUDGMENT**

**Introduction**

[1]   **MITHANI J. [Ag]**: In this Claim ("the Claim", "this Claim" or "these Proceedings"), issued on 15 December 2023, the Claimant is Access Bank Plc. I will refer to it in this judgment ("this Judgment" or "the Judgment") as the "Claimant" or "Access Bank".

[2]   The defendants to the Claim are the ten defendants and the two additional "nominal" defendants referred to as such in the heading of this Judgment. I will refer to the first defendant, Dr Ambrosie Orjiako, as either the "First Defendant" or "Dr Orjiako"; to his wife, the tenth defendant, Mrs Igra Orjiako, as either the "Tenth Defendant" or "Mrs Orjiako"; both Dr Orjiako and Mrs Orjiako together as "the Orjiakos"; and to the corporate defendants by the number in which they appear in the heading of this Judgment or by the abbreviations provided for them in that heading. In addition, unless the context otherwise requires, the expression: (a) "the Claimant" or "Access Bank" shall include its predecessors in title, including the "Original Lenders"; (b) "the Defendants" shall mean either one or all the defendants (other than the nominal defendants) to the Claim; and

2

(c) "the Shareholding Companies" shall mean any one or more of Abbeycourt, Helko Nigeria Limited ("Helko"), Neville, Plumage, Pursley, and Sinclair.

[3] Dr Orjiako is indebted to the Claimant for $220,298,038 (plus interest) under a consent order made in the Claim on 16 April 2024. This followed a judgment obtained by the Claimant in a claim brought by the Claimant against Dr Orjiako in the High Court in England in March 2016.

[4] Dr Orjiako had given a personal guarantee for a substantial syndicated loan ("the Loan") made by three lenders, Afrexim Bank (i.e., African Export-Import Bank), Diamond Bank Plc and Skye Bank Plc (referred to individually or collectively in this Judgment as "the Original Lenders" or "the Original Lender") to a Nigerian company called Shebah Exploration & Petroleum Co. Ltd ("SEPCOL"). SEPCOL was owned or controlled by him and is not a party to these Proceedings.

[5] In March 2013, SEPCOL defaulted on the Loan. In September 2013, the Original Lenders called in the Loan, and, in February 2014, they called in Dr Orjiako's personal guarantee and the corporate guarantee that a BVI company, Allenne Ltd, had provided to the Original Lenders to "secure" the indebtedness of SEPCOL to the lenders.

[6] In 2014, proceedings were commenced in England against SEPCOL as borrower, Dr Orjiako as personal guarantor, and Allenne Limited as corporate guarantor to enforce the Loan. Those proceedings were issued in 2014. They were settled on agreed terms. However, Dr Orjiako breached those terms. As a result, the Original Lenders brought fresh proceedings against Dr Orjiako and obtained summary judgment against him in 2016.

[7] Two of the Original Lenders assigned their claims to the Claimant. The assignees are the Claimant and the Twelfth Defendant. The sole remaining original lender is the Eleventh Defendant. The Eleventh and Twelfth Defendants have taken no part in this action but are aware of it and do not object to it. They are necessary parties to the Claim, but no relief is sought against them. They are, therefore, joined in the claim and described in it as "nominal defendants".

3

257

The Defendants do not challenge the ability of the Claimant to bring the Claim and to sue the Defendants as successors in title to one or more of the original lenders.

[8]   This Claim was brought by the Claimant to enforce the original English judgment. In April 2024, the Claimant obtained an order of this Court ("the BVI Judgment"), to which Dr Orjiako consented, giving effect to the English judgment. The Claimant has taken various consequential proceedings in this Claim in order primarily to obtain further information about its ability to enforce the BVI Judgment, and to prevent any dealing by one or more of the Defendants with any of their assets until the final determination of the Claim by this Court. These consequential proceedings do not require further mention in this Judgment, although I should point out that Dr Orjiako is currently the subject of bankruptcy proceedings in Nigeria. However, there is little likelihood that those proceedings will be concluded anytime soon.

[9]   The Claimant alleges that there are various shell companies in this jurisdiction, i.e., one or more of the BVI companies included as defendants in the Claim, which hold tranches of very valuable shares ("the Shares" or "the Shareholding"),[1] either directly or indirectly, in a listed Nigerian oil company, called Seplat Energy Plc ("Seplat"). The Claimant alleges that these shares remain beneficially owned and controlled by Dr Orjiako himself, despite his assertion that he transferred them to Mrs Orjiako (following threats of legal proceedings made against him in 2014). The Claimant asserts that if, contrary to that allegation, Dr Orjiako has transferred the Shares to Mrs Orjiako, that transfer was effected and motivated only by his desire to avoid the Claimant being able to enforce any claim that it has against Dr Orjiako over those shares.

[10]   Two issues, therefore, fall to be determined by this Court, which can be formulated in the form of simple questions that the Court has to answer:

---

[1] Any reference in this Judgment to "the Shares" or "the Shareholding" shall include any part of the shares or shareholding in any of the Shareholding Companies or Seplat or any associated company, alleged to have been transferred by Dr Orjiako to his wife or others.

4

258

(a)    Is Dr Orjiako entitled, or does he continue to be entitled, to the beneficial interest in the Shares? If the answer to this question is "Yes", the Court does not have to decide the second question, identified below. However, for the sake of completeness, it should do so, in case there is an appeal against this Judgment or the respondent to the appeal wishes to serve a respondent's notice to the appeal.

(b)    If the transfer to Mrs Orjiako, relied upon by Dr Orjiako, was effective to transfer both the legal title and beneficial interest in the Shares to her, was it effected and motivated by his desire to avoid the Claimant being able to enforce any claim that it had against Dr Orjiako over the Shares?

[11]    The Claimant maintains that the case against the Defendants on the above two issues is clear and obvious. It asserts that despite Dr Orjiako's attempt to raise various factual issues, which he claims ought to be determined at the trial of the Claim in order to establish the Claimant's entitlement to the relief he seeks, on a proper examination of the written evidence so far submitted in the Claim, it is clear that Dr Orjiako has no real defence to the claim or none that would withstand the scrutiny by this Court. Accordingly, the Claimant seeks summary judgment ("SJ") against the Defendants in relation to those issues pursuant to r. 15.2 of the **ECSC Civil Procedure Rules (Revised Edition) 2023** ("**ECSC CPR**").

[12]    I heard the Claimant's application for SJ ("the Application") over a period of two days on 28 and 29 July 2025 ("the SJ Hearing"). I was informed at the SJ Hearing that the Defendants had indicated they wished to enter into negotiations with the Claimant to see if the dispute between them could be resolved. Based on the fact that I have not been told that the parties have come to any resolution of the issues between them, I must assume that the negotiations have fallen through or, at any rate, have not reached the stage where the parties felt that I should defer giving judgment until I knew one way or another whether they were likely to come to a settlement.

5

259

**Background**

[13]    The background facts and matters giving rise to the Claim do not need detailed mention. A full chronology of the relevant events that give rise to the making of the Claim, and the bringing of the Application, is set out in the draft chronology, annexed to the sixth affidavit of Mr Robert Imowo, sworn on 6 January 2025, in support of the Application. Although some of the phraseology used in that chronology is based on what the Claimant says is its case, I do not believe that the Defendants dispute the substance of the chronology. For the purpose of extracting information from it, I have disregarded the narrative and words used in it, which may be perceived as controversial by the Defendants. However, what follows in this Judgment describes the conclusions I have come to, expressed in my own words.

[14]    For the purposes of this Judgment, it suffices if I provide the following short summary of the relevant events.

[15]    I have dealt briefly with the circumstances in which the Loan was made and in which it (together with the guarantees supporting it) was enforced in the High Court in England and, subsequently, made the subject of the BVI Judgment.

[16]    From incorporation in 2009 until 10 March 2014, Shebah BVI had one issued share. That share was owned both legally and beneficially by Dr Orjiako.

[17]    According to the Register of Shares of Shebah BVI, on 10 March 2014 (the day before the first English proceedings), the share structure in Shebah BVI underwent various changes. The Claimant does not accept that the events recording these changes took place on the date or dates on which they are recorded as having taken place. However, for the purposes of the Application, the Court must assume that the dates are correct:

(a)    Dr Orjiako transferred the single share in Shebah BVI to Pursley. The Claimant does not know the terms of that transfer

6

but maintains that it was at a nil or nominal consideration (and in any event for less than full value). At that time, Pursley was legally and beneficially owned by Dr Orjiako.

(c) 240,000 new shares were issued in Shebah BVI and allotted to Abbeycourt, which was, at that time, both legally and beneficially owned by Dr Orjiako.

(d) 119,968 new shares were issued by Shebah BVI and allotted to Helko.

(e) 124,000 new shares were issued by Shebah BVI and allotted to Neville, which were, at that time, both legally and beneficially owned by Abbeycourt, which was in turn legally and beneficially owned by Dr Orjiako.

(f) 43,404 new shares were issued by Shebah BVI and allotted to Plumage, which was, at that time, both legally and beneficially owned by Dr Orjiako.

(g) 119,999 new shares were issued by Shebah BVI and allotted to Pursley, which was, at that time, legally and beneficially owned by Dr Orjiako.

(h) 80,000 new shares were issued by Shebah BVI and allotted to Sinclair, which was, at that time, legally and beneficially owned by Dr Orjiako.

[18] Subsequent transfers of shares in Shebah BVI occurred between 2014 and 2017:

(a) On 21 July 2014, Dr Orjiako transferred the sole share in Pursley to Mrs Orjiako (the "Pursley Share Transfer").

(b)     On 29 May 2015, Abbeycourt transferred the sole share in Neville to Dr Orjiako (the "Neville Share Transfer"). Dr Orjiako was, at that time, the legal and beneficial owner of the sole share in Abbeycourt.

(c)     On 22 May 2017, Dr Orjiako transferred the sole share in each of Abbeycourt, Neville and Plumage to Mrs Orjiako (the "22 May 2017 Share Transfers").

[19]     The net effect of these allotments and/or transfers (individually or collectively also referred to as "the Transfers", "the Transfer", "the Share Transfers" or "the Share Transfer, as the context may require) was that by 2017, Mrs Orjiako had become the owner of most of the shares in the Shareholding Companies (except for Sinclair), which equated to a majority indirect ownership of Shebah BVI. Shebah BVI, in turn, owned valuable shares in Seplat. Dr Orjiako directly retained ownership of Sinclair and director-control over all the Shareholding Companies.

[20]     The Claimant asserts that the Share Transfers, i.e., the transfers and/or allotments, were neither made for any consideration nor for any genuine commercial reasons. The timing coincided with the onset and escalation of creditor actions against Dr Orjiako and others. The Claimant asserts that the changes referred to above were, in effect, manoeuvres which created the appearance — but not the reality — of divestment, with Dr Orjiako retaining beneficial ownership and control, in practical terms, of the Shareholding Companies, often to shield major assets (shares in Shebah BVI and, thus, Seplat) from lender-enforcement.

[21]     The basis upon which the Claimant alleges that Dr Orjiako is said to be beneficially entitled to the Shareholding is summarised at paras. 55-63 of the amended Statement of Claim in the following terms:

262

"55.     As pleaded in paragraph 13 above[2], the entire issued share capital in Sinclair is legally owned by Dr Orjiako. That shareholding is also owned by him beneficially.

56.     It is to be presumed and/or inferred that Dr Orjiako continues to own beneficially the shares in the other Shareholding Companies (namely Abbeycourt, Neville, Plumage, and Pursley), notwithstanding the Pursley Share Transfer and the 22 May 2017 Share Transfers. Such inference is to be drawn from the following facts and matters:

57.     First:

    57.1.    Paragraphs 33 to 41 above are repeated[3].

    57.2.    There was no commercial reason for the Pursley Share Transfer or the 22 May 2017 Share Transfers. Insofar as the Claimant has been able to ascertain, no consideration was paid by Mrs Orjiako to Dr Orjiako for the said transfers.

    57.3.    It is to be inferred that the transfers and allotments were done merely to give the appearance that the direct and indirect shareholding in Shebah BVI was not held solely by Dr Orjiako without altering the reality, and to enable him to cause to be charged to the Lenders only a one-third holding in Shebah BVI while informing them that he was causing to be charged to them all or substantially all the shares in Shebah BVI (while in fact himself retaining control and indirect beneficial ownership of a two-thirds shareholding not charged to the Lenders).

58.     Second, as pleaded above, Neville, Plumage, and Sinclair charged their respective shareholdings in Shebah BVI by the Shebah BVI Share Charge. That charge secured the liabilities of Shebah Nigeria under the Facility. There was no reason for Neville, Plumage, and Sinclair to charge their respective shareholdings if Dr Orjiako, as personal guarantor of the Facility, did not own those companies beneficially. In the Chairman's Letter of Comfort provided by Dr Orjiako to the Original Lenders on or around 11 May 2012 in connection with the amended and restated Facility Agreement, Dr Orjiako represented that he legally and beneficially owned both Sinclair and Plumage.

---

[2] This is likely intended to be a reference to para. 13A of the amended Statement of Claim, which sets out the position before Mrs Orjiako became, as the Claimant asserts, the legal owner of the Shares. Paragraph 13 sets out the position regarding the shareholding as of the date the Claim was issued.
[3] These paragraphs of the amended Statement of Claim largely set out the shareholding changes to Shebah BVI summarised above.

9

263

59.  Third, Dr Orjiako is and was at all material times a director of each of the Shareholding Companies (as well as Shebah BVI).

60.  Fourth, until May 2022, Dr Orjiako served as chairman of the board of Seplat on the basis that he controlled more than 7% of the shares in Seplat. He could not have controlled that number of shares unless he controlled the shareholdings of the Shareholding Companies in Shebah BVI (control of merely the shareholding in Sinclair would not have sufficed).

61.  Fifth, public reports and statements published by Seplat, which were signed by Dr Orjiako as chairman, refer to Dr Orjiako as controlling a stake in Seplat of between 6 and 7%, and record that part of those shares are held via Shebah BVI and Pursley.

62.  Sixth, Seplat confirmed in evidence provided to the Nigerian High Court on 16 August 2023 that 30,641,068 shares in Seplat were held by Shebah BVI and 900,000 shares in Seplat were held by Pursley, and described those entities as Dr Orjiako's proxies through which he held his interest in Seplat.

63.  Seventh, Dr Orjiako was, after May 2022, able to raise finance by purportedly offering as collateral the shares in Seplat held by Shebah BVI, part of which finance was used to repay part of the Facility, as well as to raise finance to fund the operations of Shebah Nigeria."

[22]  Dr Orjiako disputes the above matters. In short, he says three things.

[23]  First, he states that it is incorrect to say that the Pursley Share Transfer and the 22 May 2017 Share Transfers did not transfer his beneficial interest in that share to Mrs Orjiako. At para. 33 onwards of his eighth affidavit, sworn on 7 May 2025, he summarises his position in the following terms:

"33  The Claimant alleges that, despite the Pursley Share Transfer and the 22 May 2017 Share Transfers, I continue to beneficially own the shares in Pursley, Abbeycourt BVI, Neville and Plumage. This is certainly not the case.

34  By virtue of the Pursley Share Transfer, my wife became the legal and beneficial owner of the sole share in Pursley, whose only asset was a stake in Shebah BVI which equated to 2.15% of Seplat. Shebah BVI held 2.15% of Seplat as bare trustee for her. This is because my wife had had a 3.92% interest in Seplat via Shebah Nigeria from 2010 as part of my estate planning … When the Seplat shares were transferred from Shebah Nigeria to Shebah BVI in March 2010 her interest Seplat was transferred to Shebah BVI which held what became a 2.15%

10

264

stake in July 2014 post IPO dilution as bare trustee for my wife as recorded in the Declaration of Trust prepared in 2013. While it is important to note that document is not witnessed nor dated, it reflected the position at the time in relation to my wife's stake in Seplat and my view of the position and was entirely consistent with my wife's prior shareholder in Shebah Nigeria in line with my earlier estate planning which had been transferred to Shebah BVI to hold in an omnibus shareholding but always for the benefit of my wife. The Pursley Share transfer simply represented a transfer where the economic reality which was that my wife had owned the beneficial interest of the corresponding stake in Seplat held by Shebah BVI in substance since 2010.

35.    By virtue of the 22 May 2017 Share Transfers, my wife also became the legal and beneficial owner of the sole share in each of Abbeycourt BVI, Neville and Plumage. The transfer was made with the intention and expectation that when the loan under the Facility Agreement and the other loans was repaid, the share pledge given by Neville, Plumage and Abbeycourt BVI (and any other similar security for loans) would be released and my wife would benefit from the corresponding uplift in value of the shares in Shebah BVI.

36.    My wife is the sole legal and beneficial owner of each company. She is responsible for carrying out transactions on their behalf, making decisions regarding their assets, signing documents on their behalf, and representing the companies in dealing with third parties in all material respects.

37.    Notwithstanding this, the companies in question have not been actively engaged in any corporate activity since ownership was transferred to her. As such, there has been no occasion or need for her to act or make decisions on their behalf in the manner described above. However, had any corporate action been required, she would have dealt with it as the legal and beneficial owner.

38.    It is public knowledge that my wife owns Pursley, this fact having been reported in the business press on numerous occasions – for example, Business Day reported on 9 August 2018 that Pursley, "a Company owned by the wife of A.B.C Orjiako" had acquired 900,000 shares in Seplat ... My wife paid for these shares with funds from family assets and they were acquired from the late Chief Macauley Ofurhie."

39.    To assist me in raising funds to meet the judgment debt, my wife agreed to the use of both Shebah BVI's and Pursley's shares in Seplat being charged as security for the Providus Facilities. It is not unusual or unexpected that a spouse, as my

11

265

wife did, would use her own assets to support the business interests of her husband and, by extension, the success of herself and the family. In fact, why would my wife not help me?

40.    Put simply, the Orjiako family is a very close family. I took responsibility for developing the family businesses at my father's request in the 1990's as described in detail below and shared the benefits with my family, including my siblings, in line with my father's wishes. In good times, all members of my family have benefitted. In harder times, my family have rallied behind me when I asked them for help when dealing with the challenges both I and the businesses have faced in recent years..."

[24]    Second, Dr Orjiako states that it is untrue that his wife provided no consideration for the Share Transfers. He states that the Share Transfers were made "for consideration of mutual love and affection" and "as recognition for all of the hard work, contribution, dedication and sacrifices she made to support the success of our family's business", which he describes in more detail in his affidavit.

[25]    Third, he states that it is incorrect for the Claimant to contend that there was no, or no good, commercial or other proper motive for the Share Transfers. At para. 25(a)(vi) of his affidavit, he summarises his motive for the Share Transfers as being "for the benefit of our family in consideration of mutual love and affection, which was considerable and as part of general estate planning ... and in the hope and expectation that all loans would, one day, be repaid and she may finally benefit from unencumbered assets."

[26]    The substance of Dr Orjiako's account is supported by Mrs Orjiako in her affidavit, also sworn on 7 May 2025.

[27]    I do not need to elaborate further on the background facts and circumstances, except to mention three key points

[28]    First, the application of the Claimant is for SJ against the Defendants. As Mr Robert Weekes KC, who appeared on behalf of the Defendants, states, the Court must assume any disputed questions of fact in favour of the party against whom the application is made, i.e., the Defendants. However, this assumption is not absolute. If the Court is satisfied that the facts and matters relied upon by

12

266

the respondent to the application simply do not pass muster, it will, and should, be prepared to reject those facts and matters.

[29]     Second, each party has raised every conceivable point to support the case it advances before this Court. As is the case with the substantive trial of a claim, I do not need to decide every point that the parties have raised in connection with the Application: see, by way of examples, **Weymont v Place**;[4] and **English v Emery Reimbold & Strick Ltd**.[5] It is only necessary for me to determine whether the Claimant's case on the Application is made out by the documents I have seen and the submissions I have heard, i.e., whether the Claimant's case for SJ is so clear on the papers that it is unnecessary for me to hear the oral evidence of those deponents who have furnished affidavits and those witnesses who have made witness statements, whether because that evidence is weak and tenuous, obviously false or wholly unreliable or for some other valid reason. If the case for granting the Application is clear, I must enter SJ on the Application in favour of the Claimant. If it is not, I must give the Defendants leave to defend the Claim.

[30]     Third, it is not for me to judge any part of the Application, based on how Dr Orjiako has behaved in the past. I say this because, in the course of his submissions made at the SJ Hearing, Mr Steven Thompson KC, who appeared on behalf of the Claimant, suggested that Dr Orjiako knew how to "play the system" (my words not his), a fact which he said was reflected by Dr Orjiako arguing every conceivable point and appealing every decision which was made against him. Whether or not that is correct, that sort of (what can only be said to be) "character evidence" is inadmissible in the Claim and, *a fortiori*, the Application: see **Phipson on Evidence**.[6]


**The Relevant Law**
**Substantive Law**

---

[4] [2015] EWCA Civ 289, at [4]–[6] per Patten LJ.
[5] [2002] EWCA Civ 605, [2002] 1 W.L.R. 2409.
[6] Hodge M Malek QC (Ed), 20th Edn, Sweet & Maxwell, 2021, para. 20.05 *et seq*.

13

267

[31]    Before I consider the principles that govern the grant of SJ, it is necessary for me to set out a brief exposition of the law that relates to the two grounds upon which the Claimant seeks the substantive relief set out in its amended Statement of Claim, *viz*, the Claimant's assertion that:

      (a)    the Share Transfers only transferred the legal title in the Shares to Mrs Orjiako – i.e., that the beneficial interest in the Shares remained vested in Dr Orjiako (Ground 1"); and

      (b)    in the alternative, that the Share Transfers to Mrs Orjiako were effected to put those shares out of the reach of Dr Orjiako's creditors, which, of course, included the Claimant ("Ground 2").

[32]    For the purpose of determining the Application, only a brief exposition of the law is necessary. What follows, therefore, is that exposition, so far as it is relevant to the determination of the Application.

Ground 1

[33]    The amended Statement of Claim seeks the following relief under this ground:

> "A declaration that Dr Orjiako is the sole beneficial owner of the Shareholding Companies and the Salvic Defendants [i.e., Salvic Energy and Salvic Petroleum BVI]."

[34]    The basis upon which this head of claim is made is summarised at para. 55 of Mr Thompson's skeleton argument in the following terms:

> "The Bank's case is that the lack of consideration for those transfers, combined with the lack of any ostensible commercial purpose for them, and the clear evidence that [Dr Orjiako] has retained the right to deal with the underlying interests in Seplat as his own point to the fact that he retained beneficial title. That is to say, when he transferred legal title to his wife, D1 intended to retain beneficial ownership so that he could control, mortgage and sell the shares, as he thought fit from time."

[35]    The argument continues in para. 57 of that skeleton argument, as follows:

<div align="center">14</div>

<div align="right" style="color:red; font-size:2em">268</div>

"There are very clear indications that Dr Orjiako did not intend to dispose of his beneficial ownership in the shares:

a.    He remained the sole director of each of the companies and continued to deal with the shares as if they were his, most particularly putting them up as security for borrowing from which he personally benefitted. This [Dr Orjiako] admits, albeit he claims, without any contemporaneous supporting evidence, that his wife agreed to allow him to borrow against her shares; that is a hallmark of a sham transaction (i.e. a transaction which is presented to the world as being something other than it is): see **Midland Bank v Wyatt [1996] BPIR 288, 298-9**;

b.    The newly produced Power of Attorney … shows that D2 (the majority of whose shares are owned by Ds 3-7) allowed [Dr Orjiako] to exercise, on an irrevocable basis, complete control and ownership of D2's shares in Seplat. Pursuant to the Power of Attorney, D2 grants powers to [Dr Orjiako] tantamount to ownership (he is entitled to attend and vote at meetings of Seplat, is entitled to dividends and bonuses, he can pledge, sell, charge or assign the shares and exercise all the full rights as if the shareholder). It is trite law that a general power as wide as that is to all intents and purposes the same as ownership (see **TMSF v Merill Lynch Bank and Trust Co [2012] 1 WLR 1721, PC at [42]-[43] and [53]** (citing with approval the decision of **Upjohn J**, as he then was, in **re Triffitt's Settlement [1958] Ch 852**: the Power of Attorney falls into that category, so effectively constituting [Dr Orjiako] the true owner of D2's shares in Seplat. It is clear then that he has secured for himself complete control, tantamount to ownership, of D2 and the economic interest in D3-6.

c.    Until these enforcement proceedings were started against him, D1 advanced no case that any of the shares in BVI entities as have held Seplat shares belonged beneficially to his wife. Until 2018, there was no suggestion to any third party that his wife might be the true owner of any of his business assets. Rather like Mr Wyatt, *'when it was expedient to do so'*, Dr Orjiako has been *'prepared to allow the bank to remain in ignorance of the true position'* (see **Midland Bank v Wyatt at 299**).

(Emphasis in italics included in the skeleton argument).

15

[36]   The basis upon which the Claimant suggests that the Share Transfers only effected the transfer of the legal title to the Shares (and not Dr Orjiako's beneficial interest in them), as Mr Weekes says, usually involves the broader issue of what the law typically implies where one person makes a gift (or a transfer for mutual love and affection) to another. The position is summarised by **Lewin on Trusts,** at 10-002-10-006 (disregarding the footnotes in those paragraphs, unless otherwise stated) in the following terms:

> "10-002   If a gratuitous lifetime instrument of transfer contains express or inferred provisions determining the beneficial ownership of the property transferred, effect will be given to those express or inferred provisions and, as is the case generally with the construction of written documents, only limited extraneous evidence is admissible in aid of the construction of the document. Thus if it is apparent from the express or inferred provisions of the document of transfer that the transferee is not to take beneficially, then he is not at liberty to adduce extrinsic evidence to show that he was intended to take beneficially. And if it is apparent from those provisions that the transferee is to hold on trust, but no trusts are effectively declared, or they do not exhaust the beneficial interest, then a resulting trust in favour of the transferor arises in accordance with the principles discussed elsewhere.
>
> 10-003   Where there is a gratuitous transfer containing no express or inferred provisions determining beneficial ownership, then the starting point is that there is a *rebuttable presumption of resulting trust*, in that the transferor did not intend to make a gift… he presumption may be rebutted in two ways. First, it may be rebutted by extraneous evidence that the transferor did intend to make a gift. Secondly, it may be rebutted by a counter *rebuttable presumption of advancement*, that is that the transferor did intend to make a gift. There is a presumption of advancement if the transferor is the spouse or parent of the transferee, or in a similar relationship. The presumption of advancement may itself be rebutted by extraneous evidence that the transferor did not intend a gift. In a case where the presumption of advancement does not apply, the transferee is (sometimes misleadingly) described as a *stranger*.
>
> …

16

<span style="color:red">270</span>

10-005   The [proposed] abolition of the presumption of advancement [by section 199 of the Equality Act 2010] will not affect the application of the presumption of resulting trust. In those circumstances in which the presumption of advancement has hitherto applied, there will be a presumption of resulting trust. So, where a husband transfers property to his wife it will be presumed that she is to hold the property on trust for him unless there is evidence that a gift was intended. In practice, this presumption of resulting trust in the case of husband and wife may well, in many cases, be as weak as the existing presumption of advancement, with each case in fact usually determined by evidence of the actual intention of the transferor or provider of the purchase moneys. It should be remembered that the presumption of resulting trust has always been the general rule but subject, hitherto, to an exception where the purchaser was under a species of natural obligation to provide for the nominee.

10-006   If the evidence establishes that the transferor did not intend to make a gift then effect will be given to that intention, so that there is a resulting trust in favour of the transferor. If this is so, the evidence of the transferor's actual intention precisely accords with what is presumed by the presumption of resulting trust, if applicable, and operates to rebut any presumption of advancement which applies by virtue of the relationship between the transferor and the transferee. On the other hand, if the evidence establishes that the transferor did intend to make a gift, the transfer takes effect as a gift. If this is so, the evidence of the transferor's actual intention precisely accords with what is presumed by the presumption of advancement, should that presumption apply, and operates to rebut the presumption of resulting trust, if applicable. Thus in any case where the transferor's actual intention is established, there is no need to rely on the presumptions to show either that the transferor retains beneficial ownership or that the transfer takes effect as a gift: the resulting trust or the gift, as the case may be, is established by the evidence. The principle is generally invoked in relation to transfers of legal interests in real property, but there is no reason why it should not be invoked also in relation to dispositions of personal property and of equitable interests and rights."

17

271

(Emphasis in italics supplied by the authors of **Lewin on Trusts**).

[37]    However, the issue in the present case is not which presumption (whether that of a "resulting trust" or "presumption of advancement") applies or whether those presumptions can be rebutted by oral evidence. Were that the only issue that the Court needed to decide, it is difficult to see how the Court could do so without hearing oral evidence. In the present case, the real issue is whether the Court can conclusively determine, without a full trial, based on the fact that it is clear and obvious from the material placed before the Court on the Application, that the beneficial ownership of the Shares remained with Dr Orjiako at the time of the purported transfer of the Shares to Mrs Orjiako.

[38]    The law on sham transactions and sham trusts is summarised in the following paragraphs of **Snell's Equity**[7] (disregarding the footnotes in those paragraphs, unless otherwise stated):

> "22-067    … The classic definition of a sham was given by **Diplock LJ**: '[I]t means acts done or documents executed by the parties to the sham which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual rights and obligations (if any) which the parties intend to create; for acts or documents to be a 'sham', with whatever consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a 'shammer' affect the rights of a party whom he deceived [citing **Snook v London and West Riding Investments Ltd**][8].'
>
> The burden of proving the sham lies on the person making the allegation.

> **(a)    Common intention to mislead.**

---

[7] Steven Elliott KC *et al*, Sweet and Maxwell, 35th Edition
[8] [1967] 2 Q.B. 786 at 802.

18

272

22-068          The person who alleges the sham must prove that the purported settlor and trustee had a common intention to enter into a kind of legal transaction that was different from the trust set out in the relevant document. The aim is to discover 'the substance and reality of the transaction', and to establish that it is different from the trust the parties purported to create[9]….

…

### (c)    Consequences.

22-070          … The effect of proving that a purported trust is a sham is that the court often holds the parties to the real transaction that they intended. For example, a settlor who transferred property to a trustee to hold on a sham trust for other beneficiaries was found never to have intended to relinquish his beneficial ownership of the property. Proof of the sham did not affect the vesting of the property in the trustee so the trustee held as a bare trustee for the settlor[10].

### (d)    Shams and certainty of intention.

22-071          The question whether a person intends to declare an express trust is distinct from whether a purported declaration of trust is a sham. The ascertainment of the settlor's intention to declare a trust depends on the proper construction of the words in the relevant document, taking into account a narrow range of permissible background circumstances. The purpose of the inquiry is to elicit the objective intention of the settlor from the trust instrument.

But when a person alleges that a trust declared in an instrument is a sham, then the reality of the declaration is put in question. He alleges that the declaration should not be given effect in law because it does not reflect the true agreement between the parties about the kind of transaction they intended to enter into. This difference in purpose explains why a wider range of evidence can be used to prove a sham from that which can be used to construe a genuine trust instrument.[283]

(Underlined emphasis supplied).

---

[9] AG Securities v Vaughan,  Antoniades v Villiers [1990] A.C. 417 at 466.
[10] Minwalla v Minwalla [2004] EWHC 2823 (Fam), [2005] 1 W.L.R. 771; and JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2017] EWHC 2426, at [455].

19

273

[39]     The treatment of the subject provided in the paragraphs referred to below (disregarding the footnotes in those paragraphs, unless otherwise included) in **Lewin on Trust** is also apposite to set out in this context:

"5-020     …In certain circumstances, the courts have found that a settlor has not created a trust at all, on the ground that what on its face is a declaration of trust was a sham. In those decisions, a declaration of trust is ineffective as a sham, or pretence, if the parties to the declaration intended not to create a trust, but instead to give a false impression to third parties and ultimately the court. Properly understood thus, there is no such thing as a 'sham trust', but merely a document purporting to create a trust which does not in fact exist. The question whether a trust is a sham is a different question from the question whether the control of the settlor over the trust fund and its income under the terms of the trust is so extensive that the trust is invalid on the basis that the purported settlor has never parted with the beneficial interest in the trust property; and it does not follow from a decision that a trust is not a sham that such an outcome should not follow where the facts justify it.

5-021     In addition to the intention not to give effect to the trusts, the authorities require an intent to give a false impression. The parties will in the nature of things usually have some side intent or there would be no point in their entering into a document they mean to disregard. It is difficult to establish the necessary intent, [b]ecause a finding of sham carries with it a finding of dishonesty, because innocent third parties may often rely on the genuineness of the provision or agreement, and because the court places great weight on the existence and provisions of a formal signed document. <u>There is a requirement of very clear evidence given the seriousness of the allegation, and a presumption that parties intend to be bound by documents they enter into, but the question of sham is determined on the balance of probabilities</u>. Subsequent actions of the parties in

20

<span style="color:red">274</span>

disregarding the trusts declared are admissible in evidence to establish that they intended at the time when the trusts were declared never to carry them out, though not on any question of interpretation of the trusts. <u>Evidence of effective control by a person other than the trustee is not sufficient to prove a sham, but is admissible to establish that a trust is a sham if it indicates that it was not intended at the outset that the trust take effect according to its terms.</u>

5-022    For a transaction to be genuine, it is sufficient that the parties intended it to be given effect in the form in which it is recorded, and the courts will not inquire into their motives for so intending. As **Knox J** stated in **Chase Manhattan Equities Ltd v Goodman**,[11] 'impropriety of motive alone will not provide grounds for treating a transaction as a sham'; and **Megarry J** in **Miles v Bull**[12] stated that 'a transaction is no sham merely because it is carried out with a particular purpose or object. If what is done is genuinely done, it does not remain undone merely because there was an ulterior purpose in doing it.'

5-023    The general rule is that, for a transaction to be a sham, <u>all the parties to it must share the necessary intent</u> …

…

5-028    The effect of a trust being held to be ineffective as a sham is that third parties can treat the trust property as still belonging to the settlor or the settlor's estate. Third parties who wish to do so might include the settlor's creditors, such as revenue authorities or a trustee in bankruptcy, an estranged spouse or civil partner, or legatees, next of kin, creditors or others who might be interested in the estate of a settlor who has died. As the court will necessarily have made a finding of intentional deceit, it is justified in taking the exceptional step of determining the legal effect of the purported trust instrument on the basis of the parties' subjective intentions, including by reference to extrinsic material, as opposed to the objective meaning of the document. Where the facts justify such a conclusion, therefore, it would seem that the subjective intention to which the court may give effect is that the

---

[11] [1991] B.C.L.C. 897 at 921i.
[12] [1969] 1 Q.B. 258 at 264.

legal effect of the document is a gift to others or a trust for others, rather than (as will usually be the case) that of the property remaining vested in the settlor, or that the terms of the trust are different from those contained in the document…

…

5-031        … [Subject to certain exceptions],  a settlor's failure to part with the beneficial interest in the trust property, and trusts which purport to be lifetime trusts but are testamentary in character, and so long as the trusts are intended to take effect according to their terms, the retention of large powers or weighty influence by a settlor does not itself make <u>the trusts void as a sham</u>

…

5-032        <u>The retention by the settlor of extensive powers or interests may mean that economically the settlor is in a similar position to an absolute owner</u> …

…

…

**Reservation by settlor of powers tantamount to ownership**

5-035B      Particular difficulty arises where the settlor reserves powers which are tantamount to ownership, for example a general power of appointment or a power of revocation, which enable the settlor to make himself absolute owner of the property subject to the power, without regard to the interests of anyone other than the settlor or any fetters on the exercise of the power, by the exercise of the powers at any time from the purported creation of the trust until the power expires. Three cases decided by the Privy Council and New Zealand's highest court [*viz.*, **Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co. (Cayman) Ltd**[13], **Clayton v Clayton (No.1)**[14]**, Webb v Webb**[15]**]** are of considerable importance to the effect of reservation of such powers."

(Underlined emphasis supplied).

[13] [2011] UKPC 17, [2012] 1 W.L.R. 1721.
[14] [2016] NZSC 29, 19 I.T.E.L.R. 406.
[15] [2020] UKPC 22, [2020] W.T.L.R. 1461.

22

[40]    Referring to those three cases in para. 5-035B, above, **Lewin on Trusts** goes on to state, at para. 5-035C:

> "The following questions arise:
>
> (1)    Do settlor reserved powers need to be tantamount to ownership so as to be capable of preventing the settlor from parting with the beneficial interest in the trust property
>
> (2)    What settlor reserved powers are tantamount to ownership?
>
> (3)    Are settlor-reserved powers tantamount to ownership in themselves sufficient to prevent the settlor from parting with the beneficial interest in the trust property?
>
> (4)    What is the position where settlor reserved powers tantamount to ownership are not operative at the time of constitution of trust or terminate during the settlor's lifetime and before the end of the trust period?"

[41]    For the purpose of determining the intention of the relevant parties in this context, i.e., the intention of Dr Orjiako and (where appropriate) Mrs Ojiako, the courts, exceptionally, take a subjective rather than an objective view of such intention. As Arden LJ (as she then was) observed in **Hitch v Stone**:[16]

> " … [a]s the passage from **Snook** makes clear, the test of intention is subjective. The parties must have intended to create different rights and obligations from those appearing from (say) the relevant document, and in addition they must have intended to give a false impression of those rights and obligations to third parties."

[42]    However, although the Court will consider the subjective intention of the parties to the purported transaction in determining the true intention of the parties in entering into the transaction, it will do so by reference to an objective evaluation of the material (including any written evidence) presented to it.

[43]    The passages cited from the above practitioner works primarily deal with "express" trusts, where a trust declared by a settlor does not amount to the

---

[16] [2001] S.T.C. 214, at [66].

23

<span style="color:red">277</span>

creation of a valid trust but rather to the continued retention by the settlor of the subject-matter of the trust. However, the principles are equally applicable where, as here, a party alleges that a purported gift made by the donor to the donee did no more than transfer the legal estate (but not the beneficial interest) in the property, which forms the subject-matter of the purported gift, to the donee.

[44]    The above passages also encapsulate the principles that each party sought to derive from the several cases referred to at the SJ Hearing. Those cases do not, therefore, require any further detailed analysis, though I will refer to some of them in the course of this Judgment.

[45]    I have not seen the underlying instruments for the Share Transfers, or, at the very least, if they were included in the SJ Hearing bundle, I have not been taken through them.[17] I do not believe it to be suggested by the Claimant that those instruments may provide support or further support for the Claimant's premise that the Share Transfers were a sham. I must, therefore, proceed on the basis that, other than the Claimant being able to establish that the Share Transfers were a sham on this Application, the underlying documents that effected the transfer must, considered on their own, have been sufficient to transfer both the legal title and equitable interest in the Shares to Mrs Orjiako.

[46]    Finally, the burden of proof and the standard of proof should be briefly mentioned.

[47]    The burden of proving the facts and matters upon which the Claimant relies under this ground is upon it.

[48]    Although the primary burden of proving a fact in a claim will invariably lie with the party asserting that fact, there may be situations where the onus of proving certain facts and matters on which reliance is placed by a party will lie upon that party. As the authors of **Halsbury's Laws of England** state:[18]

_____

[17] The SJ Bundles contain various resolutions approving share transfers and allotments but not the underlying documents themselves.
[18] See Halsbury's Laws of England, 5th Edition, Reissue, Civil Procedure, Volume 12, 2020, paras. 699 and 700.

278

"The evidential burden (or the burden of adducing evidence) will rest initially upon the party bearing the legal burden. However, rather than referring to a shifting burden, it may be more accurate to say that it is the need to respond to the other party's case that changes as the trial progresses according to the balance of evidence given by each party at any particular stage. If the party bearing the legal burden fails to adduce evidence, he has failed to discharge his burden and there will be no need for the other party to respond; however, if the party bearing the legal burden brings evidence tending to prove his claim, the other party may in response wish to raise an issue and must then bear the burden of adducing evidence in respect of all material facts ... Where there is a rebuttable presumption of law in favour of one party, the burden of rebutting it lies upon the other. Therefore, a party suing on a bill of exchange need not initially give any evidence of consideration, or that he is a holder in due course, since there are presumptions to this effect in his favour. Similarly, a presumption of death may assist a party. In negligence claims, a claimant may be able to rely upon the doctrine of *res ipsa loquitur* to introduce a presumption of fact, or in claims where it is relevant to any issue that a person did or did not commit a criminal offence, previous convictions may be pleaded. Where the truth of a party's allegation lies peculiarly within the knowledge of his opponent, the burden of disproving it often lies upon the latter, but there is no general rule of law to this effect. There is authority contrary to this exception, but it certainly exists and has frequently been applied by the courts. This is particularly the case in magistrates' courts and in criminal proceedings based on statute, and in some employers' liability situations. In civil cases, the incidence of the burden of proof may be determined by agreement between the parties, so far as not prohibited by statute."

[49]     The substance of this point has been acknowledged in SJ cases. In **Quid Novi Ltd and another v Innvotec Ltd and others**,[19] Lewison J (as the then was observed):

" ... the power to order summary judgment under **CPR 24.2** is discretionary and also that I should not enter judgment unless there is no other compelling reason why the case or issue should be disposed of at a trial. Having reached the conclusion that there is no defence to the allegations of copyright infringement, it seems to me that it must be for the Defendant resisting judgment to point to the compelling reasons why there should be a trial."

---

[19] [2006] EWHC 370 (Pat), at [17].

25

279

[50]   There have been numerous cases of the type that have arisen in this Claim, where this principle has been confirmed. Examples include the **Law Society v Southall**,[20] **AC v DC and Others (Financial Remedy: Effect of s 37 Avoidance Order)**[21] and **Erste Group Bank AG v JSC 'VMZ Red October' and Others**.[22]

[51]   In **Erste Group Bank AG**, Flaux J (as he then was) observed: [23]

> "Where a party seeks to establish the existence of a matter that will assist him in persuading the court to exercise its discretion in his favour, the evidential burden in respect of that matter will rest upon the party asserting it."

[52]   This point is crucial in the present case. That is because the Claimant says that the written evidence adduced on the Application demonstrates that there is no substance whatsoever in the matters upon which the Defendants rely to defend the Claim on this ground. In other words, there is simply no material in the possession of the Defendants (and none likely to be available in the future) that would provide an answer to the Claim if unconditional leave to defend the Claim were granted to the Defendants.

[53]   It has long been established that where the case against a defendant is clear on the papers, the court will not grant him leave to defend if his position will not be improved at trial, whether by disclosure, oral evidence or otherwise. Accordingly, the defendant must condescend upon sufficient particulars of his case, in his written evidence in opposition to an application for SJ, to demonstrate that the Court is likely to accept the veracity of that evidence and any oral evidence supporting it.

[54]   In the context of the type of claim involved in these Proceedings, the above approach of the court has been confirmed in several cases. An example is

---

[20] [2001] BPIR 2023, at [33], per Hart J, reversed on other grounds: see [2001] EWCA Civ 2001.
[21] [2012] EWHC 2023 (Fam), Mostyn J, applying his own decision in Kremen v Agrest and Fishman [2010] EWHC 2571 (Fam), [2011] 2 FLR 478.
[22] [2013] EWHC 2926 (Comm).
[23] [2013] EWHC 2926 (Comm), at [16(iv)].

280

**Williams (Trustee in Bankruptcy of Taylor) v Taylor and Raines**.[24] In that case, Lloyd LJ, with whom Rafferty and Ward LJJ, agreed, said:

> "Mr Davies QC [counsel for the appellant-trustee in bankruptcy] criticised the judge for starting with his assessment of the position as regards the contentious aspects of the evidence of Mr Taylor and Dr Raines [i.e., the respondents to the **s. 423** claim]. He argued that the judge should have started with the contemporary and objective indicators, which were so clear and powerful as to shift the evidential burden to the respondents, and that only then, and from that standpoint, should he have considered the disputed aspects of the evidence. By proceeding in that way, it was said, he would have been addressing the evidence of Mr Taylor and Dr Raines in the correct context, namely that of the powerful inference which they needed to rebut, and he would have done so with a proper analysis or explanation, if he could, of why (a) he accepted their evidence; and (b) on that basis he held that the statutory purpose was not the purpose, or one of the purposes, of Mr Taylor in entering into the transaction.
>
> I accept Mr Davies QC's point that the objective factors in the case did shift the evidential burden, in the sense that if there had been no evidence in answer to that of the trustee in bankruptcy based on the documents and the objective contemporary circumstances, it would have been a legitimate inference that the statutory purpose was at least a substantial purpose of Mr Taylor in entering into the transaction."

[55]    In **Williams**, the Court of Appeal upheld the decision of the first instance judge who had found that the respondents had adduced sufficient evidence and, therefore, the question was "not to be analysed in the absence of such evidence; it comes to a question of the judge's treatment and assessment of that evidence in that context[25]." In the present case, the Claimant argues that the Orjiakos have simply not adduced sufficient evidence in response to the allegations made against them (other than their own denial of the allegations) to suggest that the case advanced by them will be improved at trial if they were to be questioned on what they have said in their written evidence.

[56]    The standard of proof in both the situations referred to above is the usual civil standard of proof – the balance of probabilities. There is no heightened standard of proof simply because the allegations made by the Claimant involve

---

[24] [2012] EWCA Civ 1443, at [20] and [21].
[25] *Ibid.*, at [21].

dishonesty on the part of both Dr Orjiako and Mrs Orjiako: see the decision of the House of Lords in **Re B**[26] and that of the UK Supreme Court in **Re S-B**.[27] However, where an allegation of serious impropriety is made, the court will require cogent evidence before it can be satisfied that the allegation is substantiated.

Ground 2

[57]    If, contrary to the Claimant's primary claim, the beneficial ownership in the Shares has passed to Dr Orjiako, the Claimant seeks a declaration that the Share Transfers were made with the intent on the part of Dr Orjiako to defraud his creditors (including the Original Lenders), contrary to the provisions of 81 of the **Conveyancing and Law of Property Act 1961** ("the CLPA 1961").

[58]    Section 81 of the **CLPA 1961** is in the following terms:

> "(1)    Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Ordinance, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced.
>
> (2)    This section does not affect the operation of a disentailing assurance, or the law of bankruptcy for the time being in force.
>
> (3)    This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith or upon good consideration and in good faith to any person not having at the time of conveyance, notice of the intent to defraud creditors."

[59]    This provision replicates the now-repealed provisions of s. 172 of the **Law of Property Act 1925** ("**LPA 1925**"). Section 172 was repealed and replaced in England and Wales by s. 423 of the **Insolvency Act 1986** ("**IA 1986**", as it applies in England and Wales. However, no similar repeal and replacement of s. 81 of the **CLPA 1961** have taken place in this jurisdiction.

---

[26] [2008] UKHL 35.
[27] [2009] UKSC 17.

28

282

[60]    In **Cadogan v Cadogan**,[28] at first instance, Slade J (as he then was) stated that:

> " … if a person is to apply successfully to set aside a conveyance under **section 172**, he has, according to its terms, to prove two matters: (1) that it was made 'with intent to defraud creditors,' within the meaning of the statute; and (2) that the application is being made by a 'person thereby prejudiced,' within the meaning of the statute. A plaintiff seeking to prove the first of these two matters does not necessarily have to prove that the conveyance was made with intent to defraud him personally; it suffices if he proves that the conveyance was made with intent to defraud creditors of the disponer, whether or not he was one of those creditors. This is shown by the fact that according to the authorities, even a creditor whose debt has been incurred after the conveyance is given the right to impeach a conveyance made with the relevant intent."

[61]    There is some debate about whether the authorities on s. 172 of the **LPA 1925** support the premise that under s. 172, "intent to defraud" may automatically be presumed from the facts and circumstances that arise from a debtor's conduct in entering into a transaction that makes his assets unavailable to his creditors. Cases which support this premise include **Re Eichholz**[29] and **Lloyds Bank Ltd v Marcan**,[30] at first instance.

[62]    In **Re Eichholz**,[31] Harman J (as he then was) observed:

> "There is no doubt that the Statute of Elizabeth was available after a man's death to his creditors to recover from a volunteer property of whatever kind … It was not necessary to prove a fraudulent intent. The mere fact of insolvency was enough: see Lord Hatherley's judgment in **Freeman v Pope**[32] **...** In my judgment, all this continues to be good law under **section 172 of the Law of Property Act**."

[63]    Likewise, in **Lloyds Bank Ltd v Marcan**,[33] at first instance, Sir John Pennycuick V-C stated:

> "The word 'intent' denotes a state of mind. A man's intention is a question of fact. Actual intent may unquestionably be proved by direct

---

28 [1977] 1 W.L.R. 1041. The Court of Appeal reversed the decision of Slade J on different grounds.
29 [1959] Ch. 708 at 722-724.
30 [1973] 1 W.L.R. 339 at 344H.
31 [1959] Ch. 708 at 722-724.
32 (1870) LR 5 Ch. App 538.
33 [1973] 1 W.L.R. 339 at 344H.

283

> evidence or may be inferred from surrounding circumstances. Intent may also be imputed on the basis that a man must be presumed to intend the natural consequences of his own act: see the judgment of **Lord Hatherley LC** and **Giffard LJ** in **Freeman v Pope** ... I would mention that today this imputation might well be considered applicable where there has been a valuable consideration short of full consideration. I do not, however, propose to pursue that point for this reason. In the present case there is evidence of actual intention. That, of course, is by no means always so in cases under this section. Where there is evidence of actual intention, in the nature of things there is very little room for imputing intention. I do not, therefore, propose to pursue the difficult questions which arise as to the circumstances in which intention may be imputed."

[64]   The cases that suggest that the claimant needs to demonstrate subjective intent on the part of the debtor include the various authorities set out in Mr Weekes' skeleton argument.

[65]   The debate about what needs to be proved by a claimant seeking to establish an intent to defraud under s. 172 of the **LPA 1925** (and, by analogy, s. 81 of the **CLPA 1961**) was considered by the Court of Appeal, in **Lloyds Bank Ltd v Marcan**.[34] Cairns LJ stated that what the claimant had to prove was dishonest intention, i.e., that the debtor was guilty of subjective dishonesty in putting the asset in question out of the reach of his creditors:

> " ... under section **172 of the Law of Property Act 1925** it is clear from the words of the enactment that fraud has to be established before a transaction can be avoided. In my opinion, fraud involves dishonesty and I cannot go with **Pennycuick V-C** [the first instance judge] in his observation that the word 'defraud' in section 172 'is not intended to be confined to cases of fraud in the ordinary modern sense of that word, i.e., as involving actual deceit or dishonesty.' It is clear enough that deceit is not a necessary element, but in my view dishonest intention is, at any rate when the conveyance is for consideration ... [referring to several cases that purportedly decide that this is so]
> Other cases make it clear that if the conveyance is voluntary it is easier to infer a dishonest intention than when it is made for consideration or even that no dishonest intention need then be established: see **Freeman v Pope**[35], **Ideal Bedding Co. Ltd. v Holland**[36]**, in Re Eichholz, decd**[37]. It does, however, appear that a conveyance for good

---

[34] [1973] 1 W.L.R. 1387 at 1392.
[35] (1870) 5 Ch. App. 538.
[36] [1907] 2 Ch. 157.
[37] [1959] 1 Ch. 708.

284

consideration will be regarded as fraudulent if made with the deliberate intention of hindering creditors and for the benefit of the debtor himself rather than as a bona fide family arrangement or an arrangement which merely prefers one set of creditors to another set. To that effect was **in Re Fasey**[38]**,** decided by a very strong Court of Appeal (**Lord Sterndale M.R., Warrington and Atkin LJJ**)."

[66]    Russell LJ, however, took a different view. He stated that:[39]

"The [first instance] judge [**Pennycuick V-C**] found that Mr. Marcan 'intended to deprive the bank of recourse to the property charged … and that such an intention is an intention to defraud the bank within the meaning of section 172.' This, it was argued, would deprive the section of any content of fraud in any sense, having regard to the express finding that, since Mr Marcan did not know that the value of the property would be less without vacant possession, 'the element of depreciation by the mere grant of a lease cannot … be material in determining Mr. Marcan's intention. Moreover, it was argued that a passage in the judgment below … indicated that **Pennycuick V-C** considered that perfectly innocent hindrance or delay to a creditor could come within **section 172**, notwithstanding the liberal content of the **Statute 13 Eliz. I, c. 5** [the forebear of **s. 172**], of words indicating dishonesty and fraud …

I am not sure what is meant by a perfectly innocent defeat, hindrance or delay. It must be remembered that in every case under this section the debtor has done something which in law he has power and is entitled to do: otherwise it would never reach the section. If he disposes of an asset which would be available to his creditors with the intention of prejudicing them by putting it, or its worth, beyond their reach, he is in the ordinary case acting in a fashion not honest in the context of the relationship of debtor and creditor. And in cases of voluntary disposition that intention may be inferred."

[67]    Goulding J, who sat as an additional judge of the Court of Appeal in **Marcan**, "approved" both judgments, without deciding whether he agreed with the observations of Cairns LJ or Russell LJ.

[68]    Subsequent cases have not specifically decided which of the views in **Marcan** is correct or to be preferred: see, for example, **Emirates NBD Bank PJSC v Almakhawi**.[40] That is presumably because s. 172, which was replaced in

---

[38] [1923] 2 Ch. 1.
[39] [1973] 1 W.L.R. 1387 at 1390.
[40] [2023] EWHC 1113 (Comm).

285

England and Wales by s. 423 of the **IA 1986**, is now largely otiose as s. 423 confers on a creditor, or where the debtor has entered into bankruptcy, administration, or liquidation, an office-holder, a much broader power to challenge transactions that a debtor has entered into to put assets beyond the reach of his creditors.

[69]    I do not need to choose which of the views expressed in **Marcan** is correct. As this is an application for SJ, I must proceed on the basis that the Claimant must establish intention in the manner suggested on behalf of Defendants, i.e., that it cannot be inferred from the mere fact that Dr Orjiako transferred the Shares out of the love and affection he had for his wife.

[70]    Two further points are necessary for me to mention.

[71]    First, there is some authority to suggest that a causal connection must exist between the prejudice to the applicant and the transfer: see **Cadogan v Cadogan**,[41] though in the context of s. 423 of the **IA 1986**, it has been said that such a causal connection is not required: see **Emirates NBD Bank PJSC v Almakhawi**,[42] in which Edwin Johnson J said[43]:

> "So far as **subsection (3)** [of **s. 423**] is concerned, it is clear that what matters is whether the statutory purpose, that is to say the required subjective intention of the transferor, exists. If it does, there is no requirement to show a causative link between that intention and the result of the relevant transaction. Equally, the victim may be a person who has only a contingent claim or a future claim. Such a person, and the nature of the claim of such person may even be unknown. The argument that a claim can only be a claim for the purposes of **s 423** if it can be shown to have a realistic prospect of success, both in terms of outcome and enforcement, seems to me to be inconsistent with the nature of the jurisdiction under **s 423**, as established by the case law to which I have been referred."

[72]    In any event, even if some sort of causal connection is required between the prejudice and the transfer under s. 81 of the **CLPA 1961**, the court will readily

---

[41] [1977] 1 W.L.R. 1041.
[42] [2023] EWHC 1113 (Comm).
[43] [2023] EWHC 1113 (Comm), at [139].

32

286

be willing to find that this requirement is met. As Robert Goff LJ (as he then was) observed in **Cadogan**:[44]

> " ... it does not seem to me that the bare fact that the damage suffered is not that intended can be sufficient to prevent relief being granted. There must, of course, be some causal connection between the fraud and the damage, but I think the court should not be too astute to divorce the two."

[73]    Mr Weekes states, at para. 7(b) of his skeleton argument, that the "claim in respect of the 22 May 2017 Share Transfers fails, in any event, for want of causation." He maintains that "[t]he shares that were transferred to Mrs Orjiako were of negligible value and Dr Orjiako believed that to be (as it was) the case. In those circumstances, the transfers cannot have caused prejudice to any creditor, nor, by the same token, can he have had any intent to defraud."

[74]    I respectfully disagree with him. It does not seem to me that the value of an asset that is transferred in breach of s. 81 of the **CLPA 1961** demonstrates any lack of causation. Neither on an application for SJ nor even at trial will the court usually enquire into the value of an asset to assess whether the requirement of causation is made out. The value of an asset will, of course, be taken into account by the court in determining the subjective intention of the debtor. However, to look into the question of its value for the purpose of deciding causation would not only be inconsistent with the observations made by Robert Goff LJ, but would make it necessary for the court to have to enquire in every case what the value of the asset was and whether it was so negligible that even if intent could be proved, causation could not. That is simply not what the authorities say. In addition, in most cases, the whole basis of a claimant's claim under s. 81 of the **CLPA 1961** is that the impugned transaction was entered into for no consideration or at an undervalue.

[75]    The second point relates to the burden of proof and the standard of proof.

---

44 [1977] 1 W.L.R. 1041 at 1062.

[76]    As already stated above under Ground 1, it is for the Claimant to prove that the requirements of s. 81 of the **CLPA 1961** are met, though the evidential burden may shift to Dr Orjiako where he seeks to make good any assertions to challenge any of the allegations made against him that the Claimant has established against him: see the observations of Lewison J in **Quid Novi Ltd**, above.

**The principles governing the application for SJ**

[77]    Part 15 of **ECSC CPR** sets out the provisions relating to the grant of summary judgment.

.

[78]    The relevant provisions of Part 15 are in the following terms:

> "15.2    The court may give summary judgment on the claim or on a particular issue if it considers that the:
>
> > (a) claimant has no real prospect of succeeding on the claim or the issue; or
> >
> > (b) defendant has no real prospect of successfully defending the claim or the issue …
>
> 15.3    The court may give summary judgment in any type of proceedings except:
>
> > (a)    admiralty proceedings in rem;
> >
> > (b)    probate proceedings;
> >
> > (c)    proceedings by way of fixed date claim;
> >
> > (d)    [various other proceedings not relevant for present purposes]
>
> …
>
> 15.5    (1)  An applicant seeking summary judgment must:
>
> > (a) …

34

(b)     file evidence on affidavit in support of the application; and

(c)     serve copies of the application and the affidavit evidence on each party against whom summary judgment is sought, not less than 14 days before the date fixed for hearing the application.

(2)  A respondent who wishes to oppose an application for summary judgment may:

(a)     file evidence on affidavit; and

(b)     serve copies of the affidavit evidence on the applicant and any other respondent to the application not less than 7 days before the date fixed for the summary judgment hearing…

…

15.6    (1)  The court may give summary judgment on any issue of fact or law, whether or not the judgment will bring the proceedings to an end …

…"

[79]    Part 15 of the **ECSC CPR** is broadly similar to the rather more detailed and elaborate provisions of Part 24 of the **CPR of England and Wales** ("**the E&W CPR**"). For the purposes of this Claim, the differences between the two provisions are largely immaterial.

[80]    **ECSC CPR** 15.3 does not expressly or impliedly exclude the availability of summary judgment in a claim which is based on fraud. This reflects the equivalent position under Part 24 of the **E&W CPR**. However, under the original version of the former **Rules of the Supreme Court** of England and Wales, the forebear of the **CPR**, summary judgment could not be obtained in cases based on fraud[45], though the position was changed with effect from 1 June 1992 by the **Rules of the Supreme Court (Amendment) 1992**.[46]

---

[45] See RSC Order 14, r. 1(2)(b).
[46] SI(E&W)1992/638.

[81]    I do not need to set out a detailed exposition of the principles that govern applications for SJ. Most leading works on civil procedure contain excellent summaries of those principles. In addition, a helpful summary of the principles is provided by Lewison J (as he then was) in **Easyair Ltd v Opal Telecom Ltd**,[47] as approved by the English and Welsh Court of Appeal in **Ward (AC) & Son Ltd v Catlin (Five) Ltd**.[48]

> "The correct approach on applications by defendants is, in my judgment, as follows:
>
> i)      The court must consider whether the claimant has a 'realistic' as opposed to a 'fanciful prospect of success: **Swain v Hillman**[49];
>
> ii)     A 'realistic' claim is one that carries some degree of conviction. This means a claim that is more than merely arguable: **ED & F Man Liquid Products Ltd v Patel**[50];
>
> iii)     In reaching its conclusion the court must not conduct a 'mini-trial: **Swain v Hillman**;
>
> iv)     This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: **ED & F Man Liquid Products Ltd v Patel**[51];
>
> v)      However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: **Royal Brompton Hospital NHS Trust v Hammond (No 5)**[52];
>
> vi)     Although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than

---

[47] [2009] EWHC 339 (Ch), at [15].
[48] [2009] EWCA Civ 1098, [2010] Lloyd's Rep IR 301, at [24], per Etherton LJ (as he then was).
[49] [2001] 1 All. E.R. 91.
[50] [2003] EWCA Civ 472, at [8], per Potter LJ.
[51] [2003] EWCA Civ 472, at [10], per Potter LJ.
[52] [2001] EWCA Civ 550.

36

is possible or permissible on summary judgment. Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: **Doncaster Pharmaceuticals Group v The Bolton Pharmaceutical Company**[53];

vii)  On the other hand it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it. The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim or successfully defending the claim against him, as the case may be. Similarly, if the applicant's case is bad in law, the sooner that is determined, the better. If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success. However, it is not enough simply to argue that the case should be allowed to go to trial because something may turn up which would have a bearing on the question of construction: ICI Chemicals & Polymers Ltd v TTE Training Ltd[54]."

[82]  For the purposes of determining this Application, it is sufficient to outline the main principles governing the making of an application for SJ that apply, derived from the above and other cases.

[83]  The power to grant summary judgment is discretionary, meaning that the choice of whether to exercise this power lies within the jurisdiction of the court. An application under **ECSC** Part 15 requires the court to undertake an exercise of judgment. It must assess the prospects of success of the relevant party and

---

[53] [2006] EWCA Civ 661.
[54] [2007] EWCA Civ 725.