# Appendix 2

# Part 2

decide whether to exercise the power to decide the case without a trial. As to the meaning of "no real prospect", in **Swain v Hillman**,[55] Lord Woolf MR said:[56]

> "The words 'no real prospect of being successful or succeeding' do not need any amplification; they speak for themselves. The word 'real' distinguishes fanciful prospects of success or, as [counsel] submits, they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success."

[84]    As noted above, the overall burden of proving the requirements for the grant of SJ lies on the applicant to the application for SJ: see, for example, **ED & F Man Liquid Products Ltd v Patel**.[57] However, as also noted above, where the underlying allegations are demonstrated to the court's satisfaction on a SJ application, the evidential burden of establishing a real prospect of success, based on the matters relied upon by the respondent in their opposition to the claim, may shift to him.  As Lewison J stated in **Easyair**, above[58]:

> "In reaching its conclusion the court must not conduct a "mini-trial": **Swain v Hillman**. … This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: **ED & F Man Liquid Products v Patel at [10]** … However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: **Royal Brompton Hospital NHS Trust v Hammond (No 5)**[59] …"

[85]    SJ may be entered by the court in favour of an applicant even if the allegations upon which he relies against the respondent are based on fraud or fraudulent conduct. As Cockerill J sated in **Foglia v Family Office**:[60]

---

[55] [2001] 1 All. E.R. 91.

[56] *Ibid*., at 92, cited with approval in the House of Lords in Three Rivers District Council v Governor and Company of the Bank of England (No 3) [2003] 2 AC 1, and endorsed in various BVI cases, such as Comodo Holdings Ltd v Renaissance Ventures Ltd BVIHCMAP2014/0032) (Judgment, 3 May 2016). at [93], per Blenman JA.

[57] [2003] EWCA Civ 472, at [9], per Potter LJ.

[58] [2009] EWHC 339 (Ch), at [15].

[59]  [2001] EWCA Civ 550.

[60] [2021] EWHC 650 (Comm).

"13. This, of course, is a somewhat unusual application – an application for summary judgment in a fraud claim on the merits. As to this, the authorities (perhaps unsurprisingly) say that there is no bar to granting such an application, but that very considerable caution is required.

14. Thus, subject to being satisfied that the test in CPR 24.2 is met, there is no impediment to the Court granting summary judgment where dishonesty is alleged....

15. As to caution, reference was made to the judgment of **Mummery LJ** at [4]-[18] of his judgment in **Doncaster Pharmaceuticals Group v The Bolton Pharmaceutical Company**[61]... and in particular:

'[5] .... The decision-maker at trial will usually have a better grasp of the case as a whole, because of the added benefits of hearing the evidence tested, of receiving more developed submissions and of having more time in which to digest and reflect on the materials....

[17] It is well settled by the authorities that the Court should exercise caution in granting summary judgment in certain kinds of case. The classic instance is where there are conflicts of fact on relevant issues, which have to be resolved before a judgment can be given ... A mini-trial on the facts conducted under CPR Part 24 without having gone through normal pre-trial procedures must be avoided, as it runs a real risk of producing summary injustice.

[18] <u>In my judgment, the Court should also hesitate about making a final decision without a trial where, even though there is no obvious conflict of fact at the time of the application, reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case</u>'."

(Emphasis supplied).

[86] In **King v Steifel**,[62] the same Judge said:

"The authorities therefore make clear that in the context of summary judgment the court is by no means barred from evaluating the evidence, and concluding that on the evidence there is no real (as opposed to fanciful) prospect of success. It will of course be cautious in doing so. It will bear in mind the clarity of the evidence available and the potential

---

[61] [2006] EWCA Civ 661, at [5], [17]-18].

[62] [2021] EWHC 1045 (Comm), at [21]-[22] and [24].

> for other evidence to be available at trial which is likely to bear on the issues. It will avoid conducting a mini-trial. But there will be cases where the Court will be entitled to draw a line and say that – even bearing well in mind all of those points – it would be contrary to principle for a case to proceed to trial.
>
> So, when faced with a summary judgment application it is not enough to say, with Mr Micawber, that something may turn up…
>
> The reality is that while the court will be very cautious about granting summary judgment in fraud cases, it will do so in suitable circumstances, and there are numerous cases of the court doing so. This is particularly the case where there is a point of law; but summary judgment may be granted in a fraud case even on the facts."
>
> (Emphasis supplied).

[87] The observations of Cockerill J make it clear that it will usually not be appropriate for an application for SJ to be made where the applicant relies upon allegations of fraud against the respondent. There is a good reason for this: given the now well-established test for dishonesty and the requirement for evidence to support such an allegation to be cogent, the applicant will usually have an uphill task of doing so even at trial, let alone on a summary basis. It is no surprise, therefore, that several English cases, as well as some BVI cases, caution against the use of the SJ procedure in fraud cases.

[88] In **Three Rivers District Council v Governor and Company of the Bank of England**,[63] Lord Hope said:

> "… The method by which issues of fact are tried in our courts is well settled. After the normal processes of discovery and interrogatories have been completed, the parties are allowed to lead their evidence so that the trial judge can determine where the truth lies in the light of that evidence. To that rule there are some well-recognised exceptions. For example, it may be clear as a matter of law at the outset that even if a party were to succeed in proving all the facts that he offers to prove he will not be entitled to the remedy that he seeks. In that event a trial of the facts would be a waste of time and money, and it is proper that the action should be taken out of court as soon as possible. In other cases, it may be possible to say with confidence before trial that the factual basis for the claim is fanciful because it is entirely without substance. It may be clear beyond question that the statement of facts is contradicted by all the documents or other material on which it is based. The simpler

[63] [2001] UKHL 16, at [95].

the case the easier it is likely to be take that view and resort to what is properly called summary judgment. But more complex cases are unlikely to be capable of being resolved in that way without conducting a mini-trial on the documents without discovery and without oral evidence. As **Lord Woolf MR** said in **Swain's** case, that is not the object of the rule. It is designed to deal with cases that are not fit for trial at all."

[89] In the same case, Lord Hobhouse made it clear that the criterion which the court applied for SJ was one of probability. It was based on the absence of reality. He stated[64]:

> "The court may exercise the power [to order SJ] where it considers that the 'claimant has no real prospect of succeeding on the claim' … The important words are 'no real prospect of succeeding'. It requires the judge to undertake an exercise of judgment. He must decide whether to exercise the power to decide the case without a trial and give a summary judgment. It is a 'discretionary' power, ie one where the choice whether to exercise the power lies within the jurisdiction of the judge. Secondly, he must carry out the necessary exercise of assessing the prospects of success of the relevant party. If he concludes that there is 'no real prospect', he may decide the case accordingly … . I stress this aspect because in the course of argument counsel referred to the relevant judgment of Clarke J as if he had made 'findings' of fact. He did not do so. … the judge is making an assessment not conducting a trial or fact-finding exercise. Whilst it must be remembered that the wood is composed of trees some of which may need to be looked at individually, it is the assessment of the whole that is called for. A measure of analysis may be necessary but the 'bottom line' is what ultimately matters… The criterion which the judge has to apply under CPR Pt 24 is not one of probability; it is absence of reality. The majority in the Court of Appeal used the phrases 'no realistic possibility' and distinguished between a practical possibility and 'what is fanciful or inconceivable' … Although used in a slightly different context these phrases appropriately express the same idea."

[90] These authorities make it clear that a respondent to a summary judgment application is not required to prove their case to a high standard. As Blenheim JA observed in **Comodo Holdings Ltd v Renaissance Ventures Ltd**,[65] "[i]t is the law that a respondent to a summary judgment application is not required to prove his case to a high standard. It will suffice to show that his case may

[64] [2001] UKHL 16, at [158].
[65] BVIHCMAP2014/0032) (Judgment, 3 May 2016), at [91].

succeed even though it is improbable. Authority for this proposition is found in **Swain v Hillman**; and **Three Rivers District Council v Bank of England**."

[91] More than one judge has cautioned against the use of the SJ procedure, except in the clearest cases. They include the cases set out in paras. 68-81 of Mr Weekes' skeleton argument. So far as those cases relate to the power of a court to strike out a statement of case under **ECSC CPR** 26.3(1)(b) (i.e., on the basis that it does not disclose any reasonable ground for bringing or defending a claim), that power is much narrower than the power of the court to grant SJ. The power to strike out under **CPR** 3.4 (the rough equivalent of **ECSC CPR** 26.3(1)(b)) is primarily restricted to whether a sufficient case for bringing (or defending) a claim is demonstrated on the face of a statement of case. As Lord Wilson JSC (with whom Baroness Hale, DPSC and Lords Clarke, Lord Hughes and Lord Hodge JSC agreed) observed in **Wyatt v Vince (Nos 1 and 2)**:[66]

> "'It is indeed common practice in civil proceedings to join an application to strike out under rule 3.4 with an application for summary judgment … But in **Swain v Hillman**, **Lord Woolf MR** … observed that the power under rule 24.2 … was wider than the power under rule 3.4 and that under the latter, unlike the former, the general focus of the court was only on the statement of case which was alleged to disclose no reasonable grounds for bringing the claim. Or, as my Lady, then **Hale J**, crisply put it three months later, 'the essence of a strike out is that one does not look at the evidence on the claim': **Bridgeman v McAlpine-Brown**."[67]

[92] The approach of the BVI courts to the granting of SJ reflects that of the courts of England and Wales. Webster JA set out the main principles in **Nam Tai Property Inc v West Ridge Investment Company Ltd**,[68] in the following terms:

> "4.1. Does the Defence and Counterclaim have a 'realistic' as opposed to a 'fanciful' prospect of success?
>
> 4.2. A claim is 'fanciful' if it is entirely without substance. A 'realistic' prospect of success carries some degree of conviction beyond being merely arguable.

[66] [2015] UKSC 14, [2015] 2 All. E.R. 755, [2015] 1 W.L.R. 1228, at [24].
[67] 19 January 2000, unreported; [2000] CA Transcript No 39, at p 4.
[68] BVIHCMAP2022/0046 (Judgment, 27 July 2023), at [20].

4.3. The object is to winnow out cases that are not fit for trial. The Court must avoid conducting a 'mini-trial' without disclosure and oral evidence. The Court should avoid being drawn into an attempt to resolve conflicts of fact. The Court should bear in mind what evidence can reasonably be expected to be available at trial.

4.4. The Court should be alive to the warning in **Easyair Ltd (t/a Openair) v Opal Telecom Ltd** that '[i]f it is possible to show by evidence that although material... is not currently before the Court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment ... .'

4.5. The Court must assume disputed questions of fact in favour of the party against whom the application is made ... The conclusion that a defence has no real prospect of success ought only to be reached in the clearest of cases, 'where it is clear that a [statement of case] on its face obviously cannot be sustained, or in some other way is an abuse of the process of the court.' This is a high bar."

[93] Webster JA went on to say:

> "I will follow this approach and would only add the following qualification from the judgment of Lewison Jin **Easyair Ltd (t/a Openair) v Opal Telecom Ltd** (following his reference to the court not conducting a mini trial at this stage) ... This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents ...This qualification is important because it is not every statement that a party, against whom summary judgment is sought, makes in its pleading or evidence that the court should assume in favour of that party. The court must carry out its own analysis to see if there is substance in the statement before assuming it in favour of the party making the statement."

[94] At para. 72 onwards of his skeleton argument, Mr Weekes refers to other propositions which he says are essential for the Court to bear in mind. These propositions are reflected in the numerous authorities cited by both counsel at the SJ Hearing. They can be summarised in a series of a few short points.

[95] First, it is well established that the remedy SJ should not be granted where the argument between the parties involves a substantial point of law which does not admit of a plain and obvious answer, or the law is in a state of development, or

where the strength of the case may not be clear because it has not been thoroughly investigated: see, by way of examples, **Citco Global Custody NV v. Y2K Finance Inc**[69] and **Didier v Royal Caribbean Cruises Ltd**.[70]

[96]     Mr Weekes rightly points out that the reason why it is not appropriate to strike out a claim or grant summary judgment in an area of developing jurisprudence is that, in such areas, decisions as to novel points of law should be based on actual findings of fact: see, for example, **Briefline Assets Ltd v. Falin**.[71] However, I cannot see that the Claim involves any new areas of law or any area of developing jurisprudence.

[97]     Second, it is trite that the summary judgment procedure is unsuitable for claims or issues which would necessitate the court embarking upon a "mini-trial" or resolving issues which ought to be properly tried. It was said in both **Comodo** and **Swain v Hillman** that the summary judgment procedure is, to quote Lord Woolf's words in **Swain**, "not meant to dispense with the need for a trial where there are issues which should be investigated at trial."

[98]     Mr Weekes makes the obvious point that the jurisdiction to strike out (or grant SJ) should be used sparingly since the exercise of the jurisdiction deprives a party of its right to a fair trial and its ability to strengthen its case through the process of disclosure and other court procedures, such as requests for information. It should also be taken into account that the examination and cross-examination of witnesses often change the complexion of a case: see, by way of example, **Farah v British Airways**,[72] applying the House of Lords' decision in **Barrett v Enfield Borough Council**.[73] Mr Weekes makes the following obvious points arising from these cases, at para. 77 of his skeleton argument:

> "a.     A statement of case is not suitable for striking out if it raises a serious live issue of fact which can only be properly determined by hearing oral evidence: see eg, **Peters v Spencer**[74] … The

---

[69] BVIHCVAP 2008/0022, Judgment, 19 October 2009.
[70] SLUHCVAP2014/0024, Judgment, 6 June 2016, at [25], [37], per Pereira CJ.
[71] BVI HC (COM) 2020/0223, Judgment, 15 February 2022, at [26], per Jack J.
[72] [2000] The Times, 26th January, E&W CA.
[73] [2001] 2 A.C. 550.
[74] HCVAP 2009/016, Judgment, 22 December 2009, at [19], per George-Creque JA.

same approach must necessarily apply to an application for summary judgment.

b.  Attempts to seek summary judgment in relation to disputed issues often fail even when the evidence appears very strong, because experience shows that a full investigation at a trial with witnesses occasionally undermines what appears pretty clearly to be the truth when relying on the documents alone. Accordingly, in practice it is only when the documentary evidence is effectively unanswerable that summary judgment can be justified: see, eg, **Gohil v. Gohil**.[75]

c.  There is also a principled reason behind this rule, namely that, at least where there is a bona fide dispute of fact on which oral testimony is available, a party is normally entitled to a trial where he and his witnesses can give evidence, and he can test the reliability of the other party and/or her witnesses by cross-examination."[76]

[99]  The above guidance about the inappropriateness of conducting a mini-trial has been confirmed in several other cases, i.e., other than **Comodo** and **Swain v Hillman**, including in two recent UK Supreme Court cases: see the observations of Lord Briggs JSC in the decision of the Supreme Court in **Lungowe and others v Vedanta Resources plc and another**[77] and Lord Hamblen JSC in the decision of the Supreme Court in **Okpabi v Royal Dutch Shell Plc**.[78]

[100]  Third, Mr Weekes states that certain categories or types of claim are (simply) not well-suited for determination by summary judgment. Claims grounded upon allegations of reprehensible conduct, including fraud or dishonesty, are ill-suited for determination by summary judgment as they are usually fact-sensitive claims, relying on complex facts and involving significant questions of law and fact for determination: see, by for example, **Amstel Investment Holdings Ltd v AMS Holdings Ltd**.[79] **In Comodo**,[80] Blenman JA said so as much, stating that SJ "will almost always be inappropriate where there are allegations of reprehensible conduct."

---

[75] [2015] UKSC 61, [2016] A.C. 849, at [49], per Lord Neuberger.

[76] *Ibid.*, at [50].

[77] [2019] UKSC 20, at [9].

[78] [2021] UKSC 3, at [21].

[79] BVIHCMAP2021/0016, Judgment, 8 November 2021, at [43], per Farara JA (Ag).

[80] BVIHCMAP2014/0032), Judgment, 3 May 2016, at [94].

[101]    As bare statements of law, the propositions advanced by Mr Weekes are entirely correct. However, what the Court must determine on this Application is whether the written evidence adduced in these Proceedings supports those propositions. For the reasons referred to below, in my judgment, it does not.

[102]    I am not sure that Dr Orjiako can derive any assistance from the observations of Lord Briggs in the decision of the Privy Council in **Gany Holdings (PTC) SA v Khan**,[81] referred to in para. 81 of Mr Weekes' skeleton argument. In that case, Lord Briggs was doing little more than restating the principles by which equity provides for the identification of beneficial interests arising from a gratuitous transfer of property. As the learned editors of **Underhill and Hayton, The Law relating to Trusts and Trustees**[82] observe:

> "[26.36]         Giving the advice of the **Privy Council in Gany Holdings (PTC) SA v Khan**, **Lord Briggs** restated the 'basic principles by which equity ... provides for identification of beneficial interests arising from a gratuitous transfer of property' in the following terms:
>
> > 'First, if either the transferor or the transferee makes a written (or oral) declaration as to those beneficial interests, or they do so together in an agreed form, that will generally be decisive, regardless of the subjective intentions of either of them. Secondly, and in default of any such declaration, the court looks for evidence from which a common intention as to beneficial ownership may be inferred. This may include evidence of statements made by either party before, at the time of or even after the relevant transfer, the parties' conduct, and the factual context in which the transfer takes place. Sometimes, a choice between possible conclusions as to beneficial interest may properly be arrived at by a process of elimination, whereby the most unlikely conclusions are first removed, leaving the least unlikely as the correct one. Finally, recourse may be had to time-honoured

---

[81] [2018] UKPC 21, at [17].
[82] 20th Edition, 2022, LexisNexis, Eds: His Honour Judge Paul Matthews *et al*, at paras [26.36] and [26.37], disregarding the footnotes in those paragraphs.

presumptions, such as the presumption of advancement or the presumed resulting trust, where there really is no evidence from which an inference as to common intention may properly be drawn. But these are, in modern times, a last resort, now that historic restrictions on the admissibility of evidence have been removed, and the forensic tools for the ascertainment and weighing of evidence are more readily available to the court.'

[26.37]     This restatement of the law is the latest signal from senior appellate courts that the use of presumptions has become less important to the resolution of cases where property has been gratuitously transferred to another or purchased in another's name. The reason, as Lord Briggs says in the foregoing passage, is that the courts' attitudes have changed regarding both the evidence which they are willing to consider when making factual findings about the intentions of a transferor or purchaser and the role played by such evidence in the resolution of cases. Nowadays there are very few cases where there is no evidence from which the courts can draw inferences about intention – and once they have done this, there is no need for, and in fact the law will not permit, a presumption to be made. Hence presumptions are only used as a "last resort" and when they are used, they cannot be rebutted by a party leading evidence establishing the transferor's or purchaser's intention because if any such evidence existed, there would *ex hypothesi* be no presumption that had to be rebutted."

[103]   There is no question that, in most cases, identifying the beneficial interests in an asset requires a highly fact-specific enquiry, and presumptions such as the presumption of a resulting trust or of advancement are of less importance now than they were. However, it is a fallacy to think that this means that every case where the beneficial interests in an asset are at stake must go to trial. It is not difficult to see why most disputes between alleged co-owners in cases involving the identification of beneficial interests in an asset will almost always require a trial. Where, as is almost invariably the case in such disputes, a party contends for a higher share in the asset than is provided to him or her by a document

setting out the parties' respective interests in it, or by legal presumptions, either based on what was allegedly orally agreed between them or by their conduct, it is difficult to see how the court could determine such disputes without hearing oral evidence.

[104] But that is not the position in a case such as this, where a claimant, at any rate, will have little to say about a party's interest in an asset other than from the document evidencing ownership of that asset or other contemporaneous documents (if any) setting out whether the party claiming the interest has behaved in a way which is inconsistent with what he contends for. In other words, the dispute between the Claimant and the Defendants does not involve the type of relationship which is nearly as close (and, often, intimate) as the relationship between parties that seek to maintain an interest over an asset or an interest that is greater than is provided to them by a document or by legal presumptions. It is not surprising that case law makes it clear that SJ is not suited for cases in the latter category. In the context of disputes between cohabiting parties, for example, a complex body of jurisprudence has developed in England and Wales regarding when a party may claim to be entitled to a greater interest than that specified in a document declaring their respective interests, or by legal presumptions.[83]

[105] There can be no universal or even general rule that an application for SJ in a case such as the present one is not appropriate. Applications for SJ are often brought under s. 423 of the **IA 1986**. An example is **The Law Society v Southall**,[84] in which Mrs S applied for SJ to strike out a claim brought by the Law Society under s. 423 of the **IA 1986**. Mrs S's late husband, a solicitor, had been investigated for serious accounting irregularities. The Law Society had incurred substantial costs in the course of that investigation and sought to claim those costs against the estate of S's late husband. During his lifetime, Mrs S's husband had transferred the matrimonial home and its contents to Mrs S. The Law Society contended that the gift of the house contents to Mrs S had not been perfected or, alternatively, that the gifts had been made with the intention of

[83] For a summary of the relevant principles, see Lewin on Trusts, para. 10-050 *et seq*.
[84] [2001] EWCA Civ 2001.

putting the assets outside the reach of creditors. Mrs S maintained that the gifts had been made for tax-planning purposes. Hart J dismissed Mrs S's application for SJ. However, the Court of Appeal allowed Mrs S's appeal, stating that the Judge had asked the wrong question in declining to grant Mrs S summary judgment. He should have asked whether the Law Society had had any real prospect of showing, in relation to the gifts that Mrs S had known, at the time he had made the gifts, that he was conducting in his business in a risky manner, from which it might be inferred that S intended to put his assets out of reach of potential creditors. There was no evidence to answer that question in a manner favourable to the Law Society. Accordingly, the Court of Appeal granted SJ in favour of Mrs S.

[106]   In **Southall**, SJ was granted against the claimant, i.e., the Law Society, in favour of the defendant, i.e., Mrs S. The position in these Proceedings is the reverse of the position that applied in that case. Nonetheless, the Court of Appeal was content to grant SJ to Mrs S. In allowing the appeal, Peter Gibson LJ (with whom Mantell LJ and Wall J (as he then was) agreed) observed:

> "[50]   Mr Collings [counsel for the Law Society] submitted that disclosure and cross-examination might come to the Law Society's aid. He drew attention to what he called an issue of fact as to whether or not Mr Southall ever ceased to live in Grimshaw Hall, and he suggested that Mrs [S's] credit as a witness might be undermined by being proven to be wrong on that point. In my judgment, it would be quite wrong to allow a case to go ahead on the basis that there was an issue which went to the credit of one of the witnesses. Mrs [S] … is the person most likely to know who was living in Grimshaw Hall and she has her children's evidence as well to support her.
>
> [51]   As for the suggestion that disclosure may produce valuable documents, I am unable to agree. This is not a case where the action is brought against S. He may well have had documents relating to his dealings with property companies and the like, but he has, unfortunately, died. There is no reason to believe that Mrs S would have any such documents. This is a case where the Law Society has intervened in Southall & Co and has had full access to all the practice's documents. In my judgment, it is wishful thinking on the Law Society's part that the pre-trial procedures, or cross-examination, would yield valuable support for its case."

[107] In proceedings of this type, neither the claimant nor any person acting on their behalf is likely to have first-hand knowledge of the matters that underpin the allegations upon which the claimant relies in obtaining the relief that he seeks. The statement of claim and the written evidence furnished in support of the application for SJ will contain facts and matters that the claimant has established through the enquiries he has made into the affairs of the defendants. However, the claimant will often seek to corroborate those facts with direct evidence from others. The enquiries made by the claimant may have been conducted in several different areas and may have involved obtaining information and documentation from multiple sources. It follows that the most that it would be possible for any written evidence he furnishes in support of the SJ application to do is to place before the court the facts which he has established from the enquiries which he has made and to draw to the attention both of the court and of the defendant those matters upon which he relies in support of his assertion that the allegations are made out. That does not mean that the primary burden of proving the facts and matters upon which the claimant relies shifts to the defendant. It remains with the claimant. However, the evidential burden would shift to the defendant, i.e., the defendant would have to explain why the underlying facts established by the claimant do not support SJ being granted against him.

[108] In addition to the matters mentioned by both counsel, I must mention the following additional matters about the approach of the Court to the Application.

[109] Unlike CPR 24.3 of the **E&W CPR**, there is no provision in Part 15 of the **ECSC CPR** which allows this Court to refuse to grant SJ if it finds that "there is no other compelling reason why the case or issue should be disposed of at a trial." This means that if the Court is satisfied that a party has no real prospect of succeeding on the claim, defence or issue in a claim, it cannot go on to consider whether the claim should go to trial anyway because there is a compelling reason for it to go to trial. In any event, even if such a provision existed in the **ECSC CPR** Part 15, there would simply be no basis for the Claim to be tried on that ground, based on the English and Welsh authorities on the subject: see **White Book, 2025 Edition**, para. 24.3.4.

[110] Mr Weekes is, of course, correct when he says that the Court can only grant SJ if the Claimant shows a clear and obvious case on the papers that the Orjiakos' case is simply untenable. However, having to demonstrate a clear and obvious case does not mean that this Court cannot, to quote Mr Thompson, "separate the wheat from the chaff". In other words, the Court will, and must, not determine the Application based on those parts of the written evidence only that support the Defendants' assertions and ignore those parts that undermine or provide an explanation for them. It has long been held in SJ cases that if an allegation or assertion does not hold up to the scrutiny of the court either because it is inherently inconsistent with the other evidence adduced in the proceedings or is weak and tenuous, the court will grant summary judgment: see, by way of examples, **National Westminster Bank Plc v Daniel and others**;[85] **ED & F Man Liquid Products Ltd v Patel**;[86] **Ostrich Farming Corp Ltd v Wallstreet LLC**;[87] **Ashworth v Newnote Ltd**;[88] **and Orange Personal Communications Services Ltd v Squires**.[89]

[111] The Claimant seeks declaratory relief against the Defendants, as opposed to an order for the Share Transfers to be set aside. I have considered whether that is the appropriate relief to grant if I were to accede to the Application. This type of declaratory relief is perfectly within the jurisdiction of this Court to grant. Indeed, **E&W CPR** 40.20, which (so far as I am aware) is not replicated in the **ECSC CPR**, makes it clear that declaratory relief may be granted even if a claimant does not apply for it. In the words of Lord Lane in **Imperial Tobacco Ltd v Attorney-General**,[90] "[a]nyone is in principle entitled to apply to the court for a declaration as to their rights unless statutorily prohibited expressly or by necessary implication." However, this principle is subject to the well-known exception that the court will not exercise its discretion to grant declaratory relief

[85] [1994] 1 All ER 156 (a pre-CPR case of the Court of Appeal of England and Wales).
[86] [2003] EWCA Civ 472.
[87] [2009] EWHC 2501 (Ch).
[88] [2007] EWCA Civ 793.
[89] [1998] Lexis Citation 3751.
[90] [1981] AC 718 at 742 and 750.

where it is not needed, i.e., the court will not act "in vain": see, for example, **Pitt v Holt**.[91]

[112] I respectfully disagree with the Defendants that this is not an appropriate case to grant a declaration. I do not read the *obiter* remarks of Lewison LJ in **J. P. Morgan International Finance Ltd v Werealize.com Ltd**[92] that every conceivable party that may be affected by a declaration must be before the court. It suffices, as Lewison LJ said in that case, that the court must be satisfied that "all those affected by the declaration are either before or will have their arguments put before the court." In the present case, the arguments of all those who may have an interest in the declaration sought have been before this Court or have had their arguments put before it. A company that has been dissolved does not have any existence, so the suggestion that it should have been made a party (which would require it to be restored to the Register of Companies) seems to me to be misconceived. I should add that it would require a counsel of perfection to make every person, however small that person's interest is in a claim, to be a party to it, simply so that the declaratory judgment made by the court extends to that party. As with any judgment of a court, the circumstances in which a party will be bound by a judgment of the court are now well-established, at least in the context of whether and who can mount a challenge to it and the circumstances in which the court will allow a party to relitigate an issue that it, or another court, has determined against that party: see, the summary of the relevant principles set out in **Re Queen's Moat House Plc, Secretary of State for Trade and Industry v Bairstow**.[93]

[113] I can well understand why the Claimant seeks declaratory relief. Setting aside the Share Transfers may create issues if third-party rights (i.e., the rights of third parties other than the Defendants) have been acquired in the Shares as a result of any dealings with them. This is especially so in relation to the claim under Ground 2 because the effect of s. 81 of the **CLPA 1961** is to make the impugned transaction voidable, not void, though several cases on s. 172 of the **LPA 1925**

[91] [2013] UKSC 26, [2013] 2 A.C. 108.
[92] [2025] EWCA Civ 57, at [118].
[93] [2003] EWCA Civ 321, [2004] Ch. 1.

use the expression "void", rather than "voidable". In those circumstances, a declaration made by the Court would enable such third parties to assert their rights in priority over the Claimant's rights (assuming they were entitled to claim such priority) by bringing fresh proceedings against the Claimant (if necessary) without needing to apply to set aside the Court's declarations. It would also allow the equivalent of a trustee in bankruptcy (if such a concept exists in Nigerian Law and if Nigerian Law is comparable to BVI Law), if Dr Orjiako is made bankrupt, to deal with such claims as part of the bankruptcy process on the basis that the declarations would binding on all "interested parties" (or, at any rate, those parties that are before the Court) and that to seek to challenge them in subsequent proceedings would be a collateral attack on the decision of this Court and amount to an abuse of process, based on the principles set out in **Henderson v Henderson**[94] and **Johnson v Gore Wood & Co**.[95]

[114] Indeed, several authoritative cases on s. 423 of the **IA 1986** have involved the court granting declaratory relief to the applicant. Those cases include **Moon v Franklin**,[96] **Barclays Bank Plc v Eustice**,[97] **National Westminster Bank Plc v Jones**,[98] **Hill v Spread Trustee Company Ltd**,[99] and, most recently, the decision of the UK Supreme Court in **Invest Bank PSC v El-Husseiny and others**.[100]

[115] In those circumstances, I consider the making of the declarations not only to be possible but to amount to the most appropriate remedy that this Court can grant.

**Discussion and Analysis**

<u>Ground 1</u>

---

94 (1843) 3 Hare 100.
95 [2001] 2 A.C. 1.
96 [1996] BPIR 196.
97 [1995] 4 All E R 511, Court of Appeal of England and Wales.
98 [2000] EWHC 1565. Neuberger J (as he then was).
99 [2006] EWCA Civ 542, at [117]–[118], and [143].
100 [2025] UKSC 4.

[116]   The basis upon which the Claimant relies on this ground can be summarised in a few short points.

[117]   The Pursley Share Transfer and the 22 May 2017 Share Transfers are undisputed. The Claimant states that the lack of consideration for those transfers, combined with the lack of any ostensible commercial purpose for them, and the clear evidence that Dr Orjiako has retained the right to deal with the underlying interests in Seplat as his own, point to the fact that he retained beneficial title, i.e., that when he transferred legal title to Mrs Orjiako, Dr Orjiako intended to (and did) retain beneficial ownership so that he could control, mortgage and sell the shares, as he thought fit from time to time.

[118]   The Claimant says that this is obvious from a proper consideration of the written evidence filed in connection with the Application and what it calls the "self-serving evidence" of Dr Orjiako and Mrs Orjiako. The Claimant draws attention to the matters referred to in para. 54 ff of Mr Thompson's skeleton argument in support of this premise. I have referred to those matters above. For the purpose of analysing Dr Orjiako's case, it is only necessary for me to refer to some of the matters upon which the Claimant places reliance in support of the Application. These matters are by no means exhaustive.

[119]   First, Dr Orjiako remained the sole director of each of the companies and continued to deal with the shares as if they were his, including providing them as security for borrowing from which he personally benefitted. At para. 39 of his eighth affidavit, sworn on 7 May 2025 in opposition to the Application, Dr Orjiako disputes this. He states that to assist him in raising funds to meet the judgment entered or obtained against him, Mrs Orjiako agreed to the use of both Shebah BVI's and Pursley's shares in Seplat being charged as security for the Providus Facilities. He points out that it would not be unusual or unexpected that a spouse, as his wife did, would use her own assets to support the business interests of her husband and, by extension, the success of herself and the family.

[120] The Claimant states that there is no contemporaneous evidence to support this. That is, of course, correct, but it would be rare to expect evidence of this type to exist between a husband and wife. In my judgment, that fact by itself would not give rise to a clear and obvious case of only the legal interest in the Shares having been transferred by Dr Orjiako to Mrs Orjiako.

[121] Nor does it seem to me that the power of attorney produced by the Orjiakos, which gives control of Mrs Orjiako's shares in Seplat to Dr Orjiako, by itself, gives rise to the obvious inference that the beneficial interest in the Shares remained with Dr Orjiako. That is what powers of attorney do – i.e., they give the donee overall control of an asset owned by the donor.

[122] But there is compelling evidence that when taken together with the other matters upon which the Claimant relies in making good this ground, the Claimant makes out a clear and obvious case for granting SJ on this ground.

[123] As the Claimant rightly points out, until these Proceedings were commenced against Dr Orjiako, he had advanced no case that any of the shares in BVI entities that held Seplat's shares belonged beneficially to his wife. Nor until 2018 had Dr Orjiako suggested to any third party that Mrs Orjiako might be the true owner of any of his business assets.

[124] Instead, all the contemporary documents demonstrate the precise opposite of the case advanced by the Orjiakos. For example, none of Seplat's official RNS announcements make any reference to a transfer of shares in Shebah BVI from Dr Orjiako to Mrs Orjiako, nor is there any reference to shares being charged or transferred to Providus. The way Shebah BVI is described both before and after the 22 May 2017 Share Transfers remains the same in the RNS announcements over that period. Thus, an RNS announcement released on 21 November 2016 stated that:

> "Following the sale of a portion of the shares registered in the name of Shebah Petroleum Development Company Limited actioned by Zenith Securities Limited in connection with the collateral agreement granted by Shebah Petroleum Development Company Limited to Zenith Bank

plc which was previously notified by the Company on 27 May 2015, Dr. Ambrosie Bryant Chukwueloka Orjiako, who holds an indirect interest in the shares of Shebah Petroleum Development Company Limited and is the Chairman of the Company, now holds a combined direct and indirect interest in 77,962,680 ordinary shares in the Company representing approximately 13.84% of the voting rights of the Company's issued share capital."

[125] Subsequent announcements were also to similar effect: see the announcement dated 19 June 2017, after the 22 May 2017 Share Transfers, in the following terms:

> "Petroleum Development Company Limited actioned by Zenith Securities Limited in connection with the collateral agreement granted by Shebah Petroleum Development Company Limited to Zenith Bank plc which was previously notified by the Company on 27 May 2015, Dr. Ambrosie Bryant Chukwueloka Orjiako, who holds an indirect interest in the shares of Shebah Petroleum Development Company Limited and is the Chairman of the Company, now holds a combined direct and indirect interest in 47,251,325 ordinary shares in the Company representing approximately 8.39% of the voting rights of the Company's issued share capital."

And an announcement made on 27 November 2018:

> "Dr. Orjiako now holds a direct interest in 16,151,325 ordinary shares and an indirect interest in 29,800,000 ordinary shares of the Company totalling 45,951,325 shares which equates to a voting interest of 7.81% (based on Issued Share Capital of 588,444,561)."

[126] Nor, for the reasons mentioned below, is there any substance in the point made by Dr Orjiako that the Pursley Share Transfer and the 22 May 2017 Share Transfers were carried out in "continuation and part execution of that asset structuring and financial/estate planning" relating to his personal financial affairs.

[127] Leaving aside the various points that Mr Thompson makes about the alleged inconsistent positions adopted by Dr Orjiako in his amended Defence and in his written evidence in opposition, it is not easy to know what Dr Orjiako now has to say about these matters.

[128] In his affidavit dated 7 May 2025, he provides the following explanation:

> "34. By virtue of the Pursley Share Transfer, my wife became the legal and beneficial owner of the sole share in Pursley, whose only asset was a stake in Shebah BVI which equated to 2.15% of Seplat. Shebah BVI held 2.15% of Seplat as bare trustee for her. This is because my wife had had a 3.92% interest in Seplat via Shebah Nigeria from 2010 as part of my estate planning (as described further below). When the Seplat shares were transferred from Shebah Nigeria to Shebah BVI in March 2010 her interest Seplat was transferred to Shebah BVI which held what became a 2.15% stake in July 2014 post IPO dilution as bare trustee for my wife as recorded in the Declaration of Trust prepared in 2013. While it is important to note that document is not witnessed nor dated, it reflected the position at the time in relation to my wife's stake in Seplat and my view of the position and was entirely consistent with my wife's prior shareholder in Shebah Nigeria in line with my earlier estate planning which had been transferred to Shebah BVI to hold in an omnibus shareholding but always for the benefit of my wife. The Pursley Share transfer simply represented a transfer where the economic reality which was that my wife had owned the beneficial interest of the corresponding stake in Seplat held by Shebah BVI in substance since 2010.
>
> 35. By virtue of the 22 May 2017 Share Transfers, my wife also became the legal and beneficial owner of the sole share in each of Abbeycourt BVI, Neville and Plumage. The transfer was made with the intention and expectation that when the loan under the Facility Agreement and the other loans was repaid, the share pledge given by Neville, Plumage and Abbeycourt BVI (and any other similar security for loans) would be released and my wife would benefit from the corresponding uplift in value of the shares in Shebah BVI.
>
> 36. My wife is the sole legal and beneficial owner of each company. She is responsible for carrying out transactions on their behalf, making decisions regarding their assets, signing documents on their behalf, and representing the companies in dealing with third parties in all material respects.
>
> 37. Notwithstanding this, the companies in question have not been actively engaged in any corporate activity since ownership was transferred to her. As such, there has been no occasion or need for her to act or make decisions on their behalf in the manner described above. However, had any corporate action been required, she would have dealt with it as the legal and beneficial owner."

[129]    As Mr Thompson rightly states, these statements are largely bare denials. They do not address any of the allegations made by the Claimant. Even where Dr Orjiako can produce a document which potentially assists him, he fails to address the evidence and documents that undermine what that document says. A prime example of this is what Dr Orjiako says in paras. 38 and 39 of his 7 May 2025 affidavit:

> "38    It is public knowledge that my wife owns Pursley, this fact having been reported in the business press on numerous occasions - for example, Business Day reported on 9 August 2018 that Pursley, 'a Company owned by the wife of A.B.C Orjiako' had acquired 900,000 shares in Seplat. My wife paid for these shares with funds from family assets and they were acquired from the late Chief Macauley Ofurhie.
>
> 39.    To assist me in raising funds to meet the judgment debt, my wife agreed to the use of both Shebah BVI's and Pursley's shares in Seplat being charged as security for the Providus Facilities. It is not unusual or unexpected that a spouse, as my wife did, would use her own assets to support the business interests of her husband and, by extension, the success of herself and the family. In fact, why would my wife not help me?"

[130]    It is difficult to see how these paragraphs of the affidavit can be consistent with the RNS announcement on 27 November 2018.

[131]    There is nothing in Mrs Orjiako's affidavit that takes matters any further. The substance of her affidavit merely supports the affidavit of Dr Orjiako.

[132]    Nor does the written evidence of Dr Orjiako's sister, Professor Christine Nwuche, assist on this or, indeed, any other issue.

[133]    Additionally, it is unclear to me when the Share Transfers to Mrs Orjiako took place. For a person to allege that the transfers took place for the purpose of estate tax or duty planning, one would expect the underlying share transfer instruments to be produced. No form of transfers or allotments, if they exist, have (so far as I know) been included in the SJ Bundles. Furthermore, none of

the other "numerous documents" referred to in the above paragraphs of the affidavit has been produced by Dr Orjiako.

[134] I have already referred to the approach that this Court must take on the Application. The first stage in the process is for me to decide whether, but for the Orjiakos' written evidence in opposition to the Application, the underlying allegations made by the Claimant against the Defendants are established, based on the material presented to the Court. Put differently, the question for the Court is that if there had been no evidence adduced on the Application by the Defendants, based on the documents and the objective contemporary circumstances, would the case against the Defendants in Ground 1 have been made out?

[135] There is no question in my mind that they would be, and indeed are, made out, based on what I have said above.

[136] The second stage is for me to decide whether the Defendants have raised a sufficient case on the papers for me to conclude that there is a real prospect of the Defendants succeeding at trial or, put more accurately, that there is "no real prospect of the Defendants being successful or succeeding" in the sense explained by Lord Woolf MR in **Swain**.

[137] There is a clear requirement on the part of a respondent to a SJ application to provide sufficient detail in his written evidence in opposition to the application to demonstrate that the claim or issue upon which SJ is sought should be tried. I have touched upon this above. However, it requires further mention at this stage.

[138] As already noted above, if an applicant for summary judgment adduces credible evidence in support of the application, the respondent then comes under an evidential burden to prove some real prospect of success or other reason for having a trial. In addition, as Stuart-Smith J (as he then was) observed in **Sainsbury's Supermarkets Ltd v Condek Holdings Ltd**:[101]

---

[101] [2014] EWHC 2016 (TCC), at [13].

> " … on an application for summary judgment the court should consider the evidence that could reasonably be expected to be available at trial. However, the Court is not required simply to take all evidence at face value or to accept without question any assertion that may be made: the question is whether the respondent's case carries some degree of conviction."

[139] A respondent to a summary judgment application who claims that further evidence will be available at trial must serve written evidence substantiating that claim. In **Korea National Insurance Corp v Allianz Global Corporate & Specialty AG (formerly Allianz Marine & Aviation Vershicherungs AG)**,[102] Moore-Bick LJ observed:

> "It is incumbent on a party responding to an application for summary judgment to put forward sufficient evidence to satisfy the court that it has a real prospect of succeeding at trial. If it wishes to rely on the likelihood that further evidence will be available at that stage, it must substantiate that assertion by describing, at least in general terms, the nature of the evidence, its source and its relevance to the issues before the court. The court may then be able to see that there is some substance in the point and that the party in question is not simply playing for time in the hope that something will turn up. It is not sufficient, therefore, for a party simply to say that further evidence will or may be available, especially when that evidence is, or can be expected to be, already within its possession, as is the case here …"

[140] Put simply, this means that the respondent must demonstrate that:

(a) the underlying allegations made by the Claimant (including any inferences sought to be drawn by the Claimant from those allegations) will not withstand scrutiny when they are put to the test at trial by the cross-examination of its witnesses;

(b) the oral evidence that the Defendants' witnesses give at trial, based on the material adduced by them in opposition to the Application, may support the case that they wish to advance to the Court; or

---

[102] [2007] EWCA Civ 1066, at [14].

(c) there is likely to be some benefit from hearing oral evidence at trial, i.e., that it may support what the Defendants are likely to say at trial, based on that evidence. Thus, for example, if the oral evidence cannot improve on the written material that the Defendants have adduced because that material is inconsistent, weak, tenuous or otherwise incapable of supporting the Defendants' case, the Court will not grant leave to defend. There would be no point in doing so if the cross-examination did not improve the Defendants' position at trial.

[141] In this context, it is important to make the following points.

[142] First, the SJ application is not intended to be exercised through a minute and protracted examination of the documents and facts of the case to determine whether a party truly has a cause of action or defence. This is because to do so is to quote Danckwerts LJ in **Wenlock v Moloney**[103] is to usurp the position of the trial judge, and to produce a trial of the case in chambers, on affidavits only, without discovery and without oral evidence tested by cross-examination in the ordinary way. This seems to me to be an abuse of the inherent power of the court and not a proper exercise of that power." However, the judge may determine a matter summarily not only if he harbours doubts about the soundness of the pleading of the respondent but, in addition, is satisfied that summary disposal will obviate the necessity for a trial or will substantially reduce the burden of preparing for the trial or the burden of the trial itself. As observed in **Williams & Humbert Ltd v W & H Trade Marks (Jersey) Ltd, Rumasa SA v Multinvest (UK) Ltd**:[104]

> "But there are special circumstances which, in my view, made it right for the judge to proceed and to make the order which he made. If the appellants' pleadings and particulars had not been struck out, the appellants would have proceeded to demand discovery before trial and to lead evidence at the trial, harassing to the plaintiffs and embarrassing to the court and designed to support the allegations and insinuations of oppression and bad faith on the part of the Spanish authorities which

[103] [1965] 1 W.L.R. 1238 at 1244.
[104] [1986] A.C. 368 at 436.

> appear in the amended defences and particulars. These allegations are irrelevant to the trade marks action and the banks' action and are inadmissible as a matter of law and comity and were rightly disposed of at the first opportunity."

[143]    Second, it is not appropriate for a court to grant leave to defend to a respondent where the respondent alleges that further documents may come to light before trial, when, as here, there is no evidence of that. As Lord Hamblen JSC observed in **Okpabi v Royal Dutch Shell Plc**,[105] when asking whether the position might change from how it appears at the summary judgment stage to what might happen at trial, the judge "was [should] not ask whether there [is] … a clear prospect that new material will become available before the trial which is likely to give the claimants a real prospect of success", but rather to ask whether "there are reasonable grounds for believing that disclosure may materially add to or alter the evidence relevant to whether the claim has a real prospect of success."

[144]    The substance of this approach has been approved in several subsequent cases. For example, in **Steifel**,[106] Cockerill J observed:

> "The authorities therefore make clear that in the context of summary judgment the court is by no means barred from evaluating the evidence, and concluding that on the evidence there is no real (as opposed to fanciful) prospect of success. It will of course be cautious in doing so. It will bear in mind the clarity of the evidence available and the potential for other evidence to be available at trial which is likely to bear on the issues. It will avoid conducting a mini-trial. But there will be cases where the Court will be entitled to draw a line and say that -even bearing well in mind all of those points – it would be contrary to principle for a case to proceed to trial… So, when faced with a summary judgment application, it is not enough to say, with Mr Micawber, that something may turn up."

[145]    There is simply no basis for the Defendants to claim that their case at trial may be improved by disclosure or in any other way. On the basis that the Claimant is likely to have little actual knowledge about why and what the Orjiakos decided to do about the Shares, it will almost certainly have no documents, either undermining its case or supporting the case that the Orjiakos advance to this

---

[105] [2021] UKSC 3, at [127]-[128].
[106] [2021] EWHC 1045 (Comm), at [21]-[22].

Court. It follows that to suggest that the Claimant may have disclosable documents which may assist the Defendants' case is a complete fallacy. If there are documents in the possession or control of the Defendants that assist the Orjiakos, they should have disclosed them in connection with their opposition to the Application or explained why they cannot be produced. They have done neither.

[146] The plain fact is that as soon as the writing on the wall became clear to Dr Orjiako, i.e., at the very latest, when he knew that he was not going to be able to pay off the Loan when it was called in, he sought to put his assets beyond the reach of his creditors. This occurred in early 2014, but, in my judgment, more likely in March 2013 (or even earlier) when SEPCOL defaulted on the payment of the Loan.

[147] Dr Orjiako then provided different accounts about his position relating to the Share Transfers, believing that somewhere along the line, he might convince the Claimant that what he was saying was true. To counter the inevitable weaknesses in his case, he has sought to bury his case in a morass of irrelevant information and documents going back many years, hoping that neither the Claimant nor the Court would be able to get to the bottom of his case at the stage of the hearing of the Application. He believed that because of the overwhelming and confusing nature of that information and documentation, which he thought would be difficult to manage, understand, or resolve at the hearing of the Application, due to its sheer volume and complexity, it would inevitably mean that he would get unconditional leave to defend the Claim. The intention on his part, in my judgment, was designed to delay and obfuscate matters in the hope that by doing so, he would delay the determination of the Claim and, as a consequence, steal a march on the Claimant and Dr Orjiako's other creditors by hindering their ability to enforce the BVI Judgment. In doing so, Dr Orjiako has been somewhat hoisted by his own petard. By flip-flopping on his position, the conclusion for the Court on the Application is clear. As I have pointed out throughout this Judgment, his case, and that of the other Defendants, simply cannot be improved at trial. That is because, whatever their position, the inconsistency in their case will, based on what they have said in

their written evidence, simply not be satisfactorily explained by an oral explanation given by them at trial.

[148] The Defendants rely on a declaration of trust signed by Dr Orjiako in June 2013 to support the premise that well before the Pursley Share Transfer, Dr Orjiako intended to hold a substantial shareholding in Shebah BVI on trust for Mrs Orjiako. They maintain that this document cannot be reconciled with the Claimant's claim either under Ground 1 or Ground 2.

[149] The Claimant challenged the authenticity of this document. However, sufficient evidence has been produced by the Defendants (from a London firm of solicitors) to suggest that the document was genuine. I have not seen all the underlying communication that resulted in this document being signed by Dr Orjiako. However, for the purpose of the Application, I accept that the document is authentic.

[150] The Defendants say that this document is evidence of the fact that the case of the Claimant (whether under Ground 1 or Ground 2) can simply not be made out, at least so far as the Application is concerned.

[151] I do not regard the Claimant's request to see the original of the document to satisfy itself that the document was authentic as amounting to any concession on the part of the Claimant that the Orjiakos had the intention to transfer the Shares legally and beneficially to Mrs Orjiako.

[152] In essence, the Defendants' position on the effect of the declaration of the trust is summarised at paras. 39 onwards of Mr Weekes' skeleton argument:

> "39 Some provision had to be made for the shareholders in Shebah Nigeria, since the valuable asset of that company (ie, the Seplat shares) had been transferred to a different company (Shebah BVI), in which they were not also shareholders. Such provision was originally to be made by Shebah BVI declaring that it was holding certain holdings of the Seplat shares on trust for them. This was to be effected by a Declaration of Trust which records (on its face) that it was to be executed in June 2013 ...

40.    The … deed provides that Shebah BVI would declare that it held shares in Seplat on trust for beneficiaries named in the Schedule to the deed. Those beneficiaries comprised:

    a.    Mrs Orjiako (being one of the original shareholders in Shebah Nigeria). Pursuant to the Declaration of Trust, Shebah BVI was to declare a trust over 3,000,000 Seplat shares in her favour. This corresponded to:

        i.    9.672% of Shebah BVI's total shares in Seplat. This was equivalent to her proportionate interest in Shebah Nigeria: she held 10,000,000 Shebah Nigeria shares, that corresponded to 10% of Shebah Nigeria's total shares in Seplat. This analysis is recorded in a table in §89 of Orjiako 8;

        ii.    This was equivalent to a 3% 'look-through interest' (or indirect interest) in Seplat.

    b.    The other 7 original shareholders in Shebah Nigeria (or their nominees); and

    c.    10 other individuals, including some of Dr Orjiako's siblings.

41.    The Declaration of Trust was signed by Dr Orjiako but the [Defendants] do not contend that it was properly executed. For present purposes, its significance is what it shows that Dr Orjiako intended and believed that (i) his wife, Mrs Orjiako already had an indirect interest in Seplat shares; (ii) more particularly, a 3% indirect (or look-through) interest in that company; and (iii) Shebah BVI was holding Seplat shares for her.

42.    As regards four of the other proposed beneficiaries under the Declaration of Trust, who were siblings of Dr Orjiako, they were simply allotted shares in Seplat: see §44 below (and thus acquired direct ownership of those shares).

43    On 31 January 2014, a corporate reorganisation of Shebah BVI was commenced with the passing of the written resolutions for the allotment and ultimately effected in March 2014. This was for the purpose of family estate planning, in anticipation of the Seplat IPO.46 This reorganisation involved the following steps:

    a.    The directors of Shebah BVI (including Dr Orjiako) authorised the transfer of the single share in that company from him to Pursley;

b.      The share capital in Shebah BVI was increased from 50,000 shares to 1 million shares;

c.      Dr Orjiako, as sole director of Abbeycourt BVI, passed a resolution permitting it (in summary) to subscribe for 240,000 shares in Shebah BVI; Neville to subscribe for 124,000 shares; Plumage to subscribe for 43,404 shares; Pursley to subscribe for 119,999 shares and Sinclair to subscribe for 80,000 shares

[153]   Paragraph 43(d) of Mr Weekes' skeleton argument sets out how the above shares were allotted, and para. 44 sets out the new allotment of shares that Dr Orjiako effected at or about the same time.

[154]   The Claimant states that the position advanced by the Defendants is contrary to the Defendants' pleaded position. Whether or not it is does not appear to be relevant on an application of this nature, i.e., an application for SJ. However, even if one accepts – as I must – the authenticity of the declaration of trust for the purpose of the Application, I am unable to see how it supports the case advanced by the Defendants.

[155]   The issue here is not the authenticity of the declaration of trust, but whether it provides any support for the premise that the Share Transfers transferred both the legal and beneficial interests to Mrs Orjiako (Ground 1), or whether those transfers were made with the intent to defraud creditors (Ground 2). On those issues, the declaration provides no assistance to the Defendants. That is because the Orjiakos have provided no explanation whatsoever about the contemporaneous documents pointing to the contrary position referred to in this Judgment.

[156]   Mr Weekes states at para. 8 of his skeleton argument that the discovery of the declaration of trust is "a salutary example of the hazard of summarily determining a claim, rather than at trial with the benefit of disclosure." That seems to me to look at matters from the wrong end of the telescope. The critical point here is that the only meaningful disclosure that could assist the Orjiakos at trial is the disclosure of documents that they have in their possession or control. If they do have such documents, they should have disclosed them at

this stage. It is difficult to see how the Claimant can have documents which will advance the Defendants' case at trial.

[157] Of course, the Orjiakos may have other documents which may provide information about Dr Orjiako's underlying intention to transfer the Shares to Mrs Orjiako. It has long been established that, if a respondent does have such documents, for example, documentation relating to the estate planning advice they received, those documents are disclosable. This is based on the principle that the court will usually order the disclosure of documents exchanged between a party to a transaction under challenge and their legal advisers, where the documents relate to the setting up of a transaction that is under challenge. The overriding of legal professional privilege is justifiable where there is *prima facie* evidence of fraud, which is widely defined for these purposes as including underhand behaviour or sharp practice: see, for example, **Barclays Bank Plc v Eustice**,[107] a case under s. 423 of the **IA 1986**.

[158] I have not been taken through the orders for disclosure that the Court made in this case, and whether they expressly or impliedly included any communication passing between Dr Orjiako and his legal advisers about the transfer of the Shares. However, the vital point here is whether disclosable or not, if the Orjiakos had any documents in their possession or control that supported the position they maintain in the Claim, they would, or should, have disclosed those documents as part of their written evidence in opposition to the Application. They plainly either do not have those documents or, if they do, those documents, rather than supporting their case, almost certainly undermine it.

[159] Third, as can be seen from the above authorities, the same principle applies where the respondent argues that the cross-examination of witnesses at trial may reveal evidence that supports the case he advances, as opposed to the case advanced by the applicant, to the court. As Warby LJ, sitting as an additional Judge of the High Court, observed in **Duchess of Sussex v Associated Newspapers Ltd**:[108]

[107] [1995] 4 All. E. R. 511, Court of Appeal of England and Wales.
[108] [2021] EWHC 273 (Ch), at [14]-[16].

"14. **Easyair** principles (vi) and (vii) contain echoes of the law traditional disapproval of a desire to investigate alleged obscurities and a hope that something will turn up…' as a basis for defending a summary judgment application; a case that is 'all surmise and Micawberism will not do: see **The Lady Anne Tennant v Associated Newspapers Ltd**[109]. The focus is not just on whether something more might emerge, but also – and crucially – on whether, if so, it might affect the outcome of the case; and the court's task is to assess whether there are 'reasonable grounds' for believing that both these things would occur: see **Doncaster Pharmaceuticals Group Ltd v The Bolton Pharmaceutical Company**[110].

15. As **Mummery LJ** warned in the **Doncaster** case **at [10]**, on applications for summary judgment the court must be alert to the defendant, who seeks to avoid summary judgment by making a case look more complicated and difficult than it really is. But as he also said at [11], the court should beware the cocky claimant who …confidently presents the factual and legal issues as simpler and easier than they really are and urges the court to be efficient…'. Efficiency is not a ground for entering summary judgment. Judgment without a trial may sometimes result in huge savings of time and costs; that would have been so in the hugely expensive litigation in **Three Rivers District Council v Bank of England**. But neither Part 24, nor the overriding objective, permits the court to enter judgment on the basis that the claimant has a strong case, the defence is not likely to succeed, and the time and costs involved in a trial are disproportionate to the potential gains.

16. The overriding objective of 'deciding cases justly and at proportionate cost' does have a role to play if the court concludes there is no realistic prospect of a successful defence … At that point, the court would be bound to have regard to considerations such as saving expense, proportionality, and the competing demands on the scarce resources … It is rare for the court to find a compelling reason for a trial, when it has concluded there is only one realistic outcome. The defendant has not suggested that this is such a case. My focus must be on whether it is realistic or fanciful to suppose the claims might fail at trial."

[160] As noted at various places in this Judgment, the Claimant's witnesses cannot say anything more at trial than the written evidence which they have provided

[109] [1979] F.S.R, 298 303, per Sir Robert Megarry V-C.
[110] [2006] EWCA Civ 661,

on behalf of the Claimant. They simply would not have first-hand knowledge of the reasons for the purported transfer of the Shares. In addition, the position of the Orjiakos is unlikely to be improved at trial by their cross-examination or the cross-examination of their witnesses. The Orjiakos have purported to provide an account of why they say that they did not form the intention contended for by the Claimant in the Claim in relation to the transfer of the Shares, and why the written evidence provided by the Claimant does not undermine that account. Their evidence on this and any other issue will primarily be judged by the existence of contemporaneous documents. As also pointed out above, those documents do not support the case that they advance to this Court.

[161] The overall assessment of the evidence in connection with a claim is within the sole province of a trial judge. However, it has been held that the presence of contemporaneous documents (and their contents) will be of substantial importance in that assessment, particularly in cases where the allegations date back many years. As Leggatt J (as he then was) observed in **Gestmin SGPS SA v Credit Suisse (UK) Ltd and another**:[111]

> "…the best approach for a judge to adopt in the trial of a commercial case is, in my view, to place little if any reliance at all on witnesses' recollections of what was said in meetings and conversations, and to base factual findings on inferences drawn from the documentary evidence and known or probable facts. This does not mean that oral testimony serves no useful purpose – though its utility is often disproportionate to its length. But its value lies largely, as I see it, in the opportunity which cross-examination affords to subject the documentary record to critical scrutiny and to gauge the personality, motivations and working practices of a witness, rather than in testimony of what the witness recalls of particular conversations and events. Above all, it is important to avoid the fallacy of supposing that, because a witness has confidence in his or her recollection and is honest, evidence based on that recollection provides any reliable guide to the truth."

[162] These remarks have not received full approval in every judicial quarter: see, for example, **Francis and another v Knapper and others**[112] and **Kogan v**

[111] [2013] EWHC 3560 (Comm), at [22].
[112] [2016] EWHC 3093 (QB), at [79(ii)], per Andrew Baker J.

**Martin**.[113] Nonetheless, the substance of this approach has been endorsed in several cases, including by the Supreme Court: see, by way of examples, **R. (on the application of Dutta) v General Medical Council**[114] where the relevant authorities are mentioned and summarised; **Re Bright Future Software Ltd, Manolete Partners plc v Ellis**;[115] **Barrow v Merrett**;[116] **MJF v University Hospitals Birmingham NHS Foundation Trust**;[117] **Kinled Investments Ltd v Zopa Group Ltd**;[118] **Mohammed and others v Daji and others**;[119] and **R. (on the application of Bancoult) v Secretary of State for Foreign and Commonwealth Affairs**.[120]

[163] The observations of Leggatt J in **Gestmin** must not be read as suggesting that one simply disregards the oral evidence of the parties. However, the critical point here is that if there are contemporaneous documents supporting an account put forward by one party, there must be convincing evidence to demonstrate that those documents do not accurately reflect what happened. That is not to say that the burden of proof switches from one party to another or that the standard of proof is higher than the usual standard of proof. It simply means that the court must regard that as an essential consideration in its evaluation of the evidence (both written and oral) that has been adduced in the proceedings.

[164] In the context of the conclusion of an oral contract – a very much different context to the present context, but nonetheless appropriate for mention because the guidance stated is roughly the same as here – the position was emphasised in the following terms by Eyre J in **Mansion Place Ltd v Fox Industrial Services Ltd**:[121]

> 'In determining whether there is an enforceable contract, the court must look at the witnesses' evidence through the prism of the contemporaneous documents; of their subsequent actions; of those events which are accepted or clearly demonstrated to have happened;

113 [2019] EWCA Civ 1645.
114 [2020] EWHC 1974 (Admin).
115 [2020] EWHC 1674 (Ch).
116 [2022] EWCA Civ 1241.
117 [2024] EWHC 3156 (KB).
118 [2022] EWHC 1194 (Comm).
119 [2024] EWCA Civ 1247.
120 [2018] UKSC 3, at [103], per Lord Kerr.
121 [2021] EWHC 2972 (TCC), at [55].

> and of inherent likelihood. The impression made by the demeanour of a witness must be set against those matters and to the extent that the contemporaneous documents in particular show a picture different from that depicted by a particular witness it is the former and not the latter which I should regard as more likely to be an accurate account of what happened.'

[165] The long and short of all of this is that it is inconceivable that the Court will accept what the Defendants and their witnesses say at trial in the face of the compelling contemporaneous documents to the contrary which exist against the case that they are advancing to the Court. This is so even if the demeanour of the Defendants and their witnesses suggests that they are attempting to provide a truthful account of their position in the Claim. The reason for that is obvious. The account they provide must give a proper explanation as to why the contents of those documents offer a completely different account of the events that took place. The plain fact is that the Orjiakos will simply not be able to do this.

[166] It is well established that an impression as to the demeanour of a witness ought not to be adopted by a judge without testing it against the whole of the evidence of the witness in question. The dangers of a court relying wholly, mainly or even significantly on the demeanour of a witness, in evaluating the overall evidence which it has heard, have been emphasised in many cases: see, for example, **R. (on the application of SS (Sri Lanka)) v Secretary of State for the Home Department**[122] and **Goodman v Faber Prest Steel**.[123] In the latter case, Moore-Bick LJ observed:[124]

> "The only evidence that Mr. Goodman had experienced pain in his knees and his back immediately after the accident came from him. Although much emphasis is quite properly placed on the advantage given to the trial judge of seeing and hearing a witness give evidence, it is generally acknowledged that it is difficult even for experienced judges to decide by reference to the witness's demeanour whether his evidence is reliable. Memory often plays tricks and even a confident witness who honestly believes in the accuracy of his recollection may be mistaken. That is why in such cases the court looks to other evidence to see to what extent it supports or undermines what the witness says

[122] [2018] EWCA Civ 1391.
[123] [2013] EWCA Civ 153.
[124] [2013] EWCA Civ 153, at [17].

and for that purpose contemporary documents often provide a valuable guide to the truth."

[167]    In **Armagas Ltd v Mundogas SA**,[125] Robert Goff LJ described why this approach was essential, particularly in a case involving fraud:[126]

> "Speaking from my own experience, I have found it essential in cases of fraud, when considering the credibility of witnesses, always to test their veracity by reference to the objective facts proved independently of their testimony, in particular by reference to the documents in the case, and also to pay particular regard to their motives and to the overall probabilities. It is frequently very difficult to tell whether a witness is telling the truth or not; and where there is a conflict of evidence such as there was in the present case, reference to the objective facts and documents, to the witnesses' motives, and to the overall probabilities, can be of very great assistance to a Judge in ascertaining the truth."

[168]    By parity of reasoning, and in line with some of the authorities cited above, the absence of relevant documents when they should have existed (and the explanation given by a party for such absence) may also be of substantial importance in the Court having to decide about the truthfulness of the account given by that party. For example, in the context of the present case, one would expect some documentation to exist that supports the assertion that the Share Transfers to Mrs Orjiako were made for "estate planning" purposes. There is no document supporting this assertion, either in the form of advice that the Orjiakos received from their advisers or even by way of an account in their written evidence of how the Share Transfers would avoid or mitigate any potential tax or other liability to which Dr Orjiako or his estate might otherwise be subject.

[169]    The upshot of all of this is that however truthful the oral evidence of the Orjiakos and their other witnesses may appear (by their demeanour) to the Court, it would simply not survive any proper analysis undertaken by the Court when set against

---

[125] [1985] 1 Lloyds Rep. 1, CA.
[126] [1985] 1 Lloyds Rep. 1 at 57. This approach has been approved in several subsequent fraud and non-fraud cases: see, by way of examples, Heffer v Tiffin Green (1998) The Times, 28 December; Gow v Harker [2003] EWCA Civ 1160; Shah v Shah [2018] EWHC 2075 (Ch); Nuttal v Kerr [2019] EWHC 1977 (QB); Re Brunt (dec'd), Wrangle v Brunt [2021] EWHC 368 (Ch); Singh v Singh Jhutti [2021] EWHC 2272 (Ch); Hotel Portfolio II UK Ltd (in liq) v Ruhan [2022] EWHC 383 (Comm); Re International Automotive Engineering Projects Ltd [2022] EWHC 1751 (Ch); and MW (a child by his litigation friend DW) and another v Wilkinson and another company [2025] EWHC 2300 (KB).

the contemporaneous documents (or lack of them) which show a picture different that is different from the oral evidence given by a particular witness. In my judgment, therefore, it would be a pointless waste of time for the Court to hear what the Orjiakos and their witnesses had to say about matters from the witness box.

[170] In those circumstances, I consider it appropriate to grant SJ under Ground 1.

[171] On this basis, I do not need to consider the Claimant's case under Ground 2. However, it is appropriate for the sake of completeness (and in case of an appeal against this Judgment) that I do.

Ground 2

[172] The relief in Ground 2 is sought alternatively to the relief sought in Ground 1.

[173] The issue for the Court under this ground is to decide whether, if the Court is wrong about Ground 1 – i.e., that the Share Transfers were only effective to transfer the legal estate in the Shares to Mrs Orjiako – the Claimant nonetheless shows a sufficient case for SJ to be granted on the basis that the transfer of the legal title to, and beneficial interest in, the Shares were made with intent to defraud creditors under s. 81 of the **CLPA 1961**.

[174] The Orjiakos admit the underlying transfer of the Shares. The principal issue for this Court to determine is whether the transfer of the Shares by Dr Orjiako to Mrs Orjiako was made with "intent to defraud" his creditors. A subsidiary issue for the Court to determine is whether the consideration provided for the Share Transfers was, to quote the words of s. 81(3) of the **CLPA 1961**, for "valuable consideration and in good faith or upon good consideration and in good faith to any person not having at the time of conveyance, notice of the intent to defraud creditors."

[175] Unlike the position that applies under Ground 1, where the Court considers the intention of both the donor and donee in deciding whether the donor retained

the beneficial interest in the Shares, the only intention under consideration under Ground 2 is that of the donor. If the requisite intention is established, the transfer is voidable under s. 81 of the **CLPA 1961**, subject to the other provisions of that section.

[176] The Claimant has amply established the intent to defraud for the purposes of the Application.

[177] It has been held that a fraudulent intent may readily be established if the debtor cannot pay his debts without the asset transferred by him being available for the payment of his debts.[127] However, that will not usually, by itself, be sufficient to impugn the transaction in question. In the present case, the chronology of events summarised above shows a deliberate, systematic and fraudulent attempt, calculated to put the Shares beyond the reach of the Claimant and Dr Orjiako's other creditors.

[178] One need only consider the brief chronology set out above to reach the unavoidable conclusion that this is the case.

[179] By May 2014, Dr Orjiako had been sued personally for $150m and settled that claim on the basis that he would pay the sums outstanding in two tranches, the first of which (for $50m) would be paid by 30 April 2014. However, in my judgment, the writing must have been on the wall for Dr Orjiako very substantially earlier. By at least March 2013, he must have known that he had no reasonable prospect of paying his guarantee liability to the Claimant. When he failed to make the two payments above, there would have been no doubt in his mind that he would be unable to do so without recourse to the Shares.

[180] By 2014 (but, in my judgment, much earlier), Dr Orjiako was insolvent (in the sense that he was unable to pay his debts as and when they fell due), and he must have known that. One would have expected him to obtain specialist advice on how to implement a scheme (formal or informal) for paying off all his creditors or to compound for their debts, using his available assets to do so.

[127] For examples, see Mackay v Douglas (1872) LR 14 Eq 106 and Re Butterworth, ex p Russell (1882) 19 Ch D 588.

[181] There is no evidence that he did. However, whether or not he did, he claims that he sought estate planning advice to transfer his assets to his wife and others. It is remarkable that, at a time when he was under pressure from creditors to pay his debts, he sought estate planning advice. The assertion is not just fanciful but false. It is not clear when he sought or obtained that advice. However, even if he did, he must have known that he was insolvent on a "cash flow" basis at the time. As a result of acting on that advice, he would also be insolvent on the basis that, other than the Shareholding, he would have insufficient assets to meet his liabilities in full.

[182] Even if one accepts the written evidence of the Orjiakos in full, the most that can be said about it is that a subsidiary purpose of transferring the Shares may have been to obtain a tax benefit upon his death. It is clear, in my judgment, that the dominant purpose for the transfer was to defraud his creditors by putting his assets out of their reach.

[183] It has long been held, in the context of s. 423 of the **IA 1986**, at any rate, that where a debtor has entered into a transaction for more than one purpose, the court does not have to be satisfied that the statutory prohibited purpose of putting assets out of the reach of creditors need not be the sole or dominant purpose of the transaction.

[184] In **Inland Revenue Commissioners v Hashmi**,[128] the court found that the debtor had two purposes in entering into the relevant transaction; he wanted to secure the future of his son financially, and he wanted to put the relevant property beyond the reach of creditors should they emerge. Hart J, at first instance, observed that it will often be the case that the motive to ensure family financial protection and the motive to defeat creditors will co-exist. They may indeed be two sides of the same coin, with the transferor unable to say which was the more important in their own mind.

[128] [2002] EWCA Civ 981.

[185]    Giving the leading judgment in the Court of Appeal, Arden LJ (as she then was) observed:[129]

> "In my judgment there is no warrant for excluding the situation where purposes of equal potency are concerned … One purpose can co-exist with another … the section does not require the inquiry to be made whether the purpose was a dominant purpose. It is sufficient if the statutory purpose can properly be described as a purpose and not merely as a consequence, rather than something which was indeed positively intended."

[186]    The other members of the Court of Appeal (Laws and Simon Brown LJJ) also made it clear that there was no room for the argument that the statutory purpose had to be one which caused the transaction to be entered into before the court could intervene. Where the court is satisfied that, in truth, the statutory purpose motivated the debtor, it will intervene and make an appropriate order even though the debtor would have entered into the transaction for legitimate purposes in any event.

[187]    The position could not have been stated with more clarity by Simon Brown LJ in **Hashmi**. He observed:[130]

> "Assume, say, that the debtor makes a gift partly out of a wish to avoid inheritance tax and partly to escape his creditors; and assume further that he would have made it in any event purely for inheritance tax purposes. That, to my mind, should not save the gift from being set aside. Escaping the creditors may well, after all, have been a substantial factor in the donor's thinking. No more should a gift, in my opinion, be saved merely because the debtor would in any event have made it to benefit the donee."

[188]    The observations of Simon Brown LJ are particularly apposite in this case, where Dr Orjiako asserts that the Transfers were made to his wife for estate planning purposes or out of the natural love and affection that he has for her. Whether or not what he says is correct – and I have already indicated that I do not accept his claims – the fact is that he was clearly motivated to transfer the Shares to put his assets beyond the reach of his creditors.

---

[129] *Ibid*, at [23].
[130] *Ibid*, at [38].

[189] In **JSC BTA Bank v Ablyazov**,[131] Leggatt LJ (with whom Coulson and Gloster LJJ agreed) cast doubt on the formulation in **Hashmi** concerning the need for there to be a substantial purpose and said that "[t]he description of the requisite purpose as a 'substantial' purpose was not necessary to the decision of the Court of Appeal in the **Hashmi** case and to my mind it risks causing confusion. The word 'substantial' is not used in section 423 and I can see no necessity or warrant for reading this (or any other) adjective into the wording of the section. At best it introduces unnecessary complication and at worst introduces an additional requirement which makes the test stricter than Parliament intended."

[190] Leggatt LJ went on to say[132] that "it is sufficient simply to ask whether the transaction was entered into by the debtor for the prohibited purpose. If it was, then the transaction falls within section 423(3), even if it was also entered into for one or more other purposes. The test is no more complicated than that."

[191] The Court of Appeal in **Hashmi** affirmed the decision at first instance in which the Judge had said that the debtor's purpose need not be his dominant purpose but must play more than a trivial role in what he decided to do in the sense that it made a contribution of importance to the debtor's purpose in entering into the transaction.[133] The Judge had held that provided the statutory purpose constituted a purpose of the debtor in entering into the transaction, the fact that he might also have had some other purpose in entering into the transaction will not prevent s. 423(3) being applied, and this was the case even if that other purpose was in fact the debtor's dominant purpose in entering into the transaction.[134]

[192] It follows from the above cases that putting assets beyond the reach of creditors need not be shown to be the sole or dominant purpose or intention of the transaction before the court will intervene under s. 423. Whether the same position applies under s. 81 of the **CLPA 1961** is not altogether clear from the

[131] [2018] EWCA Civ 1176, at [14].
[132] *Ibid*.
[133] JSC BTA Bank v Ablyazov [2016] EWHC 2071 (Comm), at [128].
[134] *Ibid*, at [128].

authorities on the subject, although I have not looked into the matter in any detail. However, even if I need to be satisfied that it was the sole intent of transferring the Shares, I am so satisfied, *a fortiori*, if that intent was simply the dominant intent for the transfer.

[193]    I readily accept that under s. 81 of the **CLPA 1961**, the test for avoiding a transaction is not the insolvency of the debtor. Indeed, it has been held, even in the case of s. 423 of the **IA 1986**, that the issue for the court is not whether the debtor was insolvent or on the verge of insolvency, but rather the discrete question of what his intention was at the time of the transaction, which is the subject of challenge: see **BTI 2014 LLC v Sequana SA**.[135]

[194]    It follows that the applicant must prove an intent to defraud. While the debtor's insolvency may provide some support for such an intention, it is not sufficient by itself.  Nor is the fact that there was no consideration for money or money's worth an indication, whether by itself or combined with the insolvency of the debtor, a sufficient basis to impugn a transaction under s. 81. However, the insolvency of the debtor may lead a court to infer the existence of the requisite purpose, just as the absence of insolvency might cause a court to lean towards finding that the requisite purpose was lacking.

[195]    Nonetheless, in the absence of any evidence suggesting that there was any other intent, it is difficult to see how the transaction can be said not to be with the intent to defraud creditors in the face of Dr Orjiako's clear and obvious insolvency. The only other purposes given by Dr Orjiako for the transfer (estate planning and a desire to benefit his wife for the substantial contribution she made to his various businesses, and out of love and affection for her and to his sister for similar reasons) simply do not come up to scratch.

[196]    In favour of the Defendants, reference must be made to the decision in **Purkiss v Kennedy**,[136] in which a transaction was entered into with the intention of mitigating any liability to tax that would arise from it. The court held that the

---

[135]  [2016] EWHC 1686 (Ch), at [494], upheld by the E&W Court of Appeal: [2019] EWCA Civ 112. The subsequent appeal to the Supreme Court did not concern this issue: [2022] UKSC 25.
[136] [2024] EWHC 1081 (Ch).

transaction did not constitute an intention to prejudice a claim for that tax liability within the purposes of s. 423(3)(b). Rajah J said:[137]

> [The applicant] relies on the fact that by transferring the full balance of the monies received from end users to the Trust (without deducting income tax and NIC on those monies), the Company was left with insufficient funds to meet the tax liabilities which would (and did) fall upon it in the event (as transpired) that the Scheme was ineffective. There is, however, a difference between a consequence of the scheme and its purpose. This is clearly demonstrated by the decisions in **Re Marylebone Warwick Balfour Management**[138] and **Asertis Ltd v Heathcote**[139]. In both these cases, applications for relief under **s 423** were made by the liquidators of companies which had entered into a tax avoidance scheme which had failed leaving the companies insolvent, and HMRC unpaid in respect of the tax which was due. In both of these cases, the applications failed because, while the consequences of the failed scheme was that HMRC was prejudiced, and assets placed out of HMRC's reach, the companies did not have a prohibited purpose having entered into the tax avoidance scheme with a genuine belief that it was tax effective."

[197]    I am not convinced by the reasoning in **Purkiss**. I am not sure that, on the facts, the respondents in that case, could not have been found to have had, as part of their purpose, the requisite statutory intention to move assets out of the reach of their creditors. Be that as it may, that case was decided on its own unusual facts, and, restricting it to its own facts, the Judge was perhaps entitled to conclude that the statutory purpose was not made out.

[198]    In any event, there is no similarity between **Purkiss** and the present case. In **Purkiss**, the court found, on the facts, that the prejudice to HMRC arose from a transaction which was part of a scheme that was entered *bona fide* for the purpose of avoiding tax. As a result of the scheme's failure, the debtor became liable to pay the tax it had sought to avoid paying. The Judge held that the purpose did not constitute an intention to prejudice a claim for that tax liability for the purposes of s. 423(3)(b). That was because, in entering into the scheme, the debtor had a genuine belief that the scheme was tax effective, and it did not matter if the consequence of the scheme was to put assets out of the reach of

---

[137] *Ibid*, at [51].
[138] [2022] EWHC 784 (Ch).
[139] [2022] EWHC 2498 (Ch).

HMRC. The position in the present case is different. The transfer of the Shares had one purpose and one purpose only: it was designed to put them outside the reach of Dr Orjiako's creditors. At the time of the transfer, Dr Orjiako was hopelessly insolvent.

[199] The only basis relied upon by Dr Orjiako to dispute the inevitable "intent to defraud" is his own word. That counts for nothing against the overwhelming evidence which points to the contrary. Nor for the reasons already given will any oral evidence on the point assist Dr Orjiako. As Peter Gibson LJ observed in **Southall**,[140] in which a similar argument was raised (on behalf of the applicant, as opposed to the respondent, in that case):

> "Mr Collings [counsel for the Law Society] submitted that disclosure and cross-examination might come to the Law Society's aid … he suggested that Mrs Southall's credit as a witness might be undermined by being proven to be wrong on that point. In my judgment, it would be quite wrong to allow a case to go ahead on the basis that there was an issue which went to the credit of one of the witnesses."

[200] Wall J (as he then was) was equally emphatic about why the cross-examination of the respondent at the trial of the application would not assist, commenting[141]:

> "I regard with particular distaste the suggestion that Mrs Southall, in her late 70s, should be cross-examined as to credibility only on her husband's infidelity some 30 years ago. I, like my Lord, am entirely satisfied that the judge should have … given summary judgment on Part 24 of the Civil Procedure Rules 1998 in favour of the defendant."

[201] In the same way as Peter Gibson LJ described that it would be "wishful thinking on the [applicant's] part that the pre-trial procedures, or cross-examination, would yield valuable support for its case"[142], it would equally be "wishful thinking" for Dr Orjiako to believe that his case might be improved if the Claim were tried.

[202] In the amended Defence, the Defendants raise a "limitation" defence. This was not pursued at the SJ hearing. So far as I must determine the issue, I agree with

---

140 [2001] EWCA Civ 2001, at [50].
141 *Ibid*, at [59].
142 *Ibid*, at [51].

Mr Thompson that there can be no limitation defence available to the Defendants for the reasons he gives: see **Hill v Spread Trustee Company Ltd**[143] and the principles relating to the extension of the limitation period set out in **Giles v Rhind**.[144]

[203] Section 81(3) of the **Conveyancing and Law of Property Act 1961** states that s. 81 "does not extend to any estate or interest in property conveyed for valuable consideration and in good faith or upon good consideration and in good faith to any person not having at the time of conveyance, notice of the intent to defraud creditors." Accordingly, an innocent transferee who takes an estate or interest in the property in good faith for valuable consideration and without notice of the intent to defraud has statutory protection. Similarly, a bona fide purchaser from the transferee without notice of the fraudulent intent is protected against an order. Neither the **Conveyancing and Law of Property Act 1961** nor any other statutory provision applicable in this jurisdiction to which I have been referred sets out the meaning of the expression "valuable consideration" or "good consideration". This may be contrasted with s. 205(1)(xxi) of the **LPA 1925**, which states that for the purposes of the meaning of the expression "purchaser" in the **LPA 1925**, the expression "valuable consideration" includes "marriage, and formation of a civil partnership, but does not include a nominal consideration in money."

[204] It is not clear whether the Orjiakos contend that the transfer of the Shares made by Dr Orjiako to Mrs Orjiako, out of the natural love and affection that he has for her, amounts to valuable or good consideration. Whether or not it constitutes valuable or good consideration for the purposes of Ground 1, I am satisfied that it does not amount to valuable or good consideration for the purposes of s. 81.

[205] There is some slight basis for suggesting that a transfer for natural love and affection can amount to valuable consideration. For example, in **Re Yates**,[145] Charles J stated that the transfer of a half share in a matrimonial home by a

---

143 [2006] EWCA Civ 542, at [117]–[118], and [143].
144 [2008] EWCA Civ 118.
145 [2005] BPIR 476.

husband in favour of his wife in consideration of the natural love and affection which he had for her could "amount to 'valuable or good consideration' for the purposes of s. 172(3)" … and that if the transfer was a genuine gift and not a sham or pretence I would accept that it was made, or can properly be said to have been made, because of the natural love and affection of [the husband] for [his wife]."[146] However, on the facts, Charles J decided that the wife did not have the protection of s. 172(3) because she did not receive the husband's half share in good faith, and the wife had notice that the husband intended to put his share in the matrimonial home beyond the reach of his creditors, particularly the Inland Revenue.

[206] The preponderance of authority is against the natural love and affection that a husband has for his wife, constituting valuable or good consideration. These authorities include **Moffat v Moffat**,[147] in which McBride J expressly stated that an assignment … made in consideration of 'natural love and affection' … is not valuable consideration."

[207] In **Re Abbott**,[148] Sir Robert Megarry V-C, sitting in the Divisional Court with Peter Gibson J (as he then was), was clear that the meaning of "purchaser for valuable consideration" in s. 42 (1) of the **Bankruptcy Act 1914**, the forebear of the I**A 1986**, so far as it concerned the insolvency of individuals. He observed:

> "Plainly 'good consideration', in the sense of the natural love and affection that a man has for his wife and children, is not enough. Nor is a merely nominal consideration, even though it would suffice to support a simple contract at common law. In the context of the avoidance of settlements by a trustee in bankruptcy, a 'purchaser … for valuable consideration' must be someone who can not only be described as being a 'purchaser' but can also be said to have given a consideration for his purchase which has a real and substantial value, and not one which is merely nominal or trivial or colourable."

[208] In any event, even if the natural love and affection that Dr Orjiako had for his wife constitutes valuable or good consideration, the statutory protection in s.

[146] [2005] BPIR 476, at [190].
[147] [2020] NICh 17, a decision of the Northern Ireland Chancery Division.
[148] [1983] Ch. 45.

81(3) is not available to her. The protection is only available to an innocent transferee who takes an estate or interest in the property in good faith for valuable consideration and without notice of the intent to defraud. It is clear from Mrs Orjiako's written evidence that, at all material times, she well knew what was going on and specifically knew that what her husband was doing was seeking to put his assets out of the reach of his creditors.

[209] It must follow from the above that the Claimant is also entitled to succeed under Ground 2 if my analysis under Ground 1 is incorrect.

**Conclusion**

[210] The substantive order I will make is that proposed by the Claimant in relation to the primary relief it claims, i.e., a declaration that Dr Orjiako is the sole beneficial owner of the Shareholding Companies and the Salvic Defendants, i.e., Salvic Energy and Salvic Petroleum BVI. I will leave it to the parties to agree an appropriate form of declaration for this purpose.

[211] On that basis, there is no need for me to concern myself with the relief sought by the Claimant under Ground 2.

**Matters outstanding and arising**

[212] There are several matters that the Court will need to deal with arising from my judgment, such as costs, including the costs of any interlocutory matter that may have been held over to be determined at, or following, the SJ Hearing.

[213] I invite counsel to lodge an approved minute of an order to reflect my judgment as soon as possible and, in any event, within 5 days of the circulation of this Judgment in draft form.

**Acknowledgments**

[214]  I again express my deep and sincere gratitude to counsel, both for the manner of the presentation of their clients' cases and for their cooperation throughout the SJ Hearing. The skeleton arguments were not just comprehensive but prepared to the highest possible standard. I do not say this out of politeness, convention, or courtesy. I say it because it is true.

[215]  I regret the length of this judgment. However, it reflects the excellent quality of both the skeleton arguments and the oral submissions that were advanced before me at the SJ Hearing. While the Judgment does not (and does not need to) deal with every conceivable point that arose in the course of the hearing of the Application, its length also reflects the very many points that arose from some of the arguments that the Defendants had raised in their skeleton argument, which were not advanced at the SJ hearing.

**Abbas Mithani KC**
High Court Judge (Ag)

**By the Court**

**Registrar**

Privy Council

# *Tasarruf Mevduati Sigorta Fonu *v* Merrill Lynch Bank and Trust Co (Cayman) Ltd and others

## [2011] UKPC 17

2011 Jan 31; Feb 1; June 21

Lord Hope of Craighead DPSC, Lord Mance, Lord Clarke of Stone-cum-Ebony JJSC, Lord Collins of Mapesbury, Lord Reed

*Execution — Equitable execution — Appointment of receiver — Settlor of discretionary trust made bankrupt following failure to meet judgment debt — Sole beneficiaries of trust being settlor and wife with settlor having power of revocation — Whether appropriate to order delegation of power of revocation to receiver to pay judgment debt — Whether power of revocation tantamount to property*

The claimant brought proceedings in Turkey against the defendant and obtained judgment in personam against him in the sum of US$30m. The defendant failed to satisfy the judgment debt and was made bankrupt in Turkey. The claimant subsequently discovered that the defendant had established two discretionary trusts in the Cayman Islands with assets of over US$24m. The beneficiaries of the trusts were the defendant and his wife and the defendant had power of revocation of the trusts. The claimant commenced proceedings in the Cayman Islands seeking the appointment of a receiver by way of equitable execution over the power to revoke the trusts and an order that the defendant assign or delegate his power of revocation to the receiver. The judge dismissed the claimant's application on the grounds that the power to appoint a receiver was limited to property; that making the order sought would involve setting aside the longstanding common law distinction between powers and the property they affected; and that where it was desirable to treat powers of appointment as property that had been achieved by legislation. The Court of Appeal upheld his decision.

On appeal by the claimant—

*Held*, allowing the appeal, that there was no invariable rule that a power was distinct from ownership, nor was there a rule that any departure from the distinction between power and property was effected solely by legislation; that, with regard to the trusts, the defendant owed no fiduciary duties and his only discretion was whether to exercise his powers in his own favour; that, in the circumstances, the powers of revocation were such that in equity they were tantamount to ownership; and that, accordingly, the appropriate order would be that the defendant should delegate his powers of revocation to the receivers so that they could exercise them to enforce the Turkish judgment (post, paras 59, 60, 61, 62, 65).

*Masri v Consolidated Contractors International (UK) Ltd (No 2)* [2009] QB 450, CA applied.

Decision of the Court of Appeal of the Cayman Islands reversed.

The following cases are referred to in the opinion of the Board:

*Bainton v Ward* (1741) 2 Atk 172

*Bremer Vulkan Schiffbau und Maschinenfabrik v South India Shipping Corpn Ltd* [1981] AC 909; [1981] 2 WLR 141; [1981] 1 All ER 289, HL(E)

*British Airways Board v Laker Airways Ltd* [1985] AC 58; [1984] 3 WLR 413; [1984] 3 All ER 39, HL(E)

*Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334; [1993] 2 WLR 262; [1993] 1 All ER 664, HL(E)

© 2012 The Incorporated Council of Law Reporting for England and Wales

*Chief Constable of Kent v V* [1983] QB 34; [1982] 3 WLR 462; [1982] 3 All ER 36, CA
*Churston Settled Estates, In re* [1954] Ch 334; [1954] 2 WLR 386; [1954] 1 All ER 725
*Clarkson v Clarkson* [1994] BCC 921, CA
*Comr of Stamp Duties v Stephen* [1904] AC 137, PC
*Cowles, In re* (1992) 143 BR 5
*Derby & Co Ltd v Weldon (No 6)* [1990] 1 WLR 1139; [1990] 3 All ER 263, CA
*Edwards & Co v Picard* [1909] 2 KB 903, CA
*Field v Field* [2002] EWHC 2762 (Fam); [2003] 1 FLR 376
*Gilchrist, Ex p; In re Armstrong* (1886) 17 QBD 521, CA
*Gouriet v Union of Post Office Workers* [1978] AC 435; [1977] 3 WLR 300; [1977] 3 All ER 70, HL(E)
*Grassa, In re* (2007) 363 BR 360
*Harris v Beauchamp Bros* [1894] 1 QB 801, CA
*Holmes v Coghill* (1802) 7 Ves 499
*Holmes v Millage* [1893] 1 QB 551, CA
*Maclaine Watson & Co Ltd v International Tin Council* [1988] Ch 1; [1987] 3 WLR 508; [1987] 3 All ER 787; [1989] Ch 253; [1988] 3 WLR 1169; [1988] 3 All ER 257, CA
*Markham v Fay* (1995) 884 F Supp 594; (1996) 74 F 3d 1347
*Masri v Consolidated Contractors International (UK) Ltd (No 2)* [2008] EWCA Civ 303; [2009] QB 450; [2009] 2 WLR 621; [2009] Bus LR 168; [2008] 2 All ER (Comm) 1099, CA
*Mathieson, In re* [1927] 1 Ch 283, CA
*Melville v Inland Revenue Comrs* [2001] EWCA Civ 1247, [2002] 1 WLR 407, CA
*Mercedes-Benz AG v Leiduck* [1996] AC 284; [1995] 3 WLR 718; [1995] 3 All ER 929, PC
*Morgan v Hart* [1914] 2 KB 183, CA
*Morgan v Inland Revenue Comrs* [1963] Ch 438; [1963] 2 WLR 416; [1963] 1 All ER 481, CA
*North London Railway Co v Great Northern Railway Co* (1883) 11 QBD 30, CA
*P v Liverpool Daily Post and Echo Newspapers plc* [1991] 2 AC 370; [1991] 2 WLR 513; [1991] 1 All ER 622, HL(E)
*Parker v Camden London Borough Council* [1986] Ch 162; [1985] 3 WLR 47; [1985] 2 All ER 141, CA
*Siskina (Owners of cargo lately laden on board) v Distos Cia Naviera SA* [1979] AC 210; [1977] 3 WLR 818; [1977] 3 All ER 803, HL(E)
*South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV* [1987] AC 24; [1986] 3 WLR 398; [1986] 3 All ER 487, HL(E)
*State Street Bank & Trust Co v Reiser* (1979) 389 NE 2d 768
*Tasarruf Mevduati Sigorta Fonu v Demirel* [2006] EWHC 3354 (Ch); [2007] 2 All ER 815; [2007] 1 All ER (Comm) 649; [2007] EWCA Civ 799; [2007] 1 WLR 2508; [2007] 4 All ER 1014; [2007] 2 All ER (Comm) 925, CA
*Thorpe v Goodall* (1811) 17 Ves 388, 460
*Triffitt's Settlement, In re* [1958] Ch 852; [1958] 2 WLR 927; [1958] 2 All ER 299
*United States v Ritter* (1977) 558 F 2d 1165
*Watts, In re* [1931] 2 Ch 302

The following additional cases were cited in argument:

*Bourne v Colodense Ltd* [1985] ICR 291, CA
*Bradford (Lord), Committee of, Ex p* (1737) West t Hard 133
*Lassells v Lord Cornwallis* (1704) 2 Vern 465
*Peacock v Monk* (1748) 1 Ves Sen 127
*Soinco SACI v Novokuznetsk Aluminium Plant* [1998] QB 406; [1998] 2 WLR 334; [1997] 3 All ER 523

© 2012 The Incorporated Council of Law Reporting for England and Wales

*Tarback v Marbury* (1705) 2 Vern 510
*Thompson v Towne* (1694) 2 Vern 319
*Townshend (Lord) v Windham* (1750) 2 Ves Sen 1

**APPEAL** from the Court of Appeal of the Cayman Islands

The claimant, Tasarruf Mevduati Sigorta Fonu ("TMSF"), appealed with conditional leave of the Court of Appeal of the Cayman Islands (Sir John Chadwick P, Forte and Mottley JJA) granted on 30 November 2009 and final leave granted on 8 February 2010, against a decision of the Court of Appeal (2009) 13 ITELR 1 (Sir John Chadwick P, Mottley and Vos JJA), given on 9 September 2009, dismissing the claimant's appeal from a judgment dated 26 June 2009 (2009) 12 ITELR 828 of Smellie CJ sitting in the Grand Court of the Cayman Islands, by which, inter alia, he had dismissed the claimant's application for the appointment of receivers over the powers of revocation of a trust established by the sixth defendant, Yahya Murast Demirel. The first defendant, Merrill Lynch Bank and Trust Co (Cayman) Ltd, was the trustee and the second to fourth defendants, Kaffe Ltd, Barla Finance Ltd, Cunur Cash Ltd and Medro Ltd, were the companies which, under the control of the trustee, held the assets of the trust.

The facts are stated in the opinion of the Board.

*Stephen Moverley Smith QC*, *Alexander Pelling* and *Christopher Russell* (instructed by *Berwin Leighton Paisner LLP*) for the claimant.

*Colin McKie* and *Jane Clarkson* (both of the Cayman Islands Bar) (instructed by *Lawrence Graham LLP*) for the first to fifth defendants.

*Nigel Meeson QC* and *Stephen Leontsinis* (both of the Cayman Islands Bar) (instructed by *Harcus Sinclair*) for the sixth defendant.

The Board took time for consideration.

21 June 2011. **LORD COLLINS OF MAPESBURY** handed down the following opinion of the Board.

*I Introduction*

1 This appeal is about the jurisdiction of the court to appoint receivers by way of equitable execution, and in particular whether the Cayman Islands court should apply the decision of the Court of Appeal in England in *Masri v Consolidated Contractors International (UK) Ltd (No2)* [2009] QB 450 ("*Masri (No 2)*") so as to appoint receivers over a judgment debtor's power of revocation of trusts established by him in the Cayman Islands under Cayman law, the assets of which are exclusively in the Cayman Islands.

2 The claimant, Tasarruf Mevduati Sigorta Fonu ("TMSF"), was established by the Turkish State to restructure and administer failed banks whose banking licences have been revoked. As part of the restructuring and administration process, TMSF has acquired the assets of two Turkish banks, Bank Ekspres and Egebank. Under Turkish banking legislation, TMSF has authority to bring proceedings in its own name for the recovery of losses sustained by the banks.

3 Mr Demirel was the controller of a group of companies which owned Egebank. TMSF claimed that at the time of its demise Egebank had accumulated losses of over US$1·2 billion, that investigations subsequently

© 2012 The Incorporated Council of Law Reporting for England and Wales

revealed that some US$490m had been misappropriated from Egebank by Mr Demirel, his family and associates, and approximately US$336m had been misappropriated from other banks. On 20 November 2001 the Turkish courts gave judgment in personam against Mr Demirel in the sum of US$30m in respect of a right of action of Bank Ekspres against Mr Demirel for damage caused by allegedly fraudulent loan transactions: see *Tasarruf Mevduati Sigorta Fonu v Demirel* [2007] 2 All ER 815, affirmed [2007] 1 WLR 2508 (service out of the jurisdiction in a claim in England to enforce the Turkish judgment).

**4** TMSF learned that Mr Demirel had established two discretionary trusts in the Cayman Islands, with assets of some US$24m. For practical purposes the beneficiaries are Mr Demirel and his wife. Mr Demirel has power of revocation of the trusts, with the consequence that he could re-vest in himself an amount which would satisfy a very large proportion of the judgment debt. TMSF seeks the appointment of a receiver by way of equitable execution with a view to reaching the power of revocation and thereby reaching the funds in the trusts.

**5** The legal background to the dispute is that the power to appoint a receiver by way of equitable execution is contained in section 37(1) of the Senior Courts Act 1981 (formerly called the Supreme Court Act 1981), as applied in the Cayman Islands by section 11(1) of the Grand Court Law (2008 Revision). Under section 37(1) the court "may by order . . . grant an injunction or appoint a receiver in all cases in which it appears to the court to be just and convenient to do so". The appointment of a receiver by way of equitable execution is not "execution" in the ordinary legal sense of the word, but a form of equitable relief for cases in which execution in that sense is not available.

**6** In *Masri (No 2)* [2009] QB 450, the Court of Appeal in England held that the jurisdiction to appoint a receiver by way of equitable execution permitted of gradual and incremental development, and in particular was not limited to choses in action which were presently available for legal execution. The appointment of a receiver was not limited to such property as might be taken in execution, but extends to whatever is considered in equity to be assets: *Masri (No 2)*, para 151; *Kerr on Receivers*, 1st ed (1869), p 87.

**7** Mr Demirel resisted the appointment of the receiver broadly on these grounds: (1) a receiver by way of equitable execution could only be appointed over property; (2) a power of revocation was for this purpose in the same category as a general power of appointment; (3) it had been long been understood that (in the absence of legislative provision to the contrary) a power of appointment was not property; (4) the order could only be effective if the receiver were authorised to revoke the trusts on Mr Demirel's behalf and/or Mr Demirel were ordered to revoke them; (5) as a matter of law, the power to revoke was not delegable and the court had no jurisdiction to order the exercise of the power of revocation.

**8** Both Smellie CJ and the Court of Appeal of the Cayman Islands refused TMSF the remedy it sought. The main question on this appeal by TMSF is whether the power of revocation of the trusts is sufficiently close to the notion of property to enable the equitable remedy of a receiver by way of equitable execution to be available to ensure that Mr Demirel has not put himself beyond the reach of the judgment creditor, and whether the

© 2012 The Incorporated Council of Law Reporting for England and Wales

appointment can be made effective by ordering Mr Demirel to transfer or delegate the power of revocation to the receivers (and, in default, ordering the transfer or delegation to be executed on his behalf).

*II The trusts and the Cayman proceedings*

*The trusts*

9 On 28 June 1999 Mr Demirel executed two deeds of trust, establishing two trusts, the Mana Trust and the Dolphin Trust ("the trusts"). The trustee of the trusts is the first defendant, Merrill Lynch Bank and Trust Co (Cayman) Ltd ("Merrill Lynch"). The trusts are Cayman Islands discretionary trusts, and it is common ground that the trusts are valid and duly constituted as a matter of Cayman Islands law.

10 The discretionary objects of both trusts are Mr Demirel, Ayse Nur Esenler, who is now the wife of Mr Demirel, and Mr Demirel's children and remoter issue now living or born afterwards. At present, Mr Demirel has no living children or remoter issue. The residuary beneficiary is charity.

11 The assets of the trusts are shares in Cayman companies. The shares are held by Fairfield Nominees Ltd as nominee for Merrill Lynch. The company owned by the Dolphin Trust is the fifth defendant, Medro Ltd. The companies owned by the Mana Trust are the second, third and fourth defendants, Kaffee Ltd, Barla Finance Ltd and Cunur Cash Ltd. As of 31 October 2006 these companies held cash balances at Merrill Lynch amounting in aggregate to about US$24m.

12 Mr Demirel reserved a power to revoke, amend, vary or alter the trusts, in these terms:

> "This trust may be revoked, amended, varied or altered in any manner whatsoever from time to time and at any time by the settlor by deed and delivered to the trustees provided always that no such revocation, amendment, variation or alteration shall take effect until actual receipt of such instrument by the trustees or with the written consent of the trustees thereto if such revocation, amendment, variation or alteration would increase or extend the obligations, liabilities or responsibilities of the trustees."

*Cayman proceedings*

13 On 1 December 2005 TMSF issued proceedings in Cayman against Merrill Lynch and the trust companies in cause No 555 of 2005 (the proprietary claim). On 5 December 2005 TMSF obtained freezing orders from Levers J against the trust companies in that action in the sum of US$30m, and on 5 January 2006 the freezing orders against the trust companies were renewed by Levers J.

14 On 23 February 2007 TMSF issued proceedings against Mr Demirel, in order to enforce the Turkish judgment in the Cayman Islands. TMSF obtained a freezing order from Levers J against Mr Demirel in the value of US$45m.

15 On 30 March 2007 the proprietary claim was consolidated with the claim to enforce the Turkish judgment.

16 On 30 April 2007 Mr Demirel served a defence to the claim against him to enforce the Turkish judgment, and on 30 April 2008 summary

© 2012 The Incorporated Council of Law Reporting for England and Wales

judgment was given in favour of TMSF in the amount of US$30m plus interest and costs.

17 On 22 August 2008 TMSF issued a summons seeking: the appointment of receivers by way of equitable execution over the power to revoke, amend, vary or alter the trusts contained in the trusts; and orders against Mr Demirel for the assignment to the receivers of the powers of revocation and/or their exercise, and upon the powers being vested in the receivers, authorisation to exercise the power to revoke the trusts; following the exercise of the power, extending the appointment of the receivers over the share capital and the assets of the companies holding the money, and vesting in the receivers the share capital and the assets of those companies.

18 The application by TMSF was dismissed by Smellie CJ on 26 June 2009 (2009) 12 ITELR 828 and TMSF's subsequent appeal against that decision was dismissed on 9 September 2009 by the Court of Appeal of the Cayman Islands (2009) 13 ITELR 1 ("the Court of Appeal"), which gave leave to appeal to the Board.

*Turkish bankruptcy*

19 Meanwhile, on 31 December 2008 Mr Demirel had been declared bankrupt by the Turkish court.

*III The judgments below and the appeal*

*Judgment of Smellie CJ*

20 Smellie CJ's starting point was that the effect of *Masri (No 2)* [2009] QB 450 was that, although the jurisdiction to appoint a receiver was not limited to property which was available for legal execution, it was still necessary that it be in the nature of property. The distinction between a power and property was fundamental and longstanding: *Ex p Gilchrist; In re Armstrong* (1886) 17 QBD 521. There was no conclusive authority that, in the absence of specific legislation, general powers (whether of appointment or of revocation) were tantamount to property. Where it was thought desirable to treat powers of appointment as property that was done by Cayman legislation: Bankruptcy Law (1997 Revision), sections 2 and 100 (equivalent to the Insolvency Act 1986, sections 436 and 283(4)); Wills Law (2004 Revision), section 22 (equivalent to the Wills Act 1837 (7 Will 4 & 1 Vict c 26), section 27); Companies Law (2007 Revision), section 87 (equivalent to the Companies Act 2006, section 900(5)).

21 Trust cases in which the courts had disregarded the distinction were cases in which statute defined property as including unexercised general powers of appointment. The power was not tantamount to ownership and was not delegable: *In re Triffitt's Settlement* [1958] Ch 852. Consequently, to make the order sought would "involve nothing less than the setting aside of the settled common law principles which have distinguished powers from the property they affect, for hundreds of years" and "would strike at the very heart of the trust concept": see 12 ITELR 828, paras 61 and 62.

*The judgment of the Court of Appeal*

22 The Court of Appeal held that it did not have jurisdiction, as a matter of law, to appoint receivers by way of equitable execution over a power of revocation in a trust; but even if it had had jurisdiction, it would

© 2012 The Incorporated Council of Law Reporting for England and Wales

not have exercised it without much more information because Mr Demirel has been made bankrupt in Turkey at the behest of TMSF and the natural person to get in his assets was his trustee in bankruptcy.

**23** The Court of Appeal said, at 13 ITELR 1, para 31:

> "The question, therefore, is whether a power of revocation should be available to a single creditor by way of equitable execution, so as to enable that single creditor to procure its execution and to recover all the settled assets to satisfy his judgment debt. We have concluded, in agreement with the Chief Justice, that if such an advance in the law is to be made, it must be made by legislation."

**24** The Court of Appeal distinguished the question whether a power of revocation should be regarded as a chose in action and so as "property", and the question whether as a matter of policy, the court should recognise for the first time that equitable execution could be allowed in respect of powers of revocation of the kind in issue. The second was the real issue. The first was ultimately inconclusive. The question was whether a power of revocation should be available to a single creditor by way of equitable execution so as to enable that creditor to procure its execution and to recover all the settled assets to satisfy his judgment debt. If such an advance in the law was to be made, it had to be made by legislation.

**25** The Bankruptcy Act 1825 (6 Geo 4, c 16), section 77, was enacted to enable assignees to exercise such powers for the benefit of the creditors, because it had been held that that a bankrupt could not be compelled to exercise a power of appointment for the benefit of creditors: *Thorpe v Goodall* (1811) 17 Ves 388, 460. A power of revocation was merely a narrow power of appointment and the legislature had considered the particular context, and had decided that for that specific context properties were to include general powers exercisable by their donees in their own favour. The repeated enactments of the legislature in the Cayman Islands and the United Kingdom showed that it would be unwise and inappropriate for a court to allow equitable execution over a power of revocation by way of the kind of incremental advance envisaged in *Masri (No 2)* [2009] QB 450. That was not because it could not in theory be done, but was because where legislatures had for almost 200 years taken it upon themselves to decide when powers should be considered to be included in a defined package of "property" the court must assume that the legislature would not wish judges to arrogate to themselves that decision. But the Court of Appeal did not agree with Smellie CJ that inclusion of powers in the species of equitable property for which equitable execution was available would automatically strike at the very heart of the trust concept.

**26** But even if the jurisdiction existed it would have been extraordinary that TMSF should, having made Mr Demirel bankrupt, have thought it appropriate to seek equitable execution to bring US$27m worth of assets to itself to the exclusion of other creditors. The undertaking that the proceeds would be brought into the bankrupt estate emphasised that TMSF had used the wrong process and the wrong procedure. Once he had been made bankrupt, the collecting in of his assets was a matter for his trustee in bankruptcy but unless much more information had been available, the court would not have exercised its discretion to appoint receivers in aid of equitable execution over the powers of revocation.

© 2012 The Incorporated Council of Law Reporting for England and Wales

*TMSF's arguments on the appeal*

**27** TMSF's arguments on the appeal were essentially these. The court's policy should be to ensure that its judgments are so far as possible enforced. The fact that the legislature has enacted statutes to include powers within the property available to a bankrupt's trustee does not imply that powers should be presumed not to fall within the scope of equitable execution unless a statute specifically says that they do, especially when section 37(1) of the Senior Courts Act 1981 provides that a receiver may be appointed "in all cases in which it appears to the court to be just and convenient to do so".

**28** A settlor of a trust who has an unfettered power of revocation is entitled to call for the trust assets to be paid over to him at any time, for any reason or for no reason. Such a right is, for most practical purposes, tantamount to ownership. The English authorities going back to Sugden have acknowledged that there may be very little difference between a power to appoint trust property and ownership of the property itself. The powers of revocation are not fiduciary powers and are assignable and/or delegable, and there is no rule that the person holding the power cannot be ordered to exercise it.

*The defendants' arguments on appeal*

**29** The arguments of the defendants are these. Unless and until the power is exercised, the donee is not the owner of the property subject to the settlement (unless he is also the trustee) and cannot be treated as owner of the property. The powers are not property. Legal title is vested in the trustee, and validly created trusts should not be destroyed to the detriment of the innocent beneficiaries of those trusts. There is no statutory provision outside bankruptcy (section 100 of the Bankruptcy Law) in favour of a single judgment creditor to enable this to be done, and no case in which the court has provided any such remedy. Any change in the law should be left to the legislature of the Cayman Islands.

**30** The real substance of TMSF's application is for the court to order the powers to be delegated to the receivers, which the court has no jurisdiction to do. If the donee of a power has not shown an intention to exercise the power, the court will not exercise it for him, unless (perhaps) his failure to exercise the power was procured by fraud. For the court to order the exercise of the power would deprive the party of any discretion.

*IV Discussion*

*Powers and property*

**31** The traditional view was that a power was distinct from property, but this was not an absolute rule. There are several early cases on the rights of creditors to reach assets which were subject to a power of appointment by a bankrupt. In modern terms they can be regarded as deciding that the property was not owned by the bankrupt or that the court had no jurisdiction to order a power to be exercised: *Holmes v Coghill* (1802) 7 Ves 499; *Thorpe v Goodall* 17 Ves 388, 460; contrast *Bainton v Ward* (1741) 2 Atk 172 (criticised at Ves Sen Supp, pp 243–247). Legislation was considered necessary to depart from the traditional rule. The effect of these decisions was reversed by, the Bankrupt Laws (England) Act 1822 (3 Geo 4, c 81), section 3, the predecessor of the Insolvency Act 1986, section 283(4)

© 2012 The Incorporated Council of Law Reporting for England and Wales

(which provides that "property" includes any power exercisable by the bankrupt over or in respect of property unless it cannot be exercised for the benefit of the bankrupt) via the Bankruptcy Act 1825, section 77, the Bankruptcy Act 1869 (32 & 33 Vict, c 71), section 15, the Bankruptcy Act 1883 (46 & 47 Vict, c 52), section 44, the Bankruptcy Act 1914, section 38, and the Insolvency Act 1985, section 130(5).

32 Section 27 of the Wills Act 1837 provided that a general devise or general bequest was to be construed as including any power to appoint and would operate as an execution of the power, unless a contrary intention appeared. See also the Administration of Estates Act 1925, section 32(1).

33 As with all legal categories, context was all important. There is no doubt that while for some purposes a power was not property, for other purposes the holder of a general power could be regarded as being for all practical purposes an owner.

34 Thus *Farwell, Powers*, 3rd ed (1916) said, at p 1:

> "A power is an authority reserved by, or limited to, a person to dispose, either wholly or partially, of real or personal property, either for his own benefit or for that of others . . . The word is used as a technical term, and is distinct from the dominion which a man has over his own estate by virtue of ownership."

35 Accordingly it was held, in the context of the Married Women's Property Act 1882 (45 & 46 Vict c 75), that a bankrupt married woman's separate property did not include such a power of which she was the donee, and she could not be compelled to exercise it in favour of her trustee in bankruptcy and so as to defeat the vested interest of her son as remainderman, in default of its exercise: *Ex p Gilchrist; In re Armstrong* 17 QBD 521, in which Fry LJ said, at p 531:

> "No two ideas can well be more distinct the one from the other than those of 'property' and 'power' . . . A 'power' is an individual personal capacity of the donee of the power to do something. That it may result in property becoming vested in him is immaterial; the general nature of the power does not make it property. The power of a person to appoint an estate to himself is, in my judgment, no more his 'property' than the power to write a book or to sing a song. The exercise of any one of those three powers may result in property, but in no sense which the law recognises are they 'property'. In one sense no doubt they may be called the 'property' of the person in whom they are vested, because every special capacity of a person may be said to be his property; but they are not 'property' within the meaning of that word as used in law."

36 So also if a power were exercised by a will, it was held that probate duty would not be payable on the property subject to the power unless legislation so provided: *Comr of Stamp Duties v Stephen* [1904] AC 137, 140–141, per Lord Lindley. See also *Melville v Inland Revenue Comrs* [2002] 1 WLR 407 for a case in which property for the purposes of the Inheritance Tax Act 1984 did include a general power of appointment, and in which it was accepted that, but for the legislation, a general power would not be property: para 30.

37 *Morgan v Inland Revenue Comrs* [1963] Ch 438 was a case dealing with a revocable trust. By a sub-settlement the settlor's son assigned to

© 2012 The Incorporated Council of Law Reporting for England and Wales

trustees his life interest in the settlement created by the settlor and the interest to which he was contingently entitled upon surviving the settlor. Under the sub-settlement the fund was to be held upon trust for himself for life and upon his death upon trust for the same persons who would take under the settlement created by the settlor had he predeceased the settlor. There was reserved to the son a power of revocation with the consent of the trustees. On the settlor's death the revenue claimed estate duty on the trust fund subject to the trusts of the settlement and sub-settlement. It was held by a majority (Upjohn and Diplock LJJ, Lord Denning MR dissenting) that estate duty was not leviable because the son continued to have a life interest notwithstanding his power of revocation.

38 Diplock LJ said, at p 455:

> "The fact that the sub-settlement is revocable has the result that Peter's life interest in the income of the shares is capable of enlargement into an absolute interest in possession in the shares themselves in the future with the trustees' consent. But this enlarged beneficial interest will arise (if at all) when the sub-settlement is revoked. The possibility that some subsequent event may enlarge Peter's beneficial interest does not in my view itself constitute a beneficial interest accruing or arising on the death of the deceased."

39 Lord Denning MR dissented. He said, at p 458:

> "I do not think that [the son] . . . did dispose of his contingent capital interest. At any rate he did not dispose of it so as to destroy it absolutely. The reason is because the [sub-settlement] was revocable. [The son] could revoke it at any time with the consent of his co-trustee. Suppose that he revoked it the day after his father's death. He could then have become entitled to the capital interest in the fund, just as if the [sub-settlement] . . . had never been executed. What does this come to? It means that, in order to avoid estate duty, the lawyer turns magician. He advises his client to execute a revocable settlement, and in an instant, before our very eyes, the contingent capital interest is gone. No one can see it. It is replaced by a continuous life interest. No estate duty is payable. And then, whilst we sit admiring the performance, wondering what is coming next, he can, when he pleases, bring back the capital interest. He advises his client to revoke the settlement, with, of course, the consent of his co-trustee, and at once the capital interest is there intact. It makes me rub my eyes. I cannot believe it is true. Those near me acclaim the feat. But I do not. I have a feeling that the contingent capital interest remained there all the time, cloaked by a revocable sub-settlement. Pull the covering aside and you will see it as it really is, a contingent capital interest which became absolute on the father's death; and on which, therefore, estate duty is payable."

40 In *In re Mathieson* [1927] 1 Ch 283 the bankrupt had exercised a general power of appointment. It was held that the avoidance in a subsequent bankruptcy by the Bankruptcy Act 1914, section 42, of voluntary settlements made within two years of bankruptcy was limited to settlements of a settlor's own property and did not apply to settlements made in exercise of a general power of appointment. The reason was that section 42 applied only to property of the bankrupt available for his

© 2012 The Incorporated Council of Law Reporting for England and Wales

creditors at the date of the disposition: at pp 295, 297, 298–299. The Court of Appeal was influenced by the fact that section 38(b) of the 1914 Act expressly included powers in the property divisible among creditors and made no such provision for the purposes of section 42.

**41** But even apart from express legislative intervention general powers have been regarded as giving rise to property rights. In *Clarkson v Clarkson* [1994] BCC 921 (a decision on the definition of property in the Insolvency Act 1986, section 283(4)) Hoffmann LJ referred to *In re Mathieson* and said, obiter, at p 931:

> "I think that even at the time this was quite a remarkable decision. Lord St Leonards [i e Sugden] in his book on *Powers*, 8th ed (1861) said: 'To take a distinction between a general power and a limitation in fee is to grasp at a shadow while the substance escapes.' "

**42** So also in *In re Triffitt's Settlement* [1958] Ch 852, 861, Upjohn J said that "where there is a completely general power in its widest sense, that is tantamount to ownership". That was in the context of the question, discussed below, whether a power could be delegated.

**43** As *Thomas, Powers* (1998) puts it (at para 1-08), the fundamental distinction between the concepts of power and property has not been preserved in all contexts and for all purposes. A donee of a truly general power can appoint the subject matter of the power to himself. He therefore has an "absolute disposing power" over the property, citing *Sugden, Powers*, 8th ed (1861), p 394. Consequently, for many purposes, the law regards the donee as the effective owner of that property.

**44** The effect of *In re Watts* [1931] 2 Ch 302, 305 (Bennett J), and *In re Churston Settled Estates* [1954] 1 Ch 334, 344 (Roxburgh J) is that, although the holder of a general power is not in quite the same position as an owner, he may be treated, for the purpose of the rule against perpetuities, as though he were for all practical purposes the owner.

**45** But in each of those cases the powers were held not to be general powers. In *In re Watts* [1931] 2 Ch 302 Mrs Abbott settled property on trust for her children, subject to a power of revocation that she was entitled to exercise only with the consent of her mother. It was held that by reason of the need to exercise the power during the lifetime of the mother, and to obtain the mother's consent, it would not be right to hold that the donee of the power was in substance the owner of the property and consequently free to deal with it in any way she pleased. Consequently it was a special power and the trusts in the revocation and appointment infringed the rule against perpetuities. Bennett J stated the question for the court as being whether, for the purpose of ascertaining whether there was an infringement of the rule against perpetuities, the power was a general power under which the donee was "thereby made the absolute owner of the settled property" (at p 305).

**46** In *In re Churston Settled Estates* [1954] 1 Ch 334, Roxburgh J referred to *In re Watts* and said, at p 344:

> "In my judgment it is correctly stated by Bennett J in the passage which I have read: '. . . [the donee] was in substance the owner of the property, and consequently free to deal with it in any way she pleased.' One must put in the words 'in substance' or 'practically', because even a person having a general power of appointment is not quite in the same position as an owner. True, he can give it to anybody he likes inter vivos. True, he

© 2012 The Incorporated Council of Law Reporting for England and Wales

can dispose of the property by will without referring to the power at all provided that he makes a residuary gift, but he may make a will which contains no residuary gift, or more probably, he may make no will at all, and in those circumstances the property will go as in default of appointment. So, as I have said, it is not absolutely true that even a person having a common general power of appointment is in quite the same position as an owner. Still, I think that the basis of the doctrine is that he is treated as though he were for all practical purposes the owner."

And, at pp 346–347:

After all, what is the underlying broad principle of the rule against perpetuities? It is that property should not be tied up beyond a certain period of time. If the property ceases to be tied up, or, in other words, if it vests in a beneficial owner, then the mischief of the rule is avoided. Therefore, it seems to me only reasonable to suspect that the reason why a general power of appointment in the ordinary sense starts a new settlement, and has not got to be read back into the original settlement, is because the property is treated as vesting in the donee of the general power, though it is not quite strictly accurate to say that it does so; or, in other words, that the test really is: is there somebody who for all practical purposes can be treated as the owner?"

*The United States authorities*

**47** There is an extensive jurisprudence in the United States to which the Board was referred, in which both creditors and trustees in bankruptcy have been able to reach trust assets which were subject to a power of revocation. As the leading textbook, *Scott & Ascher on Trusts*, 5th ed (2007), says (vol 3, section 15.4.2):

"With the rise, primarily in the second half of the twentieth century, of the revocable inter vivos trust as a popular will substitute, the error of denying the settlor's creditors access to property held subject to a revocable trust has become widely apparent. The courts, as well as the legislatures, have concluded, in a variety of contexts, that the assets of a revocable trust are, in fact, subject to the claims of the settlor's creditors, both during the settlor's lifetime and after the settlor's death, precisely because the settlor of a revocable trust necessarily retains the functional equivalent of ownership of the trust assets . . . The trend in the courts, as well, is to conclude that the settlor of a revocable trust should be treated as the virtual owner of the trust property, especially in so far as the rights of creditors are concerned. The Restatement (Third) of Trusts succinctly puts it this way: a revocable inter vivos trust 'is ordinarily treated as though it were owned by the settlor' [section 25(2), (2003)]. Thus, property subject to a revocable trust 'is subject to the claims of creditors of the settlor or of the deceased settlor's estate if the same property belonging to the settlor or the estate would be subject to the claims of the creditors . . .' "

**48** The approach of the *American Law Institute, Restatement of the Law, Trusts*, 3d (2003), is that there is a "sound public policy of basing the rights of creditors on the substance rather than the form of the debtor's property rights" (comment *e* to section 25(1)). This approach is adopted not

© 2012 The Incorporated Council of Law Reporting for England and Wales

only in legislation (e g Uniform Trust Code, section 505(a)(1) ("During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors"), which has been adopted in several states), but also, in the absence of legislative intervention, by the courts: see for example the full account of the Massachusetts authorities in *In re Grassa* (2007) 363 BR 360.

49 The approach of the courts is that "the settlor retains all the substantial incidents of ownership" and that it would be "excessive obeisance to the form in which property is held to prevent creditors from reaching property placed in trust under such terms": *State Street Bank & Trust Co v Reiser* (1979) 389 NE 2d 768, 771. But the way in which that result is achieved is to treat the property as that of the settlor. It seems that the court will not compel the settlor to revoke the trust: *In re Cowles* (1992) 143 BR 5, 8; *Markham v Fay* (1995) 884 F Supp 594, 607 (affirmed in part, reversed in part, (1996) 74 F 3d 1347): "no Massachusetts court to date has permitted a creditor to force a settlor to exercise a power to amend or revoke a trust during his or her lifetime in order to pay an indebtedness". See also *United States v Ritter* (1977) 558 F 2d 1165, 1167.

50 Although the United States authorities demonstrate the advantages of a realistic view of the revocable trust, they are only of marginal assistance on the present appeal.

*Delegation*

51 The question whether the power of revocation is delegable arises on this appeal because TMSF seeks an order that receivers be appointed over the powers of revocation, coupled with an order for Mr Demirel to execute deeds assigning the powers to the receivers so that the receivers may exercise them, or (to the extent that the powers cannot be assigned) delegating his powers of revocation to the receivers. The defendants say that the powers are not assignable or delegable.

52 A power of appointment is capable of being delegated where the holder of the power owes no duty of trust or confidence to another person. Sugden (Lord St Leonards), *Powers*, 8th ed, states, at pp 179, 180–181, 195–196:

> "wherever a power is given, whether over real or personal estate, and whether the execution of it will confer the legal or only the equitable right on the appointee, if the power repose a personal trust and confidence in the donee of it, to exercise his own judgment and discretion, he cannot refer the power to the execution of another, for delegatus non potest delegare."
>
> "Where the power is tantamount to an ownership, and does not involve any confidence or personal judgment, and no act personal to the donee is required to be performed, it may be executed by attorney in the same manner as a fee simple may be conveyed by attorney."
>
> "the rule that a power cannot be delegated, is not . . . a general inflexible rule, but is simply a regulation, that a confidence reposed in one cannot by him be delegated to another. This rule, therefore, is inapplicable to the case [where] no confidence was reposed in A, but the estate was, merely for his own convenience, conveyed to such uses generally as he should appoint."

© 2012 The Incorporated Council of Law Reporting for England and Wales

53 In *In re Triffitt's Settlement* [1958] Ch 852 Upjohn J said that the question whether a power could be delegated was a question of construction. Delegation could take place under two circumstances. First where "there is a completely general power in its widest sense, that is tantamount to ownership, and, therefore, the donee of the power can exercise it in whatever way he pleases" (p 861). Secondly, where, "as a matter of construction, some power can be spelt out enabling the donee of the power to delegate his discretion". In that case the power was within the second category and therefore delegable. Upjohn J said, at pp 863–864:

> "This is not a fiduciary power at all but a power conferred by the plaintiff on herself for her own benefit . . . In my judgment, in a widely drawn power such as this, it is to be implied in the power that the plaintiff can delegate the exercise of discretionary powers entirely. As I have said already, it is a beneficial power conferred upon her for her own benefit."

*Overall conclusion*

54 The question on this appeal is whether there is a discretion to appoint receivers over the powers of revocation and to order Mr Demirel to assign or delegate the powers to the receivers (and, in default, to order that the assignment or delegation may be executed on his behalf by the receivers or other person appointed by the court).

55 The background to the decision in *Masri (No 2)* [2009] QB 450 was that it had long been thought that the power in what is now section 37(1) of the Senior Courts Act 1981 (formerly the Supreme Court Act 1981) to "appoint a receiver in all cases in which it appears to the court to be just and convenient to do so" could only be exercised in circumstances which would have enabled the court to appoint a receiver prior to the Supreme Court of Judicature Act 1873 (36 & 37 Vict c 66), section 25(8), when it was first put on a statutory basis: *Holmes v Millage* [1893] 1 QB 551, 557; *Edwards & Co v Picard* [1909] 2 KB 903, 905; *Harris v Beauchamp Bros* [1894] 1 QB 801, 809–810; *Morgan v Hart* [1914] 2 KB 183, 189; *Maclaine Watson & Co Ltd v International Tin Council* [1988] Ch 1, 17 (affirmed [1989] Ch 253).

56 But in *Masri (No 2)* [2009] QB 450 it was held that these decisions were based on a misunderstanding of *North London Railway Co v Great Northern Railway Co* (1883) 11 QBD 30, and that the court was not bound by pre-1873 practice to abstain from incremental development. The jurisdiction could be exercised to apply old principles to new situations. *Masri (No 2)* confirms or establishes the following principles: (1) the demands of justice are the overriding consideration in considering the scope of the jurisdiction under section 37(1); (2) the court has power to grant injunctions and appoint receivers in circumstances where no injunction would have been granted or receiver appointed before 1873; (3) a receiver by way of equitable execution may be appointed over an asset whether or not the asset is presently amenable to execution at law; and (4) the jurisdiction to appoint receivers by way of equitable execution can be developed incrementally to apply old principles to new situations.

57 *Masri (No 2)* also confirmed that section 37(1) does not confer an unfettered power. It pointed out that there are many decisions on the injunctive power to that effect: *South Carolina Insurance Co v Assurantie*

© 2012 The Incorporated Council of Law Reporting for England and Wales

*Maatschappij "De Zeven Provincien" NV* [1987] AC 24, 40, per Lord Brandon of Oakbrook: "although the terms of section 37(1) of the Act of 1981 and its predecessors are very wide, the power conferred by them has been circumscribed by judicial authority dating back many years." See also *Gouriet v Union of Post Office Workers* [1978] AC 435, 500–501, 516; *Siskina (Owners of cargo lately laden on board) v Distos Cia Naviera SA* [1979] AC 210, 256; *Bremer Vulkan Schiffbau und Maschinenfabrik v South India Shipping Corpn Ltd* [1981] AC 909, 979; *British Airways Board v Laker Airways Ltd* [1985] AC 58, 80–81; *P v Liverpool Daily Post and Echo Newspapers plc* [1991] 2 AC 370, 420–421; *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334, 341, 360–361; *Mercedes-Benz AG v Leiduck* [1996] AC 284, 298.

**58** So too in *Masri (No 2)* [2009] QB 450 it was confirmed that the power to appoint receivers under section 37(1) is also not unfettered, and Lawrence Collins LJ said, at para 180, that it was doubtful whether suggestions by Sir John Donaldson MR and Browne-Wilkinson LJ in *Parker v Camden London Borough Council* [1986] Ch 162, 173 and 176, that the jurisdiction to appoint a receiver is unlimited, could stand with the rejection by the House of Lords in *P v Liverpool Daily Post and Echo Newspapers plc* [1991] 2 AC 370, 420–421 of similar statements by Lord Denning MR in *Chief Constable of Kent v V* [1983] QB 34, 42, in relation to the power to grant injunctions.

**59** In the opinion of their Lordships the decisions in *Masri (No 2)* [2009] QB 450 and its predecessors lead to the conclusion that in the present case the jurisdiction should be exercised. The powers of revocation are such that in equity, in the circumstances of a case such as this, Mr Demirel can be regarded as having rights tantamount to ownership. The interests of justice require that an order be made in order to make effective the judgment of the Cayman court recognizing and enforcing the Turkish judgment.

**60** There is no invariable rule that a power is distinct from ownership. Nor (as the cases on the rule against perpetuities show) is there an invariable rule that any departure from the distinction between power and property is effected solely by legislation. As Lord St Leonards said (and Hoffmann LJ approved), "To take a distinction between a general power and a limitation in fee is to grasp at a shadow while the substance escapes", and in *In re Triffitt's Settlement* [1958] Ch 852, 861 Upjohn J said that "where there is a completely general power in its widest sense, that is tantamount to ownership".

**61** In the present case the appropriate order would be that Mr Demirel should delegate his powers of revocation to the receivers, so that they can exercise them. There is no impediment to the court making such an order. The court may make an ancillary mandatory order: see *Derby & Co Ltd v Weldon (No 6)* [1990] 1 WLR 1139 (power to order transfer of assets from one jurisdiction to another in aid of *Mareva* injunction). This is not a case of an interlocutory mandatory order giving effect to a positive duty, and it is not necessary (contrary to the defendants' submission) for the judgment creditors to establish that Mr Demirel has a duty to delegate the powers.

**62** In the present case the power of revocation cannot be regarded in any sense as a fiduciary power, and the defendants do not suggest otherwise. The only discretion which Mr Demirel has is whether to exercise the power

© 2012 The Incorporated Council of Law Reporting for England and Wales

in his own favour. He owes no fiduciary duties. As has been explained, the powers of revocation are tantamount to ownership.

63 It is therefore unnecessary to decide the question, canvassed in argument, whether the court has jurisdiction, instead of ordering the delegation of the powers of revocation to the receivers, to order Mr Demirel to revoke the trusts, with the result that he would have substantial assets of which the receivers could take possession. Two principal objections were made by the defendants to that course. First, they relied on the decision of Lord Eldon LC in *Thorpe v Goodall* 17 Ves 388, 460 that the court will not order the exercise of powers of appointment. But that decision was superseded by the Bankrupt Laws (England) Act 1822, is not concerned with a power of revocation, precedes the modern law on injunctions, and is not a decision on jurisdiction. The second objection was based on the decision in *Field v Field* [2003] 1 FLR 376. In that case a husband had defaulted on an order to pay a lump sum to his former wife. The husband had a non-assignable right to elect for a lump sum payment under his employer's pension scheme. It was held that the pension could not be reached by the wife through an order requiring the husband to elect for a lump sum payment and appointing a receiver to receive the proceeds. Wilson J thought that to make such an order would amount to "a free-standing enforcement procedure in its own right", which was not permitted by section 37: para 17. The basis for such a characterisation of the order in that case is not clear. In the present case the order would be ancillary to TSMF's rights as judgment creditors. The Board considers that there is force in the criticism of the reasoning of this decision in *Gee, Commercial Injunctions*, 5th ed (2004), paras 16.017–16.018, but as indicated above, this is not a question which falls to be decided on this appeal.

64 The final question is whether the discretion to make the order for delegation of the powers of revocation should be exercised. In the circumstances of the present case there is no doubt as to how the discretion to make the mandatory order should be exercised. No serious suggestion has been made on behalf of Mr Demirel that there would be any prejudice to any third party. The Court of Appeal thought that the appointment of a trustee in bankruptcy of Mr Demirel made it wrong for an order to be made in favour of TMSF as a single creditor. But the Board was informed that the power of revocation does not vest in the trustee under Turkish law. TMSF has undertaken to make the proceeds available to the creditors as a whole. In those circumstances there is no reason why the discretion should not be exercised in favour of TMSF.

65 Their Lordships will therefore humbly advise Her Majesty that the appeal should be allowed. The parties will have 21 days to supply written submissions as to costs and the form of the order.

Ms B L Scully, Barrrister

354

© 2012 The Incorporated Council of Law Reporting for England and Wales

Case 1:24-cr-00239-CKK-MAU Document 119-7 Filed 03/02/26 Page 65 of 541

provision in its accounts for possible non-payment of such future income. X Ltd can incorporate an SPV the shares in which are held by trustees of a charitable purpose trust or a valid foreign non-charitable purpose trust (and not by X Ltd because, if so, the accounts of the SPV would have to appear in the group accounts of X Ltd)[1].

[1] The purpose of securitisation transactions is often to take the creditor's contract claims off the balance sheet of the creditor company, so it is important for the SPV not to be a subsidiary of the company so as to avoid consolidation of the accounts of the SPV and the company. This will be achieved by the company holding the SPV shares on charitable trusts (though expecting little value to be ultimately available for the charitable purposes). Getting assets off the creditor company's balance sheet makes its gearing look better, whilst its financial covenants will not be breached if the SPV gets into difficulties; and in the case of banks it makes it easier to comply with capital ratio requirements.

**7.38** On the basis of the income stream flowing to the SPV, it is able to raise the necessary capital by issuing debt securities (eg under a debenture trust deed) with the income stream as security for the capital lent by investors. The SPV is not a commercial company out to make a profit and, ultimately, little is left for the charitable or non-charitable purpose.

**7.39** It is also common to use SPVs in ring-fenced project finance. Z Ltd may want to acquire an aeroplane or a ship but, because of uncertainties over its financial situation or potential difficulties litigating against it or in respect of the plane or ship as security, Bank B plc will not lend the necessary money to Z Ltd. Thus, Z Ltd sets up a purpose trust with a reputable trust company, which incorporates an SPV, which buys the plane or ship, using money lent by Bank B plc to the trustee and passed on to the SPV. The Bank's security is the shares in the SPV which will lease the plane or ship to Z Ltd for sub-leasing to its customers. The income passing to the SPV is passed up to the trustee and on to the Bank to repay the loan with interest. The Bank is in a strong position with the trustee as the liable borrower and the shares in the SPV as security. If Z Ltd does not pay the hire or becomes insolvent the plane or ship can be leased out afresh.

## ARTICLE 8 'ILLUSORY' AND 'SHAM' TRUSTS

### 8.1

The term 'illusory trust' has been used to describe a purported trust the terms of which provide that the property must be held for beneficiaries but simultaneously allocate so many powers to the settlor that the arrangement cannot take effect as a trust in their favour because they have no meaningful rights in respect of it. The term 'sham trust' has been used to describe a purported trust set out in a trust deed, the terms of which do not record the settlor's true intentions and which is created with a dishonest intention to deceive. However, both expressions have been disavowed by the courts because they suggest that the purported trust in either case is a type of trust when it is simply a nullity[1].

[1] 'Illusory trust': *Clayton v Clayton (No 1)* [2016] NZSC 29, [2016] 1 NZLR 551 at [123]; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch), (2017) 20 ITELR 905 at [169]. 'Sham trust': *Official Assignee v Wilson* [2007] NZCA 122, [2008] 3 NZLR 45, [2008] WTLR 1235 at [48]; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch), (2017) 20 ITELR 905 at [145].

355

**'Illusory trusts'**

**8.2** A settlor may wish to put property on trust, but to continue making decisions about what should happen to the property. A simple way to accomplish this is to create a bare trust by transferring the property to a trustee who has agreed to hold it to the settlor's order[1]. In such cases, the trustee straightforwardly holds the property on trust for the settlor. However, it may be that the settlor wants the property to be held on trust for the benefit of other people, but at the same time wants to continue making decisions about what happens to it. A device often used to accomplish this is for the settlor to declare a trust of property for the benefit of others but to reserve powers to himself over the property and/or the trustees' decision-making[2]. Arrangements of this kind create risks for settlors, however. One is that the trust instrument will be held to be a sham if a court finds that the settlor did not intend to create a trust on the terms written in the document, and that the document was written because the settlor and trustee had a shared intention to deceive others. This possibility is discussed below[3].

1 For discussion of bare trusts see Article 4.
2 C McKenzie 'Having and Eating the Cake: A Global Survey of Settlor Reserved Power Trusts [Parts 1 and 2]' (2007) 5 PCB 336 and (2007) 6 PCB 428; TH Tey 'Settlor's Reserved Powers' (2009) 23 Tru LI 183; PG O'Hagan 'The Reluctant Settlor – Property, Powers and Pretences' (2011) 17 T&T 905; L Ho '"Breaking Bad": Settlors' Reserved Powers' in RC Nolan et al (eds) *Trusts and Modern Wealth Management* (2018); D Goodman and P Hirsch 'To Reserve or not to Reserve? That Is the Question – Part I' (2019) 25 T&T 1025; D Goodman and L Johnson 'To Reserve or not to Reserve? What Can Possibly Go Wrong – Part II' (2020) 26 T&T 692.
3 See paras **8.8–8.14**.

**8.3** A different risk is that although a settlor has no dishonest intention and genuinely means to create a trust for the benefit of others while retaining some measure of control over the trust affairs for himself, he may give himself so many powers that the arrangement cannot take effect as a trust in their favour because they have no meaningful rights which are enforceable against the trustees. The term 'illusory trust' has been used by some courts to describe such an arrangement[1]. However, this language has been disavowed by other courts who have preferred to say simply that the purported trust is void[2]. We agree that the term 'illusory trust' is unhelpful insofar as it suggests that some variety of trust has been created when all that needs to be said is that the purported trust is a nullity and that in the generality of such cases the owner of the relevant property holds it on a bare trust for the settlor[3].

1 *Re AQ Revocable Trust* (2010) 13 ITELR 260 at [29]; *MAC v MAC*, New Zealand Family Court, 2 December 2011 at [72]–[85].
2 *Clayton v Clayton (No 1)* [2016] NZSC 29, [2016] 1 NZLR 551 at [123]; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch), (2017) 20 ITELR 905 at [169].
3 But cf *Law Society v Dua* [2020] EWHC 3528 (Ch) at [143]: 'The term "illusionary" [sic] may have difficulties, but when viewed as a label for an investigation that leads to finding that a trust was either not properly constituted, or had some other defect meaning that the trust was not a trust, it can be viewed as conventional.'

**8.4** An illustrative example is *Webb v Webb*[1]. In matrimonial proceedings, the question arose whether trusts established by Mr Webb were invalid with the result that the trust property fell to be treated as forming part of his assets available for division as matrimonial property. The trusts had the following features: Mr Webb was the sole trustee and was permitted to exercise his powers and discretions as trustee notwithstanding any conflict of interest; Mr Webb

Case 1:24-cr-00239-CKK-MAU Document 119-7 Filed 03/02/26 Page 67 of 541

was a beneficiary but so also was his son; the trustee was empowered to appoint a 'Consultant' whose role was to advise the trustee in the administration and management of the trust and the investment of trust assets, and who had full discretion to remove and replace the trustee, request (with any nominated beneficiary) the early vesting of the trust assets and consent to a variation by the trustee of the trust instrument. Immediately after the trusts were created Mr Webb appointed himself Consultant. Mr Webb also had a personal power to appoint himself as sole beneficiary in place of the existing beneficiaries.

1 [2020] UKPC 22, [2021] 1 FLR 448. *See also JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426 (Ch), (2017) 20 ITELR 905; *Clayton v Clayton (No 1)* [2015] NZCA 30, [2015] 3 NZLR 293; [2016] NZSC 29; [2016] 1 NZLR 551. For a case falling on the other side of the line see *Law Society v Dua* [2020] EWHC 3528 (Ch).

**8.5** The Privy Council upheld the finding by the Cook Islands Court of Appeal that the trusts purportedly created by Mr Webb were not invalidated by the sham doctrine as the necessary intention to deceive had not been established on the facts. However, this did not 'preclude a finding that [Mr Webb] reserved such broad powers to himself as settlor and beneficiary that he failed to make an effective disposition of the relevant property'[1]. Moreover, these powers were so extensive that 'in equity and in all of the circumstances ... [Mr Webb could] be regarded as having had rights in the trust assets which were indistinguishable from ownership'[2]. In consequence, the purported trust was a nullity.

1 [2020] UKPC 22 at [87].
2 [2020] UKPC 22 at [89].

**8.6** This result was surely correct, but the court gave two reasons why Mr Webb's arrangements were invalid that cannot both be right[1]: one was that he had never divested himself of his rights as owner of the property that was transferred to the trustees, the other that he had acquired too many new property rights once the trusts had been created for them to take effect as trusts for the beneficiaries identified in the trust documents. The latter argument, moreover, sits uncomfortably with dicta that a power to appoint property is not itself 'property' owned by the power-holder[2], albeit that this is not an absolute rule, and that although for some purposes 'a power [is] not property, for other purposes the holder of a general power [can] be regarded as being for all practical purposes an owner'[3].

1 As noted in S Agnew [2021] CLJ 18, p 20; C Strachan (2021) 137 LQR 206, pp 211–212.
2 *Re Armstrong* (1886) 17 QBD 521 at 531; *Stamp Duties Comr v Stephen* [1904] AC 137 at 140. Similar 'property talk' appears in *Clayton v Clayton (No 1)* [2016] NZSC 29, [2016] 1 NZLR 551, for which the court is criticised in J Palmer 'A Lament for Trust Principles in New Zealand' in YK Liew and M Harding (eds) *Asia-Pacific Trusts Law, vol 1: Theory and Practice in Context* (2021).
3 *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank & Trust Co (Cayman) Ltd* [2011] UKPC 17, [2012] 1 WLR 1721 at [33].

**8.7** Two other possible explanations of the decision in *Webb* are more persuasive. The first is that Mr Webb did not objectively intend to create the purported trusts because the trust instruments did not manifest an intention on his part to confer the beneficial enjoyment of the assets on someone else and to do so by imposing duties on the trustees to exercise control over those assets for that person's benefit[1]. The second, noted by the court without developing the point, is that the purported trusts in *Webb*[2]: 'lacked the irreducible core of obligations

357

owed by trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust.' This is a different argument from the property-focussed argument with which it was rather misleadingly associated by the court. It turns on the idea promoted by Millett LJ in *Armitage v Nurse* that trusts definitionally entail the imposition of duties on trustees and if 'beneficiaries have no rights enforceable against the trustees there are no trusts'[3].

1 S Agnew [2021] CLJ 18, pp 20–21, noting the observation by the Cook Islands Court of Appeal that 'ultimate question . . . [was] whether the powers reserved to this respondent-settlor were inconsistent with an intention to irrevocably relinquish a beneficial interest': [2017] CKCA 4 at [56].

2 [2020] UKPC 22, [2021] 1 FLR 448 at [89].

3 [1998] Ch 241 at 253–254. Further see paras **1.80–1.82**.

**'Sham trusts'**

**8.8** The expression 'sham trust' has been used by courts and commentators to describe a trust purportedly created by a document that does not record the settlor's true intentions because it has been created with the dishonest intention of concealing a different arrangement which has been made about disposal of the property. However, this term is misleading. The sham doctrine applies not to trusts (or any other legal structures, for that matter, such as contracts) but in Lord Diplock's words, to[1]:

> 'acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create'.

It is therefore apt to speak of *trust documents* being shams but referring to a purported *trust* recorded by a sham document as a 'sham trust' misleadingly suggests that the purported trust is some variety of trust when it is in fact a nullity. This tends to have a muddling effect on analysis of the important question which arises once the sham doctrine has been applied, namely what other arrangement relating to the property has been made? When asking this question what matters is not the extent to which the 'sham trust' takes effect (the answer to that question being zero) but what the purported settlor meant to achieve and whether his efforts in this regard were successful.

1 *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786 at 802. See also *Hitch v Stone* [2001] EWCA Civ 63, [2001] STC 214 at [63]–[69].

**8.9** This point was made in a New Zealand case, *Official Assignee v Wilson*, where Robertson and O'Regan JJ said that[1]:

> 'The two situations (valid trust and sham trust) do not fall into combination. The finding that the purported trust is void as a sham does not amount to an invalidation of a trust. It is not the trust as such which is a sham. There is no trust to be a sham. It is the trust documentation that is the sham.'

Likewise, in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* Birss J said that[2]: 'Despite the frequent references to a "sham trust", there is not really any

LINCOLN'S INN LIBRARY

# SNELL'S EQUITY

THIRTY-FOURTH EDITION

JOHN MCGHEE **QC, MA (Oxon)**
*of Lincoln's Inn, Barrister*

STEVEN ELLIOTT **QC, BA (Hons), JD (Hons), DPhil (Oxon)**
*of Lincoln's Inn, Barrister*

CONTRIBUTORS

STUART BRIDGE **MA (Cantab)**
*One of Her Majesty's Circuit Judges; Bencher of the Middle Temple; Life Fellow of Queens' College, Cambridge; Law Commissioner for England and Wales 2001–2008*

MATTHEW CONAGLEN **LLB (Hons) (Auck), LLM (Mich), PhD (Cantab)**
*Professor of Equity and Trusts, University of Sydney; Academic Barrister, New South Wales and Door Tenant at XXIV Old Buildings*

PAUL S. DAVIES **MA (Cantab), PhD**
*Professor of Commercial Law, University College London; of Lincoln's Inn, Barrister*

DAVID FOX **PhD (Cantab)**
*of Lincoln's Inn, Barrister; Professor of Common Law, University of Edinburgh*

BEN MCFARLANE **MA (Oxon), BCL**
*Professor of English Law, Oxford*

RICHARD NOLAN **MA (Cantab);**
*Professor of Law, University of York; Barrister of the Middle Temple and Door Tenant at Erskine Chambers*

JANET O'SULLIVAN **MA, PhD (Cantab);**
*University Senior Lecturer, Faculty of Law, University of Cambridge; Fellow and Director of Studies in Law, Selwyn College, Cambridge*

LINCOLN'S INN LIBRARY

SWEET & MAXWELL

THOMSON REUTERS

the parties later acted as if there was no trust in existence may be decisive. It is consistent with the possibility that the trustee was acting in breach of a real trust.[274]

**22-070** (c) **Consequences.** If a purported trust is proved to be a sham then it will be void and unenforceable by the parties to it. But they may be estopped from relying on its sham status if this would benefit their own interests and prejudice third parties who have relied on its validity as a trust.[275] So a person to whom property is transferred in a sham transaction may nonetheless grant a valid mortgage charge over it. The mortgagee's security would not be prejudiced by proof that the mortgagor's interest depended on a sham transaction.

The effect of proving that a purported trust is a sham is that the court often holds the parties to the real transaction that they intended. For example, a settlor who transferred property to a trustee to hold on a sham trust for other beneficiaries was found never to have intended to relinquish his beneficial ownership of the property. Proof of the sham did not affect the vesting of the property in the trustee so the trustee held as a bare trustee for the settlor.[276]

**22-071** (d) **Shams and certainty of intention.** The question whether a person intends to declare an express trust is distinct from whether a purported declaration of trust is a sham.[277] The ascertainment of the settlor's intention to declare a trust depends on the proper construction of the words in the relevant document, taking into account a narrow range of permissible background circumstances.[278] The purpose of the inquiry is to elicit the objective intention of the settlor from the trust instrument.[279]

But when a person alleges that a trust declared in an instrument is a sham, then the reality of the declaration is put in question. He alleges that the declaration should not be given effect in law because it does not reflect the true agreement between the parties about the kind of transaction they intended to enter into.[280] This difference in purpose explains why a wider range of evidence can be used to prove a sham from that which can be used to construe a genuine trust instrument.[281]

**22-072** (e) **Shams and "illusory" trusts.** A purported trust may be "illusory". To call a trust "illusory" is a convenient, although analytically inaccurate, label.[282] The trust transaction is illusory when the true intention gathered from the trust instrument was to leave the beneficial interest in the purported settlor of the trust rather than to create a trust for the beneficiaries named in the instrument.

An illusory trust is analytically different from a purported trust set out in a sham

---

274 *A v A* [2007] EWHC 99 (Fam) at [42]–[43].

275 *National Westminster Bank Plc v Jones* [2001] 1 B.C.L.C. 98 at [60]; *Re Yates (a bankrupt)* [2004] EWHC 3448 (Ch) at [219].

276 *Minwalla v Minwalla* [2004] EWHC 2823 (Fam); [2005] 1 W.L.R. 771; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2017] EWHC 2426; (2017) 20 I.T.E.L.R. 905 at [455].

277 See para.22-013 above.

278 See *Investors Compensation Scheme Ltd v West Bromwich Building Society (No.1)* [1998] 1 W.L.R. 896, per Lord Hoffmann; *Re Sigma Finance Corporation (In Administrative receivership)* [2009] UKSC 2 at [9]–[12].

279 See para.22-013 above.

280 *Re the Esteem Settlement* [2004] 1 W.T.L.R. 1 at [53, (xi), (xii)] (Jersey R.C.); *Shalson v Russo* [2003] EWHC 1637 (Ch); [2005] Ch. 281 at [190].

281 *Official Assignee v Wilson* [2007] NZCA 122; [2008] 3 N.Z.L.R. 45; *Raftland Pty Ltd v Commissioner of Taxation* [2008] HCA 21; (2008) 246 A.L.R. 406 per Kirby J.

282 *Clayton v Clayton* [2016] NZSC 216; [2016] 1 N.Z.L.R. 551 at [124].

# Re the AQ Revocable Trust
# BQ and another v DQ and others

[2010] SC (Bda) 40 Civ

SUPREME COURT OF BERMUDA

GROUND CJ

HEARING DATES: 22–24 MARCH 2010, JUDGMENT DATE: 16 APRIL 2010

---

*Express trusts – Bermuda – Validity – Whether intention to create genuine trust during settlor's lifetime – Whether provisions testamentary in nature.*

*Express trusts – Bermuda – Testamentary provisions – Whether intention to create genuine trust during settlor's lifetime – Whether provisions testamentary in nature.*

---

The settlor purported to create trusts by making trust agreements between himself as settlor and himself as sole trustee. The trust agreements declared that they were revocable during the settlor's life and conferred upon him the right to the entire net income and to such of the capital as the trustee determined. Upon the death of the settlor, the property was to be divided per stirpes between the sons of the settlor or their issue. As well as an indemnity, the trust documents provided that the approval of the settlor of any transaction during his lifetime would be a complete release of the trustee from any liability. Two years later, the settlor married for a second time and thereafter made a new will which revoked all previous wills. Some of the beneficiaries applied to the court for declarations that the trusts were invalid or were testamentary provisions.

**Held** (finding the trusts invalid and testamentary):

The rights and powers of the settlor, coupled with the fact that he was sole trustee and had the power to absolve himself from any breaches of trust showed that he could not effectively be called to account as trustee and did not intend to fetter his control of the property during his lifetime. The trusts created by the agreements were therefore testamentary in nature and the rights of amendment and disposition during the settlor's lifetime were invalid. Alternatively, the settlor did not have the necessary intent to create a trust during his lifetime but intended that the settlement take effect on his demise. The trusts were therefore revoked by the marriage and had they not been, they would have been revoked by the recitals of the new will (see [29]–[31], below).

*Baird v Baird* [1990] 2 All ER 300 applied; *National Shawmut Bank of Boston v Joy* (1944) 315 Mass 457 not adopted; *Armitage v Nurse* [1997] 2 All ER 705, *Harrison v Harrison* [2009] WTLR 1319 considered.

**EDITORS' NOTE**

Another case of an 'illusory' trust. Such challenges to the validity of trusts, from revenue authorities and others, seem to be on the increase.

**Cases referred to in judgment**

*Armitage v Nurse* [1997] 2 All ER 705, [1998] Ch 241, CA.
*Baird v Baird* [1990] 2 All ER 300, [1990] 2 AC 548, PC.
*Beardmore Trusts, Re* [1952] 1 DLR 41, Ont HC.
*Cock v Cooke* (1866) LR 1 P & D 241.
*Harrison v Harrison* [2009] WTLR 1319, NZ HC.
*King's Proctor v Daines* (1830) 3 Hag Ecc 218, 162 ER 1136.
*National Shawmut Bank of Boston v Joy* (1944) 315 Mass 457, 53 NE 2d 113, Mass SC.
*Pfrimmer, Re* [1936] 2 DLR 460, Man CA.
*Shinbane v Minuk* [1927] 3 DLR 550, Man CA.

**Counsel:**

*Frank Hinks QC* and *John Riihiluoma* for the plaintiffs.
*Robert Hildyard QC* and *Timothy Marshall* for the first defendant.
*John Martin QC* and *Jai Pachai* for the second defendant.
*Brian Green QC* and *Paul Smith* for the third and fourth defendants.
*Francis Barlow QC* and *Mark Chudleigh* as amicus curiae.

*Cur adv vult*

16 April 2010. The following judgment was delivered.

**GROUND CJ.**

INTRODUCTION

[1] This judgment is given on the plaintiffs' application for declarations that certain trusts are invalid. The trusts are two family trusts[1] set up by a businessman ('the settlor'[2]), by instruments dated 1976 for the benefit of

1 Following the death of the settlor, each trust was divided into separate shares, for each of his sons and their descendants, each share to be held upon a separate trust, but that is an unnecessary refinement for the purposes of this application.

2 I have used the expression 'settlor' notwithstanding that the validity of the trusts is in dispute. I think it preferable to the expression 'donor' used in the trust agreements themselves.

his sons ('the sons' trust') and his grandchildren ('the grandchildren's trust') respectively. The plaintiffs are two of the settlor's sons, and are beneficiaries under the sons' trust.[3] The first defendant is a son, and a beneficiary under the sons' trust. The second defendant is a grandchild and a minor.[4] The third and fourth defendants are the trustees of the trusts.

[2] The grounds of the application are that the trusts are, either on their face when properly construed, or when taken in the factual context, testamentary in nature and have been revoked either by the settlor's subsequent marriage in 1978 or by the standard revocation of all previous wills and codicils contained in his last subsequent will of 1978. The result of granting the relief sought would be that the property of the trusts fell into the trusts established by that will and its codicils ('the testamentary trusts'). Such an outcome would have certain tax advantages.

[3] The first defendant supports the application, and the other defendants are neutral. The trustees in particular feel unable properly to support an application which attacks their own status. In those circumstances, aware that the court would not make a declaration by consent, and to ensure that the application was properly argued, the plaintiffs applied for the appointment of an independent amicus curiae to argue the contrary position. By order of 28 January 2009, I appointed Francis Barlow QC ('the amicus'), a senior and distinguished English trusts practitioner, to put the case in support of validity.

THE TRUSTS

[4] The trusts are in similar form. Each takes the form of a 'trust agreement' purported to be between the settlor and himself, as trustee. At the same time the settlor delivered to himself 12,000 shares in one of two holding companies for his business enterprises, and Sch A to each trust comprises a record of that signed twice by the settlor, once in each of his two capacities. At the time the trusts were constituted the settlor was the sole trustee (and he remained so until the appointment of his wife, FQ ('F'), as co-trustee four years later in 1982). While such an agreement with oneself is unknown to English law, it is common ground that it takes effect as a declaration of trust. However, the plaintiffs point to this as indicating that the draftsman of the trust may have been working to an American model, which may account for some of the features of the trusts which are more germane to the issue of their validity.

3 The second plaintiff became subject to an incapacity during the course of the proceedings, and his son was appointed as his next friend by order of 16 February 2010.

4 The second defendant appears by his guardian ad litem, Keith Bruce-Smith. The originating summons sought an order that he be appointed to represent all persons who are now or might become interested under the trusts other than the plaintiffs and the first defendant, but in the event that was not pursued.

[5] Article I of each trust declares that it is revocable during the settlor's life, and art II confers upon him the right to the entire net income, and such of the capital as the trustee shall determine, during his lifetime:

> 'ARTICLE I
> **Donor's right to Revoke and Amend During his Lifetime**
> The Donor hereby declares this Agreement to be fully revocable by the Donor, and subject to amendment by him in whole or in part at any time and from time to time, any such revocation or amendment to be by an acknowledged instrument signed by the Donor and delivered to the Trustee.
>
> ARTICLE II
> **Dispositions During the Donor's Lifetime**
> During the Donor's life the entire net income of the trust and so much of the principal as the Trustee shall determine in the Trustee's absolute discretion, shall be paid to the Donor.'

[6] Article III then deals with the trusts that were to arise on the settlor's death, and it provides for the division of the trust corpus into shares each to be held on a separate trust for each of the sons and their descendants:

> 'ARTICLE III
> **Disposition of Income and Principal After the Donor's Death**
> Upon the death of the Donor, this Agreement shall become irrevocable and thereupon all of the property then constituting the trust shall be divided and set apart into equal shares, one such share for each son of the Donor who shall survive the Donor, and one such share for the issue who shall survive the Donor of each son of the Donor who shall not survive the Donor.'[5]

[7] There then follow various administrative provisions, including wide powers of investment. The trustees are empowered to designate the governing law of the trust, but in default the trust is to be governed by the laws of Bermuda. The settlor is also given an unfettered power to appoint and remove trustees. There are various provisions concerning the trustees' liability. By art VIII E the trustees are absolved from liability in respect of investments. Article XII contains a fairly standard exclusion of liability for breach of trust in the absence of bad faith or gross negligence:

5 This is the version of art III from the sons' trust. The corresponding article from the grandchildren's trust is necessarily slightly different, but the division per stirpes is essentially the same.

> **'ARTICLE XII**
> **Trustee's Indemnity**
> No Trustee shall be liable for breach of trust in respect of any act or omission on the part of such Trustee or of any of such Trustee's co-Trustees or of any agents or servant employed by such Trustee or by any of such Trustee's co-Trustees (whether or not such employment was strictly necessary or expedient) unless it is proved either that such act or omission was done, omitted or concurred in by the Trustee whom it is sought to make liable in bad faith or gross negligence, or (if the act or omission is the act or omission of an agent or servant) that such agent or servant was employed by such Trustee in bad faith or gross negligence.'

But there is also a rather unusual provision upon which the plaintiffs rely heavily, namely art VIII H, which provides as follows:

> 'H. The written approval by the Donor of any trust transaction during his lifetime shall be a complete release of the Trustee (including the Donor) of any liability or responsibility of the Trustee to any person with respect to this transaction.'

THE LAW

[8] The law is that a trust which only comes into real force and effect on the death of the settlor is regarded as a testamentary disposition, and as such is subject to the formal requirements necessary for a will.[6] Testamentary dispositions are also subject to revocation in the same way as a will, including upon the marriage[7] of the settlor or by a subsequent will.[8]

[9] For a statement of the general principle see *Lewin on Trusts* (18th ed, 2007, Sweet & Maxwell) para 1–14:

> **'Settlement and will**
> A document that looks like a settlement may be a will in disguise. "It is undoubted law that whatever may be the form of a duly executed instrument, if the person executing it intends that it shall not take effect until after his death, and it is dependent on his death for its

6 Those requirements are that, with the exception of holograph wills, the instrument be signed at the foot and that such signature be made or acknowledged by the testator in the presence of two or more witnesses present at the same time who must attest and subscribe to the will in the presence of the testator: see s 7 of the Wills Act 1840, which was the governing legislation at all material times. It has now been superseded by the Wills Act 1988, s 7 of which is to like effect.

7 For the revocation of a will upon marriage see s 16 of the Wills Act 1840, and s 14 of the Wills Act 1988.

8 See s 18 of the Wills Act 1840, and s 16(b) of the Wills Act 1988.

vigour and effect, it is testamentary." If that was the intention of the settlor, then the settlement is a testamentary document, and therefore void under the Wills Act 1837 unless it was executed in the presence of two witnesses, and otherwise as required by that Act. The reservation by the settlor of large beneficial powers and interests may leave the lifetime trusts declared in favour of others so squeletic as to be considered illusory. If a power of revocation is also reserved, this can turn a settlement into a will. There are a number of judicial decisions to this effect in Canada and New York, and the principle has been recognised by the Privy Council. Often, however, declarations of trust that might otherwise run the risk of being held testamentary documents contain some provision that is plainly intended to take effect during the lifetime of the settlor. An example is a power for the trustees to apply capital of the trust fund for the benefit of the settlor while he is alive but under disability. Any such provision is enough to show that the declaration is intended to take effect during the settlor's lifetime, does not depend on his death for its vigour and effect and so is not a testamentary document that needs to be executed as such. Moreover, even without such a clear indication that the trust is intended to take immediate effect, it is not thought that the reservation even of very considerable rights and powers would make the trusts illusory during the settlor's lifetime unless the settlor was virtually the equitable owner of the trust property during his life. It has been held that retained powers do not make the settlement into a testamentary document if they are subject to the trustees' consent, that a settlement reserving a life interest and a power of revocation (though of the same economic effect as a will) is not a will, and (in the United States, but it would be the same in England) that it is not enough that the object was to avoid the expense of a will and the need for probate … In some jurisdictions there are express statutory provisions to the effect that various kinds of powers or interests reserved by the settlor neither invalidate a lifetime trust, or delay or prevent it taking effect as a lifetime trust rather than a testamentary disposition. Such provisions may go no further than give effect to what is the position without statutory intervention in England and Wales, but have the advantage of eliminating doubt as to the scope of the common law rules and are no doubt a comfort to settlors who wish to establish lifetime trusts in those jurisdiction reserving wide powers to themselves.'

[10] I have been taken through the cases in support of those propositions. The principle was formulated in *Cock v Cooke* (1866) LR 1 P & D 241 from whence comes the expression 'dependent upon his death for its vigour and effect' at 243. The admissibility of the grantor's

intention was recognized in *Cock v Cooke* itself, and derives from the following passage in *King's Proctor v Daines* (1830) 3 Hag Ecc 218 at 221, 162 ER 1136 at 1138:

> 'If there is any proof, either in the paper itself, or from clear evidence dehors; first, that it was the intention of the writer of the paper to convey the benefits by the instrument which would be conveyed by it; and secondly, that death was the event that was to give effect to it, then, whatever be its form, it may be admitted to probate as testamentary.'

[**11**] Those principles were applied in the Canadian case of *Shinbane v Minuk* [1927] 3 DLR 550, where the same language was adopted. They have been applied in subsequent Canadian cases, even though the effect was to render the instrument void for non-compliance with the statutory formalities required for wills: see *Re Pfrimmer* [1936] 2 DLR 460, and *Re Beardmore Trusts* [1952] 1 DLR 41, where it was said at 45:

> 'The form of the instrument makes no difference and documents quite absolute and immediate in their terms have been declared void when a Court has found that it was the grantor's intention that such instrument could take effect only upon his death.'

[**12**] Indeed the law in Canada appears to be essentially the same as that in England as is made clear in *Waters' Law of Trusts in Canada* 3rd ed (2005, Thompson Carswell) at p 205:

> 'Closely associated with the issue of irrevocability is the problem of when a purported *inter vivos* trust is in fact a testamentary disposition ... Against the background of all the evidence it may appear to the court that the would-be donor either did not really intend to create a trust or that he retained such a degree of control over the trust property that it is impossible to say his trust takes immediate effect, as opposed to taking effect on his death.'

[**13**] In commenting on *Re Beardmore Trusts*, *Waters'* says the following at p 207:

> 'The point was that until his death the settlor had totally unrestricted opportunities, as would any property owner, to deal with and dispose of his effects as he thought fit.'

Similarly in respect of *Re Pfrimmer* it says at p 210:

> 'The test is really an objective one. Has the settler reserved such a degree of control over the trust property during his lifetime that the trustees are merely his agents? The settlor's intention as to when the

trust should take effect is only one factor to be considered ... the question is whether that trust takes immediate effect upon creation. The crucial factor in *Re Pfrimmer* was that the donor retained unrestricted right of disposal without the need to account in relation to the trust property.'

**[14]** These principles have been recognized by the Privy Council in *Baird v Baird* [1990] 2 All ER 300, [1990] 2 AC 548, although in that case Lord Oliver also set the limits of their application when he said ([1990] 2 All ER 300 at 304–305, [1990] 2 AC 548 at 556):

> 'It is not, however, the case that every revocable instrument which creates interests taking effect on the death of the person executing the instrument is necessarily a will. The most obvious example of such a revocable but non-testamentary instrument is the exercise of a revocable power of appointment under a settlement inter vivos.'

A passage upon which the amicus relies.

**[15]** The amicus also relies upon the position in the United States, where the law appears to have developed differently from the English and Commonwealth jurisprudence. Thus §57 of the Restatement of Trusts was modified in 1957 to read:

> 'Where an interest in the trust property is created in a beneficiary other than the settlor, the disposition is not testamentary and invalid for failure to comply with the requirements of the Statute of Wills merely because the settlor reserves a beneficial life interest or because he reserves in addition a power to revoke the trust in whole or in part, and a power to modify the trust, and a power to control the trustee as to the administration of the trust.'

**[16]** In commenting on that *The Law of Trusts*, Scott & Fratcher, 4th ed (1987, Little, Brown and Co, Boston), says:

> 'The trend of the modern authorities is to uphold an inter vivos trust no matter how extensive may be the powers over the administration of the trust reserved by the settlor.' (Vol IA, p 140, § 57.2).

And the authors go on to cite *National Shawmut Bank of Boston v Joy* (1944) 315 Mass 457, 53 NE 2d 113, to which the amicus took me in some detail.

**[17]** However, I do not think that the American position is decisive. This would not be the only occasion in which the law in the United States has evolved differently from that in England and other parts of the Commonwealth. In Bermuda the position is governed by s 2(3) of the Trusts (Special Provisions) Act 1989 ('the Act') which provides:

> '(3) The reservation by the settlor of certain rights and powers, and the fact that the trustee may himself have rights as a beneficiary, are not necessarily inconsistent with the existence of a trust.'

It seems to me that that merely acknowledges the general common-law position. It certainly does not go as far as the Restatement and indeed, by the inclusion of the words 'not necessarily', implicitly contemplates that in certain circumstances the reservation of rights to the settlor and the trustee having rights as a beneficiary may indeed be inconsistent with the existence of a trust. I therefore hold that the law as it applies in Bermuda is correctly stated by *Lewin on Trusts* as set out at [9], above.

**[18]** In applying that law a key question is the degree of accountability of the trustee. In this respect the plaintiffs rely upon the following passage from the judgment of Millet LJ (as he then was) in *Armitage v Nurse* [1997] 2 All ER 705 at 713, [1998] Ch 241 at 253:

> '… there is an irreducible core of obligations owed by the trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. If the beneficiaries have no rights enforceable against the trustees there are no trusts.'

**[19]** The plaintiffs also rely upon a reformulation of that in the New Zealand case of *Harrison v Harrison* [2009] WTLR 1319 at [20], which takes up the theme of enforceability:

> '… "Trust" is a word used to sum up a relationship where equity will compel a person holding the legal interest in a property to use it for the benefit of someone else.'

**[20]** And in Bermuda that theme of enforceability, in the form of 'accountability', finds expression in s 2(2) of the Act, which lists the characteristics of a trust as follows:

> '(2) A trust has the following characteristics:
>
> (a) the assets constitute a separate fund and are not a part of the trustee's own estate;
>
> (b) title to the trust stands in the name of the trustee or in the name of another person on behalf of the trustee;
>
> (c) the trustee has the power and the duty *in respect of which he is accountable*, to manage, employ or dispose of the assets in accordance with the terms of the trust and the special duties imposed upon him by law.' [My emphasis].

THE FACTS

**[21]** The factual background is put before me in two affidavits, one made by the settlor's second wife (F) and the other by the first plaintiff

(BQ ('B')). I am told by the amicus, and accept, that he considered applying to cross-examine F on her affidavit, but decided against it in view of her age, she now being over 90. In those circumstances I accepted that it would be appropriate and permissible for him to comment adversely on her evidence, notwithstanding the absence of cross-examination. However, there appears to be no real challenge to much of the direct evidence that she gives, the issue being rather with the conclusions that she draws from it.

**[22]** Prior to her marriage F had been the settlor's personal assistant for many years. They were married in 1978, after the death in 1976 of his first wife. F deposes that the trusts were set up with the professional assistance of a US law firm, and that their purpose was 'so that the sons of [the settlor] could manage the businesses after his death.' She asserts that it was her understanding that the trusts were not effective until his death, and that the documentation was written so that it could be invoked at the time of his death. She was appointed his co-trustee in 1982, and she says that that was the settlor's wish, although he offered no explanation for the appointment at the time. She was already a director of the two holding companies, having been appointed in 1978. Following her appointment as trustee all but five of the issued shares of each of the companies were transferred into their joint names as trustees, although her role as director did not change. She produces various corporate waivers, some of which she and the settlor signed in their own names, others of which are signed by them as trustees. She does not know the reason for this distinction. Despite her appointment as trustee she was not a signatory on any of the bank accounts of the trusts, or of the underlying holding companies, prior to the settlor's death, and she says that it was normal for him to be sole signatory on bank accounts. Generally she paints a picture of a man who would not willingly relinquish control of his property.

**[23]** B's affidavit pulls together the evidence and the issues relating to this application. He produces the trust agreements and other documentation relating to the trusts, and gives the family background. He explains that his father left his native land, eventually settling in Bermuda, and that after the father's departure he and the first defendant were each given responsibility for managing the principal divisions of their father's business, but that they remained on salaries because 'they remained my Father's businesses: we were paid salaries to manage what were his businesses: there was never any question in our minds about that.' He says that he understands that the trusts were executed in Bermuda in the presence of two witnesses from the US law firm, and that therefore the plaintiffs will not be contending that they were not validly executed as

testamentary instruments.[9] He recounts the appointment of F as trustee, and also the appointment in 1982 of JJH, an attorney in the US law firm to be trustee on the death or retirement of one or the other of the settlor and his wife, an appointment which JJH eventually took up on the death of the settlor. B also confirms F's picture of the settlor, saying that his father was 'a man of very strong personality who throughout his life made it clear that the businesses he had created were his.' He acknowledges the potential tax ramifications, but deposes that 'Leading Counsel raised the issue of the invalidity of these trusts in 2006 before anyone had identified the tax consequences'. He also produces excerpts from the trust tax returns for 2003–05, which were made on the basis that for tax purposes the trusts were testamentary in nature.

[24] Among the documents that B produces is an extract from a memorandum or letter from WW, a member of the US law firm's Trusts and Estates Department, and one of the witnesses to the settlor's signature. It is dated 1976, and raises the very issue raised by this application:

> '… the question is whether retention by our client of practically absolute control would render the trusts testamentary in nature.'

He then went on to cite the passage from the Restatement set out at [15], above in support of the proposition that it would not. WW also flagged the same question in a letter dated ten days before the execution of the trusts to S&C, the settlor's other non-Bermudian attorneys, noting that it was a question that he would have to put to Bermuda counsel. However, when he came to write to Bermuda counsel a week later, he merely enclosed the trusts and asked them 'to review the trusts from a Bermuda law stand-point and advise me by telephone at the earliest possible moment of your views.' It seems that that did not arrive in Bermuda until, the same day the trusts were signed, and that Bermuda counsel advised by telephone that same day that 'the trusts would be effective as of the execution thereof by [the settlor] and the delivery of the corpus to himself as trustee notwithstanding the fact that he would be the sole trustee and the sole beneficiary'.[10] In those circumstances it is by no means clear how the concern was raised with Bermuda counsel, or that his attention was drawn to art VIII H.

[25] Another important document, again authored by WW, is a memorandum also dated ten days before the trusts were signed, headed 'Memorandum for [the settlor]' with the sub-heading 'Summary of

9 This notwithstanding that he says that one witnessed the settlor sign in his capacity as 'Donor' and the other witnessed his signature as trustee, although they were all together when this was done.

10 See WW's letter of a few days after the trusts were signed, where he asks for confirmation of that advice, and the response thereto.

Proposed Revocable Trust for Sons'. It appears to be intended as a layman's explanation for the client, and in para 2 it states:

> '2. *Dispositions During Your Lifetime*. You will be the sole trustee of the trust and you are given the *unlimited* power to revoke or amend the trust during your lifetime (Article I). All of the income of the trust and so much of the principal as you may wish to have must be paid to you (Article II).' [The emphasis on the word 'unlimited' is in the original.]

There is a similar document of even date for the grandchildren's trust.[11] The plaintiffs place great weight on this, contending that it shows that the settlor was being told that all the property, including capital, would be his, without regard to his fiduciary duties in respect of capital.

**[26]** The evidence also suggests that the sons' and grandchildren's trusts were conceived as part of a larger exercise in estate planning. This appears from a file note as to what needed to be done at closing, which refers to a general review of the settlor's will and estate plan.[12] There is also a subsequent organization chart, headed 'Current Estate Plan', which shows how these trusts fitted into the overall scheme of the settlor's estate plan. The chart bears a date in 1978 several weeks prior to the settlor's marriage to F, and so seems to go with a file note[13] dated a few days later which records that the trusts 'are to be reviewed and, if necessary, the whole estate plan is to be snugged up under the new Will'.

**[27]** For the first six years after the constitution of the trusts there is nothing in the corporate documentation of the holding companies, the shares of which formed the corpus of the trusts, to indicate that the settlor thought he was acting as trustee, or held his shares in that capacity. Nor is there any other trust documentation, such as accounts or minutes or memoranda of meetings with professional advisors. Once F was appointed as co-trustee in 1982 the shares in the two main holding companies were transferred into the joint names of herself and the settlor as trustees, but the shares of a relatively minor third company were overlooked, and remained in the settlor's sole name. After the transfer into joint names the

---

11 Although the operative phrase there has become: 'As in the case of the "Sons' Trust", you … will be entitled to all of the income and as much of the principal as you may wish to have'.

12 See p 84 of the core bundle. Someone has added the date that the trusts were signed in 1976 to it, but I am not clear who or when that was done, but the document appears to be an aide memoire which from its contents was composed on or immediately before that date.

13 See p 105 of the core bundle. This seems to have been made by the settlor's lawyer, at S&C to record a meeting between the settlor and his various lawyers in the US in 1978 to discuss the consequences of his imminent marriage to F.

corporate documents are inconsistent in their recognition of the status of the trustees. Apart from that there is nothing to show that the settlor and his wife consciously acted as trustees, and in particular there are no minutes of trustees' meetings, no trust accounts and no documentation such as correspondence, minutes or memoranda to show them taking financial or legal advice as trustees.

[28] The plaintiffs also rely on one instance in which the settlor acted in a manner inconsistent with the existence of the trusts, in that as director and sole signatory of one of the holding companies he advanced $627,924 in four tranches late in 1978 to a company in which he held 99.5% of the shares (the other 0.5% being held by the holding company concerned). The loan was interest free and repayable on demand. It was ratified by the Board shortly thereafter in 1978, but was not repaid until 1992 when it was immediately re-advanced to another company wholly-owned by the settlor and otherwise unconnected with the trusts. In none of this was there any recognition of the settlor's duties as a trustee, and it is an example of his continuing to exercise what was essentially sole and unfettered dominion over his business affairs.

CONCLUSIONS

[29] Applying the law as set out above to the facts, my primary conclusion is that the concatenation of rights and powers in the settlor, when coupled with the fact that he was the sole trustee at the time of the constitution of the trusts, rendered this trust illusory during his lifetime. In coming to that conclusion I have borne very much in mind the distinction between a power and property upon which the amicus relies. However, I accept Mr Hinks's submission that the cumulative effect of the trust documents, when taken with the de facto situation, means that the settlor as trustee could not effectively be called to account during his lifetime. Crucial to this conclusion is art VIII H, which allows the settlor to absolve himself as trustee from any and all breaches of trust. While it may be that I would not have come to that conclusion had art VIII H been coupled with a distinct and independent trustee, in this case it is the combination which pushes it over the top. Given that the trust agreements are constituted on their face with the settlor as sole trustee, and that no further appointment was made at the time, I consider that arts I and II were void on the face of the documents at the inception of the trust agreements, and that the remaining trusts created by the agreements were therefore testamentary in nature.

[30] I also find as a fact that it was not the intention of the settlor to fetter his unhindered control and enjoyment of the settled assets during his lifetime. Rather, I find that when the settlor executed the trust agreements he believed and understood that he would retain effective sole dominion

over the settled assets during his lifetime, and that that is borne out by the advice that he was receiving. In particular WW's memorandum referenced in [24] hereof must have conveyed to the settlor that he had an unimpeded right to do what he wanted with the principal without accountability or control. That the settlor's intention at the time was inimicable to the creation of a lifetime trust is further demonstrated by the informality of his subsequent administration of the assets, and by the way he treated them as his own, as in the case of the loan. There is nothing to suggest that he thought he could be held to account in any way, and everything to suggest to the contrary. I therefore consider, even were I wrong that the lifetime trusts were bad on their face, that they were in fact invalid as the settlor did not have the necessary intent to create a trust during his lifetime, but rather only intended the settlement to take effect upon his demise as part of his estate plan.

**[31]** In the circumstances I find that arts I and II of the trusts did not create valid trusts during the lifetime of the settlor, and that the trusts only came into real force and effect upon his death. They were, therefore, revoked by the settlor's marriage to F in 1978, and had they not been they would have been revoked by the recitals of his subsequent will of that same year. If it were to be suggested that the formal appointments of F and JJH as trustees, in 1982 respectively, in some way revived the trusts, in each case the settlor's signature has only one witness, so they do not comply with the formal requirements for a testamentary document.

**[32]** In the circumstances I grant the relief sought. Although I heard argument on the form of the relief, I now wonder whether it is in fact appropriate to declare that the trusts have been void at all times since their purported constitution. It seems to me that that only applies to the lifetime trusts constituted by arts I and II, and that the declaration of invalidity should be limited to those articles. As I understood it, the plaintiffs' case was that the testamentary trusts were not void at their inception, but have since been revoked, and I would be prepared to make a declaration to that effect also. The result is that all the property held upon those trusts has, upon and as a consequence of the death of the settlor formed part of the residuary assets of his estate, and so been subject to the testamentary trust and held for all purposes by the trustees thereof as one fund with the other residuary assets of his estate. But I will hear further argument upon the exact wording if necessary.

**[33]** Various consequential relief is also sought. I make the representation order at para 3(a) of the prayer to the originating summons. Paragraph 3(b) has fallen away, and I make no order on that. Having heard the plaintiffs in their representative capacity I grant the trustees the discharge and release sought in para 2 of the originating summons. I also give a liberty to apply.

274 International Trust and Estate Law Reports 13 ITELR
Berm SC Re the AQ Revocable Trust (Ground CJ)

[**34**] As to costs, I understand that the basic principle that all parties' costs of the originating summons should come out of the testamentary trust has been agreed, and I leave it to counsel to settle an appropriate form of words.

Dated this 16 day of April 2010.

375

, WELLINGTON

IRES
(G, VIENNA

Quick Law,

RIS

A LUMPUR
WARSAW

RBAN

ON, EDINBURGH
'ork

ORTING

994 to the holders of the
cept for the educational
and/or publisher. This copyright
kind of information retrieval
the publishers.

LAND

# NEW ZEALAND

# LAW REPORTS

**Editor**
GEOFF MCLAY
Barrister

**Publishing Manager**
JENNIFER WILLIAMS

2016

Volume 1

Published for, and with the authority of,
THE NEW ZEALAND COUNCIL OF LAW REPORTING

by

**LEXISNEXIS
NZ LIMITED**

WELLINGTON

:) with two young
lition, could obtain
provide him with a

misconduct of the
: interference with
at the privileged
izures of call data
the hands of those
ction as being a
ck of impact of the
ection between the
ling. The reality is
ms, and in those
f a windfall to him,

Court of Appeal to

1 is dismissed. The

ion is dismissed.

*eal dismissed.*

kau).
n).

son, *Barrister*



# Clayton v Clayton [Vaughan Road Property Trust]

Supreme Court of New Zealand SC 23/2015; [2016] NZSC 29
1, 2, 8 September 2015; 23 March 2016
Elias CJ, William Young, Glazebrook, Arnold and O'Regan JJ

*Relationship property – Trusts – Whether power of settlor/trustee amounted to general power of appointment – Whether powers of settlor/trustee "property" and "relationship property" – Valuation of such powers – Property (Relationships) Act 1976, s 2.*

*Trusts and trustees – Express trust – Whether power of settlor/trustee amounted to general power of appointment – Whether powers of settlor/trustee "property" and "relationship property" – Valuation of such powers – Property (Relationships) Act 1976, s 2.*

*Trusts and trustees – Illusory trust – Whether useful term – Whether valid trust created.*

*Trusts and trustees – Sham trust – Whether terms of trust rendered it a sham or illusory – Whether settlor/trustee had intended to settle trust.*

Mr and Mrs Clayton commenced a de facto relationship in 1986 and married in 1989. Mr Clayton was the owner of a sawmilling business and a block of land. In 1999, he executed a declaration of trust, settling the land and buildings on the Vaughan Road Property Trust (the "VRPT") of which he was the sole trustee. The discretionary beneficiaries of the trust included Mr Clayton, his wife (or former wife) and their two daughters. The final beneficiaries were the two daughters. Mr Clayton was also nominated as "Principal Family Member". In that capacity, he had the power to appoint or remove discretionary beneficiaries (cl 7.1) and trustees (cl 17.1). The trustee had power to pay or apply all of the capital to any of the discretionary beneficiaries (cl 6.1(a); to bring forward the vesting date (cl 10); and to resettle the trust fund upon the trustees of any trust which included as beneficiaries any one or more of the discretionary beneficiaries. A trustee who was also a beneficiary was entitled to exercise a power in his own favour (cl 14.1); to exercise powers without considering the interests of all beneficiaries and in a way that might be contrary to the interests of present or future beneficiaries (cl 11.1); and to exercise any power notwithstanding any conflict of interest created.

The parties separated in 2006 and were subsequently divorced. They embarked upon disputes under the Property (Relationships) Act 1976. Mrs Clayton argued that cl 7.1 of the VRPT created a general power of appointment that was covered by the definitions of property and relationship property under the PRA, or alternatively that the powers held by Mr Clayton under the trust deed rendered the trust a sham or illusory. The Court of Appeal

held that the power under cl 7.1 was a general power of appointment and was relationship property. The Court of Appeal determined that the VRPT was neither a sham nor an illusory trust. Both parties appealed to the Supreme Court.

**Held:** 1 (unanimously) Clause 7.1 of the trust deed did not create a power for Mr Clayton, as Principal Family Member, analogous to a power to revoke the VRPT, as he was unable to remove the Final Beneficiaries as Final Beneficiaries (see [46], [47], [48]).

*Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2011] UKPC 17, [2012] 1 WLR 1721 distinguished.

2 The combination of powers and entitlements of Mr Clayton as Principal Family Member, Trustee and Discretionary Beneficiary amounted in effect to a general power of appointment in relation to the assets of the trust. Such a combination of powers was properly classified as "rights" which gave Mr Clayton an "interest" in the VRPT and its assets for the purposes of the Property (Relationships) Act. Since the powers had been "acquired" by Mr Clayton during the marriage (ie when the trust was settled) they were relationship property (see [68], [69], [70], [86], [80], [98]).

(per curiam) The definition of "property" in s 2 of the Property (Relationships) Act 1976 had to be interpreted in a manner that reflected the statutory context. The expression "any other right or interest" broadened traditional concepts of property and potentially included rights and interests that might not in other contexts be regarded as property rights or interests in property (see [38]).

*Kennon v Spry* [2008] HCA 56, (2008) 238 CLR 366 discussed.

3 The value of Mr Clayton's powers under the VRPT was equal to the value of the net assets of the VRPT as he could appoint the entire assets to himself at any time. This treated the powers equivalently to a general power of appointment which could be regarded as an interest tantamount to ownership (see [104], [105], [106], [107]).

*Kennon v Spry* [2008] HCA 56, (2008) 238 CLR 366 referred to.
*Kwan v Poon* (2014) 17 HKCFAR 414, 17 ITELR 843 referred to.

4 The VRPT was not a sham. As Mr Clayton, as settlor and trustee, was the sole party to the deed the question was whether he intended to create a trust when he entered into the VRPT deed and settled the property on the trust. His reliance on his advisers and lack of knowledge of the law and of the terms of the trust did not of itself lead to the conclusion that the deed was a sham. Nor did the powers that amounted to a general power of appointment indicate that when he entered into the trust deed, Mr Clayton did not in fact intend to create a structure different from that set out in the terms of the trust deed (see [114], [115]).

*Ben Nevis Forestry Ventures Ltd v Commissioner of Inland Revenue* [2008] NZSC 115, [2009] 2 NZLR 289 applied.

(per curiam) There was no basis on which to extend the concept of a sham to encompass a trust created under a document that was not intended to be a pretence but which the Court considered was otherwise reprehensible in some way (see [116]).

**Result:** Appeal allowed.

**Observations:** (i) If the assets of the trust were such that they would have been separate property but for the settlement on trust, the Court would have to consider whether to invoke s 13 of the Property (Relationships) Act, but that is not the situation in the present case (see [89]).

(ii) There is no value in the label "illusory trust". If there is no valid trust, that is all that needs to be said. It can be argued that the VRPT was never a valid trust because, having reserved such broad powers to himself, Mr Clayton cannot be said to have disposed of the property in favour of another or that the irreducible core of trustee obligations did not apply to him. Alternatively, it can be argued that although the trust is defeasible as Mr Clayton has power effectively to bring it to an end, there is no reason why it should not be regarded as a trust and administered in accordance with the trust deed until the exercise of the powers in that manner. The settlement of the proceedings makes it unnecessary to determine the issue and, given the unusual terms of the trust deed, the issue is unlikely to arise in future (see [124], [125], [127]).

*Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2011] UKPC 17, [2012] 1 WLR 1721 discussed.

*Armitage v Nurse* [1997] EWCA Civ 1279, [1998] Ch 241 referred to.

**Other cases mentioned in judgment**

*Charman v Charman* [2005] EWCA Civ 1606, [2006] 1 WLR 1053.
*Charman v Charman (No 4)* [2007] EWCA Civ 503, [2007] 1 FLR 1246.
*Dixon v R* [2015] NZSC 147.
*Financial Markets Authority (FMA) v Hotchin* [2012] NZHC 323.
*Kain v Hutton* [2008] NZSC 61, [2008] 3 NZLR 589.
*Knight v Knight* (1840) 3 Beav 148, 49 ER 58 (Ch).
*Kan Lai Kwan v Poon Lok To Otto* [2014] HKCFA 65, (2014) 17 HKCFAR 414.
*Official Assignee v Wilson* [2007] NZCA 122, [2008] 3 NZLR 45.
*Osborne v Auckland Council* [2014] NZSC 67, [2014] 1 NZLR 766.
*Park Public Trustee v Armstrong, Re* [1932] 1 Ch 580.
*Penrose, Re* [1933] Ch 793.
*Prest v Petrodel Resources Ltd* [2013] UKSC 34, [2013] 2 AC 415.
*Triffit's Settlement, Re* [1958] Ch 852.
*W v W (Practice Note)* [2007] NZCA 30, [2007] 2 NZLR 261.
*Walker v Walker* [2007] NZCA 30, [2007] NZFLR 772.
*Watts, Re* [1931] 2 Ch 302.
*Whaley v Whaley* [2011] EWCA Civ 617, [2012] 1 FKR 735.
*Z v Z* [1989] 3 NZLR 413 (CA).
*Z v Z (No 2)* [1997] 2 NZLR 258 (CA).

**Appeal**

This was an appeal by: Mark Arnold Clayton, first appellant, and Mark Arnold Clayton [2015] NZSC 84, as trustee of the Vaughan Road Property Trust, second appellant, from the judgment of the Court of Appeal [2015] NZCA 30, [2015] 3 NZLR 293 answering a number of questions on an appeal by leave ([2013] NZHC 1529 and [2013] NZCA 633) from the judgment of Rodney Hansen J [2013] NZHC 309, [2013] 3 NZLR 236 allowing in part an appeal by the appellants from the judgment of the Family Court FC Rotorua FAM-2007-063-652, 2 December 2011, leave to appeal having been granted by the Supreme Court [2015] NZSC 84, the approved questions being:

In relation to the Vaughan Road Property Trust (VRPT): (i) Was the Court of Appeal correct to find that there is no distinction between a sham trust and what the Family Court and the High Court described as an illusory trust? (ii) Was the Court of Appeal correct to find that the VRPT was neither a sham trust nor what the Family Court and the High Court described as an illusory trust? (iii) If so: (a) was the bundle of rights and powers held by Mr and/or Mrs Clayton under the VRPT Trust Deed "property" for the purposes of the Property (Relationships) Act 1976 (PRA)? (b) was the Court of Appeal correct to find that the power of appointment under cl 7.1 of the VRPT Trust Deed was "relationship property" for the purposes of the PRA? (c) if so, did the Court of Appeal err in its approach to the valuation of the power?

*DAT Chambers QC* and *JR Hosking* for Mrs Clayton.
*CR Carruthers QC* and *AS Butler* for the trustees of the VRPT and of the Claymark Trust.
*MJ McCartney QC* and *KE Sullivan* for Mr Clayton.

***Chambers QC*** for Mrs Clayton: The evidence establishes that Mr Clayton remained owner of the property throughout although that ownership was cloaked in a trust. Overseas jurisdictions have dealt with these issues of trust property although their legislation does not expressly provide for trust assets to be divided or taken into account on separation. Those jurisdictions have focused on family values and fairness rather than principles of equity. The Court is invited to deal with the division of property owned by trusts comprehensively rather than produce a response that deals only with the details of Mrs Clayton's position. Mr Clayton's evidence is entirely consistent with the trust property being his. He has failed to produce the accounts for the earlier period and the Court can draw an adverse inference from this. Their marriage was a "traditional marriage". Mr Clayton saw it as his role to provide for Mrs Clayton and the family. They both worked hard for 20 years. He says that he set up trusts with Mrs Clayton as a beneficiary not to disenfranchise her but to protect her from contingent liabilities of the businesses. Nonetheless, he is trying to disenfranchise her by denying her an interest in the accumulated assets of the trusts. Mr Clayton's own evidence was that he was not aware of his duties as a trustee. He did not know who authorised transfers of property to the trust or who determined the division of benefits. He appears to have regarded the assets as his to deal with as he saw fit.

In other contexts, he accepted that the debts owed by the trust were to be divided between Mr and Mrs Clayton as well as the assets. In the information he provided to the bank to obtain a loan assessed his wealth at $28 million but is saying that his wife should have only $6 million. He represented to the Family Court that his business was worth nothing. In the judgment of Associate Judge Matthews [2014] NZHC 2275 Mr Clayton's assets are assessed, on the basis of his own evidence, at $28 million, including $13 million of trust assets to which he was beneficially entitled.

The trustees' role has been indicative of Mr Clayton owning the property. The trustees have never consulted Mrs Clayton on the conduct of the litigation although she is a discretionary beneficiary. The trustees have consistently taken Mr Clayton's position and argued his case for him, even cross-examining Mrs Clayton's witness on the valuation of property of Mr Clayton what was not trust property. The s 44C issue has been argued only by the trustees. They are effectively representing Mr Clayton's interests against another discretionary

beneficiary. Mr Clayton himself could not distinguish between himself and his capacity as a trustee and did not see his actions as being restricted in any way by the trust deed or by any fiduciary obligation. Where a settlor retains complete control of trust property, then the trust is either a sham or illusory or there is no genuine intention to create a trust.

Mr Clayton used relationship property to fund the Vaughan Road Property Trust. The Court of Appeal said (at [163]) that the interest free loans he made to the trust were "probably" relationship property but that as they remained assets in his hands, no s 44C order was required. It is submitted that that was an error. Between 2005 and 2008, Mr Clayton took $5.2 million from the trust current account. By 2008, the trust owed over $2 million. Mr Clayton has being drawing interest from that $5 million. In the case of both the Claymark Trust and the VRP Trust, Mr Clayton conceded in the Family Court that the advances were relationship property and said that the $2 million debt owed by the VRP Trust was a relationship debt. It would be unfair to deal with them any other way under s 9A(1) of the Property (Relationships) Act 1976. Section 8 of the P(R)A says that the Court must look at how the property is acquired and used during the relationship. Separate property does not necessarily remain separate property. Income which is a passive return on separate property may be separate property but the onus is on Mr Clayton to show that and he has not produced any evidence. In fact the income was largely put back into the business (see HC [43] and [44]). Only before this Court has Mr Clayton sought to argue that the advances made to the trusts were of his separate property; this is inconsistent with his stance in the Courts below.

The VRP trust deed allows Mr Clayton to act in his own interests without fiduciary obligation. Overseas cases have held trusts not to be valid trusts where there is no fiduciary duty (*Heartley v Nicholson* (1875) 19 LR Equity 233). In *Kwan v Poon* (2014) 17 HKCFAR 414, 17 ITELR 843 the husband was not a trustee but his powers as settlor meant that he effectively controlled the trustees. Impropriety is not required (*Poon* at [33]). The Court in *Poon*, adopting *Charman v Charman* [2005] EWCA Civ 1606, [2006] 1 WLR 1053; [2007] EWCA Civ 503, found that the settlor as protector could remove trustees and veto the removal of beneficiaries; the trustees were highly likely to comply with any request from him and he could appoint all the property to himself. He had reserved substantial powers to himself and expected the trustees to play a passive role. The decision was based on the Hong Kong Matrimonial Proceedings and Property Ordinance, s 7(1)(a) which is similar to the New Zealand provision. The entire trust assets could lawfully be distributed to the husband under the trust deed and were therefore a resource of the husband and were available for division.

An illusory trust, if there be such a thing, is a trust deed that does not create what the law recognises as a trust. It is comparable to lack of intention to create a trust. There must be a clear intention to create fiduciary obligations, otherwise the court is depriving the supposed settlor of property without due process. The trustees argue that the Court of Appeal was wrong to find that Mr Clayton could remove all the beneficiaries as he cannot remove the final beneficiaries. Mr Clayton says that the core trust obligations still exist and he can still be called to account. But he has power under the trust deed to appoint all the property to himself and bring forward the vesting date.

The High Court of Australia, and particularly Kirby J, took a wider approach in *Raftland Pty Ltd v Commissioner of Taxation* [2008] HCA 21, (2008) 238 CLR 516, 246 ALR 406 than the approach in *Official Assignee v Wilson* [2008] NZCA 122, [2008] 3 NZLR 45. The High Court of Australia looked at subsequent events as evidence of the original intentions of the settlor, see *Raftland* at [33]. The way the funds were applied raised the question whether the trust deed was to be taken at face value. Fraud is not required. In the present case, Mr Clayton ran the trust as if it were his own but there was no breach of trust.

For the purposes of the P(R)A, property is defined in s 2 and includes personal property, interest in any property real or personal, anything in action and any other right or interest. The definition is wide and is merely inclusive. The broad meaning of right includes any "power, privilege, or immunity secured to a person by law" (*Leedale (Inspector of Taxes) v Lewis* [1982] 3 All ER 810). Lord Diplock in the same case said that property was anything that one could dispose of for one's own benefit. The power to appoint assets to himself was property of Mr Clayton and was a resource.

Under s 33 of the P(R)A, the court can vest any property, which includes a beneficiary's interest in a discretionary trust and can transfer any right or interest and can order variation of trusts other than a trust in a will. None of the overseas cases involve provisions such as that, but the courts have used concepts such as that of a resource. They quantify and divide and take trust assets into account when they quantify. In *Kennon v Spry* [2008] HCA 56, (2008) 238 CLR 366 it was held that property of a relationship does not change its character as property of the relationship simply because a trust is declared over it. The Court held at [70]–[74] that Dr Spry was able to treat the trust assets as his own property. He might have been subject to fiduciary duties in respect of other beneficiaries but he could apply all the funds for his own benefit. The Court said that "property" was not a term of art but had to be interpreted in its statutory context, including the scheme and purpose of the legislation (at [93]). The sequel was *Stevens v Stevens* (2009) 42 FAMLR 423. In *Charman v Charman*, a discretionary trust was settled by a husband and accompanied by a letter of wishes stating that he should be the primary beneficiary during his lifetime. The argument that this was a dynastic trust was rejected on the evidence. The test was said to be whether if the spouse were to request the trustee to advance the whole or part of the capital of the trust to him or her, the trustee would be likely to do so. In *Whaley v Whaley* [2011] EWCA Civ 617, [2012] 1 FLR 735, the Court held that an argument that the trustees would be in breach of trust if they paid out to a single beneficiary did not survive careful reading of the trust deed. In *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2011] UKPC 17, [2012] 1 WLR 1721, it was held that a revocable settlement was to be treated as the settlor's property during his lifetime. The trustees in the present case argue that *AIB Group (UK) plc v Mark Redler & Co Solicitors* [2014] UKSC 58 says that business trusts are not nuptial trusts but what the Court was talking about (at [70]) was trusts that came about through commercial transactions and not a transfer of property subject to a trust with family members as beneficiaries. [Reference also made in printed case to: *Snook v London & West Riding Investments Ltd* [1967] 2 QB 786 (CA); *KA No 4 Trustee Ltd v Financial Markets Authority* [2012] NZCA 370; *NZI Bank Ltd v Euro National Corporation Ltd* [1992] 3 NZLR 528 (CA); *Richards v Delbridge* (1874) 8 LR

Equity 11; *Warriner v Rodgers Law Rep* 16 EQ 340; *B v X [Child support]* [2011] 2 NZLR 405 (HC); *Hospital Products Ltd v US Surgical Corporation* (1984) 156 CLR 41; *DHL International (NZ) Ltd v Richmond Ltd* [1993] 3 NZLR 10 (CA); *Grimaldi v Chameleon Mining NL (No 2)* [2012] FCAFC 6, (2012) 200 Family Court Rules 2002 296; *Norberg v Wynrib* [1992] 2 SCR 226; *Hodgkinson v Simms* [1994] 3 SCR 377; *Chan v Zacharia* (1984) 154 CLR 178; *Breen v Williams* (1996) 186 CLR 7; *Pilmer v Duke Group Ltd (In liq)* [2001] HCA 31, (2001) 207 CLR 165; *John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd* [2010] HCA 19, (2010) 241 CLR 1; *Imperial Group Pension Trust Ltd v Imperial Tobacco Ltd* [1991] 2 All ER 597 (Ch); *Bolkiah v KPMG* [1999] 2 AC 222 (HL); *Bristol and West Building Society v Mothew* [1998] Ch 1 (CA); *Purcell v Deputy Commissioner of Taxation* (1920) 28 CLR 77; *Cooper v Federal Commissioner of Land Tax* (1941) 65 CLR 320; *Knight v Knight* (1840) 3 Beav 148, 49 ER 58; *Armitage v Nurse* [1997] EWCA Civ 1279, [1998] Ch 241; *Prest v Petrodel Resources Ltd* [2013] UKSC 34, [2013] 2 AC 415; *Walker v Walker* [2007] NZCA 30, [2007] NZFLR 772; *Reid v Reid* [1979] 1 NZLR 572 (CA); *Z v Z (No 2)* [1997] 2 NZLR 258 (CA); *R v Neat* (1899) 69 LJQV 118, 121; *B v B* (1979) 3 MPC 25; *Ayerst v C&K (Construction) Ltd* [1876] AC 167; *MacKenzie v MacKenzie* [1992] NZFLR 120 (HC); *B v M* [2005] NZFLR 730 (HC); *Harrison v Harrison* [2009] NZCA 68, [2009] NZFLR 687; *X v X* (2007) 2 NZTR 17-004; [2008] NZFLR 512 (HC); *Dyas v Elliott* (2010) 3 NZTR ¶20-012 (HC); *Grant v Grant* (2011) 3 NZTR ¶21-003; *Clark v Clark* [2012] NZHC 3159, [2013] NZFLR 534; *Triffitt's Settlement, Re* [1958] Ch 852; *Re Burgess Homes Ltd* [1987] 1 NZLR 513 (CA).]

***Carruthers QC*** for the VRPT trustees: In the late 1990s the Claymark Group experienced significant financial difficulties, so the VRPT was created to protect land and buildings from risks associated with Mr Clayton's business operations. Mr Clayton is the settlor and sole trustee of the VRPT. The discretionary beneficiaries include himself and Mrs Clayton and the final beneficiaries are the children. The VRPT was mainly a banker, borrowing money from banks on the security of the properties. The VRPT was not funded by relationship property. Instead, the assets were acquired out of separate property, being Mr Clayton's pre-relationship assets. The Court of Appeal was incorrect in its interpretation of cl 7.1 of the VRPT Deed. That clause would not permit the removal of the final beneficiaries. The trustee would remain accountable to those final beneficiaries even if cl 7.1 were used to remove discretionary beneficiaries. *TMSF v Merrill Lynch* is distinguished. The Court of Appeal's finding that the power in cl 7.1 is "property" for the purposes of s 2 has the effect of exposing the assets of a validly formed trust to relationship property claims. It has never been interpreted this way before and that interpretation is inconsistent with the legislative intention. Section 44, 44B and 44C PRA are a code; they are the only way trusts can be dealt with under the PRA. The Select Committee report commented that trusts were created for legitimate reasons and should be permitted to fulfil that purpose. Any reform in this area should be by Parliament, giving people time to reorder their affairs. The same analysis applies with respect to the inclusion within the definition of property a "bundle of rights" in a trust. The Court also does not explain how powers in respect of a trust can be relationship property when the trust assets are not relationship property. The courts cannot make orders against the capital assets of trusts. Parliament made this decision deliberately. Even if the powers

were found to be property, there was no basis for classifying those powers as relationship property. Even if there was, the Court of Appeal did not adopt a just approach to the valuation of the property interest.

The label "illusory trust" is not helpful. It is not a category that needs to be defined. There either is a trust in law or there is not. The VRPT was not a sham, nor "illusory". It was a valid trust. *Raftland* was a purely conventional decision on sham. The Court of Appeal analysed the facts and found the three certainties established. There were concurrent findings of fact in the lower courts to this effect. In particular, the Courts have held that there was a genuine intent to create a discretionary trust to operate the business. The powers in the VRPT Deed that were alleged to demonstrate there was no trust in law ("the bundle of rights"), did not negate the existence of the trust. The core obligation on the trustee of accountability to the mandate was retained. The clauses of the VRPT Deed are interpreted and constrained by that fiduciary duty to account.

***Butler***, following: *Penson v Forbes* [2014] NZHC 2160 discusses a clause permitting removal of beneficiaries (at [17]), that the trustees of a discretionary trust are not required to be impartial (at [38]) and deals with conflicts of interest clauses (at [40]). *Geddes v Geddes* (CA) deals with separate property comingled with borrowings.

***McCartney QC*** for Mr Clayton: The reason that the trustees have largely carried the argument is that there is no other property available to Mr Clayton. So to satisfy any judgment, he will have to go to the trust. But the assets of the trust support the operation of the businesses. The land owned by trusts sits under the businesses. The source of the assets was separate property and so the power of appointment cannot be relationship property. Claymark Holdings Ltd was set up in 1984 and has never been relationship property. The Family Court found in Mr Clayton's favour (FC [36]–[42]) and dealt with the s 8(1)(e) argument at [38] and [39]. The question is then whether the property is subject to s 9A. Section 9A makes any increase in value relationship property, see *Rose v Rose* [2009] NZSC 46, [2009] 3 NZLR 1 at [24] per Blanchard J. Thus, the increase in the value of separate property is relationship property to be divided equally but the underlying asset remains separate property.

***Chambers*** replying: The inability to change the final beneficiaries can be evaded by resettling or bringing forward the vesting date. There is little point in saying that Mr Clayton was under the obligations of a trustee when his own evidence was that he had no idea what they were. Mr Clayton owned shares in the companies which owned the property and not the assets themselves. He personally funded some of the later purchases through interest-free loans. The Court should order Mr Clayton to pay Mrs Clayton an amount determined by the value of the property interests. If he becomes insolvent, there should be an order under s 33(3)(l) to transfer rights and interests in the trusts to Mrs Clayton or order that as trustee he must vest the trust property in Mrs Clayton. The definition of property is context-specific and can be extended to new areas (*Z v Z (No 2)*).

*Cur adv vult*

The reasons of the Court were given by

**O'REGAN J.**

**Table of contents**

| | Para no |
|---|---|
| Leave | [4] |
| Facts | [5] |
| Vaughan Road Property Trust | [10] |
| Relevant legislation | [15] |
| Are the rights of Mr (and Mrs) Clayton under the VRPT deed relationship property? Is the power of appointment under cl 7.1 of the VRPT deed relationship property? | [21] |
| Is cl 7.1 a general power of appointment? | [22] |
| Property definition | [24] |
| The Court of Appeal finding: general power of appointment in cl 7.1 | [39] |
| Our interpretation of cl 7.1 | [45] |
| The VRPT powers | [50] |
| General power of appointment? | [59] |
| Are the VRPT powers "property"? | [69] |
| Is this interpretation contrary to Parliament's intention? | [82] |
| Is the property "relationship property"? | [85] |
| Conclusions on VRPT powers | [98] |
| What is the correct valuation of the VRPT powers? | [99] |
| Sham trust or illusory trust? | [108] |
| Is the VRPT deed a sham? | [110] |
| Is the VRPT an illusory trust? | [118] |
| Is there a distinction between a sham trust and an illusory trust? | [128] |
| Result | [131] |
| Costs | [135] |

**[1]** This is an appeal and cross-appeal against a decision of the Court of Appeal, which dealt with a number of aspects of the relationship property dispute between Mark and Melanie Clayton (Mr and Mrs Clayton). Most of the dispute concerned trusts established by Mark Arnold Clayton (Mr Clayton) both during his marriage to Melanie Ann Clayton (Mrs Clayton) and after they separated.[1]

**[2]** The Court of Appeal decision dealt with issues relating to four trusts that were established during the marriage and four trusts that were established after the parties separated. The present appeal and cross-appeal relate to one of those trusts, the Vaughan Road Property Trust (VRPT). We heard this appeal and

1 *Clayton v Clayton* [2015] NZCA 30, [2015] 3 NZLR 293 (Ellen France, Randerson and White JJ) [*Clayton* (CA)].

cross-appeal contemporaneously with an appeal by Mrs Clayton relating to another trust, the Claymark Trust. Our judgment in relation to that appeal is being delivered at the same time as this judgment.[2]

[3] On 21 December 2015, the parties notified the Court that they had reached a settlement. In their memorandum, counsel said they accepted that the Court should still deliver judgment. The Court is also of the view that it is appropriate to deliver both judgments, given the importance of the issues they raise.[3]

**Leave**

[4] Leave was granted on to the following questions relating to the VRPT:[4]

(a) Was the Court of Appeal correct to find that there is no distinction between a sham trust and what the Family Court and the High Court described as an illusory trust? (Mrs Clayton's cross-appeal).

(b) Was the Court of Appeal correct to find that the VRPT was neither a sham trust nor what the Family Court and the High Court described as an illusory trust? (Mrs Clayton's cross-appeal).

(c) If so:

  (i) Was the bundle of rights and powers held by Mr and/or Mrs Clayton under the VRPT deed "property" for the purposes of the Property (Relationships) Act 1976 (the PRA)? (Mrs Clayton's cross-appeal).

  (ii) Was the Court of Appeal correct to find that the power of appointment under cl 7.1 of the VRPT deed was "relationship property" for the purposes of the PRA? (Mr Clayton's and the VRPT Trustee's appeal).

  (iii) If so, did the Court of Appeal err in its approach to the valuation of the power? (Mr Clayton's and the VRPT Trustee's appeal).

**Facts**

[5] Before dealing with those questions, we briefly recount the factual background.

[6] Mr and Mrs Clayton commenced a de facto relationship in 1986 and married in 1989. They separated in 2006 after 17 years of marriage, and their marriage was dissolved in 2009. They have two daughters who were born in 1990 and 1994 respectively.

[7] Shortly before their marriage, the parties signed an agreement (the s 21 agreement) contracting out of the regime for the division of property on dissolution of marriage, which is contained in the PRA.[5] Under that agreement, Mrs Clayton was to receive a maximum of $10,000 for each year of marriage up to a maximum of $30,000.

[8] At the time the parties met, Mr Clayton owned a small timber supply business and a block of land in Banksia Place, Tikitere, near Rotorua. The parties built a family home on that land during the relationship. The business owned two other blocks of land in Vaughan Road, Rotorua. By the time they separated, Mr Clayton had built up a significant sawmilling and timber

---

2 *Clayton v Clayton* [2016] NZSC 30, [2016] 1 NZLR 590 [the Claymark Trust judgment].
3 *Osborne v Auckland Council* [2014] NZSC 67, [2014] 1 NZLR 766 at [39]–[44].
4 *Clayton v Clayton* [2015] NZSC 84.
5 At the time the Property (Relationships) Act 1976 [PRA] was known as the Matrimonial Property Act 1976.

processing business (the Claymark business). This business was owned and controlled by companies and trusts in New Zealand and the United States. The trusts involved in the appeals before us (the VRPT and the Claymark Trust) are two of those entities. The VRPT owned the land and buildings in Vaughan Road from which the Claymark business was operated while the Claymark Trust owned some adjoining land.

**[9]** The s 21 agreement was set aside by the Family Court under s 21J of the PRA, which empowers the Court to set aside such an agreement if satisfied that giving effect to it would cause serious injustice.[6] That finding was upheld by the High Court on appeal.[7] Mr Clayton did not challenge the decision to set aside the s 21 agreement in the Court of Appeal.

### Vaughan Road Property Trust

**[10]** VRPT was settled on 14 June 1999 (some 13 years after the relationship between the Claytons commenced) by a declaration of trust executed by Mr Clayton. He is the settlor and sole Trustee of the VRPT. The discretionary beneficiaries include Mr Clayton as "Principal Family Member", Mrs Clayton as his wife or former wife, and their two daughters. The daughters are the final beneficiaries.

**[11]** The Family Court Judge said the purpose for which the VRPT was set up was to separate and distance the ownership of the land associated with the Claymark business from the operating assets of the company that held the assets of that business. She described the operation of VRPT as acting as a banker.[8] She said the VRPT had borrowed largely from the Bank of New Zealand to advance loans to other entities associated with Mr Clayton.

**[12]** As is clear from the issues on which leave to appeal has been given, Mrs Clayton claims that the VRPT is a sham or, if that claim is not upheld, that it is an illusory trust. The claim of sham has failed at all levels, but both the Family Court and High Court found that the VRPT was an illusory trust, though for differing reasons.[9] The Court of Appeal overturned the finding that the VRPT was an illusory trust, but upheld Mrs Clayton's claim that the power of

---

6 *MAC v MAC* FC Rotorua FAM-2007-063-652, 2 December 2011 (Judge Munro) [*Clayton* (FC)] at [35].

7 *Clayton v Clayton* [2013] NZHC 301, [2013] 3 NZLR 236 (Rodney Hansen J) [*Clayton* (HC)] at [14].

8 *Clayton* (FC), above n 6, at [74].

9 Rodney Hansen J summarised the Family Court decision in *Clayton* (HC), above n 7, at [70]–[84] and set out his reasoning at [85]–[90].

appointment held by Mr Clayton as "Principal Family Member" under the VRPT deed was relationship property, and that the value of that relationship property was equivalent to the net value of the assets of the VRPT.[10]

[13] In this Court, Mr Clayton, in his personal capacity and as Trustee of the VRPT, challenges the Court of Appeal's finding that the power of appointment held by Mr Clayton is relationship property and that its value is equivalent to the net value of the assets of the VRPT. Mrs Clayton challenges the Court of Appeal's rejection of her claims that the VRPT is a sham or, alternatively, that it is an illusory trust. Mrs Clayton also argues that the bundle of rights and powers held by her and/or Mr Clayton under the VRPT deed are property for the purposes of the PRA and are, in the present case, relationship property.

[14] The relevant provisions of the VRPT deed are set out in the appendix.[11] As will become apparent, the VRPT deed is unusual because Mr Clayton is settlor, Principal Family Member, sole Trustee and Discretionary Beneficiary and his powers as Principal Family Member and Trustee are both broad and free from the normal obligations imposed on fiduciaries in family trust deeds.

**Relevant legislation**

[15] Section 1M of the PRA sets out its purpose. Of particular note in the present context is the purpose of recognising the equal contributions of both spouses to a marriage partnership[12] and to provide for a "just division of the relationship property between the spouses ... when their relationship ends by separation".[13]

[16] Section 1N sets out four principles that are to guide the achievement of the purpose of the PRA. These include the principle that "a just division of relationship property has regard to the economic advantages or disadvantages of the spouses ... arising from their marriage ... or from the ending of their marriage".[14]

[17] "Property" is defined in s 2. The definition of property includes within the concept of property "rights" and "interests". We will deal with that definition in more detail later.[15]

[18] Section 4 provides that the PRA is a code, and applies "instead of the rules and presumptions of the common law and of equity" to the extent that they apply to transactions between spouses or, where the PRA provides, to transactions between one or both spouses and third persons.

[19] Sections 8 and 9 define relationship property and separate property. In broad terms relationship property is subject to the presumption of equal sharing between spouses, while separate property remains the property of the spouse who owns it.[16] The concept of relationship property incorporates the family home and family chattels, jointly owned property and property that has been acquired by either spouse during the marriage. The definitions have a number of complexities, to which we will refer when addressing issues that require their application.

---

10 *Clayton* (CA), above n 1, at [99] and [113].
11 Although these clauses refer to "the Trustees", they should be read as if they referred to "the Trustee" as Mr Clayton was the sole Trustee of the VRPT. Where we refer to defined terms from the VRPT deed, we will capitalise them as the deed does.
12 PRA, s 1M(b).
13 PRA, s 1M(c).
14 PRA, s 1N(c).
15 See [24]–[38] below.
16 PRA, s 11(1).

**[20]** We now turn to the questions relating to the VRPT on which leave to appeal was given. We will address the issues raised in paras (c)(i) and (ii) of the leave question first.

**Are the rights of Mr (and Mrs) Clayton under the VRPT deed relationship property? Is the power of appointment under cl 7.1 of the VRPT deed relationship property?**

**[21]** As these two issues overlap, we will deal with them together. Because the Court of Appeal decision engages the second issue, we will deal with that first.

*Is cl 7.1 a general power of appointment?*

**[22]** Mr Clayton, in his personal capacity and as Trustee of the VRPT, challenges the Court of Appeal's decision that the power of appointment in cl 7.1 of the VRPT deed amounted to relationship property. Under that clause, Mr Clayton, in his capacity as "Principal Family Member" may appoint or remove Discretionary Beneficiaries. He is a Discretionary Beneficiary as defined in cl 2.1. He could exercise his power under cl 7.1 to remove other Discretionary Beneficiaries and thereby make himself the only Discretionary Beneficiary. The Court of Appeal said this was a general power of appointment.[17] It was similar, in practical terms, to a power to revoke the VRPT and tantamount to ownership of the assets of the VRPT.[18]

**[23]** Mr Carruthers QC, counsel for Mr Clayton in his capacity as Trustee of the VRPT,[19] led the argument in support of this aspect of the appeal, but Ms McCartney QC, counsel for Mr Clayton in his personal capacity, adopted the argument advanced by counsel for the Trustee. The essence of the argument is as follows: Clause 7.1 does not allow Mr Clayton to remove the Final Beneficiaries, to whom Mr Clayton as Trustee would continue to owe fiduciary obligations. So the Court of Appeal was wrong to say the cl 7.1 power was relationship property. Indeed, it was not "property" as defined in the PRA.

*Property definition*

**[24]** The Court of Appeal's conclusion that the power of appointment was relationship property required it first to determine that that power was "property".[20] So the starting point is the definition of that term in s 2 of the PRA. The definition is:

> *Property* includes —
> (a) Real property;
> (b) Personal property;
> (c) Any estate or interest in any real property or personal property;
> (d) Any debt or any thing in action;
> (e) Any other right or interest.
> ...

**[25]** Paragraphs (a)–(c) of the definition highlight types of property but, as they use the term "property", are circular in nature. Paragraphs (d) and (e) do not have that circularity. The term "owner" is also defined in s 2 as follows:

---

17 *Clayton* (CA), above n 1, at [88].
18 At [101].
19 References to the VRPT Trustee are to Mr Clayton in this capacity.
20 *Clayton* (CA), above n 1, at [111].

**owner**, in respect of property, means the person who, apart from this Act, is the beneficial owner of the property under any enactment or rule of common law or equity.

**[26]** Although the format of the definition of "property" in the PRA was changed when the legislation was amended in 2001,[21] the content remains essentially the same as it was in the Act as originally passed in 1976, which, in turn, followed the definition in its predecessor legislation, the Matrimonial Property Act 1963. As the Court of Appeal noted in *Z v Z (No 2)*, this definition is similar to the definition of property in a number of other New Zealand statutes.[22]

**[27]** In *Z v Z (No 2)*, some significance was attached to the fact that the definition of property in the (then) Matrimonial Property Act was the same as that appearing in the Property Law Act 1952.[23] The Property Law Act 1952 has now been repealed and replaced by the Property Law Act 2007, which has a definition of property that differs from the definition of that term in the PRA. The Property Law Act definition is: "everything that is capable of being owned, whether it is real or personal property, and whether it is tangible or intangible property".[24] This is an attempt to define what the concept "property" means, unlike the definition in the PRA which is essentially an inclusive definition, with, arguably, an extension of the normal concept of property to include a "right" or an "interest", even if it is not a right or interest *in property*.[25]

**[28]** The PRA does not have a provision authorising the Court to take into account the "financial resources" of either spouse when determining what orders are appropriate in a relationship property dispute. That can be contrasted with the position in some other jurisdictions, for example Australia,[26] England and Wales[27] and Alberta.[28] Some New Zealand legislation contains provisions that allow a court to take into account the "financial resources" of a party or otherwise to treat trust property as the property of any person controlling or otherwise interested in the trust or who has gifted the property to the trust.[29] But Parliament has not chosen to include such provisions in the PRA.

21 By the Property (Relationships) Amendment Act 2001.

22 *Z v Z (No 2)* [1997] 2 NZLR 258 (CA) at 279, discussed at [27] and [30] below. Examples of statues using a similar definition include the Crimes Act 1961, the Child Support Act 1991, the Family Proceedings Act 1980, the High Court Rules, the Legal Services Act 2011 and the Overseas Investment Act 2005.

23 At 279.

24 Property Law Act 2007, s 4.

25 In some statutes, the phrase "right or interest" is followed by the qualifying words "in relation to property": see, for example, the Insolvency Act 2006 and the Companies Act 1993.

26 Family Law Act 1975 (Cth), s 75(2)(b), which allows the court to take into account in determining spousal maintenance "the income, property and financial resources of each of the parties".

27 Matrimonial Causes Act 1973 (UK), s 25(2)(a), which allows the court to take into account when determining the amount of the payment required to be made by one spouse to the other a number of matters including "the income, earning capacity, property and other financial resources which each of the parties to the marriage has or is likely to have in the foreseeable future".

28 Matrimonial Property Act RSA 2000 c M-8, s 8(d).

29 Examples are s 105(2)(c)(i) of the Child Support Act 1991, reg 8(4) and (5) of the Legal Services Regulations 2011, s 58 of the Criminal Proceeds (Recovery) Act 2009 and s 147A of the Social Security Act 1964, as explained in reg 9B of the Social Security (Long-term Residential Care) Regulations 2005. See also s 412 of the Insolvency Act 2006, which authorises a court to look at the "real nature" of a transaction.

**[29]** Counsel for Mrs Clayton, Ms Chambers QC, emphasised that the PRA is social legislation, which justifies a broader approach to concepts of property than may be appropriate in relation to laws dealing with the property of strangers. She said that the concept of property should, in this context, be regarded as having a degree of fluidity and as having the capacity to change to meet social conditions. She emphasised the statutory context, particularly the purpose and principles of the PRA as set out in ss 1M and 1N and also the principle in s 4 that the PRA applies instead of the rules of common law and equity in disputes relating to relationship property.[30]

**[30]** Counsel drew support for the broad approach from *Z v Z (No 2)*.[31] In that case, the Court of Appeal discussed the concept of "property" in the context of the (then) Matrimonial Property Act. The Court emphasised that it was a fluid concept that had extended to include interests which might not earlier have been covered by it. The Court said its meaning and scope must also be affected by the statutory and wider context (including changing social values, economic interests and technological developments) in which it is used.[32]

**[31]** In a later decision of the Court of Appeal, *Walker v Walker*, the Court made an obiter comment that suggested that rights associated with a trust arrangement could be property and relationship property.[33] In that case relationship property had been transferred into a trust, the trustee of which was a trustee company. The husband was the only director of that company. The spouses were both discretionary beneficiaries and had the power to appoint and remove trustees of the trust. The case was about the valuation of the debt owed by the trust to Mr and Mrs Walker. But the Court referred to "other assets" being:[34]

> (a) the directorship of the trustee company;
> (b) the shares of the trustee company;
> (c) the power to appoint and remove directors of the trustee company;
> (d) the power to appoint and remove trustees of the trust; and
> (e) the parties' discretionary interests under the trust.

**[32]** The Court then added:[35]

> Indeed, those items of property appear never to have been valued. Those five items of property, plus the debt, formed a very valuable package, as together they confer control of the company [which operated the husband's business].

**[33]** It is not necessary for us to form a view on the correctness of the classification of those items as "property". Professor Nicola Peart cautioned against attempts by the Court to widen the concept of property, emphasising the use of the conventional definition of that term in the PRA, in her chapter on equity and the PRA in *Equity and Trusts in New Zealand*.[36] She said:

---

30 This Court emphasised the importance of the statutory context in determining the meaning of "property" in *Dixon v R* [2015] NZSC 147 at [25]. That was an appeal against conviction for an offence under s 249(1) of the Crimes Act 1961. That Act has a definition of "property" that is similar to that in the PRA.
31 *Z v Z (No 2)*, above n 22.
32 At 279.
33 *Walker v Walker* [2007] NZCA 30, [2007] NZFLR 772.
34 At [48].
35 At [49].
36 Nicola Peart "Equity in Family Law" in Andrew Butler (ed) *Equity and Trusts in*

> ... the [PRA] has always defined beneficial ownership of property by reference to the general law. It is not a special definition designed to capture assets that would not normally qualify as property ... [A]s Parliament opted for conventional definitions of "property" and "ownership", it would be difficult to confine a judicial departure from the general law to claims under the [PRA] ...

**[34]** The United Kingdom Supreme Court has also recently warned against applying a different approach to the definition of "property" in matrimonial property litigation than in other areas of law.[37]

**[35]** The importance of context was however emphasised by the High Court of Australia in *Kennon v Spry*.[38] That case also concerned a matrimonial property dispute focussing on property held in a discretionary family trust. The applicable legislation was the Family Law Act 1975 (Cth). The relevant part of the definition of "property" in that Act is:[39]

> property to which [the parties to a marriage] are, or [one] party is, as the case may be, entitled, whether in possession or reversion ...

**[36]** The case was decided under s 79 of the Family Law Act, which gives power to the court determining a relationship property matter to make an order "altering the interests of the parties to the marriage in the property [of the parties to the marriage or either of them]".

**[37]** French CJ emphasised that the term "property" had to be read "widely and conformably with the purposes of the Family Law Act".[40] In their joint judgment, Gummow and Hayne JJ expressed a similar view.[41]

**[38]** We accept the submission for Mrs Clayton that the property definition in s 2 of the PRA must be interpreted in a manner that reflects the statutory context. We see the reference to "any other right or interest" when interpreted in the context of social legislation, as the PRA is, as broadening traditional concepts of property and as potentially inclusive of rights and interests that may not, in other contexts, be regarded as property rights or property interests. Against that background, we now turn to the power of appointment in cl 7.1 and other relevant provisions of the VRPT deed.

*The Court of Appeal finding: general power of appointment in cl 7.1*

**[39]** The Court of Appeal relied on the decision of the Privy Council in *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* (*TMSF*)[42] in its determination that Mr Clayton's power under cl 7.1 of the VRPT deed constituted a property right in his hands for the purposes of the

---

*New Zealand* (2nd ed, Thomson Reuters, Wellington, 2009) 1161 at 1177.

37 *Prest v Petrodel Resources Ltd* [2013] UKSC 34, [2013] 2 AC 415 at [37] per Lord Sumption and at [87]–[88] per Lady Hale. Lord Wilson agreed with Lady Hale. It should be noted that the power given to the courts of England and Wales to have regard to the income, earning capacity, property and other financial resources which each spouse has or is likely to have in the foreseeable future when determining the amount to be paid by one spouse to the other obviates the need to interpret the term "property" in anything other than its strict sense: See Matrimonial Causes Act, above n 27.

38 *Kennon v Spry* [2008] HCA 56, (2008) 238 CLR 366.

39 Family Law Act 1975 (Cth), s 4.

40 *Kennon v Spry*, above n 38, at [64].

41 At [89].

42 *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2011] UKPC 17, [2012] 1 WLR 1721 (*TMSF*).

PRA and that this property right was relationship property.[43] As *TMSF* was a key aspect of the Court of Appeal's decision in the present case, we begin with a discussion of the analysis of the Privy Council in that case.

**[40]** *TMSF* was a case resulting from the bankruptcy (under the law of Turkey) of a Mr Demirel. He had earlier established two discretionary trusts in the Cayman Islands, which, between them, had assets worth more than US$24 million. The discretionary beneficiaries included Mr Demirel and his wife and children. Mr Demirel, as settlor, had a general power to revoke the trusts. The issue before the Privy Council was whether this power of revocation was a property right that Mr Demirel could be required to delegate to the receivers in his bankruptcy, allowing them to exercise the power and obtain access to the assets of the trusts for the benefit of Mr Demirel's creditors.

**[41]** Lord Collins of Mapsbury delivered the advice of the Privy Council. Having reviewed the authorities, he concluded:[44]

> [59] ... The powers of revocation are such that in equity, in the circumstances of a case such as this, Mr Demirel can be regarded as having rights tantamount to ownership. The interests of justice require that an order be made in order to make effective the judgment of the Cayman court recognizing and enforcing the Turkish judgment.
>
> [60] There is no invariable rule that a power is distinct from ownership. Nor, (as the cases on the rule against perpetuities show) is there an invariable rule that any departure from the distinction between power and property is effected solely by legislation. As Lord St Leonards said (and Hoffman LJ approved), "To take a distinction between a general power and a limitation in fee is to grasp at a shadow while the substance escapes", and in *Re Triffitt's Settlement* [1958] Ch 852 at 861 Upjohn J said that "where there is a completely general power in its widest sense, that is tantamount to ownership".
>
> ...
>
> [62] In the present case the power of revocation cannot be regarded in any sense a fiduciary power, and the defendants do not suggest otherwise. The only discretion which Mr Demirel has is whether to exercise the power in his own favour. He owes no fiduciary duties. As has been explained, the powers of revocation are tantamount to ownership.

**[42]** Having found that the power of revocation was "tantamount to ownership", the Privy Council ordered Mr Demirel to delegate the power of revocation to receivers representing TMSF's interests as a judgment creditor.[45]

**[43]** The Court of Appeal applied *TMSF* in the present case for the following reasons:

(a) There was no good reason why in New Zealand "the traditional distinction" between the concepts of power and property should be preserved in all contexts and for all purposes.[46] Where the donee of a power is entitled to appoint the subject matter of the power to himself

43 *Clayton* (CA), above n 1, at [99].
44 *TMSF*, above n 42.
45 At [61].
46 See *TMSF*, above n 42, at [31].

or herself without regard to the interests of others, it was appropriate to regard the donee as the effective owner of the property.[47]

(b) There was no practical distinction between the power to revoke the trust subject to the decision in *TMSF* and Mr Clayton's power to appoint himself as the sole beneficiary of the VRPT. If Mr Clayton had exercised the power he would effectively have revoked the trust.[48]

(c) The power under cl 7.1 was conferred by Mr Clayton as settlor on himself in his capacity as "Principal Family Member" and not in his capacity as a Trustee. The Principal Family Member had no fiduciary duty to the Beneficiaries. It would be wrong to interpret the VRPT deed as if this power was a Trustee power.[49]

(d) The doctrine of fraud on a power would not apply and the Court would not be able to constrain Mr Clayton from exercising the general power of appointment under cl 7.1 if he wished to do so.[50]

**[44]** We agree with the Court of Appeal that, if Mr Clayton had a non-fiduciary power as Principal Family Member to make himself the sole beneficiary under the VRPT deed, the effect of the exercise of that power would be analogous to the revocation of the VRPT, justifying the application of the same analysis as in *TMSF*. However, the interpretation of the VRPT deed that led the Court of Appeal to this conclusion is itself challenged.

*Our interpretation of cl 7.1*

**[45]** Counsel for the VRPT Trustee argued that the Court of Appeal erred in its interpretation of the VRPT deed. He said this error led the Court of Appeal to conclude incorrectly that Mr Clayton as Principal Family Member under the VRPT deed could exercise the power in cl 7.1 to appoint himself as the sole beneficiary of the VRPT and so effectively revoke the trust by becoming the legal and beneficial owner of the trust assets. As a result of this error of interpretation, the Court of Appeal had incorrectly seen the power of appointment in cl 7.1 as having the same practical effect as the power of revocation in *TMSF*.

**[46]** The Court of Appeal interpreted cl 7.1 as giving Mr Clayton the unfettered right to remove not only the other Discretionary Beneficiaries but also to remove the Final Beneficiaries.[51] This appears to be based on the fact that the definition of "Discretionary Beneficiaries" in cl 2.1 includes "the Final Beneficiaries". However, as counsel said, removal of the Final Beneficiaries *as Discretionary Beneficiaries* does not mean that they cease to be Final Beneficiaries. Thus, even if Mr Clayton exercised the power in cl 7.1 to remove all other Discretionary Beneficiaries so that he was the only remaining Discretionary Beneficiary, that would not have any effect on the position of the Final Beneficiaries in their capacity as Final Beneficiaries (as opposed to

47 *Clayton* (CA), above n 1, at [100].
48 At [101].
49 At [102].
50 At [89]–[92] and [103].
51 The Court of Appeal rejected an argument made for the VRPT Trustee that, if Mr Clayton used his power under cl 7.1 as Principal Family Member to make himself the sole Discretionary Beneficiary, this would amount to a fraud on a power: *Clayton* (CA), above n 1, at [89]–[92], citing *Kain v Hutton* [2008] NZSC 61, [2008] 3 NZLR 589 at [46]–[47] per Tipping J.

Discretionary Beneficiaries). We accept that this interpretation of the VRPT deed by the Court of Appeal was in error. Mr Clayton could not, in his capacity as Principal Family Member, remove the Final Beneficiaries (his two daughters).

**[47]** Counsel for the VRPT Trustee said once this erroneous interpretation was put to one side, the position was that there would always be Final Beneficiaries to whom Mr Clayton owed fiduciary duties. Because Mr Clayton continued to owe fiduciary duties to the Final Beneficiaries, the trust would continue in existence and the Court of Appeal's conclusion that the exercise of the power under cl 7.1 was, in substance, the same as the revocation of the VRPT was incorrect.

**[48]** He argued that the Court of Appeal was therefore wrong to conclude that the power in cl 7.1 was tantamount to ownership in the same way that the power of revocation was in *TMSF*.

**[49]** We accept that, in light of the error in the Court of Appeal's interpretation of cl 7.1 of the VRPT deed, it cannot be said that cl 7.1 on its own gives Mr Clayton a power that is analogous to a power to revoke the VRPT.

*The VRPT powers*

**[50]** We do not see that conclusion as fatal to Mrs Clayton's claim in relation to the VRPT, however. We consider it is necessary to analyse the VRPT deed more closely to see whether Mr Clayton's powers and entitlements as Principal Family Member, Trustee and Discretionary Beneficiary give him such a degree of control over the assets of the VRPT that it is appropriate to classify those powers as rights or interests in terms of paragraph (e) of the definition of property in s 2 of the PRA. We will refer to these powers and entitlements as "the VRPT powers". In order to do this, it is necessary to consider what practical limitations the rights of the Final Beneficiaries had on Mr Clayton's ability to appoint the property of the VRPT to himself.

**[51]** Counsel for Mrs Clayton pointed to a number of provisions in the VRPT deed that would enable Mr Clayton, in his capacities as Principal Family Member and Trustee, to appoint all of the trust capital and income to himself. She emphasised that Mr Clayton was settlor, sole Trustee and Principal Family Member. He had power of appointment of both Discretionary Beneficiaries and Trustees.[52] He could transfer the power of appointment of Trustees to another person.[53] He had power to change any provision relating to the management and administration of the trust.[54] There was a provision requiring the VRPT deed to be interpreted in a manner broadening the powers and restricting the liabilities of Mr Clayton as Trustee.[55] Other provisions of the VRPT deed that we would also note in this context are cls 12 (broadly defining the powers and discretions of the Trustee) and 13 (the ability to lend to or guarantee any obligations of a Beneficiary, including himself).

**[52]** All of these provisions have contextual significance but three others are decisive. These are cls 6.1(a), 10 and 8.1.

---

52 VRPT deed, cls 7.1 and 17.1.
53 VRPT deed, cl 17.2.
54 VRPT deed, cl 23.1.
55 VRPT deed, cl 2.2(b).

[53] Clause 6.1(a) gives the Trustee the power to pay or apply all of any part of the capital of the Trust Fund to any one or more Discretionary Beneficiaries. As Mr Clayton is both Trustee and a Discretionary Beneficiary, he could pay or apply the entire trust capital to himself. Clause 4 has a similar power in relation to trust income.

[54] Clause 10 provides for the distribution of the trust capital on the "Vesting Day". As is evident from the definition of that term,[56] that is the date that is 80 years after the date of the VRPT deed or any earlier date that the Trustee (Mr Clayton in this case, as Trustee) may appoint. Clause 10 provides that the persons entitled to the trust capital will be such Discretionary Beneficiaries (one of whom is Mr Clayton) as the Trustee (Mr Clayton) appoints and, to the extent that any of the trust capital is not so appointed, to the Final Beneficiaries. So Mr Clayton as Trustee can appoint the trust capital to himself to the exclusion of any other Discretionary Beneficiary[57] and can also bring forward the Vesting Day to any date of his choosing. This would effectively exclude the Final Beneficiaries from deriving any benefit from the VRPT. If he brought forward the Vesting Day to a date of his choosing and had appointed all the trust capital to himself, that would give him both legal and beneficial ownership of the trust capital and the VRPT would be at an end.

[55] The VRPT deed also contains a very broad resettlement power. Under cl 8.1, the Trustee may resettle the Trust Fund upon the Trustees of any trust which includes any one or more of the Discretionary Beneficiaries (in this case, that class includes Mr Clayton himself). On the face of it, this would allow Mr Clayton to resettle the trust capital on the Trustee of a trust of which he was a (or the) beneficiary.

[56] Counsel for the VRPT Trustee said Mr Clayton's fiduciary obligations to the Final Beneficiaries constrained Mr Clayton's ability to exercise these powers in his own favour. That submission has to be evaluated against a background of a number of provisions of the VRPT deed that modify the duties imposed on the Trustee. In particular:

(a) Clause 14.1 of the VRPT deed, which authorises a Trustee who is also a Beneficiary (as Mr Clayton is) to exercise any power or discretion vested in the Trustee in his own favour;

(b) Clause 11.1, which authorises the Trustee to exercise a power or discretion conferred on the Trustee even though the interests of all beneficiaries are not considered by the Trustee (cl 11.1(a)), the exercise would or might be contrary to the interests of any present or future Beneficiary (cl 11.1(b)) and/or the exercise results in the whole of the trust capital or income being distributed to one Beneficiary to the exclusion of others (cl 11.1(c)); and

(c) Clause 19.1(c), which authorises the Trustee to exercise any power or discretion notwithstanding that the interests of the Trustee may conflict with the duty of the Trustee to the Beneficiaries or any of them.

[57] These provisions make it possible for Mr Clayton, even if he has not exercised the power conferred on him as Principal Family Member by cl 7.1, to resolve as Trustee to apply the trust capital and income to himself (to the

56 Reproduced in the appendix: see cl 2.1.
57 Of course, if he had already exercised his power as Principal Family Member under cl 7.1 to remove all Discretionary Beneficiaries other than himself, he would be the only eligible appointee under cl 10.1(a).

exclusion of the Final Beneficiaries and any remaining Discretionary Beneficiaries). He could do this without considering the interests of other Discretionary Beneficiaries (if any) or those of the Final Beneficiaries even if it meant all the trust capital and income was distributed to him to the exclusion of other Beneficiaries. The position of the Final Beneficiaries is contingent on the trust capital not being distributed before the Vesting Day. The fact that the decision involved a conflict between his personal interest and the interests of other Beneficiaries would not matter.

**[58]** These provisions mean that Mr Clayton is not constrained by any fiduciary duty when exercising the VRPT powers in his own favour to the detriment of the Final Beneficiaries. The fact that he cannot remove the Final Beneficiaries does not alter the fact that he can, unrestrained by fiduciary obligations, exercise the VRPT powers to appoint the whole of the trust property to himself. That leads to the next question: are the VRPT powers of sufficiently similar effect to a general power of appointment that it is appropriate to treat them as property for the purposes of the PRA?

*General power of appointment?*

**[59]** The power Mr Clayton has to apply the property of the VRPT to himself, with the freedom given to him by the clauses referred to at [56] above, has many of the characteristics of a general power of appointment.

**[60]** *Underhill and Hayton Law of Trusts and Trustees* defines a general power of appointment as a power under which the donee of the power may appoint to anyone including himself.[58] Similar statements are included in *Jacobs' Law of Trusts in Australia*[59] and in *Equity and Trusts in New Zealand*.[60] In *Lewin on Trusts*[61] the authors state that the distinctive feature of a general power is that the donee is free to appoint to himself without considering the interests of anyone else.[62]

**[61]** A general power of appointment is usually viewed as tantamount to ownership and can be treated as property for particular purposes.[63] This was made clear in *TMSF*.[64] As Lord Collins stated in that case:[65]

> As *Thomas, Powers* (1998) puts it (at 1-08), the fundamental distinction between the concepts of power and property has not been preserved in all contexts and for all purposes. A donee of a truly general power can appoint the subject matter of the power to himself. He therefore has an "absolute disposing power" over the property, citing *Sugden, Powers*, 8th ed (1861), p 394. Consequently, for many purposes, the law regards the donee as effective owner of that property.

---

58 D Hayton, P Matthews and C Mitchell *Underhill and Hayton Law of Trusts and Trustees* (18th ed, LexisNexis, London, 2010) at 39.

59 JD Heydon and MJ Leeming *Jacobs' Law of Trusts in Australia* (7th ed, LexisNexis, Chatswood, 2006) at 36.

60 Andrew Butler "The Trust Concept, Classification and Interpretation" in Andrew Butler (ed) *Equity and Trusts in New Zealand* (2nd ed, Thomson Reuters, Wellington, 2009) 43 at 50.

61 L Tucker, N le Poidevin and J Brightwell *Lewin on Trusts* (19th ed, Sweet & Maxwell, London, 2015) at 1395.

62 See also *Kain v Hutton*, above n 51, at [47], *Re Park Public Trustee v Armstrong* [1932] 1 Ch 580 and *Re Penrose* [1933] Ch 793.

63 Geraint Thomas *Thomas on Powers* (2nd ed, Oxford University Press, Oxford, 2012) at [1.06].

64 *TMSF*, above n 42, at [40]–[44] and [60].

65 At [44].

**[62]** The practical effect of the provisions discussed above is that Mr Clayton, as Trustee of the VRPT, could appoint all the assets of the VRPT to himself, especially (though not exclusively) if he has already exercised his power as Principal Family Member under cl 7.1 to remove all other Discretionary Beneficiaries. He could also appoint the assets of the VRPT to anyone else of his choosing by first utilising the cl 7.1 power to appoint a new Discretionary Beneficiary and then using his power as Trustee to appoint the property of the VRPT to the Discretionary Beneficiary so appointed.

**[63]** Counsel for the VRPT Trustee argued that the exercise of any power in a manner that "defeated [the] mandate [of the VRPT deed to the Final Beneficiaries]" would be an act in respect of which the Final Beneficiaries could enforce an account against the Trustee. He argued that, if Mr Clayton exercised any of these powers in favour of himself in breach of his fiduciary duty to the Final Beneficiaries, the Final Beneficiaries would have remedies for breach of trust.

**[64]** The powers Mr Clayton exercises as Trustee are fiduciary powers and it has been argued that even the cl 7.1 power is constrained by fiduciary obligations.[66] But the freedom given by cls 14.1, 11.1 and 19.1(c) mean the normal constraints of fiduciary obligations are not of any practical significance in relation to his powers as Trustee.[67] And Mr Clayton can appoint the property of the VRPT to himself without recourse to the cl 7.1 power.

**[65]** The fact that the VRPT powers are, for the most part, Trustee powers is, on the face of it, a distinction between this case and *TMSF*, where the relevant power was held by the settlor of the trust, not the Trustee. We acknowledge that but consider that the lack of the normal constraints on Mr Clayton as Trustee means that this distinction is not significant in this case.

**[66]** It was also submitted on behalf of the VRPT Trustee that if Mr Clayton acted to defeat the "mandate" (of the VRPT to the Final Beneficiaries), he would be in breach of his obligation to hold the trust assets in accordance with the trust objects, which include the protection of the Claymark business from creditor claims, to protect the operating businesses and to keep the land held by the VRPT outside the personal guarantee of Mr Clayton to the Bank of New Zealand.

**[67]** We do not accept that submission. There is nothing in the VRPT deed referring to such a "mandate". Given the breadth of the powers held by Mr Clayton and the express authorisation described in [56] above, there is no effective constraint on the exercise of powers in favour of himself.

**[68]** We conclude that the combination of powers and entitlements of Mr Clayton as Principal Family Member, Trustee and Discretionary Beneficiary of the VRPT amount in effect to a general power of appointment in relation to the assets of the VRPT.

*Are the VRPT powers "property"?*

**[69]** As *TMSF* makes clear, a general power of appointment can be treated as effectively property for some purposes. In that case, the Privy Council determined that the power of revocation of a trust was such that it was

---

66 Nicola Peart and Jessica Palmer "Double Trouble – the power to appoint and remove Trustees and the power to appoint and remove beneficiaries" (Paper presented to NZLS CLE Trusts Conference, June 2015) 33 at 37–38. See also Nicola Peart and Jessica Palmer "*Clayton v Clayton*: A step too far?" (2015) 8 NZFLJ 114 at 117.

67 See [56] above.

appropriate to treat the power as property in an insolvency context. The question for us is whether the VRPT powers, which are to the same effect as a general power of appointment, are "rights" or "interests" and thereby come within the definition of "property" in s 2 of the PRA interpreted in the context of the PRA.

[70] If the reference to rights and interests in the definition of property in the PRA is interpreted conformably with the purposes of the PRA (to borrow the phrase used by French CJ in *Kennon v Spry* referred to earlier),[68] it is clear that the VRPT powers should be regarded as property. As discussed earlier, the statutory context is an important factor in the interpretation of the property definition in s 2 of the PRA.

[71] The approach taken by the High Court of Australia in a similar situation in *Kennon v Spry* illustrates the importance of the statutory context in cases like the present.[69] That case also concerned the treatment of a family trust in the context of a marriage breakdown. The key elements of the trust were that the husband, Dr Spry, was able to appoint all of the trust capital and income to Mrs Spry, a discretionary beneficiary. Mrs Spry, as a discretionary beneficiary, had a right in equity to due administration of the trust and Dr Spry, as Trustee, had a fiduciary duty to consider whether and in what way he should exercise the power to appoint the capital and income to one or more beneficiaries.

[72] The majority of the High Court of Australia held that the trust property or the right to enjoy the trust property was "property of the parties to the marriage". There were two judgments for this majority, one by French CJ and one by Hayne and Gummow JJ. They took slightly different approaches, but both emphasised the need to interpret the property definition in a manner that gives effect to the purposes of the Act.[70]

[73] The VRPT deed presents a far more compelling case for treating powers and entitlements in relation to a family trust as property of one or both spouses than *Kennon v Spry*. In *Kennon v Spry*, it was the combination of the powers of Dr Spry to appoint the capital to Mrs Spry and the latter's rights as beneficiary that the Court treated as property of the marriage.[71] That can be compared to the present case, which involves a combination of powers that confer on Mr Clayton the ability to appoint all of the property of the VRPT to himself. The importance of *Kennon v Spry* is, however, not its similarity to the present case but the fact that the High Court majority interpreted the definition of "property" in light of its context in relationship property legislation and in a manner calculated to conform with the purposes and principles of that legislation.

[74] Some commentators have raised concerns about applying *Kennon v Spry* in New Zealand.[72] While we acknowledge the different definition of "property" in the Australian legislation and the differences between the legislative regimes in New Zealand and Australia, we do not see these as diminishing the importance of *Kennon v Spry* for the proposition that the definition of property must be interpreted in the context of the relationship property legislation.

---

68 Above at [37].
69 *Kennon v Spry*, above n 38.
70 At [64] per French CJ and [89] per Hayne and Gummow JJ.
71 At [62] per French CJ and [126] per Hayne and Gummow JJ.
72 See for example B Atkin and W Parker *Relationship Property in New Zealand* (2nd ed, LexisNexis, Wellington, 2009) at 216 and Nicola Peart "*Intervention to Prevent Abuse of Trust Structures*" [2010] NZ L Rev 567 at 591.

Whether a New Zealand court would hold, in the same circumstances as in *Kennon v Spry*, that the combination of rights and powers of the parties to the marriage was property is not something we need to decide.

**[75]** Counsel for Mrs Clayton also relied on a recent decision of the Court of Final Appeal of Hong Kong, *Kan Lai Kwan v Poon Lok To Otto*[73] and the English cases on which it is based, especially *Charman v Charman*,[74] *Charman v Charman (No 4)*[75] and *Whaley v Whaley*.[76] While we see these cases as less relevant to the issue than *Kennon v Spry*, we consider the approach taken in them supports a substance over form approach to the problem before us.

**[76]** The three English cases involve the interpretation of a statutory provision that requires the court to have regard to a number of matters including "the income, earning capacity, property and other financial resources which each of the parties to the marriage has or is likely to have in the foreseeable future". In determining whether assets held in an offshore trust over which the husband had de facto control (despite there being a nominally independent Trustee) were "financial resources" of the husband, the Court in *Charman v Charman* applied this test: "whether the Trustee would be likely to advance the capital immediately or in the future" to the relevant spouse.[77]

**[77]** That involves the Court bringing "a judicious mixture of worldly realism and of respect for the legal affairs of trusts, the legal duties of Trustees and, in the case of off-shore trusts, the jurisdictions of off-shore courts".[78] In a later decision of the England and Wales Court of Appeal, *Whaley v Whaley*, this approach was endorsed.[79]

**[78]** In *Kan Lai Kwan v Poon Lok To Otto*, the Hong Kong Court of Final Appeal adopted the *Charman* test.[80]

**[79]** The fact that the statutory context is so different from the PRA may count against applying the English and Hong Kong cases in New Zealand. However, they illustrate the need for "worldly realism" in this context and also acceptance that strict concepts of property law may not be appropriate in a relationship property context.

**[80]** We consider that, taking an approach that recognises the statutory context of the PRA, the VRPT powers are properly classified as "rights" that give Mr Clayton an "interest" in the VRPT and its assets.[81]

**[81]** Counsel for the VRPT Trustee argued that if Parliament intended that powers of appointment would be treated as property, it would have included a specific provision to this effect, as appeared in the Estate and Gift Duties Act 1968.[82] We agree with the Court of Appeal that this is not a decisive

---

73 *Kan Lai Kwan v Poon Lok To Otto* [2014] HKCFA 65, (2014) 17 HKCFAR 414.
74 *Charman v Charman* [2005] EWCA Civ 1606, [2006] 1 WLR 1053.
75 *Charman v Charman (No 4)* [2007] EWCA Civ 503, [2007] 1 FLR 1246.
76 *Whaley v Whaley* [2011] EWCA Civ 617, [2012] 1 FKR 735 at [40].
77 *Charman v Charman*, above n 74, at [12]–[13].
78 *Charman v Charman (No 4)*, above n 75, at [57].
79 *Whaley v Whaley*, above n 76. This approach is focused on the interpretation of the statutory term "financial resources [that a spouse] is likely to heave in the foreseeable future" rather than "property". See n 37 above.
80 *Kan Lai Kwan v Poon Lok To Otto*, above n 73, at [27].
81 We leave for another case what would be the position if the VRPT powers were less extensive: both the issue as to whether the powers were property and, if so, how they would be valued.
82 Estate and Gift Duties Act 1968, s 8, which provided that a deceased's dutiable estate included property over which he or she had a general power of appointment. This

consideration. As the Privy Council recognised in *TMSF*, the power of appointment may be treated as property for some purposes even where there is no legislative provision requiring that to be done.[83]

*Is this interpretation contrary to Parliament's intention?*

**[82]** It was argued by counsel for the VRPT Trustee that the interpretation that trust powers amounted to property was, in effect, a law change, and that such a change was best left to Parliament. In support of this he pointed to materials from the legislative history of the Property (Relationships) Amendment Act 2001, which indicate that there was an original proposal to give the courts wide power to distribute the capital of a trust, but that this suggestion was not carried through into the legislation as enacted. The result was s 44C of the PRA, which restricts the power of the court to a power to order the Trustee to pay the whole or part of the income (but not the capital) of the trust.[84]

**[83]** Counsel's interpretation of this process is that the legislature did not intend for trust powers to be considered property, with the effect that the capital of the trust would be available for sharing under the PRA.

**[84]** We accept that the legislative history supports the view that Parliament did not intend the court to have a "trust-busting" power. The limited scope of s 44C illustrates this. But we do not see the history of the legislative process as determinative of the issue before us, namely what constitutes "property", a necessary forerunner for a determination of what constitutes relationship property. A finding that rights and powers associated with a trust or the assets held on trust are relationship property does not, of itself, lead to an order requiring capital of the trust to be paid to a spouse. Rather, it means the size of the pool of assets subject to the default equal sharing regime in the PRA is greater than it otherwise would be.

*Is the property "relationship property"?*

**[85]** The Court of Appeal determined that the power of appointment under cl 7.1 was relationship property. However, its analysis was aimed at establishing that the power of appointment was property, which did not automatically lead to a conclusion that it was relationship property. Counsel for the VRPT Trustee criticised this aspect of the Court of Appeal's decision. He said even if the Court had been correct to conclude that the power of appointment was property, it should have concluded that it was Mr Clayton's separate property.

**[86]** As the VRPT powers, which we have found to be property, were "acquired" by Mr Clayton after his relationship with Mrs Clayton began (when the VRPT was settled in 1999), they are relationship property under s 8(1)(e) of

provision is discussed in Ivor Richardson and Robin Congreve *Law of Estate and Gift Duty* (5th ed, Butterworths, Wellington, 1978) at 80–81.

83 *TMSF*, above n 42, at [41] and [60]; *Clayton* (CA), above n 1, at [112].

84 The original proposal was in the Ministry of Justice *Report of the Working Group on Matrimonial Property and Family Protection* (Ministry of Justice, October 1988) at 28–30. This was not adopted in the provision in the Matrimonial Property Amendment Bill 1998 (109–1), cl 47. The provision in the Bill reflected recommendations in the Ministry of Justice's "Memorandum for Cabinet Social Policy Committee: Review of the Matrimonial Property Act 176" LRD 14-3-10-2 at 6. See also Matrimonial Property Amendment Bill 1998 (109–2) (select committee report) at xii and 47, Ministry of Justice "SOP to Matrimonial Property Amendment Bill – Departmental Report" (16 August 2000) MAT/J/4 at 25, Matrimonial Property Amendment Bill 1998 (109–3) and Supplementary Order Paper 1999 (25) (select committee report) at 26.

the PRA. Counsel for the VRPT Trustee suggested applying this analysis would lead to an unfair outcome, because the property transferred to the VRPT included the two Vaughan Road blocks, which Mr Clayton owned before the relationship began, and which were therefore separate property. He argued that the strict application of s 8(1)(e) of the PRA to the powers under the VRPT deed would, in substance, convert separate property into relationship property.[85]

**[87]** We do not see any basis for such a concern in this case. We accept that the Court of Appeal found that the property held in the VRPT was not relationship property.[86] But it is clear that its only reason for doing so was because the property in the trust was held on trust by Mr Clayton, not that it was Mr Clayton's separate property. The alleged unfairness would arise only if the underlying assets of the VRPT would, if they had not been settled on the VRPT, have been Mr Clayton's separate property.

**[88]** The Family Court Judge accepted a concession from Mrs Clayton that the value of Mr Clayton's separate property when the relationship began was $500,000.[87] She found that, as both s 9A(1) and s 9A(2) applied, the increase in value of that separate property over and above that $500,000 was relationship property, to be shared equally.[88] This led her to order that the increase in value be shared equally.[89] She also ordered that Mrs Clayton was entitled to be compensated for half of the value of the assets of the VRPT, which, on her approach, were treated as being owned by Mr Clayton beneficially.[90] That involved a finding by Judge Munro that, once Mr Clayton's separate property interest of $500,000 was recognised, the remaining property held by Mr Clayton personally (which, on her approach, included the assets of the VRPT) was relationship property. The Family Court's finding was upheld in the High Court.[91] It was not challenged in the Court of Appeal.[92]

**[89]** In those circumstances, we see no basis for the allegation of unfairness. If the underlying assets of the VRPT were all such that they would have been separate property but for having been settled on trust, it may have been necessary to consider whether s 13 of the PRA should be invoked, but there is clearly no basis to do so in this case.[93]

**[90]** We do not overlook the fact that the Vaughan Road blocks were owned by Mr Clayton at the commencement of the relationship and are now assets of the VRPT. So, in that sense, it could be argued that the property settled on the VRPT was, or included, separate property. But the $500,000 allowance for separate property made by the Family Court recognised that the increase in value of those blocks was (on the Family Court approach of treating the assets

---

85 A similar concern was raised in Peart and Palmer "*Clayton v Clayton*, A step too far?", above n 66, at 117.

86 *Clayton* (CA), above n 1, at [162].

87 *Clayton* (FC), above n 6, at [65].

88 At [66].

89 At [139](f).

90 At [139](h).

91 *Clayton* (HC), above n 7, at [41]–[44].

92 *Clayton* (CA), above n 1, at [4].

93 Section 13 of the PRA allows the court to distribute property or money unequally "in accordance with the contribution of each spouse to the marriage" where there are "extraordinary circumstances that make equal sharing ... repugnant to justice".

of the VRPT as assets of Mr Clayton) relationship property. To make any further allowance based on the proposition that separate property was transferred to the VRPT would effectively involve double counting.[94]

**[91]** It was argued on behalf of the VRPT Trustee that if the Court were to hold that Mr Clayton's powers under the VRPT deed were property, this would lead to a division of property that was unjust. Thus, he argued, an order treating the powers as property should not be made, given the mandate in s 25 of the PRA to make such order as the court considers just. He argued that a possible consequence of treating the powers as property was that Mr Clayton would be required to take actions as Trustee of the VRPT that were adverse to the interests of the beneficiaries of that trust other than Mrs Clayton and him (notably Mr and Mrs Clayton's daughters).

**[92]** We do not have sufficient information to know whether that concern is real or imagined,[95] but it does not seem to us to be a relevant consideration to the determination of the legal issue before us, namely whether the VRPT powers are relationship property in terms of the PRA. On the face of it there does not seem to be anything unfair about Mr Clayton as Trustee of the VRPT resolving to make a distribution to Mrs Clayton as a Discretionary Beneficiary given the breadth of his powers. After all, he could at any time distribute all or part of the property of the trust to himself without regard to the interests of his daughters as Discretionary Beneficiaries or Final Beneficiaries (and, if he did, this would also provide a way for him to meet his payment obligation to Mrs Clayton). This reflects their precarious position as beneficiaries due to the breadth of the VRPT powers.[96]

**[93]** As discussed earlier in this judgment, it is hard to see how the other Discretionary Beneficiaries, particularly the daughters of Mr and Mrs Clayton, could complain if that occurred. We say this because of the breadth of the powers given to the Trustee under the deed, the lack of constraint on the exercise of those powers (discussed at [56] above) and the fact that, as Discretionary Beneficiaries, their interest is only the right to be considered, and as Final Beneficiaries their position is contingent on the trust capital not being distributed before the Vesting Day.

**[94]** Mrs Clayton submitted that the practical solution could be dealt with by orders made under s 33 of the PRA. That section empowers the Court to make a wide variety of orders, including orders vesting any property[97] and an order varying the terms of any trusts.[98] As the parties have settled the dispute, we say no more about that.

**[95]** It was also argued on behalf of the VRPT Trustee that an order treating Mr Clayton's powers under the VRPT deed as property may have an adverse impact on the Claymark business. The argument was that it may be necessary

---

94 Ms McCartney also argued that any increase in value of separate property which is relationship property under s 9A(1) of the PRA is a separate asset from the underlying property that has increased in value. This is dealt with in the Claymark Trust judgment, above n 2, at n 143.

95 By this we mean that we do not have sufficient information to determine whether Mr Clayton has sufficient personal assets to meet any judgment in favour of Mrs Clayton.

96 In addition, we note that the court has power under s 26 of the PRA to make an order settling all or some of the relationship property for the benefit of the children of the marriage, civil union, or de facto relationship or of any of them. It was not suggested that this power should be exercised in this case.

97 Section 33(3)(e).

98 Section 33(3)(m).

for assets held in the VRPT to be sold in order to meet any order in favour of Mrs Clayton, and given the significance of the Vaughan Road blocks to the Claymark business, this would adversely affect that business.

**[96]** We do not see how this could possibly affect the legal issue that we are required to determine. If the award ultimately made in favour of Mrs Clayton requires Mr Clayton to sell or use as security assets associated with the Claymark business, that is simply a consequence of the application of the PRA to the facts of the case. It is not a reason to deviate from the application of the law. In any event, it is not difficult for the Claymark business to ensure it has security of tenure over the Vaughan Road blocks as a lessee, paying market rent. If it has that security, a change in the identity of the landlord should not be fatal to its future success.

**[97]** A similar argument was made on behalf of Mr Clayton personally and it is also rejected.

*Conclusions on VRPT powers*

**[98]** Our conclusions in relation to the grounds of appeal (c)(i) and (ii) are as follows:

(a) Are the rights of Mr (and Mrs) Clayton under the VRPT deed relationship property? We conclude that the VRPT powers (that is, Mr Clayton's powers and entitlements under the VRPT deed) are property as defined in s 2 of the PRA and relationship property as defined in s 8 of the PRA.

(b) Is the power of appointment under cl 7.1 of the VRPT deed relationship property? We conclude that the power under cl 7.1 does not give Mr Clayton the ability to remove the Final Beneficiaries and therefore does not allow him to, in effect, revoke the trust. On its own, it is not a general power of appointment. So, taken in isolation it is not property and not relationship property. But, in light of our conclusion in [98](a) above, this does not change in any practical sense the outcome of the Court of Appeal decision.

**What is the correct valuation of the VRPT powers?**

**[99]** The Court of Appeal determined that the value of the right represented by the power in cl 7.1 of the VRPT deed, which it found was a general power of appointment, was an amount equal to the net value of the assets of the VRPT.[99] The Court reasoned that the value of the right to the holder of the power was the value of the property that would be received by the holder of the power in the event that the power were exercised. In order to calculate the value, it would be necessary to work out the net value of the assets of the VRPT calculated as at 31 March 2011, which was the date that the parties had agreed should be adopted for valuation purposes. The Court of Appeal recorded that the parties had agreed that the calculation of this value should be remitted to the High Court for determination. The Court ruled that Mrs Clayton was entitled to half of the value so determined. The settlement means that there is now no need for this valuation exercise to occur.

**[100]** Counsel for the VRPT Trustee did not propose an alternative method of valuation, but instead argued that treating the powers as equal in value to the net assets of the VRPT would lead to injustice. He said this should be dealt with

99 *Clayton* (CA), above n 1, at [113].

by a recognition that the asset pool has been increased in a manner that disadvantages Mr Clayton, justifying an allocation of relationship property between Mr and Mrs Clayton under s 25(1)(a)(ii) other than on a 50/50 basis. He argued that this was permitted under that section which empowers the Court to make any order "it considers just ... dividing the relationship property or any part of that property between the spouses or partners".

**[101]** We do not see that proposal as assisting in the valuation question. The case for an order other than on a 50/50 basis would require the Court to determine that attributing to the VRPT powers a value equivalent to the net assets of the VRPT would lead to an unjust outcome. But if it is unfair, the answer is to determine the fair value, not to redistribute relationship property.

**[102]** It was also argued that there would be unfairness in the outcome because it may require Mr Clayton to exercise his powers in a way that was adverse to the interests of his daughters. We do not see that question as relevant to the valuation issue and, in any event, we have already dealt with it.[100] Counsel for the VRPT Trustee suggested that this would favour Mrs Clayton who was not a beneficiary over the interests of her daughters, who are. This is factually incorrect. Mrs Clayton is a beneficiary in her capacity as wife or former wife of Mr Clayton, as counsel acknowledged in his leave submission. There was no evidence that she had been removed as a beneficiary.

**[103]** As a further alternative, counsel argued that the Court should make an order under s 33(d) of the PRA postponing the vesting of Mrs Clayton's share in the relationship property (presumably this was intended to refer only to that aspect of the relationship property constituted by the powers held by Mr Clayton in relation to the VRPT) until the power of appointment is exercised by Mr Clayton in the manner anticipated, and also requiring that the value of the property be determined at that date under s 2G(2) of the PRA. His submission was not developed in any detail and it seems to us to beg the issue and to be contrary to the "clean break" principle.

**[104]** As Mr Clayton can appoint the assets of the VRPT to himself at any time, we see no reason to differentiate the value of the power to do this from the value of the assets to which the power relates. Indeed, some cases relating to general powers of appointment say that the power gives the donee of the power an interest tantamount to ownership of the assets to which the power relates.[101] Treating the VRPT powers as having a value equal to that of the assets to which they apply can be seen as consistent with that approach to general powers of appointment.

**[105]** As counsel for Mrs Clayton argued, if Mr Clayton's powers and entitlements under the VRPT deed were for sale, it is hard to see why Mr Clayton would not attribute to them precisely the same value as he would attribute to the net assets over which those powers give him virtually absolute control.[102]

---

100 Above at [91]–[93].

101 *Re Triffit's Settlement* [1958] Ch 852 at 861; *Re Watts* [1931] 2 Ch 302 at 305. It was not argued that the VRPT powers gave Mr Clayton a direct interest in the underlying assets of the VRPT and we leave that issue for argument in a future case.

102 This approach to valuation is consistent with *Z v Z* [1989] 3 NZLR 413 (CA) and *Walker v Walker*, above n 33.

**[106]** This outcome is also consistent with the approach taken in *Kennon v Spry*,[103] *Charman v Charman*,[104] *Whaley v Whaley*[105] and *Kan Lai Kwan v Poon Lok To Otto*.[106]

**[107]** We conclude that the value of the VRPT powers is equal to the value of the net assets of the VRPT.

**Sham trust or illusory trust?**

**[108]** We now turn to the grounds of appeal dealing with the allegations that the VRPT is a sham trust or an illusory trust. Our finding that the VRPT powers are relationship property having a value equal to the property to which they relate mean these allegations are not of great practical moment and we will deal with them relatively briefly.[107] Three issues arise for consideration:

(a) Is there a distinction between a sham trust and an illusory trust?
(b) Is the VRPT a sham?
(c) Is the VRPT an illusory trust?

**[109]** We propose to address the substantive arguments (b) and (c) first, before dealing briefly with the first issue (a).

*Is the VRPT deed a sham?*

**[110]** Mrs Clayton argued that the VRPT deed was a sham, or alternatively that the VRPT was an illusory trust.

**[111]** The Court of Appeal rejected that argument. It found that Mr Clayton did not have a subjective intent to create a document that did not evidence his true intention when he entered into the VRPT deed. On the contrary, he genuinely intended to create a trust.[108] This finding was consistent with those of Judge Munro in the Family Court[109] and Rodney Hansen J in the High Court.[110]

**[112]** The arguments advanced in support of the sham contention in this Court were largely the same as those which we have accepted as supporting the contention that Mr Clayton's powers under the VRPT deed are to the same effect as a general power of appointment and are property as defined in s 2 of the PRA. We will not rehearse those arguments again. In addition, counsel for Mrs Clayton relied on the evidence that Mr Clayton had little or no knowledge of the VRPT deed, the operation of the VRPT or his duties as Trustee. This, she argued, indicated that he did not consider he was restrained in any way by the existence of the VRPT deed and that he treated the property of the VRPT as his own.

---

103 Above n 38.
104 Above n 74.
105 Above n 76.
106 Above n 73.
107 There may have been some practical significance if Mr Clayton could not or did not meet the award to Mrs Clayton because the assets of the VRPT would not be directly available to satisfy the judgment in her favour. But the settlement means this possibility does not need to be addressed.
108 *Clayton* (CA), above n 1, at [67].
109 *Clayton* (FC), above n 6, at [73]. Judge Munro did not explicitly state that the trust was not a sham, but explained that its purpose was to separate and distance the underlying land ownership from the assets of the company.
110 *Clayton* (HC), above n 7, at [79].

**[113]** As this Court made clear in *Ben Nevis Forestry Ventures Ltd v Commissioner of Inland Revenue*, a sham is a pretence: a document that does not evidence the true common intention of the parties.[111]

**[114]** In the present case the only party to the VRPT deed is Mr Clayton, as both settlor and Trustee,[112] so, as the Court of Appeal pointed out,[113] the application of the *Ben Nevis* test requires us to determine whether the intention of Mr Clayton as settlor and Trustee was to create a trust when he entered into the VRPT deed and settled the Vaughan Road properties on the VRPT. As already noted, the concurrent findings of all three Courts below is that Mr Clayton did intend to create a trust when he established the VRPT.

**[115]** We do not consider that Mr Clayton's reliance on his advisors in relation to the VRPT and his lack of knowledge of the legal ramifications of the trust structure and the terms of the trust deed itself leads to the conclusion that the VRPT deed is a sham. Mr Clayton's reliance on his advisors does not indicate any lack of intent on his part to create a trust, nor does his lack of knowledge of the legal detail. The fact that the trust deed gives Mr Clayton powers that amount in effect, to a general power of appointment does not indicate that when entering into the VRPT deed, Mr Clayton in fact intended to create a structure different from that set out in the terms of the VRPT deed itself.

**[116]** Counsel for Mrs Clayton made a broader argument that a trust should be treated as a sham if, in light of the circumstances in which it was created and the manner it was administered, the Court came to the conclusion that "no trust had been established or that the trust should not be permitted to continue to exist". We do not accept this argument. We accept that the Court can find that the deed creating a trust is a sham if the parties are shown to have intended it to be a pretence. But there is no basis to extend the sham concept to encompass a trust created under a document that was not intended to be a pretence but that the Court considers is otherwise reprehensible in some way.

**[117]** We therefore conclude that there is no basis to depart from the concurrent findings of the Courts below that the VRPT deed was not a sham.

*Is the VRPT an illusory trust?*

**[118]** The attributes of the VRPT deed that led us to conclude that the powers of Mr Clayton as settlor, Principal Family Member and Trustee were effectively a general power of appointment were the same attributes that led the High Court Judge to conclude that the VRPT was an illusory trust. As the High Court Judge put it:[114]

> [90] ... the provisions of the [VRPT] give Mr Clayton unfettered power to distribute the income and the capital of the trust to himself if he wishes and to bring the trust to an end at any time he pleases. Mr Clayton effectively retained all the powers of ownership. What he has in fact done is neither here nor there, although it appears that, through his delegates, Mr Clayton

---

111  *Ben Nevis Forestry Ventures Ltd v Commissioner of Inland Revenue* [2008] NZSC 115, [2009] 2 NZLR 289 at [33] per Tipping, McGrath and Gault JJ.
112  Where the settlor and trustee are different people, there is controversy as to whether the focus of the inquiry should be on their collective intention or that of the trustee only: *Official Assignee v Wilson* [2007] NZCA 122, [2008] 3 NZLR 45 at [41]–[53] and [113]–[122]. See the discussion of the alternative views in Jessica Palmer "What makes a trust a sham?" [2008] NZLJ 319 and Matthew Conaglen "Trusts and Intention" in E Simpson and M Stewart (eds) *Sham Transactions* (Oxford University Press, Oxford, 2013) 122.
113  *Clayton* (CA), above n 1, at [57].
114  *Clayton* (HC), above n 7, at [90].

> exercises, in a practical sense, the powers of ownership. It is what he has the legal power to do that is important and that is basically to do whatever he wants with the trust property. Within a largely conventional framework the trust deed provides an appearance of separation. The reality is, however, that if he chooses to, Mr Clayton is able to deal with trust property just as he would if the trust had never been created.

**[119]** The concept of "illusory trust" was described by Rodney Hansen J as a trust under which the trustee retains such control that the proper construction is that he did not intend to give or part with control over the property sufficient to create a trust.[115] The essence of the concept appears to be that the trust as constituted has the attributes of a trust, including the imposition on the Trustee of the obligation to act honestly and in good faith; but the powers given to the Trustee and, we would add in this case, the Principal Family Member, given that Mr Clayton had both roles, are so broad that the Trustee can "basically ... do whatever he wants with the property".[116]

**[120]** The High Court Judge did not agree with the Family Court Judge that Mr Clayton as Trustee was not subject to the "irreducible core of obligations" owed by trustees to beneficiaries because of the authorisations in cls 11 and 19 of the VRPT deed.[117] He considered these provisions did not excuse Mr Clayton as Trustee from acting honestly and in good faith. But that did not deter him from finding the VRPT was an illusory trust for the reasons described above, so the finding made in the Family Court that the VRPT was an illusory trust was upheld, even though the Family Court Judge's reasons for reaching that conclusion were rejected. That meant that the Family Court order relating to the VRPT assets was upheld. That order was:[118]

> The assets of the [VRPT] vest in Mr Clayton personally, and as such, Mrs Clayton is entitled to be compensated for one half of their net value as at 31 March 2011.

**[121]** The High Court Judge said the breadth of the powers given to Mr Clayton did not override his overall duty to act in good faith, albeit that the interests of the beneficiaries were substantially compromised by the breadth of the powers he had to apply property to himself.[119] It is not clear whether the Judge was stating that as a general proposition or just disagreeing with Judge Munro's conclusion that cls 11.1 and 19.1(c) negated the ability of Beneficiaries to call the Trustee to account. If it was the former, the Judge's conclusion appears to have been that, while Mr Clayton had core obligations to

---

115 At [79], citing *Financial Markets Authority (FMA) v Hotchin* [2012] NZHC 323 at [30]. In that case, Winkelmann J rejected an argument that a trust having similar provisions to those of the VRPT deed was invalid because the powers reserved by the settlor/donor were so broad "the essential characteristics of a trust obligation are absent" (at [27]). However, in that case, there was a prohibition on self-dealing in the trust deed which prevented a trustee from distributing trust property to himself or herself. This distinguishes that trust from the VRPT. In addition, the power to appoint and remove beneficiaries in that case was held by a trustee rather than a non-trustee (the Principal Family Member).

116 *Clayton* (HC), above n 7, at [90].

117 At [80]. *Clayton* (FC), above n 6, at [75]–[85], citing *Armitage v Nurse* [1997] EWCA Civ 1279, [1998] Ch 241. Clauses 11 and 19 are discussed at [56] and [62] above.

118 *Clayton* (FC), above n 6, at [139(h)].

119 *Clayton* (HC), above n 7, at [81].

perform his duties honestly and in good faith for the benefit of Beneficiaries, the breadth of his powers to apply property to himself gave him such wide powers over the VRPT assets that a trust could not be said to exist.

**[122]** The Court of Appeal overturned the finding that the VRPT was an illusory trust. It saw that finding as inconsistent with the findings made by Rodney Hansen J that the VRPT was not a sham trust, that Mr Clayton had core obligations as Trustee to act honestly and in good faith, and that other beneficiaries could enforce those core obligations.[120] It also saw the terms sham trust and illusory trust as synonymous and their legal definitions as overlapping.[121] It saw both as hinging on the settlor's intention to create a trust that was valid and enforceable. The Court said once the Court accepts a valid trust has been established (with no sham), it should not be able to be treated as non-existent because the Trustee has wide powers of control over the trust property.[122] In short, "[t]here is either a valid trust or there is not".[123]

**[123]** We will come back later to the distinction between a sham and an illusory trust. For the present we observe that a finding that a trust deed is not a sham does not seem to us to preclude a finding that the attempt to create a trust failed and that no valid trust has come into existence. That would lead to a finding that the trust is illusory, to use the terminology adopted in the Courts below. For our part we do not see any value in using the "illusory" label: if there is no valid trust, that is all that needs to be said.

**[124]** Given the extent of the powers held by Mr Clayton under the VRPT deed, there are two alternative lines of analysis concerning the VRPT's validity. First, it can be argued that the VRPT is not a valid trust because Mr Clayton, having reserved such broad powers to himself in the VRPT deed, cannot be said to have disposed of the property settled under the VRPT deed in favour of another.[124] Equally, the breadth of those powers can be said to bring into question whether the irreducible core of Trustee obligations referred to in *Armitage v Nurse* apply to Mr Clayton.[125] However, this does not deny the possibility that a valid trust may come into existence at some time in the future, for example, if Mr Clayton were to be replaced by a new Trustee who was not the Principal Family Member and/or a beneficiary.

**[125]** Second, it can be argued that, even though the VRPT is effectively defeasible, in the sense that the VRPT powers in substance give Mr Clayton power to bring the VRPT to an end, there is no reason in principle why it should not be regarded as a trust and required to be administered in accordance with the VRPT deed until the exercise of the VRPT powers in that manner. In *TMSF*, the Privy Council found that the settlor's powers to revoke the trust were such that the settlor could be regarded as having rights tantamount to ownership.[126] It made no finding about the status of the trust in the period before the

120 *Clayton* (CA), above n 1, at [76].
121 At [77].
122 At [80].
123 At [85].
124 *Knight v Knight* (1840) 3 Beav 148, 49 ER 58 (Ch) at 68 per Lord Langdale.
125 See [120]–[121] above. The argument that the VRPT is not a valid trust is supported by the observations of Associate Professor Palmer and Professor Peart in their "Double Trouble" paper, above n 66, at 50–51.
126 *TMSF*, above n 42, at [59].

revocation powers were exercised, because it was not required to do so in order to resolve the issue before it. However, there was nothing in the judgment to indicate that the trust was invalid in the period before the power to revoke it was exercised.

**[126]** It should be acknowledged that the power of revocation was not a power held by the trustee in that case, so there was no question but that the trustee's fiduciary obligations continued until the power of revocation was exercised. That can be contrasted with the present case, where the VRPT powers are, for the most part, powers held by Mr Clayton as Trustee.

**[127]** Determining which of these two lines of analysis is correct is a matter of some complexity on which the Court does not have a concluded unanimous view. In light of that, we do not intend to determine the issue because the settlement of the proceedings makes it unnecessary to do so and, given the very unusual terms of the VRPT deed, the issue is unlikely to arise in future cases.

*Is there a distinction between a sham trust and an illusory trust?*

**[128]** The answer to this question is academic, given our earlier findings. As noted earlier, a sham is a pretence: the terms of the document do not represent what the party or parties really intended. A finding of sham in this case would involve the Court assessing the subjective intention of Mr Clayton and concluding that the VRPT deed did not conform with his real intention.

**[129]** As we have already said,[127] we do not find the term "illusory trust" helpful. What the Family Court and High Court meant by that term was that no trust was created. In such a case, the document as executed does represent the terms to which the party or parties intended to agree but, despite their subjective intention to create a trust, they failed in their attempt to do so.

**[130]** In the present case, Mr Clayton intended to create a trust on the terms recorded in the VRPT deed. The issue would be whether the powers held by Mr Clayton are so broad that what he intended to be a trust was not, in fact, a trust. As already noted, we are not determining that issue.

**Result**

**[131]** For the reasons given, we conclude that the Court of Appeal erred in determining that cl 7.1 of the VRPT deed was a general power of appointment and that power was relationship property. But we find that the VRPT powers are relationship property, the value of which is equal to the value of the net assets of the VRPT. The practical outcome is the same. We formally allow the appeal and quash the Court of Appeal's finding that the power of appointment under cl 7.1 of the VRPT deed is relationship property having a value equal to that of the net assets of the VRPT. We substitute a finding that the VRPT powers are relationship property having a value equal to that of the net assets of the VRPT. For the avoidance of doubt, we record the VRPT powers are Mr Clayton's power as Principal Family Member under cl 7.1 and his powers as Trustee under cls 6.1, 8.1 and 10.1, in light of cls 11.1, 14.1 and 19.1(c).

**[132]** We uphold the Court of Appeal's finding that the VRPT is not a sham.

**[133]** We do not determine whether the VRPT is an illusory trust.

**[134]** At the hearing in this Court, counsel were agreed that it would be necessary to remit the matter to the High Court so that Court can determine issues of quantum and other outstanding issues. The settlement obviates the need to do this.

---

127 Above at [123].

**Costs**

[135] The settlement also obviates the need to address the issue of costs.

**Orders**

(A) The appeal is allowed in part.

(B) We set aside the findings of the Court of Appeal that cl 7.1 of the Vaughan Road Property Trust (VRPT) trust deed (the VRPT deed) is a general power of appointment and that the power is both property and relationship property, having a value equal to that of the net assets of the VRPT.

(C) We substitute a finding that the powers of Mr Clayton as Principal Family Member and Trustee under cls 6.1, 7.1, 8.1 and 10.1 of the VRPT deed (read in light of cls 11.1, 14.1 and 19.1(c) of that deed) are property and relationship property having a value equal to that of the net assets of the VRPT.

(D) We set aside the finding of the Court of Appeal that the VRPT is not an illusory trust (ie that it is a valid trust). We decline to make a ruling on that issue.

(E) We uphold the finding of the Court of Appeal that the VRPT is not a sham.

(F) We make no award of costs.

APPENDIX

*RELEVANT PROVISIONS OF VRPT DEED*

*INTRODUCTION*

...

B. The Trustees hold the sum of ten dollars upon the terms and with and subject to the powers and discretions set out in this deed.

...

2. *DEFINITIONS AND INTERPRETATION*

2.1 *Definitions*

...

"*Discretionary Beneficiaries*" means:

(a) the Principal Family Member;

(b) the Final Beneficiaries;

(c) the issue of any Final Beneficiary;

(d) any wife, husband, widow, widower, former wife or former husband for the time being of any Beneficiary described in paragraphs (a) to (c) of this definition;

(e) any trust ... which includes ... any Beneficiary;

(f) any person appointed pursuant to cl 7.1(a),

but does not include any person who has been removed from the class of Discretionary Beneficiaries pursuant to clause 7.1(b).

...

"*Final Beneficiaries*" means the child or children of the Principal Family Member born or adopted before the Vesting Day.

...

"*Principal Family Member*" means *Mark Arnold Clayton*.

...

"*Vesting Day*" means:

(a) the day upon which the period of eighty years from the date of this deed expires, being a date within the perpetuity period permitted to be specified by virtue of section 6 of the Perpetuities Act 1964, and the perpetuity period applicable to the Trust created by this deed is specified accordingly; or

(b) such earlier day as the Trustees may by deed appoint.

...

2.2 *Interpretation*: In this deed:

...

(b) the interpretation of this deed in cases of doubt is to favour the broadening of the powers and the restricting of the liabilities of the Trustees;

...

4. *INCOME DISTRIBUTION*

4.1 *Distribution*: The Trustees may, after payment of all expenses and other charges to be met from income, and after making or retaining out of, or charging against, the income of the Trust Fund any payments, reserves or other provisions for any of the purposes of the Trust:

(a) pay or apply all or any part of the income of the Trust Fund to or for such one or more of the Discretionary Beneficiaries who are then living or in existence;

...

6. *DISTRIBUTION OF CAPITAL BEFORE THE VESTING DAY*

6.1 The Trustees may at any time:

(a) pay or apply all or any part of the capital of the Trust Fund to or for such one or more of the Discretionary Beneficiaries who are then living or in existence;

(b) appropriate all or any part of the capital of the Trust Fund for such one or more of the Discretionary Beneficiaries who are then living or in existence contingently upon the reaching of a specified age or the happening of a specified event.

7. *APPOINTMENT AND REMOVAL OF DISCRETIONARY BENEFICIARIES*

7.1 *Power to appoint and remove Beneficiaries:* The Principal Family Member may, by deed, before the expiry of the Trust Period:

(a) appoint any person to become a member of the class of Discretionary Beneficiaries ...

(b) remove any person from the class of Discretionary Beneficiaries

...

...

8. *RESETTLEMENT OF TRUST FUND*

8.1 The Trustees may at any time resettle by deed all or any part of the Trust Fund upon the Trustees of any trust ... which includes ... any one or more of the Discretionary Beneficiaries ...

...

10. *DISTRIBUTION ON THE VESTING DAY*

10.1 Distribution of capital: The Trustees shall hold the Trust Fund on the Vesting Day upon trust:

y years from the date of
n the perpetuity period
tion 6 of the Perpetuities
cable to the Trust created

deed appoint.

f doubt is to favour the
ting of the liabilities of

nt of all expenses and
making or retaining out
ist Fund any payments,
rposes of the Trust:
of the Trust Fund to or
y Beneficiaries who are

*VESTING DAY*

of the Trust Fund to or
Beneficiaries who are

the Trust Fund for such
ries who are then living
hing of a specified age

*DISCRETIONARY*

The Principal Family
e Trust Period:
nber of the class of

retionary Beneficiaries

all or any part of the
ich includes ... any one

the Trust Fund on the

(a) for such of the Discretionary Beneficiaries or such one or more of them to the exclusion of the other or others of them in such shares as the Trustees may by deed appoint on or before the Vesting Day;

(b) in respect of such of the Trust Fund as may not be validly appointed on or before the Vesting Day, for such of the Final Beneficiaries who are then living, and, if more than one, as tenants in common in equal shares and if any Final Beneficiary dies before the Vesting Day leaving issue living on the Vesting Day such issue shall take per stirpes and, if more than one, as tenants in common in equal shares all the interest in the Trust Fund which such deceased Final Beneficiary would have taken had such deceased Final Beneficiary been living on the Vesting Day;

(c) if none of the Final Beneficiaries nor any of their issue are living on the Vesting Day, for such person or persons living who would be entitled, in accordance with the applicable law governing the distribution of the estates of intestates, to the estate of the Principal Family Member if the Principal Family Member were to die intestate on the Vesting Day and, if there is more than one such person, as tenants in common in such shares as they would have been so entitled.

...

11. *TRUSTEES' DISCRETION UNFETTERED*

11.1 For the avoidance of doubt and notwithstanding anything in this deed or any rule of law which imposes upon the Trustees the duty to act impartially towards Beneficiaries, the Trustees shall have unfettered discretion as to the exercise of the powers and discretions conferred upon them by this deed even though:

(a) the interests of all Beneficiaries are not considered by the Trustees;

(b) the exercise would or might be contrary to the interests of any present or future Beneficiary;

(c) the exercise results, at any time whether before or on the Vesting Day, in the whole or in any part of the capital or income of the Trust being distributed to any one Beneficiary or to any two or more Beneficiaries in equal or unequal proportions, in either case to the exclusion of the other Beneficiaries.

12. *POWERS AND DISCRETIONS OF TRUSTEES*

12.1 *Powers*: To achieve the objects of the Trust, the Trustees shall have in the administration, management and investment of the Trust Fund all the rights, powers and privileges of a natural person and, subject always to the trusts imposed by this deed, may deal with the Trust Fund as if the Trustees were the absolute owners of and beneficially entitled to the Trust Fund and, accordingly, in addition to any specific powers vested in the Trustees by law, in dealing with the Trust Fund or acting as Trustees of the Trust, the Trustees may do any act or thing or procure the doing of any act or thing or enter into any obligation whatever, including, without limitation, exercising unrestricted powers to borrow and raise money, and to give mortgages, other securities, guarantees and indemnities.

12.2 *Discretions*: Except as otherwise expressly provided by this deed, the

Trustees may exercise all the powers and discretions vested in the Trustees by this deed in the absolute and uncontrolled discretion of the Trustees at such time or times, upon such terms and conditions and in such manner as the Trustees may decide.

12.3 *Appropriated funds*: The powers and discretions vested in the Trustees by law or by this deed may be exercised by the Trustees both in respect of the Trust Fund and, in respect of any property held by the Trustees but appropriated, credited on account or otherwise held for any Beneficiary, contingently or otherwise.

12.4 *Investment discretion*: In exercising their powers of investment the Trustees may acquire any property, or retain or deal with any property which from time to time comprises the whole or part of the Trust Fund notwithstanding that any act or omission by the Trustees in the exercise of those powers and discretions would be, or could be, contrary to the principles governing the investment of trust funds set out in the Trustee Act 1956. This clause expresses a "contrary intention" for the purposes of section 13D of that Act.

12.5 *Unanimous approval*: Where there is more than one Trustee in office, except as provided in this deed, all powers and discretions of the Trustees shall be exercised with the unanimous approval of the Trustees.

...

13. *TRUSTEES DEALING WITH BENEFICIARIES*

13.1 Without in any way limiting any of the powers and discretions vested in the Trustees by law or by this deed, the Trustees may:

(a) sell, lend, lease or license to any Beneficiary or allow any Beneficiary to occupy or use any property of the Trust Fund on any terms;

(b) for the benefit of any Beneficiary, given guarantees and/or indemnities, or enter into any obligation, either alone or jointly with any other person, and give mortgages or other securities in support of, or in place of, any such guarantee, indemnity or obligation, over any of the property of the Trust Fund.

14. *TRUSTEE/BENEFICIARY*

14.1 *Self benefit*: A Trustee who is also a Beneficiary may exercise any power or discretion vested in the Trustees in his, her or its favour.

...

17. *APPOINTMENT AND REMOVAL OF TRUSTEES*

17.1 *Principal Family Member's power of appointment and removal*: The Principal Family Member shall have the powers, exercisable, from time to time, to appoint and remove Trustees.

17.2 *Transfer of powers of appointment and removal:* The Principal Family Member may transfer the powers of appointment and removal of Trustees to such person or persons as the Principal Family Member may nominate by deed or will.

...

17.5 *Power of appointment unrestricted:* The holder of any power of appointment of Trustees may, subject to any contrary intention expressed in the deed (if any) transferring the power to that person, exercise that power in favour of himself or herself.

...

19. *TRUSTEE'S CONFLICT OF INTEREST*

19.1 *Negation of conflict*: A Trustee may act as such and exercise all of that Trustee's powers and discretions notwithstanding that:

(a) that Trustee is associated as a director, or otherwise in a private capacity, or as Trustee of any other trust, with any company or other person to which the Trustees sell or lease any property forming part of the Trust Fund, or in which the Trustees hold or propose to acquire shares, securities or other rights as part of the Trust Fund, or with which the Trustees otherwise deal as Trustees of the Trust; or

(b) that Trustee may be a Trustee of any other trust to or from which the Trustees propose to sell or purchase shares, securities or other rights or property or with which the Trustees otherwise deal as Trustees of the Trust; or

(c) the interests or duty of that Trustee in any particular matter may conflict with the duty of that Trustee to the Trust Fund or any Beneficiary; or

(d) such Trustee is personally purchasing or taking on lease any property forming part of the Trust Fund, or personally selling any property to become part of the Trust Fund, or is otherwise dealing with the Trust Fund in a personal capacity as well as that of a Trustee.

...

21. *LIABILITY AND INDEMNITY OF TRUSTEES*

21.1 *No liability of Trustees with exceptions:* No Trustee or former Trustee of any officer of any Trustee or former Trustee shall be liable for any loss incurred by the Trust Fund or by any Beneficiary not attributable to that Trustee's or officer's own dishonesty, or to the wilful commission or omission by that Trustee or officer of an act known by that Trustee or officer to be a breach of trust. No Trustee shall be bound to take any proceedings against a co-Trustee or former Trustee for any breach or alleged breach of trust committed by a co-Trustee or former Trustee or any officer of any co-Trustee or former Trustee.

...

23. *AMENDMENT OF TRUST DEED*

23.1 The Trustees may, with the prior written consent of the Principal Family Member while the Principal Family Member is living, at any time or times during the Trust Period, and without infringing the rules against perpetuities, vary, revoke or enlarge all or any of the provisions of this deed concerning the management or administration of the Trust.

[**Editorial note:** The parties settled after the hearing, but before judgment.]

*Appeal allowed.*

Solicitors for Mrs Clayton: *Anderson Creagh Lai* (Auckland).
Solicitors for Mr Clayton: *Tompkins Wake* (Hamilton).
Solicitors for the trustees: *Quigg Partners* (Wellington).

*Reported by:* Bernard Robertson, *Barrister*

Case No: HC-2014-000262

Neutral Citation Number: [2017] EWHC 2426 (Ch)

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Rolls Building, Fetter Lane,
London, EC4A 1NL

Date: 11/10/2017

**Before :**

**THE HON. MR JUSTICE BIRSS**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**(1) JSC MEZHDUNARODNIY PROMYSHLENNIY BANK**
**(2) STATE CORPORATION "DEPOSIT INSURANCE AGENCY"** — **Claimants**

**- and -**

**(1) SERGEI VIKTOROVICH PUGACHEV**
**(2) KEA TRUST COMPANY LIMITED**
**(3) FINETREE COMPANY LIMITED**
**(4) BRAMERTON COMPANY LIMITED**
**(5) BLUERING COMPANY LIMITED**
**(6)MARU LIMITED**
**(7) HAPORI LIMITED**
**(8)MIHARO LIMITED**
**(9) AROTAU LIMITED**
**(10) LUXURY CONSULTING LIMITED**
**(11) VICTOR SERGEYEVITCH PUGACHEV**
**(12) ALEXIS SERGEEVICH PUGACHEV**
**(13) IVAN SERGEEVICH PUGACHEV**
**(14) MARIA SERGEEVNA PUGACHEV**
**(The 12th, 13th and 14th Defendants by their litigation friend ALEXANDRA TOLSTOY)** — **Defendants**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**STEPHEN SMITH QC, TIM AKKOUH** and **CHRISTOPHER LLOYD** (instructed by **HOGAN LOVELLS INTERNATIONAL LLP**) appeared on behalf of the Claimants.

**HODGE MALEK QC** and **PAUL BURTON** (instructed by **DEVONSHIRES SOLICITORS LLP**) appeared on behalf of the Twelfth to Fourteenth Defendants.

Hearing dates: 4th, 5th, 10th - 13th, 28th 31st July

- - - - - - - - - - - - - - - - - - - - -

**Judgment**

**Mr Justice Birss:**

| | |
|---|---|
| Introduction and narrative | 1 |
| The issues | 70 |
| The witnesses | 80 |
| The terms of the trust deeds | 103 |
| The law | 143 |
| Shams | 145 |
| Illusory trusts | 155 |
| Discretionary trusts, protectors and fiduciaries | 173 |
| *Assessment* | 204 |
| The involvement of Victor and his father as sources of assets | 204 |
| **The True Effect of the Trusts claim** | 212 |
| (i) Preliminary general points | 214 |
| (ii) Exclusion and indemnity clauses | 216 |
| (iii) The position of Protector | 222 |
| What if the Protector's powers are personal? | 234 |
| Are the Protector's powers purely personal? | 248 |
| The nature and scope of the Protector's powers – conclusion | 265 |
| **The Sham claim** | 279 |
| (i) The subsidiary characters – Ms Hopkins and Mr Pugachev's lieutenants | 283 |
| (ii) Mr Pugachev | 286 |
| (iii) Mr Patterson | 299 |
| Mr Patterson as a witness | 308 |
| (a) Dealings with trust assets without Mr Patterson's knowledge and agreement | 312 |
| (b) and (c) Mr Pugachev as settlor | 325 |
| (d) Not aware of any basis for the trusts being shams | 336 |
| (e) Only link to the OPK trusts was as corporate administrator | 341 |
| Mr Patterson's trust law article | 347 |
| (f) No distributions to Mr Pugachev from the trusts before the freezing order | 350 |
| (g) Mr Pugachev exercising control via Ms Dozortseva | 353 |
| Mr Patterson as a witness - conclusion | 357 |
| (iv) The establishment of the trusts | 359 |
| (v) The operation of the trusts | 381 |
| Trust and non-trust assets administered interchangeably | 384 |
| Administration did not change after property put into trusts | 392 |
| Mr Patterson's involvement was limited to formalities | 401 |
| Mr Pugachev referred to as beneficial owner after transfers into the trusts | 403 |
| Operation of the trusts - conclusion | 407 |
| (vi) The loans and the appointment of the New Trustees | 410 |
| Considering sham as a whole | 422 |
| Sham and the true effect of the trusts | 438 |
| **The s423 claim** | 443 |

| Relief | 449 |
|---|---|
| **Summary of conclusions** | 453 |

*Introduction and narrative*

1. This action is about five New Zealand trusts. It arises as follows.

2. The first claimant Mezhprom Bank is a Russian bank which entered into insolvent liquidation in Russia in late 2010. The second claimant, the Deposit Insurance Agency (DIA), is its liquidator. The claimants claim to be owed the sum of RUR 76.6 billion (in excess of US $1bn) by the first defendant, Mr Sergei Viktorovich Pugachev.

3. Mr Pugachev is a Russian. He was an oligarch. He currently lives in a chateau in France. Mr Pugachev founded Mezhprom Bank in 1992 and developed it in to one of Russia's largest private banks. He was active in Russian politics at the highest level and was elected as a Senator of the Russian Federation in 2001. He initially found favour with the ruling regime and assisted President Putin's rise to power.

4. By 2008 Mr Pugachev had two sons, Victor Pugachev (the eleventh defendant) and Alexander Pugachev. At that time they were young adults.

5. In 2008 Mr Pugachev started a relationship with Ms Alexandra Tolstoy. Ms Tolstoy is the daughter of Count Nikolai Tolstoy and Georgina Tolstoy. Count Tolstoy is the head of the Tolstoy family and a relative of Leo Tolstoy. Ms Tolstoy's paternal grandfather fled Russia at the time of the revolution and settled in England. Ms Tolstoy was born and educated in England.

6. When their relationship began, Ms Tolstoy's former marriage was breaking down and, while Mr Pugachev was married, he had been separated from his former wife for ten years.

7. At that time Mr Pugachev was a man of enormous wealth. He told Ms Tolstoy he was worth $15bn. As well as Mezhprom Bank, he told Ms Tolstoy he owned a number of other things. They included a huge property on Red Square in Moscow, the largest shipyard in Russia (in St Petersburg), the second largest coking coal mine in the world (in Tuva, Siberia), the French retail chain Hediard, the French national newspaper France Soir, a chateau in the south of France, three yachts (worth $35m, $25m and $5m), two private jets and a "massive" helicopter.

8. Mr Pugachev used a company called OPK to hold some of his major assets, such as Mezhprom Bank, the Red Square property, the shipyard and the coking coal mine.

9. In late 2008 in common with many banks all over the world the Mezhprom Bank was in difficulty. The bank received support from the Russian Central Bank but this ultimately failed. The bank's license was revoked and the Russian Court declared the bank was insolvent and appointed the DIA as liquidator. At the time the bank was collapsing so too was Mr Pugachev's standing with the Russian ruling elite. The claimants contend that Mr Pugachev misappropriated very large sums of money from the bank. On the other hand Mr Pugachev contends that the Russian state unlawfully

expropriated his major Russian assets.  He contends that the Red Square property was taken in 2009 and the shipyards were expropriated in 2010.

10.    In 2009 and 2010 Ms Tolstoy and Mr Pugachev had two children, Alexis (born 20th March 2009) and Ivan (born 21st June 2010).  With their sister Maria, who was born later, these children are the 12th, 13th and 14th Defendants to these proceedings.  They are represented by their mother acting as litigation friend.

11.    When their relationship started Ms Tolstoy and Mr Pugachev lived in Russia in a property known as Gorki 2.  Ms Tolstoy returned to London in 2009 to have her first child and from that time a property at 53 Glebe Place was rented as their London home.  Later, in 2010, 53 Glebe Place was bought outright and later still, in 2011, the next door property at 54 Glebe Place was purchased as well and knocked through.  From 2009 the couple lived in London, Moscow, the south of France and St Barths in the Caribbean.  The property in St Barths was called Sand Club and had been bought as a holiday home in May 2010.  A value of $40 million has been given for it.  A country residence in Herefordshire called Great Venn was also purchased in 2010.  Later the couple sought to purchase another country house in Wiltshire called Doves House but that purchase fell through.

12.    By early 2011 Mr Pugachev's position had deteriorated and he fled Russia on 28th January 2011, just after criminal investigations were opened in Russia relating to the bank's collapse.   Ms Tolstoy said she did not remember him being particularly worried at a point around this time.  She may have meant a few months before Mr Pugachev fled, in which case it does not matter.  If the evidence was intended to suggest that his departure in January 2011 cannot fairly be called fleeing the country, then I do not accept it.

13.    A complete picture of how Mr Pugachev's personal and business interests are operated is not available but what can be said is that in this period a company called Galaxis Capital LLP was involved, with an office in Knightsbridge.  The individuals there were Pierre Lussato and Alexis Gurdjian.  Many very rich families run their affairs through a "family office" and at that time the family office seems to have been operated by Mr Lussato at Galaxis.  Later the family office seems to have been run by Martin Liechti of a company called Oakhill Management Ltd.   Another close associate of Mr Pugachev's was and remains Natalia Dozortseva.  She was the head of legal at Mezhprom Bank.  While no longer associated with the bank, she is still closely associated with Mr Pugachev.

14.    Mr Pugachev and Ms Tolstoy looked for a property in London to be their main residence.   They identified Old Battersea House in Chelsea.  Contracts were exchanged in November 2011 and the property was bought for £12 million.  It needed very substantial renovation.  That work has never been completed and the property stands empty today.

15.    A New Zealand trust called the London Residence Trust was declared of Old Battersea House on 6th December 2011.  The trust deed was drafted by William Patterson, a New Zealand solicitor, on instructions from Mr Lussato.  The trust is a discretionary trust.  Mr Pugachev, Ms Tolstoy and their children are among the named discretionary beneficiaries, as well as Victor and Alexander Pugachev.  The trustee was a newly incorporated New Zealand company called Kea Trust Company Ltd, the

second defendant. In addition the trust deed provides for a "Protector" with various powers. The First Protector is Mr Pugachev. If Mr Pugachev dies or is "under a disability" (see below) the Protector is Victor Pugachev. The London Residence Trust has terms in it expressly providing for a right of residence for Ms Tolstoy and her children in the residential property.

16.     Mr Patterson's firm Patterson Hopkins is a partnership with his wife Robyn Hopkins. The firm had been acting as corporate administrator for trust companies called OPK Trust Company and OPK Holding Trust Company. These trust companies related to Mr Pugachev's OPK vehicle. Mr Patterson explained that as a corporate administrator he carried out tasks like filing company accounts. He was not a director of those companies and took no trustee decisions relating to OPK. Unlike the position with OPK, for the London Residence Trust, Mr Patterson was one of the two directors and two shareholders of the trust company. The other director at incorporation was Mr Liechti and the other shareholder was Ms Hopkins.

17.     The relationship between Mr Pugachev and Ms Tolstoy had become volatile after the birth of their first child and for a period in 2012 the relationship seriously deteriorated although it endured all the same. In early March 2012 there was an episode involving Mr Pugachev and Ms Tolstoy's parents'. At that time Ms Tolstoy was heavily pregnant. She visited her parents' house after having a terrible argument with Mr Pugachev. Mr Pugachev had changed the locks at Glebe Place and refused to let her back in. Mr Pugachev came to Ms Tolstoy's parents house.

18.     A private conversion took place between Mr Pugachev and Ms Tolstoy's father. Count Tolstoy raised the question of marriage (Mr Pugachev had promised him in 2009 that he would marry Ms Tolstoy and repeated that promise in 2010) but Mr Pugachev said he had not been able to divorce his first wife because she would make a huge claim on his assets. The financial security of Ms Tolstoy and her children was discussed and Mr Pugachev told Count Tolstoy he had bought Old Battersea House in a trust for Ms Tolstoy and the children. He said he was putting other assets in trust for them and said they were financially secure. Mr Pugachev said that no-one could circumvent the purpose of the trust which was to look after Ms Tolstoy and her children.

19.     A particular issue was the position of Victor Pugachev. Ms Tolstoy and Victor did not get on. She thought he had prevented the purchase of a possible family home before 53 Glebe Place. Ms Tolstoy had obtained a copy of the trust deed for the London Residence Trust and taken legal advice on it. This deed names Victor as one of the beneficiaries and as the Protector after Mr Pugachev. Count Tolstoy discussed the position of Victor with Mr Pugachev. Mr Pugachev said that Victor would not have the ability to undermine the trust. Old Battersea House was to be the family home and he and Ms Tolstoy were going to live there with the children.

20.     The couple's daughter Maria was born on 28th March 2012.

21.     Also in March 2012, Alexander Pugachev, Victor's brother, was removed as a Discretionary Beneficiary from the London Residence Trust.

22.     In 2012 the pressure on Mr Pugachev from Russia was increasing. There were Russian press reports in September/October that the creditors committee of the bank

was contemplating proceedings in London to sue Mr Pugachev and trace his assets held outside Russia. At the end of 2012 Mr Pugachev's company's licence for the Tuva coking coal mine was revoked and by April 2013 the licence had been vested in another party. Mr Pugachev contends that this represented another unlawful expropriation by the Russian state.

23. In December 2012 Mr Pugachev engaged with an organisation called GPW + Co Ltd in London. The purpose was to obtain advice about how to defend his assets from claims by Russian creditors. A letter from GPW of 12th December discusses the possibility of asset searches being made against him "to identify real property or cash which can be enforced against". The letter makes the point that knowing where the vulnerabilities in Mr Pugachev's current asset structure are will enable him "either to remedy them or prepare other defences". This recommends urgently undertaking a full asset search on Mr Pugachev in order to mimic the work his opponents will do and to establish what can be found out from public information. Then "weak points" can be "strengthened".

24. The risk of an *ex parte* asset freezing order and an order requiring asset disclosure is also discussed in the letter and it notes that seizure of assets would have a substantial impact on Mr Pugachev's personal and business life. It continues:

> *"However, of greater concern is the possibility that you choose to disclose only those assets believed to be identifiable and recorded in the public domain. If it is proven that you have wilfully withheld information, your opposing party may appeal to have you held in contempt of court. If such an appeal was upheld you may lose the ability to defend the action, regardless of the strength of the initial case against you."*

25. In April 2013 an organisation called "The Private Office", which had been appointed by Galaxis to raise finance for Mr Pugachev and his family, sent a memo to Mr Liechti about Mr Pugachev's asset position. Various major banks, including Credit Suisse, UBS, Barclays and Deutsche Bank had refused to lend money to Mr Pugachev. One bank, the Bank of Singapore, had expressed a willingness to lend subject to a successful "Know Your Client" process. Galaxis provided a list of assets owned by Mr Pugachev to be used as collateral. They included the London properties (Glebe Place and Old Battersea House). But the bank wanted more information about the scandal surrounding the bankruptcy of Mezhprom Bank, the activity of the DIA and the implications for Mr Pugachev. There is no evidence that the London properties were pledged as collateral for any such loan.

26. In July 2013 Count Tolstoy and his wife travelled to Mr Pugachev's French chateau for a party for Ms Tolstoy's 40th birthday. When they arrived they found that Mr Pugachev had cancelled the party and locked the gates. The Count was angry and spoke to Mr Pugachev by telephone about the position of his daughter. Mr Pugachev said that she was fully taken care of and there were trusts (plural) in place for their benefit.

27. Between July and November 2013 four more New Zealand trusts were set up and assets placed into them. The work was done by Mr Patterson on instructions from Mr Gurdjian and Ms Dozortseva.

28. The trusts were the Kea Three Trust and the Riviera Residence Trust (both declarations of trust made on 16th July 2013), the Wiltshire Residence Trust (declared on 3rd October 2013) and the Green Residence Trust (declared 28th November 2013). The terms of these trusts are essentially the same as the terms of the London Residence Trust apart from certain differences which are minor in the context of this case. They are discretionary trusts and although the named beneficiaries are not identical to those named in the London Residence Trust, Mr Pugachev and the children of Ms Tolstoy by Mr Pugachev are among the discretionary beneficiaries. Mr Pugachev is First Protector, followed by Victor. There is no residence clause in these trusts equivalent to the residence terms in the London Residence Trust.

29. Broadly, the Kea Three Trust holds shares in an Isle of Man company Redflame Ltd, which owns 53/54 Glebe Place; the Riviera Residence Trust holds shares in companies which ultimately hold the Sand Club in St Barths, an empty watch factory in Switzerland and some other things; the Wiltshire Residence Trust holds cash which was to be used to buy Doves House in Wiltshire; and the Green Residence trust ultimately holds the property in Russia called Gorki 10.

30. At the outset the trustee of the Kea Three Trust was Kea Trust Company Ltd, the same company which was trustee of the London Residence Trust. The trustees of the other three trusts were newly incorporated New Zealand companies: Kea Two Trust Company Ltd (later changing its name to Finetree Company Ltd), Kea Four Trust Company Ltd (later changing its name to Bramerton Company Ltd), and Bluering Company Ltd. They are the third to fifth defendants. Finetree's directors and shareholders were always Mr Patterson and Ms Hopkins. The initial directors of Bramerton and Bluering were Mr Patterson and Ms Dozortseva while shareholders were Mr Patterson and Ms Hopkins.

31. Ms Tolstoy was aware that Doves House was to have been bought in trust but she was not aware of these four trusts until these proceedings.

32. Before being depleted, the value of all the assets in all the trusts, including the London Residence Trust, was over $95 million.

33. On 2nd September 2013 the Swiss authorities froze bank accounts associated with Mr Pugachev and his companies.

34. A claim in Russia against Mr Pugachev was filed by the DIA on 2nd December 2013. It is known as the "Article 14" claim.

*Proceedings start in London*

35. The Russian liquidation of Mezhprom Bank was recognised by an order made by Henderson J on 11th July 2014 pursuant to the Cross Border Insolvency Regulations 2006. The deficiency in the bank's assets at the date of its entry into liquidation was approximately RUR 70.1bn (about US $ 2.2 billion).

36. In aid of the Russian proceedings and also on 11th July 2014 Henderson J made a without-notice worldwide asset freezing injunction against Mr Pugachev. The worldwide freezing order was the start of a series of steps which took place in the Chancery Division. At times Mr Pugachev has instructed solicitors and counsel to act

for him and at times he has represented himself. There have been numerous hearings in this Division in the litigation between the claimants and Mr Pugachev. There have also been two appeals to the Court of Appeal. There are proceedings in other jurisdictions too.

37. It is impossible to summarise all the steps that have taken place in this jurisdiction since 11th July 2014. The major events in the litigation which are relevant to the issues I have to decide, and other things which happened after the freezing orders were made, are set out below.

38. As part of the freezing order in 2014, Mr Pugachev was required to disclose information about his assets. The fact that Mr Pugachev was one of the discretionary beneficiaries of the five New Zealand trusts was disclosed in a schedule of assets provided by Mr Pugachev's solicitors Stephenson Harwood on 23rd July 2014. This was pursuant to a freezing order on 11th July 2014 varied by a further order on 18th July. All that was disclosed about the trusts was their names.

39. On 16th July 2014 a Part 8 Claim was issued by the claimants in this Division against Mr Pugachev in aid of the Article 14 Russian proceedings.

40. On 25th July 2014, on the claimants' application, Henderson J directed that Mr Pugachev disclose further information about the trusts. This included details of the trustees, the beneficiaries and the location and value of trust assets. Mr Pugachev appealed Henderson J's order.

*The trustees seek directions from the New Zealand court*

41. Following a Beddoes application to the New Zealand court by the trustees of the New Zealand trusts, the trustees made an application to the English court to vary or discharge the order for disclosure relating to the trusts. The application was supported by two witness statements made by Mr Patterson. He explained that the trustees were New Zealand companies and that he was a director of each of the trustee companies. The claimants make serious criticisms of Mr Patterson's evidence on that application. The application to set aside was dismissed by David Richards J ([2014] EWHC 3547 (Ch)). The trustees appealed to the Court of Appeal.

42. Over the latter half of 2014 the London Residence Trust advanced substantial sums of money to Mr Pugachev. By November about £3.5 million had been advanced to him from that trust. The sums are expressed as unsecured loans.

43. On 5th January 2015 Mr Pugachev sought a further £½ million from the London Residence Trust but the trustee refused without further security.

*Further proceedings in London and in Russia*

44. On 27th February 2015 the Court of Appeal upheld the orders of David Richards J and Henderson J ([2015] EWCA Civ 139).

45. On 2nd March 2015 Peter Smith J granted an injunction requiring Mr Pugachev not to leave the jurisdiction and requiring him to deliver up all his passports. Mr Pugachev

applied for the temporary return of his passports. That was refused and the Court of Appeal upheld that refusal ([2015] EWCA Civ 1108).

46.    In March/April 2015 Mr Pugachev attended court for cross examination as to his assets. This took place before Mr Justice Hildyard (see the judge's judgment of 12th June at [2015] EWHC 1694 (Ch)).

47.    On 23rd April 2015 the Russian Court gave judgment in the Article 14 claim against Mr Pugachev for a sum of about RUR 76bn. That is equivalent to about US $1bn. In June 2015 the Article 14 judgment became effective in Russia. The ruling of the Court of Appeal in Russia dismissing the appeal was on 24th June 2015 but see below.

48.    On 12th June 2015 Hildyard J made a further order restricting Mr Pugachev's travel but in breach of that order, in June 2015, Mr Pugachev left England for France. He remains there.

49.    On 1st July 2015 Rose J made a without notice search and seizure order relating to four UK premises associated with Mr Pugachev. This included the premises of Mr Pugachev's family office in London.

*Replacement of the original trustees with new trustees*

50.    On 24th July 2015 instruments removing the original trustees of the New Zealand trusts and replacing them with newly incorporated trust companies more closely controlled by Mr Pugachev were signed by Mr Pugachev and his son Victor. On 27th July the new trustees entered into a funding agreement with Mr Pugachev. The new trustees are the sixth to ninth defendants.

51.    The claimants applied to bring the trust assets within the scope of the worldwide freezing order, naming both the original trustees and the new trustees as respondents. Although that was refused at first instance, the order was made on appeal by the Court of Appeal on 13th August 2015. Nevertheless on 14th August the new trustees paid US$ 800,000 to Mr Pugachev's lawyers King and Spalding. The *ex parte* order was continued by Snowden J on 27th August.

52.    Shortly after they were removed the original trustees applied to the New Zealand court for directions to determine if the removal was valid. In a judgment on 2nd October 2015 Heath J decided that the original trustees were validly removed.

*Further proceedings*

53.    On 29th September 2015 Mr Pugachev brought a claim against the Russian state under the Bilateral Investment Treaty between France and Russia. The claim was issued in the International Court of Arbitration in the Hague. By the claim Mr Pugachev seeks to recover some of the very valuable assets he said were unlawfully expropriated by the Russian state. They include the shipyard in St Petersburg and the coking coal mine. The claim accuses senior Russian officials, including Mr Putin, of dishonest and fraudulent conduct.

54.    On 19th October 2015 the claimants issued a claim in this court to enforce the Russian Article 14 judgment. At that time the firm King and Spalding were acting for Mr

Pugachev. There was correspondence between Hogan Lovells for the claimants and King and Spalding about service out of the jurisdiction. On 29th November 2015, in a letter from King and Spalding on behalf of Mr Pugachev, Mr Pugachev confirmed that he was willing to accept service at his property in France but reserved the right to object to jurisdiction. On 12th December 2015 there was deemed service in France of the enforcement proceedings and on 27th January 2016 King and Spalding ceased to act for Mr Pugachev. On 28th January 2016 the claimants applied for default judgment in the enforcement proceedings.

*Committal of Mr Pugachev for contempt of court*

55. Meanwhile proceedings to commit Mr Pugachev for contempt of court had been brought by the claimants against Mr Pugachev. In a judgment on 8th February 2016 ([2016] EWHC 192 (Ch)) Rose J found that Mr Pugachev was in contempt of court on a large number of grounds. Mr Pugachev himself had participated in those proceedings via a videolink over which he was cross examined.

56. One of the grounds for contempt was Mr Pugachev's breach of the travel restrictions order. Mr Pugachev said that he had left the jurisdiction because of fears for his safety. One factor in this was that devices had been found underneath cars belonging to him in May 2015 and the anti-terrorist branch of the police, SO15, had been called (although they were not summoned immediately). It turned out that the devices were not explosives but were tracking devices used by enquiry agents Diligence acting for the claimants. (The claimants and Hogan Lovells deny that they authorised this or were aware this method of surveillance was being used.)

57. At paragraph 75 of her judgment Rose J found that Mr Pugachev does have a genuine fear that his life is in danger from agents of the Russian state but she was also fully satisfied that there was no link between his fears for his safety and his decision to leave England. Mr Pugachev's leaving the jurisdiction was found by Rose J to be a serious breach of the order and not excused by his fears for his personal safety. Mr Pugachev was able to flee the jurisdiction because he also breached the order to deliver up his passports. He kept back a French passport. That contempt was found proved by Rose J in paragraphs 50-73 of her judgment.

58. Rose J also found that Mr Pugachev was in contempt for breaching the terms of the freezing orders by procuring or permitting the transfers of large sums of money. For example Allegation B3, dealt with at paragraphs 124-141 of the judgment, related to the transfer of about €3.75m and £1m. These sums were the proceeds of the sale of shares in a company which ultimately held the French business Hediard. The shares had been held by one of the companies named in the relevant freezing order. In breach of the freezing order the sums were paid from that company (Luxury Investments) to accounts of an entity called Luxury Consultants Ltd and then dissipated. Mr Pugachev had contended that these payments were within the exceptions to the freezing order relating to living expenses, legal expenses or tax payments but those excuses were not accepted by Rose J.

59. Other contempts found by Rose J included further dealings in frozen assets, failures to deliver up mobile devices and passwords for email accounts, failure to set out what happened to large sums of money and giving false evidence with no honest belief it was true.

60. In her second judgment Rose J sentenced Mr Pugachev to the maximum period for contempt of court which is 24 months [2016] EWHC 254 (Ch).

*Further events in 2016*

61. On 22nd February 2016 Mr Justice Henry Carr gave default judgment in respect of the Article 14 Russian judgment. No permission was sought to serve out of the jurisdiction in relation to those proceedings. The claimants say that is because of the agreement about service made with King and Spalding mentioned above.

62. By early 2016 the relationship between Ms Tolstoy and Mr Pugachev was breaking down. Mr Pugachev wanted Ms Tolstoy and the children to live with him in France but Ms Tolstoy did not wish to do that. The last time Ms Tolstoy saw Mr Pugachev was in March 2016 around the time of their daughter's birthday. After this their relationship became very hostile. Mr Pugachev cut Ms Tolstoy off financially. She explained that they speak from time to time by telephone and he speaks to his children. Ms Tolstoy wanted to defend the trusts to protect the London home for her and her children but Mr Pugachev did not want her to do this. Ms Tolstoy says that Mr Pugachev's motive for this is to force Ms Tolstoy and the children to move to France and live with him.

63. On 5th May 2016 the new trustees gave Hogan Lovells notice of an intention to pay out £2.7 million from the trusts' bank accounts but later the same day Morgan J granted an injunction restraining the payments. After that two of the individuals who were the directors of the new trustee companies resigned and the new trustees ceased to engage with these proceedings.

64. On 18th May 2016 I made an order giving permission to the claimants to serve the Amended Claim Form and Particulars of Claim. These amendments set out the claimants' case which is to be adjudicated upon at this trial. On that occasion I also gave directions allowing Ms Tolstoy's children, the twelfth to fourteenth defendants, to defend the claims against the trusts. That is because the children of Mr Sergei Pugachev and Alexandra Tolstoy are discretionary beneficiaries under the trusts. Their defence of these proceedings is paid for out of trust assets.

65. Since then other events have taken place which the claimants regard as steps orchestrated by Mr Pugachev to deal with or diminish the value of the property covered by the freezing injunction but the details of these matters are not relevant.

*This trial*

66. This trial began on 4th July 2017. At the outset counsel for the infant children applied for an order imposing reporting restrictions in relation to the proceedings. The restrictions were for the benefit of the children and related to four topics: three topics directly concerned with the children and the fourth with the breakdown of the relationship between their parents. I made the order. The judgment is at [2017] EWHC 1767 (Ch). In the end it has not been necessary in this judgment to refer to any details which would have been covered by the restrictions.

67. When the trial began Mr Pugachev had not played any part in the proceedings since 18th May 2016 nor had the second to eleventh defendants. Only the infant children

defendants defended the trial and in this judgment when I refer to the defendants' submissions, I mean the infant children defendants.

68.    Once the trial started counsel acting for Mr Pugachev applied on his behalf to adjourn the trial and to set aside the default judgment. Those matters were dealt with in various other judgments of mine given during the course of this trial. They are a judgment on 10th July 2017 ([2017] EWHC 1761 (Ch)), two judgments on 13th July 2017 ([2017] EWHC 1847 (Ch) and [2017] EWHC 1853 (Ch)) and a judgment on 26th July 2017 ([2017] EWHC 1972 (Ch)). The net result was that I dismissed Mr Pugachev's attempt to adjourn the trial. I adjourned any outstanding matters arising from these applications to be dealt with once this judgment has been handed down.

69.    Another event which took place during the trial was an application by Julia Pugacheva. Ms Pugacheva is the ex-wife of Mr Alexander Pugachev. They have two young children. The children fall within the class of discretionary beneficiaries of the London Residence Trust. Ms Pugacheva applied to be appointed as litigation friend for her children and for them to be joined as defendants and financial provision be made for them. It was not practical or appropriate to deal with that application in the middle of trial and I adjourned it to be addressed once this judgment has been handed down. The judgment on that is [2017] EWHC 1936 (Ch).

*The issues*

70.    The claimants' case is that the beneficial interest in the assets held by all the trusts belongs to Mr Pugachev. They seek an order requiring the assets to be vested in the claimants or alternatively in such persons or a receiver as the court thinks fit. The claimants' case is put on three bases.

71.    The first basis is referred to as the "Illusory Trust" claim. The submission is that according to the terms of the deeds, properly construed and on a proper application of the law to them, the trusts were not effective to divest Mr Pugachev of his beneficial ownership of the assets put into them. That claim depends on consideration of the effect of the trust deeds themselves. A key aspect of this argument relates to the role of a Protector set out in the deeds. For reasons explained below I prefer not to use the term "Illusory Trust" except to refer to some of the claimants arguments. This part of the claimants' case will be called the "True Effect of the Trusts" claim.

72.    The second basis is referred to as the "Sham" claim. The submission is that, in the alternative to the so-called Illusory Trusts claim, the trusts, or strictly the trust deeds, are shams. Therefore they have no effect and the assets are not in fact held on whatever terms purport to be set out in the deeds.

73.    The third basis for the claimants' claim is s423 of the Insolvency Act 1986. It is an alternative to the first two claims. If the trusts are effective to divest Mr Pugachev of ownership of the assets, then the transfers of the assets into the trusts was carried out to prejudice the interests of his creditors, including the claimants.

74.    An important feature of all three claims is that even if one of them succeeds in principle, it does not follow that any asset which was supposedly in the trust is automatically held by Mr Pugachev beneficially. That is because some of the assets were transferred into the trusts by Victor Pugachev. For assets transferred by Victor

rather than his father, the claimants have to establish that Victor was acting as nominee for his father and the beneficial ownership of the assets was with the father not the son.

75.    These claims are denied on behalf of the children.  They contend that the trusts are not illusory.  Rather the deeds on their face set up valid discretionary trusts with real duties, rights and obligations.  They have the effect that Mr Pugachev does not hold the beneficial ownership of any of the assets subject to the trusts.  So the so-called Illusory Trust claim, whatever it is called, should be dismissed.

76.    The defendants contend that the Sham claim should fail on the facts because in order to establish a sham the claimants have to show that the trustees were in on the sham and had the relevant state of mind (at least to the extent that they went along with any sham, even assuming the settlor was Mr Pugachev and he did have the relevant state of mind).  The relevant individual for this purpose is Mr Patterson.  The court should hold that he was not a mere cipher for Mr Pugachev but was a man with backbone, ready to stand up to Mr Pugachev as and when necessary.

77.    Moreover Ms Tolstoy was determined to get Mr Pugachev to provide for the children and he did so by setting up the trusts.  The value of the property in the trusts, while large, is small as compared to Mr Pugachev's wealth and he had no need to try and hang on to such assets.  So the submission that Mr Pugachev did not intend to set up valid trusts is wrong too.

78.    As for the s423 claim, the defendants criticise the quality of the evidence from the claimants.  All the claimants evidence is given through the vehicle of Mr Roberts, the partner in Hogan Lovells with conduct of these proceedings.  They submit that there are better or more plausible explanations for the relevant transactions said to be caught by s423 than putting the assets beyond the reach of creditors.

79.    As to the position of Victor as nominee, the defendants submit that the evidence does not establish the Claimant's case in this regard.  They argue that Mr Pugachev gave substantial assets to Victor and Alexander for their own benefit and so one cannot assume or infer that assets placed into the trusts by Victor were not owned by Victor outright.

*The witnesses*

*Mr Roberts*

80.    The only witness called by the claimants was their solicitor, Michael Roberts.  The witness statement for the trial (his forty-third) sets out the claimants' case and narrates the claimants' view of what has happened by reference to the available documents and other sources.  The only direct knowledge Mr Roberts has is about the conduct of the legal proceedings.  Everything else is inference.

81.    The defendants point out that no-one from the DIA has been called as a witness.  They submit this was a tactical decision to avoid cross-examination about a number of issues.  The issues to be avoided include what the DIA knows about other assets held by Mr Pugachev, the expropriation claims of Mr Pugachev, and wrongdoing inside the DIA.  The defendants also point out that the claimants had provided witness

statements from DIA staff at an early stage of these proceedings but those were interlocutory hearings at which no cross-examination would take place.

82. I understand that the claimants needed to pull together the materials and present a coherent picture to the court in Mr Roberts evidence. Liquidators often have to do something like this, and it justifies the bulk of the witness statement, which works through the documents relating to money flows and the setting up and operation of the trusts and explains the claimants' case about inferences to draw.

83. However the position is different in relation to the claimants' allegations about Mr Pugachev's alleged wrongdoing in relation to Mezhprom Bank. For this aspect of the evidence I accept the fundamental criticisms the defendants make of Mr Roberts' evidence. It is a mass of hearsay, some of which is unattributed and most of which is based on materials which are themselves based on hearsay, such as press reports and a review by the DIA into the operation of the bank.

84. The difference between these two classes of evidence is that the former is based on admissions and primary source material so the basis for the inference the claimants invite to be drawn can be understood, whereas the latter is based on secondary sources rather than the primary material. Primary material from Mezhprom Bank and elsewhere plainly does exist but it has not been relied on and not exhibited, so far as I am aware. Now this may not matter very much as long as one is clear about what facts it is the court is being asked to decide. I am not being asked to decide the merits of the claims by the DIA and Mezhprom Bank against Mr Pugachev. The evidence produced is entirely insufficient for that purpose. The true relevance of this evidence is to show how over time very serious allegations have been made against Mr Pugachev relating to Mezhprom Bank. Mr Roberts' statement is potentially effective for that purpose but it is important to keep the distinction in mind. The claimants believe that Mr Pugachev misappropriated very substantial sums of money from the bank but they have not set out to prove that at this trial, because their case is that they do not have to.

85. However the two aspects are intertwined in a manner which can make disentangling them difficult. I will take a single example. One of the allegations against Mr Pugachev is about a deposit scheme. The essential allegation is that:

> *"US$700 million of a US$1 billion bail-out handed to the Bank by the Central Bank of Russia (almost certainly necessitated by earlier thefts from the Bank by Mr Pugachev) was swiftly moved in December 2008 to the Swiss bank account of a newly incorporated Cypriot company, Safelight Enterprises Limited, whose director was Alexander Pugachev, Mr Pugachev's then 21-year old son."*

86. Some of this money is said to have ended up in the trusts in this case. Mr Roberts deals with this in paragraphs 123-126 and 261 of his witness statement. This evidence is in four parts. The first part is paragraph 123. That deals with allegations of misappropriation and forgery:

> *"123 In December 2008 and January 2009, very shortly following the receipt of the Central Bank funds, RUR*

> *28,810,800,000 (then equivalent to approximately US$ 900 million) was withdrawn from an account at the Bank in the name of CJSC OPK Development **("OPK Development"),** which formed part of the OPK Group (MGR2/29-30). I shall refer to the funds as the "**OPK Deposit**". (I understand that the Investigative Committee has concluded that the OPK Deposit never in fact truly existed and that the relevant deposit agreements were forged to facilitate the theft of the monies from the Bank by the creation of a book entry falsely showing a credit balance in favour of OPK Development.)*
>
> *[C3/876.5-876.6]"*

87. The reference after the quotation is a marginal cross-reference to a source on which the paragraph is based. I will come back to this.

88. The second part is in paragraphs 124-125, which explain that nearly all of the deposit was transferred into accounts of companies whereby the shares in the company at the top of the relevant corporate structure were in each case held by a David Henderson-Stewart purportedly as trustee, but Mr Pugachev admitted in the course of these proceedings that he was the ultimate beneficial owner of the relevant companies and the beneficiary of the transactions. The money was then channelled to a Cypriot company Safelight Enterprises Ltd in which Alexander Pugachev was a director and Mr Pugachev ultimately admitted in these proceedings was beneficially owned by him. This second part is solidly based on admissions by Mr Pugachev in witness statements in these proceedings, as Mr Roberts says.

89. The third part is in paragraph 126 in which Mr Roberts states that Mr Pugachev has provided some information in these proceedings but that while it does not explain the whereabouts of over $500 million of the funds:

> *"it became clear that at least a significant proportion of those monies had been channelled into (or through) a number of Mr Pugachev's other assets and overseas business interests, including the Villa that is now in the Riviera Residence Trust, Hediard SA and OPK Biotech, and large unexplained amounts had apparently been transferred to his eldest son, Victor."*

90. The reference to the villa in the Riviera Residence Trust is dealt with further in paragraph 261 in which Mr Roberts explains that in one of his affidavits for the committal application, Mr Pugachev effectively admitted that $31.2 million of the Safelight monies were used to buy that villa. This is not perfectly explained but it is reasonably clear from the underlying document (Mr Pugachev's 12th affidavit dated 20th November 2015 at paragraph 69, 69.2 and 69.10).

91. So the flow of money into one of the trusts in reasonably clear from the second, third and fourth parts of this evidence but the starting point, based on allegations of theft and forgery, is not supported in the same way. I return to paragraph 123 of Mr Roberts statement which is quoted above. It is based only on three apparent sources. The first and second sources are "MGR2/29-30" and the marginal reference "[C3/876.5-876.6]". That first reference to MGR2/29-30 refers to the second exhibit

to Mr Roberts first affidavit which is not in the trial bundles. In the draft judgment I understood MGR2 to mean something different but nothing turns on that because the documents it does refer to are apparently the same as the ones in the marginal reference. So these first and second sources are the same source. The document cited in the marginal reference is a report by the DIA dated March 2012. The report is in the bundles but not any underlying documents or evidence from the DIA themselves. The pages referred to include a table which puts a figure of RUR 28 824 662 against "CJSC OPK Development" but that is all. The third source for part of the paragraph is Mr Roberts' understanding from "the Investigative Committee". That is unexplained. Counsel for the defendants submitted that committee was the Russian equivalent of the FBI. This is the source for allegations of forgery and theft. This kind of evidence has no value at all and it is all the more surprising when the claimants had the means to call proper evidence on these topics if they wished to. In the draft judgment I said that the fact Mr Roberts was prepared to put this before the court in this manner is unfortunate. After the draft judgment was provided I was told that there was a document on which this part of Mr Roberts' evidence was based. It is C5/1821 and seems to be a decision of the special investigator Lieutenant Colonel of Justice Komarda KP of the Investigative Committee of the Russian Federation. At least it explains where Mr Roberts got what he said from, but the evidence is still not based on any underlying documents or evidence. I remain of the view that this approach is unfortunate.

92. It is not practical to run through the entire witness statement and tease it apart as has been done above. The statement runs to 479 paragraphs.

93. Overall I can rely on some of Mr Roberts' evidence but not all of it. Mr Roberts did not purport to be independent. This was borne out by his attitude to the behaviour of an agency called Diligence who had surreptitiously placed tracking devices in cars used by the Pugachev family in London, although as a matter of substance that issue is not germane. Mr Roberts evidence (written and oral) is an exercise in advocacy for his clients' cause.

*The Tolstoy family*

94. The defendants served witness statements from five witnesses, three from the Tolstoy family: Ms Tolstoy and her father and mother. Count Tolstoy's evidence related to his contact with Mr Pugachev and the discussions between these two about Mr Pugachev marrying Ms Tolstoy and about the trusts providing for the children. Georgina Tolstoy corroborates her husband's evidence. All three were available for cross-examination but the claimants chose only to cross-examine Ms Tolstoy.

95. Ms Tolstoy's evidence describes her relationship with Mr Pugachev and when she knew about the properties and the trusts. Her key evidence is directed to undermine the allegation that the trusts were shams. She explained that Mr Pugachev told her that the family properties were bought and were to be in trust for her and the children.

96. Ms Tolstoy is obviously an articulate and intelligent person. As a witness she was often nervous, no doubt because of the difficult position she and her children are in. Ms Tolstoy's relationship with Mr Pugachev has been very volatile over a number of years. By participating in these proceedings Ms Tolstoy is acting against Mr

Pugachev's wishes but she is a mother trying her best to defend the interests of her children.

97. For the most part Ms Tolstoy was a reliable witness. Her evidence about Mr Pugachev's character was credible and I will address it below. The claimants invited me to disbelieve her evidence that Mr Pugachev absolutely adored his children and was passionate about them. I do not disbelieve it. That evidence was also entirely credible.

98. There were aspects of Ms Tolstoy's oral evidence which I do not accept. They were occasions in which the obvious interpretation of contemporaneous documents could be said to support the claimants' case. Ms Tolstoy either did not accept that interpretation or proposed a different one but the attempt lacked credibility. One example was in 2012 when Ms Tolstoy asked for her and the children to be removed from the London Residence Trust and also for Victor to be removed as Protector. The documents show that the reason for the former was because she thought their status was meaningless. In cross-examination Ms Tolstoy suggested that the only real motivation for all this was about Victor and that she did not want out. Rather than a reflection of the meaningless nature of the status as beneficiaries, Ms Tolstoy said that the request to remove her and the children was an act of defiance. I do not accept that evidence. It simply does not suit her case now to accept the idea that after the London Residence Trust was set up her status and that of her children as Discretionary Beneficiaries was seen as effectively meaningless. I prefer the documents written at the time.

99. Other examples are matters of emphasis. First is an email dated 28th September 2012 which shows Ms Tolstoy complaining to Mr Pugachev that she has been left with no money and no-one in London is receiving their wages "because Victor hasn't transferred your money…". This supports an inference that at least on occasions a transfer of money from Victor was in substance a transfer of Mr Pugachev's money. In cross-examination Ms Tolstoy sought to downplay her knowledge of whether Victor held Mr Pugachev's money and also said that this sort of arrangement "might have only been a few times". I do not doubt that Ms Tolstoy did not know the full details of the arrangements between Mr Pugachev and Victor. But I do not accept Ms Tolstoy's attempt to reduce the significance of that item of evidence. Second is evidence that Ms Tolstoy told one of her friends in February 2015 that the whole family (except Mr Pugachev's mother) was dependent on him financially. Again Ms Tolstoy sought to suggest that she really did not know whether that was correct and emphasised the very difficult relationship she had with Mr Pugachev. I find that this communication in 2015 does reflect what Ms Tolstoy thought at the time and was not an idle remark. No doubt there was a great deal of information that Ms Tolstoy was not privy to but given the length of her relationship with Mr Pugachev by then, she was in a position to have a pretty shrewd idea of what the situation was.

*Mr Patterson*

100. Mr Patterson is the fourth witness called by the defendants. He explains the circumstances in which the trusts were set up and how they were run while he was the director of the trustee companies. He denies that the trusts were shams and denies that they were under the complete control of Mr Pugachev.

101. The claimants submit he was an unreliable witness, both based on his evidence at trial and on evidence he gave at the interlocutory stage. They also contend he was not impartial. It is convenient to address the detailed criticisms of Mr Patterson in the context of the sham issue.

*Ms Hewlett*

102. The fifth witness statement on behalf of the defendants is from Louise Hewlett, the London estate agent involved in the sale of Old Battersea House. She says that from her point of view the purchase was an ordinary transaction to buy a family home. She was not cross-examined.

*The terms of the trust deeds*

103. It is convenient to deal with the trust deeds in one go, starting with the London Residence Trust.

104. The material terms of the trust deed for the London Residence Trust are as follows. Under the heading "Introduction" the deed states:

> *"The trustee wishes to declare this trust and has accordingly transferred and irrevocably settled the sum of TEN DOLLARS ($10) upon the trustee to be held by the trustee upon the trusts and with the powers, authorities and discretions declared in this deed or conferred on the trustee by the law."*

105. The document is dated 6th December 2011 by Kea Trust Company and by that date the company was in fact already the owner of Old Battersea House.

106. After the introduction are a series of covenants. Definitions are in section 1.1. Discretionary Beneficiaries are defined in 1.1(c) as follows:-

> *"(i) SERGEI VICTOROVITCH PUGACHEV;*
>
> *(ii)VICTOR SERGEYEVITCH PUGACHEV and ALEXANDER SERGEYEVICH PUGACHEV the sons of SERGEI VICTOROVITCH PUGACHEV;*
>
> *(iii) ALEXANDRA TOLSTOY the partner of SERGEI VICTOROVITCH PUGACHEV;*
>
> *(iv) ALEXIS SERGEIVICH PUGACHEV and IVAN SERGEIVICH PUGACHEV the children of SERGEI VICTOROVITCH PUGACHEV and ALEXANDRA TOLSTOY;*
>
> *(v) The children of Sergei Victorovitch Pugachev hereafter born or adopted;*
>
> *(vi) The grandchildren and remoter issue of Sergei Victorovitch Pugachev;*

> *(vii) Such other person or person, charitable trust, foundation, institution or other body corporate or unincorporated (whether now in existence or established hereafter) established exclusively for any objects or purposes recognised as charitable by the laws of New Zealand as the Protector shall before the Date of Distribution either revocably or irrevocably appoint by deed PROVIDED THAT the Protector shall have no power to appoint the Trustee as a Discretionary Beneficiary;*
>
> *BUT shall not include any person whether previously a Discretionary Beneficiary or not who has been declared pursuant to clause 12.1 to have ceased to be or not to be capable of being a Discretionary Beneficiary."*

107. The Definitions also define a Date of Distribution as 80 years from the date of execution of the deed provided that it can be an earlier date declared by the trustee with the written consent of the Protector.

108. The definitions also define a "Protector" as follows:-

> *"Protector" means the person or persons from time to time acting as Protector and the "First Protector" means Sergei Victorovitch Pugachev.*

109. "Residential property" is defined as Old Battersea House and any property purchased in substitution for that property.

110. The term "Under a Disability" has an elaborate definition as follows:

> *"in relation to any person means any event of happening which renders the person temporarily or permanently incapable of exercising free will and includes imprisonment or other form of involuntary detention, being subject to coercion or duress whether physical or mental, including coercion by operation of law, and suffering from mental disorder as defined in the Mental Health (Compulsory Assessment and Treatment) Act 1992 or any enactment amending or replacing that Act (as to which a certificate in writing given to the Trustee by a duly qualified medical practitioner shall be conclusive and binding) AND a person shall be deemed to be Under a Disability if the person has disappeared or otherwise not been heard from despite the best endeavours of the Trustee to contact the person over a period of not less than 2 months."*

111. A "Trustee's Minute Book" is defined in 1.3 which provides that when a discretion is conferred on the Trustee, in addition to any other mode of exercise of a discretion, that discretion "shall be deemed to have been exercised when a resolution of the Trustee exercising that discretion has been recorded in Trustee's Minute Book relating to this settlement and the minutes so maintained shall be prima facie evidence of the nature and content of all such resolutions". (The claimants contend that no minute book has been produced in these proceedings).

112. The governing law is defined in clause 1.4 as the law of New Zealand provided that the trustee has the power to change the governing law at any time by resolution in writing to that effect. Before me at this trial the parties agree that although the governing law of the Trust Deeds is New Zealand law, for all the relevant purposes in these proceedings New Zealand law and English law are the same.

113. Paragraph 3 is the "Declaration of Trust of Original and Additional Property", as follows:

> *"3.1 The Trustee shall stand possessed of the Trust Fund upon the terms contained in this Deed.*
>
> *3.2 The Trustee shall be at liberty prior to the Date of Distribution to accept on trust any money, investments or other property of whatsoever nature and wheresoever situation from any person, or by will or by the provisions of any other trust or otherwise. Such money, investments or other property shall be held by the Trustee as an accretion of the Trust Fund.*
>
> *3.3 The Trust is irrevocable."*

114. Note that clause 3.3 provides the trust is irrevocable.

115. Section 4 of the Trust Deed deals with the Protector. Given the importance of the position of the Protector in these proceedings I will set out the provisions in full:-

> *"4 Protector*
>
> *4.1 The Protector shall be:*
>
> *(a) Sergei Victorovitch Pugachev while he is living and not Under a Disability and after death of Sergei Victorovitch Pugachev or while he is Under a Disability Victor Sergeyevitch Pugachev;*
>
> *(b) Subject as above such person as the Protector for the time being may appoint in writing, revocably or irrevocably;*
>
> *(c) If there is no Protector for the time being such person as the Trustee may appoint in writing, revocably or irrevocably.*
>
> *4.2 Resignation and Disability*
>
> *Any Protector may resign by notice in writing to the Trustee, If any Protector being a natural person is Under Disability or is bankrupt or being a body corporate is in receivership or liquidation, that Protector shall automatically and immediately cease to serve as a Protector.*
>
> *4.3 Information*

*The Protector shall have the right to request information from the Trustee and such requests shall not be unreasonably refused.*

*4.4 Remuneration*

*The Protector shall be entitled to reimbursement of reasonable expenses incurred as part of their role as Protector and any such remuneration fir their services as may be reasonable having regard to their duties and responsibilities as Protector.*

*4.5 Protector's Consent Required*

*Notwithstanding any provision in this deed conferring an absolute or uncontrolled discretion on the Trustee, the following powers and discretions which are vested in the Trustee by the provisions of this deed, shall only be exercisable after the Protector has been given fourteen (14) days prior written notice and the Trustee has received the prior written consent of the Protector:*

*(a) Specification of a Date of Distribution that is earlier than eighty (80) years (clause 1.1(b));*

*(b) Distribution of income and/or capital of the Trust Fund (clauses 5.2, 5.3, 5.4 and 5.5);*

*(c) Investment of the Trust Fund (clause 9);*

*(d) Declaring that any person shall cease to be a Discretionary Beneficiary and/or shall not be capable of being a Discretionary Beneficiary (clause 12);*

*(e) Variation of this trust deed (clause 13.1); and*

*(f) Releasing and revoking any power conferred on the Trustee by this deed (clause 14.1).*

*4.6 Power for Protector to direct sale of residential property*

*(a) The First Protector may by written instruction to the Trustee direct the Trustee to sell the residential property forming part of the Trust Fund on such terms and conditions as the Protector shall direct and the Trustee shall act in accordance with such direction. The net proceeds of sale shall then be held upon the trusts declared in clauses 5.2-5.5 of the Trust Deed (but with power thereafter with the written consent of the Protector to purchase a further residential property).*

*(b) If the First Protector has died or is Under a Disability the Protector for the time being may also instruct the Trustee in writing to sell the residential property PROVIDED*

*(i) such instruction may only be given if all the children born to Alexandra Tolstoy and the First Protector have attained the age of 21 years or subclause (d) applies; and*

*(ii) The Trustee has pursuant to clause 1.1(b) of the Trust Deed (with the written consent of the Protector) declared an earlier Date of Distribution of the Trust Fund TO THE INTENT that the net proceeds of sale of the residential property will be distributed pursuant to clause 5.5 of the Trust Deed.*

*(c) The Protector may also exercise the power conferred by clause 4.6(a) above if he is satisfied that Alexandra Tolstoy and her children are in financial distress and that it is desirable that the residential property be sold so that clauses 5.2-5.4 of the Trust Deed can take effect.*

*(d) The provisions of clause 4.6(b) also apply if more than two thirds of the trust beneficiaries (being those beneficiaries named or described in clause 1.1(c) of the Trust Deed) advise the Trustee in writing that they wish the residential property to be sold. If a trust beneficiary is under the age of 18 years the Trustee may accept written instruction signed on behalf of such beneficiary by its legal guardian."*

116. Features of these clauses worth highlighting are as follows. By clause 4.5, the Protector's consent is required before the trustee may exercise many of the powers normally vested in a trustee such as the distribution of income or capital and investment. Other steps which require the Protector's consent are the exclusion of a discretionary beneficiary and variation of the deed. By clause 4.6 the Protector can direct the sale of the residential property, subject to various provisions. By clause 4.1 while Mr Pugachev is Under a Disability (which is defined as including "coercion by operation of law" in 1.1 (i)) the Protector is Victor Pugachev.

117. Clause 4 is not an exhaustive list of all the Protector's powers. For example the definition of Discretionary Beneficiaries at clause 1.1(c) (vii) above the Protector can appoint further Discretionary Beneficiaries in addition to those named or described, and at clause 6 (below) the Protector has the power to remove and appoint trustees.

118. The trusts are declared in paragraph 5. The first part of this section deals with a right of residence in the "residential property" (i.e. Old Battersea House), as follows:-

*"5 The Trustee shall stand possessed of the Trust Fund upon trust as follows:*

*5.1 In respect of any residential property (subject to clause 4.6|)*

*(a) to permit SERGEI VICTOROVITCH PUGACHEV together with such other persons as he may from time to time permit personally to reside in the residential property and to use and*

*enjoy the furniture and household effects in the residential property free of rent and otherwise subject to such reasonable terms and conditions as the Trustee may think fit including if the Trustee thinks it fit keeping the residential property insured against such risks as the Trustee may require to its full insurable value and paying all rates and taxes and other outgoings payable in respect of the residential property and keeping it in the same state of repair as it was in at the date on which it became an asset of the Trust Fund fair wear and tear damage by fire flood tempest earthquake and other inevitable accident excepted PROVIDED THAT if at any time SERGEI VICTOROVITCH PUGACHEV does not wish to reside in the residential property he may require the Trustee to lease the same on such terms as the Trustee thinks fit and the net rentals shall be treated as income arising under clause 5.2; and*

*(b) After the death of SERGEI VICTOROVITCH PUGACHEV or if he is Under a Disability to permit his partner ALEXANDRA TOLSTOY to have a similar right of residence until all children she has had with SERGEI VICTOROVITCH PUGACHEV have reached the age of 21 years or sooner died"*

119.   Clause 5.2 provides a wide power (prior to the date of distribution) to pay any of the income or capital to any of the Discretionary Beneficiaries. In addition to the terms of clause 4, this power is expressly subject to the prior written consent of a Protector. The words of the clause are:

*"At any time prior to the Date of Distribution **with the prior written consent of the Protector** to pay apply, vest or transfer such part or parts of the income arising from the Trust Fund or of the capital of the Trust Fund as [the trustee] thinks fit for or towards the maintenance education advancement or benefit of such of them the Discretionary Beneficiaries as are from time to time living or in existence or of any one or more of them to the exclusion of the others or other of them in such shares and proportions and generally in such manner as the Trustee thinks fit and regardless of whether there is any other fund available for the purpose."*

120.   This clause expressly permits the Trustee to distribute any part of the income or capital to any single Discretionary Beneficiary to the exclusion of all the other Discretionary Beneficiaries.

121.   Clause 5.3 deals with accumulations of income.

122.   Clause 5.4 provides that the Trustee has additional powers, again with the prior written consent of the Protector. The relevant words of clause 5.4 are:

*"5.4 Notwithstanding any of the foregoing provisions of this clause 5 until the Date of Distribution the Trustee **with the***

> ***prior written consent of the Protector*** *shall have the following additional powers:*
>
> *(a) by irrevocable deed to vest in any Discretionary Beneficiary the whole or such part of the Trust Fund as the Trustee in its absolute discretion thinks fit whether or not it is otherwise probable that such person would have become entitled pursuant to the provisions of this deed to any part of the Trust Fund.*
>
> *(b) [...]"*

123. These powers permit the trustees to vest the whole or part of the Trust Fund in any Discretionary Beneficiary (clause 5.4(a)). The terms omitted, which are in clause 5.4(b), allow for resettlement by the declaration of fresh trusts for the benefit of any one or more of the Discretionary Beneficiaries.

124. Clause 5.5 provides that after the Date of Distribution the Trustee shall hold the Trust Fund for Alexandra Tolstoy and the children of Sergei Victorovitch Pugachev who are living at the Date of Distribution and have obtained the age of 21 years, subject to further provisions which do not matter.

125. Section 6 deals with the appointment and removal of Trustees. Clause 6.1 vests the power to appoint new trustees in the Protector:

> *The minimum number of Trustees of this trust shall be one PROVIDED that at all times one trustee is not a person who is for the time being a Discretionary Beneficiary. The power of appointment of new Trustees shall be vested in the Protector."*

126. Clause 6.2 deals with the case when there is no Protector and provides that in that case the trustees for the time being have the power of appointment of trustees.

127. Clause 6.3 deals with removal and provides that:

> *"the Protector shall also have the following powers namely*
>
> *(a) to remove any existing Trustee with or without cause,*
>
> *(b) to appoint at any time or times an additional Trustee or additional Trustees of this Trust*
>
> *(c) upon the retirement of the Trustee of this Trust to appoint a new Trustee or Trustees".*

128. The claimants draw particular attention to the words "with or without cause" in clause 6.3(a).

129. Clause 6.4 provides that the appointment and removal or replacement of Trustees shall be made by the Protector by instrument in writing. Clause 6.6 deals with withdrawal from the trusts by a trustee.

130. Clause 6.9 provides that

> *"When a Trustee resigns, retires is removed or stops acting as Trustee for any other reason, that Trustee shall duly surrender or transfer all Trust property (including written or electronic documentation) in his possession or under his control to the remaining or successor Trustee or Trustees AND such Trustee ("the Retiring Trustee") is deemed to irrevocably appoint the Protector on behalf of the Retiring Trustee and in the Retiring Trustee's name or otherwise to do all things and execute all documents as are necessary to vest the Trust Fund or any part of the Trust Fund in the continuing or any new Trustees of the Trust Fund and no person shall be concerned to enquire into the validity of such a vesting."*

131. This is another provision involving the Protector, who is irrevocably appointed as a retiring trustee's agent to vest the trust fund in the continuing or new trustees.

132. Clause 7 deals with trustees out of the jurisdiction and clause 8 with trustees acting as directors. Nothing turns on these clauses.

133. Clause 9 deals with the investment of the Trust Fund. Clause 9.1 (a) declares the primary investment of the Trust Fund is Old Battersea House. Clause 9.1(b) provides the Trustees may with the prior written consent of the Protector invest or reinvest portions of the Trust Fund and clause 9.1 (c) provides for a trustee's indemnity as follows:

> *"The Trustee shall not be liable for and shall be indemnified by and out of the Trust Fund in respect of any loss or liability which may be sustained or incurred by reason of the exercise of any of the powers of investment herein conferred".*

134. General powers, authorities and discretions of the Trustees are dealt with in clause 10. A further "Schedule of Trustees' Powers" is attached to the trust deed and runs to a further 8 pages and numerous sub-paragraphs. Although neither clause 10 nor any other part of the deed refers to the schedule by name, it is obviously appropriate to construe the deed as including this schedule. They refer to trust property generally, to carrying on business, farming, partnership, companies, power to appropriate and partition, guarantees, disputes, delegation, trustees remuneration and audit of accounts.

135. In the trust deed itself, clause 11 deals with exclusion from liability and indemnities, as follows:

> *"11.1 The Trustee shall not be liable for and shall be indemnified by and out of the Trust Fund in respect of any loss or liability which may be sustained or incurred by reason of the exercise, the mode of exercise, or the non-exercise of any of the powers, authorities, or discretions hereby or by law conferred upon it **AND** no Trustee shall be liable for:*

> *(a) Any loss not attributed to dishonesty or to the wilful commission or omission by the Trustee of an act known to the Trustee to be a breach of trust.*
>
> *(b) The neglect or default of any solicitor, bank accountant, auditor, stockbroker, investment advisor or other agent employed in good faith by the Trustee.*
>
> *(c) Any claim made against the Trustee by any beneficiary or any creditor or any other person having any claim whatsoever against the Trust Fund which cannot be satisfied because of any resettlement or other distribution of any or all of the Trust Fund to or for the benefit of any Discretionary Beneficiary*
>
> ***AND** in particular no Trustee shall be bound to take any proceedings against a co-Trustee or former Trustee for any breach or alleged breach of trust committed by such co-Trustee or former Trustee."*

136. As part of their so-called Illusory Trust claim the claimants contend this cause is very widely drawn and excludes liability for fraud by a trustee.

137. Clause 12 deals with the exclusion of beneficiaries, as follows:

> *"12.1 Not withstanding the foregoing provisions of this deed IT IS DECLARED that the Trustee with the prior written consent of the Protector may at any time or times prior to the Date of Distribution by deed revocable or irrevocable declare that the Discretionary Beneficiaries shall cease to include any person or persons named or described in such deed or that any person or persons named or described in such deed shall not as from the date such deed comes into effect and while such deed is in effect be capable of being a Discretionary Beneficiary."*

138. As provided for in clause 4, the exclusion of a beneficiary is subject to the consent of the Protector.

139. Clause 13 deals with variation of the trust deed. Subject to restrictions concerned with perpetuities and the prejudice of any interest of a Discretionary Beneficiary which has already vested, the clause provides:

> *"13.1 Prerequisite: The Trustee may vary or amend any of the provisions contained in this deed with the prior written consent of the Protector."*

140. Clause 14 deals with the release or revocation of powers and provides that with the prior written consent of the Protector the Trustee may release and revoke any power conferred on the Trustee under the trust deed.

*The other trust deeds*

141. The only material differences between the other trust deeds and the London Residence Trust which have been drawn to my attention are:

i) In all four of the other trusts the named or described Discretionary Beneficiaries do not include Victor or Alexander Pugachev nor do they include Ms Tolstoy. The definitions name Mr Pugachev and his children by Ms Tolstoy. Like the London Residence Trust they also include after born children of Mr Pugachev (nb not necessarily by Ms Tolstoy). In the other trusts the clause about grandchildren and remoter issue is limited to Mr Pugachev and Ms Tolstoy, unlike the drafting of the London Residence Trust.

ii) There are no residence terms in the other four deeds equivalent to the one in the London Residence Trust.

142. So the material clauses, about the Protector and the position of the trustees, are the same in all five trusts.

*The law*

143. As a starting point I accept the claimants' submission from ***Underhill & Hayton*** about the correct approach to the interpretation of trust deeds, one must:

> *"identify the meaning of the relevant words (a) in the light of (i) the natural and ordinary meaning of those words, (ii) the overall purpose of the document, (iii) any other provisions of the document, (iv) the facts known and assumed by the party or parties at the time of execution of the document, and (v) common sense, but (b) ignoring subjective evidence of the parties' intentions."*
>
> ***Underhill & Hayton*** *Art 8.1(2)*

144. The more controversial issues are addressed below as the following topics:

i) Shams

ii) Illusory trusts

iii) Discretionary trusts, protectors and fiduciaries

*Shams*

145. Despite the frequent references to a "sham trust", there is not really any such thing. What may or may not be a sham are the acts or documents which purport to set up the trust. The famous passage on sham in the judgment of Lord Diplock in ***Snook v London and West Riding Investments*** [1967] 2QB 786 at 802 is as follows:

> *"...it is I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the*

> *appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. But one thing, I think, is clear in legal principle, morality and the authorities ... that for acts or documents to be a "sham," with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a "shammer" affect the rights of a party whom he deceived".*

146.  The same point was made in New Zealand ***Official Assignee v Wilson*** [2008] 3 NZLR 45 at paragraphs 48/49:

> *"The two situations (valid trust and sham trust) do not fall into combination. The finding that the purported trust is void as a sham does not amount to an invalidation of a trust. It is not the trust as such which is a sham. There is no trust to be a sham. It is the trust documentation that is the sham*

147.  To find that a document is a sham, the focus is on the intentions of the relevant parties. In ***Hitch v Stone*** [2001] STC 214 at paragraph 66 Arden LJ put it this way:

> *"The test of intention is subjective. The parties must have intended to create different rights and obligations from those appearing from (say) the relevant document, and in addition they must have intended to give a false impression of those rights and obligations to third parties."*

148.  Both parties referred to the same authorities: ***Snook v London West Riding Investments Ltd***; ***Official Assignee v Wilson***; and ***Hitch v Stone*** as well as further cases: ***Natwest Bank v Jones*** [2001] 1 BCLC 98; ***Re Abacus (CI) Ltd (Trustee of the Esteem Settlement)*** 6 ITELR 368 [2003] JRC 092; ***Shalson v Russo*** [2005] Ch 281; ***Painter v Hutchison*** [2007] EWHC 758 (Ch); ***A v A*** [2007] EWHC 99 (Fam) and ***Clayton v Clayton*** [2016] 1 NZLR 551. I was taken to all of these cases in argument or, in the case of ***Painter***, although not taken to it during the trial I reviewed it afterwards. ***Re: Nurkowski*** [2005] BPIR 842 was also mentioned but no-one took me to that.

149.  In opening there seemed to be a disagreement of principle about who had to be a party to the sham in a case like this one in which the settlor transfers an asset to a separate trustee, on the face of it to be held on the trusts in a deed. The claimants seemed to be arguing that only the settlor's intention mattered for a finding of sham but it soon became clear that that was not really the submission and in fact there was nothing between the parties on the principles. The debate was based on the decision of David Young QC in ***Midland Bank v Wyatt*** [1997] 1 BCLC 242. In that case the judge considered a declaration of trust which was executed by a husband and wife, declaring that the property was held on trust by the husband for the wife and his daughters, was a sham. The judge found that the wife gave no thought to the content of the document or its effect so she did not share any shamming intention with her husband.

Nevertheless, the trust was held to be a sham on the basis that the husband intended it to be a sham because:

> *"a sham transaction will still remain a sham transaction even if one of the parties to it merely went along with the "shammer" not either knowing or caring about what he or she was signing." (p245 g-h)*

150.   However I was referred to the full and clear analysis of all these authorities up to 2007 which Munby J conducted in ***A v A*** at paragraphs 32 to 54, including extracts of the relevant passages.  The judge deals with ***Midland Bank*** and later cases on the same point, including the Jersey decision in ***Re Esteem*** (also known as ***Re Abacus*** (above)).  I respectively agree with Munby J's analysis and will adopt it.  I highlight the following points from ***A v A*** simply because they have a particular relevance in this case:

   i)     A finding of sham requires careful analysis of the facts.  External evidence is relevant.  The fact that an arrangement is artificial is not the same as saying it is a sham.  The fact that parties subsequently depart from an agreement does not necessarily mean they never intended the agreement to be effective.  (para 33, all these matters derive from ***Hitch v Stone***);

   ii)    The unilateral intentions of the settlor are not enough to establish a sham (para 34-40);

   iii)   For a sham there must be a common intention (para 52);

   iv)   Reckless indifference will be taken to constitute a common intention.  That is the way to interpret the point made in ***Midland Bank*** about a person "going along with" the shammer neither knowing or caring about what he or she is signing (para 49-52);

   v)    A trust which is not initially a sham cannot subsequently become one (para 42);

   vi)   A finding of sham is a serious matter (para 53) especially for professional trustees (para 54).

151.   In this case the claimants relied on evidence of conduct by the trustees after the trusts were set up as evidence of sham and the defendants replied by emphasising the point summarised at (i) above.  Evidence that the trustees may have done something later which was contrary to the terms of the trust deed may or may not support a finding of sham.  It may simply be that the trustees have acted in breach of trust.  However the converse is also true in the following sense.  Just because the trustees do something later which is in accordance with the trust deed, that is not necessarily indicative of no sham.  And that will be all the more so when the trustees are acting at a time when they know they are under scrutiny.  Evidence of proper behaviour when the trustees knows they are being watched may not count for much.  Actions when no-one was looking carry more weight.

152. In addition there was a point on dishonesty which does not arise directly out of ***A v A*** but is relevant nevertheless. The defendants submitted that dishonesty is a necessary component in the shamming intention. The claimants submitted that a sham document is a pretence, so that if it is deployed it will be misleading; but the sham document may never see the light of day. For example, an individual may create a sham deed of trust declaring that he holds his family home on trust for his children, and then put the document in the bottom drawer of his desk. It may be that the document never sees the light of day: in that case, although the individual might have intended to act dishonestly if he ever produced the document, his dishonesty is at best latent. The submission is that there can be no actual dishonesty until the document is actually produced to a third party. For that reason, the claimants argued that the defendants are wrong to suggest that a sham is necessarily dishonest. I accept that qualification but I do not believe anything turns on it. To be a sham the document must be created with an intention to mislead, but the fact that the document is never deployed to mislead does not stop it being a sham.

153. In paragraph 58 Munby J held that a transaction cannot be a sham for one purpose but not for another. I agree.

154. In this case the trustees are companies. Therefore to ascertain the intention of those trustees one needs to consider the principles for the attribution of intention to companies. The principles were not in dispute. The intention may or may not be that of the *de jure* directors. The intention is that of the natural person or persons who manage and control the relevant actions of the company, in other words the directing mind(s) in respect of the relevant act or omission (see ***El Ajou v Dollar Land Holdings*** [1994] BCC 143 at 150-151). Who those persons are in a given case will be a question of fact.

*Illusory trusts*

155. The claimants referred to a number of cases in which the term "illusory" has been applied to a trust. So in ***Re AQ Revocable Trust*** [2010] 13 ITELR 260 (Bermuda) the settlor was the sole trustee; he had the power to absolve himself of any breaches of trust such that he could not be held accountable as trustee; and he had the power to revoke the trust at any time prior to his death. Ground CJ held at [29] that:

> *"the concatenation of rights and powers in the settlor, when coupled with the fact that he was the sole trustee at the time of the constitution of the trusts, rendered this trust illusory during his lifetime...the cumulative effect of the trust documents, when taken with the de facto situation, means that the settlor as trustee could not effectively be called to account in his lifetime."*
>
> *(my emphasis)*

156. However the defendants submitted that there is no cause of action in English law of "illusory trust", arguing that absent a finding of sham there is no justification for ignoring the express declaration of trust in favour of a default resulting trust, and arguing that there is no legal principle that would enable the court to ignore an express declaration of trust in favour of ascertained and unascertained beneficiaries

and view the deeds instead as creating bare trusts in favour of one of those beneficiaries, owing to the presence of certain provisions in the deed.

157. The defendants refer to the decisions of the New Zealand courts in ***Clayton v Clayton***. That dispute involved allegations of sham and of an illusory trust. The case went to the New Zealand Supreme Court ([2016] NZSC 29) but it is convenient to start at the Court of Appeal ([2015] NZCA 30). At paragraphs 71-85 the Court of Appeal considered and rejected the concept of an "illusory trust" as distinct from a "sham trust".

158. At paragraphs 72 -73 the Court of Appeal explained that the judges in the Family Court and the High Court had held that the trust in question was "illusory". Their reasons were not the identical but the differences do not matter. The point was the very extensive control which the settlor was found to have over the trusts. A distinction had been drawn between shams and illusory trusts. The trusts were not shams. The Court of Appeal held that the difference between a sham and an illusory trust was not supportable and noted the absence of such a distinction in other jurisdictions (paragraph 79 - the USA, Canada, and Australia). The Court of Appeal was concerned that once the court accepts on the evidence that a valid trust has been established and is not a sham, the trust should not be treated as non-existent because the trustee has wide powers of control over trust property. That approach would undermine the court's acceptance of a valid trust and overlooks the trustee's irreducible core obligations and the rights of beneficiaries to have them enforced by the court (paragraph 80). In paragraphs 81 – 82 the court referred to ***Official Assignee v Wilson*** and in paragraph 83 expressed a concern that a decision to invalidate trusts other than on proof of sham might have possible unintended consequences for other valid New Zealand trusts including other discretionary trusts. At paragraphs 84-85 the court held that there was no separate principle justifying setting aside a valid trust on the ground that it is illusory, in the absence of a finding it is a sham (or some statutory power).

159. However the NZ Supreme Court set aside the Court of Appeal's finding that the trust was not an illusory trust and instead positively declined to rule on the point. The Supreme Court's reasoning is instructive. The case was a matrimonial dispute between Mr and Mrs Clayton. The issue was whether the property held in the trust in issue was "relationship property" under the relevant legislation. The trust was called the VRPT. It was a discretionary trust settled by Mr Clayton. He was sole trustee. The Discretionary Beneficiaries included Mr Clayton as "Principal Family Member", Mrs Clayton and their daughters. The first issue the Supreme Court addressed was whether the bundle of rights and entitlement held by Mr Clayton under the deed as Principal Family Member, Trustee and Discretionary Beneficiary gave him such a degree of control over the assets of the trust that it was appropriate to classify those powers as within the definition of property in the New Zealand legislation. One power (clause 7.1) gave Mr Clayton a right to remove Discretionary Beneficiaries and the Court of Appeal had held that this meant he could remove all the Discretionary Beneficiaries, leaving himself as sole beneficiary and so leading to a conclusion that it was relationship property. The Supreme Court said at paragraph 44:

> *"We agree with the Court of Appeal that, if Mr Clayton had a non-fiduciary power as Principal Family Member to make himself the sole beneficiary under the VRPT deed, the effect of*

> *the exercise of that power would be analogous to the revocation of the VRPT, justifying the application of the same analysis as in **TMSF**. [....]"*

160. Interpolating - ***TMSF*** is a decision of the Privy Council: ***Tasarruf Mevduati Sigorta Fonu v Merril Lynch*** [ 2011] UKPC 17. In that case the Privy Council held that the defendant's power of revocation of the trusts was not a fiduciary power (that was not disputed) and was in equity tantamount to ownership and so he could be ordered to delegate his powers to receivers.

161. After the quoted part of paragraph 44 the Supreme Court in ***Clayton v Clayton*** explained that the Court of Appeal's reasoning based on clause 7.1 was challenged. They went on to consider it and held that the Court of Appeal had been in error because clause 7.1 did not give Mr Clayton power to remove "Final Beneficiaries" (his daughters). However from paragraphs 50 – 58 the court went on to examine what practical limitations the Final Beneficiaries had on Mr Clayton's ability to appoint the property to himself. The powers Mr Clayton had as trustee were examined. They were very wide and allowed him to appoint assets to the Discretionary Beneficiaries (including himself) in favour of the Final Beneficiaries, and included provisions which modified the fiduciary duties of the trustee to permit a trustee who is also a beneficiary (as Mr Clayton was) to exercise a trustee's power in his own favour. At paragraph 58 the Supreme Court held that this meant Mr Clayton was not constrained by any fiduciary duty when exercising the trust powers in his own favour to the detriment of the Final Beneficiaries. Then from paragraph 58 to 68 the Supreme Court held that this amounted to a general power of appointment, i.e. one in which the donee of the power is free to appoint himself without considering the interests of anyone else (citing well known texts ***Underhill and Hayton*** and ***Lewin on Trusts***) and was tantamount to ownership (citing Lord Collins of Mapesbury in ***TMSF*** which in turn refers to ***Thomas on Powers***). After that the Supreme Court went on to consider the specific issues arising from New Zealand matrimonial law, concluding in Mrs Clayton's favour.

162. The Supreme Court then turned to sham and illusory trusts. The finding of no sham was upheld. On the issue of illusory trust, the Supreme Court noted that the finding of an illusory trust by Rodney Hansen J in the High Court was based effectively on the same considerations which had led the Supreme Court to hold that Mr Clayton had a general power of appointment. At paragraph 119 the Supreme Court said:

> *"The concept of "illusory trust" was described by Rodney Hansen J as a trust under which the trustee retains such control that the proper construction is that he did not intend to give or part with control over the property sufficient to create a trust. The essence of the concept appears to be that the trust as constituted has the attributes of a trust, including the imposition on the Trustee of the obligation to act honestly and in good faith; but the powers given to the Trustee and, we would add in this case, the Principal Family Member, given that Mr Clayton had both roles, are so broad that the Trustee can 'basically ... do whatever he wants with the property'."*

163.    Then, after dealing with a point about whether Mr Clayton was still subject to the irreducible core of obligations owed by trustees over which the Family Court and the High Court had differed, and noting the Court of Appeal's overturning of the finding of illusory trust because there was no difference between that and a sham, at paragraph 123 the Supreme Court held:

> *"We will come back later to the distinction between a sham and an illusory trust. For the present we observe that a finding that a trust deed is not a sham does not seem to us to preclude a finding that the attempt to create a trust failed and that no valid trust has come into existence. That would lead to a finding that the trust is illusory, to use the terminology adopted in the Courts below. For our part we do not see any value in using the "illusory" label: if there is no valid trust, that is all that needs to be said."*

164.    The Supreme Court then observed (paragraphs 124-127) that there were alternative lines of analysis concerning the trusts validity given the extensive powers held by Mr Clayton under the deed.  One approach was that Mr Clayton had reserved so much power to himself that there was no valid trust at all and the breadth of the powers called into question the irreducible core of trustee obligations referred to in ***Armitage v Nurse*** [1998] Ch 241.  The other approach was that even though the trust was in effect defeasible because of Mr Clayton's wide powers, there is no reason why it should not be regarded as a trust and required to be administered in accordance with the deed until the exercise of those powers to bring it to an end.  The latter was related to but different from the position in ***TMSF***.  Determining which of these approaches was correct was complicated and the court did not have a unanimous view.  Since a settlement had occurred it was unnecessary.

165.    Finally the Supreme Court held that argument about a distinction between sham and illusory trust was academic and they did not find the term "illusory trust" helpful. The conclusion was at paragraph 130:

> *"In the present case, Mr Clayton intended to create a trust on the terms recorded in the VRPT deed. The issue would be whether the powers held by Mr Clayton are so broad that what he intended to be a trust was not, in fact, a trust. As already noted, we are not determining that issue."*

166.    I have dealt with ***Clayton v Clayton*** at some length for two reasons. First it is a decision from the Supreme Court of New Zealand.  Such decisions are authoritative and will always command respect but all the more so in this case which concerns New Zealand trusts albeit the parties agree that English law and New Zealand law are the same.  Second the judgment illuminates some important principles relevant to the issues I have to decide.  Those principles relate to the analysis of trusts themselves. The fact that the court then goes on to apply its findings about the trusts to the question of matrimonial law applicable in New Zealand does not diminish the relevance of the analysis of the trusts.

167.    The case shows that when considering what powers a person actually has as a result of a trust deed, the court is entitled to construe the powers and duties as a whole and

work out what is going on, as a matter of substance. Even though the VRPT deed in that case named more than one Discretionary Beneficiary and named Final Beneficiaries which did not include Mr Clayton, when the deed is examined with care, what emerged is that in fact Mr Clayton had effectively retained the powers of ownership.

168.  This conclusion is not the same thing as a finding of sham. The analysis is all concerned with what the effect of the deed truly is. It is not concerned with the subjective intentions of the parties to create a pretence to mislead.

169.  One can see why someone might have described the trust in ***Clayton v Clayton*** as illusory because no doubt at first sight, the deed looks as though Mr Clayton has divested himself of control over the property whereas after careful consideration one reaches the conclusion that he has not. However the word is not helpful and I will only use it in this judgment as a label to refer to the claimants' arguments. As explained in paragraph 71 above, the section of the judgment which analyses what the overall effect of the trust deeds actually is will be called the "True Effect of the Trusts" claim.

*The irreducible core*

170.  In the context of the so-called illusory trust claim, the claimants also referred to the idea of an irreducible core of a trust. This was based on ***Armitage v Nurse*** at 253G-H at which Millett LJ stated the following proposition:

> *"there is an irreducible core of obligations owed by trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. If the beneficiaries have no rights enforceable against the trustees there are no trusts."*

171.  The judge then went on to reject the idea that this included duties of reasonable skill and care, prudence or diligence. What the minimum necessary to give substance to the trusts did require was that the trustees perform the trusts honestly and in good faith for the benefit of the beneficiaries. Accordingly an exclusion clause in the deed which exempted the trustees from liability no matter how negligent (etc.) they had been, unless the loss was caused by the trustees' own actual fraud, was valid.

172.  There was no dispute about these principles before me.

*Discretionary trusts, protectors and fiduciaries*

173.  I start with what will no doubt seem to some to be elementary or even jejune observations in order to put the issues into context. The trusts in this case are discretionary trusts, in other words whether any individual beneficiary receives any benefit from the trust at all is in the discretion of the trustees, albeit that discretionary power is subject to fiduciary obligations. That distinguishes these trusts from a simpler kind of trust in which a trustee holds property on trust for a particular individual beneficiary. In that simpler kind of trust the conventional analysis distinguishes between legal ownership and beneficial (or equitable) ownership. In the simpler kind of trust the legal ownership is held by the trustee but the beneficial ownership of the property remains held by the beneficiary. The concept of a trust in

the common law allows for this distinction to exist between the "legal" owner (the trustee) and the person whose property it really is. The beneficiary has the right to call for an assignment of the legal title from the trustee but it may suit the beneficiary not to do that. There are more complicated versions of what I have called the simpler kind of trust but that does not matter.

174. Consider an unscrupulous person is trying to "protect" one of their assets from creditors when the asset is a house. Since the asset is real property, it can be seen, identified and there is likely to be a public register of ownership, as there is in the UK. The simpler kind of trust achieves a significant goal for the person because it allows the public information to name the trustee as the owner of the house instead of the person. The trustee can be an anonymous "special purpose vehicle", in other words a company with no assets whose directors and shareholders are professionals. All the better if the trusts and the trustees are in a jurisdiction a long way away; that just makes the task of searching a little bit harder.

175. However there is still a significant disadvantage inherent in the simpler kind of trust. Imagine the unscrupulous person fears or is advised that they might be ordered by a court, on pain of contempt, to identify any assets they hold. Crucially the order will or may make clear that this includes any assets of which they are the beneficial owner even if they do not hold the bare legal title. To comply with that order honestly they would have to identify the asset held in the simpler kind of trust because in that arrangement the person is still the beneficial owner. Now they might decide to lie by falsely not revealing the asset but there is always a risk that the lie would be discovered. Particularly if the asset is a house which the unscrupulous person has an obvious connection with because they or their family lives in it. In addition once the beneficial ownership has been identified, a creditor may well be able to get their hands on the property beneficially held by the person.

176. This is where the discretionary trust can come in. In a discretionary trust over a piece of property the beneficiaries are themselves discretionary (cf ***Clayton v Clayton*** above). The trustees may exercise their powers to advance property to a discretionary beneficiary, but then again they may not. The trustees are fiduciaries but that does not compel them to advance property to any given beneficiary. So the analysis is that none of the discretionary beneficiaries have a proprietary interest in the property. As Lewison LJ explained when the Court of Appeal upheld the trust disclosure order in these proceedings ([2015] EWCA Civ 139) at paragraphs 13 and 15:

> *"13. A beneficiary under a discretionary trust has a right to be considered as a potential recipient of benefit by the trustees. That is an interest which equity will protect. The trustees must apply some objective criterion in deciding whether or not to exercise their discretion in favour of a particular beneficiary; so that each beneficiary has more than a mere hope. But that right is not a proprietary interest in the assets held by the trustees, although it can be described as an interest of sorts: Gartside v IRC [1968] AC 553, 617-8. In some areas of the law, such as matrimonial finance, legislation is drawn widely enough to enable the court to take into account the likelihood that trustees will exercise their discretion in favour of a particular beneficiary in deciding what provision to make for a*

*former spouse on divorce: Whaley v Whaley [2011] EWCA Civ 611. But even then the trust assets are not owned by the beneficiary spouse."*

*[...]*

*15. On the face of it assets held by the trustees of a discretionary trust would not be amenable to execution if judgment is entered against one of the class of potential beneficiaries at the suit of a third party. The trustees might in such circumstances decide to confer a benefit on the beneficiary to save him from bankruptcy; but that would be a matter for them. If they did exercise their discretion in favour of a particular beneficiary the amount of the benefit would thereupon cease to be a trust asset and would become the asset of the beneficiary. It would then truly be his asset."*

177. Furthermore in a trust like the ones in this case, the class of discretionary beneficiaries itself is open to be changed. Discretionary beneficiaries can be removed altogether and other people added.

178. So by passing the house into a discretionary trust which names the unscrupulous person as one of the discretionary beneficiaries, the person can achieve a number of goals. They can hide their relationship with the property by having the trustees named on the public registers as the owner. They can also truly state that they have no proprietary interest in or beneficial ownership of the property and, given that they are not the beneficial owner, a creditor who does find out about the property cannot get their hands on it.

179. But there is a problem. Subject to the law on unwinding transactions to defraud creditors, if a person gives away their property to someone else then it is no longer theirs. But that is not what the unscrupulous person in the example wants to do at all. As far as they are concerned the property is theirs. The objective is not to lose control of it, the objective is to hide it and protect it from creditors. Since the unscrupulous person would only be a discretionary beneficiary in this example, the trustees acting lawfully might well not do that person's bidding at all and might refuse to distribute the property back to the unscrupulous person.

180. The problem for the unscrupulous person is that in the kind of discretionary trust discussed so far, all the power is in the hands of the trustees. Now while it is not the reason the concept was invented, this is where the concept of a protector may come in. It was common ground before me that whatever its origins, the concept of "protector" is not a term of art, in that different trusts may provide for different rights and obligations on a protector. I gather that trust deeds which include a protector often provide for one or both of the following: a power to remove and appoint trustees and a power of negative consent, in that various powers of the trustees are only exercisable with the protector's consent. In the trust deeds in this case the protector has both powers and some others.

181. A question which comes up in this context is about the nature of the protector's power and duties. Are they fiduciary in nature, in other words are they only to be exercised

for the benefit of the beneficiaries as a whole? One can see that in a different context from the example I am considering, it may make sense to hold a protector's powers and duties to be fiduciary in nature. Consider a trust of family property where the objective is not to hide and protect the settlor's assets from creditors but rather to hold assets for the benefit of members of a family over an extended period of time. In that family context, a scheme with trustees – who may be professionals - and a protector who is neither a trustee nor the settlor nor a member of the class of beneficiaries, and who exercises their powers and obligations as a fiduciary, makes sense. That could be a wise old aunt or uncle. This sort of protector is there to guard the guardians. Assuming they have the relevant powers, such a protector can remove and appoint trustees and may veto distributions by the trustees but always and only while acting in a fiduciary capacity. Even if the trust deeds do not state in terms that the protector's powers and duties are those of a fiduciary, the court may well hold that they are, based on normal principles.

182. In the example of an unscrupulous person seeking to use a discretionary trust to protect assets from creditors, a trust which includes a role for that unscrupulous person as a protector with very wide powers of veto and to remove and appoint trustees may perhaps achieve the desired result. The unscrupulous person is only a discretionary beneficiary and so can truly state to a court that they do not hold any of the assets beneficially. However consider a protector who is not a fiduciary. In the capacity of such a protector, the unscrupulous person can prevent the trustees from distributing the money to anyone but himself (or herself) and can remove recalcitrant trustees who fail to do his or her bidding and replace them with trustees willing to do what the unscrupulous person wants. Viewed in that way, perhaps the discretionary trust is not really a discretionary trust at all; the unscrupulous person has retained effective control of the assets or at least can recover that control whenever they like. That is the claimants' case on the facts.

*Textbooks and other articles*

183. It is clear that in general a protector's powers are not necessarily fiduciary in nature. They may or may not be. The defendants refer to a passage on protectors in ***The International Trust*** 3rd Edition by The Hon Mr Justice David Hayton in order to dispel the idea that there is something sinister about a beneficiary protector having non-fiduciary powers of the sort in this case. The passage is as follows:

> *"Finally, it is fair at this juncture to refer to the existence of what might be regarded as a different approach to the role of protectors from that favoured above. The cornerstone proposition of the approach favoured above ('the wide view') is that although a protector may be in a fiduciary position, this is not necessarily the case: it all depends upon the circumstances. The alternative school of thought ('the narrow view') views the protector as the holder of a fiduciary office. By definition classified as a fiduciary, the protector, according to the narrow view, has an irreducible core of duties imposed upon him. It is submitted that the distinction between the wide and narrow views is largely semantic. For it cannot, surely, be disputed that it is possible to nominate a person with a non-fiduciary watchdog role under the express terms of a trust deed. If this is*

*not the case, the expectations of many settlors and their advisers will be disappointed. To say that a person is a fiduciary is (as Frankfurter J once observed) the beginning, not the end, of analysis to which we would add that to say that a person is not a fiduciary is not the end of the analysis. It should not, in our view, be supposed that the courts will be powerless to review the actions of a protector simply because he is not in a fiduciary position. The court's general jurisdiction to secure the good administration of trusts should, in principle, enable the court to intervene even if, for example, the trust instrument in terms lays down that the protector is to owe no fiduciary duties."*

*(my emphasis)*

184. This passage shows that it is or should be possible to nominate a person with a non-fiduciary watchdog role under the express terms of the trust deed without undermining the terms of the trust itself. Stated as generally as that I agree but it does not answer the question in a particular case.

185. The defendants also rely on this passage to show that even if aspects of a protector's powers are not fiduciary, the court can still intervene. I accept that the court may still be able to intervene but again it depends on the particular circumstances, not least because the concept of a protector is not well defined anyway. A protector has whatever powers and duties are conveyed by the deed on its true construction.

186. The question whether the powers given to the protector can be labelled "fiduciary" or not probably does not matter. The distinction which really matters is between a power which the protector (who in this case is also one of the Discretionary Beneficiaries) could lawfully exercise in a selfish way in favour of himself and against the interests of the other Discretionary Beneficiaries (such as his children by Ms Tolstoy and others) on the one hand, and a power which could only properly be exercised for the purpose of furthering the interests of the Discretionary Beneficiaries as a class on the other hand. The latter may well be the same thing as a fiduciary power but it does not matter. If the power is in the latter class then its exercise against the interests of the other Discretionary Beneficiaries could be unlawful and ineffective, and a court could so rule.

187. The defendants also submit, citing an extract from ***Tolley's Administration of Trusts***, that the court may be reluctant to find that a power is a personal power because it can take the matter beyond scrutiny of the court, at least if it is a "beneficial person power". I will not get into the distinction between beneficial personal powers and non-beneficial personal powers. When I refer to personal powers I mean powers which the person may exercise selfishly if they wish. The reluctance of the court which is referred to makes sense if one is looking at the trust from the point of view of protecting what seem to be the interests of beneficiaries as a whole and the good administration of trusts but these proceedings illustrate that there is another perspective, that of a creditor of the settlor. From that perspective the same sort of considerations work the other way round. Why should a court help a settlor who tried to hide but retain his beneficial ownership of property by using a trust deed which vested unfettered powers on the settlor as protector so that the settlor could retain

control. By construing expressly unfettered powers as subject to a fetter, whether it is as a fiduciary or as subject to some other limit and scrutiny, the court could be assisting the settlor in avoiding his creditors.

188. The defendants also refer to various passages from ***Thomas on Powers*** (2nd Ed). Again the main submission being made is that this work shows that one way or another the powers will always be subject to scrutiny and the supervision of the court. However the defendants' repeated point about court supervision is circular. If the exercise of the power is subject to some limitation (such as a fiduciary duty or a power conferred for a limited purpose) then there is a standard against which a court can measure whether the power was used lawfully or not. But if the power can be exercised selfishly putting the holder's own interests ahead of anyone else's then the court's scrutiny makes no difference. An analysis based on the idea of a fraud on the power does not add anything. If the purpose of the protector's powers in this case allows the protector to act in his own selfish interest then it cannot be a misuse of such a power to exercise it for example by vetoing distributions to any other of the discretionary beneficiaries or removing a trustee who does not act in the protector's wishes.

189. The claimants referred to two passages from **Underhill & Hayton**, which I will take into account along with the above references. They are at 1.86 and 71.7:

> *"1.86 ... if [a settlor] is a discretionary object of a trust or power and has a personal power (expressed to be unchallengeable in the courts in every respect unless its exercise contravenes the fraud on a power principle) from time to time to replace the current trustee with a new one, there is a danger that the trustee will be regarded as in his thrall, so that the trust is in substance a bare trust for the settlor....*
>
> *and*
>
> *71.7 Where a power to remove trustees by replacing them with new trustees is vested in a beneficiary who is the primary object of the settlor's bounty and whose power is not restricted to a few specified eventualities, the obvious inference is that the power has been conferred on the beneficiary to look after his own personal interests and not those of the beneficiaries as a whole..."*

*Judgments in England*

190. I invited the parties to consider the decision of Henderson J in ***Davidson v Seelig*** [2016] EWHC 549 (Ch). The case was an application to amend the Defence in a claim about two settlements. The second defendant Mr Haringman, who was applying to amend, held the office of one of the protectors (or purported protectors) of the settlements. In considering the application the judge said as follows:

> *"55. Assuming that the protectorship regime was validly introduced, the protectors have four principal functions to perform in relation to the administration of the trusts. First,*

> *they have power to give or withhold consent to any exercise by the Trustees of their beneficial powers of appointment, or revocation of earlier appointments, from time to time. Secondly, they have power to remove any trustee from office, with or without cause, provided that there will still remain a minimum number of trustees. Thirdly, they have a contingent power to appoint new trustees which will be exercisable only after the death or incapacity of both Settlors. Finally, the protectors may together appoint new protectors.* ***These powers are fiduciary, and they must be exercised in the interests of the beneficiaries.*** *The protectors do not, however, have a general power or duty to supervise the administration of the Settlements, and they may only apply to the court for relief which relates to the proper exercise of their own powers.*
>
> *56. I would provisionally accept these submissions, which appear to me firmly based on general principles of trust law and to reflect the limited nature of the powers conferred on the Protector by the 2003 Deeds. In the light of these principles, I can now examine the main forms of relief sought by Mr Haringman."*
>
> *(my emphasis)*

191. So not only did the judge at least provisionally accept that protector's powers similar to the ones in this case were fiduciary but he did so when the important power to remove a trustee from office was expressed as exercisable with or without cause (as in this case). On the other hand the protectors in these settlements were in a different position from the Protectors in the trusts before me. In ***Davidson*** there were two protectors (who acted jointly) and they were neither the settlor nor beneficiaries. One of the arguments for trial in that case was to be that the individuals appointed as protectors were unsuitable on personal grounds to fulfil that role.

192. Nevertheless, as the defendants also submitted, Henderson J's judgment proceeds on the basis that the court's inherent powers include a power to remove a validly appointed protector from office (see e.g. paragraph 68) and that the beneficiaries have standing to make such an application. But this cannot be taken too far since it is not surprising that the court's inherent powers might include a power to remove a protector if the powers of that protector are fiduciary.

193. Overall, ***Davidson*** does provide some support for the defendants' case, but in the end it is concerned with quite different facts.

194. In ***Twin Benefits v Barker*** [2017] EWHC 142 (Ch) Marcus Smith J followed and cited ***Davidson*** on the question of a protector's powers being fiduciary, but the decision was not concerned with the questions I have to decide. The point in ***Twin Benefits*** was that there was no serious issue to be tried of breach of fiduciary duty because of the way the allegations were pleaded. There was nothing to suggest that the breaches pleaded arose because the defendant breached his fiduciary duty as protector (paragraph 71).

*Commonwealth judgments*

195. The defendants also referred to ***New Zealand Maori Council v Foulkes*** [2016] 3 NZLR 337 for the proposition that in considering the nature of a power to appoint or remove trustees, one must bear in mind that the subject matter of the power is the office of trustee. I accept that.

196. The claimants referred me to the judgment of Henderson J (a different judge) in the Cayman Islands in ***Re Circle Trust*** 9 ITELR 676. There the judge held that a protector was to act in a fiduciary capacity. The conclusion was reached by objectively determining the intentions of the settlor by construing the trust deed in the surrounding circumstances (not including the settlor's subjective intention). The judge held that the fact a power was conferred on a beneficiary did not mean it could not be fiduciary in nature. The case was about a power to nominate trustees and the judge reviewed a number of authorities on the issue, starting from the judgment of Kay J in ***Re Skeats Settlement*** (1889) 42 Ch D 522, 58 LJ Ch 656. At paragraph 21 the judge held:

> *"Collectively, these authorities establish that the right to nominate a trustee, even when it resides with a beneficiary, is likely to impose fiduciary obligations. That will not always be the case. Everything depends upon the intentions of the settlor and the surrounding circumstances."*

197. The claimants also cited two cases in which a power was held to be personal and not fiduciary: ***Re Z Trust*** [1997] CILR 248 (Cayman Islands) in which a power of the settlor and a management committee together to amend the terms of the trust deed was held to be personal; and ***Rawson v Perlman*** [1990] BOCM 31 (Bahamas) in which the court held that when protectors who were beneficiaries were given a power to protect their own interests they are not fiduciaries.

198. Both sides also referred to the decision in Jersey in ***Re the Bird Charitable Trust and the Bird Purpose Trust*** [2008] JRC 13, (2008) 11 ITELR 157. The case concerned the power to appoint new trustees and the power to appoint a replacement protector of a charitable trust. The Court held that both powers were fiduciary powers by approaching the question as a matter of construction of the trust deed. It is not disputed that this is the right approach. The charitable trust in that case is quite different from the trusts I have to consider.

199. Before I finish considering the authorities on the nature of protector's powers I will refer to the judgment of Heath J on 2nd October 2015 when he was considering the actual trusts in this case. In this judgment (***Kea Trust Co. Ltd v Pugachev*** [2015] NZHC 2412) Heath J ruled that the removal of the original trustees by the Protector(s) and appointment of the new trustees was valid. The defendants relied on the judgment as a finding that the powers of the Protector in the trust deeds in issue were not unfettered. I will address that below. At this stage I will refer to the judge's analysis of the law.

200. The judge considered the question of whether the Protector owed fiduciary obligations to the beneficiaries of the trust. He referred to the decision of the Jersey court in ***Re Bird Charitable Trust*** and the review of authorities there, to ***Vatcher v***

***Paull*** [1915] AC 372 (PC) as well as to two New Zealand decisions, ***Kain v Hutton*** [2008] 3 NZLR 589 (SC) and ***Clayton v Clayton*** at the level of the Court of Appeal, noting that leave to appeal to the Supreme Court had been given. Heath J held that:

> *"[48] The debate about whether, in any given case, a protector exercises a fiduciary or personal power may be arid because of the need, in either event, for the power to be exercised for proper purposes. The doctrine of fraud on a power is equally applicable to both types of power. The inquiry focuses on whether the power has been exercised for a purpose, or with an intention, that goes beyond the scope of or is not justified by the instrument creating the power."*

201. Later, citing a passage from a paper by Matthew Conaglen and Elizabeth Weaver (***Protectors as Fiduciaries: theory and practice*** (2012) 18(1) *Trusts and Trustees* 1 at 19) Heath J then held at paragraph [52] that:

> *"[52] Whether, in this case, the Protector is or is not labelled a fiduciary is unlikely to affect the duty cast upon the Protector to exercise powers to promote the objects of the trust. There is nothing in the Declaration to suggest that the basic duty of loyalty to beneficiaries has in any way been compromised its terms. As Matthew Conaglen and Elizabeth Weaver have said:*
>
>> *'The paramount consideration is the settlor's intention, as derived from construction of the trust documentation. Not only will that determine whether the protector is a fiduciary, but also what sort of a fiduciary role the protector has. As we have shown, the fiduciary label can cover a number of situations and fiduciary and personal powers can co-exist in the hands of a protector. Where the purpose and intention of the settlor was that the protector was also to be able to benefit under the trusts, the courts will usually respect that intention and not find fiduciary obligations which would disable the protector from acting in his own interest, although they might still hold that the protector owes limited or qualified fiduciary duties to consider the exercise of his powers on a regular basis. On the other hand, the cases show that powers which impinge upon the trustees' position as 'ultimate guardians of the trust' are likely to be treated as fiduciary, to some degree at least, so that the court can retain a supervisory jurisdiction. We suggest that it is unlikely that the court will allow that supervision to be avoided by language purporting to free the protector from any fiduciary obligations, but, again the touchstone is always the settlor's objectively determined intention.'*

202. The judge decided that the power to remove trustees had to be exercised in the best interests of the Discretionary Beneficiaries as a class (the Pugachev family, as he put

it) and held on the facts that there was no reason to think it had not been. I will return to that below.

*Protectors and fiduciaries – conclusion*

203. Having been through the citations from cases and text books put forward by both sides, the principles which I will derive from all these sources are brief and not controversial. They are that:

i) What matters is whether or not a power given to a protector is purely personal, in the sense that it can be exercised in the protector's own selfish interests. A power will not be purely personal if it must be exercised for a purpose, such as having regard to the interests of the Discretionary Beneficiaries as a whole or in order to promote the objects of the trust. In that case the exercise of the power will be subject to the court's supervision.

ii) In this case there is no need to make a distinction between a power conferred for a purpose which takes into account the interests of the Discretionary Beneficiaries as a class and a fiduciary power. Even if they differ in other cases, they do not differ in this case. So I will use the terms "fiduciary" and "purely personal" to draw the distinction which matters in this case.

iii) The task of determining the scope and nature of a power conferred in the deed is one of construction of the deed, taking into account all relevant circumstances (which do not include the subjective intentions of the settlor). A relevant consideration is whether the donee of the power also has other roles such as trustee, discretionary beneficiary and/or settlor. Also relevant will be the actual powers conferred and their effect both individually and together. The task of construction is to consider objectively what the purpose is for which the power has been conferred. Putting it another way, the question is: for whose benefit, as a matter of construction of the trust deed, has the power been given?

***<u>Assessment</u>***

*The involvement of Victor and his father as sources of assets*

204. Before dealing with the major issues, I will address the position of Victor Pugachev, since he provided much of the money or other assets which ultimately went into the trusts. The first step is to address the involvement of Victor and his father, Mr Pugachev, as sources of funds and assets in the various trusts. The position is as follows:

*London Residence Trust*

i) Victor transferred £12.5 million into Kea Trust Company Ltd's bank account on 5th December 2011 to fund the purchase of Old Battersea House on 6th December. The London Residence Trust was declared on the 6th.

ii) Victor transferred further sums into the London Residence Trust in late 2013. Mr Patterson's understanding was that these were to fund the renovation of the

Old Battersea House and he prepared a number of deeds of gift relating to these payments. There was one in October 2013 for $8.8 million, one on 22nd November for $5 million. The defendants interpret the $8.8 million as going into the Kea Three Trust rather than the London Residence Trust (the two trusts have the same trustee although they appear to have had distinct accounts run by Oakhill Management in 2013) although Mr Patterson's evidence relates this payment to the London Residence Trust.

*Kea Three Trust*

iii) Mr Pugachev himself had provided £4.125 million to Redflame in July 2010 as a loan to purchase 53 Glebe Place. When 54 Glebe Place was bought, the money came from Victor as another loan to Redflame of £4.2 million in July 2011, although later accounting documents show the lender as Mr Pugachev and include a loan agreement executed by Mr Pugachev and Redflame.

iv) The key trust asset in the Kea Three Trust is the shareholding in Redflame. The shares were transferred to the trustee company by Mr Pugachev on 8th August 2013 under a deed of gift.

v) The $8.8 million from Victor mentioned above may have been for this trust instead (see above).

*Riviera Residence Trust*

vi) The two key assets of this trust are the shareholdings of two Luxembourg companies called Topaze Funds SA and Romy Finance SA.

vii) The Sand Club property in St Barths is held by an entity called Sand Club SCI. Topaze owns 0.1% of Sand Club SCI directly and wholly owns a Belgian company called Notting Hill Invest SA which in turn holds the other 99.9% of Sand Club SCI.

viii) Romy Finance holds the Swiss watch factory (apparently valued at CHF 2.74 million in 2014) and two companies – Hediard Monaco and Delare LLC (a Delaware company). Hediard Monaco apparently has no assets and did not hold anything relating to the Hediard group. Delare owns about 35% of an entity called Eleven Street Associates which in turn owns a property at 11 Hurley Street, Cambridge, Massachusetts, USA.

ix) Mr Pugachev transferred the shares in Topaze SA to the third defendant (now called Finetree) on 9th August 2013, recorded in a deed of gift. Mr Pugachev transferred the shares in Romy Finance on 16th December 2013, also recorded in a deed of gift.

*Wiltshire Residence Trust*

x) The price agreed in August 2013 for the purchase of Doves House in Wiltshire had been £4.2 million. Deeds of gift seem to show that Victor transferring two sums to Bramerton as trustee of this trust. The money was paid into Oakhill's Bramerton account held at Barclays Bank in London. The deeds show sums of

$5 million on 1st December 2013, and $6 million on 16th December. Since the purchase did not proceed that money remained on deposit. However it seems that the total paid into the trust was in fact only US$4.5 million.

*Green Residence Trust*

xi) The deed for this trust declares the primary investment as shares in Lenux Group Ltd. This is a BVI company. It holds a Russian company called Korporatsiva Obligaz LLC which in turn holds land in Russia (Gorki-10). The original trustee of this trust was Bluering.

xii) On 1st December 2013 Victor transferred the shares in Lenux to Bluering, recorded in a deed of gift. Prior to that the sole shareholder of Lenux was Hearnville Properties Ltd, which was beneficially owned by Victor.

205. There is no evidence which shows how Victor came to hold any of the money or other assets which Victor transferred into these trusts. There is only a circumstantial basis from which to draw an inference that Victor did so as nominee for his father and a similarly thin basis from which to infer that if Victor was not the beneficial owner, than that person was Mr Pugachev. Nevertheless I find that for all these transfers Victor was acting entirely on the instruction of his father and that the beneficial ownership of each asset (money or shares) belonged to Mr Pugachev until the property was transferred into the trusts. I reach these conclusions from considering the evidence as a whole and for essentially the following reasons.

206. I am sure that Mr Pugachev is the source of all the assets held by Victor. There is no evidence Victor had the ability or means to generate this kind of wealth independently of his father. I do not doubt that Mr Pugachev has given his son sums of money and property which to an outside observer would seem very large. There is evidence that Victor has his own residential property. However just because some of the property held by Victor was given to him by his father outright does not mean that the property Victor was transferring into these trusts was his own money or assets. No obvious reason why he should do this has been suggested.

207. For the London Residence Trust it is true that Victor is named as one of the Discretionary Beneficiaries and his children would fall within the class of grandchildren, but the residence clause shows that on its terms the trust is to provide a residence for Ms Tolstoy and her children, not Victor or his children. I cannot think of a plausible reason why Victor would want to do that, all the more so given the poor relationship between Victor and Ms Tolstoy.

208. For the later four trusts, Victor is not even named as a Discretionary Beneficiary. The named Discretionary Beneficiaries are Mr Pugachev himself and his children by Ms Tolstoy. Again no plausible reason why Victor would wish to transfer his own assets into such trusts has been suggested.

209. The evidence also shows that Victor, Mr Pugachev and Mr Pugachev's associates and family office (Mr Lussato, Mr Liechti and Ms Dozortseva) acted in concert in the setting up of the trusts. That provides some support for the inference that Victor was doing Mr Pugachev's bidding.

210. It seems to me I am also entitled to support this inference from the fact that neither Victor nor Mr Pugachev himself provided an alternative explanation to the proposition that all this property was Mr Pugachev's. Mr Pugachev has been well aware of these trust proceedings for sufficient time to advance such a case. I infer Victor is well aware of these proceedings too. There was a suggestion of a more recent falling out between Victor and Mr Pugachev but I am not prepared to place weight on that.

211. I am also satisfied that all the relevant assets beneficially belonged to Mr Pugachev. I am not troubled by the inference that the assets would have originally derived from Mr Pugachev's wealth. There is no other apparent source and for example for the Riviera Residence Trust there is clear evidence that Mr Pugachev regarded the funds to buy the Sand Club villa as his beneficially. But there is no evidence about how they came to be in Victor's hands and no evidence of the terms on which any of them may have been held before they were transferred. The inference that they were Mr Pugachev's beneficially is a weaker inference to draw from the circumstances than the inference that Victor was simply doing his father's bidding but, standing back, no other conclusion makes sense.

***<u>The True Effect of the Trusts claim</u>***

212. The foundation of this claim is the terms of the trust deeds themselves, properly construed. Although a trust deed is construed against an appropriate factual matrix, I will start by examining the terms at face value because in this case the factual matrix is tangled up with the question of sham. For the purposes of analysis I wish to keep these things separate.

213. I will start with some preliminary general points, then address the claimants' point on the wide exclusion of trustee liability and indemnity provisions in clause 11 and then turn to the main argument, which relates to the position of the Protector.

*Preliminary general points*

214. At times the defendants made submissions about the intentions of the "settlor", by which they meant the trust companies. I reject that approach. It is true that these deeds are drafted so that the declaration of trust is over a nominal sum and so from that perspective the trust company could be called a settlor. However this is unreal. The real settlor of these trusts is Mr Pugachev.

215. For the purposes of analysis nothing turns on the differences which do exist between the dates when the various trusts were declared and the dates when property was transferred in. In another case those differences might matter but in this case they do not.

*Exclusion and indemnity clauses*

216. It was suggested that the odd grammar in clause 11 is because the text is an amalgam of two different exclusion/indemnity clauses. That may be right. The claimants point out that the first few lines both purport to exclude liability on the part of the trustees and to an indemnity. The words state that the trustees shall not be liable for any loss sustained by the exercise or non-exercise of their powers and also state that the

trustees will be indemnified out of the trust fund for any such loss. The claimants submit these terms are unqualified and exclude all liability so that the trustee's obligations and therefore the beneficiaries' rights to enforce them are rendered nugatory.

217. The claimants also submit that since the trustees are companies which were set up to undertake these tasks and have no assets, and that there are no compulsory insurance provisions under New Zealand law, the beneficiaries would be unable to recover anything if there were no trust assets left. Similarly they submit clause 11.1(c) also provides that the trustee is not liable for a claim which cannot be satisfied from the Trust Fund.

218. The defendants contend that the claimants have misconstrued these clauses and that on a proper analysis these terms are reasonable, some are commonplace and in any event they do not nullify the beneficiaries rights. The defendants' points are these:

i) Clauses of this general form are commonplace because the trust is not a separate legal entity and any contract between the trust and a third party must be with the trustees. Their contractual and tortious liability is *prima facie* unlimited and so it is not surprising trustees would always insist on clauses of this kind.

ii) The opening lines of clause 11 do not exonerate the trustees if they do something which is not an exercise of their powers at all. In other words, if the trustees simply steal the money, that would be neither an exercise of their powers nor a non-exercise of them and therefore is not excluded or indemnified.

iii) Although the opening words are unqualified, clause 11.1(a) acts to significantly limit the exclusion or indemnity by expressly providing that losses attributable to dishonesty or wilful action or inaction are <u>not</u> (my emphasis) excluded.

iv) If the complete clause is construed as a whole, liability for fraud is not excluded nor will the trustees receive protection if they have acted dishonestly and in fact they will be liable for any wilful commission or omission they know to be a breach of trust. A breach which is merely negligent will be covered by the indemnity but that is all. That is less protection for a trustee than is contemplated by the decision in <u>***Armitage v Nurse***</u>.

v) Clause 11.1(b) is ordinary and not criticised by the claimants.

vi) Clause 11.1(c) is misconstrued by the claimants and is in fact a common provision and its absence would seriously hamper trustees in advancing income or capital. The clause is directed to claims made by a person such as a creditor of the trust whose claim cannot be satisfied because the trust fund has already been distributed. The words "having any claim …against the Trust Fund" mean claims against the trust. Without such a clause trustees would have to try and second guess whether claims might be made against the trust in future and retain sufficient assets in the fund to deal with them. In that case the trustees would be reluctant to appoint property out of the trust.

219. A further point had been taken about whether the trustees were prohibited from taking action against a former trustee but nothing turns on it.

220. In my judgment the defendants are right that clause 11 does not nullify the beneficiaries' rights. The starting point is that the trustees have fiduciary duties. The wording in the clause is imperfect but properly construed as a whole the clause does not exclude or indemnify fraud by the trustees, nor a case where the trustees have acted outside their powers nor does it exclude or indemnify wilful commission or omission by a trustee of an act known to be a breach of trust. The wide opening words in the clause are qualified by the terms of clause 11.1(a). Clause 11.1(c) does not have the vice alleged by the claimants because it is subject to the same limitations, in other words it does not apply to exclude the trustee's liability for fraud and so on. I accept the defendants' submission about the purpose of clause 11.1(c).

221. Therefore the points on the exclusion and indemnity clauses do not support the claimants' case.

*The position of the Protector*

222. In these deeds the First Protector is also the settlor, in the sense that Mr Pugachev was the beneficial owner of all the property placed into the trusts, and he is also one of the discretionary beneficiaries. Indeed, if it matters, he is the first named discretionary beneficiary. Apart from the power to direct sale of the residential property in the London Residence Trust and a minor proviso in clause 1.1(c)(vii), the deeds do not expressly fetter any of the powers of the Protector. Nor do they specify limited circumstances in which the powers may be used. Conversely the deeds require the Protector's consent in a wide variety of circumstances including the trustees' power of distribution, investment, and removal of a Discretionary Beneficiary but there is no express term purporting to limit the exercise of the Protector's power of veto in any of those cases.

223. The Protector's power to remove trustees may be exercised "with or without cause" (c.f. ***Davidson v Seelig*** dealt with above). Clause 6.9 facilitates the ability of the Protector to remove a trustee by allowing the Protector to act on that removed trustee's behalf to vest the trust property in the new trustee. The Protector is also vested with the power to appoint new Discretionary Beneficiaries in clause 1.1(c)(vii), which is not subject to any express fetter (save for a minor proviso).

224. There was an argument about the power to vary the trust deed but I do not believe it adds anything significant to the analysis. The claimants submitted that on its face the deed gives the Protector power to vary the terms and that this was not subject to any express fetter. However, that is not accurate. Like the powers of distribution, investment and removal of the Discretionary Beneficiary, the power to vary belongs to the trustee (see clause 13.1) but to take effect the Protector must consent. Therefore the Protector's powers relating to variation of the trusts are the same kind of veto as in the other cases.

225. As explained above I will not examine whether this trust is "illusory". The claimants' case is that properly interpreted these trust deeds do not create a trust whereby Mr Pugachev has divested himself of control of the assets. The trusts are bare trusts for Mr Pugachev. The legal title to the assets will be with the trustees but the beneficial

title remains with Mr Pugachev despite all the language in the deeds which might suggest to the contrary.

226. The defendants submit that this is the wrong way of looking at it. The defendants contend that the Protector's powers are all fiduciary in nature, as I use the term in this judgment. The point is not that an unscrupulous Protector might not try to undermine such a trust, the point is that as a matter of legal analysis of the trust deeds, even though he is both settlor and Protector and a Discretionary Beneficiary under the trusts, Mr Pugachev does not have any right in law to do what he pleases with the trust property, his rights qua Protector are only to be exercised for the benefit of the beneficiaries as a whole and are subject to the court's supervision.

227. The defendants' submissions are as follows. They contend that the key power is to remove and appoint trustees and the cases and other authorities dealt with in the section on the law above support the conclusion that this is a fiduciary power even if the Protector is settlor and beneficiary. They also contend that even if the power is not fiduciary, it is still a power which must be exercised honestly and for a proper purpose. The court's supervisory role is illustrated by what happened in this case when the original trustees challenged their removal before the New Zealand court and Heath J upheld their removal.

228. They contend that the Protector is an office and that is consistent with its being a fiduciary. Mr Pugachev is only the First Protector. Also Mr Pugachev is only one of the Discretionary Beneficiaries. If he was the sole Discretionary Beneficiary and sole Protector then there may be more scope to argue his powers are personal, but he is not.

229. As for the Protector's veto powers, the defendants contend these are limited and submit:

    i)    The Protector could have been given much wider powers, such as to change beneficiaries, or the deed could have stated that the Protector's power were purely personal. The majority of the powers are vested in the trustees and they must act in the best interests of the beneficiaries as a whole. The provision about the Protector's consent cannot change that. The trustees have ultimate control over when and how the powers are exercised, not the Protector.

    ii)   If the Protector withholds consent the trustees can apply to the court.

    iii)  If the Protector sought to exercise his powers dishonestly or in bad faith then there can be no doubt this can be challenged in court.

230. The defendants also submit that whatever the position of the Protector's powers, the powers held by the trustee under the deed are subject to the court's supervisory jurisdiction and an improper exercise of a trustee's power can be challenged or set aside and would be a breach of trust. I do not believe the claimants challenged this but in any case I accept the submission.

231. The defendants also refer to the Protector's powers relating to the residence in the London Residence Trust, submitting they are fiduciary and are subject to express limits.

232.     That is the defendants' case.

233.     The focus of the argument has been on whether the Protector's powers are subject to relevant limitations or not. Nevertheless in fact I have two questions to decide. First I need to consider what the consequences would be if the Protector's powers (or some of them) are unfettered and second I need to decide what if any limitations those powers are subject to. The reason for taking the questions that way round is because the answer to the first question may inform the answer to the second. The two questions are: (i) what is the position if the Protector's powers are purely personal; and (ii) are the Protector's powers purely personal?

*What if the Protector's powers are personal?*

234.     The decisive factors are the following:

235.     First the Protector has a right to information from the trustees. On its own this is consistent with a watchdog role but it means that the Protector has the right to be fully informed.

236.     Second the Protector has the power to veto all the major decisions a trustee might make – investment, distribution of income or capital, and variation of the deed. So if the powers are purely personal then distributions to anyone but himself can simply be stopped. Even if the trustees had concluded that a distribution to a different given Discretionary Beneficiary should be made taking into account the interests of the Discretionary Beneficiaries as a whole, the Protector could veto it. The defendants submitted that the Protector would have to act honestly. I accept that, but the hypothesis under consideration is that the Protector may act lawfully on selfish grounds. On the relevant hypothesis the Protector may selfishly but lawfully veto a distribution to any other Discretionary Beneficiary. Such an act is not dishonest. If the power is purely personal then in substance the ability of any of the Discretionary Beneficiaries to receive any distribution from this trust would be in the hands of the Protector.

237.     Third, the Protector (and not the trustees) has the right to appoint new Discretionary Beneficiaries. So if the powers are purely personal the Protector would be able to insert a new Discretionary Beneficiary for his own selfish reasons as well as vetoing any distribution to anyone else.

238.     Fourth, the Protector (and not the trustees save in limited circumstances) has the power to appoint his successor and while "Under a Disability" Mr Pugachev's powers as Protector are exercised by Victor, who for all intents and purposes would do his father's bidding.

239.     Fifth, so far the analysis shows that the Protector can stop any of the Trust Fund going to anyone else, but can he actually obtain it if or when he wants it?

240.     The first and crucial aspect of this point is that in these deeds Mr Pugachev is not only the Protector, he is a named Discretionary Beneficiary. So in principle distributions to him are possible.

241. The powers of distribution in clauses 5.2 and 5.4 are subject to the Protectors' powers of veto but they still require the trustees to initiate actions. The same goes for the right to remove Discretionary Beneficiaries. That is another power vested in the trustees albeit subject to the veto. That makes the position of Mr Pugachev different from the position of Mr Clayton in ***Clayton v Clayton***. Unlike Mr Clayton, in these deeds Mr Pugachev cannot directly remove a Discretionary Beneficiary.

242. However these powers permit the trustees to transfer part or all of the trust fund to Mr Pugachev alone and to the exclusion of any other Discretionary Beneficiary. That can be either by handing the assets to him directly despite the existence of other Discretionary Beneficiaries or by removing all the other Discretionary Beneficiaries save for Mr Pugachev and then doing the same thing. That is provided for in clauses 5.2, 5.4 and 12.

243. Now of course the trustees' powers are fiduciary and, as Lewison LJ noted in paragraph 13 of his judgment in the trusts disclosure appeal in these proceedings, the trustees of a discretionary trust must apply some objective criterion in deciding to exercise their discretion in favour of a particular beneficiary. However when the deeds contain express clauses like this it is hard to see how a transfer to a single Discretionary Beneficiary alone by a trustee carrying out the Protector's wishes would be open to a realistic challenge.

244. But even if it is, this is where the combination of the Protector's status as Discretionary Beneficiary with wide veto powers together with the Protector's power to replace trustees becomes significant. The Protector's power of removal can be exercised on the Protector's own initiative. If it is a purely personal power then the Protector can lawfully remove a trustee who does not act in accordance with the Protector's wishes. A trustee who refused to distribute trust assets to the Protector could be removed and replaced by one who will. If the power of removal is fiduciary and so may only be exercised taking into account the interests of the Discretionary Beneficiaries as a class then the situation is different. The Protector could not exercise that power simply to remove a trustee who refused to put the Protector's interests ahead of the other Discretionary Beneficiaries.

245. I note the extract from ***The International Trust*** by The Hon. Mr Justice David Hayton which contemplates that a valid trust should be able to have a person appointed to a non-fiduciary watchdog role. I do not doubt that that is possible, but if the Protector's powers in these deeds are non-fiduciary then that person is not simply a watchdog. If the powers are purely personal to Mr Pugachev then these deeds allow him to retain complete control over the assets he settled into the trusts. In substance these trusts would then be nothing more than bare trusts in which the property is held by the trustees on trust for the Protector alone.

246. If Mr Pugachev's powers as Protector are limited as contended for by the defendants then the effect of these deeds on their face would be that he has ceded control of the assets to the trustees without the power to get them back. He would not then be the beneficial owner of the assets.

247. A point I will not take into account is that all the trustees are all off the shelf companies with no assets, in which the directors consist of Mr Patterson and Ms Hopkins together with one of Mr Pugachev's lieutenants (Mr Liechti or Ms

Dozortseva) and in which the shareholders are Mr Patterson and Ms Hopkins. That is better addressed in the context of sham.

*Are the Protector's powers purely personal?*

248. In addition to the fundamental question of construction, the defendants take four further points on this topic which I will address first: (i) the Protector is an office; (ii) the Protector can be removed by the court; (iii) a point on Belize law, (iv) the judgment of Heath J in New Zealand.

*(i) The Protector is an office*

249. The defendants argue that in the deeds the Protector is an "office" rather than simply being Mr Pugachev. They also note that the deed provides for remuneration. I am not persuaded any of this is a basis for finding that the powers are limited. It is true that the deed defines the Protector as a role or office which can be held by different people, but the First Protector is to be Mr Pugachev and he will remain the Protector unless he dies or is Under a Disability. Even then the next Protector would be Victor. At least while his father is alive, Victor would not be independent. The power to appoint a new Protector is vested in the Protector too, so Mr Pugachev could appoint a suitable successor. The fact that in principle a third party might end up as Protector in the future does not make any difference to the position today.

250. The defendants submit that the fact that the first office holders are beneficiaries is unobjectionable, but while that may be so in some cases, what matters are the particular circumstances and the particular powers vested in the Protector in this case.

*(ii) The Court could remove the Protector*

251. The defendants submit that the Protector would be amenable to being removed by the court and so Mr Pugachev and Victor could be replaced. However this argument is circular. It presupposes that there is a relevant fetter on the Protector's power, because breach of that limit would be the reason the court might remove a Protector.

*(iii) Belize law*

252. Another of the defendants' arguments is that the power to change the governing law in clause 1.4 is not subject to the Protector's consent and so if the trustees were concerned about an excessive exercise of power by the Protector they could change the governing law to the law of Belize, which includes an express provision making the duties of protectors fiduciary in nature, subject to the terms of the trust (Belize Trusts Act 2000 s16(5)). This clever idea does not help. It is unreal to construe the deed by reference to such an idea.

*(iv) The New Zealand decision of Heath J dated 2nd October 2015*

253. The defendants relied on Heath J's ruling that the removal of the original trustees by the Protector(s) and appointment of the new trustees was valid. I have addressed the judge's approach in law in the section on law above. He decided it did not matter whether or not the Protector was labelled a fiduciary because even if he was not, the

exercise of the powers was still subject to the court's supervisory jurisdiction and could be impugned if the exercise was for an improper purpose.

254.    Before the court in New Zealand were the original trustees, the new trustees and three Discretionary Beneficiaries of the London Residence Trust – Mr Pugachev, Ms Tolstoy and Victor. The claimants were served with the application but elected not to participate (paragraph [17]). By the time the matter came to be decided the parties had agreed but the judge nevertheless decided to consider the validity of the removal of the original trustees independently since an order in the original trustees' favour was likely to be used as a shield to protect the original trustees against claims possible by third parties (paragraph [5]).

255.    Heath J approached the matter by dealing with the London Residence Trust. He reviewed the powers of the Protector stating (at paragraph [25]):

> *"While I have not attempted an exhaustive summary of the rights and powers of the Protector under the Declaration, the ones I have mentioned provide relevant context for a determination to be made about whether certain powers are to be regarded as fiduciary or personal in nature."*

256.    The removal instruments purporting to remove Kea Trust Company as trustee of the London Residence Trust were executed by Mr Pugachev and by Victor. That makes sense because at that time it was at least possible that Mr Pugachev was "Under a Disability" as a result of the effect of the UK freezing orders. If he was then Victor was the protector. So either one of the two individuals was Protector at that time.

257.    In his witness statement before the New Zealand court Mr Patterson explained that while the instruments suggested on their fact that they were valid and effective, he was concerned they might be ineffective. Mr Patterson's concern was explained by Heath J in paragraph [28] as follows:

> *"Mr Patterson's fundamental concern was that, if the Court were to take the view that the Protector's power to remove trustees was a fiduciary power that had been exercised improperly in the circumstances, removal may have been ineffective for that reason."*

258.    Heath J summarised the circumstances which led to the removal of the trustees in paragraphs [29] to [38]. Essentially Mr Patterson said that after reading the judgment of David Richards J on 30th October 2014 (about trust disclosure) he appreciated that the activities of the original trustees would come under "intense scrutiny". He (and Ms Hopkins) wished to take a cautious approach. On 15/16th June 2015 Mr Pugachev requested information from the trustees in his capacity as Protector. Mr Patterson refused on the basis that Mr Pugachev was no longer the Protector because he was "Under a Disability" as a result of the effect of the UK freezing order, and the trustees had had advice from New Zealand counsel to that effect. Mr Patterson said he was concerned that Ms Dozortseva was not assisting them, was being coy, and was acting in the interests of Mr Pugachev to the potential detriment of the interest of the trust beneficiaries as a whole. So on 14th July 2015 Mr Patterson and Ms Hopkins as shareholders of the original trustees resolved to remove Ms Dozortseva as director of

each trust company. That left Mr Patterson and Ms Hopkins in complete control of the original trustee companies. The removal instruments were executed on 24th July 2015. Mr Patterson's concern was about a possible claim by the claimants in this action, Mezhprom Bank and the DIA, against the original trustees. The point was that if the original trustees had not been validly removed then they ought not to have transferred the trust assets to the new trustees and if the claimants are entitled to enforce against the trust assets, the original trustees might be at risk in that case.

259. The judge started his analysis at paragraph [39]. He had affidavit evidence from Mr Pugachev, Victor, Ms Tolstoy and Ms Dozortseva. The case put to him was that from their point of view the removal of Ms Dozortseva was unexpected. At paragraph [41] Heath J explained:

> *"[41] There is nothing in the evidence to establish that the Pugachev interests have sought to influence or control Ms Dozortseva's activities, directly or indirectly. Ms Dozortseva's removal as a director was seen, as Mr Sergei Pugachev put it:*
>
> > *'As an "unwarranted and impulsive course of action by Mr Patterson", as a result of which he had "lost confidence in Mr Patterson and his ability to act appropriately as a director" of the original trustees.'"*

260. After making a point about the reason why both Mr Pugachev and Victor executed the removal notice, Heath J continued:

> *"[43] I have also received affidavit evidence from the three persons appointed as directors of the replacement trustees; Mr Smit, Ms Dozortseva and Mr Lenihan. On the face of it, all are qualified persons to act as directors of the replacement trustees and, except for the concerns expressed by Mr Patterson in relation to Ms Dozortseva's involvement, do not appear to be under the influence of Mr Sergei Pugachev.*
>
> *[44] I must accept the affidavit evidence of the witnesses to whom I have referred. They have not been cross-examined on their affidavits and there is nothing to suggest that there is anything inherently implausible about their evidence. Whether or not a different conclusion might have been reached if their evidence had been tested by cross-examination, I cannot say."*

261. At this stage I note that the evidential position before Heath J was materially different from the position before me. It is perfectly obvious in this court that Ms Dozortseva is at all material times acting for Mr Pugachev and is under his influence. She is not independent at all.

262. The judges' legal analysis has been addressed already. His conclusions are in paragraphs [51] to [53]. At [51] Heath J notes that the beneficiaries of the trust are members of the Pugachev family and holds that the Protector's powers must be taken in the best interests of that family. He notes that the family have lost trust and confidence in those responsible for directing the original trustees (i.e. Mr Patterson

and Ms Hopkins, as directors and shareholders of those trustee companies). Then at [53] the judge concludes that on the evidence before him, which he notes was uncontested, there is no reason to suggest that the Protector's power to remove the original trustees was exercised improperly.

263. For my purposes the judge's decision at paragraph [51] is more significant than the conclusion at [53]. The latter is a finding on the facts based on different evidence than is before me. However at [51] Heath J finds that the Protector's powers, such as the power to remove a trustee, are to be exercised "in the best interests of the beneficiaries", by which he means all the Discretionary Beneficiaries, in other words the members of the Pugachev family. The claimants case before me is that there is no such fetter on the Protector's powers.

264. It is true that one could reach the same result as the judge reached by concluding that there was no fetter on the power at all – and hence it could not have been exercised improperly – but that is clearly not the conclusion Heath J reached. This judgment firmly supports the defendants' case.

*The nature and scope of the Protector's powers – conclusion*

265. There are good reasons why, in many circumstances, powers conferred on protectors like the ones conferred in this case should be found to be fiduciary in nature or at any rate subject to a requirement that the power is to be exercised to further the purpose of the trust, when the purpose of the trust is found to be to operate in the best interests of the beneficiaries as a class.

266. A powerful factor in the defendants' favour is the first impression created by these deeds. At first glance these trusts are set up for a well defined class of Discretionary Beneficiaries which makes sense as a class. All the Discretionary Beneficiaries are members of the family of Mr Pugachev. Each trust has an ostensibly independent trustee and elaborate provisions deal with the trustee's powers. Given the conclusion above about the consequences if the Protector's powers are purely personal, construing the deeds that way renders quite a lot of the text superfluous.

267. However I cannot construe the powers conferred on the Protector in these deeds in the same way as Heath J. In my judgment the true construction of these trust deeds is that the powers conferred on Mr Pugachev as First Protector are conferred to be exercised freely for his own benefit. Or put another way, considered objectively, the powers are personal powers conferred to give the Protector the ability to act in his own best interests. They are not constrained by a consideration of the interests of the Discretionary Beneficiaries as a class.

268. The fundamental reason for why I reach this conclusion is having regard to the extensive nature of the Protector's powers combined with the fact that the First Protector is the settlor of all the trust assets and is also one of the named Discretionary Beneficiaries. If such extensive powers had been conferred on a third party as protector, with provisions barring that person from being a beneficiary, then I can see that a different result might follow but the fact it is a beneficiary on whom these powers are conferred militates against the idea of a limitation. One would expect a beneficiary ordinarily to be entitled to act in their own interests. Conversely if less

extensive powers were conferred on a beneficiary/protector then again one might arrive at a different result but that is not this case.

269. The fact that Mr Pugachev is also the settlor reinforces the conclusion. Another different case would be if the settlor did retain these powers as Protector but was excluded from being within the class of Discretionary Beneficiaries. The purpose of conferring those powers in that case could well be to allow the settlor to retain a watchdog role because they would be unable to benefit personally from the exercise of the powers. But that is a long way from the facts of this case.

270. I have considered whether it could be said that some of the Protector's powers are fiduciary while others are not. However construing these deeds as a whole, there is no warrant to read different limitations as applicable to some of the powers as opposed to others. Nothing in the deed supports such a conclusion.

271. I suppose it might be said that since the deed does not identify the settlor, it is an inappropriate use of extrinsic evidence into take in account that the settlor is Mr Pugachev. I would reject that approach. The trustee (in effect Mr Patterson) knew that the person behind it all was Mr Pugachev. Furthermore, I doubt it is an accident that the document does not identify a settlor at all. By not showing on the face of the deed that the settlor is the same person as the First Protector and first named Discretionary Beneficiary, the deed does not make what is going on quite so stark.

272. The fact that the power of removal of trustees is expressed to be "with or without cause" is significant. In the context of all the other factors in this case, to go to the trouble of saying expressly that removal of a trustee may be without cause seems to me to negative any idea that the power is subject to a limitation of any kind. If the Protector had not been the settlor (nor a Discretionary Beneficiary) then I can see that those words might not be read in the same way (cf ***Davidson*** in which the Protector was neither a settlor nor a beneficiary). Even before Heath J it was not so clear on the evidence before him as it is before me that Mr Pugachev was the settlor (see paragraph [38].) But on its face the document confers a power on the settlor to remove trustees without cause.

273. This construction renders much of the deed superfluous but that is not a strong enough factor set against the others to lead to a different conclusion. The language used to refer to the Protector's powers is wide. The fact that the trustees' obligations are fiduciary does not support the proposition that the Protector's powers must also be fiduciary.

274. It may be the case that for some trust deeds one can say that the trust is for the family (as a whole) rather than for one individual, or one can say that the purpose of the trust is to promote the interests of the Discretionary Beneficiaries as a whole as opposed to one individual. However the deeds here do not expressly identify what the purposes of the trusts are. While the Discretionary Beneficiaries are all members of the same family, to correctly construe the deed account needs to be taken of the Protector's powers. So to construe these trust deeds by identifying the purpose of the trusts takes one back to all the other factors under consideration.

275. I believe the provisions about the Protector being Under a Disability defined as to include a disability by operation of law support the same conclusion. The

arrangements have been set up so that if the Protector is subject to a court order requiring him to do something he does not want to do, he ceases to be the Protector and his son Victor stands in his place. If required to act against his will Mr Pugachev can truly say to the court that he has none of the Protector's powers. If the Protector's powers under the deed were limited to acting only in the best interests of the Discretionary Beneficiaries as a class, rather than in his own selfish interests, then I doubt this provision would be necessary. What it does is allows Mr Pugachev's effective complete control of the trusts to cease to exist the moment he is compelled to do something he does not want to do, like hand over the assets to a creditor. It is an attempt to make the trust judgment proof and should not be accepted.

276. The trust deeds are not identical but I do not believe the differences are significant enough to matter. The defendant's best case would be whether the unique residence clause in the London Residence Trust makes any difference. I do not believe it does. While he is alive the right of residence is given to Mr Pugachev and clause 4.6 allows him to direct a sale, with the proceeds becoming general trust assets.

277. In the other trusts the class of Discretionary Beneficiaries is more focussed on the children of Ms Tolstoy's union with Mr Pugachev (but not entirely). That does not make any difference.

278. I conclude therefore that on their own terms these trusts do not divest Mr Pugachev of the beneficial ownership he had of the assets transferred into them. In substance the deeds allow Mr Pugachev to retain his beneficial ownership of the assets.

***<u>The Sham claim</u>***

279. The claimants' sham claim is put on the footing that if they are wrong on the True Effect of the Trusts claim, and therefore the assets held in the trusts do not beneficially belong to Mr Pugachev, then they contend that each of the deeds of trust is a sham because it was the intention of the parties that the assets should continue to belong to Mr Pugachev. Nevertheless although it is easy to state the sham claim as a simple alternative to the other claim, in fact they are interrelated and the way the points were argued bore that out.

280. By closing, the claimants put their case on the facts under eight headings:

i) The express basis for establishing the Trusts.

ii) Only Mr Pugachev's intentions matter.

iii) Mr Pugachev's character.

iv) The timing of the establishment of the Trusts.

v) The operation of the trusts.

vi) The false evidence given by those involved in the administration of the trusts.

vii) The appointment of the New Trustees to do Mr Pugachev's bidding.

viii) The role of Victor.

281. Some of these topics are more useful than others. The claimants continued assertion that only Mr Pugachev's intentions matter just obscured the issues when even the claimants accepted that the state of mind of the trustees was relevant. A focus on Mr Patterson is a vital aspect of the issues I have to decide. In order to clarify the analysis, I have reorganised the topics to consider into the following:

i) The subsidiary characters –Ms Hopkins and Mr Pugachev's associates

ii) Mr Pugachev

iii) Mr Patterson

iv) The establishment of the trusts

v) The operation of the trusts

vi) The loans and the appointment of the New Trustees

282. Once I have addressed these topics I will stand back and consider the issues as a whole and draw conclusions.

*(i) The subsidiary characters –Ms Hopkins and Mr Pugachev's associates*

283. Ms Hopkins is married to Mr Patterson and they are partners in the firm Patterson Hopkins. She did not give evidence. To the extent the evidence relates to Ms Hopkins at all, she was clearly working closely with Mr Patterson throughout. Mr Patterson did not suggest that Ms Hopkins exercised any independent judgment as a director or shareholder of the trustee companies. Based on everything I have seen, it is sufficient to consider Mr Patterson alone; there is no need to consider the position of Ms Hopkins separately.

284. Mr Pugachev's associates include his son Victor as well as Ms Dozortseva, Mr Liechti and the individuals at Galaxis – Mr Lussato and Mr Gurdjian. I have addressed the position of Victor already. He did not act independently of his father. As for the other associates mentioned here, I find that they do not and did not ever act independently of Mr Pugachev. Mr Liechti, Mr Lussato and Mr Gurdjian all worked in Mr Pugachev's family office at different times and it is not surprising that they would not have exercised any independence from Mr Pugachev. They can all accurately be called Mr Pugachev's lieutenants.

285. Ms Dozortseva is in a different position. She was head of legal in Mezhprom Bank and her precise relationship with Mr Pugachev is not clear. I find that Ms Dozortseva was not independent of Mr Pugachev and is another person who can accurately be regarded as one of Mr Pugachev's lieutenants. This conclusion is based on two matters. One is the evidence as a whole. This shows that once Ms Dozortseva comes on the scene as far as this case is concerned she relays Mr Pugachev's instructions to Mr Patterson and is closely involved in the trusts from then on. Her involvement seems to have started in about March 2013 when she was introduced to Mr Patterson by Mr Gurdjian as someone who works for Mr Pugachev. The other matter is Ms Dozortseva's close relationship with the attempt to adjourn this trial. There is strong evidence that she played a part in dishonestly instructing the firm Hughmans that Mr

Pugachev was unaware of the details of these proceedings until May 2017. Ms Dozortseva was one of the people giving instructions to Mr Jenkins at Hughmans and yet she had accepted service of the relevant papers personally on Mr Pugachev's behalf a year before, in June 2016 (see [2017] EWHC 1847 (Ch) paragraphs 27, 30 and 31).

*(ii) Mr Pugachev*

286. A critical question in all this is to decide what were Mr Pugachev's intentions in setting up these trusts and transferring his assets into them. Since I have not heard from Mr Pugachev himself on this, I have to draw inferences.

287. The defendants' evidence, some of which was unchallenged (from Ms Tolstoy's parents) is that at various times Mr Pugachev said he was setting up trusts for his children by Ms Tolstoy and that they would be provided for. There is no reason to doubt that evidence and I find that Mr Pugachev did make statements of that kind on the various occasions throughout his relationship with Ms Tolstoy.

288. However just because that is what Mr Pugachev said to Ms Tolstoy and her parents, it does not follow that it reflects his true motives either at the time or in general. Ms Tolstoy gave clear evidence that Mr Pugachev is a complex character who can be charming but can also be selfish and manipulative. She accepted that he had lied to her. This is illustrated by two examples. One is from June 2011 when the couple were looking for a London residence. They made on offer on a property in Tite Street but then Mr Pugachev pulled out of the deal without telling Ms Tolstoy. Ms Tolstoy sent an email to Mr Pugachev in Russian which in translation includes the following:

> *"You have no conscience. ... Why are you so dishonest not telling me the truth, and behind my back doing completely different to what you say to me. ... You're such a coward that you always force me to be between you and your debts. I'm ashamed how dishonestly you act. My parents brought me up not to lie and cheat. ... "*

289. The other example of a lie is from later in 2012. This related to the London Residence Trust. Ms Tolstoy had asked for Victor to be removed as Protector because she did not trust him and had also asked for herself and her children to be removed from the London Residence Trust because their status as beneficiaries was meaningless. Her evidence is that at some point after July 2012 Mr Pugachev told Ms Tolstoy that Victor had been removed as a Protector but that turned out not to be true.

290. Ms Tolstoy also accepted that she had described Mr Pugachev as controlling and a control freak.

291. In addition, although Mr Pugachev did not give evidence before me, I refer again to the attempt to adjourn the trial. Mr Pugachev must have been ultimately responsible for the instructions given to Hughmans. The claimants also referred to earlier instances in this litigation in which judges have found that Mr Pugachev gave false evidence. One of the contempts of court found by Rose J was that Mr Pugachev had given false evidence with no honest belief in its truth.

292. I have accepted that Pugachev adores his children. I do not doubt he truly did and still does intend that his children should benefit from his wealth. All the more so when he was living with Ms Tolstoy and the children. But that is different from saying that at any time he intended to part with ultimate control of the underlying assets in favour of the trustees (or the other Discretionary Beneficiaries aside from himself). The fact he wanted to look after his family is not inconsistent with the idea that he wanted to retain control. Nor is the fact that Mr Pugachev allowed the family to benefit from the trust assets for a number of years. The fact Mr Pugachev and his family enjoyed the use of the trust assets while it suited Mr Pugachev to do so is not reliable evidence of what he really intended in the long run.

293. Mr Pugachev's personal relationship with Ms Tolstoy gave him an obvious motive to tell her and her parents that she and the children were and would be provided for by trusts. Given his manipulative character I do not accept that these statements by Mr Pugachev bear much weight in support of an inference that Mr Pugachev intended to cede control of trust assets.

294. A point made by the defendants is that Mr Pugachev seems to have given wealth to his adult children Victor and Alexander. This refers to different assets from the ones transferred into the trusts in issue. This submission is that one can see that Victor and Alexander live in valuable homes given to them by Mr Pugachev and have wealthy lifestyles. The invited inference is that Mr Pugachev has transferred substantial assets to them outright and so he is likely to have wished to do that for his infant children too. This is a reasonable point but it cannot be taken very far. The assumption that the homes of Victor and Alexander came from Mr Pugachev but now belong to the sons beneficially is reasonable although it is only an assumption. It makes it plausible to suppose that Mr Pugachev may also transfer some of his wealth outright to his other children at some stage. However it does not mean he meant do that in 2011 or 2013, when they were infants.

295. Another point made by the defendants is that at the relevant time the assets in these trusts represented a small fraction of Mr Pugachev's enormous wealth. This is deployed to support an inference that the trusts were more likely genuinely intended to benefit the children and not to protect Mr Pugachev's wealth. In effect the argument is that Mr Pugachev could afford to give it away. The defendants support this argument by criticising the claimants for not giving disclosure about the true state of Mr Pugachev's wealth, the suggestion being that the claimants are well aware that the trust assets are a small fraction of Mr Pugachev's wealth.

296. This point cannot be taken too far either. Given all the steps being taken by the claimants worldwide against Mr Pugachev I am sure they have more information about his assets than they have disclosed. So it would be wrong to base any inference about the assets in this case on a view that at the time the trusts were set up they represented a substantial fraction of the value of Mr Pugachev's overall wealth or even his accessible wealth outside Russia. However what these trusts do have in common is that they relate to real property. The Wiltshire Residence Trust would have held real property too although the transaction failed. Although the way in which the holdings work through different companies varies, at the heart all these trusts are concerned with land and buildings. The significance of that is that those assets are secure but visible. That is another factor which can be taken into account.

297. A further point is a rhetorical question – why go to the trouble of naming different classes of Discretionary Beneficiaries in the 2011 trusts from the 2013 trusts if they are all shams. The premise is correct. While the 2013 trusts all have the same Discretionary Beneficiaries as each other, the London Residence Trust from 2011 is different. The differences are summarised above. However the reason the differences in the Discretionary Beneficiaries does not matter is because the sham, if it exists, may not be concerned with who they are, but with how ultimate control over the trusts works.

298. The conclusions about Mr Pugachev's intentions will be drawn after considering all the other topics but at this stage I can say this. The evidence shows that Mr Pugachev has two important characteristics. He is not a person who would lightly relinquish control of anything and he is a person quite willing to lie and put forward false statements deliberately if it would suit his purpose. The circumstances as a whole and Mr Pugachev's character support a credible inference that one of Mr Pugachev's purposes in transferring the property into these trusts was what is euphemistically called "asset protection", in other words to hide them from possible claims, facilitate a plausible denial of ownership, while retaining control in fact.

*(iii) Mr Patterson*

299. I must examine Mr Patterson's position carefully. He is a very experienced solicitor. He drafted the trust deeds and set up the trusts and the trust companies on instructions from Mr Pugachev's family office. Mr Patterson and his wife were the shareholders in the trust companies and were directors, along with Mr Liechti or Ms Dozortseva. Mr Patterson looked after all the paperwork concerning the administration of the trusts, drafting various resolutions for the different entities – resolutions of trustees, resolutions of the directors of the trust companies and shareholder resolutions.

300. I will refer to Mr Patterson as a "trustee" for convenience even though he was in fact a director of the trustee company. It is clear Mr Patterson thought of himself that way and it is convenient anyway because Ms Hopkins was not independent. The point about the other directors of the trustee companies is addressed separately.

301. The claimants contend that in fact Mr Patterson had no intention independent of Mr Pugachev when the assets were transferred into the trusts and was willing to go along with whatever Mr Pugachev wanted. This submission was founded on the following major points: the criticisms of Mr Patterson as a witness, an examination of what passed between him and Mr Pugachev's family office at various stages, particularly when the trusts were established, and the submission that during the operation of the trusts Mr Patterson did not behave as a normal trustee either at all, or at least until the worldwide freezing orders were made and he realised that the trusts were going to be scrutinised and the impression they might be shams needed to be dispelled.

302. To the contrary the defendants reject the criticisms of Mr Patterson as a witness and argue that the evidence about the administration of the trusts is selective and does not establish the claimants' case. Also the defendants argue that while in cross-examination of Mr Patterson the claimants always focussed on Mr Pugachev's intentions, they never addressed Mr Patterson's intention himself. They rely on his answers in re-examination that he did not intend Mr Pugachev would have complete control over the assets in the trusts, that from Mr Patterson's point of view Mr

Pugachev was not the absolute owner of the trust assets and that Mr Patterson had no intention to relinquish control over the trusts to Mr Pugachev.

303.    I will say at the outset that I was not convinced by the claimants' attempt to show that once the trusts were set up, Mr Patterson's day to day administration of them overall indicated that he was not behaving as a trustee would.    The claimants' case was stronger concerning the 2013 trusts than the 2011 London Residence Trust but still not persuasive.    I address the detail below.    The reason for mentioning this at this stage is because while I reject that part of the claimants' case, I am not convinced this issue was as important a point as it appeared from the way it was argued.    Mr Patterson was an experienced professional.    He knows how a trustee ought to behave and even before the possibility of scrutiny became overt after the freezing order, he will always have had that in mind.    It would not be surprising if an experienced person like Mr Patterson acted ostensibly as a trustee at a time when Mr Pugachev was not seeking to exert the kind of control over the assets which would undermine the appearance that Mr Pugachev had ceded control to the trustees.    The period running up to the replacement of the Original Trustees with the New Trustees will be addressed separately.

304.    What really matters in this case is not Mr Patterson's position as trustee (or director of the trustee companies).    I do not think it was ever intended to be a sham on any view. The point can be tested this way.    Assume that the relevant persons setting up the trusts all intended that control of the assets was to remain with Mr Pugachev.    The first clever thing about the trust deeds here, if that is their purpose, is that the only aspect which would need to be a sham in order for the trust deeds to mislead anyone would be the status of the Protector (Mr Pugachev and Victor) as a fiduciary.    As I have already held, if the Protector's powers are purely personal and not fiduciary then control has not been relinquished at all anyway.    In that case the deeds simply fulfil the assumed purpose.    They are not shams.

305.    However whether or not Mr Pugachev as Protector is a fiduciary, the trustees can always behave exactly as trustees would because that is not how Mr Pugachev's control is exercised under these deeds.    The trustees do not have to do anything contrary to their fiduciary duties for Mr Pugachev to retain control if he is not a fiduciary.    Moreover, since trustees always pay some regard to the intentions of the settlor, there would be nothing odd about them doing so (as long as it did not go too far).

306.    But the situation would be cleverer still, again assuming the relevant persons setting up the trusts all intended control to stay with Mr Pugachev.    That is because the second thing about these deeds is that the putative status of the Protector as a fiduciary is not stated expressly at all.    The deeds leave it unspoken.    So if a court, when faced with the Protector's powers, construed the deeds so as to read in a limitation on their exercise which is not stated expressly, the court itself would be fulfilling the shammer's purpose for them.

307.    With this in mind, what really matters when considering Mr Patterson's state of mind not what he thought with respect to his own position as trustee, but is what he thought with regard to the position of Mr Pugachev as Protector under these deeds.    That issue requires careful scrutiny.

*Mr Patterson as a witness*

308. Mr Patterson said in his statement he was giving evidence out of a moral obligation to the beneficiaries. However Mr Patterson was not impartial. He was well aware that his position as a professional was at stake in these proceedings. Also he was paid for his evidence (not only his travelling costs).

309. A major criticism of Mr Patterson relates to evidence he gave at the interlocutory stage in the context of disclosure of information about the trusts. The trusts were named in a schedule to Stephenson Harwood's letter of 23rd July 2014. All that was revealed was that Mr Pugachev was "*one of a class of discretionary beneficiaries under the following New Zealand based trusts …*". The position taken at the time was that it was not incumbent on Mr Pugachev to identify the "*settlors, trustees, beneficiaries, protectors (if any) and assets of the trust, nor copies of the deeds of trust*". The trustees applied to discharge an order ancillary to the freezing order which required disclosure about the trusts. In support were witness statements from Mr Patterson on behalf of the trustees.

310. The claimants submit that the result which Mr Patterson was hoping to achieve was that the disclosure order would be discharged if the Original Trustees gave an undertaking not to make any distributions from the trusts to Mr Pugachev without first notifying the claimants. His evidence was intended to demonstrate that he was a responsible individual and that there could be no leakage from the trusts without his knowledge and approval. I agree. That is a fair summary of what was going on.

311. The claimants rely on a number of statements made by Mr Patterson in his interlocutory witness statements. The claimants say each of the statements was seriously misleading and some were false. I will address them in turn but in doing so I also must bear in mind the point made by the defendants' counsel that a lot of what the claimants advance as criticisms of Mr Patterson were not put squarely to the witness. That is a legitimate point and in undertaking this exercise I will have in mind those matters for which I have Mr Patterson's direct response and those I do not. The latter may have much less weight than the former, or no weight at all.

*(a) Dealings in trust assets without Mr Patterson's knowledge and agreement*

312. The first statement relied on is in paragraph 2.3 of Mr Patterson's first witness statement:

> *"2.3 Each of the five Trusts is a discretionary trust domiciled in New Zealand and governed by New Zealand law. The Trustees are all New Zealand incorporated companies. The sole shareholders of each of the Trustee companies are me and Ms Hopkins. I am also a director of each of the Trustees companies. In one of the Trustee companies Ms Hopkins is my codirector, in two of the Trustee companies Ms Natalia Dozortseva is my co-director, and in another of the Trustee companies my co-directors are both Ms Dozortseva and Ms Hopkins. It is consequently not possible for the Trust assets to be dealt with without my knowledge and agreement."*

*(claimants' emphasis)*

313. The claimants also point out that the statement was reiterated Mr Patterson's second witness statement at paragraph 52, with additional reliance on Mr Patterson being "*a New Zealand solicitor of long standing, regulated by the New Zealand Law Society*".

314. The claimants made a number of particular allegations to falsify the statement but during the trial further documents were added to the bundles which dispelled some of the points.  There was a suggestion that in Mr Patterson had "very little knowledge" of what was put into the Riviera Residence Trust and the Green Residence Trust.  As points sufficient to suggest that Mr Patterson misled the court in 2014, this was not established.  For the Riviera Residence Trust I find that Mr Patterson did know that the Sand Club villa in St Barths was a major asset, knew essentially what it was and how it was held, through Sand Club SCI and ultimately via Topaze.  He also knew how to get more information if need be (from Ms Dozortseva).  Similarly he knew the same sort of information about the other major asset – the Swiss property held via Romy Finance.  He did not know about the shares in Hediard Monaco but they were of little value and that is a minor matter.  For the Green Residence Trust, again Mr Patterson knew what the major asset was (the Gorki property), how it was held (via Lenux) and how to get more information - from Ms Dozortseva.

315. However these were not the only points.  A further point was about Sand Club.  It was clear that although Mr Patterson was aware in a very general sense how the finances of Sand Club were run, through a managing company called Sibarth, he did not know about payments made to Ms Tolstoy from Sibarth.  These were effectively living expenses for Ms Tolstoy and her children while they were staying at Sand Club of the order of tens of thousands of pounds.  The payments were made out of income from renting out Sand Club at times when the family were not in residence.  This way of funding Ms Tolstoy's lifestyle in Sand Club had taken place before Sand Club was put into the trust but it continued afterwards too.  Once the shares in Topaze were in the Riviera Residence Trust, these funds were something the trustee ought to have been concerned to know about.  Mr Patterson's answer to this in cross-examination was that the sums were modest and it was not a case of someone fraudulently taking millions of pounds out of the trusts.  The sums were indeed much less than millions but they are not trivial and the fact remains that he did not know about them.  This undermines the reassurance Mr Patterson sought to give to the court in his evidence in 2014.  The fact it would have been picked up in the accounts prepared later (which were overtaken by the freezing order) is no excuse.

316. At one stage Mr Patterson sought to rely on the fact that strictly speaking the trust assets were just the shares in companies which ultimately held the property.  That will not do.  It does not reflect the manner in which Mr Patterson actually undertook his duties at the time, no doubt because the deeds do not include a "anti-Bartlett clause" to oust the trustee's duty to enquire into the affairs of trust-owned companies (***Bartlett v Barclays Bank Trust Co*** [1980] 2 WLR 430 at 442).  For the same reason it is convenient to refer to the properties as being held in the trusts even though that is not accurate, instead of repeatedly referring to the corporate structure.

317. Finally the claimants submitted there were ways in which Mr Pugachev himself could deal with trust assets without Mr Patterson's knowledge or approval.  They relied on

three ways of dealings with assets, at least two of which Mr Patterson himself was actually aware of, further undermining the truth of his evidence to David Richards J.

318. The first way of dealing with the assets exists because in October 2013 Mr Pugachev was made a joint signatory with Mr Liechti for the "Kea client account" held in the name of Oakhill at Barclays Bank in London for sums over £25,000. There is a mandate form to that effect signed by Mr Pugachev and Mr Liechti. Mr Patterson knew nothing about it and said he was not sure it had ever been implemented. The account was clearly an account for one of the trust companies but given the name changes it is not clear which one. Since there is no evidence this mandate was in fact implemented this point cannot be taken any further in respect of Mr Patterson.

319. The second allegation is that Mr Pugachev as Protector (via Victor acting on his behalf) was a person authorised to approve expenditure by Oakhill on refurbishment of Old Battersea House. That was clearly true because there is a resolution to that effect of the Kea Trust Company as trustee of the London Residence Trust dated 3rd May 2012 and signed by Mr Patterson and Mr Liechti as directors of the trust company. All the trusts' bank accounts were held by Oakhill. Clause 5 of the resolution provided that Oakhill could approve payments of invoices up to £25,000 without further reference to the trustee while expenditure in excess of a £25,000 as a single payment "can only be approved by [*Oakhill*] upon receipt of email confirmation from Victor Pugachev on behalf of the Protector".

320. That this authorisation existed was not disputed. The arrangement was that after payment had been made, Mr Patterson would receive schedules of the invoices, so the payments would be with his knowledge, after the event, but the arrangement does mean that Mr Pugachev could authorise the spending of substantial trust money without Mr Patterson's agreement or, at the time the money was spent, his knowledge.

321. The third allegation is that Mr Pugachev was authorised to give instructions to the Isle of Man administrator company "Andco" which was the administrator of the Isle of Man company Redflame which owned the Glebe Place property which Mr Pugachev and Ms Tolstoy were living in. The shares in Redflame went into the Kea Three Trust on 8th August 2013. A few weeks later on 2nd September 2013 a corporate services agreement was signed by (i) Mr Patterson and Mr Liechti as directors of Kea Trust Company as trustee of the Kea Three Trust, (ii) the directors of Redflame, and (iii) the directors of Andco Corporate Services Ltd. The agreement was for Andco to administer Redflame. In the agreement (Clause 2.2 and Schedule 2) Mr Pugachev is named as an agent for the trustee who is authorised to give Andco instructions in all matters concerning Redflame and its business. Mr Liechti is also similarly named as an agent on the same basis but his authority is limited to property management only and to sums up to £25,000 whereas Mr Pugachev's authority is unlimited. Ms Dozortseva is also named as an agent in the same unrestricted way as Mr Pugachev.

322. Mr Patterson was clearly well aware of this issue, recognising in cross-examination that "*it probably calls for an explanation*". His explanation was that under the terms of the tenancy between Redflame as landlord and Mr Pugachev as tenant of Glebe Place, Mr Pugachev had the right to direct the landlord to proceed with combining the two properties (53 and 54). He said "*so it didn't seem extraordinary*". Mr Patterson also sought to downplay the scope of the authority given to agents like Mr Pugachev in the relevant schedule to Andco agreement, saying it was a "*pretty standard type of*

*agreement*". However the schedule expressly includes handling the day to day affairs of the company including signing cheques. I reject the idea that the tenancy agreement relating to Glebe Place justifies Mr Pugachev having such unrestricted authority to instruct Redflame.

323. Although it is a different point, it is convenient at this stage to mention the point on rent. The family appear to have lived in Glebe Place rent free at all times including after the trust was declared but an explanation was provided and not challenged by the claimants and so I find nothing turns on the rent or lack of it.

324. With these points in mind I have looked again at the passage in Mr Patterson's witness statement before David Richards J. When Mr Patterson said it was not possible for the trust assets to be dealt with without his knowledge and agreement, he was asserting that this was so as a consequence of his and Ms Hopkins' position as shareholder and directors of the trustee companies (along with Ms Dozortseva in some cases). That evidence was wrong. It was not put to Mr Patterson that this was a deliberate lie and I will not draw such an inference. However I cannot accept this was a mere slip. It was a reckless thing for Mr Patterson to say.

*(b) and (c) Mr Pugachev as settlor*

325. The next statements by Mr Patterson relied on by the claimants as misleading and false are in the first and second witness statements, as follows:

> *First Witness Statement*
>
> *"2.4 The Defendant is one of a number of discretionary beneficiaries of each of the Trusts. As such, the Defendant has no proprietary interest in the Trust assets under the law of New Zealand. I understand the claimants have suggested in correspondence that the Defendant is the Protector of each of the Trusts. That is not now correct. The Trustees sought and obtained advice from leading counsel in New Zealand (the privilege in which is not waived) the effect of which is that the Defendant has ceased to be Protector of the Trusts as a result of the Orders made in these proceedings. The claimants have also I understand asserted that the Defendant is probably the settlor of each of the Trusts. That is also incorrect. Each trust was constituted by a declaration of trust by the trustee. Assets were placed into the Trusts."*
>
> *(claimants' emphasis)*

326. So here Mr Patterson had said that the claimants' assertion that Mr Pugachev was probably settlor for each of the trusts was incorrect and then referred to the fact that the trusts were constituted by a declaration by the trustee, the point being that the trustees were not Mr Pugachev not least because all the trustees were companies. However as the claimants point out, Mr Patterson knew very well that since the trusts were foreign trusts under New Zealand law, a New Zealand company could not be the settlor anyway.

327. In any case Mr Patterson clarified his evidence in reply in his second witness statement:

*Second Witness Statement*

*"45. Mr Roberts states (at paragraph 50 of his statement) that the claimants do not accept my explanation of why the suggestion that Mr Pugachev is probably the settlor of each of the Trusts is incorrect, and further states that the it is the claimants' position that, if the Trustees made declarations of trust following which assets were gifted into the Trusts, the Trusts Disclosure must identify who gifted the assets to the Trusts, i.e. the source of the assets subject to the Trusts. <u>It may assist if I make clear that, when I was stating that Mr Pugachev is not the settlor of each of the Trusts, my reference to the settlor was intended to refer not only to the person or persons who declared the Trusts, but also those who placed assets into the Trusts.</u>"*

*(claimants' emphasis)*

328. Now as I read this, it is a statement that Mr Pugachev is not the settlor of the trusts. But that is not true. Regardless of the point about whether Victor was a nominee for Mr Pugachev in relation to some transfers into the trusts, Mr Pugachev himself placed the shares in Redflame into the Kea Three Trust and he placed the shares in Topaze and in Romy Finance into the Riviera Residence Trust. The truth was that Mr Pugachev was the settlor of some of the trusts and possibly all of them and the companies who declared the trusts were not the settlors at all. However, as the claimants say, to reveal that would have strengthened the case for maintenance of the trust disclosure order, which is the opposite of Mr Patterson's objective.

329. The point that Mr Patterson was saying that Mr Pugachev was not the person who put assets into the trusts was put to him in cross-examination. His answers were telling. He said that that was not what he was saying, that his words had been taken out of context and that he did not believe anything about his statement could mislead anyone. He also explained that the witness statements had been "crafted" (Mr Patterson's word) to respond to the claimants' allegations in Mr Roberts' evidence and he agreed that his own witness statements had been very carefully considered. His explanation for the wording was that he was responding to wording used by Mr Roberts in which Mr Roberts asserted that Mr Pugachev was probably the settlor of "each of the trusts" which meant Mr Roberts was asserting that Mr Pugachev was probably settlor of all of them. So in his response Mr Patterson used the term "each of" to mean "all of" and so from his point of view the statement was not untrue because Mr Pugachev was only settlor of two out of the five trusts. Mr Patterson also made clear that throughout all this exercise, his approach was that he was not willing to provide any information about the trusts whatsoever unless ordered to do so. He denied that his evidence was misleading and denied any intention to mislead the court.

330. Now in fact the statement does appear to have misled David Richards J but I will come back to that.

331. Before me the defendants' submissions on this are (i) to emphasise that the trustees did not want to defeat the purpose of the application to discharge the trust disclosure order and breach the confidentiality of the trusts by providing information under challenge and (ii) to submit that the statement was "not forthcoming" but was "accurate in the sense that Mr Pugachev was not settlor of each (all) of the trusts." Counsel submitted that Mr Patterson is in his late 70s, a thoroughly decent man, who has been involved in trusts for ages, was a public trustee before going into private practice and is regulated as a solicitor. He was fully aware of the consequences of a finding of sham against him at the end of his career. Counsel also submitted that this point was being magnified by the claimants out of all proportion.

332. I have these submissions well in mind but I cannot accept the defendants' attempt to play down the significance of this evidence from Mr Patterson. This was important evidence. I listened very carefully to Mr Patterson's testimony when these points were put to him. I was not convinced by his answers. In my judgment the best that can be said is that Mr Patterson rationalised a deliberate attempt to misdirect the court and the claimants by using language which he knew would most likely be understood in one natural (false) sense but which he thought he could rationalise as having a different (true) meaning. That is not acceptable behaviour. If Mr Patterson is prepared to do that in relation to this important issue, I doubt I can rely on anything Mr Patterson says unless it is supported by the documents.

333. The point about David Richards J being misled is this. Paragraph 17 of the judge's judgment is as follows:

> *"Mr Patterson states that Mr Pugachev was not the settlor of any of the trusts which were constituted by declarations of trust by the trustees. He states that assets were placed into the trusts and in his second witness statement, he states that Mr Pugachev did not place any assets in the trusts."*

334. Of course this is not correct. When the draft judgment was circulated to the parties, a note was sent to the judge suggesting changes to this paragraph. The changes would have altered the wording to follow the wording of Mr Patterson's witness statements but did not explain to the judge what the point actually was. David Richards J did not alter the paragraph. In the Court of Appeal, Lewison LJ at paragraphs 34-35 clearly thought there was something odd about this part of Mr Patterson's evidence, noting that whether it was a categorical denial that Mr Pugachev placed or caused to be placed assets into the trusts is hard to say. Mr Patterson did not know whether the representatives of the trustees in the Court of Appeal made sure that the court was not misled in the way David Richards J was.

335. The claimants levelled a separate criticism at Mr Patterson for not ensuring the problem was explained properly to the court after David Richards J's draft judgment was given. However it is not clear that Mr Patterson was involved in that exercise and I do not accept that as a separate criticism of him.

(d) *Not aware of any basis for the trusts being shams*

336. In paragraph 4.2 of his first witness statement Mr Patterson said "*Neither I nor Ms Hopkins is aware of any basis on which it could be said that the Trusts are shams*."

The claimants submit that this statement is not accurate because before the allegation of sham was raised by the claimants, there is evidence of Mr Patterson discussing it with Ms Dozortseva. In an email of 8th September 2014, after the first freezing orders were made, Mr Pugachev asked the Kea Trust Company as trustee for a loan of £½ million to cover various living expenses in France and tax liabilities. At this stage Hogan Lovells for the claimants were contesting certain payments to Mr Pugachev. Mr Patterson responded to the loan request with various questions about trust assets. These questions are part of the basis on which the claimants contend Mr Patterson lacked awareness of trust assets and so did not behave like a trustee until the scrutiny started. The email includes statements by Mr Patterson such as "*I need to understand where in the trust structure certain assets stand ....*" and questions to Ms Dozortseva like "*Is the flat in Monaco a trust asset?*" (the answer was no). In order to help persuade Ms Dozortseva to answer the questions Mr Patterson also wrote:

> *"It is important that we keep in mind that the trustee has responsibilities that effectively are those of the directors. It will not help us defend the sham trust argument if we are seen not to be acting independently."*

337. The claimants say this shows that Mr Patterson knew his role hitherto had been merely as a corporate services provider rather than as trustee and that all relevant decisions were made in London. That goes too far, nor was the point put in cross-examination. All the same, given Mr Patterson's own knowledge and experience, he is likely to have been alive to the possibility that an allegation of sham might be made about these trusts. The email indicates that defending against such an argument was part of his thinking.

338. There is plenty of evidence that Mr Patterson regarded Mr Pugachev as "the client" and "the principal", which he clearly was. It supports the point that Mr Pugachev was the settlor for all the assets but it does not show the deeds were a sham. However there is also evidence of Mr Patterson using the term "UBO". The term is used by Mr Patterson in an exchange of emails on 6th September 2013 with Mr Liechti. UBO stands for ultimate beneficial owner. Of course the idea that Mr Pugachev is the "UBO" of the assets is the claimants' case in a nutshell and is flatly contrary to Mr Patterson's position that as a Discretionary Beneficiary Mr Pugachev has no proprietary interest in the trust assets (c.f. paragraph 2.4 of his witness statement quoted above).

339. Mr Patterson accepted in cross-examination that in the email he was referring to Mr Pugachev. The emails were about arranging a meeting between Mr Patterson and "the UBO". It is a relatively casual reference in the email but it is not without significance. Mr Patterson was clearly comfortable using that term in relation to Mr Pugachev.

340. I do not doubt that in his interlocutory evidence Mr Patterson wanted to assert that the trusts were not shams but when he said that he was not aware of any basis on which the trusts could be said to be shams, that was not a candid remark.

*(e) only link to the OPK trusts was as corporate administrator*

341. The name OPK relates to the companies which held some of Mr Pugachev's very substantial Russian assets, such as the Mezhprom Bank itself. The claimants noted that the registered address of two OPK companies was Mr Patterson's address in Auckland. In his second interlocutory witness statement (paragraph 35) Mr Patterson addressed that and said "*the only connection that any of the Trustees have to the* [OPK Trusts] *is that the registered address of the trust companies which acted as trustee of those trusts was that of my firm, my firm having simply acted as corporate administrator for them, with no other broader role.*"

342. The claimants focussed on the fact that the OPK trust deeds had been used as the template for the trust deeds in this case. That was true. The significance of this is a letter from Patterson Hopkins dated 19th August 2009 about the OPK Trust Company and OPK Trust and addressed "to whom it may concern". The letter explains that Patterson Hopkins are legal advisers to OPK Trust Company Ltd and OPK Trust (cf the assertion in his witness statement that the firm was merely corporate administrator) and goes on to give an opinion concerning the ownership and controlling structure of the company and the trust. Like the trusts in this case, the OPK trust has a New Zealand company trustee. The sole director and sole shareholder was a David Henderson-Stewart with an address in Russia. Mr Henderson-Stewart is a solicitor who seems to have been acting for Mr Pugachev at that time. The trust has a protector. The initial protector is Mr Pugachev.

343. The deed itself was not in evidence. The letter sets out a summary of the relationship between the powers of the trustee and the protector. The trustee has power to bring forward the date of distribution, appoint further discretionary beneficiaries (from a list) and vary or amend any of the provisions of the deed but they are all subject to prior written consent from the protector. The protector's powers to appoint new trustees and remove existing trustees seem to be the same as the ones in the deeds in this case. The letter draws attention to the point that the protector has the power to remove any existing trustee with or without cause. The terms relating to the office of protector are addressed in paragraph (f) of the letter. They are different from the deeds in this case because in the OPK deed Mr Pugachev himself is given an overriding power to remove any existing protector, to appoint a successor or co-protector and to stipulate an order of succession. After that the letter provides the following opinion:

> *"Opinion*
>
> *While the trustee is properly appointed as trustee of the deed effective control of the actions of the trustee is held by the protector through the powers referred to above. In this respect the protector has ultimate control of the trust."*

344. The opinion was clearly advanced as being based on an analysis of the trust deed and Mr Patterson accepted that the opinion was unqualified and was not based on knowledge of what control Mr Pugachev in fact exercised. The claimants put to Mr Patterson that this same opinion would apply to the trusts in this case. His denial was not convincing. Mr Patterson accepted that he did not now suggest the opinion was incorrect. He said:

> *"We were running into this problem of banks wanting to know who the ultimate beneficial owners were, even though it was just a nonsense."; and*
>
> *"It was apparently required because there had to be some statement that the protector had ultimate control and he may well have."; and*
>
> *"It depends on context, because I don't believe that statement was necessarily correct in all respects. I didn't – I was asked to do it. I had no knowledge of what control Mr Pugachev – there's a reference at (f) above, but if you're asking me to say that that also applies to the trustee that – the current trustees and trustees – the answer would be no."*

345. Mr Patterson's answers could be interpreted as suggesting that he was prepared to put his name to whatever statement was wanted but I will not draw that inference. The reference to (f) shows that Mr Patterson was well aware of the detail. This refers to the passage in the letter dealing with the office of protector and they are indeed different from the trust deeds in this case. They appear to be the only significant distinction and I do not believe the distinction makes any difference.

346. I reach the following conclusions. First, although a lesser example than some of the matters addressed already, this is another example of a lack of candour by Mr Patterson in his interlocutory evidence. The suggestion that the only connection that Kea Trust Co and the other trustees have with the OPK trust is just that Mr Patterson's firm was corporate administrator for OPK is not accurate. The trusts in this case are founded on deeds based closely on the OPK trust and drawn up by Mr Patterson. Second, I find that Mr Patterson did hold the view he expressed in this letter about the effect of the OPK trust deeds. I note that the letter does not suggest the protector's powers are fiduciary or fettered in any way. Third, Mr Patterson believed in 2009 that under the trust expressed in the OPK trust deed, the protector (Mr Pugachev) retained ultimate control.

*Mr Patterson's trust law article*

347. This is a convenient stage to refer to an article written by Mr Patterson about trusts law. The title is "When is a trust a trust?" It was the opening paper for a major symposium on trust law in New Zealand the Legal Research Foundation. It is not dated but must have been in about 2009. The article is a sophisticated analysis of problems in trust law including the question of whether to regard a trust as obligations based as opposed to property based, focussing on the obligations of the trustee rather than property "rights" held by beneficiaries. Sham trusts are considered and the cases cited above such as ***Snook***, ***Official Assignee v Wilson***, ***Shalson v Russo***, ***Esteem (Re Abacus)*** and ***A v A*** are considered. A particular point Mr Patterson deals with is whether for a sham can exist based on the intention of the settlor alone or whether the settlor and the trustee have to have a common intention for there to be a sham. Mr Patterson supports the common intention doctrine.

348. Protectors are considered in the article too. In a historical review of how trusts have developed Mr Patterson refers to "Appointors/Protectors" appearing in about the 1990s. The paragraph is:

> ***"Appointors/Protectors appear***
>
> *About this time too, increasing attention was given to the way offshore trust deeds were drafted for use in tax havens that did not have some of the more limiting rules that applied in most common law jurisdictions. Thus the term "protector" came into vogue. An interesting discussion of the development of the "protector" concept is found in an article by Professor Donovan Waters' "The Protector, New Wine in Old Bottles" in A J Oakley (ed) Trends in Contemporary Trust Law, Clarendon, Oxford 1996 pp63-122. In New Zealand the term "appointor" was usually used. This power was usually limited to appointment (and removal) of trustees and, if appropriate, beneficiaries. It was not usually a power given to trustees but rather to the settlor client in a separate and non-fiduciary capacity."*
>
> *(claimants' emphasis)*

349. It was put to Mr Patterson that here he was expressing the view that a protector's powers of appointment and removal of trustees and beneficiaries were non-fiduciary. His answer was that this was a mistake and that while removal of beneficiaries was not fiduciary, his view was that the power to remove trustees was fiduciary. I do not accept that answer. In my judgment this article, which seems to have been reviewed at the time by a professor, represented Mr Patterson's opinions. That view, that Protector's powers to appoint or remove trustees are not fiduciary is also consistent with Mr Patterson's opinion about the effect of the deeds in the OPK trust. The two are broadly contemporaneous.

*(f) no distributions to Mr Pugachev from the trusts before the freezing order*

350. In his second and third interlocutory witness statement at paragraphs 39 and 5 respectively, Mr Patterson said the following:

> *"39. Mr Roberts' assumption that the Trusts have been a significant, if not the principal or sole, source of income for Mr Pugachev for some time prior to the ex parte injunction being served is wrong. Prior to the granting of the ex parte injunction, no distributions had been made from any of the Trusts to Mr Pugachev.*
>
> *5. I now confirm that, prior to the granting of the ex parte injunction on 11 July 2014, no loans or distributions were made from any of the Trusts to [Mr Pugachev]."*

351. The claimants say this is wrong, relying on evidence which seems to show a transfer of $400,000 which ought to have been under the control of the Riviera Residence

Trust. The transfer was to be done by Mr Liechti and he was seeking Mr Pugachev's approval for it rather than the approval of Mr Patterson as trustee of the Rivera Residence Trust. The evidence is an email exchange on 14th July 2014 in which Mr Liechti seeks Mr Pugachev's approval and Mr Pugachev gives it. When it was put to Mr Patterson he agreed that it should have been referred to him but was not. He had never seen the email before and could not comment.

352. The claimants submitted that the email showed that Mr Patterson could not have made proper enquiries before making the statements in the passages quoted above but since the cross-examination did not connect this email to a point about those passages I am not prepared to drawn the inference.

*(g) Mr Pugachev exercising control via Ms Dozortseva*

353. In paragraph 50 of his second interlocutory witness statement Mr Patterson said:

> *"If Mr Roberts is seeking to suggest that, through Ms Dozortseva, Mr Pugachev controls the Trusts, that is a suggestion I wholly reject and it does not accord with my experience of operating the Trusts."*

354. The claimants say this evidence was wrong and misleading because Ms Dozortseva did control many aspects of the trusts and, save for formal administration which Mr Patterson did perform, before the freezing order the trust assets were all administered by Mr Liechti and Ms Dozortseva. The example relied on was litigation in the USA concerning a company called Delare LLC held ultimately by the Riviera Residence Trust and through which property in Massachusetts was held. Mr Patterson accepted that Ms Dozortseva was the source of his information about that and it was she who had a handle on what was happening.

355. More generally, the position of Ms Dozortseva was as co-director of three of the original trustee companies. It was clear that she was a significant source of information to Mr Patterson and that she (and Mr Liechti) did undertake much of the day to day management of the properties in the trusts.

356. It is clear today that Ms Dozortseva does Mr Pugachev's bidding and probably always has. But Mr Patterson's statement was made in early October 2014 and the cross-examination did not put to him that he knew it was wrong at the time. He said that at that stage he had no reason to doubt the provision of information from Ms Dozortseva. I reject this as a criticism of Mr Patterson as a witness.

*Conclusion on Mr Patterson as a witness*

357. For the reasons explained above, while some of the claimants' criticisms are not well founded, in important respects Mr Patterson's evidence in these proceedings has not been satisfactory. I am well aware of Mr Patterson's position as a professional person but regrettably I cannot always rely on what he says.

358. This is the end of the section addressing Mr Patterson as a witness but it does not complete the consideration of Mr Patterson's role more generally. I now turn to the fourth aspect of the case on sham – the establishment of the trusts.

*(iv) The establishment of the trusts*

359. The focus in this section is on the discussions which passed between Mr Patterson and Mr Pugachev's family office around the establishment of the trusts. The first trust to be set up was the London Residence Trust in late 2011. Earlier in that year Mr Pugachev had fled Russia. After that he would have had every reason to try to disguise his control of visible assets in order to shield them from potential claims.

360. At that time Mr Pugachev and Ms Tolstoy were living in Glebe Place with their two children. The property Old Battersea House was identified by Ms Tolstoy and Mr Pugachev. The law firm Jones Day were acting for the purchasers. When contracts were exchanged on 11 November 2011 the property was to be bought by a BVI company called Kudu Property Ltd. For reasons which are not known, it was decided to use a different "ownership vehicle" (Mr Patterson's words).

361. Mr Patterson became involved on 29th November 2011 when he received an email from David Henderson Stuart referring him to Pierre Lussato. Mr Henderson Stuart was the person who had been the director and shareholder of the OPK Trust Company. There was then a phone call from Pierre Lussato asking Mr Patterson about setting up a New Zealand trust to own real estate in London for Mr Pugachev and his family. Mr Patterson drafted the deed and set up Kea Trust Company Ltd to be the trustee. The OPK trust deed was the template.

362. His note of the phone call on 29th November records that "they" have a problem. I take it "they" refers to Mr Pugachev's family office in London. The completion is to be on 6th December and "they" will fund the purchase price on behalf of the trust. In a later note Mr Patterson records further details – there will be no settlor, just a declaration of trust. The trustee will be a private trust company with two directors – Mr Patterson and someone from the UK. The Protector will be Mr Pugachev or his son. The beneficiaries will be Mr Pugachev and lineal descendants. In another note dated 1st December Mr Patterson notes that Victor will pay for the property "on behalf of the trust".

363. Also dated 1st December 2011 is an advice letter from Patterson Hopkins to Pierre Lussato. It clearly accompanied a draft of the deed. The final draft must have changed a little after that but nothing turns on that. The principal features of the trust are described. The point is made that the First Protector is the "principal beneficiary" (i.e. Mr Pugachev). He is also described as the "principal client" in the letter. The various powers which can be exercised by the trustee with the consent of the Protector are noted as well as the other powers of the Protector, such as to add beneficiaries and remove the trustees. In relation to the Protector's power to remove trustees in clause 6, the letter states Mr Patterson thinks the provisions are relatively clear and do not need specific reference in the advice.

364. Various discussions took place involving Alice Conway at Jones Day, Mr Lussato and Mr Gurdjian at Galaxis and Mr Patterson about the way in which the property was to be held and the terms of the deed. The time difference between London and New Zealand can confuse the apparent timings but emails dated 1st and 2nd December show Mr Lussato asking and Mr Patterson answering some questions.

365. One particular matter which was discussed was about changing the trust deed. Mr Pugachev's representatives were asking about the ability to vary the deed. On its face the deed only gave the Protector power to veto variations initiated by the trustee. The exchange on 1st/2nd December is:

> *"Lussato: How easy is it to retroactively change the trust document in case we want to fine tune it later?*
>
> *Patterson: Very easy. Cl 13 gives a total power to rewrite the deed with Protector consent."*

366. Mr Patterson's answer there is consistent with the words of the deed although the tone might be said to imply something less restrictive. In cross-examination Mr Patterson emphasised the references to fine tuning (the expression is used more than once) and a reference to minor tweaks. His point was to suggest that this topic was only ever concerned with minor adjustments. I do not accept that. Mr Patterson's own words at the time, referring to "total power to rewrite the deed", do not support it. Whether it was the tone of the response or for another reason, Mr Lussato seems not to have understood the advice from Mr Patterson as being that Mr Pugachev's power to change the trust was qualified, as can be seen by emails on 6th December which are addressed below. Meanwhile, on 5th December Mr Patterson answered Jones Day's questions about the relationship between their clients (Mr Pugachev and Victor) and Kea Trust Company. His answer was that:

> *"On the trust it is a conventional family trust to own the house with both S & V (inter alia) as trust beneficiaries & with S then V as Protector with power to change the trustee, negative consent powers in relation to other acts of the trustees etc. "*

367. Also by that time the details of the trusts had been finalised. An email on 5th December identifies Ms Tolstoy as a beneficiary as well as the need for a right of residence. A revised draft of the deed was sent by Mr Patterson to Galaxis on 6th December and in his reply thanking Mr Patterson, Mr Gurdjian refers to the rewriting the deed ("We will revisit with SP to fine tune post closing of the acquisition"). The complete exchange is missing but after this Mr Lussato writes to Mr Patterson and Mr Patterson replies, as follows:

> *"Lussato: Hi just re-read this as well. As you explained Sergei can always decide to change this after the fact but at least we have a document that reflects his current desires. Thanks for all your assistance ...*
>
> *Patterson: Thanks. Pleased we got there. ..."*

368. So here Mr Lussato's expression of how the deed can be changed goes much further than Mr Patterson's answer on 1st/2nd December. It is clearly couched in terms of Mr Pugachev deciding to change the deed. Mr Patterson does not contradict him. Finally an email dated 6th December from Mr Lussato to Mr Pugachev prior to completion reflects Mr Lussato's understanding of the ability to alter the trust deed. He says this:

> *"Attached is the trust deed that reflects the conversation we had. You can change this document at anytime and Bill (the lawyer) tells us you can basically do anything you want later but this is a good basis for the trust. Please can you have a quick read through especially clause 4 and 5. Bill has signed the deed already so that you can complete the purchase tomorrow, let me know if you have comments on the attached documents, if not we will proceed on the current basis."*

369. In this passage "you" means Mr Pugachev.

370. From one point of view there is only a rather fine distinction between the way the clause is actually drafted (including the way Mr Patterson described it initially on 1st/2nd December) and the way the later statements are expressed. However it is a distinction which Mr Patterson is alive to and in my judgment he always has been.

371. Through Mr Roberts' evidence the claimants alleged that in reality the Protector had control over the assets under these trusts. In his witness statement for trial (at paragraph 136) Mr Patterson sought to answer these allegations by taking the point about the difference between control and only a negative veto. Mr Patterson's answer was to emphasise that the powers Mr Roberts was talking about were the powers of veto and that *"the whole basis of the negative consent system is that it is the trustees that make the decision not the Protector and this regime is quite common in foreign trusts*". (By "foreign trusts" I think Mr Patterson means trusts of the kind in this case which are, as far as New Zealand law is concerned New Zealand foreign trusts.) In the same paragraph Mr Patterson also said that *"even the power to dismiss trustees is fiduciary*".

372. The difference between the Protector having only the power to veto changes in the deeds initiated by the trustee and the Protector having the power to decide to change the deed is an important point and Mr Patterson would have known that. It is also clear that Mr Pugachev being able to change the deed was important to Mr Pugachev's lieutenants. Although there were more exchanges between Mr Patterson and Galaxis in this period, these passages about variation of the deed are not a trivial part of the overall communication. I do not accept the notion that Mr Patterson could have allowed his principal's representatives to gain a wrong impression of the effect of the deed or that he would leave Mr Lussato's wider statement uncorrected by accident.

373. Mr Patterson also sought to explain the exchanges on the basis that time was short and they were rushing the trust deed through. I accept that time was short and that the timing explains why the family office would be interested in making changes later but I do not accept that that justifies Mr Patterson not expressing himself in a different way or not correcting Mr Lussato, if Mr Patterson really thought Mr Lussato had a wrong impression.

*Finalising the London Residence Trust*

374. The purchase of Old Battersea House by Kea Trust Company was completed on 6th December 2011 and property was held on trust by that company ostensibly on the terms of the London Residence Trust deed.

*After the London Residence Trust was set up*

375. On 8th December 2011 Ms Tolstoy was sent a copy of the deed and she in turn sent a copy to the solicitors Schillings for advice. The advice was that there was not much protection for Ms Tolstoy or her children in this deed and that she would be beholden to Victor. In January 2012 Ms Tolstoy questioned Mr Lussato about the London Residence Trust. That was on two grounds, one that they would be beholden to Victor and the other was that Mr Pugachev's grandchildren were beneficiaries but Mr Pugachev had said that was not what he intended. Mr Lussato replied that the trusts can *"easily be amended and tweaked. That's the advantage, hence whatever Sergei wants we can do*". This is the origin of Mr Patterson's reference to the word "tweak" to support his assertion that the context of the discussion about varying the trust was only ever about minor tweaks. I have addressed it already.

376. In March 2012 Ms Tolstoy asked that she and her children be removed from the London Residence Trust. She said that was because as the trust structure stood her and her children's status as beneficiaries was meaningless so she would rather be removed. Mr Lussato's reply was that the only person able to do that is Mr Pugachev and only if he instructed them to do it then Mr Lussato would look into it.

377. This episode occurred at a time when the relationship between Ms Tolstoy and Mr Pugachev was poor. That no doubt partly explains why Ms Tolstoy was doing this. In any case Mr Lussato's reply is another indication of how the trusts were viewed by the family office. Mr Pugachev was in control.

378. In cross-examination Mr Patterson said he would not have acceded to instructions from Mr Pugachev to alter the deed to remove Ms Tolstoy as a beneficiary. The point was put as if the request came the day after the trust deed was declared but that does not matter. The claimants say his denial was implausible because a very similar thing actually did happen. In March 2012 Alexander Pugachev, who is Victor's brother and was named as a Discretionary Beneficiary in the London Residence Trust, was removed as a Discretionary Beneficiary. An instruction to take this step was sent to Mr Patterson from Mr Lussato by email on 23rd February 2012. The instructions told him that "the family" had decided that Alexander should be removed. On 2nd March Mr Patterson received an email directly from Mr Pugachev confirming that this was to occur. Mr Patterson acted on the instruction and Alexander was removed as Discretionary Beneficiary.

379. Mr Patterson accepted that he made no attempt to contact Alexander directly about any of this and had no information about Alexander's personal circumstances. He accepted that this was not an act initiated by the trustee. He suggested that it was not an example of Mr Pugachev simply ordering the removal because the email had referred to the family. I do not accept that distinction. In fact it appears that Alexander did want to be removed but Mr Patterson had no proper basis for thinking that at the time. This is a clear example of Mr Patterson simply doing Mr Pugachev's bidding and of Mr Pugachev being in control.

*Setting up the 2013 trusts*

380. There is not much to add concerning the setting up of the 2013 trusts. It is clear that the London Residence Trust deed was the blue print for those trusts and so everything

which applied to it applies to them. The first trusts set up in 2013 were the Kea Three Trust (over Glebe Place via Redflame) and the Riviera Residence Trust (over Sand Club via Topaze inter alia). Although the discussions had started in March 2013 nothing significant happened for a while until it became urgent in June and July. Ms Dozortseva prepared the first draft of the trust deed, which Mr Patterson described as cheeky. There is an email from Ms Dozortseva to Mr Patterson on 3rd July 2013 in which she writes "*I assume that if any changes are needed in the future, we will be able to amend the trust deed?*" There is no evidence Mr Patterson replied to that question but his answer would have been affirmative. I find that whatever Mr Patterson's state of mind was about Mr Pugachev's intentions concerning his ability to control the assets in the 2013 trusts, it was the same as for the 2011 London Residence Trust. There is no reason to draw a distinction between them from Mr Patterson's point of view.

*(v) The operation of the trusts*

381. The next aspect of the claimants' case concerns the operation of the trusts and the allegation that Mr Patterson did not behave as a normal trustee either at all, or at least until the worldwide freezing orders were made and he realised that the trusts were going to be scrutinised and the impression they might be shams needed to be dispelled.

382. The claimants submitted that the Trusts were administered on Mr Pugachev's instructions and for his benefit and argued that:

i) Mr Pugachev repeatedly gave instructions in relation to the management and administration of the Trusts' assets and even on the most minor matters;

ii) The individuals responsible for administering the Trusts' assets would not take any decisions without Mr Pugachev's approval;

iii) The assets were administered by Mr Liechti, Ms Semina and Ms Dozortseva from offices in London without reference to Mr Patterson;

iv) Mr Patterson's role was akin to that of a corporate services provider. He drafted resolutions and prepared formal documents but did not make decisions in relation to the Trusts' assets;

v) Although there was an effort made after the grant of the freezing order to involve Mr Patterson in decisions and to seek formal "trustee approval", in reality the Trusts continued to be administered from London by Mr Liechti and Ms Dozortseva, on instructions from Mr Pugachev. That was despite the Original Trustees' having received legal advice that Mr Pugachev was "under a disability" such that he was automatically disabled from acting as protector of the Trusts;

383. To support these arguments the claimants rely on a mass of detailed examples of the manner in which the Trusts were administered. I was taken to a few of these points but much of it was left for me to assess based on the written materials and that is what I have done.

*Trust and non-trust assets administered interchangeably*

384. The first proposition the claimants assert is that trust and non-trust assets were administered interchangeably. This is based on the following five points.

385. First, the allegation that the Trusts' assets were administered from London by the same people responsible for administering Mr Pugachev's non-trust assets. That is correct.

386. Second, it is said that Mr Liechti drew up "weekly lists" with issues relevant to the management of Mr Pugachev's properties. Old Battersea House, Glebe Place and the Sand Club Villa all continued to appear on these lists after they had been transferred into the Trusts, and the lists remained a mixture of trust and non-trust assets. These lists acted as agenda or reports for meetings with Mr Pugachev. This is all correct. However the claimants then assert that Mr Pugachev made all the decisions in relation to all of the properties on the lists, whether owned by the Trusts or not. That is much less clear. I do not accept any of this represents an ousting of the trustee's authority, particularly given that the Discretionary Beneficiaries were the Pugachev family and these houses were their present and future London home and holiday home.

387. Third, the claimants say that the Trusts' assets were administered by Mr Liechti, Ms Semina and Ms Dozortseva whether or not they had been authorised to do so by the trustee companies. Two examples are relied on but in neither case is there enough evidence to support the inference. There is evidence that in November 2013 Mr Liechti wanted a formal mandate for Oakhill in order to regularise his administration of the Sand Club Villa but there is no evidence that his administration of Sand Club was without the tacit authorisation of the trustee. The other example is very obscure. It may well be that a Ms Semina was given a formal power of attorney to act on behalf of Romy Finance in connection with Hediard Monaco which was granted by a Mr Thielen when it ought to have been by the trustee Finetree (as trustee of the Riviera Residence Trust) but the circumstances are not clear at all and this passage of Mr Roberts evidence (paragraphs 353 (a) to (l) contains a sub-paragraph at (a) in which his selective quotation from the document is unwarranted). I will not rely on this point.

388. Fourth, the claimants say that money was lent between trust and non-trust entities without any regard for the interests of the purported beneficiaries of the trust. But this is an overstatement. Three examples are given. First is a company called Channelwood (which belonged to Mr Pugachev and owned Lower Venn Farm) borrowing money from Redflame. The sum was £10,000 and it was clearly approved by Mr Liechti who was authorised in relation to sums less than £25,000, so this example does not amount to anything. The second is that Luxury Consulting paid expenses for Kea Trust Co. That was a £252 + VAT courier charge approved by Mr Liechti and proves even less than the first example. The third is that Kea paid £25,000 in May 2014 for expenses associated with Lower Venn Farm. This does not prove anything either since Lower Venn Farm was at that time the English country residence of the family (i.e. the Discretionary Beneficiaries).

389. Fifth, the claimants say that the assets of the Trusts were used interchangeably. They rely on three episodes. First the claimants say that US$5m was initially settled on the London Residence Trust but was transferred to the Wiltshire Residence Trust because

Mr Pugachev "*changed his mind*" after the money had been received into the Kea client account. This submission ignores the fact that Mr Patterson only allowed the change to take place because when the instructions changed the transfer of money into the first trust had not been perfected, because the deed of gift had not been finalised. So the alteration was possible. This does not prove that funds were improperly taken out of the first trust.

390.    The second episode the claimants rely on is that they say Kea loaned £20,000 to Bramerton to pay fees associated with the purchase of Doves House. This is right but since Doves House was to be the family's country house it does not amount to much. It is true that the defined classes of Discretionary Beneficiaries in the London Residence Trust and the Wiltshire Residence Trust are not identical but they amount to the same family and are sufficiently similar not to support an inference of the kind the claimants suggest without much better evidence. There is nothing obviously untoward about applying trust funds for the benefit of the mother of beneficiaries who are infant children even if the mother is not named as a beneficiary.

391.    The third episode is that "Doves House was to be purchased by raising a mortgage on Old Battersea House, despite the fact that the London Residence Trust and Wiltshire Residence Trust had different beneficiaries". I put that submission in quotes because it is unfair. The claimants know, but did not state there, that no such mortgage was arranged. It did not happen.

*Administration did not change after property put into trusts*

392.    The second proposition the claimants assert is that there are a large number of documents to show that Mr Pugachev's approach to administering his assets did not change after they were placed into the Trusts. This was based on three examples.

393.    The first example relied on relates to Old Battersea House. Since that property was never not held in a trust it does not really relate to the proposition relied on anyway. Nevertheless the point being made is about the refurbishment of Old Battersea House. It was a large project with a budget of £5 – 7m and that this represented a substantial investment in the trust asset. The submission is that the decision to approve this budget was taken by Mr Pugachev, not by Mr Patterson or Kea. It is said that Mr Patterson was contacted as an afterthought, once a lender had agreed in principle to provide financing. The amount of money involved is significant and so if this was a good point it might well support the claimants' case, but it is not. Mr Pugachev approved the budgets in about April 2012. At that time there was no relevant money in the London Residence Trust bank account. In other words Mr Pugachev was not approving the expenditure of trust money, he was approving a budget of money which he would no doubt have to put into the trust in the future to refurbish the property. The money did come in much later. No significant work could be done without planning permission, which was not given until shortly before the freezing order. After that no work was done.

394.    The claimants also say that Mr Pugachev also made more minor decisions in relation to the development of Old Battersea House including the floor plans; the installation of a swimming pool; the choice of a landscape gardener for the property; and the planning applications in relation to the property. I agree but since this was to be the

dwelling for his family, it does not amount to anything. The point is also made that Mr Pugachev was a signatory on the Kea client account. I have mentioned that above.

395. The second alleged example of administration not changing when the property went into the trusts is the Sand Club. The claimants contend that Mr Liechti arranged matters concerning the villa (including due diligence on the property's defects; transfer of funds from Sibarth's account to Topaze's account; etc). He sought and obtained Mr Pugachev's approval for these decisions, both before and after the property was transferred into the Riviera Residence Trust. This is true but since this was the family's holiday home it is not clear that it amounts to anything. The claimants emphasise two pieces of evidence as "particularly striking".

396. First the claimants submit that despite the St Barth's Villa structure being placed into the Riviera Residence Trust in August 2013, Mr Liechti—the person actually administering this asset—explained on 18 December 2013 that he did not *"know anything about"* its trustee, Finetree Company Limited. This submission highlights the problem of this approach to the evidence. The 18th December email from Mr Liechti is to Ms Dozortseva. It arises because he has been sent two invoices for Patterson Hopkins' fees, one for Bluering and one for Finetree. When he wrote that he did not "*know anything about either of these companies*" it was in the context of working out from which of the accounts he managed they should be paid. For all we know he knew what they were but did not know anything about how they should be paid. But it does not end there. Bluering is trustee of the Green Residence trust which had only been declared a few weeks before on 28th November 2013 so he may well not have known what that was. Finetree was the trustee of the Riviera Residence Trust but when that trust was declared the trustee company's name was Kea Trust Two Company. It was only changed to Finetree on 19th November 2013. So again for all we know Mr Liechti just did not recognise the name Finetree. The fact Mr Liechti could not be cross-examined is not the claimants' fault but this kind of submission does not inspire confidence.

397. The claimants' second "particularly striking" point is an email from Mr Patterson in March 2015 in which he wrote *"I am still not clear what Sand Club is or how it operates"*. The claimants note that the villa was the only income generating asset held within the trusts: it produced US$989,232.14 in 2013, US$863,017.85 in 2014 and US$1,089,428.57 in 2015. The figures are accurate but the reliance on the remark in March 2015 is misplaced. There is clear evidence that Mr Patterson and his office were told what Sand Club was and how it operated contemporaneously with the Riviera Residence Trust being set up. An ownership chart showing Topaze, Notting Hill, Sand Club SCI and the villa was provided by Ms Dozortseva in August 2013 and an email to Rosemary Wood in Patterson Hopkins' office from Ms Dozortseva also in August explains that payments are made through a managing company, Sibarth. No doubt in March 2015 Mr Patterson wanted to find out more but, as he explained in cross-examination when this was put to him, he did know how Sand Club operated but he wanted to get a better understanding. I accept his evidence, which is supported by the documents. This point has been unduly magnified by the claimants.

398. The third example relied on by the claimants relates to Glebe Place. Before August 2013 (when the trust was set up) decisions relating to domestic improvement works were referred to Mr Pugachev for approval. Funding was then provided by Victor or Mr Pugachev. The evidence does show that this pattern was intended to continue

after the transfer of Redflame into the Kea Three Trust. Ms Dozortseva informed Redflame's corporate services provider when the transfer into the trust was proposed that there were to be no changes at the operational level, the company (Redflame) would continue to hold the residential property and the current banking arrangements would continue. After the trust was declared there were no significant changes to the administration of Redflame and Glebe Place. Funding requests made to Mr Pugachev before the property was transferred were followed up after the transfer and Mr Pugachev continued to both fund the property and make decisions. As addressed above, Mr Pugachev was also authorised as the trustee's agent for the purpose of giving instructions to Redflame's corporate services provider Andco. So these points are well founded as far as they go, the context is that throughout this period the property was the main residence of the family, who were the Discretionary Beneficiaries.

399. The claimants add to this point the following "*Significantly, Ms Tolstoy and the Infant Children were periodically evicted from Glebe Place by Mr Pugachev – an indication of his control over the property. This happened without reference to anyone else, least of all Mr Patterson.*" This is a bad point. As far as I am aware the evictions referred to were in March 2012 and May 2016. The first is before Glebe Place was in trust and the second is after Mr Patterson ceased to be involved and the New Trustees were in control. After the draft judgment was provided to the parties the claimants referred to a document at C4/1457 which they contended indicates Ms Tolstoy was evicted in August 2013. That is another bad point. At that time Ms Tolstoy had separated from Mr Pugachev and was not living in Glebe Place at all, she was living with her parents in Oxfordshire.

400. For the Wiltshire Residence Trust and the Green Residence Trust the claimants have little to say. As to the former, they submit that instructions were given by Ms Semina to Mr Liechti to place the funds in the Bramerton client account on treasury deposit. This is no doubt correct but it is not a substantial point. As to the latter, there is no documentation relating to the management of these properties for the period before or after the Trust was established. No doubt the administration did not change and most likely it was undertaken via Ms Dozortseva but there is just no evidence to place weight on.

*Mr Patterson's involvement was limited to formalities*

401. The claimants' third proposition is that Mr Patterson was only involved in the administration of the Trusts when formal documents were required. One example, which I have addressed already and does support the claimants case is the removal of Alexander. The claimants fairly contend that one can infer Mr Patterson's job was to draw up the deed of removal not to participate in a decision by the Kea directors. More generally it is clear Mr Patterson did not meet any of the Discretionary Beneficiaries, save he had a very short meeting with Mr Pugachev personally. However the general submission is falsified by the evidence that Mr Patterson was not only involved in formalities. The examples I will mention are that he arranged in 2012 for accounts to drawn up for the London Residence Trust, that he was sent lists of invoices paid by Mr Liechti and that when asked to prepare memorandums dealing with the appointment and authorisation of Oakhill by the London Residence Trust, Mr Patterson did not simply draw up resolutions but went back to Mr Liechti with questions seeking more information, which was provided.

402. Related to this third proposition is the submission that the types of document that one would expect to find in a discretionary trust which was properly administered by the trustees are absent:

i) There was an argument about the "minute book" for each trust referred to in the deed. The claimant said no such book had been produced but Mr Patterson explained the minute book in each case was a folder which he did have but which the disclosure exercise seemed to have taken apart. He did not agree there was no minute book. I accept that.

ii) The claimants contend there was no due diligence before the (ultimately aborted) acquisition of Doves House or before the acceptance of the St Barth's Villa or Gorki Property or US or Swiss real estate into the relevant trusts. The argument as I understand it is based on treating these trusts as "pilot trusts" – in other words as being declared over NZ$10 - and then suggesting that the trustees needed to turn their minds to whether any further transfers in should be accepted. That is unreal. Although formally these trusts were declared over $10, in substance these trusts were set up to receive the property they did.

*Mr Pugachev referred to as beneficial owner after transfer into the trusts*

403. The claimants' fourth proposition was that Mr Pugachev continued to be referred to as the beneficial owner of assets after they had been transferred into the Trusts. Three pieces of evidence are given.

404. On 29 June 2012 Mr Pugachev signed Kea Trust Company's application to Bank of Singapore as the beneficial owner of Kea. Of course Kea was then the trustee of the London Residence Trust and the shareholders were Mr Patterson and Mr Hopkins. The claimants' point is a good one.

405. In November 2012 Mr Liechti drew up a *"companies list"* in which he described each of Redflame, Channelwood, and Kea Trust Company as "*SPV holding company for residential property*". SPV means Special Purpose Vehicle as opposed to SVP which means Sergei Viktorovich Pugachev. At that time Redflame and Channelwood were not in trust whereas of course Kea was trustee of the London Residence Trust. The claimants suggested Mr Liechti drew up a similar document in April 2013 in which he listed Old Battersea House in a "*list of assets owned by SVP*". This is the document mentioned before which was in fact a memo addressed to Mr Liechti from the organisation called "The Private Office". The information in it seems to have come from Galaxis. The November 2012 list and the April 2013 memo corroborate one another in showing that Mr Pugachev's lieutenants, including Galaxis which had been involved in setting up the London Residence Trust over Old Battersea House and Mr Liechti, who was at that time still a director of the trustee for that trust, regarded Old Battersea House as owned by Mr Pugachev.

406. The third piece of evidence consists of instances in which Mr Pugachev was referred to as "UBO" or the "owner" of what was in fact trust property. One instance has been addressed already in which Mr Patterson used the term UBO. The others are by Mr Liechti but they are small stuff. One instance relied on was an email about Sand Club in January 2013, which is before the Riviera Residence Trust was set up, although the others are all at a time or context in which the asset was or was to be in trust.

*Operation of the trusts - conclusion*

407. The claimants' fifth and final proposition relating to the operation of the trusts was about the loans to Mr Pugachev made after the freezing order. I will address that separately and so this completes the review of the major arguments about the operation of the trusts. Despite its length this has not covered every point taken but it is sufficient to comprehend the substance of the matter. I am not satisfied that the evidence about the manner in which the trusts were run itself lends weight to an inference that the trusts were shams. As the defendants submitted, these trusts are concerned mostly with residential property held so as to be used by the family of Mr Pugachev and Ms Tolstoy. Ostensibly that is what they were for and the evidence about how they were run is consistent with that. The trusts hold some other assets but the evidence about them is poor. The claimants' best point on administration concerns the removal of Alexander as a Discretionary Beneficiary. I have addressed it already.

408. Overall however while the operation of the trusts is consistent with their being genuine discretionary trusts for the class of Discretionary Beneficiaries as a whole, it does not allow one to distinguish between that and Mr Pugachev retaining beneficial control of the underlying assets.

409. There is evidence which shows instances in which each of Mr Pugachev himself, Mr Patterson and Mr Liechti have used language in a way which describes Mr Pugachev as the real owner of the assets. That is a different point from the operation of the trusts.

*(vi) The loans and the appointment of the New Trustees*

410. The claimants say that following service of the freezing order an effort was made to refer more decisions to Mr Patterson so that the administration of the trusts' assets appeared to be a matter for the trustees. There are more documents of that kind for the period after the freezing order but it is not surprising in the circumstances. It is just as consistent with an inference that administration had been lax before.

*The loans*

411. What did happen after the first freezing order was that the trusts made a series of payments to Mr Pugachev as loans, ostensibly for the payment of his living expenses and legal fees. They were unsecured and interest free. Kea Trust Company lent about £3 million to Mr Pugachev over a period of just three months. Kea also lent £682k to Redflame. All this money had been transferred to Kea for the renovation of Old Battersea House. The effect of lending the money to Mr Pugachev / Redflame was that there was no way for Kea to fund the renovations needed at the property and the trust was left with a wasting asset.

412. Mr Patterson's evidence is that these loans were in the best interests of the beneficiaries as a whole. His understanding was that Mr Pugachev had no other sources of income. The claimants scoff at this and knowing what I know now it is manifest that there are other sources of finance available to be applied for Mr Pugachev's benefit. However the claimants did not establish with Mr Patterson that his view was unreasonable at the time. By then the trusts were taking advice from

experienced solicitors and leading counsel as a resolution of the directors of Kea Three Trust Co (as trustee of both the London Residence Trust and Kea Three Trust) records.

413. It is true that there is no record of the trustee expressly considering the interests of the other Discretionary Beneficiaries. The claimants submitted that an unsecured loan repayable only if Mr Pugachev succeeded in his complex legal disputes (about which the trustees do not appear to have received any advice) was not in the best interests of the beneficiaries other than Mr Pugachev himself. However Mr Patterson's testimony on this was to the contrary. He said: "the whole point of this was that if Mr Pugachev succeeded in his defence of the claims or his applications, the beneficiaries were automatically going to benefit as a consequence" and "As I saw it, Mr Pugachev had no other source of funds to fight the legal battle that he was involved in, and certainly at the time of making the decision, I believe, I still believe, it was a proper decision for the trustees to make." While I have criticised Mr Patterson as a witness, I cannot see a reason to reject this evidence as other than reflecting what Mr Patterson genuinely thought at the time.

414. The claimants make a valid point that at this stage Victor was not consulted even though Mr Patterson had been advised that Mr Pugachev was Under a Disability. His answer in cross-examination was that it never occurred to him. That is probably true because if he had considered it I do not believe he would have thought Victor would do anything other than consent.

415. The loans are in fact in various currencies and purport to be for legal expenses in various jurisdictions but are not well explained. There are also minor inconsistencies in the documents (some figures are stated as "monthly" when they appear to be one off payments).

416. So while it is striking that the loans represent large sums of money draining out of the trusts in favour of a single Discretionary Beneficiary, the evidence about them does not add to the claimants' case on sham.

*The replacement of the trustees*

417. There is a letter dated 2nd February 2015 from Kea Trust Company to Mr Pugachev. In it the trust company points out that by that time four loans had been made to Mr Pugachev without security. Mr Pugachev had sought a fifth loan but in the letter the trustee asks for security to secure all the loans. The signature on the letter is that of Ms Dozortseva. The claimants say it was written that way to bolster the idea that Ms Dozortseva was independent of Mr Pugachev. It is the only evidence I have seen which suggests any kind of independence by Ms Dozortseva. I do not accept that it shows she was genuinely independent.

418. In June 2015, acting on advice, Mr Patterson refused to sanction a payment of funds for Glebe Place. This seems to have led to Mr Pugachev's request for information from the trustees which kicked off the change in trustees. What then happened is set out above as it was explained by Mr Patterson to Heath J in his evidence to the New Zealand court. Ms Dozortseva was removed as director on 14th July 2015. She had been a director of Kea Trust Co since February 2014 when she replaced Mr Liechti, and of Bramerton and Bluering since incorporation. So the only trust company she

was not a director of was Finetree (the Riviera Residence Trust). Mr Smit and Mr Lenihan were approached to act as director of new trustees and on 21st July they met Ms Dozortseva and signed the relevant paperwork. The new trustees were incorporated on 24th July.

419. The claimants submit the new trustees have acted for Mr Pugachev's benefit. I agree. The three points are as follows. On 27th July the new trustee of the London Residence Trust Maru entered into a funding agreement with Mr Pugachev to lend him $800,000 to fund his BIT claim in return for a stake in the proceeds, In May 2016 they sought to take £2.7 million out of the trusts' bank accounts but were prevented by a freezing order. After than Mr Smitand Mr Lenihan resigned. In July 2016 they sought to evict Ms Tolstoy from Glebe Place and sell Old Battersea House but again were prevented by an injunction.

420. Clearly by the first half of 2015 and especially by June/July Mr Patterson was standing up to Mr Pugachev. But by then he was well aware that his conduct would be under scrutiny and he was taking advice. Removing Ms Dozortseva does not demonstrate that there was no sham.

421. The episode as a whole, including the conduct of the new trustees, supports a number of aspects of the claimants' case. It shows that Mr Pugachev regarded himself as being in control and so, when there was resistance from Mr Patterson, the trustee companies of which he was director and shareholder were removed. As soon as Mr Pugachev perceived resistance from the trustees, he (and Victor) exercised the Protector's powers.

*Considering sham as a whole*

422. I draw the following conclusions.

423. First, there is no need to consider the deeds separately.

424. Second concerning Mr Pugachev: I find that at all material times he regarded all the assets in these trusts as belonging to him and intended to retain ultimate control. The point of the trusts was not to cede control of his assets to someone else, it was to hide his control of them. In other words Mr Pugachev intended to use the trusts as a pretence to mislead other people, by creating the appearance that the property did not belong to him when really it did. The role of Protector was the means by which control was to be exercised. The position of Victor as a potential Protector was part of the pretence. Victor was acting on his father's instructions.

425. Mr Pugachev's family by Ms Tolstoy would benefit from the use of the assets in the trusts but that would only be on his say so. It would be just the same as a situation in which Mr Pugachev was in control and that control was not hidden. It was no part of Mr Pugachev's purpose to divest control in favour of the family as distinct from himself. Quite the opposite.

426. Third, as for the trustees, the claimants argue that since Mr Pugachev had a nominee on the board of three of the four trustee companies, his intentions should be imputed to those trustees. The nominee was either Ms Dozortseva or, for a time for one company, it was Mr Liechti. I agree those individuals took their instructions from Mr

Pugachev at all times. As directors of those companies they were his nominees. But I do not accept that those individuals are to be found as the directing mind or will of those trustee companies for all the relevant purposes. For day to day administration that may well be so, but when it came to major decisions, Mr Patterson was clearly involved too (I have not forgotten Ms Hopkins). I find that for major decisions Mr Patterson would have played a part in directing the trustee companies. For that purpose he was part of the directing mind and will of each of the trustee companies.

427. In his cross-examination Mr Patterson said that he was not in a position to comment on Mr Pugachev's intentions. In one sense that is true of any human being but when an experienced lawyer is being asked to draw up a trust deed it is rather odd for them to disavow knowledge of the settlor's actual intentions.

428. When it was put to him that keeping control of the assets was clearly what Mr Pugachev intended from the outset, Mr Patterson said he could not express a view and it seemed to him to be a matter of submission. When it was put to him that Mr Patterson went along with what Mr Pugachev intended, Mr Patterson denied this (in the sense that he denied going along with Mr Pugachev intending to retain control) and said that "*in treating Mr Pugachev as settlor, the intention of the settlor was to place the property in trust … And so on my understanding of a trustee's role in this case, paying close attention to the settlor's intentions is entirely appropriate.*" Since Mr Patterson disavowed knowledge of Mr Pugachev's actual intentions, the point he was making was in effect that he was entitled to assume that Mr Pugachev intended to place the property in trust. That is fine up to a point, after all Mr Patterson was instructed to set up a trust. All the same his clear evidence was that he did not know what Mr Pugachev's actual intentions were.

429. In re-examination Mr Patterson was asked about his own intentions. He said that he had no intention that Mr Pugachev would have complete control over the assets in the trust, that he would not have regarded Mr Pugachev as the absolute owner and that it was never his intention to relinquish control over the trust to Mr Pugachev. I have given this a lot of thought. I do not accept that evidence. It does not sit comfortably with other evidence such as Mr Patterson's reference to Mr Pugachev as the UBO, nor with his approach to the removal of Alexander, nor with his opinion about the effect of the OPK trust deed, nor with the totality of his email exchanges about Mr Pugachev's ability to alter the trust deed.

430. If these really were Mr Patterson's intentions at the time then it is striking that there is no evidence he expressed them to Mr Pugachev directly or indirectly through his lieutenants. Nor does Mr Patterson suggest he ever told Mr Pugachev directly or indirectly that any of Mr Pugachev's powers as Protector, such as to remove trustees, were fiduciary and therefore fettered in some way.

431. Furthermore, although in his witness statement for this case at paragraph 136 (quoted above) Mr Patterson asserts that the Protector's power to remove trustees is fiduciary, his thinking on this seems to have evolved over time (compare the trusts law article in 2009 and also what seems to have been a conditional basis on which the point was put to Heath J in New Zealand in 2015).

432. This case is nothing like ***Midland Bank v Wyatt***. Plainly it would be absurd to say that Mr Patterson gave no thought to the contents of the document and it would be

absurd to say that Mr Patterson signed the deed (as director of the trustee) not knowing or caring what he was signing. Mr Patterson knew very well what he was signing. He drafted it.

433. Mr Patterson himself said in his witness statement that he was concerned by the sham claim because in order for the claim to be made out "*the claimants would have to show that the trustees, which at the time of formation of the Trusts I was a Director of, were participants in the sham and had the requisite shamming intention. For the reasons set out in this statement, the Trusts were not shams.*"

434. The claimants' case is that Mr Patterson had no intention independent of Mr Pugachev. In my judgment that is the true and fair way of looking at it. Mr Patterson is an experienced professional. For a person in Mr Patterson's position, the obvious inference from the circumstances as a whole was that Mr Pugachev's intentions were what I have found them to be, including in particular that they were a pretence to disguise control, that Victor was part of the pretence and that control was to be maintained via the role of Protector.

435. Mr Patterson says he did not know what Mr Pugachev's intentions actually were. That may be so, but I do not accept that Mr Patterson did in fact infer that Mr Pugachev wanted to relinquish control. If Mr Patterson had wanted to find out what the settlor's actual intentions were, he could have asked, but he did not. Mr Patterson did nothing to suggest to Mr Pugachev's team that the new deed might not have the effect of leaving Mr Pugachev in ultimate control as Protector. If he had raised it then I am sure there would have been a negative reaction. If he had turned his mind to raising it, then Mr Patterson would have realised that that is what would be likely to happen. The best that can be said is that Mr Patterson prepared and signed these deeds entirely recklessly as to the settlor's true intentions. His involvement directing the trustee cannot add anything to the involvement of Mr Liechti and Ms Dozortseva, who were not independent of Mr Pugachev either.

436. Given Mr Pugachev's true intentions, the finding on the True Effect of the Trusts claim means that these trusts are not shams. They fulfil Mr Pugachev's true intention not to lose control. That is not surprising. For example it means that the terms of the opinion Mr Patterson gave for the OPK trust deed which was used as a template also applies to these trust deeds in just the same way. In other words – while the trustees of these deeds are properly appointed as trustees, effective control of the actions of the trustees is held by the Protector through the Protector's powers. In this respect the Protector has ultimate control of the trusts.

437. However if a proper approach to the construction of these deeds was to lead to a conclusion that the Protector's relevant powers are fiduciary, as Mr Patterson now says they are, and that in turn was to lead to a conclusion that under the deeds Mr Pugachev is not the beneficial owner, then those deeds are a sham. The settlor intended to use them to create a false impression as to his true intentions and the trustees went along with that intention recklessly.

*Sham and the true effect of the trusts*

438. The situation in this case reminds me of a similar phenomenon in patent law known as the Angora cat problem first identified by Professor Franzosi, an eminent academic

expert in the field. It was described by Jacob LJ in the Court of Appeal in ***European Central Bank v Document Security Systems*** [2008] EWCA Civ 192 at paragraph 5. In some circumstances a patentee can argue for a narrow interpretation of a document while defending it in one context but then argue for a different wide interpretation when asserting it in another context. Jacob LJ explained that:

> *"Professor Mario Franzosi likens a patentee to an Angora cat. When validity is challenged, the patentee says his patent is very small: the cat with its fur smoothed down, cuddly and sleepy. But when the patentee goes on the attack, the fur bristles, the cat is twice the size with teeth bared and eyes ablaze."*

439. This vice, that the same patent document can be presented in radically different ways in different circumstances to suit the owner's needs is not unique to patents. Both constructions may be arguable and so the canny professional who drafted the document can even salve their conscience by presenting two inconsistent but arguable interpretations on different occasions.

440. The problem can apply to any written instrument and this case provides another example in a different context. When the validity or effect of the trust is challenged, the trustee can put forward emollient submissions about Protector's powers being confined and narrow as a result of their fiduciary nature. That has happened in these proceedings. But in other circumstances, for example when Mr Pugachev needs collateral for a bank loan, a completely different stance can be taken in relation to the very same instrument. Mr Pugachev can be presented as the owner of the trust assets. This latter event has happened too. A concrete example was in April 2013, when a bank asked for collateral for a loan, Mr Pugachev's family office presented a trust asset (Old Battersea House) as an asset owned by Mr Pugachev. It might have been a slip by Mr Liechti but I do not believe so. If the bank needed persuading, a formal opinion could even be written for these trust deeds in just the same terms as the one Mr Patterson prepared for the OPK deed. The fact the loan did not go ahead is not the point.

441. I do not believe this characteristic of the deeds in this case is accidental. Whether "sham" is a perfect description is not clear but it does not matter. This is not a case in which, contrary to what an ordinary looking trust deed with just a settlor and a trustee may state in words, the whole scheme always was in truth that the settlor would exercise covert control of the trustee and both settlor and trustee always intended that that would be so. In that sort of case the word sham accurately describes the trust deed.

442. However whatever label is to be applied to this case, in my judgment the combination of circumstances here means that the court should not give an effect to these instruments that would result in the assets being regarded as outside Mr Pugachev's ultimate control. The whole scheme was set up to facilitate a pretence about ownership (or rather its absence) should the need arise.

*The s423 claim*

443. Given the findings on the previous claims, it is not necessary to look into the s423 claim in any detail. I will focus only on the question of purpose under s423. The

principles are summarised in ***JSC BTA Bank v Ablyazov*** [2016] EWHC 3071. I take them to be as follows. The burden is on the claimants. The focus is on Mr Pugachev's purpose at the time of the transactions. The purpose must be established for each transaction. The real and substantial purpose must have been to defeat the creditors. That result merely being a by-product is not enough. If the transaction is one which the debtor would have entered into in any event, the court should not too readily conclude that he also had the purpose of defeating his creditors. The purpose cannot be inferred from the simple fact of the transaction and the question is whether the individual actually did have the purpose required, not whether a reasonable person would have. Purpose is not the same as result.

444.    I would have found that for each of the trusts Mr Pugachev's purpose in setting it up and each of the transfers of assets in (either himself or by his nominee Victor) satisfied the test in section 423. That is because even if the deeds do in fact divest Mr Pugachev of control, his intention always was to use the trusts as a pretence to mislead other people, by creating the appearance that the property did not belong to him when really it did. Even if his purpose failed in the sense that he actually did divest himself of control, he always intended to use the trusts to hide whatever control he had. The people he intended to hide his control from were persons who might make a claim against him in future.

445.    The discussions about asset protection with GPW & Co in December 2012 firmly support this conclusion. That date is before all of the 2013 trusts.

446.    A further factor applicable to three of the 2013 trusts and the transfers into them is that the assets were already controlled by Mr Pugachev. The obvious reason for the change in control was the increasing pressure on Mr Pugachev in Russia and the heightened risk of his being sued. That applies to the Kea Three Trust concerning Glebe Place via Redflame, the Riviera Residence Trust concerning Sand Club via Topaze and other property via Romy Finance, and the Green Residence Trust concerning Gorki 10 via Lenux. It does not apply to the Wiltshire Residence Trust because that was to be for a new property but that trust uses the same essential structure as the other 2013 trusts and will have been set up that way for the same purpose.

447.    The defendants' best case is the London Residence Trust, set up in December 2011. That took place a year before the tell-tale discussion with GPW & Co, but even at that stage it will have been quite obvious to Mr Pugachev that he was likely to be pursued outside Russia and his assets were at risk. Some of his major Russian assets had already been lost to the Russian state by then. Criminal investigations had been started in Russia and he had fled to England in January 2011. There is some evidence to support the idea that the notion of a civil court claim against Mr Pugachev personally did not become a likelihood until years later but even if that is right, in my judgment Mr Pugachev was always aware of the risk that assets associated with him were vulnerable. Mezhprom Bank was in liquidation. Old Battersea House was valuable and visible. Mr Pugachev was not trying to hide the asset; he was trying to hide his control of it while it was used as a family home.

448.    I do not need to grapple with the other issues under s423, including the defendants' arguments about the claimants' position as a victim and the issues about relief.

*Relief*

449. The claimants submitted that the proper orders to make following these findings are declarations and an order that the trust assets be transferred to the claimants or to a receiver. I am satisfied I should make appropriate declarations but the question of what other relief to grant is not straightforward.

450. It is not clear to me whether the basis on which the court is being asked to transfer trust assets directly to the claimants is the recognition of the insolvency process or the enforcement of the Russian judgment against Mr Pugachev in the Article 14 claim. Furthermore, after the trial had concluded I was told that the Moscow Commercial Court had postponed the hearing of an appeal (or application) filed by Mr Pugachev seeking to overturn the judgment against him in the Article 14 claim for RUR 76bn. I have not heard the parties about what the effect of that is, if anything.

451. One thing is clear. I will not make findings of fact about what Mr Pugachev may or may not have done in Russia in relation to Mezhprom Bank. If any relief sought requires the court to make such findings then that relief should not be granted because it is not possible to do that based on Mr Roberts' evidence.

452. I will hear the parties as to the correct orders to be made following the findings in this judgment. The freezing order(s) will remain in place in the meantime.

***<u>Summary of conclusions</u>***

453. Mr Pugachev is the settlor of all the trusts. All the assets in the trusts were his beneficially before they were transferred. That includes the assets transferred in Victor Pugachev's name. Victor was acting as Mr Pugachev's nominee.

454. None of the Protector's powers in the trust deeds in this case are fiduciary in nature. They are purely personal powers which may be exercised selfishly.

455. When Mr Pugachev is Protector (and to the extent Mr Pugachev is under a disability, when Victor is Protector) the true effect of all the trust deeds in this case, properly construed, is to leave Mr Pugachev in control of the trust assets. Mr Pugachev is the beneficial owner. They amount to a bare trust for Mr Pugachev.

456. Mr Pugachev's intention in setting up all five trusts was to retain control of the assets but use them as a pretence to mislead third parties by hiding his control. No other natural person involved in setting up the trusts (neither Mr Liechti, Ms Dozortseva, Ms Hopkins nor Mr Patterson) had an intention independent of Mr Pugachev's. Accordingly if the interpretation of the true effect of the deeds is wrong, such that they would have the effect in law of divesting Mr Pugachev of his beneficial ownership of the trust assets, then they are shams and should not be given effect to.



[2020] UKPC 22
**Privy Council Appeal No 0013 of 2019**

# JUDGMENT

# Webb (Appellant) *v* Webb (Respondent) (Cook Islands)

## From the Court of Appeal of the Cook Islands

**before**

**Lord Wilson**
**Lord Carnwath**
**Lady Black**
**Lord Briggs**
**Lord Kitchin**

## JUDGMENT GIVEN ON

## 3 August 2020

**Heard on 20 and 21 January 2020**

| *Appellant* | *Respondent* |
| --- | --- |
| Sean Owen McAnally | Isaac Hikaka<br>Tim Mullins<br>Benjamin Marshall<br>Laura Clews |
| (Instructed by Keegan Alexander Barristers & Solicitors) | (Instructed by Little & Matysik PC) |

**LORD KITCHIN: (with whom Lord Carnwath, Lady Black and Lord Briggs agree)**

*Introduction*

1. This is an appeal in a dispute between spouses about the matrimonial property available for division between them after their relationship has come to an end. It raises many issues concerning the relevance of a tax debt incurred by the husband in New Zealand and whether it is enforceable in the Cook Islands, the validity of two trusts established by the husband and which hold assets said by the wife to be matrimonial property, and the approach to be taken to the assessment and valuation of matrimonial property where a financially dominant spouse fails to disclose relevant documents and information.

2. The appellant, Mr Webb, and the respondent, Mrs Webb, were married in New Zealand on 2 December 2005 and made their home there. They are both New Zealand citizens. They have a daughter, Bethany, who was born on 4 December 2006. Mr Webb also has a son, Sebastian, from a previous marriage. Sebastian was about three years old when Mr and Mrs Webb married.

3. Mr Webb is an entrepreneur who has managed his business affairs and assets through a complex structure of companies and trusts. His ventures have not always been successful. He was declared bankrupt on 26 July 2000 and discharged a few years later. Nevertheless, for the first nine years of their marriage, Mr and Mrs Webb enjoyed a relatively high standard of living which was apparently funded by Mr Webb's business activities. One of Mr Webb's business associates was Mr Andrew Tauber and together they operated through a group of companies called the Honk Group and an associated trust called the Honk Land Trust.

4. Shortly after Mr and Mrs Webb were married, Mr Webb established a family trust, the Arorangi Trust, for the purpose of acquiring land in the Arorangi area of Rarotonga in the Cook Islands and other assets in that jurisdiction. As settlor, he appointed himself as trustee and nominated himself and Sebastian as beneficiaries. In February 2006, the Arorangi Trust acquired a leasehold interest in a property in Arorangi known as the Arorangi Property. Later that year the Arorangi Trust acquired an interest in an adjacent property and Mr Tauber was appointed as another trustee and his children were added as beneficiaries. Yet further property has since been acquired by the Arorangi Trust, including an interest in a property known as the Terepai Arihii Property.

5.      In August 2013 Mr and Mrs Webb and Bethany moved from New Zealand to the Cook Islands, where they lived in the Arorangi Property. By this time the relationship between Mr Webb and Mr Tauber had soured. In 2014 Mr Tauber retired from his position as trustee of the Arorangi Trust and his children were removed as beneficiaries. One of the Arorangi Trust properties (though not the Arorangi Property or the interest in the Terepai Arihii Property) was sold and the proceeds were paid to the Honk Land Trust.

6.      Meanwhile, in 2011 the New Zealand Inland Revenue Department (the IRD) began an investigation into Mr Webb's business affairs. It focused on payments made to him by the Honk Group over many years and it led to the issuance of default assessments, including shortfall penalties, by the Commissioner of Inland Revenue for the 2001-2009 tax years. A challenge by Mr Webb to those assessments was rejected by the Taxation Review Authority by decision dated 7 October 2016. As of 15 September 2017, the sum of income tax, penalties and interest which remained unpaid was in excess of NZ$ 26m.

7.      Mr and Mrs Webb separated in April 2016. Mrs Webb and Bethany continued to live in the Arorangi Property. Mr Webb returned to New Zealand with Sebastian and there he began a relationship with a Ms Brenda Dixon. Mr Webb thereupon arranged for the establishment of a new trust, the Webb Family Trust, and he and Ms Dixon were appointed as trustees. The settlor was a Mr Leslie Ellison. Mr Webb, Sebastian and Bethany were named as beneficiaries. Mr Webb also arranged for the Arorangi Trust to transfer some of its assets to this new trust for a nominal consideration.

8.      In May 2016 Mrs Webb issued these proceedings in the High Court of the Cook Islands for matrimonial property orders pursuant to sections 23 and 25 of the Matrimonial Property Act 1976 of New Zealand as that Act applies in the Cook Islands by virtue of the Matrimonial Property Act 1991-92. I will refer to the Act as incorporated into Cook Islands law as the 1976 Act. Various amendments have since been made to the New Zealand Act, which is now called the Property (Relationships) Act 1976 (NZ) but these have not been adopted in the Cook Islands. I will refer to the New Zealand Act as the 1976 Act (NZ).

9.      The basis of Mrs Webb's application was that her relationship with Mr Webb had progressively deteriorated, that they were irreconcilable and that they had been unable to agree upon a division of the matrimonial property.

*The decisions of the courts below*

10.     The proceedings came on for hearing before Potter J in May 2017. Mrs Webb contended that the Arorangi Trust and the Webb Family Trust were invalid because,

among other deficiencies, they lacked the irreducible core of obligations necessary for a trust to exist; they were shams; and the settlor of each trust did not intend to relinquish control of the beneficial interest in the trust property. She also argued that the assets available for division under the 1976 Act comprised, among other things: the leasehold interest in the Arorangi Property; the interest in the Terepai Arihii Property; moneys in bank accounts in the name of the Arorangi Trust; and shares in companies called Solar 3000 Ltd, Fleet Lease Ltd, and Kuru Investments Ltd.

11.    Mr Webb took issue with most of Mrs Webb's case. He argued, among other things, that the Arorangi Property, the interest in the Terepai Arihii Property and various other assets were all the property of the Arorangi Trust, and that the shares in Solar 3000 Ltd, Fleet Lease Ltd, and Kuru Investments Ltd were all held by the Webb Family Trust and, in the case of the shares in Kuru Investments Ltd, were acquired after the parties' separation. He also argued that if any of this property was matrimonial property in his hands then the value of such property available for division would necessarily be reduced, indeed wholly extinguished, by his unsecured personal debts including his debt to the IRD. This last contention was vigorously opposed by Mrs Webb on the basis that Mr Webb's debt to the IRD was not one that could be enforced in the Cook Islands and so did not constitute a debt owed by Mr Webb within the meaning of the 1976 Act. For that reason, she submitted, the debt to the IRD should not be brought into account.

12.    Mr and Mrs Webb gave evidence at the hearing before Potter J. Mr Webb's evidence was directed at, among other things, the dealings and administration of the Arorangi Trust and the Webb Family Trust, and the relationship of these trusts to his personal business ventures and activities. Potter J gave her judgment on 23 August 2017. She found Mrs Webb to be an honest witness who gave her evidence carefully but had little knowledge or understanding of Mr Webb's business affairs or the operation of the trusts. Mr Webb's evidence, by contrast, was vague, evasive, at times contradictory and generally unreliable. Moreover, the documentary evidence as to the administration of the trusts contained what the judge described as disappointing gaps.

13.    Nevertheless, Potter J dismissed the claim. She rejected Mrs Webb's attacks on the Arorangi Trust and the Webb Family Trust and found them to be valid. She went on to consider Mr Webb's assets. She found that there was a real likelihood that Mr Webb would have to pay the debts he owed to the IRD, and that they constituted personal debts which had to be brought into account and which, even if the trusts had been invalid, would have exhausted any matrimonial property, leaving nothing available for division.

14.    An appeal by Mrs Webb to the Court of Appeal came on for hearing before Fisher, White and Grice JJA in November 2017. In a judgment of the court, given on 24 November 2017, the appeal was allowed. The court held that Mr Webb's tax debt to the IRD should not be brought into account because it was unlikely to be enforceable in

the Cook Islands. On the second critical issue, namely the validity of the Arorangi Trust and the Webb Family Trust, the court held that these were invalid because the trust deeds failed to record an effective alienation of the beneficial interest in the assets in question.

15. It only remained to determine the value of the matrimonial property available for division. Mrs Webb contended for a value of about NZ$ 8.1m, including NZ$ 2.83m in respect of the interest in the Arorangi Property. Mr Webb argued for a value of only about NZ$ 4m. Three matters accounted for most of the difference between the parties: a debt of about NZ$ 3.3m which Mr Webb said he owed to the Honk Land Trust; a dispute as to the value of Mr Webb's shareholding in Solar 3000 Ltd; and a dispute as to the value of Mr Webb's interest in Kuru Investments Ltd, and whether it should be brought into account at all.

16. The Court of Appeal rejected Mr Webb's case in relation to the debt to the Honk Land Trust, finding that it was not genuine but rather the product of an ineffective tax avoidance scheme. As for Mr Webb's shares in Solar 3000 Ltd, Mrs Webb contended they were worth approximately NZ$ 3.3m whereas Mr Webb argued for a value only about NZ$ 30,500. The court acknowledged that Mrs Webb's assessment was speculative and that it had inadequate evidence to support a conventional valuation. But, in the court's view, Mr Webb had brought this on himself by providing inadequate disclosure and it was therefore appropriate to draw adverse inferences against him. Doing what it described as the best it could on the sparse material available, the court adopted a value of NZ$ 2m. That left only the interest in Kuru Investments Ltd. Here, notwithstanding Mr Webb's deficient disclosure, the court found that Mrs Webb had failed to establish that any matrimonial property was used in its acquisition.

17. The Court of Appeal came finally to the order it should make. Mrs Webb made clear that if the Arorangi Property was allocated to her, she would forego any claim against the other matrimonial assets. The court being satisfied that the agreed value of the Arorangi Property was less than half that of the matrimonial assets as a whole, it directed that the interest in this property should vest in her.

*This appeal*

18. Mr Webb now appeals to Her Majesty in Council with leave granted by orders of the Court of Appeal dated 13 February and 17 December 2018. He contends, as he did in the courts below, that there is no matrimonial property to divide because the value of any such property in his hands is completely extinguished by his debt to the IRD, and that the assets otherwise in issue in these proceedings are owned by either the Arorangi Trust or the Webb Family Trust.

19. More particularly, Mr Webb argues that his liability to the IRD is an unsecured personal debt within the meaning of section 20(5)(b) of the 1976 Act and so it must be deducted from the value of any matrimonial property in his hands. He says that it is a personal debt, irrespective of whether or not it is enforceable by the IRD in the Cook Islands, which he submits it is.

20. As for the trusts, Mr Webb contends that the High Court and the Court of Appeal were right to reject the arguments advanced by Mrs Webb that they were shams and that they lacked the irreducible core of obligations required of a valid trust. But he argues that the Court of Appeal fell into error in finding that the terms of the trusts were such that he had effectively retained beneficial control of the trust assets. This, he says, involved a misinterpretation of the trust deeds.

21. Turning to values, Mr Webb argues that the Court of Appeal was right to describe Mrs Webb's valuation of Solar 3000 Ltd as speculative, and says that so too was the Court of Appeal's estimate of that value as NZ$ 2m. He contends that the Court of Appeal failed properly to analyse the facts and ignored evidence that indicated the value was a good deal less.

22. Mrs Webb invites the Board generally to uphold the decision of the Court of Appeal. She contends that the Court of Appeal was right to find that Mr Webb's debt to the IRD was unenforceable in the Cook Islands and it should not be brought into account.

23. As for the trusts, Mrs Webb again supports the conclusion of the Court of Appeal that the Arorangi Trust and the Webb Family Trust are invalid. She says that the trust deeds failed to record an effective alienation of the beneficial interest in the assets in question, as the Court of Appeal held; but that the court ought also to have found that each trust was a sham. She also contends that the dispositions by Mr Webb to each trust were ineffective by operation of section 44 of the 1976 Act and that the trusts are void because they offend against the common law rule against perpetuities.

24. Finally, Mrs Webb argues that in light of the manifest failures by Mr Webb to provide adequate disclosure the Court of Appeal cannot be criticised for approaching the issue of valuation of the matrimonial property in the way that it did. However, she argues that the Court of Appeal ought to have found that the interest in Kuru Investments Ltd was acquired using matrimonial property and so it ought to have been brought into account.

25. The issues on this further appeal therefore fall into three parts: first, the issues concerning Mr Webb's liability to the IRD; secondly, the issues concerning the validity of the trusts; and thirdly, the issues concerning the valuation of the matrimonial assets.

*Part I*

    *The 1976 Act*

26.    The purpose of the 1976 Act is, among other things, to recognise the equal contribution of the spouses to the marriage partnership and to provide for the just division of matrimonial property between the spouses when the marriage ends. The Act therefore provides that, subject to certain exceptions, each spouse is entitled to an equal share in the wealth created during the course of the marriage partnership. It is, I think, essentially for these reasons that the 1976 Act and the 1976 Act (NZ) have been described as social legislation (see, for example, *Clayton v Clayton [Vaughan Road Property Trust]* [2016] NZSC 29; [2016] 1 NZLR 551, para 38; *Fisher on Matrimonial Property*, 2nd ed (1984), para 15.6).

27.    Assessment of the matrimonial wealth necessarily requires the debts generated by the marriage partnership to be taken into account. In this regard section 20 of the 1976 Act provides, so far as relevant:

> "(5)    The value of the matrimonial property that may be divided between husband and wife pursuant to this Act shall be ascertained by deducting from the value of the matrimonial property owned by each spouse:
>
> > (a)    Any secured or unsecured debts (other than personal debts or debts secured wholly on separate property) owed by that spouse; and
> >
> > (b)    The unsecured personal debts owed by that spouse to the extent that they exceed the value of any separate property of that spouse.
>
> (6)    Where any secured or unsecured personal debt of one spouse is paid or satisfied (whether voluntarily or pursuant to legal process) out of the matrimonial property, the Court may order that -
>
> > (a)    The share of the other spouse in the matrimonial property be increased proportionately:

(b) Assets forming part of that spouse's separate property be deemed matrimonial property for the purposes of any division of matrimonial property under this Act:

(c) That spouse pay to the other spouse a sum of money by way of compensation.

(7) For the purposes of this section, 'personal debt' means a debt incurred by the husband or the wife, other than a debt incurred -

(a) By the husband and his wife jointly; or

(b) In the course of a common enterprise carried on by the husband and the wife, whether or not together with any other person; or

(c) For the purpose of improving the matrimonial home or acquiring or improving or repairing family chattels; or

(d) For the benefit of both the husband and the wife or of any child of the marriage in the course of managing the affairs of the household or bringing up any child of the marriage."

28. The general scheme of these provisions is not in dispute. The value of the matrimonial property available for division is to be determined by deducting from the value of the matrimonial property owned by each spouse any debts owed by that spouse other than personal debts or debts that are secured on separate property. If the debt owed by the debtor spouse is secured then the creditor will be able to look to that security without needing to resort to the debtor's matrimonial property.

29. Similarly, a creditor must look to a spouse's other property to meet the unsecured personal debts of that spouse. There is, however, an exception if a debtor spouse is unable to meet his or her personal debts from any such separate property. In these circumstances, by operation of section 20(5)(b), the creditor may look to the matrimonial property of the debtor spouse for satisfaction.

30. If secured or unsecured personal debts of one spouse are paid out of matrimonial property then, under section 20(6), the court may make an order adjusting the share of

the matrimonial property that each spouse is to receive or deeming one spouse's separate property to be matrimonial property for the purpose of division or ordering one spouse to pay to the other a sum of money by way of compensation. No such order has been sought in these proceedings.

31. Mr Webb's liability to the IRD is undoubtedly a debt incurred by him. What is more, it is a judgment debt. On 26 November 2018 his defence to a claim by the IRD in the Auckland District Court was struck out and judgment was entered against him. Mr Webb says and I accept, the debt does not fall within any of the exceptions in section 20(7). It necessarily follows, he continues, that it is a personal debt for the purposes of this section. Mrs Webb responds, and the Court of Appeal agreed, that the matter is not so straightforward and depends upon whether the debt is enforceable in the Cook Islands. This gives rise to the foreign tax issue to which I now turn.

*The foreign tax issue*

32. It is a long-standing principle of the common law that the courts will not collect taxes of a foreign state for the benefit of the sovereign of that foreign state. The history of the principle, which I will call the foreign tax principle, as did the Court of Appeal, was explored by the House of Lords in *Government of India v Taylor* [1955] AC 491. As Viscount Simonds observed at p 504, it was already well established when Lord Mansfield CJ repeated the formula: "for no country ever takes notice of the revenue laws of another" in a series of cases in the 18th century: *Planché v Fletcher* (1779) 1 Doug 251, 253; *Holman v Johnson* (1775) 1 Cowp 341, 343; and *Lever v Fletcher* (1780) unreported. A persuasive explanation for the principle, provided by Lord Keith of Avonholm in *Government of India* at p 511, is that the enforcement of a claim for taxes is an extension of the sovereign power which imposed the taxes, and that an assertion of sovereign authority by one state within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties.

33. The foreign tax principle of course applies to direct enforcement. But it also extends to indirect enforcement and, in particular, to a claim or defence raised by a party to vindicate or assert the claims of a foreign state. A few examples will suffice to illustrate its scope.

34. *Peter Buchanan Ltd v McVey* [1955] AC 516, a decision of Kingsmill Moore J in the High Court of Eire, affirmed on appeal by the Supreme Court of Eire and approved in *Government of India* at p 508 by Viscount Simonds (with whom Lord Morton of Henryton and Lord Reid agreed) and at p 510 by Lord Keith of Avonholm, concerned a company, registered in Scotland and put into liquidation by the revenue authorities there under a compulsory winding up order, in respect of a large claim for

unpaid taxes. The defendant, a director of the company and the owner of the beneficial interest in all of its issued shares, realised the assets of the company, satisfied its liabilities other than to the revenue and decamped to Ireland with the balance. In these proceedings the company, directed by the liquidator, sought to recover this balance. The judge dismissed the claim on the basis that the action, though in form an action by the company to recover the assets, was in substance an attempt to enforce indirectly a claim to tax by the revenue authorities of another State.

35.    In *Rossano v Manufacturers' Life Insurance Co* [1963] 2 QB 352, 376, 377 a Canadian insurance company sought to avoid its liability to pay to the claimant policy holder, an Egyptian national, moneys due under two endowment policies of insurance. The company contended that as garnishee orders had been served on its branch in Egypt by the Egyptian authorities in respect of tax due by the claimant, payment to the claimant of the moneys claimed would expose them to penalties or the risk of having to pay the money twice. McNair J rejected the defence, holding that recognition of the garnishee orders would offend against the well-settled principle that English courts will not recognise or enforce directly or indirectly a foreign revenue law or claim.

36.    *Brokaw v Seatrain UK Ltd* [1971] 2 QB 476 concerned a consignment of household effects shipped in a United States vessel from Baltimore to London, via Southampton. When the ship was on the high seas the United States Treasury served on the shipowners a notice of levy in respect of unpaid taxes by the consignors and, when the ship docked at Southampton, claimed possession of the goods under that notice. The claimants, the consignees and one of the consignors, thereupon brought these proceedings against the shipowners seeking return of the goods and damages for their detention. The shipowners took out an interpleader summons bringing in the United States Government as claimants. The Court of Appeal (Lord Denning MR, Salmon and Phillimore LJJ) dismissed an appeal by the United States Government against the decision of the Master that the claim was unmaintainable because the United States Government had not taken the goods into their possession and were seeking the aid of the English courts to collect tax, albeit indirectly. Lord Denning MR cited with apparent approval the decision of McNair J in *Rossano* and, at p 483C-D, continued:

> "… it appears to me that the United States Government are seeking the aid of these courts. They come as claimants in these interpleader proceedings. By so doing they are seeking the aid of our courts to collect tax. It is not a direct enforcement (as it would be by action for tax in a court of law), but it is certainly indirect enforcement by seizure of goods. It comes within the prohibition of our law whereby we do not enforce directly or indirectly the revenue law of another country. If the position were reversed, I do not think that the United States courts would enforce our revenue laws. For no country enforces the revenue laws of another."

37.     In *Damberg v Damberg* [2001] NSWCA 87; (2001) 52 NSWLR 492, a decision of the Court of Appeal of New South Wales, an issue arose as to whether the proceeds of the sale of two properties located in Germany and placed by a father in the name of his two children were held on their own account or on resulting trust for him. The father, contending for a resulting trust, maintained that he intended to retain the beneficial interest in the properties and his purpose in transferring them was to avoid German capital gains tax on their sale. The children argued that it was their right to prevent the resulting trusts from being recognised by reason of the father's non-compliance with German law, or that relief should only be granted to the father on terms that he pay the tax, interest and penalties due to the German government. They also contended that, in the circumstances I have described, the foreign tax principle did not apply. Heydon JA, with whom Spigelman CJ and Sheller JA agreed, rejected the submission that the foreign tax principle did not apply. As he explained at paras 166-169, it was enough that execution of German revenue law was indirectly involved. Given that no condition amounting to the indirect enforcement of German tax law could be imposed, the question which remained for decision was whether the resulting trusts should be recognised unconditionally or not at all. Heydon JA addressed this issue at paras 171-176. He held that the husband was entitled to relief, assuming his conduct had been contrary to German law and notwithstanding an inability to impose terms overcoming the wrongdoing.

38.     That is not to say the principle is without limits, however. Thus, whilst a court will not entertain an action by a foreign state directly or indirectly to enforce that foreign state's exchange control legislation, a court may properly recognise a foreign revenue law where necessary to do so. So, for example, a court declined to prevent trustees of a foreign trust from remitting moneys to comply with the exchange control legislation of the foreign state whose law was the proper law of the trust, where the trustees were obliged to obey that law and where their failure to do so might have serious penal consequences: *In re Lord Cable, decd* [1977] 1 WLR 7.

39.     There can in my view be no doubt that the foreign tax principle, if applicable, would preclude any attempt by the IRD, a receiver or a trustee in bankruptcy (called the Official Assignee in New Zealand) to enforce the judgment debt against Mr Webb's assets in the Cook Islands. An attempt by a receiver or the Official Assignee to enforce the debt against those assets would in those circumstances amount to indirect enforcement, just as it did in *Peter Buchanan*. This provides the foundation for Mrs Webb's argument for, as the Court of Appeal explained, if an unsecured creditor would not be able to execute a judgment against the assets in question there would no longer be any rationale for allowing the debtor spouse to set off that debt against those assets. However, Mr Webb advances two main arguments to the contrary. The first, which I have foreshadowed, turns on the proper interpretation of the expression "personal debt" in section 20(5) of the 1976 Act. The second is founded upon the historical relationship between New Zealand and the Cook Islands, in the light of which, so the argument goes, it may be assumed that the courts in the Cook Islands will enforce a debt to the IRD. I will deal with them in turn. I will then address the suggestion that Mr Webb is engaging

with the IRD, that the IRD has taken steps to appoint a receiver over his assets and that the IRD could apply for a bankruptcy order against him.

*Personal debt?*

40.     Mr Webb contends that the expression "personal debt" is defined by section 20(7) of the 1976 Act for the purposes of the section as a whole. He says, correctly, that his liability to the IRD is a debt incurred by him, indeed it is now a judgment debt; further, it does not fall within any of the exceptions in section 20(7). It necessarily follows, he continues, that it is a personal debt for the purposes of the section. Turning to section 20(5), he argues that, in ascertaining the value of the matrimonial property available for division, any unsecured personal debts of a spouse must be deducted from the value of the matrimonial property held by that debtor spouse to the extent that they exceed the value of any of his or her separate property. Importantly, he continues, section 20(5) does not limit the unsecured personal debts that are to be deducted to those enforceable against particular assets. It follows that there is no room for the foreign tax principle. Put another way, it does not matter whether the debt to the IRD is enforceable in the Cook Islands, it is enforceable against him. It is then a matter for the creditor, here the IRD, to explore all enforcement options available to it without a court in matrimonial property proceedings, to which it is not a party, addressing its enforcement rights.

41.     Attractively though this argument is presented, I do not accept it. It is not necessary for the purposes of this appeal to explore the precise meaning of all of the terms used in section 20 but only the word "debts" and the expression "personal debts". As we have seen, the general scheme underpinning section 20(5) and (7) is that spouses should share the burden of the unsecured debts they have incurred in the context of their relationship, but not the burden of unsecured personal debts unless they exceed the value of that debtor spouse's separate property. To the extent that the unsecured personal debts of either spouse do exceed the value of that debtor spouse's separate property then the spouses must share that burden too, subject to an order of the court under section 20(6). In my opinion it is plainly inherent in this scheme that for any unsecured debt to be a personal debt for the purposes of section 20 it must be enforceable or likely to be paid. It would make no sense to allow a debtor spouse to deduct from the value of any matrimonial property unsecured personal debts which are both unenforceable and unlikely to be met. Indeed, the manifest injustice which would flow from such an interpretation can readily be appreciated from the circumstances of this case, as the Court of Appeal explained. If Mr Webb were permitted to deduct the judgment debt from the value of the matrimonial assets he holds in the Cook Islands there would be nothing left to share with Mrs Webb. But if the IRD cannot enforce its judgment against those assets, Mr Webb can keep them all for himself. That cannot have been the intention behind section 20(5). In my view the expression "personal debts" does not extend to those debts which are both unenforceable and unlikely to be paid and I believe the Court of Appeal was entirely correct in saying, at para 34:

> "The sole reason for allowing a personal debt to impact on the matrimonial property division under section 20(5)(b) is to protect a debtor spouse's unsecured creditors. But if, for whatever reason, an unsecured creditor would not be able to execute a judgment against the assets in question there would no longer be any rationale for allowing the debtor spouse to set off that debt against his or her matrimonial property assets."

42.    Support for this approach to the interpretation of section 20(5) is to be found in two authorities. The first is *Government of India*. There the government sought to prove in the voluntary liquidation of an English company in respect of an amount of tax due from the company under Indian law arising from the sale of certain undertakings in India. It was said that under section 302 of the Companies Act 1948 the "liabilities" which the liquidator was bound to discharge included the tax due to a foreign state. As Viscount Simonds explained at p 508, all therefore turned on the meaning of the word "liabilities" in that section. The House of Lords rejected the contention that it extended beyond obligations enforceable in the English courts so as to include a liability for foreign tax in respect of which the company might have been sued in a court of the country imposing it.

43.    The second is the decision of Somers J in the High Court of New Zealand in *Livingstone v Livingstone* (1980) 4 MPC 129. There the parties had lived in New Zealand for three years before their separation. In proceedings under the 1976 Act (NZ), the husband sought to bring into account in assessing the value of his matrimonial property a tax liability to the Canadian revenue authorities. The judge found that the husband had no intention of paying any tax to the Canadian authorities and that it was unlikely those authorities would ever recover the money they claimed. So, while the debt existed, it could for practical purposes be disregarded. The judgment contains no detailed discussion of the issues raised before the Board but demonstrates a pragmatic and purposive approach to the legislation and the nature of the debts of which account is to be taken in ascertaining the value of the matrimonial property available for division.

44.    I have had the benefit of reading the judgment of Lord Wilson of Culworth. He considers that the overall purpose of the 1976 Act is to set firm rules for the division of the matrimonial property, irrespective of the overall financial position in which each spouse is left as a result of their application.

45.    I respectfully disagree. This is, as I have said, social legislation and in my opinion the word "debts" and the expression "personal debts" must be interpreted in a manner that reflects that statutory context. The essential aspect of the context relevant for present purposes is the recognition of the equal contribution of the spouses to the marriage partnership and an appreciation that, subject to certain exceptions, each spouse

is entitled to an equal share of the matrimonial assets available for division once the matrimonial debts have been taken into account. Moreover, the process of balancing the shares of each of the spouses in the benefits of the partnership necessarily involves a consideration of their final positions. If this was as far as it went, there would be no justification for allowing one party to bring into account personal debts which are by definition incurred outside the matrimonial partnership. But the context goes a little further in the case of such personal debts that are not secured. In the case of these debts the object of the 1976 Act extends to the protection of the unsecured creditors, as I explain further below.

46. I also respectfully disagree with Lord Wilson that this construction confers on the word “debts” in section 20(5)(b) a meaning different from the same word in subsection (5)(a). The word “debts” has the same meaning in both parts of the subsection. In neither case does it include debts which are both unenforceable and unlikely to be paid. So, debts which are incurred by a spouse in the course of the matrimonial partnership and which are enforceable against the matrimonial property or which the debtor spouse intends to pay should be brought into account. But such matrimonial debts which are both unenforceable against the matrimonial property and which neither spouse has any intention of paying should not. Were it otherwise, the spouse in whose name the matrimonial property lies could set off the matrimonial debts against the value of that property, thus reducing or even eliminating the pool available for division, yet that property would never be used to discharge the debts.

47. The position in relation to personal debts is just the same. Unsecured personal debts owed by a spouse (assume the husband) should be brought into account to the extent they exceed the value of his separate property and where he intends to pay them using matrimonial property in his name. So too should his unsecured personal debts which exceed the value of any of his separate property and which are enforceable against the matrimonial property in his name. But his personal debts which are not enforceable against the matrimonial property in his name and which are unlikely to be paid should not be brought into account. Were it otherwise the matrimonial assets available for division would be reduced or (as here) eliminated and yet those debts would never be paid. The husband would be able to retain all the matrimonial assets in his name for himself; they would neither be surrendered to meet his debts, nor would they be available for division.

48. I understand the learned editor of *Fisher* (cited at para 26 above) to have arrived at essentially the same conclusion. In considering the meaning of the word “debt” in section 20(5), it is observed, at para 15.6:

> “… in the present context it seems probable that a debt is intended to qualify if a spouse has an existing legal liability to pay either immediately or at some time in the future a sum of money either

> certain or capable of estimation which liability is likely to be satisfied by the debtor-spouse or is actionable with a real prospect of recovery on the part of the creditor." [Footnotes omitted]

*The relationship between New Zealand and the Cook Islands*

49. Mr Webb contends that if enforceability in the Cook Islands is a relevant consideration, as I would hold it is, there can be no doubt that, in light of the longstanding relationship between the Cook Islands and New Zealand, claims for taxes made in New Zealand are enforceable in the Cook Islands and so there is no room for the foreign tax principle. Mr Webb points to various aspects of that history, the most material of which for present purposes are these. By Order in Council made under section 1(1) of the Colonial Boundaries Act 1895 (UK), the boundaries of New Zealand were extended to include the Cook Islands as from 11 June 1901. In 1907 New Zealand became a dominion within the British Empire and in 1947 it adopted the Statute of Westminster of 1931. From that time until 1965 the New Zealand Parliament legislated for the Cook Islands; the Governor General, acting by and with the advice and consent of the Executive Council, exercised executive authority over the Cook Islands; and there lay an avenue of appeal to the Supreme Court of New Zealand from final judgments of the High Court of the Cook Islands in the exercise of its criminal and civil jurisdictions.

50. It may be the case that, as Mr Webb asserts, the relationship between the Cook Islands and New Zealand as it existed until 1965 was such as to exclude any justification for the application of the foreign tax principle. However, on 4 August 1965 the Cook Islands Constitution Act 1964 (NZ) came into force and from that time the Cook Islands became self-governing and the Constitution of the Cook Islands, set out in the Schedule to the 1964 Act, became the constitution and supreme law of the Cook Islands. The Constitution made provision for, among other things, the appointment of a High Commissioner of the Cook Islands; the appointment of a Cabinet of Ministers presided over by a Premier and with control of the executive government of the Cook Islands; the establishment of an Executive Council of the Cook Islands consisting of the High Commissioner and the members of the Cabinet; the appointment of a Legislative Assembly of the Cook Islands with the power to make laws for the peace, order and good government of the Cook Islands and, subject to certain conditions, to amend the Constitution; a restriction on the power of the Parliament of New Zealand to legislate for the Cook Islands; and the establishment of a High Court with a right of appeal, subject to conditions, to the Supreme Court of New Zealand.

51. The Constitution of the Cook Islands has been amended from time to time. The position of High Commissioner has now been replaced by that of the Queen's Representative, that is to say the representative of Her Majesty the Queen in the Cook Islands; the Legislative Assembly has been replaced by a sovereign Parliament for the Cook Islands and the Premier with a Prime Minister; and there has been established a

Court of Appeal of the Cook Islands as a superior court of record and with a right of appeal to Her Majesty the Queen in Council with the leave of the Court of Appeal or, if such leave is refused, with the leave of Her Majesty in Council.

52. The Joint Centenary Declaration of the Principles of the Relationship between the Cook Islands and New Zealand, signed by the Prime Minster of each country on behalf of their respective governments on 11 June 2001, affords a helpful insight into the status and nature of the relationship at that time. It recorded that all issues affecting the two countries should be resolved on a cooperative and consultative basis; that Cook Islanders did and would retain New Zealand citizenship; that Her Majesty the Queen as Head of State of the Cook Islands was advised exclusively by Her Cook Islands Ministers in matters relating to the Cook Islands; that in all matters affecting the Realm of New Zealand, of which the Cook Islands and New Zealand were part, there would be close consultation between the signatories; that in the conduct of its foreign affairs, the Cook Islands was interacting with the international community as a sovereign and independent state; and that any action undertaken by New Zealand in respect of its constitutional responsibilities for the foreign affairs of the Cook Islands was undertaken with the authority and at the request of the Cook Islands.

53. Mr Webb recognises the developing nature of the relationship between the Cook Islands and New Zealand and the evolution of the Cook Islands into a sovereign state but contends that this relationship is still so close that any rules or principles affecting the enforceability of debts, such as the foreign tax principle, do not apply. As Mr Webb accepts, the Cook Islands have no reciprocal enforcement of judgments regime but there is in place between the Cook Islands and New Zealand a system whereby memorials can be filed and judgments enforced and it is upon this that he focuses next.

54. Section 173(1) of the Cook Islands Act 1915 provides that any person in whose favour any judgment whereby any sum of money is made payable has been obtained in the High Court of New Zealand or in a District Court in New Zealand in civil proceedings may cause a memorial to be filed in any office of the High Court of the Cook Islands. Section 173(4) provides that every memorial so filed shall thenceforth be a record of such judgment, and that execution may issue with the leave of the High Court, and subject to such terms and conditions as the High Court may think fit to impose. Mr Webb relies heavily on this mechanism and contends that the only inquiry contemplated by section 173(4) relates to the terms and conditions to be imposed before leave is given to execute. He continues that the court’s discretion, except perhaps in a residual sense, does not extend to whether or not the judgment can be executed at all.

55. The Court of Appeal was not persuaded by these submissions, in my opinion rightly so. The Cook Islands are now a distinct sovereign state. They have their own parliament and they have their own government. They make their own laws and they control their own constitution. In these circumstances and on the materials before us, I

think that the better view is that the general common law principle that the courts of one country will not enforce the penal and revenue laws of another country is one that now applies to the Cook Islands. Furthermore, as Lord Keith explained in *Government of India*, the rationale underpinning this principle is that enforcement of a revenue law amounts to an extension of the sovereign power which imposed the taxes, and that an assertion of sovereign authority by one state within the territory of another is contrary to the concept of independent sovereignties. In my opinion this rationale is entirely apposite in the present context and that enforcement, absent a treaty, would run counter to the concept of the Cook Islands as a separate sovereign state. The Court of Appeal observed that enforceability might be tested in proceedings between the Commissioner and Mr Webb on a future occasion, perhaps with the assistance of the Solicitor General of the Cook Islands, and if that were to occur it was possible that a fresh approach to the foreign tax principle might be taken. However, the assessment of rights under the 1976 Act should be based upon the most likely outcome. That, as it seems to me, was a perfectly proper approach and in my view, in agreement with the Court of Appeal and for the reasons I have given, the most likely outcome is that Mr Webb's New Zealand tax debt is not enforceable in the Cook Islands.

56.     In this connection it is relevant to note a number of other matters. In 2009 New Zealand and the Cook Islands entered into two agreements: the first provided for the exchange of information with respect to taxes, and the second concerned the allocation of taxing rights with respect to certain income of individuals and established a mutual agreement procedure in respect of transfer pricing adjustments (both are scheduled to the Double Tax Agreements (Cook Islands) Order 2010/148). By contrast, the Parliament of New Zealand has enacted the Trans-Tasman Proceedings Act 2010 which minimises impediments to the enforcement of certain Australian judgments and regulatory sanctions in New Zealand. It expressly provides, in section 68, that no New Zealand court may refuse to enforce an Australian judgment on the ground that Australian tax is payable under it. The difference between the broad scope of the Trans-Tasman Proceedings Act and the limited scope of the agreements the subject of the Double Tax Agreements (Cook Islands) Order is striking and entirely consistent with the continued application of the foreign tax principle in the Cook Islands.

57.     Moreover, I do not accept that the power conferred on the High Court under section 173 of the Cook Islands Act 1915 is as limited as Mr Webb contends. I can see no justification for interpreting it in such a restrictive way. In my view it is clearly of sufficient scope to permit a court of the Cook Islands to refuse to enforce a revenue law, just as it would permit such a court to refuse to enforce a penal law.

*Will Mr Webb co-operate with the IRD?*

58.     Potter J observed that Mr Webb has taken steps to engage with the IRD and that "there is a real likelihood that [he] will have to pay or satisfy the Inland Revenue

Department's claim". She gave no reasons for this opinion. It may be inferred from the judgment of the Court of Appeal that it did not share her confidence. Nor do I. Indeed, for the following reasons, I have reached a clear view to the contrary.

59.     First, Mr Webb vigorously challenged the default assessments issued against him by the Commissioner of Inland Revenue for the 2001-2009 tax years. The assessments were issued on the basis that Mr Webb had suppressed income by failing to return amounts paid to him and on his behalf by his employer as a condition of his employment; by arranging management fees for services he had performed to be paid to trusts he controlled; and by arranging for his services to be remunerated by loan payments either made to himself or his family trusts. The investigation was complex and took a number of years and Mr Webb took an obstructive position. Shortfall penalties were imposed on the basis that he had evaded the assessment or payment of tax; that he had taken an abusive tax position; and that he had exhibited gross carelessness. His challenges were dismissed and the assessments confirmed.

60.     Secondly, in the context of these proceedings, Mr Webb has shown himself to be far from candid about his business affairs. As has been mentioned, he was found by Potter J to be an unsatisfactory witness and his evidence was evasive and generally unreliable. Indeed, later in this judgment I must describe the paltry disclosure that Mr Webb has given concerning important elements of the matrimonial property and their value.

61.     Thirdly, the Board has been provided with no details of the form of his engagement with the IRD or how and when he proposes to meet his personal liabilities or, indeed, why it should be assumed he will even remain in New Zealand. He has at every stage displayed a determination to ensure that, so far as possible, he retains the fruits of his business activities irrespective of the claims of the IRD.

62.     Fourthly, it is important to keep in mind that the particular issue with which we are concerned is not whether Mr Webb may pay some of his debt to the IRD using his property in New Zealand but whether he will use for this purpose the matrimonial property in his name in the Cook Islands. In that connection it is striking that he has never pledged that property to the IRD. Further, in response to a question from the Board at the oral hearing, his counsel made clear that he reserved the right to adopt a different position in the context of enforcement proceedings from that which he has adopted in these proceedings. In other words, Mr Webb was reserving the right to argue in enforcement proceedings that the debt to the IRD was not enforceable against the Cook Islands property, and that he might do so.

63.     For all of these reasons I find myself quite unable to accept that, in so far as the matrimonial property is out of reach of his creditors, Mr Webb will ever voluntarily apply it to meet his debts.

*Receiver and bankruptcy*

64.     As I have mentioned, the Board was informed by counsel during the course of the hearing that the IRD has taken steps in New Zealand to appoint a receiver over Mr Webb's assets and that it could petition for his bankruptcy. It was also suggested that were he to be made bankrupt, the New Zealand Official Assignee could take steps to gather in and realise the estate with a view to satisfying the claims of the IRD and other creditors.

65.     The Board has been given no details of any steps a receiver has taken or could take to gather in Mr Webb's assets, let alone assets that require enforcement steps in the Cook Islands. Nor has the Board been given any details of how the New Zealand Official Assignee could take control of Mr Webb's assets, whether in the Cook Islands or elsewhere were there to be bankruptcy proceedings. Indeed, there appears to be some doubt as to whether the New Zealand Official Assignee would be recognised in the Cook Islands at all, for the Board was informed that there is no personal bankruptcy in the Cook Islands and the position of Official Assignee does not exist in that jurisdiction. Moreover and in any event, the foreign tax principle applies to the direct and indirect enforcement of the revenue laws of another state, as I have explained above. In this connection counsel were unable to point to any case since 1965 in which the IRD has, directly or indirectly, sought to enforce a tax judgment against property in the Cook Islands.

66.     There was also some discussion before the Board about section 655(1) of the Cook Islands Act 1915 which states that: "Bankruptcy in New Zealand shall have the same effect in respect to property situated in the Cook Islands as if that property was situated in New Zealand." However, for my part and for the reasons given in the immediately preceding paragraph and the further reasons which follow, I feel unable to attach any significant weight to this provision in the context of these proceedings. First, it was not drawn to the attention of Potter J or the Court of Appeal and it formed no part of Mr Webb's written case on appeal to Her Majesty in Council. Secondly, there appeared at the hearing to be some doubt as to whether it is in force in the Cook Islands. Thirdly, counsel were unable to assist the Board as to how it would be given effect in the Cook Islands after their emergence as a sovereign and independent state. Fourthly, it may be subject to the foreign tax principle. Finally and importantly, counsel for Mr Webb made clear that Mr Webb relied on it only as "part of the context", and he accepted that no bankruptcy proceedings were presently on foot. In the end, I understood Mr Webb's position to be that he did not rely on what the IRD was doing in New Zealand in respect of the debt and the Board should place no weight upon it. As

for the context, I have addressed this at paras 49 to 57 above and I am not persuaded that section 655 adds materially to it.

67.    In respectful agreement with the Court of Appeal, I would therefore hold that the New Zealand tax debt should not be taken into account in determining the value of the Cook Islands matrimonial property available for division. On the materials before the Board, the stronger argument is that the debt is unenforceable in the Cook Islands.

*Part II*

   *Validity of the Arorangi and Webb Family Trusts*

68.    It was common ground before the Court of Appeal that the Arorangi Trust and the Webb Family Trust stood or fell together. Generally speaking, that remains the position on this further appeal. Most of the arguments arising on this further appeal can therefore be considered in relation to the Arorangi Trust alone. The material clauses of the deed establishing this trust are set out in the appendix to this judgment.

69.    Mrs Webb mounted four attacks on the trusts at trial. She contended first, that they lacked what Millett LJ described in *Armitage v Nurse* [1998] Ch 241, 253G-254A as the irreducible core of obligations owed by trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust; secondly, that the settlors never intended to relinquish control over the beneficial interest in the assets the subject of the trusts; thirdly, that the trusts were shams; and fourthly, that the Webb Family Trust was invalid for uncertainty of objects.

70.    Potter J rejected all of these attacks. The first was based largely upon clause 19 of the Arorangi Trust and its equivalent in the Webb Family Trust which, so it was said, limited the rights of the beneficiaries to call for accounts from the trustees. Potter J held that, although this clause appeared to impede the beneficiaries' rights to call for accounts, it did not oust or even purport to oust the court's inherent jurisdiction to facilitate the flow of such information or to ensure that accounts were disclosed when appropriate, or to supervise and intervene in the trusts' administration where necessary.

71.    Potter J addressed the second and third attacks together because, as she understood it, the argument in relation to them, as developed on Mrs Webb's behalf, really amounted to one point: the trusts were invalid because neither the settlors nor the trustees intended to create the rights and obligations of a trust. Potter J recognised that Mr Webb had operated the Arorangi Trust in a cavalier manner, but she was not persuaded that Mr Webb intended it to be a sham when it was established in 2005. She came to much the same conclusion in relation to the Webb Family Trust. Ms Dixon may

have been naïve as to the scope of her duties as a trustee but it had not been established that Mr Ellison, as settlor, or Mr Webb or Ms Dixon, as trustees, intended that the Webb Family Trust should not operate as a trust at all but rather as a vehicle for Mr Webb's personal use of the trust assets.

72. The final attack, on the Webb Family Trust alone, was founded upon what Potter J described as the sloppy drafting of clause 2 of the trust deed which identified as beneficiaries Mr Webb, Sebastian, Bethany and "discrencerny beneficeries", plainly a mis-transcription of "discretionary beneficiaries". The judge rejected the submission that this rendered the trust invalid, holding that it did not refer to an unidentified class of further beneficiaries but was descriptive of the status of the three identified beneficiaries.

73. On appeal, Mrs Webb challenged all of these findings. The Court of Appeal saw the key question as being whether, on an objective analysis of the powers reserved to Mr Webb in the trust deeds, Mr Webb had evinced an intention irrevocably to relinquish his beneficial interest in the trust property. In the court's view this required careful consideration of the trust deeds and was best tested by asking what would have occurred if Mr Webb had attempted to recover the property he had ostensibly settled on the trusts. It continued, at para 56:

> "If a critical step in such an attempt would have required the assent of a truly independent person, or would have been subject to an enforceable fiduciary duty on his part, it could not be said that the purported settlement on the trust was ineffective. Conversely if, on an objective view of the deed, [Mr Webb] had retained for himself the uncontrolled power to recover the property it could not be said that he had divested himself of his beneficial ownership of the property. The latter situation might usefully be described as 'objective nullity' to distinguish it from 'sham'. A sham turns on the subjective intent of the parties involved."

74. The Court of Appeal went on to examine the terms of the trust deeds before concluding on this issue, at para 65:

> "the two deeds of trust fail to record an effective alienation of the beneficial interest in the assets in question. The powers retained by [Mr Webb] meant that at any time he could have recovered, and still could recover, the property which he had purported to settle on the trusts. The trusts are therefore invalid."

75. The Court of Appeal turned next to the other grounds of appeal and dismissed them in short order. It held at para 66 that, on the factual findings of the judge, the trusts were not shams, and that while the provision for absolute non-disclosure to beneficiaries under clause 19.1 might have been ineffective, it would not have invalidated the trusts as a whole. The court did not specifically address the issue of whether the Webb Family Trust was invalid for uncertainty of objects.

76. On this further appeal, Mr Webb does not challenge the proposition that there can be no valid trust if, on the proper interpretation of a trust deed, the settlor has in fact retained beneficial ownership of the property purportedly settled on the trust. However, he contends that the Court of Appeal adopted an unduly literal interpretation of the trust deeds and that, had it adopted a purposive and contextual approach to their interpretation, it would or ought to have found each of them to be effective and valid. He also argues that he did not retain for himself the uncontrolled power to deal with the settled property as he wished. He emphasises that he was and remains a trustee of both trusts and, in that capacity, has always had fiduciary obligations, among other things, to act honestly and in good faith, to observe the terms of the trusts and to act in the best interests of all the beneficiaries.

77. It has long been recognised that a completely general power of appointment, such that the holder of the power can appoint the subject matter of the power to himself, may be tantamount to ownership. As Lord Collins of Mapesbury explained in giving the opinion of the Judicial Committee of the Privy Council in *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2011] UKPC 17; [2012] 1 WLR 1721 ("*TMSF*"):

> "41. ... even apart from express legislative intervention general powers have been regarded as giving rise to property rights. In *Clarkson v Clarkson* [1994] BCC 921 (a decision on the definition of property in the Insolvency Act 1986, section 283(4)) Hoffmann LJ referred to *In re Mathieson* and said, obiter, at p 931:
>
> > 'I think that even at the time this was quite a remarkable decision. Lord St Leonards [ie Sugden] in his book on *Powers*, 8th ed (1861) said: "To take a distinction between a general power and a limitation in fee is to grasp at a shadow while the substance escapes".'
>
> 42. So also in *In re Triffitt's Settlement* [1958] Ch 852, 861, Upjohn J said that 'where there is a completely general power in its widest sense, that is tantamount to ownership'. That was in the

> context of the question, discussed below, whether a power could be delegated.
>
> 43. As *Thomas, Powers* (1998) puts it (at para 1-08), the fundamental distinction between the concepts of power and property has not been preserved in all contexts and for all purposes. A donee of a truly general power can appoint the subject matter of the power to himself. He therefore has an 'absolute disposing power' over the property, citing *Sugden*, *Powers*, 8th ed (1861), p 394. Consequently, for many purposes, the law regards the donee as the effective owner of that property."

78. *TMSF* concerned two trusts established by a Mr Demirel in the Cayman Islands. Mr Demirel, his wife and children were discretionary beneficiaries and Mr Demirel, as settlor, had a power of revocation. TMSF, effectively a judgment creditor, sought the appointment of receivers by way of equitable execution with a view to reaching the power of revocation and thereby reaching the funds in the trusts. The issue was whether the power of revocation was a property right that Mr Demirel could be required to delegate to the receivers. The Board concluded that the power of revocation was such that in equity Mr Demirel had rights tantamount to ownership. The power could not be regarded as a fiduciary power and the only discretion Mr Demirel had was whether to exercise it in his own favour. He could and should be required to assign his rights to the receivers. In the circumstances it was unnecessary to decide the further question, canvassed in argument, whether the court had jurisdiction to order Mr Demirel to revoke the trusts, with the result that he would have substantial assets of which the receivers could take possession.

79. The reasoning of the Board in *TMSF* was applied by the Supreme Court of New Zealand in *Clayton v Clayton* cited at para 26 above. The appeal concerned a declaration of trust (the Vaughan Road Property Trust or VRPT) executed by Mr Clayton in the course of his marriage to Mrs Clayton. The discretionary beneficiaries included Mr Clayton (as "Principal Family Member"), Mrs Clayton and their two daughters. The final beneficiaries were their two daughters. After their divorce, Mr and Mrs Clayton embarked on proceedings under the 1976 Act (NZ). The Supreme Court held that the combination of powers conferred upon Mr Clayton as Principal Family Member, trustee and discretionary beneficiary amounted in effect to a general power of appointment in relation to the assets of the VRPT and that this constituted property and relationship property for the purposes of the 1976 Act (NZ) with a value equal to the net assets of the VRPT.

80. I must now consider the deeds in issue in this appeal and for this purpose I can focus on the Arorangi Trust. The terms of this deed are concise and clear and have a number of aspects which merit emphasis at the outset. First, Mr Webb is appointed as

sole trustee (the Trustee) and the trust is established for just two beneficiaries, Mr Webb and his son Sebastian (clause 2).

81.    Secondly, the deed provides for the appointment by the Trustee of a consultant (the Consultant) whose role is to assist the Trustee in the administration and management of the Trust and to advise the Trustee on all matters relating to the Trust's investments (clause 5); who is empowered, at his absolute discretion and without giving reasons, to remove the Trustee and appoint a replacement (clause 6.2); who may request with any nominated beneficiary the early vesting of the property of the Trust (clause 9.1); and who is empowered to consent to a variation by the Trustee of the trust deed (clause 18.1). Mr Webb could and did appoint himself as Consultant at the outset and so reserved to himself all of these powers.

82.    Thirdly, the Trustee, Mr Webb, is permitted to act as trustee and to exercise all the powers and discretions conferred upon him by the deed notwithstanding that his interests may conflict with his duties to the funds of the Trust or any beneficiary (clause 14.1(c)).

83.    With these points in mind it is convenient to consider next various ways in which it is said that Mr Webb can exercise these powers to secure the benefit of the trust property to himself. The first and most important is through the exercise of the power conferred by clause 10. This reserves to Mr Webb as settlor the power to nominate himself as sole beneficiary in place of the existing beneficiaries and in that way to become settlor, Trustee, Consultant and sole beneficiary. It is important to note that Mr Webb enjoys this power as settlor and not as Trustee and that, as settlor, he is not subject to any fiduciary duty, irrespective of the operation of clause 14.1(c).

84.    Another is conferred by clause 1.1 of the General Terms and Conditions. This, so it is said, confers on Mr Webb, as sole Trustee and in his uncontrolled discretion, the power to pay and apply the whole of the capital and income of the Trust for his personal use and advancement as a beneficiary and to the exclusion of any other beneficiary. Further, he is not obliged to preserve the assets or the income generating capacity of the Trust. The Court of Appeal considered that any breach of duty the exercise of this power would otherwise entail is negated by clause 14.1(c). I do not agree. Clause 14.1(c) confers on Mr Webb an entitlement to act notwithstanding that his duty as Trustee may conflict with his duty to the trust fund or to any beneficiary. However, he remains a fiduciary and must exercise the powers conferred on him in a manner which is consistent with his fiduciary duties. Clause 14.1(c) does not exonerate him from all possible breaches of trust.

85.    The third is for Mr Webb to exercise the powers conferred on him as Trustee by clause 12.1 to resettle the assets of the Trust upon the trustees of any trust anywhere

provided that other trust includes among its beneficiaries one of the beneficiaries of the Trust (of which Mr Webb is one); and, by clause 18.1, with the prior written consent of the Consultant (again, Mr Webb), to vary the terms of the Trust deed; in either case in such a way as to ensure that all of the assets of the trust vest in him. However, clause 14.1(c) would not exonerate Mr Webb from a breach of trust in this context any more than it would in respect of the exercise of the power conferred by clause 1.1 of the General Terms and Conditions.

86. I turn then to consider Mr Webb's contentions that interpretation of the deed in this way would be inconsistent with the finding of Potter J that he intended to create valid trusts, and that he did so primarily for the benefit of his children. He also argues that the exercise of the powers in the various ways described in paras 83-85 above would be inconsistent with his fiduciary duties as trustee.

87. There is, however, no inconsistency between the finding by Potter J, upheld by the Court of Appeal, that the trusts are not shams and a conclusion that Mr Webb's attempts to create the trusts have failed or are defeasible. Acceptance that Mr Webb intended to create trusts does not in any way preclude a finding that he reserved such broad powers to himself as settlor and beneficiary that he failed to make an effective disposition of the relevant property. Moreover, and as I have explained, the powers of clause 10 are conferred on Mr Webb as settlor, not in his capacity as Trustee or Consultant. These powers were therefore amply sufficient for Mr Webb to arrange matters in such a way that he alone would hold the trust property on trust for himself and no-one else, with the consequence that the legal and beneficial interest in all of that property would vest in him.

88. The purported settlor of the Webb Family Trust was, as I have mentioned, Mr Ellison, a business colleague of Mr Webb. I am wholly unpersuaded this makes any material difference, however. The point was not taken before the Court of Appeal and rightly so. Mr Ellison purported to settle in trust only NZ$ 10 and it was plainly intended by Mr Webb that this would operate as a vehicle into which he could at a later stage transfer matrimonial property, including property held by the Arorangi Trust. Indeed, the deed expressly records that the trustees, Mr Webb and Ms Dixon, would endeavour to retain and purchase, among other things, the Arorangi Property, the Arorangi Trust's shares in Solar 3000 Ltd and a substantial shareholding in Fleet Lease Ltd, a rental car business. In fact, the shares in Solar 3000 Ltd were transferred and Potter J found that many of the vehicles owned by Fleet Lease Ltd were previously owned by the Arorangi Trust. Further and as we have seen, Mr Webb and Ms Dixon were appointed as the trustees; Mr Webb was appointed as Consultant and the beneficiaries named in the deed were Mr Webb, Sebastian and Bethany. Mr Webb has given no satisfactory evidence as to the circumstances in which Mr Ellison came to settle the trust and why he did not do so himself. Mr Ellison swore an affidavit in the proceedings but when notice was given that he was required to attend at the trial for cross-examination, reliance on this evidence was withdrawn. In these circumstances I feel quite unable to place any weight on the

fact that Mr Ellison was named as settlor. To the contrary, it is a reasonable inference that Mr Ellison's activities, such as they were, in connection with this trust were carried out by him under the direction and control of Mr Webb and as his nominee.

89. The Court of Appeal considered, correctly in my opinion, that the powers reserved to Mr Webb under the trust deeds may be analysed in two different ways. One is to consider whether those powers were so extensive that Mr Webb can be said never to have disposed of any of the property purportedly settled on or acquired by the trusts. In this connection one might also ask whether the trusts lacked the irreducible core of obligations owed by trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. The other is to ask whether the powers reserved to Mr Webb were so extensive that in equity he can be regarded as having had rights which were tantamount to ownership. The Court of Appeal recorded, at para 55, the parties' agreement that in this case it can make no difference to the outcome which of these two analytical routes is taken. I will therefore confine myself to the substantive question whether Mr Webb's powers under each of the trust deeds were such that, in equity and in all of the circumstances of this case, he can be regarded as having had rights in the trust assets which were indistinguishable from ownership. In my view he plainly can. Mr Webb had the power at any time to secure the benefit of all of the trust property to himself and to do so regardless of the interests of the other beneficiaries. In my opinion, for the reasons set out at para 87 above, the Court of Appeal was plainly entitled to find as it did that the trust deeds failed to record an effective alienation by Mr Webb of any of the trust property. The bundle of rights which he retained is indistinguishable from ownership.

*Other grounds of invalidity*

90. In these circumstances it is not necessary to consider separately whether the trust deeds were ineffective for the further reason that, by operation of clause 19 of the Arorangi Trust deed and its equivalent in the Webb Family Trust deed, the beneficiaries were not entitled to require the trustees to account for their management of the trust property. Nor is it necessary to consider whether the Webb Family Trust was invalid for uncertainty of objects. These are second order issues which can have no bearing on the outcome of this appeal.

91. I would, however, say a word about the allegation that the trusts were shams. Potter J in the High Court was not persuaded that they were. It is common ground that she directed herself correctly by reference to the decision of the Supreme Court of New Zealand in *Ben Nevis Forestry Ventures Ltd v Comr of Inland Revenue* [2008] NZSC 115; [2009] 2 NZLR 289. In the context of this case she was required to consider whether Mr Webb did not at any time have any intention of respecting the formalities of the trust deeds, and whether he intended instead to give a false impression to third parties and, at the end of the day, the court of his rights and obligations. As I have noted

above, Potter J found that Mr Webb operated the Arorangi Trust in a cavalier fashion. She also found Ms Dixon was naïve about her duties as one of the trustees of the Webb Family Trust. But she was not prepared to find that Mr Webb set up the Arorangi Trust or the Webb Family Trust as a pretence, that is to say a screen which would conceal his personal use of the trust assets; nor was she prepared to find that, in the case of the Webb Family Trust, Ms Dixon or Mr Ellison had any such intention. These were findings of fact which I believe the judge was entitled to make. The Court of Appeal did not think it right to interfere with them and it cannot be criticised for taking that course.

*Section 44*

92.    Section 44 of the 1976 Act provides that where the court is satisfied that a disposition of property has been made in order to defeat the claims of a person under the Act, the court may, subject to certain exceptions, order a person who has received the property other than in good faith and for valuable consideration to transfer the property to such person as the court directs.

93.    The case advanced by Mrs Webb at trial concerned the transfers into the Webb Family Trust of the shareholding in Solar 3000 Ltd and, indirectly through Fleet Lease Ltd, the fleet of vehicles. The shareholding and the vehicles were previously held by the Arorangi Trust. In the event, Potter J found the Arorangi Trust valid and she did not deal separately with this aspect of Mrs Webb's case, apparently on the basis that the disposal of the assets by the Arorangi Trust to the Webb Family Trust did not defeat any claim by Mrs Webb.

94.    If, as I would hold, the trust deeds were not effective there is still no need to consider Mrs Webb's case under section 44. I would, however, observe that the circumstances are highly suspicious. As I have mentioned, Mr and Mrs Webb's relationship came to an end in April 2016. The Webb Family Trust was purportedly settled on 19 May 2016. By deed dated 6 February 2017 Mrs Webb was removed as a beneficiary of the Arorangi Trust and Ms Dixon and a Mr Riley were appointed as additional trustees. At trial Mr Webb was asked about the transfer of assets into the Webb Family Trust and it was suggested to him that its purpose was to defeat Mrs Webb's claims under the 1976 Act. He denied that was so and said, at one point, that he wanted "to separate the trading entities away from the Arorangi Trust". In another answer he said that his concern was to escape a liability of the Arorangi Trust to the Honk Land Trust. I do not find either of these explanations convincing. Had it been necessary to do so, I would have been minded to find that Mrs Webb had made out this aspect of her case. As it is, I will express no final view upon it.

*Perpetuity*

95.     Mrs Webb sought and has been granted permission to raise before the Board an argument that the Arorangi Trust and the Webb Family Trust are void because they breach the rule against perpetuities. In the Cook Islands the common law rule against perpetuities applies. The rule is straightforward. All future equitable interests must vest within the perpetuity period. The perpetuity period at common law is a life or any number of lives in being at the date of creation of the trust, plus 21 years, plus any actual periods of gestation. The rule is applied at the date of creation of the trust.

96.     The argument Mrs Webb was given permission to raise may be summarised as follows by reference to the Arorangi Trust deed. Clause 9.1 provides that the trust is to continue for a maximum period of 21 years and shall be determined, and the fund and all property distributed to the nominated beneficiary or beneficiaries, not later than the end of this period. Mrs Webb says that this offends the rule because the shares the beneficiaries will take is not known at the date of creation of the trust.

97.     If this argument were correct it would mean that, although, within the perpetuity period, the trustee must distribute the remaining capital and income of the trust to one or more of the beneficiaries in such shares as he in his discretion shall decide, the trust nevertheless offends against the rule. That may be thought a rather surprising conclusion. However, the Board had the benefit of only limited argument on the point and I express no final view about it for it is not necessary to do so.

98.     Shortly before the hearing before the Board, a further point emerged. It was contended for Mrs Webb that the Webb Family Trust plainly offended the rule because, unlike the Arorangi Trust which, as I have said, had a maximum trust period of 21 years, this trust was expressed to continue for maximum period of 60 years. Unsurprisingly, Mr Webb objected to this point being taken so late. His counsel told the Board that he had not had time properly to consider it or take instructions upon it. I have great sympathy with this submission. It is, however, a point of law and a relatively simple one. Moreover, it is, in my view, unanswerable. It is perfectly clear that, at the date of the deed, there was a very real possibility that a future interest might vest outside the perpetuity period. It was therefore immediately void at common law.

*Part III*

*The value of the Solar 3000 Ltd shares*

99.     This is another important issue. As the Court of Appeal recorded, it was not disputed that Mr Webb owned shares in Solar 3000 Ltd, a Cook Islands company, and

that those shares were matrimonial property. Mrs Webb contended they were worth approximately NZ$ 3.3m. Mr Webb countered that they had a value of only NZ$ 30,544.

100. Mrs Webb found herself in a difficult position. Mr Webb had produced no disclosure and very little information relating to value. However, she did have a draft “Investor Update” for Solar 3000 Group Ltd, the New Zealand based parent company. She also had the last page of the final version of this document which was signed by Mr Webb as Solar 3000 Group Ltd’s Chief Executive Officer. On this page, under the heading “Investment Offering and Process”, it was stated that “Under this Capital Raising Round 2” investors would receive 10% of the total share capital in the Solar 3000 Group Ltd in return for a capital investment of NZ$ 1m. Prospective investors were invited to lodge their expressions of interest.

101. The figures on the last page of this Investor Update suggested an overall value of the entire share capital of Solar 3000 Group Ltd of NZ$ 10m. The Court of Appeal accepted that this figure was speculative, as necessarily was Mrs Webb’s estimate of NZ$ 3.3m as the value of Mr Webb’s shareholding in the trading subsidiary Solar 3000 Ltd. However, the court continued, there was insufficient evidence on which to carry out a conventional valuation and Mr Webb had brought this on himself. The court considered that, since the relevant documents and information were in Mr Webb’s exclusive possession and control, it was appropriate to draw adverse inferences against him. Doing what it described as the best it could on the sparse material available, the court arrived at the figure of NZ$ 2m as the value of Mr Webb’s shareholding.

102. Mr Webb now contends before the Board that just as Mrs Webb’s figure of NZ$ 3.3m as the value of his shareholding was speculative, so too was the figure of NZ$ 2m arrived at by the Court of Appeal. That, he says, was not permissible. Any process of assessment had to be logical and the outcome based on proven facts. But, he continues, the Court of Appeal undertook no analysis of the facts and ignored evidence inconsistent with its conclusion. He points, in particular, to the lack of any evidence that the capital investment sought in the Investor Update was ever realised; to the description of prospective business units in a number of other countries but which never came to fruition; to the lack of any relevant correlation between the value of a shareholding in a subsidiary and the share capital of its parent; and to the description of the anticipated profit from the group business in the Cook Islands as being only around NZ$ 6m over a 20 year period. For her part, Mrs Webb argues that the figure arrived at by the Court of Appeal is too low and it had no justification for departing far, if at all, from the figure of NZ$ 3.3m.

103. I would accept that it is not permissible for a court to convert open-ended speculation by one party into findings of fact against the other; there must be a reasonable basis for some hypothesis in the evidence or the inherent probabilities before

a court can draw useful inferences from a party's failure to rebut it. In *Prest v Petrodel Resources Ltd* [2013] UKSC 34; [2013] 2 AC 415, para 44, Lord Sumption adopted with only minor modification this statement of Lord Lowry in *R v Inland Revenue Comrs, Ex p T C Coombs & Co* [1991] 2 AC 283, 300:

> "In our legal system generally, the silence of one party in face of the other party's evidence may convert that evidence into proof in relation to matters which are, or are likely to be, within the knowledge of the silent party and about which that party could be expected to give evidence. Thus, depending on the circumstances, a prima facie case may become a strong or even an overwhelming case. But, if the silent party's failure to give evidence (or to give the necessary evidence) can be credibly explained, even if not entirely justified, the effect of his silence in favour of the other party may be either reduced or nullified."

104.    The minor modification concerned the drawing of adverse inferences in claims for ancillary financial relief in matrimonial proceedings. Such proceedings, Lord Sumption explained, at para 45, have some important distinctive features. First, there is a public interest in the proper maintenance of the wife by her former husband, particularly where the interests of children are engaged, and partly for this reason the proceedings have an inquisitorial element. Secondly, the family finances will commonly have been the responsibility of the husband, so that though technically a claimant, the wife is in reality dependent upon the disclosure and evidence he gives. The concept of the burden of proof cannot be applied in the same way to proceedings of this kind. These considerations are still not a licence to engage in pure speculation. But, in Lord Sumption's view and I would respectfully agree, they have the consequence that judges exercising this jurisdiction are entitled to draw on their experience and to take notice of the inherent probabilities in deciding what an uncommunicative husband is likely to be concealing. Lord Sumption referred to the husband because the husband is usually the economically dominant spouse, but he explained and I would reiterate that of course the same applies to the economically dominant spouse, whoever it is.

105.    The circumstances of the present case do, in my opinion, call for a similar approach. Mrs Webb is entitled to a share of the matrimonial property. But she is essentially dependent upon the disclosure and evidence given by Mr Webb as the economically dominant spouse. This is a matter to which the Justices of Appeal were entitled to have regard and it was permissible for them to draw upon their experience and to take notice of the inherent probabilities in deciding what Mr Webb was likely to be concealing.

106.     That is what the Court of Appeal proceeded to do. It founded its analysis on an important piece of evidence to which Mrs Webb had access: the last page of the final investor statement bearing Mr Webb's signature. It may be the case that all of the investment sought was not forthcoming. I recognise too that the pages of the draft plan describe business activities in countries other than the Cook Islands and that it is possible that these never came to fruition. I am also conscious of what might be described as the relatively modest scale of the business in the Cook Islands described in the pages of the draft. However, Mr Webb did not disclose the information or documents that would allow the court to look into these matters fully or to quantify their impact. The court therefore had to make a broad estimate of the deduction they called for. It no doubt drew upon its experience and the inherent probabilities in so doing. I therefore feel unable to accept the criticisms made by Mr Webb of its approach. It did the best it could in all the circumstances and it arrived at a realistic figure. If Mr Webb thinks it was unduly generous to Mrs Webb, he has only himself to blame. Nor can I accept the criticisms advanced by Mrs Webb. A deduction of some kind had to be made and I think the result reached by the Court of Appeal was certainly not unduly generous to Mr Webb.

*The shares in Kuru Investments Ltd*

107.     This is a short point. Mrs Webb argues that the Court of Appeal was wrong to find that the shares in Kuru Investments Ltd did not form part of the matrimonial property. It is said that Mr Webb's evidence on this issue was far from convincing and that the court ought to have found that these shares were purchased with money taken from the matrimonial property pool. I am not persuaded that this was so. The Court of Appeal reviewed the evidence given by Mr Webb and Ms Dixon and came to a rational and entirely reasonable conclusion. It is not one with which this Board should interfere.

*Implementation of the division*

108.     The Court of Appeal explained that in the normal course it would need to arrive at precise values for all of the relevant assets and to award to each party half of the total. But in this case it was not necessary to do that because Mrs Webb had indicated that if the Arorangi Property were allocated to her, she would forego any claim against the other assets in Mr Webb's possession or for an equalisation payment. The Court of Appeal was satisfied that the agreed value of the interest in the Arorangi Property was less than half of the total value of the matrimonial property and it followed that this interest should be awarded to Mrs Webb. I have addressed and rejected the challenges made by Mr Webb to that conclusion and I see no other reason to interfere with it.

*Conclusion*

109.    For all of these reasons I would humbly advise Her Majesty that this appeal should be dismissed.

# APPENDIX

## The material provisions of the Arorangi Trust Deed

**Deed made the 9th day of December 2005**

I, **PAUL WEBB** ("the Settlor")

**HEREBY SETTLE IN TRUST** the sum of ten dollars ($10.00) and such further moneys and/or property (if any) as I may subsequently settle upon this Trust,

**AND** as the Settlor **I APPOINT** to act as the Trustee of this Trust, **PAUL WEBB** ("the Trustee") upon the terms of trust herein recorded, namely:

…

2.      The Trust is established for the benefit of the following person or persons as Beneficiaries subject to the removal or subsequent replacement of such Beneficiaries in accordance with the provisions of this deed:

**PAUL WEBB**

**SEBASTIAN PAUL WEBB**

…

**3.2     Interpretation**: In this deed:

(a)      the interpretation of this deed in cases of doubt is to favour the broadening of the powers and the restricting of the liabilities of the Trustee;

…

**5.      APPOINTMENT OF CONSULTANT TO TRUSTEE**

5.1     To assist the Trustee in the administration and management of the Trust, the Trustee may appoint by letter of appointment a Consultant ("the Consultant")

who shall signify his acceptance of the appointment by signing at the foot of the said letter.

The Consultant (if any) shall be empowered to advise the Trustee upon all matters affecting the conduct of the Trust's investments, and upon such further matters as may be elsewhere specified in this deed provided that any such advice shall not be binding on the Trustee.

**6. RETIREMENT AND REMOVAL OF TRUSTEES**

6.1 In the event that the Trustee shall withdraw from service as Trustee, or shall die, or for any reason shall become incapacitated to so serve, then but not otherwise, the person to be appointed to replace the then Trustee of the Trust shall be determined as the Trustee alone may direct, save and except that in the event of the Trustee's death or mental incapacity without having made a prior determination of a replacement trustee, but not otherwise, the direction for reappointment of a trustee to the Trust shall be referred to me as Settlor.

6.2 Notwithstanding the provisions of subclause 6.1 of this deed, the Consultant (if any) shall have power during the Trust Period at his absolute discretion and without giving reasons therefore by notice in writing given to the Trustee to remove the Trustee and to appoint one or more other persons or companies (wherever resident) to be the replacement trustee or trustees.

…

**9. TRUST PERIOD**

9.1 The Trust is to continue for a maximum period of 21 years (the Trust Period), and shall be determined and the Trust Fund and all property of the Trust distributed to the nominated beneficiary or beneficiaries not later than upon the expiry of the Trust Period, or in the alternative shall be determined and distributed to the nominated Beneficiary or Beneficiaries at such earlier time as shall be specified upon the request to so determine and distribute made by both the Consultant (if any) and by the nominated Beneficiary or Beneficiaries.

**10. NOMINATION AND REMOVAL OF BENEFICIARIES**

10.1 The Beneficiaries named in clause 2 of this deed and any subsequent Beneficiaries shall remain as the Beneficiaries until replaced by any Beneficiary nomination lodged by me with the Trustee. Any such Beneficiary nomination

which is legally valid shall, immediately upon being lodged with the Trustee, replace the current Beneficiaries.

…

**12. RESETTLEMENT OF TRUST FUND**

12.1 The Trustees may at any time resettle by deed all or any part of the Trust Fund upon the trustees of any trust (whether in the Cook Islands or elsewhere) which includes for the time being among its beneficiaries (contingent or otherwise) any one or more of the Beneficiaries then living or in existence.

…

**14. TRUSTEE'S CONFLICT OF INTEREST**

14.1 **Negation of Conflict**

THE Trustee shall be entitled to act as such and to exercise all of the Trustee's powers and discretions notwithstanding that:

…

(c) the interests or duty of the Trustee in any particular matter may conflict with his duty to the Trust Fund or any Beneficiary;

…

**18. TRUST DEED MAY BE VARIED**

18.1 The Trustee may at any time or times during the Trust Period, with the prior written consent of the Consultant, and without infringing the rule against perpetuities, by deed vary all or any of the provisions of this deed provided that no variation will adversely affect the benefits which have vested in Beneficiaries shall be made.

**19. NON DISCLOSURE**

19.1 For the avoidance of doubt, it is hereby declared that no Beneficiary hereunder nor any third party shall have any claim, right or entitlement to call for accounts (whether audited or otherwise) from the Trustee in relation to the Trust Fund and the income thereof, or to obtain any information of any nature from the Trustee in relation to the Trust Fund and the income thereof or in relation to the trusts and powers hereof.

**Schedule**

…

The following General Terms and Conditions of the Trust shall apply to and govern the conduct of the Trust provided that in the event of any contradiction, or conflict, or other difficulty in interpretation, the provisions of clauses 1 to 20 inclusive of this deed shall take precedence and apply to the exclusion of any provision contained in the Schedule, or implied or imposed by law, to the extent that the law shall permit me as Settlor and/or the Trustee to contract out of any such implication or imposition.

The General Terms and Conditions under which the Trust is to be conducted are as follows:

**1. APPLICATION OF TRUST CAPITAL/INCOME**

1.1 Until the date for distribution provided in this deed to pay apply or appropriate the whole or any portion of the capital or income of the Trust as the Trustee shall in its uncontrolled discretion think fit in discharge of such debts and obligations of the Trust fund or of the Trustee as may exist from time to time and for or towards the personal use support benefit maintenance education or advancement in life of such of the beneficiaries as may from time to time be living and of any one or more to the exclusion of the other or others as the Trustee in his sole uncontrolled discretion shall think proper without the Trustee being obliged to preserve the income generating potential of the Trust assets, nor to preserve the capital of the Trust.

…

**[Signed by Paul Webb as Settlor]**
**[Signed by Paul Webb as Trustee]**

**LORD WILSON: (dissenting)**

110. Albeit reluctantly, I would have advised Her Majesty to allow the husband's appeal. The broad justice of the case may well be reflected in the Court of Appeal's order but I, for my part, am driven to conclude that it should have dismissed the wife's appeal. Family lawyers in England and Wales are presently in energetic discussion about whether legislation for the judicial determination of issues of matrimonial finance should continue to allow it to be conducted by reference to discretionary factors or should subject the conduct of it to the application of rigid criteria. For them, section 20 of the 1976 Act ("the Act"), which, according to the author of "Fisher on Matrimonial Property", 2nd ed (1984), para 15.5, was widely criticised when it was part of the law of New Zealand, may be an example of the difficulties which subjection to rigid criteria can generate.

111. I respectfully agree with everything set out in Parts II and III of the Board's judgment. I disagree with it only in relation to its treatment in Part I of the husband's debt to the Commissioner of Inland Revenue in New Zealand ("the Commissioner").

112. The evidence referable to the tax debt is as follows:

(a) The husband did not file tax returns in New Zealand for the eight years from 2001 to 2008 inclusive.

(b) He resided in New Zealand throughout that period and, at any rate latterly, in a property in Remuera, Auckland.

(c) He married the wife in 2005.

(d) Thereafter they enjoyed what the trial judge found to be a high standard of living.

(e) In 2011 the Commissioner began to investigate the husband's tax affairs.

(f) In 2012 he was convicted of aiding and abetting the wife to obstruct the Commissioner's lawful search of the home in Remuera by hiding two hard drives.

(g) In about 2012 the Commissioner issued substantial default assessments against him, inclusive of interest and penalties.

(h)    In particular she contended that he had falsely represented that income earned by him during those eight years had been loans or owed to trusts rather than to himself.

(i)    In 2013 the Commissioner obtained a freezing order which enabled her to enter a caveat against dealings in the title to the home in Remuera.

(j)    In 2016, shortly after his separation from the wife, the husband, by counsel, challenged the assessments before the Taxation Review Authority. But Judge Sinclair dismissed the challenge and confirmed the assessments.

(k)    The husband sought judicial review of Judge Sinclair's determination but presumably the application failed.

(l)    At the hearings in 2017 before Potter J ("the trial judge") and the Court of Appeal the debt, inclusive of interest and penalties, was taken to be about NZ$24m.

(m)    In 2017 the Commissioner sought judgment against the husband in the Auckland District Court. She included a claim for unpaid tax referable to five further years, from 2010 to 2014, so the total claim rose to about NZ$26m.

(n)    Following a hearing in that court in 2018, which the husband attended in person, Judge Cunningham struck out his defence and entered judgment for the Commissioner in the sum claimed.

(o)    In his judgment Judge Cunningham noted that the Commissioner was proposing to take bankruptcy proceedings against the husband.

(p)    At the hearing before the Board in January 2020 Mr McAnally on behalf of the husband stated on instructions that the Commissioner had issued proceedings in the High Court of New Zealand for the appointment of receivers of his client's property situated both in New Zealand and in the Cook Islands.

113.    Before the trial judge Mr McAnally argued that part of the husband's tax debt was not a personal debt and so fell within section 20(5)(a) of the Act, set out in para 27 of the Board's judgment above. For he argued, seemingly with some support in the book written by Mr Fisher (as he then was) and cited in para 110 above, at para 15.7, that part was referable to income which had been used for the benefit of all three members of the family in the course of managing the affairs of the household and so, by virtue of section 20(7)(d), fell outside the ambit of personal debt. Before the Court of Appeal, however,

Mr McAnally conceded that the whole debt should be taken to be a personal debt. Since any property owned by the husband was clearly to be classified as matrimonial property within the meaning of section 8 of the Act rather than as his separate property, Mr McAnally will confidently have concluded that his claim to deduct the debt would be unaffected by whether it was treated as being entirely a personal debt under section 20(5)(b) or partly a non-personal debt under section 20(5)(a). That conclusion would, however, be fatally undermined if the Court of Appeal were to attach to the word "debts" in section 20(5)(b) a meaning different from its meaning in section 20(5)(a).

114. In the light of Mr McAnally's concession, the question before the Court of Appeal became whether, pursuant to section 20(5)(b), the tax debt fell to be deducted from the value of the matrimonial property (in particular of the home in Arorangi) which that court correctly found to be owned by the husband. If so, and in the absence of any matrimonial property owned by the wife, there would be nothing available for division under the Act.

115. It is important to understand the reasoning of the Court of Appeal in concluding that the tax debt was not deductible. It is incomplete to describe it as having been that the debt was unlikely to be enforceable in the Cook Islands. Its reasoning was more focused: it was that the debt was not enforceable against the matrimonial property owned by the husband because the property was situated in the Cook Islands where the debt was unenforceable. In para 34 of its judgment the Court of Appeal reasoned as follows:

> "The sole reason for allowing a personal debt to impact on the matrimonial property division under section 20(5)(b) is to protect a debtor spouse's unsecured creditors. But if, for whatever reason, an unsecured creditor would not be able to execute a judgment against the assets in question there would no longer be any rationale for allowing the debtor spouse to set off that debt against his or her matrimonial property assets."

116. It would be wrong to disagree with the local court's understanding of the rationale behind section 20(5)(b) of the Act. Family lawyers in other jurisdictions might at first sight wonder whether its purpose is to counter, at least in part, the residual injustice of enabling one spouse to leave the marriage with substantial assets and the other with substantial debts. But, if so, they would misunderstand the overall purpose of the Act, which is to set firm rules for the division of matrimonial property irrespective of the overall financial position in which, in the light of any difference in the amount of their separate property, each spouse is left as a result of their application.

117. But a rule is not firm unless it is taken to mean what it says.

118.   To say that the word "debts" in subsection (5)(b) of section 20 means "debts enforceable against the debtor's matrimonial property" is, as Mr Hikaka on behalf of the wife bravely conceded, to put a gloss on the word. The Act could have used those words. But it did not do so.

119.   The Court of Appeal did not suggest that the word "debts" in subsection (5)(a) of section 20 also meant "debts enforceable against the debtor's matrimonial property". On the contrary, the court explained its construction of the word in subsection (5)(b) by saying that the rationale of the subsection was different from that of subsection (5)(a). No doubt non-personal debts deductible under subsection (5)(a) will usually be enforceable against the debtor's matrimonial property. But the subsection does not mandate inquiry into their enforceability against any particular assets. It follows that, by favouring a construction of the word "debts" in subsection (5)(b) different from the word in subsection (5)(a), the Court of Appeal departed from a conventional canon of construction that words in the same Act (and surely all the more when found in the same section) are presumed to have the same meaning: "Bennion on Statutory Interpretation", 7th ed (2017), para 21.3.

120.   The Court of Appeal's construction also has, I respectfully suggest, the curious and inconvenient consequence of requiring a court, confronted with a claim to deduct a debt under section 20(5)(b), to determine, without assistance from the creditor, whether the debt is enforceable against specified assets. The present case offers a perfect example. Into the determination of a modest dispute about the division of matrimonial property under the Act the Court of Appeal insinuated a massive issue, on which there is no authority and which has substantially generated the appeal to the Board: whether a debt, now a judgment debt, owed by the husband to the Commissioner is enforceable in the Cook Islands. The issue falls to be determined in the light of the unique relationship, past and present, between New Zealand and the Cook Islands; and without a contribution from the Commissioner, who would surely have been able to assist the court, and now the Board, in relation to it with greater authority than either of the spouses.

121.   The Board concludes, in my view boldly, that the Commissioner would be unable to enforce in the Cook Islands the judgment which she had obtained in New Zealand, whether directly or by seeking a replicate judgment there with a view to its enforcement. But, even if so, section 655(1) of the Cook Islands Act 1915 in New Zealand, not brought to the attention of the Court of Appeal, provides:

> "Bankruptcy in New Zealand shall have the same effect in respect to property situated in the Cook Islands as if that property was situated in New Zealand."

Parliament in New Zealand has repealed many sections of the 1915 Act but not section 655. In para 66 of its Advice the Board seems to suggest that the Cook Islands might

now decline to afford to a New Zealand bankruptcy order the effect for which the law of New Zealand continues to provide. But there is no material to support that surprising suggestion. Indeed in my view it would be equally fanciful to consider that, if otherwise obliged to recognise the right of the Official Assignee in New Zealand to assert title to the debtor's property in the Cook Islands, the court there could decline to recognise it by reference to the identity of the Commissioner as the petitioning creditor behind the bankruptcy.

122. Had I regarded it as necessary to ask whether the husband's tax debt is enforceable against his matrimonial property in the Cook Islands, my answer would have been that it is enforceable, at any rate indirectly through bankruptcy even if not directly.

123. How then should the Court of Appeal have approached the meaning of the word "debts" in section 20(5)(b) of the Act? The trial judge considered, in my view rightly, that assistance was to be found in the analysis of that word in Mr Fisher's book, cited in para 110 above, at para 15.6 as follows:

> "To qualify under section 20(5) a proposed deduction must constitute a 'debt' … it seems probable that a debt is intended to qualify if a spouse has an existing legal liability to pay … a sum of money either certain or capable of estimation which liability is likely to be satisfied by the debtor-spouse or is actionable with a real prospect of recovery on the part of the creditor."

Note that nowhere in his book did Mr Fisher distinguish between the meaning of the word "debts" in subsection (5)(a) and in subsection (5)(b); nor did he cite any authority which supports the Court of Appeal's construction of the word when found in subsection (5)(b).

124. There is no doubt that the tax debt reflects an existing legal liability. The situation is far removed from, for example, that occasionally encountered by family lawyers, in which the husband's wealthy father makes payments to him during the marriage to enable him to meet day-to-day expenditure; in which on divorce the husband contends that they were loans which he has a legal liability to repay; and in which the divorce court usually rejects the contention.

125. Is, then, the husband's tax liability actionable with a real prospect of recovery on the part of the creditor? In support of that part of his definition Mr Fisher cited the case of *Livingstone*, addressed by the Board in para 43 above. The parties lived in Canada until 1972 and then in Scotland and New Zealand until 1977, when the husband left the wife and returned to Scotland. At the hearing in 1980 the husband produced a letter sent to him in 1973 by the Department of National Revenue in Canada in which it claimed

unpaid tax of Can$28k. The judge ruled that it was not deductible as a debt under the Act as it then applied in New Zealand. He found at p 132 that the husband had no intention of paying the tax, had avoided returning to Canada after 1972 and had been at pains to remove all his assets from Canada; and thus he held that, while the debt existed, it could for practical purposes be disregarded.

126.    In my view it is impossible in the present case to conclude that for practical purposes the husband's tax debt can be disregarded.

127.    Look, first, at the facts. We know that the liability is actionable because action has already been taken in relation to it; and the Commissioner must have a real prospect of recovery of at least a substantial part of the debt. For

    (a)    the husband is a citizen of New Zealand;

    (b)    from 2005 he resided with the wife in the home in Remuera until they moved to the Cook Islands in 2013;

    (c)    in 2016, after he left the Cook Islands, he resumed residence in the home in Remuera;

    (d)    he still resides there;

    (e)    in the absence of evidence it is reasonable to assume that he is again generating income in New Zealand;

    (f)    he regarded it as in his interest to challenge the Commissioner's assessments to the fullest possible extent; and

    (g)    the Commissioner has taken active, and no doubt expensive, steps to secure and enforce the liability, first by obtaining a freezing order, then by obtaining a judgment against the husband and now by applying for the appointment of receivers of his property.

128.    Look, second, at the trial judge's findings. After listening to the extensive cross-examination delivered to the husband, she found as a fact that there was a "real likelihood" that he would have to pay or satisfy the debt. In para 58 above the Board claimed that "she gave no reason for this opinion". With respect, I disagree. In the immediately preceding sentence she had said that the husband was resident in New Zealand and that the Commissioner was in the process of enforcing the claim; and it

was on that express basis that the judge contrasted the present case with the *Livingstone* case in which the debt had for practical purposes been disregarded.

129.    In the same paragraph the Board proceeds to "infer" that the Court of Appeal did not share the judge's confidence that the debt was likely to have to be paid or satisfied. Unfortunately I myself see no basis for drawing that inference. Indeed, if an appeal court were to consider it proper to override a trial judge's finding that an event was really likely, it would say so in terms.

130.    Also in the same paragraph the Board states that, for four reasons which it sets out in paras 59 to 62 above it has reached a clear view that the trial judge's finding was wrong. But what do the four reasons show? The Board's conclusion at para 63 is that they serve to refute any suggestion that "in so far as the matrimonial property is out of reach of his creditors, [the husband] will ever voluntarily apply it to meet his debts". But why does it follow from that conclusion that the debt is not enforceable at all?

131.    In short I agree with the Board at para 41 above that the tax debt is deductible under section 20(5)(b) of the Act only to the extent that it is enforceable or likely to be paid. My respectful disagreement with it lies in its conclusion that, if (which I do not accept) it is not enforceable against the husband's matrimonial property even through bankruptcy, the debt is not enforceable at all. On my analysis it is indeed, including on a practical level, enforceable.



Neutral Citation Number: [2020] EWHC 3528 (Ch)

Case No: PT-2019-000122

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS IN ENGLAND AND WALES**
**CHANCERY DIVISION**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 18 December 2020

**Before**:

**MR HUGH SIMS QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **THE LAW SOCIETY** | **Claimant** |
| **- and –** | |
| **(1) MRS ASHOO DUA**<br>**(2) MR SHASHI DUA** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**JULIA PETRENKO** (instructed by **Monro Wright & Wasbrough LLP**) for the **Claimant**
**THE DEFENDANTS appeared as litigants in person**

Hearing dates: 18, 19, 20, and 24 November 2020

- - - - - - - - - - - - - - - - - - - - -

**APPROVED JUDGMENT**

**Covid-19 Protocol: This judgment was handed down by the judge remotely by circulation to the parties and/or their representatives by email and release to Bailii. The date and time for hand-down is deemed to be 18th December 2020 at 10:30 AM**

**Mr Hugh Sims QC:**

## Introduction

1. Fulmer is a village about one mile from Gerrards Cross, in Buckinghamshire. In 2004 the Defendants, Mrs and Mr Dua, purchased Fulmer House, in Fulmer, as a family home. The Claimant, The Law Society, is a judgment creditor of Mrs Dua, and seeks an order for possession and sale of Fulmer House, and another property also registered in the joint names of Mr and Mrs Dua, called 49 Sudbury Avenue, Wembley. They do so pursuant to charging orders the Law Society obtained over those properties between 2011 and 2013. As at 16 November 2020, according to the updated calculations performed by Ms Petrenko, counsel for The Law Society, the sum of £354,404.29 (inclusive of interest) remains due and owing.

2. At the trial, conducted by Skype for Business during the second Covid-19 "lockdown", I heard evidence from Mr and Mrs Dua, as well as receiving written evidence from other witnesses. The parties are to be commended for co-operating to enable an effective hearing to take place. I have been assisted, in particular, by the clear written and oral submissions made by Ms Petrenko, which travelled further than they might otherwise have done due to the Duas acting in person.

3. Whilst the ultimate issue in these proceedings is whether or not orders for possession and sale should be made in relation to the two properties, under CPR 73.10C, the following issues arise for determination in order to adjudicate on the ultimate dispute between the parties:

   (1) First, whether one of Mr and Mrs Dua are entitled to contend that Mrs Dua does not have any beneficial interest in the properties, or does not have any interest with realisable value (the "Res Judicata and Abuse of Process Issue")?
   (2) Secondly, if so, what is the interest Mrs Dua has in the properties, having regard in particular to the Fulmer Settlement Trust (the "Beneficial Interest Issue")?
   (3) Third, having regard to the determination of those issues, and the matters set out in section 15 of the Trust of Land and Appointment of Trustees Act 1996, should an order for sale, and possession, be made (the "Order for Possession and Sale Issue")?

4. I will consider first the factual background relevant to the Res Judicata and Abuse of Process issue, and determine it, before moving onto further facts relevant to the Beneficial Interest and Order for Possession and Sale Issues, and my judgment on those issues.

## Res Judicata and Abuse of Process Issue

### Background

553

5.   The Law Society, a body incorporated by Royal Charter, is acting through its independently operated regulatory arm, the Solicitors Regulation Authority ("SRA"). Mrs Dua qualified as a solicitor and was admitted to the roll in 1990. An intervention was made by the SRA into the practice of Mrs Dua, in 2009, which intervention was unsuccessfully challenged by her. The costs of that intervention, and the unsuccessful challenge to it, led to judgment debts being established against Mrs Dua, including as to costs. Those judgment debts were not satisfied, and enforcement action was taken by the Law Society, which included obtaining charging orders over certain properties registered in the joint names of Mr and Mrs Dua.

6.   So far as the properties are concerned, Mr and Mrs Dua are the joint freehold owners of five registered titles: (i) Fulmer House, Fulmer Road, Fulmer SL3 6HN, which is registered under title number BM61904; (ii) Land on the North Side of Fulmer House, which is registered under title number BM242835; (iii) Ferndown Cottage, Fulmer Road, which is registered under title number BM63634; (iv) Knoll Cottage, Fulmer Road, which is registered under title number BM61442; and (v) 49 Sudbury Avenue, Wembley, HA0 3AN, which is registered under title number NGL239371.

7.   The first four properties were registered in the joint names of Mr and Mrs Dua on 1 June 2005, and the price recorded as having been paid for them collectively on their titles is the sum of £1,887,547 on 22 October 2004 (the transfer document dated 22 October 2004 also refers to another title, which may either have merged with one of those four titles, or not been registered in the names of Mr and Mrs Dua due to a defect in title, but nothing turns on that). The four titles are occupied by Mr and Mrs Dua, together with their two adult children, as a single residence, and may be conveniently referred to, for short, as Fulmer House. The 49 Sudbury Avenue property is a separate property, which was registered in the joint names of Mr and Mrs Dua on 10 September 1987. The transfer records the purchase price as being £93,000, and completing on 10 July 1987. Mr and Mrs Dua lived in this property for some time, as a married couple, before moving into Fulmer House, after the birth of their two children, in 2005, and after certain renovations were made to it.

8.   There is a linked charge over all five registered titles (i.e. both Fulmer House and 49 Sudbury Avenue) in favour of HSBC Bank Plc, which provided a loan of c. £1.8m to enable the Duas to purchase Fulmer House. As of 2018, a similar indebtedness remained: the sum of £1,791,335.77 was the redemption figure in relation to the charge as of 24 August 2018 together with, as of 8 October 2018, the additional sum of £110,800.23. The figures remain of that order into 2019 and up to the date of trial.

9.   The part of Fulmer House registered under title number BM61904 is also subject to a charging order, entered on 29 October 2007, in favour of Claire Court Schools Limited. Mr Dua described in evidence how he was pursued for a debt in relation to their son's education which he described as ultimately leading to his bankruptcy. Mr Dua was adjudged bankrupt on 12 December 2008, though he remained in occupation of Fulmer House with Mrs Dua, and their children, and remained on the title. The trustee in bankruptcy investigated a possible interest, but never made any realisation, in relation to Fulmer House. As of 24 November 2016 the sum of £14,630.62 was still due under the charging order in favour of Claire Court Schools Limited.

10. 49 Sudbury Avenue is subject to three interim charging orders against Mr Dua's beneficial interest in favour of Edwin Coe (Law Firm), Safeteach Systems Limited and Wembley Business Centres Limited respectively. Mr Dua explained at trial that these all arose in the context of the financial difficulties he was facing in 2007 and 2008 and he disputed these sums.

11. Turning back to the Law Society, between 2011 and 2013 the Law Society obtained final charging orders against Mrs Dua's interest in the properties, as set out in the four paragraphs which follow.

12. On 10 November 2011 Deputy Master Hoffman made five final charging orders (each of which related to one of the five registered titles) charging each title with payment of the sum of £76,977.53, together with any further interest becoming due and £264.80 the costs of each application.

13. On 18 April 2013 Chief Master Marsh made five final charging orders (each of which related to one of the five registered titles) charging each title with payment of the sum of £104,852.96 together with any further interest becoming due and £9,250 the costs of the application. I shall return to the proceedings before the Chief Master below.

14. On 22 April 2013 Master Leslie made five final charging orders (each of which related to one of the five registered titles) charging each title with payment of the sum of £7,096.12 together with any further interest becoming due and £1,500.00 the costs of the application.

15. On 29 October 2013 District Judge Evans made four final charging orders (each of which related to one of the five registered titles, but no order was made in relation to title number BM61442) charging each title with payment of the sum of £24,599.05 together with any further interest becoming due and £253 the costs of the application.

16. The making of the final charging orders by the Chief Master, as referred to in paragraph 13 above, was resisted by Mrs Dua. A hearing was due to take place on 23 January 2013 but was adjourned to 4 February 2013 on the basis that insufficient notice had been given to Mrs Dua. The hearing listed on 4 February 2013 was then also adjourned as Mrs Dua asserted that she had divested herself of any beneficial or equitable interest in the properties, and directions were made to enable Mrs Dua to file and serve evidence.

17. Mrs Dua filed and served a witness statement dated 4 March 2013 to support her opposition, which was prepared with the assistance of her spouse, Mr Dua. Mrs Dua exhibited and relied upon a number of documents, including: (i) a deed of settlement dated 15 October 2004 establishing the Fulmer Settlement Trust (the "Trust Deed"); (ii) minutes from a meeting of the Duas, as settlors and trustees of the Fulmer Trust on 24 October 2004, which she referred to as adjusting beneficiary clauses in the Trust Deed so precluding her and Mr Dua from being beneficiaries; (iii) further minutes of a meeting of the Duas, on 12 September 2015, which she described as transferring the remaining beneficial interest in 49 Sudbury Avenue to the Fulmer Trust. Those documents, together with some other documents, were referred to in

order to argue, in brief summary, that the properties were held by her and Mr Dua pursuant to an express trust in favour of her children.

18. On 18 April 2013, the Chief Master gave judgment. It is clear from his judgment that Mr Dua was not a party to the proceedings and nor was he treated as a person who was objecting to the order being made under CPR 73.10A. He observed that Mrs Dua had previously been assisted by Mr Dua as a McKenzie Friend, but that on this occasion Mr and Mrs Dua attended only as judgment was being given. Six points were identified as having been raised in the evidence of Mrs Dua in opposition to the charging order made final. I need consider only the sixth, namely that she no longer had any beneficial interest in any of the five properties.

19. The Chief Master concluded he should dispose of this point against Mrs Dua summarily:

20. First, he concluded that, absent a copy of the original Trust Deed, which the Law Society had been asking for and which the Duas had failed to produce, and/or any witness evidence from Mr Richard Tutty (the trust and estate practitioner who witnessed the Deed), and taking into account that the Deed was not registered at HM Land Registry until 2012 (being a date after the date on which the Law Society had obtained a final charging order), there were doubts as to its authenticity and Mrs Dua had not discharged the burden of proof which rested on her.

21. Secondly, he found that the Trust Deed only concerned that part of Fulmer House with title number BM61904, and not any of the other title numbers.

22. Thirdly, the Trust Deed was dated 15 October 2004, whereas the conveyance in relation to Fulmer House took place on 22 October 2004. The Chief Master noted that "*it is trite law that it is not possible to create a trust of future property, in other words a property which at the time was not vested in Mr and Mrs Dua. So even if the deed is authentic, it is ineffective to create a trust over either Fulmer House or any of the other former related properties*".

23. As for 49 Sudbury Avenue, Mrs Dua relied on a copy of a minute meeting of the Board of Trustees of the Fulmer Trust dated 12 October 2005 which said, in summary, that it was resolved that the unencumbered equity belonging to Mr and Mrs Dua in this property would be purchased by the Fulmer Trust for £90,000.00. The transcript of the approved judgment is not clear on this point, but it would appear that the Chief Master was persuaded by the Law Society that the minute on its own provided insufficient evidence to show a transfer of either a legal or equitable interest to the trust.

24. In these circumstances, the Chief Master considered that it was unnecessary to direct a trial of an issue before making the interim charging order final stating that "*on the evidence placed before me, for the reasons I have given, there is no reason to conclude that Mrs Dua has alienated her interest in these titles or her interest in them and there is no other good reason for declining to make these interim charging orders final such that would warrant a full investigation at the trial of a preliminary issue*".

**Procedural history in this claim**

25. The current proceedings were issued on 12 February 2019, by a Part 8 claim, as required by CPR 73.10C(4). The claim named both Mrs and Mr Dua as defendants. The relief sought is for an order for possession and sale of the properties in accordance with CPR 73.10C, as further set out in the witness statement of Michael James Acton, of Monro Wright & Wasbrough LLP, also dated 12 February 2019. Mr Acton is not a witness of fact in respect of the events in question. He has given two witness statements concerning the background to the final charging orders obtained by the Law Society, over the properties between 2011 and 2013, as well as exhibiting certain documentation relied on by the Law Society in support of their claim. At paragraph 9 of his first statement he confirms the total due under the charging orders, inclusive of interest at the date of that statement, was £324,685.64. The sum is now £354,404.29, as verified by a statement from Mr Wade, also of Monro Wright & Wasbrough LLP, dated 13 November 2020, subject to certain deductions confirmed by Ms Petrenko. The fact that the charging orders have been obtained is not in dispute.

26. By their statements dated 4 and 15 March 2019 Mr and Mrs Dua set out their initial evidence in response to the claim and why it was opposed. This raised a number of points, including the point that Mrs Dua did not have any beneficial interest.

27. The matter first came on for a hearing before Master Kaye on 21 May 2019. At that hearing Mr Brueton, a solicitor agent, attended for the Law Society and the Defendants attended in person. It had become apparent by that time that Mr Dua remained an undischarged bankrupt and the status of his last known trustee in bankruptcy, Mr Pick of Grant Thornton, was unclear. Orders were made on that date requiring the proceedings to be served on Mr Pick or any other person currently acting as Mr Dua's trustee in bankruptcy. The court also made an order permitting the Law Society to file and serve further evidence in response to the evidence of the Duas, and in particular to address the issues of payments alleged to have been made by or on behalf of Mrs Dua to the Law Society and any other credits which Mrs Dua claimed should be set off against the amount claimed to be due to the Law Society. The Duas were also given permission to file and serve evidence in reply and the matter was to be relisted for further directions after 1 August 2019.

28. Mr Acton served a further and second statement, dated 13 June 2019, in which he addressed the points identified by Master Kaye in the order of 21 May 2019, and he noted at paragraph 7 that he considered the crux of the matter was "*whether or not the First Defendant has a beneficial interest in the properties known as Fulmer House and 49 Sudbury Avenue*." He also referred, at paragraph 8, to the fact that Mrs Dua had, when seeking to challenge the conversion of an initial charging order into a final charging order before Master Marsh in 2013, made the same or similar arguments to ones she was raising in these proceedings, namely that Fulmer House and 49 Sudbury Avenue had been placed into a trust. In short, therefore, he was complaining that the Duas were wrongly seeking to relitigate the same points as "they" had raised, unsuccessfully, before the Chief Master. However, no strike out application was made.

29. As for Mr Dua's bankruptcy, Mr Acton's second statement refers to the Law Society having made further enquiries in relation to this issue, and identified that Mr Pick had ceased to act as trustee in bankruptcy and the matter had been passed back to the Official Receiver. Mr Pick recorded in his evidence that the proceedings were served on the Official Receiver by recorded post on 7 June 2019. That letter states that Mr Dua was made bankrupt on 12 December 2008. It also refers to Mr Dua's suspension from discharge, an order which would have been made under section 279(3) of the Insolvency Act 1986. The position now rests therefore, on the basis that Mr Dua's bankruptcy discharge has been suspended, and the Official Receiver is his trustee, but has not taken any interest or asserted any interest in these proceedings. Mr Pick, as his trustee in bankruptcy, did show an interest in matters concerning Fulmer House at an earlier date, and I shall return to that evidence, as it has some relevance to the failure to produce the original Trust Deed.

30. The matter came back again before Master Kaye on 14 August 2019 for further directions, Mr and Mrs Dua having not served any evidence in reply by this time. Master Kaye made an unless order on this occasion, providing under paragraph 1 of the order that "Unless the Defendants file and serve evidence in reply by 4pm on 11 September 2019 they will not be able to serve or rely on any further evidence at the Disposal Hearing". At this date the parties and the court appeared to have in mind that the disposal would be on the basis of written evidence alone. The Law Society was represented at this hearing. Mrs Dua did not attend, but Mr Dua attended in person. Still no strike out application, on abuse grounds or otherwise, was made.

31. Mr and Mrs Dua then duly filed and served the further evidence they wished to rely on, in the form of second witness statements from Mr and Mrs Dua dated 11 September 2019. Those statements, in contrast to the first set of statements, were served with the benefit of legal advice and assistance from solicitors. Mr Dua's witness statement, in particular, provides a reasonably detailed statement of his evidence, and exhibits a number of documents he relies on. So far as the Trust Deed is concerned, the exhibits included documents showing that the Original Trust Deed had been sent by Mr Tutty's firm, Teaco Associates, to Veale Wasbrough Vizards, the solicitors then acting for the trustee, Mr Pick, under cover of a letter of 1 March 2010. So, as it turns out, the failure to provide the Original Trust Deed could not be laid at the door of Mr and Mrs Dua. Nor could the absence of the Trust Deed on the register, before the Law Society took action in relation to its charging orders, be said to be suspicious, because this correspondence pre-dated the same.

32. Mrs Dua provided a shorter statement, identifying some minor differences between her evidence and that of Mr Dua, but in the main agreeing with Mr Dua's evidence. Mr Dua's brother, Ravi Dua, also provided a short statement, dated 10 September 2019, at the request of his brother. This statement dealt with the purchase of an earlier property, called 96 Hodder Drive, which was the first property transferred into the joint names of Mr and Mrs Dua. His evidence was not challenged at trial.

33. The contemplated disposal hearing on the papers, listed for hearing in January 2020, did not proceed due to, in part, the fact that the Law Society had decided they wished to cross-examine the Duas on their evidence. The disposal hearing was vacated, therefore, and relisted with a time estimate of 2 days on 17 and 18 September. Master Kaye caused a PTR listing to be arranged, and an order was issued on 25 August 2020

notifying the parties of a PTR on the 8 September 2020. That took place on 8 September 2020 and again Mr and Mrs Dua attended in person. The effectiveness of that hearing appears to have been impaired, to some degree, by difficulties the Duas were then experiencing with the technologies associated with remote hearings. They fared much better in relation to that at trial, which tends to illustrate that, with some training and experience, even litigants in person may cope effectively with remote trial hearings.

34. After the PTR, but about 10 days before trial, the Duas served a copy of a witness statement from Mr Tutty, the witness to the Trust Deed. I ruled at trial that they be permitted to rely on his evidence at trial. The Duas arranged for Mr Tutty to be available to be questioned. But the Law Society chose not to cross-examine him, and his evidence went unchallenged. He exhibited a copy of the Trust Deed and confirmed that his firm, Teaco Associates, prepared the Deed establishing the Fulmer Trust in 2004. He confirmed that he witnessed the Duas signatures and proceeded to register the Trust with the Inland Revenue. He, and his firm, thereafter ceased to have any involvement in the trust administration. He verified that his firm no longer held the original Deed, it having been released to Veale Wasbrough Vizards in 2010. This was consistent with the documentation Mr Duas had exhibited to his statement of 11 September 2019. A further evidential point which had supported the reasoning of Master Marsh had thereby been removed.

35. So, by the time of trial, the Law Society did not seek to suggest that any of the three main points which Chief Master had been persuaded of in 2013 (putting to one side for present purposes the separate question relating to 49 Sudbury Avenue) could be supported.

36. Returning to address them briefly here, the first evidential point, namely the concerns as to authenticity, I have already addressed in paragraphs 31 and 34 above.

37. The second point, that the Fulmer Trust only included that part of Fulmer House with title number BM61904, and not any of the 3 other title numbers, was not supported either, at the hearing before me. A wider consideration of the matrix of fact documentation which was available to this court at trial, and which is admissible as an aid of construction in relation to a voluntary settlement, points very clearly to the conclusion that references to Fulmer House in the Trust Deed was intended to refer to all the title numbers being acquired by Mr and Mrs Dua at Fulmer (i.e. all four title numbers) and not just the title number BM61904 associated with the main accommodation. Apart from anything else the financial numbers would not make any sense if the reference to Fulmer House did not mean all four titles. I might add that if it could have been said there was a latent ambiguity from the document, there is a suggestion in Lewin on Trusts (5th Edition) at para 7.014 that evidence might be admitted of the settlor's intention, in order to clarify the ambiguity. However, given the concession made by the Law Society on this issue and my conclusion that there is no ambiguity in the light of the surrounding relevant documentation, there is no need to resort to this.

38. The third point, whether the Trust Deed was an ineffective declaration of trust as to future property, was, also, not said to be determinative against the Duas by the Law Society at the hearing before me. This was because, even if the Chief Master was

559

correct to say that the Trust Deed was only a declaration as to trust of future property (assuming the exchange of contracts had not occurred before 15 October 2004), nevertheless the minute of 24 October 2004 amounted to a confirmation or new declaration, after the date of completion on 22 October 2004. Where property subsequently vests in the trustee and they confirm the previous declaration of trust that will suffice: see *Re Northcliffe* [1925] Ch 651 at 655.

39. It might be thought that in these circumstances there was not a stable foundation on which to contend that it would be unjust to permit the Duas to rely on the Trust Deed in support of their defence at the trial before me. However, it has been submitted that in this case I should discount any reference or reliance to the questions of the underlying merits when assessing the res judicata and abuse of process issue.

**Res Judicata and Abuse of Process: The case advanced by the Law Society**

40. Ms Petrenko, for the Law Society, contended that, save for the points of difference referred to in Mrs Dua's witness statement of 11 September 2019, Mr and Mrs Dua take the same position in this litigation as they did before Chief Master Marsh. She pointed out that both of them seek to argue that Mrs Dua does not have any beneficial interest in the properties. She referred to the fact that, in his main witness statement dated 11 September 2019, Mr Dua seeks to rely on the Trust Deed, as allegedly varied, to argue that beneficial title is held pursuant to an express trust. Mrs Dua's latest witness statement does not deal with this issue expressly, but she does say that she agrees with Mr Dua's statement, and at times she sought to rely on her earlier witness statement, including the statement put before the Chief Master.

41. In these circumstances, the Law Society contend that it should not be open to Mrs Dua to seek to argue that the properties are held by her pursuant to an express trust on the basis of the Trust Deed (as varied), or indeed on the alternative, implied, basis that Mr Dua is the sole owner. The Law Society complain Mrs Dua made this argument as to a lack of beneficial interest in the proceedings before Master Marsh who was entitled, under CPR r.73.10A(3)(c), to decide this issue and, after having given Mrs Dua the opportunity to put her case by adjourning the hearing, decided it against Mrs Dua. In these circumstances, it is contended, there has already been substantive adjudication on this point, and Mrs Dua is precluded by an issue estoppel from making this argument again. Mrs Dua is similarly estopped, submit the Law Society, from relying on the minute of transfer date 12 October 2005 as justifying her position that she divested herself of any interest in 49 Sudbury Avenue.

42. Ms Petrenko recognised that Mr Dua was not a party to the proceedings before Master Marsh, as the charging order was only sought against Mrs Dua's interest in the properties. However, she submitted that the rule against abuse of process first established in *Henderson v Henderson* (1843) 3 Hare 100 extends the ambit of *res judicata* in two respects. First, the rule applies to matters which were not decided by the court, but which might have been decided. Secondly, the rule applies not just to subsequent litigation between the same parties, but also to parties to the subsequent proceedings who were not party to the earlier proceedings. What constitutes abuse of

process depends on a broad merits-based approach taking in account all the facts and circumstances of the case.

43. She pointed in particular to the following factors, at paragraph 21 of her written opening submissions, as supporting the contention that the conduct by Mr Dua was abusive (omitting trial bundle references):

"*Mrs Dua's witness statement in the proceedings stated that it had been prepared with the assistance of Mr Dua. Further Master Marsh observed that Mrs Dua had, previously, been assisted by Mr Dua as a Mackenzie friend but that, on the occasion of the hearing, he attended only as judgment was being given. Having been closely involved in the previous proceedings, Mr Dua now seeks to mount to a collateral attack on Master Marsh's decision in his witness statement. This amounts to an attempt bring in, through the side door, an argument which Mrs Dua is not entitled to run and to an abuse of process. There was no application for permission to appeal Master Marsh's order and the Defendants have not made any such application to date (such an application would, of course, be out of time).*"

44. Ms Petrenko emphasised that it was Mr Dua's close involvement in the proceedings, as identified in the paragraph quoted above, which she was relying on to support the abuse of process argument. She stressed that the facts in this case were rare, or unusual, for the reasons summarised above.

45. It is to be noted that Ms Petrenko's submissions set out above in relation to Mrs Dua contain a mixture of submissions based on *res judicata*, or issue estoppel (as considered in *Arnold v National Westminster Bank* [1991] 2 AC 93, and more recently by the Supreme Court in *Virgin Atlantic Airways UK Ltd* [2013] UKSC 46) and abuse of process. But she recognised that in relation to Mr Dua she could only rely on the wider abuse of process principle. This was because Mr Dua was not a party to the earlier proceedings, and Ms Petrenko did not urge on me that he should be treated as a privy, either. I consider she was right not to do so, having regard to the principles which can be derived from the authorities, to which I shall now turn.

**Res Judicata and Abuse of process: the principles and further analysis**

46. The critical path for the decision-making process in this case does not rest with a consideration of whether or not Mrs Dua is barred, on issue estoppel or abuse of process grounds, from taking any of the points identified, but instead it rests with Mr Dua, and asking whether his defence should be precluded based on abuse of process principles. That is not to overlook that abuse of process principles may be said to form part of the law of res judicata (see *Virgin Atlantic* (at [23]-[25])), with substantially the same policy objectives of finality in litigation, and avoiding the oppression or harassment associated with successive actions. But it is to recognise that they are juridically very different. Res judicata is a rule of substantive law whereas abuse of process is an extension of the concept which informs the exercise of the court's procedural powers (*Virgin Atlantic* at [25]). Moreover, whereas under principles of res judicata or issue estoppel the correctness of the decision is not relevant (indeed it may be said the doctrine only comes into its own when the decision

is wrong (see the discussion in Spencer Bower and Handley: Res Judicata, Fifth Edition at [1.14])), in abuse of process cases the position is subtly different. Ordinarily, in abuse of process cases, the broad merits-based approach required by the authorities has nothing to do with the underlying merits, but to that general principle there may be said to be some exceptions, which I shall discuss further below.

47. The authority which may be said to be closest, on the facts, to the present case, is that of the Court of Appeal in *Skyparks Group Plc v Felician Marks Shanti Shah* [2001] EWCA Civ 319, which Ms Petrenko properly drew to my attention, in which Lord Justice Robert Walker (as he then was) gave the leading judgment (with which Lord Justice Keen and Mr Justice Colman agreed).

48. Skyparks brought a claim in the Queen's Bench Division against a company whose liability Mr Marks guaranteed, and Mr Marks. This concluded with judgment being entered, and a charging order being made in respect of Mr Marks' beneficial interest in a dwelling house known as Woodwinds, also close to Gerrards Cross, Buckinghamshire. The coincidence in locations with the present case might be thought remarkable. Mr Marks, the sole registered proprietor, contended that he had no beneficial interest in Woodwinds. That contention was rejected by the Master, and upheld on appeal, on the basis that Mr Marks had some beneficial interest in the house, and it was foreseen there would have to be further proceedings to enforce where the precise interest might be determined.

49. Those proceedings were duly commenced in the Chancery Division, and initially Skyparks sued Mr Marks alone, but Mrs Marks applied successfully to be joined. She contended that the beneficial interest in the house was either in a trust called the Chanick Trust, or belonged to her entirely, or as to part. Skyparks' riposte was similar to that of the Law Society in these proceedings, and to contend that Mr and Mrs Marks were not entitled to take the point. At first instance it was found that Mr and Mrs Marks were both to be treated as being bound by the decision in the Queen's Bench Division, on the basis that Mrs Marks' interest was the same as that of her husband, and she had knowingly abstained from taking any step to be joined in the proceedings.

50. That decision was reversed on appeal, Robert Walker LJ accepting the following submissions (at [41]):

"*Mr Griffiths was however on much firmer ground, in my view, in submitting that there was neither sufficient identity of interest between Mr and Mrs Marks nor sufficiently informed consent on the part of Mrs Marks to stand back and let her battle be fought by her husband. There was obviously a degree of common interest in persuading the master that the house belonged to the Chanick Trust, because that outcome held out the best prospect of the house being preserved as a family home (so long as the charge to Midland could be kept down). And a husband who is facing insolvency may wish to prefer his wife's proprietary claims to his own. Nevertheless Mr Marks, Mrs Marks and the trustees all had competing financial interests…*"

562

51. The parallels with the present situation are obvious. Like in *Skyparks* there is a common interest between Mr and Mrs Dua in persuading the court that Mrs Dua had no, or no realisable, beneficial interest of any value, because this holds out the best prospect of Fulmer House being preserved as the family home. But, nevertheless, his interests are not identical to those of Mrs Dua. A dispute with a trustee in bankruptcy of Mr Dua might illustrate that, as would a divorce dispute. That is before one begins to consider the separate interests of their children, who are stated to be potential beneficiaries under the Trust Deed.

52. It is instructive to note that whilst the main ground of appeal in *Skyparks* concerned res judicata, the Court of Appeal also rejected the attempt to uphold the decision on wider abuse of process principles (see at [46] per Robert Walker LJ).

53. Some of particular features of the *Skyparks* case are noted in the judgment of Robert Walker LJ at [43] as follows:

"*The evidence of Mrs Marks (which the judge seems to have accepted on this point) was that she knew of the master's decision at about the time it was made and that she was told not to worry because there was to be an appeal. She…had had no previous involvement in the litigation and there is no suggestion that she took (or was at any time before August 1999 advised to take) independent advice. Had she (or the trustees) applied to be joined as parties at the stage of the appeal to Sullivan J, they might well have been met by the objection that Master Murray envisaged that they (or at any rate the trustees) would have a chance of being heard in the Chancery Division.*"

54. Ms Petrenko sought to emphasise that the decision in *Skyparks* is distinguishable since it would seem that Mrs Marks may have been misled into not participating in the appeal, based on the observations quoted above. That does not appear to have been a critical feature. On the contrary, one facet of the reasoning was to note that had Mrs Marks applied to join she may well have had that application rejected on the basis she would get her chance to participate in the second stage, in the Chancery Division. Nevertheless, it may be said that the present facts show Mr Dua being more closely connected to the first proceedings than Mrs Marks was in *Skyparks*.

55. It was noted in *Skyparks* that section 2 of the Charging Orders Act 1979 is in wide terms and a wide variety of cases may occur, some straightforward and some a good deal more complicated. So, it is open to a judge to adopt a two-stage approach, if they think fit. The commentary in The Law and Practice of Charging Orders on Land, Harpum and Others, (Wildy, Simmonds & Hill Publishing) at 6.24, notes that:

"*Before making an order for sale, the court must be satisfied as to the nature of the debtor's title to the charged property. Evidence as to the nature of the debtor's title will already have been adduced at the stages of applying for and obtaining an interim and final charging order. However, evidence which sufficed at those stages may not be sufficient at the stage of enforcement. At those earlier stages, if there had been doubt as to the nature of the debtor's title, a charge may nonetheless have been granted, as it could only ever have attached to such interest as the debtor did in fact have in the property. If it transpired that he had none, then no charge would in fact*

*have been imposed. However, at the stage of enforcing the charging order, the court must be satisfied that the debtor in fact has an interest in the property to be sold, and as to the nature of that interest.*"

56. This is reflected in cases such as *Walton v Allman* [2015] EWHC 3325 (Ch) (Snowden J), which emphasise that the court need not concern itself, at the charging order stage, as to the extent of any equitable interest. Indeed, there are sound practical and policy reasons why, at the charging order stage, it should not be necessary for the judge to deal in certainties and may make an order over the debtor's interest in a property "if any", including any interest they might have under a trust.

57. Ms Petrenko did not suggest this was not a possibility, but that Chief Master Marsh decided not to take that approach here. Instead, he decided the issue, as he was entitled to, such that his rejection of Mrs Dua's contention that Fulmer House was held under the Fulmer Trust formed an essential part of his reasoning. Ms Petrenko is right that this was the approach of the Chief Master. However, his decision in this respect is not to be divorced from the context in which charging order decisions are made, where it is not necessary to determine the precise interests, and his conclusions were very much based on the evidence placed before him at that stage.

58. There are two other points I should also note here. The first is that there is a procedure whereby objectors may participate in charging order proceedings by filing and serving their own evidence, and the court may give directions for the resolution of any dispute raised by their objections: see CPR 73.10A(2) and (3)(c). That did not happen in this case. Secondly, the Law Society could, but did not, seek to join Mr Dua to the earlier proceedings. If Mr Dua had applied to be joined he might well have been faced with the same argument which the Court of Appeal theorised Mrs Marks might have been met with in *Skyparks*, namely that he should not be joined, but would become a necessary party in any later enforcement proceedings, such as are now occurring, at which stage he could produce his evidence and argument.

59. Finally, in relation to *Skyparks*, I should note that the Court concluded that Mr Marks did have a beneficial interest in Woodwinds, under the Chanick Trust, but it was a defeasible interest with no realisable value, and insufficient to serve as a basis for the orders for possession and sale which the judge made (see at [52]).

60. So far as the overall guiding principles in relation to abuse of process, the speech of Lord Bingham in the House of Lords in *Johnson v Gore Wood & Co* [2002] 2 AC 1 sets out the main principles. The case is so well known that I will take the facts very shortly. Mr Johnson, in the first set of proceedings, caused a company he controlled, to instruct solicitors in relation to the exercise of a purchase option, which resulted in litigation with the vendor and losses suffered by the company. The company sued the solicitors and shortly before that was settled it was identified Mr Johnson might have a personal claim also against the solicitors for losses he suffered. After the company's claim was settled he issued his own claim against the same solicitor defendants. They applied to strike out on abuse of process grounds, and also on the basis of the rule in

*Prudential* (the reflective loss principle). The latter is not relevant to this case, but the former is.

61. The House of Lords dismissed the abuse of process aspect of the application and considered the principles applicable in *Henderson v Henderson* abuse of process cases. The key passage is in the oft cited speech of Lord Bingham at page 31, which is worth reciting here to have in mind the key guiding principles:

> "*Henderson v Henderson abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not … it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice.*"

62. This authority emphasises that there are no hard and fast rules, or bright lines, which can be drawn in abuse of process cases. The ultimate question is whether in all the circumstances a party's conduct is an abuse.

63. The decision of the Court of Appeal in *Conlon v Simms* [2008] 1 WLR 484 also considered abuse of process principles, and may be said to support three relevant propositions, namely that: the fact that the parties are not the same is not dispositive; but, it will be a rare case where the re-litigation of an issue which has not been decided between the same parties or their privies will amount to an abuse (the latter also emphasised in the decision of the House of Lords in *Re Norris* [2001] UKHL 34, another husband and wife case); and this is particularly so where the conduct which

565

is said to be abusive is that of the defendant making a second and successive attempt at defending themselves (though as noted by Mann J in *Barnett Waddington Trustees (1980) Ltd v Royal Bank of Scotland Plc* [2017] EWHC 834 (Ch), the doctrine of abuse of process is as capable of applying to defendants and defences as claimants and claims).

64. In *Conlon v Simms* the defendant was a solicitor who had been in partnership with the claimants. The defendant was found to have acted dishonestly in certain transactions and the Solicitors Disciplinary Tribunal struck him off the roll of solicitors. The claimants sued the defendant alleging that he had induced them to enter into a partnership agreement with him, seeking to rely on the findings of the Tribunal. The defendant denied the allegations and contended that the Tribunal's findings were inadmissible as evidence of the facts found against him. The judge held that the defendant was abusing the process of the court by making a collateral attack on the Tribunal's findings.

65. The Court of Appeal allowed the defendant's appeal. At [139] Jonathan Parker LJ noted that the starting point is as follows:

*"139. As I have already pointed out, we are bound by the decision of this court in the Bairstow case [2004] Ch 1—a decision which, in so far as it relates to abuse of process, was in turn based upon the decision of the House of Lords in the Hunter case [1982] AC 529. Accordingly, the starting point on this aspect of the case must be Sir Andrew Morritt V-C's proposition (d) in para 38 of his judgment in the Bairstow case. I quote that proposition again, in full:*

*"If the parties to the later civil proceedings were not parties to or privies of those who were parties to the earlier proceedings then it will only be an abuse of the process of the court to challenge the factual findings and conclusions of the judge or jury in the earlier action if (i) it would be manifestly unfair to a party to the later proceedings that the same issues should be relitigated or (ii) to permit such relitigation would bring the administration of justice into disrepute."*

66. Jonathan Parker LJ went on to recognise that the court may be slower to conclude that a defendant raising a defence which was unsuccessful in earlier proceedings will necessarily be bringing the administration of justice into disrepute or causing substantial unfairness to the claimant by raising it again in later proceedings, in the following terms (at [146]-[147]):

*"146. In such circumstances I consider that there is force in Mr Simms's submission that in denying the allegations of dishonesty made against him in the present action he is doing no more than continuing to protest his innocence of the charges brought against him by the Law Society, albeit he is doing so in the face of the adverse findings of the SDT and the Divisional Court: to use his own words, he has initiated nothing. At the very least, as it seems to me, that is a factor which should be brought into account in considering whether the Bairstow conditions are satisfied, on the basis that in general the court should be slower in preventing a party from continuing to deny serious charges of which another court has previously found him guilty than in*

*preventing such a party from initiating proceedings for the purpose of relitigating the question whether he is guilty of those charges.*

*147. It should also be borne in mind, when determining whether a party (be he claimant or defendant) is abusing the process of the court by mounting a collateral attack on a previous court decision, that the practical effect of finding him guilty of such an abuse is to prevent him denying the allegations against him save in circumstances where he is in a position to adduce additional evidence which could not with reasonable diligence have been adduced in the earlier proceedings and which, if admitted, would have "changed the whole aspect of the case": see Phosphate Sewage Co Ltd v Molleson (1879) 4 App Cas 801, 814, per Earl Cairns LC, and the Hunter case [1982] AC 529, 545b–f, per Lord Diplock. To that extent the party guilty of abuse of process will, as I see it, be placed in a worse position in regard to the adducing of evidence than he would have been in had the previous decision been admissible as prima facie evidence (for it would be no more than that) of the facts found."*

67. The Court of Appeal decided (see further at [149]-[150]) that there was no abuse of process because: (i) the defendant had not "*initiated*" the allegation; and (ii) the facts to be established in the proceedings before the Tribunal were different from the proceedings initiated by the claimants against the defendant.

68. An additional reason why the courts may take a more cautious approach in relation to abuse of process allegations concerning defendants is because the claimant is, subject to the court's overriding case management powers, in the driving seat so far as litigation is concerned. They can choose who they join as defendants, or respondents, and when. This point takes on even greater force where the defendant in the second action was not a party in the first action, but could have been joined.

69. In the context of disputes relating to property subject to a trust, or involving more than one party alleged to have the same interest, there are procedural safeguards for a claimant to employ, even falling short of joinder. For example, under CPR 19.8A there is the power to make judgments binding on non-parties where property is subject to a trust. There also rules relating to representation of beneficiaries by trustees (CPR 19.7A). And wider rules concerning representative parties with the same interest (CPR 19.6). None of those rules have been invoked in this case.

70. The stage at which proceedings have reached may also impact on the court's decision to strike something out as an abuse. In *Booth v Booth* [2010] EWCA Civ 27 the claimants had unsuccessfully challenged the validity of their father's will. The second claim concerned the administration of their mother's estate, and raised similar issues, but it was found that this did not constitute an abuse of process by the judge at first instance, when determining a number of preliminary issues. The Court of Appeal ultimately concluded that the reasoning which led to this conclusion by the judge at first instance was not supportable, but nevertheless declined to reverse the decision. They were significantly influenced in this respect by the fact that the rights had already been substantially determined by the findings in relation to the other preliminary issues. So, it is apparent that the applicant would have been on stronger ground if they had brought their application to strike out at an earlier stage in

proceedings, before trial. This reflects the fact that the extended abuse of process principle is concerned with the court's procedures (*Virgin Atlantic* at [25]).

71. Ordinarily the court will not consider the underlying merits of the case, but it would appear that is not a rigid rule. The parameters in relation to the extent to which the merits of the underlying proceedings may be taken into account were discussed in *Stuart v Goldberg Linde* [2008] EWCA Civ 2, [2008] 1 WLR 823. The first action was brought by the claimant against the defendant solicitor for breach of their undertaking. The second action alleged inducement of a breach of contract and misrepresentation. The parties were the same. The Court of Appeal nevertheless concluded that the second action was not an abuse, reversing the decision below. When discussing points of general application, under the heading "prospects of success", the Court stated (at [57]):

*"Given Lord Bingham's emphasis [2002] 2 AC 1, 31 on the need for the court to avoid adopting "too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court", it is necessary to proceed with care in relation to a contention that some aspect of a particular case must be disregarded as irrelevant in principle. However, it seems to me that it would at most only be in an extreme case (either way) that the merits, in the sense of prospects of success, of the second proceedings can be relevant to deciding whether bringing them separately is an abuse of process. If the case can be shown to be cast-iron, so that judgment could be obtained for the claimant under CPR Pt 24, this might perhaps outweigh factors suggesting that the case ought to have been brought as part of the earlier proceedings. If, on the other hand, the case is hopeless, then it may be capable of being struck out for that reason in any event. But if, as here, the prospects of success are uncertain but the case is not suitable for summary judgment for either party under CPR Pt 24, then it seems to me that it is inappropriate to attempt to weigh the prospects of success in the balance in deciding whether it is an abuse of the process to bring the claim in later proceedings, rather than as part of the earlier proceedings. In my judgment, when Lord Bingham spoke of a "broad, merits-based" approach, the merits he had in mind were not the substantive merits or otherwise of the actual claim, but those relevant to the question whether the claimant could or should have brought his claim as part of the earlier proceedings. A defendant may feel harassed by having brought against him what appears to be a weak claim, but that factor should not count in this context. Whether the claim appears to be weak or strong, it is the fact of it being brought as a second claim, where the issue could have been raised as part of or together with the first claim, that may constitute the abuse."*

72. So, the broad-merits based enquiry contemplated by Lord Bingham in *Johnson v Gore Wood* is in almost all cases focused on "*the public and private interests involved*" and engaged by successive actions involving the same or similar issues involving the same or connected parties. This must have regard to the twin objectives and desirability of finality of litigation and prevention of unjust harassment. But where the application is being considered at trial, and where it is apparent that by the

time of trial the factors relied on by the claimant in support of that outcome are not supported by the evidence, that is a factor, in my judgment, which the court may take into account.

73. I consider there are reasons why, in this case, it may be open to do so. Firstly, because if there has been any unjust harassment it has already occurred. The claimant had the ability to stop the abuse before trial by applying to strike it out. Secondly, it is going too far to say that an abuse of process argument cannot be successful at trial. Some abuse of process arguments or defences might require oral evidence and can only be determined at trial. But where, as here, the features relied on did not require oral evidence to be adduced, then this is a relevant factor to take into account. Thirdly, reasons of efficiency justify rejecting attempts to relitigate but where the litigation has reached the trial stage, and the determination of the abuse of process argument is happening at the same time as the determination of the case itself, any efficiency or cost saving in the public interest is much reduced.

**Res Judicata and Abuse of process: conclusions**

74. Applying the above principles to this case, I reject the Law Society's contention that Mr Dua should be precluded, at this trial, from seeking to adduce evidence and argue that Mrs Dua does not have a beneficial interest in the properties in question, or any interest of any realisable value, and to do so placing reliance on the Fulmer Trust. I do so for the following reasons:

(1) I accept that Chief Master Marsh's decision in 2013, in one of the charging order proceedings, involved him rejecting substantially the same defence advanced by Mrs Dua in those proceedings and which Mr Dua now seeks to rely on;

(2) I also accept that Mr Dua's involvement in those proceedings, by assisting Mrs Dua in the preparation of her evidence, and at court, as a McKenzie Friend, may be fairly characterised as close involvement which, taken together with the first factor, could make him vulnerable to the contention that he should be treated as bound by any findings made as a result of that process;

(3) However, set against that is the important starting point that ordinarily only parties to proceedings are bound by the outcome, and care needs to be taken in the application of a rule which would depart from that. That is particularly so where there are rules which enable third parties to be joined or bound in, which can be used to protect the other parties, as I have referred to above, and where they have not been employed. Becoming a party gives the person in question certain unassailable rights: to adduce evidence, to be heard, to seek to appeal. Mr Dua had none of those in the earlier proceedings;

(4) Whilst it is not a requirement to establish an abuse, there is no suggestion that Mr and Mrs Dua were "gaming the situation" with a conscious intention to run the defence through Mrs Dua first and then Mr Dua;

(5) The context of the first decision/action was an earlier stage in the enforcement process, where it was not necessary to make the decision the Master made. I

accept he did make that decision, on a summary basis, rejecting Mrs Dua's contention that her interest in the properties had been settled on trust. But the context in which he made it, and that it was not strictly necessary for him to go as far as he did, is a relevant factor to take into account. In addition, whether an order for sale should be made gives rise to different and additional considerations;

(6)    It would do the administration of justice a disservice to conclude that those who assist others in litigation could be prejudicing their own position by doing so, at least without any conscious appreciation they were doing so. In this case no warning was given to Mr Dua of this possible consequence. I am not satisfied that the fact that a husband helps their wife with litigation is rare, particularly where the wife is acting as a litigant in person. In my judgment if a spouse is to be viewed as potentially prejudicing their own position by assisting that of their spouse it would be preferable for them to be put on notice of that, and a warning should be given by the claimant, or the court, including that they should take legal advice. The best form of warning, of course, is to be joined in. In some cases a lesser type of warning may be considered to be sufficient. In this case no warning was given. Nor is there any suggestion Mr Dua received legal advice as to his position or interests at the time, indeed it was the precise absence of such legal assistance and representation for Mrs Dua which has drawn him into the cross-wires of a strike out argument;

(7)    If there is any force in the contention that the Law Society is subject to unjust harassment by having to fend off a defence twice, that can hardly be said to be oppressive to them in this case, and nor does their conduct suggest that it has been oppressive to them. They had it in their hands to avoid the oppression by joinder or binding Mr Dua into the earlier proceedings if they wished, but they did not. They also had it in their hands to make a strike out application at an earlier stage in proceedings, in advance of trial, but they did not. Moreover, any complaint the Law Society might have made is now largely in the past;

(8)    Similarly little is to be gained, from an efficiency or cost point of view, and having due regard to the wide public policy considerations, in acceding to the strike out argument now;

(9)    It should also be noted that the Duas have not initiated either the proceedings under consideration in this case. Mr Dua is a defendant to this action and Mrs Dua was (in substance) a defendant to the earlier action (though the procedural effect of a challenge to an interim charging order may result in that person becoming the notional claimant);

(10)    In all the circumstances, I conclude that Mr Duas' close involvement in the earlier proceedings before Master Marsh in 2013, as described above, when taken with all the other factors mentioned above, is not such that it would be an abuse for him to defend these possession and sale proceedings relating to his home on the basis that Mrs Dua does not have any beneficial interest, or none with any realisable value, because the relevant properties are held by the Fulmer Trust. The fact that in doing so he may benefit Mrs Dua, as a consequence, in circumstances where she might well be said to be subject to an abuse of process argument, is not

in my judgment, a relevant, or sufficient, reason to conclude he should not be entitled to run the defence for his own benefit and reasons.

75. Accordingly, it is not necessary for me to consider the underlying merits of the proceedings in deciding whether or not Mr Dua's conduct is an abuse. But in case I am wrong, and the above factors are insufficient to reject the abuse of process argument, I consider that the merits do have a role to play in this case, at this very late stage in the proceedings, and may be said to be a further relevant factor supporting the rejection of the argument, for the following two additional reasons:

(11) As I have already stated above, the three main points in support of Chief Master Marsh's decision are now no longer supported by the Law Society or the evidence now before the Court. That is not to say the decision taken by the Master was necessarily wrong, on the evidence he had before him at the time. But with the evidence now before this court, and admitted into evidence at trial, the points are now no longer supportable, or supported by the counter-party to the earlier proceedings. That is an exceptional feature of this case;

(12) Moreover, even now it seems to me the Law Society has not captured all of those who might have an interest in the outcome of these proceedings and entitled to be heard. The (at least main) potential beneficiaries identified in the Fulmer Trust were the children of the Duas. They have not been served or joined. So there remains the risk that they could seek to argue that the Fulmer Trust is effective and removes any justification for any charging order being enforced. In these circumstances, the administration of justice is best advanced by seeking to resolve the underlying merits of issues, after having conducted a trial of those issues, between the parties now before me, especially where, as appears below, I conclude those issues should be resolved against the Law Society. It is better for the Law Society, and for wider court users, to know that now.

76. I therefore reject the abuse of process argument in relation to Mr Dua. Given that Mr Dua can raise the same line of defence which Mrs Dua wishes to rely on, there is no need to decide whether or not the stance adopted by Mrs Dua is barred by res judicata, or issue estoppel, or is an abuse of process.

77. I shall turn now to consider the facts in more detail and which may be said to be relevant to the remaining issues of what interest Mrs Dua has in the properties, having regard in particular to the Fulmer Settlement Trust, and whether I should make an order for possession and sale.

## The Beneficial Interest Issue

### Introduction

78. Before making any findings of fact in relation to the Beneficial Interest Issue it is appropriate I should say a few brief words as to my overall impressions of the witnesses I heard, namely Mr and Mrs Dua, and the approach I have taken to making my findings.

79. Starting with the latter, I have reminded myself of the principles to apply as most recently summarised by the Court of Appeal in *Martin v Kogan* [2019] EWCA Civ 1645 at [88]. Findings of fact are to be based on all the evidence, though it will usually be appropriate, especially in cases which relate to events some time ago, as in this case, to start with a consideration of the contemporaneous documents and evidence on which undoubted or probable reliance can be placed. The fallibility of human memory is well established and is best assessed against the documents and natural or probable inferences from them. The manner in which evidence is given also has its role to play, though the role played by the demeanour of the witness when giving evidence tends to be overstated. The greatest focus needs to be on linguistic consistency, or inconsistency, and the extent to which the oral evidence is corroborated or consistent with the remainder of the evidence.

80. So far as my impression of the Mr and Mrs Dua were concerned, in general terms I consider Mr Dua was doing his best to assist the court. He had a reasonably good recollection of events, and of the documents in the bundle, sometimes drawing the court's attention to documents which helped clear up matters lacking in clarity. There were times where he was prone to giving speeches in support of what, I deduce, he perceived to be his best line/s of defence, and it became apparent during the course of his oral evidence that his main witness statement, dated 11 September 2020 contained errors, including as to the consideration and basis on which 96 Hodder Drive was transferred into the joint names of him and Mrs Dua, and the timing of its sale. Mr Dua explained he had intended to correct the first and third of these points, and had done so in an earlier statement which he had been refused permission to rely on at the PTR. I do not believe Mr Dua intended to give inaccurate evidence, but he clearly did sign a statement which contained inaccuracies. I consider that hardly surprising given the passage of time. I therefore treat his oral evidence with caution. An illustration of why I should do is the second point identified above, relating to the transfer into joint names of 96 Hodder Drive. Notwithstanding the fact that the title showed that Mr and Mrs Dua had declared this should be held as beneficial joint tenants, Mr Dua insisted that he was the owner. On further questioning his stance softened. I have in mind that his evidence in this respect may have been coloured to some degree by his attitude to who would control the decision making process in relation to the use of this property, rather than necessarily pointing to the conclusion that he did not intend Mrs Dua to share in any equity in the property.

81. As for Mrs Dua, whilst she is the reason why the Law Society are pursuing this claim, she had a lesser role to play in giving evidence. She very much deferred to Mr Dua and his evidence. She had the unfortunate tendency of seeking to anticipate the line of questioning, or suggest the line of questioning was beyond her ken, which I did not find convincing, and she was very defensive. She was prone to outbursts about the mistreatment she had received at the hands of the Law Society, which was a further warning sign as to the potential lack of reliability of her evidence. So caution is also required in relation to her evidence.

82. All that said, this is not one of those cases where there is a stark conflict of oral evidence between two or more witnesses. The Law Society called no oral evidence. And I bear in mind that through the passage of time documents may no longer be

available to assist with giving evidence. Where the oral evidence in question from the Duas is background to the ultimate issues, and concerns events, rather than more subjective questions of intention, and not obviously contradicted by the available contemporaneous documents, I consider it is likely to be broadly accurate.

**The Beneficial Interest Issue: The Sub-Issue**

83. The main sub-issues raised by the parties' evidence and submissions (this being a part 8 claim, the court did not have the benefit of statements of case at trial), may be summarised as follow:

(1) The Fulmer Trust, namely and in particular: (a) proof; (b) determination of what property it holds; and (c) interpretation of its terms and whether any trust was "illusory";

(2) If sub-issue (1) does not determine the issues as to beneficial interests in relation to the properties, on what terms did Mr and Mrs Dua hold the properties, which splits into the sub-issues of whether: (a) the presumption of equality applies; or (b) an implied (or resulting) trust analysis displaces this, and in each respect considering separately Fulmer House (4 titles) and 49 Sudbury Avenue (1 title);

(3) Equity of exoneration or equitable accounting issues relating to the properties, including in particular having regard to Mr Dua's contentions about payment of the mortgage.

84. Before analysing those issues, I shall set out some further relevant facts.

**The Beneficial Interest Issue: The Facts**

85. Mr and Mrs Dua met in late 1983/early 1984. At the time Mrs Dua was studying at the College of Law, living in rented accommodation. Mr Dua was nearing the end of his four-year training contract with Arthur Anderson. After completing his training contract, in 1985, he was admitted as a member of the Institute of Chartered Accountants in England and Wales. He has worked in various accountancy and business roles since then.

86. Before Mr and Mrs Dua met, Mr Dua was living with his brother at a property called 96 Hodder Drive, Perivale, Middlesex UB6 8LL, which property the two brothers had purchased together in 1981, with assistance from their father. They were both trainee accountants at the time and Mr Ravi Dua confirmed in his evidence that they both paid for the purchase costs from their savings and they shared the mortgage and other ongoing outgoings.

87. Mr and Mrs Dua married in 1985 and after their marriage Mrs Dua moved into 96 Hodder Drive to live with Mr Dua and his brother. Mrs Dua continued with her studies. Mr Dua's brother, Ravi Dua, left the property sometime later, when he married. Mr Dua refers to him buying his brother's share at this time. Mr Ravi Dua does not address the question of the transfer to Mr and Mrs Dua in his evidence.

88. A copy of the transfer which Mr Dua referred to in his evidence has been obtained. This records that, on 11 September 1985, 96 Hodder Drive was transferred from the

two brothers to Mr and Mrs Dua for the sum of £15,000 with Mr and Mrs Dua to hold the property as "*beneficial joint tenants both in law and in equity*". Mr Dua's oral evidence was that he did not pay much attention to this at the time and that the only reason why the property was registered in joint names in this way was so that if Mr Dua died then Mrs Dua would inherit the property. He suggested he was still the person who controlled what happened to the property and viewed it as his to do what he wanted with it, including, if necessary, to make provision for other relatives.

89. In 1987 Mr and Mrs Dua decided to move to 49 Sudbury Avenue, Wembley, HA0 3AN. They did not sell 96 Hodder Drive in order to acquire the property, and instead that property was rented out. 49 Sudbury Avenue was acquired with a mortgage from Lloyds Bank plc and from using his savings, and transferred into their joint names on 10 July 1987 for the sum of £93,000. The transfer document is silent as to the terms on which they were to hold the property. Mr Dua's oral evidence in relation to this was similar to the evidence he gave in relation to 96 Hodder Drive, namely that the only reason why the property was registered in joint names in this way was so that if Mr Dua died then Mrs Dua would inherit the property and that he did not intend, by putting the property into joint names, to give Mrs Dua any share of the equity during his life. The official copy of register of title for 49 Sudbury Avenue (with title number NGL239371) shows that Mr and Mrs Dua became registered proprietors on 10 September 1987, but is silent as to the terms on which it is held and whether Mrs Dua has any beneficial interest in it.

90. Mrs Dua confirmed in her evidence that she did not have any discussions with her husband on the ownership of 49 Sudbury Avenue and that she never thought about it whilst they lived there. She stated if someone had asked her at the time she would have said it was hi property because he funded the purchase and made the mortgage payments. Mr Dua confirmed in his oral evidence that he did not any express discussions with Mrs Dua as to ownership in relation to 49 Sudbury Avenue.

91. In the meantime, Mrs Dua's training had progressed. She obtained a training contract in 1988 and qualified as a solicitor and was admitted to the roll in 1990.

92. Whilst living at 49 Sudbury Avenue, Mr and Mrs Dua had two children, a son born on 1 July 1991, Shiv Chadha Dua, and a daughter born on 28 August 1992, Ilesha Lakshmi Dua. During this time Mrs Dua worked part-time. By this time Mr Dua had set up his own accountancy practice, which was a growing success. In his evidence he referred to two major extensions being built at 49 Sudbury Avenue, in 1992/93 and in 1995, order to better accommodate his accountancy business, which he operated from that address. Mr Dua refers to paying for these extensions out of his own resources, but he has not retained any documents from this time. The overall picture, however, suggests that this is likely to be correct. Mrs Dua only seems to have started up her own practice in November 1994. From that date to 2000 she was operating a high street practice from Southall. Her main role seems to have been in conveyancing.

93. In 1997 Mr Dua started up a new business venture involving education for foreign students, offering courses to those students. He started a college based in Oxford Street, which expanded rapidly. Alongside this, he also purchased properties to provide student accommodation, including in his own name and via certain corporate

vehicles. Mr Dua described this in evidence as also being a successful and growing business.

94. 96 Hodder Drive was sold in 1999. Mr Dua stated he used the net proceeds of sale to pay for the extensions. After it became apparent that his written evidence was incorrect, by reference to the date of the sale transfer, he subsequently clarified that what he meant by this was these extensions were originally built using his funds, and loans, which were then "reimbursed" by the net proceeds of sale from 96 Hodder Drive.

95. Mrs Dua's practice in Southall was not working out for her and she decided to close the practice office and work with lower overheads from home, in Sudbury Avenue, from February 2000.

96. By 2003 Mr and Mrs Dua were looking for a bigger property to live in, for themselves and their children, who were at, or approaching, secondary school age. Mr Dua refers to various efforts by him to raise money to enable them to proceed with such a purchase by re-mortgaging various properties in his name. With some modifications, the documentary evidence substantially supported and was consistent with his recollections in this respect. By 14 March 2014 a sum of £400,000 had been raised and which was held on deposit in a Money Market Account with HSBC Bank Plc. Whilst these monies were raised substantially through Mr Dua's efforts and earnings, with Mrs Dua's practice turning over relatively modest sums during this period, they were placed into a joint account in the names of Mr and Mrs Dua.

97. By 2004 Mr and Mrs Dua had identified Fulmer House as a property they would like to buy. This property was acquired in their joint names using a mortgage from HSBC at an eventual purchase price of £1,887,547, with the purchase completing on 22 October 2004. It is necessary to refer to certain steps taken by the Duas in relation to Fulmer House before completion occurred.

98. On 8 April 2004 Mr and Mrs Dua, or an agent on their behalf, instructed a firm of surveyors called BBG Surveyors (this firm was linked, it would appear, to Bradford and Bingley plc) to report on the condition of Fulmer House and provide a market valuation. They described its location as follows: "*Fulmer is a sought after village about one mile from Gerrards Cross. It is a predominately [sic] conservation area with several Grade II listed properties, including Fulmer House*." It is described as a "*substantial Georgian period Grade II listed detached house, which dates I would estimate around 1750 and with later additions I believe added*." Some elements of disrepair were noted in the report. Accommodation is described as including the main house itself, a further guest wing and a coach house, as well as grounds of about 12 acres. Fulmer House had been on the market for some time, and had not sold with the valuer noting that the prices paid for substantial detached houses had suffered over the past year or so. The asking price had initially been set at £5m and then reduced to £2.75m and offers were then invited in excess of £2.5m. The valuer valued it, with vacant possession, at £2.25m.

99. On a date which is unclear from the documents, HSBC were approached as lender, and according to Mr Dua's evidence they valued the property at £2.5million. There is some corroboration for this figure in other documents, which I will come to shortly.

575

100. Mr Dua described the financial arrangements for the purchase of Fulmer House as being fairly complicated. HSBC lent a total of c. £1.8m to enable Fulmer House to be purchased on terms that they received a security deposit of £90,000 to be held by them for one year as security for the first year's mortgage interest repayments, which at that time were much higher than they are now. The lending by HSBC was also secured by a cross charge between Fulmer House and 49 Sudbury Avenue (and this has more recently been confirmed by HSBC).

101. Mr Dua stated in his evidence that the contracts for the purchase of Fulmer House were exchanged before the trust deed was executed on 15 October 2004, but the question of whether this is so is no longer a live issue before me and I make no finding on this point in view of the lack of documentary evidence confirming the position either way.

102. On 15 October 2004 the solicitors acting for Mr and Mrs Dua, Simon & Co, provided the Duas with an amended completion statement for the purchase of Fulmer House. In order to justify the conveyancing costs indicated the solicitors referred to the substantial additional costs arising from the numerous titles to the property, and the level of difficulty arising in the transaction.

103. Also on 15 October 2004, Mr and Mrs Dua executed a deed of settlement establishing a trust called the "Fulmer Settlement 2004" ("the Fulmer Trust"). This was drafted for them by Teaco Associates, a firm of trust and estate practitioners then practising from offices at 41-43 Green Lane, Northwood, Middlesex. Their signatures were witnessed by Mr Richard Tutty of Teaco Associates on 15 October 2004, who raised an invoice to them for his services in respect of the preparation and finalisation of the Settlement Deed ("the Trust Deed"), and registering the same with the Inland Revenue.

104. The Trust Deed identified Mr and Mrs Dua as the "*Settlors*" and "*Original Trustees*". The "*Beneficiaries*" were identified at clause 1.5 as including, at clause 1.5.1, "*The Settlors and their children and descendants*", and at clause 1.5.2, "*The spouses, widows and widowers (whether or not remarried) of paragraph .1 of this sub-clause*", and, at clause 1.5.3 "*Any Person or class of Persons nominated to the Trustees by 1.5.3.1 the Settlors or 1.5.3.2 two Beneficiaries (after the death of the last surviving Settlor) and whose nomination is accepted in writing by the Trustees*". "*Person*" was defined in clause 1.6 to include "*a person anywhere in the world and includes a Trustee*". The "*Trust Property*" was identified as any property comprised in the "*Trust Fund*", which was defined in clause 1.2.1 as the property described in Schedule 1, and any other property transferred to the trustees to hold on the terms of the Settlement, under clause 1.2.2. Schedule 1 to the Deed referred to the following items of property:

"*1 ordinary share of £1 in Espri Properties Limited valued at £1*
*1 ordinary share of £1 in 1st London Properties Limited valued at £1*
*All that the property situated at and known as Fulmer House, Fulmer, Buckinghamshire, SL3 6HN valued at £2,500,000 subject to loans on the property*."

105. As to trust income, the Trust Deed recorded at clause 2 that, subject to certain Overriding Powers (defined in clause 3), "*2.1 The Trustees shall pay the income of the Trust Fund to the Settlors during their respective lives. 2.2 Subject to that, if either Settlor dies during the Trust Period, the Trustees shall pay the income of the Trust Fund to his or her widow during his or her life. 2.3 Subject to that, during the Trust Period, the Trustees shall pay or apply the income of the Trust Fund to or for the benefit of any Beneficiaries as the Trustee think fit*."

106. Clause 3, entitled Overriding Powers, provided for wide powers of appointment in relation to the trust fund for the benefit of any of the beneficiaries, including by way of discretionary trusts.

107. Clause 4 then contained a "*Default Clause*" which stated that: "*Subject to that, the trust fund shall be held on trust for the children of the Settlors in equal shares absolutely*".

108. So far as the shares in the two companies which were placed into the trust, Espri Properties Limited and 1st London Properties Limited, Mr Dua described these companies as holding properties for which he had advanced monies for the purchase of student accommodation and that he wanted his children to benefit from them. Unfortunately, that did not transpire to be the case as these investments were adversely affected by the financial crisis, which occurred in or about 2008.

109. The purchase of Fulmer House completed on 22 October 2004. The transfer document shows that the sale was effected by Barclays Bank Plc (as successor to Woolwich Plc), under a power of sale, to Mr and Mrs Dua for the sum of £1,887,547.00 and the transfer deed had been signed on behalf of the Bank on 14 July 2004. Five title numbers are referred to on the transfer, including the 4 titles which are now showing as making up Fulmer House. The fifth title number was not explained in the evidence, but the property description on the transfer matches the description in the valuation, and the four titles still linked to the property, namely Fulmer House itself, Knoll Cottage, Ferndown Cottage and land lying to the South East of Fulmer Road but on the North side of Fulmer House. The transfer is silent as to the terms on which Mr and Mrs Dua were to hold the property and makes no reference to the Fulmer Settlement 2004.

110. The Trust Deed was, however, sent by Mr Tutty of Teaco Associates, to the Inland Revenue, on 16 October 2004, under cover of form 41G (Trust). This form recorded the trust fund assets as including Fulmer House and the two shares. The Inland Revenue confirmed receipt of the same in their letter of reply dated 2 November 2004 and that they had opened a file for the Settlement. Mr Tutty confirmed in his evidence that he had no further involvement in the trust administration thereafter, and nor did his firm. His firm no longer hold the original deed in storage as this was requested by a firm of solicitors in 2010. I will return to that point below.

111. Mr Dua gave oral evidence that shortly after the Trust Deed was executed he was advised that it would be better to entirely exclude him and his wife from being beneficiaries under the Trust Deed. Mrs Dua's oral and written evidence was consistent on this issue. She had previously noted in her witness statement of 4 March 2013, in the earlier charging order proceedings, that the beneficiary clauses of the

Trust Deed were adjusted "*precluding Mrs Dua and her spouse the settlors' from being beneficiaries*."

112. On 24 October 2004 minutes of a meeting of the trustees of the Fulmer Settlement 2004, namely Mr and Mrs Dua, record that the completion of Fulmer House had occurred and that having examined the trust deed, it was resolved that (bold emphasis added by me):

"*1. The Settlor's, being both Trustees, being both present re-affirmed transfer of all their beneficial and equitable interests in the Shares and Fulmer House as set out in Schedule 1 of the Trust Deed to the Trust* ***for the exclusive benefit of their children and lineal descendants****. To ensure there is no confusion and for the avoidance of any doubt. That accordingly clauses 1.5, 2 and 4 of the Trust Deed be and are hereby amended to read (deleted items double strike through additions underlined) as follows*:

*1.5 "The Beneficiaries" means:*
*1.5.1 The Settlors* ~~*and their*~~ children and *their descendants."*

113. In clause 2, sub-clauses 2.1 and 2.2 were also deleted, to remove the settlors from being entitled to receive trust income, and clause 2.3 was amended to read:

"*2.3 Subject to that, during the Trust Period, the Trustees shall pay or apply the income of the Trust Fund to or for the benefit of any Beneficiaries as the Trustee think fit (after making good accumulated past losses if any)*."

114. The Default Clause, clause 4, remained unchanged.

115. The minute was signed as an approved minute by both of the Duas both as Trustees and in their personal capacity. The oral evidence of Mr Dua suggested that this minute and the later minute were drafted by him, notwithstanding they were prompted by advice from third parties. The amendment to clause 2.3 does suggest an accountancy bent to them. I find it is likely he was the draftsman.

116. Following certain renovation work being carried out at Fulmer House, Mr and Mrs Dua and their children moved into Fulmer House, in or about September 2005.

117. In a further minute of a meeting of the trustees of the Fulmer Settlement 2004, dated 12 September 2005, the move to Fulmer House was noted and it was resolved that, following the move, 49 Sudbury Avenue was vacant and being used for storage and that "*the remaining unencumbered equity belonging to Mr Shashi Dua and Mrs Ashoo Dua be purchased by the Trust for £90,000 being a fair estimate of the value of the remaining equity taking into account the charge by HSBC*". This is somewhat clumsy drafting, but it is reasonably clear that what was intended was a transfer of the beneficial interest and this was being valued by estimating the equity of redemption.

*118.* The minute went on to state that: "*These monies are currently held by HSBC as surety monies on completion of purchase of Fulmer House and remortgage of 49 Sudbury Avenue on 22nd October 2004. The monies should be due for release on the*

*anniversary of the completion on 22nd October 2005. This arrangement and timing is acceptable to both Mr Shashi Dua and Mrs Ashoo Dua personally*".

119. The minute was signed as an approved minute by both of them. Again, I find this was drafted by Mr Dua.

120. The college business of Mr Dua on Oxford Street, and the residential business built off the back of it, later came to be severely impacted by the financial crisis. According to Mr Dua's evidence some of his financial difficulties had started by 2007.

121. At about the same time Mr and Mrs Dua had a dispute with the private school which was educating their son through his GCSEs. On 4 October 2007 Claire's Court Schools Limited obtained a charging order to secure the debt owed to them, which was registered against Fulmer House and in particular title no. BMC61904.

122. Mr Dua was unable to deal effectively with these all the pressures, and on 12 December 2008 he was adjudged bankrupt (as referred to in the letter of 7 June 2019 written by the solicitors for the Law Society). Mr Dua stated that the bankruptcy petition related to the debt to Claire's Court Schools Limited and documents were not properly served on him, but his application to annul was not granted.

123. With effect from 9 September 2009 a trustee in bankruptcy, Mr Robert Pick, of Grant Thornton, was appointed.

124. An intervention was also made by the SRA into the practice of Mrs Dua, in 2009, which intervention was unsuccessfully challenged by her. In October 2011 she was suspended for one year and conditions were imposed on her practice. She considers they were unfairly restrictive, and she gave evidence that her career and life had been ruined by the Law Society. She indicated that she only began to receive gainful employment again from 2015, and much of that work has been of a part-time and piecemeal nature.

125. On 24 February 2010, a firm of solicitors, Veale Wasbrough Vizards, acting for Mr Dua's trustee in bankruptcy, Mr Pick, wrote to Teaco Associates enquiring into the affairs of Mr Dua. They stated: "*We understand that your firm was responsible for drafting a deed of settlement establishing the Fulmer Settlement 2004 ("the Settlement") on behalf of Mr and Mrs Dua. The document is dated 15 October 2004. We ask that you deliver to us the file dealing with the affairs of Shashi Dua as it was his property and now falls within the bankruptcy estate.*"

126. On 1 March 2010 Teaco Associates responded to this letter and enclosed the file they had on the matter, including the original Trust Deed.

127. Under section 283A of the Insolvency Act 1986, where property comprised in the bankrupt's estate consists of a dwelling-house which at the date of the bankruptcy was the sole or principal residence of the bankrupt then at the end of three years beginning with the date of the bankruptcy the interest mentioned ceases to be comprised in the estate and vests in the bankrupt if the trustee in bankruptcy fails to

take certain realisation or preservation steps in relation to that property within that three year period.

128. The investigatory steps undertaken by the trustee within this period are therefore explicable by that section of the Insolvency Act, since Fulmer House was Mr Dua's principal residence at the date of bankruptcy.

129. It is evident however that they did not realise any interest of Mr Dua's after receipt of the Trust Deed. I have already referred to the up to date position so far as Mr Dua is concerned in paragraph 29 above. In short here, Mr Pick has since ceased to be Mr Dua's trustee and the matter has reverted back to the Official Receiver. Mr Dua remains undischarged. In his evidence he stated that his bankruptcy did not prevent him from being able to work as an accountant and property manager and he has continued to earn income from those sources since 2009. As a result, he says he has not taken steps to resolve his bankruptcy. He has more recently served subject access requests on the Official Receiver in order, he says, to try to obtain further information from them. The Official Receiver has been served but has chosen not to participate in these proceedings.

130. Mr and Mrs Duas' evidence was that throughout the period in question, and notwithstanding Mr Dua's bankruptcy, it was Mr Dua alone who continued to pay the mortgages and overheads throughout the period in question. Mr Dua sought to make good this point by reference to a lengthy spreadsheet which sought to show how money was taken from his sole account, in cash, and then moved via another account, in order to pay the mortgage payments required to be paid to HSBC. I made clear to the Duas at the outset of trial that I would permit reference to be made to an analysis schedule or spreadsheet so long as it related to documents which had been disclosed and were in the trial bundle. There are some limitations on the usefulness of the spreadsheet. This is in part due to the fact that it can only go far so far, due to the absence of bank records (before 2014, at least in the trial bundle). There also gaps in the spreadsheet in relation to the intervening accounts, though Mr Dua suggested these or some of these had been disclosed to the Law Society. But the matter is also complicated by the fact that the payments were taken from Mr Dua's account by way of cash withdrawals and not always at a time and in sums coincident to the mortgage payments. As such the spreadsheet is not simply a summary of the documents in the trial bundle, or disclosed, but also, in effect, contains forensic analysis of the money flow. Mr Dua cannot act as an expert in his own cause in this respect and no permission to rely on expert evidence has been sought or granted. All that said, and whilst I am unable to make any certain findings of fact, my overall impression is that it is likely that Mr Dua did indeed contribute most of the funds required to service the borrowings with HSBC.

## The Beneficial Interest Issue: argument, analysis and conclusions

*Sub-issue (1)(a): The Fulmer Trust: proof*

131. Whereas before Chief Master Marsh it would appear that the Law Society was casting doubt on the authenticity of the Trust Deed, before me Ms Petrenko did not

seek to do so. I consider she was right not to. There was some evidence before the Chief Master suggesting that the Trust Deed may have been executed in 2004, when Fulmer House was acquired in the joint names of Mr and Mrs Dua. By the time of trial there was further contemporaneous correspondence supporting this conclusion, showing that the trustee in bankruptcy had enquired into its validity, in 2010, and obtained the original Trust Deed from Teaco Associates. Moreover, Mr Tutty confirmed that he witnessed it and his evidence was not challenged. I find that the Trust Deed was executed on 15 October 2014. I also find, and this was also accepted by the Law Society before me, that the variations made by the minute of 24 October 2004, also took place on that date.

*Sub-issue (1)(b): The Fulmer Trust: property held*

132. So far as Fulmer House is concerned, Schedule 1 to the Trust Deed referred to the property being held as including "*All that the property situated at and known as Fulmer House, Fulmer, Buckinghamshire, SL3 6HN valued at £2,500,000 subject to loans on the property*."

133. As noted at paragraph 37 above, it was accepted at trial that this reference to Fulmer House refers to all four titles, and I consider this was rightly conceded for the reasons set out there, and also the factual context set out in paragraphs 97 to 104 above.

134. For the purposes of this case that leaves the question of 49 Sudbury Avenue, the minute recording the material matters is dated 12 September 2005 and is referred to in paragraphs 117 to 119 above.

135. Ms Petrenko initially submitted that on a proper construction of the minute of 12 September 2005, whilst it might be said that the minute recorded an agreement to transfer the equity in 49 Sudbury Avenue on 22 October 2005, there was no declaration or transfer in writing which satisfied the formality requirements of section 53 of the Law of Property Act 1925. The legal title was already vested in Mr and Mrs Dua and so the question is whether or not the signed minute of 12 September 2005 was sufficient to provide the Fulmer Trust with an equitable interest in 49 Sudbury Avenue. In my judgment it was. I read the minute as an agreement to sell the equity in 49 Sudbury Avenue for £90,000. This was sufficient to transfer the equitable interest. No further written documentation was required.

136. Ms Petrenko initially drew my attention to the decision in *Southern Pacific Mortgages Ltd v Scott (Mortgage Business plc intervening)* [2014] UKSC 52, [2015] AC 385 (also referred to as the *North East Property Buyer's Litigation*) and the passage at [79], in support of the proposition that there is no proprietary interest which can be granted before completion. However, that was in the context of proprietary effects of a sale and lease back arrangement, and whether the purchaser, prior to acquisition of the legal estate, could grant equitable rights of a proprietary character (see at [60]). It was looking at the position of the seller (not buyer), after exchange of contracts. It is clear (see at [57], and reference to the decision in *Lysaght v Edwards* (1876) 2 Ch D 499), that the Supreme Court was not intending to say anything disturbing the line of authority that following exchange of contracts the seller holds the property on trust for the purchaser.

137. In addition, Ms Petrenko accepted in closing that even if there was no equitable interest passing at the time of the minute, the section 53 requirements could be met by a combination of the minute and subsequent oral agreement and/or conduct. So ultimately this point fell away.

138. I have not overlooked the fact the 2005 minute might be said to be somewhat artificial, as the funds were being provided by Mr and Mrs Dua to the Trust to enable it to acquire this interest in 49 Sudbury Avenue from them. But I was not invited to conclude it did not reflect their true intentions, that it was a sham.

*Sub-issue 1(c): The Fulmer Trust: illusory?*

139. It was also not part of the case put by the Law Society that the Fulmer Trust itself was a sham. But it was submitted that the purported trust is "illusory" in that Mr and Mrs Dua, as settlors and trustees, have reserved such extensive powers for themselves that they have, by the express trust as set out in the Trust Deed (as varied), failed to part with the beneficial interest. This line of attack in relation to property settled on trust has gained increased judicial attention in the last few years. The Law Society referred me two authorities in support of its submission.

140. The first, in time, is the decision of Birss J (as he then was) in *JSC Mezhdunaradniy Promyshleniy Bank v Pugachev* [2017] EWHC 2426. This decision concerned five New Zealand discretionary trusts created by Mr Pugachev. The claim was brought on the basis that Mr Pugachev was the beneficial owner of all the assets held in the trusts (see at [70]). The first basis for this was said to be that the trusts were illusory in that, properly construed and on a proper application of the law to them, the trusts were not effective to divest Mr Pugachev of his beneficial ownership of the assets put in them. The second basis was that the trusts were shams (see at [71]). As Birss J explained (at [168] and [203]) the difference between the two bases is that the former is not concerned with the subjective intentions of the parties, or whether they had an intention to mislead, but instead is an objective inquiry. The third basis for attack was, in the alternative to the first two, that the transfers were effective, but amounted to transactions defrauding creditors, under section 423 of the Insolvency Act 1986.

141. On the facts, Birss J held that the powers conferred on Mr Pugachev as protector could be exercised freely, for his own personal benefit (see at [268]), that trustees could be removed without cause (see at [272]), and concluded in all the circumstances that Mr Pugachev had not divested himself of his beneficial interest (see at [278]).

142. A key part of the reasoning appears to be that as protector Mr Pugachev could exercise powers to make himself the sole beneficiary without the need to consider the interests of anyone else (see at [267], [234]-[246], [222], [180]-[182] and see also the discussion of case law at [158]-[165]). This meant the power was tantamount to ownership, because the person in question can "*basically….do whatever he wants with the property*". The label "illusory" may be said to be misleading, and the test may better be summarised as to whether or not the powers are so broad that what was intended to be a trust was not in fact a trust. See at [165], citing *Tasarruf Mevduati Sigorta Fonu v Merril Lynch* [2011] UKPC 17), or "*TMSF*" for short (where the

582

power of revocation vested in the settlor was viewed as being tantamount to ownership). It was noted a different conclusion may have been reached if the settlor, and protector, had been excluded from being within the class of discretionary beneficiaries (see at [269]).

143. This decision in *Pugachev* is criticised in Lewin on Trusts above at para. 22-071, where the authors suggest that the approach of the judge may have been influenced by his positive finding that the trusts were a sham. I consider this criticism to be unfounded and the structure of the judgment clearly shows Birss J gave each argument separate and careful consideration. The reasoning of Birss J depended heavily on his categorisation of the powers of the settlor/protector as being personal powers, and in this respect derives some support from other practitioner's texts, such as Underhill and Hayton, Law of Trusts and Trustees (19th Edn) at 17.7. The term "illusionary" may have difficulties, but when viewed as a label for an investigation that leads to finding that a trust was either not properly constituted, or had some other defect meaning that the trust was not a trust, it can be viewed as conventional.

144. The case of *Webb v Webb* [2020] UKPC 22 is an illustration of an "illusionary" trust as I have defined it. It concerned trusts established by a husband, and the dispute arose in the context of matrimonial proceedings. One of the issues before the Privy Council was the validity of those express trusts known as the Arorangi Trust and the Webb Family Trust, though the Council felt it sufficient to dispose of the issues by reference to the terms of the Arorangi Trust alone (since the points stood or fell together). The judge at first instance rejected the challenges to the Trusts. In the Court of Appeal they focussed on the question of whether, on an objective analysis of the powers reserved to Mr Webb in the trust deeds, Mr Webb had evinced an intention irrevocably to relinquish his beneficial interest in the trust property. They concluded that the deeds of trust failed to record an effective alienation since the powers retained by Mr Webb meant that any time he could have recovered and could still recover the property which he had settled on the trusts.

145. Lord Kitchin (giving the advice of the majority) observed as follows at [76]:

*"76. On this further appeal, Mr Webb does not challenge the proposition that there can be no valid trust if, on the proper interpretation of a trust deed, the settlor has in fact retained beneficial ownership of the property purportedly settled on the trust. However, he contends that the Court of Appeal adopted an unduly literal interpretation of the trust deeds and that, had it adopted a purposive and contextual approach to their interpretation, it would or ought to have found each of them to be effective and valid. He also argues that he did not retain for himself the uncontrolled power to deal with the settled property as he wished. He emphasises that he was and remains a trustee of both trusts and, in that capacity, has always had fiduciary obligations, among other things, to act honestly and in good faith, to observe the terms of the trusts and to act in the best interests of all the beneficiaries.*

146. Lord Kitchin went on (at [77] and following) to note that "*It has long been recognised that a completely general power of appointment, such that the holder of the power can appoint the subject matter of the power to himself, may be tantamount to ownership"* and cited (amongst others) the observations of Upjohn J in *In re Triffitt's Settlement* [1958] Ch 852 at 861, quoted in *TMSF* at [42].

147. Lord Kitchin noted at [80] – [82] the following material facts as to the Deed in the Arorangi Trust. Mr Webb was the sole trustee, and the trust was for him and his son as beneficiaries. The Deed provided for the appointment of a consultant who had extensive powers, including, at his absolute discretion and without giving reasons, to remove trustees. Mr Webber appointed himself as the consultant. Mr Webb, as trustee, was permitted to exercise all powers and discretions conferred on him notwithstanding any conflict with duties to the funds of the trust.

148. Lord Kitchin went on to observe at [83] that Mr Webb could appoint himself sole beneficiary under clause 10 and that (my emphasis added) "*This reserved to Mr Webb as settlor the power to nominate himself as sole beneficiary in place of the existing beneficiaries and* ***in that way to become settlor, Trustee, Consultant and sole beneficiary. It is important to note that Mr Webb enjoys this power as settlor and not as Trustee and that, as settlor, he is not subject to any fiduciary duty, irrespective of the operation of clause 14.1(c)***."

149. Lord Kitchin explained that there was no inconsistency between the finding of the first instance judge (upheld on appeal) that the trusts are not shams, and were genuinely set up to create trusts primarily for the benefit of Mr Webb's children, and the conclusion that the attempts to create the trusts have failed or are defeasible, noting at [87] to [89] as follows (with bold emphasis added by me):

*"87. Acceptance that Mr Webb intended to create trusts does not in any way preclude a finding that he reserved such broad powers to himself as settlor and beneficiary that he failed to make an effective disposition of the relevant property. Moreover, and as I have explained, the powers of clause 10 are conferred on Mr Webb as settlor, not in his capacity as Trustee or Consultant. These powers were therefore amply sufficient for Mr Webb to arrange matters in such a way that he alone would hold the trust property on trust for himself and no-one else, with the consequence that the legal and beneficial interest in all of that property would vest in him…*

*89.The Court of Appeal considered, correctly in my opinion, that the powers reserved to Mr Webb under the trust deeds may be analysed in two different ways. One is to consider whether those powers were so extensive that Mr Webb can be said never to have disposed of any of the property purportedly settled on or acquired by the trusts. In this connection one might also ask whether the trusts lacked the irreducible core of obligations owed by trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. The other is to ask whether the powers reserved to Mr Webb were so extensive that in equity he can be regarded as having had rights which were tantamount to ownership. The Court of Appeal recorded, at para 55, the parties' agreement that in this case it can make no difference to the outcome which of these two analytical routes is taken.* ***I will therefore confine myself to the substantive question whether Mr Webb's powers under each of the trust deeds were such that, in equity and in all of the circumstances of this case, he can be regarded as having had rights in the trust assets which were indistinguishable from ownership. In my view he plainly can. Mr Webb had the power at any time to secure the benefit of all of the trust property to himself and to do so regardless of the interests of the other beneficiaries****. In my opinion, for the reasons set out at para 87*

584

*above, the Court of Appeal was plainly entitled to find as it did that the trust deeds failed to record an effective alienation by Mr Webb of any of the trust property. The bundle of rights which he retained is indistinguishable from ownership."*

150. Having concluded that an "illusionary trust" is different in terms of how the court will conduct the evidential analysis from a "sham trust", I turn to the express trust being relied on in the present case. The Law Society mounted its challenge to the effectiveness of the Trust Deed in divesting Mrs Dua's beneficial ownership by advancing three points.

151. First it was noted following the entry into the minute dated 24 October 2004 Mr and Mrs Dua were both settlors and trustees.

152. Secondly, Ms Petrenko accepted that the minute of 24 October 2004 changed the wording of Clause 1.5.1, to remove Mr and Mrs Dua from the class of persons who could be beneficiaries, but that clauses 1.5.3 and clause 1.6 stood unchanged. Clause 1.5.3 provided that a beneficiary could include "*Any Person or class of Persons nominated to the Trustees by 1.5.3.1 the Settlors or 1.5.3.2 two Beneficiaries (after the death of the last surviving Settlor) and whose nomination is accepted in writing by the Trustees*". "*Person*" was defined in clause 1.6 to include "*a person anywhere in the world and includes a Trustee*".

153. Thirdly, therefore, it was submitted, it was still possible for the beneficiary class to include any person or person nominated to the trustees by either the settlors (under clause 1.5.3.1) or (b) the beneficiaries (after the death of the settlors) (under clause 1.5.3.2) and whose nomination is accepted in writing by the trustees. So, it was submitted, in effect, Mr and Mrs Dua as settlors can add to the class of beneficiaries, and could therefore reverse their exclusion as beneficiaries. It was submitted that what this means is Mr and Mrs Dua, with their settlor and trustee hats on, can appoint themselves as beneficiaries. If that were to happen, they could then, as trustees, under clause 2 apply the income to any of the beneficiaries (including themselves). Subject to compliance with clause 3.4, which effectively required there to be two trustees, they could exercise the power of appointment in favour of any of the beneficiaries under clause 3.1, or transfer property to a beneficiary under clause 3.2.

154. Accordingly, the Law Society invited me to conclude that Mr and Mrs Dua were in such a position of complete power so as to procure for themselves the benefit of the property settled on trust at any time, such that their position was indistinguishable to that of ownership, and they had not divested themselves of any beneficial ownership.

155. I consider the position first on the assumption that the Law Society is right to contend as a matter of construction that the Trust Deed (as varied) reserved the power in Mr and Mrs Dua to reappoint themselves as additional beneficiaries.

156. The Law Society's submissions would require me to travel considerably further than the existing law in a number of material respects. It was central to the reasoning of Birss J in *Pugachev* that the powers conferred on Mr Pugachev as protector could be exercised freely, for his own personal benefit and without any effective fetter or

limitation. It was also noted that he could remove trustees without cause. Neither of those features are present in this case. I also note that in *Webb* it was central to the decision that Mr Webb had the power to secure the benefit of all of the trust property to himself and to do so regardless of the interests of the other beneficiaries. It was not suggested that the same applied in this case. A beneficiary's entitlement to be considered for an appointment of benefits under a discretionary trust is a right which will be protected by the Court: see *JSC Mezhdunarodniy Promyshlenniy Bank and another v Pugachev* [2015] EWCA Civ 139, [2016] 1 WLR 160 at [13]. I also note that the submissions require me to treat Mr and Mrs Dua as effectively one for these purposes. In both *Pugachev* and *Webb* there was only one person.

157. A conclusion by me that the powers reserved to Mr and Mrs Dua are tantamount to beneficial ownership would require me to treat:

(1) the powers vested in Mr and Mrs Dua as trustees as free from any fiduciary responsibility, fetter or limitation, when that is not the case in this Deed;
(2) the beneficiary's entitlement to be considered for appointment as if it did not exist, when such a proviso is not present; and
(3) Mr and Mrs Dua as operating as one, when they are separate persons.

158. In my judgment this is not open to me, or in any event goes too far.

159. There remains the question however as to whether or not Ms Petrenko is correct in her submission that the Trust Deed (following the variations effected on the 24 October 2004) is such that it was objectively intended that Mr and Mrs Dua were persons who could become beneficiaries in the future, notwithstanding that they were removed as persons who were beneficiaries under clauses 1.5.1 and 2.1. In my judgment there are difficulties in reaching that conclusion, particularly when one has due regard to the preamble wording in paragraph 1 of the resolution in the minute, which records that the Trust was intended to be "*for the exclusive benefit of their children and lineal descendants*". The effect of Ms Petrenko's submissions is that all the variations to the trust deed did was to remove Mr and Mrs Dua from being capable of being the objects of benefit under the Trust on 24 October 2004, but that they could become beneficiaries the following day. This would be a strange conclusion to reach as it would appear to defeat the purpose of the variation as recorded in the preamble wording.

160. I have already noted that Mr Dua drafted the variations, and the "loose end", which Ms Petrenko identified in her submissions, which might permit Mr and Mrs Dua to pop back up as beneficiaries via a fresh nomination. This was not, in my judgment, objectively intended. As to the impact of the quality of drafting and the approach in these circumstances, see the observations of Lord Upjohn in *Re Gulbenkian's Settlement Trusts (No.1)* [1970] AC 508, HL at p522 and see also *Wood v Capita Insurance Services Ltd* [2017] UKSC 24, [2017] AC 1173 at [10] (Per Lord Hodge)). A reasonable person looking at the language objectively would have understood Mr and Mrs Dua to mean that they were to be excluded as beneficiaries not simply for the present but for the future. Otherwise the Trust is not for the exclusive benefit of the children and their lineal descendants.

161. In my judgment, effect can be given to what I consider to that obvious objective intention, having regard to the preamble wording I have referred to above, by reading the category of persons who could be nominated to the trustees, as future beneficiaries under clause 1.5.3, as excluding Mr and Mrs Dua (compare with the approach taken in *Chartbrook Ltd and another v Persimmon Homes Ltd and another* [2009] AC 1101 at [25], and see also Lord Upjohn above in *Re Gulbenkian's Settlement Trusts (No.1)* at p522).

162. The question arises however if I am wrong in my conclusions above, as to whether it might be said that there was a need to rectify the drafting by granting equitable relief on the basis of a mutual mistake on the part of Mr and Mrs Dua. Their evidence was that they had not intended to reserve their ability to re-appoint themselves as beneficiaries, and if the drafting did not accurately reflect this then that was a drafting mistake on Mr Dua's part. Mrs Dua had already given evidence in her statement of 4 March 2013 stating that the 24 October 2004 minutes were "*adjusting beneficiary clauses of the Trust Deed and precluding Mrs Dua and her spouse the settlors'[sic] from being beneficiaries*."

163. Ms Petrenko drew my attention to the law on rectification of voluntary settlements as summarised in Lewin on Trusts above at paragraph 5.079. The conditions as summarised there are as follows:

*"(1) There must be convincing proof to counteract the evidence of a different intention represented by the document itself;*
*(2) There must be a flaw (that is an operative mistake) in the written document such that it does not, on its true construction, give effect to the settlor's intention;*
*(3) The specific intention of the settlor must be shown; it is not sufficient to show that the settlor did not intend what was recorded; it must also be shown what he did intend; and*
*(4) There must be an issue capable of being contested between the parties affected by the mistake notwithstanding that all relevant parties consent."*

164. I also have regard to the recent guidance given by the Court of Appeal, in relation to rectification, in *FSHC Group Holdings Limited v Glas Trust Corporation Limited* [2019] EWCA Civ 1361 at [176], and the need to show an outward expression of accord.

165. The Law Society's primary submission was that the requirements for rectification are not satisfied on the basis that Mr and Mrs Dua have not established their case by "convincing proof" that their intention was different from that set out in the Fulmer Trust (as varied). In my judgment there is convincing evidence, and the four conditions are satisfied here:

(1) I have been cautious in accepting the oral evidence of Mr and Mrs Dua on this issue, having regard to my overall impression of them as witnesses, and as it could quite easily be said their evidence was self-serving, and given in the face of knowing what they needed to say to make out a case on rectification;
(2) I have in mind however that Mrs Dua had already confirmed, in a witness statement which her husband assisted her in drafting that, the intention of the 24 October 2004 minutes was to "preclude" the settlors from being beneficiaries,

and this was before the issue that the trust was "illusory", and the intention of the variations made by the 24 October 2004 minute, were the focus of any attention – indeed none of this was argued or live before Chief Master Marsh and only came into focus during the course of the trial before me;

(3) It is also apparent, from my conclusions as to the proper construction of the documentation, that if there was a mistake, it arose due to the failure by Mr Dua to give effect completely to the clearly expressed intention in the preamble;

(4) It is apparent from the preamble what the intention of the settlors was, and this was an outward expression of accord: that the Dua's children and their descendants would be exclusive beneficiaries, and that was to the exclusion of Mr and/or Mrs Dua.

166. The Law Society also submitted rectification should not be ordered in all the circumstances given in particular the length of time that has passed since the creation of the Trust and the fact that charges have been granted over the properties, including to the Law Society. This point may have acquired greater force if the Law Society had taken steps in reliance on a belief which based on their reading of the Trust Deed without rectification. But that was not their evidence, and indeed the point that the Trust Deed was illusory was not one developed until trial, and it was then that the point as to rectification was also considered. In these circumstances whilst I have in mind that there is a discretion to refuse to grant the relief, if I am wrong in my approach to the construction of the Trust Deed, as set out in paragraph 161 above, and I need to grant the relief to give effect to what I consider to be the subjective intention of the parties/settlors, I do so.

167. In view of these conclusions, I find that Mr and Mrs Dua do not have any or any, realisable beneficial interest in the properties, or none which is of any substantial value.

168. Even if it might be said that Mr and Mrs Dua might at some point have acquired a limited form of interest as discretionary beneficiaries, that is not an interest which is readily realisable. As noted by Lewison LJ in *Pugachev* ([2015] EWCA Civ 139) at [15]:

*"15. On the face of it assets held by the trustees of a discretionary trust would not be amenable to execution if judgment is entered against one of the class of potential beneficiaries at the suit of a third party. The trustees might in such circumstances decide to confer a benefit on the beneficiary to save him from bankruptcy; but that would be a matter for them. If they did exercise their discretion in favour of a particular beneficiary the amount of the benefit would thereupon cease to be a trust asset and would become the asset of the beneficiary. It would then truly be his asset."*

*Sub-issue (2): the alternative position if the Fulmer Trust is not valid and applicable*

169. It is strictly not necessary to deal with sub-issue (2), but I record briefly in this section of my judgment my findings and conclusions on the alternative case. This requires me to determine the terms on which Mr and Mrs Dua held the properties if they did not hold them under the Fulmer Trust, or if such Trust was not effective to divest them of their beneficial interests, if any, in the properties which formed part of

the Trust. This question splits into the further sub-issues of whether the presumption of equality applies, or (b) an implied (or resulting) trust analysis displaces this, and in each respect considering separately Fulmer House (4 titles) and 49 Sudbury Avenue (1 title) and the quantification of any beneficial interests (if different from the presumption of equality).

170. Mr Dua says, at the end of his main witness statement, in relation to the properties "*even if they had not been placed on trust, the Claimant would not have had any interest in the properties because the whole of the equity would have belonged to me or my trustee in bankruptcy*". Mrs Dua's evidence was to the same effect.

171. Mr and Mrs Dua do not, in their evidence, allege that they had an express discussion relating to ownership wherein they agreed that Mr Dua was the beneficial owner of the properties, rather they are asking the Court to find that there was an inferred common intention trust wholly in favour of Mr Dua. They make this argument on the basis that Mr Dua contributed the purchase price and paid the mortgage.

172. In my judgment there are a number of difficulties with such an extreme case, and I reject it.

173. Absent a valid express trust, the starting point is that equity follows the law such that where the parties acquire the property in joint names then the parties are beneficial joint tenants, unless and until beneficial title is severed, following which they hold as tenants in common with equal shares. It is for Mr and Mrs Dua to rebut this presumption (*Stack v Dowden* [2007] UKHL 17, [2007] 2 AC 432 at [56]) and, even on a full examination of the facts, a joint names case is unlikely to lead to a different conclusion unless the facts are "*very unusual*" (*Stack v Dowden* at [68]). As Baroness Hale explained in *Stack v Dowden* at [69] many more factors than financial contributions may be relevant to divining the parties' true intentions.

174. Moreover, a common intention will not be inferred where there is positive evidence inconsistent with it; see Megarry & Wade on the Law of Real Property (9th Edition) at 10-026, which refers to *Jones v Kernott* [2011] UKSC 53, [2012] 1 AC 776, per Lord Walker and Lady Hale at [51(3)].

175. I also have regard to the summary of principles to apply in relation to properties bought in joint names in *Jones v Kernott* by Lord Walker and Lady Hale at [51].

176. It was noted in cases before *Stack v Dowden* that the extent of financial contribution might carry more weight in case where the parties are married than where they were married (see for example in *Stoke's case* [1991] 1 FLR, 401). Following *Stack v Dowden* it seems to me this point is captured by the discussion at [69] and this may or may not be the case depending on the marriage relationship.

177. Applying the above principles to 49 Sudbury Avenue first, this was acquired as a property in the joint names of Mr and Mrs Dua. The starting point therefore is the presumption of joint beneficial ownership.

178. The question then arises whether that presumption can be displaced by showing a different common intention when Mr and Mrs Dua acquired 49 Sudbury Avenue, or

that they later formed the common intention that their shares in the same would change. This question is to be deduced objectively from conduct. I find that the following are relevant factors in this respect and point to the conclusion that Mr and Mrs Dua did intend Mrs Dua would share in the beneficial interest in 49 Sudbury Avenue and that there is insufficient evidence to displace the presumption:

(1) 49 Sudbury Avenue was being purchased as a family home for Mr and Mrs Dua to live in together;
(2) Mr and Mrs Dua had been married for a couple of years and Mr Dua provided the resources to acquire the property and, at least in the initial stages, to service the borrowings over it. This was because Mrs Dua had still not qualified and he viewed it as part of his matrimonial duty to provide for his wife;
(3) Mr Dua provided the initial resources to enable two substantial extensions to be built at 49 Sudbury Avenue from his own resources. However, those extensions were then reimbursed, or substantially so, according to oral evidence of Mr Dua, by the net proceeds of sale from 96 Hodder Drive. And 96 Hodder Drive was held on an express trust for Mr and Mrs Dua as "*beneficial joint tenants both in law and in equity*". I reject the oral evidence of Mr Dua in these circumstances that he and Mrs Dua did not intend Mrs Dua to share in the equity in 96 Hodder Drive, or 49 Sudbury Avenue, during his lifetime. Mr Dua accepted that if he was incapacitated Mrs Dua would be expected to make the decisions about the property and to ensure it provided a family home for the benefit of the whole family. His perceived primary decision making role in relation to 96 Hodder Drive and 49 Sudbury Avenue was more a feature of his view of his role in the family, and a desire to ensure he could, if appropriate, permit other wider family members to make use of it, such as his parents. But I do not think by that it can be safely concluded he wished to exclude Mrs Dua from any share in the equity of it during his life;
(4) The fact that Mr and Mrs Dua continued to live in 49 Sudbury Avenue until 2005 as their family home, including with their children after they were born;
(5) Mr Dua's stated intention in his witness statement, and elaborated on in oral evidence, that he put the properties into joint names so that the properties would pass to Mrs Dua "tax free and automatically" in the event of his death;
(6) Mr Dua's general stated intention in his witness statement and orally to provide for his family.

179. By the time that Mr and Mrs Dua had acquired Fulmer House, however, there can be no doubt that they must both have considered that Mrs Dua had a beneficial interest in it. That is because in the signed minute of the meeting of 12 September 2005 Mr and Mrs Dua referred to the transfer into the Fulmer Trust of "*the remaining unencumbered equity belonging to Mr Shashi Dua and Mrs Ashoo Dua*". As I have noted above I consider this to be a clear acknowledgement that Mr and Mrs Dua did intend that Mrs Dua had a beneficial share in 49 Sudbury Avenue.

180. Even if the point might have been arguable to the contrary before 12 September 2005, by this date in my judgment Mr and Mrs Dua shared a common intention that they would both share in the equity. But there is no need to infer that: Mr and Mrs Dua expressly confirmed it in the minute of that date. In my view that precludes them from submitting that Mrs Dua has no beneficial interest if the property has not been effectively settled into the Fulmer Trust and subject to that trust on the terms found

by me above. See Lord Upjohn's dictum in *Pettit and Pettit* [1970] AC 777, (83), [1969] 2 All ER 385, [1969] 2 WLR 966 cited by Slade LJ in *Goodman v Gallant* at p 521H to 522B. See also *Bernard v Joseph* [1982] 1 Ch 391 which emphasises that it is only in exceptional circumstances that the court may be willing to conclude this intention changed subsequently.

181. I also find that the fact that Mr Dua may have continued to be solely or principally responsible for discharging the mortgage after then is insufficient to justify an inference of a change in intentions. I also do not think I can exclude the possibility that Mrs Dua may have contributed, either directly or indirectly, to the family finances for at least part of the periods in question in relation to 49 Sudbury Avenue, perhaps only in a relatively modest way, and the documentary evidence is not sufficient to enable me to exclude this. I find that it is likely she made some contributions to the benefit of the overall family finances, to some degree, at least before 2009 when her practice was intervened.

182. In those cases where it is clear that the parties did not intend a beneficial joint tenancy at the outset, or had changed their original intention, and it is not possible to ascertain by direct evidence or inference what their actual intention was as to the shares in which they would own the property then the court embarks on a further enquiry to ascertain that share. However, I am not able to conclude that Mr and Mrs Dua clearly did not intend that Mrs Dua would not be a beneficial joint tenant from the outset.

183. Accordingly, I would have found, if the beneficial interest in 49 Sudbury Avenue had not been transferred into the Fulmer Trust, that Mr and Mrs Dua owned it as beneficial joint tenants, in law and in equity. Moreover, it seems to me that given that Mr and Mrs Dua settled 49 Sudbury Avenue into the Fulmer Trust, and if I had concluded that was ineffective because it was "illusory", then it is difficult to rationalise any other conclusion.

184. Before I turn to Fulmer House, I should point out that by the time of his bankruptcy Mr and Mrs Dua were no longer living in 49 Sudbury Avenue as his principal residence. Therefore if, contrary to my primary findings this property was not settled into the Trust, and if Mr and Mrs had succeeded in persuading me that he was the sole beneficial owner, then any such equity would have passed to his trustee in bankruptcy and would have remained with his trustee in bankruptcy absent the trustee's interest being bought out, and notwithstanding the lapse of time since. This is because it is only in relation to the principal residence that there can be an automatic revesting under 283A of the Insolvency Act 1986. As Mr Dua has confirmed no action has been taken by the trustee in bankruptcy then it would still be open to them to take action now, and on Mr and Mrs Dua's argument be entitled to 100% of the equity in the property (though as appears below, it is doubtful whether there is any equity in 49 Sudbury Avenue, given the cross-charge with Fulmer House).

185. Turning, therefore, to Fulmer House, again, and on the assumption, contrary to my primary findings, that this property was not effectively settled into the Fulmer Trust, then the starting point would be that equity follows the law and there was a beneficial joint tenancy.

186. The question then arises, to be answered objectively from conduct, whether that presumption can be displaced by showing a different common intention when Mr and Mrs Dua acquired Fulmer House, or that they later formed the common intention that their shares in the same would change. I find that the following are relevant factors in this respect and point to the conclusion that Mr and Mrs Dua did intend Mrs Dua would share in the beneficial interest in Fulmer House and that there is insufficient evidence to displace the presumption:

(1) Fulmer House was being purchased as a family home for Mr and Mrs Dua to live in together with their children;
(2) Whilst I accept that it is likely that the properties realised to enable it to be purchased were likely to be from the net proceeds of sale which Mr Dua may have acquired in his own name, or via companies set up under his control, it is also the case that these monies were then deposited in the joint names of Mr and Mrs Dua before being used to enable Fulmer House to be purchased. I find that these monies were placed in joint names because, like other joint ventures which Mr and Mrs Dua have engaged in their married lives, they intended to share in them together;
(3) Whilst I accept that is likely that Mr Dua has borne the main burden of discharging the mortgage, like in the case of 49 Sudbury Avenue, I do not think I can exclude the possibility that Mrs Dua may have contributed, either directly or indirectly, to the family finances for at least part of the periods in question in relation to Fulmer House and the documentary evidence is not sufficient to enable to exclude this. I find that it is likely she made some contributions to some degree, at least before 2009 when her practice was intervened;
(4) The fact that Mr and Mrs Dua continued to live in Fulmer House as their family home from 2005 to date;
(5) Mr Dua's general stated intention in his witness statement and orally to provide for his family; and
(6) It is not open, or readily open, to Mr and Mrs Dua to press on me an intention that Mr Dua alone should be the sole beneficial owner, having regard to the terms of the Fulmer Trust, which they both signed.

187. In short, there is insufficient evidence of an objective indication to show a departure from the presumption of equality in relation to Fulmer House, in the event that I had not found it was held on trust under the Fulmer House Trust.

188. Whilst I am satisfied on the evidence before me that Fulmer House is being enjoyed as one interconnected residence by the Duas family, and the Law Society did not challenge this aspect of the Duas evidence, if I had concluded that Fulmer House was beneficially owned by Mr and Mrs Dua equally I would still have required there to be a further enquiry as to whether or not as at the date of bankruptcy, in December 2008, all of it was occupied as Mr Dua's principal residence. At least I would have given the Official Receiver a further opportunity to make representations on the issue, before I could have safely concluded that the whole of Mr Dua's beneficial interest, as at the date of bankruptcy, had revested back in Mr Dua under section 283A of the Insolvency Act 1986.

*Sub-issue (3): Equity of exoneration and/or equitable accounting issues*

189. This sub-issue also does not strictly arise on my primary findings, but if the properties were not held by the Fulmer Trust, and instead were held jointly in law and in equity by Mr and Mrs Dua, then the question arises as to whether or not there should be any equity of exoneration or equitable accounting, in particular having regard to Mr Dua's contentions about payment of the mortgage. In my judgment there is little merit in these contentions, and I reject them.

190. Given that the mortgage over Fulmer House and 49 Sudbury Avenue is a joint liability of Mr and Mrs Dua the principle of equity of exoneration does not arise. That only arises where the property is used to secure the debts of one joint owner only and the other simply stands as surety; see In *Re Pittortou (a Bankrupt)* [1985] 1 WLR 58 at 61 (Scott J) and *Armstrong v Onyearu* [2018] Ch 137 at [1] (David Richards LJ).

191. Secondly, I also consider that Mr Dua has not adduced sufficient evidence to enable me to make a finding on the balance of probabilities as to the levels of contributions and how much this may justify exoneration. In headline terms the debt over Fulmer House and 49 Sudbury Avenue was c. £1.8m in 2004 and it has not been reduced. Therefore, the mortgage payments have largely been to service the interest when the matter is looked at over the entire period, even if the capital may have fluctuated during that time.

192. So far as equitable accounting this suffers similar problems. Mr and Mrs Dua have both continued to live at Fulmer House and the mere fact that Mr Dua may have shouldered the larger burden, or even the entire burden in relation to outgoings is insufficient to give rise to the inference that he and Mrs Dua intended that this imbalance would result in additional burdens being thrown onto (on this hypothesis) Mrs Dua's share in the equity. In *Clarke v Harlowe* [2005] EWHC 3062 (Ch), [2006] 1 P&CR DG 11 it was said (by HHJ Behrens) at [37], in a passage referred to with approval by the Court of Appeal in *Wilcox v Tait* [2006] EWCA Civ 1867, that in an ordinary cohabitation case there is usually no room or reason for equitable accounting whilst the parties' relationship subsists. By contrast, once the relationship has come to an end there are no longer any common arrangements in place between the parties, with the result that each ought to discharge his or her proportionate share of the outgoings. As emphasised by the Court of Appeal in *Wilcox v Tait* above, there is no absolute rule to the effect that equitable accounting cannot be applicable before relationship breakdown, but in these circumstances it may be difficult for a party to show an intention that by paying more than their fair share of mortgage payments the other partner should be burdened with that when the time came to sell. Moreover, it is to be noted that ordinarily the whole family unit will enjoy occupation of the property which in many cases is treated as approximating to an occupation rent.

193. I conclude there is no room for equitable accounting in this case for substantially the same reasons. There had been no relationship breakdown and Mr and Mrs Dua continue to live in the family home together, with their now adult children. The effect of mortgage payments made by Mr Dua was not to substantially increase any equity value in the properties since the value of secured liabilities has remained similar (and if anything is slightly higher than it was at the outset). Moreover, I find that Mr and Mrs Dua cannot contend the contrary given the terms of the Fulmer Trust.

## The Order For Possession and Sale Issue

## The principles

194. This claim has been brought under CPR 73.10C but because the property is held in joint names section 14 of the Trusts of Land and Appointment of Trustees Act 1996 applies. The matters relevant to determining an application for an order for possession and sale is therefore guided by the factors set out in section 15, which states as follows under subsection (1):

*"(1) The matters to which the court is to have regard in determining an application for an order under section 14 include—*
*(a) the intentions of the person or persons (if any) who created the trust,*
*(b) the purposes for which the property subject to the trust is held,*
*(c) the welfare of any minor who occupies or might reasonably be expected to occupy any land subject to the trust as his home, and*
*(d) the interests of any secured creditor of any beneficiary."*

195. Subsection (3) also applies, so that the court is to have regard to "*the circumstances and wishes of any beneficiaries of full age and entitled to an interest in possession in property subject to the trust or (in case of dispute) of the majority (according to the value of their combined interests*)."

196. By having regard to, and considering, the above principles I am satisfied that the rights of Mr and Mrs Dua, and others interested, under the Human Rights Convention (and in particular article 8 rights) are properly taken into account.

197. I also note, having regard to cases such as *Mortgage Corp v Shaire* [2001] Ch 743 that I have a discretion both as to whether to make any order and as to the form of any such order.

## Application

198. If I am correct in my conclusions as regards the Fulmer Trust then the Law Society accepts there would not be any proper basis to seek an order for possession and sale. It was also accepted that would be the case if I concluded that 49 Sudbury Avenue did not form part of the Fulmer Trust. Given the cross-charge arrangement in place with the bank this would not have any independent value for the Law Society.

199. I am only required, therefore, to consider this aspect of the case on the assumption that I am wrong in my conclusions in relation to Fulmer Trust. Moreover, it is only material to consider the position in relation to Fulmer Trust, for the reasons identified above. In these circumstances I will take the relevant facts and matters in brief terms here.

200. So far as the factors in subsections (1)(a) and (b) are concerned, the intention of Mr and Mrs Dua was that Fulmer House would be the family home, and that is how the property has been used. It has been the family home for 16 years. As for subsection 1(c), this does not apply. The Duas children do live in Fulmer House but neither of them are minors. As for 1(d), the interests of the secured creditor, here the Law Society, is, Ms Petrenko submits, best served by granting an order for possession and

594

sale. The fact that a creditor is being kept out of their money and is not receiving proper recompense is a powerful factor. In the present case, the debt owed to the Law Society is substantial and little has been received by way of payment since the first charging orders were made in 2011.

201.  I must also have regard to subsection (3), and in this case the circumstances and wishes of Mr Dua (on the hypothesis that he is a beneficial co-owner) are to be taken into account. He wishes to continue to preserve Fulmer House for the benefit of the family and his children in particular.

202.  He also presses on me three points to take into consideration, which Mrs Dua supported, which were that: (i) there is no good evidence as to what the properties are now worth; (ii) even if one makes certain assumptions about the worth of the properties there would be little or nothing to be gained on a sale when one takes into account the costs of sale and a delay in making the sale; and (iii) Mrs Dua confirmed an open offer by her to pay an immediate sum of £25,000 to reduce the debt to the Law Society and then to pay c. £2,000 a month (or £25,000 per annum) for 3 years. This offer was made on the basis it would secure a payment to the Law Society over 3 years which is the best the Law Society could realistically hope to achieve on a sale anyway, having regard to Mrs Dua's currently limited earning capacity.

203.  There is some force in the first point, given that the valuation of Fulmer House is a drive by valuation from 11 August 2018 and the valuation of 49 Sudbury Avenue is from Zoopla only, and dated 12 February 2019. I could have simply dismissed the application for lack of evidence, but I note that it would also have been open to Mr and Mrs Dua to seek to adduce more up to date valuation evidence, based on an internal inspection, and they have not chosen to do so. Before I would have considered making an order for sale I would have required an internal inspection of both properties to be carried out by a valuer and an up to date valuation report provided as it does not seem to me that the balancing exercise can be carried out properly without understanding with greater accuracy how much benefit would accrue to the Law Society by making that order. Depending on the valuation produced it may well have been the case that the benefit to be gained from the Law Society is so marginal as to bring into play Mr and Mrs Dua's second submission, as referred to above, and where the other factors might be said to displace any benefit to be gained by the Law Society in the balancing exercise to be struck, and having regard to any proposals being suggested by Mrs Dua for payment of the debt. If one assumes however that the properties were worth a combined figure of £2.5m and with secured lending at £1.9m, prima facie, even after some sale and debt costs, it seems likely there would be some equity remaining. The submissions of Mr Dua, to the effect there would be no benefit, require a very lengthy sale period and high unsatisfied lending costs to be assumed. Again, this is something a suitably instructed expert could have been asked to opine on; the opinion on value might be influenced by what they consider a reasonable marketing period should be. There is not much more that can be usefully said in relation to this having regard to the lack of any reliable up to date valuation evidence. Given there would need to have been an adjournment to allow this better evidence to be adduced, I would also have required the creditors on the register of 49 Sudbury Avenue to have been served with notice, and required them to be invited to indicate what if any sums they were claiming security in relation to. I do not believe I can simply accept Mr Duas oral evidence

that they asserted invalid and exaggerated claims. The Official Receiver's files might have shed further relevant light on these matters and I would have required my judgment to be circulated to them too before making an order, in case they, somewhat belatedly, wished to make any representations.

204. Finally, so far as the offer is concerned, this might have had a greater attraction if it was not limited to 3 years, and was expressed to run until such time as the judgment debt had been paid, or such shorter time as the Law Society might have agreed. It would, however, have required, on my primary conclusions, the children of the Duas to be bound into these proceedings and been given an opportunity to make representations. That has not occurred. There is little point in discussing the point further here, but I mention it in case the parties still wish to consider a consensual resolution and bearing in mind the Law Society has other enforcement options.

205. In my judgment, however, the Law Society is now in the situation summarised at paragraph 168 above, and, absent other enforcement measures, it is a matter for the trustees of the Fulmer Trust to decide what provision should be made for Mrs Dua if the Law Society concludes its only other enforcement route is bankruptcy.

**Conclusions**

206. The Claimant's claim against the Defendants fails.

207. I invite the parties to agree an order in respect of this judgment and I shall deal with any remaining and consequential issues following the remote hand down.

**CAYMAN ISLANDS**

# TRUSTS ACT

**(2021 Revision)**

**Supplement No. 3 published with Legislation Gazette No. 19 of 26th February, 2021.**

### Reserved powers

**14**. (1) The reservation or grant by a settlor of a trust of any or all of the following —

(a) any power to revoke, vary or amend the trust instrument or any trusts or powers arising thereunder in whole or in part;

(b) a general or special power to appoint either income or capital or both of the trust property;

(c) any limited beneficial interest in the trust property;

(d) a power to act as a director or officer of any company wholly or partly owned by the trust;

(e) a power to give binding directions to the trustee in connection with the purchase, holding or sale of the trust property;

(f) a power to appoint, add or remove any trustee, protector or beneficiary;

(g) a power to change the governing law and the forum for administration of the trust; or

(h) a power to restrict the exercise of any powers or discretions of the trustee by requiring that they shall only be exercisable with the consent of the settlor or any other person specified in the trust instrument,

shall not invalidate the trust or affect the presumption under section 13(1).

(2) In this Part —

“**settlor**” has the meaning ascribed to that term in section 87.

### Indemnity of trustees

**15**. A trustee who has acted in compliance with, or as a result of an otherwise valid exercise of, any of the powers referred to in section 14(1) shall not be acting in breach of trust.

## PART IV - Administration of Trusts - General Powers of Trustees

### Power of trustees for sale to sell by auction or private contract

**16**. (1) Where a trust for sale or a power of sale of property is vested in a trustee, that person may sell or concur with any other person in selling all or any part of the property, either subject to prior charges or not, and either together or in lots, by public auction or by private contract, subject to any such conditions respecting title or evidence of title or other matter as the trustee thinks fit, with power to vary any contract for sale, and to buy in at any auction, or to rescind any contract for sale and to re-sell, without being answerable for any loss.



© Copyright 2025, vLex. All Rights Reserved.

Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Fraudulent Conveyances Act 1571

| **Year:** | 1571 |
|---|---|

**vLex Document Id:** VLEX-861268432

**Link:** https://justis.vlex.com/vid/fraudulent-conveyances-act-1571-861268432

# Anno decimo tertio Regin E l i z a b e t h .

# An Act against fraudulent Deeds, Alienations, &c.

# (13 Eliz. 1) C A P. V.

'F O R the Avolishing and Abolishing of feigned, covinous and fraudulent Feoffments, Gifts, Grants, Alienations, Conveyances, Bonds, Suits, Judgments and Executions, as well of Lands and Tenements as of Goods and Chattels, more commonly used and practised in there Days than hath been seen or heard of heretofore: (2) Which Feoffments, Gifts, Grants, Alienations, Conveyances, Bonds, Suits, Judgments and Executions, have been and are devised and contrived of Malice, Fraud, Covin, Collusion or Guile, to the End, Purpose and Intent, to delay, hinder or defraud Creditors and others of their just and lawful Actions, Suits, Debts, Accounts, Damages, Penalties, Forfeitures, Heriots, Mortuaries and Reliefs, not only to the Let or Hinderance of the due Course and Execution of Law and Justice, but also to the Overthrow of all true and plain Dealing, Bargaining and Chevisance between Man and Man, without the which no Common wealth or civil Society can be maintained or continued:'

# S-II

# All fraudulent Conveyances made to avoid the Debt or Duty of others shall be void. Rast. 207.

**II All fraudulent Conveyances made to avoid the Debt or Duty of others shall be void. Rast. 207.**

II. Be it therefore declared, ordained and enacted by the Authority of this present Parliament, That all and every Feoffment, Gift, Grant, Alienation, Bargain and Conveyance of Lands, Tenements, Hereditaments, Goods and Chattels, or of any of them, or of any Lease, Rent, Common or other Profit or Charge out of the same Lands, Tenements, Hereditaments, Goods and Chattels, or any of them, by Writing or otherwise, (2) and all and every Bond Suit, Judgment and Execution, at any Time had or made sithence the Biginning of the Queen's Majesty's Reign that now is, or at any Time hereafter to be had or made, (3)to or for any Intent or Purpose before declared and expressed, shall he from henceforth deemed and taken (only as against that Person or Persons, his or their Heirs, Successors, Executors, Administrators

and Assigns, and every of them, whose Actions, Suits, Debts, Accounts, Damages, Penalties, Forfeitures, Heriots, Mortuaries and Reliefs, by such guileful, covinous or fraudulent Devices and Practices, as is aforesaid, are, shall or might be in any ways disturbed, hindred, delayed or defrauded) to be clearly and utterly void, frustrate and of none Effect; any Pretence, Colour, feigned Consideration, expressing of Use, or any other Matter or Thing to the contrary notwithstanding.

# S-III

## The Forfeiture of the Parties to fraudulent Deeds.

### III The Forfeiture of the Parties to fraudulent Deeds.

III. And be it further enacted by the Authority aforesaid, That all and every the Parties to such feigned, covinous or fraudulent Feoffment, Gift, Grant, Alienation, Bargain, Conveyance, Bonds, Suits, Judgments, Executions and other Things before expressed, and being privy and knowing of the same, or any of them; (2)which at any Time after the tenth Day of*June* next coming shall wittingly and willingly put in Ure, avow, maintain, justify or defend the same, or any of them, as true, simple, and done, had or made *bona side* and upon good Consideration; (3) or shall alien or assign any the Lands, Tenements, Goods, Leases or other Things before-mentioned; to him or them conveyed as is aforesaid, or any Part thereof; (4) shall incur the Penalty and Forfeiture of one Year's Value of the said Lands, Tenements and Hereditaments, Leases, Rents, Commons or other Profits, of or out of the same; (5) and the whole Value of the said Goods and Chattels; (6) and also so much Money as are or shall be contained in any such covinous and feigned Bond; (7)the one Moiety whereof to be to the Queen's Majesty, her Heirs and Successors, and the other Moiety to the Party or Parties grieved by such feigned and fraudulent Feoffment, Gift, Grant, Alienation, Bargain, Conveyance, Bonds, Suits, Judgments, Executions, Leases, Rents, Commons, Profits, Charges and other Things aforesaid, to be recovered in any of the Queen's Courts of Record by Action of Debt, Bill, Plaint or Information, wherein no Essoin, Protection or Wager of Law shall be admitted for the Defendant or Defendants; (8) and also being thereof lawfully convicted, shall suffer Imprisonment for one Half Year without Bail or Mainprise.

# S-IV

## Common Recoveries against the Tenants of Freehold.

**IV Common Recoveries against the Tenants of Freehold.**

IV. Provided always, and be it further enacted by the Authority aforesaid, That whereas sundry common Recoveries of Lands, Tenements and Hereditaments have heretofore been had, and hereafter may be had against Tenant in Tail, or other Tenant of the Freehold, the Reversion or Remainder, or the Right of Reversion or Remainder, then being in any other Person or Persons; (2) that every such common Recovery heretofore had, and hereafter to be had, of any Lands, Tenements or Hereditaments, shall as touching such Person and Persons which then had any Remainder or Reversion, or Right of Remainder or Reversion, and against the Heirs of every of them, stand, remain and be of such like Force and Effect, and of none other, as the same should have been if this Act had never been had ne made.

# S-V

## Making an Estate whereby a Voucher may be used in a Formedon.

**V Making an Estate whereby a Voucher may be used in a Formedon.**

V. Provided always, and be it further enacted by the Authority aforesaid, That this Act, or any Thing therein contained, shall not extend to make void any Estate or Conveyance, by reason whereof any Person or Persons shall use any Voucher in any Writ of*Formedon* , now depending or hereafter to be depending, but that all and every such Vouchers in any Writ of *Formedon* shall stand and be in like Force and Effect, as if this Act had never been had ne made; any Thing before in this Act contained to the contrary notwithstanding.

# S-VI

## Estates made upon good Consideration, and bona side.

**VI Estates made upon good Consideration, and bona side.**

VI. Provided also, and be it enacted by the Authority aforesaid, That this Act, or any Thing therein contained, shall not extend to any Estate or Interest in Lands, Tenements, Hereditaments, Leases, Rents, Commons, Profits, Goods or Chattels, had, made, conveyed or assured, or hereafter to be had made, conveyed or assured, which Estate or Interest is or shall be upon good Consideration and*bona fide* lawfully conveyed or assured to any Person or

Persons, or Bodies Politick or Corporate, not having at the Time of such Conveyance or Assurance to them made, any Manner of Notice or Knowledge of such Covin, Fraud or Collusion as is aforesaid; any Thing before mentioned to the contrary hereof notwithstanding.

# S-VII

## For farther Provisions against fraudulent Conveyances, see 29 Car. 2. c. 3. and 3 W. & M. c. 14.

**VII For farther Provisions against fraudulent Conveyances, see 29 Car. 2. c. 3. and 3 W. & M. c. 14.**

VII. This Act to endure unto the End of the first Session of the next Parliament. 50 Ed. 3. c. 6. 2 R. 2. Stat. 2. c. 3. 3 H. 7. c. 4. made perpetual by 29 Eliz. c. 5. See 27 Eliz. c. 4.

Note : this act is listed in the Chronoloical Table of Statutes as theFraudulent Conveyances Act, 1571



VIRGIN ISLANDS

# CONVEYANCING AND LAW OF PROPERTY ACT

**Revised Edition**
showing the law as at 1 January 2023

This is a revised edition of the law, prepared by the Law Revision Commissioner under the authority of the Law Revision Act 2014.

This edition contains a consolidation of the following laws—

| | Page |
|---|---|
| **CONVEYANCING AND LAW OF PROPERTY ACT** | 3 |
| Act 30 of 1961 .. in force 30 October 1961 | |

(3) The trustees may from time to time, out of the income of the land, including the produce of the sale of timber and underwood, pay the expenses incurred in the management, or in the exercise of any power conferred by this section, or otherwise in relation to the land, and all outgoing not payable by any tenant or other person, and shall keep down any annual sum, and the interest of any principal sum, charged on the land.

(4) Where the infant's estate or interest is an undivided share of land, the powers of this section relative to the land may be exercised jointly with persons entitled to possession of, or having power to act in relation to, the other undivided share or shares.

(5) This section has effect subject to an express appointment by the settlement, or the Court, of trustees for the purposes of this section or of any enactment replaced by this section.

(6) Where any person is contingently entitled to land, this section shall, subject to any prior interests or charges affecting that land, apply until his interest vests, or, if his interest vests during his minority, until he attains the age of 21 years.

This subsection applies only where a person becomes contingently entitled under an instrument coming into operation after the 31st day of December, 1881.

(7) This section applies only if and as far as a contrary intention is not expressed in the instrument, if any, under which the interest of the infant or person contingently entitled as aforesaid arises, and has effect subject to the terms of that instrument and to the provisions therein contained.

## PART XI

## VOIDABLE DISPOSITIONS

### Voluntary conveyances to defraud creditors voidable

**81.** (1) Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced.

(2) This section does not affect the operation of a disentailing assurance, or the law of bankruptcy for the time being in force.

(3) This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith or upon good consideration and in good faith to any person not having at the time of conveyance, notice of the intent to defraud creditors.

### Voluntary disposition of land how far voidable as against purchasers

**82.** (1) Every voluntary disposition of land made with intent to defraud a subsequent purchaser is voidable at the instance of that purchaser.

(2) For the purposes of this section, no voluntary disposition, whenever made, shall be deemed to have been made with intent to defraud by reason only that a subsequent disposition for valuable consideration was made, if such subsequent disposition was made after the 28th day of June, 1893.



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

**CAUSE NO. FSD 248 of 2017 (IKJ)**

IN THE MATTER OF A TRUST KNOWN AS THE STINGRAY TRUST

AND

IN THE MATTER OF THE TRUSTS LAW (2011 REVISION)

BETWEEN:

GENEVA TRUST COMPANY (GTC) SA

**Plaintiff**

AND

(1) IDF (by her Court Appointed Guardian GM)

(2) MF

**Defendants**

**Appearances**: Mr Dakis Hagen QC of counsel and Ms Rachael Reynolds and Deborah Barker Roye of Ogier for 1st Defendant/Applicant (the "Guardian")

Mr Hector Robinson QC and Mr Zachary Hoskin and Ms Jessica Vickers of Mourant for the Plaintiff/Respondent (the "Trustee")

**Before:** **The Hon. Justice Kawaley**

**Heard:** **10-11 November 2020**

**Draft Judgment Circulated:** **2 December 2020**

**Judgment Delivered:** **21 December 2020**



**HEADNOTE**

*Forum non conveniens-application for stay of Cayman Islands trust invalidity proceedings in favour of pending Italian proceedings-trust governed by Cayman Islands law-whether forum for administration clause operated as an exclusive jurisdiction clause-construction of section 90 of the Trusts Law (2020 Revision)*

## JUDGMENT

**Introductory**

1. The present application may be described as a tale of two representatives (the Guardian and the Trustee) and two jurisdictions (Italy and the Cayman Islands). Minor roles are played by MF, the 2nd Defendant, and Switzerland. The Guardian acting on behalf of the elderly settlor and beneficiary of the Stingray Trust ("the Trust") seeks to establish the invalidity of the Trust. The Trustee seeks to uphold the validity of the Trust.

2. It was the Guardian who initially issued proceedings against the Trustee in the District Court of Lugano, Switzerland (Pretore del Distretto di Lugano) on December 16, 2015; the proceedings concluded in the Appeal Court of the Republic and Canton of Ticino (Tribunale d'appelo (Cantone Ticino)) on November 11, 2016 (the "Swiss Proceedings"). She then commenced a second set of proceedings against the Trustee and the Italian resident beneficiary of the Trust, the 2nd Defendant, before the Court of Milan (Tribunale di Milano) on May 16, 2017 (the "Milan Proceedings") by filing a Writ of Summons (Atto di Citazione). It was in response to the Milan Proceedings that the Trustee commenced the present proceedings by an Originating Summons dated November 10, 2017. That Summons sought, *inter alia*, the following relief:

> "*3. A declaration that the…Stingray Trust…is an irrevocable discretionary trust validly established and subsisting under Cayman Islands law and subject to the exclusive jurisdiction of the Courts of the Cayman Islands, pursuant to art. 10, par. 2 of the Irrevocable Declaration of Trust dated 5 July 2005;*



*4. A declaration that the First defendant has no legal right, title or interest in the shares of Expressway Management Corp., a company incorporated in Panama, or in any other property held by the Plaintiff as Trustee of the Stingray Trust…*"

3. Paragraphs 1-2 of the Originating Summons, however, sought directions in relation to the Milan Proceedings (*Beddoe* relief). By an Order dated September 17, 2018 (the "First *Beddoe* Order"), Parker J approved the Trustee's defence of the "Jurisdiction Action", namely the Trustee's challenge to the jurisdiction of the Milan Court before that Court and (after the Guardian applied for a pre-trial determination of the jurisdiction question) the determination of the Milan Court's jurisdiction by Italy's highest appellate court, the Supreme Court of Cassation (Suprema Corte di Cassazione). The First *Beddoe* Order directed that the Trustee could seek further directions if the Jurisdiction Action did not succeed. The Supreme Court of Cassation determined that the Milan Court did have jurisdiction over the Guardian's claim on March 18, 2019 and the Milan Proceedings (which had been stayed pending the determination of the jurisdictional issue) resumed.

4. Further directions were given by Parker J in an Order dated July 11, 2019 (the "Second *Beddoe* Order"), including an amendment to reflect a change in the Trustee's name and directions in relation to the "Ancillary Lugano Proceedings". However, for present purposes, the most significant directions given were in the following terms:

"*2. The Plaintiff is at liberty to continue to defend the claim brought by the Court Appointed Guardian against the Plaintiff and the Second Defendant, by Writ of Summons dated 16 May 2017 filed in the Court of Milan…Italy…on its merits and to prosecute any appeal in connection with the Milan Proceedings, if so advised.*"

5. By a Summons dated August 16, 2019, however, the Trustee applied to amend the Originating Summons to seek an anti-suit injunction restraining the Guardian from further pursuing the Milan Proceedings. By a Summons filed on September 4, 2020, the Guardian sought orders, *inter alia*:

"*1. That these proceedings, commenced by the Plaintiff's Originating Summons dated 10 November 2017 (the Originating Summons); alternatively the claim for relief set out at paragraphs 3 and 4 of the Originating Summons; alternatively such part of that relief as the court sees fit, be stayed pursuant to the inherent jurisdiction of the Court on the grounds that the Cayman Islands is not the appropriate forum*

*for the trial of this matter, and that the more convenient and appropriate forum is the Court of Milan, Italy.*"

6. By the time the Guardian's stay application was heard, the Court of Milan had apparently given directions for a final hearing in December 2021. Based on the respective written submissions, the following issues fell to be decided:

   (a) whether section 90 of the Trusts Law (2020 Revision) (the "Law") provides that all questions relating to, *inter alia*, the validity of a Cayman Islands trust can only be adjudicated by the Cayman Islands courts;

   (b) whether the Trust contains an exclusive jurisdiction clause which was binding on the Guardian in relation to the invalidity claim;

   (c) whether the Cayman Islands is the most convenient forum to adjudicate the invalidity dispute in any event.

**Preliminary Factual Findings**

**The Guardian's Evidence**

7. The Guardian in her First Affidavit deposed that she was a relative in the fifth degree of IDF and the closest relative willing to assume the responsibility of serving as Guardian. She was appointed in place of the temporary appointee on May 15, 2012, when IDF was 88 years old and had lost the capacity to manage her own financial affairs. The appointment order was made by the Tutelary Judge (Il Giudice Tutelare) of the Court of Milan.

8. Charged with taking control of IDF's affairs, the Guardian learned of the Trust in 2013, that a Mr Travisano was Protector and also identified potential assets belonging to IDF in Italy. In September 2015, Italian lawyer Mr Alberto Banfi, after initially contacting the original trustee, was put in touch with the Trustee and sought information about the Trust.



9. By letter dated December 4, 2015, the Guardian's concerns about the validity of the Trust were expressed. The Guardian strongly suspected that IDF had been taken advantage of and did not know that she was setting up a trust. These suspicions were compounded by:

(a) the apparent reluctance of the Trustee to disclose basic information about the Trust and the addition of MF (a charitable foundation) as a beneficiary to the Trust in 2015 without prior notice to the Guardian; and

(b) the appearance that those administering the Trust were financially benefitting from it while IDF herself was not.

10. This prompted the Guardian to commence the Swiss Proceedings on December 17, 2015 seeking disclosure of assets, preservation of assets and delivery up of assets and, after these proceedings were determined in the Trustee's favour, to commence the Milan Proceedings. The Ancillary Lugano Proceedings were commenced on April 10, 2019 for protective relief preserving the Trust's assets pending the determination of the Milan Proceedings.

11. As regards the convenience of a trial in the Cayman Islands, the Guardian averred as follows:

(a) it would be inconvenient for her to travel to the Cayman Islands as a full-time Primary School teacher who only speaks Italian;

(b) the Trustee is based in Geneva, Switzerland and administers the Trust from Switzerland;

(c) the Trust assets are located in Lugano Switzerland;

(d) the beneficiaries and settlor reside in Milan, Italy;

(e) the main witnesses are located in Milan and Lugano

(f) the witnesses are not native English speakers and most documents are written in Italian.



12. The First Banfi Affidavit explains how the Trust was established, with funds derived from IDF's late sister's husband and IDF's husband, who were a businessman and doctor respectively. He avers: "*The issue is whether IDF understood what was being done on her behalf with her own funds and her sister's funds*." Reliance is placed on a November 21, 2005 letter from IDF to her lawyer Mr Stucchi requesting assets that had been transferred a few months earlier to the Trust as indicative of a want of understanding on her part.

13. As far as the Swiss proceedings are concerned, Mr Banfi deposes that these were only made necessary by the failure of the Trustee to be more cooperative in providing information about the Trust. As far as the Milan Proceedings are concerned, Mr Banfi deposes that the primary relief sought is a declaration of invalidity in relation to the Trust based on IDF's "*lack of knowledge, understanding and agreement to the terms of the trust*" (paragraph 81). As regards the important question of the application of Cayman Islands law to the validity question, the deponent avers as follows:

"*85. The Milan Wit…expressly states that Cayman Islands law should apply for the resolution of the case…*

*86. Furthermore, whilst the Milan Court is willing and able to apply Cayman law when it is required to do so, certain matters pertaining to the capacity of IDF and Concetta to transfer money from their personal accounts into the Expressway account, are not matters 'arising in regard to a trust governed by Cayman law'. These points fall to be determined as a question of fact, and…so far as they concern matters of law, would have nothing to do with Cayman law*."

14. A detailed summary of the Supreme Court of Cassation's determination of the jurisdictional issue, on the Guardian's application, is then set out. Reference is made, *inter alia*, to the fact that the findings included the following:

(a) clause 10.2 of the Declaration of Trust did not constitute an exclusive jurisdiction clause, having regard to sections 89-90 of the Trusts Law and the Privy Council decision in *Crociani-v-Crociani*;

(b) the Guardian had not waived the Milan Court's jurisdiction by having previously sought ex parte relief in the Swiss Proceedings;



(c)     the Milan Court had jurisdiction in a relation to a Cayman Islands trust in circumstances where the Cayman Islands was not a Lugano Convention country and trust beneficiaries were domiciled in Italy.

15.    With the jurisdiction question determined, the deponent explains that the Ancillary Lugano Proceedings were commenced to obtain ex parte precautionary relief analogous to a freezing order. These proceedings appear to me to have been  based on the premise that IDF was indeed a beneficiary of a valid trust. This relief was obtained on April 10, 2020 and confirmed by the Lugano District Court (seemingly subject to a further review) on September 17, 2019.   In a third stage of the Ancillary Lugano Proceedings, oral evidence was given by Mr Travisano (the Protector and longstanding advisor to IDF and her sister) and Mr Stucci (the lawyer who was directly involved in establishing the Trust). Final Statements were filed in March 2020 and a decision is awaited.

16.    Mr Banfi avers that the Trustee actively participated in the Milan Proceedings, having delayed them by three unsuccessful interim applications (the "*Authority Challenge*", the "*Conflict Challenge*" and the "*Jurisdiction Challenge*").  In contending that Milan is the most appropriate forum, the following main points are advanced:

(a)     the validity dispute depends on primarily factual disputes relating to events which occurred in Lugano between European witnesses;

(b)     the Milan Court is already seised of the matter and both the Trustee and the Protector have submitted to the jurisdiction of the Milan Court;

(c)     determining the validity issue in the Cayman Islands will result in a duplication of costs;

(d)     the Trustee, the Protector and the Guardian are all resident in Europe, not in Cayman.;

(e)     less than 10% of the documents are written in English. They are mostly written in Italian;

(f)     the Milan Court can apply Cayman Islands law to the extent required.



17.     Following a procedural hearing on October 13, 2020, it is deposed in the Second Banfi Affidavit, the Milan Court directed that the evidence of Messrs Travisano and Stucci before the Lugano Court could be admitted without the need for them to give oral evidence in Milan. The next hearing before the Court is scheduled for December 15, 2021 at which time the parties will be permitted to file further submissions before a final decision is delivered in 2022.

18.     The First Affidavit of Edy Salmina confirms that the issue of validity has not been determined in the Lugano Proceedings.

**The Trustee's evidence**

19.     Mr Rodney Hodges, a Director and Partner of the Plaintiff, opposed the Guardian's stay Summons through his Fourth Affidavit. A non-practising UK barrister, he has some 40 years' experience as a director of regulated trust companies. He firstly describes the history of the present proceedings, which were commenced after the Milan Proceedings and initially involved obtaining *Beddoe* relief which :

    (a)     directed that the Trustee should participate in the Milan Proceedings to challenge the jurisdiction of the Milan Court (Order dated September 4, 2018); and

    (b)     directed that the Trustee should defend the Milan Proceedings on their merits and participate in the Ancillary Lugano Proceedings (Order dated July 11, 2019).

20.     On August 16, 2019, the Trustee filed its 'Amendment Summons' seeking to add to its Originating Summons herein a prayer for an anti-suit injunction against the Guardian to restrain her from pursuing the Milan Proceedings and the Ancillary Lugano Proceedings. This was said to be in order to "*progress its application for other relief sought in these Proceedings, in particular, for a declaration that the Trust is an irrevocable discretionary trust validly established and subsisting under Cayman Islands law and subject to the exclusive jurisdiction of the courts of the Cayman Islands*" (paragraph 23). The deponent accepted that this application had not yet been heard, over a year after it was filed.



21. Mr Hodges then describes the background to the Trust, the key provisions of the Declaration of Trust, the establishment of the Trust and the Guardian's attacks on the validity of the Trust beginning with a "hostile" letter from Mr Banfi on behalf of the Guardian dated October 1, 2015. The Affidavit then responds to the evidence filed in support of the Guardian's 'Stay Summons'. Most of this response, perhaps understandably, seeks to counter complaints made by or on behalf of the Guardian by way of justifying her validity attack. These matters were of peripheral concern for the purposes of the present application. The case that this jurisdiction is the most appropriate forum is supported by reference to the following main averments:

(a) the validity of the Trust was finally determined in the Lugano Proceedings, and this decision bound the Guardian;

(b) there is no natural connection between the Trust and the issue of its validity and Milan or Italy;

(c) the Guardian initially obtained permission from the Tutelary Judge of the Court of Milan to challenge the validity of the Trust in Switzerland or the Cayman Islands, which confirms that this is an appropriate forum;

(d) using MF as a basis for gaining a jurisdictional foothold in Italy lacks substance as MF has no connection with the validity dispute;

(e) the governing law of the Trust is the most important jurisdictional consideration;

(f) the asserted grounds of invalidity are untenable in common law terms and there is a "*significant risk of the Italian courts falling into error when they seek to apply the applicable principles of Cayman Islands law*" (paragraph 170);

(g) the key witnesses are likely to be the Trustees' witnesses who are both fluent in English. The most important documents are in English and the Guardian's case is primarily based on drawing inferences from documents. Moreover, travel difficulties can be obviated through remote evidence being given;

(h) any duplication of costs will have been caused by the Guardian choosing to belatedly sue in Milan after getting permission to sue in Cayman or Switzerland.

22.     Maria Cristiana Felisi's First Affidavit provided the Trustee's Italian lawyer's perspective of the Milan Proceedings. She deposed that as Italy was a party to the 1985 Hague Convention on the Law Applicable to Trusts, Article 6 of which applied the law chosen by the settlor to questions of trust validity, the Milan Court should accordingly apply Cayman Islands law. She sought to clarify the limited nature of the Guardian's validity claim, which was based merely on a lack of consent, not on mistake or a lack of capacity. As regards the Italian law approach to expert evidence, she deposed that the Judge can conduct his or her own research although the power to admit expert evidence through a foreign live witness or a report did exist.

**Factual findings**

23.     The Trustee's evidence, perhaps understandably, failed to address what I regarded as the "elephant in the room". The present proceedings were not commenced pre-emptively but in response to the Lugano Proceedings and, primarily, the Milan proceedings. The Trustee took no steps to actively seek the adjudication of the contentious validity question in this Court. Instead, it obtained approval from Parker J on a *Beddoe* application to challenge the jurisdiction of the Milan Court and to recover the related costs from the Trust assets. In *Re Stingray Trust*, FSD 85 and 248 of 2017 (RPJ), Judgment dated September 17, 2018, (published in redacted form) Parker J pivotally held as follows:

"*81. In my judgment the Trustee is entitled to an order that it was entitled to participate in the Milan Proceedings for the purpose of challenging the jurisdiction of the Milan court in the Court of Cassation. At that stage if unsuccessful the Trustee should return to this court for specific approval of any engagement to defend the case on its merits and to seek further directions…*"

24.     The Supreme Court of Cassation determined that the Milan Court had jurisdiction over the Guardian's trust invalidity claim on March 18, 2019. The Trustee made the second application for *Beddoe* relief which was heard on July 11, 2019, four months later. The overarching consideration was that if the Trustee did not defend the Milan Proceedings on their merits, then the Guardian would obtain an Italian judgment which could be enforced against the Trustee and the Trust assets in Switzerland. In paragraph 1 of his ex tempore Ruling, Parker J held:



"…*The decision of the Trustee that it should continue to defend the interest of the beneficiaries in both the Milan Proceedings and the Ancillary Lugano Proceedings is a reasonable one*."

25. It is difficult to discern why, apart from the obvious likelihood that seeking any such direction would have been robustly rebuffed, the Trustee did not ask Parker J to also approve a decision to simultaneously seeking a declaration on the validity of the Trust from this Court. Only a month later, the Trustee flirted with the idea of litigating substantively and simultaneously on two fronts without *Beddoe* approval by filing the Amendment Summons, but then (it seems) thought better of it. But having engaged with substantively defending the Milan Proceedings for over a year, and having represented to Parker J that this was an essential strategy, the Trustee's present litigation stance seemed quite surprising, absent either (a) *Beddoe* approval and/or (b) a rational explanation for such a dramatic change of course. The Milan Proceedings, after all, have been on foot for three years.

26. This aspect of the wider litigation history, which the Guardian's counsel was keen to highlight, I consider to be central to the *forum non conveniens* analysis. Putting to one side the legal effect of section 90 and whether or not the Trust contains an exclusive jurisdiction clause, I find that it tips the scales decisively in favour of the Court of Milan as, *prima facie*, the most appropriate forum. The other considerations, standing by themselves, are less clear-cut:

(a) the fact that Cayman Islands law is the governing law is counterbalanced by the fact that the Court of Milan will apply the Trust's governing law to the validity question;

(b) the fact the witnesses are located in or near Italy and are not native English speakers is counterbalanced, to some extent, by the fact that the two main witnesses are fluent English speakers;

(c) the inconvenience to the Guardian of travelling to the Cayman Islands is counterbalanced by the fact that she is not a key witness and could testify remotely;



(d) the legal nexus of the Trust with the Cayman Islands is counterbalanced to a significant extent by the fact that the Trustee administers the Trust from Switzerland and the Trust assets are located there; and

(e) the significance of Cayman law governing the validity issue is somewhat diminished by the fact the Guardian's invalidity case appears to turn primarily on issues of fact.

27. It remains to consider the merits of the Guardian's Stay Summons in light of the determination of (a) whether section 90 of the Law requires all matters falling within its purview to be determined by this Court, (b) whether the Trust contains an exclusive jurisdiction clause and (c) how the legal principles governing the doctrine of forum non conveniens impact on the factual matrix of the present case.

**Legal findings: can section 90 of the Trusts Law be construed as containing a mandatory statutory jurisdiction clause?**

**Primary construction of the statutory provision in its context without reference to judicial authority**

28. Section 90 of the Law, so far as is material for present purposes, provides as follows:

"*90. All questions arising in regard to a trust which is for the time being governed by the laws of the Islands or in regard to any disposition of property upon the trusts thereof including questions as to* -

*(a) the capacity of any settlor;*

*(b) any aspect of the validity of the trust or disposition or the interpretation or effect thereof;*

*(c) the administration of the trust, whether the administration be conducted in the Islands or elsewhere, including questions as to the powers, obligations, liabilities and rights of trustees and their appointment and removal; or*

*(d) the existence and extent of powers, conferred or retained, including powers of variation or revocation of the trust and powers of appointment, and the validity of any exercise thereof,*



*are to be determined according to the laws of the Islands, without reference to the laws of any other jurisdictions with which the trust or disposition may be connected…*" [Emphasis added]

29. Section 90 is found in Part VII ("*Trusts-Foreign Element*"). The territorial scope of Part VII is defined by section 88 as follows:

"*88. This Part applies to every trust and every disposition of property in trust made before, on or after the 31st May, 1987, whether such property is situate in the Islands or elsewhere.*"

30. The seemingly unlimited scope of the extra-territorial reach of this Part of the Law is tempered by subsequent provisions of Part VII. Section 89 ("governing law") provides in salient part as follows:

"*89. (1) In determining the governing law of a trust, regard is first to be had to the terms of the trust and to any evidence therein as to the intention of the parties; and the other circumstances of the trust are to be taken into account only if the terms of the trust fail to provide such evidence.*

*(2) A term of the trust expressly selecting the laws of the Islands to govern the trust is valid, effective and conclusive regardless of any other circumstances.*

*(3) A term of the trust that the laws of the Islands are to govern a particular aspect of the trust or that the Islands or the courts of the Islands are the forum for the administration of the trust or any like provision is conclusive evidence, subject to any contrary term of the trust, that the parties intended the laws of the Islands to be the governing law of the trust and is valid and effective accordingly…*"

31. Reading section 88 and section 89 together, it appears that Part VII is intended to apply, not to every trust anywhere in the world, but to trusts governed by Cayman Islands law by virtue of the fact that either:

(a) local law is expressly selected as the governing law of the trust in the relevant trust instrument; or

(b) this forum is expressly selected as the forum for administration of the trust.

GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

32. None of these provisions including section 90 itself (as Mr Hagen QC for the Guardian pointed out), expressly deal with this Court's jurisdiction at all, let alone confer express statutory jurisdiction over all trusts governed by Cayman Islands law as the Trustee contended. The marginal note to section 90 is "*matters determined by governing law*". Mr Robinson QC for the Trustee rightly responded that the absence of an express jurisdiction clause (as in the Bermuda[1] and Jersey[2] legislative schemes) was immaterial. And section 48 of the Law ("*Application to the Court for advice and directions*") does confer express supervisory jurisdiction over trusts. Which trusts that jurisdiction may be exercised over is not defined in express statutory terms, but it seems obvious from the express terms of sections 88, 89 and 90, that the jurisdiction would embrace trusts governed by Cayman Islands law, irrespective of whether the trust assets are located within the jurisdiction of this Court.

33. The so-called "firewall provisions" of Part VII provide no support for the proposition that section 90 contains a statutory exclusive jurisdiction clause either. Section 91 ("*Exclusion of foreign law*") simply provides that no trust governed by Cayman Islands law should be held to be invalid or defective through application of a foreign law on the grounds that:

"*(a) the laws of any foreign jurisdiction prohibit or do not recognise the concept of a trust; or*

*(b) the trust or disposition avoids or defeats rights, claims or interests conferred by foreign law upon any person by reason of a personal relationship to the settlor or any beneficiary (whether discretionary or otherwise) or by way of heirship rights, or contravenes any rule of foreign law or any foreign judicial or administrative order or action intended to recognise, protect, enforce or give effect to any such rights, claims or interests.*"

34. This is a very narrowly defined exclusion of foreign law clause which does not even hint at the notion that no foreign court is entitled to exercise jurisdiction over a trust governed by Cayman Islands law. Section 92 ("*Heirship rights*") provides, further to section 91, that heirship rights conferred by a foreign law in relation to "*the property of a living person*" shall not be recognised as :

"*(a) affecting the ownership of immovable property in the Islands or movable property*

---

[1] Trusts (Special Provisions) Act 1989, section 9.
[2] Trusts (Jersey) Law 1984, section 5.



*wherever situate for the purposes of paragraph (i) of section 90 or for any other purpose; or*

*(b) constituting an obligation or liability for the purposes of the Fraudulent Dispositions Law (1996 Revision) or for any other purpose.*

35. This exclusion of foreign law provision, which also presumably applies to trusts governed by local law, does not by its terms support an inference that section 90 by necessary implication confers exclusive jurisdiction on this Court in relation to such trusts. The position is made clearer by section 93 ("*Foreign judgments*") which might, quite extravagantly, have provided that no judgment of a foreign court dealing with a matter within the scope of section 90 shall be recognised. Instead it merely provides:

"*93. A foreign judgment shall not be recognised, enforced or give rise to any estoppel insofar as it is inconsistent with section 91 or 92.*"

36. Section 93 only expressly renders unenforceable foreign judgments which are inconsistent with sections 91 or 92. The Guardian's counsel submitted that if there was any ambiguity as to the intended legislative effect of section 90, which there was not, the Hansard record of the Second Reading of the Trusts (Foreign) Element Bill which introduced Part VII into the Law did not support the Trustee's construction. Then Leader of Government Business Mr. Thomas Jefferson explained the purpose of the Bill (on its Second Reading) to the Legislative Assembly as follows:

"*….if it was to put it to the test as to which law governs the Trust, there is a very good chance that some other jurisdiction's law may apply….some countries of the world prohibit the establishment of Trusts, or the transfer of assets outside of their country. In this case, it is uncertain which country's law would be deemed by the Court to govern the Trust….the rationale behind it, and the gist, is that whatever Trust is created here, we want to make it abundantly clear to the Court that it is our wish that the Cayman Islands Law apply to all of them.*"

37. This legislative history supports both the Guardian's contention that section 90 is merely a governing law clause and the Trustee's contention that the jurisdiction of this Court over Cayman Islands law governed trusts is implicit in the legislative scheme, despite the absence of an express jurisdiction clause in Part VII of the Law. Against this background,



Mr Hagen QC submitted that, construing section 90 in its statutory context "unburdened by authority", it was "*counterintuitive*" to suggest that section 90 provided that only this Court could adjudicate issues relating to, *inter alia*, the validity of a trust governed by Cayman Islands law. I agree. The Trustee's counsel did not have the temerity to challenge this prima facie view of section 90 of the law, rightly electing to rely primarily on case law which appeared to support a contrary construction.

**Is the primary construction of section 90 displaced by binding or persuasive authority?**

38. Legal practice for judges and lawyers in offshore jurisdictions throws up unique challenges because complex legal questions frequently arise out of *sui generis* legislation in an environment which is not intellectually nourished by access to in-depth academic and/or practitioner texts. As a result:

(a) first instance judges are frequently required to consider complicated questions of law without the benefit of any or any substantial guidance from judicial or academic authority and/or without the benefit of full argument. In attempting to explain the legal context in which a decision is made, we often make passing observations (*obiter dicta*) which are never intended to be construed as considered statements of the law. Such observations should not be confused with reasoned judgments on points which are both directly in issue and which have received the benefit of full argument;

(b) because published judgments have a heightened significance as sources of local law, both judges and practitioners may well place greater weight on first instance *obiter dicta* relating to important but obscure areas of the law, resulting in comparatively insignificant judicial statements being accorded an inflated status within the profession; and

(c) it is in all instances necessary to remember that most judicial statements of legal principle, particularly emanating from first instance judges, lose their coherence and meaning when extracted from the factual and legal matrix of the case in which such statements are made. Such statements will rarely achieve the transcendence of Shakespeare's Mark Anthony, who "*dolphin-like…showed his properties above the element he lived in*". The first instance judicial function is first and foremost a practical and case-specific one.



39. It is against this background that the following submission in the Plaintiff's Written Submissions, and the case law cited in argument, fall to be assessed:

> "*48. These 'firewall provisions' have been the subject of a number of decisions by the Grand Court since they were introduced by the Trusts (Foreign Element) Law in 1987. The Grand Court has consistently held that, properly considered, the firewall provisions are intended to confer exclusive statutory jurisdiction on the Cayman Islands courts to determine all matters concerning Cayman Islands law governed trusts that fall within the scope of section 90 of the TL (which includes 'any questions as to any aspect of the validity of the trust').*"

40. In *Grupo Torras S.A.-v-Bank of Butterfield International (Cayman) Limited et al* [2000 CILR 452], the plaintiffs commenced proceedings in 1995 to recover allegedly stolen monies settled on trust. Five years later, having obtained discovery, they applied to vary the implied undertaking so as to use documents obtained in proceedings in The Bahamas and Jersey. The first application was refused on prematurity grounds. As regards use of the discovered documents in the Jersey proceedings, Smellie CJ recorded, *inter alia*, the submission of counsel for certain defendants as being "*very persuasive in the end*" (at page 467):

> "*…only this court has the jurisdiction to determine the nature of the Comfort Trust (s.90 of the Trusts Law (1998 Revision)).*"

41. This was one sentence out of three paragraphs summarising counsel's submissions. Nonetheless, the following observation was recorded (at page 468):

> "*…It is clear to my mind that GT will seek to invite the Jersey court to draw inferences and conclusions not only about the affairs of the Jersey trusts, but about those of the Comfort Trust as well. Those influences and conclusions will of course not be determinative of any rights or obligations under the Comfort Trust because only this court is seised of jurisdiction over the Comfort Trust. As Mr. Murray submits, s.90 of the Trusts Law (1998 Revision) governs the position.*"

42. This was at most a preliminary finding in a case in which there was "*no dispute about the governing principles*" (page 470). It was also a case in which this Court had in practical



terms been seised of the relevant dispute for some 5 years and the Jersey proceedings were at an early stage. Any inconsistent Jersey findings on matters properly before the Grand Court would probably not be recognised at common law. If Jersey law was applied to any matter covered by section 90, there would be a statutory basis for not recognising such findings. It is unarguably clear that no *decision* was made that only this Court had jurisdiction. Smellie CJ concluded his Judgment by inviting the Jersey court to submit a letter of request specifying (once pleadings had been filed) what documents from the Cayman discovery were sought (page 472). What issues relating to the Cayman trust the Jersey court would be assisted by the Cayman court to adjudicate was the subject of a preliminary view rather than a positive determination.

43. *Groupo Torras SA* does not constitute authority for the proposition that section 90 confers exclusive jurisdiction on this Court in relation to the specified matters which must be determined through the application of Cayman Islands law. However this case and others like it do provide some general support for the central thesis advanced by Mr Robinson QC: the orthodox view has historically been that section 90 confers exclusive jurisdiction on this Court in relation to the specified matters concerning Cayman Islands law governed trusts.

44. *Merrill Lynch-v-Demirel* [2010 (2) CILR 75] at first blush provides the strongest support for the proposition that section 90 confers exclusive jurisdiction on this Court, although Mr Hagen QC fairly noted that it was an unopposed application. Mr Robinson QC primarily relied on the following seemingly unambiguous statements by Smellie CJ:

> "16. *It appears that the words 'without reference to the laws of any other jurisdictions with which the trust or disposition may be connected' are intended to abrogate the English common law rules of* forum non conveniens *and the exercise of judicial discretion which they imply insofar as those rules may otherwise apply to Cayman trusts. Thus, insofar as the application of the common law* forum non conveniens *rules would point to another jurisdiction as the appropriate forum for the resolution of disputes involving a Cayman trust by virtue of factors connecting the trust to that jurisdiction, then s.90 would operate to negate such factors…*
>
> *20. By the express operation of s.90 of the Trust Law, it is my conclusion, therefore, that service of the originating summons on Mr. and Mrs. Demirel and TMSF out of the*



> *jurisdiction is permissible without the leave of the court on the basis that the* Beddoe *application is one that must be taken before this court in any event.*" [My emphasis]

45. However, a careful reading of the decision as a whole is required to gain a clearer sense of what this statement means. The question under consideration was whether a *Beddoe* application under section 48 of the Trusts Law, as read with section 90, fell within the ambit of GCR Order 11 rule 1(2). The latter rule (as reproduced at paragraph 14 of *Demirel*) provides that leave to serve out is not required if "*every claim made in the action….is one by which by virtue of a Law the Court has power to hear and determine notwithstanding that the person against whom the claim is made is not within the jurisdiction of the court or that the wrongful act, neglect or default giving rise to the claim did not take place within the jurisdiction.*" The Chief Justice's substantive decision was a finding that an application under section 48 of the Law for *Beddoe* relief in relation to a trust with both (a) a governing law clause which selected Cayman Islands law and (b) a Cayman Islands administration forum clause was an application which "*must be taken before this Court in any event*". In other words, having been conferred jurisdiction to entertain such applications, it would require extraordinary circumstances to entitle this Court to decline to exercise the statutory jurisdiction to grant *Beddoe* relief. Such a straightforward and orthodox legal finding cannot fairly be equated to a legal opinion that section 90 requires all matters which must be determined in accordance with Cayman Islands law to be determined exclusively by this Court.

46. A fair reading of Smellie CJ's judgment in *Demirel*, following what was effectively an ex parte hearing, does not support construing this case as deciding more than that. The alternative findings were that because of the governing law and forum for administration clauses, combined with the fact that the trustee was a Cayman company and the trust assets were most closely connected with Cayman, this jurisdiction was in any event the most appropriate forum. This view finds indirect support from an academic critique of *Merrill Lynch-v-Demirel* [2010 (2) CILR 75], which proceeds on the assumption that it merely decided the impact of section 90 on the need to obtain leave to serve out under GCR Order 11(1(2): Jonathan Harris, '*Jurisdictions and judgments in international trusts litigation-surveying the landscape-surveying the landscape*' (2011) Trusts & Trustees Vol. 17 pages 236-260. The relevant article does not seek to provide more than a sketch of the landscape it covers. Nonetheless, the force of the criticism made of the decision in *Demirel* is significantly undermined by the learned author's failure to have regard to section 48 of the Law and its jurisdictional impact in relation to applications for



*Beddoe* relief such as that in *Demirel*. However, I am assisted by the following observations of Professor Harris (at page 256) upon which Mr Hagen QC relied:

> "*Section 90 is clearly a set of choice of law rules for Cayman Islands trusts. But it does not contain any rules of jurisdiction of the Cayman Islands courts.*"

47. *Re B Trust* [2010 (2) CILR 248], decided a few months after *Demirel*, was a case which merely mentioned section 90 of the Trust Law. The beneficiaries of the Cayman law governed trust with an (express) exclusive jurisdiction clause included a husband and wife. The wife commenced divorce proceedings in Hong Kong and sought to vary the trust. Before participating in the proceedings, the Caymanian corporate trustee applied to the Grand Court to seek directions as to whether or not to submit to the jurisdiction of the Hong Kong Court. Henderson J described the exclusive jurisdiction clause in the trust deed being "*expressed in …wide and emphatic terms*" (paragraph 29). Section 90 was <u>not</u> mentioned in the section of the Judgment setting out the Judge's reasoning under the heading "*Should the trustee submit to the jurisdiction of the foreign court?*" The exclusive jurisdiction clause appears to be what was positively relied upon.

48. The mere mention of section 90 was what the Trustee relied upon, although it was admittedly for present purposes a very pertinent one. In discussing the legal framework established by sections 90, 91 and 93 of the Law, Henderson J stated:

> "*23… A trust in the Cayman Islands can only be varied in accordance with the law of the Cayman Islands and only by a court of the Cayman Islands. These overarching rules are provided for expressly in the Trusts Law (2009 Revision), in ss. 90, 91 and 93…*"

49. Mr Robinson QC sensibly conceded that the quoted sections did not expressly confer exclusive jurisdiction on the Cayman courts to vary a Cayman Islands trust. However, I find that *Re B* did not actually decide that sections 90, 91 and 93 conferred exclusive jurisdiction on this Court to vary a Cayman Islands law governed trust in any event. The passing comment on the effect of section 90 in a respect which was not in issue in that case has, for present purposes, neither binding nor persuasive effect.

50. It is true that Mangatal J cited the quoted passage from Henderson J with approval in *Re The A Trust*, FSD 163 of 2016 (IMJ), Judgment dated December 1, 2016. The trustee in



that case applied ex parte for directions under section 48 of the Trusts Law seeking approval for its decision not to submit to the jurisdiction of the England and Wales High Court Family Division or provide further information to the beneficiaries. Mangatal J's approval of the trustee's decision was plainly primarily based on her analysis of the substantive decision in *Re B Trust* [2010 (2) CILR 248] and *Re H Trust* [2006] JLR 280 on the principles governing (a) submission by a trustee to the jurisdiction of a foreign court, and (b) the provision of information about a trust for use in proceedings abroad. The existence of a statutory exclusive jurisdiction clause in sections 90, 91 and 93 of the Law was not the subject of any meaningful consideration and the suggestion that these provisions had this effect did not form any discernible part of the actual ex parte decision which the Learned Judge made.

51. Two more recent decisions of this Court reflect a clear finding that section 90 does not confer exclusive jurisdiction on this Court to adjudicate questions which section 90 requires to be determined under Cayman Islands law in relation to a trust governed by Cayman Islands law. Most pertinent is the first *Beddoe* ruling in relation to this very case, *Re Stingray Trust*, FSD 85 and 248 of 2017, Judgment dated September 17, 2018 (unreported), where Parker J held as follows:

> "*88. By section 90 of the Trusts Law (2018 Revision) questions regarding the validity or capacity of the settlor in relation to a trust governed by the laws of the Cayman Islands, or with regard to any disposition of property upon the trust, are to be determined in accordance with Cayman Islands law, without reference to the law of any other jurisdiction with which the trust or disposition may be connected. The Trustee anticipates therefore that the Italian courts will interpret and apply Cayman Islands law to the matters in issue.*"

52. The Order based on that Judgment approved the Trustee's decision to contest the jurisdiction of the Milan Court. After the jurisdictional battle was lost, Parker J on July 11, 2019 approved the Trustee's decision to contest the Milan Proceedings on their merits and to submit to the jurisdiction of that Court. Parker J initially expressly found that section 90 was only a governing law clause and secondly, by necessary implication, found that the present validity dispute could validly be determined by the Milan Court as a matter of Cayman Islands law.



53. Another decision, *HSBC International Trustee Limited-v- Tan Poh Lee et al*, FSD 175 of 2019 (IKJ), Judgment dated October 16, 2019 (unreported) adopted a more ambiguous position. In the latter case, in the context a *Beddoe* application in relation to proceedings relating to a Cayman Islands trust (with an exclusive trust administration forum clause), in my Ex Tempore Ruling in that case, I observed:

> "*31. In my judgment, it is not clear that the legal position is that a foreign court cannot under any circumstances, even applying Cayman Islands law, deal with the issues that appear to arise for determination in the present case, and in those circumstances, I would instead grant a declaration substituting the word "may" for 'will' because it seems to me that the position is certainly arguable. Although the decisions of Justice Henderson in Re B Trust and Mangatal J in Re A Trust did not fully consider the question of the mandatory need for the Cayman Islands court to deal with such matters, I accept entirely that it is arguable that those decisions*[3] *should be followed, but I propose to adjourn these proceedings, await further argument before deciding that issue.*"

**<u>Summary: jurisdictional effect of section 90 of the Law</u>**

54. In summary, there was no binding or persuasive authority placed before me which displaces the initial view that section 90 does not confer <u>exclusive</u> jurisdiction on this Court to adjudicate all the issues which the section expressly requires to be determined under Cayman Islands law. I find that section 90, applying a purposive construction which is entirely consistent with the natural and ordinary meaning of the section in its wider statutory context, does not require all matters which must be determined under Cayman Islands law to be determined exclusively by this Court.

55. This finding in no way undermines the proposition that the combination of sections 48 and 90 applied to a trust expressly governed by Cayman Islands law will usually mean that an application for *Beddoe* relief is one which "*must be taken before this Court in any event*": per Smellie CJ in *Merrill Lynch-v-Demirel* [2010 (2) CILR 75] at paragraph 20.

[3] *And the common law cases on refusal of recognition and enforcement on public policy grounds referred to in paragraph 19 above.*



**Findings: is the trust administration forum clause an exclusive jurisdiction clause?**

56. The following opening salvos were fired on this point in the Trustee's Written Submissions:

> *"64. Clause 10.2 of the Declaration of Trust provides that:*
>
> *The courts of the Cayman Islands shall be the forum for administration of this Trust.'*
>
> *Clause 10.2 is an exclusive jurisdiction clause*
>
> *65. It should not be controversial that 'forum for administration' clauses of this type confer exclusive jurisdiction on the courts named in the clause. This has been confirmed in at least three decisions of the Grand Court: Helmsman Limited & Anor v. Bank of New York Trust Company (Cayman) Limited [2009 CILR 490], T Co v. AA& Ors (Unreported, 13 March 2018) and HSBC International Trustee Limited v. Tan Poh Lee & Ors (supra).*"

57. Despite the rigid formulation of this opening submission, it was conceded that there were nuances to the analysis of what the effect of such a clause was to the extent that Parker J in *T Co v. AA& Ors*, FSD 188 of 2017 (unreported, 13 March 2018)[4] qualified his primary finding that a similarly worded clause conferred exclusive jurisdiction on the forum for administration court as follows:

> *"51. The clause nominating the Cayman Islands as the exclusive forum for the administration of the trust does not seem to me to be apt to catch trust litigation by beneficiaries in another jurisdiction against a sister company also in that jurisdiction. There are many aspects of the administration of a trust to which section 48 of the Trusts Law is directed and where the assistance of the Cayman court can be properly sought by the trustee. For example, the true construction of certain powers or obligations in the deed itself, or as to the prudence of distributing assets in circumstances where there are many and different claims pertaining to those assets. The court is*

[4] This decision is noted at [2018 (1 CILR Note 3].



*familiar with such applications and to those relating to sanction required to defend legal actions and as to disclosure. They are all aspects of the administration of the trust upon which the court can opine…*"

58. In my judgment the question of whether a forum for administration clause, irrespective of whether it is expressed to be exclusive or not, confers exclusive jurisdiction on the relevant court is an arid debate if the context in which the question arises is not taken into account. Clearly the nature of the dispute is relevant. An application for *Beddoe* relief under section 48 of the Trusts law made in the Cayman Islands in relation to a trust containing a forum for administration clause would in most (but not necessarily all) cases justify this Court in viewing itself as vested with exclusive jurisdiction for the purposes of such an application. It is difficult to imagine such an application being contested on jurisdictional grounds, save in the unlikely event that another court had already been invited by the trustee to grant prior or concurrent relief. In reality, when this Court accepts jurisdiction in such circumstances, the substantive finding will generally in reality be that the forum for administration jurisdiction is the natural forum for the application because there is no competing forum. However, it may exceptionally happen that a beneficiary wishing to litigate matters embraced by the clause will be restrained by the forum for administration court from so doing: see e.g. *Re A Trust* [2012] SC (Bda) 72 Civ (12 December 2012) at paragraphs 64-67. In that case an important contextual consideration was the fact that the trust itself had been established to resolve a substantial dispute which the threatened foreign litigation sought to reopen. So the analogy with a contractual exclusive jurisdiction clause was stronger than would ordinarily be the case in the trust context.

59. Mr Hagen QC challenged the Trustee's right to oppose the Guardian's Stay Summons on three important bases of principle. Firstly he submitted that the Trustee was bound by the decision of the Supreme Court of Cassation on jurisdiction. Secondly, he submitted that the Guardian's challenge to the validity of the Trust was made in her capacity as a stranger to the Trust and not as a beneficiary. And thirdly he submitted that the Court should in any event decline to enforce Clause 10.2 even if it was assumed to be an operative exclusive jurisdiction clause. I shall deal with the second and third points first because they were addressed more fully in argument.

60. On the capacity issue, the Guardian's counsel relied on the following passage in '*Lewin on Trusts*', Twentieth Edition at paragraph 11-079:



> "*It is different where the claimant asserts a claim against the trust, as where he claims to be the beneficial owner of the assets held by the trustee by reason of a prior title. In such a case there is no reason why he should be bound or affected by the terms of a trust against which he claims and under which he claims nothing. Accordingly, a jurisdiction clause in the trust instrument, whether exclusive or non-exclusive, has no direct significance…*"

61. In my judgment, despite sympathy for the Trustee's pointing out the apparent inconsistency between the Guardian challenging the validity of the Trust and seeking information *qua* beneficiary under it, the claim brought by the Guardian in the Milan Proceedings is not caught by the forum for administration clause in all the circumstances of the present case. Nonetheless, it is important to note that same paragraph from Lewin partially reproduced above goes on to opine as follows:

> "*…Nonetheless, the clause may be relevant to the question of the appropriate forum, in that because of the clause any Beddoe application about the claim will ordinarily have to be brought in the designated jurisdiction; and since one of the matters to be considered in a Beddoe application in this context is whether beneficiaries should be added as parties to the main action, and the claimant may be involved in the Beddoe application, it may be better for the main action also to be brought in the same jurisdiction.*"

62. The latter observations clearly contemplate what might fairly be described as the usual context in which the issue of which jurisdiction the main litigation should take place in ordinarily arises: before rather than after the main proceedings have not only commenced but the trustee has elected to contest on their merits before a foreign court. I will return to this pivotal factor below.

63. The second (and alternative) point of principle which Mr Hagen QC relied upon to neutralize the effect of the forum for administration clause as excluding the Guardian's right to pursue the Milan Proceedings was the different character of exclusive jurisdiction clauses in trust instruments as contrasted with contractual clauses. Even if the Guardian was regarded as bringing her invalidity claim in her capacity as a beneficiary, reliance was placed on the Judicial Committee of the Privy Council decision in *Crociani-v-Crociani* [2014] UKPC 40. In that case, concerning an express exclusive administration forum clause, Lord Neuberger (delivering the advice of the Board) held as follows:



*"30. In the Board's view, (i) the Court of Appeal was right in concluding that no part of clause 12(6) of the 1987 Deed was concerned with identifying which country's courts should have jurisdiction to determine disputes relating to the Grand Trust, but (ii) if that conclusion is wrong, (a) it may well be that the clause would only confer non-exclusive jurisdiction on the courts of the country to which it refers, and (b) there would seem to be a strong case for saying that its effect was that the Jersey courts had jurisdiction in relation to three out of the four principal claims brought in these proceedings.*

*31. It is right to mention that counsel referred to a number of cases (including EMM Capricorn Trustees Ltd v Compass Trustees Limited [2001] JLR 205, Green v Jernigan (2003) 6 ITELR 330, Koonmen v Bender (2002) 6 ITELR 568, Helmsman Ltd v Bank of New York Trust Company (Cayman) Ltd [2009] CILR 490, Re Representation of AA [2010] JRC 164 and Re A Trust [2012] Bda LR 79) where different courts have considered provisions in trust deeds which bore significant similarities with clause 12(6) of the 1987 Deed. The decisions are not all mutually consistent, some of them involved concessions and the remainder depended on the arguments advanced, they all inevitably turn on the precise wording of the clause in question, and none of them is binding on the Board. No disrespect is intended to the Judges involved in those decisions by not referring to them further, but they do not cause the Board to change its view. If, by the time the 1987 Deed had been executed, there had been a well-established judicial consensus that either or both expressions relied on by the appellants had the meaning for which they contend, then the Board may well have reached a different conclusion…*

*34. As Lord Hobhouse of Woodborough explained in para 45 of that case, the defendant to such a claim 'has a contractual right to have the contract enforced' and his 'right specifically to enforce his contract can only be displaced by strong reasons being shown by the opposite party why an injunction should not be granted'. Thus, where a claim has been brought in a court in breach of a contractual exclusive jurisdiction clause, the onus is on the claimant to justify that claim continuing, and to discharge the onus, the claimant must normally establish 'strong reasons' for doing so. Counsel referred to other cases where judges have expressed themselves somewhat differently, but the Board considers that the*



*position is accurately stated by Lord Bingham and Lord Hobhouse, and that any statement which is said to involve a different approach should not be followed.*

*35. The question of principle which arises in this case is whether the same test applies to an exclusive jurisdiction clause in a deed of trust. Contrary to the appellants' argument, the Board is of the opinion that it should be less difficult for a beneficiary to resist the enforcement of an exclusive jurisdiction clause in a trust deed than for a contracting party to resist the enforcement of such a clause in a contract. The Board is of the opinion that in the case of a trust deed, the weight to be given to an exclusive jurisdiction clause is less than the weight to be given to such a clause in a contract. Given that a balancing exercise is involved, this could also be expressed by saying that the strength of the case that needs to be made out to avoid the enforcement of such a clause is less great where the clause is in a trust deed.*

*36. In the case of a clause in a trust, the court is not faced with the argument that it should hold a contracting party to her contractual bargain. It is, of course, true that a beneficiary, who wishes to take advantage of a trust can be expected to accept that she is bound by the terms of the trust, but it is not a commitment of the same order as a contracting party being bound by the terms of a commercial contract. Where, as here (and as presumably would usually be the case), it is a beneficiary who wishes to avoid the clause and the trustees who wish to enforce it, one would normally expect the trustees to come up with a good reason for adhering to the clause, albeit that their failure to do so would not prevent them from invoking the presumption that the clause should be enforced. In the case of a trust, unlike a contract, the court has an inherent jurisdiction to supervise the administration of the trust – see eg Schmidt v Rosewood Trust Ltd [2003] UKPC 26, [2003] 2 AC 709 para 51, where Lord Walker of Gestingthorpe referred to "the court's inherent jurisdiction to supervise, and if necessary to intervene in, the administration of trusts". This is not to suggest that a court has some freewheeling unfettered discretion to do whatever seems fair when it comes to trusts. However, what is clear is that the court does have a power to supervise the administration of trusts, primarily to protect the interests of beneficiaries, which represents a clear and, for present purposes, significant distinction between trusts and contracts.*

*37. Accordingly, the Board considers that, while it is right to confirm that a trustee is prima facie entitled to insist on and enforce an exclusive jurisdiction clause in a trust deed, the weight to be given to the existence of the clause is less (or the strength of the arguments needed to outweigh the effect of the clause is less) than where one contracting party is seeking to enforce a contractual exclusive*



*jurisdiction clause against another contracting party. It is right to mention that counsel referred to some cases (including some of those identified in para 31 above) in which it seems to have been assumed that the weight was the same, but it does not appear to the Board that the issue was fully discussed or considered in any of those cases, which are in any event not binding on the Board.*"

64. I extract the following relevant principles from *Crociani*:

(a) *prima facie*, a trustee can enforce an exclusive jurisdiction clause against a beneficiary;

(b) whether the clause is an exclusive jurisdiction clause may depend on the wording of such clause;

(c) whether a particular dispute is potentially caught by the clause depends on the nature or legal character of the dispute;

(d) it will be easier for a beneficiary to resist enforcement of an exclusive forum for administration clause than it will be for a party to resist enforcement of a contractual exclusive jurisdiction clause.

65. It is true that in considering the alternative hypothesis that the clause in *Crociani* did operate as an exclusive jurisdiction clause, the Privy Council refused to give effect to the clause on the principal grounds that at the time of the relevant events, the administration forum had been Jersey (not Mauritius) and that most issues in the dispute were governed by Jersey law. Dealing with the alternative assumption here that the Guardian's claim is caught by the relevant administration forum clause[5], I find that the Guardian is not bound by it in any event because:

(a) clause 10.2 of the Declaration of Trust is not by its terms expressed to be an "exclusive" forum for administration clause;

(b) the validity issue has not arisen as an application for *Beddoe*-type relief under section 48 of the Law; and

[5] Dealing with hypotheses which have been rejected is necessarily artificial and obviously undermines the weight that can be attached to the alternative 'findings' in analytical terms.

GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

(c) (most significantly) it is too late for the Trustee to seek to compel the Guardian to have the validity issue determined in the forum for administration having already obtained *Beddoe* approval for the dispute to be adjudicated on its merits before the Milan Court.

66. No authority ought to be required to support a finding that the wider litigation history of an application to enforce an exclusive jurisdiction clause may be a weighty consideration in determining whether or not to enforce such a clause. This is obviously a factor which is equally pertinent in relation to the broader *forum non conveniens* issue considered separately below. In *Crociani*, the litigation history was far less stark, but it was nevertheless taken into account as a material consideration:

> "*44. Fourthly, the appellants made it clear in correspondence before the Proceedings were issued that they were 'willing and able to explain themselves to the Royal Court'. While the Board does not consider that this could give rise to an estoppel, it was a clear and unequivocal statement to the respondents that the appellants were content with, indeed expecting, the respondents' claims to be pursued in Jersey.*
>
> *45. Fifthly, reinforcing this point, the appellants were plainly content with the Jersey courts as the forum for determining disputes in connection with the Grand Trust, in so far as they arose under the 2012 Deed. As already indicated, this is a relatively small point but it has some force.*"

67. I assume for present purposes that the Trustee is <u>not</u> actually estopped from re-litigating the jurisdiction issue based on the findings of the Supreme Court of Cassation (a point considered summarily below). I find that the fact that the Trustee has already (with Parker J's express approval) elected to submit to the jurisdiction of the Milan Court on the merits and the fact that those proceedings have progressed to the stage where what appears to be a final hearing has been scheduled is a powerful factor weighing against permitting the Trustee to enforce Clause 10.2 at this stage. This conclusion is reinforced by the fact that:

(a) the Guardian first commenced proceedings against the Trustee on December 16, 2015 in Lugano, Switzerland; and



(b)    the Trustee first formally signified an intention to enforce the assumed exclusive jurisdiction clause on August 16, 2019 by filing its application for leave to amend its Originating Summons;

(c)    the Trustee has identified no clear explanation as to why it was considered appropriate or necessary to pursue the unusual course of litigating the same issue in concurrent proceedings just over a month after Parker J on July 13, 2019 approved the decision to contest the merits of the validity issue in the Milan proceedings

(d)    that application has not been actively pursued since its filing on 16 August 2019, over three years after the Milan Proceedings were commenced and over one year after the Trustee had submitted to the jurisdiction of the Milan Court.

68.    In seeking to enforce clause 10.2 against the Guardian as an exclusive jurisdiction clause, the Trustee was effectively asking the Court to decide, at least in principle, the Trustee's entitlement to an anti-suit injunction. Mr Robinson QC explained that if the Guardian's application to stay the present proceedings was refused, the Trustee would proceed with its amendment application and apply for an anti-suit injunction to restrain the Guardian from proceeding with the Milan Proceedings.  I do not accept Mr Hagen QC's apparent submission in reply that I should not prejudge that application. It is impossible to accept his submission that the Court in its discretion should hold that the Guardian is not bound by clause 10.2 without, by necessary implication, deciding whether the proposed application for an anti-suit application is at least arguable. If it is arguable, that would constitute grounds for either refusing the Guardian's present Stay Summons or adjourning it for determination after the Trustee's proposed application for an anti-suit injunction had been heard.

69.    Whether or not an exclusive jurisdiction clause in a contract should not be enforced on discretionary grounds typically applies in the context of an application for an anti-suit injunction.  It seems to me to be fortuitous that the issue is being formally raised in answer to the Guardian's application to stay proceedings in the "agreed" forum rather than in the context of the formal hearing of the Trustee's own application for an anti-suit injunction. The Trustee's invitation to the Court to refuse the Guardian's Stay Summons on the grounds that the Guardian, *qua* settlor is bound by an exclusive jurisdiction clause in the Trust would establish the basic foundations for an anti-suit injunction being granted in its favour.  Having regard to the Overriding Objective, it is clear that I should determine at this stage when all the relevant material (formalities apart) is before the



Court whether or not there is an arguable basis for granting an anti-suit injunction in favour of the Trustee. This issue is the corollary of the issue which has formally been placed before the Court: are there discretionary grounds for declining to enforce an assumed exclusive jurisdiction clause in the Trust instrument, bearing in mind that such a clause has less legal weight than its contractual equivalent.

70. Viewed through the lens of an application for an anti-suit injunction, the legal principles which are most pertinent in light of the delay the Trustee is guilty of in seeking to enforce Clause 10.2 in the present case were mentioned by the Privy Council in *Crociani-v-Crociani* where Lord Neuberger (at paragraph 33) cited a passage from Lord Bingham's speech in *Donoghue-v-Armco* [2002] *1 All ER 749* (at paragraph 24) which included his observation that "*a party may lose his claim to equitable relief by dilatoriness or other unconscionable conduct*". The same *dicta* were placed before the Court as cited in Eason Rajah QC and Anthony Robinson, '*Jurisdiction clauses in trusts*' (2015) Trusts & Trustees at page 6, to which the Guardian's counsel referred on another point.

71. These trite principles may be further illustrated by reference to an authority not referred to in argument, *Daiichi Chuo Kisen Kaisha-v-Chubb Seguros Brasil S.A.* [2020] EWHC 1223 (Comm). In that case, Henshaw J observed:

"*60. In Qingdao Huiquan Shipping Co v Shanghai Dong He Xin Industry Group Co Ltd [2018] EWHC 3009 (Comm); [2019] 1 Lloyd's Rep. 520 Bryan J identified the following three relevant principles relevant to delay:*

*'(1) There is no rule as to what will constitute excessive delay in absolute terms. The court will need to assess all the facts of the particular case: see Essar Shipping Ltd v Bank of China Ltd (The Kishore) [2016] 1 Lloyd's Rep 427 at paras 51 to 52 per Walker J.*

*(2) The question of delay and the question of comity are linked. The touchstone is likely to be the extent to which delay in applying for anti-suit relief has materially increased the perceived interference with the process of the foreign court or led to a waste of its time or resources: see Ecobank Transnational Inc v Tanoh [2016] 1 Lloyd's Rep 360 at paras 129 to 135 per Christopher Clarke LJ; The Kishore at para 43; and see also Sea Powerful II Special Maritime Enterprises (ENE) v Bank of China Ltd [2017] 1 HKC 153 at para 21 per Kwan JA.*



*(3) When considering whether there has been unacceptable delay a relevant consideration is the time at which the applicant's legal rights had become sufficiently clear to justify applying for anti-suit relief: see, for example, Sabbagh v Khoury [2018] EWHC 1330 (Comm) at paras 33 to 36 per Robin Knowles J." (§ 29)*

*61. Raphael summarises the principles in this way:*

> *'The significance of delay will depend on all the circumstances of a particular case. But some principles have been identified in the case law. First, even where there is a binding exclusive forum clause, the injunction should be sought promptly, and before the foreign proceedings are too far advanced. Second, the questions of delay and comity are linked. The more closely that the foreign court has become involved with the matter due to delay, the greater the interference with foreign court that an injunction is likely to produce, and so the stronger the factors against the grant of an injunction. Third, prejudice to the injunction defendant due to delay is significant, and if delay is not prejudicial it may be given significantly less weight. But delay is not necessarily immaterial in the absence of prejudice to the injunction defendant. The need to avoid delay arises from a variety of reasons including, in addition to prejudice to the injunction defendant, waste of judicial resources, the need for finality, and comity towards the foreign court. Fourth, and perhaps most importantly, the courts will take into account the extent to which the delay was justifiable or excusable in the circumstances; and will weigh delay against the importance of enforcing the forum clause. Even delay that can be criticized will often not be sufficient to justify refusing an injunction and thus permitting a breach of contract to continue. It seems that time taken in challenging the foreign court's jurisdiction does not in itself justify delay in applying for an anti-suit injunction.' (§ 8.21)."*

72. Mr Hagen QC when dealing with the *forum non conveniens* point submitted that it was "*blindingly obvious*" that this Court should not assume jurisdiction. He was relying, as I understood it, in large part on the history of the various proceedings and where things now stood. I find that it is plain and obvious that the proposed application by the Trustee for an anti-suit injunction is unarguable, being first actively advanced nearly five years after the validity of the Trust was first challenged in foreign proceedings and over a year after the Trustee submitted to the jurisdiction on the merits of the Milan Proceedings.



73. It follows that assuming Clause 10.2 to be an exclusive jurisdiction clause which captures the Guardian's invalidity claim:

(a) I would in the exercise of my discretion decline to enforce the assumed exclusive jurisdiction clause; and

(b) Clause 10.2 does not provide grounds for refusing the Guardian's Stay Summons.

74. In light of the above findings, I find it unnecessary to decide whether or not the Supreme Court of Cassation's decision on jurisdiction estops the Trustee from re-litigating the jurisdiction question. It was a decision which took into account, to some extent, Cayman Islands law and cited the *Crociani* case. However, I accept Mr Robinson QC's submission that paragraph 23 of the Judgment suggests that the pivotal decision was based on the Lugano Convention, which was said to only recognise exclusive jurisdiction clauses in instruments governed by the laws of Convention countries, "*which the Cayman Islands are not*". Recognising for issue estoppel purposes a judgment under a foreign legislative scheme which appears not to recognise Cayman Islands exclusive jurisdiction clauses raises complicated policy considerations in relation to this Court's statutory duties to supervise trusts under the Law. The complexities of this point were not sufficiently canvassed in argument to justify addressing it in the present case.

75. For the avoidance doubt, my primary finding is that the forum for administration clause is not an exclusive jurisdiction clause enforceable against a party suing in the capacity of a stranger to the Trust. Nothing set out above is intended to undermine the force of such clauses in relation to applications under section 48 of the Law for *Beddoe* relief made by the trustees of Cayman Islands law governed trusts.

**Findings: is the Cayman Islands the most appropriate forum?**

**<u>Governing principles</u>**

76. The general principles governing *forum non conveniens* were not in dispute. In *Globalvest Management Company LP et al-v-Dantas et al*, Grand Court Cause No. 418 of 2004, Judgment dated February 28, 2006, Levers J (at pages 24-25) held as follows:

> "*The Court in considering whether there is an alternative forum will look at various factors, including looking for:*



*(a)* *the country with which the action has the most real and* *substantial* *connection;*

*(b)* *the place of residence or business of the parties. A stay for example will more readily be granted if service was effected during a temporary visit to a country. On the other hand where the defendant has an established place of business within the jurisdiction very clear and weighted grounds must be shown for refusing to exercise jurisdiction;*

*(c)* *The Court will also consider the availability of factual and expert witnesses;*

*(d)* *The law governing the dispute; and*

(e) *Whether the parties have conferred jurisdiction on a particular court.*"

77. Those principles were commended to the Court by Mr Hagen QC. Mr Robinson QC relied on substantially the same principles in the Trustee's Written Submissions at paragraphs 98 to 99. In oral argument, he referred the Court to *Lungowe-v-Vedanta Resources plc* [2019] 2 WLR 1051 at 1072 where Lord Briggs (referring to CPR r 6.37(3)) opined as follows:

"*66…The italicised phrase is the latest of a series of attempts by English lawyers to label a long-standing concept. It has previously been labelled forum conveniens and appropriate forum, but the changes in language have more to do with the Civil Procedure Rules' requirement to abjure Latin, and to express procedural rules and concepts in plain English, than with any intention to change the underlying meaning in any way. The best known fleshed-out description of the concept is to be found in Lord Goff of Chieveley's famous speech in the Spiliada case, summarised much more recently by Lord Collins in the Altimo case at para 88 as follows: 'The task of the court is to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice; …'*

*That concept generally requires a summary examination of connecting factors between the case and one or more jurisdictions in which it could be litigated. Those include matters of practical convenience such as accessibility to courts for parties and witnesses and the availability of a common language so as to minimise the expense and potential for distortion involved in translation of evidence. Although they are important, they are not necessarily conclusive. Connecting factors also include matters such as the system of law which will be*



*applied to decide the issues, the place where the wrongful act or omission occurred and the place where the harm occurred.*"

78. However, the main thrust of the Trustee's legal submissions was to emphasise the importance of the governing law factor in a trust case. Reliance was placed on the following passage from '*Lewin on Trusts'* at paragraph 11-013:

> "*In the case of a claim under a trust, however, a jurisdiction clause in a trust conferring exclusive or non-exclusive jurisdiction on the [Cayman Islands] court will normally but not invariably be decisive in favour of satisfaction of the requirement that [the Cayman Islands] is the proper place in which to bring the claim, even though this country would not otherwise be the natural forum…The fact that the trust is governed by [Cayman Islands law] may be a factor of some weight in favour of treating the [Cayman Islands court] as the appropriate forum…Other things being equal, it is preferable for a case to be heard in the country of the applicable law, a principle which applies in trust cases as in others. The significance of the proper law, however, will vary from case to case: where the issues will be primarily factual rather than legal, or the trust laws of the competing fora are similar, the proper law may not matter greatly.*"

79. I accept the principles relied upon in general terms. The Guardian's counsel relied heavily on *Navigators Insurance Company-v-Atlantic Methanol Production Company LLC* [2003] EWHC 1706 (Comm) to illustrate how these general principles are applied. Steel J held that the significance of English governing law was diminished where the primary issues were factual (paragraph 45) and the legal issues were straightforward (paragraph 48). Those findings clearly support the Guardian's forum case. However, I consider the ultimate findings in that case as most persuasive for present purposes:

"*51.This leads to the last consideration namely the progress of the Texas proceedings. I appreciate that Texas was not Ampco's first choice. The rationale for plumping for Oklahoma remains obscure. I also appreciate that the Texas proceedings were not commenced until after the issuance and service of these proceedings.*

*52. But the fact remains that: -*

*i) The Texas proceedings have reached the stage of discovery: indeed the deposition of Navigators Insurance is scheduled for the 14th July 2003.*



*ii) Both Marathon and Noble Energy are co-claimants and UEII are interveners.*

*iii) There is no issue that Texas has jurisdiction and is an appropriate venue.*

*iv) The application to dismiss or stay the Texas proceedings on forum non-conveniens grounds has been denied. Although the point might be re-argued in the event that this court were to retain jurisdiction, I do not understand that that decision denying the motions has been appealed.*

*v) Case management orders have been made making provision for such matters as expert evidence and mediation leading up to a trial in March 2004, a date significantly earlier than that on which any trial in England would be likely to take place.*

*53. It is not suggested by the Claimants that concurrent proceedings are appropriate. Indeed to my mind, the usual risk involved with multiplicity of proceedings (the risk of enhanced cost and inconsistent decisions), taken with the progress already made in Texas, provides very substantial support for the Defendant's application.*

*Conclusion*

*54. In my judgment, the interests of the parties and the ends of justice are best secured (assuming that there is a triable issue) by setting aside service of these proceedings.*"

80. When considering which forum is the most appropriate in the context of concurrent proceedings, (a) the fact that jurisdiction has been challenged and lost in the foreign proceedings and (b) the more advanced status of those foreign proceedings, may well be dispositive of a stay application.

**Is the Cayman Islands the most appropriate forum?**

81. I find that it is ultimately obvious that the Milan Court is an appropriate forum in circumstances where:

(a) section 90 of the Law does not contain a statutory exclusive jurisdiction clause (a point which was previously unclear before the point was fully argued in the present case and resolved herein on the basis set out above);



(b)    Clause 10.2 of the Declaration of Trust does not constitute an exclusive jurisdiction clause enforceable against the Guardian in respect of her claim that the Trust is invalid;

(c)    there is no arguable basis upon which the Trustee could seek an anti-suit injunction to restrain the Guardian from continuing the Milan Proceedings if the Guardian's application to stay the present proceedings were to be refused; and

(d)    there is no identifiable utility to facilitating concurrent proceedings on the same issue before this Court and the Milan Court in circumstances where the Trustee has already submitted to the jurisdiction of the Milan Court and those proceedings are far advanced.

82.    The merits of the Guardian's application to stay the present proceedings do not depend on a careful weighing of the standard *forum non conveniens* factors. The dispositive consideration, in the unusual circumstances of the present case, is the stage at which the application is being heard. A trustee wishing to have a contentious issue concerning a Cayman Islands trust determined by this Court must ordinarily seek to invoke this Court's jurisdiction as first rather than as a last resort. Once a litigant has already submitted to the jurisdiction of the foreign court and concurrent proceedings are substantively proceeding abroad, the spectre which looms over a belated application to invoke this Court's jurisdiction will usually be a stark one. Should this Court permit concurrent substantive proceedings in this jurisdiction alongside proceedings in another forum? This will be the critical question, for the reasons articulated in *Navigators Insurance Company-v-Atlantic Methanol Production Company LLC* [2003] EWHC 1706 (Comm) at paragraphs 51-53 (cited above).

83.    In the present case the standard forum factors, viewed in isolation from the wider litigation history, are fairly evenly balanced, for the reasons set out at paragraph 26 above. If the present application was being heard before or shortly after the Milan Proceedings were commenced in 2016, the scales might well have tipped decisively in favour of finding that the Cayman Islands was the most appropriate forum. This Court's ability to deal with the validity issue under Cayman Islands law without the need for expert evidence and probably more quickly might well have been decisive. Four years on, with the Milan Proceedings in full flow (albeit at a somewhat stately pace), the significance of the Trust's Cayman Islands law connections have materially waned. It is understandable that the Trustee felt that its own European jurisdictional ties and the location of the trust assets there made it necessary to submit to the jurisdiction of the



Milan Court. It is unclear why, apart from Covid19-related delays in the Milan Proceedings, the Trustee thereafter sought to reverse that course. Mr Robinson QC was unable to satisfactorily respond to my query in the course of argument as to what had changed since the Trustee's Court-approved decision to submit to the merits of the Milan Proceedings. To my mind, after that submission abroad, it would have required a major shifting of the tectonic plates beneath the legal landscape of this litigation to justify the subsequent finding that the Cayman Islands was the most appropriate forum after all. In all the circumstances, I find that the Guardian's case for a stay of the present proceedings on the grounds that Italy is the most appropriate forum for the dispute as to the Trust's validity to be adjudicated has been clearly made out.

84.    Mr Hagen QC indicated that any concerns this Court had about whether or not Cayman Islands law would be applied by the Milan Court could be allayed by granting a stay subject to a condition that Cayman Islands law is in fact applied in determining the validity dispute. In my judgment the policy imperatives of section 90 of the Law are sufficiently strong for such a condition to be imposed when granting the proposed stay, more as a matter of principle than based on concerns about the approach likely to be taken by the Milan Court. That Court has seemingly already accepted that the validity issue will be determined in accordance with Cayman Islands law. Italian courts are unlikely to be unfamiliar with the task of applying foreign law in any event due to their modern and historical experience of the conflict of laws. It has been academically noted that:

> "*Private international law was invented as a mechanism for the reconciliation of higher level natural law with the existence of diverse laws in the different Italian city states.*"[6]

**Conclusion**

85.    For the above reasons, the Guardian is entitled to an Order that the claim for relief set out at paragraphs 3 and 4 of the Originating Summons be stayed pursuant to the inherent jurisdiction of the Court on the grounds that the Cayman Islands is not the appropriate forum for the trial of this matter, and that the more convenient and appropriate forum is the Court of Milan, Italy, subject to the condition that the question of whether the Trust is valid or invalid is determined through the application of Cayman Islands law. I will hear

---

[6] Mills, '*The Private History International Law*' (2006) 55 ICLQ 1-49 at 46.

counsel, if required, as to costs and any other matters arising from the present Judgment. However, my provisional view is that bearing in mind that the Trustee has pursued an arguable point of construction on section 90 of the Law, each party's costs should be payable out of the assets of the Trust.

---

**THE HONOURABLE MR JUSTICE IAN RC KAWALEY**

**JUDGE OF THE GRAND COURT**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 175 OF 2019 (IJK)**

**IN THE MATTER OF** a Deed Constituting The Tan Kim Choo Family Scholarship Trust dated 21 October 2002 made between Tan Kim Choo as Settlor and HSBC International Trustee Limited as Trustee establishing a trust known as The Tan Kim Choo Family Scholarship Trust, as amended by a Deed of Appointment of Beneficiary dated 21 August 2009 (the "**Trust**")

**AND IN THE MATTER** of the Trusts Law (2018 Revision, as amended) and GCR Order 85

**BETWEEN**

HSBC INTERNATIONAL TRUSTEE LIMITED

Plaintiff

**AND**

(1) TAN POH LEE
(2) TAN POH HUI
(3) TAN BOON THIEN
(4) TAN POH YEE
(5) JCTW
(6) JCZM
(7) TJ K
(8) TJR
(9) TYT
(10) TZH

Defendants

**IN CHAMBERS**

**Appearances:** Ms Rachael Reynolds and Mr William Jones, Ogier, on behalf of the Trustee

Mr Sebastian Said and Ms Anya Martin, Appleby, on behalf of the 6th Defendant (a minor) and the Unborn

**Before:** **The Hon. Justice Kawaley**

**Heard:** **16 October 2019**

**Date of Judgment:** **16 October 2019**

**Released for publication:** **7 November 2019**

**HEADNOTE**

*Application by Trustee for Beddoe relief in relation to defence of Singapore proceedings seeking to terminate Cayman Islands trust-Cayman Islands governing law and trust administration clauses-grant of declarations as to effect of clauses under Cayman Islands law*

## EX TEMPORE RULING

**Key provisions of Trust Deed**

1. The Plaintiff in this matter is the Trustee of a trust known as the Tan Kim Choo Family Scholarship Trust, which was settled on 21 October 2002 (the "Trust") and for present purposes the Trust Instrument contains two clauses.

2. Firstly, clause 26 ("*PROPER LAW OF THE TRUST*"):

> "*The Trust is established under the laws of the Cayman Islands and the initial proper law of the trust shall be the law of the Cayman Islands.*"

3. Secondly, 27 ("*FORUM FOR ADMINISTRATION OF THE TRUST*") records that:

> "*The Cayman Islands shall be the initial forum for the administration of the trust. The Trustee shall have power, subject to a perpetuity, not thereby being created to carry on the general administration of the Trust, from any country, province, state or territory, whether or not the law of such country, province, state or territory is for the time being the proper law of the Trust or its court are for the time being the forum for the administration of the Trust, and whether or not the Trustee is for the time being resident or domiciled in or otherwise connected with such country, province, state or territory. The Trustee may at any time declare by deed that from the date of such declaration, the forum for the administration of the Trust shall be the courts of any specified country, state or territory provided that no such declaration shall be made, which is in perpetuity.*"

191107 In the Matter of HSBC International Trustee Limited v. Tan Poh Lee et.al – FSD 175 of 2019 (IKJ) Ex Tempore Ruling
2

GRAND COURT CAYMAN ISLANDS CIV-02
646

4. I should add that of peripheral relevance is clause 28, which further provides that the proper law may be changed by deed.

**The Trustee's present application**

5. The Trustee has applied by Originating Summons filed on 30 September 2019 for various directions, and the Court has already made certain Confidentiality Orders to anonymise the Originating Summons so that the identities of minor Defendants (and I believe also the young adult Defendants) are not revealed. The Defendants are all beneficiaries of the Trust.

6. The application arises because on 10 May 2019, the 3rd Defendant in these proceedings issued proceedings against the Trustee in the Singapore High Court in proceedings HC/S471/2019 ("Singapore Proceedings"). The primary relief that is sought in those proceedings is as follows:

"*(1) a declaration that the Trust in respect of the Settlement Fund is terminated.*"

7. The Trustee, in short, is concerned to enforce and give effect to the exclusive forum for administration clause in a clause, namely clause 27, of the Trust Deed. Initially it has applied for a stay of the Singapore Proceedings but that application, which sought time to seek *Beddoe* relief from this Court, was refused and the position appears to be that the following critical timetable exists in the Singapore proceedings. The timetable relates at this point not to the substantive proceedings but an interlocutory mandatory injunction application that the plaintiff in those proceedings has filed, seeking payment out of all of the Trust assets:

(a) the Trustee is to file its reply Affidavit by 4.00 pm on 18 October, in two days' time. Having regard to time differences, it is less than two days from the present hearing;

(b) secondly, Tan Boon Thien, the plaintiff, is to file his final response Affidavit, if any, by 4.00 pm on 31 October 2019;

(c) thirdly, the parties are to file written submissions by 4.00 pm on 5 November 2019, and

(d) an oral hearing is to take place before Justice Aedit Abdullah on 8 November 2019 at 2.30pm.

8. The present proceedings were served on all adult Defendants and I am satisfied that all significant parties have had notice of these proceedings and have chosen not to participate. The 3rd Defendant, the Singapore plaintiff, by correspondence with the Court, sought an adjournment of the proceedings on the grounds initially that he was having difficulties obtaining legal representation and secondly, on the grounds that

191107 In the Matter of HSBC International Trustee Limited v. Tan Poh Lee et.al – FSD 175 of 2019 (IKJ) Ex Tempore Ruling
3

GRAND COURT CAYMAN ISLANDS CI 647

he was applying for Legal Aid. At the beginning of today's hearing I indicated that I would not entertain the application because it was not properly before the Court. And on the face of the record, it appeared to be an unmeritorious application in any event. Ms Reynolds for the Plaintiff herein referred to an Affidavit, sworn by the 3rd Defendant as plaintiff in the Singapore Proceedings, which set out his financial position and clearly contradicts the notion that he is impecunious and is unable to obtain legal advice.

9. An application was also made at the beginning of today's hearing to appoint Mr Sebastian Said of Appleby Cayman Limited, as Guardian ad Litem to represent the interests of the 6th Defendant, one of the two minor Defendants, and also to appoint him to represent all persons who may become beneficially interested with special regard to the position of the unborn. That application I granted, as it seemed obvious that it was beneficial and expedient to have some presentation for those interests to avoid the need to incur costs and pursue possibly hopeless attempts to get legal representation for the minors and unborn in circumstances where no other Defendant was willing to come forward and either nominate a Guardian ad Litem or, indeed, stand as representative for those interests[1].

10. The 3rd Defendant explicitly purported to represent his own son, the 7th Defendant, and in those circumstances, it was decided that it was inappropriate to appoint Mr Said to represent the 7th Defendant.

**The directions sought by the Trustee**

11. The various heads of relief that were sought fell into two broad categories: firstly, there was declaratory relief and, secondly, there was *Beddoe* relief. The *Beddoe* relief which was sought was limited to seeking the following broad relief.

(a) firstly, authorising the plaintiff to challenge the Singapore proceedings on the grounds of *forum non conveniens* as a preliminary issue, and

(b) in the alternative, inviting the Court in Singapore to direct that the Courts of the Cayman Islands shall act as an auxiliary Court for the purpose of determining any of the questions which were defined as follows:

(1) all questions concerning the settlor's capacity,

(2) the identity of the Trustee,

(3) the administration of the Trust,

(4) any past or future distributions from the Trust,

(5) any decision to decline a distribution, and

GRAND COURT
CIV-02
CAYMAN ISLANDS

[1] In the event, Mr Said supported the Trustee's application.

*191107 In the Matter of HSBC International Trustee Limited v. Tan Poh Lee et.al – FSD 175 of 2019 (IKJ) Ex Tempore Ruling*
4

648

(6) a determination of the Trust, or part thereof,

being questions which the Trustee submitted must be determined in accordance with Cayman Islands law without reference to any other law.

**Legal Findings**

12. I have little difficulty in approving those directions, which contemplate that, depending on the outcome of that application to the Singapore Court, the Trustee would return to this Court for further, more substantive directions if the need arose, and that eventuality would only arise if the forum challenge and alternatively the proposed auxiliary Court role for this Court were both rejected.

13. The primary legal basis for the Trustee seeking that *Beddoe* relief is statutory in nature and it arises under the trust's Trust Law (2018 Revision) and, in particular, section 90. Section 90, so far as is relevant for present purposes, provides as follows:

"*90. All questions arising in regard to a trust which appears for the time being governed by the laws of the Islands or in regard to any disposition of property upon trust thereof, including questions as to-*

*(a) the capacity of any settlor;*

*(b) any aspect of the validity of the trust or disposition or the interpretation or effect thereof;*

*(c) the administration of the trust, whether the administration be conducted in the Islands or elsewhere, including questions as to the powers, obligations, liabilities and rights of trustees and their appointment and removal; or*

*(d) the existence and extent of powers conferred or retained including powers of variation or revocation of the trust and powers of the appointment and the validity of any exercise thereof,*

*are to be determined according to the laws of the Islands without reference to the laws of any other jurisdiction with which the trust or disposition may be connected.*"

14. Reliance was also placed on two local authorities each of which considered section 90. The first authority was a decision of Henderson J in *In the Matter of the B Trust* [2010] 2 CILR 348. In that case (at paragraph 23) he said this:

GRAND COURT CIV-02 CAYMAN ISLANDS

"*An order of the Hong Kong court purporting to effect a variation of the trust, whether in a matrimonial proceeding or otherwise, cannot be recognised by the trustee. That is so even if the trustees were to return to the jurisdiction of the Hong Kong court. A trust in the Cayman Islands can only be varied in accordance with the law of the Cayman Islands and only by a court of the Cayman Islands. These overarching rules provided for expressly in the Trust Law of 2009 revision in sections 90, 91 and 93.*"

15. These observations were approved by Mangatal J in *In the Matter of the A Trust* [2016] 2 CILR 416 where she said in summary this, at paragraph 33:

"*From In Re B Trust a number of principles may be seen. First, an order of the English High Court is unenforceable in the Cayman Islands whether or not the trustee submits to the jurisdiction because of the terms of the firewall legislation*[2]*. Were the trustee to submit to the jurisdiction of the High Court this could potentially create a situation where there is a conflict between its duty to observe the terms of the trust and its obligation to comply with the terms of the order of the High Court.*"

16. And her Ladyship then proceeded to quote the passage that I have just read from Henderson J's judgment in *Re B Trust*. Those cases both suggest that there is not only a statutory requirement that Cayman Islands law should be applied to the Trust where Cayman law is its governing law, but also that those issues can only be determined by the Cayman Court.

17. At this juncture, I am not in a position to decide whether the second strand of that reasoning is applicable to the present case. What is important, though, is that those decisions emphasise how important the statutory framework of the Trust Law is to Cayman Islands public policy relating to Cayman Islands trusts. That is entirely justified because the Cayman Islands is a jurisdiction which has a substantial number of highly valuable trusts, and it is not surprising that Parliament has sought to fortify that important industry by making it clear in the governing legislation that the fact that a settlor has chosen to apply Cayman Islands law to govern a trust is something that should be upheld by the Cayman Islands courts.

18. There is, I have reminded myself over the luncheon adjournment, another important general common law principle which relates to the question of the enforcement of foreign judgments. And that is the rule that enforcement of foreign judgments may be refused on public policy grounds. There are a number of cases which illustrate this

---

[2] Section 93 of the Trusts Law provides that: "*A foreign judgment shall not be recognized, enforced or give rise to any estoppel insofar as it is inconsistent with section 91 or 92.*" Section 91 of the Trust Law provides, *inter alia*, that neither should a trust be set aside nor the capacity of a settlor questioned on the grounds that:

"*(b) the trust or disposition avoids or defeats rights, claims or interests conferred by foreign law upon any person by reason of a personal relationship with the settlor or by way of heirship rights, or contravenes any rule of foreign law or any foreign judicial or administrative order or action intended to recognise, protect, enforce or give effect to any such rights, claims or interests.*"

*191107 In the Matter of HSBC International Trustee Limited v. Tan Poh Lee et.al – FSD 175 of 2019 (IKJ) Ex Tempore Ruling*

6

GRAND COURT CAYMAN ISLANDS CIV-02

650

principle. In *Lakatamia Shipping Co Ltd v Su* [2017] 1 CILR, at page 416, Mangatal J considered the question of an objection being made to enforcement of an English judgment and (at paragraph 49) she referred to Dicey rule 51, which says this:

"*A foreign judgment is impeachable on the ground that its enforcement or, as the case may be, recognition would be contrary to public policy*."

19. So putting aside the very difficult question as to whether or not there may be statutory grounds for refusing to enforce a foreign judgment, which conflicts with the public policy expressed in sections 90 to 95 of the Trusts Law, I find that there is a freestanding common law principle that enforcement of foreign judgments may be refused on public policy grounds. And that principle has been touched upon in a variety of English cases and, just to mention, without quoting from them, two examples. One is the case of *Soleimany v Soleimany* [1998] EWCA Civ 285, and another is the judgment of McGowan J, in *Superior Composite Structures LLC-v-Malcolm Parrish* [2015] EWHC, 3688.

**Directions granted**

20. So having regard to the legal submissions, and I was also taken to authorities relating to the auxiliary court function as well, which were set out in the Plaintiff's Skeleton argument, I have reached the following conclusions as to the declaratory relief to grant at this stage.

21. The draft Order firstly sought at paragraph 4 "*a declaration that the trust is governed by the laws of the Cayman Islands*". That declaration should clearly be granted as there can be little doubt about that.

22. Paragraph 5 sought a declaration as follows:

"*All questions concerning the settlor's capacity, the identity of the Trustee, the administration of the Trust, any cost or future distribution from the Trust, any decision to decline a distribution and the termination of the trust or part of thereof must be determined in accordance with the law of the Cayman Islands without reference to any other law.*"

23. The legal position, as Ms Reynolds submitted with reference to section 90 of the Trusts Law, makes that declaration a very straightforward one indeed.

24. Next, paragraph 6 sought the following declaration:

> "*The courts of the Cayman Islands have exclusive jurisdiction in connection with all such questions both under the Trust Instrument and as a matter of Cayman Islands law.*"

25. That question is somewhat more nuanced, but in my judgment, ultimately straightforward. In my view it is ultimately clear that the effect of section 90 combined with clause 27 of the Trust Deed means that this Court has been given exclusive jurisdiction in respect to all significant trust administration questions. That finding arises not because the Trust Deed explicitly says that the courts of the Cayman Islands shall be the exclusive jurisdiction for the administration of the Trust, but because, again, for the reasons that Ms Reynolds submitted, when one construes the words in their context it is quite clear that that is the intent of the clause.

26. The clause provides that the courts of the Cayman Islands shall be the initial forum for the administration of the trust, and that is clearly saying that this Court shall, at the outset, be the court to which administration questions should be brought, and it then provides that a deed is required to change the forum for administration. Not only that, the clause also explicitly distinguishes general administration of the Trust taking place in another country, such as Singapore, from the forum for administration. An interesting analogy is that clause 26 provides that Cayman Islands law is the initial proper law of the Trust and clause 28 permits a change of the proper law by deed.

27. It seems to me that just as it is difficult to construe the Deed as providing that Cayman Islands law is <u>not</u> the exclusive governing law of the instrument, so equally it is difficult to construe the Deed as intending to be non-exclusive in nominating the courts of the Cayman Islands as the initial forum for the administration of the Trust.

28. The next declaration that I am minded to make I take from paragraph 59(d)(i) of the Plaintiff's Skeleton Argument, and that seeks a declaration:

> "*That an order of the foreign court (including a court in Singapore) directing a distribution from the Trust, ordering the termination of the Trust or changing the trustee of the Trust, where such order does not result from the application of Cayman Islands law, will not be enforced, recognised or give rise to any estoppel in the Cayman Islands.*"

29. That declaration is, in my judgment, justified because it is manifestly contrary to the public policy of this jurisdiction to recognise or give effect to an attempt by a foreign court to effectively administer a Cayman Islands trust without applying Cayman Islands law.

30. The next declaration which was sought was set out in paragraph 7 of the draft Order and this reads as follows:

*191107 In the Matter of HSBC International Trustee Limited v. Tan Poh Lee et.al – FSD 175 of 2019 (IKJ) Ex Tempore Ruling*

8

GRAND COURT CIV-02 CAYMAN ISLANDS

652

*"An order of the foreign court, including a court in Singapore, directing a distribution from the Trust, ordering the termination of the trust or changing the trustee of the Trust will not be enforced, recognised or give rise to any estoppel in the Cayman Islands."*

31. That declaration is, in my judgment, difficult to justify making at this stage. In my judgment, it is not clear that the legal position is that a foreign court cannot under any circumstances, even applying Cayman Islands law, deal with the issues that appear to arise for determination in the present case, and in those circumstances, I would instead grant a declaration substituting the word "may" for "will" because it seems to me that the position is certainly arguable. Although the decisions of Justice Henderson in *Re B Trust* and Mangatal J in *Re A Trust* did not fully consider the question of the mandatory need for the Cayman Islands court to deal with such matters, I accept entirely that it is arguable that those decisions[3] should be followed, but I propose to adjourn these proceedings, await further argument before deciding that issue.

32. Finally, a declaration was sought that the courts of the Cayman Islands are willing to act as a court auxiliary to the court in Singapore in the proceedings for the purposes of determining any questions falling within paragraph 5 above, so as to ensure those questions are determined by the courts of the Cayman Islands and that is a declaration I have no difficulty in approving. The only *caveat* of course is that those directions contemplate that option would only be pursued as a fall-back position in the event that the *forum non conveniens* challenge fails.

**Conclusion**

33. So for those reasons I grant the order substantially in the terms indicated at the end of the Plaintiff's counsel's submissions.

THE HONOURABLE MR JUSTICE IAN RC KAWALEY
JUDGE OF THE GRAND COURT

GRAND COURT CIV-02 CAYMAN ISLANDS

[3] And the common law cases on refusal of recognition and enforcement on public policy ground referred to in paragraph 19 above.

*191107 In the Matter of HSBC International Trustee Limited v. Tan Poh Lee et.al – FSD 175 of 2019 (IKJ) Ex Tempore Ruling*
9

653

Government in negotiating conventions with foreign countries for the reciprocal enforcement of foreign judgments.[226] No Order in Council has yet been made under the section. The section refers to "any foreign country." It is thus not limited to foreign countries to which Pt I of the 1933 Act applies, but is of general application. However, the term "foreign country" is limited to countries foreign in the political sense: it does not extend to countries forming part of the Commonwealth.[227]

### B. *Jurisdiction of foreign courts at common law for recognition and enforcement purposes in England*

#### (1) JURISDICTION IN PERSONAM OF FOREIGN COURT FOR RECOGNITION AND ENFORCEMENT PURPOSES IN ENGLAND

14R–058 **RULE 47—Subject to Rules 48 and 49, a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment *in personam* capable of enforcement or recognition as against the person against whom it was given in the following cases:**[228]

***First Case***[229]**—If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country. For a natural person this requires physical presence in the territory, and for a legal person it requires a fixed place of business in the territory.**

***Second Case***[230]**—If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.**

***Third Case***[231]**—If the person against whom the judgment was given, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.**

---

[226] See the Report of the Foreign Judgments (Reciprocal Enforcement) Committee, Cmd. 4213 (1932), Annex V, para.14.

[227] This is made clear in s.7.

[228] *Rubin v Eurofinance SA* [2012] UKSC 46, [2013] 1 A.C. 23, at [108]; *Belhaj v Straw* [2017] UKSC 3, [2017] A.C. 964, at [36]. See generally *Adams v Cape Industries Plc* [1990] Ch. 433, 512–525 (CA); *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC 835 (Comm.). See also *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Rousillon v Rousillon* (1880) 14 Ch.D. 351, 371; *Emanuel v Symon* [1908] 1 K.B. 302, 309 (CA); Dickinson (2015) 86 B.Y.I.L. 6; Dickinson (2018) 134 L.Q.R. 426; Arzandeh (2019) 39 Leg. Stud. 56.

[229] *Carrick v Hancock* (1895) 12 T.L.R. 59; *Littauer Glove Corp v FW Millington (1920) Ltd* (1928) 44 T.L.R. 746; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *Adams v Cape Industries Plc* [1990] Ch. 433 (CA); *cf. Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330 (a case on the 1920 Act); Read, pp.148–151.

[230] Cases cited in n.228 above, and *Burpee v Burpee* [1929] 3 D.L.R. 18 (BC); Read, p.160.

[231] *De Cosse Brissac v Rathbone* (1861) 6 H. & N. 301, as explained in *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 162; *Voinet v Barrett* (1885) 55 L.J.Q.B. 39 (CA); *Guiard v de Clermont* [1914] 3 K.B. 145; *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case under the 1933 Act); *Jet Holdings Inc v Patel* [1990] 1 Q.B. 335, 341 (CA); *Swiss Life AG v Kraus* [2015] EWHC 2133 (QB); *Golden Endurance Shipping SA v RMA Watanya SA* [2016] EWHC 2110 (Comm.), [2017] 1 All E.R. (Comm.) 438; *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC 835 (Comm.); *Evison Holdings Ltd v International Company Finvision Holdings LLC* [2020] EWHC 239 (Comm.); *Gordhan v Kerdemelides* [2013] NZHC

***Fourth Case*[232]—Subject to Rule 58, if the person against whom the judgment was given, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country.**

COMMENT

**14–059** A fundamental requirement for the recognition or enforcement of a foreign judgment in England at common law[233] is that the foreign court should have had jurisdiction according to the English rules of the conflict of laws. "All jurisdiction is properly territorial," declared Lord Selborne.[234] "In a personal action, . . . a decree pronounced *in absentem* by a foreign court, to the jurisdiction of which the defendant has not in any way submitted himself, is by international law an absolute nullity. He is under no obligation of any kind to obey it; and it must be regarded as a mere nullity by the courts of every nation, except (when authorised by special local legislation) in the country of the forum by which it was pronounced." Thus, in an early leading case[235] upon the subject, the claimant brought an action in England on a judgment of a court in the island of Tobago. The defendant had never been in the island, nor had he submitted to its jurisdiction. There had been a substituted service, valid by the law of Tobago, effected by nailing a copy of the writ to the court-house door. In refusing to recognise the judgment, Lord Ellenborough said "Can the Island of Tobago pass a law to bind the rights of the whole world? Would the world submit to such an assumed jurisdiction?"

**14–060** In *Adams v Cape Industries Plc*,[236] the leading modern authority, it was said that "in determining the jurisdiction of the foreign court . . . our court is directing its mind to the competence or otherwise of the foreign court to

566; *Wong v Jani-King Franchising, Inc* [2014] QCA 76; *Re Overseas Food Importers & Brandt* (1981) 126 D.L.R. (3d) 422; (BCCA); *Canada Trustco Mortgage Co v Rene Management & Holdings Ltd* (1988) 53 D.L.R. (4th) 222 (Man CA); *575225 Saskatchewan Ltd v Boulding* [1988] 6 W.W.R. 738 (BCCA); *First National Bank of Houston v Houston E&C Inc* [1990] 5 W.W.R. 719 (BC); *Gourmet Resources International Inc v Paramount Capital Corp* [1993] I.L.Pr. 583 (Ont); and *cf. The Atlantic Emperor (No.2)* [1992] 1 Lloyd's Rep. 624, 633 (CA); Read, pp.161–171; Clarence Smith (1953) 2 I.C.L.Q. 510; on the effect of an appearance to protest the jurisdiction of the foreign court see 1982 Act, s.33, and paras 14–074 *et seq*., below.

[232] *Feyerick v Hubbard* (1902) 71 L.J.K.B. 509; *Copin v Adamson* (1875) 1 Ex. D. 17 (CA); *Jeannot v Fuerst* (1909) 25 T.L.R. 424; *Bank of Australasia v Harding* (1850) 9 C.B. 661; *Bank of Australasia v Nias* (1851) 16 Q.B. 717; *Kelsall v Marshall* (1856) 1 C.B.(N.S.) 241; *Vallée v Dumergue* (1849) 4 Exch. 290; *Blohn v Desser* [1962] 2 Q.B. 116; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act); *Desarrollo Immobiliario y Negocios Industriales de Alta v Kader Holdings Co Ltd* [2014] EWHC 1460 (QB); *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC 835 (Comm.); *First City Capital Ltd v Winchester Computer Corp* (1987) 44 D.L.R. (4th) 301 (Sask CA); *Bank of Credit & Commerce International (Overseas) Ltd v Gokal* [1995] 2 W.W.R. 240 (BCCA); *Hertzog v Perlich* [2011] NZHC 1145; Read, pp.171–177; Restatement, ss.32, 43; Garnett (2019) 15 J. Priv. Int. L. 490.

[233] And under the 1920 and 1933 Acts. The power of the English court to review the jurisdiction of the foreign court under the Hague Convention on Choice of Court Agreements 2005 is more limited. See Rule 58, below.

[234] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670, 683–684 (PC).

[235] *Buchanan v Rucker* (1808) 9 East 192, 194.

[236] [1990] Ch. 433, 517–518 (CA).

summon the defendant before it and to decide such matters as it has decided"[237] and "we would . . . regard the source of the territorial jurisdiction of the court of a foreign country to summon a defendant to appear before it as being his obligation for the time being to abide by its laws and accept the jurisdiction of its courts while present in its territory."[238] For the same reason, a foreign judgment will also be incapable of recognition or enforcement in England if it was obtained against a person who was, under the rules of public international law as understood in UK law, entitled to immunity from the jurisdiction of the courts of that country.[239]

**14–061**      It has already been seen[240] that the identification of the relevant "country" can present a problem in the case of a federal system, whose constituent States (like those in the United States) retain some degree of legislative sovereignty. But while not deciding the issue, the Court of Appeal inclined to agree with Scott J. that the relevant country (or law district) for the purposes of the recognition and enforcement of the judgment of a federal court sitting in Texas (and applying Texan substantive law) was the United States and not Texas.

**14–062**      In that case the Court of Appeal indicated, first, that foreign judgments were enforced in England only if the foreign court was one of "competent jurisdiction";[241] second, in deciding whether the foreign court was one of competent jurisdiction, the English court would apply, not the law of the foreign court, but English rules of the conflict of laws.[242] Those rules were developed in the 19th century, and were restated in the frequently cited judgment of Buckley L.J. in *Emanuel v Symon*:[243] "In actions *in personam* there are five cases in which the courts of this country will enforce a foreign judgment: (1) where the defendant is a subject of the foreign country in which the judgment has been obtained; (2) where he was resident in the foreign country when the action began; (3) where the defendant in the character of plaintiff has selected the forum in which he is afterwards sued;[244] (4) where he has voluntarily appeared; and (5) where he has contracted to submit himself to the forum in which the judgment was obtained." The actual issue in the case was whether the possession of property in the foreign country was sufficient to give jurisdiction to the foreign court,[245] and none of the heads of jurisdiction enumerated by Buckley L.J. was subjected to scrutiny in that case. As will be seen later,[246] the first case mentioned in Buckley L.J.'s statement can no longer be relied on. The second case was adopted in the 1933 Act, but was stated without reference to those cases which led to the conclusion that mere

---

[237] Citing *Pemberton v Hughes* [1899] 1 Ch. 781, 790 (CA).

[238] [1990] Ch. 433, 517–519.

[239] See Rule 23.

[240] *Williams v Jones* (1845) 13 M. & W. 628, 633; *Godard v Gray* (1870) L.R. 6 Q.B. 139, 147; *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 159.

[241] *ibid.*

[242] See below, para.14–126.

[243] [1908] 1 K.B. 302, 309 (CA), which (as he acknowledged) was taken verbatim from the judgment of Fry J. in *Rousillon v Rousillon* (1880) 14 Ch.D. 351, 371. The Supreme Court of Canada has said that Buckley L.J.'s summary "bears a remarkable resemblance to a Code": *Morguard Investments Ltd v De Savoye* [1990] 3 S.C.R. 1077, 1087, (1990) 76 D.L.R. (4th) 256.

[244] i.e. where a counterclaim is brought.

[245] See below, para.14–088.

[246] See below, para.14–090.

presence, without residence, would be sufficient to confer jurisdiction and which were approved by the Court of Appeal in *Adams v Cape Industries Plc.*[247] The other three cases are examples of the principle of submission[248] and correspond respectively to the Second, Third and Fourth Cases of Rule 47. All four cases (including residence, rather than presence) were adopted (and slightly altered) in the 1933 Act, and in their altered and re-arranged form they are set out in Rule 57.

**14–063** The provisions of the 1933 Act were deliberately framed so as to reproduce the rules of the common law as closely as possible,[249] though, as the Foreign Judgments (Reciprocal Enforcement) Committee conceded, it was found desirable to make one or two departures from the common law rules in order to secure international agreements which would be likely to operate satisfactorily in practice.[250] The question therefore arises whether the provisions of the 1933 Act as to the jurisdiction of foreign courts, and as to the scope of the defences, can legitimately be invoked by a court which is asked to enforce a foreign judgment at common law, even though the 1933 Act has not been extended by Order in Council to the foreign country in question. Although the Act has been used[251] to negative arguments that there are additional bases for recognition at common law,[252] the Court of Appeal has held that it is wrong to use the Act to ascertain the common law "by arguing backwards from the provisions of the statute."[253]

**14–064** **The first case. Presence—natural persons.** There is divergence of authority on the question whether presence, as distinct from residence, is a sufficient basis of jurisdiction in relation to natural persons. The older cases acknowledge that the residence of a defendant in the country at the time when proceedings are commenced gives that court jurisdiction over the defendant at common law.[254] The position is the same under the 1920 Act[255] and the 1933 Act,[256] except that the former requires "ordinary residence", which probably requires an additional element of continuity,[257] and the latter contains special rules for corporations (discussed below). But some of the older cases also

---

[247] [1990] Ch. 433 (CA).

[248] But see Dickinson (2019) 135 L.Q.R. 294 (criticizing the language of "submission" in this context).

[249] Report of the Foreign Judgments (Reciprocal Enforcement) Committee, Cmd. 4213 (1932), paras 2, 16, 18 and Annex V, para.7.

[250] *ibid.*, para.18 and Annex V, para.7.

[251] See *Re Trepca Mines Ltd* [1960] 1 W.L.R. 1273, 1282 (CA); *Rossano v Manufacturers' Life Insurance Co Ltd* [1963] 2 Q.B. 352, 383.

[252] In *Owens Bank Ltd v Bracco* [1992] 2 A.C. 443, 489, it was held that, because the 1920 Act adopted the common law approach to fraud in relation to foreign judgments (below, para.14–142), it would be wrong for the courts now to alter the common law rule.

[253] *Henry v Geoprosco International* [1976] Q.B. 726, 751. *cf. Société Co-opérative Sidmetal v Titan International Ltd* [1966] 1 Q.B. 828, 845–846.

[254] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Emanuel v Symon* [1908] 1 K.B. 302, 309 (CA). In *State Bank of India v Murjani Marketing Group Ltd*, unreported, March 27, 1991 (CA), Sir Christopher Slade inclined to the view that residence (in the sense of principal home) would be a sufficient basis of jurisdiction, even if the judgment debtor was not present in the foreign country at the date of commencement of proceedings.

[255] s.9(2)(b).

[256] s.4(2)(a)(iv).

[257] *cf.* above, para.6–127.

suggest that presence, rather than residence, is a sufficient basis,[258] and presence as a basis of jurisdiction is strengthened by those authorities which suggested that "temporary allegiance" to the local sovereign was one of the reasons why a defendant might be under an obligation to comply with the judgments of its courts.[259] For this reasoning is no less applicable where a defendant is merely present within the foreign country concerned. It is also supported by the authorities on the jurisdiction of the English court over persons present in England: the temporary presence of an individual defendant in England gives the English court jurisdiction at common law.[260] It may be questioned, however, whether casual presence, as distinct from residence, is a desirable basis of jurisdiction if the parties are strangers and the cause of action arose outside the country concerned. For the court is not likely to be the *forum conveniens*, in the sense of the appropriate court most adequately equipped to deal with the facts or the law.[261] The 1920 and 1933 Acts adopted residence rather than presence as the basis of jurisdiction over individuals.

**14–065** In *Adams v Cape Industries Plc*[262] the Court of Appeal reviewed the authorities on presence and residence in the context of the jurisdiction of foreign courts over corporations, but took the opportunity to express general views on the issue. The First Case of the Rule is framed in terms of presence rather than residence in the light of this decision but the issue remains open in the Supreme Court.

**14–066** In *Carrick v Hancock*[263] the claimant was an Englishman domiciled in Sweden who had acted in Sweden as an agent on commission for the defendant, an Englishman. The defendant was served with Swedish proceedings during a short visit to Sweden, and he subsequently defended the Swedish proceedings. Accordingly, the case had a significant connection with Sweden, and in any event the defendant had clearly submitted to the jurisdiction of the Swedish courts. But in an unreserved judgment Lord Russell of Killowen C.J. decided that the Swedish judgment was enforceable because of the defendant's presence in Sweden, and "the question of the time the person was actually in the territory was wholly immaterial".[264]

**14–067** This decision (among others[265]) was relied on by the Court of Appeal in *Adams v Cape Industries Plc* as supporting the principle that, in the absence of submission to the jurisdiction of the foreign court, the competence of a foreign court to summon the defendant before it depended on the physical presence of the defendant in the country concerned at the time of suit: "So long as he remains physically present in that country, he has the benefit of its

---

[258] *Carrick v Hancock* (1895) 12 T.L.R. 59; *Herman v Meallin* (1891) 8 W.N. (NSW) 38; *Forbes v Simmons* (1914) 20 D.L.R. 100 (Alta); *cf. General Steam Navigation Co v Guillou* (1843) 11 M. & W. 377. Contrast *Australian Assets Co Ltd v Higginson* (1897) 18 L.R. (NSW) Eq. 189, 193.

[259] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *cf. Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670, 683–684 (PC).

[260] *Colt Industries Inc v Sarlie* [1966] 1 W.L.R. 440 (CA); *Maharanee of Baroda v Wildenstein* [1972] 2 Q.B. 283 (CA) above, para.11–042; *cf.* Restatement, s.28.

[261] *cf.* Dodd (1929) 23 Ill.L.Rev. 427, 437–438.

[262] [1990] Ch. 433 (CA).

[263] (1895) 12 T.L.R. 59.

[264] *ibid.*, p.60.

[265] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670, 683–684; *Employers' Liability Assurance Corp v Sedgwick Collins & Co Ltd* [1927] A.C. 95, 114–115.

laws, and must take the rough with the smooth, by accepting his amenability to the process of its courts. In the absence of authority compelling a contrary conclusion, we would conclude that the voluntary presence of an individual in a foreign country, whether permanent or temporary and whether or not accompanied by residence, is sufficient to give the courts of that country territorial jurisdiction over him under our rules of private international law."[266]

**14–068** The Court of Appeal referred to the "voluntary" presence of the defendant as being one not induced by compulsion, fraud or duress, but it is clear from the context[267] that it was not finally decided that the presence of these factors would negative jurisdiction. There is no decision in England on what the position is when the defendant is forcibly brought, or fraudulently induced to come, into the jurisdiction of the foreign court and there served with process.[268] But in the United States the view is held that in such a case jurisdiction exists but may or should be disclaimed by the court for reasons of equity if the claimant is privy to the force or fraud.[269] In this case also, it is clear, the defendant has the benefit of the laws of the State concerned and owes temporary allegiance thereto. The question whether at common law a foreign court has jurisdiction over an individual who is neither resident or present within the foreign jurisdiction but who carries on business regularly there through an agent has been raised but not decided,[270] although it is a basis of jurisdiction under the 1920 Act.[271]

**14–069** **Presence—legal persons.** Where a corporation is concerned neither residence nor presence has, of course, any real meaning. But there is a long line of cases dealing with the question whether a foreign corporation does or does not carry on business in England so as to render itself amenable to the jurisdiction of the English courts at common law.[272] The principle of these cases applies also to the question whether a corporation is present in a foreign country so as to give its courts jurisdiction over it.[273] In *Adams v Cape*

---

[266] [1990] Ch. 433, 519. The Court of Appeal indicated that dicta (in cases on the jurisdiction of the *English* court) indicated that the relevant time was *service* of proceedings, rather than *issue*, but expressed no final view. The Court of Appeal (at p.518) also left open the question whether residence without presence would be a sufficient basis of jurisdiction, but *cf. State Bank of India v Murjani Marketing Group Ltd*, above, which suggests that it does suffice, para.14–064.

[267] See *ibid.*, pp.518–519.

[268] See *Stein v Valkenhuysen* (1858) E.B. & E. 65 and *Watkins v North American Lands, etc., Co* (1904) 20 T.L.R. 534 (HL), above, para.11–042, which suggest that in appropriate circumstances English process might be set aside if the defendant was fraudulently lured into the jurisdiction.

[269] Restatement, s.82, comments b, d and f.

[270] *Blohn v Desser* [1962] 2 Q.B. 116, 123, on which see below, para.14–084. The mere fact that the defendant contracted through an agent in the foreign country is not of itself sufficient: *cf. Seegner v Marks* (1895) 21 V.L.R. 491.

[271] 1920 Act, s.9(2)(b), on which see below, para.14–173. On the jurisdiction of the English court in such a case see above, para.11–043.

[272] See above, paras 11–050 *et seq.*

[273] *Littauer Glove Corp v FW Millington (1920) Ltd* (1928) 44 T.L.R. 746; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *Adams v Cape Industries Plc* [1990] Ch. 433 (CA); see also *Moore v Mercator Enterprises Ltd* (1978) 90 D.L.R. (3d) 590 (N.S.).

*Industries Plc*[274] the Court of Appeal held that in the case of corporations the test of jurisdiction is satisfied if the corporation is carrying on business at a definite and fixed place. The basic principle is that a trading corporation will be regarded as present within the jurisdiction of the courts of a foreign country if (a) it has established and maintained a fixed place of business and for more than a minimal time has carried on its own business there, *or* (b) its representative has for more than a minimal period of time been carrying on the corporation's business in that country at or from some fixed place of business. In the latter case it will be necessary to consider a number of factors (already mentioned in connection with the jurisdiction of the English court[275]) to determine whether the business being carried on is that of the corporation or its representative. In deciding whether a company is present in a foreign country as a result of the acts of a subsidiary present there, the court must consider whether the subsidiary was acting as agent, and if so, on what terms; it may also treat the subsidiary as the *alter ego* of the parent if special circumstances exist which indicate that there is a "mere façade concealing the true facts".[276] If the local agent has authority to enter into contracts on behalf of the corporation without seeking the prior approval of the corporation, this is a powerful indicator that the corporation is present; if the agent does not have this authority, this fact points powerfully in the opposite direction.[277]

**14–070** In the case of companies which carry on or promote their business by placing advertisements or other invitations or information on an internet website which is accessible from, or even targeted at customers in, the foreign country in which the judgment was given, there is no English support for the view that this should be regarded as constituting a place of business in the foreign country for the purpose of the rules on the recognition and enforcement of judgments, and some authority against.[278] There is a distinction to be drawn between "carrying on business in" and carrying on business from a fixed place of business in the foreign country.[279] Though the former expression may have some jurisdictional relevance in some systems, it is the latter which establishes presence for the purpose of the First Case of the Rule. And this latter has not yet been held to be demonstrated or satisfied by a "presence in cyberspace".

**14–071** Under the 1920 Act the principle of the cases on the jurisdiction of the English court applies also to the question whether a corporation carries on business in the jurisdiction of the original court within the meaning of the

---

[274] [1990] Ch. 433, 530–544. *cf. Akande v Balfour Beatty Construction Ltd* [1998] I.L.Pr. 110 (a case on the 1920 Act).

[275] See above, para.11–058.

[276] [1990] Ch. 433, 539, citing *Woolfson v Strathclyde Regional Council*, 1978 S.L.T. 159, 161 (HL) (a case not involving the conflict of laws).

[277] *F&K Jabbour v Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146; *Adams v Cape Industries Plc* [1990] Ch. 433, 531 (CA).

[278] *Lucasfilm Ltd v Ainsworth* [2009] EWCA Civ 1328, [2010] 3 W.L.R. 333, at [194]. The point was not discussed on further appeal to the Supreme Court: [2011] UKSC 39, [2012] 1 A.C. 208.

[279] An Irish court has held that when a company is in liquidation and is no longer carrying on business, it is not to be regarded as present within the jurisdiction in question: *Re Flightlease (Ireland) Ltd* [2006] IEHC 193, [2008] 1 I.L.R.M. 53.

Act.[280] Thus it has been held that a New Zealand insurance company does not carry on business in Ghana merely because it maintains agents there with limited powers to settle claims.[281] The 1933 Act[282] requires that the corporation must have its principal place of business (and not merely carry on business) in the foreign country, or alternatively that the judgment debtor had an office or place of business in the foreign country and the proceedings were in respect of a transaction effected through or at that office or place.[283]

**14–072** **The second case. Appearance as claimant or counter-claimant.** It is obvious that a person who applies to a tribunal as claimant is bound to submit to its judgment, should there be an adverse judgment, if for no other reason than that fairness to the defendant demands this.[284] It is no less obvious that a claimant is exposed to acceptance of jurisdiction of a foreign court as regards any set-off, counterclaim or cross-action which may be brought by the defendant.[285] By the same token, a defendant who resorts to a counterclaim or like cross-proceeding in a foreign court clearly submits to the jurisdiction thereof.[286]

**14–073** **The third case. Appearance.** This case rests on the simple and universally admitted principle that a litigant who has voluntarily submitted to the jurisdiction of a court by appearing before it cannot afterwards dispute its jurisdiction. Where such a litigant, though a defendant rather than a claimant, appears and pleads to the merits without contesting the jurisdiction there is clearly a voluntary submission. The same is the case where the defendant does indeed contest the jurisdiction[287] but nevertheless proceeds further to plead to the

---

280 See para.14–173, below.

281 *Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330.

282 s.4(2)(a)(iv).

283 s.4(2)(a)(v). See further para.14–190, below.

284 On this basis, a foreign judgment would not, therefore, be enforceable against absent English members of a foreign opt-out class action who had not actively assented to the proceedings: Mulheron (2012) 75 M.L.R. 180; Grave, McIntosh and Rowan, *Class Actions in England and Wales* (2018), Ch.2. It is suggested that mere knowledge of the foreign opt-out class action should not normally be enough for the judgment to be enforceable, as this would not constitute an appearance and would impose a burden on claimants to "opt out" of the proceedings, although this raises the concern that those claimants might benefit from the foreign proceedings without accepting the risk of their failure. *cf. Currie v McDonald's Restaurants of Canada Ltd* (2005) 74 O.R. (3d) 321 (CA).

285 *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Burpee v Burpee* [1929] 3 D.L.R. 18 (BC); Westlake, ss.324, 325. It may, however, be otherwise where the action instituted after the claimant has submitted to the foreign jurisdiction is brought by someone other than the defendant against whom the original claim was made: see *Murthy v Sivajothi* [1999] 1 W.L.R. 467, discussed further below, para.14–079. Indeed, if a cross-action brought by the original defendant has nothing whatever to do with the subject matter of the original claim, but is permitted by the foreign court in accordance with its procedural law, it may still be arguable that the submission of the claimant should not be regarded as a matter of English law (whatever the foreign law may say, which is of no significance on this point) as automatically extending to proceedings and judgment in the cross-action.

286 *GFH Capital Ltd v Haigh* [2020] EWHC 1269 (Comm.).

287 But a defendant who wishes to enter an appearance but fails to succeed in doing so does not submit: *De Santis v Russo* [2002] 2 Qd.R 230 (Qd CA).

merits,[288] or agrees to a consent order dismissing the claims and cross-claims,[289] or where the defendant fails to appear in proceedings at first instance but appeals on the merits.[290] If the defendant takes no part in the proceedings and judgment is given in default of appearance, and the defendant later moves to set the default judgment aside, the application to set aside may be a voluntary appearance if it is based on non-jurisdictional grounds, even if the application is unsuccessful.[291] There is no English authority directly in point; in *Guiard v De Clermont*[292] the defendant applied successfully to have a default judgment set aside and to have judgment entered in his favour at first instance, but the original judgment was restored by an appeal court; he was held to have voluntarily submitted.

**14–074** *Section 33 of the Civil Jurisdiction and Judgments Act 1982.* Where the defendant contests the jurisdiction of a foreign court, the position is regulated by s.33 of the Civil Jurisdiction and Judgments Act 1982. If the challenge to the jurisdiction of the foreign court is successful, no question of submission arises. If it is unsuccessful and the defendant goes on[293] to contest the case on the merits, the defendant will have submitted to the jurisdiction of the foreign court. But if the defendant takes no further part in the proceedings and judgment in default is entered, will the defendant be regarded as having voluntarily submitted? Common sense would suggest that a defendant who has been vigorously protesting that a court has no jurisdiction should not be regarded as having voluntarily submitted.[294] Under the 1933 Act an appearance for the purpose of (inter alia) contesting the jurisdiction is not to be regarded as a voluntary appearance.[295] But in *Harris v Taylor*,[296] decided at common law, a defendant who had entered a conditional appearance in the Isle of Man court in order to set aside the proceedings on jurisdictional grounds was held to have submitted to the jurisdiction of the Manx Court, even though

---

[288] *cf. Boissière v Brockner* (1889) 6 T.L.R. 85, criticised by Clarence Smith (1953) 2 I.C.L.Q. 510, 517–520; *McFadden v Colville Ranching Co* (1915) 8 W.W.R. 163 (Alta); *Richardson v Allen* (1916) 28 D.L.R. 134 (Alta CA).

[289] *Adams v Cape Industries Plc* [1990] Ch. 433, 461, *per* Scott J., affd. on other grounds *ibid.*, p.503 (CA).

[290] *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act); *Service Temps Inc v Macleod* [2013] CSOH 162, 2014 S.L.T. 375; *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC 835 (Comm.).

[291] This may be an explanation for *Desert Sun Loan Corp v Hill* [1996] 2 All E.R. 847, where the application to set aside was based on the construction or validity of a power of attorney: a non-jurisdictional issue which had jurisdictional consequences.

[292] [1914] 3 K.B. 145.

[293] An exception may arguably arise where the claimant has no “practical alternative” to contesting the merits; *Navigators Insurance Co v Mohammed* [2015] EWHC 1137 (Comm.).

[294] *Re Dulles’ Settlement (No.2)* [1951] Ch. 842, 850 (CA), *per* Denning L.J. See also *Daarnhouwer & Co NV v Boulos* [1968] 2 Lloyd’s Rep. 259; *Navigators Insurance Co v Mohammed* [2015] EWHC 1137 (Comm.).

[295] 1933 Act, s.4(2)(a)(i).

[296] [1914] 3 K.B. 580 (CA); followed in *Kennedy v Trites* (1916) 10 W.W.R. 412 (BC); not followed in *Dovenmuehle v Rocca Group Ltd* (1981) 34 N.B.R. (2d) 444, app. Dismissed (1982) 43 N.B.R. (2d) 359 (Sup Ct Can); *WSG Nimbus Pte Ltd v Board of Control for Cricket in Sri Lanka* [2002] 3 Sing. L.R. 603 (HC). See also *Re McCain Foods and Agricultural Publishing Co Ltd* (1979) 103 D.L.R. (3d) 734 (Ont. CA); *Mid-Ohio Imported Car Co v Tri-K Investments Ltd* (1995) 129 D.L.R. (4th) 181 (BCCA).



**Michaelmas Term**
**[2023] UKSC 40**
*On appeal from: [2022] EWCA Civ 234*

# JUDGMENT

# Skatteforvaltningen (the Danish Customs and Tax Administration) (Respondent) *v* Solo Capital Partners LLP (in special administration) and others (Appellants)

before

**Lord Hodge, Deputy President**
**Lord Lloyd-Jones**
**Lord Briggs**
**Lord Hamblen**
**Lord Richards**

**JUDGMENT GIVEN ON**
**8 November 2023**

**Heard on 5 and 6 July 2023**

*Appellants*
Kieron Beal KC
Nigel Jones KC
Lisa Freeman
Laurence Page
(Instructed by Meaby & Co LLP)


*Respondent*
Lord Pannick KC
James Goldsmith KC
Andrew Scott KC
Jonathan Schwarz
Abra Bompas
James Ruddell
KV Krishnaprasad
(Instructed by Pinsent Masons LLP (London))

**LORD LLOYD-JONES (with whom Lord Hodge, Lord Briggs, Lord Hamblen and Lord Richards agree):**

1. This appeal concerns the admissibility of claims made in the Commercial Court in London by Skatteforvaltningen, the Danish Customs and Tax Administration, ("the respondent") against Mr Sanjay Shah and companies related to Mr Shah ("the appellants"). The appellants contend that the claims seek to enforce, directly or indirectly, the revenue laws or the public laws of the Kingdom of Denmark.

2. *Dicey, Morris & Collins, The Conflict of Laws*, 16th ed (2022), states the general principle as follows (at para 8R-001):

> "Rule 20 – English courts have no jurisdiction to entertain an action:
>
> (1) for the enforcement, either directly or indirectly, of a penal, revenue or other public law of a foreign State; …"

The essential questions arising on this appeal are the scope of Rule 20(1) and whether it has any application to the facts of the present case. In its application to the tax laws of a foreign State the principle is often referred to as "the revenue rule". For convenience, its application to public laws of a foreign State will be referred to in this judgment as "the sovereign authority rule".

Factual background

3. Mr Shah was a founding member of Solo Capital Partners LLP ("SCP") which was established in 2011. SCP was until 2015 a Financial Conduct Authority-regulated custodian claiming to specialise in tax structured financial products. It purported to provide custodian services to clients including US Pension Plans ("USPPs"), companies registered in the International Business and Financial Centre, Malaysia ("Labuan companies") and finance brokers.

4. The respondent is an independent ministerial authority established under Danish law. It is part of the sovereign authority of the Kingdom of Denmark which is a single legal personality. It is recognised in Danish law as having sufficient legal capacity to bring claims in its own name.

5.      A number of other defendants to the consolidated Commercial Court claims (CL-2018-000297, 000404, 000690, CL-2019-000487 and 000369) are not appellants before the Supreme Court. The respondent accepts that, subject to the precise terms of this judgment, the claims against these other defendants will be dismissed if the appellants' appeal is allowed.

6.      The case concerns certain applications in which claims were made for the refund of Danish dividend withholding tax ("WHT"). Non-residents of Denmark who receive dividends from Danish companies are liable to pay 27% tax which is withheld at source. Non-residents of Denmark who meet the requirements set out in the Danish Withholding Tax Act ("WHT Act") and applicable double taxation treaties are entitled to a partial or full refund of the tax so withheld.

7.      Non-residents of Denmark are liable to tax under either section 2 of the WHT Act or section 2 of the Danish Corporation Taxation Act on dividends they have a right to receive from Danish companies. The Danish company must withhold 27% of the dividend it has declared pursuant to section 65 of the WHT Act and pay this to the respondent pursuant to section 66 of the WHT Act, to discharge the tax liability described above. As reflected in section 69B(1) of the WHT Act, a non-resident shareholder who is liable to tax (under section 2 of the WHT Act or section 2 of the Danish Corporation Taxation Act) and who has a right to receive dividends, from which tax has been withheld by the Danish company, may claim repayment if the tax withheld exceeds the final tax that Denmark is permitted to levy in accordance with the terms of a relevant double taxation treaty.

8.      Danish public companies distribute the dividend declared, net of tax withheld, to the accounts of custodians or individuals as designated by the Danish central securities depositary based on the information in its register. A custodian registered with the central securities depositary may have clients who are themselves custodians.

9.      Non-residents of Denmark usually hold shares via a custodian, rather than directly with the central securities depositary.

10.     Dividend tax refund applications were made by the USPPs and Labuan companies who were clients of SCP and three related custodians ("the Solo WHT Applications").

11.     At the relevant time there were various ways in which a WHT reclaim might be made. So far as relevant, a shareholder or its agent could make an application by submitting to the respondent a standardised form seeking a refund of Danish dividend tax, with accompanying documents. In this case the accompanying documents included (i) a covering letter from a tax reclaim agent acting on behalf of the relevant applicant;

(ii) a credit advice note issued by a relevant custodian in respect of the purported shares, dividends and tax; and (iii) a document from the relevant foreign tax authority certifying that the applicant was resident in the relevant foreign jurisdiction.

12.    The respondent's pleaded case is that the Solo WHT applicants owned no shares in any relevant Danish companies, received no dividends on any such shares and suffered no withholding of Danish tax in respect of any such dividends. The respondent alleges that, in respect of each of the 4,590 applications made to it by clients of the custodians in these proceedings, the representations made by the Solo WHT applicants were false and made dishonestly or recklessly. It alleges that it was fraudulently induced to make payments amounting to about DKK 12.09 billion (equivalent to about £1.44 billion) pursuant to these claims.

13.    The defendants deny the claims against them. In particular, they maintain that the trade structures resulted in the USPPs and Labuan companies being entitled under Danish tax law to make bona fide claims pursuant to section 69B(1) of the WHT Act. Alternatively, they maintain that they had a reasonable belief that the trades were lawful and complied with Danish tax law.

Procedural history

14.    The respondent has issued five sets of proceedings in England and Wales which have been consolidated. There are currently 89 defendants. The claim is put primarily on the basis of common law causes of action in the law of England and Wales. The causes of action pleaded against the defendants are principally deceit and unlawful means conspiracy. The respondent also brings claims for dishonest assistance, knowing receipt and unjust enrichment. The respondent seeks equitable relief and restitutionary remedies and asserts a proprietary interest in the sums it paid out and the traceable proceeds thereof. An alternative case is advanced under Danish private law.

15.    At a case management hearing in July 2020 Andrew Baker J delivered a preliminary issues ruling and directed that the claim should be tried in three principal stages: (i) the trial of a first preliminary issue as to whether the claim as pleaded is inadmissible under *Dicey, Morris & Collins* Rule 20(1); (ii) the trial of a second preliminary issue to consider the parameters of a valid WHT application ("the validity trial"); and (iii) a main trial for the purposes of making findings on liability and quantum: [2020] EWHC 2022 (Comm).

16.    The first preliminary issue trial took place online between 22 and 25 March 2021. On 27 April 2021 Andrew Baker J handed down his judgment on the first preliminary issue, dismissing the claims in their entirety on the basis that they were

inadmissible pursuant to *Dicey, Morris & Collins* Rule 20(1): [2021] EWHC 974 (Comm).

17. The respondent appealed against the decision of Andrew Baker J on the admissibility issue in respect of all defendants except one. On 25 February 2022 the Court of Appeal (Sir Julian Flaux, Chancellor of the High Court, Phillips and Stuart-Smith LJJ) allowed the appeal: [2022] EWCA Civ 234; [2022] QB 772.

18. As a result, the validity trial and the main trial were reinstated. The validity trial took place before Andrew Baker J between 17 January and 10 February 2023. In a judgment handed down on 24 March 2023, [2023] EWHC 590 (Comm), the judge upheld the respondent's pleaded case as to the content of the relevant eligibility requirements under Danish law.

19. The main trial is listed to commence before Andrew Baker J on 15 April 2024 and to last for nearly four legal terms.

20. On 28 October 2022 the Supreme Court granted permission to appeal on the admissibility issue.

Ground 1: the Court of Appeal erred in its legal characterisation of the claims advanced by Skatteforvaltningen. It wrongly found the judge had erred in recording the inextricable link between Skatteforvaltningen's claims and the recovery of tax.

The scope of the revenue rule

21. The editors of *Dicey, Morris & Collins* state (at para 8-002 ff) that there is a well-established and almost universal principle that the courts of one country will not enforce the penal and revenue laws of another country. Whether a foreign law falls within the categories of those laws which the English court will not enforce is a matter for English law. Although Rule 20 is expressed in terms of lack of jurisdiction, the editors suggest (at para 8-003) that it is the foreign State which has no international jurisdiction to enforce its law abroad and the English court will not exercise its own jurisdiction in aid of an excess of jurisdiction by a foreign State. (See *In re State of Norway's Application (Nos 1 and 2)* [1990] 1 AC 723, 808.) They explain (at paras 8-004 – 8-005) that Rule 20(1) applies to both the direct and indirect enforcement of foreign laws of the type in question.

> "Direct enforcement occurs where a foreign State or its nominee seeks to obtain money or property, or other relief, in reliance on the foreign rule in question." (para 8-004)

> "Indirect enforcement occurs where the foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect; or where a private party raises a defence based on the foreign law in order to vindicate or assert the right of the foreign State." (para 8-006)

However, the Rule does not prevent recognition of a foreign law of the type in question and where direct or indirect enforcement does not arise a foreign law of this type will be recognised if it is relevant to the issue and provided it is not contrary to public policy (paras 8-004, 8-011). The revenue rule is, furthermore, subject to exceptions where there exists a contrary agreement by treaty or convention and the editors note that substantial inroads have been made into the revenue rule by international agreement, for example international arrangements for mutual assistance in the collection of tax debts (paras 8-009, 8-012).

22.    In *Government of India v Taylor* [1955] AC 491, where the Government of India sought to enforce in this jurisdiction an Indian tax debt, Lord Keith of Avonholm identified two possible rationales for the revenue rule. The first he described (at p 511) as follows:

> "One explanation of the rule thus illustrated may be thought to be that enforcement of a claim for taxes is but an extension of the sovereign power which imposed the taxes, and that an assertion of sovereign authority by one State within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties."

An alternative rationale, he considered, was to be found in the risk that the enforcement of such a foreign liability might be contrary to the public policy of this country and that for a domestic court to rule on such a foreign law might result in inter-State embarrassment. The former view is, in my view, to be preferred. Today courts in this jurisdiction frequently have to express critical views on the conduct of foreign countries or their public institutions, for example in deportation, asylum or extradition cases or in cases concerning forum non conveniens. (See the observations of Lord Sumption in *Belhaj v Straw* [2017] UKSC 3; [2017] AC 964, at para 241.) The risk of embarrassing the executive in the conduct of international relations does not, in my view, provide a

satisfactory basis for the revenue rule. (I note, however, that the latter view, inspired by Judge Learned Hand in *Moore v Mitchell*, 30 F 2d 600, 604 (2d Cir 1929), (cited by Kingsmill Moore J in *Peter Buchanan Ld v McVey* [1955] AC 516 at p 528 and by Lord Keith in *Government of India v Taylor* [1955] AC 491 at p 511) still finds favour in the United States. See *Attorney General of Canada v R J Reynolds* 268 F 3d 103 (2d Cir 2001) per Judge Katzmann at pp 112-113; *European Community v R J R Nabisco Inc* (2005) 8 ITLR 323 per Judge Sotomayor at p 328, both considered below. Cf *Banco Nacional de Cuba v Sabbatino* (1964) 376 US 398, 448 per White J dissenting on other grounds.) By contrast, the former view provides a principled basis which has found favour in the subsequent authorities in this jurisdiction (*In re State of Norway's Application (Nos 1 and 2)* [1990] 1 AC 723 per Lord Goff at p 808; *Webb v Webb* [2020] UKPC 22 per Lord Kitchin at paras 32, 55) and among commentators (*Dicey, Morris & Collins*, para 8-002).

23. The competing submissions of the parties on this ground have focussed on the submission on behalf of the respondent that the authorities establish that the revenue rule applies only if the claim under consideration is one made directly or indirectly for the payment of tax which is due and that if no tax is due the claim cannot be within the revenue rule.

24. In this jurisdiction the revenue rule was applied in three first instance cases decided early in the twentieth century. In *Municipal Council of Sydney v Bull* [1909] 1 KB 7 Grantham J held inadmissible an action to enforce a liability under the law of New South Wales to contribute to municipal improvements on the basis that it was "in the nature of an action for a penalty or to recover a tax" (at p 12). In *King of the Hellenes v Brostrom* (1923) 16 LI L Rep 190 Rowlatt J held that "a foreign government cannot come here … and sue a person found in [this] jurisdiction for taxes levied and which he is declared to be liable to by the country to which he belongs" (at p 193). In *In re Visser* [1928] Ch 877, where the Queen of Holland sued the estate of a deceased Dutch national for unpaid succession duty, Tomlin J observed during the course of argument that the question was whether the English courts were to be "collectors of taxes" for foreign governments (at p 879) and concluded (at p 884):

> "My own opinion is that there is a well-recognized rule, which has been enforced for at least 200 years or thereabouts, under which these courts will not collect the taxes of foreign States for the benefit of the sovereigns of those foreign States; and this is one of those actions which these courts will not entertain."

In each case the formulation of the rule is consistent with the respondent's submission, although the question as to the ambit of the rule was not in issue.

25. The same is true of *Government of India v Taylor*, the first authoritative statement of the principle by the House of Lords. Viscount Simonds described the issue as "whether there is a rule of law which precludes a foreign State from suing in England for taxes due under the law of that State" (at p 503). Referring to the three first instance decisions described above, he expressed his surprise that it should be suggested "that the courts of this country would and should entertain a suit by a foreign State to recover a tax" (at p 503). Lord Morton, Lord Reid and Lord Keith concurred with Viscount Simonds. Similarly, Lord Somervell in his speech identified the issue as "whether a foreign State can use the courts of this country for the collection of its taxes" (p 513). Once again, the formulation of the rule is consistent with the respondent's submission, although the question as to the ambit of the rule was not directly in issue. Lord Pannick KC, on behalf of the respondent, has, however, drawn to our attention a concession in the argument of counsel for the respondent taxpayer in *Government of India* (at p 500) which he says is analogous to the present case:

> "Penal, revenue and confiscatory laws deal with public claims by the sovereign and not private rights. The position would not be the same as the present if after the Indian Government had obtained possession of a taxpayer's money it was stolen by a thief; the Government could sue to recover it in this country."

26. In his speech in *Government of India* Lord Keith commended the judgment of Kingsmill Moore J in the High Court of Eire in *Peter Buchanan Ld v McVey* (21 July 1950) which is reported as a note to the decision of the House of Lords [1955] AC 516. *Buchanan* provides an example of an attempt indirectly to enforce a foreign revenue law. A tax debt was due to the Revenue from a Scottish company which had been asset stripped. The Revenue, the only creditor of the company, took steps to wind up the company, appoint a liquidator and recover the tax debt. The liquidator brought a claim in the Irish High Court against Mr McVey claiming an account as a director and also a claim for money had and received. Kingsmill Moore J held that Mr McVey's whole object had been to defeat the tax claims of the Revenue. He concluded that the Irish court was not precluded from expressing an opinion on whether the arrangement in question operated as a fraud on the Revenue under Scots law or as to its validity under that law (at p 523). However, he went on to hold that, since the substance and natural effect of the liquidator's claim was to recover a revenue debt, the claim was inadmissible. In coming to this conclusion he emphasised that:

> "In every case the substance of the claim must be scrutinized, and if it then appears that it is really a suit brought for the purpose of collecting the debts of a foreign revenue it must be rejected." (at p 529)

27. The question whether the exclusionary rule applies where the claim is not one made directly or indirectly for the payment of tax which is due was expressly considered by the House of Lords in *Williams & Humbert Ltd v W & H Trade Marks (Jersey) Ltd* [1986] AC 368. For present purposes, it is not necessary to refer in any detail to the facts of that case which was concerned with the effect of Spanish expropriatory decrees. The defendants pleaded that the plaintiff was not entitled to the relief sought because the proceedings were an attempt to enforce a foreign law which was penal or which otherwise ought not to be enforced by the court. The decision is relevant because it was submitted in that case that *Buchanan* supported a general principle that even when an action is raised at the instance of a legal person distinct from the foreign government and even where the cause of action relied upon does not depend to any extent on the foreign law in question, nevertheless if the action is brought at the instigation of the foreign government and the proceeds of the action would be applied by the foreign government for the purposes of a penal, revenue or other public law of the foreign State relief cannot be given. (See Lord Mackay at p 440D-E).

28. In rejecting this submission, Lord Mackay, with whose speech Lords Scarman, Bridge and Brandon concurred, observed in relation to the facts of *Buchanan*:

> “Most important there was an outstanding revenue claim in Scotland against the company which the whole proceeds of the action apart from the expenses of the action and the liquidation would be used to meet. No other interest was involved.” (at p 440F-G)

Lord Mackay then stated (at pp 440H – 441B):

> “Having regard to the questions before this House in *Government of India v Taylor* [1955] AC 491 I consider that it cannot be said that any approval was given by the House to the decision in the *Buchanan* case except to the extent that it held that there is a rule of law which precludes a state from suing in another state for taxes due under the law of the first state. No countenance was given in *Government of India v Taylor*, in *Rossano's* case [1963] 2 QB 352 nor in *Brokaw v Seatrain UK Ltd* [1971] 2 QB 476 to the suggestion that an action in this country could be properly described as the indirect enforcement of a penal or revenue law in another country when no claim under that law remained unsatisfied. The existence of such unsatisfied claim to the satisfaction of which the proceeds of the action will be applied appears to me to be an essential feature of the principle enunciated in the

> *Buchanan* case [1955] AC 516 for refusing to allow the action to succeed."

Lord Mackay went on to note that there was there no allegation of any unsatisfied claim under the law of Spain.

29. This approach also accords with the approach of Lord Templeman with whose speech Lords Scarman, Bridge and Brandon also agreed. Lord Templeman, while doubting that the Spanish law was penal, agreed with the judge at first instance, Nourse J, that the object of the expropriatory decrees had been achieved by perfection of the State's title in Spain and that accordingly, "on a simple but compelling view of the matter there is nothing left to enforce" (at pp 428G-429A). Furthermore, in rejecting a submission that *Buchanan* applied because the object of the plaintiffs was to collect assets which would indirectly enure for the benefit of a foreign government, Lord Templeman stated (at p 433B-D):

> "In my opinion, however, the *Buchanan* case only concerns a revenue claim.
>
> The principle that a country cannot collect its taxes outside its territories cannot be used to frustrate or contradict the principle that the courts of this country will recognise the law of compulsory acquisition of a foreign country of assets within the foreign country and will accept and enforce the consequences of that compulsory acquisition."

30. *QRS 1 ApS v Frandsen* [1999] 1 WLR 2169, on which the appellants rely, was, on its facts, indistinguishable from *Buchanan*. The Danish tax authority claimed in this jurisdiction against the plaintiff companies, all incorporated in Denmark and in compulsory liquidation, substantial sums in respect of corporation tax and interest. The Danish tax authority appointed a liquidator and funded the proceedings brought by the plaintiff companies in England against the defendant, the former owner of the companies who was accused of asset stripping. The only creditor in whose interest the liquidator was acting was the Danish tax authority. In the Court of Appeal Simon Brown LJ (with whom Auld and Thorpe LJJ agreed) considered (at p 2173) that *Buchanan* was indistinguishable and continued:

> "It can, therefore, equally be said of the plaintiffs' claim here as was said of the liquidator's claim in the *Buchanan* case, 'that the whole object of the suit is to collect tax for a foreign revenue, and … this will be the sole result of a decision in

> favour of the plaintiff …' (per Kingsmill Moore J [1955] AC 516, 529.)"

Simon Brown LJ roundly rejected a submission that Rule 3 of *Dicey and Morris* (now Rule 20 of *Dicey, Morris & Collins*), at least insofar as it extended to indirect enforcement, was no longer to be regarded as sound. He then emphasised "the relative narrowness of [the rule] in so far as it applies to this particular kind of indirect enforcement" (at p 2176C-D). He then cited extensive passages from the speech of Lord Mackay in *Williams & Humbert*, including the passages cited above, and observed that he readily understood Lord Mackay's insistence on the narrowness of the *Buchanan* decision. There is nothing here to assist the appellants.

31. The same is true of *Ben Nevis (Holdings) Ltd v Commissioners for HM Revenue and Customs* [2013] EWCA Civ 578; [2013] STC 1579. The revenue rule had no application in that case, which concerned an international agreement which permitted foreign tax claims to be brought in this jurisdiction. The case fell within an acknowledged exception to the revenue rule.

32. In *Webb v Webb* [2020] UKPC 22; [2021] 1 FLR 448 Lord Kitchin delivering the opinion of the Judicial Committee of the Privy Council stated the principle in the following terms (at para 32):

> "It is a long-standing principle of the common law that the courts will not collect taxes of a foreign state for the benefit of the sovereign of that foreign state."

Once again, this formulation is consistent with the restricted scope of the principle as identified by Lord Mackay.

33. The appellants drew attention to two US authorities which, they claimed, applied the revenue rule where there was no claim for taxes due. However, on a close examination this proposition is simply not borne out. Each is a case in which an action was brought to recover indirectly taxes due and owing.

34. In *Attorney General of Canada v R J Reynolds* 268 F 3d 103 (2d Cir 2001) the Attorney General sued on behalf of Canada in the New York courts under the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 USC para 1961 et seq, "for damages based on lost tax revenue and additional law enforcement costs" alleged to have arisen from a scheme facilitated by the defendants to avoid Canadian cigarette taxes by smuggling cigarettes across the border for sale on the Canadian black market. The US Court of Appeals, Second Circuit observed that Canada's action proceeded on

the premise that the taxes it allegedly lost as a result of the defendants' alleged violations fell within RICO's damages provisions. The court held that as the relief sought by Canada would be foreclosed by the revenue rule in the absence of RICO, and as there was no indication that Congress intended RICO to abrogate the revenue rule with respect to claims brought by foreign sovereigns under the statute, the court had no choice but to conclude that RICO may not be used by Canada to seek recovery of lost tax revenues and tax enforcement costs as RICO damages. The following passages from the judgment of Judge Katzmann leave no doubt that these proceedings were for the recovery of taxes due to Canada.

> "As to direct enforcement, Canada alleges that '[d]efendants evaded the payment of customs and excise tax and duty owed directly to Canada. This evasion was a direct cause of lost revenue to Canada … Defendants' conduct forced Canada to roll back tobacco taxes in 1994, resulting in lost revenue into the future.' As the Canadian Supreme Court said in *Harden* [[1963] SCR 366, 371 (Can)], we must look to the 'object' of the claim. When we do so, we see that, at bottom, Canada would have a United States court require defendants to reimburse Canada for its unpaid taxes, plus a significant penalty due to RICO's treble damages provision. Thus, Canada's object is clearly to recover allegedly unpaid taxes.
>
> We also conclude that Canada's claim for damages based on law enforcement costs is in essence an indirect attempt to have a United States court enforce Canadian revenue laws, an exercise barred by the revenue rule." (at p 131)

With regard to the claim in respect of the cost of law enforcement, Judge Katzmann observed:

> "We do not believe that the mechanism for the enforcement of a tax law can be so easily separated from the tax law itself. It would certainly be anomalous for the Court to permit the collection of the law enforcement costs while holding that the object of those law enforcement efforts was uncollectable. Particularly in light of the separation of powers and foreign relations concerns discussed above, we must decline to allow Canada to indirectly enforce its revenue laws simply by pleading tort damages based on the costs of enforcing those laws." (at p 132)

35. *European Community v R J R Nabisco, Inc* 8 ITLR 323 (US CA (2d Cir)), 13 September 2005 was a very similar claim. The European Community and a number of States brought actions in the United States pursuant to RICO against tobacco companies for loss of tobacco revenue duty, alleging that tobacco companies directed and facilitated the smuggling of contraband cigarettes. The US Court of Appeals, Second Circuit, held that RICO barred civil suits by foreign governments claiming violation of their tax laws, the whole purpose of which was the collection of tax revenue and the recovery of associated costs. Judge Sotomayor emphasised at p 330 that the whole object of the suit was to collect tax revenue and the costs associated with its collection.

36. I consider that the respondent is correct in its submission that the revenue rule is limited in the manner described by Lord Mackay in *Williams & Humbert*. The revenue rule only applies to proceedings in which there is an unsatisfied demand for tax which foreign tax authorities seek directly or indirectly to recover. In my view, the statement of principle by Lord Mackay cited above forms a part of the ratio decidendi of the decision in *Williams & Humbert*; it is an essential step in the reasoning which supports the decision. In any event, it is consistent with what I consider to be the rationale of the revenue rule. If there is no claim, directly or indirectly, to recover tax which is due, there is no attempt to assert the sovereign authority of the State which imposed the taxes within the territory of another. It is also consistent with the authorities considered above. Furthermore, there can be no justification for extending this exclusionary rule beyond what is required by its rationale. Finally, this limitation on the revenue rule is consistent with the principle, which is well established and which was common ground before us, that the revenue rule does not prohibit courts in this jurisdiction from recognising, as opposed to enforcing, a foreign tax law, provided that such recognition does not otherwise conflict with the public policy of this jurisdiction.

Application to facts of this case

37. Turning to the application of these principles to the facts of this case, the essential question is whether the substance of the respondent's claim as pleaded is a claim for the direct or indirect enforcement of foreign tax laws. For this purpose, it must be assumed that the respondent will be able to prove at trial the facts alleged in its pleadings. In my view, it clearly is not a claim for the direct or indirect enforcement of foreign tax laws.

38. An examination of the substance of the respondent's pleaded claim shows that it is not a claim for sums due as tax in Danish law, nor is it a claim that the appellants are liable to the respondent because they have cheated the respondent out of tax which was due to it. It is not alleged by the respondent that any sums are due from the appellants as tax, nor is it alleged that any of the appellants were at any time under a liability to pay tax. Indeed, on the pleaded case there never has been any unpaid tax in this case. The respondent has been paid all the tax to which it was entitled by the genuine shareholders

in the Danish companies. The substance of the claim is not to recover tax but to recover payments made by the respondent which were induced by fraud and to which the recipients were not entitled on any basis. It is a claim by a victim of fraud for reimbursement of the sums of which it has been defrauded.

39. A complete answer to the appellants' objection under the revenue rule to the admissibility of this claim is provided by the fact that there are no taxes due from the appellants. This essential requirement for the application of the revenue rule is missing. On the respondent's pleaded case, there never were any taxes due from the appellants. Those parties who made withholding tax refund applications and who received what may be described as "refunds", did not hold shares in the relevant Danish companies, had not received dividends net of withholding tax, were not subject to any liability to pay withholding tax, had not suffered deduction of any withholding tax and had no entitlement to recover any withholding tax. As a result, the present proceedings do not involve the indirect enforcement of any liability for fraudulently evaded tax. On the respondent's pleaded case there never was any tax payable by any of the appellants, let alone evaded. The Danish tax system undoubtedly provided the context and the opportunity for the alleged fraud and the operation of the fraud can be understood only by an examination of that system. It may well be that at the trial of this action it will be necessary to address that in detail. However, as we have seen, there is no objection to the recognition of foreign tax laws in that way. Because the present proceedings do not involve an unsatisfied claim to pay taxes due in Denmark, they fall outside the scope of the revenue rule.

40. It was common ground before us, correctly in my view, that where the revenue rule otherwise applies fraud does not of itself remove a claim from the operation of the revenue rule. A claim to recover tax which had been fraudulently evaded would fall within the rule. However, in the present case there was no fraudulent evasion of tax because the applicants for "refunds" were never taxpayers.

41. The appellants seek to circumvent this difficulty by nevertheless portraying the refund applicants as taxpayers. It is said that by making applications for withholding tax refund applications the applicants brought themselves within the Danish tax system and became Danish taxpayers. It is also said that the respondent by paying "refunds" accepted them into the Danish tax system. It is further said that in rescinding the "refunds" the respondent was acting in the capacity of a taxing authority. The appellants therefore maintain that, in all the circumstances, the recipients of "refunds" and the respondent were in the relationship of taxpayer and taxing authority. As the Court of Appeal pointed out (at para 136) this submission is misconceived. The applications for "refunds" were all based on the lie that the applicants had paid tax in the first place which, on the respondent's pleaded case, they had not. This attempt to portray the applicants as taxpayers cannot bind the respondent as the victim of their fraud and the applicants cannot take advantage of their own wrongdoing in order to bring themselves within the revenue rule.

42.     Nor are the appellants assisted by seeking to mischaracterise the claim as the vindication of the respondent's "asserted right to recover overpaid refunds". The appellants were not in a tax relationship with the respondent. The present claim for damages and restitution lacks the character of a charge by a foreign state pursuant to its tax laws; it is, rather, a claim founded on the appellants' liability for their own wrongdoing. Furthermore, although this would not of itself be conclusive, it is significant that the claim does not rely on any Danish legislation as giving rise to an obligation to repay. The claim is put on the basis of common law causes of action in English law; an alternative case is advanced on the basis of Danish private law. These private law causes of action in English or Danish law are enjoyed by all legal and natural persons. There is no question of Denmark invoking its sovereign rights.

43.     The matter is summed up admirably by the Chancellor in the Court of Appeal (at para 143):

> "Whilst, because it was induced to do what it did by fraud, SKAT thought it was making repayments or refunds to the Solo etc Applicants, they were not in fact repayments or refunds at all, but abstraction of monies by the fraudsters, … , in the same way as if they had broken into SKAT's safe and stolen the monies."

44.     On behalf of the appellants, Mr Kieron Beal KC placed at the forefront of his submissions reliance upon a case comment by Lord Collins of Mapesbury in the Law Quarterly Review ("The enforcement of foreign revenue laws", (2014) 130 LQR 353). This was a commentary on the decision of the Court of Justice of the European Union ("CJEU") in Case C-49/12 *Revenue and Customs Commissioners v Sunico ApS* [2014] QB 391. The Revenue brought proceedings in England claiming that a Danish company, Sunico, had been party to a fraud in the supply of mobile phones and that the Revenue had, as a result, been deprived of about £40 million in unpaid VAT. It was not alleged that Sunico itself had been liable for the tax, but it was alleged to have been part of a fraudulent conspiracy. In the course of the litigation the Revenue obtained attachment orders from a Danish court over assets in Denmark belonging to Sunico in order to secure payment of the claim for damages, which corresponded to the amount of VAT claimed to have been lost by the Revenue. The question whether an English judgment in favour of the Revenue would be enforceable in Denmark under the Agreement with Denmark (Agreement between the European Community and the Kingdom of Denmark on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (2005)) parallel to the Brussels I Regulation (Council Regulation (EC) No 44/2001) was referred by the Danish court to the CJEU. In particular, the Danish Court asked whether the scope of the Agreement extended to cover a case in which the authorities of a member state brought a claim for damages against undertakings and natural persons resident in another member state on the basis of an allegation, made pursuant to the national law of the first member state, of a tortious

conspiracy to defraud consisting in involvement in the withholding of VAT due to the first member state.

45.    The CJEU considered that proceedings by a public authority in the exercise of public powers were not a civil or commercial matter within the scope of the Agreement. However, "civil and commercial matters" within article 1(1) included an action in which a public authority of one member state claimed for loss caused by a tortious conspiracy to commit VAT fraud. The legal relationship between the Revenue and the defendants was not based on public law involving the exercise of powers of a public authority for three reasons. First, the action against Sunico was based not on UK VAT law but on Sunico's involvement in a conspiracy to defraud (para 37). Secondly, Sunico was not subject to VAT under the laws of the United Kingdom (para 38). Thirdly, in the context of that legal relationship the Revenue did not exercise any exceptional powers by comparison with the rules applicable to the relationships between persons governed by private law (para 39). It concluded therefore that the relationship between the Revenue and Sunico was not based on public law, in this instance tax law, involving the exercise of powers of a public authority. Moreover, the fact that the amount of the damages claimed corresponded to the amount of output VAT payable by a taxable person in the United Kingdom did not mean that the action involved the exercise of public authority, because the legal relationship between the Revenue and Sunico was not governed by UK VAT law but by the law of tort (para 41).

46.    Lord Collins commented (p 354):

> "This is a surprising result. The test for what amounts to a civil or commercial matter has no direct equivalent in the English conflict of laws, but the rule in England is that the English court will not allow a claim for the direct or indirect enforcement of a penal, revenue or other public law of a foreign state, and no doubt if an English court were considering an action by (say) the Irish Government in a similar claim against an English company it would regard the claim as being an inadmissible claim for the indirect enforcement of foreign taxes; …"

47.    The commentary by Lord Collins does not assist the appellants in this case, however. In *Sunico* there had been a fraud on the taxing authority which resulted in the evasion of tax which was due. In English law neither the allegation of fraud nor the fact that the claim was founded on common law causes of action as opposed to a statutory entitlement to recover tax would take the claim outside the ambit of the revenue rule. The claim was a claim to recover, albeit indirectly, tax which was due and which had been fraudulently evaded. The observations of Lord Collins in relation to the decision of the CJEU therefore have considerable force; in English law that would be an

inadmissible claim for the indirect enforcement of foreign tax laws. By contrast, in the present case, no tax is or ever was due, unpaid or evaded. The Danish taxation system simply provided the context for the fraud. For the reasons given above, the revenue rule is inapplicable.

48.    In the context of his submission that the appellants are within the scope of a foreign tax regime because they were recognised as being entitled to a refund, Mr Beal KC sought to draw a more general analogy with the VAT regime and to rely on cases concerning missing trader, intra-Community fraud. In particular, he drew attention to a number of decisions including *Mobilx Ltd (in administration) v Revenue and Customs Commissioners* [2010] EWCA Civ 517; [2010] STC 1436; *Natwest Markets plc v Bilta (UK) Ltd (in liquidation)* [2021] EWCA Civ 680; *Revenue and Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] AC 1174. He submitted that the decision of the Court of Appeal in the present proceedings is inconsistent with the VAT regime in that claims by a foreign taxing authority to recover sums due because of wrongful deduction of input tax would necessarily be caught by the revenue rule. They would, he submitted, be attempts to enforce a liability that arises only within a foreign tax regime. However, as Lord Pannick explained, this is a false analogy and none of these authorities assists the appellants. First, none of the cases was concerned with the revenue rule which was not raised or considered. Secondly, the cases all concerned claims where tax had been evaded by taxpayers closely linked to a party to the proceedings. Thirdly, the cases do not assist because they are all concerned with specific statutory regimes and directives relating to VAT which impose a charge to tax at each stage in the chain of production of goods and services. In the present case, by contrast, no unpaid tax is being claimed.

49.    Finally, in this regard, I note that the same conclusion as to the non-application of the revenue rule has been arrived at for similar reasons in parallel litigation in relation to the same subject matter in the United States and in Malaysia.

50.    *In re Skat Tax Refund Scheme Litigation* 356 Fed Supp, 3d 300 (2019) concerned parallel proceedings by the present respondent in the US District Court, S D New York. District Judge Lewis A Kaplan dismissed a motion to dismiss the actions on the basis of the US version of the revenue rule. The judge held that if the plaintiff could prove that the defendants never in fact owned the relevant Danish stocks the revenue rule would not apply "because the substance of the claims would be for garden variety commercial fraud" (at p 308). Judge Kaplan observed (at p 311):

> "These actions plainly do not seek direct enforcement of Danish tax law. The defendants' attempt to frame them as seeking to recover lost tax revenue – when the only reason the money was lost is because the defendants in effect allegedly stole it, and the only reason it supposedly concerns tax

> revenue is because the defendants' alleged victim was the Danish tax authority – is too clever by half."

51. Similarly, in *Customs and Tax Administration of The Kingdom of Denmark v Saling Capital Ltd* [2021] MLJU 856, which concerned parallel proceedings brought in Malaysia by the respondent in the present appeal, the Court of Appeal (Putrajaya) rejected a submission that, in claiming to recover Danish withholding tax refunds wrongly paid out, it was seeking to claim or enforce its revenue laws directly or indirectly in Malaysia. Addressing the substance of the pleaded case and the evidence filed, it considered (at paras 80, 85, 86) that the claim was an attempt to seek redress and remedies under the laws recognised by Malaysia, in particular, the tort of deceit or fraudulent misrepresentation and was not based on a debt accruing from taxes due and owing or tax evasion under the tax regime of Denmark. It observed that the claim did not arise from the tax regime of Denmark because the defendants "never owned Danish shares and were therefore never within the Danish tax regime to begin with". The claim for the recovery of monies or property was no different from that which could be brought by any private individual or entity, being the victim of a fraud and, as a result, the revenue rule had no application.

52. For these reasons, I consider that the revenue rule has no application to this case.

Ground 2 – the Court of Appeal erred in finding that Skatteforvaltningen was not exercising sovereign rights when advancing its claims. It failed to recognise Skatteforvaltningen's status as a privileged litigant with extensive executive powers which it deployed to assist in the prosecution of its claim.

53. Under this second ground of appeal the appellants rely on the broader principle reflected in *Dicey, Morris & Collins* Rule 20, namely that an action for the enforcement, either directly or indirectly, of a public law of a foreign State is inadmissible: the sovereign authority rule. They submit that the Court of Appeal erred in concluding that the respondent's claims did not involve an act of a sovereign character, the enforcement of a sovereign right or the attempted vindication of a sovereign power. In their submission the Court of Appeal was wrong to treat the respondent as making a claim as the putative victim of fraud for the restitution of monies of which it alleged it had been defrauded, in the same way as if it were a private citizen. They submit that the claims are necessarily dependent on a series of executive and legislative acts undertaken by the Danish legislature and the respondent which have the character of sovereign acts. In particular, it is said that Denmark exercised sovereign rights in establishing a tax regime involving withholding tax, in setting the tax rate and in ensuring that Danish companies accounted for that tax at source. The Danish legislature opted to levy tax at a "full" rate and then permit applications for refunds where an entitlement was asserted. It is said that the fact that the claims are civil ones raising causes of action based on tort and equity cannot disguise the sovereign or governmental character of the steps which the

respondent is taking. The appellants submit that the respondent is inviting the English court "to recognise its prerogative right to recover sums of money which have been imposed as tax by Danish legislation".

54. For the reasons set out above in relation to ground 1, this is not a claim to recover sums of money which have been imposed as tax by Danish legislation. Nor is it, as the appellants put it, "a claim to recover specific sums of overpaid tax which [Skatteforvaltningen] alleges were wrongly paid out". If the present claim falls outside the scope of the revenue rule, it might be thought that it would require exceptional circumstances to bring it within the wider sovereign authority rule stated by *Dicey, Morris & Collins*. However, in any event, the claim pursued here is clearly not of a sovereign character.

55. The distinction between sovereign and non-sovereign acts of a foreign state forms the basis of the decision of the Court of Appeal in *Mbasogo v Logo Ltd* [2007] QB 846 where the Republic of Equatorial Guinea and its head of State brought private law claims, including claims in conspiracy, for damages arising out of the alleged acts of the defendants in support of a failed coup d'état. The Court of Appeal held that the claims of Equatorial Guinea to vindicate its national security interests amounted to the exercise of sovereign authority in the territory of a foreign state which was not justiciable in the English courts. Sir Anthony Clarke MR, delivering the judgment of the Court of Appeal, referred (at para 27) to *Emperor of Austria v Day and Kossuth* (1861) 3 De GF & J 217 as "an authority which recognises the fundamental distinction between an action which amounts to the exercise of sovereign authority in the territory of another and an action brought to protect property rights, such as might be brought by an individual". He stated the principle as follows (at para 50):

> "The critical question is whether in bringing a claim, a claimant is doing an act which is of a sovereign character or which is done by virtue of sovereign authority; and whether the claim involves the exercise or assertion of a sovereign right. If so, then the court will not determine or enforce the claim. On the other hand, if in bringing the claim the claimant is not doing an act which is of a sovereign character or by virtue of sovereign authority and the claim does not involve the exercise or assertion of a sovereign right and the claim does not seek to vindicate a sovereign act or acts, then the court will both determine and enforce it. As we see it, that was the broad distinction of principle which the court was seeking to draw in the *Emperor of Austria* case 3 De GF & J 217. In deciding how to characterise a claim, the court must of course examine its substance, and not be misled by appearances: see for example, *Huntington v Attrill* [1893] AC 150."

56.    The Court of Appeal in *Mbasogo* (at para 42) drew particular attention to and approved (as did the Court of Appeal in *Attorney General of New Zealand v Ortiz* [1984] AC 1) a passage in an article by Dr F A Mann, "Prerogative Rights of Foreign States and the Conflict of Laws" (1954) 40 Tr Gro Soc 25 (reprinted in his *Studies in International Law* (1973) pp 492-514) in which Dr Mann stated, at p 34:

> "Where the foreign State pursues a right that by its nature could equally well belong to an individual, no question of a prerogative claim arises and the State's access to the courts is unrestricted. Thus a State whose property is in the defendant's possession can recover it by an action in detinue. A State which has a contractual claim against the defendant is at liberty to recover the money due to it. If a State's ship has been damaged in a collision, an action for damages undoubtedly lies. On the other hand, a foreign State cannot enforce in England such rights as are founded upon its peculiar powers of prerogative. Claims for the payment of penalties, for the recovery of customs duties or the satisfaction of tax liabilities are, of course, the most firmly established examples of this principle."

57.    Dr Mann returned to this subject in a later article, "The International Enforcement of Public Rights" (1987) 19 New York University Journal of International Law and Politics 603, where he concluded at pp 629-630:

> "The decisive question is whether the plaintiff asserts a claim that, by its nature, involves the assertion of a sovereign right. Where the state's claims arise from '*actus qui a rege sed ut a quovis alio fiant*' [H Grotius, De Jure Belli ac Pacis bk II, ch 14, vi (1625) (the quotation translates, roughly, to 'acts that may be done [not only] by the king but also by any one else')] then they are capable of international enforcement.

Dr Mann went on to state (at p 630):

> "The true question is whether in substance the claim asserts a public right. If it does, then the rule stated by Dicey and Morris in regard to English law should be applied: 'English courts have no jurisdiction to entertain an action … for the enforcement, either directly or indirectly, of a penal, revenue, or other public law of a foreign State'."

58.    In the present case, the appellants are undoubtedly able to point to prior exercises of sovereign power by Denmark in creating its laws relating to the taxation of dividends and in operating the tax system. This, however, merely provides the context for the present claims. The substance of the claims, as we have seen, does not involve any act of a sovereign character, any exercise or enforcement of a sovereign right, or any vindication of sovereign power. On the contrary, the respondent is simply bringing restitutionary claims to recover monies of which it has been defrauded, a course open to any private citizen who had been similarly defrauded. Furthermore, as the Court of Appeal pointed out, the attempt to challenge that conclusion by seeking to characterise the payment of the refunds as sovereign acts does not assist the appellants. First, even if, notwithstanding the fact they were induced by fraud, the making of the payments was correctly characterised as a sovereign act, there is no reason why an attempt to recover the payments should be considered a vindication of sovereign power. Secondly, the respondent is not seeking to vindicate the payments but to invalidate them on grounds of fraud.

59.    In this regard, Lord Pannick drew to the court's attention a US decision, *Nordrhein-Westfalen v Rosenthal* 17 AD 2d 145 (NY App Div 1962); 232 NYS 2d 963, which concerned two awards made by the plaintiff, one of the Federated States of the Federal Republic of Germany, under the Federal Indemnification Law, to the defendant as a victim of Nazi persecution. Section 7 of the Indemnification Law expressly provided for the revocation and recovery of awards induced by false or misleading statements. The plaintiff sued the defendant in New York alleging both the revocation of the award and fraud on the part of the defendant. The defendant questioned the jurisdictional basis of the revocation award. The Appellate Division of the Supreme Court of New York, First Department, confined its consideration to the first cause of action. It held that the defendant must be held to have submitted to the revocation proceedings. It held, further, that there was no contravention of domestic public policy in giving effect to the revocation. It observed (at pp 147-148) that while the plaintiff was a sovereign, its aim was merely the restoration of an outlay wrongfully obtained from it. The object of the action was not vindication of the public justice but reparation to one aggrieved. (*Nordrhein-Westfalen v Rosenthal* was applied in *Harvardsky Prumyslovy Holding AS v Kozeny* 983 NYS 2d 240 (2014).)

60.    *Nordrhein-Westfalen v Rosenthal* supports Lord Pannick's submission that reliance on a statutory cause of action conferred by a foreign State's law for the purposes of recovering an overpayment by the State is not a sovereign act. In the present case, however, the point does not arise. The respondent does not rely on any statutory cause of action in Danish law entitling it to recover the sums of which it claims to have been defrauded. Indeed, it is expressly pleaded on behalf of the respondent in these proceedings that no such cause of action exists. The respondent has pleaded that there is no unpaid tax or unsatisfied tax debt due under Danish revenue law from any of the defendants. In addition, it has pleaded that it is not entitled under Danish law to issue a tax assessment to any of the defendants or make any other public law decision obliging them under Danish revenue or public law to pay the sums sought in these proceedings

(Re-Amended Reply to the Defence of Mr Knott and Mr Hoogewerf, para 5.1(b)). As a result, it is not necessary to express a concluded view as to whether reliance on a statutory cause of action for recovery of an overpayment was correctly considered in *Nordrhein-Westfalen* not to be a sovereign act. I should, however, add that, contrary to the submission of Mr Beal, I do not understand Dr Mann in his 1987 article at pp 624-625 to cast doubt on that decision.

61. It was next submitted on behalf of the appellants that the respondent has used sovereign powers to obtain evidence in the present case. In particular, it is said that the respondent has invoked mutual assistance agreements at the international level in order to obtain information from a number of other States. Here I find myself once again in agreement with the observations of the Chancellor in the Court of Appeal. The respondent has been open with the defendants as to the information it has obtained and has not sought to use it in these proceedings so as to give itself some special advantage only available to a sovereign body. More fundamentally, however, whether the respondent's claims fall within the scope of the wider sovereign authority rule stated in *Dicey, Morris & Collins*, Rule 20 is a question of the characterisation of the substance of the claims brought. The use of powers of investigation is, at most, of merely peripheral significance in that regard.

62. Lord Pannick submits in the alternative that, if the bringing of these proceedings has involved an exercise of sovereign authority, they nevertheless fall within a public policy exception to the broader sovereign authority rule. He relies upon *Government of the Islamic Republic of Iran v The Barakat Galleries Ltd* [2009] QB 22 at paras 151 ff, and upon the statement at para 8-021 of *Dicey, Morris & Collins* that the result of the authorities in the Court of Appeal is that the English court will not enforce a claim based on foreign public law if the claim involves the exercise or assertion of a sovereign right, unless it is contrary to public policy for the claim to be shut out. (It was common ground before us that any such public policy exception does not extend to the narrower revenue rule. See *Williams & Humbert* per Lord Templeman at p 428F.) Lord Pannick points to the fact that a large number of the individuals who are alleged to have participated in these frauds were resident in this jurisdiction or British nationals or both, and that the majority of "refunds" paid out were received into bank accounts in this jurisdiction. In essence, he submits that it would be contrary to public policy to deny access to the courts of this jurisdiction to foreign public authorities which have been defrauded in this way. In the circumstances, however, it is not necessary to consider whether the present proceedings fall within such a public policy exception.

63. Finally, it is necessary to say something about a further submission on behalf of the appellants which is advanced under both the first and second grounds of appeal. On behalf of the appellants, Mr Beal asked rhetorically what the respondent could have done "to enforce the repayment of the tax refund it alleges was wrongly paid out" if it could not bring a civil claim in this jurisdiction. In response he drew attention to a number of international arrangements, in particular Council Directive 2010/24/EU of 16

March 2010 concerning mutual assistance for the recovery of claims relating to taxes, duties and other measures ("MARD"), the Convention on Mutual Administrative Assistance in Tax Matters, 1 June 2011 and the UK/Denmark Tax Convention, 1 January 2001. Lord Pannick addressed us in some detail as to whether these international arrangements had any application to the facts of the present case. It is not necessary to address these submissions, however. The short answer is that these international instruments are of no relevance to the issues this court has to decide. First, as Judge Kaplan observed in response to a similar submission in *In re Skat Tax Refund Scheme Litigation* "the US-Denmark Treaty and its provisions for 'assistance in the collection of a revenue claim' are irrelevant because the plaintiff's claims do not seek to collect tax owed by the defendants and covered by the treaty" (para 18). Secondly, the purpose of these international arrangements is to assist States to recover sums due by conferring additional powers; they do not impose barriers to other means of recovery. They have no bearing on the question whether the revenue rule or the wider sovereign authority rule applies in the circumstances of this case. For the reasons set out above, I have come to the firm conclusion that neither of those rules applies and that the present proceedings are admissible.

Ground 3: the Court of Appeal accordingly erred in overturning the judge's findings that the claims are inadmissible under the law stated in *Dicey, Morris & Collins* Rule 20(1). The Court of Appeal was wrong to conclude that an allegation of fraudulent extraction of tax from a state sufficed to render *Dicey, Morris & Collins* Rule 20(1) inapplicable.

64. This ground adds nothing of substance to the matters addressed under Grounds 1 and 2.

Conclusion

65. I would therefore dismiss the appeal.



**Michaelmas Term**
[2022] UKPC 47
**Privy Council Appeals No 0064 and 0065 of 2020**

# JUDGMENT

# Grand View Private Trust Co Ltd and another (Respondents) *v* Wen-Young Wong and others (Appellants) (Bermuda)
# Grand View Private Trust Co Ltd and others (Respondents) *v* Wong and others (Appellants) (No 2) (Bermuda)

## From the Court of Appeal for Bermuda

before

**Lord Hodge**
**Lord Sales**
**Lord Burrows**
**Lady Rose**
**Lord Richards**

**JUDGMENT GIVEN ON**
**8 December 2022**

**Heard on 8, 9 and 10 March 2022**

**JCPC 2020/0064**

*Appellants (Wong, Wen-Young, aka Winston Wong, and Wong, Ray-Tseng, aka Riley Wong)*
Elspeth Talbot Rice KC
Dakis Hagen KC
Rod Attride-Stirling
Emma Hargreaves
Stephanie Thompson
(Instructed by Baker & McKenzie LLP (London) and ASW Law Ltd (Bermuda))

*First Respondent (Grand View Private Trust Co Ltd)*
Mark Howard KC
Jonathan Adkin KC
Karyl Nairn KC
Paul Smith
Adil Mohamedbhai
Niranjan Venkatesan
(Instructed by Skadden Arps Slate Meagher & Flom (UK) LLP)

*Second Respondent (Wu Wang, Hsueh-Min, aka Jennifer Wang)* did not appear and was not represented

*Third Respondent (Wang, Ven-Jiao, aka Tony Wang)*
Richard Wilson KC
James Weale
Fozeia Rana-Fahy
Charlotte Beynon
(Instructed by MJM Ltd (Bermuda) and Stewarts Law LLP)

**JCPC 2020/0065**

*Appellant (Wang, Ven-Jiao, aka Tony Wang)*
Richard Wilson KC
James Weale
Fozeia Rana-Fahy
Charlotte Beynon
(Instructed by MJM Ltd (Bermuda) and Stewarts Law LLP)

*First Respondent (Grand View Private Trust Co Ltd)*
Mark Howard KC
Jonathan Adkin KC
Karyl Nairn KC

Paul Smith
Adil Mohamedbhai
Niranjan Venkatesan
(Instructed by Skadden Arps Slate Meagher & Flom (UK) LLP)

*Second Respondent (Wu Wang, Hsueh-Min, aka Jennifer Wang)* did not appear and was not represented

*Third and Fourth Respondents (Wong, Wen-Young, aka Winston Wong, and Wong, Ray-Tseng, aka Riley Wong)*
Elspeth Talbot Rice KC
Dakis Hagen KC
Rod Attride-Stirling
Emma Hargreaves
Stephanie Thompson
(Instructed by Baker & McKenzie LLP (London) and ASW Law Ltd (Bermuda))

**LORD RICHARDS (with whom Lord Hodge, Lord Sales, Lord Burrows and Lady Rose agree):**

*Introduction*

1. It is a fundamental principle of equity that a fiduciary power may be exercised only for a purpose for which the power has been conferred. The main issue on this appeal is whether the trustee of a settlement exercised for a proper purpose an express power contained in the trust deed to add and exclude discretionary objects, when it simultaneously added a purpose trust as an object and removed all the members of a family who had until then comprised the entire class of objects. This was immediately followed by the trustee's exercise of its discretionary dispositive power to appoint the whole trust fund to the purpose trust, thus bringing the settlement to an end.

2. At first instance, Kawaley AJ (formerly Chief Justice), sitting in the Supreme Court of Bermuda, held, on a summary judgment application, that the trustee had invalidly exercised its powers to add and exclude discretionary objects and its powers of appointment, and declared the trustee's acts in those respects to be void and of no effect. An appeal against this decision was allowed by the Court of Appeal of Bermuda (Sir Christopher Clarke P, Smellie JA and Subair Williams JA), which also granted leave to appeal to the Board.

*The facts*

3. Many of the relevant facts are not in dispute and, where they are in dispute, the appellants accept that, for the purposes of their application for summary judgment, they must accept as true the facts as stated in the respondent's evidence.

4. The settlement was created by a declaration of trust dated 10 May 2001 (the GRT trust deed) which provided that it was to be known as The Global Resource Trust No 1 (the GRT). Although the trust deed was made, and the trusts declared, by the trustee, Global Resource Private Trust Co Ltd (the GRT trustee), it is accepted that the true economic settlors were two brothers, YC Wang and YT Wang (collectively, the Founders). Starting in the 1950s, they had built a group of companies, which came to be known as the Formosa Plastics Group (FPG), into one of the largest business conglomerates in Taiwan. YC Wang, who died in 2008, and YT Wang, who died in 2014, were respectively the chairman and president of FPG.

5.      Shortly after the GRT was established, Grid Investors Corp (Grid), an investment holding company which was ultimately owned by the Founders and which owned shares in FPG companies (FPG shares), was transferred to the GRT trustee and remained the principal asset of the GRT. Grid's holding of FPG shares was then worth some US$90 million but has since increased significantly in value, being worth some US$560 million at the time of the appeal in Bermuda.

6.      Reference to the detailed terms of the GRT trust deed is made below, but at this stage it is sufficient to note those persons identified in the trust deed as the beneficiaries and discretionary objects of the GRT. During the trust period of 100 years, the trustee had a discretionary power to apply the whole or part of the capital and income of the fund to or for the benefit of the children and remoter issue of the Founders. The power to add to or exclude from this class "any person or class or description of persons" is the power at issue on this appeal. No such power existed as regards the ultimate beneficiaries who had a fixed, contingent interest in the trust assets, if any, at the expiry of the trust period. They were specified as the children and remoter issue of the Founders then living, in terms which are set out later in this judgment.

7.      On the same day as the GRT was established, another Bermuda-based trust was established at the direction of the Founders. By a deed dated 10 May 2001, Grand View Private Trust Co Ltd (Grand View) as trustee declared the Wang Family Trust (the WFT). This was something of a misnomer, because it is a purpose trust conferring no benefit on members of the Wang family or any other persons. The purposes included holding and acquiring FPG shares with a view to ensuring the continued growth, prosperity and competitive edge of FPG; providing "mutual assistance to mankind and help to those in need" through assistance to the charities established by the Founders and "improving the standard of living for mankind"; and "to implement and accomplish the Founders Vision" as set out in a statement by the Founders reproduced in a recital to the WFT trust deed. The purposes of this trust are both charitable and non-charitable. Non-charitable purpose trusts are permissible under Bermudian law by virtue of the Trusts (Special Provisions) Act 1989, as amended by the Trusts (Special Provisions) Amendment Act 1998. The trust assets largely comprise shares in investment companies owning between them FPG shares with a total value in May 2001 of some US$567 million, worth over US$3.5 billion at the time of the hearing before the Court of Appeal, assuming the same increase in value as the GRT's indirect holding.

8.      The trustee companies, although separate entities, had common directors, of whom two (Susan Wang and Sandy Wang) were daughters of YC Wang, two (William Wong and Wilfred Wang) were sons of YT Wang, and the fifth (Wen-Hsiung Hung) had a close personal relationship with the Founders and had worked for many years

for the FPG group. Mr Hung died in 2015. The Founders' immediate families are complex and extensive. Between them, they had 17 children.

9.      The circumstances in which the GRT and the WFT were established were described in an affidavit sworn by Susan Wang in opposition to the appellants' application for summary judgment. Its contents are assumed to be true for the purposes of the application. She stated that the Founders "felt strongly that, wherever possible, one must give back to society" and "regarded FPG itself as one of their greatest legacies to Taiwanese society in view of its major contribution to the economic wellbeing of Taiwan". The Founders also established and made very substantial contributions to higher education institutions, hospitals and other charitable foundations.

10.     Significant holdings of FPG shares, worth some US$1.8 billion, were by 2000 held by a number of investment companies controlled by the Founders. Ms Wang says that her father made clear to her that neither of the Founders intended these FPG shares to form part of their estates on their deaths, and specifically that they did not wish to leave them to their heirs by way of inheritance. Instead, they wished them to be applied towards the perpetuation of FPG and the fulfilment of their vision of giving back to society. They hoped that their descendants would assume the role of caretakers or managers of that wealth for the greater good of society. By 2000, the Founders had turned their attention to succession planning, which included putting in place arrangements to perpetuate and formalise the basis on which the investment companies would be held, long into the future.

11.     Following many months of discussions, involving lawyers in New York and Bermuda, it was decided that a significant portion of the assets held by the investment companies should be placed into a Bermuda purpose trust. Ms Wang says that at that time the Founders had it in mind that, as well as providing for the intended purposes, the Bermuda purpose trust would make provision for those family members who served as directors of its corporate trustee to benefit personally in some very limited way, as a means of motivating them to carry out their duties in supporting the growth and prosperity of FPG and the various charitable foundations. In early 2001, the proposal was modified and, as Ms Wang explains:

> "28…At that time, it was decided that, instead of making provision within the Proposed Bermuda Purpose Trust for family members to be incentivised…there would be a separate private Bermuda discretionary trust from which those family members could potentially benefit ("the Proposed Beneficiary Trust"). In particular, it was proposed

that the purposes to which I have referred…should be accomplished by the proposed Bermuda Purpose Trust (which came to be known as the Wang Family Trust), and that any potential benefit for family members should be provided by means of a separate trust, namely the proposed Beneficiary Trust [which] came to be known as the Global Resource Trust and the trustee of that trust came to be known as Global Resource PTC.

29. In broad terms, the structure described in paragraph 28 was designed to align the interests of the Founders' children (as potential beneficiaries of the Global Resource Trust) with the continued growth and performance of the FPG Companies. As I have stated above, the perpetuation of the success of the FPG Companies was one of the primary purposes of the Wang Family Trust. The formation of the Global Resource Trust was intended to provide a basis to motivate the descendants of YC Wang and YT Wang to perpetuate the success of the FPG Companies."

12. In April 2001, "when the proposals were close to being finalised", Ms Wang prepared a detailed memorandum (the April 2001 memorandum) to confirm with the Founders that the proposals reflected their wishes. In the memorandum, Ms Wang explained the structure of the purpose trust, and also explained that

"in addition to the Wang Family Trust, it was now being proposed that the Proposed Beneficiary Trust be established and that, although the planning of this trust had not yet been completed, it was envisaged that it should be for the benefit of the children of the Founders (it being understood that their children would serve as directors of the Wang Family Trust, with William Wong, Wilfred Wang, myself and Sandy Wang serving as the first directors)."

13. The April 2001 memorandum stated as regards the Proposed Beneficiary Trust:

"The other trust is a private trust, the assets of which may be used for any purpose. The plan is [for the trust] to benefit the children of the Chairman and the President. As

matters stand the planning of this trust has not yet been completed."

14. Each of the Founders signed the April 2001 memorandum to signify that they had read it and that they approved the proposals described in it. It was clear to Ms Wang that they fully understood and appreciated the distinction between the effect of the two proposed trusts.

15. In late April or early May 2001, the Founders decided that Grid would be placed in the GRT, as the Proposed Beneficiary Trust, and that seven other investment companies would be transferred into the WFT. The remaining investment companies would be retained but the Founders' intention was that, if the structure of the WFT worked satisfactorily, those companies would be transferred into a Bermuda purpose trust at a later date.

16. As earlier noted, the GRT and WFT were established by the declarations of trust made on 10 May 2001 and, shortly afterwards, the agreed transfers of investment companies were made to their respective trustee companies.

17. Further purpose trusts were established under Bermuda law – one in June 2002 and two in May 2005 – and investment companies owning FPG shares were transferred to them.

18. In September 2005, the GRT trustee resolved to exercise the powers to add and exclude discretionary objects and to appoint the entire fund to the trustee of the WFT. It is this decision and its implementation which are challenged in these proceedings and, for convenience, they are referred to as "the challenged decision".

19. By way of background to this decision, Ms Wang refers to "the Founders' firm intention to leave the vast majority of their wealth to society, rather than to their children and their wives, all of whom were then enjoying ample wealth and privilege". In a letter sent to his children on 20 May 2004, YC Wang expressed the hope that his children agreed and supported his decision "to leave my personal wealth to the public, so that it can continue to promote social progress, improve public welfare, and perpetuate the businesses that I founded, in a way that benefits the staff and society long into the future." Ms Wang's understanding, based on conversations with William Wong and Wilfred Wang, is that similar views were expressed by YT Wang. She also understood from conversations with Mr Hung that he was very much aware "of the Founders' views which were of course reflected in the terms of the purpose trusts which were established in Bermuda".

20.    Ms Wang says that, at the time that further purpose trusts were established in May 2005, her father YC Wang explained to her that

> "(a) after discussing the position with each other and with Mr Hung, the Founders had concluded that it would be damaging to the public's confidence in FPG if the Founders were to relinquish the majority of their personal shareholdings in FPG;
>
> (b) by retaining their personal shareholdings in FPG, however, this meant that when the Founders died, their heirs (including their children) would inherit wealth which was very significantly in excess of the value of Grid Investors; and
>
> (c) the Founders had therefore concluded that there was no longer any need for a private trust for the benefit of their children, in addition to the personal wealth (largely in the form of FPG shareholdings) which their children would inherit upon the Founders' death, and which the Founders hoped would incentivise their children in any event to support FPG."

21.    Ms Wang says that it was apparent from this discussion that the Founders wished the GRT board to take these matters into account in determining the future appointment or distribution of the assets of the GRT. She says that the board gave careful consideration to the matter, after being informed of the Founders' decision to retain their substantial personal shareholdings in FPG, and that they took into account the Founders' view that there was no longer any need for a private trust from which their children could personally benefit. She continues by saying that

> "Having done so, the GRT Board decided that the appropriate course was for the assets of the Global Resource Trust to be transferred to the Wang Family Trust. We considered that there had been a change of circumstances which altered the basis on which the Global Resource Trust had been formed. In particular, (a) the Founders' children would now be inheriting substantial wealth from the Founders in any event; and (b) a private trust for the Founders' children was no longer needed to incentivise them to be interested in the success of FPG,

> given that they would now be inheriting significant shareholdings in the FPG Companies upon the deaths of my father and my uncle….The decision to wind up the Global Resource Trust and to distribute the assets to the Wang Family Trust was supported by, and consistent with the wishes of my father and my uncle."

22.    On 9 May 2005, the directors of the GRT trustee resolved that it be authorised, pursuant to the powers contained in clauses 8 and 9 of the trust deed, to execute an irrevocable deed pursuant to which Grand View as trustee of the WFT would be added as a discretionary object, all the other discretionary objects (the children and remoter issue of the Founders) would be excluded, and all the assets of the GRT would be transferred to Grand View as trustee of the WFT. They further resolved to take all necessary steps to terminate the GRT.

23.    These resolutions were not implemented. Instead, the directors of the GRT trustee signed an instrument entitled "Written Consent of the Directors of [the GRT trustee]" dated 25 September 2005, which stated in recitals that the directors had on 9 May 2005 determined to transfer the assets of the GRT to Grand View as trustee of the WFT, that such transfer had not taken place, and that upon further analysis and discussion, the directors had concluded "that it is in the best interests of the [WFT], "as a beneficiary of the [GRT], that the Trust Fund of the [GRT] be paid and appointed to the [WFT] as a distribution pursuant to the power and authority contained in Sections 3.1 and 4.1 of the Trust". The instrument contained resolutions that the GRT trustee should execute an irrevocable deed pursuant to which all of the assets of the GRT were to be paid and appointed to the WFT and that, following that distribution, the GRT trustee should terminate the GRT.

24.    A further instrument, entitled "Irrevocable Deed by the Trustee of [the GRT]", was executed by the five directors of the GRT trustee. It declared that (i) from 26 September 2005, Grand View as trustee of the WFT was included as a discretionary object, (ii) from the same date, all current and future discretionary objects, with the exception of the WFT, were excluded, (iii) the GRT trustee should take all steps necessary to pay and appoint the assets of the GRT to the WFT, and (iv) following the distribution of all assets to the WFT, the GRT should be and was thereby terminated.

25.    In her affidavit, Ms Wang explains the change in September 2005 from the decisions in May 2005. After further consultations with the GRT trustee's lawyers (in respect of which no privilege has been waived), the GRT board decided that it was in the best interests of the WFT that the assets of the GRT should be paid and appointed to Grand View as trustee of the WFT as an appointment and distribution

under clauses 3.1 and 4.1 of the trust deed, rather than by way of exercise of the power in clause 9 to transfer capital or income to another trust.

26. It was, Ms Wang says, "in these circumstances that the members of the GRT Board ultimately came to exercise Global Resource PTC's powers as trustee in the manner which is now challenged…".

27. Although the steps taken by the GRT trustee in September 2005 clearly amounted to "a momentous decision" (see *Public Trustee v Cooper* [2001] WTLR 901, 922-923), the GRT trustee did not make any application to the court for approval. In any event, a trustee who is in genuine doubt about the propriety of any contemplated course of action in the exercise of fiduciary duties and discretions is always entitled to seek the guidance of the court: see *Marley v Mutual Security Merchant Bank and Trust Co Ltd* [1991] 3 All ER 198, 201 (PC) (Lord Oliver of Aylmerton). No application for guidance was made.

*The GRT Trust Deed*

28. Recital (A) to the GRT trust deed states that the GRT trustee (called the Original Trustee in the trust deed) "has received the Initial Property [US$100] with the intention that it should create a private express trust, and pursuant to such intention, the Original Trustee wishes to make such declaration with respect to the Initial Property". Recital (B) states that it is anticipated that further property may be transferred to the GRT trustee by way of addition to the trust fund. This refers to Grid, the investment company owning FPG shares, which was transferred in May 2001.

29. Clause 1 contains definitions, of which the following are significant for the purposes of this appeal. Clause 1.1 provides that "the "Beneficiaries" has the meaning attributed to it in the Second Schedule and "Beneficiary" means any one of the Beneficiaries." As will be seen, this definition in fact refers not to beneficiaries in the strict sense but to the objects of the discretionary dispositive powers given to the GRT trustee exercisable before the expiry of the trust period. The trust period is defined as 100 years commencing on the date of the trust deed, or such longer finite period, if any, as shall from to time be allowed under the proper law of the trust. "Person" is defined as including "any individual, company, partnership and unincorporated association and any person acting in a fiduciary capacity".

30. Clause 1.14 provides:

"references to the issue of any person shall include the children and remoter issue of such person through all degrees whether legitimate, legitimated or adopted, but shall exclude any person who is himself illegitimate and any person who is descended from such a person"

31. Clause 2.2 provides that the proper law of the trust shall be the law of Bermuda, with the courts of Bermuda being the forum for the administration of the trust, subject to the power of the trustee under clause 21 to change the proper law to the law of any other jurisdiction and the forum to the courts of that jurisdiction. This power has not been exercised.

32. The discretionary dispositive powers exercisable prior to the expiry of the trust period are contained in clauses 3 and 4:

"3. Power of Appointment

3.1 The Trustees shall, during the Trust Period, hold the Trust Fund and the income thereof;

upon such trusts in favour or for the benefit of all or any one or more exclusively of the other or others of the Beneficiaries;

in such shares or proportions if more than one Beneficiary; and

with and subject to such:

powers and provisions for advancement, maintenance, education or other benefit or for the accumulation of income;

administrative powers;

and discretionary or protective powers or trusts

as the Trustees shall, in their discretion, appoint, provided that the exercise of this power of appointment shall:

be subject to any applicable rule governing remoteness of vesting;

be by deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period; and

not invalidate any prior payment or application of all or any part or parts of the capital or income of the Trust Fund made under any other power or powers conferred by this Settlement or by law.

3.2 The trusts and powers referred to in Clause 3.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them.

4. Powers Regarding Capital and Income and Trust to Accumulate Surplus Income

4.1 In default of and subject to any appointment made under Clause 3, the Trustees may, during the Trust Period, pay, transfer, appropriate or apply the whole or any part of the capital or income of the Trust Fund to or for the maintenance, advancement, education or other benefit of all or such one or more exclusively of the other or others of the Beneficiaries in such shares and manner as the Trustees shall in their discretion and without being liable to account for the same think fit.

4.2 The Trustees shall, during the Trust Period, accumulate the whole or such part of the annual income of the Trust Fund as shall not have been paid or applied under Clause 4.1 as an accretion to the capital of the trust fund, by investing the same in or upon any of the investments hereby authorised, with power to vary the same for others so authorised.

> 4.3 The Trustees may, in exercise of their powers under any provision of this declaration, to appoint, pay, transfer, appropriate or apply any capital or income of the Trust Fund for the benefit of a Beneficiary who is a minor, pay or transfer the same to such minor's parent or guardian or some other person for the time being having the care or custody of such minor upon the recipient undertaking to apply the same for the benefit of the minor. The trustees shall not be under any obligation to see to the further application of the capital or income paid or transferred pursuant to this clause and the receipt of such parent, guardian or other person shall be a full, sufficient and complete discharge to the Trustees."

33. "Beneficiaries", and "Beneficiary", (in each case with an upper-case B), carry the meaning given in schedule 2. It is important to note that these terms refer not to beneficiaries in the full sense of those with vested, even if defeasible or contingent, interests, but to objects of the discretionary powers given to the trustee by clauses 3 and 4. In this judgment, as in the GRT trust deed, Beneficiaries and Beneficiary (with an upper-case B) will be used to mean those objects. Schedule 2 provides:

> "In the above-written declaration, the expression "the Beneficiaries" shall, subject to any exercise of the powers conferred upon the Trustees by Clause 8, mean the following persons now living or hereafter born before the expiration of the Trust Period:
>
> The children and remoter issue of Y.C. Wang and the children and remoter issue of Y.T. Wang."

34. Clause 5, headed Ultimate Trust, provides:

> "Subject as aforesaid, the trustees shall, at the expiration of the Trust Period, hold the capital and income of the Trust Fund upon the trusts set out in the Third Schedule."

35. Schedule 3, setting out the beneficiaries of the ultimate trust, provides:

> "In default of and subject to the trusts and powers contained in Clauses 4 and 5 [*it is common ground that this is an error and should refer to Clauses 3 and 4*] respectively of the above-written Declaration, the Trustees shall, at the expiration of the Trust Period, divide the Trust Fund into equal parts so that there shall be one such equal share for each of the children of Y.C. Wang and Y.T. Wang and one such equal share for the issue, collectively, of each child of Y.C. Wang and Y.T. Wang who shall not then be living but who shall have left issue who shall then be living. Each share set apart for the issue, collectively, of a deceased child of Y.C. Wang or Y.T. Wang shall be further divided among such deceased child's issue as shall then be living per stirpes. The Trustee shall hold each such share upon trust for each such child or remoter issue, as the case may be of Y.C. Wang and Y.T. Wang."

36. While schedule 2 sets out the objects of the GRT's discretionary powers, schedule 3 specifies beneficiaries in the strict sense of the word, as persons with a fixed, albeit defeasible, interest in the trust property. Their interests are defeasible in whole or in part, to the extent that the GRT trustee exercises its discretionary dispositive powers before the expiry of the trust period.

37. Clause 8 contains the powers which lie at the heart of the appeal:

> "8. Addition and Exclusion of Beneficiaries
>
> 8.1 The Trustees may, at any time before the expiration of the Trust Period by deed revocable during the Trust Period or irrevocable, declare that:
>
>> 8.1.1 any person or class or description of persons shall, as from either the date of such deed or such later date as is therein specified and permanently or for such period as is therein mentioned, be included as a Beneficiary for the purposes of this Declaration, and any such declaration may be expressed to refer either to the whole or to some part or share only of the Trust Fund and shall have effect accordingly; and

8.1.2 any person or class or description of persons then included as a Beneficiary shall, as from either the date of such deed or such later date as is therein specified and either permanently or for such period as is therein mentioned, cease to be a Beneficiary for the purposes of this Declaration, and any such declaration may be expressed to refer either to the whole or to some part or share only of the Trust Fund and shall have effect accordingly.

8.2 The powers referred to in Clause 8.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them, provided, however, such person may not exercise the powers referred to in Clause 8.1 in his or her own favour, in favour of his or her creditors, in favour of his or her estate or the creditors of his or her estate."

38.    Clause 9 contains a power which is relevant to submissions made to the Board:

"9. Power to Transfer to Trustees of another Trust

Any power hereby or by law conferred on the Trustees to appoint, pay, transfer, appropriate or apply any capital or income of the Trust Fund to or for the benefit of any Beneficiary may, at the discretion of the Trustees, be validly exercised (without prejudice to the generality of any such power or to any other mode of application) by paying or transferring the same to the trustees of any settlement (wherever such trustees are resident and whether or not the proper law of such settlement is the Proper Law of this Declaration) the provisions of which are in the opinion of the Trustees for the benefit of such Beneficiary, notwithstanding that such settlement may also contain trusts, powers or provisions (discretionary or otherwise) in favour of some other person or object, but so that no such payment or transfer shall be made which would or might infringe any applicable rule governing remoteness of vesting."

39. Clause 10 contains a power of amendment:

> "The Trustees may at any time and from time to time by deed supplemental hereto, amend in whole or in part any or all of the provisions of this Declaration except for the provisions of Clause 23, which may not be amended."

Clause 23, to which clause 10 refers, provides that: "This Declaration shall be irrevocable."

40. Clause 14 makes provision for the trustees' remuneration:

> "The Original Trustee and any successor or additional Trustee being a company shall be entitled to remuneration for its services in such amount as may from time to time be agreed between that Trustee and the adult beneficiaries or, in default of agreement, in accordance with its published terms and conditions from time to time in force."

41. Clause 15 provides, among other things, that "[e]xcept as otherwise expressly herein mentioned, every discretion or power hereby conferred upon the Trustees shall be an absolute and unfettered discretion or power".

42. Clause 19 provides:

> "19. Exclusion of Community Property Rules
>
> No benefit accruing to or devolving on any Beneficiary under this Declaration shall form or constitute a portion of any communal or joint estate or marital property of such Beneficiary, but such benefit shall be and remain the sole, separate and exclusive property of such Beneficiary. Should such Beneficiary be married or marry in community of property, any benefit so accruing or devolving shall be expressly excluded from the community; such benefit shall also be free from the interference, control or marital power of any spouse of such Beneficiary. The provisions of this Clause shall apply not only to benefits accruing to or devolving on any Beneficiary but also to the property of

> whatever nature for the time being representing the same and the income hereof."

43. The GRT trust deed contains various other provisions, which are of no direct relevance to the issues on this appeal. These include administrative provisions, such as investment powers, provisions as regards a Protector and provisions regarding the appointment and retirement of trustees.

*The proceedings*

44. The proceedings were commenced in February 2018 by Dr Winston Wong, the eldest son of YC Wang and a half-brother of Susan and Sandy Wang, against Grand View. His grandson, Riley Wong, was joined as a plaintiff in January 2019. Further family members were permitted to intervene in the proceedings, after Kawaley AJ had given judgment: Tony Wang, a son of YT Wang and a half-brother of William Wong and Wilfred Wang, in support of the claim against Grand View, and Jennifer Wang, a daughter of YT Wang and sister of William Wong and Wilfred Wang, against the claim. Both participated in the appeal before the Court of Appeal, but only Tony Wang has appeared on the appeal to the Board.

45. The writ alleges that the challenged decision was a breach of trust on four grounds: (i) the trustee took irrelevant considerations into account and did not act for the benefit of the beneficiaries of the GRT, (ii) it acted in excess of its powers, (iii) it failed to exercise its powers for the purposes for which they were conferred, and (iv) it acted in breach of the rule against remoteness of vesting in transferring trust assets to the WFT, a purpose trust. The writ seeks a declaration that Grand View holds the GRT assets transferred to it on resulting or constructive trust for the GRT, an account of all dealings with the assets and further associated relief.

46. In December 2018, Winston Wong issued a summons for summary judgment under Order 14 of the Rules of the Supreme Court 1985. The application was made on the basis that the steps comprised in the challenged decision were in excess of the GRT trustee's powers under the GRT trust deed, were taken for an improper purpose and were contrary to the rule against remoteness of vesting.

47. It was accepted that the case based on the GRT trustee taking irrelevant considerations into account raised factual disputes which could not be resolved on an application for summary judgment.

48. Kawaley AJ considered that it was appropriate to decide the issues of law raised on the application, notwithstanding that it was for summary judgment. This has not been challenged. As the facts presented by Grand View are accepted for the purposes of the application and as there has been the fullest legal argument on all sides, the Board considers this to be the correct approach. Clarke P gave at para 226 as his sixteenth reason for allowing the appeal that the claim had not been shown to be unarguably correct, the test under RSC Order 14. However, neither the President nor the other members of the Court of Appeal otherwise approached the issues on that basis, and it appears to the Board that it is right to decide whether the claim, based on the assumed facts, is established as a matter of law.

49. Kawaley AJ acceded to the application for summary judgment for the reasons given in his judgment dated 5 June 2019.

50. The Court of Appeal allowed Grand View's appeal for the reasons given in the judgments delivered on 20 April 2020. The judgment of Clarke P contains an impressive survey of the relevant authorities and legal principles and, in common with the other judgments, gives clear reasons for allowing the appeal. In addressing the issues on this appeal, the Board will generally do so by reference to the submissions made to it and, in this way, hopes to address the grounds on which the Court of Appeal allowed the appeal.

*Duties in respect of fiduciary powers*

51. It is not in dispute that the powers conferred on the GRT trustee under clause 8 of the GRT trust deed are fiduciary powers. As such, their exercise is subject to duties and restrictions imposed by equity. The issues raised by what are the most significant duties for the purposes of the present appeal were summarised by Clarke P in his judgment at para 168:

> "(a) Whether the way in which it has been exercised is not within, or contrary to, the express or implied terms of the power (the scope of the power rule);
>
> (b) Whether the trustee has given adequate deliberation as to whether and how he should exercise the power; and
>
> (c) Whether the use of the power by the GRT Trustee, although within its scope, was for an improper purpose i.e.

> a purpose other than the one for which it was conferred (the improper purpose rule)."

52. This summary, based on a submission of Grand View, is derived from the judgment of Lord Walker in *Pitt v Holt* [2013] UKSC 26, [2013] 2 AC 108 at paras 60-61. It is, in the view of the Board, a helpful and accurate summary of three major duties and restrictions applicable to the exercise of fiduciary powers, save only, as regards paragraph (c), that a power may have more than one proper purpose.

53. The second of the duties of trustees summarised by Clarke P in his judgment at para 168, to give adequate deliberation as to whether and how to exercise a power, does not arise on this appeal, although it is of course directly relevant to the alternative basis for the appellants' challenge in these proceedings.

54. The first and third duties are directly in point on this appeal. The expression "the scope of the power rule", used to refer to the first duty, may lead to some misunderstanding, as it is used in some authorities to refer to the improper purpose rule. But, as Clarke P makes clear in paragraph (a), it is concerned with the express and implied terms of the provision conferring the power in question. It is largely a question of the construction of such provision.

55. By contrast, the proper purpose rule, which Clarke P called the improper purpose rule, involves identifying the purpose for which the power has been exercised and asking whether such purpose is a purpose for which the power has been given. While identification of the purpose of a power may well be relevant to the construction of the provision conferring it, the question raised by the proper purpose rule arises only once the scope of the power has been determined and once it has been determined that the exercise of the power was within the terms, or "scope", of the power. This was made clear by Lord Sumption in *Eclairs Group Ltd v JKX Oil & Gas plc* [2015] UKSC 71, [2015] Bus LR 1395 (*Eclairs*) at paras 15 and 30:

> "15…The important point for present purposes is that the proper purpose rule is not concerned with excess of power by doing an act which is beyond the scope of the instrument creating it as a matter of construction or implication. It is concerned with abuse of power, by doing acts which are within its scope but done for an improper reason."

> "30…The rule is not a term of the contract and does not necessarily depend on any limitation on the scope of the power as a matter of construction. The proper purpose rule is a principle by which equity controls the exercise of a fiduciary's powers in respects which are not, or not necessarily, determined by the instrument."

On this, as on all other matters considered by Lord Sumption to which the Board refers in this judgment, the other members of the Supreme Court were in agreement.

56. In the past, the proper purpose rule was generally referred to as "fraud on a power", a phrase that is still sometimes used. However, as repeatedly made clear in the authorities, it is not confined to cases involving some reprehensible conduct on the part of a trustee or other fiduciary but extends to any case where a fiduciary power is used for a purpose not falling within the purposes for which the power has been conferred, even though the trustee may have acted in good faith and genuinely with a view to benefiting the beneficiaries. "Fraud on a power" has been described as "historical language" (*Kain v Hutton* [2008] 3 NZLR 589, para 46) and Lord Sumption remarked in *Eclairs* at para 15 that it was an inappropriate term. The Board considers that there is much to be said for discarding this historical language and referring instead to the proper purpose rule.

57. Little needs to be said at this stage about determining the "scope of the power". The familiar approach to the construction of legal documents applies to the construction of a trust deed as it does, for example, to contracts, with the necessary modification that it is the intention of the settlor (or, in the present case, the Founders), rather than the intention of contracting parties, which is to be objectively determined by the terms of the instrument, construed in light of the circumstances in which it was made.

58. It is, however, helpful to say something about the proper purpose rule.

59. In *Eclairs*, Lord Sumption at paras 14-15 traced the origins of the rule and referred to some of the earlier statements of the rule, such as those of Lord Westbury LC in *Duke of Portland v Topham* (1864) 11 HLC 32, 54 and Lord Parker of Waddington in *Vatcher v Paull* [1915] AC 372, 378 (who said that it means "that the power has been exercised for a purpose, or with an intention, beyond the scope of or not justified by the instrument creating the power"). In *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, 834, Lord Wilberforce, giving the judgment of the Board, said:

> "Thus, and this is not disputed, the issue [of shares] was clearly intra vires the directors. But, intra vires though the issue may have been, the directors' power under this article is a fiduciary power: and it remains the case that an exercise of such a power though formally valid, may be attacked on the ground that it was not exercised for the purpose for which it was granted."

60. In *In re Courage Group's Pension Schemes* [1987] 1 WLR 495, 505, Millett J described as "trite law" that "a power can be exercised only for the purpose for which it is conferred, and not for any extraneous or ulterior purpose".

61. It is common ground on this appeal that the proper purpose, or purposes, of a fiduciary power is to be determined as at the date of the instrument conferring the power and is to be objectively determined. In the case of a settlement such as the GRT trust, it is a question of determining objectively the intention of the settlor (or in this case the Founders). In *Eclairs*, Lord Sumption considered the approach to be adopted at [30]:

> "Ascertaining the purpose of a power where the instrument is silent depends on an inference from the mischief of the provision conferring it, which is itself deduced from its express terms, from an analysis of their effect, and from the court's understanding of the business context."

62. The identification of the purpose of a power will also be informed by the rest of the instrument containing the power, as for example in *British Airways plc v Airways Pension Scheme Trustee Ltd* [2018] EWCA Civ 1533, [2018] Pens LR 19, para 70 (Patten LJ), paras 101-102 (Lewison LJ) and para 116 (Peter Jackson LJ).

63. There was some debate before the Board as to the extent to which external materials may be admissible in determining the purpose of a fiduciary power. It was common ground, and in the Board's view correct, that documents which objectively inform the context of the instrument in question, such as in this case the WFT trust deed, are admissible, as are substantially contemporaneous documents which are intended to be read with the trust deed, such as a letter of wishes provided by the settlor or economic settlor (although there was no letter of wishes in this case). It was common ground that, while trustees could legitimately have regard to wishes later expressed by the settlor, or in this case the Founders, as to how the trustees should exercise their dispositive powers, such wishes were not admissible in determining the purpose of those powers. There is a need for certainty, given that

the terms and purpose of a trust instrument and the powers it confers create rights for beneficiaries and impose duties on trustees. Having regard to these factors and to what Lord Sumption said in *Eclairs* at para 30, the view of the Board is that the intention of the settlor in conferring a power is to be ascertained by applying ordinary rules of construction to the trust deed and in the light of the admissible factual matrix. However, as will appear, this is not critical to the decision on this appeal.

64.     With those observations, the Board turns to consider the issues arising on the appeal.

*The issues*

65.     Except for the separate issue concerning the rule against remoteness of vesting, all the matters argued before the Board concern the construction of clause 8 of the GRT trust deed and the proper purpose rule as it applies to the powers conferred by clause 8.

*The scope of clause 8 of the GRT trust deed*

66.     The powers conferred by clause 8 are expressed in very wide terms. The trustees may declare "any person or class or description of persons" to be included or excluded as a Beneficiary (as defined in schedule 2), i.e. as an object of the discretionary dispositive powers contained in the GRT trust deed. "Person" is also defined in very wide terms by clause 1.6, set out earlier in this judgment.

67.     Notwithstanding the breadth of these provisions, it was submitted on behalf of one of the appellants, Winston Wong, that the power to add a Beneficiary under clause 8.1.1 did not as a matter of construction permit the addition of the trustee(s) of a purpose trust. If well-founded, this would be fatal to the validity of the challenged decision.

68.     It was submitted, correctly, that clause 8 did not permit the addition of a purpose as a Beneficiary. Only a "person" (as defined) could be added. It followed, so it was submitted, that a trustee of a purpose trust could not be added as a Beneficiary. The immediate problem with this submission is that clause 1.6 defines "person" to include "any person acting in a fiduciary capacity" without any limitation. To overcome this difficulty, reliance was placed on the opening words of clause 1, which qualify all the definitions that follow: the definitions apply "wherever the

context permits". It was submitted that the context of clause 8 did not permit "person", as there used, to include the trustee(s) of any trust.

69.    This was based on the further submissions that the only point of adding a Beneficiary is to permit the trustee to consider exercising its discretionary dispositive powers in favour of that Beneficiary and that any such disposition must confer a benefit on the added Beneficiary. It was said that a payment to a trustee confers a benefit, not on the trustee, but on the beneficiaries or objects of the trust and that, therefore, the powers under clauses 3 and 4 of the GRT trust deed could not be exercised in favour of a trustee in its capacity as such nor could a trustee in its capacity as such be added as a Beneficiary. The proper course would be to add the beneficiaries or objects of the other trust as Beneficiaries of the GRT trust, but that of course could not be done in the case of a purpose trust.

70.    The Board does not accept this submission. There is no justification for construing a discretionary power in the terms of clause 4 so narrowly as to rule out the exercise of the power to add a trustee of another trust. Clause 4 permits payments and transfers to be made "to" as well as "for the…benefit" of a Beneficiary. Further, it is established that a power to appoint in favour of a "person" will generally include a power to benefit a purpose, because it is only through persons that purposes can be benefitted: see *In re Harvey (dec'd)* [1950] 1 All ER 491, *In re Triffitt's Settlement* [1958] Ch 852, 862. In these circumstances, where there is nothing in clause 8 to suggest that "person" is not to carry its defined meaning, there is no justification for excluding a person acting in a fiduciary capacity. There is no parallel with, for example, clause 22.3 where the context clearly does not permit the definition in clause 1.6 to apply; reference is there made to a "person…appointed as a Protector" but clause 22.2 provides that only individuals may be appointed as a Protector. Moreover, this submission would have the effect of preventing the GRT trustee from exercising the power so as to add the trustees of a charitable or other purpose trust, when to do so would, for example, enable the GRT trustee to give effect to a moral obligation of an existing Beneficiary. There may well be cases in which the exercise of the discretionary powers in favour of a trustee would be improper. For example, a payment to a bare trustee for A, when A is not an object of the power, would be objectionable. But that is a question not of the construction of the scope of the clause but as to its purpose or as to the propriety of a particular exercise by the trustee of the power.

71.    As an alternative to the case based on construction, it was briefly submitted for Winston Wong that a term should be implied into clause 8 that the power of addition was not to be used to add the trustee of a purpose trust. It was submitted that such a term was obvious because, as it was not possible to add a purpose as a Beneficiary, it went without saying that it should not be possible to add the trustee

of a purpose trust. The Board has no hesitation in rejecting this submission, for the same reasons as it rejects the submissions on construction.

*Was the challenged decision taken for a proper purpose?*

72.    The appellants' case that the GRT trustee exercised its powers under clause 8 of the GRT trust deed for an improper purpose was put in several ways, to which the Board refers below. However, the Board is of the view that the relevant question is whether the purpose for which the power was exercised was outside the purpose, or the range of purposes, for which the power was conferred. The purpose for which a power has been exercised in any particular case is a question of fact, namely the subjective purpose of the decision-maker(s): see *Eclairs* at para 15**.**

73.    In some cases, this will be controversial. In the present case, it is not disputed that the GRT trustee's purpose was to exclude all the children and remoter issue of the Founders as the entire existing class of Beneficiary and to substitute a purpose trust, the WFT, as the sole Beneficiary with a view to appointing the entire trust fund to the WFT and bringing the GRT to an end. The reason that the Board of the GRT trustee exercised its powers in this way, as it appears from the evidence filed on the summary judgment application, was prompted by the Founders' decision to retain their own substantial personal FPG shareholdings, from which their children could expect to benefit when the Founders died. The Founders considered that there was no longer any need for a private trust from which their children might benefit. The GRT board considered that there had been a change of circumstances which altered the basis on which the GRT had been formed. In particular, (a) the Founders' children would now be inheriting substantial wealth from the Founders in any event and, therefore, (b) a private trust for them was no longer needed to incentivise them to be interested in the success of FPG. In those circumstances, the board of the GRT trustee, again reflecting the Founders' views, considered that the appropriate course was for the assets of the GRT to be transferred to the WFT.

74.    The question in this case is therefore whether this purpose of the GRT trustee was outside the purpose or purposes for which the powers of addition and exclusion of Beneficiaries under clause 8 had been conferred.

75.    In submitting that the challenged decision was made for a proper purpose, Grand View laid great emphasis, as did the Court of Appeal, on the very broad terms of clause 8 and of the definition of "person" in clause 1.6, together with the qualification "subject to any exercise of the powers conferred upon the trustees by Clause 8" to the definition of Beneficiary in schedule 2 and with the provision in clause 15 that the discretions and powers conferred on the GRT trustee by the trust

deed were "absolute and unfettered". It submitted, correctly, that there is no restriction in the trust deed on the identity of any person who may added, or excluded, as a Beneficiary.

76. Grand View submitted that, consistently with the broad language of clause 8, the purpose of the powers in clause 8 was to confer the widest discretion on the GRT trustee to add or exclude Beneficiaries as it thought fit, after proper deliberation and taking account of the views of the Founders or what the GRT trustee believed would have been their views. Given that the GRT had a trust period of 100 years, the actual views of the Founders would be available for a relatively short time. The GRT trustee was to be guided not by the interests of the Beneficiaries and the default beneficiaries but by their understanding of what the Founders wanted or would have wanted in any circumstances that may arise. Although the submission was frequently put in terms of a power to respond to changing circumstances, this was given as an example of the circumstances, not a limitation on the circumstances, in which the GRT trustee might consider it appropriate to exercise its powers under clause 8.

77. The problem facing Grand View's basic proposition that the purpose of the powers in clause 8 is to be derived from the breadth of the language used in that clause is that, while the terms of clause 8 are of course highly relevant to the determination of the purpose of the powers conferred by it, they are only part of the enquiry. It is common for powers expressed in the widest of language, and hence of the widest possible scope, to be restricted as to their permissible exercise by their proper purpose. For example, the power of directors to issue shares was stated in the widest terms, with no relevant express or implied restrictions, in *Howard Smith Ltd v Ampol Petroleum Ltd*.

78. The Board does not consider that Grand View's reliance on the width of the language of clause 8 gains much additional support from the other provisions of the GRT trust deed on which it relies. The express qualification in schedule 2 to the definition of Beneficiary ("subject to any exercise of the powers conferred upon the trustees by Clause 8") does no more than state what would in any event necessarily be implicit. It follows from the existence of the powers of addition and exclusion in clause 8 that there may be alterations to the Beneficiaries as stated in schedule 2. Although clause 15 provides that every discretion and power conferred on the trustee is "absolute and unfettered", Grand View accepts that it does not displace the proper purpose rule. As the observations of Lord Cairns LC in *Gisborne v Gisborne* (1877) 2 App Cas 300, 305 suggest, a provision such as clause 15 is directed at the discretion enjoyed by a trustee in the exercise of a power, not at either the scope of the power or its purpose. For reasons appearing below, the breadth of the definition of "person" is not in any way inconsistent with a narrower purpose than that for which Grand View contends.

79.    It is necessary to set clause 8 in the context of the GRT trust deed as a whole, and in the context of the circumstances in which the GRT trust was established, to determine whether the challenged decision was outside the proper purposes of the powers of addition and exclusion. It is not, in the view of the Board, correct to rely on a general proposition or default rule, such as that stated by Clarke P at para 181 of his judgment that "[g]iving effect to the settlor's wishes in non-commercial trusts in which the beneficiaries have provided no consideration will not usually constitute a fraud on the power".

80.    In the Board's view, the natural reading of the GRT trust deed as a whole demonstrates that it established a family trust, for the benefit of the direct descendants of the Founders. This family character is emphasised by the terms of the trust deed, to a degree which may be unusual in the world of discretionary trusts. The only specified objects of the discretionary dispositive powers are the children and remoter issue of the Founders, as provided in Schedule 2. Likewise, the ultimate beneficiaries who have fixed but defeasible interests are the same as those within the class of specified objects who are living at the expiry of the trust period: see Schedule 3. Mr Wilson, counsel for Tony Wang, was right to comment that real thought had gone into the way in which the trust fund should be distributed on the termination of the trust, in default of prior discretionary appointment or distribution. This is not a case in which the ultimate beneficiaries are, for example charities with no connection with the settlor (or Founders) or individuals who, it could confidently be said, the settlor (or Founders) had no intention of benefitting (contrast the terms of the trust in *Sofer v SwissIndependent Trustees SA* [2019] EWHC 2071 (Ch), reversed [2020] EWCA Civ 699; [2020] WTLR 1075, under which the ultimate beneficiaries were identified as the youngest partners in two law firms at the date of the trust). Recital (A) to the GRT refers to it as "a private express trust", language not found in the WFT trust deed, which in Recital (A) refers to "a trust for certain charitable and non-charitable purposes". Clause 14 provides for the trustee's remuneration to be agreed between the trustee and the adult beneficiaries, or in default of agreement, in accordance with the trustee's published terms and conditions. It does not envisage that the GRT will be without individuals as beneficiaries. While the terms of clause 19, quoted above, are of limited significance, they serve to emphasise the nature of the trust as being for the benefit of individuals.

81.    By contrast, there is nothing in the GRT trust deed, beyond the use of the word "any" in clause 8 and the wide definition of "person", to suggest that clause 8 was intended to confer on the trustee the power to deprive all the children and remoter issue of the Founders of any benefit under the trust and to substitute a trust whose purpose was wholly different and which was incapable of conferring any benefit on the Founders' children and remoter issue.

82.     The breadth of the language of those two provisions of the GRT trust deed would provide a more solid basis for Grand View's case if there were no other reasonable explanation for them. However, the language is consistent with a narrower identification of the purpose of the powers under clause 8. There are many instances, involving a wide range of possible persons, where a power of addition and exclusion could reasonably be used in conformity with the family nature of the trust to benefit all or some of the Beneficiaries. It is not necessary in this case, where the issue is whether the challenged decision was outside the purposes of the power, to define the precise boundaries of the power, but examples where the power could be properly exercised are not hard to envisage. Examples of additions which could benefit one or more existing Beneficiaries are spouses, other dependants, unmarried partners, stepchildren, and other individuals to whom a moral duty may be owed by one or more Beneficiaries. Other examples include charities or other organisations to which a Beneficiary owes a moral obligation: see, for example, *In re Clore's Settlement Trusts* [1966] 1 WLR 955. The statement in *Re Shiu Pak Nin* [2014] (1) CILR 173 (Grand Court of the Cayman Islands, Cresswell J) at para 147 that "the exercise of a power of addition [to a discretionary class] will, by definition, never be in the interests of an existing class (as their beneficial interest will be diluted)" cannot be supported. For these purposes, it is important that the power of addition under clause 8 is exercisable in favour of "any" person and is not therefore subject to any limitation which would prevent the addition of any appropriate person as a Beneficiary. Likewise, "person" needs to be defined in broad terms. The power to exclude a Beneficiary is likewise capable of benefitting other Beneficiaries or the excluded Beneficiary, for example where their continued inclusion in the class has adverse tax consequences for some or all of the other Beneficiaries or for the excluded Beneficiary.

83.     It is no answer to this to say, as Grand View does, that benefits could be conferred on "persons" who are not objects if to do so would benefit existing Beneficiaries, without adding them as Beneficiaries. It may nevertheless be advantageous to add them as Beneficiaries. Ironically, this is a point that is made by Grand View in opposition to Winston Wong's case on the construction of clause 8. Moreover, there are cases where it might not otherwise be possible to provide benefits to a non-object. For example, if the spouse of a child or remoter issue of a Founder were added as a Beneficiary, benefits could unquestionably be provided to the spouse if they were widowed.

84.     When reference is made to the context in which the GRT trust was established, the case for limiting the purpose of the powers under clause 8 is all the stronger. It is very significant that the Founders established the WFT at the same time as the GRT. Objectively, it can be seen that at that time, they were dividing the FPG shares owned by the investment companies into two parts. By a large margin,

the greater part in value of those shares was to be owned by the WFT and other purpose trusts. Members of the Wang family were not to benefit from those trusts. The smaller part, no more than one sixth in value and a good deal less when the subsequent purpose trusts were established, was to be held in the GRT for the benefit of the children and remoter issue of the Founders. The division of wealth into these two parts, with wholly separate purposes and no suggestion in either trust deed that there was to be any link between them, is striking.

85.    The fact that the Founders held strong views as to the purposes to which wealth should be put, evidenced by the lengthy citation of the Founders' statement in recital (C) to the WFT trust deed, provides further support for a narrow analysis of the purpose of the GRT and the powers contained in clause 8. It was notwithstanding those views that the Founders established the GRT with its sole focus in the terms of the trust deed on benefit to their children and remoter issue.

86.    Grand View places reliance on the evidence of Susan Wang and the April 2001 memorandum. It is unnecessary to debate the admissibility of the April 2001 memorandum or Ms Wang's evidence, particularly as to her conversations with the Founders shortly before the GRT and the WFT were established. Kawaley AJ recorded in his judgment at para 124 that counsel for Winston Wong was content for the court to proceed on the basis that all the evidence was admissible.

87.    In the Board's view, this evidence, like the Founders' statement cited in Recital (A) to the WFT trust deed, supports the appellants' case. Ms Wang gives evidence that in 2000 the Founders were planning to establish a single purpose trust, with no beneficiaries, to hold a significant proportion of the investment companies which owned FPG shares. The only personal benefit to family members from the trust would be to "make provision for those family members who served as directors of the [trustee company] to benefit personally in some very limited way". This was not the proposal that was put into effect. Instead, ownership of the holding companies was divided in the way described above and the GRT was established, not to benefit in some very limited way only those family members who served as directors of the trustee of the purpose trust, but for the benefit of all the children and remoter issue of the Founders, with no link of any sort being made to the WFT.

88.    Ms Wang says in her affidavit that in broad terms the establishment of the GRT "was designed to align the interests of the Founders' children (as potential beneficiaries of the [GRT]) with the continued growth and performance of the FPG Companies…[and] to provide a basis to motivate the descendants of YC Wang and YT Wang to perpetuate the success of the FPG Companies", an aim which of course was achieved by making them the objects and beneficiaries of a trust whose sole or

principal asset was a valuable holding of FPG shares. There is nothing in the terms of the GRT trust deed, or in the surrounding circumstances at the time that it was made, to suggest that the actual and potential interests of the Founders' children and remoter issue were intended to terminate if, in the view of the GRT trustee, the trust in their favour was no longer needed to provide such alignment and motivation. Nor does Grand View submit that the powers of the GRT trustee under clause 8 are limited to such a situation. As earlier noted, its case is that the GRT trustee had the broadest possible discretion under clause 8.

89.     The establishment of two separate trusts, with quite different purposes, was fully understood by the Founders, as evidenced by their signing the April 2001 memorandum. Mr Howard, on behalf of Grand View, laid stress on the emphasised sentence in the following passage:

> "*The other trust is a private trust, the assets of which may be used for any purpose.* The plan is [for the trust] to benefit the children of the Chairman and the President. As matters stand the planning of this trust has not yet been completed." (emphasis added)

90.     Grand View relied on the emphasised sentence to show that it was intended that there was not to be any limit to the purposes to which the proposed private trust, once established, could be put and that this provides a guide to the intended purpose of the powers conferred by clause 8. In the Board's view, that sentence will not bear the weight that Grand View seeks to place on it. The immediately following sentence makes clear that the plan is for the trust to benefit the Founders' children. The passage also makes clear that the planning of the trust was not complete. There is nothing in the GRT trust deed that provides, or even suggests, that the trust assets may be used for any purpose whatsoever.

91.     Grand View relied on statements as to the breadth of powers of addition to be found in modern discretionary trusts: see *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26, [2003] 2 AC 709 (*Schmidt*) at para 1 per Lord Walker and *Re TR Technology Investment Trust plc* (1988) BCC 244, 251 per Hoffmann J. The flavour of the trusts referred to is well illustrated by Lord Walker in *Schmidt* at para 1:

> "It has become common for wealthy individuals in many parts of the world (including countries which have no indigenous law of trusts) to place funds at their disposition into trusts (often with a network of underlying companies) regulated by the law of, and managed by trustees resident

in, territories with which the settlor (who may be also a beneficiary) has no substantial connection. These territories (sometimes called tax havens) are chosen not for their geographical convenience (indeed face to face meetings between the settlor and his trustees are often very inconvenient) but because they are supposed to offer special advantages in terms of confidentiality and protection from fiscal demands (and sometimes from problems under the insolvency laws, or laws restricting freedom of testamentary disposition, in the country of the settlor's domicile). The trusts and powers contained in a settlement established in such circumstances may give no reliable indication of who will in the event benefit from the settlement. Typically it will contain very wide discretions exercisable by the trustees (sometimes only with the consent of a so-called protector) in favour of a widely-defined class of beneficiaries. The exercise of those discretions may depend on the settlor's wishes as confidentially imparted to the trustees and the protector. As a further cloak against transparency, the identity of the true settlor or settlors may be concealed behind some corporate figurehead."

92.    Reference to this type of trust does not assist Grand View. The GRT, with its carefully prescribed classes of objects and default beneficiaries, bears no similarity to such trusts. It formed part of Mr Wilson's submissions that, if Grand View were correct that the purpose of the powers under clause 8 was to permit the trustee to add any person as a Beneficiary provided only that it thought it appropriate to do so, such power was void. This in turn led to submissions on the law as to the permissible extent of the class of objects of a trust or power and warnings on the potential impact on the business of establishing and managing trusts in Bermuda and other jurisdictions if Mr Wilson's submissions were accepted. None of this arises in the present case, given what, in the Board's view, is the limited purpose of the powers under clause 8.

93.    Grand View relied on several authorities to support its case for a very broad definition of the purpose of the powers contained in clause 8: *Schmidt v Rosewood Trust Ltd (supra)*, *In re Manisty's Settlement* [1974] Ch 17, *In re Beatty (decd)* [1990] 1 WLR 1503, *In re Hay's Settlement Trusts* [1982] 1 WLR 202 and *Tam v HSBC International Trustee Ltd* [2008] HKCFI 496, (2008) 11 ITELR 246. In the Board's view they are of little, if any, assistance. First, the question whether the addition of beneficiaries or the appointment in favour of persons not named as beneficiaries was

an exercise of the relevant power for a proper purpose was not argued or considered. Second, the terms of the relevant trusts were different in each case and different from the terms of the GRT trust deed. As the High Court of Australia said in *CPT Custodian Pty Ltd v Commissioner of State Revenue* (2005) 224 CLR 98, a case concerning a unit trust, "a priori assumptions as to the nature of unit trusts under the general law and principles of equity would not assist and would be apt to mislead. All depends…upon the terms of the particular trust" (para 15). Third, the proposed additional beneficiaries or disponees were either closely connected to identified beneficiaries (*Schmidt v Rosewood Trust Ltd*, *In re Manisty's Settlement*) or named in a contemporaneous letter of wishes (*In re Beatty, Tam v HSBC International Trustee Ltd*).

94.     It is the view of the Board, in the light of the focus of the GRT trust deed on the children and remoter issue of the Founders and the circumstances in which the GRT was established referred to above, that the purpose of the powers of addition and exclusion was to further the interests of the Beneficiaries, or one or more of them.

*The "substratum rule"*

95.     A principal part of the submissions made on behalf of Winston Wong was that the powers under clause 8 of the GRT trust deed could not be exercised so as to destroy the nature or character, or the substratum, of the trust. This was referred to in submissions and in the judgments below as the substratum rule. The substratum rule was, it was submitted, applicable to powers of amendment, such as those contained in clause 10 of the GRT trust deed. The powers under clause 8 were a specific type of powers of amendment, and the substratum rule accordingly applied to their exercise.

96.     As presented on behalf of Winston Wong, the substratum rule was an absolute rule which in all cases circumscribed powers of amendment and powers such as those conferred by clause 8. The existence of the rule was supported, it was submitted, generally by several authorities dealing with powers of amendment, and specifically by decisions under the Variation of Trusts Act 1958. It was submitted that the application of the rule would, in the present case, invalidate the challenged decision since the substratum of the GRT trust was to benefit the Founders' families and this was destroyed by that decision.

97.     The Board does not accept these submissions, which fail on two grounds.

98. First, it is not correct to regard the powers under clause 8 as a species of, or even analogous to, a power of amendment. The exercise of those powers involves no amendment to the provisions of the GRT trust deed. Clause 8 specifically empowers the trustee to add persons to or exclude persons from the class of Beneficiaries, being those persons who may benefit from an exercise of the discretionary dispositive powers under clauses 3 and 4. The definition of Beneficiaries has, implicitly and explicitly, built into it the possibility of changes resulting from an exercise of the clause 8 powers.

99. Second, there is no absolute substratum rule as put forward by Winston Wong.

100. It was submitted that the substratum rule could be viewed either as a rule of construction, going to "the scope" of the amendment power as defined by Lord Walker in *Pitt v Holt*, or as a refinement of the proper purpose rule.

101. Some of the authorities relied on were directed to the scope of an amendment power, as determined by its proper construction, rather than to the identification of the purpose of the power. For example, *Hole v Garnsey* [1930] AC 472 concerned the validity of a resolution of the members of a registered Industrial and Provident Society purporting to amend the society's rules so as to require members to subscribe for additional shares. This was not a fiduciary power. The issue was whether, on the proper construction of the power of amendment contained in the rules, the majority could bind the minority so as to impose this additional liability on members. Lord Atkin at pp.493-94 stated the applicable principle to be that: "If a man enters into association with others for a business venture he commits himself to be bound by the decision of the majority of his associates on matters within the contemplated scope of the venture. But outside that scope he remains dominus, and cannot be bound against his will". This is applicable "unless there is reasonably clear indication in contractual terms" (p.495). Lord Tomlin said at p.500 that the issue was "whether, having regard to the general principles governing contracts inter partes, amendments are effective as against members who have not assented to them". He went on to say:

> "In construing such a power as this, it must, I think, be confined to such amendments as can reasonably be considered to have been within the contemplation of the parties when the contract was made, having regard to the nature and circumstances of the contract. I do not base this conclusion upon any narrow construction of the word

> 'amend' in Rule 64, but upon a broad general principle applicable to all such powers."

102. There is no discussion in *Hole v Garnsey* of the proper purpose rule applicable to the exercise of fiduciary powers and the reasoning in the House of Lords was firmly based in the principles of contractual construction against the background of the nature and purpose of the business venture.

103. If advanced as a rule of construction, the substratum rule would necessarily be subject to all the factors which are taken into account in construing any provision. It may appear from the other terms of the instrument, or from the circumstances in which it was made, that the amendment power was not intended to be restricted so as to prevent changes to the underlying purpose as it originally appeared: see *Kearns v Hill* (1990) 21 NSWLR 107, 108, quoted below.

104. If a trust has a discernible overall purpose, it will be a very powerful factor in deciding the scope of a power of amendment contained in the trust deed. It is not, however, an overriding factor which, notwithstanding all other considerations, determines the proper construction of the power.

105. In other cases where the power of amendment is a fiduciary power, limits on its exercise have been imposed as an application of the proper purpose rule.

106. The relevant issue in *In re Courage Group's Pension Schemes* [1987] 1 WLR 495 was whether the committee of management of three pension schemes could properly join in executing deeds making amendments to the schemes. The trust deeds constituting the schemes conferred powers of amendment by deeds to be executed by participating companies and by the committee of management of each scheme. The committees stood in a fiduciary position and their power to agree to amendments was a fiduciary power. The powers of amendment were subject to an express restriction that no amendment should "have the effect of altering the main purpose of the fund namely the provision of pensions on retirement at a specified age for members". In a passage on which Winston Wong relies, Millett J said, at p.505:

> "The next question is whether the plaintiffs are entitled, if so minded, to join in executing the amending deeds. They may do so only if the proposed amendments are within the power to amend the trust deeds and rules, and can properly be made. They must not infringe the provisos to

> the rule-amending power, particularly the express prohibition to be found in all three schemes against altering the main purpose of the schemes, namely, the provision of pensions on retirement at a specified age for members. This is a restriction which cannot be deleted by amendment, since it would be implicit anyway. It is trite law that a power can be exercised only for the purpose for which it is conferred, and not for any extraneous or ulterior purpose. The rule-amending power is given for the purpose of promoting the purposes of the scheme, not altering them."

107. In *Bank of New Zealand v Board of Management of the Bank of New Zealand Officers' Provident Association* [2003] UKPC 58, Lord Walker, giving the judgment of the Board, quoted the last two sentences of the above passage in Millett J's judgment. The case concerned a power to amend the rules of an incorporated association, whose purpose was to provide a superannuation fund for the bank's employees. The power was vested in the association's board of management, and it was therefore a fiduciary power. Lord Walker said at para 18 that the crucial issue was the scope of the power of amendment contained in the rules. The challenged amendment did not infringe the express restrictions to which the power was subject, so that: "Any relevant restriction is to be derived from the general principle that a power must be used only for the purpose for which it must be supposed to have been intended." This classic statement of the proper purpose rule echoed the penultimate sentence in the quoted passage from Millett J's judgment. The last sentence, that the power of amendment "is given for the purpose of promoting the purposes of the scheme, not altering it" is directed to the amendment powers in the Courage pension schemes. Lord Walker commented at para 21 that "the amendments proposed in the *Courage* case were not permissible because they were part of an unnatural and manipulative plan which would have severed the pension fund from the workforce for whom it was established".

108. These authorities confirm the central importance of the purpose of a trust to the determination of the proper purpose of a fiduciary power to amend the trust deed, but they do not provide support for the substratum rule, in its absolute terms, advanced on behalf of Winston Wong. Determination of the proper purpose of any power, including a power of amendment, is to be achieved by reference to the factors considered earlier in this judgment, with no doubt a strong presumption that a power of amendment is not to be used to alter the purpose of the trust.

109.    The absolute nature of the substratum rule advanced by Winston Wong is not consistent with Australian authority. In *Kearns v Hill* (1990) 21 NSWLR 107, a decision of the Court of Appeal of New South Wales, Mahoney JA said at p.108:

> "In earlier times, the view was taken in some cases that…the intention of the settler was that the alterations to be made should not alter the main structure of the trust or the beneficial entitlements under it. I doubt that that would be seen as the intention of such a clause at the present time. As the precedent books show, discretionary trusts have in more recent times been used to provide to the settler or the person having the benefit of the power of variation the power to make fundamental changes in the structure of the trust document and the entitlements under it."

110.    The issue in *Permanent Trustee Co Ltd v National Australia Managers Ltd* (1998, unreported), a first instance decision of the New South Wales Supreme Court, was whether a power of amendment in the trust deed constituting a unit trust permitted the termination of the unit trust and the cancellation of the units in consideration of the issue to the unitholders of shares in a new company holding the assets and carrying on the business of the unit trust. McLelland CJ in Eq held that the proposal was within the power of amendment which was "expressed very widely, one would presume, to provide machinery to meet any contingency, foreseeable or otherwise". The contrary argument was based on the principle expressed in *Hole v Garnsey* which was "really no more than that a widely expressed power may be subject to limitations implied from the context and surrounding circumstances, including its evident purpose. The same applied to implied limitations precluding the 'destruction of the substratum', as it has been expressed, of a contract or trust". This decision was cited and applied in *Mirvac v Mirvac Funds Ltd* [1999] NSWSC 457, (1999) 32 ACSR 107.

111.    The reference to the substratum of a trust appears to have originated in the judgment of Martin J in *In re Dyer* [1935] VLR 273, on appeal to the Full Court of the Victoria Supreme Court. The settlor established a trust for the express purpose of raising funds from donors, of which the settlor was one, for a permanent fund to assist the establishment and maintenance of an orchestra in the State of Victoria. Faced with difficulties in achieving this purpose, the court was asked to rule whether the objects of the trust could be altered to provide instead for the income to be paid to various musical associations. Under the terms of the trust deed, the settlor reserved the power to vary all or any part of the trusts and powers under the deed. It was held at first instance that the power did not permit the settlor to vary the trusts

so as to apply the fund in a way which would depart from the original purpose of the trust. Although the Full Court upheld the first instance decision on a different ground, the three judges expressed agreement with this reasoning. Irvine CJ and Gavan Duffy J said that the power to "vary" was "not apt enough to describe the substitution of one trust for another". Martin J said at pp.290 - 291:

> "It would be strange if the donor who desired to help in founding a fund for a particular purpose, and who expected others to contribute to that fund, attempted to reserve to himself a power to change the whole substratum of the gift, not only as regards his own donation, but also the donations of others who subscribed…What are the limits of the power to vary is a very difficult question, which does not call for determination here…".

112.    The settlor's power of variation was not a fiduciary power, so the issue was one of construction of the provision conferring the power in the context of the deed as a whole, including in particular that the fund was intended to attract contributions from other donors. Martin J's reference to substratum was picked up by Megarry J in *In re Ball's Settlement Trusts* [1968] 1 WLR 899. The issue was whether an arrangement revoking the existing trusts of a settlement and resettling the fund could be approved by the court under section 1(1) of the Variation of Trusts Act 1958. In *In re T's Settlement Trusts* [1964] Ch 158, Wilberforce J had held that a resettlement was outside the scope of a variation which the court could approve. In *In re Holt's Settlement* [1969] Ch 100, Megarry J had held that a resettlement was within section 1(1) if in substance the new trusts were recognisable as the former trusts, though with variations. In *Re Ball's Settlement Trusts*, the arrangement would result in new trusts which were very different from the old, leaving only "the general drift or purport" of the old trusts. Megarry J held that such an arrangement was nonetheless a variation that the court could approve. In identifying what had to remain of the old trusts for the arrangement to qualify as a variation, he said at p.905:

> "I borrow with gratitude from the language of Martin J [in *In re Dyer*]. If an arrangement changes the whole substratum of the trust, then it may well be that it cannot be regarded merely as varying that trust. But if an arrangement, while leaving the substratum, effectuates the purpose of the original trust by other means, it may still be possible to regard that arrangement as merely varying the original trusts, even though the means employed are

wholly different and even though the form is completely changed."

113.    These cases were concerned with the scope of the court's jurisdiction under the Variation of Trusts Act 1958. They were not dealing with the construction, or with the proper purposes, of powers of amendment contained in a trust deed.

114.    While the Board rejects the substratum rule as an absolute principle, the purpose of a trust is of central importance in determining the purpose of a power to amend it, as it is indeed also for determining the purpose of powers to add or exclude objects or beneficiaries, such as that contained in clause 8 of the GRT trust deed. It is by focusing on the purpose of the clause 8 powers, rather than applying an absolute substratum rule, that the Board has concluded that the exercise of those powers in September 2005 was invalid.

*The best interests of the identified objects and beneficiaries*

115.    On behalf of Tony Wang, it was submitted that the central question was whether the GRT trustee could validly use its powers under clause 8 to destroy, rather than to advance, the interests of the identified Beneficiaries and the default beneficiaries. The central legal submission was that the purpose of all fiduciary powers conferred on a trustee of private trust with identified beneficiaries, such as a typical family trust, was to advance the interests of the objects and beneficiaries (for convenience, together referred to as "beneficiaries") as they are constituted at the time the power is exercised. The purpose of a typical family trust is coterminous with its identified beneficiaries. Radical changes may properly be made to such a trust, or to the beneficial interests under it, provided the changes are in the interests of one or more identified beneficiaries. The only possible exception was if the trust instrument expressly provided that the power could be exercised for purposes other than the best interests of the identified beneficiaries.

116.    In his analysis of the purpose of a fiduciary power, Mr Wilson distinguished two types of purpose, the overall purpose of the trust (which he called the fundamental purpose) and the purpose specific to a particular power (which he called the power-specific purpose). A power-specific purpose must be consistent with the fundamental purpose. In the case of many powers, there may be no distinction between these purposes.

117.    Applying this analysis to a typical family trust for identified beneficiaries, it was submitted that the fundamental purpose is to advance the interests of those

beneficiaries and all powers under the trust deed must be exercised in furtherance of that purpose. This applied to powers to add or to exclude beneficiaries, such as those under clause 8 of the GRT trust deed, as much as to any other power.

118. Authorities cited in support of this principle included *Cowan v Scargill* [1985] Ch 270, 286-287 per Sir Robert Megarry V-C, *Merchant Navy Ratings Pension Fund Trustees v Stena Line* [2015] EWHC 448 (Ch), [2015] Pens LR 239 per Asplin J at paras 228-229 and an article by Lord Nicholls of Birkenhead, “Trustees and their broader community: where duty, morality and ethics converge” (1995) 9(3) TLI 71.

119. Mr Wilson submitted that the fundamental purpose of the GRT was to benefit the beneficiaries identified in schedules 2 and 3 to the trust deed, together with any further persons legitimately added to schedule 2. It followed, he submitted, that any exercise of the powers under clause 8 had to be for the benefit of those beneficiaries, or at least one of them. As the purpose of the addition of the WFT trustee and the exclusion of the children and remoter issue of the Founders was not to benefit the latter but to deprive them of any possibility of benefit under the GRT, the challenged decision was made for an improper purpose.

120. In the Board’s view, it is generally the case that fiduciary powers conferred on a trustee of a trust with identified beneficiaries must be exercised to further the interests of the beneficiaries. This is clearly the case with essentially administrative powers, such as the powers of investment. It should be noted that both *Cowan v Scargill* and Lord Nicholls’ article were concerned with powers of investment.

121. The power to add or to exclude beneficiaries is, however, a power of a potentially different character. It has the capacity to effect significant, even fundamental, changes to a trust. The question is whether, in the case of such a power contained in any particular trust deed, it is intended to have that capacity, or indeed to have any purpose that goes wider than simply furthering the interests of the identified beneficiaries. In the view of the Board, the question of the purpose of such a power is not to be answered by applying, as an overriding principle, a rule that all powers must be exercised in the interests of some or all of the beneficiaries, unless express provision to the contrary is made. The task is to discern the intended purpose of the particular power of addition and exclusion in the context of the particular trust. This requires the approach of considering the power in the context of the trust instrument, and of the circumstances surrounding it, which the Board has earlier set out and applied. The concept of a fundamental purpose of a trust, for which Mr Wilson argued, seems to come close to the substratum rule for which Mrs Talbot Rice contended. In a case such as the present, where it appears to the Board that the GRT has a clear purpose, it has a decisive effect on identifying the purpose of

the clause 8 powers, but the purpose of a trust must be judged by reference to all the terms of the trust instrument, including any powers of addition and exclusion of beneficiaries, and to the circumstances in which the trust was created.

*Conclusion on proper purpose*

122.    For the reasons given above, the Board concludes that the challenged decision was taken by the GRT trustee for an improper purpose, but does not do so by the application of the rigid approaches which formed a major part of the cases for the appellants. As regards the consequence in law of this conclusion, there has been debate as to whether the exercise of a fiduciary power for an improper purpose renders the exercise void or voidable, as to which see *Pitt v Holt* at para 62 (Lord Walker), but the parties are agreed that in the present case the consequence is that the challenged decision was void.

*Remoteness of vesting*

123.    Clarke P dealt fully and carefully with the appellants' case, as it was presented to the Court of Appeal, that the transfer of the assets of the GRT to the WFT trustee infringed the rule against remoteness of vesting. The case as presented to the Board depends, in the first instance, on either construing clause 4 of the GRT trust (under which the transfer of assets was made) as being subject to the express restriction contained at the end of clause 9, or on implying into clause 4 a restriction in the same terms. The express restriction in clause 9 was: "no such payment or transfer shall be made which would *or might* infringe any applicable rule governing remoteness of vesting" (emphasis added).

124.    The significance of the emphasised words is, as the appellants submit and may for present purposes be accepted, that it applies the equitable rule against remoteness of vesting, which prohibited a transfer to the trustee of a different trust not only where an interest in the property would definitely not vest within the perpetuity period applicable to the transferor trust but also where it might not do so. The equitable rule was modified in Bermuda by the Perpetuities and Accumulations Act 1989 by the introduction of a "wait and see" provision, so that a transfer was not immediately void if an interest in the property might not vest until after the expiry of the perpetuity period. It would be void only if an interest in the assets in fact did not vest within the perpetuity period applicable to the transferor trust.

125.    The appellants submit that if the power of transfer under clause 4 was subject only to the statutory rule, it would produce a very unsatisfactory result. If it

transpired that an interest in the transferred assets did not vest within the perpetuity period, the transfer of the assets would be void and the assets would revert to the GRT. This could be damaging to subsequent arrangements which might have been made in relation to the trust or, as in the present case, the assets would revert many years after the trust had been brought to an end. This possibility would create an undesirable degree of uncertainty. Further, it is submitted that if the restriction in clause 9 is confined to transfers to which clause 9 applies, it would be easy to avoid that restriction by the expedient of adding a trustee as a Beneficiary under clause 8 and making a transfer of assets to it under clause 4. For these reasons, the appellants submit either that, construing the GRT trust deed as a whole, the express restriction in clause 9 should be read as applying also to clause 4 or a restriction in the same terms should be implied in clause 4.

126.    The Board is unable to see any basis on which either of these submissions can be accepted. Whatever the reason for including the express restriction in clause 9, which applies the stricter equitable rule against remoteness of vesting in place of the usual statutory rule, there are no grounds for reading the stricter restriction into clause 4. Construction of the GRT trust deed must proceed on the assumption that a decision was taken to include it in clause 9, but not in clause 4. There is nothing in the terms of the trust deed to suggest that this was an oversight or mistake, as opposed to a deliberate choice. Nor is there any necessity, whether on grounds of business efficacy or otherwise, for implying the restriction into clause 4.

127.    On this basis, the appellants' case on remoteness of vesting fails. If clause 4 was properly to be read as subject to the restriction, further issues on the application of the rule against remoteness of vesting would arise. As Clarke P observed, these issues are recondite and not without difficulty. Having decided against the appellants on the applicability of the restriction, he set out his conclusions on these issues by way of a preliminary analysis only. On this appeal, it is not necessary for the Board to address those issues and it does not do so.

*Conclusion*

128.    The Board concludes that the appeal succeeds, for the reasons given in this judgment, as regards the application of the proper purpose rule to the challenged decision. The Board will accordingly humbly advise His Majesty to allow the appeal.

apply only to transfers or dispositions of property made to a trustee of a trust after the commencement of this Part, but this declaration shall be without prejudice to the validity or otherwise of transfers or dispositions made before that time.

*(Inserted by Act 7 of 1993)*

(3) This section shall only apply to trusts created before the date on which section 83A comes into force. *(Inserted by Act 11 of 2003)*

**Conflict of law rules for certain trusts and dispositions**

**83A.** (1) In this section and the First Schedule, unless the context otherwise requires—

"disposition" in relation to any property, includes every form of conveyance, transfer, assignment, lease, licence, mortgage, charge, pledge, encumbrance or other transaction of that property or by which any interest in it is created or extinguished;

"foreign law" means the law of any part of the world outside the Territory, other than a provision in an Act of the Parliament of the United Kingdom, or an enactment made under such Act, which extends to the Territory as part of the law of the Territory;

"Hague Trusts Convention" means the convention on the Law Applicable to Trusts and on their Recognition, as applicable to the Territory by virtue of the Recognition of Trusts Act 1987 (Overseas Territories) Order 1989;

"heirship rights" means any right, claim or interest in, against or to property of a person arising, accruing or existing in consequence of, or in anticipation of, that person's death, other than any such right, claim or interest created by will or other voluntary disposition by such person or resulting from an express limitation in the disposition of the property to such person;

"judgment" means any judgment or award of arbitration given by a court, tribunal or arbitrator in any part of the world, whatever the judgment or award may be called, including a decree, order, decision or writ of execution, as well as the determination of costs or expenses by an officer of the court or by a tribunal or arbitrator;

"personal relationship" includes every form of relationship by blood or marriage, including former marriage, and, in particular, a personal relationship between two persons exists if—

*(a)* one is the child of the other, natural or adopted (whether or not the adoption is recognised by law), legitimate or illegitimate;

*(b)* one is married to the other (whether or not the marriage is recognised by law);

*(c)* one cohabits with the other or so conducts himself in relation to the other as to give rise in any jurisdiction to any rights, obligations or responsibilities analogous to those of a parent and child or husband and wife; or

*(d)* personal relationships exist between each of them and a third person;

"settlor", in relation to a trust, includes every person who, directly or indirectly, on behalf of himself or on behalf of any other, as owner or as holder of a power in that behalf, makes a disposition of property to be held in that trust or declares or otherwise creates such trust;

"terms" includes express and implied terms;

"Virgin Islands trust" means a trust the essential validity of which is, for the time being, governed by the law of the Territory and which is—

*(a)* created on or after the date on which this section comes into force; or

*(b)* created before the date on which this section comes into force, but the proper law of which has been changed to the law of the Territory after that date in accordance with section 81.

(2) For the purposes of this section and the First Schedule, no change in circumstances causes a personal relationship, once established, to terminate.

(3) In the definition of "Virgin Islands trust" in subsection (1), subsections (9) and (12) and items 2, 3, 4(A) and 7 of the First section and the First Schedule, where the context so admits, "law" excludes choice of law rules, but otherwise in this Schedule, "law" includes choice of law rules.

(4) In subsection (11), "internal law" excludes choice of law rules.

(5) For the purposes of identifying the law applicable under this section and the First Schedule, the Territory shall be treated as a State and where a State comprises more than one territorial unit, each of which has its own rules of law, each territorial unit shall be treated as a State.

(6) Without prejudice to subsections (13) to (18), in ascertaining whether a trust has been completely constituted, the preliminary issues referred to in Article 4 of the Hague Trusts Convention shall be determined, to the extent so provided, in accordance with subsections (7) to (11) and the First Schedule.

(7) The formal and essential validity of a disposition, not being a testamentary disposition, of immovable property or tangible movable property, and the capacity to make the disposition, shall be determined according to the law of the State in which the property is situated at the time of the disposition.

(8) The formal and essential validity of a disposition, not being a testamentary disposition, of intangible movable property, and the capacity to make the disposition, shall be determined in accordance with the First Schedule, or, in the case of intangible movable property not provided for in the First Schedule, in accordance with the law under which the property came into existence.

(9) The capacity to subject property to a trust, not being a testamentary trust, as distinct from the capacity to dispose of that property, shall be determined in accordance with the law governing the essential validity of the trust.

(10) Where a person declares a trust of his own property, there shall be no requirement for compliance with the rules on formal or essential validity or capacity applicable to a disposition of that property or of any interest in it.

(11) Where, under subsections (6) to (10) and the First Schedule, an issue falls to be determined by the law of the Territory, the choice of law rules of the Territory shall designate the internal law of the Territory to determine the issue.

(12) Subject to subsections (6) to (11) and the First Schedule, all questions arising in regard to the validity, construction, effect or administration, whether the administration is conducted in the Territory or elsewhere, of a trust including—

*(a)* questions relating to any of the following matters, being matters specified in Article 8 of the Hague Trusts Convention—

(i) the appointment, resignation and removal of trustees, the capacity to act as a trustee, and the devolution of the office of trustee;

(ii) the rights and duties of trustees among themselves;

(iii) the right of trustees to delegate in whole or in part the discharge of their duties or the exercise of their powers;

(iv) the powers of trustees to administer or to dispose of trust assets, to create security interests in the trust assets, or to acquire new assets;

(v) the powers of investment of trustees;

(vi) restrictions upon the duration of the trust, and upon the power to accumulate the income of the trust;

(vii) the relationships between the trustees and the beneficiaries including the personal liability of the trustees to the beneficiaries;

(viii) the variation or termination of the trust;

(ix) the distribution of trust assets;

(x) the duty of trustees to account for their administration; and

*(b)* to the extent that they do not fall under paragraph *(a)*, questions as to—

(i) the fiduciary or non-fiduciary powers, obligations or duties of the trustees or to the liabilities or rights of the trustees;

(ii) the existence and extent of powers conferred or retained, including powers to vary or revoke the trust and powers of appointment, and questions as to the validity of any exercise of any such power,

are to be determined by the proper law of the trust or, where there are different proper laws for different aspects of the trust, the proper law applicable to the area in which the question falls.

(13) Subject to any express provision to the contrary in the trust or disposition, no Virgin Islands trust, and no disposition of property to be held upon the trusts of such a trust, is void, voidable, liable to be set aside or defective in any fashion, nor is the capacity of any settlor in relation to the trust or disposition to be questioned, nor is the trustee or any beneficiary or other person to be subjected to any liability or deprived of any right, by reason that—

*(a)* the law of any foreign jurisdiction prohibits or does not recognise the concept of a trust, or

*(b)* the Virgin Islands trust or the disposition—

(i) avoids or defeats any right, claim or interest conferred by foreign law upon any person by reason of a personal relationship to the settlor or by way of heirship rights; or

(ii) contravenes any rule of foreign law or any foreign judicial or administrative order or arbitration order or action intended to recognise, protect, enforce or give effect to such a right, claim or interest.

(14) Heirship rights conferred by foreign law in relation to the property of a living person shall be disregarded when determining rights of ownership of property subject to, or claimed to be subject to, a Virgin Islands trust.

(15) Heirship rights conferred on persons by foreign law shall not be taken to constitute those persons creditors for the purposes of section 81 of the Conveyancing and Law of Property Ordinance, nor to constitute those persons "creditors or others" for the purposes of the Act against Fraudulent Deeds, Gifts, Alienations, etc. to the extent, if any, that that Act has any application in the Territory.

(16) Subject to subsection (17), the law designated as applicable to succession by virtue of the Territory's choice of law rules shall apply to a Virgin Islands trust, not being a testamentary trust, only to the extent that it does not contain rules conferring any right, claim or interest upon any person by reason of a personal relationship to the settlor or by way of heirship rights.

(17) Subsection (16) shall not apply where the law so designated is that of the Territory.

(18) In the case of a conflict between any of the provisions of subsections (13) to (17) and any of the provisions of subsections (6) to (11) and the First Schedule, the provisions of subsections (13) to (17) shall prevail.

(19) To the extent that it is inconsistent with subsections (13) to (18), a foreign judgment shall not be recognised or enforced or give rise to any estoppel, and both its recognition and its enforcement shall be regarded as contrary to the public policy of the Territory,

(20) Subsections (6) to (12) apply only to trusts created on or after the date on which this section comes into force.

*(Inserted by Act 11 of 2003)*

**Purpose trusts**

**84.** (1) For the purpose of this section—

*(a)* "designated person" means—

(i) a legal practioner practising in the Territory, *(Substituted by Act 6 of 2013)*

(ii) an accountant practising in the Territory who qualifies as an "auditor" for the purposes of the Banks and Trust Companies Act,

(iii) a licensee under the Banks and Trust Companies Act, or

(iv) such other person as the Minister of Finance may by order designate; and

*(b)* "trust for any purpose" means a trust other than a trust—

(i) that is for the benefit of particular persons whether or not immediately ascertainable, or

(ii) that is for the benefit of some aggregate of persons ascertained by reference to some personal relationship.

(2) A person may create a valid trust for any purpose, whether charitable or not, if—

*(a)* the purpose is specific, reasonable and possible;

*(b)* the purpose is not immoral, contrary to public policy or unlawful;

*(c)* at least one trustee of the trust is a designated person;

*(d)* the trust instrument appoints a person, who may be a protector, to enforce the trust and provides for the appointment of a successor to such person;

*(e)* the person appointed to enforce the trust is a party to the trust instrument or consents in writing, addressed to the trustee who is a designated person, to enforce the trust; and

*(f)* the trust instrument specifies the event upon the happening of which the trust terminates and provides for the disposition of surplus assets of the trust upon its termination.

(3) The rule against perpetuities and remoteness of vesting shall not apply to a trust to which subsection (2) applies and, for the avoidance of doubt, the rule against perpetuities and remoteness of vesting includes the rule against inalienability, the rule against perpetual trusts, any rule prohibiting a trust under which trust property would, apart from that rule, be inalienable beyond a permissible period, and any rule prohibiting a trust or power under which trust property would, apart from that rule, be capable of application for a purpose beyond a permissible period. *(Amended by Act 11 of 2003)*

(4) Nothing in this section shall affect the existing law with respect to trusts established for charitable purposes.

(5) Where a trustee who is a designated person has reason to believe that a person who is appointed to enforce the trust is dead, is unwilling, refuses or is unfit to act or is incapable of acting, then that trustee shall as soon as practicable inform the Attorney General in writing of the fact and send him a copy of the instrument creating the trust, together with all relevant documents attesting to the inability of the designated person to act.

(6) The Attorney General on being informed under subsection (5) may within 90 days apply to a Judge in Chambers for the appointment of a person to enforce the trust and the court may, unless it feels that the person is not fit, by order declare that person to be the person to enforce the trust.

(7) The order of the court under subsection (6) is conclusive evidence of the appointment of the person to enforce the trust and the appointment takes effect as from the date of the order.

(8) Where any costs are incurred by the Attorney General in connection with any application under subsection (6), the court may make such order as it considers just as to the payment of those costs out of the assets of the trust.

(9) Where a designated person fails to comply with subsection (5), then, subject to subsection (10), the designated person is guilty of an offence and is liable on summary conviction to a fine of not more than $5,000.

(10) It shall be a defence to a charge of committing an offence under subsection (9) to prove that the designated person took all reasonable steps and exercised all due diligence to avoid committing the offence.

(11) The person appointed pursuant to paragraph *(d)* of subsection (1) shall be entitled, in addition to any documents, information or other rights specifically provided for in the trust instrument, to—

    *(a)* annual accounts of the trust;

    *(b)* copies of the trust instrument and deeds and other written instruments executed pursuant to the trust instrument; and

    *(c)* counsels' opinions and legal advice received by the trustees.
                *(Inserted by Act 7 of 1993)*

(12) Where any of the persons specified in subsection (13) has reason to believe that no trustee of a trust to which subsection (2) applies is a designated person or that no designated person is likely in the immediate future to be appointed as a trustee pursuant to the terms of the trust instrument, that person shall use all reasonable endeavours to secure the appointment of a designated person as a trustee of the trust and if such endeavours fail to result in such an appointment he shall make an application to the Court for the appointment of a designated person pursuant to the provisions of subsection (14).

(13) The persons referred to in subsection (12) are—

    *(a)* any trustee of the trust who is not a designated person; and

    *(b)* any person who has been appointed to enforce the trust.

(14) If, at any time following its creation, a trust to which subsection (2) applies does not have at least one trustee who is a designated person, on the application in relation to the trust by—

    *(a)* any existing trustee of the trust,

    *(b)* a person who has been appointed to enforce the trust, or

    *(c)* the Attorney General,

the Court shall make an order appointing a designated person as a trustee of the trust.

(15) On an application in relation to a purpose trust by—

    *(a)* a trustee of the trust; or

    *(b)* a person who has been appointed to enforce the trust,

the Court may in such manner as it thinks fit vary any of the purposes of the trust, or enlarge or otherwise vary any of the powers of the trustees or other provisions of the trust.

(16) In exercising the powers conferred upon it by subsection (15), the Court shall have regard to such factors as the Court thinks material, which may include—

*(a)* such changes in circumstances since the trust was created as are in the opinion of the Court relevant; and

*(b)* such factors and proposals as are set out in the application.

(17) The changes in circumstances referred to in subsection (16)*(a)* may include the fact that the execution of the trust in accordance with its terms has become in whole or in part—

*(a)* impossible or impracticable;

*(b)* unlawful or contrary to public policy; or

*(c)* obsolete in that, by reason of changed circumstances, it fails to achieve the intention of the settlor and the spirit of the gift.

(18) Where any costs are incurred in connection with an application under subsection (15), the Court may make such order as it considers just as to payment of those costs, including payment out of the property of the trust.

(19) Where any costs are incurred by the person who has been appointed to enforce the trust in connection with enforcement, the Court may make such order as it considers just as to payment of those costs, including payment out of the property of the trust.

(20) For the purposes of section 203 of the Criminal Code property held upon the trusts of a trust to which subsection (2) applies shall be regarded, as against the trustee and as against the person who has been appointed to enforce the trust, as belonging to others, and an intention on the part of any such person to defeat the trust shall be regarded as an intention to deprive others of their property.

(21) The trustee of a trust to which subsection (2) applies who is a designated person shall keep in the Territory a documentary record of—

*(a)* the terms of the trust;

*(b)* the identity of any other trustees and the person who has been appointed to enforce the trust;

*(c)* all settlements of the property upon the trust and the identity of settlors;

*(d)* the accounts of the trust; and

*(e)* all distributions or applications of the trust property.

(22) This section shall only apply to trusts created before the date on which section 84A comes into force.

*(Inserted by Act 11 of 2003)*

# Fraudulent Conveyances Act 1571

| **Year:** | 1571 |
|---|---|

**vLex Document Id:** VLEX-861268432

**Link:** https://justis.vlex.com/vid/fraudulent-conveyances-act-1571-861268432

# Anno decimo tertio Regin E l i z a b e t h .

# An Act against fraudulent Deeds, Alienations, &c.

# (13 Eliz. 1) C A P. V.

'F O R the Avolishing and Abolishing of feigned, covinous and fraudulent Feoffments, Gifts, Grants, Alienations, Conveyances, Bonds, Suits, Judgments and Executions, as well of Lands and Tenements as of Goods and Chattels, more commonly used and practised in there Days than hath been seen or heard of heretofore: (2) Which Feoffments, Gifts, Grants, Alienations, Conveyances, Bonds, Suits, Judgments and Executions, have been and are devised and contrived of Malice, Fraud, Covin, Collusion or Guile, to the End, Purpose and Intent, to delay, hinder or defraud Creditors and others of their just and lawful Actions, Suits, Debts, Accounts, Damages, Penalties, Forfeitures, Heriots, Mortuaries and Reliefs, not only to the Let or Hinderance of the due Course and Execution of Law and Justice, but also to the Overthrow of all true and plain Dealing, Bargaining and Chevisance between Man and Man, without the which no Common wealth or civil Society can be maintained or continued:'

# S-II

## All fraudulent Conveyances made to avoid the Debt or Duty of others shall be void. Rast. 207.

**II All fraudulent Conveyances made to avoid the Debt or Duty of others shall be void. Rast. 207.**

II. Be it therefore declared, ordained and enacted by the Authority of this present Parliament, That all and every Feoffment, Gift, Grant, Alienation, Bargain and Conveyance of Lands, Tenements, Hereditaments, Goods and Chattels, or of any of them, or of any Lease, Rent, Common or other Profit or Charge out of the same Lands, Tenements, Hereditaments, Goods and Chattels, or any of them, by Writing or otherwise, (2) and all and every Bond Suit, Judgment and Execution, at any Time had or made sithence the Biginning of the Queen's Majesty's Reign that now is, or at any Time hereafter to be had or made, (3)to or for any Intent or Purpose before declared and expressed, shall he from henceforth deemed and taken (only as against that Person or Persons, his or their Heirs, Successors, Executors, Administrators

and Assigns, and every of them, whose Actions, Suits, Debts, Accounts, Damages, Penalties, Forfeitures, Heriots, Mortuaries and Reliefs, by such guileful, covinous or fraudulent Devices and Practices, as is aforesaid, are, shall or might be in any ways disturbed, hindred, delayed or defrauded) to be clearly and utterly void, frustrate and of none Effect; any Pretence, Colour, feigned Consideration, expressing of Use, or any other Matter or Thing to the contrary notwithstanding.

# S-III

## The Forfeiture of the Parties to fraudulent Deeds.

**III The Forfeiture of the Parties to fraudulent Deeds.**

III. And be it further enacted by the Authority aforesaid, That all and every the Parties to such feigned, covinous or fraudulent Feoffment, Gift, Grant, Alienation, Bargain, Conveyance, Bonds, Suits, Judgments, Executions and other Things before expressed, and being privy and knowing of the same, or any of them; (2)which at any Time after the tenth Day of*June* next coming shall wittingly and willingly put in Ure, avow, maintain, justify or defend the same, or any of them, as true, simple, and done, had or made *bona side* and upon good Consideration; (3) or shall alien or assign any the Lands, Tenements, Goods, Leases or other Things before-mentioned; to him or them conveyed as is aforesaid, or any Part thereof; (4) shall incur the Penalty and Forfeiture of one Year's Value of the said Lands, Tenements and Hereditaments, Leases, Rents, Commons or other Profits, of or out of the same; (5) and the whole Value of the said Goods and Chattels; (6) and also so much Money as are or shall be contained in any such covinous and feigned Bond; (7)the one Moiety whereof to be to the Queen's Majesty, her Heirs and Successors, and the other Moiety to the Party or Parties grieved by such feigned and fraudulent Feoffment, Gift, Grant, Alienation, Bargain, Conveyance, Bonds, Suits, Judgments, Executions, Leases, Rents, Commons, Profits, Charges and other Things aforesaid, to be recovered in any of the Queen's Courts of Record by Action of Debt, Bill, Plaint or Information, wherein no Essoin, Protection or Wager of Law shall be admitted for the Defendant or Defendants; (8) and also being thereof lawfully convicted, shall suffer Imprisonment for one Half Year without Bail or Mainprise.

# S-IV

## Common Recoveries against the Tenants of Freehold.

**IV Common Recoveries against the Tenants of Freehold.**

IV. Provided always, and be it further enacted by the Authority aforesaid, That whereas sundry common Recoveries of Lands, Tenements and Hereditaments have heretofore been had, and hereafter may be had against Tenant in Tail, or other Tenant of the Freehold, the Reversion or Remainder, or the Right of Reversion or Remainder, then being in any other Person or Persons; (2) that every such common Recovery heretofore had, and hereafter to be had, of any Lands, Tenements or Hereditaments, shall as touching such Person and Persons which then had any Remainder or Reversion, or Right of Remainder or Reversion, and against the Heirs of every of them, stand, remain and be of such like Force and Effect, and of none other, as the same should have been if this Act had never been had ne made.

# S-V

## Making an Estate whereby a Voucher may be used in a Formedon.

**V Making an Estate whereby a Voucher may be used in a Formedon.**

V. Provided always, and be it further enacted by the Authority aforesaid, That this Act, or any Thing therein contained, shall not extend to make void any Estate or Conveyance, by reason whereof any Person or Persons shall use any Voucher in any Writ of*Formedon* , now depending or hereafter to be depending, but that all and every such Vouchers in any Writ of *Formedon* shall stand and be in like Force and Effect, as if this Act had never been had ne made; any Thing before in this Act contained to the contrary notwithstanding.

# S-VI

## Estates made upon good Consideration, and bona side.

**VI Estates made upon good Consideration, and bona side.**

VI. Provided also, and be it enacted by the Authority aforesaid, That this Act, or any Thing therein contained, shall not extend to any Estate or Interest in Lands, Tenements, Hereditaments, Leases, Rents, Commons, Profits, Goods or Chattels, had, made, conveyed or assured, or hereafter to be had made, conveyed or assured, which Estate or Interest is or shall be upon good Consideration and*bona fide* lawfully conveyed or assured to any Person or

Persons, or Bodies Politick or Corporate, not having at the Time of such Conveyance or Assurance to them made, any Manner of Notice or Knowledge of such Covin, Fraud or Collusion as is aforesaid; any Thing before mentioned to the contrary hereof notwithstanding.

# S-VII

## For farther Provisions against fraudulent Conveyances, see 29 Car. 2. c. 3. and 3 W. & M. c. 14.

**VII For farther Provisions against fraudulent Conveyances, see 29 Car. 2. c. 3. and 3 W. & M. c. 14.**

VII. This Act to endure unto the End of the first Session of the next Parliament. 50 Ed. 3. c. 6. 2 R. 2. Stat. 2. c. 3. 3 H. 7. c. 4. made perpetual by 29 Eliz. c. 5. See 27 Eliz. c. 4.

Note : this act is listed in the Chronoloical Table of Statutes as theFraudulent Conveyances Act, 1571

(3) The trustees may from time to time, out of the income of the land, including the produce of the sale of timber and underwood, pay the expenses incurred in the management, or in the exercise of any power conferred by this section, or otherwise in relation to the land, and all outgoing not payable by any tenant or other person, and shall keep down any annual sum, and the interest of any principal sum, charged on the land.

(4) Where the infant's estate or interest is an undivided share of land, the powers of this section relative to the land may be exercised jointly with persons entitled to possession of, or having power to act in relation to, the other undivided share or shares.

(5) This section has effect subject to an express appointment by the settlement, or the Court, of trustees for the purposes of this section or of any enactment replaced by this section.

(6) Where any person is contingently entitled to land, this section shall, subject to any prior interests or charges affecting that land, apply until his interest vests, or, if his interest vests during his minority, until he attains the age of 21 years.

This subsection applies only where a person becomes contingently entitled under an instrument coming into operation after the 31st day of December, 1881.

(7) This section applies only if and as far as a contrary intention is not expressed in the instrument, if any, under which the interest of the infant or person contingently entitled as aforesaid arises, and has effect subject to the terms of that instrument and to the provisions therein contained.

## PART XI

## VOIDABLE DISPOSITIONS

### Voluntary conveyances to defraud creditors voidable

**81.** (1) Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced.

(2) This section does not affect the operation of a disentailing assurance, or the law of bankruptcy for the time being in force.

(3) This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith or upon good consideration and in good faith to any person not having at the time of conveyance, notice of the intent to defraud creditors.

### Voluntary disposition of land how far voidable as against purchasers

**82.** (1) Every voluntary disposition of land made with intent to defraud a subsequent purchaser is voidable at the instance of that purchaser.

(2) For the purposes of this section, no voluntary disposition, whenever made, shall be deemed to have been made with intent to defraud by reason only that a subsequent disposition for valuable consideration was made, if such subsequent disposition was made after the 28th day of June, 1893.

**EASTERN CARIBBEAN SUPREME COURT**
**BRITISH VIRGIN ISLANDS**
**IN THE HIGH COURT OF JUSTICE**
**COMMERCIAL DIVISION**

**CLAIM NO. BVIHC (COM) 2022/0025**

**IN THE MATTER OF DOCILE BRIGHT INVESTMENTS LIMITED (IN LIQUIDATION)**
**AND IN THE MATTER OF THE INSOLVENCY ACT 2003**

**BETWEEN:**

**LAI WING LUN**
**(AS SOLE LIQUIDATOR OF DOCILE BRIGHT INVESTMENTS LIMITED (IN LIQUIDATION))**

**Applicant**

**-AND-**

**MARINE BRIGHT LIMITED**

**Respondent**

**Appearances**

Mr. Stuart Cribb and Mr. Dhanshuklal Vekaria of Carey Olsen for the Applicant
Mr. Robert Amey, with him Ms. Sarah Latham of Ogier for the Respondent

---

2022 July 25
August 23

---

## JUDGMENT

[1] **JACK, J [Ag.]**: In this matter, a liquidator of a company seeks to set aside a transaction with the company. The respondent cross-applies to strike out the liquidator's application.

[2] I shall use the following shorthand in this judgment:

Mr. Briscoe: Mr. Stephen Briscoe, a BVI licensed insolvency practitioner with FFP

Docile Bright: Docile Bright Investments Ltd, the company over which Mr. Lai is a liquidator, wholly owned by GZHK

The February 2017 letter: a letter sent 9th February 2017 by Marine Bright to Titan confirming that it was an affiliate of GZE

FFP: FFP (BVI) Ltd, a firm of BVI licensed insolvency practitioners

GZE: Guangdong Zhenrong Energy Company Ltd, the holding company of the group, owning all the shares in GZHK

GZHK: Guangdong Zhenrong (Hong Kong) Company Ltd, the owner of all the shares in Docile Bright and itself wholly owned by GZE

Mr. Lai: Lai Wing Lun, the applicant, one of the joint liquidators appointed over Docile Bright, also a non-executive director of Titan

Marine Bright: Marine Bright Ltd, the respondent

The preferred shares: 555,000,000 convertible preferred shares in Titan, consolidated on 5th September 2017 into 69,375,000 shares

Saturn: Saturn Petrochemical Holdings Ltd, a company owned by Warburg Pincus

Ms. Silver: Anna Silver, a BVI insolvency practitioner with FFP

Sino Charm: Sino Charm International Ltd, the petitioner, which presented a winding up petition against Titan in Bermuda claiming to be a creditor of Titan

Titan: Titan Petrochemicals Group Ltd, a company incorporated in Bermuda and listed on the Hong Kong Stock Exchange, the preferred shares of which are the subject of the current proceedings

The Titan scheme: the company restructuring of Titan started in 2012

Toprise: Toprise Global Ltd, the purchaser in June 2020 of all the shares in Marine Bright

The transaction: the sale or purported sale on 9th February 2017 by Docile Bright of the preferred shares to Marine Bright for a consideration of US$20 million (the payment of which is disputed)

Warburg Pincus: two private equity funds, Warburg Pincus Private Equity IX LP and Warburg Pincus (Bermuda) Private Equity IX LP

**The applications**

[3] The first application in time is Mr. Lai's application of 4th February 2022 to set aside the transaction. He alleges that the transaction was (1) at undervalue under section 246 and 249 of the **Insolvency Act 2003**[1] and (2) intended to defraud creditors and

[1] No 5 of 2003, Laws of the Virgin Islands.

thus liable to be set aside under section 91 of the **Conveyancing and Law of Property Act 1961**[2] and/or the **Fraudulent Conveyances Act 1571.**[3]

[4] The second application in time is Marine Bright's cross-application of 27th April 2022 to strike out Mr. Lai's set aside application. The cross-application alleges (1) that there are no reasonable grounds for bringing the set-aside application and (2) that the set-aside application is an abuse of process because (a) Mr. Lai has no authority to bring it and/or (b) it was brought for a collateral purpose.

**The undisputed facts**

[5] Docile Bright was incorporated in this Territory on 9th July 2012. It is wholly owned by GZHK. GZHK is in turn wholly owned by GZE. In around March 2007, Titan and Warburg Pincus agreed that Warburg Pincus would invest US$175 million in Titan. As part of that agreement, Titan issued the preferred shares (valued at HK$310,800,000) to Saturn, a Warburg Pincus company. By mid-2012, Titan was facing financial difficulties and provisional liquidators were appointed. This led to a restructuring via the Titan scheme, a scheme of arrangement in Bermuda.

[6] Part of the Titan scheme was the purchase of the preferred shares by Docile Bright from Saturn. On 12th October 2012, a number of documents were executed to affect the sale. These included an instrument of transfer, a declaration of trust and a grant of an irrevocable power of attorney in favour of Docile Bright, so that Docile Bright became entitled to all the benefit of the preferred shares. A straight share transfer was not possible at that time because Titan's bye-laws as they then stood made the preferred shares non-transferrable. On 22nd June 2015, as a further part of the Titan scheme the bye-laws were amended to allow a transfer of the preferred shares, but only to "[GZE] or its affiliates". The restructuring under the Titan scheme completed in mid-2016. The winding up petition presented against Titan was withdrawn. On 14th July 2016 the provisional liquidators were discharged. The next day trading in Titan's suspended shares resumed on the Hong Kong Stock Exchange.

---

[2] Cap 220, Revised Laws of the Virgin Islands
[3] 13 Eliz I c. 5

[7] Unfortunately by this time, GZE had itself run into financial difficulties. On 14th July 2016, a winding-up petition in respect of GZHK was presented to the Hong Kong Court of First Instance. An order winding GZHK up was made on 27th September 2017.

[8] On 9th February 2017, between the presentation and the deciding of the GZHK winding up petition, Docile Bright entered or purported to enter into the transaction which is the subject of the dispute in the current case. By the transaction Docile Bright sold or purported to sell the preferred shares to Marine Bright. The consideration was stated to be US$20 million. Whether that money was paid is a central issue for determination by me. The same day, Marine Bright sent a letter to Titan ("the February 2017 letter"), which asserted that it was an affiliate of GZE. The expression "affiliate" was undefined in the letter.

[9] On 26th July 2018, Mr. Lai and Mr. Osman Mohammed Arab (both insolvency practitioners in Hong Kong with the firm of RSMHK) were appointed as non-executive directors of Titan.

[10] On 4th February 2019, GZHK placed Docile Bright into insolvent liquidation by a resolution made by itself as sole member. Mr. Briscoe was appointed as its liquidator. At a creditors' meeting on 10th April 2019, Mr. Briscoe's appointment as liquidator was confirmed. Mr. Lai was appointed as joint liquidator with him.

[11] On 24th December 2020, Mr. Briscoe resigned due to retirement. This left Mr. Lai as the sole liquidator, but he was not admitted as a BVI insolvency practitioner. As I shall discuss below, this should not have occurred. Instead another BVI insolvency practitioner should have been appointed to replace Mr. Briscoe. The irregularity continued until recently when Ms. Silver, a BVI licensed insolvency practitioner with FFP was appointed as liquidator jointly with Mr. Lai.

[12] On 13th July 2021, following the service of a winding up petition by Sino Charm, which claimed to be a creditor of Titan, Hargun CJ sitting in the Supreme Court of

Bermuda made an order for the winding up of Titan. The directors of Titan have appealed, but their appeal had not yet been determined when I wrote the draft of this judgment. The learned Chief Justice found in relation to the preferred shares that:[4]

> "77. Docile Bright appears to have sold and transferred the Preferred Shares to Marine Bright after the presentation of the [winding up petition against GZHK] at a consideration of US$20 million on or about 9 February 2017. In a letter written by Conyers BVI, acting on behalf of the liquidators of Docile Bright, to Marine Bright dated 10 July 2019, Conyers referred to the sale of the 555 million Preferred Shares at a consideration of US$20 million by Docile Bright to Marine Bright and stated:
>
> > 'Copies of the Share Transfer and Bought and Sold Notes are attached for your reference. The JLs note that you are the registered shareholder of the Preferred Shares of List Co. However, there is no information to show that the purported consideration of US $20 million was received by the Company at all. In other words, the Preferred Shares were transferred to you for no consideration.'
>
> 78. In his Third Affirmation Mr. Lai seeks to further analyse the beneficial interest which Docile Bright may have in the [preferred shares] and concludes that:
>
> > 'The available information may support a view that DBIL may have acquired the beneficial interests of the Preferred Shares on 10 October 2013, DBIL have not (in particular[ ] it did not in September 2017) make any request for the issuance of the share certificate to itself and/or to register its name in the register of Titan.'
>
> 79. In considering this issue the Court reminds itself that the relevant rule is that 'it is sufficient that there is prima facie case that they are a creditor or contributory, even if their claim so is disputed' (See **Re Opus Offshore Ltd**[5]).
>
> 80. In this case the Court concludes that Marine Bright should be considered as the creditor of the Company for the purposes of this hearing given that:
>
> > (a) The transfer of the shares from Docile Bright to Marine Bright was approved by the directors of the Company.
> > (b) A copy of the register of members of the Company dated 20 September 2017 shows that Marine Bright is the registered shareholder in respect of the… Preferred Shares.

---

[4] [2021] SC (Bda) 63 Civ (11th August 2021).
[5] [2017] Bda LR 14 at [22] (Hellman J).

(c) Marine Bright has been issued Share Certificate No 3 by the Company certifying that Marine Bright is the registered shareholder of 69,375,000 convertible redeemable preferred shares issued by the Company.

81. Ms. George, who appears for Marine Bright, supports the position taken by the Petitioner and supports the immediate winding up of the Company and the appointment of Provisional Liquidators with full powers. In the circumstances it would appear that the majority of the creditors of the Company request the Court to make an order for the immediate winding up of the Company."

**Strike out: Mr. Lai's authority**

[13] I turn first to the allegation in Marine Bright's strike out application that Mr. Lai lacks authority to pursue the set aside application. Mr. Amey puts Marine Bright's case this way in his skeleton:

"68. As the court will be aware from the hearing which took place in chambers on 23 June 2022, from 24 December 2020 to 11 July 2022, Mr. Lai (who does not hold a BVI insolvency licence) was acting as sole liquidator of Docile Bright in breach of Part XX [of the **Insolvency Act 2003**]. When this was pointed out to him, Mr. Lai applied to extend the time periods in sections 485(2) and 485(3) [of the 2003 Act].

69. At the hearing on 23 June 2022, Marine Bright appeared to make submissions in opposition, but Docile Bright successfully objected to Marine Bright's appearance at a liquidator's *ex parte* application in chambers, and Marine Bright therefore did not attend the remainder of the hearing.

70. Marine Bright renews its submission that the court does not have jurisdiction to extend the time period in section 485(3). As to this:

(1) Section 496 provides that the court may extend the 'time within which an action shall or may be done' under the Act. Not all time periods within [the 2003 Act] can be extended. For example, the vulnerability period for an undervalue transaction could not be extended under section 496.

(2) Section 496 permits the court to extend the 3-day period specified in section 485(2), since this is a 'time within which an action shall or may be done' under the Act.

(3) However, section 485(3) does not specify a 'time within which an action shall or may be done'. Rather, it creates a deemed defence to the crime created by section 474(2), provided one of its conditions is satisfied.

(4) One of those conditions (in section 485(3)(a)(i)) is that the liquidator files the prescribed notice by a particular time. However, that time period is not 'a time within which an action shall or may be done', rather, the subsection simply provides that if the relevant action is done during that time, the liquidator will gain the advantage of a deemed defence.
(5) Accordingly, the time periods in section 485(3) are incapable of extension. This is unsurprising — there is no good policy reason why those time periods should be capable of extension, and every reason why they should not be. If the overseas practitioner's default was inadvertent and caused no prejudice, then that is a matter that can be taken into account by the DPP when deciding whether it is in the public interest to prosecute, or the court when deciding what sentence to impose. But it is not a basis on which the court can exonerate an individual for what is otherwise a strict liability offence.

71. This being so, the court is invited to set aside its order extending the time period in section 485(3). The natural consequence is that Mr. Lai issued the [set aside application] in breach of a criminal prohibition, and the [application] should therefore be struck out.

72. For completeness, the fact that Marine Bright did not have standing to appear at the hearing in chambers on 23 June 2022 does not preclude Marine Bright from raising the point now. Even though Marine Bright is a 'stranger' to the liquidation, the point currently being made goes to jurisdiction, see **PricewaterhouseCoopers v Saad Investments Co Ltd**.[6]"

[14] As to this last point, the **PwC** case involved a winding up petition against an overseas company which did not trade in Bermuda, where the petition was presented. The fact that an overseas company carries on business within Bermuda is usually a prerequisite for the Bermuda courts assuming a jurisdiction to wind the company up. The sole reason for presenting a winding-up petition in the **PwC** case was to invoke the Bermuda court's power to order the delivery up of documents from PwC, who had an office in Bermuda. As to *locus standi* the Privy Council held:

"36 Of course, any court asked to wind up a company should generally be very reluctant to give a person (other than the company, the liquidator or the official receiver), who is neither a contributory nor a creditor, the right to be a party and to be formally heard in support of, or against, the making of

[6] [2014] UKPC 35, [2014] 1 WLR 4482.

a winding up order. None the less, the Board can see no reason why, in appropriate circumstances, a person who will be directly affected by a winding up order should not have the right to be added as a party to the proceedings. It should be emphasised that the circumstances where such a course would be appropriate will be exceptional. Given that exceptionality is not a very useful guide, it is right to add that the Board considers that the mere fact that a person rightly anticipates that his or her rights will be detrimentally affected as a result of the winding up order would normally be quite insufficient to justify that person being added as a party.

37. In this case, however, the challenge to the winding up order was based on jurisdiction, and the sole ground for making the winding up order was to obtain relief against PwC, which involved interfering with their rights. Accordingly, it would, as already mentioned, be a denial of natural justice if they were denied the opportunity of challenging the making of the order, not merely in an informal amicus capacity, with no right of appeal, but in a formal capacity as a party. On the very unusual facts of this case, the Board considers that PwC had the right to be added as parties to the petition."

[15] In the current case, there is no issue but that Docile Bright is insolvent. The sole complaint is as to Mr. Lai's failure to take the appropriate steps to have a BVI insolvency practitioner appointed in place of Mr. Briscoe. That is not a matter which affects Marine Bright in any way. It is solely a matter of who should represent the company. It does not in my judgment go to the Court's jurisdiction, which was the issue in **PwC**. If any criminal offence has been committed, that is a matter for the Director of Public Prosecutions, not Marine Bright. Moreover, Ms. Silver has ratified any procedural missteps taken by Mr. Lai.

[16] Further this matter was conclusively decided by me on 23rd June 2022, when in action BVIHC (COM) 2021/0215 I made the following order:

"**UPON** the *ex parte* application by Lai Wing Lun (the "**Applicant**"), as sole liquidator of Docile Bright Investments Limited (In Liquidation) ("**Docile Bright**") filed on 27 May 2022 (the "**Application**")
**AND UPON** notice of the Application having been given to Marine Bright Limited ("**Marine Bright**"), the respondent in separate proceedings (Case Number BVIHC (COM) 2022/0025) commenced by the Applicant on 4 February 2022 seeking, *inter alia*, an order pursuant to sections 246 and 249 of the Insolvency Act 2003 ("**Act**") to set aside the sale of certain shares by Docile Bright to Marine Bright as a transaction at an undervalue

> **AND UPON** the Court having determined that Marine Bright has no standing to oppose the Application and that it should proceed as an *ex parte* Application in Chambers
> **AND UPON** the Court reading the [evidence]
> **AND UPON HEARING** Mr. Stuart Cribb and Mr. Dhanshuklal Vekaria for the Applicant
> **IT IS HEREBY ORDERED THAT:**
> 1. pursuant to section 496 of the Act and/or EC CPR 26.1(2)(w) and/or the Court's inherent jurisdiction, the time for the filing of the notices required under section 485(2) of the Act be extended to 16 May 2022;
> 2. that pursuant to section 496 of the Act and/or EC CPR 26.1(2)(w) [and/or] the Court's inherent jurisdiction, the time under section 485(3)(a)(i) of the Act be extended to 27 July 2022;
> 3. there be liberty to apply; and
> 4. there be no order as to costs.

[17] It was open to Marine Bright to apply to become a party to that application and to appeal against that Order, but they have not done so. I had Marine Bright's skeleton argument, which made the same points then as Mr. Amey makes now. The matter in my judgment is *res judicata*. It would be wrong for me to revisit the determination I made earlier and I shall not do so. If I erred, that is a matter for the Court of Appeal on appeal from my judgment in BVIHC (COM) 2021/0125.

**"Connected person" and the "vulnerability period"**

[18] I turn then to the set aside application. This is put in two ways. Section 246 provides:

> "(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if
> (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or
> (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and
> (c) in either case, the transaction concerned
> (i) is an insolvency transaction; and
> (ii) is entered into within the vulnerability period.

> (2) A company does not enter into an undervalue transaction with a person if
>
> (a) the company enters into the transaction in good faith and for the purposes of its business; and
> (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.
>
> (3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.
>
> (4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that
>
> (a) the transaction was an insolvency transaction; and
> (b) subsection (2) did not apply to the transaction."

[19] Mr. Amey firstly submits that Mr. Lai has not proved that Docile Bright and Marine Bright were "connected persons". This is important, because Docile Bright only went into liquidation on 4th February 2019, just days short of two years from the date of the transaction on 9th February 2017. It is only if the two companies were "connected" that the liquidator can rely on the extended two year vulnerability period for setting aside transactions at undervalue: 2003 Act section 244. Otherwise he is out of time.

[20] Section 5(1) of the 2003 Act says in relation to a company that a "connected person" includes "a related company". In turn section 5(2) provides:

> "A company is related to another company if —
>
> (a) it is a subsidiary or holding company of that other company;
> (b) the same person has control of both companies; and
> (c) the company and that other company are both subsidiaries of the same holding company."

[21] In my judgment, despite the conjunctive "and" used in the definition, the three paragraphs must be read disjunctively. (a) relates to a mother-daughter relationship between the two companies, (c) to a sister, aunt or cousin relationship, whilst (b) covers the lacuna which would otherwise exist where a natural person owns the

shares in two otherwise separate companies. (Although this may be (c)'s main purpose, (c) also covers the case of two companies controlled by a third company; it is not confined to natural persons.) It would not make sense to require a company to satisfy all three requirements simultaneously in order to be "related". If it were otherwise, the paradigm case of a parent company owning all the shares in companies A and B would be excluded, because A and B would not satisfy (a) in the definition.

[22] Mr. Cribb puts his case as follows:

> "39. Docile Bright is wholly owned by GZHK, which is in turn wholly owned by GZE. Marine Bright does not appear to dispute this, and it follows that Docile Bright has at all material times been within the control of GZE.
>
> 40. At the time of the Transaction, Marine Bright must also have been within the control of GZE. Article 8 of Titan's Amended Bye-Laws provides that '[t]he Preferred Shares shall not be capable of transfer save for a transfer to [GZE] or its Affiliates.'
>
> 41. Thus, for the Transaction to be valid under the Amended Bye-Laws of Titan, Marine Bright was required to be an 'Affiliate' of GZE at the material time. If Marine Bright was not an 'Affiliate', the purported transfer to it of the Preferred Shares was in breach of the Amended Bye-Laws, ultra vires and void: **Ashbury Railway Carriage & Iron Co v Riche**;[7] **Shackleton on the Law and Practice of Meetings**.[8]
>
> 42. In this case, Marine Bright confirmed in the 9 February 2017 Letter (signed by its Director, Si Bo, discussed below) that it was an 'Affiliate' of GZE.
>
> 43. The term 'Affiliate' is defined by Article 1 of Titan's Amended Bye-Laws:
>
> > '"Affiliates" means with respect to any person/company, any other person/company that, directly or indirectly, controls, is controlled by, or is under common control with such person/company.'
>
> 44. Here, the definition of 'Affiliate' could only have been satisfied on the basis that Marine Bright was within the control of GZE. There is no suggestion that Marine Bright controls GZE, nor that Marine Bright and GZE are in the common control of some other entity.

---

[7] (1875) LR 7 HL 653.
[8] 15th Ed (2020) at para 11-12.

45. In fact, Marine Bright's own case as to why this definition of 'Affiliate' was satisfied at the time of the Transaction was that it was within the control of GZE. Indeed, it is not open to it to contend otherwise. If it was not in GZE's control, then it was not an 'Affiliate' of GZE and as set out above, the transfer of the Preferred Shares to it was in breach of the Amended Bye-Laws and void.

46. It appears to be common ground that the key individual in this respect was one Si Bo. Mr. Lai [in his first affirmation at para 34.6] explained that as at 20 October 2017, Si Bo was Marine Bright's sole shareholder and director. He was appointed to that directorship on 9 February 2017, the date the Transaction was purportedly executed.

47. [Mr. Li in his first affirmation for Marine Bright at para 60] goes even further:

> 'In particular, the sole director and shareholder of Marine Bright at the time when Marine Bright purchased the Preferred Shares from Docile Bright was a Mr. Si Bo, as Mr. Lai refers to in paragraph 34.6 of Lai 1. Mr. Si Bo was an employee of GZE. Toprise was informed during the negotiations for the purchase of Marine Bright that GZE had handled all matters relating to the Transaction. Mr. Si Bo was appointed as the director and shareholder of Marine Bright, which was set up as a holding company for the Preferred Shares.'

48. Marine Bright's own case, therefore, is that:

(i) GZE handled all matters relating to the Transaction;
(ii) Marine Bright was set up by GZE as a holding company for the Preferred Shares; and
(iii) Si Bo, a GZE employee, was appointed as Marine Bright's sole director and shareholder.

In light of that, it is obvious that on 9 February 2017, Marine Bright was under the control of GZE.

49. Accordingly, at the time of the Transaction, both Docile Bright and Marine Bright were in the common control of GZE (the former as its wholly owned subsidiary; the latter because it was under the sole ownership and directorship of a GZE employee appointed for that purpose). That is common ground (and must be if Marine Bright wishes to assert that the Transaction was valid)."

[23] Mr. Amey's answer is:

"63. The sole evidence relied upon by Mr. Lai [to show connectedness] is [the February 2017 letter] stating that Marine Bright was an 'affiliate' (the

term is undefined in the letter) of GZE (not Docile Bright). It is unclear what this means, or the basis on which it was asserted. It is possible that it refers to the fact that Marine Bright's director, Si Bo, was also an employee of GZE. This might make GZE and Marine Bright 'affiliates' in some contexts, but would not render Docile Bright and Marine Bright 'connected persons' for **Insolvency Act** purposes.

64. In any event, the letter does not say that Marine Bright and Docile Bright were 'connected' in the way described in section 5 [of the 2003 Act]. Mr. Lai has the burden of proof, and it is notable that despite investigating the matter for a number of years (with all the powers of a liquidator to compel production of documents and examine witnesses), he has been unable to find any further evidence of a connection."

[24] I disagree that the use of the expression "affiliates" in the February 2017 letter is unclear or ambiguous. In my judgment, it is intended (and was understood) to be a reference to the Amended Bye-laws. That, after all, is why Si Bo had to write the letter: the share transfer could not otherwise be made legally. Nor do I agree that the February 2017 letter was the only evidence of control by GZE. I accept the evidential points put forward by Mr. Cribb. In my judgment Mr. Lai has established a strong case of joint control of Docile Bright and Marine Bright by GZE.

[25] On balance of probabilities, I find that Docile Bright and Marine Bright were at the time of the transaction "connected", so that the extended two year period of vulnerability applies.

**The consideration: Was it paid? Was it too little?**

[26] I turn then to the question whether the consideration of US$20 million was paid and whether, if it was, the transaction was nonetheless at undervalue.

[27] Before considering the evidence on payment, I should note that neither Mr. Lai nor Mr. Li, who gives evidence on Marine Bright's behalf, have any personal knowledge as to whether the payment was or was not made. Mr. Lai's first involvement in Docile Bright was after his appointment as liquidator in April 2019; Mr. Li's involvement with Marine Bright was in February 2020, when Toprise were

negotiating the purchase of Marine Bright. Neither side was in a position to offer any oral evidence, nor did either counsel seek an adjournment for that purpose. In particular, neither side called Si Bo. Accordingly, I have to determine the issue of payment or not on the documentary record.

[28] It is common ground between the parties that the only documents evidencing the payment of the US$20 million are (a) a one-page document dated 9th February 2019 with an entry "Sold Note" and an entry "Bought Note" and (b) a one-page transfer of shares document dated the same day. The former refers to "Consideration Received" and "Consideration Paid" of US20 million; the latter to "consideration of USD 20,000,000.00 paid to me". Marine Bright also sought to rely on a resolution of Titan's board dated 20th September 2017 which refers to the sale of the preferred shares "at the consideration of USD20 million". However, it is unclear why Titan's board should have any knowledge of whether the payment was made or not. The resolution would ordinarily be made simply after sight of the share transfer document and perhaps the bought and sold note. I attach no evidential weight to the Titan board resolution.

[29] Mr. Amey submits:

> "15. On 9 February 2017, the Share Purchase took place. The individuals currently giving instructions on behalf of Marine Bright were not personally involved in the Share Purchase, since they did not purchase Marine Bright until June 2020. However, the contemporaneous documents demonstrate the following:
>
> (1) The Preferred Shares were purchased for US$20 million.
> (2) Docile Bright acknowledged payment of the US$20 million.
> (3) Titan's directors passed written resolutions approving the transfer of the Preferred Shares to Marine Bright and issued a share certificate to Marine Bright.
> (4) Marine Bright was listed as the registered shareholder of the Preferred Shares on Titan's register of members.
>
> 16. Although Mr. Lai complains that there is 'no evidence in the records' of Docile Bright to verify that the consideration was paid, this is unsurprising, since he also says that Docile Bright 'did not keep any financial/accounting records'. He has provided no explanation as to why the court should go

> behind the various contemporaneous documents evidencing payment, in particular: [and he sets out the three documents I refer to above].
>
> 17. Also on 9 February 2017, a letter was written by a Mr. Si Bo on behalf of Marine Bright, saying 'we are the affiliates of [GZE]'… Mr Lai now relies upon this letter as evidence (indeed, the only evidence) that Docile Bright and Marine Bright were 'connected persons' at the time. However, that is simply not what this letter says.
>
> 18. Moreover, Mr. Lai has not explained why it is appropriate to place such heavy reliance on the letter saying that Marine Bright and GZE were 'affiliates', while at the same time doubting the veracity of the multiple documents indicating that the US$20 million consideration was paid."

[30] As to this last point on the February 2017 letter, there is, as I have set out above, other evidence to support the case that Marine Bright was an affiliate of GZE for the purposes of the Titan Amended Bye-laws. The letter has a different legal purpose, namely to document GZE's control. The statements in the bought/sold note and the transfer of shares as to payment of the consideration are not corroborated in the same way.

[31] I turn then to the critical question: was the US$20 million paid or not? There is a complete absence of any evidence of payment whatsoever. A payment of such a large sum would leave a large paper trail, with instructions to the relevant banks, acknowledgement of payments, entries on bank statements and so forth. Here there is nothing. There are not even any accounting entries in accounts prepared for Docile Bright, Marine Bright or any other GZE entities.

[32] Mr. Amey's point in para 16 of his skeleton that Mr. Lai has given no explanation for going behind the bought/sold note and the transfer of shares document in my judgment is unrealistic. Proving a negative is notoriously difficult. Mr. Lai points out — justifiably in my view — that documentation which must exist, if the payment was in truth made, cannot be traced. That is strong evidence that the payment was not made.

[33] I also agree with Mr. Cribb's point that Toprise showed a remarkable absence of curiosity in carrying out due diligence when buying Marine Bright. The financial report for Titan in the year ending 31st December 2019 at least arguably showed Docile Bright as the holder of the preferred shares. There is a dispute, which I cannot resolve without oral evidence, as to whether a share certificate was properly issued by Titan to Marine Bright, but, regardless of that, no declaration of ownership was made to the Hong Kong Stock Exchange. Mr. Li gives no explanation for the failure of Toprise's due diligence to identify a problem from the above. Indeed he gives no account of what due diligence was carried out at all. The most he says is in his second affirmation, where he says blandly at para 19: "Toprise carried out its due diligence when purchasing Marine Bright and was satisfied that the consideration had been paid."

[34] In my judgment, on balance of probabilities the consideration was not paid.

[35] The subsidiary question as to whether, if the consideration was paid, US$20 million was nonetheless constituted a sale at undervalue does not arise. If it had, I would have given directions for a trial of that issue with cross-examination of witnesses. I would probably also have directed that a joint expert valuer be instructed. Mr. Amey submits that the Court should make its determination on the evidence available at present and that the absence of expert evidence means I should make a determination in favour of Marine Bright on the undervalue issue. In my judgment, however, Mr. Lai was acting reasonably in putting the case forward as he did. Expert evidence is expensive. He was entitled to take the view that he had a strong case that the consideration was not paid and that incurring the fees of experts would be premature and delay the final determination of the set aside claim. In taking that view, he has of course been vindicated by this judgment.

**Non-payment of the consideration: the consequences**

[36] What then are the consequences in law of the non-payment of the consideration? Mr. Amey submits:

> "The focus of section 246(1)(a) is on the 'terms' of the transaction. If the 'terms' of the transaction provide for the company to receive consideration, then the transaction falls outside of section 246(1)(a). If it is suspected that the promised consideration was never actually paid, then the company may have a debt claim for the unpaid balance, but that is not a section 246 claim."

[37] This is not in my judgment a realistic submission on the facts of this case . This was a transaction between related parties. If the consideration was not paid, then I infer that the reason for that was that it was never intended to be paid. The statements confirming payment of the consideration mentioned in the bought/sold note and the share transfer documents were just so much wallpaper, as the parties must have realised. This was not a case, where a genuine consideration was agreed but remained unpaid; it was a case where the consideration was never going to be paid, as the parties to the agreement knew full well.

[38] Even if the point on section 246(1)(a) were well made, the transaction would in my judgment be caught by section 81 of the **Property and Conveyancing Act 1961**. There is an ongoing question as to whether the **Fraudulent Conveyances Act 1571** is still in force in this Territory: see the discussion in **Great Panorama International Ltd v Qin Hui**.[9] Further discussion in this judgment is, however, otiose, since both Acts reach the same conclusion. The transaction was entered into when GZE was in financial difficulties and the immediate holding company of Docile Bright, GZHK, was facing a winding up petition, which was ultimately granted. If no consideration was paid and was never intended to be paid, then the transaction was *prima facie* made in order to defraud creditors. There is no evidence to contradict this *prima facie* inference. I find on balance of probabilities that Mr. Lai is entitled to succeed under both Acts as well as under the 2003 Act.

[9] [2020] ECSCJ No 278 (13th August 2020) at [57].

**Collateral purpose and abuse of process**

[39] I turn then to Mr. Amey's last point, that Mr. Lai is pursuing the current application for a collateral purpose and that the application is an abuse. Mr. Amey argues:

> "52. The Preferred Shares are demonstrably worthless: Titan is in liquidation, and its latest accounts (approved by Mr. Lai himself as Titan's chairman) show insufficient assets to pay ordinary unsecured creditors (as indeed has been the case every year since 2018). Since sums owed to shareholders are subordinated to ordinary unsecured liabilities, there will be no return to shareholders, something which has recently been confirmed by Titan's liquidators.
>
> 53. At best, if Mr. Lai persuades the court that an undervalue transaction or a fraudulent conveyance has occurred, he will recover some worthless shares. At worst, he will recover some worthless shares, and will have to return the US$20 million which Docile Bright received from Marine Bright.
>
> 54. The [set aside application] is therefore an abuse of process in at least two respects, and should be struck out:
>
> > (1) Under the **Jameel** principle,[10] the [application] is a pointless waste of the parties' resources and the court's resources; 'the game is not worth the candle'. The [claim] will serve no useful purpose.
> >
> > (2) Further or alternatively, the claim should be struck out since it is being pursued for an impermissible collateral purpose. The only explanation for Mr. Lai's desire to gain control of the Preferred Shares is so that he can prevent an investigation into the transactions referred to at para 21(6) above, by interfering in the Bermuda winding up proceedings and influencing the liquidators of Titan. Were it not for this, Mr. Lai would not have commenced the [set aside claim] at all."

[40] The para 21(6) referred to says (the quotations and paragraph numbering being from the judgment of Hargun CJ):

> "Most strikingly, after the winding up petition was presented (and while Mr. Lai was chairman of Titan's board) Titan 'embarked on a wholesale disposal of its most significant assets, for nominal consideration to entities potentially connected with Mr. Zhang and his father' (para 70). Mr. Zhang is one of Mr. Lai's co-directors on Titan's board (para.2). It was 'in the interests of the general body of creditors and the wider public interest that the transfers

[10] Jameel v Dow Jones & Co Inc [2005] EWCA Civ 75, [2005] QB 946.

> of property be investigated by independent liquidators appointed by this Court' (para.86)."

[41] The submission that the preferred shares have no value is in my judgment belied by the parties' behaviour. The argument that the set aside application is pointless because the shares have no value applies equally to Marine Bright's behaviour. They have vigorously contested the current set aside application and no doubt incurred significant legal costs. If the shares were truly worthless, then there is no reason for Marine Bright to refuse to return the shares. Likewise, Marine Bright's decision to incur significant costs in the Bermuda proceedings is inexplicable, if Titan is hopelessly insolvent and the holders of the preferred shares are so far down the waterfall as to be entitled to nothing. Mr. Li first alleged that the preferred shares were valueless in his third affirmation, made less than a week before the hearing before me. There was insufficient time for Mr. Lai to answer the allegation.

[42] I put substantial weight on the view expressed by Ms. Silver in her affidavit, where she says:

> "I agree with the course of action Mr. Lai has taken in bringing the Setting Aside Application. It is in the best interests of [Docile Bright's] creditors to do so, especially if the application is successful."

As a BVI-admitted insolvency practitioner, her commercial judgment is something to which the Court will pay significant respect.

[43] Once I conclude — as I do — that the preferred shares have a potential value, Mr. Amey's argument that the *only* explanation for Mr. Lai to bring the set aside application is to prevent investigation of the allegations summarised in para 26(1) falls away.

[44] Mr. Cribb submits:

> "96. The allegation that the Set Aside Application has been pursued for an improper collateral purpose needs to be put in its proper context. As set out

above, the claim to set aside the Transaction is a strong one. It is also advantageous to Docile Bright's creditors. If the Set Aside Application succeeds, the Preferred Shares in Titan with an estimated value of US$50 million will be restored to the insolvent estate. That is a substantial benefit.

97. Further, although Titan is in liquidation, the liquidation order is being appealed. If the appeal succeeds and the Preferred Shares have not been revested in Docile Bright, it may not be able to participate in Titan's business, such that the interests of the creditors of Docile Bright would go unrepresented. They might even be harmed, if Marine Bright was permitted to exercise rights of a member that should belong to Docile Bright instead.

98. Given the strength of the Set Aside Application and the obvious benefit to Docile Bright's creditors if it succeeds, the Court should view Marine Bright's suggestion that it is pursued for a 'collateral purpose of affecting the outcome of the winding up proceedings in Bermuda against Titan' with scepticism. In truth, it is a desperate attempt to muddy the water, because Marine Bright knows that its purported defence to the merits of the Set Aside Application is fanciful."

[45] Whether the $50 million value is correct is not something on which I can adjudicate on the evidence at present, as I explain above. Apart from this, however, Mr. Cribb in my judgment makes good points. If the winding up order is successfully appealed on the basis that Sino Charm's debt is disputed on substantive grounds (as has now occurred), then the value of Titan may well be increased. The Bermudan courts appear to have accepted that Marine Bright's colourable claim to the preferred shares is sufficient to give it status as a supporting creditor, but whether that is sufficient to allow it to be substituted as the petitioning creditor, in the event that the appeal succeeds, is unclear. It is a matter for the commercial judgment of Mr. Lai and Ms. Silver what steps to take to realise the value of the preferred shares, but they cannot start to exercise that commercial judgment until the preferred shares are returned to Docile Bright. The only venue in which they can pursue the set aside application is this Court.

[46] Accordingly, I reject the argument that the set aside application is made for a collateral purpose and is an abuse of process.

**Conclusion**

[47] Accordingly I grant the set aside application and dismiss the cross-application.

[48] Ms. Silver should be added as an additional applicant. She is entitled jointly with Mr. Lai to the relief sought on Docile Bright and her appointment will ratify any technical defects in Mr. Lai's standing.

**Postscript: the judgment of the Court of Appeal for Bermuda**

[49] After completing the draft of this judgment and whilst on the point of distributing it to the parties for corrections, the Court of Appeal for Bermuda on 9th August 2022 handed down its judgment.[11] It allowed the appeal against the winding-up order and stayed the petition pending the outcome of related litigation between Titan and Sino Charm in Hong Kong.

[50] I have read the judgment. Nothing in it causes me to change my views in the draft version of this judgment. I do not consider there is any need to have further oral argument or written submissions in consequence of this Bermuda judgment.

**Adrian Jack**
Commercial Court Judge [Ag.]

**By the Court**

**Registrar**

[11] [2022] CA (Bda) 13 Civ.

Neutral Citation Number: [2023] EWHC 1113 (Comm)

Case No: CL-2021-000630

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND & WALES**
**COMMERCIAL COURT (KBD)**

Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 12/05/2023

**Before** :

**DAVID EDWARDS, KC**
**SITTING AS A JUDGE OF THE HIGH COURT**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **EMIRATES NBD BANK PJSC (a company incorporated in the Emirate of Dubai)** | **Claimant** |
| **- and -** | |
| **(1) RASHED ABDULAZIZ ALMAKHAWI (2) ABDULAZIZ RASHED ABDULAZIZ MOHAMMED ALMAKHAWI** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**WILLIAM EDWARDS** (instructed by **DWF Law LLP**) for the **Claimant**
**DANIEL LEWIS** (instructed by **Spector Constant & Williams**) for the **Defendants**

Hearing dates: 27 February – 2 March 2022

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**I direct that no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.**

.............................

DAVID EDWARDS, KC

This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to The National Archives. The date and time for hand-down is deemed to be 12 May 2023 at 10:30am.

**David Edwards, KC:**

## A. The Parties

1. The Claimant ("the Bank") is a bank incorporated in the Emirate of Dubai, United Arab Emirates ("UAE").

2. The First Defendant ("Mr Almakhawi Sr") is a UAE national. He was born on 1 October 1947 and so by the time of the trial he was 75 years old. He was at one time UAE Ambassador to Germany and subsequently Ambassador to a number of other countries. He is a well-educated man, holding doctorates from three universities. The Second Defendant ("Mr Almakhawi Jr") is his son.

## B. Background

3. Mr Almakhawi Sr was originally the sole beneficial owner of System Construct Dubai, LLC ("System Construct Dubai"), a construction company incorporated in Dubai, although at some point his shareholding was reduced to 51%. He was one of the company's three directors. The company went into insolvent liquidation on 28 September 2014 having suffered substantial losses.

4. On 25 January 2010, some years before its liquidation, System Construct Dubai entered into a Facility Agreement with the Bank (subsequently extended and amended) under which the Bank provided letter of credit, overdraft and other financial facilities ("the Facility"). Mr Almakhawi Sr, along with the other directors, provided guarantees to support the company's borrowings.

5. On 19 October 2015, following its entry into liquidation, the Bank commenced proceedings in Dubai Court of First Instance seeking repayment of the outstanding amount under the Facility from System Construct Dubai and payment of the equivalent amount from Mr Almakhawi Sr and the other guarantors under their personal guarantees ("the Dubai Proceedings").

6. On 16 January 2017 the Dubai Court of First Instance entered judgment in favour of the Bank for AED 142,303,347.42 plus interest. System Construct Dubai and the guarantors appealed to the Dubai Court of Appeal, but the appeal was unsuccessful, and on 27 February 2019 the Court of Appeal entered judgment for the revised sum of AED 218,299,040.31 plus interest.

7. There was then a further appeal to the Dubai Court of Cassation, Dubai's highest court, but this too was unsuccessful. On 7 July 2019 the Court of Cassation entered judgment ordering System Construct Dubai, Mr Almakhawi Sr and the other guarantors to pay the Bank AED 211,299,040.31 (approximately £47.5 million at current exchange rates) plus interest ("the Dubai Judgment").

8.    The Bank has sought to enforce the Dubai Judgment, but the evidence before me was that no, or at least only very limited, recoveries have been made by the Bank so far.

## C.    The English Proceedings

9.    In these English proceedings, the Bank seeks the following relief against Mr Almakhawi Sr and against his son, Mr Almakhawi Jr.

10.   First, as against Mr Almakhawi Sr, the Bank seeks to enforce the Dubai Judgment in this jurisdiction. There is no treaty providing for the recognition and enforcement of judgments between the United Kingdom and the UAE, and so the Bank seeks to enforce the judgment by way of a common law action on the judgment.

11.   Secondly, the Bank seeks relief against both Defendants in respect of transfers of property and money made by Mr Almakhawi Sr to Mr Almakhawi Jr in 2019, specifically in respect of:

   i)    A property at 193 Warren House, Beckford Close, London W14 8TR ("the Warren House Property") transferred to Mr Almakhawi Jr on 8 July 2019; and

   ii)   Sums of £200,000 and £2,336,873.28 transferred to Mr Almakhawi Jr on, respectively, 16 August 2019 and 18 October 2019 ("the Money Transfers"), still held intact by him in a UK bank account.

12.   In relation to these transfers, the Bank seeks either declarations that Mr Almakhawi Sr retained beneficial title to the relevant assets and that they are held by Mr Almakhawi Jr on resulting trust, or alternatively relief under section 423 of the Insolvency Act 1986 ("the 1986 Act") on the ground that the transfers were transactions defrauding creditors within the meaning of the section.

13.   As set out in more detail below, in relation to the issue of enforcement of the Dubai Judgment, Mr Almakhawi Sr contends that the judgment was obtained as a result of a breach of natural justice concerning the terms of the two reports submitted by the court-appointed expert in Dubai and, as such, the judgment falls within a recognised English law exception to enforcement.

14.   As for the transfers, the Defendants contend that:

   i)    The property and money transfers represented gifts made by Mr Almakhawi Sr to his son, made principally for the purposes of succession or inheritance planning;

   ii)   The Bank cannot rebut the presumption of advancement applicable to transfers between father and son; the beneficial

interest in the assets was transferred to Mr Almakhawi Jr and the assets are not held on resulting trust; and

iii)    Although it is accepted that the transfers were gratuitous, they were not made by Mr Almakhawi Sr for one of the prohibited purposes set out in section 423(3) of the 1986 Act and so relief cannot be granted under that section.

## D.    The Trial

15.    The trial before me took place over four days, with the morning of the first day used for pre-reading, followed by short oral openings.

16.    Thereafter, the remainder of Day 1, the whole of Day 2 and part of Day 3 were taken up with cross-examination of Mr Almakhawi Sr, who gave evidence remotely with the assistance of an interpreter. The remainder of Day 3 was used for the evidence of Mr Almakhawi Jr, who gave evidence in person, and for the evidence of the Dubai law experts, who gave their evidence remotely. Day 4 was used for oral closing submissions.

17.    In addition to the evidence of the two Defendants, I also received witness statements, served on behalf of the Bank, from:

i)    Oasha Obaid Khalifa Abdulla Almehairi, a Senior Vice President of the Bank; and

ii)    Amir Alkhaja of Habib Al Mulla, lawyers who represented the Bank in the Dubai Proceedings.

These statements dealt with various formal matters - the amount of the judgment and the absence of any recoveries. Neither of them was required by the Defendants to attend for cross-examination, and I accept the evidence contained in their statements.

18.    I set out my findings in relation to the evidence I received in the sections below where I deal with the substantive issues. Of the two factual witnesses from whom I heard oral evidence, the evidence of Mr Almakhawi Sr was the most significant, and I had an opportunity to assess his demeanour and candour over a cross-examination approaching two days.

19.    Many of the events occurred some years ago, and for this reason, and as is often the case in commercial disputes, I consider that the surest guide to the facts are the contemporaneous documents, the inferences that can properly be drawn from those documents (or, in some cases, from the absence of documents) and the probabilities. There are, however, areas of the case where the documentation is scant.

## E. Enforceability of the Dubai Judgment

20. The first issue I have to decide concerns the enforceability of the Dubai Judgment.

### 1. English law principles of enforceability

21. There was no dispute between the parties as to the English law principles relating to the enforceability of foreign judgments.

22. The basic principle is set out in *Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), Rule 46 at paragraph 14R-024. As there stated, subject to certain exceptions:

> "… a foreign judgment in personam given by the court of a foreign country with jurisdiction to give that judgment in accordance with the principles set out in Rules 47 and 48, and which is not impeachable under any of Rules 52 to 55, may be enforced by a claim or counterclaim for the amount due under it if the judgment is
>
> (a) for a debt, or definite sum of money (not being a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or other penalty); and
>
> (b) final and conclusive,
>
> but not otherwise."

23. There was no dispute that the Dubai courts had jurisdiction to give the judgments they did or that the requirements set out in sub-paragraphs (a) and (b) of Rule 55 are satisfied. The issue between the parties concerned the exceptions to enforcement, specifically the exception recognised in *Dicey, Morris & Collins* (*op. cit.*), Rule 55 at paragraph 14R-158 that:

> "A foreign judgment may be impeached if the proceedings in which the judgment was obtained were opposed to natural justice."

24. I was referred to a number of authorities that have considered the circumstances in which the natural justice exception applies. These authorities demonstrate that:

i) Natural justice is concerned with procedural fairness, not whether the judgment of the foreign court is wrong (or even manifestly wrong) as a matter of fact or law: *Adams v Cape Industries Plc* [1990] Ch. 433, 569E–F (Slade LJ);

ii) Proof of a mere procedural irregularity in the foreign court is not enough. What is required for the exception to bite is a

defect which would constitute a breach of the English court's view of substantial justice; *Adams* at 559F–G and 566F–568A (Slade LJ); and

iii) It is not enough that the foreign court takes a different procedural approach to that which an English court might take, unless that difference deprives the judicial process of the quality of substantial justice: *Yukos Capital v OJSC Rosneft Oil Company* [2011] EWHC 1461 (Comm), [2012] 1 All ER (Comm) 478 at [67] (Hamblen J).

25. As explained by Slade LJ in *Adams* at 570C-E, in considering whether substantial injustice has been established, the availability of a remedy in the foreign court for any error in procedure or unfairness is a relevant factor; however, the significance of an available remedy depends upon the circumstances of the particular case:

> "Since the ultimate question is whether there has been proof of substantial injustice caused by the proceedings, it would, in our opinion, be unrealistic in fact and incorrect in principle to ignore entirely the possibility of the correction of error within the procedure of a foreign court which itself provides fair procedural rules and a fair opportunity for remedy. The court must, in our judgment, have regard to the availability of a remedy in deciding whether in the circumstances of any particular case substantial injustice has been proved. However, the relevance of the existence of the remedy and the weight to be attached to it must depend upon factors which include the nature of the procedural defect itself, the point in the proceedings at which it occurred and the knowledge and means of knowledge of the defendants of the defect and the reasonableness in the circumstances of requiring or expecting that they made use of the remedy in all the particular circumstances."

## 2. Mr Almakhawi Sr's case

26. Mr Almakhawi Sr advanced a variety of points in paragraph 13 of his Amended Defence as to why, he said, the Dubai Judgment had been obtained in breach of natural justice (or, insofar as different, as to why the judgment had been obtained in breach of Article 6 of the European Convention on Human Rights or its enforcement would be contrary to English public policy).

27. By the time Mr Lewis, who appeared for both Defendants at trial, lodged his skeleton argument, however, these various points had been reduced to three; and, as reflected in a speaking note Mr Lewis handed up for use in his oral closing submissions, by the conclusion of the trial these three points had been reduced to one. As explained in Mr Lewis' speaking note:

"The only issue relied upon by the Defendants is the reliance placed by the Dubai Courts on the two expert reports dated 18 September 2016 (the 'First Report') and 20 November 2016 (the 'Second Report') which each referred to the superseded Law No. 8 of 1974 when they should have be[en] prepared in accordance with the Law No. 7 of 2012."

28. The essence of the point advanced was this:

i) The banking expert appointed by the Dubai Court of First Instance had (as was common ground) referred in his two reports to an outdated and superseded Dubai law regulating the use of expert evidence;

ii) This mis-reference - regardless, as Mr Lewis made clear, of whether there was anything wrong with the substance of the expert's reports, and regardless of whether the expert had, as a matter of fact, complied with his duties under the current regulatory law - meant that the two reports were "null and void" as a matter of Dubai law; and

iii) For the Dubai courts to rely, and to base their judgments, upon expert reports (as they obviously had) which were null and void, meant that the judicial process in Dubai was substantially unjust.

## 3. The Dubai Proceedings and the Expert

29. In order to address this point, it is necessary for me to explain the course that the Dubai Proceedings took and the role played by the court-appointed expert, and the laws and procedural rules in Dubai governing expert evidence.

30. As explained in paragraph 5 above, the Dubai Proceedings were commenced on 19 October 2015. Somewhat oddly, the trial bundles did not appear to contain the initiating document. The first document in time I was shown was a document entitled "Rejoinder", which was filed on behalf of Mr Almakhawi Sr's by his then Dubai lawyers, Dar Al Adalah ("DAA") on 17 February 2016.

31. On 28 March 2016 Mr Almakhawi Sr filed a Statement of Counterclaim. This document asserted various defences, including that the Bank had improperly cashed certain letters of guarantee after System Construct Dubai had been placed into liquidation and that it had allowed the Facility to be used by System Construct Abu Dhabi, which Mr Almakhawi Sr said was a different legal entity.

32. The relief sought by Mr Almakhawi Sr in his Statement of Counterclaim included the appointment of an expert:[1]

> Therefore, the Counter Claimant [Mr Almakhawi Sr] submitted this lawsuit to request the appointment of an expert according to Article 69 and the following articles of the law of evidence. The expert shall be assigned to investigate the elements of calculation in both the Principal and counter-claims according to this statement of claim and as a result, a judgment will be passed granting the Counter Claimant the amounts resulting from such calculation according to the technical and accounting standards.

33. In a Rejoinder filed on 16 May 2016, the Bank indicated that it had no objection to Mr Almakhawi Sr's request that the court appoint an expert, and at a hearing on 18 July 2016 the Dubai Court of First Instance accordingly did so. The court's 18 July 2016 judgment explained the expert's mandate very fully:

> "Whereas the Court decides to delegate an Expert in the Lawsuit pursuant to Article No. (69) of the Evidence Law. …
>
> The Court ruled, before adjudicating on the subject matter, to delegate the competent banking expert, who has the next turn on the roster and whose mission is to review the file of the Lawsuit and the documents submitted therein and what may be provided by the litigants of non-denied assets or non-denied photocopies of contracts, correspondence or any other documents as well as regular paper, electronic commercial records, books (in accordance with Article No. (5) of 2006 regarding transactions and E-commerce) paper and electronic correspondence, all within the limits of the Defendant's accounts with the Plaintiff Bank, subject matter of the Lawsuit, provided that they are executed in Arabic or provided with a certified translation to indicate whether there is a banking relationship between the parties to the Lawsuit or not, and in the first case, it shall indicate the following:
>
> - The nature of that relationship and its date and evidence.
> - The type, date, amount, guarantee, applicant, its capacity, beneficiary and method of benefit of the facilities granted from the Plaintiff Bank to the Defendant.
> - Interest calculated by the Plaintiff Bank on these facilities and their evidence.

---

[1] The original documents in relation to the Dubai Proceedings were in Arabic. The certified translations were generally good, but the English was, predictably, not perfect. I have not sought to correct it.

- Indicating on whether the Defendant used those facilities, subject matter of the Lawsuit, or not, and the total amounts owed and the accrued interest on them, whether the Defendant paid such amounts or part of them or not.

In the first case, indicating the total amount paid by the Defendant or obtained by the bank from the guarantees provided by the Defendant and indicating the total entitlements owed by the defendant added to the contractual interests. The same to whether or not the specified interest on the part of the plaintiff was included in the agreement to obtain such facilities. Indicating whether the interest specified by the plaintiff was included in the agreement to obtain such facilities or not, and indicating on whether the subject matter of Lawsuit amounts is in compliance with the facts of the Lawsuit. Indicating whether the current account in which these facilities were deposited and whether they were deposited in one current account or not. In the first case, the indicating of the total entitlements owed by the Defendant, if any, until the date of closing that account, which the cut-off date for the last transaction is made by the Defendant with the Plaintiff bank in any of those facilities. Provided that the compound contractual interests in all those facilities up to that date are calculated in his account added the delayed interest after closing the account until the date of the dispute's register on 19.10.2015 furthermore interest shall be calculated at 9% annually, and in the event that each facility is included in separate current accounts, these accounts shall be determined and the account closure rule applied to each account separately in accordance with the previous rules, as well as achieving the Cross Plaintiff's defense.

In general, the account shall be settled between the two parties in order to reach the extent of the eligibility of the Plaintiff bank in its requests and the fulfilment of the requests and defense of the parties to the litigation.

It authorized the Expert, in order to perform his task entrusted thereto, to move to any destination it deem to move to, including the state Plaintiff's headquarters, to review the documents it deems useful in performing the task, and to hear the statements of the litigants and their witnesses without an oath. … and the expert shall taken into account the procedures and deadlines prescribed in the Article No. 81 of the Evidence Law in addition to indicate how to perform this, the parties shall deliver the Expert what they have of exhibits in the hearing of the first meeting and the expert shall fill its report at the specified hearing."

34.    In Dubai an expert is appointed by the court from a roster of registered experts; the appointed expert is simply the individual

whose turn it is next. In the present case, the court appointed Mohamed Kamel Airan of Knowledge House Auditing ("the Expert"). As apparent from the passage in the judgment set out above, the expert was appointed to perform a fact-finding and/or investigatory role.

35.   The Expert delivered his first report on 18 September 2016 ("the First Expert Report"). After reciting the terms of the court's 18 July 2016 judgment setting out the scope of his assignment, the report explained the procedures the Expert had followed, including his correspondence and meetings with, and the documents that had been submitted to him by, the parties.

36.   This statement of procedure was introduced in the First Expert Report in the following way:

> "**Second: Procedures taken by the Expert to Perform the Task and Prepare the Report.**
>
> Within the limits of the task assigned to us by the honorable Court and in implementation for the provisions of Law No. (8) of 1974 Regulating The Experts before the Courts, Law of Evidence in Civil and Commercial Transactions promulgated by Law No. (10) of 1992 AD, the professional norms and practices, we took the following procedures."

I draw attention to the reference to Law No. 8 of 1974 "Regulating the Experts before the Courts" ("the 1974 Law"), which is at the heart of Mr Almakhawi Sr's complaint.

37.   On 29 September 2016 Mr Almakhawi Sr's lawyers filed a document entitled "Memorandum of Defence and Comment on the Bank Expert's Report in the Case". This made a number of criticisms about the substance of the First Expert Report, but it made no complaint about the fact that the report had referred to the 1974 Law, nor did it suggest that the report was null and void for that reason.

38.   The Memorandum concluded with a statement of the relief sought, which included the following:

> "4.   **To return the case to the same expert again in light of the objections** raised in the papers, especially, the lack of investigation of the defence of the Counter Defendant or to delegate another expert to perform the same missions."

Mr Almakhawi Sr thus invited the court to remit the matter back to the same expert that had issued the First Expert Report for further consideration.

39.   At a hearing on 31 October 2016 this request was granted, and this led to the production by the Expert on 20 November 2016 of a

Complementary Banking Expert Report ("the Second Expert Report"). In its format, the Second Expert Report was similar to the First Expert Report, in particular including the passage set out in paragraph 36 above referring to the 1974 Law.

40. On 16 January 2017 the Dubai Court of First Instance produced its judgment. The judgment set out the procedural history of the matter, including the issuance of the First and Second Expert Reports. The court's conclusions were set out in the following passage, which made clear that the evidence upon which the court had relied included that contained in the two Expert Reports:

> "Whereas, it is held that the Trial Court has the power to understand and comprehend the facts of the lawsuit, assess the evidence and exhibits submitted to it, and reason the facts of the lawsuit insofar as its decision is based on plausible grounds [Contestation No. 398 of 2011, hearing dated 3.10.12].
>
> Whereas, based on the foregoing judicial and legal precedents, the facts of the Case – as adequately deduced by the Court based on the entire papers of the Case and exhibits, including the original and supplementary reports of the deputized expert – are represented in that the Claimant Bank granted the Second Respondent Company, at the letter's request, various banking facilities which included overdraft, trust receipts, and documentary credits, and that the Second Respondent Company continued to pay the outstanding dues to Claimant Bank up to 28.09.2014 (account closure date), on which date the activity of the Respondent Company's current accounts ceased after the latter became indebted in favor of the Claimant Bank at the time with the amount of AED 142,303,347.42 (UAE Dirhams One Hundred Forty Two Million Three Hundred Three Thousand, Three Hundred Forty Seven and Forty Two Fils).
>
> …
>
> Whereas, in view of the foregoing, it is established that each of the Third to Fifth Respondents had submitted a continuing personal written guarantee to guarantee the indebtedness payable by the Second Respondent Company in exchange for using the banking facilities in favor of Claimant Bank on 08.12.2010, noting that the said obligation was renewed by them upon re-signing the banking facilities letter dated 14.04.2013; hence, it is admissible for the Claimant Bank to request the Third, Fourth and Fifth Respondents to jointly pay with the Second Respondent Company the amount specified in the operative part of the judgment. Accordingly, the Court impliedly rejects all the substantive pleas previously addressed by it."

41. The Dubai Court of First Instance rejected part of the Bank's claim which was concerned with certain letters of guarantee issued by System Construct Dubai in favour of third parties, but it held that Mr Almakhawi Sr and the other two guarantors were liable for the amount of AED 142,303,347.42 due from System Construct Dubai under their personal guarantees.

42. On 11 February 2017 Mr Almakhawi Sr lodged an appeal with the Dubai Court of Appeal, which was subsequently consolidated for hearing with appeals lodged by other parties. The short Statement of Appeal filed on behalf of Mr Almakhawi Sr was supported by an Explanatory Memorandum which criticized the substance of the Expert's work, saying that the Expert:

> "… did not investigate where and to whom such amounts and banking facilities were issued … did not review the accounts of System Dubai, the account holder, and the projects for which the banking facilities were signed, whether they were letters of guarantee or personal guarantees, and it did not review as well the accounts of System Abu Dhabi … [and] … did not comply with the principles of the accounting profession and did not review or examine at the accounts of System Dubai or System Abu Dhabi and did not examine to whom such facilities were issued and for which projects, knowing that the Director of System Dubai is the Second Appellee and the same Director of System Abu Dhabi."

43. There was, thus, a complaint about the substance of the Expert's work and about the substantive content of his two reports, and inevitably about the Dubai Court of First Instance's reliance upon them. No criticism was, however, made about the Expert's reference to the 1974 Law, and again no suggestion was made on behalf of Mr Almakhawi Sr that the reports were null and void for that reason.

44. The relief sought by Mr Almakhawi Sr included a request that the Dubai Court of Appeal appoint "a tripartite Committee" – a panel of three experts - to review the Bank's accounts regarding the Facilities and to investigate certain matters: essentially to carry out the work that it was alleged the Expert should have, but had not, carried out already.

45. On 27 February 2019, in a lengthy judgment, the Dubai Court of Appeal dismissed Mr Almakhawi Sr's appeal and the appeals filed by System Construct Dubai and by the other guarantors. The Court of Appeal explained its refusal to appoint a three-person expert panel in the following way:

> "Whereas, regarding the Appellant's request to deputize a tripartite expertise committee from the Ruler's Court to perform the assignment set forth in the Explanatory Memorandum and to look into the Appellant's claims and objections, it is held that the

Trial Court has full powers to understand and comprehend the facts of the lawsuit, assess the evidence and exhibits submitted to it, weigh between them and adopt whatever it is satisfied with and disregard otherwise, and has absolute power to assess the activities of the expertise as an element of evidence, and adopt whatever matters it is satisfied with on the basis of the veracity of the grounds upon which they are based in conformity with the facts established in the lawsuit, insofar as its judgment is based on plausible grounds, substantiated by the papers, and reasoned, without being bound thereafter by individually addressing each and every objection raised by the litigant against the expert's report, since the Court's adoption of the reasoned report signifies that the Court did not find in the litigants' pleading anything that would impair the veracity of the conclusion reached in the report and that such pleading is not worthy of addressing beyond what is contained in the report, with the Court's right to disregard the request of appointing a tripartite expertise committee (Contestation No. 284/2011 Civil – Hearing dated 09.05.2012).

Whereas, the Court has found the Case papers and exhibits, including the expert's reports, sufficient to establish its conviction, and that the expert has discharged of his assignment in a manner that has satisfied the purpose of his appointment within the scope of his assignment indicated in the interlocutory judgment, noting that specific matters which the Appellant requested to be investigated are not related to the subject matter of the Case, namely how the amounts and banking facilities were used, whether there was fraud committed by the Company's managers and whether the managers' personal accounts were illegally accessed etc., and other request which are not the subject matter of the Case relating to the banking facilities acquired by the Company and guaranteed by the Appellant."

46. In May 2019 Mr Almakhawi Sr made a further appeal to the Dubai Court of Cassation, Dubai's highest court. At this stage, he appointed new lawyers, Mohamed Abdulla ("MA"), in place of DAA.[2] As set out in his Statement of Appeal, there were three grounds of appeal:

"1. The Applicant challenges the challenged judgment for its error in applying the law and its interpretation, which invalidates its conclusion.

[2] Mr Almakhawi Sr complained about the conduct of DAA, and on 12 August 2020 the Professional Conduct Committee of the Government of Dubai Legal Affairs Department issued a decision giving the firm a written warning about its conduct. On the basis of the documents I was shown paragraph 22 of Mr Almakhawi Sr's witness statement, where he suggested that DAA had been suspended from practice, was incorrect.

2. Deficiency in presentation and examination in its grounds which led to another deficiently in reasoning and flaws in inference.

3. The failure to respond to the pleas submitted by the Applicant contained in the papers of the challenged judgment and the appealed judgment with justifiable reasons sufficient to dismiss them and dismiss their significance, which led to a prejudice to the right of defense."

47. As part of the third ground, Mr Almakhawi Sr made substantive criticisms of the work carried out by the Expert, alleging that it was "vitiated by the lack of evidence, deficiency and contradiction". No mention was, however, made of the fact that the Expert had referred in his two reports to the 1974 Law, and there was again no suggestion that the reports were null and void for that reason.

48. On 7 July 2019 the Dubai Court of Cassation dismissed the appeal. Commenting on Mr Almakhawi Sr's challenge to the Court of First Instance's reliance on the expert's conclusions, the Court of Cassation said the following:

> "The Claimant argued that the said judgment relied on the report produced by the deputized expert, to the effect that the Respondent Company received miscellaneous banking facilities from the Fourth Respondent Bank, whereupon the Respondent Company became indebted in favor of the Respondent Bank with the adjudged amount, and that the Claimant and Second and Third Respondents guaranteed the First Respondent by way of a continuing personal guarantee with the Fourth Respondent Bank against the use of the said facilities.
>
> …
>
> The Claimant also invoked inveracity of the expert's conclusion in the report and that the Fourth Respondent Bank allowed that the credit facilities granted to the Company be used in favor of another company, namely System Construct Abu Dhabi, which is not a party to the Agreement and is not guaranteed by the Claimant.
>
> …
>
> The Claimant argued that the Bank contravened the conditions of disbursement and the decision of the execution judge by liquidating the letters of guarantee. Therefore, the Claimant requested to appoint a banking expert or a tripartite expertise committee to consider his pleading and to determine entitlement of the Respondent Bank to grant and renew the banking facilities for the benefit of the First Respondent Company in respect of

other projects relating to another company, namely (System Construct L.L.C. Abu Dhabi). The Claimant added that the Challenged Judgment declined his substantial pleas and his request to deputize an expert or a tripartite expertise committee on the grounds that the papers of the Case and the report produced by the expert are adequate for the Court to hand down a judgment on the substance of the Case, which renders the judgment defective and necessitates that it be vacated.

…

The Trial Court has the power to understand and comprehend the facts of the lawsuit, assess the evidence submitted to it, and adopt whatever it is satisfied with and disregard otherwise, and has the power to construe contracts, agreements, and all exhibits in such a manner as it deems best satisfies the intent of the contracting parties, designate the guaranteed debt, and deduce the guarantor's approval to the continuation of the guarantee. Moreover, the Trial Court has the right to assess the activities of the expert and to adopt his conclusion insofar as it is satisfied with the veracity of his research and considers that the expert has investigated all the points of the dispute in the action. Thereafter, the Trial Court is not bound by individually addressing the exhibits submitted by the litigants or discussing every illegal argument raised or addressing their different arguments and claims and individually replying thereto, insofar as the fact it is satisfied with and evidenced impliedly refutes such arguments and claims.

…

Whereas the First Instance judgment, upheld by the Challenged Judgment in this respect, compelled the Claimant and the First, Second and Third Respondents to jointly pay to the Fourth Respondent Bank the adjudged amount and the interest based on the grounds mentioned in its recitals to the following effect:

…

It is evident from the original and supplementary reports produced by the expert, with which the Court is satisfied due to being based on plausible grounds substantiated by the papers, that the facilities, subject matter of the Case, were granted to the First Respondent Company 'System Construct L.L.C.', which benefited from the bank guarantees by entering into tenders and having contracting projects awarded thereto; …

Hence, the Fourth Respondent Bank has the right to claim the amount paid with regard to the aforesaid letters of guarantee from the value of guarantees and documentary credits, totalling

AED 149,132,233.92. On conducting a simple calculation, the Court finds that the amount payable to the Bank on the account closure date, namely 28.09.2014, is as follows:

…

Whereas, the conclusion reached by the Challenged Judgment, whereby it is established that the Claimant guaranteed the First Respondent and that the Claimant is compelled to jointly repay with the First Respondent the outstanding indebtedness, is valid and plausible; hence, the contention raised against the Challenged Judgment in this respect is unfounded.

Whereas, based on the foregoing, the Contestation is bound to be dismissed."

## 4.    Dubai law regulating expert evidence

49.    The Bank and the Defendants both served expert evidence in relation to Dubai law, including in relation to the role of an expert, and the legislation regulating the use of expert evidence, in Dubai proceedings.

50.    The Claimant's expert was Mr Ali Al Aidarous. He has been in legal practice in the UAE for approximately 30 years, initially as an in-house lawyer at various banks but since 1993 in private practice. He is licensed to practice before both the Dubai and DIFC courts. He is the founding partner of Al Aidarous Advocates and Legal Consultants, Dubai, UAE.

51.    The Defendants' expert was Mr Ali Ismael Al Zarouni. Mr Al Zarouni has more than 20 years experience in Dubai specialising in litigation and arbitration matters and is licensed to practice before both local and federal UAE courts. He was the founder, and he remains the managing partner, of Horizons & Co Law Firm, a leading independent law firm in the UAE.

52.    I am satisfied that both experts were qualified to give the evidence that they gave and that they gave their evidence impartially and with a view to assisting the court. As I explain below, on the one critical point concerning the status of what I refer to as "the Ministry Circular" I preferred the evidence of Mr Al Aidarous, but I am grateful to both experts for their assistance.

53.    In relation to the role of an expert before the Dubai courts, there was, in fact, no substantive dispute between the two experts.

54.    As Mr Al Aidarous explained in paragraph 24 of his report, and as he confirmed in cross-examination, the appointment of an expert may be appropriate in Dubai proceedings where the factual issues are complicated or technical. The expert is permitted to collect evidence

and to perform investigations. Expert evidence in Dubai proceedings is treated as evidence of fact.

55.    As to whether expert evidence should trespass on matters of law, Mr Al Aidarous accepted in cross-examination that it should not, because the law was the province of the judge; but, he explained, whilst an expert should not seek to *determine* legal issues, it might be impossible for an expert to render a report without some understanding of, or comment on, issues that were in truth legal.

56.    On this topic, Mr Al Aidarous said the following in paragraph 27 of his report, which was not challenged in cross-examination:

> "In practice, it may happen sometimes that a court appointed expert may exceed the mandate and make certain legal determinations. However, this will not of itself invalidate the Court's judgment unless the Court relies upon such legal determinations made by the expert without independently satisfying itself that the facts and evidence support the expert's findings by giving appropriate weight to the evidence submitted by the parties and applying the appropriate legal principles to the issues at hand."

57.    Mr Al Aidarous said that a court may choose to rely upon findings made by an expert and, if the court does so, then those findings will become the reasoning of the court. That the court has a discretion, and that it does not have to accept all the expert's findings, as one would expect, is confirmed by the passages in the Dubai Court of Appeal and Court of Cassation judgments set out in paragraphs 45 and 48 above.

58.    Mr Lewis's submission was that, given the potential significance of expert evidence to the final decision of a Dubai court, it was important that experts were subject to professional duties with which they were obliged to comply and which could be enforced. That, as a general proposition, is unsurprising, and it was not disputed by Mr Al Aidarous in cross-examination.

59.    So far as the legislation regulating expert evidence in Dubai proceedings is concerned, the first law in time was Federal Law No. 8 of 1974 "On the Regulation of Expertise before the Courts", *i.e.*, the 1974 Law. A copy of that law was not in the trial bundles, but in paragraph 43 of his report Mr Al Aidarous summarised the 1974 Law as follows:

> "The first law regulating experts before the Courts was Federal Law No. 8 of 1974 ('Law of 1974') that regulated the procedure for their appointment by the Court, their fees, the manner in which experts are to carry out their assignment (such as meeting the parties, preparing minutes of meetings geld with the parties,

preparing the final report, etc.), cross examination of experts by the Court, the Court's power to adopt or disregard the findings of experts, the creation of a register for experts held by the UAE Ministry of Justice, the criteria to be met for registration of experts, the disciplinary measures that may be taken against experts, etc."

60. In 2012 the 1974 Law was replaced by Federal Law No. 8 of 2012 "On the Regulation of Expertise Before the Judicial Authorities" ("the 2012 Law"). A copy of the 2012 Law was in the trial bundles, and on its first page it explained that it abrogated a number of existing UAE laws, including the 1974 Law, a point confirmed by Article 36.

61. The 2012 Law comprises some 37 Articles. Without seeking to address them all:

i) Article 3 specifies a number of requirements for an expert to be included on the register: he or she must be of good conduct, must hold a university degree, must have a prescribed number of years of post-graduate experience, must have the approval of his or her employer, and must pass procedures and tests prescribed by the Ministry;

ii) Articles 4 to 9 are concerned with the establishment of the expert register, the making of applications for inclusion, the period for which an expert is entitled to remain on the register, the taking of an expert's oath, and the circumstances in which an expert's registration might be suspended in the event of impediment and then renewed;

iii) Article 11 contains a statement of expert duties. Some 12 duties are listed, and I will not recite them all, but they include the following:

> "The expert shall abide by the following:
>
> 1 – Practice his profession with accuracy, honesty and sincerity, in a manner that preserves its dignity and consideration, while taking into account the principles and traditions in accordance with the Charter.
>
> 2 – Handle personally the task entrusted to him.
>
> 3 – Not to disclose information which he may have accessed by virtue of his work of expertise.
>
> 4 – He, nor anyone of his relatives up to the fourth degree of kinship, shall [not] have a personal interest directly or indirectly in any business related to the subject of the case subject to his expertise.

…

6 – Not to accept the work of expertise in a dispute in which he has been already asked for consultancy or briefed on the documents related thereto, by any party to the conflict."

iv) Articles 12 to 15 provide for the establishment and composition of an Expert Affairs Committee, responsible for registering, rejecting or striking off an expert from the approved list and for dealing on a preliminary basis with any complaints or court proceedings against an expert;

v) Articles 16 to 24 deal with disciplinary proceedings before a Disciplinary Board with powers to issue a warning, to suspend the registration of an expert for up to one year and to strike an expert off the approved list permanently, from whose decisions an appeal can be made to the Competent Court of Appeal; and

vi) Articles 27 and 28 provide for fines and/or for a term of imprisonment for any expert who practises without being registered on the list or who violates certain articles of the 2012 Law including Article 11.

62. The requirements of the 2012 Law were amplified and developed in Cabinet and Ministerial Resolutions issued in 2014 and 2015, both of which refer to the 2012 Law and appear to have been issued under or by reference to it.

63. The first of these was UAE Cabinet Resolution No. 6 of 2014 "On the Implementing Regulations to Federal Law No. 7/2012 Concerning the Regulation of the Profession of Expertise Before the Judicial Authorities" ("the 2014 Resolution").

64. Facially, there appears to be considerable overlap between the Articles of the 2014 Resolution and the 2012 Law (Article 14 of the 2014 Resolution, for example, substantially mirrors Article 11 of the 2012 Law), but the 2014 Resolution imposes a number of additional requirements, for example in relation to professional indemnity insurance.

65. Subsequently, in Ministerial Resolution No. 116 of 2015 "On the Technical Experts Charter" ("the 2015 Resolution") the UAE authorities established what the Dubai law experts referred to as a Code of Conduct. The 2015 Resolution comprises only 10 articles, of which Articles 4, 5 and 6 are the most relevant for present purposes:

"**Article 4 – Expert commitments**

The expert shall commit to the following:

1 – Federal Law no. 8 of 2012 on the regulation of expertise before the judicial authorities.

2 – Federal Law no. 10 of 1992 on the evidence in civil and commercial transactions and its amendments.

3 – Cabinet Decision no. 6 of 2014 on the regulation of Federal Law no. 7 of 2012 on the regulation of expertise before the judicial authorities.

**Article 5 – Main professional values**

Experts shall commit to the following professional values while performing their job and duties:

1 – Honesty, trust and impartiality.

2 – Integrity and transparency.

3 – Respect of others' rights.

4 – Cooperation with experts and teamwork in relation to the tripartite committees' matters.

5 – Commitment to job performance and completion on the set dates.

6 – The expert shall keep a true copy of the original of the reports they elaborate until a final judgment is rendered in the case.

7 – The expert shall preserve the confidentiality of the information that comes to their knowledge during or due to their performance of the tasks entrusted thereto.

8 – The expert shall commit to submitting the expertise reports on the set date to the competent court.

**Article 6 – Code of professional conduct**

1 – To commit to receiving the mission they are entrusted with from the competent court and appear before it on the set dates.

2 – To accomplish the mission entrusted thereto in person and within the scope of this mission.

3 - To perform their duties while adopting the highest standards of quality and competence.

4 – To observe the principles, ethics and practices of the profession.

5 – To exercise due diligence in improving their knowledge, developing their professional skills through education and participation in scientific and training sessions.

6 – To inform the department within one month of any amendment to or change of their address or licensing data."

66. Mr Al Aidarous was asked in cross-examination about the impact of the 2012 Law and the 2014 and 2015 Resolutions. He accepted that they contained more detail than was in, and thus that there was more regulation than under, the 1974 Law, but he resisted the suggestion that there had been any major change or that the basic duties of an expert were any different to what they had been before:

"Q. You accept, I think, that the 2012 law has expanded on the duties and requirements imposed upon experts, yes?

A. No. It doesn't expand on the duty, it is rather regulating their work in terms of the regulation for registration was a requirement, it is more detail, but there is no major change in the law about the duties of experts and the old law and the new law are the same.

…

Q. Yes. The code of conduct was a feature than only came about after the 2012 law, correct?

A. Yes, if you want to say codified code of conduct, but always there is a code of conduct, the major principle, duties of the expert contained in the old law and the new law and the conduct maybe just improve – it is nothing new.

Q. Is this a fair way of putting it, Mr Al Aidarous: after 2012 the provisions became more detailed as to what was expected of experts? Yes?

A. No. No. No. It was simply it is more regulation side, because don't forget the old law 1974, the country used this law for almost 40 years, it is a natural things, the system will be improved, there is more regulation providing for how to register the expert, about the measures of discipline measure, but it doesn't change the basic duties of the expert in the old law and the new law are the same."

67. The thrust of Mr Al Zarouni's evidence was that the 2012 Law was more modern and more detailed than the 1974 Law, but he did suggest that there was also a substantive difference:

"Q. It is correct, isn't it, that the basic duties an expert owes to the court were the same under the 1974 and 2012 laws?

A. 2012 is more advanced and more details. This is what I can say.

Q. Yes, more detail –

A. - in general

Q. - but the basic principles were the same?

A. No, there is some principle it is there, but it is more with detail, more with, you know, it is a big difference from 1974 up to the year of 2012, if I am not mistaken, okay? So that is that that big difference. Of course, the new law will be more modern, more details, and that is what I can say about it."

68. Ultimately the issue between the experts on this topic was a fairly narrow one, essentially whether the 2012 Law did anything more than spell out expressly duties that were already implicit and that any appointed expert already owed.

69. In response to a number of questions about aspects of the 2012 Law and the 2014 and 2015 Resolutions that had not featured in the previous 1974 Law, Mr Al Aidarous said that the relevant matter "goes without saying". This led to the following exchange about Article 11 of the 2012 Law:

"Q. … What article 11 does is it sets out, if you like, a code, what is expected of an expert in terms of standards of conduct, yes?

A. Yes.

Q. Do you see that? My question to you is very simple. This is the first time in the law of 2012 that those standards were expressly put, were expressly written down. Do you agree with that?

A. Yes, yes. If you said expressly, yes, agreed, but those duties exist all the time."

## 5. The Ministry Circular

70. In circumstances where the breach of natural justice relied upon by Mr Almakhawi Sr to resist enforcement is not a substantive failure by the Expert to comply with his duties or with any code of conduct, whether under the 2012 Law or any other law, it might be thought that all this is of limited relevance.

71. It was, however, the basis for Mr Lewis' submission that the reference in the Expert's two reports to the 1974 Law rather than to the 2012 Law, accepted by both Dubai law experts to be a mistake,

was significant. Mr Lewis argued that the 2012 Law contained additional safeguards, and that one could infer from the Expert's reference to the 1974 Law that he had not had regard to them.

72.    There are two obvious difficulties with this submission, which I explored with Mr Lewis in his oral closing submissions.

73.    The first is that, as Mr Lewis accepted, there is no explicit requirement in the 2012 Law or the 2014 or 2015 Resolutions that an expert report contain a reference to the 2012 Law or to *any* regulatory law concerning expert evidence:

> "Mr Lewis: … And your Lordship said to my learned friend, you said there is no requirement to actually refer to a specific law in the report.
>
> The Judge:    I don't know, I hadn't been shown one.
>
> Mr Lewis:    I have looked through the legislation that we have post 2012 and I accept that there is no such obligation."

74.    The second difficulty is that Mr Lewis's complaint was simply about the mistaken reference to the 1974 Law in the First and Second Expert Reports. Mr Lewis made clear that he did not (and could not) advance a case that the Expert had *actually* failed to comply with any provision of the 2012 Law or that he had *actually* failed to have regard to his duties under it or under the code of conduct:

> "The Judge: Just so that I am clear, you say it is a serious defect whether or not, as a matter of fact, the expert acted in a way which was consistent with the new law?
>
> Mr Lewis: Yes – well, we simply don't know.
>
> The Judge:    I think, as I understand your proposition, you are saying that regardless of whether the expert in fact acted in accordance with the new law, the fact that he referred to the old law in his report is itself a serious defect?
>
> Mr Lewis: We say that, yes, my Lord. Yes."

75.    If the matter had rested there, I would have had no difficulty in rejecting the argument that the fact of the mis-reference in the First and Second Expert Reports to the 1974 Law, even assuming it could be regarded as a procedural irregularity, was an irregularity of such significance that it constituted a breach of the English court's view of substantial justice.

76.    Mr Lewis, however, relied upon a circular issued by the Experts Division of the UAE Ministry of Justice on 1 March 2022 ("the

Ministry Circular”). I should set out the content of this document in full:

> “Dear honourable Experts,
>
> Peace be upon you.
>
> At first, we would like to extend you our best regards, wishing you continuous success and we would like to inform you that the Judicial Authorities stated the following:
>
> - Some Experts’ reports still include the phrase: (This report was prepared in accordance with Federal Law No. (8) of 1974 Regulating Expert Profession) and since Law No. 8 of 1974 was repealed by the issuance of Law No. 7 of 2012, any report that includes this phrase shall be considered null and void.
>
> - It was noted that some of the initial reports that are sent to the parties for comment are not signed by the delegated expert, which violates the Evidence Law and its amendments, and therefore please adhere to the correct law.
>
> Yours Sincerely,
>
> Expert/M.S. Aisha Suleiman Al Ali
>
> Director of Technical Experts and Translators Affairs Department.”

77. Mr Al Aidarous and Mr Al Zarouni disagreed about the impact of the Ministry Circular, but before dealing with that disagreement I should identify two points that were undisputed.

78. First, the Ministry Circular was dated 1 March 2022. It was, therefore, issued almost three years after the judgment of the Court of Cassation in the Dubai Proceedings. If the Ministry Circular had only prospective effect, then it could have no impact upon the First and Second Expert Reports or upon the reliance that had been placed upon them by the Dubai courts.

79. Secondly, whilst Mr Al Zarouni said that the Ministry Circular had retrospective effect, or at least that what it recorded reflected the law prior to 1 March 2022, he was unable to point to any authority - any decision of a Dubai trial or appellate court or any textbook - between 2012 and 2022 – which had said or decided that an expert report that referred to the 1974 Law was null and void.

80. As for the Ministry Circular itself, Mr Al Zarouni accepted that it was not itself a law or a byelaw. He relied, however, on the opening part of the circular in which the Ministry said that it wished to inform the expert community “that the Judicial Authorities [had] stated” that

any expert report that included reference to the 1974 Law "shall be considered null and void".

81.   However:

    i)    There was no evidence of what the judicial authorities – assuming that this can be taken to mean the judiciary as a whole or perhaps the senior judiciary – had actually said, or that there had been a court decision in which it had been held that an expert report which mistakenly referred to the 1974 Law was automatically null and void; and

    ii)    Even if the Ministry Circular, by its reference to the judicial authorities, can be treated as having some sort of binding legal effect, which I doubt, there was no evidence that it was intended to operate retrospectively so as to invalidate decisions in prior cases that had been reached in reliance upon expert reports which mistakenly referred to the 1974 Law.

82.   In my judgment, reading the Ministry Circular as a whole, noting its author (the Ministry, not a law-making or judicial body), its addressees (the expert community), its content and its tone, Mr Al Aidarous was correct when in his oral evidence he described the circular as essentially a notification or warning to the expert community of the importance of referring to the (new) 2012 Law:

    "A.  … This is a regulatory body of experts and they receive a complaint from the courts that is a separate stating that there are some experts who are still referring to the old law. I think the expert, the Ministry of Justice, the regulatory body, they try to notify to the expert, please abide by the new law, don't refer to the old law.

    What the statement is said by the ministry, if you refer to the old law, maybe this is the intention it was it might be or it will be nullified by the court, but the Ministry of Justice have no powers to nullify any expert report. The expert report will be nullified by the court.

    Q.  What you have then is a direction from the Ministry of Justice to the courts as to how they should treat experts' reports which refer to the 1974 law, isn't that correct?

    A.  No. This is addressed to the expert, notifying them, 'Please be careful, use the new law to make a reference', it is not addressed to the court, it is not the duty of the Ministry of Justice to say to the court what is annulled and the experts is null and void or not, this is the court, this is a court judiciary decision to be made by the court itself.

    …

A.    … This is basically a direction to the expert to the intention was to tell them you might be nullified by the court, it is not for the Ministry of Justice to nullify the expert report in the first place."

Mr Al Zarouni disagreed with the suggestion that the Ministry Circular was simply a notification or a warning, but on this point I preferred the evidence of Mr Al Aidarous.

83.    Ultimately, in fact, Mr Al Zarouni made clear that his opinion did not depend upon the Ministry Circular changing the law, either prospectively or retrospectively. Rather, he said, the circular was confirmatory of what the law already was, *i.e.*, that, since 2012, any expert report that referred to the 1974 Law rather than to the (new) 2012 Law was automatically null and void:

"Q.    … Suppose, prior to this circular being issued, a judgment relies upon a report referring to the 1974 law, once the time for appealing has passed, such that the judgment is final and binding this law doesn't retrospectively invalidate the judgment – sorry, this circular does not retrospectively invalidate the judgment?

A.    The circular is nothing to do to only invalidate. The law by itself is by operation of the law it is invalidated, because the decision based on the expert which is null and void. That is exactly what it – the grounds of that judgment was based on the expert, so if the ground is not there, then it should be like this. Now the way how they can approach the court and how they can do it, that is not part of my legal expert to be very frank, to talk about it.

Q.    Can we just unpack that? I think your point there was that the 2012 law means that a report that refers to the 1974 law is invalid and that is simply a consequence of the 2012 law. Is that what you are saying?

A.    Again.

Q.    Is your evidence that the effect of the 2012 law is that an expert report produced after the 2012 law came into force [that] refers to the 1974 law, it is invalid by virtue of the 2012 law?

A.    Yes, because that is which is the circular is confirming."

84.    The difficulty with this, however, is that, although Mr Al Zarouni said that any expert report filed after the 2012 Law came into force that referred to the preceding 1974 Law was automatically null and void, there was nothing in the 2012 Law itself which said that this should

be the case; nor was Mr Al Zarouni able to point to a case after 2012 where a court had said that.

85.    In circumstances where there is no requirement in Dubai law for an expert report to refer to *any* regulatory law, it would be odd if an unnecessary, but mistaken, reference to the 1974 Law meant that the expert report was automatically null and void, rather than simply a factor that could be taken into account by a court in deciding whether or not to admit, or the weight to be attached to, the report. The absence of any authority to that effect is, therefore, unsurprising.

86.    On the basis of the evidence that I heard, I reject the argument made on Mr Almakhawi Sr's behalf that the mistaken reference in the First and Second Expert Reports to the 1974 Law had the automatic consequence that the reports were null and void with the result that the Dubai courts were not entitled to rely upon those reports.

87.    I would, for the same reason, reject any suggestion that the mistaken reference in the First and Second Expert Reports to the 1974 Law was anything more than a defect in form or a mere procedural irregularity; I would thus reject the argument that the Dubai court's reliance upon those reports meant that the judicial process in the Dubai Proceedings was substantially unjust.

## 6.    A local remedy?

88.    There is, in any event, this further difficulty in the way of Mr Almakhawi Sr's natural justice complaint.

89.    I explained in paragraph 25 above that, in determining whether there had been substantial injustice, a relevant factor was the availability of a remedy in the foreign court for any error in procedure or unfairness that had occurred.

90.    Let it be assumed, contrary to my view, that Mr Al Zarouni is right, that the Ministry Circular was declaratory or confirmatory of existing Dubai Law, and that since 2012, when the 2012 Law came into force, an expert report that referred to the 1974 Law was automatically null and void and could not properly be relied upon by a Dubai court.

91.    If that is correct, then the invalidity of the First and Second Expert Reports, referring as they did on their face to the 1974 Law, was plain to see. Whether or not the point was actually taken on behalf of Mr Almakhawi Sr, it was *available* to be taken by him at trial, and it could also have formed the basis of an appeal to the Court of Appeal or the Court of Cassation by either of his two sets of Dubai lawyers.

92.    Mr Al Zarouni accepted this in cross-examination:

"Q. I am asking you a purely legal question. Suppose you are right, that a reference to the 1974 law means – as a result of the 2012 law – a trial judge shouldn't refer to it, shouldn't rely on it?

A. Ah ha.

Q. That, as a matter of law, is an argument you can make to the trial judge and if the trial judge accedes to it, you can appeal to the Court of Appeal on that ground and you can appeal to the Court of Cassation on that ground?

A. Yes, if their counsel they look at it, they can use that, of course. It is a matter of – there is a – they have some good reasoning, in my opinion."

93. As explained in *Adams*, the significance of an available local remedy depends upon the particular facts. I was referred by Mr Lewis in that context to the decision of the Court of Appeal in *Masters v Leaver* [2000] IL Pr. 387, a case concerning a dispute between shareholders of a US company, Cable Advertising Networks, Inc. The facts of that case were as follows.

94. In 1992 the claimants brought proceedings in Texas against a variety of parties including Mr Leaver and Hopkins & Sutter, his attorneys, claiming damages for oppressive conduct and fraud. Mr Leaver failed to comply with a number of court orders, and an order was made striking out his defence and giving judgment against him with damages to be assessed, at the claimants' option, by a judge or jury.

95. A trial subsequently took place for two purposes: to consider the liability of Hopkins & Sutter, and to assess the damages recoverable from Mr Leaver, which the claimants had chosen to be assessed by a jury. The claim against Hopkins & Sutter settled. The judge then directed the jury to return an award against Mr Leaver in the amount of damages claimed by the claimants.

96. The order drawn up by the Texas court in February 1995 stated that the jury had found that both oppressive conduct and fraud had been proved against Mr Leaver and that it had awarded damages of $9.125 million for each of them, *i.e.*, $18.250 million in total, to each claimant. Mr Leaver issued a motion for a new trial and subsequently an appeal, but both were dismissed.

97. In March 1998 proceedings were commenced by the claimants in England to enforce the Texas judgment against Mr Leaver who, by that stage, was an undischarged bankrupt. In support of an application for leave to continue the proceedings, an affidavit was sworn by the claimants' attorney asserting that the Texas jury had found fraud and that it, *i.e.*, the jury, had assessed damages in the amounts claimed.

98. A default judgment was subsequently obtained against Mr Leaver. He applied to set it aside on the basis that, contrary to the affidavit sworn by the claimants' attorney, there had been no assessment of damages by the Texas jury; rather, the sums had been awarded on the direction of the judge at the suggestion of the claimants' own attorney.

99. Morritt LJ, who gave the only substantive judgment in the Court of Appeal, referred at [31]–[33] to *Adams* and to the principles set out in paragraphs 24 and 25 above. At [33] he said the following in relation to the availability of a local remedy:

> "Thirdly, where the procedural defect is apparent to the defendant he should use the local remedy of appeal before resorting to the contention in this country that the assessment of his liability was not in accordance with the principles of substantial justice."

100. On the application of the principles to the facts of the case, at [39]–[41] Morritt LJ said this:

> "39. … On the basis of the evidence before us it appears to me that, contrary to the statement of Mr Myers in the later affidavit, it was the duty of the judge to leave the assessment of the damages for the decision of the jury in light of the wide variation in the expert evidence before them. The judge did not do so, with the result that, arguably, the assessment of damages required by the order did not take place.
>
> 40. So the question arises whether Mr Leaver should have pursued any remedy in Texas by way of appeal in respect of the failure to observe the requirements of the 1994 order. The judge considered that he should. She said:
>
> > It is sufficiently obvious, therefore, that if that was a breach of procedure, it was a matter that could be pursued in an appeal in Texas. The procedures that were provided in Texas were in themselves reasonable and the fact that a bond may or may not have been required in order for the defendant to pursue an appeal from a default judgment in Texas does not so far offend the concept of natural justice as to provide any basis for a challenge to the Texas judgement as regards the amount of the actual award of damages. I do not find therefore but any breach of procedure, even assuming there were one, or the availability of means to redress it, had gone so far as to offend the English concept of proper justice and proper procedure. This case is therefore well on the inside of the line as drawn in the Adams v. Cape Industries case as to whether the court will enforce a judgement. Therefore I reject that as a matter supposedly giving rise to a reasonable

defence such that leave to defend ought to be given on that score.

41. On the basis of the evidence before us, I would answer the question in the negative. The evidence of Mr Myers was to the effect that the quantum of liability had been assessed by the jury in the normal way. I share the judge's astonishment at Mr Myers' evidence as to the course the proceedings took. The true position did not come to light until September 1998. By that time Mr Leaver's appeal in Texas had long since been dismissed for failure to provide security for costs. I am by no means satisfied that he could at that late stage had re-opened the appeal on the new ground he might then have realised was available."

101. I do not consider that the decision in *Masters* assists Mr Almakhawi Sr.

102. As the passages set out above show, the Court of Appeal asked itself whether the defect in Texas had been "apparent" to Mr Leaver so that he could have availed himself of a local remedy. The court determined that the defect had *not* been apparent, and that the true position had not come to light until years later after Mr Leaver's appeal (on other grounds) had been dismissed.

103. In the present case, as I have explained, the reference in the First and Second Expert Reports to the 1974 Law was plain to see; and if, contrary to my view, the consequence was that the First and Second Expert Reports were null and void, the point could have been taken, either at first instance or on appeal in Dubai, by Mr Almakhawi Sr through either of his two sets of lawyers.

## 7. Conclusion

104. The natural justice exception in *Dicey, Morris & Collins* (*op. cit.*), Rule 55 is not made out. I will, therefore, declare that the Dubai Judgement is enforceable in England and Wales and enter a monetary judgment against Mr Almakhawi Sr accordingly.

## F. The Transfers

105. The second issue I have to decide concerns the transfer of the Warren House Property and the Money Transfers.

106. As I explained in paragraph 12 above, the Bank puts its claim in relation to the transfers in two ways: it says that either:

i) The assets transferred are still beneficially owned by Mr Almakhawi Sr and are the subject of a resulting trust in his favour; or

    ii) The transfers amounted to transactions in defraud of creditors within the meaning of section 423 of the Insolvency Act 1986.

I summarised the Defendants' response in paragraph 14.

107. The evidence in relation to the two ways in which the claim is put overlaps, and I propose to address it as a whole. It is convenient to deal first with the applicable principles.

## 1. Resulting Trust

108. Mr Almakhawi Sr purchased the remaining term of a long lease of the Warren House Property in January 2007 for a purchase price of just under £1.7 million.

109. There was at one stage a mortgage on the property, but by July 2019 the property was unencumbered. By a TR1 form dated 8 July 2019, legal title to the property was transferred from Mr Almakhawi Sr to Mr Almakhawi Jr. It is common ground that the transfer of the Warren House Property was gratuitous. The same is true of the Money Transfers made in August and October 2019.

110. The general rule in English law is that a gratuitous transfer is rebuttably presumed not to be a gift: see *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] 2 AC 669 at 708A-B (Lord Browne-Wilkinson). Thus, where *A* makes a voluntary transfer to *B* and the presumption applies, the asset will be held by *B* on resulting trust for *A*.

111. However:

i) The presumption is just that – a presumption;

ii) It may be rebutted by evidence, and in *Vandervell v Inland Revenue Commissioners* [1967] 2 AC 291 at 312F Lord Upjohn said that it was "easily rebutted"; and

iii) The presumption may also be rebutted by the counter-presumption of advancement - itself, of course, only a presumption - which applies to transfers between parent and child, even where the child is not a minor: *Wood v Watkin* [2019 EWHC 1311 (Ch), [2019] BPIR at [82]-[93] (ICC Judge Barber).[3]

112. So far as the evidence admissible to rebut the presumption is concerned, the authors of *Lewin on Trusts* (20th ed.) explain in paragraph 10-037 that:

3 The presumption of advancement is set to be abolished by section 199 of the Equality Act 2010, but that section has not yet been brought into force.

> "In general, any evidence of the real purchaser's actual intention at the time of purchase which is admissible under the general law of evidence may be adduced to support or rebut a presumption of resulting trust or advancement. Thus, acts and declarations antecedent to or contemporaneous with the purchase, or so immediately after it as to constitute part of the same transaction may be relied on in evidence for the purpose of rebutting or supporting the presumptions.

The focus is on the intention of the transferor; it is not necessary that the transferee's intention should be the same: see *Lewin* (*op. cit.*), paragraph 10-010.

113. As a resulting trust is imposed in order to reflect the presumed intentions of the parties, if a gratuitous lifetime instrument of transfer contains express or inferred provisions determining the beneficial ownership of the property transferred, effect will be given to those express or inferred provisions: *Lewin* (*op. cit.*), paragraph 10-002.

## 2. Section 423 of the 1986 Act

114. Section 423 of the 1986 Act, provides, insofar as relevant, as follows:

> "**423 Transactions defrauding creditors.**
>
> (1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if –
>
> (a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;
>
> …
>
> (2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such an order as it thinks fit for –
>
> (a) restoring the position to what it would have been if the transaction had not been entered into, and
>
> (b) protecting the interests of persons who are victims of the transaction.
>
> (3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose –

(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

…

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".

115. Section 424 of the 1986 Act identifies a number of persons who may apply for an order under section 423, which include a "victim of the transaction" as defined in section 423(5). If the Bank is right in what it says about the purpose for which the transfers were made, there was no dispute that the Bank would qualify as a victim.

116. Section 425 provides a non-exhaustive list of orders that the court may make in circumstances where it has found that a transaction has been entered into which satisfies the requirements of section 423. They include an order for the asset transferred to be returned to and vested in the transferor, where it will then, of course, potentially be available for enforcement by the transferor's creditors.

117. There was no dispute that the Warren House Property and the Money Transfers involved transfers from Mr Almakhawi Sr to his son for no consideration within the meaning of section 423(1)(a). The critical issue was whether the transfers were made for one of the purposes identified in section 423(3) ("a Prohibited Purpose").

118. I summarised the law, as I understood it, in relation to the Prohibited Purpose requirement in a judgment I gave earlier this year in *Integral Petroleum S.A. v Petrogat FZW* [2023] EWHC 44 (Comm). Referring to a passage in Gee, *Commercial Injunctions* (7th ed.), paragraph 13-031, and to recent Court of Appeal authority, at [63] I said this:

> "This, as Stephen Gee, KC says in *Commercial Injunctions* (7th ed.) at 13-031 requires proof of a subjective, positive intention on the part of the company entering into the transaction (the debtor) to achieve a Prohibited Purpose, which is a question of fact. However:
>
> (i) Whilst it is important to distinguish between the *purpose* of a transaction and what is simply a collateral *effect*, it is not necessary to show that a Prohibited Purpose was the only,

or the dominant, or the predominant purpose. No adjective should be read in to the statutory language: see *JSC BTA Bank v Ablyazov* at [14] *per* Leggatt LJ;

(ii) Nor is it necessarily fatal that, even absent a Prohibited Purpose, the debtor (here Petrogat) might have entered into the impugned transaction anyway: see *JSC BTA Bank v Ablyazov* at [11] – [12] *per* Leggatt LJ, citing the judgments of Laws and Simon Brown LJJ in *Inland Revenue Commissioners v Hashmi* at [33] and [38];

(iii) Proof that the consequence of the transaction was to put assets beyond the reach of creditors is not, in itself, enough; however, evidence that this was the foreseeable and foreseen result may, nonetheless, support an inference that the transaction was, in fact, entered into for a Prohibited Purpose, as may also evidence that this was something the actor desired.

119. It was common ground that section 423 does not require dishonesty on the part of the transferor: see, *e.g.*, *National Westminster Bank plc v Jones* [2001] 1 BCLC 98 at [107] (Neuberger J). That said, many cases do involve dishonesty or at least disreputable conduct, and it has been held that a *prima facie* case under section 423 is sufficient to engage the iniquity exception to legal professional privilege.

120. Mr Edwards, who appeared before me on behalf of the Bank, challenged the proposition that it was necessary in all cases to show that the transferor had a subjective, positive intention to achieve a Prohibited Purpose. Whilst acknowledging that the operation of section 423 did not depend upon proof of insolvency, Mr Edwards submitted that:

> "… a transfer at less than full value by an insolvent person is presumptively made for a prohibit[ed] purpose."

121. Mr Edwards argued that, where the transferor is insolvent and where the consequence of the transferor's conduct is to put assets beyond the reach, or otherwise to prejudice the interests of creditors, then the existence of a Prohibited Purpose is to be imputed or presumed on the basis that:

> "… a man must be presumed to intend the natural consequences of his own act."

Mr Edwards submitted in closing that, where the transferor was insolvent, there was "a completely objective" standard.

122. Mr Edwards' argument proceeded in three steps.

123. First, he submitted, under the Fraudulent Conveyances Act 1571 and under section 172 of the Law of Property Act 1925, the predecessors of section 423 of the 1986 Act, the relevant statutory purpose could and would be imputed from the consequences of the actor's conduct: see, in particular, the decision of the Court of Appeal in Chancery in *Freeman v Pope* (1870) LR 5 Ch. App. 538.

124. Secondly, Mr Edwards said, there was no reason to think that the amendments made in 1925 and then again in 1985/86, following the Report of the Review Committee into Insolvency Law and Practice chaired by Sir Kenneth Cork ("the Cork Report") were intended to change the position and to make the mental element less favourable to creditors, requiring proof of actual, subjective intent.

125. Thirdly, Mr Edwards argued, his proposition, that, in cases of where the transferor was insolvent at the time the transfer was made, a Prohibited Purpose was to be presumed from conduct, was consistent with the duties owed by insolvent persons to their creditors: see *BTI 2014 LLC v Sequana SA* [2022] UKSC 25, [2022] 3 WLR 709 at [129] (Lord Briggs JSC).

126. I asked Mr Edwards whether the presumption he suggested was a presumption of fact or law; and, if it was a presumption of law, whether it was a rebuttable or an irrebuttable presumption. Mr Edwards answered, candidly, that the authorities were not clear, and that, whilst the language used in *Freeman* was suggestive of a rule of law, that might be too high a way of putting it.

127. This argument was ably developed, but I am unable to accept it. I say this for the following reasons.

128. So far as the history is concerned, prior to 1926 fraudulent conveyances were subject to the Fraudulent Conveyances Act 1571 ("the 1571 Act", sometimes referred to as the Statute of Elizabeth). The 1571 Act referred to conveyances "to the end, purpose and intent, to delay, hinder or defraud creditors", deeming such conveyances to be void.

129. In relation to this language, in *Freeman* Lord Hatherley LC said the following at 540-541 (the underlined emphasis is mine):

> "The difficulty the Vice-Chancellor seems to have felt in this case was, that if he, as a special juryman, had been asked whether there was actually any intention on the part of the settlor in this case to defeat, hinder, or delay his creditors, he should have come to the conclusion that he had no such intention. With great deference to the view of the Vice-Chancellor, and with all the respect which I most unfeignedly entertain for his judgment, it appears that this does not put the question exactly on the right ground; for it would never be left to a special jury to find,

*simpliciter*, whether the settlor intended to defeat, hinder, or delay his creditors, without a direction from the judge that if the necessary effect of the instrument was to defeat, hinder or delay the creditors, that necessary effect was to be considered as evidencing an intention to do so. A just would undoubtedly be so directed, lest they should fall into the effort or speculating as to what was actually passing in the mind of the settlor, which can hardly ever be satisfactorily ascertained, instead of judging of his intention by the necessary consequences of his act, which consequences can always be estimated from the facts of the case.

…

But it is established by the authorities that in the absence of any such direct proof of intention, if a person owing debts makes a settlement which subtracts from the property which is the proper fund for the payment of those debts, an amount without which the debts cannot be paid, then, <u>since it is the necessary consequence of the settlement</u> (supposing it effectual) that some creditors must remain unpaid, it would be the duty of the Judge to direct the jury that <u>they must infer the intent of the settlor to have been to defeat or delay his creditors</u>, and that the case is within the statute.

130.  Sir G. M. Giffard LJ spoke similarly at 544-545 (again, the emphasis is mine):

"Of course the irresistible conclusion from that was, that the voluntary settlement was intended to defeat the subsequent creditors. That being so, I do not thing that the Vice-Chancellor need have felt any difficulty about the case of *Spirett v. Willows*, but he seems to have considered, that in order to defeat a voluntary settlement there must be proof of an actual and express intent to defeat creditors. That, however, is not so. There is one class of cases, no doubt, in which an actual and express intent is necessary to be proved – that is, in such cases as *Holmes v. Penney*, and *Lloyd v. Attwood*, where the instruments sought to be set aside were founded on valuable consideration; but where the settlement is voluntary, then the intent may be inferred in a variety of ways. For instance, if after deducting the property which is the subject of the voluntary settlement, sufficient available assets are not left for the payment of the settlor's debts, <u>then the law infers intent</u>, and it would be the duty of a Judge, in leaving the case to the jury, to tell the jury that <u>they must presume that that was the intent</u>. Again, if at the date of the settlement the person making the settlement was not in a position actually to pay his creditors, <u>the law would infer</u> that he intended, by making the voluntary settlement, to defeat and delay them.

131. I agree with Mr Edwards that the trenchant language used in these passages is consistent with the view that, under the 1571 Act, in the context of gratuitous conveyances at least, the law was prepared to deem or presume an intent to delay, hinder or defraud creditors simply on the basis that this was the necessary consequence of the relevant conduct.

132. This certainly seems to have been the view of the authors of May, *The Law of Fraudulent and Voluntary Conveyances* (3rd ed. 1908) who spoke, at pages 4-5, of a form of constructive fraud:

> "The statute of 13 Eliz. C. 5, is not only directed against transfers of property as are made with the express intention of defrauding creditors; but, as has been justly remarked, it extends as well to such as virtually and indirectly operate the same mischief, by abusing their confidence, misleading their judgment, or secretly undermining their interests. To obviate this, it has gradually grown into a practice to regard certain acts or circumstances as indicative of a so-called fraudulent intention in the construction of the Statute, although, perhaps, there was in fact, no actual fraud or moral turpitude. It is difficult, in many cases of this sort, to separate the ingredients which belong to positive and intentional fraud from those of a mere constructive nature, which the law thus pronounces fraudulent upon principles of public policy.
>
> To draw any definite invariable line of distinction between moral and technical fraud, on the one hand, or between actual and constructive on the other, would be next to impossible and could rarely serve any useful purpose. But there are certain circumstances, the presence of which has been taken as conclusive evidence of fraud, and as invariably avoiding the conveyance.
>
> The ordinary form of this constructive fraud under 13 Eliz. C. 5, is a voluntary conveyance made by a man deeply indebted, which accordingly is void, under the Statute, as against the grantor's creditors."

133. The successor to the 1571 Act (albeit indirectly) was section 172 of the Law of Property Act 1925 ("the 1925 Act"). Section 172(1) provided, in rather simpler and more modern language than the 1571 Act, that:

> "Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable, at the instances of any person thereby prejudiced."

134. I agree with Mr Edwards that there are authorities that can be said to support the view that under section 172 of the 1925 Act the same approach to intent applied as under the 1571 Act, although the cases are somewhat more equivocal as to whether intent is automatically to be presumed. See:

i) *In re Eichholz* [1959] Ch. 708 at 722-724 (Harman J):

> "There is no doubt that the Statute of Elizabeth was available after a man's death to his creditors to recover from a volunteer property of whatever kind … It was not necessary to prove a fraudulent intent. The mere fact of insolvency was enough: see Lord Hatherley's judgment in *Freeman v Pope*. … In my judgment, all this continues to be good law under section 172 of the Law of Property Act";

ii) *Lloyds Bank Ltd v Marcan* [1973] 1 WLR 339 at 344H (Sir John Pennycuick V.C.):

> "The word "intent" denotes a state of mind. A man's intention is a question of fact. Actual intent may unquestionably be proved by direct evidence or may be inferred from surrounding circumstances. Intent may also be imputed on the basis that a man must be presumed to intend the natural consequences of his own act: see the judgment of Lord Hatherley LC and Giffard LJ in *Freeman v Pope* (1870) 5 Ch. App. 538. I would mention that today this imputation might well be considered applicable where there has been a valuable consideration short of full consideration. I do not, however, propose to pursue that point for this reason. In the present case there is evidence of actual intention. That, of course, is by no means always so in cases under this section. Where there is evidence of actual intention, in the nature of things there is very little room for imputing intention. I do not, therefore, propose to pursue the difficult questions which arise as to the circumstances in which intention may be imputed.

See also, dismissing an appeal in the same case, reported at [1973] 1 WLR 1387, the judgment of Cairns LJ at 1392D-E:

> "Other cases make it clear that if the conveyance is voluntary it is easier to infer a dishonest intention than when it is made for consideration or even that no dishonest intention need then be established: see *Freeman v Pope* (1870) 5 Ch. App. 538, *Ideal Bedding Co. Ltd v Holland* [1907] 2 Ch. 157, *In re Eichholz, decd*. [1959] 1 Ch. 708."

135. That the law in relation to the meaning of the phrase "with intent to defraud" in section 172 of the 1925 Act was, however, not entirely

clear is reflected in the Cork Report issued in 1982. In paragraph 1212, commenting on section 172, the report said this:

> "The section does not render a transaction voidable unless there is an intent to defraud creditors. Unfortunately, it is not entirely clear what is the meaning of 'to defraud' in this context; though it seems that, in practice, the requisite inference of fraud will be drawn whenever the necessary consequences of the transaction is to defeat, hinder, delay or defraud the creditors or to put assets belonging to the debtor beyond their reach. Where the requisite intention is proved, or inferred, any person prejudiced may have the transaction set aside, whether or not there was any intention of defrauding that person."

136. The Cork Report went on in paragraph 1215 to recommend that section 172 be repealed and re-enacted in a different form, with the recommended re-enactment including an express provision that:

> "… the necessary intent is an intent on the part of the debtor to defeat, hinder, delay or defraud creditors, or to put assets belonging to the debtor beyond their reach, and that such intent may be inferred whenever this is the natural and probable consequence of the debtor's actions, in light of the financial circumstances of the debtor at the time, as known, or taken to have been known, to him."

The recommendation¸ I note, was for the inclusion of language that intent "may" be inferred, not, as the judgments in *Freeman* might be thought to suggest, that intent *must* be inferred in certain circumstances.

137. In the event, a new provision replacing section 172 of the 1925 Act was included as section 212 of the Insolvency Act 1985, which was then consolidated into the Insolvency Act 1986 as section 423. The language of sections 212 and 423 is materially similar, but it is materially different to the language in the 1571 Act and in section 172 of the 1925 Act that had gone before.

138. Focussing on section 423 of the 1986 Act, the relevant terms of which are set out in paragraph 114 above, it is notable that:

i) The section imposes separate, clearly cumulative requirements for relief, namely that the relevant transaction should both:

a) be entered into at an undervalue, *e.g.*, a gift or a transfer of property made for no consideration (section 423(1)); and

b) be entered into for a Prohibited Purpose (section 423(3));

ii) The section uses different language to the 1571 and 1925 statutes, referring not to a conveyance "with intent to defraud" but in section 423(3) to a transaction entered into "for the purpose" of putting assets beyond the reach, or of prejudicing the interests, of those who have or who might have claims.

The additional language suggested in the Cork Report, referred to in paragraph 136 above, was notably not included in the 1986 Act.

139. It seems to me that, whatever the position may have been under the earlier 1571 and 1925 Acts, it is section 423 of the 1986 Act that I have to interpret; and that, given its different structure and terms, it does not necessarily follow that section 423 should be interpreted to mean exactly the same, or to operate in precisely the same way, as its predecessor statutes.

140. In any event, since the coming into force of the 1986 Act, there have been at least four decisions of the Court of Appeal that have considered the meaning of the phrase "for the purpose of" within section 423(3), which I consider bind me.

141. The first, chronologically, is *Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502.[4] The case was concerned with a claim to set aside a transfer of property under section 423, and an issue as to whether the iniquity exception applied so as to defeat a claim to withhold documents from disclosure on the ground of legal professional privilege.

142. In the course of his judgment at 507-509, Sir Christopher Slade said this:

> "For the purposes of this appeal, though without deciding the point, I am content to assume in favour of the plaintiffs that the relevant purpose which has to be established in the application of s. 423 is substantial purpose, rather than the stricter test of dominant purpose.
>
> In the present case it is not open to the plaintiffs to argue that the very fact that the transfer was made for no consideration by itself establishes the requisite purpose of defrauding creditors. The requirements for the operation of the section imposed by s. 423(3) are additional to those imposed by s. 423(1) so that the actual purpose of the transferor has to be investigated. The test is not a solely objective one.
>
> …

[4] I was not taken to this case, but it was referred to in *Hashmi* with which I deal next.

No doubt the result of the transfer was to put assets beyond the reach of the plaintiffs and otherwise to prejudice their interests, but in applying the section, result cannot be equated with purpose; and as yet, in my judgment, no prima facie case showing the relevant purpose has been established."

143. The point made in the second quoted paragraph reflects the structure of section 423, making the point that the requirement for a Prohibited Purpose is an additional requirement and that it cannot be presumed simply from the fact that the transfer was made at an undervalue. The third paragraph states in unequivocal terms that result cannot be equated with purpose.

144. The second case is *Inland Revenue Commissioners v Hashmi* [2002] EWCA Civ 981, [2002] 2 BCLC 489 which, like the present case, involved a transfer between father and son. The principal issue was whether the Prohibited Purpose had to be the sole or the dominant purpose, or whether it was enough that it was one of the purposes, for which the relevant transaction was undertaken.

145. The main judgment was given by Arden LJ, whose knowledge and experience of insolvency law is well-known. At [21] she referred to the history of section 423, noting that its immediate predecessor, section 172 of the 1925 Act, had not always received a consistent judicial interpretation, and also noting the recommendations in the Cork Report.

146. At [23]-[25] Arden LJ said this:

> 23. The question arising on this appeal is whether on the true construction of s. 423 the purpose shown must be a dominant purpose. In my judgment the answer to that question must be arrived at taking into account the role, as explained above, of s. 423 in insolvency legislation. Accordingly it is not necessarily helpful to apply the construction placed on similar words in different provisions and none was suggested. In my judgment there is no warrant for excluding the situation where purposes of equal potency are concerned. … Accordingly, in my judgment, the section does not require the inquiry to be made whether the purpose was a dominant purpose. It is sufficient if the statutory purpose can properly be described as a purpose and not merely as a consequence, rather than something which was indeed positively intended. Moreover, I agree with the observation of the judge that it will often be the case that the motive to defeat creditors and the motive to secure family protection will co-exist in such a way that even the transferor himself may be unable to say what was uppermost in his mind.
>
> …

> 25. I cite these examples to emphasise that for something to be a purpose it must be a real substantial purpose; it is not sufficient to quote something which is a by-product of the transaction under consideration, or to show that it was simply a result of it, as in *Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502 itself, or an element which made no contribution of importance to the debtor's purpose of carrying out the transaction under consideration. I agree with the point made by Laws LJ in argument that trivial purposes must be excluded.

147. The distinction Arden LJ drew between the "purpose" of a transaction and the "consequence", "by product" or "result" of a transaction is important, as is also her remark that the purpose must be "something which was indeed positively intended". These remarks cannot sit with the notion of constructive purpose, a purpose presumed to exist simply because it was the result of the relevant conduct.

148. The third case is *Hill v Spread Trust Co. Ltd* [2006] EWCA Civ 542, [2006] BIPR 789. In that case, a number of issues arose in the Court of Appeal, including an issue of limitation, but the relevant issue for present purposes was whether the judge had been entitled to find that one of the transferor's purposes was a Prohibited Purpose within section 423(3).

149. Arden LJ again gave the principal judgment (she dissented on an issue concerning limitation, but Waller LJ and Sir Martin Nourse explicitly agreed with her conclusions on the other issues). At [130], at the commencement of a section addressing the legal aspects of the purpose issue, she said the following, which is consistent with her previous judgment in *Hashmi*:

> "There can be no doubt but that s. 423(3) requires the person entering into the transaction to have a particular purpose. It is not enough that the transaction has a particular result".

150. The fourth and final case is *JSC BTA Bank v Ablyazov* [2018] EWCA Civ 1176, [2019] BCC 96. The case was concerned with a claim under section 423 of the 1986 Act in respect of a sum of money transferred by Mr Ablyazov to his son at a time when Mr Ablyazov, the former chairman of the claimant bank, must have appreciated that he had been involved in serious wrongdoing, albeit that claims against him had not yet actually been brought.

151. Laurence Rabinowitz, QC (sitting as a Deputy High Court Judge) had held at first instance that putting the asset out of the bank's reach was not a substantial purpose of the transfer because Mr Ablyazov would have made the transfer anyway, and he said he was unwilling too readily to infer that the money was transferred for that purpose.

152. In the Court of Appeal Leggatt LJ addressed the statutory purpose test at [8]-[16]. Commenting on the Court of Appeal's previous decision in *Hashmi* as to whether the Prohibited Purpose had to be the sole or dominant purpose, he said this at [15]-[16]:

> 15. Arden LJ made this very point in the *Hashmi* case when she said (at [23]) that 'there is no epithet in the section and thus no warrant for reading one in'. When later in her judgement she referred (at [25]) to a 'real substantial' purpose, it is apparent from the context that the reason for using those adjectives at that point was to underline the distinction between a purpose and a consequence of the relevant transaction. As Arden LJ emphasised, it is not enough to bring a transaction at an undervalue within s. 423 that the transaction had the consequence of putting assets of the debtor beyond the reach of creditors. That is so even if the consequence was foreseeable or was actually foreseen by the debtor at the time of entering into the transaction. Evidence that the debtor believed that the transaction would result in putting assets beyond the reach of creditors may support an inference that the transaction was entered into for the purpose of doing so, but the two things are not the same. To illustrate the distinction using a less homely example than that given by Arden LJ, a commander may order a missile strike on a military target knowing that it will almost certainly cause some civilian casualties. But this does not mean that the missile strike is being carried out for the purpose of causing such casualties.
>
> 16. When judging a person's intentions, we are generally more inclined to accept that an action was not done for the purpose of bringing about a particular consequence, even if the consequence was foreseen, if there is reason to believe that the consequence was something which the actor wished to avoid or at least had no wish to bring about. Hence, in the example just given, where the missile strike had a clear strategic purpose, we may readily accept that it was not ordered for the purpose of causing civilian casualties - particularly if, for example, there is evidence that the commander gave anxious consideration to how many civilians were likely to be in the target area and planned the strike for a time when the number was expected to below. By contrast, a consequence is more likely to be perceived as positively intended if there is reason to think that it is something which the actor desired. Thus, evidence that a person who entered into a transaction at an undervalue foresaw that the result would be to put assets out of reach of creditors and desired that result might lead the court to infer that the transaction was entered into for that purpose. But such a conclusion is not a logical or legal necessity. It is a judgement which has to be based on an evaluation of all the relevant facts of the particular case.

153. There were, in addition to these four appellate decisions, three further cases on which I was addressed and with which I should deal. (Other cases were mentioned, but they did not seem to me to take matters any further.)

154. The first is *Barclays Bank Plc v Eustice* [1995] 1 WLR 1238. This case, like *Royscot*, involved a section 423 claim where there was a challenge to the withholding of documents on the ground of legal professional privilege. The question arose in that context as to whether the evidence disclosed a strong *prima facie* case for making an order under section 423.

155. Schiemann LJ considered whether the transaction had been entered into for a Prohibited Purpose. There is nothing in his judgment that supports the proposition that a Prohibited Purpose can automatically be imputed from the consequences of the relevant conduct, but Mr Edwards relied upon a passage at 1248A-B as showing how readily an inference may be drawn:

> "Once one accepts that there is a strong prima facie case that the bank's security has been transferred to members of the family at a time when action by the creditor was clearly anticipated by the debtor and that these transfers were at an undervalue and that what remains in the hands of the debtor barely if at all covers the debt, there is in my judgment a strong prima facie case that the purpose of the transactions was to prejudice the interests of the creditor."

156. The second case is the decision of the Court of Appeal decision in *Giles v Rhind* [2008] EWCA Civ 118, [2009] Ch 191, which, in chronological terms, sits after *Hill* but before *Ablyazov*. This case, Mr Edwards submitted in his skeleton argument, was the exception amongst the recent authorities, the other cases, he said, having "rather lost sight of the earlier authorities", which I understood to be a reference to *Freeman*.

157. Mr Edwards relied upon [15], but that paragraph needs to be read in the context of [14], and [17] which follows is also important:

> "14. The principle that creditors should be protected from the consequences of transactions which are designed to prejudice their interests has long been embedded in English law. Section 423 of the 1986 Act is derived from a Statute of Elizabeth (13 Eliz 1, c 5) which provided that all dispositions of property made with the intention of delaying, hindering or defrauding creditors should be void against creditors. This did not extend to any estate or interest created bona fide and for good consideration in favour of any person not having at the time notice of such fraud. It has even been said that the Statute of Elizabeth was merely declaratory of the common law. It was replaced by section 172 of

the Law of Property Act 1925, which in turn was replaced by section 423 and following.

15. There is considerable case law on the predecessors of section 423. Lord Mansfield CJ held that the Statute of Elizabeth (13 Eliz 1, c 5) should be liberally interpreted: *Cadogan v Kennett* (1776) 2 Cowp 434. Intent to defraud could be inferred from the making of a conveyance that would leave creditors unpaid: *Freeman v Pope* (1870) LR 5 Ch App 538. As Lord Hatherley LC so pithily put it in that case, at p 540, 'persons must be just before they are generous".

…

17. Section 423 does not impose a sanction on a debtor whose actions prejudice his creditors unless the debtor's purpose satisfies section 423(3). None the less, as I see it, section 423 has to be seen in the context of a debtor's responsibilities to his creditors generally. It actualises those responsibilities in particular circumstances. Any argument that section 423 does not involve a breach of duty has therefore a somewhat counter-intuitive ring to it. Section 423 can be contrasted with for example section 238 of the 1986 Act which invalidates transactions at any undervalue within a given period of the insolvency. The object of this sanction is at least in part to enlarge the pool of assets available for creditors generally."

158. In light of the first sentence of [17], the reference in [15] to *Freeman* can hardly be seen as a statement that the existence of a Prohibited Purpose can be found simply on the basis of the consequence of the relevant conduct.

159. The judgment was, furthermore, a judgment of Arden LJ, and there is nothing to indicate that she was recanting the views she had previously expressed in *Hashmi* and *Hill*. Nor, in my judgment, does the finding, that a transaction caught by section 423 involves a breach of duty for the purposes of section 32(2) of the Limitation Act 1980, demand such a conclusion.

160. The third and final case is the decision of the Court of Appeal in *BTI 2014 LLC v Sequana SA* [2019] EWCA Civ 113, [2019] BCC 631 (the section 423 issue did not arise in the subsequent appeal to the Supreme Court). In the judgment of David Richards LJ at [66] he said the following in relation to the purpose requirement:

"This is essentially a question of fact. The purpose of a person in entering into a transaction is a matter of the subjective intention of that person: what did he aim to achieve? Section 423(3) does not require the specified purpose to be the sole or dominant purpose. It is sufficient if it 'can properly be described as a

> purpose and not merely as a consequence, rather than something which was indeed positively intended': *Inland Revenue Commissioners v Hashmi* [2002] EWCA Civ 981; [2002] B.C.C. 943 at [23] per Arden LJ."

As can be seen, he said that purpose was a matter of subjective intention, and the explanation in *Hashmi* that there was a distinction between consequence and purpose was specifically endorsed.

161. In my judgment, therefore, although there may be cases that indicate that, for the purposes of the 1571 and 1925 Acts, an intent to defraud could and would be inferred or presumed simply because of the consequences of the relevant conduct, there is no support for the proposition that the same is true under section 423 of the 1986 Act.

162. There is, as it seems to me, this further difficulty.

163. The question is ultimately one of statutory construction: what is meant by the statutory requirement of "purpose" in section 423(3) of the 1986 Act, read in its context, and what does it require?

164. Mr Edwards' submission was that, where the transferor is insolvent at the time of the transfer, the fact that the consequence of a transfer made at an undervalue is to prejudice the interests of creditors results, in and of itself, in an inference or presumption that the statutory requirement for a Prohibited Purpose is made out.

165. If true, however, this means that, although (as Mr Edwards accepts) insolvency is not a prerequisite for the operation of section 423, in practical terms, section 423 cases will fall to be divided into two categories:

    i) Cases where insolvency is established where, as Mr Edwards submitted in closing, a completely objective test should be applied; and

    ii) Cases where insolvency is not established where proof of a subjective, positive intention on the part of the transferor to achieve a Prohibited Purpose is required.

166. That the same statutory language might, depending upon the circumstances, have two meanings is an inherently difficult proposition to accept. Although Mr Edwards is right that the financial condition of the transferor is always likely to be a relevant factor, if his argument were right the question of whether the transferor was formally insolvent at the time of the transfer would become a critical enquiry because it would change the nature of the test.

167. In deference to the detail of Mr Edwards' submissions, and in light of the fact that the point was not argued before me in the *Integral*

case, I have dealt with his argument as to the proper approach to the Prohibited Purpose requirement at some length. Having done so, however, I see no need to add to or amend the statement of principles set out in paragraph 118 above.

168.  To be clear:

i)    Section 423(3) requires proof of a subjective, positive intention on the part of the transferor to achieve a Prohibited Purpose;

ii)   That intention may be, and very often is, inferred from the circumstances, and the Prohibited Purpose need not be the only, or even the dominant or predominant, purpose of the relevant transaction; but proof that the consequence of the transaction is to put assets beyond the reach of creditors is not, in itself, enough.

## 3.    The parties' cases

169.  The Bank set out its case in relation to the transfer of the Warren House Property in paragraphs 23 to 25 of its Amended Particulars of Claim.

170.  The Bank said that it was to be inferred that Mr Almakhawi Sr did not intend to make a gift of the Warren House Property to his son, but that he intended to retain the beneficial ownership, displacing the presumption of advancement. It pleaded that this inference was to be drawn in view of:

i)    The timing of the transfer of the property on 8 July 2019, the day after the decision of the Court of Cassation (see paragraph 48 above);

ii)   The fact that the transfer of the property was made by (what it termed) a "bare" form TR1, not by deed of gift;

iii)  The fact that Mr Almakhawi Sr had continued to pay (up to at least November 2021) the council tax and utilities due in respect of the property, notwithstanding its transfer to Mr Almakhawi Jr more than two years earlier; and

iv)   A pattern of other divestments: these included the Money Transfers made in August and October 2019, but also:

a)    Gifts purportedly made by Mr Almakhawi Sr to Mr Almakhawi Jr and his two other children on or about 20 November 2018 of four different properties (three residential and one commercial) in Dubai with a combined recorded value of AED 195 million;

b) A gift purportedly made by Mr Almakhawi Sr to Mr Almakhawi Jr and his two other children on or about 28 February 2019 of a further property in Dubai with a recorded value of AED 10 million;

c) The transfer by Mr Almakhawi Sr to Mr Almakhawi Jr on or about 7 March 2019 of a 95% shareholding in a Dubai-registered company, United Makgroup Technologies LLC ("Makgroup"); and

d) The transfer by Mr Almakhawi Sr on or after 19 September 2019 of a residential apartment building at 39 East 29th Street, New York, NY 10016 ("the New York Property") into the Redington Trust (see below).

171. The Bank pleaded that the result of these transfers, according to the position taken by Mr Almakhawi Sr in enforcement proceedings in Dubai, was that his only remaining assets were a car of modest value, a bank account the only sums standing to the credit of which were derived from his pension which could not be attached, and one property which had since been sold.

172. In support of its alternative case under section 423 of the 1986 Act, that the transfer of the Warren House Property had been made for a Prohibited Purpose, the Bank relied upon:

i) The timing of the transfer: see paragraph 170 i) above;

ii) The fact that a deed of gift was executed only on 23 July 2019, after the transfer had taken place, and so the transfer was made by a "bare" form TR1: see paragraph 170 ii) above; and

iii) The pattern of other divestments and the result: see paragraphs 170 iv) and 171 above.

173. Similar matters were relied upon by the Bank in support of its case that the Money Transfers were not intended by Mr Almakhawi Sr to be gifts, and that the credit balance in Mr Almakhawi Jr's account was held on resulting trust for Mr Almakhawi Sr; alternatively, that the Money Transfers were transactions in defraud of creditors within the meaning of section 423 of the 1986 Act.

174. The Defendants' pleaded case in relation to both the transfer of the Warren House Property and the Money Transfers was, in essence, that they involved succession or inheritance planning, taking place against the background of a dispute within Mr Almakhawi Sr's family about an inheritance and a desire to avoid the same problem arising again: see paragraph 18 of the Amended Defence:

> "In around 2010, in view of his advancing years and also financial disputes which had arisen between him and his siblings, [Mr

Almakhawi Sr] formed an intention to transfer assets to his children as an 'inheritance' while he was still alive. His wish was to minimise the risk of disputes between them after his death and to avoid the complications of a Sharia-compliant (post-mortem) inheritance. After the death of his brother Mohamed Almakhawi in November 2014, which precipitated a bitter inheritance dispute which continues to this day, that intention on the part of [Mr Almakhawi] developed into a plan. In pursuance of that plan, and for the purposes described above in this paragraph, he first transferred to his children properties in Dubai (see paragraph 24 below) and then his flat in London, 193 Warren House, which he wished to gift to his son, [Mr Almakhawi Jr]. In respect of 193 Warren House, [Mr Almakhawi Sr] had the additional motivation that [Mr Almakhawi Jr] had paid substantial amounts of money to or on behalf of his father over the preceding few years."

175. As is apparent from the final sentence of this paragraph, whilst the principal motivating factor for the transfers was said to be inheritance planning, reliance was also placed in relation to the transfer of the Warren House Property on payments that had allegedly been made previously by Mr Almakhawi Jr either to on behalf of Mr Almakhawi Sr: a schedule exhibited to Mr Almakhawi Sr's witness statement listed some eight payments totalling AED 16,699,339.89.

176. I should note that the matters relied upon by the Defendants in their witness statements in support of their case that the purpose of the transfers was succession or inheritance planning and not a Prohibited Purpose covered a broader range than the matters pleaded by the Bank; they included, for example, the transfer made by Mr Almakhawi Sr in 2017 of some $21 million into a Jersey trust known as the Violet Trust.

177. As these additional matters were part of the Defendants' case, I have necessarily had to consider whether they are made out and whether the facts relating to them are consistent or inconsistent with the Defendants' case that the transfer of the Warren House Property and the Money Transfers were not made for a Prohibited Purpose. I make clear, however, that it is no part of my task to make findings as to the propriety of any other transfers or as to the ownership of any other transferred assets.[5]

---

[5]    I was told by Mr Edwards that proceedings had been commenced in Jersey in which the Bank was seeking to unwind the Violet Trust, but I know little about those proceedings, and the status of the Violet Trust is not for me. The same is true in relation to the Redington Trust, which I describe below. Both trusts are expressly governed by Jersey law and subject to Jersey jurisdiction. Mr Lewis suggested in his closing note that these divestments are themselves subject to the presumption of advancement, but I make no findings about that.

## 4.    The witnesses

178.   In the next section of this judgment I address the facts relating to and surrounding the transfers in detail.

179.   I should say something first, however, about the evidence of Mr Almakhawi Sr, the principal witness in relation to these matters, and also about the evidence given by his son, Mr Almakhawi Jr.

180.   As I stated in paragraph 2 above, Mr Almakhawi Sr is a well-educated man, who has held a number of positions of prominence on behalf of the UAE. Patently, he is – or at least he was at one time – a wealthy man with substantial business interests. By the time of the trial before me, however, he was a man of advanced years.

181.   On the morning of the first day of the trial (a Monday) during Mr Edwards' oral opening submissions, I was handed a medical report, which had been sent by the Defendants to the Bank over the preceding weekend, relating to Mr Almakhawi Sr's health. The report was prepared by Dr Kenneth Mackinnon Mitchell, a consultant psychiatrist in Dubai.

182.   Although I was not shown it, I was told that a medical report had previously been submitted to the court in support of an application, heard at the Pre-Trial Review earlier this year, for Mr Almakhawi Sr to give evidence by video link. That report had apparently indicated that Mr Almakhawi Sr suffered from ostitis, a bone condition, and so was advised not to travel, but it had disclosed no other difficulty he might have in giving evidence.

183.   So far as Dr Mitchell's report is concerned, this explained that Dr Mitchell had examined Mr Almakhawi Sr on 24 February 2023, *i.e.*, on the Friday preceding the hearing, and that he had done so remotely by video link, speaking at the same time with Mr Almakhawi Sr's daughter, who was able to give him a history of her father's mental health and memory problems.

184.   Dr Mitchell was candid in his report that:

> "As is typical in such cases, his daughter is far better able to recount and describe these symptoms because the nature of the condition adversely affects the sufferer's insight, making it difficult for the patient to remember and describe their symptoms in any detail or in any logical or chronological order."

His report set out the description he had been given by Mr Almakhawi Sr's daughter (who did not give evidence before me) of

the difficulties Mr Almakhawi Sr had apparently experienced previously in responding to persistent, detailed questioning in court.

185. Dr Mitchell did, of course, examine Mr Almakhawi Sr (remotely) himself. He described how he responded promptly and well to simple, non-specific questions, but he said that when Mr Almakhawi Sr was asked more searching questions he exhibited doubt, confusion and delay. Dr Mitchell's expressed opinion was that:

> "[Mr Almakhawi Sr] appears to be suffering from the following conditions and symptoms, which are likely to have been largely caused, and/or exacerbated by, the prolonged high stress and distress from many years of protracted intense legal action and court appearances:
>
> 1. Major Depressive Disorder
>
> 2. Anxiety Disorder
>
> 3. Panic Attacks / Panic Disorder
>
> 4. Insomnia and sleep deprivation
>
> 5. Chronic Confusional State."

186. Dr Mitchell did not say, and Mr Lewis did not submit, that Mr Almakhawi Sr was not fit to appear in court; but he qualified his statement that Mr Almakhawi Sr was fit to appear in the following way:

> "[Mr Almakhawi Sr] is currently fit to appear in Court but I qualify this statement as follows: I respectfully advise the Court(s) that all the above mental health conditions and symptoms suffered by [Mr Almakhawi Sr], will be significantly exacerbated by the very high stress of court appearances and persistent detailed questioning. As a result of the aforementioned mental health conditions and stressful Court appearances and questioning, [Mr Almakhawi Sr] will inevitably exhibit: significantly impaired recall; difficulty and delays in comprehending and responding to questions; confusion, vagueness, inaccuracies, factual errors and inconsistencies in answers; great difficulty organising his thoughts and answers; severe difficulty with organising and recounting answers in terms of chronology, dates, names of persons, lawyers and firms; confusion, uncertainty, hesitation, vagueness, factual errors, chronological errors and inconsistencies in answers to questions, particularly regarding which person, lawyer or legal firm made which particular comments or statements, whether written or verbal."

187.   Dr Mitchell was not called to give evidence; but notwithstanding that, and although his report was only based on an initial, remote examination of Mr Almakhawi Sr, combined with the history given to him by Mr Almakhawi Sr's daughter, I bore his report in mind when listening to Mr Almakhawi Sr's evidence, as well, of course, as Mr Almakhawi Sr's age.

188.   The indication given to me before he commenced his evidence was that Mr Almakhawi Sr would try to give his evidence in English, but that he was likely to need an interpreter for more difficult questions. It became apparent very quickly, however, that an interpreter was generally required, and so with few exceptions Mr Almakhawi Sr gave his evidence through an interpreter.

189.   Mr Almakhawi Sr's cross-examination was robust – given the nature of the case and the challenges made to Mr Almakhawi Sr's account, that was always likely to be so – but it was not, in my judgment, at any stage unfair. There was a point towards the end of his cross-examination when it was necessary to stop because Mr Almakhawi Sr said he was feeling unwell, but after a short adjournment he expressed himself content to continue.

190.   In general, and notwithstanding Dr Mitchell's diagnosis and predictions, I found Mr Almakhawi to be a generally articulate witness who had little difficulty responding to questions; indeed, his answers were often very full, which caused some problems for the interpreter. His answers were, however, at times diffuse, argumentative, or sometimes both, not responding directly to the question that had been asked.

191.   As the written notes of Mr Almakhawi Sr's exchanges with HSBC Private Bank record (see below), Mr Almakhawi Sr is a private person who does not like others to be aware of his affairs. This attitude carried through into his evidence, where he was generally defensive. He is obviously aware that the Bank's aim is to be able to enforce the Dubai Judgment against assets that he has either placed into trust or given away to family members.

192.   There were a number of occasions where Mr Almakhawi Sr protested his age and his lack of memory as a reason for not being able to answer a question. In some cases, quite apart from the points made by Dr Mitchell, this objection was perfectly understandable as the question concerned matters of historic detail. These protestations did, however, become more frequent as his evidence went on, and there were times when the complaint was far less easy to comprehend.

193.   There were two specific occasions where Mr Almakhawi Sr's evidence was thoroughly unimpressive.

194. The first was when he was asked about what I describe below as the December 2015 Letter, where I am quite sure that Mr Almakhawi Sr understood both the questions that were being asked and their importance given his defence in these proceedings, but where he professed not to understand, or protested the relevance of, what was being asked.

195. The second occasion concerned Mr Almakhawi Sr's disposal of his interest in Makgroup, where the evidence given in his witness statement, which he largely stuck to in his oral evidence, was flatly contrary to the documents that I was shown. The disparity was such that it is difficult to regard his evidence on this matter as anything but a straightforward untruth.

196. Generally, I consider that Mr Almakhawi Sr's evidence needs to be approached with real caution. Quite apart from the points made above, many of the things he said in his witness statement, if true, were matters that one would have expected to be the subject of correspondence or documented, or supported by other witness evidence; but the material produced was either non-existent or scant.

197. Mr Almakhawi Jr was a more straightforward witness, although he was plainly irritated by some of the questioning. He made clear that he had no or limited involvement in, or knowledge of, his father's businesses beyond what his father had told him. He said that did not know of the Dubai Proceedings in the beginning but only later after the judgment.

## 5.   The facts

### (a)   The Dubai Proceedings; a reminder

198. I set out the chronology of events in relation to the Dubai Proceedings earlier in my judgment. As the temporal context of the transfers is an important part of the Bank's case, by way of reminder:

   i)    On 28 December 2014 System Construct Dubai was placed into liquidation;

   ii)   On 19 October 2015 the Bank commenced the Dubai Proceedings against Mr Almakhawi Sr and others;

   iii)  On 16 January 2017, the Dubai Court of First Instance entered judgment against Mr Almakhawi Sr for AED 142,303,347.42 plus interest;

   iv)   On 27 February 2019, the Dubai Court of Appeal dismissed Mr Almakhawi Sr's appeal ordering him to pay the revised sum of AED 218,299,040.31 plus interest; and

v) On 7 July 2019, the Dubai Court of Cassation dismissed Mr Almakhawi Sr's further appeal, giving judgment for the revised amount of AED 211,299,040.31 plus interest.

199. As explained below, the transfer of the Warren House Property was put in motion after the (adverse) decision of the Dubai Court of First Instance and shortly before the judgment of the Court of Appeal, although it was formally executed after the judgment of the Court of Cassation. The Money Transfers were also made after the decision of the Court of Cassation.

**(b) The death of Mr Almakhawi Sr's brother**

200. On 21 November 2014 Mr Almakhawi Sr's brother, Muhammad Abdulazeez Muhammad Al-Makhawy Al -Swaidy ("Mr Al-Swaidy"), died.

201. Mr Al-Swaidy had no wife or children, but he had three siblings: two brothers, including Mr Almakhawi Sr, and a sister. His estate was divided between them in accordance with Sharia law. On 21 December 2014 the Dubai Court of Personal Status named Mr Almakhawi Sr and his siblings as the legal heirs of his brother's estate.

202. Mr Almakhawi Sr said in his witness statement that the death of his brother in November 2014:

> "… led to a bitter inheritance dispute between my siblings, which still remains unresolved to date."

203. If there had been such a "bitter inheritance dispute", now lasting over eight years, I would have expected to be shown court filings or other documents evidencing that dispute, but with one exception (to which I attach little weight) there were none.[6] It was obviously open to Mr Almakhawi Sr to adduce evidence from his Dubai lawyers in relation to the dispute, but no such evidence was produced.

204. A letter from the Dubai Court of Personal Status, Head of Department, Estates Department dated 10 January 2022 does, however, confirm that, although there is no issue about the shares

[6] The exception is a document that appeared at the back of one of the chronological bundles entitled "Detailed summary of the estate of the Deceased/Muhammad Abdul-Aziz Al-Mokhawi brother of Rashid Abdul-Aziz Al-Mokhawi". This appeared to describe events going back to Mr Al-Swaidy's death in 2014, but I was told that the metadata indicated that the document was not contemporaneous but had been prepared in January 2022. The Bank had served a Notice to Prove under CPR 32.19 in relation to the document; but, notwithstanding that notice, no evidence was adduced as to its authenticity or content. It was not clear who had prepared the document, for what purpose, and on the basis of what primary sources.

in which Mr Al-Swaidy's siblings are to inherit Mr Al-Swaidy's estate, the distribution of the estate is not yet complete:

> "Court of Personal Status hereby certifies that the file of the inheritance, belonging to the above-mentioned deceased/Muhammad Al-Makhawy Al -Swaidy, has been registered dated 24-08-2015 AD. His inheritance was limited to his two brothers/Rashid and Salim and to his Turkish sister. The legal division was determined by five shares, each brother is entitled to two (2) shares, while the sister is entitled to one (1) share. So far, the distribution of the inheritance elements and the proportion of each heir have not been finalized. The property located in Umm Al Quwain has been transferred in the name of the heirs. In addition, the inventory has been transferred to the heir/Rashid Abdulazeez Al-Makhawy, deducting from his proportion in an amount of (AED 19453645)."

205. As the last sentence of this passage indicates, however, there has been a partial distribution. On 30 October 2015, as his bank statements showed, and as he confirmed in his witness statement and in cross-examination, Mr Almakhawi Sr received $20,917,358.42 from his deceased brother's trust (the Atlantic Star Trust), which he deposited in an account with HSBC Luxembourg.

**(c) The December 2015 Letter**

206. Mr Almakhawi Sr's pleaded case (see paragraph 174 above) was that in around 2010, in view of his age and disputes with his siblings, he formed an intention to transfer assets to his children as an inheritance; and that, after the death of his brother in November 2014, and in the context of the supposed bitter inheritance dispute, that intention had developed into a plan.

207. There was, however, no evidence whatsoever, either in his witness statement or elsewhere, to support Mr Almakhawi Sr's pleaded case that he formed the intention to transfer assets to his children in 2010. Mr Almakhawi Sr himself effectively disavowed this part of his pleaded case during the course of his cross-examination:

> "Q. You say in your statement at paragraphs 37 and 54 that you started succession planning in 2015. That is your evidence, is it not?
>
> A. Yes, this is true.
>
> Q. You do not in your witness statement talk about succession planning in 2010, do you.
>
> …
>
> A. This subject happened in 2015 and not 2010."

208.  Indeed, notwithstanding his reference to 2015, there is, in fact, little evidence of any steps being taken by Mr Almakhawi Sr to transfer assets until the middle of 2017, after the case in the Dubai Court of First Instance had been fought and lost; and even then, as explained below, the transfers made in 2017 were not made directly to his children.

209.  The sole exception is a manuscript Arabic document, referred to in (but not exhibited to) Mr Almakhawi Sr's witness statement and produced by the Defendants on 20 December 2022, very shortly after his witness statement was served, long after the date set by the court for Extended Disclosure in these proceedings.

210.  The document is in the form of a manuscript letter from Mr Almakhawi Sr to his (then) lawyers, DAA. It reads (in translation) as follows:

> "In view of the problems that happened in the estate of my brother Mohamed Al-Makhawi, which you are aware thereof, in your capacity as the lawyers who defend me in the estate mentioned above, I decided to transfer all my property, inside and outside, in the name of my children avoiding any disputes that may arise in the future among them, noting that you have all papers and documents related to my property. I trust that you will complete such actions and you have the right to duly enlist any of the bodies and persons that have competence and experience."

211.  The document bears a note at its foot, which reads (again, in translation):

> "We, Dar Al Adalah, received on 29/12/2015".

I refer to the document for this reason as "the December 2015 Letter"; but that label is applied simply for convenience and should not be understood as indicating that I accept that the document represents a letter that was created or sent by Mr Almakhawi Sr to DAA in that month.

212.  The December 2015 Letter is not an original document but a PDF. Its date of creation, I was told, can be seen from the metadata to have been 19 December 2022, the day before it was provided to the Bank. The Arabic document bears a stamp of Al-Ahram Translation Services ("AATS") by whom an English translation of the document has been prepared which bears the same stamp.

213.  As is obvious, AATS must have been given an unstamped December 2015 Letter, either the original or a copy; they then stamped it with their own stamp, one assumes to show their receipt of the document, and then produced an English translation, which they again stamped. Neither the unstamped document presented to AATS nor

the original stamped document they generated has, however, been disclosed.

214. On 23 December 2022 the Bank served a Notice to Prove under CPR 32.19 in relation to this and other documents. A table attached to Mr Edwards' skeleton argument explained the Bank's position in relation to this document, and also what had emerged when the Bank's Dubai lawyers had sought to inspect the original of the document disclosed to them:

> "This PDF document was not included in the Defendants' original batch of Extended Disclosure. It was provided late on 20 December 2022. The First Defendant appears to make reference to this document in his witness statement for trial stating (at paragraph 39) that he has 'a letter formally instructing DAA to start transferring my assets as a part of succession planning in 2015 and I will provide a copy of this letter as soon as I am able'. DWF asked to inspect the original letter which SCW said was being held with the Defendants' lawyers in Dubai. However, upon visiting their offices, DWF were informed that the Defendants' lawyers are only holding a copy of this document and not the original."

215. Mr Almakhawi Sr was unable to explain the location of the original document in his oral evidence. If the December 2015 letter was genuine and if it had been sent, then the original ought to have been in the possession of DAA, whose file Mr Almakhawi Sr said had been handed to MA, and thus within his control, but it was not disclosed. He had no explanation as to why the original had not produced, or who had taken the copy to the translator to be translated.

216. Mr Almakhawi Sr was then asked when and where the document had been between September, the date for Extended Disclosure, and December 2022, when it was disclosed. He said that he did not know, and he complained about the unreasonableness of the question. As I indicated earlier, this was unimpressive; as the only document suggesting that Mr Almakhawi Sr had started inheritance planning in 2015, before judgment had been given against him in Dubai, I am quite sure that he appreciated its significance.

217. The informality of the December 2015 Letter is notable; it was written in manuscript. But there are further curiosities:

    i)   Mr Almakhawi Sr relies upon the letter as an instruction to his lawyers, but its content is remarkably vague;

    ii)  The letter refers to transferring "all my property, inside and outside, in the name of my children", but it contains no explanation of what the property actually is, or as to which of Mr Almakhawi Sr's children is to get what item(s) of property.

It seems unlikely to be a set of instructions upon which a lawyer could properly act, at least without asking further questions;

iii)   But insofar as DAA, to whom the letter was supposedly sent, might have asked for more specific instructions, there was no documentary evidence that Mr Almakhawi Sr was asked for or gave any such instructions, or that he met with DAA in 2015 to discuss the transfer of his property to his children, or that DAA made any attempt to effect such a transfer.

218.   Given, in particular, the Notice to Prove, one would have expected Mr Almakhawi Sr to adduce evidence – nothing more than a short witness statement would have been required – from DAA to confirm that they did indeed receive the December 2015 Letter on the date noted on the document. But no such evidence was produced.

219.   The contrast between what is said to have happened in December 2015 and what happened in 2017 and 2019, when Mr Almakhawi Sr undoubtedly did take steps to transfer his assets, is, furthermore, striking. In 2017 and 2019 matters were organized by Mr Almakhawi Sr through his wealth managers, HSBC Private Bank (Suisse) SA ("HSBC Private Bank"), and it was through HSBC Private Bank that lawyers were engaged and trusts were set up for the transfer of assets to his children and more generally. None of this occurred in 2015.

220.   So far as this last point is concerned, Mr Lewis said in his oral closing submissions that Mr Almakhawi Sr "is obviously someone who is surrounded by advisers". Given his one-time wealth, I accept that this is highly likely to be the case; but if it is, and if a decision was taken by Mr Almakhawi Sr in 2015 to engage in succession planning, then one would have expected to see a documentary trail which involved those advisors, but there was none.

221.   The position is, in fact, worse than that. Mr Almakhawi Sr *was* in contact with HSBC Private Bank in late 2015, but it was not in connection with inheritance planning or a proposal to transfer assets to his children but in connection with a possible investment for his own benefit. An HSBC Call Report of a meeting that took place with Mr Almakhawi Sr on 5 November 2015 gives the following details:

> "Met client who recently credited $21m from HSBC Jersey trustees. Courtesy meeting as was outside DIFC. Client indicated that he is a very conservative investor and is not comfortable with fluctuations of the market. Client indicated that he will invest $5m and see what performance will be and might invest further going forward. Agreed that we would provide an investment proposal to Mohamed Hadi, his PAO in DIFC which will be discussed in compliance with DFSA rules and potentially invested

accordingly. Client is shortly travelling to London and Germany where he has homes (extended invitation to Luxembourg). Discuss with David and prepare proposal for M Hadi to present to client."

222. On the balance of probabilities, bearing in mind the form and content of the document, the circumstances in which it was disclosed and the other matters described in the paragraphs above, I am not satisfied that the December 2015 Letter is genuine, *i.e.*, that the PDF document produced represents a letter that was actually written and sent by Mr Almakhawi Sr and actually received by DAA on the date that it bears in December 2015.

223. Far more likely, in my judgment, is that the December 2015 Letter is a construct: it is a document created recently (precisely when and by whom is unclear) with a view to demonstrating that Mr Almakhawi Sr was engaged in estate planning and took steps to transfer his assets to his children in late 2015, before he was found liable in the Dubai Proceedings, far earlier than he in fact did.

**(d)    The Violet Trust**

224. Whether the December 2015 Letter is genuine or not, I was shown nothing to indicate that any concrete steps were taken by Mr Almakhawi Sr to dispose of or to transfer assets to his children at any time prior to 16 January 2017, when judgment was given against him by the Dubai Court of First Instance.

225. On 11 June 2017, some five months after the decision of the Dubai Court of First Instance, Mr Almakhawi Sr met with HSBC Private Bank. A HSBC Individual Meeting Report dated 11 June 2017 (partially redacted) records the content of the meeting. Mr Almakhawi Sr is referred to in it as "RAM":

> "The meeting was being held as [redacted] and wished to set up the same for the money that had been distributed to him from this Trust.
>
> RAM is a very private person and does not like others to be aware of his affairs. Most of his assets are held in cash and he wants to protect this for his family whilst ensuring that Sharia applies in terms of distribution.
>
> [Redacted] went through the MENA Deed Questionnaire and explained to him a Trust, the parties to a Trust, the pros and cons and provided live examples. RAM made it clear he wanted his Trust to reflect that of [redacted] with his children as beneficiaries. Following his death the Trust Fund is to be distributed. [Redacted] confirmed that this could be arranged.

RAM expressed the importance to having the documents be ready for him to execute for him to execute before Eid and a meeting for 19 June 2017 was agreed."

226. Mr Edwards put to Mr Almakhawi Sr that, consistent with the second paragraph of this report, he had told HSBC Private Bank that the purpose of the proposed trust was to protect his assets for the benefit of his family, obviously to avoid them being taken by his creditors. Mr Almakhawi Sr said that he did not remember, but he denied that there was any relationship between the Dubai Proceedings and the instructions to HSBC Private Bank:

"A. There is no relation between the judgment and when I instruct my bank.

…

Q. You had $21 million in a bank account in Luxembourg which you knew your creditors would be able to attach, to execute against, if they found out about it. That is why you settled the Jersey trust, to protect that money for your family, to put it beyond the reach of creditors. That is true, is it not?

A. Okay, so the bank suggests – this is not true, because the bank comes to me with the idea of investments and I let them get on with it. The court – the judgment against me was unjust and in reference to several experts."

227. Mr Almakhawi Sr's reference in this last answer to "… the bank com[ing] to me with the idea of investments" gives the impression that it was HSBC Private Bank that came up with the idea of putting his assets into a trust, but that is not consistent with the HSBC Meeting Report. It is noteworthy that, although Mr Almakhawi Sr received a $21 million distribution from his brother's estate in October 2015, action to put the amount into trust was taken only in June 2017, after the Dubai Court of First Instance judgment.

228. As reflected in the Meeting Report, HSBC Private Bank prepared a MENA Deed Questionnaire for Mr Almakhawi Sr in relation to the proposed trust. The questionnaire noted that Mr Almakhawi Sr was not to be sent emails and was only to be contacted by mobile telephone because he was "concerned [about] safety/confidentiality". Based on what Mr Almakhawi Sr had told them, HSBC Private Bank put his total net worth at $200 million, including cash and a number of properties including the New York Property and the Warren House Property. The questionnaire indicated that Mr Almakhawi Sr's intention was to transfer $20 million into the trust initially, possibly increasing to $40 million.

229. At some point during this period HSBC Private Bank drew up a more formal Source of Wealth document in relation to Mr Almakhawi Sr.

As reflected in an Individual Meeting Report, a further meeting took place between Mr Almakhawi Sr and HSBC Private Bank on 8 October 2017 specifically for the purpose of Mr Almakhawi Sr providing additional source of wealth information.

230. The completed document referred to:

    i)    Mr Almakhawi Sr's ownership of 95% of the Rashed Al Makhawi Enterprises Group, which was said to have diversified interests in a number of industries; and

    ii)   The audited financial statements of the group for the year ended 31 March 2016, which were said to show the AED equivalent of $9,260,008 in revenue and $8,936,449 in assets.

231. There was some debate during Mr Almakhawi Sr's cross-examination about the status of his ownership of Rashed Almakhawi Enterprises LLC, which was subsequently renamed United Makgroup Technologies LLC, *i.e.*, Makgroup.

232. Mr Almakhawi Sr had said in paragraph 46 of his witness statement that he originally held a 95% shareholding in Makgroup, [7] but that he sold 45% of his shareholding in 2010. Mr Almakhawi Sr went on to say that, as a result of a dispute with the other shareholders, he was "pushed out" and was forced to sell his remaining 45% shareholding for no consideration.

233. The timing of Mr Almakhawi Sr's suggested disposal of 45% of his shares does not, however, fit with what he told HSBC Private Bank: see paragraph 230 above. Nor does it fit with a Government of Dubai printout showing the commercial license status of the company as at 12 April 2017, which showed that Mr Almakhawi Sr still held a 95% shareholding in the company as at that date.

234. Furthermore:

    i)    Data obtained by the Bank from the Dubai Department of Economic Development suggested that Mr Almakhawi Sr may have only ceased to be a shareholder, if he had, on 7 March 2019;

    ii)   The identity of the person or entity to whom Mr Almakhawi Sr's shareholding in Makgroup had been transferred, if it had been, was not disclosed nor were any documents showing the terms of the disposal;[8]

---

[7]    Mr Almakhawi Jr confirmed in his oral evidence that he owned the other 5%.

[8]    The Bank pleaded that Mr Almakhawi Sr's shareholding in Makgroup was transferred to Mr Almakhawi Jr, but there is insufficient evidence for me to find that this was the case.

    iii) Mr Almakhawi Sr patently had an ongoing connection with Makgroup as late as October 2019 when an email was sent by Makgroup's Chief Accountant on his behalf to HSBC Private Bank; and

iv) As late as 11 December 2021, as apparent from a letter he sent to HSBC in London, seeking copies of bank statements for the purposes of disclosure in this litigation, Mr Almakhawi Sr still operated a Makgroup email address rashed@makgroup.ae.

235. Mr Almakhawi Sr protested that his witness statement was accurate; that he had disposed of 45% of his shares in the company in 2010; that he "… gave it up almost for free to my friend because he [the friend] had the ability to run it" - notably, not that Mr Almakhawi Sr had been pushed out (which seems improbable if he was a 95% shareholder) - and that he was not lying.

236. The disparity between Mr Almakhawi Sr's evidence and what the documents showed was, however, marked. I do not accept his evidence on this topic. I note that, if what he said in his evidence to the court was true, then he would have lied to HSBC Private Bank when he told the bank in 2017, in the context of the Source of Wealth document, that he remained a 95% shareholder in Makgroup at that time.

237. So far as the trust is concerned, draft documents were provided to Mr Almakhawi Sr at a meeting with HSBC Private Bank on 19 June 2017. The bank's Meeting Report notes that Mr Almakhawi Sr reviewed them then but that he did not want his own trust deed to be the same as that for his deceased brother. The documents were then amended and brought into line with his letter of wishes.

238. On 23 October 2017 a Settlement Deed was executed between Mr Almakhawi Sr (as Settlor) and HSBC Trustee (C.I.) Limited, Jersey ("HSBC TCI") (as Original Trustee) creating a Jersey trust named the Violet Trust. Far from giving his assets away absolutely, the deed stipulated in clauses 3 and 4 that, subject to the consent of the trustees, the trust was revocable at Mr Almakhawi Sr's option and was also capable of variation or amendment by him.

239. A Letter of Wishes executed by Mr Almakhawi Sr on 25 October 2017 stated that:

> "My reasons for settling the Trust include:
>
> - to benefit the beneficiaries and provide for their education advancement, maintenance and support;
>
> - a desire to avoid the delay, and hardship which can be brought about by lengthy probate procedures;

 -  succession planning; and

-  to protect the assets in the Trust as much of possible from disruptive events such as the bankruptcy of a beneficiary."

240. The only discretionary lifetime beneficiary of the Violet Trust was Mr Almakhawi Sr, and he was entitled under clause 8 to direct the trustees to pay over to him the whole of the income of the Trust Fund. The trustees were also permitted to pay over the whole or part of the Trust Fund itself to Mr Almakhawi Sr during his lifetime. After his death, the Trust Fund was to be distributed to his children.

241. On 21 December 2017 Mr Almakhawi Sr gave instructions for $20,911,312.82 (identified in an HSBC Private Bank Call report as the "full balance and investments") to be transferred from his account at HSBC Luxembourg to Voijin Investments Limited, the nominated Investment Company under the Violet Trust to be added to the trust's nominal initial assets of AED 100.

**(e) The transfer of the US property**

242. On or about 20 November 2018, while his appeal in Dubai was pending, Mr Almakhawi Sr transferred four properties in the Al Garhoud and Oud Metha areas of Dubai with a combined recorded value of AED 195 million to his children. A further Dubai property with a recorded value of AED 10 million was transferred to his children in February 2019.

243. On 12 February 2019, after the final hearing in the Dubai Court of Appeal and shortly before the court's judgment was issued, Mr Almakhawi Sr met with HSBC Private Bank again. The summary contained within the HSBC Private Bank Meeting Report records some initial discussion about the Violet Trust and the Letter of Wishes, but it then moved on to other matters:

> "RAAM then made reference to his UK Premiere account explaining that he had received a letter from them requesting additional due diligence. RAAM provided CB with a copy of this letter and she confirmed that she would deal with this matter. CB asked what currency the funds in this account were held in. RAAM informed CB that the monies were held in sterling. CB suggested that RAAM consider converting this to USD as IHT would be payable if held in GBP on RAAM's passing. RAAM confirmed that he would do this and also informed MH that he wanted an account open with Premiere in the UK for his son in respect of the UK property to be gifted to his children (see below).
>
> RAAM then made reference to two properties that he owns. One in the UK located at 193 Warren House, 185 Beckford Close, W14 8TR, which he purchased in 2008/2009 for circa GBP1.6m. The

second in New York in the US which was purchased two years ago for circa USD1.65m.

RAAM wants to understand what he needs to do for succession planning in respect of these properties. CB recommended that RAAM first obtain a valuation for the property in the UK (he wants to gift this property to his three children who are all resident in the UAE) and obtain tax advice for the property in the US (which he is considering gifting to his daughter). RAAM requested that CB arrange this on his behalf."

244. Mr Almakhawi Sr confirmed in cross examination that this 12 February 2019 meeting was the first occasion on which he had mentioned to HSBC Private Bank a desire to transfer the Warren House Property.

245. Mr Almakhawi Jr suggested that he and his father had previously agreed that his father would hold the Warren House Property on trust for him as a way of paying him back for the monies that Mr Almakhawi Jr had allegedly paid on his behalf (see below); however, if there was such an agreement:

i)    There is no evidence of any steps taken by either of the Defendants in that regard prior to 2019 to document any such trust; and

ii)   There is nothing to suggest that Mr Almakhawi Sr informed HSBC Private Bank when he met them that there was an agreement to that effect and that he was already holding the Warren House Property (which, according to the Meeting Report, he said he wanted to gift not to Mr Almakhawi Jr but "to his three children") on trust for Mr Almakhawi Jr.

246. This meeting took place some time after the decision of the Dubai Court of First Instance, but there is also no indication that Mr Almakhawi Sr told HSBC Private Bank in this meeting, or indeed back in June 2017 when HSBC Private Bank was preparing a Source of Wealth document, that judgment in the Dubai Court of First Instance had gone against him or that he faced a very sizeable claim from the Bank running into many $ millions.

247.  Initially, when asked about this, Mr Almakhawi Sr was indignant and defensive:

"Q.    You didn't tell HSBC about it, did you?

A.     So why would I – every time there is a problem I have to run to HSBC and inform them.

Q. You were going to HSBC saying you were going to gift a property to your children and you didn't tell them about the judgment against you, did you? That is the question.

A. What has the bank got to do with the judgment – that is a bank, why …"

In response to a question from me, Mr Almakhawi Sr simply said that he did not remember informing HSBC that there had been a judgment against him in Dubai.

248. It is almost inevitable that, if the fact of the judgment had been communicated to HSBC Private Bank, some reference to it would have appeared in the HSBC Meeting Reports. Quite apart from any concern the bank might have had about the propriety of his proposed asset transfers, the judgment would have had a material impact upon Mr Almakhawi Sr's net wealth as reflected in the Questionnaire and the Source of Wealth document. It is plain that it was not disclosed.

249. In relation to the property in New York – the US Property – the documents showed that a decision was taken by Mr Almakhawi Sr in around June or July 2019 that the property would be transferred to a non-US corporation the shares in which would be held by a non-US trust. The non-US corporation was ultimately called Redington Holdings Limited; the non-US trust was called the Redington Trust.

250. On 9 October 2019 a Settlement Deed was executed between Mr Almakhawi Sr (as Settlor) and HSBC TCI (as Original Trustee) creating the Redington Trust. As with the Violet Trust, the settlement was revocable by Mr Almakhawi Sr, and he was the sole discretionary lifetime beneficiary. Redington Holdings Limited was the identified Investment Company.

251. On 24 October 2019 HSBC TCI and HSBC Private Banking Nominee 3 (Jersey) Limited signed Declarations of Trust acknowledging that they held the shares in Redington Holdings Limited as nominee and on trust for Mr Almakhawi Sr. The New York Property was subsequently transferred by Mr Al Makhawi Sr to Redington Holdings Limited; the precise date of the transfer is unclear.

252. An Instrument of Gift records that on 1 July 2021 Mr Almakhawi transferred his shares in Redington Holdings Limited to the trustees of the Redington Trust. Declarations of Trust were subsequently executed by HSBC TCI and HSBC Private Banking Nominee 3 (Jersey) Limited acknowledging that they held the shares as nominee and on trust for HSBC TCI as trustee of the Redington Trust.

### (f) The transfer of the Warren House Property

253. The long lease of the Warren House Property had been purchased by Mr Almakhawi Sr in January 2007. There was at one time a mortgage on the property, but this was discharged in February 2017.

254. On 11 March 2019, following and pursuant to the discussion at the 12 February 2019 meeting with Mr Almakhawi Sr (see paragraph 243 above), and having in the meantime received a valuation report for the Warren House Property, HSBC Private Bank contacted English solicitors, Charles Russell Speechlys LLP ("Charles Russell") to deal with the transfer.

255. HSBC Private Bank's introductory email said this:

> "Kindly note that I have a UAE resident client who has a property in London which is debt free.
>
> Our client wishes to gift the property to his son and as such a valuation has been carried out, which confirms that on 5 April 2015 the property value was GBP1,750,000 and today the value is GBP1,595,000 meaning that it has declined.
>
> On this basis, I understand that no CGT is payable on the gift from father to son and all that is required is for a TR1 form to be completed and filed with Land Registry.
>
> I would be grateful if you could let me know if this is the case (or if I am missing anything) and also if you would be able to assist us in arranging the gift for which we would require an indication of your costs."

256. There were some intervening exchanges, but on 18 April 2019 Charles Russell sent HSBC Private Bank a draft letter of engagement along with its standard terms and conditions. The letter of engagement identified the scope of Charles Russell's proposed work as follows:

> "**SCOPE OF OUR WORK**
>
> The scope of our work will comprise transferring the ownership of your UK property to your son, including:
>
> 1. Preparing the deed of gift to transfer the property;
>
> 2. Carrying out the property transfer work;
>
> 3. Dealing with a licence to assign and any other landlord's requirements in respect of the transfer; and

    4. Filing the non-resident capital gains tax return in respect of the transfer of ownership."

The reference to Charles Russell's anticipated instruction to prepare a deed of gift is of significance given the argument as to whether Mr Almakhawi Sr intended to transfer beneficial ownership of the Warren House Property to his son.

257. On 26 June 2019, having been formally engaged, Charles Russell sent an email to HSBC Private Bank saying that they were now ready to proceed with the transfer of title of the Warren House Property to Mr Almakhawi Jr, attaching a TR1 Transfer Deed for signature by Mr Almakhawi Sr (stating that it should be left undated).

258. The TR1 form, as completed, contained a section headed "Consideration". Within that section, Charles Russell placed a cross in the box confirming that:

> "The transfer is not for money or anything that has a monetary value."

The form was signed by Mr Almakhawi Sr and a scanned copy of the form was returned to Charles Russell by email on 2 July 2019 with the original subsequently sent by courier.

259. The TR1 form was ultimately completed and filed by Charles Russell with HM Land Registry, along with an AP1 form applying to change the register, on 8 July 2019. An official copy of the Register of Title for the Warren House Property dated 16 July 2019 shows that Mr Almakhawi Jr was registered as the owner of the Warren House Property on 8 July 2019.

260. On 18 July 2019 Charles Russell sent HSBC Private Bank by email:

> "… the deed of gift for the client and his son to sign in acknowledgment of the transfer".

261. The Deed of Gift between Mr Almakhawi Sr (the Donor) and Mr Almakhawi Jr (the Donee), which appears to have been signed on or around 23 July 2019, but which was ultimately dated 20 August 2019, recorded in its recitals that:

> "(B) The Donor has transferred the leasehold property known as 192 Warren House Beckford Close Warwick Road London W14 8TR and registered at the land registry with title number BGL42461 (the **Property**) to the Donee with full title guarantee.
>
> (C) The Donor wishes to confirm that the Property has been irrevocably gifted to the Donee.

(D)  The Donee wishes to accept the gift of the Property."

262.  The operative provisions of the deed included in clauses 1 and 2 that:

"1.  The Donor hereby confirms that beneficial title to the Property has been irrevocably transferred from the Donor to the Donee by way of gift and legal ownership of the Property has transferred so that the Property is now under the Donee's control.

2.  The Donee hereby acknowledges and accepts the gift of the Property and confirms receipt thereof."

263.  On 5 August 2019, following the transfer of the Warren House Property to Mr Almakhawi Jr, Charles Russell sent an email to Premier Estates, the managing agent of the block in which the Warren House Property was located, in response to an email from Premier Estates advising of an outstanding debit for the service charge and credits for various utilities.

264.  Charles Russell's email explained that:

"The property was not sold rather transferred between family members. The payment arrangements/direct debit will be remaining as they were an no apportionment or refunds will be necessary."

Mr Almakhawi Sr did not dispute that he continued to pay the service charges, council tax and utility bills for the Warren House Property, but he said that the amounts were very modest, and Mr Almakhawi Jr was his son.

265.  By the time Charles Russell were instructed, Mr Almakhawi Sr had lost in Dubai, both in the Court of First Instance and the Court of Appeal. By the time the TR1 form was filed, and by the time the Deed of Gift was sent and executed, Mr Almakhawi Sr had also lost in the Court of Cassation. There is no evidence that he told Charles Russell of any of these matters, and I find that he did not.

266.  It was put to Mr Almakhawi Sr that he transferred the Warren House Property to his son to protect it from his creditors, but he denied that:

"Q.  Okay, what I am going to suggest to you is this. You transferred this property to your son to protect it from your creditors for the benefit of your family.

A.  No, this is not true.

Q.  There are two possibilities: either your son was holding it for you – which is consistent with the fact that you continued to

meet the outgoings – or it was an out-and-out gift to protect it from your creditors.

A. Okay, so I did not lose all the cases. To answer your question, it is not true in terms of the gift and the transfer. Some of these cases were lost because of Dar-Al-Adalah, and by that I mean the ex solicitors, who did not submit the paperwork on time and did not attend court, and I was outside – I was out of the country at the time."

267. He made the same denial in response to a similar question concerning his transfer of the US Property into the Redington Trust:

"Q. One question, you gave the instruction to transfer the New York flat for the same reason as you gave to transfer the London flat. Namely to protect it from your creditors. That's correct, is it not?

…

A. This is part of the distribution of my assets to my children and it is my right to do so."

**(g) The cheques**

268. I mentioned in paragraph 175 above that, whilst the Defendants' case was that the principal motivating factor for the transfer of the Warren House Property was inheritance planning, they also relied as an additional motivating factor upon a number of payments that had allegedly been made by Mr Almakhawi Jr either to on behalf of Mr Almakhawi Sr.

269. A schedule exhibited to Mr Almakhawi Sr's witness statement referred to eight payments allegedly made by Mr Almakhawi Jr on dates between 11 October 2014 and 1 March 2021, all by cheque, in amounts ranging from AED 300,000.00 to AED 7,000,000.00. Five were said to have been made to settle debts of System Construct Dubai for labour costs and utilities and the other three to settle Mr Almakhawi Sr's legal fees.

270. Mr Almakhawi Sr did not accept it, but as a matter of logic it is plain that the two payments allegedly made in 2021, both for labour costs, cannot have been a motivating factor when Mr Almakhawi Sr transferred the Warren House Property to Mr Almakhawi Jr on 8 July 2019, some two years earlier, or when he made the Money Transfers in August and October 2019.

271. In relation to the preceding six payments, although copy cheques relating to the payments had been disclosed the evidence was unsatisfactory for a number of reasons: