# Appendix 2
# Part 3

i)    Bank statements for the accounts from which the payments were allegedly made, and which would show whether the cheques had been collected or cashed, had not been disclosed. Mr Almakhawi Jr said that there had been a bank merger and so it would be difficult to obtain statements, but it seems unlikely that records did not exist;

ii)   The cheques, or at least PDFs of them, had been disclosed (some completed in Arabic and some completed in English; there were also in some cases translations of notations that appeared alongside the copy of the cheque), but the cheques did not appear to bear any notation or marking indicating that they had passed through clearing;

iii)  There were multiple copies of at least one of the cheques, the cheque for AED 5.7 million (a cheque made out to cash), but the notations that were on the PDF appeared in at least one case to be different. It was, furthermore, not clear when and by whom the copies of the cheques had been made:

a)    If the cheques had been presented and cleared, they would likely have been in the hands of Mr Almakhawi Jr's bank. Mr Almakhawi Jr confirmed, however, that he did not have cheques returned to him by his bank after they had been collected;

b)    On that basis, the copies provided must have been taken before the cheques were cashed or sent to their intended recipients, if they had been. But it was not obvious, why this would have been done, or indeed who had done it;

iv)   There were generally no supporting documents; in the case of the labour and utility costs, for example, there were no documents showing the make up of the costs paid, or any correspondence with the liquidator of System Construct Dubai, sums having been paid on the company's behalf which would ordinarily fall within the insolvent estate;

v)    In the case of the cheques allegedly issued for the purpose of paying Mr Almakhawi Sr's legal fees, DAA did issue receipts, because such three receipts were included in the bundle; but these receipts did not correspond with the payments identified on the schedule, and they were seemingly issued for payments made by Mr Almakhawi Sr himself;[9]

---

[9]   A similar issue arose with other payments. There was a letter from the Chief Justice of the Labor Conciliation and Reconciliation Department in the Labor Court dated 18 January 2015, which appeared to record a payment of AED 8,126,461.00 made by Mr Almakhawi Sr to pay workers, but this did not match with any of the payments on the schedule.

vi)   The second and third of the three payments allegedly made to DAA involved cheques dated 25 February 2016; but in circumstances where Mr Almakhawi Sr had received $20,917,358.42 on 30 October 2015 (see paragraph 205 above) it was not clear on what basis it was said he was in financial difficulties and unable to make the payments himself.

272.   The schedule exhibited to Mr Almakhawi Sr's witness statement was not, to be clear, a contemporaneous document, recording payments made by Mr Almakhawi Jr on his father's behalf at or around the time they were made. It was a document prepared by Mr Almakhawi Sr's lawyers recently for the purposes of these proceedings, and as such it has no evidential value of its own.

273.   Mr Almakhawi Jr's response to questions about these matters was essentially that matters were dealt between himself and his father informally; that money flowed within the family both ways both to and from his father; that his role was simply to write the cheques and to hand them over to his father; and that he would do so whenever asked:

"A.   As I told you, I keep repeating nearly 20 times this, for now my job was to write the cheque whenever my father asks for money. I would give him the cheque.

Q.   Is that because what is mine is his, if I can put it that way, and what his is mine?

A.   Exactly.

Q.   Sort of family honour.

A.   Exactly.

Q.   If you have the money so you are morally obliged to hand it to your father and if it were the other way round he would give you the money.

A.   Exactly."

274.   Ultimately, given the limited reliance placed upon them by the Defendants, both in their Defence and in Mr Lewis' submissions, and although I have my doubts, I do not consider that I need to decide whether the cheques are genuine, in the sense that they were issued by Mr Almakhawi Jr, presented and collected on or about the dates they bear to settle sums owed by Mr Almakhawi Sr.

275.   Mr Lewis made clear in an intervention he made during Mr Almakhawi Sr's cross-examination that the Defendants' pleaded case was not that the transfer of the Warren House Property was made in discharge of existing debts, and that the "moral" obligation on Mr

833

Almakhawi Sr to repay Mr Almakhawi Jr was relied upon only as an ancillary, secondary reason for the transfer.

276. Ultimately, for the purposes of the section 423 claim, the question is whether a purpose (not necessarily the only, or the dominant or predominant, purpose) for which the transfers were made was a Prohibited Purpose. It seems to me that whether Mr Almakhawi Sr had only one other purpose (inheritance planning) or two other purposes (inheritance planning and repayment of sums paid on his behalf) in relation to the Warren House Property is unlikely to make a difference.

**(h)    The Money Transfers**

277. This takes me finally to the Money Transfers.

278. It will be recalled that at the 12 February 2019 meeting with HSBC Private Bank (see paragraph 243 above) Mr Almakhawi Sr told the bank that he wanted to have an HSBC account opened for his son in the UK. Whether pursuant to this instruction or not, an account was subsequently opened for Mr Almakhawi Jr with HSBC, Sort Code 40-03-00, Account Number 93838307.

279. Mr Almakhawi Jr swore an affidavit in these proceedings on 15 December 2021 in which he explained that this was his only bank account in England and Wales. He also confirmed that the account was established for the purpose of having monies transferred from his father.

280. Duplicate bank statements for the account have been obtained and disclosed:

    i)    The first statement for the account starts with the 16 August 2019 transfer of £200,000. The relevant page is marked "Sheet Number 001", indicating that it is the very first statement for this account, and that the 16 August 2019 transfer was the very first transaction;

    ii)   The next transaction, which also appears on Sheet Number 001, is the transfer from Mr Almakhawi Sr on 18 October 2019 of £2,226,873.28, which brought the total credit balance on the account as at that date to £2,536,873.28.

281. The duplicate statement runs through 27 further pages to Sheet Number 028. These indicate that, apart from the two Money Transfers, there has been not a *single* movement in or out of the account since it was opened. In his 15 December 2021 affidavit Mr Almakhawi Jr explained that he had been told by HSBC that they regarded the account as dormant.

834

282. The current credit balance on the account remains at £2,536,873.28, which reflects that the account is a non-interest bearing account. On the face of things, therefore, Mr Almakhawi Jr has had over £2.5 million sitting in a UK bank account for well over two years which has been unused and has been earning no interest at all.

283. Mr Almakhawi Sr suggested in his witness statement he could not recall the reason for the first transfer, but he said that it would most likely have been for family expenses. The second transfer, he suggested, was made as part of succession planning as well as an attempt to repay Mr Almakhawi Jr for the sums allegedly paid on his behalf.

284. In his oral evidence, Mr Almakhawi Sr's explanation was much more general. Asked about the explanation in his witness statement for the first transfer, he said:

> "A.   So would you like me to say no to my children? My son deals with shares and, you know, sometimes there are large amounts involved, and I do ask him occasionally, what is this amount for and this? But on the whole this is my family and when they want money, they get it."

He suggested that the reason the money had not been spent was because his son had not had the opportunity to travel to London.

285. In relation to the second, much larger transfer, he simply said:

> "My son asked me for it and I gave it to him."

286. Mr Almakhawi Jr's evidence was that the first transfer on 16 August 2019 was for family expenses sent, he said, because his family often spent the summer months in the UK. When it was put to him that the money was obviously not used in the summer of 2019, he said that the money was not necessarily for this trip, and that it could have been for future trips or for different reasons.

287. As for the second, much larger transfer on 18 October 2019, Mr Almakhawi Jr had said in his witness statement that he had had discussions with his father in which his father had agreed that he would hold these funds on trust for him as a way of paying back the cheques issued on his behalf; he accepted that there was no document supporting that, but he insisted that it occurred.

288. Asked why he had not moved the money into an interest bearing deposit account or do something with the money so that it generated a return, Mr Almakhawi Jr's answer was that:

> "A.   I don't do this business. I never do deposits.
>
> …

> A.    And I am free to do whatever I want with my money. Maybe for you it makes sense to make a deposit, for me it doesn't."

289.   One of the features of the Money Transfers upon which Mr Edwards relied was that they had been paid into a newly opened account which had not been used previously and which was never used again; there was, thus no history of debits and credits in and out of the account which might appear in other records and which might make the existence of the account, and thus the money, easier to locate.

290.   On that topic, there was this exchange between Mr Edwards and Mr Almakhawi Jr:

> "Q.    What I am going to suggest to you is this. These monies were transferred into an account not used previously for any other purpose. That is correct, isn't it?
>
> A.    It has not been used, no.
>
> Q.    They were not mixed with any other monies.
>
> A.    Okay, because that is the only money in the UK.
>
> Q.    And that is because the basis of these transfers was either that you would hold the cash for your father or because it was made to shield the asset from your father's creditors and you wanted an account that was not traceable back to you, because there were –
>
> A.    Well, it is traceable, it is not – it is traceable, you are saying we are trying to transfer to an account which cannot be traced. It is traced.
>
> Q.    What I am suggesting to you is the reason you wanted an account which had not been used before was so that somebody in Dubai who started looking into where your money had gone wouldn't be able to see that account on any document in Dubai?
>
> A.    That is not correct. That is not correct. He wanted to pay me back the loan that I have given him.
>
> Q.    Then why did you specially open an account to receive the monies?
>
> A.    Because I do not have any relation with any British bank. How was he going to give me the money?
>
> Q.    He could just organise a funds transfer to you anywhere. He could just tell his bank to make a transfer.

**836**

A.    Well, we decided and discussed to have the money in the UK.

Q.    Are you seriously suggesting that you don't know that you can tell your bank to make an international funds transfer?

A.    I did not need the money in the Emirates. I do not need it. I want this money in the UK. I don't want to put all my eggs in one basket.

Q.    But your father had a sterling account. He could have transferred it into dirhams or dollars or euros or any other currency anywhere, but what you did was open an account specially and move the money into that account.

A.    Because we – I wanted the money to be in the UK.

Q.    I am suggesting to you that you wanted it in the UK in an account which had no previous dealings in respect of it –

A.    That is not correct.

Q.    - so that somebody –

A.    Because I did not need the money to use it, okay, and I wanted to diversify, that is why I wanted to open a bank – open an account in the UK, which I had never invested in before and I have never had a relation in the UK with a bank. I dealt with different banks around the world, but I have never dealt with the UK."

291.  This evidence was unconvincing, and in part contradictory – if, for example, Mr Almakhawi Jr was intent on "diversifying" and "investing" in the UK, it made no sense to leave a sum of over £2.5 million untouched in a non-interest bearing account for a period of over two years. The facts are, in my judgment, much more consistent with a desire that the money should remain hidden.

## 6.    Discussion

### (a)    The Bank's primary case; beneficial ownership

292.  In considering how the principles identified above apply to the facts, I start with the issue of whether the assets transferred by Mr Almakhawi Sr to Mr Almakhawi Jr were transferred absolutely or whether Mr Almakhawi Sr retained the beneficial interest in the assets and they were held on resulting trust.

293.  So far as the Warren House Property is concerned, in my judgment the position is straightforward.

294.  I accept Mr Edwards' submission that the Deed of Gift strictly post-dates the transfer of the property and it was, thus, not the instrument by which the transfer was made. However:

    i)    It is admissible evidence of Mr Almakhawi Sr's intention when transferring the Warren House Property, *i.e.*, that the property was intended to be a gift under which the beneficial interest would pass to Mr Almakhawi Jr: see *Lewin* (*op. cit.*), paragraph 10-037;

    ii)    Charles Russell's instructions from the outset were that a deed of gift should be prepared; indeed, they had been told by HSBC Private Bank that "our client wishes to gift the property to his son" (see paragraphs 255 and 256 above). The fact that the Deed of Gift was only drawn up only afterwards does not indicate that Mr Almakhawi Sr's intention at the time of the transfer was *not* to make a gift but to retain the beneficial interest in the property himself.

295.  I attach little weight to the fact that Mr Almakhawi Sr continued to pay the council tax and utilities for the Warren House Property even after it had been transferred to Mr Almakhawi Jr given the very small amounts involved and the family relationship between Mr Almakhawi Sr and his son.

296.  As for the other matters relied upon by Mr Edwards, *i.e.*, the timing of the transfer of the Warren House Property and the pattern of other divestments, although I accept that these are of significance in the context of the Bank's alternative section 423 claim, none of them, in my judgment, comes close to rebutting the presumption of advancement or outweighs the positive evidence described in paragraph 294 above that the Warren House Property was intended to be gifted to Mr Almakhawi Jr.

297.  The position in relation to the Money Transfers is more difficult: there is less evidence about them, professionals were not involved, and there is no correspondence or other documentation indicating one way or another that they were or were not being made by way of gift. The timing of the transfers and the manner in which they were made, furthermore, supports the proposition that the aim was to move Mr Almakhawi Sr's money out of the reach – or at least out of view – of his creditors.

298.  Again, however, whilst these facts may (and, in my judgment, do) provide support for the alternative section 423 claim, they are insufficient to rebut the presumption of advancement and they are insufficient to satisfy me that Mr Almakhawi Sr's intention was that he should retain beneficial ownership of the money transferred such that it would be held on resulting trust for him.

299. One reason for this concerns the way in which Mr Almakhawi Sr's family apparently operated. A theme of the evidence of both Defendants was that, regardless of whether money was formally owned by Mr Almakhawi Sr or by his son, each would, as a matter of moral obligation or family honour, support the other: see the exchange in the cross-examination of Mr Almakhawi Jr set out in paragraph 273 above.

300. Assuming therefore - an issue with which I deal with next - that one of Mr Almakhawi Sr's purposes *was* to shield money from his creditors, it was not necessary for him to retain beneficial title to the money transferred to achieve that purpose. He could transfer it to Mr Almakhawi Jr, confident that, although the money was his, Mr Almakhawi Jr would be prepared to deploy the money for his or for the family's benefit if asked.

301. The Bank's primary case in relation to both the transfer of the Warren House Property and the Money Transfers accordingly fails.

### (b) The Bank's alternative case; section 423

302. As I explained earlier, the only issue between the parties in relation to the Bank's alternative case under section 423 was whether the one of the purposes for which the transfers were made was a Prohibited Purpose.

303. In her judgment in *Hashmi* (see paragraph 146 above), Arden LJ noted her agreement with an observation made by the trial judge (Hart J) that it will often be the case that the motive to defeat creditors and the motive to secure family protection will co-exist. So, in my judgment, it is here.

304. I say that because, although it may be that *one* of Mr Almakhawi Sr's purposes in transferring the Warren House Property and in making the Money Transfers was to preserve assets for his children and in that sense to engage in succession or inheritance planning, I am quite satisfied that *another* purpose of the transfers, and not merely a consequence of them, was a Prohibited Purpose, *i.e.,* to put Mr Almakhawi Sr's assets beyond the reach of, and to prejudice the interests of, the Bank and his other creditors.

305. This is an inference I draw based on the evidence set out above as a whole, but the principal factors in my decision are the following.

306. The first is timing. By this, I mean the timing of the Warren House Property and the Money Transfers and the other divestments pleaded by the Bank. I also take into account the timing of the transfer of funds into the Violet Trust, not pleaded by the Bank but part of the Defendants' own case that the transfer of the Warren House Property and the Money Transfers were not made for a Prohibited Purpose.

839

307.  The chronology of events is set out in detail earlier in this judgment. The key points, to my mind, are these:

   i)  System Construct Dubai went into insolvent liquidation in September 2014. Given his personal guarantee, it would have been apparent to Mr Almakhawi Sr from that point on that he would likely face substantial claims;

   ii)  By October 2015, when the Dubai Proceedings were commenced that expectation had become a reality; and by 16 January 2017, when the Dubai Court of First Instance gave judgment against him, he knew that, subject to a successful appeal, in relation to the Bank alone he faced very substantial liabilities approaching $40 million;[10]

   iii)  It is against that background that all the various transfers took place. Notably:

      a)  There is no evidence to support the pleaded case that Mr Almakhawi Sr had formed an intention to transfer assets to Mr Almakhawi Jr or his other children in 2010;

      b)  Indeed, aside from the December 2015 Letter, which I have held was not genuine and which, in any event, would have been sent at a time when Mr Almakhawi Sr was already facing proceedings involving a sizeable claim, there is no evidence that he took any steps to transfer assets until June 2017;

      c)  All of the transfers were made after the Dubai Court of First Instance had given judgment against him; the transfer of the Warren House Property and the Money Transfers were made after his appeals against that judgment had failed;

   iv)  It is a powerful fact that, although Mr Almakhawi Sr had received a distribution of $21 million from his brother's estate in October 2015, he took no steps to place that money into trust until June 2017, after he had been found liable in the Dubai Proceedings.

---

[10]  The Bank did not plead that Mr Almakhawi Sr was insolvent when he transferred the Warren House Property or when he made the Money Transfers, and there is no basis for me to make a finding of insolvency in those circumstances. Nor am I satisfied that it would be proper for me to do so; it appears that Mr Almakhawi Sr may still have owned property in Dubai (protected from enforcement as a gift from the Ruler of Dubai) or other assets. But, for the reasons I have explained, it is not necessary for the Bank's section 423 case that I make a finding of insolvency. On any view, at the time the Warren House Property transfer and the Money Transfers were made Mr Almakhawi Sr had very substantial liabilities and had already divested himself of significant assets.

840

308. The picture presented is, thus, of transfers of assets, including the transfer of the Warren House Property and the Money Transfers, that were responsive and reactive to, and that I infer were motivated by, defeats and reversals in the Dubai Proceedings; the transfers were not, as Mr Almakhawi Sr sought to portray them, completely unrelated to what was happening in those proceedings.

309. The observation made by Schiemann LJ in *Barclays Bank* (see paragraph 155 above) is pertinent: where assets have been transferred to a family member at a time when action by a creditor was clearly anticipated and the transfer is at an undervalue, and what is left in the hands of the debtor barely if at all covers the debt, there is a strong *prima facie* case that the purpose of the transaction was to prejudice the interests of the creditor.

310. Secondly, and although, as I have made clear, the fact that the consequence of Mr Almakhawi Sr's conduct was to prejudice his creditors is not, in and of itself, enough to establish that he acted for a Prohibited Purpose, there is every reason to think that Mr Almakhawi Sr both foresaw and desired that the effect of the transfers of the Warren House Property and the Money Transfers would be to put assets out of the reach of his creditors, including the Bank.

311. That is a legitimate basis upon which to draw an inference that he did desire this result, and that it was at least one purpose for which the transfer of the Warren House Property and the Money Transfers were made: see the passage from the judgment of Leggatt LJ in *Ablyazov* set out in paragraph 152 above. It is an inference that I draw.

312. Thirdly, there are the circumstances of the transfers, in particular the Money Transfers.

313. I dealt with this in paragraphs 289 to 291 above. Although I accept that a reason for transferring modest sums of money to a UK bank account held by Mr Almakhawi Jr might be an expectation or anticipation that expenses would be incurred by him during trips to London, the facts of the present case were extraordinary and never properly explained:

    i)    The money was transferred into a newly opened account, never used before and never used again;

    ii)   An amount of over £2.5 million was allowed to sit in a non-interest bearing account for over two years, something that no rational person would do without good reason. I agree with Mr Edwards' submission that this was a price that was obviously felt to be worth paying to avoid creating a paper trail.

841

Mr Almakhawi Jr's evidence on this topic was contradictory and unsatisfactory.

314.  Fourthly, Mr Almakhawi Sr's evidence was unsatisfactory in a number of respects, and I simply do not accept his evidence that the transfers had nothing to do with the Dubai Proceedings or with a desire to protect his assets from creditors; on the contrary, in my judgment the matters explored during the course of his evidence are consistent with the opposite being the case.

315.  So far as that is concerned, Mr Almakhawi Sr used professional wealth managers, HSBC Private Bank, but it is apparent that he kept them in the dark about the sizeable claims that he faced, in particular when providing information for the purposes of HSBC Private Bank's Source of Wealth document which would have inevitably have taken into account liabilities as well as assets.

316.  There are, I accept, and as Mr Lewis identified in his skeleton argument, references in some of the HSBC Private Bank documents to estate or succession planning. That may have been what Mr Almakhawi Sr told the bank; he would obviously want to provide an explanation to the Bank for what he was doing. But putting his assets into trust or passing them to his children for no consideration was consistent with his desire to keep them out of the hands of his creditors.

317.  There is, furthermore, the information recorded in the HSBC Private Bank Meeting Report of the 11 June 2017 meeting that Mr Almakhawi Sr was a private person, that he did not like others to be aware of his affairs, and that he wanted to protect assets for his family, which is all consistent with a desire to shield assets from his creditors, as is the fact that he was only to be contacted by mobile telephone because he was "concerned [about] safety/confidentiality".

318.  A central feature of Mr Almakhawi Sr's case was that he had been motivated to transfer assets to his children because of a bitter inheritance dispute following the death of Mr Al-Swaidy. But, as I have explained, there was no evidence of any such bitter inheritance dispute; and, whilst Mr Al-Swaidy died in November 2014, it is notable that Mr Almakhawi Sr did not take any (or certainly any concrete) steps to transfer assets until June 2017, after he had been found liable in Dubai.

319.  Finally, there is also Mr Almakhawi Sr's evidence about the disposal of his 95% shareholding in Makgroup. So far as that is concerned, his suggestion that he had sold 45% of that shareholding in 2010 was flatly contradicted by the documents I was shown and in my judgment was a lie. Mr Almakhawi Sr was, I am sure, well aware

that, if he had parted with his shareholding only in 2019 or later, that would be damaging to his case.

320. Fifthly and finally, although, even absent a Prohibited Purpose, Mr Almakhawi Sr might have (at some point) transferred assets to his children anyway, the authorities make clear that this fact is not fatal: see paragraph 118 above. On the evidence, I am satisfied that at least one of the purposes for which Mr Almakhawi Sr acted was to protect assets from his creditors.

321. The Bank's alternative case under section 423 of the 1986 Act in relation to the Warren House Property and the Money Transfers accordingly succeeds.

## G.  Conclusion

322. I will hear counsel in relation to the terms of the orders to be made to reflect my judgment, in particular the appropriate order to be made under section 423 of the 1986 Act, and in relation to any other consequential matters. I am grateful to both counsel, and to the teams behind them, for their assistance.

# Insolvency Act 1986 c. 45
# s. 423 Transactions defrauding creditors.

**Law In Force**

**Version 2 of 2**

5 December 2005 - Present

**Subjects**
Insolvency

**Keywords**
Insolvency; Judgments and orders; Transactions at an undervalue; Transactions defrauding creditors

**423.— Transactions defrauding creditors.**

(1)  This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—

(a)  he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

(b)  he enters into a transaction with the other in consideration of marriage [ or the formation of a civil partnership] [1] ; or

(c)  he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2)  Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—

(a)  restoring the position to what it would have been if the transaction had not been entered into, and

(b)  protecting the interests of persons who are victims of the transaction.

(3)  In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—

(a)  of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b)  of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4)  In this section *"the court"* means the High Court or—

(a)  if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(b)  if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up

.

(5)  In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as *"the debtor"* .

© 2026 Thomson Reuters.

<span style="color:red">845</span>

## Notes

1    Words inserted by Civil Partnership Act 2004 c. 33 Sch.27 para.121 (December 5, 2005)

*Part XVI PROVISIONS AGAINST DEBT AVOIDANCE (ENGLAND AND WALES ONLY) > s. 423 Transactions defrauding creditors.*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2026 Thomson Reuters.

Case 1:24-cr-00239-CKK-MAU   Document 119-8   Filed 03/02/26   Page 16 of 34

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

# Section 3. - Trusts Held to be Shams and Settlor Control

Lewin on Trusts 20th Ed.

Mainwork updated to include amendments from First Supplement

Volume 1

Part 1 - Definition, Classification and Creation of Trusts

Chapter 5 - Requirements for Essential Validity of Express Trusts

Section 3. - Trusts Held to be Shams and Settlor Control

# General principle

Change section title to *Trusts Held to be Shams and Settlor Control*.

In certain circumstances, the courts have found that a settlor has not created a trust at all, on the ground that what on its face is a declaration of trust was a sham.[88] In those decisions, a declaration of trust is ineffective as a sham,[89] or pretence,[90] if the parties to the declaration intended not to create a trust, but instead to give a false impression to third parties and ultimately the court.[91] Properly understood thus, there is no such thing as a 'sham trust', but merely a document purporting to create a trust which does not in fact exist. The question whether a trust is a sham is a different question from the question whether the control of the settlor over the trust fund and its income under the terms of the trust is so extensive that the trust is invalid on the basis that the purported settlor has never parted with the beneficial interest in the trust property;[92] and it does not follow from a decision that a trust is not a sham that such an outcome should not follow where the facts justify it.[93]

## The shamming intent

In addition to the intention not to give effect to the trusts, the authorities require an intent to give a false impression.[94] The parties will in the nature of things usually have some side intent or there would be no point in their entering into a document they mean to disregard. It is difficult to establish the necessary intent, "[b]ecause a finding of sham carries with it a finding of dishonesty, because innocent third parties may often rely on the genuineness of the provision or agreement, and because the court places great weight on the existence and provisions of a formal signed document".[95] There is a requirement of very clear evidence given the seriousness of the allegation, and a presumption that parties intend to be bound by documents they enter into, but the question of sham is determined on the balance of probabilities.[96] Subsequent actions of the parties in disregarding the trusts declared are admissible in evidence to establish that they intended at the time when the trusts were declared never to carry them out,[97] though not on any question of interpretation of the trusts.[98] Evidence of effective control by a person other than the trustee is not sufficient to prove a sham, but is admissible to establish that a trust is a sham if it indicates that it was not intended at the outset that the trust take effect according to its terms.[99] If, however, such an intention is not established, then in subsequently disregarding the trusts declared the trustees are simply in breach of trust.[100] In considering subsequent actions of the trustees in complying with the settlor's wishes about the administration of the trusts, it is necessary to see whether the trustees were acting in disregard of the trusts declared, which would point towards a shamming intent, or whether they were instead exercising their own discretions under the trusts, albeit in ways influenced by the settlor, which would not point to such an intent.[101]

<span style="color:red">846</span>

© 2026 Thomson Reuters.

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 17 of 34

### Relevance of motive as distinct from intention

For a transaction to be genuine, it is sufficient that the parties intended it to be given effect in the form in which it is recorded, and the courts will not inquire into their motives for so intending. As Knox J. stated in *Chase Manhattan Equities Ltd v Goodman*,[102] "impropriety of motive alone will not provide grounds for treating a transaction as a sham"; and Megarry J. in *Miles v Bull*[103] stated that "a transaction is no sham merely because it is carried out with a particular purpose or object. If what is done is genuinely done, it does not remain undone merely because there was an ulterior purpose in doing it."[104]

### The trustees or other parties to a declaration

The general rule is that, for a transaction to be a sham, all the parties to it must share the necessary intent.[105] Thus, if the trustees are parties to the declaration of trust, then they normally must, for it to be held a sham, be implicated in the intention that the trusts are not to be given effect. The general principle applies to a declaration of trust to which the trustees or others, such as a protector, are parties, though as they are volunteers it is enough that they are prepared to go along with the trusts (created primarily by the settlor) being ignored,[106] or are recklessly indifferent as to the settlor's true intentions.[107] If the original trustees do not share the settlor's shamming intent then the settlor will have placed assets under the control of trustees who will administer them in accordance with the trust instrument, and the settlor's private intention that the instrument should be a sham will have no effect.[108] Further, as a matter of evidence, unless the settlor has reason to believe that the trustees will go along with ignoring the trusts, and will be willing to treat the settlor as still the owner of the trust property, the settlor can hardly expect that this will happen, and so can hardly be found to have intended that it should.[109]

If the trustee, protector, settlor or other party to the alleged sham is a corporate entity then its intentions are those attributable to the natural person or persons who manage and control its relevant conduct,[110] which is most likely to be the decision to enter into the trust deed. If the settlor has a nominee on the board of the corporate trustee, or the directors follow his instructions without question, then the intentions of the settlor may be attributable to the corporate trustee.[111]

### Original trustees

For a trust to be a sham, the original trustees must share the settlor's shamming intent at the time of the constitution of the trust. If they receive assets intending to hold them subject to the terms of the trust instrument, any later arrangement with the settlor or one or more discretionary beneficiary to treat the trust as a sham will constitute a breach of trust and will not convert the valid trust into a sham.[112] However, if the original trustees receive additional assets from the settlor which they have agreed to hold for the settlor's benefit (or on different trusts to those declared in the trust instrument), there may be a sham in relation to those assets alone.[113]

### Appointment of new trustees

847

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 18 of 34

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

If the original trustees retire and new trustees are appointed there will be two questions. First, whether the original trustees had been parties to a sham and, secondly, whether the new trustees are also parties to the sham. If the original trustees were not parties to a sham and held the assets subject to the terms of the trust instrument, then the appointment of new shamming trustees will not convert the trust into a sham any more than will the adoption by the original trustees of a shamming intent. [114] However, if the original trustees were parties to a sham then the appointment of new trustees who do not share the shamming intent may convert the sham into a valid trust. [115] If both the original and new trustees share the same shamming intent then the sham continues.

5-027    In one case, [116] the judge required the necessary shamming intent, not in the original trustees, but rather in Guernsey trustees who were appointed three days after the settlement was executed. This was perhaps on the basis that the original trustees were not intended to take steps in relation to the administration of the trust, and executed a deed of appointment and retirement in favour of the Guernsey trustees at the same time as the trust instrument. Of course, if the shamming settlor is going to be the sole trustee then no one else's intention is relevant. [117] Likewise, where trusts were declared by trustees under a power conferred on them by an existing settlement, their intention alone was relevant. [118]

## The effect of finding a sham

5-028    The effect of a trust being held to be ineffective as a sham is that third parties can treat the trust property as still belonging to the settlor or the settlor's estate. [119] Third parties who wish to do so might include the settlor's creditors, such as revenue authorities or a trustee in bankruptcy, an estranged spouse or civil partner, or legatees, next of kin, creditors or others who might be interested in the estate of a settlor who has died. As the court will necessarily have made a finding of intentional deceit, it is justified in taking the exceptional step of determining the legal effect of the purported trust instrument on the basis of the parties' subjective intentions, including by reference to extrinsic material, as opposed to the objective meaning of the document. [120] Where the facts justify such a conclusion, therefore, it would seem that the subjective intention to which the court may give effect is that the legal effect of the document is a gift to others or a trust for others, rather than (as will usually be the case) that of the property remaining vested in the settlor, or that the terms of the trust are different from those contained in the document. [121] It may be that the trust instrument contains certain sham provisions and others which are valid despite the shamming intent. It has been held that a provision in a lease may be invalid as a sham in circumstances where the lease itself remains valid, [122] and assumed that the doctrine of sham may apply to certain provisions of legal documents more generally without invalidating the whole, [123] but the application of this point in the context of trusts remains uncertain. [124]

## Reliance on the sham by the settlor

5-029    The High Court (which is to say the highest court) of Australia once allowed a settlor to assert his own shamming intent to defeat the effect of his formal declaration of trust as against a revenue authority, [125] but according to the recent English cases, and on principle, the parties to a declaration of trust cannot rely on their own shamming intent as against innocent third parties. If the declaration of trust is a sham or pretence, then "as against an innocent third party it cannot lie in the mouths of the pretenders to say to the disadvantage of that innocent third party that the transaction was a sham, pretence and thus of no effect". [126] A settlor who has executed a declaration of trust is subject to the usual rule that prevents a party to a legal document from relying on mere mental reservations to resist its enforcement. [127] It seems that this general rule may apply to prevent a claim by a settlor to set aside a trust on the ground that he intended it to be a sham. Although dishonesty is required for a finding of sham, there need not be any illegality involved (at any rate at the point at which the sham declaration is executed). [128] If third parties have relied on the provisions of the trust instrument to their detriment, the settlor may be

848

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 19 of 34

estopped from asserting that the trust is a sham and from seeking to recover the trust property. [129]  It is, of course, an abuse of process to assert in litigation that a sham document is genuine. [130]

### Reliance by those who are not parties to the sham

**5-030**  If there ever were any subsequently appointed trustees who were not implicated in the sham, and did not know of it when appointed, they would do well to consider applying to court as soon as they discover it. They would not be giving evidence of their own wrongful intent, but that of their predecessors. [131]  A different example would be where the true arrangement (behind the apparent trust created for tax reasons) is that the trust fund should be held, not on the trusts expressed in the trust deed, but on trusts for a particular person (not the settlor) absolutely on the basis of a constructive trust or of a valid oral declaration of trust. In our view it is clear that, in such circumstances, the 'real' beneficiary can enforce the 'true' trusts in his favour. It may even be that he can do so without the need to assert the existence of a sham (and so without alleging dishonesty), if the 'true' trusts are constituted before the execution of the sham document and so take priority over it.

## Settlors retaining powers, interests and control

**5-031**  Subject to what is said below [132] about a settlor's failure to part with the beneficial interest in the trust property, and trusts which purport to be lifetime trusts but are testamentary in character, and so long as the trusts are intended to take effect according to their terms, the retention of large powers or weighty influence by a settlor does not itself make the trusts void as a sham, though it might make the settlement into a testamentary document which is invalid unless executed in accordance with the Wills Act 1837. It has generally been considered that, subject to that qualification, a trust is either a sham in the sense explained in §§ 5-020 and 5-021, or is valid and enforceable. There is no third state of affairs between a valid trust on the one hand and a sham on the other. [133]  If the settlor retains power to direct investments, that does not make the trust a sham. Indeed, his directing investments through the machinery of the trust recognises them as real. [134]  Even if the settlor retains practical control of the whole administration of the trust through informal, personal influence over the trustees, that does not enable his creditors to "pierce the veil of the trust". [135]

**5-032**  The retention by the settlor of extensive powers or interests may mean that economically the settlor is in a similar position to an absolute owner. That similarity may be particularly important in the context of insolvency or divorce, or in tax or other contexts, and may enable third parties to gain access to the trust assets in a way which would not be possible if he did not have those powers. But so long as the trust is not a sham, such a retention does not in itself mean that the trust is not a trust, nor that it takes effect in some different way from what its terms provide.

**5-033**  The settlor may of course be a beneficiary under the terms of a trust, and the terms of the trust may enable the settlor to become the sole beneficial owner on the occurrence of some future event or upon the exercise of a power, for example where the terms of the trust confer an interest in possession on another person for life or a shorter period with a reverter to settlor on expiry of that interest, or confers on the trustees a special power of appointment [136] exercisable during the settlor's lifetime with his consent in favour of a class of beneficiaries including himself. So long as the trust is not a sham, it will take effect according to its terms, and so if the power is not exercised, the trust fund will pass to the beneficiaries interested in default of appointment on the settlor's death. The consent requirement means that the settlor will be able to block any exercise of the power of which he does not approve, but it does not mean that the settlor is the absolute owner of the trust property. And if the settlor, in addition, retains a power to remove and appoint trustees, that does not mean that he is the absolute beneficial owner of the trust property, because of the existence of the power. That is because the powers of removal and appointment are fiduciary powers, [137]  but

849

Case 1:24-cr-00239-CKK-MAU   Document 119-8   Filed 03/02/26   Page 20 of 34

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

even if they are beneficial powers, [138] the trustees' power of appointment is a fiduciary power [139] which, if no sham is involved, takes effect according to its terms and prevents the settlor from being the absolute beneficial owner unless and until the power is exercised in his favour. The trust may be vulnerable to being set side under the insolvency legislation, [140] but if there are no grounds for setting aside the trust under that legislation, then the trust will take effect in accordance with its terms, and so the creditors will take the settlor's life interest, but not the capital, because that is the true effect of the trust.

5-034  There are, however, two ways in which trusts under which the settlor retains powers, interest and control have been attacked otherwise than as shams, relying on these features of the trust, rather than any shamming intent, as forming the basis for attack. The first is that, upon the true construction of the trust instrument, the settlor has failed to part with the beneficial interest by a valid lifetime trust and so remains the absolute beneficial owner of the trust property. The second is that what appears to be a lifetime trust is a testamentary disposition and so is invalid as a lifetime trust and valid only as a testamentary trust if executed in accordance with the formal requirements of the Wills Act 1837.

## Failure to part with the beneficial interest

5-035  There is nothing unusual in contentions to the effect that all the trusts and powers contained in a trust are void for uncertainty, perpetuity or some other similar reasons so that the settlor has failed to part with the beneficial interest in the trust property, which is held upon a resulting trust for him. [141] Such contentions are quite different from contentions to the effect that by reason of the reservation in favour of the settlor of rights and powers under the terms of the trust, the trust is invalid as lifetime trust on the ground that the settlor has failed to part with the beneficial interest in the trust property, so that the trust property is held in trust for him absolutely. We do not consider that the reservation to the settlor even of very considerable rights and powers would mean that the settlor has failed to part with the beneficial interest in the trust property, unless the powers and rights reserved by the settlor mean that on the true construction of the purported trust instrument the settlor remained the absolute equitable owner of the trust property or, at any rate in some circumstances, retained powers that were tantamount to beneficial ownership of the trust property. An example of a trust where the settlor remained the absolute beneficial owner would be if the terms of the trust declared that the trust property was held in trust as to capital and income for the settlor absolutely and indefeasibly and then purported to set out trusts in favour of other beneficiaries, because those trusts would be repugnant to the absolute interest retained by the settlor. The effect of the reservation of settlor powers which are said to be tantamount to beneficial ownership of the trust property is more complicated and is considered below. [142] The principle is one of construction and does not entail any dishonesty of the kind which is requisite for a finding of sham. [143] A trust which is held to be void as the result of a determination that the settlor has failed to part with the beneficial interest in the trust property has been described as an "illusory" trust" but it has been said that it is better not to use that phrase; if there is no valid trust that is all that needs to be said. [144]

## The *Pugachev* case

5-035A  However, in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*, [145] concerning a discretionary settlement in unexceptional terms of a kind frequently encountered in practice, the court, held that the reservation by the settlor of powers as protector, including the power to remove and appoint trustees, which was classified as a beneficial power, [146] and the power to veto the exercise of dispositive powers of the trustees, meant, on the true construction of the settlement, that the settlor never divested himself of the beneficial ownership of the trust property. [147] It did so without suggesting that the trusts or powers were void for reasons of the kind referred to in the previous paragraph, and did so independently of successful contentions to the effect that the settlement with which the court was concerned was a sham or liable to be set aside under the insolvency legislation. We consider this decision to be doubtful. The reasoning of the court depended heavily on its categorisation of all the powers of the settlor as protector being personal powers exercisable for the settlor's own benefit. Even if the power to appoint or remove trustees could properly be so viewed, this would give the settlor effective beneficial ownership only if he

850

could direct a new trustee to act contrary to the interests of the beneficiaries, something that would be inconsistent with the finding that the trustees' powers were fiduciary. [148] The *Pugachev* case was distinguished in a later case, [149] concerning a discretionary settlement in favour of the children of the settlors who were also the trustees, and where the settlors had a power to nominate persons for addition to the class of beneficiaries and as trustees to accept the nomination, since (among other things), even if the settlors were permitted as settlors and trustees to add themselves to the class of discretionary beneficiaries, the powers of the settlors as trustees were powers which were not freed from any fiduciary responsibility, restraint or control and the entitlement of objects of the discretionary powers conferred by the settlement on the trustees to be considered for appointment were not excluded by the terms of the settlement. [150] Although the *Pugachev* case was not criticised in the later case, that case shows that normally where the trustee, even if also the settlor, has fiduciary powers exercisable in favour of the settlor and other persons, the fact that the settlor is or may become a beneficiary will not normally suffice to show that the settlor has failed to part with the beneficial interest.

# Reservation by settlor of powers tantamount to ownership

### The *TMSF*, *Clayton* and *Webb* cases

**5-035B**    Particular difficulty arises where the settlor reserves powers which are tantamount to ownership, for example a general power of appointment [151] or a power of revocation, [152] which enable the settlor to make himself absolute owner of the property subject to the power, without regard to the interests of anyone other than the settlor or any fetters on the exercise of the power, by the exercise of the powers at any time from the purported creation of the trust until the power expires. Three cases decided by the Privy Council and New Zealand's highest court are of considerable importance to the effect of reservation of such powers:

(1) In *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co. (Cayman) Ltd*, [153] which was concerned with a revocable settlement in conventional discretionary form governed by Cayman law, it was common ground that the settlements were valid and duly constituted, [154] so that there were valid trusts and powers taking effect subject to and until exercise of the power of revocation. The Privy Council ordered the settlor to delegate to receivers the exercise of the power of revocation so as to enable a judgment in favour of the settlor's judgment creditor to be enforced out of the trust property, on the ground that the power of revocation, being a power exercisable by the settlor solely for the settlor's benefit, was tantamount to ownership of the trust property. [155]

(2) *Clayton v Clayton (No.1)* [156] was concerned with a question in litigation between a wife and husband whether the property comprised in a trust should be treated for the purposes of New Zealand matrimonial legislation as the husband's property, in circumstances where the husband was the settlor, sole trustee and a beneficiary of a discretionary trust and reserved extensive powers under the terms of the trust including a non-fiduciary power to appoint and remove discretionary beneficiaries and wide dispositive powers as sole trustee freed from the restrictions usually applicable to fiduciary powers. The Supreme Court of New Zealand, after considering the *TMSF* case, [157] held that the powers reserved by the settlor amounted in effect to a general power of appointment tantamount to ownership [158] which were property for the purposes of the matrimonial legislation, [159] with a value equal to the value of the trust property. [160] The court considered that the trust was not a sham, [161] but left open the question whether the trust was invalid on the ground that the settlor had failed to part with the beneficial interest. [162] One view was that the settlor, having reserved such broad powers to himself, could not be said to have disposed of the trust property in favour of any other beneficiary, and the breadth of such powers called into question whether the irreducible core of trust obligations applied to the settlor as sole trustee. [163] The other view was that the trust was a valid defeasible trust which took effect in accordance with its terms until the powers tantamount to ownership were exercised so as to bring the trust to an end. [164]

<span style="color:red">851</span>

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 22 of 34

(3) *Webb v Webb* [165] was, like the *Clayton* case, concerned with a question in litigation between a wife and husband whether the property comprised in trusts should be treated as matrimonial property for the purposes of matrimonial legislation, in circumstances where the husband was the settlor, trustee and beneficiary of discretionary trusts and reserved extensive powers under the terms of the trusts including a non-fiduciary power which was construed by the Privy Council as a personal power to make himself the sole beneficiary. The Privy Council considered [166] that the powers reserved to the settlor might be analysed in two different ways. One was to consider whether the powers were so extensive that the settlor could be said never to have disposed of the property purportedly settled, and in this connection to ask whether the trust lacked the irreducible core of trustee obligations. The other was to ask whether the settlor had reserved powers which were tantamount to ownership. The first analysis was clearly an analysis concerning the validity of the trusts and was expressed in similar terms to that referred to in the *Clayton* case. The second was an analysis concerning the characterisation of the reserved powers as property of the settlor but did not in itself involve any determination of the validity of the trusts. In drawing the distinction between the two analyses the Privy Council referred to the agreement between the parties that the result would be the same whether approached in terms of trust invalidity or in terms of a bundle of powers treated as matrimonial property. [167] The Privy Council then confined itself to the substantive question whether the settlor had reserved powers that were indistinguishable from ownership and answered that question in the affirmative. [168] That answer, as in the *Clayton* case, did not involve any determination that a trust reserving to the settlor powers tantamount to ownership was necessarily an invalid trust. But parts of the judgment, in contrast to the *TMSF* case and the *Clayton* case, suggest that the Privy Council was making a decision about the validity of the trusts since the part of the judgment dealing with the issue was headed as one concerning validity and the Privy Council concluded its reasoning by saying that the Court of Appeal was justified in finding as it did that the settlor had reserved such broad powers as settlor and beneficiary that he had failed to make an effective disposition of the trust property. [169] Nevertheless, we do not consider that the *Webb* case is clear authority for the proposition that the reservation to the settlor of a power tantamount to ownership invariably wholly invalidates a trust. For, if the Privy Council had intended to do that, one would have expected it to indicate that it was providing an answer to the question of validity left open in the *Clayton* case [170] with reasons for that answer, and to have explained how that answer was consistent with the *TMSF* case in which the Privy Council proceeded on the basis that the relevant settlements were valid while reserving powers to the settlor tantamount to ownership, yet the *TMSF* case was cited with apparent approval in the *Webb* case. [171] The *TMSF* and *Clayton* cases are notable for drawing a clear distinction between questions concerning the validity of trusts and questions concerning the treatment of settlor powers tantamount to ownership being the settlor's property, but that clarity is absent from the *Webb* case.

We consider that the *TMSF* case cannot be taken as a determination for the purposes of the general law that the reservation to the settlor of powers tantamount to ownership does not invalidate a trust since specific statutory provisions applied to the effect on validity of the reservation of a power of revocation, and because the Privy Council did not suggest that this was so. The *Clayton* case suggests that there is at least uncertainty on the matter since the question of validity was left open, and the *Webb* case adds to rather than resolves that uncertainty. The matter therefore needs to be considered further.

**5-035C**  The following questions arise:

(1) Do settlor reserved powers need to be tantamount to ownership so as to be capable of preventing the settlor parting with the beneficial interest in the trust property? [172]

(2) What settlor reserved powers are tantamount to ownership? [173]

(3) Are settlor reserved powers tantamount to ownership in themselves sufficient to prevent the settlor from parting with the beneficial interest in the trust property? [174]

(4) What is the position where settlor reserved powers tantamount to ownership are not operative at the time of constitution of trust or terminate during the settlor's lifetime and before the end of the trust period? [175]

<span style="color:red">852</span>

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

Case 1:24-cr-00239-CKK-MAU   Document 119-8   Filed 03/02/26   Page 23 of 34

### Whether trust valid if settlor reserved powers are not tantamount to ownership

**5-035D**  It is doubtful, in our view, whether settlor reserved powers which are anything less than powers tantamount to ownership are capable of preventing the settlor from parting with the beneficial interest in the trust property. Since the settlor can be a beneficiary, there is no need for the settlor to part with the entire beneficial interest in the trust property, and if the settlor no longer retains the ability through his own reserved powers to bring the trust to an end at any time and recover the trust property for his own absolute benefit, it is difficult to see how there has been a failure to part with the beneficial interest. The *Pugachev* case [176] might, perhaps, be seen as a case where lesser powers than powers tantamount to ownership sufficed to prevent the settlor from parting with the beneficial interest in the trust property. But in that case the court stated the test in terms of retention of the beneficial ownership of the trust property, [177] at least as tight a test as reservation of powers tantamount to ownership. The doubts about the court's decision in that case arise, not from the statement of the test that was considered to be applicable, but, from the court's decision that it was enough to satisfy that test that the settlor retained a personal power to appoint and remove beneficiaries and to veto exercises of the trustees' fiduciary powers in favour of beneficiaries other than the settlor, as well as a personal power to remove trustees.

### What settlor reserved powers are tantamount to ownership

**5-035E**  As mentioned above, [178] the most well-known examples of powers tantamount to ownership are a general power of appointment and a power of revocation. We do not consider that the settlor's reserved powers to appoint the trust property in favour of himself will be tantamount to ownership if their exercise is subject to the consent of a third party. [179] But we do not consider that a requirement for the consent of the trustees to an exercise of a settlor's power of revocation or other general power increasing or extending the obligations, liabilities or responsibilities of the trustees would prevent the power being tantamount to ownership since even an absolute beneficial owner could not increase or extend their obligations, liabilities or responsibilities without their consent. [180] Even if the settlor is a trustee from the outset, the conferral of powers on trustees under which income and capital can be appointed to the settlor will not normally be powers tantamount to ownership in view of the fiduciary nature of those powers and the rights of other objects of those powers to be considered. [181] A clause precluding the settlor as trustee from exercising trustee powers so as to benefit himself while allowing another trustee to do so is fatal to a claim that the settlor has reserved powers tantamount to ownership. [182] A clause merely allowing a trustee to exercise or join in the exercise of powers of the trustees notwithstanding a personal interest or conflict of interest will not, even if the settlor is sole trustee, by itself suffice to make the power tantamount to ownership since it does not eliminate the rights of other objects of the powers to be considered. [183] But where the restriction on the fiduciary nature of trustee powers goes further and permits the settlor as sole trustee to exercise dispositive powers over capital and income in favour of himself as an object of those powers without regard to the interests of other object, that may suffice to make the power tantamount to ownership while the settlor remains sole trustee, at any rate if the trustee also has a power to make himself the sole object of those powers. [184] Joint general powers are not for the purposes of the general law tantamount to ownership [185] and so it is doubtful whether the reservation to joint settlors of such powers would invalidate a trust. [186]

### Whether settlor reserved powers tantamount to ownership enough to invalidate trust

**5-035F**  A settlor who reserves powers tantamount to ownership over the trust property is economically in the same position as a settlor who retains absolute beneficial ownership of the trust property since he can, by the exercise of the power, make himself the absolute owner. Lord St Leonards considered that to make a distinction between a general power and a limitation in fee

<span style="color:red">853</span>

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 24 of 34

was to grasp at a shadow while the substance escapes. [187] That was the original basis for the view that there is no substantive difference between the position of a beneficiary who has a power tantamount to ownership over the trust property and a beneficiary who has an absolute beneficial interest in the trust property, and so a settlor who purports to reserve such a power cannot, in view of its width, be said to have disposed of the property purportedly settled in favour of another. [188]

**5-035G** Nevertheless, an absolute interest is distinct from a power tantamount to ownership in a trust context. That is because no-one other than a beneficiary entitled to an absolute beneficial interest in trust property, which is not subject to any prior trusts or powers, can have any beneficial interest or entitlement in that property, apart from the trustees' indemnity rights, unless and until the beneficiary's interest is disposed of by the beneficiary or passes to another by operation of law. [189] But the donee of a power tantamount to ownership, which is not subject to any prior trusts or powers, will not have an absolute beneficial interest unless and until he exercises the power. [190] Accordingly, the beneficiaries interested under the trusts until and in default of exercise of the power tantamount to ownership will have interests and rights in the trust property pending exercise of that power. Those beneficiaries may include the donee of the power, for example where the donee has a life interest, but the donee's life interest will arise under the trusts in default of exercise of the power, not because he is the donee of the power. The interests and rights under the trusts in default of exercise of the power are precarious, but that does not mean, where the donee of the power is someone other than the settlor, that they are non-existent, and so, pending the exercise of the power, the donee of the power does not have an absolute interest in the trust property unless the only trust in default of exercise of the power is an absolute interest for the donee. And if the power is never exercised by the donee during its subsistence, the trust property will devolve under the trusts in default of exercise of the power and not form part of the estate of the donee, as would have been the case if he had had an absolute beneficial interest. It can make no difference that the donee of the power is the settlor, unless there is a rule of law which invalidates the trust altogether on the ground that the settlor has failed to part with the beneficial interest if he reserves a power tantamount to ownership because of the precarious nature of the interests and rights of the beneficiaries in default of exercise of the power, so that the settlor cannot reserve to himself what he can give to another and if does so the trust is void from the outset. Some cases would appear to open the door to an argument that a reservation by the settlor of a power tantamount to ownership is sufficient by itself to invalidate a trust on that ground, [191] but there is authority to the effect that the reservation by the settlor of a power of revocation, a paradigm example of a power tantamount to ownership, is by itself insufficient to do so. [192]

**5-035H** Yet even if the reservation to the settlor of powers tantamount to ownership is not by itself enough to invalidate a trust, such a reservation may do so when combined with other factors which indicate that even the trusts in default of exercise of powers have no substance, as where the settlor not only reserved a life interest in income and a power of revocation but also was sole trustee and under the terms of the trust was as settlor entitled to release the trustee including himself from any liability or responsibility to any person in respect of any trust transaction. [193] Further, where the settlor is the sole original trustee, and the powers conferred upon him as trustee are relied upon as being tantamount to ownership, the breadth of the power reserved to him may suffice to show that the trust lacks the irreducible core of trustee obligations that is needed to constitute a trust, and thus that the retained powers are tantamount to ownership. [194]

### Settlor reserved powers tantamount to ownership not operative at time of constitution of trust

**5-035I** The reservation of powers tantamount to ownership, so far as sufficient by themselves to show that no valid trust was created, does so because the reservation means that the settlor has failed to part with the beneficial interest in the trust property at the time of purported constitution of the trust. Where, however, those powers become operative only after the expiry of an initial period during which trusts take effect in favour of beneficiaries which consist of or include persons other than the settlor, there has been no such failure to part with the beneficial ownership at the time of constitution of the trust. And if the settlor reserves powers tantamount to ownership which become operative at the end of the initial period of the trust, since the efficacy of the initial constitution of the trust is not invalidated, there seems to be no reason why the settlor should be in

**854**

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 25 of 34

any different position from any other donee who is given powers tantamount to ownership, and which need to be exercised by him if he is to become the absolute beneficial owner, and where there is no doubt that there is a valid trust.

## Effect of early termination of settlor reserved powers tantamount to ownership

**5-035J**  Where, however, the settlor reserves powers tantamount to ownership operative at the time of purported constitution of the trust which suffice to invalidate the trust, it might be thought that the attempt to create a valid lifetime trust has failed, so that it can make no difference that under the terms of the purported trust, the settlor's reserved powers cease during his lifetime, for example if the powers conferred on him as trustee counted as powers tantamount to ownership, and he subsequently ceased to be a trustee under the terms of the purported trust, Nevertheless, the Supreme Court of New Zealand has countenanced the possibility of the trust becoming valid from the time when the settlor ceases to hold powers tantamount to ownership under the terms of the purported trust. [195]

## Settlement taking effect as a testamentary disposition

**5-036**  As is mentioned elsewhere, [196] if the person executing an instrument, in whatever form, intends that it should not take effect until after his death, and that it is dependent on his death for its vigour and effect, then it is testamentary and so invalid unless executed in accordance with the requirements of the Wills Act 1837. [197] A document, appearing to be settlement, which reserves very extensive interests and powers for the settlor during his lifetime, coupled with a power of revocation, [198] can turn a settlement into a will, because it is dependent on the settlor's death for its vigour and effect. There are a number of judicial decisions to this effect in Canada [199] and New York, [200] and the principle has been recognised by the Privy Council. [201]

**5-037**  Often, however, declarations of trust that might otherwise run the risk of being held testamentary documents contain some provision that is plainly intended to take effect during the lifetime of the settlor. An example is a power for the trustees to apply capital of the trust fund for the benefit of the settlor while he is alive but under disability. Any such provision is enough to show that the declaration is intended to take effect during the settlor's lifetime, does not depend on his death for its effect and so is not a testamentary document that needs to be executed as such.

**5-038**  It has been held that retained powers do not make the settlement into a testamentary document if they are subject to the trustees' consent, [202] that a settlement reserving a life interest and a power of revocation [203] (though of the same economic effect as a will) is not a will, [204] and (in the United States, but it would be the same in England) that it is not enough that the object was to avoid the expense of a will and the need for probate. [205] We consider that if the settlor has, notwithstanding a reservation of powers or other rights to the settlor, parted during his lifetime with the beneficial interest in the trust property to an extent sufficient to create a valid lifetime trust taking effect in accordance with its terms, not being merely a bare trust for the settlor, [206] then the trust will not be testamentary since it cannot be said that the trust is dependent on the settlor's death for its vigour and effect. But a determination that there has been a failure to part with the beneficial interest in the trust property during the settlor's lifetime does not necessarily mean that no valid trust at all has been created. That is because, if the purported lifetime trust contains dispositions of the trust property in favour of persons other than the settlor which are intended to take effect on the settlor's death, and having vigour and effect after his death, [207] then a valid testamentary trust will have been created, provided that the formal requirements of the Wills Act 1837 have been satisfied and that the trust has not been revoked by a later will or by some other way in which a will can be revoked. [208] Of course if there is no beneficiary at all other than the settlor then the whole beneficial interest falls into the settlor's estate (requiring probate) and is available to his creditors. The exercise of a general power of appointment by will also makes the appointed property available to creditors. [209]

<div style="text-align: right; color: red; font-size: large;">855</div>

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 26 of 34

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

### Joint bank account

A gift into a joint bank account made by the donor with the intention that the donor should retain control during his lifetime, and that the donee should become entitled only to the balance remaining in the account at the donor's death, if the donee survives the donor, is a valid gift, not a testamentary disposition that fails for lack of compliance with the Wills Act 1837.[210]

### Settlor reserved powers provisions overseas

In some jurisdictions there are express statutory provisions to the effect that various kinds of powers or interests reserved by the settlor neither invalidate a lifetime trust, or delay or prevent it taking effect as a lifetime trust rather than a testamentary disposition.[211] Such provisions may go no further than give effect to what is the position without statutory intervention in England and Wales,[212] but have the advantage of eliminating doubt as to the scope of the common law rules and are no doubt a comfort to settlors who wish to establish lifetime trusts in those jurisdictions, reserving wide powers to themselves.[213] Wide powers which are valid in accordance with these statutory provisions may nevertheless be treated as the settlor's property for some legal purposes and so may not protect the trust from attack by creditors or others.[214]

## The difference between a finding of sham, proper legal construction and absence of certainty of intention

It is not enough to justify a finding of sham to show that, as a matter of proper legal construction, the settlor actually achieved something other than a trust, if the documentation accurately reflects what he set out to do. In the course of considering an agreement which might have been said to be a sale or a secured loan, Dillon L.J. distinguished between the class of case where parties entered into a written agreement which was "a sham intended to mask their true agreement", and the distinct class of case where, without any question of sham, there "has been held to be some objective criterion in law by which the courts can test whether the agreement that the parties have made does or does not fall into the legal category in which the parties have sought to place their agreement".[215] A clear example is the case of an apparent trust *inter vivos* which, when properly construed, but without there being any question of sham, turns out to be a will.[216] In that case, it would seem that the settlor intended each of the terms of the trust deed to have effect, but that, properly construed, they were not such as to create a trust. The difference is that between an apparent settlor who has no relevant intention to create a trust, but executes documentation by which he pretends to have such an intention; and the quite distinct settlor who fully and honestly intends his documentation to take effect according to its terms, but, as a matter of proper legal analysis, fails to create a trust. If a finding of sham is made in the context of an apparent trust, then an essential requirement of the validity of the trust will, ex hypothesi, be lacking: there will have been no necessary intention to create a trust, or, at any rate, to declare a trust on those particular terms. But a finding of sham makes it unnecessary for the court to consider the requirement of certainty of intention[217] at all, because it has evidence before it that the apparent settlement has been intended to mislead.

### Further practical considerations in the trust context

856

© 2026 Thomson Reuters.

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 27 of 34

From the point of view of settlors and trustees, and those called upon to advise them, properly anxious to avoid even the possible appearance of a sham, the following points should, in particular, be borne in mind. Where a settlor has declared himself to be a trustee, as in *Midland Bank Plc v Wyatt*,[218] it will be a great deal easier to regard what has been done as of no effect than where he has instead transferred the trust property to a trustee, and both of them have executed a deed declaring the trusts on which the trustee is to hold. It should also be borne in mind that the mere retention of wide beneficial powers and interests by the settlor does not of itself make the trust a sham, so long as the trustee genuinely has control of the assets and exercises his own independent discretions in respect of those matters where the terms of the trust require him to do so. On its proper construction, a trust where a settlor does retain very wide interests and powers might be held to be a bare trust,[219] such that the trust assets fall into the settlor's estate on death, and are subject to the rights of creditors and successors in the ordinary way, but that is a very different matter from saying that it is a sham. Again, the reservation of very large powers and interests during the settlor's lifetime might make the document into a will,[220] but that too is a different matter. The Court of Appeal has held that there is nothing sinister in a trust having as its only beneficiary the Red Cross or Oxfam, leaving other beneficiaries to be nominated from a very wide class, or in the existence of bearer shares among the trust assets.[221] If trustees of a trust, not itself alleged to be a sham, have power to transfer trust assets to another trust, and purport to exercise the power in a way which would be authorised by the power if the transferee trust were genuine, the court will not lightly infer that the transfer and transferee trust were shams and that the true intention of the trustees making the transfer was that the transferred assets should become held, in breach of trust, for a third party; but if the inference is made then the transferred assets will remain held on the trusts of the transferor trust and not in trust for the third party who was intended to benefit.[222] An 'alter ego' trust, where a person establishes a trust over the trustee of which he has control, is not, by virtue of this fact, a sham, nor does the person with control of the trustee thereby have a beneficial interest in the trust.[223]

## The concealment principle

**5-043**    Some consideration should be given to discussion in other areas of law of attempts to hide the actors behind a transaction or to protect their assets from enforcement. The Supreme Court has,[224] in the context of a matrimonial dispute where property owned by a company was found to be held on trust for the husband and thus available for the making of an order for financial provision in favour of the wife, drawn a distinction between the 'concealment principle' and the 'evasion principle'. The concealment principle was described in the following terms: "the interposition of a company or perhaps several companies so as to conceal the identity of the real actors will not deter the courts from identifying them, assuming that their identity is legally relevant. In these cases the court is not disregarding the "facade", but only looking behind it to discover the facts which the corporate structure is concealing."[225] The concealment principle differs from a sham in that genuine documents conceal the identity of the true actors where that principle applies, while in the case of a sham the true actors are concealed by false documents. Although a sham involves concealment, the concealment is of a quite different kind from that under the concealment principle.[226] The evasion principle applies where a company is deliberately interposed in order to defeat or evade an existing legal right which would otherwise be enforceable against the controller of the company.[227] In the limited circumstances in which the evasion principle applies, the court may pierce the corporate veil in order to deprive a person of the advantage sought to be obtained by the company's separate legal personality. The evasion principle is relevant for the purpose of identifying a recipient of trust property in the context of knowing receipt.[228] For the purposes of creating a trust, however, we take the view that the principle has no relevant application. The establishment of a trust does not itself interpose a separate legal entity between the settlor and his creditors allowing him to avoid his legal obligations, although in practical terms it may render impossible any enforcement of the legal obligations if the settlor has divested himself of assets from which a judgment could otherwise be satisfied. It is likely that statutory anti-avoidance provisions will be relevant if a settlor has created a trust in order put his assets beyond the reach of creditors, and that recourse should be made to such provisions,[229] and not to concepts such as piercing the veil.

**857**

## The proper law governing the question whether a trust is a sham

**5-044** Finally, if the substantive law governing sham arrangements were to diverge between jurisdictions, then the issue of the law which governs the question whether a trust is a sham would arise. If it became clear, for example, that the requirements for a sham finding were tighter in Jersey law than in English law, then such considerations would need to be addressed. It is our view that the putative governing law of the trust in each case ought, by analogy with the position in contract,[230] to decide the question whether or not the apparent arrangements are a sham, rather than (as could be argued) the *lex situs* of the trust property concerned.[231] It may also constitute an exorbitant assumption of jurisdiction of an English court to declare a foreign trust a sham, at least in matrimonial proceedings.[232]

---

### Footnotes

88    *Midland Bank Plc v Wyatt [1997] 1 B.C.L.C. 242* (deed "not to be acted on but put in the safe for a rainy day"); *Ashe (Trustee in Bankruptcy of Mumford) v Mumford [2001] B.P.I.R. 1, CA* (affirming a decision that a purported trust was ineffectual as the naming of beneficiaries was "nothing more than window-dressing"); *R. v Allen [1999] S.T.C. 846, CA (affd [2001] UKHL 45; [2002] 1 A.C. 509* (no appeal on sham); jury found Gibraltar and Jersey settlements were shams); *Minwalla v Minwalla [2004] EWHC 2823 (Fam); [2005] 1 F.L.R. 771*; *Murphy (Trustee in Bankruptcy of Munir) v Munir [2021] EWHC 278 (Ch)* at [151]: ("a 'rainy day' trust instrument"), as in *Gallagher (A bankrupt) v Losowski-Gallagher [2021] EWHC 2479 (Ch); [2022] B.P.I.R. 104* at [66]. See too *Rahman v Chase Bank (C.I.) Trust Co. Ltd 1991 J.L.R. 103, Jers RC*; *Hitch v Stone [2001] EWCA Civ 63; [2001] S.T.C. 214*; and the other authorities considered in the following two paragraphs where the requisite intention to create a trust was found not to exist. See *Conaglen (2008) 68 C.L.J. 176*.

89    For the precise effect, see § 5-028.

90    The word preferred in some of the authorities, including *A.G. Securities v Vaughan [1990] 1 A.C. 417* at 462H, HL, *per* Lord Templeman (clause in a lease dressed up as a licence).

91    *CR v MZ [2013] EWHC 295 (Fam); [2014] W.T.L.R. 233* at [83]. Further, on the necessary intent, and in particular on whether it must be shared by the trustees, see the following two paragraphs.

92    Such circumstances are best not described as involving the creation of an "illusory trust", see § 5-035.

93    *Clayton v Clayton (No.1) [2016] NZSC 29; 19 I.T.E.L.R. 406* at [118]–[130] and [133]. See §§ 5-031 to 5-035.

94    *Hitch v Stone [2001] EWCA Civ 63; [2001] S.T.C. 214* at [66]; *National Westminster Bank Plc v Jones [2001] 1 B.C.L.C. 98 at [45], [58] (affd on other issues [2002] EWCA Civ 1541; [2002] 1 B.C.L.C. 55)*; *Carman v Yates [2004] EWHC 3448 (Ch); [2005] B.P.I.R. 476* at [219]; *Equuscorp Pty Ltd v Glengallan Investments Pty Ltd [2004] HCA 55; 218 C.L.R. 471* at [46]: "[sham] refers to steps which take the form of a legally effective transaction but which the parties intend should not have the apparent, or any, legal consequences"; *Hill v Spread Trustee Co. Ltd [2005] EWHC 336 (Ch); [2005] B.P.I.R. 842 at 907 (affd on other issues [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404)*; *Raftland Pty Ltd v Commissioner of Taxation [2008] HCA 21; 238 C.L.R. 516*. The position in Canada is different. There is no requirement of tortious deceit and it is enough that the parties to a transaction present it as being different from what they know it to be: *Antle v R [2010] FCA 280; 13 I.T.E.L.R. 591* at [15]–[22]. For a summary of the requirements for a trust to be held a sham, see *Bhura v Bhura [2014] EWHC 727 (Fam); [2015] 1 F.L.R. 153* at [9]; *Raja v van Hoogstraten, unreported, February 26, 2018, Ch D*, at [39].

95    *National Westminster Bank Plc v Jones [2001] 1 B.C.L.C. 98 at [45], [59] (tenancy agreement and sale of land held not to be shams) (affd on other issues [2002] EWCA Civ 1541; [2002] 1 B.C.L.C. 55)*. And see *Carman v Yates*, above, at [219]; and *Hill v Spread Trustee Co. Ltd*, above, a case of a settlement, relying on this passage. Because of the need to prove intent, a plea of sham is unlikely to be capable of determination on written evidence alone: see *Ghassemian v Tigris Industries Inc [2016] EWCA Civ 269* for a case where a finding of sham was overturned on appeal, but where the claimants were not entitled to a retrial, and their claim was dismissed, because they had agreed to a trial on written evidence at first instance.

96    *Bhura v Bhura*, above, at [9]. The court may examine external evidence such as the parties' explanations and their subsequent conduct.

<span style="color:red">858</span>

© 2026 Thomson Reuters.

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 29 of 34

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

97 *A.G. Securities v Vaughan [1990] 1 A.C. 417* at 475–476, HL, *per* Lord Jauncey; *Minwalla v Minwalla [2004] EWHC 2823 (Fam); [2005] 1 F.L.R. 771*, where the judgment relies largely on subsequent acts, and see *Rahman v Chase Bank (C.I.) Trust Co. Ltd 1991 J.L.R. 103, Jers RC*. The court should not declare a trust to be valid, relying on the presumption of validity described in *National Westminster Bank v Jones Plc v Jones [2001] 1 B.C.L.C. 98* at [59] where there is insufficient evidence about the trust assets and the history of the administration of the trust: *Re The Brazilian Trust [2018] JRC 081A* at [54], [62].

98 *Chase Manhattan Equities Ltd v Goodman [1991] B.C.L.C. 897* at 923. On the question of the relationship between the doctrine of sham and the construction of trust instruments, see §§ 5–031 to 5–035.

99 *Official Assignee v Wilson [2007] NZCA 122; [2008] 3 N.Z.L.R. 45* at [71]; *Rosebud Corporate Trustee Ltd v Bublitz [2014] NZHC 2018* at [92]. But a trust is not a sham merely because a third party controls the trustee—what is in New Zealand called the alter ego trust, see § 5-042.

100 Parties to a contract could agree to depart from its terms but continue to allow its "shadow to mask their new arrangement" as part of a pretence: *Marac Finance Ltd v Virtue [1981] 1 N.Z.L.R. 586* at 588, NZ CA, followed in *Raftland Pty Ltd v Commissioner of Taxation [2008] HCA 21; 238 C.L.R. 516* at [149], but it is hard to see how the settlor and trustees could alter the trusts by such a mere informal agreement between themselves. In *Ben Nevis Forestry v Commissioner of Inland Revenue [2008] NZSC 15; [2009] 2 N.Z.L.R. 89* at [33], it was suggested that "a document which originally records the true common intention of the parties may become a sham if the parties later agree to change their arrangement but leave the original document standing and continue to represent it as an accurate reflection of their arrangement". See too *Keach v Keach [2011] FamCA 192* at 172.9–172.11; *Lewis v Condon [2013] NSWCA 204; 85 N.S.W.L.R. 99* at [80]–[82]; *De Santis v Aravanis [2014] FCA 1243; 227 F.C.R. 404* at [55]–[65].

101 Further, on the effect of a settlor having practical control, see §§ 5-031 to 5-040.

102 *[1991] B.C.L.C. 897* at 921i.

103 *[1969] 1 Q.B. 258* at 264.

104 Nor is it undone merely because the document does not accurately record what they intended to achieve: *Pankhania v Chandegra [2012] EWCA Civ 1438; [2013] W.T.L.R. 101* (party made a tenant in common for convenience, in order to obtain a mortgage, although allegedly intended to be only a legal owner). The defendant argued that the trust was a sham. The CA held, at [22], that the declaration of trust was entered into as a convenient way for the parties to obtain a mortgage and could not be a sham as it did not involve giving a false impression of the parties' legal ownership of the property to the mortgagee or the court, and the lender was not concerned with beneficial ownership. See too *ND v SD [2017] EWHC 1507 (Fam); [2018] 1 F.L.R. 1489* at [240]–[242].

105 *Snook v London and West Ridings Investments Ltd [1967] 2 Q.B. 786* at 802D–F, CA; *R v Quillan [2015] EWCA Crim 538; [2015] 1 W.L.R. 4673* at [89].

106 *Midland Bank v Wyatt [1997] 1 B.C.L.C. 242*; *Shalson v Russo [2003] EWHC 1637 (Ch); [2005] Ch. 281* at [190]; and see two *Jersey decisions, Re Esteem Settlement [2003] JCR 092; [2004] W.T.L.R. 1* at [41]–[54]; *MacKinnon v Regent Trust Co. Ltd [2004] JRC 211; 2004 J.L.R. 477 (affd [2005] JCA 066; [2005] W.T.L.R. 1367)*.

107 *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2017] EWHC 2426; 20 I.T.E.L.R. 905* at [150(iv)] and [435]–[437]. The court found that the trustee genuinely administered the trust but had no intention independent to that of the settlor, who intended to retain ownership of the trust assets, see at [434]. See Brightwell and Richardson (2018) 24 Trusts & Trustees 398 at 403–404 as to the problematic nature of this analysis; cited with approval in *Cohen v Arbitrage Research and Trading Ltd S.A. [2021] JRC 319; 25 I.T.E.L.R. 701* at [117]–[121] (saying that it is difficult to see how the trustee's representative in *Pugachev* was indifferent to the contents of the trust when he spent so much time advising upon it). In *Cohen*, it was held that in Jersey a trustee must have a positive intention to mislead, which may be difficult to prove where the trustee was reckless or incurious as to the terms of the trust, see at [110].

108 The view was expressed in a previous edition of this work (see 17th edn at § 4–23) that a shamming intention of a settlor need not necessarily be shared by his trustees, even if parties to the declaration, for a trust to be sham (relying in part upon *Midland Bank v Wyatt*, above, at 245 and in part upon the fact that a trust is complete without any element of acceptance by the trustees, as to which see § 13-019). This possibility has not found favour with the courts: see *Shalson v Russo*, above, at [190]; *Re Esteem Settlement*, above, at [41]–[54]; but see too *Hitch v Stone [2001] EWCA Civ 63; [2001] S.T.C. 214* at [69] and [85]. It has been said that a common intention is required, but that reckless indifference on the part of the trustee will be taken to amount to the necessary intention: *A v A [2007] EWHC 99 (Fam); [2009] W.T.L.R. 1* at [52]. In *Re Reynolds [2008] NZCA 122; 10 I.T.E.L.R. 1064* at [38], reference was made to recklessness or ignorance on the part of the trustee as being tantamount to intention, but ignorance would not be tantamount to intention unless it involved a wilful shutting of eyes.

109 We suggest that the requirement that the trustees must share the intent follows not only, or perhaps not so much, from any separate legal principle, as from the need to establish the settlor's shamming intent.

110 *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*, above, at [154] and [426]–[435].

859

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 30 of 34

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

111  *Rosebud Trust Corporate Trustee v Bublitz [2014] NZHC 2018* at [97].

112  *A v A*, above, at [41]–[43]; *Fordyce v Ryan [2016] QSC 307; [2017] 2 Qd.R. 240* at [39]–[40]. In *Shalson v Russo*, above, at [190], it was said that "unless that intention (*i.e.* the intention to treat the assets as belonging to the settlor) is from the outset shared by the trustee (or later becomes shared), I fail to see how the settlement can be regarded as a sham". The words in brackets ("or later becomes shared") were questioned in *Hill v Spread Trustee Co. Ltd [2005] EWHC 336 (Ch); [2005] B.P.I.R. 842 at 910 (affd on other issues [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404)*, and must be treated as having been said *per incuriam*.

113  *Re Reynolds [2008] NZCA 122; 10 I.T.E.L.R. 1064* at [57].

114  *A v A*, above, at [42]. At [44], Munby J. canvassed the possibility that a genuine trust could be converted into a sham with the consent of all the beneficiaries. Without such consent, there would be a breach of trust as against the beneficiaries, not a revocation of the trust. See § 5–021.

115  *A v A [2007] EWHC 99 (Fam); [2009] W.T.L.R. 1* at [45]–[47]; *Board of the Pension Protection Fund v Dalriada Trustees Ltd [2020] EWHC 2960 (Ch); [2021] Pens. L.R. 9* at [214]–[216].

116  *Hill v Spread Trustee Co. Ltd*, above.

117  *Painter v Hutchison [2007] EWHC 758 (Ch); [2008] B.P.I.R. 170* at [111]–[115].

118  *Shalson v Russo*, above.

119  See *Clayton v Clayton [2015] NZCA 30; [2015] 3 N.Z.L.R. 293 at [63] (reversed in part on other grounds: [2016] NZSC 29; 19 I.T.E.L.R. 406)*.

120  *Raftland Pty Ltd v Commissioner of Taxation [2008] HCA 21; 238 C.L.R. 516* at [140]–[142]; *Coshott v Prentice [2014] FCAFC 88; 311 A.L.R. 428* at [64].

121  *Re IC Real Estate Pty Ltd [2014] NSWSC 479* at [32].

122  *A.G. Securities v Vaughan [1990] 1 A.C. 417, HL*, where a clause giving the landlord the right to introduce new occupiers, inserted solely in order to give the impression that the tenants did not have the benefit of any statutory protection, was held to be a sham.

123  *National Westminster Bank Plc v Jones [2001] 1 B.C.L.C. 98 at [45], [59] (affd on other issues [2001] EWCA Civ 1541; [2002] 1 B.C.L.C. 55)*.

124  In Australia the possibility that "where the acts and documents reflect a transaction divisible into separate parts … a transaction is a sham as to only part of the transaction" was mentioned in the context of trusts in *Raftland Pty Ltd v Commissioner of Taxation [2008] HCA 21; 238 C.L.R. 516* at [148]. It is difficult to see why, if the trusts purportedly declared of the entirety of the beneficial ownership of the settled property are a sham, other terms such as administrative provisions should be upheld unless, perhaps on special facts, the settlor and trustees intend such provisions to be valid notwithstanding their shamming intent.

125  *Commissioner of Stamp Duties (Queensland) v Jolliffe [1920] HCA 45; 28 C.L.R. 178*, but note the powerful dissent of Isaacs J., at 182–184. That dissent was treated as now representing Australian (as well as English) law in *Byrnes v Kendle [2011] HCA 26; 14 I.T.E.L.R. 299* at [13]–[18], [60]–[66] and [116], where the statement of the law in this paragraph was approved.

126  *Carman v Yates [2004] EWHC 3448 (Ch); [2005] B.P.I.R. 476* at [219]. See too *National Westminster Bank Plc v Jones [2001] 1 B.C.L.C. 98*, at [60]; *Hill v Spread Trustee Co. Ltd*, above, referring to *Hayton [2004] J.L.R. 8*.

127  *Shalson v Russo [2003] EWHC 1637 (Ch); [2005] Ch. 281* at [190].

128  See *Painter v Hutchison [2007] EWHC 758 (Ch); [2008] B.P.I.R. 170* (applying *Tribe v Tribe [1996] Ch. 107*).

129  *Re Esteem Settlement 2003 J.L.R. 188, Jers RC*, at [53(3)]; *Carman v Yates [2005] B.P.I.R. 476* at [219].

130  *Sartipy v Tigris Industries Inc. [2019] EWCA Civ 225; [2019] 1 W.L.R. 5892* at [45].

131  The circumstances in which the trustees were appointed may themselves arouse suspicion, *e.g.* the appointment may have been an attempt to defeat the creditors of the settlor, who remained the beneficial owner of the assets under the prior sham.

132  See §§ 5-034 to 5-040.

133  *Re Esteem Settlement [2003] JCR 092; [2004] W.T.L.R. 1*.

134  Settlor control may often occur with the view of benefiting the beneficiaries and thus be quite consistent with the existence of an intention on behalf of the settlor that the trust be operative: *Re Reynolds [2008] NZCA 122; 10 I.T.E.L.R. 1064* at [127].

135  *Re Esteem Settlement*, above, at [105]–[107], [122]–[124]; *Antle v R [2009] TCC 465; 12 I.T.E.L.R. 314 at [73]–[74] (agreeing with submissions relying on the statement in the text, affd without comment on these submissions [2010] FCA 280; 13 I.T.E.L.R. 591)*. Evidence of poor administration of a trust is insufficient to establish a sham, although it may show a breach of trust: *Re Reynolds [2008] NZCA 122; 10 I.T.E.L.R. 1064* at [92], [125]. In *Hill v Spread Trustee Co.*

**860**

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 31 of 34

*Ltd* above, the settlor's intention to retain "influence, perhaps even a decisive influence, on the administrative decisions" did not render the trust a sham.

On special powers of appointment, see §§ 33-017 onwards.

See §§ 14-066, 14-067 and 15-047 onwards.

See §§ 15-051 and 15-052 (and see too § 5-035A).

See §§ 28-018, 28-020.

See §§ 27-002 onwards.

See §§ 9-002 onwards.

See §§ 5-035B to 5-035J.

*Clayton v Clayton (No.1) [2019] NZSC 29; 19 I.T.E.L.R. 406* at [123]; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2017] EWHC 2426 (Ch); 20 I.T.E.L.R. 905* at [167]–[168].

*Clayton v Clayton (No.1)*, above, at [123]. See *Agnew (2021) 80 C.L.J. 18*. See too *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*, above, at [169]. For another view on what is described as the "illusory trusts doctrine", see *Bennett (2020) 51 V.U.W.L.R. 193*. Note that in the United States, the term "illusory trust" is used to describe a sham, see Scott and Ascher on Trusts (5th edn), Vol.2, § 8.2.2.

Above.

See § 15-052.

*JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev*, above, at [267]–[278].

See *Brightwell and Richardson (2018) 24 Trusts & Trustees 398 at 400–401*; and see *Brkic v White [2021] NZCA 670* at [35]. For another view, see *Akkouh and Lloyd (2018) 24 Trusts & Trustees 151*. The court's finding in the *Pugachev* case that the trustees' powers were fiduciary is at [173], [220] and [243], and see at [230] where the court accepted that the trustees' powers were subject to the supervisory jurisdiction of the court and that an improper exercise of a trustee's power could be challenged or set aside and would be a breach of trust.. The reasoning of the court was not affected by its separate finding of sham, and that reasoning gains some support from Underhill and Hayton, Law of Trusts and Trustees (20th edn), § 75.7, see *Law Society v Dua [2020] EWHC 3528 (Ch); [2021] W.T.L.R. 1469* at [143]. And the decision was followed (in relation to a differently worded trust instrument) in *Webb v Webb [2017] CKCA 4* at [52]–[65] but not mentioned in the judgments in the Privy Council affirming the decision at *[2020] UKPC 22; [2020] W.T.L.R. 1461*. The Pugachev case was considered in *Moorgate Industries UK Ltd v Mittal [2022] EWHC 3009; [2023] B.P.I.R 476* at [165]–[182],where somewhat similar views to those in the *Pugachev* case were expressed in relation to a protector who had extensive powers under the terms of a trust, though the court in the *Mittal* case did not go the extent of saying that the true effect of the trust was that the protector was the absolute beneficial owner of the trust property. On the *Pugachev* case, see too *Davies [2018] Conv. 175*.

*Law Society v Dua*, above, at [139]–[168]. The court initially considered the matter on the footing that the settlors had power to nominate themselves as beneficiaries, but then went on to decide that there was no such power.

*Law Society v Dua*, above, at [157(1) and (2)], [158].

See §§ 33-002 to 33-016.

See §§ 33-089 to 33-107.

*[2011] UKPC 17; [2012] 1 W.L.R. 1721*.

At [9]. That the validity of the settlement was common ground was unsurprising since Cayman statutory law applicable to the settlement provided that the reservation to the settlor of a trust of a power of revocation did not invalidate the trust, see Trusts Act (2021 Revision), ss.14(1)(a), 112.

At [27]–[65], especially [60]–[61].

*[2016] NZSC 29; 19 I.T.E.L.R. 406*.

At [39]–[42].

At [43]–[68].

At [69]–[97].

At [99]–[107].

At [110]–[117].

At [118]–[127].

At [124].

At [125]. The Supreme Court said that there was nothing in the Privy Council's decision in the *TMSF* case to indicate that the trust was invalid before the exercise of the power of revocation. That somewhat understated the Privy Council's position since the decision was reached on the basis that the trust was valid (see sub-paragraph (1) above) and the order

**861**

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 32 of 34

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

made by the Privy Council would have made no sense had the trust been invalid since the settlor would have been the absolute beneficial owner without there being any valid trusts subject to a power of revocation. In *White v Brkic [2021] NZHC 919; [2021] 3 N.Z.L.R. 490* at [16] the court favoured the view that a trust reserving to the settlor powers tantamount to ownership was a defeasible trust valid until the powers were exercised so as to bring the trust to an end (affd sub nom. *Brkic v White [2021] NZCA 670* referring to the point at [12] but expressing no view on it).

*[2020] UKPC 22; [2020] W.T.L.R. 1461* at [68]–[90] (judgment of Lord Kitchin, with which other members of the Board agreed (see beginning of judgment and [111]). For consideration of this case, see *Bennett (2020) 51 V.U.W.L.R. 193; Agnew (2021) 80 C.L.J. 18*; Underhill and Hayton, Law of Trusts and Trustees (20th edn), §§ 8.5–8.7.

At [89].

At [89], referring to judgment of Cook Islands CA *[2017] CKCA 4* at [55].

At [89].

At [89]. For other indications that the PC thought that it was deciding a question of validity of the trusts, see at [69], [73]–[74], [76], [86] and [90]; but note that at [87] the PC appeared to consider that the issue was whether the trusts had either failed (*i.e.* were invalid) or were defeasible (*i.e.* defeasible in the sense referred to in the *Clayton* case, above, at [125] as being trusts reserving powers to the settlor tantamount to ownership which were valid until the trust was brought to an end).

See the *Clayton* case, above, at [118]–[127], especially [124]–[125], and sub-paragraph (2) above. In *Brkic v White*, above, at [18] it was contended that the PC in the *Webb* case had answered the question in favour of invalidity, but the CA was astute to avoid saying whether it agreed with that contention, and instead decided the case on the ground that the settlor in *Brkic v White* had not reserved powers tantamount to ownership. By contrast, the court in *Law Society v Dua [2020] EWHC 3528 (Ch); [2021] W.T.L.R. 1469* at [144]–[149], made no reference to the *Clayton* case and thought that the *Webb* case was an illustration of what it called an "illusionary" trust.

*Webb v Webb*, above, at [77]–[78]. On the treatment of the *TMSF* case in the *Webb v Webb* case, see too *Gayhart v Schank unreported, August 14, 2020, Cayman GC* at [30].

See § 5-035D.

See § 5-035E.

See §§ 5-035F to 5-035H.

See §§ 5-035I and 5-035J.

*JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2017] EWHC 2426 (Ch); 20 I.T.E.L.R. 905*. See § 5-035A.

At [278].

See § 5-035B.

*Re Watts [1931] 2 Ch. 302*; considered in *Re Churston's Settled Estates [1954] Ch. 334* at 341–344; *Re Earl of Coventry's Indentures [1974] Ch. 77* at 87–88, 91–92. See too *Re Triffitt's Settlement [1958] Ch. 852* at 861, drawing a distinction between general powers exercisable without any restrictions which are tantamount to ownership and powers restricted by a consent requirement or other limitation on the scope of the power which are not.

In *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co. (Cayman) Ltd [2011] UKPC 17; [2012] 1 W.L.R. 1721* there was such a consent requirement, see at [12], but there was no suggestion that it prevented the settlor's power of revocation being tantamount to ownership. As to the *TMSF* case, see § 5-035B(1).

*Law Society v Dua [2020] EWHC 3528 (Ch); [2021] W.T.L.R. 1469* at [156]–[158].

*Brkic v White [2021] NZCA 670* at [27] onwards.

*Webb v Webb [2020] UKPC 22; [2020] W.T.L.R. 1461* at [84]. See too § 46-073.

*Clayton v Clayton (No.1) [2016] NZSC 29; 19 I.T.E.L.R. 406* at [50]–[58].

*Re Churston's Settled Estates [1954] Ch. 334* at 344–347; *Re Earl of Coventry's Indentures [1974] Ch. 77* at 90–93. These cases were about the rule against perpetuities. The reasoning in these cases, especially the second, supports the view that the joint donees of general powers are not to be treated as just one person for the purpose of determining whether a donee of the power has a power tantamount to ownership.

*Law Society v Dua*, above, at [156], [157(c)] and [158].

Sugden on Powers (8th edn) (of which Lord St Leonards was the author), p.396, cited in *Clarkson v Clarkson [1994] B.C.C. 921*, CA (a case concerning the meaning of property in an insolvency context) by Hoffmann L.J. at 931; and further cited in *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co. (Cayman) Ltd [2011] UKPC 17; [2012] 1 W.L.R. 1721* at [41]; and *Webb v Webb [2020] UKPC 22; [2020] W.T.L.R. 1461* at [77]. Note that Lord St Leonard's extra-judicial statement was made in the context of a discussion of how the rule against perpetuities applies at common law to general and special powers of appointment (as to which see §§ 6-114 and 6-115). Elsewhere in his work, Lord St Leonards considered that, in a trust context, a general power of appointment would "of course" not give

862

Section 3. - Trusts Held to be Shams and Settlor Control, UKBC-LEWINTR 492587582...

Case 1:24-cr-00239-CKK-MAU    Document 119-8    Filed 03/02/26    Page 33 of 34

the donee of the power an absolute interest though he may acquire it by an exercise of the power, see work cited, p.104; and nothing that Lord St Leonards said in his work about the reservation to the settlor of a power of revocation, whether or not coupled with the reservation of a general power of appointment, lends any support to the view that reservation of such a power invalidates a trust, see work cited, pp.372, 376 and 387–388.

188  *Clayton v Clayton (No.1)*, above, at [124] (second sentence).

189  On the nature of absolute beneficial interests, see §§ 1-036 onwards. A gift by the settlor to another absolutely is not necessarily a gift of an absolute beneficial interest since the settlor may, upon the true construction of the trust instrument, intend that other to take as trustee for beneficiaries chosen by the settlor, not as sole beneficial owner, see § 5-005.

190  *Re Churston's Settled Estates [1954] Ch. 334* at 344.

191  *Clayton v Clayton (No.1)*, above, considered in § 5-035B(2); *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2017] EWHC 2426 (Ch); 20 I.T.E.L.R. 905*, considered in §§ 5-035A and 5-035D; and *Webb v Webb [2020] UKPC 22; [2020] W.T.L.R. 1461*, considered in § 5-035B(3).

192  See § 33-089, but *cf.* § 33-089A.

193  *Re AQ Revocable Trust [2010] SC (Bda) 40 Civ; 13 I.T.E.L.R. 260*.

194  *Clayton v Clayton (No.1)*, above, at [124] (third sentence); *Webb v Webb*; *Re AQ Revocable Trust [2010] SC (Bda) 40 Civ; 13 I.T.E.L.R. 260*, above, at [89] (though the powers conferred in that case on the settlor as original trustee were not freed from fiduciary obligations to a sufficient extent for them to count as powers tantamount to ownership, see at [84] and § 5-035E, and so it is unclear why the point about irreducible core trustee obligations was considered to be relevant in that case). On the irreducible core of trustee obligations, see *Armitage v Nurse [1998] Ch. 241* at 253, CA.

195  *Clayton v Clayton (No.1)*, above, at [124] (fourth sentence). This might be explained as a covenant to settle the trust property on a future event, which may be valid at least as long as the settlor and trustee are different persons.

196  See §§ 1-014 to 1-016.

197  *Cock v Cooke (1866) L.R. 1 P. & D. 241* at 243, *per* Sir John Wilde (later Lord Chelmsford), see Theobald on Wills (19th edn), §§ 1-003 and 1-004; and see in this text §§ 5-039, and 10-095 (concerning joint bank accounts). The statement of the law in what is now (with some modifications and additions) §§ 1-014 to 1-016, this paragraph and §§ 5-038 to 5-039 was approved in *Re AQ Revocable Trust [2010] SC (Bda) 40 Civ; 13 I.T.E.L.R. 260* at [9] and [17].

198  As to powers of revocation, see §§ 33-089 onwards.

199  *MacInnes v MacInnes [1935] 1 D.L.R. 401*, Can SC (nomination under employment savings fund) distinguished but approved in *Baird v Baird [1990] 2 A.C. 548*, PC; *Re Pfrimmer Estate [1936] 2 D.L.R. 123*, Manitoba CA; followed in the cases noted in Waters, The Law of Trusts in Canada (5th edn), pp.212–213; and applied *Western Smallwear & Stationery Co. Ltd v Bell (1966) 55 D.L.R. (2d) 193*, Manitoba CA.

200  Scott and Ascher on Trusts (5th edn), Vol.1, § 8.2.2.

201  *Baird v Baird*, above, at 556, discussing the exercise of a revocable power of appointment under a lifetime settlement, and making the point that not every revocable instrument creating interests taking effect on death is necessarily a will.

202  *Baird v Baird*, above.

203  As to powers of revocation, see §§ 33-089 onwards.

204  *Tompson v Browne (1835) My. & K. 32*, especially at 35–36 per Pepys M.R.; cited in *Jeffries v Alexander (1860) 8 H.L.C. 594*, especially at 611.

205  *National Shawmut Bank of Boston v Joy 315 Mass. 457, 53 NE 2d 113 (1944)*.

206  See §§ 5-031 to 5-035J.

207  See § 5-036.

208  As to revocation (and revival) of wills, see Theobald on Wills (19th edn), Chap.7.

209  Administration of Estates Act 1925, s.32(1). See §§ 33-015, 33-016.

210  *Re Pattinson (1885) 1 T.L.R. 216*; *Russell v Scott [1936] HCA 34; 55 C.L.R. 440*; *Young v Sealey [1949] Ch. 278*; *Re Figgis [1969] 1 Ch. 123*; *Lynch v Burke and Allied Irish Bank (1995) unreported, Ir. SC, reversing the decision below reported [1990] I.R. 1 and overruling Owens v Greene [1932] I.R. 225, Ir. SC*. See *Aroso v Coutts & Co. [2001] EWHC 443 (Ch); [2002] 1 All ER (Comm) 241* at [26] onwards on the application of the principle to a case where the joint account includes securities as well as cash.

211  e.g. THE BAHAMAS: Trustee Act 1998, s.3; BERMUDA: Trusts (Special Provisions) Act 1989, s.2(3) (on which see *Re AQ Revocable Trust [2010] SC (Bda) 40 Civ; 13 I.T.E.L.R. 260* at [17]); BRITISH VIRGIN ISLANDS: Trustee Act 1961, s.86 (revised edn, 2021); CAYMAN ISLANDS: Trusts Law (2021 Revision), ss.13, 14; 112; GUERNSEY: Trusts (Guernsey) Law 2007, s.15; JERSEY: Trusts (Jersey) Law 1984 (revised edn, 2019), art.9A.

212  See §§ 5-035B to 5-035J.

<span style="color:red">863</span>

There are limited prospects of the decision in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2017] EWHC 2426 (Ch); 20 I.T.E.L.R. 905* that no trust was created as a matter of construction, (as to which see § 5-035A), being followed in a jurisdiction with such statutory provisions.

See *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co. (Cayman) Ltd [2011] UKPC 17; [2012] 1 W.L.R. 1721*, considered in § 5-035B(1).

*Welsh Development Agency v Export Finance Co. Ltd [1992] B.C.L.C. 148* at 160, CA. See too *Re Curtain Dream Plc [1990] B.C.L.C. 925*. In *Hadjiloucas v Crean [1988] 1 W.L.R. 1006* at 1019, CA, Mustill L.J. drew a similar distinction between "an agreement or series of agreements which are deliberately framed with the object of deceiving third parties as to the true nature and effect of the legal relations between the parties" and the situation where "the document does precisely reflect the true agreement between the parties, but where the language of the document (and in particular its title or description) superficially indicate that it falls into one legal category, whereas when properly analysed in the light of surrounding circumstances it can be seen to fall into another". See too *Chase Manhattan Equities Ltd v Goodman [1991] B.C.L.C. 897* at 921–922.

See §§ 1-014 to 1-018.

As to which, see §§ 5-003 to 5-019.

*[1997] 1 B.C.L.C. 242*.

See § 1-028. See too *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2017] EWHC 2426 (Ch); 20 I.T.E.L.R. 905* at [267]–[278].

See §§ 1-014 to 1-018.

*R. v Allen [1999] S.T.C. 846 at 872g, CA (appeal dismissed [2001] UKHL 45; [2002] 1 A.C. 509, without consideration of any issues relevant to shams)*, contrast as to bearer shares *Re the Holmaengen Trust (1998) 1 I.T.E.L.R. 901, Manx SGD*. See too *Re Exeter Settlement [2010] JRC 012*.

*Wily v Fuller [2000] FCA 1512*.

*Public Trustee v Smith [2008] NSWSC 397; 10 I.T.E.L.R. 1018* at [119]–[120]. See too *Re Reynolds [2008] NZCA 122; 10 I.T.E.L.R. 1064* at [70]–[72] (alter ego arguments may provide evidence of a sham).

*Petrodel Resources Ltd v Prest [2013] UKSC 34; [2013] 2 A.C. 415* at [28], [35], [61], [81].

*Petrodel Resources Ltd v Prest*, above, at [28], *per* Lord Sumption JSC.

The proper ambit of the sham doctrine in connection with trusts has not been established at Supreme Court level, where it might be possible to advance the broader view that the notion of "sham" should be equated directly with non-effectiveness: see *Brownbill, When is a sham not a sham? (1993) 2 J.T.C.P. 13*, arguing that a finding of sham is equivalent, in the trust context, to a lack of certainty of intention; and McFarlane and Simpson, Tackling Avoidance, Chap.8 in "Rationalizing Property, Equity and Trusts: Essays in Honour of Edward Burn", 2003, arguing that the sham notion should similarly not be associated with fraud, but should simply be the other side of the coin from an effective transaction. By way of contrast, see *B v X [2011] NZHC 2117; [2011] 2 N.Z.L.R. 405* at [72], where it was said that sham is part of the common law of fraud, and the question whether a trust is a sham is not resolved by the law of equity.

For an application of the evasion principle, see *Akhmedova v Akhmedov [2018] EWFC 23; [2018] 3 F.C.R. 135* at [51]–[57].

See § 42-043.

As to which, see §§ 27-002 onwards.

See Art.8(1) of the Rome Convention on the Law Applicable to Contractual Obligations, which provides that "the existence and validity of a contract, or of any term of a contract, shall be determined by the law which would govern it under this Convention if the contract or term were valid".

See §§ 12-066 onwards, 12-143. In *Minwalla v Minwalla [2004] EWHC 2823 (Fam); [2005] 1 F.L.R. 771*, the question whether a Jersey law trust was a sham was determined by reference to English law without any consideration being given to whether English law was the applicable law. The Jersey RC was critical, rightly in our view, of the English court in *Minwalla v Minwalla*, for applying English law to the sham issue: *C.I. Law Trustees Ltd v Minwalla [2005] JRC 099; 9 I.T.E.L.R. 601* at [17].

See §§ 11-088 and 51-024.

---

**End of Document**

© 2026 SWEET & MAXWELL

**864**