# Defense Exhibit 6

**UNITED STATES SENTENCING COMMISSION**
1331 PENNSYLVANIA AVENUE, NW
SUITE 1400
WASHINGTON, D.C. 20004
(202) 662-8800



## MEMORANDUM

To:        All Commissioners
           Legal and Research Staff

From:      Suzanne B. Conlon

Subject:   Chapter III of the Draft Guidelines

Date:      July 25, 1986


This memorandum summarizes problems identified and alternatives suggested by various Commissioners and staff concerning Chapter III of the June 24th and July 10th draft guidelines.

## INCHOATE HARMS

## THREATENING HARM

PROPOSALS: (1) Incorporate threatening harm in Chapter II base harm values for offenses which include threatening behavior as an essential element.
(2) Include threats as a generic offense in Chapter II, with appropriate modifiers, to reflect various federal threat offenses.
(3) Eliminate threatening harm as a separate Chapter III adjustment.

COMMENTS: The current draft treats threats of harm as an "add on" to total harm value for an offense. The harm value of a given threat is determined by multiplying .1 times the Chapter II value of the type of harm threatened. For example, the value of a death threat would be calculated by multiplying .1 x 450, the Chapter

1

**Defense Exhibit 6-1**

II value for death. Currently, there are six additional personal harm values listed in Chapter II: permanent incapacitation at 300, permanent serious bodily injury at 250, serious bodily injury at 150, bodily injury at 50, painful contact at 20, and unlawful contact at 10. The classification of the particular type of harm threatened is determined by "the victim's reasonable belief as to the harm possibly to follow," unless the harm is explicitly stated or written.

This approach complicates the analyses of sentencing factors in the following ways: (1) by unduly compounding harm values with an "add on" threat factor for violent offenses which always include threatening behavior as an essential element, (2) by using subjective standards of personal harm with a wide range of mathematical values to categorize threatening verbal and non-verbal conduct, (3) by inviting subjective and disparate treatment of similiarly situated offenders whose threats are ambiguous or unarticulated, and (4) by failing to address offenses which are completed when the threat is made.

Threats of bodily harm are implicit in all crimes of violence and should therefore be reflected in the base harm value for such offenses. For example, even an unarmed bank robbery must be attempted or committed by force and violence, or by intimidation. 18 U.S.C. 2113(a). The base harm value for bank robbery should incorporate threatening behavior, with aggravating modifiers which increase harm value (or sanction units) if a dangerous weapon or device is used or if physical injury is caused. The same principle could be applied to assault, kidnapping, air piracy and other violent crimes. This approach would eliminate the subjective classifications and mathematical calculations of the present draft, while reducing the potential for double counting threats inherent in violent conduct.

Moreover, oral and written threats are frequently made in ambiguous language. Non-verbal threatening behaviour is usually susceptible to different interpretations of the specific harm threatened. Serious mathematical differences in harm value flow from the categorization of the type of threatened harm perceived. Since this determination would materially affect the calculation of total sanction units, disputed issues of fact and reasonable inferences to be drawn from ambiguous or unarticulated threats are likely. For example, in an extortionate credit case, the offender need not (and usually does not) specify the harms which will befall the "juice" victim or his family if he fails to repay the loan. The extortionate credit statute defines extortion as "the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property" of any person in the collection of a debt. 18 U.S.C. 891. The offender's reputation in the community and menancing demeanor when specifying the terms of repayment may be sufficient

2

**Defense Exhibit 6-2**

to subjectively convey a threat of death or bodily harm. By using "the victim's reasonable belief as to the harm which could possibly follow" as the basis for determining the categorization of threatened harm, testimony from victims concerning the level of fear they experienced would be necessary. Victims may be subjected to rigorous cross-examination concerning the reasonableness of their fear. For example, the offender may have said he would "pay a visit" to the victim's family if the debt was not timely repaid. Is this threat one of death, permanent incapacitation, permanent serious bodily injury, serious bodily injury, bodily injury, painful contact or unlawful contact? Or could the statement be reasonably construed as a business visit to collect a past due debt?

The present Chapter II harm tables do not address threats as substantive offenses. There is a broad range of federal threat offenses falling in different felony classes. For example, threatening foreign officials or official guests carries a maximum prison sentence of six months (18 U.S.C. 112), threatening the president or his successor carries a possible five year sentence (18 U.S.C. 871), threatening to kidnap or injure for ransom or reward has a potential 20 year sentence (18 U.S.C. 875), and a threat of violence affecting commerce also has a maximum 20 year sentence (18 U.S.C. 1951). It is therefore suggested that threats be added as a generic crime to Chapter II, with unique modifiers to encompass the foregoing statutory variations of victims to be protected and societal interests to be preserved.

## RISK OF HARM

PROPOSALS: (1) Incorporate risk of harm in Chapter II base harm values for offenses that always involve a risk of physical harm.
(2) Eliminate risk of harm as a separate Chapter III adjustment.

COMMENTS: The current draft also treats creation of a risk of harm as an "add on" to total harm value for an offense. A threshold determination must be made as to whether the conduct involved presented a "substantial risk" (defined as a significant probability of harm), a "risk" (defined as more likely than not to cause harm), or a "minor risk" (defined as a possibility of harm). The subjective categorization of a risk then determines the mathematical multiplier to be used: .4 for substantial risks, .3 for risks, and .2 for minor risks. [Alternatively, the Efficient Crime Control Group has proposed the following levels of risk and multipliers: "extreme risk," .7, "large risk," at .4, "substantial risk," at .3, "risk," at .2, and "minor risk," at .1.]

**Defense Exhibit 6-3**

Special rules apply under the current draft if a weapon is used to create the risk. If a deadly weapon is "brandished," a risk of death is created. If a firearm is discharged or a knife or similar weapon "is thrust at a person from a close range," a substantial risk of death is created.

The approach in the current draft and the proposals of the Efficient Crime Control Group are dependent not only on the subjective choice of risk level but also upon the often precarious and conflicting observations of eyewitnesses to stressful occurences. This poses the same problems of disputed facts and inferences as the categorization of threats discussed above.

After the level of risk has been categorized as "substantial," ordinary or "minor," [or "extreme," or "large" under the alternative proposal], the type of risk created must be selected from the seven categories of personal harms listed in Chapter II. As with the consequences of selecting the harm threatened discussed above, these range from death at 450 harm units to unlawful contact at 10 harm units. Given the range of multipliers and personal injury harm values, there is a considerable variation of numerical possibilities which may result from perceptive and judgmental differences in similar cases. The risk and bodily harm definitions are inherently imprecise and do not lend themselves to reliable or consistent measurement and application. Subjective and disparate treatment of similarly situated offenders is almost inevitable under the approach in the current draft. Risk of personal harm is implicit in all violent crimes and should be reflected in the base harm value for such offenses. Infliction of actual harm could then be reflected in aggravating modifiers.

An additional problem with treating risk of harm as a generally available adjustment is that it invites creative misapplication of this adjustment. For instance, in narcotics cases there is always some risk of physical harm; violations of regulatory statutes may produce a risk of harm; financial crime cases may create a risk of harm to banks or other institutions; corruption cases produce a risk of harm to the integrity of governmental functions; and tax evasion cases may produce a risk of harm to the stability and continuance of government. These risks might be used as "add ons" to inflate sanction units. On the other hand, offenders may claim that their conduct only created a risk of harm and seek a reduction in the harm value for the underlying conduct (e.g., fraud, corruption, narcotics) by using a substantial downward risk multiplier.

Almost every criminal offense produces some risk of harm to a public or private interest. Those risks are in large measure offense specific and are more appropriately captured in Chapter

**Defense Exhibit 6-4**

II base harm values.

## CONSPIRACY, ATTEMPT AND SOLICITATION

PROPOSALS: (1) Where a substantive federal offense specifically

includes conspiracy, attempt or solicitation provisions, incorporate these "inchoate" forms of the offense with the Chapter II harm value listed for the substantive offense, or with a modifier which reflects legislative intent and offense severity considerations.
(2) Include Chapter II base harm value provisions for all other conspiracy, contempt and solicitation offenses.
(3) Include in Chapter II a policy statement or rule addressing the treatment of conspiracy, attempt or solicitation offenses where there is also a conviction for the offense which is the object of the conspiracy, attempt or solicition.
(4) Eliminate conspiracy, attempt, solicitation and renunciation as Chapter III adjustments.

COMMENTS: The present draft treats all conspiracy, attempt and solicitation offenses alike without regard to the underlying substantive offense, or the reason why the substantive offense was not successfully completed, or legislative intent and public policy. A .5 multiplier (or 50 per cent reduction) is used to adjust the harm value of the incompleted offense without regard to any of these considerations.

Congress has recognized that aggravated societal harms flow from attempts, solicitations and conspiracies to commit certain crimes, and has authorized that such unsuccessful or uncompleted criminal ventures be punished to the same extent as if the crime had been successfully executed. Many of the offenses following this pattern involve the planning of violent crimes or offenses that undermine the fabric of our society, such as corrupt activities of public officials. Deterrence and incapacitation, as well as appropriate punishment, should be sentencing goals for these offenses. The following statutory patterns illustrate this legislative judgment and the public policy implications involved.

The federal bribery statute treats the solicitation of a bribe by a public official the same for purposes of punishment as if he had accepted or received the bribe. 18 U.S.C. 201(c) [15 year maximum sentence for either soliciting or accepting a bribe]. There is a serious harm to society whenever a public official corruptly solicits a bribe or gratuity. Bribery is not a property crime for which the harm is gauged by moneys actually

5

**Defense Exhibit 6-5**

paid or received. Solicitation of bribes undermines the integrity of government and its functions and destroys public confidence in government processes and officials. Bribery cases are not frequently prosecuted without the cooperation of an insider or the person who was solicited to pay the bribe unless there is an undercover operation involved. Many prosecutions result from the fact that the corrupt public official fortuitously solicited a bribe from an honest person or a dishonest one with self-interest in reporting the solicitation to the authorities. The bribery attempt or solicition is often confirmed in a recorded conversation. Thus the act of bribery may well not come to fruition because of circumstances entirely irrelevent to the public official's corrupt intent and conduct. Nevertheless, the current draft would give a public official a 50 per cent reduction in harm value simply because his corrupt scheme did not succeed.

Similarly, a person who attempts or conspires to violate the federal narcotics laws is explicitly subject to the same punishment prescribed for the drug offense itself. 21 U.S.C. 846. By application of this provision, a kingpin in a narcotics operation who is charged with conspiring to distribute heroin is subject to the same maximum jail sentence as the street dealer who actually distributes heroin for him. By application of the current draft, the harm value for the conspirator would be 50 per cent less than that of the street dealer, whose sentence would be further aggravated under the current approach by the likelihood that his apprehension involved a seizure of narcotics. The drug worksheet would factor in the weight and purity of the seizure. The kingpin, on the other hand, is unlikely to have been the subject of a narcotics seizure. The evidence against him would more likely be in the nature of electronic surveillance, historical testimony about conspiratorial activities, such as trips to Mexico, physical surveillance of suspicious activities, informant testimony about past dealings and unexplained wealth. In short, the 50 per cent reduction for conspiracies involving narcotics offenses is contrary to the intent of Congress and public policy with respect to the severe harm inflicted upon society by narcotics conspiracies.

Attempted piracy of an aircraft is also treated identically to successful hijackings for purposes of punishment. 49 U.S.C. 1472 provides that a person convicted of either committing or attempting to commit aircraft piracy shall be imprisoned not less than 20 years. A person who unsuccessfully attempts to take over control of an aircraft by use of force, violence or intimidation, presents a serious risk to life and public safety which Congress implicitly believed should be severely punished. Giving such a person a 50 per cent harm value reduction because his hijacking attempt is thwarted by prompt and effective law enforcement

6

**Defense Exhibit 6-6**

efforts or bravery by  the flight crew or passengers does not comport with this intent or the underlying public policy that such  conduct should be severely punished.

Assassination attempts on the president and his successors are punishable by any term of imprisonment up to life. 18 U.S.C. 1751. To reward a bad shot or a would-be assassin with a 50 per cent reduction in harm value for his failure is antagonistic to the legislative intent that violent attempts to disrupt the demoncratic processes of government must be severely punished. Similarly, the current draft would substantially reward the would-be assassin for the bravery of a Secret Service agent who intercepts the assassination attempt.

Conspiracies by nature involve premeditation, planning and concerted action. The harm to society by organized criminal ventures may be more significant with respect to certain offenses than individual criminal activity. For example, a conspiracy to violate civil rights [18 U.S.C 241] is punishable by ten years imprisonment,twice the maximum term under the general conspiracy statute [18 U.S.C. 371] and ten times the maximum penalty for an individual who deprives  another of his civil rights [18 U.S.C. 242].

The foregoing statutes suggest that not all conspiracy, attempt and solicitation offenses should receive the same generalized approach. Careful consideration must be given to the object of the unsuccessful criminal venture and legislative distinctions drawn for certain types of offenses. A general "inchoate" offense section could be added to Chapter II to cover all other cases with appropriate harm value modifiers.  A distinction should be drawn by rule or policy statement in cases where the only  offense of conviction is conspiracy or solicitation, since Congress has directed the Commission to take into consideration the general inappropriateness of imposing consecutive sentences for conspiracy or solicitation and for the offense which was the sole object of the conspiracy or solicitation. 28 U.S.C. 994(1)(2).

<u>RENUNCIATION</u>

PROPOSAL: (1) Eliminate renunciation as a Chapter III adjustment.

COMMENTS: The July 10th draft provides a .3 adjustment (or a 70 per cent reduction in harm value) for cases in which the offender "renounces." "Complete renunciation," "renunciation," and "voluntary renunciation" are defined in the draft. The use of renunciation as a sentencing adjustment presents serious concerns.

7

**Defense Exhibit 6-7**

Renunciation, which is usually expressed as "withdrawal" in conspiracy case law and jury instructions, is a complete defense to a conspiracy charge, provided that the defendant establishes by affirmative acts that the conspiracy was terminated or that he had withdrawn from it. Hyde v. United States, 225 U.S. 347 (1912); United States v. Gillen, 599 F.2d 541 (3d Cir.), cert. denied, 100 S.Ct. 137 (1979). Mere cessation of activity with later claims of withdrawal is not enough. United States v. Goldberg, 401 F.2d 644 (2d Cir. 1968), cert. denied, 393 U.S. 1099 (1969). The objective standard to be applied in determining whether a defendant withdrew from an uncompleted criminal plan is the proof of "[a]ffirmative acts inconsistent with the object of the conspiracy .... communicated in a manner reasonably caluculated to reach co-conspirators." United States v. U.S. Gypsum Co., 438 U.S. 422, 464 (1978). Similarly, the federal solicitation statute dealing with violent crimes provides that "voluntary and complete renunciation" of criminal intent under circumstances where "the defendant prevented the commission of the crime solicited" is an affirmative defense to solicitation charges. 18 U.S.C. 373.

The 70 per cent renunciation adjustment in the draft guidelines is apparently addressed to situations where the offender failed to show, by a preponderance of evidence, that he withdrew from a criminal venture and acted in a manner inconsistent with the objectives of the criminal plan. Ordinarily, the best evidence of withdrawal or renunciation in a conspiracy context is the contacting of law enforcement officials or others who are in a position to prevent the successful commission of the planned crime. There is little doubt that such unequivocal conduct would affirmatively establish an abandonment of criminal intent and participation in a scheme, thereby providing an affirmative defense to a prosecution for participation in the earlier stages of the conspiracy. Prosecution is unlikely of a person who actively prevents the commission of a crime or otherwise voluntarily cooperates with law enforcement authorities before a criminal plan is implemented. Culpable persons who abandon uncompleted criminal ventures to become informants or "cooperating individuals" and materially aid in the detection, investigation and prosecution of more culpable individuals are ordinarily not prosecuted themselves. However, even when they are prosecuted, they are generally charged pursuant to a pre-indictment agreement which gives them some recognition for their cooperation. These benefits are often conferred in the form of a charge-bargain which reduces the number or severity of the violations charged and/or an agreement that the United States Attorney's office will inform the sentencing judge and the probation office conducting the presentence investigation of the extent of the defendant's cooperation. In sum, the persons deserving of the 70 per cent

8

**Defense Exhibit 6-8**

reduction in harm value for "renunciation" are not in need of that benefit. By application of adjustments for guilty pleas and cooperation, offenders who "renounce" criminal ventures can continue to receive appropriate incentives and recognition.

The availability of this substantial reduction in the current draft, however, invites application where it is unwarranted as a matter of law and public policy. Any offender involved in a criminal venture not reaching fruition may later claim that he had decided not to go through with it. Absent objective evidence of abandonment or communication of his renunciation to law enforcment officials, the application of the 70 per cent discount would virtually nullify the consequences of his conviction. This nullfication of punishment could be based upon nothing more than a belated, self-serving assertion of a mental state inconsistent with the evidence which established his earlier participation in criminal activity beyond a reasonable doubt. The legal standards for recognition of withdrawal or renunciation as a defense are based upon sound legal principles. Where there is proof beyond a reasonable doubt that an offender participated in a criminal venture, he should not be relieved of culpability for his conduct unless he meets the applicable legal standards. The current draft provides just such a nullification of these sound legal principles.

### CALCULATION OF AGGREGATED HARM VALUE FOR MULTIPLE RELATED HARMS

PROPOSAL: Reexamine the current sections of Chapters II, III and V pertaining to merger of harms, calculation of aggregated harm value and consolidated sentences, if pending proposals to revise Chapters II and III are approved by the Commission.

COMMENTS: Chapter II of the current draft includes seven general rules relating to the merger of harms. Chapter III includes criteria for multiple related harms, calculation of aggregated harm value and multiple related harms with different Chapter III adjustments. A multiple related harms table prorates harm value points from 1.0 for the "largest" harm value to .000003 for the "sum of 30,001st through 100,000th" harm value. Chapter V includes rules for imposition of sentences in multi-count cases.

If the Commission decides to modify Chapters II and III, the foregoing provisions should be reexamined. There are a number of options for simplification and clarification of these rules which might be practicable if the format of Chapter II were modified and some of the harm adjustments now in Chapter III were incorporated into the base harm values of Chapter II. For example, it might be possible to determine the total sanction

**Defense Exhibit 6-9**

units applicable to a particular offense after appropriate mitigating or aggravating adjustments are made and to have general rules which govern imposition of concurrent and prorated consecutive sentences for multiple count indictments. The current approach basically requires the totalling up all adjusted harms values, the conversion of the total harm values to sanction units, the determination whether the harms are "related," and if so, application of the aggregate multiplier. After all these mathematical calculations are made, then the sentencing judge is required to allocate sanction units to each count of the indictment [without regard to the particular harms caused by the offense which is the subject of each count] in order to avoid the prohibition against general sentences. In their present form, these multi-step procedures are difficult to follow in a consistent, reasoned fashion.

## REDUCED CULPABILITY: RECKLESS, NEGLIGENT, BLAMELSS CONDUCT OR MISTAKE

PROPOSAL: Incorporate reckless, negligent, and blameless conduct and mistake as to lawfulness of conduct in Chapter II base harm values.

COMMENTS: Most criminal offenses require proof beyond a reasonable doubt that the offender acted knowingly and willfully in committing the acts charged. Many federal offenses additionally require proof beyond a reasonable doubt that the offender entertained a specific intent to cause the harm charged (e.g., fraud, corruption). Credible evidence that the offender acted recklessly, negligently, mistakenly or was "blameless" would negate an essential element of most federal criminal offenses. However, these concepts of reduced culpability are applicable to a limited number of offenses (such as manslaughter and some strict liability and regulatory offenses). It is therefore suggested that the concept of reduced culpability be factored into the relatively lower base harm values for these offenses in Chapter II. This would avoid confusion and eliminate the potential for misapplication of these factors as adjustments for criminal cases where they are not applicable.

## EXTREME INDIFFERENCE, GRATUITOUS INJURY AND HEINOUS HARM

PROPOSALS: (1) Prepare a policy statement permitting allocation of all sanction units to imprisonment in unusual cases

**Defense Exhibit 6-10**

where the offender uses extreme brutality in the commission of an offense.
(2) Eliminate the extreme indifference adjustment in Chapter III.

COMMENTS:  The base harm value for violent crimes, with aggravating modifiers for causing death, bodily or psychological injury, should produce adequate sentences in most situations (murder, kidnapping, air piracy, armed robbery, etc.). A policy statement could give the sentencing judge discretion, in cases involving extremely aggravated conduct, to allocate all sanction units to imprisonment.

The present draft applies a 1.3 harm value multiplier to all situations where the sentencing judge may be subjectively offended by the manner in which a crime was committed. From some perspectives, any intentional infliction of emotional, physical, or financial distress would warrant this upward adjustment. However, the harm values should reflect the nature of the conduct. Outrageous conduct should justify allocation of all sanction units to incarceration for purposes of incapacitation and punishment.

The danger inherent in drafting guidelines to apply to unusual cases is their availability in all cases. Conduct which is so uniquely brutal and outrageous that it is not adequately sanctioned under the guidelines would probably justify a sentencing judge to sentence above the guidelines without concern about reversal. The guidelines cannot provide for every bizarre and brutal situation without creating serious problems of general application.

## ABNORMAL CHARACTERISTICS AND CONDITIONS

PROPOSALS:  (1) Prepare a policy statement authorizing the sentencing judge to depart from the rules pertaining to allocation of sanction units, in cases not involving the use of violence, where the offender suffers from a serious mental or physical disability.
(2) Eliminate the abnormal characteristics and conditions adjustment from Chapter III.

COMMENTS: The present draft provides a .2 multiplier (or an 80 per cent reduction in harm value) for an offense which "a reasonable person suffering from the same disability" or "under the same circumstances" would have committed. Thus, the consequences of a conviction for a crime, presumably meeting the standards of proof beyond a reasonable doubt, would be nullified by the proposed guidelines. The draft guidelines further provide

**Defense Exhibit 6-11**

a .5 multiplier (or 50 per cent harm value reduction) for an offense which "a reasonable person would have been more likely than not to have committed" under the same circumstances or suffering from the same diability. A .9 multiplier (or 10 per cent harm value discount) is provided for an offense which "a reasonable person would have been significantly more likely to have committed" under the same circumstances or suffering from the same disability. This approach is not only questionable as a matter of public policy, but it is virtually impossible to apply.

Every offender who unsuccessfully asserts an affirmative defense of insanity, diminished capacity, coercion or duress could attempt to avail himself or herself of this downward adjustment. The adjustment would be available even though a judge or jury found beyond a reasonable doubt that the offender had the mental capacity and intent required by law to commit the offense charged. Every offender who has a history of abnormal, sociopathic or unconventional behavior could assert that any reasonable person suffering from the same aberration would have committed the offense (80 per cent harm value reduction), or "more likely than not" would have committed the offense (50 per cent harm value reduction), or would have been "significantly more likely" to have committed the offense (10 per cent harm value reduction). The nature of the crime itself may be an indicator of abnormal or aberrational behavior and pathological personality traits. For example, a person who sexually exploits children to produce pornography is subject to severe punishment under federal law. 18 U.S.C 2251 provides a maximum sentence of ten years and fine of $100,000 for the first offender, while a maximum 15 year sentence (with a mandatory minimum of two years) and a $200,000 fine are provided for subsequent convictions. Yet, any pedophile who sexually exploits children for commercial purposes could claim a substantial reduction in harm value because anyone suffering a similar psychological aberration would have "more likely than not" engaged in the same conduct.

Persons who habitually commit violent crimes often have psychopathic personality traits. This is graphically illustrated in the personality profiles of people who commit unusually violent crimes, such as aircraft piracy, assassination of a public figure or murder for hire. No doubt, anyone committing such a crime manifests abnormal characteristics which to some degree impair "the exercise of free choice" not to commit the crime and cause a propensity for violent, antisocial behavior. The kind of aberrational and abnormal behavior and personality traits which might make an offender eligible for the favored treatment proposed in the draft guidelines is precisely the kind of offender who poses a threat to public safety. Incapacitation should be of concern in sentencing persons who commit violent or exploitive crimes, even if they demonstrate aberrational and

12

**Defense Exhibit 6-12**

abornormal characteristics which limit their "freedom of choice." The Commission might consider the advisability of recommending to Congress the establishment of optional forms of confinement, such as mental institutions, for "abnormal" offenders. Such confinement facilities and procedures are not presently available in the federal system except to a limited extent in the District of Columbia.

The Commission might consider giving sentencing judges discretion to depart from the rules otherwise applicable in allocating sanction units for non-violent offenders who suffer from serious mental or physical impairments or disabilities. This would give the sentencing judge the option of tailoring an appropriate sentence for offenders who need special care or treatment or have some compelling medical or psychological condition which justifies the departure. For example, an ill or elderly person convicted of Social Security fraud (forging and cashing $50,000 worth of a deceased spouse's checks) could receive a probationary sentence, even if the guidelines would normally require that a limited portion of sanction units for that offense be allocated to incarceration.

## DEGREE OF INVOLVEMENT AND CONTRIBUTION

PROPOSAL: Refine the classifications of role in a criminal enterprise to reflect a distinction between sophisticated, on-going criminal activity and less culpable criminal ventures.

COMMENTS: The present draft identifies different levels of involvement in a criminal organization with appropriate multipliers, ranging from 1.7 for the organizer to .7 for a "supporter." The current draft draws no distinctions between different types of criminal enterprises (e.g., an international narcotics smuggling operation is treated the same way as a stolen check ring consisting of U.S. Postal employees).

It is suggested that further thought be given to defining the types of criminal activity where roles significantly impact on culpability. Consideration should also be given to treatment of multi-defendant cases which operate more in the nature of joint ventures.

**Defense Exhibit 6-13**