**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Criminal No. 24-CR-239 (CKK)** |
| **v.** | **:** | |
| | **:** | |
| **DOUGLAS EDELMAN,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**UNITED STATES' RESPONSE TO EDELMAN'S PRE-HEARING BRIEF**

The government files this response regarding defendant Douglas Edelman's pre-hearing

brief. In short, Edelman tries to confuse the issues rather than focusing on what is relevant: a

factual inquiry into whether he earned unreported income from 2013 to 2020.  For the reasons

discussed below, the points raised in his filing are largely irrelevant to the Court's consideration

of this factual inquiry.

**ARGUMENT**

**I.    The purpose of the upcoming hearing is to determine several factual issues for sentencing, including the tax loss that will set Edelman's base offense level**

The purpose of the upcoming hearing is to resolve factual disputes for sentencing on the

counts for which Edelman has been convicted. The main issue is the total tax loss, including

relevant conduct. The government's brief argued that the loss is approximately $129 million, of

which $58.2 million is the loss from tax years 2006 to 2012 (the counts of conviction) and $70.8

million is from the tax years 2013 to 2020, which comprises relevant conduct.[1] ECF 116 at 29.

---

[1] The Court could also decide that the scope of Edelman's conspiracy included tax years 2006 through 2020, and that the loss from the conspiracy count is the full $129 million. This argument is supported by the fact that his actions and crimes were essentially unchanged through 2020, including his admitting lying to the IRS in 2015-2016 and to the Department of Justice in 2018.

1

Edelman does not dispute that the loss is over $65 million but also suggests that the loss may be under $90 million. ECF 115 at 3-4. As the defense points out, this means there is no dispute as to the relevant base offense level under the current Sentencing Guidelines.[2] Still, the Court should attempt to estimate a tax loss amount. The Guidelines instruct the Court to "make a reasonable estimate based on the available facts." U.S.S.G. § 2T1.1, comment (n.1). The Court is also required to explain how it arrived at its estimate of the loss. *See United States v. Hall*, 610 F.3d 727, 745 (D.C. Cir. 2010) (requiring the district court to explain how it arrived at its estimate of the loss under Guideline 2B1.1, which also requires a "reasonable estimate").

Further, the Court should estimate the tax loss because at sentencing this will be required for a restitution order. Edelman pleaded guilty to a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Under the Mandatory Victim Restitution Act (MVRA), codified at 18 U.S.C. § 3663A, the Court must or restitution for victims in certain crimes, including offenses against property under Title 18. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). Conspiracies to defraud the IRS in violation of 18 U.S.C. § 371 are "offenses against property" covered by the MVRA. *See United States v. Turner*, 718 F.3d 226, 236 (3d Cir. 2013); *United States v. Meredith*, 685 F.3d 814, 827 (9th Cir. 2012). So, even though Edelman makes clear in his brief that he does not intend to pay any restitution, the Court must still order restitution to the IRS for his conspiracy, and must therefore still estimate the amount of loss.[3]

---

[2] Edelman argues that the difference may matter under proposed amendments to the Guidelines. This does not make a difference in the Court's determinations now. The government intends to request a sentencing date prior to when any new amendments would take effect (before November 2026).  Moreover, it would not be prudent to assume that proposed amendments will be adopted.

[3] Edelman claims that he is "not collectible." ECF 115 at 3. Edelman placed significant assets in the names of nominees around the world. Even if he is unable to exercise any control of these assets currently – and the government believes he can – his conscious decision to place assets out

(continued...)

## II.     The Court does not need to apply foreign law

In his brief, Edelman insists that the Court must apply foreign law to determine that the various trusts were actual trusts in the UK and British Virgin Islands. In his view, the Court must conduct a two-step inquiry to first determine if they are trusts and second to determine whether they were shams. Edelman's position is incorrect and distracts from the issues before the Court.

The government has argued in its brief and opposition to the notice of foreign expert that the question of whether these entities were legitimate trusts in foreign jurisdictions is not relevant. ECF 114; ECF 116. The question before the Court is whether Edelman earned income from 2013 to 2020, which is a matter of American law. Moreover, the law is clear that substance matters over form. *See Gregory v. Helvering*, 293 U.S. 465 (1935). More specifically, the relevant inquiry here is whether the entities are disregarded as shams for federal tax purposes. Put another way, the question is not whether the entities were actually trusts, but whether if in substance they were mere tax avoidance devices. If a tax evader uses a person or a business as a nominee to hide their income, the question is not whether the nominee was a real human or legally created corporation. The question is who actually earned the income, and to this end, courts have made clear that whether a trust is a sham disregarded for tax purposes does not depend on the trust's validity. *See, e.g. Richardson v. Comm'r*, 509 F.3d 736, 742 (6th Cir. 2007) (citing *Comm'r v. Tower*, 327 U.S. 280, 291 (1946); *Zmuda v. Comm'r*, 79 T.C. 714, 720 (1980)).

Moreover, even if this were a two-step process, the question is moot. The government does not dispute that these entities were trusts set up in the UK and BVI. Indeed, the core of the

---

of his own reach once he learned of the investigation was done in order to shield them from the U.S. government. At sentencing, the Court should take Edelman's refusal to cooperate in making restitution into consideration.

government's allegation is that Edelman intentionally created a complex web of foreign trusts and entities in order to hide behind, precisely so that he could obscure his income and ownership.

Indeed, Edelman's arguments about trusts fit a familiar pattern. Throughout his two-decade scheme, Edelman used his attorneys and advisors to flood tax preparers, accountants, the IRS, banks, and others with paperwork about trusts while hiding the fact that he was ultimately in control of the assets and income. For example, Exhibit 4-5 contains the information provided to Edelman's tax advisors in 2015. Of the 417 pages, the vast majority includes irrelevant and misleading documentation and legal opinions about trusts; nowhere does Edelman's actual role and relationship to the assets get explained.

Here too, Edelman's brief is replete with academic arguments about the definition of trusts with very little discussion of the facts or the inquiry into whether they were a sham. That is because the facts tell an incriminating story in which the income and assets remained Edelman's while the sham trusts were used only as means to mislead others and hide his involvement. This may have worked from 2013 until he was charged in 2024, but it should not work any further.

## III.    The entities were shams and the income was Edelman's

The government's submission included evidence to prove beyond a preponderance that from 2013 to 2020, Edelman evaded taxes on over $183.3 million in income. This income came from dividends from his ownership of Mina/Red Star as well as the sale of the business. Though on paper the business was owned by a foreign trust, this trust and its companions were shams that lacked any valid purpose other than tax avoidance. Courts consider four factors relating to a trust to determine whether is lacks economic substance and is considered a sham for federal tax purposes: (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether the trust has an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer

4

feels bound by the restrictions imposed by the trust agreement or the law of trusts. *See Markosian v. Comm'r*, 73 T.C. 1235, 1243-44 (1980); *Zmuda v. Comm'r*, 79 T.C. 714, 720-22 (1982).

The government's brief and exhibits go through these factors and explain how each one points to how the trusts were shams that should be disregarded. In his brief, Edelman notes that Collett testified that for one of the entities, Rosbelt, the trustee made the payments for the investments. ECF 115 at 23-24. It is true that the trustee signed an authorization on some major payments. But as Collett explained in hours of earlier testimony, the person who actually made the decision about each investment and who benefited from the assets was Edelman. Collett Deposition (Feb. 4, 2025) at 101-44. And as Collett explained, this was merely a formality: the trustee was only made aware of some transactions, and he could not recall a single instance between 2013 and 2020 when Edelman decided to make an investment and the trustee said 'no.' *Id.* at 123.

Edelman's argument ignores the fact that he was the one who set up Rosbelt after lying to his attorneys about the ownership of Mina/Red Star. It also ignores the reality of how Edelman continued to run Mina/Red Star and how nothing about his business practices changed after a restructuring in 2013, other than him telling a new false story to his tax preparers and the government. In other words, the assets being put in a "trust" did nothing to change Edelman's control over the assets, the flow of funds, and the people involved in moving money. Moreover, the fact that many large payments were made out of Rosbelt – a company nominally under the Galactea Trust – when the assets were owned by a series of at least eight other trusts which, on paper, purportedly had no relation, shows again how these entities were merely shams without economic substance. That Edelman's brief does not address the other factors – including how

Edelman's relationship to the property did not materially change, how no actual economic interest passed to the alleged beneficiaries, and how the trustee was not actually independent – is a tacit acknowledgement that these factors do not count in Edelman's favor.

**IV.    There is no basis for any "negative inference" for missing witnesses**

Finally, Edelman argues that the Court should draw a negative inference against the government because it does not plan to call the foreign trustees of the entities that Edelman established. ECF 115 at 25-27. In support of this, he cites to *United States v. Pitts*, which states that "There are some persons [] who potentially have so much to offer that one would expect them to take the stand. If such a person does not appear and one of the parties had some special ability to produce him, the law permits the jury to draw an inference – namely, that the missing witness would have given testimony damaging to that party." 918 F.3d 197, 199 (D.C. Cir. 1990) (finding reversible error in allowing a missing witness argument where the missing witness could aid the defense only by incriminating himself).

First, the standard of proof for the relevant conduct tax loss is a preponderance of the evidence and the Court as the fact finder is very capable of determining the weight of the evidence and testimony. As such, it is unclear what a "negative inference" would mean in this context.

Second, Edelman does not explain how the government has a "special ability to produce" foreign nationals living abroad, beyond the Court's subpoena power. If anything, one would assume that Edelman has some power to call the individuals he hired and paid for years to serve as passive "trustees" for his sham trusts. Indeed, back in December 2024 when Edelman was caught violating his conditions by attempting to influence a cooperating trial witness, Edelman made clear that he had some control over the trusts and trustees. He told the co-conspirator, "Good thing I can finally work from here on all the trust and biz matters. Trust are being horrible

frankly and that's a serious issue and trying to help get that sorted out." ECF45-3 at 2.[4] When the cooperating witness complained about assets held by the trust that he was trying to receive, Edelman told him that he was "Trying to see what can be done." *Id.* at 5. It simply does not make sense that Edelman would expect the government has the ability to call these foreign witnesses when in fact he was the person claiming to exercise control over them as recently as late 2024.

Finally, there is no need to call the Swiss trustee. The Court has before it the testimony of Collett, who had firsthand knowledge of the trustee's role and Edelman's financial dealings between 2013 and 2020. Collett's testimony, and the corroborating exhibits, is more than enough to show by a preponderance of the evidence that Edelman used the trust as a sham to evade taxes on his income between 2013 and 2020.

## CONCLUSION

The government respectfully requested that the Court make factual findings that: (1) the structure of foreign trusts set up and used by Edelman from 2013 to 2020 to hold his income was a sham; (2) Edelman caused a tax loss of $128,995,238; and (3) Edelman was a leader or organizer of criminal activity involving that involved five or more participants. These findings are supported by the evidence and take into account the scope of Edelman's wrongdoing.

---

[4] In the same messages, Edelman discussed a multi-million-dollar investment Edelman made in a satellite technology company named Isotropic, which Collett explained was Edelman's decision and which emails show Edelman deciding the investment should be held by "an entity etc". Collett Deposition (Feb. 4, 2025) at 106-09; Ex. 25-6. In his recent messages, Edelman said that he "hope[d] [the trustee was] not involved as she hasn't a clue." ECF 45-3 at 7. This is further evidence that Edelman disregarded the trusts in his business matters, except for when making representations to the U.S. government and the Court.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:          /s/ Ezra Spiro
Ezra Spiro (NY Bar No. 5921838)
Trial Attorney
Department of Justice Criminal Division
950 Pennsylvania Ave NW
Washington, DC 20530
Ezra.K.Spiro@usdoj.gov
(202) 718-7308

Sarah Ranney (NY Bar No. 5050919)
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20579
Sarah.Ranney@usdoj.gov
(202) 252-7051

8