**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **V.** | |
| **DOUGLAS EDELMAN.** | CASE NO. 24-CR-239 (CKK) |

<u>**DOUGLAS EDELMAN'S RESPONSE TO
THE GOVERNMENT'S PRE-HEARING BRIEF**</u>

**TABLE OF CONTENTS**

INTRODUCTION......................................................................................................... 1

ANALYSIS .................................................................................................................. 3

I.      Edelman had no interest in the trusts and the government's filing does not show
        otherwise. ....................................................................................................... 3

        A.      The government's pre-hearing brief alleges many facts that are at best
                unsupported and at worst misleading. .................................................3

                1.      The government's exhibits do not say what the government says they
                        do. ..........................................................................................................4

                2.      The government's Excel summary is logically irrelevant to Edelman's
                        relationship with the trusts and lacks any indicia of reliability. .......... 9

        B.      The government's exhibits show that Edelman provided strategic oversight to
                the companies and do not show that he owned them.......................................12

II.     The Court should draw a negative inference against the government for its failure
        to call the trustee, Len O'Brien, who treated the trusts as real and who did not
        treat Edelman as their beneficiary. ................................................................ 13

III.    Section 3B1.1 does not apply to Edelman. ..................................................... 21

        A.      Under the government's reading, § 3B1.1 would apply to every twenty-first
                century tax evader.........................................................................................22

        B.      The Guidelines' drafting history shows that § 3B1.1 is not intended for a
                conspiracy whose sole object was to evade one individual's personal taxes...25

                1.      DOJ Tax taught the Commission about the kinds of aggravating
                        tax crimes that make leaders more culpable. ...................................... 27

                2.      The harms caused by Edelman's tax evasion can be and have been
                        fully accounted for by other Guideline provisions............................... 32

        C.      General principles of federal sentencing confirm that the § 3B1.1 aggravating
                role enhancement should not apply to Edelman. .............................................35

CONCLUSION .......................................................................................................... 38

i

**INTRODUCTION**[1]

In his opening brief, Defendant Douglas Edelman showed that under controlling law the Galactea Trust (and the other almost identical trusts, collectively the "trusts") were validly constituted and Edelman had no interest in them. In support of its argument to the contrary, the government's brief cites emails between Edelman and Erkin Bek (the owner of the other half of the underlying income-generating businesses), the accountant Graham Collett's Rule 15 transcripts, and summary Excels. But the government's brief misrepresents the evidence it cites. For example, the government attributes language in email traffic between Bek and Edelman to Edelman when a careful read of the traffic shows the language came from Bek. In other parts, the government represents that Edelman made certain statements in the Galactea years but the underlying document shows that Edelman made these statements before the trusts ever existed.

The tardily-produced Swiss mutual legal assistance treaty materials magnify the brief's other evidentiary weaknesses. The materials obtained from Salamander, the trustee from 2013 to 2020, show that the trustee believed the trusts were real, that Delphine Le Dain was the beneficiary, and that Edelman was not. Leonard O'Brien, the head of Salamander, said that in text messages with Le Dain. Salamander's management documents show the same. These new materials shed additional light on why the government has no plans to call O'Brien: his testimony would damage its carefully mis-constructed position, heightening the need for a negative inference.

The government also conveniently ignores the facts of Edelman's case that make § 3B1.1 inapplicable. It asserts that he should receive a four-level enhancement under § 3B1.1 because he told others what to do. So did many if not all taxpayers and tax evaders who use an accountant and

---

[1] Defense counsel does not believe that the page limitations in D.D.C. Criminal Rule 47(e) apply to this filing because it is not a reply "memorandum of points and authorities in support of . . . a motion." *See* D.D.C. Local Crim. R. 47(e). To the extent the Court disagrees, Edelman seeks leave to exceed those page limitations.

a bookkeeper. But § 3B1.1 does not add two- to four-points to the base offense level of *all* tax offenses, it is an *enhancement* for the particularly egregious cases (and not just in terms of the magnitude of the tax loss). Like all sentencing *enhancements*, § 3B1.1 imposes additional punishment on a defendant for engaging in aggravating conduct—specifically, an aggravating role—that causes *additional*, otherwise uncaptured harms beyond the size of the offense which is already captured by the tax table. Most individual tax crimes do not cause additional harms beyond revenue loss. Indeed, in developing the Guidelines, DOJ's Tax Division identified, and the Sentencing Commission addressed, certain types of aggravated tax crimes in which the lead offender would be more culpable for directing others: the creator of a tax shelter scheme or the leader of a tax protester ring (*see* §§ 2T1.4 and 2T1.9) or the operator an illegal business (*see* § 2T1.1(b)(1)).

Unlike any of those aggravated tax crimes, Edelman did not cause additional, unaccounted for harms in his interactions with co-conspirators. His telling others what to do did not cause tax loss beyond his own and did not cause any harms that were not already accounted for by the sophisticated means specific offense characteristic (§ 2T1.1(b)(2)) and the obstruction of justice enhancement (§ 3C1.1). The entire scope of his misdeeds has been fully captured by his tax loss and these adjustments. Applying § 3B1.1 to Edelman would disproportionately inflate his sentence in contradiction to Congress's mandate that sentencing be proportional to harm. *See* 18 U.S.C. § 3553(a)(2); 28 U.S.C. § 994(c)(3).

## ANALYSIS

**I.    Edelman had no interest in the trusts and the government's filing does not show otherwise.**

Edelman admitted that 50% of Mina and Red Star's distributions during 2006-2012 were indeed his income. The government now bears the burden of proving that during 2013-2020, following his contribution of those businesses to his wife's trust, all the income earned during those late years was actually his. *See United States v. Alberto-Genao*, 28 F. Supp. 2d 658, 663 (D.D.C. 1998) (government bears "burden of proof by a preponderance of the evidence" for sentence increases under Guidelines), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999). In support of its position, the government's brief alleges facts that are not true and relies on irrelevant evidence. The government's exhibits do show that Edelman provided strategic advice, which does not make him an owner.

**A.    The government's pre-hearing brief alleges many facts that are at best unsupported and at worst misleading.**

The government's brief makes broad, unproven assertions about Edelman in support of which it cites to some combination of 32 exhibits (30 of which were timely-provided). Section 6A1.3(a) allows the Court to "consider relevant information without regard to its admissibility under the rules of evidence applicable at trial." That information, however, must still have "sufficient indicia of reliability to support its probable accuracy." § 6A1.3(a). And the government must use that "relevant information" to prove material facts by a "preponderance of the evidence." *Alberto-Genao*, 28 F. Supp. 2d at 663. Due process demands these protections. *See United States v. Makki*, 47 F. Supp. 2d 25, 37 (D.D.C. 1999) (calling burden of proof, one of the "due process protections to which any defendant is entitled" in sentencing proceedings).

"Although not as rigorous as the reasonable doubt or clear and convincing standards, the preponderance standard is not toothless." *United States v. Lawrence*, 47 F.3d 1559, 1566-67 (11th

3

Cir. 1995). Here, to satisfy its evidentiary burden, the government must present "*reliable and specific* evidence" to prove that the trusts did not own Mina and Red Star and that Edelman did. *Id.* (emphasis added). The government's brief falls short on both. It (1) misrepresents what the exhibits say and (2) relies heavily on its own uncorroborated summaries to provide irrelevant information or facts that cannot be proven by those exhibits.

### 1. The government's exhibits do not say what the government says they do.

The government opens its argument about the Galactea years by telling the court that

> A few months later, Bek and Edelman had a serious conversation about the business, its spending, its management, and its direction. Ex. 25-3. Edelman proposed to Bek: "*I was wondering for us to consider and decide for someone between you and I to take ultimate power . . .*" *Id.*

Gov. Opening Br. at 10 (ECF 116) (emphasis added). But Bek made this statement to Edelman, not the other way around. On March 17, 2015, at 12:25, Edelman (worldnet44@yahoo.com) emailed Bek with some thoughts about the direction Mina and Red Star were headed, including compensation and getting better financial reporting. *See* Ex. 25-3 at USPROD-03182626 (ECF 118-11) (suggesting they "look at what everyone does vs what they earn and the importance of people"). On March 18, 2015 at 00:11, "erkin.bek@timetechworld.com" responded "See below in CAPS." *Id.* at USPROD-03182625. Bek wrote:

> *I WAS WONDERING FOR US TO CONSIDER AND DECIDE FOR SOMEONE BETWEEN YOU AND I TO TAKE ULTIMATE POWER* SO WE CAN CUT OUT INEFFICIENCIES OF TOO MANY COOKS AND JUST HAVE ONE DECIDER OF EVERYTHING, A CONTROLLING HOLDER , in this might be relevant for one partner to take out all his equity and lower stake to 25pct for instance and for the other controlling stakeholder to manage the company BECAUSE WE NEED SOME SERIOUS NO JOKING LEADERSHIP. . . . WILL SOON DEPART MUSCAT. I HOLD THE SHIP FOR NOW BETWEEN ALL THE KEY PLAYERS, STAFF, VARIOUS STAKEHOLDERS BUT WONT DO IT FOR TOO LONG.

4

*Id.* at USPROD-03182626 (emphasis added). Thus, it was Bek who proposed "to consider and decide for someone between you and I to take ultimate power" *not* Edelman.[2]

And looking at Edelman's original email without Bek's interlined text (which was not one of the government's exhibits) makes it clear that Bek also said "in this might be relevant for one partner to take out all his equity and lower stake to 25pct for instance and for the other controlling stakeholder to manage the company" even though it is not in capital letters. *Id.* at USPROD-03182626. Attached as **Exhibit 14** is a copy of Edelman's original email (produced in discovery as USPROD-03182611). Whatever other leeway it might have, the government cannot attribute Bek's words to Edelman.

DOJ's citations to Collett's testimony are also misleading. The government's argument that "Edelman continued to control Mina/Red Star's dividends after 2012" begins on page 10 of its brief. On page 11, it argues that "[i]t was Edelman, not Le Dain, who continued to run Mina/Red Star after the 2012-2013 restructuring." And "it was Edelman who continued to jointly decide with his co-owner Erkin Bek when Mina/Red Star would pay out dividends," giving an example from "February 2016." Gov. Opening Br. at 11. In the next paragraph, the government writes: "[m]oreover, Edelman decided where Mina/Red Star should send the dividends. Collett Deposition (Feb. 3, 2025) at 133; Collett Deposition (Feb. 4, 2025) at 20; Collett Deposition (Feb. 5, 2025) at 135-36." Gov. Opening Br. at 11. But these citations to Collett are either to testimony about years *before* Galactea or have nothing to do with directing dividends.

The first citation, "Collett Deposition (Feb. 3, 2025) at 133" (ECF 118-26), refers to 2007 and 2008. The relevant questioning begins on page 131 and goes onto page 133, excerpted below:

---

[2] The government alleges at page 10 of its opening brief that Edelman wrote, "You and I need to speak with a single voice and give serious solid directions and instructions to people asap." That is indeed Edelman's strategic advice to Bek.

Q. And then on the next line, where it says: "I will inform Geneve as well as I am planning a USD 15 MM dividend disbursement." Do you see where it says that?

A. Yes.

Q. Do you know what 'I will inform Geneve' refers to?

A. I believe that that was informing the Geneva office of Red Star to send the 15 Million dividend disbursement to Julius Baer. Sunage Account.

Q. Around this period of time in 2007, 2008, had you been involved in or aware of other instances when distributions or dividends came out of Mina, or Red Star?

A. Sorry, can you just repeat that question for me?

Q. Around this period of time in 2007 and 2008, had you been aware of other times that distributions came out of Mina, or Red Star?

A. They, they did come out of Mina, of Red Star during those years.

Q. And were you sometimes involved in communications about when a distribution should be made or how much?

A. I was usually informed by Mr. Edelman as to when and how the dividends were being made from Red Star and Mina Corp.

Q. And in those transactions that you just mentioned, when you were informed, were you able to discern who had decided where the distribution should go; which bank Account they should go into?

A. I was normally instructed to put them into Bartol, or Aspen Wind.

Q. Who gave you those instructions to put them into Bartol, or Aspen Wind?

A. That would have been Mr. Edelman.

Q. And then after the closure of the Credit Suisse accounts, where did the dividends or distributions go?

A. They went to Sunage Foundation Account with Julius Baer.

Q. And who instructed you to put the dividends into the Sunage Account?

A. That was Mr. Edelman, Based on the on the standard instruction that all money should go to. Sunage Foundation.

Q. Around this period of time, did Mr. Edelman tell you that he wanted to give his business interests, or any of his assets to his wife?

6

A. I don't recall a discussion of that nature.

CC1 Rule 15 Dep. Tr. at 131:25-133:24 (Feb. 3, 2025) (ECF 118-26). The language does not say

what Edelman did or did not do *after* Galactea was formed.

The second citation, "Collett Deposition (Feb. 4, 2025) at 20" (ECF 118-27), refers to

distributions taking place in *2010*, not post-2012 during the Galactea years:

> Q. And looking here at the email chain a few lines up. I'm sorry, going back to the first page. Do you see in the middle of the page the response from Douglas Edelman to Mr. Shakhidi?
>
> A. I do, yes.
>
> Q. Do you see where it says: "Be very careful here. As for BO may well not be EB at all." Do you see this?
>
> A. Yes.
>
> Q. At this point in May 2010, had you ever heard discussions before about Delphine Edelman being the second beneficial owner alongside Erkin Bek of the two companies?
>
> A. At this time following the set up of Sunage Foundation, the distributions from the two Gibraltar companies from the logistics business were starting to be paid into Sunage Foundation.
>
> Q. Mr. Collet, who had made the choice to direct those distributions into Sunage Foundation?· Whose decision was that?
>
> A. I believe at the time that those the decision as to where the distributions went to, was managed by Douglas Edelman.

CC1 Rule 15 Dep. Tr. at 20 (Feb. 4, 2025) (ECF 118-27).

In the government's third citation, "Collett Deposition (Feb. 5, 2025) at 135-36" (ECF 118-

28), the only information on either page about distributions does not address any specific year. It

says as follows:

> Q. That list of individuals; did you know them to be officers of Mina and Red Star?
>
> A. Yes, indeed.

> Q. And had you observed Mr. Edelman giving directions to those individuals over the years of your involvement?
>
> A. Yes. Particularly in terms of agreeing, discussing the levels of distributions, and also in terms of asking for information on the trading activities.

CC1 Rule 15 Dep. Tr. at 135:21-136:5 (Feb. 5, 2025) (ECF 118-28). Contrary to the government's assertion, this testimony does not show that Edelman *decided* where Mina/Red Star should send the dividends. Even if discussing meant deciding, then "over the years of [Collett's] involvement" could be at any point, either pre- or post-Galactea.

The government's brief obfuscates tax years using Collett's testimony in other places, too. For example, on page 14, in the section titled "[a]fter creation of the trust, Edelman continued to control the assets as he had before," the government alleged:

> Taruki Management Limited held Edelman's $16.2 million worth of investments made between 2014 and 2017 in films and other media productions – Collett explained that this line of investing began as early as 2008 and stemmed from Edelman's interest in film. *Id.* [Collett Deposition (Feb. 4, 2025)] at 115.

But the government asked Collett, "And can you tell from the summary on page 1, how much was invested in Taruki Management Limited between *2010* and 2017?," and he answered, "A total of $16,212,000." Collett Deposition (Feb. 4, 2025) at 115:24-116:3 (emphasis added) (ECF 118-27). The specific tax years matter—Edelman has admitted that he owned all of the assets before Galactea was formed, i.e., before 2013. *See* Change of Plea Hrg. Tr. at 19-23 (ECF 118-30). The dispute is over what happened *after* that formation.[3]

---

[3] As is discussed *infra* pages 15-16, the Salamander materials provided to DOJ in response to the Swiss MLAT show Taruki as being owned and operated by the trusts and the trustee. So even if Taruki belonged to Edelman in the pre-Galactea years, it wasn't his during the Galactea years.

**2.     The government's Excel summary is logically irrelevant to Edelman's relationship with the trusts and lacks any indicia of reliability.**

At this point in the sentencing process, the parties have been tasked with "disput[ing] the validity of the trust in the context of ascertaining the total tax loss attributable to Edelman's offense conduct for Counts 1–10." Mem. Op. at 4 (June 20, 2025) (ECF 84). Determining the validity of the trusts and whether Edelman had any interest in them must happen before the precise tax loss numbers can be hashed out. The tax loss amount necessarily depends on the resolution of the trust issues because if the trusts own Mina and Red Star, and Edelman has no interest in them, then he can only be liable for tax due on income that was his, i.e., his half of Mina and Red Star's income when he owned them (in 2006-2012).

But in its opening brief, DOJ argues that the scale of the numbers at stake shows that the income belonged to Edelman. To do so, it relies heavily on an Excel bearing few clues about its provenance, Exhibit 25-1 (filed as a redacted PDF at ECF 118-9), which DOJ produced to the defense on February 17, 2026. Exhibit 25-1 is an Excel spreadsheet whose metadata shows that its author and the person who last modified it was "Spiro, Ezra K (CRM)" on "2/17/2026 10:20 AM," one of the DOJ attorneys prosecuting this case. It is not evidence gathered during the investigation and neither it nor the government's brief provides any information about its content or the origins of its content.

Exhibit 25-1 contains 11 columns and 119 lines of data. A partial screenshot of Exhibit 25-1 with sensitive information redacted is below:

9

| Year | Date | Amount | Currency | USD Exchange Rate | Amount in USD | Beneficiary | Beneficiary Bank | Beneficiary Bank Account Number | Memo | Payor Acct |
|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 11-Jan-06 | 90,000.00 | USD | 1 | $ 90,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 27-Jan-06 | 152,350.00 | USD | 1 | $ 152,350.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 9-Feb-06 | 150,000.00 | USD | 1 | $ 150,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 24-Feb-06 | 200,000.00 | USD | 1 | $ 200,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 2-May-06 | 100,000.00 | USD | 1 | $ 100,000.00 | Aspen Wind Corporation | Credit Suisse (Switzerland) | ███-52 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 3-May-06 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 7-Jun-06 | 170,000.00 | USD | 1 | $ 170,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 30-Jun-06 | 1,000,000.00 | USD | 1 | $ 1,000,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 3-Aug-06 | 415,256.04 | USD | 1 | $ 415,256.04 | Aspen Wind Corporation | BNP Paribas | ███ | Shareholder Distribution | Red Star Enterprises |
| 2006 | 4-Aug-06 | 700,000.00 | USD | 1 | $ 700,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 15-Sep-06 | 600,000.00 | USD | 1 | $ 600,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | Red Star Enterprises |
| 2006 | 20-Oct-06 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 22-Nov-06 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 12-Dec-06 | 315,000.00 | USD | 1 | $ 315,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2006 | 28-Dec-06 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Shareholder Distribution | Red Star Enterprises |
| 2007 | 12-Jan-07 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | Red Star Enterprises |
| 2007 | 16-Feb-07 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | Red Star Enterprises |
| 2007 | 6-Mar-07 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | Red Star Enterprises |
| 2007 | 10-Apr-07 | 650,000.00 | USD | 1 | $ 650,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | BNP ███ |
| 2007 | 3-May-07 | 1,000,000.00 | USD | 1 | $ 1,000,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | BNP ███ |
| 2007 | 24-May-07 | 500,000.00 | USD | 1 | $ 500,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | BN ███ |
| 2007 | 21-Jun-07 | 1,000,000.00 | USD | 1 | $ 1,000,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | BNP ███ |
| 2007 | 28-Jun-07 | 500,000.00 | USD | 1 | $ 500,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | BNP ███ |
| 2007 | 17-Jul-07 | 1,500,000.00 | USD | 1 | $ 1,500,000.00 | Bartol Ltd. (Virgin Islands) | Credit Suisse (Switzerland) | ███-32 | Dividends | BNP ███ |

The government cites Exhibit 25-1 and only Exhibit 25-1 to support each of the following allegations about the Galactea years in its pre-hearing brief:

1.    "In 2013, Mina/Red Star paid $17,789,654 in dividend distributions to the Sunage Foundation account at Bank Julius Baer, even though at this point Mina/Red Star was owned on paper by the Galactea Trust and Rosbelt International Ltd. Ex. 25-1." *See* Gov. Opening Br. at 11.

2.    "The Mirabaud account received $6,606,898 in dividends in 2016 before Edelman directed that the funds be sent to a new account at Banque J. Safra Sarasin. Ex. 25-1." *See* Gov. Opening Br. at 12.

The Court should not rely on Exhibit 25-1 (ECF 118-9) because neither the government nor the exhibit itself has provided any information to prove the exhibit is reliable. *See Makki*, 47 F. Supp. 2d at 36 (rejecting government affidavit containing only "conclusory statement" as grounds for enhancement). For example, Exhibit 25-1 does not cite the original sources of its content or explain how choices were made, such as the exchange rate, what "Memo" means, and where "Memo" comes from. [4] *See In re Case*, 246 F.3d 696, 700 (D.C. Cir. 2001) (requiring "relevant information" to have "sufficient indicia of reliability to support its probable

---

[4] Without understanding Exhibit 25-1's provenance, it is difficult to resolve, for example, discrepancies between the government's brief and the exhibit. At page 7, the government wrote in "2011 and 2012, Edelman earned an additional $66,115,728 in income from Mina/Red Star . . . . Ex. 25-1." Summing rows 57-74, the rows that list all alleged entries for 2011 and 2012, arrives at a total of $64,976,219.03, about $1.2 million less than what the government alleges in its brief. *See* Ex. 25-1 (ECF 118-9).

accuracy" (quoting § 6A1.3)). If, after the Court has made decisions about the trusts, the government attempts to use this document to prove the tax loss amount, it will need to provide at least some foundation to show Exhibit 25-1 is sufficiently reliable. *See United States v. Sterling*, 942 F.3d 439, 443 (8th Cir. 2019) (specific numerical determination requires "sufficient indicia of reliability to support its probable accuracy").

But assuming for the sake of argument that the government can clear the threshold hurdle of reliability, the key point remains that an income summary is logically irrelevant for showing that in 2013 "Mina/Red Star *was owned on paper* by the Galactea Trust and Rosbelt International Ltd. Ex. 25-1." Gov. Opening Br. at 11 (emphasis added). Nor can the line entries prove that in 2016, "*Edelman directed* that the funds be sent to a new account at Banque J. Safra Sarasin. Ex. 25-1." Gov. Opening Br. at 12 (emphasis added). Exhibit 25-1 appears to show the dollar value of deposits made to various bank accounts; it does not allow the court to "logically infer[]" who directed those deposits to be made or whether Mina and Red Star were "owned on paper" by anyone. *See United States v. Allison*, 474 F.2d 286, 289 (5th Cir. 1973) (describing logical relevance), *opinion vacated on reh'g on other grounds*, 490 F.2d 79 (5th Cir. 1974); Gov. Opening Br. at 11-12. Because the parties are not yet disputing the tax loss figures and because Exhibit 25-1 does not "tend to prove or disprove" that the trusts were real and Edelman had no interest in them, Exhibit 25-1 is not relevant. *See United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 41 (D.D.C. 2008) (rejecting expert report as irrelevant because it analyzed Medicare claims that were entirely separate from those at issue in lawsuit).

**B.**    **The government's exhibits show that Edelman provided strategic oversight to the companies and do not show that he owned them.**

Paradoxically, many of the exhibits relied on by the government show that the trusts were real and that Edelman had no interest in them. For instance, the government cites Exhibit 25-4 (ECF 118-12), a July 26, 2016 email from Edelman to Erkin Bek, for the following:

> In another example, in July 2016, Edelman and Bek discussed selling Mina/Red Star to another fuel company. Ex. 25-4. They went back and forth with each other on the value of their business and what price would be reasonable. *Id.*

Gov. Opening Br. at 10. The government also posits that "in January 2015, Edelman and Bek discussed firing Mina/Red Star's CEO and CFO, Graham O'Donoghue and Zachary Friedman. Ex 25-2." Gov. Opening Br. at 10. Edelman and Erkin Bek discussed issuing dividends in February 2016. *Id.* at 11. But Edelman has never shied away from the fact that he has given strategic direction to the businesses both before and after they were owned by the trusts. According to FINRA, the U.S. regulator for brokerage firms and exchange markets, a board of directors' "primary job is to look out for shareholders' interests." *See* FINRA, *Get on Board: Understanding the Role of Corporate Directors* (Feb. 6, 2023). Directors weigh in on "strategic planning, mergers and acquisitions, . . . , declaring dividends" and "hiring and firing the CEO and for setting the compensation of senior executives." *Id.* Edelman making strategic decisions akin to a board member does not show that he was Mina and Red Star's owner.

The Tax Court case *Estate of Fortunato v. Commissioner*, T.C. Memo. 2010-105, 2010 Tax Ct. Memo LEXIS 142, provides an analogous situation where one brother, Bobby, provided strategic direction to and management of the business owned by his brother, Anthony. The IRS argued that Bobby owned the business. The Tax Court disagreed. It found that Anthony was the business's owner even though Bobby spent "his life struggling to grow [the] business," others involved in the business believed Bobby to be the owner, and Bobby was involved in "the failed

12

sale" of the business. *Id.* at \*38, \*39. Noting that "unusual ownership and operating arrangements can occur in closely held family companies," the Tax Court rested its conclusion on the fact that under relevant state law neither Bobby nor the companies manifested the objective indicia showing he intended to own the companies. *Id.* at \*40. Here, under BVI, English, and Welsh law, Galactea and the other trusts were validly constituted, and Edelman was not their beneficiary. *See* Expert Rep. of John Machell ¶¶ 18, 19, 22, 24, 29, 36 (ECF 119-1).[5] As detailed below, the trustee and third parties that interacted with the trusts believed the same.

**II.    The Court should draw a negative inference against the government for its failure to call the trustee, Len O'Brien, who treated the trusts as real and who did not treat Edelman as their beneficiary.**

The government tardily-produced materials received pursuant to a Swiss mutual legal assistance treaty request show that the trustee from 2013 to 2020 (Salamander and Len O'Brien) believed that the trusts were indeed valid trusts, that the trustee held legal title to their assets and had authority to make decisions with respect to those assets, and that Delphine Le Dain and her daughters were the trusts' beneficiaries, not Edelman. These materials further support the Court drawing a negative inference against the government for its failure to call O'Brien or anyone else from Salamander as witnesses. *See* Def. Opening Br. at 24 (ECF 115); *United States v. Glenn*, 64 F.3d 706, 709 (D.C. Cir. 1995) (court may infer that missing witness would have damaging testimony).

---

[5] Counsel for Edelman does not intend to call Mr. Machell, instead relying on his written report. The government has informed counsel that it will not allege that it is prejudiced by its inability to cross-examine him. To the extent the Court wishes Mr. Machell present at the hearing regardless, counsel will ensure the same.

Salamander performed a "know your customer" inquiry before agreeing to become the trustee of Galactea in December 2012. **Exhibit 15** (697 – Salamander).[6] As part of that exercise, O'Brien learned about Le Dain, Mina and Red Star, and the Sunage Foundation. *See id.* at 15-25. Salamander/O'Brien was told (maybe by Collett) that "the Foundation is controlled by its trustees whilst day to day financial control is the responsibility of its Chief Financial Officer, Mr Graham A Collett." *Id.* Those facts about Sunage were of course untrue, as Edelman admitted in his change of plea hearing. *See* Change of Plea Hrg. Tr. at 21:16-21 (ECF 118-30) ("Although his wife and children were nominally the beneficiaries of Sunage, Edelman controlled the funds in the Sunage account and used them to fund his lifestyle and investments.").

Yet from the beginning, O'Brien and the Salamander team believed that the beneficiary was Delphine Le Dain, not Edelman. While still evaluating whether to become a trustee, on November 16, 2012 O'Brien sent an email to his colleague at Salamander, Jenny Mauroux:

**Jenny Mauroux**

| | |
|---|---|
| From: | Leonard O'Brien |
| Sent: | 16 November 2012 15:29 |
| To: | Jenny Mauroux |
| Subject: | FW: Delphine's Tax Report |
| Attachments: | 16.11.12 Tax report for Delphine le Dain (redacted).PDF |

Jenny,

Please see attached tax report and details re this potential client.

Interesting husband if you google him !

I think that this could be a good client for us, but I need to get more comfortable on the KYC.

Hence I am going to London on Monday to try and win the business but also to meet client and Protector and Lawyers.

Will keep u posted and have a great weekend.

len

---

[6] **Exhibits 15 through 25** are excerpts from the Swiss MLAT materials, which were produced without bates numbers. Each exhibit includes a reference to the number or numbers Swiss authorities gave to the component documents. For example, **Exhibit 25** contains WhatsApp conversations between O'Brien and Le Dain, which are excerpted from both 669 and 670.

**Exhibit 15** (697 – Salamander) at 15-2. O'Brien believed Delphine was his prospective client and Edelman was just her "husband." *Id.*

Documents that appear to be Salamander's internal productivity tracking spreadsheets were also produced as part of the Swiss MLAT materials. One of the salient features of each is that entities are organized by group or ultimate beneficial owner. Take, for example, **Exhibit 16** (623, 670, 671 – Salamander) at 16-6:

| Level 1 | Level 2 | Level 3 | Client Executive | Type of fees | Invoicing Company | Invoicing Currency |
|---|---|---|---|---|---|---|
| Delphine | Galactea Trust | Atlantic Screen Holdings Limited | VD | FF | SM | GBP |
| Delphine | Atlas Resources Holdings Ltd | Atlas Resources Holdings Ltd | VD | FF | SM | GBP |
| Delphine | Atlas Trust | Atlas Trust | VD | FF | SM | GBP |
| Delphine | Atlas Trust – Evanshire Finance Limited | Atlas Trust – Evanshire Finance Limited | VD | FF | SM | GBP |
| Delphine | Big Valley Trust | Big Valley Trust | VD | FF | SM | GBP |
| Delphine | Galactea Trust | Bluestone International Investing Limited | VD | FF | SM | GBP |
| Delphine | Galactea Trust | Bluestone Trust | VD | FF | SM | GBP |
| Delphine | Dina Maropa Trust | Dina Maropa Trust | VD | FF | SM | GBP |
| Delphine | Galactea Trust | Galactea Trust | VD | FF | SM | GBP |
| Delphine | Iverna Trust | Iverna Trust | VD | FF | SM | GBP |
| Delphine | Lang International Holdings Limited | Lang International Holdings Limited | VD | FF | SM | GBP |
| Delphine | Light Air Capital | Light Air Capital | VD | FF | SM | GBP |
| Delphine | Lightstar Limited | Lightstar Limited | VD | FF | SM | GBP |
| Delphine | Lightstar Trust | Lightstar Trust | VD | FF | SM | GBP |
| Delphine | Maropa Limited | Maropa Limited | VD | FF | SM | GBP |
| Delphine | Iverna Trust | Mountain Pass Trading Limited | VD | FF | SM | GBP |
| Delphine | Murney Overseas Limited | Murney Overseas Limited | VD | FF | SM | GBP |
| Delphine | Pepper Mill Management Limited | Pepper Mill Management Limited | VD | FF | SM | GBP |
| Delphine | Galactea Trust | Rosbelt | VD | FF | SM | GBP |
| Delphine | Iverna Trust | Storyfirst Limited | VD | FF | SM | GBP |
| Delphine | Iverna Trust | Taruki Management Limited | VD | FF | SM | GBP |

Based on these spreadsheets, Salamander believed that Galactea Trust, Murney Overseas Limited, Taruki Management Limited, and Atlantic Screen Holdings Limited were all ultimately owned by Delphine by the time Salamander started administering them. *See id.*; *see also id.* at 16-36 to -39.

In what appears to be meeting minutes or a status tracker from 2015, the Salamander team also discussed the oversight and management of Taruki and its subsidiaries' activities, along with many others. *See id.* at 16-39 to -44. Salamander's internal documents relate to Isotropic and the Mexican investments, among others. *See, e.g.,* **Exhibit 17** (696 – Salamander) (Isotropic materials);

15

**Exhibit 18** (689 – Salamander) (Mexico project). These documents show that the trustee was overseeing and authorizing these investments. O'Brien's WhatsApp and iMessage conversations confirm this. For example, O'Brien was speaking with David Saunders, who worked on Mara Investments in Africa. *See* **Exhibit 19** (670 – Salamander). O'Brien similarly spoke with Tom Ehr about the Mexico investments. *See* **Exhibit 20** (670 – Salamander) at 20-1. O'Brien met with the Mina Group CFO, Zach Friedman in Dubai. *See, e.g.*, **Exhibit 21** (697 – Salamander) at 21-1 to -5. And, of course, O'Brien spoke with Graham Collett about all aspects of the trusts. *See, e.g.*, **Exhibit 22** (670 – Salamander) at 22-2.

Everyone who was in the know understood that as agents of the trusts, O'Brien and Collett had the authority to authorize investments. For example, O'Brien, Edelman, Collett, and others were all in a WhatsApp group chat titled "Isotropic A-round closing." **Exhibit 23** (670 – Salamander) at 23-1. The group was created on January 8, 2019. *Id.* On January 10, 2019, Edelman wrote "Hi !!! Ok looks like we are good to sign." *Id.* Someone, presumably from Isotropic responded, "I think Doug you have actually given us approval above based on being good to sign but we want an email from Graham or Leonard so we are in the clear and have a proper paper trail." *Id.* Another person confirmed "[t]o John's point, DLA cannot release WML's signature until we have an email from Graham, Leonard or anyone from WML based on previous instructions from Graham." *Id.* (WML likely stood for "Waterlow Management Limited."). O'Brien responded, "Ok to proceed !" and said he would send a confirming email. *Id.*

What the government characterizes as the trustee's rubber-stamping a previously made decision by Edelman is in fact the trustee following its legal duty as the authority over trust assets while relying on Edelman for strategic advice. In *Fortunato*—a civil case—the IRS argued that the non-owning Fortunato brother (Bobby) being involved in the failed sale of the businesses

16

evidenced his ownership. *See Fortunato*, 2010 Tax Ct. Memo LEXIS 142, at *39-40. The court rejected this argument. *Id.* Likewise, Edelman approving the sale of shares in Isotropic does not prove that he is a beneficiary of the trusts or that the trusts are shams. It shows that he was looking out for his wife's interests. *Cf.* FINRA, *supra*, page 12 ("board of directors' . . . primary job is to look out for shareholders' interests"). At the end of the day, the trustee had the final say, and Edelman knew that. *See, e.g.*, **Exhibit 24** (670 – Salamander) at 24-6 ("[12.10.20, 16:05:36] Douglas Edelman : . . . on call i did make it clear i have opinions but it's your's and graha's [sic] call and decision on all of these matters etc and not me at all ..").

As for Delphine Le Dain, looking at the WhatsApp conversations downloaded from Len O'Brien's phone shows that in June 2019, she messaged O'Brien with questions about the trusts and how they worked.[7] *See* **Exhibit 25** (669, 670 – Salamander) at 25-1. She asked whether he "can confirm that there are irrevocable trusts and about who can appoint a protector if Graham one day retires etc." *Id.* at 25-2. The trustee responded: "YES the Trusts are now irrevocable," and if Graham were to retire, Salamander "as Licensed and Regulated Trustees would discuss with Beneficiaries to find a suitably qualified Protector with the default position being a Managing Partner of a major law firm with relevant expertise in Trust Law." *Id.* at 25-2 to -3. O'Brien went on: "Any Protector should be completely independent of the Trustees regardless of who they are !" *Id.* at 25-3. Le Dain called and spoke to O'Brien a few more times to ask additional questions about the trusts. *See, e.g.*, *id.* 25-7 (Feb. 5, 2020 message from Le Dain to O'Brien ("[05.02.20,

---

[7] Le Dain understood that the assets held for her benefit were managed by someone else. *See* **Exhibit 25** (669, 670 – Salamander) at 25-22 ("Also who is making financial decisions about investments, about spending, (I understood vaguely that Graham or somebody like Tom or Bonnefoy or ?? Simon Fawcett?) or Doug of course might ask for more money to invest here and there or more money just to spend and you have the right to say yes or no? And then each time Douglas via Graham must get notified, right?").

19:28:38] Delphone [sic] LeDain: Len good evening! Thank you again for your time this morning! I have one question, who can chose the protector of the trust?").

Similarly, in February 2020, when Erkin began putting pressure on the trust to sell its half of Mina and Red Star, Le Dain asked O'Brien for an update on how negotiations were progressing. *See id.* at 25-9 ("[20.02.20, 08:50:11] Delphone [sic] LeDain: Have you heard more from Kassim s side, his memorandum /offer to Erkin' s lawyers?"). O'Brien offered to speak with Erkin Bek directly, asking Delphine for Erkin's number. *See id.* at 25-10 to -11. The trustee asked Delphine whether she had "spoken with Douglas about this, as he is working with Remco to hopefully find a way forward ?" *Id.* at 25-11. He explained that "Douglas knows Erkin much longer than I," so Edelman might be better equipped to deal with Erkin. *Id.* Le Dain said she would speak to her husband and asked the trustee to keep her informed. *Id.*

After Bek demanded that Edelman become Bek's partner again, the trustee updated Le Dain. On April 3, 2020, O'Brien told her "I have made it clear that I do not believe that Doug should fall into the trap of allowing Erkin to drag him into this." *Id.* O'Brien told Le Dain he thought "Erkin should simply address his Partner (effectively the Trust) to try and find a sensible way forward." *Id.* He let her know that he "and [the trust's] lawyers have made it clear that [they] will not be making any decisions unless [they] are convinced that it is in the interests of [their] Beneficiaries, of which Douglas is not one." *Id.* He reassured her: "Please don't think that I do not care about Douglas. It is the opposite. Unfortunately I think we need to hold firm on this which is in everyone's interest but is incredibly frustrating." *Id.*

A few days later, on April 13, 2020, Le Dain messaged the trustee in a panic: "As you know, there is a deadline to avoid litigation in a US court and I also have a gun pulled over my head and need to sign papers where i give up basically all my shares and ownership of the Mina

18

group." *Id.* at 25-13. She was stuck because she understood that "not signing would create much bigger problems for Douglas etc and for the company." *Id.* She thought "Doug is being kind of bullied / blackmailed" by Erkin and she needed O'Brien's advice. *Id.* The two spoke on the phone later that day. *See id.* at 25-14 ("Len: Can I call you at 15.30 ?"). The two continued to talk as the transaction developed. Le Dain expressed her willingness to do whatever she needed to do to protect her husband and her kids. *See id.* at 25-18 ("Well if my signature is preventing Doug [from having] to go to court i am happy to sign it then.").

Looking at the messages shows that Le Dain became more involved in the trusts and asked more questions about them when she felt a threat to her security. Le Dain repeatedly asked O'Brien what it meant for the trusts to be irrevocable or what her rights were as a beneficiary. *See, e.g.*, *id.* at 25-21("I would appreciate if you could email me for instance how the « irrevocable discretionary trust » works from my perspective as the beneficiary."). While she struggled to understand details, even important ones, about her holdings, she knew that she was the grantor and a beneficiary of the trusts, and O'Brien was her trustee. *See, e.g.*, *id.* at 25-19 ("i need your opinion as my trustee."); *id.* at 25-15 ("I need to know what is actually le[f]t for me and the girls in the various trusts of which I am still the UBO."); *id.* at 25-16 ("Kassim says you are the one as my trustee who should give me the information."). O'Brien confirmed these many times. *See, e.g.*, *id.* at 25-18 ("Erkin will need to Huff and Puff . . . . [w]hich is fine as long as the Trusts Economic Interests are protected as much as possible."); *id.* at 25-8 ("Kassim is very good and When Mishcons are representing Beneficiaries, you tend to find that things get done properly !"). He also repeatedly confirmed that Edelman was not a beneficiary. *See, e.g.*, *id.* at 25-26 ("Please also understand that we are not 'giving' Douglas anything ! He is NOT a beneficiary."); *id.* at 25-23 ("You (as Settlor and Beneficiary), Graham and Kassim (as Protector) and us (as Trustees), to [meet] and discuss

19

the most important issues and concerns"); *id.* at 25-11 ("I and our lawyers have made it clear that we will not be making any decisions unless we are convinced that it is in the interests of our Beneficiaries, of which Douglas is not one.").

These Swiss MLAT materials, produced at the eleventh hour, provide the likely contents of O'Brien's testimony: Salamander and O'Brien believed and acted as though they were the trustee of Le Dain's trusts. Salamander oversaw the trusts' assets while deferring to the people who understood the businesses, including (but not limited to) Zach Friedman as the Mina Group's CFO, Tom Ehr as a jack of all trades, and Edelman as an advisor and steward of his wife's interests. At the end of the day, everyone knew that Salamander had final say over what the trust would and would not do. When Le Dain felt threatened by Erkin's aggressive bids to get the trusts to sell Mina and Red Star, she reached out to O'Brien who reassured her that despite Bek's allegations to the contrary, she was the beneficiary of the trusts, not Edelman.

In a trust dispute like this one, the trustee's testimony should be a "a natural part of the Government's case." *United States v. Jackson*, 257 F.2d 41, 44 (3d Cir. 1958). Tellingly, the government's pre-hearing brief alleges "[t]here was no independent trustee," Gov. Opening Br. at 25-26, and despite having more than 73,000 pages from O'Brien, it makes no attempt to hang O'Brien on his own petard. Collett acknowledges that he was not part of every conversation or decision and he did not have the authority given to O'Brien as trustee. *See, e.g.*, CC1 Rule 15 Dep. Tr. at 50:7-9 (Feb. 6, 2025) (ECF 118-28) ("In terms of . . . Rosbelt International Limited; signatories on that account were the Trustee."); **Exhibit 25** (669, 670 – Salamander) at 25-11 ("I and our lawyers have made it clear that we will not be making any decisions unless we are convinced that it is in the interests of our Beneficiaries, of which Douglas is not one."). Particularly in light of what the newly provided Salamander materials reveal, the Court should infer that the

20

government is not calling O'Brien as a witness because his testimony would damage its case. *See United States v. Pitts*, 918 F.2d 197, 199 (D.C. Cir. 1990) (fact finder may infer "that the missing witness would have given testimony damaging to that party" who failed to call him).

## III.    Section 3B1.1 does not apply to Edelman.

The Guidelines employ a numerical framework to recommend a sentencing range for a given case using a total offense level which consists of a base offense level and any appropriate adjustments. *See* Ch. 5, Pt. A (Sentencing Table). Specifically, the Guidelines assign a base offense level to the offense of conviction and then adjust the level upwards (sentencing enhancements) or downwards (sentencing reductions) based on any aggravating or mitigating factors in a particular case. *See* U.S.S.G. § 1B1.1(a). An upwards adjustment or sentencing *enhancement* serves to distinguish aggravating, more harmful cases from average, commonplace cases. The Guidelines contemplate two primary ways to enhance sentencing—either through offense specific characteristics designed for and built into a particular offense, *see* § 1B1.1(a)(2), or through general enhancements that capture aggravating factors present across different offenses. *See* § 1B1.1(a)(3)-(5). If a particular harm has been addressed by a specific offense characteristic, the Guidelines do not apply any duplicative general enhancements.[8]

Section 3B1.1, "Aggravating Role," is a general enhancement that adds additional offense levels as follows:

---

[8] *See, e.g.*, § 2A3.1, App. n. 3 (if the specific offense characteristic for sexually abusing a victim in the offender's custody applies, do not apply the § 3B1.3 adjustment for abuse of position of trust); § 2H3.1, App. n. 3 (if the specific offense characteristic for publishing personal information of federal judges and other officials applies, do not apply the § 3A1.2 adjustment for official victim); § 2T1.4, App. n. 2 (if the specific offense characteristic for a tax preparer to aid and abet tax fraud applies, do not apply the § 3B1.3 adjustment for abuse of position of trust); *see also Proposed Amendments to Sentencing Guidelines*, at 156 (Dec. 12, 2025) (proposing to either change sophisticated means definition in each Guideline that uses it or make it a Chapter 3 adjustment).

(a)     Four levels if "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive";

(b)     Three levels if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive"; or

(c)     Two levels if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in subsection (a) or (b)."

Applying any of §3B1.1's subsections to Edelman would be duplicative of his other sentencing enhancements—i.e., the sophisticated means specific offense characteristic (§ 2T1.1(b)(2)) and the obstruction of justice general enhancement (§ 3C1.1).

**A.      Under the government's reading, § 3B1.1 would apply to every twenty-first century tax evader.**

The globalized economy depends on an intricate net that connects us all. Living in the modern world requires others' participation in our economic lives. This is particularly true for complicated tax filings. Almost every taxpayer today interacts with other people—bookkeepers, accountants, bankers, and their staff—to report income and pay taxes. With the internet and other technology, taxpayers can even get others' help from online tutorials, software applications, and artificial intelligence tools. These relationships make modern tax evasion a crime that necessarily involves numerous people, certainly more so than it was in 1987, when the Guidelines were first published and before most people had email. This change has been recognized by the Sentencing Commission, who have proposed to modify § 2T1.1(b)(2)'s definition of sophisticated means to account for these technological advancements.[9]

---

[9] In light of "public comment expressing concern that the current 'sophisticated means' specific offense characteristics are applied based on commonplace technologies" and are really capturing common means not sophisticated means, the Sentencing Commission is considering changing the definition of the "sophisticated means" specific offense characteristics, which has been unchanged since the tax Guidelines were first published in 1987, to require "the use of advanced or emerging technologies." *Proposed Amendments to Sentencing Guidelines*, at 155 (Dec. 12, 2025).

Yet the government still reads § 3B1.1 without any regard to this reality. It argues that Edelman should receive this four-point enhancement under § 3B1.1(a), doubling his sentence from 97 to 121 months (8 to 10 years) to 188 to 235 months (16 to 20 years), simply because "he told others what to do" and "directed the actions of several co-conspirators." Gov. Opening Br. at 34. Taxpayers have a non-delegable duty to report and ensure their taxes are paid. *See Cheek v. United States*, 498 U.S. 192, 201 (1991) (crime of evasion only possible where tax "law imposed a duty on the defendant"); *United States v. Boyle*, 469 U.S. 241, 252 (1985) (taxpayer's failure to timely file returns cannot be attributed to agent). If one of § 3B1.1's subsections applies whenever a taxpayer "told others what to do," every taxpayer who evaded their taxes while interacting with bookkeepers, accountants, tax preparers, couriers, bankers, assistants of the foregoing, or the like would be a leader or organizer of their own tax evasion, regardless of whether those other people know about their illegality or not. *Cf.* § 3B1.1(c) ("the defendant was an organizer, leader, manager, or supervisor in any criminal activity").

The application notes of § 3B1.1 show that such a mechanical understanding makes no sense. Application note 4 of § 3B1.1 lists out the relevant factors for the leader/organizer determination, which are

> [1] the exercise of decision-making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

Applying those factors shows that § 3B1.1 would reach almost every modern-day criminal tax evader:

- *First*, a tax evader always exercises "decision-making authority" because he is the person who owes tax and decides not to pay it. § 3B1.1, App. n.4. He is in charge of making that decision because for criminal liability to attach, he must have decided not to pay taxes willfully and voluntarily. If someone else makes that decision for him, then the taxpayer cannot, by definition, act willfully. *See Cheek*,

23

498 U.S. at 201 (willfully includes "he voluntarily and intentionally" deciding not to pay what you owe).

- *Second*, the tax evader is indispensable in evading his own tax, whether at the planning stage or implementation stage, and thus "the nature of [his] participation in the commission of the offense" is always integral and "the degree of [his] participation in planning or organizing the offense" is always high. § 3B1.1, App. n.4.

- *Third*, it could only be the tax evader who "recruits" or reach out to others for help with evading his own tax, not vice versa, because he is the one liable for his taxes. *Id.*

- *Fourth*, the tax evader always claims not just "a larger share" but the *only* "share of the fruits of the crime," because, by definition, the fruits of his crime (tax savings) could only ever inure to him. *Id.* No one else can get a slice of the amount of tax he evaded because he and only he owes the tax he has evaded.

- *Fifth*, "the nature and scope of" contemporary tax evasion is necessarily more sophisticated and involves multiple people because of our economic interconnectedness. *Id.*

- *Sixth*, the tax evader always exercises a degree of "control and authority" over others because he has a non-delegable duty to file and pay his taxes and anyone helping him fulfilling or avoiding that duty ultimately answers to him. *Id.*

Under the government's mechanical application, if, for example, a taxpayer asks a bookkeeper and an accountant to prepare his tax return and he provides false income information to their assistants, that would make his tax evasion "any criminal activity" or even "otherwise extensive" and subject the taxpayer to enhanced sentencing under § 3B1.1.[10] But embedding § 3B1.1 into every case as the government's brief suggests, would convert § 3B1.1 from an *enhancement* for aggravated cases to part of the base offense level for all tax crimes. Instead of

---

[10] If the taxpayer only works with his bookkeeper and accountant—without their knowledge of the illegality—that activity would not be "otherwise extensive" for purposes of § 3B1.1(a)-(b) but the taxpayer would still receive a two-level enhancement under § 3B1.1(c) which would in turn disqualify him for the two-level reduction for zero-point offender under § 4C1.1. That in combination would enhance the taxpayer's sentence by four levels simply because he uses a bookkeeper and an accountant. This is wrong.

24

just looking to the tax table in § 2T4.1, the base offense level would be tax table level plus as much as four—or plus even six, for defendants like Edelman who would otherwise receive a two-level reduction under § 4C1.1 for being a zero-point offender. That cannot be the law. *See United States v. Willis*, 322 F. Supp. 2d. 76, 78 (D. Mass. 2004) (refusing to apply § 3B1.1 every time a tax evader went "through the motions of directing someone else to do something" unless he "is somehow more culpable for having done so").

Sentencing enhancements should be reserved for cases that present aggravating facts tied to the nature of the enhancement. *See* § 1A1.1, background (sentencing Guidelines "maintain[] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors"). Section 3B1.1 specifically notes this as it increases a sentence for someone assuming an "aggravating role" in the offense, i.e., for making the resulting harm *worse* than it would be had the person not assumed such a role. The idea that § 3B1.1 could apply in all cases involving more than one person must be rejected. *See Willis*, 322 F. Supp. 2d. at 78 (the government's attempt to apply § 3B1.1 was "especially problematic in the offense of tax evasion committed by a single taxpayer" with others' help). A proper reading of § 3B1.1 thus requires there to be aggravating facts that increase the offender's culpability and for which the Guidelines do not otherwise account. *See id.* (§ 3B1.1 did not apply whenever a tax evader interacted with others as part of his own evasion, it only applied when the tax evader was "more culpable for having done so").

**B.     The Guidelines' drafting history shows that § 3B1.1 is not intended for a conspiracy whose sole object was to evade one individual's personal taxes.**

Chapter Two, Part T of the Guidelines (the tax Guidelines) sets forth tax specific offenses and their base offense levels. *See, e.g.*, § 2T1.1(a) (minimum base offense level of 6 for tax evasion), § 2T1.4(a) (minimum base offense level of 6 for aiding and abetting tax fraud), § 2T1.9(a)

25

(minimum base offense level of 10 for conspiracy to impede or defeat tax). These base offense levels can be adjusted upwards by the tax loss and by specific offense characteristics that account for additional aggravating aspects of the offenses. For example, tax evasion is more serious when it is made on criminally derived income (§ 2T1.1(b)(1)) or conducted using sophisticated means (§ 2T1.1(b)(2)). A defendant aiding and abetting tax fraud is more culpable when he derives substantial income from or makes a livelihood out of promoting tax fraud schemes (§ 2T1.4(b)(1)(A)) or abuses a position of trust such as that of a tax preparer (§ 2T1.4(b)(1)(B)). Likewise, a conspiracy to impede tax collection deserves harsher punishment when it contemplates the use of violence (§ 2T1.9(b)(1)) or extends beyond co-conspirators to encourage others to violate tax laws (§ 2T1.9(b)(2)).

Indeed, when drafting the original Guidelines, effective November 1, 1987, the Commission considered another specific offense characteristic for § T211 (§ 2T1.1's draft precursor) that would apply to tax evasion "committed in furtherance of or in conjunction with an organized movement to encourage others to violate the internal revenue laws." *See* Feb. 1987 Rev. Draft Guidelines, 52 Fed. Reg. 3783, 3965 (Feb. 6, 1987).[11] Because this "movement to encourage others" specific offense characteristic had to involve more than one actor, the Commission considered it together with § Z211 (§ 3B1.1's precursor in drafts of the Guidelines). When Commissioner and then-Judge Stephen Breyer "recommended removing [that] specific offense characteristic" because it may "punish minor offenders too severely," another Commissioner

---

[11] The February 1987 Revised Draft Guidelines were circulated to certain stakeholders in January 1987. *See* Brent E. Newton & Dawinder S. Sidhu, *The History of the Original United States Sentencing Commission, 1985-1987*, 45 HOFSTRA L. REV. 1167, 1200 (2017) ("[T]he second, revised preliminary draft was prepared in January 1987 and published on February 6, 1987."). The February 1987 Revised Draft Guidelines reworked the draft Guidelines published in the Federal Register in October 1986. *See* Preliminary Draft of Sentencing Guidelines for United States Courts, 51 Fed. Reg. 35080, 35080 (Oct. 1, 1986).

suggested using the general role in the offense enhancement (then § Z211, currently § 3B1.1) to replace that specific offense characteristic for tax evasion. *See* Jan. 22, 1987 USSC Meeting Minutes (**Exhibit 13**) at 13-7 (ECF 119-21). But David Lombardero—one of the main drafters of the tax Guidelines—cautioned the Commission against the last approach and stated that the general sentencing enhancement for "role in the offense *would not apply where the offense is personal income tax evasion.*" *Id.* (emphasis added).

Ultimately, taking DOJ Tax's advice, the Commission deleted that "movement to encourage others" specific tax offense characteristic from § 2T1.1 and instead created a separate Guideline—§ 2T1.9 (conspiring with others to impede or defeat tax)—to address certain kinds of aggravated tax conspiracies. *Compare* § 2T1.1, *with* 2T1.9 (1987). By assigning a minimum base offense level of 6 to § 2T1.1 and that of 10 to § 2T1.9, the Commission made clear that § 2T1.9's conspiracy to impede tax laws is an aggravating offense compared to § 2T1.1's tax evasion. Further, the Commission carefully distinguished tax evasion involving multiple actors from aggravated tax conspiracies under § 2T1.9, explicitly stating in Application note 1 of § 2T1.9 that it "does not apply to taxpayers, such as a husband and wife, who merely evade taxes jointly or file a fraudulent return." § 2T1.9, App. n. 1 (2025). This is because the presence or even assistance of more actors in an average tax evasion case does not cause additional harms that make the "leader" more culpable for the crime.

### 1.    DOJ Tax taught the Commission about the kinds of aggravating tax crimes that make leaders more culpable.

The comprehensive and detailed tax Guidelines were the result of DOJ Tax Division's extensive education of, and ongoing conversations with, the Sentencing Commission. To ensure that the Guidelines adequately account for relevant aggravating factors in tax crimes, in the first half of 1986, the Commission asked for DOJ Tax to weigh in on sentencing. The Commission

asked the Tax Division twelve questions. *See* May 5, 1986 Letter from DOJ Tax (**Exhibit 7**) at 7-7 to -16 (ECF 119-15). In its response, DOJ Tax added additional gloss by raising, unprompted, factors that it believed were relevant "in ranking the seriousness of any criminal tax offense": (1) "The character or source of income on which the tax evaded was derived from a criminal act"; (2) "The scope of the fraudulent scheme"; (3) "Involvement of others"; (4) "Perjury"; (5) "The flagrancy of the offense"; and (6) "Repeat offenders." *See id.* at 7-3 to -5. The third factor— "Involvement of others"—shed light on the types of aggravated tax crimes that DOJ Tax considered as most serious and harmful, which may justify a role enhancement for their leaders:

> 3. <u>Involvement of others.</u> The seriousness of a criminal tax offense is increased when a defendant who personally engineered the scheme that led to the criminal tax violations *received a substantial financial benefit therefrom*. Thus, *an individual who initiated a conspiracy should be considered more culpable and treated more harshly than others in the conspiracy who may have actively engaged in the conspiracy, but who received substantially less financial benefit*. At least comparable in seriousness to the offenses of prime movers in tax evasion schemes that involve others are offenses of *tax protesters* who are also proselytizers seeking to convert ordinarily law abiding persons to their particular credos of non-compliance and non-payment. Sentencing courts in such cases appear to be cognizant of *the grave threat to the revenue and to the tax compliance program which is implicit in the actions of those protesters* and have been imposing sentences of comparable severity. . . . The convicted tax protester may have failed to pay a comparatively modest amount of taxes and, measured on a monetary scale, it could seem to be a crime of small dimensions. Factually, of course, the crime is an aggravated one and even *the monetary damage to the Government could be ten or twenty or a hundred times greater* than the taxes involved in the charge or charges for which such a person was convicted.

*Id.* at 7-4 (emphasis added).

DOJ Tax distinguished aggravated tax crimes involving a tax shelter scheme or a tax protest program from other tax crimes because they caused unique and far-reaching harms, including (1) revenue losses that can be "ten or twenty or a hundred times greater" than the tax loss caused by the individual tax protester himself, *id.*; (2) "a severe burden on the administration of the federal tax system" given the difficulty to investigate the full extent of revenue losses traceable to the tax

28

shelter promoter or tax protestor whose evasion scheme necessarily required others, *id.* at 7-2 ("The proliferation of abusive and illegal tax shelters has created a severe burden on the administration of the federal tax system and resulted in significant revenue losses."); and (3) a "grave threat to the revenue and to the tax compliance program" caused by the anti-revenue-collection social climate shelter promoters and tax protestors stirred up through wide dissemination of tax fraud and tax protest ideas, which threat was not quantifiable in terms of dollars and cents. *Id.* at 7-4; *id.* at 7-2 ("[The] number of tax protest cases has increased dramatically in the past few years."). Together, these harms created infinite compliance and investigation hurdles that went well beyond what was within a tax protestor or shelter promoter's individual capacity to cause. *Id.* at 7-4 (calling protest ring leaders "proselytizers").

For those cases presenting aggravated *harms*, DOJ Tax recommended *enhanced* sentencing for the scheme leaders because the harm of their crimes could not be fully captured by the amount of tax loss of which they were convicted. *Id.* And it made sense to hold tax shelter promoters and protest ring leaders (rather than their accomplices) primarily accountable for the additional harms because they were the ones who "received a substantial financial benefit" from the schemes they "personally engineered" and promoted, while their audience or assistants "received substantially less financial benefit." *Id.*; *see id.* at 7-9 ("[T]ax shelter promoters can earn millions of dollars by promoting fraudulent tax shelters. Thus, their monetary gain is much greater than the amount of taxes they owe the Government; it also includes the amounts of money swindled from third parties. Similarly, tax protesters can earn large sums of money through the sale of tax protest promotional materials and by conducting tax protest seminars.").

The Commission took DOJ Tax's suggestions to heart and incorporated them in the February 1987 revised Guidelines. That revised draft proposed a specific offense characteristic to

29

§ T211 (§ 2T1.1's precursor), which enhanced sentencing for tax evasion committed "in furtherance of or in conjunction with a movement to encourage others to violate the internal revenue laws" because of its aggravating "potential to subvert the tax system." *See* Feb. 1987 Rev. Draft Guidelines, 52 Fed. Reg. at 3965. In conversations with the Commission, DOJ Tax demanded that "movement to encourage" specific offense characteristic be further revised to describe specific types of aggravated tax conspiracies. *See* Feb. 27, 1987 Letter from Roger Olsen (DOJ) (**Exhibit 8**) at 8-9 to -10 (ECF 119-16). DOJ Tax emphasized that the aggravating aspect of these schemes was their "influencing others and impeding and impairing the Internal Revenue Service." *Id.* As examples, DOJ Tax gave three aggravated tax conspiracy cases: "United States v. Klein, 247 F.2d 908, 915 (2d Cir. 1957), cert. denied, 355 U.S. 924 (1958); United States v. Browning, 723 F. 2d 1544 (11th Cir. 1984), and United States v. Carruth, 699 F. 2d 1017, 1021 (9th Cir. 1983), cert. denied, 104 S. Ct. 698 (1984)." *Id.* at 8-10.

None of these cases looks like Edelman's. *Carruth* involved a shelter promoter. It was the typical scenario DOJ Tax referred to in their previous letter's discussion on "Involvement of Others." *See* **Exhibit 7** at 7-4 (ECF 119-15). *Klein* involved a group of business associates all engaging in a tax evasion scheme to evade and assist each other evade their taxes. It was an exemplary case where multiple taxpayers underreported or evaded taxes together, with one person influencing others and creating an aggregate revenue loss greater than his own tax loss. *Browning* involved a drug dealer who had been convicted of conspiracy to money launder to hide his illegally obtained income. It spoke to another aggravating factor that DOJ Tax pointed out: "The character or source of income on which the tax evaded was derived from a criminal act." *See* **Exhibit 7** at 7-3 to -4 (ECF 119-15) (tax evasion was more harmful when the relevant income was "derived from a form of criminal activity that is a threat to society" such as "organized crime or narcotics

30

trafficking"); *see also* **Exhibit 8** at 8-19 (ECF 119-16) (recommending enhanced sentencing for tax evasion on criminally derived income, which was "generally unreported or otherwise difficult to establish"). Neither *Klein*, *Browning*, nor *Carruth* involved a conspiracy whose sole objective was to assist a single individual taxpayer to evade *his own* taxes on income he lawfully obtained. Those exemplary aggravated tax crimes resulted in harms beyond the lead offenders' tax losses, the full scope of which is difficult if not impossible to assess. That is not Edelman's case.

To account for these aggravated tax crimes in the official Guidelines in 1987, the Commission made criminally derived income a specific offense characteristic under § 2T1.1(b)(1) and adopted two separate tax Guidelines—§ 2T1.4 (aiding and abetting others to commit tax fraud) and § 2T1.9 (conspiracy to impede or defeat tax). *See* § 2T1.9, App. n. 1 (1987) (listing *Carruth*, *Browning*, and *Klein* as aggravated tax conspiracies that are "far-reaching" and "difficult to evaluate the extent of the revenue loss caused"); § 2T1.4, App. n. 1 (1987) (targeting promotors of "fraudulent tax shelters"); § 2T1.1(b)(1), App. n. 5 (1987) (targeting criminal income from "racketeering" activity).

In those aggravated tax crimes, the § 3B1.1 aggravating role enhancement may apply to hold a leader accountable for causing far-reaching harms that significantly exceed his own tax loss. Empirical data bears this out.[12] As shown in the below chart, from fiscal years 1999 to 2024, courts have applied the § 3B1.1 enhancement to 21.5% of the § 2T1.9 cases and 8.9% of the § 2T1.4 cases. Meanwhile, only 3.5% of the § 2T1.1 cases have received the aggravating role enhancement, and that percentage drops to 2.3% after excluding the § 2T1.1(b)(1) criminally-derived-income cases.

---

[12] This data is publicly available at http://www.ussc.gov/research/datafiles/commission-datafiles. The data is summarized and analyzed by each relevant tax Guideline in the Report of MCM Data Consulting dated March 25, 2026 and filed as an attachment to this brief. To the extent the Court considers the report an exhibit, Edelman respectfully seeks leave to file it as such.



FY1999-2024
Frequency § 3B1.1 Imposed by Guideline

None of the concerns behind §§ 2T1.1(b)(1), 2T1.4, and 2T1.9 is present in Edelman's case. Edelman did not make a business out of his tax evasion, did not promote or sell tax evasion schemes to others, did not cause a revenue loss greater than his own tax loss, and did not derive the income on which tax was evaded from illegal, racketeering activity. It is a large individual tax evasion case to be sure; but it is still an individual tax evasion case and that magnitude of harm is reflected in the tax table. His crime does not create the kind of aggravating harms that warrant the application of § 3B1.1.

> **2.    The harms caused by Edelman's tax evasion can be and have been fully accounted for by other Guideline provisions.**

Edelman committed a serious offense. He has a history of evading taxes on income he earned from defense contracts, causing a significant tax loss of at least $65 million. He evaded the taxes he owed by creating false paperwork to move his income and ownership interests to his spouse, Delphine Le Dain, making it appear as if she held those assets from the beginning. He used foreign bank accounts and nominees to conceal his income from and interest in Mina and Red Star.

And he got other people to help him with creating and perpetuating that false story, including causing his attorneys to lie to Congress that Le Dain was a co-founder and co-owner of Mina and Red Star through a false proffer in 2010, and again causing his attorneys to tell the same lie to DOJ Tax and IRS CI Special Agents in a 2018 presentation. All that conduct has grave consequences, for which Edelman pled guilty and accepted responsibility.

Edelman has accepted that he will receive a sentence that accounts for each and every harm he caused: (1) The significant revenue loss he caused translates to a base offense level as high as 30 under the 2025 Guidelines, which requires a minimum sentence of 97 months (§§ 2T1.1, 2T4.1(M) (2025)); (2) the government's heightened investigation burden caused by his use of foreign nominees and bank accounts will qualify him for the current version of the sophisticated means specific offense characteristic as defined by the 2025 Guidelines, which increases his offense level by two levels (§ 2T1.1(b)(2)); and (3) the government's investigation difficulties caused by the lie he made and caused others to make will entitle him to another two-level enhancement for obstruction of justice (§ 3C1.1).[13]

As shown in the below table, these add up to a total offense level of 34, which is reduced by 2 levels for acceptance of responsibility (§ 3E1.1(a))[14] and another 2 levels for being a zero-point offender (§ 4C1.1):

| | |
|---|---|
| Base Offense Level, §§ 2T1.1, 2T4.1(M) | 30 |
| Sophisticated Means, § 2T1.1(b)(2) | + 2 |
| Obstruction, § 3C1.1 | + 2 |

---

[13] The government has not yet stated the factual grounds for the § 3C1.1 enhancement. The draft Presentence Report proposes the enhancement should apply because of the 2010 Congressional investigation and the 2018 DOJ proffer.

[14] Edelman will also argue, consistent with *Taveberidze*, that he is also entitled to another one-level reduction for acceptance of responsibility under § 3E1.1(b).

| | |
|---|---|
| Acceptance of Responsibility, § 3E1.1(a) | - 2 |
| Zero-Point Offender, § 4C1.1 | - 2 |
| Offense Level | 30 |
| Sentence (months), Crim. History Cat. I, Ch. 5 | 97-121 |

A sentence of 97 months, or 8 years, is still likely a death sentence to Edelman, who is 74 years old. Yet Edelman takes responsibility for his misdeeds.

Edelman only disputes his sentence when after all the above adjustments, the government pushes further under § 3B1.1(a) for what is effectively a six-level enhancement to his prison sentence. Applying §3B1.1 would bring Edelman's final offense level to 36 because § 3B1.1(a) would add 4 levels itself and deny the 2-level reduction provided for zero-point offenders in § 4C1.1. *See* § 4C1.1(a)(10) (denying reduction to defendants receiving adjustment under § 3B1.1). Edelman's within-Guidelines sentence would be 188 to 235 months, or 16 to 20 years. The government gives only one reason for its attempt to double Edelman's sentence—he "told others what to do," which helped evade the taxes he owed. Gov. Opening Br. at 34. Telling others what to do does not make him this much more culpable.

Edelman did grave damage, but his tax evasion begins and ends with him. He did not run or lead any illegal businesses or encourage others to evade their taxes or otherwise create a revenue loss greater than his own tax loss. Ultimately, because Edelman did not create additional harms not otherwise captured by his tax loss, the sophisticated means specific characteristic, and the obstruction of justice enhancement, there are no residual harms justifying the § 3B1.1 enhancement. *See United States v. Calloway*, No. 17-089 (RJL), 2021 U.S. Dist. LEXIS 140946, at \*12 (D.D.C. July 27, 2021) (not applying the § 5K2.9 enhancement for intent to commit another offense because another Guideline section "*already* takes into account [defendant's] intent to commit

another offense" (emphasis in original)), *aff'd*, 94 F.4th 130 (D.C. Cir. 2024). In this case the mere presence and even assistance of others does not justify a longer sentence.

### C. General principles of federal sentencing confirm that the § 3B1.1 aggravating role enhancement should not apply to Edelman.

A sentence must be proportionate to the harm caused by the offense. Congress mandates that a "court shall impose a sentence sufficient, but not greater than necessary . . . to reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(2). And Congress re-emphasized that principle when it created the Sentencing Commission and Guidelines, requiring the Commission to consider "the nature and degree of the harm caused by the offense" in devising appropriate sentences under the Guidelines. 28 U.S.C. § 994(c)(3).

A sentence proportionate to harm must be individualized because the nature of a harm varies under different circumstances. A judge must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). This is because "[s]ection 3553(a), unlike the guidelines themselves after *Booker*, is mandatory." *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005). As this Circuit recognizes, "every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).

The Commission made this same point when it went about drafting Chapter 3. In a memorandum containing the Commissioners' and staff's critiques of an early draft of Chapter 3, the drafters agreed that the Guidelines should not "treat[] all conspiracy, attempt, and solicitation offenses alike without regard to the underlying substantive offense." *See* July 25, 1986 Memo of Suzanne Conlon (USSC) (**Exhibit 6**) at 6-5 (ECF 119-14). Rather, the amount of harm caused by a conspiracy depends on the nature of the underlying offense. *Id.* For example, "Congress has

35

recognized that aggravated societal harms flow from attempts, solicitations and conspiracies to commit certain crimes" such as attempts and conspiracies to violate federal narcotics law (21 U.S.C. § 846), attempted aircraft hijacking (18 U.S.C. § 1472), and attempted assassination of the President (18 U.S.C. § 1751). *Id.* at 6-6 to -7. Congress dictated that those specific, aggravated inchoate crimes should be punished as severely as their choate counterparts. *Id.*

> This proportionality principle was ultimately enshrined in the Guidelines too:

> Sentencing courts do not treat the occurrence of a simple bruise identically in all cases, irrespective of whether that bruise occurred in the context of a bank robbery or in the context of a breach of peace. This is so, in part, because the risk that such a harm will occur differs depending on the underlying offense with which it is connected (and therefore may already be counted, to a different degree, in the punishment for the underlying offense).

*See* Guidelines (1987) at 1.3; § 1B1.3(a)(3) (2025) (relevant conduct includes "all harm that resulted from the acts and omissions specified in . . . [subsections describing jointly undertaken criminal activity] above, and all harm that was the object of such acts and omissions").

Just as "a simple bruise" presents different risks and harms in different situations, whether a conspiracy creates additional harms that make its leader more culpable depends on the context of the substantive crime. For tax conspiracies, a leader is more culpable if the conspiracy is to commit an aggravated tax crime as in *Carruth* (tax shelter promoter), *Browning* (tax evasion on income derived from drug trafficking), and *Klein* (one taxpayer directed other taxpayers to help him avoid his taxes while also caused other taxpayers to evade their respective taxes). If a conspiracy leader is not more culpable for causing additional harms, § 3B1.1 does not apply. *See Willis*, 322 F. Supp. 2d. at 78 (refusing to apply § 3B1.1 because the defendant was not more culpable for directing others).

Here, Edelman's substantive offense is a baseline tax crime, albeit a large one, which did not cause other taxpayers to evade taxes and did not require the government to investigate multiple

36

taxpayers in order to discover the scope of the scheme. In light of the self-contained nature of Edelman's tax evasion, his directing others did not cause additional harms that made him more culpable and were not otherwise captured by the Guidelines.

To the extent the government insists on a mechanical application of § 3B1.1, the Supreme Court has made clear that the Guidelines are not mandatory. *United States v. Booker*, 543 U.S. 220, 245 (2005) (making the guidelines "effectively advisory"); *Gardellini*, 545 F.3d at 1092 (stating the Guidelines' range is but "one factor" among many). If strict adherence to the Guidelines' mathematical approach to sentencing produces a sentence in disregard of the unique facts of a specific case, it should be rejected as "a classic example of attempting to measure an inventory of apples by counting oranges." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines should only guide—not substitute—the Court's evaluation of case-specific facts and case-specific harms in sentence determinations. The mathematical formulas in "the Guidelines do not reduce district court judges to mere automatons, passive compilers of ciphers, or credulous naifs." *United States v. Wise*, 976 F.2d 393, 402 (8th Cir. 1992), *cert. denied*, 507 U.S. 989 (1993).

In conclusion, the hallmark of § 3B1.1 is not the number of actors in an offense, but the presence of aggravating facts that cause additional *harms* which cannot be fully captured in a sentence without applying § 3B1.1. Consistent with the Guidelines' drafting history, common sense, and the principles upon which federal sentencing is built, § 3B1.1 cannot apply so broadly as to reach every tax evader regardless of whether they are "more culpable than an ordinary offender" or not. *See Willis*, 322 F. Supp. 2d. at 78 (only applying § 3B1.1 when defendant's interaction with other actors made him more culpable).

37

## **CONCLUSION**

In sum, Edelman had and has no interest in the trusts and the government's own filings indicate this. The government's not calling the trustee (Salamander/O'Brien) warrants an adverse inference that the trustee's testimony would not bear out the government's contrary assertions. Moreover, sentencing should be individualized and proportionate to the facts. The government may not read § 3B1.1 to be so broad that it applies to every tax offender, including Mr. Edelman, whose directing others did not cause additional harms unaddressed by the Guidelines.

*        *        *

Respectfully submitted,

/S/ George M. Clarke, III
GEORGE M. CLARKE, III
D.D.C. Bar No. 480073
George.clarke@bakermckenzie.com
BAKER & McKENZIE LLP
815 Connecticut Ave., N.W.
Washington, D.C. 20006
(202) 835-6184

/S/ Sonya C. Bishop
SONYA C. BISHOP
D.D.C. Bar No. NY0568
Sonya.bishop@bakermckenzie.com
BAKER & McKENZIE LLP
452 Fifth Ave.
New York, N.Y. 10018
(332) 215-5812

*Counsel for Defendant Douglas Edelman.*        Dated: March 27, 2026

38