# Defense Exhibit 17

DATED                                        2017

------------

## CONVERTIBLE LOAN NOTE INSTRUMENT

BETWEEN

(1) ISOTROPIC SYSTEMS LTD

(2) WATERLOW MANAGEMENT LIMITED

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-1**

# CONTENTS

## CLAUSE

1.      Interpretation.................................................................................................................1
2.      Amount and description of notes...................................................................................4
3.      Status of notes................................................................................................................5
4.      Interest ...........................................................................................................................5
5.      Security...........................................................................................................................5
6.      Repayment of Notes.......................................................................................................5
7.      Conversion......................................................................................................................5
8.      Certificates.....................................................................................................................7
9.      The Register...................................................................................................................8
10.     Notes not to be quoted ..................................................................................................9
11.     Variation ........................................................................................................................9
12.     Assignment ....................................................................................................................9
13.     Whole Agreement...........................................................................................................9
14.     Third Party Rights..........................................................................................................9
15.     Costs...............................................................................................................................9
16.     Notices..........................................................................................................................10
17.     Counterparts.................................................................................................................10
18.     Governing law and jurisdiction....................................................................................10

## SCHEDULE

SCHEDULE 1     FORM OF CERTIFICATE ....................................................................................11

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

# Defense Exhibit 17-2

**THIS DEED** is dated                                                                 2017

**PARTIES**

(1)    **ISOTROPIC SYSTEMS LTD** incorporated and registered in England and Wales with company number 08706503 whose registered office is at 20-22 Wenlock Road, London N1 7GU (**Company**);

(2)    **WATERLOW MANAGEMENT LIMITED** incorporated and registered in the British Virgin Islands with company number 1858967 whose registered office is at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands (**WML**).

**BACKGROUND**

A.    By exercising of the powers conferred on them by the Articles, the Directors of the Company have, by a resolution passed on the date of this Instrument, created US$4,000,000 unsecured convertible loan notes and have agreed to constitute them upon the terms of this Instrument.

B.    WML has agreed to subscribe for the full US$4,000,000 unsecured convertible loan notes upon the terms of this Instrument.

C.    Prior to the date of this Instrument, WML advanced US$2,050,000 towards the US$4,000,000 upon the terms of the Loan Facility. The parties to this Instrument intend that this Instrument shall replace the Loan Facility and accordingly the Loan Facility shall cease to have any further force or effect from the date of this Instrument.

**AGREED TERMS**

1.    **INTERPRETATION**

1.1    The definitions and rules of interpretation in this clause apply in this Instrument.

**Act:** the Companies Act 2006.

**Articles:** the articles of association of the Company, as amended or superseded.

**Business Day:** a day (other than a Saturday, Sunday or public holiday) on which banks in the City of London are open for normal banking business.

**Certificate:** a certificate for Notes in the form (or substantially in the form) set out in Schedule 1.

**Conversion Date:** simultaneously with completion of the Fundraising.

**Conversion Shares:** the total number of Senior Shares issued to WML under clause 7.

**Directors:** the board of directors of the Company for the time being.

1

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-3**

0696 - 95

**Fundraising:** a fundraising round in the Company raising US$5,000,000 or more from an issue of Senior Shares to any investor(s) (and excluding, for the avoidance of doubt, any Notes to be converted into Senior Shares).

**Initial Conversion Shares:** the Conversion Shares calculated at clause 7.2 prior to adjustment at clauses 7.3 or 7.4.

**Loan Facility:** an unsecured term loan facility from WML to the Company dated [        ].

**Notes:** up to US$4,000,000 unsecured convertible loan notes 2017 constituted by this Instrument or (as the case may be) the principal amount of such loan notes for the time being issued and outstanding, and **principal amount** shall be construed accordingly.

**Noteholder:** a person for the time being entered in the Register as holder of any Notes.

**Post Conversion Base Price:** the Post Conversion Valuation divided by (the Total Shares plus the Initial Conversion Shares).

**Post Conversion Valuation:** the Pre Money Valuation plus the amount of the Notes being converted at clause 7.

**Pre Conversion Base Price:** the Pre Money Valuation divided by the Total Shares.

**Pre Money Valuation:** the pre money valuation of the Company prior to conversion of the Notes at clause 7 and the Fundraising.

**Register:** a register of Noteholders referred to in, and kept and maintained in accordance with, clause 9.

**Registered Office:** the registered office of the Company from time to time.

**Senior Shares:** such senior class of Shares as are issued to the investor(s) at the Fundraising.[1]

**Shares:** the shares in the capital of the Company.

**Total Shares:** the total number of Shares in issue immediately prior to conversion of the Notes at clause 7 (currently being 2,873,400 Shares).[2]

**WML Shares:** the 1,350,500 Shares registered in the name of WML at the date of this Instrument.

---

[1]    I'm not referring to these as "Series A Preferred Shares" as the actual shares (and name) will be decided at the time of the fundraising round.  For ease, I therefore just refer to Senior Shares throughout this document instead.

[2]    Prior to entering into this convertible loan note, all shares in the company will be subdivided by 100. This means WML's 13,505 shares of £0.001 will become 1,350,500 shares of £0.00001. This is to facilitate future employee share options as it allows for smaller percentage awards to be made.

2

**Defense Exhibit 17-4**

0696 - 96

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

1.2 Clause, Schedule and paragraph headings shall not affect the interpretation of this Instrument.

1.3 References to clauses and Schedule 1 are to the clauses of and Schedule 1 to this Instrument and references to paragraphs are to paragraphs of Schedule 1.

1.4 Schedule 1 forms part of this Instrument and shall have effect as if set out in full in the body of this Instrument. Any reference to this Instrument includes Schedule 1.

1.5 References to **this Instrument**, or to any other agreement or document referred to in this Instrument is a reference to this Instrument or such other agreement or document as varied or novated in accordance with their terms from time to time.

1.6 Unless the context otherwise requires, words in the singular shall include the plural and in the plural shall include the singular.

1.7 Unless the context otherwise requires, a reference to one gender shall include a reference to the other genders.

1.8 A **person** includes a natural person, corporate or unincorporated body (whether or not having separate legal personality) and that person's personal representatives, successors and permitted assigns.

1.9 A reference to a **company** shall include any company, corporation or other body corporate, wherever and however incorporated or established.

1.10 A reference to **writing** or **written** includes e-mail.

1.11 Any words following the terms **including**, **include**, **in particular**, **for example** or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

1.12 Where the context permits, **other** and **otherwise** are illustrative and shall not limit the sense of the words preceding them.

1.13 A reference to a statute or statutory provision is a reference to it as amended, extended or re-enacted from time to time and a reference to a statute or statutory provision shall include all subordinate legislation made from time to under that statute or statutory provision.

1.14 Any obligation on a person not to do something includes an obligation not to allow that thing to be done.

3

**Defense Exhibit 17-5**

0696 - 97

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

1.15    A reference in this Instrument to:

    (a)    any Notes being **outstanding** means such Notes as are in issue, not redeemed, not converted and not cancelled at the relevant time;

    (b)    **US$** denotes the lawful currency of the USA; and

    (c)    **tax** shall be construed so as to include any present and future tax, levy, impost, deduction, withholding, duty or other charge of a similar nature (including, without limitation, any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

1.16    Unless the context otherwise requires, a reference to the **Notes** includes a reference to all and/or any of the Notes.

1.17    Except as otherwise provided, expressions defined in the Act shall be read as if defined in that way in this Instrument.

## 2.    AMOUNT AND DESCRIPTION OF NOTES

2.1    The aggregate principal amount of the Notes is limited to US$4,000,000.

2.2    The Notes shall be known as unsecured convertible loan notes 2017 and shall be issued by the Company to WML in separate instalments on the respective dates WML actually lends the respective instalment to the Company.

2.3    For the purposes of this Instrument, WML has agreed to subscribe for the Notes in the following proposed instalments:

| No. | Subscription date | Amount (US$) |
|---|---|---|
| 1 | 29 August 2017 | 500,000 |
| 2 | 2 October 2017 | 500,000 |
| 3 | 18 October 2017 | 350,000 |
| 4 | 6 November 2017 | 350,000 |
| 5 | 22 November 2017 | 350,000 |
| 6 | 15 December 2017 | 350,000 |

4

# Defense Exhibit 17-6
0696 - 98

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

| | | |
|---|---|---|
| 7 | 15 January 2018 | 350,000 |
| 8 | 15 February 2018 | 350,000 |
| 9 | 15 March 2018 | 300,000 |
| 10 | 15 April 2018 | 300,000 |
| 11 | 15 May 2018 | 300,000 |
| | Total | 4,000,000 |

2.4    The parties to this Instrument acknowledge that instalments 1 to 5 in the table at clause 2.3 have already been paid by WML to the Company on the relevant subscription dates.

2.5    The parties to this Instrument agree that the Loan Facility is hereby terminated with effect from the date of this Instrument and that each of the parties to this Instrument shall be released from any continuing obligations or liabilities under the terms of the Loan Facility.

**3.    STATUS OF NOTES**

3.1    The Notes when issued and outstanding shall rank pari passu, equally and rateably, without discrimination or preference among themselves and as unsecured obligations of the Company.

3.2    The Notes shall be issued and held subject to and with the benefit of the provisions of this Instrument. All such provisions shall be binding on the parties to this Instrument and all persons claiming through or under them respectively.

3.3    The Company shall recognise the registered holder of any Notes as the absolute owner of them and shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to take notice or see to the execution of any trust (whether express, implied or constructive) to which any Note may be subject.  The Company shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to enter any notice of any trust (whether express, implied or constructive) on the register in respect of any of the Notes.

3.4    A copy of this Instrument shall be kept at the Registered Office.  WML may inspect that copy of the Instrument at all reasonable times during office hours.

5

**Defense Exhibit 17-7**

0696 - 99

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

4.    **INTEREST**

The Notes shall not carry interest.


5.    **SECURITY**

The Company's obligations in respect of the Notes shall be unsecured.


6.    **REPAYMENT OF NOTES**

The Notes are non-redeemable (save for the purposes of clause 7.6) and accordingly may only be converted into Senior Shares in accordance with clause 7.


7.    **CONVERSION**

7.1    The Notes will be converted into Senior Shares:

    (a)    automatically, on completion of a Fundraising where the Pre Money Valuation for such round is US$10,000,000 or more; or

    (b)    only with the agreement of the Directors passed by a resolution of the Directors, on completion of a Fundraising where the Pre Money Valuation for such round is less than US$10,000,000.


7.2    Subject to clauses 7.3 and 7.4, the number of Senior Shares to be issued to WML upon conversion shall be based on a conversion price per Senior Share equal to the Pre Conversion Base Price subject to the following adjustments:

    (a)    Save as provided at clauses 7.2(b) or (c), the conversion price shall be at a 30% discount to the Pre Conversion Base Price.

    (b)    Save as provided at clause 7.2(c), for any payment received in cleared funds later than 10 Business Days following the due subscription dates at clause 2.3, the 30% discount noted in clause 7.2(a) shall be reduced in respect of each late tranche to the following percentage discounts:

        (i)    11 to 20 Business Days late: 25%

        (ii)    21 to 30 Business Days late: 20%

        (iii)    31 to 40 Business Days late: 15%

        (iv)    41 to 50 Business Days late: 10%

        (v)    51 to 60 Business Days late: 5%

        (vi)    61 Business Days late or more: 0%

    (c)    If WML does not invest the full US$4,000,000 on or before the Fundraising, the conversion price for the entire investment made by WML shall be at the Pre Conversion Base Price.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

6

**Defense Exhibit 17-8**

0696 - 100

7.3     Provided WML invests the full US$4,000,000 on or before the Fundraising, then in the event the Pre Money Valuation at closing leaves the WML Shares valued at less than US$4,700,000 (the value below US$4,700,000) being the **Shortfall**), the Initial Conversion Shares will be increased by such number being the lesser of (i) the Shortfall divided by the Post Conversion Base Price; or (ii) 1,350,500.

7.4     In the event the Pre Money Valuation at closing leaves the WML Shares valued at more than US$4,700,000, then the Conversion Shares shall be calculated as follows:

   (a)     The **Excess Amount** = 25% of the value of WML Shares exceeding US$4,700,000, based on the Pre Money Valuation.

   (b)     The **Loan Deductible Value** = (the Total Shares divided by 1,350,500) multiplied by the Excess Amount.

   (c)     The **Discount Rate** = the discount (if any) to the Pre Conversion Base Price determined at clause 7.2.

   (d)     The **Base Value** = the amount of the Notes in issue at the Conversion Date divided by (100% minus the Discount Rate, expressed as a decimal)

   (e)     The **Loan Conversion Value** = the Base Value multiplied by (the Post Conversion Valuation divided by (the Pre Money Valuation plus the Base Value)), less the Loan Deductible Value.

   (f)     The **Conversion Shares Percentage** = the Loan Conversion Value divided by the Post Conversion Valuation.

   (g)     The number of Conversion Shares = the Total Shares divided by (100% minus the Conversion Shares Percentage, expressed as a decimal) minus the Total Shares.

7.5     On the Conversion Date, the Directors shall convert the principal amount of the Notes into such number of new fully paid Senior Shares determined under clauses 7.2, 7.3 and 7.4 (as applicable), in accordance with the following provisions of clauses 7.6 to 7.9 (inclusive).

7.6     Conversion of the Notes shall be effected by the Company redeeming the relevant Notes on the Conversion Date. WML shall be deemed to irrevocably authorise and instruct the Company to apply the redemption moneys payable to WML in subscribing for Senior Shares on conversion of the Notes.

7.7     Senior Shares arising on conversion of the Notes shall be issued and allotted by the Company on the Conversion Date and the certificates for such Senior Shares shall be despatched to WML at its own risk. Each Senior Share arising on conversion shall be issued and allotted at such premium to reflect the difference between the nominal amount of the Senior Share and the principal amount of Notes converted into one Senior Share on the Conversion Date.

7

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-9**

0696 - 101

7.8    The Senior Shares arising on conversion of the Notes shall be credited as fully paid and rank pari passu with Senior Shares in issue on the Conversion Date and shall carry the right to receive all dividends and other distributions declared after the Conversion Date.

7.9    The entitlement of WML to a fraction of a Senior Share shall be rounded to the nearest whole number of Senior Shares which result from the conversion of the Notes.

## 8.    CERTIFICATES

8.1    WML shall be entitled to receive, without charge, one Certificate for each instalment of the Notes registered in its name.

8.2    Each Certificate shall:

   (a)    bear a denoting number; and

   (b)    be issued and executed by the Company as a deed in the form (or substantially in the form) set out in Schedule 1.

8.3    If any Certificate is worn out or defaced then, on production of it to the Directors, they may cancel it and may issue a fresh Certificate in lieu. If any Certificate is lost or destroyed it may be replaced on such terms (if any) as to evidence and indemnity as the Company may reasonably require.  An entry recording the issue of the new Certificate and indemnity (if any) shall be made in the register.

## 9.    THE REGISTER

9.1    The Company shall keep and maintain the Register at the Registered Office or (subject always to the provisions of section 743 of the Act) at such other place as the Company may from time to time appoint for this purpose and notify to WML.

9.2    There shall be entered in the Register:

   (a)    the names and addresses of the Noteholders for the time being;

   (b)    the principal amount of the Notes held by each Noteholder;

   (c)    the date of issue of each of the Notes and the date on which the name of each Noteholder is entered in the Register in respect of the Notes registered in his name;

   (d)    the serial number of each Certificate issued and the date of its issue; and

   (e)    the date(s) of all transfers and changes of ownership of any of the Notes.

8

**Defense Exhibit 17-10**

0696 - 102

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

9.3 The Company shall promptly amend the Register to record any change to the name or address of a Noteholder that is notified in writing to the Company by that Noteholder.

9.4 The Noteholders or any of them, or any person authorised by a Noteholder, shall be at liberty at all reasonable times during office hours to inspect the Register and to take copies of or extracts from it or any part of it.

9.5 Every Noteholder shall be recognised by the Company as entitled to his Notes free from any equity, set-off or cross-claim against the original or an intermediate holder of such Notes.

10. NOTES NOT TO BE QUOTED

No application has been, or shall be, made to any investment exchange (whether in the United Kingdom or otherwise) for permission to deal in, or for an official or other listing or quotation, in respect of the Notes.

11. VARIATION

All or any of the rights for the time being attached to the Notes or other provisions of this Instrument may from time to time (whether or not the Company is being wound up) be altered or abrogated with the prior written consent of each party to this Instrument. Any such alteration or abrogation shall be effected by way of deed poll executed by each party to this Instrument and expressed to be supplemental to this Instrument.

12. ASSIGNMENT

12.1 The parties to this Instrument may not assign or transfer any of their rights, benefits or obligations under this Instrument without the agreement of each party to this Instrument. Any purported assignment in breach of this clause shall be void and confer no rights on the purported assignee.

12.2 Each party to this Instrument confirms that it is acting on its own behalf and on no-one else's.

13. WHOLE AGREEMENT

This Instrument constitutes the whole agreement between the parties to this Instrument and supersedes and extinguishes all previous drafts, agreements, arrangements and understandings between them, whether written or oral, relating to its subject matter.

9

**Defense Exhibit 17-11**

0696 - 103

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

14.    **THIRD PARTY RIGHTS**

This Instrument is enforceable under the Contracts (Rights of Third Parties) Act 1999 by the Company, WML and the Founder, but not by any other person.

15.    **COSTS**

Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Instrument, and any documents referred to in it, shall be borne by WML.

16.    **NOTICES**

16.1    Any notice or other communication required or made in connection with this Instrument shall be in writing and shall be (i) delivered personally; (ii) sent by pre-paid first-class post; or (iii) sent by e-mail (but e-mail communications shall only be treated as validly sent if an appropriate report of receipt has been returned to the sender by the e-mail system); in each case to the relevant address shown at the top of this Instrument or to such other address as shall be notified in writing for these purposes.

16.2    If a notice or other communication has been properly sent or delivered in accordance with this clause, it will be deemed to have been received (i) if delivered personally, at the time of delivery; (ii) if sent by pre-paid first-class post, at 12 noon 2 Business Days after posting; or (iii) if sent by e-mail, at the time specified in the relevant report of receipt returned to the sender.

17.    **COUNTERPARTS**

This Instrument may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each party to this Instrument had signed the same document.

18.    **GOVERNING LAW AND JURISDICTION**

18.1    This Instrument and the Notes and any dispute or claim arising out of or in connection with any of them or their subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the law of England and Wales.

18.2    The courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Instrument or the Notes or their subject matter or formation (including non-contractual disputes or claims).

10

**Defense Exhibit 17-12**

0696 - 104

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This Instrument has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

11

**Defense Exhibit 17-13**

0696 - 105

<div style="text-align: right; writing-mode: vertical;">This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement</div>

**Schedule 1 Form of Certificate**

Certificate No: [NUMBER]
Date of Issue: [DATE]
Amount:       US$[AMOUNT]

## ISOTROPIC SYSTEMS LTD

US$4,000,000 UNSECURED CONVERTIBLE LOAN NOTES 2017

Created and issued pursuant to a resolution of the board of directors of the Company passed on [          ] 2017.

**THIS IS TO CERTIFY THAT** Waterlow Management Ltd (**Noteholder**) is the registered holder of US$[  ] of the US$4,000,000 unsecured convertible loan notes 2017 constituted by an instrument entered into by the Company on [          ] 2017 (**Instrument**). Such Notes are issued with the benefit of and subject to the provisions contained in the Instrument.

**Notes:**
1. The Notes are non-redeemable (save for the purposes of clause 7.4 of the Instrument) and shall not bear interest.
2. This Certificate must be surrendered to the Company before any transfer (if permitted) or conversion can be registered or effected, or any new certificate issued in exchange.
3. Any change of address of the Noteholder must be notified in writing signed by the Noteholder to the Company at the Registered Office.
4. Save as otherwise agreed at clause 14 of the Instrument, the Notes are not assignable or transferable.
5. Words and expressions defined in the Instrument shall bear the same meaning in this Certificate.
6. The Notes and any dispute or claim arising out of or in connection with any of them or their subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the law of England and Wales. The courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with the Notes or their subject matter or formation (including non-contractual disputes or claims).
7. A copy of the Instrument is available for inspection at the Registered Office.

**Defense Exhibit 17-14**

0696 - 106

This Certificate has been executed as a deed and is delivered and takes effect on the date of issue stated at the beginning of it.

Executed as a deed by **ISOTROPIC SYSTEMS LTD** acting by a director in the presence of:

..........................................

Witness:
Signature:        ....................................
Name:             ....................................
Address:          ....................................
                  ....................................
                  ....................................
Occupation:       ....................................

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

13

**Defense Exhibit 17-15**
0696 - 107

Executed as a deed by **ISOTROPIC**
**SYSTEMS LTD** acting by a director          ........................................
in the presence of:

Witness:
Signature:       ....................................
Name:            ....................................
Address:         ....................................
                 ....................................
                 ....................................
Occupation:      ....................................


Executed as a deed by **WATERLOW**
**MANAGEMENT LIMITED** acting          ........................................
by a director in the presence of:

Witness:
Signature:       ....................................
Name:            ....................................
Address:         ....................................
                 ....................................
                 ....................................
Occupation:      ....................................

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

14

**Defense Exhibit 17-16**

0696 - 108

**DATED**                                   **2017**

------------

## DEED OF VARIATION TO THE SUBSCRIPTION AND SHAREHOLDERS' AGREEMENT DATED 3 MARCH 2017

### RELATING TO ISOTROPIC SYSTEMS LTD

**BETWEEN**

**(1)  WATERLOW MANAGEMENT LIMITED**

**(2)  JOHN FINNEY**

**(3)  ISOTROPIC SYSTEMS LTD**

*This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.*

# Defense Exhibit 17-17
0696 - 109

## CONTENTS

### CLAUSE

1.      Interpretation..................................................................................................................1
2.      Variation to the Agreement..............................................................................................1
3.      The effect upon the Agreement ........................................................................................1
4.      Further assurance ............................................................................................................2
5.      Counterparts...................................................................................................................2
6.      Governing law and jurisdiction........................................................................................2

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

# Defense Exhibit 17-18

**THIS DEED** is dated                                              2017

**PARTIES**

(1)     **WATERLOW MANAGEMENT LIMITED** incorporated and registered in the British Virgin Islands with company number 1858967 whose registered office is at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands (**Investor**);

(2)     **JOHN FINNEY** of Osdorperweg 21, Sloten, Amsterdam, Netherlands. 1066EH (**Founder**); and

(3)     **ISOTROPIC SYSTEMS LTD** incorporated and registered in England and Wales with company number 08706503 whose registered office is at 20-22 Wenlock Road, London N1 7GU (**Company**).

**BACKGROUND**

A.     The parties to this deed entered into a subscription and shareholders' agreement relating to the Company on 3 March 2017 (**Agreement**).

B.     The parties have agreed to vary the Agreement in the manner set out in this deed.

**AGREED TERMS**

1.     **INTERPRETATION**

1.1     Words and expressions used in the Agreement shall, unless the context otherwise requires, have the same meanings as those contained or referred to in this deed.

2.     **VARIATION TO THE AGREEMENT**

The Agreement shall be varied as follows:

2.1     At clause 1.1, the definition of "Articles" shall be replaced with the following:

""Articles" means the articles of association of the Company as amended or superseded from time to time;"

2.2     At clause 7.1, sub-clauses 7.1(d) and 7.1(h) shall be deleted.

2.3     Clauses 7.4 to 7.7 (inclusive) shall be deleted.

2.4     At clause 9.2, the words "or where the Board otherwise determines" shall be added after the words "employee share option plan".

1

**Defense Exhibit 17-19**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

3.    **THE EFFECT UPON THE AGREEMENT**

The terms of the Agreement shall remain in full force and effect, save as amended in accordance with clause 2 of this deed.

4.    **FURTHER ASSURANCE**

The parties to this deed undertake and covenant to each other to execute and deliver any other documents and take such other steps as shall be reasonably required to give effect to the terms of this deed.

5.    **COUNTERPARTS**

This deed may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each party to this deed had signed the same document.

6.    **GOVERNING LAW AND JURISDICTION**

6.1    This deed and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the law of England and Wales.

6.2    The courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this deed or its subject matter or formation (including non-contractual disputes or claims).

This deed has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it.

2

**Defense Exhibit 17-20**

0696 - 112

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Executed as a deed by **WATERLOW
MANAGEMENT LIMITED** acting
by a director in the presence of:                    ........................................

Witness:
Signature:        ....................................
Name:             ....................................
Address:          ....................................
                  ....................................
                  ....................................
Occupation:       ....................................

Executed as a deed by **JOHN
FINNEY** in the presence of:                        ........................................

Witness:
Signature:        ....................................
Name:             ....................................
Address:          ....................................
                  ....................................
                  ....................................
Occupation:       ....................................

Executed as a deed by **ISOTROPIC
SYSTEMS LTD** acting by a director
in the presence of:                                 ........................................

Witness:
Signature:        ....................................
Name:             ....................................
Address:          ....................................
                  ....................................
                  ....................................
Occupation:       ....................................

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

3

**Defense Exhibit 17-21**

0696 - 113

From:        Waterlow Management Limited ("**Investor**")
Trinity Chambers
PO Box 4301
Road Town
Tortola
British Virgin Islands

To:        Isotropic Systems Ltd ("**Company**")
20-22 Wenlock Road
London N1 7GU

8 August 2017

Dear Sirs,

**Loan of US$1,000,000 to the Company**

This letter sets out the terms and conditions of a loan of US$1,000,000 we have agreed to make available to you.

1. **Interpretation**

    In this letter, the following words shall have the following meanings:

    | | |
    |---|---|
    | "**Business Day**" | a day (other than a Saturday or Sunday) on which banks are open for general business in London; |
    | "**Loan**" | as defined in paragraph 2; |
    | "**Loan Notes**" | as defined in paragraph 3; |
    | "**you/Company**" | Isotropic Systems Ltd; |
    | "**we/Investor**" | Waterlow Management Limited. |

2. **The Loan**

    We have agreed to provide you with an unsecured term loan facility of a total principal amount not exceeding US$1,000,000 on the terms, and subject to the conditions, of this letter ("**Loan**").

3. **Convertible Loan Notes**

    We acknowledge that this letter is being entered into in advance of the Company issuing, and the Investor subscribing for, US$4,000,000 of convertible loan note ("**Loan Notes**"), upon the principal terms and conditions set out in the term sheet from the Company to the Investor dated the same date as this letter. Once the Loan Notes have completed, the Loan shall automatically be treated as having been made under the terms of the Loan Notes and this letter shall immediately terminate and cease to have any further force or effect.

4. **Drawdown**

    The Loan may be drawn down at any time from and including 15 August 2017, upon not less than 24 hours' prior notice.

1

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-22**

0696 - 114

5. **Interest**

The principal amount of the Loan outstanding from time to time will not carry interest.

6. **Redemption**

a. Subject to paragraph 6b, or such later date as we may agree in writing, you shall repay the Loan in US$ on the date one year after drawdown of the Loan under paragraph 4, to such account as we may from time to time instruct you in writing.

b. Once the terms of the Loan Notes have completed in accordance with paragraph 3, the Loan shall immediately become non-redeemable and accordingly may only be converted into shares in the Company in accordance with the terms of the Loan Notes.

7. **Security**

The Loan shall be unsecured.

8. **Fees and expenses**

All reasonable and properly incurred costs and expenses in connection with this letter, and the arrangements and related documents set out in this letter shall be borne by the Investor.

9. **Notices**

a. Any notice or other communication required or made in connection with this letter shall be in writing and shall be (i) delivered personally; (ii) sent by pre-paid first-class post; or (iii) sent by e-mail (but e-mail communications shall only be treated as validly sent if an appropriate report of receipt has been returned to the sender by the e-mail system); in each case to the relevant address shown in the preamble to this letter or to such other address as shall be notified in writing for these purposes.

b. If a notice or other communication has been properly sent or delivered in accordance with this paragraph 9, it will be deemed to have been received as (i) if delivered personally, at the time of delivery; (ii) if sent by pre-paid first class post, at 12 noon 2 Business Days after posting; or (iii) if sent by e-mail, at the time specified in the relevant report of receipt returned to the sender.

10. **Governing Law**

a. This letter and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of England and Wales.

b. Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this letter or its subject matter or formation (including non-contractual disputes or claims).

2

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-23**

0696 - 115

Please sign and return the enclosed copy of this letter by way of acknowledgment and agreement to the terms and conditions set out above.

Yours faithfully

.................................................................

**Salamander Management Limited**
**Leonard O'Brien**
**Director duly authorised for and on behalf of**
**Waterlow Management Limited**

We acknowledge receipt of this letter and agree to the terms and conditions set out above.

Signed ................................................    Dated:  14ᵀᴴ August 2017
**John Finney**
**Director duly authorised for and on behalf of**
**Isotropic Systems Ltd**

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-24**

0696 - 116

March 3rd, 2017

(1)    WATERLOW MANAGEMENT LIMITED

(2)    JOHN FINNEY

(3)    ISOTROPIC SYSTEMS LIMITED

## SUBSCRIPTION AND SHAREHOLDERS AGREEMENT

relating to
Isotropic Systems Limited

K&L Gates LLP

One New Change London EC4M 9AF

Tel: +44 (0)20 7648 9000

Fax: +44 (0)20 7648 9001

Ref: 5102281.05001

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-25**

## CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Interpretation | 2 |
| 2. | Conditions | 6 |
| 3. | Completion | 7 |
| 4. | Warranties | 8 |
| 5. | The board and directors | 9 |
| 6. | Records, Annual Budget and information rights | 10 |
| 7. | Covenants | 10 |
| 8. | Promotion of the company's business | 14 |
| 9. | Transfer of shares | 15 |
| 10. | Restrictive covenants | 16 |
| 11. | Shares held by the Founder | 17 |
| 12. | Share options | 19 |
| 13. | Confidentiality and announcements | 19 |
| 14. | Assignment | 20 |
| 15. | Third party rights | 20 |
| 16. | Survival | 20 |
| 17. | Shareholders obligations and status of this agreement | 21 |
| 18. | Severance | 21 |
| 19. | Variation | 21 |
| 20. | Costs | 21 |
| 21. | Whole agreement | 21 |

**Defense Exhibit 17-26**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

22. Notices ................................................................................................................ 22

23. Further assurance ................................................................................................ 23

24. Counterparts ........................................................................................................ 23

25. No partnership ..................................................................................................... 23

26. Language .............................................................................................................. 24

27. Governing law ..................................................................................................... 24

1. The company ........................................................................................................ 26

2. Information supplied ............................................................................................ 26

3. Annual Budget ..................................................................................................... 27

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-27**

0696 - 119

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**THIS AGREEMENT** is dated as of March 3rd, 2017.

PARTIES

1.   **WATERLOW MANAGEMENT LIMITED**, a BVI company with registered number 1858967 whose registered office is at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands (the "**Investor**");

2.   **JOHN FINNEY** of Osdorperweg 21, Sloten, Amsterdam, 1066 EH, Netherlands (the "**Founder**"); and

3.   **ISOTROPIC SYSTEMS LIMITED**, a company incorporated in England and Wales with registered number 08706503 whose registered office is at 20-22 Wenlock Road, London N1 7GU (the "**Company**").

BACKGROUND

(A)   The Company is a company limited by shares, brief particulars of which are set out in Schedule 1.

(B)   The Company's intended business is the development and production of next generation satellite antenna solutions and it is intended to be implemented as set out in the Annual Budget.

(C)   The Investor has agreed to subscribe for shares in the capital of the Company on, and subject to, the terms of this agreement.

(D)   The Investor previously subscribed for 4,310 shares in the capital of the Company on, and subject to, the terms of that certain Subscription and shareholders agreement by and among the Investor, the Founder and the Company dated July 15, 2015 (the "**Original Shareholders Agreement**").

(E)   Contemporaneously herewith, the Founder is subscribing for 3,505 convertible preference shares of £0.001 each in the capital of the Company (the "**Additional Founder Subscription Shares**").

**Defense Exhibit 17-28**

0696 - 120

Isotropic Compare Feb14_JF_accepted changes and edits

## AGREED TERMS

1. **INTERPRETATION**

1.1 The definitions and rules of interpretation in this clause apply in this agreement.

"**Accounts**" has the meaning given in clause 6.1(a);

"**Act**" means the Companies Act 2006, to the extent in force from time to time;

"**Additional Founder Subscription Shares**" has the meaning given in Recital E;

"**Agreement**" means this agreement together with the schedules attached hereto;

"**Annual Budget**" means the budget, incorporating a detailed operating and capital budget and cash flow forecast for the a financial year, the initial version of which is in the agreed form, relating to the Company;

"**Articles**" means the Company's new articles of association, in the agreed form, to be adopted by the Company on or before Completion;

"**Board**" means the board of directors of the Company as constituted from time to time;

"**Board Observers**" means observers to meetings of the Board appointed in accordance with this Agreement and the Articles and "Board Observer" shall be construed accordingly;

"**Business**" means the development and production of next generation satellite antenna solutions;

"**Business Day**" means a day (other than a Saturday, Sunday or public holiday) when clearing banks in the City of London are open for the transaction of normal banking business;

"**Claim**" means any claim for breach of any Warranty;

"**Completion**" means completion by the parties of their respective obligations under clause 3.4;

"**Conditions**" means the conditions to Completion set out in clause 2.1;

"**Consent**" means the consent (such consent not to be unreasonably withheld or delayed) of at least a majority of the holders of Preference Shares, which may be:

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-29**

Isotropic Compare Feb14_JF_accepted changes and edits

(a)    given by the Investor Director, either by written notice to the Company or by the Investor Director signing the Company's board minutes recording the relevant decision; or

(b)    given by written notice to the Company signed by any director of the Investor;

"**Consideration**" has the meaning given to it in clause 3.4(a);

"**Costs**" means any liabilities, losses, damages, awards, costs (including legal fees), claims and expenses;

"**Deed of Adherence**" means the deed of adherence in the form set out in Schedule 3;

"**Director**" means any director of the Company appointed in accordance with the Articles;

"**Disclosed**" means fully, accurately, clearly and fairly disclosed in the Disclosure Schedule with sufficient explanation and detail to identify the nature, scope and full implications of the matters disclosed;

"**Disclosure Schedule**" means the matters Disclosed by the Warrantors to the Investor as set out in Schedule 4 to this Agreement;

"**Dollars**", "**USD**" or "**$**" means dollars in lawful currency of the United States of America;

"**Encumbrance**" means any mortgage, charge, security interest, lien, pledge, assignment by way of security, equity claim, right of pre-emption, option, covenant, restriction, reservation, lease, trust, order, decree, judgment, title defect (including retention of title claim), conflicting claim of ownership or any other encumbrance of any nature (whether or not perfected), other than liens arising by operation of law;

"**Founder Director**" means the director appointed by the Founder in accordance with clause 5.3(a)(b);

"**Group Companies**" means the Company and each of its subsidiaries for the time being and "**Group Company**" shall be construed accordingly;

"**ICTA**" means the Income and Corporation Taxes Act 1988;

"**Initial Subscription Shares**" means 4,310 convertible preference shares of £0.001 each in the capital of the Company, all of which were subscribed to by the Investor pursuant to the Original Shareholders Agreement;

"**Intellectual Property**" means all patents, rights to inventions, utility models, copyright, trade marks, service marks, trade, business and domain names, rights in trade dress or

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-30**

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

get-up, rights in goodwill or to sue for passing off, unfair competition rights, rights in designs, rights in computer software, database rights, topography rights, moral rights, rights in confidential information (including know-how and trade secrets) and any other intellectual property rights, in each case whether registered or unregistered and including all applications for, and renewals or extensions of, such rights, and all similar or equivalent rights or forms of protection in any part of the world.

"**Introducing Party**" has the meaning given in clause 7.5;

"**Investor Director**" means the director appointed by the Investor in accordance with clause 5.3(a)(a);

"**ITEPA**" means Income Tax (Earnings and Pensions) Act 2003;

"**Listing**" means the successful application and admission of all or any of the shares in the capital of the Company, or securities representing such shares (including American depositary receipts, American depositary shares and/or other instruments to the Official List of the UK Listing Authority or on the AIM market operated by the London Stock Exchange plc, or the Nasdaq National Stock Market of the Nasdaq Stock Market Inc. or to any recognised investment exchange (as defined in section 285 of the Financial Services and Markets Act 2000 (as amended)).

"**Offer Shares**" has the meaning given in clause 7.5;

"**Ordinary Shares**" means the ordinary shares of (following sub-division in accordance with clause 2.1(a)(ii)) £0.001 each in the capital of the Company, which have the rights set out in the Articles;

"**Original Shareholders Agreement**" has the meaning given in Recital D;

"**Parties**" means the parties to this Agreement, or any of them, as the context may require and shall include persons becoming a party to this Agreement by virtue of the execution of a Deed of Adherence;

"**Preferred Shares**" means the convertible preferred shares of £0.001 each in the capital of the Company, which have the rights set out in the Articles;

"**QMUL**" means Queen Mary University of London;

"**Resolutions**" means the resolutions as specified in clause 2.1(a), in the agreed form, to be passed by the Company by shareholders' written resolution;

"**ROFR**" has the meaning given in clause 7.6;



**Defense Exhibit 17-31**

0696 - 123

Isotropic Compare Feb14_JF_accepted changes and edits

"ROFR Exercise Notice" has the meaning given in clause 7.6;

"Shareholder" means a holder of shares in the Company who is either a party to this agreement, or becomes a party to this agreement by executing this agreement or a Deed of Adherence;

"Shareholder Offeree" has the meaning given in clause 7.6;

"Shares" means the Ordinary Shares and the Preferred Shares;

"SSCBA" means Social Security Contributions and Benefits Act 1992;

"Subscription Shares" means 9,195 convertible preference shares of £0.001 each in the capital of the Company;

"Termination Date" has the meaning given in clause 10.1(b);

"Third Party Investor" has the meaning given in clause 7.4;

"Third Party Investor Notice" has the meaning given in clause 7.5;

"Warranties" means the warranties, representations and undertakings given pursuant to clause 4, and references to a particular Warranty are to a warranty statement set out in Schedule 2; and

"Warrantors" means the Founder and the Company.

1.2    Clause, schedule and paragraph headings shall not affect the interpretation of this agreement.

1.3    The schedules form part of this agreement and shall have effect as if set out in full in the body of this agreement. Any reference to this agreement includes the schedules.

1.4    A person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality) and that person's legal and personal representatives, successors and permitted assigns.

1.5    A reference to a company shall include any company, corporation or other body corporate, wherever and however incorporated or established.

1.6    Words in the singular shall include the plural and vice versa.

1.7    A reference to one gender shall include a reference to the other genders.

**Defense Exhibit 17-32**
0696 - 124

Isotropic Compare Feb14_JF_accepted changes and edits



This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

1.8    A reference to a statute or statutory provision is a reference to it as it is in force as at the date of this agreement, taking account of any amendment, extension, or re-enactment and includes any statute, statutory provision or subordinate legislation which it amends or re-enacts.

1.9    A reference to writing or written includes faxes but not e-mail.

1.10    Any obligation in this agreement on a person not to do something includes an obligation not to agree or allow that thing to be done.

1.11    Documents in "agreed form" are documents in the form agreed by the parties and initialled by them for identification.

1.12    A reference to a document is a reference to that document as varied or novated (in each case, other than in breach of the provisions of this agreement) at any time.

1.13    References to clauses and schedules are to the clauses and schedules of this agreement; references to paragraphs are to paragraphs of the relevant schedule.

1.14    Where any statement is qualified by the expression "so far as the Warrantors are aware" or "to the Warrantor's knowledge" or any similar expression, that statement shall be deemed to include an additional statement that it has been made after due and careful enquiry of all relevant persons.

1.15    The expressions "holding company", "subsidiary" and "subsidiary undertaking" have the meanings given in the Act;

1.16    A reference to an Investor Director shall include any alternate appointed to act in his place from time to time.

1.17    References to times of day are to that time in London, England and references to a day are to a period of 24 hours running from midnight.

1.18    Unless the context requires otherwise and subject to clause 1.19, words and expressions defined in the Articles shall have the same meaning when used in this agreement.

1.19    Unless the context otherwise requires, words and expressions defined in the Act shall have the same meaning when used in this agreement.

2.    CONDITIONS

2.1    This agreement is subject to the conditions set out in this clause 2.1 being satisfied on or before Completion:

**Defense Exhibit 17-33**

0696 - 125

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(a)    the Shareholders passing resolutions to:

    (i)    adopt the Articles;

    (ii)    subdivide the £1.00 ordinary shares in the Company into £0.001 Ordinary Shares;

    (iii)    grant the directors of the Company authority to allot the Subscription Shares; and

    (iv)    waive pre-emption rights in respect of the allotment and issue of the Subscription Shares.

2.2    If the Conditions are not satisfied (or waived by the Investor in accordance with clause 2.3) by **March 15th 2017 all** obligations of the parties under this agreement shall cease and no party shall have any claim against any of the other parties to this agreement.

2.3    The Investor may, to such extent as it thinks fit and is legally entitled to do so, waive any of the Conditions by giving written notice to the Company and the Founder in accordance with clause 22.

3.    **COMPLETION**

3.1    Each party to the agreement warrants to each of the other parties that:

(a)    it has the power and authority to enter into and perform its obligations under this agreement;

(b)    when executed, its obligations under this agreement will be binding on it; and

(c)    the execution and delivery of, and performance by it of its obligations under this agreement will not result in any breach of applicable law.

3.2    The Company warrants to the Investor that, on the date of this agreement and on the Completion Date, the Company shall, [subject to passing the Resolutions,] be entitled to allot the Subscription Shares to the Investor on the terms of this agreement, without the consent of any other person.

3.3    The Founder agrees to vote in favour of the Resolutions and irrevocably waives any pre-emption rights that he or his nominees may have under the Company's Articles or otherwise, so as to enable the issue of the Shares to proceed.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-34**

0696 - 126

Isotropic Compare Feb14_JF_accepted changes and edits

3.4    At Completion:

(a)    the Company shall confirm

(b)    the receipt of USD [$ 1,135,000] (the "**Consideration**");

(c)    a meeting of the Board shall be held at which the Company shall:

(i)    subject to receipt of the Consideration referred to in clause 3.4 (c), allot and issue the Subscription Shares to the Investor (or such person as it may direct) and enter its name in the register of members in respect of them;

(ii)    execute and deliver to the Investor a share certificate for its Shares;

(iii)    appoint Robert Dooner to act as the Investor Director; and

(iv)    pass any other resolutions required to carry out the Company's obligations under this agreement; and

(d)    the Company shall file all appropriate resolutions and forms with the Registrar of Companies within the time limits prescribed for filing each of them.

4.    **WARRANTIES**

4.1    The Warrantors acknowledge that the Investor has been induced to enter into the agreement and to subscribe for the Subscription Shares on the basis of, and in reliance on, the Warranties.

4.2    The Warrantors jointly and severally warrant and represent to the Investor that each and every warranty set out in Schedule 2 is, at the date of this agreement, true, accurate and not misleading, subject only to the matters Disclosed in the Disclosure Schedule.

4.3    Each Warranty is a separate and independent warranty and representation and, except as otherwise expressly provided, no Warranty shall be limited by reference to any other Warranty or by the other terms of this agreement and the Disclosure Schedule.

4.4    No information relating to the Company of which the Investor and/or its agents and/or advisers has knowledge (actual, constructive or imputed), other than by reason of it being Disclosed in accordance with clause 4.2, shall prejudice any Claim that the Investor shall be entitled to bring, or shall operate to reduce any amount recoverable by the Investor under this agreement.

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-35**

0696 - 127

Isotropic Compare Feb14_JF_accepted changes and edits

4.5    Any information supplied by or on behalf of the Company or its officers, employees, agents, representatives or advisers to the Founder or his agents, representatives or advisers in connection with, or which forms the basis of, any of the Warranties, the information Disclosed in the Disclosure Letter or otherwise in relation to the Business and affairs of the Company (whether before or after the date of this agreement) shall not constitute a warranty, representation or guarantee as to the accuracy of such information in favour of the Founder, and shall not constitute a defence to any Claim by the Investor. The Founder hereby irrevocably waives any and all claims against the Company, its officers, employees or agents in respect of any information so supplied (and undertakes that no other person claiming under, or through, any of them will make any such claim).

5.    **THE BOARD AND DIRECTORS**

5.1    The appointment, dismissal and conduct of the Board shall be regulated in accordance with this agreement and the Articles.

5.2    The maximum number of directors of the Board holding office at any one time shall be 3, unless expressly agreed in advance by the Investor.

5.3    In accordance with the Articles:

(a)    the Investor has the right to appoint, and maintain in office, one natural person as the Investor may from time to time direct as a director of the Company and to remove any director so appointed and, upon his removal (whether by the Investor or otherwise), to appoint another person to act as an Investor Director. Robert Dooner shall be deemed to be the first director appointed by the Investor pursuant to this clause 5.3(a)(a).

(b)    the Founder has the right to appoint, and maintain in office, one natural person as the Founder may from time to time direct as a director of the Company and to remove any director so appointed and, upon his removal (whether by the Founder or otherwise), to appoint another person to act as a Founder Director. John Finney shall be deemed to be the first director appointed by the Founder pursuant to this clause 5.3(a)(b).

5.4    The appointment and removal of a director appointed under clause 5.3(a) shall be by written notice to the Company, which shall take effect on delivery at its registered office or at any meeting of the Board (or a committee of the Board).

5.5    The Company shall send to the Investor and, when appointed, the Investor Director (in electronic format if so required):

(a)    reasonable advance notice of each Board meeting;

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-36**

Isotropic Compare Feb14_JF_accepted changes and edits



(b)    a written agenda for each Board meeting and each committee meeting, accompanied by all relevant papers; and

(c)    as soon as practicable after each such meeting, a copy of the minutes of such meetings.

## 6.    RECORDS, ANNUAL BUDGET AND INFORMATION RIGHTS

6.1    The Company shall, and the Founder shall procure that the Company shall at all times:

(a)    maintain accurate and complete accounting and other financial records ("**Accounts**");

(b)    maintain effective and appropriate control systems in relation to the financial, accounting and record-keeping functions of the Company; and

(c)    ensure that the Accounts comply with the requirements of the Companies Acts and all current statements of standard accounting practice and financial reporting standards applicable to a company incorporated in England and Wales.

6.2    The Founder shall procure that the Company shall continue to prepare an Annual Budget for the Company for each financial year and shall provide the Investor with a copy of the Annual Budget 20 Business Days before the end of each financial year for its comments. Each Annual Budget shall require the approval of the Investor.

6.3    The Company shall provide the Investor promptly with the Accounts and such other information concerning the Company and its business as the Investor may require from time to time.

6.4    The Investor shall have the right, for so long as the Investor holds 10% or more by nominal value of the issued share capital of the Company or until a Listing, to visit the premises of the Company during normal business hours and on reasonable notice, to inspect the books and records of the Company and to discuss the business and finances of the Company with the directors and employees of the Company.

6.5    Any Investor Director may, from time to time, make full disclosure to the Investor of any information relating to the Company.

## 7.    COVENANTS

7.1    The Company undertakes to the Investor that, for so long as the at least 75% of the Initial Subscription Shares remain in issue it shall not take, and it shall procure that no Group Company takes, any of the following actions without Consent, and the Founder undertakes to the Investor (as a separate covenant) to exercise his votes as a director of,

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-37**

Isotropic Compare Feb14_JF_accepted changes and edits



or as a Shareholder in, the Company, to procure that the Company shall not take, and no Group Company shall take, any of the following actions without Consent:

(a)  enter into any negotiations, or reach any agreement, for the Company to:

    (i)  undertake a Listing; or

    (ii)  sell all or substantially all of its business, assets or undertaking;

(b)  approve any merger, liquidation, dissolution or acquisition of the Company;

(c)  make any amendment to the memorandum or articles of association of the Company or vary in any way the rights attaching to any class of Shares, in each case in a manner adverse to the Preference Shares;

(d)  increase, repay, subdivide, consolidate, capitalise, redenominate or otherwise vary the issued share capital of the Company in each case in a manner adverse to the Preference Shares;

(e)  redeem, purchase or otherwise acquire any interest in any issued share capital of the Company, other than in accordance with the Articles;

(f)  reduce the share capital of the Company, capitalise any reserves, apply any amount for the time being standing to the credit of the share premium account or capital redemption reserve of the Company, or reduce any uncalled liability in respect of partly paid shares in the capital of the Company for any purpose other than as set out in or required by the Articles;

(g)  adopt or vary any bonus or profit-sharing scheme, any share option or share incentive scheme or employee share trust or share ownership plan or retirement benefit scheme;

(h)  create, allot, issue (or enter into any negotiations or reach any agreement (legally or otherwise) to create, allot or issue) any shares or securities, or grant any option, warrant or other right to subscribe for, or convert any securities into shares ranking senior to the Preferred Shares, or require the allotment or issue of any such shares or securities, whether conditional or otherwise;

(i)  acquire any one item or stock or assets, or series of related items of stock or assets, with a purchase price in excess of £50,000;

(j)  give any guarantee or indemnity in respect of the obligations of a third party;

(k)  incur any indebtedness or borrowings in excess of £50,000;

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-38**

0696 - 130

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(l)      adopt any budget (including any Annual Budget);

(m)     enter into or amend any transaction worth more than £80,000 with any of its executive officers, directors or affiliates; or

(n)      enter into any contract, undertaking or arrangement to do any of the above.

7.2    The Company undertakes to the Investor that, for so long as at least 75% of the Subscription Shares remain in issue it shall not take, and it shall procure that no Group Company takes, any of the following actions without the consent in writing of the Investor Director, and the Founder undertakes to the Investor (as a separate covenant) to exercise his votes as a director of, or as a Shareholder in, the Company, to procure that the Company shall not take, and no Group Company shall take, any of the following actions without the consent in writing of the Investor Director:

(a)      incur any development or capital expenditure outside the terms of the Annual Budget;

(b)      dispose of any asset of a capital nature having a book or market value greater than £150,000;

(c)      carry on any business other than the Business; or make any material change in the nature or geographical area (including expanding outside the United Kingdom) of the Business or the way in which the Business is carried out, including, without limitation, the cessation of any business operation, if it is not already approved in the relevant Annual Budget;

(d)      create or close any subsidiary undertaking, joint venture, consortium, partnership or branch;

(e)      enter into any contract or arrangement that is not on an arm's length basis and in the ordinary course of business;

(f)      make any change to:

(i)      its auditors or accounting reference date; or

(ii)     its bankers or the terms of the mandate given to such bankers in relation to its account(s);

(g)      make any amendment to the Annual Budget or conduct the business of the Company otherwise than in accordance with the Annual Budget;

**Defense Exhibit 17-39**
0696 - 131

Isotropic Compare Feb14_JF_accepted changes and edits

(h) take or agree to any borrowing, loan, advance or credit otherwise than as specifically identified in the Annual Budget;

(i) appoint any employee or consultant, or vary any terms of any such appointment, where the consideration or liability is more than £80,000 or more than 6 months' notice is required of termination;

(j) appoint or terminate the appointment of any director or secretary of the Company or any Group Company;

(k) create or permit to be created any Encumbrance in relation to the Company, its assets or any of them;

(l) commence or settle any litigation, arbitration or other proceedings other than the commencement of proceedings for debt collection in the ordinary course of business;

(m) acquire or dispose of any freehold or leasehold property or any interest therein;

(n) enter into or vary any agreement or arrangement with a Director or Shareholder, or any of its associated companies or any connected person of a Director or a Shareholder; or

(o) enter into any contract, undertaking or arrangement to do any of the above.

7.3 All money raising activities by the Company's officers ("**Management**") shall require the prior approval of the Board. Accordingly, prior to entering into any discussions or negotiations with any potential investor or disclosing the Company's Annual Budget or business plan to any potential investor in, or source of money for, the Company, Management shall submit a fund raising plan (each, a "**Fund Raising Proposal**") to the Board for its consideration and approval. The Fund Raising Proposal shall include a term sheet (the "**Offer Term Sheet**") setting forth the proposed terms and conditions on which Management proposes to raise the money, including, without limitation, (a) the number and type of shares of the Company proposed to be offered for sale (the "**Offer Shares**"), (b) the total amount of money proposed to be raised for the Company and (c) the proposed price per Offer Share (the "**Offer Price**").

7.4 If the Board approves the Fund Raising Proposal, then Management shall inform the Investor in writing of the approval and, simultaneously therewith, provide a copy of the Offer Term Sheet to the Investor. The Investor shall have the right (the "**First ROFR**") to purchase some or all of the Offer Shares at the Offer Price and otherwise on the remaining terms and conditions set forth in the Offer Term Sheet. The Investor may exercise the First ROFR in writing at any time during the thirty (30) day period following the date on which the Investor is notified of the Board's approval.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-40**

 0696 - 132



Isotropic Compare Feb14_JF_accepted changes and edits

7.5    If the Investor exercises its First ROFR for less than all of the Offer Shares, then Management may continue to seek third party investors to purchase the Shares that the Investor did not agree to purchase (the **"Remaining Shares"**). However, if Management subsequently proposes to sell the Remaining Shares to a third party (**"Management's Selected Purchaser"**) on terms and conditions more favorable than those set forth in the Offer Term Sheet and the Board approves that sale, then Management shall inform the Investor in writing of such proposed sale to Management's Selected Purchaser. Thereafter, the Investor shall again have a right of first refusal (the **"Second ROFR"**) to purchase the Remaining Shares on the same terms and conditions (including price) as are offered to Management's Selected Purchaser. The Investor may exercise the Second ROFR in writing at any time during the thirty (30) day period following the date on which the Investor is notified of the Board's approval of the proposed sale to Management's Selected Purchaser.

7.6    If the Investor does not exercise the Second ROFR, then the Investor shall have a right to procure a third party investor (the **"Investor's Selected Purchaser"**) to purchase the Remaining Shares at a price per share (the **"Alternative Share Price"**) at least ten percent (10%) greater than the price per share at which Management's Selected Purchaser is proposing to purchase the Remaining Shares. The Investor shall have a period of twenty-one (21) business days following the expiration of the thirty (30) day period referenced in Section 7.5 to procure the Investor's Selected Purchaser. If the Investor procures the Investor's Selected Purchaser during such twenty-one (21) business day period, then the Investor shall notify Management of the identity of the Investor's Selected Purchaser and, simultaneously therewith, deliver a written offer signed by the Investor's Selected Purchaser to purchase the Remaining Shares at the Alternative Share Price and otherwise on terms and conditions substantially the same as those proposed for purchase by Management's Selected Purchaser. Any such written offer by the Investor's Selected Purchaser shall be deemed to be approved by Management, the Board and the Founder.

7.7    If the Investor does not present a written offer from an Investor's Selected Purchaser as described in Section 7.6 above during the twenty-one (21) day period referenced in such Section 7.6, then Management may proceed to sell the Remaining Shares to Management's Selected Purchaser substantially on the same terms and conditions (including price) as were approved by the Board and notified to the Investor pursuant to Section 7.5.

8.    **PROMOTION OF THE COMPANY'S BUSINESS**

8.1    The Founder shall promote the best interests of the Company, and ensure that the Business is conducted in accordance with the Annual Budget and good business practice.

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-41**
0696 - 133

Isotropic Compare Feb14_JF_accepted changes and edits

8.2    The Founder shall procure that the Company shall apply the proceeds of the Investor's subscription for the Subscription Shares in order to fund the Company's working capital requirements.

8.3    The Founder and the Company severally undertake to the Investor to procure, so far as it is within their respective power to do so, that the Company shall:

    (a)    take out and maintain insurance satisfactory to the Investor and shall, on request, supply the Investor with a schedule of such insurances;

    (b)    take all action as may be required to protect its Intellectual Property and any of its other property and assets;

    (c)    ensure that all new business opportunities relevant to it are pursued and taken up only by the Company (or a wholly owned subsidiary of it);

    (d)    ensure that any joint ventures are pursued by it only with the prior written consent of the Investor; and

    (e)    comply with the terms of this agreement and the Articles.

8.4    Each of the parties (other than the Company) undertakes to the other parties to be bound by the Articles for so long as each party is a holder of shares in the capital of the Company.

9.    **TRANSFER OF SHARES**

9.1    Subject to clauses 9.2 and 9.3 below, each Shareholder (other than the Investor) undertakes to the Investor that he shall not transfer or otherwise dispose of the whole or any part of this interest in, or grant any option over, and shall not create or agree to create any Encumbrance over, any Shares except:

    (a)    with Consent; or

    (b)    where required or permitted to do so by the Articles and this agreement.

9.2    Except where Shares are allotted to satisfy the exercise of an option granted under an employee share option plan, no transfer or allotment of Shares shall be registered by the Company unless the transferee of such Shares has executed and delivered a Deed of Adherence.

9.3    The Founder shall have the cumulative right to transfer (or otherwise dispose of the whole or any part of an interest in, or grant any option over, and create or agree to create any Encumbrance over such Shares) up to 10% of the Shares held by him as at the date

**Defense Exhibit 17-42**

0696 - 134

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

of this Agreement each year (such year commencing on the date of this Agreement), up to a maximum of four years in the aggregate, without the requirement for Consent, provided that such shares are otherwise transferred in accordance with the Articles.

## 10.    RESTRICTIVE COVENANTS

10.1    To assure the Investor of the value of the Business and the full benefit of the goodwill of the Business of the Company, the Founder hereby undertakes and covenants with the Investor and the Company that he shall not:

(a)    while he is a director or employee of, or a consultant to, the Company carry on or be concerned, engaged or interested (directly or indirectly), in any capacity, in any trade or business competing with the trade or business of the Company as carried on at the time or, in relation to any trade or business of the Company that he has been engaged or involved in, at any time during the previous 12 months; or

(b)    during the 12 months beginning on the date on which he ceases to be a director or employee of, or consultant to the Company (his "**Termination Date**"), either on his own behalf or on behalf of any person, firm or company (including as an employee) directly or indirectly:

   (i)    carry on or be concerned, engaged or interested in any capacity in any trade or business competing with the trade or business of the Company in which he has been actively engaged or involved at any time during the 12 months preceding the Termination Date; or

   (ii)    do or say anything which may lead to any person ceasing to do business with the Company on substantially the same terms as previously (or at all); or

   (iii)    endeavour to entice away from the Company or solicit any person, firm or company who, at the Termination Date, does, or at any time during the 12 months before the Termination Date shall have been doing, business with the Company, and who was a customer of the Company during the 12 months before the Termination Date; or

   (iv)    employ, engage or induce, or seek to induce, to leave the service of the Company any person who, at the Termination Date or at any time during the 12 months before the Termination Date, shall have been employed in a senior capacity by the Company, with whom he has had dealings during the 12 months prior to the Termination Date; or

**Defense Exhibit 17-43**

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(v)    have any dealings with any person, firm or company who was a client, customer, supplier, agent or distributor of the Company (and which is considered by the Board to be key to the Business of the Company), with whom he has been engaged or involved by virtue of his duties during the 12 months before the Termination Date.

10.2    Each covenant in clause 10.1 is:

(a)    a separate undertaking by the Founder and shall be enforceable by the Investor separately and independently of its right to enforce any one or more of the covenants in clause 10.1; and

(b)    considered fair and reasonable by the parties. If any restriction is found to be unenforceable, but would be valid if any part of it were deleted, or the period or area of application reduced, the restriction shall apply with such modification as may be necessary to make it valid and effective.

10.3    The consideration for the undertakings contained in clause 10.1 is included in the consideration paid by the Investor for the Subscription Shares.

10.4    If clause 10.1 is breached, the Founder and the Investor agree that damages alone are not likely to be sufficient compensation, and that injunctive relief is reasonable and is likely to be essential to safeguard the interests of the Investor and the Company and that injunctive relief (in addition to any other equitable remedies) may (subject to the discretion of the courts) be obtained:

(a)    for the benefit of the Company in the context of the Founder's employment by the Company; and

(b)    regarding the duration, extent and application of each of the restrictions are no greater than are necessary for the protection of the interests of the Investor and the Company.

## 11.    SHARES HELD BY THE FOUNDER

11.1    The Company agrees with all of the parties to this agreement who are responsible persons for the purposes of section 421L of ITEPA that:

(a)    it is the most appropriate responsible person to obtain information in relation to any Shares acquired by the Founder prior to or at the date of this agreement; and

(b)    the Company shall provide HM Revenue & Customs, within any relevant time limits, with the information required by section 421J of ITEPA on the occasion of any reportable event relating to such shares as defined by section 421K of

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

ITEPA, so that the other parties to this agreement who are responsible persons do not need to provide any information to HM Revenue & Customs.

11.2   Each of the parties to this agreement who is an individual:

(a)   warrants that, in the case of any party who is or is about to become an employee or director of the Company, he has entered into a valid joint election under section 431(1) of ITEPA, signed by the individual in question and the Company in respect of any Shares acquired before the date of this agreement and/or any Shares acquired pursuant to this agreement;

(b)   undertakes to inform the Company whenever a reportable event occurs in relation to their Shares and that they will provide the Company with the information required, to the extent that the Company does not have such information;

(c)   acknowledges that any Shares acquired before the date of this agreement, or any Shares or other employment-related securities received under this agreement, are received by the individual gross of tax; and

(d)   agrees that any tax arising in relation to any Shares acquired before the date of this agreement, or any Shares or other employment-related securities received under this agreement however and whenever arising, shall be the sole responsibility of the individual concerned.

11.3   Each of the parties to this agreement who is an individual undertakes to:

(a)   fully and effectually indemnify the Company, subject to clause 11.4, against any liability of the Company to account to HM Revenue & Customs or any other tax authority for any amounts of, or representing, income tax or National Insurance contributions (including employer's secondary Class 1 contributions to the extent permitted by law from time to time) which may arise as a result of the operation of Part 7 of ITEPA in relation to any shares acquired by, held by or disposed of by him or any other person associated with him (within the meaning of section 421C of ITEPA); and

(b)   join with the Company in making an election, in such terms and such form as the Company may require, subject to such approval by HM Revenue & Customs as may from time to time be required by law, for the transfer to him of the whole of any liability of the Company to employer's Secondary Class I National Insurance contributions payable in respect of any of his relevant employment income (as defined in the SSCBA).



**Defense Exhibit 17-45**

0696 - 137

Isotropic Compare Feb14_JF_accepted changes and edits

11.4 The provisions of clause 11.3 will not have effect in relation to Secondary Class 1 National Insurance contributions on any occasion if to do so would contravene the provisions of the SSCBA or of any regulations made under that Act.

12. **SHARE OPTIONS**

The Parties acknowledge that the Company intends to adopt, at a later date, an incentive share option plan for its officers and employees.

13. **CONFIDENTIALITY AND ANNOUNCEMENTS**

13.1 Subject to clause 13.3 or as otherwise provided in this agreement, each party agrees to keep secret and confidential and not to use, disclose or divulge to any third party (other than to a party's professional advisers), any:

(a) confidential information relating to the Company (including the Intellectual Property, customer lists, reports, notes, memoranda and all other documentary records pertaining to the Company or its business affairs, finances, suppliers, customers or contractual or other arrangements); or

(b) information relating to the negotiation, provisions or subject matter of this agreement (or any document referred to in it); or

(c) information concerning the Investor or any member of its group,

13.2 Subject to clause 13.3, the parties shall not make any public announcement, issue any press release, or respond to any enquiry from the press or other media that concerns or relates to this agreement or its subject matter (including, but not limited to, the Investor's investment in the Company) or any ancillary matter.

13.3 Clauses 13.1 and 13.2 shall not apply to:

(a) any information which is in the public domain (other than through the wrongful disclosure of any party); or

(b) disclosure required by:

(i) law or the rules of any regulatory body to which the Company is subject; or

(ii) any securities exchange on which either party's securities are listed or traded; or

**Defense Exhibit 17-46**

0696 - 138



Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(iii)    any regulatory or governmental or other authority with relevant powers to which either party is subject or submits, whether or not the requirement has the force of law.

## 14.    ASSIGNMENT

14.1    Subject to clause 14.2, this agreement is personal to the parties and no party shall:

(a)    assign any of its rights under this agreement; or

(b)    transfer any of its obligations under this agreement; or

(c)    subcontract or delegate any of its obligations under this agreement; or

(d)    charge or deal in any other manner with this agreement or any of its rights or obligations under it,

and any purported assignment, transfer, sub-contracting, delegation, charging or dealing in contravention of this clause 14.1 shall be ineffective.

14.2    The Investor may assign the whole or part of any of its rights under this agreement.

## 15.    THIRD PARTY RIGHTS

This agreement and the documents referred to in it are made for the benefit of the parties to them and their successors and permitted assigns, and are not intended to benefit, or be enforceable by, anyone else.

## 16.    SURVIVAL

16.1    This agreement (other than the obligations that have already been performed) remains in full force after Completion.

16.2    A party shall cease to be a party to this agreement for the purpose of receiving benefits and enforcing his rights from the date that he ceases to hold (or beneficially own) any shares in the capital of the Company (but without prejudice to any benefits and rights enjoyed prior to such cessation).

16.3    The Founder's obligations under clause 4, clause 10 and clause 13 shall survive a transfer of all or any Shares by the Founder, and shall survive the Founder ceasing to be a director or employee of, or consultant to, the Company. But otherwise, when a Founder ceases to be a Shareholder, he shall have no further obligation or liability under this agreement, but without prejudice to the due performance by the Founder of all obligations up to the date of such cessation.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-47**

0696 - 139



Isotropic Compare Feb14_JF_accepted changes and edits

16.4    This agreement shall terminate automatically on a Listing.

17.    **SHAREHOLDERS OBLIGATIONS AND STATUS OF THIS AGREEMENT**

17.1    Each Shareholder shall exercise all voting rights and other powers of control available to it in relation to the Company so as to procure (so far as is reasonably possible) that, at all times during the term of this agreement, the provisions of this agreement are promptly observed and given full force and effect according to its spirit and intention.

17.2    If, at any time, any provisions of the Articles conflict with any provision of this agreement, the provisions of this agreement shall prevail between the Shareholders.  In such circumstances, the Shareholders shall procure that such modifications as are necessary are made to the Articles.

18.    **SEVERANCE**

18.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, the other provisions shall remain in force.

18.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted or modified, that provision shall apply with whatever modification is necessary to give effect to the commercial intention of the parties.

19.    **VARIATION**

A variation of this agreement shall only be valid if it is in writing and signed by the Company, the Investor and the Founder, in which event such change shall be binding against all of the parties to this agreement, provided that if such change would detrimentally affect the rights of a party, the consent of the affected party to that variation shall be specifically required.

20.    **COSTS**

All reasonable and properly incurred costs and expenses in connection with the negotiation, preparation, execution and performance of this agreement, and any documents referred to in it, shall be borne by the Investor.

21.    **AMENDMENT AND RESTATEMENT; WHOLE AGREEMENT**

21.1    This agreement amends, restates and replaces in its entirety the Original Shareholders' Agreement, except as it concerns any representations and warranties made by the Founder or the Company in the Original Shareholders' Agreement (all of which shall survive and remain in full force and effect).

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-48**

Isotropic Compare Feb14_JF_accepted changes and edits



21.2    This agreement, and the documents referred to or incorporated in it or executed contemporaneously with it, constitute the whole agreement between the parties relating to the subject matter of this agreement, and supersede any previous arrangement, understanding or agreement between them relating to the subject matter that they cover.

21.3    Nothing in this clause 21 operates to exclude or limit any liability for fraud.

22.    **NOTICES**

22.1    A notice given under this agreement:

   (a)    shall be in writing in the English language (or be accompanied by a properly prepared translation into English);

   (b)    shall be sent for the attention of the person, and to the address or fax number, given in this clause 22 (or such other address, fax number or person as the relevant party may notify to the other party); and

   (c)    shall be:

        (i)    delivered personally; or

        (ii)    sent by fax; or

        (iii)    sent by pre-paid first-class post or recorded delivery; or

        (iv)    sent by email; or

        (v)    (if the notice is to be served by post outside the country from which it is sent) sent by airmail.

22.2    The addresses for service of notice are:

Company.
Address: 31 Chearsley Road, Long Crendon, HP18 9BS England
For the attention of: [*]
Email: [*]@isotropicsystems.com

Investor.
Address: C/o Widmore Business Solutions Limited, 1 Bromley Lane, Chislehurst, Kent. BR7 6LH England
For the attention of: Graham A Collett FCA
Email: graham@gacollett.com

**Defense Exhibit 17-49**

Isotropic Compare Feb14_JF_accepted changes and edits



This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Founder.
Address: Flat 1, 17 Cliveden Place, Belgravia, London SW1W 8LA
For the attention of: Mr John Finney
Fax number: N/A
Email: john@isotropicsystems.com

22.3    A notice is deemed to have been received:

(a)    if delivered personally, at the time of delivery; or

(b)    if delivered by fax or email, at the time of transmission; or

(c)    if delivered by pre-paid first-class post or recorded delivery, 48 hours from the date of posting; or

(d)    if delivered by airmail, five days from the date of posting; or

(e)    if deemed receipt under the previous paragraphs of this clause 22.3 is not within business hours (meaning 9.00 am to 5.30 pm Monday to Friday on a day that is a Business Day), when business next starts in the place of deemed receipt.

22.4    To prove service, it is sufficient to prove that the notice was transmitted by fax or email, to the fax number or email address of the party or, in the case of post, that the envelope containing the notice was properly addressed and posted.

23.    **FURTHER ASSURANCE**

Without prejudice to clause 3, each party shall promptly execute and deliver all such documents, and do all such things, as the other party may from time to time reasonably require for the purpose of giving full force and effect to the provisions of this agreement.

24.    **COUNTERPARTS**

This agreement may be executed in any number of counterparts, each of which is an original and which, when executed, shall be an original and which together shall have the same effect as if each party had executed the same document.

25.    **NO PARTNERSHIP**

Nothing in this agreement is intended to or shall be construed as establishing or implying a partnership of any kind between the parties.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-50**

Isotropic Compare Feb14_JF_accepted changes and edits

26.   **LANGUAGE**

If this agreement is translated into any language other than English, the English language text shall prevail.

27.   **GOVERNING LAW**

27.1   This agreement and any dispute or claim arising out of or in connection with it or its subject matter (including non-contractual disputes or claims), shall be governed by and construed in accordance with the law of England and Wales.

27.2   The parties irrevocably agree that the courts of England and Wales shall have non-exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement or its subject matter (including non-contractual disputes or claims).

This agreement has been entered into on the date stated at the beginning of it.

Signed by:   **Graham A Collett**
(under Power of Attorney)
for and on behalf of
**WATERLOW MANAGEMENT LIMITED**

Signed by

**JOHN FINNEY**

Signed by:
for and on behalf of
**ISOTROPIC SYSTEMS LIMITED**

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-51**

Isotropic Compare Feb14_JF_accepted changes and edits

## SCHEDULE 1

### The Company

| | |
|---|---|
| Registered number: | 08706503 |
| Status: | Private limited company |
| Registered office: | 20-22 Wenlock Road, London N1 7GU |
| Directors: | John Finney and Robert Dooner |
| Secretary: | None |
| Accounting reference date: | 30 September |
| Issued share capital prior to closing: | 10,000 ordinary shares of £0.001 each in the name of John Finney |
| | 862 ordinary shares of £0.001 each in the name of Charles Hannaford |
| | 862 ordinary shares of £0.001 each in the name of Yang Hao |
| | 4,310 preference shares of £0.001 each in the name of Waterlow Management Limited |
| Issued share capital after the closing: | 10,000 ordinary shares of £0.001 each in the name of John Finney |
| | 3,505 preference shares of £0.001 each in the name of John Finney |
| | 862 ordinary shares of £0.001 each in the name of Charles Hannaford |
| | 862 ordinary shares of £0.001 each in the name of Yang Hao |
| | 13,505 preference shares of £0.001 each in the name of Waterlow Management Limited |

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-52**

0696 - 144

Isotropic Compare Feb14_JF_accepted changes and edits



This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## SCHEDULE 2

### Warranties

1.    **THE COMPANY**

1.1    The Founder, Charles Hannaford, Yang Hao  and the Investor are the legal and beneficial owners of the entire issued share capital of the Company.  All of the Shares are fully paid.

1.2    None of the share capital of the Company (whether issued or unissued) is under option or subject to any Encumbrance.  No dividends or other rights or benefits have been declared, made or paid on it.

1.3    The Company is duly incorporated and existing under the laws of England and Wales, and has all necessary authority to enter into this agreement.

1.4    The Company does not have any subsidiaries or subsidiary undertakings, nor has it at any time been the holding company of any company or a member of or the beneficial owner of any shares, securities or any interest in any person.

1.5    Save as set out in the Disclosure Schedule, the Company has no:

(a)    material capital commitments; or

(b)    borrowings from a bank or otherwise; or

(c)    debts owing to it; or

(d)    security or Encumbrance over any part of its undertaking; or

(e)    employees.

2.    **INFORMATION SUPPLIED**

2.1    All information contained in the Disclosure Schedule and in the replies to preliminary enquiries is true, complete and accurate.

2.2    The information contained or referred to in the Background and Schedule 1 is true, complete and accurate and not misleading.

**Defense Exhibit 17-53**

Isotropic Compare Feb14_JF_accepted changes and edits

3.    **ANNUAL BUDGET**

3.1    The Annual Budget has been diligently prepared and, as at the date of this agreement, the Founder believes that it represents a realistic plan in relation to the future progress, expansion and development of the Business.

3.2    All factual information contained in the Annual Budget was when given, and is at the date of this agreement, true and accurate in all material respects and not misleading.

3.3    The financial forecasts, projections or estimates contained in the Annual Budget have been diligently prepared, are fair, valid and reasonable and are not in need of material amendment, modification, review or other alteration, nor have they been disproved in the light of any events or circumstances which have arisen after the preparation of the Annual Budget up to the date of this agreement.

3.4    The assumptions on which the prospects of the Company are based, as stated in the Annual Budget, are set out in the Disclosure Schedule and have been carefully considered. The Founder believes that, having regard to the information available and to the market conditions prevailing at the time that the Annual Budget was prepared, they were reasonable.

3.5    The Founder believes that all statements of opinion in the Annual Budget are fair and reasonable and are not misleading.

4.    **ACCOUNTS**

4.1    The statutory accounts of the Company for the 12 month period ended 30 September 2015:

   (a)    have been prepared in accordance with accounting principles, standards and practices which are generally accepted in the United Kingdom;

   (b)    comply with the provisions of the Companies Acts; and

   (c)    give a true and fair view of the state of affairs of the Company at 30 September 2015 and the profits and losses for the period concerned.

5.    **INTELLECTUAL PROPERTY**

5.1    The Company has taken all steps necessary or desirable for the fullest protection of all Intellectual Property and know-how used by it.  The Company has not itself granted any rights to third parties in relation to any of its Intellectual Property.

<div align="center">

## Defense Exhibit 17-54

0696 - 146

</div>



Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

5.2 The operations of the Company and any products or services supplied by it do not use or infringe the rights of any person, or infringe any right of privacy. The Warrantors are not aware of any claims or applications for registration which might be material for disclosure to the Investor as an applicant for shares in the Company.

5.3 All Intellectual Property (including know-how) which is, or is likely to be, material to the business of the Company, are (or in the case of applications will be) legally and beneficially vested exclusively in the Company, valid and enforceable and not subject to any claims or opposition from any third party.

5.4 No Intellectual Property in which the Company has any interest and which is, or is likely to be, material to the business of the Company is:

(a) being (or has been) infringed, misappropriated or used without permission by any other person; or

(b) subject to any licence, estoppel or authority or similar right in favour of any other person, except as set out in the agreements listed in the Disclosure Schedule.

5.5 All Intellectual Property which is registered in the name of the Company, or in respect of which the Company has made application for registration, is:

(a) listed and briefly described in the Disclosure Schedule;

(b) legally and beneficially vested in the Company; and

(c) valid and enforceable.

5.6 The Company has not knowingly disclosed, or permitted to be disclosed, to any person (other than to the Investor and to its agents, employees or professional advisers) any of its know-how, trade secrets, confidential information or lists of customers or suppliers.

5.7 None of the Warrantors has granted any right or licence to any person to use or exploit in any manner, or to do anything which would or may otherwise infringe, the Intellectual Property owned by the Company.

5.8 There are no third party claims that any domain name registered by the Company is in infringement of a third party's domain name or other Intellectual Property rights.

6. STATUTORY AND LEGAL REQUIREMENTS

All statutory, municipal, governmental, court and other requirements applicable to the carrying on of the business of the Company, and the formation, continuance in existence, creation and issue of securities, management, property or operation of the Company,

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-55**

0696 - 147

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

have been complied with. All permits, authorities, licences and consents have been obtained and all conditions applicable to it complied with and, so far as the Warrantors are aware, there are no circumstances which might lead to the suspension, alteration or cancellation of any such permits, authorities, licences or consents, nor is there any agreement which materially restricts the fields within which the Company may carry on its business.

7.    **RECORDS AND REGISTERS**

The records (including computer records), statutory books, registers, minute books and books of account of the Company are duly entered and maintained in accordance with all legal requirements applicable to them and contain true, full and accurate records of all matters required to be dealt with in them and all such books and all records and documents (including documents of title) which are the Company's property are in its possession or under its control. All accounts, documents and returns required to be delivered or made to the Registrar of Companies have been duly and correctly delivered or made. There has been no notice of any proceedings to rectify the register of members of the Company and there are no circumstances which might lead to any application for rectification of the register of members.

8.    **CONTRACTS WITH CONNECTED PERSONS**

8.1    There are no loans made by the Company to any of its directors or shareholders and/or any person connected with any of them, and no debts or liabilities owing by the Company to any of its directors or shareholders and/or any person connected with them as aforesaid.

8.2    Except as set out in the Disclosure Schedule, there are no existing contracts or arrangements to which the Company is a party and in which any of its directors or shareholders and/or any person connected with any of them is interested.

9.    **LITIGATION**

9.1    Neither the Company, nor any person for whose acts or omissions it may be vicariously liable, is engaged in or subject to any:

(a)    litigation, administrative, mediation or arbitration proceedings in relation to the Company or the Business or any of them; or

(b)    is the subject of any investigation, inquiry or enforcement proceedings by any governmental, administrative or regulatory body.

**Defense Exhibit 17-56**
0696 - 148



Isotropic Compare Feb14_JF_accepted changes and edits

9.2    No such proceedings, investigation or inquiry as are mentioned in paragraph 9.1 have been threatened or are pending by or against the Company or against any such person, and there are no facts or circumstances likely to give rise to any such proceedings.

9.3    The Company has not committed, and is not liable for, any criminal, illegal, unlawful, ultra vires or unauthorised act or breach of covenant, contract or statutory duty, and none of the Warrantors has committed any crime other than minor traffic offences.

## 10.    INSOLVENCY

10.1    No step has been taken to initiate any process by or under which:

(a)    the ability of the creditors of the Company to take any action to enforce their debts is suspended, restricted or prevented; or

(b)    some or all of the creditors of the Company accept, by agreement or under a court order, an amount less than the sums owing to them in satisfaction of those sums with a view to preventing the dissolution of the Company; or

(c)    a person is appointed to manage the affairs, business and assets of the Company on behalf of the Company's creditors; or

(d)    the holder of a charge over the Company's assets is appointed to control the business and assets of the Company.

10.2    In relation to the Company:

(a)    no administrator has been appointed;

(b)    no documents have been filed with the court for the appointment of an administrator; and

(c)    no notice of an intention to appoint an administrator has been given by the relevant company, its directors or by a qualifying floating charge holder (as defined in paragraph 14 of Schedule B1 to the Insolvency Act 1986).

## 11.    CAPITALIZATION/SHARE OWNERSHIP

11.1    Upon the Investor's subscription for the Subscription Shares and the Founder's subscription for the Additional Founder Subscription Shares, (a) the Investor will own an aggregate of 13,505 convertible preference shares in the capital of the company, and (b) such 13,505 convertible preference shares shall represent forty-seven percent (47.0%) of the issued and outstanding shares in the capital of the Company (on a fully diluted basis).

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-57**

Isotropic Compare Feb14_JF_accepted changes and edits



11.2    Upon the Investor's subscription for the Subscription Shares and the Founder's subscription for the Additional Founder Subscription Shares, the outstanding share capital of the Company shall be as follows:

| Shareholder Name | Shares | Ownership Percentage |
|---|---|---|
| Founder | 10,000 ordinary shares and 3,505 preference shares | 47.0% |
| Investor | 13,505 preference shares | 47.0% |
| Charles Hannaford | 862 ordinary shares | 3.0% |
| Yang Hao | 862 ordinary shares | 3.0% |

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-58**
0696 - 150

Isotropic Compare Feb14_JF_accepted changes and edits



## SCHEDULE 3

### Form of Deed of Adherence

**THIS DEED OF ADHERENCE** is made on ● 20●

**BETWEEN:**

(1)     ● of ● (the "**Covenantor**"); and

(2)     ● (the "**Company**") for itself and as attorney for the other Parties to the Shareholders' Agreement.

**RECITAL**

This Deed is supplemental to the Subscription and Shareholders' Agreement made on ● 20● between (1) ● (2) ● and (3) ● ("**Shareholders' Agreement**").

**THIS DEED WITNESSES** as follows:

1.     The Covenantor hereby confirms that it has been supplied with a copy of the Shareholders' Agreement and hereby covenants with each of the parties hereto to observe, perform and be bound by all the terms of the Shareholders' Agreement [(other than the Excluded Clauses)] as if it were a Party thereto or named therein as a Shareholder.

2.     Each of the other parties hereto hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Shareholders' Agreement (other than the Excluded Clauses) as if it were a party thereto and named therein as a Shareholder.

3.     [For the purpose of this Deed, the Excluded Clauses are Clauses ● of the Shareholders' Agreement.]

4.     The Covenantor hereby appoints the Company to be its attorney for the purposes of Clause 9.2 of the Shareholders' Agreement.

5.     This Deed shall be governed by and construed in accordance with English law.

**IN WITNESS** of which this Deed has been executed by the Covenantor and the Company for itself and as attorney for the other Parties to the Shareholders' Agreement and is intended to be and is hereby delivered on the date shown above.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-59**

0696 - 151



Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

SIGNED as a DEED by )
[COVENANTOR] )
in the presence of : )

...........................

...........................

Signature of Witness

Name of Witness:

Address of Witness:

or

EXECUTED as a DEED by )
[COVENANTOR] LIMITED )
acting by: )

..................                        .......................

Director                                   Director/Secretary

EXECUTED as a DEED by )
• LIMITED )
(for itself and as attorney for each )
Shareholder of • Limited )
acting by: )

..................                        .......................

Director                                   Director/Secretary

**Defense Exhibit 17-60**

0696 - 152

Isotropic Compare Feb14_JF_accepted changes and edits



This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-61**

0696 - 153

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Signed by
for and on behalf of
**WATERLOW MANAGEMENT LIMITED**          ..........................................

Signed by

**JOHN FINNEY**

Signed by **JOHN FINNEY**
for and on behalf of
**ISOTROPIC SYSTEMS LIMITED**

**Defense Exhibit 17-62**
0696 - 154

Isotropic Compare Feb14_JF_accepted changes and edits

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Schedule 4

Disclosure Schedule

## Warranty 3.4 – Assumptions contained in the Annual Budget

1. The main use of funds have been agreed and circulated between the investor and founder as per the original memo emailed from Founder to Investor 26th September 2016. The main uses of funding are;

   a. Prepare for funding – Appoint a strategy advisor to create the investment memorandum, supporting files, customer interviews, assess the company's right to win and addressable markets into a single coherent business case culminating in business plan capable of approval by the board in relation to upcoming major funding milestones.

   b. Appoint a financial advisor to close the next round of funding – Socialise the companies plan to Tech VC's, develop a full equity model and financial business plan.

   c. Protect our Assets – Continue to file an important series of patents that relate to the unique designs of the company.

   d. Develop a proof of concept or 'optical demonstrator' – This requires the purchase of materials required to demonstrate the technical performance of the Isotropic design as adapted to the satellite industry, with measured results.

   e. Increase the company headcount to meet the operational plan and a successful demonstration of our technology both in RF and Optical expertise.

   f. Allow additional funding for contingency and project overrun.

## Warranty 4 - Accounts

The Company has filed dormant accounts up to the most recent filing period of 30 September, 2015

**Defense Exhibit 17-63**
0696 - 155

Isotropic Compare Feb14_JF_accepted changes and edits

Company No: 8706503

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

# ISOTROPIC SYSTEMS LTD
## ("Company")

**MINUTES** of the Meeting of the Board of Directors of the Company held at 20-22 Wenlock Road, London N1 7GU on                    2018

| Present: | John Finney | (In the Chair) |
|---|---|---|
| | Robert Dooner | |
| | John Dick | |

## 1.    OPENING OF MEETING

The chairman opened the meeting, announced that a quorum was present and declared the meeting duly convened.

## 2.    DECLARATION OF INTERESTS

The directors declared the nature and extent of their interest in the proposed transactions to be considered below in accordance with the requirements of section 177 of the Companies Act 2006 ("**Act**") and the Company's articles of association ("**Articles**") by virtue of the fact they are directors of the Company or otherwise in any other way.

## 3.    PURPOSE OF MEETING

**IT WAS REPORTED** that the meeting had been convened to:

3.1    subdivide the 10,862 issued ordinary shares of £0.001 each in the capital of the Company into 1,086,200 ordinary shares of £0.00001 each;

3.2    subdivide the 17,010 issued preferred shares of £0.001 each in the capital of the Company into 1,701,000 preferred shares of £0.00001 each;

3.3    adopt new articles of association for the Company;

3.4    enter into a deed of variation to the shareholders' agreement relating to the Company dated 3 March 2017 between (1) Waterlow Management Limited ("**WML**"), (2) John Finney and (3) the Company ("**Deed of Variation**"); and

3.5    enter into a convertible loan note instrument between (1) the Company and (2) WML relating to the creation by the Company of US$4,000,000 unsecured convertible loan notes and the subscription by WML of such loan notes in tranches to replace the previous loans made by WML to the Company ("**Instrument**").

## 4.    SUBDIVISION OF SHARES AND NEW ARTICLES OF ASSOCIATION

4.1    **THERE WAS PRODUCED** to the meeting (i) a form of written resolution of the members of the Company pursuant to Chapter 2 of Part 13 of Act ("**Written Resolution**"); and (ii) a form of class consent of the holders of the preferred shares pursuant to section 630 of the Act ("**Class Consent**"); in each case the first and second to

1

1. Board Minutes - Isotropic Systems.doc

Company No: 8706503

take effect as ordinary resolutions and the third to take effect as a special resolution of the Company:

1.  "That the 10,862 issued ordinary shares of £0.001 each in the capital of the Company be sub-divided into 1,086,200 ordinary shares of £0.00001 each, having the rights set out in the articles of association of the Company adopted at resolution 3 below.

2.  That the 17,010 issued preferred shares of £0.001 each in the capital of the Company be sub-divided into 1,701,000 preferred shares of £0.00001 each, having the rights set out in the articles of association of the Company adopted at resolution 3 below.

3.  That the articles of association contained in the draft document annexed to this resolution and signed for identification by the chairman be adopted as the articles of association of the Company in substitution for and to the exclusion of the existing articles of association of the Company."

4.2  **IT WAS RESOLVED** to:

4.2.1  approve the Written Resolution and the Class Consent in the form produced to the meeting; and

4.2.2  send the Written Resolution to every eligible member of the Company (as defined in section 289(1) of the Act)) and send the Class Consent to every eligible member of the Company holding preferred shares.

4.3  The meeting was adjourned so that the Written Resolutions and the Class Consent could be submitted to the relevant members of the Company.

4.4  The meeting then reconvened and the chairman reported that (i) the Written Resolution had been duly passed by the eligible members holding more than 75% of the shares in the Company and (ii) the Class Consent had been duly passed by all the eligible members of the Company holding more than 75% of the preferred shares in the Company.

5.  **TABLING, CONSIDERATION AND APPROVAL OF DEED OF VARIATION AND INSTRUMENT**

5.1  **THERE WAS THEN PRODUCED** to the meeting the following documents (together the "Documents"):

5.1.1  the Deed of Variation; and

5.1.2  the Instrument.

5.2  The chairman explained that it was necessary for the board to consider whether executing the Documents and carrying out the business described in the Documents would be most likely to promote the success of the Company for the benefit of its members as a whole and whether it would constitute a proper exercise of the directors' powers in accordance with section 172 of the Act.

5.3  The meeting noted the advantages to the Company and in particular the Documents were being entered into to secure financing for the Company now and to prepare in advance of future funding rounds and accordingly the Documents would facilitate the success of the

1. Board Minutes - Isotropic Systems.doc

2

**Defense Exhibit 17-65**
0696 - 157

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Case 1:24-cr-00239-CKK-MAU   Document 126-5   Filed 03/27/26   Page 67 of 158

Company No: 8706503

business going forward and concluded that executing the Documents and carrying out the business described in the Documents would be most likely to promote the success of the Company for the benefit of its members as a whole and that it would constitute a proper exercise of the directors' powers in accordance with section 172 of the Act.

5.4     Accordingly, **IT WAS RESOLVED** that:

> 5.4.1   the terms of the Deed of Variation be approved and that any director of the Company be authorised to execute the Deed of Variation as a deed for and on behalf of the Company in the form produced to the meeting or with such variations or amendments, if any, as any one director may in his absolute discretion approve;

> 5.4.2   the terms of the Instrument be approved and that any director of the Company be authorised to execute the Instrument as a deed for and on behalf of the Company in the form produced to the meeting or with such variations or amendments, if any, as any one director may in his absolute discretion approve;

> 5.4.3   where any such variations or amendments as are referred to above are made, the approval of the director concerned shall in each case be conclusively evidenced by his signing or otherwise executing the relevant Document; and

> 5.4.4   the director concerned be authorised on behalf of the Company to execute and do all such deeds, documents and things as he may consider expedient in connection with the execution or performance by the Company of the Documents.

6.     **ISSUE OF CONVERTIBLE LOAN NOTES**

6.1     The chairman reported that as at the date of this meeting, WML had provided the Company with unsecured loans in the aggregate sum of US$3,400,000 ("Loans") and that it was proposed to issue WML with convertible loan notes for that sum in place of the Loans.

6.2     **IT WAS RESOLVED** that the allotment of US$3,400,000 of convertible loan notes to WML under the terms of the Instrument ("Loan Notes") be approved and that the related Loan Notes be allotted and issued, the appropriate loan note certificate be executed and the necessary entries be made in the register of loan note holders.

7.     **FILING**

**IT WAS RESOLVED** that all necessary and appropriate entries be made in the books and registers of the Company and that the following documents be prepared, signed and filed with the Registrar of Companies:

7.1     the Written Resolution;

7.2     a print of the articles of association; and

7.3     Form SH02 (notice of sub-division of shares).

3

1. Board Minutes - Isotropic Systems.doc

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

# Defense Exhibit 17-66

Company No: 8706503

8.    **CLOSURE**

There being no further business, the chairman declared the meeting closed.

_____
Chairman

I. Board Minutes - Isotropic Systems.doc

**Defense Exhibit 17-67**
0696 - 159

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Company No: 8706503

THE COMPANIES ACT 2006

PRIVATE COMPANY LIMITED BY SHARES

MEMBERS' WRITTEN RESOLUTION
(Section 288 Companies Act 2006)

OF

## ISOTROPIC SYSTEMS LTD ("Company")

Dated:                                    2018

The following resolutions were duly passed on the above date by way of written resolution under Chapter 2 of Part 13 of the Companies Act 2006 resolutions 1 and 2 as ordinary resolutions and resolution 3 as a special resolution:

**Ordinary Resolution**

1. That the 10,862 issued ordinary shares of £0.001 each in the capital of the Company be sub-divided into 1,086,200 ordinary shares of £0.00001 each, having the rights set out in the articles of association of the Company adopted at resolution 3 below.

2. That the 17,010 issued preferred shares of £0.001 each in the capital of the Company be sub-divided into 1,701,000 preferred shares of £0.00001 each, having the rights set out in the articles of association of the Company adopted at resolution 3 below.

**Special Resolution**

3. That the articles of association contained in the draft document annexed to this resolution and signed for identification by the chairman be adopted as the articles of association of the Company in substitution for and to the exclusion of the existing articles of association of the Company.

_____
Director for and on behalf of
Isotropic Systems Ltd

3. Print of Members' Written Resolution - Isotropic Systems.doc

**Defense Exhibit 17-68**
0696 - 160

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

In accordance with Section 619, 621 & 689 of the Companies Act 2006.

# SH02

### Notice of consolidation, sub-division, redemption of shares or re-conversion of stock into shares



**Companies House**

✓ **What this form is for**
You may use this form to give notice of consolidation, sub-division, redemption of shares or re-conversion of stock into shares.

✗ **What this form is NOT for**
You cannot use this form to give notice of a conversion of shares into stock.

For further information, please refer to our guidance at www.gov.uk/companieshouse

## 1 Company details

| | |
|---|---|
| Company number | 0 8 7 0 6 5 0 3 |
| Company name in full | Isotropic Systems Ltd |
| | |

→ **Filling in this form**
Please complete in typescript or in bold black capitals.

All fields are mandatory unless specified or indicated by *

## 2 Date of resolution

| | d d | m m | y y y y |
|---|---|---|---|
| Date of resolution | | | 2 0 1 8 |

## 3 Consolidation

Please show the amendments to each class of share.

| Class of shares (E.g. Ordinary/Preference etc.) | Previous share structure | | New share structure | |
|---|---|---|---|---|
| | Number of issued shares | Nominal value of each share | Number of issued shares | Nominal value of each share |
| | | | | |
| | | | | |

## 4 Sub-division

Please show the amendments to each class of share.

| Class of shares (E.g. Ordinary/Preference etc.) | Previous share structure | | New share structure | |
|---|---|---|---|---|
| | Number of issued shares | Nominal value of each share | Number of issued shares | Nominal value of each share |
| Ordinary | 10,862 | £0.001 | 1,086,200 | £0.00001 |
| Preferred | 17,010 | £0.001 | 1,701.000 | £0.00001 |
| | | | | |

## 5 Redemption

Please show the class number and nominal value of shares that have been redeemed. Only redeemable shares can be redeemed.

| Class of shares (E.g. Ordinary/Preference etc.) | Number of issued shares | Nominal value of each share |
|---|---|---|
| | | |
| | | |
| | | |

06/16 Version 5.0

## Defense Exhibit 17-69
0696 - 161

# SH02
Notice of consolidation, sub-division, redemption of shares or re-conversion of stock into shares

## 6 Re-conversion

Please show the class number and nominal value of shares following re-conversion from stock.

**New share structure**

| Value of stock | Class of shares (E.g. Ordinary/Preference etc.) | Number of issued shares | Nominal value of each share |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## 7 Statement of capital

Complete the table(s) below to show the issued share capital. It should reflect the company's issued capital following the changes made in this form.

**Complete a separate table for each currency (if appropriate).** For example, add pound sterling in 'Currency table A' and Euros in 'Currency table B'.

Please use a Statement of Capital continuation page if necessary.

| Currency  Complete a separate table for each currency | Class of shares  E.g. Ordinary/Preference etc. | Number of shares | Aggregate nominal value (£, €, $, etc)  Number of shares issued multiplied by nominal value | Total aggregate amount unpaid, if any (£, €, $, etc)  Including both the nominal value and any share premium |
|---|---|---|---|---|
| **Currency table A** |  |  |  |  |
| Pound sterling | Ordinary | 1,086,200 | £10.862 |  |
| Pound sterling | Preferred | 1,701,000 | £17.01 |  |
|  |  |  |  |  |
| Totals | | 2,787,200 | £27.872 | £0 |
| **Currency table B** |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| Totals | |  |  |  |
| **Currency table C** |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| Totals | |  |  |  |

| | Total number of shares | Total aggregate nominal value ❶ | Total aggregate amount unpaid ❶ |
|---|---|---|---|
| Totals (including continuation pages) | 2,787,200 | £27.872 | £0 |

❶ Please list total aggregate values in different currencies separately. For example: £100 + €100 + $10 etc.

06/16 Version 5.0

**Defense Exhibit 17-70**
0696 - 162

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## SH02
Notice of consolidation, sub-division, redemption of shares or re-conversion of stock into shares

| 8 | Statement of capital (prescribed particulars of rights attached to shares)❶ |
|---|---|

Please give the prescribed particulars of rights attached to shares for each class of share shown in the share capital tables in **Section 7**.

| Class of share | Ordinary |
|---|---|
| Prescribed particulars ❶ | a. 1 vote per share on a poll; b. 1 equal right per share in any share dividend declared; c. 1 equal right per share in the distribution of any surplus due to the shareholders on a winding-up or other return of capital (after first returning the price paid up on the preferred shares and then the ordinary shares); d. no redemption rights attach to these shares. |
| Class of share | Preferred |
| Prescribed particulars ❶ | a. 1 vote per share on a poll; b. 1 equal right per share in any share dividend declared; c. 1 equal right per share in the distribution of any surplus due to the shareholders on a winding-up or other return of capital (after first returning the price paid up on the preferred shares and then the ordinary shares); d. no redemption rights attach to these shares. |
| Class of share | |
| Prescribed particulars ❶ | |

❶ **Prescribed particulars of rights attached to shares**
The particulars are:
a. particulars of any voting rights, including rights that arise only in certain circumstances;
b. particulars of any rights, as respects dividends, to participate in a distribution;
c. particulars of any rights, as respects capital, to participate in a distribution (including on winding up); and
d. whether the shares are to be redeemed or are liable to be redeemed at the option of the company or the shareholder.

A separate table must be used for each class of share.

Please use a Statement of capital continuation page if necessary.

| 9 | Signature |
|---|---|

I am signing this form or behalf of the company.

| Signature | Signature X [signature] X |
|---|---|

This form may be signed by:
Director ❷, Secretary, Person authorised ❸, Administrator , Administrative Receiver, Receiver, Receiver manager, CIC manager.

❷ **Societas Europaea**
If the form is being filed on behalf of a Societas Europaea (SE) please delete 'director' and insert details of which organ of the SE the person signing has membership.

❸ **Person authorised**
Under either section 270 or 274 of the Companies Act 2006.

06/16 Version 5.0

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## Defense Exhibit 17-71

# SH02

Notice of consolidation, sub-division, redemption of shares or re-conversion of stock into shares

## 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

Contact name **Bryan Rickman**

Company name **Keystone Law**

Address **36b Chyngton Road**

Post town **Seaford**

County/Region **East Sussex**

Postcode **B N 2 5 4 H P**

Country **England**

DX

Telephone **01323 891538**

## ✔ Checklist

We may return forms completed incorrectly or with information missing.

**Please make sure you have remembered the following:**
- ☐ The company name and number match the information held on the public Register.
- ☐ You have entered the date of resolution in Section 2.
- ☐ Where applicable, you have completed Section 3, 4, 5 or 6.
- ☐ You have completed the statement of capital.
- ☐ You have signed the form.

## ❗ Important information

Please note that all information on this form will appear on the public record.

## ✉ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the appropriate address below:

**For companies registered in England and Wales:**
The Registrar of Companies, Companies House, Crown Way, Cardiff, Wales, CF14 3UZ.
DX 33050 Cardiff.

**For companies registered in Scotland:**
The Registrar of Companies, Companies House, Fourth floor, Edinburgh Quay 2, 139 Fountainbridge, Edinburgh, Scotland, EH3 9FF.
DX ED235 Edinburgh 1
or LP - 4 Edinburgh 2 (Legal Post).

**For companies registered in Northern Ireland:**
The Registrar of Companies, Companies House, Second Floor, The Linenhall, 32-38 Linenhall Street, Belfast, Northern Ireland, BT2 8BG.
DX 481 N.R. Belfast 1.

## ℹ Further information

For further information, please see the guidance notes on the website at www.gov.uk/companieshouse or email enquiries@companieshouse.gov.uk

This form is available in an alternative format. Please visit the forms page on the website at www.gov.uk/companieshouse

**Defense Exhibit 17-72**
0696 - 164

In accordance with Section 619, 621 & 689 of the Companies Act 2006.

# SH02 - continuation page
Notice of consolidation, sub-division, redemption of shares or re-conversion of stock into shares

**7** **Statement of capital**

Complete the table below to show the issued share capital.
**Complete a separate table for each currency.**

| Currency<br><br>Complete a separate table for each currency | Class of shares<br><br>E.g. Ordinary/Preference etc. | Number of shares | Aggregate nominal value (£, €, $, etc)<br><br>Number of shares issued multiplied by nominal value | Total aggregate amount unpaid, if any (£, €, $, etc)<br><br>Including both the nominal value and any share premium |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | **Totals** | | | |

06/16 Version 5.0

**Defense Exhibit 17-73**
0696 - 165

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

In accordance with Section 619, 621 & 689 of the Companies Act 2006.

# SH02 - continuation page

Notice of consolidation, sub-division, redemption of shares or re-conversion of stock into shares

## 8    'Statement of capital (prescribed particulars of rights attached to shares) ⊙

Class of share

Prescribed particulars

**⊙ Prescribed particulars of rights attached to shares**

The particulars are:

a. particulars of any voting rights, including rights that arise only in certain circumstances;

b. particulars of any rights, as respects dividends, to participate in a distribution;

c. particulars of any rights, as respects capital, to participate in a distribution (including on winding up); and

d. whether the shares are to be redeemed or are liable to be redeemed at the option of the company or the shareholder.

A separate table must be used for each class of share.

06/16 Version 5.0

**Defense Exhibit 17-74**

*These are the articles of association annexed to the members' written resolution dated*

## THE COMPANIES ACT 2006

## PRIVATE COMPANY LIMITED BY SHARES

## ARTICLES OF ASSOCIATION

## OF

## ISOTROPIC SYSTEMS LTD

(Adopted by special resolution passed on                          2018)

1.    **INTERPRETATION**

1.1    The following definitions and rules of interpretation apply in these Articles:

"**Act**" means the Companies Act 2006, in force from time to time;

"**Accepting Shareholder**" has the meaning given in article 16.5;

"**Additional Shares**" has the meaning given in article 10.1;

"**Allocation Notice**" has the meaning given in article 12.16;

"**Asset Sale**" means the disposal by the Company of all, or a substantial part of, its business and assets;

"**Applicant**" has the meaning given in article 12.16;

"**Associate**" means in relation to any person:

(a)    any person who is an associate of that person. The question of whether (or not) a person is an associate of another is to be determined in accordance with section 435 of the Insolvency Act 1986; or

(b)    any member of the same Group;

"**Bad Leaver**" has the meaning set out in article 14.3;

"**Board**" means the board of Directors and any committee of the board constituted for the purpose of taking any action or decision contemplated by these Articles;

1

6. New Articles of Association - Isotropic - Final.docx

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-75**

0696 - 167

"**Business Day**" means a day other than a Saturday, Sunday or public holiday in England when banks in London are open for business;

"**Buyer**" has the meaning given in article 16.1;

"**Called Shareholders**" has the meaning given in article 17.1;

"**Called Shares**" has the meaning given in article 17.2(a);

"**Company**" means Isotropic Systems Ltd;

"**Consent**" means the consent of at least a majority of the holders of Preferred Shares, which may be:

(a)     given by the Investor Director either by written notice to the Company or by the Investor Director signing the Company's board minutes recording the relevant decision; or

(b)     given by written notice to the Company signed by any director of the Investor;

"**Continuing Shareholders**" has the meaning given in article 12.7;

"**Controlling Interest**" means an interest in shares giving the holder control of the Company within the meaning of section 1124 of the Corporation Taxes Act 2010;

"**Conversion Date**" has the meaning given in article 8.1;

"**Deferred Shares**" means the deferred shares of £0.00001 each in the capital of the Company;

"**Director**" means a director of the Company from time to time;

"**Drag Along Notice**" has the meaning given in article 17.2;

"**Drag Along Option**" has the meaning given in article 17.1;

"**Encumbrance**" means any mortgage, charge, security, interest, lien, pledge, assignment by way of security, equity, claim, right of pre-emption, option, covenant, restriction, reservation, lease, trust, order, decree, judgment, title defect (including, without limitation, any retention of title claim), conflicting claim or ownership or any other encumbrance of any nature (whether or not perfected, other than liens arising by operation of law);

"**Family Trust**" means in relation to an individual Shareholder, a trust or settlement set up wholly for the benefit of that individual Shareholder (the "**Settlor**") and/or the Settlor's Privileged Relations;

2

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-76**

0696 - 168

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

"**First Offer Period**" has the meaning given in article 12.7;

"**Founder**" means John Finney;

"**Founder Shares**" means the 1,350,500 Shares registered in the name of the Founder at the date of adoption of these Articles;

"**Good Leaver**" means the Founder, in circumstances when he is not a Bad Leaver;

"**Group**" means in relation to a company, that company, any Subsidiary Undertaking or any parent undertaking from time to time of that company, and any subsidiary undertaking from time to time of a parent undertaking of that company. Each company in a Group is a "**Group Company**";

"**Independent Expert**" means an independent firm of accountants (acting as an expert and not as an arbitrator);

"**Initial Surplus Shares**" has the meaning given in article 12.10;

"**Investor**" means any holder of Preferred Shares from time to time;

"**Investor Director**" means the director of the Company nominated by the Investor under article 18.2;

"**Leaver**" means the Founder, if he ceases to be a consultant to, or director or employee of, the Company and does not continue as, or become, a consultant to, or director or employee of, any other Group Company;

"**Listing**" means the successful application and admission of all or any of the shares in the capital of the Company, or securities representing such shares (including American depositary receipts, American depositary shares and/or other instruments to the Official List of the UK Listing Authority or on the AIM market operated by the London Stock Exchange plc, or the Nasdaq National Stock Market of the Nasdaq Stock Market Inc., or to any recognised investment exchange (as defined in section 285 of the Financial Services and Markets Act 2000 (as amended));

"**Loan Note Instrument**" means the instrument constituting the US$4,000,000 unsecured convertible loan notes proposed to be issued by the Company to WML dated on or around the date of adoption of these Articles;

"**Minimum Transfer Condition**" has the meaning given in article 12.2(d);

"**New Securities**" means any shares (other than Shares issued pursuant to a Share Option Plan) or other securities convertible into, or carrying the right to subscribe for those shares, issued by the Company after the date of adoption of these Articles;

3

6. New Articles of Association - Isotropic - Final.docx

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-77**

"**New Shareholder**" has the meaning given in article 17.11;

"**Offer**" has the meaning given in article 16.2;

"**Offer Notice**" has the meaning given in article 16.3;

"**Offer Period**" has the meaning given in article 16.3;

"**Offer Shares**" has the meaning given in article 16.3(d);

"**Ordinary Shares**" means the ordinary shares of £0.00001 each in the capital of the Company;

"**Original Subscription Price**" means in relation to any Share, the amount paid up or credited as paid up on it, including the full amount of any premium at which such Share was issued (regardless of whether such premium is applied for any purpose after that);

"**Preferred Shares**" means the preferred shares of £0.00001 each in the capital of the Company;

"**Privileged Relation**" means the spouse, civil partner, widow or widower of a Shareholder and the Shareholder's children and grandchildren (including step and adopted children), and step and adopted children of the Shareholder's children;

"**Proposed Buyer**" has the meaning given in article 17.1;

"**Proposed Transfer**" has the meaning given in article 16.1;

"**Realisation Price**" means the value of each Ordinary Share in issue immediately before a Listing or Sale (as the case may be) and:

(a)     in relation to a Listing, shall be determined by reference to the price per share at which Ordinary Shares in the Company are to be offered for sale, placed or otherwise marketed pursuant to the Listing; and

(b)     in relation to a Sale, shall be determined by reference to the price per share at which Ordinary Shares in the Company are to be sold;

"**Recipient**" has the meaning given in article 22.1;

"**Recipient Group Companies**" has the meaning given in article 22.2(b);

4

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-78**

0696 - 170

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

"**Relevant Securities**" means any shares or other securities convertible into, or carrying the right to subscribe for those shares, issued by the Company after the date on which these Articles are adopted, but excluding:

(a)    the grant of options to subscribe for Ordinary Shares under a Share Option Plan (and the issue of the Shares on exercise of those options); and

  (b)    any Shares which the Company is required to issue by reason of a right specifically attached to Shares under these Articles;

"**Restricted Shares**" has the meaning given in article 14.5;

"**Sale**" means an Asset Sale or a Share Sale;

"**Sale Date**" has the meaning given in article 16.3;

"**Sale Shares**" means the Shares specified or deemed to be specified for sale in a Transfer Notice or a Deemed Transfer Notice;

"**Second Offer Period**" has the meaning given in article 12.11;

"**Second Surplus Shares**" has the meaning given in article 12.13;

"**Seller**" means the transferor of Shares pursuant to a Transfer Notice;

"**Sellers' Shares**" has the meaning given in article 17.1;

"**Selling Shareholders**" has the meaning given in article 17.1;

"**Shares**" means the shares in the capital of the Company from time to time (excluding the Deferred Shares);

"**Share Sale**" means the sale of (or the grant of a right to acquire or to dispose of) any of the Shares (in one transaction or as a series of transactions) which will result in the buyer of those Shares (or grantee of that right) and persons acting in concert with him together acquiring a Controlling Interest in the Company, except where the shareholders and the proportion of Shares held by each of them following completion of the Sale are the same as the Shareholders and their shareholdings in the Company immediately before the sale;

"**Share Option Plan**" means the share option plan of the Company;

"**Shareholder**" means a holder of Shares in the Company;

"**Specified Price**" has the meaning given in article 16.2;

5

**Defense Exhibit 17-79**
0696 - 171

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

"**Termination Date**" means:

(a)    where the Founder's employment ceases by virtue of notice given by the Company to the Founder, the date on which such notice expires; or

(b)    where the Founder's contract of employment is terminated by the Company and a payment is made in lieu of notice, the date on which notice of termination was served; or

(c)    where the Founder dies, the date of his death; or

(d)    the date on which the Founder ceases to hold office as a director of the Company,

and in any other case, the date on which the consultancy agreement or employment agreement is terminated;

"**Transfer Notice**" means a notice in writing given by any Shareholder to the Company where that Shareholder desires, or is required by these Articles, to transfer (or enter into an agreement to transfer) any Shares. Where such notice is deemed to have been served, it shall be referred to as a "**Deemed Transfer Notice**";

"**Transfer Price**" has the meaning given in article 12.2(c); and

"**WML**" means Waterlow Management Limited a BVI company with company number 1858967.

1.2    Headings in these Articles shall not affect the interpretation of these Articles.

1.3    Unless the context otherwise requires, words in the singular shall include the plural and in the plural shall include the singular.

1.4    Unless the context otherwise requires, a reference to one gender shall include a reference to the other genders.

1.5    A reference to a statute or statutory provision is a reference to it as it is in force as at the date of adoption of these Articles.

1.6    A reference to a statute or statutory provision shall include all subordinate legislation made as at the date of adoption of these Articles under that statute or statutory provision.

1.7    The expressions "**holding company**", "**subsidiary**" and "**subsidiary undertaking**" have the meanings given in the Act;

**Defense Exhibit 17-80**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

1.8     Any words following the terms including, include, in particular, for example or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

1.9     Where the context permits, other and otherwise are illustrative and shall not limit the sense of the words preceding them.

1.10    Save as otherwise specifically provided in these Articles:

(a)     words and expressions which have particular meanings in the Act (to the extent in force from time to time) shall have the same meanings in these Articles; and

(b)     subject to article 1.10(a), words and expressions which have particular meanings in Table A shall have the same meanings in these Articles.

2.      **ADOPTION OF MODEL ARTICLES**

2.1     The model articles for private companies limited by shares set out in the Companies (Model Articles) Regulations 2008 (SI 2008/3229) shall apply to the Company, except as they are varied or excluded by, or are inconsistent with, the following Articles.

3.      **SHARE CAPITAL**

3.1     Unless the context requires otherwise, references in these Articles to shares of a particular class shall include Shares created and/or issued after the date of adoption of these Articles and ranking pari passu in all respects (or in all respects except only as to the date from which those Shares rank for dividend) with the Shares of the relevant class then in issue.

3.2     Except as provided in these Articles, the Preferred Shares and the Ordinary Shares shall rank *pari passu* in all respects but shall constitute separate classes of shares.

4.      **ISSUE OF SHARES**

4.1     Subject to the remaining provisions of this article 4, the Directors are generally and unconditionally authorised for the purpose of section 551 of the Act to exercise any power of the Company to:

(a)     offer, allot or grant rights to subscribe for; or

(b)     convert securities into; or

(c)     otherwise deal in, or dispose of,

7

**Defense Exhibit 17-81**

0696 - 173

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

any Shares (or any other Relevant Securities in the Company) to any person, at any time and subject to any terms and conditions as the Directors think proper.

4.2    The authority referred to in article 4.1:

(a)    shall be limited to a maximum nominal amount of £100,000 (not including any Shares which have been issued by the Company on or before the date of these Articles);

(b)    shall only apply insofar as the Company has not renewed, waived or revoked it by ordinary resolution; and

(c)    may only be exercised for a period of 5 years commencing on the date on which these Articles are adopted, save that the Board may make an offer or agreement which would, or might, require Shares to be allotted after the expiry of such authority (and the Board may allot Shares in pursuance of an offer or agreement as if such authority had not expired).

4.3    In accordance with section 568 of the Act, sections 561 and 562 of the Act shall not apply to an allotment of Relevant Securities made by the Company.

4.4    Subject to article 4.2, and to sections 549 to 551 (inclusive) of the Act, any Relevant Securities shall be at the disposal of the Board who may allot, grant options over or otherwise dispose of them to any persons at those times and generally on the terms and conditions they think proper.

4.5    No Shares shall be allotted to any employee, Director, prospective employee or director unless such person has entered into a joint election with the Company under section 43 of the Income Tax (Earnings and Pensions) Act 2003 (Section 431 Election).

5.    **DIVIDENDS**

5.1    The Preferred Shares and Ordinary Shares shall rank pari passu for dividends.

5.2    Each dividend shall be distributed to the appropriate Shareholder pro rata according to the number of Shares held by them and shall accrue daily (assuming a 365-day year). All dividends are expressed net and shall be paid in cash.

5.3    Subject to the Act and these Articles, the Board may, provided Consent is obtained, pay interim dividends.

5.4    No dividends shall be paid on any Deferred Shares.

6. New Articles of Association - Isotropic - Final.docx

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-82**

0696 - 174

6.   **LIQUIDATION PREFERENCE**

6.1   On a return of the Company's assets on a liquidation, capital reduction or otherwise (other than a conversion, redemption or purchase of Shares), the assets of the Company remaining after the payment of its liabilities shall (to the extent that the Company is lawfully able to do so) be applied in the following order of priority:

(a)   first, and to the extent there are any Deferred Shares in issue at that time, in paying to each holder of Deferred Shares a total of £1 in aggregate for that holder's entire holding of Deferred Shares;

(b)   second, in paying to the holders of the Preferred Shares an amount equivalent to the Original Subscription Price per Preferred Share, together with a sum equal to any arrears and accruals of dividends calculated down to and including the date of the return of capital and, if there is a shortfall of assets remaining to satisfy the entitlements of holders of Preferred Shares in full, the proceeds shall be distributed to the holders of the Preferred Shares in proportion to the amounts due to each such Share held;

(c)   third, in paying the Ordinary Shares an amount equivalent to the Original Subscription Price per Ordinary Share, together with a sum equal to any arrears and accruals of dividends calculated down to and including the date of the return of capital and, if there is a shortfall of assets remaining to satisfy the entitlements of holders of Ordinary Shares in full, the proceeds shall be distributed to the holders of the Ordinary Shares in proportion to the amounts due to each such Share held; and

(d)   finally, in paying the Ordinary Shares and Preferred Shares *pro rata* as if they constituted one and the same class.

7.   **EXIT**

7.1   The proceeds of a Share Sale shall be distributed in the order of priority set out in article 6. The Directors shall not register any transfer of Shares if the proceeds of a Share Sale are not distributed in that manner (save in respect of any Shares not sold in connection with that Share Sale), provided that, if the proceeds of a Share Sale are not settled in their entirety on completion of the Share Sale:

(a)   the Directors may register the transfer of the relevant Shares, provided that the proceeds have been distributed in the order of priority set out in article 6; and

(b)   the Shareholders shall take any action required by the Investor to ensure that the proceeds of the Share Sale are distributed in the order of priority set out in article 6.

9

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-83**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

7.2     On an Asset Sale, the surplus assets of the Company remaining after payment of its liabilities shall be distributed (to the extent that the Company is lawfully able to do so) in the order of priority set out in article 6. If it is not lawful for the Company to distribute its surplus assets in accordance with the provisions of these Articles, the Shareholders shall take any action required by the Investor (including (but not limited to) any actions that may be necessary to put the Company into voluntary liquidation so that article 6 applies).

7.3     Immediately before a Listing, the Company shall (to the extent that it is able to do so) allot to each holder of Preferred Shares by way of automatic capitalisation of reserves such number of Ordinary Shares (disregarding any fraction of a Share) as shall have an aggregate Realisation Price equal to the Original Subscription Price of the Preferred Shares held and any arrears and accruals of dividends on those Shares

7.4     Except with Consent, the Company shall ensure that any and all premiums paid into the Company's share premium account in respect of all Shares allotted after the date of adoption of these Articles shall be preserved in order to enable the Company to satisfy its obligations under article 7.3. To the extent that the Company is not able to allot Ordinary Shares to satisfy its obligation under article 7.3 in full, the holders of Preferred Shares shall be entitled to subscribe for such additional number of Ordinary Shares at nominal value as are necessary to satisfy such obligations in full.

8.      **CONVERSION OF PREFERRED SHARES**

8.1     Any holder of Preferred Shares may at any time, by notice in writing to the Company, require conversion of all or any of the Preferred Shares held by it any time into the same number of Ordinary Shares. Those Preferred Shares shall convert automatically on the date that the holder of those Preferred Shares requires a conversion (the "**Conversion Date**").

8.2     All of the Preferred Shares shall automatically convert into Ordinary Shares on the date of a Listing.

8.3     Upon at least 75% of the Preferred Shares having been converted into Ordinary Shares, the remainder of the Preferred Shares shall also convert into Ordinary Shares, automatically upon the aforementioned threshold being reached.

8.4     In the case of:

        (a)     article 8.1, at least five Business Days after the Conversion Date; or

        (b)     in the case of article 8.2, at least five Business Days prior to the date of the Listing,

        each holder of the relevant Preferred Shares shall deliver the certificate (or an indemnity in a form reasonably satisfactory to the Board for any lost share certificate) for the Preferred Shares being converted (together with such other evidence (if any) as the Board may

10

**Defense Exhibit 17-84**

0696 - 176

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

reasonably require to prove good title to those Preferred Shares) to the Company at its registered office for the time being.

8.5    Where conversion of a Preferred Share is mandatory on the occurrence of a Listing, that conversion shall be effective only immediately before such Listing (and **"Conversion Date"** shall be construed accordingly), but after the provisions of article 6 and article 7 have been applied. If such Listing does not become effective or does not take place, such conversion shall be deemed not to have occurred.

8.6    On the Conversion Date, the relevant Preferred Shares shall (without any further authority than that contained in these Articles) stand converted into Ordinary Shares on the basis of one Ordinary Share for each Preferred Share held and the Ordinary Shares resulting from the conversion shall rank *pari passu* in all other respects with the existing issued Ordinary Shares.

8.7    On the Conversion Date, the Company shall enter the holder of the converted Preferred Shares on the register of Shareholders of the Company as the holder of the appropriate number of Ordinary Shares and, subject to the relevant holder of Preferred Shares delivering the relevant share certificate (or indemnity or other evidence) in respect of the Preferred Shares in accordance with this article 8, the Company shall, within 5 Business Days of the Conversion Date, forward a definitive share certificate for the appropriate number of fully paid Ordinary Shares to such holder of Preferred Shares by post to his address as shown in the register of Shareholders, at his own risk and free of charge.

8.8    On the Conversion Date (or as soon after that date as it is possible to calculate the amount payable), the Company shall, so far as it is legally able to do so, pay to the holders of the Preferred Shares falling to be converted a dividend equal to all arrears and accruals of dividends in relation to those Preferred Shares (to be calculated on a daily basis down to (and including) the Conversion Date).

9.    **VOTING AND CLASS RIGHTS**

9.1    Subject to any other provisions in these Articles concerning voting rights, Shares in the Company shall carry votes as follows:

(a)    the Ordinary Shares shall confer on each holder of Ordinary Shares the right to receive notice of and to attend, speak and vote at all general meetings of the Company, and each Ordinary Share shall carry one vote per share;

(b)    the Preferred Shares shall confer on each holder of such shares the right to receive notice of and to attend, speak and vote at all general meetings of the Company, and each Preferred Share shall carry one vote per share; and

11

**Defense Exhibit 17-85**

0696 - 177

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(c)     the Deferred Shares shall confer no voting rights under any circumstances and shall have no right to receive notice of or to attend, speak and vote at any general meeting.

9.2     Where Shares confer a right to vote, votes may be exercised:

(a)     on a show of hands by every Shareholder who (being an individual) is present in person or by proxy or (being a corporation) is present by a representative or by a proxy (in which case, each Shareholder holding Shares with votes shall have one vote); or

(b)     on a poll by every Shareholder who (being an individual) is present in person or by proxy or (being a corporation) is present by a representative or by a proxy (in which case, each Shareholder holding Shares with votes shall have one vote).

9.3     Whenever the share capital of the Company is divided into different classes of shares, the special rights attached to any such class may only be varied or abrogated (either whilst the Company is a going concern or during or in contemplation of a winding-up) with the consent in writing of the holders of more than 75% of the issued shares of that class.

9.4     Without prejudice to the generality of article 9.3, the special rights attaching to the Preferred Shares shall be deemed to be varied by the occurrence of the following events:

(a)     the creation of any securities ranking senior to the Preferred Shares; or

(b)     the amendment or repeal of any provision of, or addition of any provision of these Articles in each case in a manner adverse to the Preferred Shares; or

(c)     the reduction of the amount standing to the credit of the share premium account or capital redemption reserve, other than as expressly provided for in these Articles; or

(d)     the approval of any merger, liquidation, dissolution or acquisition of the Company or sale of all or a substantial part of the business, undertaking or assets of the Company; or

(e)     the entering into of a voluntary winding-up.

10.     **DEFERRED SHARES**

10.1    If additional Shares are issued to WML in accordance with clause 7.3 of the Loan Note Instrument ("**Additional Shares**"), then simultaneously with the issue of the Additional Shares, the following provisions of this article 10.1 shall apply:

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-86**

0696 - 178

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(a)     an equivalent number of Founder Shares of such class or classes as the Board shall determine (equal to the number of Additional Shares) shall immediately convert into Deferred Shares;

(b)     upon conversion into Deferred Shares pursuant to article 10.1(a), the Company shall be entitled to enter the Founder into the register of members of the Company as the holder of the appropriate number of Deferred Shares from the date of conversion; and

(c)     on the date of conversion, the Founder shall deliver to the Company at its registered office the share certificate (to the extent not already in the possession of the Company) (or an indemnity for lost certificate in a form acceptable to the Company) for the Shares so converted and upon such delivery the Company shall issue to the Founder a share certificate for the number of Deferred Shares resulting from the conversion.

10.2    The Deferred Shares (if any) may be redeemed by the Company at its option at any time for £1 in aggregate per holder of Deferred Shares for that holder's entire holding of Deferred Shares without obtaining the sanction of that holder of Deferred Shares.

10.3    The creation or issue of Deferred Shares shall be deemed to confer irrevocable authority on the Board at any time after their creation or issue to appoint any person to execute or give on behalf of the holder of those Deferred Shares a transfer of them to such person or persons as the Company may determine.

## 11.     TRANSFER OF SHARES: GENERAL

11.1    In article 11, article 12 and article 14, reference to the **"transfer of a Share"** includes the transfer or assignment of a beneficial or other interest in that Share or the creation of a trust or Encumbrance over that Share, and reference to a Share includes a beneficial or other interest in a Share.

11.2    No Share may be transferred unless the transfer is made in accordance with these Articles and/or any written agreement between Shareholders that may exist from time to time.

11.3    If a Shareholder transfers (or purports to transfer) a Share other than in accordance with these Articles and/or any written agreement between Shareholders that may exist from time to time, he shall be deemed to have served a Transfer Notice immediately in respect of all Shares held by him.

11.4    Any transfer of a Share by way of sale that is required to be made under article 11, article 12 and article 14 shall be deemed to include a warranty that the transferor sells the Share with full title guarantee.

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-87**

0696 - 179

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

11.5    In addition to the provisions of Model Articles, the Directors may refuse to register a transfer if:

(a)    it is a transfer of a Share to a bankrupt, a minor or a person of unsound mind; or

(b)    the transfer is to an employee, Director or prospective employee or director and that person has not entered into a Section 431 Election with the Company.

11.6    The Directors may, as a condition to the registration of any transfer of Shares in the Company, require the transferee to execute and deliver to the Company a deed agreeing to be bound by the terms of any shareholders' agreement (or similar document) in force between any of the Shareholders and the Company in such form as the Directors may reasonably require (but not so as to oblige the transferee to have any obligations or liabilities greater than those of the proposed transferor under any such agreement or other document). If any condition is imposed in accordance with this article 11.6, the transfer may not be registered unless that deed has been executed and delivered to the Company's registered office by the transferee.

11.7    To enable the Directors to determine whether or not there has been any disposal of Shares in the capital of the Company (or any interest in Shares in the capital of the Company) in breach of these Articles, the Directors may, and shall if so requested in writing by the Investor Director, require any holder, or the legal personal representatives of any deceased holder, or any person named as transferee in any transfer lodged for registration or any other person who the Directors may reasonably believe to have information relevant to that purpose, to provide to the Company with any information and evidence that the Directors request regarding any matter which they deem relevant to that purpose. If the information or evidence is not provided to enable the Directors to determine to their reasonable satisfaction that no breach has occurred, or that as a result of the information and evidence the Directors are reasonably satisfied that a breach has occurred, the Directors shall immediately notify the holder of such Shares in the capital of the Company in writing of that fact and the following shall occur:

(a)    the relevant Shares shall cease to confer on the holder of them (or any proxy) any rights:

(i)    to vote, whether on a show of hands or on a poll, and whether exercisable at a general meeting of the Company or at any separate meeting of the class in question. These rights shall not cease if, as a result of such cessation, the Company would become a subsidiary of the Investor; or

(ii)    to receive dividends or other distributions otherwise attaching to those Shares or to any further shares in the capital of the Company issued in respect of those Shares, or in pursuance of an offer made to the relevant holder; and

14

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-88**

0696 - 180

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(b)    the holder may be required, at any time following receipt of the notice, to transfer some or all of its Shares to any person(s) at the price that the Directors may require by notice in writing to that holder.

11.8    The rights referred to in article 11.7(a) may be reinstated by the Board on provision of the information required by the Board under article 11.7(a) or, if earlier, shall be reinstated on the completion of any transfer referred to in article 11.7(b).

11.9    Where the Board requires a Transfer Notice to be given in respect of any Shares, if a Transfer Notice is not duly given within 5 Business Days of a written demand being made, a Deemed Transfer Notice shall be given at the end of that period.  If a Transfer Notice is required to be given, or is deemed to have been given, under these Articles, the Transfer Notice shall be treated as having specified that:

(a)    the Transfer Price of the Sale Shares shall be as agreed between the Board (any Director with whom the Seller is connected (within the meaning of section 252 of the Act) not voting) and the Seller, or, failing agreement within 10 Business Days after the date on which the Board becomes aware that a Deemed Transfer Notice has been given, the Transfer Price shall be the fair value (as determined in accordance with article 13) of the Sale Shares;

(b)    there is no Minimum Transfer Condition in relation to the Sale Shares; and

(c)    the Seller wishes to transfer all of the Shares held by it.

## 12.    TRANSFER OF SHARES SUBJECT TO PRE-EMPTION

12.1    Except where the provisions of article 14, article 16 and article 17 apply, any transfer of Shares by a Shareholder shall be subject to the pre-emption rights in this article 12.

12.2    A Seller shall, before transferring or agreeing to transfer any Shares, deliver a Transfer Notice to the Company specifying:

(a)    the number of Sale Shares he wishes to sell;

(b)    if he wishes to sell the Sale Shares to a third party, the name of the proposed transferee;

(c)    the price (in cash) at which he wishes to transfer the Sale Shares (which will be deemed to be Fair Value of the Sale Shares if no cash price is agreed between the Seller and the Board (including the Investor Director)) (the "**Transfer Price**"); and

(d)    whether the Transfer Notice is conditional on all, or a specific number of, the Sale Shares being sold to Shareholders (a "**Minimum Transfer Condition**").

15

**Defense Exhibit 17-89**

0696 - 181

12.3    Once given (or deemed to have been given under) these Articles, a Transfer Notice may not be withdrawn except with the consent of the Board.

12.4    A Transfer Notice appoints the Company the agent of the Seller for the sale of the Sale Shares at the Transfer Price.

12.5    As soon as practicable following the later of:

(a)    receipt of a Transfer Notice; or

(b)    where the Transfer Price has not been specified, or a Deemed Transfer Notice has been served, the determination of the Transfer Price under article 13,

the Board shall offer the Sale Shares for sale to the Shareholders in the manner set out in articles 12.6 and 12.7. Each offer shall be in writing and give details of the number and Transfer Price of the Sale Shares offered.

12.6    Whether the Sale Shares are Preferred Shares or Ordinary Shares, they shall be offered to the holders of Preferred Shares and Ordinary Shares as if they constituted one class of Share, on the basis as set out in article 12.7.

12.7    The Board shall offer the Sale Shares to all Shareholders other than the Seller (the "**Continuing Shareholders**"), inviting them to apply in writing within the period from the date of the offer to the date 15 Business Days after the offer (inclusive) (the "**First Offer Period**") for the maximum number of Sale Shares they wish to buy.

12.8    If, at the end of the First Offer Period, the number of Sale Shares applied for is equal to or exceeds the number of Sale Shares, the Board shall allocate the Sale Shares to each Continuing Shareholder in the proportion which his existing holding of Shares bears to the total number of Shares held by those Continuing Shareholders who have applied for Sale Shares. Fractional entitlements shall be rounded to the nearest whole number. No allocation shall be made to a Shareholder of more than the maximum number of Sale Shares which he has stated he is willing to buy.

12.9    If only some of the Sale Shares are allocated in accordance with article 12.8, but there are applications for Sale Shares that have not been satisfied, those Sale Shares shall be allocated to the relevant applicant(s) in accordance with the procedure set out in article 12.8.

12.10   If, at the end of the First Offer Period, the total number of Sale Shares applied for is less than the number of Sale Shares, the Board shall allocate the Sale Shares to the Continuing Shareholders in accordance with their applications. The balance (the "**Initial Surplus Shares**") shall be dealt with in accordance with article 12.9.

16

**Defense Exhibit 17-90**

0696 - 182

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

12.11  At the end of the First Offer Period, the Board shall offer the Initial Surplus Shares to all the Continuing Shareholders, inviting them to apply in writing within the period from the date of the offer to the date 15 Business Days after the date of the offer (inclusive) (the **"Second Offer Period"**) for the maximum number of Initial Surplus Shares they wish to buy.

12.12  If, at the end of the Second Offer Period, the number of Initial Surplus Shares applied for exceeds the number of Initial Surplus Shares, the Board shall allocate the remaining Initial Surplus Shares to each Continuing Shareholder in the proportion that his existing holding of Shares bears to the total number of Shares (including Sale Shares) held by those Continuing Shareholders who have applied for Initial Surplus Shares during the Second Offer Period.  Fractional entitlements shall be rounded to the nearest whole number.  No allocation shall be made to a Shareholder of more than the maximum number of Initial Surplus Shares which he has stated he is willing to buy.

12.13  If, at the end of the Second Offer Period, the number of Initial Surplus Shares applied for is less than the number of Initial Surplus Shares, the Board shall allocate the Initial Surplus Shares to the Continuing Shareholders in accordance with their applications.  The balance (the **"Second Surplus Shares"**) shall be offered to any other person in accordance with article 12.19.

12.14  If the Sale Shares are subject to a Minimum Transfer Condition, any allocation made under articles 12.7 to 12.14 (inclusive) shall be conditional on the fulfilment of the Minimum Transfer Condition.

12.15  If the Transfer Notice includes a Minimum Transfer Condition and the total number of Shares applied for is less than the number of Sale Shares, the Board shall notify the Seller and all those to whom Sale Shares have been conditionally allocated under articles 12.7 to 12.14 (inclusive) and article 12.19 stating that the condition has not been met and that the relevant Transfer Notice has lapsed with immediate effect.

12.16  If:

(a)    the Transfer Notice does not include a Minimum Transfer Condition; or

(b)    allocations have been made in respect of all the Sale Shares,

the Board shall, when no further offers are required to be made under articles 12.7 to 12.14 (inclusive), give written notice of allocation (an **"Allocation Notice"**) to the Seller and each Shareholder to whom Sale Shares have been allocated (each an **"Applicant"**). The Allocation Notice shall specify the number of Sale Shares allocated to each Applicant and the place and time for completion of the transfer of the Sale Shares (which shall be at least 5 Business Days not more than 15 Business Days after the date of the Allocation Notice.

17

**Defense Exhibit 17-91**
0696 - 183

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

12.17    On the service of an Allocation Notice, the Seller shall, against payment of the Transfer Price, transfer the Sale Shares in accordance with the requirements specified in it.

12.18    If the Seller fails to comply with article 12.7:

(a)    the Chairman of the Company (or, failing him, one of the Directors, or some other person nominated by a resolution of the Board) may, on behalf of the Seller:

(i)    complete, execute and deliver in his name all documents necessary to give effect to the transfer of the relevant Sale Shares to the Applicants;

(ii)    receive the Transfer Price and give a good discharge for it; and

(iii)    (subject to the transfer being duly stamped) enter the Applicants in the register of Shareholders as the holders of the Shares purchased by them; and

(b)    the Company shall pay the Transfer Price into a separate bank account in the Company's name on trust (but without interest) for the Seller until he has delivered his certificate for the relevant Shares (or an indemnity, in a form reasonably satisfactory to the Board, in respect of any lost certificate, together with such other evidence (if any) as the Board may reasonably require to prove good title to those Shares) to the Company.

12.19    If an Allocation Notice does not relate to all the Sale Shares then, subject to article 12.20 and within 6 weeks following service of the Allocation Notice, the Seller may transfer the Second Surplus Shares to any person at a price at least equal to the Transfer Price. The sale of the Second Surplus Shares in accordance with this article 12.19 shall continue to be subject to any Minimum Transfer Condition.

12.20    The Seller's right to transfer Shares under article 12.19 does not apply if the Board reasonably considers that:

(a)    the transferee is a person (or a nominee for a person) who the Investor Director determines, acting reasonably, is a direct and current competitor with (or an Associate of a competitor with) the business of the Company or with a subsidiary undertaking of the Company; or

(b)    the sale of the Sale Shares is not bona fide or the price is subject to a deduction, rebate or allowance to the transferee; or

(c)    the Seller has failed or refused to provide promptly information available to it or him and reasonably requested by the Board to enable it to form the opinion mentioned above.

18

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-92**

0696 - 184

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

12.21  The restrictions imposed by this article 12 may be waived in relation to any proposed transfer of Shares with Consent.

13.  **VALUATION**

13.1  If no Transfer Price is specified in a Transfer Notice, or if a Deemed Transfer Notice is served, then, on service of the Transfer Notice or, in the case of a Deemed Transfer Notice, on the date on which the Board first has actual knowledge of the facts giving rise to the service of such a notice, the Board shall either:

    (a)  appoint an Independent Expert to determine the fair value of the Sale Shares; or

    (b)  if the fair value has been determined by an Independent Expert within the preceding 12 weeks, specify that the fair value of the Sale Shares shall be calculated by dividing that fair value by the number of Sale Shares to which it related and multiplying such fair value by the number of Sale Shares the subject of the Transfer Notice.

13.2  The fair value of the Sale Shares shall be determined by the Independent Expert on the following assumptions and bases:

    (a)  valuing the Sale Shares as on an arm's-length basis between a willing seller and a willing buyer;

    (b)  if the Company is then carrying on business as a going concern, on the assumption that it will continue to do so;

    (c)  that the Sale Shares are capable of being transferred without restriction; and

    (d)  valuing the Sale Shares as a ratable proportion of the total value of all the outstanding Shares of the Company without any premium or discount being attributable to any percentage of the total outstanding Shares of the Company which they represent,

13.3  The Independent Expert shall be requested to determine the fair value within 20 Business Days of their appointment and notify the Board of their determination.

13.4  Subject to any confidentiality provisions, the Independent Expert may have access to all accounting records or other relevant documents of the Company.

13.5  The Independent Expert's determination shall be final and binding on the parties (in the absence of fraud or manifest error).

6 New Articles of Association - sotropic - Final.docx

**Defense Exhibit 17-93**

0696 - 185

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

13.6    The costs of the Independent Expert shall be borne by the Seller and the transferee(s) in the proportion determined by the Independent Expert in the case of a Transfer Notice and solely by the Seller in the case of a Deemed Transfer Notice.

14.    **COMPULSORY TRANSFERS**

14.1    A person entitled to a Share in consequence of the bankruptcy of a Shareholder shall be regarded as giving a Deemed Transfer Notice in relation to such Shares at such time as the Directors determine.

14.2    If a company that is a Shareholder resolves to appoint (or has appointed) a liquidator, administrator or administrative receiver over it (or a material part of its business), that Shareholder shall be regarded as giving a Deemed Transfer Notice in respect of all Shares held by it at such time as the Directors determine.

14.3    For the purposes of this article 14, the Founder is a "**Bad Leaver**" if:

(a)    he is no longer on the Board or is otherwise no longer employed by or associated with the Company; and

(b)    he is deemed by the Investor, acting reasonably, to have breached any restrictive covenant applicable to him and:

(i)    the Investor has notified the Founder in writing of such breach within 30 days of such breach having occurred; and

(ii)    such breach is not cured within 30 days of such notice being served.

14.4    If the Founder becomes a Leaver, he shall be regarded as giving a Deemed Transfer Notice in respect of all the Shares held by the Founder on the Termination Date. In such circumstances the Transfer Price shall be calculated as follows:

(a)    where the Founder is a Bad Leaver, the lower of fair value (calculated in accordance with article 13) and the nominal value of the Sale Shares; and

(b)    where the Founder is a Good Leaver, the fair value of the Sale Shares (calculated in accordance with article 13).

14.5    All voting rights attached to the Founder's Shares, if any, shall be suspended on the Termination Date ("**Restricted Shares**"). However, the holders of Restricted Shares shall have the right to receive a notice of, and to attend, all general meetings of the Company, but shall have no right to vote either in person or by proxy.

14.6    Voting rights suspended by article 14.5 shall be automatically restored immediately before a Listing.

20

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-94**

0696 - 186

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

14.7    All voting rights attached to the Restricted Shares transferred under this article 14 shall be automatically restored on completion of the transfer.

## 15.    PERMITTED TRANSFERS

15.1    The Investor may transfer any or all of its Shares to any company or organisation wholly owned (directly or indirectly) by the Investor.

15.2    The Founder may transfer any or all of his Shares without restriction to a Privileged Relation or Family Trust, provided that:

(a)    If the Founder Shares are converted to Deferred Shares in accordance with article 10, any Shares previously transferred to a Privileged Relation or Family Trust shall also be subject to the provisions of article 10 as if they constituted part of the Founder Shares;

(b)    if the Founder is required to transfer Shares in accordance with article 14, any Shares previously transferred to a Privileged Relation or Family Trust shall also be subject to the provisions of article 14.3 as if they constituted part of the Founder's shareholding; and

(c)    if the voting rights attaching to the Founder's shareholding are suspended under article 14.5, the voting rights attaching to any Shares previously transferred to a Privileged Relation or Family Trust shall also be automatically suspended as if they constituted part of the Founder's shareholding.

## 16.    MANDATORY OFFER ON CHANGE OF CONTROL

16.1    Except in the case of transfers pursuant to article 15, after going through the pre-emption procedure set out in article 12, the provisions of article 16.2 shall apply if, in one or a series of related transactions, one or more Sellers propose to transfer any of the Shares (a **"Proposed Transfer"**) which would, if carried out, result in any person (the **"Buyer"**), and any person acting in concert with the Buyer, acquiring a Controlling Interest in the Company.

16.2    Before making a Proposed Transfer, a Seller shall procure that the Buyer makes an offer (an **"Offer"**) to the other Shareholders to buy all of the Company's issued Shares for a consideration in cash per Share that is at least equal to the highest price per Share offered or paid by the Buyer, or any person acting in concert with the Buyer, in the Proposed Transfer or in any related previous transaction in the 12 months preceding the date of the Proposed Transfer (the **"Specified Price"**).

16.3    The Offer shall be given by written notice (an **"Offer Notice"**), at least 20 Business Days (the **"Offer Period"**) before the proposed sale date (the **"Sale Date"**). To the extent not described in any accompanying documents, the Offer Notice shall set out:

21

**Defense Exhibit 17-95**
0696 - 187

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(a)    the identity of the Buyer;

(b)    the purchase price and other terms and conditions of payment;

(c)    the Sale Date; and

(d)    the number of Shares proposed to be purchased by the Buyer (the "Offer Shares").

16.4    If the Buyer fails to make the Offer to all of the Company's Shareholders, the Seller shall not be entitled to complete the sale and the Company shall not register any transfer intended to effect that sale.

16.5    If the Offer is accepted by any Shareholder (an "Accepting Shareholder") within the Offer Period, the completion of the Proposed Transfer shall be conditional on completion of the purchase of all the Offer Shares held by Accepting Shareholders.

16.6    The Proposed Transfer is subject to the pre-emption provisions of article 12, but the purchase of Offer Shares from Accepting Shareholders shall not be subject to those provisions.

16.7    Except in the case of transfers pursuant to articles 15 and 16.2, and subject to the pre-emption procedure set out in article 12, the provisions of this article 16.7 shall apply if, in one or a series of related transactions, a third party (an "Offeror") makes an offer to purchase more than 50% of the Shares held by Seller (this being referred to as a "Co-Sale Offer" by the Offeror), whether or not such Co-Sale Offer shall include an offer for the Shares held by any other Shareholders, then the following provisions shall apply:

(a)    before any Share is transferred to or registered in the name of the Offeror, the Seller who receives the Co-Sale Offer ("Intending Seller") shall procure that the Offeror shall make a written offer to the other Shareholders (being for the purposes of these Articles, also a Co-Sale Offer), to purchase (in the case of any proposed transfer or transfers which if implemented would not result in the obtaining of a Controlling Interest under article 16.1 in respect of the Company) the same proportion of Shares held by the Intending Seller that is proposed to be transferred (and for the purpose of calculating the amount to be offered to holders of Preferred Shares only, holders of Preferred Shares shall be deemed to have converted their Preferred Shares into Ordinary Shares at the then applicable Conversion Rate) at the price per Share he has offered or agreed with the Intending Seller (being no less than the price stated as being offered by him in any Transfer Notice);

(b)    any Co-Sale Offer made pursuant to article 16.7(a) shall remain open, and be capable of acceptance (subject to articles 16.7(c) and 16.7(d)) by written notice to the offeror, for 14 days after full implementation of the pre-emption rights and procedures set out in article 12 (so as to ensure that any Shareholder's rights of pre-emption are exhausted before any determination by a Shareholder as to

22

**Defense Exhibit 17-96**
0696 - 188

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

whether to accept any Co-Sale Offer under this article need be made). If no notice of any acceptance is received then in respect of that Shareholder the Co-Sale Offer shall be deemed to have been declined;

(c)   the Offeror shall complete the purchase of all Shares in respect of which such Co-Sale Offer is accepted at the same time as he completes the purchase of the offered shares of the Intending Seller. The acceptance by any Shareholder of such Co-Sale Offer shall not require the accepting Shareholder to give a Transfer Notice in accordance with these Articles; and

(d)   article 12 shall apply, with any necessary adaptations, to any transfer to be made under this article 16.7.

## 17.   DRAG ALONG

17.1   Subject to Consent, if the holders of at least 70% of the Shares in issue for the time being (the "**Selling Shareholders**") wish to transfer all of their interest in Shares (the "**Sellers' Shares**") to a bona fide purchaser on arm's length terms (a "**Proposed Buyer**"), the Selling Shareholders may require all the other Shareholders (the "**Called Shareholders**") to sell and transfer all their shares to the Proposed Buyer (or as the Proposed Buyer directs) in accordance with the provisions of this Article (the "**Drag Along Option**").

17.2   The Selling Shareholders may exercise the Drag Along Option by giving written notice to that effect (a "**Drag Along Notice**") at any time before the transfer of the Sellers' Shares to the Proposed Buyer. The Drag Along Notice shall specify that:

(a)   the Called Shareholders are required to transfer all their Equity Shares (the "**Called Shares**") pursuant to this article 17;

(b)   the person to whom the Called Shares are to be transferred;

(c)   the consideration payable for the Called Shares calculated in accordance with article 17.4; and

(d)   the proposed date of the transfer.

17.3   Once issued, a Drag Along Notice shall be irrevocable. However, a Drag Along Notice shall lapse if, for any reason, the Selling Shareholders have not sold the Sellers' Shares to the Proposed Buyer within 20 Business Days of serving the Drag Along Notice. The Selling Shareholders may serve further Drag Along Notices following the lapse of any particular Drag Along Notice.

17.4   The Called Shareholders shall sell each Called Share for the amount that they would be entitled to receive if the total consideration proposed to be paid by the third party purchaser

23

**Defense Exhibit 17-97**

0696 - 189

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

were distributed to the holders of the Called Shares and the Sellers' Shares in accordance with the provisions of article 6.

17.5    No Drag Along Notice shall require a Called Shareholder to agree to any terms except those specifically set out in this article 17.

17.6    Completion of the sale of the Called Shares shall take place on the same date as the date proposed for completion of the sale of the Sellers' Shares unless:

(a)     all of the Called Shareholders and the Selling Shareholders agree otherwise; or

(b)     that date is less than 5 Business Days after the Drag Along Notice, in which case completion of the sale shall be delayed until the 25th Business Day after service of the Drag Along Notice.

17.7    The rights of pre-emption set out in these Articles shall not apply to any transfer of shares to a Proposed Buyer (or as it may direct) pursuant to a sale for which a Drag Along Notice has been duly served.

17.8    Within 15 Business Days of the Proposed Buyer serving a Drag Along Notice on the Called Shareholders, the Called Shareholders shall deliver stock transfer forms for the Called Shares, together with the relevant share certificate (or a suitable indemnity for any lost share certificate) to the Company. On the expiration of that 15 Business Day period, the Company shall pay the Called Shareholders, on behalf of the Proposed Buyer, the amounts they are due pursuant to article 17.4 to the extent that the Proposed Buyer has put the Company in the requisite funds. The Company's receipt for the price shall be a good discharge to the Proposed Buyer. The Company shall hold the amounts due to the Called Shareholders pursuant to article 17.4 in trust for the Called Shareholders without any obligation to pay interest.

17.9    To the extent that the Proposed Buyer has not, on the expiration of the 15 Business Day period referred to in article 17.8, put the Company in funds to pay the consideration due pursuant to article 17.4, the Called Shareholders shall be entitled to the return of the stock transfer form and share certificate (or suitable indemnity) for the relevant Called Shares and the Called Shareholders shall have no further rights or obligations under this article 17 in respect of their Shares.

17.10   If any Called Shareholder does not, on completion of the sale of the Called Shares, execute transfer(s) in respect of all of the Called Shares held by it, the defaulting Called Shareholder shall be deemed to have irrevocably appointed any person nominated for the purpose by the Selling Shareholders to be their agent and attorney to execute all necessary transfer(s) on his behalf, against receipt by the Company (on trust for such holder) of the consideration payable for the Called Shares, and to deliver such transfer(s) to the Proposed Buyer (or as they may direct) as the holder thereof. After the Proposed Buyer (or its nominee) has been registered as the holder, the validity of such proceedings shall not be questioned by any

24

**Defense Exhibit 17-98**

0696 - 190

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

such person. Failure to produce a share certificate shall not impede the registration of shares under this article 17.10.

17.11 Following the issue of a Drag Along Notice, on any person becoming a Shareholder of the Company pursuant to the exercise of a pre-existing option to acquire shares in the Company, or on the conversion of any convertible security of the Company (a "**New Shareholder**"), a Drag Along Notice shall be deemed to have been served on the New Shareholder on the same terms as the previous Drag Along Notice. The New Shareholder shall then be bound to sell and transfer all Shares acquired by it to the Proposed Buyer (or as the Proposed Buyer may direct) and the provisions of this article 17 shall apply with the necessary changes to the New Shareholder, except that completion of the sale of the Shares shall take place immediately on the Drag Along Notice being deemed served on the New Shareholder.

18.    **DIRECTORS AND INVESTOR DIRECTORS**

18.1   Unless and until the Company in general meeting determines otherwise with Consent, the number of directors shall not be less than 2 and no more than 3.

18.2   The Investor shall be entitled to nominate 1 person to act as a Director of the Company from time to time. The other Shareholders shall not vote their Shares so as to remove any Director appointed pursuant to this article 18.2 from office. The Investor shall be entitled to remove its Investor Director from office and appoint another person to act in his place.

18.3   Any appointment or removal of an Investor Director under article 18.2 shall take effect at the time that the notice is received at the Company's registered office or produced to a Board meeting.

18.4   The Investor Director shall be entitled to be appointed to any committee of the Board established from time to time.

19.    **PROCEEDINGS AT MEETINGS OF DIRECTORS**

19.1   Notwithstanding any provision of these Articles to the contrary, any person appointed as a Director may appoint any person he thinks fit to be his alternate Director. The appointment of an alternate Director shall not require approval by a resolution of the Directors.

19.2   Meetings of the Board shall take place at least 4 times each year, with a period of not more than 12 weeks between any two meetings. At least 5 Business Days' advance notice of such meeting shall be given to each Director (except with Consent, when board meetings may take place less frequently or on shorter notice).

19.3   The quorum for the transaction of business at any meeting shall be 2 Directors, one of which shall be the Investor Director. If the necessary quorum is not present within half an hour from the time appointed for the meeting, or if, during a meeting, such quorum ceases

25

**Defense Exhibit 17-99**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

to be present, the meeting shall stand adjourned to such time and place as the Directors determine. If a quorum is not present at any such adjourned meeting within half an hour from the time appointed, then the meeting shall be deemed quorate and may proceed.

19.4    Any Director who participates in the proceedings of a meeting by means of a communication device (including, without limitation, a telephone) that allows all the other Directors present at the meeting (whether in person, alternate or using a communication device) to hear that Director at all times, and that Director to hear all other Directors present at the meeting (by whatever means) at all times, shall be deemed to be present at the meeting and counted in the quorum. A meeting held by these means shall be deemed to take place where the largest number of participants is assembled. In the absence of a majority, the Chairman's location shall be deemed to be the place of the meeting.

19.5    A Director may vote at a Board meeting, and form part of a quorum present at that meeting, in relation to any matter in which he has, directly or indirectly, an interest or duty which conflicts (or may conflict) with the interests of the Company, provided that he has previously disclosed the nature of such duty or interest to the Directors.

19.6    Questions arising at any meeting of the Directors shall be decided by a majority of votes. If there is an equality of votes, the chairman shall not have a second or casting vote.

## 20.    LIEN

The lien conferred by Model Articles shall apply to all Shares of the Company whether fully paid or not, and to all Shares registered in the name of any person indebted or under liability to the Company, whether he is the sole registered holder of the Shares or one of several joint holders.

## 21.    INDEMNITY

21.1    Subject to the Act, but without prejudice to any indemnity to which a director may otherwise be entitled, each director or other officer of the Company (other than any person (whether an officer or not) engaged by the Company as auditor) shall be indemnified out of the Company's assets against all costs, charges, losses, expenses and liabilities incurred by him as a director or other officer of the Company or any company that is a trustee of an occupational pension scheme (as defined in section 235(6) of the Act) in the actual or purported execution and/or discharge of his duties, or in relation thereto including any liability incurred by him in defending any civil or criminal proceedings, in which judgement is given in his favour or in which he is acquitted or the proceedings are otherwise disposed of without any finding or admission of any material breach of duty on his part or in connection with any application in which the court grants him relief from liability for negligence, default, breach of duty or breach of trust in relation to the Company's affairs.

26

8. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-100**

0696 - 192

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

21.2    The Company may buy and maintain insurance against any liability falling upon its Directors or other officers or auditors which arises out of their respective duties to the Company, or in relation to its affairs.

22.    **DATA PROTECTION**

22.1    Each of the Shareholders and Directors (from time to time) consent to the processing of their personal data by the Company, its shareholders and directors (each a "**Recipient**") for due diligence exercises, compliance with applicable laws, regulations and procedures and the exchange of information amongst themselves. A Recipient may process such personal data either electronically or manually.

22.2    The personal data that may be processed for such purposes under this article 22 shall include any information which may have a bearing on the prudence or commercial merits of investing, or disposing of any shares (or other investment or security) in the Company. Other than as required by law, court order or any regulated authority, that personal data shall not be disclosed by a Recipient or any other person, except to:

(a)    its parent undertaking;

(b)    to subsidiary undertakings of that parent undertaking ("**Recipient Group Companies**");

(c)    to employees, directors and professional advisors of that Recipient or the Recipient Group Companies; and

(d)    to funds managed by any of the Recipient Group Companies.

22.3    Each of the Shareholders and Directors (from time to time) consent to the transfer of such personal data to persons acting on behalf of any Recipient and to the offices of any Recipient, both within and outside the European Economic Area, for the purposes stated above, where is it necessary or desirable to do so.

27

6. New Articles of Association - Isotropic - Final.docx

**Defense Exhibit 17-101**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Certificate No: 1
Date of Issue:   ........................ 2018
Amount:          US$3,400,000

## ISOTROPIC SYSTEMS LTD

### US$4,000,000 UNSECURED CONVERTIBLE LOAN NOTES 2018

Created and issued pursuant to a resolution of the board of directors of the Company passed on .................. 2018.

**THIS IS TO CERTIFY THAT** Waterlow Management Ltd (**Noteholder**) is the registered holder of US$3,400,000 of the US$4,000,000 unsecured convertible loan notes 2018 constituted by an instrument entered into by the Company on ............................. 2018 (**Instrument**). Such Notes are issued with the benefit of and subject to the provisions contained in the Instrument.

**Notes:**
1. The Notes are non-redeemable (save for the purposes of clause 7.6 of the Instrument) and shall not bear interest.
2. This Certificate must be surrendered to the Company before any transfer (if permitted) or conversion can be registered or effected, or any new certificate issued in exchange.
3. Any change of address of the Noteholder must be notified in writing signed by the Noteholder to the Company at the Registered Office.
4. Save as otherwise agreed at clause 12 of the Instrument, the Notes are not assignable or transferable.
5. Words and expressions defined in the Instrument shall bear the same meaning in this Certificate.
6. The Notes and any dispute or claim arising out of or in connection with any of them or their subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the law of England and Wales. The courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with the Notes or their subject matter or formation (including non-contractual disputes or claims).
7. A copy of the Instrument is available for inspection at the Registered Office.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-102**

This Certificate has been executed as a deed and is delivered and takes effect on the date of issue stated at the beginning of it.

Executed as a deed by **ISOTROPIC SYSTEMS LTD** acting by a director in the presence of:

Witness:
Signature: ...............................................
Name: *Gana Sherwood*
Address: *31 LINCOLN WOODS W/ APT. 2B*
*PERRY HALL, MD 21128*

Occupation: *ADMIN ASS. @ ISOTROPIC*

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-103**
0696 - 195

Company No: 08706503

# THE COMPANIES ACT 2006

## PRIVATE COMPANY LIMITED BY SHARES

**MEMBERS' WRITTEN RESOLUTION**
(Section 288 Companies Act 2006)

**OF**

## ISOTROPIC SYSTEMS LTD ("Company")

Dated:                    2018 ("Circulation Date")

Pursuant to Chapter 2 of Part 13 of the Companies Act 2006 ("**Act**"), the directors of the Company propose the following resolution is passed as a special resolution ("**Resolution**"):

**Special Resolution**

> That the articles of association contained in the draft document annexed to this resolution and signed for identification by the chairman be adopted as the articles of association of the Company in substitution for and to the exclusion of the existing articles of association of the Company.

**AGREEMENT**

Please read the notes at the end of this document before signifying your agreement to the Resolution.

The undersigned, persons entitled to vote on the Resolution on the Circulation Date, hereby irrevocably agree to the Resolution as indicated above:

John Finney                                          Date:          2018

Director for and on behalf of
**Waterlow Management Limited**                      Date:          2018

**Charles Hannaford**                                Date:          2018

I

# Defense Exhibit 17-104

0696 - 196

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Company No: 08706503

**NOTES**

1.  If you agree to the Resolution, please indicate your agreement by signing and dating this document where indicated above and returning it to the Company using one of the following methods:

1.1  **By Hand**: delivering the signed copy to Michael Lardieri at Isotropic Systems Ltd, 20-22 Wenlock Road, London N1 7GU

1.2  **Post**: returning the signed copy by post to Michael Lardieri at Isotropic Systems Ltd, 20-22 Wenlock Road, London N1 7GU.

1.3  **E-mail**: by attaching a scanned copy of the signed document to an e-mail and sending it to Michael Lardieri at email: Michael@isotropicsystems.com.  Please enter "Isotropic Systems - Resolution" in the e-mail subject box.

   If you do not agree to the Resolution, you do not need to do anything: you will not be deemed to agree if you fail to reply.

2.  Once you have indicated your agreement to the Resolution, you may not revoke your agreement.

3.  Where, within 28 days of the Circulation Date, insufficient agreement has been received for the Resolution to pass, the Resolution will lapse. If you agree to the Resolution, please ensure that your agreement reaches us before or during this date.

4.  If you are signing this document on behalf of a person under a power of attorney or other authority please send a copy of the relevant power of attorney or authority when returning this document.

2

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

2. Members' Written Resolution Isotropic Systems

**Defense Exhibit 17-105**

# Waterlow Management Limited

To: SALAMANDER ASSOCIATES LIMITED AS TRUSTEES OF THE BIG VALLEY TRUST (**The Lender**)

From: Waterlow Management Limited (**The Borrower**)

Date: 10/01/2019

**RE: Loan Agreement dated 09/01/2019 between SALAMANDER ASSOCIATES LIMITED AS TRUSTEES OF THE BIG VALLEY TRUST and Waterlow Management Limited for an amount of USD 10'000'000.00**

To whom it may concern,

We refer to the loan agreement above, under the exact terms of which, we request to drawdown the Loan:

Amount: USD 5'000'001.38

Drawdown date: 10/01/2019

Payment Instruction:

| | |
|---|---|
| **PAYEE:** | ISOTROPIC SYSTEMS LIMITED |
| **ADDRESS:** | 20-22 Wenlock Road<br>London N1 7GU.  United Kingdom |
| **AMOUNT** | 5,000,001.38     **CURRENCY**     USD |
| **(Words)** | (FIVE MILLION AND ONE DOLLARS- 38) |
| **DETAILS:** | Share subscription on behalf of Waterlow Management Limited |
| **BANK** | NATIONAL WESTMINSTER BANK PLC<br>33 HIGH STREET, HIGH WYCOMBE  HP11 2AG<br>UNITED KINGDOM |
| **IBAN** | GB22 NWBK 6073 0118 5897 58 |
| **SWIFT** | NWBKGB2L |

**ANY SPECIAL INSTRUCTIONS:**     SORT CODE 60-73-01

We represent and warrant that the conditions of the Loan Agreement are true and correct (in all material respects).

Sincerely yours,

....................................................

Date: 10/01/2019.

Directors of Waterlow Management Limited

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-106**

0696 - 198

IN WITNESS WHEREOF, the parties hereto have each executed and delivered this Note Conversion Agreement as a deed as of the day and year first above written.

**COMPANY:**

**ISOTROPIC SYSTEMS LTD**

By: _____

      Name: John Finney
      Title:  CEO and Director

Witness Signature: _____

Witness Name: _____

**NOTEHOLDER:**

**WATERLOW MANAGEMENT LIMITED**

By: _____

      Name: _____ LEONARD O'BRIEN _____
      Title: _____

Witness Signature: _____

Witness Name: _____ DMITRY ZVONAREV _____



This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-107**

INVESTORS:

**WATERLOW MANAGEMENT LIMITED**

By: _____

Name: _____LEONARD O'BRIEN_____ _for Salamander Managed Ltd_

Title: _____Sole Corporate Director_____

SIGNATURE PAGE TO RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT

**Defense Exhibit 17-108**

0696 - 200

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

PURCHASERS:

**WATERLOW MANAGEMENT LIMITED**

By: _____

Name: ___LEONARD O'BRIEN___ _for Balamanda Management Ltd_

Title: _Sole Corporate Director_

Address:

Waterlow Management Limited
Trinity Chambers, P.O. Box 4301
Road Town, Tortola, British Virgin Islands
Attention: _Roman Kuczaj / LEONARD O'BRIEN_

Widmore Business Solutions Limited
1 Bromley Lane, Chislehurst,
Kent, BR7 6LH, England
Attention: Graham A Collett FCA

SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

**Defense Exhibit 17-109**

0696 - 201

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

| Name of corporate member: | WATERLOW MANAGEMENT LIMITED | |
|---|---|---|
| Name and position of signatory: | LEONARD O'BRIEN | |
| Signed by authorised person on behalf of corporate member: | | Dated: 10/01/19 |

| Name of member: | CHARLES HANNAFORD | |
|---|---|---|
| Signed: | | Dated: |

4

**Defense Exhibit 17-110**

0696 - 202

IN WITNESS WHEREOF, the undersigned have executed and delivered this Termination of Subscription and Shareholders Agreement as a deed as of the ___ day of January, 2019.

For and on behalf of
**Isotropic Systems Limited**

Signature: _____

Name: _____

Title: _____

Witness Signature: _____

Name of Witness: _____

**John Finney**

Signature: _____

Witness Signature: _____

Name of Witness: _____

For and on behalf of
**Waterlow Management Limited**

Signature: _____

Name: _____LEONARD O'BRIEN_____ *for Scamander Management limited*

Title: _____

Witness Signature: _____

Name of Witness: _DMITRY ZVONAREV_

**John Dick**

Signature: _____

Witness Signature: _____

Name of Witness: _____

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-111**

0696 - 203

INVESTORS:

**WATERLOW MANAGEMENT LIMITED**

By: _____

Name: _____LEONARD O'BRIEN___ *for Seaside Maypoul Ltd*

Title: _____Sole Corporate Director_____

SIGNATURE PAGE TO VOTING AGREEMENT

**Defense Exhibit 17-112**

0696 - 204

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Yours faithfully

**Waterlow Management Limited**

Signed by

Name:          LEONARD O'BRIEN       _for Salamander Management Limited_

Position:      _Sole Corporate Director_

_____

**John Finney**

_____

**John W. Dick**

_____

**Charles Hannaford**

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-113**

0696 - 205

INVESTORS:

**WATERLOW MANAGEMENT LIMITED**

By: _____

Name: _____

Title: _____

LEONARD O'BRIEN

SIGNATURE PAGE TO INVESTORS' RIGHTS AGREEMENT

**Defense Exhibit 17-114**

0696 - 206

This information is furnished under the provisions of an interntional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

THE COMPANIES ACT 2006

PRIVATE COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

ISOTROPIC SYSTEMS LTD

Company Number: 08706503

(Adopted by special resolution passed on January 11, 2019)

**1.      Interpretation**

1.1     The following definitions and rules of interpretation apply in these Articles:

"**Act**" means the Companies Act 2006, in force from time to time;

"**Adjustment Event**" has the meaning given in article 11.1;

"**Adoption Date**" means the date of adoption of these Articles;

"**Acquisition**" means:

(a)     any consolidation or merger of the Company with or into any other company or other entity or person, or any other corporate reorganisation, other than any such consolidation, merger or reorganisation in which the persons who were the Shareholders immediately prior to such consolidation, merger or reorganisation, continue to represent at least a majority of the voting power of the surviving entity (or, if the surviving entity is a wholly owned subsidiary, its parent) immediately after such consolidation, merger or reorganisation; or

(b)     a Share Sale;

"**Affiliate**" means, with respect to any person, any individual, firm, corporation, partnership, association, limited liability company, trust or any other entity who, directly or indirectly, controls, is controlled by or is under common control with such person, including, without limitation, any general partner, managing member, officer, director or trustee of such person, or any venture capital fund or registered investment company now or hereafter existing that is controlled by one or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such person;

"**Appointor**" has the meaning given in article 20.1;

"**Asset Sale**" means the sale, lease, transfer, exclusive license or other disposition by the Company of all, or substantially all of, its business and assets;

"**Associate**" means in relation to any person:

92129987.10

**Defense Exhibit 17-115**
0696 - 207

(a)    any person who is an associate of that person. The question of whether (or not) a person is an associate of another is to be determined in accordance with section 435 of the Insolvency Act 1986; or

(b)    any member of the same Group;

"**Auditors**" means the auditors from time to time of the Company;

"**B Shareholder**" means a registered holder of the B Ordinary Shares;

"**B Shareholder Bad Leaver**" means a B Shareholder who becomes a B Shareholder Leaver as a consequence of that person's dismissal for cause; where "cause" shall mean the lawful termination of that person's contract of employment, service or consultancy without notice or payment in lieu of notice as a consequence of that person's misconduct;

"**B Shareholder Good Leaver**" means a B Shareholder who becomes a B Shareholder Leaver and who is not a B Shareholder Bad Leaver and shall include, without limitation, when the Board determines that a person is not a B Shareholder Bad Leaver;

"**B Shareholder Leaver**" means a B Shareholder, if he ceases to be a consultant to, or director or employee of, the Company and does not continue as, or become, a consultant to, or director or employee of, any other Group Company;

"**B Ordinary Shares**" means the B ordinary shares of £0.00001 each in the capital of the Company;

"**Board**" means the board of Directors and any committee of the board constituted for the purpose of taking any action or decision contemplated by these Articles;

"**Boeing**" means Boeing HorizonX Ventures, LLC, a limited liability company formed under the laws of Delaware with registration number 6520810;

"**Bonus Issue**" or "**Reorganisation**" means any return of capital, bonus issue of shares or other securities of the Company by way of capitalisation of profits or reserves (other than a capitalisation issue in substitution for or as an alternative to a cash dividend which is made available to the Series A Preferred Holders and the Series A1 Preferred Holders ) or any consolidation or sub-division or redenomination or any repurchase or redemption of shares (other than Series A Preferred Shares and the Series A1 Preferred Shares ) or any variation in the subscription price or conversion rate applicable to any other outstanding shares of the Company in each case other than any Exempted Securities;

"**Business Day**" means a day other than a Saturday, Sunday or public holiday in England when banks in London and New York City are open for business;

"**Company**" means Isotropic Systems Ltd (company number 08706503);

2

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-116**
0696 - 208

"**Company Redemption Notice**" has the meaning given in article 13.6;

"**Controlling Interest**" means an interest in shares giving the holder control of the Company within the meaning of section 1124 of the Corporation Taxes Act 2010;

"**Deemed Liquidation Event**" means an Acquisition or an Asset Sale which is deemed to be a Liquidation Event in accordance with article 8.1;

"**Deferred B Ordinary Shares**" means the deferred B Ordinary Shares of £0.00001 each in the capital of the Company;

"**Deferral Event**" has the meaning given in article 15.1;

"**Director**" means a director of the Company from time to time;

"**Eligible Director**" means a Director who would be entitled to vote on a matter had it been proposed as a resolution at a meeting of the Directors;

"**Encumbrance**" means any mortgage, charge, security, interest, lien, pledge, assignment by way of security, equity, claim, right of pre-emption, option, covenant, restriction, reservation, lease, trust, order, decree, judgment, title defect (including, without limitation, any retention of title claim), conflicting claim or ownership or any other encumbrance of any nature (whether or not perfected, other than liens arising by operation of law);

"**Equity Shares**" means the Series A Preferred Shares, the Series A1 Preferred Shares the Series Seed Preferred Shares, the B Ordinary Shares and the Ordinary Shares;

"**Exempted Securities**" means:

(a)     securities issuable upon conversion of any of the Series A Preferred Shares or Series A1 Preferred Shares, or as a dividend or distribution on the Series A Preferred Shares or Series A1 Preferred Shares;

(b)     securities issued upon the conversion of any debenture, warrant, option, or other convertible security, including the Preferred Shares;

(c)     Ordinary Shares issuable upon a share split, dividend, or any subdivision of Ordinary Shares; and

(d)     Ordinary Shares (or options to purchase such Ordinary Shares) issued or issuable to employees or directors of, or consultants to, the Company (including the Share Option Plan) pursuant to any plan approved by the Board and a Preferred Majority;

(e)     securities issued in connection with licenses of technology, commercial transactions or similar transactions or in connection with the incurrence of indebtedness, in each case approved by the Board and a Preferred Majority; and

3

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-117**

0696 - 209

(f)    Ordinary Shares issued in an underwritten public offering in connection with which the Preferred Shares will be converted into Ordinary Shares.

"**Exit**" means an Acquisition, an Asset Sale or a Listing;

"**Founder Shares**" means the 1,000,000 Ordinary Shares held by John Finney as at the Adoption Date;

"**Fund Manager**" means a person whose principal business is to make, manage and/or advise upon investments in securities;

"**Group**" means in relation to a company, that company, any subsidiary undertaking or any parent undertaking from time to time of that company, and any subsidiary undertaking from time to time of a parent undertaking of that company. Each company in a Group is a "**Group Company**";

"**Independent Expert**" means an independent firm of accountants (acting as an expert and not as an arbitrator);

"**Independent Director**" has the meaning given in article 19.5;

"**Investor**" means each Series A Preferred Holder, Series A1 Preferred Holder, and each holder of the Series Seed Preferred Shares;

"**Investor Shares**" means all Shares held by an Investor;

"**Investor Director**" means each of the Series A Director and the Series Seed Director;

"**Investor Redemption Notice**" has the meaning given in article 13.1;

"**Key Holder**" means each of the Key Holders listed in Schedule B of the Voting Agreement and the Right of First Refusal and Co-Sale Agreement;

"**Key Holder Shares**" means all Shares held by a Key Holder;

"**Listing**" means the successful application and admission of all or any of the shares in the capital of the Company (or any Group Company), or securities representing such shares (including American depositary receipts, American depositary shares and/or other instruments to the Official List of the UK Listing Authority or on the AIM market operated by the London Stock Exchange plc, or the Nasdaq National Stock Market of the Nasdaq Stock Market Inc., or to any recognised investment exchange (as defined in section 285 of the Financial Services and Markets Act 2000 (as amended));

"**Liquidation Event**" means a distribution of assets on a liquidation or a return of capital (other than a conversion, redemption or purchase of shares);

"**Net Proceeds**" has the meaning given in article 7.1;

4

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-118**

0696 - 210

"**Ordinary Majority**" means the holders of a simple majority of the Preferred Shares and the Ordinary Shares (treating the Preferred Shares and the Ordinary Shares as a single class (on an as-converted basis) for those purposes);

"**Ordinary Shares**" means the ordinary shares of £0.00001 each in the capital of the Company;

"**Original Subscription Price**" means in relation to any Share, the amount paid up or credited as paid up on it, including the full amount of any premium at which such Share was issued (regardless of whether such premium is applied for any purpose after that) and for the purposes of these Articles the Original Subscription Price of any Ordinary Shares resulting from the conversion of Preferred Shares shall be the aggregate Original Subscription Price of those Preferred Shares divided by the number of Ordinary Shares resulting from the conversion; <u>provided,</u> that for avoidance of doubt the Original Subscription Price of the Series A Preferred Shares is $4.4565 and the Original Subscription Price of the Series A1 Preferred Shares is $16.8670;

"**Preferred Dividend**" has the meaning given in article 6.1;

"**Preferred Financing Documents**" means the share sale agreement, investor rights agreement and voting agreement dated on or around the Adoption Date among the parties named therein and the Company;

"**Preferred Shares**" means the Series A Preferred Shares, the Series A1 Preferred Shares and the Series Seed Preferred Shares;

"**Preferred Majority**" means (i) during such time as Boeing holds a majority of the Series A Preferred Shares, either (a) Boeing or (b) all of Waterlow Management Limited, Space Capital L.P., SAV HOLDINGS XXXI, LLC and In-Q-Tel, Inc., and (ii) after such time Boeing no longer holds a majority of the Series A Preferred Shares, holders of a majority of Series A Preferred Shares;

"**Proposed Sale**" has the meaning given in article 18.2;

"**Qualifying Issue**" has the meaning given in article 11.5;

"**Qualifying Listing**" means an underwritten Listing in which the aggregate subscription amount in respect of new Ordinary Shares issued at the time of the Listing (net of fees and expenses incurred in connection with the Listing) is not less than $50,000,000 at an issue price per Ordinary Share of at least five (5) times the Original Purchase Price for the Series A Preferred Shares (subject to appropriate adjustment following any Bonus Issue or Reorganisation);

"**Qualifying Person**" has the meaning given in section 318(3) of the Act;

"**Recipient**" has the meaning given in article 26.1;

"**Recipient Group Companies**" has the meaning given in article 26.2.2;

5

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-119**
0696 - 211

"**Redeemable Shares**" means the Series A Preferred Shares and Series A1 Preferred Shares;

"**Redeemable Share Holder**" a holder of Series A Preferred Shares and/or the Series A1 Preferred Shares;

"**Redemption Date**" has the meaning given in article 13.2;

"**Redemption Price**" has the meaning given in article 13.5;

"**Relevant Interest**" has the meaning given in article 22.5;

"**Relevant Securities**" means any shares or other securities convertible into, or carrying the right to subscribe for those shares, issued by the Company after the Adoption Date but excluding any Exempted Securities;

"**Restricted Share Agreement**" means the Restricted Share Agreement dated the same date as the Adoption Date and entered into between John Finney and the Company;

"**Sale of the Company**" means either:

(a) a Share Sale; or

(b) a Deemed Liquidation Event.

"**Selling Investors**" has the meaning given in article 18.1;

"**Series A1 Adjustment Multiple**" shall be initially one (1), and shall be adjusted as set forth in article 11.2.

"**Series A-A1 Conversion Date**" has the meaning given in article 9.1;

"**Series A Conversion Price**" means $4.4565 (as adjusted from time to time in accordance with these Articles);

"**Series A Conversion Ratio**" means the ratio determined by dividing the Original Subscription price for the Series A Preferred Shares by the Series A Conversion Price in effect at the time;

"**Series A1 Conversion Ratio**" means the Series A Conversion Ratio multiplied by the Series A1 Adjustment Multiple.

"**Series A Director**" has the meaning given in article 19.2;

"**Series A Preferred Holder**" means a holder of Series A Preferred Shares;

"**Series A1 Preferred Holder**" means a holder of Series A1 Preferred Shares;

6

92129987.10

**Defense Exhibit 17-120**

0696 - 212

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

"**Series A Preferred Shares**" means the redeemable series A preferred shares of £0.00001 each in the capital of the Company;

"**Series A1 Preferred Shares**" means the redeemable series A1 preferred shares of £0.00001 each in the capital of the Company;

"**Series Seed Conversion Date**" has the meaning given in article 10.5

"**Series Seed Conversion Ratio**" has the meaning given in article 10.6;

"**Series Seed Director**" has the meaning given in article 19.3;

"**Series Seed Preferred Shares**" means the preferred shares of £0.00001 each in the capital of the Company;

"**Share Option Plan**" means the share option plan of the Company to be approved by the Board and a Preferred Majority;

"**Shares**" means the shares in the capital of the Company from time to time;

"**Shareholder**" means a holder of Shares in the Company;

"**Shareholder Representative**" has the meaning given in article 18.1.10;

"**Share Sale**" means a transaction or series of related transactions in which a person, or a group of related persons, acquires from Shareholders, Shares representing more than fifty percent (50%) of the outstanding voting power of the Company;

"**Termination Date**" means:

(a)    where a B Shareholder's employment ceases by virtue of notice given by the Company to that B Shareholder, the date on which such notice expires; or

(b)    where a B Shareholder's contract of employment is terminated by the Company and a payment is made in lieu of notice, the date on which notice of termination was served; or

(c)    where a B Shareholder dies, the date of his death; or

(d)    where a B Shareholder is a Director but not an employee of the Company, the date on which a B Shareholder ceases to hold office as a Director,

and in any other case, the date on which the consultancy agreement or employment agreement between the B Shareholder and the Company is terminated;

"**Vest**" means that the related performance conditions in respect of the B Ordinary Shares have been satisfied in accordance with the written agreement between the Company and the related B Shareholder; and "**Vested**" and "**Vesting**" shall be construed accordingly;

7

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-121**
0696 - 213

1.2     Section 1122 of the CTA 2010 shall apply to determine whether one person is connected with another for the purposes of these Articles.

1.3     Headings in these Articles shall not affect the interpretation of these Articles.

1.4     Unless the context otherwise requires, words in the singular shall include the plural and in the plural shall include the singular

1.5     Unless the context otherwise requires, a reference to one gender shall include a reference to the other genders.

1.6     A reference to a statute or statutory provision is a reference to it as it is in force as at the date of adoption of these Articles.

1.7     A reference to a statute or statutory provision shall include all subordinate legislation made as at the date of adoption of these Articles under that statute or statutory provision.

1.8     The expressions "**holding company**", "**subsidiary**" and "**subsidiary undertaking**" have the meanings given in the Act;

1.9     Any words following the terms "**including**", "**include**", "**in particular**", "**for example**" or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

1.10    Where the context permits, other and otherwise are illustrative and shall not limit the sense of the words preceding them.

1.11    Save as otherwise specifically provided in these Articles, words and expressions which have particular meanings in the Act (to the extent in force from time to time) shall have the same meanings in these Articles.

1.12    Where there is reference to Series A Preferred Shares under these Articles, this reference shall be treated, where appropriate in the context, on an as converted basis taking into account any adjustment to the Series A Conversion Price made pursuant to these Articles.

1.13    Where there is reference to Series A1 Preferred Shares under these Articles, this reference shall be treated, where appropriate in the context, on an as converted basis.

**2.      Adoption of Model Articles**

2.1     The model articles for private companies limited by shares set out in the Companies (Model Articles) Regulations 2008 (SI 2008/3229) ("**Model Articles**") shall apply to the Company, except as they are varied or excluded by, or are inconsistent with, the following Articles.

2.2     Articles 8(2) and 14 of the Model Articles shall not apply to the Company.

8

92129987.10

**Defense Exhibit 17-122**
0696 - 214

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**3.     Share Capital**

3.1     Unless the context requires otherwise, references in these Articles to shares of a particular class shall include Shares created and/or issued after the Adoption Date of these Articles and ranking pari passu in all respects (or in all respects except only as to the date from which those Shares rank for dividend) with the Shares of the relevant class then in issue.

3.2     Except as provided in these Articles, the Series A Preferred Shares, the Series A1 Preferred Shares, the Series Seed Preferred Shares, the Ordinary Shares and the B Ordinary Shares (to the extent Vested) shall rank pari passu in all respects but shall constitute separate classes of shares.

3.3     No share is to be issued for less that the aggregate of its nominal value and any premium to be paid to the company in consideration for its issue.

3.4     Subject to the Act and the prior written consent of a Preferred Majority, the Company may purchase its own Shares to the extent permitted by section 692(1ZA) of the Act.

**4.     Issue of shares**

4.1     Subject to the remaining provisions of this article 4, the Directors are generally and unconditionally authorised for the purpose of section 551 of the Act to exercise any power of the Company to:

4.1.1     offer, allot or grant rights to subscribe for: or

4.1.2     convert securities into; or

4.1.3     otherwise deal in, or dispose of,

any Shares to any person, at any time and subject to any terms and conditions as the Directors think proper.

4.2     The authority referred to in article 4.1:

4.2.1     shall be limited to a maximum nominal amount of £500,000 (not including any Shares which have been issued by the Company on or before the Adoption Date);

4.2.2     shall only apply insofar as the Company has not renewed, waived or revoked it by resolution approved by an Ordinary Majority;

4.2.3     is in substitution for all subsisting authorities of the Company; and

4.2.4     may only be exercised for a period of 5 years commencing on the date on which these Articles are adopted, save that the Board may make an offer or agreement which would, or might, require Shares to be allotted after the expiry of such authority (and the Board may allot Shares in pursuance of an offer or agreement as if such authority had not expired).

9

92129987.10

**Defense Exhibit 17-123**

0696 - 215

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

4.3   In accordance with section 568 of the Act, sections 561(1) and 562(1) to (5) (inclusive) of the Act shall not apply to an allotment of Equity Securities made by the Company.

4.4   No Ordinary Shares shall be issued without the prior written consent or affirmative vote of an Ordinary Majority.

4.5   No Shares shall be allotted to any employee, Director, prospective employee or director unless such person has entered into a joint election with the Company under section 431 of the Income Tax (Earnings and Pensions) Act 2003 (a "**Section 431 Election**").

4.6   The Preferred Financing Documents set out the terms and conditions attaching to the rights of pre-emption of the Shareholders in relation to the issue of Relevant Securities.

**5.      Protective Provisions**

5.1   At any time when the Series A Preferred Shares and/or the Series A1 Preferred Shares are in issue, in addition to any other rights provided by law or as set forth in these Articles, the Company shall not and shall cause the other Group Companies of the Company (any reference to the Company below shall also include its Group Companies) not to, either directly or by amendment, merger, consolidation, or otherwise:

5.1.1   liquidate, dissolve or wind-up the affairs of the Company, or effect any merger or consolidation or any other Deemed Liquidation Event;

5.1.2   amend, alter, or repeal any provision of the Articles in a manner adverse to the rights of the Series A Preferred Shares and/or the Series A1 Preferred Shares;

5.1.3   create or authorize the creation of, or issue any other security convertible into or exercisable for, any equity security having rights, preferences or privileges senior to or on parity with the Series A Preferred Shares and/or the Series A1 Preferred Shares, or issue and allot any Series A Preferred Shares and/or the Series A1 Preferred Shares other than in accordance with the Preferred Financing Documents;

5.1.4   purchase or redeem or pay any dividend on any Shares in priority to the Series A Preferred Shares and/or the Series A1 Preferred Shares, other than Shares repurchased from former employees or consultants in connection with the cessation of their employment/services, at the lower of fair market value and nominal value; or

5.1.5   create or authorize the creation of any debt security if the Company's aggregate indebtedness would exceed $500,000 unless such debt security has received the prior approval of the Board; provided, however, that the Board may not approve more than $2,500,000 (in aggregate) outstanding at any time pursuant to this protective provision;

10

92129987.10

**Defense Exhibit 17-124**
0696 - 216

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

5.1.6    create or hold share capital in any subsidiary that is not a wholly-owned subsidiary or dispose of any subsidiary's shares or all or substantially all of any subsidiary's assets;

5.1.7    create, issue, sell or sponsor any cryptocurrency coins, tokens, blockchain-based assets or other cryptofinance coins, tokens or similar digital assets by the Company, an officer of the Company or any direct or indirect majority-owned subsidiary of the Company; or

5.1.8    amend the Articles to increase or decrease the maximum or minimum number of Directors that are permitted to serve on the Board at any time,

unless it has first obtained the affirmative vote or written consent of a Preferred Majority.

## 6.    Dividends

6.1    The Series A Preferred Shares and the Series A1 Preferred Shares (ranking pari passu in this respect) shall confer on the holders the right to receive, in priority to the rights of the holders of any other class of Shares in the capital of the Company to receive any dividend or other distribution, a fixed non-cumulative preferential dividend (the "**Preferred Dividend**") out of the profits of the Company available for distribution.

6.2    The Preferred Dividend is payable on the Series A Preferred Shares and Series A1 Preferred Shares at the rate of $0.133695 per Share per annum (subject to appropriate adjustment in the event of any Bonus Issue or Reorganisation affecting such Shares).

6.3    The Preferred Dividend shall accrue on a daily basis from the date of issue of any Series A Preferred Shares and/or the Series A1 Preferred Shares and shall not be payable until such time as declared or paid by the Company. Subject to article 6.4, the Company shall not be obliged to declare or pay the Preferred Dividend in respect of any financial year or other period.

6.4    No dividend may be declared or paid by the Company on the Ordinary Shares in respect of any financial year or other period for which accounts of the Company shall be made up unless and until either.

6.4.1    all accruals of the Preferred Dividend in respect of that financial year or other period have been paid to the holders of the Series A Preferred Shares and to the holders of the Series A1 Preferred Shares pari passu as if they constituted one and the same class; or

6.4.2    a Preferred Majority has consented in writing to the declaration or payment of such dividend.

6.5    Subject to articles 6.1 to 6.4 (inclusive), the profits of the Company available for dividend and which the Company may determine to distribute in respect of any financial year or other period for which the accounts of the Company shall be made up shall be distributed amongst all the holders of Equity Shares rateably in accordance

11

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

92129987.10

## Defense Exhibit 17-125
0696 - 217

with articles 6.7 to 6.10 (inclusive) as if the Series A Preferred Shares and the Series A1 Preferred Shares had been converted into Ordinary Shares at the then applicable Series A Conversion Ratio.

6.6    In this article 6, the expression "**non-cumulative**" in relation to the Preferred Dividend means that any such dividend, if declared or paid, is payable out of the profits of the Company available for distribution in respect of the financial year or other period for which accounts of the Company shall be made up and by reference to which such dividend has accrued but without any right in the case where no Preferred Dividend is declared or paid by the Company in respect of any financial year or other period to receive such dividend out of the profits of the Company available for distribution in respect of any subsequent financial year or other period.

6.7    The Series Seed Preferred Shares, Ordinary Shares and B Ordinary Shares (to the extent Vested) shall rank pari passu for dividends.

6.8    Each dividend shall be distributed to the appropriate Shareholder pro rata according to the number of Preferred Shares, Ordinary Shares and B Ordinary Shares (to the extent Vested) held by them (on an as converted basis) and shall accrue daily (assuming a 365-day year). All dividends are expressed net and shall be paid in cash.

6.9    Subject to the Act and these Articles, the Board may pay interim dividends, with the prior written consent of a Preferred Majority.

6.10   No dividends shall be paid on any B Ordinary Shares that have not Vested or on Deferred B Ordinary Shares.

7.    **Distributions**

7.1    On a Liquidation Event, the surplus assets of the Company remaining after the payment of its liabilities ("**Net Proceeds**") shall (to the extent that the Company is lawfully able to do so) be applied in the following order of priority:

7.1.1   first, in paying to each of the Series A Preferred Holders and the Series A1 Preferred Holders pari passu as if they constituted one and the same class, in priority to any other classes of Shares, an amount per Series A Preferred Share and per Series A1 Preferred Share held equal to the greater of:

7.1.1.1    the Original Subscription Price of such Series A Preferred Share or Series A1 Preferred Share together with a sum equal to any arrears and accruals of dividends thereon, calculated for all periods down to and including the date of the distribution (provided that, if there is a shortfall of assets remaining to satisfy the entitlements of the Series A Preferred Holders and the Series A1 Preferred Holders in full, the proceeds shall be distributed to the Series A Preferred Holders and the Series A1 Preferred Holders in proportion to the amounts due on each such Share held); and

12

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-126**

0696 - 218

7.1.1.2    the amount that would be payable to each Series A Preferred Holder and each Series A1 Preferred Holder in respect of each Series A Preferred Share and each Series A1 Preferred Share, if the Series A Preferred Shares and the Series A1 Preferred Shares had all been converted into Ordinary Shares in accordance with article 9 immediately prior to such Liquidation Event; and

7.1.2    second, in paying to the holders of the Series Seed Preferred Shares an amount per Series Seed Preferred Share held equal to the greater of:

7.1.2.1    the Original Subscription Price of such Series Seed Preferred Share, together with a sum equal to any arrears and accruals of dividends thereon, calculated down to and including the date of the distribution (provided that, if there is a shortfall of assets remaining to satisfy the entitlements of holders of Series Seed Preferred Shares in full, the proceeds shall be distributed to the holders of the Series Seed Preferred Shares in proportion to the amounts due to each such Share held); and

7.1.2.2    the amount that would be payable to each Series Seed Preferred Shareholder in respect of each Series Seed Preferred Share, if the Series Seed Preferred Shares had all been converted into Ordinary Shares in accordance with article 10 immediately prior to such Liquidation Event; and

7.1.3    third, and to the extent there are any B Ordinary Shares (that have not Vested) or Deferred B Ordinary Shares in issue at that time, in paying to each holder of B Ordinary Shares (that have not Vested) or Deferred B Ordinary Shares a total of £1 in aggregate for that holder's entire holding of B Ordinary Shares (that have not Vested) and £1 in aggregate for that holder's entire holding of Deferred B Ordinary Shares;

7.1.4    fourth, in paying to the holders of the Ordinary Shares and the B Ordinary Shares (to the extent Vested) pari passu as if they constituted one and the same class an amount equivalent to the Original Subscription Price per Ordinary Share or B Share (to the extent Vested), together with a sum equal to any arrears and accruals of dividends thereon, calculated down to and including the date of the distribution and, if there is a shortfall of assets remaining to satisfy the entitlements of holders of Ordinary Shares and B Ordinary Shares (to the extent Vested) in full, the proceeds shall be distributed to the holders of the Ordinary Shares and B Ordinary Shares (to the extent Vested) in proportion to the amounts due to each such Share held; and

7.1.5    finally, in paying the balance to the holders of the Ordinary Shares and B Ordinary Shares (to the extent Vested) pro rata to the number of Ordinary Shares and B Ordinary Shares (to the extent Vested) they respectively hold pari passu as if they constituted one and the same class.

13

92129987.10

**Defense Exhibit 17-127**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**8.      Exit**

8.1      In the event of an Acquisition or an Asset Sale (save where a Preferred Majority elect by giving written notice to the Company before the effective date of a merger, consolidation, sale or reorganisation that would otherwise be an Acquisition or Asset Sale, that such merger, consolidation sale or re-organisation shall not be deemed an Acquisition or Asset Sale), the Directors shall and each Shareholder shall exercise its rights in relation to the Company to procure that the Acquisition or Asset Sale is structured so that each holder of Series A Preferred Shares and the Series A1 Preferred Shares shall be entitled to receive, for each Preferred Share then held, such amount out of the consideration payable upon completion of the relevant Acquisition or Asset Sale, as if such Acquisition or Asset Sale, as regards the payment of consideration on the completion thereof, constituted a Liquidation Event and such Acquisition or Asset Sale shall be deemed to constitute a Liquidation Event for the purposes of article 7.1.

8.2      In any Acquisition or Asset Sale, subject as hereinafter provided, if the consideration to be received is securities of a company or other property other than cash, then the value of such securities or property shall be determined in good faith by the Auditors acting as experts and not as arbitrators.

8.3      In the event of a Liquidation Event, if any portion of the consideration is placed into escrow and/or is payable to the Shareholders subject to contingencies, each Shareholder shall exercise its rights in relation to the Company to procure that such Liquidation Event is structured so that:

8.3.1    the portion of such consideration that is not placed in escrow and not subject to any contingencies (the "**Initial Consideration**") shall be allocated among the holders of Shares in accordance with article 7.1 as if the Initial Consideration were the only consideration payable in connection with such Liquidation Event; and

8.3.2    any additional consideration which becomes payable to the Shareholders upon release from escrow or satisfaction of contingencies shall be allocated among the Shareholders in accordance with article 7.1 after taking into account the previous payment of the Initial Consideration as part of the same transaction.

**9.      Conversion of Series A Preferred Shares and the Series A1 Preferred Shares**

9.1      Any Series A Preferred Holder or Series A1 Preferred Holder shall be entitled, by notice in writing to the Company, to require conversion into Ordinary Shares of all of the fully paid Series A Preferred Shares and/or Series A1 Preferred Shares held by it at any time and those Series A Preferred Shares and/or Series A1 Preferred Shares shall convert automatically on the date of such notice (the "**Series A-A1 Conversion Date**"), provided that the holder may in such notice, state that conversion of its Series A Preferred Shares and/or Series A1 Preferred Shares into Ordinary Shares is conditional upon the occurrence of one or more events (the "**Conditions**").

14

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-128**
0696 - 220

9.2    All of the fully paid Series A Preferred Shares and Series A1 Preferred Shares shall automatically convert into Ordinary Shares:

9.2.1    on the date of a notice given by a Preferred Majority to the Company and the other Series A Preferred Holders and Series A1 Preferred Holders (which date shall be treated as the Series A-A1 Conversion Date); or

9.2.2    immediately upon the occurrence of a Qualifying Listing.

9.3    In the case of:

9.3.1    article 9.2.1 at least five Business Days after the Series A-A1 Conversion Date; or

9.3.2    in the case of article 9.2.2, at least five Business Days prior to the date of the Qualifying Listing,

each holder of the relevant Series A Preferred Shares and/or Series A1 Preferred Shares  shall deliver the certificate (or an indemnity in a form reasonably satisfactory to the Board for any lost share certificate) for the Series A Preferred Shares and/or Series A1 Preferred Shares being converted (together with such other evidence (if any) as the Board may reasonably require to prove good title to those Preferred Shares) to the Company at its registered office for the time being.

9.4    Where conversion of a Series A Preferred Share or Series A1 Preferred Share is mandatory on the occurrence of a Qualifying Listing, that conversion shall be effective only immediately before such Qualifying Listing (and "**Series A-A1 Conversion Date**" shall be construed accordingly). If such Qualifying Listing does not become effective or does not take place, such conversion shall be deemed not to have occurred. In the event of a conversion under article 9.1, if the Conditions have not been satisfied or waived by the relevant holder by the Series A-A1 Conversion Date such conversion shall be deemed not to have occurred.

9.5    On the Series A-A1 Conversion Date, the relevant Series A Preferred Shares and/or Series A1 Preferred Shares shall without further authority than is contained in these Articles stand converted into Ordinary Shares on the basis of the Series A Conversion Ratio or the Series A1 Conversion Ratio, respectively, and the Ordinary Shares resulting from that conversion shall in all other respects rank pari passu with the existing issued Ordinary Shares.

9.6    On the Series A-A1 Conversion Date, the Company shall enter the holder of the converted Series A Preferred Shares and/or Series A1 Preferred Shares on the register of Shareholders of the Company as the holder of the appropriate number of Ordinary Shares and, subject to the relevant holder of Series A Preferred Shares and/or Series A1 Preferred Shares delivering the relevant share certificate (or indemnity or other evidence) in respect of the Series A Preferred Shares and/or Series A1 Preferred Shares in accordance with this article 9, the Company shall, within 5 Business Days of the Series A-A1 Conversion Date, forward a definitive share certificate for the

15

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-129**

0696 - 221

appropriate number of fully paid Ordinary Shares to such holder by post to his address as shown in the register of Shareholders, at his own risk and free of charge.

9.7     On the Series A-A1 Conversion Date (or as soon after that date as it is possible to calculate the amount payable), the Company shall, so far as it is legally able to do so, pay to the holders of the Series A Preferred Shares and/or Series A1 Preferred Shares falling to be converted a dividend equal to all arrears and accruals of dividends in relation to those Series A Preferred Shares and/or Series A1 Preferred Shares (to be calculated on a daily basis down to (and including) the Series A-A1 Conversion Date).

9.8     The Shareholders shall enter into such reorganisation of the share capital of the Company as is reasonably necessary to effect any conversion of Series A Preferred Shares and/or Series A1 Preferred Shares into Ordinary Shares pursuant to these Articles ("**Conversion Reorganisation**"), including, without limitation, the following:

9.8.1     if the aggregate nominal value of the Series A Preferred Shares and/or Series A1 Preferred Shares converting into Ordinary Shares is less than the aggregate nominal value of those Ordinary Shares, the issue to the relevant holder of such additional number of Ordinary Shares as is required to make up the shortfall, credited as fully paid up by way of capitalisation, with the amount required to pay up such Ordinary Shares to be appropriated, at the discretion of the Directors, from any of the sums standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or to the credit of the profit and loss account (or income statement) and capitalised by applying the same in paying up such shares. If and to the extent that the foregoing shall be impossible or unlawful, then the relevant holder shall be entitled to subscribe for such additional Ordinary Shares in cash at nominal value and the entitlement of such holders to such additional Ordinary Shares shall be increased so that such holders shall be in no worse position than if they had not so subscribed at nominal value; and

9.8.2     if the aggregate nominal value of the Series A Preferred Shares and/or Series A1 Preferred Shares converting into Ordinary Shares exceeds the aggregate nominal value of those Ordinary Shares into which they have converted, the re-designation into B Deferred Shares of such number of Series A Preferred Shares and/or Series A1 Preferred Shares (in aggregate) as represents the excess.

9.9     Any Director may, as agent of a Shareholder, sign on behalf of that Shareholder such resolutions, consents, agreements or other documents as may be approved by a Preferred Majority for the purpose of giving effect to Conversion Reorganisation unless such reorganisation would (a) result in a new or increased obligation to the Company being imposed on that Shareholder and/or (b) diminish the rights of that Shareholder save as provided for in these Articles.

16

92129987.10

**Defense Exhibit 17-130**

0696 - 222

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

9.10    Any share split, consolidation, bonus issue or other action effective with respect to the Series A Preferred Shares which results in a conversion price adjustment to the Series A Preferred Shares (other than that contemplated in article 11.2) shall also be effected with respect to the Series A1 Preferred Shares so that the Series A Conversion Ratio and the Series A1 Conversion Ratio remain consistent other than the effect of the Series A1 Adjustment Multiple

**10.    Conversion of Series Seed Preferred Shares**

10.1    Any holder of Series Seed Preferred Shares shall be entitled, by notice in writing to the Company, to require conversion into Ordinary Shares of all of the fully paid Series Seed Preferred Shares held by it at any time and those Series Seed Preferred Shares shall convert automatically on the date of such notice (the "**Series Seed Conversion Date**").

10.2    All of the Series Seed Preferred Shares shall automatically convert into Ordinary Shares on the date of a Qualifying Listing.

10.3    Upon at least 75% of the Series Seed Preferred Shares having been converted into Ordinary Shares, the remainder of the Series Seed Preferred Shares shall also convert into Ordinary Shares, automatically upon the aforementioned threshold being reached.

10.4    In the case of:

10.4.1    article 10.1, at least five Business Days after the Series Seed Conversion Date; or

10.4.2    in the case of article 10.2 at least five Business Days prior to the date of the Qualifying Listing,

each holder of the relevant Series Seed Preferred Shares shall deliver the certificate (or an indemnity in a form reasonably satisfactory to the Board for any lost share certificate) for the Series Seed Preferred Shares being converted (together with such other evidence (if any) as the Board may reasonably require to prove good title to those Series Seed Preferred Shares) to the Company at its registered office for the time being.

10.5    Where conversion of a Series Seed Preferred Share is mandatory on the occurrence of a Qualifying Listing, that conversion shall be effective only immediately before such Qualifying Listing (and "**Series Seed Conversion Date**" shall be construed accordingly). If such Qualifying Listing does not become effective or does not take place, such conversion shall be deemed not to have occurred.

10.6    On the Series Seed Conversion Date, the relevant Series Seed Preferred Shares shall (without any further authority than that contained in these Articles) stand converted into Ordinary Shares on the basis of one Ordinary Share for each Series Seed Preferred Share held ("**Series Seed Conversion Ratio**") and the Ordinary Shares resulting from the conversion shall rank pari passu in all other respects with the existing issued Ordinary Shares.

17

92129987.10

**Defense Exhibit 17-131**
0696 - 223

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

10.7    On the Series Seed Conversion Date, the Company shall enter the holder of the converted Series Seed Preferred Shares on the register of Shareholders of the Company as the holder of the appropriate number of Ordinary Shares and, subject to the relevant holder of Series Seed Preferred Shares delivering the relevant share certificate (or indemnity or other evidence) in respect of the Series Seed Preferred Shares in accordance with this article 10, the Company shall, within 5 Business Days of the Series Seed Conversion Date, forward a definitive share certificate for the appropriate number of fully paid Ordinary Shares to such holder of Series Seed Preferred Shares by post to his address as shown in the register of Shareholders, at his own risk and free of charge.

10.8    On the Series Seed Conversion Date (or as soon after that date as it is possible to calculate the amount payable), the Company shall, so far as it is legally able to do so, pay to the holders of the Series Seed Preferred Shares falling to be converted a dividend equal to all arrears and accruals of dividends in relation to those Series Seed Preferred Shares (to be calculated on a daily basis down to (and including) the Conversion Date).

10.9    The Series Seed Conversion Ratio shall from time to time be adjusted in accordance with the provisions of this article:

10.9.1    if Series Seed Preferred Shares remain capable of being converted into new Ordinary Shares and there is a consolidation and/or sub-division of Ordinary Shares, the Series Seed Conversion Ratio shall be adjusted by an amount, which in the opinion of the Board (with the consent of the Series Seed Director (if any is serving at the time)) is fair and reasonable, to maintain the right to convert so as to ensure that each holder of Series Seed Preferred Shares is in no better or worse position as a result of such consolidation or sub-division, such adjustment to become effective immediately after such consolidation or sub-division;

10.9.2    if Series Seed Preferred Shares remain capable of being converted into Ordinary Shares, on an allotment of fully-paid Ordinary Shares pursuant to a capitalisation of profits or reserves to holders of Ordinary Shares, the Series Seed Conversion Ratio shall be adjusted by an amount, which in the opinion of the Board (with the consent of the Series Seed Director (if any is serving at the time)) is fair and reasonable, to maintain the right to convert so as to ensure that each holder of Series Seed Preferred Shares is in no better or worse position as a result of such capitalisation of profits or reserves, such adjustment to become effective as at the record date for such issue.

**11.    Adjustment of the Series A Conversion Price**

11.1    The Series A Conversion Price shall be recalculated immediately prior to the earliest to occur of:

11.1.1    the initial closing of the Company's next qualified equity financing of at least $5 million dollars;

18

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-132**
0696 - 224

11.1.2  the date which is 18 months after the Adoption Date; and

11.1.3  an Acquisition of the Company,

(such event being the "**Adjustment Event**").

11.2  Upon the occurrence of the Adjustment Event, the Series A Conversion Price shall be re-calculated on the basis of the following formula:

**NCP = (PMV + NDC)/FDC**

For the purpose of the above formula:

"NCP" =    the post-adjustment Series A Conversion Price;

"PMV" =    $20,000,000;

"NDC" =    the total amount of non-dilutive capital received by the Company since the Adoption Date ("**Non-Dilutive Capital**") which includes (i) Non-Recurring Engineering revenue ("**NRE**") earned by the Company from third-party customers of the Company (excluding Shareholders, except to the extent that any such Shareholder contracts with the Company in its capacity as a customer on arm's length terms) following the Adoption Date on the Company's standard terms (and without restrictive covenants, exclusivities, most favoured nation arrangements or other similar restrictions of the Company or additional grant of rights or other encumbrances) or reasonable modifications thereto approved by the Board with the consent of the Series A Director, provided that if the Series A Director seat is vacant, approval of the Preferred Majority shall be required (and if the Series A Director is not vacant and does not consent, a Preferred Majority may overrule such failure to consent), (ii) government grants received by the Company, and (ii) other forms of non-dilutive capital such as monetary prizes from business plan and pitch competitions received by the Company; up to an aggregate maximum of $15,000,000 of Non-Dilutive Capital. NRE commitments in connection with Phase 2 and Phase 3 scope of works (or additional phases related to the scope of work existing on the Adoption Date on terms no less favourable to the Company) from 03b Networks USA LLC and Inmarsat Global Limited shall be credited upon receipt, notwithstanding that these NREs may include non-standard terms, restrictions and rights; and

"FDC" =    (i) the number of Equity Shares in issue immediately prior to the first issuance of Series A Preferred Shares by the Company, plus (ii) the aggregate number of Equity Shares in respect of which options or warrants to subscribe were granted (including under the Share Option Plan), or which were issuable pursuant to convertible securities granted by the Company (including but not limited to warrants) at

19

92129987.10

**Defense Exhibit 17-133**

0696 - 225

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

such time, less any reduction in such reserve made in connection with the adjustment contemplated by this article 11.2.

If there is any adjustment to the Series A Conversion Price pursuant to this article 11.2, the Series A1 Adjustment Multiple shall also be adjusted so that each Series A1 Preferred Share converts into that number of Ordinary Shares as it did prior to such adjustment to the Series A Conversion Price.

11.3    Each Shareholder shall make such changes to these Articles and the Preferred Financing Documents and pass all resolutions as may be reasonably necessary to effect any adjustment to the Series A Conversion Price pursuant to article 11.2.

11.4    The Series A Conversion Price shall from time to time be adjusted in accordance with the provisions of this article:

11.4.1  if Series A Preferred Shares and/or Series A1 Preferred Shares remain capable of being converted into new Ordinary Shares and there is a consolidation and/or sub-division of Ordinary Shares, the Series A Conversion Price shall be adjusted by an amount, which in the opinion of the Board (with the approval of the Series A Director, provided that if the Series A Director seat is vacant, approval of the Preferred Majority shall be required) is fair and reasonable, to maintain the right to convert so as to ensure that each Series A Preferred Holder and Series A1 Preferred Holder is in no better or worse position as a result of such consolidation or sub-division, such adjustment to become effective immediately after such consolidation or sub-division;

11.4.2  if Series A Preferred Shares and/or Series A1 Preferred Shares remain capable of being converted into Ordinary Shares, on an allotment of fully-paid Ordinary Shares pursuant to a capitalisation of profits or reserves to holders of Ordinary Shares, the Series A Conversion Price shall be adjusted by an amount, which in the opinion of the Board (with the approval of the Series A Director, provided that if the Series A Director seat is vacant, approval of the Preferred Majority shall be required) is fair and reasonable, to maintain the right to convert so as to ensure that each Series A Preferred Holder and Series A1 Preferred Holder is in no better or worse position as a result of such capitalisation of profits or reserves, such adjustment to become effective as at the record date for such issue.

11.5    If the Company issues any Relevant Securities without consideration or at a price per share (which in the event that the Relevant Security is not issued for cash shall be a price certified by the Auditors acting as experts and not as arbitrators as being in their opinion the current cash value of the new consideration for the allotment of the Relevant Securities) which equates to less than the Series A Conversion Price in effect immediately prior to such issuance ("**Qualifying Issue**"), then the Series A Conversion Price shall immediately be reduced to a price (calculated to the nearest one hundredth of a percent) determined in accordance with the following formula:

20

92129987.10

**Defense Exhibit 17-134**

0696 - 226

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

$$CP2 = CP1*(A + B) \div (A + C)$$

For the purpose of the above formula:

"CP2" =  the Series A Conversion Price in effect immediately after the Qualifying Issue;

"CP1" =  the Series A Conversion Price in effect immediately prior to the Qualifying Issue;

"A" =  the number of Equity Shares in issue immediately prior to the Qualifying Issue plus the aggregate number of Equity Shares in respect of which options to subscribe have been granted, or which are issuable pursuant to convertible securities granted by the Company (including but not limited to warrants and including all Preferred Shares as if they had converted into Ordinary Shares in accordance with these Articles immediately prior to the Qualifying Issue, but excluding any convertible securities that are converting into Relevant Securities to be issued pursuant to the Qualifying Issue) in each case immediately prior to the Qualifying Issue;

"B" =  the value of the aggregate consideration received by the Company in respect of the Qualifying Issue divided by CP1;

"C" =  the number of Relevant Securities issued pursuant to the Qualifying Issue.

## 12.    Conversion - General

12.1    If any holder of Preferred Shares becomes entitled to fractions of an Ordinary Share as a result of conversion ("**Fractional Holders**"), the Directors may (in their absolute discretion) deal with these fractions as they think fit on behalf of the Fractional Holders.  In particular, the Directors may aggregate and sell the fractions to a person for the best price reasonably obtainable and distribute the net proceeds of sale in due proportions among the Fractional Holders or may ignore fractions or accrue the benefit of such fractions to the Company rather than the Fractional Holder. For the purposes of completing any such sale of fractions, the chairman of the Company or, failing him, the secretary will be deemed to have been appointed the Fractional Holder's agent for the purpose of the sale.

12.2    If a doubt or dispute arises concerning an adjustment of the Series A Conversion Price in accordance with article 11, or if so requested in writing by a Preferred Majority, the Board shall refer the matter to an Independent Expert for determination who shall make available to all Shareholders their report and whose certificate as to the amount of the adjustment is, in the absence of manifest error, conclusive and binding on all concerned and their costs shall be met by the Company.

21

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-135**
0696 - 227

**13.    Redemption Rights**

13.1    Subject to the Act, a Preferred Majority may at any time after 1 January 2025 require the Company by notice in writing (an "**Investor Redemption Notice**") to redeem all of the Redeemable Shares in issue.

13.2    If an Investor Redemption Notice is served, all the Redeemable Shares will become due for redemption in three equal annual instalments (subject to article 13.7 below) (the date of each such annual instalment shall be referred to as a "**Redemption Date**").

13.3    The first Redemption Date shall occur not more than eighty days after receipt by the Company of the Investor Redemption Notice. The second Redemption Date shall occur on the first anniversary of the first Redemption Date. The third Redemption Date shall occur on the second anniversary of the first Redemption Date.

13.4    On each Redemption Date, the Company shall redeem, on a pro rata basis in accordance with the number of Redeemable Shares held by each Redeemable Share Holder, a number of Redeemable Shares determined by dividing (i) the total number of Redeemable Shares held by all redeeming Redeemable Share Holders immediately prior to such Redemption Date by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies).

13.5    The Company shall redeem such Redeemable Shares at a per share redemption price equal to the sum of (i) the Original Subscription Price for such Series A Preferred Share or Series A1 Preferred Share (subject to appropriate adjustment in the event of any Bonus Issue or Reorganisation affecting such Share), plus (ii) the amount of all arrears and accruals of dividends on such Series A Preferred Share or Series A1 Preferred Share ("**Redemption Price**").

13.6    Not less than forty (40) days prior to each Redemption Date, the Company shall send written notice of the proposed Redemption Date to each registered holder of Redeemable Shares (a "**Company Redemption Notice**"). Each Company Redemption Notice shall state:

13.6.1    the number of Redeemable Shares held by the Redeemable Share Holder that the Company shall redeem on the Redemption Date;

13.6.2    the Redemption Price;

13.6.3    the relevant Redemption Date; and

13.6.4    the date on which such Redeemable Share Holder's rights to voluntarily convert their Redeemable Shares into Ordinary Shares in accordance with article 9.1 terminate.

13.7    If the Company receives, on or prior to the twentieth (20th) day after the date of deemed delivery of the Company Redemption Notice to a Redeemable Share Holder, written notice from such Redeemable Share Holder electing to be excluded from the

22

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-136**

0696 - 228

redemption described in the Company Redemption Notice, then the Redeemable Shares registered in the name of such Redeemable Share Holder at the time of the Company's receipt of such notice shall not be redeemed on the next Redemption Date.

13.8    On or before each Redemption Date, the holders of Series A Preferred Shares and Series A1 Preferred Shares to be redeemed on such Redemption Date shall deliver to the Company at its registered office the certificate(s) for the Series A Preferred Shares and the Series A1 Preferred Shares to be redeemed (or an indemnity for lost certificate in a form acceptable to the Board, in respect of any lost certificate(s)) and on such delivery (and against the receipt by the Redeemable Share Holder for the redemption moneys payable in respect of his Redeemable Shares) the Company shall pay each Redeemable Share Holder (or, in the case of joint holders, to the Redeemable Share Holder whose name stands first in the register of Shareholders in respect of those Redeemable Shares) the Redemption Price for each Redeemable Share so redeemed.

13.9    The Company shall, in the case of a redemption in full, cancel the share certificate of the relevant Redeemable Share Holder, and, in the case of a redemption of part of holding of Redeemable Shares included in a certificate, cancel the original certificate and without charge issue a new certificate to the relevant Redeemable Share Holder for the balance of the Redeemable Shares not redeemed on that occasion.

13.10   If on any Redemption Date the Company is prohibited by law from redeeming all or any of the Redeemable Shares then due to be redeemed, it shall on such Redemption Date redeem that number of the Redeemable Shares as it may then lawfully redeem, and if there is more than one holder whose Redeemable Shares are due to be redeemed then the Redeemable Shares shall be redeemed in proportion as nearly as may be to their existing holdings of Redeemable Shares and the Company shall redeem the balance of those shares as soon as practical after it is not so prohibited and, for so long as the prohibition remains and any Redeemable Shares have not been redeemed (and notwithstanding any other provisions of these Articles) the Preferred Dividend shall continue to accrue up to the date of redemption and the Company shall not pay any dividend or otherwise make any distribution of capital or otherwise (except in the ordinary course of business) decrease its profits available for distribution.  If the Company fails to make any partial redemption of Redeemable Shares on any Redemption Date, then subsequent redemptions of Redeemable Shares shall be deemed to be of those Redeemable Shares which first became due for redemption.

13.11   Any Redeemable Shares that are redeemed or otherwise acquired by the Company or any of its subsidiaries shall be automatically and immediately cancelled and shall not be reissued, sold or transferred.  Neither the Company nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Redeemable Shares following redemption.

13.12   The Company shall carry out all such actions and approve and enter into all such resolutions, consents, agreements or other documents as a Preferred Majority may agree or direct for the purpose of giving effect to the redemption rights in this article

23

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## Defense Exhibit 17-137
0696 - 229

13 in accordance with the Act. Each Shareholder shall vote its Shares and/or give any other consent as a Shareholder for the purpose of giving effect to the redemption rights in this article 13 in accordance with the Act.

**14.    Voting and class rights**

14.1    Subject to any other provisions in these Articles concerning voting rights, Shares in the Company shall carry votes as follows:

14.1.1    the Series A Preferred Shares confer on each holder of Series A Preferred Shares the right to receive notice of and to attend, speak and vote at all general meetings of the Company, and each Series A Preferred Share shall carry one vote per share (calculated on an as converted basis if the Series A Preferred Shares had converted into Ordinary Shares at the Series A Conversion Ratio immediately prior to the exercise of such rights).

14.1.2    The Series A1 Preferred Shares confer on each holder of Series A1 Preferred Shares the right to receive notice of and to attend, speak and vote at all general meetings of the Company, and each Series A1 Preferred Share shall carry one vote per share (calculated on an as converted basis if the Series A1 Preferred Shares had converted into Ordinary Shares at the Series A Conversion Ratio immediately prior to the exercise of such rights has been adjusted);

14.1.3    the Series Seed Preferred Shares shall confer on each holder of such shares the right to receive notice of and to attend, speak and vote at all general meetings of the Company, and each Series Seed Preferred Share shall carry one vote per share;

14.1.4    the Ordinary Shares shall confer on each holder of Ordinary Shares the right to receive notice of and to attend, speak and vote at all general meetings of the Company, and each Ordinary Share shall carry one vote per share;

14.1.5    the B Ordinary Shares shall confer no voting rights under any circumstances and shall confer no rights to receive notice of or to attend, speak and vote at any general meeting; and

14.1.6    the Deferred B Ordinary Shares shall confer no voting rights under any circumstances and shall confer no rights to receive notice of or to attend, speak and vote at any general meeting.

14.2    Where Shares confer a right to vote, votes may be exercised:

14.2.1    on a show of hands by every Shareholder who (being an individual) is present in person or by proxy or (being a corporation) is present by a representative or by a proxy (in which case, each Shareholder holding Shares with votes shall have one vote); or

14.2.2    on a poll by every Shareholder who (being an individual) is present in person or by proxy or (being a corporation) is present by a representative or by a

24

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-138**
0696 - 230

proxy (in which case, each Shareholder holding Shares with votes shall have one vote).

14.3   Except to the extent provided otherwise in these Articles, whenever the share capital of the Company is divided into different classes of shares, the special rights attached to any such class (other than the B Ordinary Shares that have not Vested or Deferred B Ordinary Shares) may only be varied or abrogated (either whilst the Company is a going concern or during or in contemplation of a winding-up) with the consent in writing of the holders of more than 75% of the issued shares of that class.

**15.    Deferral Event**

15.1   In these Articles, "**Deferral Event**" means:

15.1.1  a B Shareholder becoming a B Shareholder Leaver; or

15.1.2  an Exit taking place, at the date of which the B Shareholder holds any B Ordinary Shares that have not Vested; or

15.1.3  an event taking place pursuant to which Founder Shares are to convert into Deferred B Ordinary Shares under the terms of the Restricted Share Agreement,

and (in the case of a Deferral Event occurring under article 15.1.1 or article 15.1.2) the Board deciding at any time on or after the Termination Date or the Exit that the Deferral Event has occurred.

15.2   Where a Deferral Event occurs under article 15.1.1 and the B Shareholder is a B Shareholder Bad Leaver, all the B Ordinary Shares held by the B Shareholder in question (whether or not Vested) shall immediately convert into Deferred B Ordinary Shares.

15.3   Where a Deferral Event occurs either:

15.3.1  under article 15.1.1 and the B Shareholder is a B Shareholder Good Leaver; or

15.3.2  under article 15.1.2,

in each case, all the B Ordinary Shares held by the B Shareholder that have not Vested at the Termination Date or date of the Exit (as the case may be) shall immediately convert into Deferred B Ordinary Shares (rounded down to the nearest whole share).

15.4   The Board's discretion to decide that a Deferral Event has occurred under article 15.1.1 and article 15.1.2 may be exercised at any time on or after the Termination Date or the Exit and will not be affected by (and the Board will not be estopped from making that decision by) any delay in taking that decision or any decision taken (or permission given to the person) to allow the person to hold onto his B Ordinary Shares.

25

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-139**
0696 - 231

15.5 Where a Deferral Event occurs under article 15.1.3, the Founder Shares in question shall immediately convert into Deferred B Ordinary Shares (rounded down to the nearest whole share).

## 16. Deferred B Ordinary Shares

16.1 Upon conversion of any Shares into Deferred B Ordinary Shares pursuant to these Articles:

16.1.1 the Company shall be entitled to enter the relevant Shareholder into the register of members of the Company as the holder of the appropriate number of Deferred B Ordinary Shares from the date of conversion; and

16.1.2 on the date of conversion, the relevant Shareholder shall deliver to the Company at its registered office the share certificate (to the extent not already in the possession of the Company) (or an indemnity for lost certificate in a form acceptable to the Company) for the Shares so converted and upon such delivery the Company shall issue to the relevant Shareholder a share certificate for the number of Deferred B Ordinary Shares resulting from the conversion.

16.2 The Deferred B Ordinary Shares (if any) may be redeemed by the Company at its option at any time for £1 in aggregate per holder of Deferred B Ordinary Shares for that holder's entire holding of Deferred B Ordinary Shares without obtaining the sanction of that holder of Deferred B Ordinary Shares.

16.3 The creation or issue of Deferred B Ordinary Shares shall be deemed to confer irrevocable authority on the Board at any time after their creation or issue to appoint any person to execute or give on behalf of the holder of those Deferred B Ordinary Shares a transfer of them to such person or persons as the Company may determine.

## 17. Transfer of Shares: General

17.1 In this article 17, reference to the "**transfer of a Share**" includes the transfer or assignment of a beneficial or other interest in that Share or the creation of a trust or Encumbrance over that Share, and reference to a Share includes a beneficial or other interest in a Share.

17.2 No Share may be transferred unless the transfer is made in accordance with these Articles and the Preferred Financing Documents.

17.3 No B Ordinary Shares that have not Vested or Deferred B Ordinary Shares may be transferred without the prior consent of the Board, including the Series A Director provided that if the Series A Director seat is vacant, approval of the Preferred Majority shall be required.

17.4 In addition to the provisions of the Model Articles, the Directors may refuse to register a transfer if:

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## Defense Exhibit 17-140

17.4.1 it is a transfer of a Share to a bankrupt, a minor or a person of unsound mind; or

17.4.2 the transfer is to an employee, Director or prospective employee or director and that person has not entered into a Section 431 Election (as defined in article 4.5) with the Company.

17.5 The Directors may, as a condition to the registration of any transfer of Shares in the Company, require the transferee to execute and deliver to the Company documents agreeing to be bound by the terms of some or all of the Preferred Financing Documents in such form as the Directors may reasonably require (but not so as to oblige the transferee to have any obligations or liabilities greater than those of the proposed transferor under any such agreement or other document). If any condition is imposed in accordance with this article 17.5, the transfer may not be registered unless that deed has been executed and delivered to the Company's registered office by the transferee.

17.6 To enable the Directors to determine whether or not there has been any disposal of Shares in the capital of the Company (or any interest in Shares in the capital of the Company) in breach of these Articles, the Directors acting with the consent of the Series A Director, provided that if the Series A Director seat is vacant, approval of the Preferred Majority shall be required, may, and shall if so requested by the Series A Director or Preferred Majority in writing require any holder, or the legal personal representatives of any deceased holder, or any person named as transferee in any transfer lodged for registration or any other person who the Directors may reasonably believe to have information relevant to that purpose, to provide to the Company with any information and evidence that the Directors request regarding any matter which they deem relevant to that purpose. If the information or evidence is not provided to enable the Directors to determine to their reasonable satisfaction that no breach has occurred, or that as a result of the information and evidence the Directors are reasonably satisfied that a breach has occurred, the Directors shall immediately notify the holder of such Shares in the capital of the Company in writing of that fact and the following shall occur:

17.6.1 the relevant Shares shall cease to confer on the holder of them (or any proxy) any rights:

17.6.1.1 to vote, whether on a show of hands or on a poll, and whether exercisable at a general meeting of the Company or at any separate meeting of the class in question. These rights shall not cease if, as a result of such cessation, the Company would become a subsidiary of any Shareholder; or

17.6.1.2 to receive dividends or other distributions otherwise attaching to those Shares or to any further shares in the capital of the Company issued in respect of those Shares, or in pursuance of an offer made to the relevant holder; and

27

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-141**

0696 - 233

17.6.2 the holder may be required, at any time following receipt of the notice, to transfer some or all of its Shares to any person(s) at the price that the Directors may require by notice in writing to that holder.

17.7 The rights referred to in article 17.6.1 may be reinstated by the Board on provision of the information required by the Board under article 17.6.1 or, if earlier, shall be reinstated on the completion of any transfer referred to in article 17.6.2

## 18. Drag Along

18.1 In the event that:

18.1.1 the holders of at least 60% of the Ordinary Shares then issued or issuable upon conversion of the Preferred Shares (the "**Selling Investors**");

18.1.2 the Board; and

18.1.3 the holders of a majority of the then outstanding Ordinary Shares voting as a separate class,

(collectively, the "**Electing Holders**") approve a Sale of the Company in writing, specifying that this article 18 shall apply to such transaction, then, subject to satisfaction of each of the conditions set forth in article 18.1.10.1 below, each Shareholder and the Company hereby agrees:

18.1.4 if such transaction requires shareholder approval, with respect to all Shares that such Shareholder owns or over which such Shareholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favour of, and adopt, such Sale of the Company (together with any related amendment or restatement to the Articles required to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

18.1.5 if such transaction is a Share Sale, to sell the same proportion of Shares (in the case of Preferred Shares, calculated on an as-converted basis) beneficially held by such Shareholder as is being sold by the Selling Investors to the person to whom the Selling Investors propose to sell their Shares, and, except as permitted in article 18.2 below, on the same terms and conditions as the other Shareholders;

18.1.6 to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Selling Investors in order to carry out the terms and provision of this article 18, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, any associated indemnity agreement, or escrow agreement, any associated voting, support, or joinder agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and

28

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## Defense Exhibit 17-142

0696 - 234

clear of impermissible liens, claims and encumbrances), and any similar or related documents;

18.1.7 not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares of the Company owned by such party or Affiliate in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquirer in connection with the Sale of the Company;

18.1.8 to refrain from:

18.1.8.1    exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company; or

18.1.8.2    asserting any claim or commencing any suit: (i) challenging the Sale of the Company, or (ii) alleging a breach of any fiduciary duty of the Selling Investors or any affiliate or associate thereof (including, without limitation, aiding and abetting breach of fiduciary duty), in connection with the evaluation, negotiation or entry into the Sale of the Company, or the consummation of the transactions contemplated thereby;

18.1.9 if the consideration to be paid in exchange for the Shares pursuant to this article 18 includes any securities and due receipt thereof by any Shareholder would require under applicable law:

18.1.9.1    the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or

18.1.9.2    the provision to any Shareholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "**accredited investors**" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"),

the Company may cause to be paid to any such Shareholder in lieu thereof, against surrender of the Shares which would have otherwise been sold by such Shareholder, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Shareholder would otherwise receive as of the date of the issuance of such securities in exchange for the Shares; and

18.1.10 in the event that the Selling Investors, in connection with such Sale of the Company, appoint a shareholder representative (the "**Shareholder Representative**") with respect to matters affecting the Shareholders under the applicable definitive transaction agreements following consummation of such Sale of the Company:

<div align="center">29</div>

92129987.10

<div align="center">

## Defense Exhibit 17-143

0696 - 235
</div>

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

18.1.10.1    to consent to: (i) the appointment of such Shareholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Shareholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Shareholder Representative in connection with such Shareholder Representative's services and duties in connection with such Sale of the Company and its related service as the representative of the Shareholders; and

18.1.10.2    not to assert any claim or commence any suit against the Shareholder Representative or any other Shareholder with respect to any action or inaction taken or failed to be taken by the Shareholder Representative, within the scope of the Shareholder Representative's authority, in connection with its service as the Shareholder Representative, absent fraud, bad faith, gross negligence or willful misconduct.

18.2    Notwithstanding anything to the contrary set forth herein, a Shareholder will not be required to comply with article 18.1 above in connection with any proposed Sale of the Company (the "**Proposed Sale**"), unless:

18.2.1    any representations and warranties to be made by such Shareholder in connection with the Proposed Sale are limited to representations and warranties related to authority, ownership and the ability to convey title to such Shares, including, but not limited to, representations and warranties that:

18.2.1.1    the Shareholder holds all right, title and interest in and to the Shares such Shareholder purports to hold, free and clear of all liens and encumbrances;

18.2.1.2    the obligations of the Shareholder in connection with the transaction have been duly authorized, if applicable;

18.2.1.3    the documents to be entered into by the Shareholder have been duly executed by the Shareholder and delivered to the acquirer and are enforceable (subject to customary limitations) against the Shareholder in accordance with their respective terms; and

18.2.1.4    neither the execution and delivery of documents to be entered into by the Shareholder in connection with the transaction, nor the performance of the Shareholder's obligations thereunder, will cause a breach or violation of the terms of any agreement to which the Shareholder is a party, or any law or judgment, order or decree of any court or governmental agency that applies to the Shareholder;

18.2.2    in the case of an Investor, such Investor is not required to:

30

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-144**

0696 - 236

18.2.2.1     agree (unless such Investor is a Company officer or employee) to any restrictive covenant in connection with the Proposed Sale (including without limitation any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Proposed Sale);

18.2.2.2     enter into a release of claims or other rights (other than a release of claims relating to such Investor's equity interest in the Company and status as an equity holder in the Company;

18.2.2.3     agree to any confidentiality obligations that are inconsistent with the confidentiality obligations of the Investor under this Agreement or any other confidentiality agreement then in effect between the Investor and the Company; or

18.2.2.4     amend, extend or terminate any contractual or other relationship with any person (whether the Company, the acquirer, their respective affiliates, or otherwise) except that the Investor may be required to agree to terminate the investment-related documents between or among such Shareholder, the Company and/or other shareholders of the Company;

18.2.3   the Shareholder is not liable for the breach of any representation, warranty or covenant made by any other person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any shareholder of any of identical representations, warranties and covenants provided by all shareholders);

18.2.4   liability shall be limited to such Shareholder's applicable share (determined based on the respective proceeds payable to each Shareholder in connection with such Proposed Sale in accordance with the provisions of the Articles) of a negotiated aggregate indemnification amount that applies equally to all Shareholders but that in no event exceeds the amount of consideration otherwise payable to such Shareholder in connection with such Proposed Sale, except with respect to claims related to fraud by such Shareholder, the liability for which need not be limited as to such Shareholder;

18.2.5   upon the consummation of the Proposed Sale:

18.2.5.1     each holder of each class or series of Shares will receive the same form of consideration for their shares of such class or series as is received by other holders in respect of their shares of such same class or series of share;

18.2.5.2     each holder of a series of Preferred Shares will receive the same amount of consideration per share of such series of Preferred

<div align="center">31</div>

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

<div align="center">**Defense Exhibit 17-145**

0696 - 237</div>

Shares as is received by other holders in respect of their shares of such same series;

18.2.5.3 each holder of Ordinary Shares will receive the same amount of consideration per Ordinary Share as is received by other holders in respect of their Ordinary Shares; and

18.2.5.4 unless waived pursuant to the terms of the Articles and as may be required by law, the aggregate consideration receivable by all holders of the Preferred Shares and Ordinary Shares shall be allocated among the holders of Preferred Shares and Ordinary Shares on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Shares and the holders of Ordinary Shares are entitled in a Deemed Liquidation Event (assuming for this purpose that the Proposed Sale is a Deemed Liquidation Event) in accordance with these Articles; provided, however, that, notwithstanding the foregoing provisions of this article 18.2.5.4, if the consideration to be paid in exchange for the Key Holder Shares or Investor Shares, pursuant to this article 18.2.5.4 includes any securities and due receipt thereof by any Investor or Key Holder (as applicable) would require under applicable law (i) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (ii) the provision to any Key Holder or Investor of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "**accredited investors**" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Key Holder or Investor in lieu thereof, against surrender of the Key Holder Shares or Investor Shares, as applicable, which would have otherwise been sold by such Key Holder or Investor, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Key Holder or Investor would otherwise receive as of the date of the issuance of such securities in exchange for the Key Holder Shares or Investor Shares, as applicable.

18.3 No Shareholder shall be a party to any Share Sale unless:

18.3.1 all holders of Preferred Shares are allowed to participate in such transaction(s); and

18.3.2 the consideration received pursuant to such transaction is allocated among the parties thereto in the manner specified in the Articles (as if such transaction(s) were a Deemed Liquidation Event),

<div align="center">32</div>

92129987.10

<div align="center">

## Defense Exhibit 17-146

0696 - 238

</div>

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

save where a Preferred Majority elect to allocate the consideration differently by written notice given to the Company at least 10 days prior to the effective date of any such transaction or series of related transactions.

**19.    Constitution of the Board**

19.1    The number of Directors constituting the Board shall not be less than two (2) and not more than five (5).

19.2    The holders of a majority of the total of the Series A Preferred Shares and Series A1 Preferred Shares (voting together as a single class on an as-converted basis) shall have the right to appoint and maintain in office one person as a Director and to remove any Director so appointed and, upon his removal to appoint another person as a Director in his place by notice in writing to the Company ("**Series A Director**").

19.3    The holders of a majority of the Series Seed Preferred Shares shall have the right to appoint and maintain in office one person as a Director and to remove any Director so appointed and, upon his removal to appoint another person as a Director in his place by notice in writing to the Company ("**Series Seed Director**").

19.4    The Chief Executive Officer of the Company (if any) shall be appointed as a Director.

19.5    The Board shall have the right to appoint and maintain in office one person as a Director and to remove any Director so appointed and, upon his removal to appoint another person as a Director in his place, provided that such individual is not connected with the Company ("**Independent Director**"). At the Adoption Date, John William Dick shall be designated as the Independent Director for the time being.

19.6    Each Investor Director shall be entitled at his request to be appointed to any committee of the Board or and to the board of directors of any subsidiary undertaking established from time to time.

19.7    The Shareholders shall not vote their Shares so as to remove an Investor Director from office.

19.8    An appointment or removal of a Director under articles 19.2 to 19.5 (inclusive) will take effect at and from the time when the notice is received at the registered office of the Company or produced to a meeting of the directors of the Company.

**20.    Alternate Directors**

20.1    Notwithstanding any provision of these Articles to the contrary, any person appointed as a Director (the "**Appointor**") may appoint any Director or any other person as he thinks fit to be his alternate Director to:

20.1.1    exercise that Director's powers; and

20.1.2    carry out that Director's responsibilities in relation to the taking of decisions by the Directors in the absence of the alternate's Appointor.

33

92129987.10

**Defense Exhibit 17-147**

0696 - 239

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

The appointment of an alternate director shall not require approval by a resolution of the Directors.

20.2 Any appointment or removal of an alternate must be effected by notice in writing to the Company signed by the Appointor, or in any other manner approved by the Directors.

20.3 The notice must:

20.3.1 identify the proposed alternate; and

20.3.2 in the case of a notice of appointment, contain a statement signed by the proposed alternate that the proposed alternate is willing to act as the alternate of the Director giving the notice.

20.4 An alternate director may act as an alternate to more than one Director and has the same rights, in relation to any Directors' meeting (including as to notice) or Directors' written resolution, as the alternate's Appointor.

20.5 Except as these Articles specify otherwise, alternate directors:

20.5.1 are deemed for all purposes to be Directors;

20.5.2 are liable for their own acts and omissions;

20.5.3 are subject to the same restrictions as their Appointors; and

20.5.4 are not deemed to be agents of or for their Appointors,

and, in particular (without limitation), each alternate director shall be entitled to receive notice of all meetings of Directors and of all meetings of committees of Directors of which his Appointor is a member.

20.6 A person who is an alternate director but not a Director:

20.6.1 may be counted as participating for the purposes of determining whether a quorum is participating (but only if that person's Appointor is not participating); and

20.6.2 may sign a Directors' written resolution (but only if his Appointor is an Eligible Director in relation to that decision, but does not participate).

No alternate may be counted as more than one Director for such purposes.

20.7 A Director who is also an alternate director is entitled, in the absence of his Appointor, to a separate vote on behalf of each Appointor, in addition to his own vote on any decision of the Directors (provided that his Appointor is an Eligible Director in relation to that decision).

<div align="center">34</div>

92129987.10

<div align="center">

## Defense Exhibit 17-148

0696 - 240

</div>

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

20.8    An alternate director is not entitled to receive any remuneration from the company for serving as an alternate director, except such part of the alternate's Appointor's remuneration as the Appointor may direct by notice in writing made to the Company.

20.9    An alternate director's appointment as an alternate shall terminate:

    20.9.1    when the alternate's Appointor revokes the appointment by notice to the Company in writing specifying when it is to terminate;

    20.9.2    on the occurrence in relation to the alternate of any event which, if it occurred in relation to the alternate's Appointor, would result in the termination of the Appointor's appointment as a Director;

    20.9.3    on the death of the alternate's Appointor; or

    20.9.4    when the alternate's Appointor's appointment as a Director terminates.

## 21.    Proceedings at meetings of Directors

21.1    The quorum for Directors' meetings shall be three Directors. If such a quorum is not present within half an hour from the time appointed for the meeting, or if during a meeting such quorum ceases to be present, the meeting shall stand adjourned to the same day in the next week at the same time and place or at such time and place as determined by the Directors present at such meeting.

21.2    In the event that a meeting of the Directors is attended by a Director who is acting as alternate for one or more other Directors, the Director or Directors for whom he is the alternate shall be counted in the quorum despite their absence, and if on that basis there is a quorum the meeting may be held despite the fact (if it is the case) that only one Director is physically present.

21.3    If all the Directors participating in a meeting of the Directors are not physically in the same place, the meeting shall be deemed to take place where the largest group of participators in number is assembled.  In the absence of a majority the location of the chairman shall be deemed to be the place of the meeting.

21.4    Notice of a Directors' meeting need not be given to Directors who waive their entitlement to notice of that meeting, by giving notice to that effect to the Company at any time before or after the date on which the meeting is held.  Where such notice is given after the meeting has been held, that does not affect the validity of the meeting, or of any business conducted at it.

21.5    Provided (if these Articles so require) that he has declared to the Directors, in accordance with the provisions of these Articles, the nature and extent of his interest (and subject to any restrictions on voting or counting in a quorum imposed by the Directors in authorising a Relevant Interest), a Director may vote at a meeting of the Directors or of a committee of the Directors on any resolution concerning a matter in which he has an interest, whether a direct or an indirect interest, or in relation to

35

92129987.10

**Defense Exhibit 17-149**
0696 - 241

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

which he has a duty and shall also be counted in reckoning whether a quorum is present at such a meeting.

21.6    Questions arising at any meeting of the Directors shall be decided by a majority of votes. In the case of an equality of votes, the chairman (if any is appointed) shall not have a second or casting vote.

21.7    A decision of the Directors may take the form of a resolution in writing, where each Eligible Director has signed one or more copies of it, or to which each Eligible Director has otherwise indicated agreement in writing (including confirmation given by electronic means). Reference in article 7(1) of the Model Articles to article 8 of the Model Articles shall be deemed to include a reference to this article also.

## 22.    Directors' interests

*Specific interests of a Director*

22.1    Subject to the provisions of the Act and provided (if these Articles so require) that he has declared to the Directors in accordance with the provisions of these Articles, the nature and extent of his interest, a Director may (save as to the extent not permitted by law from time to time), notwithstanding his office, have an interest of the following kind:

22.1.1    where a Director (or a person connected with him) is party to or in any way directly or indirectly interested in, or has any duty in respect of, any existing or proposed contract, arrangement or transaction with the Company or any other undertaking in which the Company is in any way interested;

22.1.2    where a Director (or a person connected with him) is a director, employee or other officer of, or a party to any contract, arrangement or transaction with, or in any way interested in, anybody corporate promoted by the Company or in which the Company is in any way interested;

22.1.3    where a Director (or a person connected with him) is a Shareholder or a shareholder in, employee, director, member or other officer of, or consultant to, a parent undertaking of, or a subsidiary undertaking of a parent undertaking of, the Company;

22.1.4    where a Director (or a person connected with him) holds and is remunerated in respect of any office or place of profit (other than the office of auditor) in respect of the Company or body corporate in which the Company is in any way interested;

22.1.5    where a Director is given a guarantee, or is to be given a guarantee, in respect of an obligation incurred by or on behalf of the Company or anybody corporate in which the Company is in any way interested;

22.1.6    where a Director (or a person connected with him or of which he is a member or employee) acts (or anybody corporate promoted by the Company or in

36

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-150**

0696 - 242

which the Company is in any way interested of which he is a director, employee or other officer may act) in a professional capacity for the Company or anybody corporate promoted by the Company or in which the Company is in any way interested (other than as auditor) whether or not he or it is remunerated for this;

22.1.7  an interest which cannot reasonably be regarded as likely to give rise to a conflict of interest; or

22.1.8  any other interest authorised by ordinary resolution.

*Interests of an Investor Director*

22.2  In addition to the provisions of article 22.1, subject to the provisions of the Act and provided (if these Articles so require) that he has declared to the Directors in accordance with the provisions of these Articles, the nature and extent of his interest, where a Director is an Investor Director he may (save as to the extent not permitted by law from time to time), notwithstanding his office, have an interest arising from any duty he may owe to, or interest he may have as an appointee, employee, director, trustee, member, partner, officer or representative of, or a consultant to, or direct or indirect investor (including without limitation by virtue of a carried interest, remuneration or incentive arrangements or the holding of securities) in:

22.2.1  one or more of the Shareholders who has appointed him as a Director; or

22.2.2  a Fund Manager which advises or manages one or more of the Shareholders who has appointed him as a Director;

22.2.3  any of the funds advised or managed by a Fund Manager who advises or manages one or more of the Shareholders who has appointed him as a Director; or

22.2.4  another body corporate or firm in which a Fund Manager who advises or manages one or more of the Shareholders who has appointed him as a Director or any fund advised or managed by such Fund Manager has directly or indirectly invested, including without limitation any portfolio companies.

*Interests of which a Director is not aware*

22.3  For the purposes of this article 22, an interest of which a Director is not aware and of which it is unreasonable to expect him to be aware shall not be treated as an interest of his.

*Accountability of any benefit and validity of a contract*

22.4  In any situation permitted by this article 22 (save as otherwise agreed by him) a Director shall not by reason of his office be accountable to the Company for any benefit which he derives from that situation and no such contract, arrangement or transaction shall be avoided on the grounds of any such interest or benefit.

37

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-151**
0696 - 243

*Terms and conditions of Board authorisation*

22.5    Subject to Article 22.6 any authority given in accordance with section 175(5)(a) of the Act in respect of a Director ("**Interested Director**") who has proposed that the Directors authorise his interest ("**Relevant Interest**") pursuant to that section may, for the avoidance of doubt:

    22.5.1    be given on such terms and subject to such conditions or limitations as may be imposed by the authorising Directors as they see fit from time to time, including, without limitation:

        22.5.1.1    restricting the Interested Director from voting on any resolution put to a meeting of the Directors or of a committee of the Directors in relation to the Relevant Interest;

        22.5.1.2    restricting the Interested Director from being counted in the quorum at a meeting of the Directors or of a committee of the Directors where such Relevant Interest is to be discussed; or

        22.5.1.3    restricting the application of the provisions in articles 22.7 and 22.8, so far as is permitted by law, in respect of such Interested Director;

    22.5.2    be withdrawn, or varied at any time by the Directors entitled to authorise the Relevant Interest as they see fit from time to time; and

    subject to article 22.6, an Interested Director must act in accordance with any such terms, conditions or limitations imposed by the authorising Directors pursuant to section 175(5)(a) of the Act and this article 22.

*Terms and conditions of Board authorisation for an Investor Director*

22.6    Notwithstanding the other provisions of this article 22, it shall not (save with the consent in writing of an Investor Director) be made a condition of any authorisation of a matter in relation to that Investor Director in accordance with section 175(5)(a) of the Act, that he shall be restricted from voting or counting in the quorum at any meeting of, or of any committee of the Directors or that he shall be required to disclose, use or apply confidential information as contemplated in article 22.8.

*Director's duty of confidentiality to a person other than the Company*

22.7    Subject to article 22.8 (and without prejudice to any equitable principle or rule of law which may excuse or release the Director from disclosing information, in circumstances where disclosure may otherwise be required under this article 22), if a Director, otherwise than by virtue of his position as a Director, receives information in respect of which he owes a duty of confidentiality to a person other than the Company, he shall not be required:

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-152**
0696 - 244

22.7.1 to disclose such information to the Company or to any Director, or to any officer or employee of the Company; or

22.7.2 otherwise to use or apply such confidential information for the purpose of or in connection with the performance of his duties as a Director.

22.8 Where such duty of confidentiality arises out of a situation in which a Director has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the Company, article 22.7 shall apply only if the conflict arises out of a matter which falls within article 22.1 or article 22.2 or has been authorised under section 175(5)(a) of the Act.

*Additional steps to be taken by a Director to manage a conflict of interest*

22.9 Where a Director has an interest which can reasonably be regarded as likely to give rise to a conflict of interest, the Director shall take such additional steps as may be necessary or desirable for the purpose of managing such conflict of interest, including compliance with any procedures laid down from time to time by the Directors for the purpose of managing conflicts of interest generally and/or any specific procedures approved by the Directors for the purpose of or in connection with the situation or matter in question, including without limitation:

22.9.1 absenting himself from any discussions, whether in meetings of the Directors or otherwise, at which the relevant situation or matter falls to be considered; and

22.9.2 excluding himself from documents or information made available to the Directors generally in relation to such situation or matter and/or arranging for such documents or information to be reviewed by a professional adviser to ascertain the extent to which it might be appropriate for him to have access to such documents or information.

*Requirement of a Director is to declare an interest*

22.10 Subject to section 182 of the Act, a Director shall declare the nature and extent of any interest permitted by article 22.1 or article 22.2 at a meeting of the Directors, or by general notice in accordance with section 184 (notice in writing) or section 185 (general notice) of the Act or in such other manner as the Directors may determine, except that no declaration of interest shall be required by a Director in relation to an interest:

22.10.1 falling under article 22.1.7;

22.10.2 if, or to the extent that, the other Directors are already aware of such interest (and for this purpose the other Directors are treated as aware of anything of which they ought reasonably to be aware); or

22.10.3 if, or to the extent that, it concerns the terms of his service contract (as defined by section 227 of the Act) that have been or are to be considered by a meeting

39

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

92129987.10

**Defense Exhibit 17-153**
0696 - 245

of the Directors, or by a committee of Directors appointed for the purpose under these Articles.

*Shareholder approval*

22.11    Subject to section 239 of the Act, the Company may by ordinary resolution ratify any contract, transaction or arrangement, or other proposal, not properly authorised by reason of a contravention of any provisions of this article 22.

22.12    For the purposes of this article 22:

22.12.1    a conflict of interest includes a conflict of interest and duty and a conflict of duties;

22.12.2    the provisions of section 252 of the Act shall determine whether a person is connected with a Director;

22.12.3    a general notice to the Directors that a Director is to be regarded as having an interest of the nature and extent specified in the notice in any transaction or arrangement in which a specified person or class of persons is interested shall be deemed to be a disclosure that the Director has an interest in any such transaction of the nature and extent so specified.

## 23.    General meetings

23.1    If the Directors are required by the Shareholders under section 303 of the Act to call a general meeting, the Directors shall convene the meeting for a date not later than 28 days after the date on which the Directors became subject to the requirement under section 303 of the Act.

23.2    No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be any two or more Qualifying Persons provided that one or more of such Qualifying Persons represent(s) the holders of a majority of the total of the Series A Preferred Shares and the Series A1 Preferred Shares.

23.3    If any two or more Shareholders (or Qualifying Persons representing two or more Shareholders) attend the meeting in different locations, the meeting shall be treated as being held at the location specified in the notice of the meeting, save that if no one is present at that location so specified, the meeting shall be deemed to take place where the largest number of Qualifying Persons is assembled or, if no such group can be identified, at the location of the chairman.

## 24.    Lien

The lien conferred by Model Articles shall apply to all Shares of the Company whether fully paid or not, and to all Shares registered in the name of any person indebted or under liability to the Company, whether he is the sole registered holder of the Shares or one of several joint holders.

40

92129987.10

**Defense Exhibit 17-154**

0696 - 246

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**25.     Indemnity**

25.1     Subject to the Act, but without prejudice to any indemnity to which a director may otherwise be entitled, each director or other officer of the Company (other than any person (whether an officer or not) engaged by the Company as auditor) shall be indemnified out of the Company's assets against all costs, charges, losses, expenses and liabilities incurred by him as a director or other officer of the Company or any company that is a trustee of an occupational pension scheme (as defined in section 235(6) of the Act) in the actual or purported execution and/or discharge of his duties, or in relation thereto including any liability incurred by him in defending any civil or criminal proceedings, in which judgement is given in his favour or in which he is acquitted or the proceedings are otherwise disposed of without any finding or admission of any material breach of duty on his part or in connection with any application in which the court grants him relief from liability for negligence, default, breach of duty or breach of trust in relation to the Company's affairs.

25.2     The Company shall buy and maintain insurance against any liability falling upon its Directors or other officers or auditors which arises out of their respective duties to the Company, or in relation to its affairs.

**26.     Data Protection**

26.1     Each of the Shareholders and Directors (from time to time) consent to the processing of their personal data by the Company, its shareholders and directors (each a "**Recipient**") for due diligence exercises, compliance with applicable laws, regulations and procedures and the exchange of information amongst themselves. A Recipient may process such personal data either electronically or manually.

26.2     The personal data that may be processed for such purposes under this article 26 shall include any information which may have a bearing on the prudence or commercial merits of investing, or disposing of any shares (or other investment or security) in the Company. Other than as required by law, court order or any regulated authority, that personal data shall not be disclosed by a Recipient or any other person, except to:

26.2.1   its parent undertaking;

26.2.2   to subsidiary undertakings of that parent undertaking ("**Recipient Group Companies**");

26.2.3   to employees, directors and professional advisors of that Recipient or the Recipient Group Companies; and

26.2.4   to funds managed by any of the Recipient Group Companies.

26.3     Each of the Shareholders and Directors (from time to time) consent to the transfer of such personal data to persons acting on behalf of any Recipient and to the offices of any Recipient, both within and outside the European Economic Area, for the purposes stated above, where is it necessary or desirable to do so.

41

92129987.10

**Defense Exhibit 17-155**
0696 - 247

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**27.    Notices**

27.1    Subject to the requirements set out in the Act, any notice given or document sent or supplied to or by any person under these Articles, or otherwise sent by the Company under the Act, may be given, sent or supplied:

27.1.1    in hard copy form;

27.1.2    in electronic form; or

27.1.3    (by the Company) by means of a website (other than notices calling a meeting of Directors),

or partly by one of these means and partly by another of these means.

Notices shall be given and documents supplied in accordance with the procedures set out in the Act, except to the extent that a contrary provision is set out in this article 27.

*Notices in hard copy form*

27.2    Any notice or other document in hard copy form given or supplied under these Articles may be delivered or sent by first class post (airmail if overseas):

27.2.1    to the Company or any other company at its registered office; or

27.2.2    to the address notified to or by the Company for that purpose; or

27.2.3    in the case of an intended recipient who is a member or his legal personal representative or trustee in bankruptcy, to such member's address as shown in the Company's register of members; or

27.2.4    in the case of an intended recipient who is a Director or alternate, to his address as shown in the register of Directors; or

27.2.5    to any other address to which any provision of the Companies Acts (as defined in the Act) authorises the document or information to be sent or supplied; or

27.2.6    where the Company is the sender, if the Company is unable to obtain an address falling within one of the addresses referred to in articles 27.2.1 to 27.2.5 above, to the intended recipient's last address known to the Company.

27.3    Any notice or other document in hard copy form given or supplied under these Articles shall be deemed to have been served and be effective:

27.3.1    if delivered, at the time of delivery;

27.3.2    if posted, on receipt or 48 hours after the time it was posted, whichever occurs first.

*Notices in electronic form*

42

92129987.10

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 17-156**

0696 - 248

27.4    Subject to the provisions of the Act, any notice or other document in electronic form given or supplied under these Articles may:

27.4.1    if sent by fax or email (provided that a fax number or an address for email has been notified to or by the Company for that purpose), be sent by the relevant form of communication to that address;

27.4.2    if delivered or sent by first class post (airmail if overseas) in an electronic form (such as sending a disk by post), be so delivered or sent as if in hard copy form under article 27.2; or

27.4.3    be sent by such other electronic means (as defined in section 1168 of the Act) and to such address(es) as the Company may specify:

27.4.3.1    on its website from time to time; or

27.4.3.2    by notice (in hard copy or electronic form) to all members of the Company from time to time.

27.5    Any notice or other document in electronic form given or supplied under these Articles shall be deemed to have been served and be effective:

27.5.1    if sent by facsimile or email (where a fax number or an address for email has been notified to or by the Company for that purpose), on receipt or 48 hours after the time it was sent, whichever occurs first;

27.5.2    if posted in an electronic form, on receipt or 48 hours after the time it was posted, whichever occurs first;

27.5.3    if delivered in an electronic form, at the time of delivery; and

27.5.4    if sent by any other electronic means as referred to in article 27.4.3, at the time such delivery is deemed to occur under the Act.

27.6    Where the Company is able to show that any notice or other document given or sent under these Articles by electronic means was properly addressed with the electronic address supplied by the intended recipient, the giving or sending of that notice or other document shall be effective notwithstanding any receipt by the Company at any time of notice either that such method of communication has failed or of the intended recipient's non-receipt.

43

92129987.10

**Defense Exhibit 17-157**

0696 - 249

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.