# Defense Exhibit 18

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## SHAREHOLDERS AGREEMENT

THIS **SHAREHOLDERS AGREEMENT** ("Agreement") is entered into on March 18, 2016, among: (i) Técnicas Marítimas Sustentables, S.A. de C.V., a company organized and existing under the laws of Mexico, with registered address at Av. Lázaro Cárdenas 2470, Piso1, Villas de San Agustín, San Pedro Garza García, N.L. México ("Mexican Investor"); and (ii) Lanius B.V., a company organized and existing under the laws of the Netherlands, having its registered office in Amsterdam, Netherlands, and its business office at Nanningh Cloecklaan 30, 2061 DB Bloemendaal, Netherlands ("Lanius"), for the direct or indirect participation in the capital, management, administration and control of **SIRIUS ENERGY, S.A. DE C.V.** ("Company"), an entity organized as a "sociedad anónima de capital variable" pursuant to the laws of Mexico. Mexican Investor and Lanius are referred to herein individually as a "Party" and together as the "Parties".

### RECITALS:

**WHEREAS,** it is the intention of the Parties to execute and deliver this Agreement (i) to set forth their commitment to jointly participate in the capital of the Company; (ii) to set forth their rights and obligations as shareholders of the Company ("Shareholders"); and (iii) to specify in further detail their understanding as to the investments, management, administration, control and the conduct of the business of the Company.

**WHEREAS,** the Company shall execute this Agreement for the purpose of acknowledging notice of the terms and conditions of this Agreement and where permitted by law or required by this Agreement, for the purpose of agreeing to give effect to the terms of this Agreement.

### REPRESENTATIONS:

Each Party hereby represents and warrants to the other Party that:

(a)    Such Party has the full power and authority to execute, deliver and perform its obligations under this Agreement. Each Party's legal representative, as identified in the signature section of this Agreement, has sufficient and necessary authority to execute this Agreement and to bind such Party by the terms hereof.

(b)    This Agreement, when executed and delivered by such Party, shall constitute its valid and binding obligations enforceable in accordance with its terms, subject to applicable insolvency law; and

(c)    Neither the execution nor the performance of this Agreement violates (i) any of the terms of the articles of incorporation, constituting documents or bylaws of such Party;(ii) any material order, law, regulation, license or authorization to which such Party is subject; or (iii) any material agreement to which such Party is a party.

**NOW, THEREFORE,** in consideration of the preliminary statements, representations and mutual agreements contained herein, the Parties hereto agree as follows:

**Defense Exhibit 18-1**

0689 - 120

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## ARTICLES

### ARTICLE 1. SUBJECT MATTER

1.1    The Parties have decided to enter into this Agreement to govern their respective interests, obligations, liabilities, ownership and rights in the Company, and to provide for the government of the Company.

1.2    This Agreement is intended to set forth (i) the commitment of the Parties to participate as shareholders of the Company; (ii) to define the scope of business of the Company; (iii) to delineate the manner in which all present and future Shareholders of the Company shall participate in the capital stock and the administration of the Business; and (iv) to supplement or define in further detail the provisions contained or to be contained in the Company Bylaws.

### ARTICLE 2. DEFINITIONS

2.1    Unless otherwise expressly defined in particular sections of this Agreement, capitalized terms used herein shall have the meaning ascribed to them in **Exhibit 1** attached hereto, and shall be deemed to include the singular or plural thereof, as may be applicable in the context of their use.

### ARTICLE 3. EFFECTIVE DATE; TERM AND TERMINATION

3.1    This Agreement shall become effective on the Effective Date, and shall remain in full force and effect with respect to any Party hereto, until the date any such Party or its Permitted Assignees cease to own, directly or indirectly, any Company Shares (or rights to receive any Company Shares).

3.2    Unless all conditions precedent listed on Section 3 of **Exhibit 3** attached hereto ("Closing Conditions") have been satisfied, as determined in good faith by both Lanius and TMS, by no later than April 10, 2016, this Agreement shall terminate and be of no further force and effect.

### ARTICLE 4. AMENDMENT TO BYLAWS; APPROVAL OF BUSINESS PLAN AND BUDGET.

4.1    As soon as practicably possible after the execution of this Agreement, the Parties shall unanimously approve all pertinent shareholders resolutions to (i) complete the Company's corporate conversion from a *Sociedad Anónima de Capital Variable* to a *Sociedad Anónima Promotora de Inversion de Capital Variable*; (ii) formalize Lanius's equity participation in the Company and its inclusion as Company Shareholder; (iii) amend the Company Bylaws ("Bylaws") as the Parties may mutually agree, in terms consistent with this Agreement; (iv) develop and approve the Company Business Plan; (v) approve Lanius's Initial Capital Commitment, the Call Schedule, the Distribution Waterfall and the Shareholder Registry as stated under **Exhibit 3** attached hereto; (vi) appoint members to the Company's Board of Directors in accordance with this Agreement and the Bylaws; (vii) designate

2



Company's Key Officers in accordance with this Agreement; (viii) subscribe the banking documents to grant joint control and signatory authority to the Company's CFO and a person appointed by the Mexican Investor in accordance with this Agreement; and (ix) give powers of attorney to such Key Officers and legal representatives (as required) in accordance with the terms set forth herein, the Bylaws or as otherwise agreed by the Parties.

4.2    Every June, at the latest, the CEO must present the Company's subsequent annual operating plan or budget to the Board for approval. The annual operating plan or budget must be duly authorized no later than December every year. Pending approval by the Board of the annual operating plan or budget, the previous annual operating plan or budget shall continue in effect and with the necessary changes having been made.

## ARTICLE 5. ORGANIZATION; DOMICILE; BYLAWS; PURPOSE; CAPITAL STRUCTURE.

5.1    **Organization and Bylaws.** The Company shall be reorganized and registered as a *Sociedad Anónima Promotora de Inversion de Capital Variable ("SAPI de CV")*, under the laws of Mexico as soon as practicably possible. The Articles of Incorporation and the Bylaws shall be (i) consistent with the terms of this Agreement mutually agreed by the Parties; (ii) formalized before a Notary Public; and (iii) registered at the applicable Public Registry of Commerce, all as soon as practicably possible.

5.2    **Duration of Company.** The duration of Company shall be undetermined (*indefinida*) from the date of the filing of the Articles of Incorporation and the Bylaws at the corresponding Public Registry of Commerce.

5.3    **Domicile; Principal Office.** The corporate domicile and the Company's principal place of business shall be in the municipality of Monterrey, Nuevo León, Mexico, or such other place to be mutually agreed by the Parties. The books and records of Company must be maintained at its headquarters.

5.4    **Business Purpose.** The primary purpose of the Company is to establish and operate the Business in Mexico, directly or through its Subsidiaries.

5.5    **Trading Business.** The Parties acknowledge the intent to form an energy trading company to be named Gulfport Trading SARL (or such other name agreed by the Parties), and commit to finalizing its Shareholders Agreement and developing the Parties' trading business under Gulfport (or such other agreed name) consistent with the existing draft Shareholders Agreement for Gulfport.

5.6    **Capital Structure.** The Bylaws shall provide that (i) the Company will have a variable capital, (ii) and a minimum fixed capital of MX$30,000.00 Pesos (thirty thousand 00/100 Pesos); (iii) the maximum authorized capital of the Company shall be unlimited; (iv) except as otherwise provided in this Agreement, the capital stock of the Company shall be represented by series of shares of voting stock, all of which shall be ordinary, nominative and without par value; and (v) except as otherwise provided in this Agreement, all Shares shall convey equal rights and obligations to all Shareholders, and each Share shall confer one (1)

3

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.



**Defense Exhibit 18-3**

0689 - 122

vote at any Shareholders Meeting. The Bylaws shall provide to the Company the right to issue a series of Shares with special, limited or no voting and/or economic rights, which may be offered to Company employees and/or consultants under stock option plans, employee compensation agreements or similar plans, or as otherwise agreed by the Parties hereto.

5.7    **Initial Shareholdings; Allocations and Distributions**. As a result of the approval of the organizational matters referred to in Section 4.1(ii), the Company shall be owned as follows:

(a)    Fifty percent (50%) by Mexican Investor, or by entities designated and owned by it; and

(b)    Fifty percent (50%) by Lanius, or by entities designated and owned by it.

The allocation of Company profits and losses will be made in accordance to the proportional percentages of outstanding Shares owned by each Party or Shareholder (if applicable). The liability of each Party or Shareholder is limited to its equity participation in the Company.

**ARTICLE   6.   INITIAL   AND   ADDITIONAL   CAPITALIZATION COMMITMENTS.**

6.1    The Parties shall contribute (directly or indirectly through their respective investment companies), whether by capital contributions, loans or other structures, all necessary funding for the Company to conduct its Business on a pro rata basis from time to time, in accordance to this Agreement, subject to the terms and conditions for the Initial Capital Commitments under Section 6.2 and additional contributions under Section 6.6..

6.2    The initial capital contribution commitments of the Parties ("Initial Capital Commitments") with respect to the Company are set forth in **Exhibit 3** attached hereto. Initial Capital Commitments are to be made in accordance with the capital call schedule ("Call Schedule") as listed on **Exhibit 3** attached hereto. All other capital contributions (other than the Initial Capital Commitments and additional contributions under Section 6.6) shall be made by the Parties on a pro rata basis and on an 'as-needed' basis to carry out the Company's Business Plan in accordance to the capital call procedure set forth in Section 6.3 to this Agreement. Subject to the provisions of Section 6.6, any additional contributions or funding by any of the Parties to the Company exceeding the Initial Capital Commitments will require the approval of the Board or Shareholders Meeting. The Parties shall make such additional contributions in the amounts and at the times so approved by the Board or Shareholders Meeting on a pro rata basis, provided that no Party shall be required to make a capital contribution, loan or funding exceeding its Initial Capital Commitment and additional contributions under Section 6.6 unless such capital contribution, loan or funding has been approved by such Party.

6.3    The capital contributions, loans or funding referred to in Sections 6.1, 6.2 and 6.6 (other than the Initial Capital Commitments) shall be made by the Parties as required under Section 6.2 in accordance with the following capital call procedure ("Capital Call"): the Chief Executive Officer appointed in Section 7.1 shall send to the Parties (as applicable), at the

4

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-4**

domiciles and emails identified in Section 13.3 or the Stock Transfer Book, a notice setting forth the complete amount being called and each Party's specific pro rata capital contribution, loan or funding ("Capital Call Notice") in the Capital Call Notice form determined by the CEO and approved by the Board. Each Party agrees to make or cause to be made the corresponding Capital Call contribution, loan or funding in favor of the Company within fifteen (15) business days after receipt of its respective Capital Call Notice.

(a)    In the event a Party fails to make, or cause to be made, the corresponding capital contribution, loan or funding on the due date as stated on the applicable Capital Call Notice ("Non-Contributing Party"), and such breach or failure to make, or cause to be made, the corresponding capital contribution, loan or funding is not cured within fifteen (15) business days from such due date, then the other Party ("Contributing Party") shall have the right (but not the obligation) to make the Capital Call in favor of the Company for the whole amount not contributed, loaned or funded by the Non-Contributing Party. In such instance, the following provisions shall apply:

(b)    Contributing Party shall have the right to receive a number of new Company Shares (and the Non-Contributing Party shall be diluted accordingly) based on the following formula: (i) to the extent such capital contributions, loans or funding are part of the annual operating plan or budget and have been approved by all Parties in a Shareholders Meeting, on the terms and conditions so approved; or (ii) in any other case, based on the following (A) total amount contributed or funded by Contributing Party divided (B) by "Fair Market Share Price", where Fair Market Share Price shall be the price per share as determined by an independent recognized investment banking firm to be mutually appointed and directed by the Parties to determine the price per share, as soon as reasonably practicable.

6.4    All contributions, loans and funding provided by the Parties pursuant to this Article 6 shall be registered as "capital contributions pending capitalizations" or "loans", as the Parties may agree. Capital contributions pending capitalization shall be capitalized into the Company a soon as possible, by means of Shareholders resolutions adopted at a Shareholders Meeting (or by written Shareholders resolutions in lieu of meetings). To that effect, the Parties agree to adopt (or cause each Shareholder to adopt) such Shareholders resolutions, from time to time, and as necessary to comply with this Section 6.4.

6.5    The Parties agree that any and all funds or proceeds from Lanius's Initial Capital Commitments will be exclusively used to pay for goods and services provided, and properly invoiced, for the Lazaro Cardenas facility project and other potential permits. Lanius recognizes that Mexican Investor has paid three million two hundred thousand US Dollars (US$3,200,000) for certain invoices related to the Lazaro Cardenas facility, and that this amount shall be reimbursed to Mexican Investor from Lanius's Initial Capital Commitment in accordance with Section 3 of Exhibit 3 attached hereto.

6.6    The Parties agree to fund the Company and/or use best efforts to jointly raise the necessary funds (including via capital investment) from third parties to meet Company's Business Plan (any such fund raised from third parties shall be referred to as "Additional Capitalization").

5

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-5**

6.7    If pursuant to <u>Section 6.6</u>, a third party presents to Company a bona fide offer to invest in the Company ("<u>Third Party Offer</u>"), which offer is for no more than fifty percent of the total outstanding capital stock of the Company and is made considering on a pre-money basis at least a 2.0 multiple the price implied by the amounts of all contributions made by the Mexican Investors and Lanius to the Company to the date of closing of the said investment ("Qualified Third Party Offer"), but such Qualified Third Party Offer is acceptable to only one of the Parties ("Consenting Party") and no to the other Party ("Non-Consenting Party"), Consenting Party shall provide a written notice of its desire for the Company to accept the Qualified Third Party Offer ("Acceptance Notice") to the Non-Consenting Party as soon as reasonably possible. The Parties agree that such investment shall be made in a Sub Holding so that the Parties remain Shareholders in the Company, but the Company shall own and operate its subsidiaries through the Sub Holding which will, together with the new third party investor, own, the subsidiaries of the Company.

Non-Consenting Party shall have the right, within thirty (30) days following its receipt of the Acceptance Notice, to provide notice to Consenting Party that Non-Consenting Party shall do one or more of the following: (i) provide all funding as contemplated by the Qualified Third Party Offer, or (ii) obtain a separate bona fide offer from a new investor on substantially the same terms as proposed in the Qualified Third Party Offer and which is acceptable to Consenting Party. Either of the above options must be at least under equal financial and legal terms as those set forth in the Qualified Third Party Offer.

If Non-Consenting Party is unable to implement above-options (i) or (ii) in a period of one hundred twenty (120) calendar days after receiving the Acceptance Notice, Company may accept the Qualified Third Party Offer. If the final terms and conditions of the Qualified Third Party Offer are different from the original terms and conditions presented to the Non-Consenting Party, the Consenting Party must re-offer the Qualified Third Party Offer to the Non-Consenting Party and this Section 6.7 must be followed.

For the avoidance of doubt, such Third Party Offer is to be calculated on a pre-money basis, and by way of example, an offer for 50% at a 2.0 multiple would require a pre-money value for Sirius of US$100.0 million, and require a cash investment into Sirius of US$100.0 million, resulting in a post-money value of US$200.0 million.

Any other Third Party Offer which is not a Qualified Third Party Offer must be acceptable to both Parties, failing which it shall be rejected by the Company. For the avoidance of doubt, any Third Party Offer which results in either Party having less than fifty percent (50%) of its respective ownership percentage in the Company as shown on Exhibit 3 shall require the consent of each Party, which consent may be withheld unconditionally; provided that if there is a Third Party Offer which is not a Qualified Third Party Offer only because it proposes the acquisition of more than fifty percent of the total outstanding capital stock of the Company, it may be accepted by the Company if either or both of the Parties agree to waive the provisions of the first clause of this sentence.

The Parties hereby agree that after the incorporation of the third party investor in the Sub Holding of the Company, any and all corporate matters to be addressed in the Sub Holding through a Shareholders Meeting the Company shall have previously approved such

6



This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-6**

0689 - 125

matter in accordance with, and on the same basis, as would be required to be approved per the terms of this Agreement before approving such matter in the Shareholders Meeting of the Sub Holding of the Company; and with respect to the matters to be addressed in the Board of Directors of the Sub Holding of the Company, the directors of the Sub Holding appointed by the Company shall vote as per the instructions of the Board of Directors of the Company.

### ARTICLE 7. MANAGEMENT TEAM; KEY OFFICERS.

7.1    **Appointment of Key Officers**. As soon as practicably possible after the execution of this Agreement, certain officers will be appointed as key officers of the Company ("Key Officers"), as follows:

(a)    The Chief Executive Officer ("CEO") shall always be unanimously appointed by the Board.

(b)    The Chief Financial Officer ("CFO") shall always be unanimously appointed by the Board.

The right of any Party to nominate the CEO or CFO as stated above shall terminate with respect to either Party when such Party holds less than ten percent (10%) of Company Shares.

Additional officers and legal counsel may be hired by the Key Officers (subject to the approval of the Board) as required to implement the Business Plan and carry out Company Business. Any other employee may be hired by the CEO.

7.2    Key Officers shall receive from the Company an annual salary to be determined and reviewed annually by the Board of Directors in accordance with applicable market conditions and considering the achievement of the Business Plan and the Company's performance.

7.3    Other specific terms of the employment of the Key Officers, such as annual leave, health insurance and other details shall be determined by the Board of Directors pursuant to market conditions and included in such Key Officers' employment or consulting contracts respectively.

7.4    If any of the Key Officers permanently leaves the Company or ceases to perform as officer for the Company by any reason, the nominating Party will have the right to replace such Key Officer within two (2) months following its departure and the terms of this Article shall apply.

7.5    **Corporate Assistance**. The Mexican Investors' corporate staff may assist the management of the Company (the "**Corporate Assistance**"). The fees to be paid by the Company for the Corporate Assistance shall be in compliance as per Section 11.5 of this Agreement.

7

**Defense Exhibit 18-7**

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## ARTICLE 8. BOARD OF DIRECTORS.

### 8.1    Board of Directors.

(a)    The administration of Company shall be entrusted to a board of directors ("Board" or "Board of Directors") comprised of certain number of directors (each a "Director" and collectively "Directors") appointed by each Party, as follows:

(i)    Mexican Investor shall appoint three (3) Directors and their respective alternates; and

(ii)    Lanius shall appoint three (3) Directors and their respective alternates.

The right of any Party to appoint Directors as stated above shall terminate with respect to either Party when such Party holds less than ten percent (10%) of Company Shares.

Directors may only be elected and appointed at Shareholders Meetings. Each Party, once having voting rights, hereby commits to vote in the respective Shareholders Meeting to comply with this provision.  Only the appointing Party shall have the right to remove the Director appointed by it, as the case may be. The Parties agree that, to the extent possible, the Board of Directors of Gen Manejos Integrales, S.A. de C.V. ("GMI") and any other Company Subsidiary will be comprised in the same manner as the Company Board, unless the Parties agree otherwise. Upon a permitted transfer of all Shares by a Party, the Permitted Assignee shall succeed and assume the remaining rights and obligations of the assignor Party under this provision. In case a third party purchaser acquires any Company Shares, these rights may be renegotiated and adjusted based, without limitation, on market conditions and proposed capital contributions (if any).

(b)    The Board shall have a chairman ("Chairman") and a corporate secretary. The Mexican Investor shall have the right to appoint the Chairman of the Board and Lanius shall have the right to appoint the Vice Chairman of the Board, each subject to prior approval by the respective counterparty. The corporate secretary need not be a Director and shall be unanimously appointed by the Parties. The Chairman shall preside over the meetings of the Board and shall have the authority to execute the resolutions approved by it. The Chairman shall be a Director then in office and shall have only one (1) vote in its capacity as Director. In case Directors' votes end up in a tie, the Chairman does not have a quality vote.

(c)    All Directors shall serve on the Board without compensation from Company for services rendered.  Any Director may also serve as an officer; in such instance it shall be entitled to receive compensation as determined by the Board.

### 8.2    Authority of the Board.

(a)    Except as otherwise expressly reserved by the Parties under this Agreement, the Bylaws or applicable laws, the business and affairs of the Company shall be managed under the direction of the Board, and the Board shall have all powers and authority to manage and direct the business and affairs of the Company. Any power not delegated pursuant to a power of attorney duly issued by the Board, shall remain with the Board. Any approval or

8

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.



**Defense Exhibit 18-8**

0689 - 127

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

action taken by the Board in accordance with this Agreement and the Bylaws shall constitute approval or action by the Company. Each Director shall have one (1) vote and all resolutions of the Board will be adopted in accordance with Section 8.5 hereof.

(b)     Except as otherwise set forth in this Agreement and to the extent legally permitted, the Board may delegate the necessary authority to conduct the business and affairs of the Company in the ordinary course of business to Company officers, employees and agents in accordance with the authority delegation policy adopted and revised from time to time by the Board.

8.3     **Calls for Board Meetings; Location.**

(a)     Board Meetings may be called by (i) any Board member, or (ii) any Shareholder or group of Shareholders holding at least ten percent (10%) of Company Shares. The Board meeting notice ("Board Meeting Notice") must be written and include the time, place, purpose and agenda for the Board Meeting. A Board Meeting Notice shall only be deemed effective upon delivery (to the domicile of each Director, which domicile shall be registered with the Company) by certified mail at least seven (7) days prior to the scheduled Board Meeting.  The Board Meeting Notice may only be issued after the Director or Shareholder calling the Board Meeting consults with the each Director to reasonably accommodate their calendar.

(b)     The Board Meeting shall take place at a location selected by the Board, but failing agreement, the Board Meeting shall take place in Monterrey, N.L., Mexico. Directors may participate in a Board Meeting by means of conference telephone or similar communication equipment which allows all persons participating in the Board meeting to hear each other, and such participation shall constitute 'presence in person' at such Board Meeting.

(c)     A Director's attendance to a Board Meeting shall constitute a waiver of Board Meeting Notice for that meeting, except when the Director attends a Board Meeting for the express purpose of objecting, at the beginning of the Board Meeting, to the transaction or voting of any business or Company matter because the Board Meeting has not been lawfully called or convened.

8.4     **Quorum for Board Meetings.**

(a)     A quorum at any Board meeting shall not exist unless a majority of the Board members are present at the meeting provided that, if such Board meeting is called to discuss any Reserved Matters as listed in **Exhibit 2** attached hereto, the attendance of at least one (1) Director appointed by each Party holding at least ten percent (10%) of Company Shares shall be required to constitute a quorum in order to discuss or vote on such Reserved Matter. No corporate or business action required to be taken by the Board shall be conducted unless a quorum is then present at the Board meeting.

9

**Defense Exhibit 18-9**
0689 - 128

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

(b)    The Bylaws shall provide that the voting at the Board Meetings shall be by the Directors 'presence in person' at such Board meeting. Directors shall not be allowed to vote by proxy.

(c)    The Bylaws shall provide that any action required or permitted to be taken at any Board Meeting may be taken without a physical meeting if all Directors consent thereto in writing.

8.5    **Required Vote for Board Meetings.** The Bylaws shall provide that a majority vote (51%) will be required to approve Board resolutions, provided however, that the approval of any Reserved Matters by the Board shall require the favorable vote of at least one (1) Director appointed by each Party holding at least ten percent (10%) of Company Shares (the above subject to any Shareholders approval required by law and by this Agreement). Notwithstanding, in addition to all other matters that may be or are required to be brought before a Board or Shareholders meeting for approval, all Reserved Matters shall always require approval of the Board or Shareholders Meeting, as applicable.

8.6    **Standard of Care.** Any Director in the performance of his duties shall be protected in relying in good faith on information, opinions, reports or statements if prepared or presented by: (i) one (1) or more Company officers or employees, or (ii) legal counsel, public accountants or other persons holding themselves out as having professional or expert competence and acting on behalf of the Company.

8.7    **Company Officers; Expenditures.** The Parties agree that the Board may, from time to time, establish, increase, reduce or otherwise modify Company officers' responsibilities, and create or eliminate offices as the Board may consider appropriate, including granting authority to make expenditures in excess of certain amounts as the Board may determine, subject to the limits established under the Reserved Matters.

## ARTICLE 9. ACCOUNTING PROVISIONS; STATUTORY SUPERVISORS.

9.1    The Company shall keep all necessary accounting and corporate books and records as required by Mexican law and international corporate best practices.

9.2    The Company shall prepare its financial statements and maintain its accounting records in accordance with Mexican accounting principles or *normas de información financiera* and applicable generally accepted accounting principles, consistently applied.

9.3    The Company taxable year and the fiscal year shall be the calendar year.

9.4    The Board shall choose a firm of independent certified public accountants in Mexico to perform an annual audit of the Company. The annual audit shall be made available to all Directors and Key Officers.

9.5    Only to the extent required by law, each Shareholder representing at least ten percent (10%) of Company Shares shall have the right to appoint one (1) statutory supervisor ("Comisario"). The Comisario shall be freely removed by the Shareholders who made the

10



**Defense Exhibit 18-10**

appointment, with or without cause, but (unless otherwise agreed to by the appointing Shareholders) shall remain in office indefinitely until his successor is elected.

9.6    The Parties hereby commit to execute all necessary banking documents to grant joint control and signatory authority over all Company and Subsidiary bank accounts (i) to the CFO and (ii) to an officer to be appointed by the Mexican Investor for any Company transactions over US$25,000 Dollars, attached hereto as **Exhibit 4**. The right to control bank accounts and execute banking documents as stated above shall terminate for any Party holding less than 10% of Company Shares.

## ARTICLE 10. SHAREHOLDERS MEETINGS OF COMPANY.

10.1    **Shareholder Authority.** Shareholders Meetings shall constitute the ultimate authority of the Company. Shareholders Meetings may approve and ratify any Company action or transaction, and their resolutions shall be executed by the person specifically appointed for that effect at such Shareholders Meeting, or, if no appointment is made, by the Chairman of the Board. Resolutions legally adopted at a Shareholders Meeting shall be legally binding to the Company, its Board and its Shareholders. Notwithstanding, in addition to all other matters that may be or are required to be brought before a Board or Shareholders Meeting for approval, all Reserved Matters shall always require approval of the Board or Shareholders Meeting, as applicable.

10.2    **Shareholders Meetings.** The Bylaws shall provide that the Shareholders Meetings be called at least once every year, within four (4) months of the expiry of each financial year to consider, resolve and approve, among other things, the Company annual accounts, or any transaction upon which the Shareholders are granted statutory voting rights, in accordance to applicable Mexican corporate law, subject to the requirements that the Parties hereto have agreed to regarding Shareholder Meeting quorum and motion approval.

10.3    **Notice to the Shareholders.**

(a)    The Bylaws shall provide that a Shareholders Meeting may be called by the Board (acting through its Chairman or secretary). Any Shareholder or group of Shareholders owning Shares representing at least ten percent (10%) of Company Shares may request the Chairman of the Board to call a Shareholders Meeting.

(b)    All notices calling for a Shareholders Meeting ("Shareholder Meeting Notice") shall be sent to each Shareholder in writing at least fifteen (15) days prior to the scheduled Shareholders Meeting (to each Shareholder's domicile or e-mail address as registered on the Stock Transfer Book). The Shareholders Meeting Notice shall contain an agenda, list all transactions to be discussed and shall be signed by the person calling for the Shareholders Meeting. No notice shall be required if, at the outset of the Shareholders Meeting, all issued and outstanding Shares of the Company are represented, either in person or by proxy.

10.4    **Quorum for Shareholders Meetings.**



11

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-11**

0689 - 130

(a)      No corporate or business action required to be taken by the Shareholders shall be conducted unless a quorum is then present at the meeting.

(b)      The Bylaws shall provide that a quorum at any Shareholders meeting shall be in accordance with the quorum requirements set forth in the applicable Mexican corporate law, provided that, if such meeting is called to discuss any Reserved Matter, a quorum shall not exist with respect to any such Reserved Matter unless each Party holding at least ten percent (10%) of Company Shares are present or represented at the Shareholders meeting.

(c)      If for any reason there is not a quorum at the outset of a scheduled Shareholders Meeting, there shall be a second Shareholders Meeting notice calling for a second meeting, and so on until a quorum is present.

10.5    **Required Vote for Shareholders Meetings**. The Bylaws shall provide that every Shareholder shall be entitled to one (1) vote per Share at the Shareholders Meetings, and that the minimum voting requirements set forth in the applicable Mexican corporate law are necessary to approve any action or transaction at the Shareholders Meetings, provided that, if such Shareholders Meeting is called to discuss any Reserved Matter listed under **Exhibit 2** attached hereto, the approval of any such Reserved Matter shall require (i) the favorable vote of the Shareholders representing at least fifty percent (50%) of all issued and outstanding Shares entitled to vote plus (ii) the favorable vote of each Party holding at least ten percent (10%) of Company Shares.

## ARTICLE 11. CERTAIN ADDITIONAL RIGHTS AND OBLIGATIONS.

11.1    **Access to Books and Records**. The Parties, and their respective authorized representatives, may at all times during Company regular business hours review, inspect or copy any Company books or records for proper purposes. Any Party holding less than ten percent (10%) of Company Shares shall have access to books and records as provided by applicable Mexican corporate law.

11.2    **Confidentiality**.

(a)      Any information identified by any Party or the Company as confidential ("Confidential Information") shall be treated by the Parties as confidential. Each Party shall hold Confidential Information in strict confidence and restrict its disclosure to only such of its Subsidiaries, Affiliates, officers, employees and agents who have a proper need to know such Confidential Information. Each Party shall make all reasonable efforts and take all reasonable precautions as may be appropriate to maintain the secrecy and confidentiality of all Confidential Information. To the extent any Party proposes to disclose to any person Confidential Information in connection with a proposed transfer of all or any part of its Shares, the Party shall require that any prospective purchaser agree in writing to be bound by the provisions of a confidentiality agreement approved by the Board.

12

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-12**

**(b)**      No Party shall be subject to Section 11.2(a) to the extent that: (i) the Party, or any of its Affiliates or Subsidiaries, is required by law, in the reasonable judgment of such Party, to disclose Confidential Information, or (ii) any information is or becomes publicly available without breach of that Party's obligations of secrecy or confidentiality to the Company or any other Party.

**(c)**      None of the Parties shall make any press releases or other public disclosures concerning this Agreement, its contents or the fact that discussions and negotiations are taking place or have taken place, without the prior consent of the other Party, and this Agreement and its contents shall remain confidential.

**11.3**    **Preemptive Rights**. Except as otherwise specifically provided in this Agreement, the Parties agree, and the amended Bylaws shall provide, that each Party shall have a preemptive right to subscribe and pay its respective pro rata share of any new Shares that the Company may, from time to time, issue or propose to issue. In connection with the above, each Shareholder (i) shall receive at least thirty (30) calendar days in advance (to each Shareholder's domicile as registered on the Stock Transfer Book) the corresponding Shareholders Meeting Notice calling Shareholders to vote for the issuance of the new Shares at the Shareholders Meeting, and (ii) shall be notified personally of the initiation of the period granted for the exercise of preemptive rights, no later than on the date of initiation thereof, and (iii) shall be given no less than thirty (30) calendar days to exercise its preemptive rights.

**11.4**    **Exclusivity; Non-Competition; Other Opportunities.**

**(a)**      Each Party agrees that the Company shall be the exclusive vehicle through which each Party, its Affiliates or Subsidiaries, or parties related to or affiliated with either Party or its Affiliates or Subsidiaries, shall use to conduct Business in Mexico.

**(b)**      Each Party, notwithstanding any transfer to any Permitted Assignee, for itself and on behalf of its present and future equity holders and any of its Affiliates or Relatives, hereby covenants and agrees and shall covenant and agree with each other and the Company that, from the Effective Date until the termination of this Agreement with respect to such Party (and for a period of two (2) years thereafter in the case of a defaulting Party), (i) it will not use any vehicle or entity other than the Company to conduct Business in Mexico; and (ii) it will not enter into any agreements with any other person(s) with respect to acquiring or owning an interest in, or operating, a company or enterprise which is the same as or substantially similar to, or which competes directly with the Company Business or any of its Subsidiaries in Mexico or in such other places where the Business is carried on (except for portfolio investment representing no more than five percent (5%) of the total outstanding equity shares of any such company or enterprise whose equity shares are publicly traded or are listed on a stock exchange).

**(c)**      Each Party must present to the other Party with any business transaction or opportunity that may fall within the definition of Business ("**Exclusive Business Opportunity**"). The proposing Party ("**Proposing Party**") shall provide a written notice of the terms and conditions of the Exclusive Business Opportunity to the other Party ("**Other Party**") as soon as reasonably possible. The Other Party shall have thirty (30) days to

13



**Defense Exhibit 18-13**

0689 - 132

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

provide written notice to the Proposing Party on whether or not it will pursue such Exclusive Business Opportunity. If the Other Party is interested in the Exclusive Business Opportunity, the Parties shall enter into good faith negotiations to pursue the Exclusive Business Opportunity. If the Other Party is not interested in the Exclusive Business Opportunity, then the Proposing Party may pursue such Exclusive Business Opportunity on its own or with other parties, and such pursuit shall not be deemed a violation of Sections 11.4 (a) and (b). If the final terms and conditions of the Exclusive Business Opportunity are more favorable to any third party than the terms and conditions presented to the Other Party, the Proposing Party must re-offer the Exclusive Business Opportunity to the Other Party and this Section 11.4(c) must be followed. If the Parties agree to jointly pursue an Exclusive Business Opportunity, it shall be pursued through the Company, unless otherwise agreed by the Parties.

11.5 **Arms-Length Transactions**. The Parties agree that the Company shall be an independent, commercially operating enterprise and shall be managed upon commercial terms. The Company may only conduct business with any of its Shareholders, Affiliates or Subsidiaries on an *arm's length* basis and on commercial terms in accordance with the Business purpose of the Company and the terms hereof. To the extent any such business arrangements are Reserved Matters, the Company must have the prior approval of each Party holding at least (10%) of the Company Shares before agreeing or undertaking any such business arrangements.

Company and Mexican Investor hereby acknowledge and agree that (i) Lanius's liability shall be limited to its capital contributions in the Company, and (ii) Lanius is not, and shall not be, required to secure or guaranty any financial and legal obligations or covenants assumed by the Company under the GMI Transaction. In addition, Mexican Investor hereby agrees to release, protect, defend, indemnify and hold harmless Lanius, their Subsidiaries, and each of their officers, directors, managers, employees, agents, assigns, consultants and other contractors, from and against all claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes of action thereof, arising in connection with Section 5.2 of the Share Purchase Agreements detailed under the GMI Transaction.

11.6 **Dividend Policy**. The Company shall adopt a dividend policy to maximize the payment of dividends from available cash after the funding of a level of reserves appropriate to operate the Company in a commercially reasonable manner, as determined by the Board.

**ARTICLE 12. TRANSFERS OF SHARES.**

12.1 **General Restriction on Transfer**. No Party hereto or Shareholder shall, directly or indirectly, sell, assign or otherwise transfer, pledge or otherwise encumber (each a "Transfer"), any of its rights hereunder, any Shares issued by Company held by it, or rights in respect to any such Shares, directly or indirectly, except with the prior written consent, not to be unreasonably withheld, of all the non-transferring Parties or as specifically set forth in the following provisions of this Article 12.

**Defense Exhibit 18-14**

0689 - 133

**12.2    Transfers to Permitted Assignees.** Notwithstanding the provisions of Section 12.1, each Party shall have the unrestricted right to transfer any or all of its Shares (or rights to receive Shares) to Permitted Assignees of such Party as long as such Permitted Assignees are capable of carrying out their obligations and are not subject to any sanctions or similar restrictions, provided that the Permitted Assignee agrees to be bound and be subject to the terms of this Agreement, in the understanding that if any Party transfers less than all of its Company Shares to a Permitted Assignee, then the assignor Party and the Permitted Assignee shall be deemed one and the same "Party" for purposes of this Agreement and the combined interest of assignor Party and Permitted Assignee shall be deemed owned by one and the same party for voting purposes.

**12.3    Rights of First Offer.** Notwithstanding the provisions of Section 12.1, if a Party intends to sell or transfer, in any type of transaction or in a series of transactions, which must be on an arm's length basis, Shares or rights in respect of Company Shares held by it, to any bona fide third party purchaser (other than pursuant to Section 12.2), then such selling Party may make such transaction only after giving to the non-selling Party the option to purchase all the Shares intended to be transferred for the same consideration to be otherwise paid by the third party purchaser ("Preferential Option"). To this end, the selling Party shall provide written notice ("Option Notice") to the non-selling Party of the proposed transfer once such third party offer to purchase shares is final and binding (not subject to due diligence or legal confirmatory work), specifying (i) the proposed Shares to be transferred, (ii) the consideration to be paid for the Shares, and (iii) all material terms and conditions of the proposed transfer (including a copy of the offer made to or submitted by the proposed buyer plus all related, existing draft documentation). The non-selling Party shall have the right and option, for a period not to exceed forty five (45) days from receipt of the Option Notice, to provide written notice to the selling Party stating its intention to purchase all (but not less than all) the offered Shares ("Purchase Notice"), in which case the offered Shares shall be purchased (at the same price offered to the selling Party) by the non-selling Party or its designee within forty five (45) days of presenting the Purchase Notice. If the non-selling Party does not provide the Purchase Notice within the period stated above, then the selling Party shall have the right to sell the offered Shares to the third party purchaser, within a period not to exceed ninety (90) calendar days from non-selling Party's receipt of the Option Notice, on the same terms and conditions as those specified in the Option Notice.

**12.4    Tag-Along Rights and Registration Rights.**

(a)    If a non-selling Party does not exercise its Preferential Option under Section 12.3, such non-selling Party shall have the right to participate in the sale or transfer of Company Shares on the same terms and conditions stated under the Option Notice ("Tag-Along Party"). The Tag-Along Party must notify its election to participate in the Share sale or transfer and specify the number of Shares to be sold by giving notice to the selling Party and to the third party purchaser ("Tag-Along Notice") on or before the tenth (10th) Business Day after the expiration of the Preferential Option with respect thereto. The Tag-Along Party shall be bound and obligated to sell in the proposed sale on the same terms and conditions set forth in the Option Notice. Tag-along Party shall have the right to sell in a sale subject to this Section 12.4 the number of Shares ("Tag-Along Shares") equal to the product obtained by multiplying (i) the number of Shares held by the Tag-along Party by (ii) a fraction (A) the numerator of which is equal to the number of Shares the selling Party proposes to sell or transfer to the third

15



**Defense Exhibit 18-15**

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

party purchaser and (B) denominator of which is equal to the number of Shares then owned by such selling Party.

(b)     The Parties agree that a long-term aim of the venture is to coordinate the work between Mexican Investor and Lanius to jointly seek a direct public listing of Sirius on a best efforts basis and depending on market conditions. The Parties shall have equal, pro-rata rights of secondary sales, loan of shares to any green-shoe, lock-up provisions and any other restrictions or advantages.

(c)     In the event a Party or its holding company will become public, the other Party may request an exchange of its Shares in the Company (the "Exchanging Party") for shares in the company that will become public. The price (the "Price") shall be as determined by the placement agent, underwriter or other independent valuer to establish the basis and price upon which  the exchange of shares shall be consummated if both Parties are satisfied with the Price at its discretion, and upon such exchange and listing of shares, the Exchanging Party shall be entitled to have fully tradable and registered shares on a 'piggy-back' basis on the same terms and with the same rights as the party undergoing the public offering Furthermore, if there are any adverse tax consequences or costs resultant from an exchange into the public vehicle, those shall be borne solely by the exchanging party.

12.5     **Transfer Record**. The Company shall keep a stock transfer book in which it shall record the name and address of each Shareholder ("Stock Transfer Book"). No Transfer or issuance of any Shares shall be effective or valid unless and until recorded in such Stock Transfer Book. The Company shall not record any Transfer or Share issuance in such Stock Transfer Book unless the Transfer or Share issuance is in compliance with the provisions of this Agreement. Each Shareholder, in the event such Shareholder desires to make a Transfer within the provisions hereof, shall furnish to the Company such evidence of compliance with this Agreement as may be reasonably required by the Board or legal counsel for Company.

12.6     **Drag-Along**.

(a)     If either Party  receives an offer, from a bona fide third party, to purchase all, but not less than all, of the then outstanding Company Shares, the selling Party shall have the right to cause non-selling Party, and the non-selling Party shall be obligated to sell (together with the selling Party), all but not less than all of the Company Shares held by such non-selling Party, *but only provided that* the price at which the Company Shares are sold (i) allows the non-selling Party to recover at least three (3) times the amount of all contributions it has made to the Company to date, or (ii) if the Lázaro Cardenas terminal has been in operation for more than a year, such price is higher than six times (6x) the EBITDA for the last twelve (12) months.

(b)     To exercise the right specified in Section 12.6(a), the selling Party shall serve written notice to the non-selling Party ("Drag-Along Notice"), at least thirty (30) calendar days prior to the preliminary acceptance of any committed offer of a proposed sale. The Drag-Along Notice shall specify (i) cash price and/or other consideration to be paid by the third-

16



**Defense Exhibit 18-16**

party transferee to each selling Party, which price must satisfy the conditions in Section 12.6(a), (ii) the type of transaction and all material terms and conditions of the proposed transfer (including a copy of the offer by the bona fide third party plus all related documentation), and (iii) the identity of the third-party transferee.

(c)    The non-selling shall have the Rights of First Offer as defined in Section 12.3 in connection with any Drag-Along Notice.  The minimum notice period of forty five (45) days shall apply from the date of issuance of the Purchase Notice, contingent upon the transferee's final binding and irrevocable offer to purchase shares.

(d)    If the selling Party forwards the Drag-Along Notice exercising its drag-along right hereunder on the selected date and provides all conditions to closing, including those related to price as set forth above, have been satisfied and the non-selling Party does not exercise its Right of First Refusal, both Parties shall sell all their Company Shares to the third-party transferee at the same price and under the same terms and conditions as those applicable to the selling Party. All expenses incurred by selling Parties shall be paid by the Company.

12.7    **After-Acquired and After-Issued Shares.** Whenever any Shareholder or other person hereafter acquires any Shares, pursuant to this Agreement or otherwise, such shares so acquired shall be subject to all of the terms and provisions of this Agreement. During the effectiveness of this Agreement, the Company shall not issue or permit a Transfer of any Shares to any person unless, prior thereto or simultaneously therewith, such person has become or becomes a party to this Agreement.

12.8    **Enforcement of Transfers.** No Transfer of Shares shall be registered on the Stock Transfer Book nor shall any sale, assignment, transfer, pledge or other disposition thereof be effective unless and until the terms and provisions of this Agreement are first complied with. in case any transfer of Shares does not comply with the terms and provisions hereof in violation of this Agreement,  such sale, assignment, transfer, pledge or other disposition shall be invalid and of no effect.

12.9    **Endorsements.** The certificate or certificates representing Shares now owned or hereafter acquired by the Shareholders shall have conspicuously stamped, printed or typed on the face or on the back thereof the following legend:

> **THE RIGHT TO SELL, TRANSFER OR OTHERWISE DISPOSE OF OR PLEDGE THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO CERTAIN RESTRICTIONS AND AGREEMENTS SET FORTH IN A SHAREHOLDERS AGREEMENT DATED MARCH 18, 2016, AMONG THE COMPANY'S SHAREHOLDERS.**

12.10    **Termination.** This Article 12 shall automatically terminate upon the first date on which Company has consummated its first public offering of Shares pursuant to an effective registration under applicable Mexican securities laws and the Company has been accepted for listing on the Mexican Stock Exchange.

17

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-17**

## ARTICLE 13. GENERAL PROVISIONS.

13.1    Waivers. Any waiver of any breach of or failure to comply with any provision of this Agreement shall be in writing and approved by all Parties.

13.2    Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and Permitted Assignees. Except as expressly permitted in this Agreement, and without limiting any rights to assign Shares pursuant to Section 12.2, no Party shall assign any rights granted to it or delegate any duties imposed on it by this Agreement; provided, however, that each Party may, at any time and without any restrictions or consents of any kind, assign this Agreement in its entirety to any of its Permitted Assignees, in each such case, the Permitted Assignee shall be bound by the terms of this Agreement as if (s)he or it were an original signatory hereto.

13.3    Notices. Except as otherwise expressly provided herein, all notices and other communications required by or contemplated under this Agreement, shall be in writing and shall be deemed to have been given and delivered (i) upon receipt, when delivered by hand, or (ii) two (2) business days after having been sent by overnight delivery service, to the respective addresses of the Parties set forth below:

(a) If to Mexican Investor at:

Av. Lázaro Cárdenas 2470, Piso1
Villas de San Agustín
San Pedro Garza García, N.L. México
C.P. 66266
Attn.: Guillermo Canales
Email: gcanales@pasa.mx
Tel: +5281-13664618

Copy to: Federico Gil Chaveznava - fgil@perseus.energy
                Fernando Duran - fduran@garzaduran.com

(b) If to Lanius:

c/o Salamander
Rue du Rhone 56
1204 Geneva, Switzerland
Attn: Leonard Obrien
Email: leonard.obrien@salamanderinternational.com

c/o HVK Stevens Consultancy
Prins Bernhardplein 200
1097 JB Amsterdam, the Netherlands
Attn: Remco Polderman
E-mail: Remco Polderman - r.polderman@hvkstevens.com

18

**Defense Exhibit 18-18**

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Copy to: Thomas Ehr - ehrtom@yahoo.com
Graham Collett - graham@gacollett.com
Stephen Buscher - stephenbuscher@gmail.com

or to such other address or to such other person as any Party shall have last designated by notice to the other Parties, as the case may be.

13.4    **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.

13.5    **Parties Not Agents**. Nothing in this Agreement shall be construed to constitute a Party as partner or as agent for one another Party, or to render any Party liable for any debts, liabilities or obligations of the other Party.

13.6    **Governing Law**. This Agreement shall be governed, construed, and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws rules, except with respect to corporate matters of the Company and its Mexican subsidiaries to the extent such corporate matters are mandatorily governed by Mexican law.

13.7    **Heading; Construction**. The headings of the articles and sections of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part of this Agreement. Unless otherwise specifically stated, references in this Agreement to Articles, Sections, Exhibits refer to Articles, Sections or Exhibits of this Agreement.

13.8    **Severability**. If any provision of this Agreement or any portion thereof is declared by any court to be unenforceable, invalid or illegal, the remainder of such provision and all the remaining provisions of this Agreement shall continue to be in full force and effect.

13.9    **Further Assurances**. Each Party agrees that, from time to time, upon reasonably request of other Party, it shall make, execute, acknowledge, deliver, file and record any of the following: (i) any corporate resolution, certificate of incumbency, certificate of good standing and any other reasonable document requested by any Party evidencing such other Party's authority to enter and execute this Agreement and any other agreement related hereto; (ii) all documents, certificates or other instruments which may be required for the consummation of the transactions contemplated hereby; and (iii) all documents, certificates or other instruments which may be required or reasonably considered advisable under any applicable law.

13.10   **Publicity**. Except as may be required in connection with governmental fillings and except as required by law, any announcements or similar publicity with respect to the transactions contemplated by this Agreement, shall be mutually agreed upon by the Parties as to content, timing and method of dissemination before issuance.



19

**Defense Exhibit 18-19**

13.11  **Costs and Expenses.** Except as otherwise provided herein, each Party shall pay its own costs and expenses incurred in connection with the negotiation, preparation and performance of this Agreement and related documents, including but not limited to, legal fees and travel costs and expenses. The costs and expenses in setting up the Company shall be borne in proportion to each Party's interests in the Company unless otherwise mutually agreed.

13.12  **Entire Agreement.** This Agreement shall constitute the complete and exclusive agreement between the Parties in relation to the administration, participation and operation of the Company. The Parties hereby agree upon that, upon the Effective Date, this Agreement shall supersede any and all prior discussions, negotiations, representations, agreements and communications between the Parties in relation to the administration, participation, operation and control of the Company.

13.13  **Amendment.** This Agreement may be amended only by a written instrument executed by all of the Parties hereto.

13.14  **Dispute Resolution.** In the event of any dispute, claim, controversy or difference ("Dispute") among the Parties arising under or in connection with this Agreement:

(a)  The Parties shall attempt in good faith to promptly resolve any Dispute arising out of or relating to this Agreement by negotiation between executives who have authority to settle such Dispute. Any Party may give the other Party written notice of any Dispute not resolved in the normal course of business. Within fifteen (15) days after the giving of the notice, the receiving Party shall submit to the other a written response. The notice and the response shall include: (i) a statement of each Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive. Within thirty (30) days after delivery of the disputing Party's notice, the executives of both Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute. All reasonable requests for information made by one Party to the other will be honored. All negotiations pursuant to this Section 13.14 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence;

(b)  Any Dispute arising out of or relating to this Agreement, including the breach, termination or validity thereof, which has not been resolved by negotiation as contemplated above within ninety (90) days of the initiation of such procedure, shall be resolved through final and binding arbitration, it being the intention of the Parties that this is a broad form arbitration agreement designed to encompass all possible Disputes, including Disputes about the arbitrability of a Dispute. The arbitration shall be conducted under the arbitration rules (as then in effect) of the American Arbitration Association ("Rules"). The arbitration shall be conducted by three (3) arbitrators, unless the Parties agree to a sole arbitrator within thirty (30) Days after the commencement of the arbitration. For greater certainty, for purposes of this Section 13.14, the commencement of the arbitration means the date on which one Party's request or demand for, or notice of, arbitration is received by the other Party to the Dispute. If the arbitration is to be conducted by a sole arbitrator, then the arbitrator will be jointly selected

20



**Defense Exhibit 18-20**

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

by the Parties within thirty (30) Days after the commencement of the arbitration. If the arbitration is to be conducted by three (3) arbitrators, then each Party shall appoint one (1) arbitrator within thirty (30) Days of the commencement of the arbitration, and the two (2) arbitrators so appointed shall select the presiding arbitrator within thirty (30) Days after the latter of the two (2) arbitrators has been appointed by the Parties. Unless otherwise agreed by all Parties, the place of arbitration shall be Houston, Texas. The arbitration proceedings shall be conducted in the English language and the arbitrator(s) shall be fluent in the English language. The award of the arbitral tribunal shall be final and binding. Judgment on the award of the arbitral tribunal may be entered and enforced by any court of competent jurisdiction.

13.15 **Conduct of the Parties**. The Parties and the Company each represent, warrant and covenant that, to the best of its knowledge:

(a)    With respect to the Business, none of it, any of its Affiliates or Subsidiaries, or any person acting on behalf of it or any of its Affiliates or Subsidiaries, has at any time made, offered, authorized or promised (and has not agreed to make and will not make, authorize or promise or agree to make, authorize or promise), any payment, gift, promise, or other thing of value or advantage (including any interest in the Company, GMI and this Agreement or any other amendments thereto, or any other asset of it or its Affiliates or Subsidiaries), whether directly or through any other person: (i) for the benefit of any Government Official for the purpose of obtaining or retaining business, directing business to any person, or obtaining any improper advantage or benefit, economic or otherwise; or (ii) where such payment, gift, promise, or thing of value or advantage violates any provision of any Corrupt Practices Law;

(b)    No principal, partner, owner, Director, Key Officer, officer or any other person who currently holds an interest in either Party or the Company, or has been, at any time during the term of this Agreement or the existence of either Party, the Company, or any of their Affiliates or Subsidiaries, a Government Official, nor holds or has held any such interest for the benefit of or on behalf of a Governmental Official;

(c)    No contracts or permits negotiated or entered into in conjunction with the Business or this Agreement by the Company or any of its Affiliates or Subsidiaries were procured in violation of any Corrupt Practices Laws.

(d)    Each Party shall defend, indemnify and hold the other Party harmless from and against any and all claims, damages, losses, penalties, costs and expenses arising from or related to any breach by the first Party of the representations, warranties and covenants set forth in this Section 13.15. Such indemnity obligations shall survive the termination or expiration of this Agreement.

[SIGNATURES ON NEXT PAGE]

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

21

**Defense Exhibit 18-21**

IN WITNESS WHEREOF, the Parties hereto have caused this Shareholders Agreement to be duly executed as of the day and year first above written.

COMPANY

SIRIUS ENERGY, S.A. DE C.V.

By: _____
Name: Federico Gil Chaveznava
Title: Legal Representative

MEXICAN INVESTOR

TÉCNICAS MARÍTIMAS SUSTENTABLES, S.A. DE C.V.

By: _____
Name: Gerardo Ivan Gonzalez Villarreal
Title: Legal Representative

Signature Page

**Defense Exhibit 18-22**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Shareholders Agreement to be duly executed as of the day and year first above written.


LANIUS

LANIUS B.V.

By: _____
Name: Graham Collett
Title: Legal Representative

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

Signature Page

**Defense Exhibit 18-23**

## EXHIBIT 1
### DEFINITIONS

"Additional Capitalization" means, funds raised from third parties by the Parties to meet Company's Business Plan, as specified in Section 6.6 of this Agreement.

"Affiliate" means, with respect to any Party or Shareholder, any person who directly or indirectly controls, is controlled by, or is under common control with, such Party or Shareholder, or a family member or Relative of such Party or Shareholder.

"Agreement" means this agreement and all exhibits attached to this agreement, in each case as they may be supplemented or amended from time to time.

"Board" or "Board of Directors" has the meaning specified in Section 8.1(a) of this Agreement.

"Business" shall mean all business associated with (a) the planning, design, construction, operation, management and maintenance of import/export facilities, storage facilities and throughput facilities for crude oil, natural gas, liquefied natural gas, gasoline, heavy oil, refined products and other derivative products located in Lazaro Cardenas or any additional facilities that the Company builds or develops in Mexico, but only with respect to such facilities that are substantially the same in substance to the facilities located in Lazaro Cardenas, and (b) the development and execution of a trading strategy for crude oil, gasoline, heavy oil, refined products and other derivative products into or out of Lazaro Cardenas or any additional facilities that the Company builds or develops in Mexico, but only with respect to such facilities that are substantially the same in substance to the facilities located in Lazaro Cardenas.

"Business Plan" means a business plan of the Company adopted in accordance with the terms of this Agreement and any revisions thereto.

"Bylaws" shall mean the bylaws (*estatutos sociales*) of the Company, as amended from time to time in terms consistent with this Agreement.

"Call Schedule" has the meaning stated in Section 6.2 of this Agreement and detailed in **Exhibit 3** attached hereto.

"Capital Call" has the meaning specified in Section 6.3 of this Agreement.

"Capital Call Notice" has the meaning specified in Section 6.3 of this Agreement.

"Capital Project" has the meaning specified in Section 6.3 of this Agreement.

"Closing Conditions" has the meaning specified in Section 3.2 of this Agreement.

"Company" has the meaning specified in the heading of this Agreement.

Exhibit 1 – Page 1

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-24**

0689 - 143

"Lanius" has the meaning specified in the heading of this Agreement.

"Confidential Information" has the meaning specified in Section 11.2(a) of this Agreement.

"Corrupt Practices Laws" means (a) any applicable Mexican laws relating to bribery and/or other corrupt business practices; (b) the laws of the country of a Party's incorporation or that of its parent company or ultimate parent company, entity or individual(s) relating to bribery and/or other corrupt business practices; and (c) the Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95-213, §§101-104) of the United States of America, as amended.

"Director" has the meaning specified in Section 8.1(a) of this Agreement.

"Distribution Waterfall" has the meaning stated in Section 11.6 of this Agreement and detailed in **Exhibit 3** attached hereto.

"Dollars" or "US$" shall mean the lawful currency of the United States of America.

"Drag-Along Notice" has the meaning specified in Section 12.6(b) of this Agreement.

"Effective Date" has the meaning specified in Section 3 of **Exhibit 3** attached hereto.

"GMI" has the meaning specified in Section 8.1(a) of this Agreement.

"GMI Transaction" shall mean any and all agreements by which the Company acquired GMI, including, without limitation, the following: (i) that certain Share Purchase Agreement entered on September 4, 2015, by and between the Company and Promotora Ambiental, S.A.B. de C.V. ("PASA"); (ii) that certain Share Purchase Agreement entered on September 4, 2015, by and between the Company and Recolectora de Desechos y Residuos King Kong, S.A. de C.V. ("King Kong"); that certain Promissory Note executed on September 4, 2015, by the Company for the benefit of PASA; and (iv) that certain Promissory Note executed on September 4, 2015, by the Company for the benefit of King Kong.

"GMI Amendment" has the meaning specified in Section 11.5 of this Agreement.

"Government Official" means (a) any official or employee of a government or any department or agency thereof; (b) any political party or official or employee thereof; (c) any official or employee of a public international organization; or (d) any official or employee of a state-owned entity, trust or labor union. This term is defined broadly and includes any official or employee of a state-owned, state-operated, or state-controlled entity, such as a state-owned oil or energy company, or any of their family members or Relatives.

"Initial Capital Commitments" has the meaning specified in Section 6.2 of this Agreement.

"Initial Contribution" has the meaning specified in Section 3 of **Exhibit 3** attached hereto.

Exhibit 1 – Page 2

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-25**

0689 - 144

"Key Officers" has the meaning specified in Section 7.1 of this Agreement.

"Mexican Investor" has the meaning specified in the heading of this Agreement.

"Mexico" shall mean the United Mexican States.

"Non-Defaulting Party" shall have the meaning specified in Section 13.2(l) of this Agreement.

"Option Notice" shall have the meaning specified in Section 12.3 of this Agreement.

"Permitted Assignee" shall mean, with respect to a Party or Shareholder, (i) any Affiliate or shareholder of such Party or Shareholder; (ii) any Relative of such Party or Shareholder, (iii) any fund, co-investment scheme or contractual co-investment arrangement controlled, managed or co-managed by any such Party or Shareholder or its Affiliates or Relatives or (iv) any Key Officer of the Company or its Subsidiaries; it being understood that any of the above shall be a Permitted Assignee only if it is not a Restricted Third Party or it is not controlled by a Restricted Third Party.

"Permitted Liens" shall mean, with respect to any person, (i) pledges or deposits by such person under workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts or leases to which such person is a party, or deposits to secure public or statutory obligations of such person or deposits of cash to secure surety or appeal bonds to which such person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business; (ii) liens imposed by law, such as carriers', warehousemen's and mechanics' liens; (iii) liens in favor of issuers of surety bonds or letters of credit issued pursuant to the request of and for the account of such person in the ordinary course of its business; (iv) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property or liens incidental to the conduct of the business of such person; (v) liens in favor of customs and revenues authorities arising as a matter of law to secure customs payments in connection with the importation of goods; (vi) pledges or deposits of cash and cash equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or similar obligations to providers of property, casualty or liability insurance in the ordinary course of business; and (vii) liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto.

"Preferential Option" shall have the meaning specified in Section 12.3 of this Agreement

"Purchase Notice" shall have the meaning specified in Section 12.3 of this Agreement.

"Related Person" shall mean (i) any member of the Board of Directors of the Company or any member of the Board or sole director of any of the Company's Subsidiaries; (ii) any

Exhibit 1 – Page 3

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

officer, employee or Affiliate of the Company or of any of the Company's Subsidiaries; or (iii) any Relative of any of the individuals referred to in paragraphs (i) or (ii) of this definition.

"Relative" with respect to any individual means any person related by blood (up to the fourth degree), marriage or adoption (or formerly related by marriage) to such individual, including, without limitation, spouses, in-laws, parents, grandparents, children, grandchildren, aunts, uncles, great-aunts, great-uncles, nieces, nephews, great-nieces and great-nephews.

"Reserved Matters" means the matters mentioned in **Exhibit 2** of this Agreement.

"Restricted Third Party" shall mean any person or entity that competes, directly or indirectly, or through any Affiliate or Subsidiary, with the Company Business in Mexico by providing comparable services.

"Shareholder" means any Person or entity who is the registered holder of Company Shares and who is a party to, or agrees to be bound by the terms and conditions of this Agreement.

"Shares" or "Company Shares" shall mean any equity shares of any class issued by the Company at present or in the future, as authorized by the Bylaws.

"Sub Holding" means a wholly owned subsidiary of the Company that will be the owner directly or indirectly of all the Subsidiaries of the Company, such Sub Holding may be created on or before the Company receives a Third Party Offer.

"Subsidiary" shall mean, with respect to any person or entity, (a) any other person or entity who is directly or indirectly controlled by such first person or entity or (b) any other person or entity of which a majority of the total voting power of shares entitled to vote in the election of directors or managers thereof is at the time owned or controlled, directly or indirectly, by that first person or entity.

"Transfer" has the meaning specified in Section 12.1 of this Agreement.

Exhibit I – Page 4

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-27**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

## EXHIBIT 2
## RESERVED MATTERS

1.    Any amendment to the Company's or any of its Subsidiaries' bylaws in any manner inconsistent with this Agreement or in a manner that such amendment alters or changes the powers, preferences or special rights of any Party hereto.

2.    The issuance of any equity, quasi-equity securities or similar rights or instruments (including any securities convertible or exchangeable into equity securities, of any nature) senior to the common Shares (other than in connection with the Additional Capitalization).

3.    The reimbursement of any contributions, or the making of any loans, or the making of any distributions (other than dividends), of any nature, to Company shareholders;

4.    A merger, spin-off or equivalent transaction of the Company or any of its Subsidiaries, or the sale of all or substantially all assets of the Company (other than in connection with the Additional Capitalization).

5.    Any joint ventures or participation (including acquisition of equity or debt securities or other interests) by the Company in any other persons or any other businesses.

6.    The dissolution, liquidation or bankruptcy of the Company or any of its Subsidiaries.

7.    The issue of any equity, quasi-equity securities or similar rights or interests of any nature, or any increases or decreases in the Shares or capital stock of the Company or its Subsidiaries (other than in connection with the Additional Capitalization).

8.    Approval of the annual operating plan or budget (or any deviations therefrom) of the Company, and review and approval of the results under the annual operating plan or budget on a quarterly and semi-annual basis.

9.    Agreements that, in any manner, oblige the Company or any of its Subsidiaries, to invest or otherwise disburse funds, in any manner, in a single or in a succession of transactions, in a fiscal year, in an aggregate amount equal to or exceeding US$500,000.00 Dollars, except if any such agreement (or transaction) is contemplated in the most recently approved annual operating plan or budget.

10.    Making any loans or financings to third parties (excluding loans or financings between the Company and any of its Subsidiaries or among Subsidiaries), in an amount exceeding, on a yearly basis, US$100,000.00 Dollars.

11.    Any transaction between the Company or any of its Subsidiaries and either Party or any of their Subsidiaries, Affiliates, Related Persons or Relatives, including, without limitation, (i) the payment of management or equivalent fees; (ii) the payment of any amounts or receipt of any assistance in respect of research and development, technology, marketing,

Exhibit 2 – Page 1

**Defense Exhibit 18-28**

labor, insurance, travel, communications and other related areas; (iii) the purchase of any goods or services; or (iv) the reimbursement of any contributions, the making of any loans, or the making of any other distributions (other than payment of dividends).

12.   Any capital expenditures and capital dispositions (including leasing) by the Company or its Subsidiaries exceeding by 10% and at least US$1,000,000.00 Dollars the amount budgeted for such purpose in the most recently approved Annual Operating Plan and Budget.

13.   The incurrence of any indebtedness, of any nature and however characterized from an accounting perspective (including contingent indebtedness and indebtedness arising from the guarantee of the obligations of any third party), or lien or pledge, except for (i) indebtedness permitted under the annual operating plan or budget; (ii) refinancing indebtedness in respect to indebtedness permitted to be incurred hereunder; (iii) hedging obligations relating to currency agreements entered into for bona fide hedging purposes and not for the purpose of speculation; and (iv) obligations in respect of performance, bid and surety bonds and completion guarantees provided by the Company or its Subsidiaries in the ordinary course of business, including letters of credits and "fianzas" supporting bids, performance or surety obligations.

14.   The Appointment or removal of any of the independent members of the Company's or any of its Subsidiaries' board of directors or the appointment or removal of any of the Company's or any of its Subsidiaries' officers.

15.   Agreements or arrangements committing the Company or its Subsidiaries to not compete or that otherwise limit the ability of the Company or any of its Subsidiaries to conduct their business activities or affairs as conducted on the date of this Agreement or as permitted under this Agreement.

16.   The registration, listing or public offering of the Company's or any of its Subsidiaries' securities before any Mexican or foreign securities authority or exchange.

17.   Any transfer or the grant, amendment or termination of any license or other right in respect of, any technology, copyright, patent, trademark, industrial design or other intellectual property owned by or licensed to the Company.

18.   The adoption and revision of any general policy or plan regarding employee salaries, benefits and compensation (including any employee bonus, stock option plan and plan for loans and advances to employees) and the Company's compensation policy and remuneration of Key Officers.



Exhibit 2 – Page 2

This information is furnished under the provisions of an intentional exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-29**

## EXHIBIT 3
### SIRIUS GENERAL MATTERS

1. **Shareholders**

| Shareholder | Ownership Percentage | Shares | Initial Capital Commitments |
|---|---|---|---|
| Mexican Investor | 50% | 100 Type A Shares | - |
| Lanius | 50% | 100 Type B Shares | US$25,000,000 |

2. **Call Schedule**

| Shareholder | Prior Payments/Costs | Effective Date | 31 March 2016 | 30 April 2016 | December 2016 |
|---|---|---|---|---|---|
| Mexican Investor | - | - | | - | - |
| Lanius | US$1,725,000 | US$4,000,000* | US$14,000,000 | US$3,000,000 | US$2,275,000** |

\* This amount ("Initial Contribution") shall be funded on the first business day which is no later than two (2) days after all the following Closing Conditions have been satisfied, as determined in good faith by both Lanius and TMS ("Effective Date"):

   a) The approval and due execution of Company's Board Resolutions approving the issuance of the new 100 Type B Shares to Lanius;

   b) The approval and execution by Sirius and Lanius of a subscription agreement covering the new 100 Type B Shares;

   c) The approval of the form of share certificate for the new 100 Type B shares in the name of Lanius in accordance with this Agreement, the Company's Bylaws and applicable Mexican law;

   d) The approval of GMI's balance sheets;

   e) The approval of Company's balance sheets, reflecting the following: (i) the pre- and post-subscription time periods, (ii) the fixed and variable capital allocations, (iii) and the Share accounts of each of TMS and Lanius;

   (f) The approval and execution of all documents included under **Exhibit 4** hereto and approval of the mechanism for the joint control of all Company's bank accounts;

   (g) The approval of the wire transfer mechanism and instructions for the Initial Contribution; and

   (h) The receipt by Lanius of Company's updated KYC information acceptable to Lanius's funding bank.

\*\*This amount is to be credited toward the first funds spent on dredging, by transfer into Sirius or by offset from funds paid directly to the dredger off shore. It is to be credited to Sirius or paid into Sirius by 31 December 2016 regardless of whether any dredging occurs.

Exhibit 3 – Page 1

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-30**

3. **Use of Initial Capital Commitment Funds**

| Description | Amount |
| --- | --- |
| Prior Expenditures for Reimbursement to TMS | US$3,200,000 |
| Other Permits | US$2,000,000 |
| Overhead for 2016 | US$2,000,000 |
| Ancillary Permit Costs | US$1,500,000 |
| First Payment of Pasa notes | US$950,000 |
| Total Funds Used | US$9,650,000 |

4. **Shareholder Registry**

| Shareholder | Técnicas Marítimas Sustentable, S.A. de C.V. | Lanius B.V. |
| --- | --- | --- |
| Shares | 100 Type A Shares | 100 Type B Shares |
| Address | Av. Lázaro Cárdenas 2470, Piso1 ███████████ | c/o Salamander<br>Rue du Rhone 56<br>1204 Geneva, Switzerland<br><br>c/o HVK Stevens Consultancy<br>Prins Bernhardplein 200<br>1097 JB Amsterdam, the Netherlands |
| Contact | Guillermo Canales ███████████ | Leonard Obrien ███████████<br><br>Remco Polderman ███████████ |



Exhibit 3 – Page 2

**Defense Exhibit 18-31**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**EXHIBIT 4**
**JOINT SIGNATORY AND BANKING AUTHORITY DOCUMENTATION**

This information is furnished under the provisions of an international exchange agreement with a foreign government. Its use and disclosure must be governed by the provisions of that agreement.

**Defense Exhibit 18-32**