**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

DOUGLAS EDELMAN,

Defendant.

Criminal Action No. 24-239-1 (CKK)

**MEMORANDUM OPINION**
(October 28, 2026)

Defendant Douglas Edelman faces a thirty-count indictment charging him with conspiring to defraud the United States from 2008 to 2021, making false statements to the Department of Justice in 2016, making false statements to the Internal Revenue Service in 2018, evading taxes on his income from 2006 to 2020, and filing false reports of his foreign bank accounts with the IRS from 2007 to 2012 and again from 2015 to 2020. Edelman has pled guilty to some, but not all, of these charges. At the parties' request, the Court has agreed to proceed to sentencing on the charges to which Edelman has pled guilty while holding the remaining charges in abeyance.

At sentencing, the counts to which Edelman has pled guilty will be grouped and treated as one. Edelman's base offense level for this count will be determined by the "total tax loss" attributable to his offense. In determining the total tax loss attributable to Edelman's offense, the Sentencing Guidelines direct the Court to consider the tax loss attributable to all of Edelman's "relevant conduct," which is defined in this context as "all conduct violating the tax laws" that is not "clearly unrelated" to his offense. The parties agree that courts routinely accept as relevant conduct facts relating to uncharged counts that are proven by a preponderance of the evidence. Where they disagree is the application of that practice here.

For all intents and purposes, the total tax loss attributable to Edelman's offense will be a product of the loss stemming from Edelman's failure to report profit distributions he received from the company Mina/Red Star, which he co-founded with a Kyrgyz national to sell jet fuel to the U.S. military. It is undisputed that Edelman failed to report profit distributions from Mina/Red Star in tax years 2006 through 2020, and he is charged with a count of tax evasion for each of these years. Based on this failure and associated deceptive conduct, Edelman has pled guilty to willfully evading taxes on hundreds of millions of dollars that he received as income from Mina/Red Star during tax years 2006 through 2012. Edelman does not dispute including any tax loss from 2006 through 2012 in the calculation of the total tax loss attributable to his offense.

Edelman maintains his innocence, however, with respect to the charges of tax evasion for tax years 2013 through 2020. According to Edelman, he did not receive any profit distributions from Mina/Red Star from 2013 through 2020 because he "contributed" his ownership interest in the company to his wife's trust—the Galactea Trust—in 2013. Edelman therefore argues that the Court should only consider the tax loss stemming from tax years 2006 through 2012 in calculating the total tax loss attributable to his offense. The Government disagrees. According to the Government, the Court should include any tax loss stemming from tax years 2013 through 2020 in its calculation because the Galactea Trust was a sham trust that did not change Edelman's economic relationship to Mina/Red Star or its profit distributions. The Government, in other words, argues that Edelman continued to receive Mina/Red Star's profit distributions as his income from 2013 through 2020, and that the Court should therefore calculate the total tax loss attributable to Edelman's offense by tallying the loss stemming from Edelman's admitted 2006–2012 tax evasion and his charged 2013–2020 evasion.

Accordingly, to calculate the total tax loss attributable to Edelman's offense and thereby determine his base offense level at sentencing, the Court must first determine whether the Government has shown by a preponderance of the evidence that the Galactea Trust was a sham trust that did not change Edelman's economic relationship to Mina/Red Star or its profit distributions. If the Government fails to show that the Galactea Trust was a sham trust, then the Court will only consider the loss stemming from tax years 2006 through 2012 when calculating the total tax loss attributable to Edelman's offense. If the Government does show that the Galactea Trust was a sham trust, however, then the Court will consider whether the Government has shown by a preponderance of the evidence that Edelman willfully attempted to evade income tax on the profit distributions he received from Mina/Red Star for tax years 2013 through 2020. And if the Government makes this second showing, then the Court will consider the loss stemming from tax years 2006 through 2020 when calculating the total tax loss attributable to Edelman's offense.

Upon consideration of the parties' submissions,[1] evidence gathered from Edelman's plea hearing, evidence gathered from the Court's evidentiary hearing, the relevant legal authority, and the entire record, the Court concludes that the Government has made both showings. While the Galactea Trust was organized on paper in accordance with the applicable foreign law, the Government has shown that its purported structure did not change Edelman's control over Mina/Red Star's operations and the income it generated through profit distributions. The Court will therefore disregard the Galactea Trust, finding it is a sham trust. In addition, the Government

[1] The Court's consideration has focused on the transcript of Edelman's May 21, 2025, plea hearing, Dkt. No. 79 ("Plea Hr'g Tr."); Edelman's Sentencing Memorandum, Dkt. No. 115 ("Def.'s Mem."), and accompanying exhibits, including the Expert Report of John Machell, KC, Dkt. No. 119; the Government's Sentencing Memorandum, Dkt. No. 116 ("Gov't's Mem."), and accompanying exhibits, Dkt. No. 118; transcripts from the four-day deposition of Edelman's longtime accountant Graham Collett, Dkt. Nos. 118-26–29; the Government's Response to Edelman's Sentencing Memorandum, Dkt. No. 125 ("Gov't's Resp."); Edelman's Response to the Government's Sentencing Memorandum, Dkt. No. 126 ("Def.'s Resp."), and accompanying exhibits; the Government's additional exhibits, Dkt. No. 132; and the transcript of the Court's April 29, 2026, evidentiary hearing, Dkt. No. 135 ("Evid. Hr'g Tr.").

has shown that Edelman continued to willfully evade taxes on the Mina/Red Star profit distributions he received as income from 2013 through 2020 in much the same way he has admitted to evading taxes on the distributions he received as income from 2006 through 2012—namely, by obfuscating his ownership, making misrepresentations, and shielding his role in the spending of its income. Accordingly, at sentencing, the Court shall consider any tax loss stemming from tax years 2006 through 2020 when calculating the total tax loss attributable to Edelman's offense.

## I. BACKGROUND

### A. Factual Background

On May 21, 2025, Edelman entered, and the Court accepted, his partial plea in open court. *See* Plea Hr'g Tr., Dkt. No. 79. In doing so, Edelman pled guilty to conspiring to defraud the United States from 2008 through 2021 (Count One); making false statements to the Internal Revenue Service in October 2016 (Count Two); making false statements to the Department of Justice in March 2018 (Count Three); and willfully attempting to evade and defeat income taxes for tax years 2006 through 2012 (Counts Four through Ten). *See id.*; Indictment, Dkt. No. 1. All facts drawn from Edelman's plea hearing are facts that Edelman has admitted to.

Following Edelman's plea, the Court held an evidentiary hearing to determine whether the Galactea Trust was a sham trust and, if so, whether Edelman willfully evaded taxes on his income for tax years 2013 through 2020. *See* Evid. Hr'g Tr., Dkt. No. 135. In preparation, the parties submitted briefs and introduced evidence into the record. *See* Def.'s Mem., Dkt. No. 115 (and accompanying exhibits); Gov't's Mem., Dkt. No. 116 (and accompanying exhibits); Def.'s Resp., Dkt. No. 126 (and accompanying exhibits); Gov't's Resp., Dkt. No. 125 (and accompanying exhibits). When referencing evidence drawn from the evidentiary hearing and the parties' submissions, the Court shall identify the source of the evidence and indicate whether the evidence is undisputed, unopposed, or disputed.

1. <u>The Rise of Mina/Red Star</u>

In the 1990s and early 2000s, Douglas Edelman was living and working as a commodities trader in Bishkek, Kyrgyzstan. Plea Hr'g Tr. at 17:19–18:13. Following September 11, 2001, the U.S. military began using the Manas Air Base near Bishkek to supply U.S. troops in the Middle East. Plea Hr'g Tr. at 17:19–18:13. This led to a need for jet fuel. *Id*. Drawing on his connections in the region, Edelman and a Kyrgyz national named Erkin Bek bid on and won a contract with the U.S. Department of Defense ("DOD") to provide jet fuel to the U.S. military. *Id*. at 18:15–25. And so began the company that would come to be known as Mina/Red Star.

Edelman and Bek won their initial contract with the DOD in the name of Red Star Enterprises Limited, which was a Canadian company owned by Bek. *Id*. Edelman invested hundreds of thousands of dollars to fund Red Star's startup costs and early operations through two other companies that he owned: Aspen Wind Corporation and Bartol Limited. *Id*. at 19:3–21. Red Star grew quickly and continued to win contracts to supply the U.S. military with jet fuel. *Id*.

In 2003, Edelman created a sister company to Red Star named Mina Corp Limited. *Id*. at 19:22–20:4. Mina Corp was incorporated in Gibraltar. *Id*. In 2004, Edelman reincorporated the Red Star entity in Gibraltar as well. *Id*. These entities were known collectively as Mina/Red Star, which was owned in a 50/50 partnership between Edelman and Bek. *Id*.

From the founding of Mina/Red Star through 2008, Edelman routinely executed bank documents showing that he was the ultimate beneficial owner ("UBO") of his half of Mina/Red Star. *Id*. at 20:5–12. Edelman began receiving profit distributions from Mina/Red Star once it became profitable in 2005. *Id*. From 2005 to 2008, Edelman used Swiss bank accounts for his companies Aspen Wind and Bartol to receive profit distributions from Mina/Red Star. *Id*. These accounts were primarily with Credit Suisse. *Id*. Edelman used his profit distributions, among other things, to send money to his U.S. family members, invest in other businesses, and purchase

property around Europe, including a home in Ibiza, Spain. *Id*. at 20:15–21. The Government has introduced evidence showing that, from 2006 through 2008, the Swiss bank accounts for Aspen Wind and Bartol received approximately $50,000,000 in profit distributions from Mina/Red Star. Gov't's Mem. at 5 (citing Gov't's Ex. 25-1, Dkt. No. 118-9). Edelman does not dispute the accuracy of this evidence. Evid. Hr'g Tr., Dkt. No. 135 at 7:18–8:6. Although these Swiss accounts were not in Edelman's name, Edelman was the ultimate beneficial owner. Plea Hr'g Tr. at 20:22–21:7.

In November 2008, Credit Suisse notified Edelman's longtime accountant Graham Collett that, due to U.S. law enforcement activity regarding the use of Swiss banks for tax evasion, Edelman had to either disclose to U.S. authorities that his accounts belonged to a U.S. person or close his accounts and transfer the balance elsewhere. *Id*. Edelman chose the latter. In December 2008 and January 2009, Edelman, with the assistance of Collett, moved his funds from Credit Suisse to an account he had recently opened at Bank Julius Baer in Singapore under the name of the Sunage Foundation. *Id*. 21:8–22:3.

The Sunage Foundation was a Panamanian entity that Edelman created in April 2008. *Id*. The Government and Edelman's counsel have both explained that, under Panamanian law, a "foundation" operates much like a trust. *See* Evid. Hr'g Tr., Dkt. No. 135 at 8, 23. The purported beneficiaries of the Sunage Foundation were Edelman's French wife, Delphine Le Dain, and their children. Plea Hr'g Tr. at 21:8–22:3. But Edelman has admitted that this structure was a sham and that he was the ultimate beneficial owner of the Sunage Foundation. *Id*. Starting in 2009, Edelman began directing his Mina/Red Star profit distributions to the Sunage Foundation. *Id*. at 21:8–25. The Government has introduced evidence showing that, in 2009 and 2010, the Sunage Foundation account at Bank Julius Baer received approximately $48,000,000 in distributions from

Mina/Red Star. Gov't's Ex. 25-1, Dkt. No. 118-9. Edelman does not dispute the accuracy of these figures. Evid. Hr'g Tr. at 7:18–8:6. And he admits to being the ultimate beneficial owner of this account. Plea Hr'g Tr. at 21.

In 2010, the House of Representatives' Committee on Oversight and Government Reform, Subcommittee on National Security and Foreign Affairs (the "Subcommittee"), began investigating allegations of corruption in connection with Mina/Red Star's contracts with the Department of Defense. Plea Hr'g Tr. at 22:4–13. As part of this inquiry, the Subcommittee became interested in the identity of Mina/Red Star's owners. *Id*.

At this point, Edelman had not filed U.S. tax returns to report the millions of dollars he had earned from Mina/Red Star and had not paid U.S. taxes on his income. *Id*. at 22:14–23:1. Edelman has admitted that, rather than disclose his ownership of Mina/Red Star, he caused his attorneys to tell the Subcommittee a false story that his wife, Le Dain, (i) founded Mina/Red Star with Bek, (ii) owned 50 percent of Mina/Red Star, and (iii) held her interests through the Sunage Foundation. *Id*. This false story was beneficial to Edelman because Le Dain's French citizenship meant she had no U.S. tax obligations for her income earned outside the United States. *Id*. According to testimony from Edelman's longtime accountant Collett, Edelman made it clear to those he worked with that this false story would be "the party line" going forward. *See* Collett Dep. (Feb. 4, 2025), Dkt. No. 118-27 at 86:2–13. Collett further admitted to going along with the party line even though it contradicted the documents he had seen and the experience that he had in his years of working on these businesses with Edelman. *See* Collett Dep. (Feb. 5, 2025), Dkt. No. 118-28 at 45:8–12.

While causing these false representations to be made to the Subcommittee, Edelman, with the assistance of Collett, caused the creation of false and backdated paperwork to corroborate Le Dain's purported ownership of Mina/Red Star and remove his name from the Sunage bank account

at Bank Julius Baer. Plea Hr'g Tr. at 23:2–7; *see also* Gov't's Mem. at 7 (citing Collett Dep. (Feb. 4, 2025) at 9–60; Collett Dep. (Feb. 5, 2025) at 14–50)). During the solicitation of a contract worth hundreds of millions of dollars with the U.S. Department of Defense ("DoD") in late 2010, the DoD asked Mina/Red Star for the identity of the company's owners. *Id*. at 23:10–20. In response, Edelman caused Mina/Red Star to falsely certify that it was owned by Le Dain and Bek. *Id*. The DoD again asked Mina/Red Star to identify its owners during the solicitation of another contract worth hundreds of millions of dollars in 2011, and Edelman again caused Mina/Red Star to falsely certify that it was owned by Le Dain and Bek. *Id*.

From 2010 through late 2012, Edelman continued to direct his profit distributions from Mina/Red Star into the Sunage Foundation account. *Id*. at 23:22–24:5. The Government has introduced evidence showing that, in 2011 and 2012, Edelman earned approximately $65 million in income from Mina/Red Star. Gov't's Mem. at 7 (citing Gov't's Ex. 25-1, Dkt. No. 118-9). This brought Edelman's total income from 2006 through 2012 to over $168 million. *Id*. Edelman did not file any tax returns during this time, although he did consult a tax attorney in 2010. *Id*. (citing Collett Dep. (Feb. 4., 2025) at 64–5, 82–8).

Edelman spent his income from Mina/Red Star in a variety of ways throughout 2006 to 2012. For instance, he has admitted to using his Mina/Red Star income from this time to make a variety of investments, including investments in a music television franchise in Eastern Europe, a land venture in Tulum, Mexico, and a farm in Kenya. Plea Hr'g Tr. at 23:22–24:5. He has also admitted to using his Mina/Red Star income from this time to make personal purchases, such as a luxury townhome in London. *Id*. Testimony from Edelman's longtime accountant Collett—whom Edelman used to make many of these investments and purchases—provides additional examples. For instance, Collett testified that Edelman used income generated from Mina/Red Star to purchase

a ski chalet in Austria and a house in Ibiza, Spain. Collett Dep. (Feb. 4, 2025) at 128–37; Collett Dep. (Feb. 6, 2025) at 18–9. Collett also explained that Edelman purchased hundreds of thousands of dollars of Palantir shares. Collett Dep. (Feb. 4, 2025) at 135–8. Edelman also gave $580,000 to his son from a previous marriage. Collett Dep. (Feb. 3, 2025) at 122–24. "On paper we will structure it as a loan to his Company," he directed Collett over email regarding the gift to his son, "This is mainly for his tax purposes, as I am really just giving him the money." *Id*. at 123–24.

In detailing how Edelman directed the transfer of funds from various accounts to pay for his purchases and investments, Collett explained that Edelman was careful not to own any of the property he purchased in his own name. *See* Collett Dep. (Feb. 4, 2025) at 101–44; Collett Dep. (Feb. 3, 2025) at 108. A 2008 email from Edelman to Collett provides a good example. *See* Gov't's Ex. 14-31, Dkt. No. 132-1. Edelman opened the email by asking Collett to "handle" his purchase of an $11 million house in London, adding that they "simply need[ed] to decide who is the best for ownership, for tax purposes // wife and kids maybe . . . i do have a foundation?" *Id*. Edelman then detailed some of his anticipated spending over the coming months—"at least 2 million" on a Billy Graham movie and "1 million or 1.5 million" to purchase MTV networks in Eastern Europe. *Id*.; Collett Dep. (Feb. 3, 2025), Dkt. No. 118-26 at 109. Edelman concluded by assuring Collett, who would be the one directing these payments, of the financials: there would be "another usd 5 million [arriving] to bartol in the next couple of days," and if more was needed, Edelman "[had] other amounts [he could] lay [his] hands on pretty easily, so all should be ok." *Id*.

2. The Restructuring of Mina/Red Star and the Galactea Trust

As indicated above, Edelman admits that, in 2003 and 2004, he incorporated Mina/Red Star in Gibraltar and owned the business in 50/50 partnership with Erkin Bek until 2012. *See* Plea Hr'g Tr. at 19:22–20:4. He admits that, in 2010 and 2011, he spread the false narrative—to, among others, Congress and the Department of Defense—that his wife, Le Dain, founded Mina/Red Star

with Bek and owned it as Bek's partner, and that he later helped create false, backdated paperwork and even attempted to change Gibraltar's public registration database to corroborate this false narrative. *Id*. at 22–24, 28. And he admits that, for tax years 2006 through 2012, he willfully evaded taxes on the hundreds of millions of dollars he earned as Mina/Red Star's co-owner by (i) making false statements to U.S. authorities; (ii) using nominees to conceal income and assets; (iii) creating false documents; (iv) closing accounts and moving funds to avoid his name being disclosed to U.S. authorities; (v) providing false information to banks, attorneys, and tax return preparers regarding his income, assets, financial accounts, and the historical ownership of Mina/Red Star; and (vi) filing false tax returns. *Id*. at 29–30.

Edelman also admits that he did not report income from Mina/Red Star on his returns for tax years 2013 through 2020. *Id*. at 26:22–27:25. But he does not admit to the charges of tax evasion for those years. That is because, according to Edelman, he did not owe any taxes on Mina/Red Star's income after he "contributed" his 50% share in the company to a trust—the Galactea Trust—in 2013. *See* Def.'s Resp. at 3; Evid. Hr'g Tr. at 20.

Edelman's purported transfer of his 50% share in Mina/Red Star to the Galactea Trust coincided with a broader restructuring at Mina/Red Star that began in 2012—what Collett referred to as a "new regime." Collett Dep. (Feb. 4, 2025) at 98; *see also* Gov't's Mem. at 9. Collett testified that, as part of this new regime, Mina/Red Star's business was "transferred out" of the Gibraltar-based entities that Edelman formed in 2003 and 2004 and "into a new structure" that involved numerous layers of ownership. *Id*. At the core of this new structure was the new Mina Petroleum, now incorporated in the UAE, and the new Red Star Enterprises, now incorporated in Hong Kong—referred to collectively, again, as Mina/Red Star. Gov't's Ex. 4-5, Dkt. No. 118-1 at 16. The entities forming the new Mina/Red Star were owned by a BVI company called

Yellowstone Resources Management Limited ("Yellowstone"), which was in turn owned by a BVI partnership called Global Resources Worldwide LP ("Global Resources"), half of which was owned by a BVI company called Rosbelt International Limited ("Rosbelt"). *Id*. Through its ownership of Rosbelt, the Galactea Trust owned 50% of Mina/Red Star, at least on paper. *Id*.

Edelman claims that he "contribut[ed]" his 50% share in Mina/Red Star to the Galactea Trust. *See* Def.'s Resp. at 3 (where Edelman argues that "[t]he government now bears the burden of proving that during 2013-2020, following his contribution of [Mina/Red Star] to his wife's trust, all the income earned during those late years was actually his"); Evid. Hr'g Tr. at 20 (where Edelman's counsel confirms that the phrase "his wife's trust" means the Galactea Trust). But there is no evidence in the record of Edelman contributing his 50% share in Mina/Red Star to the Galactea Trust. Instead, the record shows that the law firm responsible for vetting the Galactea Trust—Mishcon de Reya—was told the same lie about Mina/Red Star's ownership that Edelman had been telling since the congressional investigation in 2010: that Le Dain already owned 50% of Mina/Red Star through the Sunage Foundation.[2] *See* Gov't's Ex. 4-5, Dkt. No. 118-1 at 54 (Mishcon de Reya's report regarding the organization of the Galactea Trust); Collett Dep. (Feb. 5, 2025) at 44–5 (where Collett testifies that Edelman lied to the outside attorneys that created the Galactea Trust by telling them that Le Dain had always been the 50% owner of Mina/Red Star). The record also shows that the firm responsible for organizing the Galactea Trust was told the same lie. *See* Def.'s Ex. 15, Dkt. No. 126-3. In other words, the record, at least in isolation, appears to render Edelman's claim that he contributed his 50% share of Mina/Red Star to the

[2] As the Government points out, this shows an additional falsity, as "[e]ven Edelman and Collett's 2010 attempts to create backdated documents [for Mina/Red Star] only stated that Le Dain had been the owner, not the Sunage Foundation." Gov't's Mem. at 10 n. 5 (citing Gov't's Ex. 14-50, Dkt. No. 118-4). While Edelman had discussed transferring his 50% ownership of Mina/Red Star to the Sunage Foundation in 2010, he ultimately decided not to do so because it would have "show[n] real time[] dates." Gov't's Ex. 14-49, Dkt. No. 118-3.

Galactea Trust an impossibility, as the Galactea Trust's organizing documents show that those responsible for creating the Galactea Trust acted under the misrepresentation that Le Dain already owned 50% of Mina/Red Star.

Edelman offered an explanation for this apparent discrepancy during the evidentiary hearing: "he had been lying about [his ownership of Mina/Red Star] before," so "he continued that lie." Evid. Hr'g Tr. at 20:17–21. More to the point, Edelman "agree[s] that he lied to [the Galactea Trust's trustee] about whether he owned [Mina/Red Star,] [a]nd that is why the KYC documentation says his wife owned it." *Id*. at 21:3–4. While this explanation raises additional questions about Edelman's relationship with the Galactea Trust's trustee, it aligns with the other evidence in the record. For instance, in January 2012, Edelman emailed Collett a litany of lies to "write and present" to Mina/Red Star's general counsel "to put [him] into the picture" about Mina/Red Star's restructuring, including: that Mina/Red Star "was seeded and has always been owned by Le Dain . . . and another shareholder"; that Edelman was "NOT the beneficial owner and has never been paid dividends"; that Edelman "did not operate the [Mina/Red Star] account at all and worked on an advisory basis to Le Dain"; that "those who filled out the various forms" at Mina/Red Star "mistakenly . . . used the name of douglas edelman . . . as the shareholder and true beneficial owner of the company"; and that "in fact [Edelman] was only fully recently advised that his name appears on the account." Gov't's Ex. 24-1, Dkt. No. 118-8 (cleaned up).

The deed of settlement for the Galactea Trust was executed on December 23, 2012, upon the false foundation that Le Dain owned 50% of Mina/Red Star and would be granting it to the Trust. *See* Def.'s Ex. 2, Dkt. No. 119-10 (the "Galactea Deed"). The deed identifies the grantor as Delphine Le Dain, Edelman's wife. *Id*. at 2. It identifies the original trustee as Salamander Associates Limited, *id*., which was "a professional trust administration company organized under

the laws of the British Virgin Islands" that was "owned and operated" by Leonard O'Brien, Def.'s Mem. at 22.[3] And it identifies the original protector as Graham Collett, Edelman's longtime accountant. Galactea Deed at 2. The Trust was governed by the laws of either the British Virgin Islands (BVI) or England & Wales during the relevant period. *See* Def.'s Mem. at 17; Def.'s Expert Rep., Dkt. No. 119-1. But the Government does not dispute whether the Galactea Trust was organized on paper in accordance with the requirements of the applicable foreign law. *See* Gov't's Resp. at 3. Rather, "the core of the government's allegation is that Edelman intentionally created a complex web of foreign trusts and entities in order to hide behind, precisely so that he could obscure his income and ownership" of Mina/Red Star. *Id*. at 3–4.

3. <u>Edelman and Mina/Red Star Post-Galactea Trust</u>

On paper, the Galactea Trust owned half of Mina/Red Star in partnership with Erkin Bek starting, at the latest, on December 23, 2012. *See* Galactea Deed, Def.'s Ex. 2, Dkt. No. 119-10. But the Government argues that "[t]he new trust structure did not change anything with respect to Edelman's running the business, receiving distributions, and spending the funds." Gov't's Mem. at 10.

The Government's argument finds support in the record, which shows that Edelman continued to exercise significant influence and control over Mina/Red Star's operations following the restructuring. For instance, a January 2015 email chain shows Edelman, Bek, and their Mina/Red Star associate Steve Buscher—who was "engaged with [Bek] and [Edelman] is crafting a new BOD"—discussing whether to terminate Mina/Red Star's CEO (Graham O'Donoghue) and

[3] As Edelman explains, Salamander Associates acted as trustee of the Galactea Trust from 2012 to November 2019. Def.'s Mem. at 22. A November 2019 amendment replaced Salamander Associates with Salamander Corporate Services SA, which was a Swiss company also owned and operated by Leonard O'Brien. *Id*. When referring to the purported trustee of the Galactea Trust, the Court shall simply refer to Leonard O'Brien or "Salamander."

CFO (Zack Friedman) and their potential severance packages.[4] Gov't's Ex. 25-2, Dkt. No. 118-10 at 1. The discussion opens with Buscher reporting to Edelman and Bek—referring to them collectively as "D&E"—that O'Donoghue "seem[ed] . . . 'weary' from trying to fulfill your expectations." *Id*. at 3. The conversation then moves to Friedman, with Buscher writing that O'Donoghue had told him that "D&E made it clear that if [Friedman] didn't work out, it was on [O'Donoghue's] shoulders, and [O'Donoghue would] take the heat if D&E want[ed] to get rid of [Friedman]." *Id*. at 2. The discussion ends with Edelman—writing from the email, "de@ledain.ch"— giving direction on next steps: "Let's be fair and reasonable, let [Friedman] go for sure . . . [and] do right by [O'Donoghue] as I think despite everything he did a good job in organising [sic] and cleaning up some situations that he walked into. I suggest we just get these figures clear and move it forward from there." *Id*. at 1.

A few months later, Edelman sent Bek a long email—this time from the email address, "worldnet44@yahoo.com"— expressing his concern over "how much cash we are burning every day," particularly on employees. Def.'s Ex. 14, Dkt. No. 126-2 at 2. "Bottom line is we MUST run the business at a profit as it will make even more difficult to find loans and or potential buyer's or investors," Edelman wrote, adding, "Let's review literally everyone .. I'm sure we will find loads of expenses we pay every day and every month that are not essential." *Id*. Bek, responding in all caps, agreed regarding employee compensation. Gov't's Ex. 25-3, Dkt. No. 118-11 at 2 ("WE DEFINITELY NEED TO REVISE COMPENSATION PACKAGES."). Bek also suggested that he and Edelman consolidate control over Mina/Red Star: "I WAS WONDERING FOR US TO CONSIDER AND DECIDE FOR SOMEONE BETWEEN YOU AND I TO TAKE ULTIMATE POWER SO WE CAN CUT OUT INEFFICIENCIES," wrote Bek, "AND JUST

[4] The Government represents that the individuals mentioned in these emails were Mina/Red Star's CEO and CFO. Gov't's Mem. at 10. Edelman does not dispute this representation.

HAVE ONE DECIDER OF EVERYTHING, A CONTROLLING HOLDER." *Id*. Bek further explained to Edelman that it "might be relevant for one partner to take out all his equity and lower stake to 25pct for instance and for the other controlling stakeholder to manage the company BECAUSE WE NEED SOME SERIOUS NO JOKING LEADERSHIP." *Id*. Edelman agreed with his partner's assessment: "You and I need to speak with a single voice and give serious solid directions and instructions to people asap," he said, adding that he was going to ask one of Mina/Red Star's employees for "deep accounting information" so he could "analyse [sic] it all." *Id*. at 1.

Edelman's influence and control over Mina/Red Star appeared to extend beyond its internal business operations even after his half of the company was purportedly transferred to the Galactea Trust. In July 2016, Edelman—this time writing from the email address, "globalspec1@yahoo.com"—discussed selling Mina/Red Star with Bek, explaining that it would be "very difficult" to sell some of the company but that he had "an idea what I'd accept."[5] Gov't's Ex. 25-4, Dkt. No. 118-12. Mina/Red Star's employees also appeared to treat Edelman as the part-owner of Mina/Red Star even though Le Dain, through the Galactea Trust, was the part-owner on paper. When the DoD asked Mina/Red Star for the phone numbers of its owners in 2018, an employee emailed Erkin Bek and *Edelman* asking them to "share [their] respective cell numbers (ie, Erkin and *Delphine*[6])." Gov't's Ex. 25-5, Dkt. No. 118-13 at 1 (emphasis added). The employee appeared to apologize for requesting the phone numbers, explaining that they had "pushed as much as we could" and had the DoD agree to forgo other informational items "such as . . . ownership start date" before adding, "do not know if they will try calling the numbers, but

[5] Edelman does make a passing reference to a trust in this exchange, writing that "their [sic] is a preference by the Trust to sell and enter into other things." *Id*. at 3.

[6] Le Dain's first name.

better be ready in case someone does call." *Id*. Edelman provided Le Dain's landline in response, explaining that she "rarely uses" a cell phone. *Id*. As to the prospect of Le Dain receiving a phone call from the DoD, Edelman said that he was "not sure what she say [sic] if she got a call" because she was "so 'not involved.'" *Id*.

The record indicates that the restructuring of Mina/Red Star did not appear to change Edelman's relationship with Mina/Red Star's profit distributions, either. A February 2016 exchange between Edelman and Bek shows that Edelman was directing dividend distributions following the restructuring. "I like jerome or whomever to issue dividends . . . 2m each side" Edelman wrote to Bek, adding that they needed to "use credit lines and not be so lazy and quite [sic] using cash." Gov't's Ex. 25-6, Dkt. No. 118-15. Moreover, Edelman admits that the Sunage Foundation—which Edelman admits was a "sham" trust that he used to receive Mina/Red Star distributions—continued to receive distributions from Mina/Red Star after the Galactea Trust was created and purportedly owned those distributions. Evid. Hr'g Tr. at 22–23. Specifically, the record shows that Edelman's Sunage Foundation account at Bank Julius Baer received the following payments from Mina/Red Star after the Galactea Trust was created: an April 2013 transfer of $2,789,654.72 for "Dividends"; a December 2013 transfer of $15,000,000 for a "Shareholder Distribution"; a March 2014 transfer for $3,000,000 for a "Shareholder Distribution"; and another March 2014 transfer for $12,000,000, again for a "Shareholder Distribution." *See* Gov't's Ex. 25-1, Dkt. No. 118-9 at 2. Edelman chalks this up to an accounting error. *Id*. at 23:21–23 (". . . they messed around with the bank accounts and continued to send money out to Sunage . . ."). Whatever the reason, the record gives no indication that he attempted to correct this nearly $33 million accounting error.

Collett testified that Edelman also continued to direct where Mina/Red Star's distributions would be sent following the creation of the Galactea Trust. In 2013, Bank Julius Baer—the bank housing Edelman's Sunage Foundation account—was acquired by the American bank Merrill Lynch. *See* Collett Dep. (Feb. 3, 2025), Dkt. No. 118-26 at 144–45. A representative from Bank Julius Baer informed Edelman and Collett that this had "changed the whole philosophy" of the bank, and that these "changes could have consequences in terms of disclosure." *Id.* Collett testified that this representative advised Edelman to move his money to Mirabaud Bank in Dubai, where the representative would be joining, and that Edelman did so. *Id.*; *see also* Collett Dep. (Feb. 4, 2025), Dkt. No. 118-27 at 104–05. Evidence in the record shows that, starting in 2014, Mina/Red Star's dividends stopped going to the Sunage Foundation account at Bank Julius Baer and were instead sent to an account at Mirabaud Bank in the name of Rosbelt International. *See* Gov't's Ex. 25-1, Dkt. No. 118-9. The record shows that, from February 2014 to September 2016, approximately $60,825,306 in "Dividends" went to the Rosbelt International account at Mirabaud Bank. *Id.* Edelman does not dispute the accuracy of this evidence. Evid. Hr'g Tr. at 7:18–8:6.

Starting in 2016, Mina/Red Star's distributions stopped going to the Rosbelt account at Mirabaud Bank and instead began flowing to another Rosbelt account at Banque J. Safra Sarasin ("Safra Sarasin") in Luxembourg. *See* Gov't's Ex. 25-1, Dkt. No. 118-9. Collett testified that Edelman made the decision to close the Mirabaud Bank account and move the funds to the Safra Sarasin account because one of Edelman's agents had "negotiated arrangements" with Safra Sarasin. Collett Dep. (Feb. 5, 2025), Dkt. No. 118-28 at 79–80. An email exchange between Edelman and Collett in late 2015 corroborates Collett's testimony regarding Edelman's relationship to the Galactea Trust and the decision to leave Mirabaud Bank in favor of Safra Sarasin. *See* Gov't's Ex. 11-5, Dkt. No. 118-2. The exchange opens with an email from the

aforementioned representative of Mirabaud Bank to Edelman, Collett, and Leonard O'Brien (the trustee of the Galactea Trust) in which the representative expresses concern over their failure to meet their investment obligations, writing:

> It's this time of the year that the management looks at the accounts to see if they are in line with the strategic objectives of the bank. As you may recall, earlier this year I sent numerous emails noting that the account has not fulfilled the fund investment objective agreed with the principal and mandated by Yves Mirabaud in summer 2014 as a condition for account acceptance. Effectively, all my requests to top up the fund positions have been ignored for the last 12 months and we are now USD10.5mn short of the agreed fund investment level. Not only are we not in line with the original agreement by a large margin (only 2.5m invested so far), but you are also sitting on cash and missing out on returns.
>
> I kindly request you to treat this email with the utmost urgency and revert to me by Friday, Nov 13th, with regards to fulfilling the investment criteria.

*Id*. at 1. Collett then emails Edelman directly—removing O'Brien, the trustee, from the email chain—to ask for a catch-up call, explaining that "we have some big cash calls coming up" before adding: "I have been watching the RS position quite closely with particular regard to the loan and possible shareholder distributions going forward. Will elaborate more when we speak. Meanwhile we have 30m in total reserves right now." *Id*. Edelman responds by listing a variety of investments he was considering before directing Collett to "open today or next week asap the new accounts and we just leave mirabaud." *Id*. Collett ends the conversation by agreeing about Mirabaud—explaining that "they are getting too pushy"—before reemphasizing that he was "quietly seeing what we can possibly get out of RS in the short term." *Id*. Collett testified that "RS" referred to Red Star Enterprises. Collett Dep. Tr. (Feb. 5, 2025) at 77–78. Edelman does not dispute the accuracy of the evidence in the record showing that, from 2016 to 2019, at least $55,023,399 in dividends and distributions were directed to the Rosbelt International account at Safra Sarasin.[7] *See* Gov't's Ex. 25-1, Dkt. No. 118-9.

[7] In 2020, Safra Sarasin froze the Rosbelt International account due to compliance issues. Collett testified that Safra

In addition to testifying that Edelman continued to direct Mina/Red Star's operations and its profit distributions following the creation of the Galactea Trust, Collett also gave substantial testimony detailing how Edelman continued to use the income generated from Mina/Red Star to invest in the same ventures in which he had invested from 2006 to 2012. The Government organizes this testimony by isolating specific investments that Collett testified Edelman directed after the creation of the Galactea Trust through a combination of four different entities—the Sunage Foundation, Satellite Support Services Ltd. ("SSS"), Rosbelt International ("Rosbelt"), and Bluestone International ("Bluestone").[8]

One such venture highlighted by the Government was the company Evanshire Finance Ltd. ("Evanshire"), which held the assets of a Kenyan farming business. Collett Dep. (Feb. 4, 2025) at 102–03. During his plea hearing, Edelman admitted to investing his Mina/Red Star distributions in Evanshire through late 2012. Plea Hr'g Tr. at 23:22–24:5. The Government has introduced evidence showing that the Sunage Foundation, SSS, Rosbelt, and Bluestone invested over $15 million in Evanshire from 2013 to 2017. Gov't's Ex. 14-69, Dkt. No. 118-7 at 3–5. Collett testified that Edelman directed him to make these payments through the various accounts, and that the investments continued through the end of 2020. Collett Dep. (Feb. 4, 2025) at 104–05. He also testified that the investments in Evanshire never returned any profit. *Id*. at 105.

---

Sarasin froze the account "in order to carry out a detailed analysis and examination of the various payments that were being made through the account[]." Collett Dep. (Feb. 5, 2025), Dkt. No. 118-28 at 128–29. Collett also testified that Edelman told him at the time that they "need[ed] more accounts to replace Safra." *Id*. at 129.

[8] The Court has already identified the Sunage Foundation and Rosbelt International—these were entities that received distributions from Mina/Red Star and were used to make a variety of investments. Collett testified that Satellite Support Services was an entity originally created in 2009 to hold investments in satellite technology but that became involved in a broader scope of investments at some point. *See* Collett Dep. Tr. (Feb. 3., 2025) at 152; Collett Dep. Tr. (Feb. 4, 2025) at 124. Bluestone International, on the other hand, was a company set up to operate various routine payments of the trust structure, including payments for Edelman's various advisors such as Collett, and was mainly used as a treasury company for the Galactea Trust. *See* Collett Dep. Tr. (Feb. 3, 2025) at 21; Collett Dep. Tr. (Feb. 6, 2025) at 47–51.

The Government also highlights a company called Waterlow Management Limited ("Waterlow"). *See* Gov't's Ex. 14-69, Dkt. No. 118-7 at 19. Collett testified that Edelman used Waterlow to invest in shares of another company called Isotropic, which was a company "involved in satellites and communication lines." Collett Dep. (Feb. 4, 2025) at 106. According to Collett, Edelman chose to invest in Isotropic "based on his association with the [f]ounder." *Id.* at 107. In 2015, Edelman and a business associate discussed who should sit on Isotropic's board: "Board seat is you for sure," wrote Edelman, adding, "I'm not really involved at all of course .. [sic] Shareholder will be an entity etc and end up in an easy kyc[9] trust etc. Don't want any usa connection in this of course." Gov't's Ex. 25-6, Dkt. No. 118-14. The record shows that by 2017 Waterlow had invested approximately $3,098,000 in Isotropic, with Collett estimating that an additional $4 to $5 million was invested through 2019. *Id.* at 108. Collett testified that these payments were "mainly made through Rosbelt International," which was owned by the Galactea Trust, and that he would communicate to the Galactea Trust's trustee instructions from Edelman regarding the details of these payments. *Id.* at 107–08. Collett was not aware of any profit generated from Waterlow's investments in Isotropic. *Id.* at 108.

According to Collett, Isotropic was not the only investment that Edelman directed based on personal relationships. For instance, Collett identified Mountain Pass Limited as a company that Edelman used to invest in a Chinese media company "based on his association with a Chinese national investor." Collett Dep. (Feb. 4, 2025) at 109. The Government has introduced evidence showing that SSS and Rosbelt invested millions through Mountain Pass in 2015 and 2016. Gov't's Ex. 14-69, Dkt. No. 118-7 at 21–23. And Collett further testified that Edelman continued to direct approximately $6 million through Mountain Pass between 2017 and 2020. Collett Dep. Tr. (Feb.

[9] As the Government explains, this likely refers to financial institutions' "Know Your Customer" procedures, which involve various reporting requirements.

4, 2025) at 110. Collett also testified that Edelman used an entity called the Spectral Fund to front the purchase of Palantir stock for two of his associates—first in 2009 from the Sunage Foundation, and again in 2013 from the Galactea Trust. Collett Dep. Tr. (Feb. 4, 2025) at 134–38.

In addition to investments based on personal relationships, Collett testified that Edelman directed him to use funds from the Galactea Trust to invest in a variety of ventures based on Edelman's personal preferences. For instance, Collett testified that Edelman created the company Taruki Management Limited in 2008 or 2009 to invest in films and productions because Edelman "wanted to make movies." Collett Dep. Tr. (Feb. 4, 2025) at 115. The Government has introduced evidence showing that SSS and Rosbelt invested over $15 million in Taruki between 2014 and 2017. Gov't's Ex. 14-69, Dkt. No. 118-7 at 29–39. Collett testified that he made these payments "based on the approval of Mr. Edelman," and that Edelman continued to direct investment in Taruki through 2020. Collett Dep. Tr. (Feb. 4, 2025) at 116. Another company in this area of Edelman's interest was Atlantic Screen Holdings Ltd., which Collett explained was "involved in the purchase and income from music and film royalties." *Id.* at 116–17. The Government has introduced evidence showing that, from 2015 to 2017, SSS, Rosbelt, and Bluestone invested over $5 million in Atlantic Screen Holdings. Gov't's Ex. 14-69, Dkt. No. 118-7 at 41–47. Collett testified that he was making these payments "based on the agreed amounts with Mr. Edelman." Collett Dep. Tr. (Feb. 4, 2025) at 117.

Collett identified additional companies that he testified Edelman used to direct investment from the Galactea Trust into speculative ventures. For instance, Collett testified that Edelman created the company Murney Overseas Limited in 2011 or 2012 to act as the holding company for investments in land in Mexico. Collett Dep. Tr. (Feb. 4, 2025) at 110–11. The Government has introduced evidence showing that SSS, Sunage, and Rosbelt invested more than $50 million in

Murney Overseas between 2013 and 2017. Gov't's Ex. 14-69, Dkt. No. 118-7 at 25–27. Collett testified that he made these investments based on instructions from Edelman. Collett Dep. Tr. (Feb. 4, 2025) at 111–12. He also testified that, up until the end of 2020, there had been no returns on this investment. *Id*. at 111.

In addition to land speculation, Collett testified that Edelman also directed investment in "oil exploration" in Africa and Canada and a "fuel logistics pipeline project" in Mexico through the company Lang International Holdings ("Lang"). Collett Dep. (Feb. 4, 2025) at 112–15. The Government has introduced evidence showing that, between 2013 and 2017, SSS invested over $30 million in Lang International Holdings. Gov't's Ex. 14-69, Dkt. No. 118-7 at 7–9. Collett testified that Edelman directed these investments and that the investments continued through 2020. Collett Dep. (Feb. 4, 2025) at 112–15. He also testified that the investments did not return any profit. *Id*. The record shows that, in 2016, Edelman told Collett that they "really do need in [sic] place 23 or 24 million" in the Mexico project, adding that "NONE of the money can be spent without us." Gov't's Ex. 25-7, Dkt. No. 118-16 at 1–2. In 2018, a recording was made of a meeting between Edelman and two of his business associates where they discussed the lack of value in the North American oil exploration projects and the threat of a lawsuit brought by one of their former associates. *See* Gov't's Mem. at 15 (citing Gov't's Ex. 25-8 (on file with chambers)). At the meeting, Edelman informed his associates that he wanted to "close all these companies" because they were "complete losses to this point and my name gets dragged into this and I funded it hundred percent;" "suddenly I see my name on some legal document," Edelman said, "I spend all my, all of my time trying to make sure my name isn't in anything, so any companies that we have, anything whatsoever, any penny that we have in any company, lets close everything, stop

everything." Gov't's Ex. 25-8 (on file with chambers). "I don't have enough knowledge about what's going on and yet I've invested all the money," Edelman complained. *Id.*

Beyond investing, Collett testified that Edelman also directed transfers from the Galactea Trust to make personal purchases. Collett testified that in 2014, for example, he used SSS to purchase a €711,000 yacht—*Divinity*—at the direction of Edelman. Collett Dep. (Feb. 4, 2025) at 139–43. Then he did it again the next year, using SSS to make the 2015 purchase of *Princess Juliet* for €325,000 at Edelman's direction. *Id.* An email chain from 2016 shows that Edelman "instructed" one of his associates to purchase a $480,000 home in Mexico through Murney Overseas Ltd. Gov't's Ex. 14-63, Dkt. No. 118-5. And Collett testified that in 2018, at Edelman's direction, he transferred €450,000 to an associate of Edelman's so they could purchase a property in Ibiza, Spain, where Edelman already owned a house. Collett Dep. Tr. (Feb. 5, 2025) at 10–11.

In sum, Collett, who served as Edelman's accountant from 2004 to 2020, testified at length about how Edelman continued to use the income generated from Mina/Red Star as his own after that income purportedly belonged to the Galactea Trust. Whether it was investments identified through Edelman's connections or purchases for Edelman's personal use, Collett testified that "the directions had always come from Mr. Edelman." Collett Dep. (Feb. 4, 2025) at 119. Collett also testified that, while Edelman's investments typically did not turn a profit, he could not remember a time when Edelman wanted to make an investment or transfer money and the trustee of the Galactea Trust said no. *Id.* at 124.

4. <u>Edelman's Tax Filings and Continued False Statements</u>

In 2015, Edelman, who had yet to file any U.S. income tax returns on his income from Mina/Red Star or any other source, decided to participate in the Offshore Volunteer Disclosure Program ("OVDP"), an amnesty program for taxpayers who willfully fail to report foreign financial assets and pay taxes due. Plea Hr'g Tr., Dkt. No. 79 at 24:23–25:5. So he sent a Dutch

individual—identified as Co-Conspirator 2—to the United States to meet with tax attorneys and tax preparers on his behalf. *Id*. at 24:6–22. Following this meeting, Co-Conspirator 2, along with Edelman's longtime accountant Collett, told the tax attorneys and tax preparers the same false story that Edelman had engineered in response to the 2010 congressional investigation: that Le Dain was a founder and 50% owner of Mina/Red Star and that its assets, put in a trust, had always been hers. *Id*. Over the next few months, Edelman's advisors, including Collett and Co-Conspirator 2, provided a series of false and misleading documents to support the false story that Mina/Red Star was and always had been owned by Le Dain. *Id*.

Edelman and his advisors ultimately prepared a client binder for his tax attorneys. *See* Gov't's Ex. 4-5, Dkt. No. 118-1 (the "Client Binder"). This binder relayed a series of misrepresentations regarding Edelman's relationship with Mina/Red Star. As Collett put it, the "Binder told the party line." Collett Dep. (Feb. 6, 2025) at 17:14. For instance, it repeated the misrepresentation that Le Dain was a founder and 50% owner of Mina/Red Star. *Id*. at 4. It also stated that Edelman "had no interest in [the Sunage Foundation] trust at any time." *Id*. To explain Edelman's involvement with Mina/Red Star, the client binder stated that Edelman had acted as a nominee for Le Dain from the beginning. *Id*. at 21. Edelman and his advisors attached a sworn affidavit from Le Dain to bolster these misrepresentations. *Id*. at 373. But as Edelman admitted in his plea, these representations were false. He was the co-founder of Mina/Red Star and the ultimate beneficial owner of the Sunage Foundation trust. Plea Hr'g Tr. at 19–22.

Based on the false information Edelman and his advisors provided to his tax attorneys and tax preparers, Edelman was advised to report only "gifts" from Le Dain and "consulting fees" from Mina/Red Star. *Id*. at 24:23–25:5. In March 2016, Edelman caused his attorneys to submit an OVDP letter to the IRS on his behalf. *Id*. at 25:8–18. This letter was signed by Edelman, and in

it, Edelman swore that, from 2007 to 2014, he was a "consultant" for foreign entities in which he never had an ownership interest and that he had earned less than $1 million in unreported income in each of these years. *Id*. In October 2016, Edelman caused his attorneys to make a full submission through the OVDP, which included Edelman's individual income tax returns for years 2007 through 2014 and the previously mentioned March 2016 letter. *Id*. at 25–26. Edelman's income tax returns for years 2007 through 2014 did not report the income he received for his 50% ownership of Mina/Red Star.[10] *Id*. Nor did his returns for years 2015 through 2020, which he continued to file after his 2016 OVDP submission. *Id*. at 26–27. Edelman has pled guilty to making false statements in these 2016 submissions to the IRS, and to tax evasion based on his failure to report his Mina/Red Star income for tax years 2006 through 2012.

In 2018, the Department of Justice contacted Edelman regarding Mina/Red Star. *Id*. at 28. Edelman continued to push the party line. Edelman admits that, in response to DOJ's contact, he caused his attorneys to make a presentation to a federal agent and prosecutors in which they repeated the false story that Le Dain, not Edelman, had co-founded Mina/Red Star and that Edelman received less than $1 million in income working as a consultant in each year from 2007 to 2014. *Id*. For this, Edelman has pled guilty to willfully making false statements to the Executive Branch. *Id*. at 66.

In 2019, Edelman's Mina/Red Star co-founder, Erkin Bek, began expressing concern over the way the other half of the company had been organized. This concern came to a head in a December 2019 email that Bek sent to Edelman, Collett, the trustee of the Galactea Trust (Leonard O'Brien), and another of Edelman's associates (Remco Polderman). Bek wrote that

> After . . . receiving various conflicting messages in regard to your side of ownership, mixed with various multiple misrepresentations made from your side[,]

[10] Edelman also failed to submit a tax return for the year 2006, in which he earned approximately $6,486,356 in profit distributions from Mina/Red Star. *Id*.

> . . . I conclude that you are playing with fire on compliance business operational issues and not taking them seriously.

Collett Dep. (Feb. 4, 2025) at 132:4–10 (Collett reading from Bek's email). Bek continued by clarifying that

> My partner and ultimate beneficial owner is Douglas Edelman. It is not Delphine [Le Dain]. It is not Leonard [O'Brien, the trustee], or his sham trust companies. Not Graham [Collett], not Remco [Polderman], nor anyone else. There's one and only partner and UBO—Douglas Edelman.

*Id*. at 132:14–23 (same). Bek concluded by saying that "Douglas need[ed] to formalize his position regarding his own status if he want[ed] to keep giving directions to the company's officers." *Id*. at 135:15–18.

Collett testified that Bek's email triggered a "long and confusing time" during which "Edelman consulted with various lawyers . . . and there was a long series of meetings and proposals put forward" regarding his relationship with Mina/Red Star. *Id*. at 137. Collett explained that one of the leading proposals was for Edelman to set up a new company—to be called Praedium—that would acquire the half of Mina/Red Star that was purportedly owned by the Galactea Trust. *Id*. at 150. In April 2020, Edelman sent Bek letters memorializing his "100% interest as the ultimate beneficial owner of Praedium," which Edelman described as "a holding company for the 50% interest that I personally have in Mina Group FZCO," and certifying that the "authorization of any necessary third parties, including Galactea Trust to transfer all of the business of [Mina/Red Star] to Mina Group FZCO" would "immediately occur." Collett Dep. (Feb. 6, 2025) at 14–16 (quoting Edelman's letters to Bek). At the same time as he was structuring proposals for the future, however, Edelman continued his attempts to cover up the past. During his plea, Edelman admitted that, in 2020, he directed one of his associates to change Gibraltar's public registration database to falsely reflect that Edelman was not the co-owner of Mina/Red Star. Plea Hr'g Tr. at 28:21–29:3.

Edelman's plan to convert Mina/Red Star into Mina Group FZCO and to own half of Mina Group FZCO through Praedium never materialized. Instead, in July 2020, Edelman proposed that Bek purchase the entirety of Mina/Red Star. Gov't's Ex. 25-10, Dkt. No. 118-18. Bek made an offer to Edelman and Collett in August 2020. Gov't's Ex. 25-11, Dkt. No. 118-19. The deal closed in October 2020, with Edelman signing as the Seller Guarantor for the Seller Rosbelt International Limited and Bek signing as the Purchaser Guarantor for the Purchaser, which was one of his own companies. Gov't's Ex. 25-12, Dkt. No. 118-20. A week after the sale Edelman wrote to an associate that "we sold mina .. good deal for us .. I am not really advertising it or telling people in general but thought you'd like to know." Gov't's Ex. 25-13, Dkt. No. 118-21.

Collett testified that Bek agreed to pay $76 million for the other half of Mina/Red Star, with approximately $41 million of that paid to Rosbelt International in 2020. Collett Dep. (Feb. 6, 2025) at 31–33. Collett further testified that Edelman directed much of the $41 million received in 2020 into his business ventures. *Id*. at 33. For instance, Collett testified that $10 million was invested in the Mexican fuel logistics project. *Id*. at 33–35. Edelman did not report the income from the sale of Mina/Red Star on his 2020 tax return. *See* Gov't's Ex. 25-9, Dkt. No. 118-17.

**B. Procedural Background**

On May 16, 2024, a grand jury in the District of Columbia handed down a thirty-count indictment charging Edelman with conspiring to defraud the United States from 2008 to 2021, making false statements to the Department of Justice in 2016, making false statements to the Internal Revenue Service in 2018, evading taxes on his income from 2006 to 2020, and filing false reports of his foreign bank accounts with the IRS from 2007 to 2012 and again from 2015 to 2020. *See* Indictment, Dkt. No. 1. Edelman was arrested in July 2024. *See* Mem. Op., Dkt. No. 53 at 3.

On May 21, 2025, Edelman entered, and the Court accepted, his partial open plea in open court. *See* Plea Hr'g Tr., Dkt. No. 79. In doing so, Edelman pled guilty to the first ten counts of

the indictment: conspiring to defraud the United States from 2008 through 2021 (Count One); making false statements to the Internal Revenue Service in October 2016 (Count Two); making false statements to the Department of Justice in March 2018 (Count Three); and willfully attempting to evade and defeat income taxes for tax years 2006 through 2012 (Counts Four through Ten). *See id.*; Indictment, Dkt. No. 1. Edelman maintains his innocence with respect to the remaining twenty counts: willfully attempting to evade and defeat income taxes for tax years 2013 through 2020 (Counts Eleven through Eighteen); willfully filing false reports of foreign bank accounts with the IRS for years 2007 through 2012 (Counts Nineteen through Twenty-Four); and willfully filing false reports of foreign bank accounts with the IRS for years 2015 through 2020 (Counts Twenty-Five through Thirty).

Following Edelman's open plea, the parties proposed proceeding to sentencing on the counts to which Edelman had pled guilty while holding the remaining counts in abeyance. *See* Plea Hr'g Tr., Dkt. No. 79 at 67. The Government indicated that it would decide whether to proceed to trial on the remaining counts following the Court's resolution of certain issues at sentencing—specifically, issues related to the extent of the tax loss attributable to Edelman's offense. *See* Min. Order, May 16, 2025. The Court adopted this proposal.

The parties agree that, at sentencing, the counts that Edelman has pled guilty to will be "grouped" and treated as one count. *See* Joint Notice, Dkt. No. 78 at 2 n. 1 (citing USSG §§ 3D1.1, 3D1.2). Edelman's base offense level will be determined by the "total tax loss" attributable to his offense. USSG § 2T1.1. In determining the total tax loss attributable to Edelman's offense, the Sentencing Guidelines direct the Court to consider the tax loss attributable to all of Edelman's "relevant conduct," which is defined in this context as "all conduct violating the tax laws" so long as that conduct is not "clearly unrelated" to his offense. *Id.* comment (n.2) (citing USSG

§1B1.3(a)(2)). The parties agree that "courts routinely accept as relevant conduct facts, proven by a preponderance of the evidence, relating to uncharged counts." Joint Notice, Dkt. No. 78 at 4.

For all intents and purposes, the total tax loss attributable to Edelman's offense will be a product of the loss stemming from Edelman's failure to report profit distributions he received from Mina/Red Star. It is undisputed that Edelman failed to report profit distributions from Mina/Red Star in tax years 2006 through 2020. Based on this failure and associated deceptive conduct, Edelman has pled guilty to willfully evading taxes on hundreds of millions of dollars that he received as income from Mina/Red Star during tax years 2006 through 2012. Edelman does not dispute including any tax loss from 2006 through 2012 in the calculation of the total tax loss attributable to his offense.

Edelman maintains his innocence, however, with respect to the charges of tax evasion for tax years 2013 through 2020. According to Edelman, he did not receive any profit distributions from Mina/Red Star from 2013 through 2020 because he "contributed" his ownership interest in the company to the Galactea Trust in 2013. *See* Def.'s Resp. at 3. Edelman therefore argues that the Court should only consider the tax loss stemming from tax years 2006 through 2012 in calculating the total tax loss attributable to his offense. The Government disagrees. According to the Government, the Court should include any tax loss stemming from tax years 2013 through 2020 in its calculation because the Galactea Trust was a sham trust that did not change Edelman's economic relationship to Mina/Red Star or its profit distributions. The Government, in other words, argues that Edelman continued to receive and evade taxes on Mina/Red Star's profit distributions from 2013 through 2020, and that the Court should therefore calculate the total tax

loss attributable to Edelman's offense by tallying the loss stemming from Edelman's admitted 2006–2012 tax evasion and his charged 2013–2020 evasion.[11]

Accordingly, to calculate the total tax loss attributable to Edelman's offense and thereby determine his base offense level at sentencing, the Court must first determine whether the Government has shown by a preponderance of the evidence that the Galactea Trust was a sham trust that did not change Edelman's economic relationship to Mina/Red Star or its profit distributions. If the Government fails to show that the Galactea Trust was a sham trust, then the Court will only consider the loss stemming from tax years 2006 through 2012 when calculating the total tax loss attributable to Edelman's offense. If the Government does show that the Galactea Trust was a sham trust, however, then the Court will consider whether the Government has shown by a preponderance of the evidence that Edelman willfully attempted to evade income tax on the profit distributions he received from Mina/Red Star for tax years 2013 through 2020. And if the Government makes this second showing, then the Court will consider the loss stemming from tax years 2006 through 2020 when calculating the total tax loss attributable to Edelman's offense.

## II. LEGAL STANDARD

Courts begin the sentencing process by calculating the applicable range under the U.S. Sentencing Guidelines. *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 184 (D.D.C. 2018) (CRC) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)). To do so, courts must first determine which guideline corresponds to the offense of conviction. *Id*. Edelman has pled guilty to multiple offenses: one count of conspiring to defraud the United States under 18 U.S.C. § 371,

[11] The Government argues that the total tax loss attributable to Edelman's offense is $129 million. *See* Gov't's Resp. at 1. It attributes $58.2 million to tax years 2006 through 2012, and $70.8 million to tax years 2013 through 2020. *Id*. Edelman asserts that he "has no basis for alleging that the tax loss is less than $65,000,000," but suggests it may be less than $90 million. *See* Def.'s Mem. at 3–4. However, because "the parties are not yet disputing the tax loss figures," the Court shall refrain from analyzing them at present. Def.'s Resp. at 11.

which is governed by § 2C1.1; two counts of making false statements to the Executive Branch under 18 U.S.C. § 1001, which are governed by § 2B1.1; and seven counts of tax evasion under 26 U.S.C. § 7201, which are governed by § 2T1.1. *See* Plea Hr'g Tr., Dkt. No. 79. However, the Sentencing Guidelines dictate that these counts be "grouped" and treated as one at sentencing. U.S.S.G. § 3D1.2.

Through the applicable guideline, courts then determine a "base offense level." *Abu Khatallah*, 314 F. Supp. 3d at 184. Here, the base offense level for Edelman's grouped count will be determined in accordance with the guideline for the tax evasion charges, § 2T1.1. *See* U.S.S.G. § 2B1.1(c)(3); Joint Authority, Dkt. No. 78 at 2 n. 1. This guideline directs the court to calculate the "tax loss" attributable to the offense—defined as "the total amount of loss that was the object of the offense"—and apply the corresponding offense level from the Tax Table in § 2T4.1. U.S.S.G. § 2T1.1. In determining the total tax loss, the Sentencing Guidelines direct courts to consider the tax loss attributable to all of a defendant's "relevant conduct," which is defined in this context as "all conduct violating the tax laws" that is not "clearly unrelated" to the underlying offense. *Id*. comment (n.2) (citing USSG §1B1.3(a)(2)).

Courts routinely accept as relevant conduct facts, proven by a preponderance of the evidence, relating to uncharged or acquitted conduct. *See*, *e.g.*, *United States v. Daulton*, 266 F. App'x 381, 387 (6th Cir. 2008) ("The Guidelines permit the use of uncharged conduct in calculating the tax-loss."); *United States v. Lynch*, 735 F. App'x 780, 792 (3d Cir. 2018) (explaining that "the District Court's reliance on uncharged and acquitted conduct was appropriate" when determining total tax loss); *United States v. Brown*, No. 22-cr-114 (TJK), 2024 WL 291741 at *2 (D.D.C. Jan. 24, 2024) (courts "routinely consider pending charges against a defendant"). As the D.C. Circuit has explained, "long-standing precedents of the Supreme Court

and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction." *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (Kavanaugh, J.).

## III. ANALYSIS

As the Court has explained, the parties' present dispute concerns whether the Court's calculation of the total tax loss attributable to Edelman's offense should be limited to the loss stemming from tax years 2006–2012 (the years to which Edelman has pled guilty of tax evasion) or encompass the loss stemming from tax years 2006–2020 (which includes years to which Edelman maintains he is innocent of tax evasion). To resolve this dispute, the Court must determine whether the Government has shown by a preponderance of the evidence that (1) the Galactea Trust was a sham trust and (2) Edelman continued to earn income from Mina/Red Star and willfully evade taxes on that income from 2013 through 2020.

The Court concludes below that the Government has made both showings. Accordingly, when calculating the total tax loss attributable to Edelman's offense, the Court shall consider any tax loss stemming from the years 2006 through 2020.

### A. The Government has shown by a preponderance of the evidence that the Galactea Trust was a sham trust.

The Galactea Trust[12] was created under the laws of the British Virgin Islands and England & Wales. The Government does not dispute that the Galactea Trust was valid on paper under the

[12] While the Court shall refer to the Galactea Trust, the Court's analysis applies with equal force to the numerous other trusts that were created during the relevant period and used by Edelman. As the Government explains, the client information that Edelman provided to his tax attorneys details "numerous trusts and corporate entities," including "not just the Galactea Trust (used to hold Mina/Red Star), but also entities such as Big Valley Trust (for the London townhome Edelman purchased), Iverna Trust (for Edelman's media investments), Atlas Trust (for Edelman's Kenyan farming investments), Dina Maropa Trust (for Edelman's Mexican land investments), Lightstar Trust (a trust established for Edelman's children from his first marriage), Ithaque Trust (purpose unclear), Bluestone Trust (used as a treasury account to receive dividends and fund investments), and Delfinity Trust (purpose unclear)." Gov't's Mem.

relevant foreign laws. *See* Gov't's Resp. at 3. In other words, the Government does not dispute that the Galactea Trust's organizing documents, as interpreted under the relevant foreign laws, adequately identify (1) a donor, (2) property, (3) a trustee to take title to the property for the purpose of protecting or conserving it, and (4) designated beneficiaries.

But the validity of a trust on paper is not dispositive when determining whether to attribute income to a taxpayer. *See Richardson v. Comm'r*, 509 F.3d 736, 740–41 (6th Cir. 2007). A trust must have economic substance to be valid for purposes of assessing federal income tax, which means it must change the taxpayer's economic position in a meaningful way apart from its effect on federal income tax and have a substantial purpose apart from its impact on the taxpayer's federal income tax. 26 U.S.C. § 7701(o); *see also Full-Circle Staffing, LLC v. Comm'r of Internal Revenue*, 115 T.C.M. (CCH) 1341 (T.C. 2018), *aff'd in part, appeal dismissed in part sub nom. Full-Circle Staffing, L.L.C. v. Comm'r of Internal Revenue*, 832 F. App'x 854 (5th Cir. 2020) (citing *Zmuda v. Commissioner*, 79 T.C. 714, 719 (1982), *aff'd*, 731 F.2d 1417 (9th Cir. 1984); *Markosian v. Commissioner*, 73 T.C. 1235, 1241 (1980)). Whether a trust lacks economic substance is a question of fact that is determined under a framework provided by federal law. *Full-Circle Staffing*, 115 T.C.M. (CCH) 1341 (T.C. 2018) (citing *Paulson v. Commissioner*, T.C. Memo. 1991-508, aff'd, 992 F.2d 789 (8th Cir. 1993)). If a trust lacks economic effect and does not alter a cognizable economic relationship, then the Court may ignore the trust as a sham trust and apply the tax law in accordance with the entity's substance.

Edelman suggests that it would be inappropriate to analyze the economic substance of the Galactea Trust without reference to foreign law because Congress' codification of the economic substance doctrine at 26 U.S.C. § 7701(o) rendered the doctrine a creature of statutory

---

at 27. The Government further explains that, "[o]n paper, each of these trusts oversaw numerous other corporations, partnerships, joint-ventures, and other entities." *Id.*

interpretation. *See* Def.'s Mem. at 13 ("In the modern era, 'economic substance,' refers to the rule of statutory interpretation, portions of which Congress codified at 26 U.S.C. § 7701(o)."). But this argument is not supported by the statute or the caselaw cited by the defense. Section 7701(o) directs the Court to determine whether the economic substance doctrine is relevant in the same manner as if the statute had never been enacted. 26 U.S.C. § 7701(o)(5)(C). And the caselaw clearly shows that the economic substance doctrine has been (and therefore is) relevant to trusts. *See*, *e.g.*, *Richardson*, 509 F.3d at 740–41. Accordingly, in determining whether the Government has shown by a preponderance of the evidence that the Galactea Trust lacked economic substance, the Court shall analyze the evidence under the framework provided by federal law.

Under federal law, courts consider the following four factors when determining whether a trust lacks economic substance: (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether an independent trustee existed to prevent the taxpayer from acting solely in their own interests; (3) whether an economic interest in the trust assets passed to other beneficiaries; and (4) whether the taxpayer felt bound by the restrictions imposed by the trust or the law of trusts. *See Richardson*, 509 F.3d at 742; *Markosian*, 73 T.C. at 1241. After considering the evidence in the context of these four factors, the Court concludes that the Government has shown by a preponderance of the evidence that the Galactea Trust lacked economic substance and should therefore be disregarded as a sham trust.

1. <u>The Government has shown that Edelman's relationship to Mina/Red Star and its income did not materially change after the Galactea Trust's creation.</u>

The first factor that courts consider in determining whether a trust lacked economic substance is whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation. *See Richardson*, 509 F.3d at 742. The Government has shown

by a preponderance of the evidence that Edelman's relationship with Mina/Red Star and its income did not materially change after the creation of the Galactea Trust.

To start, the record shows that Edelman and his co-founder Erkin Bek continued to manage Mina/Red Star as partners after the creation of the Galactea Trust. In 2015, for instance, Edelman and Bek exchanged numerous emails on multiple occasions regarding the termination of top executives at Mina/Red Star, their severance packages, and options for restructuring Mina/Red Star's operations afterward, including the possibility of consolidating ownership to create a "controlling shareholder" between them. Gov't's Ex. 25-3, Dkt. No. 118-11 (where Bek tells Edelman they need to "DECIDE FOR SOMEONE BETWEEN YOU AND I TO TAKE ULTIMATE POWER SO WE CAN . . . JUST HAVE ONE DECIDER OF EVERYTHING, A CONTROLLING HOLDER"); *see also* Gov't's Ex. 25-2, Dkt. No. 118-10. The next year, in 2016, Edelman and Bek discussed selling Mina/Red Star to a third-party. Gov't's Ex. 25-4, Dkt. No. 118-12 ("I have an idea what I'd accept," writes Edelman). Ultimately, it was Bek that purchased the entirety of Mina/Red Star in 2020, with Edelman signing as the Seller Guarantor for the Seller Rosbelt International Limited. Gov't's Ex. 25-12, Dkt. No. 118-20; *see also* Gov't's Ex. 25-13, Dkt. No. 118-21 (where Edelman writes to an associate: "we sold mina .. good deal for us .. I am not really advertising it or telling people in general but thought you'd like to know"). Before this happened, Bek made Edelman's relationship to Mina/Red Star clear: "My partner and ultimate beneficial owner is Douglas Edelman," Bek wrote in a 2019 email, "There's one and only partner and UBO—Douglas Edelman." Collett Dep. Tr. (Feb 5, 2025) at 132 (reading from Bek's email).

Furthermore, there is ample evidence in the record to infer that Edelman continued to treat Mina/Red Star's income as his own after the Galactea Trust was created. Emails from 2016 show

Edelman and Bek deciding when to issue dividends and for how much, with Edelman suggesting they issue the dividends via credit lines rather than cash. Gov't's Ex. 25-6, Dkt. No. 118-15. Moreover, during a four-day deposition, Edelman's longtime accountant—and admitted instrumentality—Graham Collett detailed how Edelman continued to direct investments through the Galactea Trust into the same business ventures that he had invested in before the Galactea Trust. *See, e.g.*, Collett Dep. Tr. (Feb. 4, 2025) at 101–29. And the Government has provided evidence to support Collett's testimony. *See* Gov't's Ex. 25-6, Dkt. No. 118-14 (June 2015 email exchange between Edelman and his business associate Robert Dooner where Edelman directs Dooner to "get the best deal you can and make sure we've all the rights we need," before adding: "Board seat is you for sure. I'm not really involved at all of course .. Shareholder will be an entity etc and end up in an easy kyc trust etc. Don't want any usa connection in this of course."); Gov't's Ex. 25-7, Dkt. No. 118-16 (2016 email chain between Edelman and Collett where Edelman tells Collett that they "really do need in place 23 or 24 million" into a Mexican fuel logistics company, adding: "We should not use sssl for all these payments anymore. We need a better entity and structure. Every time sssl makes a payment there are now always lots and loads of questions from the banks receiving the money."). The Government has also provided evidence to show that Edelman used Mina/Red Star's income to make personal purchases after the creation of the Galactea Trust. *See* Gov't's Ex. 14-63, Dkt. No. 118-5 (2016 email chain showing that Edelman authorized the purchase of a home in Mexico through one of his holding companies); Collett Dep. Tr. (Feb. 4, 2025) at 139–44 (where Collett testifies that Edelman directed him to purchase two yachts using one of Edelman's holding companies).

Accordingly, the Government has provided substantial support for its argument that the Galactea Trust did not change Edelman's relationship to the property he purportedly transferred to

the Trust—i.e., his 50% ownership stake in Mina/Red Star and the attendant income. Edelman's attempt to frame the record as showing that he merely "provided strategic oversight" after the creation of the Galactea Trust is not supported by the evidence. *See* Def.'s Resp. at 12. With respect to Edelman's continued role with Mina/Red Star, the most reasonable inference from the record is that Edelman continued to act as a 50/50 partner with Bek after the creation of the Galactea Trust, not as a mere advisor. And as the Court shall explain in more detail below, the most reasonable inference from the evidence regarding Edelman's relationship to the Galactea Trust is not that he merely advised the Galactea Trust how to best invest Mina/Red Star's income, but that he directed the Galactea Trust when and how to make use of Mina/Red Star's income as if that income were his own. In other words, it appears that after the creation of the Galactea Trust, Edelman "conducted [his] business and lived [his] private [life] exactly the same as before the trust was created." *Markosian*, 73 T.C. at 1243.

Accordingly, the Court finds that the Government has adequately shown that the creation of the Galactea Trust did not materially change Edelman's relationship to Mina/Red Star and its income. This first factor therefore supports finding that the Galactea Trust was a sham trust.

2. <u>The Government has shown that the Galactea Trust did not have an independent trustee to prevent Edelman from acting solely in his own interest.</u>

The second factor that courts consider in determining whether a trust lacked economic substance is whether the trust had an independent trustee to prevent the taxpayer from acting solely in their own interest. *See Richardson*, 509 F.3d at 742. The Government has shown by a preponderance of the evidence that the Galactea Trust did not have an independent trustee to prevent Edelman from using the Galactea Trust solely for his own interest.

During the relevant period, Leonard O'Brien, through his trust administration companies, was registered as the trustee of the Galactea Trust.[13] *See* Galactea Deed at 2; Def.'s Mem. at 22. As such, O'Brien owed a variety of duties to the Trust's beneficiaries, including a duty of loyalty and a "duty to ensure that trust assets [were] invested prudently." *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 647 (8th Cir. 2017) (citing Restatement (Third) of Trusts §§ 90, 91 (2007)). The D.C. Circuit has explained that the duty of "independent evaluation" is "the most basic of [a trustee's] fiduciary duties." *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985). In representing the Trust, O'Brien was accompanied by Edelman's accountant Collett, who acted as the "protector" of the Trust during the relevant period. *See* Galactea Deed at 2; Collett Dep. Tr. (Feb. 3, 2025) at 21. Collett testified that this role involved "[o]verseeing what was being done by the Trustee" and "working with the Trustee [to make] sure that the monies in and out of the Trust were being properly accounted for." Collett Dep. Tr. (Feb. 6, 2025) at 51:23–52:2 (cleaned up). Both O'Brien and Collett had a duty to act in the interests of the Galactea Trust's beneficiaries, which were purportedly Le Dain and her children. *See* Galactea Deed at 5–6.

In arguing that O'Brien served as an independent trustee of the Galactea Trust, Edelman points to testimony from Collett regarding how certain payments were structured through the Trust. Collett testified that there "were two basic accounts operated through [the] Galactea Trust:" Rosbelt International, which owned half of Mina/Red Star on paper, and Bluestone International. Collett Dep. Tr. (Feb. 6, 2025) at 47:14–17. According to Collett, Rosbelt received "most of the income . . . from the [Mina/Red Star] distributions" and was used to makes investments and

[13] On paper, the trustee of the Galactea Trust was Salamander Associates Limited, Galactea Deed at 2, which was "a professional trust administration company organized under the laws of the British Virgin Islands" that was "owned and operated" by Leonard O'Brien. Def.'s Mem. at 22. A November 2019 amendment to the deed of trust replaced Salamander Associates with Salamander Corporate Services SA, which was a Swiss company also owned and operated by Leonard O'Brien. *Id*. For ease of reference, the Court shall refer to Leonard O'Brien as the purported trustee of the Galactea Trust.

purchases through a variety of subsidiary companies. *Id*. at 48; *see also supra* Section I.A.3 (discussing subsidiary companies). Collett testified that O'Brien was the signatory on the Rosbelt account and "made the payments . . . for investments from Rosbelt." *Id*. at 50. Bluestone, on the other hand, was used to pay "administration and overhead expenses." *Id*. Collett testified that these payments from Bluestone "were always authorized[] either based on standing instructions from Mr. Edelman, or specific instructions from Mr. Edelman," and that he summarized these payments in reports to O'Brien. *Id*.

The testimony highlighted by Edelman, however, is only part of the picture painted by Collett. As the Court explained in detail above, *see supra* Section I.A.3., Collett testified that Edelman used the Galactea Trust to continue investing in a variety of companies that he had been investing in before the creation of the Trust, Collett Dep. Tr. (Feb. 4, 2025) at 101–19. Collett testified that most of these investments did not turn a profit and that "the directions [for the investments] had always come from Mr. Edelman." *Id*. at 118–20. He explained that "there wasn't a particular strategy in terms of investment in different types of assets to provide a balanced portfolio of risk," and that the investments "were made primarily on the basis of Mr. Edelman's contacts with various people within various spheres of activity." *Id*. at 120 ("[Edelman] would develop those relationships and would make decisions based on those discussions with those individuals as to when and how to invest."). While Collett attempted to get Edelman to develop some semblance of an investment strategy, he testified that "[Edelman's] Modus Operandi throughout [2004 until 2020] did not really change:" Edelman "was the one making the decisions based on his various contacts." *Id*. at 121. Collett added that O'Brien "would be kept aware of the various investments that were being made and he would authorize the main payments out of

the Rosbelt account," but Collett could not recall a single time where Edelman directed an investment or transfer of money from the Galactea Trust and O'Brien said, "No." *Id*. at 123.

Based on Collett's testimony and the evidence detailed above, *see supra* Section I.A.3, the Court finds that the Government has shown by a preponderance of the evidence that the Galactea Trust lacked an independent trustee to prevent Edelman from acting solely in his own interest. The record shows that O'Brien never "refused or even questioned [Edelman's] requests for funds" from the Galactea Trust. *Wegbreit v. Commissioner*, 2019 Tax Ct. Memo LEXIS 88, at *57 (T.C. July 8, 2019). It also shows that O'Brien did not "participate[] in the identification, evaluation, or selection of the trust assets and investments." *Id*. Edelman attempts to justify O'Brien's lack of independence by claiming that "everybody was living high on the hog" prior to 2019, Evid. Hr'g Tr. at 26, but this is no justification. First, as trustee, O'Brien had a duty to independently represent the Trust's beneficiaries by investigating Edelman's investment decisions regardless of how successful Edelman may have appeared. Second, and perhaps more importantly, the record shows that most of the investments directed by Edelman consistently failed to return a profit for the Galactea Trust, which meant that O'Brien's blind signoff on Edelman's investment decisions caused more than just theoretical harm to the Trust's purported beneficiaries. Collett Dep. Tr. (Feb. 4, 2025) at 101–19. As Edelman openly admits, this led to a "business crisis" for the Trust in 2019. *See* Evid. Hr'g Tr. at 33; *see also id*. at 24, 27, 28, 29, 31, 33. The Court shall explain this crisis in more detail in the following section.

Accordingly, the Court finds that the Government has shown by a preponderance of the evidence that the Galactea Trust lacked an independent trustee to prevent Edelman from acting in his own interest. This second factor therefore supports finding that the Galactea Trust was a sham trust.

3. The Government has shown that the purported beneficiaries of the Galactea Trust did not receive any real economic interest in Mina/Red Star and its income.

The third factor that courts consider in determining whether a trust lacked economic substance is whether the purported beneficiaries of the trust received an economic interest in the property that was purportedly transferred to the trust. *See Richardson*, 509 F.3d at 742. The Government has shown by a preponderance of the evidence that the purported beneficiaries of the Galactea Trust—Le Dain and her children—did not receive any real economic interest in Mina/Red Star and its attendant income.

Because the Galactea Trust did not have an independent trustee to prevent Edelman from acting solely in his own interests, the beneficiaries of the Trust—Le Dain and her children—did not obtain any real economic interest in the Trust's assets. Le Dain learned this the hard way when, in 2019 and 2020, the Trust underwent a "crisis" caused by a depletion of assets and Erkin Bek's refusal to continue signing off on distributions that he thought were going to a sham trust. *See* Evid. Hr'g Tr. at 24–29, 31–33; Collett Dep. Tr. (Feb. 4, 2025) at 123; Collett Dep. Tr. (Feb. 5, 2025) at 121. This brought Le Dain into the picture, but the damage had already been done. "I just do not understand," she wrote to Collett in 2020, "We keep investing in long term, shaky, very uncertain deals when in the short term we cannot even pay the bills." Collett Dep. Tr. (Feb. 5, 2025) at 129 (quoting email). These were the deals that Edelman had directed based on his personal relationships. If the trustee had been independent then the Trust would not have invested at Edelman's direction, and perhaps Le Dain and her children would have obtained an economic interest in the Trust's assets. Instead, the record shows that the Trust enabled Edelman to continue his practice of using Le Dain's name while shielding the details from her: "A man is wise to deal with his finances in his own way with talking to women," he wrote an associate in 2012, "Delphine

really never had a clue [about] what I earned or didn't and even sometimes what I did. I always felt it better that way." Gov't's Ex. 25-14, Dkt. No. 118-22 at 2.

Accordingly, the Court finds that the Government has shown by a preponderance of the evidence that the beneficiaries of the Galactea Trust did not have any real economic interest in the Trust's assets. This third factor therefore supports finding that the Galactea Trust was a sham trust.

4. The Government has shown that Edelman did not feel bound by the restrictions of the Galactea Trust or the law of trusts.

The fourth and final factor that courts consider in determining whether a trust lacked economic substance is whether the taxpayer felt bound by the purported restrictions of the trust or the law of trusts. *See Richardson*, 509 F.3d at 742. The Government has shown by a preponderance of the evidence that Edelman did not feel bound by the purported restrictions of the Galactea Trust or the law of trusts.

Edelman admits that he lied to the firm that created the Galactea Trust by representing to them that Le Dain already owned half of Mina/Red Star before the Galactea Trust was formed. Evid. Hr'g Tr. at 20–21. The record also shows that Edelman caused this lie to spread to the outside law firm involved in creating the Galactea Trust and the in-house attorneys for Mina/Red Star. *See* Gov't's Ex. 4-5, Dkt. No. 118-1 at 54; Gov't's Ex. 24-1, Dkt. No. 118-8. That Edelman caused the Galactea Trust to be created out of a lie suggests he did not consider himself bound by the Trust or the law of trusts from the very start. And nothing about his use of the Trust suggests those views changed. As discussed above, Edelman used the Galactea Trust to make the same types of investments to many of the same companies that he invested in before the creation of the Trust. This suggests that Edelman did not consider himself bound by the restrictions of the Galactea Trust, which purported to include a restriction that prohibited Mr. Edelman from being a beneficiary. *See* Expert Report, Dkt. No. 119-1. Furthermore, as the Government explains, the

fact that Edelman created so many different trusts for his various investments suggests that he did not consider the law of trusts to be binding on his activities. Gov't's Mem. at 27; *see also supra* Section III.A at 32 n. 12 (listing the various trusts).

Accordingly, the Court finds that the Government has shown by a preponderance of the evidence that Edelman did not consider the Galactea Trust or the law of trusts to be binding on his activities. This fourth factor therefore supports finding that the Galactea Trust was a sham trust.

* * *

In sum, the Court finds that the Government has adequately shown that the Galactea Trust was a sham trust and that Edelman continued to earn income from Mina/Red Star from 2013 to 2020. Despite what the Galactea Trust purported to be on paper, the record shows (1) that Edelman's relationship to Mina/Red Star and its income did not materially change after the creation of the Galactea Trust; (2) that the Galactea Trust did not have an independent trustee to prevent Edelman from acting solely in his own interest; (3) that the purported beneficiaries of the Galactea Trust—Le Dain and her children—did not receive a real economic interest in Mina/Red Star and its income; and (4) that Edelman did not feel bound by the restrictions of the Galactea Trust or the law of trusts. For these reasons, the Court concludes that the Galactea Trust was a sham trust and that Edelman continued to earn income from Mina/Red Star from 2013 to 2020.

Accordingly, the Court shall consider whether the Government has shown by a preponderance of the evidence that Edelman willfully attempted to evade taxes on his Mina/Red Star income from 2013 through 2020.

**B. The Government has shown by a preponderance of the evidence that Edelman continued to willfully evade taxes on his Mina/Red Star income from 2013 through 2020.**

For the Court to consider loss stemming from tax years 2013 through 2020 in the calculation of the total tax loss attributable to Edelman's offense, the Government must prove by

a preponderance of the evidence that Edelman willfully attempted to evade or defeat the government's collection of income tax during these years. Edelman has pled guilty to willfully evading taxes on the hundreds of millions of dollars he earned as Mina/Red Star's co-owner during tax years 2006 through 2012 by (i) making false statements to U.S. authorities; (ii) using nominees to conceal income and assets; (iii) creating false documents; (iv) closing accounts and moving funds to avoid his name being disclosed to U.S. authorities; (v) providing false information to banks, attorneys, and tax return preparers regarding his income, assets, financial accounts, and the historical ownership of Mina/Red Star; and (vi) filing false tax returns. Plea Hr'g Tr. at 29–30. The Government argues that Edelman continued this scheme to evade taxes on his Mina/Red Star income from 2013 through 2020.

The Government has shown by a preponderance of the evidence that Edelman willfully attempted to evade and defeat the government's collection of taxes on his Mina/Red Star income for tax years 2013 through 2020. To start, the record shows that, from 2013 through 2020, Edelman continued to direct Mina/Red Star's operations and use its income to make his own personal investments and purchases. *See supra* Section I.A.3; *supra* Section III.A. Edelman, in other words, continued to treat Mina/Red Star and its income as his own from 2013 to 2020. The record also supports the inference that Edelman caused the Galactea Trust to be created in an attempt to conceal the income he received from Mina/Red Star. This is evidenced by the fact that Edelman admitted that he caused the firm that created the Galactea Trust to operate under the false information that Le Dain, not Edelman, owned the 50% of Mina/Red Star that would be transferred to the Trust. Evid. Hr'g Tr. at 20–21. And the record shows that Edelman caused the lawyers that approved the structure of the Galactea Trust and Mina/Red Star's in-house lawyers to operate under the same lie. *See* Gov't's Ex. 4-5, Dkt. No. 118-1 at 54; Gov't's Ex. 24-1, Dkt. No. 118-8.

The record also shows that Edelman continued to lie about the income he received from Mina/Red Star from 2013 to 2020 in much the same way he has admitted to lying about the income he received from Mina/Red Star from 2006 to 2012. Edelman has admitted that, in 2010 and 2011, he lied to Congress and the Department of Defense about the ownership of Mina/Red Star by causing his representatives to convey the false story that Le Dain had founded Mina/Red Star with Bek and owned it in 50% partnership with Bek. Plea Hr'g Tr. at 22–23. He has also admitted to creating false and fraudulent backdated paperwork during this time to corroborate this lie with the help of his associates. *Id*. The record shows that Edelman continued spreading the same lie and falsifying documents to support it from 2013 to 2020. For instance, Edelman has pled guilty to two counts of making false statements based on his continued spreading of the Le Dain lie: one count for causing this misrepresentation to be made to the IRS in his 2016 tax submission, and another for causing this misrepresentation to be made to the Department of Justice during a 2018 inquiry. *Id*. at 24–28, 66. And he has also admitted to directing one of his associates to change Gibraltar's public registration database to remove his name from Mina/Red Star's registration documents in 2020. *Id*. at 28:21–29:3.

The record further shows that the structure of Edelman's admitted tax evasion from 2006 to 2012 mirrors the structure of his alleged tax evasion from 2013 to 2020. Edelman's admitted tax evasion centered around his use of the Sunage Foundation to conceal the profit distributions he received from Mina/Red Star. The Sunage Foundation was a Panamanian entity that, for all intents and purposes, was structured to operate like a trust. *See* Evid. Hr'g Tr. at 8, 23. The purported beneficiaries of the Sunage Foundation were Le Dain and her children. *See* Plea Hr'g Tr. at 21. But Edelman admitted that he "controlled the funds in the Sunage account and used them to fund his lifestyle and investments." *Id*. During the evidentiary hearing, counsel for

Edelman explained that the Sunage Foundation was "a sham" because it did not have an independent trustee. Evid. Hr'g Tr. at 23:8–12 ("That independent trustee didn't know anything that was going on. Mr. Edelman never even met with them. Ms. Le Dain never met with them. That trust is a sham. That Panama foundation is a sham.").

While Edelman claims that the Galactea Trust is different from the Sunage Foundation, the two bear a close resemblance. Like the Sunage Foundation, the Galactea Trust was structured under foreign law to operate as a trust for the benefit of Le Dain and her children. *See* Galactea Deed. As the Court has explained, however, the record shows that Edelman used the Galactea Trust to direct investments and purchases for his own benefit, much like he did with the Sunage Foundation. *See*, *e.g.*, *supra* Section III.A.1. In addition, the record shows that, like the Sunage Foundation, the Galactea Trust lacked an independent trustee. *See*, *e.g.*, *supra* Section III.A.2. Similar to how Edelman's counsel explained that the Sunage Foundation's purported trustee "didn't know anything that was going on," Evid. Hr'g Tr. at 23:8–12, Edelman's counsel also explained that the Galactea Trust's trustee "rel[ied] on Mr. Edelman" because the trustee was "an Irish guy running a Swiss trustee [sic] who [didn't] know anything" about Mina/Red Star's business with the U.S. military or the investments that Edelman and his associates were directing through the Trust, *id*. at 21:14–24.[14] Considering the record, the Court finds that the similarities between the Galactea Trust and the Sunage Foundation lend further support to the finding that Edelman used the Galactea Trust to willfully evade taxes on the income he received from Mina/Red Star from 2013 through 2020.

[14] Edelman's counsel stated: "I guess one thing to think about, you have got this operating business that is selling fuel to the US military and in Afghanistan and Kyrgyzstan. You have got a trustee who is an Irish guy running a Swiss trustee who doesn't know anything about that. He doesn't know anything about that. Okay. He doesn't know whether they are selling the fuel for the right price. He didn't know anything about defense contracting. He doesn't know anything about anything except for being a trustee at that level. So, of course, he is going to rely on experts. He is going to rely on Mr. Edelman. He is going to rely on Bob Dooner. He is going to rely on Zack Friedman. He is going to rely on all of these people who are actually running that operating business." Evid. Hr'g Tr. at 21:14–22:2.

The record is also littered with statements from Edelman that suggest he intended to willfully evade taxes on his Mina/Red Star income from 2013 through 2020. For example, while the Galactea Trust was being structured in 2012, Edelman emailed some life advice to a co-conspirator:

> Don't go talking and going into all kinds of details with people or even [your wife] too much. A man is wise to deal with his finances in his own way with talking to women. Delphine never really had a clue [about] what I earned or didn't and even sometimes what I did. I always felt it better that way. But then that just my way . . She just has to abide . .

Gov't's Ex. 25-14, Dkt. No. 118-22 at 2. In this same email, Edelman advised: "Maybe you should take less salary (keeps you below the tax threshold) and the rest can be paid to [your wife] somehow." *Id*. A 2016 email from Edelman to Mina/Red Star employees suggests that Edelman continued to follow his wisdom after the Galactea Trust was created. *See* Gov't's Ex. 25-5, Dkt. No. 118-13. After the employees asked Edelman for Le Dain's phone number so they could provide it to the Department of Defense, Edelman said that he was "not sure what [Le Dain would] say if she got a call" from the Department of Defense because she was "so 'not involved'" in Mina/Red Star. *Id*. at 1.

In 2012, Edelman and another co-conspirator appeared to joke about the in-progress Galactea Trust while discussing the co-conspirator's upcoming visit to a bar that Edelman owned in Kyrgyzstan. *See* Gov't's Ex. 25-15, Dkt. No. 118-23. Edelman directed the co-conspirator "not to bandy [Edelman's] name around" and to "[r]efer to [Edelman's step-son] as the founder, owner operator etc etc [sic]" of the bar, as Edelman thought it was "best to keep [his] name quiet." *Id*. at 1. Edelman then joked, "maybe tell them you think new owner is called [the first name of Edelman's then three-year-old daughter]," who was one of the beneficiaries of the Galactea Trust that was under organization. *Id*. Undisputed evidence in the record shows that Edelman sold his

interest in the bar in 2015 for at least $360,000 and did not report this income to his tax preparers. *See* Gov't's Ex. 14-64, Dkt. No. 118-6 at 12.

This was not the only time Edelman's discussions with his associates hinted at the illusory nature of the Galactea Trust. In 2014, Edelman emailed a co-conspirator about structuring other businesses and praised the Mina/Red Star attorney that managed Mina/Red Star's restructuring in 2012 and 2013. *See* Gov't's Ex. 25-17, Dkt. No. 118-25. Edelman wrote that the attorney was "quite clever re structures" and advised his co-conspirator to "[a]sk him how much scrutiny us govt has over all things" and "about 'grantor trust' and what he knows about those and how they relate to usa citizens etc . . Good to ask these things etc." *Id.* at 1. In 2019, Edelman and his associates discussed a potential lawsuit from one of their colleagues that threatened to reveal Edelman's involvement with a fuel logistics project in Mexico. Gov't's Ex. 25-16, Dkt. No. 118-24. One of Edelman's co-conspirators reassured Edelman with a joke, saying that "any legal action would go nowhere until we are all deposed and then we would all say the same thing – we take our orders from [Edelman's then-nine-year-old daughter]!" *Id.* at 2.

The record also includes a recording from a 2018 conversation that Edelman had with his associates regarding the threat of a lawsuit that would reveal his involvement with oil exploration projects in North America.[15] *See* Gov't's Ex. 25-8 (on file with chambers). In this conversation, Edelman said that they should "close all these companies . . . because suddenly I see my name on some legal document." *Id.* "I spend all of my time trying to make sure my name isn't in anything," Edelman explained, "so any companies that we have, anything whatsoever, any penny that we

[15] The Government explains that, for convenience, it provided only a snippet of the nearly four-hour long recording. *See* Gov't's Mem. at 15 n. 8. The Government represents that Edelman joined the meeting after around two-and-a-half hours, and that prior to his joining Edelman's associates discussed setting up a new structure to provide Le Dain "a job on paper" that involved a "network of Spanish companies that hold land, you know, Doug's land investments in Spain . . . and of course, Doug's nowhere in it, right?" *Id.* Edelman does not dispute the Government's characterization of this evidence.

have in any company, lets close everything, stop everything." *Id.* Edelman complained that the companies were "complete losses to this point and my name gets dragged into this and I funded it hundred percent, so I'm saying let's stop everything . . . I don't have enough knowledge about what's going on and yet I've invested all the money." *Id.* These private admissions from Edelman further reveal his intent to evade taxes from 2013 through 2020 by concealing his income from Mina/Red Star and obfuscating his investment of that income.

* * *

In sum, the Government has shown by a preponderance of the evidence that Edelman willfully attempted to evade taxes on the income he received from Mina/Red Star from 2013 through 2020. The record shows that, from 2013 to 2020, Edelman continued to invest and spend the income from Mina/Red Star's profit distributions as he did from 2006 to 2012. The record also supports the inference that Edelman adhered to the same *modus operandi* during his alleged 2013–2020 tax evasion that he employed during his admitted 2006–2012 tax evasion. Specifically, Edelman continued to spread the lie regarding Le Dain's ownership of Mina/Red Star, and he attempted to bolster that lie by creating fraudulent documentation and concealing his ownership interest in Mina/Red Star through a trust in Le Dain's name. Finally, the record is rife with statements from Edelman and his associates that reveal the truth behind all the organizational structures: that Edelman continued to own Mina/Red Star and spent its income as he saw fit.

Accordingly, at sentencing, the Court shall consider Edelman's alleged tax evasion for tax years 2013 through 2020 as "relevant conduct" to his offense and therefore calculate the total tax loss attributable to his offense by tallying the tax loss from tax years 2006 through 2020.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Edelman's base offense level at sentencing shall be determined by calculating the total tax loss caused by Edelman's admitted tax evasion for tax years 2006 through 2012 and his charged tax evasion for tax years 2013 through 2020 (i.e., the total tax loss from years 2006 through 2020). The Government has shown that Edelman's charged 2013–2020 tax evasion should be included in this calculation because it has shown by a preponderance of the evidence that (i) the Galactea Trust was a sham trust that did not change Edelman's economic relationship to Mina/Red Star and its income, and that (ii) Edelman willfully attempted to evade and defeat the government's collection of taxes on the income he received from Mina/Red Star from 2013 through 2020.

*This Memorandum Opinion shall be accompanied by a separate Order.*

**Dated:** October 28, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge